8315059

206.    The NNUK Board lacked independence and control, and approved this transaction

notwithstanding the fact that it did not benefit NNUK. NNUK was struggling at this time under

the burden of a significantly underfunded pension scheme.  As a result of Project Swift, NNUK

was effectively required to forgo cash repayment for illiquid assets whose value depended on the

continued operation of the Nortel Group and the continued use of each company in the Nortel

Group for distribution purposes. Had NNUK been repaid in cash, the recovery rate of its

creditors, and in particular the Plan, would now be substantially higher.

**iii.    Disparity Of Treatment Between NNUK And NNI With Regard To The Intercompany Loan**

207.    Prior to Project Swift, the two most significant intercompany loans that existed

within the Group were the Intercompany Loan owed by NNL to NNUK, and another loan owed

by NNL to NNI.  These were substantial loans that had built up over time, in NNUK's case as a

result of NNL having not paid sums that were due to NNUK under the transfer pricing model,

and they were not ordinary intercompany trading balances.

208.    These two loans (to NNI and NNUK respectively) were treated differently: while

the Intercompany Loan owed by NNL to NNUK was not interest-bearing, the loan which NNI

had extended to NNL was, on information and belief,  interest-bearing.

209.    In contrast to NNUK's unfavorable treatment under Project Swift, NNI received

cash repayments of its loan.  On information and belief, at or around the same time as Project

Swift, NNL made cash payments in excess of US$545 million to NNI in reduction of NNL's loan

from NNI.

210.    The disparate treatment NNUK received on its loan compared to NNI – no interest

and repayment by receipt of illiquid stock in subsidiaries that at all times remained under the

ultimate control of NNC and NNL – provided a significant financial benefit to NNL and the rest

8315059

of the Nortel Group, including NNI and NN CALA, but was detrimental to NNUK (and its

creditors including the Plan).  In particular, the disparity of treatment was beneficial to NNI

because:

(a)    By reducing NNL's obligations to repay NNUK in cash, Project Swift

enabled NNL to make cash payments in excess of US$545 million to NNI in

respect of NNI's loans to NNL;

(b)    Although NNL subsequently borrowed further sums from NNI, NNL's

indebtedness to NNI at the date of its insolvency would have been greater had this

cash not been repaid.  The repayment thus spared NNI from having to seek

recovery in NNL's insolvency for sums in excess of US$545 million;

(c)    On information and belief, the cash used by NNL to repay NNI was in part

extracted from the EMEA subsidiaries before they were transferred to NNUK as

part of Project Swift.   Thus, had it not been for NNL's desire to repay NNI, the

cash would have been available for NNUK and should have been used by NNL to

repay NNUK (or should have been left in the EMEA subsidiaries for NNUK's

benefit once the subsidiaries had been transferred under Project Swift); and

(d)    By not repaying NNUK in cash, NNL avoided having to borrow more

from NNI, or from third-party lenders (which would have increased NNI's

exposure as NNL's guarantor).

211.    As a result of the inequitable allocation of cash repayments from NNL to NNI, on

the one hand, and NNUK, on the other, during the period November 2007 to April 2008, NNUK

suffered a loss, and NNI realized a corresponding gain at NNUK's expense, of approximately

US$376.0 million.  This figure represents the amounts received by NNI during this period over

and above the amount it would have received from NNL if the cash that NNL had available to

8315059

repay its intercompany debts (at least US$545 million) had been used to repay the outstanding

loan balances owed to NNI and NNUK ratably in proportion to the balances existing at that time

on their respective loans to NNL (instead of the entirety of such sum being used only to pay

down the NNI loan balance).  If the loan balances had been repaid ratably, at least US$376.0

million of the cash would have been paid to NNUK (which sum includes the amounts for interest

that should have been paid by NNL to NNUK during the terms of the loans).  The figure of

US$376.0 million does not reflect any value for the subsidiaries that were transferred to NNUK

pursuant to Project Swift because the value of those subsidiaries is presently unknown and

depends on, among other things, resolution of the allocation of asset sale proceeds.  When the

value of those subsidiaries can be ascertained, the U.K. Pension Claimants will give credit for

that value in calculating the amount of cash that should have been paid to NNUK.

**F.**      **Underfunding Of The NNUK Pension Plan**

   **i.**      **Control of the Plan**

   212.    Whereas employer-side decisions regarding a pension plan would normally be

made by the sponsoring employer, all decisions regarding the Plan were in fact made by NNC

and NNL for the benefit of the Nortel Group, including NNI and NN CALA.  It was made clear

to the Trustee that important decisions regarding the Plan had to be approved by NNC/NNL and

that NNUK had no role in the decision-making process.

   213.    Although overall control of pension decisions was vested in NNC/NNL, NNI and

NN CALA executives were also involved in the Group's pensions policy and directly with the

management and funding of the Plan.  For example, certain directors of NNI and/or NN CALA

attended meetings of the U.K. Pension Fund Policy Committee (the "U.K. PFPC").  The U.K.

PFPC was intended, among other things, to exercise on behalf of the Plan's principal employer

its powers under the Plan's Trust Deed.  It also provided a forum for senior management figures

8315059

within Nortel (including officers of NNI and NN CALA) to discuss various issues regarding the

Plan, including (from 2004-05 onwards) the status of funding negotiations with the Trustee and

decisions (sometimes in conjunction with the Canadian PFPC) as to what the Group's position

should be in relation to specific points raised in those negotiations.  The following members of

the U.K. PFPC were also officers of NNI and/or NN CALA (as indicated) at various times:

(a)    C. V. Allen (a director of NN CALA in 1996);

(b)    William Kerr (a director of NNI between 1997 and 2000);

(c)    Nicholas de Roma (a director of NN CALA between 1999 and 2006); and

(d)    Katharine Stevenson (a director of NNI between 2005 and 2006).

214.    By way of example, at the meeting of the U.K. PFPC on March 5, 1998 (a time

when the Plan was still in surplus), those attending discussed the asset allocation of the Plan, and

in particular whether there should be a change in the relative holdings in bonds as opposed to

equities.  Those present noted that there was an anticipated trade-off between opting for a higher

equity allocation (which could be expected to lengthen the "contribution holiday" Nortel was

enjoying at the time) and increasing the risk that the Plan's funding level might drop below the

then statutory minimum (called the Minimum Funding Requirement, or "MFR").  One of those

attending was William Kerr (a director of NNI at the time) and he is recorded as making the point

that ". . . with a huge retiree population Nortel wanted to invest in the Company and would rather

not have to risk its money in the Pension Fund."

215.    The main concern of the U.K. PFPC was the funding of the Plan, and it exercised

a tight rein in that regard.  Whatever the funding level in the Plan was assessed to be, it was

always made clear that the decision as to what (if any) contributions would be paid would be

taken by senior Nortel management.  In fact, for a long time, the Group did not want to pay any

8315059

contributions to the Plan, preferring to invest in the business, rather than the Plan, as Mr. Kerr of NNI was reported as saying at the meeting of March 5, 1998.

    **ii.**       **Funding of the Plan**

    216.    The Nortel Group procured the continuation of an employer "contribution holiday" (estimated by the Plan's Actuary to be worth £950 million at present day values) which consumed the Plan's 150% surplus in 1991 and reduced it to a funding deficit of £177 million by 2002 (assessed on an on-going basis).

    217.    In 2002, a contribution of only £33 million was made to the Plan although, on the basis of actuarial advice at the time, that contribution was nowhere near enough to eliminate the Plan's deficit.  In his valuation report as at April 6, 2002, the Plan's Actuary emphasized that significant further deficit repair contributions would be needed if funding was to be restored to 100% on an on-going basis.  Nortel ignored this advice and did not put in place any schedule of contributions that would commit NNUK to provide on-going funding for the Plan to restore it to a 100% funding level.

    218.    Instead, in order to benefit the Group, including NNI and NN CALA, NNUK was permitted to make only inadequate ad hoc contributions to the Plan.

    219.    By the time of the valuation as at April 5, 2003 the size of the deficit had increased to £346 million on the on-going basis, and the Plan's Actuary recommended annual contributions of £47 million to redress the deficit. Despite this, NNUK was not permitted to put in place any schedule of contributions that would commit it to a program of on-going funding for the Plan to restore it to a 100% funding level on the on-going basis. Instead, NNUK was permitted to make only another one-off contribution of £35 million. This was not only less than the Plan's Actuary had recommended but also, as pointed out to the then CFO of Nortel (Doug

8315059

Beatty) by letter from the Trustee dated August 26, 2003, even if contributions of £35 million were made to the Plan every year the £346 million deficit would never be removed.

220.    NNUK was permitted to make a further one-off payment of £24 million in September 2003, but only £12 million was paid in 2004 even though the 2004 actuarial valuation of the Plan confirmed that the Plan was in deficit on all prudent measures.

221.    The advice of the Plan Actuary on January 4, 2005 was that NNUK's minimum level of contributions should be £56 million per year for 10 years.  However, despite this NNUK was not permitted to commit to a schedule of regular contributions and instead made only a further ad hoc contribution of £24 million.

222.    In July 2005, NNUK was eventually permitted to agree to a regular schedule of contributions which provided for a one-off payment of £10 million, followed by annual contributions of £46 million to be paid in quarterly installments for 2 years from April 6, 2005 to April 5, 2007.   However this schedule of contributions:

(a)     provided for contributions that were less than the Plan's Actuary had advised were required over a longer ten year period; and

(b)     offered no comfort for funding beyond April 5, 2007 at all and it was clear to the Trustee that NNUK  was not permitted to make any form of commitment to pay contributions going beyond this.

223.    The deficit increased further to £356 million on the on-going basis as at April 6, 2005.  The valuation report as at April 6, 2005 was finalized on April 4, 2006 and stated that a recovery plan would need to encompass annual deficit repair contributions of the following amounts, on top of the on-going contributions for future accrual of approximately £10 million per annum: £134 million per annum for a recovery plan of 3 years; £103 million per annum for a

- 63 -

8315059

recovery plan of 4 years; £85 million per annum for a recovery plan of 5 years or £64 million per annum for a recovery plan of 7 years.

224.    Following lengthy negotiation by the Trustee:

(a)    NNUK was permitted to enter into a funding agreement dated November 21, 2006 pursuant to which it agreed to make contributions between that date and April 5, 2008 of no less than £150 million, followed by contributions from April 5, 2008 to April 5, 2012 based on an assessment of the deficit at April 5, 2008;

(b)    NNL guaranteed these on-going funding obligations up to June 30, 2012 by guarantee dated November 21, 2006; and

(c)    NNL also guaranteed any Section 75 Debt triggered by NNUK entering winding up, up to a limit of US$150 million, by guarantee dated December 21, 2007, in the context of the Project Swift transaction.

225.    In any event, the full extent of NNUK's funding obligations under the funding agreement dated November 21, 2006 has not been met.

226.    NNL failed to comply with its obligations under the guarantees.

227.    In consequence of all of the above, the level of the Plan's underfunding has gradually increased, reaching a deficit of £2.1 billion (assessed on a buy-out basis) by the onset of the Nortel Group's insolvency on January 14, 2009.  The deficit is now estimated at approximately £2.6 billion (assessed on a buy-out basis).

### iii.    Cross-Subsidy Of Benefits

228.    NNI specifically benefited from NNUK/the Plan via an agreement established by the Nortel Group and referred to as a "Reciprocal Agreement" made and entered into with effect as and from January 1, 1991.  The Reciprocal Agreement was made between NNL (then called Northern Telecom Limited), NNI (then called Northern Telecom Inc.), Brock Telecom Limited,

8315059

and Northern Telecom PLC (the entity now called "Nortel Networks Optical Components

Limited" (company registered number 02515751) which was at that time the chief operating

company in the UK, and the predecessor of NNUK[7]). Pursuant to this Reciprocal Agreement,

employees of these Nortel companies and their subsidiaries (and any Nortel companies which

subsequently participated in the Group's pension schemes to which the Reciprocal Agreement

applied) who transferred their employment to another of the companies which were a party to the

Reciprocal Agreement were able to have their pension benefits calculated by reference to their

continuous period of service with the Nortel Group as a whole.

229.    Consistently with the Reciprocal Agreement, the Trustee has since about 1993

sought to give effect to its terms by augmenting the benefits of members who left NNUK

employment to work for other relevant Nortel companies, including NNI. On information and

belief, through its employment of certain ex-NNUK employees, NNI has, therefore, contributed

to the liabilities of the Plan. The costs associated with these liabilities fell outside the remit of the

Group's transfer pricing system. NNI has therefore benefitted from the fact that service costs

incurred while employees were working in its interests have not been charged to it.

## THE U.K. PENSIONS AND LEGISLATIVE FRAMEWORK

**A.    The Pensions Act 2004**

230.    The Act was passed by the U.K. Parliament to improve the protection of

occupational pensions and, where necessary, to provide a mechanism to secure financial support

for occupational pension schemes.

---

[7]    In 1991, the principal employer under the Plan was called "STC Limited" (company number 106921). STC Limited was replaced as principal employer under the Plan by Nortel Networks Optical Components Limited (then called Northern Telecom Europe Limited) by deed dated August 23, 1993. Nortel Networks Optical Components Limited was in turn replaced as principal employer of the Plan by NNUK by deed dated June 27, 2000.

8315059

231.    The Act created two new public bodies: the Regulator, which is the U.K. governmental agency charged with the responsibility of regulating the operations and administration of occupational pension schemes in the U.K., and the PPF.

### i.    The Regulator

232.    The objectives of the Regulator, as set forth in section 5 of the Act, include promoting good administration of occupational pension schemes, protecting the benefits of members of occupational pension schemes, and reducing the risk that claims for compensation are made against the PPF.  In furtherance of those statutory objectives, and to aid the Regulator in the exercise of its regulatory duties, the Act grants the Regulator, among other things, certain powers pursuant to which the Regulator may commence regulatory proceedings against employers and their corporate affiliates to address funding deficiencies.

233.    The Regulator's exercise of those powers promotes the significant public policy of ensuring that pension schemes in the U.K. are maintained at a suitably funded level and creates a powerful deterrent effect on employers and their affiliates who might otherwise fail to fund at a level that provides appropriate security for members' pension benefits.

### ii.    The PPF

234.    The PPF provides compensation to members of U.K. pension schemes where the sponsoring employer has suffered a qualifying insolvency event and where the scheme's assets are insufficient to cover a specified level of benefit.  In most cases, the level of PPF compensation received by a member will likely be less, and sometimes significantly less, than the amount of pension entitlements accrued under the scheme's rules.  Funding for this "safety net" is derived principally from a mandatory levy assessed on all eligible U.K. occupational pension schemes.  The funding of the PPF is also reliant on recoveries being made pursuant to FSDs and CNs in relation to underfunded pension schemes that qualify for PPF entry.

8315059

235.    The PPF is a statutory fund run by the Board of the Pension Protection Fund (the "Board"). Its statutory function is, in defined circumstances, to provide compensation to pensioners if their qualifying occupational pension scheme is in deficit and their employer has become insolvent. In the event of a relevant employer becoming insolvent, there is an assessment period during which (among other things) the PPF assesses whether the statutory criteria are met for the PPF to assume responsibility for the scheme. During this period, the Act transfers various rights and powers of the relevant scheme trustees (including rights in relation to the recovery of any debts due from the scheme's employer) to the PPF.

### iii.    The FSD and CN Regime

236.     FSDs and CNs were introduced in the same legislation which created and conferred functions on the Regulator and the PPF.  One of the specific reasons for their introduction was to address the perceived risk of "moral hazard" associated with the PPF's own creation. In other words, the existence of the PPF created a risk that those with the ability to influence the way in which eligible schemes were run would take less care, or otherwise behave irresponsibly or inappropriately towards the scheme, knowing that the PPF would be there to compensate the members in the end.

237.    The FSD and CN regime is a key part of the legislative framework for the achievement of the Regulator's statutory objectives under section 5 of the Act.

238.    The FSD and CN legislative regime contains various safeguards to ensure the proper use of these legislative provisions.

239.    The decision to issue an FSD or a CN is taken by the Determinations Panel of the Regulator (the "Panel") which is a committee established by, but independent of, the Regulator. The Panel consists of no fewer than six members and a chairman.  The U.K. Secretary of State appoints the chairman, who then nominates the other members of the Panel.

8315059

240.    An appeal is available from a determination of the Panel to the Tax and Chancery

Chamber of the Upper Tribunal.   A further appeal, on points of law, is also available from the

Upper Tribunal to the Court of Appeal, the second highest court in the U.K.

**B.    Financial Support Directions**

241.    The principal enforcement mechanism granted to the Regulator by the Act is the

ability to issue an FSD to an entity that is associated or connected with an employer sponsoring

an underfunded pension scheme (a "Related Entity").  An FSD requires the Related Entity (or

Related Entities) to submit a proposal to the Regulator for its approval explaining how that entity

intends to secure reasonable financial support for the scheme in question and ensure

prospectively that such reasonable financial support remains in place while the scheme is in

existence.

242.    If the Regulator has reason to believe that circumstances exist which may justify

the exercise of its statutory powers to issue an FSD against a particular entity, it has the authority,

pursuant to section 96(1) of the Act, to issue a Warning Notice to that entity or "Target."  The

issuance of a Warning Notice indicates that the Regulator believes it is reasonable to require the

Target to put in place financial support for the pension scheme at issue.

243.    Once a Warning Notice is issued, the Target is given the opportunity to submit

written representations to the Panel explaining why an FSD should or should not issue against it.

244.    Any directly affected party, which would include all the Targets that are the

subject of the Warning Notice, or the Regulator, may ask the Panel to hold an oral hearing.  At

the oral hearing, the parties may examine and cross-examine witnesses.

245.    The Panel issues a Determination Notice if, based upon the parties' written

representations and any additional evidence presented at an oral hearing, it decides that it is

reasonable that FSDs should be issued against the Targets.

8315059

246.    Under section 43 of the Act, in determining whether an FSD should issue, the Panel must consider whether, at the "relevant time," all of four prescribed tests have been satisfied.

247.    Pursuant to sections 43(5)(a) and (9) of the Act, and regulation 5 of the FSD Regulations, the "relevant time" was until recently a time determined by the Regulator that falls within the two-year period ending with the date on which the Panel determines to issue an FSD against the Target.

248.    The four tests are:

    (a)    the Scheme Test,

    (b)    the Target Test,

    (c)    the Insufficiently Resourced Test, and

    (d)    the Reasonableness Test.

249.    If each of the four tests is satisfied, the Panel may issue an FSD.

**i.    The Scheme Test**

250.    Under section 43(1) of the 2004 Act, an FSD can only be issued in relation to an occupational pension scheme that is not:

    (a)    a defined contribution or "money purchase" scheme in which a member's benefit entitlement is determined by the value of the pension fund at retirement or

    (b)    certain statutorily prescribed schemes, primarily relating to public employee pension schemes.

251.    For the purposes of section 43(1), an "occupational pension scheme" is defined in section 1 of the U.K. Pension Schemes Act 1993, the relevant part of the definition being "a scheme or other arrangements, comprised in one or more instruments or agreements, having or

8315059

capable of having effect so as to provide benefits to or in respect of people (a) on retirement, (b) on having reached a particular age, or (c) on termination of employment."

ii.        **The Target Test**

252.    To satisfy the Target Test, the Target must have been, at the relevant time, connected with or an associate of, the scheme's employer.

253.    Pursuant to section 51(3) of the Act, the meaning of the terms "associate" or "connected with" is derived from sections 249 and 435 of the U.K. Insolvency Act 1986 (the "1986 Insolvency Act").

254.    A person is "connected with" a company within the meaning of section 249 of the 1986 Insolvency Act if he is a director or shadow director of the company, or an associate of such a director or shadow director, or if he is an associate of the company.  For purposes of section 249, the definition of "associate" is derived from section 435 of the 1986 Insolvency Act, which provides in relevant part:

(1)      For the purposes of this Act any question whether a person is an associate of another person is to be determined in accordance with the following provisions of this section (any provision that a person is an associate of another person being taken to mean that they are associates of each other).

. . .

(6)      A company is an associate of another company—

(a)      if the same person has control of both, or a person has control of one and persons who are his associates, or he and persons who are his associates, have control of the other, or

(b)      if a group of two or more persons has control of each company, and the groups either consist of the same persons or could be regarded as

8315059

consisting of the same persons by treating (in one or more cases) a member of either group as replaced by a person of whom he is an associate.

(7)    A company is an associate of another person if that person has control of it or if that person and persons who are his associates together have control of it.

. . .

(10)    For the purposes of this section a person is to be taken as having control of a company if—

(a)    the directors of the company or of another company which has control of it (or any of them) are accustomed to act in accordance with his directions or instructions, or

(b)    he is entitled to exercise, or control the exercise of, one third or more of the voting power at any general meeting of the company of or another company which has control of it;

and where two or more persons together satisfy either of the above conditions, they are to be taken as having control of the company.

(11)    In this section "company" includes any body corporate (whether incorporated in Great Britain or elsewhere); and references to directors and other officers of a company and to voting power at any general meeting of a company have effect with any necessary modifications.

### iii.    The Insufficiently Resourced Test

255.    To satisfy the Insufficiently Resourced Test, the pension scheme's employer must have been insufficiently resourced at the "relevant time."

256.    The term "insufficiently resourced" is defined in section 44 of the Act and the provisions of the FSD Regulations.  An employer is "insufficiently resourced" if, at the relevant

8315059

time, (i) the value of the resources of the employer is less than the amount that is the prescribed percentage of the employer's estimated Section 75 Debt in relation to the scheme, and (ii) at that same time, a person, other than an individual, who is connected with, or an associate of, the employer exists and the value of that person's resources is not less than the amount that is the difference between (xx) the value of the resources of the employer and (yy) the amount which is the prescribed percentage of the estimated Section 75 Debt.

257.    As noted above, an employer's Section 75 Debt is broadly equal to the difference in the scheme's funding and the cost as estimated by the scheme's actuary of securing the scheme members' benefits through the purchase of annuities from an authorized insurance company.

258.    Pursuant to the FSD Regulations, the "prescribed percentage" of the employer's estimated Section 75 Debt in relation to a scheme is 50%.

iv.      **The Reasonableness Test**

259.    Pursuant to section 43(5)(b) of the Act, the Panel may issue an FSD to a Target only if it is of the opinion that it is reasonable to impose the requirements of an FSD on that Target.  Section 43(7) of the Act requires that, in deciding whether imposition of an FSD is reasonable, the Panel have regard to such matters as the Panel considers relevant.  Section 43(7) provides a non-exhaustive list of matters that the Panel must have regard to where they are relevant.  These matters are:

> (a)      the relationship the Target has or has had with the employer (including, where the employer is a company within the meaning of subsection (11) of section 435 of the 1986 Insolvency Act, whether the Target has or has had control of the employer within the meaning of subsection (10) of that section),

> (b)      the value of any benefits received directly or indirectly by the Target from the employer;

8315059

> (c)    any connection or involvement which the Target has or has had with the scheme;
>
> (d)    the financial circumstances of the Target; and
>
> (e)    such other matters as may be prescribed (none has been).

260.    In determining whether the Reasonableness Test has been satisfied, the Panel may also take into account other factors that it considers to be relevant to the exercise of its discretion.

## C.    Contribution Notices

261.    In the event an FSD is issued to a Target pursuant to section 43 of the Act and that entity fails to comply with the FSD, the Regulator may seek issuance of a CN by the Panel pursuant to section 47 of the Act.  A CN states that the Target is under a liability to pay the trustees of the scheme the sum specified in the CN.  The sum specified in the CN can be the whole or a specified part of the scheme's funding deficit.  The Panel can issue a CN to a Target only if it is of the opinion that it is reasonable to impose liability on the Target to pay the sum specified in the CN.

262.    Pursuant to section 47 of the 2004 Act, in determining whether it is reasonable to impose liability on a Target to pay the sum specified in a CN, the Panel must take into account such matters as it considers relevant including, where relevant, the following:

> (a)    whether the Target has taken reasonable steps to secure compliance with the FSD;
>
> (b)    the relationship the Target has or has had with the scheme's employer and whether it has or has had control of the employer;
>
> (c)    the value of any benefits received directly or indirectly by the Target from the scheme's employer;

8315059

(d)    the relationship the Target has or has had with any other parties to any arrangements put in place to secure financial support for the scheme in accordance with the FSD;

(e)    any connection or involvement the Target has or has had with the scheme;

(f)    the financial circumstances of the Target; and

(g)    such other matters as may be prescribed (none has been).

263.    Pursuant to section 49 of the 2004 Act, the sum specified in a CN is treated as a debt due from the Target to the trustees of the scheme.

## THE U.K. REGULATORY PROCEEDINGS

**A.    The Regulator's Requests For Information Relating To Value Of Resources (Relevant To The Insufficiently Resourced Test)**

264.    On August 24, 2009, the Regulator sent a letter to NNUK, through NNUK's administrators, Ernst & Young LLP ("E&Y"), setting out its calculation of NNUK's resources, asking that NNUK advise the Regulator if it agreed with the calculation and, if not, that it provide an alternative calculation and supporting documentation.  By letter dated September 3, 2009, NNUK, through E&Y, advised the Regulator that it would not examine or provide any opinion on the calculations provided by the Regulator.

265.    On September 4, 2009, the Regulator sent a letter to NNC, which the Regulator had selected as the relevant "associate" for purposes of the Insufficiently Resourced Test,  setting out its calculation of NNC's resources and requesting that NNC advise the Regulator if it agreed with the calculation and, if not, to provide an alternative calculation and supporting documentation.  By letter dated September 16, 2009, NNC advised the Regulator that it would not comment on the calculations provided by the Regulator nor provide an alternative valuation.

8315059

266.    Pursuant to regulation 12 of the FSD Regulations, if a person fails to provide the Regulator with any required information or documentation specified by the Regulator in writing within a reasonable time, the Regulator may deem the value of that person's resources to be an amount determined by the Regulator.

**B.    The Warning Notice**

267.    In the wake of NNUK being placed into administration, and in the exercise of its statutory authority, the Regulator commenced an investigation, pursuant to the Act (the "UK Regulatory Proceeding"). On the basis of that investigation, the Regulator issued a Warning Notice dated January 11, 2010, particularizing the case for the issuance of FSDs against 29 Nortel entities, including NNI and NN CALA. Copies of the Warning Notice and supporting documentation were sent to each Nortel entity to whom it was addressed, including NNI and NN CALA, on January 13, 2010. Copies of the Warning Notice were also sent to the U.K. Pension Claimants as directly affected parties. A copy of the Warning Notice sent to NNI and NN CALA is annexed hereto as Exhibit 2.[8]

268.    The Warning Notice alleged that it was reasonable for FSDs to issue against the Nortel entities, including NNI and NN CALA, because the Nortel Group benefitted for many years at the expense of NNUK and the Plan. Being in the telecommunications business, R&D was critical to Nortel's success and expansion, and the Warning Notice alleged that NNUK played a critical role in the Nortel Group's R&D innovations. Those innovations, for which NNUK was never adequately compensated, allowed various Nortel entities, such as NNI and NN CALA, to expand and profit within their particular geographical market. According to the Warning Notice, in the midst of all Nortel's success, NNC and NNL, the entities that ultimately

---

[8]    Because of their voluminous nature, the exhibits to the Warning Notice are not attached. The Debtors have already received a copy of the Warning Notice exhibits from the Regulator, and if the Court, or any other interested party, desires copies of the exhibits, the U.K. Pension Claimants will provide them as necessary.

8315059

controlled NNUK's business decisions, chose not to allow NNUK to properly fund the Plan. As a result, when the Nortel Group encountered financial difficulty and entered insolvency, the Plan was drastically underfunded and indeed NNUK was drastically underfunded. The Warning Notice alleged that, based on the statutory requirements of the Act, the circumstances dictated that FSDs should issue against the Nortel entities.

269.    The Warning Notice provided that any representations to the Panel by recipients of the Warning Notice were to be made by March 1, 2010.

**C.    The Automatic Stay Order**

270.    On February 18, 2010, the Debtors filed a Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the U.K. Pension Proceedings (the "Debtors' Motion"), seeking an order from the Bankruptcy Court enjoining the U.K. Pension Claimants from participating in the Panel's proceedings on the grounds that the proceedings and the U.K. Pension Claimants' participation therein violated the automatic stay contained in section 362(a) of the Bankruptcy Code. The U.K. Pension Claimants objected to the relief sought by the Debtors.

271.    Following a hearing on February 26, 2010, the Bankruptcy Court granted the Debtors' Motion and issued the Automatic Stay Order, which provides, inter alia, that:

> The automatic stay imposed by Section 362 of the Bankruptcy Code is hereby enforced as to the U.K. Pension Trustee and the PPF and is fully applicable to the U.K. Pension Proceedings with respect to the Debtors as referenced in the proofs of claim filed by the U.K. Pension Trustee and the PPF, and with respect to the Debtors such Proceedings are deemed void and of no force or effect; to the extent that either of the U.K. Pension Trustee or the PPF participate in the U.K. Pension Proceedings as to any Debtors, such participation will be in violation of the automatic stay and subject the participating persons or entities to sanctions under Section 362.

272.    The Automatic Stay Order was affirmed by the District Court and, thereafter, by the Court of Appeals for the Third Circuit. A petition for rehearing en banc was denied by the

8315059

Third Circuit, as was the U.K. Pension Claimants' petition for a writ of certiorari by the Supreme Court.

273.    At the hearing on the Debtors' Motion, this Court stated that it would decide whether, under the Act, FSDs should issue against the Debtors and, if so, what the quantum of the financial support is that they should be required to provide to the Plan.  (*See* Feb. 26 Hearing Tr. at 183:4-17.)  At the hearing, the Debtors conceded that they would not assert in this Court that, because the Automatic Stay Order declared the U.K. Regulatory Proceeding null and void with respect to the Debtors, no FSD or CN exists against the Debtors and, therefore, that as a matter of U.K. law, the U.K. Pension Claimants have no claims to assert against the Debtors in this Court.  (*Id.* at 153:5-154:2.)

**D.    The Panel Hearing**

274.    The Panel held an oral hearing on June 2, 2010, during which it heard evidence and submissions with respect to whether FSDs should issue against various Nortel entities, including NNI and NN CALA.  NNI and NN CALA did not appear at that hearing, nor did they submit any representations to the Panel.  Both the Regulator and the Trustee appeared at the hearing and made submissions, although the Trustee was prohibited by this Court's order from making, and accordingly did not make, any submissions with respect to NNI or NN CALA.  The Trustee, having been enjoined from pursuing the regulatory proceedings against NNI and NN CALA, was not able to develop its case against them and it therefore made no contribution to the argument against these entities as it was presented to the Panel. A copy of the Regulator's submission with respect to the Debtors is annexed hereto as Exhibit 3.

275.    Based on the manner in which Nortel operated its business across geographic lines, the Regulator argued that an FSD should issue against the Nortel entities, including NNI and NN CALA.  The Regulator further argued that NNUK's numerous R&D contributions

8315059

provided the engine that allowed Nortel to grow into an international telecommunications giant, and NNUK was never adequately compensated for its contributions. Accordingly, at the time of the Nortel Group's insolvency, NNUK, and the Plan, were left dramatically underfunded.

276. On June 25, 2010, the Panel issued a Determination Notice and its Reasons in relation to the Determination Notice Issued on June 25, 2010 (the "FSD Reasons"), concluding that FSDs should issue against 25 of the Nortel entities, including NNI and NN CALA. After considering all of the evidence presented by the Regulator, the Panel found that each of the four tests for issuance of an FSD under section 43 of the 2004 Act had been satisfied. Copies of the Determination Notice and the FSD Reasons are annexed hereto as Exhibits 4 and 5, respectively.

277. On April 1, 2011, FSDs were issued by the Panel against, inter alia, NNI and NN CALA. Copies of the FSDs issued against NNI and NN CALA are annexed hereto as Exhibits 6 and 7, respectively. Pursuant to those FSDs, NNI and NN CALA each had until October 1, 2011 to "secure that financial support within the meaning of Section 45 of the [Pensions] Act is put in place for the Scheme." To date, neither NNI nor NN CALA has done so.

278. Although the Automatic Stay Order declared the U.K. Regulatory Proceeding null and void as to the Debtors, it did not, and could not, declare the U.K. Regulatory Proceeding null and void with respect to the other Nortel Group entities that were the subject of the Warning Notice. Accordingly, although the Panel's findings of fact and conclusions of law set forth in its FSD Reasons with respect to NNI and NN CALA are not binding on this Court, the Panel's findings of fact and conclusions of law with respect to the other Nortel Group entities such as NNC and NNUK provide the governing precedent for the construction and enforcement of the Act and the Panel's exercise of its discretion to issue FSDs to target companies such as NNI and NN CALA.

8315059

## CLAIMS AGAINST NNI AND NN CALA FOR FINANCIAL SUPPORT OF THE PLAN IN AN AMOUNT EQUAL TO THAT WHICH THE TRUSTEE WOULD HAVE RECEIVED, BUT FOR THE AUTOMATICSTAY ORDER, PURSUANT TO AN FSD AND/OR CN ISSUED BY THE REGULATOR UNDER THE ACT

279.    The U.K. Pension Claimants repeat and re-allege each and every allegation contained in paragraphs 1 through 278 of this Complaint as if fully set forth herein.

280.    Each of the four predicate tests set forth in the 2004 Act governing the issuance of an FSD is satisfied as of the relevant time selected by the Regulator, which is June 30, 2008.

**A.    The Scheme Test**

281.    The Plan is a U.K. occupational scheme within the meaning of the Act, and it is not a money purchase scheme, or a prescribed scheme or a scheme of a prescribed description within the meaning of the Act.  Section 43 therefore applies to the Plan, and the Scheme Test is satisfied, as the Panel concluded in the FSD Reasons.

**B.    The Target Test**

282.    Pursuant to section 51(3) of the Act, the meaning of the terms "associate" or "connected with" under section 43 is derived from sections 249 and 435 of the 1986 Insolvency Act.  Pursuant to sections 43(6)(c) and 51(3) of the Act, as incorporating, among other things, section 435(6) of the 1986 Insolvency Act, a company is an associate of another company if the same person has control of both.

283.    NNUK is, and was at all material times, a wholly-owned subsidiary of NNL, which in turn is, and was at all material times, a wholly-owned subsidiary of NNC.  Accordingly, NNUK was at all material times controlled by NNL and NNC.

284.    NNI is, and was at all material times, a wholly-owned subsidiary of NNL, which in turn is, and was at all material times, a wholly-owned subsidiary of NNC.

8315059

285.    NN CALA is, and was at all material times, a wholly-owned subsidiary of NNI, which is, and was at all material times, a wholly-owned subsidiary of NNL, which in turn is, and was at all material times, a wholly-owned subsidiary of NNC.

286.    Thus, each of NNI and NN CALA was at all material times controlled by NNL and NNC.

287.    Accordingly, because NNI and NN CALA were each controlled by the same persons as NNUK, that is to say, NNL and NNC, each of NNI and NN CALA was at all material times an associate of NNUK within the meaning of sections 43(6)(c) and 51(3) of the Act.

288.    The Target Test is therefore satisfied by reference to the "relevant time" of June 30, 2008 selected by the Regulator, as the Panel concluded in the FSD Reasons.

**C.    The Insufficiently Resourced Test**

289.    Pursuant to section 44(3) of the Act, an employer in relation to a scheme is insufficiently resourced at the relevant time if:

    (a)    the value of the employer's resources was less than 50% of the employer's estimated section 75 debt in relation to the scheme; and

    (b)    at the same time, the value of the resources of an entity that is an associate of or connected with the scheme's employer is not less than the difference between:

        (i)    the value of the employer's resources; and

        (ii)    50% of the employer's estimated Section 75 Debt in relation to the scheme.

290.    Both elements of the Insufficiently Resourced Test are satisfied here, by reference to the "relevant time" of June 30, 2008 selected by the Regulator, as the Panel concluded in the FSD Reasons.

8315059

i.    **The Value Of NNUK's Resources**

291.    The value of NNUK's resources at the relevant time is calculated by reference to regulation 8(2) of the FSD Regulations, which provides that the value of the resources of an employer shall be the greater of zero or its "entity value" excluding relevant pension scheme related balances and any subordinated liabilities together with any related fair value differences.

292.    "Entity value" is defined in regulation 2(1) of the FSD Regulations as the "fair value" of the entity, which in turn is defined as the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's-length transaction.

293.    Because NNUK failed to provide the Regulator with required information and documents requested by the Regulator in writing, the Regulator was entitled to deem NNUK's resources to be a particular amount, and it did in fact deem the value of NNUK's resources to be US$453 million as at the Regulator's selected "relevant time" of June 30, 2008.  The value of NNUK's resources at the relevant time should, therefore, be deemed to be US$453 million, as the Panel deemed their value to be in the FSD Reasons.

294.    Further or alternatively, relying on the calculation methodology set forth in the FSD Regulations and based on, among other things, NNUK's statutory accounts for the year ended December 31, 2007 (which are the most recent accounts before the June 30, 2008 date selected as the relevant time for the calculation), NNUK's value of resources as at June 30, 2008 for the purposes of the Insufficiently Resourced Test ranges from approximately US$453 million to no more than US$1.53 billion.

295.    Pursuant to section 44(5) of the Act, the Regulator estimates the amount of the Section 75 Debt in relation to the Plan for the purposes of the Insufficiently Resourced Test.  As at June 30, 2008, NNUK's estimated Section 75 Debt in relation to the Plan was US$3.546

8315059

billion, as calculated in the Plan Actuary's letter dated December 17, 2009. This was the amount

determined by the Regulator to be NNUK's estimated Section 75 Debt in the U.K. Regulatory

Proceeding as at the Regulator's selected "relevant time" of June 30, 2008. Fifty percent of that

amount – the prescribed percentage for the purposes of the Insufficiently Resourced Test set forth

in section 44(3) – is approximately US$1.77 billion.

296.    Therefore, at the "relevant time" of June 30, 2008 selected by the Regulator, the

value of NNUK's resources was less than 50% of its estimated Section 75 Debt in relation to the

Plan, satisfying the employer element of the Insufficiently Resourced Test, as concluded by the

Panel in the FSD Reasons.

ii.      **The Value Of NNC's Resources**

297.    At the relevant time, NNC was the parent of the Group and all the resources and

value of the Group were ultimately held by it. As it was entitled to do under the Act and FSD

Regulations, the Regulator selected NNC as the relevant "associate" of NNUK for purposes of

determining whether NNUK was insufficiently resourced at the Regulator's selected "relevant

time" of June 30, 2008.

298.    The value of NNC's resources at the relevant time is calculated by reference to

regulation 8(3) of the FSD Regulations, which provides that the value of the resources of an

associate shall be its "entity value" excluding relevant pension scheme related balances and any

related employer balances together with any related fair value differences.

299.    Entity value is defined in regulation 2(1) of the FSD Regulations as the "fair

value" of the entity, which in turn is defined as the amount for which an asset could be

exchanged, or a liability settled, between knowledgeable, willing parties in an arm's-length

transaction.

8315059

300.    Because NNC failed to provide the Regulator with required information and documents requested by the Regulator in writing, the Regulator was entitled to deem NNC's resources to be a particular amount, and it did in fact deem the value of NNC's resources to be US$5.308 billion as at the Regulator's selected "relevant time" of June 30, 2008.  The value of NNC's resources at the relevant time should, therefore, be deemed to be US$5.308 billion, as the Panel deemed their value to be in the FSD Reasons.

301.    Further or alternatively, relying on the calculation methodology set forth in the FSD Regulations and based on, among other things, NNC's market capitalization as of the June 30, 2008 date selected by the Regulator as the "relevant time" for the calculation, NNC's value of resources as at that date for the purposes of the Insufficiently Resourced Test is US$5.321 billion.

302.    As a result, the value of NNC's resources at the "relevant time" of June 30, 2008 selected by the Regulator – US$5.308 billion to US$5.321 billion – was not less than US$240 million to US$1.32 billion, which is the difference between the range of values of NNUK's resources (US$453 million to US$1.53 billion) and 50% of the estimated Section 75 Debt in relation to the Scheme (US$1.77 billion).

303.    Accordingly, the associate element of the Insufficiently Resourced Test is also satisfied by reference to that date, as the Panel concluded in the FSD Reasons.

**iii.        Outcome Of The Insufficiently Resourced Test**

304.    NNUK was, therefore, insufficiently resourced at the Regulator's selected "relevant time" of June 30, 2008 within the meaning of the Act, as the Panel concluded in the FSD Reasons.

**D.        The Reasonableness Test**

305.    Pursuant to section 43(5) of the Act, an FSD may issue in relation to a Target only if it is reasonable to impose the requirements of an FSD on the Target.

8315059

306.    In determining whether it is reasonable to issue an FSD, the Panel must have

regard to such matters as it considers relevant.

307.    Pursuant to section 43(7) of the 2004 Act, the Panel must have regard to the (non-

exhaustive) matters set forth in that section where they are relevant.  These matters are:

> (a)    the relationship the Target has or has had with the employer (including,
>
> where the employer is a company within the meaning of subsection (11) of section
>
> 435 of the Insolvency Act 1986, whether the Target has or has had control of the
>
> employer within the meaning of subsection (10) of that section),
>
> (b)    the value of any benefits received directly or indirectly by the Target from
>
> the employer;
>
> (c)    any connection or involvement which the Target has or has had with the
>
> scheme;
>
> (d)    the financial circumstances of the Target; and
>
> (e)    such other matters as may be prescribed (although, as stated above, none
>
> has been).

i.        **NNI And NN CALA's Relationship With NNUK**

308.    As alleged in paragraphs 47 through 66, the Nortel Group operated along global

business lines rather than by geographic division or legal entity. The interest of national

subsidiaries (although legally distinct) was subordinated to the interests of the Group as a whole,

and the distinction between legal entities was ignored in the operational side of business.   The

distinction was relevant only for tax and accounting purposes. So far as the Nortel Group's global

management was concerned, every entity in the Group was simply assisting in a single global

business comprising various operating divisions.

8315059

309.    As alleged in paragraphs 67 through 68, NNI, NN CALA, and NNUK, as members of the Nortel Group, were all under the control of NNL, and, ultimately, NNC.  For many years, the Nortel entities, including NNI, NN CALA, and NNUK, operated in an interdependent manner, and the Group's profits and losses were apportioned on a global basis. Because of this operational structure, NNUK had the closest possible connection with other companies in the Nortel Group and in particular with the companies from which it was primarily managed, NNL, NNC and, in relation to tax and treasury matters, NNI.

310.    As alleged in paragraphs 69 through 79, NNI had significant influence on the management of the Nortel Group and the affairs of NNUK.  NNI jointly controlled the Group's Tax and Treasury functions with NNC/NNL, and thus jointly controlled the tax (including transfer pricing) and treasury policies to which NNUK was subject.

311.    As alleged in paragraphs 187 through 211, NNI, together with NNC/NNL, imposed transactions on NNUK – including the Intercompany Loan and Project Swift – pursuant to which cash/value was withheld from NNUK and instead remitted to NNC/NNL and/or concentrated in NNI.

312.    As alleged in paragraphs 84 through 85, the board of directors of NNUK did not act independently, as it had no real power within the organization to determine the conduct of NNUK.  In practice, NNUK was run from elsewhere within the Group; and in particular NNUK was in part run from NNI by virtue of NNI's influence on the affairs of the Group.

**ii.      The Value Of Any Benefits Received Directly Or Indirectly By NNI And NN CALA From NNUK**

313.    As a result of the global operation of the Nortel Group across geographic borders, NNI and NN CALA were able to take advantage of NNUK's R&D innovations and use NNUK personnel to assist with NNI and NN CALA's customers and accounts.  As alleged in paragraphs

8315059

89 through 125,  the benefits NNI and NN CALA received from NNUK included at least the

following:

- The acquisition of NNUK enabled Nortel to break into new markets and grow its operations in the North American and CALA regions.

- NNUK had R&D staff, as well as laboratories and engineering teams with more than 30 years of experience, all of which served as the foundation for the Nortel Group's innovation and expansion.

- NNUK's engineers contributed to international bodies setting industry standards, including ITU, ANSI, and ETSI.  These contributions allowed the Nortel entities to gain a "first-mover" advantage, giving them early access to many markets.

- NNUK employees worked on optical transmissions systems and products, which by the end of the 1990s brought the Nortel Group, including NNI and NN CALA, approximately US$10 billion in revenue per year.

- NNUK personnel played a critical role in converting DMS products from ANSI to ETSI standards, which allowed Nortel to retain key customers in North America who were looking to expand abroad, such as WorldCom.

- NNUK's R&D laboratories developed NGN products and technologies, including ASIC silicon devices, that were critical to Nortel's engagement with AT&T in 1997, as well as several other major U.S. carriers, including WorldCom, Southwestern Bell Corporation, Sprint, and Verizon.

- NNUK's laboratories played an important role in the development of Nortel's Passport product line, as NNUK developed the ETSI interfaces and ATM interfaces that formed part of every Passport product sold by the Nortel Group, including NNI and NN CALA.

- NNUK employees in Maidenhead created HLR technology for the GSM network, without which a GSM network could not operate, and which allowed Nortel to sell GSM products to customers in the United States, including Cingular, T-Mobile, and Nextel.

- NNUK's R&D created disaster recovery solutions for HLR products, which became very popular after September 11, 2001, and which were only offered by Nortel and Ericsson.

- NNUK engineers at Harlow produced smart antenna technology that was built to North American standards and sold to North American customers, including Sprint, and Verizon.