8315059

- NNUK's facilities in Maidenhead worked on switching adaptations that allowed Nortel to win a major wireless contract in 1997-98 with Bell South in the CALA region and which brought Nortel revenue of US$300-400 million.

- NNUK's facilities in Maidenhead developed Centrex IP technology that was sold to key customers in the United States, including Bank of America, First Data, Bell South, Tellus, and the United States federal government.

- Three NNUK employees invented PBT technology that allowed Nortel to successfully bid on a number of PBT Metro Ethernet contracts with large U.S. customers, including Frontier and Verizon.

- Various NNUK employees, including Malcolm Collins, and Simon Brueckheimer, held positions in the global operations of the Nortel Group that benefitted all entities in the Nortel Group, including NNI and NN CALA.

- NNUK's laboratories were significant contributors to Nortel's patent portfolio and obtained NNUK substantially more patents "per head" than the Canadian and U.S. laboratories, including more than three hundred American patents.

314.    As alleged in paragraphs 142 through 211, NNI and NN CALA also received significant financial benefits from NNUK, including at least the following:

- The Nortel Group's transfer pricing system did not adequately compensate NNUK for the services it provided for the Group, including the costs which it incurred for the benefit of the Group and thereby relieved other entities, such as NNI, from having to share the burden of those costs. In particular, the transfer pricing arrangements (i) prejudiced NNUK (and correspondingly advantaged NNI) by imposing on NNUK a disproportionate share of the Group's restructuring costs during the period 2001-2008; and (ii) prejudiced NNUK (and correspondingly advantaged NNI) by failing to take into account a reasonable estimate of the true cost of NNUK's pension liabilities.

- In most years, the Nortel Group did not pay the balance owing to NNUK as a result of its intra-Group transactions, and by late 2007, NNUK was owed £467 million.

- Because of the unpaid inter-company balance owing, NNUK was forced to make a large, interest-free loan to NNL for the correspondent amount.

- NNL and NNI imposed the Intercompany Loan, withholding cash from NNUK and making it available to NNL, satisfying the needs of the Group at the expense of NNUK.

- When the balance was finally purportedly paid off, through Project Swift, NNL "repaid" the loan by selling NNUK the shares of other Nortel Group

8315059

subsidiaries. The value of those shares was not equal to the amount owing to NNUK and, in any event, was dependent on the continued operation of the Nortel Group.

- NNI had also made a loan to NNL at approximately the same time that NNUK did, but unlike NNUK's loan, NNI's loan was interest bearing and was substantially paid back in cash. By "repaying" the NNUK loan in company stock, Nortel had the funds available to repay NNI in cash.

315.    As alleged in paragraphs 126 through 138, NNI and NN CALA also received

significant benefits from NNUK's contributions to the global operation and organization of the

Nortel Group, including at least the following:

- NNUK had a substantial sales and marketing function which worked for the benefit of the Group. NNUK managed several global customer accounts, such as BT, Cable & Wireless, and Vodafone. NNUK also provided significant training for Nortel staff, which helped develop the market for Nortel products.

- NNUK provided extensive corporate services for the Group, including providing personnel for corporate use at a Group-wide level. These personnel provided management, accounting, legal, and business services.

- NNUK provided substantial operations for the global Group, including the operation of one of only four Nortel purchasing hubs worldwide. NNUK also served as the base for part of Nortel's Global Operations function, and the NNUK site in Maidenhead was a combined Technical Support and Global Product support center.

iii.    **NNI's And NN CALA's Involvement With The Plan**

316.    As alleged in paragraphs 212 through 229, NNI and NN CALA had influence on

the Plan's funding and management. Several officers of NNI and/or NN CALA sat on the U.K.

PFPC. The Plan was drastically underfunded, both because of the decision to continue the

"contribution holiday" and because of the failure to make adequate contributions to the Plan. By

underfunding the Plan, money that should have been used to make pension contributions was

otherwise available to the Group for general business purposes. This benefitted all other Nortel

Group members, including NN CALA, and particularly NNI since it was one of the largest

entities in the Group.

8315059

iv.    **The Financial Circumstances Of NNI And NN CALA**

317.    As alleged in paragraphs 42 through 44, because NNUK was not adequately compensated for the services it provided to the Nortel Group, including NNI and NN CALA, at the time of the Nortel Group's insolvency, NNUK was left in a significantly worse financial position than NNI and it has much lower expected rates of return to its creditors.  Further, NN CALA was unduly favorably treated under transfer pricing.  Accordingly, NNI and NN CALA are each in a significantly better position to provide financial support to the Plan as compared to NNUK.

318.    Having regard to these matters, it is reasonable to impose the requirements of an FSD  on each of NNI and NN CALA, as the Panel concluded in the FSD Reasons.

319.    Accordingly, each of the requirements under the Act for issuance of an FSD against each of NNI and NN CALA in relation to the Plan are satisfied, and the U.K. Pension Claimants are entitled to appropriate relief.

## QUANTIFICATION

320.    An FSD issued pursuant to the Act is a direction requiring that a person secure that financial support  for a scheme is put in place within the period prescribed in the FSD.  An FSD does not in itself constitute a debt owed to the scheme.  In the event that a person does not comply with an FSD, the Regulator may seek issuance, pursuant to section 47 of the  Act, of a CN by the Panel against the person subject to the FSD.

321.    A CN states that the person  is under a liability to pay the trustee of the scheme the sum specified in the CN.  The sum specified in the CN can be the whole or a specified part of the scheme's funding deficit.

8315059

322.    Pursuant to section 47(3) of the Act, the Panel may issue a CN to a person if it is of the opinion that it is reasonable to impose liability on the person in the sum specified in the CN, taking into consideration, where relevant, the matters set forth in section 47(4) of the Act.

323.    Taking those matters into consideration, it would be reasonable for the Panel to issue a CN against each of NNI and NN CALA.

324.    Because this Court, rather than the Panel, is fixing and liquidating the U.K. Pension Claimants' claims arising under the Act, it should grant judgment, as the equivalent of a CN issued by the Panel, for the U.K. Pension Claimants against each of NNI and NN CALA in an amount to be determined at trial, but in no event less than US$1.335 billion.

325.    It is reasonable within the meaning of the Act to require NNI and NN CALA to compensate the Plan in an amount to be determined at trial, but in no event less than US$1.335 billion, taking into consideration at least the following amounts which should have been available to NNUK to satisfy its funding obligations to the Plan but for the manner in which NNUK was operated for the benefit of the Nortel Group, including NNI and NN CALA :

- US$376.0 million for the amount that NNUK was inadequately compensated in connection with the Intercompany Loan (as alleged in paragraphs 187 through 211);

- US$92.9 million for the amount NNUK was inadequately compensated for its restructuring costs (as alleged in paragraphs 158 through 168);

- a sum to be determined by the Court in respect of the amounts by which NNUK was inadequately compensated under transfer pricing for the true costs of its pension liabilities and the benefit which NNI thereby derived.  The value of such benefit had NNUK's costs been assessed on an economic basis is estimated by the U.K. Pension Claimants at approximately US$867 million (as alleged in paragraphs 169 through 182); and

- a sum to be determined by the Court in respect of the unduly favorable treatment received by NN CALA at NNUK's expense under the transfer pricing system (as alleged in paragraphs 183 through 186).

- a sum to be determined by the Court in respect of the fact that NNUK was inadequately compensated for the services it provided to the Nortel Group,

- 90 -

8315059

including NNI and NN CALA, for R&D, assistance with customers and accounts, vendor financing and management services, among others (as alleged in paragraphs 86 through 138).

**RELIEF REQUESTED**

WHEREFORE, the U.K. Pension Claimants pray that the Court grant judgment against each of

NNI and NN CALA:

(a)     In an amount to be determined at trial, but in no event less than US$1.335 billion, constituting the equivalent of a CN issued by the Panel under the Act, together with the costs and disbursements of this proceeding; and

(b)     Such other, further and different  relief as this Court deems just and proper.


Dated:  September 5, 2012

8315059

## RESERVATION OF RIGHTS

1.      Each Claimant reserves the right to:  (a) amend, clarify, modify, update or supplement this proof of claim at any time and in any respect, including without limitation to assert additional claims or additional grounds for its claim and/or to specify the amount of any contingent, unmatured or unliquidated claim as they become non-contingent, matured and/or liquidated; (b) file additional proofs of claim at any time and in any respect; and (c) file a request for payment of administrative priority expenses in accordance with 11 U.S.C. §§ 503(b) and 507(a)

2.      Each Claimant reserves the right to attach or bring forth additional documents supporting their claims and additional documents that may become available after further investigation and discovery.

3.      To the extent that either Claimant has or may have a right to subrogation under 11 U.S.C. § 509 or any other equitable claim under common law against the Debtor, such Claimant expressly preserves such rights.

4.      By filing this proof of claim, each Claimant does not waive, and specifically preserves, its respective procedural and substantive defenses to any claim that may be asserted against such Claimant by the Debtor, by any trustee of its estate, by the Debtor's Official Committee of Unsecured Creditors, by any other official committee appointed in these cases or by any other party or group.

5.      The filing of this proof of claim shall not constitute:  (a) a waiver or release of the rights of either Claimant against the Debtor or any other person or property; (b) a waiver of either Claimant of its right to contest the jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to the subject matter of each Claimant's claims, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in

8315059

these cases against or otherwise involving Claimants; or (c) an election of remedies or choice of

law.

6.      This proof of claim shall not be deemed to be a waiver of either Claimant's rights

to:  (a) have final orders in noncore matters entered only after *de novo* review by a District Court

Judge; (b) trial by jury in any proceeding so triable in these cases or any case, controversy or

proceeding related to these cases; (c) have a District Court withdraw the reference in any matter

subject to mandatory or discretionary withdrawal; (d) arbitrate existing or future claims or

disputes; or (e) any other rights, claims, actions, set-offs or recoupments to which either Claimant

is or may be entitled, in law or in equity, all of which rights, claims, actions, defenses, set-offs

and recoupments such Claimant expressly reserves.

# Exhibit 1

## Entity Structure as of February 11, 2009



New York 1968062_12