



# Exhibit 2

# The Pensions Regulator

## Warning Notice

### In the matter of

### NORTEL NETWORKS UK PENSION PLAN ("the Scheme")

### And in the matter of

### THE PENSIONS ACT 2004 ("the Act")

**The Pensions Regulator's case reference:**

**TM6409**

**11 January 2010**

Take notice that the Pensions Regulator is considering exercising its powers to issue a Financial Support Direction ("FSD") under section 43 of the Act in respect of the Scheme against the target companies ("the Targets") as set out below.

| | |
|---|---|
| Nortel Networks Corporation (in CCAA proceedings) | Nortel Networks Limited (in CCAA proceedings) |
| Nortel Networks Incorporated (in Chapter 11 proceedings) | Nortel Networks CALA Incorporated (in Chapter 11 proceedings) |
| Nortel GmbH (in UK Administration) | Nortel Networks NV (in UK Administration) |
| Nortel Networks SpA (in UK Administration) | Nortel Networks BV (in UK Administration) |
| Nortel Networks Hispania SA (in UK Administration) | Nortel Networks Polska Sp z.o.o. (in UK Administration) |
| Nortel Networks International Finance & Holdings BV (in UK Administration) | Nortel Networks France SAS (in UK Administration) |
| Nortel Networks (Ireland) Ltd (in UK Administration) | Nortel Networks SA (in UK Administration) |
| Nortel Networks AG | Nortel Networks O.O.O. |
| Nortel Networks Ukraine Limited | Nortel Networks South Africa (Proprietary) Limited |
| Nortel Telecom International Limited | Nortel Networks (Scandinavia) AS |
| Nortel Networks Israel (Sales and Marketing) Limited (In Israeli Administration) | Nortel Networks AB (in UK Administration) |
| Nortel Networks (Austria) GmbH (in UK Administration) | Nortel Networks s.r.o. (in UK Administration) |
| Nortel Networks Slovensko s.r.o (in UK Administration) | Nortel Networks Portugal S.A. (in UK Administration) |
| Nortel Networks Engineering Service Kft (in UK Administration) | Nortel Communication Holdings (1997) Limited (In Israeli Administration) |
| Northern Telecom France SA | |

**Introduction**

1.  This is a Warning Notice issued by the Pensions Regulator ("the Regulator") against the above named target companies which are part of the Nortel Group. It is issued pursuant to sections 96(2) and 43(2) of the Pensions Act 2004. The Regulator believes that it is reasonable, within the meaning of section 43(5) of the Act, to require the companies against whom this Warning Notice is issued to put in place financial support for the occupational pension scheme of the company known as Nortel Networks UK Limited ("NNUK"). NNUK entered administration on 14 January 2009 with a deficit in its pension scheme of some £2.1 billion. This Warning Notice is also being sent to the trustees of the Scheme and to the board of the Pension Protection Fund as Directly Affected Parties.

**Contents**

2.  The remainder of this Warning Notice adopts the following structure:

2.1. Key to References used             Paragraph 3      *Page 5*

2.2. Executive Summary                  Paragraph 4      *Page 6*

2.3. Parties                            Paragraph 19     *Page 12*

2.4. The Scheme in brief                Paragraph 24     *Page 15*

2.5. Factual Background                 Paragraph 29     *Page 15*

    2.5.1.  *The Nortel Group*           Paragraph 29     *Page 16*

    2.5.2.  *The Beginning of the Nortel Group – North America*

                                              Paragraph 32     *Page 17*

    2.5.3.  *Nortel Expansion beyond North America - the Acquisition of STC*

                                              Paragraph 34     *Page 18*

    2.5.4.  *Nortel after the STC acquisition – changes – growth and boom time –world market leader*

                                              Paragraph 41     *Page 21*

    2.5.5.  *The Structure of the Nortel Group in the 2000s- one large interdependent global group*             Paragraph 45     *Page 22*

3

2.5.6. *Role and Importance of NNUK*    Paragraph 94    *Page 41*

2.5.7. *The Downturn of the Global Group*

             Paragraph 161    *Page 65*

2.5.8. *The Insolvencies*    Paragraph 167    *Page 68*

2.6. The Scheme    Paragraph 173    *Page 69*

2.7. Jurisdiction under the Pensions Act 2004

             Paragraph 186    *Page 77*

2.7.1. *Occupational Pension Scheme*    Paragraph 186    *Page 77*

2.7.2. *Connected & Associated*    Paragraph 187    *Page 77*

2.7.3. *Insufficiently Resourced*    Paragraph 188    *Page 78*

2.7.4. *Reasonableness*    Paragraph 192    *Page 80*

2.8. Representations    Paragraph 212    *Page 92*

2.9. Publication    Paragraph 215    *Page 92*

2.10.     Appendices

2.10.1.     Appendix 1: Statutory Provisions

             Paragraph 216    *Page 93*

2.10.2.     Appendix 2: R&D Contributions from NNUK

             Paragraph 217    *Page 114*

2.10.3.     Appendix 3: Targets (Financial Circumstances & structure chart)    Paragraph 253    *Page 127*

2.10.4.     Appendix 4: "Insufficiently Resourced"

             Paragraph 254    *Page 129*

2.10.5.     Appendix 5: Section 75 Debt

             Paragraph 307    *Page146*

2.10.6.     Appendix 6: "Connected" and "Associated" under s.43 of the Pensions Act 2004

             Paragraph 309    *Page147*

2.10.7.     Appendix 7: The Scheme: current composition

             Paragraph 325    *Page 152*

2.10.8.     Appendix 8: Abbreviations

             Paragraph 326    *Page 153*

4

**Key to References Used**

| | |
|---|---|
| Act, the | The Pensions Act 2004 |
| ANSI | American National Standards Institute |
| APA | Advance Pricing Agreement |
| CALA | The region of the Caribbean and Latin America. |
| CCAA | Companies' Creditors Arrangement Act (Canadian insolvency legislation) |
| COMI | Centre of Main Interests, a concept under the Insolvency Act 1986 |
| Directly Affected Parties | The trustees of the Scheme and the board of the Pension Protection Fund |
| EMEA | The region of Europe, Middle East & Africa. |
| ETSI | European Telecommunications Standards Institute |
| GSM | Global System for Mobile communication, a wireless technology used particularly outside North America for mobile telephone networks. |
| NN CALA | Nortel Networks ( CALA) Inc. |
| NN Ireland | Nortel Networks (Ireland) Limited, Nortel's operating company in Ireland |
| NNC | Nortel Networks Corporation, a company incorporated in Canada – the ultimate parent company of the Nortel Group. |
| NNI | Nortel Networks Incorporated, a company incorporated in Delaware. |
| NNL | Nortel Networks Limited, a company incorporated in Canada. |
| NNUK | Nortel Networks UK Limited, and its predecessors as principal operating companies of Nortel's business in the UK. |
| STC | STC plc, a leading UK telecoms company acquired by |

5

| | Nortel in 1991 |
|---|---|
| Targets | The companies listed on the face of this Warning Notice |
| Nortel Group, Nortel, or The Group | The group of companies ultimately owned by NNC |
| R&D | Research and Development. |

3. A full Key of abbreviations used in this Warning Notice and supporting evidence forms Appendix 8. Attached to this Warning Notice are paginated bundles of documents marked A-D and 1-4a. Bundles A-D contain witness evidence; Bundles 1-4a contain documentary evidence. References to the witness statements in Bundles A-D are in the form [**Bundle Letter/Tab number/Surname of Deponent/paragraph number of statement**]. References to the Bundles of documentary evidence are in the form [**Bundle number/Tab number/page number**]. The Regulator received the documentation in the Bundles from various sources during the course of its investigations. To assist the Determinations Panel, the Regulator has referred to key documents in this Warning Notice. However, the Regulator relies on the entirety of the Bundles in support of its position.

**Executive Summary**

4. Prior to the insolvencies, the Nortel Group operated in the field of telecommunications and network solutions. It operated on a global interdependent basis in order to best meet the needs of its customers and also to enable it to benefit from the strength of being one unified group. Research and Development ("R&D") departments were based in many countries and work carried out was divided along business lines rather than according to regional needs or visions. Although initially a manufacturing group based in North America, the Nortel Group changed in the 2000s to being a developer and supplier of telecommunications software, hardware

6

and services. Its operations were worldwide, encompassing mobile telephones, telephone systems, internet and all forms of telecommunications. Its major competitors were other global groups such as Ericsson, AT&T, and Cisco Systems. It supplied products for the telecommunications networks of companies such as British Telecom, Mercury, Vodafone, Cable & Wireless, Telefonica, Sprint and Verizon. By the late 1990s, the technical expertise within the Nortel Group was shared on a global basis and the finance function operated on a global basis to enable the Nortel Group to use its funds wherever it needed to in the Group or wherever it could obtain better tax advantages. For operational purposes, corporate entities were ignored in favour of the global Group.

5.   The real value in the Nortel Group is in its Research and Development. In order to be able to increase its overall base and market reach, the Nortel Group needed to demonstrate that it possessed ground-breaking innovative technology and/or that its engineers or researchers had set the standard for the various products it sold. In particular in order to be a world market leader, Nortel needed to have products available for both the North American and rest of the world markets (two different technological standards are in place). The acquisition of STC plc, described below, enabled the Nortel Group to achieve this aim by giving the Group access to the inventors of other technology.

6.   The Nortel Group had various R&D departments. Nortel's operating company in the UK ("NNUK") owned one of the Group's centres of excellence for R&D which produced more than its fair share of patents[1] and additionally was involved in ground-breaking research, including various long term projects all of which enabled Nortel to become a world leader. NNUK's R&D personnel consisted of many well recognised engineers[2] who sat on various standards

———————————————

[1] Bundle A/Tab 8/Hall/ paragraph 36; see also paragraphs 137ff below.

[2] For example Simon Brueckheimer & Mike Sexton [Bundle A/Tab 10/Brueckheimer/ paragraph 59].

committees thereby enhancing the Nortel Group's status as a world leader in technology and innovation.

7.  The employer, NNUK, is an English registered company. The NNUK pension scheme was an amalgamation of various pension schemes some of which dated back to 1949. The bulk of the pension scheme (55%) was inherited from the acquisition by the Nortel Group in 1991 of the balance of the shares of STC plc, a large UK based telecommunications and fibre optics company. It was a major and significant UK public company whose specialist and ground-breaking technology in the field of optical transmission and its talented and experienced R&D team dealing with both short term and long term research projects gave the Nortel Group the ability to become a major global leader in the field of telecommunications and networking solutions. The STC acquisition effectively enabled the Nortel Group to expand rapidly into the world market thereby turning its North American business into a worldwide operation. The STC pension scheme which became the NNUK pension scheme was at the time of acquisition in surplus. This enabled the Nortel Group to benefit from a pension holiday allowing it to use its capital for funding needs of other corporate entities and business groups as opposed to NNUK (which was the corporate body which ultimately acquired the STC operation).

8.  The Nortel Group also benefited from NNUK via its R&D departments: technology created at the NNUK laboratories and the patents which emanated from NNUK in addition to the products that NNUK staff developed were products and technology capable of attracting a worldwide customer base and enabled the Group to become a worldwide market leader. Several of Nortel's products sold worldwide after 1991 were developed in NNUK's R&D laboratories. These included products capable of being sold both in North America and in the rest of the world. In particular the work done at Maidenhead on the wireless technology of GSM enabled NNI, the US-based Nortel entity, to become one of the main suppliers of GSM in North America.

8

GSM is a wireless technology and is currently the most popular standard for mobile telephone networks worldwide.[3] Nortel sold GSM networks worldwide, each incorporating and relying on a Home Location Register ("HLR") developed at Maidenhead by NNUK employees (every GSM network requires an HLR in order to "locate" users as they access the network via their mobile telephone).

9.  The Nortel Group's headquarters of the region known as EMEA (Europe, Middle East and Africa) was situated in the UK and controlled by NNUK. Effectively NNUK operated and controlled, under the supervision of its Canadian parent, all the Nortel business in the EMEA region which included over 25 entities. As stated above, for operational purposes, corporate entities were largely ignored by the Nortel Group which concentrated from about 1998 in running the Nortel Group's business along business lines. All EMEA business and operations were run out of NNUK.

10. Nortel Networks Corporation ("NNC"), the ultimate parent, allocated the Group's profits and controlled its ultimate operations. NNC decided on the loans made to its direct subsidiary and the Group's operating company (Nortel Networks Limited, "NNL") from its subsidiaries and whether such loans would attract interest or be interest free. NNC as the parent also determined, without any consideration of the particular needs of the separate corporate entities, when and how such loans would be repaid. For example, in 2007 when there was a growing and very significant pension deficiency in NNUK, NNC determined that repayment of the interest free inter-company balance from NNUK to NNL would be repaid by way of transfer of ownership of certain subsidiaries from NNL to NNUK (a transaction known as Project Swift). This was a transfer of illiquid assets none of which NNUK could realise to pay its pension scheme deficiency. At the same time as this repayment by transfer of illiquid assets, NNL determined that part repayment of the interest-bearing

---

[3] Bundle A/ Tab 8/ Watkins/ paragraph 7.

loan of $275m would be made from NNL to NNI in cash. This repayment duly occurred and clearly benefited NNI.

11. The operation of NNUK as the headquarters of EMEA and the various roles undertaken by NNUK employees in relation to certain global functions (such as President of the Enterprise Networks business line, Director of Global Treasury Operations, and Assistant General Counsel) were clearly beneficial to NNL and NNC. Equally the operation of NNUK benefited other members of the Nortel Group. The STC technology and the R&D department of NNUK thereafter enabled Nortel Networks Incorporated ("NNI"; Nortel's operating company in the USA) to benefit from being in a position to offer to its North American market products which were used in the rest of the world. This opened up new markets for NNI which was therefore able to compete with other worldwide groups in offering and selling such products, for example GSM, to its North American customers such as AT&T and Nextel.[4]

12. Further valuable benefits were obtained from NNUK in relation to the work carried out by NNUK's R&D department in modifying network switches on behalf of one of NNI's largest customers, WorldCom, despite the fact that the work was carried out at a loss to NNUK and European EMEA entities of $17m as there was no profit margin on switches.[5] However NNI clearly benefited in relation to being able to fulfil a contract with its significant customer WorldCom and also benefited from the overall global view of the Nortel Group which it had acquired due to the acquisition of STC.

13. Nortel Networks CALA Incorporated ("NN CALA"), a US registered company, was Nortel's distribution centre and operations hub for the Caribbean and Latin American market ("CALA"). However this company relied extensively upon NNUK as the EMEA headquarters for technological and sales

---

[4] Bundle A/ Tab 8/Watkins/ paragraph 70.

[5] Bundle A/Tab 1/Rees/ paragraphs 25-29.

assistance. The standards used in countries forming the CALA market were standards set by the European Telecommunications Standards Institute ("ETSI"). Products and technologies supplied by NN CALA to Nortel customers in that region originated in EMEA, or had been adapted there to meet ETSI standards. NN CALA received assistance from NNUK employees in the form of the products and technologies they developed or adapted, and through the connections with major CALA customers such as Cable & Wireless whose accounts were managed in the UK.

14. The pension deficiency in the Scheme was apparent from as early as 2002, and amounted to £117m according to an actuarial valuation in April 2002. All pension issues were dealt with globally by the Canadian parent NNC who refused to allow NNUK to commit to[6] a regular schedule of contributions during the period 2001 until 2005. Ad hoc contributions were made into the pension scheme, but these ad hoc contributions did not eliminate or indeed make sufficient inroads into the pension deficiency. In November 2006, NNC agreed to allow NNUK to enter into a funding agreement. Although contributions were made into the pension scheme after the execution of the funding agreement, the deficiency remained significant. In January 2009, the Canadian and US companies entered into insolvency processes shortly followed by 18 corporate entities in the EMEA group including the employer NNUK. As a result of the various insolvencies, each corporate entity is now being treated as a separate entity and not as part of a global group. This means that unless FSDs are issued, any recovery by the Scheme is limited to NNUK's assets only, without access to the rest of the global Group and in particular the Target companies who have benefited from the role and operation of NNUK.

15. NNUK's pension deficiency under section 75 of the Pensions Act 1995 ("section 75") was £2.1bn as at 13 January 2009.

---

[6] Bundle D/Tab 1/Gilchrist/ paragraphs 25ff.

11

16. The proposed targets are all members of the Nortel Group and are all connected and associated with NNUK. NNI is the US registered Nortel entity which itself owns 31 subsidiaries. NN CALA is a US registered subsidiary of NNI which operates the Nortel business in the Caribbean and Latin American region. As already stated above, this region relies almost entirely upon EMEA expertise and know how because it adopts the European standard of ETSI rather than the standards set by the American National Standards Institute ("ANSI") and used in North America. The rest of the target companies are all part of the Nortel's EMEA sales region.

17. The Regulator submits that the employer, NNUK, was insufficiently resourced at the relevant time (as explained below, paragraphs 188ff.), that is that the value of NNUK's resources was less than 50% of the estimated debt under section 75, and the value of the resources of NNC was not less than the amount which is the difference between the value of the employer's resources and the amount which is 50 per cent of that employer's estimated debt under section 75.

18. In the circumstances it is reasonable to issue FSDs as against the target companies for the section 75 deficiency.

**Parties**

*The Targets*

19. A chart showing the corporate structure of the Group, with the Targets highlighted, is at Appendix 3. All of the 1,468,100,001 shares in NNUK are owned by NNL. NNC is the ultimate parent company of the Group. It owns the entire shareholding in NNL which in turn owns the shareholding in NNUK and NNI. NNUK has been the Nortel Group's operating company in the UK since the year 2000. NNUK is the successor in interest to the previous two main UK operating companies since 1991, which were STC plc and then the company

now known as Nortel Networks Optical Components Limited ("NNOCL"). These operating companies, whose names have changed many times, were both principal employers in relation to the Scheme.

20. NNUK owns all the shares in Nortel Networks International Finance & Holding BV (registered in the Netherlands) ("NNIF"), which in turn owns Nortel Networks SpA (registered in Italy), Nortel Networks Polska Sp z.o.o. (registered in Poland), Nortel GmbH (registered in Germany), Nortel Networks BV (registered in the Netherlands), Nortel Networks (Scandinavia) AS (registered in Germany), Nortel Networks AG (registered in Switzerland), Nortel Networks (South Africa) Proprietary) Limited (registered in South Africa), Nortel Networks O.O.O. (registered in Russia), Nortel Ukraine Limited (registered in Ukraine) and Nortel Networks Hispania SA (registered in Spain).

21. NNUK effectively owns Nortel Networks NV (registered in Belgium) through its 100% ownership of NNIF (NNIF owns 99.99% of the shares in Nortel Networks NV, with 0.01% being owned by NNUK). NNUK also effectively owns Nortel Telecom International Limited (registered in Nigeria), which is owned as to 99.99% by NNUK and 0.01% by NNIF. Nortel Networks (Ireland) Limited ("Nortel Ireland") is wholly owned by NNL although it formed part of Nortel's EMEA group. Nortel Ireland has stated in evidence to the English court that it was operated and run by NNUK.

22. The vast majority of the Targets that are based in EMEA are in administration in this country. Those that are not were also part of Nortel's integrated business in EMEA, under the control of NNUK staff in England.[7] As part of their applications for administration orders, each Nortel company in administration in the UK confirmed by means of a witness statement from a

---

[7] See witness statement of Sharon Rolston in UK Administration proceedings, 14 January 2009 ("Rolston"), paragraphs 33-56 [B1/T2].