company director that their "centre of main interests" ("COMI") pursuant to the Insolvency Act 1986 was located in the UK. This was on the basis that they were managed by NNUK, subject to control by NNUK and that their customers would perceive NNUK as their centre of main interests. The French entity Nortel Networks SA ("NN France") is another corporate entity controlled, managed and operated by NNUK as part of EMEA although it is owned as to 91.7% by NNL, with the remaining 8.3% being owned by NNIF. Its subsidiaries Nortel Networks France SAS and Northern Telecom SA are also Targets.

23. NNI is incorporated in the USA. Employees of NNI and NNL operate the North American business of the Nortel Group, although employees of other entities, including NNUK, have worked in North America as expatriate employees of NNUK.[8] In common with the rest of the Nortel Group, the corporate entities of NNI and NNL are irrelevant for the purposes of the Nortel Group and its operation. NNI wholly owns the shares in NN CALA, being the corporate entity under which the Caribbean and Latin America region is served by Nortel. Countries in the CALA region have primarily adopted technological standards set by ETSI rather than ANSI, with the result that the majority of products supplied by the Group in this region were developed and manufactured, or at least adapted, by Nortel staff in EMEA (predominantly NNUK). The major customers in this region are European carriers, including Telefonica and Cable & Wireless.

---

[8] Bundle B/Tab 4/Collins/ paragraph 22.

14

**The Scheme**

24. The Scheme is a defined benefit pension scheme which closed to new members in 2000, having assets of £1.4bn and a section 75 buy out deficiency of £2.1bn as at 13 January 2009. Key information is shown in the table at Appendix 7.

25. The principal employer of the scheme is now Nortel Networks UK Limited. It was incorporated in England on 25 February 2000 under the Companies Act 1985.[9]  NNUK was incorporated under the name Nortel Networks Holdings Limited and commenced trading on 1 April 2000.  It took on the name NNUK on 2 March 2001.

26. The Scheme was established on 28 September 1949.[10]

27. With effect from 6 April 1989, the assets and liabilities of the STC Pension Plan were merged with the ICL Pension Plan to form the STC Group Pension Plan.[11]

28. The STC Group Pension Plan is now known as the Nortel Networks UK Pension Plan.

**Factual Background**

*(1) The Nortel Group*

---

[9] Affidavit of John Doolittle in Nortel's Canadian insolvency proceedings ("the CCAA proceedings"), 14 January 2009, paragraph 25 [**B1/T1**].

[10] Consolidated Trust Deed & Rules of Nortel Networks UK Pension Plan, 18 December 2008, Recital (B) & Schedule 1 [**B4/T8**].

[11] Consolidated Trust Deed & Rules of Nortel Networks UK Pension Plan, 18 December 2008, Schedule 1 [**B4/T8**]; STC Group Pension Plan Actuarial Group Valuation as at 30 November 1990 [**B4/T7**].

15

29. The Nortel Group is a global group involved in the worldwide supply of networking solutions (i.e. telecommunications, computer networks and software) for both Carrier (service providers) and Enterprise customers (corporate customers, such as banks, purchasing internal communication networks). The ultimate parent company of NNUK and of 142 subsidiaries operating worldwide is NNC, a Canadian registered company listed on both the Toronto Stock exchange and the New York Stock Exchange.[12] At Appendix 3 is a structure chart of the Nortel Group of companies according to corporate entities, with the Targets highlighted. However as is set out in more detail below, the Nortel Group, in common with many global organisations, operated along business lines rather than along corporate lines or even by region. The Regulator relies upon the operation of the Group on a global and integrated and interdependent basis as making it reasonable for the FSDs to be issued as against the various Targets who are all part of the same Nortel Group.

30. Nortel's corporate structure does not in itself provide much evidence for the way the Group was organised or operated. At paragraph 49 is a business line diagram which sets out the actual operation of the Nortel Group during most of the 2000s. From about 1996, Nortel was run along business lines, but the composition of the various business lines changed over time. The Group was run along business lines as far as R&D was concerned, with the budget for R&D controlled by the head of the relevant business division.[13] On an almost annual basis the business lines were variously amalgamated, re-named, expanded and re-arranged according to the Canadian parent's views of the Group's best interests in order to maximise profits and reduce losses. The Group adopted a centralised operation of the entire worldwide business as one single entity from 1996 onwards. Certainly as from 2000, the Group was

---

[12] Rolston/paragraph 12 [**B1/T2**].

[13] Bundle A/Tab 8/Hall/ paragraphs 16 & 18.

integrated to such an extent that the corporate entities were more or less ignored save for statutory obligations such as holding annual board meetings and filing statutory returns.[14]

31. The Nortel Group has always had its headquarters in Canada. This is also the location of the registered offices of the principal operating company of the Group, NNL, and the ultimate holding company, NNC.[15]

*(2) The Beginning of the Nortel Group – North America*

32. The Nortel Group has its origins as a Canadian telecommunications business that was founded by Bell Telephone Company in 1895. This business became Northern Telecom Limited in 1976, shortly after expanding into the US and into China and Japan. Northern Telecom Limited changed its name to Nortel Networks Corporation in 1998.[16] This is publicly held and is listed on the Toronto and New York stock exchanges.[17]

33. Prior to its major movement into the European market in 1991 by means of the acquisition of STC plc, Nortel was predominantly a North American telecommunications business. It was commercially successful in Canada and the USA but had no real presence outside the North American market. Nortel's business in the USA started in 1971 with Nortel's incorporation of a subsidiary named Northern Telecom Inc in order to manufacture and sell its equipment in the USA.[18] However the most significant development in the USA that allowed Nortel's business to expand dramatically was the decision by AT&T to spin off the various Bell Operating Companies, opening 90% of

---

[14] Bundle B/Tab 6/ Watkins/ paragraph 32.

[15] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 25 **[B1/T1]**.

[16] Rolston/ paragraphs 17-18 **[B1/T2]**.

[17] NNL & NNI Request for US –Canada Bilateral Advance Pricing Arrangement, with Appendices ("2008 APA Application") **[B2/T5/p.758]**.

[18] Corporate Backgrounder **[B2/T2/p.508]**.

17

the US market to competition.[19] As a result, Nortel's potential customer base for products such as its public branch exchange and digital switches increased significantly. Similar deregulation occurred in the UK market in the early 1990s, making it an attractive market in which Nortel could attempt to recreate its success in the USA.

### (3) Nortel Expansion beyond North America - the Acquisition of STC

34. As mentioned above, the worldwide telecoms business operates under two main sets of technical standards, one set by the American National Standards Institute and applied in North America and Japan, and one set by the European Telecommunications Standards Institute and applied in the rest of the world. Other international standards also exist, e.g. set by the United Nations ("ITU-U"), and individual countries may impose their own technical requirements, e.g. on applicable frequencies for mobile telephone network products.

35. Prior to 1991, Nortel's overseas operations had been run primarily as an export business with a limited UK R&D facility in Maidenhead under the banner of Bell Northern Research Limited ("BNR"). The acquisition of STC plc in that year enabled  Nortel to break into the UK and then the European markets in a similar way as the earlier 'break' into the markets in the USA due to deregulation. Although Nortel had supplied products to European customers before 1991, this was mainly done through third party distributors and on a small scale. The Nortel operating companies in EMEA were incorporated only after the acquisition of STC. In turn this expansion into Europe enabled Nortel to penetrate into parts of the Asian market as well as the Middle East.

---

[19] Corporate Backgrounder [**B2/T2/p.508**].

36. The acquisition of STC, coupled with Nortel's pre-existing operations in the UK as at 1991, resulted in a successful expansion into the UK telecoms and networking market, followed by further success in the EMEA region. This brought with it customer connections with large European carrier companies such as BT, Cable & Wireless and Telefonica, together with ownership of products that met ETSI standards rather those set by ANSI. These connections and products in turn allowed Nortel to grow in the North American and CALA regions.

37. STC was a major UK public company. The STC acquisition was the Nortel Group's first significant move into the UK sales market. Nortel had acquired a 27.1% interest in STC by 1987. The acquisition of the remaining STC shares in 1991 gave the Nortel Group major R&D units in the UK, in Harlow, Paignton, and New Southgate, as well as a manufacturing site in Monkstown, Northern Ireland.

38. According to the letter from Nortel's Chief Executive Officer ("CEO") to STC's shareholders sent in November 1990 and accompanying the offer letter sent by Barings Bank on behalf of Nortel, Nortel was "*particularly pleased at the prospect of STC joining the Northern Telecom Group. STC's rich heritage of technological innovation, its commitment to research and development and its strong market position complement Northern Telecom's strengths*".[20] Barings' letter on behalf of Nortel highlighted the same strengths of STC, stating that "*the acquisition of STC will enhance Northern Telecom's market presence in the United Kingdom while providing STC with access to a global market for its products and greater research and development resources than are currently available to it. STC will continue to manage its activities from the United Kingdom and will play a key role in the development of the worldwide business of the Northern Telecom Group. In particular, STC's existing world*

---

[20] Letter dated 27 November 1990 from Paul Stern, CEO of Nortel [**B2/T3/p.513**].

19

*class research and manufacturing capabilities will benefit from the growth
opportunities now available*".[21]

39. At the time of Nortel's offer STC was a business of some 14,000
employees.[22] STC's group profits before tax for the year ended 31 December
1989 were reported as £278.0m on a turnover of £2,607.4m (of which STC's
businesses other than ICL contributed profits of £145.2m from sales of
£991.2m).[23] In the same period Nortel reported earnings before tax of
US$515.1m on revenues of US$6,105.5m. The exchange rate on this date
was £0.62 to US$1, making Nortel's earnings before tax for the year in
question worth some £319.3m**.**

40. The effect of the purchase of STC was felt immediately on the Nortel Group's
sales figures. Its European revenues (which for reporting purposes included
Africa, the Commonwealth of Independent States and the Middle East) in the
year to 31 December 1991 increased to US$1.35bn, a rise of 514% from the
figure for the previous year (US$219m). These revenues made up 17% of the
Group's total revenue for the year to 31 December 1991 (compared to 3% of
the Group's total revenue for the years to 31 December 1990 and 1989). The
10-K filing for Nortel for that year explained the rise as being due to the
consolidation of STC, along with higher demand in the European market.[24]

*(4) Nortel after the STC acquisition –changes – growth and boom time –
world market leader*

---

[21] Northern Telecom Recommended Offer for STC, 27 November 1990, p.10 **[B2/T3/p.520]**.

[22] Excluding those from an information systems subsidiary called ICL which was acquired in 1984 and had
been agreed to be sold (save for a 20% stake) by the date of the offer.

[23] Letter dated 27 November 1990 from Barings Bank, on behalf of Nortel, to STC shareholders
**[B2/T3/p.521]**.

[24] Northern Telecom Limited's Form 10-K filing with the US SEC for 1991 **[B2/T4/p.591]**.

41. The acquisition of STC gave Nortel brand recognition in Europe, important customer connections, and ownership of significant R&D expertise. As noted in Nortel's Offer letter for STC's shares, STC's research and development capabilities were world class .[25] One of the three winners of the Nobel Prize for Physics in 2009 is a British former director of research at the Standard Telecommunications Laboratories in Harlow, part of STC. This prize was awarded to Charles Kao for work on fibre-optic transmission, which was an area in which STC brought experience, products and patents to Nortel as a result of the acquisition.

42. STC owned a significant amount of optical cabling technology which Nortel acquired. This technology enables transmission cables to be routed using fibre optic cables which was a vast improvement on the previous technology of copper cables. Copper cables required 'repeaters' to boost the signal passing down them and had a limited bandwidth. STC's technology enables signals to be passed down fibre optic cables with increased bandwidth and speed and without the need for as many repeaters. This technology was then introduced by Nortel into North America and this allowed Nortel to cover large distances by cable on land which gave it a considerable competitive advantage. Additionally the acquisition of the technology enabled Nortel to transform itself from a North American telecommunications group to a global group. According to Nortel's President of EMEA from late 2006 until December 2008 and President of Global Carrier Sales in early 2009, Darryl Edwards, the STC technology was critical to the growth and market expansion of Nortel during the late 1990s and early 2000s.[26]

43. In the late 1990s the former STC R&D laboratories at Harlow contributed to optical transmission products and products enabling voice and other data to be transmitted in "packets", e.g. over the internet. Such products included a

_____

[25] Quoted in paragraph 38 above.
[26] Bundle B/Tab 5/Edwards/ paragraph 38.

switch called CS2000 ('soft switch') and silicon chips for "Media Gateways" that allow packets of content to enter a network. The other main R&D site operated by Nortel in the UK was based in Maidenhead. Again this R&D proved invaluable to the Nortel Group in developing capabilities to adapt Nortel's product portfolio for ETSI standards, and developing wireless technologies.

44. From the mid 1980s to 2000, the Nortel Group expanded rapidly, moving from development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age.[27] Its R&D facilities were of key importance during this period of expansion, enabling the Group to compete in what was an increasingly fierce market as well as enabling it to be a recognised world leader.

### (5) The structure of the Nortel Group in the 2000s- one large interdependent global group

45. In 1998, the name Nortel Networks was officially adopted in recognition of the continuing transformation of the Group into an integrated global organisation and business.[28] The Nortel companies' business employs a global integrated business model with all the subsidiaries of the ultimate Canadian parent operating within the structure of the four business lines illustrated below (paragraph 49). The Nortel operating systems are also highly integrated and operate essentially as if the Nortel Group were one large corporation.[29] Legal entities were unimportant to the operation of the Group; the business was run across the various legal entities and without regard to them. As stated by Alan

---

[27] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 8 **[B1/T1]**.

[28] Declaration of John Doolittle in the Chapter 11 proceedings, 14 January 2009, paragraph 10 **[B1/T3]**.

[29] Declaration of John Doolittle in the Chapter 11 proceedings, 14 January 2009, paragraphs 26 & 32 **[B1/T3]**.

Bloom, Administrator of NNUK and Nortel EMEA entities, "*the Nortel Group operated along global business lines and not generally by legal entity*".[30]

46. Nortel's internal purchasing system operated so that sales orders were placed by customers at a local level and internal purchasing orders were then routed through one of Nortel's four "purchasing hubs" which were and are located in four separate countries, including the UK. These purchasing hubs then placed orders with suppliers around the world. From 1 January 2001 the Nortel Group companies used a complex transfer pricing model to allocate costs and revenues throughout the global enterprise for the purposes of ensuring the proper allocation of tax payments among relevant jurisdictions.[31]

47. The Nortel Group described itself as a "*matrix organisation, which is integrated across borders*" and "*multinational*".[32]  The Group was vertically and horizontally integrated, meaning that organisations within the Group shared information and performed common tasks across geographical boundaries.[33]

48. In addition to organising its business on the lines of business segments (see chart at paragraph 49 below), the Nortel Group also organised its activities though departments which ran across the business divisions (hence the term "matrix").

49. The Nortel Group's matrix structure as of 2008 can be graphically represented as follows, with the four business segments of Enterprise Solutions, Carrier Networks, Metro Ethernet Networks and Global Services

---

[30] See also Bundle B/Tab 4/ Collins/paragraph 19. Witness statement of A. Bloom, 19 June 2009, paragraph 30 [**B4/T3**].

[31] Declaration of John Doolittle in the Chapter 11 proceedings, 14 January 2009, paragraphs 36-38 [**B1/T3**].

[32] 2008 APA Application [**B2/T5/pp.607 & 631**].

[33] 2008 APA Application [**B2/T5/p.607**].

shown by the four vertical columns and departmental categories by the horizontal lines:

| Nortel's Customer segments | | | |
| --- | --- | --- | --- |
| Large enterprises | SME | Services Provide / Carriers | Government |

| Business Divisions | | | | |
| --- | --- | --- | --- | --- |
| Sales | Enterprise Solutions (ES) *FY08 revenue = USD2.4bn (23%)* | Carrier Networks (CN) *FY08 revenue = USD4.5bn (44%)* | Metro Ethernet Networks (MEN) *FY08 revenue = USD1.4bn (13%)* | Global Services (GS) *FY08 revenue = USD2.1bn (20%)* |
| Mktg | | | | |
| R&D | | | | |
| Operation | | | | |

| Corporate |
| --- |
| HR, Legal, Communication. Finance, Knowledge services, corporate responsibility |

50. The Nortel Group adopted the above matrix structure for its functions because it perceived that considerable benefits would be secured, including: collaboration as to technology, better integration of the Group's functions under product or process teams, more efficient use of corporate resources, economies of scale within functions, better strategic deployment across the whole Group, avoidance of duplication of functions by product or geographical area, and fostering of a collaborative environment.[34] Although there was a recognition that some reporting and operations needed a more geographical based structure, the geographical regional operations were subsidiary and

---

[34] 2008 APA Application [B2/T5/pp.631-632].

subordinate to the overall global structure and the operation of the business lines.

*Business lines operation – no corporate identity*

51. A central feature of the Nortel Group's business was its organisation around "business lines" or "business segments", sometimes also known as "leadership categories". Essentially, the Nortel Group was organised on a product line basis, with each line of business capable of operating independently.[35]

52. The business segments operated globally and were a vital part of the way that the Nortel Group's business was organised and run. As explained in the Chapter 11 filings: "*With certain exceptions, the business segments are not segregated by legal entities but are operated across various legal entities.*"[36] (The exceptions appear to relate to the Nortel Group's joint ventures which were to a greater or lesser extent operated outside the usual Group structure). The fact that the Nortel Group conducted its business through global business segments resulted in a high degree of interdependence between the various legal entities in the Group: no single subsidiary owned a whole business segment or a complete self-contained business.

*Business segments prior to the Nortel Group's insolvency*

53. As at 31 December 2008, there were four such business lines or segments:[37]

---

[35] Nortel Networks Functional Analysis 2000-2004 ("2004 Functional Analysis") **[B2/T6/p.814]**.

[36] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 32 **[B1/T4]**.

[37] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraphs 27-31 **[B1/T4]**. Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraphs 62-66 **[B1/T1]**.

25

53.1.    *Carrier Networks*: Essentially, this segment sold wireless communications products and services to Carrier networks, such as mobile phone service providers, cable operators and so on.  In turn, the Carriers used this technology to provide their customers with mobile voice, data and multimedia communications services.

53.2.    *Enterprise Solutions*: This segment sold communications products and services to businesses and large organisations.  Traditionally, such products would have included private branch telephone exchanges, but latterly a whole range of sophisticated communications systems and network products were also sold.

53.3.    *Metro Ethernet*: This segment provided optical networking products (involving, broadly speaking, data transmission using fibre-optic cables) and Ethernet technology.  The Ethernet is a family of networking technologies, originally used to provide computer networks for localised areas such as an office building or group of buildings but now used for a range of wider purposes.  Customers of this segment included Carrier networks and large businesses.

53.4.    *Global Services*: This segment provided a broad range of network support services, including technical support, network installation and planning services, network maintenance and operational support to users of multi-technology networks.

54. By way of illustration of the relative size of different parts of the Nortel Group's business, in last two years before the Nortel Group's insolvency the breakdown of revenues between the business segments was approximately:

54.1.    Carrier Networks: c. 40%;

54.2.    Enterprise Solutions: c. 24%;

54.3.    Metro Ethernet: c. 14%;

54.4.    Global Services: c. 20%;

54.5.    Other: c. 2%.[38]

55. From at least around the early 2000s, the Group CEO was responsible for assessing the performance of the business segments based on certain management accounting information. The segment managers were accountable to the CEO for the cost of revenues and selling, general and administrative expenses.  Costs associated with shared services and other corporate costs were allocated to the segments based on usage determined by headcount. Each segment was allocated resources and assets based on whether projected customer demand would support additional investment.[39] Working capital for each segment was primarily managed by the Nortel Group's regional finance organisation and its global operations organisation.

56. As is apparent from NNC/NNL's Form filings with the US Securities & Exchange Commission ("SEC"), each business segment's performance was accounted for separately, with individual financial breakdowns for each segment appearing in the Nortel Group's consolidated financial statements and reports as if the segments were businesses in their own right.  The detail of reporting for each segment has progressively increased.

57. Each segment provided professional services for the segment's networking technology, such as strategic planning, network design and engineering, network operations planning, installation and ongoing technical support.[40]

58. It appears that the Nortel Group regarded the business segments as separate business units in their own right, to the extent that the Nortel Group attempted to sell off the segments, or parts of them, separately.  Thus in late 2008, prior to insolvency, the Nortel Group announced its intention to explore the sale of

---

[38] Report of Ernst & Young Inc in the CCAA proceedings, 14 January 2009, paragraph 19 **[B1/T5/p.233]**.

[39] NNC's Form 10-K filing with the US SEC for 2003 **[B3/T6/p.1140]**.

[40] NNC's Form 10-K filing with the US SEC for 2003 **[B3/T6/p.1107]**.

the Metro Ethernet business segment.[41]   Since the insolvency, the Nortel Group has continued attempts to sell the Group by reference to its business segments or parts of them.

*Geographical Regions*

59. Although the entire group operated under the matrix system using the business lines described above, there was also some 'dotted line' recognition of geographical regions as sales areas. The phrase 'dotted line' refers to secondary reporting lines which certain Nortel employees used in addition to their primary reporting line. Certain employees had one primary reporting line and a further 'dotted line' which linked him or her to a superior within their region.[42] Regional reporting lines were subservient to those that led up the business lines, at least in relation to policy and sales decisions. Policy and sales strategy was set by the Group CEO and the heads of the business lines.

60. Although the use of business lines has emerged and grown since 1991, the sales function reported and operated in two different ways: (a) the sales function under each business line, and (b) the sales function which operated along regional lines. The sales functions had historically been operated along both of these two lines, in the four regions of:

    60.1.      Canada and the USA,

    60.2.      EMEA,

    60.3.      Asia Pacific, and

    60.4.      CALA.

---

[41] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 15 **[B1/T1]**; 2008 APA Application **[B2/T6/p.610, fn]**.

[42] Bundle B/Tab 5/Edwards/ paragraph 12.

28

61. By way of illustration of the relative size of the Nortel Group's market in each region, for 2007 the revenue breakdown and percentage of Group revenue was as follows:[43]

    61.1.      Canada: US$822m (c. 8%);

    61.2.      USA: US$4,974m (c. 45%);[44]

    61.3.      EMEA: US$2,740m (c. 25%);

    61.4.      Asia: US$1,768m (c. 16%);

    61.5.      CALA: US$644m (c. 6%).

62. Historically, there has been separate financial reporting of the Nortel Group's activities for each of the geographical regions in terms of sales (including, more recently, breakdowns for each of the business segments identified above[45]). However as from 2000 onwards, although regional reporting continued, the figures which were used and relied upon related to the business lines rather than geographical regions.[46]

*EMEA as a geographical region and a centre of operation for the relevant regions*

63. NNUK was by far the largest business of the Nortel Group's EMEA entities and was the headquarters for the EMEA region.[47]  Since 1990, NNUK has remained the largest Nortel presence in the EMEA region and has the widest

---

[43] Administrators' statement of proposals for NNUK **[B1/T8/p.475]**.

[44] Note that for the purposes of 10-K filings, the US had to file separate figures to Canada, but this was not relied upon by the Nortel group

[45] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 35 **[B1/T4]**.

[46] Bundle B/Tab 5/Edwards/ paragraph 18; Bundle B/Tab 6/ Watkins/ paragraph 17.

[47] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 25 **[[B1/T4]**; Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraphs 25 & 27 **[B1/T1]**.

coverage of Nortel business segments.[48]  It has also generated the largest business in the EMEA region since 1990.[49]

64. Most of the Nortel Group's EMEA entities were direct or indirect subsidiaries of NNUK with the exceptions of NN France SA (and its subsidiaries, Northern Telecom France SA and NN France SAS) and NN Ireland.[50] However for the purposes of the Nortel Group's operating structure NN France SA, Northern Telecom France SA, and NN Ireland were EMEA entities and were managed from NNUK.  As already explained above, NN France SA was treated as an economic subsidiary of NNUK according to the CCAA filings.[51] Additionally, both NN France SA and NN Ireland have their centre of main interests (their centre of operations and head office functions) operated through and by NNUK in England. On 14 January 2009 eighteen Nortel corporate entities including NNUK, NN France, NN France SAS and NN Ireland applied for and obtained administration orders from the English court under the Insolvency Act 1986.

65. NNUK served as the centre of operations for EMEA, and its senior management team in Maidenhead were the senior management for EMEA (in addition to performing certain global roles within the Group). They had overall responsibility for all EMEA sales, finance, human resources, legal matters and customer support.[52] The supplier approval process and real estate management for EMEA was also controlled from Maidenhead.[53]  The Administrators of the EMEA Targets state that the operations of the EMEA

---

[48] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 27 **[B1/T1]**.

[49] Administrators' statement of proposals for NNUK **[B1/T8/p.479]**.

[50] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 26 **[B1/T1]**.

[51] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 27 **[B1/T1]**.

[52] Rolston/ paragraphs 7-15 [**B1/T2**]

[53] Administrators' statement of proposals for NNUK **[B1/T8/p.479]**.

entities, including NN France SA and NN Ireland were controlled and managed on a day to day basis from Maidenhead.[54]

66. As of 2007, the Nortel Group regarded NNUK as one of its key integrated entities bearing full entrepreneurial risk.[55] NNUK is described in the CCAA filings as one of the two principal foreign (i.e. non-Canadian) operating subsidiaries of the Nortel Group, the other being NNI.[56]

*Financial reporting maintained by the Nortel Group*

67. The financial reporting carried out by the Nortel Group also reflected the global operation of the Group. The Nortel Group reported the financial results of its activities in three main ways: i) consolidated for the whole Group; (ii) by business lines/segment across the whole Group; (iii) by geographical region. Both NNC and NNL had to comply with the financial reporting requirements of the US SEC by filing annual Form 10-Ks. The Form 10-Ks and the annual reports make little mention of individual companies with the exception of joint venture companies. From 2006 individual companies were also referred to for the limited purpose of assessing the deferred tax assets of residual profit entities inducing NNUK. Initiatives and policies were announced on a group-wide basis and the only executive management identified in the 10-Ks were the executive officers and boards of NNC/NNL.

*Executive leadership*

68. As set out in the historical overview of the period since 1991 and the transformation of the Nortel group into a global player and operator, overall management of the Group has been in the hands of NNC/NNL The executive

---

[54] Administrators' statement of proposals for NNUK **[B1/T8/p.480]**.

[55] Nortel presentation to the US Internal Revenue Service, 23 October 2007 **[B3/T1/p.990]**.

[56] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 21(b) **[B1/T1]**.

officers referred to below are appointed by the boards of NNL and where applicable NNC.

69. The key posts in the Group are as follows (there having been some changes since 1991 to the date of insolvency):

    69.1.    President and Chief Executive Officer;

    69.2.    Chief Financial Officer;

    69.3.    Controller;

    69.4.    Treasurer;

    69.5.    General Counsel;

    69.6.    Vice-President, Taxation;

    69.7.    Chief Technical Officer;

    69.8.    Heads of Business Divisions.

70. NNC/NNL's Form 10-K filings with the US SEC identify the Executive Officers for each year of the Group's operation.

71. From around the early 2000s, the CEO was designated as the chief operating decision maker in assessing the performance of the Nortel Group's business segments and the allocation of resources to the segments. Each segment was managed separately with each segment manager reporting directly to the CEO.[57] The CEO had a cabinet of some 16 individuals who each represented different functions in Nortel's business, with the exception of the sales function which was represented by the four heads of the four different regions ("the CEO's Cabinet"). The other individuals on the CEO's cabinet were the heads of the four business lines, and global heads of functions, being the Chief Financial Officer, Chief Legal Officer, and Chief Strategy Officer. [58]

---

[57] NNC's Form 10-K filing with the US SEC for 2001, Financial Statements **[B3/T34/p.1441]**.

[58] Bundle B/Tab 5/Edwards paragraph 11.

72. As of the start of 2009, NNC and NNL had 15 executive officers, most of whom had a primary business location in Toronto, Canada.[59]

73. Since 2000 each of the boards of NNC and NNL were mainly comprised of the same directors and had the same non-executive chair. Meetings of the boards of NNC and NNL were generally held together as joint meetings. NNC and NNL's corporate governance was conducted from Toronto, board meetings were held there, the majority of the directors were resident in Canada, and the companies' headquarters were in Toronto.[60]

74. The treatment of the entire Group as operating essentially under the leadership and control of one board, being NNL/NNC is further demonstrated by the fact that the directors of NNUK included senior North American officers of NNC/NNL, for example Douglas Beatty, Michael Gollogly and Peter Currie.[61]

*Residual Profit Entities*

75. NNUK was an integral and vital part of the global operation of the Nortel Group. The interdependent nature of the Nortel Group entities was exemplified by the role of the "Residual Profit Entities" ("RPEs"), also known as Integrated Entities or Residual Profit Split Entities.

76. With effect from around 2000, the Nortel Group identified a number of its key operating companies as Residual Profit Entities, of which NNUK was and is one. NNL, NNI, NN France SA and NN Ireland were also Residual Profit

---

[59]Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 33 **[B1/T1]**.

[60] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraphs 44 & 189 **[B1/T1]**.

[61] E.g. for Peter Currie, CFO of NNC and Director of NNUK, see NNUK financial statements to 31 December 2006 **[B4/T9/p.1861]**, cf. NNC's Form 10-K filing with the US SEC for 2006 **[B3/T13/p.1285]**.

Entities.[62] The Residual Profit Entities' distinguishing feature was that they performed R&D for the Nortel Group together with other core sales, marketing, administrative and operations functions.[63]   Other entities in the Nortel Group functioned primarily as sales operations, acting as intermediaries between the Residual Profit Entities and customers in jurisdictions not served by the Residual Profit Entities.[64]

77. Each Residual Profit Entity performed activities known in the Group as "*fulfilment activities*", namely R&D, operations, sales and marketing and general and administrative services. The Residual Profit Entities performed the fulfilment activities in a united and interdependent manner so as to give "*extraterritorial*" support, i.e. performing fulfilment activities locally in support of Group revenues outside the Residual Profit Entities' respective jurisdictions.  Each of the Residual Profit Entities performed some degree of support activities that benefited local revenues and revenues outside their jurisdiction.[65]

78. Each Residual Profit Entity relied on the others for the R&D they produced and contributed.[66] The Residual Profit Entities were fully integrated, interacting together to provide products and services to customers.[67] The Residual Profit Entities interacted across borders and performed organisational activities to support other worldwide operations of the Group.[68]

*Transfer Pricing*

---

[62] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 92(b) **[B1/T1]**.

[63] See e.g. the 2008 APA Application **[B2/T6/p.605]**.

[64] Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 12 **[B1/T6]**.

[65] 2008 APA Application, Appendix A **[B2/T5/p.650]**.

[66] 2004 Functional Analysis **[B2/T6/p.811]**.

[67] 2008 APA Application **[B2/T5/p.607]**.

[68] 2008 APA Application **[B2/T5/p.607]**.

79. The Residual Profit Entities were also parties to the Nortel Group's transfer pricing arrangements. This was a tax-led system which the Group has operated since 2001 and which governed how much Nortel entities paid and were paid for goods and services supplied between Group members. It also allocated profits and losses and certain costs between entities in the Group, and, crucially, determined the overall profitability or otherwise of entities such as NNUK.[69] The monies available to NNUK, for purposes such as remedying its pension scheme deficit, was fixed in accordance with Transfer Pricing Arrangements rather than representing either the surplus available to it from its own trade, or the result of a calculation based on its profitability as a company.

80. As described by Sharon Rolston, Chief Financial Officer for EMEA, the Transfer Pricing Model as applied from 1 January 2001 can be broken down into two main components: Initial Mark Up and Residual Profit Sharing.[70] The position before that date is set out at paragraph 87 below. The first of these two components is the process by which a Nortel entity supplying products within the Group is able to invoice the purchasing entity for both the cost of that product and a mark up on that cost. The second component "is derived from Nortel's profit sharing adjustment model". Under this second component, the Group's operating profit is assessed and re-allocated on the basis of profit projections. This is done on a quarterly basis, and a true-up adjustment is carried out once the actual results for the year are known.[71]

81. Accordingly, and as described by Sharon Rolston, "*To the extent that any Nortel Company has enjoyed a profit that exceeds its profit entitlement (after taking into consideration the amounts paid on the Initial Mark Up) it is*

---

[69] Bundle A/Tab2 /Pugh paragraph 38.

[70] Rolston/ paragraph 81 [**B1/T2**].

[71] Rolston/ paragraph 81b [**B1/T2**]; Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 16 [**B1/T6**].

35

*required to remit additional monies back to the RPEs. RPEs then allocate amongst themselves based on their agreed upon profit entitlements."*[72]

82. It can be seen that the operation of the transfer pricing arrangements as they affected NNUK will have added Initial Mark Ups on goods supplied by NNUK (in particular on products supplied from Monkstown, the purchasing hub for EMEA). However these Initial Mark Ups, together with the cross charges that are described by witnesses such as Darryl Edwards when individuals are posted to other Nortel entities,[73] and any other income received by NNUK, will all be measured against what Sharon Rolston describes as the profit "projection" for NNUK.[74] Sums received in excess of that will be remitted for re-allocation, and NNUK will not retain monies in excess of its "entitlement". This entitlement is calculated as a share of the Group profits (or losses) for the year that is proportionate to each RPE's share of the Group's R&D costs over the previous five years (with a one year time lag). The more an RPE spends on R&D, the greater proportion of the Group's profit it will be allocated. For years where the Group makes a loss, the loss will also be divided by reference to R&D spend, with RPEs that spend most on R&D bearing the greatest proportion of the loss.

83. Each RPE is also paid compensation for the sales and marketing, "general and admin", and Global Operations costs. RPEs are given a 15% return on those parts of these costs that exceed a set benchmark (calculated either by reference to other Group entities, or other competitors). This benchmark was intended to reflect the level of costs incurred on activities within the RPE's own territory, with costs above that benchmark being "excess" and deemed to be costs incurred for extraterritorial benefit.

---

[72] Rolston/ paragraph 81b [**B1/T2**].

[73] Bundle B/Tab 5/Edwards/paragraph 7.

[74] Rolston/ paragraph 81 [**B1/T2**].

84. However it is crucial to recognise that the payment received by NNUK and other RPEs as a result of transfer pricing does not compensate entities for anything other than the cost of providing the services described above. No payment is made to compensate for R&D spend; rather the arrangements provide only for a share of Group profits after all other costs are paid. For all the years that these arrangements have been in place the Group has made an overall loss and NNUK has received no payment in respect of the contribution made by its R&D departments.

85. Nor is any payment made under transfer pricing in respect of pension deficit, with the only pension costs reflected being those in respect of ongoing pension liabilities.

86. Finally, no payments are made under the transfer pricing arrangements that reflect the *value* of services provided by NNUK to other Nortel companies, rather than the *cost* of those services. This can be seen by considering the sums paid to NNUK under the transfer pricing arrangements for the cost of services provided by senior employees. Although the cost of a senior NNUK's employee's services to the Group may be repaid to NNUK as a result of transfer pricing, if it is a cost forming part of NNUK's "excess" spend on matters such as operations, that cost is calculated solely by reference to the individual's salary and is intended to represent an arm's length cost of the service. This is unrealistic for NNUK, where the cost of a senior employee's services is not simply his salary but also pension deficit costs. A comparison with the arm's length cost of those services is not accurate.

87. A comparison with the arm's length cost of those services is also not accurate for a Group that values highly an individual's years of experience within it.[75] The value of benefit received by other Nortel entities from the services of NNUK employees such as Malcolm Collins or Darryl Edwards is not

_____

[75] Bundle A/Tab 4/ Ball paragraph 25.

37

adequately reflected by a comparison with the cost of those services provided by external individuals on an arm's length basis. Instead, Nortel recognised the value of experience within the Group and usually promoted from within.

88. It should be noted that the Transfer Pricing Arrangements appear to have evolved from bilateral arrangements between NNL and NNI, rather than taking account of the interests of NNUK:

88.1.    According to NNI's Chapter 11 filings, "*NNI and NNL from time to time seek approval of their bilateral Advance Pricing Agreement* ("APA") *application permitting such practices from taxing authorities, including the Internal Revenue Service and the Canada Revenue Agency*" ("IRS" and "CRA").[76]

88.2.    The Nortel Group's transfer pricing arrangements appear to have arisen out of NNI's initiatives with the US Internal Revenue Service. In 1993, NNI was one of the first companies to enter into the new Advance Pricing Agreement ("APA") programme introduced by the IRS. This was the basis of the R&D cost sharing arrangement between NNI and NNL. Subsequent to that, NNI sought advance approval from the Internal Revenue Service for the head office expense agreement and tangible goods agreement.[77]

88.3.    The subsequent transfer to a residual profit split transfer pricing model was also made at the suggestion of the Internal Revenue Service[78] and apparently also the Canada Revenue Agency.[79]

88.4.    A report prepared by KPMG for NNUK on the operation of Transfer Pricing before 2001 makes clear that the governing agreements were

---

[76] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 40 **[B1/T4]**.

[77] 2004 Functional Analysis **[B2/T6/p.905]**.

[78] 2004 Functional Analysis **[B2/T6/p.906]**.

[79] Canada Revenue Agency Position Paper **[B3/T2/p.1003]**.

negotiated by Nortel with the IRS and CRA and that such negotiations did not involve the UK tax authorities.[80]

88.5.    The application for an APA in 2002 was made to the UK Inland Revenue as well as to the Internal Revenue Service and the Canada Revenue Agency.  The application was made by NNC from Canada with the assistance of US professional advisors, and not by NNUK.[81]

89. The operation of the transfer pricing model was carried out by Nortel's tax team in the USA. As described by Gareth Pugh, Financial Controller for EMEA from 2000 to 2005 and director of NNUK from 2003 to 2005, transfer pricing was almost entirely driven by the Group tax function in Dallas, and the accounts prepared by NNUK's accounting team were processed by Nortel's transfer pricing team in North America who would tell the UK what the results for NNUK were. Those results would then be fed into the statutory profit and loss account of NNUK.[82]

90. The transfer pricing model described above was operated by the Group from 1 January 2001 until 14 January 2009, pursuant to the terms of a Master R&D Agreement in force from 1 January 2001.[83] From 1 January 1995 to 1 January 2001 NNUK was party to several cost sharing agreements that were intended to allocate expenses incurred by Nortel entities in the following areas:

90.1.    R&D;

90.2.    manufacturing (described in the relevant agreement as the cost of producing tangible inventory property);

---

[80] KPMG Transfer Pricing Report, 2003, paragraph 5.2 [**B3/T4/p.1058**].

[81] See letter of 27 March 2002 from Nortel Networks in Canada to UK tax authorities in London [**B3/T4/pp.1076-1079**].

[82] Bundle A/Tab 2/Pugh paragraph 38 ff.

[83] [**B4/T4**].

90.3.     running a head office for the Group; and

90.4.     providing market support groups and product line management for the EMEA region.[84]

91. These cost sharing agreements in place from 1 January 1995 only sought to compensate Nortel's entities for the basic costs of providing a product or service. They paid no attention to costs such as pension deficits, or to the *value* of the service provided. This was also the position under the transfer pricing arrangements in place after 1 January 2001. However the agreements from 1 January 1995 did not attempt to share the Group's profits among entities that included NNUK. No compensation was paid to NNUK for the value of its R&D contribution in this period, only for its cost, despite this being a time when NNUK's R&D headcount was at its height and when many of Nortel's products built on NNUK's R&D work were generating significant revenues and profits for the Group.

92. There should be no doubt of the importance of R&D to these profits. For the period after 1 January 2001 the rationale for allocating residual profits and losses based on R&D effort was that the Nortel Group regarded the development and maintenance of intellectual property as the "*key profit driver of Nortel's business.*"[85]   The Nortel Group regarded the RPEs as the source of the R&D that created Nortel's global technology "*footprint.*"[86]   Hence the Group considered that, since its success or failure was determined by its R&D, and given the functions performed and risks assumed by the RPEs, each RPE should share equitably in the residual profits or losses of the Group.[87] That rationale applies equally to the period before 1 January 2001,

---

[84] See KPMG Report of 18.7.03 on Transfer Pricing affecting NNUK in 1998 **[B3/T3/p.1055]**.

[85] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 40 **[B1/T4]**.

[86] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 62 **[B1/T4]**.

[87] 2004 Functional Analysis **[B2/T6/p.811]**.

40

but was not given effect until that date, by when the Group had become loss-making.

93. Before 1 January 1995 NNUK was not a party to any R&D cost sharing agreement,[88] and accordingly bore its own costs of the R&D that benefited the Group as a whole. As is set out in the following section, NNUK's R&D work during this period included adaptation of products that had been developed by Nortel to American technological standards and the continuation of optical technology R&D begun in STC's laboratories in Harlow. This work was important for the Group's expansion into EMEA, its growth in North America, and the increase in its profits. However none of the cost incurred by NNUK for the benefit of the Group in the period from the acquisition to 1 January 1995 was repaid to it.

### (6) Role and Importance of NNUK

*Contribution of NNUK's R&D*

94. Research and Development and new technology are at the core of Nortel's business.[89] The following section sets out brief examples of the contribution made by NNUK's employees and its operations to the Group's R&D and the revenues generated as a result. Full details of the technologies and products described below are set out in Appendix 2 to this Warning Notice.

95. NNUK and its employees have played a crucial role in the development of Nortel's intellectual property and the products based upon it. This has been the case since at least the acquisition of STC by Nortel in 1991. That acquisition brought Nortel some 14,000 staff in the UK (to add to the 400 odd in BNR Maidenhead) and laboratories and engineering teams with 30 years of experience in the field of telecommunications and the highest level of

---

[88] KPMG Report, 18.7.03, paragraph 5.3 [**B3/T3/p.1059**].

[89] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 10 [**B1/T1**].

41

developmental achievement. As stated in paragraph 41 above, one of these achievements was recognised in 2009 by the award of half the Nobel Prize in Physics to Charles Kao, an engineer in the STC laboratories in Harlow, for work in the field of fibre optic transmission technologies in the 1960s.

96. According to the filings in the Chapter 11 proceedings, NNUK was one of the two Nortel Group entities "*that have contributed, proportionate to the size of their business, the most to R&D Activity.*" The other such entity was NNL.[90] The contributions received by the Group from NNUK's R&D work may most conveniently be considered under the following headings:

96.1.    Optical transmission;

96.2.    Adaptation of products from North American to other technical standards, such as DMS switches;

96.3.    Next Generation Networks: CS2000;

96.4.    Media Gateways;

96.5.    Wireless: GSM-HLR, smart antennae, ACE;

96.6.    Centrex IP;

96.7.    Provider Backbone Transport.

97. In addition to the technologies and products represented by the above headings, NNUK's engineers produced inventions which Nortel patented, allowing it to claim and protect technological fields for it to develop, to enter licensing deals and thereby earn revenue and / or the use of others' patents in exchange, and to gain a reputation for technological leadership.[91]

---

[90] Statement of NNUK, 22 June 2009, in support of a motion by NNI in the Chapter 11 proceedings, paragraph 4 [**B1/T7**].

[91] Bundle A/Tab 8/Hall/ paragraph 27.

42

98. Finally NNUK's engineers contributed to international bodies setting industry standards such as ITU, ANSI and ETSI. As a result those standards bodies accepted Nortel's innovations as industry standards in e.g. ATM transmission and SDH (Synchronous Digital Hierarchy) transmission. This results in first mover advantage, i.e. competitor companies having to comply with that industry standard, despite them perhaps not having achieved that technological level. It also results in the company whose innovation is accepted as the standard moving more swiftly into the market, since its products are already compatible with the industry standard. NNUK's scientists and engineers have thus forced Nortel's competitors to adopt Nortel's technologies and norms in order to work in specific product areas.[92]

NNUK R&D: (1) Optical Transmission

99. In the late 1980s STC was one of the four leading suppliers of submarine fibre-optic cables in the world, with manufacturing and R&D sites at Harlow, New Southgate, Monkstown, and Paignton.[93] From 1991 onwards Nortel obtained the benefit of the expertise at STC's sites and used it to produce optical transmission technologies and products that allowed the Group to expand in its existing markets and enter new markets around the world.

100.    As explained by Peter Newcombe, Nortel's President of Carrier Networks for EMEA from 2004 to 2009, NNUK employees worked on optical transmission systems and products from 1991 onwards, e.g. developing the technology for Nortel's 10 gigabit per second optical transmission system. He states that the contributions from STC in the form of products, laboratories and personnel played an important part in the success of Nortel's global optical business in the 1990s. Nortel increased the revenue of its optical business from around $10m per year in the early 1990s to some $10bn per year by the end of that decade, resulting in profits and further acquisitions.

_____

[92] Bundle A/Tab 10/Brueckheimer/ paragraphs 59-61.

[93] Bundle A/Tab 4/ Ball/ paragraph 17.

Darryl Edwards, Nortel's President of Carrier Sales for the first half of 2009 and President of EMEA from 2006 to 2008 supports and adds to this picture, stating that the foundations for Nortel's optical revenues in the USA, which produced the largest revenue of any country for Nortel, were laid by the acquisition of STC in 1991.[94]

101.    By 2000, the Nortel Group described itself as having market leadership in EMEA in the sale of optical networking systems in the service provider and carrier segment.[95] This period includes the sale of six optical transmission networks by Nortel to WorldCom in EMEA at a price of around $25m each. All of these were designed and manufactured and had components configured and tested by employees from NNUK, whose staff also led the installation.[96] By 2003, the Group described itself as a leading provider of optical networking products to service providers and enterprises to the global market.[97]

NNUK R&D: (2) Adaptation of DMS

102.    Nortel's Digital Multiplex System ("DMS") portfolio is a family of switches that control the routing of telephone calls and thereby deliver local and long distance voice services for telecoms operators. This portfolio was developed in North America to ANSI technical standards and enjoyed success in that market.   In order for DMS products to be sold worldwide however, it was necessary to convert DMS products to other international standards and in particular, the European ETSI standards.[98]

103.    NNUK played an important role in the conversion of DMS products from ANSI to ETSI standards. NNUK engineers also developed software for a

---

[94] Bundle B/Tab 2/Newcombe/ paragraphs 13-14 & 17; Bundle B/Tab 5/Edwards/ paragraph 38.

[95] NNC's Form 10-K filing with the US SEC for 2000 **[B3/T5/pp.1084-1087].**

[96] Bundle B/Tab 8/Howard/ paragraphs 14-19.

[97] NNC's Form 10-K filing with the US SEC for 2003 **[B3/T6/p.1117].**

[98] Bundle A/Tab 8/Hall/ paragraphs 40-44.