European version of the DMS 100, called the "DMS 100 Europe". Nigel Rees, Nortel's Head of International Switching from 1995 to 1998, recalls that this proved to be a capable and popular product. In addition to its adaptation of DMS products, NNUK staff also developed new software that enabled Nortel dramatically to reduce the cost of introducing the switches to individual countries.[99]

104.    The conversion of DMS ANSI compliant products to ETSI compliant variants was important for the Nortel Group in two respects.  It opened up new markets and customers to Nortel, and assisted in retaining the Group's existing customers in the US and Canada as they were expanding their business outside North America.[100]   Examples of US customers benefiting from NNUK development of the DMS to meet ETSI standards include WorldCom, a customer of Nortel based in the US, which wanted to expand into Europe. NNUK supported this expansion with the adaptation of Nortel's DMS switch to ETSI standards for WorldCom.  This work was done at a loss but Nortel's CEO took the decision to bid at a loss-making figure since it would allow Nortel to foster relationships with WorldCom in the USA.[101]

105.    As of the year ended 2008, Nortel had deployed over 7,200 DMS products worldwide.[102]

NNUK R&D: (3) Next Generation Networks

106.    The term Next Generation Networks ("NGN") describes the evolution in telecommunications from "circuit" based technology to "packet" technology. In circuit based telecommunications systems a circuit means that a fixed amount of resources are secured between two communicating points for the duration of a telephone call.  Circuits were originally designed only for voice

---

[99] Bundle A/Tab 1/ Rees/ paragraph 21.

[100] Bundle A/Tab 8/Hall/ paragraph 39.

[101] Bundle A/Tab 1/Rees/ paragraphs 25-29; Bundle B/Tab 8/Howard/ paragraphs 20-21.

[102] Figure per Nortel CVAS presentation, undated, **[B3/T7/pp.1174 & 1176]**.

communication. They restrict the transmission of more general media as well as a severe waste of resources when the supply of information is not continuous (e.g. when web browsing).

107.    "Packet" technology means that information is formatted into "packets" which can be routed individually through a system, removing the need to keep circuits open in order to communicate.

108.    As a phrase, NGN covers a variety of products and technologies, including:[103]

108.1.    the CS2000 switch that NNUK developed as the successor to the DMS;

108.2.    the concept of phantom trunking, patented by individuals in Harlow and Maidenhead in around 1997;

108.3.    the concept of Call Servers using switched network signalling, jointly patented by NNUK's engineers in Maidenhead and Harlow; and

108.4.    the ASIC silicon devices invented and patented by leading Nortel engineer and NNUK employee Simon Brueckheimer and his team in Harlow that process multiple voice circuits through a network.

109.    These technologies and products are described in detail in Appendix 2. Their significance to the Nortel Group is in their contribution both to immediate sales revenue and to customer retention. The ASIC silicon devices referred to above formed essential parts of Nortel's Media Gateways, which allowed products that had been sold for circuit based systems to be converted to packet based transmission without expensive changes of hardware. Simon

---

[103] Bundle A/Tab 10/Brueckheimer/paragraphs 18-20.

Brueckheimer describes this as vital to Nortel's engagement with AT&T in 1997 and other major carrier bids that followed.[104]

110.  CS2000 generated worldwide sales for Nortel. It was reported by Nortel in 2002 that it was Verizon's largest softswitch vendor, with multiple solutions deployed across the United States.[105]  Nortel's CS2K was part of the backbone of Verizon's US nationwide packet network.  Its CS2K softswitches typically controlled more than 3.8 million packet trunk and line ports, with the capacity to deliver several million more.  CS2K is a global Nortel product that began as a development by NNUK engineers and depends on concepts devised by NNUK employees in Maidenhead and Harlow, employees that now hold the patents for them. Its revenues have benefited the Targets since 2002.

NNUK R&D: (4) Media Gateways

111.  Softswitches such as the CS2K allow routing of transmissions through a network. However they require products known as Media Gateways to form part of that network in order to provide the "switching fabric" for the switch to operate. This fabric refers to the connection that a Media Gateway provides between old circuit based networks and new IP or ATM networking, both of which were packet based. A diagram showing this is at p.2 of the 27 page Nortel Product overview of the CS2000.[106]

112.  Many if not all of the early CS2K switches were supplied with Media Gateways produced by Nortel and relying on silicon chip designs invented by Simon Brueckheimer in the Harlow labs in the mid 1990s. These Gateways were known as MG4000 and Passport Voice Gateway. The silicon chip designs performed the transformations necessary between the old-style circuit based networks known as the Public Switched Telephone Network

---

[104] Bundle A/Tab 10/Brueckheimer/paragraph 31.

[105] Nortel Press Release - 14 December 2005 **[B3/T8/p.1179]**.

[106] Nortel Product Overview of CS 2000 Switch **[B3/T9/p.1183]**.

("PSTN") and the new packet based ATM networks. These gateways allowed Nortel to offer customers the ability to retain existing hardware and PSTN networks, but benefit from the improved use of resources that packet based networks offer (since transmission by a circuit requires the circuit to be kept open for the duration of e.g. the telephone call. Transmission by packet avoids this constant use of resources, which are wasted when the supply of information is not continuous, e.g. when web browsing).[107]

113.    NNUK continued to be involved in the R&D of Nortel's Passport product range. Harlow provided the optical interface for the Magellan Passport product, which generated $300m of sales per annum in the European market in the late 1990s.[108] In March 1999 Nortel made available version 1.0 of the Passport 8780 in North America.  NNUK was responsible for the development of the ETSI interfaces that were rolled out with release 1.2 of the Passport 8780 in the Autumn of 1999 and successful trials were run with a number of European and global key customers including: Telecom Development in France, Global One in Australia, and Airtel in Spain.[109] NNUK's work on Passport products in the year 2000 is evidenced by the PowerPoint presentation used by Mr Hall (Nortel's EMEA CTO from 2003 to 2008) and exhibited to his witness statement showing the projects worked on by all of Nortel's European R&D laboratories, and the Harlow laboratory report for that year.[110]

114.    In addition, NNUK's site at Harlow contributed significant fundamental research leading to a patented method for delineating cell boundaries when packets of data are transmitted over ATM networks. The standard to which this patent relates is used by every ATM interface, and Nortel has taken patent infringement action based on this patent. ATM interfaces developed at

---

[107]Bundle A/Tab 10/Brueckheimer/paragraphs 29-30.

[108] Bundle B/Tab 4/Collins /paragraph 24.

[109] Harlow Lab Report 2000 **[B3/T10/p.1219]**.

[110] Bundle A/Tab 9/Exhibit GSH1. Harlow Lab Report 2000 **[B3/T10/p.1219].**

48

Harlow are likely to have formed part of every Passport 7000 product sold by Nortel.[111]

NNUK R&D: (5) Wireless

(a) GSM

115.    From 1997 the Group supplied a full portfolio of solutions for GSM networks.  GSM is a second-generation ("2G") technological standard for mobile phone systems. As described by Michel Clement in his witness statement in support of the administration application by NN France, GSM is the common standard for wireless networks principally throughout Europe, but also elsewhere. As noted by Tim Watkins, GSM and its successor wireless technology UMTS (Universal Mobile Telecommunications System) has gained approximately 50% of the market in the USA. In around 1999 Nortel had 34% of the GSM market in the USA, leading to revenues between $1bn and $2bn per year.[112]

116.    NN France is responsible for the procurement of GSM products throughout the Nortel Group.[113] The pre-eminence of Nortel's French operations in producing GSM technologies dates from 1992-1993 and a joint venture ("JV") between Nortel and the company that became Lagardere. This JV was called Nortel Matra Cellular SA ("Matra") and developed the Radio Access Networks for GSM, with considerable assistance from NNUK employees.[114]

117.    NNUK also contributed the part of Nortel's GSM network product called a Home Location Register ("HLR"). This is a fundamental element in a GSM network which identifies the location of users when they access the

---

[111] Bundle A/Tab 10/Brueckheimer/paragraphs 31 & 44.

[112] Witness Statement of Michel Clement, director of Nortel Networks SA, 14 January 2009, paragraph 10 **[B4/T1]**; Bundle B/Tab 6/ Watkins/ paragraph 72.

[113] Witness Statement of Michel Clement, 14 January 2009, paragraph 10. **[B4/T1].**

[114] Bundle B/Tab 6/ Watkins/ paragraphs 45-8.

network and ensures appropriate call routing across the network.[115]  In the words of Geoff Hall *"It is not possible to build a GSM network without a HLR."*[116]

118.    NNUK staff in Maidenhead built the entirety of Nortel's HLR for GSM. David Price, a NNUK employee, was part of the UK team of around 60 people working on the research and development of the GSM HLR product. [117] Partly as a result of their work and expertise on HLR, the Maidenhead R&D site in the UK was subsequently made a Centre for Excellence.[118]

119.    Mr Price also describes his work on disaster recover solutions for HLR products. These allowed a second HLR to take over if a network's primary one failed, avoiding loss of operational ability in the network. This product became particularly popular in the US after the terrorist attacks of 11 September 2001 and was a technology only offered by Nortel and Ericsson.[119]

120.    As a result of HLR product development in NNUK, GSM HLR products were sold to customers in Australia (c. 1992), Taiwan (c. 1993-94) and the US. Major customers in the US included: Cingular, T-Mobile and Nextel.[120]

   (b) ACE

121.    In 2008 Nortel's SEC filings announced the introduction of Agile Communications Environment ("ACE").[121]  This is a product that had

---

[115] Bundle B/Tab 1/ Price/ paragraph 11.

[116] Bundle B/Tab 6/ Watkins/ paragraph 62.

[117] Bundle B/Tab 1/ Price/ paragraph 6.

[118] Bundle A/Tab 8/Hall/ paragraph 64.

[119] Bundle B/Tab 1/ Price/ paragraphs 7 & 21.

[120] Bundle B/Tab 1/ Price/ paragraphs 23 & 27-28.

[121] NNC's Form 10-K filing with the US SEC for 2008 **[B3/T13/p.1251]**.

50

been invented and developed entirely in NNUK's laboratories in Maidenhead, from 2004 to 2008. In the words of its inventor, NNUK employee and deferred member of the Pension Scheme William Hern, ACE is "*a type of telecoms middleware that bridges the gap between the telephony and desktop IT domains. ACE is a software application which links the two together. ACE enables a customer easily to integrate diverse communication technologies using software*".[122]

122. ACE was originally conceived and developed in NNUK by William Hern and John Storrie. There were also a number of other software engineers/architects from Maidenhead involved in the prototyping and the development of ACE.[123]

123. In 2009 the Nortel Group collaborated with IBM to integrate ACE with IBM Lotus Sametime Unified Telephony to offer Enterprise customers advanced communications-enabled business applications. Nortel's General Manager for the Nortel-IBM Alliance said: "*Nortel ACE offers a solid return on investment to businesses by helping them respond quickly to changes in their environment, lower costs, drive productivity and expand revenue options.*" [124]

   (c) Smart Antennae

124. NNUK's team of engineers at Harlow were the only team in Nortel specialising in antenna technology (other than a small antenna facility at Paignton, which was wound down in the late 1990s). Harlow's scientists were recognised as experts in radio channel propagation, a technology which is fundamental to improving the performance of cellular radio systems, and Multiple Input Multiple Output technology ("MIMO"), a

---

[122] Bundle C/Tab 3/ Hern/ paragraph 21.

[123] Bundle C/Tab 3/ Hern/ paragraphs 24-27.

[124] Nortel News Release – 1 April 2009 **[B3/T12/p.1261]**.

technique for increasing the capacity and range of base stations used in wireless networks.[125]

125.    This expertise led to NNUK's staff producing smart antenna technology, increasing the range and capacity of mobile telephone base stations and thereby reducing the number needed in a wireless network. This technology was used in Nortel's GSM wireless networks as well as products built to North American standards and sold to American customers.[126]

126.    This technology included the AABS smart antenna. As described by Andy Jeffries, his team in Harlow led the development of the antenna for Nortel's AABS smart antenna product which forms part of Nortel's CDMA portfolio (sold mainly in North America). Work was carried out for Sprint, a US customer, in around 2006 that allowed Sprint to double the capacity of their base stations. Harlow also carried out work designing antennae for several Nortel wireless products which sold in their thousands, including WiFi mesh products & Flat plate antennae.[127]

NNUK R&D: (6): Centrex IP

127.    Centrex IP is a system that performs the function of a private telephone or telecommunications exchange for customers such as large banks or businesses, but by means of the internet. It connects to an existing DMS100 or CS2000 softswitch using an IP address, so that a user (e.g. one of the bank's employees) can be anywhere in the world but still able to connect to their own telephone line and into the private exchange.

––––––––––––––––––––––––

[125] Bundle A/Tab 5/Jeffries/paragraphs 12-13.

[126] Bundle A/Tab 5/Jeffries/paragraphs 23 & 33.

[127] Bundle A/Tab 5/Jeffries/paragraphs 33 & 37-8.

128.    William Hern, who was responsible for development, testing and field support for Centrex IP from October 2001 to spring 2004, describes the system as invented in Maidenhead in 1996-7. Geoff Hall confirms that it was invented exclusively in Maidenhead. Key software developers involved were Mr David Tubb, Mr David Relf, Mr Ian Barker and Mr Peter Jarvis.[128]

129.    Centrex IP reached the market in 1999/2000 from when it has been sold in the US and all over the world.[129]   The Group refers to the Centrex IP in its filings with the US SEC in both 1998 and 1999.

130.    The key customers of Centrex IP included First Data (US), Bell South (US), Tellus (US), Omnitel Italia, NTL (UK), BT (UK) and DWP (UK).  It was also sold via the CS2100 product (an Enterprise version of the CS2000) into many parts of the US Federal Government including the Secret Service, to Quantico and at least one US air force base. [130]

NNUK R&D: (7) Provider Backbone Transport

131.    In its filings with the US SEC in 2006, Nortel drew attention to a new technology, Provider Backbone Transport ("PBT"), that allows Ethernet networks to reserve end-to-end connections between two points in the network, enabling voice and other quality-sensitive content to be conveyed over an Ethernet. The SEC filing noted: "*innovative PBT, or provider backbone transport, technology developed by Nortel that can enable service providers and large enterprises to simply network management, redefine service quality and deliver substantial cost savings using Ethernet technology.*"[131]

---

[128] Bundle C/Tab 3/ Hern/ paragraph 62; Bundle A/Tab 8/Hall/ paragraph 61.

[129] Bundle A/Tab 8/Hall/ paragraph 61.

[130] Bundle C/Tab 3/ Hern/ paragraph 64.

[131] NNC's Form 10-K filing with the US SEC for 2006 [**B3/T13/p.1274**].

132.    PBT was invented in 2006 by three people from the UK (Mr Robert Friskey, Mr Nigel Bragg and Mr Simon Parry) and Mr David Allan, from Canada.[132] PBB (the new term for PBT) was ratified as an Institute of Electrical and Electronics Engineers ("IEEE") standard for the industry in August 2008,[133] giving Nortel acknowledged leadership and first mover advantage in this technology.

133.    A number of PBT Metro Ethernet contracts were won by Nortel with its US and Canadian based customers including Frontier, one of the US's largest rural communications providers, Bell Canada, and Verizon. In Asia, Nortel also won a number of PBT contracts with key customers including Shanghai Telecom and Mumbai's International Airport.

134.    A related technology: Provider Link State Bridging (PLSB) was also developed at the Harlow facility.  This enables provision of VPN networks over Ethernet networks.[134]

*The clear effectiveness of R&D in NNUK – the volume of patents – the STC inheritance*

135.    In an R&D driven industry such as telecommunications, patents play a vital role in protecting and generating revenues for a number of reasons:

135.1.    Patents are the primary mechanism for protecting intellectual capital. By getting key patents on a product or technology a company can prevent others from moving into that "market-space" quickly and so can preserve their revenue stream in relation to that product or technology. This can often be a vital head start in the market, particularly if the company is as result considered to be a market leader in that area.

---

[132] Bundle A/Tab 8/Hall/ paragraph 56.

[133] NNC's Form 10-K filing with the US SEC for 2008 **[B3/T11/p.1253].**

[134] Bundle A/Tab 10/Brueckheimer/ paragraph 50.

135.2.    Since a patent is property owned by the company in which name it is registered, the company can generate revenue from the licensing of the patented technology to other companies.   This is particularly important where a patent is considered to be "foundational" in the sense that the relevant technology relies on that patent to be developed and sold.  It is common in the telecommunications industry for companies to exchange patent portfolios rather than licence out individual patents. The better the portfolio of patents of a company the better its bargaining position in this type of patent portfolio exchange.

135.3.    A patent portfolio can also serve as a defence: if a company is accused of infringing another company's patent the two can often reach a negotiated settlement that will be to the benefit of the company which owns that patent.

135.4.    Finally, patents are important for a company to assert technological leadership.  The portfolio of patents owned by a company such as Nortel is important in building and maintaining a reputation as a leader in the industry.

136.  However, the obtaining of patents is a long and expensive process, typically taking about five or six years from submission to filing.[135]

137.  Nortel encouraged its employees and R&D teams to obtain patents. An incentive scheme was operated, and award ceremonies held to celebrate the obtaining of patents.[136] According to Nortel's Chief Technology Officer for EMEA as at December 2008, Geoff Hall, STL's Labs in Harlow had an excellent history of obtaining patents (particularly in the field of optical technology) and this continued after the acquisition of STC by the Nortel

---

[135] Bundle A/Tab 8/Hall/ paragraph 27.

[136] Bundle A/Tab 8/Hall/ paragraphs 30-31; Bundle A/Tab 10/Brueckheimer/ paragraph 54.

Group. He states that the work done at Harlow had one of the greatest patent per person ratio that he had ever come across.[137]

138.   In terms of the volume of patents generated in the UK, both the Harlow and Maidenhead Labs were significant contributors to Nortel's patent portfolio from the early 1990s. As far as Mr Hall was aware, NNUK operations produced substantially more patents "per head" than the Canadian and US Labs.[138]

139.   This conclusion is supported by an analysis of the number of patents obtained by Nortel in the UK, Canada, and the USA as compared with the R&D expenditure by each of the RPS entities. The relevant figures for the period 2003-2008 can be shown in tabular form:[139]

**R&D Productivity 2003-2008**



**Figure 2: Summary of Patents originated and obtained during 2003-2008**

---

[137] Bundle A/Tab 8/Hall/ paragraph 33.

[138] Bundle A/Tab 8/Hall/ paragraph 36.

[139] Figures for R&D Spend are taken from Nortel's filings with the US SEC and Nortel's records of patents; those for patents have been provided by Nortel to the Regulator.

| Country where invention orginated | Country where patent application was obtained | | | | | |
|---|---|---|---|---|---|---|
| | Canada | US | UK | ROW | Total | Total |
| Canada | 174 | 1,035 | 221 | 637 | 2,067 | 47% |
| US | 59 | 824 | 100 | 275 | 1,258 | 28% |
| UK | 42 | 341 | 114 | 250 | 747 | 17% |
| ROW | 2 | 74 | 51 | 218 | 345 | 8% |
| Total | 277 | 2,274 | 486 | 1,380 | 4,417 | 100% |

*NNUK provides management and head office functions for EMEA*

140.   As stated by John Doolittle in his Affidavit for the CCAA proceedings, the headquarters for Nortel's operations in EMEA is NNUK's offices in England.[140] The function of NNUK as headquarters for Nortel's entities in the EMEA region is explained at length in the witness statement of Sharon Rolston dated 14 January 2009. Paragraphs 15 and 109 to 207 of that witness statement set out details of NNUK's provision of head office functions for the EMEA entities, including the Targets situated in EMEA.[141] As stated at paragraph 30 of that witness statement, as a result of the acquisition of STC NNUK became the largest Nortel operation in the EMEA region as well as the centre of operations, making the vast majority of significant decisions for the EMEA Companies and performing head office functions. Since that time the majority of the EMEA Companies have operated as sales centres within their state of incorporation.[142]

141.   The following paragraphs are intended to provide a brief outline of the head office functions provided by NNUK to the rest of the EMEA region. The provision of these functions constitutes a benefit of significant value received by the EMEA entities, providing coordination to the management of the region and removing the need for the individual entities to provide these functions themselves.

---

[140] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraphs 25 & 27 **[B1/T1]**.

[141] **[B1/T2]**.

[142] Rolston/ paragraph 30 **[B1/T2]**.

142.    The majority of the Targets based in EMEA are in administration in the UK. Those that are not are part of Nortel's EMEA region, managed form the UK. Each EMEA entity in administration made an application to the English High Court on 14 January 2009 for which they submitted a witness statement in the name of a company director that described the companies as effectively managed from NNUK's office in Maidenhead. These witness statements concluded by confirming that the companies' "*central management and control is directed from England, where all major decisions are made, that this is ascertainable by persons with whom the [companies] carry on business*" and that in the circumstances the directors of the company believed that the company's centre of main interests ("COMI") was in England.[143]

143.    Sharon Rolston has stated that the COMI of the EMEA Targets that sought administration orders, and other EMEA companies including the remaining EMEA targets (defined by her as "EMEA Companies") is in England for 13 separate reasons:[144]

143.1.    senior management for EMEA is largely located in England at NNUK's Maidenhead campus;

143.2.    this senior management make the vast majority of significant decisions in respect of the operations of the EMEA Companies;

143.3.    the senior management of all key primary functions (i.e. sales, treasury, legal and human resources) required for the operation of the EMEA region are located in England;

143.4.    significant decisions in relation to sales and dealings with customers are largely made in England;

---

[143] See e.g. paragraph 48 of the witness statement of Sharon Rolston, director of Nortel Networks (Ireland) Limited and paragraph 43 of the witness statement of Michel Clement, director of Nortel Networks S.A., both dated 14 January 2009, in support of those companies' applications for administration orders in England **[B4/T1 & B4/T2].**
[144] Rolston/ paragraph 15 **[B1/T2]**.

58

143.5.    obligations to suppliers are subject to approval processes conducted and managed in England, a process of which the majority of suppliers are thought to be aware;

143.6.    management supervision and decision-making in relation to taxation of the EMEA Companies is made in England;

143.7.    finance and control functions are run from England;

143.8.    human resources for EMEA are supervised and run from England;

143.9.    decisions in relation to settlement of intercompany accounts are made by the EMEA Treasury team in England

143.10.    All EMEA senior legal decisions are made in England;

143.11.    all matters in relation to compliance, ethics and corporate security for the EMEA region are dealt with and managed out of England

143.12.    the EMEA leasehold portfolio is managed through a relationship corporate real estate team located in England; and

143.13.    the treasury and banking functions for the EMEA Companies are managed out of England.

144.    In addition to the above it should be noted that NNUK's operations in Northern Ireland (at Monkstown) deal with and resolve all issues in relation to the supply of products to the EMEA Companies.[145] All Nortel products supplied to the EMEA Companies are supplied from Monkstown.[146]

145.    It is significant that the benefit provided to the EMEA Targets extends beyond the provision of head office and management functions, to the management of customer relationships and input into customer bids. As set out in paragraphs 140 to 143 of Rolston, the Group's approval process for customer contracts in EMEA is managed out of England and covers "the contracting life-cycle". This process was implemented by EMEA senior management based in England and approval from England will be required

---

[145] Rolston / paragraph 79 **[B1/T2]**.

[146] Bundle A/Tab 8/Freebairn/paragraph 8.

for "certain aspects of most transactions", such as customer credit. Ms Rolston concludes that it is "*highly unlikely therefore that an EMEA Entity could complete a proposal without approval and input from EMEA Senior Management based in England.*"[147]

146.    Once bids are successful, management of customer relationships also achieved with significant input from NNUK. As stated at paragraphs 144 and 148 of Rolston, Darryl Edwards (President of Sales for EMEA and a senior employee of NNUK) is responsible for setting EMEA sales strategy and has a long term relationship with over 30 customers, and a strong relationship with several new ones, who will often contact him directly. Mr Edwards has confirmed to Sharon Rolston that most customers recognise that EMEA Senior Management in England is where all key governance and decision making resides and has always resided over the last 16 years. They would also understand that England is the centre of operations for the EMEA companies and is the point for the resolution of serious issues in respect of customer relationships.[148]

147.    In addition to these roles, NNUK employees provide the functions of legal support, compliance, audit, finance, tax, HR, banking and treasury and real estate management. As for the latter, no decisions on real estate can be taken locally as they are all managed through the real estate team in England.[149] It should be noted that NNUK employed the following percentages of the whole Group's management and administration employees:[150]

> 2000 – 11%
>
> 2001 – 13%

---

[147] Rolston/ paragraph 143 **[B1/T2]**.

[148] Rolston/ paragraphs 148 & 149 **[B1/T2]**.

[149] Rolston/ paragraph 206 **[B1/T2]**.

[150] Functional Analysis 2004, **[B2/T6/pp.895-896].**

2002 – 14%

2003 – 15%

148. As of 31 December 2007, NNUK employed 401 of the Group's 4,614 Sales & Marketing employees, 741 of the Group's 7,721 Operations employees and 349 of the Group's 3,849 Corporate Services Employees.[151]

149. In summary, the EMEA Targets in administration have each confirmed in the witness statements filed by their directors in January of 2009 that their head office functions, management and control are based in England. Sharon Rolston's witness statement confirms that the same applies to the other Targets that form part of Nortel's EMEA region, but are not in administration. These are functions of significant value, provided by NNUK to the benefit of each of the EMEA Targets. The extent of these functions is such that each EMEA Target in administration was able to submit that its centre of main interests was located in England, such that the English court could make an administration order in respect of them.

*The entity of NNUK*

150. In June 2009 the Administrators of the EMEA entities stated to the English High Court that "*the Nortel Group operated along global business lines and not generally by legal entity…*".[152] This was certainly the case for NNUK. The Board Minutes of Nortel Networks UK Limited from the date of its incorporation until 1 August 2008 are exhibited in support of this Warning Notice.[153] The Minutes of the first meeting of the Board of Nortel Networks UK Limited ("the Board") record the appointment by NNC of a director, Mr Hungle, pursuant to Nortel Networks UK Limited's Articles of Association. The

---

[151] 2008 APA Application, Exhibit E-1 [**B2/T5/p.741**].

[152] Third witness statement of A Bloom, 19 June 2009, paragraph 30 [**B4/T3**]..

[153] [**B3/T15 to T32**].

same Articles were relied on by NNL in May 2000 to appoint 5 directors to the Board. These Articles allowed the "Parent Company" (as defined) of Nortel Networks UK Limited to:

150.1.    appoint directors to the Board (Article 70);

150.2.    approve the appointment of non directors to act as alternate directors (Article 66(1)); and

150.3.    revoke appointments of alternate directors (Article 66(4).[154]

151.    The Board did not consist of the individuals who ran the business of the Group in the UK or EMEA (Darryl Edwards was not appointed a director), nor did members of the Board need to be important in the Group's operations.[155] Gareth Pugh, Director of NNUK from 2003 to 2005, stated that the Board was not important in the management of the UK business other than to the extent it was required to fulfil a statutory function.[156] Board members in recent years have been drawn from legal or financial functions (such as Sharon Rolston & Simon Freemantle).

152.    The minutes of Board meetings can be divided into those for the period up to 28 May 2002, and those thereafter. During the first period a number of Board meetings were held to ratify share transactions associated with the Group's reorganisations and to execute certain agreements. The only sales of assets during this period, being sales of certain businesses in 2001, were reported to the Board on 29 August 2001 as transactions that had been "approved by the senior management of Nortel Networks Corporation" and were thereafter approved by the Board.[157]

---

[154] Articles of Association of Nortel Networks UK Limited, incorporated under the name Nortel Networks Holdings Limited [**B3/T14pp.1297-1321**].

[155] Bundle A/Tab 4/Ball/ paragraph 48.

[156] Bundle A/Tab 2/Pugh/ paragraph 21.

[157] Minutes of Board Meeting of NNUK, 29 August 2001 [**B3/T19/p.1340**].

153.    From 21 June 2002 Board meetings were held roughly every year and simply performed routine functions. As is stated in the second paragraph of the Directors Report included with NNUK's Financial Statements for the years ended 31 December 2007 and 2006,[158] "*the majority of the management and analysis of the group's operations is not performed on an individual country basis. For further information refer to the 10-K filings of Nortel Networks Corporation*". The Board met only nine times between 21 June 2002 and 1 August 2008. These meetings almost invariably only confirmed the Minutes of the previous year's meeting, approved the accounts and Report of Directors, approved the execution of a Letter of Management Representation proposed by the auditors, and convened an Annual General Meeting after notice had been served on the one shareholder. The only matters voted on that do not fall into these categories are the entering into new banking facilities in October 2005, the approval of a loan agreement and Share Purchase Agreement in June 2003 (both of which had already been concluded in April 2003), and the entering into the Project Swift transaction described below. The Minutes of Board meetings contain no discussion of the management of the business of Nortel Networks UK Limited or its assets, issues regarding redundancies (at a time that Nortel Networks UK Limited was reducing headcount from 12,440 full time employees in 2000 to 2,054 in 2007[159]), or the future strategy to be adopted.

*Project Swift*

154.    As at the date of their administrations, NNUK was the parent of all EMEA Targets save NN France, NN France SAS and NN (Ireland) Ltd. This had been the legal position since 31 December 2007, when the entire shareholding in a company called NNIFH BV was transferred from NNL to

---

[158] **[B4/T6/p.1630]** & **[B4/T9/p.1860]**.

[159] Figures from Functional Analysis 2004 **[B2/T6/p.815]** and 2008 APA **[B2/T5/p.610]**.

NNUK. NNIFH was the holding company for the shares in a large number of Nortel Group subsidiaries, most of which were EMEA subsidiaries.[160]

155.    NNUK acquired the entire issued share capital of NNIFH from NNL for £327.6m. The purchase price was settled by a reduction in the balance outstanding under an interest free "loan" from NNUK to NNL.[161] The transaction was known as Project Swift.

156.    The interest free loan arose by NNL not paying the inter-company balance that it owed to NNUK as a result of intra-Group transactions between the two entities. This resulted in an inter-company trade balance that built up over time due to its non payment. This balance stood at around £467m at its height in late 2007. No other entity had such a large accrued balance owed by NNL, although NNI was on occasion owed significant amounts by NNL due to both trade balances and bond issues.

157.    NNL was the Head Office of the Group and incurred significant operating expenses, but earned comparatively little revenue. NNUK has therefore supported it financially, as has NNI.

158.    The NNUK to NNL "loan" was interest free, unlike the loans made by NNI to NNL.[162] When it became clear to the Group in 2006 that the tax "shelter" that had been afforded by NNUK's accrued tax losses would soon come to an end, and NNUK would have to start actually paying tax on the deemed interest on the NNUK–NNL loan, a solution was sought to reduce the amount of the loan.[163]

---

[160] 2008 Functional Analysis, Appendix J [**B2/T5/p.767**].

[161] NNUK financial statements to 31 December 2007 [**B4/T6/pp.1630 & 1652**].

[162] See Revolving Loan Agreement between NNL & NNI, dated 21 March 2008 [**B3/T33**] and the Revolving Loan Agreement between NNL & NNUK, dated 10 September 2008 [**B4/T5**].

[163] Minutes of Trustee meeting 17 April 2007, paragraph 3.2 [Exhibit CMG1, p.351; Bundle D/Tab 2].

64

159.   It was decided that NNL would sell to NNUK its 100% share holding in NNIFH BV. This resulted in NNUK taking ownership of illiquid assets in the form of subsidiary companies, whose value depended on the continued trading of the Group and the continued use of each company by the Group for distribution purposes.

160.   This should be compared with the action by NNL, also in December 2007, to repay part of its loan to NNI in cash. Some $275m was paid from NNL to NNI in cash in this month, with the result that the outstanding loan balance on NNI's interest bearing loan to NNL decreased from $410m on 17.12.07 to c.$136m on 31.12.07.[164] Although this loan balance increased again thereafter, it amounted to the lesser sum of $295m when NNL entered insolvency on 14 January 2009.[165] At the time that NNI was receiving cash from NNL in part repayment of its loan, NNUK was treated differently and received shareholdings in subsidiaries that at all times remained under the ultimate control of NNC/NNL and were assets that could never realistically be realised by NNUK. This differential treatment was despite the description of both loans to NNL (by NNI and NNUK) in their documentation as "Revolving" loan agreements. In practice, NNUK's was a steadily increasing receivable that was part paid off in illiquid assets.

### (7)The Downturn of the Global Group

161.   The Nortel Group reached its peak in 2000. Its annual revenue reached a record high of over US$30 billion, corporate acquisitions of over US$20 billion

---

[164] Figures given by Exhibit to Revolving Loan Agreement between NNL & NNI, dated 21 March 2008, **[B3/T33/p.1397]**.

[165] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 63 **[B1/T4]**.

were made and the Group employed nearly 93,000 employees. NNC's market capitalisation was over $250 billion.[166]

162. With the bursting of the high tech (or "dot.com") bubble in early 2001, the Nortel Group began to face major problems.  In its SEC filings, NNC reported a rapid and increasingly severe downturn in the US economy in the first quarter of 2001, affecting demand for the Group's products and services and increasing competition. John Doolittle reported in his Affidavit for the CCAA proceedings that the capital expenditure levels of many of the Group's customers began to decrease substantially in 2001. However he stated that at the same time R&D continued to expand as Nortel and its competitors tried to adjust to a rapidly changing technological landscape.[167]  The Group anticipated that the downturn could affect economies in Canada, Europe and other geographical regions in which the Group conducted business.

163. To address its difficulties, the Group adopted a major restructuring plan in 2001. As a result of the restructuring, the Group reduced its workforce from approximately 94,500 at the start of 2001 to 52,600 by the end of the year, a reduction of over 44%.  The workforce reduction was primarily in the UK and North America and extended across all Nortel business segments.[168]  The workforce reduction continued during 2002, and was followed by restructurings in 2004, 2006, 2007 & 2008.[169]

164. The restructuring implemented in 2001 was intended "*to streamline our operations and activities around our core markets and leadership strategies.*"[170] By 2008 Nortel had outsourced nearly all of its manufacturing &

---

[166] 2004 Functional Analysis [**B2/T6/p.903**]; Affidavit of John Doolittle in CCAA proceedings, 14 January 2009, paragraph 12 [**B1/T1**].

[167] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 12 [**B1/T1**].

[168] NNC's Form 10-K filing with the US SEC for 2001, Auditor's Report [**B3/T34/p.1420**].

[169] Affidavit of John Doolittle in the CCAA proceedings, 14 January 2009, paragraph 13 [**B1/T1**].

[170] NNC's Form 10-K filing with the US SEC for 2003 [**B3/T6/p.1170**].

production work to a number of suppliers (the major one being Flextronics Telecom Systems Ltd). The main exception to the manufacturing and supply chain sites that were sold by Nortel in this period was Monkstown in Northern Ireland. As described by its site leader, John Freebairn, Monkstown was a manufacturing site until around 2000 but since then has been the Nortel Group's supply hub for the EMEA region and has also supplied Nortel products to customers in North America, Asia and CALA. This role in the supply chain process involved "*forecasting and inventory management, dealing with customer orders .. , arranging for the supply of the product to Monkstown where it is usually configured and tested, and organising the shipping of that product to its customer destination.*"[171]

165.    By 2008 Nortel had also consolidated its R&D work in fewer locations, sold off non-core businesses such as its UMTS (United Mobile Technology System) unit in 2006, expanded the number of joint ventures and alliances with other large organisations and in general had carried out "*continued reorientation of the Nortel Companies from a traditional supplier of telecommunications equipment to a global leader in cutting edge networking hardware and software solutions.*"[172]

166.    Despite these changes, Nortel's operating costs have exceeded its revenues for most of the last few years. In January 2009 Nortel's Treasurer listed the factors contributing to this as: "*competitive pressures, an inability to reduce operating expenses fast enough, the incurrence of costs relating to restructuring efforts, significant competitor and customer consolidation, customers cutting back on capital expenditures and deferring new investments and the poor state of the global economy.*"[173] These pressures, coupled with a limit in Nortel's access to capital markets caused by a

---

[171] Bundle A/Tab 6/Freebairn/paragraphs 8-9.

[172] Declaration of John Doolittle in the Chapter 11 proceedings, 14 January 2009, paragraph 12 [**B1/T3**].

[173] Declaration of John Doolittle in the Chapter 11 proceedings, 14 January 2009, paragraph 12 [**B1/T3**].

reduction in its credit rating (as a result of its need to restate financial results from 2000 to 2004) meant that by January 2009 Nortel had decided to commence a financial and business restructuring within the framework of insolvencies in several jurisdictions.

## (8) The Insolvencies

167.   On 14 January 2009, NNC and NNL, the ultimate parent companies of the Nortel Group, and certain of their subsidiaries incorporated in Canada, filed an application in the Ontario Superior Court of Justice under the Companies Creditors' Arrangement Act seeking relief from creditors.  The Canadian court granted the application and the Canadian court now supervises the Canadian debtor companies in their management of their properties and business. Ernst & Young Inc was appointed by the Canadian court as the Monitor of the Canadian debtor companies.[174]

168.   Also on 14 January 2009, NNI and certain of its subsidiaries incorporated in the USA filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.[175]

169.   Also on 14 January 2009, NNUK and 18 of the Nortel Group's EMEA companies (most of which are NNUK subsidiaries) were placed into administration by the High Court of Justice of England and Wales pursuant to the Insolvency Act 1986.  The EMEA companies in question include NN France and NN Ireland.  Individuals from the firm of Ernst & Young LLP were appointed as Administrators.[176]  It appears from the Chapter 11 filings that the

---

[174] Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 4 **[B1/T6]**.

[175] Statement of NNUK, 22 June 2009, in support of a motion by NNI in the Chapter 11 proceedings **[B1/T7/pp.462-463]**; Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 5 **[B1/T6]**.

[176] Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 6 **[B1/T6]**.

Administration Orders for the EMEA entities were regarded as a "*consequential filings*", i.e. consequential upon the Canadian and US creditor protection proceedings.[177]

170.    On the same date two other Nortel EMEA Companies entered the Israeli equivalent of administration. These were Nortel Communications Holdings (1997) Limited and Nortel Networks (Sales and Marketing) Limited.

171.    On 28 May 2009, the Commercial Court of Versailles, France, ordered the commencement of secondary insolvency proceedings in respect of NN France.  However, the English Administration proceedings remain the main proceedings in respect of NN France.[178]

172.    On 14 July 2009, NN CALA filed a petition with the Delaware Court seeking relief under Chapter 11 of the Bankruptcy Code. On 15 July 2009, the Court entered an Order approving the joint administration and consolidation of NN CALA's case with the Chapter 11 cases of NNI and its affiliated subsidiaries, and the application to NN CALA of certain previously entered orders in NNI's and its subsidiaries' Chapter 11 cases. Nortel Ukraine Limited is in liquidation in Ukraine.

**Pension Scheme**

173.    From 6 April 1989, the companies participating in the pension schemes that became the Scheme enjoyed a 13-year contribution holiday from 1 May 1989 until 30 September 2002,[179] although employees contributed around £104m during this period.[180] By the time that the holiday ended in mid 2002,

---

[177] Motion by NNI in the Chapter 11 bankruptcy proceedings, 14 January 2009, paragraph 21 **[B1/T4]**.

[178] Affidavit of John Doolittle in the CCAA proceedings, 22 June 2009, paragraph 8 **[B1/T6]**.

[179] See e.g. Actuarial Valuation Reports from 1990 & 2002 **[B4/T7/pp.1667ff. & B4/T10/pp.1899ff].**

[180] Bundle C/Tab 3/ Hern/ paragraph 80.

the Scheme had a deficit on the ongoing basis of £177m.[181] Watson Wyatt have estimated that:

173.1.    the value of this contribution holiday to the employer was £300m, that is, that the contribution holiday benefited the employer by £300m; and

173.2.    the value of the contribution holiday to the Scheme was £500m, that is, had the contribution holiday not been taken, the Scheme would have £500m more assets.

174.    Following discussion of the valuation results, the Company made a one off special contribution of £33m in October 2002.[182] However, in his Actuarial Valuation Report at 6 April 2002, the Scheme actuary emphasized that significant further deficit repair contributions would be needed on top of this lump sum payment were funding to be restored to 100% on an ongoing basis.[183] Despite this, NNC / NNL took the decision not to put in place any schedule of contributions that would commit NNUK to a programme of ongoing funding for the Scheme to restore it to a 100% funding level on the ongoing basis, but only made ad hoc contributions when it saw fit.[184]

175.    By the time of the valuation as at 5 April 2003 the size of the deficit had increased to £346m on the ongoing basis, and the actuary recommended annual contributions of £47m to redress the deficit. Despite this, NNC, NNL and NNUK were not willing to enter into a schedule of contributions to deal

---

[181] Report on the Actuarial Valuation as at 5 April 2002 [**B4/T10/pp.1899ff**].

[182] Bundle D/Tab 1/Gilchrist/ paragraph 28.

[183] Report on the Actuarial Valuation as at 5 April 2002 [**B4/T10/pp.1914-1915**].

[184] Bundle D/Tab 1/Gilchrist/ paragraphs 30ff; Bundle C/Tab 3/ Hern/ paragraph 80ff.

70

with the problem.[185] While contributions of around £60m were made in 2003, only £12m was paid in 2004 (plus £3m for enhanced early retirement terms).

176.    Following negotiation in 2005, NNC/NNL agreed to NNUK entering into a funding agreement (agreed in June 2005) to pay £10m shortly after June 2005, followed by annual contributions of £46m (of which £10m represented future accrual)- to be paid in quarterly instalments- for 2 years from 6 April 2005 to 5 April 2007.[186] However, it offered no comfort for funding beyond 5 April 2007 at all and it was clear to the Trustee that NNC / NNL was reluctant to make any form of commitment to pay contributions going beyond this.[187]

177.    The deficit increased further to £356m on the ongoing basis as at 6 April 2005.[188] The valuation report as at 6 April 2005 was finalized on 4 April 2006 and stated that a recovery plan would need to encompass annual deficit repair contributions of the following amounts, on top of the ongoing contributions for future accrual of approximately £10m per annum:

177.1.    £134m per annum for a recovery plan of 3 years;

177.2.    £103m per annum. for a recovery plan of 4 years;

177.3.    £85m per annum for a recovery plan of 5 years; and

177.4.    £64m per annum for a recovery plan of 7 years.[189]

178.    In response to this, and following lengthy negotiation by the Trustee:[190]

---

[185] Bundle C/Tab 3/ Hern/ paragraphs 80ff.

[186] Bundle D/Tab 1/Gilchrist/ paragraph 34.

[187] Bundle D/Tab 1/Gilchrist/ paragraphs 36-7.

[188] Report on the Actuarial Valuation as at 5 April 2005 [**B4/T11/p.1936**].

[189] Report on the Actuarial Valuation as at 5 April 2005 [**B4/T11/p.1938**].

71

178.1.    At NNC/NNL's instigation, NNUK agreed by funding agreement dated 21 November 2006 to make contributions between that date and 5 April 2008 of no less than £150m, followed by contributions from 5 April 2008 to 5 April 2012 based on an assessment of the deficit at 5 April 2008;[191]

178.2.    NNL guaranteed these ongoing funding obligations up to 30 June 2012 by guarantee dated 21 November 2006;[192]

178.3.    NNL guaranteed any section 75 debt trigged by Nortel Networks UK Limited by entering winding up (not other forms of triggering event) up to a limit of US $150m, by guarantee dated 21 December 2007.[193]

The guarantees of 21 December 2006 are not close to sufficient to meet the section 75 debt, and therefore a FSD against NNL will offer the Scheme significant extra potential protection and recovery.

179.    From 4 July 2006 until the insolvencies, quarterly contributions of £21.25m were made into the Scheme.

The Scheme's liabilities

180.    The upshot of the above is that the Scheme is left with a current deficit of:

180.1.    £2.1bn on the buy-out basis; and

---

[190] Bundle D/Tab 1/Gilchrist/ paragraphs 36-50.

[191] Funding Agreement in relation to the NNUK Pension Plan, 21 November 2006 **[B4a/T12/pp.1962-1984]**.

[192] **[B4a/T13/pp.1985-2018]**.

[193] **[B4a/T14/pp.2019-2035]**.

180.2.    £670m on the PPF basis.

181.   Of this, 55% relates to service before 1991, the date of the purchase of STC, and the remaining 45% to service after that date.

**The influence and control of NNC and NNL in relation to the Scheme**

182.   The significant employer-side decisions in relation to the Scheme, particularly in relation to funding, that would ordinarily be taken by a sponsoring employer were in fact taken by senior officers of the Nortel Group in Canada.[194] NNC and NNL wholly and directly controlled NNUK's activities and stance in relation to the Scheme. The position is set out in detail in the witness statements of:

182.1.   Mr Clive Gilchrist, the independent Trustee director from 3 July 1995 to 20 June 2007, and a company appointed trustee director since that date;

182.2.   Mr Gareth Pugh, who was Chairman from 2001-2005 of the UK Pension Fund Policy Committee ("PFPC"), the committee established to manage the scheme on the employer side;

182.3.   Mr Terry Faulkner, the Pensions Manager for the Scheme from October 1990 to 31 March 2001, and (as part of this role) secretary to the UK PFPC. Mr Faulkner was also Chairman of the National Association of Pension Funds (colloquially known as the "NAPF") from 2003 to 2005;

---

[194] Bundle D/Tab 1/Gilchrist/ paragraphs 14, 17 & 22.

73

182.4.  Mr John Hern, a member-nominated director of the Trustee from December 2002 to 18 October 2006.

183.  It was made clear to the Trustee on numerous occasions that important issues affecting the Scheme required approval by "Canada", meaning NNC / NNL[195] and that in practice- as opposed to in form- NNUK had no place in the employer side decision making structure:

183.1.  It was made clear that significant employer decisions to be taken in relation to the Scheme required approval from Canada, on the basis that NNC / NNL took a global approach to the management of its pension schemes in different countries;[196]

183.2.  This was particularly apparent in relation to funding of Scheme, where the Trustee met resistance to its funding proposals from the senior officers of NNC / NNL on the basis that the proposals were inconsistent with the Nortel Group's global approach;[197]

183.3.  Mr Pugh would attend Trustee meetings (as Chairman of the UK PFPC from 2001-2005) and act as conduit for information to senior managers of NNC / NNL;[198]

183.4.  Reflecting their appreciation of where the power lay on the employer side, where the decision was particularly important the Trustee would make direct contact with senior officers of NNC / NNL;[199]

---

[195] Bundle D/Tab 1/Gilchrist/ paragraph 17.

[196] Bundle D/Tab 1/Gilchrist/ paragraphs 17 & 19.

[197] Bundle D/Tab 1/Gilchrist/ paragraph 29.

[198] Bundle D/Tab 1/Gilchrist/ paragraph 20.1.

[199] Bundle D/Tab 1/Gilchrist/ paragraph 20.2.

183.5.    NNC / NNL's involvement was particularly apparent to the Trustee in

   (a) the proposal to close the Defined Benefit section to new entrants and open a Defined Contribution section for new joiners in 1999, which emanated from NNC / NNL;[200]

   (b) funding negotiations;[201] and

   (c) reviewing the Report of the 2003 Governance of the Plan, and commenting on it, purportedly on behalf of the UK PFPC.[202]

184.    Focusing on the employer side decisions, a committee was established as the UK PFPC, to act on its behalf in relation to the Scheme:

184.1.    This comprised (as explained by Mr Pugh, its chairman from 2001-2005, and Mr Faulkner) a number of members who were senior officers of Nortel Group entities based in Canada;[203]

184.2.    The Canadian members of the PFPC were invariably more senior than their UK counterparts and were usually senior officers of NNC or NNL;[204]

184.3.    Therefore, in reality the UK-based members of the Committee would only have a limited influence on the outcome of a decision if the Canadian members were in agreement;[205]

184.4.    Mr Pugh had no doubt that the North American officers were there with the authority of NNC and NNL to protect the interests of the Nortel Group as a whole rather than just NNUK;[206]

---

[200] Bundle D/Tab 1/Gilchrist/ paragraph 24.

[201] Bundle D/Tab 1/Gilchrist/ paragraphs 25ff.

[202] Bundle A/Tab 2/Pugh/ paragraph 65.3.

[203] Bundle A/Tab 2/Pugh/ paragraphs 59-60; Bundle C/Tab 1/ Faulkner/ paragraph 41.

[204] Bundle A/Tab 2/Pugh/ paragraph 62.

[205] Bundle A/Tab 2/Pugh/ paragraph 64; Bundle C/Tab 1/ Faulkner/ paragraphs 41.3.

184.5.  In practice, most important issues would have been discussed by the senior Canadian members prior to the meeting and it would be made clear to the Committee what their collective view was.[207]

185.  Turning to funding specifically, this was dealt with between NNC / NNL on the one hand (rather than NNUK) and the Trustee:

185.1.  It was NNC / NNL with whom the Trustee negotiated over the contributions in 2002 when a deficit of £177m had emerged, and it was NNC / NNL that took the decision at this stage not to resume paying regular contributions into the Scheme;[208]

185.2.  Equally, the 2003 funding negotiations were conducted between the Trustee (largely through Mr Gardener, its chairman) and NNC / NNL, in particular Mr Beatty, the then Nortel Group CFO, and it was NNC/NNL that took the decision to make ad hoc contributions rather than sign up to a programme of regular contributions;[209]

185.3.  Similarly, the 2004/5 funding negotiations were conducted by a Trustee working group, initially with Mr Kerr, the then CFO, and subsequently with Mr Poos, Nortel's Global Pensions Manager, both of whom acted on behalf of NNC and NNL, with no-one from NNUK playing any substantive part in the negotiation. Indeed, the Trustee actually went to Canada to present to NNC / NNL directly. Mr Poos emphasised that any funding agreement would have to be agreed by North America. Again, it was NNC / NNL which decided that NNUK

---

[206] Bundle A/Tab 2/Pugh/ paragraph 63.

[207] Bundle A/Tab 2/Pugh/ paragraph 64; Bundle C/Tab 1/ Faulkner/ paragraph 41.3.

[208] Bundle D/Tab 1/Gilchrist/ paragraph 28.

[209] Bundle C/Tab 3/ Hern/ paragraphs 80-90.