should sign up to a two-year funding agreement, and Mr Currie, then CFO of the Nortel Group, who signed the 2005 funding agreement and provided a letter of comfort.[210]

185.4.  Similarly, the 2006 funding negotiations were conducted with Mr Poos and Mr Currie, and it was Mr Currie that provided group financial projections to the Trustee in order to persuade them of the strength of NNUK's employer covenant as part of the group. Again, it was NNC / NNL with whom the negotiations over the credit protection that the Trustee was entitled to took place, and NNL who ended up offering the guarantee to the Trustee in order to support NNUK's funding commitments.[211]

**Jurisdiction under the Pensions Act 2004 ("the Act")**

*Occupational Pension Scheme*

186.  The scheme is an occupational pension scheme other than a money purchase scheme in accordance with section 43(1) of the Act.

*Connected & Associated*

187.  At the relevant time the Targets were all connected and/or associated to the employer in accordance with section 43(6)(c) of the Act. Further details are set out in Appendix 6, and at Appendix 3 is a corporate chart of the Nortel group. In accordance with the corporate structure, the ultimate parent of the Nortel group is NNC which owns all the shares in NNL, which in turn owns all the shares in both NNUK and NNI.  NNL owns 91.17% of the shares in NN

---

[210] Bundle C/Tab 3/ Hern/ paragraphs 91-102; Bundle D/Tab 1/Gilchrist/ paragraphs 29-35; Bundle A/Tab 2/Pugh/ paragraphs 77-80.

[211] Bundle D/Tab 1/Gilchrist/ paragraphs 36-50.

France, the parent of Northern Telecom France SA, which in turn owns Nortel Networks France SAS. NNL owns all the shares in Nortel Networks Ireland. Both these companies were operated and controlled in fact by NNUK and were part of Nortel's EMEA group of companies. NNUK owns all the shares in the other EMEA Targets, through its ownership of the shares in the holding company NNIFH BV. NNI owns the entire shareholding in NN CALA.

*Insufficiently Resourced*

188.    The insufficiently resourced test in section 44(3) of the Act has two financial conditions to satisfy at a "relevant time", one relating to NNUK and the other relating to one or more of its associates. The Regulator is of the opinion that these tests are satisfied and therefore that NNUK was insufficiently resourced as at 30 June 2008, which is the selected "relevant time" for the purpose of section 44.

189.    Taking the condition relating to NNUK first, in accordance with Regulation 12 of the Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the "FSD Regs"), the Regulator has deemed that the value of the resources of NNUK as at 30 June 2008 were $453m, which is significantly less than the 50 percent of the estimated section 75 debt (being $1,773m) threshold set out in 44(3)(b) of the Act. At pages 2124 to 2131[212] are copies of the correspondence a between the Regulator and NNUK where the Regulator invited NNUK to provide its own calculations as well as providing the documents and information NNUK relied upon in reaching its own calculation at the time. As NNUK stated in reply that it had decided not to provide an alternative calculation or to provide any information to support any alternative calculation, the Regulator is entitled to deem- and has deemed- the value of NNUK's resources in accordance with Regulation 12. In Appendix 4 the Regulator has in any event set out the way it has reached its

---

[212] **[B4a/T18/pp.2124-2129] and [B4a/T29/pp.2130-2131].**

calculation of the value of NNUK, relying upon the expert report dated 17 December 2009 provided by PriceWaterhouseCoopers ("PwC"),[213] but the Regulator considers that the Determinations Panel does not need to go any further than the deemed value set out above. To the extent that it does, Appendix 4 provides the relevant details of the calculation.

190.    The second condition requires there to exist a person who is an associate or connected with the employer and whose resources are not less in value than the difference between NNUK's resources and 50 percent of the estimated section 75 debt, or for there to exist two or more persons- associated or connected with each other- who together satisfy this test (sections 44(3A) and (3B)). The Regulator has chosen NNC to satisfy this test. In accordance with Regulation 12 of the FSD Regs, the Regulator has deemed the value of NNC's resources as at 30 June 2008 to be $5,308m, which is very considerably greater than the difference between NNUK's resources and 50 percent of the estimated section 75 debt ($1,773m).

191.    At pages 2132 to 2137[214] are copies of correspondence between the Regulator and NNC where the Regulator invited NNC to comment upon the calculations it had carried out and invited NNC to provide its own calculation along with all documents and information relied upon in support of any alternative calculation. In its letter of 16 September 2009 NNC elected not to provide any alternative calculation and additionally did not produce any information or documents in support of such an alternative calculation. Accordingly in accordance with Regulation 12 of the FSD Regs, the Regulator is entitled to deem- and has deemed- the value of NNC's resources. In Appendix 4 the Regulator has in any event set out the way it reached its calculation of the value of NNC relying upon the report provided by PWC, but the Regulator considers that the Determinations Panel does not need to go

---

[213] **[B4a/T15]**.

[214] **[B4a/T20/pp.2132-2136] and [B4a/T21/p.2137]**.

any further than the deemed value set out above. Again, to the extent that it does, Appendix 4 provides the relevant details of the calculation.

*Reasonableness*

**It is reasonable to issue an FSD – section 43(5)(b) and 43(7) of the Act**

192.   When deciding whether to issue an FSD, the Regulator must have regard to those matters which the Regulator considers are relevant and including where relevant the factors set out in section 43(7) of the Act. As is set out in detail in the factual background given above, the Group was run to optimise the performance of its business segments and paid no regard to the needs of the corporate entities. Accordingly the Regulator relies upon the global operation of the Nortel Group and in particular avers that relevant factors to consider when deciding whether to issue an FSD must include a view of the operation of the Nortel Group as a whole rather than any attempt to  separate and divide the Group into its various corporate entities. Such separation was not carried out during its operation, and is only now being carried out because the various insolvency regimes require such an exercise to be performed. However the Regulator considers that it is important for the Determinations Panel when viewing this case to deal with how the Nortel Group operated prior to the insolvencies when considering which, if any, of the factors in section 43(7) are relevant and also how best they apply to the operation of such a global and interdependent group as Nortel.

**The sub headings of Section 43(7) of the Act**

*The relationship which the Targets had with NNUK and whether the Targets had control within the meaning of section 435(10) of the Insolvency Act 1986 (section 43(7)(a) of the Act)*

193.   All the Targets are part of the Nortel Group, as is NNUK.  Up to the point of the insolvency proceedings on 14th January 2009, the ultimate parent NNC

80

had control (as defined by section 435(10) of the Insolvency Act 1986) over all the other Targets. NNC is the ultimate parent and accordingly NNC controls all the targets and NNUK at the same time. As the Nortel Group operated as one interdependent global group, the relationship and dealings as between the various Targets and NNUK were all controlled and determined by the ultimate parent, NNC.

194.    Although NNUK was the centre of EMEA operations and controlled EMEA, it had no independence to operate the EMEA region itself. Its officers all reported ultimately to executives of NNC or NNL in Canada. Additionally the business lines dominated and took precedence over any 'EMEA' decision or interest. However as the EMEA headquarters, NNUK operated the entire business of the Group in the EMEA region to the extent that the EMEA corporate entities themselves were ignored and business in that region was controlled by NNUK under the supervision of its parent. Accordingly, although NNUK subsidiaries were controlled by NNUK, to all intents and purposes, all the EMEA subsidiary companies as well including NN France, Northern Telecom France SA, Nortel Telecom International Limited, NN (Ireland) Limited and NN France SAS were controlled by the ultimate parent, which also controlled NNUK.

*The value of any benefits received directly or indirectly by the Targets from NNUK (section 43(7)(b)*

### The operation of the global group

195.    As the ultimate parent, NNC decided how the Group was run and how it operated as well as the use made of profits earned by any particular corporate entity, or more accurately profits attributable to particular business lines. The operation of the Group as one global entity clearly provided benefits for NNC and its immediate subsidiary NNL as NNC had the flexibility to determine where any spare funds would be placed, which business lines

would have increased budgets, and how the Group could be run in the most tax efficient way possible. The Nortel Group ignored actual corporate entities for operational purposes and benefited from being able to ignore to a large degree the specific needs of NNUK as the employer of a very substantial pension scheme which, from at least 2002, had a very serious and rapidly growing pension deficiency.

196.    Equally NNC/NNL decided and determined how to divide up the Group's business and profited from being able to present and be a worldwide market leader in its operation. As is set out below by way of certain non-exhaustive specific examples, NNC/NNL benefited from the position of NNUK the employer by utilising its staff on global matters and in some instances using the staff for the purposes of improving/increasing its North American business, in particular in seeking to increase its US business.

197.    NNC also decided and controlled the finances of the group as a whole. In order to fund its operation, NNL required substantial loans to be made to it. These loans were made from at least December 2003 by NNUK and from at least 28 March 2001 by NNI.[215] However the treatment of the repayment of these loans was not the same. NNC deliberately elected to repay the loans to NNUK by Project Swift being an illiquid asset transfer of ownership of the EMEA subsidiaries to NNUK. However during the same period over $275m was repaid to NNI in cash. Clearly there was substantial value to NNC/NNL in being able to control and operate the group as it elected so to do.

**The acquisition of STC**.

198.    As set out in paragraphs 34 to 43 above, the acquisition of STC, which was then the employer of the pension scheme which later amalgamated with

---

[215] NNI dated from Revolving Loan Agreement between NNL and NNI **[B3/T33]**; NNUK dated from Revolving Loan Agreement between NNUK and NNL **[B4/T5]**.

the Nortel pension scheme to become the Scheme, gave the Nortel Group the ability to access a larger and more varied market both in North America and in the rest of the world. Additionally, it was able to increase its profits and turnover by the acquisition of technology and more importantly by the acquisition of the extremely strong R&D teams which provided much needed experience in fibre optics as well as advanced technology. This also gave indirect benefits to other targets, NNI and NN CALA because the products, and R&D and general know how which Nortel acquired from STC, enabled the Nortel Group to expand rapidly into the Latin/South American market which was operated through NN CALA. Additionally certain of the technology such as GSM was developed and created by NNUK/EMEA and used to enable NNI to become a leader in the GSM market in the US as well as used to provide services on a worldwide basis to NNI's major clients, such as Sprint. These types of valuable benefits enabled the profits of both NNI as well as NN CALA to increase significantly. There were other valuable benefits relating to products and technology and know-how dealt with below.

**NNUK's R&D after the STC acquisition**

199.    The R&D work carried out in NNUK was well recognised. Although this built on the technology and products acquired with STC, it was also of vital importance to the Nortel Group and led to numerous patents and influence on industry standards bodies long after the acquisition. The research carried out at NNUK included 'blue sky' research known in Nortel as Advanced Technology, being research on a long term basis which might or might not lead directly to a product.[216] Members of the NNUK R&D team were part of various committees that developed industry standards. STC's work in project areas such as antennae was at least 10 years ahead of Nortel's, at the time of the acquisition of STC.[217]

---

[216] Bundle B/Tab 2/Newcombe/ paragraph 16.

[217] Bundle A/Tab 5/Jeffries/ paragraph 11.

**NNUK's management of EMEA Targets**

200.   NNUK ran and operated the entire EMEA region. This is clear from the fact that administration orders were made in relation to 18 corporate entities in the EMEA region on the basis that all these companies had their centre of main interests in the UK by reason of the operation and role of NNUK in this respect. The EMEA companies therefore benefited from the role undertaken and operated by NNUK enabling them to be an integral part of a larger organisation, to share the R&D and other services provided by NNUK. As part of EMEA, NNUK operated and ran one of only Nortel four purchasing hubs worldwide (at Monkstown in Northern Ireland) which was used by all EMEA entities as well as other corporate entities and businesses, such as NN CALA.[218]

**The use of NNUK employees to manage and carry out significant global operations**

201.   NNUK employees also held positions from about 1991 in the global operations of the Nortel Group although these persons remained employees of NNUK:

201.1.    Simon Freemantle was Director of Global Treasury Operations as at January 2009.[219] His team's functions included operating the cash pooling system, cash management system and inter-company settlements.[220] Global Treasury Operations was particularly important and

---

[218] See paragraphs 140-149 above, and the witness statement of Sharon Rolston, 14 January 2009, passim **[B1/T2]**.

[219] Rolston/ paragraph 200 **[B1/T2]**.

[220] Rolston/ paragraph 201 **[B1/T4]**; Powerpoint by Simon Freemantle showing operation of Inter-company Settlements **[B4a/T22/pp.2138-2143]**.

valuable to NNI given its large intercompany cash movements. The importance of the global Treasury function and the interdependence of all members of the Nortel Group and the value placed upon this function is clear from the NNI US bankruptcy proceedings and the first day motion sought at the time of filing for Chapter 11 protection seeking leave to enable the global Treasury function, including inter-company settlements, to continue in operation.[221]

201.2.    Mark Cooper has performed a global function as Assistant General Counsel, Employment Law from January 2001 to March 2009 (save 2 years from November 2002), and was also a NNUK employee. His team, ranging from 8 in 2001 to 6 in 2009, was based worldwide and reported to him in Maidenhead.[222]

201.3.    Malcolm Collins was President of the business segment called Enterprise Networks from the end of 2002 until 2005. Although based in Raleigh, North Carolina at this time he remained an employee of NNUK.[223]

202.    All of these global functions benefited all the Targets by reason of the global functions carried out.

203.    In addition to these individuals with global roles, a number of global customer accounts were managed by NNUK employees. For these customers, NNUK staff managed the customer relationship not only for

---

[221] Motion by NNI & other Nortel companies in Chapter 11 for an Order approving, (a) the continued use of the cash management system, bank accounts and business forms and (b) permitting continued inter-company transactions, 14 January 2009 **[B1/T4]**.

[222] Bundle B/Tab 11/ Cooper/ paragraphs 9 & 12; Rolston/ paragraph 198 **[B1/T2].**

[223] Bundle B/Tab 4/ Collins / paragraph 10.

dealings and sales in the UK or EMEA, but worldwide. Examples of these global customers are BT, Cable & Wireless and Vodafone.[224]

**Benefits to particular targets: NN CALA, NNI and EMEA Targets– products and services**

204.    In addition to the global role assumed by certain NNUK employees, the work carried out by NNUK employees in other instances benefited EMEA and non-EMEA target companies, in particular NNI and NN CALA. The examples set out below are not an exhaustive list.

204.1.    The Nortel group operated along business lines and although all the heads of the business lines were based in North America, there were some product line units based in NNUK whose work ultimately created significant and valuable benefits for the Targets. Mr Rees was the President of International Carrier Switching. This sub-business line operated all over the world, save for North America. In the mid 1990s many of the large US telecommunications carriers were planning to move into the European and world market.  The Nortel Group operated an unwritten 'family and friends' policy whereby Nortel would aim to increase the sales and business it carried out for some of its major customers, in particular in the US. WorldCom was one of the major US customers which sought to move into the European market. In order to be able to win the contract for supplying WorldCom in Europe, the NNUK R&D department needed to carry out substantial loss making work on the switches. There was no profit margin on switches so NNUK would simply be unable to recover the loss from any future trading. Mr Rees specifically raised this issue with the Nortel CEO, Mr Roth as the estimated loss to NNUK and European Nortel entities to carry out this work for NNI's customer, WorldCom was US$17m. Mr Roth approved and sanctioned

---

[224] Bundle B/Tab 6/ Watkins/ paragraphs 84 & 88-92; Bundle A/Tab 4/Ball/ paragraphs 43-45.

this loss. This loss was not passed onto NNI. However NNI specifically benefited from being able to enhance and progress its relationship with its important US customer. According to Nortel's EMEA Vice President for the WorldCom Account from 1996-2000, Andrew Howard, all pricing for Nortel's deals with WorldCom was governed by Nortel in North America and WorldCom was often charged a price below fair market value in EMEA.[225]

204.2.    Similar relationships existed for other major NNI customers, including Telewest and Sprint.[226]

204.3.    Prior to the acquisition of STC and the development of GSM products in Europe, no such products were sold in North America by Nortel. The product lines involving GSM being the European standard (and rest of world standard) for wireless networks, were developed by EMEA entities (by NNUK employees as well as EMEA employees through Matra) and were sold in the NNI region to USA customers. Mr Watkins states that that GSM products were sold to US customers and Mr Price also deals with the valuable GSM HLR disaster recovery product which was developed in Maidenhead and sold to NNI customers, T-Mobile and Cingular.[227]

204.4.    The section of NNUK's R&D department led by Mr Brueckheimer was selected to lead bids to AT&T in 1997 as well as carry out work on ANSI (being the North American technological standard) Such presentations and research work on the ANSI standard would only be of benefit to NNI and the Canadian market because this standard was only

---

[225] Bundle A/Tab 1/Rees/ paragraphs 25-9. Bundle B/Tab 8/Howard/ paragraphs 12, 20-21.

[226] Bundle A/Tab 1/Rees/ paragraphs 30-31.

[227] Bundle B/Tab 1/Price/ paragraph 28.

used in North America. Also AT&T was a NNI customer with at that time no market presence outside of the USA.[228]

204.5.    Both NNI and NN CALA (as well as the EMEA countries) benefited from NNUK employees being part of various committees who set out and created the standards for particular systems and products.[229]

204.6.    The acquisition of STC also enabled the Nortel Group to benefit from acquiring technology in the radio and antennae area which was about 10 years ahead of any Nortel radio engineering expertise. Mr Jefferies, who was by 2005 the director of the Advanced Antenna Technology Group states that the Nortel Group was able to exploit in the late 1990s technology such as the orthogonal frequency division-multiplexing which STC had worked on for the military in the 1980s. The only Nortel antennae group is based in Harlow and members are all NNUK employees. In this capacity the Harlow team work and develop the necessary antennae for both the GSM products as well as its successor system, UMTS. The team developed the smart antennae technology for both GSM and the North American standard, IS-136 which is a standard only used in North America and South America. Mr Jeffries was also involved in developing the relationship of NNI with its major customer, Verizon in relation to smart antennae technology as well as being involved with other major US customers of the Nortel group including AT&T, Celarwire, TMO USA and Sprint/Nextel.[230]

204.7.    Mr Hall and Mr Hern describe the invention of a telephony system in Maidenhead called Centrex IP. This is a private exchange system for Enterprise customers such as banks that is hosted by Internet Protocol.

---

[228] Bundle A/Tab 10/Brueckheimer/ paragraphs 57.1 & 61.

[229] Bundle A/Tab 10/Brueckheimer/ paragraphs 59 & 62.

[230] Bundle A/Tab 5/Jeffries/ passim.

This enables users to connect to their phone line / extension from anywhere worldwide. Customers included the US Federal Government, Bank of America and Bell Canada.[231]

205.    The non-EMEA targets clearly benefited directly and/or indirectly from the global financial operation and in particular the decisions of NNC/NNL in relation to accrued unpaid inter-company balances of sums owed to NNUK and NNI. These balances were treated as loans, and the terms of these loans including as to repayment were dictated by the parent. Since at least 2003 there has been an increase in the loans NNC/NNL has required that NNUK make up to NNL. All such loans have always been on an interest free basis although the UK Inland Revenue required such loans to be treated for tax purposes as having interest charged on the same. During this same period, NNI was also making loans to NNL, but NNC/NNL decided that the NNI loans were to be on a proper interest-bearing basis. In 2007 substantial repayments in cash were made by NNC/NNL to NNI (US$275m) but NNC/NNL decided that no cash repayment was to be made to NNUK despite its ever increasing pension deficiency. NNUK's outstanding balance owed by NNL  may be shown as follows:[232]



---

[231] Bundle A/Tab 8/Hall/ paragraphs 60-61.

[232] Figures taken from the Exhibit to the NNL-NNUK Revolving Loan Agreement, 21 March 2008 **[B4/T5/p.1627]**.

89

206.   NNI benefited from being repaid in cash in 2007 the sum of $275m at the same time that NNUK was repaid by a transfer to it of beneficial ownership of the EMEA countries then owed by NNIF (Project Swift). This illiquid transfer of assets did not permit NNUK to sell the subsidiaries and utilise the proceeds to reduce the pension deficiency. Additionally Project Swift appears to have been in reality simply a book keeping exercise, in that the operation of EMEA and the role of NNUK as the manager and controller of all EMEA did not alter after the execution of Project Swift.

207.   As set out in paragraphs 170 ff above, the Nortel Group benefited from a pension holiday in relation to contributions into the Scheme from 1989 until 2002. This clearly benefited indirectly all the Targets because the Nortel Group did not have to allocate funds towards these contributions, but could utilise those funds for other projects and in order to increase the profitability of the Group. NNC/NNL in effect controlled the Scheme and decided the amount and timing of contributions.[233] NNUK was not free simply to make such pension contributions into its own pension scheme. Even after the pension holiday, when the deficit in the UK scheme was known to NNC/NNL, NNC made supplemental contributions in late 2004 of approximately $125m, of which the UK Scheme received nothing.[234] Indeed in all of 2004 the Scheme received only £15m, paid in December 2004. This was despite Nortel having the declared aim of treating all its pension schemes equally.[235]

208.   Although from 2000 onwards Nortel used its transfer pricing arrangements for the purposes of satisfying the relevant tax authorities that proper value was given in relation to inter-company services and dealings, the transfer

---

[233] See paragraph 181ff above, and in particular the evidence of independent Trustee director Clive Gilchrist (Bundle D/Tab 1/Gilchrist/ paragraphs 17ff.).

[234] Bundle C/Tab 3/Hern/ paragraph 92.

[235] Bundle D/Tab 1/Gilchrist/ paragraph 29

pricing arrangements did not take into account any historic pension deficiency as and when it arose. Additionally the method of working out each entity's share of profit did not compensate NNUK for the value of its R&D. NNUK's R&D departments produced more patents per head than the Nortel R&D laboratories in the USA or Canada, and on less money,[236] but this was not recognised as entitling NNUK to an increased share of the Group's profits. Moreover, NNUK's R&D was efficiently run and this again was not recognised because entitlement to profits was calculated on the simple basis of R&D spend rather than on the basis of effective and productive spend.

Connection and / or Involvement with the Scheme

209.   Section 43(7)(c): Both NNC and NNL, as the immediate and the ultimate parent companies of NNUK were closely involved with the Scheme as is set out in paragraphs 182 to 185 above. Although there was a UK pension fund policy committee, it is clear that this committee was subject to overall control from NNC/NNL, and NNUK did not act independently in this regard. The failure of NNUK to agree to a long-term schedule of regular contributions for over four years from the date the deficiency was known in 2002 was a decision taken by NNC/NNL.[237]

Financial Circumstances

210.   Section 43(7)(d): As is set out in paragraphs 167 to 173 above, almost all the Targets are in some form of insolvency process. At Appendix 3 are details of the Targets' financial circumstances as known to the Regulator as at the date of this Warning Notice.

**Conclusion**

---

[236] Bundle A/Tab 8/Hall/ paragraph 36.

[237] Paragraph 185.1 above.

91

211.   In the above circumstances the Regulator considers it reasonable to issue a financial support direction against the Targets listed on page 2 of this Warning Notice. Having regard to the matters set out in section 43(7) of the Act, such a step is both reasonable and appropriate.

**Representations**

212.   The Targets and the Directly Affected Parties have the opportunity to make written representations in response to this Warning Notice. Representations must be received by **midday on Monday 01 March 2010**. If no representations are received by this date, the Determinations Panel will make its decision based on the information contained in this Warning Notice.

213.   If you make any representations on this Warning Notice, please say whether you accept that the contents of the Warning Notice are accurate and whether you intend to oppose the imposition of a FSD.

214.   Determinations will normally be based on the documents and you will not be expected to attend a hearing.  If you consider that you need to make oral representations to the Determinations Panel, you should make this known as soon as possible after receiving this Warning Notice.

**Publication**

215.   Under section 89 of the Act, the Regulator may, if it considers it appropriate to do so, publish a report of the consideration given by it to the exercise of its functions and the results of that consideration.

92

## APPENDIX 1

## Statutory Provisions

216.    The following provisions are referred to in this Notice and are reproduced below.

### Insolvency Act 1986, Section 435

*435 - Meaning of "associate"*

(1) For the purposes of this Act any question whether a person is an associate of another person is to be determined in accordance with the following provisions of this section (any provision that a person is an associate of another person being taken to mean that they are associates of each other).

(2) A person is an associate of an individual if that person is-
(a) the individual's husband or wife or civil partner,
(b) a relative of-
(i) the individual, or
(ii) the individual's husband or wife or civil partner, or

(c) the husband or wife or civil partner of a relative of-
(i) the individual, or
(ii) the individual's husband or wife or civil partner.

(3) A person is an associate of any person with whom he is in partnership, and of the husband or wife or civil partner or a relative of any individual with whom he is in partnership; and a Scottish firm is an associate of any person who is a member of the firm.

(4) A person is an associate of any person whom he employs or by whom he is employed.

(5) A person in his capacity as trustee of a trust other than-
(a) a trust arising under any of the second Group of Parts or the Bankruptcy (Scotland) Act 1985, or
(b) a pension scheme or an employees' share scheme (within the meaning of the Companies Act),
is an associate of another person if the beneficiaries of the trust include, or the terms of the trust confer a power that may be exercised for the benefit of, that other person or an associate of that other person.

(6) A company is an associate of another company-

93

(a) if the same person has control of both, or a person has control of one and persons who are his associates, or he and persons who are his associates, have control of the other, or

(b) if a group of two or more persons has control of each company, and the groups either consist of the same persons or could be regarded as consisting of the same persons by treating (in one or more cases) a member of either group as replaced by a person of whom he is an associate.

**(7)** A company is an associate of another person if that person has control of it or if that person and persons who are his associates together have control of it.

**(8)** For the purposes of this section a person is a relative of an individual if he is that individual's brother, sister, uncle, aunt, nephew, niece, lineal ancestor or lineal descendant, treating-

(a) any relationship of the half blood as a relationship of the whole blood and the stepchild or adopted child of any person as his child, and

(b) an illegitimate child as the legitimate child of his mother and reputed father;

and references in this section to a husband or wife include a former husband or wife and a reputed husband or wife and references to a civil partner include a former civil partner  and a reputed civil partner.

**(9)** For the purposes of this section any director or other officer of a company is to be treated as employed by that company.

**(10)** For the purposes of this section a person is to be taken as having control of a company if-

(a) the directors of the company or of another company which has control of it (or any of them) are accustomed to act in accordance with his directions or instructions, or

(b) he is entitled to exercise, or control the exercise of, one third or more of the voting power at any general meeting of the company or of another company which has control of it;

and where two or more persons together satisfy either of the above conditions, they are to be taken as having control of the company.

**(11)** In this section "company" includes any body corporate (whether incorporated in Great Britain or elsewhere); and references to directors and other officers of a company and to voting power at any general meeting of a company have effect with any necessary modifications.

## Pensions Act 1995

## Section 75

### 75 - Deficiencies in the assets

**(1)** This section applies in relation to an occupational pension scheme other than a scheme which is-

(a) a money purchase scheme, or

(b) a prescribed scheme or a scheme of a prescribed description.

94

**(2)** If-
    (a) at any time which falls-
        (i) when a scheme is being wound up, but
        (ii) before any relevant event in relation to the employer which occurs while
           the scheme is being wound up,
    the value of the assets of the scheme is less than the amount at that time of
    the liabilities of the scheme, and
    (b) the trustees or managers of the scheme designate that time for the purposes
    of this subsection (before the occurrence of an event within paragraph (a)(ii)),
    an amount equal to the difference shall be treated as a debt due from the
    employer to the trustees or managers of the scheme.
This is subject to subsection (3).

**(3)** Subsection (2) applies only if-
    (a) either-
        (i) no relevant event within subsection (6A)(a) or (b) occurred in relation to the
           employer during the period beginning with the appointed day and ending
           with the commencement of the winding up of the scheme, or
        (ii) during the period-
           (a) beginning with the occurrence of the last such relevant event which
               occurred during the period mentioned in sub-paragraph (i), and
           (b) ending with the commencement of the winding up of the scheme,
        a cessation notice was issued in relation to the scheme and became binding,
        and

    (b) no relevant event within subsection (6A)(c) has occurred in relation to the
    employer during the period mentioned in paragraph (a)(i).

**(4)** Where-
    (a) immediately before a relevant event ("the current event") occurs in relation to
    the employer the value of the assets of the scheme is less than the amount at
    that time of the liabilities of the scheme,
    (b) the current event-
        (i) occurred on or after the appointed day, and
        (ii) did not occur in prescribed circumstances,

    (c) if the scheme was being wound up immediately before that event, subsection
    (2) has not applied in relation to the scheme to treat an amount as a debt due
    from the employer to the trustees or managers of the scheme,

    (d) if the current event is within subsection (6A)(a) or (b), either-
        (i) no relevant event within subsection (6A)(a) or (b) occurred in relation to the
           employer during the period beginning with the appointed day and ending
           immediately before the current event, or
        (ii) a cessation event has occurred in relation to the scheme in respect of a
           cessation notice issued during the period-
           (a) beginning with the occurrence of the last such relevant event which
               occurred during the period mentioned in sub-paragraph (i), and
           (b) ending immediately before the current event, and

    (e) no relevant event within subsection (6A)(c) has occurred in relation to the
    employer during the period mentioned in paragraph (d)(i),

95

an amount equal to the difference shall be treated as a debt due from the employer to the trustees or managers of the scheme.

**(4A)** Where the current event is within subsection (6A)(a) or (b), the debt under subsection (4) is to be taken, for the purposes of the law relating to insolvency as it applies to the employer, to arise immediately before the occurrence of the current event.

**(4B)** Subsection (4C) applies if, in a case within subsection (4)-
    (a) the current event is within subsection (6A)(a) or (b), and
    (b) the scheme was not being wound up immediately before that event.

**(4C)** Where this subsection applies, the debt due from the employer under subsection (4) is contingent upon-
    (a) a scheme failure notice being issued in relation to the scheme after the current event and the following conditions being satisfied-
        (i) the scheme failure notice is binding,
        (ii) no relevant event within subsection (6A)(c) has occurred in relation to the employer before the scheme failure notice became binding, and
        (iii) a cessation event has not occurred in relation to the scheme in respect of a cessation notice issued during the period-
            (a) beginning with the occurrence of the current event, and
            (b) ending immediately before the issuing of the scheme failure notice,
        and the occurrence of such a cessation event in respect of a cessation notice issued during that period is not a possibility, or

    (b) the commencement of the winding up of the scheme before-
        (i) any scheme failure notice or cessation notice issued in relation to the scheme becomes binding, or
        (ii) any relevant event within subsection (6A)(c) occurs in relation to the employer.

**(5)** For the purposes of subsections (2) and (4) , the liabilities and assets to be taken into account, and their amount or value, must be determined, calculated and verified by a prescribed person and in the prescribed manner.

**(6)** In calculating the value of any liabilities for those purposes, a provision of the scheme rules which limits the amount of its liabilities by reference to the amount of its assets is to be disregarded.
In this subsection "scheme rules" has the same meaning as in the Pensions Act 2004 ("the 2004 Act") (see section 318 of that Act).

**(6A)** For the purposes of this section, a relevant event occurs in relation to the employer in relation to an occupational pension scheme if and when-
    (a) an insolvency event occurs in relation to the employer,
    (b) the trustees or managers of the scheme make an application under subsection (1) of section 129 of the 2004 Act or receive a notice from the Board of the Pension Protection Fund under subsection (5)(a) of that section, or
    (c) a resolution is passed for a voluntary winding up of the employer in a case where a declaration of solvency has been made under section 89 of the Insolvency Act 1986 (members' voluntary winding up).

96

(**6B**) For the purposes of this section-
    (a) a "cessation notice", in the case of a relevant event within subsection (6A)(a), means-
        (i) a withdrawal notice issued under section 122(2)(b) of the 2004 Act (scheme rescue has occurred),
        (ii) a withdrawal notice issued under section 148 of that Act (no insolvency event has occurred or is likely to occur),
        (iii) a notice issued under section 122(4) of that Act (inability to confirm status of scheme) in a case where the notice has become binding and section 148 of that Act does not apply,

    (b) a "cessation notice" in the case of a relevant event within subsection (6A)(b), means a withdrawal notice issued under section 130(3) of the 2004 Act (scheme rescue has occurred),
    (c) a cessation event occurs in relation to a scheme when a cessation notice in relation to the scheme becomes binding,
    (d) the occurrence of a cessation event in relation to a scheme in respect of a cessation notice issued during a particular period ("the specified period") is a possibility until each of the following are no longer reviewable-
        (i) any cessation notice which has been issued in relation to the scheme during the specified period,
        (ii) any failure to issue such a cessation notice during the specified period,
        (iii) any notice which has been issued by the Board under Chapter 2 or 3 of Part 2 of the 2004 Act which is relevant to the issue of a cessation notice in relation to the scheme during the specified period or to such a cessation notice which has been issued during that period becoming binding,
        (iv) any failure to issue such a notice as is mentioned in sub-paragraph (iii),

    (e) the issue or failure to issue a notice is to be regarded as reviewable-
        (i) during the period within which it may be reviewed by virtue of Chapter 6 of Part 2 of the 2004 Act, and
        (ii) if the matter is so reviewed, until-
            (a) the review and any reconsideration,
            (b) any reference to the Ombudsman for the Board of the Pension Protection Fund in respect of the matter, and
            (c) any appeal against his determination or directions,
        has been finally disposed of, and

    (f) a "scheme failure notice" means a scheme failure notice issued under section 122(2)(a) or 130(2) of the 2004 Act (scheme rescue not possible).

(**6C**) For the purposes of this section-
(a) section 121 of the 2004 Act applies for the purposes of determining if and when an insolvency event has occurred in relation to the employer,
(b) "appointed day" means the day appointed under section 126(2) of the 2004 Act (no pension protection under Chapter 3 of Part 2 of that Act if the scheme begins winding up before the day appointed by the Secretary of State),
(c) references to a relevant event in relation to an employer do not include a relevant event which occurred in relation to him before he became the employer in relation to the scheme,

97

(d) references to a cessation notice becoming binding are to the notice in question mentioned in subsection (6B)(a) or (b) and issued under Part 2 of the 2004 Act becoming binding within the meaning given by that Part of that Act, and

(e) references to a scheme failure notice becoming binding are to the notice in question mentioned in subsection (6B)(f) and issued under Part 2 of the 2004 Act becoming binding within the meaning given by that Part of that Act.

**(6D)** Where-

(a) a resolution is passed for a voluntary winding up of the employer in a case where a declaration of solvency has been made under section 89 of the Insolvency Act 1986 (members' voluntary winding up), and

(b) either-

(i) the voluntary winding up of the employer is stayed other than in prescribed circumstances, or

(ii) a meeting of creditors is held in relation to the employer under section 95 of that Act (creditors' meeting which has the effect of converting a members' voluntary winding up into a creditors' voluntary winding up),

this section has effect as if that resolution had never been passed and any debt which arose under this section by virtue of the passing of that resolution shall be treated as if it had never arisen.

**(7)** This section does not prejudice any other right or remedy which the trustees or managers may have in respect of a deficiency in the scheme's assets.

**(8)** A debt due by virtue only of this section shall not be regarded-

(a) as a preferential debt for the purposes of the Insolvency Act 1986, or

(b) as a preferred debt for the purposes of the Bankruptcy (Scotland) Act 1985.

**(10)** Regulations may modify this section as it applies in prescribed circumstances.

The provision (above) is subject to modification.

## Pensions Act 2004

## Section 5

### 5 - Regulator's objectives

**(1)** The main objectives of the Regulator in exercising its functions are-

(a) to protect the benefits under occupational pension schemes of, or in respect of, members of such schemes,

(b) to protect the benefits under personal pension schemes of, or in respect of, members of such schemes within subsection (2),

(c) to reduce the risk of situations arising which may lead to compensation being payable from the Pension Protection Fund (see Part 2), and

(d) to promote, and to improve understanding of, the good administration of work-based pension schemes.

**(2)** For the purposes of subsection (1)(b) the members of personal pension schemes within this subsection are-

98

(a) the members who are employees in respect of whom direct payment arrangements exist, and

(b) where the scheme is a stakeholder pension scheme, any other members.

**(3)** In this section-

"*stakeholder pension scheme*" means a personal pension scheme which is or has been registered under section 2 of the Welfare Reform and Pensions Act 1999 (c. 30) (register of stakeholder schemes);

"*work-based pension scheme*" means-

(a) an occupational pension scheme,

(b) a personal pension scheme where direct payment arrangements exist in respect of one or more members of the scheme who are employees, or

(c) a stakeholder pension scheme.

## Section 10

### 10 - Functions exercisable by the Determinations Panel

**(1)** The Determinations Panel is to exercise on behalf of the Regulator-

(a) the power to determine, in the circumstances described in subsection (2) whether to exercise a reserved regulatory function, and

(b) where it so determines to exercise a reserved regulatory function, the power to exercise the function in question.

**(2)** Those circumstances are-

(a) where the Regulator considers that the exercise of the reserved regulatory function may be appropriate, or

(b) where an application is made under, or by virtue of, any of the provisions listed in subsection (6) for the Regulator to exercise the reserved regulatory function.

**(3)** Where subsection (1) applies, the powers mentioned in that subsection are not otherwise exercisable by or on behalf of the Regulator.

**(4)** For the purposes of this Part, a function of the Regulator is a "reserved regulatory function" if it is a function listed in Schedule 2.

**(5)** Regulations may amend Schedule 2 by-

(a) adding any function of the Regulator conferred by, or by virtue of, this or any other enactment,

(b) omitting any such function, or

(c) altering the description of any such function contained in that Schedule.

**(6)** The provisions referred to in subsection (2)(b) are-

(a) section 20(10) (application to permit payments out of an account that is subject to a restraining order);

(b) section 26(2) (application for order validating action taken in contravention of freezing order);

(c) section 41(7) (application for the issue of a revised contribution notice under section 41(9));

(d) section 50(7) (application for the issue of a revised contribution notice under section 50(9));

99

(e) section 3(3) of the Pensions Act 1995 (c. 26) (application for revocation of prohibition order);

(f) section 4(5) of that Act (application for revocation of a suspension order);

(g) section 7(5A) of that Act (application for appointment of a trustee under section 7(3)(a) or (c) of that Act);

(h) section 29(5) of that Act (application for waiver of disqualification);

(ha) section 58(7) of that Act (power of the Regulator in prescribed circumstances to extend or further extend the period referred to in section 58(6) of that Act in relation to a schedule of contributions);

(hb) section 60(7) of that Act (power of the Regulator in prescribed circumstances to extend or further extend the period applicable under section 60(3) of that Act in relation to securing an increase in value);

(i) section 69(1) of that Act (application for order authorising modification or modifying a scheme);

(j) section 71A(2) of that Act (application for modifying a scheme to secure winding up);

(k) section 99(4A) of the Pension Schemes Act 1993 (c. 48) (application for extension under section 99(4) of that Act of a period for compliance);

(l) section 101J(6)(a) of that Act (application for extension under section 101J(2) of that Act of a period for compliance).

**(7)** Regulations may amend subsection (6) by-

(a) adding any provision of this or any other enactment to the list in that subsection, or

(b) omitting or altering the description of any provision mentioned in that list.

**(8)** The Panel may be authorised under paragraph 20(4) or (6) of Schedule 1 to exercise further functions of the Regulator on behalf of the Regulator.

**(9)** The Panel may authorise any of its members or any of its sub-committees to exercise on its behalf-

(a) any of the functions of the Regulator which are exercisable by the Panel on behalf of the Regulator, or

(b) any of the functions of the Panel under section 93(3), section 99(11) and paragraph 18(2) of Schedule 1 (procedure).

**(10)** This section is subject to any regulations made by the Secretary of State under paragraph 21 of Schedule 1 (power to limit or permit delegation of functions).

### Sections 43 – 45

#### 43 - Financial support directions

**(1)** This section applies in relation to an occupational pension scheme other than-

(a) a money purchase scheme, or

(b) a prescribed scheme or a scheme of a prescribed description.

**(2)** The Regulator may issue a financial support direction under this section in relation to such a scheme if the Regulator is of the opinion that the employer in relation to the scheme-

(a) is a service company, or

(b) is insufficiently resourced, at a time determined by the Regulator which falls within subsection (9) ("the relevant time").

**(3)** A financial support direction in relation to a scheme is a direction which requires the person or persons to whom it is issued to secure-
(a) that financial support for the scheme is put in place within the period specified in the direction,
(b) that thereafter that financial support or other financial support remains in place while the scheme is in existence, and
(c) that the Regulator is notified in writing of prescribed events in respect of the financial support as soon as reasonably practicable after the event occurs.

**(4)** A financial support direction in relation to a scheme may be issued to   one or more persons.

**(5)** But the Regulator may issue such a direction to a person only if-
(a) the person is at the relevant time a person falling within subsection (6), and
(b) the Regulator is of the opinion that it is reasonable to impose the requirements of the direction on that person.

**(6)** A person falls within this subsection if the person is-
(a) the employer in relation to the scheme,
(b) an individual who-
   (i) is an associate of an individual who is the employer, but
   (ii) is not an associate of that individual by reason only of being employed by him, or
(c) a person, other than an individual, who is connected with or an associate of the employer.

**(7)** The Regulator, when deciding for the purposes of subsection (5)(b) whether it is reasonable to impose the requirements of a financial support direction on a particular person, must have regard to such matters as the Regulator considers relevant including, where relevant, the following matters-
(a) the relationship which the person has or has had with the employer (including, where the employer is a company within the meaning of subsection (11) of section 435 of the Insolvency Act 1986 (c. 45), whether the person has or has had control of the employer within the meaning of subsection (10) of that section),
(b) in the case of a person falling within subsection (6)(b) or (c), the value of any benefits received directly or indirectly by that person from the employer,
(c) any connection or involvement which the person has or has had with the scheme,
(d) the financial circumstances of the person, and
(e) such other matters as may be prescribed.

**(8)** A financial support direction must identify all the persons to whom the direction is issued.

**(9)** A time falls within this subsection if it is a time which falls within a prescribed period which ends with the determination by the Regulator to exercise the power to issue the financial support direction in question.

101

**(10)** For the purposes of subsection (3), a scheme is in existence until it is wound up.

**(11)** No duty to which a person is subject is to be regarded as contravened merely because of any information or opinion contained in a notice given by virtue of subsection (3)(c).
This is subject to section 311 (protected items).

### 44 - Meaning of "service company" and "insufficiently resourced"

**(1)** This section applies for the purposes of section 43 (financial support directions).

**(2)** An employer ("E") is a "service company" at the relevant time if-
  (a) E is a company within the meaning given by section 735(1) of the Companies Act 1985 (c. 6),
  (b) E is a member of a group of companies, and
  (c) E's turnover, as shown in the latest available accounts for E prepared in accordance with section 226 of that Act, is solely or principally derived from amounts charged for the provision of the services of employees of E to other members of that group.

**(3)** The employer in relation to a scheme is insufficiently resourced at the relevant time if-
  (a) at that time the value of the resources of the employer is less than the amount which is a prescribed percentage of the estimated section 75 debt in relation to the scheme, and
  (b) there is at that time a person who falls within subsection (6)(b) or (c) of section 43 and the value at that time of that person's resources is not less than the amount which is the difference between-
    (i) the value of the resources of the employer, and
    (ii) the amount which is the prescribed percentage of the estimated section 75 debt.

**(4)** For the purposes of subsection (3)-
  (a) what constitutes the resources of a person is to be determined in accordance with regulations, and
  (b) the value of a person's resources is to be determined, calculated and verified in a prescribed manner.

**(5)** In this section the "estimated section 75 debt", in relation to a scheme, means the amount which the Regulator estimates to be the amount of the debt which would become due from the employer to the trustees or managers of the scheme under section 75 of the Pensions Act 1995 (c. 26) (deficiencies in the scheme assets) if-
  (a) subsection (2) of that section applied, and
  (b) the time designated by the trustees or managers of the scheme for the purposes of that subsection were the relevant time.

**(6)** When calculating the estimated section 75 debt in relation to a scheme under subsection (5), the amount of any debt due at the relevant time from the employer under section 75 of the Pensions Act 1995 (c. 26) is to be disregarded.

**(7)** In this section "the relevant time" has the same meaning as in section 43.

102

***45 - Meaning of "financial support"***

**(1)** For the purposes of section 43 (financial support directions), "financial support" for a scheme means one or more of the arrangements falling within subsection (2) the details of which are approved in a notice issued by the Regulator.

**(2)** The arrangements falling within this subsection are-
   (a) an arrangement whereby, at any time when the employer is a member of a group of companies, all the members of the group are jointly and severally liable for the whole or part of the employer's pension liabilities in relation to the scheme;
   (b) an arrangement whereby, at any time when the employer is a member of a group of companies, a company (within the meaning given in section 736 of the Companies Act 1985 (c. 6)) which meets prescribed requirements and is the holding company of the group is liable for the whole or part of the employer's pension liabilities in relation to the scheme;
   (c) an arrangement which meets prescribed requirements and whereby additional financial resources are provided to the scheme;
   (d) such other arrangements as may be prescribed.

**(3)** The Regulator may not issue a notice under subsection (1) approving the details of one or more arrangements falling within subsection (2) unless it is satisfied that the arrangement is, or the arrangements are, reasonable in the circumstances.

**(4)** In subsection (2), "the employer's pension liabilities" in relation to a scheme means-
   (a) the liabilities for any amounts payable by or on behalf of the employer towards the scheme (whether on his own account or otherwise) in accordance with a schedule of contributions under section 227, and
   (b) the liabilities for any debt which is or may become due to the trustees or managers of the scheme from the employer whether by virtue of section 75 of the Pensions Act 1995 (deficiencies in the scheme assets) or otherwise.

**Section 100(2)(6)**

***100 - Duty to have regard to the interests of members etc***

**(1)** The Regulator must have regard to the matters mentioned in subsection (2) –
   (a) when determining whether to exercise a regulatory function-
       (i) in a case where the requirements of the standard or special procedure apply, or
       (ii) on a review under section 99, and
   (b) when exercising the regulatory function in question.

**(2)** Those matters are-
   (a) the interests of the generality of the members of the scheme to which the exercise of the function relates, and
   (b) the interests of such persons as appear to the Regulator to be directly affected by the exercise.

103

**Schedule 2: The Reserved Regulatory Functions**

*Part 4 - Functions under this Act*

21    The power to make or extend a restraining order under section 20.

22    The power to make an order under section 20(10) permitting payments out of an account that is subject to a restraining order.

23    The power to make a repatriation order under section 21.

24    The power to make a freezing order under section 23.

25    The power to make an order under section 25(3) extending the period for which a freezing order has effect.

26    The power to make an order under section 26 validating action taken in contravention of a freezing order.

27    The power to make an order under section 28 directing that specified steps are taken.

28    The power to make an order under section 30 giving a direction where a freezing order ceases to have effect.

29    The power to make an order under section 31(3) directing the notification of members.

30    The power to issue a contribution notice under section 38.

31    The power to issue a direction under section 41(4) to the trustees or managers of an occupational pension scheme.

32    The power to issue a revised contribution notice under section 41(9).

33    The power to issue a financial support direction under section 43.

34    The power to issue a contribution notice under section 47.

35    The power to issue a direction under section 50(4) to the trustees or managers of an occupational pension scheme.

36    The power to issue a revised contribution notice under section 50(9).

37    The power to make a restoration order under section 52.

38    The power to issue a contribution notice under section 55.

39    The power to issue a notice under section 71 requiring a report to be provided to the Regulator.

**40**    The power to make a direction under section 76(8) extending the retention period for documents taken into possession under section 75.

**41**    The power to make a direction under section 78(10) extending the retention period for documents taken into possession under that section.

**42**    The power to make an order under section 231 modifying a scheme, giving directions or imposing a schedule of contributions.

**43**    The power to issue a ring-fencing notice under section 292.

**44**    The power to vary or revoke under section 101-
    (a)  a determination made by the Determinations Panel whether to exercise one of the other functions listed in this Schedule, or

    (b)  an order, notice or direction made, issued or given in the exercise of one of those functions-
        (i) by the Panel, or
        (ii) by the Regulator in compliance with a direction of the Tribunal under section 103.


**The Pensions Regulator (Financial Support Directions etc) Regulations 2005**

*1 - Citation and commencement*

These Regulations may be cited as the Pensions Regulator (Financial Support Directions etc) Regulations 2005 and shall come into force on 1st September 2005.

*2 – Interpretation*

**(1)** In these Regulations-
"the Act" means the Pensions Act 2004;
"business associate" means a person referred to in-
(a) section 43(6)(b) (persons to whom the Regulator may issue a financial support direction - individuals) who is involved in the carrying on of any business; or
(b) section 43(6)(c) (persons to whom the Regulator may issue a financial support direction - non-individuals);
"calculation date" means the date specified by the Regulator, by reference to which the value of the resources of a person to whom section 43(6) applies will be calculated;
"entity" means an employer or a business associate;
"entity value" means the fair value of the entity;
"entity value difference" ("EVD") means the difference between the entity value at the calculation date and the aggregate of that entity's net assets as set out in the FSD reference accounts and any identified FVDs;
"fair value" means the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction;
"fair value difference" ("FVD") means the difference between the fair value of an asset or liability at the calculation date and the amount at which that asset or liability is recorded in the FSD reference accounts;
"FSD reference accounts" means the accounts used to establish the net assets of the relevant entity for the purposes of the value of resources calculation which shall be-