(a) the entity's most recent individual accounts, or, where the Regulator and the entity agree, subsequent accounts prepared on a basis consistent with the most recent individual accounts, taking into account any changes required in order to comply with generally accepted accounting practice; or

(b) in the case of an entity not subject to section 226 of the Companies Act 1985 (duty to prepare individual company accounts), that entity's most recent set of approved accounts, or where the Regulator and the entity agree, subsequent accounts prepared on a basis consistent with the most recent approved accounts, taking into account any changes required in order to comply with generally accepted accounting practice;

"individual accounts" means accounts prepared in accordance with section 226 of the Companies Act 1985;

"net assets" ("NA") means the aggregate of the entity's assets less the aggregate of its liabilities (and liabilities shall include any provision for liabilities made in individual accounts prepared in accordance with either section 226A (Companies Act individual accounts) or section 226B (IAS individual accounts) of the Companies Act 1985, or any similar provision for liabilities made in the accounts of any entity to which the Companies Act 1985 does not apply);

"property" has the same meaning as in section 53(7) (restoration orders - meaning of "property");

"related employer balances" ("Eb") means any amount which has been taken into account in the calculation of the value of the resources of the employer which, were it also to appear in the calculation of the value of the resources of a business associate, would result in the value of the resources of the business associate and the employer together being overstated or understated by that amount; and such an amount may include (but is not limited to)-

(a) any direct or indirect investment in the share capital of the employer;

(b) any liability of a business associate relating to the employer's liabilities to the extent that the corresponding liability is deducted in the calculation of the value of the employer's resources;

(c) any subordinated employer funding; and

(d) provisions made by the business associate against any amounts owed by the employer to the business associate, to the extent that the corresponding liability is deducted in the calculation of the value of the employer's resources;

"relevant pension scheme related balances" ("P") means any assets or liabilities included within the FSD reference accounts of the entity which relate to the scheme in relation to which section 43 applies, including any assets or liabilities relating to the scheme's deficit or surplus net of any related deferred tax asset or liability together with any other creditor or prepayment balances related to the scheme in question as calculated in accordance with the generally accepted accounting practice used for the FSD reference accounts;

"section 75 debt" means a debt due, or a debt which might become due, from the employer in relation to the scheme under section 75 of the Pensions Act 1995 (deficiencies in the scheme assets);

"subordinated employer funding" means any amounts included within the calculation of the value of the resources of the business associate that have been treated as subordinated liabilities of the employer in the calculation of the value of the employer's resources; and

"subordinated liabilities" ("Se") means any liabilities included within the FSD reference accounts of the employer which in the event of the entity being wound up would rank for payment after the unsecured creditors whether as a matter of general law or contract or otherwise.

**(2)** In these Regulations, a reference to a numbered section (other than in the phrase "section 75 debt") is a reference to the section of the Act bearing that number, unless the context otherwise requires.

### 3 - Prescribed schemes

For the purposes of section 43(1)(b) (schemes to which section 43 (financial support directions) does not apply), a prescribed scheme or a scheme of a prescribed description is as prescribed for the purposes of sections 38 and 52 (contribution notices and restoration orders) in regulation 3 of the Pensions Regulator (Contribution Notices and Restoration Orders) Regulations 2005.

### 4 - Prescribed events

An event prescribed for the purposes of section 43(3)(c) (financial support directions - content of direction) is-

(a) any event specified in any sub-paragraph of regulation 2(2) of the Pensions Regulator (Notifiable Events) Regulations 2005 (employer-related notifiable events) which occurs in respect of any party named in arrangements approved in a notice issued under section 45(1) (meaning of "financial support");

(b) any insolvency event, as defined in section 121(2) to (5) (insolvency events) as the case may be, in relation to any person named in a financial support direction;

(c) any failure to abide by, or any alteration to, an arrangement falling within section 45(2) (meaning of "financial support" - arrangements) and approved by the Regulator in a notice issued under section 45(1).

### 5 - Prescribed period

The period prescribed for the purposes of section 43(9) (financial support directions - prescription of relevant time) is the period of 12 months.

### 6 - Prescribed percentage

The percentage of the estimated section 75 debt in relation to a scheme, prescribed for the purposes of section 44(3)(a) (meaning of "insufficiently resourced" - percentage of section 75 debt), is 50 per cent.

### 7 - Resources

**(1)** The resources of an entity shall constitute all those aspects of the entity that would be taken into account when arriving at the entity value.

**(2)** The resources of a person to whom regulation 11 applies shall constitute all that person's property.

### 8 - Value of resources - business

**(1)** Paragraphs (2) and (3) are subject to regulation 9(2) and (3).

**(2)** The value of the resources of the employer shall be the greater of zero or its entity value excluding relevant pension scheme related balances and any subordinated liabilities together with any related fair value differences as verified in accordance with regulation 10.

**(3)** The value of the resources of a business associate shall be its entity value excluding relevant pension scheme related balances and any employer investment balances together with any related fair value differences as verified in accordance with regulation 10.

### 9 - Calculation of value of resources - business

**(1)** The value of the resources of an entity shall be calculated in accordance with the provisions of this regulation.

**(2)** If, following any stage of the calculation in the case of the employer, the test set out in section 44(3)(a) is not met (that is, the amount calculated to that point is greater than 50 per cent of the estimated section 75 debt in relation to the scheme) then the employer may seek the agreement of the Regulator that the employer be deemed to be not insufficiently resourced (but see regulation 10), and if the Regulator so agrees no further calculations in relation to either the employer or the business associate need be undertaken.

**(3)** If following any stage of the calculation set out in paragraphs (4) to (7) the value of the resources of the entity in relation to which the calculation is being undertaken-
(a) in the case of the employer, meets the test set out in section 44(3)(a), substituting zero if the value of resources calculated to this point is less than zero; or
(b) in the case of the business associate, meets the test set out in section 44(3)(b), that entity may seek the agreement of the Regulator that the value of that entity's resources shall be set at the amount resulting from the calculations undertaken up to that point (but see regulation 10), and if the Regulator so agrees no further calculations in relation to that entity need be undertaken.

**(4)** In the case of the employer, stage one of the calculation is as follows-
NA + P (assuming P is a liability; if P is an asset then deduct P) + Se

**(5)** In the case of the business associate, stage one of the calculation is as follows-
NA + P (assuming P is a liability; if P is an asset then deduct P) - Eb (assuming Eb is an asset; if Eb is a liability then add Eb).

**(6)** Stage two of the calculation is to add to the amount resulting from the applicable stage one any identified FVD, calculated in relation to any asset (or assets) or liability (or liabilities) selected by the relevant entity.

**(7)** Stage three of the calculation is to calculate the EVD and add that to the amount that resulted from the stage two calculation.

### 10 - Verification of value of resources - business

**(1)** If-
(a) the employer seeks the agreement of the Regulator referred to in regulation 9(2); or

(b) following either stage one or stage two of the calculation set out in regulation 9 the entity the value of whose resources is being calculated seeks the agreement of the Regulator referred to in regulation 9(3),

the relevant entity (either the employer referred to in sub-paragraph (a) or the entity referred to in sub-paragraph (b) as the case may be) must submit to the Regulator the calculation undertaken to that point together with the statutory declaration specified in paragraph (4), the supporting evidence specified in paragraph (5) and the report specified in paragraph (6).

**(2)** The Regulator will decide whether or not to give its agreement referred to in regulation 9(2) or (3) (as the case may be) following consideration of the documentation submitted in accordance with paragraph (1).

**(3)** If the entity the value of whose resources is being calculated carries out stage 3 of the calculation set out in regulation 9, that entity must submit to the Regulator that calculation together with the statutory declaration specified in paragraph (4), the supporting evidence specified in paragraph (5) and the report specified in paragraph (6).

**(4)** The making of the statutory declaration referred to in paragraphs (1) and (3) shall be approved by the board of directors of the relevant entity, and it shall be made by a director on behalf of the board and consist of a declaration that the calculation of the value of resources of the entity attached to the statutory declaration has been approved by the board of directors of that entity and in the board's opinion fairly reflects the value of resources of that entity at the calculation date as calculated to that stage in accordance with regulation 9.

**(5)** The statutory declaration shall be accompanied by evidence of such underlying assumptions and calculations as the board considers necessary to set out the basis on which they have calculated the value of resources together with such other evidence as they consider necessary to understand the basis on which they have made their declaration.

**(6)** The statutory declaration shall be accompanied by a report from a reporting accountant, or, where approved by the Regulator, another appropriately qualified person, that in his opinion the calculation of the value of resources has been compiled in accordance with the underlying assumptions and calculations accompanying the statutory declaration, and that this calculation is consistent with such provisions of regulation 9 as are relevant in that case.

**(7)** Any reference to "director" or "board" in paragraphs (4) or (5) shall, in the case of an entity which is not a company within the Companies Act 1985, be taken-

(a) in the case of a partnership, to be a reference to a partner or the partners, as the case may be;

(b) in the case of any other body (whether corporate or not) the affairs of which are managed by its members, to be a reference to a member or the body, as the case may be;

(c) in the case of any other body, to be a reference to a person who exercises functions equivalent to those of a director or either the body or the group of persons who exercise functions equivalent to those of a board of directors, as the case may be.

**(8)** In this regulation "reporting accountant" means-
  (a) in the case of an entity which is required to have its accounts audited, a person eligible under section 25 of the Companies Act 1989 at the time of the report for appointment as a company auditor;
  (b) in the case of any other entity, an independent accountant.

*11 - Value of resources - individual - calculation and verification*

**(1)** This regulation applies to an individual to whom section 43(6)(b) applies who is an associate of the employer under-
  (a) section 435(2) of the Insolvency Act 1986;
  (b) section 435(3) of that Act who is not a member of the partnership in question; or
  (c) section 435(5) of that Act.

**(2)** The Regulator may require an individual to whom this regulation applies to submit to it, within such time period as the Regulator shall specify being not less than 28 days, a statutory declaration of his resources as at the calculation date.

**(3)** The declaration of resources shall comprise the following particulars-
  (a) a list of the individual's property, divided into such categories as are appropriate for easy identification, with values assigned to each category;
  (b) a list detailing any income and usual outgoings;
  (c) a list of creditors, debts, and any other liabilities, with details of amounts; and
  (d) any other information as specified by the Regulator.

**(4)** If the information provided by the individual appears to the Regulator to be incomplete or insufficient in any way the Regulator may require the individual to submit one or more supplementary declarations of resources detailing any further information required by the Regulator.

**(5)** The Regulator may at its discretion require the individual to obtain independent valuations undertaken by a relevantly qualified independent person, of any specified asset or liability included in the declaration of resources.

*12 - Verification - Regulator's power to deem value of resources*

**(1)** If any relevant person fails to provide to the Regulator any of the required information or documentation within a reasonable time, specified in writing by the Regulator, it (the Regulator) may deem the value of that person's resources to be an amount determined by the Regulator.

**(2)** When making the determination referred to in paragraph (1), the Regulator must take into account all relevant information in its possession, and having done so, no further verification of the amount so determined is required.

**(3)** In this regulation-
"relevant person" means a person the value of whose resources the Regulator is seeking to have verified in accordance with regulation 10 or 11 (as the case may be); and
"required information or documentation" means any information or documentation required by regulation 10 or 11 (as the case may be).

*13 - Prescribed requirements*

110

The requirements prescribed for the purposes of section 45(2)(b) and (c) are that-
(a) the party or parties to the arrangement consent to the jurisdiction of the courts of England and Wales, and

(b) where there is more than one party to the arrangement, those parties enter into a legally enforceable agreement.

**14 - Prescribed arrangements**

An arrangement is prescribed for the purposes of section 45(2)(d) if-
(a) the party or parties to the arrangement consent to the jurisdiction of the courts of England and Wales, and

(b) where there is more than one party to the arrangement, those parties enter into a legally enforceable agreement.

**15 - Former employers**

**(1)** In sections 38 to 56 (contribution notices, financial support directions and transactions at an undervalue) and these Regulations, "employer", in relation to-
(a) an occupational pension scheme which is not a multi-employer scheme; or
(b) a single-employer section of a segregated scheme;
which has no active members, includes the person who was the employer of persons in the description of employment to which the scheme or section relates immediately before the time at which the scheme or section ceased to have any active members in relation to it.

**(2)** In sections 38 to 56 and these Regulations, "employer", in relation to a non-segregated scheme or a multi-employer section of a segregated scheme includes any person who has ceased to be the employer of persons in the description of employment to which the scheme or section relates unless    A, AA, AB, B, C or D is satisfied where-
(a) condition A is that a section 75 debt became due from that employer and the full amount of the debt has been paid;

(aa) condition AA is that-
   (i) such a debt became due;
   (ii) under regulation 7 of the Occupational Pension Schemes (Employer Debt) Regulations 2005 an approved withdrawal arrangement came into force and the debt treated as due, as a result of that arrangement, is the approved withdrawal arrangement share and the cessation expenses attributable to the employer within the meaning of those Regulations; and
   (iii) that debt has been paid;

(ab) condition AB is that¾
   (i) such a debt became due;
   (ii) under regulation 6C of the Occupational Pension Schemes (Employer Debt) Regulations 2005 a withdrawal arrangement came into force and the debt treated as due, as a result of that arrangement, is the withdrawal arrangement share and the cessation expenses attributable to the employer within the meaning of those Regulations; and

(iii) that debt has been paid.

(b) condition B is that
    (i) such a debt became due;
    (ii) a legally enforceable agreement has been entered into in good faith the effect of which is to reduce the amount which may be recovered in respect of the debt; and
    (iii) the reduced amount has been paid in full;

(c) condition C is that such a debt became due but it is excluded from the value of the assets of the scheme or section because it is unlikely to be recovered without disproportionate costs or within a reasonable time;

(d) condition D is that at the time at which any such person ceased to be the employer of persons in the description of employment to which the scheme or section relates the value of the assets of the scheme or section was such that no such debt was treated as becoming due.

**(3)** In this regulation-
"multi-employer section" means a section of a segregated scheme which has at least two employers in relation to that section; and
"segregated scheme" means a multi-employer scheme which is divided into two or more sections where-
    (a) any contributions payable to the scheme by an employer in relation to the scheme or by a member are allocated to that employer's or that member's section; and
    (b) a specified proportion of the assets of the scheme is attributable to each section of the scheme and cannot be used for the purposes of any other section.

*16 - Multi-employer schemes*

**(1)** Where sections 38 to 56 apply in relation to an occupational pension scheme which is a multi-employer scheme, those sections are modified so that references to the employer are to be treated as references to any employer in relation to the scheme to which those sections apply.

**(2)** In sections 38 to 51, in relation to a multi-employer scheme, any reference to the estimated section 75 debt, in relation to the scheme, shall be modified so that it applies as if it were a reference to the section 75 debt due from any specified employer in relation to the scheme calculated in accordance with sections 75 and 75A of the Pensions Act 1995 and any regulations made thereunder.

**The Pensions Regulator (Miscellaneous Amendment) Regulations 2009**

***Citation and commencement***

1. These Regulations may be cited as the Pensions Regulator (Miscellaneous Amendment)
Regulations 2009 and shall come into force on 6th April 2009.

***Amendment of the Pensions Regulator (Financial Support Directions etc.) Regulations 2005***

2.—(1) The Pensions Regulator (Financial Support Directions etc.) Regulations 2005(b) are
amended in accordance with this regulation.

(2) For regulation 5 (prescribed period), substitute—

"Prescribed period

5.—(1) Subject to paragraph (2), the period prescribed for the purposes of section 43(9) (financial support directions – prescription of relevant time) is 24 months.
(2) Until 6th April 2010 (the "Transition Date"), the period at paragraph (1) is reduced by a period equal to the number of complete months then remaining until the Transition Date.
(3) For the purposes of paragraph (2), a complete month means a period from and including the sixth day of a month to and including the fifth day of the following month.".

**APPENDIX 2**

**NNUK's Contribution to the Group's R&D**

217.    The following paragraphs provide further detail of the benefit provided to the Group by NNUK engineers and R&D departments. The text complements paragraphs 94 to 134 above, and expands on the following five of the seven product areas discussed in those paragraphs of the Warning Notice:

    217.1.    Optical transmission;

    217.2.    Adaptation of products from North American to other technical standards;

    217.3.    Next Generation Networks: CS2000;

    217.4.    Media Gateways;

    217.5.    Provider Backbone Transport.

NNUK R&D: (1) Optical Transmission

218.    In the late 1980s STC was one of the four leading suppliers of submarine fibre-optic cables in the world, with manufacturing and R&D sites at Harlow, New Southgate, Monkstown, and Paignton.[238] It was also a leading centre for the development of optical transmission systems. Its laboratory at Harlow saw the discovery in 1966 that light signals could be transmitted over long distances via optical glass fibres; it is those light signals that carry data, images, sound and other content through an optical transmission network.

---

[238] Bundle A/Tab 4/Ball/ paragraph 17.

219.  Optical transmission systems are commonly referred to by their transmission speed, as measured in Gigabits per second, or "Gb/s". When Nortel acquired STC its transmission portfolio included a system called "565", which was capable of operating at .565 Gb/s.[239] The NNUK R&D laboratories at Harlow developed techniques which made possible increasing speeds of transmission, resulting in the 2.5Gb/s hybrid system and 10Gb/s system. Both used modulation techniques developed at Harlow, and hardware from NNUK.[240]

220.  The Harlow laboratories included teams working "Advanced Technology", meaning R&D that was not directed at specific products but was closer to pure academic research. The work done by these teams allowed Nortel to demonstrate optical transmission systems of 40Gb/s and 100Gb/s at the telecommunications industry conference Telecom 92.[241] By 1999 Harlow's development work meant that Nortel could demonstrate transmission of 80Gb/s on only a single wavelength, offering the potential to carry 6.4 Terabits per second on a single fibre, increasing the capacity of the fibres.[242]

221.  By 2000, the Nortel Group described itself as having market leadership in EMEA in the sale of optical networking systems in the service provider and carrier segment.[243] By 2003, the Group described itself as a leading provider of optical networking products to service providers and enterprises to the global market.[244]

222.  These optical transmission systems were supported by several products which NNUK either developed or adapted for markets outside North America.

---

[239] Bundle B/Tab 2/ Newcombe/ paragraph 13.

[240] Bundle B/Tab 2/ Newcombe/ paragraph 14

[241] Bundle B/Tab 2/ Newcombe/ paragraph 16.

[242] Harlow Lab Report 2000,[**B3/T10/p.1211**]

[243] NNC's Form 10-K filing with the US SEC for 2000 [**B3/T5/pp.1084-1087**].

[244] NNC's Form 10-K filing with the US SEC for 2003 [**B3/T6/p.1117**].

Those worthy of particular note are the Optera product range and the TN-16 and TN-64, both high capacity optical products.

### Optera

223.  NNUK employees in Harlow had a primary responsibility for the development and support of a switch for use in optical networks called OPTera Connect DX (an optical switch supporting Dense Wavelength Division Multiplexing ("DWDM")), as well as the product known as OPTera LH (a long haul optical Multiplexer supporting DWDM). These propelled Nortel in 2000 to become the market leader for DWDM and Synchronous Optical Networking / Synchronous Digital Hierarchy ("SONET"; "SDH" – both protocols for optical transmission) Optical Internet solutions (with a global market share of 30% of the worldwide US$19 billion market).[245]

### OPTera Connect DX

224.  By 2002, Nortel's OPTera Connect DX product family was able to offer up to 120 Gb/s of optical connection management capacity per connection point, or "node". The work undertaken in the UK was principally the development of new application software in support of the OPTera HDX cross-connect, together with the associated OPTera LH 500 Dense Transport Terminal and the OPTera Dense Amplifier Platform.  Such software was central to controlling the hardware circuit packs, and to allowing customers to provision and maintain the product. This work was carried out in Harlow and Monkstown.[246]

---

[245] Harlow Lab Report 2000 [[**B3/T10/p.1217**].

[246] Bundle A/Tab 6/ Freebairn/ paragraph 24.

225.  Nortel reported in 2002 that more than 6,000 OPTera Connect DX optical switches had been deployed worldwide to support long haul, metro and regional applications for more than 100 customers. Sunrise, Switzerland's leading alternative full-service telecommunications provider, were planning to use OPTera Connect DX to enhance Optical Ethernet service provisioning. China Telecom in Hunan and Shoaxing were also planning to build an optical backbone based on the OPTera Connect DX and OPTera Long Haul 1600 Line System, which extends the reach of DWDM solutions.[247]

226.  NNUK's Harlow site was responsible for the adaptation of Nortel's TN-16 Four Fibre, optical network products for markets in Europe, Asia and CALA. The TN-16 Four Fibre product is a 2.5Gb/s optical transmission product that complies with ETSI standards. As at 2000 release 9 of the TN16X was one of the key projects being worked on at Monkstown.[248]   NNUK was also responsible for the development, prototyping and the adoption of the core software for four fibre ring protection switching to be used across all applications of Nortel's global high capacity transport platform.  The software was reused to offer Nortel's 10Gb/s optical transmission product in June 1998 and TN-64X in October 1998.[249]

227.  NNUK was responsible for the development and the release of TN-64X, which went on trial in September and launched in December 1998.  TN-64X allowed high capacity transport and enjoyed tremendous success with contracts gained with several European network providers including UTS in Austria and British Telecom.  In addition, it enabled the winning of 7 contracts for new backbone networks in Europe.[250]

NNUK R&D: (2) Adaptation of Products: DMS Switches

---

[247] Nortel News Release – 16 September 2002 **[B3/T35/pp.1448-1450]**.

[248] Exhibit GSH1, Bundle A/Tab 9.

[249] Nortel Networks 1998 Harlow Report **[B3/T36/p.1461]**.

[250] **[B3/T36/p.1461]**.

228.  Nortel's Digital Multiplex System ("DMS") portfolio is a family of circuit switches that control the routing of telephone calls, delivering local and long distance voice services. The portfolio of DMS products was developed in North America to ANSI technical standards.  In order for DMS products to be sold worldwide however, it was necessary to convert them to other international standards.[251]

229.  NNUK played an important role in the conversion of DMS products from ANSI to ETSI standards; this was carried out by the Maidenhead Laboratory with the assistance of staff at WIPRO Technologies Limited, Bangalore.[252] NNC referred to its DMS sales in Europe in its 10-K filings with the SEC as examples of the success of its business outside North America. These sales included sales of DMS 100 to Czechoslovakia, Poland, Austria, Germany and Australia.[253]

230.  NNUK's Maidenhead laboratory developed software for a European version of the DMS 100, called the "DMS 100 Europe". Nigel Rees, Nortel's Head of International Switching from 1995 to 1998 and a NNUK employee, recalls that this proved to be a capable and popular product. The software used for DMS 100 Europe underpinned the development of DMS APC (Asia Pacific). [254]

231.  In addition to its adaptation of DMS products, NNUK staff also developed new software that enabled Nortel dramatically to reduce the cost of introducing the switches to individual countries, coupled with testing facilities. This software development took place in the mid 1990s, and allowed the DMS products to be adapted to the particular standards of a new country more easily (both as to configuration for a particular market, and testing). NNUK's development of testing facilities (test rigs and simulations) reduced the cost

---

[251] Bundle A/Tab 8/Hall/ paragraphs 40-44.

[252] Bundle A/Tab 8/Hall/ paragraphs 40-41.

[253] E.g. Northern Telecom Limited's Form 10-K filing with the US SEC for 1991 **[B2/T4/pp.582-583].**

[254] Bundle A/Tab 1/ Rees/ paragraph 21.

and time of preparing Nortel products for new markets. Geoff Hall, an employee of NNUK and Nortel's Chief Technology Officer for EMEA from 2003 to 2008 considers these developments by NNUK as key to Nortel becoming a global enterprise.[255]

232.    The conversion of DMS ANSI compliant products to ETSI compliant variants was important for the Nortel Group in two respects.   It opened up new markets and customers to Nortel, and assisted in retaining the Group's existing customers in the US and Canada as they were expanding their business outside North America.[256]   Examples of US customers benefiting from NNUK development of the DMS to meet ETSI standards include:

232.1.    WorldCom, a customer of Nortel based in the US, which wanted to expand into Europe. NNUK supported this expansion with the adaptation of Nortel's DMS switch to ETSI standards for WorldCom.  This work was done at a loss but Nortel's CEO took the decision to bid at a loss-making figure since it would allow Nortel to foster relationships with WorldCom in the USA.[257]

232.2.    US West and Telewest: Telewest was a cable television operator in the UK that was owned by US West.  Telewest bought from Nortel all of the DMS voice switches that were used in its UK cable television operation.   The required adaptations from ANSI standards were all carried out by NNUK.  This enabled the Group to expand its relationship with US West in North America.[258]

---

[255] Bundle A/Tab 8/Hall/ paragraph 44.

[256] Bundle A/Tab 8/Hall/ paragraphs 42-43.

[257] Bundle A/Tab 1/ Rees/ paragraphs 25-29.

[258] Bundle A/Tab 1/ Rees/ paragraph 30.

232.3.    Other North American customers that benefitted from the switching adaptations carried out in the UK included: Sprint, Nynex, Qwest, Global Crossing, Level 3 Communications, Bell Cable media and Carrier One.[259]

233.    As of the year ended 2008, Nortel had deployed over 7,200 DMS products worldwide.[260]

NNUK R&D: (3) Next Generation Networks

234.    The phrase Next Generation Networks ("NGN") describes the evolution in telecommunications that results in one single network that carries voice, data and other content.[261] As a phrase, NGN covers a variety of products and technologies, including:

234.1.    the CS2000 switch that NNUK developed as the successor to the DMS;

234.2.    the concept of phantom trunking, patented by individuals in Harlow and Maidenhead in around 1997;

234.3.    the concept of Call Servers using switched network signalling, jointly patented by NNUK's engineers in Maidenhead and Harlow; and

234.4.    the ASIC silicon devices invented and patented by leading Nortel engineer and NNUK employee Simon Brueckheimer and his team in Harlow that process multiple voice circuits through a network.

CS 2000 ("CS2K") and supporting concepts

---

[259] Bundle A/Tab 1/ Rees/ paragraph 30.

[260] Figure per Nortel CVAS presentation **[B3/T7/p.1174-1178]**..

[261] Bundle A/Tab 10/Brueckheimer/ paragraph 18.

235.    The CS2K softswitch evolved Nortel's digital switching technology in the late 1990s by replacing the TDM (Time Division Multiplex) switch which is used in DMS products with a switch that used Voice over Internet Protocol ("VoIP") technology. The concept of the CS2K came from NNUK's Harlow labs and the prototype work was carried out in Maidenhead. The switch was then recognised as a significant development and further work was shared between Maidenhead and Ottawa, and (from 1999) Raleigh in North Carolina.[262] CS2K is shown as a key project being worked on in Maidenhead's R&D labs as at September 2000.[263]

236.    Whereas the DMS was a circuit based switch, the CS2K was based on packet technology and used IP as the medium for routing packets of information (containing the signal that "contains" the voice to be transmitted) from one place to another.[264]

237.    NNUK developed two key patents that enabled CS2K functionality: (i) call server and connection control (1996), and (ii) phantom trunking (1997); this latter patent was an essential and valuable patent which enables older SS7 telephone network switching protocols to control aspects of a modern packet network.  Both of these key patents were developed at Harlow.[265]

<u>Significance of CS2K to Nortel Group</u>

238.    The CS2K product was one of the main VoIP softswitch products of the Nortel Group's "CVAS" business (Carrier VoIP and Applications Solutions). The CVAS business generated US$873 million in revenue for the Group in 2008, 58% of which was generated in North America.[266] Nortel's President of sales in EMEA from August 2006 to December 2008 and current head of

---

[262] Bundle A/Tab 8/Hall/ paragraphs 30-51.

[263] European R&D lab report, Exhibit GSH1, p.2 [Bundle A/Tab 9].

[264] Bundle A/Tab 8/Hall/ paragraph 48.

[265] Bundle A/Tab 10/Brueckheimer/ paragraph 36.

[266] CVAS Top 20 Customers by Revenue **[B3/T37/p.1476]**.

Global Carrier Sales, Darryl Edwards, recognises CS2K as a successful product for the Group arising out of capabilities from NNUK in Maidenhead.[267]

239.   By the year ended 2008 the Nortel Group had shipped more than 106 million Carrier VoIP and multimedia ports globally to over 340 carriers.  Of these 106 million, 70 million were CS2K wireline ports.[268]  By this stage, the Nortel Group had 961 customers using its digital switching, VoIP and CVAS products and services, of which 306 used VoIP (requiring the use of CS2K).[269]  Of the 306 VoIP customers, the large majority (nearly 200) were situated in North America,[270] illustrating the extent to which CS2K had been successfully sold there.

240.   The Nortel Group was the leader in carrier VoIP globally for every year between 2002 and 2007, according to the Dell'Oro Group (a leading market research organisation for the networking and telecommunications industries).[271]   In 2009, Dell'Oro ranked the Nortel Group number one worldwide based on softswitch revenue for the past seven years; according to Dell'Oro, in the first quarter of 2009, the Nortel Group maintained its global leadership for softswitches with 20.3% of global market share.[272] According to another telecoms market research organisation, Infonetics Research, the Nortel Group maintained its revenue market share lead in the worldwide softswitch market in the first quarter of 2009 and in North America it had won over half of all softswitch sales.[273] Nortel's CVAS product line was reported on 14 December 2009 as leading the global Carrier VoIP market according to

---

[267] Bundle B/Tab 5/ Edwards/ paragraphs 36 & 39.

[268] Nortel CVAS presentation **[B3/T7/pp.1174-1178]**..

[269] Nortel CVAS presentation **[B3/T7/pp.1174-1178]**..See also the Nortel CS2K product overview **[B3/T9/pp.1205]**.

[270] Nortel CVAS presentation **[B3/T7/pp.1174-1178]**.

[271] Nortel CS2K product overview **[B3/T9/p.1205]**.

[272] Nortel press release - 8 June 2009 **[B3/T39/p.1477]**.

[273] Nortel press release - 8 June 2009 **[B3/T39/p.1477]**..

Dell'Oro Group, Infonetics Research and Synergy Research for the third quarter of 2009.[274]

*CS2K global customers*

241.   The CS2K product has been and continues to be supplied to Nortel Group customers in all regions.[275] In 2009 LG Dacom and LG-Nortel built myLG070 using the Nortel CS2K. During 2008, the Nortel Group announced contracts to provide CS2K and its related VoIP products to Turk Telecom, and BT Spain. During 2007, the Nortel Group announced such contracts with AT&T, Videotron, Cablecom, The Telephone Connection of LA and for the Vancouver Olympics.   In 2006, similar contracts were won with France Telecom, Sunrise (Switzerland's leading alternative full-service telecommunications provider), Videotron and Swisscom. Also in 2006 Chunghwa Telecom, Taiwan's largest integrated telecommunications operator, selected Nortel's CS2K for its VoIP Next Generation Networks solution.

242.   In 2005, CS2K contracts were won with Cable One US (the leading rural market cable operator in the United States), Adelphia Communications Corporation (the fifth largest cable television corporation in the United States), and Hong Kong Broadband Network Limited, the city's largest alternative residential voice and broadband service.

243.   It was reported by Nortel in 2002 that it was Verizon's largest softswitch vendor, with multiple solutions deployed across the United States. Nortel's CS2K was part of the backbone of Verizon's US nationwide packet network. Its CS2K softswitches typically controlled more than 3.8 million packet trunk and line ports, with the capacity to deliver several million more.   Mark Wegleitner, senior vice president and chief technology officer at Verizon, was

---

[274] Nortel press release – 14 December 2009 **[B3/T39/p.1479]**.

[275] Nortel CS2K product overview **[B3/T9/pp.1205-1207]**.

reported by Nortel in 2005 to have said "Verizon, .. has been using Nortel's softswitch since 2001..".[276]

244.   During 2002 to 2004, contracts for VoIP solutions including CS2K were won with Verizon, China Ministry of Information, and Warid Telecom of Pakistan.

245.   CS2K is thus a global Nortel product that began as a development by NNUK engineers and depends on concepts devised by NNUK employees in Maidenhead and Harlow, who hold the patents for them. Its revenues have benefited the Targets since 2002.

NNUK R&D: (4) Provider Backbone Transport

246.   PBT technology provides paths through Ethernet systems using a principle similar to that used in alternative Multiprotocol Label Switching technology; it essentially provides connection oriented circuits over packet technology which enables control over service quality. This is increasingly important as converged packet networks are used as common transmission platforms for multimedia services.  PBT has been standardised by IEEE as Provider Backbone Bridge (PBB) technology and is seen as a cost effective alternative to MPLS technology.[277]

247.   PBT was invented in 2006 by three people from the UK (Mr Robert Friskey, Mr Nigel Bragg and Mr Simon Parry) and Mr David Allan, from Canada.[278]

248.   In its filings with the US SEC in 2006, the Group drew attention to "*innovative PBT,* or *provider backbone transport, technology developed by Nortel that can enable service providers and large enterprises to simply*

---

[276] Nortel Press Release - 14 December 2005 **[B3/T8/p.1179].**

[277] Bundle A/ Tab 10/Brueckheimer/ paragraphs 45ff.

[278] Bundle A/Tab 8/Hall/ paragraph 56.

*network management, redefine service quality and deliver substantial cost savings using Ethernet technology. ... We captured a significant PBT win with BT in January 2007 and hope to capitalize to build market momentum and drive additional sales.*"[279]   According to the filings, this was one of the innovative technologies in which the Group was investing in order to deliver on transformation of modern networks.[280]

249.   As one of its key innovative technologies, PBT was presented by Nortel in a number of key telecoms conferences listed below:

249.1.   Carrier Ethernet World Congress 2007, Geneva;

249.2.   Broadband World Forum Europe 2007;

249.3.   Carrier Ethernet World Congress, Madrid, Spain: September 25 - 29, 2006;

249.4.   Futurecom 2007, Brazil; and

249.5.   Carrier Ethernet World Congress, Berlin: September 22 2008.

250.   In its filings with the US SEC in 2008, the Group reported that  PBB (the new term for PBT)  was ratified as an IEEE standard (IEEE 802.1ah) in August 2008 and that it believed these initiatives would prove beneficial for extending the simplicity and ease-of use of Ethernet.[281]

251.   The IEEE also announced on 18 June 2009 that it had ratified PBB-TE (IEEE 802.1Qay), the industry's first packet-based connection-oriented Ethernet technology for next-generation service provider transport networks. IEEE 802.1Qay defined Provider Backbone Bridge Traffic Engineering (PBB-

---

[279] NNC's Form 10-K filing with the US SEC for 2006 **[B3/T13/p.1274]**.

[280] NNC's Form 10-K filing with the US SEC for 2006 **[B3/T13/p.1279]**.

[281] NNC's Form 10-K filing with the US SEC for 2008 **[B3/T11/p.1253]**.

TE) as "a technology that helps enable service providers explicitly to set up traffic engineered paths across a Carrier Ethernet Network".[282]

252.    "*The ratification of IEEE 802.1Qay is an important milestone for the telecommunications industry, as service providers now have an approved standard for packet-based Connection-Oriented Ethernet technology and they can confidently proceed today with their IP network transformation programs*," said Tony Jeffree, Chair of the IEEE 802.1 Working Group. [283]

---

[282] http://standards.ieee.org/announcements/802.1Qay_Ratified.html **B3/T40/pp.1481-1482].**

[283] http://standards.ieee.org/announcements/802.1Qay_Ratified.html **B3/T40/pp.1481-1482]..**

# APPENDIX 3

## Financial Circumstances of Targets

253.    The table below shows the financial circumstances of the Targets as known to the Regulator at the date of this Warning Notice, relying in particular on information provided by the Administrators of NNUK and the EMEA Companies in administration. Information for NNC, NNL and NNI was sourced from the Form 10-Q filed by NNC with the SEC the quarter ended 30.09.09. For other companies, cash balances as at 23.09.09 were sourced from information provided by Nortel, and information on other assets and liabilities was obtained as indicated in the Table of Sources.

| Company | Insolvency Status | Cash Balances ($m) | Source of Information | Estimated assets ($m) | Total claims or liabilities ($m) |
|---|---|---|---|---|---|
| Nortel Networks Corporation | CCAA | 2 | A | (1,792) | (3,005) |
| Nortel Networks Incorporated | Chapter 11 | 691 | A | 2,481 | (7,179) |
| Nortel GmbH | UK Admin | 52 | B | 86 | (93) |
| Nortel Networks SpA | UK Admin | 14 | B | 31 | (32) |
| Nortel Networks Hispania SA | UK Admin | 7 | B | 24 | (23) |
| Nortel Networks International Finance & Holdings BV | UK Admin | 24 | B | 18 | (13) |
| Nortel Networks (Ireland) Limited | UK Admin | 108 | C | 203 | (180) |
| Nortel Networks AG | active | 11 | D | 14 | (3) |
| Nortel Networks Ukraine Limited | liquidation | - | D | 4 | (2) |
| Nortel Telecom International Limited | Not known ("n.k.") | n.k. | | n.k. | n.k. |
| Nortel Networks Israel (Sales and Marketing) Limited | Israeli admin | 11 | D | 15 | (18) |
| Nortel Networks (Austria) GmbH | UK Admin | 2 | B | 4 | (3) |
| Nortel Networks Slovensko s.r.o. | UK Admin | 1 | B | 2 | (2) |
| Nortel Networks Engineering Service Kft | UK Admin | 2 | B | 4 | (3) |
| Northern Telecom France SA | active | 2 | D | 2 | (1) |

| Nortel Networks Limited | CCAA | 173 | A | 3,290 | (8,067) |
|---|---|---|---|---|---|
| Nortel Networks CALA Inc. | Chapter 11 | 56 | D | 125 | (130) |
| Nortel Networks NV | UK Admin | 6 | C | 17 | (7) |
| Nortel Networks BV | UK Admin | 10 | B | 22 | (56) |
| Nortel Networks Polska Sp z.o.o. | UK Admin | 19 | B | 85 | (118) |
| Nortel Networks France SAS | UK Admin | 36 | B | 37 | (30) |
| Nortel Networks SA | UK Admin | 50 | B | 122 | (308) |
| Nortel Networks O.O.O. | active | 2 | D | 7 | (12) |
| Nortel Networks South Africa (Proprietary) Limited | active | - | D | - | - |
| Nortel Networks (Scandinavia) AS | active | 1 | D | 1 | (1) |
| Nortel Networks AB | UK Admin | 1 | B | 6 | (3) |
| Nortel Networks s.r.o. | UK Admin | 3 | C | 7 | (5) |
| Nortel Networks Portugal S.A. | UK Admin | 2 | B | 4 | (3) |
| Nortel Communication Holdings (1997) Limited | Israeli admin | - | C | - | - |

Table of Sources:

| Source A | Nortel Networks Corporation Form 10-Q for the quarter ended 30.09.09 |
|---|---|
| Source B | Directors' Statement of Affairs as at 14.01.09 contained in the Administrators' progress report to creditors dated 13.08.09 |
| Source C | Unaudited balance sheet as at 31.12.08 contained in the Statement of Administrators' Proposals dated 25.02.09 |
| Source D | Extracted by PwC from trial balance information provided by Nortel as at 31.12.08 |

## APPENDIX 4

### Insufficiently Resourced

254.   In order to issue an FSD, the Regulator must be of the opinion that the employer in relation to the Scheme is "insufficiently resourced at a time determined by the Regulator which falls within subsection (9) ("the relevant time")" (section 43(2) of the Act[284]).

255.   An employer is insufficiently resourced at the relevant time if both conditions set out in section 44(3) are satisfied, namely:

255.1.   The value of the resources of the employer is less than the prescribed percentage of the estimated section 75 debt in relation to the Scheme (the **"employer test"**), the prescribed percentage being 50% (regulation 6 of the FSD Regs); and

255.2.   Either

(a)   There is a person who falls within section 43(6)(b) or (c) (i.e. a person who is an associate of or connected with the employer), and the value of that person's resources at the relevant time is not less than the difference between the value of the employer's resources and 50% of the estimated section 75 debt; or

(b)   There are two or more persons who fall within section 43(6)(b) or (c) and are connected with or associates of each other, and the aggregate value at the relevant time of the resources of these

---

[284] All references to section numbers in this Appendix are to the Act save for "section 75", referring to section 75 of the Pensions Act 1995. References to the expert report dated 17 December 2009 provided by PwC are to "the report", found at **[B4a/T15/pp.2036-2114]**.

persons, or any of them, is not less than the difference between the value of the employer's resources and 50% of the estimated section 75 debt

(the **"associate test"**).

256.   The Regulator will deal with the application of each test to the facts here in turn.

257.   The relevant time that the Regulator has chosen is 30th June 2008, because this is the last quarterly date for which reliable financial information for the Group is available before its market capitalisation was adversely impacted by the exceptional conditions in the financial markets in the second half of 2008. Accordingly, the Regulator considers this to be an appropriate relevant time.

258.   All figures will be given in US$, with a conversion rate of £1 = $1.9954 being used for amounts that need to be converted at 30th June 2008 and a rate of £1 = $1.9973 being used for amounts that need to be converted as at 31st December 2007 (namely the figures in NNUK's statutory accounts for the year ending 31st December 2007[285]).

**(1) The employer test**

259.   The Regulator submits that the employer test is satisfied at 30th June 2008, and that the relevant figures for the value of NNUK's resources and 50% of the estimated section 75 debt are as follows:

| Value of NNUK's | 50% of estimated |
| --- | --- |

---

[285] **[B4/T6/pp.1628-1666]**

130

| resources ($m) | section 75 debt ($m) |
|---|---|
| 453 | 1,773 |

260.   The calculation of the estimated section 75 debt is dealt with in Appendix 5. Therefore, the focus in this section is on the calculation of the value of NNUK's resources.

261.   Before getting into the detail of the calculation of the value of NNUK's resources, it is helpful to step back from the calculation for a moment and compare the figure of $453m for NNUK's resources with the total value of the Group. The market value of the Group as a whole at 30th June 2008 was $4,083m. Therefore, given that NNUK is only one of 143 companies in the Group,[286] it is entirely unsurprising that the value of its resources is well under the $1,773m threshold for the employer test.

*(a) The general framework for calculating the value of NNUK's resources*

262.   The starting point for calculating the value of NNUK's resources is regulation 8(2) of the FSD Regs, which provides that:

> "*The value of the resources of the employer shall be the greater of zero or its entity value excluding relevant pension scheme related balances and any subordinated liabilities together with any related fair value differences as verified in accordance with regulation 10.*"

263.   Therefore, the Regulator's principal focus in calculating NNUK's resources is upon ascertaining NNUK's entity value. Entity value is defined in regulation 2(1) of the FSD Regs as the-

---

[286] Rolston/ paragraph 12 **[B1/T2]**.

131

"*fair value of the entity*"

- "fair value" in turn being defined as-

"*the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction*"[287]

264.   The other constituent of NNUK's resources referred to in regulation 8(2) is the employer's "relevant pension scheme related balances" together with any related fair value differences (there are no subordinated liabilities in this case, so the references in regulation 8(2) to these are not relevant for present purposes). "Relevant pension scheme related balances" are defined in regulation 2(1) as:

"*any assets or liabilities included within the FSD reference accounts of the entity which relate to the scheme in relation to which section 43 applies, including any assets or liabilities relating to the scheme's deficit or surplus net of any related deferred tax asset or liability together with any other creditor or prepayment balances related to the scheme in question as calculated in accordance with the generally accepted accounting practice used for the FSD reference accounts.*"

265.   The idea behind excluding such balances in valuing an employer's resources is that if the pension scheme is in deficit so that the FSD reference accounts (the employer's most recent statutory accounts prior to the date of

---

[287] The Regulator interprets this phrase as requiring one to value the assets and liabilities of the entity, rather than value its shares, particularly given that the broad rationale behind the insufficiently resourced test appears to be to establish how much the employer could have realised to put towards the pension scheme debt at a particular date. PwC have at the appropriate places in their report explained the minor differences in the figures if the calculation is done on the latter basis.

the calculation) contain a liability in respect of the scheme, this liability should be removed from consideration when considering the value of the employer's resources. This is because the broad rationale behind the test appears to be to establish the assets that the employer had at the relevant date that could be put towards meeting the deficit.

266.   Having set out the general framework for calculating the value of NNUK's resources, this Appendix now sets out in parts (b) and (c) the calculation of the value of NNUK's resources, that is, the entity value of NNUK excluding its relevant pension scheme related balances.

267.   The FSD Regs include as a route for valuing an employer's resources a three-stage approach (regulations 9(4), (6) and (7)). Once all three stages are carried out, this takes one to exactly the same result, namely NNUK's entity value excluding relevant pension scheme related balances. Therefore, in part (d) of this section, the Regulator will set out its calculations at each stage of the three-stage process, and explain how they are reached.

268.   The final and important provision of the FSD Regs that needs to be dealt with here is regulation 12:

"*12 Verification- Regulator's power to deem value of resources*

*(1) If any relevant person fails to provide to the Regulator any of the required information or documentation within a reasonable time, specified in writing by the Regulator, it (the Regulator) may deem the value of that person's resources to be an amount determined by the Regulator.*
*(2) When making the determination referred to in paragraph (1), the Regulator must take into account all relevant information in its possession, and having done so, no further verification of the amount so determined is required.*
*(3) In this regulation-*

133

> *"relevant person" means a person the value of whose resources the*
> *Regulator is seeking to have verified in accordance with regulation 10 or*
> *11 (as the case may be); and*
>
> *"required information or documentation" means any information or*
> *documentation required by regulation 10 or 11 (as the case may be)."*

269.    The "required information or documentation" referred to is the employer's calculation of its own resources, coupled with the means of verification set out in regulations 10 and 11. Therefore, if the Regulator gives the employer the opportunity to carry out its own calculation, but the employer does not do so, the Regulator is able under regulations 12(1) and (2) to determine conclusively the value of the employer's resources.

270.    In the present case, the Regulator wrote to NNUK through its Administrators, Ernst & Young LLP ("E&Y"), on 24th August 2009,[288] setting out its then calculation of the value of NNUK's resources and asking NNUK whether it agreed with the calculation, and if not, to provide its alternative calculation together with the relevant supporting evidence. Bearing in mind the fast-approaching bar date of 30th September 2009 for submitting claims in NNC's insolvency proceedings, the Regulator asked for a response by 7th September 2009. NNUK responded through E&Y by letter dated 3rd September 2009,[289] stating that "*[h]aving taken advice, we consider that it would not be appropriate for the Joint Administrators to examine or provide opinions on the calculations which have been carried out by PwC on behalf of the trustees and the Pensions Regulator*".

271.    Accordingly, the Regulator is entitled under regulation 12 to deem the value of NNUK's resources to be an amount determined by it. The Regulator,

---

[288] **[B4a/T18/pp.2124-2129].**

[289] **[B4a/T19/pp.2130-2131].**

as set out in parts (b) and (c) below, has therefore deemed this value to be $453m.

272.    The Regulator submits that this satisfies the employer test. However, in order to set out fully the reasoning behind its decision, it will explain in outline in the following section how its calculation has been carried out.

*(b) Method for calculating the value of NNUK's resources*

273.    PwC provide a detailed explanation of their approach in section 4 of their report, the results then being summarised in section 5. The following paragraphs provide a brief summary of the approach.

274.    In line with regulation 8(2), the approach is to:

274.1.    estimate the entity value and

274.2.    then adjust this by the relevant pension scheme related balance (together with any related fair value differences).

*(c) NNUK's entity value*

275.    NNUK's entity value being the amount for which it could (a) sell it assets and (b) settle its liabilities, the first question to be asked is what form a sale of NNUK's business and assets would take. PwC explain that in their expert opinion, NNUK would have two options: sell to a purchaser outside the Group or sell to another Group company.

276.    Taking the first option:

276.1.    The issue is whether NNUK would be able to sell its business on a going concern basis, or a break-up basis. PwC's analysis, with which the

135

Regulator agrees, is that the latter is the correct basis. In order to be sold on a going concern basis, the rest of the Nortel Group would have to agree to grant sufficient exclusive licences to the purchaser to allow the business of NNUK to continue to perform its core business. However, by granting such exclusive licences to the purchaser, the Nortel Group would lose the ability to set up a new business to replace NNUK's business (which it would need to do). Therefore, NNL would demand a considerable price for providing such licences to reflect the loss of value to the Group as a whole from granting them. PwC's analysis is that this price is not one that a purchaser outside the Group would pay. This is because the benefit that a purchaser would get from these licences would be less (and therefore the prices that a purchaser would be willing to pay for them would be less) than the loss to the Nortel Group in granting them (and therefore the amount that the Group would demand for them). Accordingly, NNUK would only be able to sell to a purchaser outside the group by selling its business and assets on a break up basis, without such licences.

276.2.    In PwC's opinion, such a sale of NNUK's <u>assets</u> would realise **$856m**.

276.3.    However, in order to reach a figure for NNUK's entity value, one then has to ask how much NNUK would need to settle its liabilities. Its only liability relates to the deficit in the pension scheme. However, given that it is not selling its business as a going concern, but instead on a break up basis, the value of its pension scheme liability is the buy-out debt, because there is no-one to run the scheme on. Therefore, the amount that it would need to settle its liabilities is **$3,546m.**

276.4.    Accordingly, this gives an entity value of **-$2,690m**, this being ($856m-$3,546m). In other words, NNUK has assets far below those needed to settle its liabilities.