277.   NNUK's only other option would be to sell to another Group company on a going concern basis. While a break up sale of the business and assets to an outside purchaser would not deprive the Group of the valuable exclusive licences granted to NNUK (these licences would most likely lapse and could be granted to another Group company), and the Group could re-establish the centre of operations of its EMEA network, the Group would nevertheless have <u>some</u> interest in NNUK continuing as a going concern without interruption. PwC estimates that NNUK is worth just over $1bn to NNC as a part of the Group. Moreover, unlike a purchaser out of the Group, a purchaser from within the Group could take on the scheme and run it as an ongoing scheme, because it will be taking on the business as a going concern. Therefore, it would be a very attractive purchaser to NNUK and correspondingly it would not need to offer NNUK very much at all to take the business and pension scheme off its hands. Accordingly, given the Group's interest in the NNUK business continuing as a functioning part of it, a sale to a Group purchaser would give the best price to NNUK for selling its assets and settling its liabilities.

278.   Given that NNUK's only other option is to sell its assets to an outside purchaser for $856m, far less than it needs to settle its pension liabilities, PwC consider and the Regulator agrees that NNC or another Nortel Group company could successfully offer NNUK a nominal amount for both the NNUK business and its pension liabilities. Accordingly, its entity value is <u>**$1.**</u>

*(c) Adjusting NNUK's entity value to reach the value of its resources*

279.   In order to reach the value of NNUK's resources, this entity value of $1 must then be adjusted by the relevant pension scheme related balance together with any related fair value differences. What this means is that the fair value of the pension liability must be added back on to NNUK's entity value.

137

280.  Given that the pension liability is being sold to another Nortel Group company who can run the Scheme on, PwC consider that the fair value of the pension liability is based on the <u>ongoing</u> funding liability rather than on the (far higher) buy-out measure. Accordingly, in their view the fair value of the pension liability is **$453m**, the value of the ongoing liability set out in the then most recent US accounts.

281.  Adding this figure to the $1 entity value gives a value of **$453m** for NNUK's resources.

*(d) The 3-stage approach set out in regulations 9(4), (6) and (7)*

282.  PwC deal with this at the end of section 5 of their report. In their expert opinion, with which the Regulator agrees, the value of NNUK's resources as calculated at stages 1, 2 and 3 of the process are as follows:

|  | Value of NNUK's resources ($m) | 50% of estimated section 75 debt ($m) |
|---|---|---|
| Stage 1 | 2,412 | 1,773 |
| Stage 2 | 2,412 | 1,773 |
| Stage 3 | 453 | 1,773 |

283.  The Regulator considers the figure at stage 3 to be the appropriate one, because it is the most accurate and sophisticated manner of assessing the value of NNUK's resources. However, the figures at stage 1 and 2 are explained below.

284.  Starting with stage 1, regulation 9(4) states that this is:

"*NA + P (assuming P is a liability; if P is an asset then deduct P) + Se*"

where

*NA* means "*net assets*"

*P* means "*relevant pension scheme related balances*"

*Se* means "*subordinated liabilities*"

285.   NNUK's accounts for the year ended 31st December 2007 (the most recent before the calculation date of 30th June 2008) disclose net assets of $2,019m and relevant pension scheme related balances of $393m. Therefore, the figure at stage 1 is the sum of these two figures: $2,412m.

286.   Turning to stage 2, regulation 9(6) states that the figure at stage 2 is derived by adding:

"*to the amount resulting from the applicable stage one any identified FVD, calculated in relation to any asset (or assets) or liability (or liabilities) selected by the relevant entity*"

where *FVD* means "*fair value difference*" (regulation 2(1)).

287.   No FVDs have been applied at stage 2 because NNUK has not selected any assets or liabilities to adjust.

**(2) The associate test**

288.   The Regulator submits that the associate test is satisfied at 30th June 2008, and that the relevant figures for the value of NNC's resources on one

139

hand and the difference between NNUK's resources and 50% of the estimated section 75 debt on the other are as follows:

| Value of NNC's resources ($m) | Difference between the value of NNUK's resources and 50% of estimated section 75 debt ($m) |
|---|---|
| 5,308 | 1,320[290] |

Therefore, it can be seen that NNC easily satisfies the associate test.

*(a) The general framework for calculating the value of NNC's resources*

289.    The starting point for calculating the value of NNC's resources is regulation 8(3) of the FSD Regs, which provides that:

"*The value of the resources of a business associate shall be its entity value excluding relevant pension scheme related balances and any [related employer balances] together with any related fair value differences as verified in accordance with regulation 10*" (the reference in regulation 8(3) to "*employer investment balances*" is a typographical error which should read "*related employer balances*", as corrected in the above extract).

290.    Therefore, as with the calculation of an employer's resources (here NNUK), the Regulator's principal focus in calculating the value of the resources of an associate (here NNC) is upon ascertaining NNC's entity value.

291.    The other constituents of NNC's resources referred to in regulation 8(3) are its "*relevant pension scheme related balances*" and its "*related employer*

---

[290] This being $(1,773-453)m.

*balances*", together with any "*related fair value differences*". "*Relevant pension scheme related balances*" has been dealt with in paragraphs 264-265 above. "*Related employer balances*" are defined in regulation 2(1) as:

> "*any amount which has been taken into account in the calculation of the value of the resources of the employer which, were it also to appear in the calculation of the value of the resources of a business associated, would result in the value of the resources of the business associate and the employer together being overstated or understated by that amount; and such an amount may include (but is not limited to)-*
>
> *(a) any direct or indirect investment in the share capital of the employer;*
> *(b) any liability of a business associate relating to the employer's liabilities to the extent that the corresponding liability is deducted in the calculation of the value of the employer's resources;*
> *(c) any subordinated employer funding; and*
> *(d) provisions made by the business associate against any amounts owed by the employer to the business associate, to the extent that the corresponding liability is deducted in the calculation of the value of the employer's resources.*"

292.   The purpose of excluding "*related employer balances*" is as follows. The associate test is only satisfied if the value of the employer's resources plus the value of the associate's resources are greater than 50% of the estimated section 75 debt. Therefore, to the extent that the employer forms part of the value of the associate (as where the employer is a subsidiary of the associate), the value of the employer needs to be stripped out of the value of the associate in order to avoid double counting in this calculation.

293.   As in the case of the section on the employer test, this section begins by setting out (in part (b)) the calculation of the value of NNC's resources, that is,

141

of the entity value of NNC excluding its related employer balances and relevant pension scheme related balances.

294.    As in the case of the employer test, the FSD Regs include as one route for valuing an associate's resources a three-stage approach (regulations 9(5), (6) and (7)), the only difference from the employer test being at stage 1, where the calculation is set out in regulation 9(5,) rather than in 9(4) as for the employer test. Once all three stages are carried out, this takes one to exactly the same result, namely NNC's entity value excluding related employer balance and relevant pension scheme related balances. Therefore, in part (c) of this section, the Regulator will set out its calculations at each stage of the three-stage process, and explain how they are reached.

295.    Again, as in the case of the employer test, regulation 12 (the Regulator's power to deem value of resources) requires mention (see paragraph 268 above). It applies equally to the valuation of the resources of associates (such as NNC) as it does to employers (such as NNUK). To recap, if the Regulator gives the associate the opportunity to carry out its own calculation, but it does not do so, the Regulator is able under regulations 12(1) and (2) to determine conclusively the value of the associate's resources.

296.    In the present case, the Regulator wrote to NNC on 4th September 2009,[291] setting out its then calculation of the value of NNC's resources and asking NNC whether it agreed with the calculation, and if not, to provide its alternative calculation together with the relevant supporting evidence. The letter was sent to NNC a week after the equivalent letter to NNUK, in case NNUK wished to contest the Regulator's calculation, in which case this information would have been included in the NNC letter in the context of the calculation of the "related employer balances". Bearing in mind the fast-approaching bar date of 30th September 2009 for submitting claims in NNC's

---

[291] [B4a/T20/pp.2132-2136].

insolvency proceedings, the Regulator asked for a response by 18th September 2009. NNC responded by letter dated 16th September 2009,[292] stating that "*we must at this stage, decline the opportunity to comment on the calculation you refer to in your letter, and also decline to provide an alternative valuation*".

297.    Accordingly, the Regulator is entitled under regulation 12 to deem the value of NNC's resources to be an amount determined by it. The Regulator, as set out in part (b) below, has deemed this value to be $5,308m.

298.    As in the case of the employer test, the Regulator submits that this satisfies the associate test. However, in order to set out the reasoning behind its decision, it will explain in outline in the following section how the calculation has been done.

 (b) The calculation of the value of NNC's resources

299.    The calculation of NNC's resources is straightforward. The only adjustment needed to the market capitalisation figure (i.e. the value that the market places on NNC shares) of $4,083m to give NNC's entity value is the addition of the 30% control premium (which again needs to be included because in valuing NNC we are valuing the Group as a whole), giving a figure of $5,308m.

300.    This figure then needs to be adjusted for any related employer balances and relevant pension scheme related balances (as adjusted by fair value differences). This requires one to subtract the value of NNUK's resources ($453m) in order to avoid the double counting referred to in paragraph 292 above, and then add the fair value of NNUK's pension deficit: $453m. The two

---

[292] **[B4a/T21/p.2137].**

cancel each other out, so ultimately no adjustment is made to the $5,308m figure.

301.   Accordingly, the value of NNC's resources is **$5,308m**.

*(c) The 3-stage approach*

302.   In the Regulator's opinion, the value of NNC's resources as calculated at stages 1, 2 and 3 of the process set out in Regulation 9 are as follows:

|  | Value of NNC's resources ($m) | Difference between the value of NNUK's resources and 50% of estimated section 75 debt ($m) |
|---|---|---|
| Stage 1 | 2,305 | 1,320 |
| Stage 2 | 2,305 | 1,320 |
| Stage 3 | 5,308 | 1,320 |

303.   As in the case of NNUK's resources, the Regulator considers the figure at stage 3 to be the appropriate one, because it is the most accurate and sophisticated manner of assessing the value of NNC's resources. However, the above figures for stage 1 and 2 are explained as follows.

304.   Starting with stage 1, regulation 9(5) states that this is:

"*NA + P (assuming P is a liability; if P is an asset then deduct P) – Eb (assuming Eb is an asset; if Eb is a liability then add Eb)*"

where

*NA* means "*net assets*"

144

> *P* means "*relevant pension scheme related balances*"

> *Eb* means "*related employer balances*"

305.   Starting with stage 1, NNC's balance sheet as at December 2007 gives a net assets figure of $2,758m. As explained above (paragraph 300), Eb is $453m. P is zero because the then most recent US NNC accounts do not include a figure for it. Accordingly, the stage 1 figure is $2,305m (derived as $2,758-453).

306.   No adjustment is applied at stage 2 because NNC has not selected any assets or liabilities to apply FVDs to.

## APPENDIX 5

## The estimated section 75 debt (section 44(5))

307.   Section 44(5) requires the Regulator to estimate the section 75 debt that would have arisen at the relevant time if such a debt had arisen then under section 75(2) of the Pensions Act 1995.

308.   The Scheme actuary, Mr Mobbs of Watson Wyatt, has calculated what such section 75 debt would have been, and he puts the figure at £1,777m. The explanation of this can be found in his letter of 17 December 2009.[293] The Regulator has adopted this calculation for the purpose of estimating the debt, and accordingly estimates it at £1,777m.

---

[293] **[B4a/T17/pp.2120-2123]**

## APPENDIX 6

## "Connected with or an associate of the employer"; section 43(6)(c) Pensions Act 2004

309.   Under section 43(6)(c) of the Act, in order to issue a financial support direction to a person, the person must be, at the relevant time, a person, other than an individual, who is connected with, or an associate of, the employer.

310.   The '**relevant time**' is the time determined by the Regulator in accordance with section 43(2), being a time which falls within section 43(9) of the Act. Subsection 43(9) provides that

> *"A time falls within this subsection if it is a time which falls within a prescribed period which ends with the determination by the Regulator to exercise the power to issue the financial support direction in question."*

311.   The "prescribed period" referred to in the subsection is 24 months (Regulation 5 of the Pensions Regulator (Financial Support etc) Regulations 2005 (S.I. 2005/2188) as amended by the Pensions Regulator (Miscellaneous Amendment) Regulations 2009 (S.I. 2009/617), Regulation 2(2).

312.   In this case the Regulator has determined 30 June 2008 as the relevant time.[294] This falls within the period of 24 months ending with the Regulator's determination to exercise the power to issue a financial support direction.

---

[294] See paragraph 253 in Appendix 4.

147

313.    As at the relevant time, each of the Targets was a) not an individual and b) connected with and an associate of the employer, NNUK.

314.    Whether a person is connected with, or an associate of, the employer is determined by reference to section 249 of the Insolvency Act 1986 and section 435 of the Insolvency Act 1986 respectively (these sections of the Insolvency Act 1986 are applied to the Pensions Act 2004 by section 51(3) of that Act).

315.    A person is "connected with" a company in accordance with section 249 of the Insolvency Act 1986 if he is a director or shadow director of the company, or an associate of such a director or shadow director, or he is an associate of the company. The word "associate" in section 249 has the meaning given by section 435 of the Insolvency Act 1986.

316.    Section 435 of the Insolvency Act 1986 provides, so far as relevant,:

*"(1) For the purposes of this Act any question whether a person is an associate of another person is to be determined in accordance with the following provisions of this section (any provision that a person is an associate of another person being taken to mean that they are associates of each other).*

*(6) A company is an associate of another company -*

*(a) if the same person has control of both, or a person has control of one and persons who are his associates, or he and persons who are his associates, have control of the other, or*

*(b) if a group of two or more persons has control of each company, and the groups either consist of the same persons or could be regarded as consisting of the same persons by treating (in one or more cases) a member of either group as replaced by a person of whom he is an associate.*

148

*(7) A company is an associate of another person if that person has control of it or if that persons who are his associates together have control of it.*

*(10) For the purposes of this section a person is to be taken as having control of a company if -*

*(a) the directors of the company or of another company which has control of it (or any of them) are accustomed to act in accordance with his directions or instructions, or*

*(b) he is entitled to exercise, or control the exercise of, one third or more of the voting power at any general meeting of the company or of another company which has control of it;*

*and where two or more persons together satisfy either of the above conditions, they are to be taken as having control of the company.*

*(11) In this section "company" includes any body corporate (whether incorporated in Great Britain or elsewhere); and references to directors and other officers of a company and to voting power at any general meeting of a company have effect with any necessary modifications."*

317. As applied to NNUK and the Targets of the proposed financial support direction, it is relevant that:

    (i)       A company is an associate of another company if the same person has control of both (s.435(6));

    (ii)      a company is an associate of another person if that person has control of it (s.435(7)), and

    (iii)     that a person is taken as having control of a company if he is entitled to exercise or control the exercise of 1/3 or more of the voting power at any general meeting of the company or of another company that has control of it (s. 435(10)(b)).

149

318.    In respect of each of the Targets, the corporate structure chart at Appendix 3 shows their position within the Nortel Group. The status of each Target as an associate of NNUK will be considered in turn.

319.    NNUK is a wholly owned subsidiary of NNL, which in turn is a wholly owned subsidiary of NNC. Both NNC and NNL are therefore taken as having control of NNUK under s. 435(10) and are associates of it (s.435(7)).

320.    The following Targets are also wholly or majority owned by NNL,[295] and thus are controlled by the same person as has control over NNUK. They are therefore associates of NNUK (s.435(6):

    (iv)        NNI;
    (v)         Nortel Networks (Ireland) Limited; and
    (vi)        Nortel Networks SA ("NN France")

321.    NNIFH BV and Nortel Telecom International Limited were wholly owned subsidiaries of NNUK as at the relevant date. NNUK is taken as having control of these two companies, which are therefore associates of NNUK (ss. 435(1),(7),(10)).

322.    As regards the EMEA Targets other than NNIFH BV, Nortel Networks SA, Nortel Networks (Ireland) Limited and NN France SAS, all of these Targets are wholly owned by NNIFH BV which is wholly owned by NNUK. NNUK has control over NNIFH BV which has control over these EMEA Targets. Accordingly they are associates of NNUK (ss. 435(7) and (10)).

323.    NN CALA is a wholly owned subsidiary of NNI. NN France SAS is wholly owned by Northern Telecom France SA, which is owned as to 99.99% by

---

[295] NNL owns 91.17% of the shares in Nortel Networks SA. It owns the entire shareholding in NNI and Nortel Networks (Ireland) Limited.

Nortel Networks SA. NN CALA, Northern Telecom France SA, and NN France SAS are accordingly ultimately controlled by NNL, as is NNUK. These companies are therefore associates of NNUK (s.435(6)).

324.    Consequently, each of the Targets is a person that falls within section 43(6)(c) of the Act because they were, at the relevant time, an associate of and connected with NNUK, which was the employer in relation to the Scheme.    Each of the Targets is a person to whom the Regulator can issue an FSD.

**APPENDIX 7**

**The Scheme**

325.   Key information is set out in the following table:

| Scheme details | | |
|---|---|---|
| **Name of scheme** | Nortel Networks UK Pension Plan | |
| **Type of scheme** | Defined benefit | |
| **Status of scheme** | Closed to new members in 2000<br><br>Accrual ceased on entry to PPF assessment | |
| **Membership** | As at 30/09/2008 from Scheme Return data<br><br>Active: 936 (nil from14 January 2009)<br><br>Deferred: 21,538<br><br>Pensioner: 20,243<br><br>Total: 42,717 | |
| **Size of fund** | £1.4bn as at 13 January 2009 | |
| **Size of various deficits** | PPF: | £670m as at 13 January 2009 |
| | Section 75: | £2.1bn as at 13 January 2009 |

152

# APPENDIX 8

## Abbreviations

326.   This Appendix is divided into three:

    326.1.   Part A – General abbreviations used in witness statements

    326.2.   Part B – Technological abbreviations used in witness statements

    326.3.   Part C – Further Abbreviations used in the Warning Notice

### Part A – General (witness statements)

| | |
|---|---|
| ADB Committee | Administration Discretions and Benefits Committee |
| AT&T | American Telephone & Telegraph |
| BNR | Bell Northern Research, an R&D business of Nortel |
| BT | British Telecommunications plc |
| Canadian PFPC | Canadian Pension Fund Policy Committee |
| CALA | Caribbean and Latin America |
| CFO | Chief Financial Officer |
| Comfort Letter | Comfort letter dated 25 August 2005 from NNC/NNL to the Trustee |
| Confidentiality Agreement | Confidentiality agreement between the directors of the Trustee and NNUK and NNL |
| CTO | Chief Technology Officer |
| C&W | Cable and Wireless |
| DB | Defined benefit |
| DC | Defined contribution |
| EMEA | Europe, Middle East and Africa |
| Funding Working Party | Funding working party with the express terms of reference for negotiating with NNUK and NNC |

| | |
|---|---|
| GPP | Group Personal Pension Plan |
| ICL | International Computers Limited |
| Interim Funding Agreement | Agreement on funding for the Scheme agreed in around June 2005 |
| Matra | Matra Communications S.A.S. |
| Mercer | Mercer Human Resource Consulting |
| Mercury | Mercury Communications |
| NAPF | National Association of Pension Funds |
| Netas | Nortel Networks Netas Telekomunicasyon A.S, Nortel's operation in Turkey |
| Nortel | The Nortel Group |
| Nortel Group | The Nortel Group |
| NNC | Nortel Networks Corporation |
| NNL | Nortel Networks Limited |
| NNI | Nortel Networks Incorporated |
| NNOCL | Nortel Networks Optical Components Limited |
| NNUK | Nortel Networks UK Limited and generally the UK operating company of the Nortel Group |
| NWT | Nortel World Trade |
| One 2 One | Mercury One 2 One |
| PIC | Pensions Investment Committee |
| P&L | Profit and Loss |
| Plan | Nortel Networks UK Pension Plan |
| PwC | PricewaterhouseCoopers LLP |
| R&D | Research & Development |
| STC | STC plc |
| STL Labs | STC's R&D laboratories |

| Towers Perrin report | The March 1995 Towers Perrin report (on Governance) |
|---|---|
| Trustee | Nortel Networks UK Pension Trust Limited |
| UK PFPC | UK Pension Fund Policy Committee |

## Part B – Technology (witness statements)

| AADS | Adaptive Antennas Beams Switching |
|---|---|
| ACE | Agile Communication Environment |
| ANSI | American National Standards Institute |
| AS | Application Server |
| ATM | Asynchronous Transfer Mode |
| BABT | British Approvals Board of Telecommunications |
| BTS | Base Transceiver Station |
| COTS | Commercial Off the Shelf |
| CDMA | Code Division Multiple Access |
| CS | Call Server |
| CSCF | Call Session Control Function |
| DECT | Digital European Cordless Telephone |
| DMS | Digital Multiples System |
| EBI | Even Bit Inversion |
| EMEA | Europe Middle East & Africa |
| ETSI | European Technical Standards Institute |
| FAS 2 | Fibre Access System 2 |
| FWA | Fixed Wire Access |
| GSM | Global System for Mobile Communications |
| GSF | Generic Services Framework |

155

| | |
|---|---|
| HLR | Home Location Register |
| HSS | Home Subscriber System |
| IEEE | Institute of Electrical and Electronics Engineers |
| IS-136 | A North American wireless standard (known also as US-TDMA) |
| IMS | Internet Protocol Multi Media System |
| IP | Internet Protocol |
| IPR | Intellectual Property Rights |
| ITU | International Telecommunications Union |
| LTE | Long Term Evolution standards |
| MCS | Multimedia Communication Server |
| MG | Media Gateways |
| MIMO | Multiple Input Multiple Output technology |
| MMP | DMS 100 Multi Market Product |
| MPLS | Multiprotocol Label Switching |
| MSC | Mobile Switching Centre |
| MTS | Mid Term System |
| NTV | Network Trial Vehicle |
| OBI | Odd-bit Inversion |
| OFDM | Orthogonal Frequency-division Multiplexing |
| PBT or PBB-TE | Provider Backbone Transport |
| PBX | Private Branch Exchange |
| PDMX | Programmable Multiplexer |
| PLSB | Provider Link State Bridging |
| PLD | Primary Line Draw |
| PSTN | Public Switched Telephone Network |
| PVG | Packet or Passport Voice Gateway |

| SDMA | Spatial Division Medium Access |
|---|---|
| SDH | Synchronous Digital Hierarchy |
| SFS | Single Fabric (Packet) Switch |
| SONET | Synchronous Optical Networking |
| SPM | Spectrum or SDH Peripheral Module |
| SRU | Small Remote Unit |
| Succession | The term used to describe Nortel's next generation technology that would replace DMS products |
| TDM | Time Division Multiplex |
| TDMA | Time Division Multiple Access |
| TN-4X & TN-4XE | Multiplexers produced by Nortel |
| TXE2 | Telephone Exchange |
| TXE4 | Telephone Exchange |
| UMTS | Universal Mobile Telecommunications System |
| US-TDMA | A North American wireless standard (known also as IS-136) |
| VoATM | Voice over Asynchronous Transfer Mode |
| VLR | Virtual Location Register |
| VOIP | Voice over Internet Protocol |
| VPN | Virtual Private Network |
| WiMax | Worldwide Interoperability for Microwave Access |
| WLT | Wireless Technology Laboratories Research & Development facility in Ottawa |
| WWRF | Wireless World Research Forum |

**Part C – Abbreviations used in Warning Notice**

| APA | Advance Pricing Agreement |
|---|---|
| BNR | Bell Northern Research |

157

| BT | British Telecom |
|----|----------------|
| CALA | Caribbean and Latin America |
| CTO | Chief Technology Officer |
| DMS | Digital Multiplex System |
| EMEA | Europe, Middle East and Africa region |
| Flextronics | Flextronics Telecom Systems Limited |
| GPP | Group Pension Plan |
| the Group | The Nortel Group of companies |
| ICL | International Computers Limited |
| Matra | Matra Communications S.A.S. |
| Mercury | Mercury Communications |
| Nortel | The Nortel Group |
| Nortel Group | The Nortel Group |
| NNC | Nortel Networks Corporation |
| NN France | Nortel Networks SA |
| NNI | Nortel Networks Inc |
| NNIF | Nortel Networks International Finance & Holding BV |
| NN Ireland | Nortel Networks (Ireland) Limited |
| NN Germany | Nortel GmbH |
| NNL | Nortel Networks Limited |
| NNOCL | Nortel Networks Optical Components Limited |
| NNUK | Nortel Networks UK Limited and generally the UK operating company of the Nortel Group |
| R&D | Research & Development |
| the Scheme | Nortel Networks UK Pension Plan |
| SEC | US Securities and Exchange Commission |

| STC | STC plc |
|---|---|
| STL Labs | STC's laboratories |
| Trustee | Nortel Networks UK Pension Trust Limited |
| UK PFPC | UK Pension Fund Policy Committee |
| Verizon | Verizon Communications Inc |

# Exhibit 3

IN THE MATTER OF NORTEL NETWORKS UK PENSION PLAN
AND IN THE MATTER OF THE PENSIONS ACT 2004

---

### REGULATOR'S SKELETON ARGUMENT

---

(References in the form **[X/Y/Z]** are to **[bundle/tab/page]** of the bundles in support of the Warning Notice ("**WN**"). References to paragraphs of the WN in this skeleton are in the form §[*paragraph number*])

## Introduction

1. In its Warning Notice dated 11 January 2010, the Regulator set out why it considered that it would be reasonable for a Financial Support Direction ("**FSD**") to be issued under s 43 of the Pensions Act 2004 ("**PA 2004**") against the target companies set out on p.2 of the WN (the "**Targets**"), all of which are part of the Nortel Group ("**the Group**"), in order to support the Nortel Networks UK Pension Plan (the "**Scheme**"), the occupational pension scheme of Nortel Networks (UK) Limited ("**NNUK**"), which has a s 75 deficit[1] of some £2.1bn (as at 13 January 2009).

2. The Targets fall into three categories, reflecting their place in Nortel's regional structure:

   2.1. the Canadian Entities (the two parent companies of the Nortel Group: Nortel Networks Corporation ("**NNC**") and Nortel Networks Limited ("**NNL**"));

   2.2. the American Entities (the Nortel Group's operating company in the USA, Nortel Networks Inc ("**NNI**"), and that in the region of Caribbean and Latin America (Nortel Networks (CALA) Inc) ("**NN CALA**"));

   2.3. the EMEA Entities (the remaining Targets, all of whom formed part of Nortel's EMEA Region and had NNUK as their headquarters and centre of operations).

---

[1] A deficit under section 75 of the Pensions Act 1995. All section numbers referred to in this skeleton argument are to sections of the Pensions Act 2004 unless otherwise stated.

3. The three categories of Targets have responded as follows to the WN:

    3.1. The Canadian Entities are in insolvency proceedings in Canada with Ernst & Young Inc appointed as "monitor". They have instructed Freshfields LLP to act for them in this jurisdiction in relation to the WN. As set out in detail at paragraph 39 below, Ernst & Young Inc have obtained a court order in Canada that the Regulator's acts in pursuing an FSD against the Canadian Entities are null and void in the Canadian insolvency proceedings. The Regulator has obtained leave to appeal that order from the Court of Appeal in Ontario, with the appeal listed for 16 June 2010. The Canadian Entities have filed no representations in response to the WN.

    3.2. The American Entities are in Chapter 11 insolvency proceedings in the USA. They have instructed Linklaters LLP to act for them in this jurisdiction in relation to the WN. As set out in detail at paragraph 40 below, they have obtained a court order in the USA against the Trustee and PPF ordering that the Regulator's acts in pursuing an FSD against them are deemed void as against those two companies. The Trustee and PPF are in the course of appealing that order. The American entities have filed no representations in response to the WN.

    3.3. One of the EMEA Entities, Nortel Telecom International Limited, has filed representations in response to the WN. The remainder of the EMEA Entities has not filed any representations, despite the grant by the Determinations Panel ("**DP**") of an extension of time for representations. The remaining EMEA Entities have confirmed that they do not intend to file any representations.[2]

4. In the light of the representations received and other material obtained by the Regulator's case team, the Regulator no longer seeks an FSD against four of the original targets to the WN: Nortel Communications Holdings (1997) Limited, Nortel Networks Israel (Sales & Marketing) Limited, Nortel Networks Ukraine Limited and Nortel Telecom International Limited.

---

[2] Letter from Ernst & Young LLP to DP Support, dated 10 May 2010.

5.  The Regulator does not anticipate attendance at this hearing on behalf of the Canadian Entities, the American Entities or the EMEA Entities. The Trustee will be represented at this hearing.

6.  The WN is a detailed and lengthy document, with a considerable number of exhibits, so care has been taken not to duplicate its content in this skeleton. Instead, it is hoped that this skeleton will provide the easiest way into the detail of the case and act a guide to the WN and the attached exhibits, as well as bringing the position up to date.

7.  Accordingly, this skeleton is divided into the following sections:

    7.1. An introduction to s.43 PA 2004, and the Nortel Group, the Targets and the Scheme;

    7.2. Developments that have occurred since the issue of the WN, and

    7.3. The relevant requirements of s 43 and why in outline the Regulator considers that each is satisfied.

**s.43 PA 2004 – an introduction**

8.  The relevant requirements of s 43 are that:

    8.1. the scheme is an occupational pension scheme (s 43(1)) and does not fall into either of the two exceptions in s 43(1)(a) and (b);

    8.2. the employer, NNUK, is insufficiently resourced at a "relevant time" (s 43(2)), this being an "insufficiently resourced" case rather than a "service company" case;

    8.3. the Targets are each connected with or an associate of the employer, NNUK, at the relevant time (s 43(5)(a), (6)(c)); and

3

8.4. the Regulator is of the opinion that it is reasonable to impose the requirements of an FSD on the Target in question (s 43(5)(b)).

9. The first requirement is clearly made out here. The same is true of the third: the Targets are all associates of NNUK within the meaning of section 435 of the Insolvency Act 1986[3] as part of the structure of the Group and by reason of their ultimate ownership by NNC. Control of all of the Targets (and of NNUK) within the meaning of section 435(10) of the Insolvency Act 1986, was held by the ultimate parent of the Group, NNC. Full details are given in WN §187 pp77-78, and Appendix 6 to the WN (pp147-151). A structure chart of the Nortel Group as at 11 February 2009 is at Tab 1 of Bundle 2 in support of the WN. It should be noted that under s.43(4) an FSD may be issued to one or more persons.

10. Accordingly section 3 below focuses on the remaining two limbs of s.43, being (i) the reasonableness of issuing the FSD against each of the Targets and (ii) the test of insufficiently resourced.

**An introduction to the Nortel Group and the Scheme**

**(a) An introduction to the Group**

11. The WN contains a detailed explanation of the relevant aspects of the structure and operation of the Group, and NNUK's place in it, at:

11.1.    §§4-18 pp6-12 (Executive Summary); and

11.2.    §§29-172 pp15-69.

12. The Regulator submits that the key outline points are as follows.

---

[3] Being the relevant provision for the test of "associates" of NNUK in section 43(6), see s.51(3)(b).

13. Prior to its insolvency on 14.1.09, the Nortel Group operated in the field of telecommunications and network solutions.

14. The Group started out as a manufacturing group based in North America (WN §§32-33 pp17-18), but thereafter expanded into the following global structure:[4]

    14.1.    a holding company, NNC;

    14.2.    NNC's immediate subsidiary and the Group's operating company in Canada: NNL;

    14.3.    two main subsidiaries of NNL, being the Group's operating companies in the USA and EMEA (NNI and NNUK);

    14.4.    subsidiaries of NNI that operated in the Americas, including NN CALA; subsidiaries of NNUK that operated in EMEA; and certain further subsidiaries of NNL that included Nortel Networks (Ireland) Limited, Nortel Networks SA and its subsidiary Nortel Networks France SAS.

15. The Group had changed by the 2000s to being a developer and supplier of telecommunications software, hardware and services, with a global reach like its competitors Ericsson, AT&T and Cisco Systems.

16. Integral to this change was its acquisition in 1991 of STC plc ("**STC**"), a substantial UK public company whose research and development expertise allowed the Group to penetrate the UK and European markets as it had done the North American one. STC came with a substantial pension plan, the Scheme, which in 1991 had a healthy surplus.

17. From this point on, one of the Group's centres of excellence for research and development ("**R&D**") was the UK.

18. From the late 1990s onwards, the Group was operating on a highly integrated and interdependent global basis. Technical expertise was shared on a global basis and the finance function operated on a global basis as well.

---

[4] See the Structure Chart at [2/1].

19. The real value of the Group is its R&D. In order to be able to increase its overall base and market reach the Nortel Group needed to demonstrate that it possessed ground-breaking innovative technology and/or that its engineers had set the standard for the various products it sold. In particular, in order for it to be a world market leader, Nortel needed to have products available for both the North American and rest of the world markets. Different technological standards are in place for these two markets (known as "ANSI" and "ETSI" respectively).

20. The acquisition of STC played a key role in this, by giving the Group access to the inventors of other technology which (i) operated on the ETSI technological standards used in much of the world outside North America (including EMEA and most countries in the Caribbean and Latin America ("**CALA**") and / or (ii) had worldwide application. These included optical transmission systems that were developed by STC and were crucial to Nortel's optical revenues in the USA (WN §§99-101, pp. 43-4), and wireless technology areas where STC's work for the military had led to more advanced technical capabilities than Nortel possessed at the time.[5] From the acquisition of STC onwards, Nortel's operations in the UK played a key part in the Group, producing more than their fair share of patents and ground-breaking research, including various long term projects that helped enable Nortel to become a world leader (WN §§6, p.7). This process continued with the incorporation of NNUK as the main UK operating company on 25 February 2000. NNUK's R&D personnel consisted of many well recognized engineers who sat on various standards committees thereby enhancing the Group's status as a world leader in technology and innovation.

21. By way of example of the benefits provided by NNUK for the Group, several of Nortel's products sold worldwide after 1991 were developed in NNUK's R&D laboratories. These included products capable of being sold both in North America and the rest of the world, such as the work done in Maidenhead on the wireless technology of "GSM", which enabled NNI to become one of the main

---

[5] A/5/witness statement A. Jeffries, paragraphs 5-18.

suppliers of GSM in North America. GSM is a wireless technology and is currently the most popular standard for mobile telephone networks worldwide.

22. A considerably more detailed account of NNUK's contribution to the Group and its R&D can be found at WN §§94-149 pp41-61 and Appendix 2 pp114-126.

23. In understanding how the Group operated, the most important features to appreciate are:

    23.1. its interdependent and highly integrated nature; and

    23.2. its operation through business lines rather than corporate entities.

24. The Group operated as essentially one entity, with technological and other expertise shared throughout it (WN §§45-74 pp22-33). Instead of a collection of separate corporate entities acting independently, the Group operated through four business lines- one of each of its main product areas- with instructions being given from Canada at the top of each line, and the people involved in each business line reporting back up it to his or her superior. Overall management of the Group was in the hands of NNC and NNL, and their boards were responsible for appointing all the key posts in the Group. Accordingly, NNUK's officers all reported ultimately to executives of NNC and NNL in Canada. Therefore, legal entities were unimportant to the operation of the Group, because the business was run across the various legal entities and without regard to them. By way of example, NNUK's board did not consist of the individuals who actually ran the business of the Group in the UK (or EMEA) or indeed have any significant role in the operation of that business.

25. Therefore, while the Regulator attached a corporate structure chart to the Warning Notice at [2/1], it also included an illustration of how the group operated in practice in the form of a business line table after WN §49, which is reproduced for convenience below:



26. The Group also divided its operations into four sales regions that enabled the Group to offer an efficient and more localized service to customers. These were: North America, CALA, Asia Pacific and EMEA. NNUK was by far the largest Nortel presence in the EMEA region and served as the centre of operations for EMEA, with its senior management team in Maidenhead acting as the senior management of EMEA. They had overall responsibility for all EMEA sales, finance, human resources, legal matters and customer support.

27. It is clear from the witness statement of Ms Sharon Rolston dated 14.1.09,[6] filed on behalf of those EMEA Entities making applications for administration orders in this jurisdiction, that "*the principal activities of the Company* [NNUK] *are the*

---

[6] **[1/2]**.

*development and supply of telecommunication equipment and software services and serving as centre of operations of the EMEA Region*" (paragraph 33).

28. The value of this role was substantial and significant. The functions provided by NNUK in respect of EMEA removed the need for the individual EMEA entities to provide these functions themselves. By way of example, 13 important functions listed in WN §143 pp58-59 were all provided by NNUK, including:

28.1. significant decisions in respect of the operations of the EMEA companies;

28.2. management of sales functions;

28.3. management of treasury functions;

28.4. management of legal and human resources functions;

28.5. significant decisions in respect of sales and dealings with customers;

28.6. management, supervision and decision-making in respect of taxation;

28.7. financial and control functions;

28.8. management of compliance, ethics and corporate security matters; and

28.9. treasury and banking functions.

More detail on this issue is found at WN §§141-149 pp57-61.

29. As far as the corporate relationship between NNUK and the other EMEA companies is concerned, NNUK was at the time of its entry into insolvency the parent of all EMEA entities that are Targets with the exceptions of Nortel Networks SA, Nortel Networks France SAS and Nortel Networks (Ireland) Ltd, following the settlement in 2007 of an intercompany balance owed by NNL to NNUK by NNL transferring the shares in the EMEA entities to NNUK (a

transaction called "Project Swift"). However, the Regulator suggests that the formal corporate relationship between NNUK and the other EMEA companies is of little importance in a group where legal entities were disregarded: what is more important is what role NNUK played vis a vis EMEA in the Group.

30. Turning finally to the downturn of the Group, this is dealt with in more detail at WN §§161-172 pp65-69. With the bursting of the dot.com bubble in early 2001, the Group began to face major problems. Despite attempts to deal with the problem by restructuring the Group, on 14.1.09:

    30.1. NNC and NNL applied to the Ontario Supreme Court of Justice for, and were granted, an order under the Companies' Creditors Arrangement Act ("**CCAA**") that gave relief from creditors. This order resulted in that Court supervising the Canadian companies in their management of their properties and business via a Court-appointed monitor ("**the Monitor**");

    30.2. NNI and certain of its subsidiaries incorporated in the US filed for relief under Chapter 11 of the United States Bankruptcy Code;

    30.3. NNUK and 18 of the Group's EMEA companies were placed in administration. England & Wales - consistently with the role played by NNUK as regards the Nortel companies located in EMEA - was recognized as the centre of main interests for those companies; and

    30.4. two other EMEA Entities entered into the Israeli equivalent of administration.

31. Almost all of the other Targets entered various forms of insolvency over the 6 months after 14 January 2009, as set out in WN §§171-172 p69.

**(b) The Targets**

32. The Targets have been described at paragraphs 2 and 3 above. They comprise the Canadian Entities, the American Entities and the EMEA Entities. Full details of their ownership is at WN §§19-23 pp12-14.

**(c) The Scheme**

33. The Scheme was established on 28.9.49. Its principal employer is NNUK. It closed to new members in 2000 and has assets of £1.4bn and a s.75 liability of £2.1bn, in both cases calculated as at 31.1.09.

34. As set out in the WN the following points are relevant relating to the Scheme:

34.1.    All company-side decisions in relation to the Scheme were taken far higher up the group than NNUK, namely by senior Group officers in Canada, so that NNC and NNL wholly and directly controlled NNUK's activities and stance in relation to the Scheme;

34.2.    Having taken over a Scheme with a very healthy surplus on the acquisition of STC in 1991, the group enjoyed an employer contribution holiday worth around £300m to it until 30.9.02, which benefited all Targets indirectly by freeing up these funds for other purposes of the Group.

34.3.    The effect of this contribution holiday was that by April 2002 a deficit of £117m had emerged on the ongoing funding basis;

34.4.    Despite the emergence of this deficit, NNC refused to allow NNUK to commit to a regular schedule of contributions to redress this during the period 2001-2005, instead only allowing ad hoc contributions. NNC did not consider it was in the best interests of the global Group to agree a schedule of contributions;

34.5.    the transfer pricing agreements in existence after 2000 did not cater or seek to deal with the historic pension deficiency. No attempt was made to compensate or alter the transfer pricing arrangements after 2002 or to enter