into any other arrangement (i.e. for contributions) when the pension deficiency appeared and, thereafter, increased significantly.

35. Further detail is given at:

35.1.    WN §14 p11 (introductory outline of Scheme);

35.2.    WN §§24-28 p15 and §§173-181 pp69-73 (more detailed factual narrative of history of Scheme);

35.3.    WN §§182-185 pp73-77 (influence and control of NNC and NNL in relation to the Scheme);

35.4.    WN 207-208 p.90-1 (historic pension deficiency);

35.5.    WN §207 p90 and §209 p91 (submissions); and

35.6.    WN Appendix 7 p152 (current status of Scheme).

**3. Developments since the issue of the WN**

36. There have been three main developments since the issue of the WN, one relating to each of the 3 groups of Targets.

37. First, and most simply, despite repeatedly requesting a significant extension of time until 14.5.10 to file their representations and necessitating a DP procedural hearing to decide upon the appropriate extension, the EMEA Entities[7] have chosen not to file or serve any representations. It is understood that their representatives will not be attending this hearing.

---

[7] Save Nortel Telecom International Limited.

38. The second and third developments relate to the Canadian and American Entities. Both these sets of Targets have made or supported applications in their domestic courts to have the UK FSD process against the Targets in question be declared both a breach of the domestic stay on proceedings in force in those countries and of no effect in the insolvency proceedings in those countries. The final result of those proceedings has yet to be determined. The Regulator's submissions on the relationship between these foreign proceedings and the decision that the DP has to make as to whether to grant a FSD are that:

38.1.    the foreign proceedings do not pose any obstacle to the grant of a FSD, and;

38.2.    that it is still very important to the Scheme to have an FSD issued to both the Canadian and American Entities.

39. Taking the Canadian proceedings first:

39.1. On 17.2.10, the Monitor of the Canadian Entities filed a motion in the Ontario Supreme Court Commercial List seeking an order:

(a) Declaring that the purported exercise of rights and the commencement of proceedings against NNC and NNL by the Regulator under PA 2004 amounted to breaches of the order made under the CCAA (referred to in paragraph 30.1 above);

(b) Authorizing, directing and requiring NNC and NNL and the Monitor to refrain from participating in any proceedings commenced by the Regulator in breach of the said order; and

(c) Declaring that for the purposes of the CCAA proceedings all acts taken by the Regulator in purported exercise of rights and in commencing any proceedings against NNC or NNL are null, void and to be given no force or effect in the CCAA proceedings, nor should they be recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against NNC or NNL (or their assets, property or undertaking in Canada).

39.2. On 26.2.10, Morawetz J of the Ontario Supreme Court of Justice Commercial List granted the relief listed at paragraph 35.1(a) and (c) and refused to grant part (b). The Canadian Entities have not been ordered to refrain from participating in these proceedings, and there is no bar on them doing so;

39.3. The Regulator considers that this decision is wrong in law and therefore has sought leave to appeal it. Leave to appeal was granted by the Honourable Justice Blair of the Court of Appeal for Ontario on 11 May 2010. That appeal is listed to be heard on 16 June 2010.

39.4. Whatever the outcome of that appeal, Morawetz J's order does not pose any obstacle to the Regulator issuing an FSD to the Canadian Entities. His order has no extra-territorial effect outside Canada, particularly as the Monitor has not sought recognition before the English courts of its position as an office-holder in respect of a foreign insolvency. It was and remains open to the Monitor to do so, and then to apply for enforcement of the Canadian stay in this country. The Monitor has not sought recognition or such an enforcement order (and in the Regulator's view it would not be *able* to do so, by reason of Article 20(4) of the UNCITRAL Model Law, brought into force in this country by the Cross Border Insolvency Regulations 2006 (SI 2006/1030)).

40. As regards the US proceedings, a motion was filed by NNI and associated debtors (all in Chapter 11 proceedings, including NN CALA) on 18 February 2010 against the Trustee and the Pension Protection Fund, seeking to enforce a stay of proceedings against NNI and its affiliated debtors. The Regulator has not been joined to those proceedings. An order was made by Judge Kevin Gross on 26 February 2010 that enforced the stay "as to the UK Pension Trustee and the PPF" and provided that to the extent that either of the Trustee or PPF participate in these proceedings as to NNI and NN CALA, such participation will be in violation of the stay. The Trustee is currently appealing this decision, however for the purposes of this hearing:

40.1.    the Regulator has at no time been joined to the US proceedings or had relief granted against it.

40.2.    Judge Gross confirmed at the time of making the order that "*there's nothing that I am saying here, and in fact, the debtors made no request that I impose, as I don't think I could, any restrictions upon the regulator.*"[8]

40.3. If Gross J's order is overturned on appeal, in accordance with the decision in Sea Containers that admitted an FSD issued by the DP for the purposes of claiming in a Chapter 11 estate, then the issuance of a FSD to the American Entities will be of the utmost importance to the Scheme, because there will then be no order barring the FSD being given effect in the Chapter 11 insolvency process;

40.4. The US proceedings pose no obstacle to the Regulator issuing a FSD to the American Entities.

## 4. The relevant requirements under s.43 are satisfied

41. Paragraph 9 above deals with two of the four relevant requirements under s 43 (§§8-9 above). The two that remain to be dealt with are whether:

41.1. the employer, NNUK, was insufficiently resourced at the relevant time; and

41.2. it would reasonable to issue an FSD against the Targets.

### (a) The employer, NNUK, was insufficiently resourced at the relevant time

42. The Regulator submits that NNUK meets the statutory test of "insufficiently resourced" set out in s.44(3) and given detail in the Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the **"2005 Regs"**). Regulation 12 of those Regulations allows the Regulator, in circumstances where the company whose resources are being valued fails to provide its own calculation of its resources, to "deem" the value of that company's resources for the purpose of the insufficiently resourced calculation.

---

[8] Transcript of hearing on 26.2.10, p.188, lines 1-5.

43. The Regulator has complied with these provisions and sent its calculations to the two companies whose resources must be valued as part of the test in this case (NNUK and NNC). No alternative calculations have been provided by either company. Accordingly the Regulator has deemed the value of NNUK's resources at \$453m and those of NNC at \$5,308m. These figures show that (a) the value of the resources of NNUK is less than 50% of the estimated section 75 debt in relation to the Scheme (being \$1,773m), and (b) the value of the resources of NNC is not less than the difference between the value of NNUK's resources and 50% of the estimated s.75 debt, which is the sum of \$1,320m (\$1,773m - \$453m). In these circumstances the insufficiently resourced test is met.

44. The two-limb insufficiently resourced test is set out in s.44(3) PA 2004,[9] which provides that:

> *The employer in relation to a scheme is insufficiently resourced at the relevant time if-*
> *(a) at that time the value of the resources of the employer is less than the amount which is a prescribed percentage [50%[10]] of the estimated section 75 debt in relation to the scheme [the* **"employer test"**]*, and*
> *(b) there is at that time a person who falls within subsection (6)(b) or (c) of section 43 and the value at that time of that person's resources is not less than the amount which is the difference between-*
>    *(i) the value of the resources of the employer, and*
>    *(ii) the amount which is the prescribed percentage [50%] of the estimated section 75 debt. [the* **"associate test"**]*.*

45. The detail of the calculation process is then set out in the 2005 Regs, more specifically regs 8-12 (set out at WN pp107-110).

---

[9] Section 44(3)(b) was amended (and s.44 re-ordered) by the Pensions Act 2008 in relation to acts occurring on or after 14.4.08 (s 126 and Sched 9 (§§14, 15(1)), to allow the Regulator to aggregate the resources of *more* than one person for the purposes of the associate test. However, given that (a) the Regulator does not need to so aggregate to satisfy the associate test here and (b) the Regulator relies on acts before 14.4.08 as well as afterwards, the relevant version of s 44 in use for this case is that extracted above.

[10] The 2005 Regs, reg8 (WN p107).

46. The "relevant time" selected by the Regulator is 30.6.08, because this is the last quarterly date for which reliable financial information for the Group is available, before its market capitalization was adversely impacted by the exceptional conditions in the financial markets in the second half of 2008, with Lehman Brothers entering into insolvency on 15 September 2008 (WN §257 p130). The selection of this date has important consequences for the timing of the DP hearing: the FSD must be issued within 2 years of this date (this being the period prescribed by s.43(9) and reg 5 of the 2005 Regs as amended by reg 2 of the Pensions Regulator (Miscellaneous Amendments) Regulations 2009). Accordingly, it is this feature of the case that results in the need for the FSD to be issued before 30.6.10.

47. The person selected by the Regulator for the associate test is NNC, the holding company of the Group. The Regulator submits that this is a particularly suitable person to choose because NNC encapsulates the value of the Group taken as a whole (minus the value of NNUK's resources, which are deducted in order to avoid double counting, NNUK's resources already having been taken into account in the employer test).

48. The Regulator wrote to NNUK on 24 August 2009 and to NNC on 4 September 2009[11] setting out and seeking comments on the Regulator's then calculations on the employer and associate tests respectively. Neither provided any response to the Regulator's calculations or put forward any alternative calculation of its own (WN §270 p134, §296 pp142-143).

49. Therefore, the Regulator submits that:

   49.1. it is entitled to deem the value of the resources of NNUK and NNC under Reg 12 of the 2005 Regs (set out at WN §258 pp133-134 and p110), such provision applying where the company whose resources are being valued fails to provide any calculation of its own, and

---

[11] WN §§270 & 296, pp134 and 142.

49.2. even if (contrary to the above) the deeming provision is not applied, the employer and associate tests are both easily satisfied.

50. Taking the employer test first:

50.1. The Regulator considers that the value of NNUK's resources is $453m, very significantly under the 50% s.75 debt threshold of $1,773m. The detail of this calculation can be found at WN §§273-287 pp135-139 (which is supported by the PwC report referred to therein, from which this calculation is taken **[B4a/15/2036-2214]**);

50.2. the fact that the value of NNUK's resources is under the $1,773m threshold entirely accords with its position in the Group, because the market value of the entire Group <u>as a whole</u> at 30.6.08 was $4,083m (see §261 p131 WN).

51. Turning to the associate test:

51.1. The value of NNC's resources is heavily based on the market value of its shares, $4,083m, which is very considerably in excess of 50% of the s 75 debt ($1,773m), let alone the difference between NNUK's resources and the s 75 debt ($1,320m).

51.2. The Regulator submits that the value of its resources, once this figure has been adjusted in the manner mandated by the 2005 Regs, comes to $5,308m, very far above the $1,320m associate test threshold (WN §§299-306 pp143-145).

52. This issue is dealt with in the WN at:

52.1. §188-191 pp78-80;

52.2. Appendix 4 pp129-146 (in more detail); and

52.3. the relevant legislation- being ss 43-45 PA 2004 and the Pensions Regulator (Financial Support Directions etc) Regulations 2005 (the **"2005 Regs"**)- can be found at Appendix 1 pp100-103, 105-112.

**(b) It is reasonable to issue a FSD against the Targets**

53. In submitting that it is reasonable for an FSD to be issued in this case the Regulator relies upon the global operation of the Group and avers that relevant factors to consider when deciding whether to issue an FSD must include a view of the operation of the Group as a whole, rather than attempting to separate and divide the Group into its various corporate entities. Such separation was not carried out during the Group's operation, and is only now imposed as a result of the various different national insolvency regimes in place. The FSD is necessary to reflect the Group's actual mode of operation, as one global group depending on a central treasury operation for its resources, rather than separate, independently resourced entities.

54. Section 43(7) lists certain factors to which the DP must have regard when assessing whether it is reasonable to issue an FSD, to the extent that the DP considers them relevant. They are considered in WN 193ff. The following specific factors should be emphasized at this stage.

*The operation of the global group*

55. As the ultimate parent of the Group, NNC decided how it was operated, as well as the use made of profits earned by any particular corporate entity, or more accurately profits attributable to particular business lines. The operation of the Group as one global entity clearly provided benefits for NNC and its immediate subsidiary NNL as NNC had the flexibility to determine where any spare funds would be placed, which business lines would have increased budgets, and how the Group could be run in the most tax efficient way possible. The Nortel Group ignored actual corporate entities for operational purposes and benefited from being able to ignore to a large degree the specific needs of NNUK as the employer

of a very substantial pension scheme which, from at least 2002, had a very serious and rapidly growing pension deficiency.

56. Equally NNC/NNL decided and determined how to divide up the Group's business and profited from being able to be a worldwide market leader in its operation.

57. NNC also decided and controlled the finances of the Group as a whole. In order to fund its operation, NNL required substantial loans to be made to it. These loans were made from at least December 2003 by NNUK and from at least 28 March 2001 by NNI. However the treatment of the repayment of these loans was not the same. NNC deliberately elected to repay the loans to NNUK by Project Swift, being an illiquid asset transfer of ownership of the EMEA subsidiaries to NNUK. However during the same period over $275m was repaid to NNI in cash. Clearly there was substantial value to NNC/NNL in being able to control and operate the Group as it elected so to do.

*The acquisition of STC*

58. The acquisition of STC gave the Nortel Group the ability to access a larger and more varied market both in North America and in the rest of the world. Additionally, it was able to increase its profits and turnover by the acquisition of technology and more importantly by the acquisition of the extremely strong R&D teams which provided much needed experience in fibre optics as well as advanced technology. This also gave indirect benefits to other targets, including NNI and NN CALA because the products, and R&D and general know-how which Nortel acquired from STC, enabled the Nortel Group to expand rapidly into the Latin/South American market which was operated through NN CALA. Additionally certain of the technology such as GSM was developed and created by NNUK/EMEA and used to enable NNI to become a leader in the GSM market in the US as well as used to provide services on a worldwide basis to NNI's major clients, such as Sprint. These types of valuable benefits enabled the profits of both NNI as well as NN CALA to increase significantly.

*NNUK's R&D after the STC acquisition*

59. The R&D work carried out in NNUK was well recognised. Although this built on the technology and products acquired with STC, it was also of vital importance to the Nortel Group and led to numerous patents and influence on industry standards bodies long after the acquisition. The research carried out at NNUK included 'blue sky' research known in Nortel as Advanced Technology, being research on a long term basis which might or might not lead directly to a product. Members of the NNUK R&D team were part of various committees that developed industry standards.

*NNUK's management of EMEA Targets*

60. NNUK ran and operated the entire EMEA region. This is clear from the fact that administration orders were made in relation to 18 corporate entities in the EMEA region on the basis that all these companies had their centre of main interests in the UK by reason of the operation and role of NNUK in this respect. The EMEA companies benefited from the role undertaken and operated by NNUK enabling them to be an integral part of a larger organisation, to share the R&D and other services provided by NNUK. As part of EMEA, NNUK operated and ran one of only Nortel four purchasing hubs worldwide (at Monkstown in Northern Ireland) which was used by all EMEA entities as well as other corporate entities and businesses, such as NN CALA.

*The use of NNUK employees to manage and carry out significant global operations*

61. NNUK employees held positions from about 1991 in the global operations of the Nortel Group although these persons remained employees of NNUK:

   61.1.    Simon Freemantle, Director of Global Treasury Operations as at January 2009.

   61.2.    Mark Cooper, Assistant General Counsel, Employment Law from January 2001 to March 2009 (save 2 years from November 2002)

61.3.    Malcolm Collins, President of the business segment called Enterprise
Networks from the end of 2002 until 2005.

62. In addition to these individuals with global roles, a number of global customer
accounts were managed by NNUK employees. For these customers, NNUK staff
managed the customer relationship not only for dealings and sales in the UK or
EMEA, but worldwide. Examples of these global customers are BT, Cable &
Wireless and Vodafone.

*Contribution Holiday*

63. The Nortel Group benefited from a pension holiday in relation to contributions
into the Scheme from 1989 until 2002. This clearly benefited indirectly all the
Targets because the Nortel Group did not have to allocate funds towards these
contributions, but could utilise those funds for other projects and in order to
increase the profitability of the Group. NNC/NNL in effect controlled the Scheme
and decided the amount and timing of contributions. NNUK was not free simply
to make such pension contributions into its own pension scheme. Even after the
pension holiday, when the deficit in the UK scheme was known to NNC/NNL,
NNC made supplemental pension contributions to Group pension schemes in late
2004 of approximately $125m, of which the UK Scheme received nothing.[12]
Indeed in all of 2004 the Scheme received only £15m, paid in December 2004.
This was despite Nortel having the declared aim of treating all its pension
schemes equally.[13]

64. Although from 2000 onwards Nortel used its transfer pricing arrangements for the
purposes of satisfying the relevant tax authorities that proper value was given in
relation to inter-company services and dealings, neither the transfer pricing
arrangements nor any other arrangements took account of any historic pension
deficiency. Additionally the method of working out each entity's share of profit
did not compensate NNUK for the value of its R&D. NNUK's R&D departments
produced more patents per head than the Nortel R&D laboratories in the USA or

---

[12] Bundle C/Tab 3/Hern/ paragraph 92.
[13] Bundle D/Tab 1/Gilchrist/ paragraph 29

Canada, and on less money, but this was not recognised as entitling NNUK to an increased share of the Group's profits. Moreover, NNUK's R&D was efficiently run and this again was not recognised because entitlement to profits was calculated on the simple basis of R&D spend rather than on the basis of effective and productive spend. The Group's transfer pricing arrangements took no account of historic pension deficiencies, to the detriment of NNUK.

65. In these circumstances, despite their key contribution to the Group, and the Group being run as one entity, the employees of NNUK (and its predecessor STC) have been left with a deficit of some £2.1bn in their pension fund. The Regulator therefore submits that it is appropriate to issue an FSD to the Targets. The following paragraphs consider each of the 3 groups of Targets in turn and set out in outline the Regulator's reasons behind this submission. In each case, more detail can be found in the WN, paragraph 192 ff.

(i) *Canadian Entities*

66. In short,

66.1. The Canadian Entities controlled the Group (including NNUK), including questions of how it was run and how its profits were used;

66.2. As part of their control, the Canadian Entities controlled the company-side decisions in relation to the Scheme, including the 13-year contribution holiday up to 2002 and the refusal to agree a schedule of contributions for the period 2001-2005.

66.3. Another facet of the Canadian Entities' control was the ability to control the finances of the Group as a whole. Pursuant to this, NNL required substantial loans to be made to it, from at least December 2003 by NNUK. In return, NNC elected to repay the loans to NNUK by providing it with an illiquid asset transfer of ownership of the EMEA subsidiaries to the UK. However, in contrast, when NNC repaid a debt of $275m due to NNI it elected to repay the sum in cash.

23

66.4. Even putting to one side the control factors set out above, NNUK provided extremely significant benefits through its R&D for the Canadian Entities. Particular product areas where NNUK's R&D activity contributed to the products and revenues of the Group are listed in WN §§94-134 pp41-54. As the parent companies of the Group NNC and NNL were the ultimate beneficiaries of the revenues generated by NNUK's R&D work in areas from optical transmission products (fibre-optic cables) to GSM and smart antenna technology, used in mobile telephone base stations. In addition to specific product areas, NNUK's R&D personnel contributed to international bodies setting industry standards and produced inventions which Nortel patented, leading to first mover advantage and technological leadership (WN §§97-98 & 135-138, pp.42-3 & 54-6).

*(ii) EMEA Entities*

67. As set out above:

67.1. NNUK provided the central management for EMEA;

67.2. This management function extended across a wide range of important areas and constituted a very significant benefit to all EMEA Entities;

67.3. Even apart from this management function, NNUK's R&D provided a very significant and profitable benefit to the EMEA Entities.

*(iii) American Entities*

68. As set out above:

68.1. NNUK's R&D services provided a very valuable benefit for the American Entities, NNUK's GSM work allowing them to become one of the main suppliers of this extremely important and successful technology in the US market and NNUK's invention of Centrex IP being sold to customers

including the US Federal Government and Bank of America (WN §204.7, p.88-9);

68.2. NNUK's activities assisted NNI's relationships with its customers in the USA, for example NNUK's modification of network switches on behalf of one of NNI's largest customers, Worldcom, allowed that customer to expand into Europe, benefiting the Group as a whole and NNI in particular, but at a loss to NNUK and the EMEA Entities of $17m (WN §§101 & 204.1 (describing Nortel's "family & friends" policy to assist main customers), p.45 & 86);

68.3. NN CALA benefited from NNUK as a provider and developer of products operating on ETSI technological standards. In addition NNUK was instrumental in managing accounts and relationships with certain major customers in the CALA region, who had their headquarters in Europe (e.g Cable & Wireless and Telefonica).

**Conclusion**

69. In these circumstances the Regulator submits that it is entirely reasonable and appropriate to issue an FSD against the Targets. Such an FSD would be issued in accordance with s.43(3) PA 2004 and require financial support to be put in place for the Scheme by the person or persons to whom it is issued. The form of that financial support, including issues of joint and several liability for the whole or part of the s.75 deficit, are matters to be dealt with after the issue of the FSD, in conjunction with the Targets, and in accordance with s.45 PA 2004.

**Raquel Agnello QC**
**Jonathan Hilliard**
**Thomas Robinson**

**Lincoln's Inn**
**26 May 2010**

IN THE MATTER OF NORTEL NETWORKS UK PENSION PLAN

AND IN THE MATTER OF THE PENSIONS ACT 2004

_____

## REGULATOR'S SKELETON

_____

# Exhibit 4

| | |
|---|---|
| **DETERMINATION NOTICE**<br>Issued pursuant to section 96 of<br>the Pensions Act 2004 ("the Act")<br>in respect of<br>Nortel Networks UK Pension Plan<br>("the Scheme") | Internal case reference:<br><br>**TM 6409** |

1.  Following an oral hearing before the Determinations Panel (the "Panel") on 2 June 2010 the Panel in exercise of its powers pursuant to Sections 10, 43 and 96 of the Act hereby gives notice of its Determination.

2.  The reasons of the Panel have been issued separately.

**DEFINITIONS**

3.  "The Targets" means the list of companies set out in Appendix A to this Determination Notice.

**DETERMINATION**

4.  In respect of those of the Targets as are listed in Section 1 of Appendix A, The Pensions Regulator has not pursued its case for a Financial Support Direction and no Determination is therefore made.

5.  In respect of those of the Targets as are listed in Section 2 of Appendix A, a Financial Support Direction will be issued pursuant to Section 43 of the Act against those Targets. Such issue is not to take place during the period within which this Determination may be referred to the Upper Tribunal (Tax and Chancery) (the "Upper Tribunal") or, if this Determination is so referred, until the final disposal of the reference and of any appeal against the Upper Tribunal's decision.

6.  The period of time in which the Targets as listed in Section 2 of Appendix A should put financial support in place for the Scheme, pursuant to Section 43 (8) of the Act, will be specified in the Financial Support Direction as 6 months.

7.  Any person who receives this Determination Notice as a directly affected person (pursuant to Section 96(2) (d) of the Act), or any person who appears to the Upper Tribunal to be directly affected by this Determination, may refer this Determination to the Upper Tribunal.

Name        Geoffrey Fitchew

Position    Chair

Signature   ....................

Date        25 June 2010

DM: 1694856                                    1

**Appendix A**

The Target Companies are as set out below.

Section 1:

| | |
|---|---|
| Nortel Communication Holdings (1997) Limited (In Israeli Administration) | Nortel Telecom International Limited |
| Nortel Networks Israel (Sales and Marketing) Limited (In Israeli Administration) | Nortel Networks Ukraine Limited |

Section 2:

| | |
|---|---|
| Nortel Networks Corporation (in CCAA proceedings) | Nortel Networks Limited (in CCAA proceedings) |
| Nortel Networks Incorporated (in Chapter 11 proceedings) | Nortel Networks CALA Incorporated (in Chapter 11 proceedings) |
| Nortel GmbH (in UK Administration) | Nortel Networks NV (in UK Administration) |
| Nortel Networks SpA (in UK Administration) | Nortel Networks BV (in UK Administration) |
| Nortel Networks Hispania SA (in UK Administration) | Nortel Networks Polska Sp z.o.o. (in UK Administration) |
| Nortel Networks International Finance & Holdings BV (in UK Administration) | Nortel Networks France SAS (in UK Administration) |
| Nortel Networks (Ireland) Ltd (in UK Administration) | Nortel Networks SA (in UK Administration) |
| Nortel Networks AG | Nortel Networks O.O.O. |
| Nortel Networks (Austria) GmbH (in UK Administration) | Nortel Networks South Africa (Proprietary) Limited |
| Nortel Networks Slovensko s.r.o (in UK Administration) | Nortel Networks (~~Scandinavia~~) AS *amended* *[initials]* 30/02/2010 |
| Nortel Networks Engineering Service Kft (in UK Administration) | Nortel Networks AB (in UK Administration) |
| Northern Telecom France SA | Nortel Networks s.r.o. (in UK Administration) |
| Nortel Networks Portugal S.A. (in UK Administration) | |

# Exhibit 5



REASONS of the
DETERMINATIONS PANEL of
THE PENSIONS REGULATOR
in relation to the Determination
Notice issued on
25 June 2010

NORTEL NETWORKS UK PENSION
PLAN
(the "Scheme")

All references to section numbers below are to those of
the Pensions Act 2004 save for references to "Section
75" which are references to Section 75 of the Pensions
Act 1995 and save as otherwise indicated

The Pensions
Regulator
case ref
TM6409

**Introduction**

1.      The Nortel Group (the "Group") was once a leading presence in the telecommunications and networks industry.   The Group operated across many different countries including (a) North America, (b) Europe, the Middle East and Africa ("EMEA") and (c) the Caribbean and Latin America ("CALA").

2.      However, many of the members of the Group have entered into formal insolvency processes in the UK, North America and elsewhere.   One of those companies, Nortel Networks UK Limited ("NNUK"), was the principal employer of the Scheme.   At the time NNUK entered administration, on 14 January 2009, the Scheme's deficit was approximately £2.1 billion if valued in accordance with Section 75.

3.    Based on the current funding level of the Scheme, the present trustee of the Scheme (the "Trustee") is not able to pay the Scheme members their full benefits.  In such circumstances, the cost of those benefits would have to be borne, in part, by The Pension Protection Fund ("PPF"). One of the statutory objectives of The Pensions Regulator ("TPR") is to protect the benefits of members of occupational pension schemes.  Another is to reduce the risk of situations arising whereby compensation would become payable by the PPF.  TPR has sought to further its objectives by requesting that we, the Determinations Panel (the "Panel"), issue a Financial Support Direction ("FSD") pursuant to Section 43 against a number of companies within the Group ("the Target Companies").

4.    On 2 June 2010 we convened an oral hearing to hear evidence and submissions as to whether we should issue an FSD against any of the Target Companies.

5.    At the oral hearing TPR was represented by Ms Raquel Agnello QC, Mr Jonathan Hilliard and Mr Thomas Robinson.  The Trustee was represented by Mr Michael Tennet QC and Mr Edward Sawyer.  None of the Target Companies participated in the oral hearing although representatives from Herbert Smith LLP (solicitors acting for some of the Target Companies in the EMEA region) and Ernst & Young LLP (administrator of some of the EMEA Target Companies) were present as observers.

6.    We have been presented with extensive written representations and evidence in the form of witness statements, expert reports and documentary evidence by both TPR and the Trustee.  We heard oral evidence from Ms Wendy Nicholls, an expert in transfer pricing, who had given written evidence on behalf of the Trustee.  We also heard oral submissions from both TPR and the Trustee.  Although we do not refer exhaustively in the following discussion to the evidence and submissions presented to us by the parties, we have taken all of that evidence and those submissions into account when reaching our conclusions in this case.

7.    Before we discuss the evidence and submissions and our findings, we first set out our understanding of the identity and status of the directly affected parties and their level of participation in the process before us.

**The Parties**

8.    It is convenient to consider the Target Companies as falling into three broad categories defined by their geographical location, namely:

8.1.    Nortel Networks Corporation ("NNC") and Nortel Networks Limited ("NNL") (together "the Canadian Entities"); these companies were incorporated in Canada and are the two ultimate parent companies of the Group;

8.2.    Nortel Networks Inc ("NNI") and Nortel Networks (CALA) Inc ("NN CALA") (together "the American Entities"); these companies were both incorporated in the USA – NNI was the Group's operating company in the US and NN CALA operated in the Caribbean and Latin American area. As explained below, NN CALA sold products which were based on European rather than American technical standards;

8.3.    The following companies (with their country of incorporation in parenthesis) which operated in the EMEA region (together "the EMEA Entities"):

- Nortel Networks International Finance & Holding BV – (Netherlands);
- Nortel GmbH – (Germany);
- Nortel Networks SpA – (Italy);
- Nortel Networks Hispania SA – (Spain);
- Nortel Networks AG – (Switzerland);
- Nortel Networks (Austria) GmbH – (Austria);
- Nortel Networks Slovensko sro – (Slovakia);
- Nortel Networks Engineering Service Kft – (Hungary);
- Nortel Networks NV – (Belgium);
- Nortel Networks BV – (Netherlands);
- Nortel Networks Polska SP zoo – (Poland);
- Nortel Networks OOO – (Russia);
- Nortel Networks South Africa (Proprietary) Limited – (South Africa);
- Nortel Networks AS – (Scandinavia);
- Nortel Networks AB – (Sweden);
- Nortel Networks sro – (Czech Republic);
- Nortel Networks Portugal SA – (Portugal);
- Nortel Networks SA – (France);
- Nortel Networks France SAS – (France);

- Northern Telecom France SA – (France);
- Nortel Networks (Ireland) Limited – (Republic of Ireland).

9.  By the time of the oral hearing TPR had decided not to pursue the following four companies in the EMEA region (with their country of incorporation in parenthesis); accordingly, references below to the EMEA Entities exclude these companies unless the context requires otherwise:

- Nortel Communications Holdings (1997) Limited – (Israel);
- Nortel Networks Israel (Sales and Marketing) Limited – (Israel);
- Nortel Networks Ukraine Limited – (Ukraine);
- Nortel Telecom International Limited – (Nigeria).

10.  In light of TPR's indication that it no longer seeks an FSD against the four companies named in the previous paragraph, we have made no determination in respect of those companies.

11.  In addition to the Target Companies, the other directly affected parties are the PPF and the Trustee. The PPF did not make any representations to the Panel.

12.  We note here that we have been provided by TPR with a helpful chart showing the structure of the Group as at 11 February 2009 (Appendix 3 to the Warning Notice) which sets out the position of each of the Target Companies in relation both to each other and to the other companies in the Group. Appendix 3 also contains a useful table, which sets out the financial circumstances of all the Target Companies after they had entered insolvency proceedings.

**The participation of the Target Companies and the Trustee**

13.  The Canadian and American Entities are currently in insolvency proceedings in their respective jurisdictions. As a result of those proceedings, as we understand it, there is a stay or moratorium on certain types of proceedings against them. The Canadian and American Entities have obtained orders in their respective jurisdictions to the effect that any FSD we are minded to issue will be void in those jurisdictions. They have chosen not to participate before the Panel either by way of written representation or at the oral hearing.

14.    We have been informed that TPR and/or the Trustee are currently appealing the various orders made in Canada and the USA.  However, the Trustee's express position, pending the outcome of those appeals, is that it does not put forward any case in relation to the Canadian or American Entities. The Trustee has only advanced a case in relation to the EMEA Entities; it supports TPR's request for an FSD only in respect of these entities. TPR has advanced a case for an FSD against all of the Target Companies.

15.    Finally, we deal with the position of the EMEA Entities.  Initially, Herbert Smith LLP indicated, on behalf of most (but, as far as we are aware from the correspondence, not all) of the Target Companies in the EMEA region that they had strong grounds to oppose the imposition of an FSD against them.  However, on 10 May 2010 Herbert Smith LLP wrote to the Panel's support team in the following terms:

*"We are writing to inform the Panel that, whilst they* [i.e. the EMEA Target Companies represented by Herbert Smith LLP] *do not consider that there is any basis for an FSD to be imposed against them, the EMEA Entities have decided, for practical and commercial reasons, that they do not propose to make representations to the Panel in the DP Proceedings."*

16.    Accordingly, with one exception, none of the EMEA Entities put forward any substantive representations to the Panel and nor did any of them (save for the observers from Herbert Smith LLP and Ernst & Young LLP) participate in the oral hearing.  The one exception was Nortel Telecom International Limited (a Nigerian company) which submitted brief written representations resisting the issue of an FSD against it; in any event, as noted above, TPR no longer pursues that company.

17.    Even though they have, to somewhat varying degrees, not actively participated in these proceedings, each of the Target Companies was sent the Warning Notice, has been kept informed of the progress of the proceedings and has either been sent, or invited to request, all of the material that has been submitted to the Panel.  The Target Companies were also invited to attend the oral hearing but declined to do so save for the attendance of observers as set out above.

18.    We have decided, having considered the submissions of TPR and the Trustee, to deal with the non-participation of the Target Companies in the following way.  First,

despite the absence of any active challenge from any of the Target Companies, it is still for TPR (and the Trustee in so far as it supports TPR's case) to persuade us that it is appropriate to issue an FSD in this case in relation to each of the Target Companies. Secondly, we agree with the Trustee's submission that the correct approach to uncontested evidence is for us to accept it save where we consider parts of the evidence to be either inconsistent or manifestly incredible.

19. We should also stress that much of the evidence and representations which have been submitted to us are based on the Group's own documentation in submissions to the regulatory or tax authorities or on documentation submitted by representatives for the individual companies to the UK or North American courts in insolvency proceedings. Where necessary, we refer specifically to that documentation but, as already noted above, we will not attempt exhaustively to repeat the underlying documentation in these Reasons.

**Factual background**

20. We now turn to consider, relatively briefly, the relevant factual background, and in particular:

20.1.  the Group and its origins;

20.2.  the international expansion of the Group;

20.3.  the structure of the Group;

20.4.  NNUK's responsibilities for the EMEA Entities;

20.5.  examples of NNUK's role in supporting the EMEA Entities' sales and marketing and allocation of contracts;

20.6.  other services provided by NNUK to the EMEA Entities;

20.7.  provision of sales and marketing services and other benefits to NN CALA and NNI;

20.8.  NNUK's cost structure;

20.9.  transfer pricing systems;

20.10. NNUK's intercompany loan to NNL and "Project Swift";

20.11. the insolvency of the Group;

20.12. the Scheme.

**The Group and its origins**

21.   As set out above, the Group is involved in the global supply of networking solutions including telecommunications, computer networks and software.  The ultimate parent of NNUK is NNC which is a Canadian registered company, which was listed on both the Toronto and New York stock exchanges. NNUK is wholly owned by NNL which, in turn, is wholly owned by NNC.  The Group is comprised of NNC and over 140 subsidiaries.

22.   Although we discuss this in more detail below, the Group was run along business lines rather than corporate lines. Essentially, the Group was run as an integrated global organisation with each member of the Group being treated as part of a common endeavour rather than a distinct corporate entity with its own interests. This integrated approach was adopted from about 1996 onwards and from 2000 the Group was integrated to such an extent that the legal status of the individual corporate entities was largely ignored. We note, for example, that Mr Timothy Watkins, who was an employee of NNUK, states in his witness statement that:

*"NNUK was not itself a significant decision making entity. So far as I am aware, the Board of Directors did not exercise executive decision-making power and, like the Boards of other EMEA entities, was responsible solely for the statutory functions of the specific legal entity, such as signing off the accounts. So far as I could tell as I became more senior within the organisation they certainly had no obvious role to play in the governance or operational strategy of the Nortel Group."* [1]

23.   The Group was founded in Canada as the Bell Telephone Company in 1895 and became Northern Telecom Limited in 1976 having expanded into the US, China and Japan.  Business began in the US in 1971 with the incorporation of a subsidiary called Northern Telecom Inc but rapidly expanded with the decision of AT&T to undertake a corporate restructuring which opened the US market to NNC.  This sort of deregulation dramatically improved NNC's customer base.  Similar deregulation was occurring in the UK where, prior to 1991, NNC had only a minor presence in the form of a research and development facility ("R&D") in Maidenhead.  This made the UK an attractive market as the Group's filing for the US Securities and Exchange Commission explains:

---

[1]   Bundle B, Tab 6, Paragraph 32.

*"....in many countries, of which the United Kingdom, Germany, France, Japan and Australia are examples, an increasing trend towards privatization and deregulation of telecommunications operations and the emergence of agreed-upon international standards are expected to facilitate access by non-traditional suppliers. Northern Telecom selects countries for major international marketing efforts based upon careful evaluation of such factors as product suitability, market opportunities, competition and the business and political environment."*[2]

24.    In keeping with this policy, the Group decided to take advantage of the deregulation of the UK and to pursue its expansion into the EMEA region.

**The international expansion of the Group**

25.    In 1987 the Group owned a 27.1% stake in STC plc ("STC") which was a major UK public telecommunications company. However, in 1991 the Group acquired the remaining shares of STC for $2,609 million. This represented the Group's first major step into the UK market and gave the Group ownership of a number of additional significant R&D facilities throughout the UK and also ownership of STC's existing and future patents and other technology. TPR, in the Warning Notice (at paragraph 36), summarises the effect of STC's acquisition on the Group as a whole:

*"The acquisition of STC, coupled with Nortel's pre-existing operations in the UK as at 1991, resulted in successful expansion into the UK telecoms and networking market, followed by further success in the EMEA region. This brought with it customer connections with large European carrier companies such as BT, Cable & Wireless and Telefonica, together with ownership of products that met ETSI*[3] *standards rather* (sic) *those set by ANSI*[4]. *These connections and products in turn allowed Nortel to grow in the North American and CALA regions."*

26.    In particular, the acquisition of STC gave the Group, as set out in the Warning Notice (at paragraph 41), access to significant R&D assets:

---

[2]    Trustee Bundle 1, Tab 2, Page 9, Paragraph 24 quoting from NNL's Form 10-K US SEC filing for 1990.
[3]    European Telecommunications Standards Institute – which sets the standards in EMEA and CALA (and everywhere else apart from North America and Japan).
[4]    American National Standards Institute – which sets the standards in North America (and Japan).

*"... STC's research and development capabilities were world class. One of the three winners of the Noble Prize for Physics in 2009 is a British former director of research at the Standard Telecommunications Laboratories in Harlow, part of STC. This prize was awarded to Charles Kao for work on fibre-optic transmission, which was an area in which STC brought experience, products and patents to Nortel as a result of the acquisition."*

27.    The effect of the purchase of STC was reflected in the Group's sales figures. European revenues (which included Africa, the Commonwealth of Independent States and the Middle East) in the year to 31 December 1991 were US$1.35 billion, an increase of 514% from the previous year. These revenues accounted for 17% of the Group's total revenue. By way of example, during the 1990s the Group also benefited substantially from its acquisition of STC in the following ways:

27.1.    the fibre optic technology which it had acquired from STC;

27.2.    from the introduction into the US market of the GMS mobile phone technology developed by NNUK in collaboration with Matra and from NNUK's work in converting Nortel's switching products to comply with ETSI standards;

27.3.    from the work of NNUK's R&D teams, whose output per head and relative to their R&D expenditure, as measured by new patents, was superior to that of the Group's other R&D centres.[5]

28.    The fortunes of the Group were summarised by Mr John Doolittle (Treasurer of the Canadian Entities), in his affidavit sworn on 14 January 2009, as follows:

*"From the mid-1980s to 2000, the Nortel Companies expanded substantially, helping to lead the telecommunications boom, moving from the development and manufacturing of traditional landline phone technology and equipment into the wireless and digital age. Expanding from its Canadian base, North American operations were expanded into the Unites States. At the same time, the Nortel Companies moved aggressively into Europe, Asia, Africa and Latin America, becoming a truly global enterprise and generated significant revenue in areas such as Asia where other North American companies had been unable to penetrate markets."[6]*

---

[5]    See bar chart and table in Warning Notice, Pages 56-57, Paragraph 139.
[6]    Bundle 1, Tab 1, Paragraph 8.

29.    In short, the Group had gone from being a significant presence in the North American market to a significant international company and a world leader in many of its market fields.

**The structure of the Group**

30.    As set out above, the Group operates on business lines rather than by reference to legal entities. Mr Alan Bloom, joint administrator of NNUK and some of the EMEA Entities, explained in a witness statement in support of the administration of NNUK and other Target Companies, that:

"… the Nortel Group operated along global business lines and not generally by legal entity, the Nortel Group has complex inter-dependent trading relationships between the various global entities." [7]

31.    The Group was also horizontally and vertically integrated. It described itself, in an advanced pricing agreement application dated 31 October 2008, in the following terms:

"Nortel is a Matrix Organisation – Nortel is vertically and horizontally integrated meaning, organizations within Nortel share information and perform common tasks across geographical boundaries. Fully integrated entities performing R&D, manufacturing support and distribution functions interact together to fulfil customer demand for product and services."[8]

32.    The matrix structure manifested itself within the Group by establishing four distinct Lines of Business ("LOBs"), namely:

32.1    Enterprise Solutions;

32.2    Carrier Networks;

32.3    Metro Ethernet Networks;

32.4    Global Services.

---

[7]    Bundle 4, Tab 3, Paragraph 30.
[8]    Bundle 2, Tab 5, Page 607.

33.     The LOBs (the names of which changed from year to year) were the main profit centres in the Group and their leaders in North America effectively managed the Group's business strategy and controlled the budgets and R&D programmes of the regional subsidiaries. The vertically organised LOBs meshed with regionally organised sales organisations, including NNUK. However, the LOBs were the dominant voice.

34.     The Warning Notice (at paragraph 50) summarises the Group's rationale for adopting this structure in the following way:

*"… the Nortel Group adopted the above matrix structure for its functions because it perceived that considerable benefits would be secured, including: collaboration as to technology, better integration of the Group's functions under product or process teams, more efficient use of corporate resources, economies of scale within functions, better strategic deployment across the whole Group, avoidance of duplication of functions by product or geographical area, and fostering of a collaborative environment."*

35.     From 1995-96 onwards[9] NNUK was put in charge (subject to direction from NNL and the LOB hierarchy) of the day to day management of the EMEA region and was regarded as a key operating company within the Group's integrated structure. As such, it was designated as an Integrated Enterprise ("IE") (subsequently renamed as a Residual Profit Entity ("RPE")). NNL, NNI, Nortel Networks SA ("NN France SA") and Nortel Networks (Ireland) Limited ("NN Ireland") were the other IEs/RPEs. The other categories of company within the Group were classified as Limited Risk Entities, Cost Plus Entities, At Risk Entities and holding companies[10]. Apart from NN France SA and NN Ireland, all the other EMEA Entities managed by NNUK fell into these four categories.

36.     The key feature of an RPE was that it performed R&D for the Group as a whole as well as other key activities such as sales, marketing, administrative and operations functions. The Group, in its advanced pricing agreement application dated 31 October 2008, described the RPEs' activities as follows:

---

[9]   Mr Gareth Pugh: Bundle A, Tab 2, Page 4 Paragraph 13.
[10]  Bundle 1, Tab 2, Page 63, Paragraph 40; their roles are summarised in paragraphs 41-58 of the same document.

*"in addition to performing ongoing R&D functions, the IEs....perform all functions relating to the customer fulfilment process including manufacturing support and distribution functions both inside and outside of their geographic markets."*[11]

37.    In return for taking these responsibilities the IEs/RPEs were, at least from 2001 if not earlier, given an exclusive license to use the full range of the Group's patents and other technology in their own territories (i.e. for NNUK in the UK) and non-exclusive licenses outside their own territories. The Limited Risk Entities enjoyed non-exclusive licenses in their own territories.[12]

38.    The IEs/RPEs also provided these fulfilment activities across the Group as a whole. The advanced pricing agreement states:

*"Nortel is organized in a manner that a significant portion of the global support activities such as executive leadership, operations and corporate services are located within NNL and NNI. However, each of the IEs* [i.e. the RPEs] *perform some degree of similar support activities that benefit local revenues and revenues outside their jurisdiction."*[13]

39.    In addition to its status as an RPE, NNUK was also one of four "purchasing hubs" through which sales orders were routed and products ordered and delivered to the local Nortel sales subsidiary.[14]

**NNUK's Responsibilities for the EMEA Entities**

40.    The management and other responsibilities of NNUK for the operations of the EMEA companies were very broad, covering all key primary functions, including sales, finance, treasury, leasehold property, legal and human resources.[15] It is on the basis of their management by NNUK that 18 of the EMEA Entities were able to satisfy the

---

[11]    Bundle 2, Tab 5, Page 605.
[12]    Bundle 4, Tab 4, Master Research and R&D Agreement.
[13]    Bundle 2, Tab 5, Page 650.
[14]    Bundle 1. Tab 3, Paragraphs 36-37.
[15]    Bundle 1, Tab 2, Pages 59-60, Paragraph 15.