IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X
: 
*In re* : Chapter 11
:
Nortel Networks Inc., *et al.*,[1] : Case No. 09-10138 (KG)
:
                Debtors. : Jointly Administered
:
: Hearing date: June 11, 2013 at 10:00 a.m. (ET)
: Objections due: June 4, 2013 at 4:00 p.m. (ET)
---------------------------------------------------------------X

### APPLICATION OF THE DEBTORS PURSUANT TO 11 U.S.C. § 327(A) TO RETAIN AND EMPLOY CB RICHARD ELLIS-RALEIGH, LLC AS LISTING AND LEASING AGENT FOR THE DEBTORS *NUNC PRO TUNC* TO MARCH 27, 2013

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors"), hereby move this Court (the "Application") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 327(a), 328(a), 330 and 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"): (i) authorizing the employment and retention of CB Richard Ellis-Raleigh, LLC[2] ("CBRE Raleigh" or the "Firm") as a listing and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2] CBRE, Inc. ("CBRE"), a distinct entity from CBRE Raleigh, was retained in these Chapter 11 Cases as the listing and leasing agent for the Debtors for their former U.S. corporate headquarters in Richardson, Texas.  See

leasing agent for the Debtors in connection with the sublease of real property located in Raleigh, North Carolina (the "Property"), *nunc pro tunc* to March 27, 2013; (ii) approving the terms and conditions under which CBRE Raleigh will be retained and compensated; (iii) authorizing NNI to pay CBRE Raleigh a commission (the "Potential Sublease Commission") for its role in a potential sublease transaction with International Business Machines Corporation ("IBM") upon the occurrence of certain conditions; and (iv) granting such other and further relief as the Court deems just and appropriate.  In support of this Application, the Debtors rely upon the Declaration of J.D. "Butch" Miller (the "Miller Declaration"), attached hereto as Exhibit B.  In further support of this Application, the Debtors respectfully represent as follows:

### Jurisdiction

1.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.  The statutory predicates for the relief sought herein are sections 105(a), 327(a), 328(a), 330 and 331 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2014 and 2016 and Local Rule 2014-1.

---

Order Authorizing the Retention and Employment of CB Richard Ellis Inc. as Listing and Leasing Agent for the Debtors *Nunc Pro Tunc* to January 6, 2011, dated March 9, 2011 [D.I. 5086].

**Background**

3. On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[3] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only (the "Chapter 11 Cases"). The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5. On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[4] commenced a proceeding with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada), seeking relief from their creditors and a Monitor, Ernst & Young Inc., was appointed by the Canadian Court. Also on the Petition Date, the High Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the "EMEA Debtors")[5] into administration under the control of individuals from Ernst & Young LLP. Other

---

[3] Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

[4] The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[5] The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A., Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks

Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

6.  Since the Petition Date, Nortel has sold its business units and other assets to various purchasers. For further information regarding these chapter 11 cases, reference may be made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

7.  By this Application, the Debtors seek entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 327(a), 328(a), 330 and 331 of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016, and Local Rule 2014-1: (i) authorizing the employment and retention of CBRE Raleigh as listing and leasing agent for the Debtors, *nunc pro tunc* to March 27, 2013, in order to solicit and procure prospective tenants in connection with the sublease of the Property; (ii) approving the terms and conditions under which CBRE Raleigh will be retained and compensated, as outlined in that certain agreement, dated as of September 19, 2012 and attached hereto as Exhibit C (the "Agreement")[6], as amended by that certain agreement dated May 21, 2013, and as may be extended from time-to-time; (iii) authorizing NNI to pay CBRE Raleigh the Potential Sublease Commission upon the occurrence of certain conditions; and (iv) granting such other and further relief as the court deems just and proper.

## Facts Relevant to this Motion

8.  NNI currently is the tenant under an existing lease with U.S. Bank National Association, (as successor trustee to State Street Bank and Trust Company) as owner trustee of

---

B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[6]  The summary of any terms of the Agreement in this Application is solely for the benefit of the Court and parties-in-interest. To the extent that the summary and terms of the Agreement are inconsistent, the terms of the Agreement shall control.

4

ZSF/Research Gateway Trust (the "Master Landlord"), dated July 27, 2001, for the Property (the "Master Lease").  The Property consists of office, electronic laboratory and warehouse space used by NNI in connection with its business prior to its various divestitures.  NNI assumed the Master Lease in late 2009 pursuant to section 365 of the Bankruptcy Code in connection with the closing of the sale of the CMDA and LTE business to Telefonaktiebolaget L.M. Ericsson ("Ericsson").  See Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' CDMA and LTE Business Free and Clear of All Liens, Claims and Encumbrances, (B) the Assumption and Assignment of Contracts and (C) the Assumption and Sublease of Certain Leases, dated July 28, 2009 [D.I. 1204].

9. NNI subsequently subleased approximately 54% of the rentable square footage available under the Master Lease to third parties, including purchasers of certain former Nortel businesses, GENBAND US, Avaya Inc. and Ericsson (collectively, along with Forse, Inc.,[7] the "Existing Subtenants").  NNI uses some of the remaining office space for its residual winddown activities, and the remaining rentable square footage available under the Master Lease currently remains unused.

10. In an effort to obtain value for the unused rentable square footage at the Facility, NNI has marketed the available space since September 2012 with the assistance of CBRE Raleigh.  Among other things, CBRE Raleigh implemented a marketing campaign that included listing the Facility locally and nationally, having the Facility featured in a local business journal and hosting regular tours of the Facility.

---

[7] On February 4, 2013, NNI entered into a sublease with Forse, Inc. for approximately 17,000 square feet available under the Master Lease.  CBRE Raleigh assisted the Debtors with this transaction, and was paid a fee of $6,693 on February 28, 2013 in connection with its work on this transaction (the "Prior Commission").

11. On April 25, 2013, the Debtors executed a term sheet with IBM for the sublease of a majority of the space that is currently unused under the Master Lease.[8] On April 26, 2013, the Debtors filed the Debtors Motion for an Order approving NNI's Entry into a Sublease Term Sheet and Sublease Agreement at Facility in Raleigh, North Carolina [D.I. 10325] (the "<u>Sublease Approval Motion</u>").  After a hearing on May 7, 2013, this Court approved the Sublease Approval Motion on the same date [D.I. 10463].  As further described in the Sublease Approval Motion, the Potential Sublease would yield approximately $7.8 million in rent to NNI's estate during its initial term.[9]  <u>See</u> Sublease Approval Motion ¶ 12.  In the Sublease Approval Motion, the Debtors also informed the Court of their intent to file this Application.  Sublease Approval Motion ¶ 14.

## Basis for Relief

12. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. §105(a).

13. Under section 327 of the Bankruptcy Code, a debtor in possession may employ one or more professionals "that do not hold or represent an interest adverse to the estate, and that are disinterested persons" to assist the debtor in possession in carrying out its duties under the Bankruptcy Code.  11 U.S.C. §327(a).

14. Section 328 of the Bankruptcy Code provides, in pertinent part, that under section 327 of the Bankruptcy Code, a professional may be employed "on any reasonable terms and

---

[8] In connection with the potential sublease to IBM (the "<u>Potential Sublease</u>"), CBRE acted as agent for IBM and CBRE Raleigh acted as agent for NNI.

[9] As of the date of this Application, the Potential Sublease has not been executed.

conditions of employment, including a retainer, on an hourly basis, on a fixed percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a).

15. Bankruptcy Rule 2014 requires that an application for retention of a professional include:

> [S]pecific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a). Local Rule 2014-1 further requires that "[a]ny entity seeking approval of employment of a professional person pursuant to 11 U.S.C. § 327 . . . shall file with the Court a motion, a supporting affidavit or verified statement of the professional person and a proposed order for approval." Del. Bankr. L. R. 2014-1(a).

16. By this Application, the Debtors request that the Court approve the employment and retention of CBRE Raleigh as set forth herein. The proposed retention of CBRE Raleigh is beneficial to the Debtors' estates and the professional compensation arrangements (as described in the Agreement) provide certainty and proper inducement for CBRE Raleigh to act expeditiously and prudently with respect to the matters for which it will be employed. Most importantly, under the Agreement, CBRE Raleigh is not entitled to compensation with respect to any particular sublease, unless NNI executes a sublease with a subtenant. Though the Potential Sublease would account for a majority of the currently unused space under the Master Lease, the Debtors will continue to market any space that currently is, or may in the future become, available under the Master Lease in order to seek to obtain additional value for their estates.

17. The Debtors also request approval of the employment of CBRE Raleigh *nunc pro tunc* to March 27, 2013, the date CBRE Raleigh was first contacted by IBM. Such relief is

warranted by the extraordinary circumstances presented by these cases.  The Third Circuit has identified absence of prejudice as a factor favoring *nunc pro tunc* retention.  See <u>In re Arkansas Co.</u>, 798 F.2d 645, 650 (3d Cir. 1986).  In exercising their discretion on this issue, bankruptcy courts may also consider whether a particular professional is in the midst of participating in a transaction that will benefit a debtor's estate.  See <u>In re Indian River Homes, Inc.</u>, 108 B.R. 46, 51 (D. Del. 1989), <u>appeal dismissed</u>, 909 F.2d 1476 (3d Cir. 1990).  While the Agreement was signed in advance of this Application, the Potential Sublease to IBM is the first material transaction that CBRE Raleigh has worked on under the Agreement, and the Debtors accordingly seek *nunc pro tunc* treatment only as necessary to capture CBRE Raleigh's work on the Potential Sublease.

### Selection of CBRE Raleigh and Scope of Services

18.     As the business operations of the Debtors continue to wind down and assets are sold for the benefit of the estates and creditors, it is important for the Debtors to either exploit or liquidate their position in the Property.  In order to facilitate an expeditious and profitable subleasing plan for the Property, the Debtors need to retain the services of a real estate listing and leasing agent who can properly market the property and attract qualified purchasers or tenants.  For such reasons, the Debtors seek retention of CBRE Raleigh pursuant to this Application.

19.     CBRE Raleigh is well-suited to provide the type of real estate services required by the Debtors.  The Debtors seek to retain CBRE Raleigh as their listing and leasing agent because of, among other reasons, the Firm's experience and knowledge in complex commercial real estate transactions involving large corporate properties in the local commercial real estate market, and in-depth insight into local market conditions.  In 2012 alone, the CBRE Raleigh completed 278 lease transactions encompassing 3.9 million square feet worth $314 million.  The

Firm also has an excellent reputation for its use of innovative and successful marketing strategies.

20.     The Debtors believe that the retention of experienced professionals specializing in the leasing of commercial real estate fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals in these cases. The Debtors believe they require the services of a capable and experienced listing and leasing agent because, among other reasons, such retention would allow the Debtors to efficiently market the Property for sublease, which will allow them to maximize creditor recoveries, and such efforts are important to the Debtors' success in their Chapter 11 Cases.

21.     Pursuant to the Agreement, CBRE Raleigh agreed to use its "best efforts" to effect a sublease of the Property. Since the Agreement was executed, CBRE Raleigh has performed the following services for NNI in furtherance of such efforts:

- Developed marketing flyers highlighting the Property for distribution to brokers and brokerage firms both locally and nationally.

- Listed the Property on several commercial real estate websites.

- Hosted numerous tours of the Property for prospects with requirements ranging from 20,000 square feet to 150,000-175,000 square feet of space, for both office and industrial space.

- Facilitated coverage of the Property in a local business journal to increase visibility of the Property in the market.

## CBRE Raleigh's Disinterestedness

22.     To the best of the Debtors' knowledge and except as disclosed in the Miller Declaration, CBRE Raleigh has not represented, and does not have any connection, with the Debtors, their creditors, their insiders, their shareholders, their respective attorneys or accountants, or any other parties in interest in any matters relating to the Property, except as to which approval is being sought as disclosed herein and in the Miller Declaration.

9

23.     As disclosed in the Miller Declaration, CBRE Raleigh currently represents the entities listed on the form attached to the Miller Declaration as Exhibit II.  CBRE Raleigh has informed the Debtors of its ongoing representation of the entities identified in Exhibit II, and the Debtors have agreed both to CBRE Raleigh's continued representation of these entities in matters unrelated to the Property and to CBRE Raleigh's representation of the Debtors.

24.     CBRE Raleigh has represented NNI in connection with the Property since September of 2012.  In connection with the Potential Sublease to IBM (the "Potential Transaction"), CBRE, an entity separate and distinct from CBRE Raleigh, acted as agent for IBM, the potential subtenant.  The Debtors have been informed by CBRE Raleigh that, as is the customary practice, CBRE used the services of an agent from CBRE Raleigh (Jason High) to assist it with finding space for a client (IBM) in North Carolina.  Andrew Kelton, a CBRE Raleigh agent, provided market information to CBRE for a (then unnamed) client of CBRE (IBM).  The information included the recommendation of four properties for IBM to consider, two of which were listed with CBRE Raleigh, and two of which were not.  One of the properties identified was the Property.  Mr. High provided customary services to CBRE and IBM, including providing local market information, preparing a local market survey, visiting available properties, touring prospective lease properties with IBM representatives and, along with CBRE representatives, putting together the request for proposal, soliciting proposals from the agents for the prospective landlords and assisting with the negotiation of lease rates on behalf of IBM for the request for proposal with respect to the Property.  Other agents of CBRE Raleigh provided services to NNI with regard to the Potential Transaction.

25.     Notwithstanding their use of similar trade names, CBRE and CBRE Raleigh are separate entities with separate operations.  CBRE is an indirect, wholly-owned subsidiary of

CBRE Group, Inc., a publicly traded company. CBRE owns a non-controlling fifty percent membership interest in CBRE Raleigh; the other fifty percent membership interest is owned by CB Richard Ellis of North Carolina, LLC. CB Richard Ellis of North Carolina, LLC is owned by a number of individuals; CB Richard Ellis of North Carolina, LLC is not owned by CBRE. CBRE and CB Richard Ellis of North Carolina, LLC may each appoint two directors to CBRE Raleigh's board of directors. A fifth seat, to be held by an independent director, has been vacant for the past several years. The day-to-day operations of CBRE Raleigh are conducted by individuals who are not officers, directors or employees of CBRE. One or more of the officers and/or directors of CBRE Raleigh owns or may own small stock interests in public company CBRE Group, Inc. One minority member (less than 5%) of CB Richard Ellis of North Carolina, LLC is an agent for CBRE and provided services to IBM in connection with the Potential Transaction.

    26.  CBRE Raleigh is a party to a Service Mark Licensing Agreement and a Program Partner Agreement with CBRE for the license of trademarks and mutual referrals of prospective or potential clients. It is regular and customary for CBRE Raleigh to provide co-brokerage services to CBRE under the Program Partner Agreement, and in the last year there were approximately fifty transactions where such services were provided. In addition, under the Program Partner Agreement CBRE has subcontracted management of certain properties, which do not include the Property, in the Raleigh area to CBRE Raleigh. CBRE Raleigh subleases office space in its offices to certain employees of CBRE under the terms of certain occupancy agreements. CBRE Raleigh also subleases office space in its Greensboro office to CBRE, for one of its appraisers, on a month-to-month basis for a monthly rent of $1,750, but there is no written agreement pertaining to such sublease. The total amount of rents booked by CBRE

Raleigh for subleases to CBRE in years 2011 and 2012 were $102,314 and $121,557, respectively.

27.     CBRE Raleigh's agreement with NNI specifies that in the event that a co-broker became involved in a transaction involving the Property, the co-broker's fee would be paid directly by NNI. While it is regular and customary that co-brokers share commissions, there is no written co-broker agreement for the Potential Transaction, and CBRE Raleigh has agreed to waive any sharing of CBRE's brokerage fee earned with regard to the Potential Transaction in connection with the Court's approval of CBRE Raleigh's employment by NNI. The aggregate of the broker commissions that would be payable if the Potential Transaction closes is six percent, which is fair and customary in the marketplace.

28.     As further disclosed in the Miller Declaration, CBRE Raleigh formerly represented the entities listed on the form attached to the Miller Declaration as <u>Exhibit III</u> in matters wholly unrelated to the Property. CBRE Raleigh has informed the Debtors of its past representation of such entities. The Debtors believe that CBRE Raleigh's past representation of these entities will not in any way adversely affect their representation of the Debtors.

29.     As set forth in the Miller Declaration:

    I.    No agent assigned to work on CBRE Raleigh's team with respect to the Property (the "<u>Listing and Marketing Teams</u>") holds or represents an interest adverse to the Debtors' estates.

    II.    No member of the Listing and Marketing Teams is or was a creditor, an equity security holder or an insider of the Debtors.

    III.    No member of the Listing and Marketing Teams is or was, within two years before the Petition Date, a director, officer, or employee of the Debtors.

    IV.    No member of the Listing and Marketing Teams is related to the Hon. Kevin Gross or has a connection to the United States Trustee for the District of Delaware or to any known employee in the office thereof.

30. To the best of the Debtors' knowledge and as disclosed in the Miller Declaration, CBRE Raleigh does not hold or represent any interest adverse to the Debtors or their estates, CBRE Raleigh is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code and as required by section 327(a) of the Bankruptcy Code, and CBRE Raleigh's employment and retention by the Debtors is necessary and in the best interests of the Debtors and their estates.

31. CBRE Raleigh will periodically review its files during the pendency of this retention to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, CBRE Raleigh will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration if needed, as required by Bankruptcy Rule 2014(a).

**Professional Compensation**

32. As part of this Application, CBRE Raleigh seeks to be paid a commission of 2% in accordance with the terms of the Agreement for its services to NNI in connection with the Potential Transaction. With respect to any future commissions, CBRE Raleigh intends to apply to the Court for allowance of compensation and reimbursement of expenses in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and orders of the Court, and consistent with the proposed compensation arrangement set forth in the Agreement (the "Fee Structure").

33. CBRE Raleigh and the Debtors have negotiated the terms of the Agreement, which reflect customary and commercially reasonable compensation and employment terms for a listing of the size and nature of the Property. Thus, the Debtors request approval of the Agreement, including the Fee Structure, which does not include any expense reimbursement provisions.

34. In summary, the Fee Structure provides that with respect to commissions payable in respect of subleases for which negotiations were initiated prior to May 21, 2013 (the date an addendum to the Agreement was signed,[10] extending its time and making certain clarifying and other changes described in this paragraph), the Debtors shall pay CBRE Raleigh a fee equal to four percent (4%) of the total base rent received over the term of any sublease if a sublease is not co-brokered, and two percent (2%) of the total base rent over the term of any sublease if a sublease is co-brokered. Agreement at Schedule of Sublease Commissions ¶ A. With respect to commissions payable in respect of subleases for which negotiations were initiated after May 21, 2013 that are co-brokered, the Debtors shall pay an aggregate fee of 6% of the total base rent to CBRE Raleigh and a co-broker, to be allocated between CBRE Raleigh and the co-broker as agreed among them after receiving a joint letter from CBRE Raleigh and the co-broker that acknowledges (i) the amount and allocation of the fee and (ii) that no amounts other than such fee will be sought from NNI in connection with the relevant transaction. Agreement at Schedule of Sublease Commissions ¶¶ A, B. Treatment for commissions payable in respect of subleases for which negotiations were initiated after May 21, 2013 that were not co-brokered shall remain the same (any such commission referenced in this paragraph, a "<u>Lease Fee</u>").

35. The Lease Fee shall be paid for services rendered if: (i) the Property is subleased to a tenant procured by CBRE Raleigh; (ii) tenant and NNI execute a sublease that is unconditionally delivered by both NNI and tenant; (iii) tenant makes the initial agreed payments to NNI, including any base or additional rent and any other sums due and owing under the sublease, and (iv) NNI has received all other documents required to be delivered by tenant under the sublease (collectively, "<u>Sublease Execution</u>"). Agreement at ¶ 2. The Lease Fee shall be

---

[10] Effectiveness of the addendum is conditioned upon this Court's approval of this Application.

payable, subject to the approval of the Bankruptcy Court, fifty percent (50%) within ten (10) business days of Sublease Execution and fifty percent (50%) within ten (10) business days of occupancy.  Agreement at ¶ 4.

36.	Further, NNI agrees that it shall pay a Lease Fee if, within sixty (60) calendar days after the expiration or termination of the term of the Agreement, the Property is subleased to, or negotiations continue, resume or commence and thereafter continue to Sublease Execution to any prospective tenant with whom CBRE Raleigh had initiated discussions or negotiations with respect to subleasing a portion of the Property.  Agreement at ¶ 4.

37.	No Lease Fee shall be payable for any existing expansion and renewal rights that are reflected in sublease agreements that pre-date the Agreement.  Agreement at Schedule of Sublease Commissions ¶ 5.  Additionally, no Lease Fee shall be payable if a transaction is developed as a direct result of business-to-business contact between NNI and the tenant entity, with no involvement from CBRE Raleigh.

38.	Notwithstanding anything to the contrary in the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, orders of this Court or any guidelines regarding submission and approval of fee applications, in light of the services to be provided by CBRE Raleigh and the structure of CBRE Raleigh's compensation pursuant to the Agreement (including the fact that CBRE Raleigh will only be paid pursuant to the Agreement if the Debtors consummate a sublease transaction that yields value to their estates), CBRE Raleigh and its professionals request that it be excused from maintaining time records as set forth in Local Rule 2016 in connection with the services to be rendered pursuant to the Agreement.

39.	Given the numerous issues which CBRE Raleigh may be required to address in the performance of its services hereunder, CBRE Raleigh's commitment to the variable level of

time and effort necessary to address all such issues as they arise, and the market price for CBRE Raleigh's services for engagements of this nature, the Debtors believe that the Fee Structure described above is reasonable under the standards set forth in section 328(a) of the Bankruptcy Code.

## Notice

40. Notice of the Motion has been given via first class mail to (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; and (iv) the general service list established in these chapter 11 cases. The Debtors submit that under the circumstances no other or further notice is necessary.

## No Prior Request

41. No prior request for the relief sought herein has been made to this or any other court.

[*Remainder of Page Intentionally Left Blank*]

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 21, 2013  
      Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley (admitted *pro hac vice*)  
Lisa M. Schweitzer (admitted *pro hac vice*)  
One Liberty Plaza  
New York, New York 10006  
Telephone: (212) 225-2000  
Facsimile: (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

  /s/ Tamara K. Minott  
Derek C. Abbott (No. 3376)  
Eric D. Schwartz (No. 3134)  
Ann C. Cordo (No. 4817)  
Tamara K. Minott (No. 5643)  
1201 North Market Street  
P.O. Box 1347  
Wilmington, Delaware 19801  
Telephone: (302) 658-9200  
Facsimile: (302) 658-3989

*Counsel for the Debtors*  
*and Debtors in Possession*