**EXHIBIT C**
**AGREEMENT**

CGSH Draft – 9/13/12



Part of the CBRE affiliate network

EXCLUSIVE SUBLEASE LISTING AGREEMENT
CB RICHARD ELLIS – RALEIGH, LLC
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

1. In consideration of the listing for sublease of all or a portion of the real property hereinafter described (the "Property") by CB RICHARD ELLIS-RALEIGH, LLC ("Broker") pursuant to this Sales and Lease Listing Agreement (the "Agreement"), and Broker's agreement to use its best efforts to effect a sublease of same, the undersigned Nortel Networks Inc. ("Sub-landlord") hereby grants to Broker the exclusive right to sublease the Property for a period commencing September 19, 2012 and ending April 30, 2013 (the "Term"), upon the following terms. Sub-landlord shall have the right to terminate this Agreement any time after the sixth month of the Term on 7 days written notice. The Property is situated in Research Triangle Park, County of Durham, State of North Carolina, and is further described as 4001 NC 54 Hwy, RTP, NC 27709-3103.

2. Sub-landlord agrees to pay Broker a subleasing commission (the Lease Fee, as defined on the Schedule) in accordance with Broker's Schedule of Sublease Commissions (the "Schedule"), attached hereto and made a part hereof. This Lease Fee shall be earned for services rendered if, during the Term: (i) the Property is subleased to a tenant procured by Broker, (ii) tenant and Sub-landlord execute a sublease and such sublease is unconditionally delivered by both Sub-landlord and tenant, (iii) tenant makes the initial agreed payments to Sub-landlord, including any base or additional rent and any other sums due and owing under the lease, and (iv) Sub-landlord has received all other documentation required to be delivered by tenant under the lease (such conditions, collectively, "Sublease Execution"). Broker is authorized to cooperate with and to share its Lease Fee with other licensed real estate brokers, regardless of whether said brokers represent prospective tenants or act as Broker's subagents in accordance with the terms of this Agreement, provided, however, Broker shall be solely responsible for the payment of any commissions to such cooperating broker and Broker hereby agrees to indemnify Sub-landlord against any loss or damage from Broker's failure to do so.

3. Sub-landlord further agrees that Sub-landlord shall pay Broker the Lease Fee in accordance with the Schedule if, within sixty (60) calendar days after the expiration or termination of the Term, the Property is subleased to, or negotiations continue, resume or commence and thereafter continue leading to Sublease Execution to any Prospective Tenant (as defined herein). Broker agrees to submit a list of any persons with whom Broker has initiated discussions or negotiations with respect to subleasing any portion of the Property (each, a "Prospective Tenant") and for which a Lease Fee will be payable hereunder to Sub-landlord as a precondition to this section no later than five (5) calendar days following the expiration or termination of the Term, provided, however, that if a written offer to sublease has been submitted then it shall not be necessary to include the offeror's name on the list and, provided further, that Sub-landlord shall be required to agree to such list of Prospective Tenants by acknowledging the same from Broker in writing within five (5) calendar days of its receipt of the list from Broker.

4. Lease Fees shall be payable as follows, at all times subject to the approval of the Bankruptcy Court (as defined herein): (i) fifty percent within ten (10) business days of Sublease Execution and fifty percent (50%) within ten (10) business days of occupancy.

5. BROKER SHALL CONDUCT ALL ITS BROKERAGE ACTIVITIES IN REGARD TO THIS AGREEMENT WITHOUT RESPECT TO THE RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, HANDICAP OR FAMILIAL STATUS OF ANY SUBTENANT OR PROSPECTIVE SUBTENANT.

6. Sub-landlord agrees to cooperate with Broker in bringing about a sublease of the Property and to refer to Broker all inquiries of anyone interested in the Property unless Sub-landlord has a preexisting relationship with the prospective subtenant (such prospective subtenants set forth on Schedule I) and, if Sub-landlord does have a preexisting relationship with such prospective tenant, no Lease Fee shall be due or payable to Broker under any circumstances. Broker is authorized to accept a deposit from any prospective subtenant and to handle it in accordance with the instructions of the parties unless contrary to applicable law. Broker is exclusively authorized to advertise the Property and, provided Broker complies with all applicable signage laws and all applicable covenants and restrictions set forth in the lease between Sub-landlord and master landlord related to the Property, exclusively, to place a sign(s) on the Property if, in Broker's opinion, such would facilitate the subleasing of the Property.

7. Sub-landlord agrees to disclose to Broker any and all information in Sub-landlord's actual possession regarding present and future zoning and environmental matters affecting the Property and regarding the condition of the Property, including, but not limited to structural, mechanical and soils conditions, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, and underground storage tanks, in, on, or about the Property which is not otherwise subject to a confidentiality agreement between Sub-landlord and any third party. Broker is authorized to disclose any such information to prospective subtenants after Broker has received written authorization from Sub-landlord that the same may be disclosed and Broker may not disclose any information that Sub-landlord declines to authorize disclosure for in writing. Broker acknowledges and agrees that any information tendered to it pursuant to this Paragraph 7 shall be destroyed by Broker upon the expiration or termination of this Agreement.

8. If earnest money or similar deposits made by a prospective purchaser or tenant are forfeited, Broker shall not be entitled any portion thereof, nor shall Broker be entitled to a Lease Fee if the conditions in Paragraph 2 hereof aren't met.

9. In the event that the Property becomes the subject of foreclosure proceedings prior to the expiration of this Agreement, then this Agreement shall terminate and be of no further force or effect.

10. Subject to Paragraph 19, in the event of any dispute between Sub-landlord and Broker relating to this Agreement, the Property or Sub-landlord or Broker's performance hereunder, Sub-landlord and Broker agree that such dispute shall be resolved by means of binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent

[NEWYORK 2557424_4]

CGSH Draft – 9/13/12

jurisdiction. The arbitrator(s) shall issue a written opinion for each issue addressed and such opinion(s) shall be based on current principles of law. Depositions may be taken and other discovery obtained during such arbitration proceedings to the same extent as authorized in civil judicial proceedings in the state where the office of Broker executing this Agreement is located. The arbitrator(s) shall be limited to awarding compensatory damages and shall have no authority to award punitive, exemplary or similar type damages. The prevailing party in the arbitration proceeding shall be entitled to recover its expenses, including the costs of the arbitration proceeding, and reasonable attorneys' fees.

11. Sub-landlord acknowledges that Broker is an international brokerage firm and that in some cases it may represent prospective tenants (a "Dual Agency"). Sub-landlord desires that the Property be presented to such persons or entities and consents to dual representation created thereby in accordance with the terms of Paragraph 16 hereof. Broker shall not disclose confidential information of one principal to the other or to any employee or representative of Broker representing the other. Broker shall take affirmative steps to ensure that the confidential information of one principal is not disclosed to the other principal or to any employee or representative of Broker representing the other principal. In seeking prospective tenants, Broker shall not favor in any way any person or entity represented by Broker over persons or entities not represented by Broker. Broker will disclose in writing to the Sub-landlord the existence of any Dual Agency at the time it arises.

12. Each signatory to this Agreement represents and warrants that he or she has full authority to sign this Agreement on behalf of the party for whom he or she signs and that this Agreement binds such party.

13. This Agreement constitutes the entire agreement between Sub-landlord and Broker and supersedes all prior discussions, negotiations and agreements, whether oral or written. No amendment, alteration, cancellation or withdrawal of this Agreement shall be valid or binding unless made in writing and signed by both Sub-landlord and Broker. This Agreement shall be binding upon, and shall benefit, the heirs, successors and assignees of the parties. In the event any clause, provision, paragraph or term of this Agreement shall be deemed to be unenforceable or void based on any controlling state or federal law, the remaining provisions hereof, and each part, shall remain unaffected and shall continue in full force and effect.

14. The parties hereto agree to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment In Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

15. A "Working with Real Estate Agents" is attached hereto and made a part hereof. In accordance with North Carolina law and the rules and regulations of the North Carolina Real Estate Commission, Sub-landlord is hereby advised that Broker represents both all types of tenants. This means that it is possible that a tenant represented by Broker will want to lease a property leased by Sub-landlord. When that occurs, Broker and its agents will act as a Dual Agent if all parties agree and Sub-landlord consents in writing to the same. Broker shall not disclose the confidential information of one principal to the other.

16. Broker agrees to indemnify and defend Sub-landlord from and against all claims, costs, liabilities, settlements and judgments, and all costs of defense against the foregoing (including attorneys' fees and disbursements) by a third party based upon Broker's wrongful act, failure to act, or misrepresentation, including, but not limited to, any claims brought by a Cooperating Broker (as defined herein) if Broker has not acted in accordance with the terms of Paragraph B on the Schedule of Sublease Commissions attached hereto. The indemnities set forth herein shall survive the expiration or earlier termination of this Agreement.

17. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party; provided, however, that Sub-landlord may assign this Agreement or any of its rights, interests or obligations hereunder to a reorganized Sub-landlord or other successor to Sub-landlord's interest in this Agreement pursuant to a confirmed plan or plans of reorganization or liquidation or other order of the Bankruptcy Court.

18. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the state in which the Property is located, without regard to its conflicts of laws principles.

19. Notwithstanding anything contained herein to the contrary, the parties agree that during the pendency of Sub-landlord's and its affiliates' chapter 11 cases under the U.S. Bankruptcy Code (the "Chapter 11 Cases"), the venue of any dispute or disagreement between the parties of or under this Agreement shall lie in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and if a dispute is brought after entry of final decree(s) closing the Chapter 11 Cases, disputes may be handled in accordance with the terms of Paragraph 10.

[REMAINDER OF PAGE BLANK; SIGNATURES ON SUBSEQUENT PAGE]

CGSH Draft – 9/13/12

The undersigned Sub-landlord hereby acknowledges receipt of a copy of this Agreement, the Schedule, and a Description of Agent Duties and Relationships.

Accepted:

CB Richard Ellis – Raleigh, LLC
Licensed Real Estate Broker

By: _____

Title: Managing Director

Address: 4208 Six Forks Road, Ste. 1220

        Raleigh, NC 27609

Date: 9/19/12

Telephone: 919-831-8200

Sub-Landlord:

Timothy C. Ross
Nortel Networks Inc.

By: _____

Title: Chief Financial Officer & Corporate Secretary

Address: 4001 E. Chapel Hill Nelson Highway

        Research Triangle Park, NC 27709

Date: 9/19/12

Telephone: 919-905-2721

**CONSULT YOUR ADVISORS** - This document has legal consequences. No representation or recommendation is made by Broker as to the legal or tax consequences of this Agreement or the transaction(s) which it contemplates. These are questions for your attorney and financial advisors.



Part of the CBRE affiliate network

**SCHEDULE OF SUBLEASE COMMISSIONS**
CB RICHARD ELLIS – RALEIGH, LLC
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

## SCHEDULE OF SUBLEASE COMMISSIONS

**FOR PROPERTY AT:** 4001 NC 54 Hwy, RTP, NC 27709-3103

This Schedule is attached to and made a part of that certain Exclusive Sublease Listing Agreement ("Agreement") between Nortel Networks Inc., as Sub-landlord, and CB Richard Ellis – Raleigh, LLC, as Broker, dated as of September __, 2012.

### A. LEASES OR SUBLEASES
Lease Fees (as defined herein) shall be payable in accordance with the following rates:

       Direct:        4% of the total base rental for the term of the lease.
       Co-Brokered:   2% of the total base rent for the term of the lease

The term "base rent" shall mean such base or basic rent payable monthly under any lease or other occupancy arrangement for which Broker has earned a fee in accordance with the terms of this Agreement, provided, however, that such term shall not include (and no commission shall be payable on or be calculated with respect to) (i) additional rent and any other items, charges or fees payable pursuant to such lease or occupancy arrangement, (ii) any rent escalations applicable to items, charges or fees other than base rent, (iii) any termination fee or penalty that may be payable by a tenant under a lease and (iv) security deposits or letters of credit and, provided further, that the actual costs and expenses assumed or incurred by Sub-landlord shall be deducted from the computation of base rent and shall be amortized on a straight line basis without interest over the entire initial term of the lease and deducted from the rent for each lease year prior to calculating the commission (such commission payable hereunder, the "Lease Fee").

The above rates are subject to the following provisions:

1. *Minimum Commission:*
   If a lease term is 12 months or less, then the Lease Fee shall be calculated upon the actual month's base rental to be received by Sub-landlord.

2. *Month to Month Tenancy:*
   The minimum Lease Fee for a month to month tenancy, tenancy at will, or any other tenancy which is not reduced to a written lease agreement between a tenant and Sub-landlord shall be treated as a lease term of one year. The Lease Fee shall be payable as set forth in the Agreement. In the event such a tenant subsequently executes a written lease with Sub-landlord, either directly or with the assistance of Broker or anyone else, within 12 months from the date of such tenant's initial occupancy at the Property, then Broker shall receive a Lease Fee with respect to such lease (which such Lease Fee shall be calculated in accordance with the terms hereof, except that such Lease Fee shall be reduced by the Lease Fee paid by Sub-landlord for such tenant's initial occupancy arrangement at the Property).

3. *Income from Industrial Services:*
   Sub-landlord shall not pay any Lease Fee on any gain obtained from the sale of any industrial service to a tenant. Industrial services include supplying steam, cooling water, fire suppression, wastewater treatment and other services to the tenant.

4. A Lease Fee will only be paid if Broker is involved in the transaction.

5. *Exclusions:*
   There will be no Lease Fee earned for any existing expansion and renewal rights that are reflected in the existing sublease agreements or any other occupancy arrangement or agreement that Sub-landlord currently has with any other party set forth on Schedule I for any portion of the Property.

   There will be no Lease Fee earned if a transaction is developed as a direct result of business to business contact between Sub-landlord and the tenant entity, terms are negotiated/agreed upon and documentation is managed solely between the parties with no involvement from the Broker. If, however, Broker makes proactive contact with each of the Sub-landlord and tenant and develops or drives a subleasing opportunity that would not have existed without the Broker's involvement, then Broker shall receive a Lease Fee in accordance with the terms of the Listing Agreement.

[NEWYORK 2557425_5]

There will be no Lease Fee earned for the following specific transaction: Avaya has expressed interest in leasing the former Fitness Center space of approximately 4,000 square feet in the basement level of the West office and the small awards or trophy area of approximately 1,000 square feet along the yellow wall entrance hallway.

In the event Sub-Landlord fails to pay the Lease Fee within thirty (30) days of demand of the same by Broker (such demand to be made in accordance with the terms and conditions of this Agreement), then from the date due until paid the delinquent amount shall bear interest at 1.5% per month, up to 18% per annum.

**B. CO-BROKERAGE**

Notwithstanding anything herein or in the Agreement to the contrary, all payments or commissions paid to another real estate broker involved in a transaction subject to this Agreement (such broker a "Cooperating Broker") shall be made by Sub-landlord directly to such Cooperating Broker, pursuant to a separate agreement between Sub-landlord and the Cooperating Broker. If negotiations proceed with a prospective subtenant to a point where it may reasonably be anticipated that a sublease may be entered into (a "Prospective Sublease"), CBRE shall, at Sub-landlord's direction, use commercially reasonable efforts to procure from any Cooperating Broker representing such prospective tenant an agreement in form and substance reasonably satisfactory to Sub-landlord which shall provide that the commission shall be due to such Cooperating Broker only as, if, and when a leasing transaction is finally concluded and a Lease Fee would be payable to CBRE hereunder and that such commission or fee owed to the Cooperating Broker shall be computed and payable in accordance with this Agreement. Sub-landlord may, in its sole discretion, determine whether a different amount of such fee will be payable to a Cooperating Broker on a case-by-case basis. CBRE shall be permitted to provide standard marketing flyers, including such information as the Property's name, size, age, quoted rental rates and floor plans, in addition to such other facts and data customarily provided in a preliminary marketing flyer, to a Cooperating Broker at any time; provided, however, that any further information requested by a Cooperating Broker or by CBRE for dissemination to a Cooperating Broker shall, at the discretion of Sub-landlord, be subject to a confidentiality agreement on Sub-landlord's form. From and after such time as a Prospective Sublease exists, a Cooperating Broker shall, at Sub-landlord's discretion, be required to execute an agreement procured by Sub-landlord that shall provide that such Cooperating Broker shall indemnify and hold harmless Sub-landlord, CBRE and their respective affiliates, successors, assigns, employees, officers and directors from any and all claims sustained or incurred by, or asserted against, Sub-landlord and/or CBRE arising out of any claim for brokerage commissions made by any other broker alleging to have dealt with or through such Cooperating Broker in connection with a transaction contemplated hereunder.

[NEWYORK 2557425_5]





**ADDENDUM TO**
**EXCLUSIVE SUBLEASE LISTING AGREEMENT**
CB RICHARD ELLIS – RALEIGH, LLC
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

Part of the CBRE affiliate network

THIS ADDENDUM to the Exclusive Sublease Listing Agreement by and among CB RICHARD ELLIS – RALEIGH LLC, a Delaware limited liability company ("Broker"), and NORTEL NETWORKS INC., a corporation ("Sub-landlord") executed on September 19, 2012 (the "Agreement") is made as of this 21st day of May, 2013 (the "Execution Date"), by the undersigned parties.

WITNESSETH:

For good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1. <u>Extension of Term</u>. The Term is extended to October 31, 2013.

2. <u>Agreement</u>. In the second line of Paragraph 1 of the Agreement, the words "Sales and Lease Listing Agreement" are replaced with "Exclusive Sublease Listing Agreement."

3. <u>Prospective Tenants</u>. The following sentence is added to the end of Paragraph 3 of the Agreement:

"The term "Prospective Tenant" shall also include the prospects identified on the Park Point Industrial Status Report dated May 7, 2013 attached to the Addendum to this Agreement dated May 21, 2013."

The Park Point Industrial Status Report dated May 7, 2013 attached hereto is incorporated herein by this reference.

4. <u>Commissions</u>.

(a) To confirm the commission payable to a Cooperating Broker in respect of subleases, the negotiation of which was initiated prior to the Execution Date, the Schedule of Sublease Commissions is retroactively amended as follows:

(i) The phrase "except as otherwise provided in the Schedule," is added after "provided, however," in the ninth line of Paragraph 2 of the Agreement.

(ii) The first line of Paragraph "A. LEASES OR SUBLEASES" in the Schedule of Sublease Commissions attached to the Agreement is amended and restated as follows.

"Lease Fees (as defined herein) shall be payable to Broker in accordance with the following rates:"

(iii) The following sentence is added at the end of Paragraph "B. CO-BROKERAGE" in the Schedule of Sublease Commissions attached to the Agreement.

"Unless otherwise agreed between the Sub-landlord and Cooperating Broker, the commission payable to the Cooperating Broker will be 4% of the total base rental for the term of the lease, calculated on the same basis (and with the same limitations and exclusions) as the Lease Fee."

(b) With respect to commissions payable in respect of subleases, the negotiation of which is initiated after the Execution Date, the foregoing amendments in subparagraphs 4(a)(i) and 4(a)(iii) above are rescinded, and the Schedule of Sublease Commissions is further amended as follows:

(i) The third line of Paragraph "A. LEASES OR SUBLEASES" in the Schedule of Sublease Commissions attached to the Agreement is amended and restated as follows.

"Co-Brokered    6% of the total base rental for the term of the lease, to be allocated between Broker and the Cooperating Broker as agreed between such parties."

(ii) The first three sentences of Paragraph "B. CO-BROKERAGE" in the Schedule of Sublease Commissions amended and restated as follows:

Notwithstanding anything herein or in the Agreement to the contrary, if another real estate broker is involved in a transaction subject to this Agreement ( such broker, a "Cooperating Broker" and such transaction, a "Co-Brokerage"

Part of the CBRE affiliate network

**ADDENDUM TO**
**EXCLUSIVE SUBLEASE LISTING AGREEMENT**
CB RICHARD ELLIS – RALEIGH, LLC
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER



or "Co-Brokered" transaction), the Broker will provide Sub-landlord with the allocation of the Lease Fee between the Broker and the Cooperating Broker. After receipt of a joint letter from Broker and Cooperating Broker that acknowledges (i) the amount and allocation of the Lease Fee and (ii) that no amounts other than the Lease Fee will be sought from Sub-landlord in connection with the relevant transaction, all payments or commissions payable to a Cooperating Broker shall be made by the Sub-landlord directly to the Cooperating Broker when a leasing transaction is finally concluded and the Lease Fee is payable hereunder.

5. Condition to Effectiveness. This Addendum shall become effective on the date that the United States Bankruptcy Court for the District of Delaware presiding over the chapter 11 bankruptcy case of Sub-landlord approves the retention of Broker in the bankruptcy case of Sub-landlord.

6. Ratification. The Agreement, as herein modified and amended, is ratified and confirmed in all respects.

7. Counterparts. This Addendum may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one document.

WITNESS, the following signatures.

CB RICHARD ELLIS – RALEIGH LLC

By: [signature] (SEAL)
Name: THOMAS A. FRITSCH
Title: MANAGING DIRECTOR

Date Signed: May 21, 2013

NORTEL NETWORKS INC.

By: [signature] (SEAL)
Name: Timothy C. Ross
Title: CFO & Secretary

Date Signed: May 21, 2013



Part of the CBRE affiliate network

**PARK POINT**
**INDUSTRIAL STATUS REPORT**
**MAY 7, 2013**

| **Property Information:** | |
|---|---|
| Property Name: | Park Point |
| Property Address: | 4001 E. NC Hwy 54<br>Durham, North Carolina |

### A. Leasing Prospects

| Tenant | RSF | Broker/Contact | Term | Rent/sq. ft. | T.I. Allowance | Comments |
|---|---|---|---|---|---|---|
| Tekelec | 100,000 | JLL/Mike Morgan | N/A | N/A | N/A | |
| Undisclosed | 30,000 | Avison Young/Matt Winters | N/A | N/A | N/A | |
| ByteGrid | 150,000 | CBRE/Tom Cleaver | N/A | N/A | N/A | |
| Absolute Transportation | 25,000 | CBRE/Tom Thibodeau | N/A | N/A | N/A | |
| Undisclosed | 60,000 | JLL/Mike Morgan | N/A | N/A | N/A | |
| Undisclosed | 150,000 | Hunter Willard/Cassidy Turley | N/A | N/A | N/A | |
| Undisclosed | N/A | Brian Everett/Avison Young | N/A | N/A | N/A | |
| Undisclosed | 150,000 and 250,000 | Barney Earles/CBRE, Inc. | 3 years | | | |
| IBM | 150,000 and 250,000 | Glenn Dyke/CBRE, Inc. | 3 years | | | |

### B. Executed Leases this calendar year

| Tenant | Bldg/Suite Date Executed | RSF | New, Renewal, or Expansion | Term | Rent/sq. ft. | Base Year | T.I. Allowance | Comments |
|---|---|---|---|---|---|---|---|---|
| Forse | 2/1/2013 | 17,158 | New | 42 Months | $5.50 | | | One month free |

### C. Leases in Negotiation

| Tenant | Building & Suite | RSF | New, Renewal, or Expansion | Term | Rent/sq. ft. | Base Year | T.I. Allowance | Comments |
|---|---|---|---|---|---|---|---|---|
| IBM | | 250,000 | New | 3 years | | | | |