**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>(Jointly Administered) |

**JOINT ADMINISTRATORS' RESPONSE REGARDING THE ALLOCATION
ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE
BUSINESS AND RESIDUAL PATENT ASSETS**


YOUNG CONAWAY STARGATT &
TAYLOR, LLP
    Rodney Square
    1000 North King Street
    Wilmington, Delaware 19801
    Telephone: 302-571-6600
    Fax: 302-571-1253

       -and-

HERBERT SMITH FREEHILLS LLP
    Exchange House
    Primrose Street
    London EC2A 2EG

HUGHES HUBBARD & REED LLP
    One Battery Park Plaza
    New York, New York 10004
    Telephone: 212-837-6000
    Facsimile: 212- 422-4726

*Counsel for the Joint Administrators*

01:13648132.1

## INTRODUCTION

1. This response (the "Allocation Response") is made by the Joint Administrators pursuant to the Discovery Plan ordered in the Order of the Honorable Mr. Justice Morawetz of the Canadian Court dated May 15, 2013 re: Allocation Protocol – Litigation Timetable and Discovery Plan and the Order of the U.S. Court Approving the Litigation Timetable and Discovery Plan, dated May 17, 2013. Unless otherwise stated, capitalized terms used and not defined herein shall have the meaning ascribed to them in the Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets dated May 16, 2013 (the "Allocation Statement").

2. This Allocation Response does not seek to respond to all the assertions made in the various statements filed by the Core Parties on May 16, 2013. As such, failure to specifically respond to an assertion made in a statement of a Core Party is not an acceptance of or acquiescence to that assertion. The Joint Administrators reserve their right to amend or supplement this response or otherwise respond to any and all assertions made by the Core Parties with respect to allocation.

3. This Allocation Response deals primarily with certain arguments made by the U.S. and Canadian Debtors. Although various Core Parties are entitled to make submissions, allocation of the Sale Proceeds will ultimately be only between the EMEA, U.S. and Canadian Debtors.

4. Both the U.S. Debtors and Canadian Debtors seek the overwhelming portion of the Sale Proceeds for themselves. Although the exact amounts those Debtors are seeking is not clear, it would seem (on at least one reading) that together they are claiming for themselves more

than $12.5 billion[1] of the Sale Proceeds, or some 160% of the available proceeds, before any allowance is made for the EMEA Debtors. The Joint Administrators, on the other hand, seek only $2.7 billion of the Sale Proceeds for the EMEA Debtors.

5.    Neither the U.S. nor the Canadian Debtors seek an allocation that in any sense reflects the true rights of the respective parties or the manner in which the Nortel Group operated prior to the Petition Date. Neither approach reflects the manner in which the assets that were sold were created, the basis upon which the Nortel group had allocated interests in those assets, nor the contribution each made to the businesses and assets that were sold. The arguments the U.S. and Canadian Debtors make are consequently without legal merit (or any concept of equity) and do not offer a basis upon which to allocate the Sale Proceeds.

6.    The fundamental basis on which the Nortel entities intended and agreed to conduct their affairs prior to the Petition Date was that they would be placed in the same economic position they would have been in if they were independent, arm's length companies. Therefore any outcome in which one entity would be entitled to all or substantially all of an asset that was jointly created by others (as the Canadian Debtors suggest) or to an allocation based on all the revenue of a particular region in exploiting jointly created assets (as the U.S. Debtors suggest) is not in conformity with how the parties agreed to develop and own IP or transact with each other generally. Any allocation based other than on what an arm's length party would expect is fundamentally flawed.

7.    We summarize and respond to certain of the principal arguments of the Canadian and U.S. Debtors below.

---

[1] All references to currency contained herein shall be U.S. dollars, unless otherwise stated.

01:13648132.1

**JOINT ADMINISTRATORS' RESPONSE TO THE U.S. ALLOCATION POSITION**

8. The U.S. Debtors seek "the substantial majority" of Sale Proceeds. (Motion to Approve Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors ("U.S. Allocation Statement"), dated May 16, 2013, at 1.)

9. The U.S. Debtors concede, correctly, that the Courts must "first determine what each legally distinct Selling Debtor held prior to the sales, and second, determine the value of what that Selling Debtor sold or relinquished." (U.S. Allocation Statement at 19.)

10. However, having identified the task, the U.S. Debtors do not seek to carry it out. Instead, the U.S. Debtors invoke factors such as geography, revenue, cash flow, fair market valuation techniques and the "credit support" it allegedly provided. These factors establish neither which entities had interests in the assets that were sold nor the value of those assets. The fact that the United States was a significant geographic market for the Nortel Group, or that certain patent assets were registered in the United States, is not relevant in determining which entities held interests in the assets that comprised the businesses and patents that were sold.

11. The U.S. Debtors' position is also contrary to representations the Nortel Group made to its auditors (and therefore the market) before bankruptcy. In relation to the UMTS sale, described more particularly in the Allocation Statement, the Nortel Group allocated the proceeds of that sale, which was almost exclusively an European business generating European revenue, amongst all of the RPEs - including the United States and Canada - to reflect the joint beneficial ownership between these RPEs of the IP sold by the Nortel Group. Upon inquiry by the auditors, the Nortel Group justified the allocation by reference to the beneficial and joint ownership of the IP sold.

12. While fair market value principles may be relevant in determining what portion of the Sale Proceeds is attributable to particular assets, once those assets have been identified and valued, their allocation between the Selling Debtors can only be determined by reference to the interests of each selling entity.

13. The only purported reference by the U.S. Debtors to a particular asset is to the exclusive licenses under the MRDA, which at most, could be relevant to the IP assets. The licenses are not relevant to other assets - fixed assets, inventory and customer assets - which comprised the Business Sales. These other assets cannot be ignored in any equitable allocation scheme.

14. The U.S. Debtors also ignore the fact that IP was created jointly, and could only be exploited jointly, by the RPEs. The parties have long recognized this, and the principle of joint development and ownership was the basis on which these parties structured their relationships, as is evidenced by the MRDA. Accordingly, despite holding an exclusive license for its territory, the U.S. Debtors could not keep for themselves all of the revenue generated in its territory as a result of the exploitation of IP, but was obliged to share with the other RPEs.

15. No independent, arm's length entity would have contributed to the creation of IP, as the RPEs did, without the assurance that it would be entitled to receive value commensurate with its contribution. Indeed, the inequity of both the U.S. Debtors' and the Canadian Debtors' positions is exposed by the fact that, if they each receive what they seek, they leave nothing for the EMEA Debtors, failing to recognize the contributions of the EMEA Debtors to the IP that fuelled the global Nortel enterprise.

16. The U.S. Debtors also ignore the fact that purchasers acquired the right to exploit Nortel IP on a global basis, not just in the five territories to which the RPEs' exclusive licenses relate.

17. More specifically, the U.S. Debtors' allocation methodology only takes account of revenue and cash flow figures in respect of the RPEs' exclusive territories, ignoring the fact that a significant proportion of the Nortel Group's global revenue was generated elsewhere. The U.S. Debtors also ignore the fact that most of that revenue was created in the EMEA regions by the EMEA LREs, CPEs and AREs. Each of these entities was entitled to exploit the IP in its local territory, with the RPEs also having a non-exclusive right to the IP in these territories, as well as other countries around the world.

18. In effect, the U.S. Debtors seek to allocate Sale Proceeds referable to territories outside the United States by reference to the level of revenue or cash flow that the U.S. Debtors generated in their own territory.

19. There is no justification in law or equity, or in the parties' past practices, for this proposed allocation.

20. At various points in the U.S. Debtors' submission, they appear to agree with the EMEA Debtors that contribution is a proper basis for allocation of value attributable to IP. When calculating each Debtor's respective contribution, however, they entirely ignore the very significant contributions of the EMEA Debtors and the unfair and unmeritorious transfer of value from those EMEA Debtors, misstate how transfer pricing payments operated and make no realistic attempt to properly analyze the contribution of the EMEA Debtors as a whole.

21. Finally, the U.S. Debtors argue that they should receive the lion's share of proceeds because most of the underlying patents were filed in the United States. However, the jurisdiction in which a patent is filed is primarily a matter of how best to exploit the patent under patent laws, and is not an indication as to where the invention was created or who owns the invention. In fact, the Nortel companies jointly submitted a Functional Analysis to the tax authorities in the United States, Canada and the United Kingdom, at the time the MRDA was adopted, which represented to the taxing authorities that "the majority of patent filing activity occurs in the U.S." but that "the choice of location to file a patent application is often based upon patent protection laws and, therefore, bears no correlation to where the efforts were undertaken to develop the invention."

## JOINT ADMINISTRATORS' RESPONSE TO THE CANADIAN ALLOCATION POSITION

22. The Canadian Debtors essentially seek over 80% of the Sale Proceeds, notwithstanding that their interest in the assets sold as part of the Asset Sales is only a fraction of this figure.

23. The Canadian Debtors purport to base their analysis on the MRDA, while at the same time ignoring its intention, its words and its effect.

24. Like the U.S. Debtors, the Canadian Debtors agree that the approach that has to be undertaken is to determine what assets comprise the Asset Sales and to allocate these according to the interests of the Selling Debtors. Also like the U.S. Debtors, the Canadian Debtors fail to follow this approach in staking out their position on allocation.

25. In relation to the Business Sales, the Canadian Debtors appear to assume that other than tangible assets, all the value in the Business Sales is attributable to IP. The Canadian Debtors make no allowance for the significant Customer Assets that were an important part of the Business Sales.

26. In relation to IP, the Canadian Debtors' position is that NNL retains legal title and is therefore prima facie entitled to all the proceeds from the sale of IP. For the Canadian allocation theory to be successful, one would have to accept that the EMEA Debtors voluntarily agreed to share the proceeds of their labors on a basis that provided them a percentage return for the exploitation of the IP but absolutely nothing – not one penny – when that IP was sold.

27. This approach is entirely at odds with the manner in which the parties structured their relationships with one another and with the jointly developed body of Nortel IP. The RPEs own the beneficial and equitable title in the IP amongst themselves in accordance with contribution to the creation of IP. The transfer of legal, but not beneficial, ownership to NNL was for administrative convenience only and was never intended to determine ownership as among the RPEs themselves. This joint beneficial ownership is evidenced in the MRDA itself and in the sharing of operating revenues that the MRDA specified.

28. It would violate all relevant principles of law and equity for the Canadian Debtors to rely on bare legal title and to deny the existence of the RPEs' beneficial and equitable interests in IP. It is contrary to the transfer pricing arrangements under which the Nortel group operated, including the terms of the MRDA, and the Functional Analysis upon which entry into the MRDA was based. It is also inconsistent with the manner in which these parties presented themselves to auditors and taxing authorities in multiple jurisdictions.

29. If the MRDA did operate in the way the Canadian Debtors assert, then for the reasons set out in the Allocation Statement, the other RPEs are entitled under Ontario law (and the laws of other relevant jurisdictions) to the Sale Proceeds of the IP in accordance with their contribution to its creation in order to properly reflect the intentions of the parties and to prevent the inequitable transfer of value.

30. While the Canadian Debtors concede, in relation to the Business Sales, that the U.S. and EMEA Debtors are able to claim some value in respect of the IP assets on the basis of the exclusive and non-exclusive licenses which they held, the Canadian Debtors assert that the amount which could be claimed must be proved by the U.S. and EMEA Debtors separately and that such amounts are "capped" by the formula in Schedule A of the MRDA. Putting to one side the fact that the Schedule A methodology itself is flawed, the Canadian Debtors have offered no theory under which the MRDA could serve as a "cap" on other debtors' rights.

31. In relation to the Residual Patents Sale, the Canadian Debtors seek the whole of these proceeds by both denying the beneficial and equitable ownership of the patents by the other RPEs and then asserting that the exclusive and non-exclusive licenses do not apply. First, for the reasons set out above and as made clear in the Functional Analysis supporting the MRDA, the patents that were registered were jointly created and jointly owned by the RPEs. Second, to the extent relevant, the licenses do include the residual patents. That much is clear from Articles 4 and 5 of the MRDA itself.

32. There is no juristic justification, economic rationale or legal basis for the Canadian Debtors to now seek to claim the jointly created IP in the Nortel Group for itself. The position they are adopting is extreme, leads to an irrational result and has no legal merit.

01:13648132.1

**LICENSE BASED APPROACH**

33.     For the reasons set out in the Allocation Statement and above, the correct basis upon which to allocate the Sale Proceeds attributable to IP is by reference to the RPEs' beneficial ownership entitlements, which are measured by reference to each RPEs' contribution.  That is the only approach that is consistent with the way the parties actually operated and with the joint ownership rights in IP that the parties have long acknowledged.  The contrary approaches urged by the U.S. and Canadian Debtors would effect a massive reallocation of values that would be contrary to the parties' rights and the legitimate rights of their respective creditors.

34.     If, contrary to the Joint Administrators' primary position, it were to be held that a "license based" allocation approach is appropriate, the EMEA Debtors note that the U.S. and Canadian Debtors' "license based" approaches overlook a number of critical points, including but not limited to the following:

    a.     In respect of non-RPE territories, the sale proceeds attributable to IP for those territories should be split equally between the holders of the non-exclusive licenses for each territory;

    b.     Given that EMEA holds:

        (1)     four non-exclusive licenses in respect of the EMEA regions, the EMEA Debtors should be entitled to four-sixths of all Sale Proceeds attributable to IP in those territories; and

        (2)     three non-exclusive licenses in respect of the rest of the world (other than the U.S. and Canada), the EMEA Debtors should be

entitled to three-fifths of all Sale Proceeds attributable to IP in such territories

## CONCLUSION

35.     For the reasons set out in the Joint Administrators' Allocation Statement and above, allocation of the Sale Proceeds should be determined by analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed to the purchaser in each Asset Sale.  Each Selling Debtor should receive a corresponding portion of the Sale Proceeds attributable to the assets in which it had an entitlement or interest.  The contrary approaches urged by the U.S. and Canadian Debtors would effect a massive reallocation of value that would be contrary to the parties' rights and the legitimate rights of their respective creditors.  The Joint Administrators' proposed asset-based methodology should be adopted as the only logical, equitable and legally sound approach.  However, even if, alternatively to the EMEA Debtors' primary position, a license based approach is ultimately adopted, such an approach must proceed in a manner that reflects the true rights of the respective parties and the manner in which the group operated prior to the Petition Date.

Dated: Wilmington, Delaware
      May 29, 2013

          YOUNG CONAWAY STARGATT & TAYLOR, LLP

          <u>/s Jaime Luton Chapman</u>
          James L. Patton (No. 2202)
          Edwin J. Harron (No. 3396)
          John T. Dorsey (No. 2988)
          Jaime Luton Chapman (No. 4936)

          Rodney Square
          1000 North King Street
          Wilmington, Delaware 19801
          Telephone:  302-571-6600
          Fax:  302-571-1253

          − and −

          HUGHES HUBBARD & REED LLP

          Derek J.T. Adler
          Neil J. Oxford
          David W. Wiltenburg
          Gabrielle Glemann

          One Battery Park Plaza
          New York, New York 10004
          Telephone:  212-837-6000
          Fax:  212-422-4726

          − and −

          HERBERT SMITH FREEHILLS LLP

          Kevin Lloyd
          John Whiteoak
          Richard Lawton

          Exchange House
          Primrose Street
          London EC2A 2EG

          *Counsel for Joint Administrators*