## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X
                    :

*In re*                                :      Chapter 11

                    :

Nortel Networks Inc., *et al.*,[1]        :      Case No. 09-10138 (KG)

                    :

               Debtors.     :      Jointly Administered

                    :

                    :      **Hearing date:  To commence January 6, 2014**

                    :      **Re: D.I. 9947**

                    :

-------------------------------------------------------- X

## RESPONSE OF US DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS

---

[1]      The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://dm.epiq11.com/nortel/.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

I.    ALLOCATION MUST BE BASED ON THE FAIR MARKET VALUE OF
THE ASSETS SOLD OR RELINQUISHED BY EACH SELLING DEBTOR .... 6

II.    THE CANADIAN INTERESTS' ARGUMENT THAT THEY ARE
ENTITLED TO ALL OF THE RESIDUAL PATENT PORTFOLIO SALE
PROCEEDS IS WITHOUT MERIT ...................................................................... 10

    A.    The Plain Text Of The MRDA Refutes The Canadian
Interests' Position...................................................................................... 11

    B.    The Canadian Debtors And Monitor Repeatedly Have Acknowledged
The Licensed MRDA Participants' Ownership Rights In Nortel IP ......... 15

    C.    The Canadian Interests' Misreading Of The MRDA Would Lead To
An Absurd Result....................................................................................... 18

    D.    The Value Of The Exclusive Licenses Was Confirmed In The Business
And Rockstar Sales .................................................................................... 18

III.    THE CANADIAN INTERESTS' POSITION REGARDING ALLOCATION
OF THE BUSINESS SALES PROCEEDS IS EQUALLY FLAWED.................. 20

IV.    THE EMEA DEBTORS' VALUATION AND ALLOCATION METHODS
SHOULD BE REJECTED.................................................................................... 24

V.    TRADITIONAL VALUATION PRINCIPLES, NOT VAGUE ASSERTIONS
OF FAIRNESS TO INDIVIDUAL CREDITORS, MUST DETERMINE THE
ALLOCATION OF SALE PROCEEDS ............................................................... 28

CONCLUSION............................................................................................................ 35

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 544(a) ......................................................................... 22

11 U.S.C. § 548(a)(1)..................................................................... 22

Insolvency Act, 1986, c. 45, § 238 (U.K.)...................................... 22

Insolvency Act, 1986, c. 45, § 239 (U.K.)...................................... 22

Insolvency Act, 1986, c. 45, § 240 (U.K.)...................................... 22

Insolvency Act, 1986, c. 45, § 241 (U.K.)...................................... 22

**Cases**

Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.,
122 A. 142 (Del. Ch. 1923) ........................................................... 25

Canadian Imperial Bank of Commerce v. Bramalea Inc.
(1995), 33 O.R. (3d) 692 (Can. Ont. Ct. J. (Gen. Div.) [Commercial List])...................... 22

Dubois v. Cooperants (Les), Societe mutuelle d'assurance-vie (Liquidation),
[1996] 1 S.C.R. 900 (Can. S.C.C.).................................................. 22

In re Owens Corning,
419 F.3d 195 (3d Cir. 2005) ........................................................... 30

In re Stayton SW Assisted Living, L.L.C.,
No. 09–cv–6082-HO, 2009 WL 5173512 (D. Or. Dec. 22, 2009) ................................... 31

Northland Properties Ltd., Re
(1988), 69 C.B.R. (N.S.) 266 (Can. B.C. S.C.)................................ 30

Phillips v. Brewin Dolphin Bell Lawrie Ltd,
[2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.).................................. 8

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)
(1998), 218 A.R. 59 (Can. Alta. Q.B.), aff'd, (2000), 250 A.R. 188 (Can. Alta. C.A.) ..... 8

R. v. Dunn,
2013 ONSC 137 (Ontario Sup. Ct. of Justice 2013)........................ 33

Syracuse Eng'g Co. v. Haight,
110 F.2d 468 (2d Cir. 1940) ........................................................... 8

**Page(s)**

United States v. Cartwright,
411 U.S. 546 (1973) ........................................................................................    8

**Other Authorities**

L.W. Houlden & Geoffrey B. Morawetz, Houlden and Morawetz Bankruptcy and
Insolvency Analysis, Bankruptcy and Insolvency Act, Part IV (ss. 67-101.2), F§108 ......    22

Michael Maher et al., Managerial Accounting: An Introduction to Concepts, Methods,
and Uses (Houghton Mifflin Harcourt Publ'g, 4th ed. 1991) ...........................................    25

OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax
Administrations (2010) § 6.27 ........................................................................................    25

Roy Goode, Principles of Corporate Insolvency Law (4th ed. 2011), ¶ 16-10 .................    30

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors"), and the Official Committee of Unsecured Creditors (the "Committee," and together with the US Debtors, the "US Interests") hereby submit this memorandum in further support of their motion to the US and Canadian Courts for the allocation of sale proceeds and for such other relief as the Courts deem just and proper ("US Interests' Motion" or "US Interests' Mot.").[2]

## PRELIMINARY STATEMENT

As explained in the US Interests' Motion, each Selling Debtor is entitled to receive the fair market value of the assets, rights and other property interests it sold or relinquished in connection with the Sales.  Using well-established valuation methodologies, the US Interests will prove at trial that NNI is entitled to a substantial majority of the Sale proceeds.

NNI was the most valuable entity in the Nortel group of companies and concomitantly sold, conveyed or relinquished the most valuable rights and assets in the Sales. As detailed in the US Interests' Motion, NNI:  (i) generated the overwhelming majority of revenue and cash flow among the MRDA Participants; (ii) engaged in substantial research and development in addition to making billions of dollars in transfer pricing payments that funded NNL's and other Licensed MRDA Participants' research and development; and (iii) provided extensive credit support for Nortel debt, including guarantees of $4 billion in debt issued by NNC and/or NNL.  Through NNI's exclusive, perpetual royalty-free licenses and related critical enforcement rights, NNI owned all of the valuable economic rights to Nortel intellectual property ("Nortel IP" or "NN Technology") in the United States.  The United States was far and away the

---

[2]    Capitalized terms used herein but not otherwise defined shall have the meaning set forth in the US Interests' Motion.

most important and profitable geographic region for the exploitation and enforcement of those rights. The substantial majority of Nortel patents sold in the Rockstar Sale,[3] including approximately 75% of all "high interest" patent families, were registered *solely* in the United States, NNI's exclusive territory.

The opening submissions make clear that all Selling Debtors are in agreement that allocation must be based on the value of what each Selling Debtor sold or relinquished in the Sales. However, having realized that all roads – and all supportable allocation methodologies – lead to NNI receiving the substantial majority of Sale Proceeds, the Canadian Debtors, the Monitor and the Canadian Creditors' Committee (together, the "Canadian Interests") as well as the Joint Administrators and the UK Pension Claimants, each in their own way, go to extreme lengths to avoid a reasoned allocation of value between the Selling Debtors. These efforts, whether premised on flawed readings of material documents or appeals to their notions of fairness that ignore the corporate form, should be rejected.

The Canadian Interests seek to avoid an actual allocation of value by an obviously flawed reading of the MRDA, a construction that can be rejected based on the plain language of the MRDA, without any need for discovery or an evidentiary hearing. The Canadian Interests make the extraordinary claim – for the first time, two years after the closing of the Rockstar Sale and over three years after the ground for that transaction was laid – that NNL should get *all* of the $4.5 billion in proceeds from that Sale. They base this assertion on the theory that NNL

---

[3]     The "Rockstar Sale" refers to the Debtors' sale of the Residual Patent Portfolio to a consortium called "Rockstar Bidco" ("Rockstar"), consisting of Apple, EMC, Ericsson, Microsoft, Research in Motion and Sony, which closed on July 29, 2011. See US Interests' Mot. at 18-19. The separate sales of Nortel's business lines and related assets between 2009 and 2011, see US Interests' Mot. at 17-18, are herein referred to as the "Business Sales."

owned *all* of Nortel's Residual Patent Portfolio and that NNI and the other Licensed MRDA Participants supposedly had *no* interest or rights whatsoever in that portfolio.

This argument flies in the face of the plain language of the MRDA, the sole document upon which the Canadian Interests rely for their new position. The MRDA provides that while NNL held bare legal title to Nortel IP – no matter which MRDA Participant developed that particular IP – NNL simultaneously licensed back, *on an exclusive, perpetual and royalty free basis*, all exploitive rights in *all* Nortel IP to the Licensed MRDA Participants in their respective exclusive territories. In addition, carved out of NNL's bare legal title was the right of the Licensed MRDA Participants to enforce the Nortel IP in their respective exclusive territories. As a result, regardless of NNL's bare legal title, NNI retained economic ownership in perpetuity of the Nortel IP in the United States by virtue of its exclusive royalty-free license and enforcement rights. The other Licensed MRDA Participants enjoyed the same rights with respect to Nortel IP in their respective exclusive territories. This separation of bare legal title from economic ownership of the Nortel IP in the Licensed MRDA Participants' exclusive territories was deliberate and was the bedrock principle under which the Nortel group of companies operated for many years. Moreover, NNL – and, after January 14, 2009, the Monitor – have acknowledged this principle over and over again in numerous public filings, including securities filings, filings with taxing authorities and in the Monitor's Reports filed in the Canadian Court.

Interpreting the MRDA in the manner urged by the Canadian Interests would not only run afoul of the MRDA's plain language, it would lead to an economically irrational result in violation of settled canons of contractual construction. NNI developed much of Nortel's IP at its six research facilities in the United States and the remaining Nortel IP, wherever it was

created, was bankrolled by NNI, including through *$7 billion* in transfer pricing payments in the

ten years before the petition date. The Canadian Interests' position would require the Courts to

conclude that NNI handed to NNL full legal and economic title to the billions of dollars of

Nortel's Residual Patents that were sold in the Rockstar Sale – patents that NNI largely either

developed or funded – for free. Such an arrangement would have frustrated the entire purpose of

Nortel's transfer pricing arrangements, and contradicted NNL's position taken with taxing

authorities that the arrangements were at arm's length.

        It is also impossible to reconcile the Canadian Interests' current claim of complete

economic ownership over all of Nortel's Residual Patent Portfolio with their willing participation

in and active support for a *joint* sale and auction process for the Residual Patents jointly overseen

by the US and Canadian Courts and governed by US auction procedures; their agreement for the

Canadian, US and EMEA Debtors to jointly retain and pay for Global IP Law Group and other

consultants; their decision to work together with the US and EMEA Debtors pursuant to the

IFSA to develop strategies for monetizing the Residual Patent Portfolio; and their agreement to

place the $4.5 billion in Rockstar Sale proceeds in a joint escrow account. If, as the Canadian

Interests now claim, it is so evident from the MRDA that the Canadian Debtors were the only

entities with any interest in or rights to the Residual Patent Portfolio, then none of this would

have been necessary and the Canadian Interests would have (and should have) made clear from

the start to the US and Canadian Courts, as they did with other transactions such as the sale of

internet addresses and joint venture interests in China and Korea, that they believed there was no

need for a joint sale process or for an allocation process at all with respect to the Residual Patent

Portfolio. Indeed, the Canadian Interests' argument that NNI's exclusive US licenses were

valueless is belied by the fact that Rockstar required that NNI (and all of the Licensed MRDA Participants) relinquish its exclusive licenses in connection with the Rockstar Sale.

With respect to the Business Sales, the CCC takes the argument even further, claiming that NNI is entitled to a *zero* allocation with respect to intangible assets that were part of such sales, including Nortel IP, again on the theory that NNI and the other Licensed MRDA Participants had *no* interest in the Nortel IP, again ignoring the clear terms of the MRDA.  The CCC's argument on the Business Sales is as meritless as the argument on the Rockstar Sale. Indeed, all parties, including the Monitor and the Canadian Debtors, disagree with the CCC with respect to the Business Sales, acknowledging instead that NNI and the other Licensed MRDA Participants did have valuable rights and interests in the Nortel IP that were transferred in connection with those Sales.

The Monitor and Canadian Debtors nonetheless again seek to avoid any actual valuation of those rights that were sold or relinquished in the Business Sales.  The Monitor and Canadian Debtors argue that, at most, NNI and the other Licensed MRDA Participants are entitled to an allocation based on the RPSM percentages set forth in Schedule A to the MRDA with respect to the Business Sale proceeds.  This argument is easily dismissed because, among other reasons, the MRDA states that those percentages do *not* apply with respect to allocation of proceeds from the sale of Nortel's businesses.  The Monitor's and Canadian Debtors' attempt to substitute the MRDA Schedule A percentages for an actual valuation is entirely without merit.

For their part, the Joint Administrators acknowledge that allocation must be based on the value of the basket of rights, property and assets that each Selling Debtor sold in the Sales. The Joint Administrators also agree with NNI that the Licensed MRDA Participants held valuable rights in Nortel's IP that were sold or relinquished in the Sales.  However, the Joint

Administrators adopt an approach to valuation that is both flawed and internally inconsistent, advocating different valuation methodologies for different asset classes, without any principled basis.  Many of these scattered methodologies bear no relation to the value of what each Selling Debtor actually sold or relinquished in the auctions.  Moreover, in an effort to both "supersize" their allocation and create a pseudo-security interest in the Sales proceeds, the Joint Administrators once again trot out their claims, which as set forth in the US Interests' Objections to those claims, are lacking in merit.

Finally, the CCC and the UK Pension Claimants also argue for a *pro rata* distribution among the Nortel group's creditors as a whole.  Whether called an equitable *pro rata* distribution or global substantive consolidation, there is no precedent in any jurisdiction that supports such an outcome.  In addition, there is no factual or legal basis for this unprecedented position and the Courts should reject it.

In sum, for the reasons set forth herein and in the US Interests' Motion, and as will be established in these proceedings, the Courts should determine allocation based on the fair market value of what each Selling Debtor sold or relinquished in the Sales.  Based on this well-established approach to valuation, NNI is entitled to a substantial majority of the Sale proceeds.

# I.    ALLOCATION MUST BE BASED ON THE FAIR MARKET VALUE OF THE ASSETS SOLD OR RELINQUISHED BY EACH SELLING DEBTOR

All of the Selling Debtors agree that allocation should be determined based upon the assets that each Selling Debtor sold or relinquished in the Business Sales and sale of the Residual Patent Portfolio.  US Interests' Mot. at 19; Joint Administrators' Statement Regarding the Allocation Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets, dated May 16, 2013, ¶ 3 [D.I. 10536] ("EMEA Debtors' Br.") ("The EMEA Debtors contend that allocation of the Sale Proceeds should be determined by analyzing

the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed

to the purchaser in each Asset Sale."); Allocation Position of the Monitor and Canadian Debtors,

dated May 16, 2013, ¶ 4 [D.I. 10543] ("Canadian Debtors' Br.") (the relevant question for

allocation is "[w]hat portion of the proceeds realized" by the sales "was due to the transfer of, or

surrender by, the Canadian Debtors, EMEA Debtors or US Debtors, as the case may be, of

property interests").  The largest creditor of the Canadian and US Debtors – the ad hoc group of

Bondholders (the "Bondholder Group") – also agrees with this position, see Opening Allocation

Position of *Ad Hoc* Group of Bondholders, dated May 16, 2013, ¶ 17 [D.I. 10540] ("Bondholder

Group Br."), as do the Committee and the Canadian Creditors' Committee (the "CCC").[4]

Accordingly, the issues before the Courts are as set forth in the US Interests'

Motion:  the Courts must first determine what each legally distinct Selling Debtor held prior to

the Sales, and second, determine the value of what that Selling Debtor sold or relinquished in the

Sales.  US Interests' Mot. at 19.  Those relative values are the allocation percentages to which

each Selling Debtor is entitled.  The allocation process is thus a straightforward valuation

exercise.  Notably, by advocating various methods by which the Courts could divide sales

proceeds according to the assets held or owned by each of the Selling Debtors, the parties agree

not only that it is appropriate to allocate proceeds in this manner, but that it is possible to do so.

As discussed in the US Interests' Motion, the valuation standard that the Courts must employ is

fair market value, the metric used for legal and economic valuations of property and businesses

---

[4]      The CCC's opening brief seeks an order "allocating, administering and effecting the distribution of the Sale
Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets, as set out below
and as will be more particularized in advance of trial." Allocation Position of the Canadian Creditors Committee,
dated May 16, 2013, ¶ 5(a) [D.I. 10538] ("CCC Br."). Bare legal title, however, it not the determinative factor in
determining which entity held the value of IP rights.  This is particularly true because NNL, in the same document
that confirmed its legal title to Nortel IP, simultaneously confirmed the Licensed MRDA Participants' economic
ownership in that IP in their respective territories flowing from their exclusive, royalty-free and perpetual licenses
(that were fully paid up and held free and clear by those Licensed MRDA Participants) and enforcement rights.

throughout all relevant jurisdictions.  See, e.g., United States v. Cartwright, 411 U.S. 546, 550-51

(1973) ("[T]he value of property is to be determined by its fair market value[.]"); Syracuse Eng'g

Co. v. Haight, 110 F.2d 468, 471 (2d Cir. 1940) ("A proper regard for the interests of the

bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market

price is the most equitable standard."); Pocklington Foods Inc. v. Alberta (Provincial Treasurer)

(1998), 218 A.R. 59, para. 197, 354 (Can. Alta. Q.B.), aff'd (2000), 250 A.R. 188 (Can. Alta.

C.A.) (noting that "the most common value standard is fair market value"); Phillips v. Brewin

Dolphin Bell Lawrie Ltd, [2001] UKHL 2, [2001] 1 W.L.R. 143 (H.L.), 154 (appeal taken from

Eng.) ("The value of an asset that is being offered for sale is, prima facie, not less than the

amount that a reasonably well informed purchaser is prepared, in arm's length negotiations, to

pay for it."); US Interests' Mot. at 19-23.

It is indisputable that NNI was the principal revenue driver in the Nortel group,

including among the five major Nortel entities that were parties to the MRDA.[5]  As detailed in

the US Interests' Motion at 2, NNI generated 66% of the MRDA Participants' collective revenue

from 2005 to 2009, and it generated 75% of the MRDA Participants' collective cash flow during

the same period.  NNI paid $7.1 billion in transfer pricing payments between 2001 and 2009,

much of which was used to fund R&D conducted by other MRDA Participants.  Indeed, adding

together its own R&D funding and transfer pricing payments used to fund R&D outside the

---

[5]        These parties included NNI, NNL, NNUK, NN Ireland, and Nortel's French operating company, NNSA.
As the US Debtors and other parties have noted, these five entities were the five primary entities within the Nortel
group that had a stand-alone corporate infrastructure and bore economic risk associated with the Nortel group's
businesses.  See, e.g., US Interests' Mot. at 2 n.3, 9; EMEA Debtors' Br. ¶¶ 13-14 (noting that the Nortel entities
that comprised a "fully integrated business with management, sales and marketing, R&D and support functions"
were NNI, NNL, NNUK, NNSA, and NN Ireland); Allocation Position of the Trustee of Nortel Networks UK
Pension Plan and the Board of the Pension Protection Fund, dated May 16, 2013, ¶ 19 [D.I. 10539] ("UK Pension
Claimants' Br.") (noting that these entities "performed R&D for the Group, together with other core sales,
marketing, administrative, and operating functions whereas [other Nortel entities] functioned primarily as sales
operations, acting as intermediaries between the [five fully-functioning entities] and customers in jurisdictions not
served by [them]").

United States, NNI funded 69% of the Nortel group's total IP investment between 2005 and 2009.  Moreover, NNI provided extensive credit support for Nortel group debt – including acting as a guarantor on multi-billion dollar debt financings – and extended a $1 billion credit facility to NNL which the latter used to fund its working capital requirements.

The parties agree that the Selling Debtors' most valuable assets were their rights to Nortel IP.[6]  See, e.g., EMEA Debtors' Br. ¶ 6 (noting that Nortel's IP constituted a "very large proportion" of assets in the Business Sales and all of the assets in the Residual Patents sale); Canadian Debtors' Br. ¶ 6 ("The primary component and driver of the value of the intangible assets sold in the Business Sales was intellectual property").  Pursuant to the MRDA, while the Licensed MRDA Participants transferred bare legal title to Nortel IP to NNL (even when the Licensed MRDA Participants actually developed the Nortel IP), each Licensed MRDA Participant "held and enjoyed equitable and beneficial ownership" of Nortel IP through "an exclusive, royalty-free license" and enforcement rights with respect to its particular geographical territory.  MRDA Arts. 4(e), 5(a), 9(b).  NNI held this exclusive license to Nortel's IP in the United States free and clear.  The United States was the most lucrative territory for exploitation of the Nortel IP, as evidenced by the facts that the United States was the largest revenue generator among the Nortel group and that substantially all of the patents in the Residual Patent Portfolio were registered in the United States.  Indeed, the large majority were registered *only* in the United States.[7]  As the entity able to exploit the NN Technology and assert actions for

---

[6]    The MRDA broadly defines NN Technology as "any and all intangible assets including but not limited to patents, industrial designs, copyrights and application thereof, derivate works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the [MRDA] Participants, but excluding trademarks and any associated goodwill."  MRDA Art.1(h).

[7]    Over 70% of the 3,485 unique patent families and 1,335 "high interest" patent families sold in the Residual Patent Portfolio were filed only in the United States.

infringement of NN Technology in the United States, NNI was thus the economic owner of the

Selling Debtors' most valuable asset in the most profitable country for exploitation of that asset.

In short, NNI was the Nortel group's most valuable company and is therefore

entitled to a substantial majority of the proceeds from the Business and Rockstar Sales. The US

Interests will use well-accepted economic methods of fair market valuation to establish this at

trial.

## II.   THE CANADIAN INTERESTS' ARGUMENT THAT THEY ARE ENTITLED TO ALL OF THE RESIDUAL PATENT PORTFOLIO SALE PROCEEDS IS WITHOUT MERIT

In an effort to avoid a methodologically sound allocation of value, the Canadian

Interests contend that NNL is entitled to *all* of the $4.5 billion in proceeds from the Rockstar

Sale. Their position is based entirely on one contention, which is contrary to the clear terms of

the MRDA. According to the Canadian Interests, after the Business Sales, the exclusive,

perpetual royalty-free licenses granted to the Licensed MRDA Participants, including NNI,

became "irrelevant and without value." Canadian Debtors' Br. ¶ 55. The Canadian Interests

base this extraordinary argument on the assertion that the exclusive licenses only granted the

Licensed MRDA Participants a right to make or sell Nortel Products using NN Technology (as

Nortel IP was termed in the MRDA) and that, after the Business Sales, "none of the Nortel

entities, and in particular the U.S. Debtors and EMEA Debtors, were carrying on business

operations in their exclusive or any territory." Id.

The Canadian Interests' argument fails for at least four reasons:  (i) it is refuted by

the plain language of the MRDA; (ii) the Canadian Debtors and the Monitor have consistently

admitted that the Licensed MRDA Participants, including NNI, were the economic owners of all

Nortel IP in their respective exclusive territories; (iii) the interpretation of the MRDA now

advanced by the Canadian Interests would lead to an absurd result; and (iv) the Canadian

Interests' position cannot be reconciled with the fact that Rockstar required that each of the

Licensed MRDA Participants relinquish their exclusive licenses in connection the Rockstar Sale,

without which the Sale would not have occurred.

### A.    The Plain Text Of The MRDA Refutes The Canadian Interests' Position

The Canadian Interests' argument cannot be reconciled with the plain language of

the MRDA upon which it is purportedly based.  The MRDA creates a straightforward regime

under which:  (a) NNL and the Licensed MRDA Participants would each engage in research and

development activity to develop NN Technology, including patents; (b) NNL would be granted

bare legal title to all NN Technology no matter which MRDA Participant created that particular

NN Technology or funded its development; (c) carved out of NNL's bare legal title would be

enforcement rights with respect to *all* NN Technology for the Licensed MRDA Participants in

their exclusive territories; and (d) NNL would grant exclusive licenses with respect to *all* NN

Technology back to the Licensed MRDA Participants, on a royalty-free basis in perpetuity, in

their respective exclusive territories, which for NNI was the United States and Puerto Rico.  As

set forth in the second recital of the MRDA, this provided the Licensed MRDA Participants with

"equitable and beneficial *ownership* rights of certain exclusive rights under NN Technology" for

their respective territories.  MRDA at 2 (emphasis added).  The Canadian Interests' argument

that the Licensed MRDA Participants had *no* rights with respect to over $4 billion worth of NN

Technology is entirely inconsistent with the plain language of the MRDA.

Article 4 of the MRDA provides that "*[e]xcept as otherwise specifically agreed*,

legal title to any and all NN Technology . . . shall be vested in NNL."  MRDA Art. 4(a)

(emphasis added).  However, this is only bare legal title.  All other rights are vested in the

Licensed Participants for their respective exclusive territories.  For example, Article 4(e), as an

unambiguous express exception, vests in the Licensed MRDA Participants the "right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."  Notably, despite extensively discussing the MRDA and quoting wholesale several of its provisions in their opening briefs, the Monitor and Canadian Debtors conspicuously fail even to mention Article 4(e).[8]  Under Article 4(e), however, NNI's and the other Licensed MRDA Participants' enforcement rights in their exclusive territories were carved out of NNL's bare legal title and were thus perpetual and unlimited.  In addition, on their face, these enforcement rights applied to *all* NN Technology, which by definition included the Residual Patent Portfolio sold in the Rockstar Sale.

NNL also granted to NNI and the other Licensed MRDA Participants an enhanced license with respect to *all* NN Technology in their respective exclusive territories.  Article 5 of the MRDA provides that NNL:

> continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").

Id. Art. 5(a)(i).  This exclusive license is extremely broad and encompasses, among other things, the right to sublicense Nortel IP, the right to make, offer to sell and sell Products using NN Technology, and *all* rights to the patents for *all* Nortel IP within each Licensed MRDA Participant's exclusive territory.  Based on a plain reading of Article 5(a)(i), these licenses were

---

[8]    The CCC quotes Article 4(e) but fails to acknowledge its significance in its brief.

broad and applied to all patents, which *a fortiori* included the residual patents sold in the Rockstar Sale.  The licenses were not limited solely to NN Technology as used in Nortel Products.

The arguments of the Canadian Interests also ignore the fact that following the sale of Nortel's then substantial manufacturing facilities to Flextronics in 2005, all but a very small amount of Nortel Products were manufactured by third parties under contract.  Thus, even if the exclusive licenses were limited in the manner suggested by the Canadian Interests (which is not the case based on a plain reading of the MRDA), after the Business Sales nothing would have prevented the Licensed MRDA Participants from again hiring a contract manufacturer (such as Flextronics) to manufacture Nortel Products, nor would anything have prevented a Licensed MRDA Participant from using NN Technology in a product.  It also bears noting that "Nortel Products" in the MRDA is defined to include products "designed, developed, manufactured or marketed" or even simply "proposed to be designed, developed, manufactured or marketed, at any time, by, or for, any" of the MRDA parties, including the Licensed MRDA Participants.  Id. Art. 1(1).  In either case, even under the Canadian Interests' erroneous reading of the MRDA, the Licensed MRDA Participants would have had all of the rights to *all* NN Technology in their respective territories after the sale of the Nortel business units.  Moreover, the critical enforcement rights vested in NNI and the other Licensed MRDA Participants by Article 4(e) of the MRDA are not limited only to NN Technology being used in Nortel Products. The Canadian Interests do not and cannot contend otherwise.  And the right to sublicense in perpetuity likewise meant that NNI and the other Licensed MRDA Participants continued to have substantial rights in the Residual Patent Portfolio even under the Canadian Interests' flawed theory.

The combined grant of an exclusive, perpetual royalty-free license and the enforcement rights vested in NNI have all of the attributes of economic ownership of all Nortel IP in the United States and Puerto Rico.[9]  This structure, moreover, was deliberate and agreed to by NNL and the Licensed MRDA Participants for good, sound and legitimate business reasons, including because this was a tax-efficient structure for the Nortel group of companies.  With this structure, NNL for tax and other purposes held its interest in the NN Technology in the Licensed MRDA Participants' exclusive territories solely through its equity ownership of those Licensed MRDA Participants.  This structure avoided the need for NNL to charge royalties to the Licensed MRDA Participants, which royalties would have been subject to withholding and other taxes, and for NNL to pay fair market consideration for the IP created by the Licensed MRDA Participants.[10]  A consequence of NNL's deliberate choice to hold its interest in the NN Technology in the exclusive territories through its equity ownership in the Licensed MRDA Participants is that NNL, pursuant to the absolute priority rule, cannot now extract the value of that NN Technology from NNI and the Licensed MRDA Participants through allocation.  Stated simply, the Canadian Interests should not be permitted to walk away from the terms of the MRDA that NNL structured, agreed to and, indeed, promoted to tax authorities in numerous countries, including in the United States and Canada.

---

[9]    Consistent with this, Article 7 of the MRDA provides that each Licensed MRDA Participant "shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology."  MRDA Art. 7(b).  NNI and the other Licensed MRDA Participants would not have undertaken such an indemnification obligation unless they were the effective owners of the NN Technology in their respective exclusive territories.  The Canadian Interests make much ado about the fact that the exclusive licenses were not assignable.  This is irrelevant since, among other reasons, Article 5 provides the Licensed MRDA Participants with the right to sublicense in perpetuity.

[10]    In addition, Article 13 of the MRDA provides that the "relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose."  This provision makes it clear that NNL did not retain economic ownership of the NN Technology, including all patents, in the exclusive territories of the Licensed MRDA Participants or benefit from the kinds of fiduciary duties that partners have to each other.

**B.**    **The Canadian Debtors And Monitor Repeatedly Have Acknowledged The Licensed MRDA Participants' Ownership Rights In Nortel IP**

The Canadian Debtors' and the Monitor's consistent statements and conduct prior to the unveiling of their new litigation position in their allocation briefs confirms that the Licensed MRDA Participants were the economic owners of Nortel IP in their respective exclusive territories, including the Residual Patent Portfolio.  For instance, the Canadian Debtors and Monitor have consistently stated that while NNL held bare legal title to all Nortel IP, NNL, in turn, licensed all Nortel IP back to the Licensed MRDA Participants in their exclusive territories, without qualifying that statement by saying the licenses did not extend to the Residual Patent Portfolio.  Thus, in NNL's 2002 and 2008 submissions to the IRS and CRA (which were joined by NNI) in connection with the review of Nortel's transfer pricing system, NNL represented that each Licensed MRDA Participant owned the Nortel IP in its respective territory.  The Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement, dated October 31, 2008 ("2008 APA"), made to both the IRS and CRA stated that "*[a]ll intellectual property ('IP') created from the investment in R&D by the IEs* [the Licensed MRDA Participants] is registered by NNL.[11]  *Each IE maintains an economic ownership in the IP.*"  2008 APA, App. A at 4 (emphasis added).  The 2002 Horst-Frisch Report *submitted by NNL* to the same tax authorities in support of the proposed APA described Nortel's historic R&D and IP rights system in the same way, stating that "[f]rom an economic standpoint, each R&D cost sharing participant [the future Licensed MRDA Participants] could be considered to 'own' the NT technology as it related to its specific region."  Horst-Frisch Report at 10.

---

[11]      "IE" refers to Integrated Entity, which was the term used in the APA for NNI and the other Licensed MRDA Participants.  2008 APA, App. A at 1.

15

Other examples abound.  Notably, in its July 6, 2011 report filed with the

Canadian Court – the report describing the successful auction of the Residual Patent Portfolio –

the Monitor affirmed, with respect to the Residual Patents that were subject to the Rockstar Sale,

that:

> NNL holds legal title to the Residual IP which, in turn, is subject to
> various intercompany licensing agreements with other Nortel
> entities around the world, in some cases on an exclusive basis and
> in other cases on a non-exclusive basis.

Seventy-First Report of the Monitor (July 6, 2011) at 18.  The Monitor did not say, as it does

now, that these licenses with respect to the "Residual IP" were "irrelevant, inapplicable and of no

value,"  Canadian Debtors' Br. ¶ 52, even though this report was filed after the Business Sales

closed.  Similarly, NNC's 2011 10-K, as with previous 10-Ks filed by NNC, stated that "IP was

generally owned by NNL and licensed to participating Nortel affiliates (i.e., NNI and certain

EMEA Debtors) through exclusive and non-exclusive licenses."[12]  The 10-Ks nowhere state that

the exclusive licenses were limited only to Nortel IP used in Nortel Products.[13]

Moreover, the Canadian, US and EMEA Debtors worked cooperatively together

beginning in the late summer of 2009, before a single Business Sale had closed, strategizing on

alternative plans to maximize the value of the Residual Patent Portfolio.  Many plans were

considered collectively by the Canadian Debtors, the Monitor, the US Debtors, the Committee,

the Bondholders and the Joint Administrators, including jointly forming a new reorganized

company or corporate group  (colloquially referred to as IP Co.) to enforce the patents or jointly

---

[12]       Nortel Networks Corporation, Annual Report (Form 10-K), at 4 (Mar. 8, 2012). See also Nortel Networks
Corporation, Annual Report (Form 10-K), at 5 (Mar. 4, 2011); Nortel Networks Corporation, Annual Report (Form
10-K), at 11 (Mar. 15, 2010).

[13]       This is echoed in numerous Monitor's Reports to the Canadian Court.  See, e.g., Report of Ernst & Young
Inc. (Jan. 14, 2009) at 14-15; Fourteenth Report of the Monitor (June 23, 2009) at 5.

selling the Residual Patent Portfolio, as in the end they did.  Of course, if the Canadian Debtors

alone had an interest in that patent portfolio, the participation of the US and EMEA Debtors (as

well as the Committee) in this process would have been wholly unnecessary.  At a minimum, the

years in which the these interested parties were spending considerable time, effort and money

together devising a plan for maximizing the value of the Residual Patent Portfolio would have

been an opportune time for the Monitor or the Canadian Debtors to inform the US and Canadian

Courts that they believed the US and EMEA Debtors had no interest in the Residual Patent

Portfolio and that their exclusive licenses and enforcement rights were worthless (or that those

interests would somehow become worthless once the Business Sales closed).

   Notably, in seeking US Court approval for the estates' joint retention of Global IP

Law Group to assist in developing strategies to maximize the value of the Residual Patent

Portfolio, NNI stated in its retention application, without qualification, that: "[c]ertain of Nortel's

affiliates, including NNL, NNI, NNUK and NN Ireland have decided it is in their interests, *as

owners of and/or holders of exclusive licenses to patents contained within the Residual Patent

Portfolio*, to retain an intellectual property consultant."[14]  In addition, in its October 22, 2009

report filed with the Canadian Court, the Monitor stated that the Global IP Law Group "has been

jointly engaged by NNL, NNI, NNUK, and [NN Ireland]."  Twenty-Fifth Report of the Monitor

(Oct. 22, 2009) at 79.  Not a word was heard from the Canadian Interests, or anyone else,

claiming that this statement was incorrect.  The US Court granted the application for the Nortel

estates to jointly retain Global IP Law Group, to the benefit of all of the Canadian Interests at the

shared expense of NNI.

---

[14]  Application for an Order Authorizing Employment and Retention of Global IP Law Group, LLC *Nunc Pro Tunc* to October 13, 2009 as Intellectual Property Consultant to the Debtors and Debtors in Possession, dated Oct. 30, 2009, ¶ 19 [D.I. 1796] (emphasis added).

C.     **The Canadian Interests' Misreading Of The MRDA Would Lead To An Absurd Result**

Contracts should not be interpreted to reach irrational results, yet that is precisely what the result would be if the Canadian Interests' new reading of the MRDA were accepted.  It is not reasonable to construe the MRDA to mean that NNI and the other Licensed MRDA Participants agreed to give patents worth billions of dollars (both patents created domestically by NNI and patents created internationally that were funded largely by NNI's transfer pricing payments) to NNL for nothing.  Nor would such an agreement have passed muster under the tax laws in all relevant jurisdictions, which require transactions between affiliates to be on an arm's length basis.  Further, the reading of the MRDA urged by the Canadian Interests becomes even more untenable to the extent they are arguing – as it appears[15] – that NNI and the other Licensed MRDA Participants had, but then somehow lost, valuable interests in the Residual Patent Portfolio by closing the Business Sales.  There is no basis under the MRDA to conclude that the Licensed MRDA Participants forfeited billions of dollars' worth of rights and assets merely because the MRDA Participants sold the business lines before and apart from the Residual Patent Portfolio.

D.     **The Value Of The Exclusive Licenses Was Confirmed In The Business And Rockstar Sales**

The Canadian Debtors, along with the other Nortel estates, acknowledged the value of the exclusive licenses before, during and after the Business Sales by executing numerous agreements with NNI in which NNI transferred, terminated or licensed its exclusive license rights in order to enable the sales.  The License Termination Agreement ("<u>LTA</u>") signed

---

[15]     Canadian Debtors' Br. ¶ 55 ("At the time of the Rockstar Transaction, none of the Nortel entities, and in particular the US Debtors and EMEA Debtors, were carrying on business operations in their exclusive or any territory . . ."); CCC Br. ¶ 57 ("[A]fter all of Nortel's Lines of Business had been sold . . . [n]one of the Licensed Participants had any right, title or legal interest in the Residual IP . . . .").

in connection with the Rockstar Sale, for example, as with the LTAs signed in conjunction with the business line sales, provided for each Licensed MRDA Participant to terminate its exclusive license rights with respect to the IP assets being sold.  Each LTA specified NNI would terminate its exclusive license rights in the assets being transferred to a buyer and in return "(e)ach Seller shall have a right to an allocation of a portion of the sale proceeds from the Sale."  Residual Patent Sale LTA § 2.04.  The fact that Rockstar required that each of the Licensed MRDA Participants relinquish their exclusive licenses in connection with the Rockstar Sale belies the argument that the exclusive licenses were valueless.  Without such relinquishment, the Licensed MRDA Participants would have had a continuing right to exploit those Residual Patents themselves and sue anyone else who exploited them in their territories.  The Licensed MRDA Participants' remaining exclusive licenses would have precluded the sale of the Residual Patent Portfolio.

Each of the LTAs also make clear that the license terminations did not result in the termination of the MRDA itself and that the Licensed MRDA Participants continued to hold rights thereunder.  Similarly, Section 5.13(b) of the Rockstar Asset Sale Agreement required that LTAs be executed: "[e]ffective as of the Closing, the Sellers shall terminate all license rights granted under the Master R&D Agreement to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests."  June 30, 2011 ASA § 5.13(b).  NNI was included in the definition of "Sellers" and was in fact deemed a "Primary Seller Party" along with NNC, NNL and NNUK.  Id. at Preamble § 1.1.  Further, NNI was included as one of the licensors granting rights to certain patents owned by the licensors in connection with the closing of the Residual Patent Portfolio.  There would have been no reason to include NNI as a party to the LTA or as a licensor, or as a party to any of the residual patent

sale agreements for that matter, if NNI's exclusive license either did not exist or had become worthless at such time.[16]

## III.    THE CANADIAN INTERESTS' POSITION REGARDING ALLOCATION OF THE BUSINESS SALES PROCEEDS IS EQUALLY FLAWED

Continuing their effort to avoid any actual fair market valuation of the assets and rights each Selling Debtor sold or relinquished in the Sales – because they know the outcome of that valuation exercise would not be in their favor – the Canadian Interests half-heartedly offer several arguments with respect to the Business Sales.

The CCC submits that virtually all of the Business Sales proceeds should be allocated to the Canadian Debtors because the Licensed MRDA Participants' exclusive, royalty-free perpetual licenses "had no value, or in the alternative, no material value in the context of the Business Sales." CCC Br. ¶ 58. The CCC devotes but one paragraph to explaining this absurd proposition in its brief, asserting simply that the Licensed MRDA Participants "had no right to assign or otherwise transfer their rights under the MRDA" or under the licenses, id., as if that were somehow relevant. First, as quoted above, Article 5 of the MRDA granted to the Licensed MRDA Participants the unfettered right to sublicense, in perpetuity, Nortel IP within their respective territories. MRDA Art. 5(a)(i). This is the functional equivalent of an assignment right. Second, and more importantly, whether or not the Licensed MRDA Participants had a right to further assign or transfer the licenses, there is no question that they held them at the time

---

[16]    In light of the Canadian Interests' litigation position relating to the Residual Patents, to which, as described above, the Courts should give no credence, the US Interests note that in the highly unlikely event the Courts conclude that NNI should receive no value for the relinquishment of its exclusive, perpetual license and enforcement rights in the Rockstar Sale, the US Debtors will then have additional significant claims that may be asserted against the Canadian Debtors, potentially, including, without limitation, claims for fraudulent inducement arising therefrom. This is in addition to any other claims the US Debtors may bring, including, without limitation, claims for contribution and indemnification, in the event the US Debtors are found liable in respect of the separate claims brought by the EMEA Claimants and UK Pension Claimants. The US Debtors reserve their rights to bring any such claims.

of the Business Sales.  And as the CCC itself acknowledges, these IP rights were Nortel's most valuable assets.

The Monitor and the Canadian Debtors do not go as far as the CCC and do not claim that the enhanced licenses in the context of the Business Sales had no, or no material, value.  Instead, they first say that the Licensed MRDA Participants, including NNI, have the "onus" to demonstrate that those licenses had value.  Canadian Debtors' Br. ¶¶ 59-60.  There is no basis for the Monitor and Canadian Debtors' attempt to shift the burden of proof solely to NNI or any other Licensed MRDA Participant.  In any event, it is easy to establish that the exclusive licenses had immense value, particularly in light of the plain language of the MRDA and its predecessor agreements, and the Canadian Debtors' repeated admissions, noted above, to taxing authorities and elsewhere that "[f]rom an economic standpoint," as a result of the enhanced licenses, each Licensed MRDA Participant "own[s] the NT technology as it related to its specific region."  Horst-Frisch Report 10.

The Monitor and Canadian Debtors next argue that NNI's allocation, with respect to the Business Sales, must be capped at the RPSM percentages set forth in Schedule A to the MRDA.  This argument is completely without merit, as the MRDA plainly provides that those RPSM percentages do not apply to the sale of a business.  3d Add. to MRDA at 7.  Instead, the parties agreed that the touchstone for valuing the exclusive licenses was fair market value.  Thus, Article 9 of the MRDA provides that upon termination of the MRDA, "each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and in particular" the exclusive, royalty-free right to exploit and

enforce NN Technology in its respective exclusive territory in perpetuity. MRDA Art. 9.[17] In the event a Licensed MRDA Participant entered bankruptcy or insolvency proceedings, the MRDA provided that a party must surrender its exclusive license in exchange for the "Special Retirement Allocation," which is defined as the *fair market value* of the exclusive license at the time of retirement, and *not* the RPSM percentage. See MRDA Arts. 1(p), 1(q), 11(c), 11(d)(iii)).[18] This provision – which comports with the universal bankruptcy principle that a conveyance by an insolvent company for less than reasonably equivalent value is subject to potential rescission and avoidance[19] – is fully supportive of the US Interests' allocation position.

Further, it is inappropriate to apply to allocation an RPSM percentage used in a transfer pricing regime. The purpose of the MRDA's transfer pricing regime, which relates to taxes, is to create an arm's length pricing agreement among affiliated operating entities. Whatever the virtues of the MRDA percentages in that context, they do not answer the separate question of how to determine the fair market value of the assets and rights surrendered by any entity that is looking to sell its assets as they currently exist. The MRDA explicitly acknowledges this by treating the sale of a business as a fundamentally different proposition than the contribution to ongoing R&D development. Moreover, even if transfer pricing RPSM

---

[17]     This arrangement predated the MRDA. See 1992 Cost Sharing Agreement Art. 10 ("Upon expiration of the [1992 Cost Sharing Agreement], participants are deemed to have acquired a fully paid up license permitting them to continue to exercise the rights granted them [thereunder].").

[18]     As noted in the US Interests' Motion, Article 11 of the MRDA – which governed the retirement of MRDA Participants – was not triggered here because the automatic stay in the bankruptcy proceedings prevented application of the termination provision of the MRDA, and because the MRDA was amended on December 31, 2008 to state that "no Participant affected by" a bankruptcy, insolvency, receivership or liquidation event would "be automatically terminated from participation in the Agreement." See US Interests' Mot. at 13 n.13.

[19]     See, e.g., 11 U.S.C. §§ 544(a), 548(a)(1); L.W. Houlden & Geoffrey B. Morawetz, Houlden and Morawetz Bankruptcy and Insolvency Analysis, Bankruptcy and Insolvency Act, Part IV (ss. 67-101.2), F§108; Dubois v. Cooperants (Les), Societe mutuelle d'assurance-vie (Liquidation), [1996] 1 S.C.R. 900 (Can. S.C.C.); Canadian Imperial Bank of Commerce v. Bramalea Inc. (1995), 33 O.R. (3d) 692 (Can. Ont. Ct. J. (Gen. Div.) [Commercial List]); Insolvency Act, 1986, c. 45, §§ 238-241 (U.K.).

percentages had any relevance to allocation – which is not the case – it is entirely inappropriate

to use the Schedule A percentages here, given the heavy criticism those percentages received

from taxing authorities.  As noted in the US Interests' Motion, both the IRS and CRA concluded

that the RPSM percentages in Schedule A were deeply flawed and resulted in at least *$2 billion*

in overpayments by NNI to NNL for the period of 2001 to 2005 alone.  These Schedule A RPSM

percentages have no relevance to the allocation of sale proceeds and clearly are not a cap on

allocation recoveries from the Business Sales to NNI or to any other party.

       The remaining arguments by the Monitor and Canadian Debtors do not merit

extended discussion.  The Monitor and Canadian Debtors, like the Joint Administrators as

discussed below, seek to use an "asset-based" approach to valuation, which entails dividing up

the proceeds from sales according to asset classes (*e.g.*, IP and tangible assets) and purporting to

attribute a value to each asset.  An asset-by-asset valuation approach, however, injects

unnecessary complexity into the valuation exercise, particularly where, as here, the market or

income approach to valuation can be used.

       More importantly, the Canadian Debtors and Monitor do not use the asset

approach correctly.  In addition to their desperate attempts to eliminate or cap NNI's interests in

Nortel IP, by way of further example, their position ignores other intangible assets, such as

goodwill and customer relationships.  Their argument that these assets are "not relevant to [the

US or EMEA Debtors'] allocation entitlement" because they have no "value separate and apart

from the IP," Canadian Debtors' Br. ¶ 31 n.20, goes unexplained and is erroneous.  The Monitor

and Canadian Debtors also contend that tangible assets "were effectively sold for their net book

values" and, therefore, "the respective entities that owned and contributed those assets to the

sales are entitled to the net book value of those assets."  Canadian Debtors' Br. ¶ 57; <u>see also</u> <u>id.</u>

¶ 5.  But the Debtors' tangible assets were not sold at net book value – an accounting concept which measures an asset's original price less its depreciation and amortization for tax purposes. Rather, they were sold to purchasers for their fair market value – the US Debtors' and Committee's metric for valuation – in arm's length auctions based on those assets' forward-looking profit streams.  Net book value has no relevance to the values at which the assets were actually sold or to which the parties are now entitled.[20]

## IV.    THE EMEA DEBTORS' VALUATION AND ALLOCATION METHODS SHOULD BE REJECTED

The Joint Administrators concede that allocation should be determined by valuing the assets and rights held and then sold or released by the Selling Debtors.  See EMEA Debtors' Br. ¶ 3.  However, they choose an unnecessarily complicated valuation method and then apply that method incorrectly.

The Joint Administrators principally argue that the Courts should break down the sale price from each Business Sale to account for various asset classes sold.  As noted above with respect to the Monitor's and Canadian Debtors' arguments, an asset-based approach to valuation is an unnecessarily complicated method where, as here, other more suitable valuation methods, such as the market or income approach, are available.  More importantly, the Joint Administrators have applied the asset-based approach incorrectly.

The most significant error made by the Joint Administrators is that they purport to value what they assert is the largest and most valuable asset class – Nortel IP (which the Joint

---

[20]    The Monitor and Canadian Debtors misleadingly note that "[i]n the agreements for the Business Sales, the parties agreed to allocate the purchase price first to tangible assets in accordance with their net book values, with the balance of the purchase price being allocated to intangible assets."  Canadian Debtors' Br. ¶ 22.  The "parties" which "agreed" were the Selling Debtors and the *purchasers*.  Not only did the Selling Debtors not make any such agreement among themselves, but to the contrary, the Selling Debtors executed clear reservations of rights that any purchase price breakdowns would not be binding or precedential for the purposes of allocation of the sale proceeds among the Selling Debtors themselves.

Administrators improperly lump together with goodwill) – by "looking at contributions, in a broad sense, which the RPEs [the Licensed MRDA Participants] made to the Nortel Group which enabled the development of IP." EMEA Debtors' Br. ¶ 69. Here, the Joint Administrators conflate contribution with cost. Their submission actually focuses on cost. However, the cost of an asset is not the fair market value of that asset and, indeed, often bears no relation to the amount for which one could sell that asset in an arm's length transaction.[21] The Joint Administrators, however, assert baldly that under the MRDA, "it was intended that the beneficial ownership of each of NNUK, NN Ireland and NNSA in the IP would be proportionate to the contribution each made" when allocating sale proceeds. EMEA Debtors' Br. ¶ 57. Nowhere does the MRDA say this, and indeed, as noted above, the MRDA expressly says that the RPSM Schedule A percentages are *not* applicable to business sales. The relevance of the MRDA in this context is that it confirms that NNI had a fully paid up exclusive, royalty-free license in perpetuity with respect to Nortel IP in the United States. Accordingly, when NNI sold or relinquished those licenses and related IP enforcement rights in the Sales, even under an asset-based approach, NNI would have to receive the fair market value of those IP rights. The amount NNI – or NNUK, NN Ireland and NNSA – paid for their exclusive, perpetual royalty-free licenses (*i.e.*, their contribution to Nortel's R&D) is therefore not determinative of the allocation

---

[21]    It is well settled that contribution to the creation of value, or cost, is not equivalent to value. See Michael Maher et al., Managerial Accounting: An Introduction to Concepts, Methods, and Uses 924 (Houghton Mifflin Harcourt Publ'g, 4th ed. 1991) (defining value as "[m]onetary worth . . . do not confuse with cost") (emphasis added); OECD Transfer Pricing Guidelines for Multinational Enterprises and Tax Administrations (2010) ("OECD Guidelines (2010)") § 6.27 ("[T]here is no necessary link between costs and value."); see also Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am., 122 A. 142, 146 (Del. Ch. 1923) ("[I]n considering value in a sale, earning power will control replacement cost."). Costs are a particularly inappropriate measure of the value of intangible property: "the actual fair market value of intangible property is frequently not measurable in relation to the costs involved in developing and maintaining the property." See OECD Guidelines (2010) § 6.27. This is no surprise because, as insolvency illustrates, the amount spent to build or develop a business has no necessary connection with its value in the marketplace. Thus, in determining the fair market value of what each Selling Debtor sold or relinquished in the auctions, the Courts should not look to costs as a substitute for value.

of the Sale Proceeds.  Because the Joint Administrators erroneously look to "contribution" rather

than the fair market value of the rights to Nortel IP each Selling Debtor sold or relinquished in

the Sales, the Joint Administrators' asset-based approach fails.

Even if one were to look to contribution to the development of Nortel IP – in

other words, R&D spend (although the Joint Administrators' brief is opaque as to how they

define and calculate "contribution") – it is clear that NNI was by far the largest contributor.  Not

only did NNI engage in substantial research and development activities in the United States, but

it funded the research and development activities of all other MRDA parties, including the

EMEA MRDA Participants, through NNI's more than $7 billion in transfer pricing payments

from 2001 to 2009.  As set forth in the US Interests' Motion, NNI, directly through its own R&D

activities and indirectly through transfer pricing payments that funded other Nortel entities' R&D

activities, funded 69% of the Licensed MRDA Participants' total IP investment in R&D between

2005 and 2009 and 75% of their R&D investment in the fifteen years prior to the insolvency of

the Nortel companies.  US Interests' Mot. at 15.

Based on their erroneous "contribution to IP" theory, the Joint Administrators

assert that the EMEA Debtors are entitled to 36% of the value of the Nortel IP sold or

relinquished in the Sales.  EMEA Debtors' Br. ¶¶ 73, 80, 83.  While "contribution" to IP is not

an appropriate metric for valuation, it is worth noting that the Joint Administrators never explain

how they reach this percentage.  Indeed, it is difficult to fathom how they could possibly have

arrived at this figure, which appears to have been pulled out of thin air.  NNUK, NN Ireland and

NNSA never came close to contributing 36% of Nortel's total R&D in any given year.  As best

as we can discern from the Joint Administrators' submission, they appear to be artificially

increasing their "contribution" by phantom amounts they claim they would have spent but did

not spend on R&D because NNUK, NN Ireland and NNSA somehow suffered a "deprivation of cash." See id. ¶ 72.  What any of this has to do with valuation or allocation is a mystery.  One can only assume that the Joint Administrators hoped their arguments could escape scrutiny if they were impenetrable.

      The Joint Administrators' asset-based approach suffers from numerous other basic errors.  While it is not necessary to catalogue all of these errors here, we note two particularly egregious errors.  First, like the Canadian Debtors, the Joint Administrators argue that goodwill evaporates upon insolvency.  To the contrary, where a business is sold as a going concern – as was the case for each of the Business Sales – the fact that the seller is in bankruptcy is irrelevant to the question of how much of the value of the sold assets is attributable to goodwill.  Second, the Joint Administrators say that customer assets should be valued based on something called "fair arm's length return."  Id. ¶¶ 48(C)(4), 49(B)(1).  This is not a recognized concept for determining either asset valuation or allocation.  To the extent, however, that the Joint Administrators are attempting to explain that revenue is the true driver of value, see id. ¶ 48(C)(2) ("Customer Assets produce a future stream of revenue for the purchaser of the businesses."), ¶ 48(C)(3) ("This asset class relates to the revenue that is able to be generated through the sales and marketing structure in each entity."), the US Interests agree.

      Finally, the Joint Administrators' alternative arguments for allocation based upon doctrines of resulting trust, unjust enrichment and proprietary estoppel are without merit.  There is no basis under any applicable law for the Joint Administrators to invoke these doctrines.

These arguments, moreover, are simply a rehash of the Joint Administrators' claims, which are without basis for the reasons set forth in the US Interests' Objections to those claims.[22]

## V.    TRADITIONAL VALUATION PRINCIPLES, NOT VAGUE ASSERTIONS OF FAIRNESS TO INDIVIDUAL CREDITORS, MUST DETERMINE THE ALLOCATION OF SALE PROCEEDS

The CCC and UK Pension Claimants each argue for the application of "fairness principles" to resolve the allocation dispute by simply dividing the Sale proceeds – or even all of the various debtors' assets – to provide creditors of the US, Canadian and EMEA debtors with "pro rata" recoveries, CCC Br. ¶¶ 60-76; UK Pension Claimants' Br. ¶¶ 54-70, or "broadly equivalent dividend[s]," UK Pension Claimants' Br. ¶ 65.[23]  In the case of the CCC, they argue that should the Courts reject their preferred method of allocating the Sale Proceeds based on their erroneous assertions of NNL's bare title in the IP, then the Courts should do away with valuation and allocation of the Sale Proceeds altogether and rather enter orders based on an entirely incompatible and in fact antithetical approach of releasing the escrowed proceeds "so as to effect a *pro rata* distribution" of all of the US, Canadian and EMEA debtors' assets – both related and unrelated to the Sales – across all of their respective creditors as a whole.   CCC Br. ¶ 60.  The UK Pension Claimants also directly advocate for pro rata distributions.  Quite simply, neither the CCC nor the UK Pension Claimants offer any valid legal or factual basis for disbursing the sale proceeds in the manners they propose.

---

[22]    See Joint Omnibus Objection to the Remaining Amended Claims Filed by the EMEA Claimants, dated May 14, 2013 [D.I. 10521].  To the extent the EMEA Debtors' assert the 36% allocation is derived from their claims, see EMEA Debtors' Br. ¶¶ 72-73, that too is improper.

[23]    In its submission, Wilmington Trust appears to raise the same arguments as the CCC.  See Allocation Position of Wilmington Trust, National Association, as successor Indenture Trustee, dated May 17, 2013, ¶ 13 [D.I. 10562] ("Wilmington Trust Br.").

It is noteworthy that none of the US, Canadian or EMEA Debtors – the actual sellers in the various Sales and the entities with claims to the escrowed proceeds – argue for an abandonment of traditional legal and valuation principles in favor of a pro rata distribution of money to creditors across their various estates. This is unsurprising, as the Courts are tasked with determining each estate's allocation of the approximately $7 billion[24] in sale proceeds obtained from the assets it sold and rights it relinquished, not the sudden and complete substantive consolidation into one massive estate of the over forty different companies subject to distinct creditor protection proceedings pending in the US, Canada, UK and elsewhere. While the various estates disagree, possibly in significant ways, as to how such proceeds should be divided, a review of their submissions shows that each of the estates believes a valuation and allocation can and should be done.

Moreover, the CCC and UK Pension Claimants have not offered any valid legal basis by which the Courts either could or should resolve the sale proceeds allocation dispute solely by considering what would be "fair, reasonable and equitable" to creditors of the different specific estates. Neither cites any law or precedent, other than by conclusory analogy to general equitable principles, in support of their arguments. Substantive consolidation, the legal principle on which they appear to primarily rely either directly or by analogy, is inapplicable both to this dispute and the facts at hand.

Substantive consolidation – an equitable remedy rarely invoked in the United States and Canada and unheard of in a contested, cross-border context such as this one – is a

---

[24]    As stated in the US Interests' Motion, the US Debtors are entitled to certain proceeds now sitting in the Sale Proceed escrow accounts prior to the allocation of the remaining proceeds. These include, among other things, proceeds related to the sale of the equity in NGS and DiamondWare in connection with the Enterprise transaction and amounts related to the sale of the Santa Clara facility in an amount of approximately $177 million.

principle by which legally separate debtors are consolidated into one surviving company (akin to

a merger or an amalgamation), which has the effect of combining their assets and creditor bases

and erasing inter-company liabilities and guaranty claims.  Even where this sort of multi-entity

veil piercing is sought among companies based in a single jurisdiction, the bar is very high.  For

example, in the United States, substantive consolidation is a "last resort" remedy, not to be used

merely for administrative convenience, that requires that either "(i) prepetition [the debtors]

disregarded separateness so significantly [that] their creditors relied on the breakdown of entity

borders and treated them as one legal entity, or (ii) postpetition [the debtors'] assets and

liabilities are so scrambled that separating them is prohibitive and hurts all creditors."  In re

Owens Corning, 419 F.3d 195, 211 (3d Cir. 2005).[25]  In Canada, to the extent substantive

consolidation is even available, it is typically supported by a majority of creditors and must be

accompanied by a showing that "the creditors will suffer greater prejudice in the absence of

consolidation than the debtors (and any objecting creditors) will suffer from its imposition."

Northland Properties Ltd., Re (1988), 69 C.B.R. (N.S.) 266, para. 49 (Can. B.C. S.C.) (citation

and quotation marks omitted).  Under English law, substantive consolidation is justified only in

exceptional circumstances, "generally confined to situations in which the assets and liabilities of

the different companies are so intermingled that there is no sensible alternative."  Roy Goode,

Principles of Corporate Insolvency Law (4th ed. 2011), ¶ 16-10.  The non-consensual

consolidation of debtors' estates *across* legal jurisdictions is without precedent in insolvency

cases generally, much less in the context of the allocation of sale proceeds among debtors.  It

---

[25]    In articulating this high bar, the Third Circuit overruled a lower court finding that consolidation would be
justified where the financial affairs of various entities were entangled such that consolidation would "greatly
simplify and expedite" the bankruptcy proceeding, held that "mere benefit" to case administration or to some
creditors but not others "falls far short" of justifying the imposition of the "rare" remedy, and that substantive
consolidation could not be used to tactically disadvantage a group of creditors.  Id. at 202-03 (internal quotation
marks and citation omitted); 211-14.

therefore is no surprise that neither the CCC nor the UK Pension Claimants cite a single case in support of imposing substantive consolidation.[26] The UK Pension Claimants' amorphous reference to the proposed use of "international principles of allocation" as opposed to "domestic allocation principles," UK Pension Claimants' Br. ¶ 3(c), does not correct this obvious defect – and in any event, as explained above, none of the relevant jurisdictions would apply substantive consolidation in this case. By urging this approach, the CCC and UK Pension Claimants are seeking to take a remedy that is both rare and employed as a last resort within a single jurisdiction upon satisfaction of a rigid standard, and apply it cavalierly, without analysis and in an unprecedented manner to multiple entities in multiple jurisdictions.[27]

Here, not only is there no legal ground to apply substantive consolidation principles to this dispute, the CCC's and UK Pension Claimants' allegations do not warrant such a drastic and unprecedented result. The CCC's allegations regarding Nortel's financing arrangements are wrong or otherwise irrelevant. While they allege NNC and NNL "bore all or

---

[26]    The one case referenced to support substantive consolidation by Wilmington Trust, Wilmington Trust Br. ¶ 13 n.7, is inapposite. In In re Stayton SW Assisted Living, L.L.C., No. 09–cv–6082-HO, 2009 WL 5173512 (D. Or. Dec. 22, 2009), the district court was examining an estate, in which pre-petition funds from various entities were improperly intermingled to cover shortfalls in accounts of certain entities and pay investors without regard to corporate formalities to the extent that the Securities and Exchange Commission filed a civil enforcement action alleging that certain entities "committed violations of securities laws in the offering of investments in the Sunwest Enterprise, operating the Sunwest Enterprise as a unitary enterprise, and operating the unitary enterprise virtually as a 'Ponzi' scheme." 2009 WL 5173512, at *2. That is not the case here.

[27]    In support of its "pro rata" position, the CCC incorrectly invokes a post-filing disclosure by NNC stating, inter alia, that "[t]here is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of the other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors," and notes "reports filed by the Monitor and Canadian Debtors during the Insolvency Proceedings [that] have treated the assets of and claims against the Canadian Debtors as one entity within Canada." CCC Br. ¶¶ 71-72. The risk disclosure cited – one of many "procedural risks" listed in the statements to investors – only provides that there is a risk that a creditor could seek such a remedy, and is not an admission that such a claim would be valid. Regardless, these two examples cited by the CCC, if anything, show that the risk identified is that of substantive consolidation within the United States ("some or all of the U.S. Debtors") and, separately, within Canada ("one entity within Canada"). But this disclosure reveals that even NNC did not foresee any risk of substantive consolidation across jurisdictions. Similarly, while the UK Pension Claimants argue that courts in Canada, the US and the UK have applied "[e]quitable distribution based on relative proven creditor claims" in insolvency proceedings, UK Pension Claimants' Br. ¶ 59, this ipse dixit does not provide a single example of substantive or partial consolidation in a cross-border contested proceeding such as this one.

substantially all of the costs of borrowing" for the group, CCC Br. ¶ 62(e), in fact NNI guaranteed substantially all of the public debt currently outstanding.  And the preparation of Nortel's SEC financial reporting on a consolidated basis was not merely appropriate but required by law.  Indeed, NNI was subject to separate SEC financial reporting requirements as a significant subsidiary and guarantor.  Many other allegations – including the placement of public debt at the parent company, the existence of intercompany cash management systems and overlapping board seats, and the use of transfer pricing agreements and master terms and conditions agreements with suppliers and customers – are arrangements commonly implemented by large or multi-national corporations and as a matter of law do not come close to evidencing the factors that would permit the abandonment of traditional asset valuation principles in a sale proceeds dispute.

Even in the course of their creditor protection proceedings, the EMEA Debtors and their Joint Administrators have admitted under oath that the EMEA entities were managed and controlled from England, independent from any control by Canada, much less control by the US.  The Monitor similarly has previously described the operation of each estate as a "standalone" entity, equipped to "independently administer and complete their respective insolvency plans." Fifty-Fifth Report of the Monitor (Oct. 21, 2010) ¶ 87.  These Courts also have treated the Nortel entities separately.  For example, the US and Canadian Courts have entered final orders that authorized NNL to borrow funds from NNI (imposing a super-priority charge on NNL's assets to secure such debt); authorized post-petition intercompany supply and trading arrangements between the Canadian Debtors and the EMEA Debtors; allowed more than $2 billion in intercompany claims that NNI holds against NNL and ordered that post-petition intercompany transactions between the respective Canadian and US Debtors be accorded administrative

expense priority.[28]  In light of this treatment, the UK Pension Claimants' assertion that Nortel operated as a single entity, see, e.g., UK Pension Claimants' Br. ¶¶ 6-7, 22, is not well-founded. As the Canadian Court overseeing the criminal case against three former Nortel officers in its decision acquitting the officers of fraud recognized, "there is a tendency to think of Nortel as a single entity," but "[t]his is not precise."  See R. v. Dunn, 2013 ONSC 137, para. 169 (Ontario Sup. Ct. of Justice 2013).  The reality was that Nortel's "organizational chart included dozens of separate entities operating in geographies all over the world."  Id. at para. 170.

Contrary to the suggestion of the CCC and the UK Pension Claimants that pro rata distributions are necessary to protect creditors' rights, they cannot prove that creditors had such expectations.  The UK Pension Claimants assert that "there was a reasonable and legitimate expectation on the part of the Group's proven creditors" that estate assets would not be allocated "in such a way as to create an unequal treatment of proven creditors based on the jurisdiction in which they were located."  UK Pension Claimants' Br. ¶ 55.  Yet they cite no basis for creditors holding such a belief.  To the contrary, on two separate occasions the UK Pension Claimants specifically negotiated to obtain written guarantees from NNL of the UK pension debt.  They cannot credibly be suggesting that all creditors of the Nortel group had an expectation that they would be treated equally when they specifically recognized the need for the guarantees either to improve the UK Pension Claimants' position vis-à-vis other creditors of the various affiliates or

---

[28]    The CCC claims that the Nortel Group "held itself out . . . as a single indivisible entity" to Flextronics Telecom Systems Ltd. ("Flextronics"), a major supplier of multiple lines of business of the Nortel Group, and that Nortel Group and Flextronics "effectively consolidated their claims inter se" through a November 2009 settlement and release agreement. CCC Br. ¶ 74.  The November 2009 settlement and release agreement, however, lists out the various Nortel entities that are parties to the settlement with Flextronics and makes clear that, even though NNL is the sole Nortel signatory to the master or umbrella manufacturing and repair agreements with Flextronics, different Nortel entities issued forecasts for materials needed from Flextronics and directly issued purchase orders to Flextronics.

to ensure the UK Pension Claimants had recourse against a more financially sound affiliate than NNUK.

The remainder of the scattered theories offered by the UK Pension Claimants for pro rata creditor distributions – ranging from general principles of equity, receivership, pooling arrangements, commingling and the like – are similarly poorly defined and unprecedented as a basis for allocating sale proceeds between companies, as evidenced by their failure to identify even a single actual case or other precedent in their submission. Similarly, their argument that the Nortel Group entities "were acting, on a contractual basis, in concert towards a common business venture" and thus a joint venture should be implied is not grounded in law, or, as the UK Pension Claimants themselves admit, in the express terms of the MRDA – the one contract to which they point. UK Pension Claimants' Br. ¶ 45. Indeed, the MRDA states that "[t]he relationship of the Participants under this Agreement *shall not constitute a partnership or joint venture for any purpose*." MRDA Art. 13 (emphasis added).

In the case of the UK Pension Claimants, arguments based on equality across creditors ring particularly hollow. In connection with such arguments, the UK Pension Claimants do not suggest they intend to abandon their guaranty and other claims against the various Nortel affiliates, including, in particular, their argument as recently as *May 2013* before the Supreme Court in the United Kingdom that their claims against the non-UK EMEA Debtors for Financial Support Directions should rank in priority as administration expenses. Even were they willing to abandon such claims, however, it would not erase the fact that they previously acknowledged the separateness of the different Nortel affiliates by pursuing and obtaining the guarantees. No better evidence exists regarding the "reasonable and legitimate expectations" of creditors than the rights they negotiated for in protecting their own interests. The UK Pension

Claimants' submission also shows how determining a *pro rata* distribution (even if one were appropriate, which it is not) would be no less impractical or time consuming than using traditional valuation principles. For example, they suggest that certain costs should be unwound and reallocated among the estates separate from the larger allocation process – a proposal that sounds simple in concept (even if misguided) but that would have no end in practice.

Finally, it is incorrect that a *pro rata* allocation would be an equitable result. <u>See</u> UK Pension Claimants' Br. ¶¶ 54, 58. Fairness in a bankruptcy proceeding begins with ensuring that each creditor receives the value that it reasonably expects under the well-crafted and longstanding legal principles of corporate separateness and absolute priority. <u>See</u> US Interests' Mot. at 1, 5, 12, 24-25, 28. This requires valuing the rights and assets sold by each Selling Debtor (in accordance with the fair market value of such rights and assets) to ensure that creditors recover first the value of assets or rights from the corporate entity against which they have claims before any recovery flows to equity holders or the creditors of such equity holders. To impose substantive consolidation would impermissibly prejudice certain creditors in favor of others, disregard well-established and respected corporate structures, strip assets from certain of the Debtors (in particular, the Licensed MRDA Participants' exclusive licenses), and violate the bedrock principle of all insolvencies – understood by creditors and shareholders – that equity takes last.

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, the Movants request that the US and Canadian Courts (i) allocate the asset sale proceeds by applying the principle of fair market value to determine each Selling Debtor's relative share of assets, rights and property it sold or relinquished in the sales; (ii) award the US Debtors a fair market allocation in an amount to be

determined at trial, which is the substantial majority of the total sale proceeds; and (iii) grant

such other and further relief as the Courts deem just and proper.


Dated:                          CLEARY GOTTLIEB STEEN & HAMILTON LLP
May 29, 2013
Wilmington, Delaware            Howard S. Zelbo (admitted *pro hac vice*)
                                James L. Bromley (admitted *pro hac vice*)
                                Jeffrey A. Rosenthal (admitted *pro hac vice*)
                                Lisa M. Schweitzer (admitted *pro hac vice*)
                                One Liberty Plaza
                                New York, New York 10006
                                Telephone:  (212) 225-2000
                                Facsimile:  (212) 225-3999

                                    - and -

                                MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                   */s/ Ann C. Cordo*
                                Derek C. Abbott (No. 3376)
                                Ann C. Cordo (No. 4817)
                                1201 North Market Street
                                P.O. Box 1347
                                Wilmington, Delaware 19801
                                Telephone:  (302) 658-9200
                                Facsimile: (302) 658-3989

                                *Counsel for the Debtors*
                                *and Debtors in Possession*

                                    - and -


                                AKIN GUMP STRAUSS HAUER & FELD LLP

                                Fred Hodara (admitted *pro hac vice*)
                                David Botter (admitted *pro hac vice*)
                                Abid Qureshi (admitted *pro hac vice*)
                                One Bryant Park
                                New York, New York 10036
                                Telephone:  (212) 872-1000
                                Facsimile:  (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Christopher M. Samis*
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile: (302) 651-7701

*Counsel for the Official Committee
of Unsecured Creditors*