# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

---

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| | Case No. 09-10138 (KG) |
| Nortel Networks Inc., *et al.*,[1] | |
| | Jointly Administered |
| Debtors. | |
| | **Hearing Date: To commence January 6, 2014** |
| | **Submission Deadline: May 29, 2013** |

---

## ALLOCATION RESPONSE OF
## NORTEL NETWORKS UK PENSION TRUST AND
## THE BOARD OF THE PENSION PROTECTION FUND

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332) ("NNI"), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("NN CALA").

{BAY:02293603v1}

Pursuant to the litigation timetable approved by the Court on May 15, 2013, Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension Protection Fund (the "PPF," and together with the Trustee, the "U.K. Pension Claimants") hereby respectfully make this submission in further support of their allocation position. In support of this submission, the U.K. Pension Claimants, by and through their undersigned counsel, respectfully state as follows:

**I.     Overview**

1.    In determining the appropriate allocation of the Lockbox Funds[2] in this proceeding, the Courts will be required to assess the allocation approaches put forward by each Core Party. That process will involve an analysis of the appropriateness of those approaches, as well as a determination of whether the particular models have been applied accurately.

2.    There have been three widely divergent theories of allocation put forward by the other Core Parties. The first model is based on allocating value from intellectual property primarily, or solely, to the purported legal title holder of the underlying assets the sales of which gave rise to the Lockbox Funds now being allocated (the "Legal Title Approach"). The second model (the "License Approach") principally seeks to allocate value to the licenses (to exploit the underlying intellectual property) to which it is said the MRDA gave rise. A yet third model (the "Contribution Approach") proposes an allocation of the proceeds of intellectual property based on the beneficial ownership acknowledged in the MRDA, but reflecting the comparative contribution made to the creation of that intellectual property while the Group's business was ongoing.

---

[2]    All terms not defined herein shall have the definition ascribed to such term in the Allocation Position served and filed by the U.K. Pension Claimants in these proceedings on May 16, 2013. [D.I. 10539]

{BAY:02293603v1}                                             - 2 -

3. The widely divergent nature of the interpretations of the same document – the MRDA –confirms the position of the U.K. Pension Claimants that the MRDA was not intended to govern the situation which has arisen in practice, namely the sharing of (principally) intellectual property assets on a group insolvency. It also reinforces the U.K. Pension Claimants' position that to deploy the MRDA (or indeed other entity-by-entity theories) for allocation purposes would be unworkable, from both a theoretical and practical perspective. Accordingly, the U.K. Pension Claimants continue to propose that a *pro rata* allocation based upon proven creditor claims represents the fairest and most credible solution for the Courts (the "<u>Pro Rata Approach</u>").

### II. Legal Title Approach

4. The U.K. Pension Claimants submit that the Legal Title Approach, which has been supported in a joint position by the Monitor and the Canadian Debtors, as well as separately by the Canadian Creditors' Committee (the "<u>CCC</u>"), is fundamentally flawed because it fails to recognize the beneficial and equitable interests and other rights held and enjoyed by the non-Canadian parties. A central assumption of this approach is that since the Canadian entities held nominal legal title to many of the intellectual property assets, virtually all of the value of Nortel should be allocated to these entities.

5. In order to reach this conclusion it is necessary for the interests of the non-Canadian entities to be eliminated. All beneficial and equitable interests, including the value of each of the exclusive and non-exclusive licenses to intellectual property held by non-Canadian entities, are assigned little or no value through this approach. This appears to be premised in part on the assertion that the intellectual property licenses granted in the MRDA required joint approval for their assignment. However, in so far as the MRDA governs such matters, this

limitation - of joint approval for any transfer of rights - must necessarily have applied equally to the Canadian as well as the non-Canadian parties to the MRDA.  The non-Canadian entities must have had a veto over any assignment of rights by the Canadian entities if the opposite was also true.  Rather than making the interests of all the non-Canadian entities non-assignable, and thus on the Monitor's case essentially valueless, on this approach the interests of *all* parties to the MRDA were assignable only on a mutually acceptable basis.  This is exactly what occurred in the business and asset sales that gave rise to the Lockbox Funds.  Value was created for all Nortel entities when the sales were mutually approved by the legal owners and the license holders.

6. Prior to the insolvency proceedings commenced in respect of the Group, it was explicitly recognized that the legal title to the various Nortel assets was not determinative of ownership.  The second recital to the MRDA, dated December 22, 2004 (and stated to be effective from January 1, 2001) read:

> Whereas each Licensed Participant ***held and enjoyed equitable and beneficial ownership*** of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, ***and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights***. (Emphasis added.)

7. The December 14, 2007 Addendum to the MRDA included the following second recital:

> Whereas each Participant ***holds and enjoys equitable and beneficial ownership*** of NN Technology as defined in the Prior Agreement. (Emphasis added.)

8. In addition, the Memorandum of Understanding entered into on December 31, 2008, stated in paragraph 2:

> Notwithstanding the termination of the 1992 Agreement, the fully vested and fully paid rights of each Licensed Participant in and to the NN Technology (as defined herein) granted under the 1992 Agreement survived the termination of the 1992 Agreement, and each Licensed Participant ***continues to hold such exclusive rights as stated in the recitals to the 2004 Agreement***.  (Emphasis added.)

9. Rather than recognize this fundamental premise of Nortel's corporate structure, those Core Parties who support the Legal Title Approach ignore the historical reality and the explicit agreements in place.  Instead, parties such as the Monitor and the Canadian Debtors characterize the rights as follows:

> The bargain that was struck thus limited the licence rights to specified uses for and by specific members of the Nortel Group and they were non-assignable and personal to those Nortel Participants that were party to the MRDA.[3]

10. This assertion is premised on the following language within Article 14 of the MRDA, which is mischaracterized as giving rise to "non-assignability":

> This Agreement shall not be assigned by any other participant except with the written consent of each of the other Participants.

11. Rather than preventing assignment, this provision provides, as in fact occurred, that assignment requires the consent of all Participants (i.e. the parties to the MRDA).  This is exactly what happened in that the relevant business assets and intellectual property were disposed of with the consent of all of the relevant Nortel entities and those proceeds are now to be allocated among them.

12. In addition, the Monitor, Canadian Debtors and (in part of their submission) the CCC suggest that since the U.S. Debtors and EMEA Debtors were not carrying on business in their exclusive territories and had no prospect of doing so, any license in respect of the Residual

---

[3] Allocation Position of the Monitor and Canadian Debtors at ¶ 52. [D.I. 10543]

IP was essentially valueless and therefore such entities no longer held any beneficial or equitable ownership in the residual intellectual property sold in the Rockstar transaction.[4] Leaving aside that this factual premise is not accepted, such a position seeks to draw an artificial distinction between some rights conferred by the MRDA and others.

13. By the Legal Title Approach, the Monitor and Canadian Debtors seek to give effect to the legal title provisions of the MRDA. However, they also seek to ignore the fact that NNL only took such nominal legal title on the basis of the *perpetual* licenses conferred and the mutual obligations of the RPEs to share profits and losses of the Group's global endeavours.

14. As an illustration of the diametrically opposed approaches which are evident on these issues (and which reflect the fact that there is no principled approach consistent with Nortel's actual operations), the U.S. Debtors and Unsecured Creditors Committee submit (which is similarly not accepted) that by designating the U.S. as the sole jurisdiction where the majority of Nortel's Residual Patent Portfolio was filed, NNL acknowledged that the United States was the most profitable market for exploiting Nortel's intellectual property and that NNI's exclusive rights in the Residual Patent Portfolio were the most valuable.[5]

15. The reality of Nortel was that each of the members of the Group had a legitimate expectation, which was embodied in both the express agreements between the parties and the contributions to creation of value, that allocation upon insolvency of the Group would not be based solely upon primary legal title or jurisdiction of registration. Therefore, the Legal Title Approach should be rejected.

---

[4] Allocation Position of the Monitor and Canadian Debtors at ¶ 55; Allocation Position of the CCC at ¶ 57. [D.I. 10538]

[5] Motion to Approve Allocation Position of the US Debtors and UCC at 28. [D.I. 10537]

### III. The License and Contribution Approaches

16. The submissions of the U.S. Debtors, Bondholders, EMEA, and the Indenture Trustees each contains a summary description of an approach to allocation and some broad examples of how a model might be developed. Each model attempts to apply a valuation methodology to the businesses and assets that were sold, which gave rise to the Lockbox Funds now to be allocated. The U.K. Pension Claimants are not in a position to evaluate fully the models that have been put forward because sufficient detail of the approach and supporting data have not been provided. Eventually, it is assumed that detailed models will be submitted that will include not only the complete numerical calculations, but also the underlying data and assumptions. By necessity, therefore, this Response only addresses certain broad principles which have been articulated by others. Since the other Core Parties who have used these approaches have not stated final allocation splits between the estates, there is no corresponding response by the U.K. Pension Claimants.

17. As a result of the imprecision contained in the allocation positions of the other Core Parties, the observations in this pleading are not exhaustive. The fact that any particular point of fact asserted or any assumption imbedded in a proposed model is not specifically addressed should not be taken as any waiver or implied admission. Only after the full discovery process will each of the Core Parties be in a position to assist the Courts with a final position for trial.

18. The discrepancies between the approaches suggested by the respective Core Parties demonstrate that there is no one obvious method of allocation based upon a valuation exercise. The U.K. Pension Claimants have noted a number of questionable aspects of each of the models proposed. Some of these models represent exercises in advocacy rather than an

attempt to reflect the realities of the previous Nortel business in a consistent and defensible manner.  After the U.K. Pension Claimants have had the benefit of the discovery process including documentary production, witness depositions and, perhaps, expert reports, they will be in a position to make such detailed submissions to the Courts as may be appropriate on the validity of the various approaches that have been proposed.

19.    The materials that have been submitted give rise to some general observations about the process of attempting to value the assets that were sold.  These assets can be grouped into the business sales and the Residual IP sold in the Rockstar transaction.  There appears to be a general consensus that, with respect to the allocation of the proceeds of the business sales, it may be possible to trace, with some degree of precision, the value of fixed assets, stock and working capital (although the position of customer relations/distribution rights and goodwill is less clear).  The confounding element in both the business sales and the Residual IP sales is how to properly allocate the value of the intellectual property associated with each.

20.    Several methods have been suggested for allocating the value of the intellectual property imbedded in the business sales and sold residually in the Rockstar transaction.  One of the major challenges inherent in this exercise is to determine the extent of the equitable and beneficial ownership interests held and enjoyed by the entities making up each of the estates.  The complex nature of the Nortel business and the manner in which it was operated creates challenges in identifying the exact bundle of rights and assets that are attributable to each of the entities in each of the estates.  As several of the initial allocation positions have indicated, the identification of the ownership of the underlying assets may involve the application of contractual considerations, determination of joint venture principles, or the imposition of resulting and constructive trusts.

21. In order to complete any valuation-type approach, once the assets and rights of each entity are identified, an appropriate valuation methodology must be chosen. The choice of a methodology only starts the exercise of determining whether it is being applied in a manner that is appropriate. Among the inquiries the Courts will have to make is whether the chosen methodology is applied appropriately. This will include, among other things, an assessment of whether the methodology accurately reflects the historical realities of the Nortel business (and whether the historical realities represent an accurate reflection of present or potential future value) and is consistent with legitimate creditor expectations.

22. The inherent complexities at each stage – asset and rights identification, choice of valuation methodology and ensuring proper application of the chosen valuation methodology – may give rise to a process in which the Courts are unable to determine, with the requisite degree of confidence, that any single method of valuation accurately reflects historic reality.

### IV.    The *Pro Rata* Approach

23. As the U.K. Pension Claimants and the CCC (in its alternative "equitable" argument) have submitted, the *Pro Rata* Approach reflects the fact that it is not possible to attribute ownership of the jointly held assets on an entity by entity basis as a result of the interconnectivity of Nortel, the co-mingling of assets and the intertwining of the Group's affairs. This is particularly the case in respect of the collection of over 6,000 patents representing the Residual IP, which intellectual property was the product of the highly integrated and combined work of the Group over many years. The creditors of Nortel had legitimate expectations with respect to the assets and the business dealings of the Group as a whole. These expectations were premised on the fact that Nortel was run as one global business with its business divided across business groups rather than geographical lines or based on corporate structure.

24.     The U.K. Pension Claimants represent over 40,000 Nortel employees who in essence contributed over £2.6 billion of deferred compensation to the operation of Nortel. That sum, which should have been applied to the pension scheme to secure their remuneration, but was not, benefitted not only NNUK, their immediate employer, but also the entire Group. Without this, the entire Group would have had to raise equivalent funds to support the global operation. The decision to impose this state of affairs was made by the officers and employees of NNC and NNL, who, assisted by NNI, operated the Group wide cash management system and decided how cash would be allocated within the Group, including pension funding. When the Group declared an international insolvency in three primary jurisdictions, those 40,000 employees relying on Nortel for their pensions did not expect, for the first time in their careers, to have the consolidated reality of Nortel denied as if it did not previously exist. They continue to have a legitimate expectation that their pension entitlements will be dealt with in insolvency in the same manner that they were treated prior to insolvency, namely in a manner supported by the Group.

25.     Nortel did not hold itself out externally as a group of individually separate corporate entities. In its filings with securities regulators, each business segment's performance (as opposed to each legal entity's performance) was set out separately, with individual financial breakdowns for each segment appearing in the Group's consolidated financial statements and reports as if the segments were separate businesses.

26.     Internally, under the MRDA profits and losses were not allocated on the basis of each entity's particular financial performance in terms of revenue, cash-flow, profit or other financial metric. Rather, profits and losses were allocated by reference to the respective R&D expenditure. This disregard for individual corporate legal entities reflected the lack of

independence of each separate corporation. Decisions, including pension funding decisions, were made centrally.

27. There was a reasonable and legitimate expectation on the part of Nortel's proven creditors that on any cessation of Nortel's total business operations, Nortel's assets would be allocated in such a way as to create equal treatment among proven creditors, regardless of the jurisdiction in which they were located. The fact that the Courts have treated this allocation as a single endeavour to be jointly managed, underlines this reality. The fact that the major estates were forced to work together to dispose of the Group's assets, generating the Lockbox Funds, was also a result of the inherently co-mingled and cross-jurisdictional nature of the assets to be sold.

28. As pointed out by the CCC, Nortel has expressly warned in its post filing statements that the U.S. Debtors' estates might be substantively consolidated.[6] The *Pro Rata* Approach has been publicly stated as a legitimate basis for settlement of creditor claims. This fact is an admission of the reality – creditors had a legitimate expectation that they were dealing with the consolidated entity of Nortel, and any other method of allocation suffers from such flaws and inaccuracies that to apply it would lead to injustice.

29. Accordingly, the U.K. Pension Claimants continue to submit that the *Pro Rata* Approach to allocation is the most appropriate.

---

[6] Allocation Position of the CCC at ¶ 71.

**CONCLUSION**

WHEREFORE, the U.K. Pension Claimants respectfully request that the Court approve the U.K. Pension Claimants' allocation position.

Dated: Wilmington, Delaware
May 29, 2013

        BAYARD, P.A.

        */s/ Justin R. Alberto*
        Charlene D. Davis (No. 2336)
        Justin Alberto (No. 5126)
        222 Delaware Avenue, Suite 900
        Wilmington, Delaware 19899
        Telephone: (302) 655-5000
        Facsimile: (302) 658-6395
        Email: cdavis@bayardlaw.com
              jalberto@bayardlaw.com

        -and-

        WILLKIE FARR & GALLAGHER LLP
        Marc Abrams
        Brian E. O'Connor
        Sameer Advani
        Andrew Hanrahan
        787 Seventh Avenue
        New York, New York 10019
        Tel: (212) 728-8000
        Fax: (212) 728-8111

        *Counsel for Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund*

*9657358*