**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| Nortel Networks Inc., *et al.*, | : | Case No. 09-10138 (KG) |
| Debtors. | : | (Jointly Administered) |

- and the -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

# RESPONSE OF *AD HOC* GROUP OF BONDHOLDERS TO ALLOCATION POSITIONS OF OTHER CORE PARTIES

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ....................1

II. RESPONSE TO ALLOCATION POSITION OF CANADIAN DEBTORS AND MONITOR ....................4

A. The Estates Never Agreed Among Themselves to Allocate Proceeds From the Sale of Tangible Assets According to Net Book Value. ....................5

B. Allocation of IP Value to the Canadian Debtors Based on Nominal Legal Title Completely Disregards the Extensive and Valuable Licenses That Were Granted to the Other Nortel Entities. ....................7

C. The Value of the Exclusive Licenses Was Not Dependent Upon the Ongoing Operation of Nortel's Businesses ....................9

D. The RPSM is Irrelevant to the Allocation of Proceeds from the Sale of Nortel IP. ....................11

III. RESPONSE TO ALLOCATION POSITION OF THE EMEA DEBTORS ....................13

A. The EMEA Debtors' Approach to Valuation and Allocation Based on Asset Categories is Fundamentally Flawed. ....................14

B. The EMEA Debtors' Proposed Method for Allocating the Nortel IP is Inconsistent With the Applicable Law. ....................15

i. Nortel IP Sale Proceeds Should Be Allocated Based on Fair Market Value Principles, Not Contributions to R&D. ....................15

ii. The MRDA's Cost-Based Approach for Transfer Pricing is Not Relevant to Allocation of the Sale Proceeds. ....................17

C. The EMEA Debtors' Alternative "Operation of Law" Arguments for Allocation of Nortel IP Are Equally Meritless. ....................17

D. The EMEA Debtors Misapply Their Proposed Allocation Methodology. ....................18

IV. RESPONSE TO THE SECONDARY ALLOCATION POSITION OF CCC AND THE ALLOCATION POSITION OF THE UK PENSION CLAIMANTS ....................19

A. CCC's "*Pro Rata*" Distribution Approach is Simply a Call for Global Substantive Consolidation and Therefore Should Be Rejected. ....................20

B. UK Pension Claimant's "*Pro Rata*" Approach Effects an Impermissible Deemed Substantive Consolidation and Therefore Should Be Rejected ....................25

RESERVATION OF RIGHTS ....................27

CONCLUSION ....................27

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Armstrong Pump, Inc. v. Hartman*,
745 F. Supp. 2d 227 (W.D.N.Y. 2010) ..........9

*Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107 ..........22

*In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) ..........22, 23

*In re Kaiser Aluminum Corp.*,
No. 02-10429(JFK), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006)..........26

*In re LTV Steel Co*., 285 B.R. 259 (Bankr. N.D. Ohio 2002) ..........16

*In re Owens Corning,*
419 F.3d 195 (3d Cir. 2005).......... passim

*Northland Properties Ltd.* B.C.J. No. 1210 (S.C.)..........22

*PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544
(C.A.) ..........16

**OTHER AUTHORITIES**

*Canadian Patent Law and Practice* (Toronto: Canada, 1969) at p 283 ..........9

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY CHIEF JUDGE AND THE HONORABLE JUSTICE GEOFFREY B. MORAWETZ OF THE ONTARIO SUPERIOR COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group")[1] hereby delivers to the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and, together with the U.S. Court, the "Courts") its response (the "Response") to the opening allocation positions of (i) the Canadian Debtors and the Monitor; (ii) the EMEA Debtors; (iii) the CCC; and (iv) the UK Pension Claimants:

## I. PRELIMINARY STATEMENT

"***Sunlight is said to be the best of disinfectants.***"[2]

1. After nearly four years of squabbling and failed negotiations behind closed doors, the parties' allocation arguments are now exposed to the public light of day. These Courts and the creditors of the Nortel Debtors are finally able to scrutinize and evaluate the strength of the arguments that have kept the parties so far apart for so long and have now propelled us down the litigation path that we are on today. Most of the arguments prove to be incapable of survival in the light of day to which they are now being exposed for the first time.

2. The Courts are presented with a single, straightforward question: how much money should each Nortel estate receive on account of the various Sale Transactions? The Bondholder Group submits that the answer is as straightforward as the question: each estate is entitled to the fair market value of the assets sold and the rights relinquished by its constituent Debtors. A review of the competing allocation submissions reveals that an allocation premised

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bondholder Group's Opening Allocation Submission [D.I. 10540] and the 2013 Allocation Protocol [D.I. 1013, Ex. A].

[2] United States Supreme Court Justice Louis D. Brandeis.

on the fair market valuation of what each Nortel Debtor actually gave up in the Sale Transactions: (i) is the only legally and commercially sound approach to allocation; (ii) is the only approach that is consistent with the expressed and documented intention of the parties; and (iii) provides the Courts with the very same tool to resolve this litigation—namely, a customary and time-tested valuation methodology—that is used every day by courts in both Canada and the U.S. to resolve valuation disputes like these.

3. Each of the Debtors has presented an allocation methodology that, in each case, maximizes their own entitlement to the Sale Proceeds. That does not mean, however, the proposed methodologies are equally valid. That is because in order to reach an allocation position that maximizes their respective returns, the Canadian Debtors and EMEA Debtors have had to stretch and reform fact and law so wildly that they settle on positions that cannot withstand even the most cursory analysis. Moreover, the CCC (in its alternative argument) and UK Pension Claimants fail to suggest an "allocation" methodology altogether, instead arguing for an unprecedented drastic remedy of global substantive consolidation that is not nearly justified by the facts of this case. After four years, creditors deserve a final resolution of the allocation issue so they can receive their distributions. Not further attempts at delay.

4. The argument put forward by the Canadian Debtors and the Monitor (and joined, unsurprisingly, by the CCC) that the Canadian Debtors *exclusively* own *all* of Nortel's intellectual property and are therefore entitled to virtually *all* of the Sale Proceeds is impossible to sustain. That argument makes a mockery of the express terms of the MRDA—a document that the Canadian Debtors first rely upon to assert "legal title" to all Nortel intellectual property, but then incredibly and completely ignore when it comes to the "equitable and beneficial ownership" and express rights granted thereunder to the U.S. Debtors and the other main Nortel

entities.  That argument likewise ignores numerous other documents and facts, the consistent conduct of the parties throughout these cases, and the import of various prior rulings of these Courts.  It is a "swing for the fences" approach that thoroughly strikes out.

5.      The approach of the EMEA Debtors, not surprisingly when considered against their long track record in these proceedings, is more convoluted but equally devoid of substance. It is a Rube Goldberg-contraption designed to obfuscate the facts and applicable law and leave the parties and these courts tangled in an endless loop where meritless claims are somehow spun into allocation entitlements.  As discussed below, when stripped of all subterfuge, the EMEA Debtors' approach yields no substance for these Courts to consider.

6.      Although the U.S., Canadian, and EMEA Debtors differ on proposed allocation methodologies, they do all agree on the question these Courts are being asked to answer—how to allocate asset sale proceeds among the Nortel estates.  Notwithstanding this global consensus, the CCC (in its alternative argument) and the UK Pension Parties fail to even propose an allocation methodology.  They answer the Courts' question of "how should we allocate proceeds among the Nortel estates?" with "just don't do it."  Instead, they ask the Courts to embark on an unprecedented path tantamount to global substantive consolidation, which would disregard the legal and express contractual rights of the Nortel Debtors and their respective creditors.  Such a path is unsupportable in law or fact.  It is not an allocation—it is a failure to allocate.  It would also have the practical effect of imposing endless discovery and countless appeals on the parties, delaying distributions to creditors for years.  It is apparent that the CCC and UK Pension Claimants position is an effort to further delay and leverage the litigation process.  The Courts rightfully placed this matter on an expedited schedule and all of the estates and the Monitor have agreed on the question before these Courts.  The CCC and UK Pension Claimants should not be

allowed to frustrate these Courts' efforts through unsupportable positions.

7. What is left is the fair market value approach advocated by the U.S. Debtors. This approach does not require these Courts to ignore facts and their own prior rulings the way the Canadian Debtors' approach does; it does not rely on the fanciful claims to which the EMEA Debtors cling; nor does it require the Courts to apply the unprecedented legal theories urged by the CCC and the UK Pension Claimants. Instead, this approach asks the Courts simply to provide each Nortel estate with the fair market value of what its constituent Debtors sold or relinquished in the Sale Transactions. What the U.S. Debtors suggest is a simple, routine valuation path forward that is supportable in the law and grounded in the facts. It is the path that will best position creditors to finally receive distributions and bring these cases to an appropriate close.

## II. RESPONSE TO ALLOCATION POSITION OF CANADIAN DEBTORS AND MONITOR

8. The allocation position asserted by the Canadian Debtors and the Monitor (together, the "Canadian Debtors"),[3] and joined in by the CCC, rests on three main premises:

(i) that in connection with the Business Sales, the Nortel estates "agreed" that all tangible assets should be valued at net book value;

(ii) that virtually all the remaining value from the Business Sales and the *entirety* of the value from the Residual IP Portfolio is attributable to intellectual property and that NNL, as the nominal owner of legal title to that intellectual property, is entitled to the entirety of that value; and

(iii) that the exclusive, perpetual, royalty-free licenses (the "Exclusive Licenses") granted to NNI and certain of the EMEA Debtors (A) were without any value with respect to the Residual IP Portfolio or (B) with

[3] The Bondholder Group understands that Wilmington Trust, National Association ("Wilmington") has adopted in full the allocation position of the Canadian Debtors. As such, this Response is intended to apply equally to Wilmington's allocation position. To the extent Wilmington asserts a different position or other arguments, the Bondholder Group reserves the right to supplement this Response accordingly.

respect to the Business Sales, were limited in value to the RPSM percentage each Debtor would have had under the MRDA.

9. None of these premises holds water.

10. First, the Canadian Debtors are incorrect that the Nortel estates agreed among themselves to allocate the Sale Proceeds attributable to tangible assets according to their net book value. To the contrary, the estates specifically reserved all rights regarding allocation.

11. Second, contrary to the Canadian Debtors' suggestion, by granting the Exclusive Licenses pursuant to the MRDA, NNL indisputably gave the holders of such licenses *all* of the valuable rights with respect to Nortel IP in their respective exclusive territories. Each Exclusive License conferred upon its holder, among other things, (i) the exclusive right to exploit the Nortel IP across its home jurisdiction; (ii) the exclusive right to sublicense to third parties; and (iii) the ability to enforce that right through legal action. Without being able to obtain these rights, no purchaser would have attributed significant (or any) value to the Nortel IP.

12. Third, the Exclusive Licenses continued to retain significant value and were plainly ***not*** rendered "inapplicable" upon the sale of Nortel's business lines or Residual IP Portfolio.

13. Fourth, contrary to the Canadian Debtors' argument, the RPSM does not "cap" any Sale Proceeds attributable to the Exclusive Licenses of the U.S. Debtors. For these reasons, and those described below, the Courts should reject the Canadian Debtors' allocation position.

## A. The Estates Never Agreed Among Themselves to Allocate Proceeds From the Sale of Tangible Assets According to Net Book Value.

14. The Canadian Debtors appear to suggest that the various Nortel estates collectively agreed that proceeds from the sale of tangible assets would be allocated based on the net book value of the tangible assets sold by each estate's constituent Debtors. This suggestion

is belied by the Nortel estates' explicit agreements with each other in respect of the asset sales. While it is true that the buyers of Nortel's assets proposed allocations for tangible property, such allocations were for the benefit of the buyers in connection with their financial reporting requirements and tax considerations and were not negotiated or approved by the various estates for application to the allocation of Sale Proceeds.

15. Thus, while the Nortel estates may have *collectively* agreed with buyers that buyers were free to allocate value in this manner for purposes of the buyers' purchase accounting, these agreements have absolutely no bearing upon the allocation *among* the Selling Debtors themselves. To the contrary, the Selling Debtors made this point crystal clear by entering into various "Side Agreements" in conjunction with the sale of Nortel's business lines in which they unequivocally confirmed that the allocation methodology set forth in the purchase agreements between buyer and seller "shall not in any way determine the final allocation or distribution of proceeds from the sale of the Business or otherwise bind the Parties in respect of the final allocation." (*See, e.g.*, Side Agreement § 3.16.) It is wholly disingenuous for the Canadian Debtors to turn a blind eye to the directly applicable Side Agreements and instead argue that the unrelated agreements with the third party buyers in the Sale Transactions should form the basis of allocation among the Nortel estates.

16. The allocation of proceeds from the sale of Nortel's tangible and intangible assets among the Nortel estates should be based on the fair market value of the assets sold. Net book value is an accounting concept that accounts for the historical acquisition cost of an asset, less any depreciation of that asset over time and any other possible accounting adjustments. It does not, and is not intended to, measure how much an asset might bring if sold and, therefore, cannot

compensate the Nortel estates for the actual value of the assets and property rights that their
constituent Debtors transferred in the Sale Transactions.

17.    In addition, by understating the value of the tangible assets sold by the other
Selling Debtors, the Canadian Debtors' proposal would *overstate* the value of the Nortel IP to the
Canadian Debtors.  This is because the Canadian Debtors claim entitlement to *all* value over and
above the net book value of tangible assets—so the lower the value attributed to tangible assets,
the higher the value "captured" by the Canadian Debtors via their intellectual property catch-all.
The use of a straightforward fair market value approach prevents exactly this kind of accounting
gamesmanship.

**B.    Allocation of IP Value to the Canadian Debtors Based on Nominal Legal Title
Completely Disregards the Extensive and Valuable Licenses That Were Granted to
the Other Nortel Entities.**

18.    The Canadian Debtors assert that: (i) substantially all of the value received in the
Sale Transactions was attributable to intellectual property and (ii) nearly all of that value should
be allocated to NNL as the holder of nominal title to that property.  (The CCC, in supporting this
position, goes even further, asserting that nominal title is the ***only*** relevant consideration in
determining how the proceeds from the sale of the Nortel IP should be allocated.)

19.    These assertions ignore a fundamental reality:  bare legal title to the Nortel IP did
not provide (and could not have provided) purchasers of the Nortel IP with the most valuable
rights associated with that intellectual property, because NNL's ownership of title to the Nortel
IP was at all relevant times subject to the exclusive, perpetual, and royalty-free Exclusive
Licenses and enforcement rights granted to NNI, NNUK, NN Ireland, and NNSA (the
"Exclusive License Holders"), pursuant to the MRDA.

20.    Indeed, the Exclusive Licenses were expressly intended by the parties to the
MRDA to be so all-encompassing as to grant to their holders the "equitable and beneficial

ownership"[4] of virtually all of the rights that drive the value of intellectual property—including the ***exclusive and perpetual rights*** to use, exploit, and sublicense the Nortel IP within their respective home jurisdictions (the United States and Puerto Rico for NNI, United Kingdom for NNUK, Ireland for NN Ireland and France for NNSA), as well as the right to enforce these rights through legal action.

21. Specifically, the MRDA transferred to the Exclusive License Holders the following key rights in the Nortel IP (referred to in the MRDA as "NN Technology"):

- "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others" (MRDA at Art. 4(e));
- an exclusive, royalty-free right to sublicense within their home jurisdictions (*id.* at 5(a)(i));
- an exclusive, royalty-free right to "make, have made, use, lease, license, offer to sell and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant" (*id.*); and
- exclusive, royalty-free "rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how..." (*id.*).

Taken together, these provisions gave each Exclusive License Holder the perpetual right to exploit the Nortel IP and exclude all the world—***including NNL or any purchaser of NNL's interests***—from so-exploiting in its respective jurisdiction and the exclusive ability to effectively transfer that exclusionary right (through sublicense) to other parties.

22. It is inconceivable that the IP purchasers attributed billions of dollars of value to NNL's bare title to the Nortel IP, where such title was openly and unequivocally encumbered by Exclusive Licenses that would contractually bar such purchasers from using, exploiting, or sub-licensing the intellectual property across the home jurisdictions of the Exclusive License Holders.

---

[4] MRDA at 1.

*See, e.g.*, *Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 233 (W.D.N.Y. 2010) ("It is well-settled . . . that an assignee of a patent takes title to the patent subject to existing licenses." (citation omitted)); *see also* Fox on *Canadian Patent Law and Practice,* (Toronto: Canada, 1969) at p 283, ("An assignment cannot defeat the rights of a licensee").

23. It was only because the Exclusive License Holders agreed to relinquish their Exclusive Licenses—and the substantial and valuable rights in the Nortel IP that the Exclusive Licenses conferred—that the value in the Nortel IP was unlocked for the benefit of third-party purchasers. Indeed, as required by these purchasers, the Exclusive License Holders each agreed to terminate their Exclusive Licenses, but solely "for the purpose of facilitating . . . the sale" of Nortel's assets (businesses and IP) and "in consideration of a right to allocation." (IFSA ¶11(a).)

24. The proceeds from the sale of the Nortel IP should thus be allocated according to the fair market value of the Exclusive Licenses, *i.e.* the value attributable to the exclusive right of each Exclusive License Holder to exploit the Nortel IP in its home jurisdiction. Because the U.S. was the most valuable market in which to exploit the Nortel IP—a fact recognized by Nortel, which registered the vast majority of its patents exclusively in the U.S.—the proceeds generated from the various sales of the Nortel IP are largely attributable to the purchase of the interests and rights of NNI. The Canadian Debtors' argument that the exclusive right to use the Nortel IP in the U.S. territory (the largest market for Nortel and one of the largest markets in the world) was worthless or nearly worthless defies all common sense.

**C. The Value of the Exclusive Licenses Was Not Dependent Upon the Ongoing Operation of Nortel's Businesses.**

25. The Canadian Debtors contend that the Exclusive Licenses held value only insofar as the Exclusive License Holders continued to exercise their exclusive right to generate products using or embodying the Nortel IP within their geographic territories. But this position

focuses solely on one aspect of the Exclusive Licenses and completely disregards the other equally substantial and valuable rights to the Nortel IP that were conferred to each Exclusive License Holder through the MRDA—including the exclusive and perpetual right to monetize its interests in the Nortel IP through sublicenses to third parties and the right to enforce its interests in the Nortel IP through actions for infringement or misappropriation.

26. These rights preserve for the Exclusive License Holders the essential value of what a patent provides—not simply the right to make, use, lease, offer to sell, and sell products using the intellectual property (as the Canadian Debtors suggest), but also the right to ***exclude*** others from doing so. Indeed, an entire industry has developed that is dedicated to the strategic acquisition of patents not to exploit them but instead to enforce the affirmative right to sue potential infringers. The result is that potential infringers pay top dollar for licenses to patents to avoid infringement suits. The value inherent in each of the Exclusive License Holders' right to exclude and sublicense—as well as its right to exploit—is what the purchasers of the Residual IP Portfolio paid to acquire. In fact, in evaluating the options for maximizing the value of the residual IP to the Nortel estates, the Nortel Debtors—***including NNL***—spent substantial time and analysis considering the formation of a new entity and creating a financial plan to do exactly that—license and litigate to monetize the value of the residual IP.

27. Finally, the court orders and party agreements governing the Sale Transactions ***expressly contemplated*** that the Exclusive License Holders would be entitled to an allocation of the sale proceeds generated by the relinquishment of their Exclusive Licenses. (*See* IFSA ¶11(a) ("Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination . . . with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the [MRDA] . . . for the purposes of facilitating, ***and in***

***consideration of a right to allocation*** . . . the sale of any material assets . . .") (emphasis added); *see also* License Termination Agmt. § 2.04.

28. Undeterred, the Canadian Debtors argue just the opposite—that the Exclusive Licenses should be disregarded or treated as somehow no longer existing, as though somewhere along the line they were extinguished or terminated as part of the bankruptcy proceedings. This challenge seeks to upset the integrity of critical and common provisions in sale orders that are the lifeblood of chapter 11 and CCAA cases. Debtors and their creditors must know and be assured that their contractual entitlements and property rights are not impaired or abrogated by sale orders of property. The fact that bankruptcy or insolvency sales, as here, are accomplished free and clear of those contractual entitlements and property rights is only true vis-à-vis the ***purchaser*** of those assets, ***not other claimants in the estate***. Such sales do not extinguish or diminish creditors' entitlements and rights, but instead channel them to the proceeds of the sales to which they attach with the same force and effect as they did to the debtors and their property prior to the sales. The Canadian Debtors' attempts to vitiate these entitlements and rights must not be countenanced. This is especially true here where the IFSA clearly evidences the intent and bargain of the parties to release their Exclusive Licenses in direct exchange for an equivalent right to an allocation of proceeds.

**D. The RPSM is Irrelevant to the Allocation of Proceeds from the Sale of Nortel IP.**

29. As a fallback to their assertion that they are entitled to receive 100% of any value attributable to Nortel IP in connection with the Business Sales, the Canadian Debtors argue that any allocation of the Sale Proceeds attributable to the relinquishment of Exclusive Licenses in connection with the sale of Nortel's business lines would necessarily be "capped" by the RPSM set forth in Schedule A to the MRDA. In so arguing, the Canadian Debtors attempt to repurpose the RPSM from its intended function as a methodology to increase tax efficiencies into a formula

to allocate business value.

30. The RPSM was a transfer pricing arrangement through which each of the operating entities, NNL, NNI, NNUK, NNSA, and NN Ireland (collectively, the "RPS Participants") were entitled to share in Nortel's profits (or losses) based on that RPS Participant's relative contribution to overall research and development ("R&D") spending. Although the RPSM functioned to divide profits and losses when Nortel was operating as a going concern, it is inapplicable here for several reasons.

31. First, and most importantly, the terms of the MRDA make clear that it does not apply. The MRDA ***expressly*** states that the RPSM is not applicable in the event of a liquidation or other sale of the Nortel business. (*See* MRDA, Sch. A (specifically excluding "gain/loss on the sale of business" when calculating the residual profit or loss to be divided among the RPS Participants pursuant to the RPSM).)

32. Second, even if the MRDA were applicable, it does not support a cost or contribution-based approach to allocation, but rather expressly contemplated a return to each of the Exclusive License Holders of the fair market value of their licenses. Specifically, the MRDA provides that if an RPS Participant retires from the MRDA, the retiring RPS Participant would receive "the fair market value (at the time of retirement of [the participant's] Exclusive License) . . ." (MRDA at 3-4, 9.) Accordingly, even if this were treated as the equivalent of a termination under the MRDA, the MRDA would mandate that the estate of each RPS Participant receive the fair market value of its Exclusive License, not its entitlement under the RPSM.

33. Third, pursuant to orders entered by these Courts, the U.S. Debtors no longer have any RPSM obligation under the MRDA. In consideration of the funding by the U.S. Debtors to the Canadian Debtors in the Final Canadian Funding and Settlement Agreement ("FCFSA"), the

Canadian Debtors agreed that the U.S. Debtors had no further obligation to make transfer pricing payments under the MRDA or otherwise. (*See* FCFSA ¶¶ 3, 28, 29.) The Canadian Debtors' argument that the RPSM should serve as the basis for allocation of value necessarily suggests that the U.S. Debtors have further obligations to "pay" for the licenses. Even if the RPSM applied (which it does not), the FCFSA terminated any such obligation of the U.S. Debtors to the Canadian Debtors, thereby entitling the U.S. Debtors to the full value of their Exclusive License.

34. For all of the foregoing reasons, the Courts should reject the approach to allocation proposed by the Canadian Debtors and the Monitor.

## III. RESPONSE TO ALLOCATION POSITION OF THE EMEA DEBTORS

35. The EMEA Debtors offer a different but equally flawed approach to allocation of the Sale Proceeds. They first suggest separating the assets into four different categories (fixed assets, inventory, customer assets, and intangible assets), then valuing the assets within each category, and finally allocating that value among the Nortel estates. The EMEA Debtors suggest valuing these asset categories using inconsistent methodologies in an effort to "cherry pick" the value-maximizing approach for the EMEA entities in each asset category. With respect to the first three asset categories (fixed assets, inventory, and customer assets), the EMEA Debtors appear to base allocation on each estate's legal ownership rights. With respect to the fourth category, IP proceeds, the EMEA Debtors take an entirely different approach, contending that allocation should be proportional to each estate's contributions to R&D. Not content with the allocation that would result to the EMEA Debtors based on this expanded and baseless "contribution" approach, the EMEA Debtors seek to further inflate their allocation by incorporating their meritless "proprietary claims" against the U.S. and Canadian Debtors ***as though they were actual contributions to R&D spending***.

36. The EMEA Debtors' approach to allocation should be rejected on at least two fundamental grounds. First, the EMEA Debtors' division of assets into four separate categories for valuation and allocation purposes appears designed solely to create a construct in which each of the individual EMEA estates can cherry-pick an allocation approach that best suits its recovery. Second, the EMEA Debtors' approach to allocating the value of the Nortel IP based on each estate's contribution to R&D is legally and factually unsupportable, ultimately amounting to nothing more than a transparent attempt by the EMEA Debtors to realize value (and, indeed, dollar for dollar value) on account of their meritless, and at best, unsecured claims.

**A. The EMEA Debtors' Approach to Valuation and Allocation Based on Asset Categories is Fundamentally Flawed.**

37. The proposal by the EMEA Debtors to separate the assets into four different categories for valuation and allocation purposes is flawed because it is not consistent with the economic reality of the Sale Transactions. Through the Sale Transactions, Nortel sold its businesses as going concerns. As the U.S. Debtors and UCC discussed at length in their opening allocation submission, the most common and accepted valuation methodology for valuing a business in this situation is one based on the business's fair market value. (*See* U.S. Debtors Opening Br. at 19-24 (citing cases).) In stark contrast, the EMEA Debtors' asset-based approach to valuation would essentially ascertain the ***liquidation*** value of the business, *i.e.*, the value if it were sold piecemeal rather than as a collective going concern. This piecemeal approach should not be used, because it fails to reflect the manner in which Nortel's businesses were actually sold and would lead to results that are unreliable and divorced from reality.

38. In addition to being inapplicable to the sale of a going concern, the EMEA Debtors' asset-based approach to valuation appears prime for abuse. Specifically, it allows the EMEA Debtors—and potentially other parties as well—to cherry-pick ways to maximize the

value allocated to their estates under each asset category.  An approach based on fair market value principles, on the other hand, avoids this problem by eliminating areas of potential gamesmanship.

39.     For all of these reasons, the Courts should decline to adopt the EMEA Debtors' asset-based approach to allocation and instead apply an approach based on the fair market value of the businesses that were sold.

**B.     The EMEA Debtors' Proposed Method for Allocating the Nortel IP is Inconsistent With the Applicable Law.**

40.     According to the EMEA Debtors, the Nortel IP proceeds should be allocated to each Nortel estate based on the direct and indirect contributions to R&D made by each estate's constituent Debtors.  This approach to allocation, which is designed to create outsized allocations to the EMEA Debtors, is wholly without merit, for two separate reasons.  First, as discussed in the Bondholder Group's opening brief, the proceeds from the Sale Transactions should be allocated based on the value of the Nortel IP rights relinquished by the relevant Nortel Debtors, not the costs incurred in developing those rights.  Second, the MRDA, which the EMEA Debtors rely upon heavily as purported evidence of the Debtors' expectations, is inapplicable to allocation of sale proceeds by its express terms and, in any event, does not support the EMEA Debtors' position.

i.     Nortel IP Sale Proceeds Should Be Allocated Based on Fair Market Value Principles, Not Contributions to R&D.

41.     As discussed in the Bondholder Group's Opening Allocation Position, an allocation methodology based on fair market value represents the most logical and legally sound method of allocating Sale Proceeds among the Nortel estates.  This approach has been widely

used by courts to accomplish allocation in similar circumstances, particularly in the insolvency context. (*See* Bondholder Group's Opening Br. at 6-9 (citing cases, including *In re LTV Steel Co.*, 285 B.R. 259, 267-68 (Bankr. N.D. Ohio 2002) ("Courts allocate sale proceeds between individual assets based upon each asset's portion of the total value of all the assets.") and *PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544 (C.A.) (to decide whether a transaction by debtor may be declared void, court "must determine the fair market value of what the bankrupt gave up and the fair market value of what it received in the transactions.").) The same approach should be followed here. The Courts should allocate the Sale Proceeds from the sale of the Nortel IP according to the fair market value of the rights in the Nortel IP that the constituent Debtors relinquished in the Sale Transactions. Any other approach, particularly the cost-based approach offered by the EMEA Debtors, is inconsistent with the relevant jurisprudence.

42. In addition to being without legal support, the EMEA Debtors' approach to allocation of the Nortel IP is factually flawed. The EMEA Debtors fail to account for the immensely valuable Exclusive Licenses that the Exclusive License Holders relinquished in the Sales Transactions. As noted above, prior to the Sale Transactions, certain Nortel Debtors bargained for and obtained from NNL an Exclusive License to exploit Nortel IP in its geographic territory. These licenses were particularly valuable to the U.S. Debtors, whose Exclusive License to exploit the Nortel IP in the U.S. market was significantly more valuable than the licenses granted to the other Nortel Debtors to exploit the Nortel IP in other, less lucrative markets. The EMEA Debtors' approach to allocation, however, completely ignores the Exclusive Licenses, and provides ***no*** compensation to the estates in exchange for them. This result cannot be reconciled with the legitimate expectations of the Nortel Debtors.

ii. The MRDA's Cost-Based Approach for Transfer Pricing is Not Relevant to Allocation of the Sale Proceeds.

43. The MRDA provides no support for the EMEA Debtors' allocation position. The EMEA Debtors use the MRDA, and specifically the RPSM contained therein, to argue that the Nortel Debtors intended that each of them would acquire beneficial ownership rights in the Nortel IP based on its contributions to R&D. (EMEA Debtors Br. at 23.) At the same time, however, the EMEA Debtors distance themselves from an actual application of the RPSM, because they do not like the results it would bring. In addition to being internally inconsistent (*i.e.*, suggesting that the MRDA both applies and does not apply), the EMEA Debtors' argument must be rejected because the MRDA, by its express terms, has no relevance to allocation of sale proceeds. (*See supra* ¶¶ 31-32 (reciting provisions of MRDA which demonstrate that it does not apply to sale of Nortel business).) Accordingly, any attempt by the EMEA Debtors to rely on the MRDA in support of their allocation position should be rejected.

**C. The EMEA Debtors' Alternative "Operation of Law" Arguments for Allocation of Nortel IP Are Equally Meritless.**

44. As an alternative to their flawed argument that the MRDA supplies the appropriate allocation methodology, the EMEA Debtors resort to various equitable remedies to purportedly demonstrate that they are entitled to a beneficial interest in the Nortel IP "by operation of law." (EMEA Debtors Br. at 25.) These theories fail.

45. As an initial matter, contrary to the EMEA Debtors' implicit suggestion that a fair market value approach would somehow not be equitable, there is nothing at all inequitable about the approach to allocation advanced by the U.S. Debtors. In fact, the fair market value approach is the ***only*** approach that appropriately compensates the relevant Nortel Debtors for the value of their Exclusive Licenses, which they bargained for under the MRDA and then later relinquished as part of the Sales Transactions. An allocation approach based on fair market value is also

equitable because it accurately reflects the reality that the U.S. Debtors were the primary drivers of revenue throughout the Nortel Group and, therefore, should receive a substantial majority of the Sale Proceeds.

46.     In addition to the foregoing, the EMEA Debtors' arguments based on these equitable remedies should be rejected because they do no more than reiterate the baseless theories that the EMEA Debtors have advanced in their proprietary claims.  These claims will be adjudicated in the separate claims litigation pending before these Courts and have no place in the allocation dispute.

47.     For these reasons, the Courts should reject the alternative argument of the EMEA Debtors that they are entitled to beneficial interests in the Nortel IP by some unsubstantiated "operation of law."

**D.     The EMEA Debtors Misapply Their Proposed Allocation Methodology.**

48.     Even if the Courts were to adopt the EMEA Debtors' contribution-based approach to allocation (which, for all of the foregoing reasons, they should not), the EMEA Debtors' flawed application of that approach must be rejected.

49.     The EMEA Debtors assert in their brief that they contributed over $1.9 billion to R&D spending, but they did not.  Instead, this figure appears to assume erroneously that the EMEA Debtors will succeed on their "proprietary claims" against the U.S. and Canadian Debtors. Because these claims are utterly meritless, they should be attributed ***no*** value for allocation purposes.[5]  Moreover, even if these claims were somehow successful, they would only result, at best, in unsecured claims against the applicable Nortel Debtors, not the dollar-for-dollar recovery that the EMEA Debtors seek to realize by improperly tying these claims to the allocation dispute.

---

[5]     The EMEA Debtors' claims against the U.S. Debtors should be dismissed for the reasons set forth in the U.S. Debtors' claim objection [D.I.10521], in which the Bondholder Group has joined [D.I. 10550].

50. In addition to grossly overstating the value that the EMEA Debtors contributed to the development of the Nortel IP, the EMEA Debtors improperly fail to account for the U.S. Debtors' substantial direct and indirect contributions to R&D spending through (among other things) transfer pricing payments. If necessary, the Bondholder Group believes that, following discovery and trial, the evidence will show that the EMEA Debtors' contributions to R&D spending were significantly less than those of the U.S. Debtors and not nearly $1.9 billion.

## IV. RESPONSE TO THE SECONDARY ALLOCATION POSITION OF CCC AND THE ALLOCATION POSITION OF THE UK PENSION CLAIMANTS

51. In their opening allocation positions, both the CCC and the UK Pension Claimants ask the Courts to abdicate their responsibility to allocate the Sale Proceeds and take the drastic, unprecedented, and legally indefensible step of wholly or partially consolidating the global Nortel estates. The CCC seeks substantive consolidation as an alternative remedy in the event the Courts reject the CCC's primary argument that the Canadian Debtors are entitled to receive all of the proceeds from the sale of the Nortel IP. The UK Pension Claimants, on the other hand, devote their entire allocation position to a request for a partial substantive consolidation that allocates the Sale Proceeds ratably to all Nortel creditors.

52. Neither the global substantive consolidation sought by the CCC nor the partial consolidation sought by the UK Pension Claimants is legally supportable. First, no court or courts possess the authority to order substantive consolidation over the objections of creditors and one or more debtors in these cross-border, multi-entity insolvency proceedings. Second, neither the facts nor the equities support the extreme and extraordinary remedy of substantive consolidation, particularly given that it would deny many creditors, including the Bondholder Group, their bargained-for rights. Finally, the partial substantive consolidation approach

advanced by the UK Pension Claimants fares no better, as it represents an improper "deemed" substantive consolidation that courts have consistently rejected.

**A. CCC's "*Pro Rata*" Distribution Approach is Simply a Call for Global Substantive Consolidation and Therefore Should Be Rejected.**

53. With only end-results in mind, the CCC asserts that, if the Courts refuse to hand over all of the Sale Proceeds to the Canadian Debtors, the Courts should ignore the allocation question plainly before them and enter an order globally consolidating the Nortel assets for *pro rata* distribution among all Nortel creditors. (CCC Brief at ¶ 5(b).) This proposed "*pro rata*" distribution approach is nothing more than a thinly-disguised request for these Courts to order something that has never been done before—a non-consensual, global substantive consolidation of multiple estates. The CCC's approach must be rejected.

54. First, and most importantly, the Courts do not have the authority to order or enforce a cross-border substantive consolidation of the Nortel Debtors. In fact, ***substantive consolidation has never been ordered over a creditor's objection in a cross-border insolvency proceeding.*** Further, under Canadian law, substantive consolidation has never been granted over the objection of a debtor whose assets are to be consolidated. Accordingly, granting substantive consolidation in this case over the objection of, among others, the Bondholder Group, U.S. creditors, and U.S. Debtors (and probably one or more EMEA entities) would be unprecedented and wholly unsupportable.

55. Second, substantive consolidation is a ***remedy*** designed to address harms caused by debtors' disregard of corporate separateness; it may not be used offensively by any creditor group to better its position or recovery. *See, e.g., In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) ("While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively"). In particular, substantive

consolidation may not be used "to disadvantage tactically a group of creditors in the plan process or to alter creditor rights." *Id.*

56. The CCC identifies no harm resulting from the Nortel Debtors' alleged failure to observe corporate separateness (even if such failure could be assumed, which it cannot) that would justify the remedy of substantive consolidation. Instead, the CCC seeks to use substantive consolidation as a sword to (i) dilute the recoveries of creditor groups in the United States and EMEA in order to improve the CCC's recovery; (ii) deny the Bondholders their bargained-for guarantee rights; and (iii) render worthless the $2 billion claim of NNI against NNL that was agreed to post-filing and approved by the Courts. The equitable remedy of substantive consolidation cannot be used in this manner. *See Owens Corning*, 419 F.3d at 199.[6]

57. Finally, even if the Courts had the authority to order substantive consolidation, it is simply not warranted in this case. Substantive consolidation is considered an extraordinary remedy under both U.S and Canadian law that is to be used "sparingly" and should only be granted as a last resort when all other possible remedies have failed. *See, e.g.*, *Owens Corning*, 419 F.3d at 208-209, 211 ("because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this 'rough justice' remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies").

58. In the Third Circuit, absent consent, a party seeking substantive consolidation must prove either that:

---

[6] As the Third Circuit recognized in denying substantive consolidation that was sought in order to eliminate certain guarantee claims:

> No principled, or even plausible, reason exists to undo [the debtor's] and [the lenders'] arms'-length negotiation and lending arrangement, especially when to do so punishes the very parties that conferred the prepetition benefit—a $2 billion loan unsecured by [the debtor] and guaranteed by others only in part. To overturn this bargain, set in place by [the debtor's] own pre-loan choices of organizational form, would cause chaos in the marketplace, as it would make this case the Banquo's ghost of bankruptcy.

*Owens Corning*, 419 F.3d at 216.

(i) prepetition, the entities that are to be substantively consolidated disregarded their separateness so significantly that their creditors actually and reasonably relied on the breakdown of entity borders and treated them as one legal entity; or

(ii) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Owens Corning*, 419 F.3d at 211, 212.[7] The burden of proof lies with the party seeking substantive consolidation. *Id.* at 212. Based on the allegations contained in its opening allocation position, the CCC cannot carry this burden.

59. With respect to the first substantive consolidation factor, the relevant inquiry is whether ***creditors*** viewed Nortel as ***one legal entity*** when extending credit. *See, e.g.*, *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).[8] The CCC fails to present any evidence suggesting that creditors reasonably and actually relied upon the integration of the Nortel Debtors as a single economic unit. In fact, the evidence will rebut the CCC's assertions and establish that creditors understood that each Nortel Debtor was a ***separate*** legal entity responsible for its own debts. There are substantial creditors in these cases that clearly ***did not*** view the Nortel entities as a single entity as evidenced by their pre-petition bargaining for guarantees from various Nortel entities.

60. The guarantee rights bargained for by the Bondholder Group are a clear example. If, as the CCC contends, creditors viewed the Nortel entities as jointly responsible for each

---

[7] Canadian courts have made reference to U.S. case law in considering when the extraordinary relief of substantive consolidation should be granted. *See*, *e.g.*, *Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107; *Northland Properties Ltd. (Re)*, [1988] B.C.J. No. 1210 (S.C.). The factors for determining whether to grant substantive consolidation under Canadian law are substantially similar to those under applicable U.S. law. Under Canadian law, a proponent of substantive consolidation must show either (i) improper conduct by one or more debtors, such as fraud or misusing its corporate identity, or (ii) the debtors' financial affairs being such that it would be manifestly unfair to creditors' expectations to treat the debtors as separate legal entities. To the extent it is determined that the U.S. law analysis of substantive consolidation is not determinative of the issue under Canadian law, the Bondholder Group fully reserves its rights to make additional arguments under Canadian law.

[8] In *Owens Corning*, the Third Circuit adopted in substance the *Augie/Restivo* substantive consolidation factors. *See* 419 F.3d at 209 (noting that Third Circuit favors the approach of *Augie/Restivo*).

other's debts, the Bondholder Group's guarantees would have been entirely redundant and unnecessary. The guarantees were not redundant, however, because creditors properly viewed NNL and NNI as separate legal entities having independent creditworthiness. That the Nortel entities may have ***operated*** globally across business lines and shared certain common systems and personnel, a common practice for multinational corporations, is wholly insufficient to establish that creditors viewed Nortel as a single indivisible ***economic*** entity.

61. There is a similar lack of evidence to support substantive consolidation under the second factor in the analysis, which relates to the entanglement or "scrambling" of the estates' assets and liabilities. As an initial matter, contrary to the CCC's suggestions (*see* CCC Brief ¶¶ 19, 69), the fact that purchasers paid one aggregate purchase price for the Selling Debtors' assets and property rights in the Sale Transactions does not in any way evidence entanglement of the estates' assets and liabilities for purposes of substantive consolidation. The Selling Debtors determined to sell their assets and property rights on a global basis in order to maximize their value, not because they ***had*** to be sold in that manner.

62. Moreover, even if there were some degree of commingling of assets and liabilities among the Nortel Debtors, it would not justify substantive consolidation in this case, because not every creditor would benefit from substantive consolidation. *See Owens Corning*, 419 F.3d at 214 ("[C]ommingling justifies consolidation only when . . . ***every creditor*** will benefit from the consolidation." ) (emphasis added). Indeed, ***at least three creditor groups***, including the Bondholders (through the loss of their bargained-for guarantee rights), the U.S. creditors, and creditors of the vast majority of the EMEA Debtors (through the dilution of their assets) will be harmed by the significant diminution of their recoveries if substantive consolidation were

granted. Accordingly, substantive consolidation cannot be justified under the facts and circumstances of this case.

63. The CCC suggests that this harm to creditors, including the Bondholder Group, does not preclude granting substantive consolidation because they were aware of the potential for substantive consolidation. (*See* CCC Brief ¶ 71.) The CCC does not cite any relevant case law for this premise. Further, this argument appears to rest entirely on a purported warning contained in a post-insolvency financial disclosure that substantive consolidation was possible. The CCC completely ignores, however, two obvious and important facts. First, risk factors are commonly included in financial disclosures, and the mere citing of a risk does not mean it is likely or even remotely likely. Second, and even more importantly here, the noted risk concerned only the possibility of substantive consolidation among the U.S. Debtor entities. (*Id.* ("There is a risk that an interested party . . . could request that the assets and liabilities of ***NNI, or those of other U.S. Debtors***, be substantively consolidated with those of one or more ***other U.S. Debtors***") (emphasis added).) The risk of the substantive consolidation ***within*** the U.S. estate is irrelevant to the unprecedented possibility of global substantive consolidation of multiple estates in multiple jurisdictions across the globe.

64. Finally, the principal equitable consideration for granting substantive consolidation based on "commingling of assets and liabilities" is that substantive consolidation would benefit creditors by avoiding the cost of unscrambling those assets and liabilities. That benefit is simply not present here. Assuming *arguendo* that the CCC prevails on its alternative *pro rata* approach, the costs to the estates associated with resolving the allocation dispute will already have been substantially incurred by the time such ruling is obtained. Indeed, rather than ***saving*** the estates' money, substantive consolidation would likely result in considerable

additional ***costs*** to the estates due to, among other things, the inevitable and prolonged appeals and legal challenges by numerous creditors and debtors in multiple estates to a ruling that would be entirely unprecedented and without legal support.[9]

65. For all of the foregoing reasons, the CCC's alternative "allocation" position must be rejected.

**B. UK Pension Claimant's "*Pro Rata*" Approach Effects an Impermissible Deemed Substantive Consolidation and Therefore Should Be Rejected.**

66. Similarly to the CCC, the UK Pension Claimants advocate the substantive consolidation of the Nortel Debtors—likewise cloaked as a *pro rata* approach to "allocation"—for the limited purpose of distributing only the Sale Proceeds (as opposed to ***all*** of the Nortel Group's assets). This limited substantive consolidation proposed by the UK Pension Claimants fails for the same reasons that the CCC's proposal of global substantive consolidation fails: although the UK Pension Claimants suggest some overlap of business functions and operations, they fail to plead any facts suggesting that either (i) creditors viewed Nortel as a single economic unit in extending credit or (ii) the assets and liabilities of the Nortel Debtors are unduly scrambled. The UK Pension Claimants have presented no facts that would justify the imposition of the extraordinary and extreme remedy of substantive consolidation.[10]

67. Moreover, the "*pro rata*" approach advocated by the UK Pension Claimants is an impermissible "deemed" consolidation. Under the UK Pension Claimants' method, the Sale Proceeds would be consolidated solely for the related purposes of allocation and valuing and

---

[9] In addition, substantive consolidation would require all claims in all estates to be determined prior to making any distributions. This would further delay creditors' recoveries.

[10] The UK Pension Claimants alternatively seek a limited substantive consolidation of the Nortel Debtors under the guise of "equitable principles." These arguments equally fail. The UK Pension Claimants should not be allowed to use these so-called equitable principles to avoid the stringent requirements of substantive consolidation, which they cannot meet. To the extent the Courts decide these equitable arguments may be considered on their merits (which they should not), each argument fails for reasons that the Bondholder Group reserves the right to describe more fully at trial.

satisfying creditor claims, without establishing that full substantive consolidation is warranted. The Third Circuit has expressly rejected "deemed" consolidation as inequitable,[11] especially where, as here, such consolidation is not being used as a defensive remedy but instead as an offensive strategy designed to increase the recoveries of certain creditor groups to the detriment of others, including those holding guarantee claims. Indeed, the Third Circuit addressed precisely this issue in *Owens Corning*, holding that substantive consolidation should not be used to eliminate bargained-for guarantees:

> Substantive consolidation is at its core equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained for unequal treatment by obtaining guarantees of separate entities . . . . With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip codes (if not area) codes away from anything resembling substantive consolidation,"—fails to even qualify for consideration.

419 F.3d at 216 (internal citations omitted).

68. Accepting the UK Pension Claimants' "allocation" position would directly violate *Owens Corning* by giving effect to a thinly-veiled deemed consolidation that would have the harmful and prejudicial effect of depriving the Bondholder Group of the benefits of its guarantee rights and diluting the recoveries of other creditor groups, including the creditors of the U.S. Debtors and the EMEA Debtors. *See Owens Corning*, 419 F.3d at 216 (rejecting substantive consolidation where proponents sought substantive consolidation not as a remedy but as a

[11] The only instance in which deemed consolidation has been approved by courts in the Third Circuit is where it forms part of a settlement agreement or plan of reorganization. *See, e.g., In re Kaiser Aluminum Corp.*, No. 02-10429(JFK), 2006 WL 616243, at *22 (Bankr. D. Del. Feb. 6, 2006) (approving deemed consolidation in plan of reorganization given "the absence of any creditor objection to the deemed consolidation, and . . . the overwhelming creditor support for the Plan"). Those cases have no relevance here, because the substantive consolidation proposed by the UK Pension Claimants is neither part of a plan of reorganization nor consensual.

strategy to strip certain creditors of their bargained-for guarantee rights). As a result, like the CCC's "allocation" position, the UK Pension Claimant's "allocation" position must be rejected**.**

**RESERVATION OF RIGHTS**

69. The arguments set forth herein represent the Bondholder Group's initial responses to the allocation positions advanced by the other Core Parties. The Bondholder Group reserves all rights to revise and/or supplement these responses at any time.

**CONCLUSION**

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the US and Canadian Courts (i) allocate the Sale Proceeds by determining the fair market value of each Selling Debtor's share of assets, rights, and property it sold or relinquished in the Sale Transactions; and (ii) grant such other and further relief as the Courts deem just and proper.

Dated: May 29, 2013

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Kathleen Makowski*
Laura Davis Jones (No. 2436)
Kathleen P. Makowski (No. 3648)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & McCLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

***Attorneys for Ad Hoc Group of Bondholders***