Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE

(COMMERCIAL LIST)


IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,

R.S.C. 1985, c. C-36, AS AMENDED


AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF

NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,

NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS

INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY

CORPORATION


APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT

ACT, R.S.C. 1985, c. C-36, AS AMENDED


**CANADIAN CREDITORS' COMMITTEE (THE "CCC")**
**RESPONSE TO CORE PARTIES' OPENING ALLOCATION POSITIONS**

**TABLE OF CONTENTS**

PART I – GENERAL RESPONSE AND OVERVIEW ................................................................3

PART II – SPECIFIC RESPONSES TO CORE PARTY POSITIONS .................................7

    A.    Response to US Interests ....................................................................................7

    B.    Response to EMEA Debtors ...........................................................................10

    C.    Response to UK Pension Claimants ...............................................................14

# PART I – GENERAL RESPONSE AND OVERVIEW

1.      The Canadian Creditors Committee (the "CCC")[1] responds to the opening allocation positions, submissions and pleadings filed on May 16, 2013 by the following Core Parties:

      a)  the US Debtors, UCC, Bondholder Group and related joinders (the "US Interests");

      b)  the EMEA Debtors;

      c)  the UK Pension Claimants;

      d)  the Monitor and Canadian Debtors; and

      e)  Wilmington Trust, National Association.

2.      Unless as otherwise expressly admitted or stated herein, the CCC denies the assertions by all other Core Parties and puts them to the strict proof thereof.

3.      The CCC repeats and relies on its request for an **Ownership Allocation Order**. In response to the opening positions of the other Core Parties:

      a)  all Core Parties agree that a substantial majority of the Sale Proceeds is attributable to IP transferred in the Sales;

      b)  all Core Parties acknowledge (and no Core Party disputes) that NNL is the legal title holder of substantially all of the IP sold, pursuant to long-standing agreements among Nortel Entities;

      c)  the Monitor, Canadian Debtors and Wilmington Trust agree with the CCC that the substantial majority of Sale Proceeds attributable to IP must be allocated to NNL. The Limited Licenses surrendered by the

---

[1]   Unless defined herein, all capitalized terms have the meanings ascribed to them in the Glossary of Terms annexed to the Allocation Position of the CCC filed on May 16, 2013.

Licensed Participants had no value in the context of the Residual IP Sale and a limited amount at best is attributable to the Limited Licenses in the context of the Business Sales;

d) the US Interests and the EMEA Debtors fundamentally mischaracterize the rights of the Licensed Participants and significantly overstate the amounts attributable to the Limited Licenses relinquished in connection with the Sales;

e) the US Interests place undue emphasis on the concept of fair market value. The fair market value of Nortel's assets has already been determined by the purchasers of the Residual IP and the Lines of Business and approved by the Courts and Nortel. The issue in this Allocation Proceeding is how to allocate the Sale Proceeds, the substantial majority of which is attributable to IP owned by NNL;

f) the other Core Parties knew that NNL owned the IP. They knew this even as they engaged with NNL in the credit and commercial marketplace, Pre-Filing and Post-Filing; and

g) the attempts by certain Core Parties to create an ownership interest in the IP where none before existed directly contradicts the MRDA, a contract on which such Core Parties otherwise rely.

4.    The CCC relies on and repeats its request, in the alternative, for an **Equitable Allocation Order**. In response to the opening positions of the other Core Parties:

a) if the Courts determine that legal title should not form the basis for allocation of the Sale Proceeds, the only fair, reasonable, defensible and equitable remedy is to allocate the Global Assets among the Nortel Debtors so as to effect a distribution to Creditors rateably by valid Claims;

b) the UK Pension Claimants' position is allocation through "equitable distribution" based on a "universal treatment of the proven creditors'

claims" [UK, paras. 58-59]. This position is substantially aligned with the CCC's alternative request for an Equitable Allocation Order;

c) the US Interests and the EMEA Debtors make numerous statements directly supportive of the CCC's Equitable Allocation Order;

d) the US Interests further assert that an "enterprise-wide" approach was necessary to effect the Business Sales because the business units disregarded geographic and corporate boundaries within the Nortel multinational corporate enterprise group;

e) the framework, operations and dealings among Nortel's multinational enterprise group are directly aligned with decisions of US, UK and Canadian courts sustaining enterprise group substantive consolidation, and with proposals being considered for adoption by international governmental and multi-governmental bodies including the EU Parliament, UNCITRAL, the World Bank and the IMF. The US Interests do not address this law and policy in their multinational enterprise group position;

f) in asserting that they "contributed" to Nortel's overall value and, therefore, that the Sale Proceeds should be allocated in a manner that ignores the parties' bargained-for contractual rights and obligations, the US Interests directly reject their own contention that the individual Nortel Entities' "separate and legally distinct" nature must be respected;

g) a number of Core Parties suggest that the Courts should allocate some or all of the Sale Proceeds based on the Nortel Debtors' direct or indirect contribution to Nortel's IP[2]. It would be prohibitive, if not impossible to allocate the Sale Proceeds on this basis;

---

[2] EMEA Debtors, para. 32: R&D was "interrelated and coordinated" and "the RPEs created and exploited IP on a joint and collective basis"; US Debtors/UCC, p. 10: "substantial R&D also was

h) throughout their pleadings, the US Interests and EMEA Debtors make bald assertions without pleading any facts in support thereof, let alone facts pleaded with particularity[3]. The CCC rejects these bald contentions, has pleaded facts in its opening allocation position (the "CCC Allocation Position") refuting many of them, and will establish those and additional negating facts at trial;

i) the information provided to purchasers of the Bonds and to other Nortel investors reflects Nortel as a global enterprise, not each Nortel Entity's specific operations. Indeed, the financial statements relied upon by the US Debtors/UCC to support "separateness" expressly caution that they are not representative of each Nortel Entity's operations and cannot be relied upon for such purposes;

j) contrary to the assertion by the US Debtors and UCC [US, p.26], none of the US Debtors' general unsecured creditors, including bondholders, is entitled in whole or in part in accordance with legal or equitable principles to any claims for Post-Filing interest, make whole payments, or any similar claims; and

k) Core Party Wilmington Trust National Association wholly supports and adopts the CCC's Allocation Position, namely, the Ownership Allocation Order and, in the alternative, the Equitable Allocation Order. Wilmington Trust is an indenture trustee and financial creditor of NNL. This creditor's support for the CCC Allocation position is a complete answer to the statement of the US Debtors and UCC [p.4] that "those

---

conducted by Nortel's United States [and EMEA] affiliates".

[3] For example, "NNI alone provided credit support for substantially all of the Nortel group's public debt" [US, p.3]; "That Nortel was a multinational enterprise comprised of separate legal entities was recognized and relied on, repeatedly, by the financial markets and key counterparties" [US, p.6]; and the US Debtors' creditors must be "paid in full, including with post-petition interest" [US, p.26].

that lend money" expected that NNI would be the driver of Nortel's value.

5.      In summary, the facts of this case including the facts pleaded by the other Core Parties support the CCC Allocation Position. If the Courts are unable to allocate the Sale Proceeds based upon the parties' express legal and contractual rights concerning ownership of assets, equitable consolidation should be ordered.

# PART II – SPECIFIC RESPONSES TO CORE PARTY POSITIONS

## A.      Response to US Interests

6.      The US Interests instruct the Courts that they *must* allocate the Sale Proceeds to each of the Nortel Debtors according to the fair market value of assets and rights relinquished in the Sales [US, opening paragraph]. The US Interests then immediately ask the Courts to ignore the legal ownership of such assets and rights and to fabricate US Debtor ownership based on inappropriate, inaccurate and incomplete methodologies.

7.      The US Debtors/UCC erroneously characterize the Limited Licenses held by NNI as "enhanced" and akin to legal ownership of IP. In fact, the Limited Licenses held by the Licensed Participants were subject to very specific field of use limitations set out in the MRDA and described in the CCC's opening Allocation Position at paragraphs 11-12 and 53-55.

8.      The Limited Licenses were exclusive licenses for the use of NN Technology.  As with any license, the Limited Licenses did not confer any interest or property in the patent licensed. Simply put, the Limited Licenses permitted NNI to perform the acts specified in the license, coupled with a covenant by NNL not to allow any other person permission to do the same act for the duration of the license. There is no support for the proposition that the Limited Licenses

conferred legal or proprietary interests in the NN Technology, or were "enhanced" in any way.

9.    The US Debtors/UCC erroneously state [p.12] that NNL's interest in the IP rights of the Licensed Participants "is indirect and a function of the value of NNL's equity ownership". This is patently false. NNL's interest in the IP was direct and expressly set out in s. 4 of the MRDA. Section 4 of the MRDA provided that "[l]egal title to any and all NN Technology" vested in NNL. The Limited Licenses simply granted leave to the Licensed Participants to make, use and sell Nortel products embodying the NN Technology exclusively in prescribed territories and non-exclusively elsewhere.[4]

10.    The US Debtors/UCC state throughout their Allocation Position that substantially all of the patents transferred in the Residual IP Sale were registered in the United States.[5] The jurisdiction in which patents were registered is irrelevant to the allocation of the Residual IP Proceeds.

11.    As described at paragraphs 13, 45-47 and 57 of the CCC's Allocation Position, the Residual IP Sale involved the sale of Nortel's residual patent portfolio separate from Nortel's Lines of Business. NNL held legal title to substantially all of the patents transferred in the Residual IP Sale regardless of where they were registered, and this was the substance of what Rockstar purchased. As the non-assignable Limited Licenses were merely to make, use

─────────────────────

[4]   At page 12, footnote 12 of their Allocation Position, the US Interests rely on s. 9(b) of the MRDA in support of their contention that the Licensed Participants "owned" the Nortel IP in their respective jurisdictions. Section 9(b) of the MRDA provides no support for this contention. Section 9(b) simply provides that "upon expiry or termination of the MRDA, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and in particular, the rights granted to it in Article 5 as though this Agreement had continued."

[5]   The US Interests also rely on NNI's alleged historical contributions to R&D and the location in which patents are filed in support of their claim to "the substantial majority" of the Sale Proceeds. The jurisdiction in which a patent is filed bears no relationship to and is not indicative of any contribution by entities in that jurisdiction towards the development of technology covered by that patent. For example, technology can be invented in one jurisdiction and the patents could be filed in another for commercial purposes.

and sell Nortel products embodying the licensed technology, Rockstar did not pay any consideration in respect of the relinquishing of these licenses.[6]

12.     At pages 2-3 and 14-17 of their Allocation Position, the US Debtors/UCC point to NNI's alleged contributions to revenue, cash flow, R&D funding and credit support for debt financing.[7] The US Interests have overstated their contributions by including both R&D and transfer pricing payments made by NNI. More fundamentally, these contributions do not bear on the ownership of the IP or the portion of the Sale Proceeds, if any, attributable to the Limited Licenses relinquished by NNI in the Sales. As discussed above and in the CCC's Allocation Position, the Limited Licenses held by the Licensed Participants had no value, or no material value, in the context of the Sales.

13.     The US Debtors/UCC rely [pp. 13-14] on s. 11 of the MRDA in support of their assertion that the Licensed Participants are entitled to "fair market value" for the Limited Licenses surrendered on exiting from the MRDA. In fact, the MRDA expressly provided that these Insolvency Proceedings would *not* trigger an automatic termination as currently proposed by the US Debtors/UCC. As the US Debtors/UCC concede [p. 13, footnote 13], the Fourth Addendum to the MRDA dated December 31, 2008 expressly provided that "notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv) [bankruptcy, insolvency, receivership or liquidation] no Participant affected by such event shall be automatically terminated from participation in the Agreement."

14.     The US Debtors/UCC misstate the issue in this Allocation Proceeding. The issue is not whether FMV is applicable, but rather, how to allocate the Global Assets among the Nortel Entities.

_____

[6] It is noteworthy that the EMEA Debtors contend at paragraphs 77 and 81 of their Allocation Position that the Residual IP was purchased by Rockstar for strategic reasons.

[7] At pages 3 and 26-27 of their Allocation Position, the US Debtors/UCC reference NNI's alleged transfer pricing payments and its R&D expenses between 2001 and 2009.

15.    As stated in the CCC Allocation Position, ownership of all or substantially all of the Sales Proceeds can be determined:

    a)  NNL invented the digital switching technology that breathed life into Nortel in the 1970s; and,

    b)  as reflected in the agreements that have governed Nortel's operations since the time of the formation of NNI (f/k/a Northern Telecom, Inc.) in the 1970s, NNL has owned all IP subject only to Limited Licenses that were of no value in the context either the Residual IP Sale or the Business Sale.

16.    As a result of the foregoing:

    a)  all of the proceeds of the Residual IP Sale are allocable to NNL, in the same way that if legal ownership is respected, (i) NNI is entitled to the cash in its bank account as of the Filing Date and to the proceeds of sale of the Richardson facility in Texas, and (ii) NNUK is entitled to the cash in its bank account on the Filing Date and the proceeds of sale of the Maidenhead facility in England;

    b)  the Sale Proceeds derived from the Business Sales attributable to IP (which is the majority thereof) are also primarily allocable to NNL; and

    c)  the portion of the Sale Proceeds derived from the Business Sales attributable to assets other than IP are allocable among the Nortel Debtors in accordance with legal title to the extent discernible and otherwise in accordance with appropriate valuation principles.

## B.    *Response to EMEA Debtors*

17.    The EMEA Debtors claim entitlement to the Sale Proceeds on the basis of beneficial ownership and equitable principles including resulting trust, unjust enrichment and proprietary estoppel. As explained below, these arguments have no merit.

18.    The CCC denies that the EMEA Debtors are entitled to the Sale Proceeds claimed and puts the EMEA Debtors to the strict proof thereof.

### 1)    "Beneficial Ownership"

19.    The EMEA Debtors claim that the Sale Proceeds attributable to IP should be allocated to NNL and the Licensed Participants on the basis of "beneficial ownership", determined by measuring relative contributions of Nortel Debtors to R&D. While the EMEA Debtors reject the strict application of RPSM as a construct to allocate the Sale Proceeds, they nonetheless contend that arm's length transfer pricing principles should apply.

20.    The RPSM was a transfer pricing methodology which was implemented by Nortel to allocate the costs and benefits of R&D conducted by Nortel, on an arm's length basis. Neither the RPSM nor the arm's length principle determined the ownership of Nortel's IP or the allocation of the Sale Proceeds attributable thereto. As discussed above and in the CCC's Allocation Position, legal title to any and all NN Technology was indivisible and vested exclusively in NNL. The Licensed Participants held no legal or proprietary interest in the NN Technology by virtue of their contributions to R&D. The alleged contributions of NNUK, NNIR and NNSA to Nortel's R&D (which are not admitted) therefore have no relevance to the allocation of the Sale Proceeds.

21.    At paragraphs 53-54 of their Allocation Position, the EMEA Debtors rely upon the recitals to the MRDA in support of their claim to Sale Proceeds attributable to IP. There is no merit to this position. The recitals do not override the operative provisions regarding legal title to NN Technology and the specific field of use limitations of the Limited Licenses in s. 5 of the MRDA[8] and do not create any legal or proprietary interest in IP in favour of the EMEA Debtors and do not support their claims.[9]

─────────────────────

[8] The EMEA Debtors concede that the MRDA was not "a document designed to dictate allocation of the sale proceeds on the disposal of any of the Nortel businesses" (para. 52).

[9] The first recital, relied upon by the EMEA Debtors at paragraph 53 of their Allocation Position, reads as follows:

> WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its

- 12 -

### 2)     Resulting Trust

22.     Contrary to the allegations of the EMEA Debtors at paragraphs 59-60 of their Allocation Position, the presumption of resulting trust has no application. Such an interest cannot arise as it would contradict the express terms of the MRDA, which terms were intended to apply to the Licensed Participants. There was also no gratuitous transfer of assets by NNUK, NNIR or NNSA to NNL at any time.

23.     Title to the IP was not held by NNL in trust for the benefit of the Licensed Participants and the Licensed Participants did not contribute to the acquisition of title to NNL's IP. The Licensed Participants held non-assignable Limited Licenses to make, use or sell Nortel products embodying the licensed technology only and had no legal or proprietary interest that would give rise to a resulting trust.

24.     The Licensed Participants signed onto the MRDA and its predecessor agreements and received access to NN Technology, in exchange for, among other things, the vesting of IP in NNL. The Licensed Participants received access to NN Technology, the opportunity to share in profits generated by that technology through the RPSM, and the benefits of being part of a stronger and more competitive corporate enterprise group.

---

contribution to that R&D activity in the context in the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits. [Underlining added.]

This recital makes clear that the RPSM was chosen by Nortel as the best available arm's length measure for the purposes of pricing intercompany R&D. The recital does not suggest that ownership of Nortel's IP is split based on the Participant's relative contributions to R&D.

At paragraph 54 of their Allocation Submission, the EMEA Debtors rely upon a recital in an addendum to the MRDA dated December 14, 2007, which stated that "(i) each Participant holds and enjoys equitable and beneficial ownership of NN Technology; and (ii) this addendum continues each Participants' rights and obligations in the NN Technology." This recital was not made as an amendment to the MRDA and therefore does not have contractual force to modify the substance of the MRDA. The Third Addendum to the MRDA effective January 1, 2006 did not contain this recital. Furthermore, and in any event, any equitable or beneficial interest possessed by the Licensed Participants under the MRDA would have been limited to the Limited Licenses themselves and did not give rise to a legal or proprietary interest in the NN Technology.

### 3)     Unjust Enrichment

25.     There has been no unjust enrichment as alleged at paragraphs 61-66 of the Allocation Position of the EMEA Debtors. There was no agreement or common intention that NNUK, NNIR and NNSA would obtain a "beneficial interest" in IP by reason of their contributions to R&D. The agreement and common intention was expressed in the clear language of the MRDA, pursuant to which legal title to the NN Technology vested exclusively in NNL. NNL was not enriched and NNUK, NNIR and NNSA did not suffer any corresponding detriment by reason of the relative contributions of the parties to R&D. In fact, NNUK, NNIR and NNSA specifically benefited from the royalty-free Limited Licenses granted by NNL to make, use and sell Nortel products embodying the licensed technology, as illustrated by the significant cash reserves available to those Nortel Entities as at the Filing Date.

26.     In any event, the express agreement of NNUK, NNIR and NNSA to vest any and all NN Technology in NNL constitutes a juristic reason for any enrichment, which enrichment is specifically denied.

27.     There is no basis in law or in equity to impose a constructive trust.

### 4)     Proprietary Estoppel

28.     The EMEA Debtors' claims based on proprietary estoppel at paragraphs 67-68 of their Allocation Position have no merit. NNL did not encourage NNUK, NNIR or NNSA to believe that it would obtain a proprietary interest in the NN Technology. There was no detrimental reliance by NNUK, NNIR or NNSA to the knowledge of NNL and NNL did not take unconscionable advantage of NNUK, NNIR or NNSA.

### 5)     Alleged Non-Arm's Length Transactions

29.     The CCC specifically denies the EMEA Debtors' allegations of non-arm's length transactions, including the allegations contained in paragraphs 69-73 of their Allocation Position and puts the EMEA Debtors to the strict proof thereof.

### 6)    Value of Non-IP Assets

30.    The CCC specifically denies that the EMEA Debtors are entitled to the amounts claimed in respect of fixed assets and inventory and customer assets sold in the Business Sales and puts the EMEA Debtors to the strict proof thereof.

## C.    *Response to UK Pension Claimants*

31.    The CCC agrees with and supports the allocation position of the UK Pension Claimants to the extent that it is consistent with and supportive of the Equitable Allocation Order proposed by the CCC. The CCC denies the balance of the UK Pension Claimants' submissions.

32.    The CCC accepts and agrees with the UK Pension Claimants that:

a)  Nortel was run as one global business, with operations that spanned corporate and geographic borders;

b)  Nortel was highly integrated and operated as one global enterprise;

c)  employees involved in research and development, manufacturing support, distribution, and other functions, collaborated to meet customer demands associated with each of the Lines of Business, and revenues booked by a particular Nortel Entity were the product of this collaborative effort; and

d)  stakeholders dealt with Nortel as a group, and not with individual Nortel entities.

33.    The UK Pension Claimants are wrong when they suggest that it was recognized as part of the Sales that the IP was owned jointly by more than one debtor, and when they assert that ownership of the Sales Proceeds cannot be determined. To the contrary, title to the Sale Proceeds and to the IP in particular is determinable, as described above at paras. 15-16 and in the CCC Allocation Position.

34.    What was recognized as part of the Sales was that the Lines of Business crossed corporate and geographic borders, no purchaser was interested in buying part of a Line of Business, and the expedient and value maximizing

approach was to complete the Sales and postpone disputes over the allocation of the proceeds.

35.    The UK Pension Claimants are wrong to the extent that they suggest that NNUK or the pensions sponsored by NNUK were dealt with unfairly in the Nortel enterprise.  In particular and without limitation:

a)  NNUK contributed very little to Nortel's global enterprise.  In the early 1990s, Nortel's Canadian parent made a number of acquisitions as part of its plan to expand into the European market, including the acquisition of STC Plc ("STC"), at a cost of approximately $2.5 billion in cash.  Nortel's plan was to use STC's existing business as a platform to market Nortel's superior digital switching technology in England, including to STC's existing customer British Telecom.  Unfortunately, the plan was not effective.  STC's lasting contribution to Nortel has turned out to be a large legacy pension obligation, and the public debt issued to finance the $2.5 billion acquisition;

b)  the NNUK Pensions were not dealt with wrongfully or even unfairly by Nortel;

c)  the NNUK Pensions were administered by the U.K. Pension Fund Policy Committee (the "UK PFPC"), which was comprised mainly and perhaps entirely of NNUK employees.  For example, Gareth Pugh, who is mentioned in the UK Pension Claimants' pleading, chaired the UK PFPC for a period time. Mr. Pugh was a UK resident, a former STC employee, and the controller for EMEA;

d)  the decision to take contribution holidays in respect of the NNUK pension plan was:

i.  made by the UK PFPC in consultation with its actuary, Watson Wyatt, which was completely independent from Nortel and from the actuary for any other plans administered by Nortel;

ii.  in accordance with applicable pension regulations, having regard to the financial position of the pension plan at the time;

      iii. consistent with the treatment of the Canada and the US pension plans, in respect of which contribution holidays were also taken at that time; and,

      iv. not contentious;

e) furthermore, it should not be overlooked that *voluntary* contributions to the NNUK pension plan were made in or about 2002-2003, at a financially difficult time for the Nortel group;

f) the UK Pension Claimants' assertion that NNUK did not operate as an independent freestanding business and lacked corporate independence misses the point: none of Nortel Entities operated as an independent freestanding business and all of the Nortel Entities lacked corporate independence. The Nortel Entities, including each of NNUK, NNSA, NNI, and NNL legitimately and properly worked in common cause to support the objectives of the Lines of Business;

g) NNC and NNL did not order Nortel's affairs to ensure that NNI remained financially strong in order to make NNI appear to be a credit worthy guarantor of NNC and NNL debt. NNI was a credit worthy guarantor because it was one of the North American operating entities (where the debt was raised), but did not directly hold any of Nortel's debt; and

h) the "financial assurances" allegedly provided by the Canadian Debtors to the UK Pension Claimants were restricted to the terms of the limited guarantees of the amounts owing to the NNUK pension plan, the enforceability of which is not admitted by the CCC.

36. The CCC recognizes that an allocation consistent with the contracts that governed Nortel might generate a result that is more favourable to some creditors than others. To the extent that the UK Pension Claimants are suggesting that the Courts exercise their equitable discretion to prevent that

result by ordering an allocation resulting in a common recovery to all Nortel creditors (as would be the case if the Nortel Debtors were substantively consolidated), the CCC supports the UK Pension Claimants' position.

37.    The Courts should not deprive the Canadian Debtors and their creditors of the benefit of Nortel's contractual framework including the ownership of its IP and simultaneously impose the burden of the other contracts on the Canadian Debtors which would allow other stakeholders the benefits of all of their asserted claims, such as the UK Pension Guarantee, the Bond guarantees, and the cash generated by operations.

DATE:  May 29, 2013

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Susan Philpott / Ari Kaplan
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
        sphilpott@kmlaw.ca
        akaplan@kmlaw.ca

Lawyers for the Canadian Former Employees
and Disabled Employees through their court
appointed Representative


**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel:  416.495.3776
Fax: 416.495.3786

Email:  barry.wadsworth@caw.ca

Lawyers for the Canadian Autoworkers Union


**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON   M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel:    416.214.5213/5206
Fax:    416.214.5413/5400

Email: arthur.jacques@shibleyrighton.com
        thomas.mcrae@shibleyrighton.com

Lawyers for active and transferred employees
of Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J.
Boake
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
         jgage@mccarthy.ca
         bboake@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as
administrator of the Nortel Canada registered
pension plans


**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo
Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
         lily.harmer@paliareroland.com
         max.starnino@paliareroland.com

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund