# EXHIBIT A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND**
**NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**RESPONSE OF THE MONITOR**
**AND CANADIAN DEBTORS TO THE OPENING ALLOCATION**
**PLEADINGS OF THE OTHER CORE PARTIES**

**PART I - INTRODUCTION**

1.     This is the response of the Monitor and the Canadian Debtors[1] to the pleadings on the

issue of allocation delivered by:

- the U.S. Debtors and the Official Committee of Unsecured Creditors (all, collectively,

  the "**U.S. Interests**"), as joined in by (i) Bank of New York Mellon, as Indenture

  Trustee ("**BNY Mellon**") and (ii) Law Debenture Trust Company of New York, as

  Indenture Trustee for the NNCC Notes ("**Law Debenture**");

---

[1] Capitalized terms not otherwise defined herein have the meaning set out in the Allocation Position of the Monitor and Canadian Debtors ("**Canadian Pleading**") dated May 16, 2013.

- the *ad hoc* Group of Bondholders (the "**Bondholders**"), as joined in by Law Debenture;

- the Joint Administrators and authorized foreign representatives of the EMEA Debtors (the "**Joint Administrators**");

- Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund (collectively, the "**UK Pension Trustee**");

- Wilmington Trust, National Association, as Successor Indenture Trustee ("**Wilmington Trust**"); and

- the Canadian Creditors' Committee ("**CCC**").

## PART II - PRELIMINARY STATEMENT

2.      As set out in the Canadian Pleading, the question for the Courts in the determination of the allocation issue is:

> What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?

3.      All of the other Core Parties' descriptions of the question to be determined concede, in whole or in part, that the question as posed in the Canadian Pleading is the correct question: that is, the resolution of the allocation requires a determination of each seller's property interest in the assets transferred or surrendered in the relevant transaction, and of the portion of the proceeds attributable to such transfer or surrender:

- 3 -

(i)     The starting proposition of the U.S. Interests, joined in by BNY Mellon and Law Debenture, contains the acknowledgement that what each selling debtor is entitled to receive is on account of the assets and rights that it sold or relinquished in connection with the sales, which (to be meaningful) must be a reference to the property interests in assets;

(ii)    The Bondholders' position, that what each estate is entitled to receive by allocation flows from the assets it sold and the rights it relinquished, contains the same acknowledgement as made by the U.S. Interests and is meaningful only to the extent it refers to property interests in assets;

(iii)   The Joint Administrators' pleading, namely that what is to be determined is which selling debtor owned (or had an entitlement to or interest in) which assets sold in the transactions, acknowledges the key property interest to be ownership.  To the extent the Joint Administrators refer to entitlements or interests, to be meaningful they must be referring to property interests;

(iv)    The UK Pension Trustee's position also recognizes that the allocation question is one of ownership of the assets sold.  Its qualification that this applies only where "the owner of the assets may be easily ascertainable" is incorrect, but in any event is inapplicable on the facts of the case;

(v)     Wilmington Trust likewise pleads that legal ownership of the IP assets sold determines allocation of the proceeds; and

(vi)    The CCC's primary position (which it calls "allocation by ownership") is entirely consistent with the position in the Canadian Pleading.

- 4 -

4.      Importantly, all of the Core Parties rely upon the MRDA.   At least implicitly they acknowledge its centrality to the allocation exercise and that it is a binding contract.   The IP rights that are at the core of this allocation exercise are exactly those rights specified in the MRDA – no more and no less.   The obligations, including payment obligations among the parties to the MRDA, are similarly binding on all parties thereto.   The IP rights,  and the obligations, set out in what is a single contract (the MRDA), are inseparable.   Parties should not be permitted to "cherry pick" among the terms of the MRDA, which, as shown below, is what certain parties seek to do.

5.      To the extent that the allocation results contended for by the other Core Parties differ from that of the Monitor and the Canadian Debtors, the differences primarily result from the following:

(i)      **U.S. Interests**. The U.S. Interests' premise that allocation derives from a legal basis (recognition of each seller's rights and assets sold or relinquished), and their express invocation of the MRDA, are appropriate foundational premises, provided they are correctly applied.  However, the balance of the approach of the U.S. Interests is contradictory to these premises. They choose to ignore the actual terms, obligations and effect of the complete MRDA (which remains in full force and effect), particularly the parties' respective interests in IP (as set out in the MRDA) and the limited scope of the licences granted thereby.  They further attempt to divorce the benefits they receive under the MRDA (licence rights which are more limited than they claim) from the obligations they have under the MRDA, including their fundamental obligation to split profits in return for

the grant of license rights to them.   They propose an incorrect interpretation of the MRDA – this leads to a fundamentally flawed allocation position,  and a purported "fair market" valuation of assets that they did not own as though they owned them and of rights beyond the scope of the limited licenses granted to them under the MRDA.

(ii)    **Bondholders**.  The Bondholders' position on allocation appears to be that of the U.S. Interests, and accordingly is subject to the same fundamental flaws as that of the U.S. Interests.

(iii)    **Joint Administrators**. The Joint Administrators acknowledge that the proper focus is on the legal ownership or entitlement of each seller to the assets sold, and, like the U.S. Interests, they expressly invoke the MRDA. However, they proceed inconsistently with the application of legal ownership or entitlement and with the actual terms of the MRDA.   In effect they seek to undo and alter both.  They ask that the MRDA be construed (or re-written) contrary to its actual terms and obligations, so that the EMEA Debtors are said to obtain a "beneficial interest" in IP "proportionate to" an ill-defined "contribution" each company is said to have made, rather than the contractually limited license rights that the MRDA actually gave them, and contrary to the MRDA's specifically prescribed calculation of contribution.  Equally flawed are their alternative claims for equitable remedies of constructive trust, unjust enrichment and proprietary estoppel which all suffer from a similar flaw, namely that those equitable doctrines cannot be invoked to negate the MRDA's

express terms as to ownership and legal interests, and are unfounded at law.

(iv) **UK Pension Trustee**. The UK Pension Trustee acknowledges that where the ownership of assets is not at issue a court may order allocation of proceeds to the identifiable owner.  It then incorrectly claims that Nortel assets were "co-mingled", or that legal ownership does not "accurately reflect beneficial and other interests in, and claims over, against the property", and suggests that therefore a court "may" allocate those proceeds on some other basis.  Ownership of and any other property interest in the assets sold are ascertainable and should be allocated accordingly.

Like the U.S. Interests and the Joint Administrators, the UK Pension Trustee expressly invokes the MRDA.  However, like them it incorrectly proffers a position that ignores the actual terms, obligations and consequences of the MRDA including in delineating the scope and limitations of the parties' interests in IP.

(v) **Wilmington Trust**. Wilmington Trust properly acknowledges the role of legal ownership and interests as governing the allocation issue, and invokes the MRDA.  Wilmington Trust goes on to posit that there "may" be an alternative "global *pari passu*" approach. The Monitor and the Canadian Debtors submit that the determinative nature of the property interests obviates the need to search for such an alternative.

(vi)   **CCC**.  The CCC posits an alternative "equitable" allocation (a form of substantive consolidation of the three estates), but only if it is concluded that legal title should not form the basis for allocation.  The Monitor's and the Canadian Debtors' position is that property interests are in fact clearly and completely determinable in this case, and legal title should form the basis for allocation.

6.     The approaches taken by the U.S. Interests, the Joint Administrators and the UK Pension Trustee are internally inconsistent and cannot properly form the basis of allocation.  The approach set forth in the Canadian Pleading is the only approach that is consistent with the proper premises.

## PART III - RESPONSES TO EACH POSITION

### A.  U.S. Interests

7.     When the U.S. Interests attempt to apply the proposition that each selling debtor is entitled to the "fair market value" of the assets and rights that it sold or relinquished in connection with the sales, they commit two fundamental errors.  First, what is to be allocated here is a fixed, known amount that has already been realized (namely, the proceeds of the Business Sales and the Rockstar Transaction): the very nature of the exercise does not involve a "ground-up" calculation of notional "fair market value" but an allocation of actual proceeds.  In other words, the matter at hand is not whether fair market value is applicable but rather how to allocate the already ascertained fair market value among the Canadian Debtors, EMEA Debtors and U.S. Debtors.  Second, the "value" the U.S. Interests seek is of alleged assets and rights that the U.S. Debtors did not have, and assumes cash inflows to which the U. S. Debtors were not

- 8 -

entitled, while also ignoring required associated cash outflows, including to NNL, as the owner of the IP.

8.      The U.S. Interests correctly concede the legal separateness of the corporate entities in the Nortel Group. They also concede that the MRDA, in addition to addressing Nortel's transfer pricing regime, was an "intentional" structure setting forth "the agreement among the key Nortel entities concerning the creation, ownership and licensing" of Nortel's IP, and informing a structure in this regard that pre-dates the MRDA.[2]

9.      The U.S. Interests, without any justification or even purported explanation, either ignore, or completely misconstrue, the terms and obligations of the MRDA as a whole. They assert that somewhere there exist "enhanced exclusive licenses" of the licensed participants that "constituted effective ownership of the IP in their respective jurisdictions".  This is patently incorrect.  The MRDA provides for carefully limited licences and provides for NNL to be the IP owner.  To the extent the U.S. Interests attempt to ground their proposition in a document, the U.S. Interests' claim that the MRDA states in a preamble paragraph on page 2 that "equitable and beneficial ownership" of Nortel's IP is transferred to the licensed participants.  This is equally incorrect -  the MRDA does no such thing.

10.     The portion of the MRDA to which the U.S. Interests refer is a recital that the licensed participants held and enjoyed equitable and beneficial ownership *of certain exclusive rights* under NN Technology (essentially Nortel IP) for specified territories pursuant to the prior cost-sharing agreement.  The cost-sharing agreement clearly described those rights as being in the

---

[2] To the extent that the U.S. Interests assert that transfer pricing "is about tax", there is no legal consequence that flows from that characterization and, in any event, the statement itself is incomplete.

nature of a field-of-use license.  The MRDA in no way transfers, or purports to transfer, any ownership of the IP, which ownership unequivocally is recited and agreed to reside with NNL. Rather the MRDA recites the intention that those certain exclusive rights were to continue, and went on to implement that intention by defining (and circumscribing) the license rights of the (aptly named) licensed participants in Article 5 of the MRDA. To make it clear that those limited license rights were the entirety of the Licensed Participants' rights in the IP, they agreed in Article 14 of the MRDA that, "[i]n respect to the subject matter" of the MRDA, it "sets forth the entire agreement and understanding between the Participants".

11.     The U.S. Interests' assertion that the licenses "have all the hallmarks of and are the economic and tax equivalent of ownership of the intellectual property in the exclusive jurisdictions" is unfounded, unknown to law and indeed without meaning.  It cannot be reconciled with the actual terms of the MRDA that clearly delineate the licenses to licensed participants as being limited in scope, and granted by NNL, who was unambiguously said to be the legal owner of the IP.  Contrary to the U.S. Interests' assertion, there is *no* grant to them of ownership, whether legal, equitable or beneficial ownership, of any IP.  Indeed any such grant would be inconsistent with the grant of limited licenses to use IP, and would render the licensing provisions redundant.

12.     The U.S Interests effectively recognize that "ownership" is the key right for allocation purposes – but lacking actual ownership, they invalidly conjure up a purported "ownership" claim to the IP by simply asserting without justification that the MRDA transferred them an ownership interest. Having invalidly claimed ownership in such assets, they proceed to claim "fair market value" of those assets as if they were owners (even though they were not), ignoring the provisions, limitations and their actual rights and obligations as dictated by the MRDA.

13.     The U.S. Interests claim that Schedule "A" of the MRDA is inapplicable to allocation. Their position is misconceived.  As set out in paragraph 53 of the Canadian Pleading, the RPSM in Schedule "A" to the MRDA sets the maximum that the U.S. Debtors or the EMEA Debtors could realize by the use of their licenses and other intangible assets in the operations of their businesses.

14.     The U.S. Interests appear to assert that the U.S. Debtors' share of the sale proceeds should be based on some calculation of the U.S. Debtors' share of overall Nortel Group revenue, cash flow and/or R&D funding.  In so claiming, the U.S. Interests essentially assert that they can take the licence grant provided by the MRDA without the financial and other obligations imposed by the MRDA.  If the parties to the MRDA had intended to grant the field-of-use licenses without concomitant financial obligations (either royalties, or, as was done in this case, residual profit split payments) they would have done so.  Deliberately defined benefits and deliberately defined obligations were carefully specified by the parties to the MRDA who are bound by all of its terms.  The U.S. Interests confuse the "royalty free" language of the MRDA with an arrangement that is obligation free.  The U.S. Interests cannot escape recognition of their financial obligation under the MRDA.

15.     First, NNI was only able to participate in the Nortel business by virtue of being a licensee of NNL's IP under the terms of the MRDA, which specified the residual profit split obligations and benefits of each party, including NNI.  During the period when NNI was operating, it received its full contracted-for benefit from revenue, cash flow and R&D funding; however, the U.S. Debtors did not own assets that generated or could generate revenue or cash flow at the times relevant for allocation purposes.  To the extent they had any assets, or property interests in assets, that earned such revenues or cash flows they had concomitant obligations to contribute

residual profits for distribution under the MRDA.  The U.S. Interests' approach suffers from the fundamental error of 'cherry picking' provisions in the MRDA that they wish to invoke, and ignoring the concomitant obligations that the MRDA imposes on them.

16.     Second, there were no R&D contributions by the U.S. Debtors which did or could create property interests in assets for the U.S. Debtors other than those granted as licence rights in the MRDA.

17.     Third, to the extent that the U.S. Interests make arguments as to the value of their R&D contribution, they have grossly overstated the value of their contribution by counting their payments under the MRDA to other RPS Entities according to the RPSM to inflate their purported R&D contributions.   This is wholly inappropriate. The only appropriate R&D contribution would be as set out in the MRDA's specifically prescribed calculation of contribution.

18.     The purported "fair market value" approach of the U.S. Interests must accordingly be rejected. The Courts are simply not tasked with valuing a fictional business with fictional rights for the U.S. Debtors and not associated obligations.

19.     As set out in the opening allocation pleading of the Monitor and Canadian Debtors, to the extent limited license rights of the U.S. Debtors had value, any analysis of that value must recognize and account for the scope of those rights and the U.S. Debtors' obligations under the MRDA.  In the Rockstar Transaction, those limited license rights had no value. In the Business Sales they, at most, had a limited value to be assessed as described in the Canadian Pleading.

20.      The U.S. Interests' submissions in respect of the "retirement" provisions of Article 11 of the MRDA are incorrect and Article 11 does not assist them.    Article 11 deals with an insolvency-driven exit from the MRDA of an individual party to it.   The U.S. Interests' attempt to invoke this Article as dictating a "fair market value" allocation in this situation is confused and erroneous.   In the present circumstances, there has been no exit from the MRDA triggering these provisions.   Quite to the contrary, the MRDA survives by express agreement of the parties. In any event,  Article 11 in no way informs the resolution of the allocation dispute in respect of the sale proceeds in issue here.

21.      The U.S. Interests' attempt to put significant weight on what they term the "absolute priority rule" is misplaced.   The absolute priority rule applies only to priority of distribution among proven creditor claims in a single estate.   The concept is inapplicable to the allocation of the sale proceeds among the three estates.

**B.  Bondholders**

22.      The Bondholders agree that the relevant task for the Courts is to determine the respective legal entitlements of the estates to the sale proceeds.   Their purported "fair market value" analysis, however, suffers from the same flaws as that of the U.S. Interests.

**C. Joint Administrators**

23.      The Joint Administrators have asserted that the appropriate approach is one of:

> analyzing the entitlement of each Selling Debtor to the proceeds of the specific assets that were conveyed to the purchaser in each Asset Sale. To determine the proper allocation of the Sale Proceeds, first the classes of assets sold in a particular Asset Sale must be identified, then the proportion of Sale Proceeds attributable to each class of assets should be determined, and

> finally it should be determined which Selling Debtor owned (or had an entitlement to or interest in ) which assets. Each EMEA Debtor is entitled to a corresponding portion of the Sale Proceeds attributable to those assets. This asset based methodology is the only logical, equitable and legally sound approach.

24.    In fact, there are many similarities between the proposed allocation calculation of the Joint Administrators and that of the Monitor and Canadian Debtors with respect to the Business Sales.  The Joint Administrators appear to correctly recognize that tangible assets should be allocated first based on property rights, that there is no goodwill, that IP is what generated the vast majority of proceeds to be allocated and that reference must be made to the MRDA to determine parties' rights in the IP.

25.    Indeed, the Joint Administrators correctly state with respect to IP that "[t]he determination of the ownership of the IP will therefore be the critical issue in allocating the Sale Proceeds."  Then, rather than recognizing the IP ownership rights (as contracted for by the parties in the MRDA) as the answer to the question, the Joint Administrators simply assert that "each entity with a beneficial ownership in the IP is entitled to an allocation of the Sale Proceeds from those IP assets in a manner which properly and fairly reflects its contribution to the value of those assets".  This is incorrect.

26.    The relevant question acknowledged by the Joint Administrators with respect to the IP – i.e., what is the ownership? – is squarely answered by the MRDA.[3]  All IP of the Nortel Group was owned by NNL.[4] The other Licensed Participants, including NNUK, had a prescribed

---

[3] NN Germany and NN SAS assert ownership of a non-material set of Nortel patents with respect to which they should receive an allocation, if they can prove such ownership.

[4] NNL primarily paid for the prosecution of Nortel patents which is consistent with  NNL's ownership of IP.  The jurisdictions in which NNL, as owner of the patents, chose to register or prosecute those patents, has no bearing on ownership.  NNL is the owner of the patents under the MRDA.

limited license interest to use the IP, which interest may have had some remaining value in the case of the IP sold in the Business Sales. The limited license interests had no value in the case of the IP sold in the Rockstar Transaction, which was not IP used or that could be used for the purpose of any Nortel product or business, all of the businesses having been sold to third party buyers.

27.    The Joint Administrators' allocation pleading attempts to portray the Nortel transfer pricing system in the MRDA as not being "at arm's-length". The assertion is misplaced and ineffective.

28.    First, irrespective of the merits of the transfer pricing criticisms, the terms of the MRDA in respect of ownership of the IP are unambiguous.  The purported challenges to the transfer pricing system – and what the Joint Administrators claim are necessary 'adjustments' thereto – have no connection with or impact upon the unequivocal ownership terms of the IP as set out in the MRDA.

29.    Moreover, in any event,  not only does this attack on the transfer pricing have no place in the allocation dispute, it is without substance.

30.    The Joint Administrators are confused as to the nature of a transfer pricing system.  A transfer pricing system is not, by its very nature, developed at arm's-length with respect to the affiliated companies *inter se* (though it is subject to extensive arm's length scrutiny by taxing authorities).  Rather, transfer pricing, by definition, is designed by a group of affiliated companies as a proxy for arm's length arrangements.  In any event, the parties in this case went

to great lengths to develop a transfer pricing system that they *agreed* best allocated the global profit or loss on an arm's length basis.[5]  The parties are bound by that agreement.

31.     As set out in the Joint Response of the Monitor and Canadian Debtors to the Claims filed on behalf of the EMEA Claimants, Nortel's transfer pricing arrangements were developed with considerable care and effort and after the expenditure of significant resources, and with the advice of independent transfer pricing professionals. It was subjected to the extensive review and approval of the relevant tax authorities, and continuous review and updating by the parties to ensure appropriateness, and the parties operated under the MRDA's transfer pricing arrangements since January 1, 2001.

32.     Additionally, the EMEA Debtors and the U.S. Debtors operated under the Nortel transfer pricing arrangements without challenging it.  The U.S. Debtors and EMEA Debtors filed their respective tax as well as their statutory and regulatory financial filings on the basis of the transfer pricing arrangements in the MRDA.

33.     The Joint Administrators' *ex post facto* attack on the transfer pricing arrangements, under which the Nortel Group operated for years, is nothing more than result-oriented and revisionist history, is without factual basis or legal basis, and should be rejected by the Courts.

---

[5]    The Joint Administrators' attack on the MRDA and the transfer pricing system is addressed in the Monitor's and Canadian Debtors' responses to EMEA claims and the UK Pension Trustee's claim against one or more of the Canadian Debtors.

34.     The Joint Administrators' fall-back assertions of so-called proprietary claims to "their beneficial interest" in the IP by "necessary operation of law", to a "resulting trust"; or to a claim for "unjust enrichment" and "proprietary estoppel" are all unfounded.

35.     The proprietary claims cannot stand in the face of the parties' clear contractual agreement with respect to the ownership of Nortel IP. These claims are nothing more than an attempt to circumvent the parties' actual agreement as to the ownership of the IP, without any claim – let alone any basis - to set aside the MRDA.  The contract - the MRDA – is a juridical reason that defeats all of these claims.  Moreover, as addressed in detail in Joint Response of the Monitor and Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants, these proprietary claims are without merit for many additional reasons.

## D.  UK Pension Trustee

36.     The Allocation Position of the UK Pension Trustee departs from recognized legal principles to become a result-driven plea that "allocation should enable a broadly common dividend to be paid to the Nortel Group's creditors from each relevant debtor's insolvency".  The UK Pension Trustee asserts  four "core principles":

> (i)     "The Group was run as one global business, divided across business groups rather than geographical lines or based on corporate structure."

> (ii)    It is not possible to attribute ownership of the jointly sold assets on an entity-by-entity basis as a result of the interconnectivity of the Group, the co-mingling of assets, the blurred lines of ownership of certain of the Group's assets and the *en bloc* sale of the residual IP.

    (iii)    "The location of the assets of the Group had an international range."

    (iv)    "The creditors of the Group had legitimate expectations with respect to the assets and business dealings of the Group as a whole."

37.    Although the UK Pension Trustee pleads the MRDA and acknowledges that by legal principle allocation of proceeds is by ownership, it states that such an approach will not adequately address allocation where the circumstances of a sale "involve co-mingled assets, the ownership of which cannot be separately attributed on an entity-by-entity basis", and asserts that the Courts should order a result-oriented allocation, namely an allocation to claimants *pro rata*.

38.    There are numerous mischaracterizations of fact set out in the UK Pension Trustee's pleading (and its 104 paragraph Appendix). These mischaracterizations of fact are addressed in the Joint Response of the Monitor and Canadian Debtor to the Claims by the UK Pension Trustee and PPF Re: UK Pension Scheme.  Moreover, the UK Pension Trustee's position is fundamentally incorrect.

39.    First, in this case it is possible to attribute ownership of the sold assets on an entity-by-entity basis.  This is precisely the allocation methodology advanced by the Monitor, the Canadian Debtors, the CCC and Wilmington Trust.

40.    Second, the fact of assets having an "international range" has no relevance, on any legal principle.  Here, the parties specifically provided for ownership of the IP assets, wherever located.  The whole *raison d'être* of the MRDA was the international make-up of the Nortel Group.

41.    Third, the alleged expectations of creditors to the extent (if any) they are relevant, do not support the UK Pension Trustee's position.   The Nortel companies had separate and distinct existence.  Employees were employed by the specific company they worked for.  Trade creditors contracted with specific Nortel entities.   Bondholders invested with or lent to specific Nortel members of the Nortel Group.   Where applicable, guarantees were negotiated from specific Nortel Group members.   The UK Pension Trustee's *ex post facto* characterization of creditors dealing indiscriminately with members of the Nortel Group is entirely incorrect and unsubstantiated.

42.    The UK Pension Trustee's allegation that an "implied term" can be imposed into the MRDA by the Courts to the effect that on a sale there should be a rateable payment to the Nortel Group's creditors suffers from two flaws.  First, there is no basis in law or fact to impose a term into the MRDA, particularly one that is fundamentally inconsistent with its actual terms including those about ownership of IP limited license rights.   Second, even if a term could be implied, the sharing would be according to the RPSM, not the sharing proposed by the UK Pension Trustee.

43.    The UK Pension Trustee goes on to claim a resulting or constructive trust to effect its result-oriented approach. There is no basis in law for the imposition of any such remedy in this case.  The rights and intentions of the parties are express, unequivocal and contractually binding.

44.     The Monitor and the Canadian Debtors dispute the ability of the UK Pension Trustee to re-visit or re-open any agreements among the Estates or any orders of the Courts regarding costs paid or that should be paid from the proceeds of the Business Sales and the Rockstar Transaction.

**E.  CCC**

45.     The CCC states that where legal title is discernible it should form the basis of the allocation among the Nortel debtors and that allocation by legal title is a reasonable and principled approach that respects the legal and contractual rights of the Nortel entities.

46.     As stated by the CCC, "Nortel deliberately vested legal title in all or substantially of [*sic*] all its IP in NNL". The CCC correctly pleads that the MRDA (continuing the agreement in the prior cost sharing agreements) vested ownership of Nortel's IP in NNL, with the consequence that the entirety of the proceeds from the Rockstar Transaction belongs to NNL, along with the proceeds from the Business Sales except to the extent that a nominal amount can be attributed to licensed participants under the MRDA.

47.     The Monitor and Canadian Debtors assert that the facts and law support the primary position of the CCC as stated above. The ownership of the relevant assets, to give effect to that position, is entirely ascertainable in this case.

**PART IV - CONCLUSION**

48.     The Monitor and Canadian Debtors accordingly respectfully request that the Courts give effect to the Allocation Position set forth the Canadian Pleading.

May 29, 2013

**Goodmans LLP**
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Benjamin Zarnett LSUC#17247M
Jay A. Carfagnini LSUC#22293T
Jessica Kimmel LSUC#32312W
Peter Ruby LSUC#38439P
Joseph Pasquariello LSUC#38390C

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**Gowling Lafleur Henderson LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario M5X 1G5

Derrick Tay LSUC#21152A
Jennifer Stam LSUC#46735J

Tel: 416.862.5697
Fax: 416.862.7661

Lawyers for the Canadian Debtors

**TO**:         Core Parties Service List

\6207362

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' *CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

| | |
|---|---|
| | ***ONTARIO*** **SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)** Proceeding commenced at Toronto |
| | **RESPONSE OF THE MONITOR AND THE CANADIAN DEBTORS TO THE OPENING ALLOCATION PLEADINGS OF THE OTHER CORE PARTIES** |
| | **Goodmans LLP** 333 Bay Street, Suite 3400 Toronto, Ontario M5H 2S7 Benjamin Zarnett LSUC#17247M Jay A. Carfagnini LSUC#22293T Jessica Kimmel LSUC#32312W Peter Ruby LSUC#38439P Joseph Pasquariello LSUC#38390C Tel: 416.979.2211 Fax: 416.979.1234 Lawyers for the Monitor, Ernst & Young Inc. **Gowling Lafleur Henderson LLP** Suite 1600, First Canadian Place 100 King Street West Toronto, Ontario M5X 1G5 Derrick Tay LSUC#21152A Jennifer Stam LSUC#46735J Tel: 416.862.5697 Fax: 416.862.7661 Lawyers for the Canadian Debtors |

\6207362