**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

# TABLE OF CONTENTS

THIS PLEADING..................................................................................................................... 1

THE NORTEL GROUP INSOLVENCY PROCEEDINGS ........................................................... 3

THE EMEA PARTIES AND CLAIMS ..................................................................................... 5

CONTEXTUAL RESPONSE TO CLAIMS .................................................................................. 8

NATURE OF THE GLOBAL NORTEL ENTERPRISE ............................................................. 11
Lines of Business ............................................................................................................. 12
Operational Entities......................................................................................................... 12
      (a)     RPS Entities........................................................................................... 13
      (b)     LREs...................................................................................................... 14
General Management and Administration......................................................................... 15
EMEA Regional Management .......................................................................................... 16
Corporate Governance...................................................................................................... 18

MRDA & DISTRIBUTION AGREEMENTS ........................................................................... 19
The Transfer Pricing Concept .......................................................................................... 20
Cost-Sharing Arrangements ............................................................................................. 22
Development of the RPSM................................................................................................ 23
Implementation of the RPSM .......................................................................................... 25
MRDA .............................................................................................................................. 27
Distribution Agreements .................................................................................................. 36

THE EMEA CLAIMS BY SUBJECT MATTER ...................................................................... 36
"Transfer Pricing" Claims ............................................................................................... 37
      (a)     Transfer Pricing Claims Generally Seek to Avoid the Binding Contracts ............ 38
      (b)     Transfer Pricing Claims Seeking to Adjust Prior Allocations............................... 43
          *i.*    *Vendor Financing* ......................................................................... 43
          *ii.*   *North American Headquarter and Stewardship Costs* ................. 46
          *iii.*  *Restructuring Costs*..................................................................... 49
Claims Relating to Transactions among the Nortel Group Members ............................... 53
      (a)     Inter-Company Loans............................................................................. 53
          *i.*    *Inter-Company Trading Accounts*.................................................. 54
          *ii.*   *MRDA Allocations were properly Recorded in the Inter-Company Accounts* ....... 54
          *iii.*  *Cash Management* ....................................................................... 55
          *iv.*  *Interest and Non-Interest Bearing Loans* .................................. 56
          *v.*   *NN Ireland Loan and Dividend Repayment*................................. 57
          *vi.*  *NN France Loan Payment*........................................................... 59
      (b)     Project Swift and NNIF Reorganization................................................ 60
          *i.*    *NNUK initiated and approved Project Swift*................................. 61
          *ii.*   *Due Diligence by NNUK* ............................................................ 62
          *iii.*  *Valuations* .................................................................................. 63
          *iv.*  *NNIF Reorganization*................................................................. 64
Customer Revenue Claims ............................................................................................... 64
Past Dispositions of Businesses ....................................................................................... 67

ONTARIO (NOT FOREIGN) LAW APPLIES AND NO CAUSE OF ACTION LIES ...................... 69
      (a)     No Breach of Contract or Mistake ........................................................ 71

- 2 -

| | | |
|---|---|---|
| (b) | No Basis for Statutory Oppression Claims | 72 |
| (c) | No fiduciary or other implied duties owed or breached | 74 |
| (d) | No "Enhanced" Duties | 78 |
| (e) | No Conspiracy | 79 |
| (f) | No Unjust Enrichment | 80 |
| (g) | No Breach of Trust | 81 |
| (h) | EMEA Claims are Barred by Prescription/Limitations | 81 |
| (i) | Estoppel, Waiver and Acquiescence | 82 |
| (j) | No Entitlement to other Remedies Claimed | 83 |
| (k) | No Entitlement to any Reservation of Rights | 84 |

FOREIGN LAW CLAIMS ... 84

Foreign Law does not Apply ... 85

Foreign Law has not been Properly Pled or Proven and the Requirements that are Identified cannot be Established ... 85

| | | |
|---|---|---|
| (a) | The Contracts and Documented Arrangements are Unassailable | 86 |
| (b) | The Necessary Element of "Influence" or "Control" under Foreign Law does not Exist | 86 |
| (c) | Claims of "Near Insolvency" are Unsubstantiated | 87 |
| (d) | Additional Defences Under Foreign Law | 88 |
| (e) | Unparticularized Foreign Law Claims | 89 |

PENSION CLAIMS BY EMEA ... 89

Direct Pension Claims against Nortel Canada ... 90

Responses to Direct Pension Claims ... 91

| | | |
|---|---|---|
| (a) | Nortel Canada did not Exercise full Control over the EMEA Claimants (as Shadow-Director, Quasi-Director, Ultimate-Controller, fiduciary or otherwise) | 91 |
| (b) | Elimination of Pension Deficit | 92 |
| (c) | Nortel Canada did not owe a Duty of Care to the Creditors of the EMEA Claimants even if the Nortel Group approached Insolvency | 94 |
| (d) | No Equitable Compensation | 94 |
| (e) | No Oppression | 95 |
| (f) | Foreign Law Claims | 95 |

FSD Claims ... 95

| | | |
|---|---|---|
| (a) | Contribution is not Available | 96 |
| (b) | There is no Unjust Enrichment | 97 |
| (c) | Subrogation is not Available | 97 |

Additional Responses to the Pension Claims ... 98

| | | |
|---|---|---|
| (a) | The EMEA Claimants do not have Standing | 98 |
| (b) | The EMEA Claimants have no Losses or Damage | 99 |
| (c) | Double Proof | 99 |
| (d) | No Deficiencies in the EMEA Schemes | 100 |
| (e) | Limitation Period Expired | 100 |

OTHER CONTINGENT CLAIMS/RESERVATIONS OF RIGHTS ... 100

CLAIMS AGAINST FORMER DIRECTORS AND OFFICERS ... 101

ORDER REQUESTED ... 101

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

# JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

**THIS PLEADING**

1.      This pleading is made pursuant to the Order implementing the Litigation Timetable and

Discovery Plan dated May 15, 2013. It is the response of Nortel Networks Corporation, Nortel

Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International

Corporation and Nortel Networks Global Corporation (the "**Canadian Debtors**") and Ernst &

Young, Inc. (the "**Monitor**") to the particularized proofs of claim filed by the Joint

Administrators,[1] against, in each case, Nortel Networks Limited ("**NNL**") and Nortel Networks

---

[1]     Except in the case of Nortel Networks AG ("**NN Switzerland**") and Nortel Networks AS ("**NN Norway**"), who
filed their proofs of claim (mirroring proofs of claim already filed by other EMEA Claimants) in their own names
because they are not subject to administration orders.
Certain proofs of claim filed by the Joint Administrators also purport to be made on behalf of the "office holders"
of the named EMEA Claimants, but no such officeholders are named, nor is there evidence or assertion of the
authority of the Joint Administrators to act on behalf of any officeholder, and therefore those claims are not validly
made and will not be separately addressed herein. However, without prejudice to that position, the claims are
substantially the same as those made by or on behalf of the EMEA Claimants and are thus fully answered by this
pleading and should be dismissed in any event.

- 2 -

Corporation ("**NNC**"), collectively "**Nortel Canada**"[2], and their (unnamed) former officers and directors ("**EMEA Claims**"). All twenty-one (21) EMEA entities named in the proofs of claim filed are collectively referred to as the "**EMEA Claimants**".[3] This pleading sets forth the grounds, material facts and legal bases relied upon by the Monitor for the disallowance of the EMEA Claims and in support of the request by the Monitor and the Canadian Debtors that this Court dismiss the EMEA Claimants' dispute of the disallowances and dismiss all of the EMEA Claims, with costs. The Notices of Disallowance are incorporated herein and form part of this response. Unless expressly admitted in this pleading, the Monitor and the Canadian Debtors deny all of the assertions set forth in the proofs of claim of the EMEA Claimants and put them to the strict proof thereof.

2.      This pleading asserts the set-off by NNL for overpayments (and necessary Compensating Adjustments as defined and described in more detail hereinafter) involving three of the EMEA Claimants (NNUK, NN France and NN Ireland, each as defined below) under the governing transfer pricing mechanism (the MRDA, described below), as well as other credits in NNL's favour that are reflected in the inter-company accounts.[4] This leaves on a net basis less than $2.5 million owing by NNL to only two of the EMEA Claimants, in contrast with the US$100s of millions owing to NNL on a net basis by the other EMEA Claimants.

---

[2]     To the extent that a proof of claim has been filed in these proceedings by or on behalf of an EMEA Claimant naming any of the other Canadian Debtors, this pleading is a response to those claims (which are identical in all material respects) as well.

[3]     The EMEA Claimants are listed in alphabetical order on **Schedule "A"** hereto. For ease of reference, while Nortel Networks UK Limited ("**NNUK**") will continued to be referred to as NNUK hereinafter, the other EMEA Claimants are sometimes referred to by their country of residence (i.e., "NN Austria", or "NN Belgium") instead of by their corporate name.

[4]     The Nortel pre-filing inter-company balances as between the Canadian Debtors and the EMEA Claimants, with the Compensating Adjustments are detailed in **Schedule "B"** hereto.

- 3 -

**THE NORTEL GROUP INSOLVENCY PROCEEDINGS**

3.       NNC is a Canadian company and one of the Applicants/Canadian Debtors in this proceeding. At the time of the commencement of these proceedings, NNC owned, directly or indirectly, over 140 companies. NNC and its direct and indirect subsidiaries were commonly referred to as "**Nortel**" or the "**Nortel Group**".[5]

4.       NNC is a holding company. The major Canadian operating company in the Nortel Group was NNL which is also a Canadian Debtor.

5.       At its height in 2000, NNC had a market capitalization of approximately US$250 billion. Members of the Nortel Group had customers across the globe and in the aggregate they employed a total of nearly 93,000 employees worldwide.

6.       The burst of the high-tech "bubble" in 2001, followed by increasing competitive pressures in the communications technology industry, as well as legal and regulatory proceedings detrimentally affected the profitability of the business of the Nortel Group. Attempts to solve these challenges were made, but those efforts were ultimately unsuccessful.

7.       On January 14, 2009 (the "**Filing Date**"), the Canadian Debtors filed for and obtained protection from this Court in this proceeding under the *Companies' Creditors Arrangement Act*.

---

[5]     Although the terms Nortel Group or Nortel are used herein to refer to the collectivity of the many different Nortel operating and holding entities, they do not describe a legal entity but a number of affiliated legal entities commonly described in business terms as a corporate group or enterprise. The individual legal entities that were part of this corporate group as of January 5, 2009, prior to the first filing for insolvency protection, have been identified in the corporate chart attached at **Schedule "C"** hereto.

- 4 -

8.      On January 14, 2009 Nortel Networks Inc. ("**NNI**"), a U.S. corporation and several of its U.S. affiliates[6] (collectively, the "**U.S. Debtors**") which were all members of the Nortel Group, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") for protection under chapter 11 of Title 11 of the U.S. *Code*.

9.      NNUK, on behalf of itself and fifteen (15) of its European subsidiaries, together with three (3) of its European affiliates, including Nortel Networks France S.A. ("**NN France**"), Nortel Networks France SAS ("**NN SAS**") and Nortel Networks Ireland ("**NN Ireland**")[7] (these nineteen European Nortel filing entities being collectively referred to as the "**EMEA Debtors**"), all of which were members of the Nortel Group, were granted administration orders in the U.K. on January 15, 2009, under the U.K. *Insolvency Act 1986,* pursuant to which joint administrators were appointed (the "**Joint Administrators**").[8]

10.      The U.K. administration orders were supported by and predicated on evidence under oath attesting to NNUK's autonomy and control of the corporate management and decision-making for the EMEA Debtors from England. Those representations enabled the EMEA Debtors to use England as the single jurisdiction and venue for their insolvency administration proceedings, and the U.K. administration orders have since been recognized by the U.S. Court, in reliance upon the same underlying factual predicates.

---

[6]    Nortel Networks (CALA) Inc. ("**NN CALA**") subsequently filed a voluntary petition on July 14, 2009.

[7]    NNUK, NN France and NN Ireland were the EMEA "Participants" in the residual profit split method (referred to as the "**RPSM**") provided for under the MRDA and are also referred to in this pleading as the "**EMEA RPS Entities**".

[8]    NN Switzerland and NN Norway are both European entities that filed proofs of claim but they did not file for administration orders. They are represented by the counsel representing the EMEA Debtors.

- 5 -

11.     In the result, there are three main estates (the "**Estates**") under insolvency proceedings: (i) the Canadian Debtors, (ii) the U.S. Debtors, and (iii) the EMEA Debtors.[9]

**THE EMEA PARTIES AND CLAIMS**

12.     The EMEA Claimants make claims in their various capacities as direct and/or indirect subsidiaries and/or professed creditors against both NNC (the ultimate parent company) and NNL. NNL is the direct shareholder of NNUK, NN France and NN Ireland. The remaining EMEA Claimants are all indirect subsidiaries of NNUK through its holding company Nortel Networks International Finance & Holding BV ("**NNIF**")[10]. All of the EMEA Claimants are located in an operating region known as Europe, the Middle East and Africa ("**EMEA**").

13.     The Joint Administrators have filed more than one hundred and eighty (180) proofs of claim on behalf of the EMEA Debtors. An additional six (6) similar proofs of claim were filed in 2012 on behalf of NN Switzerland and NN Norway.

14.     Despite having been required to provide particulars, the EMEA Claims remain vague and devoid of specific supporting factual allegations and any reasonable identification or quantification of alleged losses.

15.     The EMEA Claims seek to unwind years of corporate dealings by asserting claims variously characterized as claims for breach of fiduciary and other duties (including as "shadow director", "*de facto* director" and ultimate controller), oppression, breach of contract, mistake, unlawful or unconscionable receipt, debt, and breach of pension funding obligations, all made

---

[9]   Certain other Nortel subsidiaries also filed for creditor protection in their local jurisdictions. For example, on May 28, 2009, NN France commenced secondary proceedings pursuant to which an administrator and liquidator have been appointed by the Versailles Commercial Court.

[10]   Except NNSAS which is an indirect subsidiary of NN France.

- 6 -

under domestic law and purportedly under foreign law as well. In other words, the EMEA Claimants seek to rely on any cause of action known to any law to see what "sticks".

16.    Further, the EMEA Claims purport to include broad reservations to expand or supplement this panoply and to advance contingent or future claims still not identified, and while making all of these claims they also purport to reserve future challenges to the Ontario Superior Court of Justice's jurisdiction to adjudicate the claims.[11]

17.    At the core of the EMEA Claims, notwithstanding the myriad of permutations and characterizations in them, is the allegation that the EMEA Claimants were in some manner controlled, oppressed or taken advantage of by NNC and NNL, as the 100% ultimate shareholders of the EMEA Claimants, resulting in the siphoning off of hundreds of millions of dollars from the EMEA Claimants, and that there should be massive payments and/or transfers of assets from the estate of the Canadian Debtors to the EMEA Claimants, not only as reparation, but on some proprietary (and therefore, priority) basis.

18.    The vast majority of the complaints are in respect of, or the result of, the contractually agreed upon and duly authorized transfer pricing arrangements that governed the Nortel Group from January 1, 2001 to the present, in which the EMEA Claimants fully participated. The EMEA Claimants allege that the transfer pricing arrangements developed by outside professionals,

---

[11]    The Ontario Court has already ruled on its jurisdiction, most recently in paragraphs 34 to 39 of Reasons for Decision released April 3, 2013, and corresponding Orders of the same date, but also in its prior Orders, including those dated July 30, 2009 (Claims Procedure), September 16, 2010 (Claims Resolution), and January 14, 2011 (EMEA Claims Procedure). Thus, jurisdictional questions are not being addressed in this pleading. In any event, the filing of the EMEA Claims without acceptance that this Court is the appropriate forum with jurisdiction over the claims is improper. The EMEA Claimants have waived any argument to that effect and are bound by the Court's ruling in this regard. Further, this Court is in fact the appropriate forum and has jurisdiction over these claims by virtue of the authority established under the CCAA and the initial Order of this Court dated January 14, 2009 (as supplemented and amended). In the alternative, all rights of response to any challenges to the Ontario Court's jurisdiction are reserved.

- 7 -

encouraged by taxation authorities, applied in the annual tax filings, codified in formal, binding contracts among the Nortel participants (including all the EMEA Claimants), which were carried out by all these participants (including all the EMEA Claimants) without challenge and without complaint were not "fair" to them and were designed and implemented so as to deprive the EMEA Claimants of hundreds of millions of dollars to the benefit of one or both of NNL and NNC.[12]

19.     A fundamental tenet of the EMEA Claims is to portray the EMEA Claimants as exploited, powerless puppets of Nortel Canada. This position is taken despite the significant independence and sophistication of the EMEA Claimants and the professional advice of which they availed themselves and despite the many years of their having operated without complaint within the Nortel Group under the structure, agreements and arrangements that governed the Nortel Group, having taken the benefit of that structure and those agreements and arrangements, and having themselves acted in reliance thereon. Without that structure, the EMEA Claimants would not have existed let alone enjoyed the benefits that accrued to them as members of the Nortel Group. The attacks now made are a disingenuous attempt by the EMEA Claimants to 'cherry pick' from Nortel's history, to keep the benefits they obtained by participating in that structure and those agreements and arrangements and opportunistically seek to reverse any aspect of them which now seem inconvenient to them (including, in some instances, transactions that were vetted at the time by the same professional advisors who continue to advise the EMEA Claimants now). There is no legal principle, under any applicable law, which allows the EMEA Claimants to do this.

---

[12]    They also complain of other contractual transactions, such as sales of business and intercompany loans, long since performed and accounted for under the transfer pricing arrangements, also without prior complaint. They make similar claims against the U.S. Debtors.

- 8 -

**CONTEXTUAL RESPONSE TO CLAIMS**

20.    The facts categorically belie the manner in which the EMEA Claimants seek to characterize the Nortel Group. The EMEA Claimants, although ultimately 100% owned by NNL and NNC, nonetheless had substantial autonomy and were not victims of abuse by NNC or NNL. While the EMEA Claimants did operate as part of an integrated global enterprise, they were properly constituted corporate entities and were governed by their own boards of directors and management.

21.    Each EMEA Claimant was fully cognizant of, and supported, the agreements and operational arrangements with other Nortel Group members, and enjoyed the benefits to which it had any reasonable and legal expectation from being a member of the Nortel Group. NNUK, in particular, was a sophisticated company that 100% owned all but two of the other EMEA Claimants, and had management oversight and responsibility for the entire EMEA Region (defined below). The EMEA Claimants were managed by a combination of local and regional management in the U.K. and their individual countries, not by NNL or NNC.[13]

22.    The purported complaints were not asserted by the EMEA Claimants during the operational years of the Nortel Group because they had no basis for doing so. They are revisionist fiction.

23.    At a very general level, it is apparent that the EMEA Claims suffer from three major mischaracterizations of historical reality:

(a)    they either ignore or misconstrue the valid, binding and fundamental agreements that governed the parties and upon which their dealings with taxation authorities in three jurisdictions were predicted (including recent dealings which recognized and

---

[13]    This regional management was an important part of the organizational structure that also included lines of business and operations that were managed without regard to geographic boundaries, as discussed below.

applied the foundational transfer pricing contracts that the EMEA Claimants seek to avoid);

(b)    they ignore the realities of the separate corporate entities with active, functioning boards of directors and management and how those companies operated within the larger corporate enterprise;

(c)    they make claims predicated on assertions that ought to have been raised long before the proofs of claim were filed (and would have been if they were valid), that are inconsistent with their conduct, and that are contrary to any reasonable expectations they could have held during the operative years.

24.    The Canadian Debtors and the Monitor deny each and every EMEA Claim, whether or not they are specifically addressed in whole or in part herein. Each EMEA Claim is unfounded in fact and in law, and should be disallowed or dismissed. The Canadian Debtors and the Monitor put the EMEA Claimants to the strict proof of each of the EMEA Claims and each of their requisite elements.

25.    This pleading supplements the Notices of Disallowance issued by the Monitor in respect of the EMEA Claims. The Notices of Disallowance are relied upon in addition to, and are incorporated by reference into, this pleading, and the bases for disallowance set out in the Notices of Disallowance are maintained and not waived, abandoned or superseded by virtue of this pleading, notwithstanding that they may not be expressly pleaded herein. Further, the Canadian Debtors and the Monitor reserve, and do not waive, their right to have particularization of the EMEA Claims and/or to seek their disallowance or dismissal in whole or in part by reason of not setting out a reasonable cause of action or claim, being subject to summary disposition, not being

- 10 -

sufficiently or properly pleaded or particularized, being frivolous, prolix or vexatious and/or failing to comply with the requirements for Proofs of Claim in this proceeding or the requirements for pleading.

26.    With respect to the EMEA Claims that allege loss or damage to creditors or other third parties, even if they were valid, which they are not, those claims do not belong to the EMEA Claimants or the Joint Administrators.

27.    With respect to the purported reservations of rights in the EMEA Claims for future, contingent or unidentified claims, if these claims have not been identified or materialized by now they must be treated as unascertainable and dismissed. Further, a claims bar date of March 18, 2011[14] was established by Order of this Court. That date has long since passed. Only those claims that have actually been asserted with particularity, and not under any reservation of right, may be pursued, subject to their having met all other pre-conditions for consideration by this Court. If proven, they are subject to the established priorities of any payments out of the Canadian Estate and a set-off for the amounts established to be owing by the EMEA Claimants to NNL, including without limitation by NNUK, NN France and NN Ireland on account of the retroactive transfer pricing adjustments imposed under the agreements which the U.S. and Canadian tax authorities reached in 2011 that adjusted the entitlements of NNI in its favour, which pursuant to the MRDA results in corresponding reductions to the entitlements of NNUK, NN France and NN Ireland.

28.    The Monitor and the Canadian Debtors object to the EMEA Claimants' attempt to characterize their claims as proprietary, as an apparent means of improving their Allocation

---

[14]    This claims bar date applied to all EMEA Claimants except NN Switzerland and NN Norway, which had a claims bar date of September 7, 2012.

- 11 -

Position. Quite the opposite, the EMEA Claims should have no impact on the relative entitlements of the Estates to sale proceeds from asset dispositions, nor anything to do with the EMEA Claimants' ownership interests in the assets disposed of in those sales. Nor should the EMEA Claimants' attempt to intermingle these positions change the ultimate determination (and dismissal) of the EMEA Claims.

**NATURE OF THE GLOBAL NORTEL ENTERPRISE**

29.     To properly appreciate the structure and reality of the Nortel Group it is necessary to understand the nature of the Nortel business, its fundamental drivers and functions and how those drivers and functions led to the agreements and arrangements that governed its structure and organization.

30.     The Nortel Group traces its origins back to Northern Electric and Manufacturing Company Limited, incorporated in the 1890s as an equipment provider for Canada's then-nascent telephone system. In more recent times, the Nortel Group was focussed on the development and provision of software and hardware technology solutions for telecommunications environments. These included wireless communications, data transmission networks, wired communications, internet technology, communications software and other high-technology products and services in the communications field.

31.     The Nortel Group operated in a manner wholly consistent with appropriate governance of a complex, sophisticated multinational organization, wholly-owned by one public company as the ultimate parent, accountable to its shareholders.

- 12 -

### *Lines of Business*

32.     Nortel had a matrix organizational structure with the 'lines of business' ("**LOBs**"), "**Regions**" and "**Global Operations**" being the three major functions that overlaid the corporate structure and were responsible for the end-to-end delivery of all of Nortel's products and services. All Nortel member companies, including the EMEA Claimants, actively, willingly and deliberately participated in, contributed to and benefitted from the matrix nature of the Nortel Group's operations.

33.     The LOBs prepared budgets in conjunction with the Regions based on their anticipated revenues and forecasted expenditures in the different Regions where their product lines were sold. The Regions were responsible for the direct customer interactions and selling to the Nortel Group customers around the world. Global Operations was responsible for the manufacturing, delivery, installation and post-sale support of the products and services.[15]

34.     In addition, the Nortel Group had a finance function that supported its members. Finance was broadly split into two main areas: Finance Planning and Analysis was the part of the finance function that supported the various LOBs, Regions, Global Operations and other functions, and Compliance was made up of the financial control, treasury and tax functions which also supported the various groups.

### *Operational Entities*

35.     Two types of operational entities can be identified within the Nortel Group: (i) companies that engaged in entrepreneurial, risk-taking activities focused on research and development

---

[15]    While the organization of the lines of business changed over time, business decisions were consistently driven by the lines of business. Business decisions were not dictated from Canada on high. All of the RPS Entities and certain LREs had representation at the line of business management level.

("**R&D**") of technology in the highly competitive high-tech industry, and (ii) companies that performed routine, low-risk operations and distribution of products and services.

36.     Nortel was a technology company in a very competitive industry with value that was primarily driven by R&D activities, as set out in more detail below. At the time of the insolvency filings, the R&D function was carried out by five of the Nortel companies: NNL, NNI, NNUK, NN France and NN Ireland. For reasons described below, those five entities are known as Residual Profit Share Entities or "RPS Entities". The RPS Entities also carried out distribution, administration and/or other functions and, for a time, manufacturing.

37.     Other members of Nortel did not contribute to the R&D functions, but carried out the low-risk distribution function: they can be characterized as Limited Risk Entities or "**LREs**". The EMEA Claimants other than the EMEA RPS Entities (NNUK, NN France and NN Ireland) are principally LREs.

(a)     *RPS Entities*

38.     Nortel's strength historically lay in its ability to research, design, install and deploy innovative telecommunication solutions. The key driver of the Nortel business was high-tech R&D leading to the creation of its intellectual property ("**IP**"). Nortel's continuing and extensive investment in R&D was at the core of its success. From its inception, Nortel made many technological discoveries. It applied that knowledge to the design, development and deployment of innovative communications products, systems and solutions.

39.     Accordingly, Nortel's operating structure and philosophy emphasized eliminating R&D duplication and encouraging innovation and risk-taking in R&D to develop leading edge technology products.

40.    The RPS Entities, in the aggregate, invested billions of dollars in R&D over the years. They bore the risks of this investment, and stood to share the future returns on it.

41.    R&D within the Nortel Group was undertaken by a combination of in-house developers and external alliances, partnerships and joint ventures. Functionally headquartered in Ottawa, the global R&D team carried out internal R&D in ten key centres in Canada, the U.S., the U.K., Ireland and France (by the RPS Entities), as well as in other locales, and through joint ventures and outsourcing arrangements.

42.    The RPS Entities were also able to perform distribution activities, and they had technical and other regional sales/marketing personnel who supported the sales effort in all geographic Regions. No one RPS Entity could provide all functions so they supported each other and were supported.

        (b)    LREs

43.    While the LREs were responsible for the sales and distribution activities within their local markets, their activities were generally limited to:

- •    performing sales and support services;
- •    analyzing local market conditions and supplying local market information;
- •    distributing Nortel products in the local market; and
- •    installing Nortel products on client premises.

44.    The LREs undertook a minimal amount of marketing strategy and development activities. Their efforts were guided by the strategic marketing plan developed by the LOBs, which, in turn received input from each Region (thus, with input from the EMEA marketing and sales group in

- 15 -

any particular LOB). The regional senior management facilitated the revenue-generating activities of the LREs with a view to their long-term success.

45.     Each LRE was responsible for employing a front line sales team to manage the sales process and service the customers in their geographic location.

46.     Due to the highly technical nature of the Nortel products, Nortel typically established technical teams of experts (e.g., Market Support Groups ("**MSGs**") and Product Line Management Groups ("**PLMs**")) for each product group, whose role was to support the front line sales teams/customer service teams in the pre-sales and after-sales stages of the selling process, providing both technical and marketing support. These MSG/PLM teams did not lead the sales effort, but acted as a support function. These support teams were co-operative organizations housed in various different legal entities and territories. The technical experts in the MSG/PLM groups performed the more complex and technical aspects of the customer service and support functions. These MSG/PLM product-specific teams provided a full range of product and service support to the operating entities.

*General Management and Administration*

47.     Each Nortel entity was responsible for performing general management and administration ("**G&A**") activities relative to its operations.  NNL, NNI, NNUK and NN France all performed headquarter activities and G&A activities in support of the entire Nortel Group. Headquarter and G&A activities included finance, treasury, public reporting, information systems, training, human resources, legal and internal audit.  NNL also performed certain head office functions which were not duplicative of the headquarter functions.

48.    The Nortel Global Treasury team was comprised of both central and regional treasury professionals, and was responsible for global cash, investment and liquidity management, risk management, inter-company funding, compliance and related functions.

49.    Regional treasury teams worked directly with the business and regional finance professionals to understand and support each Nortel entity's local financing requirements, performance bonding requirements, and short-term cash and investment management and managed, known foreign exchange risk through hedging. Cash flow forecasts were developed within the region allowing regional treasury to effectively identify and manage currency and liquidity risk.

50.    Global inter-company funding was coordinated and managed centrally for the Nortel Group. Funding structures were designed to ensure efficient use of liquidity based on local cash needs, cross border tax and legal considerations and regulatory considerations. All intercompany loans were fully documented. A group of companies operating across international borders would be expected to have global treasury, tax compliance and other functions such as these, designed to benefit all entities in the group and reduce their overall cost of funds.

### EMEA Regional Management

51.    The EMEA Claimants' dealings with each other were both regional and product based. They were wholly-owned (directly or indirectly) by NNUK (except for NN France and NN Ireland).  Each of them was overseen by NNUK. NNUK acted largely autonomously in this regard. NNUK was by far the largest operating entity of the EMEA Claimants, and had the widest coverage of Nortel business segments. Nortel was a matrixed organization that operated through

the LOBs and operational entities and was supported by a number of centralized functions. No single region had the resources or infrastructure to be completely stand-alone.

52.     The EMEA Region had its own president and "cabinet". As the headquarters and centre of operations for the EMEA Claimants, NNUK's senior management team also served as the senior management for the EMEA Region ("**EMEA Senior Management**") and had primary responsibility across EMEA for the co-ordination among the EMEA Claimants of the following functions:

- sales
- finance
- human resources
- legal matters
- customer dealings

53.     NNUK had a significant role in the setting of strategy for the EMEA Region and managing its inter-company accounts and supply chain. NNUK had its own corporate services personnel responsible for finance, human resources, legal, compliance, information technology and real estate. The majority of EMEA senior tax, legal, treasury, control, accounting and finance functions were based in NNUK, including for NN France and NN Ireland.

54.     Of the Global Treasury team's 53 employees, 11 were employed by NNUK as of December 2007, including the Director of Global Treasury Operations.

55.     NNUK's treasury group managed the inter-company loans to EMEA Claimants and EMEA inter-company lending arrangements. NNUK and NNIF also provided funding for the EMEA Region businesses.

- 18 -

56.    In summary, the EMEA Claimants operated with a large degree of autonomy from NNL and NNC, notwithstanding the 100% ultimate shareholding of the EMEA Claimants by NNL and NNC. The EMEA Region in conjunction with the LOBs, set its own policies, procedures, budgets, targets and operational objectives and those were the parameters within which the EMEA Claimants individually operated.

57.    All of this is consistent with the evidence of senior NNUK personnel that was adduced by the Joint Administrators in the U.K. proceedings and before the U.S. Court:

- All the key functions required for the operation of the EMEA Region were located in and carried out by NNUK.

- EMEA operated with a large degree of autonomy from Canada, with its own policies, procedures, budgets, targets and operational matters.

- Policies were set on a global basis, but adherence to them by the EMEA Claimants was implemented by NNUK or the EMEA Claimants themselves.

- The EMEA Senior Management exercised control and authority over the EMEA Region through a global decision-making approval procedure and policy.

- This approval procedure was implemented and governed by a process devised by EMEA Senior Management, called the "OCA Process".

- Senior management at NNUK was required to operate from and live in England.

- NNUK also provided services, expertise and leadership for the other companies in the Nortel Group.

### *Corporate Governance*

58.    Each EMEA Claimant was a separate legal entity from the Canadian Debtors, with its own board of directors and management (either directly or through NNUK), with access to independent legal and other professional advice. Each EMEA Claimant that entered into any agreements that are the subject matter of the EMEA Claims did so deliberately, knowingly and by virtue of its own authority.

- 19 -

59.    Each EMEA Claimant's board of directors was responsible to meet, act and give due consideration to the affairs of the company in accordance with its governing laws, monitor management's operations and actions, and review and duly consider, where applicable, the agreements, arrangements, protocols and policies under which that company participated in the Nortel Group.

60.    Each EMEA Claimant's board of directors was autonomous and did not act simply based on instructions from Nortel Canada.

61.    The Nortel Group was structured to optimize the contributions of each company to the interests of Nortel as a whole, and to avoid duplication of effort and resources. To the extent that, as the EMEA Claimants allege, decisions were made by them, including by their management or through their boards of directors, that considered the welfare and interests of NNL or the Nortel Group as a whole or other entities within it, such considerations and decisions were entirely proper and it was in the EMEA Claimants' interests to do so.

**MRDA & DISTRIBUTION AGREEMENTS**

62.    At the heart of the EMEA Claims are complaints regarding the implementation of Nortel's transfer pricing arrangements under the "Master R&D Agreement" ("**MRDA**") and various distribution agreements ("**Distribution Agreements**"), described in more detail below.

63.    It is important to understand the background of the Nortel transfer pricing arrangements and the MRDA and Distribution Agreements in order to put the EMEA Claims into the proper historical, and operational, perspective.

- 20 -

*The Transfer Pricing Concept*

64.     The underlying premise of transfer pricing methodologies is to price transactions and/or allocate profit and loss among non-arm's length entities, such as the Nortel Group members, in accordance with accepted principles that establish prices and/or profit and loss allocations on a basis that approximates what would be achieved if they been operating under the same or in similar circumstances at arm's length. Thus, transfer pricing structures institute pricing and profit(loss)-sharing arrangements that approximate those which would have been achieved by unrelated parties with similar functions, risks and assets. As such, they are designed to establish fair and reasonable method of allocating profits and losses (based on functions, risks and assets) amongst related entities in a manner consistent with what a similarly situated third party would earn.

65.     Transfer pricing mechanisms, on the one hand, help ensure that a taxing jurisdiction is not disadvantaged by the ability of related entities to transact so as to reduce tax liabilities that would otherwise arise if the transactions were between arm's length parties, and on the other hand help ensure those businesses are not unfairly double-taxed on the same amounts by more than one taxing jurisdiction by attributing an arm's length amount earned and taxed in each aforesaid jurisdiction. Accordingly, transfer pricing arrangements within a multi-national corporate enterprise such as Nortel, are developed and are subject to thorough review and scrutiny by specialized experts and the tax authorities.

66.     Upon request, certain tax authorities may agree to enter into an "advance pricing agreement" ("**APA**"), after close consideration of the appropriateness of the transfer pricing arrangements to determine whether they meet the governing transfer pricing principles and

standards.[16] (An APA is not required, but when available, provides comfort to the business that, if it complies with the transfer pricing arrangements agreed to in the APA by the tax authority, the resulting inter-entity pricing and/or income (or loss) allocation will be considered by that tax authority as being acceptably equivalent to that which would arise from an arm's length relationship.) Tax authorities from multiple jurisdictions can be party to the same APA or their own APAs, giving the taxpayer comfort that none of those jurisdictions will challenge the transfer pricing results and hence there will be no double taxation.  Tax authorities that are not party to an APA may defer to the integrity of a transfer pricing method and resulting intercompany profit/loss on the basis that there is an APA for that intercompany transaction entered into by another tax authority and may implicitly affirm the transfer pricing method by accepting a taxpayer's tax filings based on that method, or may challenge the transfer pricing method employed as well as the resulting profit/loss.

67.    As a large multinational enterprise with LOBs across international boundaries and corporate lines, Nortel developed, and operated under, a comprehensive transfer pricing arrangement. This was for the purposes of both establishing a method of allocating the financial benefits and losses, as the case may be, of the Nortel Group's businesses amongst the companies in the Nortel Group, and determining profit, loss and other financial results to be reported for the purpose of each entity's filings with the pertinent tax authorities.

68.    Indeed, from the mid-1970s, Nortel dedicated substantial internal resources and engaged independent transfer pricing professionals to develop appropriate transfer pricing arrangements in accordance with the international transfer pricing standards and the requirements of the tax

---

[16]    An APA is proposed by the company but independently assessed by the taxation authorities. They often negotiate between themselves without involvement of the companies.

- 22 -

authorities in numerous countries. The transfer pricing arrangements were updated over time to appropriately reflect the underlying changes to, and growth of, Nortel's business and structure. The transfer pricing arrangements that were in place were designed to deal with the transactions that the EMEA Claimants now seek to impugn.

*Cost-Sharing Arrangements*

69.     Nortel's first transfer pricing regime was based on a cost-sharing methodology. This is a recognized transfer pricing methodology by which the participating non-arm's length entities agree to an allocation among them of certain types of costs relating to activities from which all of them benefit. The allocation is done on a basis that is intended to reflect a sharing of costs that would exist among arm's length entities engaged in a similar enterprise (i.e. based on the expected risks and benefits from the arrangement).

70.     More particularly, by the mid-1990s each of the RPS Entities (then referred to as "cost sharing participants") had entered into Research and Development Cost Sharing Agreements ("**R&D CSAs**") requiring them to allocate and share the costs of the aggregate R&D of the RPS Entities, regardless of whether one company's own respective R&D resulted in the successful production of Nortel technology. Pursuant to the R&D CSAs, NNL (then called Northern Telecom), as owner of the Nortel IP, also granted the other RPS Entities licences to exploit the IP within their respective territories, subject to the cost-sharing obligations. The cost sharing allocation regime was the subject of three separate APAs[17] with the U.S. Internal Revenue Service ("**IRS**") and what is now the Canada Revenue Agency ("**CRA**").

---

[17] Dealing with Headquarter expenses, R&D cost sharing and tangible inventory property.

- 23 -

71.     The cost sharing regime was the product of detailed analysis and expert professional advice from a leading U.S. transfer pricing firm, Horst Frisch Incorporated ("**Horst Frisch**"). It was applied by the various Nortel Group entities for the many years when it was in effect. It was accepted as an appropriate methodology for the time period it covered by the various tax authorities who had jurisdiction over the Nortel Group entities, including the IRS, the CRA and the English taxation authority, Inland Revenue.

### *Development of the RPSM*

72.     Various acquisitions from 1998 through 2001 introduced complexity in the application of the existing R&D cost sharing methodology under the R&D CSAs. The tax authorities encouraged the development of a new allocation regime. In 2000, therefore, Nortel began an analysis to replace the existing cost sharing regime and the three APAs with a single, comprehensive and more administrable APA that reflected changes in the business.

73.     The IRS specifically encouraged the use of a residual profit split method as the most appropriate transfer pricing methodology for the new Nortel. The CRA concurred.

74.     In 2002, Nortel again retained Horst Frisch to provide independent, professional advice on the most appropriate transfer pricing methodology for Nortel. Horst Frisch studied the evolving Nortel enterprise in detail, and considered several different methods of evaluating inter-company transactions on an arm's length basis. They conducted an extensive assessment and analysis, including as to the nature and diversity of Nortel's businesses, the inter-connectedness of the Nortel entities across geographic boundaries and the relative contributions of the Nortel participants to its various global functions and operations.

- 24 -

75.     The mandate of Horst Frisch included a review of the historical transfer pricing methodologies and the prior APAs for the Nortel Group and, most significantly, making a recommendation of "the best methodology for a new, comprehensive and more administrable APA". The contemplated new and comprehensive regime was to replace the prior one and was described by Horst Frisch to "cover all primary intercompany transactions consisting of:

(a)     intangible property transfers among the pre-2000 R&D cost sharing participants;

(b)     tangible property transfers among former cost sharing participants and related party distributors; and

(c)     global headquarter services provided by certain Nortel entities."

76.     This undertaking ultimately lead to the issuance by Horst Frisch of its report entitled "Economic Analysis of Nortel Networks' Intercompany Transactions", dated March 14, 2002 (the "**Horst Frisch Report**").

77.     The Horst Frisch Report considered the recognized alternative transfer pricing methodologies and whether they were appropriate in the specific context of the Nortel Group. It concluded that the residual profit split method was "the best method to be used to allocate income or loss among the various Nortel entities". Horst Frisch accordingly recommended this method as the go-forward transfer pricing methodology for Nortel.

78.     The residual profit split approach, as noted above, had also been specifically encouraged by the IRS as the most appropriate approach for Nortel. As CRA later articulated, the residual profit split approach was the most suitable means of establishing arm's length transfer prices for Nortel's intercompany dealings, "given the overall complexity of Nortel's intercompany transactions, the

- 25 -

high degree to which they are integrated, coupled with the sheer volume of transactions occurring over the period of examination....".[18]

79.     Under a residual profit split methodology, a determination is made as to the key profit driver of a business. The contribution of each entity to that profit driver is then assessed. Where there are also more routine functions, generally of a lower-risk nature, these are compensated on an appropriate basis. The residual profit remaining after compensating for the routine functions is split among the contributors, using the value driver as a basis for allocation. In the case of Nortel, that value driver was R&D/technology. As such, the RPS Entities that performed R&D and developed IP were entitled to a proportionate economic interest in the revenues generated from the exploitation of Nortel's IP, whereas the LREs had limited non-operational risk and therefore a capped return.

*Implementation of the RPSM*

80.     In simplified terms, the residual profit split method designed specifically for Nortel (previously identified as the RPSM) resulted in (i) routine functions, such as sales, administration, distribution and similar functions being identified and compensated with routine returns commensurate with their functional asset and risk profiles, and (ii) residual operating profits and losses of the business being allocated to the relevant entities according to their relative contributions to the key profit driver, R&D/technology.

81.     With the key profit driver in the Nortel undertaking being the ongoing development of IP, the amount spent on R&D activity ("**R&D Spend**") was the key relevant indicator of a particular RPS Entity's contribution.

---

[18]    CRA Position Paper September 30, 2008 on p. 9.

- 26 -

82.    The Horst Frisch Report recommended implementing the RPSM in two steps. First, using the comparable profits method, routine returns (at market rates) would be determined for: (i) the distribution functions of the LREs, and (ii) the distribution, manufacturing and other routine functions of the RPS Entities. Second, a profit split methodology would be applied to allocate the residual economic profit (or loss) among the RPS Entities based on the ratio of the capitalized value of each RPS Entity's R&D Spend to the capitalized value of the total R&D Spend of the RPS Entities ("**R&D Capital Stock**").

83.    Accordingly, the RPSM was designed so that each RPS Entity's annual share of the total economic profit or loss equalled the sum of (i) the RPS Entity's routine return for distribution, manufacturing and other routine functions (if any), and (ii) its share of the residual operating profit or loss based on its R&D contribution. The difference, if any, between each RPS Entity's adjusted operating earnings or loss before applying the RPSM and its allocation under the RPSM would determine whether any "true up" payments were required among the Nortel entities to adjust actual profits over a period to those determined by the RPSM.

84.    For purposes of initially applying the RPSM, consistent with the Horst Frisch Report, the current value of Nortel's intangible property was determined by capitalizing and amortizing historic R&D expenses to determine the opening values of the R&D Capital Stock (i.e., for 2001), with a view to ensuring that they properly reflected each RPS Entity's historical contribution to R&D. These opening values were arrived at after thorough analysis by Horst Frisch and Nortel, and were agreed to by each of the RPS Entities.

85.    The initial R&D capital stock recognized each RPS Entity's historical net payments under all previous cost sharing agreements, including the R&D CSAs, and the historical R&D Spend of

companies that Nortel had acquired. Going forward, the R&D Capital Stock was calculated annually using a 30% amortization rate on historical R&D Spend.

86.     Subsequently, in order to better reflect the evolution of the market to ever increasing  rapid changes in technology, the RPSM was amended, effective in 2006, replacing the "R&D Capital Stock" with the "RPS Percentage", which reflected a five-year rolling average of each RPS Entity's previous spending on R&D.

87.     As noted, the RPSM first allocates a return for routine functions. The routine return attributable to each RPS Entity and each LRE is deducted before determining the amount of residual profit to be allocated among the RPS Entities. Until 2005, these functions included distribution and manufacturing. Due to changes in business, routine returns were no longer provided for manufacturing after 2005 since Nortel had by then outsourced virtually all of its manufacturing. A return for distribution continued to be provided, although the mechanics were adjusted after 2005, and the RPS Entities received a return on excess expenses related to global operations (selling, general and administration expenses).

88.     The LREs were compensated on an appropriate basis for their routine low-risk (mainly distribution) activities, pursuant to Distribution Agreements that provided a fixed percentage return of sales using a benchmark exercise involving third parties that was periodically reviewed and set under the governing contracts.

## MRDA

89.     The MRDA is the key contractual document which describes, confirms and defines the RPSM. Although the parties in fact operated under the RPSM from January 1, 2001, the formal documentation of their agreement to do so – the MRDA – was finalized and dated

- 28 -

December 22, 2004. The MRDA was duly executed and entered into by the relevant members of the Nortel Group, including NNL, NNI, NNUK, NN France and NN Ireland (each a "**Participant**" within the meaning of the MRDA).[19]

90.    Accordingly, since January 1, 2001, the RPS Entities, being the Nortel entities that contributed to the development of Nortel's IP, have been governed by the residual profit split and allocation regime under the MRDA and the RPSM adopted thereunder, as amended from time to time, and have conducted themselves in their business dealings with each other, in their statutory filings and with the tax authorities in accordance therewith. Furthermore, their boards of directors approved their financial statements prepared based on the transfer pricing and other terms of the MRDA and RPSM.

91.    Reflecting the recognition within the Nortel Group that the quantum of R&D Spend of members of the Nortel Group was the appropriate measure to ascertain the respective shares of residual profits or losses derived from the use of IP in their operations of the business, the preamble of the MRDA stated:

> ...each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted *and that the residual profit split methodology (RPSM) is the best arm's length measure*, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;[20]

92.    Each of the Participants, including NNUK and NN France, also expressly agreed that:

> WHEREAS Participants acknowledge that as a result of a collective review by the Canadian Customs and Revenue Agency, the US Internal Revenue Service, and

---

[19]    Nortel Networks Australia Pty Limited ("**NN Australia**") also entered into the MRDA when it was originally executed. NN Australia no longer operates under the MRDA, having exited therefrom.

[20]    All italics in excerpts is by way of emphasis added.

the UK Inland Revenue (collectively, the "Revenue Authorities") regarding the application of the RPSM, *the calculation of the RPSM as set forth in Schedule A may be amended which amendments would require the consent of the Participants*;

. . .

**Article 3 – R&D Activity Payments** (a)    For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)    *Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Schedule A as representing such Participant's share of the R&D Allocation.*

(c)    The R&D Allocation will be computed pursuant Schedule A which sets forth the basis of the RPSM as originally proposed to the Revenue Authorities. The Participants understand that the RPSM is the subject of review, discussions and negotiations with the Revenue Authorities. *The Participants agree to amend this Agreement and to adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation.*

(d)    NNL agrees to administer this Agreement and the determinations under the RPSM as contemplated in this Agreement with respect to its interest and the interests of the Participants, and in particular, to compute the amount of any R&D Allocation to, and payment due from, each Participant on a periodic basis. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in Schedule A. *Any payment to, and payment from, a Participant will be reflected in the intercompany accounts of the affected Participant as a payable or a receivable, whatever the case may be and may be netted pursuant to the standard NNL practice for managing inter-company accounts.*

(e)    Each Participant and NNL, in its capacity as described in (d) above, agree to keep clear and accurate records to support the calculations under the RPSM as set forth in Schedule A. *Each Participant and NNL, in its capacity as described in (d) above, shall provide to each other, upon request in such form as may reasonably be requested, documentation with respect to the foregoing. Each Participant shall have the right to examine and audit, during normal business hours all such records and accounts as may under recognized accounting practices contain information bearing upon the amounts payable under this Article 3. Prompt adjustment shall be made by the appropriate Participant in order to correct any errors or omissions disclosed by an examination or audit.*

. . .

**Article 14 – General Provisions**

. . .

**Article 14** (d)    *In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.*

. . .

- 30 -

**Article 14** (f)     *This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.*

. . .

<u>Schedule A</u>

**Calculation of Arm's Length R&D Allocation to each Participant**

The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy and to provide clarity as to how each Participant is to be compensated under this Agreement.

In 2002, Nortel made a submission to Canada Revenue Agency ("CRA"), the Internal Revenue Service ("IRS") and Inland Revenue ("IR") seeking approval to an Advance Pricing Arrangement ("APA"). The current APA submission is for the 2000 to 2004 taxation years but could be extended for a longer term if requested by either Nortel or the tax authorities.

*The current transfer pricing methodology is the residual profit split method ("RPSM") which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D Activity to be provided pursuant to the Master R&D Agreement.* The RPSM acknowledges the fact that the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP").

Accordingly, the compensation provided to Participants under RPSM reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. *Mathematically the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk in such business.*

*On the other hand, other Nortel entities not subject to the Master R&D Agreement (i.e., Nortel Distribution Entities)[1] generally are the least complex entities in the group. They do not perform R&D, and generally perform routine activities. In addition, these entities have limited business risks in that they engage in a limited amount of functions. Thus, these entities are provided a routine return as compensation for the distribution function that they perform (generally, a nominal amount of operating profit ranging from 0% to 4% of sales).*

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:

1.     Identify RPSM Participants

2.     Determine Accounting Operating Profit

    (a)     add back R&D Expense

    (b)     deduct R&D Capital Stock Amortization in order to arrive at the gross economic profit;

- 31 -

5.        From the gross economic profit,

(a)        deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

(b)        deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any relevant taxing authority)

to arrive at the Residual Profit pool.

6.        Compute each RPSM Participants relative level of R&D Capital Stock.

7.        Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool with bears the same ratio as such Participant's ratio of its R&D Capital Stock as a percentage of the total R&D Capital Stock for all RPSM Participants.

9.        Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity.[2]

_____
1.        Also excluded are entities that are excluded from the Nortel transfer pricing policy. This generally applies to our joint ventures companies because Nortel does not control the joint venture entities. The results of the excluded entities are removed from consolidated results (leaving only the global results that are subject to the RPSM).
2.        The final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any taxing authority that would affect the RPSM calculation for such taxable year.

93.        Schedule "A" was amended, on the agreement of all parties, by addendum and effective from January 1, 2006[21]. The revised RPSM formula was set out by way of Amended Schedule "A" to the MRDA, providing:

The formulaic steps for calculating the R&D Allocation to each Participant is as follows:

1.        Identify RPSM Participants.

2.        Determine Accounting Operating Profit (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any relevant taxing authority).

_____
[21] This change in the formula was the result of comments received from the taxation authorities in 2005, referred to above.

- 32 -

3.        From the Accounting Operating Profit,

(a)        deduct the Functional Routine Return of Distributors (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority)

(b)        deduct the Functional Routine Return of RPSM Participants (as provided by the selected transfer pricing method that establishes such return or as may be finally determined by, or negotiated with, any Revenue Authority) to arrive at the Residual Profit pool.

4.        Complete each RPSM Participants relative level of R&D Stock (as determined by the selected transfer pricing method or as may be finally determined by, or negotiated with, any Revenue Authority).

5.        Calculate R&D Allocation attributable to each RPSM Participant equal to that portion of the Residual Profit pool which bears the same ratio as such Participant's ratio of its R&D Stock as a percentage of the total R&D Stock for all RPSM Participants.

6.        Establish entity level adjustments to the reflect arm's length R&D Allocation calculations of profit or loss for each entity. [22]

94.        In the Third Addendum[23] signed in December 2008 and early January 2009, the parties agreed:

Whereas Nortel expected that the RPSM attached to the Original Agreement as Schedule A would apply for an indefinite period beginning in January 1, 2001; however it was determined in discussions with certain Revenue Authorities in 2007 that certain amendments thereto retroactive from January 1, 2006 were necessary or desirable, as reflected in the revised RPSM attached as a revised Schedule A to the Second Addendum; and it has been determined at this time as a result of further discussions with Revenue Authorities that further amendments thereto, retroactive to the Third Addendum Effective Date, are necessary or desirable due to changes in the Nortel business, primarily as a result of Nortel's completion of the process of outsourcing its manufacturing activities, which changes have been reflected in the financial statements of each Participant since the Third Addendum Effective Date;

Whereas, the Participants wish to provide for additional flexibility in administration of the agreement to effect routine process and business efficiencies, as set forth in Article 3(d) as amended herein;

---

[22]    The Final R&D Allocation for any particular year could be adjusted upward or downward in order to reflect the final determination of any Revenue Authority that would affect the RPSM calculation for such taxable year.

[23]    The Third Addendum also addressed changes to the formula that arose out of comments from the taxation authorities and, *inter alia,* the operational change that resulted in all manufacturing being outsourced as of the effective date of this addendum.

- 33 -

95.    Accordingly, Article 3(d) was amended by the "Third Addendum", effective January 1, 2006, to provide:

> NNL agrees to administer this Agreement, or cause this Agreement to be administered by a Licensed Participant or a third party, including without limitation the making of any determinations required under the RPSM with respect to the Participants' respective interests, and the computation of amounts of the R&D Allocations due to and payments due from, as applicable, each Participant on a periodic basis. The Participants will agree to appropriate compensation for administers of this Agreement. Each Participant will be supplied with a copy of the calculations required under the RPSM as set forth in <u>Schedule A</u>. Any true up payment to or from a Participant as described in paragraph 6 of Schedule A will be reflected in the inter-company accounts of the affected Participant as a payable or a receivable as applicable, and may be netted pursuant to the standard Nortel practice for managing inter-company accounts.

96.    The RPSM formula in Schedule "A" was amended by the Third Addendum to read:

> 1.    Identify the Nortel entities that are "Participants" under the Agreement as amended from time to time.

> 2.    Determine consolidated Nortel operating earnings/loss in accordance with U.S. GAAP.

> 3.    From the consolidated Nortel operating earnings/loss:

> (i)    Deduct the operating earnings/loss of Nortel's existing joint ventures; deduct the operating earnings/loss of Nortel's former joint venture entities that own significant intangibles, as determined by the Participants from time to time; and deduct the operating earnings/loss of Nortel entities that do not perform the function of distribution of Products containing NN Technology.

> (ii)    The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations;

> ➢    amortization of intangibles[1]

> ➢    gain/loss of the sale of business

> ➢    restructuring charges

> ➢    stewardship costs

> The resulting amount is the adjusted operating earnings/loss ("Adjusted Operating Earnings/Loss").

> (iii)    From the Adjusted Operating Earnings/Loss:

> ➢    deduct the Functional Routine Return of each Nortel Distribution Entity, and

- 34 -

> ➤ deduct the Functional Routine Returns of each Participant

in each case as determined by the selected transfer pricing method that establishes such return based on current industry standards and third party studies, or as may be finally determined by Nortel's negotiations with Revenue Authorities, to determine the amount representing the residual profit or loss ("Residual Pool").

4.    Determine the R&D Allocation for each Participant:

(i)    Calculate the relative ratios of each Participant's spending on its R&D Activity to the R&D spend of all Participants, by taking each Participant's total R&D spend over the previous five years as a ratio of the total R&D spend of the previous five years for all Participants.

(ii)    Apply the ratio determined above to the Residual Pool to determine each Participant's R&D Allocation.

Take the R&D Allocation and Functional Routine Return for each Participant and compare it to such Participant's operating earnings/loss, adjusted in the manner described in paragraph 3(ii), to determine whether any "true up" payments are necessary (whereby a Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share).

_____
1.    Amortization of intangibles includes goodwill impairment, purchased in-process research and development, amortization of acquired technology, and other intangibles such as trademarks, patents, etc.

97.    In the context of a recognized need for a standstill agreement with respect to the MRDA, the (then proposed) Joint Administrators of NNUK, NN France and NN Ireland, on January 14, 2009 specifically acknowledged and agreed to the Fourth Addendum which provided that, notwithstanding the terms of the MRDA, no RPS Entity would be terminated from the MRDA in the event it filed for or became subject to administration proceedings under the U.K. *Insolvency Act 1986* until the earlier of such entity ceasing to be in administration or ceasing to trade. The Fourth Addendum confirmed that all other terms of the MRDA "shall remain in full force and effect", and it remains as such as of the date of this pleading.

98.    In summary:

•    The MRDA was amended, and specifically confirmed by the parties to remain in full force and effect, by a first addendum executed by counterparts between October 18, 2005 and June 21, 2006.

- 35 -

- The MRDA was amended, and specifically confirmed by the parties to remain in full force and effect, by a second addendum executed by counterparts in December, 2007.

- The MRDA was amended, and specifically confirmed by the parties to remain in full force and effect, by a third addendum executed by counterparts between December 19, 2008 and January 13, 2009.

- The parties to the MRDA entered into a Memorandum of Understanding (fourth addendum) in December 31, 2008, effective January 1, 2006, to "provide a record of certain operating arrangements and understanding" of the parties (as and from January 1, 2006) in respect of the operation of the MRDA and the RPSM.

99.   NN France, NN Ireland and NNUK fully participated in the development and implementation of the RPSM.  Further, in the spring of 2002 NNUK sought an APA with its governing tax authority, Inland Revenue, and a bilateral APA between Inland Revenue and CRA, in respect of the RPSM. There are APAs with the IRS and the CRA for the period 2001-2005. Inland Revenue expressly accepted the terms of the APAs up to the end of 2005.  The Monitor and Canadian Debtors are not aware of any challenge by Inland Revenue to the transfer pricing methodology relating to the period post-2005.

100.   From the time of implementation of the RPSM as of January 1, 2001, the parties to the MRDA, and indeed all members of the Nortel Group operated under the RPSM and the MRDA, as amended from time to time, participated in the exchange of information and disclosure reciprocally required to implement the RPSM, accepted all true-up payments and/or receivables or obligations to pay in respect thereof, reported their financial affairs and participated in issuing financial statements based on the implementation of the RPSM and participated in the filing of returns to their taxation authorities on the basis of the RPSM as implemented by the parties, without objection or complaint.

- 36 -

*Distribution Agreements*

101.    The same is true in respect of all participants in Distribution Agreements. The components of the Distribution Agreements now complained about: the treatment of foreign exchange, hedging losses, interest, restructuring costs, head office costs, projected useful life of IP, the 1% distribution return, were all part of the RPSM implementation post-January 1, 2001.

102.    The LREs have been governed by the RPSM and the Distribution Agreements (and have conducted themselves in their business dealings and with the tax authorities in accordance therewith) since January 1, 2001. Their respective boards of directors approved their financial statements prepared based on the results of the implementation of these agreements.

### THE EMEA CLAIMS BY SUBJECT MATTER

103.    The particularized claims asserted against the Canadian Debtors by the EMEA Claimants are in respect of:

      (a)    transfer pricing;

      (b)    inter-company loans and other dealings among Nortel Group members;

      (c)    customer revenues;

      (d)    past dispositions of businesses;

      (e)    future contingent claims relating to potential tax or customer revenue related claims not yet made against the EMEA Claimants; and

      (f)    pension funding.

- 37 -

The first four of these types of claims are dealt with in the sections immediately following, after which the applicability of domestic law to their resolution is addressed.[24] The pension funding claims are dealt with briefly in a later section of this pleading but more extensively in the separate Response Pleading of the Monitor and certain Canadian Debtors to the Claims by the U.K. Pension Trustee and the U.K. Pension Fund which are adopted and incorporate herein, *mutatis mutandis*. The future contingent claims are dealt with at the end of this pleading.

### *"Transfer Pricing" Claims*

104.    Each of the EMEA Claimants that were RPS Entities (namely, NNUK, NN France and NN Ireland) baldly claim for "all loss or damage which it has suffered" as a result of or in connection with the transfer pricing arrangements in which it participated from January 2001 to the Filing Date. Similar claims predicated upon complaints about the contractually agreed and implemented transfer pricing arrangements are made by sixteen (16) of the other EMEA Claimants (thereby leaving only NN France SAS and NNIF, both of which have other EMEA Claimants in their jurisdictions of France and Holland, without direct transfer pricing complaints). The transfer pricing claims of these EMEA Claimants are asserted under both domestic law (the laws of the Province of Ontario and the laws of Canada applicable therein ("**Domestic Law**")) and the laws of foreign jurisdictions ("**Foreign Law**"), as indicated in Part 1 of the Summary of EMEA Claims attached at **Schedule "D"** hereto.

---

[24]    There are also proprietary claims asserted but to the extent those claims are made in respect of the "Lockbox" they are dealt with in the Allocation Position of the Monitor and the Canadian Debtors (and their further Response pleading Re: Allocation). Other claims classified as "proprietary" by the EMEA Claimants are derivative of their other claims which should be dismissed in any event for the reasons set forth herein and in the notices of disallowance.

- 38 -

105.   These claims implicitly and explicitly seek to avoid the legal effects of validly constituted and enforceable agreements (the MRDA, RPSM and Distribution Agreements) which, *inter alia*, sought to give effect to the arm's length principle.

106.   As part of their revisionist history, these EMEA Claimants now try to suggest that their transfer pricing arrangements required them to, in fact, act at arm's-length in all of their dealings with each other and thus allow them to avoid any contractual arrangements in which they were not acting at arm's length. This is a fundamental misstatement of principle and a *non sequitor*. Transfer pricing does not require parties to act at arm's-length: by definition they are not at arm's-length; transfer pricing seeks to apply a methodology that effects a commercial result that is reasonably proportionate to what would be obtained if the parties had been at arm's-length. The related parties' agreement as to that methodology is binding and governs their relationship. That is what was embodied in their agreements which are a full answer in defence of these EMEA Claims.

*(a)    Transfer Pricing Claims Generally Seek to Avoid the Binding Contracts*

107.   It does not lie in the mouths of the EMEA Claimants to claim that there is any obligation on NNL (or any of the Canadian Debtors) to compensate them on any basis other than as agreed under the MRDA and their Distribution Agreements. This rules out, without limitation, any claim that a different transfer pricing methodology should govern other than the RPSM agreed to in the MRDA, and applied and accepted by all parties in practice, and any claim that an "arm's-length" treatment of any particular entity would result in a different treatment or result from what in fact occurred.

108.   There was no agreement (in the MRDA or otherwise) with NNL (or any Canadian Debtor) and no obligation on any Canadian Debtor to implement an "arm's-length" regime as such, but

rather the parties went to great lengths to agree that the RPSM was the best proxy for an arm's-length methodology and agreed to be governed by it. There never was any expectation of the Nortel companies in fact operating at arm's-length to one another, and no legal conclusions, causes of action or liabilities can result from any claim based on the EMEA Claimants' attempt to now mischaracterize the premise of these agreements and re-write or supplement them. To the contrary, the parties to the MRDA and the Distribution Agreements expressly set out the terms of dealing among them, and they expressly agreed that these terms set forth the <u>entire agreement</u> and understanding of the parties on this topic.

109.    The EMEA Claimants that were RPS Entities now assert that "there were a number of flaws in the RPSM in fact employed by the Nortel Group, with the consequence that it resulted in action which did not comply with the arm's-length principle, did not properly or fairly reward certain entities ... and resulted in an improper transfer of value to NNL."

110.    The parties expressly agreed that the RPSM *as set out in the MRDA* was the governing methodology. It is simply not open to the EMEA Claimants to assert any claim based on, premised by, or dependent on any other methodology or after the fact revisions to the RPSM. It is not open to any EMEA Claimants (who are all subject to the RPSM) to assert, with hindsight, that it would have been more advantageous to it had some other methodology been adopted. No contract can be disregarded on such a basis.[25]

111.    The EMEA Claimants point to post-filing adjustment to NNI's income (for the years 2001 – 2005) negotiated by the IRS and the CRA, as reflecting "the fact that the RPSM methodology

---

[25]    Furthermore, if anything, the guaranteed returns to the LREs under the Distribution Agreements in an environment of operating losses following the economic downturn proved favourable to them. The LREs were protected from operating losses and were only exposed to limited risks.

employed was designed to benefit NNL at the expense of others in the group" as another basis for setting it aside. This assertion misrepresents what happened. The IRS and CRA accepted the RPSM, but considered the routine returns to be too high and required a reallocation of income, using revised routine returns, in accordance with the RPSM. That adjustment (the "**Compensating Adjustment**") reinforces the endorsement of the tax authorities (including Inland Revenue which was prepared to sign an APA consistent with the eventual agreements with the IRS and CRA) of the overall transfer pricing methodology. The only implication of the Compensating Adjustment is that it gives rise to a flow through claim-back against NNUK, NN France and NN Ireland to offset the corresponding overpayments received by them in those years.[26]

112.    The parties to the MRDA and to the Distribution Agreements deliberately, knowingly and expressly agreed to the terms of those agreements and operated under them for years. In the case of the MRDA, they spent years negotiating it and amended and confirmed it several times. The suggestion now that those agreements were "imposed" on (rather than agreed to by) them is another fiction, particularly in light of the fact that the RPSM was presented to all three taxation authorities for their acceptance of it as reflective of an arm's length arrangement for the period 2001-2005.

113.    The assertion that the "move to an RPSM was primarily motivated by a desire to allocate more profit to NNL "as a tax haven" is irrelevant and unfounded. As regards taxation, the purpose was, in fact, to prevent the Nortel Group from inappropriately moving income to a tax haven. The

---

[26] The EMEA Claimants have suggested that the changes to the RPSM giving rise to the $2 billion adjustments should increase NNUK's Attributable Share (as defined in the MRDA). This is incorrect. Under both the IRS and CRA methodologies, the reduction in routine returns reduces NNUK's Attributable Share for 2001 to 2005. After the 2005 fiscal year, the RPSM aligned routine returns with those proposed by the tax authorities. The current Attributable Shares of all RPS Entities are appropriate. Tax authorities must be taken to agree, since no RPS Entity is under assessment or reassessment on the ground that its income, as determined under the MRDA in effect as of January 1, 2006, has been under-reported. What this also demonstrates is that the RPSM which was in place for 2001-2005, according to the taxing authorities, overcompensated NNUK.

tax consequences of the RPSM were accepted by the taxing authorities[27] because the RPSM reflected a market-based and objectively fair and reasonable allocation of costs and benefits.

114.    NNUK participated with NNL and NNI in meetings and exchanges with Inland Revenue, the CRA and the IRS in respect of the tax authorities' analysis and consideration of the RPSM, in which the MRDA and the RPSM with R&D Spend as the profit allocation driver, were affirmatively endorsed as the most appropriate measure of the Participants' contribution to R&D/IP and most appropriate measure for determining the arm's-length equivalency for compensation. Equivalent submissions were made by or on behalf of all EMEA Claimants to the relevant tax authorities either directly and/or by virtue of the submissions of NNUK, and by virtue of all of their annual tax filings. Furthermore, most of the EMEA Claimants prepared (or had prepared for them) annual reports in support of their financial results effected by the MRDA, RPSM and/or Distribution Agreements, which confirmed that the returns they earned were comparable to what an arm's length third party would have earned.

115.    NNL and the other Canadian Debtors relied upon the participation and implementation of the RPSM by the other members of the Nortel Group, in good faith, trusting that the other members were honestly and in good faith participating in the RPSM and accepting of it, consistent with their outward conduct.

116.    The EMEA RPS Entities received the same treatment under the MRDA as every other RPS Entity. For example: (i) opening R&D Capital Stock balances for each RPS Entity were calculated using the same methodology (including recognition of acquired R&D); (ii) the same amortization rates for R&D Capital Stock applied to each entity; (iii) routine returns for each RPS Entity were

---

[27]    Including a significant share of the residual losses being allocated to Canada in the ensuing environment of operating losses.

- 42 -

developed and applied in a consistent manner; and (iv) head office costs were compensated for based on those functions performed by each RPS Entity, including NNUK from 2006 onwards[28].

117.    The consistent application of the RPSM among the RPS Entities was important for many reasons. For example, as noted above, if NNL determined an opening R&D Capital Stock balance that was lower than that determined by the relevant taxing authority, the RPS Entity could have been considered to have disposed of its property and triggered an income inclusion. Neither the Monitor nor the Canadian Debtors are aware of any challenges by tax authorities with responsibility for the EMEA RPS Entities of their opening R&D Capital Stock balances as understated.

118.    As set out above, the parties to the MRDA agreed that NNL would compute the R&D allocation to, and payments due from, each party, on a periodic basis. Each party agreed to keep clear and accurate records to support the calculations and/or the RPSM as set out in Schedule "A" to the MRDA, to provide to each other upon request documentation with respect to those records and to examine and audit all records and accounts containing information bearing upon the amounts payable under the MRDA. Each party expressly agreed to make prompt adjustment in order to correct any errors or omissions disclosed by an examination or audit or in the event of any action by the taxation authorities.

119.    At no time did the EMEA Claimants provide notice of a breach of the MRDA or RPSM or of any of the errors or omissions upon which the claims now purportedly made are based, nor did they request documentation or clarification as they were entitled to or invoke the remedies available under the MRDA.

---

[28]    This change to the MRDA in the addenda discussed above, arose out of comments from the taxation authorities.

- 43 -

(b)     *Transfer Pricing Claims Seeking to Adjust Prior Allocations*

120.    Certain of the EMEA Claimants challenge charges that were made under the transfer pricing arrangements for vendor financing, headquarter and stewardship and restructuring costs. These claims are all precluded by the binding and enforceable contracts (MRDA, RPSM and Distribution Agreements) and the fact that any allocations or charges now complained of were made in accordance with those agreements. Additional responses to the claims are set out in following paragraphs.

i.      *Vendor Financing*

121.    The EMEA RPS Entities describe vendor financing losses as "losses associated with bad debts arising from vendor financing that was provided by Nortel to its customers." Losses arising from bad credit extended to customers were allocated among the RPS Entities (including NNL) through the RPSM. The EMEA RPS Entities now assert that "an independent party acting at arm's length would not accept these losses, given that it did not make the credit decision itself" and that "such costs should have been allocated only to NNL," and they seek reimbursement for those losses. Vendor financing losses were properly allocated pursuant to the RPSM to the RPS Entities as the risk-taking entities, and these claims are without merit. (Since vendor financing losses were not allocated among the LREs, the LREs do not have a claim in respect of vendor financing).

122.    The assertion that the EMEA claimants were uninvolved in or did not benefit from the extension of credit is fallacious. In the years leading up to the economic downturn that gripped the telecommunications industry and the wider global economy in 2001, telecommunications suppliers (including Nortel) customarily provided financing to customers for the products and services they sold. In response to the extremely competitive environment which existed in the

- 44 -

telecommunications industry between 1998 and 2001, Nortel (and its competitors) regularly provided medium and long-term financing support to customers as a key requirement of doing business.

123.    Nortel regularly refinanced its customer debt with third party lenders due to the quantum and scale of customer financing that Nortel needed to extend to customers during that period. Post-2000, banks and capital markets no longer had an appetite for telecommunications debt financing and, as a result, Nortel was generally no longer able to refinance its customer debt with third party lending institutions as it had done in prior years. However, Nortel was still expected by customers to extend financing in the normal course of business. In fact, Nortel provided financing to customers as a means to stimulate sales which otherwise would not likely have been concluded, given that customers were reluctant to initiate significant capital outlays in the difficult years following the economic downturn which began in 2001.

124.    In the years following the 2001 telecommunications industry downturn, Nortel made efforts to limit customer financing, though its ability to do so was restricted. Pursuant to certain financing agreements, Nortel was committed to providing future financing in connection with purchases of Nortel products and services. Those commitments to extend future financing generally had conditions for funding, fixed expiration or termination dates and specific interest rates and purposes.

125.    After early 2002, Nortel acted primarily as an intermediary to introduce its customers to external financing companies. However, Nortel occasionally provided bridge or temporary financing where there was a compelling customer or technology-strategic issue.

- 45 -

126.    Nortel centralized customer financing activities. This permitted a global approach to risk and the alignment of credit policy with the business objectives. It also allowed for the pooling of expertise, the avoidance of functional duplication, the facilitation of a consistent credit policy and ultimately the saving of administrative costs.

127.    Even though customer financing was centrally located, it was up to each LOB and Region to determine the terms and conditions of sale and when those would involve vendor financing. Each RPS Entity agreed under the MRDA to share in the risk because the benefits were not enjoyed exclusively by NNL. The LOBs and Regions were responsible for identifying and sourcing customers. If a customer was identified by local sales people that required financing, the local sales people typically wanted Nortel to provide vendor financing.

128.    Sales revenues resulted in the profits that were in turn allocated to the RPS Entities. Bad debt was a cost that the parties expressly agreed to include in G&A expenses. As such, expenses of this nature were shared in the RPS pool. The post-facto assertion now by the EMEA RPS Entities that they ought not to have been included cannot be taken seriously.

129.    Any benefits resulting from good credit decisions would benefit all of the RPS Entities (not just NNL). Therefore, it would be unreasonable and inconsistent with the arm's length principle to suggest that a party would benefit from the upside of an arrangement but not suffer any downside consequences.

130.    NNUK also took advantage of the allocation of bad debts to obtain tax benefits. NNUK treated some of the vendor financing losses as passive losses for taxes, because they were not direct customers of NNUK (where NNUK was the direct contracting party for sale of goods, any losses were treated as an active operating expense). The passive losses were very valuable. It is

- 46 -

estimated that up to the end of 2005, these passive losses saved NNUK approximately £35 million. Had the vendor financing losses been borne solely by NNL, that would have exposed NNUK to tax on passive income in prior years that it offset by these losses.

### ii.    North American Headquarter and Stewardship Costs

131.    The EMEA RPS Entities state that the RPSM allocated NNL's (and NNI's) corporate costs to the residual profit pool and given "the industry decline and the sudden reduction in volume of business, the corporate costs of NNL (and NNI) would have been significantly in excess of what was necessary to oversee and manage the global Group, and in particular the EMEA region, given that EMEA had its own head office." The EMEA RPS Entities allege that the excess costs incurred by NNL over the period from 2001 to the Filing Date that were included in the residual profit pool can be estimated at 50% of NNL's general and administrative costs (i.e. excluding sales, marketing, technical and operational costs), along with the 15% return on excess central services costs received by NNL for the period 2006-2008.[29] They argue that an independent party acting at arm's length would not agree to effectively bear these costs (or be charged a higher rate for services) simply because its supplier had incurred excess costs. However, they did agree to share in those costs and it was not commercially unreasonable for them to have done so under the circumstances.

---

[29] The EMEA RPS Entities also claim that: "A return of 15% was provided in the RPSM from 2006 onwards to RPEs in respect of regional central services and costs incurred by RPEs to support other Group entities outside their respective territories. However, under the RPSM for the period from 2001 to 2005, although such costs were incurred by RPEs, there was no specific provision for any return to RPEs for such costs. Given the nature of the central services undertaken and given that they provided benefit to other Group entities, an independent entity in the position of the RPEs would expect to be remunerated by NNL for such services on an arm's length basis in the period 2001-2005." This claim may form part of the EMEA RPS Entities' Distribution Return Claim, since it is not specifically quantified and is rather grouped as part of "routine returns" (see para. 199.1 of NNUK's Proof of Claim). This section therefore does not address this claim.

- 47 -

132.    Between 1996 and 2000, Nortel was governed by a Headquarters Cost Sharing Agreement (the "**HQ CSA**"), whereby headquarter costs were pooled and allocated to the corporate group. The methodology allocated the costs in over 200 cost centres to Nortel entities throughout the world, taking into account direct allocable costs, indirect costs and stewardship costs.

133.    The allocation of headquarter costs was an extremely burdensome task, requiring hundreds of man hours to implement. The type of costs allocated via the headquarter cost sharing methodology included global advertising costs, global marketing costs (such as trade shows, events and sponsorships), Nortel website management and content costs, legal and treasury support costs, executive leadership costs for various products and lines of business and numerous other similar costs.

134.    The HQ CSA was terminated as of January 1, 2002.

135.    In order to streamline and simplify the cost-sharing methodology, but taking into account the historical outputs of the more complicated methodology under the RPSM, excess headquarter costs (above those properly attributed to the RPS Entity itself) were allocated back to the RPS Entities and they were provided a routine return on account of these excess costs.

136.    The EMEA RPS Entities have not established (and cannot establish) that the headquarter costs incurred by NNL were not reasonable. These costs were for the benefit of the entire Nortel Group. Even though there was a general industry decline beginning in the early 2000s, it is not possible to reduce overhead costs immediately, as the EMEA RPS Entities seem to suggest. A reduction in workforce, space, and other overhead costs takes time and is costly. Also, many of the functions of Nortel's head office were necessary, even if business was down overall.

- 48 -

137.    In any event, NNL effectively managed significant reductions in headquarter costs (general and administrative costs) across the Nortel Group.  During the period 2001 to the end of 2008, these headquarter costs were reduced from US$1.4 billion to US$800 million with NNL's own headquarter costs having been reduced by 45% during that period.  This was in line with the global headquarter reductions.[30]

138.    The head office costs were also not duplicative of the headquarter costs incurred by the other RPS Entities, as alleged. In any event, if any services were duplicative, it was open to the EMEA RPS Entities to reduce their headquarter costs to avoid duplication.

139.    The EMEA RPS Entities have further claimed that the "excess costs" incurred by NNL from 2001 to the Filing Date which have been included in the residual profit pool can be estimated at 50% of NNL's general and administrative costs (i.e. excluding sales and marketing and technical and operational costs), along with the 15% return on excess central services costs received by NNL for the period 2006-2008. This claim is unfounded and unsupported by the Joint Administrators. The EMEA RPS Entities have provided no basis or explanation for this statement or calculation. Similarly, no particulars or foundation have been provided to support the claim that pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the residual profit pool but were not. These assertions are without foundation. If there had been any basis for them, they would and should have been raised at the time the expenses were allocated.

---

[30]  This analysis appropriately excludes the necessary increase in headquarters costs incurred by NNL in relation to the proceedings pertaining to accounting irregularities during 2003-2005 involving the business affairs of the entire Nortel Group.

- 49 -

iii.    *Restructuring Costs*

140.    In 2000, global demand for telecommunications products began a steep and unforeseen decline, which continued through 2001 and 2002. As a result, substantial decreases in capacity were required. The industry as a whole was caught off-guard by the collapse of the market. The fallout of the collapse was not limited to the Nortel Group.

141.    Members of the Nortel Group had to restructure their operations and streamline activities in response to the decreased demand for products. Following the restructuring undertaken in 2001, the Nortel Group was thought to be well-positioned for growth when telecommunications equipment spending recovered.

142.    The EMEA Claimants assert that they were forced to absorb restructuring costs that were imposed on them by NNL, and which were incurred as a result of decisions made and instructions provided by NNL. In particular, they claim to have been coerced into increasing capacity during boom times and, when the forecasted demand did not appear, to have been left to bear the costs of restructuring. The EMEA Claimants assert that parties acting at arm's length would not have agreed to bear all of such costs or would have been reimbursed for them.

143.    The LREs also assert that as a result of NNL requiring the LREs to bear restructuring costs without reimbursement (except in 2002) and without an increase in the routine return paid to the LREs to cover such costs, the LREs did not receive a reasonable, arm's length return for their distribution and service activities, which they claim is a breach of the applicable distribution agreements.

144.    The LREs claim that it is inconsistent with their role and characterization as limited risk entities that they should bear the costs of the Nortel Group's restructuring activities. The LREs

- 50 -

claim that an arm's length reimbursement would have been 75% of their restructuring costs in all years, relying upon a one time reimbursement of 75% that was made to the LREs in 2002 (discussed below).

145.    In the first few years of operation under the RPSM, even though there was a decline in demand, the transfer pricing policy dictated that the LREs were to be compensated with a 1% operating margin. The LREs' minimum distribution return was then reduced from 1% to 0% in 2002[31]. The 0% floor was reflected in the income tax filings in all jurisdictions. LREs were not reimbursed for any restructuring costs in 2000 or 2001. Eventually, though, the charges related to restructuring were large enough that net losses were incurred by the LREs beginning in 2002.

146.    While there was no obligation to reimburse the LREs for these costs, the Nortel Group and its advisors considered how the situation would be treated in an arm's length relationship: would the RPS Entities reimburse a percentage of the LREs' restructuring costs and, if so, what percentage and over what period of time?

147.    There was no precedent Nortel could use to arrive at a definitively "correct" position. The downturn in the telecommunications industry was unprecedented, and the Nortel Group did not have any comparable transactions.[32]

148.    The Nortel Group and its advisors concluded that in an arm's length situation, the RPS Entities would agree to reimburse the LREs for a portion of their restructuring charges, rather than have the LREs become insolvent and/or be forced into receivership.

---

[31]    Given the downturn in the Nortel Group's business and in the telecommunications industry generally, it was no longer economically justifiable to guarantee the LREs a positive operating margin. Had the margin not been reduced, it would have resulted in the LREs receiving an unjustifiable return that would not have been representative of an arm's length relationship.

[32]    The third party benchmarks did confirm that arm's length distributors like the LREs do bear restructuring costs.

- 51 -

149.    The RPS Entities recognized that the Nortel Group's distribution network was important for the Nortel Group's long-term survival. Should members of that distribution network have become insolvent or ceased operations, the RPS Entities' ability to offer their products for sale – and customers' willingness and ability to buy those products – could have been severely impacted. Therefore, it was determined to be in the best economic interests of the Nortel Group at that time to reimburse part of the restructuring costs of the LREs, to ensure that a strong distribution network continued. The payment was not a recognition of an obligation, but an exigent business judgment. It was never agreed to be an ongoing reimbursement to the LREs.

150.    When business circumstances improved after 2002, it was determined to no longer be necessary to provide any such "exceptional" funding or reimbursement to the LREs and no further such reimbursements were made.

151.    Consistent with this, the LREs' routine returns were increased to 1% in 2003 from 0% in 2002.

152.    There is no justification for NNL being required to reimburse the LREs for restructuring costs without imposing the same obligation on the other RPS Entities. Singling out NNL is unprincipled and demonstrates the arbitrariness of the assertion.

153.    The EMEA RPS Entities have asserted that they bore the entirety of the restructuring costs they incurred, and that the amount of the restructuring charges led to substantial net losses. They now claim that a proportion of the restructuring costs borne by them should have been reimbursed by NNL. The EMEA RPS Entities assert (without foundation) that a reasonable reimbursement, which takes into account their respective "risk profiles" and allows for some sharing of restructuring costs, would have been 50% of their restructuring costs for each year from 2001

- 52 -

onwards. No reimbursement has previously been made by NNL to the other RPS Entities for restructuring costs. To do so would be inconsistent with the MRDA.

154.    The EMEA RPS Entities have claimed the following amounts in relation to restructuring costs (all exclusive of any applicable interest):

- NNUK: US$525,300,000;

- NN Ireland: US$11,956,659.74;

- NN SA: US$87,100,000.

155.    Parties transacting at arm's length would not permit a party like an EMEA RPS Entity to participate fully in the upside of an arrangement but then require the other parties to bear the costs of any downturn. This logic is incorporated in the MRDA where the RPS Entities agreed pursuant to the Third Amendment that restructuring costs would in effect be borne directly by each RPS Entity.

156.    As one would expect, in the environment of the 2001 downturn in the technology market, restructuring costs of the entire Nortel Group were significant.  For the period 2001 to the end of 2008, the Nortel Group incurred approximately US$5.5 billion in restructuring costs with US$4.5 billion of this amount having been incurred during the 2001 and 2002 bursting of the telecom bubble.

157.    It also cannot seriously be contended that the failure to foresee the bursting of the telecom bubble was a failure of NNL's alone and that, but for that failure, less substantial restructuring costs would have been necessary. Independent third parties found themselves in the same position as the Nortel Group during the period of market difficulty. There is no evidence that any of the other RPS Entities knew that the telecommunications bubble was about to burst and that they

- 53 -

would have therefore, if acting independently, elected not to ramp up operations. As previously noted, EMEA personnel were engaged in the business forecasting exercise. Revenue and market forecasts were developed in the EMEA Region based on inputs from the EMEA Claimants.

### Claims Relating to Transactions among the Nortel Group Members

158.    The EMEA RPS Entities (NN Ireland, NN France and NNUK), as well as nine (9) other EMEA Claimants (identified in Part 2A of the Summary of Claims against NNL at **Schedule "D"** hereto) make various assertions seeking payment of amounts they claim are owing to them under both Domestic Law and Foreign Law. Certain debts disclosed in NNL's books and records (itemized below) are acknowledged by the Monitor and the Canadian Debtors and will be dealt with in the ordinary course of the CCAA proceedings. The remaining amounts are not book debts, but are amounts claimed to be "owing" as a result of transactions that these EMEA Claimants engaged in with NNL which they claim were undertaken on terms that they now consider to be unfavourable. The Monitor and the Canadian Debtors maintain that these transactions, undertaken in the normal course of dealings with these EMEA Claimants, do not give rise to any cause of action and that their only entitlement is to payment of acknowledged net trade debts on the terms agreed to (detailed below).

(a)    *Inter-Company Loans*

159.    Certain of the EMEA Claimants complain about the inter-company accounting. Their "debt" claims are asserted under both Domestic Law and Foreign Law, as indicated in Part 2A of **Schedule "D"** hereto.

- 54 -

*i.    Inter-Company Trading Accounts*

160.    The net pre-Filing Date inter-company receivables, debt and loan balances between the Canadian Debtors and the EMEA Claimants (using January 14, 2009 foreign exchange rates) are set forth in **Schedule "B"** hereto.

161.    On a net basis, the EMEA Claimants owe the Canadian Debtors in excess of US$500 million. The Monitor acknowledges (with reference to the Canadian Debtors named in the EMEA Claimants' Proofs of Claim) that there are *de minimus* unsecured debt claims reflected on **Schedule "B"** owing to NN Italy and NNIF by NNL and owing to NNUK by Nortel Networks Global Corporation and owing to NN Belgium by Nortel Networks Technology Corporation, which will be allowed, subject to any rights of set off.[33]

*ii.    MRDA Allocations were properly Recorded in the Inter-Company Accounts*

162.    NNUK alleges that NNL wrongly recorded payments due to NNUK, NN France and NN Ireland under the MRDA as book entries rather than forwarding cash to those entities for such amounts. However, the MRDA expressly provides that any payments due under the MRDA or RPSM "will be reflected in the inter-company accounts of the affected Participant as a payable or receivable as applicable and may be netted pursuant to the standard Nortel practice for managing inter-company accounts". Accordingly NNUK, NN France and NN Ireland each expressly agreed to the disposition of any transfer pricing balances due to them by way of inter-company accounts and this complaint is frivolous.

---

[33]    In addition to the amounts owing by any EMEA Debtor to any Canadian Debtor on **Schedule B**, the Canadian Debtors have and may have additional claims against one or more of the EMEA Claimants and hereby reserve any and all rights to advance such claims either directly or by way of set off.

- 55 -

### iii.    Cash Management

163.    Certain EMEA Claimants assert that actions by NNUK employees who managed inter-company loans for the entire Nortel Group, resulted in breaches of duties owing by NNL or NNC as a result of cash being transferred to Canada in the form of inter-company loans.

164.    Every member of the Nortel Group benefited from the global management of funds. They also benefited from NNL's contributions towards more than 50% of the R&D expenditures. NNL and NNC had borrowed billions of dollars in the capital markets (i.e. from the noteholders) for general corporate purposes, which included funding the ongoing losses of NNUK and other EMEA Claimants after the market downturn. There was nothing improper about the EMEA Claimants agreeing to lend cash that they had through inter-company accounts to enable NNL to service or partially repay third party debt and to fund ongoing operations. Provided they acted in a manner consistent with their local legal duties, there was no impediment to, and there were valid business reasons for, the directors and officers of all NNL subsidiaries repatriating cash to their parent through loans or equity distributions.

165.    The EMEA Claimants assert that NNUK was improperly compelled to grant loans to NNL from 2003 to 2008. This ignores that the global cash management functions were overseen, and the "loans" were recommended and implemented, by NNUK employees.  Moreover, the bulk of the accounts due to NNUK by NNL were not originally "loans", but trade credit book entries due to transfer pricing adjustments and NNUK specifically agreed to be paid by such method in the

MRDA.  In any event, all amounts owing to NNUK were later eliminated by the set off of the US$481 million owing by NNUK to NNL as part of the Compensating Adjustment.[34]

166.    Further, in approving certain of the loans, NNUK's board of directors, on full information, exercised their business judgment and concluded that NNUK should consider the inter-dependency between itself and others in coming to the view that providing liquidity support to its affiliates was in the best interest of NNUK itself. They periodically obtained legal advice to ensure that they were acting within the scope of their duties in doing so.

iv.    *Interest and Non-Interest Bearing Loans*

167.    NNUK asserts a claim of approximately US$120 million against the Canadian Debtors in respect of interest it claims NNL should have paid on its inter-company loan balance. NNL does not owe any amount to NNUK on account of outstanding interest. By agreement of NNUK and NNL, the loans in question were not interest-bearing, and therefore no interest was due and payable at any time.

168.    Nortel's general funding practice around the world involved the use of both interest-bearing and non-interest-bearing loans in accordance with acceptable legal and accounting practices in each jurisdiction. Nortel's Treasury Department had responsibility for managing the inter-company account in accordance with the practices suggested by local subsidiaries and affiliates. NNUK was on both the giving and receiving end of interest-free loans.

---

[34] In fact, given the Compensating Adjustment pertains to the tax years of 2001 to 2005, had the adjustments been applied at the time in the relevant tax year the result would have been that the appropriate "loan" balance from NNUK to NNL and therefore the consideration required to retire the loan at the time of Project Swift (in 2007) would have been reduced by US$481 million.  This further demonstrates the appropriateness of the set off claim outlined below.

- 57 -

169.    The inter-company non-interest bearing loans between NNUK and NNL were recommended and established by (among others) Simon Freemantle, an NNUK employee and at times a member of the board of directors of NNUK. Mr. Freemantle had Treasury Department responsibility for determining the inter-company funding for NNUK that met its lawful requirements and was acceptable to its management and board of directors.

<em>v.    NN Ireland Loan and Dividend Repayment</em>

170.    NN Ireland challenges an interest-free loan made by NN Ireland to NNL in June, 2006 and repaid in cash by NNL one month later. The loan was made as part of efforts by employees in NNUK's Treasury Department to manage cash among Nortel affiliates in a tax-efficient manner. NN Ireland was accumulating large amounts of cash and it had the ability to lend the funds interest-free due to the absence of transfer pricing legislation in Ireland. There was no duty owing or breached by NNL in borrowing and repaying these funds as recommended by NNUK.

171.    NN Ireland also claims that NNL is liable in respect of a dividend declared by NN Ireland to NNL on June 10, 2008 in respect of results for fiscal 2007. There is no basis for this claim.

172.    As a result of Project Swift (discussed in the next section), NN Ireland became a wholly owned subsidiary of NNL. As a wholly owned subsidiary, it was lawful, beneficial and tax-efficient for NN Ireland to lend money to NNL to be repaid from future dividends declared in favour of NNL as shareholder. The "loan-to-be-repaid-by-dividend" structure avoided the possibility of withholding tax being payable on a cash dividend payment to NNL and prevented certain other taxes from becoming payable by NN Ireland. On April 22, 2008, the board of directors of NN Ireland declared a dividend of €21.6 million in favour of NNL in respect of 2006 results.

173.    In June 2008, the board of directors of NN Ireland determined that as substantial cash had once again built up and remained in NN Ireland, it would declare a dividend in favour of NNL in respect of 2007 results. Rather than offsetting this dividend against NNL's inter-company loan, the board of directors determined to pay the dividend in cash in order to reduce the amount of cash being inefficiently held in NN Ireland. The decision was based upon financial information that was available to the board of directors at the time that supported the propriety of the dividend as declared.

174.    In September, 2008, NN Ireland determined that due to changes to the MRDA implemented after the dividend was declared (that were made as a result of ongoing transfer pricing negotiations with taxation authorities), NN Ireland retrospectively adjusted its results for fiscal 2007 and determined that it lacked sufficient distributable profits for fiscal year 2007 to support declaration of the June 10, 2008 dividend.

175.    The NN Ireland board of directors obtained independent legal advice from McCann, Fitzgerald, its Irish lawyers, and the independent accounting advice of its Irish accountants, KPMG, to determine how to proceed. Both counsel and accountants advised that it was appropriate and proper for NNL to repay the dividend by way of increase to its inter-company loan and that so long as the loan was accounted for at full face value, no impairment provision was required. NNL's inter-company loan was later repaid in full to NN Ireland by offsetting it against amounts due to NN Ireland under the MRDA. NN Ireland was not at the time of this repayment (and is not even today) insolvent.[35]

---

[35]    Excluding the contingent FSD claim (discussed in more detail hereinafter), the majority of the EMEA Claimants were not, at the Filing Date, and are still not, insolvent (in that they have sufficient assets to pay their liabilities to third parties). NN Ireland's solvency, in particular, is of note as any equity benefit in NN Ireland would accrue to NNL as its sole shareholder.

- 59 -

*vi.     NN France Loan Payment*

176.    NN France claims that a payment of €25 million to pay down an outstanding loan to NNL made on or about February 25, 2008 constitutes an unlawful preference under U.K. insolvency law (which governs the administration proceedings that NN France is part of in the U.K.), a conspiracy, oppression under Domestic Law or that NNL is liable to refund the payment due to unjust enrichment, as indicated on Part 2B of **Schedule "D"** hereto. NNL denies that there is any basis to require it to refund the payment that was justly owed to it by NN France and paid in the ordinary course.

177.    In 2002, NN France borrowed €200 million from NNL and issued a promissory note to NNL for that amount. At the same time, NNL made a capital injection into NN France of a further €204.4 million. While the promissory note was subordinated to the claims of other creditors on liquidation, it remained payable in accordance with its terms. €25 million that remained due and owing was repaid in good faith in the ordinary course of business on or about February 25, 2008.

178.    NN France could not have had an expectation that it would not be required to repay its debt to NNL, nor would such an expectation have been reasonable in light of the terms of the loan agreement between the parties. NNL made both a capital injection and a loan to NN France in the same transaction in 2002. The difference between the two was well understood by NN France. While the loan was subordinated to the claims of other creditors in liquidation, there was no such proceeding pending or contemplated at the time of the repayment.

179.    At the time of the payment, neither company had any intention of giving NNL an advantage over other creditors of NN France in the event of an insolvency; nor was NN France insolvent (unable to pay its debts) at the time of the repayment.

- 60 -

180.    There was no agreement between the NNL and NN France (or others) either to injure NN France or to act unlawfully, nor could it be reasonably alleged that NN France was itself a party to any conspiracy with that objective.

181.    No enrichment was obtained by NNL nor was any detriment suffered by NN France. The transaction was neutral for both parties as NNL replaced one asset, a receivable, with another, cash and NN France eliminated a liability that matched its reduction in cash.

       *(b)*     *Project Swift and NNIF Reorganization*

182.    NNUK claims that a complicated group of related transactions in 2007 known as 'Project Swift' was "a scheme purportedly to reduce NNL's liabilities under the loan to NNL by NNUK". In fact, Project Swift was designed and implemented principally by NNUK employees in the Nortel Treasury Department for the purpose of improving NNUK's own tax position and reducing the inter-company account owing from NNL. Under Project Swift, NNL satisfied US$630 million of a US$950 million book debt owing to NNUK (later eliminated by the Compensating Adjustment owing by NNUK to NNL of US$481 million) by transferring the shares of NNIF to NNUK.

183.    NNUK was required to recognize revenue for tax purposes on imputed interest on its interest-free loan to NNL.[36] This deemed interest income was offset for a time by available tax losses. By 2007, NNUK had utilized the bulk of its tax losses and was at risk of having to actually pay tax on the imputed interest. NNUK determined and recommended to NNL and NNC that it was in NNUK's interest (and in the interests of the Nortel Group as a whole) to reduce NNUK's

---

[36]    This loan arose during years in which, despite operating at a loss, NNUK was allocated a 1% distribution return under the MRDA that was initially recorded as a loan back to NNL in the intercompany records, as provided for in the MRDA and ultimately it was agreed to be included in inter-company loan accounts.

taxes payable. Hence NNUK created and implemented Project Swift to repay NNL's interest-free loan to NNUK and to eliminate the anticipated tax inefficiency to NNUK and the Nortel Group. Now both NNUK and NNIF (the holding company that was the subject of Project Swift) complain that they were negatively impacted by this transaction. These claims are made under both Domestic Law and Foreign Law, as indicated in Part 2C of **Schedule "D"** hereto.

### i.    *NNUK initiated and approved Project Swift*

184.    Project Swift was negotiated and entered into by NNUK by way of a Sale and Purchase Agreement dated December 20, 2007. The transaction was completed in accordance with its terms, and NNUK received the shares of NNIF and, indirectly, the other EMEA subsidiaries for which it bargained.

185.    Project Swift was initiated by NNUK, largely handled by NNUK's senior management, and was approved by NNUK's board of directors after consideration of independent expert advice discussed below.

186.    The adequacy of the consideration NNL provided to NNUK in connection with Project Swift was subjected to extensive due diligence and active oversight by NNUK's board of directors. In order to obtain independent advice for Project Swift, NNUK engaged professional advisers including legal counsel and Ernst & Young UK LLP, to value the shareholdings transferred to NNUK for Project Swift.

187.    At the same time, Nortel Networks U.K. Pension Trust Limited ("**Trustee**"), the independent administrator of the NNUK pension plan ("**Scheme**"), engaged PricewaterhouseCoopers ("**PWC**"), to confirm the conclusion of Ernst & Young UK LLP that Project Swift would not materially adversely affect NNUK and to do so in the context of NNUK's

ongoing obligation to fund the Scheme. The Trustee accepted PWC's advice that Project Swift provided fair value to NNUK on a going concern basis, but identified a potential "insolvency" scenario in which the shares being transferred to NNUK might be insufficient to meet its funding obligations. To provide additional support, NNL and the Trustee negotiated a written guarantee by NNL of certain (specified) of NNUK's pension funding obligations ("**Swift Guarantee**") in certain specified scenarios. The Trustee also negotiated to obtain NNL's agreement to make a US$68 million capital contribution in cash to one of the subsidiaries transferred to NNUK.

188.    NNUK's board of directors, cognizant of their duties and with the guidance of independent legal and financial advice, gave full and proper consideration to Project Swift and specifically concluded, in writing, that, upon NNL agreeing to grant the Swift Guarantee, the terms of Project Swift (which included the specific obligations and scenarios covered by the Swift Guarantee) were fair and reasonable and in the best interests of NNUK and its shareholders.

189.    The board of directors also understood that the potential tax savings from Project Swift would be approximately US$12.3 million per year and that NNUK benefited by trading a non-income bearing asset (the NNL receivable) for the potential of dividend income from the EMEA Claimants.

*ii.    Due Diligence by NNUK*

190.    As noted above, in carrying out their duties to prudently evaluate Project Swift, the board of directors of NNUK engaged the firm of Ernst & Young UK LLP to perform an independent valuation of NNIF and its subsidiaries being indirectly acquired by NNUK. The Joint Administrators are also members of Ernst & Young UK LLP. The independent valuation conducted by the Joint Administrators' own accounting firm concluded that NNUK received fair

- 63 -

consideration in exchange for the loan forgiveness it provided to NNL, along with additional tax-related and other benefits. Now they seek to challenge that value.

191.    The NNUK directors questioned Ernst & Young UK LLP on its valuation, and satisfied themselves with the accountants' responses. NNUK further specifically carried out additional research and due diligence into the valuation and the conclusions of Ernst & Young UK LLP.

192.    The NNUK directors met, including with other key finance personnel, at least five times over October and November, 2007, specifically to review and discuss the valuation and recommendations of Ernst & Young UK LLP and to ensure that due care and attention was given to the transactions.

193.    Given the external valuations conducted by professional advisers, the additional support from NNL obtained by the Trustee, and the depth of scrutiny of the Project Swift transactions by NNUK's board of directors, the Project Swift transaction cannot now be characterized, with the benefit of hindsight, as a preference, a wrongful diversion of property from NNUK or wrongful at all.

       *iii.    Valuations*

194.    The Project Swift assets were fairly valued, and NNUK received its full entitlement under the transaction.

195.    In this context, the EMEA Claimants plead that "to the detriment of the interests of NNUK, the value attributed to the assets transferred was much greater than the actual value of those assets" and go so far as to suggest that NNIF and its subsidiaries were insolvent (or were rendered insolvent) in December of 2007 at the time of these transactions. This characterization entails the Joint Administrators establishing that their firm, Ernst & Young UK LLP, fundamentally breached

- 64 -

its duty and negligently valued the Project Swift assets for NNUK, the proof of which will be their burden to establish (with any associated consequences). It also entails the Joint Administrators establishing the insolvency of the EMEA Debtors more than one year before the Filing Date for their appointment Orders. Both propositions are factually untenable.

*iv.    NNIF Reorganization*

196.    NNIF also complains about transactions relating to Project Swift, from a different perspective than NNUK with the effect of asserting that *too much* value was given to NNUK. NNIF claims to have been forced into a "reorganization" transaction to facilitate Project Swift (the "**NNIF Reorganization**"), in the course of which they claim to have been stripped of their value and cash, which they suggest rendered them more vulnerable to insolvency. This too is more revisionist history. Each and every step in this reorganization was duly approved and implemented through validly executed agreements for good and valuable consideration. The approvals by, and valuations undertaken for, NNUK and the Trustee further reinforce this. The fact that NNUK was a proponent of Project Swift also renders the alleged motive behind this transaction being to benefit NNL untenable, except in the very broad way that NNL would benefit from any transaction that was intended to be beneficial to the Nortel Group or any of its members. Furthermore, NNIF is not and never was insolvent[37]. This properly excludes the contingent FSD claim.

**Customer Revenue Claims**

197.    Two of the three EMEA RPS Claimants (NNUK and NN France (but not NN Ireland)) and all of the LREs (except NN Poland and NN Switzerland) seek compensation for customer revenues which they claim to have been wrongly denied. They do so under both Domestic Law and Foreign

---

[37]    If its contingent FSD Claim, discussed below, is excluded as it should be.

- 65 -

Law, as indicated in Part 3 of **Schedule "D"** hereto. They claim that revenue was recorded and received without reference to the entity which performed the obligations under customer contracts, or which entity had procured the contract. They assert that this was done under NNL's direction and its designation of which Nortel entity would enter into a given customer contract, to minimize taxes and maximize cash repatriation to Canada.

198.    The EMEA Claimants claim that, as a consequence, certain Nortel entities were deprived of revenue under customer contracts which were rightfully those entities' to enjoy, without identifying which contracts are at issue. Despite a specific demand for particulars, there is not one specific contract identified, nor any particular fact or allegedly misapplied revenue identified in any of the claims or in the particulars provided. The allegation is bald and is properly denied.

199.    In reality, customer contracts were typically entered into based on a "local to local" approach, whereby the local Nortel entity in the customer's jurisdiction would enter into the contract. In the result, revenue was predominantly recognized, attributed and recorded appropriately to the entity in the same location as the customer to whom goods were delivered or services were provided.

200.    If, however, the customer contract was multi-jurisdictional, the EMEA Tax and Finance function would liaise with the relevant commercial personnel dealing with the customer. The principal drivers behind the ultimate choice of contracting party would be the customer's preferences and requirements and the VAT position for Nortel and the customer.

201.    Revenue derived from these multi-jurisdictional customer contracts was allocated to the Nortel contracting entity. For example, revenue earned by NN Spain through a contract that NNUK staff had helped secure, would stay with Nortel Spain, and Nortel Spain's only obligation

would be to reimburse NNUK for the time spent by NNUK MSGs and PLMs (service engineers and project managers) in helping to deliver the contract. NNUK would seek reimbursement from NN Spain by way of inter-company billing, the terms of which would depend on the particular circumstances of the contract.

202.    The Nortel Group took a fair and principled approach to customer contracts. The EMEA Claimants operated under this approach for years and never complained that it was unfair to them. To the extent they now complain, whatever they seek to recover would, in most instances, be from another EMEA Claimant, not NNL (which they essentially admit in their particulars). NN Ireland, for example, received customer contract revenues for the Enterprise LOB in the EMEA Region and would be on the receiving end of such a claim.

203.    Moreover, even if an EMEA Claimant was allocated a particular customer contract, all of the EMEA Claimants were ultimately subject to the transfer pricing regime under the MRDA. This transfer pricing methodology ultimately determined the appropriate allocation of profits earned by the EMEA Claimants.

204.    NNL had no obligation to attribute customer revenue to one entity over another, or to allocate proceeds from one customer transaction to another, outside of what would flow from the implementation of the terms of the MRDA and Distribution Agreements or what may arise as a result of third party arm's length negotiations. As pleaded above, the transfer pricing regime was implemented and managed in good faith, in accordance with the terms of the MRDA and Distribution Agreements, as amended, and in accordance with internal Nortel policies.

*Past Dispositions of Businesses*

205.    The EMEA Debtors allege that at various times prior to the Filing Date, they disposed of assets as part of various co-ordinated business sales with NNL and other Nortel entities and that, following those business sales, NNL allocated (and/or directed the allocation of) the portion of the proceeds of sale referable to each entity. These claims are asserted under both Domestic Law and Foreign Law, as indicated in Part 4 of **Schedule "D"** hereto. The EMEA Claimants state that each entity was entitled to a portion of the proceeds that was actually referable to the assets that that entity had an ownership interest in and was selling. The EMEA Claimants allege that to the extent that they did not receive from any business sale a fair and appropriate allocation of the proceeds for the assets they sold, they have various claims.

206.    In the particulars provided by the EMEA Claimants, the EMEA Claimants list seven dispositions which they say were not properly allocated among the Nortel entities. The EMEA Claimants do not specify which EMEA Claimants were entitled to proceeds from these dispositions, on what basis they were entitled to proceeds, or what amount they should have received other than in respect of the UMTS transaction, for which they provide an amount, but no other such particulars.

207.    In response to these very general assertions, the Monitor and Canadian Debtors state that in any transaction that involved assets that an EMEA Claimant had a legitimate and valuable ownership interest in, that EMEA Claimant did receive a fair and appropriate allocation of the net sale proceeds (if any).

208.    The UMTS transaction, which was a sale of substantially all of the assets and liabilities related to its UMTS access products and services to Alcatel-Lucent, was completed on

- 68 -

December 31, 2006. As a result of the sale, Nortel transferred approximately $290M in net assets comprised primarily of fixed assets and inventory, certain existing UMTS contracts, intellectual property, and approximately 1,700 employees attributed to the UMTS access products.

209.    A Share and Asset Sale Agreement ("**SASA**") between NNL and Alcatel governed the sale, with local sale agreements for asset transfers in specific countries. The SASA was a global agreement reached by the two parent corporations, followed by local approval at the entity level.

210.    The SASA provided for Alcatel's allocation of the proceeds of sale among various asset classes. Its allocation was subject to two provisos: (1) Nortel's net book value under U.S. GAAP was the value to be utilized for both fixed assets and inventory; and (2) the allocation of the proceeds attributable to intangibles (IP and goodwill) was to be determined based on Alcatel's outside appraisal. Upon receipt of Alcatel's appraisal, the contract provided that Nortel's role was to determine the fair and appropriate allocation among the Nortel selling entities, which it did.

211.    The determination of a fair and appropriate allocation of sale proceeds from a transaction like UMTS involving the sale of the assets of an ongoing business was a function, in each instance, of the nature of the assets being sold, the nature of the ownership interests in those assets and of business judgment applied in the circumstances and at the time of the particular transaction. The allocation of the UMTS sale proceeds was made on that basis to the appropriate EMEA Claimants in the appropriate amounts at the time (in or shortly after December, 2006) and they were accepted by the affected EMEA Claimants without any timely challenge, the first such purported challenge coming when their Claims herein were particularized almost five years later, in 2011.

- 69 -

212.    In addition to UMTS, the other prior transactions listed in the EMEA Claimants' particulars to be the subject of complaint are:

• Sale of assets of Nortel's Access Solutions Division to Aastra Technologies Limited for approximately US$25 million in January 2009 [SIC 2000];

• Sale of assets relating to the business of the design, development, operation, service and support of the Mobile Location Centre products to Andrew Corporation for approx US$5 million in August 2005;

• Sale of various assets relating to the business of design, development, manufacture, distribution, sales and support products in Nortel's (i) optical amplifiers and pump module product line and (ii) transmitters and receivers product line to Bookham Technology plc for approx US$50 million November 2002;

• Sale of the assets relating to High Speed Modules Business to Breconridge Manufacturing Solutions Corporation for approx US$2.5 million in July 2003;

• Sale of various assets to Metasolv Software Inc. for approx US$35 million in January 2002; and

• Sale of silicon manufacturing operations to STMicroelectronics (Canada) Inc. for approx US$100 million in May 2000.

213.    There is no indication of whether or how allocations of these sale proceeds were improper, or even which EMEA Claimants assert that they owned assets that were sold for which they were not properly compensated. Moreover, all of these transactions took place in or before 2006 without any question or challenge since. The Monitor and Canadian Debtors maintain that there is nothing objectionable nor grounds upon which any of these seven past dispositions transaction can now be challenged by the EMEA Claimants.

**ONTARIO (NOT FOREIGN) LAW APPLIES AND NO CAUSE OF ACTION LIES**

214.    The summary of EMEA Claims at **Schedule "D"** hereto includes both Domestic Law and Foreign Law claims. However, all the pleaded claims may be adjudicated only under Domestic Law.

- 70 -

215.    The MRDA expressly provides, in Article 14, that it shall be construed in accordance with and governed by the laws of the Province of Ontario. The Distribution Agreements are also governed by Domestic Law. All of these agreements contain "entire agreement" clauses. All of the EMEA Claims are asserted in respect of, or are answered by, or are connected to, the arrangements reflected in the MRDA, RPSM and/or the Distribution Agreements. Thus, they are governed by Domestic Law. Any other law that is pleaded is irrelevant.

216.    The Monitor and the Canadian Debtors submit that the Ontario Court can and should apply Domestic Law to all of the EMEA Claims, which will lead to their dismissal. However, it is submitted that the same result will ensue under the Foreign Law pleaded. The Foreign Law pleaded is not materially different from Domestic Law, but if there are different requirements under Foreign Law, they will lead to the dismissal of the EMEA Claims. The specific Foreign Law pleas are addressed in the next section.

217.    The Domestic Law claims all fail because they seek to avoid and ignore the contractual framework and corporate structure within which the members of the Nortel Group operated without objection or complaint for more than eight (8) years before the Filing Date. Legal and equitable obligations, duties and expectations cannot be recast with hindsight; they must be determined with reference to the historical actual dealings between the EMEA Claimants and the Canadian Debtors and the legal distinctions that were respected and maintained between them. When assessed in this context, no cause of action or claim lies. There is simply no basis under any of the various causes of action asserted upon which to set aside the agreements and transaction documents and corporate arrangements under which the EMEA Claimants and the Canadian Debtors have been operating, which is what the EMEA Claimants now seek to do.

- 71 -

*(a)      No Breach of Contract or Mistake*

218.    The EMEA Claimants do not seriously contend that the MRDA or RPSM or Distribution

Agreements were breached[38]. In essence, the EMEA Claimants seek through their transfer pricing

claims to avoid the contractual framework or set aside these contracts so that they can recalculate

their entitlements. They cannot do so because:

- •      the MRDA and Distribution Agreements were implemented and carried out according to their terms;

- •      calculations pursuant to the MRDA, RPSM and Distribution Agreements were made in accordance therewith, and the appropriate entitlements and liabilities resulting therefrom were paid or were recorded as inter-company entitlements and liabilities, as the case may be, as the contracts contemplated they would be, without complaint; and

- •      no notice of breach or challenge, or request for recalculation was ever given or made.

219.    Further, their claims are based on a distortion of the terms of the MRDA, RPSM and/or

Distribution Agreements and the obligations and entitlements thereunder. To the extent they seek

to imply terms they cannot do so in order to alter the express terms of the agreements, which were

adhered to.

220.    Rather than alleging that the contracts were breached, the EMEA Claimants appear to

assert that there was some kind of "mistake" in them, either as the contractual terms or the

assumptions. The fact is, there was no mistake, and the EMEA Claimants assert no facts about

mutual or even unilateral intentions or understanding upon which a finding of mistake could be

founded. To do so the EMEA Claimants would have to show a mistake in a fundamental term of a

contract or how it was written down. Merely having different views about how to interpret or apply

---

[38]    The three that purport do so (NN Germany, NN Poland and NNUK) base their unparticularized claims on misapprehensions and misconstructions of the contacts relied upon.

- 72 -

the terms or a formula contained in a contract is not enough. Further, if the mistake is unilateral, some showing of fraud or intentional misconduct is also required.

221.    The EMEA Claimants agreed to the formula that was applied to determine their distributions. None allege that the formula was written down incorrectly or that it failed to reflect a fundamental mutual assumption, common intention or agreement that would have led to a different formula being written down.

222.    What the EMEA Claimants apparently were "mistaken" about was how they had satisfied themselves that the routine return they received for distribution activities "represented fair market value, arm's-length compensation for [their] distribution activities, and that [their] returns and share of residual profits had been determined on an arm's-length basis". Now they assert that what they received was not this "arm's-length" compensation and suggest that they (mistakenly) thought the RPSM contractual formula was subject to after-the-fact "arm's-length" verification and adjustment, which it clearly was not. In any event, such a belief, even if honestly held, does not constitute a mistake of contract.

223.    Furthermore, even if the distributions should have been calculated differently, that would not ground a remedy of restitution or unjust enrichment as pled by the EMEA Claimants because they have not alleged that it was the Canadian Debtors that necessarily received any particular distributions complained about. Adjustments to distributions would affect all RPS and LRE entities over the entire eight (8) year period under which the RPSM was applied.

        (b)      No Basis for Statutory Oppression Claims

224.    In order to grant relief under the oppression remedy in section 241 of the *Canada Business Corporations Act* ("**CBCA**"), the Court must be satisfied that a company incorporated under that

statute (or any of its affiliates) acted, conducted their business and affairs, or the powers of their directors were exercised in a manner oppressive or unfairly prejudicial to a shareholder, creditor, directors or officer. The complainant must be shown to have had a reasonable expectation that was defeated through the conduct complained of. In this case, it was the opposite.

225.    As described above, at all times, Nortel Canada acted within the reasonable expectations of the parties, having regard to, among other things, (i) the course of dealings between Nortel Canada and the EMEA Claimants as parent and subsidiaries and the manner in which the EMEA Claimants operated within the EMEA Region and in the LOBs; (ii) the various agreements and transactions that were negotiated and entered into between Nortel Canada and the EMEA Claimants, with the aid of independent and sophisticated professional advisors; (iii) the various regimes, laws, regulations and agreements that governed the EMEA Claimants, including their pension schemes; (iv) the functional and operational relationship between the various Nortel entities; (v) the financial resources of the Nortel Group; and (vi) the various legal regimes in which Nortel operated.

226.    The oppression remedy under the CBCA has no application in this case where the fundamental relationship between the parties that is complained about is contractual (namely, the transfer pricing arrangements). The EMEA Claimants' reasonable expectations must be defined by their contractual arrangements and dealings with the Canadian Debtors and their course of conduct under them.

227.    Not only is the statutory oppression remedy not applicable to transfer pricing issues, it is inapplicable to the documented inter-company loans, documented and approved reorganization transactions and dividends, customer contracts and other transactional agreements (including with respect to business dispositions and pension schemes) on which many of the EMEA Claims are

- 74 -

grounded. They similarly cannot be avoided by reference to "oppression". The only reasonable expectations of an entity in the Nortel Group would be to have engaged in the transactions now complained of.

228.    The oppression remedy is intended to protect reasonable expectations of certain groups of complainants (such as shareholders, directors, officers and creditors) who could be vulnerable to the acts of a company incorporated under the CBCA. The EMEA Claimants do not qualify.

229.    Furthermore, the EMEA Claimants are each foreign entities incorporated under the laws of foreign jurisdictions, and are not incorporated under the CBCA. Thus, their oppression remedy claims have to stem from the wrongful acts of NNL and NNC and/or themselves (as the affiliates) that they now say unfairly prejudiced or disregarded or oppressed them and caused them injury. NNL and NNC did not oppress them, and even if they are affiliates of NNL and NNC they cannot complain about having oppressed themselves.

(c)    <em>No fiduciary or other implied duties owed or breached</em>

230.    In order to do a different end run around the same outcomes dictated by the agreements and documented arrangements they seek to avoid under the oppression remedy, many of the EMEA Claimants allege that NNL and NNC were "shadow directors", "<em>de facto</em> directors", "quasi-directors", "ultimate controllers", or otherwise owed them the duties of care of a director or fiduciary[39] and that NNL and NNC breached those duties and are therefore liable to pay damages

---

[39]    This is claimed under Ontario common law, as well as under various foreign laws as detailed in **Schedules "E" to "Y"** hereto: NNUK (common law); NN Ireland (s. 27 of the Irish Companies Act 1990 and applicable Irish common law); NN Holland (s. 2:248 of the Dutch Civil Code); NN France and NN France (liquidator) (Article L651-2 of the French Code de Commerce and French common law); NN Czech Republic (section 66a, para. 14 of the Czech Commercial Code (being Act no. 513/1991 Coll); NN Belgium (articles 1382-1383 of the Belgium Civil Code); NN Austria (s. 24 and 25 Austrian Act of Limited Liability Companies); NN Portugal; NN Spain (section 225 to 229 and 236 to 240 of the Spanish Companies Act (Spanish Act 1/2010, of July the 2nd on Limited Liability Companies, and sections 164.1 and 172 of the Spanish Insolvency Act (Ley 22/2003).

- 75 -

or to compensate the EMEA Claimants for the consequences and effects of having operated under those prior agreements and transactions.

231. Under Ontario law, a company does not owe fiduciary duties (or like duties) to another company, as a "shadow director" or *de facto* director or otherwise. To impose such duties would be contrary to the most basic tenet of legal separation of corporate entities. Grounds for piercing the corporate veil under Ontario law have not been particularized as would be required, nor could they be established. The EMEA Claimants cannot be said to have acted as the agents or alter egos of Nortel Canada, nor were they "sham" companies or operated under any fraudulent pretext.[40]

232. Furthermore, even if "director-like" duties could be imposed, among other requirements, it would be dependent upon the establishment of a relationship of full direction and control or domination by Nortel Canada that did not exist in this case.

233. Among other factual impediments to this claim, the Joint Administrators have admitted that the management and control of the EMEA Claimants emanated from Senior Management. The EMEA Senior Management operated on their own authority. The fact that they interacted with and participated in the Global Tax and Treasury Groups or operated within certain Nortel LOBs is not remarkable. To the contrary, it demonstrates the matrix organizational structure of Nortel.

234. Beyond whatever managerial direction they received from senior management of the EMEA Region, the EMEA Claimants had their own management who did not act simply in accordance with Nortel Canada's instructions. The EMEA Claimants cannot be said to have acted as the agents or alter egos of Nortel Canada.

---

[40] Even if Nortel Canada was a *de facto*, shadow, or quasi- director, ultimate controller or other similar person, which is not admitted, Nortel Canada complied with its obligations, and its conduct did not amount to fraud, serious misconduct or gross negligence as the EMEA Claimants baldly allege.

- 76 -

235.    At no time did Nortel Canada meddle in the affairs of the various EMEA Claimants in a way that it could be said to have acted as a manager or director of the EMEA Claimants, even if that was a tenable legal proposition (which it is not). Nortel Canada did not exercise complete control over, or impose decisions on, the EMEA Claimants. Any interaction that they might have had with the EMEA Claimants was not more than the customary and expected interaction that a parent company of a multi-national corporation would have with any of its wholly-owned direct and indirect subsidiaries. Such coordination was expected and necessary in order to run a global enterprise of Nortel's size and reach.

236.    The relationship between Nortel Canada and each of the EMEA Claimants was such that their individual separate corporate entities were respected. The EMEA Claimants improperly link (i) the fact that business functions operated across companies and that certain responsibilities were assigned to specific entities with (ii) an argument that separate entities did not exist and were not accounted for. The separate entities were respected, were legally recognized and were separately accounted for through the transfer pricing protocol. Any transfer of funds from an EMEA Claimant to NNL or NNC as the parent company, and any other transaction between them, was done with consideration of the needs and interests of the EMEA Claimant and applicable law.

237.    As detailed above, each of the EMEA Claimants was governed by a board of directors, who were appointed in accordance with the EMEA Claimant's constating documents and applicable laws. At all material times, the boards of directors of the EMEA Claimants exercised their judgment independently from any undue or improper influence or interference from Nortel Canada and took their own decisions. Furthermore, the boards of directors of the EMEA Claimants retained from time to time the necessary or desirable independent experts to provide them with advice with respect to the decisions they were making.

- 77 -

238.    In any event, while the EMEA Claimants were solvent (which was the case, according to their filings in the U.K. administration proceedings, at least until their application for orders of administration in January 2009 and for many, remains the case today), their directors and any other fiduciaries were fully entitled to consider and act in the interests of their ultimate shareholders, NNL and NNC. No breach of fiduciary duty arises from such considerations.

239.    In the alternative and in any event, absent proof of insolvency, even acts undertaken to the detriment of a subsidiary can be ratified by the parent (shareholder) in its own best interests. NNL approved (and according to the EMEA Claimants, in fact directed) all of the relevant transactions that form the basis of the EMEA Claims. This would have cured the alleged breaches of fiduciary or other implied duties in any event.

240.    These claims of fiduciary or other like duties are equally problematic from the perspective of the standing of the EMEA Claimants to make them. Even if third parties might be able to, in certain very specific circumstances (which do not exist here), look beyond the subsidiary company to its parent for accountability, the subsidiary itself has no such claim. The EMEA Claimants go even further, to suggest not only that such a duty can be imposed in favour of the subsidiary itself, but then seek to use that as a springboard for imposing the statutory and other duties of an individual director on the corporation. Another legal fiction.

- 78 -

(d)      No "Enhanced" Duties

241.    Certain of the EMEA Claimants[41] also assert that "given the doubtful solvency and/or risk of insolvency" from 2000 onwards, NNL was obliged at all times to consider the interests of the creditors of the EMEA Claimants "as paramount".

242.    There can be no reasonable expectation that creditors' interests would be put ahead of or considered paramount to the interests of the Nortel Group members under those circumstances as the EMEA Claimants assert. This "zone of insolvency" is not a known or established circumstance under Domestic Law (or any Foreign Law) upon which a duty of care can be found to be owing by the shareholders of the EMEA Claimants to the EMEA Claimants or their creditors.

243.    In Ontario, a duty to take into account other stakeholders' interests arises in the context of the statutory duty owed by directors under section 122 of the CBCA, which requires them to look to the long term interests of the corporation. This statutory duty (which is specific to directors and officers) cannot be extended to "quasi" or "shadow" directors; but even if it could, the consideration of the interests of other stakeholders (like creditors) is permissive, not mandatory. At its highest, the duty is to act in the best interests of the corporation, having regard to all relevant considerations which may include treating other stakeholders in an equitable and fair manner. There is no suggestion that the EMEA Claimants' boards of directors did not do this and, thus, there can be no suggestion that anything NNL or NNC did caused them to do so.

244.    In the alternative, even if there were theoretical duties to other stakeholders, they only arise with respect to the entity's conduct occurring <u>after</u> insolvency. The conduct complained of by the EMEA Claimants occurred prior to (in most cases many years before) the Filing Date. The

---

[41]    NN Ireland, NN France and NNUK.

insolvency of the EMEA Claimants has not been established dating back to the transactions now challenged by them. To the contrary, several of the EMEA Claimants remain solvent today (excluding, as is appropriate, the contingent FSD Claim discussed below). Specific legislation exists that provides for what transactions can be reviewed and/or set aside once insolvency is established. Insolvency is a precondition to any reliance on such legislation under both Domestic and Foreign Law.[42]

245.    The premise and precondition as set out in the claims themselves is that there was "doubtful solvency and/or risk of insolvency from 2000 onwards". This is not sufficient to found a claim, and is itself not substantiated. If it were true, the EMEA Claimants likewise owed a duty to disclose that to Nortel Canada and their own auditors so that appropriate measures could be taken, and their failure to do so is fatal to the credibility and tenability of this claim predicated on such undisclosed circumstances.

246.    In any event, none of the creditors of the EMEA Claimants can be said to have been treated unfairly or inequitably, having regard to the existing contracts and course of dealings and, even if they could make such an assertion, the EMEA Claimants have no status to do so. They have suffered no loss in respect of such claim, and they have no entitlement to assert any such claim.

(e)    No Conspiracy

247.    The conspiracy claims of the EMEA Claimants similarly are directed to the same agreements and documented arrangements that the EMEA Claimants seek to avoid under the oppression remedy and/or by their alleged breaches of fiduciary or other duties. To establish a conspiracy under Ontario law would require proof of an agreement to which NNL and NNC were

---

[42] Even if insolvency were to be established the transactions at issue would be upheld.

party, with the predominant purpose being to injure the EMEA Claimants, or that they combined to act unlawfully towards the EMEA Claimants knowing that they would be injured. Quite apart from the difficulties of proving the existence of the agreements or the occurrence of any unlawful acts (to which the EMEA Claimants themselves would have to have been a party), it is antithetical to suggest that the predominant purpose of the actions of NNL and NNC was to injure the EMEA Claimants, or even that injury to them was a known or expected outcome.

248.    As detailed earlier in this pleading, the premise of the arrangements now complained of arises from the manner in which the Nortel Group operated, which was, in the broadest sense, with a view to the best interests of the Nortel Group (and its members). This renders any alleged conspiracy which must be predicated on a predominant intention to injure any individual EMEA Claimant (or even predicated on the knowledge of the likelihood of that outcome) unsustainable.

249.    Furthermore, all of the agreements and arrangements complained of were binding and lawful.

### (f)    No Unjust Enrichment

250.    To claim unjust enrichment as a result of the alleged wrongdoing described above, the EMEA Claimants have to show Nortel Canada was unjustly enriched at their expense, which they cannot do.  Even if they could demonstrate enrichment, it was justified. The MRDA, RPSM and Distribution Agreements and the duly authorized and documented loan arrangements, customer contracts and documented and approved transactional agreements are the juridical reasons for any amounts paid and received by Nortel Canada. There was nothing unjust about the Nortel Group's operations or these transactions which were all properly documented and approved in the regular course.

- 81 -

(g)    *No Breach of Trust*

251.    This claim presupposes, among other things, that contractual and commercial arrangements pursuant to which funds were paid and received were unlawful. The "trust" properly must be directly linked to alleged wrongdoing. Here the payments received were pursuant to lawful and binding agreements and transactions so this claim cannot be established. At their highest, the EMEA Claimants are unsecured creditors for any claims that they may establish in the Canadian Estate of Nortel and their constructive trust claim must be considered in light of the interests of the creditors of the Canadian Estate.

(h)    *EMEA Claims are Barred by Prescription/Limitations*

252.    By the time the earliest of the EMEA Claims were filed in 2011 they were statute-barred by the *Limitations Act* (R.S.O. 1990, as amended) and barred in equity by the passage of time and laches. The Ontario two-year limitation period applicable to the causes of action upon which the EMEA Claims are predicated expired prior to the EMEA Claims being made.

253.    The EMEA Claimants knew at the time of the transactions, contracts and arrangements at issue, of what they now complain about. The contractual arrangements and course of dealings upon which they are predicated had been in place for many years and well over two years before the EMEA Claims were made (and most occurred long before that). There was no fraud or concealment and the time for bringing these claims has long since passed. In addition to being a bar to the EMEA Claims, this is also indicative of the dependency of the EMEA Claims on revisionist history.

- 82 -

*(i)        Estoppel, Waiver and Acquiescence*

254.    Each EMEA Claimant is complaining about matters in which it was an active, knowing and willing participant. The EMEA Claimants cannot maintain any claim in respect of actions or conduct in which they participated, even if such actions or conduct involved any wrongdoing on the part of the NNL or NNC which is denied.

255.    In particular, but without limitation, the EMEA Claimants are governed and are bound by the terms of the MRDA, RPSM and Distribution Agreements and estopped from asserting any claims or position inconsistent with them, by reason of (i) participating in and taking the benefits of the transfer pricing arrangements under the MRDA and the RPSM mandated thereby; (ii) their agreement to the Distribution Agreements which are inseparable from, which incorporate by reference and are integrally related to, the MRDA and the RPSM; (iii) the agreement to the MRDA by their 100% parent EMEA Claimant company (NNIF and/or NNUK); (iv) the invocation of the MRDA by the in common Joint Administrators on behalf of the EMEA Claimants who are RPS Entities; (v) their acquiescence in the application of the MRDA and the RPSM, effective since January 1, 2001 and acceptance of payments thereunder.

256.    The EMEA Claimants also accepted the benefits of other arrangements and transactions without complaint. This ratification and approval of the conduct complained of is also a waiver of their claims.

257.    Furthermore, in terms of their claims predicated upon Nortel Canada's domination and control of them, the administration orders granted in the U.K. proceedings (and repeated to the U.S. Court) were made on the representations of the Joint Administrators on behalf of the EMEA

- 83 -

Debtors that they were managed and controlled from England. Thus, they are now estopped from alleging differently in these proceedings.

258.    In the result:

(a)    the EMEA Claimants have no standing or capacity to assert claims founded on conduct or actions that they participated in;

(b)    all such claims fail by reason of the doctrine of *ex turpi causa non oritur* action; and/or

(c)    all such claims fail by reason of the doctrine of *in pari delicto*.

*(j)    No Entitlement to other Remedies Claimed*

259.    The EMEA Claimants have failed to prove any damages, or alternatively, have failed to mitigate them. Further, they cannot prove that they were harmed by the transfer pricing regime or transactions they willingly agreed to and/or acquiesced in and took the benefits of and thus cannot establish that the alleged breaches complained of caused them any loss or damage or that they were harmed by any act or omission of Nortel Canada.

260.    Furthermore, if the EMEA Claimants were to establish any entitlements to adjustments under the transfer pricing regime, or for customer revenues or past dispositions, these would have to be reconciled with adjustments to the other participants with corresponding adjustments under the applicable formulas to avoid double counting.

261.    To the extent proprietary claims are made (for breach of trust or otherwise), no foundation for such claims has been established. Furthermore, these claims are transparent attempts to give priority to the EMEA Claimants over other creditors of the Canadian Estate of Nortel, which the

- 84 -

CCAA Court will not and should not endorse to the detriment of other legitimate Canadian creditors.

262.    Certain of the EMEA Claimants[43] claim that Nortel Canada is liable for "equitable compensation" or an "equitable accounting".

263.    Nortel Canada denies that there is a separate cause of action of "equitable compensation" under Canadian law (or any other applicable Foreign Law) and puts the EMEA Claimants to the strict proof thereof. Even if there was such a cause of action, it would not be "equitable" to deprive the stakeholders of the Canadian Estate of their recoveries in order to compensate the EMEA Claimants for losses they suffered due to ordinary course business dealings and market fluctuations.

*(k)    No Entitlement to any Reservation of Rights*

264.    This is not a proceeding in which rights can be reserved for the future. It must have finality and any rights that cannot now be asserted and proven must be discounted to zero or dismissed outright on the basis that they do not exist. Purposed claims that did not arise until after the Filing Date cannot be proven as contingent claims or otherwise.

**FOREIGN LAW CLAIMS**

265.    As identified in **Schedule "D"** hereto, all EMEA Claims are asserted under both Domestic Law and Foreign Law.

---

[43]    NN Ireland, NN Holland, NN France, NN Norway and NNUK.

- 85 -

*Foreign Law does not Apply*

266.    Foreign Law is not applicable to the within proceedings or to the EMEA Claims. For the reasons already set forth above, Domestic Law, not Foreign Law, applies to the EMEA Claims. Further, the Ontario Superior Court of Justice has exclusive jurisdiction with respect to claims against the Canadian Debtors. The EMEA Claimants have not provided an adequate basis upon which to assert a cause of action under Foreign Law, nor for any finding of wrongdoing under Foreign Law which may be a requisite component of any cause of action asserted.

*Foreign Law has not been Properly Pled or Proven and the Requirements that are Identified cannot be Established*

267.    To the extent that the EMEA Claimants have asserted claims or remedies based on any law other than Domestic Law, the EMEA Claimants must prove, among other things: (i) the existence of the Foreign Law; (ii) the applicability of the Foreign Law to the particular claim at issue; (iii) the extent of any differences between the Foreign Law and the Domestic Law in respect of the particular subject matter; (iv) the facts required to be established for the claim or remedy under said law, and (v) that said Foreign Law can and ought to be enforced and applied by the Ontario Superior Court of Justice in these CCAA Proceedings.

268.    In the event that this court determines that it can or ought to apply Foreign Law, the EMEA Claimants will not prove that the Foreign Law leads to any different outcome than under Domestic Law. Neither Domestic Law nor Foreign Law gives rise to any cause of action, rights or remedies against the Canadian Debtors.

269.    It is denied that the Foreign Law has been properly pleaded. In the alternative, if it is determined that the Foreign Law has been properly pleaded, the existence of, *inter alia*, any facts, causation or damages necessary to meet the required elements of the Foreign Law that the EMEA

- 86 -

Claimants rely upon is denied. Further details of the requirements of the Foreign Law as pleaded by the EMEA Claimants are set forth in **Schedules "E"** to **"Y"** hereto[44]. Most of these Foreign Law Claims are answered by the same factual predicates that render the EMEA Claims unsustainable under Domestic Law. The factual realities that are each individually, and together, fatal to all of the EMEA Claims (foreign and domestic) are:

1)   They are answered by the valid and subsisting contractual and authorized documented transactional arrangements; and/or

2)   They arise out of transactions and a course of dealing that the EMEA Claimants willingly participated in with the full knowledge and endorsement of their boards of directors; and/or

3)   Their insolvency date has been established to coincide with the Filing Date, not some earlier date.

(a)      *The Contracts and Documented Arrangements are Unassailable*

270.      The EMEA Claimants seek to avoid the binding nature and effects of their lawfully entered into contracts. The causes of action asserted under Foreign Law do not assist the EMEA Claimants in doing this. The MRDA, RPSM, Distribution Agreements, documented inter-company loans, customer contracts and duly authorized dividends and other corporate re-organizations or transactions are a full answer in defence to all Foreign Law claims as well.

(b)      *The Necessary Element of "Influence" or "Control" under Foreign Law does not Exist*

271.      Under the various Foreign Laws pleaded, the EMEA Claimants acknowledge that they must establish that Nortel Canada – in some manner or another – exercised control or influence or

---

[44] The assertions of the Foreign Law relied upon by the EMEA Claimants are summarized in these attached Schedules. The Monitor and the Canadian Debtors reserve all rights as set forth in these Schedules to fully respond to these claims in the ordinary course of these proceedings if the EMEA Claimants "prove" the Foreign Law they assert. These Schedules are intended only to demonstrate that, even as currently pled, these claims will all fail.

- 87 -

dominance over the EMEA Claimants and did so in breach of obligations arising from that position of control or influence. The EMEA Claimants cast their allegations similarly under the Foreign Law claims in various forms including, but not limited to, allegations that Nortel Canada was a *de facto* director, shadow director, quasi director, managing director, or was otherwise a dominant or influencing entity. Regardless of the Foreign Law claimed, the factual answer to these allegations includes the same considerations discussed above under Domestic Law. The alleged duties and elements of breach cannot be established by virtue of the existence of practices and procedures that were intended to benefit the participants in the Nortel Group, including the EMEA Claimants. The EMEA Claimants benefited from their participation in the group, and governed themselves and made decisions having regard to those benefits. Now, having taken the benefits during their years of operation, they seek to challenge them as unlawful and cast themselves as the poor cousins who were taken advantage of.

(c)    *Claims of "Near Insolvency" are Unsubstantiated*

272.    To the extent that the EMEA Claimants seek to allege any additional duties owed by Nortel Canada on account of alleged insolvency events in support of their Foreign Law claims, these allegations are unfounded. None of the EMEA Claimants filed for any type of insolvency protection until January 15, 2009 (and at that time, most of them were just predicting the possibility of insolvency which has, even to date not yet materialized[45]), nor have they delineated any events of insolvency that occurred before then, or when.

273.    Furthermore and in any event, the particulars provided by the Joint Administrators assert reliance by all of the EMEA Debtors on the U.K. *Insolvency Act*, 1986, but they do not

---

[45] Excluding, as is appropriate, the contingent FSD claim discussed below.

- 88 -

particularize any date or event of insolvency for purposes of claims under that statute prior to their January 15, 2009 filing date. The Monitor and Canadian Debtors maintain that reviewable transactions (at undervalue) or preferences alleged under the U.K. *Insolvency Act*, 1986 are not relevant or applicable to the determination of the EMEA Claims. In any event, it is denied that any transactions between the EMEA Claimants and Nortel Canada were at undervalue or were preferences (for the reasons outlined previously). Furthermore, under that statute, the relevant date for evaluating whether the adjustments the EMEA Claimants seek for prior transactions alleged to be preferences or to have been undertaken at under value is the onset of insolvency when they were unable to pay their debts. As indicated previously, for many of the EMEA Claimants that has still not occurred. Furthermore, these are claims that would have to be made by the creditors of the EMEA Claimants, not by or on behalf of the EMEA Claimants themselves.

274.    In any event, the absence of any intent or desire to prefer Nortel Canada over other creditors and the fact that all transactions complained of were carried out in good faith for the purpose of carrying on the business of the EMEA Claimants and for the benefits that they derived from their participation in the Nortel Group, renders all claims being advanced under this statute equally unsustainable by virtue of the provisions of, *inter alia*, sections 238, 239 and 240 of the U.K. *Insolvency Act*, 1986.

        (d)    *Additional Defences Under Foreign Law*

275.    In addition to the defences detailed above in respect of the Foreign Law complaints, and without admitting the application of Foreign Law, the Monitor and the Canadian Debtors further plead and rely on any and all available defences under the Foreign Law.

- 89 -

*(e)      Unparticularized Foreign Law Claims*

276.    Nortel Canada denies that the unparticularized provisions of Foreign Law relied upon by certain of the EMEA Claimants[46] are applicable as a matter of private international law. In the alternative, if such provisions of Foreign Law are applicable, Nortel Canada states that it complied with such provisions.

**PENSION CLAIMS BY EMEA**

277.    The EMEA Claimants each make a claim against Nortel Canada to recover the alleged deficits or losses suffered by the pension schemes run by the various EMEA Claimants (the "**EMEA Schemes**").

278.    The pension claims advanced by the EMEA Claimants generally fall into two broad categories: (i) claims that Nortel Canada is directly liable for the deficits or losses suffered by the EMEA Schemes ("**Direct Pension Claims**"); and (ii) contribution for any amounts that the EMEA Claimants are required to pay under an FSD (defined below) (the "**FSD Claims**"). These claims are asserted by the EMEA Claimants under both Domestic Law and Foreign Law as indicated in Part 5 of **Schedule "D"** hereto and are discussed separately below.

---

[46]    The following entities have not provided any particulars of their allegations regarding the content, applicability or breach of foreign law: NN Slovakia, NN Romania, NN Switzerland, NN Norway and NN Finland.

- 90 -

***Direct Pension Claims against Nortel Canada***

279.    Each of the EMEA Claimants assert that Nortel Canada is directly liable for any deficits or losses suffered by the EMEA Schemes as a result of the following allegations (many of which overlap with the allegations made in support of their other claims):

(a)    <u>Exercised Full control over and have liability as a *de facto*, shadow or quasi-director</u> – Each of the EMEA Claimants allege that Nortel Canada exercised full control over the EMEA Claimants, and over the applicable EMEA Scheme, or acted as a *de facto*, shadow or quasi- director or ultimate controller in relation thereto. Certain EMEA Claimants[47] claim that Nortel Canada breached such duties and therefore became liable for the pension deficits under this theory.

(b)    <u>Failed to ensure rapid deficit elimination and breach of general duties</u> – Each of the EMEA Claimants asserts that Nortel Canada appreciated, or ought to have appreciated, that it was in the best interests of the particular EMEA Claimant, and its creditors and employees, to effect the rapid elimination of the funding deficit of the applicable scheme and to ensure that the scheme could meet its obligations and it failed to do so and its failure to do so was a breach of duty under Canadian, UK or local law, such that Nortel Canada became directly liable for the deficits of the EMEA Schemes.

(c)    <u>Eve of Insolvency</u> – Certain EMEA Claimants[48] claim that Nortel Canada owed a specific duty of care to the creditors (in this instance, pensioners) of the particular

---

[47]    NN Ireland, NN Holland, NN France, NN Czech, NN Austria, NN Belgium, NN Spain and NNUK.

[48]    NN Ireland, NN France and NNUK.

- 91 -

EMEA Claimant as the EMEA Claimant approached insolvency, and that Nortel Canada breached that duty.

(d)     Equitable Compensation – Certain EMEA Claimants[49] claim that, as a result of Nortel Canada's alleged wrongful conduct, Nortel Canada is liable for equitable compensation.

(e)     Oppression – Each of the EMEA Claimants claim that Nortel Canada's conduct in relation to the EMEA Schemes amounted to oppressive conduct within the meaning of section 241 of the CBCA, and therefore, Nortel Canada is liable for compensation and damages thereunder.

(f)     Specific claims under Foreign Law – Certain of the EMEA Claimants claim that Nortel Canada violated, and therefore is liable under, certain Foreign Laws relating to pension funding as a result of the allegations above.

*Responses to Direct Pension Claims*

(a)     *Nortel Canada did not Exercise full Control over the EMEA Claimants (as Shadow-Director, Quasi-Director, Ultimate-Controller, fiduciary or otherwise)*

280.    The response to these pension funding claims by NNUK is also addressed in Nortel Canada's Response to the Claims of the Trustee and PPF (the "**Pension Response**"), filed in response to the claim filed by the Trustee and the PPF in the CCAA proceedings. Nortel Canada repeats and relies on the Pension Response addressing the funding of the UK Scheme, and Nortel

---

[49]    NN Ireland, NN Holland, NN France, and NNUK.

- 92 -

Canada's involvement with and relationship to NNUK and the UK Scheme in its response to the EMEA Claims herein, *mutatis mutandis*.

281.    As discussed above, Nortel Canada in fact did not exercise the type of control over the EMEA Claimants that would be required to pierce the corporate veil or impose "director-like" duties. This applies equally to decisions made about funding of the EMEA Schemes and the investment of their assets and Nortel Canada repeats and relies on the paragraphs above in maintaining that it did not and cannot be deemed to have assumed the role of shadow, *de-facto*, or quasi-director or ultimate-controller.

282.    The funding decisions about the EMEA Schemes were made by the relevant EMEA boards of directors (with or without independent advice of their choosing) in consultation and negotiations with the administrators of the respective pension schemes as appropriate under local laws and customs. At all material times, for example, all investment decisions for the NNUK Pension Scheme were made by its independent trustee and not by NNUK or Nortel Canada.

283.    In the alternative, to the extent that Nortel Canada owed any of the alleged duties to the EMEA Claimants or the EMEA Schemes, Nortel Canada pleads, and the fact is, that it complied with and satisfied such duties, and in the further alternative, that any such breach did not cause the loss or damage alleged by the EMEA Claimants.

(b)    *Elimination of Pension Deficit*

284.    Contrary to the allegations made by the EMEA Claimants, it was not in the best interests of the EMEA Claimants to rapidly pay down any deficit that existed in the EMEA Schemes.

- 93 -

285.    There was no legal obligation on any of the EMEA Claimants to fund the EMEA Schemes more than they did, and no corresponding obligation on Nortel Canada to ensure that the EMEA Claimants funded more to the EMEA Schemes than they did.

286.    The deficit and surplus position of a pension scheme fluctuates over time. Just as a deficit can be created by movements in the capital markets and interest rates, so too can deficits be eliminated by similar movements. Accordingly, there is no law governing any of the EMEA Schemes that required or contemplated that the applicable EMEA Claimant, or Nortel Canada as the direct or indirect parent of such entity, would make additional contributions to rapidly eliminate any deficit in a scheme.

287.    In the absence of such legal requirements, it was not in the best interests of any of the EMEA Claimants to rapidly eliminate any deficit in any scheme, or to eliminate any such deficit quicker than required by law. The EMEA Claimants conflate what is in the best interests of the individual inactive members of an individual EMEA Scheme with what was in the best interests of the EMEA Claimants themselves and the broader constituency of both active and inactive members of the EMEA Claimants and other interests that NNUK properly was entitled to take into account.[50]

288.    Nortel Canada repeats and relies on the Pension Response as it applies to both NNUK and the other EMEA Claimants, *mutatis mutandis*, and in particular, the sections of the Pension Response that address the coextensive interests between the various entities of the Nortel Group,

---

[50] For example, it would not be in the interest of a young, active employee who is a member of a scheme for Nortel to jeopardize its long-term interests in order to rapidly eliminate a deficit in a scheme for the benefit of the retired members of the scheme.

- 94 -

the duties of the various entities to consider various constituencies, the prudent use of resources and the rights of shareholders to receive distributions from their companies.

(c)     *Nortel Canada did not owe a Duty of Care to the Creditors of the EMEA Claimants even if the Nortel Group approached Insolvency*

289.    The answer to this claim as it relates to the EMEA Schemes is the same as pleaded generally in response to the other claims dependent upon "near insolvency" set forth above, and will not be repeated.

(d)     *No Equitable Compensation*

290.    As pleaded above, there is no separate cause of action for equitable accounting. Even if such a cause of action exists, or if equitable compensation is claimed as a remedy with respect to another alleged breach of a duty, it would not be equitable to award equitable compensation against Nortel Canada. The fact is that any deficits in the EMEA Schemes were not caused by any improper interference by Nortel Canada in the decisions regarding the funding or investments of the EMEA Schemes, or a failure of Nortel Canada to fund the Schemes or a failure of Nortel Canada to properly account for a Scheme's liabilities on its balance sheets[51], but rather the deficits arose as a result of the natural fluctuations in the financial markets, the various trustees' own investment decisions and management of their Schemes' assets, or the variances in actual results from the Schemes' actuarial assumptions, or a combination thereof.

---

[51]    As claimed by NN Germany.

- 95 -

*(e)      No Oppression*

291.    The answer to this claim as it relates to the EMEA Schemes is the same as pleaded in response to the other claims relying on oppression above and in the Pension Response, and will not be repeated. Nortel Canada repeats and relies on the Pension Response, *mutatis mutandis*.

292.    The EMEA Claimants could not have had any reasonable expectation that Nortel Canada would itself fund the EMEA Schemes, or that it would provide funds to the EMEA Claimants for them to in turn pay more to the EMEA Schemes than what was legally required to pay according to the applicable local laws.

*(f)      Foreign Law Claims*

293.    Certain of the EMEA Claimants have made additional claims against Nortel Canada under various provisions of Foreign Law. These are addressed generally in the Foreign Law section of this pleading and in **Schedules "E"** to **"Y"** hereto.

**FSD Claims**

294.    The EMEA Claimants, with the exception of NNUK (collectively, the "**EMEA FSD Claimants**"), each make a contingent claim against Nortel Canada for contribution, unjust enrichment or subrogation for any amounts that they pay to NNUK or the UK Pension Trustee on account of the Financial Support Direction ("**FSD**") or Contribution Notice ("**CN**") issued by the Pension Regulator.

295.    Nortel Canada repeats and relies on the Pension Response regarding the FSD claims in response to the EMEA FSD Claimants' claims, *mutatis mutandis*.

- 96 -

296.    Furthermore, Nortel Canada states that the EMEA FSD Claimants are not entitled to contribution, subrogation or an unjust enrichment remedy in respect of their FSD claims.

### (a)    Contribution is not Available

297.    Contribution is not available under either Canadian or U.K. law with respect to the EMEA FSD Claimants' claims. In both Canada and the U.K., contribution is a statutory claim available in the limited circumstances provided under the applicable statutes[52]. In both Canada and the U.K., those circumstances are limited to tort claims where fault may, by statute, be apportioned as between various tortfeasors.

298.    To the extent that the FSD creates an enforceable claim, which is denied, or a CN was issued and enforceable (which is not the case), such a claim does not give rise to any right to contribution as between the various targets of the FSD. The FSD was issued against each of the EMEA FSD Claimants individually. To the extent that the FSD creates an obligation to make any payment (which is denied), it is an independent, several obligation of each of the EMEA FSD Claimants for which there is no right of contribution.

299.    Moreover, any amounts that the EMEA Claimants have or may pay in the future on account of the FSD are gratuitous payments since the FSD does not create an enforceable obligation, and therefore they are not entitled to any contribution for such payments.  Although the FSD relates to matters that occurred before the Filing Date, it was not issued until after the Filing Date and thus cannot itself be a valid (even if contingent) claim.

---

[52]    *Negligence Act*, R.S.O. 1990, c. N.1
       *Civil Liability (Contribution) Act 1978* (UK), 1978 c. 47

- 97 -

300.    Lastly, and in any event, the EMEA Claimants have not paid any amounts on account of the FSD to the UK Trustee or the PPF, and therefore, are not entitled to claim contribution.

   (b)    There is no Unjust Enrichment

301.    Similarly, to the extent that the FSD creates an enforceable claim against any of the EMEA FSD Claimants, which is denied, they cannot claim for unjust enrichment against Nortel Canada.

302.    There is no benefit received by Nortel Canada that is matched by a corresponding deprivation suffered by the EMEA FSD Claimants. The FSD does not create an enforceable claim under U.K. law, and therefore there is no obligation on Nortel Canada or the EMEA Claimants to make a payment on account of the FSD. Any payment made by an EMEA FSD Claimant on account of the FSD does not provide a benefit to Nortel Canada either directly or indirectly.

303.    This is further reinforced by the fact that before the FSD was issued, the Ontario Superior Court of Justice and the Ontario Court of Appeal held that the FSD and the FSD process was of no force or effect against Nortel Canada. This is detailed further in the Pension Response adopted and relied upon herein.

304.    In any event, Nortel Canada had no obligation to leave excess cash in the EMEA Claimants (that they might have used to pay the FSD) – all amounts paid or credited to Nortel Canada were pursuant to lawful and binding arrangements and therefore were juristic reasons for any amounts Nortel Canada received.

   (c)    Subrogation is not Available

305.    Because Nortel Canada is not under an obligation under U.K. or Canadian law to pay any amount on account of the FSD, the EMEA FSD Claimants cannot maintain a claim against Nortel

- 98 -

Canada through subrogating to the position of the Trustee or the PPF vis-a-vis Nortel Canada by making a payment under the FSD.

306.    Moreover, the FSD was issued against each of the EMEA FSD Claimants individually. To the extent that the FSD creates an obligation to make any payment (which is denied), it is an independent, several obligation of each of the EMEA FSD Claimants. Therefore, subrogation is not available.

307.    Lastly, if the EMEA FSD Claimants are entitled to be subrogated to the Trustee and PPF's position, which is denied, they only have such rights as the Trustee and PPF have against Nortel Canada. Nortel Canada repeats and relies upon the pleadings and issues raised in the Pension Response in response to any subrogated claim by the EMEA FSD Claimants, including, but not limited to, the fact that the Ontario Superior Court of Justice and the Ontario Court of Appeal held that the FSD and the FSD process was of no force or effect against Nortel Canada.

***Additional Responses to the Pension Claims***

      *(a)     The EMEA Claimants do not have Standing*

308.    The EMEA Claimants do not have any standing to bring the claims against Nortel Canada relating to the deficiencies in the EMEA Schemes. Each of the EMEA Schemes is governed and managed by an independent trustee or similar entity, which is charged with the responsibility and power to advance claims on behalf of the applicable EMEA Scheme. It is such entities, and not the EMEA Claimants, that have the ability to advance claims on behalf of the EMEA Schemes should the EMEA Schemes have a legitimate claim against Nortel Canada (which is denied).

(b)    *The EMEA Claimants have no Losses or Damage*

309.    To the extent that there are any losses or deficiencies in one or more EMEA Schemes (which is denied), such losses or deficiencies are not losses or damages suffered by the EMEA Claimants. Any such loss or deficiency is a loss of the applicable trustee and scheme, none of which (except for the Trustee whose claim is addressed in the Pension Response) have commenced a claim against Nortel Canada. Even though a deficiency in a scheme may give rise to a claim by the scheme against the EMEA Claimant under the applicable local law, such an obligation owing by the EMEA Claimant does not create a corresponding claim by the EMEA Claimant against Nortel Canada. Nortel Canada repeats and relies upon the allegations in the Pleading Response that (i) the EMEA Claimants would not have made any further additional contributions to the applicable Schemes given that they each had fully paid all amounts that were required by law, and therefore would have used additional funds for other purposes; and (ii) that it would have been a breach of their duties to prefer the interests of the EMEA Scheme over the interests of others, including the interests of their shareholders.

(c)    *Double Proof*

310.    The claim of NNUK is the same claim that is being advanced against Nortel Canada by the Trustee and the PPF. Those claims are based on the same facts, and claim compensation for the same alleged losses. Accordingly, if the Trustee's and PPF's claim is not dismissed, NNUK's claim is an impermissible double proof and must be dismissed.

*(d)      No Deficiencies in the EMEA Schemes*

311.    Nortel Canada denies that there are any deficiencies in any of the EMEA Schemes, and in the alternative, that the deficiency claimed by the EMEA Claimant is accurate, and puts the EMEA Claimants to the strict proof thereof.

*(e)      Limitation Period Expired*

312.    The alleged conduct on which the EMEA Claimants base their claims was known to each of them, or was discoverable by them, by no later than 2006. As a result, the limitation period expired prior to the commencement of the claims, and the claims are therefore statute barred.

313.    Furthermore, certain of the conduct arose more than 15 years before the claims were commenced. Accordingly, the limitation period for each such claim has expired.

**OTHER CONTINGENT CLAIMS/RESERVATIONS OF RIGHTS**

314.    The EMEA Claimants seek to advance future contingent tax claims arising out of claims yet to be asserted or even threatened against them by the tax authorities, under both Domestic Law and Foreign Law as identified in Part 6 of **Schedule "D"** hereto. They also seek to advance future contingent customer revenue claims arising out of unidentified contracts with unidentified customers, who have yet to assert or even threaten any claims, under both Domestic Law and Foreign Law as identified in Part 7 of **Schedule "D"** hereto. These contingencies have not occurred and no basis is suggested upon which the Court could determine whether, or when, they ever might occur. Thus, they cannot be proven and must be dismissed or valued at zero.

**CLAIMS AGAINST FORMER DIRECTORS AND OFFICERS**

315.    The EMEA Creditors claims against former Directors and Officers of the Canadian Debtors ought to be dismissed entirely as the EMEA Claimants have failed to (i) identify the individual directors and officers claimed against, and (ii) provide an adequate factual or legal basis on which to establish liability of such individuals. Further, they assume duties owing by the directors and officers which do not exist under any applicable law, or to the extent they do, were not breached. In any event, to the extent these claims purport to be advanced on the same basis as the claims described above against the Canadian Debtors, they are subject to the same responses herein.

316.    These claims will be addressed in a separate pleading to be delivered on behalf of the former directors and officers of the Canadian Debtors.

**ORDER REQUESTED**

317.    NNL is entitled to a Compensating Adjustment from each of NNUK, NN France and NN Ireland (corresponding to the amounts paid to NNI under the MRDA after the Filing Date) in respect of prior transfer pricing payments they received, as follows:

| | |
|---|---|
| NNUK: | US$481,000,000 |
| NN France: | US$131,000,000 |
| NN Ireland: | US$3,000,000 |

318.    After these amounts for the Compensating Adjustment and the other amounts owing by the EMEA Claimants as reflected in the Nortel inter-company account balances[53] are accounted for, in

---

[53]    Based on Canadian Debtors' US GAAP pre-filing intercompany balances, at **Schedule "B"** hereto.

- 102 -

the aggregate, the EMEA Claimants owe the Canadian Debtors more than US$500 million, all as particularized in **Schedule "B"** hereto.[54]

319.    For all of the reasons set forth above, it is the position of the Monitor and Canadian Debtors that all of the EMEA Claims (with the exception only of the NNIF and NN Italy debt claims, which should be allowed in the amounts indicated above, without interest[55] to be dealt with as unsecured claims in the Canadian Estate in the ordinary course) should be dismissed or valued at zero, and they ask the Court to make an order to that effect, with costs.

Dated: May 29, 2013

Goodmans LLP
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Benjamin Zarnett LSUC#17247M
Jay Carfagnini LSCU#22293G
Jessica Kimmel LSUC#32312W
Joe Pasquariello LSUC#38390C

Tel: 416.979.2211
Fax: 416.979.1234
Lawyers for the Monitor, Ernst & Young Inc.

Gowling Lafleur Henderson LLP
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario M5X 1G5

Derrick Tay LSUC# 21152A
Jennifer Stam LSUC# 46735J

Tel: 416.862.5697
Fax: 416.862.7661
Lawyers for the Canadian Debtors

---

[54]    *De minimus* amounts are owing by some of the Canadian Debtors to a few EMEA Claimants as shown on **Schedule "B"** hereto.

[55]    It is the position of the Monitor and the Canadian Debtors that, by virtue of the EMEA Claims Procedure Order of this Court EMEA Claims are to be valued as of the Filing Date; therefore, no interest is payable on any EMEA Claim after the Filing Date. To the extent that any amounts are owing to the specific EMEA Claimants with net inter-company account balances in their favour, interest is not payable because the loans reflected in these account balances were not interest bearing in any event.

Court File No: 09-CL-7950

**IN THE MATTER OF THE COMPANIES' *CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

| | |
|---|---|
| | ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br> Proceeding commenced at Toronto |
| | **RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE EMEA CANADIAN CLAIMS** |
| | Goodmans LLP <br> 333 Bay Street, Suite 3400 <br> Toronto, Ontario M5H 2S7 <br><br> Benjamin Zarnett LSUC#17247M <br> Jay Carfagnini LSCU#22293G <br> Jessica Kimmel LSUC#32312W <br> Joe Pasquariello LSUC#38390C <br><br> Tel: 416.979.2211 <br> Fax: 416.979.1234 <br> Lawyers for the Monitor, Ernst & Young Inc. <br><br> Gowling Lafleur Henderson LLP <br> Suite 1600, First Canadian Place <br> 100 King Street West <br> Toronto, Ontario M5X 1G5 <br><br> Derrick Tay LSUC# 21152A <br> Jennifer Stam LSUC# 46735J <br><br> Tel: 416.862.5697 <br> Fax: 416.862.7661 <br> Lawyers for the Canadian Debtors |

\6211147