**SCHEDULE "A"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**LIST OF EMEA CLAIMANTS**

1. NN Germany – Nortel GmbH

2. NN Austria – Nortel Networks (Austria) GmbH

3. NN Ireland – Nortel Networks (Ireland) Limited

4. NN Sweden – Nortel Networks AB

5. NN Holland – Nortel Networks BV

6. NN Hungary – Nortel Networks Engineering Service Kft

7. NNSAS – Nortel Networks France SAS (a French entity)

8. NN Spain – Nortel Networks Hispania SA

9. NNIF – Nortel Networks International Finance and Holdings BV (a Dutch entity)

10. NN Belgium – Nortel Networks NV

11. NN Finland – Nortel Networks Oy

12. NN Poland – Nortel Networks Polska Sp z.o.o

13. NN Portugal – Nortel Networks Portugal S.A.

14. NN Romania – Nortel Networks Romania Srl

15. NN France – Nortel Networks S.A.

16. NN Czech – Nortel Networks s.r.o.

17. NN Slovakia – Nortel Networks Slovensko S.r.o.

18. NN Italy – Nortel Networks SpA

19. NNUK – Nortel Networks UK Limited

20. NN Switzerland – Nortel Networks AG

21. NN Norway – Nortel Networks AS

Schedule "B"

**Nortel Networks**
**Intercompany Balances of Canadian Debtors vis-a-vis EMEA Debtors**
**All figures in USD**
**Translated using Jan 14, 2009 Foreign Exchange Rates**

**Table 1: Net amounts owing to Canadian Debtors by EMEA Debtors**

| Canadian Company Code | Canadian Company Name | EMEA Counterparty Company Code | EMEA Counterparty Name | AP | AR | Net Book Debt[1] | Compensating Adjustment | Total Claim |
|---|---|---|---|---|---|---|---|---|
| 1002 | Nortel Networks Limited | 4360 | Nortel Networks UK Limited | (204,758,770) | 5,212,923 | (199,545,847) | 481,000,000 | 281,454,153 |
| 1002 | Nortel Networks Limited | 4160 | Nortel Networks S.A. | (1,933,112) | 36,246,911 | 34,313,799 | 131,000,000 | 165,313,799 |
| 1002 | Nortel Networks Limited | 4240 | Nortel Networks B.V. | 41,986 | 18,374,259 | 18,416,244 | - | 18,416,244 |
| 1002 | Nortel Networks Limited | 4260 | Nortel Polska Sp. z o.o. | (325,000) | 14,050,957 | 13,725,957 | - | 13,725,957 |
| 1002 | Nortel Networks Limited | 4210 | Nortel (Ireland) Ltd | 3,615,065 | 6,173,150 | 9,788,216 | - | 9,788,216 |
| 1002 | Nortel Networks Limited | 4110 | Nortel Networks N.V. | (21,299) | 5,822,751 | 5,801,452 | - | 5,801,452 |
| 1002 | Nortel Networks Limited | 4180 | Nortel GmbH | (164,594) | 4,377,000 | 4,212,406 | - | 4,212,406 |
| 1002 | Nortel Networks Limited | 4130 | Nortel Networks, s.r.o. | - | 3,233,218 | 3,233,218 | - | 3,233,218 |
| 1002 | Nortel Networks Limited | 4310 | Nortel Networks Hispania | - | 3,021,588 | 3,021,588 | - | 3,021,588 |
| 1101 | Nortel Networks Technology Corporation | 4210 | Nortel (Ireland) Ltd | (109,404) | (320,111) | (320,111) | 3,000,000 | 2,679,889 |
| 1002 | Nortel Networks Limited | 4301 | Nortel Slovensko, s.r.o. | - | 1,761,214 | 1,761,214 | - | 1,761,214 |
| 1002 | Nortel Networks Limited | 4200 | Nortel Hungary | - | 1,414,784 | 1,414,784 | - | 1,414,784 |
| 1002 | Nortel Networks Limited | 4100 | Nortel (Austria) GmbH | - | 1,359,441 | 1,359,441 | - | 1,359,441 |
| 1002 | Nortel Networks Limited | 4270 | Nortel Portugal S.A. | (17,823) | 1,047,605 | 1,029,782 | - | 1,029,782 |
| 1002 | Nortel Networks Limited | 4162 | Nortel France SAS | - | 828,085 | 828,085 | - | 828,085 |
| 1101 | Nortel Networks Technology Corporation | 4180 | Nortel GmbH | (172,172) | 843,054 | 670,882 | - | 670,882 |
| 1002 | Nortel Networks Limited | 4280 | Nortel Networks Romania Srl | - | 297,504 | 297,504 | - | 297,504 |
| 1101 | Nortel Networks Technology Corporation | 4360 | Nortel Networks UK Limited | (75,653) | 163,984 | 88,331 | - | 88,331 |
| 1101 | Nortel Networks Technology Corporation | 4100 | Nortel (Austria) GmbH | - | 71,205 | 71,205 | - | 71,205 |
| 1101 | Nortel Networks Technology Corporation | 4160 | Nortel Networks S.A. | 12,642 | 39,475 | 52,118 | - | 52,118 |
| 1101 | Nortel Networks Technology Corporation | 4130 | Nortel Networks, s.r.o. | - | 27,869 | 27,869 | - | 27,869 |
| 1101 | Nortel Networks Technology Corporation | 4270 | Nortel Portugal S.A. | - | 6,250 | 6,250 | - | 6,250 |
| 1101 | Nortel Networks Technology Corporation | 4240 | Nortel Networks B.V. | - | 5,106 | 5,106 | - | 5,106 |
| **Total** | | | | **(204,009,437)** | **104,268,929** | **(99,740,508)** | **615,000,000** | **515,259,492** |

**Table 2: Net amounts owing by Canadian Debtors to EMEA Debtors**

| Canadian Company Code | Canadian Company Name | EMEA Counterparty Company Code | EMEA Counterparty Name | AP | AR | Net Book Debt[1] | Compensating Adjustment | Total Claim |
|---|---|---|---|---|---|---|---|---|
| 1002 | Nortel Networks Limited | 4220 | Nortel Networks S.p.A. | 13 | (2,344,906) | (2,344,893) | - | (2,344,893) |
| 1104 | Nortel Networks Global Corporation | 4360 | Nortel Networks UK Limited | (327,740) | 122,962 | (204,778) | - | (204,778) |
| 1002 | Nortel Networks Limited | 4002 | NNIF&H BV | (202,059) | 48,289 | (153,770) | - | (153,770) |
| 1101 | Nortel Networks Technology Corporation | 4110 | Nortel Networks N.V. | (19,548) | | (19,548) | - | (19,548) |
| 1104 | Nortel Networks Global Corporation | 4210 | Nortel (Ireland) Ltd | (8,191) | | (8,191) | - | (8,191) |
| **Total** | | | | **(557,525)** | **(2,173,655)** | **(2,731,180)** | **-** | **(2,731,180)** |

**Table 3: EMEA Debtors with Nil balances with Canadian Debtors[2]**

| Canadian Company Code | Canadian Company Name | EMEA Counterparty Company Code | EMEA Counterparty Name | AP | AR | Net Book Debt[1] | Compensating Adjustment | Total Claim |
|---|---|---|---|---|---|---|---|---|
| NA | Canadian Debtors | 4150 | Nortel Networks OY | - | - | - | - | - |
| NA | Canadian Debtors | 4320 | Nortel Networks AB | - | - | - | - | - |
| NA | Canadian Debtors | 4330 | Nortel Networks AG | - | - | - | - | - |
| NA | Canadian Debtors | 4250 | Nortel Networks AS | - | - | - | - | - |
| **Total** | | | | **-** | **-** | **-** | **-** | **-** |

(1) Based on Canadian Debtors' US GAAP Pre-Filing intercompany balances
(2) Canadian Debtors include: Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation, Nortel Networks Global Corporation

**Schedule "C"**



New York 1968062_12

**NNC-NNL06001104_0001**

**Schedule "D"**

**Summary of EMEA Claims\***

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Breach of Contract | Domestic |
| | Destructive Intervention (wrongful removal of assets by managing directors knowing it would cause harm/lead to insolvency) | German |
| | Breach of Capital Maintenance Rules (asset reducing payment to shareholder) | German |
| | Breach of Fiduciary Duty or Like Duties | |
| | Transaction Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Austria | Breach of Contract | Domestic |
| | Breach of Fiduciary Duties (owed by shareholders and by managing directors) | Austrian |
| | Breach of Capital Maintenance Rules (asset reducing payment to shareholder) | Austrian |
| | Breach of Trust (as co-perpetrator with directors) | Austrian |
| | Transaction Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Ireland | Breach of Contract | Domestic |
| | Unconscionable Receipt | [Silent, assume Domestic] |

---

\*    This summary chart is based on the proofs of claim against NNL which are repeated in the other EMEA proofs of claim as well.

- 2 -

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Ireland | Unauthorised Return of Capital | [Silent, assume Domestic] |
| | Breach of Fiduciary Duty | Irish |
| | Fraudulent Disposition | Irish |
| | Mistake | Irish |
| | Transaction Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Sweden | Breach of Fiduciary Duty or Like Duties | [silent] |
| | Unlawful value Transfer | Swedish |
| | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| NN Holland | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unjust Enrichment | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Caused or Contributed to Insolvency | Dutch |
| | Transaction Under Value | English |
| NN Hungary | Breach of Contract | Domestic |
| | Transaction Under Value | English |
| | Breach of Contract | Hungarian |

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Hungary | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Inadequate Consideration (Invalid contract) | Hungarian |
| | Action for Damages for breach of contract | Hungarian |
| | Disguised Dividends | Hungarian |
| | Breach of Fiduciary or like Duties | [Silent] |
| | Disguised Dividend | Hungarian |
| | Inadequate Consideration (Void Contract) | Hungarian |
| | Mistake | Hungarian |
| | Benefits without lawful title | Hungarian |
| NN Spain | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Breach of Fiduciary Duty | Spanish |
| | Transaction Under Value | English |
| NN Belgium | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Mistake | Belgian |
| | Breach of Fiduciary Duty | Belgian |
| | Annulment of Contract for Defective Consent | Belgian |
| | Disguised Dividend | Belgian |
| | Gross Negligence contributing to Bankruptcy | Belgian |
| | Transaction Under Value | English |

- 4 -

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Finland | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Breach of Fiduciary Duty or Like Duties | [Silent] |
| | Transaction Under Value | English |
| NN Poland | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic Polish |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Unlawful influence resulting in deemed income for tax purposes | Polish |
| NN Portugal | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Breach of Fiduciary Duties | Portuguese |
| | Liability as a Parent Company for orders to transfer assets causing harm | Portugal |
| | Shareholder joint and severally liable for Directors' breach of Fiduciary Duty | Portuguese |
| | Unauthorized return of Capital (against Shareholders) | Portugal |
| | Transaction Under Value | English |
| | Termination of prejudicial transaction (Insolvency based) | Portuguese |
| NN Romania | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Romania | Conspiracy | Domestic |
| | Breach of Fiduciary Duty or Like Duties | [Silent] |
| | Transaction Under Value | English |
| NNSA | Breach of Contract | Domestic |
| | Breach of Duty of Care | [Silent] |
| | Mistake | [Silent] |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| NN Czech | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic Czech |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Directors are Guarantors (reimbursement for loss) | Czech |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Czech |
| | Unauthorized Distribution of Profit | Czech |
| NN Slovakia | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Breach of Fiduciary Duty or Like Duties | [Silent] |
| NN Italy | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |

- 6 -

| PART 1 – Transfer Pricing Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Italy | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Breach of Fiduciary Duty or Like Duties | Italian |
| | Claw Back Actions (unwinding of transactions within defined period prior to insolvency) | Italian |
| | Negligence | Italian |
| NNUK | Breach of Contract | [Domestic] |
| | Mistake | English |
| | Breach of Fiduciary Duty or Like Duties | English |
| | Unconscionable Receipt | English |
| | Unauthorized Return of Capital | English |
| | Transaction Under Value/Preference | English |
| | Unjust Enrichment | English |
| | Oppression | Domestic |
| NN Switzerland | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Norway | Breach of Contract | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |

| PART 2A—Inter-Company Loans and/or Debt Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Debt Claim | German |
| NN Ireland | Debt Claim | Irish |
| | Breach of Fiduciary Duty or Like Duties | Irish |
| | Unconscionable Receipt | Irish |
| | Transaction Under Value | English |
| | Fraudulent Disposition | Irish |
| | Fraudulent Preference | Irish |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Holland | Debt Claim | Dutch |
| NN SAS | Debt Claim | French |
| NN Spain | Debt Claim | Spanish |
| NN Belgium | Debt Claim | Belgian |
| NN Poland | Debt Claim | Polish |
| NN Portugal | Debt Claim | Portuguese |
| NNIF | Debt Claim | Dutch |
| NN Italy | Debt Claim | Italian |
| NNUK | Debt Claim | English |
| | Transaction Under Value | English |
| | Breach of Fiduciary Duty or Like Duties | English |
| | Unconscionable Receipt | English |
| | Unjust Enrichment | English |
| | Oppression | Domestic |
| | Conspiracy | English |
| NNSA | Debt Claim | French |

| PART 2B—NNSA Claim About Loan Repayment | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NNSA | Acts of Mismanagement | French |
| | Preference (repayment of subordinate debt) | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |

| PART 2C—OTHER INTER-COMPANY TRANSACTIONS | | |
|---|---|---|
| **Project Swift** | | |
| **Claimant** | **Claim** | **Law** |
| NNUK | Breach of Fiduciary Duty or Like Duties | English |
| | Unconscionable Receipt | English |
| | Unjust Enrichment | English |
| | Oppression | Domestic |
| | Conspiracy | English |
| | Transaction Under Value | English |

| NNIF Reorganization | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NNIF | Breach of Fiduciary Duty or Like Duties | Dutch |
| | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Transaction at Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |

| PART 3—Loss of Customer Revenue and Recognition Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Destructive Intervention (wrongful removal of assets by managing directors knowing it would cause harm/lead to insolvency) | German |
| | Transaction Under Value | English, German Insolvency Law |
| | Breach of Capital Maintenance Rules (asset reducing payment to shareholder) | German |
| NN Austria | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Breach of Fiduciary Duties (owed by shareholders and by managing directors) | Austrian |
| NN Sweden | Breach of obligations under Swedish law | [Swedish, but not particularized] |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Holland | Unjust Enrichment | Dutch |
| | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |

| PART 3—Loss of Customer Revenue and Recognition Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Hungary | Transaction Under Value | English |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Action for Damages | Hungarian |
| | Benefits without lawful title | Hungarian |
| NN SAS | Breach of fiduciary duties | Domestic |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Spain | Transaction Under Value | English |
| | Breach of Fiduciary Duty (de facto director) | Spanish |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NNIF | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Unjust Enrichment | Dutch Domestic |
| | Oppression | Domestic |
| | Conspiracy | Dutch |
| NN Belgium | Breach of Fiduciary Duty | Belgian |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| NN Finland | Breach of Fiduciary Duty or Like Duties | [Silent] |
| | Unjust Enrichment | Domestic |

| PART 3—Loss of Customer Revenue and Recognition Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Finland | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Portugal | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English, Portuguese |
| | Unauthorized return of Capital (against Shareholders) | Portugal |
| NN Romania | "under the Romanian Civil Code" [Silent on specifics] | Romanian |
| | "under English Insolvency Law [Silent on specifics] | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN SA | Breach of Duties | [Silent] |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Czech | Transaction Under Value | English, Czech |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Czech |
| | Directors are Guarantors (reimbursement for loss) | Czech |
| | Unjust Enrichment | Domestic Czech |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Slovakia | "under Slovakian law" [Silent as to specifics] | Slovakian |

- 12 -

| PART 3—Loss of Customer Revenue and Recognition Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Slovakia | Transaction Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NN Italy | Breach of Fiduciary Duty or Like Duties | Italian |
| | Negligence | Italian |
| | Claw Back Action (pre-petition disposition prejudices creditors) | Italian |
| | Claw Back Actions (unwinding of transactions within defined period prior to insolvency) | Italian |
| | Transaction Under Value | English |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| NNUK | Breach of Fiduciary Duties | English |
| | Unjust Enrichment | English |
| | Oppression | Domestic |
| | Conspiracy | English |
| | Breach of Contract/Debt Claim | English |
| | Third Party Contractual Claims | English |
| NN Norway | Breach of duties/obligation | [Silent] |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |

| PART 4—Claims Relating to Past Disposition of Businesses | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Mistake | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Destructive Intervention (wrongful removal of assets by managing directors knowing it would cause harm/lead to insolvency) | German |
| | Transaction Under Value | English, German |
| | Breach of Capital Maintenance Rules (asset reducing payment to shareholder) | German |
| NN Austria | Mistake | Domestic |
| | Oppression | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| | Breach of Fiduciary Duties (owed by shareholders and by managing directors) | Austrian |
| NN Ireland | Transaction Under Value | English |
| | Breach of Fiduciary Duties | Irish |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| | Defacto/Shadow Director | Irish |
| NN Sweden | Transaction Under Value | English, Swedish |
| | Unlawful value Transfer | Swedish |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN Holland | Breach of Fiduciary Duty or Like Duties | Dutch |

- 14 -

| PART 4—Claims Relating to Past Disposition of Businesses | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Holland | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unjust Enrichment | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN Hungary | Transaction Under Value | English, Hungarian |
| | Liability for Damages | Hungarian |
| | Benefits without lawful title | Hungarian |
| | Mistake | Hungarian |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN SAS | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN Spain | Transaction Under Value | English, Spanish |
| NN Spain | Breach of Fiduciary Duty (de facto director) | Spanish |
| NN Spain | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| | Breach of Fiduciary Duty | Spanish |
| NNIF | Breach of Fiduciary Duty or Like Duties | Dutch |
| | Mismanagement Causing or Leading to Bankruptcy | Dutch |

- 15 -

| PART 4—Claims Relating to Past Disposition of Businesses | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NNIF | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Unjust Enrichment | Dutch Domestic |
| | Oppression | Domestic |
| | Mistake | Domestic |
| NN Belgium | Gross Negligence contributing to Bankruptcy | Belgian |
| | Unjust Enrichment | Domestic |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| | Transaction Under Value | English |
| NN Finland | [Silent] "claims under Finnish Law" | Finnish |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| | Breach of Fiduciary Duty or Like Duties | [Silent] |
| NN Poland | Unjust Enrichment | Polish Domestic |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN Portugal | Transaction Under Value | English, Portuguese |
| | Termination of prejudicial transaction (Insolvency based) | Portuguese |
| | Oppression | Domestic |

- 16 -

| PART 4—Claims Relating to Past Disposition of Businesses | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Portugal | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| NN Romania | "under Romanian law" [Silent on specifics] | Romanian |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| NN SA | Breach of Duties | French |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| NN Czech | Transaction Under Value | English, Czech |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Czech |
| | Directors are Guarantors (reimbursement for loss) | Czech |
| | Unjust Enrichment | Domestic Czech |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Conspiracy | Domestic |
| NN Slovakia | "under local law" [Silent as to specifics] | Slovakian |
| | Transaction Under Value | English |
| | Oppression | Domestic |

| PART 4—Claims Relating to Past Disposition of Businesses | | |
| --- | --- | --- |
| **Claimant** | **Claim** | **Law** |
| NN Slovakia | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| NN Italy | Breach of Fiduciary Duty or Like Duties | Italian |
| | Negligence | Italian |
| | Claw Back Action (pre-petition disposition prejudices creditors) | Italian |
| | Claw Back Actions (unwinding of transactions within defined period prior to insolvency) | Italian |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| | Mistake | Domestic |
| | Unjust Enrichment | Domestic |
| | Conspiracy | Domestic |
| NNUK | Breach of Fiduciary Duties | English |
| | Breach of Duty of Care | English |
| | Unjust Enrichment | English |
| | Oppression | Domestic |
| | Conspiracy | English |
| | Mistake | English |

- 18 -

| PART 5—Pension Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Oppression | Domestic |
| | Breach of Capital Maintenance Rules (asset reducing payment to shareholder) | German |
| | Destructive Intervention (wrongful removal of assets by managing directors knowing it would cause harm/lead to insolvency) | German |
| NN Austria | Conspiracy | Domestic |
| | Breach of Fiduciary Duties (owed by managing directors) | Austrian |
| NN Ireland | Breach of De facto/Shadow Director Duties | Irish |
| | Breach of fiduciary duties (failure to properly fund) | [Silent] |
| | Oppression | Domestic |
| NN Sweden | Unlawful value Transfer | Swedish |
| | Oppression | Domestic |
| NN Holland | Unjust Enrichment | Dutch |
| | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| NN Hungary | Civil Liability for damages | Hungarian |
| | Transaction Under Value | English |
| | Oppression | Domestic |
| NN SAS | Oppression | Domestic |
| NN Spain | Breach of fiduciary duties | Spanish |
| | Oppression | Domestic |
| NNIF | Mismanagement Causing or Leading to Bankruptcy | Dutch |

- 19 -

| PART 5—Pension Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NNIF | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| | Unjust Enrichment | Dutch |
| | Oppression | Domestic |
| NN Belgium | Breach of Fiduciary Duty | Belgian |
| | Oppression | Domestic |
| NN Finland | [Silent] "have claims under Finnish Law | Finnish |
| | Oppression | Domestic |
| NN Poland | Oppression | Domestic |
| NN Portugal | [Silent] "have claims under Portuguese Law | Portuguese |
| | Oppression | Domestic |
| NN Romania | Oppression | Domestic |
| | [Silent] "under Romanian law" | Romanian |
| | [Silent] "under English Insolvency Law | English |
| NN SA | Breach of Fiduciary Duties | [Silent] |
| | Oppression | Domestic |
| NN Czech | Oppression | Domestic |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Czech |
| | Directors are Guarantors (reimbursement for loss) | Czech |
| | Unjust Enrichment | Czech |
| NN Slovakia | Oppression | Domestic |
| NN Italy | Breach of Fiduciary Duty or Like Duties | Italian |
| | Claw Back Action (pre-petition disposition prejudices creditors) | Italian |
| | Claw Back Actions (unwinding of transactions within defined period prior to insolvency) | Italian |

- 20 -

| PART 5—Pension Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Italy | Negligence | Italian |
| | "under the Italian Civil Code , including" {the above pleaded actions} | Italian |
| | Oppression | Domestic |
| NNUK | Breach of Fiduciary Duties | English |
| | Oppression | Domestic |
| NN Switzerland | Oppression | Domestic |
| NN Norway | "have claims under Norwegian law" [Silent as to specifics]* *No particulars have yet been requested | Norwegian |
| | Oppression | Domestic |

- 21 -

| PART 6—Future and Contingent Tax Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Oppression | Domestic |
|  | Transaction Under Value | German |
| NN Austria | Oppression | Domestic |
|  | Transaction Under Value | Austrian |
| NN Ireland | Breach of Defacto/Shadow Director Duties | Irish |
|  | Oppression | Domestic |
| NN Sweden | [Silent] | Swedish |
|  | Oppression | Swedish |
| NN Holland | Mismanagement Causing or Leading to Bankruptcy | Dutch |
|  | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
|  | Oppression | Domestic |
| NN Hungary | Oppression | Domestic |
|  | Liability for Damages | Hungarian |
| NN SAS | Breach of Fiduciary duties | [silent] |
|  | Oppression | Domestic |
| NN Spain | Breach of Fiduciary Duty (de facto director) | Spanish |
|  | Oppression | Domestic |
| NNIF | Breach of Fiduciary Duties | Dutch |
|  | Oppression | Domestic |
| NN Belgium | Breach of Fiduciary Duties | Belgian |
|  | Oppression | Domestic |
| NN Finland | [Silent] "claims under Finnish Law" | Finnish |
|  | Oppression | Domestic |

| PART 6—Future and Contingent Tax Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Poland | Unlawful influence resulting in deemed income for tax purposes | Polish |
| | Oppression | Domestic |
| NN Portugal | [Silent] "under Portuguese Law, including the Portuguese Civil Code" | Portuguese |
| | Oppression | Domestic |
| NN Romania | "under Romanian law" [Silent on specifics] | Romanian |
| | Oppression | Domestic |
| NN SA | Breach of Duties | [Silent] |
| | Oppression | Domestic |
| NN Czech | "under Czech law, including under the Czech Commercial and Czech Civil Code" [Silent on specifics] | Czech |
| | Oppression | Domestic |
| NN Slovakia | "under local law" [Silent as to specifics] | Slovakian |
| | Oppression | Domestic |
| NN Italy | Breach of Fiduciary Duty or Like Duties | Italian |
| | Negligence | Italian |
| | Oppression | Domestic |
| NNUK | Breach of Fiduciary Duty and Duty of Care | English |
| | Oppression | Domestic |
| NN Switzerland | "has claims under Swiss law" [Silent as to specifics]* *no particulars have yet been requested | Swiss |
| | Oppression | Domestic |
| NN Norway | "has claims under Norwegian law" [Silent as to specifics]* *no particulars have yet been requested | Norwegian |
| | Oppression | Domestic |

- 23 -

| PART 7—Future and Contingent Revenue Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Germany | Oppression | Domestic |
| | Transaction Under Value | German |
| NN Austria | Oppression | Domestic |
| | Transaction Under Value | Austrian |
| NN Ireland | Breach of Defacto/Shadow Director Duties | Irish |
| | Oppression | Domestic |
| NN Sweden | Transaction Under Value | Swedish |
| | Oppression | Swedish |
| NN Holland | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| NN Hungary | Oppression | Domestic |
| | Liability for Damages | Hungarian |
| NN SAS | Breach of Fiduciary duties | [silent] |
| | Oppression | Domestic |
| NN Spain | Breach of Fiduciary Duty (de facto director) | Spanish |
| | Transaction Under Value | Spanish |
| NNIF | Mismanagement Causing or Leading to Bankruptcy | Dutch |
| | Unlawful Acts as controlling entity resulting in damage or insolvency | Dutch |
| NN Belgium | Breach of Fiduciary Duties | Belgian |
| | Oppression | Domestic |
| NN Finland | [Silent] "claims under Finnish Law" | Finnish |
| | Oppression | Domestic |
| NN Poland | Breach of Fiduciary Duties | [Silent] |

- 24 -

| PART 7—Future and Contingent Revenue Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Poland | [Silent] "has claims under Polish law" | Polish |
| | Oppression | Domestic |
| NN Portugal | Oppression | Domestic |
| | Breach of Fiduciary Duties | [Silent] |
| NN Romania | "under Romanian law"<br>[Silent on specifics] | Romanian |
| | Oppression | Domestic |
| NN SA | Breach of Duties | [Silent] |
| | Oppression | Domestic |
| NN Czech | "under Czech law, including under the Czech Commercial and Czech Civil Code"<br>[Silent on specifics] | Czech |
| | Oppression | Domestic |
| NN Slovakia | Breach of Duties | [Silent] |
| | "under local law"<br>[Silent as to specifics] | Slovakian |
| | Oppression | Domestic |
| NN Italy | Breach of Fiduciary Duty or Like Duties | Italian |
| | Negligence | Italian |
| | Oppression | Domestic |
| NNUK | Breach of Fiduciary Duty and Duty of Care | English |
| | Oppression | Domestic |
| NN Switzerland | Breach of Fiduciary Duties | [Silent] |
| | "has claims under Swiss law"<br>[Silent as to specifics]*<br>*no particulars have yet been requested | Swiss |
| | Oppression | Domestic |
| NN Norway | "has claims under Norwegian law"<br>[Silent as to specifics]*<br>*no particulars have yet been requested | Norwegian |

| PART 7—Future and Contingent Revenue Claims | | |
|---|---|---|
| **Claimant** | **Claim** | **Law** |
| NN Norway | Oppression | Domestic |

**SCHEDULE "E"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL GmbH ("NN GERMANY")**

1.     It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Germany and that NN Germany has not properly pleaded (nor proven) any foreign law.

2.     For ease of reference, in this Schedule, NN Germany's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement that NN Germany has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NN Germany's characterization of the law.

3.     If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Germany and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NN Germany, NN Germany has not and cannot meet those requirements.

**A.     Section 30(1) of the German *Limited Liability Company Act* - Breach of Capital Maintenance Rules**

*(i)     Assertions made by NN Germany*

4.     NN Germany claims that payments made by NN Germany to NNL through transfer pricing resulted in NN Germany's net assets falling short of the amount of its nominal share capital, in breach of the Capital Maintenance Rules in section 30(1) of the German *Limited Liability Company Act* and that NNL is liable to reimburse all such payments to NN Germany.

- 2 -

5.    NN Germany states that in order to bring a German law claim against NNL for breach of the Capital Maintenance Rules, it must establish that:

(a)    payments or non-cash benefits were made by NN Germany to NNL;

(b)    NNL was, at the time the payment was made, a direct or indirect shareholder of NN Germany (directly or indirectly) controlling NN Germany; and

(c)    such payments resulted in NN Germany's net assets falling short of the amount of its nominal share capital (short balance) (or were at a point in time where such short balance already existed).

6.    NN Germany relies on section 30(1) of the German *Limited Liability Company Act* in support of its claims in respect of transfer pricing, pension funding, customer revenues and past dispositions of business.

*(ii)    Response of NNL*

7.    NNL denies that it ever received any payment or value or non-cash benefit from NN Germany that was contrary to the Capital Maintenance Rules, or that it knew, or ought to have known, was in violation of German law and puts NN Germany to the strict proof thereof.  Most or all of the payments received by NNL from NN Germany constituted a repayment of a shareholder loan or economically equivalent transactions.

8.    NNL further denies that NN Germany's net assets ever fell short of the amount of its nominal share capital and puts it to the strict proof thereof.

- 3 -

**B.**    **"Destructive Intervention"**

*(i)*    *Assertions made by NN Germany*

9.    NN Germany alleges that NNL's actions in relation to the operation of the Distribution Agreement and RPSM amounted to destructive intervention as a matter of German law, such that NNL is liable to compensate NN Germany in damages for all losses it has suffered as a result.

10.    NN Germany states that in order to bring a German law claim against NNL for liability for "destructive intervention" ("piercing the corporate veil"), pursuant to German case law (and in combination with section 826 of the German *Civil Code*), it must establish that:

    (a)    the managing directors or members of the management board of NNL removed assets or business opportunities from NN Germany by entering into the pricing agreements which were not at arm's length, knowing that the removal of these assets or business opportunities:

        (i)    would destroy the economic basis of NN Germany;

        (ii)    was not business-related;

        (iii)    was not covered by any compensation; or

        (iv)    would lead to an insolvency of NN Germany; and

    (b)    the damages were caused by the directors or members of management board of NNL when exercising their profession.

11.    NN Germany relies on "destructive intervention" in support of its claims in respect of transfer pricing, pension funding, customer revenues and past dispositions of business.

**C.**     **Response of NNL**

12.     NNL states that in addition to the requirements set out above, in order to bring a claim for "destructive intervention", NN Germany must also prove that the intervention was in violation of public policy.  NNL also states that the requirements of paragraph (a) above are cumulative, rather than in the alternative (as suggested by NN Germany).

13.     NNL denies that it, or its managing directors of members of its management board, removed assets or business opportunities from NN Germany or that it knew such actions would destroy the economic basis of NN Germany or would impair NN Germany's ability to meet its liabilities.  NNL denies that it ever acted with an intention to impair NN Germany's ability to meet its liabilities.

**D.**     **Contract Law/Debt Claim under German Law**

***(i)***     ***Assertions made by NN Germany***

14.     NN Germany refers to German contract and debt law in support of its claims in respect of intercompany trading debts.

15.     NN Germany states that under the German *Civil Code*, it is a general rule that the recovery of contractual claims depends on the nature of the contractual obligation and, therefore, is subject to the relevant provisions of the German *Civil Code* for specific types of contracts. Under the German *Civil Code*, a claim for breach of duty is given pursuant to section 280, paragraph 1, where:

       (a)     a claimant is a party to a contract with the defendant;

       (b)     the defendant has breached a duty arising from the contract;

- 5 -

(c)      the claimant has suffered damage as a result of the duty; and

(d)      the defendant can show that he is not responsible for the breach.

## E.      Response of NNL

16.      NNL denies that any intercompany trading debts are due and owing to NN Germany by NNL. To the contrary, there is a net amount owing by NN Germany to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

## F.      U.K. *Insolvency Act*

17.      NN Germany also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenues and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

## G.      Unparticularized Claims

18.      NN Germany also generally alleges that NNL had obligations and liability to NN Germany under German law with respect to future and contingent claims in respect of taxation and revenue. NN Germany has failed to plead any particulars of the German law relied on in respect of these claims. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Germany are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

- 6 -

**H.    General**

19.    To the extent that particular relief or remedies are claimed by NN Germany under German statutes and those statutes give the German courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

20.    Even if NN Germany establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

21.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

22.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Germany against NNC, NNTC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Germany against NNL.

\6205509

**SCHEDULE "F"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS (AUSTRIA) GmbH ("NN AUSTRIA")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Austria and that NN Austria has not properly pleaded (nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Austria's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement that NN Austria has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NN Austria's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Austria and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NN Austria, NN Austria has not and cannot meet those requirements.

**A.      Austrian *Capital Maintenance Rules*/Section 82 of Austrian *Act of Limited Liability Companies*/Section 10 Austrian *Code of International Laws***

***(i)      Assertions made by NN Austria***

4.      NN Austria states that the Austrian *Capital Maintenance Rules* ("**ACMR**") are regulated by section 82 of the Austrian *Act of Limited Liability Companies*.

- 2 -

5.      NN Austria states that the ACMR provide that only a company's net profit as evidenced in the latest financial statement is available for distribution to its shareholders. A company's shareholders must not claim more than the net profit evidenced in that company's most recent financial statements.

6.      NN Austria states that a company may not make any other asset-reducing payment to a shareholder or a sister company, subject to the following three exceptions:

(a)      a payment which is within the scope of a stated capital decrease (pursuant to a formal stated capital decrease proceeding according to section 54f of the Austrian *Act of Limited Liability Companies*);

(b)      a payment within the scope of the company's liquidation (section 89f of the Austrian *Act of Limited Liability Companies*); or

(c)      a payment or economic benefit to a direct or indirect shareholder, or direct or indirect sister company, which is within the scope of a permitted arm's length transaction, i.e. the transaction must be effected on conditions which the company would also have accepted with a third party.

7.      NN Austria states that a transaction that breaches the ACMR is deemed to be null and void.

8.      NN Austria states that where there has been a breach of the ACMR, section 10 of the Austrian *Code of International Laws*, in connection with section 82 of the Austrian *Act of Limited Liability Companies*, entitles the company to make a claim for strict liability (i.e. no fault needed) against its shareholders to claw-back the unlawful payments.

- 3 -

9.      NN Austria states that managing directors of a private limited company must not make payments or transactions in breach of the ACMR, even if such payments or transactions have been approved by the company's shareholders.

10.     NN Austria relies on the foregoing in support of its claims in respect of transfer pricing. NN Austria states that NNL deprived NN Austria of an arm's length routine return and received payments from NN Austria as a result. NN Austria claims that in so doing, NNL breached the ACMR, with the result that such transactions are deemed null and void and NN Austria may claim repayment from NNL.

*(ii)      Response of NNL*

11.     NNL denies that it ever received any payment or value from NN Austria that fell within the scope and/or that was contrary to the ACMR or was in violation of Austrian law, and/or states that any payments or value received fell within the permitted exceptions.  NN Austria is put to the strict proof of these claims.

**B.      Section 61 of Austrian *Act of Limited Liability Companies* – Fiduciary Duties owed by a company's Shareholders**

*(i)      Assertions made by NN Austria*

12.     NN Austria states that pursuant to section 61 of the Austrian *Act of Limited Liability Companies*, direct and indirect shareholders owe fiduciary duties to the company, including:

(a)      to act in the best interests of the company and with the diligence of a prudent manager;

(b)      not to damage the company; and

- 4 -

(c)      not to interfere with the company's management without involvement of the shareholders' meeting.

13.      NN Austria states that a shareholder is liable to the company for damage caused as a result of the shareholder breaching these duties.

14.      NN Austria states that accordingly, in order for a company to bring a claim under section 61 against one of its shareholders, it must establish that:

(a)      there was a breach of a fiduciary duty;

(b)      the breach was committed by a shareholder against the company in a negligent or wilful way; and

(c)      the breach caused the company to suffer loss.

15.      NN Austria relies on section 61 of the Austrian *Act of Limited Liability Companies* in support of its claims in respect of transfer pricing, customer revenues, and past dispositions of business.

*(ii)      Response of NNL*

16.      NNL denies that it owed any fiduciary duties to NN Austria in its capacity as an indirect shareholder of NN Austria. In the alternative, however, even if NNL owed any fiduciary duties to NN Austria, which is not admitted, NNL complied with its obligations and did not breach any fiduciary or other duty which it owed to NN Austria, let alone in a negligent or wilful way, nor was any of NNL's conduct the cause of any loss to NN Austria.

- 5 -

**C.      Sections 24 and 25 of Austrian *Act of Limited Liability Companies* – Fiduciary Duties owed by a company's Managing Directors**

*(i)      Assertions made by NN Austria*

17.     NN Austria claims that NNL was a factual (or *de facto*) managing director of NN Austria, and in particular acted as such in relation to NN Austria's participation in the RPSM and performance of the Distribution Agreement.

18.     NN Austria claims that under Austrian law the managing directors of a company owe fiduciary duties to that company.

19.     NN Austria claims that section 24 of the Austrian *Act of Limited Liability Companies* provides that the managing directors of a private limited company must not:

       (a)      conduct business, or manage another company which conducts business;

       (b)      which is the same as the business of the private limited company;

       (c)      without the consent of that company.

20.     NN Austria claims that section 25 of the Austrian *Act of Limited Liability Companies* provides that the managing directors of a private limited company must:

       (a)      act with the diligence of a prudent manager;

       (b)      observe their duties according to the Austrian *Act of Limited Liability Companies* and other laws and the provisions of the company's articles of association; and

       (c)      comply with resolutions or instructions passed by the shareholders.

21.    NN Austria states that section 25(3) of the Austrian *Act of Limited Liability Companies* also makes the managing directors liable towards the company for payments or transactions that are in breach of the ACMR.

22.    NN Austria states that a claim against a managing director is governed by general principles of Austrian tort law. In order to bring a damages claim, the following elements must be established:

(a)    the company suffered loss;

(b)    there was an unlawful act, such as a transaction in breach of the ACMR;

(c)    the company's loss was caused by that unlawful act; and

(d)    the unlawful act was due to the negligent or wilful misconduct of the managing director.

23.    NN Austria states that the Austrian Supreme Court has held that any shareholder who influences the management of a company to a significant extent is treated as a factual managing director. A shareholder's influence on the management of the company may be direct or indirect. For example:

(a)    the shareholder exercises his right to issue instructions within the limited liability company (direct influence); or

(b)    the shareholder influences the controlling or sole shareholder of the company (indirect influence).

- 7 -

24.     NN Austria states that the Austrian Supreme Court has held that a shareholder will be regarded as a factual managing director if it is established that some or all of the following factors apply:

>   (a)     the formally appointed manager is a simple straw man and obeys any instruction by the factual manager;

>   (b)     the factual manager appears as manager and representative of the company to third parties on a sustained basis;

>   (c)     the formally appointed manager does not take any decisions independently.

25.     NN Austria states that when exercising his influence, a factual managing director must comply with the duties which the formal managing directors are required to observe by law. If a factual managing director breaches his duty, he is liable to the company to the same extent as if he was a formally appointed director.

26.     NN Austria claims that in breach of its fiduciary duties owed as a shareholder and/or factual managing director, NNL acted otherwise than in the best interests of NN Austria, damaged the company, interfered with the company's management and/or caused the company to make payments or transactions in breach of the ACMR.

27.     NN Austria relies on its allegations of NNL being a managing director of NN Austria and breaching its fiduciary duties to NN Austria in support of its claims in respect of transfer pricing, pension funding, customer revenues and past dispositions of business.

- 8 -

*(ii)*      *Response of NNL*

28.      As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* director or fiduciary of NN Austria.  NN Austria was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice.  NN Austria's board of directors was autonomous, appointed in accordance with NN Austria's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL.  Rather, the board of directors of NN Austria exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions.  NNL did not undertake or take on the role or functions of a director of NN Austria.  Similarly, NNL did not direct or interfere with the management and affairs of NN Austria and NN Austria's management did not act simply based on NNL's instructions.  The management and control of NN Austria emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management.  NNL did not exercise complete control or domination or influence over NN Austria.

29.      In the alternative, if is found that NNL was a *de facto* director of NN Austria, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NN Austria or any other person, whether under the *Act of Limited Liability Companies*, any other relevant legislation, or under the common law and equitable principles.

**D.      Section 153 Austrian *Criminal Code*/Sections 1295 and 1311 Austrian *Civil Code* – damages for breach of trust**

*(i)      Assertions made by NN Austria*

30.    NN Austria states that section 153 of the Austrian *Criminal Code* provides that a breach of trust is committed where:

(a)      a person is authorized to act on behalf of a company;

(b)      the person commits an act which abuses his authorization;

(c)      the person is aware of the abuse of his authorization and intends a financial loss or at least considers a financial loss of the company seriously possible; and

(d)      the abusive act causes the company to suffer loss.

31.    NN Austria states that managing directors are authorized to act on behalf of the company without limitation, provided that they comply with their duties required by law. NN Austria states that if the managing directors of a company breach their fiduciary duties, they and any co-perpetrators such as a factual manager or the shareholder are liable to the company for loss arising from the breach pursuant to section 153 of the Austrian *Criminal Code* and sections 1295, 1301 and 1311 of the Austrian *Civil Code*.

32.    NN Austria claims that in neglecting their fiduciary duties as directors of NN Austria, NNL committed a breach of trust.

33.    NN Austria relies on its allegations of breach of trust in support of its claims in respect of transfer pricing.

*(ii)*     *Response of NNL*

34.      As noted above, NNL denies that it was a factual or *de facto* managing director of NN

Austria and therefore denies that it owed any duties to NN Austria. In the alternative, NNL

denies that it breached any fiduciary duties owed to NN Austria or committed a breach or abuse

of its authority or breach of trust vis-a-vis NN Austria.

**E.     U.K. *Insolvency Act***

35.      NN Austria also relies on the U.K. *Insolvency Act* in respect of claims for transactions at

undervalue, customer revenues and past dispositions of business. The application of the U.K.

*Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the

Claims Filed on behalf of the EMEA Claimants

**F.     Unparticularized Claims**

36.      NN Austria generally alleges that NNL had obligations and liability to NN Austria under

Austrian law with respect to future and contingent claims in respect of taxation and revenue. NN

Austria has failed to plead any particulars of the Austrian law relied on in respect of these claims.

The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law

relied upon by NN Austria (including the ones noted above) are applicable as a matter of private

international law or would apply in any event. In the alternative, if such provisions of foreign law

are applicable, the Canadian Debtors state that they have complied with such provisions.

**G.     General**

37.      To the extent that particular relief or remedies are claimed by NN Austria under Austrian

statutes and those statutes give the Austrian courts jurisdiction to grant such relief/remedies, such

relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

38.     Even if NN Austria establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

39.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

40.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Austria against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Austria against NNL.

\6198576

**SCHEDULE "G"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS (IRELAND) LIMITED ("NN IRELAND")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Ireland and that NN Ireland has not properly pleaded (nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Ireland's foreign law claims from its proofs of claim and particulars have been summarized. This is in no way an acknowledgement that NN Ireland has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NN Ireland's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Ireland and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NN Ireland, NN Ireland has not and cannot meet those requirements.

**A.      Claims for Breach of Fiduciary Duty of Shadow or *De Facto* Directors under Irish Law**

*(i)      Assertions made by NN Ireland*

4.      NN Ireland alleges that NNL was a director of NN Ireland and breached its fiduciary duties to NN Ireland.

- 2 -

5.      NN Ireland states that a director's common law duties under Irish law can be summarised as follows:

(a)      a director must exercise his powers in good faith in the interests of the company as a whole;

(b)      a director must never make a secret profit out of his office and thus he will be obliged to account to the company for any benefit he obtains from his position, regardless of whether the company has suffered any loss;

(c)      a director must exercise skill, due diligence and care in the discharge of his functions; and

(d)      a director must consider the best interests of creditors and take those interests fully into account when exercising powers and discretions.

6.      NN Ireland states that these duties apply whether a director is formally appointed as a director or whether that person is acting as a *de facto* and/or shadow director.

7.      NN Ireland states that the intercompany loan arrangements amounted to unsecured interest free obligations, which had no legitimate commercial purpose. NN Ireland claims that the advances and agreements were entered into to move cash and/or value from NN Ireland to NNL, and were contrary to the interests of and prejudicial to NN Ireland and its creditors. NN Ireland claims that the advances and agreements were entered into by reason of breaches of fiduciary duty on the part of the directors of NN Ireland, including NNL.

8.      NN Ireland also claims that NNL owed a duty of care to NN Ireland and breached that duty of care by failing to calculate NN Ireland's routine returns in a manner consistent with the

arm's length principle, failed to reimburse any part of the restructuring costs or vendor financing losses that it caused NN Ireland to incur and allocated stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool such that those costs were effectively (and wrongfully) borne by all the RPEs, including NN Ireland.

## B.    *De Facto* Director

9.    According to NN Ireland, a person would be a *de facto* director where:

(a)    although the person was not, in fact, formally appointed as a director, that person occupied the position of director; and

(b)    the company held that person out as a director and he acquiesced in this; or

(c)    that person held himself out as a director and the company acquiesced in this.

10.    NN Ireland then sets out the factors established by Irish case law that indicate that a person is or was a *de facto* director.

11.    NN Ireland claims that *de facto* directors owe the duties set out in paragraph **4** above and a company can be a *de facto* director.

12.    NN Ireland relies on its assertions that NNL was a *de facto* director of NN Ireland in support of its claims in respect of intercompany loans, transfer pricing, pension funding, past dispositions of business and future and contingent claims in respect of taxation and revenue.

## C.    Shadow Director

13.    NN Ireland states that section 27 of the Irish *Companies Act 1990* defines a shadow director as a person in accordance with whose directions or instructions the directors of a

company are accustomed to act. NN Ireland states that a corporation can be a shadow director within the meaning of section 27.

14.     According to NN Ireland, a person is a shadow director of a company if:

(a)     that person directed the directors of the company (whether *de jure* or *de facto*) how to act in relation to the company or that person was one of a number of persons who did so;

(b)     those directors acted in accordance with such directions; and

(c)     they were accustomed to so act.

15.     NN Ireland states that section 27 does not require that the board of directors should always act on the directions or instructions of a shadow director for a shadow directorship to exist, nor does it necessarily require that the directions and instructions should extend over the whole range of the company's activities.

16.     NN Ireland relies on its assertions that NNL was a shadow director of NN Ireland in support of its claims in respect of intercompany loans, transfer pricing, pension funding, past dispositions of business and future and contingent claims in respect of taxation and revenue.

*(ii)     Response of NNL*

17.     As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* or shadow director of NN Ireland.  NN Ireland was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice.  NN Ireland's board of directors was autonomous, appointed in accordance with NN Ireland's constating documents and

applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL.  Rather, the board of directors of NN Ireland exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions. NNL did not undertake or take on the role or functions of a director of NN Ireland. Similarly, NNL did not direct the management and affairs of NN Ireland and NN Ireland's management did not act simply based on NNL's instructions.  The management and control of NN Ireland emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management.  NNL did not exercise complete control or domination or influence over NN Ireland.

18.     In the alternative, if is found that NNL was a *de facto* or shadow director or fiduciary of NN Ireland, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NN Ireland or any other person, whether under any relevant legislation, or under the common law and equitable principles.  Rather, if it is found that NNL was a *de facto* or shadow director, NNL states that it acted honestly and responsibly.

19.     NNL's response to NN Ireland's allegations regarding restructuring costs, vendor financing losses, stewardship costs and NNL's general and administrative costs are found in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

- 6 -

**D.      Claims for a Fraudulent Disposition pursuant to section 139 of the Irish *Companies Act 1990***

*(i)      Assertions made by NN Ireland*

20.      NN Ireland states that section 139 of the Irish *Companies Act 1990* provides that where it can be shown that property has been disposed of and the effect of the disposal was to "perpetuate a fraud" on the company or its members or creditors the Court may, if it deems it just or and equitable to do so, order that the property or proceeds of the sale thereof be returned to the company. NN Ireland states that there is no time limit for invoking this challenge.

21.      According to NN Ireland, there is no requirement to demonstrate insolvency at the time of the transaction, or any intention to defraud creditors of the company. It is only necessary to show that the effect of the transaction was to perpetuate a fraud on the company or its stakeholders. The effect of a transaction is to perpetuate fraud whether the company, its creditors or members are deprived of something to which it is, or they are, lawfully entitled. There is no need for fraudulent actions to be proven.

22.      NN Ireland relies on section 139 of the Irish *Companies Act 1990* in support of its claims in respect of inter-company loans (specifically, NN Ireland claims that the aim of what it describes as the NNL Repatriation Strategy was to channel cash to NNL from NN Ireland and, as such, NN Ireland was deprived of value to which it was entitled) and transfer pricing (specifically, NN Ireland states that the aim of the transfer pricing arrangements was to channel cash to NNL from NN Ireland and, as such, NN Ireland was deprived of value to which it was entitled).

*(ii)*     ***Response of NNL***

23.     NNL states in order to invoke section 139, a liquidator would have to be appointed in Ireland and as no liquidator has been appointed, this provision does not apply. NNL further denies that any transactions were undertaken to perpetuate a fraud within the meaning of section 139. Without prejudice to this denial, it will be necessary as part of any proceedings to establish that any such step had the effect of perpetuating a fraud causing an actionable loss to the creditors of NN Ireland.  To the contrary, and as set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims filed on behalf of the EMEA Claimants, the impugned transactions were not fraudulent.

**E.     Claims for a Fraudulent Preference pursuant to section 286 of the Irish *Companies Act 1990***

24.     NN Ireland states that section 286 of the Irish *Companies Act 1990* provides that any disposal of property or other transaction made by a company unable to pay its debts as they become due, in favour of any creditor, and made with a view to preferring that creditor over other creditors of the company, within six months (or two years in the case of a connected party) of the company entering into liquidation is deemed to be a fraudulent preference. At the time of the transaction concerned the company must be unable to pay its debts as they fall due.

25.     According to NN Ireland, a connected party for these purposes is defined in section 286(5) as a person who at the time of the transaction was:

(a)     a director of the company;

(b)     a shadow director of the company;

(c)     a director's spouse, parent, brother, sister or child;

(d)    a related company (including a holding company, subsidiary, sister company or a company that controls the voting rights); or

(e)    any trustees of, or surety or guarantor for the debt due to any of the above.

26.    NN Ireland also states that a dominant intention to prefer one creditor over another must be established. Such an intention may be inferred from the surrounding circumstances. However a statutory presumption of intention to prefer arises in the case of a connected party.

27.    NN Ireland relies on section 286 of the Irish *Companies Act 1990* in support of its claims in respect of inter-company loans (specifically, NN Ireland alleges that it has a valid claim (to be brought by any liquidator appointed in Ireland) to have the April 2008 Revolving Loan Agreement set aside as it was entered into with a connected person in the two years ending with NN Ireland entering insolvency and undertaken with the intention to prefer NNL) and transfer pricing (specifically, NN Ireland alleges that it has a valid claim (to be brought by any liquidator appointed in Ireland) to have certain of the transfer pricing payments it made to NNL set aside as they were entered into with a connected person in the two years ending with NN Ireland entering insolvency and undertaken with the intention to prefer NNL).

*(i)*    ***Response of NNL***

28.    NNL states in order to invoke section 286, a liquidator would have to be appointed to NNL Ireland and accordingly, this provision does not apply. NNL further denies that any transactions were undertaken with the intention to prefer NNL and NNL reserves its right to defend and displace the burden of proof by demonstrating that in entering into the April 2008 Revolving Loan Agreement that NN Ireland acting via its board of directors (a) did not intend to prefer NNL and (b) did not prefer NNL over the other creditors of NN Ireland at the time of

entering into the agreement. As a general submission, NNL notes that in order to successfully establish and succeed in relation to a claim under section 286 that it is necessary to prove that the board of directors of NN Ireland intended to and as a matter of fact preferred the interests of NNL over the interests of its other creditors.   To the contrary, and as set out in the Joint Response of the Monitor and Canadian Debtors to the Claims filed on behalf of the EMEA Claimants, the circumstances of the lending arrangements were typical and had legitimate objectives unrelated to other creditors.

**F.    Claim of Duress under Irish law**

*(i)    Assertions made by NN Ireland*

29.    NN Ireland states that under Irish law, duress can be invoked by a party who claims that it was forced into entering a contract or modifying a term in a contract by the other party to the contract. Economic duress occurs where one party obtains a benefit from another party by exerting economic or commercial pressure on that party.

30.    NN Ireland states that the relevant factors to be considered when assessing a claim of duress are the:

(a)    source of pressure;

(b)    nature of the pressure; and/or

(c)    existence of causation.

31.    According to NN Ireland, in order to claim duress, it must be proven that pressure came from a party with whom the party claiming duress usually contracts and that this pressure was not legitimate. When assessing what is legitimate, the courts have had regard to the nature of the

pressure and the nature of the demand. Once it has been established that illegitimate pressure has been placed on a contracting party, it is for the party exerting the pressure to prove that the illegitimate pressure was not the reason for which the other party entered the contract or even a significant cause inducing entry into the contract.

32.     NN Ireland states that duress may render a contract void or at least voidable or result in an award of damages.

33.     NN Ireland claims that it entered the MRDA under duress and was coerced into doing so by pressure from NNL. On the basis that this pressure came from a person with whom NN Ireland usually contracted and that the pressure put on NN Ireland was not legitimate, NN Ireland can make a claim for duress under Irish law. NN Ireland alleges that this claim renders the MRDA voidable NN Ireland's election.

*(ii)*     ***Response of NNL***

34.     NNL denies that it exerted illegitimate pressure on NN Ireland to enter into the MRDA and also denies that the MRDA is voidable as a result.

**G.**     **Contract law/Debt Claim under Irish Law**

*(i)*     ***Assertions made by NN Ireland***

35.     NN Ireland states that under Irish law, a claim to recover a debt is possible where:

    (a)     a debt is owed to a claimant by the defendant; and

    (b)     the sum which is owed pursuant to the debt is due and payable.

36.     NN Ireland also states that under Irish law, a claim for breach of contract is possible where:

- 11 -

(a)      a claimant is party to a contract with the defendant;

(b)      the defendant has breached the terms of the contract (for example, in relation to payment); and

(c)      the claimant has suffered loss as a result.

37.      NN Ireland refers to Irish contract and debt law in support of its claims in respect of outstanding gross intercompany trading debts.

## (ii)      *Response of NNL*

38.      NNL denies that any intercompany trading debts are due and owing to NN Ireland by NNL or NNTC as alleged.   (To the extent any non-material amounts are shown in the intercompany balances as owing to NN Ireland by any other Canadian Debtor, they will be addressed as part of the administration of the Canadian Estate). To the contrary, there is a net amount owing by NN Ireland to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

## H.     U.K. *Insolvency Act*

39.      NN Ireland also relies on the U.K. *Insolvency Act* in respect of claims for transactions at under value related to intercompany loans and transfer pricing. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

- 12 -

## I.     General

40.     To the extent that particular relief or remedies are claimed by NN Ireland under Irish statutes and those statutes give the Irish courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

41.     Even if NN Ireland establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

42.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

43.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Ireland against NNC, NNTC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Ireland against NNL.

\6198579

SCHEDULE "H"
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS AB ("NN SWEDEN")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Sweden and that NN Sweden has not properly pleaded

(nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Sweden's foreign law claims from its proofs

of claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Sweden has properly stated or characterized the law, or that the Monitor and the Canadian

Debtors agree with NN Sweden's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Sweden and

to introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Sweden, NN Sweden has

not and cannot meet those requirements.

**A.      Swedish *Companies Act*, chapter 12, sections 2 and 5 – Unlawful Value Transfer**

4.      In support of its claims in respect of unlawful value transfer, pension funding and past

dispositions of business, NN Sweden relies on the Swedish *Companies Act*, chapter 12, sections

2 and 5.

5.      NN Sweden claims that, under Swedish law, if a dividend or other value transfer to a

shareholder exceeds a certain amount based on a company's net profit for the year (subject to

- 2 -

various adjustments), or the dividend or other value transfer was made contrary to generally accepted business practices, the shareholder is liable to repay such amounts. If the payment was a distribution of profits, the company must also prove that the recipient knew or should have realized that the value transfer was in violation of the statute.

6.       NN Sweden claims that it made payments to NNL in the period 2001-2002 which represented or amounted to an unlawful value transfer to NNL, in breach of the Swedish *Companies Act*, chapter 12, sections 2 and 5, to the knowledge of NNL. NN Sweden alleges that such payments exceeded the amount properly payable pursuant to the Swedish *Companies Act* and that NNL is liable to repay such sums to NN Sweden.

7.       NNL denies that it ever received a value transfer from NN Sweden that was, or that it knew or ought to have know, was in violation of the Swedish *Companies Act* or applicable rules, and puts NN Sweden to the strict proof thereof. NNL denies that there were any "generally accepted business practices" that applied to the impugned transactions at the time, but if there were any, NNL states that it adhered to them.

**B.       U.K. *Insolvency Act***

8.       NN Sweden also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**C.       Unparticularized Claims**

9.       NN Sweden also generally alleges that NNL had obligations and liability to NN Sweden under Swedish law with respect to customer revenues, and future and contingent claims in

respect of taxation and revenue. NN Sweden has failed to plead any particulars of the Swedish law relied on in respect of these claims. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Sweden are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**D.    General**

10.    To the extent that particular relief or remedies are claimed by NN Sweden under Swedish statutes and those statutes give the Swedish courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

11.    Even if NN Sweden establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

12.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

13.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Sweden against NNC and the directors

- 4 -

and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Sweden against NNL.

\6205499

SCHEDULE "I"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS BV ("NN HOLLAND")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Holland and that NN Holland has not properly pleaded

(nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Holland's foreign law claims from its proofs

of claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Holland has properly stated or characterized the law, or that the Monitor and the Canadian

Debtors agree with NN Holland's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Holland and

to introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Holland, NN Holland has

not and cannot meet those requirements.

A.      **Article 6:162 of the Dutch *Civil Code* – General Tort Action**

*(i)      Assertions made by NN Holland*

4.      NN Holland alleges that NNL exercised excessive control over NN Holland, and in

particular in relation to NN Holland's participation in the RPSM and performance of the

Distribution Agreement. NN Holland alleges that NNL committed unlawful acts against NN

Holland and/or its joint creditors, which caused damage and led or contributed to NN Holland's

- 2 -

insolvency. NN Holland therefore claims against NNL under article 6:162 of the Dutch *Civil Code*, which is the general tort action under Dutch law. In order to bring a claim under article 6:162, it must be established that NNL committed an attributable unlawful act (including committing a legal act that is detrimental to the company and prejudices the ability of creditors to recover their debts) against NN Holland, which caused NN Holland loss. NN Holland relies on article 6:162 in support of its claim in respect of transfer pricing, pension funding, customer revenues, past dispositions of business and future and contingent claims with respect to taxation and revenue.

### (ii)    *Response of NNL*

5.    NNL denies that it exercised excessive control over NN Holland or that it committed unlawful acts against NN Holland and/or its joint creditors which caused damage and led or contributed to NN Holland's insolvency.

### B.    Article 2:248 of the Dutch *Civil Code* – De Facto Director

### (i)    *Assertions made by NN Holland*

6.    NN Holland claims that NNL was a *de facto* director (or quasi director) of NN Holland, and that as *de facto* director (or quasi director) of NN Holland, NNL managed NN Holland in a manner which was manifestly improper.

7.    NN Holland states that article 2:248 of the Dutch *Civil Code* provides that where a company is subject to bankruptcy proceedings, the managing directors of that company may be held liable for the entire deficit of the bankrupt estate. NN Holland also notes that it is only the bankruptcy trustee who can bring a claim based on article 2:248. NN Holland also states that in order to bring a claim under article 2:248, it must establish that:

- 3 -

(a)      the directors exercised manifestly improper management of a company;

(b)      the manifestly improper management occurred in the three years preceding the insolvency; and

(c)      the manifestly improper management formed an important cause of the bankruptcy of the company.

8.      NN Holland relies on article 2:248 in support of its claim in respect of transfer pricing, pension funding, customer revenues, past dispositions of business and future and contingent claims with respect to taxation and revenue.

***Response of NNL***

9.      NNL states that since it is only the bankruptcy trustee who can bring a claim under article 2:248, NN Holland has no standing to bring this claim.

10.      In any event, as set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* or quasi or managing director of NN Holland. NN Holland was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NN Holland's board of directors was autonomous, appointed in accordance with NN Holland's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL. Rather, the board of directors of NN Holland exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions. NNL did not undertake or take on the role or functions of a director of NN Holland.  Similarly, NNL did not direct the management and affairs of NN Holland and NN Holland's management did not act simply based

- 4 -

on NNL's instructions.  The management and control of NN Holland emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management.  NNL did not exercise complete control or domination or influence over NN Holland.

11.      In the alternative, if is found that NNL was a *de facto* or quasi director of NN Holland, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NN Holland or any other person, whether under the Dutch *Civil Code*, any other relevant legislation, or under the common law and equitable principles. If it is found that NNL was a *de facto* or quasi director of NN Holland, NNL specifically denies that it exercised manifestly improper management of NN Holland, or that if it did, such improper management was an important cause of the bankruptcy of the company.

## C.      Article 6:212 of the Dutch *Civil Code* – Unjust Enrichment

### (i)      *Assertions made by NN Holland*

12.      NN Holland pleads article 6:212 of the Dutch *Civil Code* in support of its claims in respect of transfer pricing, pension funding, customer recognition and past dispositions of business. In order to bring a claim under article 6:212, NN Holland must establish that NNL was enriched, NN Holland became impoverished, the enrichment of NNL was at the expense of NN Holland and the enrichment was unjustified.

### (ii)      *Response of NNL*

13.      NNL denies that it was enriched, or that any enrichment of NNL was at the expense of NN Holland. NNL states that if it was enriched in any way, such enrichment was justified. As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on

- 5 -

behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements and the customer contracts and approved transaction agreements and loan agreements are juristic reasons for any amounts paid by NN Holland to NNL.

**D.      Article 3:296 of the Dutch *Civil Code* – Contract Law/Debt Claim**

*(i)      Assertions made by NN Holland*

14.      NN Holland refers to Dutch contract and debt law in support of its claims in respect of intercompany trading debts.

15.      NN Holland states that under Dutch law, a claim to recover debt is possible pursuant to article 3:296 of the Dutch *Civil Code* where a debt is owed to a claimant by a defendant and the sum which is owed pursuant to the debt is due and payable.

16.      NN Holland also states that a claim for breach of contract is possible pursuant to article 6:74, in conjunction with articles 6:80 and 6:81 *et seq*.

*(ii)      Response of NNL*

17.      NNL denies that any intercompany trading debts are due and owing directly to NN Holland by NNL.  (If any of the amounts reflected in the intercompany balance owed to NNIF belong to NN Holland they will be addressed in the context of the administration of the Canadian Estate). There is a net amount owing by NN Holland to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

- 6 -

### E.        U.K. *Insolvency Act*

18.        NN Holland also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

### F.        General

19.        To the extent that particular relief or remedies are claimed by NN Holland under Dutch statutes and those statutes give the Dutch courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

20.        Even if NN Holland establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

21.        NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

22.        The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Holland against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Holland against NNL.

\6198594

SCHEDULE "**J**"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS ENGINEERING SERVICES KFT ("NN HUNGARY")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Hungary and that NN Hungary has not properly pleaded

(nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Hungary's foreign law claims from its proofs

of claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Hungary has properly stated or characterized the law, or that the Monitor and the Canadian

Debtors agree with NN Hungary's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Hungary and

to introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Hungary, NN Hungary has

not and cannot meet those requirements.

A.      **Section 318 of the Hungarian *Civil Code* – Liability for Breach of Contract**

*(i)      Assertions made by NN Hungary*

4.      NN Hungary claims indemnification from NNL for loss and damage it allegedly suffered

by reason of NNL's breaches of contract and duty under sections 318 and 339 of the Hungarian

*Civil Code.*

- 2 -

5.      In support of its claims in respect of transfer pricing and past dispositions of business, NN Hungary relies on section 318 of the Hungarian *Civil Code*. NN Hungary states that in order to bring a claim for breach of contract under section 318 of the Hungarian *Civil Code*, NN Hungary must establish that:

(a)      there was a contract entered into between NN Hungary and NNL according to which NN Hungary was entitled to a reasonable arm's length rate of return for its services;

(b)      NNL breached this agreement;

(c)      NNL's action breaching the contract was unlawful;

(d)      damage was suffered by NN Hungary; and

(e)      there was a causal relationship between the illegal action and the damage suffered.

6.      NN Hungary must prove the amount of the damage and loss and the causal relationship between the illegal action and the damage suffered.

*(ii)      Response of NNL*

7.      NNL denies that it has breached any agreement with NN Hungary. In the alternative, NNL denies that any breach of its agreement with NN Hungary was unlawful or that NN Hungary suffered any damages as a result of any illegal or unlawful conduct of NNL.  NNL states that at all times it acted in a manner that could generally have been expected in the circumstances.

- 3 -

**B.    Section 339 of the Hungarian *Civil Code* – General Civil Law Liability for Damages**

*(i)    Assertions made by NN Hungary*

8.      In support of its claims in respect of transfer pricing, pension funding, customer revenues, past dispositions of business and future and contingent claims in respect of taxation and revenue, NN Hungary relies on section 339 of the Hungarian *Civil Code*. NN Hungary states that in order to bring a claim under section 339 of the Hungarian *Civil Code*, NN Hungary must establish that:

    (a)    NNL's action caused damages to NN Hungary;

    (b)    NNL's action was unlawful;

    (c)    damage was suffered by NN Hungary;

    (d)    there was a causal relationship between the illegal action and the damage suffered; and

    (e)    the defendant did not act in a manner that can be generally expected in the given situation.

9.      NN Hungary must prove the amount of the damage and loss and the causal relationship between the illegal action and the damage suffered.

*(ii)    Response of NNL*

10.     NNL denies that it has caused damage to NN Hungary, that its conduct was unlawful or that NN Hungary suffered any damages as a result of any illegal or unlawful conduct of NNL. NNL states that at all times it acted in a manner that could generally have been expected in the circumstances.

- 4 -

**C.** **Section 201(2) of the Hungarian *Civil Code* – Challenge of the Distribution Contract based on the material difference between the value of service and the consideration**

**(i)** ***Assertions made by NN Hungary***

11.    NN Hungary relies on section 201(2) of the Hungarian *Civil Code* in support of its transfer pricing claims. NN Hungary states that there was a significant and unreasonable difference between the value of the services to be provided by NN Hungary and the consideration paid by NNL and that NNL deprived NN Hungary of significant fees that would otherwise be due to NN Hungary on an arm's length basis. NN Hungary states that section 201(2) of the Hungarian *Civil Code* (which appears to deal with transfer pricing, although it is not clear from NN Hungary's pleading), does not apply to contracts made between a Hungarian company and a foreign entity. However, NN Hungary argues that this section *may* apply to agreements that breach transfer pricing regulations.

**(ii)** ***Response of NNL***

12.    NNL denies that section 201(2) of the Hungarian *Civil Code* has any application to this case involving a foreign entity and international contract. In the alternative, even if section 201(2) has any application, NNL states that the transfer pricing methodology used was appropriate and achieved the "normal market price".

**D.** **Section 210 of the Hungarian *Civil Code* – Challenge of the validity of a contract based on a mistake or deception regarding essential circumstance of the contract**

**(i)** ***Assertions made by NN Hungary***

13.    NN Hungary relies on section 210 of the Hungarian *Civil Code* in order to challenge the validity of its Distribution Agreement and to support its claims relating to transfer pricing and past dispositions of business. In order to challenge the validity of a contract under this section, it must be established that NN Hungary acted under a mistake or deception regarding any essential

- 5 -

circumstance relating to the contract, that the mistake or deception existed at the time of the conclusion of the contract, the mistake had been caused or could have been recognized by the defendant, and the deception had been caused by the defendant or by a third party and the defendant recognized or should have recognized it. NN Hungary states that it was fundamentally mistaken as to how the transfer pricing arrangements would operate pursuant to the terms of the Distribution Agreement, as NN Hungary believed that it would receive an arm's length remuneration pursuant to the transfer pricing arrangements and its Distribution Agreement.

### (ii)    *Response of NNL*

14.    NNL denies each and every one of the constituent elements of this cause of action. For the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL denies that NN Hungary has any claim for mistake.

15.    NN Hungary also notes that in order to challenge the validity of a contract, NN Hungary must send a notice to NNL setting out the challenge in accordance with section 236 of the Hungarian *Civil Code*. NNL states that it has not received any such notice from NN Hungary and therefore NN Hungary is barred from asserting a claim under section 210.

### E.    Section 131 of the Hungarian *Companies Act* – Transfer of Value Constituting Disguised Dividends

### (i)    *Assertions made by NN Hungary*

16.    NN Hungary states that the payments made to NNL by NN Hungary pursuant to the transfer pricing arrangements represented or amounted to disguised dividends in breach of section 131 of the Hungarian *Companies Act*. NN Hungary relies on this provision in support of

its transfer pricing claims. NN Hungary states that in order to reclaim from NNL funds transferred as disguised dividends, it must establish that:

(a)    funds were transferred from NN Hungary to its shareholder;

(b)    the payment was made from the funds of NN Hungary based on the shareholder's status;

(c)    the payment was made in violation of section 131 of the Hungarian *Companies Act*;

(d)    The shareholder acted in bad faith when receiving the funds.

### (ii)    *Response of NNL*

17.    NNL states that it is not a direct shareholder of NN Hungary and that it could not receive any dividends from NN Hungary. NNL further states that any payments received by it, directly or indirectly from NN Hungary, were not made in violation of section 131 of the Hungarian *Companies Act*. In the alternative, NNL states that any amounts received from NN Hungary were legally received and that NNL did not act in bad faith when receiving any funds from NN Hungary.

### F.    Section 361 of the Hungarian *Civil Code* – Receipt of Benefits or Funds without Legal Title

### (i)    *Assertions made by NN Hungary*

18.    NN Hungary states that pursuant to section 361 of the Hungarian *Civil Code*, funds paid without due legal cause or title may be reclaimed from a defendant.

19.     NN Hungary relies on section 361 in support of its transfer pricing claims, customer revenue claims and past dispositions of business claims, in order to try to reclaim the funds received by NNL.

*(ii)*     ***Response of NNL***

20.     NNL states that any and all amounts received from NN Hungary by NNL were received by it with due legal cause, pursuant to lawful agreements between the parties.

**G.     U.K. *Insolvency Act***

21.     NN Hungary also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenues and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**H.     General**

22.     To the extent that particular relief or remedies are claimed by NN Hungary under Hungarian statutes and those statutes give the Hungarian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

23.     Even if NN Hungary establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

24.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf

- 8 -

of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

25.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Hungary against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Hungary against NNL.

\6198595

SCHEDULE "K"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS FRANCE SAS ("NNSAS")

1.     It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NNSAS and that NNSAS has not properly pleaded (nor proven) any foreign law.

2.     For ease of reference, in this Schedule, NNSAS's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement that NNSAS has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NNSAS's characterization of the law.

3.     If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NNSAS and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NNSAS, NNSAS has not and cannot meet those requirements.

A.     **Contract Law/Debt Claim under French Law**

*(i)     Assertions made by NNSAS*

4.     NNSAS alleges that it has debt claims against NNL and NNTC in respect of outstanding intercompany trading debts. NNSAS relies on the French *Civil Code* in respect of these claims.

5.     NNSAS states that under French law, a claim to recover a debt is possible pursuant to articles 1134 *et seq* of the French *Civil Code* (and, in particular, article 1147) where a debt is

- 2 -

owed to a claimant by a defendant and the sum which is owed pursuant to the debt is due and payable.

6.      NNSAS also states that a claim for breach of contract is possible pursuant to articles 1134 *et seq* of the French *Civil Code* (and, in particular, article 1147) where a claimant is a party to a contract with the defendant, the defendant has breached the terms of the contract and the claimant has suffered loss as a result.

*(ii)      Response of NNL*

7.      NNL denies that any intercompany trading debts are due and owing to NNSAS by NNL or NNTC. To the contrary, there is a net amount owing by NNSAS to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**B.      Unparticularized Claims**

8.      NNSAS also generally alleges that NNL had obligations to NNSAS under French law with respect to pension funding. NNSAS has failed to plead any particulars of the French law relied on in respect of these claims. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NNSAS are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**C.      General**

9.      To the extent that particular relief or remedies are claimed by NNSAS under French statutes and those statutes give the French courts jurisdiction to grant such relief/remedies, such

- 3 -

relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

10.     Even if NNSAS establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

11.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

12.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NNSAS against NNC, NNTC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NNSAS against NNL.

\6198596

**SCHEDULE "L"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS HISPANIA SA ("NN SPAIN")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Spain and that NN Spain has not properly pleaded (nor

proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Spain's foreign law claims from its proofs of

claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Spain has properly stated or characterized the law, or that the Monitor and the Canadian Debtors

agree with NN Spain's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Spain and to

introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Spain, NN Spain has not

and cannot meet those requirements.

**A.**     ***De Facto* Directors and sections 236-240 of the Spanish *Companies Act***

***(i)***     ***Assertions made by NN Spain***

4.      NN Spain alleges that NNL was a *de facto* director of NN Spain and accordingly owed

fiduciary duties to NN Spain and breached those duties.

- 2 -

5.     NN Spain states that under Spanish law, a company may be a *de facto* director of another company if it is able to exercise control over the company and impose business decisions on the other company.

6.     NN Spain states that the term "*de facto* director" is not legally defined by the Spanish *Insolvency Act*, the Spanish *Companies Act* (as defined) or other relevant corporate laws. According to NN Spain, Spanish courts' precedent and scholars have repeatedly provided that a *de facto* director generally falls under one of the following categories:

(a)     directors whose appointed term has lapsed;

(b)     persons appointed as directors, but whose appointment could be annulled; i.e., due to the resolution appointing them violating a provision of law;

(c)     persons who control the company's management and administration without being formally appointed to do so, and who act as directors with third parties (apparent director); and/or

(d)     persons who, without acting as directors to outsiders, control the company's management and day-to-day operations, exercising decisive influence on the directors (indirect or "covered" directors).

7.     NN Spain states that *de facto* directors must comply with the same fiduciary obligations imposed upon a *de jure* director of a Spanish company pursuant to sections 225-229 of the Spanish *Companies Act*, in particular:

(a)     a duty to act diligently in view of the best interests of the company;

(b)     a duty to act loyally in defence of the interests of the company;

- 3 -

(c)      a duty not to put their own interests ahead of the company;

(d)      a duty not to take profit from business opportunities which the company could have profited from; and

(e)      a duty to report any conflict of interest with the company, and to refrain from taking part in agreements or decisions related to the transaction to which the conflict of interest relates.

8.      NN Spain states that pursuant to sections 236 to 240 of the Spanish *Companies Act*, a claim can be brought against a *de facto* director of a company for breaches of fiduciary duty which cause the company loss and/or damage.

9.      NN Spain states that:

(a)      NNL was a *de facto* director of NN Spain;

(b)      NNL committed an act or omission contrary to law or NN Spain's bylaws, and/or is in breach of any of its fiduciary duties as a *de facto* director;

(c)      that act, omission and/or breach was attributable to a default (negligence) or wilful misconduct (fraud) of NNL;

(d)      NN Spain has suffered loss and/or damage; and

(e)      there is a link between the act, omission and/or breach and the damage and/or loss suffered.

- 4 -

10.     NN Spain relies on its allegations that NNL was a *de factor* director and sections 236 to 240 of the Spanish *Companies Act* in support of its claim in respect of past dispositions of business, customer revenues, transfer pricing and pension funding.

### (ii)    *Response of NNL*

11.     NNL denies that NN Spain is entitled to plead and rely on the Spanish *Companies Act*. The Spanish *Companies Act* came into force after the alleged conduct took place and no justification has been provided for its retroactive or retrospective application.  In the alternative, if the Spanish *Companies Act* is found to have retroactive or retrospective application, the law is contrary to the public policy of Canada as it relates to the limitations of retroactive or retrospective laws and the public policy against the reordering of creditor priorities in an insolvency.  Accordingly, the law should not be recognized or enforced.

12.     In any event, as set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* director of NN Spain.  NN Spain was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NN Spain's board of directors was autonomous, appointed in accordance with NN Spain's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL. Rather, the board of directors of NN Spain exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions. NNL did not undertake or take on the role or functions of a director of NN Spain. Similarly, NNL did not direct the management and affairs of NN Spain and NN Spain's management did not act simply based on NNL's instructions. The management and control of NN Spain emanated from the Senior Management of the EMEA Region, including

- 5 -

NNUK's management, who coordinated with other management. NNL did not exercise complete control or domination or influence over NN Spain or any decisive influence over its directors.

13.    In the alternative, if is found that NNL was a *de facto* director of NN Spain, which is not admitted, NNL states that it complied with its obligations and did not commit an act or omission contrary to law or NN Spain's bylaws or in breach of any fiduciary or other duty which it owed to NN Spain or any other person, whether under the Spanish *Companies Act*, any other relevant legislation, or under the common law and equitable principles, or that any such act, omission and/or breach was attributable to a default or wilful misconduct of NNL.

**B.    Sections 164.1 and 172 of the Spanish *Insolvency Act***

*(i)    Assertions made by NN Spain*

14.    NN Spain states that pursuant to the Spanish *Insolvency Act* (sections 164.1 and 172), *de facto* directors can be held liable in an amount up to a company's total deficit as regards creditors in circumstances where by breaches of fiduciary duty and/or negligence those directors contributed to the existence or worsening of the company's financial situation that led to it being placed into bankruptcy proceedings.

15.    NN Spain states that the elements of a claim under section 164.1 of the Spanish *Insolvency Act*, as applied to NNL and NN Spain, are as follows:

(a)    the bankruptcy proceedings are classified by the relevant bankruptcy judge as guilty, i.e. the insolvency situation was created or worsened through fraud, serious misconduct and/or gross negligence of NN Spain's directors;

(b)    NNL was a *de facto* director of NN Spain;

(c)     NNL's conduct amounted to fraud, serious misconduct and/or gross negligence;

(d)     NN Spain has suffered loss and/or damage; and

(e)     there is a link between NNL's conduct and the damage and/or loss suffered by NN Spain and its creditors.

16.     NN Spain relies on the Spanish *Insolvency Act* in support of its claim in respect of transfer pricing, pension funding, past dispositions of business, customer revenues and future and contingent claims with respect to taxation and revenue.

*(ii)*     ***Response of NNL***

17.     For the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL denies that Spanish *Insolvency Act* has any application to NN Spain's claims or these proceedings. In any event, as noted above, NNL denies that it was a *de facto* director of NN Spain.  NNL further denies that any conduct on its part amounted to fraud, serious misconduct and/or gross negligence or that NN Spain has suffered any damages.

**C.     Contract Law/Debt Claim under Spanish Law**

*(i)*     ***Allegations made by NN Spain***

18.     NN Spain states that under the Spanish *Civil Code*, a claim to recover a debt is possible pursuant to sections 1,096; 1,101; 1,125; and 1,157 where:

(a)     a debt is owed to a claimant by the defendant; and

(b)     the sum which is owed pursuant to the debt is due and payable.

19.      NN Spain also states that under the Spanish *Civil Code*, a claim for breach of contract is possible pursuant to sections 1,096; 1,101; and 1,124 where:

(a)      a claimant is party to a contract with the defendant;

(b)      the defendant has breached the terms of the contract (for example, in relation to payment); and

(c)      the claimant has suffered loss.

20.      NN Spain refers to Spanish contract and debt law in support of its claims in respect of intercompany trading debts.

### (ii)      *Response of NNL*

21.      NNL denies that any intercompany trading debts are due and owing to NN Spain by NNL. To the contrary, there is a net amount owing by NN Spain to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

### D.      U.K. *Insolvency Act*

22.      NN Spain also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue, customer revenues and past dispositions of business. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimant.

### E.      General

23.      To the extent that particular relief or remedies are claimed by NN Spain under Spanish statutes and those statutes give the Spanish courts jurisdiction to grant such relief/remedies, such

- 8 -

relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

24.    Even if NN Spain establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

25.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

26.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Spain against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Spain against NNL.

\6198597

**SCHEDULE "M"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS INTERNATIONAL FINANCE AND HOLDINGS BV ("NNIF")**

1.     It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NNIF and that NNIF has not properly pleaded (nor proven) any foreign law.

2.     For ease of reference, in this Schedule, NNIF's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement that NNIF has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NNIF's characterization of the law.

3.     If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NNIF and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NNIF, NNIF has not and cannot meet those requirements.

**A.     Article 6:162 of the Dutch *Civil Code* – General Tort Action**

***(i)     Assertions made by NNIF***

4.     NNIF alleges that NNL committed an attributable unlawful act towards NNIF and/or NNIF's creditors in approving (and/or causing or procuring the making of) the NNIF Reorganization. NNIF states that its officeholders are entitled to bring claims both on the basis of actionable unlawful conduct, attributable to NNL, towards NNIF and its joint creditors.

- 2 -

5.      NNIF states that NNL failed to subordinate its interest to the interests of NNIF and NNIF's joint creditors, thereby breaching a duty of care towards NNIF and/or NNIF's joint creditors which is imposed upon NNL as a matter of Dutch law by reason of its actions in planning, enacting and implementing the NNIF Reorganization. NNIF states that NNL not only participated in the NNIF Reorganization, but had the lead role in relation thereto and was at all material times able to influence it and benefited from it. NNIF states that in all the circumstances, NNL's acts and/or omissions constituted unlawful conduct towards NNIF and/or its joint creditors actionable under Dutch law.

6.      NNIF therefore alleges that it has a claim against NNL under article 6:162 of the Dutch *Civil Code*, which is the general tort action under Dutch law. In order to bring a claim under article 6:162, it must be established that NNL committed an attributable unlawful act (including committing a legal act that is detrimental to the company and prejudices the ability of creditors to recover their debts) against NNIF, which caused NNIF loss.

7.      NNIF also relies on article 6:162 in support of its claim in respect of pension funding, customer revenues, past dispositions of business and future and contingent claims with respect to taxation and revenue.

*(ii)*      ***Response of NNL***

8.      For the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL did not commit any unlawful act or conduct against NNIF or anyone else, including (without limitation) by approving the NNIF Reorganization, and therefore article 6:162 has no application.  Furthermore, NNL's conduct was not detrimental to NNIF nor did it prejudice the ability of NNIF's creditors to recover their debts.

- 3 -

**B.    Article 2:248 of the Dutch *Civil Code* – Quasi Director**

*(i)    Assertions made by NNIF*

9.    NNIF states that article 2:248 of the Dutch *Civil Code* provides that where a company is subject to bankruptcy proceedings, the managing directors of that company may be held liable for the entire deficit of the bankrupt estate. NNIF also notes that it is only the bankruptcy trustee who can bring a claim based on article 2:248. NNIF also states that in order to bring a claim under article 2:248, it must establish that:

(a)    the directors exercised manifestly improper management of a company;

(b)    the manifestly improper management occurred in the three years preceding the insolvency; and

(c)    the manifestly improper management formed an important cause of the bankruptcy of the company.

10.    NNIF claims that NNL was a quasi director of NNIF, being the person that determined the management of NNIF (effectively in place of NNIF's board), as if NNL itself was managing director of NNIF, or at least co-determining the management of NNIF together with NNIF's formal management board as if NNL was managing director of NNIF. NNIF claims that in approving (and/or causing or procuring the making of) the NNIF Reorganization and/or its constituent elements, NNL acted in a way in which no reasonable managing director would have acted under the same circumstances. NNIF alleges that NNL managed NNIF in a manifestly improper manner and this constituted a direct and important cause of NNIF's insolvency and it being put into administration proceedings.

- 4 -

11.      NNIF also relies on article 2:248 in support of its claim in respect of pension funding, customer revenues, past dispositions of business and future and contingent claims with respect to taxation and revenue.

### (ii)      Response of NNL

12.      NNL states that since it is only the bankruptcy trustee who can bring a claim under article 2:248, NNIF has no standing to bring this claim.

13.      In any event, as set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a quasi or managing director of NNIF. NNIF was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NNIF's board of directors was autonomous, appointed in accordance with NNIF's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL.  Rather, the board of directors of NNIF exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions.  NNL did not undertake or take on the role or functions of a director of NNIF.  Similarly, NNL did not direct the management and affairs of NNIF and NNIF's management did not act simply based on NNL's instructions.  The management and control of NNIF emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management.  NNL did not exercise complete control or domination or influence over NNIF.

14.      In the alternative, if is found that NNL was a quasi director of NNIF, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NNIF or any other person, whether under the Dutch *Civil Code*, any

other relevant legislation, or under the common law and equitable principles.  If it is found that NNL was a quasi director of NNIF, NNL specifically denies that exercised manifestly improper management of NNIF, or that if it did, such improper management was an important cause of the bankruptcy of the company.

**C.      Article 3:296 of the Dutch *Civil Code* – Contract Law/Debt Claim**

*(i)      Assertions made by NNIF*

15.      NNIF refers to Dutch contract and debt law in support of its claims in respect of intercompany trading debts.

16.      NNIF states that under Dutch law, a claim to recover debt is possible pursuant to article 3:296 of the Dutch *Civil Code* where a debt is owed to a claimant by a defendant and the sum which is owed pursuant to the debt is due and payable.

17.      NNIF also states that a claim for breach of contract is possible pursuant to article 6:74, in conjunction with articles 6:80 and 6:81 *et seq*.

*(ii)     Response of NNL*

18.      As particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and in Schedule "B" thereto, NNL acknowledges that there is an unsecured net balance shown on the intercompany accounts to be owing by NNL to NNIF, which is immaterial, but will be addressed in the context of the administration of the Canadian Estate.

- 6 -

**D.      U.K. *Insolvency Act***

19.      NNIF also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**E.      General**

20.      To the extent that particular relief or remedies are claimed by NNIF under Dutch statutes and those statutes give the Dutch courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

21.      Even if NNIF establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

22.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

23.      The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NNIF against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NNIF against NNL.

\6198598

SCHEDULE "N"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS NV ("NN BELGIUM")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Belgium and that NN Belgium has not properly pleaded

(nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Belgium's foreign law claims from its proofs

of claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Belgium has properly stated or characterized the law, or that the Monitor and the Canadian

Debtors agree with NN Belgium's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Belgium and

to introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Belgium, NN Belgium has

not and cannot meet those requirements.

A.      **Claim for Breach of Fiduciary Duty of NNL as Shadow Director of NN Belgium**

*(i)      Assertions made by NN Belgium*

4.      NN Belgium states that in order to bring a claim against NNL for breach of fiduciary duty

and hold NNL liable in its capacity as a shadow director of NN Belgium pursuant to articles

1382-1383 of the Belgian *Civil Code* for any damages, it must establish that:

        (a)      NNL was a shadow director of NN Belgium;

- 2 -

(b)    NNL as shadow director committed a fault within the meaning of articles 1382-1383 of the Belgian *Civil Code* (a fault within the meaning of articles 1382-1383 encompasses the violation of a legal obligation (though a wrongful act or omission) and/or the failure to observe a general obligation of prudence and diligence);

(c)    NN Belgium incurred damages; and

(d)    the damages incurred by NN Belgium resulted from the fault committed by NNL (i.e. a causal link between the fault and damages has to be established).

5.    NN Belgium states that under Belgian law, NNL will qualify as a shadow director if:

(a)    it carried out a material act(s);

(b)    it carried out material management acts (i.e. any acts and/or decisions affecting or determining the commercial and financial destiny of NN Belgium); and

(c)    the above mentioned acts and decisions are carried out independently.

6.    NN Belgium states that in order to demonstrate that NNL is a shadow director, it must show that NNL was in a position to determine the commercial, industrial and/or financial fate of NN Belgium, for example by deciding to enter into contracts.

7.    NN Belgium states that any gratuitous actions (e.g. granting non-interest bearing loans, entering into prejudicial transfer pricing arrangements, etc.) can be challenged and the shadow directors found liable on the basis of such actions being contrary to the company's corporate nature, purpose and/or interest.

- 3 -

8.      NN Belgium claims that NNL, as a shadow director of NN Belgium, acted contrary to the interests of NN Belgium and its creditors, and favoured its own interests over those of NN Belgium.

9.      NN Belgium relies on its allegations of NNL being a shadow director of NN Belgium and breaching its fiduciary duties in support of its claim in respect of transfer pricing, pension funding, customer revenues, past dispositions of business and future and contingent claims with respect to revenue.

10.     In its Proof of Claim, NN Belgium also relies on article 527 of the Belgian *Companies Code* in support of its claim that NNL breached its fiduciary duty. NN Belgium has not, however, provided any particulars of article 527 of the Belgian *Companies Code*.  NNL denies however, that article 527 has any application to shadow directors.

*(ii)      Response of NNL*

11.     As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a shadow director of NN Belgium. NN Belgium was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NN Belgium's board of directors was autonomous, appointed in accordance with NN Belgium's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL. Rather, the board of directors of NN Belgium exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions. NNL did not undertake or take on the role or functions of a director of NNUK. Similarly, NNL did not direct the management and affairs of NN Belgium and NN Belgium's management did not act simply based on NNL's instructions.    The

- 4 -

management and control of NN Belgium emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management.  NNL did not exercise complete control or domination or influence over NN Belgium.

12.    In the alternative, if is found that NNL was a shadow director of NN Belgium, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NN Belgium or any other person, whether under the Belgian *Companies Code*, any other relevant legislation, or under the common law and equitable principles. NNL specifically denies that it committed a fault within the meaning of articles 1382-1383 of the Belgian *Civil Code* or that NN Belgium has suffered any damages.

**B.    Claim for Annulment of a Contract under Article 1109 of the Belgian *Civil Code***

*(i)    Assertions made by NN Belgium*

13.    NN Belgium claims that its consent to the Distribution Agreement was defective and therefore invalid pursuant to article 1109 of the Belgian *Civil Code*, by reason of it having been given in error and/or coerced by NNL. NN Belgium claims that the Distribution Agreement is therefore liable to be annulled and NNL is liable to compensate NN Belgium for all loss it has suffered.

14.    NN Belgium states that in order to bring a claim for annulment of the Distribution Agreement pursuant to article 1109 of the Belgian *Civil Code*, it must establish that:

(a)    its consent to enter into the Distribution Agreement was defective, and therefore invalid as it was:

(i)    given in error further to a fault on the part of NNL (NN Belgium states that the error must have been made with respect to an element which had a

- 5 -

decisive influence on NN Belgium and that such error was excusable, i.e. it could have been committed by any reasonable, diligent and prudent person);

(ii)    coerced by NNL (NN Belgium states that such coercion must have been of a physical, moral or material nature, was imminent, substantial and decisive for NN Belgium to enter into the contract);

(iii)    obtained by fraud on the part of NNL (NN Belgium states that the fraud must be a wilful misrepresentation of reality which led NN Belgium to enter into the contract (i.e. principal fraud) or to accept such terms and conditions which it would not have accepted under normal circumstances (i.e. secondary fraud)); or

(iv)    NN Belgium was put at a substantial disadvantage induced by NNL (NN Belgium states that substantial disadvantage exists if a clear and significant disproportion exists between reciprocal performances originating from the exploitation of the subordinate position of NN Belgium by NNL);

(b)    the cause of the validity set out in a(i)-(iv) above constitutes a fault within the meaning of articles 1382-1383 of the Belgian *Civil Code* (as noted above, a fault within the meaning of articles 1382-1383 encompasses the violation of a legal obligation (though a wrongful act or omission) and/or the failure to observe a general obligation of prudence and diligence);

- 6 -

(c)     NN Belgium incurred damages which will not be fully compensated by the annulment of the contract; and

(d)     the damages incurred by NN Belgium resulted from the fault committed by NNL, i.e. a causal link between the fault and the damages has to be established.

### (ii)    *Response of NNL*

15.     NNL states that NN Belgium's decision to enter into the Distribution Agreement was not given in error, coerced or obtained by fraud, nor was NN Belgium put at a substantial disadvantage.NNL states that NN Belgium has failed to establish any of the requirements of this cause of action.

### C.     Claim for Disguised Dividends under Articles 617-618 of the Belgian *Companies Code*

### (i)     *Assertions made by NN Belgium*

16.     NN Belgium alleges that payments received by NNL from NN Belgium in respect of transfer pricing represented or amounted to disguised dividends to NNL, in breach of articles 617 and 618 of the Belgian *Companies Code*. NN Belgium asserts that NNL knew or should have known that such payments were made in violation of these rules and is liable to repay such amounts to NN Belgium.

17.     NN Belgium states that in order to bring such a claim against NNL, it must establish that:

(a)     NNL was a shadow director of NN Belgium;

(b)     NNL as shadow director committed a fault within the meaning of articles 1382-1383 of the Belgian *Civil Code* (see above) (for example, the payments under the

transfer pricing arrangements constituted disguised dividend distributions in violation of the provisions of articles 617-618 of the Belgian *Companies Code*);

(c)    NN Belgium incurred damages which it was not able to recover from its shareholders pursuant to article 619 of the Belgian *Companies Code* (article 619 says that any distribution in breach of articles 617-618 must be repaid by the shareholder to whom such distribution was made if the company proves that the shareholder was aware that the distribution in its favour was in breach of the provisions or that the shareholder could not have been unaware of the breach); and

(d)    the damages incurred by NN Belgium resulted from the fault committed by NNL (i.e. a causal link between the fault and damages has to be established).

*(ii)*    ***Response of NNL***

18.    For the reasons noted above, NNL states that it was not a shadow director of NN Belgium. NNL further states that the payments received by it from NN Belgium as part of the transfer pricing arrangements were paid pursuant to the MRDA, RPSM and Distribution Agreements and were contractually justified amounts. No amounts received by NNL from NN Belgium were "disguised dividends".

**D.    Claim under Article 530 of the Belgian *Companies Code* for gross negligence contributing to bankruptcy**

*(i)*    ***Assertions made by NN Belgium***

19.    NN Belgium states that pursuant to article 530 of the Belgian *Companies Code*, where a company has been declared bankrupt with insufficient assets to repay its debts, and any director,

- 8 -

former director or other person who had *de facto* authority to manage and administer the business of the company has committed an act of manifest gross negligence which contributed to the bankruptcy of the company, that person may be held personally liable, whether or not jointly and severally, for all or part of the liabilities of the company up to the amount of the shortfall.

20.    NN Belgium states that in order to bring a claim against NNL pursuant to article 530, it must establish:

(a)    the bankruptcy or involuntary liquidation of NN Belgium;

(b)    that NN Belgium has insufficient assets to repay its debts;

(c)    that NNL was a shadow director of NN Belgium;

(d)    that NNL as a shadow director committed a manifestly serious fault (i.e. the manifest violation of a legal obligation (through a wrongful act or omission, such as total mismanagement) or the manifest failure to observe a general obligation of prudence and diligence); and

(e)    such manifestly serious fault contributed to the bankruptcy or involuntary liquidation of NN Belgium (although the manifestly serious mistake need not be the exclusive cause of the bankruptcy, nor the decisive cause of the bankruptcy).

21.    NN Belgium claims that NNL was a *de facto* director of NN Belgium and acted in breach of its fiduciary duties to NN Belgium and committed acts of gross negligence which contributed to the insolvency of NN Belgium.

22.    NN Belgium relies on article 530 in support of its claims in respect of transfer pricing and past dispositions of business.

- 9 -

*(ii)*    ***Response of NNL***

23.    For the reasons noted above, NNL denies that it was a shadow director of NN Belgium. In the alternative, if NNL was a shadow director of NN Belgium, NNL denies that it committed a manifestly serious fault, let alone one that contributed to the bankruptcy or involuntary liquidation of NN Belgium.

**E.    Mistake**

*(i)*    ***Assertions made by NN Belgium***

24.    NN Belgium pleads that between 2002 and 2008, NN Belgium mistakenly believed that a routine return of 1% represented fair market value, arm's length compensation for its distribution and service activities, and that it was not necessary, in order to achieve an arm's length return, that its restructuring costs be reimbursed by NNL. That mistaken belief was either common to NN Belgium and NNL or was reasonably held by NN Belgium and not corrected by NNL. NN Belgium therefore claims that the excess amount which it paid to NNL may be recovered pursuant to article 1235 *et seq*. of the Belgian *Civil Code.*

*(ii)*    ***Response of NNL***

25.    NN Belgium has failed to provide any particulars of its claim pursuant to article 1235, nor has it specified what other articles of the Belgian *Civil Code*, if any, it is relying on.

26.    In any event, for the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL denies that there was any mistake on the part of NN Belgium actionable at law.

- 10 -

**F.**      **Contract Law/Debt Claim – Articles 1134 and 186 of the Belgian *Civil Code***

*(i)*      ***Assertions made by NN Belgium***

27.      NN Belgium refers to Belgian contract and debt law in support of its claims in respect of intercompany trading debts.

28.      NN Belgium states that under Belgian law, a claim to recover debt is possible pursuant to articles 1134 and 1186 of the Belgian *Civil Code* where a debt is owed to a claimant by a defendant and the sum which is owed pursuant to the debt is due and payable.

29.      NN Belgium also states that a claim for breach of contract is possible pursuant to article 1184.

*(ii)*      ***Response of NNL***

30.      NNL denies that any intercompany trading debts are due and owing to NN Belgium by NNL. To the contrary, there is a net amount owing by NN Belgium to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants. To the extent that the intercompany account balances show an amount due to NN Belgium from any of the other Canadian Debtors against which it has filed a proof of claim that will be addressed in the administration of the Canadian Estate.

**G.**      **Unparticularized Claims**

31.      NN Belgium also generally alleges that NNL had obligations and liability to NN Belgium under Belgian law with respect to future and contingent claims in respect of taxation. NN Belgium has failed to plead any particulars of the Belgian law relied on in respect of this claim. The Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by

NN Belgium (including the ones noted above) are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**H.      U.K. *Insolvency Act***

32.      NN Belgium also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**I.      General**

33.      To the extent that particular relief or remedies are claimed by NN Belgium under Belgian statutes and those statutes give the Belgian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

34.      Even if NN Belgium establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

35.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

- 12 -

36.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Belgium against NNC, NNTC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Belgium against NNL.

\6198599

## SCHEDULE "O"
## TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

## RESPONSE TO FOREIGN LAW CLAIMS OF
## NORTEL NETWORKS OY ("NN FINLAND")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Finland and that NN Finland has not properly pleaded (nor proven) any foreign law.

2.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Finland and to introduce evidence of different or additional requirements and defences, in the normal course.

## A.      Unparticularized Claims

3.      NN Finland generally alleges that NNL had obligations and liability to NN Finland under Finnish law with respect to customer revenues, pension funding, past dispositions of business and future and contingent claims in respect of taxation and revenue. However, there are no specific references to Finnish laws in the Proof of Claim and NN Finland has failed to provide any particulars in respect of its claims

4.      The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Finland are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

- 2 -

**B.**     **U.K.** *Insolvency Act*

5.      NN Finland also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**C.**     **General**

6.      To the extent that particular relief or remedies are claimed by NN Finland under Finnish statutes and those statutes give the Finnish courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

7.      Even if NN Finland establishes that the requirements of some or all of its foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable

8.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

9.      The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Finland against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Finland against NNL.

**SCHEDULE "P"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS POLSKA Sp z.o.o. ("NN POLAND")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Poland and that NN Poland has not properly pleaded (nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN Poland's foreign law claims from its proofs of claim and particulars have been summarized. This is in no way an acknowledgement that NN Poland has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NN Poland's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Poland and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NN Poland, NN Poland has not and cannot meet those requirements.

**A.      Damages relating to NN Poland's Liability for Corporate Income Tax on Deemed Income**

*(i)      Assertions made by NN Poland*

4.      NN Poland states that in order to bring a Polish law claim against a legal person for damages caused to a company as a result of assessment of corporate income tax on the company's deemed income it must establish that:

- 2 -

(a)     the person was exerting unlawful influence on the company in respect of decisions of the company;

(b)     such person's unlawful influence caused:

(i)     the company to enter into contractual arrangements regarding transfer pricing, which were in breach of Polish tax regulations;

(ii)     Polish tax authorities to assess deemed income relating to the execution of the aforementioned arrangements and impose corporate income tax on the company;

(iii)     the payment by the company of the aforementioned corporate income tax adversely affected the company's cash flow situation; and

(iv)     such breach of relevant Polish tax regulations caused the company loss.

5.      NN Poland claims that NNL was a dominant entity towards NN Poland and in particular imposed the transfer pricing arrangements and Distribution Agreement on NN Poland. NN Poland claims that if and to the extent that the Polish Tax Authorities instigate proceedings against NN Poland seeking payment of additional tax based on NN Poland's deemed income had the transfer pricing arrangements been conducted on an arm's length basis, then NNL is liable to reimburse NN Poland for such additional tax.

6.      NN Poland also relies on these allegations in support of its future and contingent claims in respect of taxation.

- 3 -

*(ii)*      *Response of NNL*

7.      NNL states that no proceedings have been commenced by the Polish Tax Authorities against NN Poland and NN Poland has no claim against NNL. NNL further denies that it was exerting unlawful influence on NN Poland in respect of decisions of NN Poland or that it caused NN Poland to enter into contractual arrangements regarding transfer pricing, which were in breach of Polish tax regulations. Furthermore, as set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements provided for an arm's length return to NN Poland.

**B.      Claims in Tort**

*(i)*      *Assertions made by NN Poland*

8.      NN Poland states that unlawful influence by one party on another party's business may constitute a tort. NN Poland states that torts are regulated by the Polish *Civil Code*, with the basic regulation included in Article 415, which provides that whoever by his fault caused damage to another person shall be obliged to redress it. This rules applies to legal persons as well as natural persons. Accordingly, a legal person (e.g. a company) shall be obliged to redress a damage caused by a fault of its management board.

9.      NN Poland states that in order to commit a tort under the Polish *Civil Code*, a person:

(a)      must commit an act (or failure to act) that is unlawful;

(b)      must be aware that its act (or failure to act) will, or may be likely to, cause damage to another; and

(c)      such act (or failure to act) must have caused damage to another.

- 4 -

10.      NN Poland states that the loss must be established in a specific amount (in any currency). The amount of the financial loss shall determine the value of damage claimed by a claimant.

11.      NN Poland states that its claim under tort law relates to the claims throughout its Proof of Claim, but in particular its transfer pricing claims and claims in respect of past dispositions.

*(ii)*      *Response of NNL*

12.      As noted above, NNL denies that it was exerted unlawful influence on NN Poland. As stated in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, any acts relating to transfer pricing and past dispositions were undertaken pursuant to lawful and binding agreements and duly authorized corporate transactions and were not unlawful. Finally, NNL states that NN Poland has failed to plead or establish any acts of NNL which were unlawful, any alleged loss in any specific amount and any causal link between such act or acts and losses suffered by NN Poland which constitutes another necessary condition for the alleged liability, and on that basis alone its claim must fail.

*C.*      **Unjustified Enrichment under Article 405 of the Polish *Civil Code***

*(i)*      *Assertions made by NN Poland*

13.      NN Poland states that unjustified enrichment is an independent source of liability, irrespective of torts and/or contractual liability, defined in Article 405 of the Polish *Civil Code*, according to which:

(a)      a person (including a legal person);

(b)      which has gained a material benefit, without legal grounds, at the expense of another person;

- 5 -

(c)    such expense being equivalent in value to the material benefit or enrichment;

(d)    shall be obliged to return such benefit in kind and, if that is impossible, to return its value.

14.    NN Poland also states that the expense must be established in a specific amount (in any currency) and the amount of the expense shall determine the value of compensation claimed by a claimant.

15.    NN Poland relies on Article 405 of the Polish *Civil Code* in support of its transfer pricing claims. NN Poland alleges that through its involvement in the Distribution Agreement and its transfer pricing arrangements, NNL was unjustly enriched at NN Poland's expense.

*(ii)    Response of NNL*

16.    NNL was not enriched at the expense of NN Poland. NNL states that if it was enriched in any way, such enrichment was justified by the Distribution Agreement and the transfer pricing arrangements. As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements are juristic reasons for any amounts paid by NN Poland to NNL. Consequently, no liability of NNL towards NN Poland arises in this case. Finally, NNL states that NN Poland has failed to plead or establish an alleged financial benefit of NNL at the expense of NN Poland in any specific amount, so on that basis alone its claim must fail.

**D.    Contract Claim/Debt Claim under Polish Law**

*(i)    Assertions made by NN Poland*

17.    NN Poland states that under Polish law, a claim for payment may be applicable to obligations of various types, including debts arising out of ordinary trading. NN Poland states

that with respect to ordinary trading debts, under Polish law a claim to recover a debt arising from a breach of contract is possible pursuant to Article 471 of the Polish *Civil Code* where a claimant is party to a contract with the defendant, the defendant has breached the terms of the contract and the claimant has suffered a loss.

18.    NN Poland refers to Article 471 in support of its claims in respect of intercompany trading debts.

*(ii)    Response of NNL*

19.    NNL denies that any intercompany trading debts are due and owing to NN Poland by NNL. To the contrary, there is a net amount owing by NN Poland to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**E.    U.K. *Insolvency Act***

20.    NN Poland also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue and past dispositions of business. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**F.    Unparticularized Claims**

21.    NN Poland generally alleges that NNL had obligations and liability to NN Poland under Polish law with respect to pension funding and future and contingent claims with respect to revenue. Other than NN Poland's statement (noted above) that its claim under Polish tort law relates to the claims throughout its Proof of Claim, NN Poland has not provided any particulars of Polish law applicable to its claims with respect to pension funding and future and contingent

claims with respect to revenue. NN Poland also claims that its claims in respect of transfer pricing are also pursuant to English law, but has failed to provide any particulars of the English law relied on.

22.     The Monitor and Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Poland (including the ones noted above) are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

## G.    General

23.     To the extent that particular relief or remedies are claimed by NN Poland under Polish statutes and those statutes give the Polish courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

24.     Even if NN Poland establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

25.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

- 8 -

26.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Poland against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Poland against NNL.

\6206015

SCHEDULE "Q"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS PORTUGAL S.A. ("NN PORTUGAL")

1.     It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Portugal and that NN Portugal has not properly pleaded

(nor proven) any foreign law.

2.     For ease of reference, in this Schedule, NN Portugal's foreign law claims from its proofs

of claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Portugal has properly stated or characterized the law, or that the Monitor and the Canadian

Debtors agree with NN Portugal's characterization of the law.

3.     If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Portugal and

to introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Portugal, NN Portugal has

not and cannot meet those requirements.

A.     **Directors' Duties under the Portuguese *Companies Code***

*(i)     Assertions made by NN Portugal*

4.     NN Portugal states that each of the directors of NN Portugal owed fiduciary duties of

care and loyalty towards NN Portugal and that such directors breached their fiduciary duties and

acted in the interests of NNL. NN Portugal states that NNL, as an indirect shareholder of NN

Portugal, was able to (and did) control the constitution of the board of directors of NN Portugal

and that accordingly it is jointly and severally liable with the directors of NN Portugal for their breaches of fiduciary duty.

5.      NN Portugal states that the directors of a company have the following fiduciary duties set out in rules 64 and 72 of the Portuguese *Companies Code*:

    (a)      to act bona fide in the best interests of the company;

    (b)      to act for the proper purposes (or avoid acting for collateral or improper purposes);

    (c)      to avoid conflicts of interest or favouring the interests of themselves or any other person over the interests of the company;

    (d)      not to profit from their fiduciary position at the expense of the company; and

    (e)      to comply with duties of care and loyalty towards the company and towards the company's business.

6.      If a director fails to comply with such duties, he may be held personally responsible for the damages incurred by the company, unless:

    (a)      such failure to comply results from the directors' compliance with a resolution approved by shareholders, even if such resolution is voidable; or

    (b)      the directors prove that they have acted with no fault.

7.      NN Portugal relies on breach of directors' duties under the Portuguese *Companies Code* in support of its claim in respect of transfer pricing.

- 3 -

*(ii)*      ***Response of NNL***

8.      NNL denies that it is in any way responsible for any breach of fiduciary duties on the part of the directors.  NN Portugal does not cite any legal authority for the proposition that an indirect shareholder of NN Portugal (such as NNL) could be held to control the constitution of the board of directors of NN Portugal in a manner that would render NNL severally liable with the directors of NN Portugal for their breaches of fiduciary duty. NNL denies that this is a viable claim. In any event, NNL denies that it did, in fact, control the constitution of the board of directors of NN Portugal in the manner necessary to give rise to the several liability claimed and denies that its influence was the cause of the conduct of the directors complained of (or that the directors were unqualified or inadequate) . NNL puts NN Portugal to the strict proof of the allegation that the directors of NN Portugal breached any of their fiduciary duties and states that the directors acted without fault and/or in accordance with shareholder resolutions. .  Without limitation, the *Companies Code* contemplates that directors may consider the purpose of the company in the context of the Nortel Group in carrying out their duties.

**B.**      **Shareholders' Liability under the Portuguese *Companies Code***

*(i)*      ***Assertions made by NN Portugal***

9.      NN Portugal states that under rule 83 of the Portuguese *Companies Code*, a shareholder is jointly and severally liable with the directors who have breached their fiduciary duties if:

>      (a)      the shareholder failed to exercise the degree of care required in performing its duties, for example in its choice of director; or

>      (b)      the shareholder had the power to dismiss the directors, and, through its significant influence over the directors, instructed them to practice an act (or omit practicing

- 4 -

an act) which resulted in them being liable to the company and the remaining shareholders.

10.     NN Portugal states that in order to bring a Portuguese law claim against a shareholder of a company for its directors' breaches of fiduciary duties, it must establish that:

(a)     the directors breached one or more of the fiduciary duties set out above;

(b)     such breach(es) caused loss to the company; and either

(c)     the shareholder was able to appoint a director of the company without the votes of all the shareholders, and there was fault in their choice regarding the director in question; or

(d)     the shareholder

   (i)     had voting rights (directly or through other shareholders with whom it entered into a shareholder agreement) enabling it to appoint a director or a member of the supervisory board of the company; and

   (ii)     committed a fault in choosing to appoint that director, provided that the resolution which appointed the relevant director was approved by its votes (and those of the related shareholders) and by less than half the votes of other shareholders which attended the meeting; or

(e)     the shareholder had the power to dismiss a director or a member of the supervisory board (either pursuant to the company's by-laws or because of votes held in the company, directly or not) and by using its influence caused the director to act or not to act.

- 5 -

11.     NN Portugal relies on rule 83 of the Portuguese *Companies Code* in support of its claim in respect of transfer pricing. NN Portugal states that the entry by NN Portugal into the Distribution Agreement and the participation by NN Portugal in the Nortel Group's transfer pricing arrangements, was determined and controlled by NNL. NN Portugal claims that NNL determined the transfer of assets of NN Portugal to other group entities (namely NNL) without a fair return for NN Portugal.

*(ii)     Response of NNL*

12.     As noted above, NNL denies that it controlled the constitution of the board of directors of NN Portugal in a manner that could render NNL liable for their actions. In the alternative, if it is determined that NNL did in fact control the constitution of the board of directors of NN Portugal in such a manner, NNL denies that it failed to exercise the degree of care required in choosing the directors (NNL denies that the directors of NN Portugal were so unqualified or inadequate that NNL was negligent in its choice or that it deliberately made a poor choice of directors). NNL further denies that it had significant influence over the directors or instructed them to practice an act (or omit practicing an act) which resulted in them having liability to the company and the remaining shareholders. NNL puts NN Portugal to the strict proof of the allegation that the board of directors of NN Portugal breached their fiduciary duties and states that they acted without fault and/or in accordance with shareholder resolutions.   Without limitation, the *Companies Code* contemplates that directors may consider the purpose of the company in the context of the Nortel Group in carrying out their duties.

- 6 -

**C.      Breach of Rule 503 of the Portuguese *Companies Code***

*(i)      Assertions made by NN Portugal*

13.      NNL states that in order to bring a claim against a parent company for breach of rule 503 of the Portuguese *Companies Code* it must establish that the parent company:

> (a)      caused the transfer of assets of the subsidiary to other group companies without a fair return (derived from market values); and

> (b)      such transfer caused a loss to the subsidiary company to the extent that its economic survival was put in jeopardy.

14.      NN Portugal states that instructions given by the parent company may consist of direct orders or general management guidelines.

15.      NN Portugal relies on rule 503 of the Portuguese *Companies Code* in support of its claim in respect of transfer pricing. As noted above, NN Portugal states that the entry by NN Portugal into the Distribution Agreement and the participation by NN Portugal in the Nortel Group's transfer pricing arrangements, was determined and controlled by NNL. NN Portugal claims that NNL determined the transfer of assets of NN Portugal to other group entities (namely NNL) without a fair return for NN Portugal.

*(ii)     Response of NNL*

16.      NNL denies that it caused the transfer of assets from NN Portugal to other group companies without a fair return or that any such alleged transfer caused a loss to NN Portugal to the extent that its economic survival was put in jeopardy.

- 7 -

**D.      Claim for Unauthorized Return of Capital**

*(i)      Assertions made by NN Portugal*

17.      NN Portugal states that the payments in respect of transfer pricing represented or amounted to an unauthorised or unlawful distribution of assets to NNL, the ultimate beneficial shareholder of NN Portugal, to the knowledge of NNL and that NNL is liable to return such sums to NN Portugal.

18.      NN Portugal states that in order to bring a Portuguese law claim against a shareholder of a company for unauthorized return of capital it must establish that:

(a)      there was no resolution approved by the shareholders of the company in order to authorize the return of capital, or there was an approved resolution but the legal requirements regarding capital maintenance were not met;

(b)      either of the breaches described in paragraphs 9(a) or 9(b) above occurred and the transfer of value to the shareholder caused the company loss; and

(c)      one of the requirements set out at paragraphs 10(c), 10(d) or 10(e) above has been met.

19.      NN Portugal states that under rule 503 of the Portuguese *Companies Code*, the claim may be brought against a parent company.

20.      NN Portugal states that under rule 31 of the Portuguese *Companies Code*, the return of capital has to be approved by the shareholders within a shareholder's meeting.

21.     NN Portugal states that under rules 31 and 32 of the Portuguese *Companies Code*, the shareholders may not approve the return of capital or distribution of assets by means of a resolution within a shareholder's meeting if:

(a)     the liquid position of the company, as demonstrated by the accounts prepared and approved in accordance with the law, is less than the sum total of capital and reserves, the distribution of which is prohibited by law or by the articles of association; or

(b)     the liquid position of the company would become lower than the sum total of capital and reserves as a result of such a distribution.

22.     NN Portugal states that under rules 31 and 33 of the Portuguese *Companies Code*, the shareholders may not approve a distribution of dividends by means of a resolution within a shareholder's meeting:

(a)     if such profits were required to cover any losses brought forward or to form or reconstitute reserves required by law or by the articles of association;

(b)     whenever incorporation costs or research and development costs are not fully redeemed, except in cases where the total value of free reserves and results brought forward is at least equal to the said unredeemed costs; and

(c)     whenever the existence or value of reserves is not expressly stated on the balance sheet.

23.      NN Portugal states that rule 34 of the Portuguese *Companies Code* requires that the transfer of value that was made in breach of the applicable legal provisions explained above must be returned by the shareholders.

(a)      In respect of profits, the shareholder is only obliged to return the value transfer if they knew that the transfer was irregular according to rules 31-33 and 35, or they were negligent in not having regard to this possibility (rule 34(1)).

(b)      In respect of any other assets, the shareholder's level of knowledge is not relevant.

24.      NN Portugal states that to the extent that the directors have executed such unlawful distributions of assets to the shareholders, the directors may also be deemed liable for not complying with the legal provisions governing the distribution of assets and ultimately by failing to comply with their fiduciary obligations.

25.      NN Portugal relies on Portuguese law regarding the unauthorized return of capital in support of its transfer pricing claims and claims with respect to customer.

*(ii)      Response of NNL*

26.      No amounts received by NNL from NN Portugal constitute an "unauthorized return of capital." NNL states that the payments received by it from NN Portugal as part of the transfer pricing arrangements were paid pursuant to the MRDA, RPSM and Distribution Agreements and were contractually justified amounts. NNL further denies that any amounts paid out by NN Portugal breached the Portuguese *Companies Code*. NNL also denies that rule 503 of the Portuguese *Companies Act* allows this type of claim to be brought against a parent company.

**E.      Termination of Prejudicial Transactions pursuant to the Portuguese *Insolvency Company Code***

*(i)      Assertions made by NN Portugal*

27.      NN Portugal states that the administrator of NN Portugal is entitled to, and seeks, termination pursuant to the Portuguese *Insolvency Company Code*, of all transactions performed by NN Portugal, in which NNL participated, within 2 years prior to NN Portugal entering into administration (such transactions being presumed to be prejudicial transactions). NN Portugal states that in the circumstances, the administrator is entitled to claim, and claims, the return of the sums paid by NN Portugal to NNL in that period. NN Portugal claims that NN Portugal and/or the administrators are entitled, pending resolution (if necessary) of such claims in the Courts of Portugal and in any event, to prove for such amount.

28.      NN Portugal states that under rule 120 of the Portuguese *Insolvency Company Code*, an Insolvency Administrator may terminate transactions performed by a company within four years prior to the beginning of insolvency proceedings if it can be established that:

(a)      such transactions were prejudicial to the estate; and

(b)      the counterparty of such transactions acted in bad faith.

29.      NN Portugal states that under rule 120/2, prejudicial transactions are transactions that may diminish, frustrate, obstruct, delay or put at risk the satisfaction of the debts claimed within the insolvency proceedings.

30.      NN Portugal states that under rule 120/4, if:

(a)      the transactions were performed within the last two years prior to the beginning of insolvency proceedings; and

(b)      a company with a special link to the insolvent company (e.g. a parent company)

has participated in such a transaction or has profited from it, even if such a link

did not exist at the time of its execution,

they are assumed to be prejudicial acts.

31.      NN Portugal states that prejudicial transactions as defined in the Portuguese *Insolvency*

*Company Code* could include restructuring costs and costs in relation to hedging activities,

where there is no benefit to a company making such payments.

32.      NN Portugal provides a list of acts that the Insolvency Administrator may terminate

without the need of fulfilling any other requirements.

33.      NN Portugal relies on the provisions of the Portuguese *Insolvency Company Code* noted

above in support of its claims relating to transfer pricing and past dispositions of business.

*(ii)      Response of NNL*

34.      For the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the

Claims Filed on behalf of the EMEA Claimants, NNL denies that Portuguese *Insolvency*

*Company Code* has any application to NN Portugal's claims or these proceedings. NNL also

states in any event, NN Portugal does not have standing to bring this claim (rather, it has to be

brought by the Insolvency Administrator). In any event, NNL denies that any transactions

relating to transfer pricing or dispositions of business were prejudicial transactions within the

meaning of the Portuguese *Insolvency Company Code*. NNL's response to NN Portugal's

statements regarding restructuring costs and costs in relation to hedging activities are addressed

in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the

EMEA Claimants.  In any event, the recourse afforded by this provision would be to terminate the transactions and revoke or put an end to any continuing obligations.

## F.    Contract Law/Debt Claim under Portuguese Law

### (i)    *Assertions made by NN Portugal*

35.    NN Portugal states that under the Portuguese *Civil Code*, a claim to recover a debt is possible pursuant to rules 798 and 808 where:

> (a)    a debt is owed to a claimant by the defendant; and

> (b)    the sum which is owed pursuant to the debt is due and payable.

36.    NN Portugal also states that under the Portuguese *Civil Code*, a claim for breach of contract is possible pursuant to rules 406, 562 and 564 where:

> (a)    a claimant is party to a contract with the defendant;

> (b)    the defendant has breached the terms of the contract (for example, in relation to payment); and

> (c)    the claimant has suffered loss.

37.    NN Portugal refers to Portuguese contract and debt law in support of its claims in respect of intercompany trading debts.

### (ii)    *Response of NNL*

38.    NNL denies that any intercompany trading debts are due and owing to NN Portugal by NNL. To the contrary, there is a net amount owing by NN Portugal to NNL which NNL seeks

payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**G.      U.K. *Insolvency Act***

39.      NN Portugal also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue, customer revenues and past dispositions of business. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimant.

**H.      Unparticularized Claims**

40.      NN Portugal generally alleges that the law applicable to its claims arising out of the operation of transfer pricing includes English law. NN Portugal has failed to plead any particulars of the English law relied on in respect of these claims. NN Portugal also generally alleges that it has claims under Portuguese law/Portuguese *Civil Code* in respect of pension funding and future and contingent claims in respect of taxation. NN Portugal has failed to plead any particulars of the law relied on in respect of these claims, including any particulars of the Portuguese *Civil Code*. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Portugal (including the ones noted above) are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**I.      General**

41.      To the extent that particular relief or remedies are claimed by NN Portugal under Portuguese statutes and those statutes give the Portuguese courts jurisdiction to grant such

- 14 -

relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

42.     Even if NN Portugal establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

43.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

44.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Portugal against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Portugal against NNL.

\6198632

**SCHEDULE "R"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS ROMANIA ("NN ROMANIA")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN Romania and that NN Romania has not properly pleaded (nor proven) any foreign law.

2.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN Romania and to introduce evidence of different or additional requirements and defences, in the normal course.

**A.      Unparticularized Claims**

3.      NN Romania generally alleges that NNL had obligations and liability to NN Romania under Romanian law with respect to customer revenues, pension funding, past dispositions of business and future and contingent claims in respect of taxation and revenue. Other than a general reference to NNL having obligations and liability to NN Romania under the Romanian *Civil Code* in respect of customer revenues, there are no specific references to Romanian laws in the Proof of Claim and NN Romania has failed to provide any particulars in respect of its claims.

4.      The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Romania are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**B.      U.K. Insolvency Act**

5.      NN Romania also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenues and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**C.      General**

6.      To the extent that particular relief or remedies are claimed by NN Romania under Romanian statutes and those statutes give the Romanian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

7.      Even if NN Romania establishes that the requirements of some or all of its foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

8.      NNL relies, inter alia, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

9.      The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Romania against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Romania against NNL.

- 3 -

\6198634

**SCHEDULE "S"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS S.A. ("NN FRANCE")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NN France and that NN France has not properly pleaded (nor proven) any foreign law.

2.      For ease of reference, in this Schedule, NN France's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement that NN France has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NN France's characterization of the law.

3.      If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NN France and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NN France, NN France has not and cannot meet those requirements.

**A.      Contract Law/Debt Claim under French Law**

*(i)      Assertions made by NN France*

4.      NN France alleges that it has debt claims against NNL and NNTC in respect of outstanding intercompany trading debts. NN France relies on the French *Civil Code* in respect of these claims.

- 2 -

5.      NN France states that under French law, a claim to recover a debt is possible pursuant to articles 1134 *et seq* of the French *Civil Code* (and, in particular, article 1147) where a debt is owed to a claimant by a defendant and the sum which is owed pursuant to the debt is due and payable.

6.      NN France also states that a claim for breach of contract is possible pursuant to articles 1134 *et seq* of the French *Civil Code* (and, in particular, article 1147) where a claimant is a party to a contract with the defendant, the defendant has breached the terms of the contract and the claimant has suffered loss as a result.

*(ii)      Response of NNL*

7.      NNL denies that any intercompany trading debts are due and owing to NN France by NNL or NNTC. To the contrary, there are net amounts owing by NN France to NNL and NNTC which NNL and NNTC seek payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**B.      Claim for acts of mismanagement committed as a *de facto* director of NN France pursuant to Article L651-2 of the French *Code de Commerce***

*(i)      Assertions made by NN France*

8.      NN France states that article L651-2 of the French *Code de Commerce*, provides, in its relevant parts:

> Where the rescission of a safeguard or of a reorganization plan or the liquidation of a legal entity reveals an excess of liabilities over assets, the court may, in instances where management fault has contributed to the excess of liabilities over assets, decide that the debts of the legal entity will be borne, in whole or in part, by all or some of the *de jure* or *de facto* managers, who have contributed to the management fault. If there are several managers, the court may,

- 3 -

by way of a reasoned ruling, declare them jointly and severally liable.

9.      NN France is in Court liquidation proceedings in France. NN France states that in order to bring a French law claim against NNL for acts of mismanagement under article L651-2 of the French *Code de Commerce* it must establish that:

(a)      NNL acted as *de facto* director of NN France;

(b)      NNL has contributed to management fault; and

(c)      the management fault contributed to the excess of NN France's liabilities over its assets.

10.      NN France states that under French law, a company will be a *de facto* director of a second company, in circumstances where it is not the *de jure* director of a second company, if it can be shown that the first company takes an active and continuous role in the management of the second company while acting under its own discretion.

11.      NN France states that where a company, acting as a *de facto* director of a second company, has committed acts or omissions of mismanagement in relation to that second company that contributed to decisions that are not in the second company's best interests, this will constitute management fault.

12.      NN France states that under French law, the management fault must have contributed to a shortfall in the assets of NN France. As long as this condition is satisfied, the French Court has the discretion to award up to the total value of the deficit between assets and liabilities.

- 4 -

13.     NN France states that the liquidator of NN France is also entitled to claim interest on the sum awarded in accordance with French law.

14.     NN France states that the requirements of article L651-2 are met in this case.

15.     NN France relies on article L651-2 of the French *Code de Commerce* in relation to the making up of any shortfall in the assets of NN France.

*(ii)*     ***Response of NNL***

16.     As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* director of NN France. NN France was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NN France's board of directors was autonomous, appointed in accordance with NN France's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL. Rather, the board of directors of NN France exercised its judgment independently from any undue or improper influence or interference from NNL and took its own decisions. NNL did not undertake or take on the role or functions of a director of NN France. Similarly, NNL did not direct the management and affairs of NN France and NN France's management did not act simply based on NNL's instructions. The management and control of NN France emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management. NNL did not exercise complete control or domination or influence over NN France.

17.     In the alternative, if is found that NNL was a *de facto* director of NN France, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or

- 5 -

other duty which it owed to NN France or any other person, whether under the *Code de Commerce*, any other relevant legislation, or under the common law and equitable principles. NNL specifically denies that it contributed to any management fault or that such management fault contributed to any excess of NN France's liabilities over its assets.

18.     NNL further denies the circumstances NN France alleges surrounding the entering into of the MRDA and RPSM but in any event denies that those circumstances would allow NN France to avoid the binding effect of the MRDA and RPSM.  NNL further denies the facts pleaded by NN France to support its allegations that NNL was a *de facto* director and/or acted as such in relation to the MRDA and RPSM.

**C.      U.K. *Insolvency Act***

19.     NN France also relies on the U.K. *Insolvency Act* in respect of claims for transactions at undervalue, customer revenues and past dispositions of business. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants

**D.      Unparticularized Claims**

20.     NN France states that to the extent that its claims in respect of transfer pricing arise under U.K. insolvency legislation, it will contend that the proper law is English. NN France also states that to the extent that its claims in respect of transfer pricing arise under French statutory insolvency law, including and in particular its claim against NNL for acts of mismanagement committed as *de facto* director of NN France, it will contend that the proper law is French law. Other than article L651-2 of the French *Code de Commerce*, NN France does not make any specific references to U.K. or French law. NN France also generally alleges that NNL had obligations and owed duties to NN France under French law with respect to pension funding,

- 6 -

customer revenues and future and contingent claims with respect to taxation and revenue. NN France has failed to plead any particulars of the French law relied on in respect of these claims. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN France are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

### E.    General

21.    To the extent that particular relief or remedies are claimed by NN France under French statutes and those statutes give the French courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

22.    Even if NN France establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

23.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

24.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN France against NNC, NNTC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or

- 7 -

on behalf of the joint administrators of NN France against NNL and the claims purported to be

asserted by or on behalf of the liquidator of NN France against NNL.

\6209516

SCHEDULE "T"
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS s.r.o. ("NN CZECH")**

1.    It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Czech and that NN Czech has not properly pleaded (nor

proven) any foreign law.

2.    For ease of reference, in this Schedule, NN Czech's foreign law claims from its proofs of

claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Czech has properly stated or characterized the law, or that the Monitor and the Canadian Debtors

agree with NN Czech's characterization of the law.

3.    If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Czech and to

introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Czech, NN Czech has not

and cannot meet those requirements.

**A.    Section 66a paras. 14 and 15 of the Czech *Commercial Code* – Reimbursement of
Detriment Suffered**

**(i)    *Assertions made by NN Czech***

4.    NN Czech alleges that it has a claim against NNL pursuant to section 66a, paragraph 14,

of the Czech *Commercial Code*, for reimbursement of detriment and/or loss and damage suffered

as a result of NNL using its influence to enforce the adoption of the RPSM and Distribution

Agreement by NN Czech and to "procure" NN Czech to enter into the Distribution Agreement.

- 2 -

NN Czech also alleges that it has a claim against NNL's directors as guarantors of NNL's obligations to reimburse NN Czech for losses it has suffered, pursuant to paragraph 15 of section 66a. NN Czech relies on section 66a of the Czech *Commercial Code* in support of its claims relating to transfer pricing, pension funding, customer revenues and past dispositions of business.

5.      NN Czech states that in order to bring a claim under section 66a, paragraph 14, it must establish that:

(a)      NNL was a controlling person (as defined in the Czech *Commercial Code*) of NN Czech;

(b)      NNL required NN Czech to enter into certain contracts or to take certain measures which were detrimental to NN Czech;

(c)      the entering into such contracts or taking such measures caused NN Czech to suffer detriment and/or loss and damage;

(d)      such detriment and/or loss and damage was not reimbursed by the end of the relevant accounting period in which it arose and no agreement on its settlement was entered into between NN Czech and NNL by the end of the relevant accounting period in which it arose; and

(e)      as a result of the breach of obligation of NNL to reimburse the detriment and/or loss and damage or the lack of entry into an agreement on reimbursement by the end of the relevant accounting period, NN Czech has suffered detriment and/or loss and damage.

- 3 -

*(ii)*     ***Response of NNL***

6.     NNL was not a control person.  There was no controlling agreement between NNL and NN Czech, nor any report identifying NNL as a control person or specifying the relations or transactions between NNL and NN Czech.  Even if there were, no instructions were given by NNL as a control person and control person reports were filed by other entities.

7.     NNL denies that the adoption of the RPSM and Distribution Agreement caused NN Czech to suffer any detriment, loss or damage. To the contrary, and as set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements were commercially reasonable. NNL states that the RPSM and the Distribution Agreement benefitted NN Czech.

**B.**     **Section 456 of the Czech *Civil Code* – Unjust Enrichment**

*(i)*     ***Assertions made by NN Czech***

8.     NN Czech claims that it has a claim against NNL for unjust enrichment pursuant to section 456 of the Czech *Civil Code*. NN Czech states that NNL received payments from NN Czech without legal title and thereby enriched itself at the expense of NN Czech. NN Czech states that in order to bring a claim under section 456, it must establish that:

(a)     NN Czech paid to NNL monies or provided to NNL certain services; and

(b)     the amounts paid or services provided were without any legal title, based on an invalid legal title or based on a legal title which ceased to exist (for example, because of withdrawal).

9.     NN Czech relies on section 456 of the Czech *Civil Code* in support of its claims relating to transfer pricing, pension funding, customer revenues and past dispositions of business.

*(ii)*    *Response of NNL*

10.    NNL denies that it was enriched, or that any enrichment of NNL was at the expense of NN Czech. NNL states that if it was enriched in any way, such enrichment was justified. As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements and the customer contracts and approved transaction agreements and loan agreements are juristic reasons for any amounts paid by NN Czech to NNL.

**C.    Unparticularized Claims**

11.    NN Czech also generally alleges that NNL had obligations and liability to NN Czech under Czech law with respect to future and contingent claims in respect of taxation and revenue. NN Czech has failed to plead any particulars of the Czech law relied on in respect of these claims. The Monitor and the Canadian Debtors deny that the unparticularized provisions of foreign law relied upon by NN Czech are applicable as a matter of private international law or would apply in any event. In the alternative, if such provisions of foreign law are applicable, the Canadian Debtors state that they have complied with such provisions.

**D.    U.K. *Insolvency Act***

12.    NN Czech also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenues and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

- 5 -

## E.    General

13.    To the extent that particular relief or remedies are claimed by NN Czech under Czech statutes and those statutes give the Czech courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

14.    Even if NN Czech establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

15.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

16.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Czech against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Czech against NNL.

\6198636

SCHEDULE "U"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS SLOVENSKO S.r.o. ("NN SLOVAKIA")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Slovakia and that NN Slovakia has not properly pleaded

(nor proven) any foreign law.

2.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Slovakia and

to introduce evidence of different or additional requirements and defences, in the normal course.

A.      **Unparticularized Claims**

3.      NN Slovakia generally alleges that NNL had obligations and liability to NN Slovakia

under Slovakian law with respect to transfer pricing, customer revenues, pension funding, past

dispositions of business and future and contingent claims in respect of taxation and revenue.

However, there are no specific references to Slovakian laws in the Proof of Claim and NN

Slovakia has failed to provide any particulars in respect of its claims.

4.      The Monitor and the Canadian Debtors deny that the unparticularized provisions of

foreign law relied upon by NN Slovakia are applicable as a matter of private international law or

would apply in any event. In the alternative, if such provisions of foreign law are applicable, the

Canadian Debtors state that they have complied with such provisions.

- 2 -

**B.     U.K. Insolvency Act**

5.      NN Slovakia also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenues and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**C.     General**

6.      To the extent that particular relief or remedies are claimed by NN Slovakia under Slovakian statutes and those statutes give the Slovakian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

7.      Even if NN Slovakia establishes that the requirements of some or all of its foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

8.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

9.      The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Slovakia against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Slovakia against NNL.

**SCHEDULE "V"**
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO**
**THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF**
**NORTEL NETWORKS SpA ("NN ITALY")**

1.     It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Italy and that NN Italy has not properly pleaded (nor

proven) any foreign law.

2.     For ease of reference, in this Schedule, NN Italy's foreign law claims from its proofs of

claim and particulars have been summarized.  This is in no way an acknowledgement that NN

Italy has properly stated or characterized the law, or that the Monitor and the Canadian Debtors

agree with NN Italy's characterization of the law.

3.     If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Italy and to

introduce evidence of different or additional requirements and defences, in the normal course.

However, even if the requirements of foreign law are as pled by NN Italy, NN Italy has not and

cannot meet those requirements.

**A.     Article 2497 of the Italian *Civil Code***

**(i)     *Assertions made by NN Italy***

4.     In support of its claims in respect of transfer pricing, pension funding, customer revenues,

past dispositions of business and future and contingent claims in respect of taxation and revenue,

NN Italy relies on article 2497 of the Italian *Civil Code*. NN Italy states that article 2497

provides that where a company, exercising control and coordination over another company, acted

- 2 -

in its own best interest and in breach of proper management rules causing loss, damage or prejudice, then the company exercising control and coordination may be found liable for such losses. NN Italy states that in order for it to bring a claim against NNL for breach of article 2497, it must establish that:

(a)     control of NN Italy was exercised by NNL acting in its own best interests;

(b)     such control was not in the interests of NN Italy and was in breach of NN Italy's proper management rules;

(c)     NN Italy suffered loss, damage or prejudice. This may be demonstrated if there are insufficient assets to satisfy the claims of NN Italy's creditors and, as far as shareholders are concerned, if the value of their shares are decreased; and

(d)     there is a causal link between the controlling company's conduct and the loss, damage or prejudice suffered by the controlled company.

## (ii)     *Response of NNL*

5.     NNL states that:

(a)     NNL did not exercise control over NNL Italy, whether acting in its own best interests or otherwise;

(b)     NNL and NN Italy did not breach any proper management rules of NN Italy; and

(c)     NN Italy did not suffer any loss, damage or prejudice.

- 3 -

**B.      Article 2043 of the Italian *Civil Code***

*(i)      Assertions made by NN Italy*

6.      Also in support of its claims in respect of transfer pricing, pension funding, customer revenues, past dispositions of business and future and contingent claims in respect of taxation and revenue, NN Italy relies on article 2043 of the Italian *Civil Code.* NN Italy states that article 2043 is the provision governing tort liability generally and provides that: "*Any wilful or negligent act that causes an unjustified damage to another obliges the person who has committed the act to compensate the damage.*" NN Italy states that in order to bring a claim against NNL for breach of article 2043, it must establish that there has been:

(a)      unlawful behaviour (including NNL's wilful participation in value being wrongly transferred away from NN Italy). This includes any behaviour affecting a right or interest protected by the law;

(b)      intention (either wilful or negligent);

(c)      damage suffered (including but not limited to costs incurred, loss of profits, or a reduction in the value of assets held by a company); and

(d)      a causal link between the unlawful behaviour and the damaging event.

*(ii)      Response of NNL*

7.      NNL denies that it engaged in any unlawful behaviour (whether intentionally or not), or that NN Italy suffered any damages.

- 4 -

**C.    Article 2901 of the Italian *Civil Code* and Article 67 of the Italian *Bankruptcy Law***

*(i)    Assertions made by NN Italy*

8.    NN Italy claims that the transfers of monies from NN Italy to NNL in the five year period prior to NN Italy's entry into administration may be recovered by the administrator of NN Italy pursuant to article 67 of the Italian *Bankruptcy Law.* NN Italy further claims that such transfers were carried out with the purpose of depriving NN Italy of its assets to the disadvantage of creditors, and NNL was aware of that and that therefore such transfers must be returned to NN Italy or its creditors in accordance with article 2901 of the Italian *Civil Code*.

9.    According to NN Italy, in order for transactions to be "clawed back" under article 67, the counterparty to the transaction must have been aware of the insolvent state of the debtor. NN Italy invokes article 67 of the Italian *Bankruptcy Law* in support of its claims in respect of transfer pricing.

10.    According to NN Italy, pursuant to article 2901, creditors can demand that acts by which assets were disposed of to the prejudice of the creditors, be declared ineffective and monies clawed back.  NN Italy states that in order to bring an action under article 2901, NNL must have been aware of the prejudice which the act would cause to the rights of NN Italy's creditors or that the transaction was fraudulently designed for the purpose of prejudicing a creditor.  NN Italy invokes article 2901 of the Italian *Civil Code* in support of its claims in respect of transfer pricing, pension funding, customer revenues and past dispositions of business.

*(ii)    Response of NNL*

11.    For the reasons set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL denies that the Italian *Bankruptcy Law* or

article 2901 of the Italian *Civil Code* has any application to NN Italy's claims or these proceedings

12.    NNL further states that NN Italy has not established (and cannot) that the requirements of article 67 of the Italian *Bankruptcy Law* or article 2901 of the Italian *Civil Code*. NNL denies that NN Italy was insolvent or that it was aware that NN Italy was insolvent at the time of the impugned transactions or prior to the Filing Date. NNL also denies that any payments made by NN Italy to NNL prejudiced the rights of NN Italy's creditors or that it was aware that any payments made by NN Italy would prejudice the rights of NN Italy's creditors.

**D.    Articles 1173 and 1218 of the Italian *Civil Code***

*(i)    Assertions made by NN Italy*

13.    NN Italy states that under Italian law, a claim to recover a debt is possible pursuant to article 1173 and following of the Italian *Civil Code* where:

    a.    a debt is owed to a claimant by the defendant; and

    b.    the sum which is owed pursuant to the debt is due and payable.

14.    NN Italy states that under Italian law, a claim for breach of contract is possible pursuant to article 1218 of the Italian *Civil Code* where:

    a.    a claimant is party to a contract with the defendant;

    b.    the defendant has breached the terms of the contract (for example, in relation to payment); and

    c.    the claimant has suffered loss as a result.

15.    NN Italy cites articles 1173 and 1218 of the Italian *Civil Code* in respect of its debt claims against NNL.

*(ii)*      ***Response of NNL***

16.      As particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and in Schedule "B" thereto, NNL acknowledges that there is an unsecured, net balance shown in the intercompany accounts to be owing by NNL to NN Italy which is not material but will be addressed in the context of the administration of the Canadian Estate.

**E.      U.K. Insolvency Act**

17.      NN Italy also relies on the U.K. *Insolvency Act* in respect of its transactions at undervalue claims, customer revenue claims and past dispositions of business claims. The application of the U.K. *Insolvency Act* is addressed in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

**F.      General**

18.      To the extent that particular relief or remedies are claimed by NN Italy under Italian statutes and those statutes give the Italian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

19.      Even if NN Italy establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

20.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf

- 7 -

of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

21.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Italy against NNC and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NN Italy against NNL.

\6198638

SCHEDULE "W"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS UK LIMITED ("NNUK")

1.   It is the position of the Monitor and the Canadian Debtors that foreign law has no application to the claims asserted by NNUK and that NNUK has not properly pleaded (nor proven) any foreign law.

2.   For ease of reference, in this Schedule, NNUK's foreign law claims from its proofs of claim and particulars have been summarized.  This is in no way an acknowledgement NNUK has properly stated or characterized the law, or that the Monitor and the Canadian Debtors agree with NNUK's characterization of the law.

3.   If and to the extent that proof of foreign law is tendered, all rights are reserved to challenge its application, to challenge the foreign law requirements asserted by NNUK and to introduce evidence of different or additional requirements and defences, in the normal course. However, even if the requirements of foreign law are as pled by NNUK, NNUK has not and cannot meet those requirements.

A.   **Breach of Fiduciary Duties by NNL as a *de facto* or Shadow Director of NNUK**

*(i)   Assertions made by NNUK*

4.   NNUK states that it is able to claim against NNL for breach of fiduciary duty where:

(a)   NNL owed fiduciary duties by virtue of being a *de facto* or shadow director of NNUK and/or assumed fiduciary duties to NNUK by virtue of acting in relation to the property and affairs of NNUK;

- 2 -

(b)      NNL breached the fiduciary duties it owed to the company; and

(c)      such breach caused loss to NNUK (and/or the making of profit by NNL which NNL must account for).

5.      NNUK claims that NNL was a *de facto* director of NNUK and owed fiduciary duties to NNUK. In the alternative, NNUK claims that if NNL was not generally a *de facto* director of NNUK at all times, it assumed the role of *de facto* director in respect of each and every decision of NNUK in which it was involved. In the further alternative, NNUK claims that NNL was a person in accordance with whose directions or instructions the *de jure* directors of NNUK were accustomed to act and NNL was accordingly a shadow director of NNUK and assumed fiduciary duties to NNUK.

6.      NNUK states that a *de facto* director is a person who acts as a director but is not actually appointed as such. NNUK states that there is no single test to establish whether a person is in the position of a *de facto* director and no requirement that he must hold himself out as a director. The question of whether a person has acted as a *de facto* director (and should therefore be liable accordingly) is one of fact and degree that requires a consideration of all of the relevant factors. NNUK states that in relation to creditor protection laws, the liability is imposed on those who are in a position to prevent damage to creditors by taking proper steps to protect their interests and so those who assume to act as directors and who thereby exercise the powers and functions of a director, whether validly appointed or not, must accept the responsibilities of the office.

7.      In order to be liable for misfeasance as a *de facto* director, a person must be proven to have assumed a role in the company sufficient to impose on him a fiduciary duty to the company (as a matter of English law, all directors of a company owe fiduciary duties to the company).

- 3 -

NNUK states that some specific duties are set out in sections 171 to 177 of the *Companies Act 2006* and that those duties are based on common law rules and equitable principles (s. 170(3)) and regard is to be had to the corresponding common law rules or equitable principles in interpreting and applying the general duties (s. 170(4)). NNUK states that these duties include acting bona fide in the best interests of the company, acting for proper purposes (and not collateral or improper ones), avoiding conflicts of interest and not favouring the interests of themselves or any other person over the interests of the company, not profiting from their fiduciary position at the expense of the company, exercising independent judgment and considering the best interests of creditors and taking those interests fully into account in exercising powers and discretions. In fact, NNUK argues that given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, in carrying out their fiduciary duties to NNUK, the directors were obliged at all times (and, from October 1, 2007, statutorily obliged pursuant to section 172(3) of the *Companies Act 2006*), to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

8.     NNUK states that a shadow director is a person in accordance with whose directions or instructions the *de jure* directors of a company are accustomed to act (see s. 251 of the *Companies Act 2006* and section 741 of the *Companies Act 1985*). NNUK states that a parent company can be a shadow director of its subsidiary (s. 251(3) of the *Companies Act 2006*). NNUK states that a shadow director owes fiduciary duties to a company, especially where he has exercised control over the activities or assets of the company.

9.     NNUK states that a person may be both a *de facto* director and a shadow director simultaneously, in relation to the same or different parts of the company's activities.

- 4 -

10.    NNUK states that irrespective of whether or not a person is a *de facto* or shadow director, a fiduciary relationship will arise when a party entrusts to another property or assets and relies on that party to deal with those assets on its behalf, or entrusts a job to be performed (for instance the negotiation of a contract) and relies on the other to perform that job on its behalf. NNUK states that equity will find a fiduciary relationship where one party has assumed to act in relation to the property or affairs of another. The fiduciary relationship arises in situations where one person is in a relationship with another that gives rise to a legitimate expectation, which equity will recognize, that the fiduciary will not utilise his or her position in any manner which is adverse to the interests of the principal. The fiduciary relationship entails an obligation of loyalty; further, the fiduciary must act in good faith; he must not make a profit out of his fiduciary relationship; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal – although this is not an exhaustive list.

11.    NNUK relies on its allegations of NNL being a shadow director of NNUK and breaching its fiduciary duties to NNUK in support of its claim in respect of:

    (a)    inter-company loans (specifically its claim that NNL knew and understood that the Interest-Free Loan arrangements were not in the best interests of NNUK and its claim that NNL failed to determine that NNUK should rescind, or alternatively exercise the right pursuant to Article 2, section 2.4(b) of each agreement to terminate the Interest Free Loan arrangements);

    (b)    Project Swift (specifically that Project Swift was not in NNUK's best interests or in the interests of its creditors);

- 5 -

(c)     transfer pricing (specifically that NNL failed to ensure that NNUK received an arm's length share of residual profits and losses);

(d)     pension funding (specifically that NNL caused NNUK to make contributions to the Scheme at a lower level than required and/or caused a relatively aggressive investment strategy to be adopted);

(e)     customer revenues (specifically that NNL failed to ensure that NNUK received the revenue it was entitled to);

(f)     past dispositions of business (specifically that NNL failed to ensure that NNUK received its rightful allocation from the business sales); and

(g)     future and contingent claims with respect to revenue and taxation (specifically that NNL failed to ensure that NNUK paid the appropriate level of taxation and/or declared the appropriate level of income for tax purposes and failed to ensure that NNUK was paid and recorded the revenue to which it was entitled).

## (ii)    *Response of NNL*

12.    As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL was not a *de facto* or shadow director or fiduciary of NNUK. NNUK was a separate legal entity from NNL, with its own board of directors and with access to independent legal and other professional advice. NNUK's board of directors was autonomous, appointed in accordance with NNUK's constating documents and applicable laws, and did not act simply based on instructions from NNL, nor was it accustomed to act on the directions or instructions of NNL. Rather, the board of directors of NNUK exercised its judgment independently from any undue or improper influence or interference from NNL and

- 6 -

took its own decisions. NNL did not undertake or take on the role or functions of a director of NNUK.  Similarly, NNL did not direct the management and affairs of NNUK and NNUK's management did not act simply based on NNL's instructions. The management and control of NNUK emanated from the Senior Management of the EMEA Region, including NNUK's management, who coordinated with other management. NNL did not exercise complete control or domination or influence over NNUK.

13.    No circumstances existed to give rise to any fiduciary obligation on the part of NNL vis-a-vis NNUK.  In the alternative, and in any event, even if it could be demonstrated that NNL owed a fiduciary duty to NNUK, NNL states that in addition to pleading and proving that any duties arose as a result of NNL allegedly being a *de facto* or shadow director of NNUK, NNUK must plead and prove each and every other fiduciary obligation which it alleges NNL owed to NNUK.

14.    In the alternative, if is found that NNL was a *de facto* or shadow director or fiduciary of NNUK, which is not admitted, NNL states that it complied with its obligations and did not breach any fiduciary or other duty which it owed to NNUK or any other person, whether under the *Companies Act 2006*, any other relevant legislation, or under the common law and equitable principles.

**B.    Unconscionable receipt of benefits by NNL**

*(i)    Assertions made by NNUK*

15.    NNUK states that under English law, it is able to claim against NNL for unconscionable receipt where:

(a)    NNL commits a breach of trust or fiduciary duty;

(b)       NNL receives property as a result of the breach; and

(c)       NNL's knowledge is such as to make it unconscionable for it to retain the benefit of the receipt.

16.     NNUK states that where this occurs, NNL will hold such property on trust for, and be liable to restore such property to, NNUK and will be personally liable to account for property passing through NNL's hands.

17.     NNUK relies on its allegations of unconscionable receipt in support of its claims in respect of inter-company loans (specifically that NNL breached its duties to NNUK in approving the Interest-Free loans), Project Swift (specifically that NNL breached its duties to NNUK in approving Project Swift), transfer pricing (specifically that NNL failed to ensure that NNUK receive an arm's length share of residual profits and losses) and past dispositions of business (specifically that NNL failed to ensure that NNUK received its rightful allocation from the business sales).

*(ii)*       ***Response of NNL***

18.     As noted above, NNL denies that it was a *de facto* or shadow director or fiduciary of NNUK

19.     NNL further denies that it has committed a breach of trust or fiduciary duty or that it is unconscionable for it to retain the benefit of any assets it received from NNUK**.**

20.     NNL further denies that NNUK had any pre-existing proprietary right in the receipts claimed for upon which to ground any proprietary claim in respect of any sums of money or assets received by NNL.

C.      **Unauthorized return of Capital**

*(i)      Assertions made by NNUK*

21.      NNUK states that section 830(1) of the *Companies Act 2006* provides that a company may only make a distribution out of profits available for the purpose and that where a distribution is made to a shareholder in contravention of section 830(1), in accordance with section 847,

(a)      where the distribution is made in cash, the shareholder is liable to repay it; or

(b)      where the distribution is made otherwise than in cash the shareholder is liable to pay to the company a sum equal to the value of the distribution (or the portion of it that is unlawful).

22.      NNUK also states that it is *ultra vires* for a company to pay a dividend except out of profits available for the purpose.

23.      NNUK further states that a member of a company who has received an unlawful distribution is liable to account to the company for the sums received as constructive trustee and an unlawful distribution cannot be ratified by shareholders.

24.      NNUK relies on the law of unconscionable receipt in support of its claim that sums received by NNL from NNUK in respect of transfer pricing amounted to unauthorised returns of capital to NNL and were *ultra vires* and incapable of ratification.

*(ii)      Response of NNL*

25.      No amounts received by NNL from NNUK constitute dividends or an "unauthorized return of capital." NNL states that the payments received by it from NNUK as part of the transfer

pricing arrangements were paid pursuant to the MRDA, RPSM and Distribution Agreements and were contractually justified amounts – these payments cannot be properly classified as distributions. NNL further denies that any amounts received by it from NNL exceeded the profits available for the purpose, or that it knew or had reasonable grounds for knowing that any distribution was other than from profits available for the purpose.

**D.      Breach of Duty of Care**

*(i)      Assertions made by NNUK*

26.      NNUK states that under English law, a duty of care is owed by one person to another where there is a sufficient proximate relationship between them to give rise to a duty. Where one party assumes or undertakes responsibility to another, including for the provision of services, a duty will be owed. NNUK also states that there may be concurrent liability in contract and in tort, and liability may attach for economic loss.

27.      NNUK cites the law related breach of duty of care in respect of its claims relating to transfer pricing (specifically that NNL breached its duty of care to NNUK by failing to calculate NNUK's routine returns in a manner consistent with the arm's length principle, by failing to reimburse any part of the restructuring or vendor financing losses that it caused NNUK to incur and by allocating stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool such that those costs were effectively and wrongly borne by all the RPEs, including NNUK) and future and contingent rights arising out of any claim by a tax authority against NNUK (specifically that NNL breached its duty of care to NNUK by failing to ensure that NNUK paid the appropriate level of taxation and/or declared the appropriate level of income for tax purposes).

*(ii)*     ***Response of NNL***

28.     NNL denies that it owed any duty of care to NNUK or, in the alternative, that it breached any duty of care that it owed to NNUK. NNL further denies that NNUK has suffered any loss as a result of NNL's alleged breach of a duty of care.

29.     NNL states that all of the impugned acts complained of were undertaken pursuant to the MRDA, RPSM and Distribution Agreements, which are validly subsisting and enforceable contracts to which NNUK is a party. The performance of a valid and subsisting contract cannot be a breach of duty.

**E.     Mistake**

*(i)*     ***Assertions made by NNUK***

30.     NNUK states that under English law, where:

    (a)     money is paid to, or a benefit conferred upon a person; and

    (b)     such payment is made, or such benefit is conferred, under a mistake as to fact and would not otherwise have been made,

an action will lie to recover the payment or benefit (and the payor may retain equitable property in the sums paid over).

31.     NNUK pleads that between 2006 and the Filing Date, NNUK mistakenly believed that a routine return of 1% represented fair market value, arm's length compensation for its distribution activities, and that its returns and share of residual profits had been determined on an arm's length basis. NNUK pleads that this mistaken belief was either common to NNUK and NNL or was held by NNUK and not corrected by NNL. NNUK further claims that between 2001 and

2005, it mistakenly believed that it was not entitled, on an arm's length basis, to a return in respect of excess central services costs or reimbursement of restructuring and/or vendor financing losses. NNUK claims that that mistaken believe was also either common to NNUK and NNL or was held by NNUK and was not corrected by NNL.

32.     NNUK also claims that it mistakenly believed that the allocation it received from the various co-ordinated business sales was a fair allocation representing the assets that it had sold in that business and/or that it was not entitled to any more than it received. NNUK claims that that mistaken belief was also either common to NNUK and NNL or was held by NNUK and was not corrected by NNL.

33.     NNUK claims that as a result of these mistaken beliefs it was deprived of entitlements it should properly have had or received and/or made payments or gave credits to NNL in respect of amounts it believed to be due to NNL but which were not or ought not to have been due, and/or NNL was unjustly enriched at the expense of NNUK.

*(ii)     Response of NNL*

34.     For the reasons more fully set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, NNL denies that there was any mistake as to the terms of any contract with NNUK or any fundamental fact or law which affects the contract. NNUK agreed to the formula that was applied to determine its distributions. NNUK does not allege that the formula was written down incorrectly or that it failed to reflect a fundamental mutual assumption, common intention or agreement that would have led to a different formula being written down, nor was it obvious or apparent that NNUK was operating under a mistaken understanding or belief. Therefore, there is no mistake actionable at law.

35.    Payments made pursuant to a contract cannot be recovered unless the contract itself is held void or is discharged. There is no basis for so doing. There was also no mistake of payment – the amounts were paid to the appropriate party.

**F.    Unjust Enrichment**

*(i)    Assertions made by NNUK*

36.    NNUK claims that a claimant may bring a claim for unjust enrichment where:

(a)    the defendant has been enriched;

(b)    by the receipt of a benefit at the expense of the claimant;

(c)    in circumstances where it would be unjust to allow him to retain such benefit.

37.    NNUK states that if those elements are made out and where the defendant does not have a defence, the defendant is required to make restitution to the claimant of the benefit received or its traceable substitutes.

38.    NNUK relies on unjust enrichment in support of its claims in respect of inter-company loans, Project Swift, transfer pricing, customer revenues and past dispositions of businesses (specifically that through these various items, NNL was unjustly enriched at the expense of NNUK).

*(ii)    Response of NNL*

39.    NNL denies that it was enriched, or that any enrichment of NNL was at the expense of NNUK. NNL states that if it was enriched in any way, such enrichment was just and justified. As set out more fully in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the MRDA, RPSM and Distribution Agreements and the

customer contracts and approved transaction agreements and loan agreements are juristic reasons for any amounts paid by NNUK to NNL.

**G.      Conspiracy**

*(i)      Assertions made by NNUK*

40.      NNUK states that under English law, 'lawful means' conspiracy is committed where:

(a)      two or more persons combine and take action;

(b)      their predominant purpose it to injure a third party; and

(c)      such action does in fact result in damage to the third party.

41.      NNUK states that 'unlawful means' conspiracy is committed where:

(a)      two or more persons combine and take action;

(b)      such action is

(i)      unlawful in itself; and

(ii)      undertaken with an intention of causing damage to a third party (whether or not it is their predominant purpose to do so); and

(c)      such action does in fact result in damage to the third party.

42.      NNUK relies on the law of conspiracy in support of its claims in respect of:

(a)      inter-company loans (specifically that in connection with the scheme of entering into the Interest-Free Loans, NNL entered into an agreement with others (including but not limited to NNI) with the predominant purpose of injuring

NNUK and/or where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct);

(b)    Project Swift (specifically that in connection with the scheme of entering into the Project Swift Transaction, NNL entered into an agreement with others (including but not limited to NNI) with the predominant purpose of injuring NNUK and/or where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct);

(c)    customer revenues (specifically that in connection with customer revenues, NNL entered into an agreement with others (including but not limited to NNI) with the predominant purpose of injuring NNUK and/or where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct); and

(d)    past dispositions of businesses (specifically that in connection with the allocation of proceeds of business sale, NNL entered into an agreement with others (including but not limited to NNI) with the predominant purpose of injuring NNUK and/or where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct).

43.    NNUK has not identified anything unlawful about the arrangements complained about.

*(ii)*    ***Response of NNL***

44.    For the reasons more fully set out in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants, the alleged facts do not establish

- 15 -

a conscious agreement among the Nortel Group affiliates or NNL and NNC, and certainly not one intended to harm the EMEA Claimants or carried out by unlawful means.

45.     The entire premise of the arrangements now complained of arises from the manner in which the Nortel Group operated, which was with a view to the best interests of the Nortel Group (and its members), which renders a conspiracy predicated on a predominant intention to injure any individual EMEA Claimant (or even predicated on the likelihood of injury to them) unsustainable. Furthermore, all of the arrangements complained of were lawful.

### *H.*     **Contract Claim/Debt Claim under English Law**

### *(i)*     *Assertions made by NNUK*

46.     NNUK states that under English law, a claim for money due and payable is possible where a claimant is a party to a contract with the defendant and the sum which the claimant claims is due and payable under the terms of the contract. NNUK also states that a claim for breach of contract is possible where a claimant is a party to a contract with the defendant, the defendant has reached the terms of the contract and the claimant has suffered a loss.

47.     NNUK refers to English contract and debt law in support of its claims in respect of intercompany trading debts (as against NNL, NNG and NTC) and intercompany loans.  The particulars are unclear as to whether it applies to pension claims and Project Swift.

### *(ii)*     *Response of NNL*

48.     NNL denies that any intercompany trading loans or debts are due and owing to NNUK by NNL. To the contrary, there is a net amount owing by NNUK to NNL which NNL seeks payment of, as particularized in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

- 16 -

**I.      Third Party Contractual Claims**

*(i)      Assertions made by NNUK*

49.      NNUK states that under English law, pursuant to s. 1(1)(b) of the *Contracts (Rights of Third Parties) Act* 1999, a person who is not a party to a contract nevertheless has a right to enforce a term of that contract if that term purports to confer a benefit on him. A third party will not be permitted to enforce the term of the contract where, on the proper construction of the contract, it appears that the parties did not intend the term in question to be enforceable by a third party.

*(ii)      Response of NNL*

50.      The identity of the third party and the circumstances or the basis upon which this statutory provision might apply are not apparent or disclosed.

51.      NNL states that to the extent that this claim extends to any purported obligation to the Pension Trustee or PPF, those claims are dealt with in the Response Pleading of the Monitor and certain Canadian Debtors to the Claims by the U.K. Pension Trustee and the U.K. Pension Fund, which is adopted and incorporate herein, *mutatis mutandis*.

**J.      General**

52.      To the extent that particular relief or remedies are claimed by NNUK under English statutes and those statutes give the English courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

53.      Even if NNUK establishes that the requirements of some or all of its pleaded foreign law have been met, all such claims are statute-barred having been brought after the expiry of the

- 17 -

applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

54.    NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

55.    The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NNUK against NNC, NNTC, Nortel Networks Global Corporation and the directors and officers of NNL and NNC, as well as to the claims purported to be asserted by or on behalf of the officeholders of NNUK against NNL.

\6198639

SCHEDULE "X"
TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS

RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS AG ("NN SWITZERLAND")

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Switzerland and that NN Switzerland has not properly

pleaded (nor proven) any foreign law.

2.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Switzerland

and to introduce evidence of different or additional requirements and defences, in the normal

course.

A.      **Unparticularized Claims**

3.      NN Switzerland generally alleges that NNL has breached its duties under local law in

connection with pension scheme obligations and that it has claims against NNL under Swiss law

with respect to future and contingent claims regarding taxation and revenue. However, there are

no specific references to Swiss laws in the Proof of Claim and NN Switzerland has failed to

provide any particulars in respect of its claims

4.      The Monitor and the Canadian Debtors deny that the unparticularized provisions of

foreign law relied upon by NN Switzerland are applicable as a matter of private international law

or would apply in any event. In the alternative, if such provisions of foreign law are applicable,

the Canadian Debtors state that they have complied with such provisions.

- 2 -

**B.      General**

5.      To the extent that particular relief or remedies are claimed by NN Switzerland under Swiss statutes and those statutes give the Swiss courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

6.      Even if NN Switzerland establishes that the requirements of some or all of its foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

7.      NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

8.      The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Switzerland against NNC and the directors and officers of NNL and NNC.

\6198643

SCHEDULE "Y"
**TO THE JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO
THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**

**RESPONSE TO FOREIGN LAW CLAIMS OF
NORTEL NETWORKS AS ("NN NORWAY")**

1.      It is the position of the Monitor and the Canadian Debtors that foreign law has no

application to the claims asserted by NN Norway and that NN Norway has not properly pleaded

(nor proven) any foreign law.

2.      If and to the extent that proof of foreign law is tendered, all rights are reserved to

challenge its application, to challenge the foreign law requirements asserted by NN Norway and

to introduce evidence of different or additional requirements and defences, in the normal course.

**A.      Unparticularized Claims**

3.      NN Norway generally alleges that NNL had obligations and liability to NN Norway

under Norwegian law with respect to customer revenues and that NN Norway and/or the Joint

Administrators have claims against NNL under Norwegian law with respect to pension funding

and future and contingent claims with respect to taxation and revenue. However, there are no

specific references to Norwegian laws in the Proof of Claim and NN Norway has failed to

provide any particulars in respect of its claims.

4.      The Monitor and the Canadian Debtors deny that the unparticularized provisions of

foreign law relied upon by NN Norway are applicable as a matter of private international law or

would apply in any event. In the alternative, if such provisions of foreign law are applicable, the

Canadian Debtors state that they have complied with such provisions.

- 2 -

**B.** **General**

5.     To the extent that particular relief or remedies are claimed by NN Norway under Norwegian statutes and those statutes give the Norwegian courts jurisdiction to grant such relief/remedies, such relief/remedies cannot be granted by the Ontario court in these proceedings, even if the foreign law claims are proven.

6.     Even if NN Norway establishes that the requirements of some or all of its foreign law have been met, all such claims are statute-barred having been brought after the expiry of the applicable limitation period(s) and/or are barred by the passage of time, laches and/or estoppel, if and as applicable.

7.     NNL relies, *inter alia*, on the facts, circumstances and defences, where applicable, pleaded in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants in support of its denials of this EMEA Claimant's ability to establish the requirements of the foreign law pleaded.

8.     The positions set out in this Schedule, although stated to be in reference to the claims against NNL, apply equally to the claims asserted by NN Norway against NNC and the directors and officers of NNL and NNC.

\6198642