## EXHIBIT B

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE
CLAIMS BY THE UK PENSION TRUSTEE AND PPF RE: UK PENSION SCHEME**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................ 4

II.   THE PARTIES ................................................................................................................... 5
   A.   The Nortel Group .................................................................................................. 5
   B.   Acquisition of NNUK's Predecessor by Nortel Canada .................................... 6
   C.   The Trustee ............................................................................................................ 6
   D.   The Scheme ............................................................................................................. 7
   E.   The PPF .................................................................................................................. 8

III.  NATURE OF THE PENSION ADMINISTRATION CLAIM AND THE GUARANTEE CLAIMS ................................. 8
   A.   Pension Administration Claims ............................................................................ 9
   B.   Guarantee Claims ................................................................................................ 10
   C.   Governing Law ..................................................................................................... 10

IV.   FACTUAL BACKGROUND ............................................................................................. 11
   B.   Contribution Holiday .......................................................................................... 11
   C.   NNUK's Ad-hoc Contributions ........................................................................... 12
   D.   2005 Funding Agreement .................................................................................... 14
   E.   2006 Funding Agreement and the Main Guarantee ........................................ 17
   F.   The Swift Guarantee ........................................................................................... 19

V.    THE FSD REGIME AND FSD DECISION ........................................................................ 20
   A.   The FSD Regime .................................................................................................. 20
   B.   The FSD Decision against Nortel Canada ......................................................... 22

VI.   PRELIMINARY OBJECTIONS TO THE FSD CLAIM ..................................................... 23
   B.   The Trustee and PPF Have No Standing ........................................................... 24
   C.   The Trustee and Nortel Canada Agreed to the Nature and Extent of Nortel Canada's Potential Liability to the Scheme .................................................................................................................... 25
   D.   The Limitation Period Expired ........................................................................... 25
   E.   An FSD is not the type of Claim that will be enforced In Canada .................. 26
   F.   Double Proof ........................................................................................................ 28

VII.  AN FSD WOULD NOT BE ISSUED IN ANY EVENT ....................................................... 28
   B.   The Test for an FSD ............................................................................................. 28
   C.   Insufficiently Resourced Test Cannot be Met ................................................... 29
   D.   Nortel Canada did not Exercise Full or Undue Control of NNUK ................. 32
        (i)    NNUK Operated Independently From Nortel Canada ............................ 32
        (ii)   Examples of Past Transactions Relied upon by the UK Pension Claimants do not demonstrate Full or Undue Control of NNUK by Nortel Canada ............................................................................................ 35
        (iii)  Interest Free Loans .................................................................................. 35
        (iv)   Project Swift ............................................................................................ 36
        (v)    Transfer Pricing ...................................................................................... 37
   E.   Nortel Canada Did Not Receive Extraordinary Benefits from NNUK or the Scheme That Would Justify the Imposition of an FSD or a CN .................................................................................................................... 39
   F.   Nortel Canada Did Not Interfere With the Operation or Funding of the Scheme ........................... 41
   G.   Financial Position of Nortel Canada Makes It Unreasonable to Issue an FSD ................................ 44

VIII. OTHER PENSION ADMINISTRATION CLAIMS ............................................................ 45

| | | |
|---|---|---|
| A. | Bad Faith Claim | 45 |
| B. | Oppression | 48 |
| C. | Unjust Enrichment | 50 |
| D. | Quantum of any Damages | 52 |
| E. | Proprietary Remedies | 52 |
| **IX.** | **THE LIMITED GUARANTEES HAVE NOT BEEN TRIGGERED** | **53** |
| A. | Overview | 53 |
| B. | Main Guarantee | 54 |
| C. | Swift Guarantee | 56 |
| **X.** | **RELIEF SOUGHT** | **57** |

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

**JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE
CLAIMS BY THE UK PENSION TRUSTEE AND PPF RE: UK PENSION SCHEME**

## I.      INTRODUCTION

1.      Ernst &Young Inc. was appointed monitor (the "**Monitor**") for the purposes of these

CCAA proceedings in the Initial Order dated January 14, 2009, as amended and restated.

Together with Nortel Networks Limited ("**NNL**") and Nortel Networks Corporation

("**NNC**") (together, "**Nortel Canada**"), the Monitor files this Response to the claims

brought against Nortel Canada by Nortel Networks UK Pension Trust Limited (the

"**Trustee**"), the independent trustee of the pension plan (the "**Scheme**") sponsored by

NNUK Nortel Networks UK Inc. ("**NNUK**"), and the UK Pension Protection Fund (the

"**PPF**") (together with the Trustee, the "**UK Pension Claimants**"), as set out in their

Proofs of Claim (defined below).

2.      The claims can be distilled into the following two claims: (i) a claim that Nortel Canada is somehow liable for the entirety of the Scheme's deficit (the "**Pension Administration Claims**"); and (ii) an alternative claim that NNL is liable under two guarantees between NNL and the Trustee (the "**Guarantee Claim**s").  Nortel Canada denies that it has any liability for any of the claims.

3.      Unless otherwise expressly admitted elsewhere in this Response, Nortel Canada denies all of the claims whether set out in the Proofs of Claim or otherwise and puts the UK Pension Claimants to the strict proof thereof.

## II.     THE PARTIES

### A.     The Nortel Group

4.      The Nortel Group and the nature of its global enterprise is described in detail in the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on Behalf of the EMEA Debtors (the "**Canadian Response to the EMEA Claims**").  The Canadian Response to the EMEA Claims is incorporated by reference herein in full including capitalized terms used herein and not otherwise defined.

5.      NNUK is a company incorporated under the law of the UK, and is a wholly owned subsidiary of NNL.  NNUK was at all material times governed by a board of directors and a senior management team that was located in the UK.  NNUK was the sponsor of the Scheme and bore sole responsibility for making the employer's or sponsor's funding payments to the Scheme in accordance with the Scheme's constating documents and UK law.

6.      NNUK struck a committee, the Pension Fund Policy Committee (the "**UK PFPC**") to address NNUK's pension issues.  The committee was at all times a committee of, and accountable to the board of NNUK.  The UK PFPC did not have any decision making authority, and instead provided advice and recommendations to the board of NNUK, who at all material times had authority for addressing NNUK's pension issues.

**B.      Acquisition of NNUK's Predecessor by Nortel Canada**

7.      In 1991, Nortel Canada acquired STC Plc ("**STC**"), a UK company.

8.      At the time Nortel Canada acquired STC, STC was the sponsor of the Scheme. Following a series of internal reorganizations and substantial sales or divestures of operating divisions, NNUK became the successor to what was left of STC and became the successor employer sponsor of the Scheme.

**C.      The Trustee**

9.      The Trustee is a corporation governed by the laws of the UK.  It is governed by a board of directors having 9 members who are formally appointed by NNUK.  However, three of the nine directors are selected by the Scheme's members and one of the directors must be independent.  It was the practice of NNUK to appoint a chair who was independent of NNUK.

10.     The Trustee established the Pension Investment Committee (the "**PIC**") to oversee and set the investment strategy and management of the Scheme's assets.

**D.**    **The Scheme**

11.    The Scheme is a pension scheme organized under the laws of the UK.  The Scheme was governed by the laws of the *Pension Act 1995* (UK) (the "**PA 1995**") and later by the *Pension Act 2004* (UK) (the "**PA 2004**").

12.    In June 2000, the Scheme's defined benefits section was closed to new members. Thereafter, any employees of NNUK entitled to participate in a pension became members of the defined contributions division of the Scheme.  Only the defined benefits division of the Scheme is at issue in this proceeding and any reference to the "Scheme" is a reference to the defined benefits division of the Scheme unless the context suggests otherwise.

13.    When NNUK acquired STC in 1991, there were approximately 48,400 members of the Scheme, only approximately 9,750 of whom who were active employees.  Since 1991, the number of active members of the Scheme steadily declined, such that by January 14, 2009, only approximately 950 members were active employees being only approximately 3% of the Nortel Group's employees worldwide.

14.    As the size of NNUK decreased, so too did the relevancy of its input to the Nortel Group's R&D efforts and the Group's financial results.  NNUK made only a *de minimis* proportion of the R&D expenditures of the Nortel Group.  The NNUK pension Scheme is in the main a legacy liability from a transaction that occurred two decades ago.

15.    Following the commencement of Nortel Canada's CCAA proceedings and the NNUK's administration proceedings in the UK, the PPF declared the Scheme to be a "failed scheme" under the UK regulatory process.  The amount of the Scheme's deficit, if any, is disputed.

16.     Only NNUK was and is required to fund the Scheme.  Nortel Canada had and has no obligation to fund the Scheme.  Moreover, the Trustees and PPF knew this and therefore at various times sought express guarantees or other "credit enhancements" from Nortel Canada to assist NNUK meet its obligations to the Scheme.  Negotiations for "credit enhancements" would not have been necessary had Nortel Canada otherwise been liable to fund the Scheme under UK law.  The UK Pension Claimants similarly had no expectation, and certainly no reasonable expectation, that Nortel Canada was liable to fund the Scheme.  Nortel Canada only had obligations to provide credit enhancements or guarantees when it expressly undertook to do so.  Nortel Canada has complied with any obligations that it undertook by way of express written guarantees.

**E.      The PPF**

17.     The PPF is a statutory body created by the PA 2004.  The PPF provides prescribed compensation to eligible scheme members of eligible distressed pension plans, and can step into the shoes of the trustee of a pension plan when and if it provides support to the Scheme.  References herein to the "Trustee" include the PPF to the extent it has or may in the future step into the shoes of the Trustee.

**III.    NATURE OF THE PENSION ADMINISTRATION CLAIM AND THE GUARANTEE CLAIMS**

18.     The Pension Administration Claims and the Guarantee Claims are set out in the following documents: a joint Proof of Claim dated September 30, 2009 (the "**Original Proof of Claim**"), the Amended Proof of Claim dated November 29, 2010 (the "**Amended Proof of Claim**"), and the Affirmative Claims Pleading of Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection dated May 16, 2013 (the "**Affirmative**

**Claims Pleading**" and together with the Original Proof of Claim and the Amended Proof of Claim, the "Proofs of Claim").

**A.      Pension Administration Claims**

19.      Pension Administration Claims against Nortel Canada are comprised of the following three claims:

(a)      "**FSD Claim**":  The Trustee claims Nortel Canada is liable to pay the full amount of any deficit in the Scheme because it is alleged that Nortel Canada would be liable to make such payments pursuant to a financial support direction ("**FSD**") if issued by the UK Pension Regulator (the "**Pension Regulator**") against Nortel Canada;

(b)      "**Bad Faith / Oppression Claim**":  The Trustee also claims that Nortel Canada is liable for the full amount of the Scheme's deficit on the basis that it allegedly breached an implied duty of good faith that it allegedly owed to the Scheme's members, or, alternatively, it allegedly acted oppressively towards the Scheme's members and is therefore liable for the Scheme's deficit under the oppression remedy pursuant to section 241 of the *Canada Business Corporations Act* ("**CBCA**"); and

(c)      "**Unjust Enrichment Claim**":  The Trustee has added in its Affirmative Claims Pleading a further plea that Nortel Canada was unjustly enriched by allegedly receiving funds from NNUK over time that could have been used to pay the Scheme's deficit.

20.     The underlying premise of the Pension Administration Claims is that Nortel Canada caused NNUK to fail to appropriately fund the Scheme and that such failure caused all or a significant portion of the Scheme's alleged deficit.   These claims are without merit. The Trustees and the PPF do not, and cannot, allege that NNUK failed to comply with any UK pension law requiring it to fund the Scheme or that Nortel Canada prevented it from doing so because, until the Filing Date of January 14, 2009, NNUK in fact paid into the Scheme all amounts that it was required to pay under law and all amounts that it had agreed to pay under the agreements that were reached between NNUK and the Trustee.

**B.     Guarantee Claims**

21.     In connection with the 2006 Funding Agreement and Project Swift (both defined below), NNL provided two limited guarantees (the "**Limited Guarantees**") to the Scheme in which it guaranteed certain of NNUK's obligations to the Scheme. The Trustee and PPF make a claim under those Guarantees.  Nortel Canada pleads that it has no liability under either Limited Guarantee in accordance with the terms as written and agreed to by the parties.

**C.     Governing Law**

22.     Nortel Canada submits that it is solely the laws of Ontario (including the federal laws of Canada applicable in Ontario) that apply to it in these proceedings.   In addition, and without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon the sections of the Canadian Response to the EMEA Claims entitled "Foreign Law Claims" and "Foreign Law does not apply".

**IV.    FACTUAL BACKGROUND**

23.    The negotiations between NNUK and the Trustee described below were at all times conducted in good faith and in accordance with any duties that NNUK, or Nortel Canada, might have had to the Scheme.

**B.    Contribution Holiday**

24.    When Nortel Canada acquired STC in 1991, the Scheme was in a significant surplus position.  According to the Trustee and the independent actuary whom it engaged, the assets of the Scheme exceeded the amount required to be invested to produce the defined pension benefits required to be paid by the Scheme then and in the future.  As a result of the Scheme's surplus of assets, STC was not required to make further contributions to the Scheme and it ceased doing so prior to the closing of Nortel's purchase of the company. While referred to as a "contribution holiday", legally, no further funding was then required of STC or NNUK at law or by contract and their actions were consistent with industry practice.  No one asserted that STC or NNUK acted unlawfully or violated any duty owed to the Scheme and the time for doing so has long since expired.

25.    As a defined benefit pension plan, the Scheme is required to produce only the benefits at the levels set out it its constating documents.  There was no obligation to fund a pension plan under PA 1995 when the plan's assets exceeded the amount necessary to produce the defined benefits.

26.    Under the Scheme's constating documents, NNUK was required to fund only the amounts required by the Scheme's actuary.  The actuary was engaged by and accountable to the Trustee.  After NNUK acquired STC, the Scheme continually remained in a surplus

under all measures until 2002.  Accordingly, with the approval of the Scheme's actuary and the Trustee, NNUK was not required to make any contributions to the Scheme.

27.     Throughout the time, the Trustee reported to the Scheme members that the Scheme remained in a well-funded position.

28.     NNUK breached no law or duty by failing to pay contributions where none was required by law as calculated by the Scheme's actuary.  Until it entered administration in January 2009, NNUK always made every contribution required by the Scheme's actuary.

**C.     NNUK's Ad-hoc Contributions**

29.     The investment of the assets held by the Scheme was the responsibility of the Trustee and not NNUK.  By 2002, the Scheme had experienced losses in the value of its assets as a result of the wide-spread recession associated with the bursting of tech-bubble.  Those losses were exacerbated because the Trustee had adopted an investment strategy that resulted in the Scheme holding a higher degree of equities than other more conservatively invested pension funds.  It also had not matched long-term assets to liabilities as conservatively as it ought to have done.  The UK Pension Claimants are seeking to shift to NNUK and Nortel Canada responsibility for the Trustee's failure to meet its projected investment targets.

30.     Starting in 2002, certain measures of funding levels showed that the Scheme was in a deficit position; however, the Scheme remained in a surplus according to the statutory Minimum Funding Requirement ("**MFR**"), the measure by which required contributions were calculated under the PA 1995.  Accordingly, despite the change in the Scheme's

position, NNUK was still not required to make any contributions to the Scheme by the scheme's actuary or under applicable UK law at that time.

31.     Nonetheless, in 2002, NNUK began discussions with the Trustee, at times involving UK pension regulators, about making contributions to the Scheme, even though it had no obligations to do so by law.

32.     The deficit and surplus position of a pension scheme fluctuated over time.  Just as a deficit can be created by movements in the capital market and changes in interest rates, so too can deficits be eliminated by similar movements.  Accordingly, UK law neither required nor contemplated that NNUK would immediately make additional contributions to completely or quickly eliminate any projected deficit in the Scheme.  It was in this context that the discussions between NNUK, the Trustee and its actuaries took place to determine what, if any, contributions would be appropriate and agreed to, and over what period of time they would be made.  Contrary to the allegations made by the UK Pension Claimants, the amount of NNUK's contributions to the Scheme were discussed with, and approved by, the Scheme's actuaries.

33.     Between 2002 and 2005, NNUK made *ad hoc* contributions of approximately £150 million to the Scheme.

34.     All of the *ad hoc* contributions made by NNUK between 2002 and 2005 were greater than or equal to the amounts that NNUK was required to make to the Scheme during that period.

35.     The Trustee never reported to the Scheme's members that the *ad hoc* contributions being made by NNUK were less than the amounts that NNUK was required to contribute under applicable law.

36.     Even if the *ad hoc* contributions made by NNUK between 2002 and 2005 had been less than the amounts required under the applicable law, the Trustee commenced no proceedings and its claims are now barred by the expiry of the limitations period, laches, and estoppel by conduct including, *inter alia*, the subsequent interim 2005 Funding Agreement, long-term 2006 Funding Agreement and the Limited Guarantees which established, by agreement with the Trustee, the extent to which NNUK or Nortel Canada were to make any contributions to the Scheme.

**D.     2005 Funding Agreement**

37.     Despite NNUK's *ad hoc* contributions, the deficit in the Scheme continued to grow.  The deficit grew as a result of market forces, including lower than projected interest rates, and the Trustee's continued implementation of an aggressive investment strategy.   In addition, NNUK divested itself of the bulk of STC shortly after it completed the purchase in the early 1990s. NNUK itself was diminishing in size throughout the 1990s and the first decade of the new century.

38.     The Scheme was not the only pension plan sponsored by a Nortel entity that suffered from a projected deficit after 2000 or today.  For example, Canadian and US Nortel defined benefit pension plans also have very substantial projected deficits that place pensioners under those plans at risk of suffering severe cuts in their retirement benefits. The claims advanced by the UK Pension Claimants seek to appropriate funds that would

otherwise be available to pay dividends to other pensioners and creditors in favour of the claims of UK pensioners.

39.    Nortel Canada, as the parent company of more than 140 subsidiaries, was aware of the pension funding obligations of its subsidiaries around the world.    To understand its subsidiaries' financial needs and wants, Nortel Canada included pension funding issues among its financing considerations.    In the early 2000s, NNUK had advised Nortel Canada that legislative reform was being implemented in the UK concerning pension funding.    Moreover, the Trustee had begun making requests for Nortel Canada to assist NNUK in increasing its funding to the Scheme.

40.    Nortel Canada took the Trustees' requests into consideration and engaged in negotiations designed to assist NNUK to reach an agreement with the Trustee on pension funding proactively and before such was required under the new UK law.    It was anticipated that under the statutory reform amendments, the Pension Regulator would have the authority to impose funding requirements on NNUK in the event that no pension funding agreement was reached with the Trustee.    Therefore, NNUK was proactive and sought to agree on pension funding with the Trustee.

41.    On June 14, 2005, NNUK and the Trustee reached an interim funding agreement having a term of two years (the "**2005 Funding Agreement**").    The 2005 Funding Agreement provided that, among other things, NNUK would make the following contributions:

(a)    £10 million shortly after June 2005; and

(b)    annual contributions of £46 million from April 6, 2005 to April 5, 2007.

42.    At the time the 2005 Funding Agreement was being negotiated, NNUK had the support of Nortel Canada to enter into a long-term funding agreement with the Trustee. However, contrary to its pleading, it was the Trustee who refused to enter into a long-term agreement at that time.  Instead, the Trustee demanded that the parties only enter into a short-term agreement so that the parties would continue to have negotiations for a long-term agreement closer to the time that the statutory reform amendments would come into force.

43.    The Trustee never reported to the Scheme's members that the contributions being made by NNUK under the 2005 Funding Agreement were less than the amounts that NNUK was required to contribute under applicable law.

44.    All of the contributions made by NNUK under the 2005 Funding Agreement were greater than or equal to the amounts that NNUK was required by the Scheme actuary or by law to make to the Scheme during that period.

45.    In the alternative, even if the contributions being made by NNUK under the 2005 Funding Agreement were less than the amounts required to be made under the applicable law (which is denied), it is not open to the UK Pension Claimants to now complain about the contract that they made.  Moreover, the Trustee had various remedies available to it, none of which it exercised or threatened to exercise, and it is precluded from doing so now as such claims are barred by the expiry of the limitations period, laches and estopped by conduct as well as by the antecedent long-term 2006 Funding Agreement and the Limited Guarantees.

46.    NNUK made all of the contributions required under the 2005 Funding Agreement.

**E.**    **2006 Funding Agreement and the Main Guarantee**

47.    After the 2005 Funding Agreement was agreed to, NNUK and the Trustee continued their negotiations towards a longer-term funding agreement.

48.    On May 30, 2006, NNUK and the Trustee agreed to a schedule of contributions under which NNUK made quarterly contributions of £21.25 million to the Scheme from July 4, 2006.

49.    On November 21, 2006, NNUK and the Trustee reached the long-term funding agreement (together with the schedule of contributions, the "**2006 Funding Agreement**"), which provided for the following contributions:

(a)    contributions of no less than £150 million between November 21, 2006 and April 5, 2008; and

(b)    contributions from April 5, 2008 until April 5, 2012 based on an amount of the Scheme's deficit as of April 5, 2008.

50.    As part of the negotiations for the 2006 Funding Agreement, the Trustee expressed concern for the solvency of NNUK.  It therefore requested that NNL provide credit enhancement to support the funding obligations being undertaken by NNUK.  It was clearly understood by all parties that only NNUK was obliged to fund the Scheme. Following arm's length negotiations, NNL ultimately agreed to provide a limited guarantee of certain of NNUK's obligations under the 2006 Funding Agreement (the "**Main Guarantee**") on specific terms.   As pleaded below, the terms of the Main

Guarantee as agreed between the parties do not oblige NNL to make any payment in the current circumstances.

51.     The Trustee also refused to agree to the 2006 Funding Agreement until it had received comfort from the Pension Regulator that the 2006 Funding Agreement was consistent with what it could obtain under PA 2004 statutory amendments that were about to come into force.

52.     As a result of the statutory amendments, the amount that an employer sponsor was to contribute to a Scheme was no longer to be determined by a formula established by the act or regulation.   Rather, under the new regime, the employer sponsor and the trustee were to negotiate a contribution schedule which would establish the contributions the employer sponsor would be required to make.   If the parties failed to reach such an agreement, either party can submit the matter to the Pension Regulator who would have the power to impose a contribution schedule on the parties.

53.     The final negotiations for the 2006 Funding Agreement actually took place at the Pension Regulator's office, with representatives of the Pension Regulator assisting NNUK and the Trustee to reach agreement.   The Pension Regulator was thus aware of the status of the negotiations and the terms of the proposed funding agreement.   While the Pension Regulator advised the parties that it could not give a "clearance letter"-type opinion as to whether the proposed agreement was one that the Pension Regulator might have imposed under the new regime, it did confirm to NNUK and the Trustee that the 2006 Funding Agreement was acceptable to it and was in line with the intention of the new pension regime.

54. All of the contributions made by NNUK under the 2006 Funding Agreement were greater than or equal to the amounts that NNUK was required by law to make to the Scheme during that period and the Trustee never reported otherwise to Scheme members.

55. Even if the contributions made by NNUK under the 2006 Funding Agreement were less than the amounts required to be made under the applicable law (which is denied), the Trustee had various remedies available to it, none of which it exercised, and it is precluded from doing so now as such claims are barred by the expiry of the limitations period, laches, and estoppel by conduct.

56. NNUK made all of the contributions required under the 2006 Funding Agreement to the time of its filing for insolvency protection in January, 2009.  Thereafter, control of expenditures by NNUK was placed in the hands of the Joint Administrators of the EMEA Debtors and therefore any failure or refusal of NNUK to pay amounts that it had agreed or was obliged to pay in relation to the Scheme rests with the NNUK estate in administration and the Joint Administrators.

**F.**    **The Swift Guarantee**

57. After the 2006 Funding Agreement came into effect, the Trustee also negotiated for, and NNL agreed to provide, a limited guarantee of NNUK's pension funding obligations in connection with Project Swift (discussed below).

58. During the negotiations for Project Swift, NNUK and the Trustee, both of whom were represented by professional advisors, had raised a concern that in the event that NNUK became insolvent, the Scheme could be worse off as a result of Project Swift.  As a result, arm's length negotiations ensued.  Ultimately both the Trustee and NNUK required, and

NNL agreed to provide, the Swift Guarantee, under which NNL provided a limited guarantee to pay the Scheme up to US$150 million in certain limited circumstances connected to a liquidation of NNUK.   As pleaded below, the terms of the Swift Guarantee as agreed between the parties do not oblige NNL to make any payment in the current circumstances.

## V.    THE FSD REGIME AND FSD DECISION

### A.    The FSD Regime

59.    An FSD is a direction that may be issued by the Determinations Panel of the Pension Regulator, an administrative tribunal, following a hearing commenced by the Pension Regulator under the provisions of the PA 2004.

60.    An FSD is a direction to a party associated with an employer sponsor of a scheme (the "target") to provide financial support for an underfunded pension scheme.   The purpose of an FSD is to seek funding for a pension deficit from a party who otherwise has no legal obligation to the scheme.   In short, an FSD is a long-arm insolvency device that is designed to obtain payments from third parties, wherever located, due to the insolvency of a UK pension sponsor.

61.    An FSD is not itself enforceable.   If the target fails to provide support required by an FSD, then the Pension Regulator may bring further administrative proceedings to a determinations Panel to seek a Contribution Notice ("**CN**").   If issued, a CN would require the target to pay the amounts set out in the CN to the Scheme (or PPF on behalf of the Trustee).   It is only a CN, and not an FSD, which purports to create a debt that, has the force of a judgment in the UK.

62.     The FSD regime purports to provide the Pension Regulator with a very broad and unusual authority to try to create liabilities to ameliorate the consequences to pension creditors of the insolvency of the employer in the UK.  There is no equivalent legislation in Canada or the US to impose the liabilities of an insolvent employer on other entities who are not otherwise liable for the employer's funding of its pension.  The exact scope of the FSD provisions in the PA 2004 remains largely untested in litigation in the UK.

63.     In order to obtain an FSD and then, if desired, a CN, the Pension Regulator must decide to bring two administrative proceedings.  To obtain an FSD, the Pension Regulator must prove the existence of certain facts and obtain a discretionary determination that it is reasonable to issue an FSD from the Determinations Panel – a branch of the adjudicative arm of the Pension Regulator.  A CN is obtained in a subsequent and separate administrative determination.  A CN, too, requires a determination of the existence of certain preconditions and a discretionary determination by the Determinations Panel that it is reasonable to issue a CN against the target in the circumstances.

64.     The decision of whether or not to seek an FSD or CN is a regulatory prerogative of the Pension Regulator, exercisable by it alone.  There is no right or ability for anyone else, such as the Trustee or PPF, to bring an application for the issuance of either an FSD or a CN.  While the PPF may have the ability to enforce a CN once one is issued, neither it nor the Trustee has any right to make the discretionary prosecutorial decision to launch the process to seek an FSD or a CN.

**B.** **The FSD Decision against Nortel Canada**

65.     On January 11, 2010, almost a year after the commencement of these CCAA

proceedings, the Pension Regulator served two warning notices (collectively, the

"Warning Notice") on NNC and NNL at their offices in Mississauga, Ontario, advising

that it was considering seeking an FSD against them.  By serving the Warning Notice on

Nortel Canada in Canada, the Pension Regulator was purporting to comply with the

statutory requirement to serve targets with notice of the launch of its US$3 billion FSD

proceeding before the Determinations Panel.  The Pension Regulator did not seek leave

of the Ontario Superior Court to lift the CCAA stay of proceedings under the CCAA

before doing so.

66.     The Pension Regulator clearly understood and disclosed that its proceedings for the FSD

were aimed at assisting the UK Pension Claimants improve their recovery in light of the

insolvency of NNUK by creating long-arm claims under UK law to be advanced against

Nortel Canada in these CCAA proceedings and against the US Debtors under Chapter 11.

67.     The Canadian courts held that as a result of the stay of proceedings in the CCAA

proceedings, the FSD proceedings and any decision rendered thereunder are null and void

and of no force or effect against Nortel Canada and that any order made in the FSD

proceedings cannot create or form the basis of any rights against Nortel Canada.  In

particular: (i) Justice Morawetz expressly held that the delivery of the Warning Notice by

the Pension Regulator to Nortel in Canada breached the stay of proceedings in the CCAA

Initial Order, and that such proceedings were null and void, and that the FSD proceedings

cannot form the basis for creating or enforcing any rights, remedies or claims with

respect to Nortel Canada or their property, assets or undertakings in Canada; (ii) this decision was unanimously upheld by the Court of Appeal for Ontario; and (iii) the Supreme Court of Canada denied leave to appeal (together, the "**Canadian FSD Decisions**").

68.     Despite the Canadian FSD Decisions, the Pension Regulator purported to continue its proceedings before the Determinations Panel, which issued FSDs against Nortel Canada *in abstentia*.  The Determinations Panel also issued FSDs against NNUK's subsidiaries. However, pursuant to the Canadian FSD Decisions, the FSD against Nortel Canada is null and void and of no force or effect against Nortel Canada.

69.     Despite the fact that the FSDs have been issued and none of the targets of the FSDs have provided any of the security or support purportedly required thereby, the Pension Regulator has not commenced any proceedings for the issuance of a CN to enforce the FSD, something only it can do.  For its own reasons, the Pension Regulator has not filed a Proof of Claim in the CCAA proceedings.  It is now barred from doing so by the expiration of the deadline for the filing of claims under the Amended and Restated Claims Procedure Order (the "**CCAA Claims Process**").

## VI.     PRELIMINARY OBJECTIONS TO THE FSD CLAIM

70.     The FSD Claim should be dismissed without any consideration of its merits for the following reasons.

**B.**     **The Trustee and PPF Have No Standing**

71.     The UK Pension Claimants lack standing to bring the FSD Claim in the CCAA Claims

Process. Under the PA 2004, only the Pension Regulator can seek an FSD or a CN.  The

decision to seek of an FSD or a CN is a matter of discretion for the Pension Regulator.  It

is akin to the discretion that a public prosecutor has to decide to whether or not bring a

claim.  The PA 2004 does not create any independent cause of action or private remedy

which the Trustee or the PPF can assert in the UK or in the CCAA Claims Process.  The

statute allows the PPF to enforce a CN once one is issued; however no CN has been

issued nor has one even been sought by the Pension Regulator against Nortel Canada.

72.     As it is only the Pension Regulator that could decide to bring proceedings to seek an

FSD, or to seek a CN, only the Pension Regulator could bring these proceedings for an

order akin to an FSD or a CN to be recognized as a claim in the CCAA proceedings.  It

has elected to refrain from seeking leave of this Honourable Court to bring FSD

proceedings in the UK.  No one – whether the Pension Regulator or the UK Pension

Claimants may rely on the existing FSD as creating any enforceable rights in Canada due

to the prior decisions of this Honourable Court.  As a result, there is nothing for the

CCAA Court to recognize and enforce, and neither the Trustee nor the PPF have any

standing to bring the Pension Administration Claims based on the PA 2004 FSD/CN

regime.

73.     Furthermore, the losses allegedly suffered by the UK Pension Claimants are merely

derivative of the losses allegedly suffered by NNUK as a result of Nortel Canada's

alleged conduct and for which NNUK is already seeking recovery against Nortel Canada.

Accordingly, the claims are impermissible derivative claims for which the UK Pension Claimants have no standing.

**C.    The Trustee and Nortel Canada Agreed to the Nature and Extent of Nortel Canada's Potential Liability to the Scheme**

74.    Nortel Canada did not have any independent obligations to fund the Scheme.  It was because the Trustee knew and understood that Nortel Canada did not have any such obligations that the Trustee negotiated for, and NNL agreed to provide, the Main Guarantee and the Swift Guarantee.  By these agreements, the parties negotiated for, and agreed to, the full scope and limitations of their relationship and their obligations to each other.

75.    The negotiations regarding the Limited Guarantees took place at a time when the Trustee was aware of the very financial risks relating to the Scheme of which it now complains. In fact, not only was it aware of those risks, the Trustee addressed those risks by agreeing to the 2006 Funding Agreement and the terms of the Limited Guarantees.  The Trustee is now estopped from denying the fact that the Limited Guarantees define the extent of its relationship with Nortel Canada.  The only claims that it is entitled to assert against Nortel Canada are the claims under the Limited Guarantees.  However, as discussed below, Nortel Canada does not have any obligations under the terms of the Limited Guarantees as negotiated and agreed upon by the Trustee.

**D.    The Limitation Period Expired**

76.    The alleged conduct on which the UK Pension Claimants base their claims was known to the Trustee, or was discoverable by the Trustee, as early as 2004 and no later than 2006.

Nonetheless, the Trustee entered into the 2005 Funding Agreement, 2006 Funding Agreement and the Limited Guarantees instead of commencing claims. As a result, the limitation period expired prior to the commencement of the claims, and the claims are therefore statute barred.

77.    Furthermore, certain of the conduct relied upon occurred more than 15 years before the claim was commenced. Accordingly, the limitation period for each such claim has expired.

78.    Lastly, the claims made by the Trustee and PPF are barred by the doctrine of laches.

**E.    An FSD is not the type of Claim that will be enforced In Canada**

79.    As noted above, Nortel Canada denies that UK law applies to it in this proceeding.

80.    An FSD and even a CN are not the type of orders that will be recognized by the CCAA Court in any event. Accordingly, no claim should be recognized or granted on the basis of the PA 2004 FSD/CN regime.

81.    First, the FSD is not an "order" that is capable of enforcement by a Canadian Court. The FSD does not create a debt obligation or an obligation to make any payment. The FSD is not enforceable itself, and is only enforceable as against Nortel Canada once a CN is issued. As the Pension Regular has not sought leave of this Honourable Court to proceed in the UK and the Determinations Panel has not yet held a hearing on whether or not to issue a CN, there is no enforceable debt even under UK law. As the FSD cannot be enforced in the UK as a debt, the FSD is not capable of being enforced in Canada as a provable claim in a CCAA proceeding.

82.     Second, the FSD is a highly discretionary decision of an administrative tribunal exercising the executive powers of the UK government.  As a result, the decision to issue an FSD or a CN is a decision of public law that will not be recognized or enforced by a foreign court without a treaty requiring such recognition.  There is no such treaty between Canada and the UK and therefore the FSD and any CN is not capable of being enforced in Canada.

83.     Third, the FSD and any CN, are contrary to well recognized Canadian public policy relating to creditor priorities in an insolvency proceeding.  It is the long-standing and fundamental public policy of Canadian insolvency principles that creditors cannot jump the queue or create new liabilities within an insolvency proceeding for the purposes of altering any applicable statutory priority or recognition of claims.  An FSD and CN are designed to do just that – to create a claim where none existed before the insolvency in order to alter the scheme of distribution as it existed on the date of filing under the CCAA.  The UK High Court itself has stated that in the context of insolvency, the FSD is an impediment to rescue culture in insolvencies and is unfair to the creditors of the target company.  As any FSD and CN would offend a fundamental tenet of Canadian public policy, the FSD and CN cannot be recognized by a Canadian Court, nor can the Court grant an order on the basis of the PA 2004 FSD/CN regime.

84.     Fourth, comity does not require that the FSD or a CN be recognized in Canadian insolvency proceedings.  Comity and recognition of a foreign decision are premised upon reciprocity.  A similar decision made by a Canadian administration tribunal would not be recognized by the Courts in the UK.  Accordingly, neither an FSD nor a CN is a type of order or direction that can or should be recognized by a Canadian Court.

**F.**     **Double Proof**

85.     The claim of the UK Pension Claimants is the same claim that is being advanced against Nortel Canada by NNUK.  Those claims are based on the same facts and claim compensation for the same alleged losses.  Accordingly, the claims of the UK Pension Claimants are impermissible double proofs and must be dismissed.

**VII.     AN FSD WOULD NOT BE ISSUED IN ANY EVENT**

86.     Even if the Court were to decide to consider the merits of the FSD Claim and determine whether or not an FSD should be issued as if it were the Determinations Panel of the Pension Regulator, the claim should be dismissed as the test for the issuance of an FSD and a CN cannot be satisfied.

**B.**     **The Test for an FSD**

87.     In order to issue an FSD, the Determinations Panel must determine that:

(a)     the Scheme was a UK-based defined benefit occupational pension scheme;

(b)     the targets of the FSD are associated with the NNUK;

(c)     NNUK was insufficiently resourced at the relevant time within the meaning of the PA 2004; and

(d)     it would be reasonable to issue the FSD as against the Nortel Canada.

88.     In deciding whether or not it is reasonable to issue an FSD against a target, the Determinations Panel would have to consider the following factors:

(a)     the relationship between the Nortel Canada and NNUK, including whether the non-employer controlled the employer;

(b)     the value of any benefits received directly or indirectly by the Nortel Canada from NNUK;

(c)     any connection or involvement of Nortel Canada with the pension plan;

(d)     the financial circumstances of the Nortel Canada; and

(e)     such other matters as may be prescribed.

89.     Nortel Canada does not dispute that the first two elements of the FSD test would be met (i.e., that the scheme is a defined benefits occupational pension scheme and that NNL and NNC are "associated" with NNUK).  However, for the reasons described below, Nortel Canada denies that the Trustee can satisfy the "insufficiently resourced" test or demonstrate that it would be reasonable for an FSD or CN to be issued as against Nortel Canada.

C.     **Insufficiently Resourced Test Cannot be Met**

90.     Nortel Canada denies that the insufficiently resourced test can be satisfied as at the appropriate "relevant time", and puts the UK Pension Claimants to the strict proof thereof.

91.     The insufficiently resourced test has two parts, one focuses on the Scheme and the other focuses on the resources of Nortel Canada.  An employer sponsor is "insufficiently resourced" at a "relevant time" if, at that time:

(a)     the value of the employer's resources is less than 50% of the estimated

debt under section 75 of the PA 2004 (being the deficit upon a wind up

of the scheme) (the "**Section 75 Debt**"); and

(b)     there is an entity, either connected with the employer or an associate

thereof, the value of whose resources is not less than the difference

between the value of the employer's resources and 50% of the estimated

Section 75 Debt.

Thus, to meet the insufficiently resourced test, the UK Pension Claimants must prove that

NNUK could not fund 50% of its Section 75 Debt and Nortel Canada's resources has

sufficient resources to pay more than the shortfall of NNUK's ability to pay half of the

Section 75 Debt.  The Monitor and Nortel Canada deny that either test can be met.

92.     The time for assessing claims in this CCAA proceeding is as of the filing date (January

14, 2009) as defined in the Amended and Restated Claims Procedure Order.  The Pension

Regulator admitted in writing to the Court of Appeal that it could not have made out this

condition of the FSD test at the Filing Date because Nortel Canada was insolvent at that

time.

93.     The "relevant time" purportedly used by the Pension Regulator in its proceedings before

the Determinations Panel was June 18, 2008.  The "relevant time" purportedly selected

by the Pension Regulator was 18 months before the date on which it actually commenced

the FSD proceedings by delivering the Warning Notice to Nortel Canada.  That date was

selected with hindsight to a day that was just prior to the commencement of the global

financial crisis, which crisis has, with hindsight, been associated with the cause of the demise of Nortel (and many other companies).

94.     The Pension Regulator admitted before the Canadian Courts that it intentionally selected that date to try to ensure that the FSD would be issued because the Pension Regulator would have unable to meet the second part of the test due to the insolvency of Nortel Canada had a later date been chosen.  Such a results-oriented approach to try to create a pre-filing claim by intentionally purporting to back-date a cause of action to a time pre-dating a known insolvency is not a good faith exercise of discretion that can be countenanced by the Court.  Nor does it amount to a "claim" that was in existence on the filing date as defined in the CCAA or under the Amended and Restated Claims Procedure Order.

95.     As a result of Nortel Canada's financial position, at no other "relevant time" that might reasonably be selected will the second part of the "insufficiently resourced" test be satisfied.

96.     The CCAA court is not bound to use the arbitrary date selected by the Pension Regulator and its selection of the date is not entitled to any deference, particularly in light of the strategic reasons for which it was selected.

97.     To the extent that the UK Pension Claimants continue to rely on the "relevant time" strategically selected by the Pension Regulator, they are continuing to perpetuate a false description of reality and the claim should be dismissed as it is not a just basis on which to impose billions of dollars of liability on a third party.

98.   If, on the other hand, the UK Pension Claimants allege that the CCAA court is considering the FSD issue *de novo*, then the insufficiently resourced test still cannot be proven as Nortel Canada would not have sufficient resources to satisfy the second part of the test.

**D.    Nortel Canada did not Exercise Full or Undue Control of NNUK**

*(i)    NNUK Operated Independently From Nortel Canada*

99.   Nortel Canada did not exercise full or undue control over NNUK.   NNUK and the Trustee were governed by separate boards of directors, who were appointed in accordance with their constating documents and applicable laws, and in accordance with the reasonable expectations of the NNUK and the Trustee.

100.   NNUK was a wholly owned subsidiary of NNL, and as the only shareholder, NNL is the only one who could appoint the directors of NNUK.   Accordingly, the ability to control the appointment of the board of directors of NNUK itself cannot be sufficient "control" for the purpose of an FSD.

101.   At all material times, the directors of NNUK exercised their judgment independently and free from any undue or improper influence or interference from Nortel Canada. Furthermore, whenever it wished to do so, the board of directors of NNUK retained independent professionals to provide it with advice with respect to the decisions it was making, including in connection with all significant decisions regarding the funding of the Scheme.

102.    Any interaction that Nortel Canada had with NNUK was not more than the normal, customary and expected interaction that a parent company of a multi-national corporation would have with any of its wholly owned direct and indirect subsidiaries.    Such coordination was not only expected, but also necessary, to run a global enterprise with Nortel's size and reach, for the benefit of all of its entities, including NNUK.

103.    The same issue is raised in the claims of the EMEA Debtors and the Monitor and Nortel Canada make specific reference to the Canadian Response to the EMEA Claims that is incorporated by reference in paragraph 4 above.    Without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon the sections of the Canadian Response to the EMEA Claims entitled: General Management and Administration, EMEA Regional Management, Corporate Governance, No Basis for Statutory Oppression Claims, "No Fiduciary or other Implied Duties Owed or Breached", "The Necessary Element of 'Influence' or 'Control' Under Foreign Law does not Exist", and "Responses to Direct Pension Claims".

104.    In its negotiations with NNUK and the Trustee, Nortel Canada properly had regard to the effect that any decision would have on the Nortel Group as a whole.    It was in the best interests of all of the entities in the global Nortel Group, including NNUK, that the contributions to the various pension schemes around the world be made having regard to all relevant factors, including, but not limited to, the overall financial position of the Nortel Group, anticipated performance of the various pension schemes, the position of pensioners under the Scheme and under other Nortel entities' pension plans, applicable local pension laws, and other relevant factors.

105.    Indeed, the best interests of NNUK were coextensive with to the best interests of the Nortel global enterprise.   NNUK benefited from being a part of the global Nortel Group, by having access to the R&D created by the other entities, and being given a licence to use the technology owned by Nortel Canada.   Similarly, NNUK would ultimately suffer if the other Nortel entities were harmed by an imprudent decision to use its financial resources to rapidly eliminate any and every projected pension deficit in a pension plan, particularly when such decision was not required by law, could negatively impact its ability to pay other creditors on standard commercial and contractual terms, to remain competitive, or require it to reduce R&D spending which was essential to the Nortel Group's on-going competitive posture.

106.    Nortel Canada considered the interests of NNUK's pensioners in its negotiations with NNUK.   However it could not singularly prefer the interests of UK pensioners in its considerations.   Rather, NNL and NNC were required to act in their own corporate best interests.   They could take into account the interests of UK pensioners in the context of the global enterprise, along with the interests of employees, suppliers, shareholders and other creditors.   The UK Pension Claimants seek to change Canadian and UK corporate law to give supremacy to the rights and interests of UK pension claimants in matters of multinational corporate governance and decision making in Canada and the US.

107.    The UK Pension Claimants conflate the facts that business functions operated across a number of entities and that certain responsibilities were assigned to specific entities with the fact that separate legal entities existed and were accounted for.   The separate entities were respected and compensated separately, were legally recognized and were accounted for separately.   The transfer of funds from NNUK to Nortel Canada as its sole

shareholder and parent company, and any other transactions between them, were always undertaken with appropriate consideration and lawfully.

> (ii)    *Examples of Past Transactions Relied upon by the UK Pension Claimants do not demonstrate Full or Undue Control of NNUK by Nortel Canada*

108.    The Trustee cites and relies on certain past transactions that NNUK entered into with Nortel Canada that they allege were to the detriment of NNUK to try to establish that Nortel Canada "controlled" NNUK.   However, none of these transactions demonstrate any inappropriate acts by Nortel Canada or harm by Nortel Canada inflicted upon NNUK for which Nortel Canada is liable at law.   In fact, as sole shareholder, NNL will be taken to have ratified all acts of NNUK up to the date of its insolvency in any event.

> (iii)    *Interest Free Loans*

109.    The Trustee objects to interest-free loans that NNUK provided to NNL. Such interest-free loans were permissible under UK law, and were consistent with common business and accounting practice at that time.   The loans were suggested by and arranged principally by members of the Nortel Treasury Department and Tax Departments who were NNUK employees and resident in the UK.   Moreover, NNUK did not suffer any harm given that such loans were ultimately repaid through Project Swift and otherwise.   Any differences in whether or not loans bore interest between NNUK and other Nortel entities were the result of different legal requirements in different jurisdictions, and not as a result of any attempt to harm or ignore the interests of NNUK.   Indeed, NNUK itself was the recipient of interest free loans from other Nortel entities.

110.    In addition, and without limiting the generality of the foregoing, the Monitor and Nortel
        Canada plead and rely upon the sections of the Canadian Response to the EMEA Claims
        entitled "Interest and Non-Interest bearing Loans".

        *(iv)    Project Swift*

111.    The Trustee also refers to the Project Swift transactions as another example of alleged
        control and harm.  In fact, Project Swift was designed and implemented principally by
        NNUK employees in the Nortel Treasury Department located in the UK for the purpose
        of improving NNUK's own tax position and reducing the inter-company account owing
        to NNUK from NNL at a time when NNL's creditworthiness had begun to be a concern
        to NNUK.  NNUK created and implemented Project Swift to reduce NNL's interest-free
        loan balance to NNUK and to eliminate the upcoming tax inefficiency to NNUK and the
        Nortel Group.  Project Swift was initiated by NNUK, largely handled by NNUK's senior
        management, and was approved by NNUK's board of directors after consideration of
        independent expert advice discussed below.  Neither NNL nor any other Nortel entity
        imposed Project Swift on NNUK.

112.    At the same time, the Trustee engaged Lovells and PricewaterhouseCoopers LP ("**PwC**")
        to provide it with advice legal and financial advice, respectively, regarding Project Swift.
        These are the same advisors who continue to advise the Trustee in respect of these
        proceedings.  At the time however, the Trustee accepted PwC's advice that Project Swift
        provided fair value to NNUK on a going concern basis, but identified NNUK's
        insolvency as a potential scenario in which the value of the shares being transferred to
        NNUK might not have had sufficient value to support the transaction.  To mitigate that

perceived risk, NNL and the Trustee negotiated the Swift Guarantee, and also negotiated to obtain NNL's agreement to make a US$68 million capital contribution in cash to one of the subsidiaries transferred to NNUK.

113.    If Project Swift had not happened, NNUK would have US$630 million more in debt owing to it by the insolvent NNL and NNL would own many of the EMEA Debtors, some of which are solvent with significant cash that may now be available to NNUK and its creditors (including the UK Pension Claimants).  NNUK has not offered or sought to rescind Project Swift and return to the *status quo ante*.

114.    In addition, and without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon the sections of the Canadian Response to the EMEA Claims entitled "Project Swift and NNIF Reorganization".

*(v)     Transfer Pricing*

115.    The UK Pension Claimants rely on the transfer pricing system agreed to by Nortel Canada, NNUK and other Nortel Entities as being another *indicia* of the control and harm Nortel Canada inflicted on NNUK.  However:

(a)     As set out more fully in the Canadian Response to the EMEA Claims, the residual profit split method ("**RPSM**") was adopted contractually in the MRDA by Nortel Canada, NNUK and other Nortel entities.

(b)     From the time of implementation of the RPSM as of January 1, 2001, the parties to the MRDA, and indeed all RPS Entities and LREs operated under the RPSM and the MRDA, as amended from time to

time, participated in the exchange of information and disclosure reciprocally required to implement the RPSM, accepted all true-up payments and/or receivables or obligations to pay in respect thereof, reported their financial affairs and participated in issuing financial statements based on the implementation of the RPSM and participated in the filing of returns to their taxation authorities on the basis of the RPSM as implemented by the parties, without objection or complaint.

(c)     NNUK participated with NNL and NNI in meetings and exchanges with Inland Revenue, the CRA and the IRS in respect of the tax authorities' analysis and consideration of the RPSM, in which the MRDA and the RPSM with R&D Spend as the profit allocation driver, were affirmatively endorsed as the most appropriate measure of the Participants' contributing to R&D/IP and most appropriate measure for determining the arm's-length equivalency for compensation. Equivalent submissions were made by or on behalf of all EMEA Claimants to the relevant tax authorities either directly and/or by virtue of the submissions of NNUK, and by virtue of all of their annual tax filings. Furthermore, most of the EMEA Claimants prepared (or had prepared for them) annual reports in support of their financial results effected by the MRDA, RPSM and/or Distribution Agreements

(d)     The parties to the MRDA and to the Distribution Agreements deliberately, knowingly and expressly agreed to the terms of those agreements and operated under them for years. In the case of the

MRDA, they spent years negotiating it and amended and confirmed it

several times;

116.    To the extent that the UK Pension Claimants raise a new claim based on accounting for

pension liabilities within the Nortel Group, the Monitor and Nortel Canada deny any such

claim.    All such accounting was consistently applied with appropriate accounting

standards across the RPS Entities.

117.    In addition, and without limiting the generality of the foregoing, the Monitor and Nortel

Canada plead and rely upon to the sections of the Canadian Response to the EMEA

Claims entitled "MRDA", "Distribution Agreements" and "'Transfer Pricing' Claims".

**E.    Nortel Canada Did Not Receive Extraordinary Benefits from NNUK or the Scheme
That Would Justify the Imposition of an FSD or a CN**

118.    The relative benefits provided by NNUK are overstated by the UK Pension Claimants,

such that it would be unfair to impose Nortel Canada with any liability for the Scheme's

deficit.    As noted above, since the acquisition of STC and the initial divestment of large

portions of its assets and businesses, the operations of NNUK have continually

diminished over time to the point that its contribution to R&D was virtually immaterial.

119.    The jurisdiction where patents were registered by the Nortel Group was not indicative of

where the underlying invention was developed.    Similarly, the length of the registration

of a patent was not determinative of or related to the useful life of technology.    Nortel

Group considered that the technology had an average useful life of approximately five

years.    This determination was supported by substantial independent expert functional

analyses of all of Nortel's lines of business and R&D centres.    As a result, the bulk of the

historic facts claimed by the UK Pension Claimants as showing the "benefits" that its members purportedly provided do not reflect any enduring value and are wholly irrelevant because any technology they may have developed is no longer considered valuable.

120.    The Monitor and Nortel Canada deny the relevancy of the facts alleged in Schedule "D" to the Affirmative Claims Pleading and deny the facts set out therein in any event.

121.    Moreover, the UK Pension Claimants ascribe all benefits allegedly provided by NNUK to the small percentage of NNUK employees who participated in the defined benefits division of the Scheme.

122.    While NNUK did contribute to the development of products and carry out R&D, as an RPS Entity that was part of its corporate objectives.  All of the RPS Entities contributed to R&D and many Nortel divisions contributed to the very projects relied upon by the UK Pension Claimants herein.  NNUK also received the benefits of belonging to the Nortel Group and having access to its full range of products, services and especially, its intellectual property.  The fact that NNUK made some useful contributions to the business over the course of years by making some efforts to fulfil its mandate is unremarkable.  Were it otherwise, NNUK would have ceased to carry on business years ago.  NNUK was compensated for whatever benefits it provided to the Nortel Group.

123.    NNUK was paid under the transfer pricing regime for its R&D and it received benefits in relation to the amount of the R&D it did provide (regardless of whether such R&D was fruitful or commercially successful).  Moreover, NNUK was a net recipient of transfer pricing payments from and after 2001 when the Nortel Group was suffering net losses

overall. As a result, any benefits provided by NNUK have already been accounted for by the consideration provided to NNUK.

**F.      Nortel Canada Did Not Interfere With the Operation or Funding of the Scheme**

124.    At all times, the Trustee operated independently of NNUK with respect to all negotiations regarding the funding of the Scheme and the funding of NNUK. To the extent that NNL and NNC negotiated to provide assistance to NNUK, they acted in good faith and with regard to the various factors impacting on their decisions including, but not limited to, the interests of the Scheme's members while acting in the respective best interests of their own respective corporate entities as required by law.

125.    To the extent that Nortel Canada was entitled to appoint members to the board of directors of NNUK or the Trustee, the right to make such appointments was set out in the Trustee's constating documents, was within the reasonable expectations of NNUK, Nortel Canada, the Trustee and the Scheme's members, and was consistent with UK law and the governance structures of the pension plans of other large multi-national companies.

126.    At all material times, the directors of the Trustee exercised their judgment independently and free from any undue or improper influence or interference from Nortel Canada or NNUK. Neither the Trustee nor the PPF has sued any member of the board of directors of the Trustee for any alleged improper conduct. Furthermore, the boards of directors of the Trustee retained the necessary and desirable independent professionals to provide them advice with respect to the decisions they were making, including in connection with significant decisions regarding the funding of the Scheme.

127. Any interaction that NNUK, or Nortel Canada, had with the Trustee was not more than the normal, customary and expected interaction that an employer sponsor, or its parent company, would have with pension scheme sponsored by the subsidiary.    Such coordination was not only expected but also necessary in a global enterprise with Nortel's size and reach.

128. Moreover, the statutory amendments proposed and then adopted by the PA 2004 contemplated that NNUK would become more involved in understanding the operation and funding of the Scheme since they were to negotiate the funding levels directly with the Trustee.    As parent company, it was appropriate and expected that Nortel Canada would have interest in such negotiations especially where credit enhancements and guarantees were sought from it by the Trustee.

129. As noted above, the Trustee extracted two Limited Guarantees from NNL as security for certain of NNUK's obligations under the 2006 Funding Agreement and as a concession in order to enter into Project Swift.    Nortel Canada had initially opposed providing the Guarantees and they would not have been granted if Nortel Canada had full control over the NNUK and the Trustee as now alleged by the Trustee.

130. During the funding negotiations, the Trustee had available to it various forms of leverage that it could have exerted against NNUK if it had determined that the offers being proposed by NNUK were not reasonable or in its best interest.    One form of leverage that the Trustee could have exercised would have been to wind-up the Scheme, which would have crystallized any deficiency and caused NNUK to become liable for the amount of

the deficiency.  However, the Trustee chose not to do that and instead proceeded on the basis – shared by all – that the Scheme should be treated and funded as a going concern.

131.    Another form of leverage enjoyed by the Trustee was the ability to engage the Pension Regulator to impose a contribution schedule on NNUK if the Trustee did not agree to accept the funding that NNUK proposed.  As noted above, the funding negotiations were taking place immediately before amendments to the PA 2004 were to come into force. Under those amendments, the Trustee could have asked the Pension Regulator to impose a funding schedule on NNUK.  Accordingly, it was always open to the Trustee to refuse to make an agreement with NNUK and to refer the matter to the Pension Regulator if they were of the view that NNUK – or Nortel Canada – was being unreasonable.

132.    The Trustee knew that the threat of having the matter referred to the Pension Regulator was a significant point of leverage in the negotiations.  As noted above, by 2005, NNUK was prepared to enter into a long-term agreement for the funding of the Scheme's deficit and on-going contributions.  However, the Trustee refused, and instead demanded that the parties only enter into a short-term agreement so that they would have to have further negotiations closer to the time at which the new regime would come into force.  Indeed, at the insistence of the Trustee, the negotiations for the 2006 Funding Agreement took place with the knowledge and active assistance of the Pension Regulator.

133.    The independence of the Trustee from Nortel Canada and is also evident with respect to the Trustee's adoption of its investment strategy.

134.    NNUK's representatives recommended to the Trustee that it adopt a more conservative approach in its investment strategy and rebalance its asset portfolio so that the Scheme

would hold a greater percentage of fixed-income assets and a lower percentage of equities, and to more closely match the maturity of its fixed-income assets to its liabilities, in order to better protect the Scheme from fluctuations in interest rates and the equity markets.  The Trustee repeatedly rejected these recommendations.  As a result the Scheme suffered greater losses than it otherwise would have during the tech-bubble bust in 2001 and the financial crisis in 2008.

135.    The UK Pension Claimants allege that the appointment of John Poos to the board of directors of the Trustee caused Nortel Canada to have undue influence over the Trustee, but. in fact, Mr. Poos was asked to join the Trustee's board of directors because (i) there was a vacancy for an NNUK-appointed representative according to the Trustee's constating documents; and (ii) his extensive knowledge and expertise in pension investment was a skill set that the independent chair of the board was looking for.   Mr. Poos delayed his appointment to the Trustee's board until the conclusion of the negotiations between NNUK and the Trustee regarding the long-term funding of the Scheme in 2006.

**G.    Financial Position of Nortel Canada Makes It Unreasonable to Issue an FSD**

136.    Having regard to Nortel Canada's actual financial circumstances, it would not be reasonable to impose an FSD on Nortel Canada.  As noted above, the "relevant time" selected by the Pension Regulator in its proceedings before the Determinations Panel was arbitrary and not chosen to accurately describe reality.  It is clear that Nortel Canada does not have the financial resources that would make it reasonable to issue an FSD against it.

137.    Moreover, it would not be reasonable to impose a CN on Nortel Canada even if an FSD would be issued or could be recognized.  The preconditions for the issuance of a CN are not met.  Since the FSD proceedings were commenced after the CCAA proceedings, in all possible dates for the CN, Nortel Canada has been, and will be insolvent.

138.    Furthermore, the imposition of an FSD or CN on Nortel Canada would have a catastrophic effect on its ability to pay its creditors, including its own pensioners whose pensions are already underfunded, its bondholders, and its others creditors.

139.    In light of the good faith negotiations that led to the 2005 Funding Agreement, the 2006 Funding Agreement and the Limited Guarantees, it is neither just nor equitable for the UK Pension Claimants to seek more from Nortel Canada than the amounts to which the parties agreed.

140.    Therefore, no liability should be recognized against Nortel Canada in respect of any FSD or CN.

## VIII.    OTHER PENSION ADMINISTRATION CLAIMS

### A.    Bad Faith Claim

141.    For the reasons described above, Nortel Canada denies that it acted in bad faith or in a breach of any implied or expressed duty of good faith owed to the Scheme if any.

142.    The duty of good faith, to the extent that one exists in Ontario, has to do with parties to a contract.  No duty of good faith exists in relation to an Ontario parent company in its dealings with its foreign subsidiary in respect of a pension plan sponsored by the subsidiary nor with an independent statutory trustee of such pension plan.

143.    Under UK law, neither an employer sponsor of a scheme (such as NNUK), nor its parent

company (such as Nortel Canada), acts as a fiduciary to the pension scheme or its trustee.

They are not required to consider only the interests of the Scheme's members or treat

such interests as paramount when making decisions with respect to the Scheme or

otherwise.  The only duty of good faith under UK law upon NNUK is to consider in its

decision-making process, as but one factor, the interests of the Scheme or its members.

Under UK law, NNUK was entitled to prefer its own interests in its dealings with the

Trustee and the Scheme.

144.    Furthermore, under UK law, the parent company of an employer sponsor owes no duty to

the members of its subsidiary's pension scheme and this was known and understood

throughout by the Trustee and its counsel Lovells.  Accordingly, Nortel Canada did not

owe the Scheme's members any duty of care.  In the alternative, any duty of care that

Nortel Canada owed to the Scheme's members was limited to the same limited duty of

care that NNUK owed to the Scheme's members.

145.    Any disagreements between NNUK, Nortel Canada and the Trustee during the course of

any negotiations were not the result of bad faith, but rather the normal and expected to

and fro in any arm's length negotiations and the final results of the negotiations reflect

reasonable compromises reached by the parties.

146.    At all times, NNUK, and Nortel Canada to the extent that it assisted or had its own

negotiations with NNUK, considered the interests of the Scheme's members as one factor

in reaching decisions regarding the Scheme.  However, whereas the Trustee only had to

consider the interests of the Scheme's members, NNUK had to consider a broader range

factors and constituents when negotiating the funding of the Scheme, including, but not limited to, the interests of the larger Nortel Group since the health and success of the Nortel Group as a whole affected the health and success of NNUK and the Scheme.

147.    In order to ensure that the Nortel Group could address these competing needs in a reasoned and fair manner, the Nortel Group, with the assistance of independent professional pension advisors, developed the "common platform".  The common platform was set of principles and models used by the Nortel Group to assist it in understanding the positions of the various pension schemes of numerous subsidiaries so that it could approach decisions to fund the subsidiaries on an equitable basis, having regard to, among other things, the local legal funding requirements, the relative surplus or deficit of the various plans, and the finite financial resources of the Nortel Group.  Nortel Canada was guided by the common platform when negotiating an agreement with NNUK regarding the funding of the Scheme.

148.    In addition, whether or not Nortel Canada's conduct amounted to bad faith must be viewed in light of Nortel Canada's entitlement to repatriate any amounts from NNUK that it considered advisable or desirable so long as it was in compliance with any provisions of any agreements between Nortel Canada and NNUK, and any provisions of UK law that addressed any limits on the amounts that could be distributed to shareholders.

149.    Moreover, any issue or complaint that might have been raised by the Trustee with respect to an alleged breach of an obligation of good faith is subsumed by the 2005 Funding Agreement and the 2006 Funding Agreement.  At the time that those agreements were

negotiated and entered into, the risks now raised by the Trustee regarding NNUK's solvency were known to or discoverable by the Trustee.  It was with that knowledge that the Trustee entered into the 2005 Funding Agreement and the 2006 Funding Agreement, and the Limited Guarantees, to settle the amounts that NNUK, and NNL under the Limited Guarantees, would be liable to pay to the Scheme.  Accordingly, the UK Pension Claimants are estopped from claiming that Nortel Canada breached any applicable duty of good faith.

**B.      Oppression**

150.    The UK Pension Claimants claim that Nortel Canada is liable for damages or compensation under the oppression remedy under section 241 of the CBCA.

151.    Nortel Canada is not liable for damages or compensation under, or susceptible to, an oppression remedy.

152.    In addition, and without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon to the sections of the Canadian Response to the EMEA Claims entitled "Foreign Law Claims", "Foreign Law does not apply", "Ontario (Not Foreign) Law Applies and No Cause of Action Lien", "No Oppression", and "No Basis for Statutory Oppression Claims".

153.    The oppression remedy under the CBCA has no application in this case.  NNUK is a foreign entity incorporated under the laws of the UK, and not incorporated under the CBCA.  The UK Pension Claimants' claims against Nortel Canada relate to concerns regarding NNUK's affairs, and not the affairs of Nortel Canada.  Accordingly, the CBCA does not apply.  The UK Pension Claimants have not made any oppression-type claim

under the laws of the UK, and are now barred from doing so under the Amended and Restated Claims Procedure Order.   Accordingly, Nortel Canada denies that any such applicable remedy exists.

154.    Second, the complaints of the UK Pension Claimants cannot establish the statutory requisites for the oppression remedy.

155.    Third, Nortel Canada did not engage in any conduct that can be considered oppressive against the UK Pension Claimants.  At all times, Nortel Canada acted with good faith and in accordance with the reasonable expectations of the parties.  The parties' reasonable expectations were informed by, among other things: (i) the relationship between Nortel Canada and NNUK as parent and subsidiary; (ii) the limited duties owed by NNUK and Nortel Canada, if any, to the Scheme; (iii) the various agreements that were negotiated and entered into between Nortel Canada and NNUK with the aid of independent and sophisticated professional advisors; (iv) the various pension regimes, laws, regulations and agreements; (v) Nortel Canada's right to repatriate any funds from NNUK in accordance with applicable laws; (vi) the synergistic and interdependent relationship between the various Nortel entities; (vii) the available and finite financial resources of the Nortel group; (viii) general market conditions; and (ix) the competing demands of the various legal regimes in which Nortel operated.

156.    Fourth, NNUK and the Trustee did not have any expectation let alone any reasonable expectation that Nortel Canada would itself fund the Scheme, or that it would provide funds to NNUK for it to contribute to the Scheme more than what was legally required

under applicable UK law, particularly given the needs of the other entities of the Nortel Group.

C.    **Unjust Enrichment**

157.    By its Affirmative Claims Pleading delivered on May 16, 2013, the Trustee and PPF assert, for the first time, that it has a claim for unjust enrichment against Nortel Canada based on perceived grievances with the transfer pricing agreements.  That claim cannot succeed.

158.    First, the unjust enrichment claim is a new claim asserted after the Claims Bar Date of September 30, 2009.  As a result, it is barred by the Amended and Restated Claims Procedure Order.

159.    Second, there was neither enrichment of Nortel Canada nor deprivation of the Scheme as those terms are understood at law.

160.    In the alternative, there is a juristic reason for any enrichment.  The transfer pricing agreements, the agreements related to Project Swift, and the Limited Guarantees were agreed to by NNUK and remained in effect at all times.  Such agreements are the juristic reason for any benefits received by Nortel Canada pursuant to the transfer pricing agreements or Project Swift.

161.    Third, the Trustee was not deprived of any benefit.  There is no connection between the alleged benefit received by Nortel Canada and the alleged deprivation suffered by the Trustee.  If there was any deprivation (which is denied), such deprivation is of NNUK, not the Trustee.  The Trustee has no standing to bring such claim.

162.    Fourth, the UK Pension Claimants wrongly assume that any funds left in NNUK would have sat idle in NNUK to be used for future pension contributions, including the extraordinary contributions required upon an unforeseen wind-up of the Scheme. Such an assumption is contrary to the pension funding regimes in the UK, Canada and elsewhere, contrary to sound business management, and contrary to common sense. No company would let such amounts sit idle, and instead would have invested such amounts in R&D, capital projects, marketing, or other business uses or would have returned them to the shareholders. Thus, any amounts left in NNUK would not have been used for pension funding in any event. Since the Scheme would not have received those funds in any event, it has not suffered any deprivation.

163.    Fifth, unjust enrichment does not lie to rewrite an agreement which was in existence and operated for a number of years with the full knowledge of the parties.

164.    Lastly, regardless of the transfer pricing agreement, Nortel Canada was entitled to repatriate any amounts from NNUK that it considered advisable or desirable so long as it was in compliance with any provisions of any agreements between Nortel Canada and NNUK, and any UK law that set limits on the amounts that could be distributed to shareholders. The transfers effected under the transfer pricing agreements were permitted or not prohibited under UK law and therefore there is a juristic reason for such transfer.

165.    In addition, and without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon the sections of the Canadian Response to the EMEA Claims entitled "No Unjust Enrichment" and "There is No Unjust Enrichment".

D.     **Quantum of any Damages**

166.   Nortel Canada denies that the UK Pension Claimants have suffered damages.  Moreover, the damages claimed are excessive and remote.  The UK Pension Claimants have also failed to mitigate any damages that they claim to have suffered.

167.   By their claims, the UK Pension Claimants alleged that Nortel Canada should be liable for the full amount of the outstanding deficit.  However, they claim that, if the contribution holiday did not occur, the Scheme's deficit would be approximately £470 million less.

168.   Canada denies the amount of the Scheme's deficit set out in the Proofs of Claim and puts the UK Pension Claimants to the strict proof thereof.  Nortel Canada will provide its own calculation of any deficit at trial.

169.   In addition, and without limiting the generality of the foregoing, the Monitor and Nortel Canada plead and rely upon to the sections of the Canadian Response to the EMEA Claims entitled The EMEA Claimants have no Losses or Damages and No Deficiencies in the EMEA Schemes

E.     **Proprietary Remedies**

170.   The UK Pension Claimants also claim that they are entitled to a proprietary remedy in the form of a constructive or resulting trust as a remedy for their claims.

171.   No proprietary remedy would be appropriate.  First, the UK Pension Claimants do not claim an interest in any property held by NNUK or Nortel Canada.    Second, the claims of the UK Pension Claimants are, at best, claims of unsecured creditors.  The imposition

or recognition of a proprietary remedy in respect of such claims is contrary to the principle that proprietary remedies should not be used to prefer one creditor over another or to reorder the priority of creditors, in insolvency.

## IX.    THE LIMITED GUARANTEES HAVE NOT BEEN TRIGGERED

### A.    Overview

172.    As noted above, NNL entered into two limited guarantees with the Trustee:  (i) the Main Guarantee in November 2006, guaranteeing certain of NNUK's obligations under the 2006 Funding Agreement; and (ii) the Swift Guarantee in December 2007, which guaranteed up to $150 million in defined circumstances.  Both Limited Guarantees were heavily negotiated with the Trustee having the benefit of sophisticated legal and financial advice.

173.    As discussed below, by their very terms as interpreted in accordance with UK law, NNL has and will have no liability to make payments under the Main Guarantee or the Swift Guarantee.  Under the Main Guarantee, NNL only has responsibility for any Past Service Deficit Contributions or Current Service Contributions (both defined below) which were owing and unpaid by NNUK up to the date it entered into administration.  However, no such contributions were left owing and unpaid prior to the commencement of the CCAA proceedings and the UK administration proceeding in January 2009.  Under the Swift Guarantee NNL is obliged to pay only in the event that NNUK is liquidated and certain specified events follow the liquidation.  NNUK has not been liquidated and the other terms set out in this guarantee cannot now be met.

B.    **Main Guarantee**

174.    The Main Guarantee does not apply to the claims asserted by UK Pension Claimants. The Main Guarantee only covered certain specified liabilities that arose under the 2006 Funding Agreement and not any other liabilities that might arise with respect to the Scheme.    Upon NNUK's administration and the administrator's decision to declare the Scheme a failed scheme, all of NNUK's obligations under the 2006 Funding Agreement expired.    While NNUK's obligations to the Scheme were replaced by new obligations created by section 75 of the PA 2004, NNL's obligations under Main Guarantee expired along with the 2006 Funding Agreement.

175.    The Main Guarantee created a backstop for NNUK's contractual obligations to make contributions to the Scheme to the extent that the Scheme is ongoing.    Under the Main Guarantee NNL guaranteed NNUK's obligations under the 2006 Funding Agreement to make certain Current Service Contributions and Past Service Deficit Contributions designed to eliminate the Deficit over a Recovery Period.[1]  NNL did not provide a guarantee of any statutory or other obligations that arise on a wind up of the Scheme or otherwise.

176.    Current service contributions and past service deficit contributions are defined and well-understood pension law concepts.    These obligations arise only with respect to ongoing pension schemes. Current service contributions are contributions which fund benefits as they accrue to active members.    Past service deficit contributions are contributions

---

[1]    The reference to a "Recovery Period" in the 2006 Funding Agreement is a concept that derives from Part 3 of the PA 2004.  It is the period within which deficit contributions are payable with a view to meeting the statutory funding objective by the end of that period, where it appears to the scheme's trustees that the funding objective was not met on the effective date of an actuarial valuation.

required to liquidate, during an amortized period when the scheme is ongoing, unfunded liabilities that have been disclosed in an actuarial valuation.  It is only these obligations as they arise under the 2006 Funding Agreement that could be covered by the Main Guarantee in the present circumstances.

177.    Contrary to the allegations made by the UK Pension Claimants, NNUK made all current service contributions and past service deficit contributions that it was required to make under the 2006 Funding Agreement.  Accordingly, the Main Guarantee was never triggered.

178.    By operation of law, once a pension scheme ceases to continue as a going concern, current service contributions, past service deficit contributions, and recovery plans under Part 3 of PA 2004 all cease.  They are replaced by the obligations in section 75 of the PA 1995 ("**Section 75 Debt**").

179.    The Section 75 Debt is the amount the employer must pay into the scheme to fund a shortfall between: (i) the scheme's assets calculated at market value; and (ii) the benefit liabilities, calculated on a buy-out basis.  The buy-out basis is the cost of purchasing insurance which will cover all the benefits (pensions and lump sums) the scheme is required to pay.

180.    As noted above, the Main Guarantee was limited to guaranteeing NNUK's obligations that arose under the 2006 Funding Agreement.  The Section 75 Debt is not an obligation arising under the 2006 Funding Agreement, nor is it a current service contribution or a past service deficit contribution. Accordingly, the Main Guarantee does not require NNL to fund NNUK's obligation to pay the Section 75 Debt.

### C.    Swift Guarantee

181.    The Swift Guarantee also has no application. That Guarantee only applies in the circumstances that NNUK is liquidated and other certain events follow that liquidation. None of those conditions has occurred since NNUK is in administration, not liquidation.

182.    Unlike a winding-up, the ultimate outcome of an administration is not certain. A company in administration may be rehabilitated and continue as a going concern or may be wound up and liquidated. While a company is in administration, an administrator may carry on the business of the company and make decisions that, ultimately, could increase the pension funding obligations of an employer and its guarantor. On the clear wording of the Swift Guarantee, as explained below, NNL did not guarantee NNUK's pension funding obligations under administration.

183.    Liability under the Swift Guarantee (which is limited to US$150 million) is triggered by the receipt of a Demand after the occurrence of an Insolvency Event. An Insolvency Event requires three things to occur:

(a)    one of:

   (i)    a court order for the winding up, dissolution or liquidation of NNUK;

   (ii)    the dissolution of NNUK; or

   (iii)    a resolution for the winding up of NNUK.

(b)    the Scheme going into a winding up "following" the event specified in (a); and

(c)     the Scheme going into a winding up "as a consequence of" the event

specified in (a).

184.    None of the events specified in sub-paragraph 182(a) includes an administration order

being made for NNUK.  Because there has been no event specified in sub-paragraph (a),

there has been no Insolvency Event and no Demand can be made.

185.    Nor has the Scheme gone into a winding up as required by sub-paragraph 182(b).  To

satisfy the requirement in sub-paragraph 182(b), the Scheme must wind up "following"

(i.e. later than) the winding up or dissolution of NNUK.

186.    Even if these events might happen in future and that they might happen in the sequence

required under sub-paragraph 182(b), the winding up of the Scheme will still not occur

"as a consequence of" NNUK being wound up, dissolved or liquidated as specified in

sub-paragraph 182(a).   Instead, the winding up of the Scheme will occur as a

consequence of the issuance of the "scheme failure notice" by the PPF on February 2,

2009, shortly after NNUK entered administration on January 14, 2009. Thus, the

condition set out in sub-paragraph 182(c) can never be fulfilled.

## X.     RELIEF SOUGHT

187.    The Monitor and Nortel Canada submit that the Monitor's Notices of Disallowance be

upheld, and the claims advanced in the Proofs of Claims as defined in paragraph 1 above

should all be dismissed with costs on a full indemnity basis payable by the Trustee and

the PPF.

Dated:  May 29, 2013

| | |
|---|---|
| Goodmans LLP<br>333 Bay Street, Suite 3400<br>Toronto, Ontario   M5H 2S7<br><br>Benjamin Zarnett   LSUC #17247M<br>Jay Carfagnini   LSUC #22293G<br>Fred Myers   LSUC #26301A<br>Jessica Kimmel   LSUC #32312W<br>Joe Pasquariello   LSUC #38390C<br><br>Tel:  416.979.2211<br>Fax:  416.979.1234<br>Lawyers for the Monitor, Ernst & Young Inc. | Gowling Lafleur Henderson LLP<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, Ontario     M5X 1G5<br><br>Derrick Tay   LSUC #21152A<br>Jennifer Stam   LSUC #46735J<br><br>Tel:  416.862.5697<br>Fax:  416.862.7661<br>Lawyers for the Canadian Debtors |

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' *CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

|  |  |
|---|---|
|  | ***ONTARIO*** **SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)** Proceeding commenced at Toronto |
|  | **JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE CLAIMS BY THE UK PENSION TRUSTEE AND PPF RE: UK PENSION SCHEME** |
|  | Goodmans LLP 333 Bay Street, Suite 3400 Toronto, Ontario M5H 2S7 Benjamin Zarnett LSUC#17247M Jay Carfagnini LSCU#22293G Fred Myers   LSUC #26301A Jessica Kimmel LSUC#32312W Joe Pasquariello LSUC#38390C Tel: 416.979.2211 Fax: 416.979.1234 Lawyers for the Monitor, Ernst & Young Inc. Gowling Lafleur Henderson LLP Suite 1600, First Canadian Place 100 King Street West Toronto, Ontario M5X 1G5 Derrick Tay LSUC# 21152A Jennifer Stam LSUC# 46735J Tel: 416.862.5697 Fax: 416.862.7661 Lawyers for the Canadian Debtors |