Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT,* R.S.C. 1985, c. C-36, AS AMENDED

---

**FACTUM OF THE CANADIAN CREDITORS' COMMITTEE**

---

**Paliare Roland Rosenberg Rothstein LLP**
155 Wellington Street West
35th Floor
Toronto ON  M5V 3H1
Tel:    416.646.4300
Fax:    416.646.4301

**Kenneth T. Rosenberg (LSUC #21102H)**
Tel:        (416) 646-4304
Email: ken.rosenberg@paliareroland.com

**Andrew K. Lokan (LSUC #31629Q)**
Tel: (416) 646-4324
Email: andrew.lokan@paliareroland.com

**Lawyers for the Canadian Creditors' Committee**

**TO:**    **Service List**

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT
ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF THE CANADIAN CREDITORS' COMMITTEE**

**PART I – OVERVIEW**

1.    In this motion, the Canadian Creditors' Committee ("CCC") seeks to establish a procedure for dealing with the documents that is lawful, fair, and consistent with the open court principle.  The CCC seeks a procedural framework that will allow parties producing genuinely confidential documents for discovery or trial to protect the confidentiality of those documents – but will place the practical and legal burden of establishing confidentiality where it properly lies: on the party that seeks to impose restrictions.

2.    The trial of this matter will involve the direct and material pension interests of tens of thousands of pensioners in many different countries, including over 20,000 in Canada.  Approximately $9 billion in assets will be allocated.  The Nortel story has attracted significant media coverage in past, and this coverage will undoubtedly continue throughout the trial.  There is an enormous public interest in ensuring that the trial process is fair and transparent.

1

3.    Canada does not have secret trials.  It is axiomatic that court proceedings must be transparent and open to the public in all but the most exceptional circumstances, and that the public presumptively has the right to know what is going on in judicial proceedings.    The public's right to know comes from foundational principles that find expression in the *Charter*, and have deep historical roots.[1]

4.    Other parties to this action have proposed a complex, highly restrictive, and draconian protective order ("U.S. Debtors' Draft Order") that would seek to designate thousands upon thousands of documents as "confidential", and thus beyond public view, without any judicial scrutiny, simply on counsel's say-so. Moreover, an entire database consisting of some 44,000 documents (the "Merrill Database") that were ostensibly produced for the mediation would be so designated - for no better reason than because the parties that produced them do not want to undertake the work involved in going through them to determine which ones are truly confidential in character.

5.    The U.S. Debtors' Draft Order is manifestly inconsistent with Canadian law. It is also fundamentally unfair.  The U.S. Debtors' Draft Order would interfere substantially with the ability of the CCC and other parties to conduct discoveries, and prepare for and conduct the trial.

6.    The CCC is not aware of any specific documents that warrant a protective order. However, on the assumption that such documents exist, and in the spirit of compromise, the CCC has suggested an order (the "CCC Draft Order") that would allow parties to designate <u>truly</u> confidential documents as confidential for the purposes of the discovery process only, with appropriate safeguards, and would allow parties to move before the court for designation of such documents as confidential for the purposes of court filings or evidence at trial.  This is fair to the parties, and respects Canadian law and the open court principle.

---

[1] *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41 ("*Sierra Club*"), para. 36.

7.   The key differences between the CCC's proposal and the U.S. Debtors' Draft Order are as follows:

(a)   The CCC proposes that the order supersede all prior existing confidentiality agreements among and between the parties, and that all materials disclosed pursuant to those agreements shall be deemed to have been produced pursuant to the new order;[2]

(b)   The CCC proposes that only information that is required to be kept confidential pursuant to a law or regulation, or commercially sensitive information that is subject to a non-disclosure agreement with a third party, may qualify as "highly confidential";[3]

(c)   The CCC would define "confidential" information less broadly than the U.S. Debtors, who would include a wide range of financial and tax data that is not demonstrably confidential;[4]

(d)   The CCC would require that the party designating material as "highly confidential" or "confidential" indicate the justification for the designation in the document coding;[5]

(e)   The CCC would expressly allow information designated as "highly confidential" or "confidential" to be shared with a broader category of persons than the U.S. Debtors would, on their undertaking to comply with the Order;[6]

(f)   For material to be filed with the court, the CCC would require that producing parties bring a motion for a sealing order, rather than reversing the onus so that the material designated by a party as confidential is deemed confidential without any review by the court and must be filed under seal, and cannot be filed as part of the public record without the agreement of the producing party or order of the court;[7] and

---

[2] Para. 1(c), CCC Draft Order.
[3] Para. 2(a)(vii), (b), CCC Draft Order.
[4] Para. 3(b)(ii) and (iii), U.S. Debtors' Draft Order.
[5] Para. 4(c), CCC Draft Order;
[6] Para. 5(b)(viii) and (ix), CCC Draft Order.
[7] Para. 8(a), (b), and (c), CCC Draft Order.

(g)   For material in the Merrill Database, the CCC would allow the producing parties to designate specific documents as "highly confidential" or "confidential", rather than presuming that all 44,000 documents are confidential.[8]

8.   Keeping the onus on the party asserting confidentiality, as the CCC's proposal does, will increase the efficiency of production. Parties will exercise discipline and restrict their assertions of confidentiality to very important matters when they know they must consume their own time and effort to obtain the confidentiality protection. This is especially so given the expedited schedule.

9.   Conversely, the U.S. Debtors' Draft Order would force parties to waste their time and the Court's time unwinding an overbroad assertion of confidentiality.

## PART II – FACTS

### Background to the Allocation Proceeding

10.   Nortel was a large multi-national technology enterprise headquartered in Canada, with a history dating to the nineteenth century. Nortel was a world leader in digital telecommunications technology, operating several lines of business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies. At its peak Nortel had annual revenue of approximately $30 billion and employed approximately 93,000 people.[9]

11.   On January 14, 2009, Nortel's Canadian debtors, U.S. debtors, and UK/EMEA (Europe, Middle East, and Africa) debtors commenced insolvency proceedings in their respective jurisdictions. Thereafter, Nortel proceeded to

---

[8] Para. 20(e), U.S. Debtors' Draft Order.
[9] Affidavit of Kristian Borg-Olivier sworn June 5, 2013 ("Borg-Olivier Affidavit"), para. 4.

liquidate its lines of business and a residual portfolio of patents (the "residual IP").[10]

12.  The proceeds of sale arising from the liquidation of Nortel's lines of business and residual IP (the "Sale Proceeds") are currently being held in escrow pending the disposition of competing claims to those funds (the "Allocation Dispute").[11]

13.  Nortel's insolvency has attracted widespread public and media interest worldwide, and particularly in Canada. The sales of Nortel's lines of business and residual IP were covered extensively. This proceeding to determine the allocation of the Sale Proceeds to Nortel's creditors will undoubtedly be the focus of comprehensive and ongoing media coverage.[12]

**Various Confidentiality Agreements**

14.  The parties' possession and/or review of the various documents obtained in the course of the liquidation and mediation phases of the proceeding are governed by a number of overlapping confidentiality agreements. In the course of the liquidation and mediation phases of this case, Paliare Roland has entered into multiple confidentiality agreements, including for example:

   (a)  a March 25, 2009 agreement with a variety of Nortel companies, pursuant to which Nortel agreed to provide certain confidential information to Paliare Roland subject to the terms and conditions contained in the agreement, "in connection with [Paliare Roland's] representation of the [Superintendent] in connection with the Chapter 11 Cases and the CCAA Proceedings";

   (b)  a July 2009 "confidentiality acknowledgment and agreement" with LGE Electronics Inc. ("LGE"), pursuant to which Paliare Roland was

---

[10] Borg-Olivier Affidavit, para. 5.
[11] Borg-Olivier Affidavit, para. 6.
[12] Borg-Olivier Affidavit, paras. 9-10.

entitled to receive periodic updates with respect to the sale of some or all of the interests or assets of a joint venture between LGE and Nortel, subject to Paliare Roland's agreement that LGE was entitled to all the confidentiality protections of the March 25, 2009 agreement described in (a) above;

(c)  a November 10, 2010 addendum to the confidentiality agreement described in (a) above, pursuant to which Paliare Roland and Farber Financial Group, which is the financial advisor to the Superintendent and Paliare Roland, were granted access to certain confidential information for the purpose of participating "in settlement discussions, including a mediation", on the condition that they not "use any Confidential Information for any reason or purpose other than for the purpose of the [settlement discussions]";

(d)  a June 30, 2011 "Interim Confidentiality Agreement" by which the Superintendent and Paliare Roland were granted access to the approximately 10,000 documents that had been placed into the Merrill database by the Monitor and the Canadian Estate (the "Canadian database"). Other CCC entities signed similar confidentiality agreements to gain access to the Canadian database.[13]

15.   The moving parties understand that the various other parties, their counsel, and their advisors, have also executed multiple confidentiality agreements.[14]

**Efforts to Reach a New Confidentiality Protocol**

16.   Between May 1 and May 15, 2013 certain parties held discussions regarding the scope of the proposed protective order, but were unable to resolve

---

[13] Borg-Olivier Affidavit, paras. 11-12.
[14] Borg-Olivier Affidavit, para. 13.

their differences.  On May 15, 2013, the U.S. and Canadian Courts were advised of the dispute over the terms of the protective order, and directed that:

a) The parties shall aim to reach agreement on a protective order as soon as possible, and

b) To the extent that agreement cannot be reached on the terms of a final protective order, the parties file their respective versions of the Confidentiality Stipulation and Protective Order with the Courts by May 17, 2013.[15]

17.  On or before May 16, 2013, the Core Parties agreed to a consent interim protective order, without prejudice to their respective positions.[16]

18.  On or before May 17, 2013, as directed by the Courts, the parties filed their respective versions of a final protective order.[17]

**PART III – ISSUES AND ARGUMENT**

    (a)    **Protective Orders and the Open Court Principle**

19.  The open court principle is one of the underlying principles of the judicial process in Canada.  As the Supreme Court of Canada noted in *Sierra Club*, the link between openness in judicial proceedings and freedom of expression under the *Charter* is "firmly established":[18]

> 36 ... The principle of open courts is inextricably tied to the rights guaranteed by s. 2(*b*). Openness permits public access to information about the courts, which in turn permits the public to discuss and put forward opinions and criticisms of court practices and proceedings. While the freedom to express ideas and opinions about the operation of the courts is clearly within the ambit of the freedom guaranteed by s. 2(*b*), so too is the right of members of the public to obtain information about the courts in the first place.

---

[15] Borg-Olivier Affidavit, para. 14.
[16] Borg-Olivier Affidavit, para. 15.
[17] Borg-Olivier Affidavit, para. 16.
[18] *Sierra Club*, 2002 SCC 41, at paras. 1, 36.

20.  Protective orders are permitted as an exception to the open court principle, but only when the party proposing to keep information confidential meets the following strict test:

> 53     Applying the rights and interests engaged in this case to the analytical framework of *Dagenais* and subsequent cases discussed above, the test for whether a confidentiality order ought to be granted in a case such as this one should be framed as follows:
>
> A confidentiality order... should only be granted when:
>
>> (a)     such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and
>>
>> (b)     the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.
>
> 54     As in *Mentuck*, I would add that three important elements are subsumed under the first branch of this test. First, the risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.
>
> 55     In addition, the phrase "important commercial interest" is in need of some clarification. In order to qualify as an "important commercial interest", the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. For example, a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests. However, if, as in this case, exposure of information would cause a breach of a confidentiality agreement, then the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information. Simply put, if there is no general principle at stake, there can be no "important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in *F.N. (Re)*, 2000 SCC 35 (CanLII), [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the <u>public</u> interest in confidentiality outweighs the public interest in openness" (emphasis added).
>
> 56     In addition to the above requirement, courts must be cautious in determining what constitutes an "important commercial interest". It must be remembered that a confidentiality order involves an infringement on freedom of expression. Although the balancing of the commercial interest

with freedom of expression takes place under the second branch of the test, courts must be alive to the fundamental importance of the open court rule…

57      Finally, the phrase "reasonably alternative measures" requires the judge to consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

21.    The onus is on the party seeking the order to establish that the requirements for the order have been fulfilled, and the Court must be satisfied that the *Sierra Club* test has been met.  This has been described as a "heavy onus", under which "[i]t must be demonstrated that it is necessary to deny public access in order to protect a value of "super-ordinate importance.""[19]  As noted by the Court of Appeal in *Hollinger Inc. v. The Ravelston Corporation*,[20] since restrictions on public access to the judicial process engage the *Charter* right to freedom of expression, "constitutional law provides that a party attempting to justify the infringement of a *Charter* guarantee bears the onus."[21]

22.    It follows that the Court cannot accept a blanket designation of a large number of documents, without conducting a document-by-document review to ensure that the protective order sought is no broader than necessary to protect truly confidential information.  In *Hollinger*, the motion judge had made the kind of blanket order that the U.S. Debtors seek here, designating all the materials filed by the applicants on a motion as confidential, without conducting such a review, on the grounds that the documents filed might prejudice Mr. Black's criminal trial in the U.S.  The Court of Appeal overturned the order, in part because "the motion judge erred by failing to consider whether there was a portion of the sealed material that could be released."[22]  The Court of Appeal stated:

---

[19] *Ontario Council of Hospital Unions v. Ontario (Min. of Health)*, 2007 CanLII 2659 (Div.Ct.) at para. 77, citing *MacIntyre v. Nova Scotia (Attorney General)*, [1982] 1 S.C.R. 175 at 185-187.
[20] 2008 ONCA 207, leave to appeal denied 2008 CanLII 53791 (SCC) ("*Hollinger*").
[21] *Hollinger, supra,* at para.79 *per* Juriansz J.A. (dissenting in part, but not on this point).
[22] *Hollinger, supra,* at para. 107.

9

The first reason the motion judge offered for declining to embark on a document-by-document review was that he was aware of the charges Mr. Black was facing in only the most general way, and he was not in a position to determine what of the material might be said to be relevant or prejudicial to the defence of those charges. The proper perspective should have been that all the material was presumptively disclosed and that the burden was on Mr. Black to satisfy the court as to which portions of the material should not be released. If the specific nature of the charges was relevant to that determination, the onus was on the respondents to place the necessary information before the court...

The motion judge also observed that a document-by-document review would be time-consuming and costly to Hollinger and the Blacks. These parties were seeking a special dispensation of the court—a departure from the open court principle that routinely applied. There was no onus on the Globe to establish that granting its routine right of access could be accomplished efficiently and without occasioning cost to the parties. The record did not disclose any evidence that the cost and inconvenience to Hollinger and the Blacks of the special treatment they were seeking would be unreasonable in the circumstances.[23]

23.    Moreover, the Court cannot simply delegate to the parties the responsibility for determining what material is to be kept confidential.[24]  Documents for which a protective order is sought are not to be regarded as confidential just on counsel's say-so.  As noted by the Court of Appeal in *Hollinger*:

> I agree with the remark of Farley J. that "Sealing orders cannot be granted merely because the parties involved agree to have the material sealed – or 'withdrawn'"[25]

24.    Under the first branch of the *Sierra Club* test, the party proposing the order must satisfy the Court that the risk of harm from disclosure is real and substantial, and is well grounded in the evidence.  Evidence that is speculative and lacks specificity does not suffice.[26]  Further, the party seeking the order must

---

[23] *Hollinger, supra*, at paras. 108, 110.
[24] *GasTOPS Ltd. v. Forsythe*, 2011 ONCA 186, at paras. 5-6.
[25] *Hollinger, supra*, at para. 105, citing *Re Stelco Inc.*, [2006] O.J. No. 277. See also *Teva Neuroscience*, 2008 FC 1091, para. 8: "The Court cannot... merely serve as a rubber stamp to whatever agreements counsel may enter into regarding confidentiality and the sealing of public records – an open court process and the public interest can only be curtailed in clear cases."
[26] *Anderson v. St. Jude Medical Inc.*, 2010 ONSC 5191, at para. 14; *Fairview Donut Inc. v. TDL Group Corp.*, 2010 ONSC 789.

identify a public interest in preserving confidentiality, not just that a private party regards the information as confidential.[27]

25.   Under the second branch of the *Sierra Club* test, the Court must weigh the interests in preserving confidentiality against the public interest in having open court proceedings.   That public interest is particularly important in the present case, in light of the following:

- Nortel was one of Canada's largest companies, with annual revenue of approximately $30 billion at its peak;

- Nortel employed approximately 93,000 people at its peak, many of whom face the loss of pension benefits in these proceedings;

- These proceedings concern the allocation of approximately $9 billion;

- Nortel's insolvency has been the subject of widespread media coverage, which will undoubtedly continue; and

- There is a strong public interest in ensuring that the process by which the claims of former employees are treated, is as open and transparent as possible.[28]

## (b)   The U.S. Debtors' Draft Order is Flawed

26.   The CCC respectfully submits that the U.S. Debtors' Draft Order suffers from serious legal defects, and is inconsistent with Canadian law and the open court principle.

27.   First, the scope of the categories covered goes well beyond information that is truly confidential.   For example, while true trade secrets are properly covered by a protective order, information that is merely private or embarrassing is not.[29] As set out in *Sierra Club*, a confidentiality order is *exceptional* relief, that should

---

[27] See e.g. *SRM Global Master Fund LP v. Hudbay Minerals Inc.*, 2009 CanLII 9377 (ONSC), at paras. 8-26; *Pfizer Canada Inc. v. Novopharm Limited*, 2010 FC 668, at paras. 42-46.
[28] Borg-Olivier Affidavit, paras. 4-7
[29] *Anderson v. St. Jude Medical Inc.*, *supra*, at para. 14; *Fairview Donut Inc.*, *supra*; *Eli Lilly & Co. v. Apotex Inc.*, 2008 FC 892, at paras. 11, 41.

only be granted when there is sufficient evidence before the Court to satisfy the Court that it is *necessary to prevent a serious risk to an important interest*, and that the salutary benefits of the order including the right of the litigants to a fair trial outweigh its effects on the public interest in open courts.[30]

28.    Several of the categories reflected in the U.S. Debtors' Draft Order – such as "personal information" (undefined), "including, but not limited to… information about current or former employee compensation and or/benefits, … and financial information" – do not on their face appear to qualify as information that is on the same level of confidentiality as a true trade secret.[31]  Yet such information is to be designated as not just confidential, but "highly confidential".[32]  Likewise, the confidential category in the U.S. Debtors' Draft Order purports to include "non-public financial or accounting results or data", and "all financial and tax records relating to the estate that form part of a parties' [*sic*] general ledger or otherwise constitute accounting records", as well as drafts of such records.[33]  There is no general principle that non-public financial records are entitled to confidentiality - to the contrary, the party seeking a protective order must demonstrate that the order is necessary to prevent a serious risk to an identifiable public interest to obtain such an order.[34]

29.    Second, the definitions of "highly confidential" and "confidential" documents are drafted without reference to how old the information may be.  Outdated information, even if it was once of a commercially sensitive nature, does not

---

[30] *Teva Neuroscience*, 2008 FC 1091, at para. 4; *Sierra Club, supra*.
[31] See, for example, *M.E.H. v. Williams*, 2012 ONCA 35 (CanLII), where the Court of Appeal overturned a protective order that would have restricted publication of such matters as the individual Applicant's name, photograph, employer, assets and liabilities, and the financial institutions she dealt with.  However, the Appellants did not appeal restrictions on publishing her social insurance number, date of birth, bank account numbers, or medical information, because they did not regard these as relevant: see paras. 3, 7, 8.  In the present case, likewise, information such as social insurance numbers could be redacted on the grounds that it is irrelevant.
[32] U.S. Debtors' Draft Order, para. 2(b).
[33] U.S. Debtors' Draft Order, para. 3(b).
[34] *Out-Of-Home Marketing Association of Canada v. Toronto (City)*, 2012 ONCA 212 (CanLII), at paras. 49 – 59.

warrant a protective order.[35]  This applies in particular to the records of Nortel, which largely ceased to conduct active business more than four years ago.  This illustrates the problems with attempting to define confidentiality by category.  While it may be that some documents in any particular proposed category would meet the standards set by *Sierra Club*, there are likely many that do not.  Individualized assessment is required for each document claimed to be confidential.

30.   Third, the Draft Protective Order purports to classify as confidential the entire contents of the Merrill Database, comprising some 44,000 documents.[36]  No argument has been made that all such documents are in fact confidential, within the meaning of *Sierra Club*, although some may be.  Rather, those who produced the documents apparently do not wish to go through the exercise of sorting between those that are and are not legitimately covered by a protective order, to the satisfaction of the Court.  This is contrary to the clear requirements of *Sierra Club* and cases following it, that a protective order is the exception, not the rule, and that the party seeking such an order must satisfy the Court that the requirements have been met.[37]

31.   The fact that it may be burdensome to sort through thousands of documents to determine which ones truly meet the *Sierra Club* test, does not relieve the parties proposing the order of their legal obligations.  In the analogous case of *Air Canada v. WestJet Airlines Limited*,[38] the plaintiff sought to produce some 75,000 documents for discovery without reviewing them, but with a term that if any were subsequently discovered to be subject to solicitor-client privilege, they could be clawed back.  The court was critical of this proposed approach, noting that solicitor-client privilege was "too important a principle" for the court to agree to a

---

[35] *Anderson v. St. Jude Medical Inc.*, *supra*, at para. 19; see also, *Carey v. Ontario*, [1986] 2 S.C.R. 637, at para. 83.
[36] U.S. Debtors' Draft Order, para. 20(d).
[37] *Sierra Club*, *supra*, at paras. 53-55; *Fairview Donut Inc.*, *supra*, paras. 31-41.
[38] 2006 CanLII 14966 (ON SC).

procedure that appeared to cede this principle to considerations of expediency.[39] The same could be said of the open court principle in this case.

32.  Fourth, the U.S. Debtors' Draft Order purports to reverse the burden of proof on recipients of information designated as confidential by a party, who wish to file such information with the Court, to establish that the information is not appropriately designated.[40]  With respect, the burden of satisfying the Court that the requirements of a protective order are met with any particular document must always remain on the party seeking the order.  Therefore, it should be sufficient for a party seeking to file information that is so designated to give notice to the producing party so that it may bring a motion to satisfy the Court that a sealing order is appropriate.

33.  Fifth, the U.S. Debtors' Draft Order is self-contradictory and unworkable.  As noted above, it purports to designate the entirety of the Merrill Database as "confidential".  It then purports to place the onus on parties that object to the designation of "any particular" document, to state the grounds of their objection, and seek a ruling from the Court "that such information should not be treated as Confidential".[41]  Practically, this places the onus on objecting parties to justify openness and transparency, and to make the case for non-confidential treatment on a document-by-document basis.  However, the Order goes on to say that "the burden shall be on the Producing Party to justify the claim that disputed material has been properly designated and is entitled to protection from disclosure."[42]

34.  This language is confusing and invites disputes.  Further, by making the removal of the confidential designation contingent upon objecting parties investing the resources to identify "particular" documents, and mobilize arguments for their disclosure, it could very well result in a great many

---

[39] *Ibid.* at para. 15-16; *Hollinger, supra* at paras. 108, 110.
[40] U.S. Debtors' Draft Order, para. 8(a).
[41] U.S. Debtors' Draft Order, para. 11(a).
[42] U.S. Debtors' Draft Order, para. 11(a).

documents that are not in fact confidential being designated as such. Alternatively, on the clear legal principles articulated by the Supreme Court, any party would be on solid legal ground in simply objecting to the designation of all 44,000 documents, and requiring the Producing Party to discharge their burden. If this kind of document review is to occur anyway, it would be better to use the orderly and reasonable process proposed by the CCC.

35.    Finally, the U.S. Debtors' Draft Order appears to raise a number of practical issues which could hamper significantly the parties' ability to prepare for trial. Among other things:

   (a)    Clients are not permitted to see "highly confidential" information, which includes, for example, information about employee compensation, benefits, and financial information. The restriction is so profound that a client can only review a pleading that contains a reference to highly confidential information if they sign the confidentiality agreement, and only to the extent necessary to give advice. A client could not review affidavits, attend discoveries, or attend the trial where highly confidential material is referred to. It would be difficult for counsel to obtain instructions from clients who are not permitted to review affidavits, attend discoveries, or attend portions of the trial;

   (b)    Any party can designate any document as confidential or highly confidential at any time, even if the party producing the document does not consider it to be confidential within the requirements of *Sierra Club*, as long as s/he reasonably believes in good faith that it falls within one of the broad and undefined "confidential" categories described in the order. This raises a number of potential problems, including inconsistent designations, documents being differently designated over time, and no time limit on the power to re-designate documents. These provisions have the potential to greatly increase the cost of the litigation and to slow down efforts to

prepare for trial. For example, a party could draft an affidavit that refers to or appends a public document. Months later, the document could be re-designated by another party with no notice (the designating party simply has to apply a legend to the document). Parties will have to continually review the designations, recode the documents, and revise all materials in light of the latest designation on the document. Parties would presumably also have to retrieve the document from any person to whom they had provided the document who did not have authorization to see highly confidential or confidential documents;

(c)    Any person who is examined for discovery can designate all or part of their transcript as "highly confidential" or "confidential". The designation does not have to be given until seven days after the court reporter provides the transcript. This means, in practice, that clients could not see transcripts for seven days after they are provided, in case some party wants to designate the transcript as highly confidential. Given the compressed litigation schedule, a week's delay is significant;

(d)    Persons expected to be examined for discovery, deponents, or trial witnesses can only see highly confidential documents if they had prior, rightful access to them. It is unclear to the CCC how counsel would know if a witness had previously seen a document. It would seem that if a document is relevant to a witness's evidence, they should be permitted to review it. Otherwise, counsel cannot prepare their case or their witnesses. The remedy in the agreement is for the party wanting to allow their witnesses to review the documents to apply to the Courts for an order; again, this creates a reverse onus and would be too time consuming.[43]

(c)    **The CCC Draft Order is Fair and Consistent with _Sierra Club_**

---

[43] Borg-Olivier Affidavit, para. 64.

36.   By contrast, the CCC Draft Order will ensure that a fair and transparent trial process is followed.  The CCC Draft Order will not cause prejudice to any party. The CCC Draft Order respects the open court principle, while allowing any party that genuinely requires an order to protect the confidentiality of specific documents to seek judicial determinations according to accepted principles and in an orderly process.

37.   First, the CCC Draft Order keeps the categories of "Highly Confidential" and "Confidential" documents, as designated by the parties, properly confined.  The stricter definitions of these categories in the CCC Draft Order are consistent with *Sierra Club* and cases following that decision.[44]

38.   Second, the CCC Draft Order would require that parties seeking to designate documents as "highly confidential" or "confidential" provide a justification in their document coding.  The CCC respectfully submits that this will in itself act to provide a check on possibly overreaching claims of confidentiality, especially when coupled with the possibility of subsequent judicial scrutiny.[45]

39.   Third, the CCC Draft Order would permit counsel to share documents designated by parties as "highly confidential" or "confidential" with client representatives, consultants, and potential witnesses, whether or not they are formally nominated (or qualify) as experts, upon such persons entering into appropriate undertakings.[46]   This broader ability to share documents, as proposed by the CCC, would go a long way to addressing the concerns expressed above that an unduly restrictive protective order would hamper the CCC's ability to conduct discoveries and prepare for trial.

---

[44] See Paras. 2(a)(vii), (b), and 3(b), CCC Draft Order, as compared to Paras. 2(b)(i), 3(b)(ii) and (iii), U.S. Debtors' Draft Order.
[45] Para. 4(c), CCC Draft Order.
[46] Para. 5(b)(viii) and (ix), CCC Draft Order.

40.  Fourth, for documents to be filed with the Courts, the CCC Draft Order would ensure that the parties proposing that they be filed under seal would bear the onus of bringing a motion for a sealing order.  Those parties would be given notice before any document designated as confidential by a party is filed with the Courts, to allow them to bring their motion.[47]  This procedure would ensure that the onus remains where it belongs, on the party seeking to restrict the open court principle.    Further, and crucially, this procedure would ensure that such documents are subject to a judicial determination as to their confidential character.

41.  The law is crystal clear that the agreement of the parties cannot be substituted for a determination by the court,[48] and for this reason judicial determination is a mandatory step for any document to be filed with the court or entered as an exhibit at trial under seal.[49]

42.  Fifth, the CCC Draft Order would not automatically designate all 44,000 documents in the Merrill Database as confidential, whether or not they are truly confidential in character.  Rather, the CCC Draft Order would give the producing parties the opportunity to so designate any specific documents that are truly confidential in character.[50]  With respect, this is the only possible procedure that is consistent with the requirements of *Sierra Club*, including the clear onus on parties seeking to justify restrictions on the open court principle to do so on specific and compelling grounds.

---

[47] Para. 8(a), (b), and (c), CCC Draft Order.
[48] See e.g. *GasTOPS Ltd. v. Forsyth*, 2011 ONCA 186, where approximately 150 exhibits had been designated as confidential at trial, apparently at the request of counsel with "no indication" that the requirements of *Sierra Club* were met; on appeal (after the court instructed that there be a motion in open court with notice to the media) the parties sought to preserve confidentiality in only 4 of them.
[49] See e.g. *Teva Neuroscience G.P.-S.E.N.C. v. Canada (Attorney General)*, 2008 FC 1091, at para. 8.  Nevertheless, in cases where parties that are at arm's length agree on the confidential character of the document, we would hope that such determinations could proceed expeditiously.
[50] CCC Draft Order, para. 20(c).  Para. 20(e) of the U.S. Debtors' Draft Order would be omitted.

## PART IV – ORDER REQUESTED

43.   The CCC therefore respectfully requests the relief set out in its Notice of
Cross-Motion, with costs.


ALL OF WHICH IS RESPECTFULLY SUBMITTED.


June 5, 2013

Kenneth T. Rosenberg

Andrew K. Lokan


Paliare Roland Rosenberg Rothstein LLP

Lawyers for the
Canadian Creditors' Committee

## SCHEDULE "A'
## TABLE OF AUTHORITIES

1.  *Sierra Club of Canada v. Canada (Minister of Finance)*, 2002 SCC 41 ("*Sierra Club*")

2.  *Ontario Council of Hospital Unions v. Ontario (Min. of Health)*, 2007 CanLII 2659 (Div.Ct.)

3.  *MacIntyre v. Nova Scotia (Attorney General)*, [1982] 1 S.C.R. 175

4.  *Hollinger Inc. v. The Ravelston Corporation*, 2008 ONCA 207, leave to appeal denied 2008 CanLII 53791 (SCC)

5.  *GasTOPS Ltd. v. Forsythe*, 2011 ONCA 186

6.  *Re Stelco Inc.*, [2006] O.J. No. 277

7.  *Teva Neuroscience G.P.-S.E.N.C. v. Canada (Attorney General)*, 2008 FC 1091

8.  *Anderson v. St. Jude Medical Inc.*, 2010 ONSC 5191

9.  *Fairview Donut Inc. v. TDL Group Corp.*, 2010 ONSC 789

10. *SRM Global Master Fund LP v. Hudbay Minerals Inc.*, 2009 CanLII 9377 (ONSC)

11. *Pfizer Canada Inc. v. Novopharm Limited*, 2010 FC 668

12. *Eli Lilly & Co. v. Apotex Inc.*, 2008 FC 892

13. *M.E.H. v. Williams*, 2012 ONCA 35 (CanLII)

14. *Out-Of-Home Marketing Association of Canada v. Toronto (City)*, 2012 ONCA 212 (CanLII)

15. *Carey v. Ontario*, [1986] 2 S.C.R. 637

16. *Air Canada v. WestJet Airlines Limited*, 2006 CanLII 14966 (ON SC)

885584_6.DOC

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED
AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL
NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION
AND NORTEL NETWORKS TECHNOLOGY CORPORATION
APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL COURT)

PROCEEDING COMMENCED AT
TORONTO

FACTUM OF THE
CANADIAN CREDITORS' COMMITTEE

**Paliare Roland Rosenberg Rothstein LLP**
155 Wellington Street West
35th Floor
Toronto ON  M5V 3H1
Tel:    416.646.4300
Fax:    416.646.4301

Kenneth T. Rosenberg (LSUC #21102H)
Tel:      (416) 646-4304
Email: ken.rosenberg@paliareroland.com

Andrew K. Lokan (LSUC #31629Q)
Tel: (416) 646-4324
Email: andrew.lokan@paliareroland.com

**Lawyers for the Canadian Creditors' Committee**