**<u>EXHIBIT B</u>**

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**BRIEF OF AUTHORITIES OF ERNST & YOUNG INC. IN
ITS CAPACITY AS MONITOR**

**(Motion for Approval of Protective Order)
(Returnable June 11, 2013)**

| | |
|---|---|
| **Goodmans LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| Bay Adelaide Centre | 1 First Canadian Place |
| 333 Bay Street, Suite 3400 | 100 King Street West, Suite 1600 |
| Toronto, ON  M5H 2S7 | Toronto, ON  M5X 1G5 |
| | |
| Jay A. Carfagnini  LSUC#: 22293T | Derrick Tay  LSUC#: 21152A |
| Peter Ruby  LSUC#: 38439P | Jennifer Stam  LSUC#: 46735J |
| Joseph Pasquariello  LSUC#: 37389C | |
| | |
| Tel:    416.979.2211 | |
| Fax:    416.979.1234 | Tel:  416.862.5697 |
| | Fax:  416.862.7661 |
| Lawyers for the Monitor, | |
| Ernst & Young Inc. | Lawyers for the Canadian Debtors |

# <u>INDEX</u>

**<u>Tab</u>**    **<u>Document</u>**

1.    *Sierra Club v. Canada (Minister of Finance),* [2002] 2 S.C.R. 522

2.    *Andersen v. St. Jude Medical, Inc.* 2010 ONSC 5191 (S.C.J.)

3.    *Re Canwest Global Communications Corp.,* [2009] O.J. No. 4286 (S.C.J.—Commercial List)

4.    *Shaw v. Shaw,* [2007] O.J. No. 4999 (S.C.J.)

5.    *Reichmann v. Toronto Life Publishing Co.,* [1990] O.J. No. 538 (H.C.J.)

6.    *Fairview Donut Inc. v. TDL Group Corp.,* [2010] O.J. No. 502 (S.C.J.)

*7.*    *Re Nortel Networks Corp.,* [2009] O.J. No. 4487 (S.C.J.—Commercial List)

8.    *Re Stelco Inc.,* [2006] O.J. No. 275 (S.C.J.—Commercial List

**TAB 1**

**Atomic Energy of Canada Limited**  *Appellant*

*v.*

**Sierra Club of Canada**  *Respondent*

and

**The Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada**  *Respondents*

**INDEXED AS: SIERRA CLUB OF CANADA *v.* CANADA (MINISTER OF FINANCE)**

**Neutral citation: 2002 SCC 41.**

File No.: 28020.

2001: November 6; 2002: April 26.

Present: McLachlin C.J. and Gonthier, Iacobucci, Bastarache, Binnie, Arbour and LeBel JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Practice — Federal Court of Canada — Filing of confidential material — Environmental organization seeking judicial review of federal government's decision to provide financial assistance to Crown corporation for construction and sale of nuclear reactors — Crown corporation requesting confidentiality order in respect of certain documents — Proper analytical approach to be applied to exercise of judicial discretion where litigant seeks confidentiality order — Whether confidentiality order should be granted — Federal Court Rules, 1998, SOR/98-106, r. 151.*

Sierra Club is an environmental organization seeking judicial review of the federal government's decision to provide financial assistance to Atomic Energy of Canada Ltd. ("AECL"), a Crown corporation, for the construction and sale to China of two CANDU reactors. The reactors are currently under construction in China, where AECL is the main contractor and project manager. Sierra Club maintains that the authorization of financial assistance

**Énergie atomique du Canada Limitée**  *Appelante*

*c.*

**Sierra Club du Canada**  *Intimé*

et

**Le ministre des Finances du Canada, le ministre des Affaires étrangères du Canada, le ministre du Commerce international du Canada et le procureur général du Canada**  *Intimés*

**RÉPERTORIÉ : SIERRA CLUB DU CANADA *c.* CANADA (MINISTRE DES FINANCES)**

**Référence neutre : 2002 CSC 41.**

Nᵒ du greffe : 28020.

2001 : 6 novembre; 2002 : 26 avril.

Présents : Le juge en chef McLachlin et les juges Gonthier, Iacobucci, Bastarache, Binnie, Arbour et LeBel.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Pratique — Cour fédérale du Canada — Production de documents confidentiels — Contrôle judiciaire demandé par un organisme environnemental de la décision du gouvernement fédéral de donner une aide financière à une société d'État pour la construction et la vente de réacteurs nucléaires — Ordonnance de confidentialité demandée par la société d'État pour certains documents — Analyse applicable à l'exercice du pouvoir discrétionnaire judiciaire sur une demande d'ordonnance de confidentialité — Faut-il accorder l'ordonnance? — Règles de la Cour fédérale (1998), DORS/98-106, règle 151.*

Un organisme environnemental, Sierra Club, demande le contrôle judiciaire de la décision du gouvernement fédéral de fournir une aide financière à Énergie atomique du Canada Ltée (« ÉACL »), une société de la Couronne, pour la construction et la vente à la Chine de deux réacteurs CANDU. Les réacteurs sont actuellement en construction en Chine, où ÉACL est l'entrepreneur principal et le gestionnaire de projet. Sierra Club soutient que

by the government triggered s. 5(1)(*b*) of the *Canadian Environmental Assessment Act* ("*CEAA*"), requiring an environmental assessment as a condition of the financial assistance, and that the failure to comply compels a cancellation of the financial arrangements. AECL filed an affidavit in the proceedings which summarized confidential documents containing thousands of pages of technical information concerning the ongoing environmental assessment of the construction site by the Chinese authorities. AECL resisted Sierra Club's application for production of the confidential documents on the ground, *inter alia*, that the documents were the property of the Chinese authorities and that it did not have the authority to disclose them. The Chinese authorities authorized disclosure of the documents on the condition that they be protected by a confidentiality order, under which they would only be made available to the parties and the court, but with no restriction on public access to the judicial proceedings. AECL's application for a confidentiality order was rejected by the Federal Court, Trial Division. The Federal Court of Appeal upheld that decision.

*Held*: The appeal should be allowed and the confidentiality order granted on the terms requested by AECL.

In light of the established link between open courts and freedom of expression, the fundamental question for a court to consider in an application for a confidentiality order is whether the right to freedom of expression should be compromised in the circumstances. The court must ensure that the discretion to grant the order is exercised in accordance with *Charter* principles because a confidentiality order will have a negative effect on the s. 2(*b*) right to freedom of expression. A confidentiality order should only be granted when (1) such an order is necessary to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and (2) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings. Three important elements are subsumed under the first branch of the test. First, the risk must be real and substantial, well grounded in evidence, posing a serious threat to the commercial interest in question. Second, the important commercial interest must be one which can be expressed in terms of a public interest in confidentiality, where there is a general principle at stake. Finally, the judge is required to consider not only whether reasonable alternatives are available to such an order but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

l'autorisation d'aide financière du gouvernement déclenche l'application de l'al. 5(1)*b*) de la *Loi canadienne sur l'évaluation environnementale* (« *LCÉE* ») exigeant une évaluation environnementale comme condition de l'aide financière, et que le défaut d'évaluation entraîne l'annulation des ententes financières. ÉACL dépose un affidavit qui résume des documents confidentiels contenant des milliers de pages d'information technique concernant l'évaluation environnementale du site de construction qui est faite par les autorités chinoises. ÉACL s'oppose à la communication des documents demandée par Sierra Club pour la raison notamment qu'ils sont la propriété des autorités chinoises et qu'elle n'est pas autorisée à les divulguer. Les autorités chinoises donnent l'autorisation de les communiquer à la condition qu'ils soient protégés par une ordonnance de confidentialité n'y donnant accès qu'aux parties et à la cour, mais n'imposant aucune restriction à l'accès du public aux débats. La demande d'ordonnance de confidentialité est rejetée par la Section de première instance de la Cour fédérale. La Cour d'appel fédérale confirme cette décision.

*Arrêt* : L'appel est accueilli et l'ordonnance demandée par ÉACL est accordée.

Vu le lien existant entre la publicité des débats judiciaires et la liberté d'expression, la question fondamentale pour la cour saisie d'une demande d'ordonnance de confidentialité est de savoir si, dans les circonstances, il y a lieu de restreindre le droit à la liberté d'expression. La cour doit s'assurer que l'exercice du pouvoir discrétionnaire de l'accorder est conforme aux principes de la *Charte* parce qu'une ordonnance de confidentialité a des effets préjudiciables sur la liberté d'expression garantie à l'al. 2*b*). On ne doit l'accorder que (1) lorsqu'elle est nécessaire pour écarter un risque sérieux pour un intérêt important, y compris un intérêt commercial, dans le contexte d'un litige, en l'absence d'autres options raisonnables pour écarter ce risque, et (2) lorsque ses effets bénéfiques, y compris ses effets sur le droit des justiciables civils à un procès équitable, l'emportent sur ses effets préjudiciables, y compris ses effets sur la liberté d'expression qui, dans ce contexte, comprend l'intérêt du public dans la publicité des débats judiciaires. Trois éléments importants sont subsumés sous le premier volet de l'analyse. Premièrement, le risque en cause doit être réel et important, être bien étayé par la preuve et menacer gravement l'intérêt commercial en question. Deuxièmement, l'intérêt doit pouvoir se définir en termes d'intérêt public à la confidentialité, mettant en jeu un principe général. Enfin le juge doit non seulement déterminer s'il existe d'autres options raisonnables, il doit aussi restreindre l'ordonnance autant qu'il est raisonnablement possible de le faire tout en préservant l'intérêt commercial en question.

Applying the test to the present circumstances, the commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality, which is sufficiently important to pass the first branch of the test as long as certain criteria relating to the information are met. The information must have been treated as confidential at all relevant times; on a balance of probabilities, proprietary, commercial and scientific interests could reasonably be harmed by disclosure of the information; and the information must have been accumulated with a reasonable expectation of it being kept confidential. These requirements have been met in this case. Disclosure of the confidential documents would impose a serious risk on an important commercial interest of AECL, and there are no reasonably alternative measures to granting the order.

Under the second branch of the test, the confidentiality order would have significant salutary effects on AECL's right to a fair trial. Disclosure of the confidential documents would cause AECL to breach its contractual obligations and suffer a risk of harm to its competitive position. If a confidentiality order is denied, AECL will be forced to withhold the documents in order to protect its commercial interests, and since that information is relevant to defences available under the *CEAA*, the inability to present this information hinders AECL's capacity to make full answer and defence. Although in the context of a civil matter, this does not engage a *Charter* right, the right to a fair trial is a fundamental principle of justice. Further, the confidentiality order would allow all parties and the court access to the confidential documents, and permit cross-examination based on their contents, assisting in the search for truth, a core value underlying freedom of expression. Finally, given the technical nature of the information, there may be a substantial public security interest in maintaining the confidentiality of such information.

The deleterious effects of granting a confidentiality order include a negative effect on the open court principle, and therefore on the right to freedom of expression. The more detrimental the confidentiality order would be to the core values of (1) seeking the truth and the common good, (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit, and (3) ensuring that participation in the political process is open to all persons, the harder it will be to justify the confidentiality order. In the hands of the parties and their experts, the confidential documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would assist the court in reaching accurate factual conclusions. Given the highly technical nature of the documents, the important value of the search for the truth which underlies

En l'espèce, l'intérêt commercial en jeu, la préservation d'obligations contractuelles de confidentialité, est suffisamment important pour satisfaire au premier volet de l'analyse, pourvu que certaines conditions soient remplies : les renseignements ont toujours été traités comme des renseignements confidentiels; il est raisonnable de penser que, selon la prépondérance des probabilités, leur divulgation compromettrait des droits exclusifs, commerciaux et scientifiques; et les renseignements ont été recueillis dans l'expectative raisonnable qu'ils resteraient confidentiels. Ces conditions sont réunies en l'espèce. La divulgation des documents confidentiels ferait courir un risque sérieux à un intérêt commercial important de ÉACL et il n'existe pas d'options raisonnables autres que l'ordonnance de confidentialité.

À la deuxième étape de l'analyse, l'ordonnance de confidentialité aurait des effets bénéfiques considérables sur le droit de ÉACL à un procès équitable. Si ÉACL divulguait les documents confidentiels, elle manquerait à ses obligations contractuelles et s'exposerait à une détérioration de sa position concurrentielle. Le refus de l'ordonnance obligerait ÉACL à retenir les documents pour protéger ses intérêts commerciaux et comme ils sont pertinents pour l'exercice des moyens de défense prévus par la *LCÉE*, l'impossibilité de les produire empêcherait ÉACL de présenter une défense pleine et entière. Même si en matière civile cela n'engage pas de droit protégé par la *Charte*, le droit à un procès équitable est un principe de justice fondamentale. L'ordonnance permettrait aux parties et au tribunal d'avoir accès aux documents confidentiels, et permettrait la tenue d'un contre-interrogatoire fondé sur leur contenu, favorisant ainsi la recherche de la vérité, une valeur fondamentale sous-tendant la liberté d'expression. Il peut enfin y avoir un important intérêt de sécurité publique à préserver la confidentialité de ce type de renseignements techniques.

Une ordonnance de confidentialité aurait un effet préjudiciable sur le principe de la publicité des débats judiciaires et donc sur la liberté d'expression. Plus l'ordonnance porte atteinte aux valeurs fondamentales que sont (1) la recherche de la vérité et du bien commun, (2) l'épanouissement personnel par le libre développement des pensées et des idées et (3) la participation de tous au processus politique, plus il est difficile de justifier l'ordonnance. Dans les mains des parties et de leurs experts, les documents peuvent être très utiles pour apprécier la conformité du processus d'évaluation environnementale chinois, et donc pour aider la cour à parvenir à des conclusions de fait exactes. Compte tenu de leur nature hautement technique, la production des documents confidentiels en vertu de l'ordonnance demandée favoriserait mieux l'importante valeur de la recherche de la vérité, qui

both freedom of expression and open justice would be promoted to a greater extent by submitting the confidential documents under the order sought than it would by denying the order.

Under the terms of the order sought, the only restrictions relate to the public distribution of the documents, which is a fairly minimal intrusion into the open court rule. Although the confidentiality order would restrict individual access to certain information which may be of interest to that individual, the second core value of promoting individual self-fulfilment would not be significantly affected by the confidentiality order. The third core value figures prominently in this appeal as open justice is a fundamental aspect of a democratic society. By their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection, so that the public interest is engaged here more than if this were an action between private parties involving private interests. However, the narrow scope of the order coupled with the highly technical nature of the confidential documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts. The core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. The salutary effects of the order outweigh its deleterious effects and the order should be granted. A balancing of the various rights and obligations engaged indicates that the confidentiality order would have substantial salutary effects on AECL's right to a fair trial and freedom of expression, while the deleterious effects on the principle of open courts and freedom of expression would be minimal.

sous-tend à la fois la liberté d'expression et la publicité des débats judiciaires, que ne le ferait le refus de l'ordonnance.

Aux termes de l'ordonnance demandée, les seules restrictions ont trait à la distribution publique des documents, une atteinte relativement minime à la règle de la publicité des débats judiciaires. Même si l'ordonnance de confidentialité devait restreindre l'accès individuel à certains renseignements susceptibles d'intéresser quelqu'un, la deuxième valeur fondamentale, l'épanouissement personnel, ne serait pas touchée de manière significative. La troisième valeur joue un rôle primordial dans le pourvoi puisque la publicité des débats judiciaires est un aspect fondamental de la société démocratique. Par leur nature même, les questions environnementales ont une portée publique considérable, et la transparence des débats judiciaires sur les questions environnementales mérite que l'intérêt public est en l'espèce plus engagé que s'il s'agissait d'un litige entre personnes privées à l'égard d'intérêts purement privés. Toutefois la portée étroite de l'ordonnance associée à la nature hautement technique des documents confidentiels tempère considérablement les effets préjudiciables que l'ordonnance de confidentialité pourrait avoir sur l'intérêt du public à la publicité des débats judiciaires. Les valeurs centrales de la liberté d'expression que sont la recherche de la vérité et la promotion d'un processus politique ouvert sont très étroitement liées au principe de la publicité des débats judiciaires, et sont les plus touchées par une ordonnance limitant cette publicité. Toutefois, en l'espèce, l'ordonnance de confidentialité n'entraverait que légèrement la poursuite de ces valeurs, et pourrait même les favoriser à certains égards. Ses effets bénéfiques l'emportent sur ses effets préjudiciables, et il y a lieu de l'accorder. Selon la pondération des divers droits et intérêts en jeu, l'ordonnance de confidentialité aurait des effets bénéfiques importants sur le droit de ÉACL à un procès équitable et à la liberté d'expression, et ses effets préjudiciables sur le principe de la publicité des débats judiciaires et la liberté d'expression seraient minimes.

**Cases Cited**

**Applied:** *Edmonton Journal v. Alberta (Attorney General)*, [1989] 2 S.C.R. 1326; *Canadian Broadcasting Corp. v. New Brunswick (Attorney General)*, [1996] 3 S.C.R. 480; *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835; *R. v. Mentuck*, [2001] 3 S.C.R. 442, 2001 SCC 76; *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157; *Irwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 S.C.R. 927; *R. v. Keegstra*, [1990] 3 S.C.R. 697; **referred to:** *AB Hassle v. Canada (Minister of National Health and*

**Jurisprudence**

**Arrêts appliqués :** *Edmonton Journal c. Alberta (Procureur général)*, [1989] 2 R.C.S. 1326; *Société Radio-Canada c. Nouveau-Brunswick (Procureur général)*, [1996] 3 R.C.S. 480; *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835; *R. c. Mentuck*, [2001] 3 R.C.S. 442, 2001 CSC 76; *M. (A.) c. Ryan*, [1997] 1 R.C.S. 157; *Irwin Toy Ltd. c. Québec (Procureur général)*, [1989] 1 R.C.S. 927; *R. c. Keegstra*, [1990] 3 R.C.S. 697; **arrêts mentionnés :** *AB Hassle c.*

Case 09-10138-MFW    Doc 10792-2    Filed 06/10/13    Page 9 of 118

526    SIERRA CLUB *v.* CANADA (MINISTER OF FINANCE)    *Iacobucci J.*    [2002] 2 S.C.R.

*Welfare)*, [2000] 3 F.C. 360, aff'g (1998), 83 C.P.R. (3d) 428; *Ethyl Canada Inc. v. Canada (Attorney General)* (1998), 17 C.P.C. (4th) 278; *R. v. Oakes*, [1986] 1 S.C.R. 103; *R. v. O.N.E.*, [2001] 3 S.C.R. 478, 2001 SCC 77; *F.N. (Re)*, [2000] 1 S.C.R. 880, 2000 SCC 35; *Eli Lilly and Co. v. Novopharm Ltd.* (1994), 56 C.P.R. (3d) 437.

**Statutes and Regulations Cited**

*Canadian Charter of Rights and Freedoms*, ss. 1, 2(*b*).
*Canadian Environmental Assessment Act*, S.C. 1992, c. 37, ss. 5(1)(*b*), 8, 54, 54(2)(*b*).
*Federal Court Rules, 1998*, SOR/98-106, rr. 151, 312.

APPEAL from a judgment of the Federal Court of Appeal, [2000] 4 F.C. 426, 187 D.L.R. (4th) 231, 256 N.R. 1, 24 Admin. L.R. (3d) 1, [2000] F.C.J. No. 732 (QL), affirming a decision of the Trial Division, [2000] 2 F.C. 400, 178 F.T.R. 283, [1999] F.C.J. No. 1633 (QL). Appeal allowed.

*J. Brett Ledger* and *Peter Chapin*, for the appellant.

*Timothy J. Howard* and *Franklin S. Gertler*, for the respondent Sierra Club of Canada.

*Graham Garton*, *Q.C.*, and *J. Sanderson Graham*, for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada.

The judgment of the Court was delivered by

IACOBUCCI J. —

I.   Introduction

1    In our country, courts are the institutions generally chosen to resolve legal disputes as best they can through the application of legal principles to the facts of the case involved. One of the underlying principles of the judicial process is public openness, both in the proceedings of the dispute, and in the material that is relevant to its resolution. However, some material can be made the subject of a confidentiality order. This appeal raises the important

*Canada (Ministre de la Santé nationale et du Bien-être social)*, [2000] 3 C.F. 360, conf. [1998] A.C.F. nᵒ 1850 (QL); *Ethyl Canada Inc. c. Canada (Attorney General)* (1998), 17 C.P.C. (4th) 278; *R. c. Oakes*, [1986] 1 R.C.S. 103; *R. c. O.N.E.*, [2001] 3 R.C.S. 478, 2001 CSC 77; *F.N. (Re)*, [2000] 1 R.C.S. 880, 2000 CSC 35; *Eli Lilly and Co. c. Novopharm Ltd.* (1994), 56 C.P.R. (3d) 437.

**Lois et règlements cités**

*Charte canadienne des droits et libertés*, art. 1, 2*b*).
*Loi canadienne sur l'évaluation environnementale*, L.C. 1992, ch. 37, art. 5(1)*b*), 8, 54, 54(2) [abr. & rempl. 1993, ch. 34, art. 37].
*Règles de la Cour fédérale (1998)*, DORS/98-106, règles 151, 312.

POURVOI contre un arrêt de la Cour d'appel fédérale, [2000] 4 C.F. 426, 187 D.L.R. (4th) 231, 256 N.R. 1, 24 Admin. L.R. (3d) 1, [2000] A.C.F. nᵒ 732 (QL), qui a confirmé une décision de la Section de première instance, [2000] 2 C.F. 400, 178 F.T.R. 283, [1999] A.C.F. nᵒ 1633 (QL). Pourvoi accueilli.

*J. Brett Ledger* et *Peter Chapin*, pour l'appelante.

*Timothy J. Howard* et *Franklin S. Gertler*, pour l'intimé Sierra Club du Canada.

*Graham Garton*, *c.r.*, et *J. Sanderson Graham*, pour les intimés le ministre des Finances du Canada, le ministre des Affaires étrangères du Canada, le ministre du Commerce international du Canada et le procureur général du Canada.

Version française du jugement de la Cour rendu par

LE JUGE IACOBUCCI —

I.   Introduction

Dans notre pays, les tribunaux sont les institutions généralement choisies pour résoudre au mieux les différends juridiques par l'application de principes juridiques aux faits de chaque espèce. Un des principes sous-jacents au processus judiciaire est la transparence, tant dans la procédure suivie que dans les éléments pertinents à la solution du litige. Certains de ces éléments peuvent toutefois faire l'objet d'une ordonnance de confidentialité. Le

issues of when, and under what circumstances, a confidentiality order should be granted.

For the following reasons, I would issue the confidentiality order sought and accordingly would allow the appeal.

## II. Facts

The appellant, Atomic Energy of Canada Limited ("AECL") is a Crown corporation that owns and markets CANDU nuclear technology, and is an intervener with the rights of a party in the application for judicial review by the respondent, the Sierra Club of Canada ("Sierra Club"). Sierra Club is an environmental organization seeking judicial review of the federal government's decision to provide financial assistance in the form of a $1.5 billion guaranteed loan relating to the construction and sale of two CANDU nuclear reactors to China by the appellant. The reactors are currently under construction in China, where the appellant is the main contractor and project manager.

The respondent maintains that the authorization of financial assistance by the government triggered s. 5(1)(*b*) of the *Canadian Environmental Assessment Act*, S.C. 1992, c. 37 ("*CEAA*"), which requires that an environmental assessment be undertaken before a federal authority grants financial assistance to a project. Failure to undertake such an assessment compels cancellation of the financial arrangements.

The appellant and the respondent Ministers argue that the *CEAA* does not apply to the loan transaction, and that if it does, the statutory defences available under ss. 8 and 54 apply. Section 8 describes the circumstances where Crown corporations are required to conduct environmental assessments. Section 54(2)(*b*) recognizes the validity of an environmental assessment carried out by a foreign authority provided that it is consistent with the provisions of the *CEAA*.

In the course of the application by Sierra Club to set aside the funding arrangements, the appellant

pourvoi soulève les importantes questions de savoir à quel moment et dans quelles circonstances il y a lieu de rendre une ordonnance de confidentialité.

Pour les motifs qui suivent, je suis d'avis de rendre l'ordonnance de confidentialité demandée et par conséquent d'accueillir le pourvoi. 2

## II. Les faits

L'appelante, Énergie atomique du Canada Limitée (« ÉACL »), société d'État propriétaire et vendeuse de la technologie nucléaire CANDU, est une intervenante ayant reçu les droits de partie dans la demande de contrôle judiciaire présentée par l'intimé, Sierra Club du Canada (« Sierra Club »), un organisme environnemental. Sierra Club demande le contrôle judiciaire de la décision du gouvernement fédéral de fournir une aide financière, sous forme de garantie d'emprunt de 1,5 milliard de dollars, pour la construction et la vente à la Chine de deux réacteurs nucléaires CANDU par l'appelante. Les réacteurs sont actuellement en construction en Chine, où l'appelante est entrepreneur principal et gestionnaire de projet. 3

L'intimé soutient que l'autorisation d'aide financière du gouvernement déclenche l'application de l'al. 5(1)*b*) de la *Loi canadienne sur l'évaluation environnementale*, L.C. 1992, ch. 37 (« *LCÉE* »), qui exige une évaluation environnementale avant qu'une autorité fédérale puisse fournir une aide financière à un projet. Le défaut d'évaluation entraîne l'annulation des ententes financières. 4

Selon l'appelante et les ministres intimés, la *LCÉE* ne s'applique pas à la convention de prêt et si elle s'y applique, ils peuvent invoquer les défenses prévues aux art. 8 et 54 de cette loi. L'article 8 prévoit les circonstances dans lesquelles les sociétés d'État sont tenues de procéder à des évaluations environnementales. Le paragraphe 54(2) reconnaît la validité des évaluations environnementales effectuées par des autorités étrangères pourvu qu'elles soient compatibles avec les dispositions de la *LCÉE*. 5

Dans le cadre de la requête de Sierra Club en annulation des ententes financières, l'appelante a 6

filed an affidavit of Dr. Simon Pang, a senior manager of the appellant. In the affidavit, Dr. Pang referred to and summarized certain documents (the "Confidential Documents"). The Confidential Documents are also referred to in an affidavit prepared by Mr. Feng, one of AECL's experts. Prior to cross-examining Dr. Pang on his affidavit, Sierra Club made an application for the production of the Confidential Documents, arguing that it could not test Dr. Pang's evidence without access to the underlying documents. The appellant resisted production on various grounds, including the fact that the documents were the property of the Chinese authorities and that it did not have authority to disclose them. After receiving authorization by the Chinese authorities to disclose the documents on the condition that they be protected by a confidentiality order, the appellant sought to introduce the Confidential Documents under Rule 312 of the *Federal Court Rules, 1998*, SOR/98-106, and requested a confidentiality order in respect of the documents.

7    Under the terms of the order requested, the Confidential Documents would only be made available to the parties and the court; however, there would be no restriction on public access to the proceedings. In essence, what is being sought is an order preventing the dissemination of the Confidential Documents to the public.

8    The Confidential Documents comprise two Environmental Impact Reports on Siting and Construction Design (the "EIRs"), a Preliminary Safety Analysis Report (the "PSAR"), and the supplementary affidavit of Dr. Pang which summarizes the contents of the EIRs and the PSAR. If admitted, the EIRs and the PSAR would be attached as exhibits to the supplementary affidavit of Dr. Pang. The EIRs were prepared by the Chinese authorities in the Chinese language, and the PSAR was prepared by the appellant with assistance from the Chinese participants in the project. The documents contain a mass of technical information and comprise thousands of pages. They describe the ongoing environmental assessment of the construction site by the Chinese authorities under Chinese law.

déposé un affidavit de M. Simon Pang, un de ses cadres supérieurs. Dans l'affidavit, M. Pang mentionne et résume certains documents (les « documents confidentiels ») qui sont également mentionnés dans un affidavit de M. Feng, un expert d'ÉACL. Avant de contre-interroger M. Pang sur son affidavit, Sierra Club a demandé par requête la production des documents confidentiels, au motif qu'il ne pouvait vérifier la validité de sa déposition sans consulter les documents de base. L'appelante s'oppose pour plusieurs raisons à la production des documents, dont le fait qu'ils sont la propriété des autorités chinoises et qu'elle n'est pas autorisée à les divulguer. Après avoir obtenu des autorités chinoises l'autorisation de communiquer les documents à la condition qu'ils soient protégés par une ordonnance de confidentialité, l'appelante a cherché à les produire en invoquant la règle 312 des *Règles de la Cour fédérale (1998)*, DORS/98-106, et a demandé une ordonnance de confidentialité à leur égard.

Aux termes de l'ordonnance demandée, seules les parties et la cour auraient accès aux documents confidentiels. Aucune restriction ne serait imposée à l'accès du public aux débats. On demande essentiellement d'empêcher la diffusion des documents confidentiels au public.

Les documents confidentiels comprennent deux Rapports d'impact environnemental (« RIE ») sur le site et la construction, un Rapport préliminaire d'analyse sur la sécurité (« RPAS ») ainsi que l'affidavit supplémentaire de M. Pang qui résume le contenu des RIE et du RPAS. S'ils étaient admis, les rapports seraient joints en annexe de l'affidavit supplémentaire de M. Pang. Les RIE ont été préparés en chinois par les autorités chinoises, et le RPAS a été préparé par l'appelante en collaboration avec les responsables chinois du projet. Les documents contiennent une quantité considérable de renseignements techniques et comprennent des milliers de pages. Ils décrivent l'évaluation environnementale du site de construction qui est faite par les autorités chinoises en vertu des lois chinoises.

As noted, the appellant argues that it cannot introduce the Confidential Documents into evidence without a confidentiality order, otherwise it would be in breach of its obligations to the Chinese authorities. The respondent's position is that its right to cross-examine Dr. Pang and Mr. Feng on their affidavits would be effectively rendered nugatory in the absence of the supporting documents to which the affidavits referred. Sierra Club proposes to take the position that the affidavits should therefore be afforded very little weight by the judge hearing the application for judicial review.

The Federal Court of Canada, Trial Division refused to grant the confidentiality order and the majority of the Federal Court of Appeal dismissed the appeal. In his dissenting opinion, Robertson J.A. would have granted the confidentiality order.

III. Relevant Statutory Provisions

*Federal Court Rules, 1998*, SOR/98-106

**151.** (1) On motion, the Court may order that material to be filed shall be treated as confidential.

(2) Before making an order under subsection (1), the Court must be satisfied that the material should be treated as confidential, notwithstanding the public interest in open and accessible court proceedings.

IV. Judgments Below

A. *Federal Court, Trial Division*, [2000] 2 F.C. 400

Pelletier J. first considered whether leave should be granted pursuant to Rule 312 to introduce the supplementary affidavit of Dr. Pang to which the Confidential Documents were filed as exhibits. In his view, the underlying question was that of relevance, and he concluded that the documents were relevant to the issue of the appropriate remedy. Thus, in the absence of prejudice to the respondent, the affidavit should be permitted to be served and filed. He noted that the respondent would be prejudiced by delay, but since both parties had brought

Comme je le note plus haut, l'appelante prétend ne pas pouvoir produire les documents confidentiels en preuve sans qu'ils soient protégés par une ordonnance de confidentialité, parce que ce serait un manquement à ses obligations envers les autorités chinoises. L'intimé soutient pour sa part son droit de contre-interroger M. Pang et M. Feng sur leurs affidavits serait pratiquement futile en l'absence des documents auxquels ils se réfèrent. Sierra Club entend soutenir que le juge saisi de la demande de contrôle judiciaire devrait donc leur accorder peu de poids.

La Section de première instance de la Cour fédérale du Canada a rejeté la demande d'ordonnance de confidentialité et la Cour d'appel fédérale, à la majorité, a rejeté l'appel. Le juge Robertson, dissident, était d'avis d'accorder l'ordonnance.

III. Dispositions législatives

*Règles de la Cour fédérale (1998)*, DORS/98-106

**151.** (1) La Cour peut, sur requête, ordonner que des documents ou éléments matériels qui seront déposés soient considérés comme confidentiels.

(2) Avant de rendre une ordonnance en application du paragraphe (1), la Cour doit être convaincue de la nécessité de considérer les documents ou éléments matériels comme confidentiels, étant donné l'intérêt du public à la publicité des débats judiciaires.

IV. Les décisions antérieures

A. *Cour fédérale, Section de première instance*, [2000] 2 C.F. 400

Le juge Pelletier examine d'abord s'il y a lieu, en vertu de la règle 312, d'autoriser la production de l'affidavit supplémentaire de M. Pang auquel sont annexés les documents confidentiels. À son avis, il s'agit d'une question de pertinence et il conclut que les documents se rapportent à la question de la réparation. En l'absence de préjudice pour l'intimé, il y a donc lieu d'autoriser la signification et le dépôt de l'affidavit. Il note que des retards seraient préjudiciables à l'intimé mais que, puisque les deux parties ont présenté des requêtes

9

10

11

12

interlocutory motions which had contributed to the delay, the desirability of having the entire record before the court outweighed the prejudice arising from the delay associated with the introduction of the documents.

13    On the issue of confidentiality, Pelletier J. concluded that he must be satisfied that the need for confidentiality was greater than the public interest in open court proceedings, and observed that the argument for open proceedings in this case was significant given the public interest in Canada's role as a vendor of nuclear technology. As well, he noted that a confidentiality order was an exception to the rule of open access to the courts, and that such an order should be granted only where absolutely necessary.

14    Pelletier J. applied the same test as that used in patent litigation for the issue of a protective order, which is essentially a confidentiality order. The granting of such an order requires the appellant to show a subjective belief that the information is confidential and that its interests would be harmed by disclosure. In addition, if the order is challenged, then the person claiming the benefit of the order must demonstrate objectively that the order is required. This objective element requires the party to show that the information has been treated as confidential, and that it is reasonable to believe that its proprietary, commercial and scientific interests could be harmed by the disclosure of the information.

15    Concluding that both the subjective part and both elements of the objective part of the test had been satisfied, he nevertheless stated: "However, I am also of the view that in public law cases, the objective test has, or should have, a third component which is whether the public interest in disclosure exceeds the risk of harm to a party arising from disclosure" (para. 23).

16    A very significant factor, in his view, was the fact that mandatory production of documents was not in issue here. The fact that the application involved a voluntary tendering of documents to advance the

interlocutoires qui ont entraîné les délais, les avantages de soumettre le dossier au complet à la cour compensent l'inconvénient du retard causé par la présentation de ces documents.

Sur la confidentialité, le juge Pelletier conclut qu'il doit être convaincu que la nécessité de protéger la confidentialité l'emporte sur l'intérêt du public à la publicité des débats judiciaires. Il note que les arguments en faveur de la publicité des débats judiciaires en l'espèce sont importants vu l'intérêt du public envers le rôle du Canada comme vendeur de technologie nucléaire. Il fait aussi remarquer que les ordonnances de confidentialité sont une exception au principe de la publicité des débats judiciaires et ne devraient être accordées que dans des cas de nécessité absolue.

Le juge Pelletier applique le même critère que pour une ordonnance conservatoire en matière de brevets, qui est essentiellement une ordonnance de confidentialité. Pour obtenir l'ordonnance, le requérant doit démontrer qu'il croit subjectivement que les renseignements sont confidentiels et que leur divulgation nuirait à ses intérêts. De plus, si l'ordonnance est contestée, le requérant doit démontrer objectivement qu'elle est nécessaire. Cet élément objectif l'oblige à démontrer que les renseignements ont toujours été traités comme étant confidentiels et qu'il est raisonnable de croire que leur divulgation risque de compromettre ses droits exclusifs, commerciaux et scientifiques.

Ayant conclu qu'il est satisfait à l'élément subjectif et aux deux volets de l'élément objectif du critère, il ajoute : « J'estime toutefois aussi que, dans les affaires de droit public, le critère objectif comporte, ou devrait comporter, un troisième volet, en l'occurrence la question de savoir si l'intérêt du public à l'égard de la divulgation l'emporte sur le préjudice que la divulgation risque de causer à une personne » (par. 23).

Il estime très important le fait qu'il ne s'agit pas en l'espèce de production obligatoire de documents. Le fait que la demande vise le dépôt volontaire de documents en vue d'étayer la thèse de l'appelante,

appellant's own cause as opposed to mandatory production weighed against granting the confidentiality order.

In weighing the public interest in disclosure against the risk of harm to AECL arising from disclosure, Pelletier J. noted that the documents the appellant wished to put before the court were prepared by others for other purposes, and recognized that the appellant was bound to protect the confidentiality of the information. At this stage, he again considered the issue of materiality. If the documents were shown to be very material to a critical issue, "the requirements of justice militate in favour of a confidentiality order. If the documents are marginally relevant, then the voluntary nature of the production argues against a confidentiality order" (para. 29). He then decided that the documents were material to a question of the appropriate remedy, a significant issue in the event that the appellant failed on the main issue.

Pelletier J. also considered the context of the case and held that since the issue of Canada's role as a vendor of nuclear technology was one of significant public interest, the burden of justifying a confidentiality order was very onerous. He found that AECL could expunge the sensitive material from the documents, or put the evidence before the court in some other form, and thus maintain its full right of defence while preserving the open access to court proceedings.

Pelletier J. observed that his order was being made without having perused the Confidential Documents because they had not been put before him. Although he noted the line of cases which holds that a judge ought not to deal with the issue of a confidentiality order without reviewing the documents themselves, in his view, given their voluminous nature and technical content as well as his lack of information as to what information was already in the public domain, he found that an examination of these documents would not have been useful.

par opposition à une production obligatoire, joue contre l'ordonnance de confidentialité.

En soupesant l'intérêt du public dans la divulgation et le préjudice que la divulgation risque de causer à ÉACL, le juge Pelletier note que les documents que l'appelante veut soumettre à la cour ont été rédigés par d'autres personnes à d'autres fins, et il reconnaît que l'appelante est tenue de protéger la confidentialité des renseignements. À cette étape, il examine de nouveau la question de la pertinence. Si on réussit à démontrer que les documents sont très importants sur une question cruciale, « les exigences de la justice militent en faveur du prononcé d'une ordonnance de confidentialité. Si les documents ne sont pertinents que d'une façon accessoire, le caractère facultatif de la production milite contre le prononcé de l'ordonnance de confidentialité » (par. 29). Il conclut alors que les documents sont importants pour résoudre la question de la réparation à accorder, elle-même un point important si l'appelante échoue sur la question principale.

Le juge Pelletier considère aussi le contexte de l'affaire et conclut que, puisque la question du rôle du Canada comme vendeur de technologies nucléaires est une importante question d'intérêt public, la charge de justifier une ordonnance de confidentialité est très onéreuse. Il conclut qu'ÉACL pourrait retrancher les éléments délicats des documents ou soumettre à la cour la même preuve sous une autre forme, et maintenir ainsi son droit à une défense complète tout en préservant la publicité des débats judiciaires.

Le juge Pelletier signale qu'il prononce l'ordonnance sans avoir examiné les documents confidentiels puisqu'ils n'ont pas été portés à sa connaissance. Bien qu'il mentionne la jurisprudence indiquant qu'un juge ne devrait pas se prononcer sur une demande d'ordonnance de confidentialité sans avoir examiné les documents eux-mêmes, il estime qu'il n'aurait pas été utile d'examiner les documents, vu leur volume et leur caractère technique, et sans savoir quelle part d'information était déjà dans le domaine public.

17

18

19

20    Pelletier J. ordered that the appellant could file the documents in current form, or in an edited version if it chose to do so. He also granted leave to file material dealing with the Chinese regulatory process in general and as applied to this project, provided it did so within 60 days.

B.  *Federal Court of Appeal*, [2000] 4 F.C. 426

(1) Evans J.A. (Sharlow J.A. concurring)

21    At the Federal Court of Appeal, AECL appealed the ruling under Rule 151 of the *Federal Court Rules, 1998*, and Sierra Club cross-appealed the ruling under Rule 312.

22    With respect to Rule 312, Evans J.A. held that the documents were clearly relevant to a defence under s. 54(2)(*b*) which the appellant proposed to raise if s. 5(1)(*b*) of the *CEAA* was held to apply, and were also potentially relevant to the exercise of the court's discretion to refuse a remedy even if the Ministers were in breach of the *CEAA*. Evans J.A. agreed with Pelletier J. that the benefit to the appellant and the court of being granted leave to file the documents outweighed any prejudice to the respondent owing to delay and thus concluded that the motions judge was correct in granting leave under Rule 312.

23    On the issue of the confidentiality order, Evans J.A. considered Rule 151, and all the factors that the motions judge had weighed, including the commercial sensitivity of the documents, the fact that the appellant had received them in confidence from the Chinese authorities, and the appellant's argument that without the documents it could not mount a full answer and defence to the application. These factors had to be weighed against the principle of open access to court documents. Evans J.A. agreed with Pelletier J. that the weight to be attached to the public interest in open proceedings varied with context and held that, where a case raises issues of public significance, the principle of openness of judicial process carries greater weight as a factor in

Dans son ordonnance, le juge Pelletier autorise l'appelante à déposer les documents sous leur forme actuelle ou sous une version révisée, à son gré. Il autorise aussi l'appelante à déposer des documents concernant le processus réglementaire chinois en général et son application au projet, à condition qu'elle le fasse sous 60 jours.

B.  *Cour d'appel fédérale*, [2000] 4 C.F. 426

(1) Le juge Evans (avec l'appui du juge Sharlow)

ÉACL fait appel en Cour d'appel fédérale, en vertu de la règle 151 des *Règles de la Cour fédérale (1998)*, et Sierra Club forme un appel incident en vertu de la règle 312.

Sur la règle 312, le juge Evans conclut que les documents en cause sont clairement pertinents dans une défense que l'appelante a l'intention d'invoquer en vertu du par. 54(2) si la cour conclut que l'al. 5(1)*b*) de la *LCÉE* doit s'appliquer, et pourraient l'être aussi pour l'exercice du pouvoir discrétionnaire de la cour de refuser d'accorder une réparation dans le cas où les ministres auraient enfreint la *LCÉE*. Comme le juge Pelletier, le juge Evans est d'avis que l'avantage pour l'appelante et pour la cour d'une autorisation de déposer les documents l'emporte sur tout préjudice que le retard pourrait causer à l'intimé, et conclut par conséquent que le juge des requêtes a eu raison d'accorder l'autorisation en vertu de la règle 312.

Sur l'ordonnance de confidentialité, le juge Evans examine la règle 151 et tous les facteurs que le juge des requêtes a appréciés, y compris le secret commercial attaché aux documents, le fait que l'appelante les a reçus à titre confidentiel des autorités chinoises, et l'argument de l'appelante selon lequel, sans les documents, elle ne pourrait assurer effectivement sa défense. Ces facteurs doivent être pondérés avec le principe de la publicité des documents soumis aux tribunaux. Le juge Evans convient avec le juge Pelletier que le poids à accorder à l'intérêt du public à la publicité des débats varie selon le contexte, et il conclut que lorsqu'une affaire soulève des questions de grande importance pour le public, le principe de la publicité des débats a plus de poids

the balancing process. Evans J.A. noted the public interest in the subject matter of the litigation, as well as the considerable media attention it had attracted.

In support of his conclusion that the weight assigned to the principle of openness may vary with context, Evans J.A. relied upon the decisions in *AB Hassle v. Canada (Minister of National Health and Welfare)*, [2000] 3 F.C. 360 (C.A.), where the court took into consideration the relatively small public interest at stake, and *Ethyl Canada Inc. v. Canada (Attorney General)* (1998), 17 C.P.C. (4th) 278 (Ont. Ct. (Gen. Div.)), at p. 283, where the court ordered disclosure after determining that the case was a significant constitutional case where it was important for the public to understand the issues at stake. Evans J.A. observed that openness and public participation in the assessment process are fundamental to the *CEAA*, and concluded that the motions judge could not be said to have given the principle of openness undue weight even though confidentiality was claimed for a relatively small number of highly technical documents.

Evans J.A. held that the motions judge had placed undue emphasis on the fact that the introduction of the documents was voluntary; however, it did not follow that his decision on the confidentiality order must therefore be set aside. Evans J.A. was of the view that this error did not affect the ultimate conclusion for three reasons. First, like the motions judge, he attached great weight to the principle of openness. Secondly, he held that the inclusion in the affidavits of a summary of the reports could go a long way to compensate for the absence of the originals, should the appellant choose not to put them in without a confidentiality order. Finally, if AECL submitted the documents in an expunged fashion, the claim for confidentiality would rest upon a relatively unimportant factor, i.e., the appellant's claim that it would suffer a loss of business if it breached its undertaking with the Chinese authorities.

Evans J.A. rejected the argument that the motions judge had erred in deciding the motion without

comme facteur à prendre en compte dans le processus de pondération. Le juge Evans note l'intérêt du public à l'égard de la question en litige ainsi que la couverture médiatique considérable qu'elle a suscitée.

À l'appui de sa conclusion que le poids accordé au principe de la publicité des débats peut varier selon le contexte, le juge Evans invoque les décisions *AB Hassle c. Canada (Ministre de la Santé nationale et du Bien-être social)*, [2000] 3 C.F. 360 (C.A.), où la cour a tenu compte du peu d'intérêt du public, et *Ethyl Canada Inc. c. Canada (Attorney General)* (1998), 17 C.P.C. (4th) 278 (C. Ont. (Div. gén.)), p. 283, où la cour a ordonné la divulgation après avoir déterminé qu'il s'agissait d'une affaire constitutionnelle importante et qu'il importait que le public comprenne ce qui était en cause. Le juge Evans fait remarquer que la transparence du processus d'évaluation et la participation du public ont une importance fondamentale pour la *LCÉE*, et il conclut qu'on ne peut prétendre que le juge des requêtes a accordé trop de poids au principe de la publicité des débats, même si la confidentialité n'est demandée que pour un nombre relativement restreint de documents hautement techniques.

Le juge Evans conclut que le juge des requêtes a donné trop de poids au fait que la production des documents était volontaire mais qu'il ne s'ensuit pas que sa décision au sujet de la confidentialité doive être écartée. Le juge Evans est d'avis que l'erreur n'entache pas sa conclusion finale, pour trois motifs. Premièrement, comme le juge des requêtes, il attache une grande importance à la publicité du débat judiciaire. Deuxièmement, il conclut que l'inclusion dans les affidavits d'un résumé des rapports peut, dans une large mesure, compenser l'absence des rapports, si l'appelante décide de ne pas les déposer sans ordonnance de confidentialité. Enfin, si ÉACL déposait une version modifiée des documents, la demande de confidentialité reposerait sur un facteur relativement peu important, savoir l'argument que l'appelante perdrait des occasions d'affaires si elle violait son engagement envers les autorités chinoises.

Le juge Evans rejette l'argument selon lequel le juge des requêtes a commis une erreur en statuant

24

25

26

reference to the actual documents, stating that it was not necessary for him to inspect them, given that summaries were available and that the documents were highly technical and incompletely translated. Thus the appeal and cross-appeal were both dismissed.

### (2) Robertson J.A. (dissenting)

27    Robertson J.A. disagreed with the majority for three reasons. First, in his view, the level of public interest in the case, the degree of media coverage, and the identities of the parties should not be taken into consideration in assessing an application for a confidentiality order. Instead, he held that it was the nature of the evidence for which the order is sought that must be examined.

28    In addition, he found that without a confidentiality order, the appellant had to choose between two unacceptable options: either suffering irreparable financial harm if the confidential information was introduced into evidence, or being denied the right to a fair trial because it could not mount a full defence if the evidence was not introduced.

29    Finally, he stated that the analytical framework employed by the majority in reaching its decision was fundamentally flawed as it was based largely on the subjective views of the motions judge. He rejected the contextual approach to the question of whether a confidentiality order should issue, emphasizing the need for an objective framework to combat the perception that justice is a relative concept, and to promote consistency and certainty in the law.

30    To establish this more objective framework for regulating the issuance of confidentiality orders pertaining to commercial and scientific information, he turned to the legal rationale underlying the commitment to the principle of open justice, referring to *Edmonton Journal v. Alberta (Attorney General)*, [1989] 2 S.C.R. 1326. There, the Supreme Court of Canada held that open proceedings foster the search for the truth, and reflect the importance of public scrutiny of the courts.

sans avoir examiné les documents réels, affirmant que cela n'était pas nécessaire puisqu'il y avait des précis et que la documentation était hautement technique et partiellement traduite. L'appel et l'appel incident sont donc rejetés.

### (2) Le juge Robertson (dissident)

Le juge Robertson se dissocie de la majorité pour trois raisons. En premier lieu, il estime que le degré d'intérêt du public dans une affaire, l'importance de la couverture médiatique et l'identité des parties ne devraient pas être pris en considération pour statuer sur une demande d'ordonnance de confidentialité. Selon lui, il faut plutôt examiner la nature de la preuve que protégerait l'ordonnance de confidentialité.

Il estime aussi qu'à défaut d'ordonnance de confidentialité, l'appelante doit choisir entre deux options inacceptables : subir un préjudice financier irréparable si les renseignements confidentiels sont produits en preuve, ou être privée de son droit à un procès équitable parce qu'elle ne peut se défendre pleinement si la preuve n'est pas produite.

Finalement, il dit que le cadre analytique utilisé par les juges majoritaires pour arriver à leur décision est fondamentalement défectueux en ce qu'il est fondé en grande partie sur le point de vue subjectif du juge des requêtes. Il rejette l'approche contextuelle sur la question de l'ordonnance de confidentialité, soulignant la nécessité d'un cadre d'analyse objectif pour combattre la perception que la justice est un concept relatif et pour promouvoir la cohérence et la certitude en droit.

Pour établir ce cadre plus objectif appelé à régir la délivrance d'ordonnances de confidentialité en matière de renseignements commerciaux et scientifiques, il examine le fondement juridique du principe de la publicité du processus judiciaire, en citant l'arrêt de notre Cour, *Edmonton Journal c. Alberta (Procureur général)*, [1989] 2 R.C.S. 1326, qui conclut que la publicité des débats favorise la recherche de la vérité et témoigne de l'importance de soumettre le travail des tribunaux à l'examen public.

Robertson J.A. stated that although the principle of open justice is a reflection of the basic democratic value of accountability in the exercise of judicial power, in his view, the principle that justice itself must be secured is paramount. He concluded that justice as an overarching principle means that exceptions occasionally must be made to rules or principles.

He observed that, in the area of commercial law, when the information sought to be protected concerns "trade secrets", this information will not be disclosed during a trial if to do so would destroy the owner's proprietary rights and expose him or her to irreparable harm in the form of financial loss. Although the case before him did not involve a trade secret, he nevertheless held that the same treatment could be extended to commercial or scientific information which was acquired on a confidential basis and attached the following criteria as conditions precedent to the issuance of a confidentiality order (at para. 13):

(1) the information is of a confidential nature as opposed to facts which one would like to keep confidential; (2) the information for which confidentiality is sought is not already in the public domain; (3) on a balance of probabilities the party seeking the confidentiality order would suffer irreparable harm if the information were made public; (4) the information is relevant to the legal issues raised in the case; (5) correlatively, the information is "necessary" to the resolution of those issues; (6) the granting of a confidentiality order does not unduly prejudice the opposing party; and (7) the public interest in open court proceedings does not override the private interests of the party seeking the confidentiality order. The onus in establishing that criteria one to six are met is on the party seeking the confidentiality order. Under the seventh criterion, it is for the opposing party to show that a *prima facie* right to a protective order has been overtaken by the need to preserve the openness of the court proceedings. In addressing these criteria one must bear in mind two of the threads woven into the fabric of the principle of open justice: the search for truth and the preservation of the rule of law. As stated at the outset, I do not believe that the perceived degree of public importance of a case is a relevant consideration.

Selon le juge Robertson, même si le principe de la publicité du processus judiciaire reflète la valeur fondamentale que constitue dans une démocratie l'imputabilité dans l'exercice du pouvoir judiciaire, le principe selon lequel il faut que justice soit faite doit, à son avis, l'emporter. Il conclut que la justice vue comme principe universel signifie que les règles ou les principes doivent parfois souffrir des exceptions.

Il fait observer qu'en droit commercial, lorsque les renseignements qu'on cherche à protéger ont trait à des « secrets industriels », ils ne sont pas divulgués au procès lorsque cela aurait pour effet d'annihiler les droits du propriétaire et l'exposerait à un préjudice financier irréparable. Il conclut que, même si l'espèce ne porte pas sur des secrets industriels, on peut traiter de la même façon des renseignements commerciaux et scientifiques acquis sur une base confidentielle, et il établit les critères suivants comme conditions à la délivrance d'une ordonnance de confidentialité (au par. 13) :

1) les renseignements sont de nature confidentielle et non seulement des faits qu'une personne désire ne pas divulguer; 2) les renseignements qu'on veut protéger ne sont pas du domaine public; 3) selon la prépondérance des probabilités, la partie qui veut obtenir une ordonnance de confidentialité subirait un préjudice irréparable si les renseignements étaient rendus publics; 4) les renseignements sont pertinents dans le cadre de la résolution des questions juridiques soulevées dans le litige; 5) en même temps, les renseignements sont « nécessaires » à la résolution de ces questions; 6) l'octroi d'une ordonnance de confidentialité ne cause pas un préjudice grave à la partie adverse; 7) l'intérêt du public à la publicité des débats judiciaires ne prime pas les intérêts privés de la partie qui sollicite l'ordonnance de confidentialité. Le fardeau de démontrer que les critères un à six sont respectés incombe à la partie qui cherche à obtenir l'ordonnance de confidentialité. Pour le septième critère, c'est la partie adverse qui doit démontrer que le droit *prima facie* à une ordonnance de non-divulgation doit céder le pas au besoin de maintenir la publicité des débats judiciaires. En utilisant ces critères, il y a lieu de tenir compte de deux des fils conducteurs qui sous-tendent le principe de la publicité des débats judiciaires : la recherche de la vérité et la sauvegarde de la primauté du droit. Comme je l'ai dit au tout début, je ne crois pas que le degré d'importance qu'on croit que le public accorde à une affaire soit une considération pertinente.

31

32

33    In applying these criteria to the circumstances of the case, Robertson J.A. concluded that the confidentiality order should be granted. In his view, the public interest in open court proceedings did not override the interests of AECL in maintaining the confidentiality of these highly technical documents.

34    Robertson J.A. also considered the public interest in the need to ensure that site plans for nuclear installations were not, for example, posted on a Web site. He concluded that a confidentiality order would not undermine the two primary objectives underlying the principle of open justice: truth and the rule of law. As such, he would have allowed the appeal and dismissed the cross-appeal.

V.   Issues

35    A.   What is the proper analytical approach to be applied to the exercise of judicial discretion where a litigant seeks a confidentiality order under Rule 151 of the *Federal Court Rules, 1998*?

B.   Should the confidentiality order be granted in this case?

VI.   Analysis

A.   *The Analytical Approach to the Granting of a Confidentiality Order*

(1)   The   General   Framework:   Herein   the *Dagenais* Principles

36    The link between openness in judicial proceedings and freedom of expression has been firmly established by this Court. In *Canadian Broadcasting Corp. v. New Brunswick (Attorney General)*, [1996] 3 S.C.R. 480, at para. 23, La Forest J. expressed the relationship as follows:

The principle of open courts is inextricably tied to the rights guaranteed by s. 2(*b*). Openness permits public access to information about the courts, which in turn permits the public to discuss and put forward opinions and criticisms of court practices and proceedings. While the freedom to express ideas and opinions about the operation of the courts is clearly within the ambit of the

Appliquant ces critères aux circonstances de l'espèce, le juge Robertson conclut qu'il y a lieu de rendre l'ordonnance de confidentialité. Selon lui, l'intérêt du public dans la publicité des débats judiciaires ne prime pas l'intérêt de ÉACL à préserver le caractère confidentiel de ces documents hautement techniques.

Le juge Robertson traite aussi de l'intérêt du public à ce qu'il soit garanti que les plans de site d'installations nucléaires ne seront pas, par exemple, affichés sur un site Web. Il conclut qu'une ordonnance de confidentialité n'aurait aucun impact négatif sur les deux objectifs primordiaux du principe de la publicité des débats judiciaires, savoir la vérité et la primauté du droit. Il aurait par conséquent accueilli l'appel et rejeté l'appel incident.

V.   Questions en litige

A.   Quelle méthode d'analyse faut-il appliquer à l'exercice du pouvoir judiciaire discrétionnaire lorsqu'une partie demande une ordonnance de confidentialité en vertu de la règle 151 des *Règles de la Cour fédérale (1998)*?

B.   Y a-t-il lieu d'accorder l'ordonnance de confidentialité en l'espèce?

VI.   Analyse

A.   *Méthode d'analyse applicable aux ordonnances de confidentialité*

(1)   Le cadre général : les principes de l'arrêt *Dagenais*

Le lien entre la publicité des procédures judiciaires et la liberté d'expression est solidement établi dans *Société Radio-Canada c. Nouveau-Brunswick (Procureur général)*, [1996] 3 R.C.S. 480. Le juge La Forest l'exprime en ces termes au par. 23 :

Le principe de la publicité des débats en justice est inextricablement lié aux droits garantis à l'al. 2*b*). Grâce à ce principe, le public a accès à l'information concernant les tribunaux, ce qui lui permet ensuite de discuter des pratiques des tribunaux et des procédures qui s'y déroulent, et d'émettre des opinions et des critiques à cet égard. La liberté d'exprimer des idées et des opinions sur

freedom guaranteed by s. 2(*b*), so too is the right of members of the public to obtain information about the courts in the first place.

Under the order sought, public access and public scrutiny of the Confidential Documents would be restricted; this would clearly infringe the public's freedom of expression guarantee.

A discussion of the general approach to be taken in the exercise of judicial discretion to grant a confidentiality order should begin with the principles set out by this Court in *Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835. Although that case dealt with the common law jurisdiction of the court to order a publication ban in the criminal law context, there are strong similarities between publication bans and confidentiality orders in the context of judicial proceedings. In both cases a restriction on freedom of expression is sought in order to preserve or promote an interest engaged by those proceedings. As such, the fundamental question for a court to consider in an application for a publication ban or a confidentiality order is whether, in the circumstances, the right to freedom of expression should be compromised.

Although in each case freedom of expression will be engaged in a different context, the *Dagenais* framework utilizes overarching *Canadian Charter of Rights and Freedoms* principles in order to balance freedom of expression with other rights and interests, and thus can be adapted and applied to various circumstances. As a result, the analytical approach to the exercise of discretion under Rule 151 should echo the underlying principles laid out in *Dagenais*, although it must be tailored to the specific rights and interests engaged in this case.

*Dagenais* dealt with an application by four accused persons under the court's common law jurisdiction requesting an order prohibiting the broadcast of a television programme dealing with the physical and sexual abuse of young boys at

le fonctionnement des tribunaux relève clairement de la liberté garantie à l'al. 2*b*), mais en relève également le droit du public d'obtenir au préalable de l'information sur les tribunaux.

L'ordonnance sollicitée aurait pour effet de limiter l'accès du public aux documents confidentiels et leur examen public; cela porterait clairement atteinte à la garantie de la liberté d'expression du public.

L'examen de la méthode générale à suivre dans l'exercice du pouvoir discrétionnaire d'accorder une ordonnance de confidentialité devrait commencer par les principes établis par la Cour dans *Dagenais c. Société Radio-Canada*, [1994] 3 R.C.S. 835. Cette affaire portait sur le pouvoir discrétionnaire judiciaire, issu de la common law, de rendre des ordonnances de non-publication dans le cadre de procédures criminelles, mais il y a de fortes ressemblances entre les interdictions de publication et les ordonnances de confidentialité dans le contexte des procédures judiciaires. Dans les deux cas, on cherche à restreindre la liberté d'expression afin de préserver ou de promouvoir un intérêt en jeu dans les procédures. En ce sens, la question fondamentale que doit résoudre le tribunal auquel on demande une interdiction de publication ou une ordonnance de confidentialité est de savoir si, dans les circonstances, il y a lieu de restreindre le droit à la liberté d'expression.

Même si, dans chaque cas, la liberté d'expression entre en jeu dans un contexte différent, le cadre établi dans *Dagenais* fait appel aux principes déterminants de la *Charte canadienne des droits et libertés* afin de pondérer la liberté d'expression avec d'autres droits et intérêts, et peut donc être adapté et appliqué à diverses circonstances. L'analyse de l'exercice du pouvoir discrétionnaire sous le régime de la règle 151 devrait par conséquent refléter les principes sous-jacents établis par *Dagenais*, même s'il faut pour cela l'ajuster aux droits et intérêts précis qui sont en jeu en l'espèce.

L'affaire *Dagenais* porte sur une requête par laquelle quatre accusés demandaient à la cour de rendre, en vertu de sa compétence de common law, une ordonnance interdisant la diffusion d'une émission de télévision décrivant des abus physiques et

37

38

39

religious institutions. The applicants argued that because the factual circumstances of the programme were very similar to the facts at issue in their trials, the ban was necessary to preserve the accuseds' right to a fair trial.

40    Lamer C.J. found that the common law discretion to order a publication ban must be exercised within the boundaries set by the principles of the *Charter*. Since publication bans necessarily curtail the freedom of expression of third parties, he adapted the pre-*Charter* common law rule such that it balanced the right to freedom of expression with the right to a fair trial of the accused in a way which reflected the substance of the test from *R. v. Oakes*, [1986] 1 S.C.R. 103. At p. 878 of *Dagenais*, Lamer C.J. set out his reformulated test:

A publication ban should only be ordered when:

(a) Such a ban is <u>necessary</u> in order to prevent a real and substantial risk to the fairness of the trial, because reasonably available alternative measures will not prevent the risk; and

(b) The salutary effects of the publication ban outweigh the deleterious effects to the free expression of those affected by the ban. [Emphasis in original.]

41    In *New Brunswick*, *supra*, this Court modified the *Dagenais* test in the context of the related issue of how the discretionary power under s. 486(1) of the *Criminal Code*, R.S.C. 1985, c. C-46, to exclude the public from a trial should be exercised. That case dealt with an appeal from the trial judge's order excluding the public from the portion of a sentencing proceeding for sexual assault and sexual interference dealing with the specific acts committed by the accused on the basis that it would avoid "undue hardship" to both the victims and the accused.

42    La Forest J. found that s. 486(1) was a restriction on the s. 2(*b*) right to freedom of expression in that it provided a "discretionary bar on public and media access to the courts": *New Brunswick*, at para. 33;

sexuels infligés à de jeunes garçons dans des établissements religieux. Les requérants soutenaient que l'interdiction était nécessaire pour préserver leur droit à un procès équitable, parce que les faits racontés dans l'émission ressemblaient beaucoup aux faits en cause dans leurs procès.

Le juge en chef Lamer conclut que le pouvoir discrétionnaire de common law d'ordonner l'interdiction de publication doit être exercé dans les limites prescrites par les principes de la *Charte*. Puisque les ordonnances de non-publication restreignent nécessairement la liberté d'expression de tiers, il adapte la règle de common law qui s'appliquait avant l'entrée en vigueur de la *Charte* de façon à établir un juste équilibre entre le droit à la liberté d'expression et le droit de l'accusé à un procès équitable, d'une façon qui reflète l'essence du critère énoncé dans *R. c. Oakes*, [1986] 1 R.C.S. 103. À la page 878 de *Dagenais*, le juge en chef Lamer énonce le critère reformulé :

Une ordonnance de non-publication ne doit être rendue que si :

a) elle est <u>nécessaire</u> pour écarter le risque réel et important que le procès soit inéquitable, vu l'absence d'autres mesures raisonnables pouvant écarter ce risque;

b) ses effets bénéfiques sont plus importants que ses effets préjudiciables sur la libre expression de ceux qui sont touchés par l'ordonnance. [Souligné dans l'original.]

Dans *Nouveau-Brunswick*, précité, la Cour modifie le critère de l'arrêt *Dagenais* dans le contexte de la question voisine de l'exercice du pouvoir discrétionnaire d'ordonner l'exclusion du public d'un procès en vertu du par. 486(1) du *Code criminel*, L.R.C. 1985, ch. C-46. Il s'agissait d'un appel d'une décision du juge du procès d'ordonner l'exclusion du public de la partie des procédures de détermination de la peine pour agression sexuelle et contacts sexuels portant sur les actes précis commis par l'accusé, au motif que cela éviterait un « préjudice indu » aux victimes et à l'accusé.

Le juge La Forest conclut que le par. 486(1) limite la liberté d'expression garantie à l'al. 2*b*) en créant un « pouvoir discrétionnaire permettant d'interdire au public et aux médias l'accès aux

however he found this infringement to be justified under s. 1 provided that the discretion was exercised in accordance with the *Charter*. Thus, the approach taken by La Forest J. at para. 69 to the exercise of discretion under s. 486(1) of the *Criminal Code*, closely mirrors the *Dagenais* common law test:

(a) the judge must consider the available options and consider whether there are any other reasonable and effective alternatives available;

(b) the judge must consider whether the order is limited as much as possible; and

(c) the judge must weigh the importance of the objectives of the particular order and its probable effects against the importance of openness and the particular expression that will be limited in order to ensure that the positive and negative effects of the order are proportionate.

In applying this test to the facts of the case, La Forest J. found that the evidence of the potential undue hardship consisted mainly in the Crown's submission that the evidence was of a "delicate nature" and that this was insufficient to override the infringement on freedom of expression.

This Court has recently revisited the granting of a publication ban under the court's common law jurisdiction in *R. v. Mentuck*, [2001] 3 S.C.R. 442, 2001 SCC 76, and its companion case *R. v. O.N.E.*, [2001] 3 S.C.R. 478, 2001 SCC 77. In *Mentuck*, the Crown moved for a publication ban to protect the identity of undercover police officers and operational methods employed by the officers in their investigation of the accused. The accused opposed the motion as an infringement of his right to a fair and public hearing under s. 11(*d*) of the *Charter*. The order was also opposed by two intervening newspapers as an infringement of their right to freedom of expression.

The Court noted that, while *Dagenais* dealt with the balancing of freedom of expression on the one hand, and the right to a fair trial of the accused on the other, in the case before it, both the right of the

tribunaux » (*Nouveau-Brunswick*, par. 33). Il considère toutefois que l'atteinte peut être justifiée en vertu de l'article premier pourvu que le pouvoir discrétionnaire soit exercé conformément à la *Charte*. Donc l'analyse de l'exercice du pouvoir discrétionnaire en vertu du par. 486(1) du *Code criminel*, décrite par le juge La Forest au par. 69, concorde étroitement avec le critère de common law établi par *Dagenais* :

a) le juge doit envisager les solutions disponibles et se demander s'il existe d'autres mesures de rechange raisonnables et efficaces;

b) il doit se demander si l'ordonnance a une portée aussi limitée que possible; et

c) il doit comparer l'importance des objectifs de l'ordonnance et de ses effets probables avec l'importance de la publicité des procédures et l'activité d'expression qui sera restreinte, afin de veiller à ce que les effets positifs et négatifs de l'ordonnance soient proportionnels.

Appliquant cette analyse aux faits de l'espèce, le juge La Forest conclut que la preuve du risque de préjudice indu consiste principalement en la prétention de l'avocat du ministère public quant à la « nature délicate » des faits relatifs aux infractions et que cela ne suffit pas pour justifier l'atteinte à la liberté d'expression.

43   La Cour a récemment réexaminé la question des interdictions de publication prononcées par un tribunal en vertu de sa compétence de common law dans *R. c. Mentuck*, [2001] 3 R.C.S. 442, 2001 CSC 76, et l'arrêt connexe *R. c. O.N.E.*, [2001] 3 R.C.S. 478, 2001 CSC 77. Dans *Mentuck*, le ministère public demandait l'interdiction de publication en vue de protéger l'identité de policiers banalisés et leurs méthodes d'enquête. L'accusé s'opposait à la demande en soutenant que l'interdiction porterait atteinte à son droit à un procès public et équitable protégé par l'al. 11*d*) de la *Charte*. Deux journaux intervenants s'opposaient aussi à la requête, en faisant valoir qu'elle porterait atteinte à leur droit à la liberté d'expression.

44   La Cour fait remarquer que *Dagenais* traite de la pondération de la liberté d'expression, d'une part, et du droit de l'accusé à un procès équitable, d'autre part, tandis que dans l'affaire dont elle est saisie, le

accused to a fair and public hearing, and freedom of expression weighed in favour of denying the publication ban. These rights were balanced against interests relating to the proper administration of justice, in particular, protecting the safety of police officers and preserving the efficacy of undercover police operations.

45   In spite of this distinction, the Court noted that underlying the approach taken in both *Dagenais* and *New Brunswick* was the goal of ensuring that the judicial discretion to order publication bans is subject to no lower a standard of compliance with the *Charter* than legislative enactment. This goal is furthered by incorporating the essence of s. 1 of the *Charter* and the *Oakes* test into the publication ban test. Since this same goal applied in the case before it, the Court adopted a similar approach to that taken in *Dagenais*, but broadened the *Dagenais* test (which dealt specifically with the right of an accused to a fair trial) such that it could guide the exercise of judicial discretion where a publication ban is requested in order to preserve <u>any</u> important aspect of the proper administration of justice. At para. 32, the Court reformulated the test as follows:

A publication ban should only be ordered when:

(a) such an order is necessary in order to prevent a serious risk to the proper administration of justice because reasonably alternative measures will not prevent the risk; and

(b) the salutary effects of the publication ban outweigh the deleterious effects on the rights and interests of the parties and the public, including the effects on the right to free expression, the right of the accused to a fair and public trial, and the efficacy of the administration of justice.

46   The Court emphasized that under the first branch of the test, three important elements were subsumed under the "necessity" branch. First, the risk in question must be a serious risk well grounded in the evidence. Second, the phrase "proper administration of justice" must be carefully interpreted so as not to

droit de l'accusé à un procès public et équitable tout autant que la liberté d'expression militent en faveur du rejet de la requête en interdiction de publication. Ces droits ont été soupesés avec l'intérêt de la bonne administration de la justice, en particulier la protection de la sécurité des policiers et le maintien de l'efficacité des opérations policières secrètes.

Malgré cette distinction, la Cour note que la méthode retenue dans *Dagenais* et *Nouveau-Brunswick* a pour objectif de garantir que le pouvoir discrétionnaire des tribunaux d'ordonner des interdictions de publication n'est pas assujetti à une norme de conformité à la *Charte* moins exigeante que la norme applicable aux dispositions législatives. Elle vise cet objectif en incorporant l'essence de l'article premier de la *Charte* et le critère *Oakes* dans l'analyse applicable aux interdictions de publication. Comme le même objectif s'applique à l'affaire dont elle est saisie, la Cour adopte une méthode semblable à celle de *Dagenais*, mais en élargissant le critère énoncé dans cet arrêt (qui portait spécifiquement sur le droit de l'accusé à un procès équitable) de manière à fournir un guide à l'exercice du pouvoir discrétionnaire des tribunaux dans les requêtes en interdiction de publication, afin de protéger <u>tout</u> aspect important de la bonne administration de la justice. La Cour reformule le critère en ces termes (au par. 32) :

Une ordonnance de non-publication ne doit être rendue que si :

a) elle est nécessaire pour écarter le risque sérieux pour la bonne administration de la justice, vu l'absence d'autres mesures raisonnables pouvant écarter ce risque;

b) ses effets bénéfiques sont plus importants que ses effets préjudiciables sur les droits et les intérêts des parties et du public, notamment ses effets sur le droit à la libre expression, sur le droit de l'accusé à un procès public et équitable, et sur l'efficacité de l'administration de la justice.

La Cour souligne que dans le premier volet de l'analyse, trois éléments importants sont subsumés sous la notion de « nécessité ». En premier lieu, le risque en question doit être sérieux et bien étayé par la preuve. En deuxième lieu, l'expression « bonne administration de la justice » doit être interprétée

allow the concealment of an excessive amount of information. Third, the test requires the judge ordering the ban to consider not only whether reasonable alternatives are available, but also to restrict the ban as far as possible without sacrificing the prevention of the risk.

At para. 31, the Court also made the important observation that the proper administration of justice will not necessarily involve *Charter* rights, and that the ability to invoke the *Charter* is not a necessary condition for a publication ban to be granted:

> The [common law publication ban] rule can accommodate orders that must occasionally be made in the interests of the administration of justice, which encompass more than fair trial rights. As the test is intended to "reflec[t] the substance of the *Oakes* test", we cannot require that *Charter* rights be the only legitimate objective of such orders any more than we require that government action or legislation in violation of the *Charter* be justified exclusively by the pursuit of another *Charter* right. [Emphasis added.]

The Court also anticipated that, in appropriate circumstances, the *Dagenais* framework could be expanded even further in order to address requests for publication bans where interests other than the administration of justice were involved.

*Mentuck* is illustrative of the flexibility of the *Dagenais* approach. Since its basic purpose is to ensure that the judicial discretion to deny public access to the courts is exercised in accordance with *Charter* principles, in my view, the *Dagenais* model can and should be adapted to the situation in the case at bar where the central issue is whether judicial discretion should be exercised so as to exclude confidential information from a public proceeding. As in *Dagenais*, *New Brunswick* and *Mentuck*, granting the confidentiality order will have a negative effect on the *Charter* right to freedom of expression, as well as the principle of open and accessible court proceedings, and, as in those cases, courts must ensure that the discretion to grant the order is exercised in accordance with *Charter* principles.

judicieusement de façon à ne pas empêcher la divulgation d'un nombre excessif de renseignements. En troisième lieu, le critère exige non seulement que le juge qui prononce l'ordonnance détermine s'il existe des mesures de rechange raisonnables, mais aussi qu'il limite l'ordonnance autant que possible sans pour autant sacrifier la prévention du risque.

Au paragraphe 31, la Cour fait aussi l'importante observation que la bonne administration de la justice n'implique pas nécessairement des droits protégés par la *Charte*, et que la possibilité d'invoquer la *Charte* n'est pas une condition nécessaire à l'obtention d'une interdiction de publication :

> Elle [la règle de common law] peut s'appliquer aux ordonnances qui doivent parfois être rendues dans l'intérêt de l'administration de la justice, qui englobe davantage que le droit à un procès équitable. Comme on veut que le critère « reflète [. . .] l'essence du critère énoncé dans l'arrêt *Oakes* », nous ne pouvons pas exiger que ces ordonnances aient pour seul objectif légitime les droits garantis par la *Charte*, pas plus que nous exigeons que les actes gouvernementaux et les dispositions législatives contreviennent à la *Charte* soient justifiés exclusivement par la recherche d'un autre droit garanti par la *Charte*. [Je souligne.]

La Cour prévoit aussi que, dans les cas voulus, le critère de *Dagenais* pourrait être élargi encore davantage pour régir des requêtes en interdiction de publication mettant en jeu des questions autres que l'administration de la justice.

*Mentuck* illustre bien la souplesse de la méthode *Dagenais*. Comme elle a pour objet fondamental de garantir que le pouvoir discrétionnaire d'interdire l'accès du public aux tribunaux est exercé conformément aux principes de la *Charte*, à mon avis, le modèle *Dagenais* peut et devrait être adapté à la situation de la présente espèce, où la question centrale est l'exercice du pouvoir discrétionnaire du tribunal d'exclure des renseignements confidentiels au cours d'une procédure publique. Comme dans *Dagenais*, *Nouveau-Brunswick* et *Mentuck*, une ordonnance de confidentialité aura un effet négatif sur le droit à la liberté d'expression garanti par la *Charte*, de même que sur le principe de la publicité des débats judiciaires et, comme dans ces affaires, les tribunaux doivent veiller à ce que le

47

48

However, in order to adapt the test to the context of this case, it is first necessary to determine the particular rights and interests engaged by this application.

### (2) The Rights and Interests of the Parties

49    The immediate purpose for AECL's confidentiality request relates to its commercial interests. The information in question is the property of the Chinese authorities. If the appellant were to disclose the Confidential Documents, it would be in breach of its contractual obligations and suffer a risk of harm to its competitive position. This is clear from the findings of fact of the motions judge that AECL was bound by its commercial interests and its customer's property rights not to disclose the information (para. 27), and that such disclosure could harm the appellant's commercial interests (para. 23).

50    Aside from this direct commercial interest, if the confidentiality order is denied, then in order to protect its commercial interests, the appellant will have to withhold the documents. This raises the important matter of the litigation context in which the order is sought. As both the motions judge and the Federal Court of Appeal found that the information contained in the Confidential Documents was relevant to defences available under the *CEAA*, the inability to present this information hinders the appellant's capacity to make full answer and defence, or, expressed more generally, the appellant's right, as a civil litigant, to present its case. In that sense, preventing the appellant from disclosing these documents on a confidential basis infringes its right to a fair trial. Although in the context of a civil proceeding this does not engage a *Charter* right, the right to a fair trial generally can be viewed as a fundamental principle of justice: *M. (A.) v. Ryan*, [1997] 1 S.C.R. 157, at para. 84, *per* L'Heureux-Dubé J. (dissenting, but not on that point). Although this fair trial right is directly relevant to the appellant, there is also a general public interest in protecting the right to a fair trial. Indeed, as a general proposition, all disputes in the courts should be decided under a fair trial standard. The legitimacy of the judicial process alone

pouvoir discrétionnaire d'accorder l'ordonnance soit exercé conformément aux principes de la *Charte*. Toutefois, pour adapter le critère au contexte de la présente espèce, il faut d'abord définir les droits et intérêts particuliers qui entrent en jeu.

### (2) Les droits et les intérêts des parties

L'objet immédiat de la demande d'ordonnance de confidentialité d'ÉACL a trait à ses intérêts commerciaux. Les renseignements en question appartiennent aux autorités chinoises. Si l'appelante divulguait les documents confidentiels, elle manquerait à ses obligations contractuelles et s'exposerait à une détérioration de sa position concurrentielle. Il ressort clairement des conclusions de fait du juge des requêtes qu'ÉACL est tenue, par ses intérêts commerciaux et par les droits de propriété de son client, de ne pas divulguer ces renseignements (par. 27), et que leur divulgation risque de nuire aux intérêts commerciaux de l'appelante (par. 23).

Indépendamment de cet intérêt commercial direct, en cas de refus de l'ordonnance de confidentialité, l'appelante devra, pour protéger ses intérêts commerciaux, s'abstenir de produire les documents. Cela soulève l'importante question du contexte de la présentation de la demande. Comme le juge des requêtes et la Cour d'appel fédérale concluent tous deux que l'information contenue dans les documents confidentiels est pertinente pour les moyens de défense prévus par la *LCÉE*, le fait de ne pouvoir la produire nuit à la capacité de l'appelante de présenter une défense pleine et entière ou, plus généralement, au droit de l'appelante, en sa qualité de justiciable civile, de défendre sa cause. En ce sens, empêcher l'appelante de divulguer ces documents pour des raisons de confidentialité porte atteinte à son droit à un procès équitable. Même si en matière civile cela n'engage pas de droit protégé par la *Charte*, le droit à un procès équitable peut généralement être considéré comme un principe de justice fondamentale : *M. (A.) c. Ryan*, [1997] 1 R.C.S. 157, par. 84, le juge L'Heureux-Dubé (dissidente, mais non sur ce point). Le droit à un procès équitable intéresse directement l'appelante, mais le public a aussi un intérêt général à la protection du droit à un procès équitable. À vrai dire, le principe

demands as much. Similarly, courts have an interest in having all relevant evidence before them in order to ensure that justice is done.

Thus, the interests which would be promoted by a confidentiality order are the preservation of commercial and contractual relations, as well as the right of civil litigants to a fair trial. Related to the latter are the public and judicial interests in seeking the truth and achieving a just result in civil proceedings.

In opposition to the confidentiality order lies the fundamental principle of open and accessible court proceedings. This principle is inextricably tied to freedom of expression enshrined in s. 2(*b*) of the *Charter*: *New Brunswick*, *supra*, at para. 23. The importance of public and media access to the courts cannot be understated, as this access is the method by which the judicial process is scrutinized and criticized. Because it is essential to the administration of justice that justice is done and is <u>seen</u> to be done, such public scrutiny is fundamental. The open court principle has been described as "the very soul of justice", guaranteeing that justice is administered in a non-arbitrary manner: *New Brunswick*, at para. 22.

### (3) Adapting the *Dagenais* Test to the Rights and Interests of the Parties

Applying the rights and interests engaged in this case to the analytical framework of *Dagenais* and subsequent cases discussed above, the test for whether a confidentiality order ought to be granted in a case such as this one should be framed as follows:

A confidentiality order under Rule 151 should only be granted when:

(a) such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

général est que tout litige porté devant les tribunaux doit être tranché selon la norme du procès équitable. La légitimité du processus judiciaire n'exige pas moins. De même, les tribunaux ont intérêt à ce que toutes les preuves pertinentes leur soient présentées pour veiller à ce que justice soit faite.

Ainsi, les intérêts que favoriserait l'ordonnance de confidentialité seraient le maintien de relations commerciales et contractuelles, de même que le droit des justiciables civils à un procès équitable. Est lié à ce dernier droit l'intérêt du public et du judiciaire dans la recherche de la vérité et la solution juste des litiges civils. 51

Milite contre l'ordonnance de confidentialité le principe fondamental de la publicité des débats judiciaires. Ce principe est inextricablement lié à la liberté d'expression constitutionnalisée à l'al. 2*b*) de la *Charte* : *Nouveau-Brunswick*, précité, par. 23. L'importance de l'accès du public et des médias aux tribunaux ne peut être sous-estimée puisque l'accès est le moyen grâce auquel le processus judiciaire est soumis à l'examen et à la critique. Comme il est essentiel à l'administration de la justice que justice soit faite et soit <u>perçue</u> comme l'étant, cet examen public est fondamental. Le principe de la publicité des procédures judiciaires a été décrit comme le « souffle même de la justice », la garantie de l'absence d'arbitraire dans l'administration de la justice : *Nouveau-Brunswick*, par. 22. 52

### (3) Adaptation de l'analyse de *Dagenais* aux droits et intérêts des parties

Pour appliquer aux droits et intérêts en jeu en l'espèce l'analyse de *Dagenais* et des arrêts subséquents précités, il convient d'énoncer de la façon suivante les conditions applicables à une ordonnance de confidentialité dans un cas comme l'espèce : 53

Une ordonnance de confidentialité en vertu de la règle 151 ne doit être rendue que si :

a) elle est nécessaire pour écarter un risque sérieux pour un intérêt important, y compris un intérêt commercial, dans le contexte d'un litige, en l'absence d'autres options raisonnables pour écarter ce risque;

(b) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.

54    As in *Mentuck*, I would add that three important elements are subsumed under the first branch of this test. First, the risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.

55    In addition, the phrase "important commercial interest" is in need of some clarification. In order to qualify as an "important commercial interest", the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. For example, a private company could not argue simply that the existence of a particular contract should not be made public because to do so would cause the company to lose business, thus harming its commercial interests. However, if, as in this case, exposure of information would cause a breach of a confidentiality agreement, then the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information. Simply put, if there is no general principle at stake, there can be no "important commercial interest" for the purposes of this test. Or, in the words of Binnie J. in *F.N. (Re)*, [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court rule only yields "where the public interest in confidentiality outweighs the public interest in openness" (emphasis added).

56    In addition to the above requirement, courts must be cautious in determining what constitutes an "important commercial interest". It must be remembered that a confidentiality order involves an infringement on freedom of expression. Although the balancing of the commercial interest with freedom of expression takes place under the second

b)    ses effets bénéfiques, y compris ses effets sur le droit des justiciables civils à un procès équitable, l'emportent sur ses effets préjudiciables, y compris ses effets sur la liberté d'expression qui, dans ce contexte, comprend l'intérêt du public dans la publicité des débats judiciaires.

Comme dans *Mentuck*, j'ajouterais que trois éléments importants sont subsumés sous le premier volet de l'analyse. En premier lieu, le risque en cause doit être réel et important, en ce qu'il est bien étayé par la preuve et menace gravement l'intérêt commercial en question.

De plus, l'expression « intérêt commercial important » exige une clarification. Pour être qualifié d'« intérêt commercial important », l'intérêt en question ne doit pas se rapporter uniquement et spécifiquement à la partie qui demande l'ordonnance de confidentialité; il doit s'agir d'un intérêt qui peut se définir en termes d'intérêt public à la confidentialité. Par exemple, une entreprise privée ne pourrait simplement prétendre que l'existence d'un contrat donné ne devrait pas être divulguée parce que cela lui ferait perdre des occasions d'affaires, et que cela nuirait à ses intérêts commerciaux. Si toutefois, comme en l'espèce, la divulgation de renseignements doit entraîner un manquement à une entente de non-divulgation, on peut alors parler plus largement de l'intérêt commercial général dans la protection des renseignements confidentiels. Simplement, si aucun principe général n'entre en jeu, il ne peut y avoir d'« intérêt commercial important » pour les besoins de l'analyse. Ou, pour citer le juge Binnie dans *F.N. (Re)*, [2000] 1 R.C.S. 880, 2000 CSC 35, par. 10, la règle de la publicité des débats judiciaires ne cède le pas que « dans les cas où le droit du public à la confidentialité l'emporte sur le droit du public à l'accessibilité » (je souligne).

Outre l'exigence susmentionnée, les tribunaux doivent déterminer avec prudence ce qui constitue un « intérêt commercial important ». Il faut rappeler qu'une ordonnance de confidentialité implique une atteinte à la liberté d'expression. Même si la pondération de l'intérêt commercial et de la liberté d'expression intervient à la deuxième étape

branch of the test, courts must be alive to the fundamental importance of the open court rule. See generally Muldoon J. in *Eli Lilly and Co. v. Novopharm Ltd.* (1994), 56 C.P.R. (3d) 437 (F.C.T.D.), at p. 439.

Finally, the phrase "reasonably alternative measures" requires the judge to consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

B. *Application of the Test to this Appeal*

(1) Necessity

At this stage, it must be determined whether disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and whether there are reasonable alternatives, either to the order itself, or to its terms.

The commercial interest at stake here relates to the objective of preserving contractual obligations of confidentiality. The appellant argues that it will suffer irreparable harm to its commercial interests if the Confidential Documents are disclosed. In my view, the preservation of confidential information constitutes a sufficiently important commercial interest to pass the first branch of the test as long as certain criteria relating to the information are met.

Pelletier J. noted that the order sought in this case was similar in nature to an application for a protective order which arises in the context of patent litigation. Such an order requires the applicant to demonstrate that the information in question has been treated at all relevant times as confidential and that on a balance of probabilities its proprietary, commercial and scientific interests could reasonably be harmed by the disclosure of the information: *AB Hassle v. Canada (Minister of National Health and Welfare)* (1998), 83 C.P.R. (3d) 428 (F.C.T.D.), at p. 434. To this I would add the requirement proposed

de l'analyse, les tribunaux doivent avoir pleinement conscience de l'importance fondamentale de la règle de la publicité des débats judiciaires. Voir généralement *Eli Lilly and Co. c. Novopharm Ltd.* (1994), 56 C.P.R. (3d) 437 (C.F. 1re inst.), p. 439, le juge Muldoon.

Enfin, l'expression « autres options raisonnables » oblige le juge non seulement à se demander s'il existe des mesures raisonnables autres que l'ordonnance de confidentialité, mais aussi à restreindre l'ordonnance autant qu'il est raisonnablement possible de le faire tout en préservant l'intérêt commercial en question.

57

B. *Application de l'analyse en l'espèce*

(1) Nécessité

À cette étape, il faut déterminer si la divulgation des documents confidentiels ferait courir un risque sérieux à un intérêt commercial important de l'appelante, et s'il existe d'autres solutions raisonnables que l'ordonnance elle-même, ou ses modalités.

58

L'intérêt commercial en jeu en l'espèce a trait à la préservation d'obligations contractuelles de confidentialité. L'appelante fait valoir qu'un préjudice irréparable sera causé à ses intérêts commerciaux si les documents confidentiels sont divulgués. À mon avis, la préservation de renseignements confidentiels est un intérêt commercial suffisamment important pour satisfaire au premier volet de l'analyse dès lors que certaines conditions relatives aux renseignements sont réunies.

59

Le juge Pelletier souligne que l'ordonnance sollicitée en l'espèce s'apparente à une ordonnance conservatoire en matière de brevets. Pour l'obtenir, le requérant doit démontrer que les renseignements en question ont toujours été traités comme des renseignements confidentiels et que, selon la prépondérance des probabilités, il est raisonnable de penser que leur divulgation risquerait de compromettre ses droits exclusifs, commerciaux et scientifiques : *AB Hassle c. Canada (Ministre de la Santé nationale et du Bien-être social)*, [1998] A.C.F. no 1850 (QL) (C.F. 1re inst.), par. 29-30. J'ajouterais à cela

60

by Robertson J.A. that the information in question must be of a "confidential nature" in that it has been "accumulated with a reasonable expectation of it being kept confidential" as opposed to "facts which a litigant would like to keep confidential by having the courtroom doors closed" (para. 14).

61    Pelletier J. found as a fact that the *AB Hassle* test had been satisfied in that the information had clearly been treated as confidential both by the appellant and by the Chinese authorities, and that, on a balance of probabilities, disclosure of the information could harm the appellant's commercial interests (para. 23). As well, Robertson J.A. found that the information in question was clearly of a confidential nature as it was commercial information, consistently treated and regarded as confidential, that would be of interest to AECL's competitors (para. 16). Thus, the order is sought to prevent a serious risk to an important commercial interest.

62    The first branch of the test also requires the consideration of alternative measures to the confidentiality order, as well as an examination of the scope of the order to ensure that it is not overly broad. Both courts below found that the information contained in the Confidential Documents was relevant to potential defences available to the appellant under the *CEAA* and this finding was not appealed at this Court. Further, I agree with the Court of Appeal's assertion (at para. 99) that, given the importance of the documents to the right to make full answer and defence, the appellant is, practically speaking, compelled to produce the documents. Given that the information is necessary to the appellant's case, it remains only to determine whether there are reasonably alternative means by which the necessary information can be adduced without disclosing the confidential information.

63    Two alternatives to the confidentiality order were put forward by the courts below. The motions judge suggested that the Confidential Documents could be expunged of their commercially sensitive contents, and edited versions of the documents could be

l'exigence proposée par le juge Robertson que les renseignements soient « de nature confidentielle » en ce qu'ils ont été « recueillis dans l'expectative raisonnable qu'ils resteront confidentiels », par opposition à « des faits qu'une partie à un litige voudrait garder confidentiels en obtenant le huis clos » (par. 14).

Le juge Pelletier constate que le critère établi dans *AB Hassle* est respecté puisque tant l'appelante que les autorités chinoises ont toujours considéré les renseignements comme confidentiels et que, selon la prépondérance des probabilités, leur divulgation risque de nuire aux intérêts commerciaux de l'appelante (par. 23). Le juge Robertson conclut lui aussi que les renseignements en question sont clairement confidentiels puisqu'il s'agit de renseignements commerciaux, uniformément reconnus comme étant confidentiels, qui présentent un intérêt pour les concurrents d'ÉACL (par. 16). Par conséquent, l'ordonnance est demandée afin de prévenir un risque sérieux de préjudice à un intérêt commercial important.

Le premier volet de l'analyse exige aussi l'examen d'options raisonnables autres que l'ordonnance de confidentialité, et de la portée de l'ordonnance pour s'assurer qu'elle n'est pas trop vaste. Les deux jugements antérieurs en l'espèce concluent que les renseignements figurant dans les documents confidentiels sont pertinents pour les moyens de défense offerts à l'appelante en vertu de la *LCÉE*, et cette conclusion n'est pas portée en appel devant notre Cour. De plus, je suis d'accord avec la Cour d'appel lorsqu'elle affirme (au par. 99) que vu l'importance des documents pour le droit de présenter une défense pleine et entière, l'appelante est pratiquement forcée de les produire. Comme les renseignements sont nécessaires à la cause de l'appelante, il ne reste qu'à déterminer s'il existe d'autres options raisonnables pour communiquer les renseignements nécessaires sans divulguer de renseignements confidentiels.

Deux options autres que l'ordonnance de confidentialité sont mentionnées dans les décisions antérieures. Le juge des requêtes suggère de retrancher des documents les passages commercialement délicats et de produire les versions ainsi modifiées.

filed. As well, the majority of the Court of Appeal, in addition to accepting the possibility of expungement, was of the opinion that the summaries of the Confidential Documents included in the affidavits could go a long way to compensate for the absence of the originals. If either of these options is a reasonable alternative to submitting the Confidential Documents under a confidentiality order, then the order is not necessary, and the application does not pass the first branch of the test.

There are two possible options with respect to expungement, and in my view, there are problems with both of these. The first option would be for AECL to expunge the confidential information without disclosing the expunged material to the parties and the court. However, in this situation the filed material would still differ from the material used by the affiants. It must not be forgotten that this motion arose as a result of Sierra Club's position that the summaries contained in the affidavits should be accorded little or no weight without the presence of the underlying documents. Even if the relevant information and the confidential information were mutually exclusive, which would allow for the disclosure of all the information relied on in the affidavits, this relevancy determination could not be tested on cross-examination because the expunged material would not be available. Thus, even in the best case scenario, where only irrelevant information needed to be expunged, the parties would be put in essentially the same position as that which initially generated this appeal, in the sense that, at least some of the material relied on to prepare the affidavits in question would not be available to Sierra Club.

Further, I agree with Robertson J.A. that this best case scenario, where the relevant and the confidential information do not overlap, is an untested assumption (para. 28). Although the documents themselves were not put before the courts on this motion, given that they comprise thousands of pages of detailed information, this assumption is at best optimistic. The expungement alternative would be further complicated by the fact that the Chinese

La majorité en Cour d'appel estime que, outre cette possibilité d'épuration des documents, l'inclusion dans les affidavits d'un résumé des documents confidentiels pourrait, dans une large mesure, compenser l'absence des originaux. Si l'une ou l'autre de ces deux options peut raisonnablement se substituer au dépôt des documents confidentiels aux termes d'une ordonnance de confidentialité, alors l'ordonnance n'est pas nécessaire et la requête ne franchit pas la première étape de l'analyse.

64

Il existe deux possibilités pour l'épuration des documents et, selon moi, elles comportent toutes deux des problèmes. La première serait que ÉACL retranche les renseignements confidentiels sans divulguer les éléments retranchés ni aux parties ni au tribunal. Toutefois, dans cette situation, la documentation déposée serait encore différente de celle utilisée pour les affidavits. Il ne faut pas perdre de vue que la requête découle de l'argument de Sierra Club selon lequel le tribunal ne devrait accorder que peu ou pas de poids aux résumés sans la présence des documents de base. Même si on pouvait totalement séparer les renseignements pertinents et les renseignements confidentiels, ce qui permettrait la divulgation de tous les renseignements sur lesquels se fondent les affidavits, l'appréciation de leur pertinence ne pourrait pas être mise à l'épreuve en contre-interrogatoire puisque la documentation retranchée ne serait pas disponible. Par conséquent, même dans le meilleur cas de figure, où l'on n'aurait qu'à retrancher les renseignements non pertinents, les parties se retrouveraient essentiellement dans la même situation que celle qui a donné lieu au pourvoi, en ce sens qu'au moins une partie des documents ayant servi à la préparation des affidavits en question ne serait pas mise à la disposition de Sierra Club.

65

De plus, je partage l'opinion du juge Robertson que ce meilleur cas de figure, où les renseignements pertinents et les renseignements confidentiels ne se recoupent pas, est une hypothèse non confirmée (par. 28). Même si les documents eux-mêmes n'ont pas été produits devant les tribunaux dans le cadre de la présente requête, parce qu'ils comprennent des milliers de pages de renseignements détaillés, cette hypothèse est au mieux optimiste. L'option de

authorities require prior approval for any request by AECL to disclose information.

66    The second option is that the expunged material be made available to the court and the parties under a more narrowly drawn confidentiality order. Although this option would allow for slightly broader public access than the current confidentiality request, in my view, this minor restriction to the current confidentiality request is not a viable alternative given the difficulties associated with expungement in these circumstances. The test asks whether there are <u>reasonably</u> alternative measures; it does not require the adoption of the absolutely least restrictive option. With respect, in my view, expungement of the Confidential Documents would be a virtually unworkable and ineffective solution that is not reasonable in the circumstances.

67    A second alternative to a confidentiality order was Evans J.A.'s suggestion that the summaries of the Confidential Documents included in the affidavits "may well go a long way to compensate for the absence of the originals" (para. 103). However, he appeared to take this fact into account merely as a factor to be considered when balancing the various interests at stake. I would agree that at this threshold stage to rely on the summaries alone, in light of the intention of Sierra Club to argue that they should be accorded little or no weight, does not appear to be a "reasonably alternative measure" to having the underlying documents available to the parties.

68    With the above considerations in mind, I find the confidentiality order necessary in that disclosure of the Confidential Documents would impose a serious risk on an important commercial interest of the appellant, and that there are no reasonably alternative measures to granting the order.

    (2)  <u>The Proportionality Stage</u>

69    As stated above, at this stage, the salutary effects of the confidentiality order, including the effects on the appellant's right to a fair trial, must be weighed against the deleterious effects of the confidentiality order, including the effects on the right to free

l'épuration serait en outre compliquée par le fait que les autorités chinoises exigent l'approbation préalable de toute demande de divulgation de renseignements de la part d'ÉACL.

    La deuxième possibilité serait de mettre les documents supprimés à la disposition du tribunal et des parties en vertu d'une ordonnance de confidentialité plus restreinte. Bien que cela permettrait un accès public un peu plus large que ne le ferait l'ordonnance de confidentialité sollicitée, selon moi, cette restriction mineure à la requête n'est une option viable étant donné les difficultés liées à l'épuration dans les circonstances. Il s'agit de savoir s'il y a d'autres options <u>raisonnables</u> et non d'adopter l'option qui soit absolument la moins restrictive. Avec égards, j'estime que l'épuration des documents confidentiels serait une solution virtuellement impraticable et inefficace qui n'est pas raisonnable dans les circonstances.

    Une deuxième option autre que l'ordonnance de confidentialité serait, selon le juge Evans, l'inclusion dans les affidavits d'un résumé des documents confidentiels pour « dans une large mesure, compenser [leur] absence » (par. 103). Il ne semble toutefois envisager ce fait qu'à titre de facteur à considérer dans la pondération des divers intérêts en cause. Je conviens qu'à cette étape liminaire, se fonder uniquement sur les résumés en connaissant l'intention de Sierra Club de plaider leur faiblesse ou l'absence de valeur probante, ne semble pas être une « autre option raisonnable » à la communication aux parties des documents de base.

    Vu les facteurs susmentionnés, je conclus que l'ordonnance de confidentialité est nécessaire en ce que la divulgation des documents confidentiels ferait courir un risque sérieux à un intérêt commercial important de l'appelante, et qu'il n'existe pas d'autres options raisonnables.

    (2)  <u>L'étape de la proportionnalité</u>

    Comme on le mentionne plus haut, à cette étape, les effets bénéfiques de l'ordonnance de confidentialité, y compris ses effets sur le droit de l'appelante à un procès équitable, doivent être pondérés avec ses effets préjudiciables, y compris ses effets sur le droit

expression, which in turn is connected to the principle of open and accessible court proceedings. This balancing will ultimately determine whether the confidentiality order ought to be granted.

(a)  *Salutary Effects of the Confidentiality Order*

As discussed above, the primary interest that would be promoted by the confidentiality order is the public interest in the right of a civil litigant to present its case, or, more generally, the fair trial right. Because the fair trial right is being invoked in this case in order to protect commercial, not liberty, interests of the appellant, the right to a fair trial in this context is not a *Charter* right; however, a fair trial for all litigants has been recognized as a fundamental principle of justice: *Ryan*, *supra*, at para. 84. It bears repeating that there are circumstances where, in the absence of an affected *Charter* right, the proper administration of justice calls for a confidentiality order: *Mentuck*, *supra*, at para. 31. In this case, the salutary effects that such an order would have on the administration of justice relate to the ability of the appellant to present its case, as encompassed by the broader fair trial right.

The Confidential Documents have been found to be relevant to defences that will be available to the appellant in the event that the *CEAA* is found to apply to the impugned transaction and, as discussed above, the appellant cannot disclose the documents without putting its commercial interests at serious risk of harm. As such, there is a very real risk that, without the confidentiality order, the ability of the appellant to mount a successful defence will be seriously curtailed. I conclude, therefore, that the confidentiality order would have significant salutary effects on the appellant's right to a fair trial.

Aside from the salutary effects on the fair trial interest, the confidentiality order would also have a beneficial impact on other important rights and interests. First, as I discuss in more detail below, the confidentiality order would allow all parties and the court access to the Confidential Documents, and

à la liberté d'expression, qui à son tour est lié au principe de la publicité des débats judiciaires. Cette pondération déterminera finalement s'il y a lieu d'accorder l'ordonnance de confidentialité.

a)  *Les effets bénéfiques de l'ordonnance de confidentialité*

Comme nous l'avons vu, le principal intérêt qui serait promu par l'ordonnance de confidentialité est l'intérêt du public à la protection du droit du justiciable civil de faire valoir sa cause ou, de façon plus générale, du droit à un procès équitable. Puisque l'appelante l'invoque en l'espèce pour protéger ses intérêts commerciaux et non son droit à la liberté, le droit à un procès équitable dans ce contexte n'est pas un droit visé par la *Charte*; toutefois, le droit à un procès équitable pour tous les justiciables a été reconnu comme un principe de justice fondamentale : *Ryan*, précité, par. 84. Il y a lieu de rappeler qu'il y a des circonstances où, en l'absence de violation d'un droit garanti par la *Charte*, la bonne administration de la justice exige une ordonnance de confidentialité : *Mentuck*, précité, par. 31. En l'espèce, les effets bénéfiques d'une telle ordonnance sur l'administration de la justice tiennent à la capacité de l'appelante de soutenir sa cause, dans le cadre du droit plus large à un procès équitable.

Les documents confidentiels ont été jugés pertinents en ce qui a trait aux moyens de défense que l'appelante pourrait invoquer s'il est jugé que la *LCÉE* s'applique à l'opération attaquée et, comme nous l'avons vu, l'appelante ne peut communiquer les documents sans risque sérieux pour ses intérêts commerciaux. De ce fait, il existe un risque bien réel que, sans l'ordonnance de confidentialité, la capacité de l'appelante à mener à bien sa défense soit gravement réduite. Je conclus par conséquent que l'ordonnance de confidentialité aurait d'importants effets bénéfiques pour le droit de l'appelante à un procès équitable.

En plus des effets bénéfiques pour le droit à un procès équitable, l'ordonnance de confidentialité aurait aussi des incidences favorables sur d'autres droits et intérêts importants. En premier lieu, comme je l'exposerai plus en détail ci-après, l'ordonnance de confidentialité permettrait aux parties ainsi qu'au

70

71

72

Case 09-10138-MFW   Doc 10792-2   Filed 06/10/13   Page 33 of 118

550          SIERRA CLUB *v.* CANADA (MINISTER OF FINANCE)   *Iacobucci J.*          [2002] 2 S.C.R.

permit cross-examination based on their contents. By facilitating access to relevant documents in a judicial proceeding, the order sought would assist in the search for truth, a core value underlying freedom of expression.

tribunal d'avoir accès aux documents confidentiels, et permettrait la tenue d'un contre-interrogatoire fondé sur leur contenu. En facilitant l'accès aux documents pertinents dans une procédure judiciaire, l'ordonnance sollicitée favoriserait la recherche de la vérité, qui est une valeur fondamentale sous-tendant la liberté d'expression.

73   Second, I agree with the observation of Robertson J.A. that, as the Confidential Documents contain detailed technical information pertaining to the construction and design of a nuclear installation, it may be in keeping with the public interest to prevent this information from entering the public domain (para. 44). Although the exact contents of the documents remain a mystery, it is apparent that they contain technical details of a nuclear installation, and there may well be a substantial public security interest in maintaining the confidentiality of such information.

En deuxième lieu, je suis d'accord avec l'observation du juge Robertson selon laquelle puisque les documents confidentiels contiennent des renseignements techniques détaillés touchant la construction et la conception d'une installation nucléaire, il peut être nécessaire, dans l'intérêt public, d'empêcher que ces renseignements tombent dans le domaine public (par. 44). Même si le contenu exact des documents demeure un mystère, il est évident qu'ils comprennent des détails techniques d'une installation nucléaire et il peut bien y avoir un important intérêt de sécurité publique à préserver la confidentialité de ces renseignements.

### (b) *Deleterious Effects of the Confidentiality Order*

### b) *Les effets préjudiciables de l'ordonnance de confidentialité*

74   Granting the confidentiality order would have a negative effect on the open court principle, as the public would be denied access to the contents of the Confidential Documents. As stated above, the principle of open courts is inextricably tied to the s. 2(*b*) *Charter* right to freedom of expression, and public scrutiny of the courts is a fundamental aspect of the administration of justice: *New Brunswick, supra*, at paras. 22-23. Although as a <u>general</u> principle, the importance of open courts cannot be overstated, it is necessary to examine, in the context of this case, the <u>particular</u> deleterious effects on freedom of expression that the confidentiality order would have.

Une ordonnance de confidentialité aurait un effet préjudiciable sur le principe de la publicité des débats judiciaires, puisqu'elle priverait le public de l'accès au contenu des documents confidentiels. Comme on le dit plus haut, le principe de la publicité des débats judiciaires est inextricablement lié au droit à la liberté d'expression protégé par l'al. 2*b*) de la *Charte*, et la vigilance du public envers les tribunaux est un aspect fondamental de l'administration de la justice : *Nouveau-Brunswick*, précité, par. 22-23. Même si, à titre de principe <u>général</u>, l'importance de la publicité des débats judiciaires ne peut être sous-estimée, il faut examiner, dans le contexte de l'espèce, les effets préjudiciables <u>particuliers</u> que l'ordonnance de confidentialité aurait sur la liberté d'expression.

75   Underlying freedom of expression are the core values of (1) seeking the truth and the common good; (2) promoting self-fulfilment of individuals by allowing them to develop thoughts and ideas as they see fit; and (3) ensuring that participation in the political process is open to all persons: *Irwin Toy Ltd. v. Quebec (Attorney General)*, [1989] 1 S.C.R.

Les valeurs fondamentales qui sous-tendent la liberté d'expression sont (1) la recherche de la vérité et du bien commun; (2) l'épanouissement personnel par le libre développement des pensées et des idées; et (3) la participation de tous au processus politique : *Irwin Toy Ltd. c. Québec (Procureur général)*, [1989] 1 R.C.S. 927, p. 976; *R. c. Keegstra*, [1990]

927, at p. 976; *R. v. Keegstra*, [1990] 3 S.C.R. 697, at pp. 762-64, *per* Dickson C.J. *Charter* jurisprudence has established that the closer the speech in question lies to these core values, the harder it will be to justify a s. 2(*b*) infringement of that speech under s. 1 of the *Charter*: *Keegstra*, at pp. 760-61. Since the main goal in this case is to exercise judicial discretion in a way which conforms to *Charter* principles, a discussion of the deleterious effects of the confidentiality order on freedom of expression should include an assessment of the effects such an order would have on the three core values. The more detrimental the order would be to these values, the more difficult it will be to justify the confidentiality order. Similarly, minor effects of the order on the core values will make the confidentiality order easier to justify.

Seeking the truth is not only at the core of freedom of expression, but it has also been recognized as a fundamental purpose behind the open court rule, as the open examination of witnesses promotes an effective evidentiary process: *Edmonton Journal*, *supra*, at pp. 1357-58, *per* Wilson J. Clearly the confidentiality order, by denying public and media access to documents relied on in the proceedings, would impede the search for truth to some extent. Although the order would not exclude the public from the courtroom, the public and the media would be denied access to documents relevant to the evidentiary process.

However, as mentioned above, to some extent the search for truth may actually be <u>promoted</u> by the confidentiality order. This motion arises as a result of Sierra Club's argument that it must have access to the Confidential Documents in order to test the accuracy of Dr. Pang's evidence. If the order is denied, then the most likely scenario is that the appellant will not submit the documents with the unfortunate result that evidence which may be relevant to the proceedings will not be available to Sierra Club or the court. As a result, Sierra Club will not be able to fully test the accuracy of Dr. Pang's evidence on cross-examination. In addition, the court will not have the benefit of this cross-examination or

3 R.C.S. 697, p. 762-764, le juge en chef Dickson. La jurisprudence de la *Charte* établit que plus l'expression en cause est au cœur de ces valeurs fondamentales, plus il est difficile de justifier, en vertu de l'article premier de la *Charte*, une atteinte à l'al. 2*b*) à son égard : *Keegstra*, p. 760-761. Comme l'objectif principal en l'espèce est d'exercer un pouvoir discrétionnaire dans le respect des principes de la *Charte*, l'examen des effets préjudiciables de l'ordonnance de confidentialité sur la liberté d'expression devrait comprendre une appréciation des effets qu'elle aurait sur les trois valeurs fondamentales. Plus l'ordonnance de confidentialité porte préjudice à ces valeurs, plus il est difficile de la justifier. Inversement, des effets mineurs sur les valeurs fondamentales rendent l'ordonnance de confidentialité plus facile à justifier.

76

La recherche de la vérité est non seulement au cœur de la liberté d'expression, elle est aussi reconnue comme un objectif fondamental de la règle de la publicité des débats judiciaires, puisque l'examen public des témoins favorise l'efficacité du processus de présentation de la preuve : *Edmonton Journal*, précité, p. 1357-1358, le juge Wilson. À l'évidence, en enlevant au public et aux médias l'accès aux documents invoqués dans les procédures, l'ordonnance de confidentialité nuirait jusqu'à un certain point à la recherche de la vérité. L'ordonnance n'exclurait pas le public de la salle d'audience, mais le public et les médias n'auraient pas accès aux documents pertinents quant à la présentation de la preuve.

77

Toutefois, comme nous l'avons vu plus haut, la recherche de la vérité peut jusqu'à un certain point être <u>favorisée</u> par l'ordonnance de confidentialité. La présente requête résulte de l'argument de Sierra Club selon lequel il doit avoir accès aux documents confidentiels pour vérifier l'exactitude de la déposition de M. Pang. Si l'ordonnance est refusée, le scénario le plus probable est que l'appelante s'abstiendra de déposer les documents, avec la conséquence fâcheuse que des preuves qui peuvent être pertinentes ne seront pas portées à la connaissance de Sierra Club ou du tribunal. Par conséquent, Sierra Club ne sera pas en mesure de vérifier complètement l'exactitude de la preuve de M. Pang en contre-

documentary evidence, and will be required to draw conclusions based on an incomplete evidentiary record. This would clearly impede the search for truth in this case.

78    As well, it is important to remember that the confidentiality order would restrict access to a relatively small number of highly technical documents. The nature of these documents is such that the general public would be unlikely to understand their contents, and thus they would contribute little to the public interest in the search for truth in this case. However, in the hands of the parties and their respective experts, the documents may be of great assistance in probing the truth of the Chinese environmental assessment process, which would in turn assist the court in reaching accurate factual conclusions. Given the nature of the documents, in my view, the important value of the search for truth which underlies both freedom of expression and open justice would be promoted to a greater extent by submitting the Confidential Documents under the order sought than it would by denying the order, and thereby preventing the parties and the court from relying on the documents in the course of the litigation.

79    In addition, under the terms of the order sought, the only restrictions on these documents relate to their public distribution. The Confidential Documents would be available to the court and the parties, and public access to the proceedings would not be impeded. As such, the order represents a fairly minimal intrusion into the open court rule, and thus would not have significant deleterious effects on this principle.

80    The second core value underlying freedom of speech, namely, the promotion of individual self-fulfilment by allowing open development of thoughts and ideas, focusses on individual expression, and thus does not closely relate to the open court principle which involves institutional expression. Although the confidentiality order would

interrogatoire. De plus, le tribunal ne bénéficiera pas du contre-interrogatoire ou de cette preuve documentaire, et il lui faudra tirer des conclusions fondées sur un dossier de preuve incomplet. Cela nuira manifestement à la recherche de la vérité en l'espèce.

De plus, il importe de rappeler que l'ordonnance de confidentialité ne restreindrait l'accès qu'à un nombre relativement peu élevé de documents hautement techniques. La nature de ces documents est telle que le public en général est peu susceptible d'en comprendre le contenu, de sorte qu'ils contribueraient peu à l'intérêt du public à la recherche de la vérité en l'espèce. Toutefois, dans les mains des parties et de leurs experts respectifs, les documents peuvent être très utiles pour apprécier la conformité du processus d'évaluation environnementale chinois, ce qui devrait aussi aider le tribunal à tirer des conclusions de fait exactes. À mon avis, compte tenu de leur nature, la production des documents confidentiels en vertu de l'ordonnance de confidentialité sollicitée favoriserait mieux l'importante valeur de la recherche de la vérité, qui sous-tend à la fois la liberté d'expression et la publicité des débats judiciaires, que ne le ferait le rejet de la demande qui aurait pour effet d'empêcher les parties et le tribunal de se fonder sur les documents au cours de l'instance.

De plus, aux termes de l'ordonnance demandée, les seules restrictions imposées à l'égard de ces documents ont trait à leur distribution publique. Les documents confidentiels seraient mis à la disposition du tribunal et des parties, et il n'y aurait pas d'entrave à l'accès du public aux procédures. À ce titre, l'ordonnance représente une atteinte relativement minime à la règle de la publicité des débats judiciaires et elle n'aurait donc pas d'effets préjudiciables importants sur ce principe.

La deuxième valeur fondamentale sous-jacente à la liberté d'expression, la promotion de l'épanouissement personnel par le libre développement de la pensée et des idées, est centrée sur l'expression individuelle et n'est donc pas étroitement liée au principe de la publicité des débats judiciaires qui concerne l'expression institutionnelle. Même

restrict individual access to certain information which may be of interest to that individual, I find that this value would not be significantly affected by the confidentiality order.

The third core value, open participation in the political process, figures prominently in this appeal, as open justice is a fundamental aspect of a democratic society. This connection was pointed out by Cory J. in *Edmonton Journal*, *supra*, at p. 1339:

It can be seen that freedom of expression is of fundamental importance to a democratic society. It is also essential to a democracy and crucial to the rule of law that the courts are seen to function openly. The press must be free to comment upon court proceedings to ensure that the courts are, in fact, seen by all to operate openly in the penetrating light of public scrutiny.

Although there is no doubt as to the importance of open judicial proceedings to a democratic society, there was disagreement in the courts below as to whether the weight to be assigned to the open court principle should vary depending on the nature of the proceeding.

On this issue, Robertson J.A. was of the view that the nature of the case and the level of media interest were irrelevant considerations. On the other hand, Evans J.A. held that the motions judge was correct in taking into account that this judicial review application was one of significant public and media interest. In my view, although the public nature of the case may be a factor which strengthens the importance of open justice in a particular case, the level of media interest should not be taken into account as an independent consideration.

Since cases involving public institutions will generally relate more closely to the core value of public participation in the political process, the public nature of the proceeding should be taken into consideration when assessing the merits of a confidentiality order. It is important to note that this core value will <u>always</u> be engaged where the open court

si l'ordonnance de confidentialité devait restreindre l'accès individuel à certains renseignements susceptibles d'intéresser quelqu'un, j'estime que cette valeur ne serait pas touchée de manière significative.

La troisième valeur fondamentale, la libre participation au processus politique, joue un rôle primordial dans le pourvoi puisque la publicité des débats judiciaires est un aspect fondamental de la société démocratique. Ce lien est souligné par le juge Cory dans *Edmonton Journal*, précité, p. 1339 :

On voit que la liberté d'expression est d'une importance fondamentale dans une société démocratique. Il est également essentiel dans une démocratie et fondamental pour la primauté du droit que la transparence du fonctionnement des tribunaux soit perçue comme telle. La presse doit être libre de commenter les procédures judiciaires pour que, dans les faits, chacun puisse constater que les tribunaux fonctionnent publiquement sous les regards pénétrants du public.

Même si on ne peut douter de l'importance de la publicité des débats judiciaires dans une société démocratique, les décisions antérieures divergent sur la question de savoir si le poids à accorder au principe de la publicité des débats judiciaires devrait varier en fonction de la nature de la procédure.

Sur ce point, le juge Robertson estime que la nature de l'affaire et le degré d'intérêt des médias sont des considérations dénuées de pertinence. Le juge Evans estime quant à lui que le juge des requêtes a eu raison de tenir compte du fait que la demande de contrôle judiciaire suscite beaucoup d'intérêt de la part du public et des médias. À mon avis, même si la nature publique de l'affaire peut être un facteur susceptible de renforcer l'importance de la publicité des débats judiciaires dans une espèce particulière, le degré d'intérêt des médias ne devrait pas être considéré comme facteur indépendant.

Puisque les affaires concernant des institutions publiques ont généralement un lien plus étroit avec la valeur fondamentale de la participation du public au processus politique, la nature publique d'une instance devrait être prise en considération dans l'évaluation du bien-fondé d'une ordonnance de confidentialité. Il importe de noter que cette valeur

81

82

83

principle is engaged owing to the importance of open justice to a democratic society. However, where the political process is also engaged by the <u>substance</u> of the proceedings, the connection between open proceedings and public participation in the political process will increase. As such, I agree with Evans J.A. in the court below where he stated, at para. 87:

   While all litigation is important to the parties, and there is a public interest in ensuring the fair and appropriate adjudication of all litigation that comes before the courts, some cases raise issues that transcend the immediate interests of the parties and the general public interest in the due administration of justice, and have a much wider public interest significance.

84    This motion relates to an application for judicial review of a decision by the government to fund a nuclear energy project. Such an application is clearly of a public nature, as it relates to the distribution of public funds in relation to an issue of demonstrated public interest. Moreover, as pointed out by Evans J.A., openness and public participation are of fundamental importance under the *CEAA*. Indeed, by their very nature, environmental matters carry significant public import, and openness in judicial proceedings involving environmental issues will generally attract a high degree of protection. In this regard, I agree with Evans J.A. that the public interest is engaged here more than it would be if this were an action between private parties relating to purely private interests.

85    However, with respect, to the extent that Evans J.A. relied on media interest as an indicium of public interest, this was an error. In my view, it is important to distinguish <u>public</u> interest, from <u>media</u> interest, and I agree with Robertson J.A. that media exposure cannot be viewed as an impartial measure of public interest. It is the public <u>nature</u> of the proceedings which increases the need for openness, and this public nature is not necessarily reflected by the media desire to probe the facts of the case.

fondamentale sera <u>toujours</u> engagée lorsque sera mis en cause le principe de la publicité des débats judiciaires, vu l'importance de la transparence judiciaire dans une société démocratique. Toutefois, le lien entre la publicité des débats judiciaires et la participation du public dans le processus politique s'accentue lorsque le processus politique est également engagé par la <u>substance</u> de la procédure. Sous ce rapport, je suis d'accord avec ce que dit le juge Evans (au par. 87) :

   Bien que tous les litiges soient importants pour les parties, et qu'il en va de l'intérêt du public que les affaires soumises aux tribunaux soient traitées de façon équitable et appropriée, certaines affaires soulèvent des questions qui transcendent les intérêts immédiats des parties ainsi que l'intérêt du public en général dans la bonne administration de la justice, et qui ont une signification beaucoup plus grande pour le public.

   La requête est liée à une demande de contrôle judiciaire d'une décision du gouvernement de financer un projet d'énergie nucléaire. La demande est clairement de nature publique, puisqu'elle a trait à la distribution de fonds publics en rapport avec une question dont l'intérêt public a été démontré. De plus, comme le souligne le juge Evans, la transparence du processus et la participation du public ont une importance fondamentale sous le régime de la *LCÉE*. En effet, par leur nature même, les questions environnementales ont une portée publique considérable, et la transparence des débats judiciaires sur les questions environnementales mérite généralement un degré élevé de protection. À cet égard, je suis d'accord avec le juge Evans pour conclure que l'intérêt public est en l'espèce plus engagé que s'il s'agissait d'un litige entre personnes privées à l'égard d'intérêts purement privés.

   J'estime toutefois avec égards que, dans la mesure où il se fonde sur l'intérêt des médias comme indice de l'intérêt du public, le juge Evans fait erreur. À mon avis, il est important d'établir une distinction entre l'intérêt <u>du public</u> et l'intérêt <u>des médias</u> et, comme le juge Robertson, je note que la couverture médiatique ne peut être considérée comme une mesure impartiale de l'intérêt public. C'est la <u>nature</u> publique de l'instance qui accentue le besoin de transparence, et cette nature publique ne se reflète

I reiterate the caution given by Dickson C.J. in *Keegstra*, *supra*, at p. 760, where he stated that, while the speech in question must be examined in light of its relation to the core values, "we must guard carefully against judging expression according to its popularity".

Although the public interest in open access to the judicial review application as a whole is substantial, in my view, it is also important to bear in mind the nature and scope of the information for which the order is sought in assigning weight to the public interest. With respect, the motions judge erred in failing to consider the narrow scope of the order when he considered the public interest in disclosure, and consequently attached excessive weight to this factor. In this connection, I respectfully disagree with the following conclusion of Evans J.A., at para. 97:

Thus, having considered the nature of this litigation, and having assessed the extent of public interest in the openness of the proceedings in the case before him, the Motions Judge cannot be said in all the circumstances to have given this factor undue weight, even though confidentiality is claimed for only three documents among the small mountain of paper filed in this case, and their content is likely to be beyond the comprehension of all but those equipped with the necessary technical expertise.

Open justice is a fundamentally important principle, particularly when the substance of the proceedings is public in nature. However, this does not detract from the duty to attach weight to this principle in accordance with the specific limitations on openness that the confidentiality order would have. As Wilson J. observed in *Edmonton Journal*, *supra*, at pp. 1353-54:

One thing seems clear and that is that one should not balance one value at large and the conflicting value in its context. To do so could well be to pre-judge the issue by placing more weight on the value developed at large than is appropriate in the context of the case.

pas nécessairement dans le désir des médias d'examiner les faits de l'affaire. Je réitère l'avertissement donné par le juge en chef Dickson dans *Keegstra*, précité, p. 760, où il dit que même si l'expression en cause doit être examinée dans ses rapports avec les valeurs fondamentales, « nous devons veiller à ne pas juger l'expression en fonction de sa popularité ».

Même si l'intérêt du public à la publicité de la demande de contrôle judiciaire dans son ensemble est important, à mon avis, il importe tout autant de prendre en compte la nature et la portée des renseignements visés par l'ordonnance demandée, lorsqu'il s'agit d'apprécier le poids de l'intérêt public. Avec égards, le juge des requêtes a commis une erreur en ne tenant pas compte de la portée limitée de l'ordonnance dans son appréciation de l'intérêt du public à la communication et en accordant donc un poids excessif à ce facteur. Sous ce rapport, je ne partage pas la conclusion suivante du juge Evans (au par. 97) :

Par conséquent, on ne peut dire qu'après que le juge des requêtes eut examiné la nature de ce litige et évalué l'importance de l'intérêt du public à la publicité des procédures, il aurait dans les circonstances accordé trop d'importance à ce facteur, même si la confidentialité n'est demandée que pour trois documents parmi la montagne de documents déposés en l'instance et que leur contenu dépasse probablement les connaissances de ceux qui n'ont pas l'expertise technique nécessaire.

La publicité des débats judiciaires est un principe fondamentalement important, surtout lorsque la substance de la procédure est de nature publique. Cela ne libère toutefois aucunement de l'obligation d'apprécier le poids à accorder à ce principe en fonction des limites particulières qu'imposerait l'ordonnance de confidentialité à la publicité des débats. Comme le dit le juge Wilson dans *Edmonton Journal*, précité, p. 1353-1354 :

Une chose semble claire et c'est qu'il ne faut pas évaluer une valeur selon la méthode générale et l'autre valeur en conflit avec elle selon la méthode contextuelle. Agir ainsi pourrait fort bien revenir à préjuger de l'issue du litige en donnant à la valeur examinée de manière générale plus d'importance que ne l'exige le contexte de l'affaire.

86

87    In my view, it is important that, although there is significant public interest in these proceedings, open access to the judicial review application would be only slightly impeded by the order sought. The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts.

88    In addressing the effects that the confidentiality order would have on freedom of expression, it should also be borne in mind that the appellant may not have to raise defences under the *CEAA*, in which case the Confidential Documents would be irrelevant to the proceedings, with the result that freedom of expression would be unaffected by the order. However, since the necessity of the Confidential Documents will not be determined for some time, in the absence of a confidentiality order, the appellant would be left with the choice of either submitting the documents in breach of its obligations, or withholding the documents in the hopes that either it will not have to present a defence under the *CEAA*, or that it will be able to mount a successful defence in the absence of these relevant documents. If it chooses the former option, and the defences under the *CEAA* are later found not to apply, then the appellant will have suffered the prejudice of having its confidential and sensitive information released into the public domain, with no corresponding benefit to the public. Although this scenario is far from certain, the possibility of such an occurrence also weighs in favour of granting the order sought.

89    In coming to this conclusion, I note that if the appellant is not required to invoke the relevant defences under the *CEAA*, it is also true that the appellant's fair trial right will not be impeded, even if the confidentiality order is not granted. However, I do not take this into account as a factor which weighs in favour of denying the order because, if the order is granted and the Confidential Documents are not required, there will be no deleterious effects on either the public interest in freedom of expression or the appellant's commercial interests or fair trial right. This neutral result is in contrast with the

À mon avis, il importe de reconnaître que, malgré l'intérêt significatif que porte le public à ces procédures, l'ordonnance demandée n'entraverait que légèrement la publicité de la demande de contrôle judiciaire. La portée étroite de l'ordonnance associée à la nature hautement technique des documents confidentiels tempère considérablement les effets préjudiciables que l'ordonnance de confidentialité pourrait avoir sur l'intérêt du public à la publicité des débats judiciaires.

Pour traiter des effets qu'aurait l'ordonnance de confidentialité sur la liberté d'expression, il faut aussi se rappeler qu'il se peut que l'appelante n'ait pas à soulever de moyens de défense visés par la *LCÉE*, auquel cas les documents confidentiels perdraient leur pertinence et la liberté d'expression ne serait pas touchée par l'ordonnance. Toutefois, puisque l'utilité des documents confidentiels ne sera pas déterminée avant un certain temps, l'appelante n'aurait plus, en l'absence d'ordonnance de confidentialité, que le choix entre soit produire les documents en violation de ses obligations, soit les retenir dans l'espoir de ne pas avoir à présenter de défense en vertu de la *LCÉE* ou de pouvoir assurer effectivement sa défense sans les documents pertinents. Si elle opte pour le premier choix et que le tribunal conclut par la suite que les moyens de défense visés par la *LCÉE* ne sont pas applicables, l'appelante aura subi le préjudice de voir ses renseignements confidentiels et délicats tomber dans le domaine public sans que le public n'en tire d'avantage correspondant. Même si sa réalisation est loin d'être certaine, la possibilité d'un tel scénario milite également en faveur de l'ordonnance sollicitée.

En arrivant à cette conclusion, je note que si l'appelante n'a pas à invoquer les moyens de défense pertinents en vertu de la *LCÉE*, il est également vrai que son droit à un procès équitable ne sera pas entravé même en cas de refus de l'ordonnance de confidentialité. Je ne retiens toutefois pas cela comme facteur militant contre l'ordonnance parce que, si elle est accordée et que les documents confidentiels ne sont pas nécessaires, il n'y aura alors aucun effet préjudiciable ni sur l'intérêt du public à la liberté d'expression ni sur les droits commerciaux ou le droit de l'appelante à un procès

scenario discussed above where the order is denied and the possibility arises that the appellant's commercial interests will be prejudiced with no corresponding public benefit. As a result, the fact that the Confidential Documents may not be required is a factor which weighs in favour of granting the confidentiality order.

In summary, the core freedom of expression values of seeking the truth and promoting an open political process are most closely linked to the principle of open courts, and most affected by an order restricting that openness. However, in the context of this case, the confidentiality order would only marginally impede, and in some respects would even promote, the pursuit of these values. As such, the order would not have significant deleterious effects on freedom of expression.

## VII.  Conclusion

In balancing the various rights and interests engaged, I note that the confidentiality order would have substantial salutary effects on the appellant's right to a fair trial, and freedom of expression. On the other hand, the deleterious effects of the confidentiality order on the principle of open courts and freedom of expression would be minimal. In addition, if the order is not granted and in the course of the judicial review application the appellant is not required to mount a defence under the *CEAA*, there is a possibility that the appellant will have suffered the harm of having disclosed confidential information in breach of its obligations with no corresponding benefit to the right of the public to freedom of expression. As a result, I find that the salutary effects of the order outweigh its deleterious effects, and the order should be granted.

Consequently, I would allow the appeal with costs throughout, set aside the judgment of the Federal Court of Appeal, and grant the confidentiality order on the terms requested by the appellant under Rule 151 of the *Federal Court Rules, 1998*.

équitable. Cette issue neutre contraste avec le scénario susmentionné où il y a refus de l'ordonnance et possibilité d'atteinte aux droits commerciaux de l'appelante sans avantage correspondant pour le public. Par conséquent, le fait que les documents confidentiels puissent ne pas être nécessaires est un facteur en faveur de l'ordonnance de confidentialité.

En résumé, les valeurs centrales de la liberté d'expression que sont la recherche de la vérité et la promotion d'un processus politique ouvert sont très étroitement liées au principe de la publicité des débats judiciaires, et sont les plus touchées par une ordonnance limitant cette publicité. Toutefois, dans le contexte en l'espèce, l'ordonnance de confidentialité n'entraverait que légèrement la poursuite de ces valeurs, et pourrait même les favoriser à certains égards. À ce titre, l'ordonnance n'aurait pas d'effets préjudiciables importants sur la liberté d'expression. 90

## VII.  Conclusion

Dans la pondération des divers droits et intérêts en jeu, je note que l'ordonnance de confidentialité aurait des effets bénéfiques importants sur le droit de l'appelante à un procès équitable et sur la liberté d'expression. D'autre part, les effets préjudiciables de l'ordonnance de confidentialité sur le principe de la publicité des débats judiciaires et la liberté d'expression seraient minimes. En outre, si l'ordonnance est refusée et qu'au cours du contrôle judiciaire l'appelante n'est pas amenée à invoquer les moyens de défense prévus dans la *LCÉE*, il se peut qu'elle subisse le préjudice d'avoir communiqué des renseignements confidentiels en violation de ses obligations sans avantage correspondant pour le droit du public à la liberté d'expression. Je conclus donc que les effets bénéfiques de l'ordonnance l'emportent sur ses effets préjudiciables, et qu'il y a lieu d'accorder l'ordonnance. 91

Je suis donc d'avis d'accueillir le pourvoi avec dépens devant toutes les cours, d'annuler l'arrêt de la Cour d'appel fédérale, et d'accorder l'ordonnance de confidentialité selon les modalités demandées par l'appelante en vertu de la règle 151 des *Règles de la Cour fédérale (1998)*. 92

*Appeal allowed with costs.*

*Solicitors for the appellant: Osler, Hoskin & Harcourt, Toronto.*

*Solicitors for the respondent Sierra Club of Canada: Timothy J. Howard, Vancouver; Franklin S. Gertler, Montréal.*

*Solicitor for the respondents the Minister of Finance of Canada, the Minister of Foreign Affairs of Canada, the Minister of International Trade of Canada and the Attorney General of Canada: The Deputy Attorney General of Canada, Ottawa.*

*Pourvoi accueilli avec dépens.*

*Procureurs de l'appelante : Osler, Hoskin & Harcourt, Toronto.*

*Procureurs de l'intimé Sierra Club du Canada : Timothy J. Howard, Vancouver; Franklin S. Gertler, Montréal.*

*Procureur des intimés le ministre des Finances du Canada, le ministre des Affaires étrangères du Canada, le ministre du Commerce international du Canada et le procureur général du Canada : Le sous-procureur général du Canada, Ottawa.*

**TAB 2**

**CITATION:** Andersen v. St. Jude Medical, 2010 ONSC 5191
**COURT FILE NO.:** 00-CV-195906CV, Toronto
**DATE:** 20101007

2010 ONSC 5191 (CanLII)

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

Yvonne Andersen on her own behalf and as Executrix of the Estate
of Erik Andersen, Sharon Frost and Her Majesty the
Queen in Right of the Province of Alberta, as represented by
the Minister of Health and Wellness

Plaintiffs

**- and -**

St. Jude Medical, Inc. and St. Jude Medical Canada, Inc.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**COUNSEL:**

*Angus McKinnon*, for the Plaintiffs
*Gordon McKee*, *Marcy McKee*, for the Defendants

**WRITTEN SUBMISSIONS.**

### Ruling on Sealing of Spire Corporation Documents and Information

## LAX J.

[1]     The defendants, St. Jude Medical, Inc. and St. Jude Medical, Canada Inc. (collectively "SJM"), seek a sealing order for 24 documents or portions of documents in the event they become exhibits at trial. Most of these documents contain confidential or proprietary information belonging to Spire Corporation ("Spire"). The plaintiffs' position is that none of the documents meet the legal test for sealing, but they are not opposing the motion.

Page: 2

[2]     At the time of filing these written submissions, only one of the 24 documents at issue had been made an exhibit in this trial: JB # 14105, which was marked as Exhibit 30, and is subject to an interim sealing order. The defendants are seeking to permanently seal or redact pages 48 and 49 of Exhibit 30, on the grounds that these pages contain Spire's confidential information about its unique processing procedures and parameters. Exhibit 30 is SJM's Supplementary Notice of Compliance submission to Health Canada for the Masters Series Silzone valve.

[3]     In support of their request for a sealing order, the defendants provided affidavits of Richard Oliver of Spire, in which Oliver attests to the prejudicial consequences to Spire of disclosure of these documents/excerpts. Oliver also refers to SJM's License and Supply Agreement with Spire, which requires that SJM keep Spire's information confidential and that the confidentiality provisions of the Licence and Supply Agreements survive the termination of those agreements.

[4]     The defendants categorize the documents for which they are seeking a sealing order into the following three categories:

1.   documents containing detailed confidential information concerning processing steps and parameters and equipment specifications for Spire's proprietary Spi-Argent and IBAD (ion beam assisted deposition) processes;

2.   documents that disclose thickness, weight and/or other measurements of the Spi-Argent coating; and

3.   documents that disclose confidential and commercially sensitive pricing information.

The documents in these categories are listed in the appendix to this order.

[6]     The first category of documents or excerpts includes documents in Spire's Master File with the U.S. Food and Drug Administration ("FDA"). These documents contain a detailed explanation of Spire's IBAD process, including detailed information about the equipment associated with Spire's IBAD process; detailed instructions for use by IBAD technicians; and confidential processing parameters and measurements, which are versions of Spire's work

2010 ONSC 5191 (CanLII)

instructions for Spi-Argent processing. Pages 48 and 49 of Exhibit 30 fall into category 1. The second category includes documents/excerpts that disclose thickness parameters and confidential measurements of Spi-Argent coating. The defendants submit that disclosure of these documents/excerpts would allow competitors to duplicate Spire's technology as Spire uses the same equipment and procedures today.

[5]     The third category is a letter from 1999 that contains confidential pricing information for Spi-Argent processing. The defendants submit that although outdated, the information discloses information about Spire's pricing policies and strategies that are still in use today and could be used by competitors to Spire's prejudice.

**The law on sealing orders**

[6]     Pursuant to the *Courts of Justice Act*, R.S.O. 1990, c. C-43, on payment of a fee, a person is entitled to see any document filed in a civil proceeding in a court, unless an Act or an order of the court provides otherwise (s. 137(1)). The court may treat as confidential and seal and exclude from the public record any document filed before the court in a civil proceeding (s. 137(2)).

[7]     The decision of the Supreme Court of Canada in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522 is the governing authority on the granting of a sealing or confidentiality order. In *Sierra*, the Supreme Court granted a sealing order over technical information about an environmental assessment of a site in China for the construction of two CANDU nuclear reactors. The documents were the property of the Chinese authority, which had provided the documents to Atomic Energy of Canada Ltd. ("AECL") on condition that they be protected by a confidentiality order.

[8]     The Court established the following test for granting a sealing order, at para. 53:

A.   such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and

2010 ONSC 5191 (CanLII)

Page: 4

B.   the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.

[9]    The Court stated that the three elements of the first branch are as follows (paras. 54-57):

i.    The risk in question must be real and substantial, in that the risk is well grounded in the evidence, and poses a serious threat to the commercial interest in question.

ii.    To qualify as an "important commercial interest," the interest in question cannot merely be specific to the party requesting the order; the interest must be one which can be expressed in terms of a public interest in confidentiality. Where exposure of information would cause a breach of a confidentiality agreement, the commercial interest affected can be characterized more broadly as the general commercial interest of preserving confidential information.

iii.   To assess whether there are "reasonably alternative measures," the judge must consider not only whether reasonable alternatives to a confidentiality order are available, but also to restrict the order as much as is reasonably possible while preserving the commercial interest in question.

[10]    In *Sierra*, the Court found that branch A, the necessity branch, was satisfied. The commercial interest at stake was the objective of preserving contractual obligations of confidentiality. In establishing confidentiality, the applicant demonstrated that the information in question had been treated at all relevant times as confidential; that on a balance of probabilities the applicant's proprietary, commercial, and scientific interests could reasonably be harmed by the disclosure of the information; and that the information had been accumulated with a reasonable expectation of it being kept confidential. Further, the Court found that disclosure of the confidential documents would impose a serious risk to an important commercial interest of the appellant, and there were no reasonably alternative measures to granting the order.

2010 ONSC 5191 (CanLII)

Page: 5

[11]    The Court found that the salutary effects of an order outweighed the deleterious effects and that branch B of the test was also satisfied. Absent a sealing order, the appellant's ability to mount a successful defence would be curtailed as the AECL would have been prevented from disclosing the information. The confidential documents in issue contained detailed technical information pertaining to the construction and design of a nuclear installation, and it may have been in the public interest to prevent this information from entering the public domain. The Court noted that the technical nature of the documents made it unlikely that the general public would understand their contents. At para. 78, the Court stated: "The narrow scope of the order coupled with the highly technical nature of the Confidential Documents significantly temper the deleterious effects the confidentiality order would have on the public interest in open courts."

[12]    The courts have recognized the importance of contractual obligations between a party to the proceedings and a third party. For example, in *117560 Ontario Ltd. v. Great Atlantic Pacific Co. of Canada* (2003), 121 A.C.W.S. (3d) 426, [2003] O.J. No. 1016 (S.C.) (*A&P*), Master Macleod granted a permanent confidentiality order related to commercially sensitive information about supplier discounts. The master noted at para. 6 that exclusive suppliers had disclosed detailed information about pricing and profit margins and that in the public domain, "[t]his information could be used to devastating effect by other suppliers who might bid against the current supplier in dealing with A&P, by other grocery stores with whom they will be negotiating and by other suppliers who might bid with other customers." In *Camoplast Inc. v. Soucy International Inc*, [2003] F.C.J. No. 1791 (T.D.), the Federal Court recognized that contractual obligations of confidentiality raise a general commercial or important interest in circumstances where a confidentiality agreement existed between the plaintiff and a third party.

[13]    As in the matter before me, *Sierra*, *Camoplast*, and *A&P* each address the commercial interests of third parties. In contrast, in *Fairview Donut Inc. v. TDL Group Corp*, 2010 ONSC 789, 100 O.R. (3d) 510 (S.C.), the information sought to be protected was confidential to parties to the litigation, but not third parties. In *Fairview*, the court dismissed a motion by the defendants, Tim Hortons, for a sealing order restricting public access to certain documents or portions thereof.   In applying the *Sierra* test, Strathy J. was not satisfied that the defendants met

2010 ONSC 5191 (CanLII)

Page: 6

the necessity branch of the test as the defendants did not satisfy the court that the interests affected went beyond the private commercial interests of Tim Hortons and its franchisees. Further, although the defendants submitted that Tim Hortons and its franchisees would suffer commercial harm if the information was disclosed to competitors, the defendants did not satisfy the court that this risk was real or substantial or well-grounded in the evidence. Rather, the defendants' evidence was speculative and lacked specifics. Strathy J. noted that although sealing orders have been routinely granted in cases involving true trade secrets (such as *Eli Lilly*, discussed below), the information that the defendants described as trade secrets was "of the most general nature and at the very lowest level of 'secrecy'" (para. 66).

[14]    In *Eli Lilly and Co. v. Apotex Inc*., 2008 FC 892, [2008] F.C.J. No. 1593, Gauthier J. ordered certain documents and portions of other documents sealed, having found that they met the *Sierra* test. The court found that for certain documents, "the public interest in maintaining the confidentiality of documents containing proprietary information filed with the regulator on a confidential basis outweighs the public interest in open and accessible Court proceedings, in a private matter such as this one" (para. 7). The court ordered sealed documents/excerpts that contained details of a particular manufacturing process and those that contained material information about the supplier's process (paras. 42 & 45). On the other hand, the court did not order sealed documents that did not "contain information not publicly available or maintained in strict confidentiality" (para. 11) and contained no details of the particular manufacturing process (para. 41).

[15]    Similar to the concern over confidential processes and proprietary information expressed in *Eli Lilly*, in *Dish Network LLC v. Ramkissoon*, 2010 ONSC 761, [2010] O.J. No. 440 (S.C.), Cumming J. allowed the plaintiffs' motion to seal a document that contained technical specifications that "could be used by third parties to design other devices and software capable of infringing the Plaintiffs' trade secrets, descrambling their encrypted satellite signals, and circumventing technological measures that protect access to copyrighted and other proprietary works" (para. 8).

2010 ONSC 5191 (CanLII)

2010 ONSC 5191 (CanLII)

**Analysis**

**A i. Serious risk to important commercial interest**

[16]    The defendants (through their written submissions and the affidavits of Richard Oliver) explain how the proposed documents/excerpts could be used by competitors to replicate Spire's technology. Further, the evidence shows that a number of other companies are currently using or developing silver or silver-based coatings on medical devices. Interest in such technology increases the likelihood that potential competitors will be interested in this information, and makes the risk to Spire more likely and less speculative. SJM is under a continuing contractual obligation to preserve the confidentiality of Spire's IBAD technology. As in *Eli Lilly*, the documents/excerpts listed in categories 1 and 2 contain both submissions filed confidentially with regulators as well as details of a particular manufacturing process. Further, as in *Dish Network*, Spire's business relies on the confidentiality of its technical specifications and processes.

[17]    Consistent with *Eli Lilly*, *Dish Network*, and *A&P*, I am satisfied that public disclosure of the documents in categories 1 and 2 – documentation of the IBAD process, Spi-Argent coating methods, and other technical information – would create a real and substantial harm to Spire's commercial interests. This information is sensitive and confidential, and disclosure enables Spire's competitors to replicate Spire's otherwise confidential technology to unfairly compete with Spire to Spire's detriment.

[18]    I am not satisfied that disclosure of the now outdated pricing information in category 3, contained in a July 1999 letter from SJM to Spire, creates a serious risk to Spire's commercial interest. Therefore, this document does not meet the necessity branch of the test and the defendants have not satisfied me that the document should be sealed.

2010 ONSC 5191 (CanLII)

## A ii. Public interest in maintaining confidentiality

[19]    As established by *Sierra* and applied in *A&P* and *Camoplast*, there is a broad public interest in preserving contractual confidentiality obligations and in preserving the confidential information of non-parties. SJM and Spire's Licence and Supply Agreement requires SJM to preserve the confidentiality of Spire's confidential information and disclosure would result in a breach of this agreement. It is also in the public interest to promote commercial incentives for scientific innovation and preserve the intellectual property or proprietary rights of innovators. It is clear that Spire intended to keep its processes and technology out of the public domain by maintaining the secrecy of its information and regulatory filings. Disclosure would undermine this. Unlike *Fairvew*, where it was the defendants' interests at stake, and where the court found the information sought to be sealed very general and not particularly secretive, in this case, it is a non-party whose commercial interests are at stake, and the information sought to be sealed is highly technical and specific.

## A iii. Reasonable alternative measures

[20]    I am satisfied that ordering the documents/excerpts in categories 1 and 2 sealed is the least obtrusive way to protect Spire's commercially sensitive information. Apart from the document in category 3, the defendants have been appropriately selective about the information they seek to seal.

## B. Effects of order

[21]    As discussed in *Sierra* and in *Fairvew*, there is a very strong public interest to ensure that the public has access to information in court proceedings. A sealing order reduces transparency in this process and can result in the public losing trust and confidence in the administration of justice. However, here, as in *Sierra*, the documents/excerpts in the first two categories contain detailed and highly technical information that is not likely to be of interest or comprehensible to the general public. Unlike *Fairview*, there is little or no risk that these proceedings will be incomprehensible to the public without reference to the information in these documents. I find

2010 ONSC 5191 (CanLII)

that the salutary effects of sealing the documents/excerpts in categories 1 and 2 outweigh its deleterious effects.

## Conclusion

[22]    For the reasons above, I order permanently sealed the documents/excerpts contained in categories 1 & 2 in the attached appendix in the event that any or all such documents or excerpts become exhibits at trial, including pages 48 and 49 of JB#14105, Exhibit 30. The document in category 3 does not meet the necessity branch of the *Sierra* test and should not be sealed.

_____

**LAX J.**

**Released:**       October 7, 2010

Page: 10

2010 ONSC 5191 (CanLII)

**APPENDIX**

**1) Documents disclosing Spire Processing and Equipment Specifications and Parameters**

| JB# | SJM Production # | Pages to be Sealed |
|---|---|---|
| 14105 (Exhibit 30) | 152 | 48-49 |
| 1649 | 1763 | 10-11, 39-40 |
| 2604 | 151 | 39-40 |
| 2617 | 152 | 47-48 |
| 5741 | 153 | 161-162 |
| 2646 | 171 | 36-37 |
| 2609 | 186 | 85-86 |
| 2616 | 41462 | 40-41 |
| 6027 | 49328 | All |
| 6401 | 49261 | 2-3 |
| 6025 | 2003 | 3-10 |
| 5221 | 2031 | 3-17, 18-23, 29, 30, 32. |
| 6405 | 2033 | 8-15 |

Page: 11

| 5857 | 49267 | 18-34 |
|------|-------|-------|
| 2119 | 49219 | 5 |
| 145 | 1368 | 7 |
| 5557 | 49321 | 5 |

**2) Documents Disclosing Spi-Argent® Measurements**

| JB# | SJM Production # | Pages to be Sealed |
|-----|------------------|--------------------|
| 3183 | 49320 | 6 |
| 3464 | 1355 | 4 |
| 3298 | 3253 | 9-13, 15-24, 40-45, 46-48, 49-51, 190-199 |
| 5220 | 1969 | 9-10, 67-92, 40-45 |
| 13160 | 68342 | 68, 74, 100 |
| 2648 | 13904 | 7 |

**3) Documents Disclosing Confidential Spire Pricing Information**

| JB# | SJM Production # | Pages to be Sealed |
|-----|------------------|--------------------|
| 5221 | 2301 | 34-37 |

**CITATION:** Andersen v. St. Jude Medical, 2010 ONSC 5191
**COURT FILE NO.:** 00-CV-195906CV, Toronto
**DATE:** 20101007

2010 ONSC 5191 (CanLII)

# ONTARIO

# SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

Yvonne Andersen on her own behalf and as Executrix of the Estate of Erik Andersen, Sharon Frost and Her Majesty the Queen in Right of the Province of Alberta, as represented by the Minister of Health and Wellness

Plaintiffs

**- and -**

St. Jude Medical, Inc. and St. Jude Medical Canada, Inc.

Defendants

Proceeding under the *Class Proceedings Act, 1992*

---

**Ruling on Sealing of Spire Corporation
Documents and Information**

---

LAX J.

Released:        October 7, 2010

# TAB 3

*Case Name:*
# Canwest Global Communications Corp. (Re)

### IN THE MATTER OF the Companies' Creditors Arrangement Act, R.S.C. 1985, C-36. as amended
### AND IN THE MATTER OF a Proposed Plan of Compromise or Arrangement of Canwest Global Communications Corp. and the other applicants listed on schedule "A"

**[Editor's note:**
**Schedule "A" was not attached to the copy received by**
**LexisNexis Canada and therefore is not included in the**
**judgment.]**

[2009] O.J. No. 4286

59 C.B.R. (5th) 72

2009 CanLII 55114

2009 CarswellOnt 6184

Court File No. CV-09-8241-OOCL

Ontario Superior Court of Justice
Commercial List

**S.E. Pepall J.**

October 13, 2009.

(60 paras.)

*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters -- Application of Act -- Affiliated debtor companies -- Application by Canwest Global for relief under the Companies' Creditors Arrangement Act and to have the stay of proceedings and other provisions extend to several partnerships allowed -- Applicant Canwest Global owned CMI which was insolvent -- CMI Entities and Ad Hoc Committee of noteholders had agreed on terms of a going concern recapitalization transaction -- Stay under Act was extended to several partnerships that were intertwined with the applicants' ongoing operations -- DIP and administration charges approved -- Applicants were also permitted to pay pre-filing liabilities to their critical suppliers.*

Application by Canwest Global for relief under the Companies' Creditors Arrangement Act and to have the stay of proceedings and other provisions extend to several partnerships. The applicants were affiliated debtor companies with total claims against them exceeding $5 million. The partnerships were intertwined with the applicants' ongoing operations. Canwest was a leading Canadian media company. Canwest Global owned 100 per cent of CMI. CMI had direct or indirect ownership interests in all of the other CMI Entities. The CMI Entities generated the majority of their revenue from the sale of advertising. Fuelled by a deteriorating economic environment, they experienced a decline in their advertising revenues. This caused problems with cash flow and circumstances were exacerbated by their high fixed operating costs. CMI breached certain of the financial covenants in its secured credit facility. The stay of proceedings was sought so as to allow the CMI Entities to proceed to develop a plan of arrangement or compromise to implement a consensual pre-packaged recapitalization transaction. The CMI Entities and an Ad Hoc Committee of noteholders had agreed on the terms of a going concern recapitalization transaction which was intended to form the basis of the plan. The applicants anticipated that a substantial number of the businesses operated by the CMI Entities would continue as going concerns thereby preserving enterprise value for stakeholders and maintaining employment for as many as possible. Certain steps designed to implement the recapitalization transaction had already been taken prior to the commencement of these proceedings.

HELD: Application allowed. The CMI Entities were unable to satisfy their debts as they come due and were insolvent. Absent these proceedings, the applicants would lack liquidity and would be unable to continue as going concerns. It was just and convenient to grant the relief requested with respect to the partnerships. The operations and obligations of the partnerships were so intertwined with those of the applicants that irreparable harm would ensue if the requested stay were not granted. The DIP charge for up to $100 million was appropriate and required having regard to the debtors' cash-flow statement. The administration charge was also approved. Notice had been given to the secured creditors likely to be affected by the charge, the amount was appropriate, and the charge should extend to all of the proposed beneficiaries. The applicants were also permitted to pay pre-filing liabilities to their critical suppliers.

### Statutes, Regulations and Rules Cited:

Companies' Creditors Arrangement Act, R.S.C. 1985, c. c. 36, s. 11, s. 11(2), s. 11.2, s. 11.2(1), s. 11.52

### Counsel:

Lyndon Barnes, Edward Sellers and Jeremy Dacks, for the Applicants.

Alan Merskey, for the Special Committee of the Board of Directors.

David Byers and Maria Konyukhova,> for the Proposed Monitor, FTI Consulting Canada Inc.

Benjamin Zarnett and Robert Chadwick, for Ad Hoc Committee of Noteholders.

Edmond Lamek, for the Asper Family.

Peter H. Griffin and Peter J. Osborne, for the Management Directors and Royal Bank of Canada.

Hilary Clarke, for Bank of Nova Scotia,

Steve Weisz, for CIT Business Credit Canada Inc.

### REASONS FOR DECISION

S.E. PEPALL J.:--

Relief Requested

**1**    Canwest Global Communications Corp. ("Canwest Global"), its principal operating subsidiary, Canwest Media Inc. ("CMI"), and the other applicants listed on Schedule "A" of the Notice of Application apply for relief pursuant to the *Companies' Creditors Arrangement Act.*[1] The applicants also seek to have the stay of proceedings and other provisions extend to the following partnerships: Canwest Television Limited Partnership ("CTLP"), Fox Sports World Canada Partnership and The National Post Company/La Publication National Post ("The National Post Company"). The businesses operated by the applicants and the aforementioned partnerships include (i) Canwest's free-to-air television broadcast business (ie. the Global Television Network stations); (ii) certain subscription-based specialty television channels that are wholly owned and operated by CTLP; and (iii) the National Post.

**2**    The Canwest Global enterprise as a whole includes the applicants, the partnerships and Canwest Global's other subsidiaries that are not applicants. The term Canwest will be used to refer to the entire enterprise. The term CMI Entities will be used to refer to the applicants and the three aforementioned partnerships. The following entities are not applicants nor is a stay sought in respect of any of them: the entities in Canwest's newspaper publishing and digital media business in Canada (other than the National Post Company) namely the Canwest Limited Partnership, Canwest Publishing Inc./Publications Canwest Inc., Canwest Books Inc., and Canwest (Canada) Inc.; the Canadian subscription based specialty television channels acquired from Alliance Atlantis Communications Inc. in August, 2007 which are held jointly with Goldman Sachs Capital Partners and operated by CW Investments Co. and its subsidiaries; and subscription-based specialty television channels which are not wholly owned by CTLP.

**3**    No one appearing opposed the relief requested.

Backround Facts

**4**    Canwest is a leading Canadian media company with interests in twelve free-to-air television stations comprising the Global Television Network, subscription-based specialty television channels and newspaper publishing and digital media operations.

**5**    As of October 1, 2009, Canwest employed the full time equivalent of approximately 7,400 employees around the world. Of that number, the full time equivalent of approximately 1,700 are employed by the CMI Entities, the vast majority of whom work in Canada and 850 of whom work in Ontario.

**6**    Canwest Global owns 100% of CMI. CMI has direct or indirect ownership interests in all of the other CMI Entities. Ontario is the chief place of business of the CMI Entities.

**7**    Canwest Global is a public company continued under the *Canada Business Corporations Act*[2]. It has authorized capital consisting of an unlimited number of preference shares, multiple voting shares, subordinate voting shares, and non-voting shares. It is a "constrained-share company" which means that at least 66 2/3% of its voting shares must be beneficially owned by Canadians.

The Asper family built the Canwest enterprise and family members hold various classes of shares. In April and May, 2009, corporate decision making was consolidated and streamlined.

**8**    The CMI Entities generate the majority of their revenue from the sale of advertising (approximately 77% on a consolidated basis). Fuelled by a deteriorating economic environment in Canada and elsewhere, in 2008 and 2009, they experienced a decline in their advertising revenues. This caused problems with cash flow and circumstances were exacerbated by their high fixed operating costs. In response to these conditions, the CMI Entities took steps to improve cash flow and to strengthen their balance sheets. They commenced workforce reductions and cost saving measures, sold certain interests and assets, and engaged in discussions with the CRTC and the Federal government on issues of concern.

**9**    Economic conditions did not improve nor did the financial circumstances of the CMI Entities. They experienced significant tightening of credit from critical suppliers and trade creditors, a further reduction of advertising commitments, demands for reduced credit terms by newsprint and printing suppliers, and restrictions on or cancellation of credit cards for certain employees.

**10**    In February, 2009, CMI breached certain of the financial covenants in its secured credit facility. It subsequently received waivers of the borrowing conditions on six occasions. On March 15, 2009, it failed to make an interest payment of US$30.4 million due on 8% senior subordinated notes. CMI entered into negotiations with an ad hoc committee of the 8% senior subordinated noteholders holding approximately 72% of the notes (the "Ad Hoc Committee"). An agreement was reached wherein CMI and its subsidiary CTLP agreed to issue US$105 million in 12% secured notes to members of the Ad Hoc Committee. At the same time, CMI entered into an agreement with CIT Business Credit Canada Inc. ("CIT") in which CIT agreed to provide a senior secured revolving asset based loan facility of up to $75 million. CMI used the funds generated for operations and to repay amounts owing on the senior credit facility with a syndicate of lenders of which the Bank of Nova Scotia was the administrative agent. These funds were also used to settle related swap obligations.

**11**    Canwest Global reports its financial results on a consolidated basis. As at May 31, 2009, it had total consolidated assets with a net book value of $4.855 billion and total consolidated liabilities of $5.846 billion. The subsidiaries of Canwest Global that are not applicants or partnerships in this proceeding had short and long term debt totalling $2.742 billion as at May 31, 2009 and the CMI Entities had indebtedness of approximately $954 million. For the 9 months ended May 31, 2009, Canwest Global's consolidated revenues decreased by $272 million or 11% compared to the same period in 2008. In addition, operating income before amortization decreased by $253 million or 47%. It reported a consolidated net loss of $1.578 billion compared to $22 million for the same period in 2008. CMI reported that revenues for the Canadian television operations decreased by $8 million or 4% in the third quarter of 2009 and operating profit was $21 million compared to $39 million in the same period in 2008.

**12**    The board of directors of Canwest Global struck a special committee of the board ("the Special Committee") with a mandate to explore and consider strategic alternatives in order to maximize value. That committee appointed Thomas Strike, who is the President, Corporate Development and Strategy Implementation of Canwest Global, as Recapitalization Officer and retained Hap Stephen, who is the Chairman and CEO of Stonecrest Capital Inc., as a Restructuring Advisor ("CRA").

**13**      On September 15, 2009, CMI failed to pay US$30.4 million in interest payments due on the 8% senior subordinated notes.

**14**      On September 22, 2009, the board of directors of Canwest Global authorized the sale of all of the shares of Ten Network Holdings Limited (Australia) ("Ten Holdings") held by its subsidiary, Canwest Mediaworks Ireland Holdings ("CMIH"). Prior to the sale, the CMI Entities had consolidated indebtedness totalling US$939.9 million pursuant to three facilities. CMI had issued 8% unsecured notes in an aggregate principal amount of US$761,054,211. They were guaranteed by all of the CMI Entities except Canwest Global, and 30109, LLC. CMI had also issued 12% secured notes in an aggregate principal amount of US$94 million. They were guaranteed by the CMI Entities. Amongst others, Canwest's subsidiary, CMIH, was a guarantor of both of these facilities. The 12% notes were secured by first ranking charges against all of the property of CMI, CTLP and the guarantors. In addition, pursuant to a credit agreement dated May 22, 2009 and subsequently amended, CMI has a senior secured revolving asset-based loan facility in the maximum amount of $75 million with CIT Business Credit Canada Inc. ("CIT"). Prior to the sale, the debt amounted to $23.4 million not including certain letters of credit. The facility is guaranteed by CTLP, CMIH and others and secured by first ranking charges against all of the property of CMI, CTLP, CMIH and other guarantors. Significant terms of the credit agreement are described in paragraph 37 of the proposed Monitor's report. Upon a CCAA filing by CMI and commencement of proceedings under Chapter 15 of the Bankruptcy Code, the CIT facility converts into a DIP financing arrangement and increases to a maximum of $100 million.

**15**      Consents from a majority of the 8% senior subordinated noteholders were necessary to allow the sale of the Ten Holdings shares. A Use of Cash Collateral and Consent Agreement was entered into by CMI, CMIH, certain consenting noteholders and others wherein CMIH was allowed to lend the proceeds of sale to CMI.

**16**      The sale of CMIH's interest in Ten Holdings was settled on October 1, 2009. Gross proceeds of approximately $634 million were realized. The proceeds were applied to fund general liquidity and operating costs of CMI, pay all amounts owing under the 12% secured notes and all amounts outstanding under the CIT facility except for certain letters of credit in an aggregate face amount of $10.7 million. In addition, a portion of the proceeds was used to reduce the amount outstanding with respect to the 8% senior subordinated notes leaving an outstanding indebtedness thereunder of US$393.25 million.

**17**      In consideration for the loan provided by CMIH to CMI, CMI issued a secured intercompany note in favour of CMIH in the principal amount of $187.3 million and an unsecured promissory note in the principal amount of $430.6 million. The secured note is subordinated to the CIT facility and is secured by a first ranking charge on the property of CMI and the guarantors. The payment of all amounts owing under the unsecured promissory note are subordinated and postponed in favour of amounts owing under the CIT facility. Canwest Global, CTLP and others have guaranteed the notes. It is contemplated that the debt that is the subject matter of the unsecured note will be compromised.

**18**      Without the funds advanced under the intercompany notes, the CMI Entities would be unable to meet their liabilities as they come due. The consent of the noteholders to the use of the Ten Holdings proceeds was predicated on the CMI Entities making this application for an Initial Order under the CCAA. Failure to do so and to take certain other steps constitute an event of default under the Use of Cash Collateral and Consent Agreement, the CIT facility and other agreements. The CMI

Entities have insufficient funds to satisfy their obligations including those under the intercompany notes and the 8% senior subordinated notes.

**19**     The stay of proceedings under the CCAA is sought so as to allow the CMI Entities to proceed to develop a plan of arrangement or compromise to implement a consensual "pre-packaged" recapitalization transaction. The CMI Entities and the Ad Hoc Committee of noteholders have agreed on the terms of a going concern recapitalization transaction which is intended to form the basis of the plan. The terms are reflected in a support agreement and term sheet. The recapitalization transaction contemplates amongst other things, a significant reduction of debt and a debt for equity restructuring. The applicants anticipate that a substantial number of the businesses operated by the CMI Entities will continue as going concerns thereby preserving enterprise value for stakeholders and maintaining employment for as many as possible. As mentioned, certain steps designed to implement the recapitalization transaction have already been taken prior to the commencement of these proceedings.

**20**     CMI has agreed to maintain not more than $2.5 million as cash collateral in a deposit account with the Bank of Nova Scotia to secure cash management obligations owed to BNS. BNS holds first ranking security against those funds and no court ordered charge attaches to the funds in the account.

**21**     The CMI Entities maintain eleven defined benefit pension plans and four defined contribution pension plans. There is an aggregate solvency deficiency of $13.3 million as at the last valuation date and a wind up deficiency of $32.8 million. There are twelve television collective agreements eleven of which are negotiated with the Communications, Energy and Paperworkers Union of Canada. The Canadian Union of Public Employees negotiated the twelfth television collective agreement. It expires on December 31, 2010. The other collective agreements are in expired status. None of the approximately 250 employees of the National Post Company are unionized. The CMI Entities propose to honour their payroll obligations to their employees, including all pre-filing wages and employee benefits outstanding as at the date of the commencement of the CCAA proceedings and payments in connection with their pension obligations.

Proposed Monitor

**22**     The applicants propose that FTI Consulting Canada Inc. serve as the Monitor in these proceedings. It is clearly qualified to act and has provided the Court with its consent to act. Neither FTI nor any of its representatives have served in any of the capacities prohibited by section of the amendments to the CCAA.

Proposed Order

**23**     I have reviewed in some detail the history that preceded this application. It culminated in the presentation of the within application and proposed order. Having reviewed the materials and heard submissions, I was satisfied that the relief requested should be granted.

**24**     This case involves a consideration of the amendments to the CCAA that were proclaimed in force on September 18, 2009. While these were long awaited, in many instances they reflect practices and principles that have been adopted by insolvency practitioners and developed in the jurisprudence and academic writings on the subject of the CCAA. In no way do the amendments change or detract from the underlying purpose of the CCAA, namely to provide debtor companies with the opportunity to extract themselves from financial difficulties notwithstanding insolvency and to re-

organize their affairs for the benefit of stakeholders. In my view, the amendments should be inter-
preted and applied with that objective in mind.

> (a) <u>Threshhold Issues</u>

**25**     Firstly, the applicants qualify as debtor companies under the CCAA. Their chief place of
business is in Ontario. The applicants are affiliated debtor companies with total claims against them
exceeding $5 million. The CMI Entities are in default of their obligations. CMI does not have the
necessary liquidity to make an interest payment in the amount of US$30.4 million that was due on
September 15, 2009 and none of the other CMI Entities who are all guarantors are able to make
such a payment either. The assets of the CMI Entities are insufficient to discharge all of the liabili-
ties. The CMI Entities are unable to satisfy their debts as they come due and they are insolvent.
They are insolvent both under the *Bankruptcy and Insolvency Act*[3] definition and under the more
expansive definition of insolvency used in Re Stelco[4]. Absent these CCAA proceedings, the appli-
cants would lack liquidity and would be unable to continue as going concerns. The CMI Entities
have acknowledged their insolvency in the affidavit filed in support of the application.

**26**     Secondly, the required statement of projected cash-flow and other financial documents re-
quired under section 11(2) of the CCAA have been filed.

> (b) <u>Stay of Proceedings</u>

**27**     Under section 11 of the CCAA, the Court has broad jurisdiction to grant a stay of proceed-
ings and to give a debtor company a chance to develop a plan of compromise or arrangement. In my
view, given the facts outlined, a stay is necessary to create stability and to allow the CMI Entities to
pursue their restructuring.

> (b) <u>Partnerships and Foreign Subsidiaries</u>

**28**     The applicants seek to extend the stay of proceedings and other relief to the aforementioned
partnerships. The partnerships are intertwined with the applicants' ongoing operations. They own
the National Post daily newspaper and Canadian free-to-air television assets and certain of its spe-
cialty television channels and some other television assets. These businesses constitute a significant
portion of the overall enterprise value of the CMI Entities. The partnerships are also guarantors of
the 8% senior subordinated notes.

**29**     While the CCAA definition of a company does not include a partnership or limited partner-
ship, courts have repeatedly exercised their inherent jurisdiction to extend the scope of CCAA pro-
ceedings to encompass them. See for example Re Lehndorff General Partners Ltd.[5]; Re
Smurfit-Stone Container Canada Inc.[6]; and *Re Calpine Canada Energy Ltd.*[7]. In this case, the part-
nerships carry on operations that are integral and closely interrelated to the business of the appli-
cants. The operations and obligations of the partnerships are so intertwined with those of the appli-
cants that irreparable harm would ensue if the requested stay were not granted. In my view, it is just
and convenient to grant the relief requested with respect to the partnerships.

**30**     Certain applicants are foreign subsidiaries of CMI. Each is a guarantor under the 8% senior
subordinated notes, the CIT credit agreement (and therefore the DIP facility), the intercompany
notes and is party to the support agreement and the Use of Cash Collateral and Consent Agreement.
If the stay of proceedings was not extended to these entities, creditors could seek to enforce their

guarantees. I am persuaded that the foreign subsidiary applicants as that term is defined in the affidavit filed are debtor companies within the meaning of section 2 of the CCAA and that I have jurisdiction and ought to grant the order requested as it relates to them. In this regard, I note that they are insolvent and each holds assets in Ontario in that they each maintain funds on deposit at the Bank of Nova Scotia in Toronto. See in this regard *Re Cadillac Fairview*[8] and *Re Global Light Telecommunications Ltd.*[9]

(c)    DIP Financing

**31**      Turning to the DIP financing, the premise underlying approval of DIP financing is that it is a benefit to all stakeholders as it allows the debtors to protect going-concern value while they attempt to devise a plan acceptable to creditors. While in the past, courts relied on inherent jurisdiction to approve the terms of a DIP financing charge, the September 18, 2009 amendments to the CCAA now expressly provide jurisdiction to grant a DIP financing charge. Section 11.2 of the Act states:

(1)    On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, a court may make an order declaring that all or part of the company's property is subject to a security or charge -- in an amount that the court considers appropriate -- in favour of a person specified in the order who agrees to lend to the company an amount approved by the court as being required by the company, having regard to its cash-flow statement. The security or charge may not secure an obligation that exists before the order is made.

(2)    The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

(3)    The court may order that the security or charge rank in priority over any security or charge arising from a previous order made under subsection (1) only with the consent of the person in whose favour the previous order was made.

(4)    In deciding whether to make an order, the court is to consider, among other things,

(*a*) the period during which the company is expected to be subject to proceedings under this Act;

(*b*) how the company's business and financial affairs are to be managed during the proceedings;

(*c*) whether the company's management has the confidence of its major creditors;

(*d*) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;

(*e*) the nature and value of the company's property;

(*f*) whether any creditor would be materially prejudiced as a result of the security or charge; and

(g) the monitor's report referred to in paragraph 23(1)(b), if any.

**32**    In light of the language of section 11.2(1), the first issue to consider is whether notice has been given to secured creditors who are likely to be affected by the security or charge. Paragraph 57 of the proposed order affords priority to the DIP charge, the administration charge, the Directors' and Officers' charge and the KERP charge with the following exception: "any validly perfected purchase money security interest in favour of a secured creditor or any statutory encumbrance existing on the date of this order in favour of any person which is a "secured creditor" as defined in the CCAA in respect of any of source deductions from wages, employer health tax, workers compensation, GST/QST, PST payables, vacation pay and banked overtime for employees, and amounts under the Wage Earners' Protection Program that are subject to a super priority claim under the BIA". This provision coupled with the notice that was provided satisfied me that secured creditors either were served or are unaffected by the DIP charge. This approach is both consistent with the legislation and practical.

**33**    Secondly, the Court must determine that the amount of the DIP is appropriate and required having regard to the debtors' cash-flow statement. The DIP charge is for up to $100 million. Prior to entering into the CIT facility, the CMI Entities sought proposals from other third party lenders for a credit facility that would convert to a DIP facility should the CMI Entities be required to file for protection under the CCAA. The CIT facility was the best proposal submitted. In this case, it is contemplated that implementation of the plan will occur no later than April 15, 2010. The total amount of cash on hand is expected to be down to approximately $10 million by late December, 2009 based on the cash flow forecast. The applicants state that this is an insufficient cushion for an enterprise of this magnitude. The cash-flow statements project the need for the liquidity provided by the DIP facility for the recapitalization transaction to be finalized. The facility is to accommodate additional liquidity requirements during the CCAA proceedings. It will enable the CMI Entities to operate as going concerns while pursuing the implementation and completion of a viable plan and will provide creditors with assurances of same. I also note that the proposed facility is simply a conversion of the pre-existing CIT facility and as such, it is expected that there would be no material prejudice to any of the creditors of the CMI Entities that arises from the granting of the DIP charge. I am persuaded that the amount is appropriate and required.

**34**    Thirdly, the DIP charge must not and does not secure an obligation that existed before the order was made. The only amount outstanding on the CIT facility is $10.7 in outstanding letters of credit. These letters of credit are secured by existing security and it is proposed that that security rank ahead of the DIP charge.

**35**    Lastly, I must consider amongst others, the enumerated factors in paragraph 11.2(4) of the Act. I have already addressed some of them. The Management Directors of the applicants as that term is used in the materials filed will continue to manage the CMI Entities during the CCAA proceedings. It would appear that management has the confidence of its major creditors. The CMI Entities have appointed a CRA and a Restructuring Officer to negotiate and implement the recapitalization transaction and the aforementioned directors will continue to manage the CMI Entities during the CCAA proceedings. The DIP facility will enhance the prospects of a completed restructuring. CIT has stated that it will not convert the CIT facility into a DIP facility if the DIP charge is not approved. In its report, the proposed Monitor observes that the ability to borrow funds from a court approved DIP facility secured by the DIP charge is crucial to retain the confidence of the CMI Enti-

ties' creditors, employees and suppliers and would enhance the prospects of a viable compromise or arrangement being made. The proposed Monitor is supportive of the DIP facility and charge.

**36**     For all of these reasons, I was prepared to approve the DIP facility and charge.

(d)     <u>Administration Charge</u>

**37**     While an administration charge was customarily granted by courts to secure the fees and disbursements of the professional advisors who guided a debtor company through the CCAA process, as a result of the amendments to the CCAA, there is now statutory authority to grant such a charge. Section 11.52 of the CCAA states:

> (1)     On notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring that all or part of the property of a debtor company is subject to a security or charge -- in an amount that the court considers appropriate -- in respect of the fees and expenses of
>
>> (*a*) the monitor, including the fees and expenses of any financial, legal or other experts engaged by the monitor in the performance of the monitor's duties;
>>
>> (*b*) any financial, legal or other experts engaged by the company for the purpose of proceedings under this Act; and
>>
>> (*c*) any financial, legal or other experts engaged by any other interested person if the court is satisfied that the security or charge is necessary for their effective participation in proceedings under this Act.
>
> (2)     The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

**38**     I must therefore be convinced that (1) notice has been given to the secured creditors likely to be affected by the charge; (2) the amount is appropriate; and (3) the charge should extend to all of the proposed beneficiaries.

**39**     As with the DIP charge, the issue relating to notice to affected secured creditors has been addressed appropriately by the applicants. The amount requested is up to $15 million. The beneficiaries of the charge are: the Monitor and its counsel; counsel to the CMI Entities; the financial advisor to the Special Committee and its counsel; counsel to the Management Directors; the CRA; the financial advisor to the Ad Hoc Committee; and RBC Capital Markets and its counsel. The proposed Monitor supports the aforementioned charge and considers it to be required and reasonable in the circumstances in order to preserve the going concern operations of the CMI Entities. The applicants submit that the above-note professionals who have played a necessary and integral role in the restructuring activities to date are necessary to implement the recapitalization transaction.

**40**     Estimating quantum is an inexact exercise but I am prepared to accept the amount as being appropriate. There has obviously been extensive negotiation by stakeholders and the restructuring is of considerable magnitude and complexity. I was prepared to accept the submissions relating to the administration charge. I have not included any requirement that all of these professionals be re-

quired to have their accounts scrutinized and approved by the Court but they should not preclude this possibility.

    (e)   <u>Critical Suppliers</u>

**41**    The next issue to consider is the applicants' request for authorization to pay pre-filing amounts owed to critical suppliers. In recognition that one of the purposes of the CCAA is to permit an insolvent corporation to remain in business, typically courts exercised their inherent jurisdiction to grant such authorization and a charge with respect to the provision of essential goods and services. In the recent amendments, Parliament codified the practice of permitting the payment of pre-filing amounts to critical suppliers and the provision of a charge. Specifically, section 11.4 provides:

    (1)    On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring a person to be a critical supplier to the company if the court is satisfied that the person is a supplier of goods or services to the company and that the goods or services that are supplied are critical to the company's continued operation.

    (2)    If the court declares a person to be a critical supplier, the court may make an order requiring the person to supply any goods or services specified by the court to the company on any terms and conditions that are consistent with the supply relationship or that the court considers appropriate.

    (3)    If the court makes an order under subsection (2), the court shall, in the order, declare that all or part of the property of the company is subject to a security or charge in favour of the person declared to be a critical supplier, in an amount equal to the value of the goods or services supplied under the terms of the order.

    (4)    The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

**42**    Under these provisions, the Court must be satisfied that there has been notice to creditors likely to be affected by the charge, the person is a supplier of goods or services to the company, and that the goods or services that are supplied are critical to the company's continued operation. While one might interpret section 11.4 (3) as requiring a charge any time a person is declared to be a critical supplier, in my view, this provision only applies when a court is compelling a person to supply. The charge then provides protection to the unwilling supplier.

**43**    In this case, no charge is requested and no additional notice is therefore required. Indeed, there is an issue as to whether in the absence of a request for a charge, section 11.4 is even applicable and the Court is left to rely on inherent jurisdiction. The section seems to be primarily directed to the conditions surrounding the granting of a charge to secure critical suppliers. That said, even if it is applicable, I am satisfied that the applicants have met the requirements. The CMI Entities seek authorization to make certain payments to third parties that provide goods and services integral to their business. These include television programming suppliers given the need for continuous and undisturbed flow of programming, newsprint suppliers given the dependency of the National Post on a continuous and uninterrupted supply of newsprint to enable it to publish and on newspaper distributors, and the American Express Corporate Card Program and Central Billed Accounts that are required for CMI Entity employees to perform their job functions. No payment would be made

without the consent of the Monitor. I accept that these suppliers are critical in nature. The CMI Entities also seek more general authorization allowing them to pay other suppliers if in the opinion of the CMI Entities, the supplier is critical. Again, no payment would be made without the consent of the Monitor. In addition, again no charge securing any payments is sought. This is not contrary to the language of section 11.4 (1) or to its purpose. The CMI Entities seek the ability to pay other suppliers if in their opinion the supplier is critical to their business and ongoing operations. The order requested is facilitative and practical in nature. The proposed Monitor supports the applicants' request and states that it will work to ensure that payments to suppliers in respect of pre-filing liabilities are minimized. The Monitor is of course an officer of the Court and is always able to seek direction from the Court if necessary. In addition, it will report on any such additional payments when it files its reports for Court approval. In the circumstances outlined, I am prepared to grant the relief requested in this regard.

(f)     Directors' and Officers' Charge

**44**     The applicants also seek a directors' and officers' ("D &O") charge in the amount of $20 million. The proposed charge would rank after the administration charge, the existing CIT security, and the DIP charge. It would rank pari passu with the KERP charge discussed subsequently in this endorsement but postponed in right of payment to the extent of the first $85 million payable under the secured intercompany note.

**45**     Again, the recent amendments to the CCAA allow for such a charge. Section 11.51 provides that:

(1)     On application by a debtor company and on notice to the secured creditors who are likely to be affected by the security or charge, the court may make an order declaring that all or part of the property of the company is subject to a security or charge -- in an amount that the court considers appropriate -- in favour of any director or officer of the company to indemnify the director or officer against obligations and liabilities that they may incur as a director or officer of the company

(2)     The court may order that the security or charge rank in priority over the claim of any secured creditor of the company.

(3)     The court may not make the order if in its opinion the company could obtain adequate indemnification insurance for the director or officer at a reasonable cost.

(4)     The court shall make an order declaring that the security or charge does not apply in respect of a specific obligation or liability incurred by a director or officer if in its opinion the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct or, in Quebec, the director's or officer's gross or intentional fault.

**46**     I have already addressed the issue of notice to affected secured creditors. I must also be satisfied with the amount and that the charge is for obligations and liabilities the directors and officers may incur after the commencement of proceedings. It is not to extend to coverage of wilful misconduct or gross negligence and no order should be granted if adequate insurance at a reasonable cost could be obtained.

**47**    The proposed Monitor reports that the amount of $20 million was estimated taking into consideration the existing D&O insurance and the potential liabilities which may attach including certain employee related and tax related obligations. The amount was negotiated with the DIP lender and the Ad Hoc Committee. The order proposed speaks of indemnification relating to the failure of any of the CMI Entities, after the date of the order, to make certain payments. It also excludes gross negligence and wilful misconduct. The D&O insurance provides for $30 million in coverage and $10 million in excess coverage for a total of $40 million. It will expire in a matter of weeks and Canwest Global has been unable to obtain additional or replacement coverage. I am advised that it also extends to others in the Canwest enterprise and not just to the CMI Entities. The directors and senior management are described as highly experienced, fully functional and qualified. The directors have indicated that they cannot continue in the restructuring effort unless the order includes the requested directors' charge.

**48**    The purpose of such a charge is to keep the directors and officers in place during the restructuring by providing them with protection against liabilities they could incur during the restructuring: *Re General Publishing Co.*[10] Retaining the current directors and officers of the applicants would avoid destabilization and would assist in the restructuring. The proposed charge would enable the applicants to keep the experienced board of directors supported by experienced senior management. The proposed Monitor believes that the charge is required and is reasonable in the circumstances and also observes that it will not cover all of the directors' and officers' liabilities in the worst case scenario. In all of these circumstances, I approved the request.

    (g)   <u>Key Employee Retention Plans</u>

**49**    Approval of a KERP and a KERP charge are matters of discretion. In this case, the CMI Entities have developed KERPs that are designed to facilitate and encourage the continued participation of certain of the CMI Entities' senior executives and other key employees who are required to guide the CMI Entities through a successful restructuring with a view to preserving enterprise value. There are 20 KERP participants all of whom are described by the applicants as being critical to the successful restructuring of the CMI Entities. Details of the KERPs are outlined in the materials and the proposed Monitor's report. A charge of $5.9 million is requested. The three Management Directors are seasoned executives with extensive experience in the broadcasting and publishing industries. They have played critical roles in the restructuring initiatives taken to date. The applicants state that it is probable that they would consider other employment opportunities if the KERPs were not secured by a KERP charge. The other proposed participants are also described as being crucial to the restructuring and it would be extremely difficult to find replacements for them.

**50**    Significantly in my view, the Monitor who has scrutinized the proposed KERPs and charge is supportive. Furthermore, they have been approved by the Board, the Special Committee, the Human Resources Committee of Canwest Global and the Ad Hoc Committee. The factors enumerated in *Re Grant Forest*[11] have all been met and I am persuaded that the relief in this regard should be granted.

**51**    The applicants ask that the Confidential Supplement containing unredacted copies of the KERPs that reveal individually identifiable information and compensation information be sealed. Generally speaking, judges are most reluctant to grant sealing orders. An open court and public access are fundamental to our system of justice. Section 137(2) of the *Courts of Justice Act* provides authority to grant a sealing order and the Supreme Court of Canada's decision in *Sierra Club of*

*Canada v. Canada (Minister of Finance)*[12] provides guidance on the appropriate legal principles to be applied. Firstly, the Court must be satisfied that the order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk. Secondly, the salutary effects of the order should outweigh its deleterious effects including the effects on the right to free expression which includes the public interest in open and accessible court proceedings.

**52**    In this case, the unredacted KERPs reveal individually identifiable information including compensation information. Protection of sensitive personal and compensation information the disclosure of which could cause harm to the individuals and to the CMI Entities is an important commercial interest that should be protected. The KERP participants have a reasonable expectation that their personal information would be kept confidential. As to the second branch of the test, the aggregate amount of the KERPs has been disclosed and the individual personal information adds nothing. It seems to me that this second branch of the test has been met. The relief requested is granted.

Annual Meeting

**53**    The CMI Entities seek an order postponing the annual general meeting of shareholders of Canwest Global. Pursuant to section 133 (1)(b) of the CBCA, a corporation is required to call an annual meeting by no later than February 28, 2010, being six months after the end of its preceding financial year which ended on August 31, 2009. Pursuant to section 133 (3), despite subsection (1), the corporation may apply to the court for an order extending the time for calling an annual meeting.

**54**    CCAA courts have commonly granted extensions of time for the calling of an annual general meeting. In this case, the CMI Entities including Canwest Global are devoting their time to stabilizing business and implementing a plan. Time and resources would be diverted if the time was not extended as requested and the preparation for and the holding of the annual meeting would likely impede the timely and desirable restructuring of the CMI Entities. Under section 106(6) of the CBCA, if directors of a corporation are not elected, the incumbent directors continue. Financial and other information will be available on the proposed Monitor's website. An extension is properly granted.

Other

**55**    The applicants request authorization to commence Chapter 15 proceedings in the U.S. Continued timely supply of U.S. network and other programming is necessary to preserve going concern value. Commencement of Chapter 15 proceedings to have the CCAA proceedings recognized as "foreign main proceedings" is a prerequisite to the conversion of the CIT facility into the DIP facility. Authorization is granted.

**56**    Canwest's various corporate and other entities share certain business services. They are seeking to continue to provide and receive inter-company services in the ordinary course during the CCAA proceedings. This is supported by the proposed Monitor and FTI will monitor and report to the Court on matters pertaining to the provision of inter-company services.

**57**    Section 23 of the amended CCAA now addresses certain duties and functions of the Monitor including the provision of notice of an Initial Order although the Court may order otherwise. Here the financial threshold for notice to creditors has been increased from $1000 to $5000 so as to re-

duce the burden and cost of such a process. The proceedings will be widely published in the media and the Initial Order is to be posted on the Monitor's website. Other meritorious adjustments were also made to the notice provisions.

**58**     This is a "pre-packaged" restructuring and as such, stakeholders have negotiated and agreed on the terms of the requested order. That said, not every stakeholder was before me. For this reason, interested parties are reminded that the order includes the usual come back provision. The return date of any motion to vary, rescind or affect the provisions relating to the CIT credit agreement or the CMI DIP must be no later than November 5, 2009.

**59**     I have obviously not addressed every provision in the order but have attempted to address some key provisions. In support of the requested relief, the applicants filed a factum and the proposed Monitor filed a report. These were most helpful. A factum is required under Rule 38.09 of the Rules of Civil Procedure. Both a factum and a proposed Monitor's report should customarily be filed with a request for an Initial Order under the CCAA.

Conclusion

**60**     Weak economic conditions and a high debt load do not a happy couple make but clearly many of the stakeholders have been working hard to produce as desirable an outcome as possible in the circumstances. Hopefully the cooperation will persist.

S.E. PEPALL J.

cp/e/qlafr/qljxr/qljxh/qlaxr/qlaxw/qlcal/qlced

1 *R.S.C. 1985, c. C. 36, as amended*

2 R.S.C. 1985, c.C.44.

3 R.S.C. 1985, c. B-3, as amended.

4 *(2004), 48 C.B.R. (4th) 299; leave to appeal refused, [2004] O.J. No. 1903, 2004 Carswell-lOnt 2936 (C.A.).*

5 *(1993), 9 B.L.R. (2d) 275.*

6 [2009] O.J. No. 349.

7 (2006), 19 C.B.R. (5th) 187.

8 (1995), 30 C.B.R. (3d) 29.

9 (2004), 33 B.C.L.R. (4th) 155.

10 *(2003), 39 C.B.R. (4th) 216.*

11 [2009] O.J. No. 3344. That said, given the nature of the relationship between a board of directors and senior management, it may not always be appropriate to give undue consideration to the principle of business judgment.

12 [2002] 2 S.C.R. 522.

**TAB 4**

*Case Name:*
# Shaw v. Shaw

**Between**
**Nicholas Shaw, also known as Nicholas Rodgers,**
**Plaintiff, and**
**Terena Anna Marie Shaw, also known as Terena Titus,**
**David Buchanan, Miller Thomson LLP, Cabarete Holding**
**BV, Arnold van der Heide, Cancaribe Limited, Orlaford**
**Limited, Sadu Blue Water Ltd., Light n' Strike Inc.,**
**Light n' Strike Corp., Turlough Mullen, Barry Butterly**
**and Grant Thornton, Defendants**
**And between**
**Terena Anna Marie Shaw, Cabarete Holding BV, and**
**Cancaribe Limited, Plaintiffs by Counterclaim, and**
**Nicholas Shaw also known as Nicholas Rodgers, James**
**Cheung and Chameleon, Inc., Defendants by Counterclaim**

[2007] O.J. No. 4999

162 A.C.W.S. (3d) 571

Court File No. 06-CV-303679 PD1

Ontario Superior Court of Justice

**F.J.C. Newbould J.**

Heard: December 19, 2007.
Judgment: December 20, 2007.

(16 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Production and inspection of documents -- Confidentiality orders -- Motion by the defendants for a protective confidentiality order with respect to information to be produced in the litigation to the plaintiff and to the defendants by counterclaim -- Motion allowed -- Defendants sufficiently established that the documentation to be produced was confidential and commercially sensitive and that a competitor could obtain an unfair advantage if the information were released.*

Motion by the defendants for a protective confidentiality order with respect to information to be produced in the litigation to the plaintiff and to the defendants by counterclaim -- Defendants asserted that the information sought to be protected was confidential, commercially sensitive and if disclosed would result in an unfair business advantage to competitors and particularly to the plaintiff and the defendants by counterclaim -- HELD: Motion allowed -- Defendants sufficiently established that the documentation to be produced by Cancaribe was confidential and commercially sensitive and that a competitor could obtain an unfair advantage if the information were released -- Plaintiff and the defendants by counterclaim had filed no affidavit material stating that they would suffer prejudice if the order was made.

**Counsel:**

*Bryan Finlay, Q.C.*, and *Caroline E. Abela*, for Terena Anna Marie Shaw, Cabarete Holding BV and Cancaribe Ltd.

*Chris Dockrill*, for Nicholas Shaw, also known as Nicholas Rodgers, James Cheung and Chameleon Inc.

*Sara J. Erskine*, for Arnold van der Heide.

*Sandra Barton*, for David Buchanan and Miller Thomson LLP.

---

## ENDORSEMENT

**1**     **F.J.C. NEWBOULD J.**:-- The defendants Terena Anna Maria Shaw, Cabarete Holding BV., and Cancaribe Limited ("the Shaw defendants") move for a protective confidentially order with respect to information to be produced in this litigation to the plaintiff and to the defendants by counterclaim. They assert that the information sought to be protected is confidential, commercially sensitive and if disclosed will result in an unfair business advantage to competitors and particularly to the plaintiff and the defendants by counterclaim.

**2**     In my view the Shaw defendants are entitled to the order sought with some changes.

**3**     There is little in this action that is not contested. Included in the orders that have been made in this litigation is a decision of Justice Cumming of April 20, 2006 enjoining the plaintiff from dealing with litigation in Bermuda and Florida without the consent of Cabarete Holding BV ("Cabarete") and providing related orders. There is also an order of Justice Jennings dated July 9, 2007 in which he made an order restraining the plaintiff and defendants by counterclaim from contravening a Licence Agreement made between the plaintiff and Cabarete, restraining them from continuing litigation in the United States against Brown Shoe Company and Elan Polo, Inc., and from commencing an action against any other client of Cabarete or Cancaribe Limited ("Cancaribe") or interfering in any way in their business in any foreign jurisdiction. The order also restrains them from interfering with the relationship between Walmart and Brown Shoe Company and from interfering with the relationship between Brown Shoe Company and Cancaribe. These orders of Cumming J. and Jennings J. are interlocutory orders.

**4**    The test for the making of a protective order is discussed by Master Beaudoin in *BASF Canada Inc. v. Max Auto Supply (1986) Inc.* (1999), 30 C.P.C. (4th) 23. In that case Master Beaudoin stated the following:

> 16.    As described by Cumming J. in the *CPC International Inc.* case, [1996] O.J. No. 2059 the making of a protective order is designed to strike a balance between the disclosure necessary for the conduct of an action and a party's bona fide right to protection of confidential and sensitive information. The courts have held that where the information at issue would be such that the disclosure would allow a competitor to improve its competitive position, it is appropriate that a protective order be issued to guard against such effect. (*Zellers Inc. v. Venta Investments Ltd.* (May 25, 1998), [1998] O.J. No. 2118, Doc. 94-CR-55831 (Ont. Gen. Div.)
>
> 17.    In the present case, the court is satisfied that the information is confidential, that it is commercially sensitive, and that a competitor could obtain an unfair advantage through its release and, therefore, *prima facie*, the moving parties should be entitled to a protective order unless the defendants, plaintiffs by counterclaim, would be unduly prejudiced by this.

**5**    Mr. Dockrill contends in his factum that "trade secrets" may be protected by a protective order but that the information sought to be protected by the Shaw defendants cannot be characterized as "trade secrets". In this regard he points to the reference by Master Beaudoin to Cumming J. in the *CPC International* case. In that case, however, Cumming J. did not purport to limit the right to relief to "trade secrets" as opposed to "confidential information". He was dealing with both categories of information and for ease of reference referred to both of them collectively as "trade secrets". In *BASF Canada Inc.*, Master Beaudoin was not dealing with trade secrets such as food formula, but was dealing with the kind of information which concerns the Shaw defendants, namely, commercially sensitive information such as price lists, and he made a protective order in that case.

**6**    Terena Shaw lists in paragraph 11 of her affidavit the information that is to be produced. She states in paragraph 12 that the information is confidential and that it is not commonly known or readily assessable to her future competitors and to the plaintiffs and defendants by counterclaim.

**7**    In paragraph 14(g) Ms Shaw states that the information is commercially sensitive and it could cause loss, undue hardship or damage to the Shaw defendants' commercial interests. She states that once the shoe patent in question expires in March 2008, the plaintiff and defendants by counterclaim will likely compete with the Shaw defendants and further explains in paragraphs 15 to 18 as to how the information could be used to the disadvantage of the Shaw defendants if not protected. Ms. Shaw was not cross-examined on her affidavit and there is no responding affidavit material questioning her statements.

**8**    Ms. Shaw refers to prior competition that the Shaw defendants have had with the plaintiff and defendants by counterclaim and refers to that competition as unlawful. Whether that competition was unlawful is contested and presumably will be dealt with at the trial. I am in no position to, nor would I, make any finding as to whether past competition was unlawful. However, it appears clear from all of the evidence that there has been competition and there no doubt will be in the future once the patent expires.

**9**    Mr. Dockrill contends that the information is not confidential because the plaintiff has a right to the information by virtue of paragraph 4 of the Licence Agreement made as at December 31,

1996 between the plaintiff and Cabarete. That paragraph provides the licensor with the right to an independent audit of all records and books of account of the licensee necessary for the determination of royalty payments to be made and provides that the independent chartered accountants are entitled to provide anything they obtain from the licensee to the licensor. Mr. Dockrill contends that because of this contractual right, the Shaw defendants are not entitled to any protective order as the information cannot be considered confidential between them. As to this contention:

(i)     Mr. Finlay advises that the documents that will be produced are documents of Cancaribe which is not a party to the Licence Agreement. Cancribe is a sub-licensee of the licence from Cabarete. I have been provided with the sub-licence agreements which were in effect at different times. These sub-licences do not obligate Cancribe to the plaintiff. They do provide for Cancaribe to pay the royalties to Cabarete that Carabete is to pay to the plaintiff but do not make Cancaribe a party to the auditing provision in the Licence Agreement between the plaintiff and Cabarete.

(ii)    Whether the Licence Agreement made as of December 31, 1996 between the plaintiff and Cabarete is in force is a matter for determination at the trial. The plaintiff's position is that he lawfully terminated that licence effective May 31, 2004. The Shaw defendants' position is that the agreement was not lawfully terminated and that they have complied with its terms.

(iii)   Even if the auditing provisions of the Licence Agreement applied to Cancaribe, which is not the case, I would hesitate to decide this motion on the basis of whether or not the Licence Agreement was in force. Moreover, it is clear that the relationship between the parties has substantially changed from the time the Licence Agreement was first made.

**10**     I conclude that the Shaw defendants have sufficiently established that the documentation to be produced by Cancaribe is confidential and commercially sensitive and that a competitor could obtain an unfair advantage if the information were released.

**11**     The issue then becomes whether the plaintiff and the defendants by counterclaim will be unduly prejudiced by the order sought.

**12**     The plaintiff and the defendants by counterclaim have filed no affidavit material stating that they will suffer prejudice if the order is made. This is unlike the case of *GasTOPS Ltd. v. Forsyth* (2000), 15 C.P.C. (5th) 116 that was referred to by Mr. Dockrill. In that case Master Beaudoin acted on evidence that the defendant's solicitors would be unable to properly conduct the case without input from their clients. There is no such evidence on the motion before me.

**13**     Mr. Dockrill has stated that he will need his client to review the documentation produced in order to determine if the documentation that is produced is credible. That statement appears to be premature in that the documentation has not yet been produced and it cannot now be known whether what will be produced will be credible or not. Moreover, it may well be that the expert witnesses to be retained by Mr. Dockrill will be more than able to deal with any such issues. Without any compelling affidavit evidence on the point, I am not prepared to act on it to refuse the order sought. If there is any basis for the need to amend the order sought after the information has been produced, an appropriate motion could be brought.

**14**     In the U.S. litigation against Brown Shoes that was commenced by Chameleon, Inc. and Nicholas Rodgers, they requested and obtained a discovery confidentiality order binding on all parties that was said to be necessary to protect the confidentiality of non-public and competitively sensitive information that may need to be disclosed. It prevented the disclosure of "Highly Confidential" information except under conditions substantially the same as those sought by the Shaw defendants in the motion before me. The issues in the Brown Shoe litigation were not dissimilar to the present action in Ontario in that the action attacked the business relationship between Cancaribe and Brown Shoe and claimed damages based upon the shoes sold by Brown Shoes that had been acquired from Cancaribe. It would appear that Mr. Rodgers and Chameleon, Inc. were satisfied in the Brown Shoe litigation that they could conduct the litigation without themselves knowing the confidential information provided by Brown Shoes that would be looked at by their expert witnesses and lawyers. Without any affidavit evidence from them in this case, the fact that they entered into such a confidentiality arrangement in the U.S. litigation is somewhat telling against the assertion that they will be prejudiced in Ontario if the confidentiality order is made.

**15**     I recognize that making such an order is a discretionary matter. In this case based upon the foregoing, I exercise my discretion and I am prepared to make the order sought by the Shaw defendants in the form attached to the notice of motion with the following changes:

    (i)    Paragraph 7(c) allows for the provision of the information to any expert retained to assist any of the plaintiffs or defendants. I see no need for a reference to experts retained by the Shaw defendants as it is their documents that are being produced and I think that should be made clear. This would also apply to paragraph 8 of the proposed order.

    (ii)    Mr. Dockrill said that it may be that an expert retained by him may be someone the Shaw defendants do not want as it would be someone who is active in the marketplace and would have access to the information. In order to prevent that from occurring, I think the order should provide that before any of the confidential information is provided to an expert retained by the plaintiff or the defendants by counterclaim, the name of such expert with his or her curriculum vitae should be provided to counsel for the Shaw defendants who shall have 30 days to consider whether they object to any such expert.

    (iii)    The draft order provides in paragraph 21 that it is subject to further direction of the court. I think that should be broadened to ensure that the plaintiff and the defendants by counterclaim are not precluded from moving for some variation of the order once the confidential information has been delivered.

**16**     The Shaw defendants are entitled to their costs of the motion to be paid by the plaintiff and defendants by counterclaim. If these costs cannot be agreed, brief written submissions should be made by the Shaw defendants along with a bill of costs, and any brief responding submissions should be made within 10 days thereafter.

F.J.C. NEWBOULD J.

cp/e/qlbxr/qlpxm/qljxl/qlesm

**TAB 5**

*Indexed as:*
# Reichmann v. Toronto Life Publishing Co.

**Between
Renee Reichmann, Albert Reichmann, Paul Reichmann, Ralph
Reichmann and Olympia & York Developments Limited, Plaintiffs,
and Toronto Life Publishing Co., Key Publishers Company Ltd.,
Cuc Limited, Marq de Villiers, Stephen Trumper and Elaine
Dewar, Defendants**

[1990] O.J. No. 538

44 C.P.C. (2d) 206

20 A.C.W.S. (3d) 479

Action No. 25372/88

Ontario Supreme Court - High Court of Justice
Toronto Weekly Court

**Anderson J.**

Heard: April 4, 1990
Judgment: April 10, 1990

[Ed. note: Corrigenda, released April 19, 1990, appended and corrections made to judgment.]

*Practice -- Discovery -- Production of documents -- Financial statements -- Conditions for access.*

The court had ordered production of the plaintiff's financial statements. The parties were unable to agree on the terms on which the defendant was to have access to the documents.

HELD: Access to documents was given only to the defendant's solicitors and to an accountant. If the solicitor's felt that the defendants should have access to certain documents, such access was to be arranged with the plaintiffs or the court.

Julian Porter, Q.C., and David Potts, for the Moving Parties, Defendants.
H. Lorne Morphy, Q.C., and John B. Laskin, for the Responding Parties, Plaintiffs.

**ANDERSON J.:**-- On January 30th I heard a motion by the defendants seeking production of certain financial statements of the plaintiff, Olympia & York Developments Limited (Olympia & York), and such further oral discovery of Paul Reichmann as may arise upon their production. The motion was dealt with by reasons in writing released February 21, 1990, of which these reasons may be considered a continuation. I made the order asked but directed that the production of the financial statements should be upon terms, either to be agreed between the parties or fixed by me. Despite an exchange of correspondence and alternative sets of draft conditions, the parties were unable to reach agreement and seek further directions.

While he did not vigorously resist the making of some conditions, counsel for the defendants made the point that, on the argument of the motion, production of the statements had been resisted by Olympia & York on the grounds that they were not relevant, that there had been no real argument based on their confidential nature, and that mention of terms first appeared in my reasons for judgment. It is also true that those conditions were proposed having in mind the confidential nature of the statements. That they would be deemed to be confidential by the shareholders and directors of Olympia & York may not be a fact of which a court could ordinarily taken judicial notice, but to conclude otherwise would display a degree of naivete unlikely to be found in anyone who had the slightest acquaintance with the commercial world. In any event, their confidential nature is clearly to be inferred from the pleadings and from the examinations for discovery to date.

Counsel for Olympia & York, in supporting the conditions which in his view were appropriate, relied on a number of authorities, most of which dealt with disputes over patented or other secret processes, in which the litigants were direct commercial competitors. Such cases are not strictly in point; in such cases the parties are usually engaged in directly competing business enterprises. There is no such competition between the plaintiffs and defendants in this case. But those authorities demonstrate that in a proper case a court may exercise a discretion to attach conditions to production and discovery when the circumstances establish that such protection is warranted. I continue to be of the view that it is warranted in the case at bar, and that all there is to decide is what conditions are appropriate. The concept that fiscal matters may be deemed private has been much eroded, but I consider it to be a legitimate interest in those who choose to assert it. The ambit of the differences between the parties on this issue can best be demonstrated by setting out the sets of conditions which each proposes; they are attached as Appendices "A" and "B". There are differences in detail, but the most fundamental and critical difference concerns access by the defendants themselves and not only by their solicitors.

Both parties referred to the decision of the English Court of Appeal in Warner-Lambert Co. v. Glaxo Laboratories Limited [1975] R.P.C. 354. In resisting the suggestion that communication should be limited to the defendants' solicitors, counsel for the defendants referred to the language of the judgment at p. 360:

> If in a particular case it is right that disclosure of any facts should be made by one party to his opponent s advisers before trial, it must normally follow as a matter of course that the opponent should be entitled to know the facts so disclosed. His advisers are his agents in the matter, and strong grounds must be re-

quired for excluding the principal from knowledge which his agents properly acquire on his behalf. But this principle must be subject to some modification if trade secrets are to be protected from disclosure to possible competitors....

If the principle can be modified to protect a commercial interest of one kind, it can be modified to protect another. In my previous reasons, I expressed the doubt, which I still entertain, that the statements will in the long run be of any significance. In any event, I do not consider that any prejudice to the defendants results from denying them access personally. I doubt their capacity to make any useful comment on the statements as those may be relevant to the assessment of damages, the only basis on which they can be deemed relevant. It is indiscriminate disclosure which is of concern and no authority is required for the proposition that the danger of such disclosure is directly increased with an increase in the number of persons having access to the information. If the defendant's solicitors find a legitimate need to make some disclosure to the defendants, leave may be sought.

Counsel for Olympia & York suggested the possibility of approaching the matter in stages. Production would first be made to designated solicitors and a designated accountant. If, in their collected view, there was no utility for the defendants' case in utilizing information from the financial statements, that would end the matter. If certain specific information was deemed to be useful, the possibility might be explored of obtaining it from Olympia & York by way of stipulation or undertaking. If no satisfactory result was accomplished in either of those ways, the matter could be brought back to the court for resolution. In the climate of this litigation, I have a trained intuition that the latter would be the conclusion and I see no purpose in delaying the evil hour.

I have not considered it appropriate to require of the solicitors who are to have access, any express undertaking to deal with the information they obtain as confidential. They are officers of the court and may be expected to behave accordingly.

There was some controversy over the provision relating to the selection of an accountant. I can see that Olympia & York, considering the scope of its affairs, has a legitimate concern about what accountant is selected. I have sought to resolve this by alternative proposals and hope that the result will not be to trigger still another motion to the court.

The following are the conditions which will be comprised in the formal order:

1.    Access shall be permitted to Julian Porter, David Potts, Joyce Harris and Lisa Feld, of solicitors to the defendants.

2.    Access shall be permitted to a chartered accountant, selected by the defendants, and one associate of such accountant. Prior to such access each shall sign an agreement not to disclose any information obtained as a result of such access, the agreement to be in form satisfactory to the solicitors for the plaintiffs, or approved by the court.

3.    The solicitors for the defendants shall within seven days of the date of this order advise the solicitors for the plaintiffs, in writing, of the name of the accountant, and the associate, if any, and the form of agreement proposed. The solicitors for the plaintiffs shall within seven days of receipt of such notice advise the solicitors for the defendants whether they object to the intervention of the proposed accountant or to the proposed agreement. If the parties are unable to agree on an accountant or an agreement, the selection shall be made and the agreement settled by the court.

4.  Access shall be provided only at the offices of Davies, Ward and Beck, where suitable and private facilities shall be provided for the purpose.

5.  No copies of the statements shall be taken. Any notes made of their contents shall be kept in a secure and private place and shall be destroyed upon final disposition of this action.

6.  If the solicitors for the defendants deem it necessary that any defendant have access, and are unable to arrange such access with the solicitors for the plaintiffs, they may seek leave of the court. Save pursuant to such an arrangement or approval of the court, the defendants shall have no access, and no information concerning the statements shall be communicated to them by any person who has access.

7.  No part of the statements or any information derived from them shall be led in the court in any form without prior leave of the court.

Costs of the attendance on April 4th will be part of those in the substantive motion, which were ordered to be in the cause.

ANDERSON J.

\* \* \* \* \*

APPENDIX "A"

Proposed Conditions on Access to the Financial Statements of Olympia & York 1. Access to be permitted to Julian Porter and David Potts, counsel for the defendants, and to one expert accountant who is a member of a national firm of chartered accountants.

2.  Access to be permitted on the basis of an express undertaking to the plaintiffs and to the court not to make use of the statements or any information obtained from them for any purpose other than the conduct of the action, and not to disclose their contents, directly or indirectly, to any other person.

3.  Neither the defendants nor any other member or staff of Porter, Posluns & Harris or the firm of accountants to have access.

4.  Access to be provided only at the offices of Davies, Ward & Beck, and no copies of the statements to be taken.

5.  No information obtained from the statements to be filed with the court in any form, whether in affidavits, in transcripts or otherwise, without first obtaining leave of the court.

6.  Any notes taken by the persons permitted access containing information obtained from the statements to be kept in a secure manner and to be destroyed immediately upon the final disposition of the action.

7.  Any official examiner or reporter attending at any examination at which evidence is given concerning the contents of the statements, or participating in any way in the preparation of the transcript, to give an express undertaking to the plaintiffs and to the court not to make use of any information obtained from the statements for any purpose other than the examination and the preparation of the transcript, and not to disclose their contents, directly or indirectly, to any other person.

8.    The identity of the accountant to be disclosed to the plaintiffs, on the plaintiffs' under-
taking not to discuss the action with him or her or to call him or her as a witness at the
trial.

9.    No use of the statements or of any information obtained from them to be made at the
trial without first obtaining leave of the trial judge.

APPENDIX "B"

PROPOSED CONDITIONS ON ACCESS -- DEFENDANTS (1) Members of the
law firm of Porter, Posluns & Harris, solicitors for all the defendants, to have access to the financial
statements;

(2)    The defendants to have access to the financial statements for the purpose of instructing
counsel on signing an appropriate confidentiality order;

(3)    An individual accountant who would sign a confidentiality agreement to be held in trust
by Julian Porter and whose name would be revealed only on order by this court to have
access to financial statements for the purpose of advising counsel;

(4)    In the event that counsel for the defendants needs further assistance beyond the indi-
vidual accountant, counsel be entitled to apply for leave to allow such further expert
access to the financial statements after the review of the material in issue.

* * * * *

Corrigenda Released: April 19, 1990
Page 1 - "H. Lorne Morphy" changed to "H. Lorne Morphy, Q.C."
Page 4 - "In any event, do not ..." changed to "In any event, I do not ..."

**TAB 6**

*Case Name:*

# Fairview Donut Inc. v. TDL Group Corp.

**RE: Fairview Donut Inc. and Brule Foods Ltd.,
Plaintiffs/Respondents, and
The TDL Group Corp. and Tim Hortons Inc., Defendants/Moving
Parties**

[2010] O.J. No. 502

2010 ONSC 789

100 O.R. (3d) 510

Court File No. CV-08-00356806-CP00

Ontario Superior Court of Justice

**G.R. Strathy J.**

Heard: December 22, 2009.
Judgment: February 8, 2010.

(72 paras.)

*Civil litigation -- Civil evidence -- Documentary evidence -- Publication bans and confidentiality orders -- Sealed evidence -- Motion by the Tim Hortons' defendants for a sealing order dismissed -- The proposed class action asserted that the costs and expenses associated with a convection baking method and new lunch menu items were a breach of their individual franchisee licenses -- The defendants sought the order for certain documents in their motion record on certification and summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in the evidence -- Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2), 137(2).*

*Civil litigation -- Civil procedure -- Parties -- Class or representative actions -- Procedure -- Motion by the Tim Hortons' defendants for a sealing order dismissed -- The proposed class action asserted that the costs and expenses associated with a convection baking method and new lunch menu items were a breach of their individual franchisee licenses -- The defendants sought the order for certain documents in their motion record on certification and summary judgment -- The risk of commercial harm was not real, substantial or well-grounded in the evidence -- Even if an important*

*commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects -- Courts of Justice Act, ss. 135(2), 137(2).*

The Tim Hortons' defendants in the proposed class action moved for a confidentiality or sealing order restricting public access to certain documents, or portions of certain documents, in their motion record on certification and summary judgment. The two putative class representatives were franchisees of Tim Hortons'. The action asserted that the conversion to preparation of frozen baked goods in convection ovens result in increased costs and expenses in breach of their individual license agreements. The action further asserted that the requirement imposed on franchisees to sell lunch menu items at low margins was also a breach of their licence agreements. Tim Hortons' position was that the plaintiffs' claims were entirely without merit and that the information deleted or redacted was personal information about franchisees, financial information about franchisees, competitively sensitive commercial data and trade secrets.

HELD: Motion dismissed. The Court was not satisfied that the interests affected extended beyond the commercial interests of Tim Hortons' and its franchisees or that those interests could be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. The risk of commercial harm was not real, substantial or well-grounded in the evidence. The baking system was introduced in 2002 and was not unique. The information described as trade secrets was of the most general nature and in order to take advantage of that information it would be necessary to create a substantial baking infrastructure. There was no general authority to redact documents appended to affidavits, or portions thereof, on the grounds they were irrelevant. Even if an important commercial interest was engaged the salutary effects of a sealing order would not have outweighed its deleterious effects. A sealing order was not required to ensure a fair trial and such an order would have adverse effects on public confidence in the administration of justice.

**Statutes, Regulations and Rules Cited:**

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B, s. 2(b)

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 135, s. 135(2), s. 137(2)

Criminal Code, R.S.C. 1986, c. C-46, s. 486

**Counsel:**

*Peter Howard and Samaneh Hosseini*, for the Defendants/Moving Parties.

*Jerome Morse and Agapé Lim*, for the Plaintiffs/Respondents.

---

## REASONS FOR DECISION
## REQUEST FOR SEALING ORDER

**1      G.R. STRATHY J.**:-- The defendants ("Tim Hortons") in this proposed class action move for a "confidentiality order" or sealing order, restricting public access to certain documents, or por-

tions of certain documents, in their motion record on certification and summary judgment. Tim Hortons seeks this order on the ground that these documents are said to contain highly sensitive and competitive financial information, the disclosure of which would cause serious harm to their commercial interests. They propose a mechanism that would allow the plaintiff, members of the proposed class and other advisors to have access to the information while preserving its confidentiality. They also propose an ongoing process for dealing with confidential information in this case, under which parties will be allowed to designate information as confidential, subject to a ruling by the court. The motion engages the test for confidentiality orders in *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 S.C.R. 522, [2002] S.C.J. No. 42 ("*Sierra Club*").

*The Proposed Class Action - Certification and Summary Judgment Motions*

**2**     The two putative class representatives are franchisees of the well-known Tim Hortons organization. Their action asserts two basic complaints. The first relates to a franchise-wide conversion in 2002 from a full-baking system, whereby donuts and most other baked goods were baked on-site in each store, to a method called "Always Fresh" or "par baking," where donuts and "timbits" and later sandwich buns and pastries, were baked at a central facility, frozen and shipped to the retail stores, where they were prepared in a special convection oven. The plaintiffs claim that this conversion resulted in increased costs, increased capital expenses and was a breach of their individual license agreements.

**3**     The second complaint relates to the obligation of all franchisees to provide a lunch menu - a requirement that the plaintiffs say was imposed on franchisees, and has caused them to lose money. They say that Tim Hortons breached their license agreements by requiring them to sell lunch menu items at unreasonably low margins.

**4**     The plaintiffs assert claims in breach of contract, unjust enrichment, breach of the *Arthur Wishart Act (Franchise Disclosure) 2000*, S.O. 2000, c. 3 and misrepresentation.

**5**     Tim Hortons has delivered its responding motion record on the certification motion and in support of a motion for summary judgment, to be brought at the same time as the certification motion. The materials are voluminous and include fifteen affidavits of factual witnesses and an affidavit of one expert witness and numerous exhibits, including extensive financial information.

**6**     Certain material has been redacted in the motion record, or has not been included in the record, but a complete and unredacted copy has been delivered to the plaintiffs' lawyers on their undertaking to keep the material confidential pending the outcome of this motion. I have been provided with a copy of the unredacted materials. The plaintiffs have acknowledged that a confidentiality order is warranted for some of the documents and information, but not for other documents.

**7**     Tim Hortons' position on the summary judgment motion is that the plaintiffs' claims are entirely without merit. It says that while the conversion to "Always Fresh" baking had the predicted result of increasing the franchisees' food costs, it has also had the expected result of reducing their labour costs, because they no longer have to hire expensive professional bakers to produce baked goods "from scratch." The result, says Tim Hortons, is that franchisees' profits have generally increased and the program has been a resounding success. Tim Hortons says that lunch items have been part of its business plan since 1986 and that every franchisee is expected to provide a lunch menu.

**8**    Much of the evidence in Tim Hortons' certification and summary judgment motion record, including some of the financial information at issue on this motion, is intended to refute the plaintiffs' assertion that the conversion to par baking, and the lunch menu, resulted in increased costs and lower margins for franchisees. Tim Hortons will argue that the putative plaintiffs were inefficient operators and that their experiences are not reflective of the positive and profitable experiences of the great majority of competent franchisees. It also says that the plaintiffs' financial information and margin analysis are fundamentally flawed.

*The Information at issue*

**9**    A list of the documents at issue, prepared by counsel for the defendants, is attached as a schedule to this endorsement. I will describe it in more detail shortly.

**10**    In his affidavit filed in support of the summary judgment motion and in response to the certification motion, Mr. David Clanachan, the Chief Operating Officer of Tim Hortons, describes the information at issue as "sensitive commercial information that is not public and would be of considerable interest and use to the competitors of Tim Hortons and its store owners." Mr. Jeff O'Rourke, Director Financial Analysis Franchise Operations, who has also filed an affidavit in support of the summary judgment motion, describes the information as "commercially sensitive information."

**11**    Mr. O'Rourke elaborates on his concerns in two affidavits filed in support of the motion for a confidentiality order. As well, a supporting affidavit has been sworn by Drew McLennan, a Tim Hortons franchisee, and a member of the Tim Hortons Advisory Board of franchisees. I will briefly summarize their evidence.

**12**    Mr. O'Rourke describes the information sought to be protected as including "highly confidential and competitively sensitive financial and business data such as profit margins and sales information of Tim Hortons franchisees from 2001 to 2009."

**13**    Mr. O'Rourke says that public disclosure of this information would give competitors useful information about Tim Hortons' costs, sales and margins that would allow them to increase their market penetration. He says information concerning the "Always Fresh" conversion would facilitate the entry of competitors into the par baking market. He claims that competitors could target geographic areas with lower than average margins and could identify regions where there is untapped demand or lower costs; suppliers and landlords could gain useful information about margins that would lead them to increase franchisees' costs.

**14**    Mr. O'Rourke says that Tim Hortons is careful to secure the confidentiality of this information through confidentiality provisions in its licence agreements with its franchisees and through express notices on some of its documents.

**15**    While Mr. O'Rourke acknowledges that as a public company Tim Hortons makes disclosure of consolidated business and financial information, confidentiality is not claimed for information in the public domain. He says, however, that it is the "level of granularity and detail" in the documents at issue that would make them valuable to competitors and their disclosure would cause damage to Tim Hortons and its franchisees.

**16**    Mr. McLennan, a franchisee and member of the Advisory Board, agrees with Mr. O'Rourke that the information at issue is provided to or by franchisees on a confidential basis. He also says:

> I also agree with [Mr. O'Rourke] that the material he describes is competitively
> sensitive and if it were made public could be used by our competitors and other
> third parties with whom we deal to the real disadvantage of the franchisees. [Mr.
> O'Rourke] has detailed some of the ways that this information could be used to
> the detriment of the franchisees and I believe that those are all valid and addi-
> tionally that there are likely other negative consequences for franchisees from
> potential adverse publicity likely attendant upon that publication.

**17**    Mr. McLennan says that the disclosure of sales and margin information would result in "real
harm" to franchisees.

**18**    The defendants say that the information redacted or deleted falls into four general catego-
ries:

### (a)    Personal information of Tim Hortons' franchisees

**19**    The information redacted includes names, addresses and phone numbers of franchisees,
which Tim Hortons claims was "collected from franchisees in the expectation that it would not be
widely disseminated." The personal information is contained in Exhibits 7, 16 and 40 of Mr.
Clanachan's affidavit. Exhibit 7 is a 2001 disclosure document, provided to prospective franchisees.
It contains a "Confidentiality Notice" on its face. Names and addresses of franchisees have been re-
dacted. Exhibit 16 is a franchise agreement that has been attached as an example. The name of the
franchisee and other personal information about the franchisee have been redacted. The amount of
the licence fee and other financial information pertaining to charges to the franchisee, as well as
hours of operation, have been redacted. Exhibit 40 is a powerpoint presentation made at Tim Hor-
tons' Ontario Regional Meeting in 2003. It contains some information about the financial experience
of identified franchisees.

### (b)    Financial information of franchisees

**20**    This information is described as financial information used to track operating margins, in-
cluding sales and profit and loss information. This information is collected from franchisees by Tim
Hortons on the basis that it is confidential.

**21**    Exhibit 35 is part of a presentation made to franchisees in 2002 concerning the "roll-out" of
the "Always Fresh" system. It contains breakdowns of food and labour costs at various franchise
locations. Exhibit 38 is entitled "Always Fresh Financial Update" and was prepared in 2003. The
information redacted includes profit and loss results and operating margins prior to and after the
"Always Fresh" conversion. Exhibits 39, 40 and 41 contain similar information. Exhibit 43 was
prepared for the 2004 meetings with franchisees and contains information about food unit costs,
sales revenue and comparisons of gross margins before and after the "Always Fresh" conversion.
Exhibit 2 to Mr. O'Rourke's affidavit shows historical operating margins for Ontario for the period
from 2002 to 2008. It is tendered in evidence to support Tim Hortons' position that historical mar-
gins have increased as a result of the introduction of the "Always Fresh" baking method.

**22**    Exhibit 3 to Mr. O'Rourke's affidavit is financial information provided by Mr. Jollymore, the
operator of one of the putative class representatives, and appears to be introduced to support the as-
sertion that the experiences of the plaintiffs are due to their own inefficiencies and that their finan-
cial performance is not representative of those of other franchisees. Exhibit 4 to Mr. O'Rourke's af-

fidavit contains profit margin information for all regions in Canada in the period from 2002 to 2008. It appears to be introduced to support the assertion that the "Always Fresh" conversion has not had a negative effect.

    (c)    <u>Competitively sensitive commercial data</u>

**23**    This category includes earnings, projections, profitability and productivity information, historical costs of food, paper and labour, pricing information, operating margins and gross margins, profit and loss results, costs versus pricing per region, and break-downs of sales by time of day.

**24**    Many of the documents in this category are presentations made at the time of the "Always Fresh" conversion in 2002-2003. They consist of analyses of food and labour costs, sales, profits and margins to demonstrate historic results and to project anticipated results of the conversion. Exhibits 28, 33, 35, 37-40 and 43-45 of Mr. Clanachan's affidavit fall within this description. Several of the documents contain more current information of the same kind: exhibit 46 (historic costs vs. price of donuts and timbits 2003-2009); exhibit 2 to Mr. O'Rourke's affidavit (historic operating margins for Ontario Region 2002-2008, including costs of food, paper, labour, rent, royalty, advertising fees, operating expenses and operating margins); exhibit 4 (historical operating margins 2002-2008, including costs and sales volumes; exhibit 5 (retail price change history); and exhibit 6 (costs versus price of donuts and timbits, 2003-'09) to Mr. O'Rourke's affidavit.

**25**    Exhibit 3 to Mr. O'Rourke's affidavit, referred to above, contains financial information comparing the performance of the proposed representative plaintiffs to average performance figures.

**26**    Paragraph 8 of Mr. Clanachan's affidavit contains information pertaining to the labour costs of Ontario store owners in contrast with Mr. Jollymore's - this information has been redacted. Also redacted is paragraph 20 and portions of one of the exhibits that shows information concerning the percentage of sales made at various times of the day, including during lunch times. This is introduced to respond to complaints that the introduction of the lunch menu was unreasonable and to support the argument that the plaintiffs' evidence is flawed.

    (d)    <u>"Trade secrets"</u>

**27**    This information is generally described as "confidential product preparation methods and procedures," relating to the preparation of Tim Hortons' products. Tim Hortons claims disclosure of this information would allow competitors to make use of its experience to gain an unfair competitive advantage.

**28**    The documents that Tim Hortons wishes to redact or seal on this basis include exhibit 29, a 2003 "Production Manual" that includes instructions and procedures for "Always Fresh." It is essentially a "how to" manual for the baking system. The parties agree that it should be excluded and sealed.

**29**    Exhibit 34 is an extract from a meeting of the Advisory Board in 2002 that contains information about the "Always Fresh" roll-out and some very basic information about the par baking system. It describes various products and contains simple baking information such as "Muffins ... bake at x [degrees] for y minutes". The plaintiff does not contest the claim for confidentiality of this document. Exhibit 35 contains similar information.

<u>Redaction for Relevance</u>

**30**      In addition to these documents, certain documents have been partially redacted on the basis that the redacted portions are not relevant to the issues before the court on certification or summary judgment.

*The Sierra Club Test*

**31**      The general principle, expressed in s. 135 of the *Courts of Justice Act*, R.S.O. 1990, c. C.43, is that "all court hearings shall be open to the public." Sub-section 135(2) permits the court to exclude the public from a hearing "where the possibility of serious harm or injustice to any person justifies a departure from the general principle that court hearings shall be open to the public."

**32**      The principle is also expressed in s. 486 of the *Criminal Code*, R.S.C. 1986, c. C-46, as amended, which permits exclusion of the public only where "the judge or justice is of the opinion that such an order is in the interest of public morals, the maintenance of order or the proper administration of justice or is necessary to prevent injury to international relations or national defence or national security." The "proper administration of justice" includes ensuring that witnesses under the age of eighteen are safeguarded and that participants in the justice system are protected. Specific provision is made in s. 486.4 to prevent publication of the names of victims of sexual offences.

**33**      The importance of the open court principle has been repeatedly affirmed by the Supreme Court of Canada in a line of cases interpreting s. 2(b) of the *Canadian Charter of Rights and Freedoms: Dagenais v. Canadian Broadcasting Corp.*, [1994] 3 S.C.R. 835, [1994] S.C.J. No. 104; *R. v. Mentuck*, [2001] 3 S.C.R. 442, [2001] S.C.J. No. 73; *Vancouver Sun (Re.)*, [2004] 2 S.C.R. 332, [2004] S.C.J. No. 41; and *Toronto Star Newspapers Ltd. v. Ontario*, [2005] 2 S.C.R. 188, [2005] S.C.J. No. 41. In the civil context, the principle has been most recently and definitively stated by the Supreme Court in *Sierra Club*.

**34**      The open court principle also governs applications, such as this, to seal portions of a court file. There is no doubt that the court has inherent jurisdiction, and jurisdiction under s. 137(2) of the *Courts of Justice Act*, to seal a portion of the court file:

>          A court may order that any document filed in a civil proceeding before it be treated as confidential, sealed and not form part of the public record.

**35**      Even before *Sierra Club*, it was clearly established that a sealing order is an exceptional measure that violates the open court principle, a principle that should be curtailed only "where there is present the need to protect social values of superordinate importance": *Nova Scotia (Attorney General) v. McIntyre* (1982), 132 D.L.R. (3d) 385, [1982] 1 S.C.R. 175 (S.C.C.).

**36**      In *Sierra Club,* at para. 53, the Supreme Court of Canada held that a sealing order will be granted where:

>     (a)     such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonable alternative measures will not prevent the risk; [the necessity stage of the test] and
>
>     (b)     the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the ef-

fects on the right to free expression, which in this context includes the public in-
terest in open and accessible court proceedings [the proportionality stage of the
test].

**37**     In that case, Justice Iacobucci stated, at para. 53, that three important elements are subsumed
under the first branch of this test. First, the risk in question must be *real and substantial*, in that the
risk is *well-grounded in evidence* and poses a serious threat to the *commercial interest* in question.
As this case involves interests that are primarily commercial in nature, the words I have italicized
bear emphasis - the risk must be real, substantial, and well-grounded in evidence, and disclosure
must pose a serious threat to the interest in question.

**38**     Second, Justice Iacobucci made it clear that a "commercial" interest must be an interest that
goes beyond harm to the private commercial interests of a person or a business. In order to qualify
as an "important commercial interest," the interest must be one that can be expressed in terms of a
public interest in confidentiality. Justice Iacobucci stated, at para. 55:

> In addition, the phrase "important commercial interest" is in need of some clari-
> fication. In order to qualify as an "important commercial interest", *the interest in*
> *question cannot merely be specific to the party requesting the order*; the interest
> must be one which can be expressed in terms of a public interest in confidential-
> ity. For example, a private company could not argue simply that the existence of
> a particular contract should not be made public because to do so would cause the
> company to lose business, thus harming its commercial interests. However, if, as
> in this case, exposure of information would cause a breach of a confidentiality
> agreement, then the commercial interest affected can be characterized more
> broadly as the general commercial interest of preserving confidential informa-
> tion. Simply put, if there is no general principle at stake, there can be no "impor-
> tant commercial interest" for the purposes of this test. Or, in the words of Binnie
> J. in *F.N. (Re)*, [2000] 1 S.C.R. 880, 2000 SCC 35, at para. 10, the open court
> rule only yields "where the public interest in confidentiality outweighs the public
> interest in openness" [emphasis added].

**39**     Third, the phrase "reasonable alternative measures" requires the judge to consider not only
whether reasonable alternatives to a confidentiality order are available, but also to restrict the order
as much as is reasonably possible while preserving the commercial interest in question.

**40**     In *Sierra Club,* the Supreme Court granted a confidentiality order over technical information
concerning an environmental assessment of a site, in China, for the construction of two CANDU
nuclear reactors. The documents were the property of the Chinese authority and had been provided
to Atomic Energy of Canada Limited ("AECL") on condition that they be protected by a confidenti-
ality order. The Supreme Court found that the test had been met. Under the necessity branch of the
test, there was a commercial interest in preserving contractual obligations of confidentiality. The
information had been treated as confidential, had been accumulated with a reasonable expectation
that it would be kept confidential and proprietary commercial and scientific interests would be
harmed by its disclosure. There was a serious risk of harm to an important commercial interest of
AECL if there was disclosure. No alternative measures were available.

**41**     On the application of the proportionality branch of the test, the salutary effect of the order
was to promote a fair trial, which would otherwise have been impaired if AECL could not disclose

the documents. Limiting disclosure of the documents to the parties, under the protection of a confidentiality order, would promote, rather than harm, the search for the truth. Finally, the technical nature of the information, pertaining as it did to a nuclear facility, gave rise to a public security interest in the confidentiality order.

**42**    The deleterious effect of the order was, in general, to impair the open court principle. In these circumstances, the Supreme Court held that the salutary effects of the confidentiality order outweighed its deleterious effects.

*Application of the Sierra Club test in various contexts*

**43**    The *Sierra Club* case signals an important development of the open court principle and it has been applied in a number of cases. To illustrate the types of cases, and the interests they engage, they can be grouped as follows:

*Trade Secret and Intellectual Property Cases*

**44**    Cases of true trade secrets and patents are likely to involve important public and private interests and sealing orders have frequently been granted in such cases: see *Eli Lilly and Co. v. Apotex Inc.,* 2008 FC 892, [2008] F.C.J. No. 1593; *Laboratoires Servier v. Apotex Inc.,* 2006 FC 1405, [2006] F.C.J. No. 1764; *Camoplast Inc. v. Soucy International Inc.,* 2003 FC 1401, [2003] F.C.J. No. 1791; *Merck & Co. v. Apotex Inc.,* 2004 FC 567, [2004] F.C.J. No. 684; *AB Hassle. v. Canada (Minister of National Health and Welfare)* (2003), 5 C.P.R. (4th) 149, [2000] F.C.J. No. 283 (F.C.A.). They have been granted prior to *Sierra Club*- see, for example, *Dupont Canada Inc. v. Russel Metals Inc.,* [2000] O.J. No. 2043; *CPC International Inc. v. Seaforth Creamery Inc.,* [1996] O.J. No. 2059, 70 C.P.R. (3d) 434. In *Abbott Laboratories v. Canada (Minister of Health),* 2005 FC 1368, [2005] F.C.J. No. 1669, Prothonotary Milczynski of the Federal Court refused to make a confidentiality order in a patent case, although she noted that such orders were common in patent cases. She found that, on the evidence, the *Sierra Club* test had not been met. See also *Hyundai Auto Canada v. Cross Canada Auto Body Supply (West) Ltd.,* 2006 FC 1127, [2006] F.C.J. No. 1402. Orders were refused in *Osmose-Pentox Inc. v. Société Laurentide Inc.,* 2005 FC 1689, [2005] F.C.J. No. 2093; and in *Novopharm Ltd. v. Company "X",* 2008 FC 840, [2008] F.C.J. No. 1062.

*CCAA Cases*

**45**    Sealing orders have been granted in several Ontario cases under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 where the release of commercial information would have undermined the efficacy of the proceedings or prejudiced the position of stakeholders: *Re Nortel Networks*, [2009] O.J. No. 4487, 56 C.B.R. (5th) 224 (S.C.J.); *Re Stelco Inc.* [2006] O.J. No. 275, 17 C.B.R. (5th) 76 (S.C.J.); *Re Canwest Global Communications Corp.* [2009] O.J. No. 4286, 2009 CanLII 55114 (S.C.J.). It makes sense in such "real time" litigation that confidential information should be protected where its release would jeopardize the very purpose of the proceeding.

*Cases involving minors or persons under a disability*

**46**    Cases involving children frequently engage public interests that transcend the interests of the parties: *DB Trust (Trustees of) v. J.B. (Litigation guardian of),* [2009] O.J. No. 2693, 50 E.T.R. (3d) 50 (S.C.J.). So too may cases involving persons under a disability. In *Re. Phelan* (1999), 29 E.T.R. (2d) 82, [1999] O.J. No. 2465, a case prior to *Sierra Club,* Kitely J. granted a partial sealing order in a proceeding under the *Substitute Decisions Act, 1992,* S.O. 1992, c. 30.

*Commercial Cases*

**47**      The application of *Sierra* Club in the commercial context requires the court to distinguish between an interest that is specific to the party requesting the order and a general interest that goes beyond the interest of the party. In *Publow v. Wilson* (1992), 36 C.P.C. (3d) 33, [1994] O.J. No. 3036 (Gen. Div.) which pre-dated *Sierra Club*, Spence J. refused to grant a sealing order in spite of the argument that the disclosure of a company's insolvency to its suppliers and customers might cause them to cease dealing with the company, leading to its demise and possible unemployment for hundreds of employees. Relying on the then leading case of *Nova Scotia (Attorney General) v. McIntyre*, above, Spence J. stated, at para. 18:

> The disclosure of internal corporate information in the course of legal proceedings may almost always have the potential for harm to the company concerned and perhaps to others as well. This consequence of the resort to the courts is not limited to corporate parties in commercial matters; individuals may suffer from the public disclosure which ordinarily accompanies litigation. If the prospect of harm were a sufficient basis for preventing disclosure, a great many litigants might justifiably seek to have their proceedings shielded from public view, whether through a sealing order, an order for in camera proceedings or otherwise. Widespread granting of such orders could tend to diminish public confidence in the administration of justice. These considerations suggest that such orders should be available only in exceptional cases.

**48**      The observations of Spence J. in *Publow v. Wilson* were referred to by Nordheimer J. in *Lederer v. 372116 Ontario Ltd.* (2000), 50 O.R. (3d) 282, [2000] O.J. No. 3000 (S.C.J.), another pre-*Sierra Club* case, in which the moving party sought to seal a court file containing allegedly confidential and potentially damaging information. Nordheimer J. refused to seal the file. He observed, at paras. 26 and 27, that litigation frequently involves disclosure of sensitive, embarrassing and sometimes prejudicial information, but the principle of open justice admits of limited exceptions:

> There are, of course, many instances where matters that parties would prefer to keep private become public because the parties become embroiled in litigation. This applies not only to corporations, both public and private, but also to individuals. Many private matters are forced into the public view as a result of the fact that litigation ensues. That is a necessary consequence of maintaining an open and public judicial system.
>
> As Madam Justice Swinton observed [in *Ethyl Canada Inc. v. Canada (Attorney General)*, [1998] O.J. No. 315 (Gen. Div.) at para. 9], over the years courts have made exceptions to the general principle that all matters before the court must be part of the public record. Matters involving minors are one example. Matters involving trade secrets or secret processes are other examples. Customer lists and pricing information may constitute even other examples. Also, in cases where victims might be precluded, as a result of trauma and embarrassment, from pursuing a claim or giving evidence then orders restricting the openness of the proceedings may be justified. In all of these situations, though, the court must be satisfied that there is a need to protect "societal values of superordinate importance" before such restrictions on public access to the proceedings of the courts

> can be justified - see *MacIntyre v. Nova Scotia (Attorney-General),* [1982] 1
> S.C.R. 175, supra per Dickson J. at p. 186.

**49**    Subsequent to *Sierra Club*, requests for confidentiality orders or sealing orders have been considered and rejected in *SRM Global Master Fund Limited Partnership v. Hudbay Minerals Inc.*, [2009] O.J. No. 797 (S.C.J.); *Rieger Printing Ink Co. (Re)* (2009), 94 O.R. (3d) 440, [2009] O.J. No. 755 (S.C.J.); *Ontario Council of Hospital Unions v. Ontario (Minister of Health),* (2007), 85 O.R. (3d) 55, [2007] O.J. No. 411 (Div. Ct.); and *John Deere Ltd. v. Long Tractor Inc.,* 2003 SKQB 24, [2003] S.J. No. 57 (Q.B.).

*Class action cases*

**50**    Class actions, such as this one, give rise to particular concerns in dealing with requests for confidentiality. They frequently attract public attention due to their relative novelty, the public interest in the issues involved, the size of the proposed class, and the large sums at issue. Apart from the public, members of the putative class have a substantial and direct interest in the proceedings, prior to certification, and they have a particular interest in observing and understanding the proceedings. While the defendant in this action is prepared to release the information at issue to members of the putative class who undertake to be bound by the confidentiality order, such undertakings are difficult to monitor and enforce.

**51**    A class action engages broader interests than in an ordinary civil action. With its goals of access to justice, efficient use of judicial resources and behaviour modification, a class action serves public purposes that go beyond the immediate interests of the parties, including members of the putative class. It is particularly important, therefore, that the open court principle should be observed in such proceedings and a request for a sealing order in a class action should be approached with particular caution.

**52**    A sealing order was granted by Master MacLeod in *1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada*, [2003] O.J. No. 1016, 121 A.C.W.S. (3d) 426 (S.C.J.), a proposed class action in which franchisees alleged that the defendant franchisor had failed to pass on or account for discounts that had been provided by a supplier. The parties had reached an agreement that the confidential information would be sealed and made available only to the proposed class representatives and their counsel. Members of the proposed class would have access to summaries of the information, provided they signed a confidentiality agreement. The Master was satisfied that the proposed order struck an appropriate balance and was prepared to sign it. However, some of the suppliers (whose discounts were at issue) attended court, having been put on notice that their rights might be affect. They claimed an interest as their sensitive, and allegedly proprietary, information was at issue. They were concerned that the release of summaries of information to class members who were not named parties could potentially enable third parties to calculate their prices, costs and contractual arrangements with the defendant.

**53**    It is obvious from the Master's reasons, at para. 6, that he considered the information to be highly confidential and that the release would have "devastating" effects for the suppliers:

> An affidavit was filed on behalf of Parmalat [one of the suppliers]. Other suppliers appeared but only Canada Bread and Hostess Frito-Lay made submissions. Parmalat and Canada Bread appear to be in the most vulnerable position. They are exclusive suppliers of certain products and as a result of their special rela-

tionship with the defendant, they have disclosed detailed information about pric-
ing and profit margins. This is a complex and highly competitive business in
which the interests of the parties and the suppliers may be congruent for some
purposes and adverse for others. I am advised that an example of this sensitivity
would be an agreement to supply certain lines at close to cost while entering into
an agreement with the defendant to promote other lines which have a higher
profit margin. This information could be used to devastating effect by other sup-
pliers who might bid against the current supplier in dealing with A&P, by other
grocery stores with whom they will be negotiating and by other suppliers who
might bid with other customers.

**54**    The Master granted the suppliers standing and provided that they were entitled to enforce
the order if the defendant failed to do so. They were entitled to be informed of the release of infor-
mation to members of the class. It is noteworthy that in this case the information sought to be pro-
tected was, like the information in *Sierra Club*, confidential to persons who were not parties to the
litigation.

**55**    Hoy J. in an unreported endorsement dated November 16, 2007 in *Peter v. Medronic Inc.*
(05-CV-295910-PD2), granted a sealing order at the conclusion of a certification motion, at the de-
fendant's request and without opposition from the plaintiff. She found that the documents contained
commercially sensitive market information and there was evidence that one of the defendant's
competitors had taken an interest in the proceeding. She found that there was a public interest in not
granting an unfair advantage to competitors of the defendant, since the public financed the class of
medical devices at issue. The information subject to the sealing order was "minimal" and had not
even been referred to at the hearing. In that case, the order agreed upon by counsel and approved by
Hoy J. permitted the court to refer to any facts in the sealed materials in its reasons. The order was
amended by Hoy J. to provide that it would expire in seven years.

**56**    In *Prendiville v. 407 International Inc.* [2002] O.J. No. 2548, 24 C.P.C. (5th) 184 (S.C.J.),
leave to appeal refused, [2002] O.J. No. 3913 (Div. Ct.), a decision subsequent to *Sierra* Club,
Nordheimer J. declined to grant a sealing order in a proposed class action against the operators of
Highway 407, a toll highway. The defendants, supported by the province, sought to seal the court
file, which contained agreements between the defendants and the province. The defendants claimed
that the disclosure of this information would put them at a competitive disadvantage in future high-
way privatizations because it would disclose their costs and pricing structures to their competitors.
They argued that disclosure of this information would give third parties access to information about
their business and their projections as well as historical financial information that could be used in
the bid process. Nordheimer J. concluded, at paras. 14 and 15, that the commercial interest of the
defendants did not meet the *Sierra Club* test:

In any event where the 407 defendants fail in their request for a sealing order is
in their inability to establish that there is an important public interest in the con-
fidentiality that is sought. As I set out in the quotation from Mr. Justice Iacobucci
above, the important commercial interest which has to be established to justify
such an order cannot be specific to the party requesting the order. Mr. Justice
Iacobucci mentioned expressly that "a private company could not argue simply
that the existence of a particular contract should not be made public because to
do so would cause the company to lose business, thus harming its commercial

interests" and yet that is essentially what the argument of the 407 defendants boils down to here. For example, at para. 16 of their factum, the 407 defendants state:

> "... the disclosure of the Share Purchase Agreement and the 407 Agreements will put the 407 defendants at a competitive disadvantage vis-à-vis their cost and pricing structure in future competitive bidding processes concerning highway development and privatization."

While no doubt arguments could be made as to the actual degree of commercial sensitivity which attaches to such information given that the prospect of future private highway acquisitions is very much speculative both in its occurrence and its timing, it would seem almost by definition to be very specific to the party whose information is involved. While it may well be that the 407 defendants will indeed be put at a commercial disadvantage if their pricing and other information is publicly revealed, that result would appear to fall squarely within the category of commercial information which Mr. Justice Iacobucci said does not constitute the type of important commercial interest justifying a confidentiality or sealing order. In fact, it would appear to more properly fall within the type of information of which Mr. Justice Spence spoke in *Publow v. Wilson* (1994), 36 C.P.C. (3d) 33 (Ont. Gen. Div.) at p. 39 [quoted above] ...

**57**    Confidentiality orders or sealing orders have also been granted in class actions to limit or prevent disclosure of:

   (a)   private medical information: *Logan v. Harper* (2004), 72 O.R. (3d) 706, [2004] O.J. No. 4132 (S.C.J.);

   (b)   names of victims of sexual assault: see *M.G. v. Association Selwyn House*, [2008] Q.J. No. 7721 (S.C.); *White v. Canada (Attorney General)*, [2006] B.C.J. No. 760 (S.C.);

   (c)   financial information concerning the defendant and the names of investors and shareholders, on the settlement of the class action where other
   para57     proceedings were pending in another jurisdiction: *Mortillaro v. Cash Money Cheque Cashing Inc.* (2009), 73 C.P.C. (6th) 369, [2009] O.J. No. 2904 (S.C.J.); and

   (d)   information concerning young offenders: *Richard v. British Columbia*, [2008] B.C.J. No. 1794 (S.C.).

**58**    The use of pseudonyms has also been permitted where private medical information is being disclosed: *Jane Doe 1 v. Manitoba* (2008), 66 C.P.C. (6th) 125, [2008] M.J. No. 292 (Q.B.).

**59**    It is my understanding that confidentiality orders have been made in the case management of some class actions, to protect the names of victims of mass torts and in other cases on a consent basis, where it was in the interests of both parties to keep information confidential.

*Redaction based on Relevance*

**60**    There is no general authority to redact documents appended to affidavits, or portions thereof, on the grounds that they are irrelevant: see *Albrecht v. Northwest Protection Services Ltd.*,

[2005] O.J. No. 2149 (S.C.J.); *Guelph (City) v. Super Blue Box Recycling Corp.* (2004), 2 C.P.C. (6th) 276, [2004] O.J. No. 4468 (S.C.J.).

**61**    Requests for redaction frequently come up at the discovery stage and are often resolved on consent. Although the practice of redacting has in some cases been sanctioned by the court, the cases in which it has been permitted are usually ones in which other important interests are affected: see, for example, *Kimberly-Clark Corp v. Procter & Gamble Inc.* (1990), 31 C.P.R. (3d) 207, [1990] F.C.J. No. 451 (F.C.T.D.) (patent action); *Janhevich v. Thomas* (1977), 15 O.R. (2d) 765, [1977] O.J. No. 2227 (H.C.) (personal tax returns); *United States Surgical Corp. v. Downs Surgical Canada Ltd.,* [1982] 1 F.C. 733, [1981] F.C.J. No. 164 (patent action); *Collins v. Beach* (1988), 24 C.P.C. (2d) 228, [1988] O.J. No. 43 (H.C.) (personal tax returns); *Manufacturers Life Insurance Co. v. Dofasco Inc.* (1989), 38 C.P.C. (2d) 47, [1989] O.J. No. 1456 (H.C.) (confidential and sensitive market information); *John Labatt Ltd. v. Molson Breweries* (1993), [1994] 1 F.C. 801 [1993] F.C.J. No. 1343 (confidential and sensitive commercial information); *North American Trust Co. v. Mercer International Inc.* (1999), 71 B.C.L.R. (3d) 72, [1999] B.C.J. No. 2107 at paras. 11, 13-16 (S.C.) (commercially sensitive information).

*Application of Sierra Club Test*

**62**    As Spence J. observed in *Publow v. Wilson*, above, at para. 18, court proceedings frequently require parties and even witnesses who have no stake in the outcome, to disclose information that they would much rather keep to themselves. The information can be embarrassing and sometimes prejudicial, both personally and financially. Yet the principle of open courts has generally prevailed except in the limited circumstances now permitted by the *Sierra Club* test. In spite of this, requests for sealing orders remain commonplace. It is appropriate to observe that sealing orders impose an additional layer of complexity on an already complicated and expensive litigation process. They require that separate court files be kept, one open to the public and one not. They may require bifurcation of discovery and trial transcripts to exclude references to information in sealed documents. They may require *in camera* hearings where reference is made to documents that are subject to a sealing order. This can give rise to confusion by witnesses, counsel and the court as to what is and what is not sealed. They may restrict the ability of the court to give clear and comprehensible reasons where reference to sealed documents is necessary.

**63**    The request for a sealing order itself raises questions about whether notice must be given to the media and the public to give them an opportunity to contest the order and to speak in favour of the open court principle. On a practical level, this may give the proceeding more notoriety than would otherwise be the case - or than either party might wish.

**64**    Applying the *Sierra Club* test to the facts of this case, I am not satisfied that the interests affected extend beyond the private commercial interests of Tim Hortons and its franchisees or that these interests can be expressed in terms of the broader commercial interest in the preservation of confidential information or the promotion of fair competition. I accept that much of the information has been treated by Tim Hortons and its franchisees as confidential - obviously in the ordinary course of their businesses they would have absolutely no reason to disclose it to third parties or to make it public. This is true in almost every business relationship, however, and in almost every such relationship it would be possible to characterize the "interest" in terms of a broader public interest in the preservation of confidential information.

**65**     That is not, however, the real interest at stake in this motion. Tim Horton puts the case on the basis that it and its franchisees will suffer commercial harm if the information is disclosed to competitors. While the promotion of fair competition is an important societal interest, I am not satisfied that the risk of harm in this case is real and substantial or well-grounded in the evidence. Tim Hortons' evidence of harm is speculative, general and lacking in specifics. The par baking system was introduced at very substantial costs in 2002, some eight years ago. The system itself is not unique. The notion that information on the successful implementation of the system, even at a "granular" level, would give competitors an unfair advantage is simply speculative. So is the notion that competitors, landlords and suppliers could take advantage of information on costs, sales, profit margins and other financial information, to the detriment of Tim Hortons and its franchisees. The information sought to be disclosed is not dissimilar to the information in *Prendiville v. 407 International Inc.*, above, and it is the kind of private commercial interest that Iacobucci J. in *Sierra Club* expressly excluded from the scope of protection.

**66**     The information described as "trade secrets" is of the most general nature and at the very lowest level of "secrecy." In order to take advantage of the information it would be necessary to create a substantial par baking infrastructure. There is no evidence that any competitor of Tim Hortons has done so or is in a position to do so. Any competitor with the resources to do so would not likely need to know that you must bake a frozen lump of ingredients for a particular length of time at a particular temperature in order to make a muffin.

**67**     As I have noted earlier, sealing orders have been routinely and appropriately granted in cases involving true trade secrets, but this case does not involve that kind of information.

**68**     In light of my conclusion that the information in this case does not meet the necessity test, I need not move to the second stage of the test in *Sierra Club*. However, if I had found that an important commercial interest was engaged in this case, I would not have found that the salutary effects of the order outweighed its deleterious effects. First, a sealing order is not required in this case to ensure a fair trial. In *Sierra Club*, AECL would have been prevented from disclosing the evidence without a sealing order. The absence of a sealing order would have impaired its right to a fair trial. There is no evidence that this is the case here. Nor is there any evidence that the request for disclosure is abusive or being used for the purpose of an unfair tactical advantage - for example, to force the defendant to settle to avoid disclosure of potentially damaging information.

**69**     Second, a sealing order in this case could have significant adverse effects on public confidence in the administration of justice. The defendants' case on the motion for summary judgment depends to a large degree on the proposition that the putative plaintiffs are inefficient operators, whose experience is not representative of the class. To make out this case, the devil will be in the details and I expect that a careful analysis of the defendants' and the franchises' financial information will be required. There is a real risk that the proceedings will not be comprehensible to the public without reference to the information sought to be sealed. If a detailed examination of the sealed information is required at the hearing, the proceeding may have to be held *in camera*. Any analysis of this issue in reasons may require reference to the confidential information so as to be intelligible. As I said earlier, as a putative class proceeding openness is a particularly important consideration in this case.

**70**     While the consent of the parties does not absolve the court of its responsibility to ensure that court proceedings are open and transparent, I would be reluctant to compel the parties to disclose information that neither of them wishes to produce, *provided* that such material forms no part of the

court record. If the parties can agree to any of the redactions proposed by Tim Hortons, and can un-dertake that the redacted information is not material to the motions and will not be relied upon by either party, the redacted information does not need to form part of the court record. The open court principle will not be infringed by excising irrelevant confidential material as long as the public has access to the same record as the parties and the motion judge.

**71**     Although procedural orders have been granted in some cases to protect documents pending a determination of confidentiality, no purpose would be served by such an order in this case.

**72**     For these reasons, the defendants' motion is dismissed, with costs. If counsel are unable to agree on costs, written submissions may be addressed to me in accordance with a timetable agreed upon by counsel.

G.R. STRATHY J.

* * * * *

**SCHEDULE**
**CONFIDENTIAL INFORMATION PUT IN ISSUE BY PLAINTIFFS**

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 7 | Excerpts from TDL's Ontario 2001 Disclosure Document containing references to: initial license fees, royalty fees, total initial licensee investment, advertising levies, disclosure of administrative proceedings and civil litigation and liabilities, projected store earnings at varying sales levels, names and addresses of franchisees and Ontario store list. Certain portions redacted for relevance. | Personal Information  Competitively Sensitive Commercial Data |
| Ex. 12 | This document has not been redacted. The only reference in the Clanachan Affidavit is to the Acknowledgement of Receipt of Ontario Disclosure Document. | Not Applicable |
| Ex. 16 | Personal information on sample of agreements has been redacted. | Personal Information |
| Ex. 17 | This document has not been redacted on the basis of confidentiality. The Affidavit refers to only the relevant portion of the Tim Hortons Production Manual. | Not applicable |
| Ex. 28 | Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 29 | Always Fresh Baking Production Manual (entire document redacted). | Trade Secrets |
| Ex. 33 | August 2002 Always Fresh Financial Forecast (entire document redacted). Contains references to single store costs, sales, margins and profitability pre-Always Fresh and the projections post-Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 34 | Excerpt from Advisory Board minutes referring to production methods and procedures. | Trade Secrets |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 35 | Excerpts from November 2002 Always Fresh Presentations relating to product preparation methods, food costs, labour costs and projections, costs model, sales and costs information from specific franchisees | Trade Secrets<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para. 130 of Clanachan Affidavit and Ex. 37 | Excerpts from 2003 Always Fresh Baking Presentation containing current and projected single store costs models and the results to date under Always Fresh. | Competitively Sensitive Commercial Data |
| Ex. 38 | Excerpt from September 2003 Always Fresh Financial Update referring to Ontario and Alberta P&L results, operating margin comparisons, operating margins by month for Always Fresh stores, Ontario and Alberta store sales. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Para 132 of Clanachan Affidavit and Ex. 39 | Excerpts from Advisory Board minutes containing references to Ontario P&L results and pre and post Always Fresh conversion. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 40 | Excerpts from the Ontario 2003 Regional Meeting Presentation containing profit and loss analysis, price changes, operating margins, productivity data and financial experiences of franchisees. | Personal Information<br><br>Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |
| Ex. 41 | Excerpts from the Atlantic Canada 2003 Regional Meeting Presentation containing single store operating margins, food cost impact, operating margin comparisons, and Always Fresh financial results. | Franchisee Financial Information<br><br>Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 42 | Excerpt from Advisory Board meeting minutes of February 4 and 5, 2004 referring to product improvements | [Not listed in schedule prepared by counsel] |
| Ex. 43 | Excerpts of Spring 2004 Regional Meeting Presentation slides referring to food unit costs, sales revenue and comparison of pre and post Always Fresh gross margins at the store level. | Franchisee Financial Information

Competitively Sensitive Commercial Data |
| Ex. 44 | 2002 Ontario Product Cost Summary (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 45 | Toronto Order Guide, November 2003 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 46 | 2003-2009 Costs vs. Prices Report (entire document redacted). | Competitively Sensitive Commercial Data |
| Para. 8 | Reference to labour costs in specific years redacted. | Competitively Sensitive Commercial Data |
| Para. 20 | Percentage of sales by time of day has been redacted. | Competitively Sensitive Commercial Data |
| Ex. 2 | Ontario Historical Operating Margins based on P&Ls reported for 2002-2008 (entire document redacted). | Franchisee Financial Information

Competitively Sensitive Commercial Data |
| Ex. 3 | Jollymore reported P&L data (entire document redacted). | Franchisee Financial Information

Competitively Sensitive Commercial Data |
| Ex. 4 | Historical Operating Margins for all Canadian regions for 2002-2008 (entire document redacted). | Franchisee Financial Information

Competitively Sensitive Commercial Data |

| Reference | Confidential Information | Basis for Claim of Confidentiality |
|---|---|---|
| Ex. 5 | Price Change History for Ontario for 2002-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 6 | Costs vs. Prices – Donuts and Timbits 2003-2009 (entire document redacted). | Competitively Sensitive Commercial Data |
| Ex. 7 | 2003- 2009 report showing volume and percentage of sale for each part of the day and for each region. | Competitively Sensitive Commercial Data |

cp/e/qllxr/qljxr/qljyw/qljxr/qlaxw/qlhcs/qljxh

**TAB 7**

*Case Name:*
# Nortel Networks Corp. (Re)


**IN THE MATTER OF the Companies' Creditors Arrangement
Act, R.S.C. 1985, c. C-36, as Amended
AND IN THE MATTER OF a Plan of Compromise or
Arrangement of Nortel Networks Corporation, Nortel
Networks Limited, Nortel Networks Global Corporation,
Nortel Networks International Corporation and Nortel
Networks Technology Corporation, (Applicants)**


[2009] O.J. No. 4487

56 C.B.R. (5th) 224

2009 CarswellOnt 4838

Docket: 09-CL-7950


Ontario Superior Court of Justice
Commercial List - Toronto, Ontario

**G.B. Morawetz J.**

Heard: July 28, 2009.
Judgment: July 28, 2009.

(41 paras.)


*Bankruptcy and insolvency law -- Companies' Creditors Arrangement Act (CCAA) matters -- Compromises and arrangements -- Applications -- Eligible financial contracts -- Motion by protected company for order approving and authorizing execution of Asset Sale Agreement, vesting order with respect to Intellectual Property and order sealing certain financial documents allowed -- Monitor approved of application and no one objected -- Bidding process and auction completed according to approved procedure and principles of law -- Purchase price fair and, in fact, higher than expected -- Purchaser committed to making 2,500 employment offers to applicant's employees -- Asset Sale Agreement and Vesting Order for IP interests approved -- Appendices of Seventeenth Report contained sensitive commercial information that could prejudice stakeholders so those reports sealed.*

**Statutes, Regulations and Rules Cited:**

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 363

**Counsel:**

Mr. D. Tay, Ms J. Stam, for Nortel Networks Corporation et al.

Mr. J.A. Carfagnini, Mr. C.G. Armstrong, for Monitor, Ernst and Young Incorporated.

Mr. Arthur O. Jacques, for Felske, Sylvain.

S.R. Orzy, for Noteholders.

Ms S. Grundy, Mr. J. Galway, for Telefonaktiebolaget LM Ericsson.

Ms L. Williams, Ms K. Mahar, for Flextronics.

Mr. M. Zigler, for Former Employees.

Mr. L. Barnes, for Board of the Directors of Nortel Networks Corporation, Nortel Networks Limited.

Mr. A. MacFarlane, for Official Committee of Unsecured Creditors.

Ms T. Lie, for Superintendent of Financial Services of Ontario.

Mr. B. Wadsworth, for CAW Canada.

Mr. S. Bomhof, for Nokia Siemens.

Mr. R.B. Schwill, for Nortel Networks UK Limited.

---

**1**   **G.B. MORAWETZ J.**:-- Nortel Networks Corporation ("NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation, (collectively the "Applicants"), bring this motion for an Order approving and authorizing the execution of the Asset Sale Agreement dated as of July 24, 2009, ("the Sale Agreement"), among Telefonaktiebolaget LM Ericsson (PUBL) (the "Purchaser"), as buyer, and NNL, NNC, Nortel Networks, Inc.) ("NNI") or ("Ericsson"), and certain of their affiliates as vendors, (collectively, the "Sellers"), in the form attached and as an Appendix to the Seventeenth Report of Ernst and Young Inc. in its capacity as Monitor in the CCAA proceedings.

**2**   The Applicants also request, among other things, a Vesting Order, an Order approving and authorizing the execution and compliance with the Intellectual Property Licence Agreement substantially in the form attached to the confidential appendix to the Seventeenth Report and the Trademark Licence Agreements substantially in the form attached to the appendix and an Order declaring that the Ancillary Agreements, (as defined in the Sale Agreement), including the IP Licences, shall be binding on the Applicants that are party thereto, and shall not be repudiated disclaimed or otherwise compromised in these proceedings, and that the intellectual property subject to the IP Licences shall not be sold, transferred, conveyed or assigned by any of the Applicants unless the buyer or assignee of such intellectual property assumes all of the obligations of NNL under the

IP Licences and executes an assumption agreement in favour of the Purchaser in a form satisfactory to the Purchaser.

**3**      Finally, the Applicants seek an order sealing the Confidential Appendixes to the Seventeenth Report pending further order of this court.

**4**      This joint hearing is being conducted by way of video conference. His Honor Judge Gross is presiding over the hearing in the U.S. Court. This joint hearing is being conducted in accordance with the provisions of the Cross-Border Protocol, which has previously been approved by both the U.S. Court and this court.

**5**      The Applicants have filed two affidavits in support of the motion. The first is that of Mr. George Riedel, sworn July 25, 2009. Mr. Riedel is the Chief Strategy Officer of NNC and NNL. Mr. Riedel also swore an affidavit on June 23, 2009 in support of the motion to approve the Bidding Procedures. The second affidavit is that of Mr. Michael Kotrly which relates to an issue involving Flextronics which was resolved prior to this hearing.

**6**      The Monitor has also filed its Seventeenth Report with respect to this motion. The Monitor recommends that the requested relief be granted.

**7**      The Applicants' position is also enthusiastically supported by the Unsecured Creditors' Committee in the Chapter 11 proceedings and the Noteholders.

**8**      No party is opposed to the requested relief.

**9**      On June 29, 2009 this court granted an Order approving the Bidding Procedures for a sale process for certain of Nortel's Code Division Multiple Access ("CMDA") business, and Long Term Evolution ("LTE") Access. The procedures were attached to the Order.

**10**      The Court also approved the Stalking Horse Agreement dated as of June 19, 2009 among Nokia Siemens Networks B.V. ("Nokia Siemens") and the Sellers (also referred to as the "Nokia Agreement") and accepted agreement for the purposes of conducting the Stalking Horse bidding process in accordance with the Bidding Procedures, including the Break-Up-Fee and Expense Reimbursement as both terms are defined in the Stalking Horse Agreement.

**11**      The order of this court was granted immediately after His Honor, Judge Gross, of the United States Bankruptcy Court for the District of Delaware, approved the Bidding Procedures in the Chapter 11 proceedings.

**12**      The Bidding Procedures contemplated a bid deadline of 4 p.m. on July 21, 2009. This gave interested parties 22 days to conduct due diligence and submit a bid.

**13**      By the Bid Deadline, three bids were acknowledged as "Qualified Bids" as contemplated by the Bidding Procedures. Qualified Bids were received from MPAM Wireless Inc., otherwise known as Matlin Patterson and Ericsson.

**14**      The Monitor also reports that on July 15, 2009 one additional party submitted a non-binding letter of intent and requested that it be deemed a Qualified Bidder. The Monitor further reports that upon receiving this request, the Applicants' provided such party with a form of Non-Disclosure Agreement substantially in the form as that previously executed by Nokia Siemens. This party declined to execute the Non Disclosure Agreement and was not deemed a Qualified Bidder. The Monitor further reports that it, the UCC and the Bondholder Group were all consulted in connection with the request of such party to be considered a Qualified Bidder.

**15**     The Monitor also reports that it is of the view that any party that wanted to bid for the business and complied with the Bidding Procedures was permitted to do so.

**16**     In the period up to July 21, 2009, the Monitor reports that it was kept apprised of all activity conducted between Nortel and the potential buyers. In addition, the Monitor participated in conference calls and meetings with the potential buyers, both with Nortel and independently. The Monitor further reports that it conducted its own independent review and analysis of materials submitted by the potential buyers.

**17**     On July 22, 2009, in accordance with the Bidding Procedures, copies of both the MPAM bid and the Ericsson bid were provided to Nokia Siemens, MPAM and Ericsson were both notified that three Qualified Bids had been received.

**18**     After consultation with the Monitor and representatives of the UCC and the Bondholder Group, the Sellers determined that the highest offer amongst the three bids was submitted by Ericsson and accordingly on July 22, 2009, the three Qualified Bidders were informed that the Ericsson bid had been selected as the starting bid pursuant to the Bidding Procedures. Copies of the Ericsson bid were distributed to Nokia Siemens and MPAM.

**19**     The Monitor reports that the auction was held in New York on July 24, 2009.

**20**     Pursuant to the Bidding Procedures the auction went through several rounds of bidding. The Sellers finally determined that the Ericsson bid submitted in the sixth round should be declared the Successful Bid and that the Nokia Siemens bid submitted in the fifth round should be an Alternate Bid. The Monitor reports that these determinations were made in accordance with consultations with the Monitor and representatives of UCC and the Bondholder group held during the seventh round adjournment.

**21**     The Monitor reports that the terms and conditions of the Successful Bid are substantially the same as the Nokia Agreement described in the Fourteenth Report with the significant differences being as follows:

    1)    The purchase price has been increased from U.S. $650 million to U.S. $1.13 billion plus the obligation of the Purchaser to pay, perform and discharge the assumed liabilities. The Purchaser made a good faith deposit of U.S. $36.5 million.

    2)    The Termination Date has been extended to September 30, 2009 or in the event that closing has not occurred solely because regulatory approvals have not yet been obtained, October 31, 2009 as opposed to August 31 and September 30, respectively, for the Nokia Agreement.

    3)    The provisions in the Nokia Agreement with respect to the Break-Up Fee and Expense Reimbursement have been deleted.

**22**     Further, I note that the Nokia Agreement provided for a commitment to take at least 2,500 Nortel employees worldwide. Under the Sale Agreement, the Purchaser has also committed to make employment offers to at least 2,500 Nortel employees worldwide.

**23**     The Nokia Agreement provided for a payment of a Break-Up Fee of $19.5 million and the Expense Reimbursement to a maximum of $3 million, upon termination of the Nokia Agreement. The Monitor reports that if both this court and the U.S. Court approve the Successful Bid, the Ap-

plicants are of the view that the Break-Up Fee and the Expense Reimbursement will be payable and in accordance with the order of June 29, 2009, the company intends to make such a payment. The Monitor reports that it is currently contemplated that 50% of the amount will he funded by NNL and 50% by NNI.

**24**    The assets to be transferred by the Applicants and the U.S. Debtors pursuant to the successful bid are to be transferred free and clear of all liens of any kind. The Monitor is of the understanding that no leased assets are being conveyed as part of this transaction.

**25**    The Monitor also reports that at the request of the Purchaser, the proposed Approval and Vesting Orders specifically approves Intellectual Property Licence Agreement and Trademark Licence Agreement, collectively, (the "IP Licences"), entered into between NNL and the Purchaser in connection with the Successful Bid.

**26**    The Monitor also reports that subject to court approval, closing is anticipated to occur in September 2009.

**27**    The Bidding Procedures provide that the Seller may seek approval of the next highest or otherwise best offer as the Alternate Bid. If the closing of the transaction contemplated fails to occur the Sellers would then be authorized, but not directed, to proceed to effect a Sale Pursuant to the terms of the Alternate Bid without further court approval. The Sellers, in consultation with the Monitor, the UCC and the Bondholders, determined that the bids submitted by Nokia Siemens in the fifth round with a purchase price of $1,032,500,000 is the next highest and best offer and has been deemed to be the Alternative Bid. Accordingly, the company is seeking court approval of the alternative bid pursuant to the Bidding Procedures.

**28**    The Monitor reports that, as noted in its Fourteenth Report, the CMDA division and the LTE business are not operated through a dedicated legal entity or stand alone division. The Applicants have an interest in intellectual property of the CMDA business and the LTE business which is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. The Monitor is of the view that the task of allocating sale proceeds stemming from the Successful Bid amongst the various Nortel entities and the various jurisdictions is complex. Further, as set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the Europe, Middle East, Asia entities, ("EMEA") through their U.K. Administrators entered into the Interim Funding and Settlement Agreement, the IFSA, which was approved by this court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors and EMEA Debtors agreed that the execution of definitive documentation with a purchaser of any material Nortel assets was not conditional upon reaching an agreement regarding the allocation of sale proceeds or binding procedures for the allocation of the sale proceeds. The Monitor reports that the parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sale proceeds but, as of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Selling Debtors have determined that the proceeds are to be deposited in an escrow account. The issue of allocation of sale proceeds will be addressed at a later date.

**29**    The Monitor expects that the Company will return to court prior to the closing of the transaction to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds.

**30**      In his affidavit, Mr. Riedel concludes that the sale process was conducted by Nortel with consultation from its financial advisor, the Monitor and several of its significant stakeholders in accordance with the Bidding Procedures and that the auction resulted in a significantly increased purchase price on terms that are the same or better than those contained in the Stalking Horse Agreement. He is of the view that the proposed transaction, as set out in the Sale Agreement, is the best offer available for the assets and that the Alternate Bid represents the second best offer available for the Assets.

**31**      The Monitor concludes that the company's efforts to market the CMDA Business and the LTE Business were comprehensive and conducted in accordance with the Bidding Procedures and is further of the view that the Section 363 type auction process provided a mechanism to fully determine the market value of these assets. The Monitor is satisfied that the purchased priced constitutes fair consideration for such assets and, as a result, the Monitor is of the view that the Successful Bid represents the best transaction for the sale of these assets and the Monitor therefore recommends that the court approve the Applicants' motion.

**32**      A number of objections have been considered by the U.S. Court and they have been either resolved or overruled. I am satisfied that no useful purpose would be served by adding additional comment on this issue.

**33**      Turning now to whether it is appropriate to approve the transaction, I refer back to my Endorsement on the Bidding Procedures motion. At that time, I indicated that counsel to the Applicants had emphasized that Nortel would aim to satisfy the elements established by the court for approval as set out in the decision of Royal Bank v. Soundair Corp. (1991), 7 C.B.R. (3d) 1 (Ont. C.A.), which, in turn, accepts certain standards as set out by this court in Crown Trust Co. v. Rosenberg (1986), 60 O.R. (2d) 87 (Ont. H.C.).

**34**      Although the Soundair and Crown Trust tests were established for the sale of assets by a receiver, the principles have been considered to be appropriate for sale of assets as part of a court supervised sales process in a CCAA proceeding. For authority see Tiger Brand Knitting Co., Re (2005), 9 C.B.R. (5th) 315 (Ont. S.C.J.)

**35**      The duties of the court in reviewing a proposed sale of assets are as follows:

> 1)    It should consider whether sufficient effort has been to obtain the best price and that the debtor has not acted improvidently;
> 2)    It should consider the interests of all parties;
> 3)    It should consider the efficacy and integrity of the process by which offers have been obtained; and
> 4)    It should consider whether there has been unfairness in the working out of the process

**36**      I am satisfied that the unchallenged record clearly establishes that the sale process has been conducted in accordance with the Bidding Procedures and with the principles set out in both Soundair, and Crown Trust. All parties are of the view that the purchase price represents fair consideration for the assets included in the Sale Agreement. I accept these submissions. The consideration provided by Ericsson pursuant to the Sale Agreement, in my view, constitutes reasonably equivalent value and fair consideration for the assets.

**37**      In my view, it is appropriate to approve the Sale Agreement as between the Sellers and Pur-
chaser. I am also satisfied that it is appropriate to grant the relief relating to the Vesting Order, the
IP Licences, the Ancillary Agreement and the Alternate Bid, all of which are approved.

**38**      The Applicants also requested an order sealing the Confidential Appendixes to the Seven-
teenth Report pending further order. In considering this request I referred to the decision of the Su-
preme Court of Canada in Sierra Club of Canada v. Canada (Minister of Finance), 2002 SCC 41
(S.C.C.), which addresses the issue of a sealing order. The Supreme Court of Canada held that such
orders should only be granted when:

> 1)    An order is needed to prevent serious risk to an important interest because
>       reasonable alternative measures will not prevent the risk;
>
> 2)    The salutary effects of the order outweigh its deleterious effects, including
>       the effects on the right to free expression, which includes public interest in
>       open and accessible court proceedings.

**39**      I have reviewed the Confidential Appendixes to the Seventeenth Report. I am satisfied that
the Appendixes contain sensitive commercial information, the release of which could be prejudicial
to the stakeholders. I am satisfied that the request for a sealing order is appropriate and it is so
granted.

**40**      Other than with respect to the payment and reimbursement of amounts in respect of the Bid
Protections nothing in this endorsement or the formal order is meant to modify or vary any of the
Selling Debtors' (as such term is defined in the ISFA) rights and obligations under the ISFA. It is
further acknowledged that Nortel has advised that the Interim Sales Protocol shall be subject to ap-
proval by the court.

**41**      An order shall issue in the form presented, as amended, to give effect to the foregoing rea-
sons.

cp/s/qllxr/qljxr/qlaxw

**TAB 8**

*Case Name:*
# Stelco Inc. (Re)

**APPLICATION UNDER the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36, as amended
AND IN THE MATTER OF a proposed plan of compromise or
arrangement with respect to Stelco Inc. and the other
applicants listed in Schedule "A"**

[2006] O.J. No. 275

17 C.B.R. (5th) 76

145 A.C.W.S. (3d) 230

2006 CarswellOnt 394

Court File No. 04-CL-5306

Ontario Superior Court of Justice
Commercial List

**J.M. Farley J.**

January 17, 2006.

(8 paras.)

*Civil evidence -- Documentary evidence -- Publication bans and confidentiality orders -- Motion for
permanent sealing order of confidential information allowed -- There was minimal redaction of
material related to Stelco's revenues, costs, selling prices and profitability -- Disclosure of such in-
formation to competitors, suppliers and customers could be injurious to Stelco's business activities,
and benefits of confidentiality order with respect to elements redacted outweighed deleterious ef-
fects of confidentiality order -- Accordingly there was to be a permanent sealing order -- Three
lines of an affidavit that were inadvertently not blacked out were to be treated as having been
blacked out ab initio.*

*Civil procedure -- Discovery -- Production and inspection of documents -- Confidentiality orders -- Motion for permanent sealing order of confidential information allowed -- There was minimal redaction of material related to Stelco's revenues, costs, selling prices and profitability -- Disclosure of such information to competitors, suppliers and customers could be injurious to Stelco's business activities, and benefits of confidentiality order with respect to elements redacted outweighed deleterious effects of confidentiality order -- Accordingly there was to be a permanent sealing order -- Three lines of an affidavit that were inadvertently not blacked out were to be treated as having been blacked out ab initio.*

**Counsel:**

Geoff R. Hall, for the Stelco Applicants

Kyla Mahar, for the Monitor

Peter Jacobsen, for Globe & Mail

Kevin Zych, for the 8% and 10.4% Stelco Bondholders

Peter Jervis and Karen Kiang, for the Equity Holders

Sharon White, for USW Local 1005

---

## ENDORSEMENT

(Motion by Applications for permanent sealing order
of confidential information)

**1**     J.M. FARLEY J. (endorsement):-- This Endorsement deals with two of the three issues, the third will be forthcoming.

**2**     I am satisfied that there has been minimal redaction of material related to Stelco's revenues, costs, selling prices and profitability (directly or implied) which would be ordinarily kept confidential as disclosure of such information to competitors, suppliers and customers would be injurious to Stelco's business activities. Reasonable alternative measures would not prevent the risk to Stelco. The salutory effects of a confidentiality order as to the elements redacted, including the ability of the participants in this CCAA proceeding to deal reasonably pursuant to Non-Disclosure Agreements with submissions related to such confidential financial information, outweigh the deleterious effects of such confidentiality order.

**3**     I am satisfied that there has been a minimal effect negative to the concept of an open court. The Globe was not opposed to this redaction effort.

**4**     It appears to me that the principles and tests involved in Sierra Club of Canada v. Canada (Minister of Finance) (2002), 211 D.L.R. (4th) 193 (S.C.C.) has been met. See also Re Air Canada (S.C.J.) released September 26, 2004.

**5**     There is to be a permanent sealing order subject to any interested party asking for a review of same upon notice to Stelco.

**6**      The second issue relates to the inadvertence as to not blanking/blacking out three lines in an affidavit of one Fabrice Taylor. The first part of the paragraph, all on the preceding page, had been blacked out. Upon reasonable reflection, it would be obvious to a person receiving same that the part not so blacked out did not make any sense on any stand-alone basis. Unfortunately, the incompletely blacked-out affidavit was flipped over to a reporter at the Globe who was not permitted to review unredacted copy (Stelco and the Globe had worked out a very reasonable and common sense arrangement whereby unredacted copy could be reviewed by counsel for the Globe and a Globe employee who was restricted from using same or disclosing such to others). The flip-over by counsel for the Globe was "innocent" as he had not reviewed the material before doing the flip and he had not expected that there would have been a problem with the blacking out.

**7**      The reporter has quite responsibly agreed to treat the three lines not previously blacked-out as having been blacked out ab initio.

**8**      The remaining third issue is whether the portion of the affidavit and exhibits which were blacked out (including the subject 3 lines) and as agreed by Stelco and the equity holders' counsel were to be blacked-out qualify for such redaction. I will deal with that in a further endorsement.

J.M. FARLEY J.

cp/e/qw/qljxh

**For Discussion Purposes Only**
**DRAFT: 2 - June 7, 2013 at 7:47 PM**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED        Court File No. 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

| | **ONTARIO** |
|---|---|
| | **Superior Court of Justice** |
| | **(Commercial List)** |
| | Proceeding commenced at Toronto |
| | **BRIEF OF AUTHORITIES OF ERNST & YOUNG INC. IN ITS CAPACITY AS MONITOR AND THE CANADIAN DEBTOR (MOTION RE APPROVAL OF PROTECTIVE ORDER) (RETURNABLE JUNE 11, 2013)** |

| **Goodmans LLP** | **Gowling Lafleur Henderson LLP** |
|---|---|
| Barristers & Solicitors | Barristers & Solicitors |
| Bay Adelaide Centre | 1 First Canadian Place |
| 333 Bay Street, Suite 3400 | 100 King Street West, Suite 1600 |
| Toronto, ON  M5H 2S7 | Toronto, ON  M5X 1G5 |
| | |
| Jay A. Carfagnini  LSUC#: 22293T | Derrick Tay LSUC#: 21152A |
| Peter Ruby LSUC#: 38439P | Jennifer Stam LSUC#: 46735J |
| Joseph Pasquariello LSUC#: 37389C | |
| | |
| Tel:    416.979.2211 | Tel:    416.862.5697 |
| Fax:   416.979.1234 | Fax:   416.862.7661 |
| | |
| **Lawyers for the Monitor,** | |
| **Ernst & Young Inc.** | **Lawyers for the Canadian Debtors** |

\6213032