## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |
| | Hearing Date: August 27, 2013 at 10:00 a.m. (ET) |
| | Objections Due: August 26, 2013 at 10:00 a.m. (ET) |

### MOTION TO MODIFY SCHEDULING ORDERS
### IN JOINT CROSS-BORDER PROCEEDINGS TO DETERMINE
### ALLOCATION OF ASSET SALE PROCEEDS AND CERTAIN CLAIMS

The court-appointed administrators and authorized foreign representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East, and Africa (collectively, the "EMEA Debtors") hereby move to amend the schedule set forth in the Allocation Protocol (D.I. 10565-1, attached hereto as Exhibit A), Litigation Timetable (D.I. 10566-1, attached hereto as Exhibit B), and Discovery Plan (D.I. 10566-2, attached hereto as Exhibit C) entered by this Court on May 17, 2013.  The grounds for this motion are as follows:

### PRELIMINARY STATEMENT

The Joint Administrators bring the present motion seeking to amend the schedule for litigating disputes that are pending between the bankruptcy estates of the former Nortel Group companies located in Canada (the "Canadian Debtors"), the United States (the "U.S. Debtors"), and Europe, the Middle East, and Africa (the EMEA Debtors, and together with the

Canadian Debtors and the U.S. Debtors, the "Debtors").  The main dispute concerns how to allocate approximately $7.5 billion in proceeds from the sales of the global Nortel businesses among the Debtors.  This allocation dispute is being litigated in conjunction with the determination of (i) intercompany claims the EMEA Debtors have asserted against the Canadian and U.S. Debtors, and (ii) claims asserted by the Trustee of the NNUK Pension Plan and the Board of the U.K.'s Pension Protection Fund (collectively, the "U.K. Pension Claimants") against the Canadian and U.S. Debtors.  Pursuant to a series of orders entered on May 15 and 17, 2013, this Court and the Ontario Superior Court of Justice – Commercial List (Morawetz, J.) (the "Canadian Court," and, together with this Court, the "Courts") set a schedule for litigating the aforementioned disputes through joint pleadings, discovery, and trial before both Courts.  The joint trial is scheduled to commence on January 6, 2014.[1]

When the schedule for the joint proceedings was set, it appeared that the discovery necessary to prepare the case and present it at trial would be "limited."  (Ex. B at 2; Ex. C. at 3.)  The EMEA Debtors, like the Canadian and U.S. Debtors, wish the disputes to be resolved as quickly and efficiently as possible so they can pay their creditors.  Over the past several months, the parties have done an enormous amount of work toward completing this litigation.  But, now that the parties have exchanged pleadings, negotiated the agreed terms for document and other discovery, and embarked on the actual discovery process, it has become apparent that the scale of the necessary discovery is far broader than anticipated:

- In an attempt to reduce the number of separate document requests made by the parties, the parties negotiated a uniform set of document requests to which each party would respond (the "Consolidated Document Requests").  Further, the Debtors agreed on keyword searches and other procedures for gathering those documents.  Although

---

1.  A cross-border protocol entered in these proceedings permits communication and coordination between this Court and the Canadian Court, which presides over the Canadian Debtors' insolvency proceedings.

production is not yet complete, it appears that the resulting pool of material will amount to more than 1.1 million documents, comprising many millions of pages.

- The Litigation Timetable required the parties to substantially complete their document productions by July 22, 2013. (Ex. B at 4.) Although all parties have acted with diligence and good faith, it is likely that roughly half of the total volume of documents or more will have been produced well after this date. It appears that, at best, document productions may be completed by August 31, 2013. At least half a million documents — and potentially many more — are expected to have been produced between July 22 and August 31, 2013.

- The Litigation Timetable allowed approximately eight weeks for review of the parties' document productions and depositions of fact witnesses, ending on September 27, 2013. (Ex. B at 7.) Most of this period has been lost because the parties will not be able to commence depositions until after document productions have been completed at the end of August. In addition, the unexpectedly large volume of documents produced means that the parties require more time than anticipated to review documents before commencing depositions.

- The parties have provided interrogatory responses identifying witnesses most knowledgeable about the matters in dispute, and have exchanged lists of anticipated trial witnesses. Based on these disclosures, the parties identified 113 persons whose depositions they wish to take. Although the parties have met and conferred in a successful effort to reduce this number, it seems likely that there will nevertheless be over 100 depositions.

- With the best will in the world, it will not be feasible to complete 100 depositions by the September 27, 2013 deadline set in the Litigation Timetable. Aside from the obvious logistical difficulty of scheduling so many depositions in such a short period of time, many of the witnesses are not under party control and must be summoned through compulsory process, including cross-border procedures under the Hague Evidence Convention or other channels.

It is notable that the parties are in substantial agreement about the scope of necessary discovery. Objections to document requests and interrogatories were resolved by negotiations that led to a uniform set of requests and interrogatories to which all parties agreed to respond. Recent meet and confer sessions about the list of witnesses who should be deposed, and the procedures for conducting depositions, have been similarly cooperative. Until the present motion, no party has needed assistance from either Court in relation to any discovery matter.

The Litigation Timetable is subject to amendment upon written agreement of the parties or a showing of "good cause."  (Ex. B at 9.)  Good cause is generally defined to mean that "scheduling deadlines cannot be met despite a party's diligent efforts."  *Pettinaro Enters., LLC v. Cont'l Cas. Co.*, C.A. No. 09-139-GMS, 2010 Dist. LEXIS 115305, at *5 (D. Del. Oct. 29, 2010) (citation omitted).

Here, all parties have made diligent efforts to comply with the deadlines in the Litigation Timetable, but it has not been feasible to do so.  The Joint Administrators therefore respectfully request that the schedule set in the Allocation Protocol, Litigation Timetable, and Discovery Plan be amended to provide sufficient time for document disclosure to be completed and depositions to be taken before proceeding to exchanges of expert reports and other pre-hearing procedures.  Proposed revisions to the schedule are set forth in Section II below and in the accompanying Proposed Order, attached hereto as Exhibit D.

As the impossibility of meeting the current schedule has become apparent over the past several weeks, the Joint Administrators have engaged in an ongoing dialogue with the Canadian and U.S. Debtors about the need to modify the schedule.  The other Debtors have not disputed the reality of the scheduling problems, and indeed the deadlines in the proposed amended schedule reflect changes the Joint Administrators have adopted to take account of particular issues and concerns expressed by other parties.  Although the other Debtors have offered no solution to the scheduling problems, they have indicated that they are not prepared to join in the present motion at this time.  In light of the fact that deadlines have already been missed, and with other important deadlines looming, the Joint Administrators do not believe it is appropriate to delay the present motion.

## BACKGROUND

The background for the present motion is set forth in detail in the accompanying Declaration of James Edward Seaton Norris-Jones, executed August 16, 2013 (the "Norris-Jones Decl.," filed concurrently herewith).  The facts most relevant to this motion may be summarized as follows:

Until late 2008, the Nortel Group was one of the leading players in the global telecommunications industry, including networking solutions, computer networks, and software. (Norris-Jones Decl. ¶ 5.)  The parent company, Nortel Networks Corporation, was located in Canada.  The group had major operating subsidiaries in the United States, Europe, and elsewhere around the world.

On January 14, 2009, the principal companies in the Nortel Group commenced insolvency proceedings.  The Canadian Debtors sought protection in the Canadian Court under the Canadian Companies' Creditors Arrangement Act.  The U.S. Debtors filed voluntary petitions in this Court pursuant to Chapter 11, Title 11 of the United States Code.  The EMEA Debtors were placed into administration in England under the Insolvency Act 1986 by orders of Mr. Justice Blackburne of the English High Court.

At the outset of the proceedings, this Court and the Canadian Court entered orders establishing procedures for the coordination of cross-border hearings between the Courts (as amended, the "Cross-Border Protocol").[2]  The Cross-Border Protocol permits the Courts to hold joint hearings "where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or . . . to, among other things, facilitate or coordinate proper and

---

2.  (Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-to-Court Protocol, Jan. 15, 2009, D.I. 54, as amended by the Order Approving Stipulation of the Debtors and the Official Comm. of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol, June 29, 2009, D.I. 990.)

efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the

Insolvency Proceedings."  (Cross-Border Protocol, Ex. 1 ¶ 12(d).)

It was determined that the way to maximize the assets available to pay creditors of

the various Nortel entities would be to engage in Section 363 auction sales of the worldwide

Nortel businesses.  Because the major business lines of the Nortel Group functioned across

national boundaries and business entities, the participation and support of all of the companies

was required in order to consummate sales of the businesses.  The Debtors therefore agreed to

cooperate and move quickly to accomplish the sales, but to defer the question of how the

resulting proceeds should be divided among them.  The sales of eight Nortel business lines, as

well as a pool of residual intellectual property not associated with any of the business lines,

generated over $7.5 billion in proceeds.  This sum remains in various escrow accounts pending

an agreement between the parties or other binding determination as to how the funds should be

allocated.

In addition to the dispute over how to allocate the proceeds of the Nortel asset

sales, the EMEA Debtors have asserted substantial intercompany claims against the U.S. and

Canadian Debtors in relation to, among other things, intercompany loans, the Nortel Group's

transfer pricing arrangements, and the improper depletion of cash and value from the EMEA

Debtors.  The U.K. Pension Claimants have asserted substantial claims against the U.S. and

Canadian Debtors in relation to the underfunding of NNUK's pension plan.

Over a period of years, several attempts were made to mediate the dispute over

how to allocate the Nortel asset sale proceeds.  After the first of these efforts failed, the U.S. and

Canadian Debtors filed applications with this Court and the Canadian Court seeking to initiate a

joint cross-border proceeding to decide allocation.  The EMEA Debtors responded with a cross-

motion to compel arbitration of this dispute in accordance with the terms of a written agreement the parties had entered in connection with the asset sales.  On April 3, 2013, this Court entered an order denying the cross-motion to compel arbitration and approving the entry of the Allocation Protocol, which established procedures for joint determination by this Court and the Canadian Court of (i) allocation of the Nortel asset sale proceeds, (ii) the EMEA Debtors' claims against the U.S. and Canadian Debtors, and (iii) the U.K. Pension Claimants' claims against the U.S. and Canadian Debtors.  Parallel orders were entered by the Canadian Court.[3]

The Canadian Court and this Court approved the final form of the Allocation Protocol, as well as a related Litigation Timetable and Discovery Plan, on May 15 and 17, 2013, respectively.  The Allocation Protocol gave rights of participation to various creditor groups, which together with the Debtors comprise the "Core Parties."[4]

The Allocation Protocol provides that the joint trial of the pending disputes should commence on January 6, 2014.  (Ex. A at 3.)  The Litigation Timetable and Discovery Plan, working backwards from this trial date, provided approximately four and a half months for fact discovery, beginning in mid-May and ending September 27, 2013.  In its endorsement of the Litigation Timetable and Discovery Plan, the Canadian Court stated that it had "taken into account that the EMEA Claimants and the U.K. Pension Claimants are major creditors in the

---

3.   The EMEA Debtors have appealed from the order denying their motion to compel arbitration.  This appeal has been accepted for direct appeal to the Third Circuit and will be heard on October 8, 2013.  The EMEA Debtors' motion to stay the present proceedings has been denied.  Their participation in these proceedings is without prejudice to their contention that allocation should be decided in arbitration.  (Ex. C at 14-15.)

4.   Pursuant to Annex A of the Litigation Timetable, the Core Parties were placed into various "groups."  The EMEA Allocation Group consists of the EMEA Debtors and the U.K. Pension Claimants; the EMEA Claims Group consists of the EMEA Debtors, the U.K. Pension Claimants, and the Joint Administrators or any other administrator of an EMEA Debtor who made claims against the U.S. Debtors, the Canadian Debtors, or the Canadian Directors and Officer; the U.S. Allocation and Claims Defendant Groups consist of the U.S. Debtors and the U.S. Creditors Committee; the Canadian Allocation Group consists of the Canadian Debtors, the Monitor, and the Canadian Creditors Committee; and the Canadian Claims Defendant Group consists of the Canadian Debtors, the Monitor, and the Canadian Directors and Officers.

global Nortel Insolvency and it is necessary to ensure that they have the full opportunity to put

forth their case, within the confines of the trial schedule." (Endorsement of Justice Morawetz

(May 3, 2013), attached hereto as Exhibit E.)

        In accordance with the Litigation Timetable, the parties served document requests

on May 22, 2013.  Cumulatively, the number of individual requests totaled over 1000.  (Norris-

Jones Decl. ¶ 13.)  After a lengthy meet and confer process, on June 20, 2013, the Core Parties

agreed on a uniform set of 140 Consolidated Document Requests to which each party would

respond.  (*Id.* ¶ 14.)  The Debtors also agreed on a list of Nortel custodian data to be searched for

responsive documents.  (*Id.* ¶ 15.)  On June 28, 2013, the Debtors finalized a list of search terms

to be used to identify documents responsive to the Consolidated Document Requests.  (*Id.*)

        The Litigation Timetable and Discovery Plan required document production to be

substantially complete by July 22, 2013.  (Ex. B at 4; Ex. C at 6.)  By July 22, 2013, the U.S.

Debtors had produced approximately 119,000 documents, the Canadian Debtors had produced

approximately 243,000 documents, and the EMEA Debtors had produced approximately 239,000

documents.  (Norris-Jones Decl. ¶ 17.)  After July 22, 2013, the Debtors have continued to

search for, review, and produce hundreds of thousands of documents, and they expect the

productions to continue to at least the end of August.  At least half a million documents, and

potentially many more than that, are expected to be produced after the July 22 deadline.  (*Id.*

¶ 27.)

        In accordance with deadlines established in the Litigation Timetable and

Discovery Plan, the parties initially identified a total of 113 witnesses for deposition.  (*Id.* ¶ 23.)

The parties have subsequently met and conferred in an effort to reduce this number.  As a result,

they have added and withdrawn certain witnesses from the deposition list, resulting in a current

total of 107 witnesses.  (*Id.*)  It appears that as many as half of the likely deponents are outside

the reach of the Courts' compulsory process and thus will be unavailable for trial.

## ARGUMENT

## I.    THE SCHEDULE SHOULD BE MODIFIED.

The Litigation Timetable provides that "[a]ny Core Party may . . . file a motion

with the applicable Court or Courts to modify this Litigation Timetable upon a showing of good

cause."  (Ex. B at 9.)

The Discovery Plan acknowledged that it might not be possible to meet the

Litigation Timetable.  In such case, the Discovery Plan gives the parties an affirmative obligation

to negotiate with each other and inform the Courts if they recognize that it has become

"impracticable or impossible" to meet the existing schedule:

> The Discovery Participants recognize that, as additional
> information becomes available throughout the Allocation, US
> Claims and Canadian Claims litigation, it may become apparent
> that:  (a) it is impracticable or impossible for a Discovery
> Participant to comply with the terms of the Discovery Plan, or to
> do so in a time-efficient or cost-efficient manner, or (b) further
> steps, beyond those set out in this Discovery Plan, are required in
> order for a Discovery Participant to obtain access to potentially
> relevant documents, information or witness testimony.    Each
> Discovery Participant agrees to notify the other Discovery
> Participants promptly when it reasonably believes that it will not
> comply with any term of the Discovery Plan or when it reasonably
> concludes that further steps beyond those set out in this Discovery
> Plan are required.  The Discovery Participants agree to negotiate in
> good faith with respect to any amendments to the Discovery Plan
> requested by a Discovery Participant on that basis, and to seek the
> assistance of the Courts(s) when appropriate in order to resolve
> disputes between the Discovery Participants.

(Ex. C at 14.)

"Good cause" for modifying a scheduling order is established if the existing

schedule "cannot reasonably be met despite the diligence of the party seeking the extension."  *In*

*re Fleming Cos.*, 323 B.R. 144, 150 (Bankr. D. Del. 2005) (citation omitted); *accord Novartis Vaccines & Diagnostics, Inc. v. MedImmune, LLC*, Civ. No. 11-84-SLR, 2013 WL 3812074, at *2-3 (D. Del. July 22, 2013) (finding good cause based on parties' continued diligence and the fact that delay was "not of the [parties'] making"); *Pettinaro Enters.*, 2010 WL 4274658, at *2 (observing that "good cause means that scheduling deadlines cannot be met despite a party's diligent efforts" (internal quotation marks and citation omitted)).

Here, although the parties have been working diligently and cooperatively to meet their discovery obligations, it has become apparent that the existing schedule cannot be met. A very large quantity of documents was produced after the July 22 deadline. Many more documents have yet to be produced, and it appears that document productions will not be complete until, at best, about six weeks after the date contemplated in the original schedule. (Norris-Jones Decl. ¶¶ 21, 30, Schedule B.) As a result of this, and the fact that the number of anticipated deponents is also far larger than any party expected, it will not be possible to complete depositions by the September 27, 2013 deadline provided for in the schedule. There is therefore good cause to extend the schedule to allow the parties sufficient time to (i) complete the production of documents, (ii) review the documents in advance of depositions, and (iii) complete the large number of depositions the parties consider necessary in order to represent their clients' interests.

A.      **Despite The Parties' Diligence, Document Productions Are Not Complete.**

As detailed in the Declaration of James Norris-Jones, the parties have made diligent efforts to meet the July 22, 2013 deadline for "substantial completion" of their document productions, as set forth in the Litigation Timetable. (Ex. B at 4.) Although the parties had indeed made substantial productions by the July 22 deadline, it has become clear that the volume of documents that remained to be produced after that date will likely dwarf the pre-July 22

productions.  (Norris-Jones Decl. ¶ 18.)  The schedule proposed by the EMEA Debtors would require that all outstanding productions in fact be completed by August 31, 2013.

The parties served their requests for production of documents on May 22, 2013, the deadline set in the Litigation Timetable.  The requests for production incorporated, collectively, over 1000 individual requests.  (*Id.* ¶ 13.)  To avoid the burden of having every party respond and object to each of these requests, the Debtors worked in good faith to agree to a single, limited, uniform set of Consolidated Document Requests that would incorporate (as appropriate) and replace the requests served by each party.  (*Id.* ¶ 14.)  This was a time-consuming but worthwhile process, which avoided the need for court intervention to decide disputes about what documents should be produced.

The exercise of collecting, searching, reviewing, and producing documents in response to the Consolidated Document Requests could not begin in earnest until June 28, 2013, after the Consolidated Document Requests had themselves been finalized and the Debtors had agreed on the custodians whose documents would be searched and the searches to be used.  (*Id.* ¶ 16.)  As a result, although the Debtors were able, in accordance with the Litigation Timetable, to make small productions of previously collected documents on June 10, the major part of the document review and production exercise could not begin until after June 28.  (*Id.*)

The Debtors worked diligently to meet the July 22 deadline for substantial completion of document productions, and in fact collected, searched, reviewed, and produced hundreds of thousands of documents in the twenty-four days following the date on which the Debtors agreed on searches (June 28, 2013).  (*Id.* ¶ 17.)

Since the productions on July 22, 2013, the parties have continued their document review and have produced more than 365,000 additional documents:  on July 26 and August 2,

the U.S. Debtors produced approximately 15,000 and 30,000 more documents, respectively; and on August 12, the Canadian Debtors produced approximately 323,000 additional documents. (*Id.* ¶ 19.)

At the parties' meet and confer session on August 6, 2013, the Canadian Debtors indicated that, in addition to the 323,000 documents they ultimately produced to the parties on August 12, they were still in the process of reviewing a large volume of additional documents, from which documents found to be responsive would be produced at a later date.  (*Id.* ¶ 21.)  On August 13, 2013, the Canadian Debtors indicated their intention to streamline the scope of their remaining review in order to enhance their ability to complete all further productions by August 31, 2013.  (*Id.* ¶ 21 n.7.)

At the meet and confer session, the U.S. Debtors revealed that they also expect to produce another approximately 100,000 documents in August, which represent responsive documents subject to a joint privilege held by two or more of the Debtors.  (*Id.* ¶ 21.)  The Debtors are currently considering whether the joint-privileged documents can be produced to all Core Parties to this litigation.  (*Id.* ¶ 21 n.8.)  Production of joint-privileged documents to the other Core Parties, if such production is appropriate, cannot occur until there is final agreement on the issue or, failing that, intervention by the Courts.  (*Id.*)

The EMEA Debtors also anticipate producing additional documents in August. (*Id.* ¶ 21.)  The timing of productions by the EMEA Debtors has been affected by the fact that the vast majority of the custodian records that the EMEA Debtors agreed to review for production had been in the possession of the Canadian Debtors, which held repositories of documents for subsidiary companies.  (*Id.* ¶ 21 n.10.)  That data had to be collected by the Canadian Debtors and sent to the EMEA Debtors for processing and review.  (*Id.*)  The EMEA

Debtors received this data on a rolling basis, beginning in mid-June, with a final set of data received from the Canadian Debtors on July 22, 2013.  (*Id*.)  In total, the EMEA Debtors will have reviewed more than one million documents upon completion of their document production.

Thus, it is now believed that the productions made by July 22, 2013 could represent less than half of the total documents that will ultimately be produced by the Debtors. (*Id*. ¶¶ 18, 27.)  With hundreds of thousands of documents just produced and hundreds of thousands more anticipated to be produced through August, it will not be possible for the Debtors to complete document production and perform an adequate review of other parties' documents in time to complete 100 or more depositions by September 27, 2013 — the deadline in the Litigation Timetable.  (Ex. B at 7.)

> **B.**    **The Parties Should Be Entitled To A Reasonable Opportunity To Review Documents In Advance Of The Depositions.**

Effective and efficient discovery practice requires that the parties have some period after documents have been produced to review those materials before the commencement of depositions.  The materials produced by the parties necessarily provide the groundwork for examining witnesses in order to achieve the purposes for which discovery is intended under the Federal Rules of Civil Procedure.  Here, the parties have expended an enormous amount of effort and resources producing documents, which will have been wasted if counsel are not able to make use of the resulting evidence to represent the interests of their clients.

Proceeding with depositions before even half of the documents are produced and reviewed is also likely to lead to unnecessary additional burdens on the witnesses, as it will all but guarantee an extension of the deposition schedule down the road.  If documents produced after a deposition reveal new and important information as to which a witness should be examined, the prejudice to a party can only be mitigated by re-deposing the witness.  *See*

13

*Hopkins v. City of Wilmington*, C.A. No. 08-302-LPS, 2012 U.S. Dist. LEXIS 135729, at *1 (D.

Del. Sept. 21, 2012) (granting motion to compel additional discovery and re-depose plaintiff

based on "new and relevant information"); *Hibbert v. Bellmawr Park Mut. Hous. Corp.*, C.A.

No. 10-5386-NLH/JS, 2013 WL 3949024, at *3 (D.N.J. Aug. 1, 2013) (defendants had "good

cause" to re-depose plaintiff because "[d]efendants should not be prejudiced because they only

recently learned of relevant documents plaintiff should have produced before his deposition").

As such, the parties may get to the end of depositions only to have to redo some or almost all of

them.  This, of course, will only further prolong the discovery period.

Further, of the 107 witnesses currently identified for depositions, as many as half

are believed to be outside the subpoena power of the Courts and therefore will not be available

for trial.  (Norris-Jones Decl. ¶ 32.)  Thus, their deposition testimony is likely to be their only

testimony and will be admissible at trial.  (*Id*. ¶¶ 32-33.)  Given that the deposition testimony of

a substantial number of the parties' witnesses will count as their trial testimony, it would

severely prejudice the parties to have to conduct depositions without the opportunity to review

relevant documents.  (*Id*. ¶ 35.)  Indeed, requiring the parties to proceed with depositions on this

basis is akin to requiring them to go to trial without the benefit of document discovery.

C.     **The Large Number Of Deponents Means That It Will Not Be**
       **Possible To Complete Depositions In The Time Originally Permitted.**

In accordance with the Litigation Timetable and Discovery Plan, the parties

exchanged lists of proposed deponents on July 30, 2013.  (Norris-Jones Decl. ¶ 22.)  In their

respective lists:  (i) the EMEA Allocation and Claims Groups identified 62 witnesses; (ii) the

U.S. Allocation and Claims Defendant Groups identified 58 witnesses; and (iii) the Canadian

Allocation and Claims Defendant Groups identified 50 witnesses.  (*Id*.)  On August 9, 2013, the

parties cross-designated certain witnesses listed by the other parties, bringing the total number of

witnesses designated by: (i) the EMEA Allocation and Claims Groups to 79; (ii) the U.S.

Allocation and Claims Defendant Groups to 74; and (iii) the Canadian Allocation and Claims

Defendant Groups to 69. (*Id.*) In sum, the parties collectively identified a total of 113 witnesses

for deposition. (*Id.* ¶ 23.)

The parties subsequently agreed to remove eleven witnesses from the deposition

list, reducing the number of witnesses to 102. However, on August 12, the Canadian Directors

and Officers added four trial witnesses (three who had been previously designated as deposition

witnesses) and, on August 13, the U.S. Allocation and Claims Defendant Groups added four new

deposition witnesses, resulting in the current total of 107 witnesses. (*Id.*) The Litigation

Timetable requires completion of these 107 depositions by September 27, 2013. (Ex. B at 7.)

Even assuming the Debtors manage to produce the balance of their documents by

the end of August, and allotting zero time to review the hundreds of thousands of documents

expected to be produced, the parties are left with a mere nineteen business days, not including

certain religious holidays, to complete these depositions. Accordingly, to meet the current

schedule, the parties must conduct approximately six depositions on every single business day

until September 27, 2013, of witnesses spread across the globe. This is simply not feasible or

physically possible. (Norris-Jones Decl. ¶ 36.)

## II.    THE SCHEDULE SHOULD BE EXTENDED BY APPROXIMATELY THREE MONTHS.

The production of hundreds of thousands of documents after the substantial

completion deadline, as well as the identification of over 100 witnesses to be deposed, means

that the remaining schedule — which provided zero margin for slippage — cannot possibly be

met. The schedule should be amended to (i) permit time to complete the pending document

productions in advance of starting depositions, (ii) allow a brief period for review of documents,

and (iii) re-set the period for depositions based on the delays in document productions and the

large number of deponents.  Accordingly, the Joint Administrators respectfully submit that the

schedule should be extended by approximately three months, as follows:

| Deadline | Current Date | Proposed Revised Date |
|---|---|---|
| Date for completion of outstanding production | No date | August 31, 2013 |
| Date for service of privilege logs | No date | September 7, 2013 |
| Date for depositions to begin | No date | September 30, 2013 |
| Deadline to identify experts and the subject matter of their reports | September 13, 2013 | November 27, 2013 |
| Deadline to complete witness depositions, including 30(b)(6) depositions | September 27, 2013 | December 13, 2013 |
| Deadline for service of expert reports | October 4, 2013 | December 20, 2013 |
| Deadline for service of rebuttal expert reports | November 1, 2013 | January 24, 2014 |
| Preliminary pre-trial conference | Week of November 11, 2013 | Week of February 17, 2014 |
| Deadline to complete expert depositions | December 6, 2013 | February 28, 2014 |
| Deadline to file a list of all witnesses and exhibits that each Core Party intends to rely upon as part of its direct case | December 9, 2013 | March 6, 2014 |
| Deadline to file:<br>• Pre-trial motions<br>• Pre-trial briefs<br>• All fact affidavits to be used in direct case<br>• All exhibits to be used in direct case<br>• All deposition testimony to be used in direct case | December 13, 2013 | March 14, 2014 |
| Pre-trial conference | Week of December 16, 2013 (if the Courts desire) | Week of March 17, 2014 (if the Courts desire) |
| Beginning of trial | January 6, 2014 | March 31, 2014 (or as soon thereafter as is convenient for the Courts) |

## CONCLUSION

For the foregoing reasons, the Allocation Protocol, Litigation Timetable, and Discovery Plan should be modified to grant the parties additional time to complete fact discovery. The Joint Administrators therefore respectfully request that the Court (i) enter an Order substantially in the form attached hereto as Exhibit D, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
August 16, 2013

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Jaime Luton Chapman
Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Jaime Luton Chapman (No. 4936)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: 302-571-6600
Fax: 302-571-1253

– and –

HUGHES HUBBARD & REED LLP

Derek J.T. Adler
Neil J. Oxford
Kenneth M. Katz
Gabrielle Glemann
Fara Tabatabai

One Battery Park Plaza
New York, New York 10004
Telephone: 212-837-6000
Fax: 212-422-4726

– and –

HERBERT SMITH FREEHILLS LLP

John Whiteoak
James Norris-Jones

Exchange House
Primrose Street
London EC2A 2EG
Telephone:  +44 20 7374 8000
Fax:  +44 20 7374 0888

*Counsel for Joint Administrators*