## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br><br>                             Debtors.[1] | Chapter 11<br><br>Case No. 09-10138 (KG)<br><br>Jointly Administered |

### DECLARATION OF JAMES EDWARD SEATON NORRIS-JONES IN SUPPORT OF THE JOINT ADMINISTRATORS' MOTION TO MODIFY SCHEDULING ORDERS IN JOINT CROSS-BORDER PROCEEDINGS TO DETERMINE ALLOCATION OF ASSET SALE PROCEEDS AND CERTAIN CLAIMS

I, James Edward Seaton Norris-Jones, of Exchange House, Primrose Street, London EC2A 2EG, United Kingdom, declare under penalty of perjury that the following is true and correct:

1.      I am admitted to practise law in England and Wales, and I am a partner in the law firm of Herbert Smith Freehills, LLP, solicitors for the court-appointed Joint Administrators and authorised foreign representatives of Nortel Networks UK Limited ("NNUK") and its affiliates in the region known as Europe, Middle East, and Africa ("EMEA"), collectively known as the "EMEA Debtors."

2.      I submit this declaration in support of a motion brought by the Joint Administrators in the Ontario Court (Court File No. 09-CL-7950) and the Delaware Court (Case No. 09-10138

---

1.    The debtors in these chapter 11 cases (the "US Debtors") are Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

(KG)) to modify the Litigation Timetable and Discovery Plan (as approved by the Ontario Court on May 15, 2013 and the Delaware Court on May 17, 2013) in accordance with the dates set out in Schedule A hereto.

3.      In my role as solicitor for the Joint Administrators, I have knowledge of the matters referred to in this declaration. Unless otherwise indicated, the facts contained in this declaration are within my own knowledge. Where the facts are not within my own knowledge, I identify the source of my information and/or belief. As I have not been directly involved from the outset of these proceedings, the information relating to matters that occurred before 2013 has been provided to me by other members of the Joint Administrators' legal team or is derived from my review of contemporaneous documents.

A.    **BACKGROUND**

4.      Broadly, for the purposes of the present proceedings, the Nortel group of companies (the "Nortel Group") is split into three categories: the Canadian Estate, the US Estate, and the EMEA Estate (each an "Estate" and collectively the "Estates"). Debtors from within each of these Estates are referred to as the Canadian Debtors (including the court-appointed Monitor for the Canadian Debtors), the US Debtors, and the EMEA Debtors (collectively, the "Debtors").[2]

5.      The Nortel Group was one of the world's leading companies in the telecommunications industry, including networking solutions, computer networks, and software. The Nortel Group was founded in Canada in 1895 and subsequently expanded into the US (by the 1990s becoming one of the leading telecommunications companies there). From this base, the Group expanded overseas.

---

2.    In addition to the three Estates, the following parties have "Core Party" status in this case: (i) Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund (collectively, the "UK Pension Claimants"), (ii) the US Creditors Committee, (iii) the Canadian Creditors Committee, (iv) the Canadian Directors and Officers, (v) the Bank of New York Mellon, Law Debenture Trust, and Wilmington Trust (collectively, the "Indentured Trustees"), and (vi) the Ad Hoc Group of Bondholders.

6.      Beginning in 2001, in the wake of the "Dot-Com" crisis, the demand for the Nortel Group's products dropped, and competition also increased.  By 2008, the Nortel Group was forced to undertake a major restructuring.  Whilst this restructuring bought the Group some time, in January 2009, insolvency proceedings were commenced by the EMEA Debtors and by Nortel's US and Canadian entities, Nortel Networks Inc. and Nortel Networks Limited ("NNI" and "NNL", respectively) and their affiliates.  NNL was the operating parent corporation of the Nortel Group.

7.      Following the commencement of insolvency proceedings, substantially all of the assets of the Nortel Group were sold, giving rise to approximately US $7.5 billion in sale proceeds, which are currently held in various escrow accounts (the "Sale Proceeds").  One of the critical issues in dispute between the Debtors is how the Sale Proceeds should be divided among them for eventual distribution to their respective creditors (the "Allocation Dispute").

8.      The EMEA Debtors are also pursuing, in both the Ontario and Delaware Courts, various claims against NNL and NNI in relation to, amongst other things, intercompany loans, the Nortel Group's transfer pricing arrangements, the improper depletion of value from the EMEA Debtors, and various proprietary claims (the "Claims Dispute").  Due to the way the Nortel Group operated, much of the relevant documentation relating to these claims is likely to be held by NNL and NNI.

9.      Pursuant to Orders of the Ontario and Delaware Courts, the Allocation Dispute and Claims Dispute will be tried together in a joint trial presided over by both Courts.  As a result, both disputes are proceeding on the same litigation schedule.[3]

---

3.   The EMEA Debtors continue to reserve all rights in relation to whether the US and Canadian Courts are the appropriate fora for the resolution of the Allocation Dispute.  (See the General Terms of the Discovery Plan.)

B.      **THE LITIGATION TIMETABLE AND DISCOVERY PLAN**

10.     In an attempt to resolve their disputes without litigation, the parties attended mediation sessions in the fall of 2010 and spring of 2011, but were unable to reach any settlement agreement.  In June 2011, the Ontario and Delaware Courts ordered the parties back to mediation. Those mediation sessions concluded, without success, in January 2013.

11.     Before the discovery process had commenced, on April 3, 2013, the Ontario and Delaware Courts set a date of January 6, 2014 for commencement of a joint trial of the Allocation Dispute and Claims Dispute.  To comply with the trial schedule set by the Courts, the EMEA Debtors met and conferred with the other parties to agree on a Litigation Timetable and Discovery Plan based on the January 2014 trial date.  The Ontario and Delaware Courts ordered the Litigation Timetable and Discovery Plan on May 15 and May 17, 2013, respectively.  In accordance with a May 3, 2013 Endorsement of the Ontario Court, the Litigation Timetable and Discovery Plan was to allow for approximately four and a half months for fact discovery.

12.     The expedited discovery schedule set forth in the Litigation Timetable and Discovery Plan was premised on the belief that discovery in this case would be "limited." (Litigation Timetable at 2.)  Although the parties have sought to comply with that schedule (and the EMEA Debtors have worked diligently and in good faith to this end), it has since become clear that, in light of the number of document requests that have been made (agreed by all parties in the litigation and necessary given the complexity of the parties' claims and defences), the scope of discovery is significantly broader than might have been envisioned when the schedule was originally set.  As a result, despite the efforts made to date, the current schedule cannot reasonably be met.

C.    **DOCUMENT REQUESTS AND PRODUCTION**

13.    In accordance with the Litigation Timetable and Discovery Plan, the parties served document requests on May 22, 2013. The EMEA Allocation and Claims Groups[4] served requests for production of documents containing a total of 115 individual requests on the US and Canadian Debtors; the US Allocation and Claims Defendant Groups served a total of 251 requests for production, comprised of 89 individual requests on the EMEA Debtors, 75 requests on the Monitor and Canadian Debtors, 62 requests on the UK Pension Claimants, 17 requests on the Canadian Creditors Committee, and 8 requests on Wilmington Trust; and the Canadian Allocation and Claims Defendant Groups served requests for production containing 714 individual requests and a further 259 requests for specific documents set out in a schedule to their requests, for a total of 973 document requests. In total, the requests for production served by the parties contained significantly in excess of 1,000 individual document requests.

14.    Rather than require each party to go through the exercise of responding and objecting to more than 1,000 requests, the parties worked together to agree to a single, more limited, set of Consolidated Document Requests that would incorporate (as appropriate) and replace the requests served by each party. On May 30, 2013, the US Debtors circulated a first draft of the consolidated requests, which the parties marked up and negotiated during a series of in-person meetings and nearly daily conference calls that continued through mid-June. Ultimately, the parties were able to reduce the more than 1,000 individual document requests addressed to various parties to 140 requests to which all parties would respond. Even with numerous live and

telephonic meet and confer sessions, the Consolidated Document Requests were not finalised until June 20, 2013.

15.      While negotiation of the Consolidated Document Requests was taking place, the EMEA, US, and Canadian Debtors were also attempting to reach agreement on a list of former Nortel employees whose documents would be reviewed and a list of search terms that would be used to identify documents responsive to the Consolidated Document Requests.  Despite the efforts put into this process, final agreement on the employee documents to be reviewed was not reached until June 20, 2013 and the search terms were finalised on June 28, 2013.

16.      The exercise of collecting, searching, reviewing, and producing documents in response to the Consolidated Document Requests could not begin in earnest until the Consolidated Document Requests had themselves been finalised and the three Debtors had agreed on the scope of discovery (*i.e.*, the employee documents to be searched and the searches to be used).  Although all three Debtors were able, in accordance with the Litigation Timetable and Discovery Plan, to make small productions of previously collected documents on June 10, 2013, the parties did not know the scope of their documentary discovery obligations until June 28, 2013 — more than five weeks after the date for document requests set out in the Litigation Timetable and Discovery Plan. As a result, the great majority of the document review and production exercise could not begin until after June 28.

17.      The Litigation Timetable and Discovery Plan required document production to be substantially complete by July 22, 2013.  To comply with that deadline, the EMEA Debtors made

---

4.   Pursuant to Annex A of the Litigation Timetable, the Core Parties were placed into various "groups."  The EMEA Allocation Group consists of the EMEA Debtors and the UK Pension Claimants; the EMEA Claims Group consists of the EMEA Debtors, the UK Pension Claimants, and the Joint Administrators or any other administrator of an EMEA Debtor who made claims against the US Debtors, the Canadian Debtors, or the Canadian Directors and Officer; the US Allocation and Claims Defendant Groups consist of the US Debtors and the US Creditors Committee; the Canadian Allocation Group consists of the Canadian Debtors, the Monitor, and

extraordinary efforts to collect, review, and produce a large volume of documents as quickly and

efficiently as possible. Counsel for the US Debtors and Canadian Debtors have indicated orally

and in correspondence that they have also made very substantial efforts. As a result of those

efforts, by July 22, the US Debtors had produced approximately 119,000 documents, the Canadian

Debtors had produced approximately 243,000 documents, and the EMEA Debtors had produced

approximately 239,000 documents.[5]

18.     On July 22, all parties certified substantial completion of their document

productions. However, notwithstanding the considerable efforts that led to the production of more

than half a million documents in a period of only a few weeks, all three Debtors openly

acknowledged that they were continuing their searches and expected to make supplemental

productions in the ensuing weeks. At that stage, the understanding (at least of the EMEA Debtors)

was that the supplemental productions of the various parties would be considerably smaller than

the productions previously made. In fact, those productions will be over 100 percent more than the

documents produced by July 22.

19.     Since July 22, the Debtors have produced hundreds of thousands of additional

documents and expect to produce hundreds of thousands more. So far:

    a. the US Debtors have produced another approximately 45,000 more documents,

       comprised of approximately 15,000 documents produced on July 26 and

---

the Canadian Creditors Committee; and the Canadian Claims Defendant Group consists of the Canadian Debtors, the Monitor, and the Canadian Directors and Officers.

5.   These figures were provided to me by the specialist team at Ernst & Young ("EY") that has been providing technical assistance to the Joint Administrators in connection with the document production exercise. I understand that EY extracted this information from the Merrill Lextranet database that all parties had been using to upload their productions.

Due to technical difficulties with downloading productions from the Merrill Lextranet database, in addition to uploading their productions to the database, each party also provided the other parties with courtesy copies of their productions on hard drives or other media. Pursuant to a discussion at a meet and confer among the parties on August 6, 2013, productions made after that date are no longer being uploaded to the Merrill Lextranet database and are instead being provided via hard drives or other media to all parties.

approximately 30,000 documents produced on August 2; and

b.  the Canadian Debtors have produced another approximately 323,000 documents, which were sent to the parties on August 12 and received by the EMEA Debtors on August 14.

20.    Schedule B, attached hereto, provides a breakdown of the productions made by each Debtor, including a summary of the expected future productions (as communicated to date).[6] As shown on Schedule B, the production of documents post-July 22 is expected to double the volume of documents produced by July 22.

21.    At a meet and confer on August 6, 2013 (the "August 6 Meeting"), all three Debtors indicated that they would need to make additional supplemental productions at least throughout August and potentially into September.  The Canadian Debtors indicated that they were in the process of reviewing another 200,000 documents, from which they would be producing an as-yet-unknown (but likely to be large) quantity of documents.[7]  The US Debtors advised the parties that they would, at a later date, be producing approximately 100,000 additional documents, representing responsive documents subject to a joint privilege held by two or more Estates.[8,9]  The EMEA Debtors also stated at the August 6 Meeting that they anticipated producing approximately

---

6.  Schedule B sets out figures for the document productions of the three Debtors.  This schedule does not include the production statistics for the remaining Core Parties.  In total, the document production of those remaining parties is just over 50,000 documents.

7.  On August 13, 2013, the Canadian Debtors indicated their intention to streamline the scope of their remaining review in order to enhance their ability to complete all further productions by August 31, 2013.

8.  At present, the parties have not reached agreement as to how joint privileged documents should be treated, given that not all parties are within the privilege.  The Debtors are currently considering whether the joint privileged documents should be produced to all parties to this litigation.  Production of joint privileged documents to the other parties in this case, if such production is appropriate, cannot occur until there is final agreement on the issue or, failing that, intervention by the Courts.

9.  As an aside, the EMEA and Canadian Debtors have expressed concern regarding the production of the US Debtors.  These concerns are set out in the August 5 letter from the Canadian Debtors.  (*See* Letter from P. Ruby to H. Zelbo (Aug. 5, 2013) (attached hereto as Exhibit 1).)  The EMEA Debtors share those concerns.  The EMEA Debtors have not yet determined whether further discovery will be necessary, but must reserve their position pending review of the documents that have been produced.

50 to 100,000 more documents in August.[10]  In addition, discovery is being sought from a number of third parties in each of the US, Canada, and the UK (resulting from requests made by the US Debtors and the EMEA Debtors).  This discovery remains outstanding and will likely result in further documents being produced to the parties in the coming weeks.

### D.    DEPOSITIONS

22.    Notwithstanding the continuing work in relation to document production, in accordance with the Litigation Timetable and Discovery Plan, the parties exchanged initial trial witness lists on July 24, 2013[11] and deposition lists on July 30, 2013.  In total, the parties designated 41 trial witnesses.  In their respective deposition witness lists, the EMEA Allocation and Claims Groups listed 62 witnesses, the US Allocation and Claims Defendant Groups listed 58 witnesses, and the Canadian Allocation and Claims Defendant Groups listed 50 witnesses.  On August 9, each of the groups cross-designated a certain number of the witnesses listed by the other parties, bringing the total number of witnesses designated by each group to 79 witnesses for the EMEA Allocation and Claims Groups, 74 witnesses for the US Allocation and Claims Defendant Groups, and 69 witnesses for the Canadian Allocation and Claims Defendant Groups.  Given the complexity of these proceedings and the number of factual issues to be addressed, these numbers are not unreasonable, as demonstrated by the fact that each of the parties has put forward roughly the same number of witnesses.

---

10. The schedule for completion of the EMEA Debtors' document production results, in large part, from the fact that the vast majority of the electronically stored information that had been generated by EMEA personnel, and that the EMEA Debtors agreed to review for production purposes, was in the possession of the Canadian Debtors, which controlled the main repositories of electronically stored information for the entire Nortel Group.  This data was collected by the Canadian Debtors and sent to the EMEA Debtors for processing and review.  The EMEA Debtors received this data on a rolling basis, beginning in mid-June 2013.  Unfortunately, the EMEA Debtors did not receive the final set of data from the Canadian Debtors until July 22, 2013 (the date on which the document production process was in fact due to be substantially complete).  I understand from EY that there have been unanticipated processing and other technical issues in respect of the data received from the Canadian Debtors, which has delayed even further the review and production of this data.

23.    In total, accounting for overlap among the witnesses designated by each group, the parties designated 113 witnesses for deposition.  The parties have engaged in several meet and confer sessions in an effort to reduce these numbers.  As a result of these efforts, on August 13, the parties agreed to de-designate 11 witnesses, including one trial witness; however, on August 12, the Canadian Directors and Officers added another four trial witness to their list, and, on August 13, the US Allocation and Claims Defendant Groups added another four deposition witnesses.  Thus, as of today, the parties have designated 107 deposition witnesses, including 44 trial witnesses.

24.    Significantly, documents relating to several of the witnesses on the parties' deposition lists have not been produced and are not part of the scope of discovery agreed by the Debtors on June 20, 2013.  For the most part, this is because the identity or significance of those witnesses was not known until the parties had served responses to witness identification interrogatories.  These responses were not served until after the Debtors had already agreed on the list of former Nortel employees whose documents would be searched.

25.    The lack of documents is a particularly significant issue with respect to witnesses whom the parties have designated as trial witnesses.  As matters stand, 16 trial witnesses have not had their documents reviewed or produced.  The parties are in discussions regarding the best way to manage these difficulties.  The EMEA Debtors are hopeful that the parties can agree on an approach that is reasonable and proportionate, whilst safeguarding the parties' rights.  At this stage, the EMEA Debtors reserve all of their rights in relation to this issue.

---

11. The EMEA Debtors supplemented their list of trial witnesses on July 29, and the Canadian Directors and Officers supplemented their list on August 12.

E.      **THE PROPOSED MODIFICATION TO THE LITIGATION TIMETABLE**

26.      Before depositions begin, the parties should have a reasonable opportunity to review the documents that have been produced.  The Litigation Timetable and Discovery Plan envisaged a period of approximately two months, between July 22 and September 27, 2013, to review documents and conduct depositions.  This timetable was, on any view, extremely tight.  The volume of material produced, the delays in producing that material (neither of which were contemplated by the Litigation Timetable and Discovery Plan), and the number of deposition witnesses designated by the parties make clear that this timetable has now become unworkable.

27.      Despite the certifications that were provided on July 22, 2013, in hindsight, the fact that approximately 50% of the documents that the parties have subsequently identified for production were yet to be produced demonstrates that "substantial completion" of production had not yet been achieved.  As at today, over 500,000 more documents are still expected to be produced.[12]  There is nothing to suggest that the documents yet to be disclosed will be any less material to the proceedings than the documents that have already been produced.

28.      The modifications the EMEA Debtors have proposed to the Litigation Timetable, as set forth in Schedule A, are intended to ensure that all parties have the opportunity better to prepare for depositions and that no party suffers any prejudice as a result of having to proceed with depositions without the benefit of reviewing the documents that have been produced.  The EMEA Debtors do not seek a long, or indefinite, delay.  Overall, the EMEA Debtors propose that the trial be put back by less than three months.  In the circumstances, the proposed variation to the timetable is modest and would still require that all parties make intense efforts to complete discovery quickly and efficiently.  Even under the EMEA Debtors' proposed schedule, the time

---

12. Including the latest tranche of production from the Canadian Debtors which is not yet available for the EMEA Debtors to review.

available to the parties to review the document productions and prepare for the depositions would be very tight, and the depositions would need to be completed on a very compact timetable thereafter. Even with this extension the timetable is very much shorter than would usually be expected in proceedings of this size and complexity. That said, in view of the indication expressed by the Courts that these proceedings ought to be determined quickly, the EMEA Debtors are doing all they can to ensure these proceedings are brought to trial as soon as sensibly possible and in a manner that best serves the interests of the Debtors' creditors.

29.    The proposed modifications to the Litigation Timetable recognise that, while a great deal of work has been done in a short amount of time, there remains a very significant amount of work to be completed before depositions can begin, both for each party to finalise the production of its own documents and to review the documents produced by the parties. As at today, the parties have produced nearly a million documents, including approximately 323,000 documents received from the Canadian Debtors on August 14 (which are not yet accessible to the EMEA Debtors for review). When document production is finally complete, it is likely to run to over a million documents and tens of millions of pages. Despite the efforts of the parties to narrow the scope of the production by agreeing on Consolidated Document Requests and reasonable parameters for the searches, the scope of the document production exercise has been expansive to take account of the complexity of the parties' claims and the fact that the matters relevant to these claims stretch back more than a decade.

30.    As described above, all parties are indicating that they are working hard to ensure that the document production process is completed as quickly as possible, and I can confirm that the EMEA Debtors are committing substantial resources to ensuring this happens. However, even once a party produces documents, our experience to date in these proceedings is that, on average, it

takes a further week before those documents become available for review. This is only an average figure, as I understand from EY that the time it takes to make documents available for review varies greatly depending on the format and volume of data. The timing generally breaks down as follows: (a) two days to create and image a hard drive and resolve any issues with the data, (b) two days to process the data and upload it onto the review platform, and (c) one day to run the searches over the data and to batch it to document reviewers. These tasks can only be completed sequentially. It is therefore important to factor this additional time into any analysis of the time that it will reasonably take to review any further document productions. By way of example, the effect of the above is that the latest production of 323,000 documents by the Canadian Debtors, which EY received on August 14, will not be ready for review until August 19 at the earliest.[13]

31.    The document production process has been expensive. Based on the costs incurred by the EMEA Debtors, I would expect that the costs for all of the Estates run into many millions of dollars. If depositions are required to take place before the parties have had an opportunity to review the documents that have been produced, quite apart from the prejudice referred to above, all of the time, money, and resources that have been expended by all parties risks being wasted. At present there is simply not enough time in the current schedule to undertake a meaningful review of the documents in advance of the depositions. The vast majority of the documents will have been produced for no purpose.

---

13.  I should mention one further issue in this context. I understand from the UK Pension Claimants that it appears that some batches of documents that they have received from other parties are not accompanied by the metadata. The missing data is necessary if the documents are to be capable of being searched efficiently, and having good search functionality across all, or at least the vast majority of, produced documents is of course essential given the quantity of documentation that has been produced.

The EMEA Debtors are presently investigating this issue to ascertain whether it also applies to the productions they have received. If so, it may of course be that there are reasons why such metadata is missing. Clearly, however, this issue may add to the challenges faced by the parties in marshalling and interrogating the documents which have been produced, and in preparing for depositions in the timeframe set out in the current timetable.

32.     Proceeding with depositions, including depositions of trial witnesses, without having had an opportunity to review the documents of those witnesses or the vast majority of documents produced by the parties, would ordinarily be unthinkable.  The prejudice that would result to the parties in such a scenario is particularly extreme here, given that a substantial number — potentially as many as half — of the witnesses designated by the parties do not reside within the subpoena power of the Ontario and Delaware Courts.  As a result, the deposition testimony of these witnesses may be the only testimony they give in this case and may, indeed, serve as their trial testimony.

33.     I understand from the US Counsel of the EMEA Debtors that, under US Federal Rule of Civil Procedure 32, the deposition transcript of a witness who lives outside the State of Delaware and more than 100 miles away from the courthouse where the trial is being conducted may be read into the record as trial evidence.  The Canadian Debtors have suggested that this type of rule should apply to the Canadian proceedings as well and discussions on that point are ongoing. In other words, in respect of a substantial number of the parties' witnesses, the deposition transcripts will be — at least in the US proceedings and possibly in the Canadian proceedings as well — usable in Court as trial testimony.

34.     If the parties are required to complete depositions by September 27, 2013, as presently required by the Litigation Timetable and Discovery Plan, they will essentially be forced to do their direct and cross-examinations of witnesses for trial without (a) adequate and proper document production having been completed beforehand, and (b) the parties' legal teams having been allowed a reasonable opportunity to review the documents and prepare for examinations accordingly.

35.     Given that much of the deposition testimony in this case will be admissible as trial evidence, it would be a fundamental breach of the EMEA Debtors' due process rights to have to conduct or defend the depositions without document production being substantially complete and the parties and witnesses having been provided with a reasonable opportunity to review the relevant documents.  No trial would proceed without an adjournment if a party produced hundreds of thousands of documents just prior to the commencement of trial.  In addition, to the extent that any depositions were to take place before all documents have been received and reviewed, there would be a significant risk that certain of the witnesses would have to be re-deposed in light of new information revealed following review of the productions.  The re-deposition of these witnesses would only inconvenience the witness and waste the time and resources of all parties and would risk further delaying the commencement of the trial.

36.     Further, from a practical perspective alone, it is not possible to ensure that all depositions are completed within the next six weeks:  there are more trial witnesses than number of days between now and September 27, 2013 (and this is not even half of the individuals who are currently due to be deposed).  These witnesses are located all over the world and have their own time constraints, not to mention that they too will want time to prepare for the deposition following a review of their own documents.  Even with the best efforts of the parties, and with more than one deposition being conducted per day, the present timetable of September 27, 2013 for the completion of depositions is realistically not going to be met.

F.     **ATTEMPTS TO AGREE REVISIONS TO THE TIMETABLE**

37.     As referred to above, the parties convened on August 6, 2013 for a meet and confer session. Both in advance of that meeting, at the meeting, and subsequently, the EMEA Debtors have sought to engage with the other parties regarding proposed amendments to the timetable.

38.     Given the parties' obligations under the Litigation Timetable and Discovery Plan to inform the Courts regarding difficulties in meeting the contemplated schedule, the EMEA Debtors then raised the parties' inability to comply with the timetable with Justice Morawetz at an attendance on August 8, 2013. At the attendance, the Canadian Debtors suggested that the EMEA Debtors had not made any concrete proposals regarding the proposed amendments to the schedule. Whilst the EMEA Debtors considered that their position was made clear at the August 6 Meeting, a letter was sent on August 12, 2013 to ensure there was no misunderstanding in this regard. (Letter from M. Gottlieb to All Core Parties (Aug. 12, 2013), attached hereto as Exhibit 2.)[14] The Canadian and US Debtors responded on August 13 to indicate that they were prepared to discuss the EMEA Debtors' proposals. (Letters from P. Ruby to M. Gottlieb (Aug. 13, 2013) and from J. Rosenthal to D. Adler (Aug. 13, 2013), attached hereto as Exhibits 4 and 5, respectively.)

39.     Since those letters, the EMEA Debtors have continued good faith discussions with the other parties in an effort to reach agreement on proposed amendments to the schedule. Indeed, the timetable set out in Schedule A reflects amendments in various deadlines we have made in an effort to address specific concerns expressed by the US and Canadian Debtors. Although the Canadian and US Debtors have offered no solution to the impossibility of meeting the current timetable, they have so far not been willing to join a motion to amend the schedule at this time.

---

14. A minor correction was made to the August 12 letter by way of a follow-up email from Matthew Gottlieb. That email is attached hereto as Exhibit 3.

The EMEA Debtors hope to engage in further discussions with them between the date of this Affidavit and the hearing on the motion.

40.     The Litigation Timetable provides at page 9 that any date therein can be amended by agreement of all parties.  The EMEA Debtors are still hopeful that an agreement may be reached on extending the timetable.  In view of the urgency of resolving this issue and their duties to bring this matter to the Courts' attention without undue delay, the EMEA Debtors have felt compelled, pending any consensus of the parties that might be achieved, to proceed by way of this motion.

SWORN BEFORE ME at

L̲O̲N̲D̲O̲N̲ , U̲N̲I̲T̲E̲D̲ ̲K̲I̲N̲G̲D̲O̲M̲ on

August 16, 2013

ALEXI DIMITRIOU

~~Commissioner for taking affidavits~~

SOLICITOR AT

**Ashurst LLP
Broadwalk House
5 Appold Street
London EC2A 2HA**

_____
James Edward Seaton Norris-Jones

**SCHEDULE A**

**PROPOSED REVISIONS TO THE LITIGATION TIMETABLE**

| Deadline | Current Date | Proposed Revised Date |
|---|---|---|
| Date for completion of outstanding production | No date | August 31, 2013 |
| Date for service of privilege logs | No date | September 7, 2013 |
| Date for depositions to begin | No date | September 30, 2013 |
| Deadline to identify experts and the subject matter of their reports | September 13, 2013 | November 27, 2013 |
| Deadline to complete witness depositions, including 30(b)(6) depositions | September 27, 2013 | December 13, 2013 |
| Deadline for service of expert reports | October 4, 2013 | December 20, 2013 |
| Deadline for service of rebuttal expert reports | November 1, 2013 | January 24, 2014 |
| Preliminary pre-trial conference | Week of November 11, 2013 | Week of February 17, 2014 |
| Deadline to complete expert depositions | December 6, 2013 | February 28, 2014 |
| Deadline to file a list of all witnesses and exhibits that each Core Party intends to rely upon as part of its direct case | December 9, 2013 | March 6, 2014 |
| Deadline to file:<br><br>• Pre-trial motions<br>• Pre-trial briefs<br>• All fact affidavits to be used in direct case<br>• All exhibits to be used in direct case<br>• All deposition testimony to be used in direct case | December 13, 2013 | March 14, 2014 |
| Pre-trial conference | Week of December 16, 2013 (if the Courts desire) | Week of March 17, 2014 (if the Courts desire) |
| Beginning of trial | January 6, 2014 | March 31, 2014 (or such later date as is convenient for the Courts) |

## SCHEDULE B

## PRODUCTION STATISTICS FOR THE THREE DEBTORS[1]

### 1. TOTAL PRODUCTION OF THE MAIN ESTATES

**To July 22, 2013 ("Substantial Completion"): 602,095**

**Since July 22, 2013: 367,914[2]**

**Projected Future Production:** Unknown, but likely to be at least 150,000

### 2. US DEBTORS

| Production to July 22, 2013 | |
|---|---|
| **Date** | **Number of Documents** |
| June 10, 2013 | 6,679 |
| July 5, 2013 | 43,259 |
| July 22, 2013 | 69,313 |
| **Total** | **119,251** |

| Production to date | |
|---|---|
| **Date** | **Number of Documents** |
| July 26, 2013 | 15,311 |
| August 2, 2013 | 29,612 |
| **Cumulative total** | **164,174** |

| Projected future production | |
|---|---|
| **Date** | **Number of Documents** |
| Unknown | c. 100,000[3] |

---

1.  Except for the figure relating to the Canadian Debtors' production on August 12, 2013, the information in this Schedule was compiled by Ernst & Young from the Merrill Lextranet database on August 8, 2013.

2.  This figure includes the documents produced by the Canadian Debtors on August 12, 2013, which are not yet available for review.

3.  The US Debtors have indicated that these documents are subject to a joint privilege held by two or more Estates.

1042488582_1

1

## 3. CANADIAN DEBTORS

| Production to July 22, 2013 | |
|---|---|
| **Date** | **Number of Documents** |
| June 10, 2013 | 6,198 |
| July 5, 2013 | 20,228 |
| July 5, 2013 | 9,156 |
| July 22, 2013 | 1,632 |
| July 22, 2013 | 206,171 |
| **Total** | **243,385** |

| Production to date | |
|---|---|
| **Date** | **Number of Documents** |
| August 12, 2013 | 322,991[4] |
| **Cumulative total** | **566,376** |

| Projected future production | |
|---|---|
| **Date** | **Number of Documents** |
| August 31, 2013 | Unknown |

## 4. EMEA DEBTORS

| Production to July 22, 2013 | |
|---|---|
| **Date** | **Number of Documents** |
| June 10, 2013 | 7,346 |
| July 5, 2013 | 3,051 |
| July 22, 2013 | 229,062 |
| **Total** | **239,459** |

| Projected future production | |
|---|---|
| **Date** | **Number of Documents** |
| August 16, 2013 | c.78,000 |
| Later in August 2013 | Unknown |

---

4.    This figure is taken from correspondence sent on behalf of the Canadian Debtors on August 9, 2013.

10/42488582_1

**EXHIBIT 1**

**Goodmans** LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

pruby@goodmans.ca
416-597-4184

August 5, 2013

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006-1470

Dear  Mr. Zelbo:

**Re:**    ***In re: Nortel Networks, Inc.***, **Case No. 09-10138 (KG)**
         **Nortel Networks Corporation, Court File No. 09-CL-7950**

We write in response to your letter of August 3, 2013. We consider your letter to be self-serving record building and thus we feel compelled to go on record ourselves to make it clear that we disagree with almost every aspect of that letter, particularly the unfounded allegation that the Monitor and Canadian Debtors have "run afoul" of their obligations under the Litigation Timetable and Discovery Plan. If the Canadian Debtors/Monitor is offside its productions obligations then all three estates are offside.  We are not prepared to make that bald assertion right now and we are surprised and disappointed that you would do so.

We also find it regrettable that, instead of continuing the productive  informal dialogue that the three estates have had about productions since the last meet and confer, the US Debtors have decided to escalate to a letter writing approach.  The estates have been regularly communicating about production matters, so the surprise mentioned in Mr. Zelbo's letter comes as a surprise to us.

**The Monitor and Canadian Debtors Have Complied with Their Obligations**

On July 22 (clarified the next day), the Monitor and Canadian Debtors certified substantial completion of their productions, based on the documents that had been identified as responsive and not privileged from the processing of the agreed custodian hard drives (with the exceptions noted therein), using the agreed upon search terms. Having applied the agreed privilege search terms, we recognized that some of the documents captured by them were not, in fact privileged, and have been manually coding as non-privileged many of the documents that had hit the privilege search terms. That process was underway at the time we certified substantial completion of the production of the relevant/non-privileged hits and it continues today.  On July 22 we listed by name exactly which custodians had been processed and transparently listed what remained to be done and certified substantial completion based on the status of our searches for the relevant and non-privileged custodian records that the Monitor and Canadian Debtors had originally been assigned to process.  From time to time we have informally updated the other

**Goodman's** LLP

estates about our progress.  Contrary to the assertion in Mr. Zelbo's letter, we did not advise that we only needed a week and a half beyond July 22 to complete any part of our production.

The Monitor and Canadian Debtors have borne a more significant production burden than any other estate.  More than 2.1 million custodian records hit the relevance search terms, a large proportion of which also hit the privilege search terms (in most cases over 80%).  The Monitor and Canadian Debtors could have exercised their rights under the agreed reservation of rights and ceased all further efforts to review and re-categorize the documents that hit the privilege search terms, and could have refused to re-process certain custodians whose data had been searched and produced previously using different search terms, on the basis that the efforts this would entail were disproportionate and unduly burdensome.  Had the Monitor and Canadian Debtors simply stopped there and declared all additional work unduly burdensome or taken review shortcuts (as the other estates have apparently done, in varying degrees), we would have been in a position to have had produced all responsive processed documents that did not hit the privilege search terms and produce a complete set of privilege logs by next week, together with the records with respect to which the Canadian estate shares a joint privilege with one or both of the other estates.

Instead, we continued our efforts, which were burdensome, to not only manually review and re-categorize the documents that hit the privilege search terms but also to extract further potentially responsive data from additional hard drives, archive files, the Global Patent System and record repositories such as Livelink.  Instead of resting on our laurels, we continued to work on the four categories of documents identified in our July 22 letter as problems that had not yet been solved, and addressed the additional processing requested by EMEA.  As we have conveyed to the other estates informally, in part, with respect to these five categories of documents:

(a)     We have located, downloaded and processed the hard drives and/or back-up server data of the custodian media with respect to which we had encountered difficulties, namely Khush Dadyburjor's server backup, Elena King's server backups, and all of Anna Ventresca's data (the Dadyburjor and King hard drives were previously addressed).  This media contained an unexpectedly large number of documents (760,651 documents), 532,299 of which hit the relevance search terms and 479,756 of which also hit the privilege search terms.  **By the end of this week, we expect to have produced all of the remaining custodian data that is responsive but did not hit the privilege search terms, including through a production of over 300,000 documents this week.**

(b)     We have found that on average, when manually reviewed, approximately 62% of the custodian documents that hit the privilege search terms not to be privileged, in respect of the agreed custodian records.  We continue to work our way manually through the documents hit by the privilege search terms and have produced, and will continue to produce, those found not to be privileged on a rolling basis.  To date the Monitor and Canadian Debtors have manually coded with respect to privilege approximately one million documents (including coding as non-privileged, Canada-only privilege,

**Goodmans** LLP

Canada/US privilege, etc).   The joint privileged documents will be produced (to whichever party or parties share the privilege and anyone else determined to be entitled to receive them in this proceeding) with the privilege logs once we have completed the privilege review.  That is expected to occur by the end of August.

(c)     We continue to discuss with you the viability and burden of extracting, processing and reviewing for privilege the voluminous responsive data from Nortel's non-custodian records (for example, residing in shared servers such as LiveLink), in respect of which we expect that there will be at least some shared privileges.  The assessment of relevance, potential for duplication and the obligations and burdens associated with this data do not rest solely on the Monitor and Canadian Debtors as the US Debtors also have LiveLink and may have had access to other shared servers as well.

(d)     The Monitor and Canadian Debtors have found a way to grant the Core Parties working access to the Global Patent System and have made such access available.

(e)     The Monitor and Canadian Debtors had processed, reviewed and produced custodian records of Peter Look, Karina O, John Poos, Katharine Stevenson, John Doolittle and Peter Currie, which were key-word searched using search terms developed at the time of the mediation.  In July, the Joint Administrators requested that the Monitor and Canadian Debtors prioritize and re-process this data.  Reserving all of their rights, the Monitor and Canadian Debtors have complied with this request.  This has resulted in another 221,389 documents that hit the relevance search terms, 158,137 of which also hit the privilege terms.  Adding these documents to the privilege review workflow on a priority basis has delayed the privilege review of other records.  The records that hit the relevance search terms and not the privilege search terms are included in the productions that you will be receiving this week.  The privilege review and any re-characterization (as not-privileged) remains underway and those records determined not to be privileged will be included in the productions over the weeks that follow as they work their way through the manual review process.

The bottom line is that the parties will have this week all the Canadian custodian records that did not hit the privilege search terms. By this week the parties will also have hundreds of thousands of documents that hit the privilege search terms but were manually reviewed and found not to be privileged.  While our privilege review will not be completed until later in August, we could be in a position next week to produce, on a rolling basis, documents with multiple estate privilege designations, with a privilege log, if the other estates agreed to do so as well. Obviously, the end of our privilege review and any resulting production will lag behind the end of our production from any remaining sources.

**The US Debtors' Approach to Production**

The US Debtors have taken the position that raw numbers govern whether a party has produced on time and appropriately.  This is not the correct approach.  Quality, and not merely quantity, is what matters.

Based on the limited information available we note the following differences in the approach taken by the US Debtors which may account for the US Debtors' having a disproportionately smaller set of records to process and review and your premature declaration of completion::

1.     The US Debtors chose not to run the complete set of search terms against all custodian records (all rights continue to be reserved in this regard).

2.     The US Debtors have not processed server data for custodians where they had already searched and reviewed the hard drives of a custodian. (All rights continue to be reserved in this regard).

3.     Without the transparency we requested and despite having been told that we had received advice that the data set in this matter was unlikely to yield reliable results and that predictive coding was inappropriate in this case, we understand that the US Debtors have used predictive coding technology.  We reserve the right to request that the US Debtors re-do manually any portion of their document review they did with predictive coding and await the disclosure about your predictive coding that we previously requested.

4.     The number of documents produced by the US Debtors, and ratio between relevance search term hits and production, is strongly indicative that they production approach they used was too restrictive.  (We found that the relevance search terms were a reasonably good predictor of responsiveness to the consolidated document requests.)

5.     The US Debtors have not undertaken a full-scale review and have not made uniform production from their instance of LiveLink.

**Unilateral Demands**

We do not accept as reasonable or appropriate the demands that you have made or the deadlines you have imposed.  The Monitor and Canadian Debtors will continue to work, as they have been to date, diligently and tirelessly to try to enable the parties to meet the Litigation Timetable.  We also remain open to suggestions for dealing with the production and handling at depositions of documents over which a joint estate privilege has been identified.  We consider your threat to go to Court to be unproductive.  The parties have an obligation to do everything possible to meet the schedule and until we get closer to September 27 we will not be able to properly assess whether there is a problem.  We continue to reserve all rights on behalf of the Monitor and Canadian

**Goodmans** LLP

Debtors and will bring the matters noted herein to the attention of the Courts at the appropriate time, if need be.



Copy: Neil Oxford/Derek Adler (Hughes Hubbard)

\6233414

**EXHIBIT 2**

**MATTHEW P. GOTTLIEB**
Direct: (416) 644-5353
mgottlieb@counsel-toronto.com
File No.: 12379

**LAX O'SULLIVAN SCOTT LISUS LLP**
Suite 2750, 145 King Street West
Toronto ON  M5H  1J8  Canada
Tel: 416 598 1744  Fax: 416 598 3730



August 12, 2013

**BY EMAIL**

TO:  CORE PARTIES SERVICE LIST

Dear Counsel:

**Re:    In the Matter of Nortel Networks Corporation, et al.**

We are writing with respect to the issues the EMEA Debtors and UKPI have previously raised regarding the Core Parties' compliance with the Litigation Timetable and Discovery Plan and resulting changes that are needed to the schedule going forward. These issues were discussed at the meet and confer on August 6, 2013, and during the appearance before Justice Morawetz on August 8, 2013.  At the appearance before Justice Morawetz, the Canadian Debtors suggested that we had not put forward a proposal with respect to proposed amendments to the schedule.  So as to avoid any confusion or misunderstanding regarding our discussions, our proposal is set out below.

We, like all parties, wish to progress the matters as expeditiously as possible and have been working towards a January 6 trial date. However, given the current status of this proceeding and being realistic, we have serious concerns about the feasibility of this because of the matters set out below. We all have duties to the courts and to our clients regarding the need for a proper trial and court process. In view of the significance of the issues and the matter generally, we have determined that it is appropriate to seek variations to the timetable. Clearly it would be sensible and in our view appropriate that this is dealt with by consent.

As you know, the trial is scheduled to begin on January 6, 2014. The Litigation Timetable and Discovery Plan, approved by Justice Morawetz on May 15, 2013 and Judge Gross on May 17, 2013, requires that document production be substantially complete by July 22, 2013, and that, following the completion of document production, depositions of fact witnesses would be completed by September 27, 2013. Each of the steps in the Litigation Timetable and Discovery Plan necessarily flow from the completion of these earlier steps. There can be no meaningful or appropriate examination of witnesses without prior production of documents and a reasonable opportunity to review them.

**May 3, 2013 Endorsement of Justice Morawetz**

On May 3, 2013, Justice Morawetz issued an endorsement (the "**Endorsement**"), providing reasons in respect of the joint hearing, heard April 23, 2013, addressing the Litigation Timetable

- 2 -

and Discovery Plan that was filed with the Court on April 22, 2013 in respect of which submissions were made at the hearing of the motion.

The Endorsement explicitly provides in paragraph 14 that fact discovery will last 4.5 months. In this regard, Justice Morawetz held:

> [15]   In making this determination, I have taken into account that the EMEA Claimants and the U.K. Pension Claimants are major creditors in the global Nortel Insolvency and it is necessary to ensure that they have the full opportunity to put forth their case, within the confines of the trial schedule.

**Consolidated Document Requests**

The Litigation Timetable and Discovery Plan required the parties to serve "limited and specific requests for production of non-privileged documents" by May 22, 2013. The deadline for supplemental document requests was June 3, 2013.

On May 22, 2013, in accordance with the Litigation Timetable and Discovery Plan, the Core Parties served their first document request lists.

Given the large number of disparate document requests served by each of the Core Parties, the Core Parties undertook successful negotiations in order to agree on  a consolidated list (the "**Consolidated Document Requests**") that would limit the number of document requests and scope of discovery as well as avoid unnecessary objections or motions to compel documentary production. These negotiations among the Core Parties took a number of weeks and the Consolidated Document Requests were finalized on June 20, 2013. The Consolidated Document Requests consist of 140 separate document requests, some of which contain multiple sub-parts. The Consolidated Document Requests described the documents all Core Parties agreed to locate and produce, and delineated the scope of documentary discovery in these proceedings.

The Canadian, U.S. and EMEA Estates separately negotiated a protocol setting out agreed search terms to be used and custodians to be searched for the purpose of making document productions (the "**Production Protocol**") that would satisfy the Consolidated Document Requests. The Production Protocol was not finalized by the three estates until June 28, 2013. As a result the estates did not have clarity as to what documents they were to search for and produce until June 28, more than five weeks beyond the date provided for in the Discovery Plan. Further, much of the material to be reviewed by the EMEA Estate was not in the control of the EMEA Estate and had to be provided by Canada.  This material was delivered in a number of tranches, the last of which was only provided on July 22, 2013, the date on which document production was due to be substantially complete.

**Documentary Production to Date**

On July 3, 2013, each of the Core Parties was required to certify substantial progress with regard to the production of documents.  Although each of the Core Parties made the required certification, the actual volume of documents that had been produced by this date was relatively small.

On July 22, 2013, the Core Parties were required to certify substantial completion with regard to the production of documents. Although each of the Core Parties made the required certification, each of the estates acknowledged that some responsive documents were still being gathered and that further productions would be made.

On August 2, 2013, the US Debtors produced a further 29,612 documents and advised that their documentary production was complete.

**Documentary Production is Not Complete**

Despite the best efforts of the Core Parties, and notwithstanding each Core Party's certification on July 22, 2013, documentary production is not nearly complete. As a result, the Core Parties are not in compliance with the Litigation Timetable and Discovery Plan.

At a minimum, the following documentary production based on the agreed upon Consolidated Document Requests and Production Protocol remains outstanding:

1. The EMEA Debtors anticipate producing a further 50,000 to 100,000 documents in two tranches shortly.
2. The UK Pension Claimants anticipate making a further production of approximately 10,000 documents shortly.
3. The Monitor, on behalf of the Canadian Debtors, has  indicated that it will be providing hard drives containing 322,991 documents to the Core Parties on August 12, 2013.  This material does not represent its final production.  At the meet and confer on August 6, the Monitor advised that it cannot definitively say when documentary production on behalf of the Canadian Debtors will be complete, but advised that there are 200,000 further documents (in addition to the 300,000 odd referenced above) that need to be reviewed for privilege and production which it hopes to complete by the end of August or early September.
4. The US Debtors have indicated that they have approximately 100,000 documents subject to joint privilege with the other Estates to review that have not been produced. They are not yet in a position to advise when that document review will be completed, or to whom those documents will be produced.

In total, there a minimum of 700,000 documents that remain to be produced by the Core Parties that are responsive to the Consolidated Document Requests, and therefore need to be produced by the Core Parties in order for document production to be complete.  At best, these will be produced by the end of August.  A number of subpoenas and letters of request seeking documents from third parties are also outstanding and will result in a substantial volume of further documents being produced to the parties in the coming weeks.  Finally, once the production of documents has been completed, each Core Party must serve a privilege log.  At the recent meet and confer session, each of the three estates agreed to provide its privilege log by September 7, 2013.

**Document Review**

Because of the volumes of documents being produced in electronic form, there is an inevitable time delay between production by a party and the availability of documents for review by other Core Parties. It has generally taken about one week to upload and configure the documents produced in a given tranche in order to have them available for review. Thus, assuming that the parties do in fact complete their document productions during the month of August, the full set of production materials, comprising over 1.4 million documents, will not be available for review until the second week of September.

All parties should have a reasonable opportunity to review the materials that have been produced in advance of depositions.  Depositions are currently required to be <u>completed</u> by September 27, 2013.  It would be unrealistic to suggest that the parties can reasonably meet this deadline.

- 4 -

## Number of Designated Deponents

The Core Parties have identified a total of 113 witnesses to be deposed. While the Core Parties are working together to reduce the number of proposed deponents, the number of depositions to be scheduled will still be large. Each of the Core Parties will be required to determine which documents are applicable to each of these witnesses, prepare for depositions, and ensure their own witnesses are prepared for examination. It is simply not possible to properly complete these tasks in the time currently allotted.

## Use of Deposition Transcripts at Trial

The Litigation Timetable and Discovery Plan provides at section 6, page 10, of the Discovery Plan that:

> Designated portions of any examination/deposition may be filed as part of the evidence that any Discovery Participant may rely upon at trial in accordance with the usual rules that apply in the Canadian and US Courts, respectively.

The Canadian Debtors take the position that, in accordance with the U.S. Federal Rules, evidence given at examinations should be available to be tendered as part of the evidentiary record in the Canadian proceedings. While we agree that it would be preferable if the depositions could be used in the Canadian proceedings (Allocation and Canadian Claims) any use of the depositions must comply with the "usual rule" in the Ontario Courts.  Ontario (and Canadian) law clearly provides that a meaningful opportunity must be given to have the benefit of the documents which will be produced prior to commencing examinations which will form part of the trial record. Therefore, the parties must be given the appropriate ability to review and use the documents before the depositions commence.

## Purpose of Documentary Production and Examinations

Documentary production and examinations are intended to achieve a level of disclosure so that each side can proceed efficiently, effectively and expeditiously towards a fair hearing, knowing exactly the case each has to meet. It invokes a fundamental principle of justice – the right to a fair trial. Neither Justice Morawetz, nor any counsel took issue at the appointment last Thursday with the statement of the Supreme Court of Canada held in SCC in **Sierra Club of Canada v. Canada (Minister of Finance)**, 2002 CarswellNat 822:

> 50      Aside from this direct commercial interest, if the confidentiality order is denied, then in order to protect its commercial interests, the appellant will have to withhold the documents. This raises the important matter of the litigation context in which the order is sought. As both the motions judge and the Federal Court of Appeal found that the information contained in the Confidential Documents was relevant to defences available under the CEAA, the inability to present this information hinders the appellant's capacity to make full answer and defence or, expressed more generally, the appellant's right, as a civil litigant, to present its case. In that sense, preventing the appellant from disclosing these documents on a confidential basis infringes its right to a fair trial. Although in the context of a civil proceeding this does not engage a Charter right, the right to a fair trial generally can be viewed as a fundamental principle of justice: M. (A.) v. Ryan, [1997] 1 S.C.R. 157 (S.C.C.), at para. 84, per L'Heureux-Dubé J. (dissenting, but not on that point). Although this fair trial right is directly relevant to the appellant, there is also a general public interest in protecting the right to a fair trial. Indeed, as a general proposition, all disputes in the courts should be decided under a fair

trial standard. The legitimacy of the judicial process alone demands as much. Similarly, courts have an interest in having all relevant evidence before them in order to ensure that justice is done.

The legitimacy of this trial process requires that the Core Parties all be provided a reasonable opportunity to review the complete set of relevant productions and to prepare for a meaningful examination of the witnesses. This is especially so with respect to examinations that will be trial evidence. It is simply unheard of that in Canadian proceedings a party be required to conduct examinations, let alone trial examinations, when it is clear that party has not been provided with all relevant documents and time to review and use those documents.

**Expert Evidence**

Expert evidence will be based, in part, on documentary production and the factual record adduced during depositions. As a consequence, expert reports cannot be finalized and served until these steps are completed.

**Notification of the Core Parties**

The Litigation Timetable and Discovery Plan provide at section 9, page 14, of the Discovery Plan that:

> The Discovery Participants recognize that, as additional information becomes available, it may become apparent that: (a) it is impracticable or impossible for a Discovery Participant to comply with the terms of the Discovery Plan, or to do so in a time-efficient or cost-effective manner, or (b) further steps, beyond those set out in this Discovery Plan, are required in order for a Discovery Participant to obtain access to potentially relevant documents, information or witness testimony. Each Discovery Participant agrees to notify the other Discovery Participants promptly when it reasonable believes that it will not comply with any term of the Discovery Plan or when it reasonably concludes that further steps beyond those set out in this Discovery Plan are required. The Discovery Participants agree to negotiate in good faith with respect to any amendments to the Discovery Plan requested by a Discovery Participant on that basis, and to seek the assistance of the Court(s) when appropriate in order to resolve disputes between the Discovery Participants.

As required by this provision, and in recognition of the principles of communication, cooperation and common sense endorsed by the Commercial List, the EMEA Debtors and UK Pension Claimants previously advised the Core Parties that it has become apparent that the Core Parties are not in compliance with the Litigation Timetable and Discovery Plan and that it is impossible for them to comply with its terms moving forward.   We provide this letter in accordance with our obligation to negotiate in good faith with respect to amendments to the Discovery Plan that are necessary in order to address the production of a massive volume of documents after the intended deadlines.

**Proposal**

The Litigation Timetable and Discovery Plan provides at page 9 of the Litigation Timetable that:

> Any date in this Litigation Timetable may be amended by the written agreement of all Core Parties, submitted to the US Court through the filing of a certification of counsel and to the Canadian Court through the filing of a letter from the

Monitor to Justice Morawetz on notice to the Core Parties. Any Core Party may also file a motion with the applicable Court or Courts to modify this Litigation Timetable upon a showing of good cause.

For the reasons set out above, we propose that the relevant portions of the Litigation Timetable and Discovery Plan be amended in accordance with the following:

| Deadline | Current Date | Proposed Revised Date |
|---|---|---|
| Date for completion of outstanding production | No date | August 31, 2013 |
| Date for service of privilege logs | No date | September 7, 2013 |
| Date for depositions to begin | No date in current schedule | September 30, 2013 |
| Deadline to identify experts and the subject matter of their reports | September 13, 2013 | November 27, 2013 |
| Deadline to complete witness depositions, including 30(b)(6) depositions | September 27, 2013 | December 13, 2013 |
| Deadline for service of expert reports | October 4, 2013 | December 23, 2013 |
| Deadline for service of rebuttal expert reports | November 1, 2013 | January 27, 2014 |
| Preliminary pre-trial conference | Week of November 11, 2013 | Week of February 17, 2014 |
| Deadline to complete expert depositions | December 6, 2013 | March 3, 2014 |
| Deadline to file a list of all witnesses and exhibits that each Core Party intends to rely upon as part of its direct case | December 9, 2013 | March 6, 2014 |
| Deadline to file:<br><br>• Pre-trial motions<br>• Pre-trial briefs<br>• All fact affidavits to be used in direct case<br>• All exhibits to be used in direct case<br>• All deposition testimony to be used in direct case | December 13, 2013 | March 4, 2014 |

- 7 -

| Pre-trial conference | Week of December 16, 2013 (if the Courts desire) | Week of March 17, 2014 (if the Courts desire) |
| Beginning of trial | January 6, 2014 | March 31, 2014 |

The proposed amendments take into account the following information, which was not available to the Core Parties at the time the Litigation Timetable and Discovery Plan was implemented:

1. The Core Parties have produced more than 1,000,000 documents.
2. The Core Parties have, at this time, identified 113 witnesses to be deposed. The Core Parties will be required to identify documents relevant to each of these witnesses, prepare for depositions, and prepare their own witnesses for examination.
3. The Core Parties reasonably expect that it will take 10 weeks to complete depositions of 113 witnesses.

The EMEA Debtors and UK Pension Claimants propose that the remainder of the Litigation Timetable and Discovery Plan be adjusted accordingly.

The EMEA Debtors and UK Pension Claimants are proposing this amendment to the Litigation Timetable and Discovery Plan in order to uphold the integrity of the trial process and to ensure that each of the Core Parties can proceed efficiently, effectively and expeditiously towards a fair hearing, knowing exactly the case each has to meet.

We are available to confer with you further with respect to the above proposal. However, we believe the matters addressed herein must be raised with the Canadian and U.S. Courts promptly in accordance with the Parties' obligations under the Discovery Plan. Accordingly, please advise whether you will consent to an amendment of the Litigation Timetable and Discovery Plan in the manner substantially in accordance with what is set out above by close of business on Tuesday, August 13, 2013, failing which we will file a motion with the U.S. and Canadian Courts, as contemplated in the Litigation Timetable and Discovery Plan.

Yours truly,

Matthew P. Gottlieb

MPG/amh

**EXHIBIT 3**

## Tabatabai, Fara

| | |
|---|---|
| **From:** | Anne Marie Harkin <aharkin@counsel-toronto.com> |
| **Sent:** | Monday, August 12, 2013 3:12 PM |
| **To:** | Abid Qureshi; Adam Hirsh; Adam Slavens; ainslie.benedict@nelligan.ca; Albert Pisa; Alexander Cobb (acobb@osler.com); Andrea McEwan; Andrew Gray; Andrew Hanrahan; Andrew LeBlanc; Angela Dimsdale Gill; Angela Pearson; Annie Cordo; Antonia Croke; Ari Kaplan; Arthur Jacques; Atara Miller; Barabara Grossman; Barbara Boake; Barbara Walancik; Barry Wadsworth; Ben Hemington; Ben Zarnett; Betsy Putnam; Bill Burden; Brad Kahn (bkahn@akingump.com); Brian O'Connor; Bruce Leonard; Bryan McLeese; Byron Shaw (bdshaw@mccarthy.ca); Charlene Davis; Huberty, Charles; Chris Armstrong (carmstrong@goodmans.ca); Christine Doniak; Christopher Horkins; Christopher Rootham; Christopher Samis; Craig Barbarosh; D.J. Miller; Dan Queen; Daniel Guyder; Daniel Lowenthal; Darryl Stein; David Botter; David Crichlow; David Ward; Derek Abbot; Adler, Derek J.T.; derrick.tay@gowlings.com; Ed Harron; Ed Lamek; Edward Sellers; Elder Marques; Tabatabai, Fara; Farah Lisa Whitley-Sebti; Fred Hodara; Fred Myers; Gabrielle Ruha; Gavin Finlayson; Howard Zelbo; Jacqueline Moessner; James Bromley; James Doris; James Gage; James Norris-Jones; James Szumski; Janice Payne; Jay Carfagnini; Jeffrey Rosenthal; Jennifer Harris; Jennifer Stam; Jessica A. Kimmel; John Dorsey; John Finnigan (jfinnigan@tgf.ca); John Salmas; John Tillman; Jonathan Bell; Jonathan Cho; Joseph Badtke-Berkow; Joseph Pasquariello; Justice Alberto; Karen Dine; Karen Jones; Kathleen Murphy; Ken Coleman; Ken Rosenberg; Kenneth Kraft; Kevin Zych; Lara Jackson; Laura Hall; Lewis Gottheil; Lily Harmer; Lisa Schweitzer; Luis Sarabia; Lyndon Barnes; Mark Zigler; Marla Decker; Mary Caloway; Matthew Bullen; Matt Gottlieb; Max Starnino; Zhen, Mei Li; Michael Barrack; Michael Hirschfeld; Michael Lang; Michael Riela; Michael Wunder; Michelle Jackson; Murray McDonald & Brent Beekenkamp; Neil Forrest; Oxford, Neil; Nick Bassett; Nicolette Ward; Paul Keller; Paul Michell; Paul Steep; Peter Ruby; Rachel Pojunas; Rebecca Lewis; Richard Hans; Richard Swan; Robert Johnson; Robin Schwill; Ryan Jacobs; S.  Richard Orzy; Sameer Advani; Samir Vora; Sara-Ann Van Allen; Scott Bomhof; Sean Campbell; Sean Zweig; Selinda Melnik; Shayne Kukulowicz; Sheila Block; Sheryl Seigel; Steven Levitt; Sunny Gulati; Susan Philpott; Thomas Kreller; Thomas McRae; Timothy Hoeffner; Tina Lie; Tom Matz; Tony DeMarinis; Tracy Wynne |
| **Cc:** | Matt Gottlieb |
| **Subject:** | In the Matter of Nortel Networks et al. [IWOV-CLIENT.FID5923] |

It has come to our attention that there was a typo on p. 6 in the date with respect to the deadline to file Pre-trial motions, Pre-trial briefs, etc.  The date should be March 14 not March 4.

We apologize for the error.

**Anne Marie Harkin**
Assistant to Matthew Gottlieb,
Paul Fruitman and Matthew Law
Direct: (416) 849-9048
aharkin@counsel-toronto.com

**Lax O'Sullivan Scott Lisus LLP**
Suite 2750, 145 King Street West
Toronto ON  M5H 1J8  Canada
T 416 598 1744  F 416 598 3730
counsel-toronto.com



This e-mail message is confidential, may be privileged and is intended for the exclusive use of the addressee. Any other person is strictly prohibited from disclosing, distributing or reproducing it. If the addressee cannot be reached or is unknown to you, please inform us immediately by telephone at 416 598 1744 at our expense and delete this e-mail message and destroy all copies. Thank you.

**EXHIBIT 4**

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4184
pruby@goodmans.ca

# Goodmans LLP

August 13, 2013

Our File No.: 083800

**By Email**

Matthew Gottlieb
Lax O'Sullivan Scott Lisus LLP
145 King Street West
Suite 2750
Toronto ON M5H 1J8

Dear Mr. Gottlieb:

Re:    **In Re: Nortel Networks Inc., Case No. 09-10138 (KG) and
       Nortel Networks Corporation, Court File No. 09-CL-7950**

Thank you for your letter dated August 12, 2013.  While we have a different perspective and specific comments on much of the history and assertions upon which you premise the proposal of the EMEA Debtors and UKPI for a revised litigation timetable and a new trial date, we would be pleased to meet and confer with you about streamlining the litigation process and the proposal set out at pages 6 and 7 of your letter.

The first five pages of your letter describe your view of the background underlying the EMEA Debtors and UKPI proposal for a revised litigation timetable.  We take to heart Justice Morawetz's remarks last week about avoiding letter writing as a building-the-record exercise and refrain on commenting point by point about the content of your letter.  As was said when you canvassed many of these points at the August 8, 2013 attendance before Justice Morawetz, we will respond to these arguments and make our own submissions, if necessary, at the appropriate time.  Our lack of response now (or in court) should not be taken as concurrence with them, however, we believe that to engage in such an exercise at this time will be counter-productive to the good faith negotiations that we hope to engage in with you and the other Core Parties with a view to streamlining the process to get us to the earliest possible trial date,

In the interests of clarifying the foundation for our discussions, we address the following matters raised in your letter (and reserve our position/response on the balance of the points):

- As we have expressed previously, the Monitor and Canadian Debtors are of the view that there are witnesses who can be deposed before productions are fully complete.

**Goodmans** LLP

- The Monitor and Canadian Debtors have not taken the position that any of the Core Parties are not in compliance with their obligations under the Litigation Timetable and Discovery Plan, although they reserve their rights to do so.

- The Consolidated Documents Requests (and the Discovery Plan) included a heavily negotiated reservation of rights, including the right of a party to limit production on the basis that production "would be unduly burdensome or violate the principle of proportionality".

- We have written to the Core Parties today with an update on the status of the productions from the Monitor and the Canadian Debtors. We did not indicate at the August 6 meet and confer that we expected a specific number (200,000 is what you refer to on page 3 of your letter) of further productions to come. To be clear, we do not know the number of further productions, as it depends on the outcome of the ongoing review of the privilege cull.

- The Monitor and Canadian Debtors are concerned about the time and volume of production that may flow from the outstanding third party subpoenas and letters of request. Such third party discovery may be problematic under even the revised timetable proposed by EMEA/UKPC and this needs to be addressed.

- The Monitor and Canadian Debtors' proposal with respect to the use of deposition transcripts at trial is more nuanced than as described in your letter. We anticipate continuing to discuss this subject with you and the other Core Parties.

We look forward to speaking with you about how the documentary productions and depositions can be streamlined in order for us to be ready for the earliest possible trial date, whether that be January 6, 2014 or the alternative date you have proposed or some other date as may be directed by the Courts.

Yours truly,

**Goodmans LLP**

Peter Ruby

Copy: Core Parties Service List

6235657

**EXHIBIT 5**

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW

FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG

BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial: +1 212 225 2086
E-Mail: jrosenthal@cgsh.com

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
DONALD A. STERN
CRAIG B. BROD
SHELDON H. ALSTER
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
JOHN PALENBERG
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
FILIP MOERMAN

PAUL J. SHIM
STEVEN L. WILNER
ERIKA W. NIJENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRALDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN

ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
JONATHAN S. KOLODNER
HUGH C. CONROY JR
KATHLEEN M. EMBERGER
WALLACE L. LARSON JR
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
RESIDENT COUNSEL

August 13, 2013

**VIA EMAIL**

Derek Adler, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482

Re: *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG)
    Nortel Networks Corporation, Court File No. 09-CL-7950

Dear Derek:

      I write on behalf of the U.S. Debtors in response to your co-counsel Matt Gottlieb's letter of yesterday regarding the EMEA Debtors' view that the current litigation schedule needs to be extended.

      Without expressing agreement or disagreement with any aspect of Matt's letter, because his letter requested a response from other parties today, I wanted to send you this brief note.

      As you know, since the EMEA Debtors raised the subject of a possible extension before Justice Morawetz last Thursday, you and I have had a regular dialogue on the subject, which I have found to be quite productive. While I cannot commit at this time to the ultimate

Derek Adler, Esq., p. 2

position of the U.S. Debtors and other members of our discovery group, we are interested in continuing our dialogue to see if we can reach a common understanding.

Very truly yours,

Jeffrey A. Rosenthal

cc: Matt Gottlieb, Esq.
    Jessica Kimmel, Esq.
    Abid Qureshi, Esq.
    Sheila Block, Esq.