MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

DEREK C. ABBOTT
302 351 9357
302 425 4664 FAX
dabbott@mnat.com

September 11, 2013

**VIA HAND DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 N. Market St., 6th Floor
Wilmington, DE 19801

Re: In re: Nortel Networks Inc., et al., Case No. 09-10138 (KG)

Dear Judge Gross:

Pursuant to the Court's direction that the parties bring discovery disputes to Your Honor's attention by letter,[1] on behalf of the U.S. Debtors with the agreement of the Official Committee of Unsecured Creditors (together, the "U.S. Interests"), we raise herein five specific discovery disputes we have with the Joint Administrators, who have filed separate proofs of claims before this Court on behalf of numerous individual EMEA Debtors (the "EMEA Claims" and "EMEA Claimants"), and the EMEA Claimants themselves. At the outset, the U.S. Interests apologize for the length of this letter, which is necessitated by the number of issues in dispute. While the parties have engaged in considerable efforts during the past six months to resolve discovery disputes without Court intervention, the EMEA Claimants and Joint Administrators are refusing to comply with certain important discovery requests. These refusals threaten to impede the U.S. Interests' ability to defend against the EMEA Claims, leaving the U.S. Interests no choice but to seek judicial intervention at this time, particularly in light of the imminent start of depositions.

The five discovery disputes are as follows:

- The EMEA Claimants – each of whom have filed multi-million dollar claims against the U.S. Debtors – have refused to respond separately to

[1] May 15, 2013 email from Your Honor to Annie Cordo and Derek Abbott; Hr'g Tr. Mar. 27, 2013, 30:3-21.

certain interrogatories, instead supplying us with a single, lumped response on behalf of the EMEA Debtors collectively, naming primarily witnesses from Nortel Networks UK Limited ("NNUK") and a handful of other EMEA Claimants, but no one from many of the remaining EMEA Claimants.

- The Joint Administrators refuse to appear for depositions.
- The EMEA Claimants will not agree for each to appear for "representative party" depositions.
- The Joint Administrators, all but one of whom are partners in Ernst & Young LLP ("E&Y UK"), refuse to assist in securing the production of documents from E&Y UK.
- Despite certifying the "substantial completion" of their document production on July 22 and repeatedly advising us that their remaining production was relatively small, only after obtaining an extension of the trial date from this Court did the EMEA Claimants reveal to us that more than half of their non-privileged documents had not been produced through their production last Wednesday night. As a result, the U.S. Interests will need an opportunity to follow up with certain witnesses whose documents have only now been produced.

**1) The EMEA Claimants' Refusal to Respond to Certain "Consolidated" Interrogatories**

In May, the parties collectively served each other with more than a thousand document requests and hundreds of interrogatories. Recognizing that such a large number of requests was unmanageable, the U.S. Debtors proposed and drafted a set of "consolidated" document requests and interrogatories to which all parties would respond as applicable, along with a "mutual reservation of rights" that enabled the parties to dispense with individual objections to the consolidated requests. After an in-person conference in Toronto followed by several telephonic meet and confers during which all parties had an opportunity to propose additions, deletions and edits to these proposed consolidated requests and reservations of rights, all parties accepted a single consolidated set of discovery requests.

One important feature of the consolidated requests was the inclusion of a number of "most knowledgeable person" interrogatories. These agreed-upon interrogatories required the parties to identify the persons "associated with you" most knowledgeable about particular subjects relevant to the EMEA Claims (and/or the allocation dispute or the claims brought by the Nortel U.K. Pension Trust Limited and the Board of the Pension Protection Fund (the "U.K. Pension Claimants")). Interrogatories of this type are standard in any litigation, as they enable parties to identify potential deponents. The U.S. Debtors made clear at the outset that these

requests required responses by each of the EMEA Claimants that filed separate claims against the U.S. Debtors.

Notwithstanding that individual EMEA Claimants are pursuing separate and distinct claims against the U.S. Debtors, the EMEA Claimants' initial responses did not name knowledgeable witnesses associated with each of the individual EMEA Claimants for many topics, even where the proofs of claim filed by those EMEA Claimants make allegations concerning the topics. Instead, the Joint Administrators served a single set of responses on behalf of the "EMEA Debtors" collectively, that in many cases name representatives of just a handful of the EMEA Claimants and in some cases only NNUK. The U.S. Debtors rejected the Joint Administrators' insufficient responses and engaged in several meet and confers seeking an adequate response. As a compromise, the U.S. Debtors identified sixteen particular interrogatories as to which we insisted that responses be provided by each individual EMEA Claimant or at least certain additional EMEA Claimants.[2] In return, we offered to accept the EMEA Claimants' limited responses to the remaining requests. In response to this offer, the Joint Administrators agreed to review and supplement their interrogatory responses.

On August 2, the Joint Administrators supplemented their interrogatory responses. However, they continued to fail to identify even a single knowledgeable witness (or make the aforementioned representation) for most of the EMEA Claimants in respect of the sixteen interrogatories at issue.

To provide the Court with just three examples:

- Interrogatory No. 5 requires the identification of persons most knowledgeable about Nortel's transfer pricing arrangements, including but not limited to the operation of the RPSM, the execution and negotiation of the MRDA and the impact of the RPSM on the EMEA entities.[3]

- Interrogatory No. 10 requires the identification of persons most knowledgeable about R&D Funding and Strategy.

- Interrogatory No. 12 requires the identification of persons most knowledgeable about policies governing which Nortel entity or entities would contract with customers, record or receive revenue earned from customers and market, sell, supply, install or service Nortel products in each jurisdiction or territory of an EMEA entity.

---

2 The U.S. Debtors advised that for certain of these interrogatories, we would accept, if true, a written representation from any individual EMEA Claimant that it had no involvement with regard to the subject matter and, for that reason, would not have any knowledgeable witness. We told Joint Administrators that this representation was much different from one by the Joint Administrators which simply stated that they have not identified a witness.

3 The Master Research and Development Agreement (the "MRDA") set out the terms of the transfer pricing system adopted by the Nortel Group (the Residual Profit Split Methodology or "RPSM").

In supplementing their interrogatory responses, the Joint Administrators provided the following excuse – which we told them in advance would not be acceptable – for failing to identify a single witness from most of the EMEA Claimants in respect to these and other interrogatories: "the Joint Administrators represent that, based on their review of the limited documents and information available to them and to the best of their current knowledge, information, and belief, the individuals they have identified are those who are most knowledgeable about the relevant topics, and the Joint Administrators are not aware of any additional persons most knowledgeable who are associated with each EMEA Debtor."

In other words, the Joint Administrators assert that they are unaware of a single individual from most of the EMEA Claimants, on whose behalf they have purported to bring hundreds of millions of dollars of claims, who even have knowledge about these topics essential to their claims, let alone who can support those claims. If that is correct, one questions how in good faith the Joint Administrators could have filed those claims in the first place or what basis they have to continue pursuing those claims now.

The Joint Administrators do not deny that the EMEA Claimants each have a duty to identify "most knowledgeable" witnesses from themselves. The Joint Administrators simply cannot rest on a generalized statement that they are unable to identify any knowledgeable persons from most of the EMEA Claimants. Notably, the Joint Administrators have failed even to identify what steps they have taken to attempt to identify knowledgeable witnesses. While they refer to "limited documents and information available to them," surely the Joint Administrators – who were first engaged nearly five years ago – conducted an extensive investigation of the separate claims prior to bringing them, as amended in 2011, on behalf of separate EMEA Claimants. And it is unclear how the Joint Administrators can say that they only have "limited documents and information available to them" when they have produced millions of pages in this litigation.

Based on the Joint Administrators' own allegations, there obviously must be individuals associated with each of the EMEA Claimants knowledgeable about the subjects in the three aforementioned interrogatories (and the others highlighted by the U.S. Debtors to the Joint Administrators). For example, the Joint Administrators' response to Interrogatory No. 5, regarding Nortel's transfer pricing arrangements, does not identify any most knowledgeable individual associated with Nortel Networks (Ireland) Limited ("NN Ireland"), even though NN Ireland was a signatory (indeed, one of only six signatories) to the MRDA, which embodied the RPSM, and the proof of claim filed by NN Ireland contains extensive allegations seeking damages in excess of $96 million for the purported unfairness of Nortel's transfer pricing system to NN Ireland. Nor does the Joint Administrators' response identify a single individual associated with sixteen other EMEA Claimants that assert transfer pricing-based claims, each alleging that it was subjected to unfair control in respect of transfer pricing and that it was harmed by Nortel's transfer pricing system.[4] If most of the EMEA Claimants cannot identify a

4 Although NNUK, Nortel Networks S.A. ("NNSA") and NN Ireland are the only EMEA Claimants who are parties to the MRDA, sixteen other EMEA Claimants have alleged that Nortel's transfer pricing arrangements deprived them of value, that they had "no substantive involvement in the formulation, implementation and operation

single witness associated with themselves who is knowledgeable regarding Nortel's transfer pricing arrangements or the impact of the arrangements upon those EMEA Claimants, the relevant allegations – such as about any alleged compulsion of the EMEA Claimants or their purported exclusion from transfer pricing decisions – would appear to be without basis and should be struck.

In regard to Interrogatory No. 10, it is difficult to believe that even NNSA (Nortel's principal French affiliate and another signatory to the RPSM) cannot identify a single witness associated with itself knowledgeable about R&D Funding and Strategy, when NNSA was a party to the MRDA/RPSM and allegedly did substantial R&D. Indeed, NNSA's proof of claim, which seeks over $433 million in damages relating to transfer pricing, includes significant allegations (beginning at paragraph 54) that, for example, "NNSA got a particularly bad deal from the RPSM as it was increasing its R&D investment with little opportunity to exploit routine returns." This allegation, and NNSA's claims themselves, cannot stand if NNSA cannot identify a single witness even knowledgeable about the subject matter of its allegation.

Similarly, Interrogatory No. 12 requires the identification of persons most knowledgeable concerning policies relating to customer relationships, including which Nortel entities would "market, sell, supply, install, or service Nortel products in each jurisdiction or territory of an EMEA entity." It seems obvious that someone from Nortel's Belgian affiliate, for example, must have been knowledgeable about the Belgian customer relationships. And each EMEA Claimant bringing transfer pricing claims alleges, in words or substance, that "[t]he level of return [received by the EMEA Claimant] failed to recognize significant customer intangibles [and] the service element performed alongside the distribution function."[5] Yet most EMEA Claimants do not identify a witness of theirs with any knowledge about, for example, those "customer intangibles," the "service element performed," or anything else regarding customer relationships.

These three examples are representative of the EMEA Claimants' failure to respond adequately to the agreed-upon consolidated interrogatories. Many other examples exist. The inability of the EMEA Claimants to support their individual claims with a single knowledgeable witness from each of them underscores the meritless nature of these claims and

---

of the RPSM transfer pricing arrangements as applied under the Distribution Agreement between NNL and [the EMEA Claimant] . . . and the Master Research and Development Agreement," and that they were "instructed to sign" the distribution agreements. See, e.g., Claim filed by Nortel Networks S.p.A., dated June 3, 2011 [Proof of Claim Number 7775]; Claim filed by Nortel Networks Hispania SA, dated June 3, 2011 [Proof of Claim Number 7787]; Claim filed by Nortel Networks B.V., dated June 3, 2011 [Proof of Claim Number 7780]; Claim filed by Nortel Networks NV, dated June 3, 2011 [Proof of Claim Number 7781].

5 See, e.g., Claim filed by Nortel Networks NV, dated June 3, 2011 [Proof of Claim No. 7781]; Claim filed by Nortel Networks Polska, Sp.z.o.o., dated June 3, 2011 [Proof of Claim No. 7754]; Claim filed by Nortel Networks A.G., dated June 3, 2011 [Proof of Claim No. 7752].

confirms the doubt as to the merits of these claims expressed by the Court in its March 20, 2012 decision dismissing many of the EMEA Claimants' original claims.[6]

The U.S. Interests have a right to cross examine knowledgeable witnesses from each entity pursuing claims in these bankruptcy proceedings and their ability to do so depends significantly on the identification of such witnesses in response to interrogatories. Accordingly, for any EMEA Claimant who intends to continue to pursue its claims against the U.S. Debtors, we respectfully request that the Court set a firm deadline for that Claimant to respond with the most knowledgeable witnesses associated with that Claimant (on the specific subjects previously identified by the U.S. Debtors) so that depositions may be noticed and conducted before the December 13 agreed-upon date for the completion of fact depositions.

**2) The EMEA Claimants Must Produce the Joint Administrators for Depositions**

The U.S. Interests noticed the depositions of Alan Bloom, one of the EMEA Joint Administrators , as well as several other Joint Administrators. The EMEA Claimants have responded that they will not produce any of the Joint Administrators absent court order.

The EMEA Claimants have offered no reason for their position that the Joint Administrators are beyond the scope of discovery. They are plainly knowledgeable fact witnesses (or at least they purport to be) properly subject to deposition. This is supported by numerous facts:

- Mr. Bloom signed the NN Ireland proof of claim against the U.S. Debtors (for more than $289 million) with detailed factual assertions. "[A] proof of claim should be treated as if it were a verified complaint or a deposition." In re O'Brien, 440 B.R. 654, 664 (Bankr. E.D. Pa. 2010), superseded by rule on other grounds as recognized in In re Umstead, 490 B.R. 186 (Bankr. E.D. Pa. 2013). See also Fed. R. Bankr. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."). As the witness "verifying" the complaint and submitting prima facie evidence of the validity and amount of NN Ireland's claim, it is self-evident that Mr. Bloom is subject to cross examination on it.

- In his affidavit dated January 20, 2010, Mr. Bloom stated that he had "personal knowledge" or "verily believed" information relating to the center of main interest of each of the EMEA companies in administration. He also attested to knowledge about the IFSA and the workings of the MRDA, both of which are material to the EMEA Claims.

---

[6] After acknowledging the "weakness and unlikelihood of ultimate success" of the surviving EMEA Claims, Your Honor stated that the question of whether the EMEA Claimants' directors acted in bad faith was one issue that precluded the Court from dismissing the claims at the motion to dismiss stage. Opinion, March 20, 2012, at 45. That issue is undoubtedly specific to each EMEA Claimant.

- Mr. Bloom also signed a declaration dated October 18, 2010 stating that "England is the center of main interest for each of the EMEA Debtors as each of the EMEA Debtor's central management and control is handled to a large extent from Maidenhead, England." This fact is material to the U.S. Interests' defense of the EMEA Claims.

- On June 22, 2009, Mr. Bloom signed a witness statement attesting to extensive personal knowledge relating to the MRDA, the RPSM and Nortel's transfer pricing regime (both pre- and post-petition), all of which are material to the allocation and claims litigation.

- At his deposition on December 16, 2010 (which was limited to the chapter 15 documents and petitions and thus did not address subjects such as NN Ireland's proof of claim that are now being litigated), Mr. Bloom testified that the witness statements of Michel Clement and Sharon Rolston – previously submitted to his Court by the EMEA Claimants – were true and correct to the best of his knowledge, information and belief.[7] The EMEA Claimants have advised us that Ms. Rolston refuses to appear voluntarily for her deposition, thus making more important the U.S. Debtors ability to discover Mr. Bloom's bases for his endorsement of Ms. Rolston's statement. Moreover, we understand that the EMEA Claimants have sued several of their former directors (including, we believe, Ms. Rolston) for breaches of fiduciary duty, and we are entitled to probe the factual underpinnings of that decision with the decision-makers.[8]

- In his deposition, Mr. Bloom testified that the Joint Administrators "effectively bec[a]me the senior management of Nortel and we exercise our control through a series of communications that we apply throughout Nortel and externally and we advise third-party stakeholders of our role and our authority." Deposition Transcript of Alan Robert Bloom, Dec. 16, 2010 at 125:20-25.

---

7 As this Court is aware, the U.S. Debtors have argued that the EMEA Claimants are judicially and collaterally estopped from now claiming that NNI allegedly directed and controlled them because of the detailed statements to this Court of Ms. Rolston and Mr. Clement, including that NNUK was the center of main interest, all management and operations were run from England and that NNUK exercised control over tax and treasury functions. "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992) (internal quotations and citations omitted). Although Your Honor did not apply these doctrines at the motion to dismiss phase, the Court recognized that the EMEA Claimants' inconsistencies were "troublesome." See Opinion, March 20, 2012, at 36-37. At the discovery stage, the U.S. Interests are certainly entitled to explore the bases for these prior representations of fact to the Court.

8 The U.S. Interests requested production of documents concerning these lawsuits months ago and since that time, have requested that the EMEA Claimants identify such documents for us in their production given that we have been unable to find them. These requests have gone ignored.

We would note that both the U.S. Debtors' principal officer, John Ray, and a representative of the Canadian Monitor, Murray McDonald, are being deposed. Particularly given the grave doubt we have regarding not only the viability of the EMEA Claims, but whether they were filed in good faith in the first place (which is underscored by the Joint Administrators' inability to name any witnesses for many of the EMEA Claimants who can support the claims filed by those Claimants), the U.S. Interests respectfully request that the Court order the Joint Administrators to appear in Delaware (or New York) for their depositions so that they may be examined on the claims they have chosen to pursue here against the U.S Debtors.[9]

**3) Each of the EMEA Claimants Must Produce a Representative Witness For Deposition**

After the parties collectively served each other with notices of hundreds of categories for examination pursuant to Fed. R. Civ. P. 30(b)(6), the U.S. Debtors spearheaded an effort to design a more manageable procedure. At our suggestion, the core parties all agreed to forego traditional Rule 30(b)(6) examinations and instead utilize a modified Canadian "representative witness" approach whereby each party would put up a witness for a one or two day examination (parties who did not file a pleading were excepted). Notwithstanding that each of the EMEA Claimants filed their own pleadings – some seeking hundreds of millions of dollars from the U.S. Debtors – alleging their own specific facts, the Joint Administrators advised us that the EMEA Claimants would only put up a single witness to testify about all of the EMEA Claims. In other words, the Joint Administrators refuse to put up a representative witness for each of the EMEA Claimants.

This is unacceptable. Whether through Rule 30(b)(6) or the representative witness approach, the U.S. Interests are entitled to examine a witness specifically with respect to each EMEA Claimant who has filed a claim. This need is exacerbated by the EMEA Claimants' refusal to respond to interrogatories directed to them individually as well as the fact that a number of EMEA Claimant witnesses who the U.S. Interests wish to depose have refused to testify (while the U.S. Interests are pursuing their testimony through letters rogatory, it is uncertain that the U.S. Interests will succeed in compelling their testimony within the limited time available before trial). The EMEA Claimants' collective positions identified in this letter represent a concerted effort to thwart discovery of and preclude the cross-examination of witnesses for each EMEA Claimant on their spurious claims. The U.S. Interests respectfully request that this Court order each EMEA Claimant to provide a witness for a representative deposition so that even if we are unsuccessful in our efforts to obtain the testimony of fact witnesses from each of them, we are able to examine for a sufficient time a dedicated witness focused on each EMEA Claimant pursuing a sizeable claim against the U.S. Debtors.

9 Independent of all of the foregoing reasons, given that the Joint Administrators have sought to excuse their failure to name witnesses from most of the EMEA Claimants by reference to their own knowledge and belief, it is particularly appropriate for them to be examined promptly on that knowledge and belief and their underlying efforts to identify knowledgeable witnesses so as to ensure we have an adequate opportunity to learn the identity of undisclosed knowledgeable witnesses in time to take their depositions.

**4) The Joint Administrators' Refusal to Cooperate in the Production of E&Y UK Documents**

The U.S. Interests have sought discovery from several U.K. parties who provided advisory services to the EMEA Claimants or the U.K. Pension Claimants, or have some other relationship with them. While we have commenced the pursuit of letters rogatory to avoid wasting the precious time available to us, we have repeatedly requested – virtually without success – the assistance of the EMEA Claimants and the U.K. Pension Claimants in obtaining the voluntary cooperation of their advisors. One such advisor is E&Y UK. As this Court is aware, all but one of the Joint Administrators are partners of E&Y UK and they have retained E&Y UK to provide services to all of the EMEA Debtors. Not only has E&Y UK provided comprehensive post-petition services to the EMEA Debtors, but as Mr. Bloom testified, it also earned around $100 million in fees from the Nortel bankruptcies through December 2010 (a number that has likely grown by a significant amount in the last two and a half years). See Deposition Transcript of Alan Robert Bloom, Dec. 16, 2010 at 260:9-19. Notwithstanding the foregoing, quite unbelievably, E&Y UK has opposed our letters rogatory request in England and is forcing the U.S. Interests to engage in time-consuming and expensive litigation overseas and taking the position that, at best, the U.S. Interests are only entitled to a small fraction of the documents we seek.[10] In stark contrast, we would note that the U.S. Debtors requested, obtained and produced voluntarily documents from Ernst & Young's U.S. affiliate, which advised the U.S. Debtors pre-petition.

E&Y UK also provided critical pre-petition services to NNUK that go to the very core of NNUK's claims against the U.S. Debtors. For example, the Joint Administrators have alleged that a pre-petition restructuring of certain Nortel Europe entities known as Project Swift was unfair and highly prejudicial to NNUK. The U.K. Pension Claimants have alleged the same. Notwithstanding these allegations, before it was implemented, the Project Swift transaction was carefully examined for fairness by E&Y UK and culminated in the delivery by E&Y UK of a valuation report to the board of directors of NNUK. For E&Y UK to be fighting a pitched battle – with the Joint Administrators watching their firm silently from the sidelines – to prevent discovery of the authors and process underlying the Project Swift valuation report is unjustifiable. What began as hair-splitting has evolved into hypocrisy.

Moreover, for nearly five years the Joint Administrators have repeatedly characterized E&Y UK interchangeably with themselves. For example, when seeking approval of their chapter 15 petition, the EMEA Debtors submitted a witness statement from Sharon Rolston (who, as noted above, now refuses to appear voluntarily as a witness and is believed to now be a defendant in a breach of fiduciary duty suit brought by the Joint Administrators against her on behalf of NNUK) stating, "[w]here an administration order over a non-UK company would not be recognized in the country of incorporation, I understand that E&Y (if appointed as

---

10 E&Y UK, as target of the letters rogatory, has requested an extension of time until mid-November to litigate their objections before courts in the U.K., which would leave us with no time to obtain and use their documents in the upcoming depositions absent their cooperation.

administrators) intend to assess how best to deal with that company." Declaration of Sharon L. Rolston in support of the Administrators' Verified Petition for Recognition of Foreign Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code, dated January 14, 2009, ¶ 101 (emphasis added). She later added, "[a]ll professional advice for restructuring the EMEA Region is being provided by E&Y, who were formally engaged in December 2008." Id. ¶ 207. Further, in the Joint Administrators' February 6, 2009 "Primer on UK Administration Process," the Joint Administrators wrote, "[s]ubsequent to the grant of an Administration Order, Ernst & Young was appointed Administrator to represent the interests of creditors." *UK Administration Process*, (Feb. 6, 2009), http://www.nortel.com/emea/collateral/uk_administration_primer.pdf (emphasis added).

In light of these facts, it is clear that the Joint Administrators can and should be required to support the U.S. Interests and indeed procure the cooperation of E&Y UK in discovery. In whatever manner the Joint Administrators now wish to define their relationship with their own firm, E&Y UK, they should be ordered to secure E&Y UK's immediate cooperation in the full production of its documents.[11]

**5) The EMEA Claimants' Massive Recent Document Production**

Finally, but perhaps most significantly of all, we are alarmed that just days after obtaining Court approval of their motion to extend the discovery schedule and delay trial for nearly three months, the EMEA Claimants produced late last week approximately 375,000 documents containing more than one million pages. This production dramatically impacts the U.S. Interests' ability to prepare for the upcoming depositions.

By way of background, the original scheduling order required parties to substantially complete their document productions by July 22. On that date, the U.S. Debtors certified their substantial completion and noted that they required up to two more weeks to virtually finish their production.[12] By August 4, the U.S. Debtors produced 99% of all of their documents in this litigation.

On July 22, the EMEA Claimants also certified their substantial completion of their document production. However, as we only learned after last week's production, by August 4, the EMEA Claimants had in fact only produced 35% of their documents. Despite their July 22 certification of "substantial completion," more than half of the EMEA Claimants' document production was made just before midnight on September 3.

---

[11] We continue to discuss the cooperation of the U.K. Pension Claimants with respect to certain third parties and reserve all rights.

[12] References to production numbers and percentages of all parties exclude documents initially withheld on the basis of joint privilege, since the parties have been working on a protocol with respect to, and prior to, the production of such documents. All references to documents in this section, therefore, exclude documents initially withheld or subsequently produced that were subject to joint privilege.

This 375,000 document production last week is contrary to all of the EMEA Claimants' prior representations to us. In addition to their obviously meaningless certification of "substantial completion" on July 22, the EMEA Claimants had advised us of the following:

- On August 2, the EMEA Claimants advised us in a telephonic conference that they would complete production of all non-privileged documents by the third week of August.

- At the August 6 meet and confer, in a room full of dozens of lawyers, the EMEA Claimants represented that they had only approximately 50,000 non-privileged documents remaining to produce, which would be completed the next week.

- In an August 16 email, the EMEA Claimants produced 77,809 documents and stated the "[w]e anticipate making further, smaller productions over the next two weeks, which will contain joint privileged documents and the remaining non-privileged documents identified in our review." (emphasis added).

- In their August 16 Motion for Extension of Schedule, the EMEA Claimants stated that although the schedule mandated substantial completion of document productions by July 22, "it is likely that roughly half of the total volume of documents or more will have been produced well after this date." The EMEA Claimants cited production estimates from the other parties (which included the significant joint privilege documents); at no time did the EMEA Claimants even hint that half of their own non-privileged documents would not be produced until September.

This shocking development – disclosed only after the EMEA Claimants obtained the support of the U.S. Interests for their extension motion (which, ironically, was predicated on the EMEA Claimants' argument that spending millions of dollars for document productions was meaningless without adequate opportunity to review those documents prior to depositions) – was dismissed cavalierly by the EMEA Claimants. In the cover letter accompanying their September 3 production of more documents than all of their productions to date combined, counsel for the EMEA Claimants wrote, "[f]rom time-to-time during the production process, the EMEA Debtors have provided the Core Parties with estimates of the number of non-privileged documents that remained to be produced. While those estimates were, at all times, given in good faith, having now finalized today's production set, the number of documents to be produced is larger than we had anticipated, due in large part to the inherent difficulty of estimating the number of documents that will ultimately be coded for production following a manual review…"

While the U.S. Interests wish to take the EMEA Claimants at their word, it is frankly inconceivable that just a week earlier – when they were successfully persuading the U.S. Interests, this Court and the Canadian Court to accept an extension of the trial date with

depositions to commence on September 23 – the EMEA Claimants had no idea that their prior representations of their remaining document production was inaccurate by many orders of magnitude.

We add that the EMEA Claimants have advised us that they have reviewed nearly all of these documents prior to their production; thus they are presumably fully prepared to conduct and defend depositions now using these documents while the U.S. Interests are put in the position of having to review this substantial production at a time our resources are fully engaged preparing for multiple tracks of depositions that are scheduled to take place virtually every day for the next three months.

Given that depositions are about to commence, we need a solution that does not penalize the U.S. Debtors for producing 99% of their non-privileged documents close to the time set by the Court for substantial completion (and nearly two months before the first deposition) while rewarding the EMEA Claimants for producing most of their documents on the eve of depositions. Delaying the EMEA depositions is not a reasonable option – the U.S. Interests insisted upon (and the EMEA Claimants agreed to) evenly staggered depositions throughout the 12-week period in return for their support of EMEA's extension motion. There are many EMEA depositions and it is simply impossible to delay them entirely until after these new documents are reviewed; not only would it vitiate the EMEA Claimants' explicit agreement with us, but backloading the schedule with multiple EMEA depositions in Europe each day would place enormous strain on the U.S. Interests' ability to prepare their case. We negotiated for a balanced schedule when the EMEA Claimants sought and obtained our support for the extension without revealing that their representations about the volume of their remaining production were so inaccurate.

Accordingly, while we had previously advocated only a single deposition session per witness (at a time when we had no reason to believe we would receive this massive new production so late in the process), we believe that the fair alternative is for the Court to order that depositions proceed as scheduled and for the depositions of EMEA witnesses to remain open for limited follow up examination in December (shortly before the December 13 deadline) on documents produced in September (or later). We would spend a week in London in early December during which we could have up to a couple of hours with each witness to examine them on these new documents. We can think of no other alternative that does not further benefit the EMEA Claimants, and further prejudice the U.S. Debtors, for the EMEA Claimants' enormous new production, but would obviously welcome any suggestions Your Honor may have.[13]

* * *

13 We note that the Canadian Debtors and Monitor and U.K. Pension Claimants also have made significant new productions of documents, with respect to which the U.S. Interests reserve all rights.

The first four discovery disputes have been the subject of repeated communications between the parties as we have sought resolution without requiring judicial intervention. We have not discussed the EMEA Claimants' recent document production with them as we cannot roll back the clock on what has occurred. While it is a common tactic for a party whose fulfillment of its discovery obligations is challenged by an adversary to respond in kind, we are unaware of a single outstanding complaint of the EMEA Claimants about the U.S. Interests' responses with the exception of an inquiry we received on Sunday about the U.S. Debtors' privilege log (raising an issue that we also have with respect to the EMEA Claimants' log), on which we have requested to confer so that we may reach resolution promptly.[14]

Given the imminent commencement of depositions and the impact of many of these issues on depositions, the U.S. Interests respectfully request that this be placed on the calendar at the 3:00 p.m. hearing scheduled by the EMEA Claimants on September 18, if not earlier.

Sincerely,

Derek C. Abbott

DCA/alc

cc: All Core Parties (via email)

[14] The U.S. Interests have several other disagreements with the EMEA Claimants on which we are still awaiting their response, including the EMEA Claimants' counsel's communications with former employees of the U.S. Debtors and issues concerning joint privilege and the EMEA Claimants' public release of confidential and highly confidential documents produced by the U.S. Debtors. Until we receive their response and make further efforts at amicable resolution, we believe it would be premature to involve the Court at this time but reserve the right to do so if necessary.