

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

September 16, 2013

**VIA HAND DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
824 N. Market Street, 6th Floor
Wilmington, DE 19801

Re: *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

Dear Chief Judge Gross,

        We write on behalf of the Joint Administrators of the EMEA Debtors in response to the September 11, 2013 letter from the US Debtors to Your Honor concerning five discovery disputes (the "US Debtors' Letter").

1. **The Joint Administrators Fully Complied With Their Discovery Obligations And Identified Persons Most Knowledgeable On Behalf Of Each EMEA Claimant.**

        The US Debtors' assertion that the Joint Administrators have not identified persons most knowledgeable on behalf of the majority of the EMEA Claimants is simply wrong. On June 27, 2013, the Joint Administrators served interrogatory responses, in which they identified, on behalf of all EMEA Claimants, 47 separate "persons most knowledgeable" on a wide variety of topics. As the Joint Administrators have repeatedly told the US Debtors during several meet-and-confer sessions on this subject and have represented in writing, the individuals they identified are most knowledgeable on behalf of each EMEA Claimant, and the Joint Administrators have not, after conducting a diligent investigation, learned the identity of any additional "persons most knowledgeable."

        The US Debtors' only complaint with respect to the Joint Administrators' interrogatory responses is that the 47 individuals identified as "most knowledgeable" are

primarily NNUK employees, as opposed to employees of the other EMEA Claimants.[1] This complaint is based on the erroneous assumption that an NNUK employee cannot be the most knowledgeable person on behalf of other EMEA entities. In fact, because of the way Nortel operated, it makes perfect sense that the individuals with the most knowledge of the topics relevant to the claims would be NNUK employees. As the US Debtors are aware — and readily acknowledge elsewhere in their letter (see US Debtors' Letter at 7 & n.7) — Nortel was organized such that the day-to-day tax, treasury, banking, finance, control, sales, legal, and human resource functions for the EMEA region were performed in England. As a result, the EMEA witnesses with the most knowledge of key aspects of the EMEA Claimants' business were NNUK employees. Moreover, although many of the individuals the Joint Administrators named were technically employed by NNUK, they held senior EMEA-wide positions, such as EMEA Controller or EMEA Tax Leader, and were therefore specifically tasked with overseeing the operations of all EMEA Claimants.

   The Joint Administrators' investigation in connection with identifying the relevant "most knowledgeable" individuals fully complied with the applicable standard for responding to interrogatories, which requires that a party respond "to the best of the [party's] knowledge, information, and belief formed after a reasonable inquiry." (Fed. R. Civ. Proc. 26(g)(1).) The Joint Administrators undertook significant efforts to identify the individuals with the most knowledge of each of the topics referenced in the interrogatories, notwithstanding that the Joint Administrators no longer employ or have access to several key former EMEA employees and only employ one individual outside of the United Kingdom (a filing clerk formerly employed by NN Poland). The Joint Administrators' legal team had several meetings and telephone interviews with Nortel personnel to identify former EMEA employees who would qualify as most knowledgeable on each of the interrogatory topics. Those personnel reviewed available records to assist them in coming up with a list of names, which were then discussed among themselves and with the Joint Administrators' legal team. In addition, the legal team suggested names from their review of relevant documents in the Joint Administrators' possession at the time and discussed these with Nortel personnel.

   Notwithstanding that the Joint Administrators had already fully complied with their obligations under the Federal Rules when they submitted their responses, in an effort to cooperate with the US Debtors, the Joint Administrators twice agreed to re-review their interrogatory responses to consider whether there were any additional "persons most knowledgeable" who should have been included. As part of this exercise, the Joint Administrators went back to the Nortel personnel with whom they had spoken and asked for additional work to be done to determine whether there were individuals who had been employed by non-NNUK EMEA Claimants and qualified as most knowledgeable on the interrogatory topics. No new names were identified.[2] At the request of the US Debtors, the Joint Administrators provided a written representation that, to the best of their knowledge,

---

1. The Joint Administrators' interrogatory responses also identified individuals from NN Ireland and NNSA, as well as nine individuals who had served, collectively, as directors of every EMEA Claimant.

2. The Joint Administrators did, however, inform the US Debtors that two individuals they had previously identified were knowledgeable — though not "most knowledgeable" — on additional interrogatory topics.

information, and belief, the individuals they had named were "most knowledgeable" on behalf of every EMEA Claimant, and there were no additional "most knowledgeable" individuals of whom the Joint Administrators were aware. The Joint Administrators went above and beyond their discovery obligations in providing this representation, which should suffice to satisfy the US Debtors that the Joint Administrators have disclosed all "persons most knowledgeable" of which they are aware. The US Debtors have, however, refused to accept this representation.[3]

It is difficult to imagine in what respect the US Debtors have suffered or will suffer any prejudice as a result of the fact that the persons most knowledgeable on behalf of each EMEA Claimant are primarily NNUK employees. The US Debtors have noticed a large number — though not all — of the EMEA "persons most knowledgeable" for deposition. In those depositions, they will have the opportunity to examine the witnesses on the facts underlying the claims of each EMEA entity. To the extent the US Debtors are not satisfied with this testimony, the US Debtors will also be entitled to examine an EMEA corporate representative on the EMEA claims. The US Debtors have no basis for presuming — before they have even deposed a single witness — that the individuals that the Joint Administrators identified as "most knowledgeable" on behalf of each EMEA Claimant are not actually "most knowledgeable" simply because they were employees of NNUK. In fact, this presumption is directly contrary to the operational structure of Nortel's EMEA entities.

In sum, it would serve no purpose for the Court to "set a firm deadline for [each EMEA Claimant] to respond with the most knowledgeable witnesses associated with that Claimant." (US Debtors' Letter at 6.) The Joint Administrators have already conducted a reasonable inquiry, have identified the 47 EMEA individuals most knowledgeable on behalf of all EMEA Claimants on the interrogatory topics, and have represented in writing to the US Debtors that there are no other "most knowledgeable" persons of which they are aware. The US Debtors' continued challenge to the Joint Administrators' interrogatory responses is not merely unwarranted — it is an exercise in futility. The Joint Administrators do not know what further steps they could take and cannot invent additional witnesses simply to satisfy the US Debtors' speculation that such additional witnesses exist.

---

3. In their letter, the US Debtors state that they would have accepted "a written representation from an individual EMEA Claimant that it had no involvement with regard to the subject matter and, for that reason, would not have any knowledgeable witness." (US Debtors' Letter at 3 n.2.) Such a representation is well beyond anything the Federal Rules require with respect to interrogatory responses. Most importantly, such a representation would not have been true. The fact that the "most knowledgeable" EMEA witnesses are primarily NNUK employees is not equivalent to stating that other EMEA Claimants had no involvement in the subject matter of the interrogatory — it simply indicates that the most knowledgeable witness on the topic is an NNUK employee.

Moreover, the US Debtors' decision to raise this issue before the Court now indicates that their complaint is purely tactical. The Joint Administrators provided their representation in respect of the interrogatory responses on August 2, more than five weeks before the US Debtors chose to put this issue before the Court. While the US Debtors have raised the issue in conversations since August 2, there have been no active discussions in recent weeks, and the Joint Administrators repeatedly made it clear that their position had not changed since August 2.

2. **The Joint Administrators and French Liquidator Should Not Be Compelled To Give Fact Witness Testimony Because They Are Estate Principals With No Unique First-Hand Knowledge Of The Facts Underlying The EMEA Claims.**

The US Debtors have no reasonable basis for insisting on the depositions, in their individual capacities, of Alan Bloom and Christopher Hill (two of the Joint Administrators) or Cosmé Rogeau (the French Liquidator). None of these individuals are properly "fact witnesses" who should be subject to deposition because none of them have unique first-hand knowledge of the facts underlying the EMEA claims. To the extent the US Debtors are seeking testimony regarding the factual underpinnings of the EMEA claims, they are entitled to obtain that testimony from one of the more than 100 witnesses scheduled to be deposed in this case who were actually involved in the events underlying the EMEA claims and have personal knowledge of those events. They will also have the opportunity to depose a corporate representative for each of the EMEA Claimants. The US Debtors should not be permitted to burden the Joint Administrators and French Liquidator with depositions seeking their personal testimony on matters in which they were not involved and which they only learned about in their capacity as estate principals, primarily through conversations with their attorneys.

The US Debtors are not able to put forward a single plausible reason why Mr. Bloom's testimony is relevant to this case:

- Mr. Bloom is solely an estate principal for the EMEA Debtors, who was appointed at the time the petition was filed. He was not a pre-petition Nortel employee and has no personal knowledge of the facts underlying the EMEA claims. The fact that he signed the NN Ireland claim does nothing to alter that reality. The US Debtors will have the opportunity to depose several former Nortel employees with personal knowledge of the facts underlying the NN Ireland claim, as well as a designated corporate representative.

- The US Debtors have already deposed Mr. Bloom on his October 18, 2010 declaration and should not be permitted to do so again. The US Debtors' expressed intent in deposing Mr. Bloom on this declaration and his January 20, 2010 affidavit is to prove England's status as the "center of main interest" for the EMEA companies in administration. However, following on an order from the English court, this Court has already ruled that England was the "center of main interest" for each of the EMEA Debtors. (Order Granting Recognition of Foreign Proceedings and Related Relief with Respect to the EMEA Debtors ¶ G (Jan. 31, 2011) (Docket No. 116).) The US Debtors can have no reason to examine Mr. Bloom on an issue that is *res judicata*.

- The US Debtors incorrectly state that Mr. Bloom's June 19, 2009[4] witness statement "attest[s] to extensive personal knowledge relating to the MRDA, the

---

4. The US Debtors incorrectly identified the date of this witness statement as June 22, 2009.

> RPSM and Nortel's transfer pricing regime." (US Debtors' Letter at 7.) The sections of Mr. Bloom's witness statement that address these issues rely heavily on his review of relevant documents and largely contain summaries of and quotes from relevant transfer pricing agreements, all of which the US Debtors can review for themselves. Mr. Bloom does not attest to having personal knowledge of those agreements or the facts or circumstances underlying them.

- The witness statements submitted by Michel Clement and Sharon Rolston may justify deposing Mr. Clement and Ms. Rolston — but not Mr. Bloom. The US Debtors will have the opportunity to depose both: Mr. Clement has agreed to appear voluntarily for his deposition in this case, and the US Debtors have filed letters rogatory to compel the deposition of Ms. Rolston. Moreover, the mere fact that Mr. Bloom believed that the witness statements the Joint Administrators submitted to the Court were accurate does not suggest that he has personal knowledge of the underlying facts.

- The US Debtors' statement that they are entitled to "probe the factual underpinnings" of the Joint Administrators' decision to sue certain former EMEA directors is simply another way of saying that they want to depose Mr. Bloom on the facts underlying the claims. As noted above, Mr. Bloom does not have personal knowledge of those facts, and information about the decision-making process itself is privileged.

- The US Debtors do not give any indication as to why Mr. Bloom's summary of the role of the Joint Administrators in his December 2010 deposition — in which he noted that the Joint Administrators "effectively bec[a]me senior management of Nortel" and "exercise our control through a series of communications that we apply throughout Nortel" — is in any way relevant to the events underlying the EMEA claims or would justify Mr. Bloom's deposition. Moreover, the Joint Administrators' post-petition role in overseeing the administration of the EMEA Claimants is entirely irrelevant to the Joint Administrators' claims for pre-petition conduct. To the extent the US Debtors seek testimony regarding the post-petition asset sales, the US Debtors have already noticed numerous other witnesses for deposition on this topic.

Notably, the US Debtors have not offered any justification for their demands to depose Christopher Hill or Cosmé Rogeau.

Finally, the US Debtors suggest, disingenuously, that Messrs. Bloom, Hill, and Rogeau should be deposed because the US Debtors' principal officer, John Ray, and the Canadian Monitor, Murray McDonald, are both being deposed. This argument fails to mention the critical facts that Mr. Ray is only being deposed because the US Debtors affirmatively named him as one of their anticipated trial witnesses and that Mr. McDonald is only being deposed because the US Debtors noticed him for deposition. The EMEA Debtors have not cross-noticed Mr. McDonald for deposition precisely because they do not believe he has any unique first-hand knowledge of the facts relevant to the EMEA claims or allocation dispute.

5

3. **The US Debtors' Proposal That The Joint Administrators Provide 24 Representative Witnesses For 25 Days Of Corporate Representative Examinations Is Absurd, Inefficient, And A Waste Of Estate Resources.**

Contrary to the US Debtors' assertions, the Joint Administrators have not refused to produce a corporate representative witness for each of the EMEA Claimants. During several conversations with the US Debtors, the Joint Administrators agreed to produce one corporate representative witness — just as the US and Canadian Debtors were producing one corporate representative witness — who would testify on behalf of each EMEA Claimant. The US Debtors counter-proposed that the Joint Administrators instead produce a different representative witness for each EMEA Claimant, each of whom would be deposed for one or two full days, for a total of at least 25 days of corporate representative depositions.

In addition to being incredibly burdensome and plainly absurd, the US Debtors' proposal is directly contrary to this Court's repeated directions to the parties to preserve estate resources by pursuing efficient and streamlined discovery.

The US Debtors have not offered any plausible reason — nor does any such reason exist — why the Joint Administrators should not be permitted to designate one witness to act as a corporate representative for all of the EMEA Claimants. The Joint Administrators have the same obligation to inform their corporate representative witness of the nature of each of the EMEA claims, regardless of whether one person or 24 are acting as corporate representatives, and the US Debtors would not suffer any prejudice as a result of having to depose a single witness knowledgeable on each of the claims. By contrast, if the US Debtors' proposal were adopted, the Joint Administrators would be forced to prepare and defend 24 witnesses over the course of nearly a month of continuous corporate representative depositions. Moreover, these examinations certainly could not be complete within the two-week time frame that has been set aside for corporate representative examinations under the current schedule. The US Debtors' proposal would therefore require a further modification and extension of the schedule. Such an exercise would be wholly inefficient and an enormous waste of resources for all parties involved.

The US Debtors' request for 25 days of EMEA corporate representative examinations is also premature. The Joint Administrators have already agreed in the Deposition Protocol to provide a corporate representative witness for two full days of examination, with one day allocated to the US Deposition Group and one day to the Canadian Deposition Group.[5] Under Section G(1)(a) of the Deposition Protocol, "at least ten business days before the commencement of Representative Depositions, a Deposition Group may serve a very limited number of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony." Without having taken a single deposition, the US Debtors are certainly not in a position to decide that they have not obtained adequate first-hand testimony on a sufficient number of topics to fill

---

5. In Section G(3)(a) of the Deposition Protocol, the US Debtors, Canadian Debtors, and UK Pension Claimants also agreed that each would produce a corporate representative for two days of examination .

6

25 days of corporate representative examinations or even the one full day have already been allocated under the Deposition Protocol. Nor does it seem possible that the US Debtors could comply with the Deposition Protocol's requirement that the scope of the corporate representative examinations be "very limited" if there are 25 days of such examinations.

To the extent the US Debtors ultimately determine that they need more than one day to examine a corporate representative witness on each of the EMEA claims, the Joint Administrators would be willing to consider a reasonable request for extension of the length of the examination to accommodate the US Debtors. But the Joint Administrators cannot agree to the plainly ridiculous proposal that they produce 24 witnesses for 25 days of corporate representative examinations, and they respectfully request that the Court deny the US Debtors' attempt to compel them to do so.

### 4. The Joint Administrators Do Not Control EY UK And Do Not Have The Ability To Compel EY UK To Produce Documents.

The US Debtors' letter mischaracterizes the facts with respect to the role of the Joint Administrators vis-à-vis Ernst &Young UK ("EY UK") and their willingness to cooperate in requesting that EY UK produce documents to the US Debtors.

First, the Joint Administrators have no ability to compel EY UK to produce documents. In suggesting that they do, the US Debtors fundamentally misstate the relationship between the Joint Administrators and EY UK. The Joint Administrators serve in their individual capacities — not as employees of EY UK — as estate principals for the EMEA entities. Pursuant to English law, the Joint Administrators were appointed as individuals and can neither act for EY UK nor direct EY UK's actions.[6] UK Insolvency Act 1986 § 390(1) ("A person who is not an individual is not qualified to act as an insolvency practitioner.") The fact that a January 2009 witness statement from Sharon Rolston and a February 2009 progress report mistakenly suggest that EY UK was appointed Administrator of the EMEA entities does not change the reality of the relationship between the Joint Administrators and EY UK. They are not interchangeable, and one cannot control the other.

Second, even though the Joint Administrators do not control EY UK and cannot compel them to produce documents, the Joint Administrators have done what they could to assist the US Debtors in obtaining documents from EY UK. Far from "refusing to cooperate" with the US Debtors, the Joint Administrators have made multiple requests that EY UK produce documents, including on a phone call in which one of the Joint Administrators personally spoke with senior EY UK personnel and communicated that the Joint Administrators wanted EY UK to comply with the US Debtors' document requests.

Third, even in their capacity as successors in interest to entities that were clients of EY UK, the Joint Administrators are not entitled, as a matter of English law, to all of the

---

6. The relationship between the Joint Administrators and EY UK is analogous to the relationship between the Canadian Monitor and EY Canada. EY Canada is also refusing to produce documents voluntarily.

documents the US Debtors have requested. Under English law, an auditor's client is not, for example, entitled to demand the auditor's working papers. *Chantrey Martin v. Martin*, 1953 2 Q.B. 286 (applying *Leicestershire County Council v. Michael Faraday and Partners, Limited* [1941] 2 K.B. 205. Insofar as the Joint Administrators are entitled as clients of EY UK to require the production of documents, they have made it clear to EY UK that they should produce these documents as soon as possible. The US Debtors cannot, however, accomplish an end-run around established English law by seeking a US court order requiring the Joint Administrators to compel the production of documents which they have no right to obtain from a party they have no ability to compel.[7]

**5. The US Debtors Should Not Be Permitted To Avoid The "Good Cause" Requirement For Re-Deposition Of Witnesses On The Basis Of Document Production Estimates Made In Good Faith.**

The US Debtors' unfounded speculation that the Joint Administrators knew and deliberately hid that their September 3 production was going to be significantly larger than expected is entirely false. In the interests of transparency, at various points over the course of the last two months, the Joint Administrators endeavored to provide estimates to the Core Parties regarding the number of documents they anticipated remained to be produced. At a meet and confer session on August 6, 2013, and again in the Declaration of James Norris-Jones filed with this Court on August 16, 2013, the Joint Administrators advised the parties that they anticipated producing another 50-100,000 non-privileged documents (not, as the US Debtors asserted in their letter, only 50,000 documents). This estimate was made in good faith based on the number of documents that remained to be reviewed, the approximate percentage of the documents already reviewed that had been found to be responsive and non-privileged, and the categories of documents that the Joint Administrators believed they had already produced.

The Joint Administrators did not learn the actual number of documents to be included in their September 3 production until the technical preparation of the production was in its final stages. To prepare each production, the Joint Administrators' e-Discovery vendor used a complex production logic to determine which documents across various data sources qualified for production. This logic could not be run until the documents were being prepared for production (*i.e.*, at best, a few days before the production) without disrupting the system and the remaining review process. As a result, the Joint Administrators only became aware of the size of the September 3 production in the last few days before the production was made, in which time the Joint Administrators were investigating the reasons for the higher than expected number of documents

The Joint Administrators have now learned that there were several reasons that the September 3 production was larger than anticipated — none of which evidence any bad faith on their part.

---

7. We understand that EY UK is currently engaging in discussions with the US Debtors to reach agreement on certain categories of documents they may produce. The Joint Administrators are encouraging this dialogue.

- Based on the instructions provided to our e-Discovery vendor, the Joint Administrators' legal team understood that post-petition data had been included in prior productions. We learned in the few days before the September 3 production that our e-Discovery vendor had, in error and without our knowledge, changed the production logic the legal team had approved. As a result, post-petition documents were inadvertently withheld and therefore had to be added to the September 3 production.

- Unbeknownst to the Joint Administrators' legal team, our e-Discovery vendor had held back a portion of the intended production set from each prior EMEA production. These documents, which the legal team believed had already been produced, had to be included in the September 3 production.

- The September 3 production set included tens of thousands of "family" documents (i.e., documents that are linked — usually by attachment — to a document identified for production). These documents are only included in the production set when the final production logic is run, and the number of family documents varies significantly from document to document. As a result, prior to finalizing the production, the Joint Administrators were unable to give an accurate estimate of the number of family documents to be included in the production set. The number of family documents included in the September 3 production was much greater than expected.

- When the final production logic was run on the Joint Administrators' July 22 production and family documents were included, the legal team asked the Joint Administrators' e-Discovery vendor to run a privilege cull over the family documents that had been added to the production set. We then instructed the e-Discovery vendor to withhold from production pending review all documents with a family member responsive to the privilege cull. We understood from our e-Discovery vendor that only a small number of documents were withheld for this reason. We learned shortly before the September 3 production that this number was significantly higher than we had previously been advised.

- When the Joint Administrators gave their estimate in mid-August of their remaining non-privileged production, the legal team had understood that all data sources received from the Canadian Debtors[8] for review and production had been uploaded to the review platform and included in that estimate. Contrary to that

---

8. Early in the document production process, the Joint Administrators agreed to review for production purposes a significant amount of custodian data that was in the possession of the Canadian Debtors. The Canadian Debtors had to collect and send this data to the Joint Administrators for processing and review. The Joint Administrators began receiving this data on a rolling basis, beginning in mid-June and continuing through July 22, 2013 (the date on which document production was due to be substantially complete). The fact that the Joint Administrators did not receive all of the data they had agreed to review and produce until July 22 substantially hampered their ability to complete production in early August.

understanding, not all of the data had been uploaded. As a result, the Joint Administrators' estimates were based on a significantly smaller document universe than was actually the case.

It is telling that, despite the US Debtors' professed shock and outrage about the size of the Joint Administrators' September 3 production, they have nothing to say in respect of the Canadian Debtors' productions. As of August 12, the Canadian Debtors had produced approximately 566,000 documents. Between August 26 and September 3, they produced another 613,000 new documents. If the US Debtors truly believe they are prejudiced by the Joint Administrators' productions, they must believe that they are equally — if not more — prejudiced by the Canadian Debtors' significantly larger productions. However, the US Debtors seek no remedy with respect to the Canadian Debtors' documents or witnesses.

The US Debtors' opportunistic approach on this issue is nothing more than a transparent, one-sided, and wholly unnecessary attempt to get a second bite at the apple with respect to the depositions of EMEA witnesses. The US Debtors have requested that the Court order all of the EMEA witnesses to be available for a week in December so that the US Debtors can re-examine them on any documents produced in September, regardless of the importance of those documents or whether those documents are duplicative of others produced earlier. First, all but four of the EMEA witnesses are non-parties resident in Europe and therefore outside of the Joint Administrators' control and this Court's subpoena power. The US Debtors are therefore requesting a remedy that this Court, in large part, cannot grant. Second, to the extent there are key documents in the Joint Administrators' September 3 production that the US Debtors would not have an opportunity to review before some of the early EMEA witness depositions, Section D(4) the Deposition Protocol agreed among the Core Parties and ordered by this Court on August 26, 2013 gives the US Debtors the right to seek a second deposition "upon order of the Court for good cause shown or consent of each of the Deposition Groups." The US Debtors are now seeking improperly to make a blanket end-run around this "good cause" requirement and should not be permitted to do so.

Furthermore, the US Debtors incorrectly state that the Joint Administrators "have advised us that they have reviewed nearly all of [their] documents prior to their production" and that the Joint Administrators are thus "presumably fully prepared to conduct and defend depositions now using these documents." As we explained to the US Debtors in an August 26, 2013 letter, a sizeable percentage of the documents the Joint Administrators produced were not reviewed prior to production.[9] In addition, because of the tight time frames for production, the Joint Administrators reviewed documents primarily for responsiveness to the consolidated document requests and for privilege. Given the breadth of the 140 consolidated document requests, the analysis necessary to determine responsiveness is quite different than the analysis necessary to determine whether a document is relevant or key with respect to the issues

---

9. These documents were those that were responsive to search terms agreed among the three estates, but were not responsive to a privilege cull. Given the expedited time frame for production in this case and the enormous volume of documents that were responsive to the search terms, the Joint Administrators were only able to review documents that were responsive to both the general search terms and the privilege cull.

underlying EMEA claims or allocation. As a result of the difference between responsiveness and relevance reviews, the Joint Administrators' legal team now has to re-review its own productions to prepare for depositions, on top of reviewing the more than one million documents it received from the various Core Parties.

Finally, we note that, in stark contrast to the Joint Administrators' production of 692,000 non-privileged documents and the Canadian Debtors' production of 1.1 million non-privileged documents, the US Debtors have only produced 167,000 non-privileged documents, despite having a roughly equal number of custodian data sources and systems to review. It is no wonder that the US Debtors were able to complete their non-privileged document production ahead of the Joint Administrators and Canadian Debtors, given the relatively tiny number of documents they ultimately produced. The Joint Administrators are in the process of reviewing the US Debtors' production and reserve all rights, but given the surprisingly small size of that production, the Joint Administrators have serious concerns as to whether the US Debtors have complied with their discovery obligations.[10]

Sincerely,

*Neil J. Oxford /FT*

Neil J. Oxford

---

10. For example, in contrast to the Joint Administrators and Canadian Debtors, the US Debtors refused to run agreed searches across several of the custodians they had previously reviewed, insisting instead that their previously run searches were sufficient, notwithstanding that those previously run searches were not tailored to the consolidated document requests. The failure to re-run these searches resulted in a significantly lower production burden for the US Debtors. The Joint Administrators recognize that, pursuant to Section 2(a) of the Stipulation Regarding EMEA Motion for Extension, ordered by this Court on August 26, 2013, the parties agreed not to challenge the methodology that any other party disclosed it had used to gather, review, and produce responsive documents. Section 3 of the Stipulation provides, however, that parties may seek "limited, targeted disclosure of particular material documents or types of documents that were not captured by the prior searches," and the Joint Administrators are considering whether the US Debtors' limited production necessitates requests for additional, targeted disclosure.