# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

(302) 658-9200
(302) 658-3989 Fax

**Derek C. Abbott**
302 351 9357
302 425 4664 Fax
dabbott@mnat.com

September 18, 2013

**VIA HAND DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 N. Market St., 6th Floor
Wilmington, DE 19801

          Re: *In re: Nortel Networks Inc., et al.*, Case No. 09-10138 (KG)

Dear Judge Gross:

          On behalf of the U.S. Interests, we write in response to the September 16, 2013 letter from counsel for the EMEA Claimants regarding the parties' discovery disputes (the "EMEA Letter").

          There are over twenty EMEA Claimants. Each has filed a separate proof of claim against the U.S. Debtors, and most seek many millions of dollars in damages against the U.S. Debtors.[1] In total, the EMEA Claimants seek more than $4 billion in damages against the U.S. Debtors. It is axiomatic that <u>each</u> EMEA Claimant must participate fully in the discovery process. This includes, at the most basic level, identifying and producing for deposition witnesses associated with each Claimant who are knowledgeable on key topics raised in the Claims and a party representative for each Claimant.

          A common theme pervading the EMEA Letter is that it would allegedly be too burdensome – "ridiculous," they say – to require each EMEA Claimant to fulfill its discovery obligations. But the EMEA Claimants do not get a free pass on discovery merely because they are many in number. The burden and cost of defending against all of these Claims is, of course, not something the U.S. Debtors have chosen to undertake; it was foisted upon them by the Joint

---

[1] This excludes claims asserting only intercompany trading debts or contingent liability, or FSD-based claims of the type this Court already has dismissed.

Administrators, who made the decision to bring all of these claims on behalf of all of these Claimants.

Despite the EMEA Claimants' effort to make this all sound more complicated than it is, these discovery disputes do not raise novel issues.

- Each EMEA Claimant was asked to identify the person(s) currently or formerly associated with that Claimant who is most knowledgeable about pertinent topics. Responding to that question by identifying persons who were <u>never</u> associated with the Claimant is non-compliant. If there is not a single person associated with a particular Claimant who has any knowledge about allegations made by that Claimant, then the Claimant should admit this in its response.

- The Joint Administrators – who admit they are the "successors in interest" to the EMEA Claimants – must sit for their depositions. It is not too much of a burden to ask that the persons who are, in effect, the Claimants and who made the decision to burden the U.S. Debtors with billions of dollars in claims to each sit for a one-day deposition. This is particularly so because the Joint Administrators have repeatedly admitted under oath having first-hand knowledge with respect to the Claims, including by verifying the proofs of claims.

- It is typical in a litigation that each party provide a party representative for deposition. Contrary to the EMEA Claimants' statement, the U.S. Debtors have not insisted that each such deposition last a full day.

- The Joint Administrators should be required to secure the cooperation of E&Y U.K and they have the ability to do so.

- The EMEA Claimants' late production of such a large percentage of their documents is "good cause" to leave open the deposition of EMEA witnesses.

1.  **The EMEA Claimants Have Not Fully Complied With Their Discovery Obligations And Identified Persons "Associated With You" Most Knowledgeable On Behalf Of Each EMEA Claimant**

The heading of the EMEA Claimants' first argument reveals the fatal flaw in their response. The interrogatories served upon each EMEA Claimant individually did not merely ask them to identify the "most knowledge person" on a particular subject. The interrogatories required each EMEA Claimant to identify the most knowledgeable person "associated with you," the Claimant. It is a basic and proper interrogatory that merits a straightforward response. It is entirely appropriate, indeed necessary, for a debtor opposing a claim to learn who the knowledgeable witnesses are *from the claimant*, and not just to know who may be the most knowledgeable third-party witnesses.

The inclusion of this "associated with you" language, moreover, was no mere happenstance. The U.S., Canadian and EMEA Debtors had explicitly discussed this issue when crafting the consolidated interrogatories and agreed to include the words "associated with you" to certain interrogatories to ensure that one debtor could not point to witnesses from another as being "most knowledgeable" and thereby avoid identifying witnesses from that debtor. Yet, despite having participated in the drafting of these interrogatories, this is precisely what the EMEA Claimants have done. In providing us with a single consolidated response to interrogatories served upon each of the EMEA Claimants individually, and in identifying <u>only</u> NNUK witnesses for many of the interrogatory responses, the EMEA Claimants have not responded to the consolidated, agreed-upon interrogatories.

The EMEA Claimants tout their disclosure of "47 individuals identified as 'most knowledgeable' [who] are primarily NNUK employees" and "nine individuals who had served, collectively, as directors of every EMEA Claimant." However, these numbers are an aggregate of the EMEA Claimants' responses to all 30 most knowledgeable person interrogatories. As to the nine individuals who served as directors, these include directors who only served post-bankruptcy and who, according to the EMEA Claimants' own reasoning in resisting the depositions of the Joint Administrators, would have no personal knowledge of facts as to which they now claim to be "most knowledgeable." The bottom line is that in response to a number of those interrogatories, <u>most EMEA Claimants do not identify a single person associated with that Claimant with knowledge of allegations made by that Claimant</u>. That is the central problem with the interrogatory responses.

The subjects of non-responded-to interrogatories include the impact of the RPSM on each of the EMEA Claimants, R&D Funding and Strategy, and customer relationships, all subjects highlighted in the EMEA Claims. It is inconceivable that there is not a single knowledge person associated with <u>each</u> EMEA Claimant knowledgeable about the impact of the RPSM or customer relationships, or that no one from Claimants such as NNSA (supposedly an R&D-producing entity) was knowledgeable about R&D funding and strategy. If nevertheless each of the EMEA Claimants cannot identify its <u>own</u> knowledgeable witnesses on the requested subjects then they must represent that they do not have anyone knowledgeable, not merely that the Joint Administrators still have not figured out who to identify despite their five years of investigation.

### 2. <u>The U.S. Interests Are Entitled To Depose The Joint Administrators</u>

The EMEA Claimants appear to have no basis to resist these depositions other than that it would "burden the Joint Administrators and French Liquidator" to each have to sit for a one-day deposition "seeking personal testimony on matters in which they were not involved and which they only learned about in their capacity as estate principles, primarily through conversations with their attorneys."

Not only does their "burden" argument ring particularly hollow relative to the burden on the U.S. Debtors to spend many millions of dollars defending claims that are confirmed to be more meritless by the day, but the Joint Administrators' claimed lack of personal

knowledge is contradicted by their prior statements to this Court and elsewhere. In addition to the Joint Administrators signing proofs of claim (the equivalent of verifying them), Mr. Bloom has attested about his extensive personal knowledge relating to the MRDA, the RPSM and Nortel's transfer pricing regime, proclaimed the center of main interest for each of the EMEA Debtors to be England, and endorsed the factual assertions in the witness statements of Michel Clement and Sharon Rolston.[2]

Moreover, even were it true that notwithstanding their prior avowals of knowledge, the Joint Administrators do not have unique first-hand knowledge of the facts relevant to the EMEA claims or allocation dispute, that is not the standard for a party's entitlement to a deposition. Discovery is permitted of relevant information irrespective of admissibility. See Fed. R. Civ. P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). The mere fact that the Joint Administrators may only direct us to other witnesses, documents or other sources of information is more than enough to permit their depositions. And, the U.S. Debtors are entitled to depose the Joint Administrators with respect to their new disavowal of personal knowledge despite their earlier attestations to the contrary.

While the EMEA Claimants assert that Mr. Bloom has already been deposed, they do not and cannot argue that such deposition covered the subjects raised in the EMEA Claims and allocation dispute. The prior deposition, therefore, is irrelevant.

Finally, we disagree with the EMEA Claimants' preposterous assertion that we are not entitled to depose the decision-makers on the _facts_ underlying _their_ decision to sue EMEA directors because "information about the decision-making process itself is privileged." There is no basis to make the blanket assertion that any question whatsoever relating to these lawsuits (including, for example, inquiries made by the Joint Administrators themselves or other non-lawyers) – which are quite material to the U.S. Debtors' defense – will inevitably require disclosure of privileged information. In the event the EMEA Claimants believe that some questions at the deposition raise a privilege issue, they will have the opportunity to assert privilege and seek a judicial ruling at that time. The Court has no record before it now to reach any such conclusion before any questions are even posed of these non-lawyers. See Robocast, Inc. v. Microsoft Corp., 13 MC 104(RGA), 2013 WL 1498666, at *2 (D. Del. Apr. 12, 2013) ("Because courts must be able to rule with specificity on issues of attorney-client privilege, the

---

[2] Whether or not Mr. Clement and Ms. Rolston ultimately testify (and it is remarkable that the EMEA Claimants say categorically that the "US Debtors will have the opportunity to depose both" when Ms. Rolston has resisted all efforts thus far and it is quite uncertain letters rogatory will successfully compel her appearance within the requisite time frame), we are entitled to depose Mr. Bloom on _his_ basis for expressly endorsing their statements.

party seeking the privilege must establish it as to the specific questions asked and records requested.").³

### 3. The U.S. Interests Are Entitled To A Representative Witness From Each EMEA Claimant

The mere fact that there are many EMEA Claimants is not a reason to deprive the U.S. Debtors of their basic right to depose a party representative for each Claimant. It is critical that the U.S. Debtors not lose their right to depose a representative from each EMEA Claimant. While the EMEA Claims do have common themes, each EMEA Claimant stands in its own unique position, with its own unique factual allegations and its own causes of action that they allege are governed by separate legal regimes. The U.S. Debtors must be able to depose a representative from each EMEA Claimant to explore each Claimants' individual claims.

The U.S. Debtors have not made what the EMEA Claimants assert is a "plainly ridiculous proposal that they produce 24 witnesses for 25 days of corporate representative examinations." The U.S. Debtors informed the EMEA Claimants' counsel from the outset that while each Claimant must offer a representative witness, most of them need only testify for a fraction of a day, such that several representatives could be deposed per day.⁴ If the U.S. Interests are only permitted to depose one representative on behalf of all 24 EMEA Claimants for one day, as the EMEA Claimants suggest, not only will that person likely have no knowledge about most EMEA Claimants, but the U.S. Interests would receive only 17.5 minutes for their

---

3    Incidentally, the EMEA Claimants do not deny that they have ignored our repeated requests that they identify in their voluminous production the documents requested concerning these lawsuits. We ask that the Court order them to do so immediately. See Barton v. RCI, LLC, 10 Civ. 3657(PGS), 2013 WL 1338235, at *5 ("While Rule 34 does not obligate a producing party to *per se* organize and label usable documents for the requesting party's convenience, a party exercising Rule 34's option to produce records as they are kept in the usual course of business should organize the documents in such a manner that the requesting party may obtain, with reasonable effort, the documents responsive to their requests.") (citing Armor Screen Corp. v. Storm Catcher, Inc., 07 Civ. 81091, 2009 WL 291160, at *5 (S.D. Fla. Feb. 5, 2009)).

4    It is ironic that the EMEA Claimants respond to the U.S. Interests' complaint about their failure to identify witnesses from most EMEA Claimants in response to the interrogatories by stating that "[t]o the extent the US Debtors are not satisfied with this testimony [from NNUK employees], the US Debtors will also be entitled to examine an EMEA corporate representative on the EMEA claims." And they justify their refusal to produce the Joint Administrators for deposition by asserting that the U.S. Interests "will also have the opportunity to depose a corporate representative for each of the EMEA Claimants." But only when they later address their opposition to the deposition of these corporate representatives do they reveal their shell game that "each" means a single "EMEA corporate representative," who presumably would be from NNUK.

examination with regard to each EMEA Claimant despite the specific allegations made and the millions of dollars in claims pursued by each of them.

It is plainly not burdensome, particularly given the amount of damages sought, for each EMEA Claimant to provide a representative to sit for a few-hour deposition (although a few could be longer). That the Joint Administrators chose to bring claims on behalf of numerous EMEA Claimants is not a basis to deprive the U.S. Debtors of the most basic discovery tools.

 4. **The U.S. Interests Are Entitled To Documents From E&Y UK**

The EMEA Claimants do not challenge the following:

- All but one of the Joint Administrators are partners of E&Y UK;

- E&Y UK has provided comprehensive post-petition services to the EMEA Debtors and had earned approximately $100 million in fees through December 2010 (a number that has likely grown significantly in the past two and a half years);

- E&Y UK provided critical pre-petition services to NNUK that go to the core of NNUK's claims against the U.S. Debtors, including examining the fairness of Project Swift and delivering a valuation report to the board of directors of NNUK;

- The EMEA Claimants submitted to this Court a written witness statement that *E&Y* was seeking appointment as administrators;

- The Joint Administrators prepared and publicly posted a primer on the U.K. administration process stating that "*Ernst & Young* was appointed Administrator;" and

- The U.S. Debtors secured the voluntarily cooperation of E&Y U.S. (from whom the EMEA Claimants desired documents) and obtained, reviewed and produced their documents.[5]

The EMEA Claimants also concede that they are "successors in interest to entities that were clients of EY UK."

The Joint Administrators' argument that they "have no ability to compel EY UK to produce documents" is beyond hair-splitting. In light of the undisputed facts above, there can

---

[5] The EMEA Claimants are also concurrently seeking an order of the Canadian Court ordering the production of documents from E&Y Canada.

be no serious doubt that if this Court orders the Joint Administrators to take all necessary steps to obtain E&Y U.K.'s responsive documents concerning Nortel, the documents will be produced. Can there be really any question that if the Joint Administrators insist to E&Y U.K. that it produce the documents, it will be done? A simple threat by the Joint Administrators to fire E&Y UK – thus turning off the stream of income E&Y U.K. expects to receive going forward from this proceeding – will undoubtedly secure its immediate cooperation. Were it even necessary, which we doubt, the Joint Administrators have ample tools at their disposal to obtain these documents and merely need to be sufficiently motivated by the Court to use them. The same applies with respect to any party's current advisor whose cooperation can be secured by its client's purse strings. See Mercy Catholic Medical Ctr. v. Thompson, 380 F.3d 142, 160 (3d Cir. 2004) ("In the context of Fed. R. Civ. P. 34(a), so long as the party has the legal right or ability to obtain the documents from another source upon demand, that party is deemed to have control.").

The Joint Administrators decided to bring separate claims on behalf of numerous EMEA Claimants, apparently without ever speaking to or even being able to identify witnesses from most of those Claimants with respect to central allegations they chose to make accusing the U.S. Debtors of misconduct. Now, the EMEA Claimants refuse to respond individually to interrogatories requiring them to reveal the identity of knowledgeable witnesses from each of them, the Joint Administrators refuse to testify, the EMEA Claimants refuse to produce a representative witness from each even for a few-hour deposition and the Joint Administrators refuse to obtain for production documents from their own firm, E&Y UK. The pattern is clear. The U.S. Debtors are seeking nothing more than enforcement of basic discovery rights.

5. **The EMEA Claimants' Massive Recent Production Of Documents Is "Good Cause" To Leave Open The Depositions Of EMEA Witnesses**

The EMEA Claimants do not dispute (indeed, they reiterate) that at all times until they produced 375,000 documents to us on September 3, they had represented that their remaining production would be only 50,000-100,000 documents. In other words, they concede that they produced as many as seven and a half times the volume they explicitly told us to expect when they persuaded the U.S. Interests to support their Extension Motion and to agree to their proposed new schedule.

The incorrectness of those representations, even if made in good faith, presents an enormous problem in our defense of the EMEA claims.[6] While the EMEA Claimants suggest

---

[6] Notwithstanding the EMEA Claimants' citation to their generic August 26, 2013 letter to represent to the Court that "a sizeable percentage of the documents the Joint Administrators produced were not reviewed prior to production," they subsequently advised us in writing on September 4 that "the majority" of documents in their September 3 production about which we complain were "reviewed both for responsiveness and privilege" and that only a "small portion of the documents in our [September 3] production… were produced without review."

that the solution is to require the U.S. Interests to demonstrate "good cause" later – presumably by showing Your Honor that at least some of these 375,000 documents are material to our defense (something seemingly self-evident at this time) – the U.S. Interests' proposal renders that unnecessary because we propose that we be entitled to re-examine their witnesses only on these newly produced documents. Moreover, the fact that most of these witnesses "are non-parties resident in Europe and therefore outside of the Joint Administrators' control and this Court's subpoena power" makes it all the more critical that the Court explicitly leave our cross-examination open now. If our cross examination never concludes, then the EMEA Claimants will be unable to use their deposition testimony against the U.S. Debtors and, therefore, the EMEA Claimants will be motivated to ensure the return of their cooperating witnesses. Otherwise, as with E&Y UK, the EMEA Claimants will have no incentive to secure their cooperation and these witnesses will have no motivation to return (and, as the EMEA Claimants themselves note, without the EMEA Claimants ensuring cooperation, the Court could not compel most of these witnesses). Accordingly, we need to know now – and not take our chances in the future – that these depositions will be kept open for brief follow-up examinations on the new documents.[7]

Finally, we are compelled to respond to the EMEA Claimants' attack on the U.S. Debtors' production of "only" 167,000 non-privileged documents as giving rise to "serious concerns as to whether the US Debtors have complied with their discovery obligations." First, the U.S. Debtors provided the EMEA Claimants with a detailed letter on August 10, 2013 describing their production methodology and, following review of that letter, the EMEA Claimants waived any complaint regarding such methodology in the stipulation demanded by the U.S. Interests in return for our support of the Extension Motion.[8] Second, the simple explanation for the "stark contrast" between the EMEA Claimants' production of 692,000 documents and the U.S. Debtors' production of 167,000 is that only the U.S. Debtors complied with their fundamental obligation to review their documents for responsiveness before production. In

---

[7] The EMEA Claimants respond to their enormous recent production by pointing a finger up north and asserting that U.S. Debtors "have nothing to say in respect to the Canadian Debtors' production." Not only is that untrue – footnote 13 of our initial letter raises the Canadian Debtors' and U.K. Pension Claimants' "significant new productions, with respect to which the U.S. Interests reserve all rights" – but Section 9 of the Discovery Plan makes clear that requests for relief against the Canadian Debtors regarding allocation matters must be brought before both the U.S. and Canadian Courts. Moreover, the Canadian Debtors are not pursuing claims against the U.S. Debtors and, therefore, unlike the EMEA Claimants (all of whose documents presumably relate to an issue on which the U.S. Interests and EMEA Claimants are adverse), we cannot tell at this time the percentage of Canadian documents that are relevant to areas of adversity and whether we will be able to review them before the depositions in which we would need to use them.

[8] Despite our repeated requests, the EMEA Claimants never provided us with a corresponding letter until after the parties executed the stipulation.

contrast, with respect to most of the EMEA Claimants' production, they dumped on the U.S. Interests any document – however irrelevant it may be – that hit a search term and essentially shifted to us the burden to review their entire haystack to find the documents we actually requested. "Trying to overwhelm opposing counsel with irrelevant documents when preparing for depositions – especially in connection with an accelerated discovery schedule – is, of course, highly improper." Loparex, LLC v. MPI Release Techs., Inc., No. 1:09-cv-01411-JMS-TAB, 2011 WL 1326274, at *2 (S.D. Ind. Mar. 25, 2011) (citing Rothman v. Emory Univ., 123 F.3d 446, 455 (7th Cir. 1997)). While our production is beyond challenge as a result of the EMEA Claimants' agreement and thus raised by them for no reason other than to deflect attention from their conduct, we proudly stand by the U.S Debtors' unilateral fulfillment of their obligations under the Federal Rules of Civil Procedure.

Respectfully submitted,

Derek Abbott/ae

Derek C. Abbott

cc:    All Core Parties (via email)

7569947.1