## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| NORTEL NETWORKS INC., *et al.*, | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | **Objection Deadline: November 19, 2013 at 4:00 p.m. (ET)** |
|  | : | **Hearing Date: December 3, 2013 at 10:00 a.m. (ET)** |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

### OBJECTION OF WILMINGTON TRUST, N.A., AS TRUSTEE, TO CLAIMS OF THE BANK OF NEW YORK MELLON, AS TRUSTEE AND LAW DEBENTURE TRUST COMPANY OF NEW YORK, AS TRUSTEE

Wilmington Trust, N.A., as successor indenture trustee (the "6⅞ Trustee") for the 6.875% Notes due 2023 (the "6⅞ Notes") issued by Nortel Networks Limited ("NNL"), hereby objects (the "Objection") to two proofs of claim (Nos. 3971 & 3972) (collectively, the "BNYM Claims") filed by The Bank of New York Mellon ("BNYM"), as indenture trustee for various notes and convertible notes (the "Guaranteed Notes") guaranteed by Nortel Networks Inc. ("NNI"), and one proof of claim (No. 3946) (the "Law Debenture Claim" and, together with the BNYM Claims, the "Claims") filed by Law Debenture Trust Company of New York ("Law Debenture"), as indenture trustee for certain senior unsecured debt securities (the "NNCC Notes") issued by Nortel Networks Capital Corporation ("NNCC"). In support of the Objection, the 6⅞ Trustee respectfully states as follows:[1]

### Preliminary Statement

1.    This Objection rests on a single, simple legal determination based on settled precedent in this district (*In re Wash. Mutual, Inc.*, 461 B.R. 200, 242 (Bankr. D. Del. 2011),

---

[1] The Objection is supported by the *Declaration of James P. Seery, Jr.* (the "Seery Declaration"), attached as Exhibit A hereto.

*vacated on other grounds*, 2012 WL 15163880 (Bankr. D. Del. Feb. 24, 2012)) and persuasive authority from other courts across the country following that legal determination, which states: The Federal Judgment Rate is the "legal rate" used to calculate the amount of postpetition interest payable to unsecured creditors of a solvent estate. Thus, the 6⅞ Trustee requests that this Court disallow the Claims to the extent such claims exceed the sum of: (i) principal, (ii) accrued prepetition interest, and (iii) postpetition interest at the rate of 0.44%, the Federal Judgment Rate applicable to these chapter 11 cases.[2]

2.      A prompt ruling on this Objection is critical.  Nearly five years and almost $1 billion in professional fees into these liquidating cases, the parties to the Allocation Dispute continue to fight over the distribution of approximately $7.3 billion in sale proceeds.  While at first blush the Allocation Dispute may seem like a worthwhile endeavor, allocation is not the real issue.  Rather, the ultimate question is how much can unsecured creditors obtain from each estate, and the Objection answers that very simple question as it relates to the Claims (approximately 77% of U.S. unsecured creditor claims) by recognizing the statutorily mandated cap imposed by the Bankruptcy Code and the Federal Judgment Rate.

3.      By ruling now to disallow postpetition interest on the Claims in excess of interest calculated at the Federal Judgment Rate, this Court will establish the upper boundary for recoveries to U.S. unsecured creditors and effectively end the Allocation Dispute (as defined below) as between the U.S. and Canadian estates, thereby saving the estates untold delay and countless millions in needless, additional administrative expense claims.

4.      Assuming, *arguendo*, that the U.S. estates prevail entirely in the Allocation Dispute (i.e., every single dollar goes to the U.S. estates), distributions on the Claims are capped,

---

[2] *See* Federal Reserve Statistical Release, H.15 Selected Interest Rates, www.federalreserve.gov/releases/h15/20090112/ (last updated Jan. 12, 2009) (showing Treasury constant maturities, 1-year, Week Ending January 9, 2009).

as of December 31, 2013, at $4,181,898,419.96, which includes principal, accrued prepetition interest and approximately $18 million per year of postpetition interest calculated at the "legal rate" (i.e., the Federal Judgment Rate).[3]  Under such circumstances, NNL, as ultimate parent of a solvent NNI and NNCC (and NNL's creditors), would obtain all assets of the U.S. estates, including all sale proceeds, above that capped claim amount.  Thus, the Allocation Dispute is really just a fight over whether or not the Claims will receive $18 million per year of postpetition interest.

5.    A dispute over $18 million per year in postpetition interest does not justify the scorched earth style tactics presently pursued in the Allocation Dispute.  More importantly, the parties well understand that this Court would not possibly countenance the current litigation posture and attendant costs given the true economics.  The 6⅞ Trustee urges this Court to sustain the Objection to establish the true boundaries for U.S. creditor recoveries so that the parties can address the real question in these chapter 11 cases and put these cases on a fast track to creditor distributions.

**Jurisdiction and Venue**

6.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  The statutory bases for the relief requested herein is section 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002 and 3007 of the Federal Rules of Bankruptcy Procedure.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] *See* Seery Declaration, ¶ 8, nn.8-9.

**Background**

7.      These liquidating cases were commenced more than four years ago.   Since January 14, 2009 (the "Petition Date"), virtually all of the estates' (Canadian and U.S.) assets have been sold, and approximately $9.5 billion awaits distribution.[4]   Notwithstanding serious effort, there has been little positive effect for unsecured creditors, at least for the past two years, and those creditors, be they U.S., Canadian or EMEA,[5] have received virtually nothing.   Since the filings, it is estimated that advisor fees across the jurisdictions presently exceed $900 million and are growing rapidly as the parties prepare for trial.[6]

8.      After the asset sales were largely completed, various key parties negotiated over the allocation of the approximately $7.3 billion in sale proceeds (the "Allocation Dispute").   They had no success.   This Court and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") then ordered successive mediation proceedings.   However, both of those mediations ended in failure.   In May 2013, this Court and the Canadian Court ordered the parties to commence the Allocation Protocol,[7] a protocol to litigate the Allocation Dispute.   The 6⅞ Trustee is a "Core Party" to the Allocation Dispute.   A trial on the Allocation Dispute is not scheduled until next spring, at the earliest.

---

[4] Total Sale Proceeds of $7.3 billion plus approximately $907.5 million in cash as of June 30, 2013 in the U.S. estates, plus approximately $500 million in cash in the Canadian estates, plus approximately $750 million in the EMEA estates.   *See* Debtor in Possession Monthly Operating Report, *In re Nortel Networks Inc.*, No. 09-10138-KG (Bankr. D. Del. Sept. 25, 2013), ECF No. 11765; Ninety-First Report of the Monitor dated January 25, 2013, *In re Companies' Creditors Arrangement Act* (2013), File No. 09-CL-7950 (Can. Ont. Sup. Ct. J.).

[5] European, Middle Eastern, or African.

[6] *See* Theresa Tedesco, *No End in Sight to Nortel Fees Frenzy*, Financial Post (June 24, 2013, 8:43 AM), http://business.financialpost.com/2013/06/24/nortel-bankruptcy-fees/ (citing results from analysis conducted by Diane Urquhart, independent financial analyst for representatives of the Nortel Long-term Disabled Former Employees).

[7] *See* Order Entering Allocation Protocol, *In re Nortel Networks Inc.*, No. 09-10138-KG (Bankr. D. Del. May 17, 2013), ECF No. 10565; Order (Allocation Protocol), *In re Companies' Creditors Arrangement Act* (2013), File No. 09-CL-7950 (Can. Ont. Sup. Ct. J.).

9.      On September 25, 2009, BNYM, as trustee for the Guaranteed Notes, filed the BNYM Claims against NNI, one claim for $2,785,241,840.28 (plus unliquidated amounts) as guarantor of the various notes issued under an indenture dated as of July 5, 2006, and the other claim for $1,155,508,420.14 (plus unliquidated amounts) as guarantor of various convertible notes under an indenture dated as of March 28, 2007. BNYM asserts postpetition interest as part of each of the BNYM Claims.

10.     On September 28, 2009, Law Debenture, as trustee for the NNCC Notes, filed the Law Debenture Claim against NNCC for $150,986,875.00 (plus unliquidated amounts) as issuer under an indenture dated as of February 15, 1996. Law Debenture expressly reserved its rights with respect to postpetition interest. The Claims constitute approximately 77% of all unsecured claims against the U.S. estates.

11.     The Canadian creditors, as the ultimate beneficiaries of the equity in the U.S. estates, will receive distributions from the U.S. estates if the U.S. estates are solvent.[8]  As described in more detail below, because the Bankruptcy Code mandates that the maximum rate of postpetition interest payable to unsecured creditors is the Federal Judgment Rate as of the Petition Date (0.44% per annum), even an allocation of all the sale proceeds to the U.S. estates will leave significant value for the Canadian estates. Indeed, a "win" for U.S. creditors means that Canadian creditors would receive only $91 million less than if the Canadian estates had

---

[8] The 6⅞ Trustee does not concede that any appropriate allocation of the asset sale proceeds would render any of the U.S. estates solvent. As noted in the Trustee's May 16, 2013 Opening Submission of Allocation Position in the Allocation Protocol, it may be appropriate to allocate all of the value attributable to the asset sales to NNL in the first instance or alternatively on a global pari passu basis. Under either of those allocations, the U.S. estates will not be solvent and no postpetition interest can be awarded.

"won" the Allocation Dispute.[9]   Simply put, the Allocation Dispute is a dispute over the incremental amount of postpetition interest payable to U.S. creditors, no more than $91 million.

### Grounds for Objection

12.    The 6⅞ Trustee requests that this Court disallow the Claims to the extent they seek postpetition interest in excess of the Federal Judgment Rate.   In essence, the 6⅞ Trustee requests that this Court "cap" the Claims, thereby significantly narrowing the goal posts of the Allocation Dispute and helping the parties move to the long overdue resolution of these chapter 11 cases.

### I.    Under Section 726(a)(5) of the Bankruptcy Code, the Legal Rate of Interest Is the Federal Judgment Rate.

13.    Unsecured creditors are not generally entitled to recover postpetition interest in bankruptcy. *United Savs. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372-73 (1988) (noting the "general rule" of Section 502(b)(2)); *Frito-Lay, Inc. v. LTV Corp. (In re Chateaugay Corp.)*, 156 B.R. 391, 403 (S.D.N.Y. 1993) ("502(b)(2) bars post-petition interest on a pre-petition unsecured claim."). The only exception to this general prohibition is contained in section 726(a)(5).[10]

---

[9] The $91 million in postpetition interest through December 31, 2013 is calculated as follows.  According to the BNYM Claims, the total outstanding principal as of the Petition Date was $3.825 billion, and the total claimed accrued prepetition interest was $115,750,260.42.  According to the Law Debenture Claim, the total outstanding principal as of the Petition Date was $150,000,000, the total claimed accrued prepetition interest was $984,375.00, and prepetition fees and expenses were $2,500.00.  Therefore the total amount of the Claims is $4,091,737,135.42. As of the Petition Date, the Federal Judgment Rate was 0.44%.  Therefore, based on the claimed amount, the annual postpetition interest accruing on the Claims is approximately $18,003,643.40 ($4,091,737,135.42 x 0.44%).  The amount of postpetition interest that will have accrued on the Claims from the Petition Date through December 31, 2013, or 1,813 days, and compounded annually is approximately $90,161,284.54 (($4,091,737,135.42*((1+0.0044)^4)) + ($4,164,228,400.92*0.0044/365*352) -$4,091,737,135.42).

[10] Section 506(b) of the Bankruptcy Code addresses the somewhat more common situation in which an <u>oversecured</u> secured creditor seeks to recover postpetition interest, which is the contract rate, subject to a statutory reasonableness standard.  At issue here instead is the rate at which certain <u>unsecured</u> creditors are entitled to recover postpetition interest.  Section 506(b) simply does not apply to this case.

14.     Section 726(a)(5) permits payment of postpetition interest on unsecured claims "at the legal rate" in a chapter 7 liquidation where a debtor's estate is solvent.  Section 726(a)(5) applies in a chapter 11 case through the so-called "best-interests test," which requires that, to confirm a chapter 11 plan, each holder of a claim or interest must receive the amount the holder would receive if the debtor's estate were liquidated under chapter 7 of the Bankruptcy Code.  See 11 U.S.C. § 1129(a)(7).  (While these cases are clearly liquidations with no prospect of reorganization, it matters not whether this Objection is decided under a chapter 7 or chapter 11 rubric.  In both cases, unsecured claims may only receive postpetition interest, if at all, "at the legal rate.").

15.     While the Bankruptcy Code does not expressly define the phrase "the legal rate," the majority of bankruptcy court decisions addressing this issue, including all recent decisions, conclude that the Federal Judgment Rate is "the legal rate" for postpetition interest on unsecured claims in a solvent case.  See, e.g., In re Wash. Mutual, Inc., 461 B.R. at 242; Onink v. Cardelucci (In re Cardelucci), 285 F.3d 1231, 1234 (9th Cir. 2002); Branch Banking & Trust Co. v. McDow (In re Garriock), 373 B.R. 814, 816 (E.D. Va. 2007); In re Adelphia Commc'ns Corp., 368 B.R. 140, 257 (Bankr. S.D.N.Y. 2007); In re Best, 365 B.R. 725, 727 (Bankr. W.D. Ky. 2007); In re Dow Corning Corp., 237 B.R. 380, 412 (Bankr. E.D. Mich. 1999); In re Chiapetta, 159 B.R. 152, 161 (Bankr. E.D. Pa. 1993); In re Melenyzer, 143 B.R. 829, 832-33 (Bankr. W.D. Tex. 1992).  These courts rest their decisions on sound statutory construction and fundamental policies that underlie the Bankruptcy Code.

16.     The most recent exhaustive treatment of this issue, fully weighing both lines of authority, is Judge Walrath's decision in In re Washington Mutual, Inc., 461 B.R. 200 (Bankr. D. Del. 2011).  That opinion's logic is persuasive, and the salient points are worth reviewing.

## A.    Congress Expressly Required the Legal Rate Under § 726(a)(5)

17.    Section 726(a)(5) states that interest on unsecured claims shall be paid at "the legal rate" as opposed to "a" legal rate or the "contract rate." 461 B.R. at 242. Had "Congress intended that the contract rate of interest [would] apply, it [could have] so stated." *Id.*; *see* 11 U.S.C. § 506(b) (stating that if a secured creditor is over-secured, the creditor shall be entitled to "interest on such claim . . . provided for *under the agreement* or State statute under which such claim arose.") (emphasis added); *see also Adelphia Commc'ns*, 368 B.R. at 257 ("[i]t is by far the better view . . . that 'legal rate' is the federal judgment rate and not the same as that authorized under section 506(b), which is a contract rate."); *In re Country Manor of Kenton, Inc.*, 254 B.R. 179, 182 (Bankr. N.D. Ohio 2000) ("[H]ad Congress desired to provide interest at the parties contractual rate under § 726(a)(5), it certainly knew how to specify such an arrangement, as numerous provisions of the Bankruptcy Code direct a court to examine the contractual arrangement between respective parties."); *Dow Corning*, 237 B.R. at 405-06 (holding that use of "legal" rate as opposed to "contract" rate mandated conclusion that Congress meant "a rate fixed by statute").[11]

## B.    Using the Federal Judgment Rate Provides an Efficient and Fair Way to Calculate Postpetition Interest

18.    Using the Federal Judgment Rate promotes two important bankruptcy goals: "fairness among creditors and administrative efficiency." *Wash. Mutual*, 461 B.R. at 242 (*citing Cardelucci*, 285 F.3d at 1236); *see also Best*, 365 B.R. at 727. Using a uniform rate "keeps the bankruptcy estate from being saddled with potentially difficult and time-consuming administrative burdens" of determining what rate is applicable to each creditor's claim. *Dow*

---

[11] Moreover, there is no "contract rate" for postpetition interest with respect to the BNYM Claims. The basis for the BNYM Claims is a guarantee of debt issued by two Canadian Nortel entities. Postpetition interest is not and never will be due and payable from any insolvent Canadian estate, as postpetition interest is barred by the Canadian insolvency proceeding. Since interest cannot be lawfully paid by the Canadian issuer, it cannot be subject to NNI's guarantee, which by its terms is limited to amounts not paid "when due."

*Corning*, 237 B.R. at 407; *see Country Manor*, 254 B.R. at 182 ("[U]tilizing one unified rate for any distribution made under § 726(a)(5) provides a predictable and easily ascertainable rate to apply to a creditor's claim, and thereby facilitates administration of the debtor's bankruptcy estate."); *Melenyzer*, 143 B.R. at 833 (federal judgment rate provides court with an "easily ascertainable, nationally uniform rate" and increases predictability in the process).

19.    Indeed, application of the Federal Judgment Rate requires only the basic calculation set forth in 28 U.S.C. § 1961. All creditors of a solvent debtor are entitled to a uniform payment of interest from the Debtors at the Federal Judgment Rate in effect on the Petition Date, compounded annually. 28 U.S.C. § 1961(b) (providing that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually."); *see Wash. Mutual*, 461 B.R. at 247; *see also Curry v. Am. Int'l Grp., Inc.*, 579 F. Supp. 2d 424, 426 (S.D.N.Y. 2008) (noting that the federal judgment rate is "compounded annually").

20.    By using a uniform interest rate, no single creditor will be eligible for a disproportionate share of any remaining assets to the detriment of other unsecured creditors. *See Cardelucci*, 285 F.3d at 1236 (declaring use of uniform interest rate will ensure proportionate allocation of remaining assets); *see also Country Manor*, 254 B.R. at 182 (reasoning uniform rate will bolster important bankruptcy goal of fair and equal distribution of a debtor's assets); *Dow Corning*, 237 B.R. at 409 (stating "payment of post-petition interest at the federal judgment rate . . . cannot be seen as being inequitable to unsecured creditors"). This consideration is particularly apt here where all of the claimants from each of the estates are creditors of an integrated entity that took creditor and not equity risk.

C.    **Congress Meant "the Legal Rate" to Be the Rate Fixed by Statute**

21.    At the time the Bankruptcy Code was enacted, the commonly understood meaning of "interest at the legal rate" was a rate fixed by statute. *Cardelucci*, 285 F.3d at 1234-35; *see,*

*e.g.*, *Inv. Serv. Co. v. Allied Equities Corp.*, 519 F.2d 508, 511 (9th Cir. 1975) (distinguishing "interest at the legal rate" as a rate defined by statute from a rate determined pursuant to the parties' contract). For over 100 years, in fact, courts have consistently used the term, "interest at the legal rate" to mean a rate of interest fixed by statute. *Dow Corning*, 237 B.R. at 402 (citing cases). Congress's careful choice of words is binding.

22.    Indeed, the language originally proposed for section 726(a)(5) was "interest on claims allowed." Report of the Comm'n on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. (1973), § 4–405(a)(8), reprinted in Collier App. Pt. 4(c), at 4–679. An explanatory note to the Report illustrates what was meant by this proposed phrase. It stated that "[t]he rate of interest is to be determined by other applicable law." Id. at § 4–405, Note 6, reprinted in Collier App. Pt. 4(c), at 4–681.

23.    Congress, however, rejected the use of that proposition in favor of the more specific "interest at the legal rate." 11 U.S.C. § 726(a)(5). This narrowing of the statute is instructive, as "other applicable law" is a broad, general term. *Dow Corning*, 237 B.R. at 403. Conversely, "interest at the legal rate" carries a definite meaning, a rate of interest fixed by statute. *Id.*; *see Cardelucci*, 285 F.3d at 1234 ("[I]nstead of a general statement allowing for awards of interest, Congress modified what type and amount of interest could be awarded with the specific phrasing 'at the legal rate.'"). One of the cornerstone rules of statutory interpretation is that "'[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'" *Dow Corning*, 237 B.R. at 404 (*citing Field v. Mans*, 516 U.S. 59, 69 (1995)). In this case, the established meaning manifestly was a "rate fixed by statute."

**D.    Use of the Federal Judgment Rate Promotes Uniformity of Federal Law**

24.    Like a federal money judgment, which accrues post-judgment interest at the Federal Judgment Rate, an allowed bankruptcy claim is a right to payment pursuant to federal law. The purpose of both post-judgment and postpetition interest is to compensate a successful claimant or creditor for any delay that occurs between the time of entitlement and the time of payment. *See Cardelucci,* 285 F.3d at 1235. Section 502 of the Bankruptcy Code provides for allowance of claims "as of the date of the filing of the petition" to mimic all claims being judgments as of the petition date. *Chiapetta,* 159 B.R. at 161. Postpetition interest, just like post-judgment interest, is procedural in nature and therefore governed by federal, rather than state, law. *See Cardelucci,* 285 F.3d at 1235; *Dow Corning,* 237 B.R. at 406. At the time Congress drafted section 726, procedural issues were controlled by federal law. *Hanna v. Plumer,* 380 U.S. 460, 473-74 (1965) (stating that procedural matters arising in federal court are decided by federal law). It therefore follows that the computation of postpetition interest in bankruptcy cases, just as in non-bankruptcy federal cases, must be determined by reference to federal law. *Dow Corning,* 237 B.R. at 406.

**E.    No Grounds Justify Departure from the Statute**

25.    Any assertion that the equities or other factors should be considered in determining the rate of postpetition interest pursuant to section 726(a)(5) cannot be considered. *See Wash. Mutual,* 461 B.R. at 243 ("[T]he Court agrees that the effect on equity is not an appropriate factor to be considered . . . ."). The language Congress chose to use in section 726(a)(5) is clear and does not afford any discretion and none should be engrafted onto the statute. *Cardelucci,* 285 F.3d at 1236 ("'[I]nterest at the legal rate' is a statutory term with a definitive meaning that cannot shift depending on the interests invoked by the specific factual circumstances before the court.") (citation omitted); *Garriock,* 373 B.R. at 817 ("Even if the

11

Court believed that Congress struck the wrong balance in this case, and did not adequately consider the potential creation of windfalls for solvent debtors, the Court is not at liberty to substitute its policy judgment for that of Congress.").

26.    Finally on this point, even if equities were considered, they would entirely support using the Federal Judgment Rate.  This is not a case in which any assets of a solvent NNI or NNCC would simply go to equity holders that took equity risk.  Quite to the contrary, the "equity holder" here is the parent company and issuer in an interconnected enterprise involved in multiple insolvency proceedings.  The amount left for the U.S. estates' Canadian parent, if any, will go to pay Nortel's Canadian creditors, principally former employees, pensioners and pension plans, and also including trade creditors and the holders of the 6⅞ Notes.  While "equities" are not an appropriate consideration here, if equity is considered, it strongly militates in favor of capping the Claims with the Federal Judgment Rate, or even at no postpetition interest at all.

## II.    The Issues Raised in this Objection Are Ripe for an Immediate Decision.

27.    The parties to the Allocation Dispute are immersed in extensive discovery preparing for a trial scheduled to begin next spring.  Between now and the trial, the Core Parties will spend tens of millions more and then millions of dollars again on the trial and the inevitable appeals.  Absent this Court's ruling on the Objection, the spending on professional fees will continue unabated, and Nortel's global creditors will continue to wait with little more in view than the inevitable appeals and more delay.

28.    By contrast, the disallowance of unlawful postpetition interest on the Claims can be made now as a matter of law with no discovery whatsoever.  Moreover, after this Court's application of clear, well-developed bankruptcy law to cap the Claims, the parties on both sides of the Allocation Dispute will be able to correctly set their expectations and negotiating and litigating positions.  They will know that even if all of the assets are allocated to the U.S. estates,

the most that the Claims can receive as postpetition interest is 0.44%, the Federal Judgment Rate on the Petition Date. They can then focus on swiftly resolving claims and distribution disputes and cease wasting time and estate money fighting an allocation dispute that has little economic significance in the context of these chapter 11 cases.

## Notice

29.     This Objection, along with a notice of hearing, has been provided to: (i) the Debtors; (ii) the Committee; (iii) the U.S. Trustee; (iv) BNYM; (v) Law Debenture; (vi) the Core Parties; and (vii) the parties requesting notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the 6⅞ Trustee submits that no other or further notice is necessary.[12]

## No Prior Request

30.     No prior request for the relief sought in this Objection has been made to this or any other court.

**WHEREFORE**, Wilmington Trust, N.A., as successor indenture trustee, respectfully requests that this Court enter an order:

a.     finding that the Federal Judgment Rate as of the Petition Date is the appropriate rate for postpetition interest on the Claims;

b.     disallowing the Claims to the extent such claims exceed the sum of: (i) principal, (ii) accrued prepetition interest, and (iii) postpetition interest at the rate of 0.44%, the Federal Judgment Rate applicable to these chapter 11 cases, compounded annually from the Petition Date; and

---

[12] Due to the voluminous nature of the Claims attached as exhibits to the Seery Declaration, a copy of the Objection omitting the Claims was served on the Core Parties and parties that have requested notice pursuant to Bankruptcy Rule 2002. All other notice parties have received the Objection attaching the Claims. Copies of the Claims may be obtained from the Bankruptcy Court docket or by request on the undersigned counsel.

c.    granting such other and further relief as is just and proper.

Dated: October 25, 2013
    Wilmington, Delaware

**COUSINS CHIPMAN & BROWN LLP**

_____
Scott D. Cousins (No. 3709)
Mark D. Olivere (No. 4291)
Ann M. Kashishian (No. 5622)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:  (302) 295-0191
Facsimile:  (302) 295-0199
Email:  cousins@ccbllp.com
        olivere@ccbllp.com
        kashisian@bccllp.com

    -and-

**ROPES & GRAY LLP**

D. Ross Martin (_pro hac vice_ pending)
Jonathan P. Reisman (_pro hac vice_ pending)
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Email:  ross.martin@ropesgray.com
        jonathan.reisman@ropesgray.com

Mark R. Somerstein (_pro hac vice_ pending)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Email:  mark.somerstein@ropesgray.com

_Special Litigation Counsel for Wilmington Trust, N.A. as successor trustee and not individually_