Exhibit A-1

B 10 (Official Form 10) (12/08)

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Nortel Networks Inc. | Case Number: 09-10138 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**The Bank of New York Mellon, as Indenture Trustee**

Name and address where notices should be sent:
Latham & Watkins LLP   and   The Bank of New York Mellon, as Indenture Trustee
885 Third Avenue                   Corporate Trust Risk
New York, NY 10022              101 Barclay Street, Floor 8W
Attn: Robert J. Rosenberg        New York, NY 10286
Michael J. Riela                       Attn: Martin N. Feig
Telephone: (212) 906-1200

Name and address where payment should be sent (if different from above):
The Bank of New York Mellon, as Indenture Trustee
Corporate Trust Risk
101 Barclay Street, Floor 8W
New York, NY 10286
Attn: Martin N. Feig

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** <u>$2,785,241,840.28, plus unliquidated amounts (including indemnification), as described in the attachment hereto.</u>

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

2. **Basis for Claim:** <u>Money loaned under Indenture dated as of July 5, 2006, as supplemented **(see attachment)**</u>
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____

   **3a.** Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
   Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

   **Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
   **Describe:**

   **Value of Property:** $_____  **Annual Interest Rate** _____%

   **Amount of arrearage and other charges as of time case filed included in secured claim,**

   **if any:** $_____  **Basis for perfection:** _____

   **Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

6. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. **Documents:** Attach redacted copies of any do...                                        ...purchase
   orders, invoices, itemized statements of runni...                                           of
   agreements. You may also attach a summary. ...                                        *edacted"*
   perfection of a security interest. You may als...
   *on reverse side.)*

   Filed: USBC - District of Delaware
   Nortel Networks Inc., Et Al.
   09-10138 (KG)          0000003972

   DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUME...
   SCANNING.

   If the documents are not available, please explain:

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

   Specify the priority of the claim.

   ☐ Domestic support obligation under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

   ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507(a)(4).

   ☐ Contributions to an employee benefit plan – 11 U.S.C. §507(a)(5).

   ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(7).

   ☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507(a)(8).

   ☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(___).

   **Amount entitled to priority:**

   $_____

   *\*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to case...
   the date of adju...*

| DATE: 9/21/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | FILED / RECEIVED FOR COURT USE ONLY SEP 25 2009 EPIQ BANKRUPTCY SOLUTIONS, LLC |
|---|---|---|

**Martin N. Feig, Vice President, Default Administration Group, The Bank of New York Mellon**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.*[1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

## ATTACHMENT TO PROOF OF CLAIM OF THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, RELATING TO THE INDENTURE DATED JULY 5, 2006

1.      The Bank of New York Mellon (f/k/a The Bank of New York), as indenture trustee ("BNY"), hereby files this proof of claim (the "Proof of Claim") against debtor Nortel Networks Inc. ("NNI").  BNY serves as indenture trustee under that certain Indenture dated as of July 5, 2006 (as supplemented by that certain First Supplemental Indenture dated as of July 5, 2006, that certain Second Supplemental Indenture dated as of May 1, 2007, and that certain Third Supplemental Indenture dated as of May 28, 2008, and as may otherwise may have amended, modified or supplemented, the "Indenture"), among Nortel Networks Limited ("NNL"), as issuer, Nortel Networks Corporation ("NNC") and NNI, as guarantors, and BNY, as indenture trustee.

2.      Pursuant to the Indenture, NNL issued (a) the London Interbank Offered Rate (LIBOR) + 4.250% Floating Rate Notes due 2011 in the original principal amount of $1,000,000,000.00 (the "2011 Notes"), (b) the 10.125% Fixed Rate Notes due 2013 in the original principal amount of $550,000,000.00 (the "2013 Notes") and (c) the 10.75% Fixed Rate Notes due 2016 in the original principal amount of $1,125,000,000.00 (the "2016 Notes," and together with the 2011 Notes and the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

2013 Notes, the "Notes"). A copy of the Indenture and the three supplemental indentures thereto are annexed hereto as Exhibit A.

3. Under the Indenture and the related documents, agreements and instruments executed and delivered in connection with the Indenture, NNL is obligated to pay all outstanding principal, any premium, accrued interest and certain other costs and expenses in connection with the Notes. As a guarantor, NNI is also fully liable for NNL's obligations to holders of the Notes.

4. On January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware. Also on the Petition Date, NNC, NNL, and certain of their Canadian affiliates filed applications with the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act in Canada (the "Canadian Proceedings").

5. BNY is authorized to file this Proof of Claim against NNI on behalf of itself and the holders of the Notes pursuant to section 501(a) of title 11 of the United States Code, section 510 of the Indenture, and this Court's August 4, 2009 *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof*. Separately, BNY is filing one or more proofs of claim against NNC and NNL in the Canadian Proceedings in connection with the Indenture and the Notes.

6. As of the Petition Date, NNL was (and continues to be) indebted to the holders of the Notes issued pursuant to the Indenture in the aggregate amount of $2,785,241,840.28, plus unliquidated amounts as described herein. By virtue of its guaranty, NNI is also indebted to the holders of the Notes for these amounts. NNI's guaranty obligations with respect to the Indenture and the Notes are comprised as follows:

a. NNI's guaranty obligations to the holders of the 2011 Notes are in the aggregate principal sum of $1,000,000,000.00, plus accrued and unpaid interest in the amount of $22,419,965.28;

b. NNI's guaranty obligations to the holders of the 2013 Notes are in the aggregate principal sum of $550,000,000.00, plus accrued and unpaid interest in the amount of $27,689,062.50; and

c. NNI's guaranty obligations to the holders of the 2016 Notes are in the aggregate principal sum of $1,125,000,000.00, plus accrued but unpaid interest in the amount of $60,132,812.50.

7. In addition, NNI has guaranty obligations with respect to any Additional Amounts and Additional Interest (as defined in the Indenture) that are due under the Indenture. Moreover, pursuant to the Indenture and NNI's guaranty of NNL's obligations thereunder, NNI is obligated to indemnify and hold BNY harmless against any loss, damages, claims, liability or expense (including reasonable attorney's fees and expenses) incurred without negligence, bad faith or willful misconduct on the part of BNY, and arising out of or in connection with BNY's role as indenture trustee. BNY hereby asserts a claim in an unliquidated amount with respect to NNI's indemnification obligations, plus any and all other amounts due and owing by NNI under the Indenture.

8. In addition to any and all other amounts due and owing by NNI as guarantor under the Indenture and the Notes, BNY also asserts a claim in an unliquidated amount for the continuing postpetition (a) accrual of interest (including interest upon the overdue installments of interest), (b) expense reimbursements of BNY as indenture trustee and (c) fees and expense reimbursements of BNY's legal counsel and other professionals, in respect of the Indenture and the Notes.

NY\1567682.1

9.      BNY may have post-petition administrative expense claims against NNI.  By filing this Proof of Claim, BNY does not waive any of its post-petition claims against NNI, and expressly reserves all of its rights in connection with such claims.

10.     To the best of BNY's knowledge, no judgment has been rendered on the claims set forth herein.

11.     To the best of BNY's knowledge, all payments made by NNI, NNC or NNL in connection with the Notes have been credited and deducted for the purposes of making this Proof of Claim.  To the best of BNY's knowledge, the claims described in this Proof of Claim are not subject to any setoff or counterclaim.

12.     BNY does not waive any right of action that it has or may have against NNI, NNC, NNL or any other person or persons.

13.     BNY reserves the right to amend or supplement this Proof of Claim for any purpose, including but not limited to, (a) fixing or liquidating any claims stated herein, (b) specifying and quantifying expenses or other charges or claims incurred by BNY or (c) asserting any claim for priority.

14.     In filing this Proof of Claim, BNY does not submit itself to the jurisdiction of the Court for any purpose other than with respect to this Proof of Claim.

15.     The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future defaults or events of default under the terms of the Indenture.

16.    All notices and communications concerning this Proof of Claim should be sent to the following addresses:

> The Bank of New York Mellon, as Indenture Trustee
> Corporate Trust Risk
> 101 Barclay Street, Floor 8W
> New York, NY 10286
> Attn:   Martin N. Feig
>
> and
>
> Latham & Watkins LLP
> 885 Third Avenue
> New York, NY 10022
> Attn:   Robert J. Rosenberg
>             Michael J. Riela
> Telephone: (212) 906-1200

**EXHIBIT A**

**Indenture**

#415  P. 001/102

01/16/2009  13:51

12128155802

From:Bank of NY Mellon

**NORTEL NETWORKS LIMITED**

*as Issuer,*

**NORTEL NETWORKS CORPORATION**

**AND**

**NORTEL NETWORKS INC.**

*as Guarantors,*

**AND**

**THE BANK OF NEW YORK**

*as Trustee*

---

*INDENTURE*

*Dated as of July 5, 2006*

---

[New York #1531721 v17]

#415  P. 002/102   01/16/2009 13:52   12128155802   From:Bank of NY Mellon

**NORTEL NETWORKS LIMITED**
Reconciliation and tie between Trust Indenture Act of 1939 and
Indenture, dated as of July 5, 2006

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 609 |
| (a)(2) | 609 |
| (a)(3) | Not Applicable |
| (a)(4) | Not Applicable |
| (b) | 609 |
| (c) | Not Applicable |
| 311(a) | 610 |
| (b) | 610 |
| 312(a) | 701 |
| (b) | 701(b) |
| (c) | 701(c) |
| 313(a) | 702(a) |
| (b) | 702(a) |
| (c) | 702(a) |
| (d) | 702(b) |
| 314(a) | 703(b) |
| (b) | Not Applicable |
| (c)(1) | 102 |
| (c)(2) | 102 |
| (c)(3) | Not Applicable |
| (d) | Not Applicable |
| (e) | 102 |
| 315(a) | 601(b) |
| (b) | 605 |
| (c) | 601(a) |
| (d) | 601(c) |
| (d)(1) | 601(b) |
| (d)(2) | 601(c)(2) |
| (d)(3) | 601(c)(3) |
| (e) | 511 |
| 316(a)(1)(A) | 506(a)(1) |
| (a)(1)(B) | 506(a)(2) |
| | 503(a) |
| (a)(2) | Not Applicable |
| (b) | 508 |
| 317(a)(1) | 509 |
| (a)(2) | 510 |
| (b) | 1003 |
| 318(a) | 107 |

Note: This reconciliation and tie shall not, for any purpose, be deemed to be a part of the Indenture.

[New York #1531721 v17]

i

## TABLE OF CONTENTS

#415  P. 003/102
01/16/2009 13:52
12128155802
From:Bank of NY Mellon

Page

### ARTICLE ONE
### DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

Section 101.   Definitions......................................................................................... 1
  (1)   "Acquired Funded Debt" ..................................................................... 1
  (2)   "Act" .................................................................................................. 1
  (3)   "Additional Amounts" ......................................................................... 2
  (4)   "Additional Debt Securities" ............................................................... 2
  (5)   "Additional Interest" ........................................................................... 2
  (6)   "Adjusted EBITDA" ........................................................................... 2
  (7)   "Affiliate" ........................................................................................... 3
  (8)   "Asset Acquisition" ............................................................................ 3
  (9)   "Authorized Newspaper" ..................................................................... 3
  (10)   "Authorized Officers" ......................................................................... 3
  (11)   "Board of Directors" ........................................................................... 4
  (12)   "Board Resolution" ............................................................................. 4
  (13)   "Business Day" ................................................................................... 4
  (14)   "Capital Stock" ................................................................................... 4
  (15)   "Capitalized Lease Obligation" ........................................................... 4
  (16)   "Certificated Security" ........................................................................ 4
  (17)   "Change of Control" ........................................................................... 4
  (18)   "Commission" ..................................................................................... 6
  (19)   "Common Stock" ................................................................................ 6
  (20)   "Consolidated Fixed Charge Coverage Ratio" ..................................... 6
  (21)   "Consolidated Fixed Charges" ............................................................ 7
  (22)   "Consolidated Interest Expense" ......................................................... 7
  (23)   "Consolidated Net Income" ................................................................. 8
  (24)   "Consolidated Net Tangible Assets" .................................................... 8
  (25)   "Corporate Trust Office" ..................................................................... 9
  (26)   "corporation" ...................................................................................... 9
  (27)   "Credit Enhanced Foreign Subsidiary Debt" ....................................... 9

[New York #1531721 v17]

**TABLE OF CONTENTS**
(continued)

|  |  | Page |
|---|---|---|
| (28) | "Debt Securities" | 9 |
| (29) | "Default" | 9 |
| (30) | "Defaulted Interest" | 9 |
| (31) | "Depositary" | 9 |
| (32) | "Designated Qualified Preferred Stock" | 9 |
| (33) | "Disclosure Materials" | 9 |
| (34) | "Disqualified Capital Stock" | 9 |
| (35) | "Dollar" | 10 |
| (36) | "DTC" | 10 |
| (37) | "Event of Default" | 10 |
| (38) | "Exchange Act" | 10 |
| (39) | "Exchange Debt Securities" | 10 |
| (40) | "Exchange Offer" | 10 |
| (41) | "Exchange Rate" | 10 |
| (42) | "Exchange Rate Officers' Certificate" | 11 |
| (43) | "Exchange Registration Statement" | 11 |
| (44) | "Excluded Holder" | 11 |
| (46) | "Existing NNC Convertible Notes" | 11 |
| (46) | "Existing Preferred Stock" | 11 |
| (47) | "Foreign Currency" | 11 |
| (48) | "Foreign Subsidiary" | 11 |
| (49) | "Funded Debt" | 11 |
| (50) | "GAAP" | 13 |
| (51) | "Global Security" | 13 |
| (52) | "Guarantee" | 13 |
| (53) | "Guarantor" | 13 |
| (54) | "Guarantor Request" | 13 |
| (55) | "Holder" | 13 |
| (56) | "Indenture" | 13 |
| (57) | "Initial Purchasers" | 13 |

[New York #1531721 v17]

iii

01/16/2009 13:52   #415 P.004/102
1212815802
From:Bank of NY Mellon

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| (58) | "Initial Debt Securities" | 13 |
| (59) | "Interest" | 14 |
| (60) | "Interest Payment Date" | 14 |
| (61) | "Interest Swap Obligations" | 14 |
| (62) | "Investment Grade Status" | 14 |
| (63) | "Issue Date" | 14 |
| (64) | "Issue Date Registration Rights Agreement" | 14 |
| (65) | "Issuer" | 14 |
| (66) | "Issuer Request" and "Issuer Order" | 14 |
| (67) | "Lien" | 14 |
| (68) | "Managed Service Contract Liens" | 14 |
| (69) | "Maturity" | 14 |
| (70) | "Measurement Date" | 15 |
| (71) | "Moody's" | 15 |
| (72) | "NGSH" | 15 |
| (73) | "NNC" | 15 |
| (74) | "NNCC" | 15 |
| (75) | "NNI" | 15 |
| (76) | "NNL" | 15 |
| (77) | "Officers' Certificate" | 15 |
| (78) | "Opinion of Counsel" | 15 |
| (79) | "Original Issue Discount Security" | 15 |
| (80) | "Outstanding" | 15 |
| (81) | "Participant" | 16 |
| (82) | "Paying Agent" | 16 |
| (83) | "Permitted Funded Debt" | 16 |
| (84) | "Person" | 17 |
| (85) | "Place of Payment" | 18 |
| (86) | "Predecessor Security" | 18 |
| (87) | "Preferred Stock" | 18 |

01/16/2009 13:52    #415 P. 005/102

12128155802

From:Bank of NY Mellon

TABLE OF CONTENTS
(continued)

Page

(88) "Purchase Money Lien"...............................................................18
(89) "QIB"...........................................................................................18
(90) "Qualified Capital Stock".........................................................18
(91) "Qualified Equity Proceeds"....................................................18
(92) "Redemption Date"..................................................................18
(93) "Redemption Price"..................................................................18
(94) "Refinance"..............................................................................18
(95) "Refinancing Funded Debt"......................................................19
(96) "Registration Rights"...............................................................19
(97) "Registration Rights Agreement".............................................19
(98) "Registration Statement".........................................................19
(99) "Regular Record Date".............................................................19
(100) "Regulation S".........................................................................19
(101) "Regulation S Debt Securities"...............................................19
(102) "Regulation S Global Security"...............................................19
(103) "Resale Restriction Termination Date"...................................19
(104) "Responsible Officer".............................................................20
(105) "Restricted Debt Securities"....................................................20
(106) "Restricted Debt Securities Certificate".................................20
(107) "Restricted Debt Securities Legend".......................................20
(108) "Restricted Period"..................................................................20
(109) "Restricted Subsidiary"...........................................................20
(110) "Reversion Date".....................................................................20
(111) "Rule 144A".............................................................................20
(112) "Rule 144A Debt Securities"...................................................20
(113) "Rule 144A Global Security"...................................................21
(114) "S&P".......................................................................................21
(115) "Securities Act".......................................................................21
(116) "Security Custodian"...............................................................21
(117) "Security Register"...................................................................21

From:Bank of NY Mellon    12128155802    01/16/2009 13:52    #415 P.006/102

**TABLE OF CONTENTS**
(continued)

Page

(118)  "Security Registrar" ................................................................ 21
(119)  "Shelf Registration Statement" ............................................. 21
(120)  "Special Record Date" ............................................................ 21
(121)  "Stated Maturity Date" ........................................................... 21
(122)  "Subsidiary" ............................................................................ 21
(123)  "Successor Debt Security" ...................................................... 21
(124)  "Suspended Covenants" .......................................................... 22
(125)  "Suspension Period" ............................................................... 22
(126)  "Synthetic Purchase Agreement" ........................................... 22
(127)  "Trust Indenture Act" ............................................................. 22
(128)  "Trustee" .................................................................................. 22
(129)  "United States" ........................................................................ 22
(130)  "Weighted Average Life to Maturity" .................................... 22

Section 102.    Compliance Certificates and Opinions ................................ 23
Section 103.    Form of Documents Delivered to Trustee ............................ 23
Section 104.    Acts of Holders ..................................................................... 24
Section 105.    Notices, etc., to Trustee, Issuer and Guarantors ................. 25
Section 106.    Notice to Holders; Waiver .................................................... 25
Section 107.    Conflict with Trust Indenture Act ........................................ 26
Section 108.    Effect of Headings and Table of Contents ........................... 26
Section 109.    Successors and Assigns ......................................................... 26
Section 110.    Separability Clause ............................................................... 26
Section 111.    Benefits of Indenture ............................................................ 26
Section 112.    Governing Law, etc. .............................................................. 26
Section 113.    WAIVER OF JURY TRIAL .................................................. 27
Section 114.    Legal Holidays ...................................................................... 27
Section 201.    Forms Generally .................................................................... 28
Section 202.    Forms of Debt Securities ...................................................... 28
Section 203.    Guarantee by Guarantor; Form of Guarantee; Release of Guarantee ............ 28
Section 204.    Form of Trustee's Certificate of Authentication ................. 31

From:Bank of NY Mellon          12128155802          01/16/2009 13:52          #415 P.007/102

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| | **ARTICLE THREE** | |
| | **THE DEBT SECURITIES** | |
| Section 301. | Amount Unlimited; Issuable in Series | 31 |
| Section 302. | Denominations | 34 |
| Section 303. | Execution, Authentication, Delivery and Dating | 34 |
| Section 304. | Temporary Debt Securities | 37 |
| Section 305. | Registration, Registration of Transfer and Exchange | 37 |
| Section 307. | Legends | 40 |
| Section 311. | Mutilated, Destroyed, Lost or Stolen Debt Securities | 45 |
| Section 312. | Payment of Interest; Interest Rights Preserved | 46 |
| Section 315. | Persons Deemed Owners | 49 |
| Section 316. | Cancellation | 49 |
| Section 317. | Computation of Interest | 49 |
| Section 318. | Payment in Currencies | 49 |
| Section 319. | Judgments | 51 |
| Section 320. | CUSIP Numbers | 52 |
| | **ARTICLE FOUR** | |
| | **SATISFACTION AND DISCHARGE** | |
| Section 401. | Satisfaction and Discharge of Indenture | 52 |
| Section 402. | Application of Trust Money | 53 |
| | **ARTICLE FIVE** | |
| | **DEFAULTS AND REMEDIES** | |
| Section 501. | Events of Default and Enforcement | 53 |
| Section 502. | Waiver of Declaration | 55 |
| Section 503. | Waiver | 55 |
| Section 504. | Other Remedies | 56 |
| Section 505. | Application of Money Collected | 56 |
| Section 506. | Control by Holders | 57 |
| Section 507. | Limitation on Suits | 57 |

[New York#1531721 v17]

vii

From:Bank of NY Mellon    1212815802    01/16/2009 13:52    #415 P.008/102

01/16/2009 13:53    #415  P.008/102    12128155802    From:Bank of NY Mellon

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| Section 508. | Rights of Holders To Receive Payment | 57 |
| Section 509. | Collection Suit by Trustee | 57 |
| Section 510. | Trustee May File Proofs of Claim | 58 |
| Section 511. | Undertaking for Costs | 58 |
| Section 512. | Delay or Omission Not Waiver | 58 |
| Section 513. | Waiver of Stay or Extension Laws | 58 |

### ARTICLE SIX
### THE TRUSTEE

| | | |
|---|---|---|
| Section 601. | Duties of Trustee | 58 |
| Section 602. | Rights of Trustee | 59 |
| Section 603. | Individual Rights of Trustee | 60 |
| Section 604. | Trustee's Disclaimer | 60 |
| Section 605. | Notice of Defaults | 60 |
| Section 606. | Compensation and Indemnity | 61 |
| Section 607. | Replacement of Trustee | 61 |
| Section 608. | Successor Trustee by Merger, etc. | 63 |
| Section 609. | Eligibility; Disqualification | 64 |
| Section 610. | Preferential Collection of Claims Against the Issuer | 64 |

### ARTICLE SEVEN
### HOLDERS' LISTS AND REPORTS BY TRUSTEE, ISSUER AND GUARANTORS

| | | |
|---|---|---|
| Section 701. | Preservation of Information; Communications to Holders | 64 |
| Section 702. | Reports by Trustee | 65 |
| Section 703. | Reports by Issuer and Guarantors | 66 |

### ARTICLE NINE
### SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| Section 901. | Supplemental Indentures Without Consent of Holders | 68 |
| Section 902. | Supplemental Indentures with Consent of Holders | 69 |
| Section 903. | Execution of Supplemental Indentures | 70 |
| Section 904. | Effect of Supplemental Indentures | 71 |

**TABLE OF CONTENTS**
(continued)

Page

Section 905.    Conformity with Trust Indenture Act .................................................. 71
Section 906.    Reference in Debt Securities to Supplemental Indentures .................. 71

ARTICLE TEN
COVENANTS

Section 1001.    Payment of Principal, Premium and Interest .............................. 71
Section 1002.    Maintenance of Office or Agency .............................................. 71
Section 1003.    Money for Debt Securities Payments to Be Held in Trust ........... 72
Section 1008.    Compliance Certificate .............................................................. 80
Section 1009.    Waiver of Certain Covenants .................................................... 80

ARTICLE ELEVEN
REDEMPTION OF DEBT SECURITIES

Section 1101.    Applicability of Article .............................................................. 81
Section 1106.    Debt Securities Payable on Redemption Date ......................... 83
Section 1107.    Debt Security Redeemed in Part ............................................... 84

ARTICLE TWELVE
SINKING FUNDS

Section 1201.    Applicability of Article .............................................................. 84
Section 1202.    Satisfaction of Sinking Fund Payments with Debt Securities ...... 84
Section 1203.    Redemption of Debt Securities for Sinking Fund ...................... 85

ARTICLE THIRTEEN
DEFEASANCE

Section 1301.    Discharge by Deposit of Money or Debt Securities ................. 85
Section 1302.    Application of Trust Money ....................................................... 87
Section 1303.    Repayment to the Issuer or Guarantors .................................... 87

ARTICLE FOURTEEN
MEETINGS OF HOLDERS OF DEBT SECURITIES

Section 1401.    Purposes for Which Meetings May Be Called .......................... 87
Section 1402.    Call, Notice and Place of Meetings ........................................... 87

[New York #1531721 v17]                                ix

**INDENTURE** dated as of July 5, 2006 among Nortel Networks Limited (together with any successors, "NNL" or the "Issuer"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6, Nortel Networks Corporation (together with any successors, "NNC"), a Canadian corporation having its principal place of business at 8200 Dixie Road, Suite 100, Brampton, Ontario, Canada L6T 5P6 and Nortel Networks Inc. (together with any successors, "NNI"), a Delaware corporation having its principal place of business at 4008 Chapel Hill – Nelson Highway, Research Triangle Park, North Carolina, U.S.A., 27709, and The Bank of New York (the "Trustee"), a New York corporation authorized to conduct a banking business, having its Corporate Trust Office at 101 Barclay Street 21W, New York, New York, U.S.A., 10286.

For and in consideration of the premises and the purchase of the Debt Securities by the Holders thereof, it is mutually covenanted and agreed, for the equal and proportionate benefit of all Holders of the Debt Securities or of a series thereof, as follows.

ARTICLE ONE

DEFINITIONS AND OTHER PROVISIONS OF GENERAL APPLICATION

SECTION 101.    *DEFINITIONS.*

For all purposes of this Indenture, except as otherwise expressly provided or unless the context otherwise requires:

    (A) the terms defined in this Article have the meanings assigned to them in this Article, and include the plural as well as the singular;

    (B) all other terms used herein that are defined in the Trust Indenture Act, either directly or by reference therein, have the meanings assigned to them therein;

    (C) all accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP;

    (D) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision; and

    (E) each reference to an Article or Section refers to an Article or Section of this Indenture, unless otherwise specified herein.

(1)    "Acquired Funded Debt" means Funded Debt of a Person or any of its Subsidiaries existing at the time such Person becomes a Subsidiary of NNC or at the time it merges, amalgamates or consolidates with or into NNC or any of its Subsidiaries or assumed in connection with the acquisition of property or assets from such Person and in each case not incurred by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Subsidiary of NNC or such acquisition, merger or consolidation or acquisition of such property or assets.

(2)    "Act" when used with respect to any Holder, has the meaning specified in Section 104.

[New York #1531721 v17]

(3)    "Additional Amounts" has the meaning specified in Section 313.

(4)    "Additional Debt Securities" means any Debt Securities of a series issued after the Issue Date of the Initial Debt Securities of such series pursuant to Section 310.

(5)    "Additional Interest" when used with respect to the Debt Securities of any series issued with Registration Rights, has the meaning specified in the applicable Registration Rights Agreement.

(6)    "Adjusted EBITDA" means, with respect to NNC, for any period, the sum, all as determined on a consolidated basis for NNC and its Subsidiaries in accordance with GAAP (without duplication), of:

      (a).    Consolidated Net Income; *plus*

      (b)    to the extent Consolidated Net Income has been reduced thereby (without duplication):

      (i)    all income taxes and related interest and penalties of NNC and its Subsidiaries paid or accrued (net of any income tax credits or gains) in accordance with GAAP for such period;

      (ii)    Consolidated Fixed Charges;

      (iii)    any non-cash expenses, charges or losses that decreased Consolidated Net Income during such period;

      (iv)    any loss, charge or cost attributable to exit or disposal activities approved by the Board of Directors of NNC as part of a restructuring plan;

      (v)    any loss, charge or cost attributable to any restatements of financial information of NNC or any of its subsidiaries described in the Disclosure Materials or any related internal control remedial measures;

      (vi)    any loss, charge or cost attributable to the actual and contemplated transactions with Flextronics described in the Disclosure Materials;

      (vii)    any loss, charge or cost attributable to the finance transformation project of NNC and its Subsidiaries including, without limitation, the implementation of a new information technology platform (SAP) to provide an integrated global financial system;

      (viii)    any loss, charge or cost attributable to any payment of fines, penalties or other amounts paid to any government authority or stock exchange in connection with any regulatory or enforcement proceeding relating to events described in the Disclosure Materials; and

[New York #1531721 v17]                                           2

(ix)    any loss, charge or cost attributable to the contracts existing on the date of this Indenture with Bharat Sanchar Nigam Limited described in the Disclosure Materials, but not any expansion option, extension, renewal or replacement thereof; *minus*

(c)    any non-cash credits and gains that increased Consolidated Net Income during such period, including any reversal of a charge referred to in subclauses (b)(iii) or (ix) above; *minus*

(d)    to the extent Consolidated Net Income has been increased thereby:

(i)    any gains attributable to reversals prior to the date of this Indenture of provisions relating to a certain customer bankruptcy settlement during the year ended December 31, 2003 as described in the Disclosure Materials;

(ii)    any credits and gains attributable to the restructuring of customer financing receivables prior to the date of this Indenture; and

(iii)    any reversals of any reserves for any losses, charges or costs with respect to the matters covered by subclauses (iv), (v), (vi), (vii), (viii) or (ix) of clause (b) above.

(7)    "Affiliate" means, with respect to any specified Person, any other Person who directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person.  The term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise; and the terms "*controlling*" and "*controlled*" have meanings correlative of the foregoing.

(8)    "Asset Acquisition" means (1) an investment by NNC or any Subsidiary of NNC in any other Person pursuant to which such Person shall become a Subsidiary of NNC or shall be merged, consolidated or amalgamated with or into NNC or any Subsidiary of NNC, or (2) the acquisition by NNC or any Subsidiary of NNC of the assets of any Person (other than a Subsidiary of NNC) which constitute all or substantially all of the assets of such Person or comprise any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

(9)    "Authorized Newspaper" means a newspaper in an official language of the country of publication or in the English language customarily published on each Business Day, whether or not published on Saturdays, Sundays or holidays, and of general circulation in the place in connection with which the term is used or in the financial community of such place.  Where successive publications are required to be made in Authorized Newspapers, the successive publications may be made in the same or in different newspapers in the same city meeting the foregoing requirements and in each case on any Business Day.

(10)    "Authorized Officers" means, with respect to, (i) each of NNC and NNL, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Corporate Secretary, its Treasurer, any Assistant Secretary or any Assistant Treasurer; and (ii) NNI, any one of its President, its Vice-President, Finance and Treasurer, any other of its Vice-

01/16/2009 13:53    #415 P.013/102

12128155802

From:Bank of NY Mellon

Presidents, its Secretary, or any of its Assistant Secretaries; *provided* that NNC, NNL and NNI may, from time to time, designate additional officers who would qualify as "Authorized Officers" pursuant to an Officers' Certificate delivered to the Trustee.

(11)    "Board of Directors" means, in respect of the Issuer or a Guarantor, the board of directors, the executive committee or any other committee of that board or any group of directors of that board, duly authorized to make a decision on the matter in question.

(12)    "Board Resolution" means a copy of a resolution certified by the Corporate Secretary, the Secretary or an Assistant Secretary of the Issuer or a Guarantor, as the case may be, to have been duly adopted by the Board of Directors of the Issuer or such Guarantor, respectively, and to be in full force and effect on the date of such certification.

(13)    "Business Day" means, (a) when used with respect to any Place of Payment, any Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in that Place of Payment are authorized or obligated by law to close and (b) otherwise, any Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in New York City are authorized or obligated by law to close.

(14)    "Capital Stock" means:

        (a)    with respect to any Person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of Common Stock and Preferred Stock of such Person; and

        (b)    with respect to any Person that is not a corporation, any and all partnership, membership or other equity interests of such Person.

(15)    "Capitalized Lease Obligation" means, as to any Person, the obligations of such Person under a lease that are required to be classified and accounted for as capital lease obligations under GAAP and, for purposes of this definition, the amount of such obligations at any date shall be the capitalized amount of such obligations at such date, determined in accordance with GAAP.

(16)    "Certificated Security" means any Debt Security issued under this Indenture in fully-registered, certificated form (other than a Global Security).

(17)    "Change of Control" means the occurrence of one or more of the following events:

        (a)    any "person," including its Affiliates and associates, or any "group," in each case, other than NNC, any one or more Subsidiaries of NNC or NNC's or such Subsidiaries' employee benefit plans, files a Schedule 13D or Schedule TO (or any successor schedule, form or report under the Exchange Act) disclosing that such person or group has become the "beneficial owner" of 50% or more of the combined voting power of NNC's Capital Stock having ordinary power to elect directors, or has the power to, directly or indirectly, elect a majority of the members of the

From: Bank of NY Mellon        12128155802        01/16/2009 13:54        #415 P. 014/102

NNC's Board of Directors; *provided* that the foregoing shall not apply if as a result of, and immediately following, the transaction giving a person or group such beneficial ownership (including an exchange offer or a transaction referred to in clause (c) below), the holders of the Issuer's or NNC's Common Stock immediately prior to such transaction are, directly or indirectly, the beneficial owners of at least a majority of the total voting power in the aggregate of all classes of Capital Stock of such Person;

(b)    NNC ceases to be the "beneficial owner" of 100% of the voting power of the Common Stock of the Issuer;

(c)    there shall be consummated any share exchange, amalgamation, consolidation or merger of NNC pursuant to which NNC's Common Stock would be converted into cash, securities or other property, or the Issuer or NNC sells, assigns, conveys, transfers, leases or otherwise disposes of all or substantially all of its assets, in each case other than pursuant to a share exchange, amalgamation, consolidation or merger of the Issuer or NNC in which the holders of the Issuer's or NNC's Common Stock immediately prior to the share exchange, amalgamation, consolidation or merger have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital Stock of the continuing or surviving corporation (or of the parent of such continuing or surviving corporation) immediately after the share exchange, amalgamation, consolidation or merger; or

(d)    the Issuer or NNC is dissolved or liquidated.

For purposes of this "Change of Control" definition:

(i)    "person" or "group" has the meaning given to it for purposes of Sections 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision;

(ii)    a "beneficial owner" will be determined in accordance with Rule 13d-3 under the Exchange Act, as in effect on the date of this Indenture; and

(iii)    the number of shares of the Issuer's voting stock outstanding will be deemed to include, in addition to all outstanding shares of the Issuer's voting stock and unissued shares deemed to be held by the "person" or "group" or other person with respect to which the Change of Control determination is being made, all unissued shares deemed to be held by all other persons.

Notwithstanding the foregoing, any (A) amalgamation, consolidation or merger of NNC with or into the Issuer (whether directly or indirectly by merger with or into an entity with only nominal assets created in anticipation or contemplation of such

[New York #1531721 v17]                5

amalgamation, consolidation or merger), (B) transfer of assets solely between or among NNC, the Issuer and any successor entity to NNC or the Issuer or (C) liquidation or dissolution of NNC or the Issuer resulting in the transfer of all of the assets of NNC or the Issuer to NNC, the Issuer or any successor entity to NNC or the Issuer shall, in each case, not constitute a Change of Control; *provided* that such transaction does not contravene the terms of Article Eight of this Indenture.

(18)    "Commission" means the United States Securities and Exchange Commission, as from time to time constituted, created under the Exchange Act, or if at any time after the execution of this instrument such Commission is not existing and performing the duties now assigned to it under the Trust Indenture Act, then the body performing such duties on such date.

(19)    "Common Stock" of any Person means any and all shares, interests or other participations in, and other equivalents (however designated and whether voting or non-voting) of, such Person's common equity interests, whether outstanding on the date of this Indenture or issued after the date of this Indenture, and includes, without limitation, all series and classes of such equity interests.

(20)    "Consolidated Fixed Charge Coverage Ratio" means the ratio of (i) Adjusted EBITDA of NNC during the four full fiscal quarters (the "Four Quarter Period") ending prior to the date of the transaction (the "Transaction Date") giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio for which financial statements are publicly available to (ii) Consolidated Fixed Charges for such Four Quarter Period.  In addition to and without limitation of the foregoing, for purposes of this definition, "Adjusted EBITDA" and "Consolidated Fixed Charges" shall be calculated after giving effect on a *pro forma* basis (as reasonably estimated by NNC) for the period of such calculation to:

(a)    the incurrence of any Funded Debt of NNC or any of its Subsidiaries giving rise to the need to make such calculation and any incurrence or repayment of other Funded Debt (and the application of the proceeds thereof), other than the incurrence or repayment of Funded Debt in the ordinary course of business for working capital purposes pursuant to working capital facilities, occurring during the Four Quarter Period or at any time subsequent to the last day of the Four Quarter Period and on or prior to the Transaction Date, as if such incurrence or repayment, as the case may be (and the application of the proceeds thereof), occurred on the first day of the Four Quarter Period; and

(b)    (i) any asset sale during the Four Quarter Period involving the sale of a Subsidiary or line of business by NNC or any of its Subsidiaries, in each case, that accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period and (ii) any Asset Acquisition by NNC or any of its Subsidiaries during the Four Quarter Period which would have accounted for at least $150,000,000 of NNC's consolidated revenue for the Four Quarter Period, in each case, so as to exclude or include, as the case may be, NNC's good faith estimate of any Adjusted EBITDA (including any pro forma expense and cost reductions calculated on a basis consistent with Regulation S-X under the Exchange Act)

[New York #1531721 v17]

6

attributable to the assets which are the subject of such asset sale or Asset Acquisition, as if such asset sale or Asset Acquisition occurred on the first day of the Four Quarter Period.

If NNC or any of its Subsidiaries directly or indirectly guarantees Funded Debt of a third Person, the preceding sentence shall give effect to the incurrence of such guaranteed Funded Debt, without duplication, as if NNC or any Subsidiary of NNC had directly incurred or otherwise assumed such guaranteed Funded Debt.

Furthermore, in calculating the "Consolidated Fixed Charge Coverage Ratio":

(i)     for purposes of determining the numerator (but not the denominator) of this "Consolidated Fixed Charge Coverage Ratio," interest income determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date;

(ii)    for purposes of determining the denominator (but not the numerator) of this "Consolidated Fixed Charge Coverage Ratio," interest on outstanding Funded Debt, determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter, shall be deemed to have accrued at a fixed rate per annum equal to the applicable rate of interest in effect on the Transaction Date; and

(iii)   notwithstanding clause (i) or (ii) above, interest on Funded Debt determined on a fluctuating basis, to the extent such interest is covered by agreements relating to Interest Swap Obligations, shall be deemed to accrue at the rate per annum resulting after giving effect to the operation of such agreements.

(21)   "Consolidated Fixed Charges" means, for any period, the sum, without duplication, of:

(a)     Consolidated Interest Expense for such period; plus

(b)     the amount of all dividends on any series of Disqualified Capital Stock (including the Existing Preferred Stock) or Designated Qualified Preferred Stock of NNC or its Subsidiaries paid, declared or accrued during such period multiplied, to the extent such dividend payments are not a deduction to the federal income tax liabilities of NNC or its applicable Subsidiary, by a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of NNC or such Subsidiary, expressed as a decimal.

(22)   "Consolidated Interest Expense" means, for any period, total interest expense (including that portion attributable to Capitalized Lease Obligations in accordance with GAAP) of NNC and its Subsidiaries for such period, on a consolidated basis, determined in accordance with GAAP (without duplication).

From:Bank of NY Mellon        12128155802                01/16/2009 13:55        #415  P.017/102

01/16/2009 13:55    #415  P. 018/102

12128155802

From:Bank of NY Mellon

(23)    "Consolidated Net Income" means, with respect to NNC, for any period, the aggregate net income (or loss) of NNC and its Subsidiaries for such period on a consolidated basis, determined in accordance with GAAP; *provided* that there shall be excluded therefrom (without duplication):

(a)    net after-tax gains or losses classified in NNC's consolidated statement of operations as gains or losses on the sale of businesses or assets;

(b)    net after-tax items classified as extraordinary gains or losses;

(c)    the net after-tax expense (or gain) resulting from any payment, distribution or accrual in connection with the settlement of, or satisfaction of any judgment resulting from, any shareholder litigation or regulatory or law enforcement investigation, in each case, relating to circumstances described in the Disclosure Materials;

(d)    the net income (but not loss) of any Subsidiary of NNC (other than the Issuer or any Guarantor) to the extent that (i) the declaration of dividends by such Subsidiary of that income is prohibited by a contract, operation of law (other than as a result of any solvency or minimum capital requirement) or applicable judgment and (ii) such net income cannot otherwise be distributed or transferred to NNC;

(e)    the net income or loss of any Person that is not a Subsidiary of NNC, and any joint ventures in which NNC or any Subsidiary is a party, except to the extent of cash dividends or distributions paid to NNC or to a Subsidiary of NNC by such Person;

(f)    after-tax income or loss attributable to discontinued operations;

(g)    the cumulative effect of changes in accounting principles; and

(h)    for purposes of calculating Consolidated Net Income pursuant to clause (iii) of Section 1007(b) only, in the case of a successor to NNC by consolidation, amalgamation or merger or as a transferee of assets of NNC or the Issuer, as applicable, the net income (but not loss) of the successor corporation prior to such consolidation, amalgamation, merger or transfer of assets (other than the successor of a merger, amalgamation or consolidation of the Issuer with or into NNC or any Subsidiary of NNC or of NNC into any Subsidiary of NNC).

(24)    "Consolidated Net Tangible Assets" means NNC's consolidated total assets after deducting therefrom (i) all current liabilities and (ii) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangible assets, as shown in NNC's then most recent consolidated balance sheet prepared in accordance with GAAP contained in (x) NNC's most recent annual or quarterly report on Form 10-K or Form 10-Q, as applicable, as filed with the Commission or (y) if NNC is no longer subject to reporting

requirements under the Exchange Act, NNC's most recent annual or quarterly financial statements certified by NNC's chief financial officer.

(25)   "Corporate Trust Office" means the principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered.

(26)   "corporation" includes corporations, associations, companies and business trusts.

(27)   "Credit Enhanced Foreign Subsidiary Debt" means any Funded Debt of a Foreign Subsidiary payable to a financial institution that has (a) sold a participation for cash consideration in the full principal amount of such Funded Debt to NNC, the Issuer or any other Subsidiary of NNC or (b) a Lien on or right of set-off against deposits of cash, cash equivalents or investment securities of NNC, the Issuer or any other Subsidiary of NNC; *provided* that, in the case of clause (b) above, the principal amount of such Funded Debt does not exceed the amount of cash, cash equivalents or investment securities so deposited.

(28)   "Debt Securities" means Debt Securities issued by NNL and guaranteed by the Guarantors and authenticated and delivered under this Indenture.

(29)   "Default" means an event or condition the occurrence of which is, or with the lapse of time or the giving of notice or both would be, an Event of Default.

(30)   "Defaulted Interest" has the meaning specified in Section 312.

(31)   "Depositary" means, with respect to the Debt Securities of any series issuable or issued in whole or in part in the form of one or more Global Securities, the Person designated as Depositary by the Issuer pursuant to Section 301 until a successor Depositary shall have become such pursuant to the applicable provisions of this Indenture, and thereafter "Depositary" shall mean or include each Person who is then a Depositary hereunder, and if at any time there is more than one such Person, "Depositary" as used with respect to the Debt Securities of any such series shall mean the Depositary with respect to the Debt Securities of that series.

(32)   "Designated Qualified Preferred Stock" means any Preferred Stock consisting of Qualified Capital Stock issued by NNC or any of its Subsidiaries that is designated as such by NNC by an officers' certificate delivered to the Trustee; *provided* that, immediately after giving effect to the issuance thereof, the Consolidated Fixed Charge Coverage Ratio is greater than 2.0 to 1.0.

(33)   "Disclosure Materials" means the Offering Memorandum of NNL, dated July 5, 2006, (the "Offering Memorandum") and all materials disclosed in, incorporated by reference in or contemplated by the Offering Memorandum.

(34)   "Disqualified Capital Stock" means, with respect to the Debt Securities of any series, that portion of any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder thereof), or upon the happening of any event (other than an event which would constitute an asset sale or Change of Control), matures or is mandatorily redeemable (other than such Capital Stock that will be redeemed with Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is

[New York #1531721 v17]                                  9

redeemable at the sole option of the holder thereof (except, in each case, upon the occurrence of an asset sale or Change of Control) on or prior to the final Maturity of the Debt Securities of such series.

(35)    "Dollar" or "$,", unless otherwise indicated, means the lawful currency of the United States of America.

(36)    "DTC" means The Depository Trust Company, its nominees and their respective successors and assigns, or such other depositary institution hereinafter appointed by the Issuer that is a clearing agency registered under the Exchange Act.

(37)    "Event of Default" has the meaning specified in Section 501.

(38)    "Exchange Act" means the United States Securities Exchange Act of 1934, as amended, or any successor statute or statutes thereto.

(39)    "Exchange Debt Securities" means (a) any Debt Securities issued in exchange for Initial Debt Securities or Additional Debt Securities pursuant to an Exchange Offer or any other registration under the Securities Act and (b) any Debt Security with respect to which the next preceding Predecessor Security of such Debt Security was an Exchange Debt Security.

(40)    "Exchange Offer" when used with respect to the Debt Securities of any series issued with Registration Rights, means an exchange offer by the Issuer pursuant to which Initial Debt Securities may be exchanged for Exchange Debt Securities evidencing the same, continuing indebtedness as the Initial Debt Securities registered under the Securities Act.

(41)    "Exchange Rate" means:  (i) with respect to payments in Dollars to be made on Debt Securities denominated in a Foreign Currency, the noon buying rate for that currency for wire transfers quoted in The City of New York on the Regular Record Date or Special Record Date with respect to such Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, as certified for customs purposes by the Federal Reserve Bank of New York; (ii) with respect to payments in a Foreign Currency to be made on Debt Securities denominated in Dollars, the noon Dollar buying rate for that currency for wire transfers quoted in The City of New York on the Regular Record Date or Special Record Date with respect to such Interest Payment Date or date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, as certified for customs purposes by the Federal Reserve Bank of New York; and (iii) with respect to payments in a Foreign Currency to be made on Debt Securities denominated in a different Foreign Currency, the exchange rate between such Foreign Currencies determined in the manner specified pursuant to Section 301(b)(14).  If for any reason such rates are not available with respect to one or more currencies for which an Exchange Rate is required, the Trustee shall use such quotation of the Federal Reserve Bank of New York as of the most recent available date, or quotations from one or more major banks in The City of New York or in the country of issue of the currency in question, or such other quotations as the Trustee shall deem appropriate, such banks being satisfactory to the Issuer. Unless otherwise specified by the Trustee, if there is more than one market for dealing in any currency by reason of foreign exchange regulations or otherwise, the market to be used in respect

of such currency shall be that upon which a non-resident issuer of securities designated in such currency would purchase such currency in order to make payments in respect of such securities.

(42)    "Exchange Rate Officers' Certificate," with respect to any date for the payment of principal of (and premium, if any) and interest on any series of Debt Securities, means a certificate setting forth the applicable Exchange Rate or Exchange Rates as of the Regular Record Date or Special Record Date with respect to such Interest Payment Date, the date for payment of Defaulted Interest or the fifteenth day immediately preceding the maturity of an installment of principal, as the case may be, and the amounts payable in Dollars and Foreign Currencies in respect of the principal of (and premium, if any) and interest on Debt Securities denominated in any Foreign Currency, and signed by an Authorized Officer of the Issuer and delivered to the Trustee.

(43)    "Exchange Registration Statement" means, when used with respect to the Debt Securities of a series having Registration Rights, a registration statement filed by the Issuer and the Guarantors in accordance with the Issue Date Registration Rights Agreement or any other Registration Rights Agreement entered into with respect to such Debt Securities.

(44)    "Excluded Holder" has the meaning specified in Section 313.

(45)    "Existing NNC Convertible Notes" means the 4.25% Convertible Senior Notes due September 1, 2008 issued by NNC and guaranteed by NNL pursuant to the Indenture dated as of August 15, 2001 among NNC, as issuer, NNL, as guarantor, and Deutsche Bank Trust Company Americas, as successor to The Bankers Trust Company, as trustee.

(46)    "Existing Preferred Stock" means the Issuer's Cumulative Redeemable Class A Preferred Shares Series 5, of which 16,000,000 shares are outstanding on the date of this Indenture (and the Issuer's Redeemable Class A Preferred Shares Series 6 into which such shares are convertible), and Non-cumulative Redeemable Class A Preferred Shares Series 7, of which 14,000,000 shares are outstanding on the date of this Indenture (and the Issuer's Non-Cumulative Redeemable Class A Preferred Shares Series 8 into which such shares are convertible), in each case as the same may be amended from time to time.

(47)    "Foreign Currency" means a currency issued by the government of any country other than the United States of America.

(48)    "Foreign Subsidiary" means a Subsidiary of NNC organized under the laws of a jurisdiction outside the United States of America and Canada.

(49)    "Funded Debt" means with respect to any Person, without duplication:

     (a)    all indebtedness of such Person for borrowed money;

     (b)    all indebtedness of such Person evidenced by bonds, debentures, notes or other similar instruments;

     (c)    all Capitalized Lease Obligations of such Person;

[New York #1531721 v17]                11

(d)    guarantees of indebtedness of another Person of the type referred to in clauses (a) through (e) above and clause (e) below (each such guarantee to constitute Funded Debt in an amount equal to the maximum amount of such other Person's Funded Debt guaranteed thereby);

(e)    all indebtedness of any other Person of the type referred to in clauses (a) through (d) which is secured by any Lien on any property or asset of such Person, the amount of such indebtedness being deemed to be the lesser of the fair market value of such property or asset and the amount of the indebtedness so secured; and

(f)    all Disqualified Capital Stock (including the Existing Preferred Stock) and Designated Qualified Preferred Stock issued by such Person with the amount of Funded Debt represented thereby being equal to the greater of its voluntary or involuntary liquidation preference and its maximum fixed repurchase price, if any, but excluding accrued dividends, if any.

For greater certainty, (i) proceeds received in respect of any factoring, securitization, sale of receivables or similar transaction, (ii) obligations in respect of the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and obligations of a like nature, (iii) guarantees of, and indemnity arrangements with respect to, obligations described in clauses (i) and (ii) of this paragraph, or (iv) obligations under letters of credit and letters of guarantee issued to support (A) trade or performance obligations, (B) obligations under operating leases or (C) contingent obligations arising in connection with the settlement of any shareholder litigation or regulatory or criminal investigation, or satisfaction of any judgment resulting therefrom, will not be considered Funded Debt.

For purposes hereof, the "maximum fixed repurchase price" of any Disqualified Capital Stock that does not have a fixed repurchase price shall be calculated in accordance with the terms of such Disqualified Capital Stock as if such Disqualified Capital Stock were purchased on any date on which Funded Debt shall be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the fair market value of such Disqualified Capital Stock shall be determined in accordance with the definition thereof.

Accrual of interest, accrual of dividends, the accretion of accreted value, the payment of interest in the form of additional Funded Debt and the payment of dividends in the form of additional shares of Preferred Stock will not be deemed to be an incurrence of Funded Debt. The amount of any Funded Debt outstanding as of any date shall be (i) the accreted value of the Funded Debt, in the case of any Funded Debt issued with original issue discount or (ii) the principal amount or liquidation preference of such Funded Debt, in any other case.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Funded Debt, the U.S. dollar-equivalent principal amount of Funded Debt denominated in a Foreign Currency shall be calculated based on the relevant currency exchange rate in effect on the date such Funded Debt was incurred, in the case of term Funded Debt, or first committed, in the case of revolving credit Funded Debt. Notwithstanding any other provision of Section 1006 of this Indenture, the maximum amount of Funded Debt that NNC, the Issuer or the Guarantors may incur pursuant to Section 1006 of this Indenture shall not be

[New York #1531721 v17]                                12

From:Bank of NY Mellon          12128156802          01/16/2009 13:56          #415  P. 022/102

deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Funded Debt incurred to Refinance other Funded Debt, if incurred in a different currency from the Funded Debt being Refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such Refinancing Funded Debt is denominated that is in effect on the date of such Refinancing.

(50)    "GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

(51)    "Global Security" means a Debt Security evidencing all or part of a series of Debt Securities, issued to the Depositary for such series in accordance with Section 303 and bearing the appropriate legend prescribed in Section 303.

(52)    "Guarantee" means the guarantee of each of the Guarantors as endorsed on each Global Security and Certificated Security authenticated and delivered pursuant to this Indenture and shall include the Guarantee set forth in Section 203 of this Indenture and all other obligations and covenants of the Guarantors contained in this Indenture and any Global Security and Certificated Security.

(53)    "Guarantor" means each of (a) Nortel Networks Corporation, (b) at any time other than during a Suspension Period, Nortel Networks Inc. and (c) any successor corporation to a Guarantor that has become a Guarantor pursuant to the applicable provisions of this Indenture.

(54)    "Guarantor Request" means a written request or order signed in the name of a Guarantor by, in the case of NNC, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Authorized Officers, or, in the case of NNI, any one of its Authorized Officers and, in each case, delivered to the Trustee.

(55)    "Holder," with respect to a Debt Security, means the Person in whose name such Debt Security is registered in the Security Register.

(56)    "Indenture" means this instrument as originally executed or as it may from time to time be supplemented, amended or restated by or pursuant to one or more indentures supplemental hereto entered into pursuant to the applicable provisions hereof and, unless the context otherwise requires, shall include the terms of a particular series of Debt Securities established as contemplated by Section 301.

(57)    "Initial Purchasers" means J.P. Morgan Securities Inc., Citigroup Global Markets Inc., ABN AMRO Incorporated, Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc.

(58)    "Initial Debt Securities," when used with respect to the Debt Securities of any series having Registration Rights, means the Debt Securities of such series issued upon original

From: Bank of NY Mellon          12128155802          01/16/2009 13:56          #415 P. 023/102

issuance and all Debt Securities, other than Exchange Debt Securities, issued upon the registration of transfer, exchange or partial redemption of Initial Debt Securities.

(59)    "interest," when used with respect to an Original Issue Discount Security that by its terms bears stated interest only after Maturity, refers to interest payable after Maturity.

(60)    "Interest Payment Date,", with respect to any Debt Security, means the Stated Maturity Date of an installment of interest on such Debt Security.

(61)    "Interest Swap Obligations" means the obligations of any Person pursuant to any arrangement with any other Person, whereby, directly or indirectly, such Person is entitled to receive from time to time periodic payments calculated by applying either a floating or a fixed rate of interest on a stated notional amount in exchange for periodic payments made by such other Person calculated by applying a fixed or a floating rate of interest on the same notional amount and shall include, without limitation, interest rate swaps, caps, floors, collars and similar agreements.

(62)    "Investment Grade Status,", with respect to the Debt Securities of any series, shall occur when the Debt Securities of such series have both (a) a rating of "BBB-" or higher from S&P and (b) a rating of "Baa3" or higher from Moody's, and each such rating shall have been published by the applicable agency, in each case with no negative outlook.

(63)    "Issue Date" means the date of original issue of any Initial Debt Securities.

(64)    "Issue Date Registration Rights Agreement" means the registration rights agreement dated as of the date of this Indenture among the Issuer, the Guarantors and the Initial Purchasers.

(65)    "Issuer" has the meaning assigned to such term in the first paragraph of this Indenture.

(66)    "Issuer Request" and "Issuer Order" mean, respectively, a written request or order signed in the name of the Issuer by an Authorized Officer of the Issuer and delivered to the Trustee.

(67)    "Lien" means any mortgage, hypothec, pledge, lien, security interest, privilege, floating charge, conditional sale or other title retention agreement or other similar encumbrance securing indebtedness for borrowed money.  For greater certainty, "Lien" does not include any such encumbrance covering receivables or other assets an interest in which has been transferred to a third party in a factoring, securitization or similar transaction that is accounted for as a sale under GAAP.

(68)    "Managed Service Contract Liens" means any Lien in favor of a customer of NNC or any of its Subsidiaries and/or a third party financing company relating to equipment owned by NNC or any of its Subsidiaries that is (a) used by such customer in the conduct of its business and (b) managed by NNC or any of its Subsidiaries under a managed services or hosting services contract between NNC or any of its Subsidiaries, such customer and/or such third party financing company.

(69)    "Maturity," when used with respect to any Debt Security, means the date on which the principal of such Debt Security becomes due and payable as therein or herein provided, whether

[New York #1531721 v17]                                   14

at the Stated Maturity Date or by declaration of acceleration, call for redemption, repayment at the option of the Holder or otherwise.

(70)    "Measurement Date" means March 31, 2006.

(71)    "Moody's" means Moody's Investors Service, Inc. and its successors.

(72)    "NGSH" means Nortel Government Solutions Holding Corporation, a Delaware corporation, and any successor corporation thereto.

(73)    "NNC" has the meaning specified in the preamble hereto.

(74)    "NNCC" means Nortel Networks Capital Corporation, a Delaware corporation, and any successor corporation thereto.

(75)    "NNI" has the meaning specified in the preamble hereto.

(76)    "NNL" has the meaning specified in the preamble hereto.

(77)    "Officers' Certificate" means a certificate signed by, in the case of NNC or NNL, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Authorized Officers, and, in the case of NNI, any one of its Authorized Officers and, in each case, delivered to the Trustee.

(78)    "Opinion of Counsel" means a written opinion of counsel, who may be counsel to or an employee of the Issuer or a Guarantor or both, which opinion shall be subject to customary assumptions and qualifications.

(79)    "Original Issue Discount Security" means any Debt Security that is issued with "original issue discount" within the meaning of Section 1273(a) of the United States Internal Revenue Code of 1986 and the regulations thereunder and any other Debt Security designated by the Issuer as issued with original issue discount for United States federal income tax purposes.

(80)    "Outstanding" when used with respect to Debt Securities means, as of the date of determination, all Debt Securities theretofore authenticated and delivered under this Indenture, *except*:

(a)    Debt Securities theretofore cancelled by the Trustee or delivered to the Trustee for cancellation;

(b)    Debt Securities for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer or a Guarantor) in trust or set aside and segregated in trust by the Issuer or a Guarantor (if the Issuer or a Guarantor shall act as its own Paying Agent) for the Holders of such Debt Securities; *provided* that if such Debt Securities are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made; and

[New York #1531721 v17]                                    15

(c)     Debt Securities that have been surrendered to the Trustee pursuant to
Section 311 or in exchange for or in lieu of which other Debt Securities
have been authenticated and delivered pursuant to this Indenture, other
than any such Debt Securities in respect of which there shall have been
presented to the Trustee proof that such Debt Securities are held by a *bona
fide* purchaser in whose hands such Debt Securities are valid and binding
obligations of the Issuer;

*provided* that in determining whether the Holders of the requisite principal amount of
Outstanding Debt Securities have taken any Act hereunder, Debt Securities owned by the Issuer
or any other obligor upon the Debt Securities or any Affiliate of the Issuer or of such other
obligor shall be disregarded and deemed not to be Outstanding; *provided further* that, in
determining whether the Trustee shall be protected in relying upon such Act, only Debt
Securities that a Responsible Officer of the Trustee knows to be so owned shall be so
disregarded; and *provided further* that Debt Securities so owned that have been pledged in good
faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee
the pledgee's right to act with respect to such Debt Securities and that the pledge is not the
Issuer or any other obligor upon the Debt Securities or any Affiliate of the Issuer or of such other
obligor.

(81)    "Participant" means, with respect to the Depositary, a Person who has a direct account
with the Depositary.

(82)    "Paying Agent" means any Person authorized by the Issuer to pay the principal of (and
premium, if any) or interest on any Debt Securities on behalf of the Issuer.

(83)    "Permitted Funded Debt" means, without duplication, each of the following:

(a)     Funded Debt under the Debt Securities issued on the date of this indenture
and any Exchange Debt Securities issued with respect to such Debt
Securities;

(b)     Funded Debt incurred to finance the acquisition, improvement or
construction of assets that is secured by Purchase Money Liens on the
assets so acquired, improved or constructed;

(c)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC
outstanding on the date of this Indenture;

(d)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC to NNC,
the Issuer and/or any Subsidiary of NNC;

(e)     Funded Debt of NNC, the Issuer and/or any Subsidiary of NNC owing to
any joint-venture in which NNC, the Issuer or such Subsidiary has a
minority holding;

[New York #1531721 v17]                                    16

(f)     any guarantee of Funded Debt by NNC, the Issuer or any Subsidiary of
        NNC so long as the incurrence of such Funded Debt would otherwise be
        permitted or is otherwise not restricted under this Indenture;

(g)     Refinancing Funded Debt;

(h)     any Credit Enhanced Foreign Subsidiary Debt and any Funded Debt
        arising out of the deposit of cash or cash equivalents to secure any Credit
        Enhanced Foreign Subsidiary Debt;

(i)     additional Funded Debt of NNC, the Issuer and any Subsidiary of NNC in
        an aggregate outstanding principal amount not to exceed, after giving
        effect to the relevant transaction, $250,000,000;

(j)     any other Funded Debt of any Foreign Subsidiary; *provided* that the
        aggregate outstanding principal amount of Funded Debt issued or assumed
        pursuant to this clause (j) by any individual Foreign Subsidiary would not,
        after giving effect to the relevant transaction, exceed $5,000,000; and

(k)     Funded Debt in an aggregate outstanding principal amount not to exceed
        15% of Consolidated Net Tangible Assets after giving effect to any such
        incurrence of Funded Debt under this clause (k).

        For purposes of determining compliance with Section 1006 of this Indenture, in the event
that an item of Funded Debt meets the criteria of more than one of the categories of Permitted
Funded Debt other than clause (c) above or is entitled to be incurred pursuant to the Consolidated
Fixed Charge Coverage Ratio provisions of such covenant, the Issuer or the applicable Guarantor
shall, in its sole discretion, classify such item of Funded Debt in any manner that complies with
such covenant.  In addition, the Issuer or the applicable Guarantor may, at any time, change the
classification of an item of Funded Debt (or any portion thereof) to any other clause, and may
classify an item in part under any one or more of the clauses listed above, or in whole or in part
to Section 1006(a) of this Indenture; *provided* that NNC, the Issuer or any other Subsidiary of
NNC would be permitted to incur such item of Funded Debt (or portion thereof) pursuant to such
other clause or clauses, as the case may be, or Section 1006(a) of this Indenture, as the case may
be, at such time of reclassification.  Accrual of interest, accretion or amortization of original
issue discount or other discounts or premiums, the payment of interest on any Funded Debt in the
form of additional Funded Debt with the same terms, and the payment of dividends on
Disqualified Capital Stock or Designated Qualified Preferred Stock in the form of additional
shares of the same class of Disqualified Capital Stock or Designated Qualified Preferred Stock
and any other changes in reported Funded Debt required by GAAP and other non-cash changes
in Funded Debt due to fluctuations in currency exchange rates, will not be deemed to be an
incurrence of Funded Debt or an issuance of Disqualified Capital Stock or Designated Qualified
Preferred Stock for purposes of Section 1006 of this Indenture.

(84)    "Person" means an individual, partnership, corporation, limited liability company,
unincorporated organization, trust or joint venture, or a governmental agency or political
subdivision thereof.

[New York #1531721 v17]                              17

(85)   "Place of Payment" means:  (i) when used with respect to the Debt Securities of any series payable in Dollars, the Corporate Trust Office of the Trustee in the Borough of Manhattan, The City and State of New York; and (ii) when used with respect to the Debt Securities of any series payable in a Foreign Currency, the other place or places, if any, where the principal of (and premium, if any) and interest on the Debt Securities of that series are payable as specified as contemplated by Section 301.

(86)   "Predecessor Security" of any particular Debt Security means every previous Debt Security evidencing all or a portion of the same debt as that evidenced by such particular Debt Security; and, for the purposes of this definition, any Debt Security authenticated and delivered under Section 311 in lieu of a lost, destroyed or stolen Debt Security shall be deemed to evidence the same debt as the lost, destroyed or stolen Debt Security.

(87)   "Preferred Stock" of any Person means any Capital Stock of such Person that has preferential rights to any other Capital Stock of such Person with respect to dividends or redemptions or upon liquidation.

(88)   "Purchase Money Lien" means any Lien on property existing at the time of acquisition thereof by NNC or any Subsidiary of NNC; any Lien on any property acquired, constructed or improved by NNC or any Subsidiary of NNC incurred subsequent to the date of this Indenture, which is created or assumed contemporaneously with, or within 180 days after, such acquisition or the completion of such construction or improvement, to secure or provide for the payment of the purchase price thereof or the cost of construction or improvement thereon incurred subsequent to the date of this Indenture (including the cost of any underlying real property); *provided* that in the case of any such acquisition, construction or improvement, the Lien shall not apply to any property previously owned by NNC or any Subsidiary of NNC, other than, in the case of any such construction or improvement, any real property, theretofore substantially unimproved for the purposes of NNC or any Subsidiary of NNC, on which the property so constructed, or the improvement, is located and other than any machinery or equipment installed at any time so as to constitute immovable property or a fixture on the real property on which the property so constructed, or the improvement, is located.

(89)   "QIB" means any "qualified institutional buyer" as defined in Rule 144A.

(90)   "Qualified Capital Stock" means any Capital Stock that is not Disqualified Capital Stock.

(91)   "Qualified Equity Proceeds" means the net cash proceeds from any issuance or sale of Qualified Capital Stock of NNC or NNL, other than issuances or sales to NNC or any Subsidiary of NNC.

(92)   "Redemption Date," when used with respect to any Debt Security to be redeemed, means the date fixed for such redemption by or pursuant to this Indenture.

(93)   "Redemption Price," when used with respect to any Debt Security to be redeemed, means the price at which it is to be redeemed pursuant to this Indenture.

(94)   "Refinance" means, with respect to any security or Funded Debt, to refinance, extend, renew, refund, repay, prepay, redeem, defease or retire, or to issue a security or any Funded Debt

From:Bank of NY Mellon          12128156802          01/16/2009 13:57          #415   P. 028/102

#415  P. 029/102    01/16/2009 13:56    12128155802    From:Bank of NY Mellon

in exchange or replacement for, such security or Funded Debt in whole or in part. "Refinanced" and "Refinancing" have correlative meanings.

(95)    "Refinancing Funded Debt" means any Refinancing by NNC, the Issuer or any other Subsidiary of NNC of Funded Debt permitted by Section 1006 of this Indenture (other than pursuant to clauses (d), (e), (f), (h), (i), (j) or (k) of the definition of "Permitted Funded Debt"), in each case that does not:

    (a)    result in an increase in the aggregate principal amount of Funded Debt of such Person as of the date of such proposed Refinancing (plus the amount of any premium required to be paid under the terms of the instrument governing such Funded Debt and plus the amount of reasonable expenses incurred by NNC, the Issuer or any other Subsidiary of NNC in connection with such Refinancing); or

    (b)    create Funded Debt with either (i) a Weighted Average Life to Maturity that is less than the Weighted Average Life to Maturity of the Funded Debt being Refinanced or (ii) a final maturity earlier than the final Maturity of any Debt Security.

(96)    "Registration Rights," when used with respect to any Debt Security, means that such Debt Security has the benefit of a Registration Rights Agreement entered into in connection with the issuance of such Debt Security.

(97)    "Registration Rights Agreement" means any registration rights agreement among the Issuer, the Guarantors and one or more investment banks acting as initial purchasers in connection with any issuance of Debt Securities under this Indenture, including the Issue Date Registration Rights Agreement.

(98)    "Registration Statement" means an effective Exchange Registration Statement or Shelf Registration Statement.

(99)    "Regular Record Date" for the interest payable on any Interest Payment Date on the Debt Securities of any series means the date specified for that purpose as contemplated by Section 301.

(100)    "Regulation S" means Regulation S under the Securities Act (or any successor provision), as it may be amended from time to time.

(101)    "Regulation S Debt Securities," when used with respect to an identifiable series of the Debt Securities of any series, means all Debt Securities of such series sold (whether in the original issuance or afterwards) pursuant to Regulation S.

(102)    "Regulation S Global Security" has the meaning specified in Section 301(i).

(103)    "Resale Restriction Termination Date" means, (a) for any Restricted Debt Security (or beneficial interest therein) that is not a Regulation S Debt Security, two years (or such other period specified in Rule 144(k)) from the later of (i) the Issue Date thereof and (ii) the last date on which the Issuer, any Guarantor or any Affiliate of the Issuer or any Guarantor was the owner

[New York #1531721 v17]

19

of such Debt Securities and (b) for any Restricted Debt Securities that are Regulation S Debt Securities (or beneficial interests in a Regulation S Global Security), 40 days after the later of (i) the Issue Date thereof and (ii) the last date on which the Issuer, any Guarantor or any Affiliate of the Issuer or any Guarantor was the owner of such Debt Securities.

(104)  "Responsible Officer," when used with respect to the Trustee, means any vice-president (whether or not designated by a number or word or words added before or after the title "vice-president"), any assistant secretary, any assistant treasurer, any trust officer or assistant trust officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

(105)  "Restricted Debt Securities," when used with respect to an identifiable series of the Debt Securities, means all Debt Securities of such series other than Exchange Debt Securities, and shall include the Regulation S Global Security and the Rule 144A Global Security; *provided* that Restricted Debt Securities of such series shall cease to be Restricted Debt Securities upon the removal of the Restricted Debt Securities Legend.

(106)  "Restricted Debt Securities Certificate" means a certificate substantially in the form set forth in Exhibit B.

(107)  "Restricted Debt Securities Legend" means, collectively, the legends substantially in the forms of the legends required by Section 307 to be placed upon each Restricted Debt Security.

(108)  "Restricted Period" means, in the case of any Regulation S Debt Securities of an identifiable series, the period of 40 consecutive days beginning on and including the later of (i) the day on which such Debt Securities are first offered to Persons other than distributors (as defined in Regulation S) in reliance on Regulation S and (ii) the Issue Date for such Regulation S Debt Securities.

(109)  "Restricted Subsidiary" means (a) during a Suspension Period, NNI and NNCC, and (b) at all other times, any Subsidiary of NNC (other than the Issuer).

(110)  "Reversion Date" means, for any series of Debt Securities, the date such Debt Securities cease to have the applicable rating from either Moody's or S&P specified in the definition of Investment Grade Status; *provided* that solely for the purpose of determining whether and when the Reversion Date shall have occurred, a series of Debt Securities shall be deemed to have Investment Grade Status if clauses (a) and (b) of the definition of Investment Grade Status are otherwise satisfied, notwithstanding that either Moody's and/or S&P shall have announced a negative outlook with respect to such Debt Securities.

(111)  "Rule 144A" means Rule 144A under the Securities Act (or any successor provision), as such Rule 144A may be amended from time to time.

(112)  "Rule 144A Debt Securities" means the Debt Securities purchased by the initial purchasers thereof for resale pursuant to Rule 144A. Such term includes the Rule 144A Global Securities.

[New York #1531721 v17]

20

(113) "Rule 144A Global Security" has the meaning specified in Section 301(h).

(114) "S&P" means Standard & Poor's Rating Service, a division of The McGraw-Hill Companies, Inc., and its successors.

(115) "Securities Act" means the United States Securities Act of 1933, as amended, or any successor statute or statutes thereto.

(116) "Security Custodian" means the custodian with respect to any Global Security appointed by DTC, or any successor Person thereto, and shall initially be the Trustee.

(117) "Security Register" has the meaning specified in Section 305.

(118) "Security Registrar" has the meaning specified in Section 305.

(119) "Shelf Registration Statement," when used with respect to the Debt Securities of any series having Registration Rights, means an effective shelf registration statement under the Securities Act that registers the resale by Holders (and beneficial owners) of Initial Debt Securities (or beneficial interests therein).

(120) "Special Record Date" for the payment of any Defaulted Interest means a date fixed by the Trustee pursuant to Section 312.

(121) "Stated Maturity Date," when used with respect to any Debt Security or any installment of interest thereon, means the date specified in such Debt Security as the fixed date on which the principal of such Debt Security or such installment of interest is due and payable.

(122) "Subsidiary," with respect to any Person, means:

    (a)    any corporation of which the outstanding Capital Stock having at least a majority of the votes entitled to be cast in the election of directors under ordinary circumstances shall at the time be owned, directly or indirectly, by such Person; or

    (b)    any other Person of which at least a majority of the voting interest under ordinary circumstances is at the time, directly or indirectly, owned by such Person;

*provided* that none of (i) NGSH, (ii) any direct or indirect Subsidiary of NGSH or (iii) for so long as it is a tax exempt organization under Section 501(c)3 of the Internal Revenue Code or an application for such status is pending, Nortel LearnIT, a Virginia non-stock corporation, shall constitute a Subsidiary of NNC or any of its Subsidiaries for purposes of Sections 1005, 1006 and 1007 of this Indenture (or the defined terms used therein other than Consolidated Net Income and Adjusted EBITDA) or any Event of Default.

(123) "Successor Debt Security" of any particular Debt Security as a series means every Debt Security of such series issued after, and evidencing all or a portion of the same debt as that evidenced by, such particular Debt Security; and, for purposes of this definition, any Debt Security of a series authenticated and delivered under Section 311 of this Indenture in exchange

[New York #1531721 v17]

21

01/16/2009 13:59    #415  P.032/102    12128155802    From:Bank of NY Mellon

for or in lieu of a mutilated, destroyed, lost or stolen Debt Security shall be deemed to evidence the same debt as the mutilated, destroyed, lost or stolen Debt Security.

(124)  "Suspended Covenants" has the meaning specified in Section 1010.

(125)  "Suspension Period" means, for any series of Debt Securities, any period (a) beginning on the date that:

    (i)  the Debt Securities of such series have Investment Grade Status, *provided* that prior to the assignment of the ratings contemplated by the definition of Investment Grade Status, the Issuer has advised Moody's and S&P that the Suspended Covenants will not apply during such Suspension Period;

    (ii)  no Default or Event of Default has occurred and is continuing; and

    (iii)  the Issuer has delivered an Officers' Certificate to the Trustee certifying that the conditions set forth in clauses (i) and (ii) above are satisfied; and

(b) ending on the Reversion Date for such series of Debt Securities.

(126)  "Synthetic Purchase Agreement" shall mean any derivative or similar agreement pursuant to which NNC or any of its Subsidiaries is or may become obligated to make any payment the amount of which is determined by reference to the price or value at any time of any Capital Stock of NNC; *provided* that no phantom stock or similar plan providing for payments only to current or former directors, officers, employees, consultants or contractors of NNC or any Subsidiary of NNC (or to their heirs or estates or successors or assigns) shall be deemed to be a Synthetic Purchase Agreement.

(127)  "Trust Indenture Act" means the United States Trust Indenture Act of 1939 as in force at the date as of which this Indenture was executed, except as provided in Sections 609 and 905.

(128)  "Trustee" means the Person named as the "Trustee" in the first paragraph of this Indenture until a successor Trustee shall have become such pursuant to the applicable provisions hereof, and thereafter "Trustee" shall mean or include each Person who is then a Trustee hereunder, and if at any time there is more than one such Person, "Trustee" as used with respect to the Debt Securities of any series shall mean the Trustee with respect to Debt Securities of that series.

(129)  "United States" means the United States of America.

(130)  "Weighted Average Life to Maturity" means, when applied to any Funded Debt at any date, the number of years obtained by dividing (a) the then outstanding aggregate principal amount of such Funded Debt into (b) the sum of the products obtained by multiplying (i) the amount of each then-remaining installment, sinking fund, serial maturity or other required payment of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) which will elapse between such date and the making of such payment.

[New York #1531721 v17]

22

SECTION 102.    *COMPLIANCE CERTIFICATES AND OPINIONS.*

(a)    Upon any application or request by the Issuer or a Guarantor to the Trustee to take any action under any provision of this Indenture, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee an Officers' Certificate and Opinion of Counsel stating that all conditions precedent, if any, provided for in this Indenture related to the proposed action have been complied with except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture related to such particular application or request, no additional certificate or opinion need be furnished.

(b)    Every Officers' Certificate or Opinion of Counsel with respect to compliance with a condition or covenant provided for in this Indenture (other than the certificate required by Section 1008) shall include substantially: (1) a statement that each individual signing such certificate or opinion has read such covenant or condition and the definitions herein related thereto; (2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based; (3) a statement that, in the opinion of each such individual, he has made such examination or investigation as is reasonably necessary to enable him to make the statement or to express an opinion whether such covenant or condition has been complied with; and (4) a statement whether, in the opinion of each such individual, such condition or covenant has been complied with.

SECTION 103.    *FORM OF DOCUMENTS DELIVERED TO TRUSTEE.*

(a)    In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b)    Any Officers' Certificate or Opinion of Counsel of the Issuer or a Guarantor may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer or counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such certificate or opinion is based are erroneous.  Any such certificate or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Issuer or such Guarantor, as the case may be, stating that the information with respect to such factual matters is in the possession of such certifying entity unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

(c)    Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

[New York #1531721 v17]

23

From:Bank of NY Mellon        12128155802        01/16/2009 13:59        #415 P.033/102

SECTION 104.    *ACTS OF HOLDERS.*

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of the Debt Securities of any series may be embodied in and evidenced by (i) one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing; (ii) the record of such Holders voting in favor thereof, either in person or by proxies duly appointed in writing, at any meeting of Holders of the Debt Securities of such series duly called and held in accordance with the provisions of Article Fourteen or (iii) a combination of any such record and one or more instruments of substantially similar tenor signed by such Holders in person or by proxies duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such record or instrument or instruments (and the action embodied therein or evidenced thereby) are delivered to the Trustee and, where it is hereby expressly required, to the Issuer and the Guarantors or any of them.  Such record or instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders signing such instrument or instruments or so voting at any such meeting.  Proof of execution of any such record or instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and, subject to Section 601, conclusive in favor of the Trustee, the Issuer and the Guarantors, if made in the manner provided in this Section.  The record of any meeting of Holders of Debt Securities shall be proved in the manner provided in Section 1406.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by a certificate of a notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by a signer acting in a capacity other than his individual capacity, such certificate or affidavit shall also constitute sufficient proof of his authority.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)    The ownership of Debt Securities shall be proved by the Security Register.

(d)    If the Issuer or a Guarantor shall solicit from the Holders of Debt Securities of any series any Act, the Issuer or such Guarantor, as the case may be, may, at its option, by Board Resolution, fix in advance a record date for the determination of Holders of Debt Securities entitled to take such Act, but the Issuer or such Guarantor, as the case may be, shall have no obligation to do so.  Any such record date shall be fixed at the discretion of the Issuer or such Guarantor, as the case may be.  If such a record date is fixed, such Act may be sought or taken before or after the record date, but only the Holders of record at the close of business on such record date shall be deemed to be Holders for the purpose of determining whether Holders of the requisite proportion of Debt Securities of such series Outstanding have authorized or agreed or consented to such Act, and for that purpose the Debt Securities of such series Outstanding shall be computed as of such record date.

(e)    Any Act of the Holder of any Debt Security shall bind every future holder of the same Debt Security and the Holder of every Debt Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof in respect of anything done, suffered or omitted

[New York #1531721 v17]                    24

by the Trustee, the Issuer or the applicable Guarantor in reliance thereon, whether or not notation of such action is made upon such Debt Security.

SECTION 105.    *NOTICES, ETC., TO TRUSTEE, ISSUER AND GUARANTORS.*

Any request, demand, authorization, direction, notice, consent, waiver or Act of Holders or other document provided or permitted by this Indenture to be made upon, given or furnished to, or filed with:

(1)    the Trustee by any Holder, the Issuer or any Guarantor shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office, Attention: Corporate Trust Department, facsimile (212) 815-5915, or such other facsimile number as may be provided by the Trustee from time to time, and shall be deemed to have been made at the time of actual receipt of such written notice or facsimile transmission thereof; *provided* that any delivery made or facsimile sent on a day other than a Business Day in New York shall be deemed to be received on the next following Business Day in New York; or

(2)    the Issuer or any Guarantor by the Trustee or by any Holder shall be sufficient for every purpose hereunder (unless otherwise herein expressly provided) if in writing to the Issuer or such Guarantor, as the case may be, addressed to it at the address of its executive office specified in the first paragraph of this Indenture, Attention: Corporate Secretary of NNL, facsimile number (905) 863-8386, in the case of NNC, NNL or NNI, or at any other address or facsimile number previously furnished in writing to the Trustee by the Issuer or such Guarantor, as the case may be, and shall be deemed to have been made at the time of delivery or facsimile transmission; *provided* that any delivery made or facsimile sent on a day other than a Business Day in Research Triangle Park, North Carolina, in the case of NNI, or Toronto, Ontario, in the case of the NNC or NNL, shall be deemed to be received on the next following Business Day in Research Triangle Park, North Carolina or Toronto, Ontario, respectively.

SECTION 106.    *NOTICE TO HOLDERS; WAIVER.*

(a)    Except as otherwise expressly provided herein, where this Indenture provides for notice to Holders of the Debt Securities of any series of any event, such notice shall be sufficiently given to such Holders if in writing and mailed, first-class postage prepaid, to each Holder affected by such event, at his address as it appears in the Security Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice.

(b)    If the regular mail service is suspended or for any other reason it shall be impracticable to give notice to Holders by mail, then such notification to Holders as shall be made with the approval of the Trustee shall constitute sufficient notification for every purpose hereunder. In any case where notice to Holders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Holder shall affect the sufficiency of such notice with respect to other Holders.

#415 P.035/102    01/16/2009 13:58    12128155802    From:Bank of NY Mellon

01/16/2009 14:00    #415 P.036/102

12128155802

From:Bank of NY Mellon

(c)      Where this Indenture provides for notice in any manner, such notice may be waived in writing by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice.  Waivers of notice by Holders shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

(d)      Any request, demand, authorization, direction, notice, consent, waiver or Act required or permitted under this Indenture shall be in the English language.

SECTION 107.      *CONFLICT WITH TRUST INDENTURE ACT.*

If any provision of this Indenture limits, qualifies or conflicts with a provision of the Trust Indenture Act that is required under the Trust Indenture Act to be a part of and govern this Indenture, the latter provision shall control.  If any provision of this Indenture modifies or excludes any provision of the Trust Indenture Act that may be so modified or excluded, the latter provision shall be deemed to apply to this Indenture as so modified or excluded, as the case may be.

SECTION 108.      *EFFECT OF HEADINGS AND TABLE OF CONTENTS.*

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 109.      *SUCCESSORS AND ASSIGNS.*

All covenants and agreements in this Indenture by the Issuer or a Guarantor shall bind its successors and assigns, whether expressed or not.

SECTION 110.      *SEPARABILITY CLAUSE.*

If any provision in this Indenture or in the Debt Securities of any series shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 111.      *BENEFITS OF INDENTURE.*

Nothing in this Indenture or in the Debt Securities of any series, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, any Paying Agent and the Holders of such Debt Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 112.      *GOVERNING LAW, ETC.*

(a)      This Indenture, the Debt Securities and the Guarantees shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

[New York #1531721 v17]                    26

(b)    Each of NNC and the Issuer has appointed CT Corporation System with offices at 111 Eighth Avenue, 13th Floor, New York, New York, 10011 as its authorized agent (the "Authorized Agent") upon whom all writs, process and summonses may be served in any suit, action or proceeding arising out of or based upon this Indenture or the Debt Securities which may be instituted in any state or federal court in The City of New York, New York.  NNC and NNL hereby represent and warrant that the Authorized Agent has accepted such appointment and has agreed to act as said agent for service of process, and NNC and the Issuer agree to take any and all action, including the filing of any and all documents, that may be reasonably necessary to continue each such appointment in full force and effect as aforesaid so long as the Debt Securities remain Outstanding.  NNC and the Issuer agree that the appointment of the Authorized Agent shall be irrevocable so long as any of the Debt Securities remain Outstanding or until the irrevocable appointment by NNC and the Issuer of a successor authorized agent in The City of New York, New York as the authorized agent of each of them for such purpose and the acceptance of such appointment by such successor.  Service of process upon the Authorized Agent shall be deemed, in every respect, effective service of process upon NNC and the Issuer.

(c)    Each of the Issuer and the Guarantors hereby:

(i)    agrees that any suit, action or proceeding against it arising out of or relating to this Indenture or the Debt Securities, as the case may be, may be instituted in any federal or state court sitting in The City of New York,

(ii)    waives to the extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding, and any claim that any suit, action or proceeding in such a court has been brought in an inconvenient forum,

(iii)    irrevocably submits to the non-exclusive jurisdiction of such courts in any such suit, action or proceeding, and

(iv)    agrees that service of process by mail to the addresses specified herein shall constitute personal service of such process on it in any such suit, action or proceeding.

SECTION 113.    *WAIVER OF JURY TRIAL.*

EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY (BUT NO OTHER JUDICIAL REMEDIES) IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE OR THE TRANSACTIONS CONTEMPLATED THEREBY.

SECTION 114.    *LEGAL HOLIDAYS.*

If any Interest Payment Date, Redemption Date or Stated Maturity Date of any Debt Security shall not be a Business Day at any Place of Payment, then (notwithstanding any other provision of this Indenture or of the Debt Securities) payment of interest or principal (and premium, if any) need not be made at such Place of Payment on such date, but may be made on the next

[New York #1531721 v17]                    27

From:Bank of NY Mellon          12128155802          01/16/2009 14:00          #415 P. 037/102