Exhibit A-2

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

| Name of Debtor:    **Nortel Networks Inc.** | Case Number:   09-10138 |
|---|---|

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

---

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**The Bank of New York Mellon, as Indenture Trustee**

Name and address where notices should be sent:
Latham & Watkins LLP   and    The Bank of New York Mellon, as Indenture Trustee
885 Third Avenue             Corporate Trust Risk
New York, NY 10022       101 Barclay Street, Floor 8W
Attn: Robert J. Rosenberg    New York, NY 10286
Michael J. Riela            Attn: Martin N. Feig
Telephone: (212) 906-1200

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):

The Bank of New York Mellon, as Indenture Trustee
Corporate Trust Risk
101 Barclay Street, Floor 8W
New York, NY 10286
Attn: Martin N. Feig

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check this box if you are the debtor or trustee in this case.

---

**1. Amount of Claim as of Date Case Filed:** <u>$1,155,508,420.14, plus unliquidated amounts (including indemnification), as described in the attachment hereto.</u>

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** <u>Money loaned under Indenture dated as of March 28, 2007 **(see attachment)**</u>
(See instruction #2 on reverse side.)

**3.** Last four digits of any number by which creditor identifies debtor: _____

    **3a.** Debtor may have scheduled account as: _____
    (See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:**   ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
**Describe:**

**Value of Property:** $_____    **Annual Interest Rate** _____%

**Amount of arrearage and other charges as of time case filed included in secured claim,**

**if any:** $_____   **Basis for perfection:** _____

**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any docum_____ hase orders, invoices, itemized statements of running ac_____ agreements. You may also attach a summary. Att_____ perfection of a security interest. You may also atta_____ *ted"* on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACI_____
SCANNING.

If the documents are not available, please explain:

Filed: USBC - District of Delaware
Nortel Networks Inc., Et Al.
09-10138 (KG)     0000003971

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligation under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(___).

**Amount entitled to priority:**

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

---

DATE:
9/21/09

**Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

_____
**Martin N. Feig, Vice President, Default Administration Group, The Bank of New York Mellon**

FILED/RECEIVED
FOR COURT USE ONLY
SEP 2 5 2009
EPIQ BANKRUPTCY SOLUTIONS, LLC

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTEL NETWORKS INC., *et al.*[1] | ) | Case No. 09-10138 (KG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | |

### ATTACHMENT TO PROOF OF CLAIM OF THE BANK OF NEW YORK MELLON, AS INDENTURE TRUSTEE, RELATING TO THE INDENTURE DATED MARCH 28, 2007

1.      The Bank of New York Mellon (f/k/a The Bank of New York), as indenture trustee ("BNY"), hereby files this proof of claim (the "Proof of Claim") against debtor Nortel Networks Inc. ("NNI").  BNY serves as indenture trustee under that certain Indenture dated as of March 28, 2007 (as may have been amended, modified or supplemented, the "Indenture"), among Nortel Networks Corporation ("NNC"), as issuer, Nortel Networks Limited ("NNL") and Nortel Networks Inc. ("NNI") as guarantors, and BNY, as indenture trustee.

2.      Pursuant to the Indenture, NNC issued (a) 1.75% Convertible Senior Notes due 2012 in the original principal amount of $575,000,000.00 (the "2012 Notes") and (b) the 2.125% Convertible Senior Notes due 2014 in the original principal amount of $575,000,000.00 (the "2014 Notes" and together with the 2012 Notes, the "Notes").  A copy of the Indenture is annexed hereto as Exhibit A.

3.      Under the Indenture and the related documents, agreements and instruments executed and delivered in connection with the Indenture, NNC is obligated to pay all outstanding principal, any

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).

NY\1567938.1

premium, accrued interest and certain other costs and expenses in connection with the Notes.  As a guarantor, NNI is also fully liable for NNC's obligations to holders of the Notes.

4.      On January 14, 2009 (the "Petition Date"), NNI and certain of its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware.  Also on the Petition Date, NNC, NNL, and certain of their Canadian affiliates filed applications with the Ontario Superior Court of Justice under the Companies' Creditors Arrangement Act in Canada (the "Canadian Proceedings").

5.      BNY is authorized to file this Proof of Claim against NNI on behalf of itself and the holders of the Notes pursuant to section 501(a) of title 11 of the United States Code, section 6.09 of the Indenture, and this Court's August 4, 2009 *Order Establishing Deadlines for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof.*  Separately, BNY is filing one or more proofs of claim against NNC and NNL in the Canadian Proceedings in connection with the Indenture and the Notes.

6.      As of the Petition Date, NNC was (and continues to be) indebted to the holders of the Notes issued pursuant to the Indenture in the aggregate amount of $1,155,508,420.14, plus unliquidated amounts as described herein.  By virtue of its guaranty, NNI is also indebted to the holders of the Notes for these amounts.  NNI's guaranty obligations with respect to the Indenture and the Notes are comprised as follows:

   a.   NNI's guaranty obligations to the holders of the 2012 Notes are in the aggregate principal sum of $575,000,000.00, plus accrued but unpaid interest in the amount of $2,487,673.61; and

b. NNI's guaranty obligations to the holders of the 2014 Notes are in the aggregate principal sum of $575,000,000.00, plus accrued but unpaid interest in the amount of $3,020,746.53.

7.    In addition, NNI has guaranty obligations with respect to any Additional Amounts and Additional Interest (as defined in the Indenture) that are due under the Indenture.  Moreover, pursuant to section 7.07 of the Indenture and NNI's guaranty of NNC's obligations thereunder, NNI is obligated to indemnify and hold BNY harmless against any loss, damages, claims, liability or expense (including reasonable attorney's fees and expenses) incurred without negligence, bad faith or willful misconduct on the part of BNY, and arising out of or in connection with BNY's role as indenture trustee.  BNY hereby asserts a claim in an unliquidated amount with respect to NNI's indemnification obligations, plus any and all other amounts due and owing by Nortel under the Indenture.

8.    In addition to any and all other amounts due and owing by NNI as guarantor under the Indenture and the Notes, BNY also asserts a claim in an unliquidated amount for the continuing postpetition (a) accrual of interest (including interest upon the overdue installments of interest), (b) expense reimbursements of BNY as indenture trustee and (c) fees and expense reimbursements of BNY's legal counsel and other professionals, in respect of the Indenture and the Notes.

9.    BNY may have post-petition administrative expense claims against NNI.  By filing this Proof of Claim, BNY does not waive any of its post-petition claims against NNI, and expressly reserves all of its rights in connection with such claims.

10.    To the best of BNY's knowledge, no judgment has been rendered on the claims set forth herein.

11.    To the best of BNY's knowledge, all payments made by NNI, NNC or NNL in connection with the Notes have been credited and deducted for the purposes of making this Proof of

Claim.  To the best of BNY's knowledge, the claims described in this Proof of Claim are not subject to any setoff or counterclaim.

12.    BNY does not waive any right of action that it has or may have against NNI, NNC, NNL or any other person or persons.

13.    BNY reserves the right to amend or supplement this Proof of Claim for any purpose, including but not limited to, (a) fixing or liquidating any claims stated herein, (b) specifying and quantifying expenses or other charges or claims incurred by BNY or (c) asserting any claim for priority.

14.    In filing this Proof of Claim, BNY does not submit itself to the jurisdiction of the Court for any purpose other than with respect to this Proof of Claim.

15.    The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future defaults or events of default under the terms of the Indenture.

16.    All notices and communications concerning this Proof of Claim should be sent to the following addresses:

> The Bank of New York Mellon, as Indenture Trustee
> Corporate Trust Risk
> 101 Barclay Street, Floor 8W
> New York, NY 10286
> Attn:  Martin N. Feig
>
> and
>
> Latham & Watkins LLP
> 885 Third Avenue
> New York, NY 10022
> Attn:  Robert J. Rosenberg
>              Michael J. Riela
> Telephone: (212) 906-1200

NY\1567938.1

**EXHIBIT A**

**Indenture**

**NORTEL NETWORKS CORPORATION,**
*as Issuer,*


**NORTEL NETWORKS LIMITED**


**AND**


**NORTEL NETWORKS INC.**
*as Guarantors,*


**and**


**THE BANK OF NEW YORK,**
*as Trustee, Registrar, Paying Agent and Conversion Agent*


$575,000,000 1.75% Convertible Senior Notes due 2012 and


$575,000,000 2.125% Convertible Senior Notes due 2014


---


**INDENTURE**


Dated as of March 28, 2007


[New York #1699265 v7]

ARTICLE 1      DEFINITIONS............................................................................1

SECTION 1.01.   Definitions.............................................................1

SECTION 1.02.   Other Definitions ...............................................10

SECTION 1.03.   Incorporation by Reference of Trust Indenture Act................11

SECTION 1.04.   Rules of Construction ...........................................12

ARTICLE 2      THE NOTES AND THE GUARANTEES....................................12

SECTION 2.01.   Form and Dating ...............................................12

SECTION 2.02.   Registrar, Paying Agent and Conversion Agent.................17

SECTION 2.03.   Money for Notes Payments to be Held in Trust ...............17

SECTION 2.04.   Holder Lists....................................................19

SECTION 2.05.   Transfer and Exchange ........................................19

SECTION 2.06.   Replacement Notes .............................................21

SECTION 2.07.   Outstanding Notes..............................................21

SECTION 2.08.   When Treasury Notes Disregarded..............................22

SECTION 2.09.   Temporary Notes ...............................................22

SECTION 2.10.   Cancellation ...................................................23

SECTION 2.11.   Defaulted Interest.............................................23

SECTION 2.12.   CUSIP Number .................................................23

SECTION 2.13.   Judgment........................................................23

SECTION 2.14.   Legends; Restricted Securities Legends ....................24

ARTICLE 3      REDEMPTION.......................................................28

SECTION 3.01.   Optional Redemption ..........................................28

SECTION 3.02.   Notices to Trustee ............................................28

SECTION 3.03.   Redemption for Changes in Canadian Withholding Taxes............28

SECTION 3.04.   Selection of Notes To Be Redeemed ..........................29

SECTION 3.05.   Notice of Redemption .........................................29

SECTION 3.06.   Effect of Notice of Redemption ...............................30

SECTION 3.07.   Deposit of Redemption Price ..................................30

SECTION 3.08.   Notes Redeemed in Part......................................31

SECTION 3.09.   Conversion Arrangement on Call for Redemption ............31

ARTICLE 4      COVENANTS .........................................................3^

SECTION 4.01.   Payment of Notes.............................................

| SECTION 4.02. | Reports | 32 |
| SECTION 4.03. | Compliance Certificate | 33 |
| SECTION 4.04. | Maintenance of Office or Agency | 33 |
| SECTION 4.05. | Reserved | 33 |
| SECTION 4.06. | Offer to Repurchase Upon a Change of Control | 33 |
| SECTION 4.07. | Payment of Additional Amounts | 37 |
| SECTION 4.08. | Registration Rights | 38 |
| ARTICLE 5 | SUCCESSORS | 38 |
| SECTION 5.01. | Amalgamation, Merger, Conveyance, Transfer or Lease | 38 |
| SECTION 5.02. | Successor Corporation Substituted | 39 |
| SECTION 5.03. | Offer to Repurchase on Change of Control | 39 |
| SECTION 5.04. | Amalgamation of the Issuer and NNL | 39 |
| ARTICLE 6 | DEFAULTS AND REMEDIES | 40 |
| SECTION 6.01. | Events of Default | 40 |
| SECTION 6.02. | Acceleration | 41 |
| SECTION 6.03. | Other Remedies | 42 |
| SECTION 6.04. | Waiver of Past Defaults | 42 |
| SECTION 6.05. | Control by Majority | 42 |
| SECTION 6.06. | Limitation on Suits | 42 |
| SECTION 6.07. | Rights of Holders to Receive Payment | 43 |
| SECTION 6.08. | Collection Suit by Trustee | 43 |
| SECTION 6.09. | Trustee May File Proofs of Claim | 43 |
| SECTION 6.10. | Priorities | 43 |
| SECTION 6.11. | Undertaking for Costs | 44 |
| ARTICLE 7 | THE TRUSTEE | 44 |
| SECTION 7.01. | Duties of the Trustee | 44 |
| SECTION 7.02. | Rights of the Trustee | 45 |
| SECTION 7.03. | Individual Rights of the Trustee | 47 |
| SECTION 7.04. | Trustee's Disclaimer | 47 |
| SECTION 7.05. | Notice of Defaults | 47 |
| SECTION 7.06. | Reports by the Trustee to Holders | 47 |
| SECTION 7.07. | Compensation and Indemnity | 47 |

SECTION 7.08.   Replacement of the Trustee ................................................... 48

SECTION 7.09.   Successor Trustee by Merger, Etc. ...................................... 50

SECTION 7.10.   Eligibility, Disqualification ................................................... 50

SECTION 7.11.   Preferential Collection of Claims Against Issuer ................. 50

SECTION 7.12.   Appointment of Co-Trustee ................................................... 50

ARTICLE 8          SATISFACTION AND DISCHARGE OF INDENTURE ........................... 51

SECTION 8.01.   Discharge of Indenture ........................................................... 51

SECTION 8.02.   Deposited Monies to be Held In Trust by Trustee ............... 51

ARTICLE 9          AMENDMENTS ....................................................................... 51

SECTION 9.01.   Without the Consent of Holders ............................................ 51

SECTION 9.02.   With the Consent of Holders .................................................. 53

SECTION 9.03.   Compliance With the Trust Indenture Act ............................. 54

SECTION 9.04.   Notation on or Exchange of Notes ......................................... 54

SECTION 9.05.   Trustee Protected ................................................................... 54

SECTION 9.06.   No Discharge, Revision, Extinguishment, Novation, Rescission
                         or Substitution ........................................................................ 54

ARTICLE 10        GENERAL PROVISIONS .......................................................... 55

SECTION 10.01.  Trust Indenture Act Controls ............................................... 55

SECTION 10.02.  Notices ................................................................................. 55

SECTION 10.03.  Communication by Holders With Other Holders ................. 56

SECTION 10.04.  Certificate and Opinion as to Conditions Precedent ........... 56

SECTION 10.05.  Statements Required in Certificate or Opinion .................... 56

SECTION 10.06.  Legal Holidays ...................................................................... 57

SECTION 10.07.  No Recourse Against Others ................................................ 57

SECTION 10.08.  Counterparts ......................................................................... 57

SECTION 10.09.  Other Provisions ................................................................... 57

SECTION 10.10.  Governing Law, Etc. ............................................................. 58

SECTION 10.11.  WAIVER OF JURY TRIAL .................................................. 59

SECTION 10.12.  No Adverse Interpretation of Other Agreements ................ 59

SECTION 10.13.  Successors ............................................................................. 59

SECTION 10.14.  Severability ........................................................................... 59

SECTION 10.15.  Table of Contents, Headings, Etc. ....................................... 60

iv

[New York #1699265 v7]

SECTION 10.16. Interest Act (Canada) .......................................................................... 60

SECTION 10.17. Acts of Holders ................................................................................... 60

ARTICLE 11   COVENANT DEFEASANCE ............................................................... 61

SECTION 11.01. Discharge by Deposit of Money or Notes .......................................... 61

SECTION 11.02. Application of Trust Money ................................................................ 62

SECTION 11.03. Repayment to the Issuer or the Guarantor ......................................... 62

ARTICLE 12   CONVERSION OF NOTES ................................................................. 63

SECTION 12.01. Right to Convert ................................................................................. 63

SECTION 12.02. Exercise of Conversion Privilege; Issuance of Common Shares
on Conversion; No Adjustment for Interest or Dividends ................. 63

SECTION 12.03. Cash Payments in Lieu of Fractional Common Shares ..................... 65

SECTION 12.04. Conversion Price ................................................................................ 65

SECTION 12.05. Adjustment of Conversion Rate ......................................................... 65

SECTION 12.06. Effect of Reclassification, Amalgamation, Consolidation,
Merger or Sale ................................................................................... 69

SECTION 12.07. Conversion Upon a Make Whole Change of Control ........................ 71

SECTION 12.08. Taxes on Shares Issued ...................................................................... 72

SECTION 12.09. Reservation of Shares; Shares to be Fully Paid; Listing of
Common Shares ................................................................................. 72

SECTION 12.10. Responsibility of Trustee ................................................................... 73

SECTION 12.11. Notice to Holders Prior to Certain Actions ....................................... 73

SECTION 12.12. Restriction on Common Shares Issuable Upon Conversion .............. 74

SECTION 12.13. Calculations and Determinations ....................................................... 75

ARTICLE 13   MEETINGS OF HOLDERS OF NOTES ............................................. 75

SECTION 13.01. Purposes for Which Meetings May Be Called ................................... 75

SECTION 13.02. Call, Notice and Place of Meetings ................................................... 75

SECTION 13.03. Persons Entitled to Vote at Meetings ................................................. 76

SECTION 13.04. Quorum; Action .................................................................................. 76

SECTION 13.05. Determination of Voting Rights; Conduct and Adjournment of
Meetings ............................................................................................ 77

SECTION 13.06. Counting Votes and Recording Action of Meetings .......................... 77

# CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.11 |
| (a)(3) | n/a |
| (a)(4) | n/a |
| (b) | 7.08, 7.10, 10.02 |
| (c) | n/a |
| (g) | 7.10 |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | n/a |
| 312(a) | 2.04 |
| (b) | 10.03 |
| (c) | 10.03 |
| 313(a) | 7.06 |
| (b)(1) | n/a |
| (b)(2) | 5.07, 7.05 |
| (c) | 7.06, 10.02 |
| (d) | 7.06 |
| 314(a) | 4.02, 6.02(b), 10.02, 10.05 |
| (b) | n/a |
| (c)(1) | 10.04 |
| (c)(2) | 10.04 |
| (c)(3) | n/a |
| (d) | n/a |
| (e) | 10.05 |
| (f) | n/a |
| 315(a) | 7.01(b) |
| (b) | 7.05, 10.02 |
| (c) | 7.01(a) |
| (d) | 7.01(c) |
| (e) | 6.11 |
| 316(a)(last sentence) | n/a |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | n/a |
| (b) | 6.04, 6.07 |
| (c) | 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.03(c) |
| 318(a) | 10.01 |
| (b) | n/a |
| (c) | 10.01 |

"n/a" means not applicable.

*This Cross-Reference Table shall not, for any purpose, be deemed to be a part of the Indenture.

vi

THIS INDENTURE, dated as of March 28, 2007, is among Nortel Networks Corporation, a Canadian corporation (together with any successors, the "Issuer"), Nortel Networks Limited, a Canadian corporation (together with any successors, "NNL"), Nortel Networks Inc., a Delaware corporation (together with any successors, "NNI" and, together with NNL, the "Guarantors"), and The Bank of New York, a New York banking corporation, as trustee (together with any successors, the "Trustee"), Registrar, Paying Agent and Conversion Agent. The Issuer has duly authorized the creation of its 1.75% Convertible Senior Notes due 2012 (the "2012 Notes") and its 2.125% Convertible Senior Notes due 2014 (the "2014 Notes" and, together with the 2012 Notes, the "Notes"). Each Guarantor has duly authorized its Guarantee of the Notes to the extent described herein, and each of the Issuer, each Guarantor and the Trustee have duly authorized the execution and delivery of this Indenture. Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the holders from time to time of the Notes:

## ARTICLE 1
## DEFINITIONS

SECTION 1.01. Definitions.

"2012 Notes" has the meaning specified in the preamble hereto.

"2014 Notes" has the meaning specified in the preamble hereto.

"Additional Amounts" means any additional payments required to be made by the Issuer or the Guarantors as a result of a requirement to withhold or deduct for or on account of Canadian Tax pursuant to Section 4.07 hereof.

"Additional Interest" means (i) any "Liquidated Damages," as such term is defined in the Registration Rights Agreement and (ii) any liquidated damages pursuant to Section 6.02(b) hereof.

"Affiliate" means, when used with reference to any person, any other person directly or indirectly controlling, controlled by, or under direct or indirect common control of, the referent person. For the purposes of this definition, "control" when used with respect to any specified person means the power to direct or cause the direction of management and policies of the referent person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise. The terms "controlling" and "controlled" have meanings correlative of the foregoing.

"Agent" means any Registrar, Paying Agent, Conversion Agent, authenticating agent or co-registrar.

"Agent Member" means any member of, or participant in, the Depositary.

"Applicable Exchange Rate" means, on any date, the noon Dollar buying rate for Canadian Dollars for wire transfers quoted in The City of New York, as certified for customs purposes by the Federal Reserve Bank of New York.

1

"Applicable Securities Exchange," with respect to any security, means (i) if that security is listed on the NYSE, the NYSE; (ii) if that security is listed on one or more U.S. national securities exchange (other than the NYSE) and not listed on the TSX, the U.S. national securities exchange with the highest volume of sales for that security on that date; (iii) if that security is listed on (a) one or more U.S. national securities exchanges (other than the NYSE) and (b) the TSX, whichever of such exchanges had the highest volume of sales for that security on that date; and (iv) if that security is (a) listed on the TSX and (b) not listed on any U.S. national securities exchange, the TSX.

"Applicable Procedures" means, with respect to any transfer or transaction involving a Global Security or beneficial interest therein, the rules and procedures of the Depositary for such Global Security to the extent applicable to such transaction and as in effect from time to time.

"Authorized Newspaper" means a newspaper in an official language of the country of publication or in the English language customarily published on each Business Day, whether or not published on Saturdays, Sundays or holidays, and of general circulation in the place in connection with which the term is used or in the financial community of such place. Where successive publications are required to be made in Authorized Newspapers, the successive publications may be made in the same or in different newspapers in the same city meeting the foregoing requirements and in each case on any Business Day.

"Authorized Officers" means, with respect to, (i) each of the Issuer and NNL, any two of its President and Chief Executive Officer, General Counsel, Chief Legal Officer, Chief Operating Officer and Chief Financial Officer or any one of the aforesaid officers together with any one of its Corporate Secretary, its Treasurer, any Assistant Secretary or any Assistant Treasurer; and (ii) NNI, any one of its President, its Vice-President, Finance and Treasurer, any other of its Vice-Presidents, its Secretary, or any of its Assistant Secretaries; *provided* that the Issuer, NNL and NNI may, from time to time, designate additional officers who would qualify as "Authorized Officers" pursuant to an Officers' Certificate delivered to the Trustee.

"Board of Directors" means, in respect of the Issuer or any Guarantor, the board of directors, the executive committee or any other committee of that board or any group of directors of that board, duly authorized to make a decision on the matter in question.

"Board Resolution" means a copy of a resolution certified by the Corporate Secretary or an Assistant Secretary of the Issuer or a Guarantor, as the case may be, to have been duly adopted by the Board of Directors of the Issuer or such Guarantor, respectively, and to be in full force and effect on the date of such certification.

"Business Day" means any Monday, Tuesday, Wednesday, Thursday or Friday that is not a day on which banking institutions in New York City (or the city in which the Corporate Trust Office of the Trustee is located, if not New York City) are not required to be open or are authorized or obligated by law to close.

"Canadian Dollar" means the lawful currency of the Government of Canada.

"Canadian Taxes" means any present or future taxes, duties, assessments or governmental charges imposed or levied by or on behalf of the Government of Canada or of any

2

[New York #1699265 v7]

province or territory therein or thereof, or by any authority or agency therein or thereof having power to tax.

"Capital Stock" means:

(a)    with respect to any person that is a corporation, any and all shares, interests, participations or other equivalents (however designated and whether or not voting) of corporate stock, including each class of common shares and preferred stock of such person; and

(b)    with respect to any person that is not a corporation, any and all partnership, membership or other equity interests of such person.

"Certificated Note" means any Note issued under this Indenture in fully-registered, certificated form (other than a Global Security).

"Change of Control" means the occurrence of any of the following events:

(a)    any "person," including its affiliates and associates, or any "group," in each case, other than the Issuer, any one or more of the Issuer's Subsidiaries or the Issuer's or the Issuer's Subsidiaries' employee benefit plans, files a Schedule 13D or Schedule TO (or any successor schedule, form or report under the Exchange Act) disclosing that such person or group (x) has become the "beneficial owner" of 50% or more of the combined voting power of the Issuer's Capital Stock having ordinary power to elect members of the Issuer's Board of Directors, or (y) has the power to, directly or indirectly, elect a majority of the members of the Issuer's Board of Directors; provided that the foregoing shall not apply if as a result of, and immediately following, the transaction giving a person such beneficial ownership (including an exchange offer or a transaction referred to in clause (c) below), the holders of the Common Shares or holders of the common shares of NNL immediately prior to such transaction are, directly or indirectly, the beneficial owners of at least a majority of the total voting power in the aggregate of all classes of Capital Stock of such person;

(b)    a change of control occurs with respect to NNL which shall mean that the Issuer ceases to be the "beneficial owner" of 100% of the voting power of the common shares of NNL;

(c)    consummation of any transaction or event (whether by means of a liquidation, share exchange, tender offer, consolidation, recapitalization, reclassification, merger or amalgamation of the Issuer or any sale, lease or other transfer of 90% or more of the Issuer's consolidated assets) or a series of related transactions or events pursuant to which Common Shares are exchanged for, converted into or constitute the right to receive cash, securities or other property, in each case other than pursuant to such a transaction, event or series of related transactions or events in which the holders of Common Shares immediately prior to such transaction, event or series of related transactions have, directly or indirectly, at least a majority of the total voting power in the aggregate of all classes of Capital

3

Stock of the continuing or surviving corporation (or of the parent of such continuing or surviving corporation) immediately after such transaction, event or series of related transactions; or

(d)     the Issuer or NNL is dissolved or liquidated,

*provided, however,* that a Change of Control shall not be deemed to have occurred if:

(1)     the Change of Control Sale Price per Common Share for any five Trading Days within the period of ten consecutive Trading Days ending immediately after the later of the potential Change of Control or the public announcement of the potential Change of Control (in the case of a potential Change of Control under clause (a) above) or the period of ten consecutive Trading Days ending immediately before the Change of Control (in the case of a potential Change of Control under clause (c) above) shall equal or exceed 105% of the Conversion Price of the Notes in effect on the date of the potential Change of Control or the public announcement of the potential Change of Control, as applicable; or

(2)     at least 90% of the consideration (excluding cash payments for fractional Common Shares) in the transaction or transactions constituting the potential Change of Control consists of common shares that are, or upon issuance will be, traded on a U.S. national securities exchange or the TSX.

Notwithstanding the foregoing, any (i) amalgamation, consolidation or merger of the Issuer with or into NNL (whether directly or indirectly by amalgamation, consolidation or merger with or into an entity with only nominal assets created in anticipation or contemplation of such amalgamation, consolidation or merger), (ii) transfer of assets solely between or among the Issuer, NNL and any successor entity to the Issuer or NNL or (iii) liquidation or dissolution of the Issuer or NNL resulting in the transfer of all of the assets of the Issuer or NNL to the Issuer, NNL or any successor entity to the Issuer or NNL shall, in each case, not constitute a Change of Control; *provided* that such transaction does not contravene the terms of Section 5.01.

For purposes of this "Change of Control" definition:

(i)     "person" or "group" has the meaning given to it for purposes of Sections 13(d) and 14(d) of the Exchange Act or any successor provisions, and the term "group" includes any group acting for the purpose of acquiring, holding or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act or any successor provision; and

(ii)     a "beneficial owner" will be determined in accordance with Rule 13d-3 under the Exchange Act, as in effect on the date of this Indenture.

"Change of Control Sale Price," on any date, means the closing sale price per Common Share (or if no closing sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices) on such date as reported in composite transactions for the Applicable Securities Exchange. In the absence of such quotations, the Issuer shall be entitled to determine the Change of Control Sale Price on the

4

basis of such quotations as it considers appropriate. The Trustee shall be entitled to rely exclusively upon the Issuer's certification of the Change of Control Sale Price as set forth in an Officers' Certificate.

"Commission" means the United States Securities and Exchange Commission.

"Common Shares" means any share of any class of the Issuer which has no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer and which is not subject to redemption by the Issuer. Subject to the provisions of Section 12.06, however, shares issuable on conversion of Notes shall include only shares of the class designated as Common Shares of the Issuer at the date of this Indenture or shares of any class or classes resulting from any reclassification or reclassifications thereof and which have no preference in respect of dividends or of amounts payable in the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer and which are not subject to redemption by the Issuer; *provided* that if at any time there shall be more than one such resulting class, the shares of each such class then so issuable shall be substantially in the proportion which the total number of shares of such class resulting from all such reclassifications bears to the total number of shares of all such classes resulting from all such reclassifications.

"Conversion Price" as of any day will equal $1,000 divided by the Conversion Rate applicable to a particular series of Notes as of such date.

"Conversion Rate" means (a) with respect to any 2012 Note, the initial conversion rate specified in paragraph 16 of the form of Note attached as Exhibit A hereto, as adjusted in accordance with the provisions of Article 12 hereof and (b) with respect to any 2014 Note, the initial conversion rate specified in paragraph 16 of the form of Note attached as Exhibit B hereto, as adjusted in accordance with the provisions of Article 12 hereof.

"Corporate Trust Office" means the principal office of the Trustee at which at any particular time its corporate trust business shall be administered.

"Current Market Price" of the Common Shares on any day means the average of the Last Reported Sale Price of the Common Shares for each of the 10 consecutive Trading Days ending on the earlier of the day in question and the day before the Ex-Dividend Date with respect to the issuance or distribution requiring such computation.

"Default" means any event that is, or after notice or passage of time, or both, would be, an Event of Default.

"Depositary" means, with respect to any Global Securities, a clearing agency that is registered as such under the Exchange Act and is designated by the Issuer to act as Depositary for such Global Securities (or any successor securities clearing agency so registered), which shall initially be DTC.

"Dollar" or "$,", unless otherwise indicated, means the lawful currency of the United States of America.

5

[New York #1699265 v7]

"DTC" means The Depository Trust Company, a New York corporation.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Ex-Dividend Date" means the first date on which the Common Shares trade on the Applicable Securities Exchange or in the applicable market, regular way, without the right to receive a specified issuance or distribution or without giving effect to a specified stock split or stock combination, as the case may be.

"GAAP" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States, which are in effect from time to time.

"Global Class Action Settlement" means the Issuer's agreement to settle certain significant class action lawsuits pending in the U.S. District Court for the Southern District of New York and related Canadian actions as disclosed in the Issuer's Current Report on Form 8-K dated February 8, 2006.

"Global Securities Legend" means the legend substantially in the form set forth in Section 2.14(b) hereof.

"Guarantee" means the guarantee of each of the Guarantors as endorsed on each Global Security and Certificated Note authenticated and delivered pursuant to this Indenture and shall include the Guarantee set forth in Section 2.01(f) of this Indenture and all other obligations and covenants of the Guarantors contained in this Indenture and any Global Security and Certificated Note.

"Guarantor" means each of (a) Nortel Networks Limited, (b) at any time other than during a Suspension Period, Nortel Networks Inc. and (c) any successor corporation to a Guarantor that has become a Guarantor pursuant to the applicable provisions of this Indenture.

"Guarantor Request" and "Guarantor Order" mean, respectively, a written request or order signed in the name of a Guarantor by, in the case of NNL, any two Authorized Officers and, in the case of NNI, any Authorized Officer, and delivered to the Trustee.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Initial Purchasers" has the meaning set forth in the Purchase Agreement.

"Interest Payment Date" means April 15 and October 15 of each year.

"Investment Grade Status," with respect to the Notes of any series, shall occur when the Notes of such series have both (i) a rating of "BBB—" or higher from S&P and (ii) a rating of "Baa3" or higher from Moody's, and each such rating shall have been published by the applicable agency, in each case with no negative outlook.

6

"Issue Date" means the first date on which Notes are issued and authenticated under this Indenture.

"Issuer" has the meaning specified in the preamble hereto. References to the Issuer shall not include any Subsidiary of the Issuer.

"Issuer Articles" means the original or restated articles of incorporation, articles of amendment, articles of amalgamation, articles of continuance, articles of reorganization or articles of arrangement of the Issuer from time to time in effect and includes all amendments thereto.

"Issuer Request" and "Issuer Order" mean, respectively, a written request or order signed in the name of the Issuer by any two Authorized Officers and delivered to the Trustee.

"Last Reported Sale Price" means, on any date, with respect to (a) any security listed on an Applicable Securities Exchange other than the TSX, the closing sale price per share (or if no closing sale price is reported, the average of the bid and asked prices or, if more than one in either case, the average of the average bid and the average asked prices) on that date as reported by such Applicable Securities Exchange, (b) any security listed on the TSX, (x) the closing sale price per share (or if no closing sale price is reported, the average of the bid and asked prices or, if more than one in either case, the average of the average bid and the average asked prices) on that date as reported by such Applicable Securities Exchange multiplied by (y) the Applicable Exchange Rate for such date, and (c) any security that is not listed on an Applicable Securities Exchange, the average of the mid-point of the last bid and asked prices of such security on the relevant date from each of at least three nationally recognized independent U.S. investment banking firms selected by the Issuer for this purpose, or if such prices are not so available, the market value of such security in Dollars on the relevant date as determined by a nationally recognized U.S. independent investment banking firm selected by the Issuer for this purpose.

"Make Whole Change of Control" means the occurrence, after the Issue Date, of any Change of Control or an event that would have been a Change of Control but for the 105% trading price exception or for the 90% of consideration exception contained in clauses (1) and (2), respectively, of the proviso to such definition; *provided* that the occurrence of a Change of Control resulting from a transaction described in clause (d) of the definition of Change of Control shall not constitute a Make Whole Change of Control.

"Make Whole Change of Control Effective Date" means, with respect to a Make Whole Change of Control, the date on which such Make Whole Change of Control becomes effective.

"Maturity Date" means, (i) with respect to the 2012 Notes, April 15, 2012 and (ii) with respect to the 2014 Notes, April 15, 2014.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"NNI" has the meaning specified in the preamble hereto. References to NNI shall not include any Subsidiary of NNI.

[New York #1699265 v7]

"NNL" has the meaning specified in the preamble hereto. References to NNL shall not include any Subsidiary of NNL.

"Notes" has the meaning specified in the preamble hereto.

"NYSE" means the New York Stock Exchange.

"Offering Memorandum" means the final Confidential Offering Memorandum relating to the Notes and the related Guarantees, dated March 22, 2007.

"Officers' Certificate" means a certificate signed by, in the case of the Issuer or NNL, any two Authorized Officers and, in the case of NNI, any Authorized Officer and delivered to the Trustee.

"Opinion of Counsel" means a written opinion of counsel, who may be counsel to the Issuer or one or more Guarantor or both, or the Trustee, as the case may be, which opinion shall be subject to customary assumptions and qualifications.

A "person" means any individual, corporation, partnership, joint venture, trust, estate, unincorporated organization, limited liability company or government or any agency or political subdivision thereof.

"Prospectus" shall mean the prospectus included in the Shelf Registration Statement, including any preliminary prospectus, and any such prospectus as amended or supplemented by any prospectus supplement, including a prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by the Shelf Registration Statement, and by all other amendments and supplements to such prospectus, and in each case including any document incorporated by reference therein.

"Redemption Date" when used with respect to any Note to be redeemed, means the date fixed by the Issuer for such redemption pursuant to Article 3 of this Indenture and the applicable Note.

"Redemption Price" when used with respect to any Note to be redeemed, means the price fixed for such redemption pursuant to Article 3 of this Indenture and the applicable Note.

"Registrable Securities" shall mean each Note and related Guarantees and the Common Shares into which such Note is convertible until the earlier of (i) the date on which such Note and related Guarantees or the Common Shares into which such Note is convertible have been sold or otherwise transferred pursuant to an effective Shelf Registration Statement; (ii) the date that is two years after the later of the date of original issue of such Note and related Guarantees and the last date that the Issuer or any of its Affiliates was the owner of such Note and related Guarantees (or any predecessor thereto); (iii) the date on which such Note and related Guarantees or the Common Shares into which such Note is convertible may be resold without restriction pursuant to Rule 144(k) under the Securities Act or any successor provision thereto; or (iv) the date such Note and related Guarantees or the Common Shares into which such Note is convertible have been publicly sold pursuant to Rule 144 under the Securities Act or any successor provision thereto.

8

[New York #1699265 v7]

"Registration Rights Agreement" means the Registration Rights Agreement relating to the Notes, the Guarantees and Common Shares issuable upon conversion of such Notes, dated March 28, 2007, among the Issuer, the Guarantors and the Initial Purchasers, as such agreement may be amended, modified or supplemented from time to time.

"Regular Record Date" means the April 1 or October 1 immediately preceding each Interest Payment Date.

"S&P" means Standard & Poor's Rating Service, a division of The McGraw-Hill Companies, Inc., and its successors.

"Securities Act" means the United States Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Share Price" means, with respect to a Make Whole Change of Control, (i) if holders of Common Shares receive only cash in such Make Whole Change of Control transaction, the cash amount paid per share in such Make Whole Change of Control; and (ii) otherwise, the average of the Last Reported Sale Price of the Common Shares over the five-Trading Day period ending on the Trading Day immediately preceding the applicable Make Whole Change of Control Effective Date.

"Shelf Registration Statement" shall mean a "shelf" registration statement of the Issuer and the Guarantors that covers all of the Registrable Securities on an appropriate form under Rule 415 under the Securities Act, or any similar rule that may be adopted by the Commission, and all amendments and supplements to such registration statement, including post-effective amendments, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein; *provided, however*, that a registration statement shall not be deemed the Shelf Registration Statement until such time as it includes a Prospectus relating to the Registrable Securities.

"Subsidiary" means, with respect to the Issuer or any Guarantor, a corporation, a majority of the outstanding voting shares of which are owned, directly or indirectly, by the Issuer or such Guarantor or by one or more other Subsidiaries of the Issuer or such Guarantor, or by the Issuer or such Guarantor and one or more other Subsidiaries of the Issuer or such Guarantor. For the purposes of this definition, "voting shares" means shares having voting power for the election of directors, whether at all times or only so long as no other shares have such voting power by reason of any contingency.

"Suspension Period" means, for any series of Notes, any period (a) beginning on the date that:

(1) the Notes of such series have Investment Grade Status;

(2) no Default or Event of Default has occurred and is continuing; and

(3) the Issuer has delivered an Officers' Certificate to the Trustee certifying that the conditions set forth in clauses (1) and (2) above are satisfied; and

9

(b) ending on the date (the "Reversion Date") that the Notes of such series cease to have the applicable rating from either Moody's or S&P, specified in the definition of Investment Grade Status; provided that solely for the purpose of determining whether and when the Reversion Date shall have occurred, a series of Notes shall be deemed to have Investment Grade Status if clauses (i) and (ii) of the definition of Investment Grade Status are otherwise satisfied, notwithstanding that either Moody's and/or S&P shall have announced a negative outlook with respect to such Notes.

"TIA" means the United States Trust Indenture Act of 1939, as amended, as in effect on the date of execution of this Indenture, except as provided in Sections 9.03 and 12.06.

"Trading Day" means (x) if the applicable security is listed or admitted for trading on an Applicable Securities Exchange, a day on which such Applicable Securities Exchange is open for trading or quotation or (y) if the applicable security is not so listed or admitted for trading, any day that is a Business Day.

"Trustee" means the party named as such above until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor.

"Trust Officer" means, when used with respect to the Trustee, any officer within the Corporate Trust Office, including any Vice President, Assistant Vice President or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers, and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge and familiarity with the particular subject.

"TSX" means The Toronto Stock Exchange.

"U.S. Government Obligations" means direct obligations of the United States of America for the payment of which the full faith and credit of the United States of America is pledged and which are not callable at the issuer's option.

"Voting Shares" means any class or classes of Capital Stock the holders of which under ordinary circumstances have the power to vote in the election of the board of directors, managers or trustees of any person or other persons performing similar functions irrespective of whether or not, at the time Capital Stock of any other class or classes shall have, or might have, voting power by reason of the happening of any contingency.

SECTION 1.02.  Other Definitions.

|  | Defined in Section |
| --- | --- |
| "Act" | 10.16 |
| "Additional Shares" | 12.07(b) |
| "Canadian Restricted Securities Legend" | 2.14(a) |
| "cash" | 4.06(a) |
| "Change of Control Date" | 4.06 |

10

"Change of Control Offer"......................................................... 4.06
"Change of Control Offer Termination Date" ............................ 4.06
"Change of Control Payment" ................................................... 4.06
"Change of Control Payment Date".......................................... 4.06
"Change in Tax Redemption"..................................................... 3.02
"Conversion Agent".................................................................... 2.03
"Defaulted Interest".................................................................... 2.11
"Event of Default" ..................................................................... 6.01
"Expiration Time"....................................................................... 12.05
"fair market value"..................................................................... 12.05
"Global Security"........................................................................ 2.01
"Ineligible Consideration" ......................................................... 12.05(i)
"Issuer Notice"............................................................................ 4.06
"Legal Holiday"........................................................................... 10.06
"Make Whole Change of Control Notice.................................... 12.07(a)
"Make Whole Conversion Cut-off Date ..................................... 12.07(d)
"Make Whole Conversion Date" ................................................ 12.07(d)
"Make Whole Conversion Period" ............................................. 12.07(a)
"Optional Redemption" .............................................................. 3.02
"Paying Agent"............................................................................ 2.02
"Permitted Securities"................................................................. 12.05(i)
"Purchase Agreement"................................................................ 2.01
"Purchase Notice"....................................................................... 4.06
"purchased shares" ..................................................................... 12.05(e)
"QIBs"......................................................................................... 2.01
"Registrar" .................................................................................. 2.02
"Register".................................................................................... 2.02
"Restricted Common Share Legend"........................................... 2.14(a)
"Restricted Securities"................................................................ 2.14(a)
"Restricted Securities Legend".................................................... 2.14(a)
"Rule 144A"................................................................................ 2.01

SECTION 1.03.  Incorporation by Reference of Trust Indenture Act.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"Commission" means the Commission;

"indenture securities" means the Notes and the Guarantees;

"indenture security holder" means a holder of a Note;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

11

"obligor" on the Notes means the Issuer or any other obligor on the Notes and on the Guarantees means the respective Guarantor or any other obligor on the Guarantees.

All other terms in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by Commission rule under the TIA have the meanings so assigned to them.

SECTION 1.04.  Rules of Construction.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and in the plural include the singular;

(5)    the male, female and neuter genders include one another; and

(6)    references in this Indenture to Articles, Sections, subsections, paragraphs, clauses, other subdivisions, Exhibits, appendices or schedules are to Articles, Sections, subsections, paragraphs, clauses, other subdivisions, Exhibits, appendices or schedules of or to this Indenture.

ARTICLE 2
THE NOTES AND THE GUARANTEES

SECTION 2.01.  Form and Dating.

(a)    *Global Securities.*  The Notes and the Guarantees are being offered and sold by the Issuer pursuant to a Purchase Agreement relating to the Notes, dated March 22, 2007, among the Issuer, the Guarantors and the Initial Purchasers (the "Purchase Agreement").

The Notes and the Guarantees are being offered and sold to "qualified institutional buyers" as defined in Rule 144A ("QIBs") in reliance on Rule 144A under the Securities Act ("Rule 144A") and, in the case of sales in Canada, pursuant to an exemption available under applicable Canadian securities laws, as provided in the Purchase Agreement and shall be issued in the form of one or more permanent global securities in definitive, fully registered form without interest coupons with the Global Securities Legend, the Restricted Securities Legend and the Canadian Restricted Securities Legend set forth in Section 2.14 (each, a "Global Security"). Any Global Security shall be deposited on behalf of the purchasers of the Notes and the Guarantees represented thereby with the Trustee, at its New York office, as custodian for the Depositary, and registered in the name of the Depositary or a nominee of the Depositary for the accounts of participants in the Depositary, duly executed by the Issuer and the Guarantors and

12

authenticated by the Trustee as hereinafter provided. The aggregate principal amount of a Global Security may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee as hereinafter provided.

(b)     *Book-Entry Provisions*. This Section 2.01(b) shall apply only to a Global Security deposited with or on behalf of the Depositary. The Global Securities initially shall:

(i)     be registered in the name of DTC (or a nominee thereof), as the initial Depositary;

(ii)     be delivered to the Trustee as custodian for DTC; and

(iii)     bear the Restricted Securities Legend set forth in Section 2.14(a)(i);

(iv)     bear the Canadian Restricted Securities Legend set forth in Section 2.14(a)(iii); and

(v)     bear the Global Securities Legend set forth in Section 2.14(b).

Agent Members shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Depositary, or the Trustee as its custodian, or under such Global Security, and the Depositary may be treated by the Issuer, any Guarantor, the Trustee and any agent of the Issuer, any Guarantor or the Trustee as the absolute owner of such Global Security for all purposes whatsoever. Notwithstanding the foregoing, nothing contained herein shall prevent the Issuer, any Guarantor, the Trustee or any agent of the Issuer, any Guarantor or Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and the Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any Note.

(c)     The registered holder of a Global Security may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action that a holder is entitled to take under this Indenture or the Notes.

(d)     A Global Security may not be transferred, in whole or in part, to any person other than the Depositary (or a nominee thereof), and no such transfer to any such other person may be registered. Beneficial interests in a Global Security may be transferred in accordance with the rules and procedures of the Depositary and the provisions of Section 2.05 hereof.

(e)     Notwithstanding any other provisions of this Indenture or the Notes, a Global Security shall not be exchanged in whole or in part for a Note registered in the name of any person other than the Depositary or one or more nominees thereof; provided that a Global Security may be exchanged for Notes registered in the names of any person designated by the Depositary in the event that (i) the Depositary has notified the Issuer that it is unwilling or unable to continue as Depositary for such Global Security or such Depositary has ceased to be a "clearing agency" registered under the Exchange Act, and, in each case, a successor Depositary is not appointed by the Issuer within 90 days; (ii) to the extent permitted by the Depositary, the Issuer determines at any time that the Notes shall no longer be represented by Global Securities

13

[New York #1699265 v7]

and shall inform such Depositary of such determination and participants in such Depository elect to withdraw their beneficial interests in the Global Securities from such Depository, following notification by the Depository of their right to do so; or (iii) an Event of Default has occurred and is continuing and the Depositary so requests. Any Global Security exchanged pursuant to clause (i) above shall be so exchanged in whole and not in part, and any Global Security exchanged pursuant to clause (ii) or (iii) above may be exchanged in whole or from time to time in part as directed by the Depositary. Any Note issued in exchange for a Global Security or any portion thereof shall be a Global Security; *provided* that any such Note so issued that is registered in the name of a person other than the Depositary or a nominee thereof shall be a Certificated Note.

Upon the occurrence of (i), (ii) or (iii) above, the Depositary shall surrender such Global Security or Global Securities to the Trustee for cancellation and the Issuer and the Guarantors shall execute, and the Trustee, upon receipt of an Officers' Certificate and Issuer Order for the authentication and delivery of Notes, shall authenticate and deliver in exchange for such Global Security or Global Securities, Certificated Notes of like tenor as that of the Global Securities in an aggregate principal amount equal to the aggregate principal amount of such Global Security or Global Securities. Such Certificated Notes shall be registered in such names as the Depositary shall identify in writing as the beneficial owners of the Notes represented by such Global Security or Global Securities (or any nominees thereof).

Notwithstanding the foregoing, in connection with any such surrender and subsequent exchange pursuant to Section 2.05 hereof, the Registrar shall reflect on its books and records the date and a decrease in the principal amount of such Global Security in an amount equal to the principal amount of the beneficial interest in such Global Security to be transferred.

(f)      *Guarantee by the Guarantors; Form of Guarantee.* (i) Each Guarantor by its execution of this Indenture hereby agrees with each Holder of a Note of each series authenticated and delivered by the Trustee and with the Trustee on behalf of each such Holder, to be unconditionally bound by the terms and provisions of the Guarantees set forth below and authorizes the Trustee to confirm such Guarantees to the Holder of each such Note by its execution and delivery of each such Note, with such Guarantees endorsed thereon, authenticated and delivered by the Trustee. Guarantees to be endorsed on the Notes shall, subject to this Section 2.01 be in substantially the form set forth below:

GUARANTEE

OF

[GUARANTOR]

For value received, [Guarantor] (the "Guarantor") hereby fully and unconditionally guarantees, jointly and severally, to the Holder of the Note upon which this Guarantee is endorsed and to the Trustee on behalf of each such Holder the due and punctual payment of the principal of, premium, if any, interest, Additional Interest, if any, and Defaulted Interest, if any, on such Note when and as the same shall become due and payable, whether on April 15, 201[2][4] (the "Maturity Date"), by declaration of acceleration, call for redemption or otherwise, according to the terms thereof and of the indenture dated as of March 28, 2007 among Nortel

14

[New York #1699265 v7]

Networks Corporation, as Issuer (together with any successor person under the Indenture, the "Issuer"), Nortel Networks Limited and Nortel Networks Inc., as guarantors, and The Bank of New York, as trustee (the "Indenture"). In case of the failure of the Issuer to punctually make any such payment of principal, premium, if any, interest, Additional Interest, if any, or Defaulted Interest, if any, the Guarantor, for so long as this Guarantee shall be in effect, hereby agrees to cause any such payment to be made to or to the order of the Trustee punctually when and as the same shall become due and payable, whether on the Maturity Date or by declaration of acceleration, call for redemption or otherwise, and as if such payment were made by the Issuer.

The Guarantor hereby agrees that its obligations hereunder shall be as if it were the principal debtor and not merely surety, and shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of such Note or the Indenture, any failure to enforce the provisions of such Note or the Indenture, or any waiver, modification or indulgence granted to the Issuer with respect thereto, by the Holder of such Note or the Trustee or any other circumstance which may otherwise constitute a legal or equitable discharge of a surety or guarantor. The Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of merger or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest or notice with respect to such Note or the indebtedness evidenced thereby or with respect to any sinking fund or analogous payment required under such Note and all demands whatsoever, and covenants that this Guarantee will not be discharged except by payment in full of the principal of, premium, if any, interest, Additional Interest, if any, and Defaulted Interest, if any, on such Note or as otherwise described in Section 2.01(g) of the Indenture.

This Guarantee shall be automatically and unconditionally released on the terms set forth in Section 2.01(g) of the Indenture.

The Guarantor shall be subrogated to all rights of the Holder of such Note and the Trustee against the Issuer in respect of any amounts paid to such Holder by the Guarantor pursuant to the provisions of this Guarantee; *provided, however,* that the Guarantor shall not be entitled to enforce, or to receive any payments arising out of or based upon such right of subrogation until the principal of, premium, if any, interest and Additional Interest, if any, on all Notes shall have been paid in full.

The Guarantor hereby agrees that its obligations hereunder shall be direct, unconditioned and unsubordinated. The Holder of a guaranteed Note will be entitled to payment under this Guarantee without taking any action whatsoever against the Issuer.

No reference herein to the Indenture and no provision of this Guarantee or of the Indenture shall alter or impair the Guarantee of the Guarantor, which is absolute and unconditional, of the due and punctual payment of the principal of, premium, if any, interest, Additional Interest, if any, or Defaulted Interest, if any, on the Note upon which this Guarantee is endorsed.

This Guarantee shall not be valid or obligatory for any purpose with respect to any Note until the certificate of authentication of such Note shall have been manually executed by or on behalf of the Trustee under the Indenture.

15

[New York #1699265 v7]

All capitalized terms used but not defined in this Guarantee shall have the meanings assigned to them in the Indenture.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, but without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby.

Executed and dated the date on the face hereof.

[GUARANTOR]

By      _____
           Name:
           Title:

(g)     Release of Guarantee.

(i)     The Guarantee of each Guarantor shall be released automatically with respect to any series of Notes upon discharge or defeasance of such series of Notes as provided below under Article Eight or Article Eleven of this Indenture.

(ii)     The Guarantee of NNI will be automatically and unconditionally released and NNI shall be relieved of any obligations under its Guarantee with respect to any series of Notes upon the occurrence, and during the continuance, of a Suspension Period with respect to such series of Notes. At such time as NNI's Guarantee is released with respect to any series of Notes, NNI will no longer be considered a "Guarantor" of such series of Notes. Within 15 Business Days of the occurrence of a Reversion Date with respect to such series of Notes, NNI will enter into a supplemental indenture in order to provide a Guarantee of such series of Notes on the terms set forth herein.

(iii)     The Trustee shall promptly execute any documents reasonably requested by the Issuer or a Guarantor in order to evidence the release of a Guarantor from its obligations under its Guarantee in accordance with this clause (g); *provided* that the Trustee shall not be obligated to execute or deliver any document evidencing the release of a Guarantee pursuant this Section 2.01(g) unless the Issuer has delivered an Officers' Certificate or an Opinion of Counsel to the effect that such release is in accordance with the provisions of this Indenture.

(h)     *Execution and Authentication.* Any two Authorized Officers of the Issuer shall sign the Notes for the Issuer by manual or facsimile signature. Any two Authorized Officers of NNL and any Authorized Officer of NNI shall sign the Guarantee for each Guarantor by manual or facsimile signature.

If an Authorized Officer whose signature is on a Note or the Guarantee endorsed thereon no longer holds that office at the time the Note is authenticated, the Note and the Guarantee shall nevertheless be valid.

16

[New York #1699265 v7]

A Note shall not be valid until authenticated by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

Upon an Issuer Order, the Trustee shall authenticate 2012 Notes for original issue up to an aggregate principal amount of $575,000,000 and 2014 Notes for original issue up to an aggregate principal amount of $575,000,000 to the Initial Purchasers.

The Notes shall be issuable only in registered form without coupons and only in denominations of $1,000 or any integral multiple thereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer and the Guarantors, to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.

SECTION 2.02.  Registrar, Paying Agent and Conversion Agent.

The Issuer shall maintain or cause to be maintained in the borough of Manhattan, the City and State of New York, which may be a Corporate Trust Office, an office or agency where: (i) securities may be presented for registration of transfer or for exchange ("Registrar"); (ii) Notes may be presented for payment ("Paying Agent"); (iii) Notes may be presented for conversion (the "Conversion Agent"); and (iv) notices and demands to or upon the Issuer or the Guarantors, as the case may be, in respect of Notes, the Guarantees and this Indenture may be served by the holders of the Notes. The Registrar shall keep at the office or agency of the Registrar in the borough of Manhattan a Register (each, a "Register") of each series of the Notes and of their transfer and exchange. The Issuer may appoint one or more co-registrars, one or more additional paying agents and one or more additional conversion agents. The term "Paying Agent" includes any additional paying agent and the term "Conversion Agent" includes any additional Conversion Agent. The Issuer may change any Paying Agent, Registrar, Conversion Agent or co-registrar without prior notice. The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture and shall enter into an appropriate agency agreement with any Registrar, Paying Agent, Conversion Agent or co-registrar not a party to this Indenture. The agreement shall implement the provisions of this Indenture that relate to such Agent. The Issuer or any of its Subsidiaries may act as Paying Agent, Registrar, Conversion Agent or co-registrar. If the Issuer fails to appoint or maintain another entity as Registrar, or Paying Agent or Conversion Agent, the Trustee shall act as such, and the Trustee shall initially act as such.

SECTION 2.03.  Money for Notes Payments to be Held in Trust.

(a)    If the Issuer, NNL or NNI shall at any time act as its own Paying Agent with respect to any payment on the Notes, it will, on or before each due date of the principal of (and premium, if any) or interest (including Additional Interest, if any) on the Notes, segregate and hold in trust for the benefit of the persons entitled thereto a sum sufficient to pay the principal (and premium, if any) or interest (including Additional Interest, if any) so becoming due until such sums shall be paid to such persons or otherwise disposed of as herein provided, and will promptly notify the Trustee of its action or failure so to act.

17

(b)     Whenever the Issuer shall have one or more Paying Agents with respect to the Notes, it will, prior to each due date of the principal of (and premium, if any) or interest (including Additional Interest, if any) on the Notes (but no later than 10:00 a.m., New York City time on such due date), deposit with a Paying Agent a sum sufficient to pay the principal of (and premium, if any) or interest (including Additional Interest, if any) so becoming due, such sum to be held in trust for the benefit of the persons entitled to such principal, premium or interest, and (unless such Paying Agent is the Trustee) the Issuer will promptly notify the Trustee of its action or failure so to act.

(c)     The Issuer will cause each Paying Agent, other than the Trustee, to execute and deliver to the Trustee an instrument in which such Paying Agent shall agree with the Trustee, subject to the provisions of this Section, that such Paying Agent will:

(i)     hold all sums held by it for the payment of the principal of (and premium, if any) or interest (including Additional Interest, if any) on the Notes in trust for the benefit of the persons entitled thereto until such sums shall be paid to such persons or otherwise disposed of as herein provided;

(ii)     give the Trustee notice of any Default by the Issuer or a Guarantor in the making of any payment of principal of (and premium, if any) or interest (including Additional Interest, if any) on the Notes or Guarantees endorsed thereon; and

(iii)     at any time during the continuance of any such Default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by such Paying Agent.

(d)     The Issuer may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Issuer or such Paying Agent, such sums to be held by the Trustee upon the same trusts as those upon which such sums were held by the Issuer or such Paying Agent; and, upon such payment by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

(e)     Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer or the Guarantors, in trust for the payment of the principal of (and premium, if any) or interest (including Additional Interest, if any) on the Notes and remaining unclaimed for two years after such principal (and premium, if any) or interest (including Additional Interest, if any) has become due and payable shall be paid to the Issuer or Guarantors on Issuer Request or Guarantors Request, as the case may be, or (if then held by the Issuer or Guarantors) shall be discharged from such trust; and the holder of Notes shall thereafter, as an unsecured general creditor, look only to the Issuer or Guarantors, as the case may be, for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer or Guarantors, as the case may be, as trustee thereof, shall thereupon cease; *provided, however,* that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Issuer or Guarantors, as the case may be, cause to be published once, in an Authorized Newspaper of general circulation in the borough of Manhattan, notice that such money remains unclaimed and that, after a date specified therein, which shall not

18

be less than 30 days from the date of such publication or mailing, any unclaimed balance of such money then remaining will be repaid to the Issuer or Guarantors, as the case may be.

SECTION 2.04.  Holder Lists.

The Registrar shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of holders of each series of Notes and shall otherwise comply with TIA § 312(a).  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least seven Business Days before each Interest Payment Date, and as the Trustee may request in writing within fifteen (15) days after receipt by the Issuer of any such request (or such lesser time as the Trustee may reasonably request in order to enable it to timely provide any notice to be provided by it hereunder), a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of holders of Notes.

SECTION 2.05.  Transfer and Exchange.

(a)      Upon surrender for registration of transfer or exchange of any Notes of any series to the Registrar or a co-registrar, the Issuer shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same series of any authorized denomination or denominations, of like tenor and aggregate principal amount and having endorsed thereon the Guarantees executed by the applicable Guarantor(s).  Every Note presented or surrendered for registration of transfer or for exchange shall (i) be accompanied by a completed "Assignment Form" substantially as set forth on such Note and (ii) (if so required by the Issuer, any Guarantor, the Registrar or the Trustee) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer, any Guarantor, the Registrar and the Trustee, and duly executed, by the holder thereof or his attorney duly authorized in writing.  No service charge shall be made to a holder for any registration of transfer or exchange (except as otherwise expressly permitted herein), but the Issuer may require payment of a sum sufficient to cover any transfer tax or other governmental charge payable upon transfers or exchanges pursuant to Sections 2.09, 3.08, 9.04 or 12.02.

The Issuer or the Registrar shall not be required (i) to issue, register the transfer or exchange of Notes of a series during a period beginning at the opening of business fifteen (15) days before the day of the mailing of the notice of redemption with respect to such series under Section 3.02 and ending at the close of business on the day of such mailing, (ii) to register the transfer or exchange of any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part, or (iii) to register the transfer of any Notes surrendered for repurchase pursuant to Section 4.06.

All Notes issued upon any transfer or exchange of Notes in accordance with this Indenture shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture as the Notes surrendered upon such registration of transfer or exchange.

(b)      Notwithstanding any other provision of this Section 2.05, unless and until it is exchanged in whole or in part for a Certificated Note, a Global Security representing all or a portion of the Notes of a series may not be transferred except as a whole by the Depositary for

19

[New York #1699265 v7]

such series to a nominee of such Depositary or by a nominee of such Depositary to such Depositary or another nominee of such Depositary or by such Depositary or any such nominee to a successor Depositary for such series or a nominee of such successor Depositary.

In the event that a Global Security is exchanged for Certificated Notes pursuant to Section 2.01(e) or Section 2.09 prior to the effectiveness of a Shelf Registration Statement with respect to such Notes, such exchange may occur, and such Notes may be further exchanged or transferred, only upon receipt by the Registrar of (1) such Global Security or such Certificated Notes, duly endorsed as provided herein, as applicable, (2) instructions from the holder directing the Trustee to authenticate and deliver one or more Certificated Notes in definitive form of the same aggregate principal amount as the Global Security or the Notes in definitive form (or portion thereof), as applicable, to be transferred, such instructions to contain the name or names of the designated transferee or transferees, the authorized denomination or denominations of the Certificated Notes to be so issued and appropriate delivery instructions, and (3) such certifications or other information and, in the case of transfers pursuant to Rule 144 under the Securities Act, legal opinions as the Issuer may reasonably require to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act (including the certification requirements intended to ensure that such transfers comply with Rule 144A, as the case may be).

(c)    Except in connection with a Shelf Registration Statement contemplated by and in accordance with the terms of the Registration Rights Agreement, if Notes are issued upon the registration of transfer, exchange or replacement of Notes bearing a Restricted Securities Legend, or if a request is made to remove such a Restrictive Securities Legend from Notes, the Notes so issued shall bear the Restricted Securities Legend, or a Restricted Securities Legend shall not be removed, as the case may be, other than as set forth in Section 2.14.

(d)    Neither the Trustee nor any Agent shall have any responsibility for any actions taken or not taken by the Depositary.

(e)    The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Notes (including any transfers between or among the Depositary's participants or beneficial owners of interests in any Global Security) other than to require delivery of such certificates and other documentation as is expressly required by, and to do so if and when expressly required by, the terms of this Indenture and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(f)    Each holder of a Note will be deemed to have represented and agreed for the benefit of the Issuer that it will not transfer such Note, or the Common Shares issuable upon conversion of such Note, into or in Canada, including through the facilities of a Canadian stock exchange, for a period of four months and one day following the Issue Date except pursuant to an available exemption from the prospectus requirements of applicable Canadian securities laws. Any transfer of Notes or Common Shares issuable upon conversion of such Notes into or in Canada shall be made in compliance with applicable Canadian securities laws.

20

[New York #1699265 v7]

SECTION 2.06.  Replacement Notes.

If the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, in the absence of notice to the Issuer, the Guarantors or the Trustee that such Notes have been acquired by a protected purchaser the Issuer shall issue, the Guarantors shall endorse and the Trustee shall authenticate a replacement Note if the Issuer's and the Guarantors' requirements are met.  If required by the Trustee, the Issuer or Guarantors as a condition of receiving a replacement Note, the holder of a Note must provide a certificate of loss and an indemnity and/or an indemnity bond sufficient, in the judgment of the Issuer, the Guarantors and the Trustee, to fully protect the Issuer, the Guarantors, the Trustee, any Agent and any authenticating agent from any loss, liability, cost or expense which any of them may suffer or incur if the Note is replaced. The Issuer, the Guarantors and the Trustee may charge the relevant holder for their expenses in replacing any Note.

The Trustee or any authenticating agent may authenticate any such substituted Note, and deliver the same upon the receipt of such security or indemnity as the Trustee, the Issuer, the Guarantors and, if applicable, such authenticating agent may require.  Upon the issuance of any substituted Note, the Issuer and the Guarantors may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith.  In case any Note which has matured or is about to mature, has been called for redemption pursuant to Article 3, has been submitted for repurchase pursuant to Section 4.06 or is about to be converted into Common Shares pursuant to Article 12, shall become mutilated or be destroyed, lost or stolen, the Issuer and the Guarantors may, instead of issuing a substitute Note, pay or authorize the payment of or convert or authorize the conversion of the same (without surrender thereof except in the case of a mutilated Note), as the case may be, if the applicant for such payment or conversion shall furnish to the Issuer and the Guarantors, to the Trustee and, if applicable, to the authenticating agent such security or indemnity as may be required by them to save each of them harmless for any loss, liability, cost or expense caused by or connected with such substitution, and, in case of destruction, loss or theft, evidence satisfactory to the Issuer, the Guarantors, the Trustee and, if applicable, any paying agent or conversion agent of the destruction, loss or theft of such Note and of the ownership thereof.

Every replacement Note (including the related Guarantee) is an additional obligation of the Issuer and the Guarantors and shall be entitled to all the benefits provided under this Indenture equally and proportionately with all other Notes duly issued, authenticated and delivered hereunder.

SECTION 2.07.  Outstanding Notes.

The Notes outstanding at any time are all the Notes properly authenticated by the Trustee except for those canceled by the Trustee, those delivered to it for cancellation, and those described in this Section as not outstanding.

If a Note is replaced pursuant to Section 2.06, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

[New York #1699265 v7]

If Notes are considered paid under Section 4.01 or converted under Article 12, they cease to be outstanding and interest (and Additional Interest, if any) on them ceases to accrue.

Subject to Section 2.08 hereof, a Note does not cease to be outstanding because the Issuer, any Guarantor or an Affiliate of the Issuer or any Guarantor holds the Note.

SECTION 2.08.  When Treasury Notes Disregarded.

In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, a Guarantor or an Affiliate of the Issuer or a Guarantor shall be considered as though they are not outstanding except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded; Notes so owned that have been pledged in good faith may be regarded as outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to act with respect to such Notes, and that the pledgee is not the Issuer or a Guarantor or any Affiliate of the Issuer or a Guarantor.

SECTION 2.09.  Temporary Notes.

(a)     Until definitive Notes are ready for delivery, the Issuer may prepare, and the Guarantors shall endorse and the Trustee shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of definitive Notes but may have variations that the Issuer and the Guarantors consider appropriate for temporary Notes and shall be reasonably acceptable to the Trustee.  Without unreasonable delay, the Issuer shall prepare, the Guarantors shall endorse and the Trustee shall authenticate definitive Notes in exchange for temporary Notes.

(b)     A Global Security deposited with the Depositary or with the Trustee as custodian for the Depositary pursuant to Section 2.01 shall be transferred to the beneficial owners thereof in the form of Certificated Notes in definitive form only if such transfer complies with Section 2.05 and this Section 2.09.

(c)     Any Global Security or interest thereon that is transferable to the beneficial owners thereof in the form of Certificated Notes in definitive form shall, if held by the Depository, be surrendered by the Depositary to the Trustee, without charge, and the Trustee shall authenticate and deliver, upon such transfer of each portion of such Global Security, an equal aggregate principal amount of Notes of authorized denominations in the form of Certificated Notes in definitive form.  Any portion of a Global Security transferred pursuant to this Section shall be executed, authenticated and delivered only in denominations of $1,000 and any integral multiple thereof and registered in such names as the Depositary shall direct.  Any Notes in the form of Certificated Notes in definitive form delivered in exchange for an interest in the Global Security shall, except as otherwise provided by Section 2.14, bear the Restricted Securities Legend and the Canadian Restricted Securities Legend.

(d)     Prior to any transfer pursuant to Section 2.09(b), the registered holder of a Global Security may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action which a holder is entitled to take under this Indenture or the Notes.

22

SECTION 2.10.  Cancellation.

The Issuer or the Guarantors at any time may deliver Notes to the Trustee for
cancellation.  The Registrar and Paying Agent shall forward to the Trustee any Notes
surrendered to them for registration of transfer, exchange or payment.  The Trustee and no one
else may cancel Notes surrendered for registration of transfer, exchange, payment, replacement,
conversion, redemption, repurchase or cancellation.  Upon written instructions of the Issuer, the
Trustee shall destroy and dispose of canceled Notes in accordance with its customary practices in
effect from time to time.  The Issuer may not issue new Notes to replace Notes that it has paid or
redeemed or that have been delivered to the Trustee for cancellation or that any holder has
(i) converted pursuant to Article 12 hereof, (ii) submitted for redemption pursuant to Article 3
hereof or (iii) submitted for repurchase pursuant to Section 4.06 hereof (unless revoked).

SECTION 2.11.  Defaulted Interest.

If the Issuer (and the Guarantors) fail to make a payment of interest on the Notes, it (and
the Guarantors) shall pay such defaulted interest plus, to the extent lawful, any interest payable
on the defaulted interest (collectively, the "Defaulted Interest").  It may pay such defaulted
interest, plus any such interest payable on it, to the persons who are holders of Notes on a
subsequent special record date.  The Issuer shall fix any such record date and payment date, and
the Issuer shall provide written notice of such record date and payment date to the Trustee.  At
least 10 days before any such record date, the Trustee shall mail to holders of the Notes a notice
that states the record date, payment date and amount of such interest to be paid.

SECTION 2.12.  CUSIP Number.

The Issuer in issuing the Notes may use a "CUSIP" number, and if so, such CUSIP
number shall be included in notices of redemption, repurchase or exchange as a convenience to
holders of Notes; *provided, however*, that any such notice may state that no representation is
made as to the correctness or accuracy of the CUSIP number printed in the notice or on the Notes
and that reliance may be placed only on the other identification numbers printed on the Notes.
The Issuer will promptly notify the Trustee of any change in the CUSIP number.

SECTION 2.13.  Judgment.

Any payment in respect of principal of (and premium, if any) and interest (and Additional
Interest, if any) otherwise due on Notes made in Canadian currency by the Issuer or the
Guarantors to any holder of Notes (the "Payee") pursuant to a judgment or order of a court or
tribunal in Canada shall constitute a discharge of the Issuer only to the extent of the amount of
U.S. Dollars on such Notes (the "Purchased Amount") that the Payee, on the date of such
payment in Canadian currency, would be able to purchase with the amount so paid based on the
noon buying rate for U.S. Dollars for wire transfers quoted on the date of payment or, if such
date if not a business day in Toronto, Canada, on the next business day in Toronto, Canada.  If
the amount otherwise due to the Payee (the "Amount Due") is greater or less than the Purchased
Amount, the Issuer shall indemnify and hold harmless the Payee to the extent that the Amount
Due exceeds the Purchased Amount and the Issuer may retain the amount, if any, by which the
Amount Due is less than the Purchased Amount.  This indemnity shall constitute a separate and

[New York #1699265 v7]

independent obligation from the other obligations contained in this Indenture and shall give rise to a separate and independent cause of action and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of amounts due under the Notes or any judgment or order.

SECTION 2.14.  Legends; Restricted Securities Legends.

(a)     Each Note issued hereunder shall, upon issuance, bear the legend set forth in Section 2.14(a)(i) (the "Restricted Securities Legend") and such legend shall not be removed except as provided in Section 2.14(a)(iv).  Each Note issued hereunder shall, upon issuance, bear the legend set forth in Section 2.14(a)(iii) (the "Canadian Restricted Securities Legend") and such legend shall not be removed except as provided in Section 2.14(a)(iii).  Each Note that bears or is required to bear the Restricted Securities Legend and/or the Canadian Restricted Securities Legend (together with any Common Shares issued upon conversion of the Notes and required to bear the Restricted Securities Legend set forth in Section 2.14(a)(ii) (the "Restricted Common Share Legend") and/or the Canadian Restricted Securities Legend set forth in Section 2.14(a)(iii), collectively, the "Restricted Securities") shall be subject to the restrictions on transfer set forth in this Section 2.14(a), and the holder of each such Restricted Security, by such holder's acceptance thereof, shall be deemed to have agreed to be bound by all such restrictions on transfer.

As used in this Section 2.14(a), the term "Transfer" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

(i)     Restricted Securities Legend for Notes.  Except as provided in Section 2.14(a)(iv), until the expiration of the holding period applicable to sales of the Notes under Rule 144(k) under the Securities Act (or any successor provision) as evidenced by a certificate to such effect from the Issuer to the Trustee, any Note (and all securities issued in exchange therefor or substitution thereof, other than Common Shares, if any, issued upon conversion thereof, which shall bear the legend set forth in Section 2.14(a)(ii), if applicable) shall bear a Restricted Securities Legend in substantially the following form:

THIS SECURITY AND THE COMMON SHARES ISSUABLE UPON CONVERSION OF THIS SECURITY HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION.  NONE OF THIS SECURITY (AND RELATED GUARANTEES), THE COMMON SHARES ISSUABLE UPON CONVERSION OF THIS SECURITY AND ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.  THE HOLDER OF THIS SECURITY (AND RELATED GUARANTEES), BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS TWO YEARS AFTER THE LATER OF THE ORIGINAL ISSUE DATE

24

HEREOF AND THE LAST DATE ON WHICH THE ISSUER, ANY GUARANTOR OR ANY AFFILIATE OF THE ISSUER OR ANY GUARANTOR WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER OR ANY GUARANTOR, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, OR (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S, ANY GUARANTOR'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

(ii)     Restricted Securities Legend for Common Shares issued upon conversion of any Note. Except as provided in Section 2.03(a)(iv), until the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision) as evidenced by a certificate to such effect from the Issuer to the Trustee, any share certificate representing Common Shares issued upon conversion of such Note shall bear a Restricted Common Share Legend in substantially the following form:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "RESALE RESTRICTION TERMINATION DATE") THAT IS TWO YEARS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS

25

GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, OR (D) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRANSFER AGENT'S RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (D) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

      (iii)    Canadian Restricted Securities Legend for Notes Common Shares Issued upon Conversion of any Note. Except as provided in this Section 2.14(a)(iii), until July 29, 2007, each Note (and all securities issued in exchange therefor or substitution thereof, other than Common Shares, if any, issued upon conversion thereof) and any share certificate representing Common Shares issued upon conversion of such Note shall bear a Canadian Restricted Securities Legend in substantially the following form:

UNLESS PERMITTED UNDER CANADIAN SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THIS SECURITY IN CANADA BEFORE JULY 29, 2007.

Notwithstanding the foregoing, the Canadian Restricted Securities Legend may be removed if there is delivered to the Issuer such satisfactory evidence, as may be reasonably required by the Issuer, that neither the Canadian Restricted Securities Legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with applicable Canadian securities laws. Upon provision to the Issuer and the Guarantors of such satisfactory evidence, the Trustee, upon receipt of an Issuer Order, shall authenticate and deliver Notes (including the related Guarantee) that do not bear the Canadian Restricted Securities Legend.

      (iv)    Each Note shall bear the Restricted Securities Legend set forth in Section 2.14(a)(i) and each Common Share issued upon conversion of such Note shall bear the Restricted Common Share Legend set forth in Section 2.03(a)(ii), in each case, until the earlier of:

      (A)    the expiration of the holding period applicable to sales thereof under Rule 144(k) under the Securities Act (or any successor provision) as evidenced by a certificate to such effect from the Issuer to the Trustee;

      (B)    such Note or Common Share has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and that was effective at the time of such sale); or

      (C)    in the case of any such Common Share, such Common Share has been issued upon conversion of any Note that has been sold pursuant to a registration statement that has been declared effective under the Securities Act (and that was effective at the time of such sale).

The holder must give notice of the occurrence of any event described in clause (A), (B) or (C) above to the Trustee and any transfer agent for the Common Shares, as applicable.

26

Notwithstanding the foregoing, the Restricted Securities Legend or Restricted Common Share Legend, as the case may be, may be removed if there is delivered to the Issuer such satisfactory evidence, which, in the case of a transfer made pursuant to Rule 144 under the Securities Act, may include an opinion of counsel, as may be reasonably required by the Issuer, that neither the legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A or Rule 144 under the Securities Act or that such Notes are not "restricted" within the meaning of Rule 144 under the Securities Act. Upon provision to the Issuer and the Guarantors of such satisfactory evidence, the Trustee, upon receipt of an Issuer Order, shall authenticate and deliver Notes (including the related Guarantee) that do not bear the legend. The Issuer shall not otherwise be entitled to require the delivery of a legal opinion in connection with any transfer or exchange of Securities

If the Restricted Securities Legend has been removed from a Note or Common Share, as the case may be, as provided above, no other Note or Common Share issued in exchange for all or any part of such Note or Common Share shall bear such legend, unless the Issuer has reasonable cause to believe that such other Note or Common Share is a "restricted security" within the meaning of Rule 144 and instructs the Trustee in writing to cause a Restricted Securities Legend or Restricted Common Share Legend to appear thereon.

Any Note (or security issued in exchange or substitution thereof) as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the Restricted Securities Legend set forth in Section 2.14(a)(i) as set forth therein have been satisfied may, upon surrender of such Note for exchange to the Registrar in accordance with the provisions of Section 2.05 hereof, be exchanged for a new Note or Notes, of like tenor and aggregate principal amount, which shall not bear the Restricted Securities Legend required by Section 2.14(a)(i).

(v)     Any Common Share issued upon conversion of a Note as to which such restrictions on transfer shall have expired in accordance with their terms or as to which the conditions for removal of the Restricted Common Share Legend set forth in Section 2.14(a)(ii) or the Canadian Restricted Securities Legend set forth in Section 2.14(a)(iii), as the case may be, have been satisfied may, upon surrender of the certificates representing such Common Shares for exchange in accordance with the procedures of the transfer agent for the Common Shares, be exchanged for a new certificate or certificates for a like aggregate number of Common Shares, which shall not bear the Restricted Securities Legend required by Section 2.14(a)(ii) or the Canadian Restricted Securities Legend required by Section 2.14(a)(iii), as applicable.

(b)     Each Global Security shall also bear the following legend on the face thereof:

THIS NOTE IS A GLOBAL SECURITY WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF THE DEPOSITARY OR A NOMINEE OF THE DEPOSITARY, WHICH MAY BE TREATED BY THE ISSUER, ANY GUARANTOR, THE TRUSTEE AND ANY AGENT THEREOF AS OWNER AND HOLDER OF THIS NOTE FOR ALL PURPOSES.

27

[New York #1699265 v7]