**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------X
                                                         :
*In re*                                                  :      Chapter 11
                                                         :
Nortel Networks Inc., *et al.*,[1]                       :      Case No. 09-10138 (KG)
                                                         :
                                   Debtors.              :      Jointly Administered
                                                         :
                                                         :      **Hearing date: November 19th, 2013 at 10:00 a.m. (ET)**
                                                         :      **Objections due: October 11, 2013 at 4:00 p.m. (ET)**

------------------------------------------------------------ X

### DECLARATION OF DEBORAH PARKER IN SUPPORT OF DEBTORS' REPLY TO THE RESPONSE OF ALEX THOMPSON TO DEBTORS' THIRTY-FIRST OMNIBUS OBJECTION (SUBSTANTIVE) TO CERTAIN CLAIMS

I, Deborah Parker, do hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Shared Services Team Leader at Nortel Networks Inc. ("<u>NNI</u>").

2.      I respectfully submit this declaration in support of the *Debtors' Reply to the Response of Alex Thompson to the Debtors' Thirty-First Omnibus Objection (Substantive) to Certain Claims* (the "<u>Reply</u>").[2]  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, information supplied to me by employees of the Debtors or their affiliates and professionals retained by the Debtors, or learned from my review of relevant documents, including the Debtors books and records and documents supplied

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Reply.

by Mr. Thompson.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      In order to place before the Court certain documents relevant to the Reply, annexed to this declaration are true and correct copies of the following documents:

| | |
|---|---|
| **EXHIBIT 1:** | Nortel Networks Special Incentive Plan ("<u>NSIP</u>") |
| **EXHIBIT 2:** | Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group  ("<u>AIP</u>") |
| **EXHIBIT 3:** | Email from Patricia Uche-Chiemeka of Ericsson to Mr. Thompson, dated January 26, 2011 |

4.      On November 16, 2010, Ericsson expressed an interest in making an offer of employment to Mr. Thompson to NNI.  Between November 16, 2010 and January 20, 2011, Ericsson and NNI negotiated in an attempt to find a mutually agreeable transition date for Mr. Thompson.  NNI initially sought a departure date of November 30, 2011 so that Mr. Thompson could be available to continue to provide any necessary transition services to purchasers of Nortel business lines.  Ericsson initially sought a start date of January 24, 2011.  On January 2, Mr. Thompson received confirmation from Ericsson that it had received his application for a position.  The parties ultimately agreed that Mr. Thompson could depart employment with NNI on April 29, 2011.

5.      On January 26, 2011, Mr. Thompson received an offer of employment from Ericsson for the position of Process Management Specialist III as part of the CDMA Mobile Systems Business Unit in Richardson, Texas.  On February 2, 2011, Ericsson confirmed to NNI that Mr. Thompson accepted his offer, with a start date of May 2, 2011.

6.      On March 25, 2011, Mr. Thompson received $51,511 in incentive plan payments under the Nortel Special Incentive Plan (the "<u>NSIP</u>") for meeting completion and performance

metrics in the 2010 plan year.  On the same date, Mr. Thompson received a total of $10,284 in incentive plan payments under the Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group (the "AIP"), $3,541 of which constituted a hold-back for amounts earned during the first half of the 2010 plan year, and $6,743 of which constituted payments earned during the second half of the 2010 plan year.

7.      On April 29, 2011, Mr. Thompson's employment with NNI terminated.

8.      On May 20, 2011, Mr. Thompson received $25,276 in incentive plan payments under the NSIP for meeting completion metrics in the 2011 plan year.  On September 9, 2011, Mr. Thompson received $5,175 in incentive plan payments under the AIP, which constituted a pro-rated payment for the first four months of 2011.  On March 9, 2012, Mr. Thompson received $25,756 in incentive plan payments under the NSIP for meeting performance metrics in the 2011 plan year.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Dated: Research Triangle Park, North Carolina
      November 14, 2013

Deborah Parker

**EXHIBIT 1**

# NORTEL SPECIAL INCENTIVE PLAN

## I.   PLAN OBJECTIVE

The Nortel Special Incentive Plan (the "Plan") is designed to provide cash incentive payments (the "Payments") to certain employees of Nortel Networks Inc. ("NNI"), Nortel Networks Limited ("NNL") and certain of their direct and indirect subsidiaries and affiliates participating in the Plan (each a "Participating Employer" and collectively, the "Company") in positions within Nortel Business Services ("NBS") or Nortel Finance and Corporate Services ("Corporate Group") to encourage the achievement of certain performance targets and other business goals important to the Company, including a successful conclusion of its proceedings under the Companies' Creditors Arrangement Act (Canada) and the US Bankruptcy Code (the "Proceedings"), compliance with its obligations under various transaction agreements and the wind down of various Company entities during the Plan Term (as defined below).

## II.   PARTICIPATING EMPLOYERS AND EMPLOYEES

(a)  The Participating Employers and the employees of the Participating Employers who may participate in the Plan have been selected in accordance with criteria approved by the Boards of Directors of NNL and NNI (the "Board").

(b)  Each employee of a Participating Employer selected for participation in the Plan shall receive a letter (each, a "Participation Letter") that sets forth the Target Payment Amount (as defined below) that he or she may be eligible to receive under the Plan with respect to each applicable Plan Period (as defined below) and requires such employee to be bound by the terms and conditions of the Plan, including any amendments thereto.  Upon execution and timely return of the Participation Letter in accordance with its terms, such employee shall become a participant in the Plan (a "Plan Participant") and will be eligible to receive a Payment.

(c)  As set forth on Appendix A, based on Job Complexity Indicator and Job Family Group, each Plan Participant employed by the Company in a position within NBS (an "NBS Plan Participant") will be identified as either "NBS Group A," "NBS Group B," or "NBS Group C" and each Plan Participant employed by the Company in a position within Corporate Group (a "Corporate Plan Participant") will be identified as either "Corporate Group A" or "Corporate Group B" (each of the foregoing, a "Plan Participant Group").

## III.   PAYMENT AMOUNTS

(a)  Subject to Section IV(c) of the Plan, each Plan Participant will be eligible to receive a Payment in respect of each Plan Period up to an amount (the "Target Payment Amount") set forth in the Participation Letter determined in accordance with the criteria approved by the Board, pursuant to the guidelines established by the Board from time to time.

(b) Each Plan Participant's Target Payment Amount shall be comprised of a component conditioned upon completion of the Plan Participant's role during the Plan Term in furthering the business purposes of NBS and Corporate Group, as applicable, in the relevant Plan Period (the "Completion Payment") and may also include a component based upon the achievement of specific performance metrics established by the Board in its sole discretion (the "Performance Metrics") for the Plan Period (the "Performance Payment," and together with the Completion Payment, the "Payment Amounts").  With respect to NBS Plan Participants in NBS Group A and NBS Group B, two thirds of the Target Payment Amount shall be allocated to the Performance Payment and one third shall be allocated to the Completion Payment.  With respect to NBS Plan Participants in NBS Group C, one half of the Target Payment Amount shall be allocated to the Performance Payment and one half shall be allocated to the Completion Payment.  With respect to Corporate Plan Participants, all of the Target Payment Amount shall be allocated to the Completion Payment.

(c) In the event that, following the Effective Date (as defined below), a Plan Participant is reassigned to a different Plan Participant Group, including a Plan Participant employed within NBS who becomes employed within Corporate Group (or vice versa), the Board may in its discretion elect to modify the terms of the Payment for such Plan Participant.  In the event that the Board elects to modify a Plan Participant's Target Payment Amount pursuant to this Section III(c), the affected Plan Participant shall receive an amended Participation Letter setting forth the terms of the new Payment that he or she may be eligible to receive under the Plan and any necessary reconciliation with respect to the terms of the prior Payment.  Notwithstanding anything to the contrary in this Section III(c), any modification made to the terms of a Plan Participant's Payment pursuant to this Section III(c) shall be made in compliance with Section 409A (as defined below).

(d) In the event that the Board determines that certain additional performance metrics to be developed by the Board together with the Unsecured Creditors Committee, the Ad Hoc Bondholder group, Ernst & Young Inc. as the Monitor appointed under the Companies' Creditors Arrangement Act and the NNI Principal Officer (together, the "Group") have been achieved, the Board may (subject to the approval of the U.S. Bankruptcy Court for the District of Delaware, the Ontario Superior Court of Justice and other approvals which may be required, including by the Group) pay additional amounts under the Plan to any current or former Plan Participant(s) subject to such terms and conditions as may be established at such time; provided, however, that such additional bonus amounts will be permitted to be paid only to the extent that such amounts in the aggregate do not exceed US$20,000,000.

(e) Except as required by applicable law or the terms of Company benefit plans or programs, Payments will not be taken into account for purposes of Company benefits in which a Plan Participant may participate and will not be included in "eligible earnings" for purposes of capital accumulation and retirement plans offered in various jurisdictions by the Company.  Where required, deductions will be made from the Payments paid in accordance with the specific capital accumulation and retirement plan in which the Plan Participant participates.

2

## IV.    PLAN PERIODS

(a) The Plan shall have two periods (each a "<u>Plan Period</u>").  The "<u>First Plan Period</u>" shall commence on January 1, 2010 and end on December 31, 2010.  The "<u>Second Plan Period</u>" shall commence on January 1, 2011 and end on December 31, 2011.

(b) With respect to each Plan Period, a Plan Participant's actual Performance Payment shall be determined by reference to the level of achievement, as determined by the Board, in respect of Performance Metrics established by the Board to measure relevant performance during such Plan Period.  The target Performance Payment, as described in the Participation Letter, in respect of the First Plan Period shall be known as a "<u>Year One Target Performance Payment</u>."  The actual amount to be paid following the applicable determination by the Board of the achieved performance level in respect of the Year One Target Performance Payment shall be known as the "<u>Year One Actual Performance Payment</u>."  The target Performance Payment, as described in the Participation Letter, in respect of the Second Plan Period shall be known as a "<u>Year Two Target Performance Payment</u>."  The actual amount to be paid following the applicable determination by the Board of the achieved performance level in respect of the Year Two Target Performance Payment shall be known as the "<u>Year Two Actual Performance Payment</u>."  A Completion Payment in respect of the First Plan Period shall be known as a "<u>Year One Completion Payment</u>."  A Completion Payment in respect of the Second Plan Period shall be known as a "<u>Year Two Completion Payment</u>."

(c) Except as otherwise provided in the applicable Participation Letter, a Plan Participant shall be eligible to participate in the Second Plan Period, and shall be eligible for a Year Two Completion Payment and, if applicable, a Year Two Actual Performance Payment, only if such Plan Participant is actively employed by the Company on January 1, 2011 and before that date has not received notice of the Company's intention to terminate such Plan Participant's employment.

## V.    PAYMENT PROCESS

(a) Following completion of each Plan Period, the Board will determine the amount of the Year One Actual Performance Payment or Year Two Actual Performance Payment, as applicable, with respect to each Plan Participant based upon its determinations regarding the level of achievement by the relevant entity in respect of the targets established by the Board for the applicable Performance Metrics.  In the event that the Board determines that the relevant entity's performance did not meet the target performance level established by the Board with respect to any particular Performance Metric(s), the Board may (but is not required to) decide in its sole discretion that an amount less than the Target Performance Payment (including zero) is appropriate with respect to the relevant Plan Period.  In no event shall a Year One Actual Performance Payment or a Year Two Actual Performance Payment be in an amount in excess of the applicable Target Performance Payment.  For the avoidance of doubt, any determination of performance related to the Performance Metrics required pursuant to the Plan shall be made in the sole discretion of the Board.

3

(b)  Subject to Sections VII and X, payment of any portion of any Payment payable upon completion of the First Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2011, but in no event later than April 30, 2011. Payment of any portion of any Payment payable upon completion of the Second Plan Period will be made in a lump sum cash payment as soon as practicable following March 1, 2012, but in no event later than April 30, 2012.

(c)  Subject to Section VII, the Payment of each Plan Participant will be paid in the amounts and at the times set forth below for his or her applicable Plan Participant Group so long as, on the date the Payment is paid (the "Payment Date"), such Plan Participant is either (i) actively employed by a Participating Employer or (ii) an inactive employee of a Participating Employer as a result of short- or long-term disability or other leaves of absence approved by the relevant Participating Employer and not constituting a "separation from service" as defined in Section 409A ("Approved LOA"):

   (i)      NBS Group A:

      1.  100% of both the Year One Actual Performance Payment and Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period;

      2.  50% of the Year One Completion Payment following the completion of the First Plan Period; and

      3.  50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

   (ii)     NBS Group B:

      1.  100% of the Year One Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the First Plan Period;

      2.  100% of the Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period; and

      3.  100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

   (iii)    NBS Group C:

      1.  100% of the Year One Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the First Plan Period;

4

    2.  100% of the Year Two Actual Performance Payment (as determined by the Board pursuant to Section V(a)) following the completion of the Second Plan Period;

    3.  100% of the Year One Completion Payment following the completion of the First Plan Period; and

    4.  100% of the Year Two Completion Payment following the completion of the Second Plan Period.

(iv)    Corporate Group A:  100% of both the Year One Completion Payment and Year Two Completion Payment following the completion of the Second Plan Period.

(v)    Corporate Group B:

    1.  50% of the Year One Completion Payment following the completion of the First Plan Period; and

    2.  50% of the Year One Completion Payment and 100% of the Year Two Completion Payment following the completion of the Second Plan Period.

(d) For purposes of the Plan, a Plan Participant will be considered to be "actively employed" on those days when he or she is classified as "active" on the applicable Participating Employer's payroll and has not experienced a "separation from service" as defined in Section 409A.

(e) If a Plan Participant is not actively employed by a Participating Employer on a Payment Date applicable to the Participant Group to which the Plan Participant is assigned as a result of an Approved LOA, any appropriate Payment Amounts related to that Payment Date will be made to such Plan Participant at the same time as all other Payment Amounts related to such Payment Date are made to other Plan Participants in the same Plan Participant Group who are actively employed on such Payment Date, unless otherwise required by applicable law.

(f) If a Plan Participant is actively employed by a Participating Employer or is on an Approved LOA on a Payment Date, and was not actively employed for the entire Plan Period(s) relating to any Payment Amounts to be paid on such Payment Date as a result of an Approved LOA, a portion of such Payment Amount will be paid to such Plan Participant on such Payment Date in an amount equal to such Payment Amount multiplied by a fraction the numerator of which is the number of calendar months during the relevant Plan Period in which the Plan Participant was actively employed for at least one day and the denominator of which is 12.  Any unpaid portion of such Payment Amount will be forfeited and such Plan Participant will have no further rights under the Plan with respect to such forfeited portion.

(g) (i)  If, at the Company's request, a Plan Participant transitions from regular full-time employment to regular part-time employment without a change in Plan Participant

5

Group, all aspects of such Plan Participant's participation in the Plan, including his or her Target Payment Amount, will remain unchanged.

(ii)     If, at a Plan Participant's request, a Plan Participant transitions from regular full-time employment to regular part-time employment without a change in Plan Participant Group, the dollar amount of any Payment Amount paid to such Plan Participant following such transition to regular part-time employment and attributable to portions of the Plan Period(s) occurring after such transition shall be reduced in proportion with the percentage of a regular full-time schedule that such Plan Participant works as a regular part-time employee.

(h) If an NBS Plan Participant transfers from one business division to another business division within NBS (*e.g.*, a move from IT to Supply Chain Operations) during a Plan Period, but does not change Plan Participant Groups, such NBS Plan Participant's Year One Actual Performance Payment (if the transfer occurs during the First Plan Period) or Year Two Actual Performance Payment (if the transfer occurs during the Second Plan Period), as applicable, shall be calculated on a pro-rata basis based on the number of months such NBS Plan Participant was employed in each division (such prorated award, the "Prorated Actual Performance Payment"). For the purposes of determining the Prorated Actual Performance Payment, an NBS Plan Participant will be considered to have been employed by a business division for any month during which he or she was employed by such division on the first business day of such month. The Prorated Actual Performance Payment will be determined based on the Performance Metrics applicable to each portion of the Prorated Actual Performance Payment and otherwise as described in Section V(a) of the Plan. Notwithstanding anything to the contrary herein, in no event shall an NBS Plan Participant's Prorated Actual Performance Payment exceed the amount of such NBS Plan Participant's applicable Year One Target Performance Payment or Year Two Target Performance Payment.

(i) Notwithstanding anything in the Plan to the contrary, if the Board, in its sole discretion, upon consideration of facts and circumstances determined by the Board to be relevant, concludes that a Plan Participant has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation relating to the forfeiture and/or recoupment of incentive compensation, the Plan Participant will forfeit any Unpaid Payments (as defined below) and/or reimburse his or her Participating Employer the amount of the Payment Amounts received, as determined by the Board.

## VI.     PLAN ADMINISTRATION

The Board shall have full discretionary authority to administer the Plan, including discretionary authority to interpret and construe any and all provisions of the Plan.

## VII.    TERMINATION OF EMPLOYMENT

(a) Upon the involuntary termination of employment of a Plan Participant by the Company for Cause (as defined below) by a Participating Employer or voluntary termination of employment by a Plan Participant for any reason (other than a voluntary termination in connection with a Transfer (as defined below)), the right to any unpaid Payment Amount(s) (the "Unpaid Payments") of such Plan Participant will be forfeited on the date of such employment termination and such Plan Participant will have no further rights under the Plan.

(b) Except as stated to the contrary in a Plan Participant's Participation Letter, upon the involuntary termination of employment of a Plan Participant (other than a Plan Participant identified as NBS Group A (an "NBS Group A Plan Participant")) by the Company during the First Plan Period for reasons determined by the Board to be other than an involuntary termination for Cause, the following shall apply: (i) any Unpaid Payment that is a Year One Completion Payment will be accelerated and paid in accordance with Section VII(i) of the Plan and (ii) any Unpaid Payment that is a Year One Actual Performance Payment shall be paid at the same time as all other such Year One Actual Performance Payments are made to other Plan Participants in the same Plan Participant Group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law. A Plan Participant whose employment is terminated in accordance with this Section VII(b) shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above.

(c) Subject to Section IV(c) of the Plan, upon the involuntary termination of employment of a Plan Participant (other than an NBS Group A Plan Participant) by the Company during the Second Plan Period for reasons determined by the Board to be other than an involuntary termination for Cause, the following shall apply: (i) any Unpaid Payments that are Completion Payments will be accelerated and paid in accordance with Section VII(i) of the Plan and (ii) any Unpaid Payments that are Year One Actual Performance Payments or Year Two Actual Performance Payments shall be paid at the same time as all other such Year One Actual Performance Payments and/or Year Two Actual Performance Payments are made to other Plan Participants in the same Plan Participant Group who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.

(d) Upon the termination of employment of a Plan Participant during the First Plan Period due to such Plan Participant's death, any Unpaid Payments that are Year One Completion Payments or Year One Target Performance Payments will be accelerated and paid as soon as practicable, but no later than the 30th day following the date of termination of employment. Any Year One Target Performance Payments accelerated pursuant to this Section VII(d) shall be made in the amount set forth with respect to the Year One Target Performance Payments in such Plan Participant's Participation Letter. A Plan Participant whose employment is terminated in accordance with this Section VII(d) shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above.

(e)  Subject to Section IV(c) of the Plan, upon the termination of a Plan Participant during the Second Plan Period due to such Plan Participant's death, any Unpaid Payments will be accelerated and paid as soon as practicable, but no later than the 30th day following the date of termination of employment.  Any Performance Payments accelerated pursuant to this Section VII(e) shall be made based on the amount set forth with respect to the Year One Target Performance Payment and/or Year Two Target Performance Payment, as applicable, in such Plan Participant's Participation Letter.

(f)  For the purposes of the Plan, "<u>Cause</u>" shall mean inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance by a Plan Participant or cause (as "cause" is legally defined, if at all, in the relevant jurisdiction) as determined by the Board in its sole discretion.

(g)  Subject to Section IV(c) of the Plan, upon the involuntary termination of employment of an NBS Group A Plan Participant by the Company for reasons determined by the Board to be other than an involuntary termination for Cause, or upon any termination of employment of an NBS Group A Plan Participant due to a Transfer, the following shall apply: (i) any Unpaid Payment that is a Year One Actual Performance Payment will be accelerated and paid on (x) May 31, 2011, if such termination occurs on or before April 30, 2011 or (y) the 30th day following such termination if such termination occurs after April 30, 2011 and (ii) any Unpaid Payment that is a Year One Completion Payment (or, if such termination occurs during the Second Plan Period, any Unpaid Payment that is a Year One Completion Payment or a Year Two Completion Payment) will be accelerated and paid on the 30th day following such termination (it being understood that any payment made on the regular payroll date applicable to the relevant Participating Employer's first full payroll period following May 31, 2011 or the 30th day following such termination, as applicable, pursuant to this Section VII(g) will be deemed to have been made on May 31, 2011 or the 30th day following such termination, as applicable).  If such termination occurs during the First Plan Period, such terminated NBS Group A Plan Participant shall not be eligible for any portion of the Year Two Target Performance Payment or Year Two Completion Payment, as described in Section IV above.  If such termination occurs during the Second Plan Period, any Unpaid Payments that are Year Two Actual Performance Payments shall be paid at the same time as all other such Year Two Actual Performance Payments are made to other NBS Group A Plan Participants who are actively employed on the relevant Payment Date, unless otherwise required by applicable law.  Any acceleration of the payment of any Unpaid Payment pursuant to this Section VII(g) shall be contingent upon the terminated Plan Participant executing and submitting to the Company a release in a form to be determined and provided by the Company (the "<u>Release</u>") of all claims related to the Plan.  Any Unpaid Payment accelerated pursuant to this Section VII(g) shall paid on the date described above, <u>provided</u> that, on or before such payment date, (i) such terminated Plan Participant has executed and submitted to the Company the Release and (ii) any statutory period during which such terminated Plan Participant is entitled to revoke the Release has expired without any such revocation having occurred.

8

(h) In the event that a Plan Participant's (other than an NBS Group A Plan Participant) employment with the Company terminates as a result of such Plan Participant's transfer to a new employer not affiliated with the Company that purchased one or more of the Company's business units or to which Company services have been outsourced (each, a "New Employer"), such Plan Participant's employment termination shall be treated in accordance with Sections VII(b) and (c) above, as applicable, provided that both the Company and the New Employer agree in advance in writing to such transfer and the effective date of such transfer (such transfer, a "Transfer").

(i) Any acceleration of the payment of any Unpaid Payment pursuant to Section VII(b), (c) or (h) of the Plan) shall be contingent upon the terminated Plan Participant executing and submitting to the Company a Release of all claims related to the Plan and shall be paid on the 30th day following the date of such Plan Participant's termination of employment, provided that, on or before such 30th day, (i) such terminated Plan Participant has executed and submitted to the Company the Release and (ii) any statutory period during which such terminated Plan Participant is entitled to revoke the Release has expired without any such revocation having occurred, and provided further that, for purposes of the Plan, any payment made on the regular payroll date applicable to the relevant Participating Employer's first full payroll period following such 30th day pursuant to this Section VII(i) will be deemed to have been made on such 30th day.

## VIII.  EFFECTIVE DATE; TERMINATION DATE OF THE PLAN

The Plan shall be effective as of January 1, 2010 (the "Effective Date") and shall expire on June 30, 2012 (the "Termination Date") (such period, the "Plan Term").  All rights to Unpaid Payments shall lapse on the Termination Date.  For the avoidance of doubt, no payments shall be made under the Plan in connection with any Payment Amount if such Payment Amount has not been paid prior to the Termination Date.

## IX.  NO PROMISE OF CONTINUED EMPLOYMENT

The Plan and any Plan Participant's selection as a participant in the Plan does not, and is in no manner intended to constitute, a promise of employment for any period of time or to change a Plan Participant's employment status, if applicable, as an at will employee subject to employment termination at any time for any reason.

## X.  TAXES; SECTION 409A

(a) All payments made pursuant to the Plan shall be subject to applicable taxes and standard withholding and deductions as determined by the relevant Participating Employer.  Neither the Company nor its officers or agents makes or has made any representation about the tax consequences of any payments made or offered to any Plan Participant under the Plan.

(b) All payments under the Plan are designed to comply with the requirements of section 409A of the US Internal Revenue Code of 1986 and regulations promulgated thereunder ("<u>Section 409A</u>").  The Plan may be modified to the extent necessary to comply with all applicable requirements of, and to avoid the imposition of any additional tax, interest and penalties under, Section 409A in connection with the benefits and payments to be provided hereunder.  Each payment of a Payment Amount or portion thereof contemplated by the Plan will be treated as a separate payment for purposes of Section 409A.

(c) Notwithstanding anything to the contrary contained in any other provision of the Plan, if a Plan Participant is a "specified employee" (as defined in Section 409A) at the time of his or her "separation from service" (as defined in Section 409A), then any payment otherwise required to be made to such Plan Participant under the Plan on account of his or her separation from service, to the extent such payment (after taking into account all exclusions applicable to such payment under Section 409A) is properly treated as a "deferral of compensation" subject to Section 409A, shall not be made until the first business day after (i) the expiration of six months from the date of such Plan Participant's separation from service, or (ii) if earlier, the date of such Plan Participant's death (the "<u>Delayed Payment Date</u>").  On the Delayed Payment Date, there shall be paid to such Plan Participant or, if he or she has died, to such Plan Participant's estate, in a single cash lump sum, an amount equal to the aggregate amount of the payments delayed pursuant to the preceding sentence.

(d) Notwithstanding any other provision of this Plan, for the purposes of the Plan, the date of termination of employment of any Plan Participant shall be the date such Plan Participant has a "separation from service" as defined in Section 409A.

## XI.    CONFIDENTIALITY

Subject to applicable law, a Plan Participant's participation in the Plan, Participation Letter, Target Payment Amounts, Payment Amounts and Payments are confidential and a Plan Participant may not disclose, publicize or discuss his or her participation in the Plan, Participation Letter, Target Payment Amounts, Payment Amounts or Payments with any current or former employee of the Company or any other person except a Plan Participant's spouse, accountant, financial advisor or attorney, who must be informed by the Plan Participant not to further disclose such confidential information. Notwithstanding the foregoing, the Company may disclose Participants' participation in the Plan, Participation Letter, Target Payment Amounts, Payment Amounts and Payments as required under applicable law and as it deems necessary in the implementation and administration of the Plan and in the conduct of the Company's business.

## XII.    SEVERABILITY

If any provision of the Plan is determined to be invalid or unenforceable, in whole or in part, this determination shall not affect any other provision of the Plan and the provision in question shall be modified as to be rendered enforceable in a manner consistent with

the intent of the parties insofar as possible.  Any waiver of or breach of any of the terms of the Plan shall not operate or be construed as a waiver of any other breach of such terms or conditions or of any other terms and conditions, nor shall any failure to enforce any provision hereof operate or be construed as a waiver of such provision or of any other provision.

## XIII.    CHOICE OF LAW AND VENUE

The Plan shall be governed by the laws of Ontario and the laws of Canada applicable therein.  With respect to any Plan Participant of a Participating Employer that is subject to the Proceedings, such Plan Participant and such Participating Employer will (a) irrevocably and unconditionally consent to the exclusive jurisdiction of the court in which such Participating Employer is subject to the Proceedings, (b) will irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of or related to the Plan or any Payment in such court and (c) will further irrevocably and unconditionally waive and agree not to plead or claim that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum.

## XIV.    ENTIRE AGREEMENT AND AMENDMENT

This Plan document (together with the Participation Letters) constitutes the complete, final and exclusive embodiment of the terms and conditions of the Plan.  Any amendments or modifications of the Plan must be authorized by the Board or a person specifically authorized by the Board to take action with respect to the Plan; provided, in each case, subject to any approvals which may be required in light of the Proceedings. Any agreement between any Plan Participant and the Company with regard to the Plan and its subject matter is hereby superseded.

## XV.    NO ASSIGNMENT

The rights of a Plan Participant or any other person to any payment or other benefits under the Plan may not be assigned, transferred, pledged or encumbered except by will or the laws of descent and distribution.

## XVI.    FUNDING

The Plan is an unfunded plan and any and all amounts payable to a Plan Participant under the Plan shall be paid from the general assets of his or her Participating Employer.  The obligation under the Plan with respect to any specific Plan Participant shall be the several obligation of his or her Participating Employer and will not be a joint obligation of any other Company entity.

**APPENDIX A**

| Plan Participant Group | Positions, Job Complexity Indicators and Job Family Groups Covered |
|---|---|
| NBS Group A | Positions within NBS with a Job Complexity Indicator of 55 |
| NBS Group B | Positions within NBS with a Job Complexity Indicator of 5 or 6 (Job Family Group B) |
| NBS Group C | Positions within NBS with a Job Complexity Indicator of 1-4 (Job Family Group B) or 1-6 (Job Family Group A) |
| Corporate Group A | Positions within Corporate Group with a Job Complexity Indicator of 55 |
| Corporate Group B | Positions within Corporate Group with a Job Complexity Indicator of 1-6 (Job Family Groups A and B) |

**EXHIBIT 2**

## Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group

### Section 1:  Introduction

The Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group ("NBS/CG Plan") is a short-term, incentive bonus plan that provides the potential for "Eligible Employees" (as defined below) to receive cash awards based on their contributions to the success of the relevant "Business Unit"[1] of the Company[2], conditioned on the relevant Business Unit meeting its objectives.

The NBS/CG Plan is intended to drive business performance by rewarding Eligible Employees for their contributions to the relevant Business Unit's overall success and the completion of their role.  An Eligible Employee's contribution is determined by the following factors:  (1) the impact of the employee's role on business results and (2) the employee's performance during the employee's active employment with the Company.  The actual award received by an Eligible Employee will reflect (1) the scope, complexity, and responsibilities of the employee's role and the employee's performance during the applicable Plan Period[3] and (2) the relevant Business Unit's performance during the applicable Plan Period as indicated by the Business Unit Performance Factor, as described below.

---

[1]  For purposes of the NBS/CG Plan, the "Business Unit" is defined as Nortel Business Services ("NBS") or Nortel Finance and Corporate Services ("Corporate Group") or other organization or reporting entity/function as defined and approved by the Board of Directors (as defined in Section 2).

[2] For purposes of the NBS/CG Plan, the "Company" is defined as Nortel Networks Limited and its subsidiaries and affiliates and other entities, which it controls directly or indirectly and which have been approved for participation in the NBS/CG Plan by the Board of Directors.

[3]  The Plan Period applicable to Eligible Employees who are in JCI 55 roles as of January 1st or, if later, their first day of NBS/CG Plan participation in the relevant calendar year ("Annual Basis Eligible Employees") is the relevant calendar year.  The Plan Periods applicable to Eligible Employees whose roles are other than JCI 55 as of January 1st or, if later, their first day of NBS/CG Plan participation in the relevant calendar year ("Semi-Annual Basis Eligible Employees") is January 1st through June 30th of the relevant calendar year ("First Half") and July 1st through December 31st of the relevant calendar year ("Second Half").  For avoidance of doubt, subsequent changes in the JCI of an Eligible Employee's role during the relevant calendar year will not affect the Plan Period applicable to such Eligible Employee.  The Plan Period(s) may be changed by the Board of Directors at any time.

- 2 -

## Section 2:  NBS/CG Plan Eligibility

Generally, regular full-time and regular part-time[4] Company employees assigned to a Business Unit are eligible to participate in the NBS/CG Plan ("Eligible Employees"), subject to the following:

(1) Eligible Employees, who participate in other Company incentive plans for a full calendar month or the greater portion of a calendar month, as determined by the Company, are not eligible to participate in the NBS/CG Plan during that calendar month.  For purposes of the NBS/CG Plan, "other incentive plans" mean sales incentive compensation or any other incentive/bonus arrangements which the Company determines have been offered in lieu of the NBS/CG Plan.

(2) Subject to applicable law, employees who are covered under a collective labor agreement are not eligible unless that collective labor agreement provides for their participation in the NBS/CG Plan.

(3) Individuals determined by the Company to be students, co-op students, interns, temporary[5], or non-payroll workers (i.e., individuals who are not paid from a Company employee payroll) are ineligible to participate in the NBS/CG Plan.

(4) The Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited (the "Board of Directors") may determine that certain Company employees (including employees who are not otherwise eligible for the NBS/CG Plan) may be eligible to receive an award from a Discretionary Bonus Pool created pursuant to Section 5 hereof.

(5) Subject to applicable law, to be eligible for an award for any relevant Plan Period an employee must be actively employed in a role that is eligible under the NBS/CG Plan or other incentive plan ("Incentive Eligible Role") for at least one calendar month in that Plan Period[6] and (a) be employed by the Company (i) on the last day of the relevant Plan Period if an Eligible Employee employed in EMEA ("EMEA Employee") or (ii) on the applicable Payment Date, as defined in Section 4 hereof, if an Eligible Employee

---

[4] For purposes of the NBS/CG Plan, regular full-time and regular part-time Company employees are those employees who are eligible for participation in the Company health benefit plans based on their regularly scheduled hours.

[5] Where legally required, temporary full time employees on fixed term contracts with the Company may be included as Eligible Employees subject to the other conditions in Section 2 of the NBS/CG Plan.

[6] The required period of active employment status may be changed by the Board of Directors at any time.

employed in a region other than EMEA ("Non-EMEA Employee") [7] or (b) if no longer employed as of the applicable date set out in sub-section 5(a) above, then (i) with respect to EMEA Employees, be terminated from employment prior to the last day of the relevant Plan Period due to death, Transfer (as defined below) or involuntarily by the Company for a reason determined by the Company to be other than for Cause (as defined below) and (ii) with respect to Non-EMEA Employees, be terminated from employment prior to the applicable Payment Date due to death, Transfer or involuntarily by the Company for a reason determined by the Company to be other than for Cause. For purposes of the NBS/CG Plan, an employee will be considered to be "actively employed" on those days when the employee is classified as "active" on the applicable Company payroll and one day of active employment in a calendar month is deemed to be active employment for that full calendar month. "Transfer" under the NBS/CG Plan means an Eligible Employee's transfer to or hire by a new employer not affiliated with the Company that purchased one or more of the Company's business units or to which Company services have been outsourced with the advance written consent, including with respect to the Eligible Employee's transfer or hire date, of the Company and the new employer. "Cause" under the NBS/CG Plan means the employee's inappropriate actions or inactions, misconduct, breach of an agreement with the Company or unsatisfactory performance or cause (as legally defined, if at all, in the relevant jurisdiction)(collectively, "Cause").

(6) Pro-rated awards will be made as described below to employees who (a) transfer into or out of positions covered by other incentive plans, (b) move from or to a job within the Company that is ineligible for the NBS/CG Plan, (c) are on a Company approved leave of absence or on "notice" of termination of employment and not actively employed for part of the Plan Period or (d) are terminated from employment due to death, Transfer or by the Company involuntarily for a reason determined by the Company to be other than for Cause prior to the end of the relevant Plan Period, provided that the employee meets the other NBS/CG Plan requirements set out above. However, subject to applicable law, an employee is not eligible for an NBS/CG Plan payout for any calendar month in which the employee is not actively employed in a position eligible under the NBS/CG Plan for at least one day. Except as provided in the following sentence, if an employee meets the above NBS/CG Plan requirements, but is actively employed in a position that is eligible under the NBS/CG Plan for less than the full relevant Plan Period, the employee's NBS/CG Plan award for the relevant Plan Period will be based on the number of months during the relevant Plan Period that the employee is actively employed in a NBS/CG Plan eligible position for at least one calendar day divided by the number of months in the relevant Plan Period. For purposes of determining the amount of a pro-rata NBS/CG Plan award, an employee will

---

[7] If an Eligible Employee's country of payroll is  a country not in the EMEA region, the employee is considered to be a Non-EMEA Employee for purposes of the NBS/CG Plan.

not be considered to be actively employed in an NBS/CG Plan eligible position in a calendar month in which (x) the employee participates in another incentive plan for that full calendar month or (y) the employee participates in another incentive plan for the greater portion of the month, each as determined by the Company.

(7) With respect to former employees who continue to be eligible for an NBS/CG Plan award under Section 2(5) (b) of the NBS/CG Plan, the Company may deny payment of that NBS/CG Plan award to those former employees if they engage in conduct after their employment termination date and prior to the applicable Payment Date that constitutes Cause, as determined by the Company.

Notwithstanding the foregoing, any payment made after termination of employment to a "specified employee" that would be considered a "deferral of compensation" within the meaning of, and subject to, Section 409A of the U.S. Internal Revenue Code and regulations thereunder ("Section 409A") will be paid on the later of the date which is six months and one day after (a) the termination date and (b) the date on which the award is otherwise payable under Section 4 of the NBS/CG Plan. A "specified employee" means any U.S. taxpayer who is a key employee (as defined in Section 416(i) of the U.S. Internal Revenue Code without regard to paragraph 5 thereof) of the Company. (This is generally limited to employees who are (i) in the top 50 officers having an annual compensation greater than US$145,000, (ii) a 5-percent owner, or (iii) a 1-percent owner having an annual compensation of more than US$150,000.). For this purpose, termination of employment means "a separation from service" as defined in Section 409A.

(8) An employee's Management Team[8] may, in consultation with the relevant Human Resources Business prime, make limited exceptions to the 'actively employed' requirement set out in Section 2(5) above where required by applicable law (e.g., as required under applicable maternity, paternity, parental, military, family, or medical leave laws). Notwithstanding anything in the foregoing to the contrary, nothing in the NBS/CG Plan shall preclude the Company paying an employee an award under the NBS/CG Plan for more than the number of months the employee was actively employed in an NBS/CG Plan eligible role during the relevant Plan Period pursuant to an approved individual employee's employment termination agreement..

(9) Company affiliates and joint ventures may choose to offer the NBS/CG Plan or a similar plan subject to the approval of the Board of Directors.

---

[8]    The "Management Team" consists of the managers with whom the employee has a direct or indirect reporting relationship as set out in the Organization Structure Manager ("OSM") or its equivalent as maintained by the Company from time to time.

**Section 3:  Award Elements**

An Eligible Employee's cash award for the relevant Plan Period under the NBS/CG Plan will be based on the following formula[9]:

Formula Applicable to Semi-Annual Basis Eligible Employees:
50%[10] of <u>Annual Base Salary</u> x <u>Award %</u> x <u>Business Unit Performance Factor for First Half or Second Half, as applicable</u>

Formula Applicable to Annual Basis Eligible Employees:
100%[11] of <u>Annual Base Salary</u> x <u>Award %</u> x <u>Business Unit Performance Factor for Calendar Year</u>

<u>Annual Base Salary</u> means the annualized regular compensation paid to an Eligible Employee, excluding any other compensation, such as, but not limited to, bonuses, commissions, overtime, and relocation benefits.  The Annual Base Salary for these purposes will be measured for all Eligible Employees during the last calendar month of the relevant Plan Period on a uniform date. .

<u>Award %</u> is the percentage determined for each Eligible Employee for purposes of the applicable formula above based on the scope, complexity, and responsibilities of the employee's role and that employee's performance during the applicable Plan Period.  An Eligible Employee's Award % is subject to review, modification and approval by the Senior Management Team and the Board of Directors as provided in Section 4.[12]

For Eligible Employees in Job Complexity Indicator ("JCI") 1-6 and 55, target Award %s ("Target Award %") ranging from 3.5% to 100% are established that reflect JCI level and assume that the Eligible Employee's performance is at a minimum satisfactory.  The JCI level for these purposes will be measured concurrently with Annual Base Salary as described above.  There is no guarantee that an Eligible Employee's Award % used in the formula above will equal the applicable Target Award %.

The total NBS/CG Plan award for all Eligible Employees for a Business Unit is recommended by the Senior Management Team for approval by the Board of Directors after the end of the relevant Plan Period.  The Board of Directors will determine, in its sole discretion, whether all or any part of the recommended total NBS/CG Plan award for

---

[9] The NBS/CG Plan award will be pro-rated as applicable under Section 2(6) and (8).

[10] The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

[11] The percentage of Annual Base Salary that is applied to the formula may be changed by the Board of Directors at any time.

[12]  For purposes of the Plan only, the "Senior Management Team" shall consist of the person holding the most senior position in Nortel Business Services (NBS), the person holding the most senior position in Corporate Services and any other position(s) as identified and approved by the Board of Directors (as defined in Section 2).

.

a Business Unit for the relevant Plan Period will be paid and the amount of any total NBS/CG Plan award for a Business Unit  in respect of that Plan Period.

Business Unit Performance Factor applicable to each Business Unit shall be determined by the Board of Directors in its sole discretion based on its assessment of that Business Unit's achievements against performance metrics targets established for that Business Unit by the Board of Directors in its sole discretion for the First Half and the Second Half. The Business Unit Performance Factor may be based on one or more performance metrics, each with specific targets.  The performance metrics may have equal or different weightings. Performance metrics are the general Business Unit objectives for the First Half or Second Half, as applicable.  Targets will be based on objective and/or subjective criteria established to measure, directly or indirectly, the performance metrics. Weightings will be the relative weight or percentage accorded in the relevant Business Unit Performance Factor for achieving each specific target.  After approval by the Board of Directors, the relevant Business Unit's objectives for the First Half and the Second Half will be communicated to Eligible Employees within that Business Unit. The Business Unit Performance Factor for each Business Unit is deemed to be 1.0 (achievement) throughout the relevant Plan Period and is then adjusted by the Board of Directors based on its determination of each Business Unit's performance for (i) the First Half and Second Half, as applicable, with respect to the award calculation of  Semi-Annual Basis Eligible Employees for the relevant Plan Period and (ii) the calendar year with respect to the award calculation of Annual Basis Eligible Employees for the relevant Plan Period; provided, however, that, the Business Unit Factor for the calendar year, which is used in the award calculation for Annual Basis Eligible Employees, will be equal to the average of the applicable Business Unit Factor for the First Half and the Second Half. The Senior Management Team may, in its sole discretion, recommend to the Board of Directors that the applicable Business Unit Performance Factor be adjusted with respect to certain sub-units within a Business Unit, JCI levels or any other groups of employees and the Board can approve such adjustment to the relevant Business Unit Performance Factor, in its sole discretion, based on additional factors that the Senior Management Team and Board of Directors determine in their sole discretion are relevant to the award including, without limitation, collective relative contribution to achievement of the key Business Unit objectives during the relevant Plan Period.

The Business Unit Performance Factor used in an Eligible Employee's Award calculation will be based on the Business Unit to which the Eligible Employee is aligned in the Company's Organization Structure Manager (OSM) as of a uniform date in the last calendar month in the relevant Plan Period; provided, however, that the Business Unit Performance Factor used in the Award calculation of  EMEA Employees shall be the average of the Business Unit Factors for all Business Units for the relevant Plan Period.

**Section 4:  NBS/CG Plan Awards**

Awards for each relevant Plan Period are calculated as described in Section 3. Notwithstanding any provision in the NBS/CG Plan to the contrary, the maximum NBS/CG Plan award payable to an Eligible Employee in the relevant Plan Period is a

cash amount equal to (a) 100% of such Eligible Employee's Annual Base Salary multiplied by a percentage equal to one and one-half (1.5) times the Eligible Employee's Target Award % if such employee is an Annual Basis Eligible Employee or (b) 50% of such Eligible Employee's Annual Base Salary multiplied by a percentage equal to one and one-half (1.5) times the Eligible Employee's Target Award % if such employee is a Semi-Annual Basis Eligible Employee.

Any award under the NBS/CG Plan to an Eligible Employee is subject to the discretion of the Eligible Employee's Management Team and Senior Management Team and the Board of Directors. That is, an Eligible Employee's Management Team determines, in its discretion, the Award % for an Eligible Employee subject to review, modification and approval by the Senior Management Team. Specifically, the Senior Management Team reserves the right, in its discretion, to review and adjust Eligible Employees' Award percentages, which are assigned to those Eligible Employees by their Management Team, to reflect its assessment of the employees' contributions, as reflected in their performance, to the Business Unit or the achievement of the Business Unit's key objectives, as well as to ensure that the final payouts, if any, are within appropriate budgetary guidelines. Finally, the Board of Directors reserves the right, in its discretion, to make a final determination of the Award % of any Eligible Employee. The Board of Directors determines, in its sole discretion, the achievement of the targets for the performance metrics, the final calculation of the Business Unit Performance Factor (which may include a determination of a Business Unit Performance Factor of zero, even if certain of the performance metrics targets are achieved, and/or an adjustment to the relative weighting of the performance metrics) and whether NBS/CG Plan awards will be paid in respect of a Plan Period. During the relevant Plan Period, the Board of Directors can review Business Unit objectives, performance measures, weightings, and targets to determine whether they remain appropriate. The Board of Directors may, at its sole discretion, adjust the Business Unit's objectives, performance measures, weightings, targets, and/or plan payouts for the relevant Plan Period, as it deems necessary, to reflect changes in business conditions or other circumstances.

Subject to applicable law, the Senior Management Team, may approve the reduction of NBS/CG Plan awards payable to Eligible Employees for a Plan Period by the full or partial amount of other bonuses or similar payments, including, without limitation, Company performance related payments required by applicable law, that are payable to such employees in respect of any part of such Plan Period. The Senior Management Team, will have sole discretion to determine those bonuses or payments that are subject to the preceding sentence and the amount of any such reduction to the NBS/CG Plan award.

Subject to applicable law, the Senior Management Team may approve accelerated payments at target (Business Unit Performance Factor of 1.0) to Eligible Employees in entities designated for entity closure prior to the determination of a Business Unit Performance Factor for the Plan Period by the Board of Directors.. These payments may be made on a pro-rated basis and as soon as practicable to Eligible Employees who are terminated from employment involuntarily (not for Cause) by the Company due to the

entity closure action.  Any accelerated payment shall be contingent upon the Eligible Employee executing and submitting to the Company a release in a form to be determined and provided by the Company (the "Release") of all claims related to the Plan.

If the Board of Directors approves the payment of a total NBS/CG Plan award for a Business Unit for the relevant Plan Period in accordance with the provisions of the NBS/CG Plan, any NBS/CG Plan award approved for an Eligible Employee under the NBS/CG Plan in that Business Unit will be payable as follows:

<u>Semi-Annual Basis Eligible Employees employed outside of EMEA</u>:
1.    50% of the award, if any, with respect to the First Half Plan Period following completion of the First Half;
2.    50% of the award, if any, with respect to the First Half Plan Period following completion of the Second Half; and
3.    100% of the award, if any, with respect to the Second Half Plan Period following completion of the Second Half.
 Notwithstanding the foregoing, if the employment of a Semi-Annual Basis Eligible Employee employed outside of EMEA is terminated involuntarily by the Company for a reason determined by the Company to be other than for Cause or due to the Employee's death or Transfer and the employment termination occurs (a) on or before June 30th of the relevant calendar year, then 100% of the award with respect to the First Half Plan Period will be payable following completion of the First Half and no award will be payable with respect to the Second Half Plan Period or (b) on or after July 1st of the relevant calendar year, then (i) with respect to any First Half award that is payable, 50% will be paid following completion of the First Half and the remaining 50% will be paid within 90 days of such employment termination, but in no event earlier than such initial 50% payment, and (ii) with respect to any Second Half award that is payable, 100% will be paid following completion of the Second Half.

<u>Semi-Annual Basis Eligible Employees employed in EMEA</u>:
1.      100% of the award, if any, with respect to the First Half Plan Period following completion of the First Half;
2.      100% of the award, if any, with respect to the Second Half Plan Period following completion of the Second Half.

<u>Annual Basis Eligible Employees</u>:
100% of the award, if any, with respect to the calendar year Plan Period following the completion of the Second Half.

The payment of any award or portion of an award payable upon completion of the First Half, as provided above,  will be made as soon as practicable following September 1st of that calendar year, but in no event later than October 31st of that calendar year.  The payment of any award or portion of an award payable upon completion of the Second Half, as provided above, will be made as soon as practicable following March 1st of the following calendar year but in no event later than April 30th of the following calendar year.

The applicable date on which an award is paid as described above is the "Payment Date". NBS/CG Plan awards are considered income and are therefore subject to national, state/provincial, and/or local taxes.  All appropriate taxes and other withholdings will be deducted from any such awards and payments as required by applicable law.  Each NBS/CG Plan award for each separate Plan Period will be treated as a separate payment for purposes of Section 409A.

Depending on local laws and policies, NBS/CG Plan awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company. Where appropriate, deductions may be made from NBS/CG Plan awards in accordance with the specific capital accumulation and retirement plan in which the Eligible Employee participates.

Notwithstanding anything in the NBS/CG Plan to the contrary, if the Board of Directors, in its sole discretion, upon consideration of facts and circumstances determined by the Board of Directors to be relevant, concludes that an Eligible Employee has committed intentional misconduct, as defined in the Policy Regarding Recoupment of Incentive Compensation (the "Recoupment Policy") relating to the forfeiture and/or recoupment of incentive compensation, including NBS/CG Plan award payments, the Eligible Employee will forfeit any planned but unpaid NBS/CG Plan award and/or reimburse the Company the amount of the NBS/CG Plan award received, as determined by the Board of Directors.

**Section 5**:  **Discretionary Bonus Pool**

During a Plan Period, the Board of Directors may consider the creation of a separate Discretionary Bonus Pool under the NBS/CG Plan to provide discretionary, incremental bonus awards.  These awards may be made to all employees of the Company or employees of the Company who individually or in groups made a relative contribution that significantly added to the overall success of the Company, whether or not the employees are eligible to participate in the NBS/CG Plan under the criteria set out in Section 2 of this document.  The determination that a Company employee is eligible for a Discretionary Bonus Pool award does not otherwise entitle that employee to generally participate in the NBS/CG Plan.  The Board of Directors have complete discretion to determine: the establishment of the Discretionary Bonus Pool; the eligibility criteria for participation; any performance metrics, weightings and targets; the achievement, if any, of the targets for the performance metrics; and the amount of the awards, if any, paid from the Discretionary Bonus Pool.  Whether or not an Eligible Employee receives a NBS/CG Plan award shall have no effect on that employee's eligibility to receive a Discretionary Bonus Pool award.

Discretionary Bonus Pool awards will be considered income and therefore subject to national, state/provincial, and/or local taxes.   All appropriate taxes and other withholdings will be deducted from the award as required by applicable law.

Depending on local laws and policies, Discretionary Bonus Pool awards may have an impact on some benefits and may or may not be included in the "eligible earnings" for purposes of capital accumulation and retirement plans offered in the various regions by the Company.  Where appropriate, deductions may be made from the Discretionary Bonus Pool awards in accordance with the specific capital accumulation and retirement plan in which the employee participates.

**Section 6:  Interpretations and Amendments**

This document, as amended from time to time, constitutes the "Nortel Networks Limited Annual Incentive Plan for Nortel Business Services and Corporate Group".  In the event of any conflicts or inconsistencies between the provisions of the NBS/CG Plan and any other document or communication, written or oral, concerning the NBS/CG Plan, the provisions of this document, as amended from time to time, will govern.

The Board of Directors will interpret the provisions of the NBS/CG Plan and that interpretation will be final and binding on the Company, the Business Units and all NBS/CG Plan participants.  This document is also subject to interpretation to comply with applicable laws.  It is not and shall not be construed as either an employment contract or as a contract concerning the subject matter contained herein.  There is no guarantee that any award under the NBS/CG Plan will actually be paid.  Any award is determined at the discretion of an Eligible Employee's Management Team, the Senior Management Team and the Board of Directors, as the case may be.  If any awards, however, are paid, they will be determined and paid in accordance with the provisions herein.

The NBS/CG Plan can only be terminated or amended by the Board of Directors, which has the full authority, at any time, to terminate the NBS/CG Plan or to delete, modify and/or add to any and all terms, conditions, and provisions of the NBS/CG Plan.

As adopted by the Board of Directors of Nortel Networks Limited on July 25, 2002, as amended on January 23, 2003 with effect from January 1, 2003, as amended on July 28, 2003 with effect from January 1, 2003, as amended on February 26, 2004 with effect from January 1, 2004, as amended on March 9, 2006 with effect from January 1, 2006, as amended on March 15, 2007 with effect from January 1, 2007, as amended on February 22, 2008 with effect from January 1, 2008, as amended on February 20, 2009 with effect from January 1, 2009,  as amended on November 13, 2009 with effect from October 1, 2009, as amended on  March 10, 2010 with effect from January 1, 2010 and as amended on March 3, 2011 with effect from January 1, 2011.

**EXHIBIT 3**

| | |
|---|---|
| **From:** | Patricia Uche-Chiemeka <patricia.uche-chiemeka@ericsson.com> |
| **Sent:** | Wednesday, January 26, 2011 1:02 PM |
| **To:** | Thompson, Alex (GWRTP:1832) |
| **Cc:** | Rose Casanave; Crotzer, Rachele EGSM (External:RICH1:1175); Tandra Rogers; Kenna Spencer; Mark Royal |
| **Subject:** | Alex Thompson - Ericsson Offer of Employment |
| **Importance:** | High |

Alex,

At this time, I am pleased to extend a formal offer of employment for the position of Process Management Specialist III within the CDMA Mobile Systems Business Unit in Richardson, TX.  Attached is your copy of the employment offer.

Please complete, sign and return all documents to my attention, including a copy of the signed offer letter, as your acceptance of employment. You can either fax to my attention at: 972-583-1804 or scan and email the completed document.

As indicated in the attached offer letter, drug screening is another component of our pre-employment process. You will receive an email notification regarding your registration for drug screening. Please be sure to take the Registration form and a photo ID with you to the facility of your choice.

Should you have any additional questions, please feel free to contact me directly at 972-583-8774.

<u>**Congratulations**</u> on your full-time position with **Ericsson**!

———————————————

PATRICIA UCHE-CHIEMEKA
**Senior Recruiting Consultant**

Ericsson Inc
Talent Acquisition
6300 Legacy Drive
Plano, Texas 75024, U.S.A.
Phone 972-583-8774
Mobile 214-418-5440
Fax 972-583-1804
patricia.uche-chiemeka@ericsson.com
www.ericsson.com



This Communication is Confidential. We only send and receive email on the basis of the terms set out at www.ericsson.com/email_disclaimer