## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------- X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
|  | : | **Hearing Date: January 7, 2013 at 10:00 a.m. (ET)** |
|  | : | **Objections Due: January 2, 2014 at 4:00 p.m. (ET)** |

--------------------------------------------------------- X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 503(b) AND 507(a)(2) AND BANKRUPTCY RULES 6004(h) AND 9019 APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE CREDITORS' COMMITTEE, THE JOINT ADMINISTRATORS, THE EMEA DEBTORS, NORTEL NETWORKS OPTICAL COMPONENTS LIMITED, NORTEL TELECOM FRANCE SA, THE LIQUIDATOR, THE FRENCH LIQUIDATOR, THE UK PENSION PARTIES AND CERTAIN AFFILIATES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in

possession (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of

an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a),

363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and

Rules 6004(h) and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

(i) authorizing the Debtors' and the Official Committee of Unsecured Creditors' (the

"Committee") entry into and approving the Agreement Settling US Claims Litigation dated

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

December 17, 2013 attached hereto as <u>Exhibit B</u> (the "<u>Settlement Agreement</u>") by and among the Debtors, the US Non-Filed Entities (as defined below) and the Committee (together, the "<u>US Interests</u>") on the one hand, and the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, Nortel Networks Optical Components Limited ("<u>NNOCL</u>"), Northern Telecom France SA ("<u>NTF</u>"), the Liquidator (collectively with the EMEA Debtors, the EMEA Non-Filed Entities, the Joint Administrators, NNOCL and NTF, the "<u>EMEA Parties</u>"), the French Liquidator, the UK Pension Trustee, the PPF (together with the UK Pension Trustee, the "<u>UK Pension Parties</u>"), and for purposes of Section 8.14 of the Settlement Agreement only, the Joint Administrators, the Liquidator and the French Liquidator in their individual capacities, on the other hand  (each as defined below, and the US Interests, the EMEA Parties, the French Liquidator and the UK Pension Parties each being a "<u>Party</u>" and collectively, the "<u>Parties</u>") and (ii) granting them such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.      The Debtors are pleased to request the approval of a comprehensive settlement that would fully and finally resolve complex and substantial claims filed by the EMEA Parties, the UK Pension Parties and the French Liquidator against the Debtors and settle and release other claims between the Parties.  The Settlement Agreement represents a critical step forward by the Parties to resolve the costly and contentious litigation amongst the Nortel affiliates.  As a result of the compromises embodied in the Settlement Agreement and the settlement and release of certain claims thereunder, the Debtors, the EMEA Parties and the UK Pension Parties have simplified the disputes existing between the Parties.  The settlement also provides for the Parties to attempt to reach agreement to work together in good faith to cooperate in the pending

litigation with respect to the allocation of the Nortel group's sale proceeds as set forth in the Settlement Agreement.

2.       The Settlement Agreement is a significant milestone for the Debtors in bringing their cases to final resolution, through the settlement and release of claims filed against the Debtors that have been the subject of years of contentious litigation and three mediations.  In the wake of the last several months of expedited and broad-sweeping discovery, the Parties seized the opportunity presented by the upcoming close of discovery to explore, and ultimately reach agreement on, the resolution of various claims by and against the Debtors, the UK Pension Parties, the French Liquidator, the EMEA Parties and certain of their affiliates.  As discussed in greater detail below, the Settlement Agreement provides marked benefits to the Debtors, the EMEA Parties and each of their creditors and stakeholders by bringing finality and certainty to the Debtors' estates with respect to claims that have been the subject of costly litigation for years and encouraging the coordination of resources and further potential cost savings with respect to the upcoming trial regarding the allocation of the various sale proceeds.

## JURISDICTION

3.       The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware (the "District Court") dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.       The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019.

## FACTUAL BACKGROUND

### A.    Procedural Background

5.    On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA"),[2] filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

"Court"), which cases are consolidated for procedural purposes only (the "Chapter 11 Cases").

The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

6.    The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed the Committee in respect of the Debtors [D.I.s 141, 142], and an ad hoc

group of bondholders has been organized (the "Bondholder Group").

7.    On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  Also on the Petition Date, the High Court of Justice in England and Wales

(the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks

UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa

---

[2]    NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009,
which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural
purposes [D.I. 1098].

[3]    The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

(collectively, the "EMEA Debtors"),[4] into administration (the "UK Proceedings") under the control of court-appointed administrators and foreign representatives (the "Joint Administrators").  On July 29, 2011, NNOCL commenced a creditors' voluntary liquidation, represented by Kerry Trigg (the "Liquidator").

8.      On May 28, 2009, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France  (the "French Secondary Proceedings," and together with the Chapter 11 Cases, the Canadian Proceedings and the U.K. Proceedings, the "Insolvency Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the "French Liquidator"), and an administrator were appointed by the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) for NNSA.  NTF is in voluntary liquidation and the French Liquidator has been appointed Liquidateur amiable of NTF.

9.      Certain of NNI's U.S. affiliates, while being under the majority ownership of NNI, have not filed chapter 11 petitions (including their respective branches, the "US Non-Filed Entities").[5]  Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors (the "EMEA Non-Filed Entities").[6]  Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

---

[4]      The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[5]      The U.S. Non-Filed Entities include Nortel Networks India International Inc. and Nortel Technology Excellence Centre Private Ltd.

[6]      The EMEA Non-Filed Entities include Nortel Networks AS, Nortel Networks AG and Nortel Networks South Africa (Pty) Limited.

B.    **The Allocation Dispute And The Mediation Process**

10.    Soon after the commencement of the Insolvency Proceedings, the various companies comprising the Nortel group agreed to pursue an orderly and coordinated sale of the Nortel businesses and assets.  This agreement between the Debtors, the Canadian Debtors and certain of the EMEA Debtors was memorialized in the Interim Funding and Settlement Agreement, dated as of June 9, 2009 (the "IFSA").[7]  Following a joint hearing on June 29, 2009, the IFSA was approved by each of the Court [D.I. 993] and the Canadian Court.  Among other things, the parties to the IFSA agreed not to condition the sale of Nortel's businesses and assets on a prior agreement among the selling parties regarding the allocation of the ultimate sale proceeds (plus accrued interest, the "Sale Proceeds") from the relevant sale transaction and to hold all Sale Proceeds in escrow accounts until an allocation methodology is agreed upon or resolved pursuant to the IFSA.  See IFSA, ¶¶ 12(a), (b).  With this framework in place, from 2009 to 2011, Nortel conducted an extensive series of court-approved sale transactions generating approximately $7.5 billion in net Sale Proceeds.

11.    Over the last several years, the Debtors, the Canadian Debtors, the EMEA Debtors, the Joint Administrators, the Committee, the Bondholder Group, the UK Pension Parties and other key constituencies (the "Core Parties") have engaged in comprehensive settlement discussions with respect to the allocation of the Sale Proceeds and the potential resolution of claims filed by the EMEA Parties and the UK Pension Parties, including three formal rounds of mediation.

12.    After the third failed mediation in January 2013, certain of the Core Parties sought relief from the Court and the Canadian Court to approve litigation procedures to govern the

---

[7]    See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

allocation disputes and the claims filed by the EMEA Parties and the UK Pension Parties against the Debtors and the Canadian Debtors.  On April 3, 2013, this Court issued an order and opinion granting the Debtors' motion for approval of binding procedures and an expedited schedule for the cross-border resolution of the dispute concerning the allocation of the Sale Proceeds (the "Allocation Dispute"), denying the Joint Administrators' cross-motion to compel arbitration (the "Cross-Motion") and directing the Core Parties to continue negotiation of an allocation protocol consistent with the Court's opinion [D.I.s 9946, 9947] (the "US Allocation Dispute Order").  Additionally, the U.S. Allocation Dispute Order scheduled a trial to determine the allocation of the Sales Proceeds, the EMEA Claims and the UK Pension Claims, each as described below, to commence on January 6, 2014.  The Canadian Court issued a parallel order and endorsement on March 8, 2013 and April 3, 2013 respectively (the "Canadian Allocation Endorsements").[8]

13.    The Joint Administrators pursued appeals of the US Allocation Dispute Order and the Canadian Allocation Endorsements in the applicable jurisdictions.  On April 17, 2013, the Joint Administrators, on behalf of the EMEA Debtors, appealed as of right the order denying their Cross-Motion to compel arbitration [D.I. 10166] (the "US Appeal").[9]  On December 6, 2013, the United States Court of Appeals for the Third Circuit issued an opinion affirming this Court's denial of the Cross-Motion (the "Third Circuit Decision").[10]

---

[8]    See Exhibits C and D to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

[9]    The Joint Administrators, on behalf of the EMEA Debtors, also sought leave from the Court to appeal the portion of the US Allocation Dispute Order regarding approval of an allocation protocol [D.I. 10244] (the "Interlocutory Appeal").  After this Court refused the Joint Administrators' request to certify the Interlocutory Appeal [D.I. 10407], the Joint Administrators sought leave with respect to the Interlocutory Appeal from the Third Circuit and the District Court, both of which denied the Joint Administrators' motions for leave.  See In re Nortel Networks Inc., No 13-8055 (3d Cir. June 13, 2013); Order Denying Motion for Leave to Appeal from Order Approving Allocation Protocol, ECF No. 31, In re Nortel Networks Inc. et al., C.A. No. 13-757(LPS) (D. Del. July 23, 2013).

[10]    See In re Nortel Networks Inc., et al., No. 13-2739 (3d Cir. Dec. 6, 2013).

14.      In Canada, the Joint Administrators filed a motion for leave to appeal the

Canadian Allocation Dispute Endorsements with the Ontario Court of Appeal,[11] which was

denied on June 20, 2013 [D.I. 11256-1].  Subsequently, the Joint Administrators filed a motion

for leave to appeal the denial of the Canadian Cross-Motion to compel arbitration in the Supreme

Court of Canada (the "Canadian Motion for Leave").  The Canadian Motion for Leave remains

pending in the Supreme Court of Canada.

      **C.**     **The US Claims Litigation**

15.      As this Court is aware, the EMEA Parties and the UK Pension Parties filed

lengthy and significant proofs of claim against the Debtors asserting claims in relation to certain

intercompany loans, Nortel's transfer pricing arrangements, an alleged depletion of cash and

value from the EMEA Debtors and the purported underfunding of the Nortel Networks UK

Pension Plan (the "UK Pension Plan"), among other things.  As discussed in more detail below,

litigation of the EMEA Claims, the French Liquidator Claim and the UK Pension Claims (each

as defined below) against the Debtors (collectively, the "US Claims Litigation") has proceeded

over a span of more than three years at a substantial cost to the Debtors' estates.

     (i)  THE EMEA CLAIMS, THE FRENCH LIQUIDATOR
         CLAIM AND THE NNI CLAIM

16.      On September 30, 2009, the EMEA Parties filed over three hundred proofs of

claim against NNI and the other Debtors (the "Original EMEA Claims").  The Debtors objected

to the Original EMEA Claims and filed a motion for an order requiring a more definite statement

of claim on April 1, 2011 [D.I. 5200] (the "EMEA Claims Objection").  This Court granted the

EMEA Claims Objection, ordering that the EMEA Parties provide a more definite statement of

their claims on or before June 3, 2011, absent which the Original EMEA Claims and any of the

---

[11]      See Exhibit E to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

EMEA Parties' prepetition claims against the Debtors would be disallowed and expunged with prejudice [D.I.s 5402, 5588].

17.     On June 3, 2011, the EMEA Parties filed thirty-seven (37) amended proofs of claim against the Debtors (the "Amended EMEA Claims").[12]  The Amended EMEA Claims include claims asserted by the Joint Administrators on behalf of:  (i) NNUK, for nearly $2.5 billion and other contingent and unliquidated amounts (Claim No. 7786, the "NNUK Claim"); (ii) NNIR, for approximately $291 million and other contingent and unliquidated amounts (Claim No. 7774, the "NNIR Claim"); and (iii) NNSA for approximately $473 million and other contingent and unliquidated amounts (Claim No. 7785, the "NNSA Claim").[13]  Additionally, the French Liquidator filed a proof of claim on behalf of NNSA against NNI (Claim No. 7784, the "French Liquidator Claim") asserting claims for damages of approximately $473 million along with other contingent and unliquidated amounts, and NNI filed a proof of claim against NNSA in the French Secondary Proceedings (the "NNI Claim").

18.     The Amended EMEA Claims and the French Liquidator Claim assert multiple causes of action under U.S. and foreign law, primarily alleging that NNI jointly controlled Nortel's operations with NNC and NNL and allowed the improper removal of value from the EMEA Debtors and the Non-Filed EMEA Entities for the benefit of NNL and NNI through a complex series of prepetition transactions.[14]  The Amended EMEA Claims and the French

---

[12]     The Amended EMEA Claims are listed on the Debtors' claim register as proof of claim numbers 7750 through 7783 and 7785, 7786 and 7787.  Pursuant to a parallel order of the Canadian Court, the EMEA Parties and the French Liquidator filed proofs of claim against the Canadian Debtors (the "Canadian EMEA Claims").  See Notice of Submission of Proofs of Claim, dated May 18, 2011 [D.I. 5433].  The Canadian EMEA Claims are separate and distinct from the EMEA Claims and the French Liquidator Claim asserted against the Debtors in the Chapter 11 Cases.

[13]     Over 300 Original EMEA Claims that were not timely amended were disallowed and expunged with prejudice.

[14]     See, e.g., NNUK Claim ¶¶ 13, 15; NNIR Claim ¶¶ 13, 15; NNSA Claim ¶¶ 13, 15; French Liquidator Claim ¶¶ 13, 15.

Liquidator Claim also assert a substantial amount of ordinary course trading claims against the Debtors in amounts exceeding $25 million.  The EMEA Parties may have additional claims that have not been filed, whether through set off or otherwise, against certain of the Debtors and/or the U.S. Non-Filed Entities for ordinary course trading debts (the "US EMEA Non-Filed Claims," and together with any remaining Original EMEA Claims and the Amended EMEA Claims, the "EMEA Claims").

19.     On July 15, 2011 and July 22, 2011, the Debtors and the Committee filed joint objections and motions to dismiss the NNUK Claim, the NNIR Claim, the NNSA Claim and the French Liquidator Claim [D.I.s 5970, 6022, 6026] (the "Motions to Dismiss").  After briefing and oral argument, this Court granted in part and denied in part the Motions to Dismiss on March 20, 2012 [D.I. 7404] (the "US EMEA Claims Dismissal Order").  Specifically, the Court dismissed all claims predicated on allegations that (i) NNI acted as a director or shadow director of NNUK, NNIR, or NNSA; (ii) that NNI owed a duty of care to NNUK or NNIR; or (iii) that NNI was liable as a result of any financial support directive or contribution notice issued in proceedings in the United Kingdom concerning the UK Pension Plan.[15]  The remaining EMEA Claims have been the subject of mediation, extensive discovery and discussions between the Debtors and the EMEA Parties.  The Debtors and the Committee filed a subsequent objection to the remaining EMEA Claims on May 14, 2013 [D.I. 10521].  The Court will not need to rule on the merits of the objection following approval of the Settlement Agreement.

(ii) THE UK PENSION CLAIMS

20.     On September 30, 2009 (and January 25, 2010 in the case of NN CALA), the Nortel Networks UK Pension Trust Limited (as trustee of the UK Pension Plan, the "UK Pension

---

[15]     See In re Nortel Networks, Inc., 469 B.R. 478, 485, 518 (Bankr. D. Del. 2012).

Trustee") and the Board of the Pension Protection Fund (the "PPF") filed several proofs of claim

against the Debtors (the "Original UK Pension Claims").[16]

      21.     In January 2010, the UK Pension Regulator ("TPR") issued a warning notice

initiating administrative proceedings in the United Kingdom (the "UK Administrative

Proceedings") against NNI and NN CALA regarding the alleged shortfall in the funding of the

UK Pension Plan.  Subsequently, the Debtors filed a motion to enforce the automatic stay against

the UK Pension Parties with respect to their participation in the UK Administrative Proceedings

against NNI and NN CALA [D.I. 2441] (the "Stay Motion").  The Court granted the Stay Motion

over the UK Pension Parties' objection, issuing an order (the "Automatic Stay Order") enforcing

the stay and deeming the UK Administrative Proceedings "void and of no force or effect" in this

Court with respect to the Debtors.[17]

      22.     On June 11, 2012, the Debtors filed an objection to the Original Proofs of Claim

and a motion for an order requiring a more definite statement of claim [D.I. 7818].  This Court

granted the Debtors' objection on July 11, 2012 and ordered the UK Pension Parties to serve a

more definite statement of their proofs of claim, along with supporting documentation, by

September 5, 2012 [D.I. 7984].

      23.     On September 5, 2012, the UK Pension Parties filed amended proofs of claim

against NNI and NN CALA (Claim Nos. 8357 and 8358, together, the "Amended UK Pension

---

[16]     The Original UK Pension Claims are listed on the Debtors' claim register as proof of claim numbers 5573, 5574, 5575, 5576, 5577, 5578, 5579, 5580, 5581, 5582, 5583, 5584, 5585, 5586, 5587 and 6979.  The UK Pension Parties also filed proofs of claim against the Canadian Debtors (the "Canadian UK Pension Claims," and together with the Canadian EMEA Claims, the "Canadian Claims Litigation").  The Canadian UK Pension Claims are separate and distinct from the UK Pension Claims asserted against the Debtors in the Chapter 11 Cases.

[17]     Order Enforcing the Automatic Stay Against Certain Claimants With Respect to the U.K. Pension Proceedings, dated Feb. 26, 2010, ¶ 3[D.I. 2576].  The Automatic Stay Order has since been affirmed by both the District Court on March 29, 2011 and the Third Circuit on December 29, 2011.  See In re Nortel Networks, Inc., 669 F.3d 128 (3d Cir. 2011), aff'g In re Nortel Networks Inc., No. 09-10138-KG, 2011 WL 1154225 (D. Del. Mar. 29, 2011), cert. denied, 133 S. Ct. 34 (2012).

Claims," and collectively with any remaining Original UK Pension Claims, the "UK Pension Claims").[18]  The Amended UK Pension Claims purport to assert claims against each of NNI and NN CALA in an amount of no less than $1.335 billion, alleging, among other things, that grounds exist for NNI and NN CALA to provide financial support to satisfy NNUK's funding obligations to the UK Pension Plan pursuant to the U.K. Pensions Act 1995 and 2004.[19]  The Amended UK Pension Claims further assert unliquidated claims related to NN CALA's allegedly "unduly favorable treatment" under its separate transfer pricing arrangements with NNL and NNUK's alleged "inadequate[ ] compensat[ion] for the services it provided to the Nortel Group."[20]

24.    On May 14, 2013, the Debtors and the Committee filed an objection to the Amended UK Pension Claims, asserting that the Amended UK Pension Claims should be disallowed in full, including on the grounds that (i) the U.K. Pension Act should not be applied against the Debtors both as a matter of comity and choice of law principles, (ii) the Amended UK Pension Claims seek duplicative recovery on claims brought directly by NNUK and (iii) the UK Pension Parties are unable to satisfy the U.K. Pension Act requirements for a financial support direction  [D.I. 10519]  (the "UK Pension Claims Objection").  The UK Pension Claims Objection is currently scheduled to be heard at the Trial (as defined below).

**D.    Current Procedural Posture Of The Allocation
         Dispute And The US Claims Litigation**

25.    On May 17, 2013, this Court entered an order approving the final allocation protocol (the "Allocation Protocol") [D.I. 10565] and an order establishing a litigation timetable

---

[18]        The Amended UK Pension Claims state that the U.K. Pension Parties withdrew their proofs of claim filed against the Debtors other than NNI or NN CALA.  See Amended U.K. Pension Claims at 1 n.2.

[19]        See id. ¶ 325.

[20]        Id.

and discovery plan setting forth procedures for discovery and other pre-trial proceedings with regard to the Allocation Dispute, US Claims Litigation and the Canadian Claims Litigation [D.I. 10566] (as amended and supplemented from time to time, the "Litigation Timetable and Discovery Plan").  The Canadian Court entered substantially similar orders on May 15, 2013.

26.     Pursuant to the Litigation Timetable and Discovery Plan, as amended, the joint trial for the Allocation Dispute, the US Claims Litigation and the Canadian Claims Litigation (the "Trial") is currently scheduled to commence on May 12, 2014 [D.I. 12522-1].  In preparation for the Trial, the Core Parties have engaged in an extensive and expedited discovery process in accordance with the Litigation Timetable and Discovery Plan.  Since May 2013, the Core Parties have collectively produced more than two million documents, conducted approximately 100 depositions in 15 cities worldwide, responded to interrogatories and have met and conferred on multiple discovery-related issues, nearly all of which were successfully resolved without requiring judicial intervention.

E.     **Summary Of The Proposed Settlement Agreement**

27.     In the midst of extensive discovery, the Debtors and the EMEA Parties began a new round of discussions in an attempt to achieve a consensual resolution of the US Claims Litigation.  After vigorous negotiations, the Debtors, the Committee, the EMEA Parties, the French Liquidator and the UK Pension Parties were able to reach the primary terms of a settlement in principle finally resolving the US Claims Litigation and providing for coordination in good faith of their efforts with respect to the ongoing Allocation Dispute.  The Settlement Agreement embodies that agreement, as ultimately formalized and memorialized by the Parties.

28.     The Settlement Agreement provides that, subject to the approval or direction, as applicable, of this Court, the French Court, and entry of the Bedoe Order by the English Court, as provided in the Settlement Agreement, the following terms shall result:[21]

- The Allowed Claims.

    o   On the Effective Date, NNI shall grant an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, in favor of the Joint Administrators, on behalf of the EMEA Parties, against NNI in the amount of $37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy (the "EMEA Allowed Claim").[22]

    o   On the Effective Date, NNI shall grant an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, in favor of the UK Pension Parties against NNI in the amount of $37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy (the "UK Pension Parties' Allowed Claim" and, together with the EMEA Allowed Claim, the "Allowed Claims").

    o   NNI shall pay the Allowed Claims in full in immediately available funds, without any deduction, setoff, recoupment or withholding for tax purposes, to accounts designated by the Joint Administrators and the UK Pension Parties, as applicable,  in writing, on or before three (3) business days from the Effective Date (as defined in the Settlement Agreement) (the date(s) on which payments in respect of the EMEA Allowed Claim and the UK Pension Parties' Allowed Claim are made by NNI, the "EMEA Payment Date" and the "UK Pension Payment Date" respectively).

- Canadian EMEA Claims and Canadian UK Pension Claims.  The US Interests will not oppose or object to the Filed Canadian Claims, provided, however, that nothing in the Settlement Agreement shall constitute a release or waiver or discharge of any right of the US Interests to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute.

---

[21]     This discussion is intended as a summary of the terms of the Settlement Agreement.  To the extent that the summary and the terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall control.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

[22]     All amounts provided for in the Settlement Agreement are in U.S. dollars.

- <u>Allocation Dispute</u>.

    o <u>Allocation Cooperation Period</u>.  The US Debtors, the Committee, the UK Pension Parties, the Joint Administrators on behalf of the EMEA Debtors, the Liquidator on behalf of NNOCL and the EMEA Non-Filed Entities agree that they will work in good faith commencing on the date of execution of the Settlement Agreement by all of the Parties (with the exception of the US Non-Filed Entities) (the "<u>Allocation Cooperation Period</u>") in an effort to see if they can develop a common allocation position and other agreements related to the conduct of the trial.  To that end, the Parties will use commercially reasonable best efforts during the Allocation Cooperation Period to coordinate and co-operate in respect of (a) discussion of experts on allocation methodologies in connection with the Allocation Dispute and preparation of submissions and reports regarding the same; (b) remaining depositions and discovery; (c) conduct of the trial of the Allocation Dispute; (d) pre-trial motion practice and pre- and post-trial briefing in respect of the Allocation Dispute; and (e) appeals, if any, from determinations in respect of the Allocation Dispute at or following trial.

    o <u>Duration of the Allocation Cooperation Period</u>.  Any Party may bring to an end its involvement in such cooperation arrangement with respect to the Allocation Dispute by providing the other Parties with five (5) business days' written notice of its intention to do so.  Where a Party exercises such termination right, the rights and obligations of all the other Parties to each other under section 6.1 of the Settlement Agreement shall remain and there will be no impact on the settlement of the US Claims Litigation or the Parties' obligations as provided in the other sections of the Settlement Agreement.

    o <u>Exchange of Information</u>.  The US Interests, the Joint Administrators on behalf of the EMEA Debtors, the EMEA Non-Filed Entities, the Liquidator on behalf of NNOCL and the U.K. Pension Parties may continue to seek information, disclosure, or discovery from one another in connection with the Allocation Dispute pursuant to any applicable order or endorsement of the Court or the Canadian Court and in accordance with the terms of the Settlement Agreement.

    o Nothing in the Settlement Agreement shall create any affirmative obligation on the part of the US Interests, the EMEA Parties or the UK Pension Parties to support any particular legal or valuation theories in respect of the Allocation Dispute, nor shall it prevent such Parties from advocating any particular legal or valuation theories in respect of the Allocation Dispute.  Furthermore, subject to Section 5 of the Settlement Agreement, nothing in the Settlement Agreement shall create an affirmative obligation on the part of the US Interests, the EMEA Parties or the UK Pension Parties in respect of the Canadian Claims Litigation.

- Withdrawal of Claims and No Further Claims.

  o On the EMEA Payment Date, the US EMEA Filed Claims shall be deemed withdrawn, with prejudice, and the US EMEA Non-Filed Claims shall be deemed waived. The EMEA Parties shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to matters resolved in the Settlement Agreement.

  o On the UK Pension Payment Date, the US UK Pension Claims shall be deemed withdrawn, with prejudice, and the UK Pension Parties shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

  o On the Effective Date, the US French Liquidator Claim shall be deemed withdrawn, with prejudice, and the French Liquidator shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

  o Upon completion of the payments in respect of the Allowed Claims, the NNI Claim shall be deemed withdrawn, with prejudice, and the US Non-Filed Claims shall be deemed waived. The Debtors and the U.S. Non-Filed Entities shall be forever barred from asserting against any of the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the Joint Administrators, the French Liquidator or the UK Pension Parties in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

- Appeals.

  o U.S. Appeal. From the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, agree that they shall not appeal from or seek reconsideration of the Third Circuit Decision.

  o Dismissal of the Canadian Motion For Leave. Promptly following the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, shall discontinue the Canadian Motion for Leave.

  o US EMEA Claims Dismissal Order. NNUK, NNIR and NNSA will not take any steps to appeal or otherwise challenge the US EMEA Claims Dismissal Order.

  o Allocation Dispute. For the avoidance of any doubt, nothing in Section 3 of the Settlement Agreement concerning waiver of appeals shall prevent or in any way inhibit the Parties from pursuing any appeal or making any

arguments whatsoever in respect of the determinations reached by the Canadian and/or US Court following trial of the Allocation Dispute.

- Releases.

  - The US EMEA Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, and (to the extent under the control of the Liquidator or the Joint Administrators (as the case may be)) the respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing, shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US EMEA Claims or the facts and circumstances that were alleged to provide a basis for the US EMEA Claims.

  - The US UK Pension Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the UK Pension Parties and (to the extent under the control of the UK Pension Parties) their respective current and former affiliates, subsidiaries, shareholders (but not including any member of the Nortel Group) and the employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the

definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the UK Pension Parties, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US UK Pension Claims or the facts and circumstances that were alleged to provide a basis for the US UK Pension Claims.

o    The US French Liquidator Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the French Liquidator, on behalf of NNSA and NTF, and (to the extent under the control of the French Liquidator) their respective current and former affiliates, subsidiaries,  employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which the French Liquidator, on behalf of NNSA and NTF, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US French Liquidator Claim or the facts and circumstances that were alleged to provide a basis for the US French Liquidator Claim.

o    The U.S. Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the US Interests, and (to the extent under the control of the US Entities) their respective current and former affiliates, subsidiaries,  employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the UK Pension Parties, the Joint Administrators, the Liquidator, and the French Liquidator, in their respective representative capacities, and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated,

18

which the US Interests now have, had, may have had or hereafter may have however so arising.

o   For the avoidance of doubt, the Releases shall include releases in respect of any and all claims in respect of costs, expenses and fees (including, but not limited to, attorneys' fees, experts' fees, and other professional fees) incurred by any of the Parties in connection with the US EMEA Claims, the US UK Pension Claims, the US French Liquidator Claim and the US Appeal.

•   <u>Limitation of Releases</u>.

Nothing in the Settlement Agreement shall constitute a release or waiver or discharge (in whole or in part) of (i) the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation; (ii) any claims of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NNOCL against the current or former directors and officers (in their capacities as such) of the Canadian Debtors; (iii) any claims of the EMEA Debtors and/or EMEA Non-Filed Entities and/or NTF and/or NNOCL against the current or former directors and officers (in their capacities as such) of the EMEA Debtors or the EMEA Non-Filed Entities or NTF or NNOCL (including for the avoidance of any doubt any such directors or officers even if they were also directors or officers of any of the US Debtors or the Canadian Debtors); (iv) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (v) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute; or (vi) any claim of the UK Pension Parties against any of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator or any defence that the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator might have against any claim of the UK Pension Parties.

o   Nothing in the Settlement Agreement shall prevent or in any way inhibit the EMEA Parties, the French Liquidator or the UK Pension Parties from making any arguments in respect of, or pursuing any appeal of any determinations of the Court or the Canadian Court with respect to the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation.  Furthermore, nothing in the Settlement Agreement shall operate as or constitute any admission with respect to the merits of any allegations or arguments underlying the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or the Canadian Claims Litigation.

       o  For the avoidance of doubt, nothing in the Settlement Agreement shall constitute a release or waiver or discharge of any rights created under the Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of the Settlement Agreement, nor shall the Settlement Agreement be used, referred to or contended by any Party to have any relevance or probative value in connection with any claims not released herein.

- <u>Effectiveness with Respect to the US Non-Filed Entities</u>.  The Execution of the Settlement Agreement by the US Non-Filed Entities prior to the Effective Date is a condition to the effectiveness of the Settlement Agreement solely with respect to each of the US Non-Filed Entities.  Upon execution of the Settlement Agreement, the US Non-Filed Entities shall be Parties to the Settlement Agreement for the benefits provided and the burdens imposed by the provisions of the Settlement Agreement expressed to be conferred on or given to the US Non-Filed Entities.  For the avoidance of doubt, the condition of the effectiveness of the Settlement Agreement as to the US Non-Filed Entities shall not constitute a condition to the effectiveness of the Settlement Agreement with respect to the US Debtors, the Committee, the EMEA Parties, the UK Pension Parties, or the French Liquidator.

## RELIEF REQUESTED

29.      By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019, entry of an order (i) authorizing the Debtors' and the Committee's entry into and approving the Settlement Agreement (the "<u>Settlement Order</u>") and (ii) granting them such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

30.      The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.  Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

31.      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing.  11 U.S.C. § 363(b).  Section 363 applies when an agreement involves the disposition of the estate's

assets in such a way that it ventures beyond an ordinary course transaction.  See Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

32.    The use or transfer of estate property under Section 363 must be supported by a sound business purpose.  Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civil Action No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008).  A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."  In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071).  In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange.  See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re Del. & Hudson Ry. Co., 124 B.R. at 176.

33.    Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Citing this authority, the Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy."  In re Martin, 91 F.3d at 393 (second alteration in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re

World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").  And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court.  See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

34.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'"  In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation."  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968).  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  In re Coram Healthcare Corp., 315 B.R. at 330.  Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."  Travelers Cas. & Sur. Co., 2008 WL 821088, at *5 (citing Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at 330.

35.     The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"):  "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

36.     The Debtors respectfully submit that the Settlement Agreement squarely satisfies each of the requirements under section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. The Settlement Agreement is proposed in the Debtors' business judgment as a good faith means to avoid the costs and uncertainty associated with continuing what has been a contentious and time-consuming litigation of the EMEA Claims, the French Liquidator Claim and the UK Pension Claims. The Settlement Agreement should be approved as a compromise that is in the best interests of the Debtors, their estates, their creditors and other stakeholders.

37.     The Settlement Agreement will fully and finally resolve the US Claims Litigation, providing the Parties with certainty in respect of substantial and intricate claims that have been asserted against the Debtors and removes a significant remaining impediment to resolution of the Chapter 11 Cases. As demonstrated by the length of time that the US Claims Litigation has been pending and the substantial costs that have been borne by the Parties to date, the Parties are willing to litigate their disputes to conclusion absent a settlement. While the Debtors are confident in their legal position with respect to the US Claims Litigation, such litigation carries with it inherent uncertainties and material costs with no guarantee that a better result could be achieved through further litigation for the Debtors or their creditors than the terms of the proposed settlement.

38.     In the event that the Settlement Agreement is not approved, the Parties will continue to pursue the US Claims Litigation, including the completion of further discovery, litigation of the US Appeal, to the extent it is further pursued, and preparation for the Trial, with no assurance as to how the courts will ultimately rule on the various litigation issues at stake or the length of time such proceedings will extend. By contrast, the settlement of the US Claims Litigation in accordance with the terms of the Settlement Agreement fairly balances the Parties'

likelihood of success on the merits and eliminates any risk regarding the ultimate resolution of these disputes. Resolving such uncertainty is particularly important here to avoid saddling the Parties with further legal fees and costs related to the US Claims Litigation and to simplify the issues to be litigated at the upcoming Trial. The Settlement Agreement also advances the interests of the EMEA Debtors and the UK Pension Parties by providing for allowed claims against NNI and the immediate payment of the settlement amount in cash, such that these parties are certain of receiving a recovery on their claims and can determine the value of the settlement with certainty. By contrast, in the pursuit of further litigation, these parties face the risk of not knowing the amount and priority of the recovery (if any) they could obtain against the Debtors.

39.    Finally, the Settlement Agreement was heavily negotiated and is the result of years of arm's-length settlement discussions and mediation sessions that preceded the most recent settlement efforts. The Settlement Agreement fully and finally resolves the EMEA Claims, the French Liquidator Claim and the UK Pension Claims in an amount that is fair and reasonable given the benefits of reaching a final settlement and the balancing of all the various risks and considerations, and the full release of other claims the Parties may hold against each other. The Settlement Agreement provides the further benefit of the Parties' agreement to cooperate in future litigation activities with respect to the Allocation Dispute, as described in the agreement itself. Further, as evidenced by it being a Party to the Settlement Agreement, the Committee supports the resolution embodied therein.

40.    In light of the foregoing, the Debtors respectfully submit that the Settlement Agreement satisfies sections 105(a) and 363 of the Bankruptcy Code, as well as the requirements of Bankruptcy Rule 9019.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

41.    The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## NOTICE

42.    Notice of the Motion has been given via electronic transmission, first class mail, hand delivery or overnight mail to (i) the Core Parties; (ii) the U.S. Trustee; and (iii) the general service list established in these chapter 11 cases.  The Debtors also will provide notice of this Motion on the docket in the Canadian Proceedings.  No further notice is required under that certain Cross-Border Protocol on the Resolution of Claims, as approved by this Court on September 16, 2010 [D.I. 3922 and 3956] as the Debtors consulted with the Monitor and the Canadian Debtors in advance of filing the Motions to Dismiss and the entry of the Allocation Protocol, including in the course of three mediations, and this Court and the Canadian Court provided joint direction of the procedure for resolving the EMEA Claims, the French Liquidator Claim and the UK Pension Claims pursuant to the Allocation Protocol.  Accordingly, the Debtors submit that under the circumstances no other or further notice is necessary.

**NO PRIOR REQUEST**

43.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  December 17, 2013          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

    - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*