**Amended Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Sunday, Dec. 15)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AMENDED REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 13, 2013)**
**(December 15, 2013)**

## Subjects for the Representative Witness of the US Debtors

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

2.  The facts and documents, other than the MRDA, demonstrating the ownership interests that the US Debtors allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

3.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest in Nortel's intellectual property held by parties other than NNL.

4.  The factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licences, held by parties other than NNL.

5.  The past practices of NNL and its subsidiaries concerning the scope of the licenses to Nortel intellectual property under the Cost-Sharing Agreements and the MRDA.

6.  The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

7.  The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The facts and documents demonstrating the reasons why it was decided that NNL would
        be the registered owner of all of the NN Technology (as that term is defined in the
        MRDA).

9.      The facts and documents demonstrating how and to what extent intellectual property was
        assigned to NNL by NNL's subsidiaries, inventors/authors and others.

10.     The facts and documents demonstrating Nortel's processes for the identification and
        development of products, including as they varied over time before and after January 14,
        2009.

11.     The scope and use of third-party products and components used or embodied in Nortel
        products and the marketing of third party Original Equipment Manufacturer products by
        Nortel.

12.     At the time each of the lines of business were sold and when the Rockstar transaction
        closed, the value, including the dollar value, of the US Debtors' alleged interest in the
        Nortel global patent portfolio and the factual bases for those values.

13.     The facts and documents underlying the contention of the US Debtors that they could
        have generated value from the intellectual property sold in the Rockstar transaction in the
        absence of a sale of that intellectual property.

14.     The value the US Debtors attribute to intangible assets other than intellectual property
        sold as part of each of the line of business sales and the Rockstar transaction, including
        without limitation goodwill and customer relationships, and all factual bases for those
        values.

15.     The value the US Debtors attribute to tangible assets sold as part of each of the line of
        business sales and the factual bases supporting those values.

16.     The US Debtors' position on what amounts should be allocated to each of the estates in
        respect of the sales of tangible assets and on what factual basis.

17.     The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between
        2001 and 2009 for directly funded research and development; (2) the amounts that NNL,
        NN Ireland, NNUK, and NNSA paid for direct funding of research and development
        from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN
        Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund
        research and development by Nortel group entities; and (4) the amounts that NNI
        contends were paid in transfer pricing adjustments under the Nortel transfer pricing
        model between 2001 and 2009.

18.    The facts and documents supporting the US Debtors' position that without the backing of
NNI's balance sheet the Nortel Group's access to credit markets would not have been
possible or would have been greatly reduced.

19.    The facts and documents supporting the US Debtors' position that without access to the
pre-petition NNI revolving credit facility NNL would not have been able to operate.

20.    The facts and documents demonstrating the US Debtors' recognition that the best way to
maximize value for creditors was to sell the Nortel Group's rights, property and other
assets together in each of the line of business sales and the Rockstar transaction instead of
turning it into an intellectual property licensing business, including

    a.    the facts and documents demonstrating all efforts made to determine the US
Debtors' ability, after January 14, 2009, to use a contract manufacturer to
manufacture products embodying Nortel intellectual property.

    b.    the facts and documents demonstrating all efforts made to determine the
feasibility of sublicensing NNI's license rights under the MRDA after January 14,
2009.

    c.    the facts and documents demonstrating all efforts undertaken by the US Debtors
to determine the feasibility of forming a new reorganized company or corporate
group to enforce the Nortel patents.

21.    The facts and documents demonstrating which Nortel entity paid for the prosecution and
maintenance of the patents in Nortel's global patent portfolio, including but not limited to
patents registered in the United States.

22.    The facts and documents demonstrating when and under what circumstances the US
Debtors came to the understanding that at the time of the Rockstar transaction the value
of the US Debtors' rights with respect to Nortel's intellectual property had changed.

23.    The facts and documents related to the US Debtors understanding that the sale processes
put in place to dispose of the Nortel Group's assets would not succeed if a selling party
could hold up a sale pending agreement on the allocation of sale proceeds.

24.    The facts and documents upon which the US Debtors rely upon to assert that the Monitor
and Canadian Debtors are estopped or should not otherwise be permitted to assert
entitlement to all of the proceeds of the Rockstar transaction.

25.    The facts and documents demonstrating the estimated gross and  net assets of the Estate
available for distribution to creditors, without recourse to the allocation proceeds, and the
best estimate of valid claims (by creditor category) against the Estate, excluding inter-
company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

26.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

27.    The facts and documents that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for the Representative Witness of the Ad Hoc Group of Bondholders

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The same subjects as those provided to the US Debtors.

2.  The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees.

3.  The expectations of the Bondholder Group with respect to any guarantees to proceeds from the line of business sales and Rockstar transaction, and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates.

4.  The Claims asserted by the Ad Hoc Group of Bondholders in In re Nortel Networks Inc. et al, case No. 09-10138 (KG) (jointly administered), including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for the Representative Witness of the UCC

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The same subjects as those provided to the US Debtors.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNUK Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The facts and documents, other than the MRDA, demonstrating NNUK's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNUK allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.      The value NNUK attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.      The facts and documents evidencing  (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNUK contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any challenge NNUK intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNUK for the years 2001 through 2005 inclusive corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.      The current status of any ongoing (or outcome of any historical) audit by Inland Revenue (HMRC) of NNUK's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10.     The facts and documents that establish any expectations that NNUK will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.     The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.     The factual and documentary basis for any claims arising from the treatment of UK pension obligations under US GAAP for the purposes of transfer pricing and that entitle NNUK or Nortel Networks UK Pension Trust Limited or the PPF to any relief.  On what basis was NNUK  or the NNUK Pension Scheme worse off by the treatment of all Nortel

pension plans under US GAAP for transfer pricing purposes?  On what basis and upon what evidence is a claim made that any funds (or lower losses) that might be claimed for NNUK would have altered the position of NNUK or the NNUK Pension Scheme as at the date of insolvency.

17.     The facts that support the claim that NNUK pension funding should have been pooled or otherwise funded or compensated for by entities other than NNUK by means of the transfer pricing methodology or otherwise in the RPS.

18.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

19.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

20.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

21.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties.  Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage.  Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22.     The facts and documents that demonstrate the timing and source of evidence to support
the issuance of claims or threatened and tolled claims against individually named
directors of NNUK.

23.     The timing and source of discovery and particulars of any "new" evidence that came to
light after the Rolston and Clement statements filed in connection with the UK COMI
application in 2009 that is relied upon to contradict or supersede any matters that were
attested to in those statements or in the accompanying filings of the JA's in both the UK
and the US courts.

24.     The facts and documents that explain why the claims predicated on events that occurred
more than two years before the proofs of claim were filed in the Canadian CCAA
proceedings were not made within two years of these events.

25.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency,
or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at
any given date from any after January 1999 until November/December 2008, and that
establish when this state arose and for how long it persisted to the extent the contention is
predicated on circumstances other than liabilities exceeding assets and/or the existence of
a going concern note in audited financial statements.

26.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be
specified) period prior to any alleged date of insolvency that are claimed to have
"preferred" the Canadian Debtors over other creditors and be subject to review or
scrutiny as a result of that timing.

27.     The facts and documents that form the basis for any claims for resulting trust,
constructive trust or any other claims for proprietary estoppel or equitable claims and that
disclose the particular basis for any equitable or proprietary claim being pursued.

28.     The facts and documents that demonstrate the factual components of the pleaded
requirements for certain foreign law assertions disclosed in Schedule "W" of the Joint
Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the
EMEA Claimants with respect to the unauthorized return of capital.

29.     The facts and documents demonstrating the estimated gross and  net assets of the Estate
available for distribution to creditors, without recourse to the allocation proceeds, and the
best estimate of valid claims (by creditor category) against the Estate, excluding inter-
company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Germany Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Germany attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Germany's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Germany will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "E" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the destructive intervention/breach of capital maintenance rules.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

        <u>NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.</u>

24.      The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Austria Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Austria attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Austria's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Austria will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.  The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.  The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.  The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.  Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.  The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.  The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "F" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the breach of capital maintenance rules.

22.  The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.     The facts that relate to any other topics designated by any other parties for this witness.

## Subjects for NN Ireland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.     The facts and documents, other than the MRDA, demonstrating NN Ireland's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NN Ireland allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.     The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.     The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.     The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.     The value NN Ireland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.     The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NN Ireland contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.     The factual and documentary basis for any challenge NN Ireland intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NN Ireland for the years 2001 through 2005 inclusive

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Ireland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10.     The facts and documents that establish any expectations that NN Ireland will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.     The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.     The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NN Ireland by means of the transfer pricing methodology or otherwise in the RPS.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

17.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

19.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20.  The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

21.  The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NN Ireland.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

23. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "G" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized return of capital.

28. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Sweden Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.      The value NN Sweden attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Sweden's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.      <u>The facts and documents that establish any expectations that NN Sweden will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.</u>

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
        customer revenues, the details of which customers, the dates and amounts of associated
        revenues claimed, which other entity received the claimed revenues and the basis for
        adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
        vendor financing arrangements for Nortel customers and that demonstrate that it was that
        it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
        practice was unfair to that the party and the basis on which it claims to have been  unable
        to represent itself and its interests in respect of the practice, or that would be indicative of
        any deficiencies with respect to the party's financial statements or audits.

12.     ~~The facts that support the claim that the pension funding should have been pooled or
        otherwise funded or compensated for by entities other than NNUK by means of the
        transfer pricing methodology or otherwise in the RPS.~~

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
        respect of the pension plan, including but not limited to: (i) the basis of the calculation of
        such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
        potential costs of annuitizing member's benefits; (iv) the information that the pension
        trustee or administrator provided to its pension advisors and consultants to enable them to
        calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
        (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
        deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
        pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing
        and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
        Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
        EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
        the party is anything other than an unsecured debt.

14.     The facts that form the basis for and calculation of the amount of any claims relating to
        the allocation of proceeds or any other aspect of past dispositions of businesses including
        the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew,
        Bookham, Breconridge, Metasolv, STM (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not
        made, (ii) contracts or transactions alleged to have been approved or not approved, and
        (iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
        at what meeting and/or by which resolution) in breach of de facto director or de jure
        and/or shadow director duties. Identification of the individual Directors & Officers
        against whom claims are being asserted, and in respect of each such individual, which
        decisions, contracts, transactions or other conduct are the subject of the claims made
        against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "H" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Holland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Holland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Holland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Holland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations a

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have been "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "I" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the mismanagement.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Hungary Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Hungary attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Hungary's tax filings tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Hungary will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until January 2009, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have been "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "J" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NNSAS Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NNSAS attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSAS's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NNSAS will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
customer revenues, the details of which customers, the dates and amounts of associated
revenues claimed, which other entity received the claimed revenues and the basis for
adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
vendor financing arrangements for Nortel customers and that demonstrate that it was that
it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
practice was unfair to that the party and the basis on which it claims to have been unable
to represent itself and its interests in respect of the practice, or that would be indicative of
any deficiencies with respect to the party's financial statements or audits.

~~12.     The facts and documents that demonstrate that a particular financial or accounting
practice was unfair to that the party and the basis on which it claims to have been unable
to represent itself and its interests in respect of the practice, or that would be indicative of
any deficiencies with respect to the party's financial statements or audits.~~

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
respect of the pension plan, including but not limited to: (i) the basis of the calculation of
such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
potential costs of annuitizing member's benefits; (iv) the information that the pension
trustee or administrator provided to its pension advisors and consultants to enable them to
calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
(a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
pensioners whose pensions have been reduced.

13.     The facts that demonstrate any different amounts claimed to be owing and/or payable to
or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the
Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and
the basis, if any, for claiming that amounts said to be "owing" to the party is anything
other than an unsecured debt.

14.     The facts and documentary basis for and calculation of the amount of any claims relating
to the allocation of proceeds or any other aspect of past dispositions of businesses
including the following noted in the particulars of the proofs of claims: sales to
AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts that demonstrate (i) decisions alleged to have been made or not made, (ii)
contracts or transactions alleged to have been approved or not approved, and (iii) any
other conduct by EMEA BOD's (including which BOD, which members, when, at what
meeting and/or by which resolution) in breach of de facto director or de jure and/or
shadow director duties. Identification of the individual Directors & Officers against
whom claims are being asserted, and in respect of each such individual, which decisions,
contracts, transactions or other conduct are the subject of the claims made against them,

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of the events now complained about.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "K" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Spain Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value NN Spain attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Spain's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.   The facts and documents that establish any expectations that NN Spain will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should
        be reimbursed and the basis for calculating the amounts for each year and any
        corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
        customer revenues, the details of which customers, the dates and amounts of associated
        revenues claimed, which other entity received the claimed revenues and the basis for
        adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
        vendor financing arrangements for Nortel customers and that demonstrate that it was that
        it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
        practice was unfair to that the party and the basis on which it claims to have been  unable
        to represent itself and its interests in respect of the practice, or that would be indicative of
        any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
        respect of the pension plan, including but not limited to: (i) the basis of the calculation of
        such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
        potential costs of annuitizing member's benefits; (iv) the information that the pension
        trustee or administrator provided to its pension advisors and consultants to enable them to
        calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
        (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
        deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
        pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing
        and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
        Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
        EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
        the party is anything other than an unsecured debt and/or they are alleged to owe the
        Canadian Debtors.

14.     The facts that form the basis for and calculation of the amount of any claims relating to
        the allocation of proceeds or any other aspect of past dispositions of businesses including
        the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew,
        Bookham, Breconridge, Metasolv, STM (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not
        made, (ii) contracts or transactions alleged to have been approved or not approved, and
        (iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
        at what meeting and/or by which resolution) in breach of de facto director or de jure
        and/or shadow director duties. Identification of the individual Directors & Officers
        against whom claims are being asserted, and in respect of each such individual, which
        decisions, contracts, transactions or other conduct are the subject of the claims made

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "L" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNIF Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.     The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.     The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.     The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.     The value NNIF attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.     The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNIF's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.     The facts and documents that establish any expectations that NNIF will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "M" of the Joint Response of the Monitor and the Canadian Debtors to the Claims.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Belgium Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Belgium attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Belgium's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Belgium will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "N" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Finland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Finland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Finland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Finland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

54

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "O" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Poland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Poland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Poland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Poland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.   The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "P" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Portugal Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Portugal attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Portugal's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Portugal will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by

which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Q" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Romania Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Romania attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Romania's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Romania will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "R" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Czech Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Czech attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Czech's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Czech will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "T" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

**<u>Subjects for NN Slovakia Representative Witness</u>**

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.      The value NN Slovakia attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Slovakia's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.      The facts and documents that establish any expectations that NN Slovakia will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "U" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Italy Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Italy attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Italy's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Italy will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been  unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "V" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Switzerland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Switzerland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority ~~of (HMRC)~~ of NN Switzerland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Switzerland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.   ~~The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.~~

12.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.   The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.   The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.   The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or

by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "X" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Norway Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Norway attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Norway's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Norway will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should
        be reimbursed and the basis for calculating the amounts for each year and any
        corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
        customer revenues, the details of which customers, the dates and amounts of associated
        revenues claimed, which other entity received the claimed revenues and the basis for
        adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
        vendor financing arrangements for Nortel customers and that demonstrate that it was that
        it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
        practice was unfair to that the party and the basis on which it claims to have been unable
        to represent itself and its interests in respect of the practice, or that would be indicative of
        any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
        respect of the pension plan, including but not limited to: (i) the basis of the calculation of
        such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
        potential costs of annuitizing member's benefits; (iv) the information that the pension
        trustee or administrator provided to its pension advisors and consultants to enable them to
        calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
        (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
        deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
        pensioners whose pensions have been reduced.

13.     The facts that establish any different amounts claimed to be owing and/or payable to or
        by them to NNL than what is set forth in Schedule "B" to the Joint Response of the
        Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and
        the basis, if any, for claiming that amounts said to be "owing" to the party is anything
        other than an unsecured debt.

14.     The facts that form the basis for and calculation of the amount of any claims relating to
        the allocation of proceeds or any other aspect of past dispositions of businesses including
        the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew,
        Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts
        or transactions alleged to have been approved or not approved, and (iii) any other conduct
        by EMEA BOD's (including which BOD, which members, when, at what meeting and/or
        by which resolution) in breach of de facto director or de jure and/or shadow director
        duties. Identification of the individual Directors & Officers against whom claims are
        being asserted, and in respect of each such individual, which decisions, contracts,
        transactions or other conduct are the subject of the claims made against them, and by
        which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Y" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks (Northern Ireland) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company lisencing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks (Northern Ireland) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks Optical Components Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value Nortel Networks Optical Components Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks South Africa (pty) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value Nortel Networks South Africa (pty) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

**NNSA Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Tuesday, Dec. 17)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**NNSA REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN**
**ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 17, 2013)**

## Subjects for NNSA Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The facts and documents, other than the MRDA, demonstrating NNSA's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNSA allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.    The value NNSA attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.    The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNSA contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.    The factual and documentary basis for any challenge NNSA intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNSA for the years 2001 through 2005 inclusive

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSA's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.   In particular but without limitation, the facts or documents related to any audit by any taxation authority including (i) communication with the French tax authority regarding the sufficiency of the documentation to establish the basis for the MRDA during the time in which the RPS method was in force but before the formal execution of the MRDA and (ii) communication with the French tax authority related to a proposed transfer pricing agreement for NNSA.

10.     The facts and documents that establish any expectations that NNSA will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.     The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.     The factual and documentary basis for any claim that NNSA did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that NNSA was worse off on a net basis for having done so.

15.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to NNSA and the basis on which NNSA claims to have been

unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.     The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NNSA by means of the transfer pricing methodology or otherwise in the RPS.

17.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing members' benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by NNSA to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to NNSA are anything other than an unsecured debt.

19.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties.  Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage.  Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

4

21.   The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA.  Specifically, and without limitation, the facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA as asserted in the Commercial Court of Versailles (the "French Proceeding"), including (i) documents or facts to support any allegations made against Jean-Marie Lesur and Darryl Edwards; (ii) documents of facts to support the French Liquidator's decision not to name certain other directors of NNSA (*e.g.*, Michel Clement, Pascal Debon, Alain Biston, Sharon Rolston and/or Simon Freemantle) in the Summons to Appear issued in the French Proceeding; (iii) any documents filed in relation to any procedural steps taken in the French Proceeding, including, in particular, any documents in support of or opposition to a stay of same; and (iv) any evidence not yet produced in this proceeding on which the French Liquidator intends to rely in the French Proceeding.

22.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JAs in both the UK and the US courts.

23.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "S" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

28.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

30.     The facts and documents that demonstrate that the repayment by NNSA in 2008 of €25m of the loan from NNL was improper, including without limitation (i) the documents that show that such a partial repayment was contrary to the loan agreement including, in particular, the relevant provisions of the loan agreement itself; (ii) any facts or documents to show that NNSA was not solvent at the time the repayment was made; and (iii) any facts or documents that show that NNL imposed the repayment on NNSA and/or that NNSA approved the repayment despite it not being in NNSA's best interest to do so.

**UKPC Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Thursday, Dec. 18)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**UKPC REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 19, 2013)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## <u>Subjects for UKPC Representative Witness</u>

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:[1]**

1.      The facts and documents relating to the amount of each of the NNUK Pension Plan deficit and section 75 debt including but not limited to: (i) the basis of the calculation of each; (ii) the assumptions used in the calculation of each; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the Trustee provided to its pension advisors and consultants to enable them to calculate the deficit and section 75 debt; and (v) the liabilities used in the calculation of the deficit and section 75 debt referable to (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

2.      The facts and documents relating to the age and the amount of the benefit of pension plan members, before and after reduction.

3.      The facts and documents relating to the quantum of the PPF claim.

4.      The facts and documents relating to the UKPC's position that NNUK failed to follow a recommendation made by the NNUK Pension Plan's actuary in a manner that violated the Scheme's Trust Deed or Rules or any statute or other UK law or regulation or made a funding commitment that it failed to fulfill.

5.      The facts and documents relating to the mortality assumptions proposed by Trustee and the Scheme's actuary for the March 31, 2008 actuarial valuation of the Scheme and the 2005 actuarial valuation of the Scheme.

6.      The facts and documents relating to the UKPC's claim that NNUK is entitled to any or all of NNSA's assets as a result of Project Swift.

7.      The facts and documents relating to the UKPC's claim that NNUK or Nortel Canada acted in bad faith, oppressively, or otherwise improperly during the negotiations that lead to the 2002, 2003 and 2004 funding contributions, the 2005 Interim Funding Agreement, the 2006 Long Term Funding or the negotiations regarding the 2008 actuarial valuation of the Scheme.

8.      The facts and documents relating to the investment performance of the Scheme assets each year from 2002 through 2008, as a whole and by asset category.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Joint Response Of The Monitor And Canadian Debtors To The Claims By The UK Pension Trustee and PPF re: UK Pension Scheme

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

9.      The facts and documents relating to the UKPC's involvement in FSD proceedings before the Determinations Panel including, but not limited to: (i) all communications that the Trustee had with tPR; (ii) any work that the Trustee retained PwC to undertake with respect to the FSD proceedings; (iii) tPR's selection of June 30, 2008 as the Relevant Time; and (iv) any communications among any of the UKPC, PwC and the tPR with respect to seeking a contribution notice against Nortel Canada.

10.     The facts and documents relating to the UKPC's claim that NNUK was insufficiently resourced as at the Relevant Time for purposes of the FSD.

11.     The facts and documents relating to the UKPC's claim that it is reasonable to impose an FSD on Nortel Canada.

12.     The facts and documents relating to the potential imposition of a Contribution Notice on Nortel Canada;

13.     The facts and documents relating to the UKPC's claim that NNUK provided benefits to Nortel Canada whose value exceeded the benefits that Nortel Canada provided to NNUK;

14.     The facts and documents relating to the UKPC's claim that the RPSM failed to adequately take into account NNUK's restructuring costs, pension obligations and the Reciprocal Agreement, and that such alleged failures had an adverse impact on the funding contributions made by NNUK to the Scheme or otherwise harmed the Scheme;.

15.     The facts and documents relating to any documents or information provided by the Trustee to any experts that the Trustee or tPR retained to submit reports to the Determinations Panel in connection with the FSD proceedings including, but not limited to the reports of Ronald Bowie, Gary Squires and Brian Becker.

16.     The facts and documents relating to the UKPC's claim that they have standing to commence this claim.

17.     The facts and documents that disclose why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

6275522

**US Deposition Group's Letter regarding Representative Witness Topics (Friday, Dec. 13)**

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA

NEW YORK, NY 10006 1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW

FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG

BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

LAURENT ALPERT
VICTOR I. LEWKOW
LESLIE N. SILVERMAN
ROBERT L. TORTORIELLO
LEE C. BUCHHEIT
JAMES M. PEASLEE
ALAN L. BELLER
THOMAS J. MOLONEY
JONATHAN I. BLACKMAN
WILLIAM F. GORIN
MICHAEL L. RYAN
ROBERT P. DAVIS
YARON Z. REICH
RICHARD S. LINCER
JAIME A. EL KOURY
STEVEN G. HOROWITZ
JAMES A. DUNCAN
STEVEN M. LOEB
DONALD A. STERN
CRAIG B. BROD
SHELDON H. ALSTER
MITCHELL A. LOWENTHAL
EDWARD J. ROSEN
JOHN PALENBERG
LAWRENCE B. FRIEDMAN
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
SETH GROSSHANDLER
WILLIAM A. GROLL
JANET L. FISHER
DAVID L. SUGERMAN
HOWARD S. ZELBO
DAVID E. BRODSKY
MICHAEL R. LAZERWITZ
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
FILIP MOERMAN

PAUL J. SHIM
STEVEN L. WILNER
ERIKA R. NUENHUIS
LINDSEE P. GRANFIELD
ANDRES DE LA CRUZ
DAVID C. LOPEZ
CARMEN A. CORRALES
JAMES L. BROMLEY
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL J. VOLKOVITSCH
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
DAVID AMAN

ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
    RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
DAVID H. HERRINGTON
HEIDE H. ILGENFRITZ
JONATHAN S. KOLODNER
HUGH C. CONROY, JR
KATHLEEN M. EMBERGER
WALLACE L. LARSON, JR
JAMES D. SMALL
AVRAM E. LUFT
DANIEL ILAN
ANDREW WEAVER
HELENA K. GRANNIS
GRANT M. BINDER
MEYER H. FEDIDA
    RESIDENT COUNSEL

Writer's Direct Dial:  +1 212 225 2025
E-Mail:  mdecker@cgsh.com

December 13, 2013

VIA EMAIL TO THE CORE PARTIES SERVICE LIST

Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
     Nortel Networks Corporation. et al.: Court File No 09-CL-7950

To all Core Parties:

     Pursuant to the Deposition Protocol, we write on behalf of the U.S. Deposition Group to notify each Core Party as to specific topics on which the U.S. Debtors will conduct representative examinations of each Core Party listed below, to the extent such depositions occur.  In accordance with Section G(1)(c) of the Deposition Protocol, the U.S. Deposition Group is not limited in their examinations to the topics listed herein, but barring objection, the designated representatives have an obligation to be prepared to testify on the specified topics.

     As we have conveyed, it is our position that representative depositions are unnecessary, inappropriate and a waste of resources in light of the extensive discovery to date. While we identify topics to avoid any claim of waiver, this letter is served with an express reservation of all rights, including our right to seek judicial relief to modify the existing Deposition Protocol to eliminate representative depositions.

     Subject to the foregoing reservation of rights, the U.S. Interests hereby designate the following topics:

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE.

[NEWYORK 2830407_5]

## Topics for Canadian Debtors Representative

1) Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and pre-petition and post-petition potential asset purchasers.

2) Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.

3) The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4) Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.

## Topics for CCC Representative

1) The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The justification for listing in response to Interrogatory Number 42 each transaction, arrangement and event identified therein and how each such transaction, arrangement and event supports the CCC's Allocation Position.

4) Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

Core Parties Service List, p. 3

## **Topics for Wilmington Trust Representative**

1) The terms of the Indenture dated November 30, 1988 between NNL and the Bank of New York Mellon ("Indenture") and the expected financial result to note holders under different allocation scenarios.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The understanding of Wilmington Trust or its predecessors regarding liability of any Nortel entity under the Indenture beyond the terms of the Indenture and any communications regarding same.

In addition, all party representatives should be prepared to address any topic, as applicable to that party, designated by that party to representatives of any of the U.S. Interests.

We look forward to continuing to discuss the scope and necessity of these examinations, including the possibility of foregoing live examinations in favor of an efficient written exchange with any of the core parties above.

Best regards,

/ Marla A. Decker /

Marla A.  Decker

**EMEA's Letter regarding Representative Witness Topics (Friday, Dec. 13)**



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 13, 2013

**VIA EMAIL TO ALL CORE PARTIES**

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

*In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Counsel,

As we have previously advised, the Joint Administrators[1] and U.K. Pension Claimants believe that, given the more than 100 fact witness depositions that the parties have taken to date and the millions of documents that the parties have produced, representative witness examinations are unnecessary and cannot be justified in light of the substantial additional expenses and other resources that would be required to prepare for them, conduct them, and comply with the resulting undertakings.  Subject and without prejudice to this position, to preserve their rights in the event that representative witness examinations go forward, the Joint Administrators and U.K. Pension Claimants hereby give notice to the Canadian Debtors of the following subjects on which they would seek representative witness testimony.

1.    The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.

2.    The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.

3.    The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.

---

1.   Unless otherwise indicated, capitalized terms used herein shall have the same meaning as in the Joint Administrators' and U.K. Pension Claimants' Rule 30(b)(6) Deposition Notices dated July 26, 2013.

4.      The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between Nortel and the Internal Revenue Service and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.

5.      Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard.

*** 

The Joint Administrators and U.K. Pension Claimants reserve all rights, including with respect to the appropriate scope and use of any representative witness examinations that are ultimately conducted.


Sincerely,


/s/ Neil J. Oxford

**Objections to the Representative Topics Served on the Canadian Deposition Group by the US Deposition Group (Thursday, Dec. 18)**

# ALLEN & OVERY

Marla A. Decker
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

| | |
|---|---|
| Tel | 212 610 6300 |
| Fax | 212 610 6399 |
| Direct line | 212 610 6414 |
| Personal fax | 212 610 6399 |

paul.keller@allenovery.com

Our ref          /0017242-0000008 NY:18434047.1

December 18, 2013

*In re Nortel Networks Inc., et al., Case No. 09-1-138*
*Nortel Networks Corporation, et al.:  Court File No. 09-CL-7950*

**Re:**    **Objections to the Representative Topics Served on the Candadian**
          **Deposition Group by the US Deposition Group**

Dear Ms. Decker:

Below please find the Canadian Debtors and the Monitor's objections to the representative topics served by the US Deposition Group.

**Topic No. 1:  Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and prepetition and post-petition potential asset purchasers.**

**RESPONSE TO TOPIC 1:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from

disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and

immunities. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning

"affiliated entities" and "any employee, advisor or representative" over which neither the Canadian Debtors or

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

the Monitor have any custody or control. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning the broad categories of the "MRDA" and "transfer pricing", which cover a nine year time period, as well as information from four other third-parties. The Canadian Debtors and the Monitor object to the extent this topic seeks information beyond the information maintained by the Canadian Debtors and the Monitor with respect to statements made by them concerning ownership of intellectual property or intellectual property license rights.

**Topic No. 2: Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.**

**RESPONSE TO TOPIC 2:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every license of intellectual property and to the extent it seeks information relating to Commercial Licenses as described in the Rockstar Agreement or licenses of intellectual property other than patents.

**Topic No. 3: The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.**

**RESPONSE TO TOPIC 3:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 4: Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.**

**RESPONSE TO TOPIC 4:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks expert discovery prior to Court ordered date for such disclosures. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every divesture, acquisition or transaction.

\*    \*    \*

Finally, the Canadian Debtors and the Monitor further object to the extent the US Debtors intend to seek information from the Canadian Debtors and the Monitor on topics and subject matter beyond the topics enumerated above.

Very truly yours,

Paul B. Keller
Partner

**Responses and Objections of the CCC to the US Deposition Group's and US Debtors'
Topics for CCC Representative (Thursday, Dec. 18)**

Court File No.  09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL**
**NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS**
**GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND**
**NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

- and-

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------X

|  |  |  |
|---|---|---|
| *In re* | : | Chapter 11 |
|  | : |  |
| Nortel Networks Inc., *et al.*,[1] | : | Case No. 09-10138 (KG) |
|  | : |  |
| Debtors. | : | Jointly Administered |
|  | : |  |
|  | : |  |
|  | : |  |

--------------------------------------------------------- X

**RESPONSES AND OBJECTIONS OF THE CCC TO THE**
**US DEPOSITION GROUP'S AND US DEBTORS'**
**TOPICS FOR CCC REPRESENTATIVE**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

The Canadian Creditors Committee (the "CCC"), by and through its undersigned counsel and pursuant to, *inter alia,* the Deposition Protocol, submits these objections (the "Objections") to the US Deposition Group's and US Debtors' (collectively, the "US Group") December 13, 2013 Topics for CCC Representative (the "Topics"). The CCC reserves all rights.

## GENERAL OBJECTIONS

The following General Objections are incorporated into each of the CCC's Objections to the US Group's individual topics.

1.      The CCC objects to the Topics, to the extent they seek information that is in the possession, custody or control of the requesting party. The Canadian Debtors, US Debtors, and UK/EMEA Debtors (collectively, the "Nortel Debtors") conducted the liquidation of Nortel's assets via the sale of Nortel's lines of business, including the business units (the "Business Sales") and the sale of Nortel's remaining patent portfolio to Apple, RIM, Sony and Microsoft (the "Residual IP Sale"). The Nortel Debtors operated the Nortel Entities as going concerns including interacting with employees and creditors, conducted the post-filing bidding process and ultimate sales, maintain all related financial records, and possess license agreements and all other relevant contracts. It is therefore unreasonable for the US Group to seek this same information from the CCC, which, in any event, does not possess such information.

2.      The CCC objects to the Topics to the extent they seek information that was previously provided by a fact witness currently or formerly associated with the CCC.

3.      The CCC objects to the Topics to the extent they seek information from persons or entities other than the CCC.

4.      The CCC objects to the Topics to the extent that they are overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent that they are unreasonable un scope pursuant to the Deposition Protocol.

5.    The CCC objects to the Topics to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, proprietary, financial or trade secret protections, the business strategies privilege, the right to privacy, confidentiality doctrines, any protective order, or any other privilege and/or immunity, and which is not subject to an appropriate protective order entered into by the parties and approved by the Court.    The inadvertent disclosure of any protected or privileged information shall not operate as a waiver of any privileges or protections.

6.    The CCC objects to the Topics to the extent they attempt or purport to impose obligations beyond those imposed or authorized by the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware, or any other applicable rules, orders, or protocols.

7.    The CCC objects to the Topics to the extent they do not contain a reasonable time limitation, on the grounds that any such Topic is overbroad, unduly burdensome, oppressive, vague, and/or ambiguous.

8.    By providing a representative witness to testify regarding any of the Topics, the CCC does not admit the relevance or admissibility of any of the testimony provided but instead reserves the right to object to the relevance and admissibility of any such testimony.

9.    These General Objections will be deemed to be continuing throughout the responses that follow, whether or not expressly referred to therein.    The stating of additional or other specific objections shall not constitute a waiver or limitation of these General Objections.

Subject to and without waiver of these General Objections, the CCC objects as follows:

## OBJECTIONS TO THE US GROUP'S
## TOPICS FOR CCC REPRESENTATIVE

TOPIC NO. 1  The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

RESPONSE:

The CCC objects to this Topic.  (*See* General Objections 2, 4, 7).  Further, to the extent the Topic seeks information regarding the "financial condition" of any CCC constituent, whether of creditor groups or of an individual court-appointed representative, the CCC objects to the Topic.  The CCC also objects to the terms "financial condition" and "legal relationship" as vague and ambiguous.  Subject to and without waiving the foregoing Objections, the CCC will produce a representative witness to testify regarding the identity of constituent creditor groups of the CCC and the legal relationship between any Nortel entity to each such creditor group.

TOPIC NO. 2  Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

RESPONSE:

The CCC objects to this Topic.  (*See* General Objections 1, 2, 3, 4, 7).  The CCC further objects to this Topic as vague and ambiguous.  To the extent the CCC has relevant information, and subject to the foregoing Objections, the CCC will produce a representative witness to testify regarding certain creditors' perception of Nortel as a single and indivisible entity, as alleged in paragraphs 63, 64, 66, and 74 of its allocation position.

TOPIC NO. 3  The justification for listing in response to Interrogatory Number 42 each transaction, arrangement, and event identified therein and how each such transactions, arrangement and event supports the CCC Allocation Position.

RESPONSE:

The CCC objects to this Topic.  (*See* General Objections 1, 2, 4, 6).  The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process.  To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

TOPIC NO. 4  Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

RESPONSE:

The CCC objects to this Topic.  (*See* General Objections 1, 2, 4, 6).  The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process.  To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

Dated: December 18, 2013

**CANADIAN CREDITORS COMMITTEE**

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, Ontario  M5H 3E5

Mark Zigler
Susan Philpott
Ari Kaplan
Barbara Walancik

Email:  mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:     416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:     416.204.2882

Email:  akaplan@kmlaw.ca
Tel:     416.595.2087
Fax:     416.204.2875

Email:  bwalancik@kmlaw.ca
Tel:     416.542.6288
Fax:     416.204.2906

Lawyers for the Former Employees of Nortel
and LTD Beneficiaries

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Karen Jones
Tina Lie
Michelle Jackson

Email:  ken.rosenberg@paliareroland.com
Tel:     416.646.4304
Fax:     416.646.4301

Email:  max.starnino@paliareroland.com
Tel:     416.646.7431
Fax:     416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:     416.646.4326
Fax:     416.646.4301

Email:  karen.jones@paliareroland.com
Tel:     416.646.4339
Fax:     416.646.4301

Email:  tina.lie@paliareroland.com
Tel:     416.646.4332
Fax:     416.646.4301

Email:  michelle.jackson@paliareroland.com
Tel:     416.646.7470
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
        lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:     416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham
Ainslie Benedict

Email:  janice.payne@nelligan.ca
        steven.levitt@nelligan.ca
        christopher.rootham@nelligan.ca
        ainslie.benedict@nelligan.ca

Tel:     613.231.8245
Fax:     613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:     416.214.5213
Fax:     416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee


**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage
Elder C. Marques
Paul Steep
Byron Shaw

E-mail:  bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:  jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Email:  emarques@mccarthy.ca
Tel:     416.601.7822
Fax:     416.686.0673

Email:  psteep@mccarthy.ca
Tel:     416.601.7998
Fax:     416.686.0673

Email:   bdshaw@mccarthy.ca
Tel:     416.601.8256
Fax:     416.686.0673

Lawyers for Morneau Shepell Limited

**DLA PIPER**
1201 N. Market Street
Suite 2100
Wilmington, Delaware 19801

Selinda A. Melnik
Richard Hans
Timothy Hoeffner
Farah Lisa Whitley-Sebti

Email:   selinda.melnik@dlapiper.com
Tel:     302.468.5650
Fax:     302.778.7914

Email:   richard.hans@dlapiper.com
Tel:     212.335.4530
Fax:     212.884.8730

Email:   timothy.hoeffner@dlapiper.com
Tel:     212.656.3341
Fax:     215.606.3341

Email:   farahlisa.sebti@dlapiper.com
Tel:     212.335.4829
Fax:     212.884.8529

U.S. Lawyers for the Canadian Creditors
Committee