Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

<u>**Subjects for NN Portugal Representative Witness**</u>

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.     The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.     The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.     The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.     The value NN Portugal attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.     The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Portugal's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.     The facts and documents that establish any expectations that NN Portugal will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by

which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Q" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24. The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Romania Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Romania attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Romania's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Romania will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.   The factual and documentary basis for any claim that restructuring costs incurred should
     be reimbursed and the basis for calculating the amounts for each year and any
     corresponding transfer pricing adjustment claimed for that year.

9.   The factual and documentary basis for any claim that it did not get appropriate credit for
     customer revenues, the details of which customers, the dates and amounts of associated
     revenues claimed, which other entity received the claimed revenues and the basis for
     adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in
     vendor financing arrangements for Nortel customers and that demonstrate that it was that
     it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting
     practice was unfair to that the party and the basis on which it claims to have been unable
     to represent itself and its interests in respect of the practice, or that would be indicative of
     any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in
     respect of the pension plan, including but not limited to: (i) the basis of the calculation of
     such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
     potential costs of annuitizing member's benefits; (iv) the information that the pension
     trustee or administrator provided to its pension advisors and consultants to enable them to
     calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
     (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
     deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
     pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing
     and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
     Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
     EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
     the party is anything other than an unsecured debt and/or they are alleged to owe the
     Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims
     relating to the allocation of proceeds or any other aspect of past dispositions of businesses
     including the following noted in the particulars of the proofs of claims: sales to
     AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts and documents that demonstrate (i) decisions alleged to have been made or not
     made, (ii) contracts or transactions alleged to have been approved or not approved, and
     (iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
     at what meeting and/or by which resolution) in breach of de facto director or de jure
     and/or shadow director duties. Identification of the individual Directors & Officers
     against whom claims are being asserted, and in respect of each such individual, which
     decisions, contracts, transactions or other conduct are the subject of the claims made
     against them, and by which EMEA entity or entities (collectively, the "Impugned
     Conduct"). Identification of the damages alleged to have been suffered as a result of the

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "R" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

<u>**Subjects for NN Czech Representative Witness**</u>

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Czech attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Czech's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Czech will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "T" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Slovakia Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value NN Slovakia attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Slovakia's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.   The facts and documents that establish any expectations that NN Slovakia will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "U" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Italy Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Italy attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Italy's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Italy will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "V" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Switzerland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Switzerland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority ~~of (HMRC)~~ of NN Switzerland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Switzerland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. ~~The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.~~

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or

by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   <u>The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "X" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.</u>

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24. The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Norway Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Norway attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Norway's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Norway will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Y" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks (Northern Ireland) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company lisencing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks (Northern Ireland) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks Optical Components Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks Optical Components Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks South Africa (pty) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value Nortel Networks South Africa (pty) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

- and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**NNSA REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 17, 2013)**

## Subjects for NNSA Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The facts and documents, other than the MRDA, demonstrating NNSA's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNSA allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.  The value NNSA attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.  The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNSA contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.  The factual and documentary basis for any challenge NNSA intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNSA for the years 2001 through 2005 inclusive

2

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSA's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.  In particular but without limitation, the facts or documents related to any audit by any taxation authority including (i) communication with the French tax authority regarding the sufficiency of the documentation to establish the basis for the MRDA during the time in which the RPS method was in force but before the formal execution of the MRDA and (ii) communication with the French tax authority related to a proposed transfer pricing agreement for NNSA.

10.  The facts and documents that establish any expectations that NNSA will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.  The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.  The factual and documentary basis for any claim that NNSA did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that NNSA was worse off on a net basis for having done so.

15.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to NNSA and the basis on which NNSA claims to have been

unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16. The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NNSA by means of the transfer pricing methodology or otherwise in the RPS.

17. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing members' benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by NNSA to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to NNSA are anything other than an unsecured debt.

19. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

21.   The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA.  Specifically, and without limitation, the facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA as asserted in the Commercial Court of Versailles (the "French Proceeding"), including (i) documents or facts to support any allegations made against Jean-Marie Lesur and Darryl Edwards; (ii) documents of facts to support the French Liquidator's decision not to name certain other directors of NNSA (*e.g.*, Michel Clement, Pascal Debon, Alain Biston, Sharon Rolston and/or Simon Freemantle) in the Summons to Appear issued in the French Proceeding; (iii) any documents filed in relation to any procedural steps taken in the French Proceeding, including, in particular, any documents in support of or opposition to a stay of same; and (iv) any evidence not yet produced in this proceeding on which the French Liquidator intends to rely in the French Proceeding.

22.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JAs in both the UK and the US courts.

23.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "S" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

28.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

30.    The facts and documents that demonstrate that the repayment by NNSA in 2008 of €25m of the loan from NNL was improper, including without limitation (i) the documents that show that such a partial repayment was contrary to the loan agreement including, in particular, the relevant provisions of the loan agreement itself; (ii) any facts or documents to show that NNSA was not solvent at the time the repayment was made; and (iii) any facts or documents that show that NNL imposed the repayment on NNSA and/or that NNSA approved the repayment despite it not being in NNSA's best interest to do so.

This is Exhibit "D" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

_____.


_____
A commissioner, etc.

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470

(212) 225-2000

FACSIMILE (212) 225-3999

WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial +1 212 225 2086
E-Mail. jrosenthal@cgsh.com

December 18, 2013

Peter Ruby
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto M5H 2S7

       Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
          Nortel Networks Corporation, et al.: Court File No. 09-CL7950

Dear Peter:

      On behalf of the U.S. Debtors, we write to formally object to the topics listed in your December 13, 2013 letter for a representative deposition of the U.S. Debtors.  Wholly apart from our position that representative depositions generally are inappropriate, unnecessary and would result in a significant waste of the parties' time and resources in this litigation, we object to the topics themselves as being unreasonable in number relative to the time limitation for the examination, subjects of an impermissibly broad scope and subjects inappropriate for a representative deposition.  We would be pleased to meet and confer with you further regarding our objections.

      Subject to the foregoing, in the event the courts order the U.S. Debtors to appear for a representative deposition, we designate Tim Ross as our witness for appearance on January 14 or 15.  This designation is with a full reservation of the U.S. Debtors' rights, including our objections to representative depositions generally and the Canadian Group's topics specifically.

         Very truly yours,

         Jeffrey A. Rosenthal

cc:  all Core Parties

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE

This is Exhibit "E" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

_____.


_____
A commissioner, etc.



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 18, 2013

**VIA EMAIL TO ALL CORE PARTIES**

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

   *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Counsel,

        We write on behalf of the Joint Administrators to object to the Representative Witness Subjects that the Canadian Deposition Group served on the Joint Administrators on December 13, 2013 (as amended on December 15, 2013) and December 17, 2013 (the "Canadian Deposition Group Subjects"). Contrary to the Deposition Protocol, the Canadian Deposition Group Subjects are not "small in number," "reasonable in scope," or limited to topics on which "no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony." Further, the Canadian Deposition Group Subjects are "inappropriate for a Representative Deposition." We are prepared to meet and confer with the Canadian Deposition Group regarding our objections.

        As previously advised, it is the Joint Administrators' position that it is now clear that proceeding with representative witness examinations at this stage of the case would be extremely wasteful (in the millions of dollars) and entirely unnecessary. Subject to the foregoing, in the event that the Courts order the Joint Administrators to produce a representative witness, we designate Robin Jowitt as our representative witness for appearance on dates during the week of January 13, 2014. The Joint Administrators reserve all rights, including with respect to our objections to representative witness examinations generally and the Canadian Deposition Group Subjects specifically.

                    Sincerely,

                    /s/ Neil J. Oxford

This is Exhibit "F" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

_____.


_____
A commissioner, etc.

# MILBANK, TWEED, HADLEY & McCLOY LLP

INTERNATIONAL SQUARE BUILDING

1850 K STREET, NW, SUITE 1100

WASHINGTON, D.C. 20006

202-835-7500

FAX: 202-835-7586

ANDREW M. LEBLANC
PARTNER
DIRECT DIAL NUMBER
202-835-7574
FAX: 202-263-7574
E-MAIL: aleblanc@milbank.com

**NEW YORK**
212-530-5000
FAX: 212-530-5219

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

December 18, 2013

**VIA EMAIL**
Peter Ruby
GOODMANS LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto M5H 2S7

Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
     Nortel Networks Corporation, et al.: Court File No. 09-CL7950

Dear Peter:

On behalf of the Ad Hoc Group of Bondholders (the "Bondholder Group"), we write in response to your Amended Representative Witness Subjects, served on December 15, 2013, and the request contained therein for a representative deposition of the Bondholder Group (the "Deposition Request").

As we informed you previously, the Bondholder Group agrees with the position of the U.S. Debtors and other Core Parties that representative depositions are inappropriate, unnecessary and would result in a significant waste of time and resources, particularly given that the parties have already taken over 100 fact-witness depositions in this case. Separately, we object to the subjects set forth in the Deposition Request (the "Subjects") on a number of grounds, including that they are unreasonable in number relative to the time limitation for the examination, of an impermissibly broad scope, on topics inappropriate for a representative deposition, and inconsistent with the terms of the Amended Deposition Protocol Stipulation [D.I. 11747].  Enclosed with this letter is a copy of our formal objections to each of the Subjects.

Subject to the foregoing, in the event the courts order the Bondholder Group to respond to the Deposition Request, we would be willing to meet and confer regarding the appropriate subject matter and form of the Bondholder Group's responses. If the Bondholder Group is ultimately required to produce a witness for deposition, we would designate Michael Katzenstein of FTI Consulting as our witness. Mr. Katzenstein is available for deposition on

Peter Ruby
December 18, 2013
Page 2


January 15, 2014 from 9 a.m. to 4 p.m. This designation is with a full reservation of the
Bondholder Groups' rights, including our objections to representative depositions generally and
the Subjects specifically.

Very truly yours,

Andrew M. Leblanc                    /RP

cc:  all Core Parties

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------------- x
                                          :
```
*In re*                                   :        Chapter 11
                                          :
Nortel Networks Inc., *et al.*,           :        Case No. 09-10138 (KG)
                                          :
                    Debtors.              :        (Jointly Administered)
                                          :
                                          :
```
------------------------------------------------------- x
```

-   and the   -

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**THE AD HOC GROUP OF BONDHOLDERS' OBJECTIONS TO THE**
**REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN**
**ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

Pursuant to the Order Entering Litigation Timetable and Discovery Plan, Case No.

09-10138-KG [D.I. 10566], Ontario Superior Court of Justice (Commercial List) Court File No.

09-CL-7950 (the "Discovery Order") and the Order Amending Litigation Schedule in Joint

Cross-Border Proceedings to Determine Allocation of Asset Sale Proceeds and Certain Claims

(the "Discovery Amendment" and together with the Discovery Order, the "Amended Discovery

Order") [D.I. 12522], the Deposition Protocol Stipulation (the "Deposition Protocol") [D.I.

11439] and the Amendment to Deposition Protocol Stipulation (the "Protocol Amendment" and

together with the Deposition Protocol, the "Amended Deposition Protocol") [D.I. 11747],[1] the

Ad Hoc Group of Bondholders (the "Bondholder Group"),[2] by and through its undersigned

counsel, hereby responds and objects to the Representative Witness Subjects Served by the

Canadian Allocation Group and the Canadian Claims Defendant Group, dated December 13,

2013, as amended on December 15, 2013 (collectively, the "Subjects").  The Bondholder Group

submits these objections to the Subjects solely on its own behalf.

## GENERAL OBJECTIONS

The Bondholder Group, along with other Core Parties, believes that any

"Representative Witness" or 30(b)(6) depositions are unnecessary in light of the more than 100

fact witness depositions that have taken place to date and would result in a waste of estate

resources.  Accordingly, the Bondholder Group asserts and reserves its rights to argue to the

Courts that any such "Representative Witness" or 30(b)(6) depositions should not proceed.  The

Bondholder Group provides the following General and Specific Objections in accordance with

the Amended Discovery Order subject to, and without waiving, this reservation of rights.

The Bondholder Group responds and objects generally to the Subjects as follows

(the "General Objections"):

1.    The Bondholder Group objects to the Subjects to the extent they seek to impose

obligations on the Bondholder Group that are inconsistent with the requirements of the Amended

Discovery Order, the Amended Deposition Protocol, the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Federal Rules of Civil Procedure (the "Civil Rules"), the Ontario

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Amended
Discovery Order and the Amended Deposition Protocol.

[2]    The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks
Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation.

*Rules of Civil Procedure* (the "Canadian Rules" and collectively with the Bankruptcy Rules and the Civil Rules, the "Rules"), or any other applicable rules, orders or law.

2.      The Bondholder Group objects to the Subjects to the extent they seek information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection.

3.      The Bondholder Group objects to the Subjects to the extent they are vague, ambiguous, overly broad, unduly burdensome, unduly prejudicial, oppressive, misleading, duplicative, cumulative, not susceptible to a reasoned interpretation, not reasonably particular, or would require the Bondholder Group to speculate as to the nature or scope of the information sought thereby.

4.      The Bondholder Group objects to the Subjects to the extent they are not relevant to a claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute.

5.      The Bondholder Group objects to the Subjects on the grounds that they appear calculated to annoy and harass the Bondholder Group to the extent they seek information not relevant to the Allocation dispute or outside the Bondholder Group's possession, custody or control or that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors.

6.      The Bondholder Group objects to the Subjects to the extent they violate section G(1)(a) of the Amended Deposition Protocol ("Section G(1)(a)"), which states, in relevant part, as follows:

> [A] Deposition Group may serve *a very limited number* of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first hand testimony.  Provided such subjects are

3

> ***small in number and reasonable in scope***, the Representative
> Witness has a duty to prepare to testify on the designated subjects.

(emphasis added).  Specifically, the Bondholder Group asserts that the Subjects are neither "very limited" in number nor "reasonable in scope" as required by Section G(1)(a).

7.     The Bondholder Group objects to the statement that the Subjects "are not believed to have been fully canvassed with the fact deposition witnesses . . . ." Each Subject has been sufficiently canvassed through the over 100 fact-witness depositions that have already been taken by the Core Parties.  Any additional testimony is unnecessary and would result in a waste of resources.

8.     The Bondholder Group objects to the Subjects to the extent they assume disputed facts or legal conclusions in defining the information requested.  The Bondholder Group hereby denies any such disputed facts or legal conclusions to the extent assumed by any Subject.  Any response or objection by the Bondholder Group is without prejudice to this objection.

9.     The Bondholder Group objects to the Subjects to the extent they seek information that is not properly obtained in a deposition and may be more appropriately obtained through other means, including, but not limited to, expert witness testimony or written discovery.

10.     All responses to the Subjects are provided subject to the provisions of the Protective Order entered by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice on June 11, 2013, as amended, including but not limited to section 18 thereof, which provides that the inadvertent disclosure of any information in response to the Subjects shall not constitute a waiver of privilege or of any other ground for objection to discovery with respect to such information or the subject matter thereof.

11.    The Bondholder Group reserves the right to amend, revise, correct, supplement or clarify the General and Specific Objections (defined below) based on facts or other information gathered at any time subsequent to the date of these General and Specific Objections.

## SPECIFIC OBJECTIONS

Without waiving or limiting, and subject to the foregoing General Objections, which are hereby expressly incorporated by reference into each objection below, the Bondholder Group objects specifically as follows to the Subjects (the "Specific Objections"):

**Subject No. 1:**

The same subjects as those provided to the US Debtors (the "US Debtors' Subjects").

**US Debtors' Subject No. 1:**

The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

**Response to US Debtors' Subject No. 1:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the "US Debtors' understanding" of statements made in the US Debtors' allocation pleadings; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or