**Exhibit B**

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF NORTEL NETWORKS INC.**
**AND THE OTHER US DEBTORS**
(Representative Depositions)

Date: January 2, 2014

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

16406209.5

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF NORTEL NETWORKS INC. AND**
**THE OTHER US DEBTORS**
**(Representative Depositions)**

**PART I -OVERVIEW**

1.      Nortel Networks Inc. and its affiliated debtors[1] (collectively, the "US Debtors") seek an order further amending the Amended Litigation Timetable[2] to dispense with depositions of representatives of the Core Parties ("Representative Depositions").[3]  Representative Depositions are unnecessary given the extensive discovery to date and would be unduly burdensome if they proceed.

---

[1] The US Debtors are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (US) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[2] Set out at Schedule "A" of the order of the Court dated November 19, 2013 (the "November 19 Order").

[3] Unless otherwise noted, capitalized terms have the meaning set out in the November 19 Order and in the Litigation Timetable (as amended), the Discovery Protocol and the Deposition Protocol.

16406209.5

- 2 -

2.     Representative Depositions were intended to be a constrained exercise allowing a party to "clean-up" or fill "gaps" that might remain after the fact depositions were completed.  Given the success of the fact depositions, as explained in Part II, Representative Depositions are no longer necessary for factual discovery.  Representative Depositions are therefore unnecessary to achieve any appropriate discovery objective, and it is evident that the Monitor and Canadian Debtors intend to use Representative Depositions to seek inappropriate discovery of the US Debtors' work product and to require the US Debtors to complete their trial preparation months before the commencement of trial.

3.     In connection with a prior discovery dispute in this case, this Court has previously recognized the principle of proportionality that is now applicable to discovery disputes under the *Rules of Civil Procedure*[4].  Especially from this perspective, Representative Depositions are unnecessary and disproportionate.  They are a burden that should not have to borne by the parties in this case.

4.     The position of the US Debtors is supported by the EMEA Debtors, the UK Pension Claimants, the UCC and the Ad Hoc Group of Bondholders.

## PART II – FACTS

**BACKGROUND**

*Nortel's Insolvency Proceedings*

5.     On January 14, 2009, this Court made an Initial Order granting Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Canadian Debtors") protection under the *Companies' Creditors Arrangement Act*[5] and, among other things, appointing Ernst & Young Inc. as monitor in these proceedings.[6]

---

[4] R.R.O., 1990, Reg. 194 [*Rules of Civil Procedure*].

[5] R.S.C. 1985, c. C-36, as amended [CCAA].

[6] Unless otherwise indicated, the facts set out in Part II of the Factum are derived from the Rosenthal Affidavit, Tab 2 of the US Debtors' Motion Record.

6.      Also on January 14, 2009, the US Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the US Bankruptcy Court.

7.      Also on January 14, 2009, this Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect to the automatic stay under the Bankruptcy Code in Canada.

8.      Also on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (the "EMEA Debtors"), including Nortel Networks UK Limited ("NNUK"), into administration (the "Administration Proceedings") under the control of individuals from Ernst & Young LLP (the "Joint Administrators").

9.      On February 27, 2009, the US Bankruptcy Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Bankruptcy Code.

10.     On June 26, 2009, the US Bankruptcy Court granted a petition recognizing the Administration Proceeding of NNUK as a "foreign main proceeding" pursuant to Chapter 15 of the Bankruptcy Code.

11.     On January 31, 2011, the US Bankruptcy Court granted petitions recognizing the Administration Proceedings of the other EMEA Debtors as "foreign main proceedings" pursuant to Chapter 15 of the Bankruptcy Code.

### *The Allocation Protocol*

12.     On April 3, 2013 and May 17, 2013, this Court and the US Bankruptcy Court, respectively, signed orders approving the Allocation Protocol.  The Allocation Protocol set forth procedures for determining:  (i) the allocation of sale proceeds among the Canadian Debtors, the US Debtors and the EMEA Debtors; (ii) certain claims by the EMEA Debtors against the Canadian Debtors and the US Debtors; and (iii) certain claims by the UK Pension Trustee and the Board of the Pension Protection Fund (the "UK Pension Claimants") against the Canadian Debtors and the US Debtors.

13.     On May 15, 2013 and May 17, 2013, this Court and the US Bankruptcy Court, respectively, signed orders approving the Litigation Timetable and Discovery Plan pursuant to the Allocation Protocol.

14.    On August 27, 2013 and August 26, 2013, this Court and the US Bankruptcy Court, respectively, made orders modifying the schedule set out in the Litigation Timetable and approving the Deposition Protocol.

15.    On November 19, 2013 and November 27, 2013, this Court and the US Bankruptcy Court, respectively, made orders further modifying the schedule set out in the Litigation Timetable.

## THE REPRESENTATIVE DEPOSITION PROCESS

### *Purpose of Representative Depositions in the Context of this Cross-Border Proceeding*

16.    The Litigation Timetable and Discovery Plan originally contemplated that the parties would conduct Representative Depositions (as defined in the Deposition Protocol) after the completion of fact witness depositions.  The Deposition Protocol contemplated that a party could serve a list setting forth "a very limited number of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony."  The topics for Representative Depositions were to be "small in number and reasonable in scope," and any undertakings arising from these depositions were to be limited to matters "not already the subject of first-hand deposition testimony obtained from a knowledgeable fact witness."  Accordingly, and as acknowledged by the parties throughout their negotiation of the Deposition Protocol, the purpose of the Representative Depositions was to "fill the gaps," if any, remaining after the close of fact witness discovery.  The parties anticipated that such gaps might exist in the event the parties were unable to obtain testimony from witnesses with first-hand knowledge of pertinent facts, particularly because most witnesses no longer worked for and were no longer under the control of any Nortel entity.

17.    Representative Depositions were incorporated into the Litigation Timetable and Discovery Plan prior to the commencement of fact discovery and at a time when the parties did not have a basis to confirm whether they would ultimately be able to conduct the depositions of all of the witnesses they sought to depose, many of whom were no longer associated with the various Nortel affiliates.  As noted above, it was this concern – and the corresponding potential need to fill in any remaining gaps – that animated the parties' agreement to conduct Representative Depositions.

18.     As the parties neared the completion of the more than 100 fact depositions they ultimately conducted, and prior to the delivery of any topics for Representative Depositions, the US Debtors proposed that the Core Parties agree to dispense with Representative Depositions. The US Debtors noted that in light of the unexpectedly broad opportunity each party had for fact discovery of percipient witnesses, including former employees of Nortel entities and other third parties, Representative Depositions were unnecessary and that going forward with such depositions would result in a waste of resources.  The particular bases for that position were set out in correspondence later sent to the US Bankruptcy Court and to this Court, as discussed below.

19.     Only the Monitor, the Canadian Debtors, the CCC, and the Directors and Officers disagreed with the US Debtors' proposal.

***Noticing of Topics for Representative Depositions***
***According to the Litigation Timetable***

20.     Because there was no agreement among all of the Core Parties whether to dispense with Representative Depositions, on December 13, 2013 (the deadline in the Litigation Timetable, as amended), while reserving their right to argue that Representative Depositions were unnecessary and should not be required, the US Debtors sent a letter listing a limited number of advance topics for Representative Depositions of the Canadian Debtors' Representative (four topics), the CCC Representative (also four topics) and the Wilmington Trust Representative (three topics). The advance topics designated by the US Debtors were narrow in scope and limited in number. The US Debtors made it clear in their letter that they continued to believe Representative Depositions were unnecessary and inappropriate and should therefore not occur.[7]

21.     A letter from counsel to the Joint Administrators, on behalf of the EMEA Debtors and the UK Pension Claimants, concurred with the US Debtors' position that there was no further need for Representative Depositions and listed five advance topics for a deposition of the Canadian

---

[7] A copy of the US Debtors' letter setting out their advance topics is attached to the Rosenthal Affidavit as Exhibit "A", Tab 2A to the US Debtors' Motion Record.  In the US Debtors' letter, they reserved their right to examine each party's representative on "any topic, as applicable to that party, designated by that party to representatives of any of the US Interests."

Debtors' Representative Witness in the event such Representative Depositions nonetheless went forward.[8]

22.     On December 13, 2013, the Canadian Allocation Group delivered a 92-page pleading containing, among other things, 27 broad-ranging topics for the deposition of the US Debtors' Representative. The Canadian Allocation Group's pleading purported to require each representative witness to prepare in advance of his or her deposition to testify to all of the topics directed to his or her party, an impossible task given their breadth.[9]

***Objections to Noticed Topics***

23.     In accordance with the Deposition Protocol, on December 18, 2013, the Core Parties timely delivered objections to the Representative Deposition topics noticed by other Core Parties.[10]

24.     Each of the Core Parties' objections articulated the basis for their objections to the Representative Deposition topics through either general objections for all of the topics, specific objections for each of the topics, or both. The US Debtors, for example, stated that the Monitor and Canadian Debtors' topics were "unreasonable in number relative to the time limitation for the examination," that the topics had "an impermissibly broad scope," and that the subjects were "inappropriate for a representative deposition." These objections conformed to the possible bases for objections identified in the Deposition Protocol, which stated that objections may be made "in the event a party designates an unreasonable number of subjects relative to the time

---

[8]   This letter is attached to the Rosenthal Affidavit as Exhibit "B", Tab 2B to the US Debtors' Motion Record.

[9] The 92-page pleading was amended on December 15, 2013, and the amended pleading is attached to the Rosenthal Affidavit as Exhibit "C" (together with a supplement, dated December 17, 2013, in respect of the French affiliate, NNSA), Tab 2C to the US Debtors' Motion Record.

[10] The objections timely made by the US Debtors are attached as Exhibit "D" to the Rosenthal Affidavit, and the objections timely delivered by counsel for the Joint Administrators on behalf of the EMEA Debtors and the UK Pension Claimants are attached as Exhibit "E" to the Rosenthal Affidavit, Tabs 2D and 2E of the US Debtors' Motion Record. Objections to the topics noticed by the Canadian Allocation Group were also timely delivered by the Ad Hoc Group of Bondholders (Exhibit "F" to the Rosenthal Affidavit) and by the Unsecured Creditors Committee of the US Debtors (the "UCC") (Exhibit "G" to the Rosenthal Affidavit), Tabs 2F and 2G of the US Debtors' Motion Record. Separate objections were delivered by the Monitor and Canadian Debtors to the US Debtors (Exhibit "H" to the Rosenthal Affidavit) and to the EMEA Debtors and the UK Pension Claimants (Exhibit "I" to the Rosenthal Affidavit), and by the CCC (Exhibit "J" to the Rosenthal Affidavit), Tabs 2H to 2J of the US Debtors' Motion Record.

limitations for the examination, subjects of an impermissibly broad scope or subjects inappropriate for a Representative Deposition."

25.     In their December 22, 2013 letter to the US Bankruptcy Court (discussed below), the Monitor and the Canadian Debtors state that all of the other parties "have not articulated the basis for objection to any single topic designated for them (with the time for doing so under the litigation timetable and discovery plan having now passed)." This is incorrect. In fact, the objections of the US Debtors reflect that the US Debtors (as well as other Core Parties) objected to the other Core Parties' topics by timely delivering to the other parties on December 18, 2013 objections consistent with the Deposition Protocol.

26.     Following the exchange of topics and objections, described above, on December 19, 2013 the Canadian Allocation Group served 17 topics on the UK Pension Claimants. On that same date, Wilmington Trust delivered an objection to the US Debtors' topics.[11]

## AMENDING ORDER IS REQUIRED
### *Dispute Brought to the Attention of the Courts*

27.     Pursuant to the US Bankruptcy Court's direction that the parties may bring discovery disputes to the US Bankruptcy Court's attention by letter, after meeting and conferring unsuccessfully throughout the week following service on December 13, 2013 of Representative Deposition topics by the Monitor and Canadian Debtors, the US Debtors raised the dispute regarding Representative Depositions in a letter to the US Bankruptcy Court on December 20, 2013 (the "December 20 Letter").[12]

28.     Further correspondence was delivered to the US Bankruptcy Court on December 20, 2013 by the EMEA Debtors and the UCC, and by the Monitor and Canadian Debtors and by the CCC on December 22, 2013. The US Debtors delivered a second letter to the US Bankruptcy Court on December 23, 2013.[13]

---

[11] Exhibits "K" and "L" to the Rosenthal Affidavit, Tabs 2K and 2L of the US Debtors' Motion Record.

[12] A copy of the December 20 Letter is attached as Exhibit "M" to the Rosenthal Affidavit (Tab 2M of the US Debtors' Motion Record), and was previously delivered to this Court on December 20, 2013 in connection with booking the December 23, 2013 chambers appointment in connection with, among other things, this discovery dispute.

[13] Exhibits "N" to "R" to the Rosenthal Affidavit, Tabs 2N to 2R of the US Debtors' Motion Record.

***Representative Depositions Are Unnecessary and***
***Unduly Burdensome***

29.     As set out in the December 20 Letter, the Litigation Timetable and Discovery Plan in this litigation contemplated fact depositions followed by Representative Depositions that were a hybrid of Ontario and US procedural rules and were designed to enable the Core Parties to obtain testimony on factual subjects as to which the witnesses with first-hand knowledge were either unknown or unavailable for deposition.

30.     In addition to the production of more than two million documents, the discovery that has occurred to date has included over 100 witness depositions taken in more than 15 cities on three continents in less than three months.

31.     Approximately 99% of all former Nortel employees, officers or directors and pension trustees that the Core Parties sought to depose ultimately testified.  The deposed witnesses included one of Nortel's former Chief Executive Officers, several Chief Financial Officers, and numerous Treasurers, general counsels, senior executives in the tax and treasury departments, present and former directors of various Nortel affiliates, senior intellectual property lawyers, merger and acquisition executives and pension trustees.  Deposed witnesses also included two EMEA joint administrators, two representatives of the Monitor, the US principal officer and the French liquidator.

32.     In their December 22, 2013 letter to the US Bankruptcy Court, the Monitor and Canadian Debtors assert that nothing has changed since the November 14, 2013 joint motion to amend the Litigation Timetable, at which time the US Debtors still contemplated that Representative Depositions might be appropriate, and that many of the depositions since then have involved third parties.  To the contrary, since November 14, 2013, nearly one-third of all depositions have been conducted.  These included the depositions of current representatives of the various Nortel estates such as representatives of the Canadian Monitor, two Joint Administrators, the French Liquidator and NNI's Principal Officer.  In addition, since November 14, 2013, the parties have deposed several senior former officers and employees of various Nortel entities, including former senior NNUK officers with respect to NNUK's claims against the Canadian Debtors and US Debtors (Simon Freemantle and Sharon Rolston), all four of the former NNSA officers currently residing in France that the Core Parties sought to depose (Messrs. Clement, Lesur, Debon and Lebrun), former senior officers from NNL responsible for tax and transfer pricing

matters (Peter Look and John Doolittle), a former senior employee from NNL also involved in tax and transfer pricing matters, and outside legal advisors to Nortel entities on tax and transfer pricing matters (Scott Willkie and Giovanna Sparagna). In other words, numerous factual gaps that still remained as of November 14, 2013 were filled by depositions of percipient witnesses in the subsequent month.

33.     The fact discovery that has occurred in connection with the pending litigations far exceeds the examinations that typically occur in Canadian litigation.

34.     In addition to the depositions of fact witnesses produced by the Core Parties, examinations also have been taken and documents have been obtained from numerous third parties, including financial and other advisors.

35.     The gap-filling measure of Representative Depositions has been rendered unnecessary by the breadth of witnesses made available for examination, such that there is no longer any need for an additional "clean-up" process. Notably, the Monitor and the Canadian Debtors have not explained what information they believe is missing from the evidence they have sought to obtain through the fact witness depositions or the document productions.

36.     Not only has the deposition discovery of fact witnesses been extensive and complete, but any possible concern about the potential for "surprise" at trial has been addressed by the Deposition Protocol and by ongoing negotiations that have required or will require: (i) identification of potential trial witnesses at the outset prior to the commencement of depositions and a corresponding prohibition against a party calling any witness who has not been deposed; (ii) exchange of expert reports and expert depositions; and (iii) pre-trial filing of fact affidavits and the designation of exhibits and deposition testimony to be used at trial. Thus, no evidence may be offered at trial that has not been identified by the parties to each other prior to trial (indeed, under the US Debtors' latest proposal, prior to the submission of pre-trial briefs).

***The Monitor and Canadian Debtors' Proposed Alternative Is Even More
Unnecessary and Burdensome than the Existing Representative Depositions
and Its Topics Are In Any Event Improper***

37.     Contrary to the suggestion in their December 22, 2013 letter that they have made multiple "proposals" that would "narrow the scope of the representative party discovery and the overall

costs to the estates," the Monitor and Canadian Debtors have offered only one such proposal.[14]
This proposal, described in the December 22, 2013 letter, is "to reduce the total number of topics
to five topics on allocation and five on the claims asserted by the EMEA Debtors against the
Canadian estates . . . and to allow the parties to respond to questions by way of written responses,
which would be provided by January 17, 2014." This proposal would not reduce the burden of
the examinations on the other Core Parties but, rather, would create a new process that is more
burdensome than the Monitor and Canadian Debtors' original topics for examination.

38.     Implicitly recognizing that their initial 27 requests were overbroad, the Monitor and
Canadian Debtors have now proposed to limit the number of allocation topics to five.
Nevertheless, their proposed topics remain extremely overbroad and, in fact, subsume most of
the 27 topics initially noticed. Further, the Monitor and Canadian Debtors propose to be
permitted to ask an unlimited number of questions on each broad topic. Moreover, the nature of
their topics themselves is improper, as they appear to seek specific identification months before
trial of all evidence, including all documents, that each Core Party will rely upon in support of
their case and claims or to refute positions that may be taken by the Monitor and the Canadian
Debtors.

39.     Thus, the Monitor and Canadian Debtors purport to "reduce" their original 27 topics for
the US Debtors by limiting themselves to an undefined and unlimited number of questions on the
following five topics:

    (a)    The facts and documents, other than the MRDA, demonstrating the US Debtors'
            understanding of the phrase "equitable and beneficial ownership" as used in the
            MRDA and the term "economic ownership" as used in the US Debtors' allocation
            pleadings.

    (b)    The factual and documentary basis for and scope of licenses of Nortel's
            intellectual property, including any enhanced licenses, held by parties other than
            NNL.

---

[14] Tab 2P of the US Debtors' Motion Record.

(c)     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

(d)     The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009.

(e)     The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property.

40.     These five topics are no less broad than the Monitor and Canadian Debtors' original 27 topics for the US Debtors because they purport to include all "the facts and documents" underlying each of the listed broad topics relating to the historic intellectual property and "products" practices of the various Nortel affiliates.  Each of the broad examination topics does not attempt to fill discrete gaps remaining after the voluminous fact discovery conducted to date because they were unable to depose percipient witnesses, but rather seeks an exhaustive compilation of all facts and documents the US Debtors may rely upon in support of their own allocation arguments as well as facts and documents the US Debtors may use to counter facts and arguments that the Monitor and Canadian Debtors have raised or may attempt to prove at trial.[15]

41.     Under the Litigation Timetable to which the parties agreed, the US Debtors (like all parties) have until shortly before trial to review the extensive record and ascertain which documents and testimony they believe support their position.  This was a critical part of the

---

[15] The original 27 topics also seek information that is more properly the subject of expert submission or other trial submissions, to the extent they don't also improperly seek discovery of work product of the US Debtors.  Amended Representative Witness Subjects Served by the Monitor and Canadian Debtors, see, e.g., Subjects 12, 14, 15 and 16 that were directed to the US Debtors, Tab 2C of the US Debtors' Motion Record.  For example, Subject #12:  At the time each of the lines of business were sold and when the Rockstar transaction closed, the value, including the dollar value, of the US Debtors' alleged interest in the Nortel global patent portfolio and the factual bases for those values, Subject #14:  The value the US Debtors attribute to intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, Subject #15, The value the US Debtors attribute to tangible assets sold as part of each of the line of business sales and the factual bases supporting those values, and Subject #16:  The US debtors' position on what amounts should be allocated to each of the estates in respect of the sales of tangible assets and on what factual basis.

bargain for the US Debtors when negotiating the Litigation Timetable and its subsequent amendments. The Monitor and Canadian Debtors, however, seek to overturn entirely the carefully negotiated schedule and accelerate from April/May to January or February the duty of the US Debtors (and other Core Parties) to put their "pens down" nearly four months before trial and finalize and specifically and exhaustively identify the factual evidence upon which they may rely with respect to the broadly described subjects at trial. It would be extremely onerous and simply unworkable for the parties, in such a short time-frame, to exhaustively identify each document and other facts based on the millions of pages of documents produced and facts gathered at the over 100 deposition taken over the last few months.

42.    During the negotiations regarding the Allocation Protocol, the Monitor and Canadian Debtors never suggested that they would seek to use Representative Depositions as a means to obtain the US Debtors', or any other Core Party's, trial work product or to force the US Debtors, or any other Core Party, to distill from produced documents and deposition transcripts the facts they intend to rely on at trial months before trial is scheduled to commence and months before agreed-upon procedures would require the disclosure of direct testimony affidavits and pre-trial designation of exhibits and deposition testimony that parties intend to rely on at trial. Not only was this strategy not part of the discussion relating to Representative Depositions, it is improper as it would require the US Debtors (and other Core Parties) to disclose not merely facts about a specific transaction or event (or, in this case, comprehensive business practices of the Nortel group over a period of many years), but the US Debtors' privileged and work product analysis of those facts, the testimony obtained and the relevance of such information to the issues in dispute.

43.    If the Canadian Debtors' and Monitor's new proposal is imposed by the Courts notwithstanding that the Monitor and Canadian Debtors have never filed their own motion or sought relief from the Litigation Timetable, Discovery Protocol or Deposition Protocol to make any such alteration (and, to the contrary, advised last week that they did not plan to seek any affirmative relief from the Courts) – it would place an even more severe burden on the US Debtors than the Representative Deposition procedure set forth in the Allocation Protocol (if not amended) for an additional reason. To the extent Representative Depositions were permitted under the existing procedures (which the US Debtors contend have been rendered unnecessary and no longer appropriate), the existing Representative Depositions procedure would permit the parties to answer the questions by way of undertaking 60 days after the depositions took place

and would also permit the parties to object to improper questions.  The new Monitor and Canadian Debtor proposal would require the US Debtors to consent to examinations on topics to which the US Debtors have already objected as overly broad and unduly burdensome, would dispense with any motion practice on those objections and would instead require that any written responses to the questions be provided by January 17, 2014, less than one month after such topics were proposed by the Monitor and Canadian Debtors (without accounting for the holidays during this period).  Even were this extended by several weeks or a month or so, the proposed deadline for "pens down" would be impossible.

44.     The US Debtors have produced a substantial volume of documents, offered for deposition numerous witnesses knowledgeable about the relevant subjects of this proceeding and will be providing  appropriate pre-trial submissions, including witness affidavits, prior to trial.  The Monitor and the Canadian Debtors have not offered any basis for their new proposal which increases, rather than decreases, the burden of Representative Depositions.  Instead, Representative Depositions should be dispensed with entirely because they have been rendered unnecessary as a result of the exhaustive factual discovery that has already occurred.

## PART III – LAW & ARGUMENT

45.    The position of the US Debtors – that Representative Depositions should be dispensed with – is supported by the EMEA Debtors, the UK Pension Claimants, the UCC and the Ad Hoc Group of Bondholders.  As is evident from the facts set out above, Representative Depositions are unnecessary as a gap-filling measure, and being unnecessary, and given the cost, it would be burdensome to require the parties to go through the exercise.  It is also evident that the Monitor and Canadian Debtors  intend to use Representative Depositions to seek inappropriate discovery of the US Debtors' work product and to require the US Debtors to complete their trial preparation months before the commencement of trial.

### *Position of the Monitor and the Canadian Debtors*

46.    The position of the Monitor and Canadian Debtors and the others insisting on proceeding with Representative Depositions can best be evaluated by considering the reasons for that position set out in the Monitor's and Canadian Debtors' December 22, 2013 letter to the US Bankruptcy Court and also their own conduct with respect to the Representative Deposition process:  the topics they have noticed, the new proposal they made, and the objections made by the members of the Canadian Allocation Group themselves to the topics noticed by other parties.

47.    In their letter, the Monitor and Canadian Debtors set out their reasons for insisting on Representative Depositions.  The primary reason is that Representative Depositions were included in the Litigation Timetable and Deposition Protocol.  However, that is not a principled reason for insisting on an expensive discovery exercise that has now been rendered unnecessary. As set out in Part II, the circumstances have changed since the parties agreed on the Litigation Timetable and Deposition Protocol and, indeed, since November 14, 2013, when they sought an adjournment of the trial.  In particular, the parties have now completed more than 100 depositions, one-third of which were taken after November 14, 2013, and approximately 99% of all former Nortel employees, officers or directors and pension trustees that the Core Parties sought to depose ultimately testified.

48.    The Monitor and Canadian Debtors say they have "relied" on Representative Depositions, that they are "essential", particularly for obtaining the parties' "positions" on issues in the litigations.  These broad, general statements are made without citation to any examples to support the points, and the lack of any concrete examples simply serves to underscore how

unnecessary Representative Depositions have become.  Given the 27 all-encompassing topics they noticed, and the restatement of those topics in their new proposal, Representative Depositions would be unduly burdensome if the parties were required to conduct them.  And, given the nature of the topics that have been noticed to the US Debtors, it seems that the only real motive that the Monitor and Canadian Debtors have for requiring that Representative Depositions proceed is to seek inappropriate discovery.

49.     The objections made by the members of the Canadian Discovery Group to the US Debtors' topics (served without waiving the US Debtors' argument that Representative Depositions should no longer go forward) reinforces this conclusion.  The Monitor and Canadian Debtors have objected to each and every one of the four, narrowly focused topics served by the US Discovery Group (and also to each of the five topics served by the EMEA Discovery group) on the grounds that they are unnecessary in light of the discovery record, that they would be burdensome, and that the topics are inappropriate.  The Canadian Creditors Committee – which has likewise objected to every one of the four topics directed at it – has served an objection that even more clearly highlights why the depositions sought by the Canadian Discovery Group are improper.  In the words of the CCC, some of the topics directed to it are "improper request[s] to supplement interrogatory responses via the representative witness process.  To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time."  It is impossible to review the Canadian Group's topics and, more fundamentally, the reasons advanced by the Canadian Group for wanting to proceed with Representative Depositions, and not reach the same conclusion drawn by the CCC itself.

**REPRESENTATIVE DEPOSITIONS ARE NO LONGER NECESSARY**

50.     Representative Depositions were intended to be a constrained exercise allowing a party to "clean-up" or fill "gaps" that might remain after the fact depositions were completed.  Given the success of the fact depositions, as explained in Part II, Representative Depositions are no longer necessary for factual discovery.  Dispensing with them will not result in any "surprise" at trial.  Representative Depositions are therefore unnecessary to achieve any appropriate discovery objective.

***No Need to Fill "Gaps"***

51.     It is apparent from the Deposition Protocol that Representative Depositions were intended to be "gap-filling" to permit a party to seek factual discovery that was not otherwise obtained through depositions of witnesses with first-hand knowledge.

52.     The Monitor and Canadian Debtors said in their letter to the US Bankruptcy Court, without explanation, that Representative Depositions are "essential discovery required to analyze and resolve these cross-border disputes over claims and allocation." This statement is not supported by a single example of what makes Representative Depositions essential for filling a gap – for discovering facts relevant to the matters in the litigations that were not already the subject of fact depositions. The Monitor and Canadian Debtors do not identify witnesses who refused or were unable to answer questions, or did so incompletely, on specific subjects. In light of the extensive and comprehensive fact witness depositions that have been completed, as described above in Part II, they cannot find such a gap, rendering the Representative Depositions unnecessary.

### No Prospect of "Surprise" At Trial

53.     In their correspondence to the US Bankruptcy Court, the Canadian Debtors and Monitor refer in general terms to what they say is a purpose of the Representative Depositions: to avoid surprises at trial.

54.     It is the case that avoiding surprises at trial is the purpose of discovery under the *Rules of Civil Procedure*.[16] However, in light of the enormous amount of discovery that has been completed, and the pre-trial steps that will be completed, nobody could reasonably claim that there is a prospect of being surprised at trial.

55.     The depositions that have occurred to date in these litigations exceed by a considerable amount what a party would be entitled to under Ontario rules. Under our rules, a party is only entitled to one examination of a party or its representative where that party is a corporation or other business organization. Representative depositions, therefore, replace first-hand discovery from the relevant witnesses, who may appear at trial without any advance examination by the

---

[16] *Livent Inc. (Special Receiver) v. Deloitte & Touche,* 2012 ONSC 7007 (S.C.J. (Master)) [*Livent*] at para. 34, US Debtors' Brief of Authorities, Tab 1; *Ontario v. Rothmans Inc.,* 2011 ONSC 2504 (S.C.J.) at para. 120 [*Rothmans*], US Debtors' Brief of Authorities, Tab 2.

adverse parties.  In marked contrast, in this case, more than 100 depositions have occurred of witnesses who are knowledgeable with respect to the issues in the litigations and who were able to provide first-hand testimony.  If the Monitor and Canadian Debtors or the CCC had questions about the facts relevant to the issues in the litigations, there was ample opportunity to ask those questions during the depositions.

56.     Moreover, procedural entitlements provided by the Litigation Timetable, Discovery Protocol and Deposition Protocol, including the pre-trial steps currently being negotiated, go even further in protecting a party from the risk of surprise at trial.  These required, or will require: (i) identification of potential trial witnesses at the outset prior to the commencement of depositions and a corresponding prohibition against a party calling any witness who has not been deposed; (ii) exchange of expert reports and expert depositions; and (iii) pre-trial filing of fact affidavits and the designation of exhibits and deposition testimony to be used at trial.

57.     The result of these measures is that no affirmative evidence may be offered at trial that has not been identified by the parties to each other prior to trial, or even prior to the submission of pre-trial briefs.  These steps far exceed discovery rights and pre-trial requirements in litigation before this Court.  Before the trial in these litigations, the parties will have had the opportunity to depose every potential trial witness, as opposed to only a representative as would otherwise be the case in Ontario, as well as many, many other witnesses; the parties will have the evidence in chief of trial witnesses in affidavit form; the parties will have had an opportunity to depose expert witnesses; the parties will know the exhibits and deposition transcript experts the other parties will rely on for their affirmative case.  These measures are not part of the Ontario *Rules of Civil Procedure*, and they protect parties from surprise in these litigations beyond what could possibly be expected.

## PROCEEDING WITH REPRESENTATIVE DEPOSITIONS WOULD BE UNDULY BURDENSOME

58.     In considering whether to require that the parties prepare for and conduct Representative Depositions, the Court should consider the burden that would be imposed on the parties, in particular the cost of the exercise relative to the lack of need for the discovery.  That is consistent with the principle of proportionality which is now applicable with respect to discovery disputes under the *Rules of Civil Procedure*.  As set out below, this Court has already approached a discovery dispute in this case in a similar manner.

- 18 -

### Earlier Decision in this Case

59.     In September 2013, the Monitor and Canadian Debtors successfully resisted a third-party discovery request made by the EMEA Debtors for information from Ernst & Young LLP, an affiliate of the Monitor.  The discovery requested dealt with advice provided on transfer pricing, a central issue in these litigations.  The position of the Monitor and Canadian Debtors was that the requested discovery was unnecessary in light of (using this Court's words) the "enormous volume of material already produced" and "the production sought has already been produced from other sources."[17]

60.     In their factum filed in connection with the September 2013 motion, the Monitor and Canadian Debtors resisted the production from Ernst & Yong LLP on the basis that it would impose an "additional burden on them," that it was inconsistent with the "the overarching principal [sic] of proportionality that governs the discovery process pertaining to the Allocation Dispute," and that it was important to be mindful of the "reality of this case – that it remains an insolvency where every dollar spent in resolving the Allocation Dispute will be a dollar not paid to a creditor of any Nortel entity".[18]

61.     In other words, even though it related to the central issue of transfer pricing and was of an advisor integrally involved in that subject, the discovery of Ernst & Young that was sought was said by the Monitor and the Canadian Debtors to be unnecessary and disproportionate having regard to, among other things, the cost of the exercise.  Discovery that is unnecessary and disproportionate is burdensome if it is ordered.  Not only do the Monitor's and Canadian Debtors' own words and argument apply aptly with respect to Representative Depositions, but many of the Monitor's and Canadian Debtors' topics for the representative witnesses directly

---

[17] *Re Nortel Networks Corporation*, 2013 ONSC 5998, at para 8 (S.C.J.) [*Nortel*], US Debtors' Brief of Authorities, Tab 3.

[18] Factum of the Monitor and Canadian Debtors, paras. 3, 4, 42 to 48.  In para. 44 of that factum, the Monitor and Canadian Debtors state that "[b]y any measure, the production and discovery in the Allocation Dispute to date has been extensive.  It is unprecedented in the context of a CCAA proceeding."  The factum is accessible at: http://documentcentre.eycan.com/eycm_library/Project%20Copperhead/English/Other%20Motions%20and%20End orsements/28.%20Motion%20Record%20for%20Production%20of%20Documents/Factum%20of%20the%20Monit or%20and%20Canadian%20Debtors.pdf.

pertain to the identical subject – transfer pricing – on which they so strenuously fought discovery when sought from Ernst & Young LLP.[19]

62.    The Court concluded in this earlier discovery dispute that much of the information requested had already been the subject of document production, and that in the circumstances it "would not be unfair" to require the EMEA Debtors to proceed to trial without the additional discovery.[20]  In considering the discovery request, the Court also considered that the EMEA Debtors had not been able to demonstrate the "gap" that existed in the documents on which the additional discovery would "shed light"[21] or show "how the present disclosure of communicated materials is not sufficiently adequate to the issues to which the non-communicated documents are relevant."[22]

63.    Another argument advanced previously by the Monitor and Canadian Debtors is also particularly relevant here.  In that earlier discovery dispute, the Monitor and Canadian Debtors stressed that the Court must weigh the cost of additional discovery when considering whether it should be ordered.  That argument applies with even greater force to Representative Depositions.  This Court has more recently expressed concern about the cost of the Nortel insolvency

――――――――――――――――――

[19] Amended Representative Witness Subjects Served by the Monitor and Canadian Debtors, see, e.g., Subjects  6, 7 and 17 that were directed to the US Debtors, Tab 2C of the US Debtors' Motion Record.  For example, Subject # 6: The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision, Subject #7:  The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision, and Subject #17:  The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between 2001 and 2009 for directly funded research and development; (2) the amounts that NNL, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund research and development by Nortel group entities; and (4) the amounts that NNI contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

[20] *Nortel*, at para. 22, US Debtors' Brief of Authorities, Tab 3.

[21] *Nortel*, at para. 24, US Debtors' Brief of Authorities, Tab 3.

[22] *Nortel*, at para. 26, US Debtors' Brief of Authorities, Tab 3.

proceedings, including these litigations.[23]  Requiring the parties to go through the Representative Deposition exercise would be, as the Ad Hoc Group of Bondholders put it, "a significant waste of time and resources".  Representative Depositions will result in additional costs to the estates and to their creditors, in the millions of dollars, with little or no corresponding benefit in light of the significant deposition discovery conducted to date.[24]

### *The Proportionality Principle*

64.    Rule 29.2 of the *Rules of Civil Procedure* requires the Court to apply the principle of proportionality when considering a discovery dispute.[25]  The relevant factors are:

(a)    the time required for the party or other person to answer the question or produce the document would be unreasonable;

(b)    the expense associated with answering the question or producing the document would be unjustified;

(c)    requiring the party or other person to answer the question or produce the document would cause him or her undue prejudice;

(d)    requiring the party or other person to answer the question or produce the document would unduly interfere with the orderly progress of the action; and

(e)    the information or the document is readily available to the party requesting it from another source.[26]

65.    In this case, first-hand testimony on factual issues has already been obtained from more than 100 witnesses, and the Monitor and Canadian Debtors have not identified any gaps in that evidence that need to be filled through the Representative Deposition process.[27]  Submitting the parties to Representative Depositions would therefore be wasteful of both time and money.

---

[23] *Re Nortel Networks Corporation*, 2013 ONSC 7301, at para 6 (S.C.J.), US Debtors' Brief of Authorities, Tab 4.

[24] See: Letter from the Ad Hoc Group of Bondholders, dated December 18, 2013, Tab 2F of the US Debtors' Motion Record; and the December 20 Letter, Tab 2M of the US Debtors' Motion Record.

[25] *Livent*, at paras. 69-73, US Debtors' Brief of Authorities, Tab 1; *Ramdath v. George Brown College of Applied Arts & Technology* 2012 ONSC 2747 (S.C.J.), at paras. 22-23, US Debtors' Brief of Authorities, Tab 5; *Passy Estate v. Forrest-Cluney (Litigation Guardian of)* 2013 ONSC 3206 ((S.C.J.) (Master)), at para. 20; US Debtors' Brief of Authorities, Tab 6; *Rothmans*, at paras. 159-162, US Debtors' Brief of Authorities, Tab 2.

[26] *Rules of Civil Procedure*, Rule 29.2, Schedule "A".

[27] Somewhat surprisingly, the CCC says in its letter to the US Bankruptcy Court (Tab 2Q of the US Debtors' Motion Record), that "the CCC has not *had* "*ample opportunity to thoroughly explore*" the factual questions relevant to the positions and assertions" pleaded.  There were over 100 depositions, and to the extent that the CCC did not ask

66.      In a decision in this case, the Court noted that the "court retains the ability to control its own process including litigation against CCAA debtors and claims procedures within a CCAA process."[28] In exercising those powers, the Court should consider and apply the proportionality principle that the Monitor and Canadian Debtors themselves urged on the Court months ago in an earlier discovery dispute.

67.      As set out above, there is no demonstrable gap to be filled by the Representative Depositions.  They will be an enormously expensive exercise, involving many weeks of preparation and examination for no discernible benefit.  The new proposal made by the Monitor and Canadian Debtors – substituting five all-encompassing topics for written responses for the 27 overbroad topics noticed for oral questioning – would in fact make the Representative Deposition process even more burdensome, as it would involve reviewing the complete discovery record (including the millions of documents produced and the transcripts of over 100 depositions) in an impossible timeframe.

## INAPPROPRIATE DISCOVERY

68.      In their letter to the US Bankruptcy Court, the Monitor and Canadian Debtors state that one of the things that motivates their insistence on Representative Depositions is the desire to ask questions about the other parties' "positions".  However, that is not what the Representative Depositions were intended to facilitate.  When the topics noticed by the Monitor and Canadian Debtors are reviewed, as well as their new proposal for written questions, it becomes apparent that what the Monitor and Canadian Debtors are trying to obtain is the litigation work product of the US Debtors, and that is not appropriate discovery under Ontario discovery principles.

### *Representative Depositions Intended for Fact Gathering*

69.      It is apparent from the Deposition Protocol that the purpose of Representative Depositions was to facilitate gap-filling with respect to matters of fact and was not intended as an opportunity to explore a party's "position", which is properly a matter of pleading and argument and not fact discovery.  Topics for Representative Depositions (including undertakings) were

---

questions on the relevant facts of any particular witnesses despite having appeared at nearly every deposition (if not every deposition) it was never for lack of opportunity.

[28] *Nortel Networks Corporation (Re)*, 2010 ONSC 1304, at para. 36 (S.C.J.), US Debtors' Brief of Authorities, Tab 7.

supposed to address matters on which no knowledgeable fact witness has provided adequate first-hand testimony.  To the extent that the Monitor and Canadian Debtors seek to explore "positions", that is not appropriate Representative Deposition discovery under the Deposition Protocol.

### Ontario Discovery Principles

70.    When the 27 original topics noticed by the Canadian Allocation Group (to which the U.S Debtors have objected) are reviewed, or when the five overbroad all-encompassing topics included in the Monitor and Canadian Debtors' new proposal are reviewed, it is apparent that what the Monitor and Canadian Debtors are looking for are not facts but rather the analysis by the US Debtors of the facts and evidence that have already been the subject of comprehensive document production and depositions from knowledgeable witnesses.  In other words, independent of the fact that the US Debtors have objected to these topics, the Monitor's and Canadian Debtors' insistence on these topics reveals their agenda not to fill in gaps in the factual record but instead to have the US Debtors essentially prepare for and present their trial case now.

71.    For example, original topic #3 asked for "[t]he factual and documentary basis for and scope of the alleged beneficial/equitable interest in Nortel's intellectual property held by parties other than NNL".  What this is calling for is not fact evidence – that was available through document production and fact witness depositions.  What this is calling for is the US Debtors' analysis of the evidentiary record, and the Canadian Allocation Group is not entitled to that analysis.  Similarly, the topics proposed in the alternative require the US Debtors to review all the documents, review all the transcripts from fact depositions and make additional inquiries and answer questions on those topics.  What they are really looking for is the US Debtors' litigation work product, including the lawyers' analysis of the strengths and weakness of the various allocation positions of the various Core Parties (including the Monitor).  This is not appropriate discovery.

72.    Once again, to underscore the inappropriateness of the way the Monitor and Canadian Debtors are seeking to use the Representative Depositions, it is only necessary to look at their objections and the objections of the CCC to the topics noticed to their Representative Witness. The Monitor and Canadian Debtors object to the topics served by the US Debtors on the basis that they are protected by "work product immunity", and they make the same objection to the

topics noticed by the EMEA Debtors and the UK Pension Claimants.  The CCC states that the topics "seek information protected by … the attorney work product doctrine".[29]

73.      Precedent supports the rejection of the Monitor's and Canadian Debtors' pursuit of Representative Depositions to achieve their objectives here.

74.      Questions of the kind identified above were the subject of analysis in *Livent*.  The background facts in *Livent* are relevant to the Master's analysis of the discovery dispute that arose in the case.  The Court noted that extensive document production had occurred, and that there had been 69 days of oral discovery.  The plaintiff was asked in writing additional questions, including to provide summaries of evidence that the plaintiff intended to call at trial, and a list of documents that would be relied on at trial, a summary of the relevant facts obtained from the defendants' witnesses in discovery.  The Court held that the plaintiff did not have to do any of that.

75.      First, the Court stated that "[i]n effect, the plaintiff is being asked to identify those portions of the evidence given by or on behalf of the defendant, which it disputes.[30].  That was inappropriate, and was likened by the Court to a peculiar request to admit, but one where the plaintiff was being asked to "flag what it regards as the weaknesses or problems with their opponent's case."[31]  The Court held that there is no obligation under the *Rules* to require the other side "show you all their cards.[32]

76.      Witness statements were unnecessary in *Livent* given the scope of the discovery that had already occurred: "the extent of information provided to date and the nature of the case is such that there is not likely to be any significant degree of surprise as to the case each side has to meet."[33]  In this case, of course, every trial witness has been subject to deposition and their evidence in chief is being delivered in affidavit form prior to trial.

---

[29] See Tab 2M of the US Debtors' Motion Record.

[30] *Livent*, at para. 20, US Debtors' Brief of Authorities, Tab 1.

[31] *Livent*, at para. 21, US Debtors' Brief of Authorities, Tab 1.

[32] *Livent*, at para. 53, US Debtors' Brief of Authorities, Tab 1.

[33] *Livent*, at para. 34, US Debtors' Brief of Authorities, Tab 1.

77.      The documents that the plaintiff intended to rely on in *Livent* did not have to be identified through discovery. The Court found there was no duty for a party to provide its opponent with a list of all the documents it will be relying on at trial, particularly in light of the nature of the discovery in that case. Some definition of the facts relied upon is required, but not what the defendant demanded: "[t]he ground has been ploughed numerous times and neither side is going to trial guessing what the other side's case is about."[34] That statement applies *a fortiori* in this case, where there has not only been more than 100 fact depositions, but where there will be an opportunity for the parties to know what exhibits and transcript excerpts the other parties rely on for their case.

78.      Finally, with respect to the facts obtained through discovery that a party may rely on at trial, the Court in *Livent* held that there "is no obligation to identify any and [all] evidence obtained from the other side on oral examination, on which a party intends to rely."[35] As the Court stated, "[c]ounsel are well aware of the issues as defined in the pleadings. They have had and used ample opportunities to obtain the knowledge of various witnesses. It is beyond the scope of pre-trial discovery to have the other side 'show you all their cards.'[36] Of course, that is precisely what the Monitor and Canadian Debtors and CCC seek through the Representative Depositions. The Court noted that "the moving party seeks an order requiring a fixed position be taken prior to trial with respect to about 3000 pages of transcript with an implicit consequence of tying counsel's hands at trial with respect to the evidence of these individuals. This is not my understanding of the practice and tradition of civil trial courts in Ontario."[37]

79.      In addition to finding that the discovery sought was inappropriate, the Court in *Livent* also considered that it was not proportionate: it is "incumbent upon this court to avoid directing further activities where the cost and delay that would be incurred as a consequence are not proportional to the value added."[38] The Court concluded that "this is not a case where the

---

[34] *Livent*, at para. 51, US Debtors' Brief of Authorities, Tab 1.

[35] *Livent*, at para. 53, US Debtors' Brief of Authorities, Tab 1.

[36] *Livent*, at para. 53, US Debtors' Brief of Authorities, Tab 1.

[37] *Livent*, at para. 67, US Debtors' Brief of Authorities, Tab 1.

[38] *Livent*, at para. 70, US Debtors' Brief of Authorities, Tab 1.

[plaintiff] has simply pointed to a stack of documents or materials and left [the defendant] to play a guessing game as to what will be relied upon at trial."[39] This concern is not present in this litigation, as the Discovery Protocol requires parties to, *inter alia*: (i) identify potential trial witnesses at the outset and prohibits a party from calling any witness who has not been deposed; and (ii) file in advance of trial fact affidavits, exhibits and deposition testimony to be used at trial. The Court further concluded that "to require further and better answers to any of the matters refused would not accord with the dictates of the proportionality principle. The parties ought to be permitted to spend their available time preparing their *own* cases for trial" emphasis in the original).[40] The same conclusion should be reached on this motion.

---

[39] *Livent*, at para. 72, US Debtors' Brief of Authorities, Tab 1.

[40] *Livent*, at para. 72, US Debtors' Brief of Authorities, Tab 1.

## PART IV - ORDER REQUESTED

80.    For the reasons set out above, the US Debtors seek an order dispensing with Representative Depositions.

ALL OF WHICH IS RESPECTFULLY SUBMITTED

_for_ _____
Sheila R. Block

_for_ _____
Scott Bomhof

_____
Adam Slavens

Lawyers for the US Debtors

TAB A

## SCHEDULE "A" – LEGISLATION

## RULE 29.2 PROPORTIONALITY IN DISCOVERY

**DEFINITION**

29.2.01  In this Rule,

"document" has the same meaning as in clause 30.01 (1) (a). O. Reg. 438/08, s. 25.

**APPLICATION**

29.2.02  This Rule applies to any determination by the court under any of the following Rules as to whether a party or other person must answer a question or produce a document:

1. Rule 30 (Discovery of Documents).

2. Rule 31 (Examination for Discovery).

3. Rule 34 (Procedure on Oral Examinations).

4. Rule 35 (Examination for Discovery by Written Questions). O. Reg. 438/08, s. 25.

**CONSIDERATIONS**

*General*

29.2.03  (1)  In making a determination as to whether a party or other person must answer a question or produce a document, the court shall consider whether,

(a) the time required for the party or other person to answer the question or produce the document would be unreasonable;

(b) the expense associated with answering the question or producing the document would be unjustified;

(c) requiring the party or other person to answer the question or produce the document would cause him or her undue prejudice;

(d) requiring the party or other person to answer the question or produce the document would unduly interfere with the orderly progress of the action; and

(e) the information or the document is readily available to the party requesting it from another source. O. Reg. 438/08, s. 25.

*Overall Volume of Documents*

(2)  In addition to the considerations listed in subrule (1), in determining whether to order a party or other person to produce one or more documents, the court shall consider whether such an order would result in an excessive volume of documents required to be produced by the party or other person. O. Reg. 438/08, s. 25.

16406209.5

# TAB B

## SCHEDULE "B" – LIST OF AUTHORITIES

1.  *Livent Inc. (Special Receiver) v. Deloitte & Touche,* 2012 ONSC 7007 (S.C.J. (Master))

2.  *Ontario v. Rothmans Inc.*, 2011 ONSC 2504 (S.C.J.)

3.  *Re Nortel Networks Corporation*, 2013 ONSC 5998 (S.C.J.)

4.  *Re Nortel Networks Corporation*, 2013 ONSC 7301 (S.C.J.)

5.  *Ramdath v. George Brown College of Applied Arts & Technology* 2012 ONSC 2747 (S.C.J.)

6.  *Passy Estate v. Forrest-Cluney (Litigation Guardian of)* 2013 ONSC 3206 ((S.C.J.) (Master))

7.  *Nortel Networks Corporation (Re)*, 2010 ONSC 1304 (S.C.J.)

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at TORONTO

FACTUM OF NORTEL NETWORKS INC.
AND THE OTHER U.S. DEBTORS
(Representative Depositions)

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

13685185.2