Court File No: 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### BRIEF OF AUTHORITIES OF
### NORTEL NETWORKS INC.
### AND THE OTHER US DEBTORS
### (Representative Depositions)

Date: January 2, 2014

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

# INDEX

## INDEX OF AUTHORITIES

1.   *Livent Inc. (Special Receiver) v. Deloitte & Touche,* 2012 ONSC 7007 (S.C.J. (Master))

2.   *Ontario v. Rothmans Inc.,* 2011 ONSC 2504 (S.C.J.)

3.   *Re Nortel Networks Corporation,* 2013 ONSC 5998 (S.C.J.)

4.   *Re Nortel Networks Corporation,* 2013 ONSC 7301 (S.C.J.)

5.   *Ramdath v. George Brown College of Applied Arts & Technology* 2012 ONSC 2747 (S.C.J.)

6.   *Passy Estate v. Forrest-Cluney (Litigation Guardian of)* 2013 ONSC 3206 ((S.C.J.) (Master))

7.   *Nortel Networks Corporation (Re),* 2010 ONSC 1304 (S.C.J.)

# TAB 1



2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

C

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

Livent Inc. (Receiver of) v. Deloitte & Touche

Livent Inc., Through Its Special Receiver and Manager, Roman Doroniuk, Plaintiff v. Deloitte & Touche, and Deloitte & Touche LLP, Defendants

Ontario Superior Court of Justice

Master D.E. Short

Heard: June 4, 2012
Judgment: December 8, 2012
Docket: 02 CV 225823CM2, 04-CL-5321

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Brian Leonard, Jeremy Millard, for Defendant / Moving Party, Deloitte & Touche [Canada]

Patrick O'Kelly, Jonathan Levy, for Plaintiff / Responding Party

Subject: Civil Practice and Procedure; Torts

Civil practice and procedure --- Discovery — Discovery of documents — Privileged document — Solicitor-client privilege

Plaintiff commenced action for damages for negligence, breach of contract, and breach of fiduciary duty against former auditors through special receiver — Order for security for costs was issued — Motion was commenced to vary existing security for costs order — Defendant brought motion to compel plaintff to answer questions refused in examination of special receiver by written questions — Motion granted in part — Refusal with respect to questions was upheld — Extent of information provided and nature of case was such that there was not likely to be significant degree of surprise as to case each side had to meet — To require further and better answers to matters refused would not accord with proportionality principle — Request for all articles or legal principles experts relied on was not justified having regard to degree of disclosure already made and lack of proportional value — Correspondence between experts and instructing counsel that contained foundational information were ordered to be produced.

Civil practice and procedure --- Discovery — Examination for discovery — Miscellaneous

Plaintiff commenced action for damages for negligence, breach of contract, and breach of fiduciary duty against former auditors through special receiver — Order for security for costs was issued — Motion was commenced to vary existing security for costs order — Defendant brought motion to compel plaintff to answer questions refused in examination of special receiver by written questions — Motion granted in part — Refusal with respect to questions was upheld —

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

Extent of information provided and nature of case was such that there was not likely to be significant degree of surprise as to case each side had to meet — To require further and better answers to matters refused would not accord with proportionality principle — Request for all articles or legal principles experts relied on was not justified having regard to degree of disclosure already made and lack of proportional value — Correspondence between experts and instructing counsel that contained foundational information were ordered to be produced.

**Cases considered by *Master D.E. Short*:**

*Aherne v. Chang* (2011), 2011 ONSC 2067, 2011 CarswellOnt 2730, 106 O.R. (3d) 297 (Ont. Master) — considered

*Aherne v. Chang* (2011), 337 D.L.R. (4th) 593, 2011 ONSC 3846, 2011 CarswellOnt 5402, 16 C.P.C. (7th) 143 (Ont. S.C.J.) — referred to

*Andersen v. St. Jude Medical Inc.* (2007), 2007 CarswellOnt 9601 (Ont. Master) — followed

*Arunasalam v. Guglietti Estate* (2010), 2010 CarswellOnt 5655, 2010 ONSC 4267 (Ont. Master) — considered

*Aviaco International Leasing Inc. v. Boeing Canada Inc.* (2000), 2000 CarswellOnt 3088, [2000] O.T.C. 994, 48 C.P.C. (4th) 366 (Ont. S.C.J.) — considered

*Boldt v. Law Society of Upper Canada* (2010), 2010 ONSC 3568, 2010 CarswellOnt 4353 (Ont. S.C.J.) — considered

*Bookman v. Loeb* (2009), 2009 CarswellOnt 3796, 72 R.F.L. (6th) 388 (Ont. S.C.J.) — followed

*Brock-Tech Inc. v. XYcorp Inc.* (1999), 1999 CarswellOnt 3678 (Ont. Master) — referred to

*Browne (Litigation Guardian of) v. Lavery* (2002), 37 C.C.L.I. (3d) 86, [2002] O.T.C. 109, 2002 CarswellOnt 496, 18 C.P.C. (5th) 241, 58 O.R. (3d) 49 (Ont. S.C.J.) — considered

*Carmen Alfano Family Trust v. Piersanti* (2009), 2009 CarswellOnt 1199 (Ont. S.C.J.) — referred to

*Carmen Alfano Family Trust v. Piersanti* (2012), 2012 ONCA 297, 2012 CarswellOnt 5668, 291 O.A.C. 62 (Ont. C.A.) — referred to

*Cigar500.com Inc. v. Ashton Distributors Inc.* (2009), 99 O.R. (3d) 55, 2009 CarswellOnt 5241, 77 C.P.C. (6th) 80 (Ont. S.C.J.) — considered

*Conceicao Farms Inc. v. Zeneca Corp.* (2006), 2006 CarswellOnt 5672, 215 O.A.C. 233, 32 C.P.C. (6th) 201, *(*sub nom. *Horodynsky Farms Inc. v. Zeneca Corp.)* 272 D.L.R. (4th) 545, 83 O.R. (3d) 792 (Ont. C.A.) — followed

*Davies v. Clarington (Municipality)* (2010), 2010 ONSC 6103, 2010 CarswellOnt 8662 (Ont. S.C.J.) — considered

*De Marco v. Mascitelli* (2001), 2001 CarswellOnt 3137, 14 C.P.C. (5th) 384, [2001] O.T.C. 655 (Ont. S.C.J.) — considered

*Dionisopoulos v. Provias* (1990), 1990 CarswellOnt 405, 71 O.R. (2d) 547, 45 C.P.C. (2d) 116 (Ont. H.C.) — followed

*Fyffe v. Ontrac Equipment Services Inc.* (2008), 2008 CarswellOnt 5669 (Ont. S.C.J.) — considered

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

*Leliever v. Lindson* (1977), 3 C.P.C. 245, 1977 CarswellOnt 222 (Ont. H.C.) — considered

*Livent Inc. (Receiver of) v. Deloitte & Touche* (2010), 2010 CarswellOnt 2855, 2010 ONSC 2267 (Ont. Master) — referred to

*Livent Inc. (Receiver of) v. Deloitte & Touche* (2011), 2011 ONSC 648, 2011 CarswellOnt 2371, 76 C.B.R. (5th) 172 (Ont. Master) — referred to

*Loewen, Ondaatje, McCutcheon & Co. v. Snelling* (1985), 2 C.P.C. (2d) 93, 1985 CarswellOnt 383 (Ont. H.C.) — considered

*McIntyre Estate v. Ontario (Attorney General)* (2001), 14 C.C.L.T. (3d) 223, 2001 CarswellOnt 5315, 26 C.P.C. (5th) 312 (Ont. C.A.) — considered

*Noranda Metal Industries Ltd. v. Employers Liability Assurance Corp.* (2000), 2000 CarswellOnt 3693, 23 C.C.L.I. (3d) 60, 49 C.P.C. (4th) 336 (Ont. S.C.J.) — considered

*Shuter v. Toronto Dominion Bank* (2007), 2007 CarswellOnt 5732 (Ont. Master) — followed

*Zeitoun v. Economical Insurance Group* (2008), 236 O.A.C. 76, 64 C.C.L.I. (4th) 52, 2008 CarswellOnt 2576, 53 C.P.C. (6th) 308, 292 D.L.R. (4th) 313, 91 O.R. (3d) 131 (Ont. Div. Ct.) — followed

*Zeitoun v. Economical Insurance Group* (2009), 73 C.C.L.I. (4th) 255, 257 O.A.C. 29, 2009 ONCA 415, 73 C.P.C. (6th) 8, 307 D.L.R. (4th) 218, 2009 CarswellOnt 2665, 96 O.R. (3d) 639 (Ont. C.A.) — considered

**Statutes considered:**

*Champerty, Act respecting*, R.S.O. 1897, c. 327

Generally — referred to

*Solicitors Act*, R.S.O. 1990, c. S.15

Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

Generally — referred to

R. 1.04(1) — considered

R. 1.04 (1.1) [en. O. Reg. 438/08] — considered

R. 4.1.01 [en. O. Reg. 438/08] — considered

R. 4.1.01(2) [en. O. Reg. 438/08] — considered

R. 29.2 — considered

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

R. 29.2.02 [en. O. Reg. 438/08] — considered

R. 29.2.03 [en. O. Reg. 438/08] — considered

R. 29.2.03(1) [en. O. Reg. 438/08] — considered

R. 31.06 — considered

R. 31.06(1) — considered

R. 31.06(2) — considered

R. 31.06(3) — considered

R. 51.02(1) — considered

R. 51.03 — considered

R. 51.04 — considered

R. 56.01 — considered

R. 56.01(1)(d) — considered

MOTION by defendant to compel plaintff to answer questions refused in examination of special receiver by written questions.

*Master D.E. Short*:

**Sequel**

1       Litigation relating to the affairs of the theatrical production company Livent Inc. was first launched in 1998. In 2002 this action was commenced on behalf of Livent against its former auditors for damages.

2       In reasons delivered in March of 2011 (2011 ONSC 648 (Ont. Master)) I addressed the quantum to be posted as a consequence on an earlier decision on mine holding that security for costs could be ordered in the circumstances of this case. (2010 ONSC 2267 (Ont. Master)).

3       Those motions were brought seeking security for costs against the plaintiff, Livent Inc. ("Livent") which brought the action through its Special Receiver and Manager, Roman Doroniuk ("Doroniuk" or "the Special Receiver").

4       The motions were, originally brought under Rule 56.01 of the *Rules of Civil Procedure* by the defendants, Deloitte & Touche LLP in Canada ("Deloitte Canada"), [incorrectly named in the title of proceedings as Deloitte & Touche] and the Defendant, Deloitte & Touche LLP, which is based in the United States ("Deloitte US").

5       The Deloitte Defendants asserted that they had "good reason to believe" that the Plaintiff, and its Special Receiver and Manager, (the "Special Receiver"), has insufficient assets in Ontario, or no ability to pay the costs of this proceeding if ordered to do so at the end of the trial in this action.

6       At the argument of the second half of this motion, I was advised that during the intermission following the first

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

portion of the argument, the claims against Deloitte US had been resolved by the parties. Thus, I was only required to address the request of Deloitte Canada (herein "Deloitte") that security for its costs alone, be posted.

7      Now each side has brought a further motion. The Special Receiver moves to vary the existing security for costs order and Deloitte moves on a variety of discovery issues.

8      I will deal with the latter matter first.

### I. Nature of Overall Livent Litigation

9      This action was commenced in February 2002. The Special Receiver claims $450 million in damages against Deloitte for, among other things, negligence, breach of contract and breach of fiduciary duty in connection with the audits conducted by Deloitte of the financial statements of Livent Inc. ("Livent") during the relevant period. This action relates to, among other things, Deloitte's alleged negligence in its audits of Livent's financial statements for the years ended 1993 to 1997 (the "Negligence Action").

10      The Amended Statement of Claim amended on May 24, 2002 consists of 117 pages and 419 paragraphs. The Amended Statement of Claim also refers to the Amended Statement of Claim that Livent issued in the fraud action it had commenced against Garth Drabinsky ("Drabinsky") and Myron Gottlieb ("Gottlieb") in November 1998 bearing the Court file number 98-CL-31S7 (the "Fraud Action"). The Amended Statement of Claim in the Fraud Action, in turn, consists of 51 pages and 118 paragraphs.

11      By Order dated March 20, 2002, Justice Ground ordered that this action and the Fraud Action (collectively, the "Proceedings") and other related proceedings be tried together and be subject to common production of documents and discoveries.

12      The documents that have been produced in the Proceedings have been extensive. They include, but are not limited to, the following:

(i) over 91,807 documents produced by the Special Receiver;

(ii) 11,476 documents produced by Deloitte; and

(iii) 2,968 documents obtained from the Crown disclosure provided to Drabinsky and Gottlieb in the criminal proceedings that were brought against them.

13      Examinations for discovery covering approximately 69 days have been conducted of numerous witnesses in the Proceedings.

14      In addition to the evidence in the Proceedings, extensive evidence was provided by numerous witnesses in the criminal proceedings that led to the conviction of each of Drabinsky and Gottlieb on two counts of fraud and one count of forgery.

15      When the present motions were argued twelve weeks had been tentatively reserved for the evidence in this action. In the interim, the trial date has been delayed and there are still differences of opinion between the parties as to the likely length of the actual trial, which is scheduled to take place in 2013.

### II. Current motions

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

16    The Defendant, Deloitte & Touche LLP ("Deloitte"), seeks an order compelling the Plaintiff, Special Receiver, to answer questions that they allege were improperly refused in an examination of the Special Receiver by written questions served on November 2, 2009. In the alternative, Deloitte seeks an order requiring the Special Receiver to attend at an oral examination to answer the questions set out in the Refusals Chart.

17    In addition, Deloitte seeks an order requiring the production of the files of three experts retained by the Special Receiver.

18    The written interrogatories for the Special Receiver contained almost 350 subject areas and were some 45 pages in length. Counsel have narrowed the outstanding issues. Only five questions remain to be addressed. However the breadth of information sought in those questions presents the difficulties I have faced in considering this motion.

19    The specific questions were as follows

• Produce any witness statements, will-say statements and/or summaries of evidence of anyone in the Special Receiver intends to call as a witness at trial or that the Special Receiver believes has knowledge of the matters in issue in these proceedings.

• Provide a list of the documents produced by Deloitte Canada that the special receiver will be relying on at trial.

• Provide a summary of the facts obtained from the Deloitte Canada witnesses produced an examination of discovery that the special receiver will be relying on at trial.

• Identify with a reasonable degree of specificity the evidence given by the partners of Deloitte Canada and Deloitte US during their respective examinations for discovery that the special receiver intends to rely on at trial to support the allegations made in the amended statement of claim against Deloitte Canada. Undertake to do the same for any evidence that will be given by the partners of Deloitte Canada and Deloitte US before trial.

• Specify the evidence given by the following witnesses during their respective examinations for discovery in this action and of the Fraud Action that the Special Receiver disputes:

Robert Webster;

Maria Messina;

Christopher Craib,

Grant Malcolm;

Diane Winkfein and

Tony Fiorino.

20    In effect, the plaintiff is being asked to identify those portions of the evidence given by or on behalf of the defendant, which it disputes.

21    To my mind, this appears to be an indirect notice to admit, where instead of serving a notice to admit specific evidence upon which the defendant intends to rely; they instead are asking the party opposite to flag what it regards as the weaknesses or problems with their opponent's case.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

22      Is this an appropriate remedy at this stage in litigation that has been ongoing for 10 years and is expected to proceed to trial in the foreseeable future?

23      The individuals listed are amongst at least 18 individuals who were examined for discovery at some point in this litigation

24      To put their specific involvement in context. It is my understanding that the number of days and pages of discovery transcript for those particular individuals is as follows:

Robert Webster; three days 534 pages

Maria Messina; nine days, 1300 pages

Christopher Craib, four days, 722 pages

Grant Malcolm; one day, 139 pages

Diane Winkfein two days, 287 pages and

Tony Fiorino, one day at 137 pages.

25      The Deloitte Canada and US witnesses alone had in excess of 30 days of discovery and well in excess of 5000 pages of examination for discovery transcripts.

**III. Responses Made**

26      Counsel for the Special Receiver summaries his position that the five interrogatories were properly refused because the questions:

a) are redundant and seek information already available to Deloitte;

b) are overly broad and will have the effect of putting Livent to unjustified costs in preparing for trial; and

c) under the circumstances, are not questions that are properly the subject of discovery as established by applicable case law.

27      The factum submitted by counsel for Deloitte summarizes their position:

The questions at issue are intended to enable Deloitte to know the case it must meet at trial, to procure admissions, to narrow the scope of issues for trial and to avoid surprises at trial. The importance of these questions to Deloitte is amplified because of the following:

(a) the magnitude of the claim it faces (the Special Receiver seeks $450 million in damages);

(b) the complexity of the claims asserted by the Special Receiver (the Amended Statement of Claim is 117 pages long);

(c) the immense volume of productions;

(d) the extensive examinations of numerous witnesses that have been conducted in the Proceedings and related

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

proceedings; and

(e) the fact that the Special Receiver has no personal knowledge of any of the events underlying the claims he is pursuing against Deloitte.

28      These two positions both raise classic arguments as to limits of pre-trial discovery. I intend to address each of the five specific interrogatories, which are the subject matter of this motion. Bearing question numbers, 334, 335 336, 340 and 341. I intend to address each individually but much of my reasoning applies to all five.

29      For convenience I will set out the question and answer presently provided, in each instance at the outset of my analysis.

*Q. 334 Will-says*

"Produce any witness statements, will say statements and/or summaries of evidence of anyone in the Special Receiver intends to call as a witness at trial or that the Special Receiver believes has knowledge of the matters in issue in these proceedings."

<u>Response:</u>

Special Receiver will not produce will-say statements for the individuals it may call as witnesses at trial that have either been examined for discovery, have given witness statements or whose evidence is already contained in the record. The discovery transcripts and witness statements, all of which are in Deloitte's possession, set out with sufficient particularity what each potential witness's evidence will be and there is no reason that either party should be put to the task of creating duplicative will-say statements in advance of trial. While the Special Receiver reserves the right to call as witnesses whomever it deems necessary for trial, a list of potential witnesses likely to be called by the Special Receiver, together with a list of their available transcripts and witness statements, is set out in the attached Schedule "A".

To the extent that the attached proposed witness list includes individuals whose evidence is not contained in the record, these individuals are all Deloitte personnel. The Special Receiver cannot be compelled to provide will-say statements or summaries of evidence for individuals with whom Livent had no relationship, such as any witnesses who were employed through Deloitte during the relevant time period,

30      Rule 31.06(1) &(2) provides:

**31.06**(1) A person examined for discovery shall answer, to the best of his or her knowledge, information and belief, any proper question relevant to any matter in issue in the action or to any matter made discoverable by subrules (2) to (4) and no question may be objected to on the ground that,

(a) the information sought is evidence;

(b) the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness; or

(c) the question constitutes cross-examination on the affidavit of documents of the party being examined.

(2) A party may on an examination for discovery obtain disclosure of the names and addresses of persons who might

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

reasonably be expected to have knowledge of transactions or occurrences in issue in the action, unless the court orders otherwise.

31      What is the extent of disclosure mandated by subrule (2)? More than twenty years ago, Justice Granger in *Dionisopoulos v. Provias* (1990), 71 O.R. (2d) 547 (Ont. H.C.), provided this direction with respect to its interpretation:

> 14. To summarize, a party being examined for discovery is required under rule 31.06 to provide the names and addresses of persons who might reasonably be expected to have knowledge of the matters in issue, but are not required to provide a list of trial witnesses. A summary of the substance of the evidence of those persons who might reasonably be expected to have knowledge of the matters in issue, must be provided if requested. Rule 31.06(1) requires a person being examined to answer "any proper question relating to any matter in issue" or "any matter made discoverable by subrules (2) to (4)" and questions may not be objected to on the ground that "the information sought is evidence". If the "names and addresses of persons having knowledge" is discoverable, then it would seem to me that a proper question relating to that is "what is the substance of their knowledge?" This is so even if the information to be disclosed is evidence.

32      How substantive does that disclosure of substance need to be? More recently, in *Davies v. Clarington (Municipality)*, 2010 ONSC 6103 (Ont. S.C.J.) P. Lauwers J., had occasion to consider the extent of appropriate disclosure required. After commenting on my decision on this point in *Arunasalam v. Guglietti Estate*, [2010] O.J. No. 3303 (Ont. Master), his Honour set out what he regarded as the extent of disclosure required under the rule:

> 26. I revert to Rule 31.06(2) and the case law to hold that the defendants must be provided with "the names and addresses of persons who might reasonably be expected to have knowledge of transactions or occurrences in issue in the action" known to the plaintiff and from whom the witnesses giving evidence at the trial on the plaintiff's behalf will be drawn, summaries of what the information that they possess, and copies of any relevant documents that they have in their possession. In the circumstances, this material must be provided well before the continuation of the examination for discovery. As to content, any such summary must contain a fair degree of detail addressing the normal journalistic questions related to the person and the relevant knowledge that he or she possesses, being: "who, what, where, when, why and how". If the level of detail is inadequate in the opinion of the defendants, I may be spoken to. A summary need not be sworn or signed.

33      Relying upon this case law, Deloitte asserts that it is permitted to obtain disclosure of witness statements or summaries of evidence of any witnesses that the Special Receiver intends to call at trial and that the fact that such witnesses may have been examined by another party or may have been in Deloitte's employ during the relevant time does not diminish this obligation.

34      I disagree. I think that the extent of information provided to date and the nature of the case is such that there is not likely to be any significant degree of surprise as to the case each side has to meet

35      The affidavit evidence before me satisfies me that Deloitte's interrogatories canvassed, in great detail, the facts and evidence that would be relied upon by the Special Receiver in advancing the allegations contained in the Amended Statement of Claim in the Negligence Action. Notably, the portions of the interrogatories that relate to Livent's pleadings are structured to mirror the headings used by the Special Receiver in the Amended Statement of Claim.

36      On March 8, 2010, the Special Receiver delivered to counsel for Deloitte its written answers to interrogatories, which were contained in a 177 page volume (the "Written Answers").

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

37      In his factum the Special Receiver asserts:

The Written Answers are highly detailed and describe the facts on which the Special Receiver will rely in support of its allegations in the Proceedings, including: the negligence claim against Deloitte; matters relating to the frauds that occurred at Livent (including who participated in the frauds and the role they played); the stakeholders that stand to benefit from the Proceedings; damages; the administrative and criminal proceedings related to Livent; witnesses; experts; and various other matters. Wherever possible, the Written Answers make reference to specific documents (including their respective Summation database identification numbers) and describe the information contained in the document on which the Special Receiver intends to rely.

38      For example, in addressing an interrogatory concerning disclosure of the frauds to Deloitte prior to August 1998, the Special Receiver provided the following response:

[In] August 18, 1995 Livent entered into an agreement with Pace to tour Show Boat in certain U.S. cities. A copy of this agreement was contained in Deloitte's 1995 year end audit work papers at DT11265 to DT11266 and a second copy was in Deloitte's 1996 year end audit work papers at DT21470 to DT21471. Deloitte failed to assess the implication of this 1995 agreement on the accounting for the June 15, 1996 Show Boat touring rights agreement and its inconsistencies and contradictions with management's representations to Deloitte as documented in the various versions of the Peter Chant memo to file "re: 1996 year-end issues".

39      In my view this type of response more than satisfies the need to provide a summary that contains "a fair degree of detail addressing the normal journalistic questions related to "who, what, where, when, why and how".

*Q. 335 Documents relied upon*

"Provide a list of the documents produced by Deloitte Canada that the special receiver will be relying on at trial."

<u>Response</u>

The Special Receiver is not currently in a position to provide Deloitte with a list of all documents upon which the Special Receiver will be relying at trial. In any event, and as set out in Mr. Howard's letter of November 23, 2011, we believe it would benefit both parties to come to some agreement on a Joint Book of Documents, certainly to avoid issues of authenticity, sent or received and the fact of their existence. Equally, we can discuss truth of the contents of documents on a case by case basis to attempt to narrow and shorten matters....

40      This response seems reasonable to me.

41      I expect that while this matter was under reserve the parties have moved forward on a protocol for a joint book of documents. But is a party obliged to provide its opponent, in advance of trial, with a list of *all* documents it will be relying upon at trial?

42      Clearly the Special Receiver alleges that Deloitte conducted its audit of Livent's financial statements in a manner that was negligent and in breach of contract and fiduciary duty during the relevant period.

43      As noted above, Deloitte has produced over 11,476 documents, many of which consist of its working papers for the audits in question.

44      Counsel for Deloitte submits:

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

18. In complex cases involving extensive productions and examinations for discovery of numerous witnesses, the party being examined is required to identify, with a reasonable degree of specificity, the documents it is relying upon in support of its allegations. It is not enough for the Special Receiver to "point to a stack of documents and say that the documents relied upon are within the voluminous productions".

45     Amongst the cases cited in support of this argument are:

*Loewen, Ondaatje, McCutcheon & Co. v. Snelling* (1985), 2 C.P.C. (2d) 93 (Ont. H.C.); at paras. 9, 14 and 16

*Noranda Metal Industries Ltd. v. Employers Liability Assurance Corp.* (2000), 49 C.P.C. (4th) 336 (Ont. S.C.J.) at para. 30

*Brock-Tech Inc. v. XYcorp Inc.*, 1999 CarswellOnt 3678 (Ont. Master) at para. 59

*Andersen v. St. Jude Medical Inc.*, 2007 CarswellOnt 9601 (Ont. Master) at para. 23

46     In *Loewen, Ondaatje, supra* Justice Steele refers to the decision of Justice Osler approving on appeal the decision of Justice Keith in a case (on which, coincidentally, I was counsel) *Leliever v. Lindson* (1977), 3 C.P.C. 245 (Ont. H.C.):

While there are few, if any, decided cases upon the point, it has in my view been customary to determine questions of this sort by having regard to the importance and the complexity of documents, with respect to which it is sought to question parties. There is no universal test that can be applied to situations of this sort as obviously there will be cases in which the whole of a document can be easily seen and comprehended and it may appear quite obvious that a party intends to rely upon it all. There will be others in which the documents are **so voluminous and so complex that the opposing party is quite obviously entitled to obtain** *some definition* **from the plaintiffs of those parts upon which he intends to rely**. In the present instance, each of the documents is approximately 18 pages in length and is of some complexity, even though both refer to the same entity.... Each covers a wide range and in my view there is no reason to doubt the correctness of the decision of my brother Keith that the plaintiff should indicate within reasonable bounds the specific part of each statement upon which he intends to rely.

47     Later in his reasons Justice Steele observes:

For these reasons, I am of the opinion that the Master was correct in his ruling with respect to the answers to the various questions relating to the conspiracy and asking upon what *facts* the plaintiff relied, rather than leaving it to the respondents to speculate amongst the mammoth amount of transcripts and productions....

[my emphasis throughout]

48     I agree that *some* definition of the facts relied upon is required. That is a long way in my opinion from entitling the defendant to information in the quantity contemplated by the subject interrogatory.

49     More recently on a refusals motion, Master MacLeod in *Andersen v. St. Jude Medical Inc., supra,* provided this helpful clarification:

23 ....The plaintiffs were asked to identify the evidence or documents on which they will rely in support of a specific proposition. "Please see the productions" is not helpful and is not a proper response. It is also unreasonable to expect the answer to be so precise that the plaintiffs paint themselves into a corner. Again, I suggest a timetable for exchange of such information may be the practical response but in the meantime the plaintiff is obliged to answer the

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

question to the best of her knowledge at this time. **This requires a reasonable degree of specificity but not absolute precision.** See *Loewen, Ondaatje, McCutcheon & Co. v. Snelling* (1985), 2 C.P.C. (2d) 93 (Ont. H.C.)

24 Q. 193 was said to be an example of an improper cross examination technique. It is fair to put to a witness evidence that apparently contradicts a proposition in the pleadings and ask how the witness can continue to assert his or her position in the face of that evidence. It is not reasonable to put a negative proposition to the witness and then to ask the witness to review the productions and to identify documents that might support the negative proposition. If the defendants believe there are such documents, it is their responsibility to challenge the witness with the documents and seek a specific admission. In the case of an expert, the expert may be challenged with scientific literature though the expert ought first to be asked if he or she recognizes the authority of a text or author. **A discovery witness cannot be asked to go and survey the literature and identify anything that might contradict his or her expert.** This kind of question and this kind of objection has appeared repeatedly in this proceeding.

50    In *Noranda*, a defendant insurer had been ordered to pinpoint the specific facts in the plaintiffs' evidence on which the insurer intended to rely in support of its defence that the plaintiffs acted recklessly. Given that the plaintiffs had no basis upon which to test the insurer's case, other than through an understanding of its view that the plaintiffs acted recklessly, on appeal, Justice Nordheimer held that:

30....In my view the law is clear that if a party **says that it relies _only_ on the evidence of another party** in support of an allegation, that party is required to identify with some measure of specificity what parts of the evidence of the other party it is relying on....

[my emphasis]

51    In my view, that description does not apply to the facts of this case. The ground has been ploughed numerous times and neither side is going to trial guessing what the other side's case is about.

*Q. 336 Provide summary of facts from discovery of other side to be relied upon at trial*

Provide a summary of the facts obtained from the Deloitte Canada witnesses produced on examination of discovery that the special receiver will be relying on at trial.

**Response**

See response to Q. 334 above. The Special Receiver intends to rely on the entirety of the transcripts from the examinations for discovery of Deloitte's witnesses in conducting the trial. It is impossible, in advance of trial, to exclude any portion of the transcripts as the oral evidence of the Deloitte witnesses at trial may require use of all or part of the transcripts during cross-examinations.

*Q. 340 Discovery evidence of Deloitte partners that is going to be used to support allegations in amended statement of claim*

Identify with a reasonable degree of specificity. The evidence given by the partners of Deloitte Canada and Deloitte US during their respective examinations for discovery that the special receiver intends to rely on at trial to support the allegations made in the amended statement of claim against Deloitte Canada. Undertake to do the same for any evidence that will be given by the partners of Deloitte Canada and Deloitte US before trial.

**Response**

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

See response to Q. 334 above.

52    Deloitte asserts that the Special Receiver is required to identify with a reasonable degree of specificity the evidence given by the partners of Deloitte that he intends to rely upon at trial and submits:

Stating that he will be relying upon the "entirety of the transcripts from the examinations for discovery of Deloitte witnesses" is improper, especially since 9 partners of Deloitte and Deloitte US were examined in the Proceedings over a period of 32 days, resulting in almost 6,000 pages of transcripts.

53    However the answer refers to such use of the entirety of such evidence as being "in conducting the trial". Is there an obligation to identify any and evidence obtained from the other side on oral examination, upon which a party intends to rely? In view there is not. Counsel are well aware of the issues as defined by the pleadings. They have had and used ample opportunities to obtain the knowledge of various witnesses. It is beyond the scope of pre-trial discovery to have the other side "show you all their cards".

54    As noted above, I do not interpret the decision of Justice Nordheimer in *Noranda*, *supra*, as applying in this case where the specifics of the alleged breaches of professional responsibility and negligence have been identified with what I regard as sufficient detail.

*Q.441 Specific Witness testimony*

Specify the evidence given by the following witnesses during their respective examinations for discovery in this action and of the Fraud Action that the Special Receiver disputes:

Robert Webster;

Maria Messina;

Christopher Craib;

Grant Malcolm;

Diane Winkfein and

Tony Fiorino.

**Response:**

The Special Receiver is not required to identify the evidence given by Robert Webster, Maria Messina, Christopher Craib, Grant Malcolm, Diane Winkfein and Tony Fiorino at their respective examination for discoveries that the Special Receiver disputes. There is no basis under the Rules for Deloitte to make such a request, In the event that the Special Receiver calls these individuals as witnesses at trial, Deloitte will have an opportunity to cross-examine them and test their evidence with use of their respective discovery transcripts.

55    In effect, the plaintiff is being asked to identify those portions of the evidence given by not in the employ of the defendant, which it disputes, regardless of whether it is relevant to the issues at the trial.

56    To my mind, this appears to be an attempt at a reverse Request to Admit. This is not the document contemplated by the *Rules* identifying specific evidence of these witnesses upon which *Deloitte* intends to rely. They could specify any

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

such evidence of these witnesses (with reasonable specificity) to establish whether the evidence is admitted or that it will be necessary to prove that evidence at trial.

57      Instead, they are asking the party opposite to flag what *that party* regards as the weaknesses or problems with the evidence of these third party witnesses.

58      Is this an appropriate remedy at this stage in litigation that has been ongoing for 10 years and is expected to proceed to trial in the foreseeable future?

59      Here the individuals listed are amongst at least 18 individuals who were examined for discovery at some point in this litigation. As noted earlier the discoveries of the subject witnesses are voluminous:

Robert Webster; three days, 534 pages

Maria Messina; nine days, 1300 pages

Christopher Craib, four days, 722 pages

Grant Malcolm; one day, 139 pages

Diane Winkfein, two days, 287 pages and

Tony Fiorino, one day, 137 pages.

60      In addition, the Deloitte Canada and US witnesses alone had in excess of 30 days of discovery and well in excess of 5000 pages of examination for discovery transcripts.

61      Rule 51 dealing with such notices to admit, in part, provides a procedure to be followed:

**51.02**(1) A party may at any time, by serving a request to admit (Form 51A), request any other party **to admit,** for the purposes of the proceeding only, **the truth of a fact** or the authenticity of a document.

62      I observe the rule does not contemplate a *denial* of the truth of evidence given. It then deals with the time frames for admission of "facts" identified:

**51.03**(1) A party on whom a request to admit is served shall respond to it within twenty days after it is served by serving on the requesting party a response to request to admit (Form 51B).

**Deemed Admission Where No Response**

(2) Where the party on whom the request is served fails to serve a response as required by subrule (1), the party shall be deemed, for the purposes of the proceeding only, to admit the truth of the facts or the authenticity of the documents mentioned in the request to admit.

63      The rule addresses the consequences of a failure to admit (as opposed to a failure to respond:

(3) A party shall also be deemed, for the purposes of the proceeding only, to admit the truth of the facts or the authenticity of the documents mentioned in the request, unless the party's response,

(a) specifically denies the truth of a fact or the authenticity of a document mentioned in the request; or

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

    (b) refuses to admit the truth of a fact or the authenticity of a document and sets out the reason for the refusal.

64    In *De Marco v. Mascitelli* (2001), 14 C.P.C. (5th) 384 (Ont. S.C.J.), Justice LaForme, held that, in the words of the headnote:

> There was nothing improper about a flat denial, regardless of the allegedly contingent or tentative language used. Although the plaintiffs might have vacillated in moving the action along, they did not do so in a fashion that showed a contempt for the action, the process, or the defendants. Furthermore, the delay did not give rise to a presumed or actual substantial prejudice to a fair trial.

65    In his reasons re refers to two helpful previous decisions:

> **11** The essence of the position of the Defendants is that a response that merely states that: "we deny the facts for the time being" is one that is pro forma and tentative, and is improper. That is, pro forma responses intended to circumvent Rule 51 are improper.

> **12** With respect, I believe the complete answer to this submission is found in the Ontario Divisional Court decision of *Docouto v. Ontario (Attorney General)*, [(2000) 44 C.P.C. (4th)182]

> **13** In *Docouto* the strategy in connection with a Request to Admit was to deny the truth of all the statements within it. O'Leary J. in a unanimous decision stated that there is no rule, either in Rule 52.03(1) or elsewhere, that requires a party to admit the truth of any fact. After making that observation, he went on to say:

>> ... it cannot be found that a party that decides to deny all facts in a Request to Admit, be they true or false ... is guilty in abusing the processes of the court.

> **14** He concluded this point by saying that, the rules provide that any failure to admit the truth of facts known to be true could result in costs against them.

> **15** Master Clark in *De Naray v. Gainers Inc.*, [(1997), 17 C.P.C.(4th) 396] was of the same view in respect of a flat denial of all facts. In an opinion that I share, he held that Form 51B (Response to Request to Admit) found in the Rules of Civil Procedure allows for six (6) answers, three (3) deal with facts and three (3) with documents and **require a party to admit, deny, or refuse in respect of either.** Further, Rule 51.03(3) provides that **where the response is a denial, no reason need be given, but where there is a refusal, a reason must be given. Pursuant to this scheme, a flat denial constitutes full and complete compliance with Rule 51.03(3).**

> [my emphasis]

66    The only consequence for a failure to admit a fact subsequently proven at trial is a potential *costs* consequence:

> **51.04** Where a party denies or refuses to admit the truth of a fact or the authenticity of a document after receiving a request to admit, and the fact or document is subsequently proved at the hearing, the court may take the denial or refusal into account in exercising its discretion respecting costs.

67    Here the moving party seeks an order requiring a fixed position to be taken prior to trial with respect to about 3000 pages of transcript with an implicit consequence of tying counsel's hands at trial with respect to the evidence of these individuals. This is not my understanding of the practice and tradition of civil trial courts in Ontario.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

68     This refusal is upheld

## IV. Proportionality in Discovery

69      I find further justification for my holdings on these matters in the relatively new rule 29.2 relating to Proportionality in Discovery. The need for proportionality in interpreting the Rules flows from new rule 1.04:

**1.04** (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding

70      Notwithstanding the costs incurred to date, it still is incumbent upon this court to avoid directing further activities where the cost and delay that would be incurred as a consequence are not proportional to the value added.

71      As well, in addressing discovery issues, present day courts must consider the provisions of new rule 29.2 that deals specifically with proportionality in Discovery. That rule provides in part:

**29.2.02** This Rule applies to any determination by the court under any of the following Rules as to whether a party or other person must answer a question or produce a document:

1. Rule 30 (Discovery of Documents).

2. Rule 31 (Examination for Discovery).

3. Rule 34 (Procedure on Oral Examinations).

4. Rule 35 (Examination for Discovery by Written Questions).

**29.2.03**(1) In making a determination as to whether a party or other person must answer a question or produce a document, the court shall consider whether,

(a) the time required for the party or other person to answer the question or produce the document would be unreasonable;

(b) the expense associated with answering the question or producing the document would be unjustified;

(c) requiring the party or other person to answer the question or produce the document would cause him or her undue prejudice;

(d) requiring the party or other person to answer the question or produce the document would unduly interfere with the orderly progress of the action; and

(e) the information or the document is readily available to the party requesting it from another source.

(2) In addition to the considerations listed in subrule (1), in determining whether to order a party or other person to produce one or more documents, the court shall consider whether such an order would result in an excessive volume of documents required to be produced by the party or other person.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

## V. Conclusion

72      Ultimately, this is not a case where the Special Receiver has simply pointed to a stack of documents or materials and left Deloitte to play a guessing game as to what will be relied upon at trial. To the contrary, it seems to me that the Special Receiver has gone to great efforts to provide the details of its position with a reasonable degree of specificity that is commensurate with the number of matters at issue in this action and the volume of material contained in the record.

73      In my judgment, having regard to the entire history of productions and examinations in various fora in this case, to require further and better answers to any of the matters refused would not accord with the dictates of the proportionality principle. The parties ought to be permitted to spend their available time preparing their *own* cases for trial. In my view the all the factors in rule 29.2.03 support my view that the defendant's motion with regard to these undertakings ought to be dismissed.

## VI. Expert Files

74      Deloitte moves as well for additional materials relating to the expert reports being relied upon by the Special Receiver at trial. In their factum the following assertion is made:

> 24. The Special Receiver is obliged to produce more than the "documents and materials given" to his experts "for use in forming their respective opinions". Deloitte is entitled to production of all foundational information underlying the findings, opinions and conclusions made by the Special Receiver's experts in the reports they have produced, including:
>
>> (a) documents that show the instructions upon which the experts proceeded and the assumptions they were asked to make;
>>
>> (b) documents that show that the instructions given to the experts changed over time;
>>
>> (c) documents that show all the facts that the experts relied upon, including raw data and calculations;
>>
>> (d) all articles or legal principles that the experts have relied upon;
>>
>> (e) all prior drafts of the experts' reports; and
>>
>> (f) correspondence between the experts and their instructing counsel that contain foundational information.

75      Deloitte's counsel further submit:

> The Special Receiver's refusal to produce the requested information will impede Deloitte from meeting the case put before it and from responding in a meaningful fashion to the experts' opinions that the Special Receiver relies on.

76      In support of his position the Special Receiver asserts:

> 21. On March 9, 2010, the Special Receiver served its liability experts' reports on counsel for Deloitte. The report of D. Paul Regan, dated March 8, 2010, consists of 261 pages, is organized chronologically and then sub-divided by the accounting items with which the Special Receiver's liability experts take issue in each audit year from 1989 to 1997. On May 7, 2012, the Special Receiver served further liability experts' reports on counsel for Deloitte. The report of D. Paul Regan, dated May 7, 2012, is organized to mirror the two liability reports relied upon by Deloitte.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

77    The reports of the two experts obtained by the Special Receiver made available for inspection by me at the hearing of these motions.

22. The documents relied upon by the experts in forming their opinions are set out \in detail and include descriptions of each document (as well as its Summation database number for ease of reference). The Special Receiver's liability experts have also identified specific discovery transcript references where they are relied upon in support of a particular point.

23. In the Written Answers, the Special Receiver clearly advised counsel for Deloitte that the expert reports would be relied upon in response to many of the interrogatories. While Deloitte initially sought to have the Special Receiver provide further answers to interrogatories for which it had relied upon the experts' reports, Deloitte has subsequently determined not to pursue those requests for further answers.

24. The Special Receiver has not refused to produce experts' files. On April 12, 2012, counsel for the Special Receiver advised that it would agree to exchange lists of all documents and materials provided to its experts, provided that was done on a reciprocal basis. Deloitte commenced this motion rather than respond to that proposal.

78    The factum of Special Receiver argues:

67. Deloitte brings this motion to compel production of the expert files despite the Special Receiver's offer for the parties to make the appropriate disclosure concerning their respective experts. The Special Receiver has offered to produce to Deloitte "the documents and materials given to each of [its experts]," and has requested that Deloitte do the same. This encompasses much of what Deloitte seeks to have produced.

68. To the extent that Deloitte seeks production of experts' notes, it is only entitled to those notes that reflect the information the experts obtained that formed part of the foundation of their opinions. This is not a blanket entitlement, and all other notes remain subject to litigation privilege.

69. As is the case with experts' notes, the right to disclosure of correspondence between experts and instructing counsel is not unlimited. Correspondence between counsel and an expert which is not relied upon for the purposes of preparing an experts' report remains subject to litigation privilege and is not disclosable.

## VII. Rule 31.06 entitlements

79    The rule is brief and seems to be quite limited in the required production at first blush:

31.06(3) A party may on an examination for discovery obtain disclosure of the findings, opinions and conclusions of an expert engaged by or on behalf of the party being examined that are relevant to a matter in issue in the action and of the expert's name and address, but the party being examined need not disclose the information or the name and address of the expert where,

(a) the findings, opinions and conclusions of the expert relevant to any matter in issue in the action were made or formed in preparation for contemplated or pending litigation and for no other purpose; and

(b) the party being examined undertakes not to call the expert as a witness at the trial.

80    The law regarding the extent of disclosure under rule 31.06(3) is not settled. In my 2011 decision in *Aherne v. Chang* (2011), 106 O.R. (3d) 297 (Ont. Master) (affirmed (2011), 337 D.L.R. (4th) 593 (Ont. S.C.J.)) I examined many

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

of these issues and I will not repeat the bulk of that analysis here.

81      Much of the tension and uncertainty in this area flows from the decision in *Browne (Litigation Guardian of) v. Lavery*, [2002] O.J. No. 564, 58 O.R. (3d) 49, [2002] O.T.C. 109, 37 C.C.L.I. (3d) 86, 18 C.P.C. (5th) 241 (Ont. S.C.J.). There, Mr. Justice Ferguson dealt with a situation not involving a defence medical. In that case, a second expert retained by a party was provided with a copy of the report delivered by a previous expert. Justice Ferguson determined that the previous expert's report (the "first report") formed part of the "findings" relied upon by the second expert and, therefore, had to be produced, even though it would have, otherwise, remained privileged.

82      In arriving at his conclusion, Justice Ferguson considered whether or not the first report could be a "finding" since it was supposedly not relied upon by the second expert. In that regard, he reasoned:

"In my view, that is no longer a proper restriction. The fundamental' difficulty with that principle is that there is no practical and fair way to determine what documents (either in whole or in part) have been influential or relied upon.

It seems logical that <u>if counsel sends the expert information counsel does so because he or she believes this information is relevant to the expert's task. If it is relevant to the task then it seems to me it should be available to counsel who must test the opinion.</u>"

[my emphasis]

83      The Court of Appeal examined what may be considered a "finding" in such circumstances in *Conceicao Farms Inc. v. Zeneca Corp.*, [2006] CanLII 31976; (2006), 83 O.R. (3d) 792, 272 D.L.R. (4th) 545, 215 O.A.C. 233 (Ont. C.A.). The concept of waiver of privilege, however, was not considered. *Conceicao* involved a motion by counsel, in preparation for an appeal of the trial decision, for production of a privileged memorandum that the opposing party's lawyer had made following a telephone conversation with an expert witness who testified at trial.

84      The Court ruled in *Conceicao* that rule 31.06(3) "clearly encompasses *not only the expert's opinion but the facts on which the opinion is based*". Justice Goudge writing for the Court of Appeal in 2006, observed that the rule entitles a party to obtain, on discovery, the *foundational information* of the expert's final opinion:

"[13] In *Holmested and Watson* at p. 31-106, the learned authors clearly and concisely summarize these aspects of the rule:

Rule 31.06(3) is concerned with fact disclosure, not with documentary production. If prepared in contemplation of litigation an expert's report is privileged and the report itself (*i.e.*, the document) remains technically privileged, notwithstanding rule 31.06(3). However, in practice the parties often waive this privilege and deliver or exchange expert's reports in lieu of, or in fulfillment of their obligations under rule 31.06(3).

[14] There is an area of debate concerning the scope of information that may be obtained pursuant to this rule. It clearly encompasses not only the expert's opinion but the facts on which the opinion is based, the instructions upon which the expert proceeded, and the expert's name and address. How far beyond this the right to obtain foundational information (as our colleague called it) extends, need not be determined here. Suffice it to say that we are of the view that **it does not yet extend as far as is tentatively suggested in** *Browne (Litigation Guardian of) v. Lavery*, 2002 CanLII 49411 (ON S.C.), (2002), 58 O.R. (3d) 49. We simply proceed on the basis that the rule entitles the appellant to obtain on discovery the foundational information for Dr. Grafius' final opinion. As will become clear, we need not decide in this case the precise extent of the information that is discoverable.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

[my emphasis]

85      Again in the present case I must weigh what I believe was the view "tentatively suggested" in *Browne* that the Court of Appeal rejects in *Conceicao* is the *obiter* view set out by Justice Ferguson,:

> It is my tentative view that our system of civil litigation would function more fairly and effectively if parties were required to produce all communications which take place between counsel and an expert before the completion of a report of an expert whose opinion is going to be used at trial.

86      My present analysis is guided by three factors: the subsequent jurisprudence, the requirements of proportionality and the new *Rules* provisions dealing with the role of experts.

87      For example, new Rule 4.1 outlines the duty of an expert to assist court. An expert is to be fair, objective and non-partisan. The expert is to provide opinion evidence that is related only to matters that are within the expert's area of expertise. As well the expert is to provide such additional assistance as the court may reasonably require to determine a matter in issue.

88      Under subrule 4.1(2) the expert's duty prevails over any obligation owed by the expert to the party by whom he or she is engaged. Arguably this obligation may ultimately mean that the expert's entire file should be available to the court at an early stage. My analysis of the present state of Ontario jurisprudence does not support such an expansion at this time. I therefore turn to the previous case law.

89      Three years after the decision in *Conceicao*, Justice Mesbur in *Bookman v. Loeb* (2009), 72 R.F.L. (6th) 388, 2009 CarswellOnt 3796 (Ont. S.C.J.); dealt with these issues on a motion heard prior to the hearing of that dispute.

90      I adopt her analysis at paragraphs 23 through 39 of her reasons in *Bookman*. Although that case was a family law matter I find the principals and approach she adopted useful in this case. In *Bookman* counsel resisting broad production took the position that much of what is requested was being sought for either for the purpose of impeachment of the expert rather than for pretrial disclosure or was protected by litigation privilege.

91      Justice Mesbur addresses the fundamental concepts requiring consideration in such cases:

> **26** The respondents also need to be able to respond in a meaningful fashion to the expert reports the plaintiff has delivered. To do so, they must know, among other things, what the expert was retained to provide an opinion on, whether those instructions changed over time, whether the experts' opinions themselves have changed over time, and what instructions or assumptions the expert was told to make in formulating his opinion. If the expert has relied on any documents from the court proceedings, or other documents, the respondents need to know what the expert has relied on, in order that their experts can respond in a meaningful fashion. If the expert has relied on particular articles or legal principles, again, the respondents are entitled to know this, for the same reason. In fact, the parties do not really disagree with this broad description of what should be provided....

92      They differ, however, in relation to the respondents' specific requests for some broad categories of information. These categories reflect areas where there appears to be continuing uncertainty as to the extent of present disclosure requirements in Ontario civil cases. The specific areas remaining in this case are:

> (a) prior drafts of the expert's report with all attachments;

> (b) both counsel's and the expert's notes of any meetings they had prior to the expert's preparation of his final report.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

If there are no notes, a summary of what was discussed;

(c) production of the entire file of the expert;

(d) if not entitled to full file, copies of any letters of instruction given to the expert by any of the party's lawyers, including all email, letter and other correspondence passing between prior counsel and the expert;

(e) copies of all accounts the expert has rendered to the party and bills paid from the outset of his retainer, together with disclosure of the terms of the expert's engagement together with all correspondence and payment records in relation to fees;

(f) production of the files of any other experts, including letters of instruction, letters of retainer, correspondence with counsel and/or the client directly, earlier drafts of reports, note of meetings with counsel etc.

93    Resisting counsel generally take the position that the experts' files are protected by litigation privilege. While, privilege is asserted as well with respect to counsel's notes of conversations with the expert, counsel are generally prepared to advise as to the instructions given to the experts if not already contained in their expert reports. This can be provided either by way of memorandum, or by providing actual letters where they exist. Any letters referred to specifically in the expert's report are to be produced.

94    In reviewing the Court of appeal's decision in *Conceicao* Justice Mesbur addressed the scope of information that could be obtained pursuant to the rule.

28. ...Simply put, the court held that the requesting party was entitled to the "foundational information" for the expert's final opinion. The court said that the rule clearly encompasses not only the expert's opinion but the facts on which the opinion was based and the instructions upon which the expert proceeded. The court, however, declined to comment on how far beyond this foundational information discovery extends....

95    Based upon that Court's comments she went on to infer that the scope of what must be produced "lies somewhere between the foundational information for the expert's opinion, and everything that has passed between the expert and the instructing solicitor, including the expert's entire file." She went on to echo the reasoning of Pierce J in *Fyffe v. Ontrac Equipment Services Inc.*, 2008 CarswellOnt 5669 (Ont. S.C.J.):

...where she noted that while an opposing party is entitled to foundational information, this is not a "limitless entitlement".

96    She then endeavoured to delineate the "zone of privacy" of litigation privilege, while recognizing "the tension between widening discovery while retaining the area of privacy necessary for the advocate to perform his or her role in the adversarial context."

97    Justice Mesbur's analysis of the role of litigation privilege is instructive:

31 Lederer J faced the same interpretive challenge in *Babakar v. Brown*, [71 C.C.L.I. (4th) 258] that is to say, how far the right to obtain foundational information extends. He noted that it has been established that it is improper to allow questions that set out to contradict, or confirm, the findings of experts. Such questions enter the realm of cross-examination.

32 Another question is whether litigation privilege is lost once the expert report itself has been produced, or whether

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

privilege is maintained in the expert's file until trial. The Supreme Court of Canada [in *Blank v. Canada (Department of Justice)*, 2006 SCC 39] stated that litigation privilege is based on the need for a protected area to facilitate investigation and preparation of a case for trial by the adversarial advocate. Litigation privilege aims to facilitate that process. As the court said, "Litigation privilege ... is not directed at, still less, restricted to communications between solicitor and client. It contemplates, as well, communications between a solicitor and third parties ..." The court went on to quote with approval the comments of R.J. Sharpe (now Sharpe J.A.) when he said [in [1984] *Special Lectures* LSUC 163.]: "Litigation privilege is based upon the need for a protected area to facilitate investigation and preparation of a case for trial by the adversarial advocate." Both *Blank* and *Conceicao Farms Inc.* suggest that the proper approach is to maintain privilege in the expert's file until trial.

98      Against the context of this brief overview of the law, I will address the disclosure requests the respondents have made. I will deal with each in turn.

*(a) documents that show the instructions upon which the experts proceeded and the assumptions they were asked to make*

99      I understand that his information has been provided by both sides already. If there were any other instructions given, upon which the experts proceeded, both sides have a duty to produce such further instructions.

*(b) documents that show that the instructions given to the experts changed over time;*

100     I do not believe there is a stand alone obligation to provide this information prior to trial. What must be provided is the foundational information for the report as delivered. The respondents are clearly entitled to receive the letters of instruction to each of the experts,. If no such letters exists, the experts or counsel must provide the particulars of the instructions that were provided. This includes any changes to these instructions, if such changes were made. Beyond the foregoing, to the extent this might be construed as a request for emails, letters or other correspondence passing between counsel and any expert, that material is in my view subject to litigation privilege that has not yet been waived.

*(c) documents that show all the facts that the experts relied upon, including raw data and calculations;*

101     In a case such as this, such a request is, in my view, impractical and not in accord with the dictates of proportionality, generally and of rule 29.2.03(1), in particular. This refusal is upheld.

*(d) all articles or legal principles that the experts have relied upon;*

102     To my mind this item seeks a similar degree of time and cost to produce little of assistance to the trier of fact. The experts have delivered their reports. If they have missed an important principle of law or economics that can be tested on cross examination. To require the experts to delineate *all articles or legal principles* upon which they have relied is not justified having regard to the degree of disclosure already made and the lack of proportional value of undertaking the exercise requested at this stage.

103     Based on the affidavit evidence filed, I accept that the Special Receiver has endeavoured to state its position clearly to the other side. The extent of its attempt to clarify its position is summarized in this portion of the responding factum which, in part, describes the electronic information available:

52. Throughout the Written Answers, the Special Receiver set out his position on the matters at issue in the Proceedings, the facts that will be relied upon in support, and the documents supporting those facts (including

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

references to examination transcripts). To the extent possible, referenced documents have been identified with their Summation database document number, which makes them easily accessible to Deloitte.

53. In response to certain interrogatories, the Special Receiver cross-referenced the reports delivered by its experts. In turn, the expert reports delivered by the Special Receiver also identify the documents upon which the experts relied to form their opinions, using Summation reference numbers that allow Deloitte to locate them among the productions. The Special Receiver has advised Deloitte that he will be relying on those documents at trial.

54. Short of creating a master list of all of the documents already identified in the Written Answers and expert reports, taken out of context, and therefore made less useful, there is nothing further that the Special Receiver can do to better particularize the documents to be relied upon at trial.

104      In my view this is more than sufficient to comply with the requirements of the Rules and the applicable caselaw....It would seem this request for even more precision, is aimed largely at the impeachment of the expert at trial, and is impermissible at this stage. In my view, this additional information does not go to the foundation of the experts' opinions, but rather to the potential impeachment of the expert's expertise and evidence.

105      That type of challenge is best reserved for a hearing before the trial judge who is the person best suited to determine if the expert is not objective nor independent. (see May 9, 2012 decision of the Court of Appeal in *Carmen Alfano Family Trust v. Piersanti*, 2012 ONCA 297, 291 O.A.C. 62 (Ont. C.A.).)

*(e) all prior drafts of the experts' reports*

106      In his factum the Special Receiver asserts that he understands that his experts do not have a practice of retaining prior drafts of their reports.

107      This is not a helpful statement. Are there no copies on any hard drives, email servers or clouds? Did no one receive a copy of the draft for comment? Is no preliminary draft or portion of such a draft extant anywhere? Perhaps.

108      I am ordering that any existent previous drafts in the care or control of the expert, the Special Receiver or its counsel be produced on the basis that this is a reciprocal obligation upon both sides in this litigation. If Deloitte does not wish to produce any drafts on this basis, with regard to its expert, then this order will apply to neither party.

*(f) correspondence between the experts and their instructing counsel that contain foundational information.*

109      The portions of any correspondence containing foundational information clearly must be produced to the extent that has not already occurred. The experts' files otherwise remain privileged until trial. They need not be produced now.

**VIII. Refusals upheld**

110      It perhaps goes without saying that all the foregoing findings are in no way intended to limit the discretion of the trial judge to require more extensive production either at a pre-trial stage or once the trial begins. What I have addressed is simply whether further pre-trial disclosure is required at this stage. (*viz. Carmen Alfano Family Trust v. Piersanti*, 2009 CarswellOnt 1199 (Ont. S.C.J.)).

111      In the circumstances I am awarding the Special Receiver his costs of the refusal motion on a partial indemnity basis in any event of the cause. In light of the unusual costs environment in this case, I have determined such costs are to be paid following trial. If the parties cannot agree on a quantum I will establish an *ad hoc* procedure to receive their

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

submissions.

**Security for Costs Redux**

112      As well as dealing with the matters addressed above, I heard a second motion relating to a variation of a previous order I made relating to the requiring that the plaintiff post security for costs.

113      This motion was brought by the defendant, Deloitte & Touche LLP ("Deloitte"), to vary the quantum of security for costs to be posted by the plaintiff. That quantum was originally set by me by order dated March 10, 2011.

114      That order was appealed by both sides and upheld on appeal.

**IX. Plot Synopsis**

115      In order to assist in appreciating the basis for the present motion, a brief summary of the factual history, set out at length in my earlier reasons, is required. As well, developments occurring subsequent to the release of my reasons in March of 2011 are quite germane.

116      The Amended Statement of Claim asserts claims not only on behalf of Livent for Livent's own purported losses, but also on behalf of, and for damages allegedly suffered by, Livent's "Stakeholders", which the Statement of Claim defines as Livent's creditors, shareholders, and other stakeholders.

117      The Stakeholders include Cerberus Capital Management LP ("Cerberus") and Tri-links Investment Trust ("Tri-links"), who, *following discovery of the Frauds,* purchased Livent notes with a face value of over US $37 million for a discounted amount of approximately US $18 million.

118      Discovery of the Frauds resulted in Livent seeking bankruptcy protection in Canada and the United States. Livent was eventually made subject to a Plan of Arrangement (the "Plan").

119      The Plan established a "D&T Litigation Fund," defined as:

the fund in the amount of [U.S.] $3,171,000 to be established by the Liquidation Trustee and deposited in trust with Stikeman Elliott, counsel to Livent (Canada) in the D&T Litigation, on the Effective Date **for the payment of the Estates' costs and expenses of prosecuting the Canadian Action, including the D&T Litigation**

[emphasis added]

120      In the Plan, "Canadian Action" is defined as any action, including this action and an action brought against Livent's former management, asserted or to be asserted by Livent to recover monies against non-debtor third parties.

121      Pursuant to the Plan, a creditor's committee was empowered to raise funds from the creditors to be deposited into the D&T Litigation Fund.

**X. The Existing Security for Costs Order**

122      On the original motion the plaintiff argued that it was inappropriate to make an order for security for costs against a court appointed special receiver. In the alternative, it was submitted that the most that should be awarded as security for costs of preparation and trial was $559,000.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

123      In determining the quantum to be ordered, I considered a number of factors based on the information available at that time. One of those factors was my assumption, based on the submissions of counsel, that the trial would last 8 weeks.

124      As detailed in my reasons, I determined that an allowance of $1,225,000 was appropriated this was calculated applying a reduction of roughly 10% to a gross total of $1,363,006. Which amount was based upon this calculation:

| | |
|---|---|
| Pre-trial matters | $168,000 |
| Trial Preparation matters | $197,000 |
| Trial period | $434,400 |
| Experts | $280,000 |
| Disbursements | $126,800 |
| Sub-total | $1,206,200 |
| HST | $ 156,806 |
| TOTAL | $1,363,006 |

125      That amount was premised on an 8 week trial commencing in September of this year. That prediction proved to be overly optimistic in two respects. The trial is now scheduled for 2013 and is expected to last 12 weeks. As well additional expert testimony is anticipated.

126      The factum filed by Deloitte identifies indications in my reasons as to the inability, at that stage, to predict with certainty a number of elements:

> 21. Master Short appreciated the possibility that changed circumstances in the future would make a variation of his order appropriate. For example, he noted that:
>
> (a) "I have determined to use a roughly 2 month estimate for the duration of the trial... [i]f the actual situation differs, there would seem to be good reason to seek a variation of my ultimate decision on this motion";
>
> (b) the 2 month estimate for the duration of the trial was taken from the "probably over optimistic estimate of the plaintiff"; and
>
> (c) "obviously matters of alteration of this timing and of any potential further security to be posted during the trial or otherwise, remain in the discretion of the trial judge."

127      Both parties appealed aspects of my security for costs order to Justice Colin Campbell. Those appeals were dismissed in reasons released September 13, 2011, [2011 ONSC 5353].

128      Justice Campbell heard a further motion having a bearing on the present motion on the same day the appeals were heard. That motion dealt with the application by the Special Receiver for approval of the terms of a Litigation Financing Arrangement. In many respects the decision on that application, [2011 ONSC 5352] gives rise to the present motion.

129      As there was no dispute filed before me with respect to the Deloitte interpretation of the Financing Arrangement, I base my decision on the following understanding of the arrangement approved by Justice Campbell.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

## XI. The Plaintiff's Litigation Financing Arrangement

130      The plaintiff's motion sought approval of a new Litigation Financing Arrangement. That motion was required because, as Livent's Special Receiver deposed in support of the motion:

> (a) the D&T Litigation Fund had been fully utilized to fund the litigation to that date;
>
> (b) the Special Receiver did not have the funds to pay Master Short's security for costs award directly. The D&T Litigation Fund had been consumed, and there was no further opportunity to replenish the D&T Litigation Fund as available funds under the Plan had been distributed; and
>
> (c) **as such it was necessary for the plaintiff to seek out alternative sources of financing for the security for costs owing to Deloitte, as well as the estimated costs of pursuing the Canadian Actions. Without such additional financing, the Canadian Actions would not continue.**

[my emphasis]

131      Under the Litigation Financing Arrangement, the plaintiff would turn to some of Livent's creditors to bear the financial burden of posting security for costs and continuing the action.

132      In particular the Litigation Financing Arrangement would vary the financing provided for in the Plan and would alter the priorities between creditors from those anticipated when the original Plan was sanctioned under the Litigation Financing Arrangement, if the plaintiff won a judgment in the litigation, there would be a different allocation of success amongst creditors, with first recovery going to those who would now be bearing the financial burden.

## XII. Deloitte Objection to Arrangement

133      Deloitte objected to the Litigation Financing Arrangement, submitting in part:

> (a) under the Litigation Financing Arrangement, Daedalean Financial Corporation ("Daedalean") and Cerberus, who are alleged to hold approximately $80 million of unpaid claims on Livent's estate, have agreed to subscribe to the litigation financing. **In return for their advancing up to $5 million they will receive *super-priority, not only in respect of that $5 million but also in respect of the entirety of their $80 million claim.* The same super-priority will be awarded to other participants in the Litigation Financing. Daedalean and Cerberus will be paid interest on any advances they make at the rate of 18% per annum and Daedalean will also be paid $10,000 per month as an administration fee;**
>
> (b) Daedalean and Cerberus appear to have acquired their claims through the purchase of Livent's debt following its insolvency. Whatever their rights to advance claims on Livent estate, they were not victims of the fraud at Livent and have no claims against Deloitte; and
>
> (c) as a consequence of the Litigation Financing Arrangement, this litigation will be changed from an action brought by a court-appointed receiver to **one controlled by and for the benefit of a subset of Livent's creditors, Daedalean and Cerberus, who will receive preferential treatment for their claims and who will not be at risk for Deloitte's costs should the claims made in the litigation be unsuccessful.**

[my emphasis]

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

134    Justice Campbell dismissed Deloitte's objections. He approved the Litigation Financing Arrangement but went on to hold that:

"[i]n my view it is appropriate ... to alleviate any prejudice to [Deloitte] by permitting a further motion for security for costs to be brought after the action is set down for trial.

### XIII. Extent of Financing Available and- Changed Circumstances

135    It now appears clear that, pursuant to the Litigation Financing Arrangement, the plaintiff now has access to up to a further $10 million to prosecute this litigation.

136    Before me, Deloitte's counsel asserted that Deloitte has no knowledge of the extent to which the plaintiff has obtained funds under the Litigation Financing Arrangement or the current balance of the D&T Litigation Fund. As a consequence it is submitted absent the assistance of this Court, Deloitte would still be unable to reach those funds to satisfy a costs order in Deloitte's favour.

137    They further argue that circumstances have now developed such that the quantum of security for costs previously determined by me is no longer just or proportionate. The circumstances they rely upon include that:

(a) Master Short's original ruling was based on an eight-week trial, but this the trial has now been scheduled for at least twelve weeks;

(b) Further expert reports, which were not anticipated in the proceedings before Master Short, have now become necessary;

(c) The plaintiff recently provided a list of its likely trial witnesses, which lists 26 fact witnesses; and I

(d) The plaintiff now has access to significant funds to prosecute this litigation, raising issues of proportionality under Rule 1.04(1.1).

### XIV. Historical perspective

138    In recent decades the attitude to the funding of plaintiff's cases by third parties has being the subject of a major sea change. Most of the change has been prompted by the development of class actions and the permitting of contingent fee arrangements

139    Little has been decided with regard to the interaction between those changes in attitude and the appropriate approach to security for costs in cases not falling within the class action legislation.

140    In one such case, *McIntyre Estate v. Ontario (Attorney General)* [2001 CarswellOnt 5315 (Ont. C.A.)], 2001 CanLII 7972, Osborne A.C.J.O. described historical concepts relating to the funding of litigation by third parties.

141    This was a motion by Imperial Tobacco Canada Limited (ITCL) for leave to intervene in an appeal by the Attorney General for Ontario from the order which concluded that the proposed contingent fee arrangement between the plaintiff and her counsel in an action against ITCL did not violate the provisions of *An Act Respecting Champerty*, R.S.O. 1897, c. 327 (the *Champerty Act*).

142    In her statement of claim in that action the plaintiff alleged that her late husband died of lung cancer as a direct result of smoking ITCL products to which he had become addicted. The plaintiff's income and assets are not sufficient to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

fund what she contended would be relatively costly litigation. Accordingly, plaintiff's counsel took the position that they would only act for her on a contingent fee basis.

143     Rather than simply proceeding with the action on a contingent fee basis, the plaintiff applied for a declaration that the particular contingent fee arrangement with her counsel did not violate the *Champerty Act*, the *Solicitors Act*, R.S.O. 1990, c. S.15, or the common law.

144     One of the arguments raised by ITCL involved invoking the common law tort of "barratry" to justify its interest in the appeal.

145     In his reasons the Associate Chief Justice noted:

[22] I include myself among those who had never heard of the tort of barratry until I read the material on this motion. Nonetheless, this submission requires some comment because of the position ITCL takes with respect to it. ITCL claims that the tort of barratry permits a defendant who is exposed to costs as a result of a champertous proceeding to sue the lawyer through whose "efficacious intermeddling" or improper motive the champertous action was brought in the first place.

146     Justice Osborne then provides a brief history of this area of the law:

[23] Barratry is related to, but clearly different from, champerty and maintenance. Barratry is defined in *Black's Law Dictionary*, 7th ed. (St. Paul: West Publishing, 1999) as "[t]he offence of frequently exciting and stirring up quarrels and suits, either at law or otherwise". According to Black's, barratry is also "a crime in most jurisdictions".

[24] By contrast, champerty refers to a bargain between a stranger and a party to a lawsuit by which the stranger pursues the party's claim in consideration of receiving part of any judgment proceeds. The difference between champerty and barratry appears to be that while champerty is purely self-interested, barratry requires the additional intent to harm the third person: "... if the design was not to recover his own right, but only to ruin and oppress his neighbour, that is barratry". See *Words and Phrases Judicially Defined, Vol. I* (London: Butterworth & Co., 1943).

[25] Maintenance is further distinguished from barratry and champerty on the basis that it appears to be motivated by altruism. That is, it requires a person to "lay out money on behalf of another in suits at law to recover a just right, and this may be done in respect of the poverty of the party; but if he lends money to promote and stir up suits, then he is a barrator". *Words and Phrases, supra.*

[26] In Canada, the common law criminal offences of champerty, maintenance and barratry (as well as refusing to serve in office and being a "common scold") were abolished after the 1950 *Report of the Royal Commission on the Revision of the Criminal Code*. There is no reference to a tort of barratry in torts texts such as *Canadian Tort Law*, Lewis Klar, (Toronto: Butterworths, 1999), *Remedies in Tort*, Lewis Klar et al., (Toronto: Carswell, Looseleaf ed.) or *The Law of Torts*, 9th ed., John Fleming (N.S.W.: The Law Book Company, 1998). Nonetheless, for the purpose of this motion I will assume, but not decide, that there is such a thing as the tort of barratry.

147     More recently Justice Penny in *Boldt v. Law Society of Upper Canada*, 2010 ONSC 3568 (Ont. S.C.J.) (CanLII) was required to consider these concepts where a plaintiff's pleading alleged that the defendants engaged in champerty, maintenance and barratry.

148     His Honour provided this summary of the law at that point in time:

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

[48] In *McIntyre Estates v. Ontario (Attorney General)*, 2002 CarswellOnt 2880 (Ont.C.A.) at paragraphs 26 and 34, the Court of Appeal summarized the general principles of the torts of champerty and maintenance, as follows:

(i) champerty is a subspecies of maintenance. Without maintenance, there can be no champerty.

(ii) for there to be maintenance the person allegedly maintaining an action or proceeding must have an improper motive which motive may include, but is not limited to, officious intermeddling or stirring up strife. There can be no maintenance if the alleged maintainer has a justifying motive or excuse.

(iii) for there to be champerty there **must be maintenance with the added element that the maintainer shares in the profits of the litigation.**

(iv) **the type of conduct that has been found to constitute champerty and maintenance has evolved over time so as to keep in step with the fundamental aim of protecting the administration of justice from abuse.**

(v) when the courts have had regard to statutes such as the *Champerty Act* and the *Statute Concerning Conspirators*, they have not interpreted those statutes as cutting down or restricting the elements that were otherwise considered necessary to establish champerty and maintenance at common law."

[my emphasis]

149    Following the release of that decision, David Cheifetz wrote on this topic in a September 20th, 2011 posting in *Slaw*, Canada's online legal magazine. In part, his comment read:

Barratry is implicit in much of the class action process south of the border, and not much less up here. It is most obvious in the class actions where few, if any, of the plaintiff class have suffered any injury of any type — let alone a compensable injury — so that the relief sought is disgorgement of revenue (profits) through the "waiver of tort" remedy.

Another way to put it is the class action process had almost made barratry, in its traditional meaning, mostly legal. Lawyers still can't create the facts that amount to the civil wrong — for example, if you know that some place is not properly maintained, suggest that somebody would do well to have a slip and fall there — but, if they see some problem likely to have injured unknown people, they can now advertise the fact that the wrong exists and troll for clients to make it worthwhile for the lawyers to sue.

. . .

I expect that many most lawyers who represent plaintiff classes would publicly disagree with me, if the barratry proposition was put to them. They will describe this as a necessary aspect of the regulatory function — the conduct modification purpose of class actions. After all, if we lawyers don't lead the charge (from the front, of course, with suitable pay for the danger of leading the charge from the front) then who will?

150    Perhaps in the future the answer to that rhetorical question, for cases that are not brought under the class action legislation, will be third party investors.

151    In my view such financing approaches, while permitting potentially meritorious claims to proceed, nevertheless need to be subject to a re-thought approach to potential liability for costs in the event the action is unsuccessful. What type of order is just in such circumstances?

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

## XV. An Order "That Is Just" in the Circumstances

152     Clearly the new subrule 1.1, added to Rule 1.04 in 2010 may have a bearing on this matter as well:

**1.04(1)** These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

153     Master Haberman in *Shuter v. Toronto Dominion Bank*, [2007] O.J. No. 3435 (Ont. Master), 2007 CanLII 37475, provided helpful guidance on establishing a just order once it has been determined that security ought to be provided.

**64** It is important, at the second stage of the inquiry, to bear in mind what Rule 56.01 is intended to address. An order for security for costs is consistent with the overall philosophy of our Rules, which emphasises a number of objectives, including streamlining proceedings so that matters move through our courts within a reasonable timeframe; encouraging early and reasonable settlements; and discouraging litigation or steps in litigation that are doomed to fail. As a result, in this jurisdiction, costs generally follow the event - the party whose position fails is generally required to pay a significant portion of the costs of the party who has prevailed. This approach is intended to deter parties from launching frivolous actions, from dragging their heels to court and from initiating unnecessary or unmeritorious steps along the way.

**65** In keeping with this general set of goals, our Rules recognize that this approach to costs provides no such deterrent if a party is unable to pay costs at the end of the day. Hence, in certain cases where the court agrees that there is genuine cause for concern about a plaintiff's ability to do so, it will entertain a motion requiring that party, either a plaintiff or plaintiff by counterclaim, to post security during the course of the litigation so that funds are available to pay a cost order if and when required. In this way, a defendant is partially protected from having to bear the costs of an action that ought not to have been started.

154     In *Cigar500.com Inc. v. Ashton Distributors Inc.* (2009), 99 O.R. (3d) 55 (Ont. S.C.J.). Justice Code delivered a judgment reversing the master and following the decision of the Divisional Court in, *Zeitoun v. Economical Insurance Group* (2008), 91 O.R. (3d) 131, [2008] O.J. No. 1771, 292 D.L.R. (4th) 313, 53 C.P.C. (6th) 308, 165 A.C.W.S. (3d) 770, 236 O.A.C. 76, 64 C.C.L.I. (4th) 52 (Ont. Div. Ct.).

155     The Divisional Court decision in that case was subsequently affirmed by a unanimous five Justice panel of the Court of Appeal in *Zeitoun v. Economical Insurance Group*, 2009 ONCA 415, 73 C.P.C. (6th) 8, 307 D.L.R. (4th) 218, 73 C.C.L.I. (4th) 255, 2009 CarswellOnt 2665, 96 O.R. (3d) 639 (Ont. C.A.).

156     In his reasons in *Cigar500.com* Justice Code observed:

"[[68] In any event, the court's decision in *Zeitoun* is simply the culmination of a clear trend or evolution in the modern rule 56.01 case law **towards flexible consideration of the merits at the second stage of analysis.** A number of the pre-Zeitoun decisions, cited above to this effect, involved corporate plaintiffs on rule 56.01(1) (d) motions....:

[69] For all these reasons, I am satisfied that Zeitoun is a binding decision to the effect that the merits of a plaintiff's claim remain a relevant factor at the second stage of rule 56.01 analysis, even when the plaintiff is not

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

"impecunious". Furthermore, this principle applies generally to rule 56.01 motions, including to corporate plaintiffs under rule 56.01(1) (d). **This is not to say that the courts will not take a stricter approach to corporate plaintiffs who lack assets in Ontario but who have wealthy shareholders. Indeed, the courts are likely to give considerable weight to this factor for the policy reasons** set out by Nordheimer J. in *Aviaco* [*International Leasing Inc. v. Boeing Canada Inc.*; 48 C.P.C. (4th) 366, 99 A.C.W.S. (3d) 391]. In this regard, it is to be remembered that the burden in *Zeitoun* for a plaintiff who is not "impecunious" is a high one. It must establish that its claim "has a good chance of success". Furthermore, this remains **only one factor to be balanced with other relevant factors, such as the existence of "wealthy shareholders [who] have decided to carry on business and litigation through a shell corporation"**, as Sutherland J. put it in *Smith Bus Lines Ltd.*, [61 O.R. (2d) 688 at 705]. All of these factors should be considered at the second-stage inquiry under rule 56.01."

[my emphasis]

157    I agree with Justice Code's conclusion that the ultimate decisions in *Zeitoun* are simply the culmination of a clear trend or evolution in the modern, rule 56.01 case law, towards flexible consideration of applications for security for costs. In my view this includes not only a consideration of the merits at the second stage of analysis but also a consideration of all relevant factors.

158    Furthermore, this principle applies generally to rule 56.01 motions, including to corporate plaintiffs under rule 56.01(1) (d). This is not to say that the courts will not take a stricter approach to corporate plaintiffs who lack assets in Ontario but who have wealthy shareholders. I agree that the courts should give considerable weight to this factor for the policy reasons set out by Nordheimer J. in *Aviaco International Leasing Inc. v. Boeing Canada Inc.* [2000 CarswellOnt 3088 (Ont. S.C.J.)], *supra*.

159    In the earlier portion of my reasons I referred to the lead article in the 2009 edition of the *Annual Review of Civil Litigation* (edited by Justices Archibald and Echlin of this court) which was entitled "The End of the Action at Its Beginning: The Relationship between Security for Costs Motions and the Insolvent Corporate Plaintiff". In that article, the authors considered the difficulty of addressing the competing interests in cases such as this:

In our current global economic climate, there would appear to be increased likelihood that lawsuits will be brought by insolvent corporate plaintiffs, or that corporate plaintiffs with lawsuits already in progress may become insolvent during the course of litigation. In the next decade, this issue will of great significance for both plaintiffs and defendants. Defendants' counsel will have an interest in seeking and obtaining security from corporate plaintiff with questionable finances. Plaintiffs' counsel will have an interest in resisting orders for security; or in assessing whether to bring suits on behalf of corporations with minimal assets....

160    The authors address a major concern I have had in coming to my ultimate conclusion:

In a great many cases, a successful motion for security for costs effectively spells the end of the litigation. This is especially true where the plaintiff is insolvent. ...if the plaintiff corporation is a shell company that is being directed to pursue a course of litigation by a risk-averse shareholder, the order for-security for costs effectively upends the shareholder's litigation strategy, and in most cases will also mean the end of the litigation. The difficulty for motions judges in these situations is to carefully balance the interests of the defendant in not being put to a costly defence by a plaintiff with nothing on the line, while also recognizing that an order for security could derail a prima facie meritorious claim.

161    In his factum counsel for the Special Receiver addresses the issue of the extent to which this court ought to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

consider the financial position of those presently supporting the plaintiff's action:

> 40. From these principles, Deloitte takes the preposterous leap to argue that the financial status of a corporate plaintiff's creditors is somehow relevant in determining the quantum to be fixed in an order for security for costs. The Ontario Court of Appeal has stated that costs ought to be fixed based on the "amount that is fair and reasonable for the unsuccessful party to pay in the particular proceeding ..." [*Boucher v. Public Accountants Council (Ontario)*, 2004 CarswellOnt 2521 (CA.) at para 26]

> Applied to the security for costs context, this requires determining an amount, which, objectively, would be fair and reasonable for a plaintiff to pay in the event that it is unsuccessful at trial. That this amount might somehow fluctuate based on the funds available to a creditor would be an unwelcomed change in the law: "from each according to his ability" is not a recognized legal principle in determining the quantum for security for costs, and nor should it be.

162    In this case "investors" in the plaintiff's position negotiated and were allowed super priorities with regard to any ultimate recoveries, such that if they are successful at trial, they potentially will be in a position to reap profits in the tens of millions of dollars. Obviously their position is not without risk. Nevertheless, in my view investors in this type of claim should expect to undertake a reasonable exposure to additional losses resulting from a cost award, if they are unsuccessful at trial

163    This is not David and Goliath. This is not an unfortunate investor who has lost his life savings and has already "bet the farm".

164    If parties wish to participate in high stake games, they my need to be given strong incentives to do so, but having received those incentives they should be prepared to "ante up" so that there is an equality of both arms and exposure.

165    I have little doubt that if the plaintiff's position is upheld at the conclusion of the various court processes, not only is it probable that the full amounts posted as security will be returned, but also those advocating the plaintiff's cause will seek a very substantial costs award in addition to the damages that may be awarded. My view of the requirement of proportionality for "equality of arms" includes an element of equality of "risk and reward" exposure.

166    I therefore feel it is appropriate to order additional security for costs at this time. Subject to the trial judge's discretion, I am directing that security in the amount set out below be paid into court and posted at least sixty days prior to the scheduled date for the opening of the trial.

167    Having considered the caselaw and the requirements of the existing *Rules*, I am exercising my discretion in making this order which I regard as "just in the circumstances".

## XVI. Quantum

168    In my previous reasons I noted that there was little, if any, incentive for Messrs Drabinsky and Gottlieb to proceed with their defence of the Drabinsky Litigation, and in all likelihood trial of that matter will not proceed. I accepted this as a reasonable probability and accordingly, held that the time required for trial in Deloitte's original costs estimate needed to be be significantly reduced to reflect the probability that trial will more likely only proceed for 2 months as opposed to the six originally contemplated.

169    Schedule "H" of the Special Receiver's factum sets out the calculation of Deloitte's proposed upwardly adjusted total security amount of $2,100,000. I calculate a lesser sum as being appropriate

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

170     In my view in light of the changes in circumstances, the number of witnesses now identified and the addition anticipated expert evidence, an extra month of trial is probable.

171     I originally used eight weeks for two months of trial in my calculations. Eight weeks resulted in an allowance of $434,400 or $54,300.00. In my view an additional five weeks need to be contemplated now. Those five extra weeks mean an additional allowance of $271,500 is appropriate.

172     As well, preparation for a longer trial will mean additional preparation costs. Here, since we are dealing with three months rather than two and I allowed $197,000 I have taken a rough approximation of a 33.3 % increase and allowed an additional $100,000 for increased required trial preparation.

173     With respect to expert evidence Deloitte originally sought $700,000. I was not satisfied that anywhere near this amount has been adequately proven at that stage. Clearly expert evidence was going to be required. In my view 40% of the amount sought is a more reasonable allowance for the obtaining and presenting such evidence for the purposes of my establishing a total sum to be posted. Thus, I included $280,000 in my calculation. Clearly there will now be additional expert costs and I am allowing a further 20% of the original claim, being $140,000.

174     To reflect the roughness of these approximations I am not increasing the previous Disbursement Allowance nor directing any sum for pre-trial matters. An amount to reflect applicable HST on the additional sums will need to be posted as well.

175     In my earlier reasons I incorporated a 10% reduction due, amongst other reasons, to the delay in bringing the application. Given the present fact situation I see no reason for such a reduction to delay here.

176     In light of the changed circumstances, I am not adding the complexity of a weekly payment option but rather requiring the additional amount established to be paid by way of a lump sum. However, I would commend as a pay as you go element to be considered by the trial judge if it becomes apparent that the trial will continue below the present twelve week estimate.

177     I therefore have come to an additional amount to be paid as security for costs in this case in the total of $577,995.00 based upon this calculation of allowances for added costs:

| | |
|---|---:|
| Trial Preparation matters | $100,000 |
| Trial period costs | $271,500 |
| Experts | $140,000 |
| Sub-total | $511,500 |
| HST | $66,495 |
| TOTAL | $577,995 |

178     Taken together with my previous award of $1,363,006, this brings the total security to be posted pursuant to my judgements to $1,941,001.

**XVII. Conclusion**

179     Obviously matters of alteration of this timing and of any potential further security to be posted during the trial or otherwise, remains in the discretion of the trial judge.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 15624, 2012 ONSC 7007, 224 A.C.W.S. (3d) 283

180        In particular, there are two factors upon which I place particular reliance in determining to exercise my discretion in this way. Firstly, the overall claim against this defendant being in the hundreds of millions of dollars and the concept of proportionality places this amount within the range of reasonableness.

## XVIII. Costs of Motions

181        Firstly I commend all counsel for their advocacy in this matter. Once again their courtesy and assistance to me in addressing these important issues is greatly appreciated.

182        If the allegations which appear to sound in fraud are not proven at trial, the trial judge will have to weigh that fact in establishing the costs payable. Obviously such a determination could have impact on costs awards made throughout in this action.

183        As a consequence of that possibility, in my earlier award I elected to reserve the costs of this motion, throughout, to the trial judge who will be in a much better position ultimately to address the fairest disposition of the costs of this element of the overall litigation. That ruling was upheld on appeal.

184        In all the circumstances, I feel that the costs of this increased security for costs motion should be to Deloitte on a partial indemnity basis, but again subject to the discretion of the trial judge at the completion of the trial.

*Motion granted in part.*

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 2



2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Ontario v. Rothmans Inc.

Her Majesty the Queen in Right of Ontario, Plaintiff and Rothmans Inc., Rothmans, Benson & Hedges Inc., Carreras Rothmans Limited, Altria Group, Inc., Philip Morris U.S.A. Inc., Philip Morris International, Inc., JTI-MacDonald Corp., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International Inc., Imperial Tobacco Canada Limited, British American Tobacco p.l.c., B.A.T Industries p.l.c., British American Tobacco (Investments) Limited, and Canadian Tobacco Manufacturers' Council, Defendants

Ontario Superior Court of Justice

Perell J.

Heard: April 5-7, 2011
Judgment: April 26, 2011[FN*]
Docket: 09-CV-387984

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing *Ontario v. Rothmans Inc.* (2011) ((Ont. Master))

Counsel: Ronald Carr, John Kelly, Kevin Hille, for Plaintiff

Charles Scott, Shaun Laubman, for Defendant, B.A.T. Industries p.l.c.

Chris Rusnak, for Defendant, Carreras Rothmans Limited

Craig Dennis, for Defendant, British American Tobacco (Investments) Limited

Subject: Civil Practice and Procedure; Public; International

Civil practice and procedure --- Discovery — Examination for discovery — Range of examination — Relevance of questions

Plaintiff Crown brought action against defendant tobacco companies for costs of health care allegedly necessitated by damage caused by tobacco products — Several tobacco companies were based outside Canada and challenged court's jurisdiction — Crown sought information as to connection to Canada through cross-examination — Tobacco company representatives refused to answer several questions as to documentation which they possessed dating back to 1970s — Crown brought refusals motion to compel answers to unanswered questions — Lower court ruled that documents relating to possible connection with Canadian companies were essential to claim, and that tobacco companies could either produce relevant documents or show more evidence as to why they could not do so — Tobacco companies appealed from findings of lower court — Appeal allowed — Standard of review was correctness on matters of law, which included

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

relevancy of questions, and reasonableness on matters of discretion, which included undertakings — Lower court erred in ordering disclosure of full record as this may have required tobacco companies to put harmful evidence before court — Cross-examination on motion did not require same standards of disclosure as examination for discovery, at which time Crown would be able to obtain much of information that they sought — Information sought would not have been within personal knowledge of deponents for tobacco companies and there was no requirement to inform themselves of other information — Proportionality principle that was to be promoted in discovery was best served by not requiring widespread searches that companies would have to do to provide requested information — Discovery plan would be appropriate in setting out capabilities of each party to find necessary information.

Civil practice and procedure --- Practice on appeal — Powers and duties of appellate court — Upon appeal from Master — Reversing finding of fact — Where Master's decision discretionary

Plaintiff Crown brought action against defendant tobacco companies for costs of health care allegedly necessitated by damage caused by tobacco products — Several tobacco companies were based outside Canada and challenged court's jurisdiction — Crown sought information as to connection to Canada through cross-examination — Tobacco company representatives refused to answer several questions as to documentation which they possessed dating back to 1970s — Crown brought refusals motion to compel answers to unanswered questions — Lower court ruled that documents relating to possible connection with Canadian companies were essential to claim, and that tobacco companies could either produce relevant documents or show more evidence as to why they could not do so — Tobacco companies appealed from findings of lower court — Appeal allowed — Standard of review was correctness on matters of law, which included relevancy of questions, and reasonableness on matters of discretion, which included undertakings — Lower court erred in ordering disclosure of full record as this may have required tobacco companies to put harmful evidence before court — Cross-examination on motion did not require same standards of disclosure as examination for discovery, at which time Crown would be able to obtain much of information that they sought — Information sought would not have been within personal knowledge of deponents for tobacco companies and there was no requirement to inform themselves of other information — Proportionality principle that was to be promoted in discovery was best served by not requiring widespread searches that companies would have to do to provide requested information — Discovery plan would be appropriate in setting out capabilities of each party to find necessary information.

**Cases considered by *Perell J.*:**

*Abrams v. Abrams* (2010), 102 O.R. (3d) 645, 2010 ONSC 2703, 2010 CarswellOnt 2915, 91 C.P.C. (6th) 337 (Ont. S.C.J.) — considered

*Air Canada v. McDonnell Douglas Corp.* (1995), 22 O.R. (3d) 140, 1995 CarswellOnt 839 (Ont. Master) — considered

*Air Canada v. McDonnell Douglas Corp.* (1995), 23 O.R. (3d) 156, 1995 CarswellOnt 4241 (Ont. Gen. Div.) — referred to

*Allarco Broadcasting Ltd. v. Duke* (1981), 1981 CarswellBC 374, 26 C.P.C. 13, 34 B.C.L.R. 7 (B.C. S.C.) — considered

*Andersen v. St. Jude Medical Inc.* (2007), 61 C.P.C. (6th) 315, 2007 CarswellOnt 9436 (Ont. Master) — considered

*Bank of Montreal v. Carrick* (1973), 1 O.R. (2d) 574n (Ont. H.C.) — referred to

*BASF Canada Inc. v. Max Auto Supply (1986) Inc.* (1998), 75 O.T.C. 58, 1998 CarswellOnt 3751 (Ont. Master) —

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

referred to

*Blank v. Canada (Department of Justice)* (2006), 2006 CarswellNat 2704, 2006 CarswellNat 2705, 47 Admin. L.R. (4th) 84, 40 C.R. (6th) 1, 2006 SCC 39, *(*sub nom. *Blank v. Canada (Minister of Justice))* 352 N.R. 201, 270 D.L.R. (4th) 257, 51 C.P.R. (4th) 1, *(*sub nom. *Blank v. Canada (Minister of Justice))* [2006] 2 S.C.R. 319 (S.C.C.) — considered

*Blum v. Sweet Ripe Drink Inc.* (1991), 47 C.P.C. (2d) 263, 1991 CarswellOnt 417 (Ont. Master) — considered

*Bot Construction (Ontario) Ltd. v. Dumoulin* (2007), 2007 CarswellOnt 7636 (Ont. S.C.J.) — considered

*Canadian Imperial Bank of Commerce v. Molony* (1983), 32 C.P.C. 213, 1983 CarswellOnt 369 (Ont. H.C.) — considered

*Caputo v. Imperial Tobacco Ltd.* (2002), 25 C.P.C. (5th) 78, 2002 CarswellOnt 3270 (Ont. Master) — referred to

*Caputo v. Imperial Tobacco Ltd.* (2003), 33 C.P.C. (5th) 214, 2003 CarswellOnt 2154 (Ont. S.C.J.) — considered

*Cominco Ltd. v. Westinghouse Canada Ltd.* (1979), 11 B.C.L.R. 142, 1979 CarswellBC 69 (B.C. C.A.) — considered

*Descôteaux c. Mierzwinski* (1982), 1982 CarswellQue 13, [1982] 1 S.C.R. 860, 28 C.R. (3d) 289, 1 C.R.R. 318, 44 N.R. 462, 141 D.L.R. (3d) 590, 70 C.C.C. (2d) 385, 1982 CarswellQue 291 (S.C.C.) — considered

*Ferring Inc. v. Richmond Pharmaceuticals Inc.* (1996), 65 C.P.R. (3d) 361, 45 C.P.C. (3d) 299, 90 O.A.C. 88, 1996 CarswellOnt 606 (Ont. Div. Ct.) — considered

*Gajraj v. DeBernardo* (2002), 28 M.V.R. (4th) 10, 213 D.L.R. (4th) 651, 40 C.C.L.I. (3d) 163, 24 C.P.C. (5th) 258, 2002 CarswellOnt 1766, 160 O.A.C. 60, 60 O.R. (3d) 68, 13 C.C.L.T. (3d) 194 (Ont. C.A.) — considered

*General Accident Assurance Co. v. Chrusz* (1999), 180 D.L.R. (4th) 241, 124 O.A.C. 356, 45 O.R. (3d) 321, 38 C.P.C. (4th) 203, 1999 CarswellOnt 2898 (Ont. C.A.) — considered

*Graydon v. Graydon* (1921), 67 D.L.R. 116, 21 O.W.N. 192, 51 O.L.R. 301 (Ont. S.C.) — considered

*Guestlogix Inc. v. Hayter* (2010), 100 C.P.C. (6th) 389, 2010 CarswellOnt 7689, 2010 ONSC 5570 (Ont. S.C.J.) — considered

*Hinke v. Thermal Energy International Inc.* (2011), 2011 CarswellOnt 926, 2011 ONSC 1018 (Ont. Master) — referred to

*Javitz v. BMO Nesbitt Burns Inc.* (2011), 2011 ONSC 1332, 2011 CarswellOnt 1244 (Ont. S.C.J. [Commercial List]) — considered

*Kay v. Posluns* (1989), 71 O.R. (2d) 238, 1989 CarswellOnt 917 (Ont. H.C.) — considered

*Lemmex v. Bernard* (2002), 2002 CarswellOnt 1812, 213 D.L.R. (4th) 627, 160 O.A.C. 31, 60 O.R. (3d) 54, 26 C.P.C. (5th) 259, 13 C.C.L.T. (3d) 203 (Ont. C.A.) — considered

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

*Leufkens v. Alba Tours International Inc.* (2002), 2002 CarswellOnt 1811, 213 D.L.R. (4th) 614, 160 O.A.C. 43, 60 O.R. (3d) 84, 26 C.P.C. (5th) 247, 13 C.C.L.T. (3d) 217 (Ont. C.A.) — considered

*Logan v. Canada (Minister of Health)* (2001), 2001 CarswellOnt 6233 (Ont. Master) — considered

*Lubotta v. Lubotta* (1959), [1959] O.W.N. 322 (Ont. Master) — considered

*Moyle v. Palmerston Police Services Board* (1995), 1995 CarswellOnt 1716, 25 O.R. (3d) 127 (Ont. Div. Ct.) — considered

*Muscutt v. Courcelles* (2002), 213 D.L.R. (4th) 577, 2002 CarswellOnt 1756, 160 O.A.C. 1, 60 O.R. (3d) 20, 26 C.P.C. (5th) 206, 13 C.C.L.T. (3d) 161 (Ont. C.A.) — considered

*Mutual Life Assurance Co. of Canada v. Buffer Investments Inc.* (1985), 5 C.P.C. (2d) 5, 52 O.R. (2d) 335, 1985 CarswellOnt 579 (Ont. H.C.) — referred to

*Ontario (Attorney General) v. Ballard Estate* (1995), 129 D.L.R. (4th) 52, 44 C.P.C. (3d) 91, *(*sub nom. *Ontario (Attorney General) v. Stavro)* 86 O.A.C. 43, *(*sub nom. *Ontario (Attorney General) v. Stavro)* 26 O.R. (3d) 39, 1995 CarswellOnt 1332 (Ont. C.A.) — considered

*Playfair v. Cormack* (1913), 4 O.W.N. 817, 24 O.W.R. 56, 9 D.L.R. 455, 1913 CarswellOnt 86 (Ont. S.C.) — considered

*R. v. Cloutier* (1979), 1979 CarswellQue 15, [1979] 2 S.C.R. 709, 1979 CarswellQue 164, 12 C.R. (3d) 10, 28 N.R. 1, 48 C.C.C. (2d) 1, 99 D.L.R. (3d) 577 (S.C.C.) — considered

*R. v. Khelawon* (2006), 355 N.R. 267, 274 D.L.R. (4th) 385, 220 O.A.C. 338, [2006] 2 S.C.R. 787, 42 C.R. (6th) 1, 2006 CarswellOnt 7825, 2006 CarswellOnt 7826, 2006 SCC 57, 215 C.C.C. (3d) 161 (S.C.C.) — considered

*R. v. Morris* (1983), 1983 CarswellBC 695, [1983] 2 S.C.R. 190, 1 D.L.R. (4th) 385, 48 N.R. 341, [1984] 2 W.W.R. 1, 7 C.C.C. (3d) 97, 36 C.R. (3d) 1, 1983 CarswellBC 730 (S.C.C.) — considered

*Rabbiah v. Deak & Co.* (1961), [1961] O.W.N. 280 (Ont. H.C.) — considered

*Republic National Bank of New York (Canada) v. Normart Management Ltd.* (1996), 1996 CarswellOnt 3617, 31 O.R. (3d) 14, 6 C.P.C. (4th) 206, 15 O.T.C. 395 (Ont. Gen. Div.) — considered

*Rodrigues v. Madill* (1985), 3 C.P.C. (2d) 1, 1985 CarswellOnt 401 (Ont. Master) — considered

*Rubinoff v. Newton* (1966), [1967] 1 O.R. 402, 1966 CarswellOnt 504 (Ont. H.C.) — considered

*Schreiber v. Mulroney* (2007), 2007 CarswellOnt 6505, *(*sub nom. *Schreiber c. Mulroney)* 87 O.R. (3d) 651, 87 O.R. (3d) 643 (Ont. S.C.J.) — distinguished

*Seaway Trust Co. v. Markle* (1988), 1988 CarswellOnt 343, 25 C.P.C. (2d) 64 (Ont. Master) — considered

*Shannon v. BGC Partners LP* (2011), 2011 CarswellOnt 1364, 2011 ONSC 1415 (Ont. Master) — considered

*Sinclair v. Cracker Barrel Old Country Store Inc.* (2002), 213 D.L.R. (4th) 643, 2002 CarswellOnt 1755, 160 O.A.C.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

54, 60 O.R. (3d) 76, 26 C.P.C. (5th) 239, 13 C.C.L.T. (3d) 230 (Ont. C.A.) — considered

*Six Nations of the Grand River Band v. Canada (Attorney General)* (2000), 2000 CarswellOnt 1342, 46 C.P.C. (4th) 365, 132 O.A.C. 316, (sub nom. *Six Nations of the Grand River Indian Band v. Canada (Attorney General)*) 48 O.R. (3d) 377 (Ont. Div. Ct.) — considered

*Solosky v. R.* (1979), 1979 CarswellNat 4, [1980] 1 S.C.R. 821, 105 D.L.R. (3d) 745, 16 C.R. (3d) 294, 30 N.R. 380, 50 C.C.C. (2d) 495, 1979 CarswellNat 630 (S.C.C.) — considered

*Superior Discount Ltd. v. N. Perlmutter & Co.* (1951), 1951 CarswellOnt 355, [1951] O.W.N. 897 (Ont. Master) — considered

*TELUS Communications Co. v. Sharp* (2010), 97 C.P.C. (6th) 148, 2010 ONSC 2878, 2010 CarswellOnt 3351, 102 O.R. (3d) 93 (Ont. Master) — considered

*Thomson v. Thomson* (1948), 1948 CarswellOnt 132, [1948] O.W.N. 137 (Ont. H.C.) — considered

*Toronto Board of Education Staff Credit Union Ltd. v. Skinner* (1984), 46 C.P.C. 292, 1984 CarswellOnt 477 (Ont. H.C.) — considered

*Van Breda v. Village Resorts Ltd.* (2010), 98 O.R. (3d) 721, 71 C.C.L.T. (3d) 161, 81 C.P.C. (6th) 219, 316 D.L.R. (4th) 201, 77 R.F.L. (6th) 1, 2010 CarswellOnt 549, 2010 ONCA 84, 264 O.A.C. 1 (Ont. C.A.) — considered

*Van Breda v. Village Resorts Ltd.* (2010), 2010 CarswellOnt 4829, 2010 CarswellOnt 4830, (sub nom. *Club Resorts Ltd. v. Van Breda*) 409 N.R. 398 (note) (S.C.C.) — referred to

*Van Horn v. Verrall* (1911), 3 O.W.N. 439, 1911 CarswellOnt 690, 20 O.W.R. 773 (Ont. C.A.) — considered

*Warman v. National Post Co.* (2010), 103 O.R. (3d) 174, 77 C.C.L.T. (3d) 122, 2010 CarswellOnt 5920, 2010 ONSC 3670 (Ont. Master) — followed

*Westminer Canada Holdings Ltd. v. Coughlan* (1989), 33 C.P.C. (2d) 27, 1989 CarswellOnt 345 (Ont. Master) — considered

*Westminer Canada Holdings Ltd. v. Coughlan* (1989), 37 C.P.C. (2d) 314, 1989 CarswellOnt 431 (Ont. H.C.) — referred to

*Wojick v. Wojick* (1971), [1971] 2 O.R. 687, 1971 CarswellOnt 660 (Ont. H.C.) — considered

*Zeitoun v. Economical Insurance Group* (2008), 236 O.A.C. 76, 64 C.C.L.I. (4th) 52, 2008 CarswellOnt 2576, 53 C.P.C. (6th) 308, 292 D.L.R. (4th) 313, 91 O.R. (3d) 131 (Ont. Div. Ct.) — considered

*Zeitoun v. Economical Insurance Group* (2009), 73 C.C.L.I. (4th) 255, 257 O.A.C. 29, 2009 ONCA 415, 73 C.P.C. (6th) 8, 307 D.L.R. (4th) 218, 2009 CarswellOnt 2665, 96 O.R. (3d) 639 (Ont. C.A.) — referred to

*671122 Ontario Ltd. v. Canadian Tire Corp.* (1996), 1996 CarswellOnt 2591, 5 C.P.C. (4th) 182, 9 O.T.C. 72 (Ont. Gen. Div.) — considered

**Statutes considered:**

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

*Companies Act*, 1985, c. 6

    Generally — referred to

*Companies Act, 2006*, 2006, c. 46

    Generally — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43

    s. 106 — considered

*Limitations Act, 2002*, S.O. 2002, c. 24, Sched. B

    Generally — referred to

*Tobacco Damages and Health Care Costs Recovery Act, 2009*, S.O. 2009, c. 13

    Generally — referred to

    s. 1(1) "cost of health care benefits" — considered

    s. 1(1) "health care benefits" — considered

    s. 1(1) "manufacture" — considered

    s. 1(1) "tobacco related wrong" — considered

    s. 2 — referred to

    s. 6 — considered

    s. 10 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

    Generally — referred to

    R. 1.04(1) — considered

    R. 1.04(1.1) [en. O. Reg. 438/08] — considered

    R. 17.02 — considered

    R. 17.02(g) — considered

    R. 17.02(h) — considered

    R. 17.02(o) — considered

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

R. 17.02(p) — considered

R. 29.1.03(2) [en. O. Reg. 438/08] — considered

R. 29.2.03 [en. O. Reg. 438/08] — considered

R. 30 — referred to

R. 31 — referred to

R. 31.06 — considered

R. 31.06(1) — considered

R. 31.06(1)(a) — considered

R. 31.06(1)(b) — considered

R. 31.06(2) — considered

R. 31.06(3) — considered

R. 31.06(4) — considered

R. 31.07 — considered

R. 31.11 — referred to

R. 31.11(1) — considered

R. 31.11(2) — considered

R. 31.11(3) — considered

R. 31.11(4) — considered

R. 32 — referred to

R. 33 — referred to

R. 37.10(10) — considered

R. 39.01(1) — considered

R. 39.01(4) — considered

R. 39.01(5) — considered

R. 39.02 — considered

R. 39.02(1) — considered

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

R. 53.01(1) — considered

APPEAL from judgment reported at *Ontario v. Rothmans Inc.* (2011), 2011 ONSC 1083, 2011 CarswellOnt 3042 (Ont. Master), granting refusals motion by plaintiff Crown.

*Perell J.*:

## A. Introduction

1      This is an appeal from a Master's order on a refusals motion. The Master's decision and the appeal pose questions about the nature and scope of a cross-examination for an application or motion. Some of the questions posed are infrequently asked, and some of the traditional answers require reconsideration because of the recent amendments to the *Rules of Civil Procedure* and its codification of the proportionality principle. This appeal requires answers to such questions as:

  • What are the determinants of a proper question on a cross-examination for an application or a motion?

  • In determining whether an examination question is proper, is there a difference among cross-examination on an affidavit, examinations for discovery, and cross-examination at trial?

  • In determining whether a cross-examination question is proper, does it matter if the deponent is testifying from personal knowledge or if the deponent is testifying based on information and belief?

  • What role, if any, does the proportionality principle play in determining whether a cross-examination question (as opposed to an undertaking) is proper?

  • How informed must a deponent be or become if he or she is cross-examined on an affidavit for an application or motion?

  • What is the role of undertakings on a cross-examination of a deponent as contrasted with undertakings on an examination for discovery?

  • When may an undertaking be requested?

  • When may an answer to a refused undertaking be compelled?

  • What role, if any, does the proportionality principle play in determining whether an undertaking on a cross-examination of a deponent may be demanded?

2      These fundamental questions arise in the case at bar because in a humongous action in which Her Majesty the Queen in the Right of Ontario ("the Crown") seeks to recover $50 billion, two deponents for three defendants refused to give undertakings during their cross-examinations to questions for which they did not know the answers.

3      The deponents swore their affidavits in support of motions to stay the Crown's action on the grounds that this court does not have jurisdiction over the foreign defendants. The Crown cross-examined the deponents and treated the refusals to give undertakings as refusals to answer questions. The Crown moved for answers to the refused undertakings, and after a three-day hearing, the Master ordered that (a) Richard Cordeschi, the deponent for British American Tobacco (Investments) Limited ("Investments"), answer 68 (of approximately 100) questions; (b) Nicola Snook, the deponent for B.A.T. Industries p.l.c. ("Industries"), answer 13 (of 16) questions; and (c) Richard Cordeschi, the deponent for Carreras

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Rothmans Limited ("Carreras"), answer 18 (of 26) questions.

4      For the Reasons that follow, I allow the appeal, and I dismiss the Crown's refusal motion in its entirety.

**B. Methodology**

5      In additional to describing the factual background, the Master's judgment, and the standard of review of a Master's order on a refusals motion, to address the questions posed on these appeals by Investments, Industries, and Carreras, it is necessary to describe, among other things, the law of civil procedure about: proper questions on examinations, including cross-examinations on affidavits, examinations for discovery, and examinations at trial; the role of undertakings; and the use that may be made of the transcripts of examinations on motions and at trials.

6      As will appear, it is my opinion that the Master made errors in applying and developing the law in these areas, and he made errors in the exercise of his discretion to order that undertakings be given and answered. By and large, the Crown's requests for undertakings was an attempt to engage in a premature examination for discovery.

7      As it will also appear from the discussion below, in order to analyze whether the Master's approximately 100 rulings were right or wrong, it is necessary to calibrate for the Defendants' jurisdiction motions, the legal tools used to determine whether a question or undertaking asked for on a cross-examination is a proper question.

8      In the case at bar, an important ingredient of the arguments of both sides was their competing positions about the scope of a cross-examination of a deponent for a party who is challenging whether the court has jurisdiction over the party and their competing positions about the role of undertakings.

9      In order for me to address the competing arguments and to calibrate the legal tools for the case at bar, it is necessary to describe the parameters for relevancy for questions for the jurisdiction motion that will eventually be heard by Justice Conway, who is case managing the action.

10      A key insight of these Reasons for Decision is what is a proper question depends upon factors or legal metrics that have different measures at different stages of a proceeding. Thus, what is a proper question at an examination for discovery or later at the trial of the merits of the cause of action or defence may not be a proper question at a cross-examination of a deponent on an application or a motion.

11      Practically speaking, this appeal requires me to consider the parties' positions about the refused undertakings and unanswered questions *de novo*. Where the appellants challenge the Master's decision about the relevancy of the question underlying the request for an undertaking, it is necessary for me to assess relevancy *de novo*. Where the appellants succeeded in demonstrating that the Master had erred in principle about discretionary matters associated with compelling a party to give and answer an undertaking, it is necessary for me to assess the exercise of discretion *de novo*.

12      Thus, to answer the various questions posed by Investments, Industries, and Carreras' appeals, I have organized these Reasons for Decision into the following sections:

• Introduction

• Methodology

• Factual Background o The Crown's Action against Tobacco Manufacturers

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

- The Nature of the Defendants' Jurisdiction Motion

- Investments' Challenge to the Court's Jurisdiction

- Industries' Challenge to the Court's Jurisdiction

- Carreras' Challenge to the Court's Jurisdiction

- The Crown's Reply to the Challenges

- The Cross Examinations

- The Master's Decision

- Standard of Appellate Review

- The Law of Examinations o Introduction

- Examination at Trial

- Examination for Discovery

- Examination of Deponent for Motions and Applications

- The Role of Proportionality

- "Onerous Searches" and the Availability of Search Engines

- The Master's Use of Internet Searches

- The Determination of Investments' Appeal

- The Determination of Industries' Appeal

- The Determination of Carreras' Appeal

- Conclusion

## C. Factual Background

### 1. The Crown's Action against Tobacco Manufacturers

13      Pursuant to the *Tobacco Damages and Health Care Costs Recovery Act, 2009*, S.O. 2009, c. 13, *Her Majesty the Queen in Right of Ontario ("the Crown")* sues Rothmans Inc., Rothmans, Benson & Hedges Inc., *Carreras Rothmans Limited ("Carreras")*, Altria Group, Inc., Philip Morris U.S.A. Inc., Philip Morris International, Inc., JTI-MacDonald Corp., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International Inc., Imperial Tobacco Canada Limited, British American Tobacco p.l.c., *B.A.T Industries p.l.c. ("Industries")*, *British American Tobacco (Investments) Limited ("Investments")*, and Canadian Tobacco Manufacturers' Council.

14      Under s. 2 of the Act, the Crown has a cause of action against a manufacturer to recover the cost of health care

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

benefits caused or contributed to by a tobacco related wrong. "Manufacturer" "cost of health care benefits" "health care benefits" and "tobacco related wrong" are all defined terms under the Act. The Crown's action is for damages of $50 billion for the cost of health care benefits from tobacco related disease or the risk of tobacco related disease that have been paid or will be paid by the Crown for insured persons.

15    Under s. 6 of the Act, an action commenced by the Crown within two years after s.6 comes into force cannot be barred under the *Limitations Act, 2002* or any other Act.

16    Section 10 of the *Tobacco Damages and Health Care Costs Recovery Act, 2009* gives the Act retroactive effect. Section 10 states:

> 10. When brought into force under section 13, a provision of this Act has the retroactive effect necessary to give the provision full effect for all purposes including allowing an action to be brought under subsection 2 (1) arising from a tobacco related wrong, whenever the tobacco related wrong occurred.

17    On September 29, 2009, the Crown commenced its action against 14 domestic and foreign entities in the tobacco industry. The Crown pleads that all the Defendants are "manufacturers" under the Act.

18    The Defendants Investments, Industries, and Carreras are companies incorporated pursuant to the laws of the United Kingdom with registered offices in London, England.

19    In its Statement of Claim, the Crown alleges that Investments and Industries were lead companies in the "BAT Group," which was one of four multinational tobacco enterprises, whose member companies directly or indirectly manufactured and promoted cigarettes sold in Ontario and throughout the world. Imasco Limited and Imperial Tobacco Limited, now the Defendant Imperial Tobacco Canada Limited, were members of the BAT Group.

20    Between 1902 to 1976, Investments was the ultimate parent corporation of a group of subsidiaries and associated companies that were known as the BAT Group. Between 1976 and 1998, after a reverse takeover, the ultimate parent became Industries, which was always a non-operating holding company with diverse investments in financial services, retail, cosmetics, pulp and paper, and tobacco. In 1998, the defendant British American Tobacco p.l.c. became the ultimate parent, and Industries became and remains an intermediate holding company with holdings in Investments and, until March 2000, in Imasco Limited, now Imperial Tobacco Canada Limited.

21    The domestic Defendant, Imperial Tobacco Canada Limited was created through the amalgamation of Imperial Tobacco Limited and Imasco Ltd., and it is a company incorporated under the laws of Canada with a registered office in Montreal, Quebec.

22    In its Statement of Claim, the Crown alleges that by 1950, the Defendants knew or ought to have known that smoking cigarettes could cause or contribute to disease and that by 1970, the Defendants knew or ought to have known that exposure to second hand smoke could cause or contribute to disease.

23    It is alleged, among other things, that the Defendants: (a) suppressed scientific and medical data which revealed the serious health risks of smoking; (b) misinformed the public as to the harm of both smoking and of exposure to cigarette smoke; (c) targeted children and adolescents in their advertising, promotional, and marketing activities for the purpose of inducing children and adolescents in Ontario to start or to continue to smoke; and (d) participated in a misleading campaign to enhance their own credibility and diminish the credibility of health authorities and anti-smoking groups for the purpose of reassuring smokers that cigarettes were not as dangerous as authorities were saying.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

24    The Crown alleges that all the Defendants participated, over several decades, in an international conspiracy to mislead the public and the government in Ontario and elsewhere about the harmful effects and addictiveness of tobacco. As a result of the removal of the limitation period, the Crown's action spans events that go as far back as the early 1950s.

25    The Crown alleges that the Defendants intentionally circulated false and misleading information and resisted health warnings long after their internal research revealed the deleterious effects of smoking. The Crown further alleges that the Defendants suppressed research regarding the hazards of smoking and resisted efforts, even from within the industry, to develop a potentially safer cigarette for fear of what such research would imply about the industry's product.

26    The Crown alleges that the Defendants advanced their conspiracy through committees, conferences, and meetings that were organized, convened, and attended by senior personnel of Industries and Investments and by their Canadian subsidiaries. And it alleges that the BAT Group Defendants directed how Imperial and Imasco should vote at meetings of the Canadian Tobacco Manufacturers Council, including the approval of funding for research on smoking and health issues.

27    The Crown alleges that Industries and Investments prepared policies on smoking and health and distributed written policy directives about smoking and health to their subsidiaries, including Imperial and Imasco.

28    In its Statement of Claim, the Crown alleges that Carreras was a lead company in the Rothmans Group. It is alleged that Carreras directed or co-ordinated the Rothmans Group's common policies on smoking and health by preparing and distributing statements which set out the Rothmans Group's position on smoking and health issues.

29    The Crown alleges that between late 1953 and the early 1960s, the Lead Companies formed or joined several research organizations including the Tobacco Industry Research Council, renamed the Council for Tobacco Research in 1964, the Centre for Co-operation in Scientific Research Relative to Tobacco, and the Tobacco Research Council. It is alleged that the Lead Companies conspired with the research organizations to distort the research and to publicize misleading information to undermine the truth about the link between smoking and disease with the intent of misleading the public and the Crown into believing that there was a medical or scientific controversy about whether smoking caused addiction and disease.

30    In its Statement of Claim, the Crown alleges that in June, 1977, the Lead Companies, and some or all of the Defendants with international interests, met in England to establish the International Committee on Smoking Issues ("ICOSI") for the purposes, among others, of: resisting government efforts to provide adequate warnings about smoking and disease; disseminating false and misleading information regarding the risks of smoking; suppressing research regarding the risks of smoking; and advancing a public relations program with the object of promoting cigarettes, protecting cigarettes from attack based upon health risks, and reassuring smokers, the public and authorities in Ontario and other jurisdictions that smoking was not hazardous.

31    The Crown alleges that in furtherance of the various conspiracies, Investments and Industries organized committees, conferences and meetings attended by senior personnel including those of Imperial Tobacco Limited and Imasco Limited to direct or co-ordinate the BAT Group's common policies on smoking and health. The committees included the Chairman's Policy Committee, the Research Policy Group, the Scientific Research Group, the Tobacco Division Board, the Tobacco Executive Committee, and the Tobacco Strategy Review Team (which later became known as the Tobacco Strategy Group).

32    It is alleged that Investments and Industries directed or co-ordinated the BAT Group's common policies on smoking and health by preparing and distributing to the members of the BAT Group, including Imperial Tobacco

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Limited and Imasco Limited, written directives and communications including "Smoking Issues: Claims and Responses", "Consumer Helplines: How To Handle Questions on Smoking and Health and Product Issues", "Smoking and Health: The Unresolved Debate", "Smoking: The Scientific Controversy", "Smoking: Habit or Addiction?", and "Legal Considerations on Smoking and Health Policy".

33      With respect to Carreras, the Crown alleges that Carreras directed the Rothmans Group's policies on smoking and health and prepared and distributed statements to its Canadian subsidiaries that set out the Rothmans Group's position on smoking and health issues. It is alleged that Carreras also directed how Rothmans of Pall Mall Canada Limited (predecessor to the Rothmans Defendants in this action) would vote at meetings of the Canadian Tobacco Manufacturers Council and was directly involved in the approval of research proposals about smoking and health issues.

34      The Crown served Investments, Industries, and Carreras with its Statement of Claim without leave for service *ex juris*. It relied on rules 17.02 (g), (h), (o) and (p), which state:

**SERVICE OUTSIDE ONTARIO WITHOUT LEAVE**

17.02 A party to a proceeding may, without a court order, be served outside Ontario with an originating process or notice of a reference where the proceeding against the party consists of a claim or claims, ....

*Tort Committed in Ontario*

(g) in respect of a tort committed in Ontario;

*Damage Sustained in Ontario*

(h) in respect of damage sustained in Ontario arising from a tort, breach of contract, breach of fiduciary duty or breach of confidence, wherever committed;

*Necessary or Proper Party*

(o) against a person outside Ontario who is a necessary or proper party to a proceeding properly brought against another person served in Ontario;

*Person Resident or Carrying on Business in Ontario*

(p) against a person ordinarily resident or carrying on business in Ontario;

*2. The Nature of the Defendants' Jurisdiction Motion*

35      In January 2010, of the Defendants, six foreign corporations moved to challenge the jurisdiction of the Ontario courts. (This appeal involves three of the six Defendants.)

36      None of the foreign Defendants attorned to the court's jurisdiction, and their motion challenged whether the Ontario court should assume jurisdiction over them.

37      As will be explained below, the nature of a motion is a factor in determining whether questions on a cross-examination of a deponent for the motion are proper. The nature of the motion will determine what questions are relevant and is a factor in determining whether refused undertakings should be answered.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

38      For the present purposes of addressing the appeal from the Master's rulings, it is, therefore, necessary to briefly describe the law about challenging the jurisdiction of the court in Ontario.

39      In *Van Breda v. Village Resorts Ltd.*, [2010] O.J. No. 402 (Ont. C.A.), leave to appeal granted, [2010] S.C.C.A. No. 174 (S.C.C.), the Court of Appeal recalibrated the law on the court's jurisdiction over foreign defendants as it had been described in *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (Ont. C.A.) and four companion cases: *Lemmex v. Bernard* (2002), 60 O.R. (3d) 54 (Ont. C.A.); *Gajraj v. DeBernardo* (2002), 60 O.R. (3d) 68 (Ont. C.A.); *Sinclair v. Cracker Barrel Old Country Store Inc.* (2002), 60 O.R. (3d) 76 (Ont. C.A.); *Leufkens v. Alba Tours International Inc.* (2002), 60 O.R. (3d) 84 (Ont. C.A.).

40      The test for whether an Ontario court has jurisdiction *simpliciter* is whether there is a real and substantial connection between the matter and the parties and Ontario: *Muscutt v. Courcelles, supra*; *Van Breda v. Village Resorts Ltd., supra*. The test is not rigid but rather is a flexible test that captures the ideas that there are limits to the jurisdiction of a domestic court, which should not overreach, and that the decision not to exercise jurisdiction must ultimately be guided by the requirements of order, efficiency and fairness, not a mechanical counting of contacts or connections: *Van Breda v. Village Resorts Ltd., supra*, at paras. 43-46.

41      A variety of factors, none of which are in and of themselves determinative, are weighed to determine whether Ontario has jurisdiction *simpliciter*. The weight to be given to any of the factors will depend upon the circumstances of the particular case. As outlined in *Muscutt v. Courcelles* but as later explained, refined and modestly simplified in *Van Breda v. Village Resorts Ltd.*, the factors include:

- the connection, if any, between Ontario and the plaintiff's claim;

- the connection, if any, between Ontario and the defendant;

- unfairness, if any, to the defendant if the Ontario court assumes jurisdiction;

- unfairness, if any, to the plaintiff if the Ontario court does not assume jurisdiction;

- the involvement of others, if any, in the suit;

- the Ontario court's willingness to recognize and enforce an extra-provincial judgment made on the same jurisdictional basis;

- whether the case is interprovincial or international in nature; and,

- comity and standards of jurisdiction, recognition and enforcement prevailing elsewhere.

42      In *Van Breda v. Village Resorts Ltd.*, for the determination of jurisdiction *simpliciter*, the Court introduced a category-based presumption based on the rules for service *ex juris* under the *Rules of Civil Procedure*; namely rule 17.02.

43      With the exceptions of subrules 17.02(h) ("damages sustained in Ontario") and (o) ("a necessary or proper party"), if a case falls within one of the connections listed in rule 17.02, a real and substantial connection for the purposes of assuming jurisdiction against the defendant shall be presumed to exist: *Van Breda v. Village Resorts Ltd., supra*, at paras. 71-80.

*3. Investments' Challenge to the Court's Jurisdiction*

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

44      In support of their motions challenging this court's jurisdiction, Investments and Carreras filed affidavits sworn by Richard Cordeschi. Mr. Cordeschi is the corporate secretary of Investments and one of two directors of Carreras. Having graduated from the Institute of Chartered Secretaries and Administrators, he holds the professional designation of chartered secretary.

45      In his affidavit in support of Investments' motion, Mr. Cordeschi deposes that the facts set out in the affidavit are based on personal knowledge and on information in Investments company records that he believes to be true.

46      Mr. Cordeschi deposes that Investments is a limited company under the laws of England and Wales incorporated in 1902 with a registered office in London, England. He states that until 1976, it was the ultimate parent company of various subsidiary, affiliate, and associated companies engaged in various businesses including the tobacco business. In 1976, after a reverse takeover, Industries became the parent corporation and Investments became an intermediate holding company for all of the tobacco operating subsidiaries.

47      Based on his own knowledge and based on inquiries and searches of Investments company's records, Mr. Cordeschi deposed that Investments never researched, manufactured, packaged, promoted, advertised, or distributed tobacco products or other products in Ontario. It did not authorize any agents to research, manufacture, package, promote, advertise, or distribute tobacco products or other products in Ontario. It did not act as an agent for any subsidiary that researched, manufactured, packaged, promoted, advertised, or distributed tobacco products or other products in Ontario. It has never had any assets in Ontario. It has never owned, leased, or possessed property in Ontario. It has never been registered extra-provincially in Ontario and has never been licensed to conduct and has never conducted business in Ontario. It has no offices, employees, records, place of business, bank account, telephone listing, or mailing address in Ontario. It has never been assessed nor paid taxes in Ontario.

48      Further, Mr. Cordeschi deposed that Investments has never been a member of the Ad Hoc Committee on Smoking and Health or the Canadian Tobacco Manufacturers Council.

49      He states that beginning in 1912 until 1981, Investments had a shareholder's interest in Imperial Tobacco Company of Canada, which was renamed Imasco Limited and later became Imperial Tobacco Canada Limited. Investments shareholding was as high as 83% but declined to less than 50% when it sold its remaining shares. Investments and Imasco operated as separate corporations, and Mr. Cordeschi deposes that Investments never participated in the day-to-day management and control of Imasco and never directed Imasco how to vote in committees of the Canadian manufacturers or at meetings of the Canadian Tobacco Manufacturers Council. He states that Investments never gave Imasco express or implied authority to act as its agent and Investments never had expressed or implied authority as an agent for Imasco.

### 4. Industries' Challenge to the Court's Jurisdiction

50      In support of its motion challenging the court's jurisdiction, Industries filed an affidavit sworn by Nicola Snook. She is Industries' corporate secretary. She deposes that the facts in the affidavit are based on personal knowledge and information in Industries company's records that she believes to be true.

51      In her affidavit, Ms. Snook deposed that Industries is a public limited company, incorporated under the laws of England and Wales with its registered office in London, England. It is a holding company with all its assets in the United Kingdom.

52      Ms. Snook deposes that Investments and its agents have never commissioned research in relation to,

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

manufactured, produced, assembled, marketed, packaged, sold, shipped, promoted, advertised, or distributed tobacco products sold or intended for sale anywhere. It does not derive revenues from the manufacture or sale of tobacco products anywhere. It has no connections with Ontario or ever held assets in Ontario. It has never been licensed or qualified to conduct, or conducted business in Ontario or registered extra-provincially in Ontario. It has never maintained a place of business in Ontario or had any office, employees, records, or representatives in Ontario. It has never owned, leased, used, or possessed any real or personal property of any kind within Ontario or had any bank account, mailing address or telephone listing in Ontario. It has never been assessed nor paid taxes in Ontario. It has never contracted to supply any goods (including tobacco products) or services in Ontario or advertised or promoted tobacco products, or any other goods or products, sold or intended for sale in Ontario.

53      In her affidavit, Ms. Snook deposes that Industries was never a member of any of the international organizations named in the Statement of Claim nor has it ever had any role in, or any involvement with, any of the committees, conferences, and written "directives" and communications associated with it as alleged in the Statement of Claim.

54      Ms. Snook deposes that Industries neither organized nor attended Group Research Conferences as alleged in the Statement of Claim. Industries did, however, have a representative on the Tobacco Strategy Review Team and its successor, the Tobacco Strategy Group, which was made up of senior executives of the principal tobacco operating company, just as the Financial Services Strategy Review Team included senior executives of financial services companies.

55      Ms. Snook deposes that Industries' top executive body was the Chairman's Policy Committee, which had oversight over Industries' holdings around the world. She states that this committee managed Industries but did not control or manage the day-to- day operational activities or policies of any of Industries' subsidiaries or associates.

56      In her affidavit, Ms. Snook states that the only document referred to in paragraph 138 of the Crown's Statement of Claim that was an Industries' document is the "Legal Considerations on Smoking and Health Policy." She denies that this document was a means to direct, control, or manage the day-to-day operations of policies of Imasco.

*5. Carreras' Challenge to the Court's Jurisdiction*

57      In his affidavit on behalf of Carreras, Mr. Cordeschi deposed that the facts set out were based on his personal knowledge and on information contained in Carreras' annual reports and accounts for the years ended March 31, 1984 through December 31, 2008.

58      Mr. Cordeschi's affidavit is only seven paragraphs in length. His evidence is found in paragraph 6, which I will set out in full. Paragraph 6 states:

> 6. [Carreras] is a non-trading, non-operating company that carries on no business of any kind. Since March 1984, the company has been dormant in accordance with the meaning ascribed to the term in the United Kingdom *Companies Act 1985*, c.6 and the United Kingdom *Companies Act 2006* c. 46 (which superseded the *Companies Act 1985* as of April 2008 insofar as dormant companies are concerned), and its functions have been limited to meeting the statutory requirements imposed on dormant companies incorporated in England, such as filing annual reports and accounts.

*6. The Crown's Reply to the Challenges and its Request for Admissions*

59      In response to the motions by the six foreign defendants, including Investments, Industries, and Carreras, the Crown delivered an affidavit from Fabian Esprit, who is a law clerk with the Ministry of the Attorney General.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

60      In his affidavit, Mr. Esprit, among other things, deposed that he retrieved documents from public websites including the websites of: (a) Imperial Tobacco Canada Limited; (b) the London Stock Exchange; (c) SEDAR (System for Electronic Document Analysis and Retrieval); (d) and Tobacco.org and (e) the Legacy Tobacco Documents Library of the University of California, San Francisco.

61      In his affidavit, Mr. Esprit indicated that as a result of his searches, he had learned that after the settlement of litigation in the United States against members of the tobacco industry, the Defendants had established two repositories for tobacco industry documents, one of which was in Guildford, England, for the BAT Group of companies.

62      Mr. Esprit stated that he had obtained many documents from the Legacy Tobacco Documents Library. Those documents were exhibits to his affidavit.

63      Before Mr. Cordeschi's cross-examination, the Crown served a Notice of Examination that required him to produce, at the examination, 120 documents of Investments and 12 documents of Carreras that had been located by Mr. Esprit.

64      By letter dated October 28, 2010, John Kelly, a lawyer for the Crown, wrote Investments' lawyer, Craig Dennis, and requested that Mr. Cordeschi admit the authenticity of the documents that had been retrieved by Mr. Esprit. Mr. Kelly's letter stated:

> I am asking you to review the list of documents and the brief of documents with your client prior to cross-examinations for the purpose of determining whether your client on behalf of [Investments] and [Carreras] is prepared to admit the authenticity of the documents. This admission would be without prejudice to the right of your clients to continue to take the position that they have not attorned to the jurisdiction of Ontario. By "authenticity" I mean that the documents were authored by the persons who purported to author them and received by the persons who purported to receive them. To the extent that documents refer to meetings, we are asking for admissions that, as far as [Investments] and Carreras are concerned, the persons referred to as employees, officers, directors or servants of the said corporations noted in attendance at the said meetings were, in fact, in attendance at said meetings.

65      By letter dated November 30, 2010, Craig Dennis, Investments' lawyer, responded to Mr. Kelly's letter and in particular to Mr. Kelly's request that Investments admit the authenticity of the listed documents. Mr. Dennis refused this request, but did provide some information. His letter stated:

> While we are willing to work constructively with you to streamline the cross-examination, your request presents some practical difficulties. First, we have determined to this point that the following documents in Schedule A are not documents from [Investments] files: [17 documents]. Second, the remaining documents date in the main from the 1950s, 1960s, 1970s and 1980s. Only a small number date from the 1990s and the most recent of those is from 1992. With documents of this vintage, it is not obvious to my client or me how to go about making the determinations you have asked for. Nor is it obvious, particularly in the context of a jurisdiction motion, that there can be an obligation to do so. ....

> In consequence, [Investments] does not admit the authenticity as you have defined the term or any of the documents listed. Without conceding the relevance of any of the documents, and for the purposes of this motion only, what we have been able to determine is that the following documents in Schedule A appear to be unedited copies (or portions of copies) of documents from [Investments] files: [97 documents].

66      A copy of Mr. Kelly's letter of October 28, 2010 was forwarded to Mr. Rusnak, a lawyer for Carreras, who

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

replied by letter dated November 26, 2010. Mr. Rusnak disputed that there was an obligation to make the requested admissions in the context of a jurisdiction motion and that there were practical problems. Mr. Rusnak wrote as follows:

[Carreras] is a UK company that has been dormant for over 25 years. Similarly all the documents in your Schedule B were, on their face, prepared more than 25 years ago. Mr.Cordeschi, on the other hand, has held his position as director of [Carreras] since September 25, 2009. His role with the company since that time has been to carry out those tasks required of a director of a dormant company in the UK. Mr. Cordeschi's affidavit simply sets out [Carreras'] status as a dormant company since 1984 based upon documents filed in the United Kingdom with Companies' House, the official UK government register of UK companies. Mr. Cordeschi understandably has no knowledge of who authored or received the documents in your schedule B, or whether the documents accurately record meeting attendances. Mr. Cordeschi also has no information on the whereabouts of any of the individuals referenced in the documents or whether any of them are even still alive.

67      By letter dated November 29, 2010, Mr. Kelly replied to Mr. Rusnak's letter. In his letter, Mr. Kelly wrote the following:

You are undoubtedly aware that we are not confined in our questioning to the matters raised in Mr. Cordeschi's affidavit. We are entitled to cross-examine on all matters relevant to the issue of jurisdiction including these documents. In addition, as an affiant being put forward on behalf [of Carreras], Mr. Cordeschi has an obligation to take reasonable steps to inform himself of issues on the motion for the purposes of the cross-examination. Mr. Cordeschi has not indicated that he is unable to obtain access to these documents and to make efforts to enquire as to their authenticity. It is obvious that these documents are business records within the meaning of the *Civil Evidence Act* and that they formed part of previous litigation in with the B.A.T. group of companies have been involved. Your client has had ample opportunity to make the appropriate inquiries and if he fails to do so, his failure will be subject to the appropriate motion.

68      Before Ms. Snook's cross-examination, the Crown served a Notice of Examination that required her to produce, at the examination, 127 documents of British-American Tobacco p.l.c. and Industries that had been located by Mr. Esprit. By letter dated October 22, 2010, Ronald Carr, counsel for the Crown, wrote Industries' lawyer, Charles Scott, and requested that Ms. Snook admit the authenticity of the documents that had been retrieved by Mr. Esprit. Mr. Carr's letter stated:

In order to expedite the cross-examinations, we would request your client's admission as to the authenticity of the above documents. By authenticity we mean that: (a) the document was executed or authored by the person to whom the document purports to be signed or written, (b) the document was prepared on or shortly after the date that appears on the document, and (d) the document is a true copy of the original. In regard to documents that purport to record the minutes of a meeting or report on a meeting held, that (e) the meeting was held on or about the date set out in the document and (f) the persons said to be in attendance were present at such meeting.

69      Mr. Scott replied by letter dated November 26, 2010, and he stated:

You have asked for a series of admissions in respect of the documents listed in your letter. While we are prepared to work with you to streamline Industries cross-examination, Industries will not be admitting the authenticity, as you have defined the term, or any of the documents listed in our letter in advance of Ms. Snook's cross-examination. In the context of a jurisdiction motion, I do not believe that there is any obligation on Industries to provide the advance admissions you seek. Moreover, your request presents some very real practical difficulties. The documents date from the 1970s, 1980s and 1990s; accordingly, I do not see how, on any realistic and proportional basis, Ms. Snook or

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Industries could possibly go about making the determinations you seek.

We can advise, however, that only the following documents, identified in your October 22 letter and attached as Exhibit I to the Esprit Affidavit, appear to be unedited copies (or, in some cases portions of copies) of documents that have been located in Industries' files (using the Esprit Exhibit I tab numbers): ... [58 documents].

### 7. The Cross-Examinations

70      Mr. Cordeschi was cross-examined on his affidavits for Investments in London, England, on December 7 and 8, 2010. The following day, he was cross-examined on his affidavit for Carreras.

71      As Investments' witness, Mr. Cordeschi was asked 846 questions, and as Carreras' witness, he was asked 184 questions. The Crown eventually sought answers from Mr. Cordeschi to approximately 100 questions from the cross-examination on behalf of Investments, and the Crown sought answers to 26 questions from his cross-examination on behalf of Carreras.

72      Ms. Snook, who was Industries' witness, was cross-examined on December 15, 2010. She was asked 691 questions. She answered all but 42, which questions were either taken under advisement or refused. Of the questions taken under advisement, 12 were subsequently answered in writing. The Crown eventually sought answers from Ms. Snook for 16 refusals.

73      All the cross-examinations focused on the documents from the Legacy Archive. The majority of questions refused by the appellants relate to these documents.

74      In light of the refusals, on January 26, 2011, the Crown brought a motion to compel Ms. Snook and Mr. Cordeschi to re-attend to answer these questions.

### D. The Master's Decision

75      In this section of my Reasons, I will simply describe the Master's decision, which is reported as *Ontario v. Rothmans Inc.*, 2011 ONSC 1083 (Ont. Master). Later in these Reasons, I will explain where I think he erred in his analysis or application of the applicable law.

76      After some preliminary remarks about the nature of the refusals motion before him (paras. 1-15), the Master reviewed the *Tobacco Damages and Health Care Costs Recovery Act* (paras. 16-31). He thought this analysis provided the framework for the case, and he considered the review to be helpful in determining the appropriate approach to determining the refusals motion.

77      After reviewing the Act, the Master came to several operative conclusions about aspects of his approach to the refusals motion. At paragraphs 28 to 31 of his judgment, he stated, with my emphasis added:

28. It is my view that the foregoing section clearly demonstrates the intent of the legislature to permit recovery of damages in this case regardless of how long ago the tobacco related wrong, may have occurred. I thus find arguments by the foreign defendants, that the subject information is very old and perhaps difficult to locate, to not be of much assistance. **After hearing all counsel, it was my conclusion that if I were satisfied documentation might exist, it ought to be looked for, if it was otherwise producible.**

29. One of the rationales for our present limitations statute was that memories fail, witnesses die and documentation

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

may be very difficult to locate. One of the arguments for implementing a limitation period normally made is that ought to be a cut-off point so that parties may dispose of records rather than having to retain them perpetually to guard against being exposed to the threat of litigation.

30. Here I see the statutory provision in Section 6 as clearly electing to over-ride such objections. The balance between the ability to recover the health care costs as preventing recovery due to the age of the claims has clearly been tipped by the legislature.

31. **As a consequence the age of the information sought has largely been discounted in my analysis**.

78      The Master then turned to whether the notion of "proportionality," which has expressly been introduced as a factor in the Rules of Civil Procedure had a role to play in his approach to the refusal's motion (paras. 32-36). He quoted rule 1.04 (1) and new subrule 1.04 (1.1.), which read:

**General Principle**

1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

79      Noting that in England, Lord Woolf had made the concept of proportionality an important feature in the reform of civil procedure in England, the Master quoted Chapter 1 of Lord Woolf's 1995 Report, *Access to Justice*, in its entirety.

80      In that chapter, Lord Woolf noted that "a system of civil justice is essential to the maintenance of a civilized society" and that "effective access to the enforcement of rights and the delivery of remedies depends on an accessible and effective system of civil litigation."

81      In his report, Lord Woolf stated that the basic principles of a civil justice system to provide access to justice were that: (a) it should deliver just results; (b) it should be fair and seen to be fair by ensuring equal access to assert or defend their legal rights regardless of their resources and by providing each litigant with an adequate opportunity to state the case and answer the opponent's case; its procedures and costs should be proportionate to the nature of the issues involved; (d) it should deal with cases with reasonable speed; (e) it should be understandable to those who use it; (f) it should be responsive to the needs of those who use it; (g) it should provide as much certainty as the nature of particular cases allows; and (h) it should be effective: adequately resourced and organized so as to give effect to the previous principles.

82      In para. 35 of his judgment, the Master, then quoted the following passage from Chapter 5 of Lord Woolf's report:

The overall aim of my Inquiry is to improve access to justice by reducing the inequalities, cost, delay and complexity of civil litigation and to introduce greater certainty as to timescales and costs. My specific objectives are:

(a) to provide appropriate and proportionate means of resolving disputes;

(b) to establish "equality of arms" between the parties involved in civil cases;

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

(c) to assist the parties to resolve their disputes by agreement at the earliest possible date; and

(d) to ensure that the limited resources available to the courts can be deployed in the most effective manner for the benefit of everyone involved in civil litigation.

83      The Master then concluded this portion of his judgment by setting out another operative conclusion about his approach to the refusals motion. In paragraph 36, he stated with my emphasis added:

36. How do I establish **"equality of arms"** between these parties with respect to the presentation of their respective positions on the jurisdiction motions which potentially could end this litigation with respect to some or all of the foreign defendants? In my view that potentiality **requires a somewhat different approach than in cases where the cross-examination is with respect to a motion at an interlocutory stage of the related action.**

84      The Master then noted (paras. 37-49) the substance of the motions for which Investments, Industries, and Carreras had filed their affidavits was to challenge the jurisdiction of the court in Ontario and that they relied on s. 106 of the *Courts of Justice Act* which provides that "a court, on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just."

85      He noted that Investments, Industries, and Carreras did not attorn to the jurisdiction and that these Defendants submitted that there was no real and substantial connection between the causes of action pleaded and the forum of Ontario, service outside of Ontario is not authorized, and having regard to all aspects of the action, order and fairness would render it unfair for the court to assume jurisdiction.

86      Considering the substance of the motions, the Master came to two more operative conclusions about the appropriate approach to the refusals motion. These conclusions are set out in paragraphs 46 and 49 of his judgment, which state, with my emphasis added:

46. **The determination of whether a stay is just should surely be made on as complete a relevant record as is available.**

49. On what basis is the Court to determine the issue of what will constitute an order as is just in the circumstances of this unique case? Is there an adequate foundation to determine the "justness" of the position asserted in the affidavit in support? **In my view, a proportional approach involves considering all reasonably available relevant evidence,** in attempting to achieve the just, most expeditious and least expensive determination of *this* civil proceeding *on its merits.*

87      The next portion of the Master's judgment (paras. 50-55) comes under the title "Admissions Sought," and this section includes independent Internet research by the Master. It is the position of Investments, Industries, and Carreras, that the Master made a serious error in relying on his own Internet research and in formulating his approach to the refusals motion by reference to what he learned. For present purposes, I will let these paragraphs speak for themselves, and I will discuss their significance, if any, later. Paragraphs 50-55 state:

50. "The Man Who Knew Too Much" was an influential article on the tobacco industry "whistle-blower" Jeffrey Wigand, written by journalist Marie Brenner for the May 1996 issue of *Vanity Fair* magazine. The article was subsequently adapted into the 1999 film *The Insider*, which tells the controversial true story of a *60 Minutes* television series segment, as seen through the eyes of Wigand.

51. While portions of the film were unquestionably fictionalized, the movie ends accurately with "a series of title

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

cards appear stating that a $246 billion settlement was made by tobacco companies with Mississippi and other States". [http://en.wikipedia.org/wiki/ The_Insider_(film)]

52 As part of those settlements the companies agreed to the establishment of document repositories of materials obtained during the various U.S. actions.

53 Prior to the cross examination of each deponent counsel for the Crown wrote to the individual counsel opposite with respect to documents that Ontario intended to put to each witness on their Cross examinations. The portion of that letter dealing with the repository read in part:

> With respect to the BATCo documents, they were taken from the Legacy Tobacco web-site, which as you know is a compilation of documents taken from the repository created by your client in Guildford, England and the repository in Minnesota which repositories were created as a result of the litigation in the United States between Minnesota Blue Cross and Blue Shield of. Minnesota. and, among others, British American Tobacco. (Investments) Limited and B.A.T. Industries plc. These documents were, as I understand it, admitted into evidence and accepted by the Court in that litigation and accordingly, should not be difficult for your client to identify.

54. The request of counsel related to the attempt to obtain an acknowledgement of the reliability of various documents relating to each of the four foreign defendants. In part, the request read:

> "... I am asking you to review the list of documents and the brief of documents with your client prior to cross-examinations for the purpose of determining whether your client on behalf of British American Tobacco (Investments) Ltd. ("BATCo") and Carreras Rothmans Limited ("Carreras") is prepared to admit the authenticity of the documents. This admission would be without prejudice to the right of your clients to continue to take the position that they have not attorned to the jurisdiction of Ontario. By "authenticity", I mean that the documents were authored by the persons who purported to author them and received by the persons who purported to receive them. To the extent that documents refer to meetings, we are asking for admissions that, as far as BATCo and Carreras are concerned, the persons referred to as employees, officers, directors or servants of the said corporations noted as in attendance at the said meetings were, in fact, in attendance at the said meetings.

55. In as much as these documents appeared in some cases to be over 50 years old, the desirability of obtaining such admissions from the Crown's position is obvious.

88    In the next two sections of his judgment (paras. 56-63), the Master considered the nature of the responses given by the Defendants to the Crown's requests for undertakings. He noted that the Defendants general position was to refuse to obtain the information and that to the extent, the Defendants had volunteered information, it was not very helpful to the Crown. He noted that the Defendants had justified their refusals for a catalogue of reasons including the irrelevancy of the questions and the disproportionate and onerous efforts that would be required to obtain the information being sought.

89    In the following paragraphs from para. 63 to para. 79, the Master reviewed the case law about refusals motions to set out the relevant principles and to explain what would be his approach to the disputed questions that Investments, Industries, and Carreras had refused to answer. In this regard, he referred to: Master MacLeod's decision in *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Ont. Master); Justice Pierce's judgment in *Bot Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (Ont. S.C.J.), Justice Rosenberg's judgment in *Mutual Life Assurance Co. of Canada v. Buffer Investments Inc.* (1985), 52 O.R. (2d) 335 (Ont. H.C.); and Master Beaudoin's judgment in *BASF Canada Inc. v.*

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

*Max Auto Supply (1986) Inc.,* [1998] O.J. No. 3676 (Ont. Master). (All of these judgments are mentioned below in my own analysis of the scope of cross-examinations on an affidavit for an application or motion.)

90      The Master's analysis of the case law led him to the following operative conclusions about the appropriate approach to the refusals motion, which are found in paragraphs 67, 69, 71, 76, and 78, which state, with my emphasis added:

> 67. **It seems to me that the nature of the action and the statutory foundation for the causes of action asserted must be taken into account in determining what ought to be involved in establishing what are "reasonable inquiries" in order to answer "proper" questions.**
>
> 69. I believe that my role in this case requires **a careful exercise of my discretion in the highly unusual environment of this litigation,** to determine whether further enquiry along the lines attempted by counsel for the Crown is necessary or reasonable.
>
> 71. While it was not raised as a real issue before me, I think in cases such as this where the witnesses are outside the country and have specifically, not attorned, to the jurisdiction of Ontario courts, the issue of the power to bind the witnesses is potentially of concern. I adopt, for the purposes of my directions, Master Macleod's approach:
>
>> In a note above, I observed that the witnesses are not themselves parties to the motion and in the case of the American experts they are not presently within the jurisdiction of the court. A ruling that the witness answer a question or carry out inquiries therefore should be taken to be an order to the defendants to use their best efforts to cause the witness to answer and to provide particulars of why that cannot be done if they are unable to do so. Naturally, if the defendants are unable to obtain the full co-operation of the witnesses, that may be a factor to be weighed by the judge in deciding whether or not to admit the evidence and what weight is to be given to it if it is admitted.
>
> 76. **I think the parallel to an affidavit of merits is of some assistance in this case.** Under the Specially Endorsed Writ regime, which was formerly part of the Rules in Ontario, a default judgment could be obtained against a defendant (for example, on a collection matter) unless a meaningful affidavit was filed setting out, with particularity the defences relied upon. Here the foreign defendants seek to bring the action [sic, the motion] to block, *ab initio* the plaintiff's potential recovery, filing affidavits which only tangentially speak to the merits. **I am not satisfied that it is fair or appropriate to the court charged with assessing whether there is a "real" and substantial connection to not have as much relevant information as possible. I am guided by the judgment of Justice Rosenberg in recognizing the court has inherent jurisdiction to see that all relevant evidence is before it on a motion such as this, and so long as it is not unduly oppressive to order that the information be obtained.**
>
> 78. My analysis of these cases leads me to a number of factors to be weighed with respect to each refusal: (1) Is it this issue raised in the affidavit of the deponent? (2) If not, is the question in a bona fide way being directed to an issue on the motion, or to the credibility of the witness?" (3) Is the question fair?

91      In paragraphs 80 -100 and in the accompanying refusals charts, the Master completed his judgment by providing his general rationale for his rulings and his specific rulings for the questions for which Investments, Industries, and Carreras had refused to provide answers.

92      By way of describing his general rationale, the Master indicated that he regarded questions about whether documents were sent to Imperial or Imasco as an essential area of inquiry in determining whether there is real and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

substantial connection with these Canadian companies at any point in time. He said questions about the Defendants company's policies and about their document retention systems were relevant to the issues on the jurisdiction motion.

93      He was not impressed with the Defendants' argument that millions of document pages would have to be searched. He said that it was likely that the Defendants had modern document management systems. However, since he did not have evidence one way or the other, he thought that the appropriate approach was to order the questions to be answered, but to permit the Defendants to return with evidence that finding the answers would indeed be unduly onerous. He said that since he was seized of the matter, he would be available to rule "on the fly" on whether the search was unduly onerous. (I foreshadow here to note that the parties disagree about the Master's approach to the use of document retrieval technology based on the presence or possible presence of this technology to the Defendants.)

94      The Master stated that he rejected the Defendants' argument that they should not be asked to make inquiries about documents that could more readily be made to another party. He said that given the nature of the motion, the Defendants should answer the questions.

95      By way of summary of the Master's Reason for Decision, the Master's approach was as follows. The nature of the action and the statutory foundation for the causes of action must be taken into account in determining what are proper questions and reasonable inquiries. This case required a careful exercise of discretion because it was highly unusual. A court charged with assessing whether there is a "real" and substantial connection should have as much relevant information as possible. The determination of whether a stay is justified requires as complete a record as is available, and in this case, a proportional approach involves considering all reasonably available relevant evidence. In order to establish equality of arms, this case required a somewhat different approach from normal. If a document was relevant and might exist, it ought to be looked for regardless of its age. The court has inherent jurisdiction to see that all relevant evidence is before it on a motion such as this jurisdiction motion, and so long as it is not unduly oppressive, the court should order that the information be obtained.

### E. Standard of Appellate Review

96      This being an appeal from a Master's order on a refusals motion, it is necessary to consider the standard of appellate review for such orders. This consideration is necessary because the standard of review will guide the approach to reviewing the Master's decision and to determining whether Investments, Industries, and Carreras have shown grounds for setting aside the Master's order.

97      A Master's decision will be interfered with on appeal if the Master made an error of law or exercised his or her discretion on the wrong principles or misapprehended the evidence such that there is a palpable and overriding error. Where the Master has erred in law, the proper standard of review is correctness. See *Zeitoun v. Economical Insurance Group* (2008), 91 O.R. (3d) 131 (Ont. Div. Ct.) at paras. 40-41, aff'd, (2009), 96 O.R. (3d) 639 (Ont. C.A.).

98      When considering whether a refused question should be answered, the Master has to determine whether the question is relevant, which is a matter of law, and whether the question is proper, which is a matter of discretion: *Republic National Bank of New York (Canada) v. Normart Management Ltd.* (1996), 31 O.R. (3d) 14 (Ont. Gen. Div.).

99      In a few instances, Investments, Industries, and Carreras challenge the Master's assessment of relevancy, which is a legal question subject to the correctness standard. In the main, however, they challenge the Master's discretionary decisions about undertakings, which is a question about whether the Master made an error in principle in the exercise of his discretion.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

100     Practically speaking, insofar as Investments, Industries, and Carreras challenge the Master's decision' about relevancy, I must determine *de novo* whether the Master was right or wrong.

101     Practically speaking, if the Appellants first demonstrate that the Master erred in principle in the exercise of his discretion, then I must determine *de novo* how the court should exercise its discretion.

102     In order for me to determine whether the Master did err in principle, it is necessary to examine the law about undertakings and about proper questions on a cross-examination of a deponent.

103     However, that law can only be understood by also discussing the law about examinations at trial and at examinations for discovery. That discussion follows in the next several sections of these Reasons for Decision.

## F. The Law of Examinations

### 1. Introduction

104     As I noted at the outset of these Reasons, this appeal poses questions about the fundamental nature of a cross-examination for a motion. The argument on this appeal very much focused on the scope of a cross-examination on an affidavit delivered for use on a motion, and the Master examined this matter at some length in his judgment. I shall make my own analysis to explain why I agree with some but not of all of the Master's analysis and conclusions. It is my ultimate conclusion that the Master erred in principle.

105     As will appear below, in my opinion, the Master erred by treating the cross-examinations of Mr. Cordeschi and Ms. Snook for the pending jurisdiction motion as if they were being examined for discovery where a party is obliged to inform himself or herself about the matters in issue in the action. He further erred by misapplying the "equality of arms" principle, which led him to ordering that all relevant evidence be provided unless it was unduly onerous to do so. And he erred in his treatment of the proportionality principle which led him to the same conclusion that all relevant evidence be produced.

106     In this part of my Reasons for Decision, I will describe, compare, and contrast the *Rules of Civil Procedure*, the law of evidence, and the jurisprudence about: (a) examinations at trial; (b) examinations for discovery; and (c) examinations of a deponent swearing an affidavit for an application or motion. In the next section of these Reasons, I will consider the role of the proportionality principle.

107     The analysis of the law of examinations is necessary to explain my conclusions about the Master's errors in principle.

### 2. Examination at Trial

108     At trial, oral evidence (evidence *viva voce*) is the general rule. Rule 53.01 (1) provides:

**Oral Evidence as General Rule**

53.01 (1) Unless these rules provide otherwise, witnesses at the trial of an action shall be examined orally in court and the examination may consist of direct examination, cross-examination and re-examination.

109     At trial, jurisprudence about the law of evidence applies to a witness' examinations and determines the scope of the examination. In other words, the law of evidence determines what are proper questions and what testimony is

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

admissible as evidence.

110      Relevance is the key determinate for the admissibility of evidence at trial. Evidence that is not logically probative of a fact requiring proof (a fact in issue) is inadmissible. To be probative, the evidence must increase or decrease the probability of the truth of a fact. See: *R. v. Morris*, [1983] 2 S.C.R. 190 (S.C.C.); *R. v. Cloutier*, [1979] 2 S.C.R. 709 (S.C.C.).

111      At trial, subject to numerous exceptions, hearsay evidence is not admissible. In technical terms, evidence of an out of court statement repeated in court for the purposes of establishing the truth of the statement is inadmissible hearsay. Hearsay is not evidence of the witness' own experiences, observations, or perceptions and subject to the hearsay exceptions, the hearsay declarant is not a substitute for the genuine witness of the events. The essential defining feature of hearsay are: (1) the statement is adduced as proof of its contents; and (2) the opportunity for a contemporaneous cross-examination of the actual speaker is absent. See *R. v. Khelawon*, [2006] 2 S.C.R. 787 (S.C.C.).

112      At trial, privileged communications are inadmissible. The two major privileges, among many, are lawyer and client privilege and litigation privilege. See: *Solosky v. R.* (1979), [1980] 1 S.C.R. 821 (S.C.C.); *Descôteaux c. Mierzwinski*, [1982] 1 S.C.R. 860 (S.C.C.); *General Accident Assurance Co. v. Chrusz* (1999), 45 O.R. (3d) 321 (Ont. C.A.); *Blank v. Canada (Department of Justice)*, [2006] 2 S.C.R. 319 (S.C.C.).

113      For present purposes, it is important to note that while cross-examination is regarded as a powerful tool of advocacy in the adversarial system of justice and a powerful tool in determining the truth, the cross-examining party at trial runs a risk by asking questions. The evidence elicited by cross-examination may be harmful to his or her case. This risk is also present for cross-examinations on affidavits for motions and applications. However, in contrast, as noted below, the examiner at an examination for discovery may question without risk because under rule 31.11, the examining party controls the use of the examination for discovery at trial.

114      For reasons that will also emerge below, it is also important to note that undertakings do not play a role at trial. If a witness does not know the answer to a question in cross-examination at trial, the witness will not be required to undertake to obtain the answer. As noted in several cases about the scope of examinations for discovery, a witness at an examination for discovery is obliged to inform himself or herself and to offer hearsay evidence but this is different from a witness at trial, who cannot "be ordered off the witness-stand to inform himself of the knowledge of his servants" or others. As Justice Middleton noted in *Van Horn v. Verrall* (1911), 20 O.W.R. 773 (Ont. C.A.) at p. 775 about discovery witnesses:

>    As a witness [at trial] the party must confine himself to his knowledge. On examination [for discovery] he not only may but must give his information.

See the discussion of this point in W.B. Williston & R.J. Rolls, *The Law of Civil Procedure* (Toronto: Butterworths, 1970) at pp. 787-99.

115      That the evidence of a trial witness becomes a part of the trial record and that a witness at trial is not required to answer undertakings has tactical and substantive significance in the context of an adversarial system of adjudication, where the parties and not the court determine how to present the opposing cases.

116      For example, at trial, a party may decide to prove his or her case without calling a particular witness because that particular witness might disclose harmful evidence. The court may draw an adverse inference from the failure to call the witness, but it is ultimately for the party to assess the risks of calling a witness and of not calling a witness.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

117      It is not for the court to take these decisions from the parties by compelling the witness to testify or by compelling another witness to undertake to inform himself or herself about what the absent witness would have said or what the absent witness knew or did not know.

118      I make these points because it helps me to explain why the application of the "equality of arms" principle as used by the Master was an error in principle. It was a departure from the adversarial system into an inquisitorial system of adjudication to demand that all relevant information be presented to the court. I agree with the Master that the court has an inherent jurisdiction to require the parties to disclose evidence, and while a case can be made for expanding the court's inquisitorial powers, particularly in areas of family law and child welfare law, it is an error in principle to take the case away from the parties in order to introduce equality of arms or to require as complete a record as possible.

*3. Examination for Discovery*

119      A party has a right to an examination for discovery of his or her opponent.

120      In J.W. Morden and P.M. Perell, *The Law of Civil Procedure in Ontario* (1st ed.) (Toronto: NexisLexis, 2010), at p. 487 I describe the purposes of an examination for discovery as follows:

> The examinations for discovery provide an opportunity to define the issues that are contested and uncontested and to move forward in the proof or disproof of contested facts. In *Modriski v. Arnold*, [1947] O.J. No. 132 (C.A.), the Court of Appeal stated that the purposes of production and discovery are: (1) to enable the examining party to know the case he or she has to meet; (2) to enable the examining party to obtain admissions that will dispense with formal proof of his or her case; and (3) to obtain admissions that will undermine the opponent's case.
>
> In *Ontario Bean Producers Marketing Bd. v. W.G. Thompson & Sons* (1982), 35 O.R. (2d) 711 (Div. Ct.), the Divisional Court elaborated and extended the various aims of discovery. The Court noted the following purposes for examinations for discovery: (1) to enable the examining party to know the case he or she has to meet; (2) to procure admissions to enable a party to dispense with formal proof; (3) to procure admissions which may destroy an opponent's case; (4) to facilitate settlement, pre-trial procedure, and trials; (5) to eliminate or narrow issues; and (6) to avoid surprise at trial.

121      An examination for discovery is similar to a cross-examination in the sense that it is an examination by one opponent of another. It is not an examination-in-chief, and the scope of the examination of the person being examined is determined by the *Rules of Civil Procedure*.

122      As already noted above, the use of the evidence from an examination for discovery does not become evidence at trial, unless the examining party decides to use the evidence against the adverse party by reading in portions of the transcript of the examination. Rule 31.11 states:

**USE OF EXAMINATION FOR DISCOVERY AT TRIAL**

*Reading in Examination of Party*

31.11 (1) At the trial of an action, a party may read into evidence as part of the party's own case against an adverse party any part of the evidence given on the examination for discovery of,

  (a) the adverse party; or

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

(b) a person examined for discovery on behalf or in place of, or in addition to the adverse party, unless the trial judge orders otherwise,

if the evidence is otherwise admissible, whether the party or other person has already given evidence or not.

*Impeachment*

(2) The evidence given on an examination for discovery may be used for the purpose of impeaching the testimony of the deponent as a witness in the same manner as any previous inconsistent statement by that witness.

*Qualifying Answers*

(3) Where only part of the evidence given on an examination for discovery is read into or used in evidence, at the request of an adverse party the trial judge may direct the introduction of any other part of the evidence that qualifies or explains the part first introduced.

*Rebuttal*

(4) A party who reads into evidence as part of the party's own case evidence given on an examination for discovery of an adverse party, or a person examined for discovery on behalf or in place of or in addition to an adverse party, may rebut that evidence by introducing any other admissible evidence. ....

123    As befits the purposes of examination for discovery, the rules for examinations for discovery are different from the rules for examinations at trial. The scope of an examination for discovery is prescribed by rule 31.06, which states:

**SCOPE OF EXAMINATION**

*General*

31.06 (1) A person examined for discovery shall answer, to the best of his or her knowledge, information and belief, any proper question relevant to any matter in issue in the action or to any matter made discoverable by subrules (2) to (4) and no question may be objected to on the ground that,

(a) the information sought is evidence;

(b) the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness; or

(c) the question constitutes cross-examination on the affidavit of documents of the party being examined.

*Identity of Persons Having Knowledge*

(2) A party may on an examination for discovery obtain disclosure of the names and addresses of persons who might reasonably be expected to have knowledge of transactions or occurrences in issue in the action, unless the court orders otherwise.

*Expert Opinions*

(3) A party may on an examination for discovery obtain disclosure of the findings, opinions and conclusions of an

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

expert engaged by or on behalf of the party being examined that are relevant to a matter in issue in the action and of the expert's name and address, but the party being examined need not disclose the information or the name and address of the expert where,

(a) the findings, opinions and conclusions of the expert relevant to any matter in issue in the action were made or formed in preparation for contemplated or pending litigation and for no other purpose; and

(b) the party being examined undertakes not to call the expert as a witness at the trial.

*Insurance Policies*

(4) A party may on an examination for discovery obtain disclosure of,

(a) the existence and contents of any insurance policy under which an insurer may be liable to satisfy all or part of a judgment in the action or to indemnify or reimburse a party for money paid in satisfaction of all or part of the judgment; and

(b) the amount of money available under the policy, and any conditions affecting its availability.

(5) No information concerning the insurance policy is admissible in evidence unless it is relevant to an issue in the action.

*Divided Discovery*

(6) Where information may become relevant only after the determination of an issue in the action and the disclosure of the information before the issue is determined would seriously prejudice a party, the court on the party's motion may grant leave to withhold the information until after the issue has been determined.

124    The basic scope of an examination for discovery is set out in rule 31.06 (1) with rules 31.06 (2), 31.06 (3), and 31.06 (4) extending the scope of the examination. These rules overcome restrictions that had developed in the case law under the former *Rules of Practice*. Particularly important changes are found in paragraphs (a) and (b) of rule 31.06 (1), which stipulate that no question may be objected to on the grounds that the information sought is evidence or that the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness.

125    The notion of proportionality is a factor in determining the scope of an examination for discovery. I discuss this factor later in these Reasons for Decision.

126    For the context of examinations for discovery, the *Rules of Civil Procedure* recognizes questions, questions taken under advisement, and undertakings.

127    Rule 31.07 provides sanctions for the failure to answer questions, questions taken under advisement, which are treated as refusals, and undertakings. Rule 31.07 states:

**FAILURE TO ANSWER ON DISCOVERY**

*Failure to Answer Questions*

31.07 (1) A party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question if,

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

(a) the party or other person refuses to answer the question, whether on the grounds of privilege or otherwise;

(b) the party or other person indicates that the question will be considered or taken under advisement, but no answer is provided within 60 days after the response; or

(c) the party or other person undertakes to answer the question, but no answer is provided within 60 days after the response.

### Effect of Failure to Answer

(2) If a party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question as described in subrule (1), the party may not introduce at the trial the information that was not provided, except with leave of the trial judge.

### Additional Sanction

(3) The sanction provided by subrule (2) is in addition to the sanctions provided by rule 34.15 (sanctions for default in examination).

### Obligatory Status of Undertakings

(4) For greater certainty, nothing in these rules relieves a party or other person who undertakes to answer a question from the obligation to honour the undertaking.

128    The *Rules of Civil Procedure* recognize that undertakings may be given on examinations for discovery and also on cross-examinations on affidavits. This recognition is found in the procedure for a refusals motion, where under rule 37.10 (10), the parties are obliged to deliver a refusals and undertakings chart for "undertakings given on an examination or cross-examination." Rule 37.10 (10) states:

### Refusals and Undertakings Chart

37.10 (10) On a motion to compel answers or to have undertakings given on an examination or cross-examination satisfied,

(a) the moving party shall serve on every other party to the motion and file with proof of service, in the court office where the motion is to be heard, at least seven days before the hearing, a refusals and undertakings chart (Form 37C) that sets out,

(i) the issue that is the subject of the refusal or undertaking and its connection to the pleadings or affidavit,

(ii) the question number and a reference to the page of the transcript where the question appears, and

(iii) the exact words of the question; and

(b) the responding party shall serve on the moving party and every other party to the motion and file with proof of service, in the court office where the motion is to be heard, at least four days before the hearing, a copy of the undertakings and refusals chart that was served by the moving party completed so as to show,

(i) the answer provided, or

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

(ii) the basis for the refusal to answer the question or satisfy the undertaking.

129    The case law has developed the following principles about the scope of the questioning on an examination for discovery:

• The scope of the discovery is defined by the pleadings; discovery questions must be relevant to the issues as defined by the pleadings: *Playfair v. Cormack* (1913), 4 O.W.N. 817 (Ont. S.C.).

• The examining party may not go beyond the pleadings in an effort to find a claim or defence that has not been pleaded. Overbroad or speculative discovery is known colloquially as a "fishing expedition" and it is not permitted. See *Cominco Ltd. v. Westinghouse Canada Ltd.* (1979), 11 B.C.L.R. 142 (B.C. C.A.); *Allarco Broadcasting Ltd. v. Duke* (1981), 26 C.P.C. 13 (B.C. S.C.).

• Under the former case law, where the rules provided for questions "relating to any matter in issue," the scope of discovery was defined with wide latitude and a question would be proper if there is a semblance of relevancy: *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (Ont. H.C.); *Air Canada v. McDonnell Douglas Corp.* (1995), 22 O.R. (3d) 140 (Ont. Master), aff'd (1995), 23 O.R. (3d) 156 (Ont. Gen. Div.). The recently amended rule changes "relating to any matter in issue" to "relevant to any matter in issue," which suggests a modest narrowing of the scope of examinations for discovery.

• The extent of discovery is not unlimited, and in controlling its process and to avoid discovery from being oppressive and uncontrollable, the court may keep discovery within reasonable and efficient bounds: *Graydon v. Graydon* (1921), 67 D.L.R. 116 (Ont. S.C.), at pp. 118 and 119 *per* Justice Middleton ("Discovery is intended to be an engine to be prudently used for the extraction of truth, but it must not be made an instrument of torture ..."); *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (Ont. H.C.) at p. 246; *Ontario (Attorney General) v. Ballard Estate* (1995), 26 O.R. (3d) 39 (Ont. C.A.) at p. 48 ("The discovery process must also be kept within reasonable bounds."); *671122 Ontario Ltd. v. Canadian Tire Corp.*, [1996] O.J. No. 2539 (Ont. Gen. Div.) at paras. 8-9; *Caputo v. Imperial Tobacco Ltd.*, [2003] O.J. No. 2269 (Ont. S.C.J.). The court has the power to restrict an examination for discovery that is onerous or abusive: *Andersen v. St. Jude Medical Inc.*, [2007] O.J. No. 5383 (Ont. Master).

• The witness on an examination for discovery may be questioned for hearsay evidence because an examination for discovery requires the witness to give not only his or her knowledge but his or her information and belief about the matters in issue: *Van Horn v. Verrall* (1911), 3 O.W.N. 439 (Ont. C.A.); *Rubinoff v. Newton* (1966), [1967] 1 O.R. 402 (Ont. H.C.); *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (Ont. H.C.).

• The witness on an examination for discovery may be questioned about the party's position on questions of law: *Six Nations of the Grand River Band v. Canada (Attorney General)* (2000), 48 O.R. (3d) 377 (Ont. Div. Ct.).

130    The Defendants' refusals in the case at bar to give undertakings did not occur during an examination for discovery, and it is necessary to explain why I have considered the law in this area. I have done so because it allows me to make the following seven points that are pertinent to resolving the parties' arguments about whether in the context of a cross-examination for a motion, the Master erred in ordering the refused undertakings to be answered.

131    First, while the undertakings were requested on a cross-examination for a motion, the *Rules of Civil Procedure* recognize that undertakings may be given during a cross-examination of a deponent for an application or motion. Thus, to answer a question posed at the outset of these Reasons for Decision, an undertaking may be requested during cross-

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

examinations on affidavits and during examinations for discovery. However, requests for undertakings are not available at trial.

132      Second, the court can compel undertakings to be given on examinations for discovery because the person examined is required under the *Rules of Civil Procedure* to inform himself or herself about the matters in issue.

133      Third, the extent to which the court can compel undertakings to be given on a cross-examination is less clear. If the deponent confines his or her evidence to personal knowledge, there is no apparent basis to compel him or her to obtain information about what others know about the case. For an application, the information would be hearsay and not admissible for contentious matters. Moreover, compelling the evidence raises concerns that the adversarial system has been replaced by an inquisitorial system.

134      Fourth, if a deponent does provide information based on information and belief, there would appear to be a basis to compel him or her to give undertakings, at least with respect to that information.

135      Fifth, the Master's rulings in the case at bar about the undertakings might have been correct had the refusals been made in the context of an examination for discovery where the party being examined is obliged to inform himself or herself about the matters in issue. It is, however, my conclusion in the case at bar that the refusals were appropriate in the context of a cross-examination and that it was wrong to compel answers to the refused undertakings. (I wish to make it clear that nothing in these Reasons should be taken as a ruling one way or another about the propriety of the same questions should this action reach examinations for discovery.)

136      Sixth, in the case at bar, it appears that the in furtherance of achieving an "equality of arms" the Master treated the matter of undertakings as if they were requested on an examination for discovery, which I regard as an error in principle.

137      Seventh, in a submission, with which I agree, Investments, Industries, and Carreras argue that the problem in the case at bar is not just about answering the particular undertaking but rather the problem is the burden of responding to the inevitable follow-up questions. Imposing this burden may be appropriate in the context of examinations for discovery, but they submit it is not appropriate in the context of their jurisdictional motion.

### 4. Examination of Deponent for Motions and Applications

138      I turn now to the law directly applicable to the case at bar, the law about the scope of cross-examinations of deponents for applications and motions.

139      On motions and applications, evidence usually is not presented to the court orally (*viva voce*). Rather, the evidence is presented by an affidavit and by reference to the transcript of the cross-examination of the deponent of the affidavit. Rule 39.01 (1) states:

**EVIDENCE BY AFFIDAVIT**

*Generally*

39.01 (1) Evidence on a motion or application may be given by affidavit unless a statute or these rules provide otherwise.

140      Unlike the situation at trials, where, generally speaking, hearsay evidence is not admissible, the Rules of Civil

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Procedure permit some hearsay evidence in the deponent's affidavit. The Rules permit a deponent to testify on information and belief. Thus, hearsay is permitted on motions, and a very limited use of hearsay is permitted on applications. For motions, rule 39.01 (4) provides:

**Contents — Motions**

39.01 (4) An affidavit for use on a motion may contain statements of the deponent's information and belief, if the source of the information and the fact of the belief are specified in the affidavit.

For applications, hearsay evidence is permitted only for non-contentious facts. Rule 39.01 (5) provides:

**Contents — Applications**

39.01 (5) An affidavit for use on an application may contain statements of the deponent's information and belief with respect to facts that are not contentious, if the source of the information and the fact of the belief are specified in the affidavit."

141      Under rule 39.02, an adverse party may cross-examine a deponent who has sworn an affidavit for a motion or application. Rule 39.02 (1) provides:

**EVIDENCE BY CROSS-EXAMINATION ON AFFIDAVIT**

*On a Motion or Application*

39.02 (1) A party to a motion or application who has served every affidavit on which the party intends to rely and has completed all examinations under rule 39.03 may cross-examine the deponent of any affidavit served by a party who is adverse in interest on the motion or application.

142      Case law has determined what are proper questions for a cross-examination on an affidavit. Once again, relevancy is a key determinant of a proper question, and relevancy is determined by reference to the matters in issue in the motion in respect of which the affidavit has been filed and by the matters put in issue by the deponent's statements in the affidavit. The scope of the cross-examination for an application or motion only coincidentally will be commensurate with the scope of an examination for discovery.

143      The case law has developed the following principles about the scope of the cross-examination of a deponent for an application or motion:

• The scope of a cross-examination of a deponent for an application or motion is narrower than an examination for discovery: *Bot Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (Ont. S.C.J.) at para. 6.

• A cross-examination is not a substitute for examinations for discovery or for the production of documents available under the *Rules of Civil Procedure: Bot Construction (Ontario) Ltd. v. Dumoulin, supra* at para. 7; *Westminer Canada Holdings Ltd. v. Coughlan*, [1989] O.J. No. 252 (Ont. Master), aff'd [1989] O.J. No. 3038 (Ont. H.C.).

• The examining party may not ask questions on issues that go beyond the scope of the cross-examination for the application or motion: *Thomson v. Thomson*, [1948] O.W.N. 137 (Ont. H.C.); *Toronto Board of Education Staff Credit Union Ltd. v. Skinner*, [1984] O.J. No. 478 (Ont. H.C.) at para. 12; *Westminer Canada Holdings Ltd. v. Coughlan*, [1989] O.J. No. 3038 (H.C.J.).

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

• The questions must be relevant to: (a) the issues on the particular application or motion; (b) the matters raised in the affidavit by the deponent, even if those issues are irrelevant to the application or motion; or (c) the credibility and reliability of the deponent's evidence: *Superior Discount Ltd. v. N. Perlmutter & Co.*, [1951] O.W.N. 897 (Ont. Master) at p. 898; *Lubotta v. Lubotta*, [1959] O.W.N. 322 (Ont. Master); *Wojick v. Wojick*, [1971] 2 O.R. 687 (Ont. H.C.); *Toronto Board of Education Staff Credit Union Ltd. v. Skinner*, [1984] O.J. No. 478 (Ont. H.C.) at para. 11; *BASF Canada Inc. v. Max Auto Supply (1986) Inc.*, [1998] O.J. No. 3676 (Ont. Master) at paras. 6, 10-11; *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Ont. Master) at paras. 14-15; *Bot Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (Ont. S.C.J.) at para. 4; *Shannon v. BGC Partners LP*, 2011 ONSC 1415 (Ont. Master) at para. 8.

• If a matter is raised in, or put in issue by the deponent in his or her affidavit, the opposite party is entitled to cross-examine on the matter even if it is irrelevant and immaterial to the motion before the court: *Wojick v. Wojick*, [1971] 2 O.R. 687 (Ont. H.C.), at p. 688; *Ferring Inc. v. Richmond Pharmaceuticals Inc.*, [1996] O.J. No. 621 (Ont. Div. Ct.) at paras. 14 and 15; *Logan v. Canada (Minister of Health)*, [2001] O.J. No. 6289 (Ont. Master); *Guestlogix Inc. v. Hayter*, 2010 ONSC 5570 (Ont. S.C.J.) at para. 16.

• The proper scope of the cross-examination of a deponent for an application or motion will vary depending upon the nature of the application or motion: *Blum v. Sweet Ripe Drink Inc.* (1991), 47 C.P.C. (2d) 263 (Ont. Master); *Moyle v. Palmerston Police Services Board* (1995), 25 O.R. (3d) 127 (Ont. Div. Ct.).

• A question asked on a cross-examination for an application or motion must be a fair question: *Superior Discount Ltd. v. N. Perlmutter & Co.*, [1951] O.W.N. 897 (Ont. Master) at p. 898; *Canadian Imperial Bank of Commerce v. Molony*, [1983] O.J. No. 221 (Ont. H.C.) at para. 3; *Seaway Trust Co. v. Markle*, [1988] O.J. No. 164 (Ont. Master); *BASF Canada Inc. v. Max Auto Supply (1986) Inc.*, [1998] O.J. No. 3676 (Ont. Master) at para. 6. (See discussion below.)

• The test for relevancy is whether the question has a semblance of relevancy: *Lubotta v. Lubotta*, [1959] O.W.N. 322 (Ont. Master); *Rodrigues v. Madill*, [1985] O.J. No. 1666 (Ont. Master).

• The scope of cross-examination in respect to credibility does not extend to a cross-examination to impeach the character of the deponent: *Moyle v. Palmerston Police Services Board* (1995), 25 O.R. (3d) 127 (Ont. Div. Ct.).

• The deponent for an application or motion may be asked relevant questions that involve an undertaking to obtain information, and the court will compel the question to be answered if the information is readily available or it is not unduly onerous to obtain the information): *Bank of Montreal v. Carrick* (1973), 1 O.R. (2d) 574 (Ont. Master), aff'd [ (1973), 1 O.R. (2d) 574n (Ont. H.C.)] *ibid* p. 574n; *Mutual Life Assurance Co. of Canada v. Buffer Investments Inc.* (1985), 52 O.R. (2d) 335 (Ont. H.C.) at paras. 9-13; *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Ont. Master) at paras. 42, 56; *Bot Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (Ont. S.C.J.) at para. 8; *Hinke v. Thermal Energy International Inc.*, 2011 ONSC 1018 (Ont. Master) at paras. 36-37.

• The deponent for a motion or application who deposes on information and belief may be compelled to inform himself or herself about the matters deposed: *Rabbiah v. Deak & Co.*, [1961] O.W.N. 280 (Ont. H.C.); *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Ont. Master) at paras. 42, 46.

144     There are some subtle points about these principles that are worth noting. First, although the case law establishes that a cross-examination question must be "fair," the nature of fairness is not explained in the case law. This principle would appear to be the source of the court's jurisdiction to stop abusive questioning and questioning designed to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

discomfort a witness but having little probative value. In my opinion, the fairness principle would also provide the court with the jurisdiction to stop a party from using a cross-examination in a way that disturbed the fairness of the procedure or the fairness of the adversary system under which justice is administered in Ontario.

145        In what is perhaps a related point, relying on Justice Lax's decision in *Schreiber v. Mulroney* (2007), 87 O.R. (3d) 643 (Ont. S.C.J.), the Defendants argued that it would be unfair to compel answers to undertakings of a deponent on a jurisdictional motion precisely because the court's jurisdiction over the Defendants had not been established. I did not find this argument helpful for the circumstances of the case at bar, and I disregarded it in coming to my decision on this appeal. The *Schreiber* case concerned a situation where the plaintiff Schreiber served a summons to examine the defendant Mulroney to gather evidence to refute Mr. Mulroney's motion challenging the jurisdiction of the Ontario court. In the case at bar, the circumstances are different. Ms. Snook and Mr. Cordeschi voluntarily provided evidence, and exposed themselves to cross-examination. I do not think it unfair that they be examined having regard to the broad ambit of issues that arise for a jurisdictional motion. The question remains, however, whether the Master made an error in principle about the refused undertakings in the circumstances of this case which are different than in the *Schreiber* case.

146        Another subtle point is associated with undertakings. The problem about undertakings concerns when they can be compelled. If an undertaking is voluntarily given, then it simply must be honoured. As already noted earlier, that there is no prohibition against an examining party asking for an undertaking, and there is no preventing a deponent from volunteering an undertaking as a way to answer a proper question, and, as noted above, the rules recognize that undertakings may be given on both examinations for discovery and on cross-examinations of deponents.

147        Indeed, a deponent might be quite happy to give an undertaking to provide evidence that he or she omitted to provide in the affidavit. In asking for an undertaking, the examining party runs the risk associated with cross-examinations that the answer to a question may not help his or her case, and unlike evidence from an examination for discovery, the examining party does not control what use can be made of the transcript from a cross-examination of a deponent for an application or motion.

148        It is also worth emphasizing that one of the more important principles to be applied for a refusals motion is the principle that the scope of the cross-examination will vary depending upon the nature of the motion or application. Thus, questions about the merits of the action or application may not be within the scope of a particular motion. For example, in *Seaway Trust Co. v. Markle*, [1988] O.J. No. 164 (Ont. Master), on a refusals motion, Master Sandler held that questions about the merits were not proper for a motion to amend the statement of claim to add new parties.

149        The above being the main principles applicable to determining the scope of questioning on a cross-examination for an application or motion, what conclusions can be drawn for the Master's decision in the case at bar?

150        With a few exceptions, which I note in the undertakings charts below, I discern no errors about the relevancy of the requested undertakings. In my opinion, the questions were relevant to a jurisdictional motion where the fundamental issue is whether there is a real and substantial connection with Ontario and the defendants and the subject matter of the action.

151        In my opinion, the Master, however, did err in determining the scope of proper questions. As the authorities above reveal, the scope of a cross-examination of a deponent is not the same as the scope of an examination for discovery. In the case at bar, the Master made the scope of the cross-examination co-extensive with an examination for discovery. Indeed, it is arguable that based on his approach to proportionality, discussed below, and in pursuit of the "equality of arms" principle, he enlarged the scope beyond what even might be available on an examination for discovery.

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

152     It is also my opinion that the Master erred by failing to apply the principle that a deponent may be asked questions that involve an undertaking to obtain information if the information is readily available or it is not unduly onerous to obtain the information. In the case at bar, the Master essentially ignored this principle. Even assuming that sophisticated state of the art search engines were available to the Defendants, answering questions and follow-up questions about events that covered a 60-year period are inherently difficult and finding answers would be difficult even if the person being examined had actually been a participant or witness to the events those many years ago, which was not the case for Mr. Cordeschi or Ms. Snook. The Master, however, expressly paid no heed to the difficulties inherent with the passage of time.

153     The Master also essentially ignored the distinction between examinations for discovery, where the rule is that the witness inform himself or herself, and cross-examinations on affidavits where the obligation to be informed about the evidence of others is the exception rather than the rule.

## G. The Role of Proportionality

154     The recent amendments to the *Rules* added new Rule 29.2 (Proportionality in Discovery).

155     Rule 29.2.03 requires the court to consider a variety of factors associated with the idea of proportionality when making a determination of whether a party or other person must answer or produce a document in an affidavit of documents, for an examination for discovery, for an inspection of property, for a medical examination or for an examination for discovery by written questions. The rule states:

### CONSIDERATIONS

#### *General*

29.2.03 (1) In making a determination as to whether a party or other person must answer a question or produce a document, the court shall consider whether,

(a) the time required for the party or other person to answer the question or produce the document would be unreasonable;

(b) the expense associated with answering the question or producing the document would be unjustified;

(c) requiring the party or other person to answer the question or produce the document would cause him or her undue prejudice;

(d) requiring the party or other person to answer the question or produce the document would unduly interfere with the orderly progress of the action; and

(e) the information or the document is readily available to the party requesting it from another source.

#### *Overall Volume of Documents*

(2) In addition to the considerations listed in subrule (1), in determining whether to order a party or other person to produce one or more documents, the court shall consider whether such an order would result in an excessive volume of documents required to be produced by the party or other person.

156     It is notable that the proportionality principle for discovery is not made to apply to cross-examinations, which

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

suggests that the rule makers appreciated that cross-examinations were not meant to be a substitute for the discovery process, where the proportionality principle definitely has an important role to play.

157     In the case at bar because the Master essentially treated the cross-examination as if it were an examination for discovery or because he regarded proportionality as relevant to his determination of the scope of proper questions and undertakings for a cross-examination on an affidavit filed for a very important motion, he considered the proportionality principle to be applicable. As noted above, he quoted rule 1.04 (1) and new subrule 1.04 (1.1.), which state:

**General Principle**

1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

158     In my opinion, the Master erred in principle in his approach to the proportionality principle.

159     The proportionality principle is a manifestation of the policy of frugality that led to the introduction of the simplified procedure to the *Rules of Civil Procedure*. To use a metaphor, the normal *Rules of Civil Procedure* are the Cadillac of procedure, an expensive vehicle with all the accessories. However, not all actions or applications require such an expensive vehicle, and a Chevrolet, a serviceable, no frills vehicle, will do just fine for many cases, and it will provide access to justice and judicial economy.

160     Proportionality is a parsimonious principle. In *Javitz v. BMO Nesbitt Burns Inc.*, 2011 ONSC 1332 (Ont. S.C.J. [Commercial List]) at para. 28, Justice Pepall noted that the proportionality principle was introduced because the system of justice was under severe strain because cases were taking too long and costing too much for litigants. In the passage quoted by the Master from Chapter 5 of Lord Woolf's report, Lord Woolf said that his overall aim was to "improve access to justice by *reducing* the inequities, cost, delay, and complexity of civil litigation." In *Abrams v. Abrams*, 2010 ONSC 2703 (Ont. S.C.J.) at para. 70, Justice D.M. Brown, stated: "Proportionality signals that the old ways of litigating must give way to new ways which better achieve the general principle of securing the "just, most expeditious and least expensive determination of every proceeding on its merits."

161     In the case at bar, however, because of his concern about Lord Woolf's ideal of an "equality of arms," and because of the strategic importance he gave to the jurisdictional motion, the Master concluded that proportionality could have an expansive influence and thus the jurisdictional motion in an action with an enormous claim called for a Rolls-Royce of procedure, where the court should have as much relevant information as possible, as complete a record as is available, and all reasonably available relevant evidence regardless of its age or the difficulties associated with finding it.

162     In adopting this approach, the Master departed from his own views, with which I agree and would endorse, expressed in *Warman v. National Post Co.*, 2010 ONSC 3670 (Ont. Master), where he stated at paras. 84-86:

[84] The time has come to recognize that the "broad and liberal" default rule of discovery has outlived its useful life. It has increasingly led to unacceptable delay and abuse. Proportionality by virtue of the recent revisions has become the governing rule. 84. To the extent that there remains any doubt of the intention of the present rules I see no alternative but to be explicit.

85. Proportionality must be seen to be the norm, not the exception — the starting point, rather than an afterthought.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Proportionality guidelines are not simply "available". The "broad and liberal" standard should be abandoned in place of proportionality rules that make "relevancy" part of the test for permissible discovery, but not the starting point.

86. If embraced by the courts, parties and their counsel, such proportionality guidelines offer hope that the system can actually live up to the goal of securing for the average citizen "a just, speedy and inexpensive determination" of his or her case

163    In my opinion, an expansionary approach to proportionality is wrong. A parsimonious proportionality principle provides a useful tool for cases large and small. The base line is that the *Rules of Civil Procedure* are designed for cases of all sizes, but the proportionality principle allows the court to downsize the procedure and still do justice for the parties. If downsizing is not procedurally fair then the normal rules should apply to the proceedings without augmentation.

164    If adopted as a precedent, the Master's approach of treating proportionality as having an expansionary influence destroys the parsimony of the proportionality principle and allows the argument that because a case is important or the claim large, there should be more procedure not less procedure. The proportionality principle would lose its utility for large cases, such as class proceedings and other public interest litigation, where justice can be done by reducing not expanding the procedure. The proportionality principles yields an "equality of arms" by arms reduction and is not meant to prompt an arms race. In my opinion, in this particular case, the Master erred in principle in his treatment of the proportionality principle.

## H. "Onerous Searches" and the Availability of Search Engines

165    The factums and quite a bit of time during the argument of the appeal was dedicated to the issue of whether the Master erred in his approach to the issue of whether an undertaking would be unduly onerous having regard to the availability or possible availability of search engines or document retrieval technology.

166    That this became a hotly contested issue arose, in part, because neither party foresaw the need of providing any evidentiary basis for making or refuting a submission that an undertaking demanded during a cross-examination of a deponent would or would not be unduly onerous.

167    In the case at bar, I do not think that the Master's approach to this issue was wrong. As I understand what he did, he presumed that the technology was available to the Defendants, and he ordered the refused undertakings to be answered but without prejudice to the Defendants returning to substantiate that their answering the undertakings would indeed be unduly onerous. This approach appears to have been used in other cases, and it seems a reasonable exercise of the court's discretion.

168    That said, for future cases, it is my opinion that a party who objects to giving an undertaking during a cross-examination for an application or motion because it would be unduly onerous to answer it should not be required to provide evidence of his or her search capabilities (or absence of them) on any subsequent refusals motion.

169    It would be counterproductive to the due process of a proceeding to make an issue to be adjudicated whether a party had the capability to answer undertakings demanded during a cross-examination with the attendant issues of whether the party has document management and retrieval technology and also the human resources to intelligently and responsible operate the technology.

170    The issue of a party's litigation management resources could easily become an expensive, time consuming, and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

unproductive distraction, particularly because the needs of every case would be different. Moreover, making an issue of a party's capability would mean that a refusal's motion would entail cross-examinations of deponents for the refusals motion and further delay in the proceedings. As it is, a refusals motion is a meta-motion about obtaining information for an application or motion. Requiring an evidentiary basis for adjudicating a party's capability to answer undertakings would introduce a meta-meta motion.

171      Rather than making assumptions or requiring after-the-fact evidence of whether a party has information management technology, the better approach is prospective. This approach is already envisioned by the *Rules of Civil Procedure*, where the availability of information technology can be addressed prospectively as part of the preparation for the examinations for discovery. In other words, the availability of search engines and other information retrieval technology should inform the party's discovery plans that are required by the *Rules of Civil Procedure*. It is as an aspect of the discovery plans that the parties can address the technology that is available or that might become available to facilitate documentary discovery and the examinations for discovery.

172      Where a party to an action intends to obtain evidence by the discovery of documents (Rule 30), by examinations for discovery (Rule 31), by inspection of property (Rule 32), by a medical examination (Rule 33) or by examination for discovery by written questions, the parties must agree to a discovery plan in accordance with rule 29.1. Under rule 29.1.03(2), "[t]he discovery plan shall be agreed to before the earlier of, (a) 60 days after the close of pleadings or such longer period as the parties may agree to; and (b) attempting to obtain the evidence." If the parties fail to agree, the court has the jurisdiction to impose a discovery plan: *TELUS Communications Co. v. Sharp*, 2010 ONSC 2878 (Ont. Master).

173      The time spent on this issue during the argument of the appeal demonstrates how counterproductive it would he to make the outcome of a refusals motion depend on whether a party had offered evidence for the refusals motion and proven his or her search incapabilities as a justification for not giving an undertaking.

174      The examination of the issue also demonstrated the problems of treating a cross-examination as if it were an examination for discovery.

## I. The Master's Use of Internet Searches

175      In their factums mainly, but also during the argument of the appeals, Investments, Industries, and Carreras made much of the Master's reference to Internet materials and information from television and the media about the history of tobacco litigation in the United States.

176      With respect, the Defendants' efforts here to establish grounds of appeal are to make a mountain out of a mole hill.

177      The Master's comments, which comprise three paragraphs of his lengthy judgment, only modestly augmented what Mr. Esprit had disclosed in his affidavit and what the Crown had disclosed in its correspondence about where the Crown had uncovered the documents to be presented to Mr. Cordeschi and Ms. Snook for authentication.

178      I see no need to explore the law about judicial notice or about a reasonable apprehension of bias based on the Master's use of this material from popular culture. The Master's rulings were not based on any reliance on this material, and his comments play no role in my own rulings.

## J. The Determination of Investments' Appeal

179      For the above Reasons, it is my opinion that the Master made several errors in principle and his decision should

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

be set aside in its entirety.

180    I have completed my own analysis of the undertakings requested from Mr. Cordeschi as Investments' deponent for the jurisdictional motion. In my opinion, the refusals were proper. My discrete rulings are set out in the following chart:

| Reference | Questions | Investments' Response | Master's Disposition | Ruling |
|---|---|---|---|---|
| Cordeschi (Investments)— p.30-1 Q63 | Produce a copy of BAT Investments' records management policy whereby all business records are retained | The question regarding the "BAT Investments' records management policy" is irrelevant to the motion and is tantamount to discovery. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.33 Q71 | Produce any document retention policies that predate BAT Investments' existing policy | The question is irrelevant to the motion and is tantamount to discovery in the action generally. | For Past 40 Years | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— pp.42-3 Q101 | To advise to whom shares of Imasco referred to at paragraph 12 of his affidavit were transferred in 1981 | This question is irrelevant to the issues on the motion, as the entity to which the shares were transferred is not a party. | Answer | *Withdrawn by Crown* |
| Cordeschi (Investments)— p.68 Q172—Vol.6A-61 | Enquire whether there are any records that indicate whether Imperial Tobacco Canada was one of the operating companies of the BAT group as described in the document | This question is unduly onerous and disproportionate in that the document is over 40 years old and it is not clear who the author is. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.77 Q193—Vol.6A-64 | Advise whether the reference to sending the reports to research centres in the group included sending the report to Imperial Tobacco Canada | This question is unduly onerous and disproportionate. The report is over 30 years old and the purported author, Dr. Felton, is no longer employed by Investments. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.79 Q196—Vol.6A- | Confirm from BATCo/ Investments' records that RM Gibb was an employee of Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that Mr. Cordeschi should not be required to confirm employment of someone who | Answer | *Premature discovery request - Refusal* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| 13 | | purportedly worked at a company other than Investments. The question would more properly be directed to Imperial. | | *upheld* |
| Cordeschi (Investments)— p.86 Q210—Vol.6A-56 | Confirm that Mr. Wade and Mr. Dunn were with Imperial Tobacco in Canada | The question is unduly onerous and disproportionate in that Mr. Cordeschi should not be required to confirm employment of someone who purportedly worked at a company other than BATCo or Investments. This question is more properly directed to someone from Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.89 Q218—Vol.6A-67 | To advise if Cordeschi becomes aware of information that Dr. Blackman and Dr. Heard are not from BATCO/Investments, and Gibb and Dunn are not from Imperial as indicated in the document | The form of the question is objectionable as it assumes facts that have not been established in the evidence. Drs. Blackman and Heard will be addressed by Q 210. Beyond that, the question is also unduly onerous and disproportionate in that Mr. Cordeschi should not be required to confirm employment of someone who purportedly worked at a company other than Investments. The question would more properly be directed to Imperial. | Answer to best of ability | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.94 Q230—Vol.6A-69 | Enquire into whether the reference in the letter dated Feb. 10, 1984 to biologists in the BAT Group include the biologists at Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is almost 30 years old and its author no longer works with Investments, if he ever did. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.118 Q293—Vol.6A-88 | Advise whether the SJ Green referenced as chairman of the conference is Dr. Green from BATCo/Investments | This question is irrelevant to the issues on the motion. Even if it were not irrelevant, it is unduly onerous and disproportionate in that the document is 43 years old. Further, it is unlikely that any author is still employed by Investments. | Advise if any information he is not | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.119 Q294—Vol.6A-88 | Advise whether LC Laporte reported as present at the conference is LC Laporte from BATCo/Investments | This question is unduly onerous and disproportionate in that the conference in question took place 43 years ago and the employees who attended of Investments that attended this conference are no longer employed by Investments. | Advise if any information he is not | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Cordeschi (Investments)— p.121 Q304—Vol.6A-89 | Enquire whether the reference to "individual companies" on page 13, paragraph 13 of the document includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate given that this document is 42 years old. Further, it is unlikely that any author is still employed by Investments | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.121 Q305—Vol.6A-89 | Confirm that RS Wade listed as an attendee of the Kronberg conference is from Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that it asks Mr. Cordeschi to confirm the employment of someone who is not employed by Investments. The question would more properly be directed to Imperial. | Advise if any information he is not | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.124 Q314—Vol.6A-10 | Confirm that the author of the report, Dr. Green, is the Dr. SJ Green from BATCo/Investments | This question is unduly onerous and disproportionate in that the document is 37 years old and Dr. S.J. Green is no longer employed by Investments. | Advise if any information he is not | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.128-9 Q333—Vol.6A-10 | Enquire whether the reference to "number ones" in the document refers to chief executive officers of the BAT companies in May 1974 | The question is unduly onerous and disproportionate in that the document is 37 years old. Further, it is unlikely that any author is still employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.131 Q344—Vol.6A-14 | Confirm that Mr. Ricard and Mr. P. Pare from Imperial Tobacco Canada attended the conference at Chewton Glen | This question is unduly onerous and disproportionate given that Mr. Cordeschi is being asked about employees from Imperial Tobacco Canada and not Investments. The question would more properly be directed to Imperial. | Advise if any information they did not attend | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.133 Q350—Vol.6A-14 | Enquire whether the reference to "major companies in the tobacco division" in the statement "to keep fully informed those responsible for the major companies in Tobacco Division where this area presents a continuing problem and to this end to exchange ideas and current thinking of the managements concerned", found on page 2, paragraph 1 of the document, includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate given that this document is over 35 years old and the author is not indicated. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— | Confirm that reference to various attendees from Canada at the | This question is unduly onerous and disproportionate in that it refers to a | Advise if any information | *Premature discovery* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| p.135 Q357—Vol.6A-93 | Group Research Conference in Montreal, April 5-9, 1976 - Mr. R.M. Gibb, Mr. R. S. Wade, Mr. S. Candlish - were from Imperial Tobacco Canada | document that is 35 years old and asks Mr. Cordeschi to confirm the employment of someone who is not employed by Investments. The question would more properly be directed to Imperial. | they were not | *request - Refusal upheld* |
| Cordeschi (Investments)— p.137 Q363—Vol.6A-93 | Enquire whether reference to companies in the statement at page 4, paragraph 10 of the document - "the need was identified for further development of the central Milbank advisory service on smoking and health matters. In particular, a capability of fairly rapid reaction to enquiries and a broad and anticipatory approach similar to that developed by the Group's North American competitors was desired. Companies were asked to set out and detail their suggestions in this field" - includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate given that the author of the document is not indicated and the document is 35 years old. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.143 Q384—Vol.6A-18 | Enquire whether the reference to companies in the statement at page 2280, number 5 of the document - "it is necessary for companies to ensure that national governments are presented with a balanced view of the industry's economic benefits and also with alternative arguments, a positive approach and a credible position by companies must be pursued" - includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate given that the author of the document is not indicated and the document is 31 years old. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.145 Q389—Vol.6A-19 | Enquire whether the reference to companies at page 5 of the document includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is 30 years old and there is no indication as to who authored the document. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— | Enquire whether the reference regarding lead companies at page | The question is unduly onerous and disproportionate in that the document | Answer | *Premature discovery* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| p.145 Q391—Vol.6A-19 | 22 of the document includes Imperial Tobacco Canada | is 30 years old and there is no indication as to who authored the document. | | *request - Refusal upheld* |
| Cordeschi (Investments)— p.148 Q400—Vol.6B-96 | Enquire whether the reference to an upcoming scientists meeting in March 1983 includes scientists from Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is likely around 28 years old and there is no indication as to who authored the document. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— pp.153-4—Vol. 6B-100 | Enquire whether the reference to CAC companies on page 4 of the document refers to chairman's advisory companies, what that means, and whether that includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is likely over 20 years old. Further, it is unlikely that any author is still employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.157 Q424—Vol.6A-11 | Enquire whether statement referring to group companies already dealing with the smoking and health issue includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is likely at least a decade old and the author is not indicated. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.159 Q429—Vol.6B-103 | Enquire whether the document entitled "Consumer Help Lines" was sent to Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the author of the document is not indicated. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— pp.159-60 Q431—Vol.6B-103 | Enquire whether statement referencing procedures to be followed by "all companies" includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the author is not indicated. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.160 Q432—Vol.6B.-104 | Enquire whether document entitled "Environmental Tobacco Smoke: Improving the Quality of Public Debate" was published by BATCo/Investments and on which date | This question is irrelevant to the issues on the motion. Even if it were not irrelevant, it is unduly onerous and disproportionate in that if a BATCo employee did produce this document, it is highly likely that that employee is no longer with BATCo given the passage of time. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi | Enquire whether the document | This question is irrelevant and unduly | Answer | *Premature* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

Page 45

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | |
|---|---|---|---|
| (Investments)— p.161 Q433—Vol.6B- 104 | entitled "Environmental Tobacco Smoke: Improving the Quality of Public Debate" was sent to the BAT group of companies and, in particular, Imperial Tobacco Canada | onerous and disproportionate. Even if it were not irrelevant, this document is not dated and the author of it is not indicated. The determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial Tobacco Canada. | *discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.163 Q441 | Confirm whether the document entitled "Smoking and Health: The Unresolved Debate" was produced by BATCo/Investments and, if so, when it was produced | This question is unduly onerous and disproportionate. This document is likely at least 20 years old. There is nothing to indicate who the author is. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.164 Q442—Vol.6B- 105 | Enquire whether the document entitled "Smoking and Health: The Unresolved Debate" was sent to the BAT group of companies, specifically Imperial Tobacco Canada | This question is unduly onerous and disproportionate. This document is not dated and its author is not indicated. Further, the question is overly broad in that it asks whether this document was sent to Imperial Tobacco Canada but it does not specifically ask whether it was Investments that sent it to Imperial Tobacco Canada. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.167 Q452—Vol.6B- 108 | Enquire whether the reference to "all number ones overseas" in the letter dated July 16, 1982, includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate given that the document is almost 30 years old and the author is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.168 Q454—Vol.6B- 108 | Enquire whether the statement at page 3, number 7 of the document was a direction given by BATCo/Investments to the group of companies including Imperial Tobacco Canada, as to what to say with respect to this | The question is unduly onerous and disproportionate given that the document is almost 50 years old and the author is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | matter | | | |
|---|---|---|---|---|
| Cordeschi (Investments)— p.169 Q458—Vol.6B-109 | Enquire whether the reference to "strictly confidential to all number ones in associated companies" in the document attached to the letter dated June 12, 1970, refers to chief executive officers including Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is over 40 years old and its author is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.171 Q463—Vol.6B-109 | Confirm whether reference to members of the group in the statement on page 2 of the document - "it is thought desirable to set out revised guidelines to be observed wherever possible in future by members of the group in their approaching to the smoking and health controversy" - includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is 40 years old and the author of the document is unknown. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.172 Q467—Vol.6A-6 | Enquire whether the reference to "all number ones of associated companies" in the memo includes the chief executive officer of Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is nearly 40 years old. Further, it is unlikely that any author is still employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.173 Q473—Vol.6A-15 | Enquire whether reference to "all associated number ones" in the memo dated June 26, 1974, includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that, even assuming that GC Hargrove authored the document and was an Investments employee at the time, the document is 37 years old and Mr. Hargrove is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.174 Q475—Vol.6A-16 | Confirm whether the memo from Mr. Hargrove dated June 20, 1975, was sent to Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is 36 years old and Mr. Hargrove is no longer employed by Investments. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi | Confirm whether the memo dated | This question is unduly onerous and | Answer | *Premature* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| (Investments)— p.175 Q477—Vo.6B.- 114 | April 25, 1983, and the attached guidelines, were created by BATCo/Investments | disproportionate in that the author of this 28 year old document is unknown. | | *discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.175 Q479—Vo.6B.- 114 | Enquire whether the reference to "associated companies" in the last paragraph of the first page of the memo dated April 25, 1983, includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is 28 years old and the author of the constituent document is unknown. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.177 Q484—Vol.6B- 115 | Enquire whether the document entitled "Public Affairs Interim Guidelines" dated April 11, 1988, was prepared by a BATCo/ Investments employee | This question is unduly onerous and disproportionate in that the document was prepared 23 years ago. Further, it is unlikely that any author is still employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.177 Q485—Vol.6B- 115 | Advise whether the document entitled "Public Affairs Interim Guidelines" dated April 11, 1988, was forwarded to Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is 23 years old. The question is irrelevant to the issues on the motion. Without conceding relevance, excerpts from the document have been located in Investments' files. Further undertakings would be unduly onerous and disproportionate. Further, it is unlikely that any author is still employed by Investment. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.178 Q488—Vol.6B- 115 | Enquire whether the reference to "operating companies" on the last paragraph of page two of the document includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is over 20 years old. Further, it is unlikely that any author is still employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.178 Q489—Vol.6B- 116 | Enquire whether the document entitled "BAT Environmental Tobacco Smoke — Improving the Quality of Public Debate: Strategies" was prepared by a BATCo/Investments employee | This question is irrelevant to the issues on the motion. Even if it were not irrelevant, the question is unduly onerous and disproportionate in that there is no indication as to the author of this document, which is 21 years | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

old.

| | | | | |
|---|---|---|---|---|
| Cordeschi (Investments)— p.179 Q492 | Confirm whether the document entitled "BAT Environmental Tobacco Smoke — Improving the Quality of Public Debate: Strategies" was sent to the chief executive officer of Imperial Tobacco Canada | This question is unduly onerous and disproportionate. The document is 21 years old and its author is not indicated. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.182 Q502—Vol.6A-43 | Confirm whether Mr. Patrick Sheehy and Mr. Stuart Lockhart from BATCo/Investments attended the meeting referred to as Operation Berkshire in or about June 1977 | The statement contained therein is hearsay with respect to Investments. This question is also unduly onerous and disproportionate given that Mr. Cordeschi is being asked to confirm attendance at a meeting that purportedly took place 34 years ago and given that Messrs. Sheehy and Stewart-Lockhart are no longer employed by Investments. | Advise if any information they did not attend | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.186-7 Q516—Vol.6A-48 | Enquire whether BATCo/ Investments either prepared or received a copy of the document entitled "Third Meeting of the International Committee on Smoking Issues: Conclusions and Recommendations." | The question is irrelevant to the issues on the motion. Without conceding relevance, excerpts from the document have been located in Investments' files. Further undertakings would be unduly onerous and disproportionate. Further, even if the document were prepared by an employee of Investments, it is unlikely that that person is still employed by Investments as the document is over 30 years old. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.188 Q519 | Confirm whether Mr. Lockhart was the chairman of the ICOSI Committee in 1978 | This question is unduly onerous and disproportionate given that none of the Investments employees who were purportedly at that meeting currently work for Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.192 Q528—Vol.6A.-7 | Confirm whether BATCo/ Investments created the divisional boards referred to in the memo dated May 15, 1973, and whether the individuals under | This document is unduly onerous and disproportionate given that this document is almost 40 years old and none of the persons who purportedly sat on the tobacco divisional board at | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| | number one sat on the tobacco divisional board | this time are currently employed by Investments | | |
| Cordeschi (Investments)— p.194 Q534—Vol.6A-9 | Enquire whether Mr. Sheehy was responsible for Canada in the tobacco division at the time the chart entitled "British-American Tobacco Company Limited: Outline Organisation" was prepared | This question is misleading as the chart indicates Mr. Sheehy was purportedly the liaison with operating companies in Canada. Moreover, Mr. Sheehy is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.203 Q11 | Confirm whether the reference to "group" in the statement on page 2, paragraph 2 - "the divisional board's report to group headquarters through the chairman's policy committee, whose members include the vice chairman, chairman of the four operating divisions and the senior finance director, the policy committee is responsible to the BAT board for the overall development and well being of the group and for the control and allocation of central group resources" includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate as the author of this paper cannot be consulted. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.244 Q148—Vol.6C-145 | Advise whether BATCo/ Investments representatives were present at the conference in Chelwood, England on Nov. 6 1979 | This question is irrelevant to the issues on the motion. Even if it were not irrelevant, the question is unduly onerous and disproportionate given that the purported conference took place 32 years ago and there is no indication on the face of the document who the attendees at the conference were. | Answer | *Withdrawn by Crown* |
| Cordeschi (Investments)— p.248 Q157—Vol.6C-147 | Enquire whether the document entitled "Research Progress and Policy" was authored by Dr. Blackman, an employee of BATCo/Investments | The question is irrelevant to the issues on the motion. Even if it were not irrelevant, the question is unduly onerous and disproportionate in that Dr. Blackman is not currently employed by Investments. | Answer | *Withdrawn by Crown* |
| Cordeschi (Investments)— pp.249-50 | Confirm whether the reference to "number ones and senior marketing staff" on page 1, | This question is unduly onerous and disproportionate in that the document is 31 years old and the author of the | Answer | *Premature discovery request -* |

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Q164—Vol.6C-147 | paragraph 4 of the document entitled "Research Progress and Policy" includes Imperial Tobacco Canada's personnel | document is no longer employed by Investments. | | *Refusal upheld* |
| Cordeschi (Investments)— pp.250-1 Q168—Vol.6C-147 | Confirm whether the reference to CAC companies on page 2, paragraph 4 of the document entitled "Research Progress and Policy" refers to Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is 31 years old and the author of the document is no longer employed by Investments. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— pp.252-3 Q176—Vol.6C-147 | Confirm that Dr. Massey was an employee of BATCo/Investments and was transferred to Imperial Tobacco at or about October 1982 | Currently believed that we can respond in most cases as to past associations with BATCo/Investments but may be not be able to provide precise positions held or dates worked - partial (as to whether BATCo employee). | Answere | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.264-5 Q205—Vol.6C-162 | Confirm that BATCo/Investments undertook research and development for the group of companies, including Imperial Tobacco Canada, in or around Dec 2000 | This question is irrelevant to the issues on the motion. The question is tantamount to discovery in the action generally. | Answer | *Relevancy not established - Refusal upheld* |
| Cordeschi (Investments)— p.267 Q 214—Vol.6C-162 | Confirm whether BAT BATCo/ Investments undertook to do research into tobacco-related issues to be shared with Imperial Tobacco Canada in 2009 | The question is irrelevant to the issues on the motion. The question is tantamount to discovery in the action generally. | Answer | *Relevancy not established - Refusal upheld* |
| Cordeschi (Investments)— p.269 Q219—Vol.6C-153 | Confirm that Mr. Sheehy was a director of the tobacco board of the tobacco division of BAT on Dec. 1, 1986 | Currently believed that we can respond in most cases as to past associations with BATCo/Investments but may be not be able to provide precise positions held or dates worked. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.272 Q229—Vol.6C-154 | Confirm that JL Mercier referenced as an attendee of the May 18, 1990, meeting of the Tobacco vStrategy Review Team is JL Mercier from Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the author of the document is not indicated and because it asks Mr. Cordeschi to confirm the employment of someone who is not employed by Investments. The question would more properly be directed to Imperial. | Advise if any information he is not | *Premature discovery request - Refusal upheld* |
| Cordeschi | Confirm whether the document | This question is irrelevant with | Answer | *Premature* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| (Investments)— p.274 Q232—Exhibit9 -165 | entitled "Hot Springs Papers on Social Unacceptability Issues" dated Sept. 8, 1976, was authored by Mr. Haddon, a BATCo/ Investments employee | respect to the issues on the motion. Even if it were not irrelevant, the question is unduly onerous and disproportionate in that Mr. Haddon is not currently employed by Investments and because the document is 35 years old. | | *discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.288 Q270—Exhibit1 1-167 | Confirm whether a copy of the document entitled "To all members of the BAT Industries board" dated July 1987 was sent to BATCo/BAT Industries | This document is irrelevant to the issues on the motion. Even if it were not irrelevant, it is unduly onerous and disproportionate in that the document is 24 years old. Further, it is unlikely that any author is still employed by Investments. In addition, the document appears to be a BAT Industries document and not a Investments document. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.290 Q277—Ex11-16 7 | Confirm whether the reference to "group wide programme" on page 2, paragraph 15 includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that Mr. Cordeschi should not be required to ascertain the meaning of a word or phrase contained in a document which appears to be a BAT Industries document and whose author was likely an employee of that company. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.291 Q279—Page Bates Number 1747 | Enquire whether a copy of the document entitled "Guidelines for IMASCO July 1987" was sent by BATCo/Investments to IMASCO | This question is unduly onerous and disproportionate given that the document in question appears to be 24 years old. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.291 Q281—Exhibit1 2-168 | Enquire whether the document entitled "Smoking: The Scientific Controversy" was produced by BATCo/Investments | This question is not relevant to the issues on the motion and is tantamount to discovery in the action generally. Even if it were not irrelevant, the question is unduly onerous and disproportionate in that there is no indication who was the author of this document. | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Cordeschi (Investments)— p.293 Q289—Exhibit1 3-169 | Advise whether the document entitled "Note for the Tobacco Strategy Review Team" was distributed to Imperial Tobacco Canada at or about Jan. 24, 1990 | This question is unduly onerous and disproportionate given that the document in question is over 20 years old. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Investments)— p.299 Q305—Ex14-17 2 | Enquire whether the statement at page 180 of the document - "BAT has six regional research and development and production technology centre around the world" - includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate. The author of this document is not indicated and it appears to be a BAT Industries document rather than a Investments documents. | Answer | *Premature discovery request - Refusal upheld* |

## K. The Determination of Industries' Appeal

181    For the above Reasons, it is my opinion that the Master made several errors in principal and his decision should be set aside in its entirety.

182    I have completed my own analysis of the undertakings requested from Ms. Snook as Industries' deponent for the jurisdictional motion. In my opinion, the refusals were proper. My discrete rulings are set out in the following chart:

| *Reference* | *Questions* | *Industries Response* | *Master's Disposition* | *Ruling* |
|---|---|---|---|---|
| Snook (Industries)—p. 34, Q103—ExI-50 | Check the records of Industries and advise whether the document dated July 23, 1976 was sent to either Imasco Limited ("Imasco") or Imperial Tobacco Company Limited ("Imperial") | The question is irrelevant to the pending motion. Even if it were not irrelevant, the Industries employee to whom this document, which is almost 35 years old, is attributed is no longer with Industries. The determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. 47 Q 140—Ex I, | Was a copy of this letter sent to Imasco or Imperial | The question is irrelevant to the pending motion. Even if it were not irrelevant, the Industries employee to | Answer | *Premature discovery request -* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Tab 9 | | whom this document, the exact date of which is unknown, is attributed is no longer with Industries. The determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | | *Refusal upheld* |
| Snook (Industries)—p. 50 Q 150—Ex. I-10 | Check the records of Industries and advise whether the document "Issues Update" was sent to either Imasco or Imperial | The question is irrelevant to the pending motion. Even if it were not irrelevant, the whereabouts of the author of this document, which appears to be several decades old, are not known. The determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. 66 Q201—ExI-53 | Advise whether Industries ever produced a set of party line answers to the main criticisms of multinationals | The question relates to a document that is not an Industries document and is irrelevant to the pending motion and tantamount to discovery in the underlying action. Even if the question were not irrelevant, the determination of whether Industries ever produced a set of "party line answers" is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. | Answer | *Relevancy not established - Refusal upheld* |
| Snook (Industries)—p. 87 Q 267—ExI-62 | Was it a policy of Industries that the companies speak with one voice on policy matters in Sept 1976 | The question relates to a document that is not an Industries document. The question is irrelevant to the pending motion and tantamount to discovery in the underlying action. | Answer | *Relevancy not established - Refusal Upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| | | Even if it were not irrelevant, the determination of whether the purported "policy" is attributable to Industries is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. | | |
| Snook (Industries)—p. 88 Q 268—ExI-62 | Was it a policy of Industries that it influence medical and official opinion against incautious imposition of constraints and any unnecessary restriction on smoking | The question relates to a document that is not an Industries document. Moreover, the question is irrelevant to the pending motion and tantamount to discovery in the underlying action. Even if it were not irrelevant, the determination of whether the purported "policy" is attributable to Industries is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. 108 Q 323—ExI-87 | Was this document distributed to Imasco or Imperial | The question is irrelevant to the pending motion. Even if it were not irrelevant, the document, which is almost 35 years old, does not originate from Industries' files. Moreover, the determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. 163 Q499—ExI-138 | Enquire whether Mr. Sheehy, from and after June 30, 1981, as a member of the Board of Industries, retained responsibility of that board for Imasco | The question is vague and open-ended and would require an unduly onerous and disproportionate search of millions of document pages, which may still not provide an answer. Moreover, Mr. Sheehy is no longer with Industries. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. | Advise whether a copy of this document was sent to Imperial or | The question is irrelevant to the pending motion. Even if it were not | Answer | *Premature discovery* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| 177 Q 546—ExI-166 | Imasco | irrelevant, the Industries employee to whom this document, which is over 25 years old, is attributed is no longer with Industries. The determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | | *request - Refusal upheld* |
| Snook (Industries)—p. 188 Q 588—ExI-203 | Determine whether the July 1987 guidelines were sent to Imasco | The question is irrelevant to the pending motion. Even if it were not irrelevant, the authors of the constituent parts of this document, which is more than 23 years old, are either unknown or no longer with Industries. The determination of whether the document was sent to Imperial/Imasco is unduly onerous and disproportionate as it would require a search of millions of document pages, which may still not provide an answer. Given the foregoing, the question would more properly be directed to Imperial. | Answer | *Premature discovery request - Refusal upheld* |
| Snook (Industries)—p. 203 Q625—ExI-236 | Advise whether the material attached to this letter is a document retention policy of Imperial that Mr. Ackman is sending to Mr. Chalfen for questions or thoughts of Industries | The question is irrelevant to the pending motion. The issue of a document retention policy is not an issue in the pleadings or the affidavits. Even if it were not irrelevant, Mr. Chalfen is no longer with Industries. | Answer | *Relevancy not established - Refusal upheld* |
| Snook (Industries)—p. 205 Q628—ExI-237 | Confirm that Mr. Chalfen is suggesting some revisions of the draft document retention policy of Imperial for Mr. Mercier's consideration | The question is irrelevant to the pending motion. The issue of a document retention policy is not an issue in the pleadings or the affidavits. Even if it were not irrelevant, Mr. Chalfen is no longer with Industries. | Answer | *Relevancy not established - Refusal upheld* |
| Snook (Industries)—p. 225 | Confirm that Mr. Levitt of Imasco attended meetings of the financial services strategy group | The question is irrelevant as the financial services strategy group has no relevance to the pending motion. | Answer | *Relevancy not established - Refusal* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Q684—ExI-273 | of Industries from July 1992 to 2000 | Moreover, it would be unduly onerous and disproportionate to search millions of document pages, which may still not provide an answer. | | *upheld* |

## L. The Determination of Carreras' Appeal

183      For the above Reasons, it is my opinion that the Master made several errors in principle and his decision should be set aside in its entirety.

184      I have completed my own analysis of the undertakings requested from Mr. Cordeschi as Carreras' deponent for the jurisdictional motion. In my opinion, the refusals were proper. My discrete rulings are set out in the following chart:

| *Reference* | *Questions* | *Industries Response* | *Master's Disposition* | *Ruling* |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.19 Q54 | To make enquiries as to whether Carreras has documents that predate 1984 | Mr Cordeschi responded to this question during the cross examination. He does not know the answer and that should end the inquiry. To compel Mr. Cordeschi to undertake a search for documents or make inquiries of others upon whom he did not rely to swear his affidavit is contrary to established legal principle. Further, the question posed is irrelevant to a determination of the jurisdiction motion. Regardless of whether Mr. Cordeschi is able to determine if the answer is "yes" or "no", the answer will not advance the analysis of the Court hearing the Jurisdiction Challenge. The inquiry is simply in the nature of discovery that amounts to a fishing expedition. | Answer | *Premature discovery request- Refusal upheld* |
| Cordeschi (Carreras)—p.19 Q56 | To provide a description generally of what documents still exist that predate 1984 | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. In circumstances where Mr. Cordeschi swore a narrow uncontroversial affidavit on behalf of | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | a non-attorning foreign entity, it is inconsistent with legal principle to have him make further inquiries to determine if documents exist and to review them. Further, the question is irrelevant to a determination of the jurisdiction motion. Regardless of Mr. Cordeschi's "description generally" of the nature of any documents that exist, the answer will not advance the analysis of the Court hearing the Jurisdiction Challenge. The inquiry is simply in the nature of discovery that amounts to a fishing expedition. | | |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.2 1 Q62 | To provide a copy of Carreras' current business records policy (requirement to retain all business records and documents in relation to the company) | Mr. Cordeschi indicated on cross examination that he could not recall the exact words of this policy. That should end the matter. The question does not relate in any way to the Cordeschi Affidavit, nor is its relevance to the jurisdiction motion even apparent. In these circumstances, compelling a non-attorning defendant, who has no discovery obligations, to produce a document for some speculative purpose of the plaintiff is improper and contrary to the legal principles applicable to undertakings on cross examination on an affidavit. | Answer | *Relevancy not established - Refusal upheld* |
| Cordeschi—p.2 1 Q62 | To provide a copy of Carreras' current business records policy (requirement to retain all business records and documents in relation to the company) | Mr. Cordeschi indicated on cross examination that he could not recall the exact words of this policy. That should end the matter. The question does not relate in any way to the Cordeschi Affidavit, nor is its relevance to the jurisdiction motion even apparent. In these circumstances, compelling a non-attorning defendant, who has no discovery obligations, to produce a document for some speculative purpose of the plaintiff is improper and contrary to the legal principles applicable to undertakings on cross | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | examination on an affidavit. | | |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.2 1 Q64 | To advise whether Carreras had a similar policy or some kind of business records policy in place prior to 1984 | Mr Cordeschi responded to this question during the cross examination. He does not know the answer and that should end the inquiry. The question does not relate to the Cordeschi Affidavit nor is its relevance to the jurisdiction motion apparent. Mr. Cordeschi swore a narrow uncontroversial affidavit on behalf of a non-attorning entity and to compel him, in these circumstances, to undertake a search for a document (that may or may not exist) on the basis of a speculative position of the plaintiff is improper in the context of a cross examination on an affidavit. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.2 9 Q95 | To confirm that during the time when Carreras' ultimate parent was Rothmans International Limited, Rothmans International Limited was also the parent of a company called Pall Mall of Canada Limited | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That is not surprising as this is a question to which one would expect Rothmans of Pall Mall Canada Limited (a predecessor company to a defendant in these proceedings) to have the answer. The plaintiff chose not to undertake inquiries of that entity to obtain this information in support its position on the motion. The burden of finding this information ought not now be placed on Mr. Cordeschi particularly in circumstances where he has sworn only a narrow and uncontroversial affidavit on behalf of a non-attorning foreign entity and the inquiry does not relate to his affidavit. An order compelling a response to this request is not consistent with the applicable legal principles. | Answer with best available information | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.2 9-30 Q96 | To confirm the period of time when Rothmans International plc was Carreras' ultimate parent, that it was also the ultimate parent of Rothmans of Pall Mall Canada Limited | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That is not surprising as this is a question (like the one above) to which one would expect Rothmans of Pall Mall Canada Limited to have the answer. The plaintiff chose not to undertake inquiries of these entities to obtain this information in support its position on the motion. The burden of finding this information ought not now be placed on Mr. Cordeschi particularly in circumstances where he has sworn only a narrow and uncontroversial affidavit on behalf of a non-attorning foreign entity and the inquiry does not relate to his affidavit. An order compelling a response to this request is not consistent with the applicable legal principles. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.3 2 Q106 | To confirm that for some period up to 1984, at least during the period 1978 to 1984, Carreras was the Rothmans group research centre | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That should end the inquiry. Further inquiries of documents or of others who did not provide information for Mr Cordeschi's affidavit and on issues unrelated to the affidavit is not consistent with the applicable legal principles Further, the question is irrelevant to a determination of the jurisdiction motion. Mr. Cordeschi's opinion today on whether CRL was a "group research centre" is of no | Answer whether had responsibility for research during period | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | assistance to the Court on the Jurisdiction Challenge. The inquiry is simply in the nature of discovery that amounts to a fishing expedition. | | |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.3 2 Q108 | To confirm that Carreras conducted research for companies in the Rothmans group in 1978-1984 | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That should end the inquiry. To compel Mr. Cordeschi to undertake searches for, and review of, documents unrelated to his affidavit or to make inquiries of others upon whom Mr. Cordeschi did not rely to swear his affidavit is not consistent with established legal principle. Further, the question is irrelevant to a determination of the jurisdiction motion. Mr. Cordeschi's opinion today on whether CRL "directed and coordinated smoking and health policies for companies in the Rothmans Group" for a period of time over 25 years ago is of no assistance to the Court on the Jurisdiction Challenge. The question is also inappropriate as it asks for what is, in essence, a legal conclusion. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.3 2-33 Q109 | To confirm that Rothmans of Pall Mall Canada was part of the Rothmans group in 1978-1984 | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That is not surprising as this is a question to which one would expect Rothmans of Pall Mall Canada Limited (a predecessor company to a defendant in this proceeding) to have | Answer | *Premature discovery request - Refusal upheld* |

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| | | the answer. The plaintiff chose not to undertake inquiries of this entity to obtain this information in support its position on the motion. The burden of finding this information ought not now be placed on Mr. Cordeschi particularly in circumstances where he has sworn only a narrow and uncontroversial affidavit on behalf of a non-attorning foreign entity and the inquiry does not relate to his affidavit. An order of this nature is not consistent with the applicable legal principles. | | |
| Cordeschi (Carreras)—p.3 3 Q 111 | To advise whether Carreras has documents and reports prior to 1984 that include records of who was employed by the company and the term of their employment | Mr Cordeschi responded to this question during the cross examination. He does not know the answer and that should end the inquiry. To compel Mr. Cordeschi to undertake a search for documents or make inquiries of others upon whom he did not rely to swear his affidavit is contrary to established legal principle. Further, the question is irrelevant to a determination of the jurisdiction motion. Regardless of whether Mr. Cordeschi is able to determine if the answer is "yes" or "no", the answer will not advance the analysis of the Court hearing the Jurisdiction Challenge. The inquiry is simply in the nature of discovery that amounts to a fishing expedition. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.3 3 Q 112 | To advise whether Peter Brown was employed by Carreras, for what period of time, and his position | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know Peter Brown or his whereabouts. That should end the inquiry. In the context of a | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find Mr. Brown in an attempt to answer the plaintiff's question, particularly where Mr. Brown has nothing to do with Mr. Cordeschi's affidavit. | | |
|---|---|---|---|---|
| Cordeschi (Carreras)—p.3 4 Q113 | To advise whether RWJ Williams was employed by Carreras, for what period of time, and his position | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know RWJ Williams or his whereabouts. That should end the inquiry. In the context of a jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find RWJ Williams in an attempt to answer the plaintiff's question, particularly where RWJ Williams has nothing to do with Mr. Cordeschi's affidavit. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)i—p.4 0 Q125—Supple mental Appeal Record of CRL, Tab 5, p. 223 | To advise if Mr. Brown was employed by Carreras in January 1982, the length of employment, his position, and confirm that the letter was sent by Carreras | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know Peter Brown or his whereabouts. That should end the | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| | | inquiry. In the context of a jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find Mr. Brown in an attempt to answer the plaintiff's question, particularly where Mr. Brown has nothing to do with Mr. Cordeschi's affidavit. | | |
| Cordeschi (Carreras)—pp. 44-5 Q137—Supplemental Appeal Record of CRL, Tab 5, p. 211 | To confirm that Mr. Wesnos was an employee of Carreras in Sept. 1980, his position and length of employment | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know Mr. Wesnos or his whereabouts. That should end the inquiry. In the context of a jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find Mr. Wesnos in an attempt to answer the plaintiff's question, particularly where Mr. Wesnos has nothing to do with Mr. Cordeschi's affidavit. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.46 Q141—Supplemental Appeal Record of CRL, Tab 5, p. 216 | To confirm that R. Allen and N. Cohen were employed by Rothmans Pall Mall Canada in Dec. 1980 | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That is not surprising as this is a question to which one would expect | Answer | *Premature discovery request - Refusal upheld* |

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| | | Rothmans of Pall Mall Canada Limited (a predecessor company to a defendant in this proceeding) to have the answer. The plaintiff chose not to undertake inquiries of this entity to obtain this information in support its position on the motion. The burden of finding this information ought not now be placed on Mr. Cordeschi particularly in circumstances where he has sworn only a narrow and uncontroversial affidavit on behalf of a non-attorning foreign entity and the inquiry does not relate to his affidavit. An order of this nature is not consistent with the applicable legal principles | | |
| Cordeschi (Carreras)—pp. 54-5 Q163—Supple mental Appeal Record of CRL, Tab 5, p. 246 | To confirm that Dr. WD Rowland was an employee of Carreras Rothmans and the length of his employment in his position | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know Dr. W.D. Rowland or his whereabouts. That should end the inquiry. In the context of a jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find Dr. W.D. Rowland in an attempt to answer the plaintiff's question, particularly where Dr. W.D. Rowland has nothing to do with Mr. Cordeschi's affidavit. | Answer | *Premature discovery request - Refusal upheld* |
| Cordeschi (Carreras)—p.5 5 Q164—Supple | To confirm that Mr. RW Allan was an employee of Rothmans of Pall Mall Canada | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, | Answer | *Premature discovery request - Refusal* |

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

| | | | | |
|---|---|---|---|---|
| mental Appeal Record of CRL, Tab 5, p. 246 | | nor is the information found in the documents readily available to him in the course of carrying out his responsibilities as director for CRL. That is not surprising as this is a question to which one would expect Rothmans of Pall Mall Canada Limited (a predecessor company to a defendant in this proceeding) to have the answer. The plaintiff chose not to undertake inquiries of this entity to obtain this information in support its position on the motion. The burden of finding this information ought not now be placed on Mr. Cordeschi particularly in circumstances where he has sworn only a narrow and uncontroversial affidavit on behalf of a non-attorning foreign entity and the inquiry does not relate to his affidavit. An order of this nature is not consistent with the applicable legal principles. | | *upheld* |
| Cordeschi (Carreras)—pp. 59-60 Q176—Supple mental Appeal Record of CRL, Tab 5, p. 203 | To confirm that Mr. Matchett was an employee of Carreras Rothmans in June 1977, his position and the length of his employment | In Mr. Cordeschi's responses to the "under advisements" from his cross examination, he advised that he does not know the answer to this question, nor is the information in the documents readily available to him in the course of carrying out of his responsibilities as director for CRL. Mr. Cordeschi also indicated that he does not know Mr. Matchett or his whereabouts. That should end the inquiry. In the context of a jurisdiction motion, where Mr. Cordeschi has sworn a narrow uncontroversial affidavit, it is a misapplication of legal principle to compel him to undertake efforts to search for and (if found) review documents or attempt to find Mr. Matchett in an attempt to answer the plaintiff's question, particularly where Mr. Matchett has nothing to do with | Answer | *Premature discovery request - Refusal upheld* |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellOnt 2916, 2011 ONSC 2504, 5 C.P.C. (7th) 112, 201 A.C.W.S. (3d) 341

Mr. Cordeschi's affidavit.

**M. Conclusion**

185     For the above Reasons, I allow the appeal and set aside the Master's order.

186     If the parties cannot agree about the matter of costs, they may make submissions in writing beginning with Investments, Industries, and Carreras within 20 days of the release of these Reasons for Decision followed by the Crown within a further 20 days.

187     Counsel are to be commended for their helpful argument and factums and for their admirable skill in arguing a refusals motion, which is not an easy task for lawyers, judges, or Masters.

*Appeal allowed.*

FN* Leave to appeal refused at *Ontario v. Rothmans Inc.* (2011), 2011 CarswellOnt 5363, 2011 ONSC 3685 (Ont. Div. Ct.).

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 3

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 5998
COURT FILE NO.: 09-CL-7950
DATE: 20130923

SUPERIOR COURT OF JUSTICE – ONTARIO
(COMMERCIAL LIST)

RE:      IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

           AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:    MORAWETZ J.

COUNSEL:  Matthew P. Gottlieb, Luis Sarabia, Paul Michell and Arden Beddoes, for the Joint Administrators of EMEA Debtors

           Peter Griffin, for Ernst & Young LLP

           Andrew Gray and Scott Bomhof, for Nortel Networks Inc. and the U.S. Debtors

           Shayne Kukulowicz, for the Unsecured Creditors' Committee

           Christopher Naudie and Gillian Scott, for the Non-Party Deloitte LLP

           Gavin Finlayson, for the Noteholder Group

           John Finnigan and Michael Barrack, for the U.K. Pension Claimants

           Elizabeth Allen Putnam, for the Nortel Directors & Officers

           Jeff Galway, for the Non-Party KPMG LLP

           Jessica Kimmel and Chris Armstrong, for the Monitor and Canadian Debtors

           Derrick Tay, for Nortel Networks Limited

HEARD:     SEPTEMBER 18, 2013

2013 ONSC 5998 (CanLII)

- Page 2 -

## ENDORSEMENT

**Background**

[1]    The joint administrators for the EMEA Debtors (the "Joint Administrators") move for production of documents from Ernst & Young LLP (Canada) ("EY Canada"), under rule 30.10 of the *Rules of Civil Procedure*.

[2]    The underlying proceedings concern, among other things, the allocation of assets of the Nortel Group of Companies amongst its individual entities.

[3]    Production of documents has been ongoing for a number of months and discoveries are being conducted over the next few months.

[4]    To date, over two million documents have been produced to the parties to the litigation.

[5]    The trial, originally scheduled to commence on January 6, 2014, has already been postponed and will now commence in late March or early April 2014.

[6]    Various Nortel entities performed research and development and developed intellectual property. According to the Joint Administrators, the Nortel Group of Companies entered into a "transfer pricing agreement" with the stated purpose of compensating the various entities on an arms-length basis for contributions to the global enterprise. The transfer pricing agreement is a central issue of contention in these proceedings, particularly as it relates to determining the appropriate allocation of proceeds which arose from the sale of Nortel assets, including its intellectual property.

[7]    The Joint Administrators submit that, as an important third party consultant, EY Canada was "intimately involved" in the development of the agreement. They believe that EY Canada possesses documents related to the development of the transfer pricing agreement that are "highly relevant" to the dispute. They seek disclosure of these documents from EY Canada.  The U.K. Pension Claimants support the Joint Administrators.

[8]    The Monitor and Canadian Debtors oppose this motion. They advance two related arguments: (i) the production request must be viewed in light of the enormous volume of material already produced; and (ii) the production sought has already been produced from other sources. EY Canada submits that it does not wish to undertake the significant exercise involved in reviewing and producing these documents, given its position that the requested documents have already been produced. EY Canada advises that the working paper files amount to more than 7 boxes of hard copy files, as well as 150,000-170,000 pages of documentation.

**Law**

[9]    Rule 30.10(1) provides as follows:

- Page 3 -

The court may, on motion by a party, order production for inspection of a document that is in the possession, control or power of a person not a party and is not privileged where the court is satisfied that,

(a) the document is relevant to a material issue in the action; and

(b) it would be unfair to require the moving party to proceed to trial without having discovery of the document.

[10]    The moving party bears the burden of showing that it would be unfair to make them proceed to trial without the production: *Ontario (Attorney General) v. Ballard Estate* (1995), 26 O.R. (3d) 39 (C.A.), at para. 16 [*Ballard*].

[11]    An order under rule 30.10 should not be made as a matter of course; such an order should be made only in exceptional cases: *Morse Shoe (Canada) Ltd. v. Zellers Inc.* (1997), 10 O.A.C. 116 (C.A.), at para. 19 [*Morse Shoe*].

[12]    In *Ballard*, the Court of Appeal articulated the principles that should guide the fairness analysis under subsection (b). The Court noted, at paras. 12-13:

In making the fairness assessment required by Rule 30.10(1)(b), the motion judge must be guided by the policy underlying the discovery regime presently operating in Ontario. [...] By its terms, Rule 30.10 assumes that requiring a party to go to trial without the forced production of relevant documents in the hands of non-parties is not per se unfair [...] The discovery process must also be kept within reasonable bounds.

[13]    The Court then listed six factors to be considered by the motion judge (*Ballard*, at para. 15):

1. the importance of the documents in the litigation;
2. whether production at the discovery stage of the process as opposed to production at trial is necessary to avoid unfairness to the moving party;
3. whether the discovery of the defendants with respect to the issues to which the documents are relevant is adequate and if not, whether responsibility for that inadequacy rests with the defendants;
4. the position of the non-parties with respect to production;
5. the availability of the documents or their informational equivalent from some other source which is accessible to the moving parties;
6. the relationship of the non-parties from whom production is sought, to the litigation and the parties to the litigation.

**Analysis**

- Page 4 -

[14]    The Joint Administrators seek five categories of documents from EY Canada:

1. Documents showing the scope, duration, objectives, and nature of services rendered during the relevant period by EY Canada for any Nortel entity;
2. All documents, including working papers and e-mails, concerning transfer pricing arrangements considered or applied by the Nortel Group during the relevant period;
3. All documents concerning IP developed or created by one or more Nortel entities;
4. Documents showing bills or invoices prepared by EY Canada concerning services rendered for Nortel entities;
5. Documents showing the names of EY Canada personnel who recorded time for services rendered on behalf of any Nortel entities, and detailed information on time billed and descriptions of work.

30.10(1)(a): Relevancy

[15]    The Joint Administrators submit that the documents it requests are "highly relevant" to the allocation dispute. The Monitor and Canadian Debtors neither concede nor deny the relevancy of the documents sought to the allocation dispute. However, in view of my conclusion, it is not necessary to determine the relevancy of the documents sought to the allocation dispute. Assuming that the documents are relevant, I have determined that the motion fails on the fairness assessment.

30.10(1)(b): Requiring the Joint Administrators to proceed to trial without production would not be unfair.

[16]    There are two distinct types of documents requested by the Joint Administrators. Each engages different considerations under the fairness analysis.    In my view, neither creates unfairness.

*(i) Documents communicated to the client*

[17]    The first category contains documents in the possession of EY Canada that would have been communicated to the client. These include invoices, emails, engagement letters, and advice given to the client.

[18]    The parties agreed on search parameters used for production that were designed to identify, and appear to have identified, communications between EY Canada and its clients. The Monitor and Canadian debtors submit that to organize production, the parties agreed upon "Consolidated Document Requests", which listed various types of documents the parties would agree to find and produce. The Consolidated Document Requests specifically sought communications with EY Canada pertaining to transfer pricing matters and certain analyses that EY Canada is alleged to have performed in connection with Nortel's transfer pricing system. The parties also agreed to document "custodians" likely to have documents responsive to the Consolidated Document Requests. The searches used to search custodian records for potentially

2013 ONSC 5998 (CanLII)

- Page 5 -

responsive documents included searching for instances of the terms "transfer pricing" (and various derivative and related terms) appearing along with "Ernst", "EY", "E&Y" or "E and y".

[19]     Searches of the documents produced confirmed the presence of communications between EY Canada and its clients.  For example, according to the Monitor and Canadian Debtors, the names of EY Canada professionals identified in the Norris-Jones Affidavit as being involved in EY Canada's transfer pricing related work appear thousands of times in the documents produced, and that "the search string 'ca.ey.com', being the usual suffix to EY Canada email addresses, hits nearly 23,000 documents".[1]

[20]     Two of the principles listed in *Ballard* were: (i) whether the discovery of the defendants with respect to the issues to which the documents are relevant is adequate; and (ii) the availability of the documents or their informational equivalent from some other source which is accessible to the moving parties.

[21]     I am satisfied that much of the documentation requested has been previously communicated to the client, and thus is already subject to production and ongoing production.

[22]     In my view, it would not be unfair to require the Joint Administrators to proceed to trial without production of this information from EY Canada.

### (ii) Documents not communicated to the client

[23]     What remains are documents which EY Canada did not communicate to its clients (Nortel entities). These documents may not have already been produced from another source (except insofar as the information was shared with Ernst and Young US and subpoenaed by the Joint Administrators in the United States). It is unclear what these documents would be other than work product or internal memoranda.

[24]     It seems to me that the Joint Administrators have not provided evidence that shows how these documents which were not communicated to the client are important in the litigation. There is no dispute that advice given to clients with respect to the transfer price agreements could be important, or that communication between the parties might shed light on the development of these policies.  But, the Joint Administrators have not provided evidence of some kind of gap upon which internal EY Canada documents would shed light. The Joint Administrators, in explaining the importance of the documents sought, suggest that "EY Canada acted as an extension of the Nortel Group by performing high-level strategic analysis in respect of transfer pricing" and specifically, that EY Canada was "consulted, and provided advice... engaged on behalf of the Nortel Group... [and] engaged to advise on the drafting..."[2] These are all activities that would have resulted in communication with clients. There is no allegation that what was

---

[1] Affidavit of Christina Ierullo, para. 18.

[2] Affidavit of James Norris-Jones, at paras. 17-18.

- Page 6 -

communicated to the clients somehow represents an incomplete picture of what occurred. Nor is there an allegation that such an incomplete picture could be supplemented by work product.

[25]    In *Morse Shoes* Austin J.A. stated that rule 30.10 orders should be granted only in "exceptional cases". *Morse Shoes* was such a case. The plaintiff was defunct – its knowledgeable personnel had been dispersed and its documents had many gaps. An example of such a gap is instructive: the former comptroller was examined for discovery with respect to certain documents produced by the plaintiff. He agreed that there was a meeting between the company and a bank on a particular date but had no recollection about what happened at that meeting or even if he attended (*Morse Shoes* at para. 14).

[26]    In my view, a consideration of the *Ballard* factors in light of *Morse Shoes* reveals that the Joint Administrators have not met their burden.    It is clear that EY Canada is not a "true stranger" to the litigation and that the internal EY Canada documents may not be available from another source. However, the other factors outweigh these considerations. The Joint Administrators have failed to show that, should a particular issue arise, the unfairness could not be remedied by production at trial. Nor have they shown how the present disclosure of communicated materials is not sufficiently adequate to the issues to which the non-communicated documents are relevant.

[27]    Again, it is my conclusion that it would not be unfair to require the Joint Administrators to proceed to trial without production of this information.

[28]    In the result, the motion for production of documents from EY Canada is dismissed with costs.

MORAWETZ J.

**Date:**    September 23, 2013

2013 ONSC 5998 (CanLII)

# TAB 4

**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 7301
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20131122

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:  MORAWETZ J.

COUNSEL:  A. Mark, J. Pasquariello and C. Armstrong, for Ernst & Young Inc., Monitor

R. Swan and G. Finalyson, for Noteholders Group

J. Stam, for the Canadian Debtors

M. Zigler, for the Former & Disabled Canadian Employees

S. Bomhof, for Nortel Networks Inc. and US Debtors

M. Milne-Smith, for the EMEA Debtors

K. D. Kraft, for Wilmington Trust

P. Cavanagh and R. Jacobs, for the Unsecured Creditors Committee

J. Galway, for Northern Trust Canada

E. A. Putnam, for the Nortel Directors and Officers

HEARD &
ENDORSED: NOVEMBER 19, 2013

REASONS:  NOVEMBER 22, 2013


<u>**ENDORSEMENT**</u>

- Page 2 -

[1]     At the conclusion of the hearing on November 19, 2013, parties were informed that the trial would now start on May 12, 2014 for 20 days. These are the reasons.

[2]     The parties proposed a deferral of the trial from April 1, 2014 to April 28, 2014. Counsel to the Bondholders objected to extending the trial date at this time – but they were content to extend interim timetable dates. Other parties, including counsel to the Former Employees supported a four-week deferral.

[3]     It is apparent, having reviewed the record and hearing submissions, that maintaining a trial date of April 1, 2014 could result in a chaotic trial. I considered deferring the start of trial to April 28, 2014, but the parties could not provide any degree of certainty that April 28, 2014 would be a realistic start date. A "rolling" start date is undesirable.

[4]     In my view, it is a better approach to achieve certainty with the start date – even if an additional delay is the result.

[5]     The trial is rescheduled to start May 12, 2014, peremptory to all parties, and will run for 20 days. A trial management conference is to take place two weeks before the start of trial. A Case Management Conference is also scheduled for January 29, 2014.

[6]     The court continues to be concerned about the costs of this litigation. To this end, I am requiring comprehensive fee and disbursement summaries from all parties to the litigation. Summaries are to cover the period from May 1, 2013 to present. Mr. Armstrong – counsel to the Monitor – is to coordinate and submit the information by November 20, 2013 [Information has since been received]. Parties who are not funding the litigation from the estate must still provide this information – unless they waive all future claims for reimbursement of these fees, including reimbursement through costs claims.

MORAWETZ J.

**Date:**  November 22, 2013

# TAB 5

Westlaw.

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

## C ⬚

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

Ramdath v. George Brown College of Applied Arts & Technology

Katrina Ramdath, Zsolt Kovessy & Ashish Singh, Plaintiffs/Respondents The George Brown College of Applied Arts and Technology, Defendant/Moving Party

Ontario Superior Court of Justice

G.R. Strathy J.

Heard: May 1, 2012
Judgment: May 22, 2012
Docket: CV-O8-363847 CP

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Norman Mizobuchi, for Plaintiffs / Respondents

Michael C. Smith, Court Peterson, for Defendant / Moving Party

Subject: Civil Practice and Procedure; Corporate and Commercial; Public

Civil practice and procedure --- Discovery — Examination for discovery — Second examination

Action was certified class proceeding — Plaintiffs were former students of program at College — Plaintiffs claimed course calendar misrepresented benefits of program and falsely stated it would enable plaintiffs to obtain three industry designations in addition to college certificate — Defendants brought motion to compel answers to questions refused, taken under advisement or subject of undertakings on examinations for discovery of three plaintiffs — Some questions did not require answers while others did — Some questions were improper and were correctly refused — Questions were subject to litigation privilege and were irrelevant — Question was properly refused that offended privilege principle, sought to discover class members, and to discover issues other than common issues — Plaintiffs were ordered to disclose additional factual information contained in documents and not previously disclosed that was relevant to common issues — Damages were not common issue but if plaintiffs proposed to adduce evidence of damages at common issues trial plaintiffs were to answer question — Further examination was not required to enable college to prepare for trial — Outstanding matters in S.'s examination could be answered in writing.

Cases considered by *G.R. Strathy J.*:

*Abdulrahim v. Air France* (2010), 2010 CarswellOnt 5320, 2010 ONSC 3953, 99 C.P.C. (6th) 254 (Ont. S.C.J.) — referred to

*Andersen v. St. Jude Medical Inc.* (2006), 2006 CarswellOnt 5612, 33 C.P.C. (6th) 159 (Ont. Master) — referred to

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

*Andersen v. St. Jude Medical Inc.* (2006), 2006 CarswellOnt 9773, 63 C.P.C. (6th) 328 (Ont. S.C.J.) — referred to

*Axiom Plastics Inc. v. E.I. Dupont Canada Co.* (2011), 2011 ONSC 4510, 2011 CarswellOnt 7387 (Ont. S.C.J.) — followed

*General Accident Assurance Co. v. Chrusz* (1999), 180 D.L.R. (4th) 241, 124 O.A.C. 356, 45 O.R. (3d) 321, 38 C.P.C. (4th) 203, 1999 CarswellOnt 2898 (Ont. C.A.) — referred to

*L. (T.) v. Alberta (Director of Child Welfare)* (2010), 492 A.R. 394, 2010 ABQB 203, 2010 CarswellAlta 543 (Alta. Q.B.) — referred to

*Pennyfeather v. Timminco Ltd.* (2011), 2011 CarswellOnt 6829, 107 O.R. (3d) 201, 2011 ONSC 4257 (Ont. S.C.J.) — considered

*Ramdath v. George Brown College of Applied Arts & Technology* (2010), 93 C.P.C. (6th) 106, 2010 CarswellOnt 2038, 2010 ONSC 2019 (Ont. S.C.J.) — referred to

*Ratana-Rueangsri v. Shorrock* (2009), 2009 CarswellOnt 1167 (Ont. S.C.J.) — referred to

*Senechal v. Muskoka (District Municipality)* (2005), 2005 CarswellOnt 1414 (Ont. Master) — referred to

*Supercom of California Ltd. v. Sovereign General Insurance Co.* (1998), 37 O.R. (3d) 597, 1998 CarswellOnt 788, 18 C.P.C. (4th) 104, 1 C.C.L.I. (3d) 305 (Ont. Gen. Div.) — referred to

*Ward-Price v. Mariners Haven Inc.* (2004), 3 C.P.C. (6th) 116, 2004 CarswellOnt 2238, 71 O.R. (3d) 664 (Ont. S.C.J.) — referred to

*1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada Ltd.* (2003), 2003 CarswellOnt 5808 (Ont. Master) — considered

**Statutes considered:**

*Class Proceedings Act, 1992*, S.O. 1992, c. 6

    Generally — referred to

    s. 5(1) — considered

    s. 15(2) — referred to

*Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A

    Generally — referred to

    Pt. III — referred to

    s. 14 — considered

    s. 15 — considered

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

s. 18 — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

Generally — referred to

R. 1.04(1.1) [en. O. Reg. 438/08] — considered

R. 29.1 — considered

R. 29.1.03 [en. O. Reg. 438/08] — considered

R. 29.2 — considered

R. 29.2.03 [en. O. Reg. 438/08] — considered

R. 31.05.1 [en. O. Reg. 438/08] — considered

**G.R. Strathy J.:**

1      The defendant moves to compel answers to questions refused, taken under advisement or the subject of undertakings on the examinations for discovery of the three plaintiffs.

2      To put the motion in context, some background is required.

**The Certification Decision**

3      This action was certified as a class proceeding under the *Class Proceedings Act, 2002*, S.O. 2002, c. 6 (the *C.P.A.*) on April 8, 2010: *Ramdath v. George Brown College of Applied Arts & Technology*, 2010 ONSC 2019, [2010] O.J. No. 1411 (Ont. S.C.J.).

4      I case managed the action before that date and I have case managed it since.

5      The material facts are set out in my reasons for certification. The plaintiffs are former students in the International Business Management Program (the "Program") at The George Brown College of Applied Arts and Technology ("George Brown"). They claim that the course calendar misrepresented the benefits of the Program and falsely stated that it would enable them to obtain three industry designations (the "Industry Designations") in addition to a college certificate.

6      As I noted in my reasons, the print and web version of George Brown's calendar stated that:

The International Business Management post-graduate program provides students with the opportunity to complete three industry designations/certifications in addition to the George Brown College Graduate Certificate.

7      The plaintiffs allege that this statement was untrue, because they could not obtain the Industry Designations without paying additional fees, completing further courses and/or submitting proof of work experience.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

8       The plaintiffs claim that they relied to their detriment on the description of the Program in the calendar and they assert a cause of action for negligent misrepresentation. They also claim that George Brown breached its contract to provide the Industry Designations as part of the educational services it agreed to supply to students in the Program. Finally, the plaintiffs claim that George Brown engaged in unfair practices prohibited by s. 14 and 15 of the *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A.

9       I found that the action met the requirements of s. 5(1) of the *C.P.A.* In particular, I found that the proposed common issues of misrepresentation, breach of contract and breach of the *Consumer Protection Act, 2002* were appropriate for certification and were capable of determination on a class-wide basis. I noted, in particular, at para. 101, that the plaintiffs relied on a single written representation in the course calendar. I found, at para. 104, that while George Brown asserted that some students may have obtained information about the Industry Designations from other sources, "including the Industry Associations, discussions with George Brown and information sessions that were held with students at the beginning of each session", this did not detract from the commonality of the issue.

10      The pertinent common issues that were certified were:

**Negligent Misrepresentation**

1. Was George Brown in a special relationship with the Class Members?

2. Did George Brown make representations to the Class Members that it would provide the Class Members with the opportunity to complete the three Industry Designations in addition to the George Brown College Graduate Certificate?

3. If such representations were made, were they untrue, inaccurate or misleading? If so, was George Brown negligent in making the representations?

***Consumer Protection Act 2002***

4. Did George Brown breach Part III of the *Consumer Protection Act, 2002*, S.O. 2002, c. 30, Sched. A (the "*Act*")?

5. If so, what remedy, if any, are the Class Members entitled to under the *Act*?

6. Does the Class, or any portion thereof, require, and is it entitled to, a declaration waiving the notice provisions of section 18 of the *Act*?

**Breach of Contract**

7. Was the relationship between George Brown and the Class Members a contractual relationship?

8. If the answer to question #6 is yes, did the contract include a term by which George Brown agreed to provide the Class Members with the opportunity to complete the three Industry Designations in addition to the George Brown College Graduate Certificate?

9. If the answer to question #7 is yes, did George Brown breach that contract?

11      It is noteworthy that the three groups of common issues have a similar structure. All focus on the alleged contractual term or misrepresentation that by enrolling in the Program, Class Members would receive "the opportunity to complete the three Industry Designations in addition to the George Brown College Graduate Certificate". The resolution

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

of the three groups of issues will require the common issues judge to determine what, if anything, George Brown promised and what, if anything, George Brown delivered. The trial judge will then decide, as a matter of law, whether any gap between what was promised and what was delivered gives rise to an actionable claim for damages for breach of contract, misrepresentation or under the *Consumer Protection Act, 2002*.

12      In the preferability analysis, I rejected the submission of George Brown that individual issues of knowledge and reliance would make the case inappropriate for certification and that the negligent misrepresentation and breach of contract claims would essentially break down due to their individuality. I noted at para. 136:

> In this case, the plaintiff relies on a single representation, made in the course calendar in printed form and on the George Brown website. The language used in both media was the same. The web version of the calendar was amended in July, 2008 but the printed calendar was not. The representation was clearly important to students wishing to enroll in the Program and the calendar is an important contractual document. George Brown has produced no other contractual document that might contradict the representation. It is a reasonable conclusion that the calendar would be read by every student before enrolling in the Program.

13      I noted at para. 138 that the causes of action asserted by the plaintiffs all hinged on the legal effect of statements contained in the George Brown calendar:

> The claims of negligent misrepresentation, breach of contract and breach of the *Consumer Protection Act, 2002* all hinge on the legal effect of the statements made in the calendar and whether those statements were inaccurate or misleading. As in *Hickey-Button*, the resolution of those issues in favour of George Brown would likely put an end to the action. The resolution of one or more of those issues in favour of the plaintiffs will not put an end to the action, but it would substantially advance the claim of every Class Member.

14      I concluded, at para. 141 and following, that the proposed class action met the preferability requirement and fulfilled the goals of the *C.P.A.*:

> Looking at the preferability analysis having regard to the goals of the *C.P.A.*, a class action will provide access to justice to a vulnerable group of students, many of whom are from different lands and cultures. Class Members may lack the individual resources, initiative and sophistication to pursue legal action on their own and may be intimidated by the legal process. Their claims are relatively modest, and while they might be individually pursued in the Small Claims Court or under the Simplified Procedure, they can be more efficiently managed in a single action case managed by a single judge. The prospect that the international students might pursue George Brown in their homelands, seems very remote and, from the evidence, such litigation would likely be unproductive and expensive.

> A class proceeding would also fulfill the goal of judicial economy by addressing important aspects of George Brown's liability at the outset. A multiplicity of legal proceedings would be a drain on court resources. [paras. 141-2].

15      I noted at the conclusion of my reasons that George Brown had proposed that the proceedings should be bifurcated and that there should be discovery and trial of individual liability issues before trial of the common issues. It argued that the action could not be resolved without the determination of numerous individual issues. I rejected this submission, concluding at para. 150:

> George Brown is really trying to turn this action into an opt-in class action by requiring each Class Member to come forward and establish his or her entitlement to claim prior to the resolution of the common issues. This proposal

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

stands class proceedings on their head and would result in a waste of judicial and private resources if the common issues were ultimately decided against the Class. It may be the case that, in an exceptional circumstance, the court's jurisdiction under s. 12 of the C.P.A. would permit the determination of some or all individual issues before the common issues, but I have some difficulty in contemplating what those circumstances might be. I see no reason to do so in this case.

16      Having certified the action, with very narrow common issues, acknowledging that there were individual issues that would ultimately have to be addressed, it was my assumption that there would be a focused examination for discovery of the representative plaintiffs, if necessary, followed by a relatively short trial of the common issues. If the common issues were decided in favour of George Brown, that would be the end of the matter. If some or all common issues were answered in favour of the plaintiffs, the common issues judge would give further directions with respect to the resolution of the individual issues, including directions for further discovery, if necessary.

**Examinations for Discovery**

17      I should note, to begin with, that the defendants have now had two examinations of each representative plaintiff. The plaintiffs Ramdath and Kovessy were cross-examined at some length prior to the certification motion. There were approximately 650 questions asked of Ramdath and 400 questions asked of Kovessy. In addition, the plaintiff Singh, who brought a motion to be added as a representative of the non-resident class members, was cross-examined on his affidavit and was asked about 100 questions.

18      It was very sensibly agreed that these cross-examinations would be applied for the purposes of examination for discovery.

19      In addition, each of the representative plaintiffs was examined for discovery.

20      The examination for discovery of Ramdath lasted most of a day. The transcript runs to 213 pages and she was asked nearly 1,000 questions. Kovessy's examination lasted about $3\,^1/_2$ hours and runs to 133 pages and nearly 500 questions. Singh's examination lasted until 4 o'clock in the afternoon. His transcript is 173 pages long and has 817 questions.

**Some Pertinent Principles**

21      In the interests of efficiency, I do not propose to write an *opus* on discovery in class actions or on discovery more generally. The principles are well understood. Instead, I will state the principles most pertinent to the issues before me, and will then apply those principles to the motion before me and the specific questions at issue.

*A. The Proportionality Principle*

22      Effective January 1, 2010, the *Rules of Civil Procedure*, R.R.O. 1990, reg. 194, incorporated a new principle, the principle of proportionality. The principle is expressed, generally, in rule 1.04(1.1), which requires the court to make orders and give directions in the application of the rules "that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding."

23      The principle is also expressed, in rule 29.1 and 29.2, in relation to discovery. Rule 29.1 requires the parties to agree on a discovery plan. Rule 29.2.03 requires the court to consider proportionality factors in making a determination of whether a person is required to answer a question or produce a document, including whether:

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

    (a) the time required would be unreasonable;

    (b) the expense would be unjustified;

    (c) requiring the answer or document would unduly interfere with the orderly progress of the action; and

    (d) the information or document is readily available to the party requesting it from another source.

## B. Time Limit for Discovery

24    Rule 31.05.1 imposed a new requirement that no party's examination for discovery shall exceed a total of seven hours, regardless of the number of parties to be examined, except with the consent of the parties or leave of the court. In determining whether leave should be granted, the court is required to consider:

    (a) the amount of money in issue;

    (b) the complexity of the issues of fact or law;

    (c) the amount of time that ought reasonably be required for oral examination;

    (d) the financial position of each party;

    (e) the conduct of any party, including unresponsiveness on previous discoveries, improper refusals, failure to provide complete answers and proving answers that are evasive, unresponsive, irrelevant or unduly lengthy;

    (f) denial or failure to admit anything that should have been admitted; and

    (g) any other reason that should be considered in the interest of justice.

25    This rule is an aspect of the proportionality principle. It reflects an assumption that in a typical case, the examination for discovery conducted by a party can and should be reasonably completed in one day. It puts an onus on a party seeking a greater amount of time to seek the consent of the other party or to obtain leave from the court. I accept that leave can be obtained after the fact.

## C. The Purpose of Discovery

26    The scope of discovery is informed by the purpose of discovery. The purpose is well known: to enable the examiner to know the case to be met; to obtain admissions; to define and narrow the issues; to promote settlement.

## D. Discovery is Limited to the Common Issues

27    It is well-settled that discovery prior to the common issues trial is generally defined by and limited to the common issues. It does not serve efficiency or economy to permit discovery of the representative plaintiff on matters that are irrelevant to the common issues: *Abdulrahim v. Air France*, 2010 ONSC 3953 (Ont. S.C.J.) at para. 13.

28    The point was aptly made by Master MacLeod in *1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. of Canada Ltd.*, [2003] O.J. No. 5703 (Ont. Master) at para. 6:

    In any proceeding the starting point to determine relevance is the pleadings. Relevance of course is the touchstone in determining whether or not a question is proper. A class proceeding, however, takes place in two stages. Firstly there

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

is a trial on the common issues. Thereafter a mechanism is established for resolution of the issues that have not been defined as common issues. Discovery of the representative plaintiffs at the present stage in the case before me is limited by the definition of common issues. In other words, the pleadings inform interpretation of the common issues and set out the facts to be relied upon but a question is only a proper question in this phase of the action if it relates to the common issues and not the individual claims. It is therefore the certification order as informed by the pleadings and not the pleadings at large that define relevance for the first phase of the trial.

29      This extract was referred to with approval by Perell J. in *Axiom Plastics Inc. v. E.I. Dupont Canada Co.*, [2011] O.J. No. 3465, 2011 ONSC 4510 (Ont. S.C.J.) at para. 38. See also: *Andersen v. St. Jude Medical Inc.*, [2006] O.J. No. 3659 (Ont. Master), aff'd [2006] O.J. No. 5769 (Ont. S.C.J.); *L. (T.) v. Alberta (Director of Child Welfare)*, 2010 ABQB 203 (Alta. Q.B.) at para. 18.

30      In *Pennyfeather v. Timminco Ltd.*, [2011] O.J. No. 3286, 2011 ONSC 4257 (Ont. S.C.J.), Perell J. observed that the rule is not an absolute one and will depend on the exigencies of the particular case, including the scope of the common issues trial.

*E. Discovery of Class Members is Exceptional*

31      In a class action, prior to the common issues trial, the representative plaintiffs have carriage of the action and class members are not, generally, intended to be active participants: *Andersen v. St. Jude Medical Inc.*, [2006] O.J. No. 5769, 63 C.P.C. (6th) 328 (Ont. S.C.J.) per Cullity J. at para. 19. There is no general rule requiring the representative plaintiff to make inquiries concerning the circumstance of individual class members, although the court has discretion to permit appropriate inquiries to be made where relevant to the common issues and necessary to accomplish the purposes of discovery. The court also has discretion, under s. 15(2) of the *C.P.A.*, to grant leave to examine individual class members in appropriate circumstances.

*F. No Absolute Right to Follow-up Discovery*

32      There is no absolute right to a follow-up examination for discovery — the onus is on the moving party to establish that it would serve a useful purpose: *Ratana-Rueangsri v. Shorrock*, [2009] O.J. No. 900 (Ont. S.C.J.) at paras. 24-27; *Senechal v. Muskoka (District Municipality)*, [2005] O.J. No. 1406 (Ont. Master).

*G. Privilege*

33      Solicitor and client privilege applies to communications made in confidence between a client and a solicitor for the purpose of giving or receiving legal advice: *General Accident Assurance Co. v. Chrusz* (1999), 45 O.R. (3d) 321 (Ont. C.A.) at para. 89. In a class action, once the action has been certified, class counsel becomes counsel to the class and communications between class counsel and class members are privileged: *Ward-Price v. Mariners Haven Inc.*, [2004] O.J. No. 2308 (Ont. S.C.J.).

34      Litigation privilege applies to documents or communications produced or made with the dominant purpose of being used to obtain legal advice or to conduct or to aid in the conduct of litigation. Litigation privilege applies only in the context of litigation and is intended to enable parties to investigate and prepare a case for trial without fear of disclosure: *Supercom of California Ltd. v. Sovereign General Insurance Co.*, [1998] O.J. No. 711 (Ont. Gen. Div.); *General Accident Assurance Co. v. Chrusz*, above.

35      Common interest privilege is an extension of litigation privilege. It applies to communications between parties

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

who have a common interest in litigation and it enables them to communicate, or exchange information, for the dominant purpose of informing each other of the facts and issues in the litigation: *Supercom of California Ltd. v. Sovereign General Insurance Co.*, above.

### H. Court's Discretion to Control Discovery

36      In all actions, but perhaps most particularly in complex actions and case-managed actions, the court has a duty and discretion to control the discovery process, to prevent it from being delayed, unduly costly, onerous or oppressive. This discretion must be balanced against the other principles, including permitting the examining party to know the case it must meet and to obtain admissions to support its claim or defence.

### I. An Approach to Refusals

37      Keeping these principles in mind, an appropriate approach is that proposed by Perell J. in *Axiom Plastics Inc. v. E.I. Dupont Canada Co.*, [2011] O.J. No. 3465, 2011 ONSC 4510 (Ont. S.C.J.) at paras. 78-79 and to require that the question pass successfully through the following filters:

(a) Is the question over-broad and speculative?

(b) Does the question offend the proportionality principle, in the sense that answering the question will offer only a modest probative return?

(c) Is the question relevant having regard to the statement of claim without regard to the common issues?

(d) Is the question relevant having regard to the common issues?

38      With these principles in mind, I now turn to this particular case. I will begin with some general observations and will then turn to an examination of the questions at issue, which have been grouped under four headings.

**General Observations with Respect to this Case**

39      Before turning to the questions at issue, I will make some general observations with respect to the discovery in this case.

40      First, the parties failed to complete a discovery plan as required by Rule 29.1.03. That plan would have set out the information necessary to "result in the expeditious and cost-effective completion of the discovery process in a manner that is proportionate to the importance and complexity of the action." It might have avoided some of the issues that have been raised on this motion. If a party, in this case the defendant, fails to observe rules that are designed to ensure fairness, efficiency and cost-effectiveness in the discovery process, the onus will be on it to show why the court should exercise its discretion in its favour.

41      Second, in this case, in addition to the examination for discovery of the three plaintiffs, which was spread over three separate days and took about two days in total, the defendant has had the added benefit of quite extensive cross-examination of each plaintiff which has been incorporated into the discovery.

42      Third, while this case is an important class action, and involves a claim for $10 million, the common issues themselves are not complex. They are, fundamentally, issues concerning the interpretation of a single document and a comparison of what that document promised against what the defendant delivered. In my view, a fair, efficient and

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

focused discovery of all plaintiffs, confined to the common issues, could easily have been accomplished in one day, particularly having regard to the fact that the cross-examinations were, by agreement, treated as part of the discovery. As it is, the defendant has had a full day of discovery of Ramdath and essentially a half day of each of the other plaintiffs. That should have been more than adequate.

43      Fourth, I have reviewed the transcripts of the examinations for discovery. I am satisfied that the examinations were not prolonged due to the conduct of the party being examined or counsel for the plaintiffs. It is true that there were some interruptions, many undertakings and "under advisements" and some refusals, but that is not unusual. Much of the reason for the length of the examinations is due to the defendant's counsel pursuing issues, with each of the three plaintiffs and repetitively, that were fundamentally individual issues rather than common issues. Many of the questions asked were irrelevant to the trial of the common issues. It seems to me that many of the questions were framed not with a view to the common issues trial, but with a view to re-litigating the certification motion or — perhaps — attempting to lay the groundwork for a decertification motion.

44      All these factors make me disinclined to exercise my discretion — in cases where there is discretion — in favour of the defendant on this motion.

45      I now turn to a discussion of the particular questions at issue.

**Discussion of the Issues**

*Issue 1 — Privilege*

46      George Brown says that the plaintiffs have not discharged their onus to establish privilege with the result that the defendant is entitled to production of documents over which privilege is claimed, and is, in any event, entitled to the facts and evidence contained in such documents. The questions at issue are set out below.

*Under Advisements given by Zsolt Kovessy, at his Examination for Discovery held on January 31, 2012*

| Issue & Relationship to Pleadings or Affidavit | Quest . No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 1. The plaintiffs have not established any privilege that attaches to the emails that prompted Mr. Kovessy's July 31 and August 3 emails. | 264 | 74 | To advise what Ms. Ramdath put to Mr. Kovessy to get him to respond "Please add my name to your complaint" in the July 31, 2008 email at 6:07p.m. to Ms. Ramdath. | The e-mail which prompted Mr. Kovessy's July 31, 2008 e-mail at 6:07 pm is privileged and listed as item 1 in the Supplementary Schedule B. |

47      I find that this question and the other questions under this heading, are improper and were correctly refused for two reasons. First, they are subject to litigation privilege: Principle G, above. They deal with communications between the plaintiffs, and between the plaintiffs and class members, for the purpose of conducting the litigation that was then contemplated. From the context and timing, the communications occurred at or near the time that counsel was first consulted. Second, the questions are improper because they are irrelevant to the common issues: see Principle D. The questions are clearly designed to get at individual issues and are improper for that reason as well.

| 2. The plaintiffs have not established any privilege that | 295 | 83 | To check Mr. Kovessy's records and database for the emails that he is | The e-mail with the subject line "important-what do you |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| attaches to the emails that prompted Mr. Kovessy's July 31 and August 3 emails. | | | responding to in the July 31 and August 3 emails from Ms. Ramdath with the subject line "important: what do you think." | think?" was not an e-mail sent by Ms. Ramdath. It was sent by Daniel Lie to Richard Lu on Tuesday, July 29, 2008, who then forwarded it to Mr. Kovessy that same day. Privilege is claimed over that e-mail, which is listed as Item 1 on Schedule B of the Ramdath Affidavit of Documents. |
| 48    See above. | | | | |
| 3. The plaintiffs have not established any privilege that attaches to the email chain. | 307 | 86 | To produce the entire chain of emails for the subject "Important: what do you think?" | As noted earlier, the e-mail exchange: "important: what do you think?" was not a communication between Mr. Kovessy and Ms. Ramdath—All Additional e-mails from Ms. Ramdath to Mr. Kovessy that have not been produced in unredacted form herewith at Tab 4 (Mr. Kovessy's records), and at Tabs 10 and 11 of Ms. Ramdath's answers (Ms. Ramdath's records) or listed in Schedule B or Supplementary Schedule B, are produced herewith at Tab 2 (Mr. Kovessy's records). |
| 49    See above. | | | | |
| 4. The plaintiffs have not established that privilege attaches to this information. The information has already been produced and no privilege is claimed over the paragraph — an explanation of the information is not privileged. | 313 | 88 | To check the context and advise what the last paragraph on the email of July 31, 2008 at 3:59 a.m. (Tab 43 of the plaintiffs' AOD) meant. | The last paragraph of the July 31, 2008 e-mail at 3:59am is a reference to the e-mail with the subject line "important-what do you think?" sent by Daniel Lie to Richard Lu on Tuesday, July 29, 2008, who then forwarded it to Mr. Kovessy that same day. Privilege is |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

Page 12

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

claimed over that e-mail, which is listed as Item 1 on Schedule B of the Ramdath Affidavit of Documents.

50    See above.

| 7. The plaintiffs have not established that privilege attaches to the electronic communications between Mr. Kovessy and Ms. Ramdath. | 423 | 117 | To identify electronic communication between Mr. Kovessy and Ms. Ramdath and produce them. | All electronic communications with Ms. Ramdath that have not been produced herewith at Tab 2 (Mr. Kovessy's records), and at Tabs 10 or 11 of the Ramdath answers (Ms. Ramdath's records), or listed in Schedule B or Supplementary Schedule B, are produced herewith at Tab 3 (Mr. Kovessy's records). |

51    See above.

*Under Advisements & Refusals given by Katrina Ramdath, at her Examination for Discovery held on January 30, 2012*

| *Issue & Relationship to Pleadings or Affidavit* | *Quest. No.* | *Page No.* | *Specific Under Advisement* | *Answer or Precise Reason for not doing so* |
| --- | --- | --- | --- | --- |
| 9. At minimum, the facts contained in such communications should be provided. | 785 | 175 | To produce any and all communications to Ms. Paris' office from any member of the class about the issues in the action. | Refused. Argues such communications are privileged. |

52    This question offends two principles and partially offends a third. It seeks production of communications between class members and counsel and offends the privilege principle — Principal G. It seeks, in effect, discovery of class members and thus offends principle E. As well, to the extent is seeks discovery of issues other than the common issues, it offends principal D. The question was properly refused.

| 22. The plaintiffs have not stated the basis for their refusal. The defendants are entitled to the facts contained in those documents. | 902 | 202 | To produce the actual documents in the plaintiffs' Schedule B.—*Response:— Refused on grounds of litigation, solicitorclient, and common interest privilege.* | Refused. |

53    The question was properly refused on the ground of privilege.

| 23. The plaintiffs have not provided a basis for refusing this question. The defendant | 904 | 202 | To provide a summary of all of the facts contained within the documents that are contained in Schedule B.—*Response:—* | Refused. |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| is entitled to the facts underlying all material that privilege is claimed over. | | | *Refused on grounds of litigation, solicitorclient, and common interest privilege.* | |

54    The question was properly refused on the ground of privilege. To the extent that the question sought disclosure of facts that were not relevant to the common issues, it was overly broad and offends Principle D.

| | | | | |
|---|---|---|---|---|
| 24. The plaintiffs have not provided a basis for refusing this question. The defendant is entitled to the facts underlying all material that relevant to the action. | 905 | 20 2 | To provide the facts contained in any document that is not listed in Schedule A.—*Response:—Refused on grounds of litigation, solicitorclient, and common interest privilege.* | Refused. |

55    The question is overly broad. I will, however, order the plaintiffs to disclose any additional factual information, contained in those documents, and not previously disclosed, that is relevant to the common issues. This fulfills the purpose of discovery of enabling the defendant to know the case it must meet.

| | | | | |
|---|---|---|---|---|
| 2. The plaintiffs have not provided a basis for their refusal. The defendants require this information to evaluate the plaintiff's privilege claims. | 99 | 25 | To advise whether it was in early August 2008 that Ms. Ramdath decided that she would have to start a legal case.— *Response:—Refused on grounds of litigation privilege.* | Refused. |

56    The question was properly refused on the ground of litigation privilege. In addition, it is irrelevant and is not related to the common issues.

| | | | | |
|---|---|---|---|---|
| 3. The plaintiffs have not provided a basis for their refusal. The defendants require this information to evaluate the plaintiff's privilege claims. | 100 | 25 | To advise whether Ms. Ramdath decided that she had to sue before she sought the advice of a lawyer.—*Response:—Refused on grounds of litigation privilege.* | Refused. |

57    The question was properly refused on the ground of litigation privilege. In addition, it is irrelevant and not related to the common issues.

| | | | | |
|---|---|---|---|---|
| 4. The plaintiffs have not provided a basis for their refusal. The defendants require this information to evaluate the plaintiff's privilege claims. | 101 | 25 | To advise whether Ms. Ramdath had already formed the opinion, in her mind, that she had to sue before she contacted a lawyer.—*Response:—Refused on grounds of litigation privilege.* | Refused. |

58    The question was properly refused on the ground of litigation privilege. In addition, it is irrelevant and not related

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

to the common issues.

*Issue 2 — Particulars*

59    George Brown says that it is entitled to "particulars" of the plaintiffs' allegations of misrepresentation and breach of contract. The pertinent questions are set out in the table below.

60    It seems to me that many of these questions, notably those asked of Ramdath and Kovessy, are repetitive and go beyond what the defendant reasonably requires in order to know the case that it must meet. As I said in my reasons on certification, this is a case in which there is a single misrepresentation, which is clearly spelled out in the statement of claim, and which the plaintiff alleges was false, resulting in three consequences: breach of contract, negligent misrepresentation and breach of the *Consumer Protection Act.* It is not a complicated question, and it is one that I have found can be answered on a common basis.

61    The common issues judge will have the responsibility of determining, on an objective basis, whether the representation is true.

### Under Advisements given by Ashish Singh, at his Examination for Discovery held on February 1, 2012

| Issue & Relationship to Pleadings or Affidavit | Quest. No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 1. The plaintiffs have not provided a basis for their refusal. The plaintiffs seem to allege that they were promised industry certifications as a part of the Program. The plaintiffs' expectation for who was to pay the fees associated with such designations is relevant. | 625 | 130-131 | To advise if Mr. Singh is prepared to accept that it was not George Brown's obligation to pay your association membership fees or dues. | Refused. |

62    I will permit the question to be answered. There are statements in the calendar dealing with association membership fees or dues. The defendant is entitled to know whether the plaintiffs claim that their tuitions fees were intended to cover their membership fees or dues in the Industry Associations or whether the plaintiffs acknowledge that it was their own responsibility to pay such fees or dues. An answer to the question will enable George Brown to know the case it must meet and may also narrow the issues.

### Under Advisements given by Zsolt Kovessy, at his Examination for Discovery held on January 31, 2012

| Issue & Relationship to Pleadings or Affidavit | Quest. No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 8. The plaintiffs' answer does not explain how the words were false or misleading, especially given that the class was provided with the "opportunity to complete | 460 | 125 | To advise what the precise false, misleading or deceptive representation made by George Brown College. | The false, misleading or deceptive misrepresentation made by George Brown is the representation that by taking the course, the students would have the |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| three industry designations/ certifications in addition to the George Brown College Graduate Certificate". Do the plaintiffs seek to have words read into the course description in order to give it a different meaning? | | | | opportunity to complete the three industry designations. This representation was made in the course calendars in print and on-line. |

63    The answer is sufficient. The answer is clear and enables the defendant to know the case it is required to meet.

| | | | | |
|---|---|---|---|---|
| 9. The plaintiffs' answer does not explain how the words were deceptive, or unconscionable, especially given that the class was provided with the "opportunity to complete three industry designations/ certifications in addition to the George Brown College Graduate Certificate". Do the plaintiffs seek to have words read into the course description in order to give it a different meaning? | 461 | 126 | To advise as to what the unconscionable representation precisely is, the actual words, that Mr. Kovessy says George Brown College made, which is an unconscionable representation. | The unconscionable misrepresentation made by George Brown is the representation that by taking the course, the students would have the opportunity to complete the three industry designations. This representation was made in the course calendars in print and on-line. |

64    The answer is sufficient. The plaintiffs have identified the words of which they complain. The interpretation of the words is a matter for legal argument, not a matter for discovery.

| | | | | |
|---|---|---|---|---|
| 11. The plaintiffs' answer does not provide particulars of what the damages evidence will be with respect to para 35. | 472 | 129 | To advise whether, in paragraph 35 of the Statement of Claim, what the damages evidence will be for the claim in breach.—*What will be presented at the common issues trial? Any evidence from class members?* | The Plaintiffs' damages are described at paragraph 44 of the Amended Fresh as Amended Statement of Claim. The Plaintiffs' documentary evidence with respect to the Representative Plaintiffs' damages is contained in the affidavit of documents. |

65    Damages are not a common issue. If, however, the plaintiffs propose to adduce any evidence of their damages at the common issues trial, they must answer the question. The plaintiffs shall, within ten days, advise the defendants whether they propose to introduce evidence of their damages as part of their case at the common issues trial and, if so, shall provide full particulars of such evidence, to the extent not previously disclosed.

| | | | | |
|---|---|---|---|---|
| 12. The plaintiffs do not answer whether "all | 473 | 129-130 | To advise whether the plaintiffs have produced all of the documents | The course calendars, in print and on-line, are relied upon. |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| documents" have been produced in support of the breach of contract allegations. | | | | between the plaintiffs and George Brown College to support the breach of contract claim.—*Anything else?* |
|---|---|---|---|---|

66    The answer appears to be sufficient, but it is ambiguous. The plaintiffs shall forthwith advise whether they rely on any other documents in connection with their claims for misrepresentation, breach of contract or their claims under the *Consumer Protection Act*.

| 13. The plaintiffs do not answer what "precise representation" is being relied on and how that representation is to their detriment. | 474 | 130 | To advise what is the precise representation that Mr. Kovessy claims he was given that he relied upon to his detriment. | The Plaintiffs rely on the representation that was made in the course calendar and on-line, in support of the allegation of misrepresentation. |
|---|---|---|---|---|

67    Ruling: The answer is sufficient. The plaintiffs are not required to parse, explain or interpret the statement of which they complain.

| 14. The plaintiffs do not answer whether there is anything in the program description that was true and accurate. | 475 | 130 | To advise if there was anything in the program description that was true and accurate. | When read as a whole, the program description was false and misleading. |
|---|---|---|---|---|

68    The answer is sufficient.

| 15. The plaintiffs do not answer whether there is anything in the program description that was true and accurate. | 477 | 130 | To advise if there are true and accurate statements in the program description. | When read as a whole, the program description was false and misleading. |
|---|---|---|---|---|

69    The answer is sufficient.

| 16. The plaintiffs' answer is vague and does not provide and "details" of any evidence of damages that is to be tendered at the common issues trial. | 478 | 130-131 | With reference to paragraph 43 of the Statement of Claim, to advise and provide complete details of damages alleged in relation to the complaint of negligent misrepresentation or any evidence with respect to damages that is to be tendered at the common issues trial.—*What will be presented at the common issues trial? Any evidence from class members?* | The Plaintiffs' damages are described at paragraph 44 of the Amended Fresh as Amended Statement of Claim. The Plaintiffs' documentary evidence with respect to the Representative Plaintiffs' damages is contained in the affidavit of documents. |
|---|---|---|---|---|

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

70    See answer to No. 11, above.

| | | | | |
|---|---|---|---|---|
| 17. The plaintiffs' answer is vague and does not provide any "details" as to evidence of damages. | 480 | 131 | With reference to paragraph 44, to advise if there are any details for those damages.—*What will be presented at the common issues trial? Any evidence from class members?* | The Plaintiffs' documentary evidence with respect to the Representative Plaintiffs' damages is contained in the affidavit of documents. |

71    See answer to No. 11, above.

*Under Advisements and Refusals given by Katrina Ramdath, at her Examination for Discovery held on January 30, 2012*

| *Issue & Relationship to Pleadings or Affidavit* | *Quest . No.* | *Page No.* | *Specific Under Advisement* | *Answer or Precise Reason for not doing so* |
|---|---|---|---|---|
| 10. The plaintiffs' answer does not explain how the words were false, misleading, deceptive, or unconscionable, especially given that the class was provided with the "opportunity to complete three industry designations/ certifications in addition to the George Brown College Graduate Certificate". Do the plaintiffs seek to have words read into the course description in order to give it a different meaning? | 859-8 60 | 191-192 | To identify, in paragraph 11 of the Statement of Claim, the complete false, misleading or deceptive representation or the unconscionable representation that George Brown allegedly made. | The misrepresentation referred to in paragraph 11 of the Statement of Claim as being false, misleading or deceptive, or unconscionable, is the representation that by taking the course, the students would have the opportunity to complete the three industry designations. This representation was made in the various course calendars in print and on-line. |

72    The answer is sufficient.

| | | | | |
|---|---|---|---|---|
| 11. The plaintiff's answer does not specify what the offer is or what the entirety of the terms are. | 864 | 193 | To advise what the plaintiffs' position is as to the offer, the acceptance, and who made the acceptance, and the terms of the contract referred to in paragraph 30 of the Statement of Claim and, indeed, in the entire claim itself, which alleges breach of contract. | The plaintiffs' position is set out in paragraph 36-37 of the Amended Fresh as Amended Statement of Claim. |

73    The answer is sufficient.

| | | | | |
|---|---|---|---|---|
| 12. The plaintiffs' answer did | 866 | 193-19 | With reference to unfair practices | The false, misleading, deceptive or |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| not provide particulars with respect to the actual words that are alleged to constitute the false, misleading, deceptive, or unconscionable representations and their alleged meaning. Merely parroting the legislation does not suffice to let the defendants know the case they have to meet. | | 4 | under the *Consumer Protection Act* in paragraph 31 of the Statement of Claim, to advise if there is anything beyond what has been taken under advisement as to what the false, misleading or deceptive representation or unconscionable representation might be and whether there are further unfair practices being referred to. | unconscionable representation is particularized at paragraphs 33-35 of the Amended Fresh as Amended Statement of Claim. |

74    The answer is sufficient.

| | | | | |
|---|---|---|---|---|
| 13. The plaintiffs' answer does not contain sufficient particulars of the plaintiffs' position with respect to how the course description is a part of the contract. | 869 | 194 | With reference to paragraph 35 [*sic* 36] of the Statement of Claim, to advise of the plaintiffs' position that indicates how the program description becomes part of the contract. | The offer did not come from the Plaintiff. The program was offered and advertised by George Brown by way of the course calendar. The program description is contained in the course calendar. |

75    The answer is sufficient. The plaintiffs' "position" is set out in the statement of claim.

| | | | | |
|---|---|---|---|---|
| 14. The plaintiffs' answer do not contain sufficient particulars of the plaintiffs' position with respect to how the course description becomes a fundamental term of the contract. | 870 | 195 | To advise how the course description becomes a fundamental term of whatever the contract is that you might or might not advise of. | The course description is a fundamental term of the contract because it is the essence of the contract. It is the reason for which the students are attending the program. |

76    The answer is sufficient. The plaintiffs' "position" is set out in the statement of claim.

| | | | | |
|---|---|---|---|---|
| 15. The plaintiffs' answer does not provide particulars with respect to the actual words that are alleged to constitute the negligent misrepresentation or their alleged meaning. | 871 | 195 | To provide complete details of what the representation is that the plaintiffs rely upon in support of the allegations that there has been a negligent misrepresentation. | The Plaintiffs rely on the representation that was made in the course description, both in the course calendar and on-line, in support of the allegation of misrepresentation. |

77    The answer is sufficient.

| | | | | |
|---|---|---|---|---|
| 16. The plaintiffs' answer is incomplete. What were the plaintiffs relying on getting | 872 | 195 | To provide details of what reliance has been to the detriment of the plaintiffs. | The Plaintiffs relied on the representation in the course calendar and on-line that they |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| and how was it to their detriment? | | | | would have the opportunity to complete three industry designations in addition to the George Brown certificate, by taking the Program at George Brown. After having completed the program, the students were not awarded the designations and only received the certificate. |

78    The answer is sufficient.

| | | | | |
|---|---|---|---|---|
| 17. The plaintiffs' answer does not provide particulars with respect to the "precise words" that are alleged to constitute the false, misleading, deceptive, or unconscionable representations and their alleged meaning. It seems as though the plaintiffs wish to read additional words into thte course description and allege a meaning other than the literal meaning. | 892 | 199 | With reference to paragraph 40 of the Statement of Claim, to advise what representations are alleged that the Defendant made, the precise words, and what part of those representations were not true or were inaccurate or were somehow misleading. | The inaccurate or misleading statements referred to in paragraph 40 of the Statement of Claim are that the students would have an opportunity to complete the three industry designations in addition to the George Brown certificate. The statements are contained in the course description in the course calendar and on-line. The course description must be read as a whole. These statements were inaccurate because the students were not awarded the designations upon completion of the program. They received only the certificate. |

79    The answer is sufficient.

*Issue 3 — Further Answers*

80    The Defendant says that the plaintiffs have failed to provide full and complete answers to the questions set out in the table below.

*Under Advisements given by Ashish Singh, at his Examination for Discovery held on February 1, 2012*

| Issue & Relationship to Pleadings or Affidavit | Quest . No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 2. What happened at the meeting is contested by the parties. The plaintiffs have only answered with respect to Ms. Ramdath's notes, they have not answered with respect to the student | q.806 | p.169-17 0 | To inquire of the Student Association and Ms. Ramdath for any notes of the meeting with George Brown.—Response:—The Student Association is a non-party to this action, and it is improper to ask the plaintiff to inquire of a non party answers to a question on discovery, because to do | Ms. Ramdath does not have any notes of the August 14, 2008 meeting. |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | | |
|---|---|---|---|---|
| association. | | | so would amount to a cross-examination of a witness before trial. | |

81      The question does not need to be answered. The plaintiffs have no control over the Student Association and have no obligation to make inquiries of the association.

*Under Advisements given by Zsolt Kovessy, at his Examination for Discovery held on January 31, 2012*

| Issue & Relationship to Pleadings or Affidavit | Quest . No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 5. The plaintiffs answered that Ms. Ramdath "did not send" the documents, they did not answer "why". | 347 | 97 | To advise why Ms. Ramdath did not send Mr. Kovessy the CIFFA education documents. | Ms. Ramdath did not send a copy of the e-mail thread at Tab 20F to any of the students. |

82      The question is not relevant to any common issue and need not be answered. Further, the witness cannot advise why Ramdath did not send him something he never received and if the question was important, it should have been asked of Ramdath.

| | | | | |
|---|---|---|---|---|
| 6. The plaintiffs' answer did not specify any particular statements of fact that they allege are false. | 395 | 110-111 | Mr. Kovessy to review the Dean's response to the complaint and advise whether there is any statement of fact in that response that is false. | Mr. Kovessy disputes the Dean's characterization of what occurred. |

83      The answer to this question is incomplete and unresponsive. The question shall be answered. Mr. Kovessy should state, with particularity, what aspect(s) of the Dean's response he disputes and what statement(s) of fact made by the Dean is false.

| | | | | |
|---|---|---|---|---|
| 18. The plaintiffs' answer does not provide a list of individuals that Mr. Kovessy has spoken to or specified any relevant information obtained from any other students. | 485 | 132 | To advise if Mr. Kovessy has spoken to others with relevant information about the common issues that he is not going to be relying upon. To advise what information Mr. Kovessy has from any students who took the program, any professors who [taught] the program, anybody who thought of taking the program, anybody with relevant information [on what is your belief]. | Mr. Kovessy relies on the information that is contained in the Plaintiffs' affidavit of documents and answers to undertakings, refusals and questions taken under advisement, as well as the testimony of the representative plaintiffs. |

84      The question is overly broad and need not be answered.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

*Under Advisements and Refusals given by Katrina Ramdath, at her Examination for Discovery held on January 30, 2012*

| Issue & Relationship to Pleadings or Affidavit | Quest. No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 1. The answer refers exclusively to Ms. Ramdath and does not address any other students, including the class member(s) who constructed and/or controls the site. | 43 | 10 | To provide copies of all the electronic communications from students to the email site where complaints were collected.—*Response:—As stated in the answer to questions 44 and 45, Ms. Ramdath does not have any information regarding any such communications.* | The e-mail site referred to in the cross-examination and the discovery of Ms. Ramdath is "bus_student_issues@george brown.ca" This e-mail site was not established by Ms. Ramdath, and she has never had access to it. As Ms. Ramdath expressed at question 481 of the cross-examination of December 18, 2009, she does not believe that this e-mail site still exists, and she does not have any copies of any statements that went into that site. |

85    It has not been established that this question is relevant to any common issue: Principle D. Further, Ramdath did not establish or operate this web site and does not have control over the site. She is not required to answer the question.

| | | | | |
|---|---|---|---|---|
| 2. The answer refers exclusively to Ms. Ramdath and does not address any other students, including the class member(s) who constructed and/or controls the site. | 44 | 10 | *Relates to previous*—To list in Schedule B any communications that you claim privilege communication that went into the email site discussed in the previous question; Ms Ramdath does not have any information regarding any such over. | This question refers to the communications. |

86    It has not been established that this question is relevant to any common issue. Further, Ramdath did not establish or operate this web site and does not have control over the site. She is not required to answer the question.

| | | | | |
|---|---|---|---|---|
| 3. The answer refers exclusively to Ms. Ramdath and does not | 45 | 10-11 | *Relates to previous*—To provide facts set out in the electronic communications and to provide redacted versions of those documents. | This question refers to the communication that went into the email site discussed in the previous question; Ms Ramdath does not have any information regarding any such communications. |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| address any other students, including the class member(s) who constructed and/or controls the site. | | | | |

87    It has not been established that this question is relevant to any common issue. Further, Ramdath did not establish or operate this web site and does not have control over the site. She is not required to answer the question.

| 6. Information from other students has not been provided. | 145-150 | 36-37 | To provide any information to contradict the assertion that information was provided at the orientation session that the post-graduate certificate program would not result in automatic industry designations. | Ms. Ramdath has not been made aware of any information regarding the orientation session. |

88    Although I have some concerns about the relevance of this evidence, it appears that the defendant intends to take the position at trial that any statements made in the course calendar were qualified or explained at the orientation session in question. It will be for the common issues judge to determine the relevance and admissibility of such evidence. Bearing in mind the **purposes** of discovery, and the importance of enabling a party to know the case it will he required to meet at **trial**, and without determining the relevance of the question for the **purpose** of trial, (particularly whether a post-contractual correction of a pre-contractual representation has any bearing on either the breach or damages) I have concluded that the plaintiffs should be required to inform the defendant of their knowledge, information and belief as to any statements that were made to, or information that was provided to students at the orientation — to the extent relevant to the common issues.

| 8. The class members should be asked to identify their statements in the Complaint. | 610-613 | 138-139 | To provide the names of the people that are quoted in the letter of complaint (Tab 23 of the plaintiffs' AOD).— *Documents attached in Schedule D.* | Ms. Ramdath cannot identify the names of the people quoted in the letter at Tab 23 from memory. The email correspondences between Ms. Ramdath and the class members, which are produced in unredacted form herewith at Tabs 2, 10, and 11, reveal six named authors of the quotes in the letter at Tab 23.—"v" — Masazu Miyakawa;—"vii." — Inui Aki;—"xxi." — Aman Sandhu;—"xxiii." — Wael Malas;—"xxv." — Catherine Hoang;—"xxvi." |

89    The objection is proper — the names of the witnesses are not relevant to the common issues.

| 18. The plaintiffs' answer states | 895 | 200 | To advise if there are witnesses that have statements or narratives that the plaintiffs intend to rely upon at the | At this time, the Plaintiffs have not prepared any will-say statements for the trial. Any witnesses will be identified |

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

| | | | |
|---|---|---|---|
| that they have not prepared any statements, it does not state whether there were witnesses that the plaintiffs will rely upon at the common issues trial. | common issues trial. | | prior to the trial in accordance with the Rules. |

90     This answer is not responsive. It is appropriate to ask about witness statements and the facts disclosed therein if the plaintiff intends to rely on the witness at trial. The plaintiffs shall provide a responsive answer.

| | | | | |
|---|---|---|---|---|
| 5. The plaintiffs' answer does not address the breadth of the question. Was she provided with this information from others? | 142 | 36 | To advise whether Ms. Ramdath was aware at the orientation session that it was made clear that industry designations were not automatically awarded upon completion of the post-graduate course.—Response:—Ms. Ramdath was not provided with this information from others. | Ms. Ramdath did not attend the orientation session. The statements asserted were not made. |

91     This answer is imprecise as it is not clear what "the statements asserted" means. Without deciding the issue, it is possible that the discussions at the orientation session will become relevant. The defendant is entitled to know the evidence, if any, the plaintiffs propose to rely upon with respect to what was, or was not, said at the orientation session. The plaintiffs shall provide their knowledge, information and belief as to what was said at the orientation session.

### Issue 4: Further Examination for Discovery

92     Counsel for George Brown submits that he should be entitled to conduct further discovery of all three representative plaintiffs, both with respect to matters that were not finished on the original examinations for discovery and on matters arising from undertakings and "under advisements" as well as any questions ordered to be answered on this motion. Nowhere in his written or oral submissions did counsel identify any question of significance that was not addressed on the extensive discoveries that have already taken place or that has been left unanswered as a result of the undertakings.

93     In view of the extensive examinations that have taken place to date, including the cross-examinations, and the fact that each of the three plaintiffs has been examined at length, the onus is on the party seeking further examination to show that such an examination will serve a useful purpose, in the sense that it is necessary in order to enable the party to understand the case that it must meet, narrow the issues or promote settlement: see *Ratana-Rueangsri v. Shorrock*, above, at paras. 26 and 27.

94     In this case, the examination of Ramdath was conducted first and took an entire day. It was adjourned "pending

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

the answers to the undertakings and questions taken under advisement." There was no suggestion that there were any other questions outstanding or that counsel had not had time to complete.

95      That examination having taken place, one could reasonably expect that the examinations of the other plaintiffs would not have to cover the same ground and would be shorter.

96      The discovery of Kovessy, the following day, was adjourned. It ended with the usual kinds of wrap-up questions about pleadings, information from witnesses and so on. There was no suggestion then, or now, that there were any unasked questions.

97      On the discovery of Singh, which started at 11 a.m. at the request of the witness and was adjourned at 4 p.m. to suit the schedule of defendant's counsel, a listing of four matters of unfinished business was identified by defendant's counsel. None of these, including pleadings questions which were asked of the other plaintiffs, are of such significance as to require a further personal attendance.

98      In the circumstances, with the exception of the four matters on the Singh examination, I am not satisfied that George Brown has discharged the onus of showing that further examination is necessary. In light of the extensive examinations to date, I am not satisfied that further examination is required in order to enable George Brown to prepare for trial. The outstanding matters in Singh's examination, referred to in the preceding paragraph can be answered in writing. In all other respects, this aspect of the motion is dismissed.

### Issue 5: Date of Retainer of Counsel

99      The defendant moves with respect to the following additional question as to "when a lawyer became involved":

Under Advisements given by Katrina Ramdath, at her Examination for Discovery held on January 30, 2012

| Issue & Relationship to Pleadings or Affidavit | Quest. No. | Page No. | Specific Under Advisement | Answer or Precise Reason for not doing so |
|---|---|---|---|---|
| 7. Class counsel can provide the exact date and have not. | 596-5 97 | 134-135 | To advise of the date in August when a lawyer became involved. | Ms. Ramdath first sought legal counsel sometime after the July 23, 2008 meeting with Harmeet Kohli, but before the letter of complaint was finalized on July 31, 2008. |

100     I find that the answer is sufficiently precise. The question did not ask when a lawyer was retained or when class counsel was retained. The question need not be answered.

### Conclusion

101     An order will issue in accordance with the above. The plaintiffs were substantially, but not completely successful. However, in light of the failure of the parties to agree on a discovery plan, as required by rule 29.1.03 (which is mandatory, not optional), I am inclined to refuse costs to either party, in the exercise of my discretion. If either party considers that the are other circumstances that should be brought to my attention with respect to costs, the parties shall make written submissions, no more than 5 pages in length, excluding the costs outline. The submissions shall be addressed to me, care of Judges' Administration, within 20 days.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2012 CarswellOnt 6834, 2012 ONSC 2747, 216 A.C.W.S. (3d) 859

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 6


Westlaw.

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

C

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

Passy Estate v. Forrest-Cluney (Litigation Guardian of)

The Estate of Nancy Elizabeth Passy by its Estate Trustee, Elizabeth Gale Galloway, Plaintiff and Nell Forrest-Cluney, by her Litigation Guardian Mary Hopwood, Defendant

Ontario Superior Court of Justice

Master MacLeod

Heard: April 30, 2013
Judgment: May 31, 2013
Docket: 11-53097

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: David Cutler, for Plaintiff / Moving Party

Gail S. Nicholls, for Defendant / Responding party

Subject: Civil Practice and Procedure; Estates and Trusts

Civil practice and procedure --- Discovery — Discovery of documents — Affidavit of documents — Motion for further and better affidavit

Defendant, who was over 90 years old and suffered from dementia, lived in long-term care facility — Her litigation guardian was her 87-year-old sister, who lived in Calgary — Defendant's now-deceased husband T apparently held powers of attorney for both defendant and now-deceased plaintiff and misused both — T's estate was sued by plaintiff, trustee of plaintiff's estate, and by defendant's litigation guardian in separate actions — Plaintiff brought claim against defendant, alleging that defendant was unjustly enriched by T's wrongful acts — In action for accounting and damages for unjust enrichment, plaintiff brought motion for further and better affidavit of documents — Motion granted in part — Action was governed by simplified procedure rules — In cases under R. 76 of Rules of Civil Procedure there is enhanced importance placed on production — Affidavit of documents served was completely inadequate and contained only documents generated by litigation, rather than all relevant documents — Further and better affidavit of documents was directed to be served — While long-term care facility did not keep records of source of funds, defendant should be directed to ask facility to determine if such information was available and what would be involved in retrieving it.

Civil practice and procedure --- Discovery — Examination for discovery by interrogatories — Right to discovery by interrogatories — General principles

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

Defendant, who was over 90 years old and suffered from dementia, lived in long-term care facility — Her litigation guardian was her 87-year-old sister, who lived in Calgary — Defendant's now-deceased husband T apparently held powers of attorney for both defendant and now-deceased plaintiff and misused both — T's estate was sued by plaintiff, trustee of plaintiff's estate, and by defendant's litigation guardian in separate actions — Plaintiff brought claim against defendant, alleging that defendant was unjustly enriched by T's wrongful acts — In action for accounting and damages for unjust enrichment, plaintiff brought motion for order requiring defendant's litigation guardian, who lived in Calgary, to attend examination for discovery in Ottawa — Motion granted in part on other grounds — Action was governed by simplified procedure rules — Defendant's litigation guardian voluntarily took on task of defending defendant's interests — To simply provide half-hearted production and baldly claim it was too onerous to travel to Ottawa was not acceptable — Case was not likely to turn on credibility of litigation guardian — Oral examination would be expensive and possibly futile, since litigation guardian had no personal knowledge of allegations against T or funds he might have used for defendant's benefit — If adequate documentary discovery was provided, questioning litigation guardian under oath might serve no cost-effective purpose — Once proper affidavit of documents was prepared and production completed, counsel could negotiate discovery plan.

Estates and trusts --- Estates — Actions involving personal representatives — Practice and procedure — Discovery

Defendant, who was over 90 years old and suffered from dementia, lived in long-term care facility — Her litigation guardian was her 87-year-old sister, who lived in Calgary — Defendant's now-deceased husband T apparently held powers of attorney for both defendant and now-deceased plaintiff and misused both — T's estate was sued by plaintiff, trustee of plaintiff's estate, and by defendant's litigation guardian in separate actions — Plaintiff brought claim against defendant, alleging that defendant was unjustly enriched by T's wrongful acts — In action for accounting and damages for unjust enrichment, plaintiff brought motion for further and better affidavit of documents and for order requiring defendant's litigation guardian, who lived in Calgary, to attend examination for discovery in Ottawa — Motion granted in part — Action was governed by simplified procedure rules — Affidavit of documents served was completely inadequate and contained only documents generated by litigation, rather than all relevant documents — Further and better affidavit of documents was directed to be served — Defendant's litigation guardian voluntarily took on task of defending defendant's interests — To simply provide half-hearted production and baldly claim it was too onerous to travel to Ottawa was not acceptable — Oral examination would be expensive and possibly futile, since litigation guardian had no personal knowledge of allegations against T or funds he might have used for defendant's benefit — If adequate documentary discovery was provided, questioning litigation guardian under oath might serve no cost-effective purpose.

**Cases considered by *Master MacLeod*:**

*Senechal v. Muskoka (District Municipality)* (2005), 2005 CarswellOnt 1414 (Ont. Master) — referred to

*Trewin v. MacDonald* (2007), 2007 CarswellOnt 1904 (Ont. S.C.J.) — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

Generally — referred to

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

R. 1.04 — considered

R. 1.04(1) — considered

R. 1.04(1.1) [en. O. Reg. 438/08] — considered

R. 24.1 — referred to

R. 29.1 — considered

R. 29.1-34 — referred to

R. 29.2 — considered

R. 31.10 — referred to

R. 76 — considered

R. 76.04 — considered

MOTION by plaintiff for further and better affidavit of documents and for order requiring litigation guardian for defendant to attend for examination for discovery.

*Master MacLeod:*

1       This is a motion by the plaintiff for a further and better affidavit of documents and for an order requiring the litigation guardian for the defendant, currently resident in Calgary, to attend in Ottawa for examination for discovery. The action is governed by the simplified procedure in Rule 76 of the Rules of Civil Procedure.

2       Following argument I directed that a proper affidavit of documents be served and production completed by May 30th. I directed that following receipt of the documents counsel meet and confer in an attempt to arrive at a cost effective and efficient discovery procedure to ensure proper pre-trial disclosure. I directed the defendant's litigation guardian to advise if and when she would be coming to Ottawa. I indicated I would release written reasons including directions regarding the timing and location of discovery and the question of costs.

3       These reasons deal with the interaction between the primary directives in Rule 1.04, the requirement of discovery planning in Rule 29.1, the imperative for streamlined cost effective proceedings contained in Rule 76 and the discovery procedures and processes contained in Rules 29.1 to 34.

**Background**

4       The action itself is revealed to be part of a triangular dispute between the estates of parties who are now either deceased or incapacitated. The defendant Nell Forrest-Cluney ("Nell") is over 90 years of age and suffers from dementia. Her litigation guardian is her sister, Mary Hopwood who is 87 years of age and lives in Calgary.

5       Nell was married to Terrence Forrest-Cluney ("Terry" her second husband). Nell has lived at Starwood Extendicare, a long-term care facility, since 2005. It appears that Terry (now deceased) held powers of attorney for both Nell and the now deceased plaintiff ("Nancy") and misused both. Terry's estate has been sued by Nancy's estate and by Nell in separate actions. The action in which this motion has been brought is a claim by

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

Page 4

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

Nancy's estate against Nell. There are therefore three related actions.

6      The three sides of the resulting litigation triangle are as follows:

a. *Claim by Nancy against Terry:* Nancy's estate sued Terry and I am advised the estate has judgment against his estate for $275,000.00.

b. *Claim by Nell against Terry:* In action 11-52715 Nell's litigation guardian sued Terry's estate claiming that he had misappropriated Nell's property including her home (which belonged to her and her first husband prior to her marriage to Terry). In this action a receiver was appointed to sell the home and contents and the receiver now holds the net proceeds. Depending on the outcome of that litigation those proceeds are either the property of Terry (presumably subject to execution by Nancy's estate in the first action) or are the property of Nell or partially Nell's and partially Terry's.

c. *Claim by Nancy against Nell:* This is the action in which the motion was brought. Nancy's estate asserts that the defendant Nell benefitted from Terry's wrongful acts and was unjustly enriched as a result. The plaintiff seeks an accounting of any funds originating with Nancy and received by Nell or paid on her behalf as well as damages for unjust enrichment. In particular this action is concerned with payments made to Starwood Extendicare by Terry on behalf of Nell.

7      Prior to his death, Terry passed his accounts with respect to his administration of Nancy's affairs for the period of April 2008 - March 2010. In those accounts there is evidence of one payment of $1,800.00 paid by Terry out of Nancy's bank account and paid to Extendicare for the benefit of Nell. There is also separate evidence of a cheque prepared by Terry and signed by Nancy in February of 2010 in which she pays Terry $3,000.00. "Starwood" is noted on the cheque. This may be evidence that Terry intended to use those funds to pay for care for Nell as there is no connection between Nancy and Starwood Extendicare.

8      The defendant has obtained a print out from Extendicare for all funds received on behalf of Nell since April, 2008 but that print out does not disclose the source of the funds received. The plaintiff wishes the court to order the defendant to obtain that additional information from Starwood Extendicare although the defendant has been told by Extendicare that it does not record the source of funds in its records.

9      The issues raised by the motion are as follows:

a. Will the court order the litigation guardian who is 87 years of age and living in Calgary to come to Ontario for an oral examination for discovery and if not how should the discovery be conducted and who should bear the cost?

b. Is the affidavit of documents deficient and should a new affidavit be ordered?

c. Should the defendant be required to obtain further records from Extendicare?

**Affidavit of Documents**

10      In Rule 76 cases there is an enhanced importance placed on production. The affidavit of documents requires all relevant documents to be served with the affidavit. The affidavit is also to contain a list of potential witnesses.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

11      What was served was completely inadequate. In the first place Schedule A contains only documents generated as part of the litigation and no documents relevant to the issues. This is not what the rule calls for. The affidavit of documents is to catalogue all documents in the possession, power or control of the party which have evidentiary value in relation to the issues in dispute. This would include all of Nell's financial and banking records, documents relevant to the litigation between Nell and Terry's estate, all Extendicare records and any other documents showing the source of funds used to support Nell.

12      I have already ordered a further and better affidavit of documents.

**Extendicare Records**

13      The defendant has provided a print out from Starwood Extendicare and states that the long term care facility does not keep records of the source of funds. Evidently the print out does not include such information but that does not mean it cannot be found in records such as original deposit books or books of entry. The defendant should be directed to ask the facility to determine if such information is available and what would be involved in retrieving it. Assuming it cannot be easily and voluntarily retrieved then the plaintiff could bring a Rule 31.10 motion on notice to the facility if it appeared appropriate to do so.

14      The defendant is therefore to make further inquiries of the facility to determine if the information could be retrieved from bank deposit information should that be necessary and also to determine what might be involved in doing so.

**Discovery**

15      In considering whether to order the litigation guardian to attend for oral discovery in Ottawa, the court is caught between two imperatives. On the one hand the defendant has served an inadequate affidavit of documents and would not appear to have taken either the production obligation or the discovery planning obligation seriously. Moreover the affidavit stating that it would be onerous to have to come to Ontario from Calgary is completely devoid of specifics and other than the fact that the litigation guarding is 87 years of age is simply a bald assertion.

16      Ms. Hopwood took on the task of representing her sister's interests. She sought the order declaring Nell incapable of managing her affairs granted in February of 2011. She launched litigation on behalf of Nell against Terry's estate and had herself appointed litigation guardian in that proceeding. She was in Ottawa in 2011 and in 2012. She has agreed to act as litigation guardian in this proceeding and she has instructed counsel to defend this action on behalf of Nell. I am not being critical. It is simply that she has assumed the obligations of acting as litigation guardian and is obligated to fulfill them. It will simply not do to provide a half hearted draft affidavit of documents and then simply swear that it is too onerous to have to come from Calgary.

17      The defendant has to take the litigation seriously and if she wishes to avoid the strict application of the rules she must do everything reasonably possible to ensure the plaintiff is given full and complete disclosure. She and her counsel must also take the requirement of discovery planning seriously and this means engaging the other counsel in a good faith dialogue intended to arrive at a focused purposeful plan to unearth and produce all relevant documents and facts. Since it appears she has done neither of these things and the evidence regarding it being onerous to come from Calgary is lacking in specifics an order for both a further and better affidavit of documents and for personal attendance for discovery is more than justified.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

18       On the other hand I am very conscious of the cost and potential futility of oral examination of the litigation guardian. In this case the litigation guardian has no personal knowledge of the allegations against Terry or what funds Terry may have utilized for the benefit of Nell. Any knowledge of these events can only be derived from reviewing the documents which she controls by virtue of being both the litigation guardian and one of the two guardians for the property and person of the defendant.

19       This case may well hinge on documentary production but it is not likely to turn on the credibility of the litigation guardian. Thus there is a significant question in a Rule 76 case whether any purpose is served by ordering this 87 year old woman to come from Calgary to submit to two hours of oral discovery. This may well be a case where discovery is a waste of time and money and counsel should be jointly examining other mechanisms by which the **purposes** of discovery may be fulfilled.

20       I want to make it very clear that the new requirements for discovery planning, proportionality and cost effective litigation strategy mean that oral discovery will not automatically be ordered by the court simply because it is available. This requires some analysis.

**Analysis**

21       At the outset it is important to note the mandatory provisions of Rule 1.04 (1) & (1.1) which require the court to apply the rules in order to secure the just, most expeditious and least expensive determination of every proceeding on its merits and (as of January 1st, 2010) also require that any orders and directions be proportionate to the importance and complexity of the issues and to the amount involved in the proceeding. In the case of an action proceeding under Rule 76 the court must also take into account the presumption that complexity of procedure is to be avoided and the right to discovery is limited.

22       Rule 76 was introduced in 1996 as a pilot project and was made permanent in 2001. The intention of the rule was to streamline and simplify procedures for smaller disputes. The scheme of the rule is to require each party to produce its documents and a list of witnesses without the need for discovery, strict limits on interlocutory procedures, a streamlined motion procedure, a streamlined pre-trial procedure and the availability of a summary trial. In its earliest incarnation the rule included a complete prohibition all forms of discovery.

23       On January 1, 2010 there were significant amendments to the rule. In conjunction with the increase in jurisdiction of Small Claims Court to $25,000.00, Rule 76 was made applicable to actions between $25,000.00 and $100,000.00. Secondly the prohibition on any form of discovery was removed and parties were permitted the right to limited oral discovery. Rule 76.04 still limits rights to other forms of discovery but it permits oral discovery to a maximum of two hours for each party.

24       It is important to understand this amendment in context. The changes were part of a package of recommendations made by the Honourable Coulter Osborne who conducted a review of civil justice at the request of the Attorney General. He had the following to say about Rule 76 and discovery:

> The prohibition on examinations for discovery was a key concern for many consulted. Judges and lawyers said that the absence of pre-trial discovery resulted in discoveries being conducted at trial and delayed meaningful settlement discussions. They noted that the problem is particularly acute where credibility is in issue. Some lawyers said that they feel that they are going to trial "blind." This concern was said to be especially relevant in personal injury litigation.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

. . .

I believe time-limited discoveries should be allowed in simplified procedure cases where the cost is in balance with the amounts or issues at stake. I do not think that discovery will be necessary in all cases. Counsel should be able to identify those cases where discovery would be a waste of time and money. I think, in particular, of debt collection cases where on a case-by-case assessment discovery may accomplish nothing beyond increasing costs.[FN1]

25        Discovery in other words was provided in Rule 76 as an option but it was not necessarily to be encouraged. Indeed, simultaneously with the introduction of limited discovery in Rule 76 cases there were also reforms intended to limit discovery in ordinary actions. Specifically the scope of discovery was narrowed, time limits were imposed and the obligation to collaboratively craft a proportionate discovery plan was introduced. Rules 29.1 and 29.2 were introduced. The former deals with discovery planning and the latter with proportionality in discovery. These rules also apply to discovery in Rule 76 cases.

26        The important thing about discovery planning and proportionality is the intention that the parties develop a customized discovery process appropriate to each action. Though the discovery plan is to be reduced to writing, the objective is not to create a document but to seriously consider the needs of the case and to engage in a dialogue to keep costs down while nevertheless ensuring sufficient disclosure to reach a just result. Through the discovery planning process the parties are encouraged to take a flexible approach to discovery and to only use those processes that are necessary and justified given what is at stake.

27        Whatever rules may govern discovery, the discovery process ultimately operates under court supervision and control. There is a saying that the Rules of Civil Procedure should be the servants of justice and not its master which is another way of saying that the rules are not ends in themselves but should be directed towards achieving a just result. Thus the court will not automatically enforce the right to an oral examination if to do so would serve no purpose.[FN2]

28        This is an action for an accounting. The claim has not been quantified. It is possible that the funds diverted from Nancy for the benefit of Nell do not exceed the one payment that has been found. There is a real risk that the amount in dispute will be less than the cost of litigating. While it is possible some of the plaintiff's money was used to benefit the defendant, it also appears that the defendant herself was defrauded by Terry. The defendant herself is incompetent and may be destitute since it is her sister, the litigation guardian that is now paying the fee at Extendicare. If that is accurate then unless she recovers something in her litigation against Terry it is going to be hard to argue that she is presently enriched at the expense of the plaintiff. Both the plaintiff and the defendant claim to be victims of Terry.

**Conclusion and Order**

29        In conclusion, questioning of the litigation guardian under oath may serve no cost effective purpose providing adequate documentary disclosure is provided. The main purpose of such an examination in a case such as this would probably be to extract undertakings for production of documents or other evidence. If that is not the case and discovery is necessary then counsel should explore how it can be done cost effectively and that discussion should include the possibility of Skype or other long distance technological solution. That will only be preferable to attendance in Ottawa however if it is truly less expensive and can be shown to be reasonably practical or if there is a genuine and specific medical impediment to travel.

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

2013 CarswellOnt 7379, 2013 ONSC 3206, 230 A.C.W.S. (3d) 1002, 90 E.T.R. (3d) 99

30      Once a proper affidavit of documents has been prepared and production completed assuming counsel cannot then negotiate a discovery plan taking into account the principles enunciated above then they may arrange to reattend before me for further direction.

31      They are also to consider the timing of mediation under Rule 24.1 and who should be involved. It may well be that all three of these actions must be mediated together. The timing of mediation and how it interacts with discovery can be modified by agreement or by direction of the court.

32      I will also deal with costs if requested to do so within the next 21 days.

*Motion granted in part.*

FN1 See "Simplified Procedure" and recommendations in the report of the Honourable Coulter Osborne, available       on       the       Attorney       General's       web       site: *http://www.attorneygeneral.jus.gov.on.ca/english/about/pubs/cjrp/060_simplified.asp*

FN2 See *Senechal v. Muskoka (District Municipality)*, [2005] O.J. NO. 1406, 2005 CarswellOnt 1414 (Ont. Master); *Trewin v. MacDonald*, [2007] O.J. No. 1249 (Ont. S.C.J.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 7

**CITATION:** Nortel Networks Corporation (Re), 2010 ONSC 1304
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20100318

## SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERCIAL LIST)

**RE:** IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:** MORAWETZ J.

**COUNSEL:** Fred Myers, J. Carfagnini and C. Armstrong, for Ernst & Young, Inc., Monitor

Derrick Tay, Alan Merskey and Suzanne Wood, for the Applicants

Adam Hirsh, for the Board of Directors of Nortel Networks Limited and Nortel Networks Corporation

Arthur O. Jacques, for Nortel Canadian Continuing Employees

Kevin Zych, for Informal Noteholder Group

John Marshall and James Szunski, for The Pensions Regulator (U.K.)

Mark Zigler, for the Former and Disabled Canadian Employees

William Burden and David Ward, for the UK Pension Trustee and the Pension Protection Fund

M. Starnino, for the Pension Benefit Guarantee Fund

Alex MacFarlane, for the Unsecured Creditors' Committee

**HEARD:** FEBRUARY 25, 2010

**RELEASED:** FEBRUARY 26, 2010

**REASONS:** MARCH 18, 2010

## ENDORSEMENT

2010 ONSC 1304 (CanLII)

- Page 2 -

2010 ONSC 1304 (CanLII)

## INTRODUCTION

[1]     Ernst & Young, Inc., in its capacity as Monitor of the Applicants (the "Monitor") brings this motion for an order:

(a) validating short service;

(b) declaring that the purported exercise of rights and the commencement of proceedings against the Applicants, Nortel Networks Corporation and Nortel Networks Limited, by The Pensions Regulator under the *Pensions Act 2004* (U.K.) amount to breaches of paragraphs 14 and 15 of the Initial Order;

(c) authorizing, directing and requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator in breach of the Initial Order; and

(d) declaring that the for the purposes of these proceedings all acts taken by the U.K. Pensions Regulator in the purported exercise of rights and in commencing any proceedings against any of the Applicants, without the consent of those Applicants and the Monitor or without leave of this court having been first obtained, are null and void and should be given no force or effect in these proceedings nor otherwise recognized as creating or forming the basis of any valid or enforceable rights, remedies or claims against the Applicants or any of their assets, property or undertaking in Canada.

[2]     The motion was heard on February 25, 2010.

[3]     On February 26, 2010, the Record was endorsed: "The Stay applies. The relief requested in (a), (b) and (d) of the Notice of Motion is granted. No order in respect of (c). Reasons will follow".

[4]     These are those reasons.

## FACTS

[5]     Paragraphs 14 and 15 of the Initial Order, granted January 14, 2009, provide as follows:

14. THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in

- Page 3 -

respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

15. THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

[6]     The Pensions Regulator ("The Pensions Regulator") is the body charged with the enforcement of certain provisions of the *Pensions Act 2004* (U.K.) (the "U.K. Statute").

[7]     The U.K. Statute's objectives include protecting the benefits of employees in work-based pension schemes and promoting proper administration of those schemes. Under s. 96 of the U.K. Statute, the Regulator may determine whether or not to take regulatory action, which includes, *inter alia*, determining whether the applicable pension is underfunded, quantifying the deficit and holding the employer or a related party responsible for such deficit. The Determinations Panel, an internal group, determines whether the regulatory functions should be exercised.

[8]     On August 24, 2009, The Pensions Regulator advised the Administrators of the Nortel Networks UK Limited ("NNUK") (the "Administrators") Pension Plan that it was considering issuing a warning notice, a mandatory step towards issuing a financial support direction ("FSD"). A warning notice sets out the grounds for the potential issuance of an FSD, which is a direction requiring a party to put financial supports in place for an underfunded pension scheme. Any company that is an associate of or is otherwise connected with an employer may be issued an FSD.

[9]     On September 4, 2009, The Pensions Regulator wrote to Nortel Networks Corporation ("NNC") advising that it was considering issuing a warning notice seeking an FSD against NNC and other members in the Nortel Group.

[10]    On September 16, 2009, NNC wrote to The Pensions Regulator advising that because of the stay issued by this court under the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36 ("CCAA"), it could not consider individual potential claims.

[11]    On January 11, 2010, The Pensions Regulator issued a warning notice to NNC, NNI and 27 other companies in the Nortel Group (the "Notice"). The Notice was sent to Nortel Networks Limited ("NNL") and NNC in Canada.

2010 ONSC 1304 (CanLII)

- Page 4 -

[12]    The Pensions Regulator informed NNL and NNC that they had until March 1, 2010 to make submissions under the U.K. Statute, failing which default proceedings would be taken. The court was advised that the issuance of an FSD is subject to time limits and that the decision to issue an FSD must occur no more than two years after the "relevant time." The relevant time is designated by The Pensions Regulator in this case as June 30, 2008, such that any decision to issue an FSD in respect of this matter must be made by June 30, 2010.

## ISSUE

[13]    By issuing the Notice, did The Pensions Regulator contravene the stay granted in the Initial Order?

## POSITIONS OF THE PARTIES

[14]    Counsel to the Monitor submits that the issuance of the Notice constitutes the commencement of an enforcement process by a tribunal that is stayed by paragraph 14 of the Initial Order and an assertion of rights by a governmental body that is stayed by paragraph 15 of the Initial Order.

[15]    The Monitor takes the position that the Notice is effectively a pleading required under the U.K. Statute to enable The Pensions Regulator to make an FSD under the U.K. Statute. Such a determination would cause foreign affiliates of NNUK, including NNL and NNC, to become liable to provide financial support for the pension plan maintained by NNUK.

[16]    The Monitor contends that in the Notice, The Pensions Regulator purports to exercise rights under the U.K. Statute including, without limitation, the commencement of proceedings to require NNL and NNC to pay up to £2.1 billion (approximately CDN$4 billion) to fund the deficit in NNUK's pension plan. The Pensions Regulator also exercises purported statutory rights, such as deeming certain facts for the purposes of the U.K. Statute and demanding a response by a time limit under threat of default proceedings. Counsel submits that these exercises of rights without consent or leave are stayed by paragraphs 14 and 15 of the Initial Order.

[17]    Counsel to the Monitor further submits that if The Pensions Regulator is allowed to proceed under the Notice and the process described therein, the result would be extremely prejudicial to the Applicants' ongoing restructuring efforts and to their creditors generally because:

> i. Management is fully engaged in the restructuring process and the Applicants cannot afford to sacrifice the time and resources required to participate in the complex process envisaged in the Notice.

> ii. The restructuring would be disrupted and the progress already made therein, including the international efforts to negotiate the Allocation Protocol under the

2010 ONSC 1304 (CanLII)

- Page 5 -

IFSA, would be threatened by The Pension Regulator's proceedings or its efforts to make determinations therein.

iii. This Court is the proper forum for proceedings to determine the validity of and resolve all claims against the Applicants at an appropriate time and in an appropriate manner.

[18]    Regarding forum, the Monitor submits that the issues put forth by The Pensions Regulator can only be properly determined under the CCAA. The NNUK Pension Trust Limited (the "Trustee") and the U.K. Pension Protection Fund (the "PPF") filed proofs of claim in accordance with the October 7, 2009 Claims Process Order (the "Claims Process Order"). The Trustee and the PPF claim "in the amount to be determined to be owing to [the Trustee and the PPF] pursuant to the Financial Support Direction Proceedings undertaken pursuant to the provisions of the [Pension Act]". Counsel to the Monitor submits that the filing under the Claims Procedure Order expressly raises the issues in the Notice.

[19]    The Monitor submits that there are extensive issues of fact and law for resolution in those proceedings. Moreover, there are issues as to whether any FSD determination can or ought to be recognized as a proper claim under the CCAA. Counsel submits that these are substantial issues upon which determination may or may not be required depending on the outcome of the Allocation Protocol negotiations, and regardless of when such issues may be resolved, there are issues that have been raised in these proceedings by the parties having the economic interest in the FSD claims and who have appeared before this Court and have filed proofs of claims under the Claims Process Order. Counsel argues that it is not efficient, reasonable or appropriate for the Applicants to proceed with massive litigation now in a severely compressed timeframe before a foreign tribunal with an expressed interest in benefiting one group of creditors.

[20]    At the very least, the Monitor submits that the Notice, having been issued in breach of the stay, should be declared null and void and of no force or effect due to the court's power to compel observance of its orders and to fulfill the purpose of the CCAA.

[21]    The Monitor also seeks a direction that it refrain from engaging in the proceedings commenced by The Pensions Regulator due to the prejudice caused by a diversion of resources.

[22]    The Applicants substantially adopt the Monitor's characterization of the Notice and the prejudice it would cause the parties.

[23]    The Applicants support the Monitor's request for an order declaring that any findings or claims emanating from the Notice and the associated process be null and void, and not recognizable or enforceable in this proceeding.

[24]    The position of the Monitor is also supported by counsel to the Noteholders, the Unsecured Creditors' Committee, the Former Disabled Canadian Employees and the Nortel Continuing Canadian Employees.

[25]    Counsel to the PPGF and the Board of Directors of NNL and NNC took no position.

2010 ONSC 1304 (CanLII)

- Page 6 -

[26]    The motion was opposed by counsel on behalf of The Pensions Regulator, which responds only to one of the heads of relief sought in the Monitor's Notice of Motion: whether the activities of The Pensions Regulator are a breach of paragraphs 14 and 15 of the Initial Order. The Pensions Regulator submits that the issue is whether this court has jurisdiction to make the order sought by the Monitor in relation to The Pensions Regulator.

[27]    The Pensions Regulator further submits that if this Court does have such jurisdiction, it should not be exercised in this case in any event.

[28]    Regarding the assertion by the Monitor and Applicants that the Notice is a pleading, Counsel for The Pensions Regulator took the position that that the Notice provides a standard procedure for determining, internally, whether The Pensions Regulator should commence proceedings to exercise its statutory powers (the "Standard Procedure").

[29]    Counsel to The Pensions Regulator submits that pursuant to the Notice, the Determinations Panel will consider exercising its powers to issue an FSD and that these powers have not yet been exercised and may never be exercised. A determination in this regard will not be made until the responding parties to the Notice have had an opportunity to make representations and those representations have been considered by the Determinations Panel pursuant to the Standard Procedure set out at sections 96(2)(b) and (c) of the U.K. Statute.

[30]    Counsel further submitted that the FSD powers which The Pensions Regulator is considering exercising will not result in additional *ex post facto* claims in the proceedings under the CCAA as the Monitor has alleged, as the activities of the Determinations Panel will not result in making The Pensions Regulator a creditor of the Applicants.

[31]    Counsel to The Pensions Regulators submits this court does not have jurisdiction to make, and/or ought not to make, the order sought by the Monitor for the following reasons:

    (a)    The Initial Order is of no effect in the UK;

    (b)    The Monitor has not sought to enforce the Initial Order in the UK by way of an application for a recognition order;

    (c)    Although it is speculative to predict whether a UK court would make a recognition order enforcing the Initial Order in the UK, a number of factors suggest that any such recognition would not stay the regulatory proceedings;

    (d)    The blanket request for aid and recognition in the Initial Order does not eliminate the need for an application for a recognition order and the inquiry by the UK court that would be triggered thereby; and

[32]    Counsel further submits that this court lacks the jurisdiction to make an order under the CCAA that purports to have an inherent effect in a foreign state.

2010 ONSC 1304 (CanLII)

- Page 7 -

[33]    Counsel to the Trustee of the NNUK Pension Plan also opposed the making of any order. In particular, counsel submitted that an FSD could assist this court in CCAA proceedings, as the Panel making the determination has expertise and operates in a similar legal system as Canada.

## LAW AND ANALYSIS

[34]    The CCAA stay of proceedings has been described as "the engine that drives a broad and flexible statutory scheme": see *Re Stelco Inc.*, 2005 CarswellOnt 1188 at para 36 (C.A.).

[35]    This court had the jurisdiction to make the Orders in paragraphs 14 and 15 of the Initial Order. Subsection 11(3) (with respect to initial applications) and subsection 11(4) (with respect to subsequent applications such as extensions of the initial stay) of the CCAA expressly empower the Court to make an order staying "any action, suit or proceeding" against the company on such terms as it may impose.

[36]    The court retains the ability to control its own process including litigation against CCAA debtors and claims procedures within a CCAA process.  To ensure its effectiveness, s. 11, and in particular "proceedings" has been broadly interpreted to cover both judicial and extra-judicial proceedings which could prejudice an eventual arrangement.

[37]    In *Re Woodward's Ltd.*, (1993) 17 C.B.R. (3d) 236 (B.C.S.C.), the court found that "if a step must be taken vis-a-vis the insolvent company" for the creditor to enforce its rights, that step was a proceeding (at para. 27). The B.C. court looked to Black's Law Dictionary's definition of "proceeding" to base its finding:

> "proceeding" may refer not only to a complete remedy but also to a mere procedural step that is part of a larger action or special proceeding.

[38]    In *Meridian Development Inc. v. Toronto Dominion Bank*, (1984) 52 C.B.R. (N.S.) 109 (Alta Q.B.), Wachowich J. provided a helpful analysis of the breadth of the definition of "proceeding" at para 27:

> ... I am mindful of the wide scope of action which Parliament intended for this section of the Act. To narrow the interpretation of "proceeding" could lessen the ability of a court to restrain a creditor from acting to prejudice an eventual arrangement in the interim when other creditors are being consulted. As I indicated earlier, it is necessary to give this section a wide interpretation in order to ensure its effectiveness. I hesitate therefore to restrict the term "proceedings" to those necessarily involving a court or court official, because there are situations in which to do so would allow non-judicial proceedings to go against the creditor which would effectively prejudice other creditors and make effective arrangement impossible. The restriction could thus defeat the purpose of the Act ... (i)n the absence of a clear indication from Parliament of an intention to restrict proceedings" to "proceedings which involve either a court or court official", I cannot find that the term should be so restricted. Had Parliament intended to so restrict the term, it would

2010 ONSC 1304 (CanLII)

have been easy to qualify it by saying for instance "proceedings before a court or tribunal".

[39]    It has also been established that the term "proceeding" may refer to any procedural step that is part of a larger proceeding.  Delivery of a certificate to the debtor company as a prerequisite to drawing on a letter of credit has been stayed as a proceeding against a CCAA debtor: see *Re Woodward's Ltd.*, *supra*, at paras 26-27.

[40]    It seems to me that, even though the Notice may be described as a warning shot across the bow, the effect of the Notice in this case is something far more significant.  It clearly puts the Applicants and the Monitor on notice that there is a substantial claim that is being considered in the CCAA proceedings.  At the present time, the claim as filed by the U.K. Pension Trustee makes reference to the FSD which may very well flow from the activities being undertaken by The Pensions Regulator.  Having already set out the parameters of this claim in the proof of claim, the claim has to be considered a contingent claim in the CCAA proceedings.  In my view, the issuance of the Notice is another step on the road to crystallizing the contingent claim.

[41]    The issuance of an FSD is a remedy created by a statute of the United Kingdom. Regardless of whether the U.K. Statute purports to extend its reach beyond the borders of the U.K., the Notice, naming the Applicants, NNC and NNL, as "target companies" affects these entities which are clearly within the jurisdiction of this Court.  Moreover, The Pensions Regulator purported to deliver the Notice to NNL and NNC by sending it to them in Canada in purported compliance with the U.K. Statute.  In my view, The Pensions Regulator took steps in Canada in respect of a proceeding.  In this context, The Pensions Regulator is, in my view, a person affected by the Initial Order, with which it must comply when it takes any proceedings in Canada.

[42]    The Pensions Regulator did not obtain the consent of NNC and NNL or the Monitor, and did not obtain the leave of this court, before taking steps in Canada which affected NNC and NNL.  In my view, the delivery of the Notice in Canada was in breach of the Initial Order.  It follows that any continuation of these proceedings in Canada and attempted enforcement of rights in Canada will also be in breach of the Initial Order.

[43]    As such, section (b) of the relief requested by the Monitor should be granted.

[44]    It also follows that for the purposes of the CCAA proceedings, the actions taken by The Pensions Regulator, are null and void in Canada and are to be given no force or effect in these CCAA proceedings. Accordingly, section (d) of the requested relief should also be granted.

[45]    Having made this determination, in my view, it is not necessary to consider the arguments outlined at [17].  The points raised in [17] may be relevant to any motion to lift the stay, but that issue is not before the court.

[46]    The Monitor also requested an order authorizing, directing or requiring the Applicants and the Monitor to refrain from participating in any proceedings commenced by The Pensions Regulator.  In my view,  it is not necessary to comment further and provide directions with

2010 ONSC 1304 (CanLII)

- Page 9 -

respect to a proceeding which, on its face, is null and void. The UK proceedings operate under UK law, and I decline to make a declaration on their legitimacy or to provide direction to the Monitor and the Applicants on their obligations to attend.

[47]    An order shall issue to give effect to the foregoing.

_____

MORAWETZ J.

**Date:** March 18, 2010

2010 ONSC 1304 (CanLII)

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**BRIEF OF AUTHORITIES OF**
**NORTEL NETWORKS INC.**
**AND THE OTHER U.S. DEBTORS**
**(Representative Depositions)**

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

13685185.2