Court File No.: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**RESPONDING MOTION RECORD OF NORTEL DIRECTORS AND OFFICERS**
**(Motion re Representative Witness Depositions, returnable January 7, 2014)**

January 3, 2014

**OSLER, HOSKIN & HARCOURT LLP**
P.O. Box 50
1 First Canadian Place
Toronto, ON  M5X 1B8

**Lyndon Barnes  LSUC#: 13350D**
Tel:  (416) 862-6679
Email:  lbarnes@osler.com

**Alexander Cobb  LSIC#: 45363F**
Tel:  (416) 862-5694
Email:  acobb@osler.com

Fax: (416) 862-6666

Lawyers for the Board of Directors of Nortel
Networks Corporation and Nortel Networks
Limited

# INDEX

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

### INDEX

| TAB | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1. | Affidavit of Elizabeth Allen Putnam, (unsworn) | 1 – 7 |
| A. | Exhibit "A" – List of EMEA entities that have filed claims against the D&Os | 8 – 9 |
| B. | Exhibit "B" – Proof of claim filed by NNUK against NNL | 10 – 87 |
| C. | Exhibit "C" – Proof of claim filed by NNUK against NNC | 88 – 93 |
| D. | Exhibit "D" – Proof of claim filed by NNUK against the Directors and Officers of NNC and NNL | 94 – 99 |
| E. | Exhibit "E" – Proof of claim filed by NN Poland against NNL | 100 – 133 |
| F. | Exhibit "F" – Proof of claim filed by NN Poland against NNC | 134 – 140 |
| G. | Exhibit "G" – Proof of claim filed by NN Poland against the Directors and Officers of NNC and NNL | 141 – 146 |

H.   Exhibit "H" – Relevant Excerpts From the Joint Administrators'      147 – 181
     ("JA's) First & Second Sets of Responses to the Consolidated
     Interrogatories (the "JA's 1st Response" and the "JA's 2nd
     Response", respectively)

**Transactions Listed By the Joint Administrator as a transactions on which the
claims against the Canadian Directors and the *de jure* Directors of the EMEA
Entities are based**

                                                                        **Page No.**

H(I).    **General Reservation of Rights in the JA's 1st Response**      149 – 154

         **Interrogatory Nos. 5 and 6** in the JA's 1st Response

         (i.e. *Persons most knowledgeable about the Transfer Pricing Claims
         against the D&Os*)

H(II).   **Interrogatory No. 13** in the JA's 1st Response               155 – 158

         (i.e. *Persons most knowledgeable about the Intercompany Loan Claims
         against the D&Os*)

H(III).  **Interrogatory Nos. 29-30, 36-37, and 39** in the JA's 1st Response   159 – 166

         (i.e. *Persons most knowledgeable about the alleged failure by the D&Os
         to ensure that appropriate provision was made to meet the liabilities of
         the NNUK Pension Plan*)

H(IV).   **General Reservation of Rights in the JA's 2nd Response**          167 – 169

H(V).    **Interrogatory No. 15** in the JA's 2nd Response              170 – 174

         (i.e. *The Intercompany Loans that are the subject of the Claims against
         the D&Os.*)

H(VI).   **Interrogatory No. 42** in the JA's 2nd Response              175 – 178

         (i.e. *the Transfer Pricing Claims that are the subject of the Claims
         against the D&Os.*)

H(VII).  **Interrogatory No. 50:** Transactions listed by the JA as a transactions on   179 – 181
         which the claims against the Canadian Directors and the *de jure* Directors
         of the EMEA Entities are based

         The appointment by NNSA of KPMG as its statutory auditor.

# TAB 1

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF ELIZABETH ALLEN PUTNAM**
**(sworn January ●, 2013)**

**I, ELIZABETH ALLEN PUTNAM**, of the City of Toronto, in the
Province of Ontario, **MAKE OATH AND SAY**:

1.          I am an associate with the law firm of Osler, Hoskin & Harcourt LLP,
lawyers for the Directors and Officers of Nortel Networks Corporation and Nortel
Networks Limited (the "D&Os") in Nortel's Canadian insolvency proceeding. As such, I
have personal knowledge of the matters to which I depose herein, except where otherwise
indicated.

2.          The D&Os are the subject of open-ended claims by more than a dozen
former European Nortel entities (the "EMEA Debtors"). As set out further below, they
have approached the discovery phase of this case, from the beginning, on the express

1

understanding that they would have an opportunity to examine representatives of the EMEA Debtors asserting claims against them.  In this motion, it is proposed that the representative party discovery process be cancelled. The D&Os oppose this motion. I swear this affidavit in support of the position of the D&Os.

**The D&O Claims Against the Cross-Appointees**

3.          The D&Os' need for representative party discovery is particularly acute given the manner in which the EMEA Debtors' Claims against the D&Os (the "D&O Claims") have been asserted.

4.          Certain D&Os (the "Cross-Appointees") were also directors of certain EMEA Debtors at various times throughout the period that is the subject of the EMEA Claims against Nortel Networks Limited ("NNL") and/or Nortel Networks Corporation ("NNC").

5.          In 2011, a total of twenty one (21) EMEA Debtors filed proofs of claim against the D&Os.  Attached as Exhibit "A" is a list of the EMEA Debtors who have made claims against the D&Os. Each proof of claim follows a standard format: the EMEA Debtor refers to allegations of breach of duty asserted against NNC and NNL, and says that "certain" of those allegations also lie against the Cross-Appointees.

6.          An illustrative sampling of the proofs of claim are attached as Exhibits, "B", "C", "D", "E", "F" and "G".

    (a)     Exhibit B is the proof of claim filed by Nortel Networks U.K. against
            NNL;

(b)     Exhibit C is the proof of claim filed by Nortel Networks U.K. against NNC;

(c)     Exhibit D is the proof of claim filed by Nortel Networks U.K. against the Directors and Officers of NNC and NNL;

(d)     Exhibit E is the proof of claim filed by Nortel Networks Polska Sp. z.o.o. ("Nortel Networks Poland") against NNL;

(e)     Exhibit F is the proof of claim filed by Nortel Networks Poland against NNC;

(f)     Exhibit G is the proof of claim filed by Nortel Networks Poland against the Directors and Officers of NNC and NNL.

7.      Each of the proofs of claim filed by the EMEA Debtors is similarly *pro forma*. The impugned acts or omissions are not identified, and neither are the individuals who are the subject of the D&O Claims: in each case, the EMEA Debtor pleads that the D&O Claims, and the individuals against whom they are asserted, are still being developed. A D&O reading any of these proofs of claim would not know whether a Claim was being asserted against him or, if so, for what.

8.      In June 2013, the EMEA Debtors provided responses in writing to certain interrogatories.

9.         In both the Joint Administrators' First and Second Set of Responses to the Consolidated Interrogatories—relevant excerpts of which are attached as Exhibit "H"—the Joint Administrators reserved to themselves the general right to amend, modify, supplement, or correct their responses.

10.        In addition to this general reservation of rights, at the end of the majority of their responses, the Joint Administrators made specific reservations of rights.

11.        Interrogatory #50 asked the Joint Administrators to identify all transactions on which the D&O Claims against the Directors are based, and the persons associated with the Joint Administrators most knowledgeable about them. The response identifies broad subject areas—transfer pricing, for example—and the Joint Administrators specifically reserve the right to supplement or amend their list as information becomes available in discovery. Accordingly, the response to Interrogatory #50 provides little or no guidance as to what D&O Claims are being asserted against which Cross-Appointees now, and no guidance as to whether any additional D&O Claims will be advanced at trial.

**D&O Participation in the Fact Depositions**

12.        Prior to the commencement of oral examinations, the parties all agreed that there would be two types of depositions:

(a)        Fact witness depositions, in which third parties (whether notionally affiliated with one party or not) could be asked questions of fact relating to matters in dispute; and

(b)     Representative party depositions, in which witnesses would be put forward
by the corporate parties, whose answers would be binding on the corporate
party on whose behalf the witness spoke.

13.     The key distinction between the two types of depositions is that the core
parties are not bound by the statements made by fact witnesses, including those with
whom they are notionally affiliated.

14.     As has been noted in the material filed by the other parties to this motion,
over 100 fact depositions took place over the course of the past few months. Counsel for
the D&Os attended the depositions of a dozen D&Os, ten of whom were Cross-
Appointees. With few exceptions, the D&Os did not participate in the other fact
depositions. This was a prudent and appropriate course for the D&Os because, as set out
further below, the key objective for the D&Os in the discovery phase was to obtain
confirmation of the case the Cross-Appointees have to meet, which could only be
obtained through the representative party discovery process. There was no suggestion
until the very end of the fact witness depositions that certain parties would advocate for
the elimination of representative party examinations.

15.     The D&Os require confirmation of the case the Cross-Appointees have to
meet at trial. None of the individuals deposed to date has been in a position to answer the
fundamental questions about the D&O Claims—what they are and against whom they are
asserted—and, by his answer, bind the EMEA Debtors, or any one or more of them. On
the contrary, the EMEA Debtors have specifically pleaded that their Claims against the

5

Cross-Appointees were being developed through, among other things, the discovery process.

16.        The representative party discovery process is the one opportunity the Cross-Appointees will have to ask questions of a representative who can bind the EMEA Debtors as to what the D&O Claims are, and against whom they are asserted. The sheer number of fact depositions that have taken place to date does not alter that reality.

17.        It is critical that the D&Os have an opportunity to bind the EMEA Debtors through an examination of a representative party. If the representative party discovery process is dispensed with, the individuals against whom the EMEA Debtors are purportedly making D&O Claims will have to prepare for trial without knowing whether they have a case to meet and, if so, what it is. As a result, the elimination of the representative party depositions would be highly prejudicial to the D&Os. On that basis and the others set out in this affidavit, the D&Os strongly oppose the elimination of the representative party discovery process.

**SWORN BEFORE ME** at the City of
Toronto, in the Province of Ontario, on
January ●, 2013.

_____

_____
Commissioner for Taking Affidavits

_____
ELIZABETH ALLEN PUTNAM

7

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRAGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES CREDITORS' ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

---

*Ontario*

**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**
Proceeding commenced at Toronto

---

**AFFIDAVIT OF ELIZABETH ALLEN PUTNAM**

---

**OSLER, HOSKIN & HARCOURT LLP**
Box 50, 1 First Canadian Place
Toronto, Ontario, Canada  M5X 1B8

Lyndon Barnes LSUC#: 13350D
Tel: 416-862-6679
Email: lbarnes@osler.com

Alexander Cobb LSUC#: 45363F
Tel: (416) 862-5694
Email: ahirsh@osler.com

Lawyers for the Boards of Directors of Nortel Networks Corporation and Nortel Networks Limited

# TAB " A "

THE FOLLOWING IS EXHIBIT "A" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014


_____
A COMMISSIONER FOR TAKING AFFIDAVITS

## EXHIBIT A

## LIST OF EMEA ENTITIES THAT FILED PROOFS OF CLAIM AGAINST THE D&OS

1. Nortel Networks UK Limited

2. Nortel Networks SA (France)

3. Nortel GmbH (Germany)

4. Nortel Networks (Ireland) Limited (Ireland)

5. Nortel Networks N.V. (Belgium)

6. Nortel Networks S.p.A. (Italy)

7. Nortel Networks B.V. (Netherlands)

8. Nortel Networks Polska S.p. z.o.o. (Poland)

9. Nortel Networks Hispania S.A. (Spain)

10. Nortel Networks International Finance & Holding B.V. (Netherlands)

11. Nortel Networks (Austria) GmbH (Austria)

12. Nortel Networks s.r.o. (Czech Republic)

13. Nortel Networks Engineering Service Kft. (Hungary)

14. Nortel Networks Portugal S.A. (Portugal)

15. Nortel Networks Slovensko s.r.o. (Slovakia)

16. Nortel Networks France S.A.S. (France)

17. Nortel Networks Oy (Finland)

18. Nortel Networks Romania SRL (Romania)

19. Nortel Networks AB (Sweden)

20. Nortel Networks AG (Switzerland)

21. Nortel Networks AS (Norway)

# TAB " B "

THE FOLLOWING IS EXHIBIT "B" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014

_____

COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit B – Nortel Networks UK Limited ("NN UK") Claim filed against Nortel Networks Limited ("NNL")**

**CANADIAN CCAA Proof of Claim        re Nortel Networks Corporation and others**

**❶   Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Limited

**❷   Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor<br>Nortel Networks UK Limited | Name of Contact |
|---|---|
| Address<br>C/O The Joint Administrators<br>Ernst & Young LLP<br>1 More London Place | Phone # |
| | Fax # |

| City<br>London | Prov / State | Postal/Zip code<br>SE1 2AF | e-mail |
|---|---|---|---|

**❸   Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| Address | Phone # |
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|

**❹   Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked* — *(Check only if applicable)*

If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim

| Currency | Original Currency Amount | Secured | S. 138 Priority | Restructuring | |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ See attached |
| | | ☐ | ☐ | ☐ | ☐ Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺   Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻   Certification**

I hereby certify that:
• I am the Creditor, or authorized Representative of the Creditor.
• I have knowledge of all the circumstances connected with this Claim.
• The Creditor asserts this claim against the Debtor, and the Officer(s) and Director(s) as indicated above.
• Complete documentation in support of this claim is attached.

This space reserved for use by the Monitor

| Signature | Name  C. J. W. Hill |
|---|---|
| | Title  JOINT ADMINISTRATOR |
| Dated at     18/3/11 | Signed at   LONDON |

**❼   Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on <u>SEPTEMBER 30, 2009</u>, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks (UK) Limited**

**against Nortel Networks Limited:**

**Particulars of the Claim**

**under section 5 of the Proof of Claim**

A.  Introductory Section ........................................................................... 2
B.  Summary of Claims ............................................................................ 4
C.  Debt Claims ........................................................................................ 7
D.  Claims by NNUK in respect of Intercompany Loans ........................ 8
E.  Claims by NNUK in respect of Project Swift ................................... 23
F.  Claims in respect of Transfer Pricing .............................................. 33
G.  Proprietary Claims ............................................................................ 55
H.  NNUK'S Pension Scheme Funding Claims ..................................... 61
I.  Customer Recognition ...................................................................... 64
J.  Claims in respect of Past Dispositions of Business ......................... 66
K.  Future and Contingent Rights .......................................................... 69
L.  Reservation of Rights ....................................................................... 72

## A.    INTRODUCTORY SECTION

### A.1.    This document

1.    This document provides particulars of the Claim by Nortel Networks (UK) Limited ("NNUK") against Nortel Networks Limited ("NNL") as required by section 5 of the Proof of Claim to which this document is attached.

2.    This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3.    NNUK is incorporated in England and Wales and is a subsidiary company of NNL.

4.    The documentation supporting the Claims set out herein is extensive and will be provided as part of the agreed upon or court ordered process. In addition, NNUK notes that a significant proportion of the evidence relevant to NNUK's claims is held by NNL and has not yet been made available to NNUK (or to the limited extent that it has been made available, is subject to confidentiality and without prejudice restrictions preventing NNUK's providing such evidence together with this Proof of Claim).

5.    The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of NNUK and its office-holders.  NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNL (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

### A.2.    Reservations of rights

6.    This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in section L of this document, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

### A.3.    Proprietary claims

7.    Certain of the Claims referred to in this document are proprietary claims.

8.    NNUK's case is that in so far as its claims are proprietary claims, they attach to the assets that are the subject of them and/or their identifiable or traceable substitute

(and all profits made thereon) in NNL's hands. Such assets are in these circumstances the property of NNUK. NNUK is entitled to those assets in full (failing which it is entitled to equitable compensation for their value in full, together with interest in equity on a compounded basis). The assets which are the subject of these proprietary claims fall outside the insolvent estate of NNL, are NNUK's, and are not available for distribution to any of NNL's creditors.

9.      In so far as NNUK's proprietary claims are not able to be satisfied out of the assets that are properly the subject of those claims, NNUK will have a claim against NNL for the deficiency.

10.     In this context, as explained at paragraph 213 below, NNUK is entitled to assert an equitable lien over NNL's assets (both inside and outside the Lockbox[1]); if NNUK elects to do so in respect of the diversion of resources from NNUK as a result of the wrongful conduct of NNUK's directors (including NNL), and in which NNL participated (as set out at paragraph 213).

11.     NNUK refers further to section G below in respect of its proprietary claims.

**A.4.    Security**

12.     Save as pleaded at paragraphs 7 to 11 above, and the parts of this Proof of Claim to which those paragraphs refer (including section G below), NNUK's claims are not secured.

---

[1] Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds held pursuant to escrow agreements ("the Lockboxes"), to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA")

**B.**     **SUMMARY OF CLAIMS**

13.     The table below provides a summary of the claims dealt with in this Proof of Claim, together with a cross-reference to those parts of the document dealing the relevant claim. This provides a breakdown of the Amount of Claim identified at section 4 of the Proof of Claim form to which this document is attached.

14.     The interest amounts included in this summary table have been calculated to 14 January 2009 ("the Filing Date") and will also accrue thereafter.

15.     In summary, the claims dealt with in this document are grouped into various main areas:

15.1.     A claim in respect of the outstanding intercompany trading debts as between the two entities.

15.2.     Claims in respect of interest-free inter-company loans made by NNUK to NNL at NNL's behest, which were uncommercial, improper and unlawful, thereby giving rise to a liability on NNL's part on a number of bases. This is dealt with at section D below.

15.3.     Claims in respect of the Project Swift transaction, under which NNL devised a scheme purportedly to reduce its liabilities under the above loans, and which was itself uncommercial and improper, giving rise to further liabilities on the part of NNL. This is dealt with at section E below.

15.4.     Claims relating to the transfer pricing arrangements between NNL and NNUK. These are dealt with at section F.

15.5.     Proprietary claims. These arise both by reason of the matters dealt with at sections D to F and otherwise. These are dealt with at Section G below. That section also refers more generally to NNUK's claims in relation to the allocation of the proceeds in the Lockboxes.

15.6.     Claims relating to the funding of the NNUK Pension Plan

| Claim | Curr-ency | Original currency amount | Principal Claim component | Interest component | Cross-reference to proof document |
|---|---|---|---|---|---|
| Claim for trading debt | CAN$ | 733,976.69 | 708,812.13 | 25,164.56 | C |
| Claim for trading debt | US$ | 588,321.29 | 588,242.00 | 79.29 | C |
| Claim for trading debt | € | 107,579.49 | 104,111.75 | 3,467.74 | C |
| Claim for trading debt | £ | 30,875,969.39 | 30,460,040.87 | 415,928.52 | C |
| NNUK/NNL loan: claim for amounts contractually owing | £ | 489,253,803.87 | 489,253,803.87 | - | D.4 |
| NNUK/NNL loan: setting aside/restitution on a proprietary basis | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: equitable account of profits | £ | To be assessed by the relevant Court | | | D.4 |
| NNUK/NNL loan: equitable compensation | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4D.4 |
| NNUK/NNL loan: unconscionable receipt | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: transaction at an undervalue | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 | D.4 |
| NNUK/NNL loan: value of eroded non-trading losses | £ | As yet to be ascertained | | | D.4 |
| Swift: setting aside /restitution on a proprietary basis | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: equitable account of profits made | £ | As to be assessed by the relevant Court | | | E.4 |
| Swift: equitable compensation being difference in value between | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |

| purchase price and value of Swift Subsidiaries at time of Swift | | | | | |
|---|---|---|---|---|---|
| Swift: unconscionable receipt | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: transaction at an undervalue | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 | E.4 |
| Swift: claim re NNIF restructuring | US$ | 125,662,334.28 | 120,574,803 | 5,087,531.28 | E.4 |
| Transfer pricing claim | US$ | 1,351,000,000.00 | 1,083,000,000.00 | 268,000,000.00 | F.3 |
| **See paragraphs 7 to 10 above regarding secured/proprieta ry claims** | | | | | |

C.      **DEBT CLAIMS**

16.      NNUK has the following debt claims against NNL:

   16.1.    A claim in respect of the outstanding intercompany trading debts as between the two entities.

   16.2.    As at 14 January 2009, the balance of the intercompany trading debts owed by NNL to NNUK stood at CAN$708,812.13; US$588,242.00; €104,111.75; and £30,460,040.87. As such, this amount is contractually due and payable to NNUK by NNL together with interest in the amounts of CAN$25,164.56; US$79.29; €3,467.74; and £415,928.52 respectively to the best of NNUK's knowledge. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

**D.**  **CLAIMS BY NNUK IN RESPECT OF INTERCOMPANY LOANS**

**D.1.**  **The Claim**

17.  NNUK claims against NNL in respect of any and all loss or damage which it has suffered (and/or to assert any proprietary rights which it has) as a result of or in connection with the interest free loan facilities advanced by NNUK to NNL from December 2003 onwards.

18.  Without in any way derogating from the generality of the claims set out in paragraph 17 above, NNUK sets out below in sections D.2 to D.3 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has.  NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and/or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

19.  NNUK makes all claims in respect of these intercompany advances made to NNL without prejudice to NNUK's claims with regard to transfer pricing at section E of this Proof of Claim.

**D.2.**  **The NNUK intercompany loans**

**D.2.1.**  **Background and intention to benefit NNL**

20.  NNL operated the Nortel Group at all relevant points so as to ensure that cash and or value in the group were transferred away from subsidiary companies, including NNUK, to NNL.

21.  In line with this general practice, in or around May 2003, NNL commenced the search for "Cash to Canada" initiatives to identify new schemes which would enable the transfer of cash and/or value to NNL from NNUK (and other EMEA entities).

22.  One such scheme was to use interest free loan facilities as a means of transferring cash from NNUK to NNL. Under this scheme, NNL compelled NNUK to make a series of interest free loan facilities available to NNL (each a "Loan Facility" and collectively "Loan Facilities").

23.  The Loan Facilities benefitted NNL (to NNUK's detriment) by:

   23.1.  enabling NNL to make cash drawings from NNUK as necessary, thereby improving NNL's liquidity position;

   23.2.  enabling NNL to purportedly discharge its inter-company debt obligations to NNUK (particularly in respect of transfer pricing adjustments which it owed to NNUK) without having to make any cash payments to NNUK;

   23.3.  enabling NNL to avoid paying interest to NNUK which would have otherwise been due to NNUK under the MRDA in respect of unpaid transfer pricing adjustments; and

   23.4.  providing NNL with a way of avoiding having to withhold sums in respect of tax which it would otherwise have had to withhold if the Loan Facility had been interest bearing.

24.  The key consideration at all relevant points was how to benefit NNL. There was no desire to protect or further NNUK's best interests.

**D.2.2.    The various Loan Facility agreements and drawdowns**

25.  A Loan Facility was established on 10 December 2003 when NNUK was compelled by NNL to make available to NNL an unsecured, interest free loan facility of £200,000,000 ("the December 2003 Agreement") until 31 October 2004. The term of the loans was subsequently effectively extended by the grant of replacement Loan Facilities.

26.  Between December 2003 and December 2008, NNL used the Loan Facilities to discharge its inter-company debt obligations to NNUK, particularly in respect of transfer pricing adjustments NNL owed to NNUK. Through NNL's continual drawdowns and its inability readily to repay the Loan Facilities, the maximum facility amount increased under later loan agreements[2], reaching a peak of £600,000,000.00 available for draw-down in September 2007. Each time the maximum facility amount was increased, the consideration was not to the best interests of NNUK or its creditors.

---

[2] Which were otherwise on substantially the same terms as the December 2003 Agreement.

27.    The drawn-down loan balance owed by NNL was at £466,782,402 in October 2007. From March 2007 onwards, the loan balance apparently tended to reduce due to purported offsetting of transfer pricing adjustments purportedly owed by NNUK to NNL and set-offs under Project Swift. Project Swift concerned the transfer of various subsidiary companies of NNL to NNUK. For the avoidance of doubt, the claims arising out of Project Swift are set out in section E below. It is not accepted that this, or any other purported set-off by reason of Project Swift and/or the transfer pricing adjustments referred to at section F below were validly made. With regard to all such purported set-offs, NNUK refers further to its claims in relation to Project Swift and transfer pricing. The purported transactions under the Loan Facilities are set out in the table below:

| | | | Loan Balance (£) |
|---|---|---|---|
| **Agreement dated 10 December 2003, maximum facility amount £200,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2003 | 112,985,142.04 | Draw-down | 112,985,142.04 |
| 20 April 2004 | 23,716,754.95 | Draw-down | 136,701,896.99 |
| 17 September 2004 | 27,298,103.01 | Draw-down | 164,000,000.00 |
| **Agreement dated 31 October 2004, maximum facility amount £250,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 17 December 2004 | 30,000,000.00 | Draw-down | 194,000,000.00 |
| 18 March 2005 | 36,000,000.00 | Draw-down | 230,000,000.00 |
| **Agreement dated 01 April 2005, maximum facility amount £350,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 20 June 2005 | 38,000,000.00 | Draw-down | 268,000,000.00 |
| 24 October 2005 | 81,500,000.00 | Draw-down | 349,500,000.00 |
| **Agreement dated 29 December 2005, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 16 February 2006 | 26,700,000.00 | Draw-down | 376,200,000.00 |
| 25 September 2006 | 10,000,000.00 | Draw-down | 386,200,000.00 |

| 15 December 2006 | 41,500,000.00 | Draw-down | 427,700,000.00 |
|---|---|---|---|
| **Agreement dated 27 December 2006, maximum facility amount £500,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 23 February 2007 | 27,400,000.00 | Draw-down | 455,100,000.00 |
| 20 March 2007 | (6,068,812.15) | Purported to be money owed by NNUK to NNL | 449,031,187.85 |
| **Agreement dated 13 September 2007, maximum facility amount £600,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 23 October 2007 | 17,751,215.01 | Draw-down | 466,782,402.86 |
| 04 December 2007 | (1,146,616.98) | Purported offset for transfer pricing adjustments | 465,635,785.88 |
| 31 December 2007 | (316,031,255.28) | Purported offset for Project Swift | 149,604,530.60 |
| 31 December 2007 | (1,019,661.22) | Purported offset for Project Swift | 148,584,869.38 |
| 27 March 2008 | (12,669,776.98) | Purported offset for transfer pricing adjustments | 135,915,102.40 |
| 31 March 2008 | (10,528,925.74) | Purported offset for Project Swift | 125,386,166.66 |
| 24 June 2008 | 8,956,636.70 | Draw-down | 134,342,803.36 |
| **Agreement dated 10 September 2008, maximum facility amount £250,000,000.00** | | | |
| **Date** | **Amount (£)** | **Description** | |
| 10 September 2008 | (3,976,581.52) | Purported offset for transfer pricing adjustments | 130,366,221.84 |
| 25 November 2008 | 7,445,952.30 | Draw-down | 137,812,174.14 |
| 16 December 2008 | (24,779,973.80) | Purported offset for transfer pricing adjustments | 113,032,200.34 |

### D.2.3. Loan Facility contrary to NNUK's best interests

28.     Each of the loan agreements identified in the table at paragraph 27 above and the advances thereunder (together "the Interest-Free Loans") amounted to unsecured interest-free obligations, which had no legitimate commercial purpose for NNUK.

29.    They were entered into so as to transfer cash and/or value from NNUK to NNL, and, as stated in paragraphs 23 to 24 above, were contrary to the best interests of and prejudicial to NNUK and its creditors. In particular:

29.1.    At the time that the idea of the Loan Facilities were initially conceived in May 2003, and on the grant of the replacement Facilities and the draw-downs thereunder, NNL was not in a position, and knew that it was not in a position, to make repayment of the Interest-Free Loans on an adequately timely or commercial basis and it was not intended that NNL do so.

29.2.    The maximum facility amount under the Loan Facilities was increased repeatedly between December 2003 and October 2007, with the loan balance improperly allowed to accrue to £466,782,402.86 on or around 23 October 2007, in circumstances where NNL was not in a position to make repayment on any or any adequately timely or commercial basis (and was not intended to do so) and there was a serious and unacceptable likelihood or risk that the loans would never be repaid in full.

29.3.    In order for an inter-company loan to be at arm's length, it was necessary to charge interest on the Interest-Free Loans and to obtain valid security in respect of them. NNUK was not paid interest on the amounts it provided and nor was it granted any security under these arrangements in spite of the fact that this:

29.3.1.    was uncommercial and of no, or no acceptable, benefit to NNUK;

29.3.2.    was contrary to Nortel Group's general practice in respect of inter-company loans;

29.3.3.    effectively operated to impede NNUK's ability to enjoy benefits to which it was otherwise entitled under the MRDA (i.e. its entitlement to be paid interest by NNL on overdue transfer pricing adjustments which it owed to NNUK).

29.4.    Notwithstanding that NNUK was not paid interest by NNL, interest was imputed on the balance of the Loan Facility for UK tax purposes by Her

Majesty's Revenue and Customs ("HMRC"), thereby eroding NNUK's corporate income tax on trading losses

30.    Notwithstanding the above, the Loan Facilities were extended, renewed and enlarged on an unsecured (as well as interest-free) basis without any, or any adequate, regard to the interests of NNUK (or its creditors), even though NNL's interests were plainly favoured over NNUK's (and its creditors) and in spite of the fact that NNUK was entitled to terminate those agreements and demand repayment of the outstanding loan amounts in full from NNL at any time on five days' notice (see Article 2, Section 2.4(b)).

31.    When the balance of the Loan Facilities was purportedly reduced in December 2007, as a result of Project Swift (which is denied, as set out below), this was done to the detriment of NNUK (and its creditors) through the transfer of various group companies (being entirely illiquid assets which, for all practical purposes, NNUK would never be able to realise on a going concern basis) to NNUK, rather than by way of repayment in cash.

32.    Even following Project Swift, a loan balance of £113,032,200.34 was left outstanding on the Interest-Free Loans as at 14 January 2009.

**D.3.    Particulars of claims in respect of Interest-Free Loans**

**D.3.1.    Claims in respect of the breach of fiduciary duties by NNL as de facto director of NNUK**

33.    The claims set out in this section D.3.1 are governed by English law.

34.    The directors of NNUK owed fiduciary duties to NNUK, including (inter alia) duties:

34.1.    to act bona fide in the best interests of the company;

34.2.    to act for proper purposes (and not collateral or improper ones);

34.3.    to avoid conflicts of interest and not to favour the interests of themselves or any other person over the interests of the company;

34.4.    not to profit from their fiduciary position at the expense of the company.

35.     Further, given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, in carrying out their fiduciary duties to NNUK, the directors were obliged at all times (and, from 1 October 2007, statutorily obliged pursuant to section 172(3) of the Companies Act 2006), to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

36.     As NNL and the *de jure* directors of NNUK knew and understood (or ought to have known and understood) the Interest-Free Loan arrangements were not in the best interests of NNUK for the reasons set out in paragraph 29 above. By approving (and/or causing or procuring the making of) the Interest-Free Loan arrangements, the directors of NNUK acted in breach of the duties set out at paragraph 34.

37.     The directors of NNUK acted in further breach of their obligations by reason of their failure to determine that NNUK should rescind, or alternatively exercise the right pursuant to Article 2, Section 2.4(b) of each agreement, to terminate the Interest-Free Loan arrangements.

*Breach of fiduciary duties by NNL*

38.     NNL was itself a *de facto* director of NNUK. In this context:

38.1.     From around 2000, the *de jure* board of directors of NNUK met infrequently. The role of the *de jure* board of directors was limited to the fulfilment of statutory functions, such as the approval of accounts and the signing of documents for corporate acquisitions or divestures.

38.2.     At all material times the Nortel Group operated predominantly along business and functional lines, with control of the Nortel Group's operations highly centralised in NNL.

38.3.     At all material times from about the year 2000, the principal commercial decision-making function in respect of the Nortel EMEA subsidiary companies (the "EMEA subsidiaries"), including, but not limited to, NN Lux, NNUK, NN Ireland, NNSA and NNIF, was exercised by NNL.

38.4.     All major decisions about, concerning and/or by NNUK were in practice taken by NNL (including in conjunction with NNI). For example:

38.4.1.  inter-company lending decisions of NNUK, including whether to lend to other group entities and on what terms, were taken by NNL;

38.4.2.  all decisions regarding the implementation, operation and subsequent amendment of the transfer pricing arrangements to which NNUK was subject were taken exclusively by NNL, with little or no consultation with the NNUK board of directors, as explained further in paragraph 177 below.

38.4.3.  whilst pension scheme funding decisions were notionally the responsibility of the NNUK Pension Funding Policy Committee (the "UK PFPC") all such decisions were in fact taken by NNL which controlled the funding of the NNUK Pension Plan.

38.4.4.  all decisions to upscale capacity at Nortel's subsidiaries and all subsequent decisions to reduce such capacity, thereby necessitating restructuring costs to be incurred, were taken by NNL (as explained further at paragraphs 152 to 154 below).

38.4.5.  All decisions in relation to the provision of vendor financing to Nortel's customers were taken by NNL, as explained further at paragraphs 155 to 156 below.

38.5.  Such decisions were habitually made by NNL (including in conjunction with NNI) despite the fact that they resulted in prejudicial consequences for NNUK.

38.6.  Further, at all material times, the NNUK board of directors included senior North American representatives. For example, Bill LaSalle was a director of NNUK until May 2008 whilst also holding the position of General Counsel of the Nortel Group and being an employee of NNL. When NNL made a determination on behalf of NNUK which formally required a resolution of the *de jure* board of NNUK or the signature of a *de jure* director of NNUK, this would be obtained through representatives of NNL contacting the necessary board member(s) and setting out the course of action required by NNL.

39.   In directing the affairs of NNUK and/or in undertaking the decision-making function in respect of NNUK, NNL assumed the role of a *de facto* director of NNUK at all material times from, or about, at least the year 2000.

40.   In its role as a *de facto* director of NNUK, NNL owed the company and creditors of NNUK all applicable statutory, common law and fiduciary duties. Such obligations included, but were not limited to the duties pleaded at paragraph 34 above.

41.   Further or alternatively, if, which is denied, NNL was not generally a *de facto* director of NNUK at all times, NNL assumed the role of *de facto* director in respect of each and every decision of NNUK in the determination of which it was involved. Such determinations included, but were not limited to, NNUK's decision to enter into, and advance loan funding pursuant to, the Loan Facilities and/or NNUK's failure to exercise the right, pursuant to Article 2, Section 2.4(b) of each of these agreements, to terminate the Interest-Free Loan arrangements. Each of those decisions were decisions taken and implemented by NNL, as to which paragraphs 38.3 and 38.4 above are repeated. In its role of *de facto* director in respect of these decisions, NNL owed the company and creditors of NNUK the like duties as are pleaded at paragraphs 34 above.

42.   Further and alternatively, NNL was a person in accordance with whose directions or instructions the *de jure* directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK (as pleaded above), NNL assumed fiduciary duties to NNUK and creditors in respect of NNL's role (including its role in the approval, procuring or arranging the agreements and advances referred to above) such that it owed the like duties as are pleaded at paragraph 34 above.

43.   In approving and/or arranging and/or procuring each of the Interest-Free Loans in the circumstances described at paragraph 38.4.1 above, NNL acted in breach of its duties to NNUK. In particular NNL breached its fiduciary duties to NNUK (entitling NNUK to the relief identified at paragraph 59 below) in that it:

43.1.    acted contrary to the best interests of NNUK and its creditors;

43.2.    acted for a collateral purpose;

43.3.    favoured its own interests over those of NNUK;

43.4.    profited from its fiduciary position at the expense of NNUK.

**D.3.2.    Unconscionable receipt claim against NNL**

44.    Further or alternatively, the directors of NNUK owed the duties to NNUK set out in paragraph 34 above. In breach of their duties, such directors approved (and/or caused or procured the making of) the Interest-Free Loans referred to above.

45.    At all material times (and by reason of its intimate involvement in NNUK's commercial affairs and its role in procuring the advances for NNL's benefit) NNL was aware of these breaches of fiduciary duty, and knowingly or unconscionably assisted in and received the benefits of such breaches.

46.    Accordingly, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**D.3.3.    Claim in respect of transactions at an undervalue pursuant to section 238 of the Insolvency Act 1986 ("the IA 1986")** [1]

47.    Further, or alternatively, the administrators of NNUK are entitled to relief in relation to the Interest-Free Loan arrangements as being transactions at an undervalue under section 238 of the IA 1986.

48.    The Loan Facilities in 2007 and 2008 identified at paragraph 27 above ("the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement") and the advances made under them were transactions at undervalue for the purpose of section 238(4) of the IA 1986, on the basis that they were:

48.1.    transactions which were entered into with a connected party within two years of the date of NNUK entering insolvency (being 14 January 2009);

48.2.    transactions for which NNUK received no consideration and/or where the value of the consideration provided by NNL was significantly less than the value of the consideration provided by NNUK;

48.3.    in circumstances where the statutory presumption under section 240(2) that the transaction occurred at a time when NNUK was unable to pay its debts and/or caused NNUK to be unable to pay its debts is applicable;

48.4.    thereby entitling the office-holders of NNUK, if they so elect, to an order pursuant to section 238 of the IA 1986, an order that NNUK should be restored to the position that it would have been if NNUK had not entered into the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement.

49.    For the avoidance of doubt the claims dealt with in this section D.3.3 are governed by English law, and the appropriate jurisdiction and forum for the resolution of any dispute in relation to them is the Courts of England and Wales.

**D.3.4.    Claim for money due and payable**

50.    Alternatively to the claims and relief referred to above, NNUK is entitled to claim the full amount still outstanding under the September 2008 Revolving Loan Agreement:

50.1.    Pursuant to Article 3, Section 3.3 of the September 2008 Revolving Loan Agreement, NNL was obliged to repay the principal outstanding not later than the last day of the Term.

50.2.    Pursuant to Article 2, Section 2.4(c)(ii) of the September 2008 Revolving Loan Agreement, the Term of the Agreement ended on 14 January 2009.

51.    As at 14 January 2009, the balance of the loan from NNUK to NNL stood at £113,032,200.34. As such, this amount is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

52.    Further, on the basis of the claims pleaded below, the £42,572,949.28 purportedly set off for money owed to NNL under transfer pricing was not in fact owed and was not able to be set off. As such, in addition to the amounts in paragraph 51 above,

£42,572,949.28 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

53.    Further, on the basis of the claims pleaded below at section E.3, the £327,579,842.10 purportedly set off under Project Swift to NNL was not able to be set off. As such, in addition to the amounts in paragraph 51 and 52 above, £327, 579,842.10 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

54.    Further, the £6,068,812.15 purportedly set off on 20 March 2007 was not able to be set off. As such, in addition to the amounts in paragraph 51, 52 and 53 above, £6,068,812.15 is contractually due and payable to NNUK by NNL. Alternatively, NNUK is entitled to damages in this amount for breach of contract.

### D.3.5.    Further claims in relation to inter-company loans

55.    Further, or alternatively, NNUK has the following claims in relation to the above Interest-Free Loans, entitling it to the relief set out in section D.4 below.

#### D.3.5.1.    Unjust Enrichment

56.    In addition or in the alternative, through its involvement in the Interest-Free Loans as detailed above, NNL has been unjustly enriched at NNUK's expense.

#### D.3.5.2.    Oppression

57.    In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive and unfairly disregarded the interests of NNUK and its creditors through its involvement in the Interest-Free Loans contrary to section 241 of the *Canada Business Corporations Act*.

#### D.3.5.3.    Conspiracy

58.    In addition or in the alternative, in connection with the scheme of entering into the Interest-Free Loans, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct.

**D.4.    Summary of remedies to which NNUK is Entitled**

59.    As a result of the above, NNUK is, in summary, entitled to at least the following relief:[3]

59.1.    If NNUK elects for this remedy, the setting aside of the Loan Facilities and the restitution to NNUK of all sums advanced by it to NNL, including restitution (together with any traceable or identifiable product or substitute of the same) on a proprietary basis.

59.2.    Further, or alternatively, an equitable account of profits that NNL has made pursuant to the Interest-Free Loans.

59.3.    Further, or alternatively, equitable compensation or damages measured at the total of all sums advanced by NNUK to NNL (without deduction for any alleged repayment), together with the amount of interest that should have been charged in relation to the same if NNUK's directors had discharged their duties, calculated at a commercial rate, and (as equitable compensation) compounded at quarterly rests.

59.4.    Further, or alternatively, damages in respect of the value eroded from the corporate income tax non-trading losses in NNUK as a result of the notional tax charges resulting from the imputed interest on the Interest-Free Loans (see paragraph 29.4 above).

59.5.    Further, or alternatively, NNL is liable for the unconscionable receipt of any and all benefits received by NNL under the Loan Facilities and accordingly, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

59.6.    Further, or alternatively, under section 238 of the IA 1986 the administrators of NNUK are entitled, if they elect to do so, pursuant to

---

[3] For the avoidance of doubt, all references in this paragraph to the claims set out earlier in this section D are to be taken as incorporating and repeating, for the purposes of the claim to relief, any identification of law, forum and jurisdiction in respect of those claims.

section 238 of the IA 1986, to an order that NNUK should be restored to the position that it would have been if NNUK had not entered into the September 2007 Revolving Loan Agreement and/or the September 2008 Revolving Loan Agreement.

59.7.  Alternatively to the claims set out above, £489,253,803.87, as the amount contractually due and payable to NNUK by NNL.

59.8.  Further, or alternatively, damages.

59.9.  In any event, interest (equitable or otherwise) in relation to any of the entitlements referred to in this paragraph, calculated (in the case of all equitable claims) by reference to the rate and quarterly compounding referred to at paragraph 59.3 above.

60.  NNUK's best current estimates of the amounts of these claims are set out in the table below.  For the avoidance of doubt NNUK specifically reserves the right to amend any basis and calculation of any interest component identified.

| Claim | Currency | Original currency amount | Principal Claim component | Interest component |
|---|---|---|---|---|
| NNUK/NNL loan: claim for amounts contractually owing | £ | 489,253,803.87 | 489,253,803.87 | - |
| NNUK/NNL loan: setting aside/restitution on a proprietary basis | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: equitable account of profits | £ | To be assessed by the relevant Court | | |
| NNUK/NNL loan: equitable compensation | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: unconscionable receipt | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |
| NNUK/NNL loan: transaction at an undervalue | £ | 609,760,299.79 | 489,253,804.01 | 120,506,495.78 |

| | | | | |
|---|---|---|---|---|
| NNUK/NNL loan: value of eroded non-trading losses | £ | As yet to be ascertained | | |

E.      CLAIMS BY NNUK IN RESPECT OF PROJECT SWIFT

E.1.    The Claim

61.     NNUK claims against NNL in respect of any and all loss or damage which it
        has suffered (and or to assert any proprietary rights which it has) as a result of
        or in connection with the transaction to which NNUK and NNL were party
        ("Project Swift") pursuant to which NNL's indebtedness under the Interest-
        Free Loans referred to in the previous section of this Proof of Claim was
        purportedly reduced (which is denied).

62.     Without in any way derogating from the generality of the claims set out in
        paragraph 61 above, NNUK sets out below in sections E.3 to E.4 particulars of
        those claims and the quantum of those claims as best as it is currently able on the
        basis of the information that it currently has. NNUK reserves its right to alter, add
        to or otherwise amend the below facts relied on in support of the claims, the nature
        and or quantum of the claims, including as a result of documentary and other
        information obtained from NNL (or others) and to the extent that expert evidence
        may be required in order to establish quantum.

E.2.    The Project Swift transaction

E.2.1.  Background

63.     As explained in paragraph 29.2 above, by October 2007, NNL owed
        £466,782,402.86 to NNUK under the Interest-Free Loans.

64.     Due to the size of the outstanding debt under the Loan Facilities, the notional tax
        charges resulting from the imputed interest on the loan were significant
        (approximately US$20 million per year) and were eroding the corporate income tax
        non-trading losses in NNUK. By mid-2007, this erosion was such that NNUK
        would soon have had to pay tax on its non-operating income.

65.     In 2007 NNL was responsible for promoting and implementing a scheme whereby
        NNL could purportedly reduce the amount that it owed under the Interest-Free
        Loans without making any payment to NNUK in cash ("Project Swift").

66.    Pursuant to the Project Swift scheme, NNL determined that NNUK would agree to buy a 100% shareholding in NNIF and various Nortel subsidiaries held by NNIF (the "Swift subsidiaries") from NNL, the purchase price of which would be offset against the outstanding amount NNL owed to NNUK. It was envisaged that Project Swift would include the transfer from NNL to NNUK of the Swift subsidiaries and the transfer from NNL to NNUK of NNL's 91% shareholding in NNSA, the remaining 9% shareholding in NNSA being held by NNIF.

67.    Prior to, and in connection with, the Project Swift transaction NNL also decided to effect a restructuring of NNIF (the "NNIF Restructuring"). The NNIF Restructuring included a capital reduction in NNIF of €295,005,419.57 with the benefit of this redemption going to NNL as sole shareholder.  The net effect of the NNIF Restructuring included the release of approximately US $121 million of cash to NNL. This cash amount was formed of a combination of dividends which were paid by NNIF subsidiaries to NNIF in anticipation of the NNIF Restructuring and money already in the accounts of NNIF. The result of this was to remove a significant sum of cash from NNIF prior to its transfer to NNUK.

68.    The benefits of Project Swift for NNL were as follows:

68.1.    the repatriation of cash to Canada of US$121 million;

68.2.    it allowed NNL to be able to purport to discharge a substantial proportion of the debt it owed to NNUK under the Interest-Free Loans whilst not having to make a cash payment to NNUK.

69.    For the reasons explained below at paragraphs 75 to 85 it was not in the best interests of NNUK or its creditors that NNL should purport to make a settlement of the Interest-Free Loans by virtue of the Project Swift transaction rather than by effecting repayment in cash. Moreover, to the detriment of the interests of NNUK, the value attributed to the assets transferred was much greater than the actual value of those assets.

### E.2.2.    The transaction structure

70.    The eventual implementation of Project Swift occurred via a Sale and Purchase Deed dated 20 December 2007 (the "Deed"), whereunder NNUK agreed to purchase

the entire issued share capital of NNIF from NNL at an initial purchase price of US $628,902,198, with further payment to be made if the aggregate Net Cash of the NNIF Group was greater than US$168,000.000.

71.    As mentioned above, it had initially been intended that Project Swift would involve the transfer from NNL to NNUK of NNL's 91% shareholding in NNSA (the remaining 9% shareholding in NNSA being held by NNIF). However, it was subsequently decided to exclude this shareholding in NNSA from Project Swift.

72.    Pursuant to Project Swift and the Deed, on or about 31 December 2007, the Initial Purchase Price of £316,031,255.28, and a further £1,019,661.22 as a result of a exchange rate clarification, was purportedly offset against the outstanding loan balance that NNL owed to NNUK under Interest-Free Loans, reducing the loan balance from £465,635,785.88 to £148,584,869.38. Further, on or about 31 March 2008, the sum of £10,528,935.74 was further offset against the then outstanding loan balance of £135,915,092.40, the sum of £10,528,935.74 being payable as a valuation adjustment by NNUK to NNL pursuant to Article 2, Section 2.3 of the Deed (the "Adjustment").

73.    In the event, given the financial position of NNUK (and the Nortel Group more generally) at the time of Project Swift, the value of the Swift subsidiaries to NNUK was substantially lower than the amount of NNL's debt to NNUK which was deemed to be discharged as a result of the arrangement.

74.    Further, those assets were entirely illiquid and as such had no, or little, value on a going concern basis. They were obviously inferior by comparison with the cash equivalent given up.

### E.2.3.    Project Swift not in NNUK's best interests

75.    The purported benefits of the Project Swift transaction to NNUK were that:

75.1.    NNUK's financial exposure to NNL pursuant to the NNUK/NNL inter-company loan arrangements was reduced from £465,635,785.88 to £148,584,869.38; and

75.2.    NNUK would reduce its potential exposure to tax charges in respect of the imputed interest on the Loan Facility, estimated at around US$12.3 million per year.

76.    Whilst the purported reduction in the balance pursuant to the Interest-Free Loans might appear to have ostensibly been in NNUK's interests, in reality they were not.

77.    In light of NNUK's (and the wider Nortel Group's) financial position at the time, the value of the Swift Subsidiaries to NNUK was substantially lower than the amount of NNL's debt to NNUK which was deemed to be discharged as a result of the Project Swift.

78.    The assets acquired by NNUK in place of the cash repayment of its loans to which it was otherwise entitled comprised illiquid assets, whose real ascertainable (or realisable, or sufficiently certain) value was substantially less than the cash value given up, and which it was not in NNUK's interests to have instead of cash repayment.

79.    Prior to the implementation of Project Swift, and at a time when there was a significant threat of the Nortel Group entering insolvency, both NNUK and NNL had been advised that, following Project Swift, NNUK would likely be in a materially worse position in any such insolvency than it would be were Project Swift not to occur.

80.    Given its financial circumstances, NNUK ought properly to have received repayment of the outstanding receivable in cash from NNL.

81.    By receiving shares in the Swift subsidiaries, rather than cash, in settlement of the amount owed by NNL under the Interest-Free Loans, NNUK was put in a materially worse position in any Group-wide and/or NNUK insolvency situation than it would have been otherwise.

82.    In particular, in light of the exclusion of NNSA from Project Swift, US$121 million in cash was extracted from NNIF and which could have been paid to NNUK.

83.    As regards the purported reduction in NNUK's potential tax exposure going forward, NNUK should never have been exposed to such a tax charge in the first place. The only reason that it was exposed to this was because interest was being

imputed on a loan facility which was not itself interest bearing.   The potential reduction of NNUK's tax exposure cannot therefore truly be regarded as a benefit to NNUK.   It was, in effect, nothing more than mitigation of a potential tax liability to which NNUK should never have been exposed, and to which it was only exposed by virtue of the breaches of duty by NNL referred to in section D.3 above.

84.     Properly considered Project Swift was therefore a transaction designed to benefit NNL, and it did so at NNUK's expense and to its detriment.

85.     Not only was Project Swift not in the best interests of NNUK, but it was not in the interests of NNUK's creditors even though it was implemented at a time when NNUK's directors had a duty to act in the best interests of their creditors as a result of NNUK's and the Nortel Group's financial position.

**E.3.     Particulars of Claims in respect of Project Swift**

**E.3.1.   Claims arising from the breaches of fiduciary duty by NNL as de facto director of NNUK**

86.     The claims dealt with in this section E.3.1 are governed by English law.

87.     Project Swift, as executed by the Deed, was not in NNUK's best interests or in the interests of its creditors (see paragraphs 69 and 85 above).

*Breach of fiduciary duties by NNL as a de facto director of NNUK*

88.     The directors of NNUK owed fiduciary duties to NNUK, including (inter alia) the duties pleaded at 34 above.   The directors were further obliged to take into account creditors' interests as pleaded at paragraph 35 above.

89.     As explained at paragraphs 38 and 39 above, NNL was itself a *de facto* director of NNUK from at least the year 2000 onwards. Further and in any event, in directing the affairs of NNUK and/or in undertaking the decision-making function in respect of NNUK, NNL assumed the role of a *de facto* director of NNUK at all material times in relation to Project Swift (in which it was the decision-maker) and/or each and every decision made in relation thereto.

90.     In its role as a *de facto* director of NNUK, NNL owed the company and creditors of NNUK all applicable statutory, common law and fiduciary duties. Such obligations included, but were not limited to the duties pleaded at paragraph 34 above.

91.     Further and alternatively, NNL was a person in accordance with whose directions or instructions the *de jure* directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK, NNL assumed fiduciary duties to NNUK and creditors in respect of NNL's role (including its role in the approval, procuring or arranging Project Swift in particular) such that in respect of the Project Swift transaction (at least) it owed the like duties as are pleaded at paragraph 34 above.

92.     In approving and/or arranging and/or procuring Project Swift in the circumstances described at sections E.2.1 to E.2.3 above, the directors of NNUK, and NNL in particular, acted in breach of their duties to NNUK, entitling NNUK to the relief set out at paragraph 104 below.

**E.3.2.    Unconscionable receipt by reason of the breach of fiduciary duties by NNUK's directors**

93.     Further or alternatively, the directors of NNUK owed the duties to NNUK set out in paragraph 34 above.  In breach of their duties, such directors approved (and/or caused or procured the making of) the Project Swift transactions referred to above.

94.     At all material times (and by reason of its intimate involvement in NNUK's commercial affairs and its role in procuring, organising and implement the Project Swift transactions) NNL was aware of these breaches of fiduciary duty, and knowingly or unconscionably received the benefits of them.

95.     Accordingly, those benefits (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**E.3.3.   Claim in respect of transactions at an undervalue pursuant to section 238 of the IA 1986**

96.     Further, or alternatively, the administrators of NNUK are entitled to relief in respect of the Project Swift transaction as a transaction at an undervalue under section 238 of the IA 1986.

97.     Project Swift, as executed by the Deed, was a transaction at an undervalue for the purpose of section 238(4) of the IA 1986, on the basis that it was:

   97.1.   a transaction which was entered into with a connected party (i.e. NNL) within two years of the date of NNUK entering insolvency (being 14 January 2009);

   97.2.   a transaction for which NNUK received no consideration and/or where the value of the consideration provided by NNL was significantly less than the value of the consideration provided by NNUK; and

   97.3.   the statutory presumption under section 240(2) that the transaction occurred at a time when NNUK was unable to pay its debts and/or caused NNUK to be unable to pay its debts is applicable.

98.     As a result, the office-holders of NNUK are entitled, if they so elect, to an order pursuant to section 238 of the IA 1986 that NNUK should be restored to the position that it would have been if NNUK had not entered into the Project Swift transaction.

99.     For the avoidance of doubt the claims dealt with in this section E.3.3 are governed by English law.

**E.3.4.   Further claims in relation to Project Swift**

100.    Further, or alternatively, NNUK has the following claims in relation to Project Swift, entitling it to the relief set out in section E.4 below.

### E.3.4.1.   Unjust Enrichment

101.    In addition or in the alternative, through its involvement in Project Swift as detailed above, NNL has been unjustly enriched at NNUK's expense.

### E.3.4.2.    Oppression

102.    In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive and unfairly disregarded the interests of NNUK and its creditors through its involvement in the Project Swift Transaction contrary to section 241 of the *Canada Business Corporations Act*.

### E.3.4.3.    Conspiracy

103.    In addition or in the alternative, in connection with the scheme of entering into the Project Swift Transaction, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct.

**E.4.    Summary of remedies to which NNUK is Entitled**

104.    As a result of the above, NNUK is, in summary, entitled to at least the following relief:[4]

104.1.    The setting aside, if NNUK elects to do so, of the Deed.

104.2.    Further or alternatively, equitable compensation or damages, measured as the difference in the value between the purchase price pursuant to the Deed, and the true value of the shareholding in NNIF, such shareholding value being effectively nominal.

104.3.    Further, or alternatively, NNL is liable for the unconscionable receipt of any and all benefits received by NNL in relation to Project Swift, such sums (and their identifiable or traceable substitutes) are held on trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

104.4.    Further, or alternatively, under section 238 of the IA 1986 the administrators of NNUK are entitled at their election to an order that

---

[4] For the avoidance of doubt, all references in this paragraph to the claims set out earlier in this section E are to be taken as incorporating and repeating, for the purposes of the claim to relief, any identification of law, forum and jurisdiction in respect of those claims

NNUK should be restored to the position that it would have been if NNUK had not entered into the Project Swift transaction.

104.5.   Further, or alternatively, damages.

104.6.   In any event, interest (equitable or otherwise) in relation to any of the entitlements referred to in this paragraph, calculated (in the case of all equitable claims) at a commercial rate of Libor +1 compounded at quarterly rests.

104.7.   Further, or alternatively, an equitable account of profits that NNL has made pursuant to Project Swift.

104.8.   Further, or alternatively a claim in damages (or to otherwise recover) US$121 million in respect of the cost extracted through the NNIF Reorganisation.

105.   NNUK's best current estimates of the amounts of these claims are set out in the table below. For the avoidance of doubt NNUK specifically reserves the right to amend any basis and calculation of any interest component identified.

| Claim | Curr-ency | Original currency amount | Principal Claim component | Interest component |
|---|---|---|---|---|
| Swift: setting aside /restitution on a proprietary basis | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: equitable account of profits made | £ | As to be assessed by the relevant Court | | |
| Swift: equitable compensation being difference in value between purchase price and value of Swift Subsidiaries at time of Swift | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: unconscionable receipt | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: transaction at an undervalue | £ | 349,793,039.00 | 327,579,852.24 | 22,213,186.76 |
| Swift: claim re | US$ | 125,662,334.28 | 120,574,803 | 5,087,531.28 |

| NNIF restructuring | | | | |
|---|---|---|---|---|

**F.    CLAIMS IN RESPECT OF TRANSFER PRICING**

**F.1.    The Claim**

106.    NNUK claims against NNL in respect of any and all loss or damage which it has suffered (and/or to assert any proprietary rights which it has) as a result of or in connection with the transfer pricing arrangements to which it was subject from 1 January 2001 to the Filing Date.

107.    Without in any way derogating from the generality of the claims set out in paragraph 106 above, NNUK sets out below in sections F.3 to F.4 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has.  NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

**F.2.    Transfer Pricing**

**F.2.1.    Overview**

108.    Transfer pricing is a mechanism which is intended to ensure that intra-group trading of a multinational group is performed on a basis which (i) enables an allocation of profit across the countries in which it trades (and across the entities within the group) in a manner which replicates an arm's length situation and (ii) avoids double taxation.

109.    It is a fundamental part of transfer pricing that individual group members structure their commercial affairs on the basis that they act at arm's length in their dealings with each other ("the arm's length principle").

110.    The OECD has developed and published Guidelines ("the OECD Guidelines") detailing the approach which multinational groups should take to determine their allocation of profits, in accordance with the arm's length principle.  The arm's length principle is also reflected in Article 9 of the OECD Model Tax Convention, which states that:

"[where] conditions are made or imposed between two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly."

111.   The OECD Guidelines outline a number of different transfer pricing methods and outline a transactional profit method which is consistent with the arm's length principle, namely the "profit split method".

### F.2.2.   Transfer Pricing within the Nortel Group

112.   Prior to 2001, the Nortel Group had used a Cost Sharing Arrangement or Cost Contribution Arrangement ("CSA" or "CCA") to deal with research and development ("R&D") and resulting intangibles. From 2001, the transfer pricing methods were revised, and thereafter a residual profit split method ("RPSM") was used.

113.   These claims relate to the RPSM imposed on NNUK and operated by the Nortel Group from 2001 to 14 January 2009.

114.   The move to an RPSM was primarily motivated by a desire to allocate more profit to NNL. NNL was seen as a "tax haven" because it had extensive tax losses, and because Canada had a system of R&D tax credits which could shelter a greater level of profits. Under the previous cost sharing method, NNL did not derive a great deal of profit. However, using an RSPM which used R&D expenditure as the key means of allocating residual profit going forward would see much more profit allocated to NNL.

115.   Under the RPSM, the Residual profit entities ("RPEs", see paragraph 116 below) remained beneficial or economic owners of the intangible assets and IP that they had created and/or contributed to. This is dealt with in more detail in paragraphs 142 to 143 below.

116.   The RPSM approach used by Nortel made a distinction between two types of RPSM participants.

116.1.   RPEs (also sometimes referred to as "integrated entities") are those entities which had been actively engaged in R&D, but also engaged in

manufacturing and distribution activities. These included NNL, NNI, NNUK, NNSA, NN Ireland and Nortel Networks Australia Pty Ltd ("NN Australia")[5].

116.2. Limited risk distribution entities ("LREs") are those entities which had not been engaged in R&D activities, but rather performed routine distribution functions, such as sales and support services, and distributing and installing Nortel products.

117. In brief, under the RPSM arrangements from 2001 onwards:

117.1. Both RPEs and LREs, regardless whether or not they undertook R&D activities, were first rewarded with a routine return.

117.2. These returns then formed the basis for determining the level of residual profits (or losses) attributable to the Nortel Group's intangible development activities (i.e. R&D).

117.3. The residual profits (or losses) were then divided between the RPEs only based on their proportional contribution to R&D activity.

118. Whilst Nortel adopted an RPSM throughout the period 2001 to 14 January 2009, the RPSM methodology was amended from 2006 onwards (inclusive). For this reason NNUK's claims in respect of transfer pricing are dealt with below in respect of two distinct time periods: 2001 to 2005 and 2006 to 14 January 2009.

119. There were a number of flaws in the RPSM in fact employed by the Nortel Group, with the consequence that it resulted in outcomes which did not comply with the arm's length principle, did not properly or fairly reward certain entities (including NNUK) and resulted in an improper transfer of value to NNL.

120. In this regard, the US Inland Revenue Service ("IRS") challenged the 2001 to 2005 model. Such challenge resulted in a US$2 billion adjustment being made in favour of NNI. The IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by US$2 billion, and that NNI increase the amount of income reported on its US income tax returns by US$2 billion, being US$400

---

[5] Until 2008 when NN Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005, and ceased to be an RPE

million for each of the years 2001 – 2005. These adjustments were said to reflect net overpayment made by NNI to NNL for those tax years. An adjustment of this magnitude plainly calls into question the arm's length nature of that model. It also reflects the fact that the RPSM methodology employed was designed to benefit NNL at the expense of others in the group.

**F.2.3.    The operation of RPSM from 2001 to 2005**

<u>Routine Returns for LREs, 2001-2005</u>

121.    Routine Returns for LREs in the period 2001-2005 were calculated using the transactional net margin method and an operating margin profit level indicator. In practice, the margins used for the LREs' Routine Returns were as follows:

121.1.    In 2001, the ranges fluctuated from entity to entity, ranging from 1% to 4.8% of sales to third parties (although the majority earned less than a 2% operating margin)

121.2.    In 2002, the margin was 0% on third party sales.

121.3.    In 2003-2005, the margin was 1% of third party sales.

122.    The LREs did, however, bear certain risks and costs outside of the routine return.

<u>Routine Returns for RPEs, 2001-2005</u>

123.    Routine returns for RPEs for the period 2001-2005 were calculated using an adjusted return on net assets ("RONA"). The RONA return was intended to reflect the RPEs' manufacturing and related support functions, and was calculated by applying a return to short-term assets and a second return to long-term assets.

124.    The RPEs bore certain risks and costs outside of this return.

<u>Residual Profits, 2001-2005</u>

125.    The residual profits to be allocated to RPEs in the Period 2001-2005 were determined as follows:

125.1.    Consolidated economic profit for the Group was calculated.[6] Economic profit for each RPE was calculated by adding back to each entity's operating profit all R&D expenses incurred in a particular year, and then subtracting from this figure the amortised portion of the entity's R&D capital stock for that year. As LREs did not incur R&D costs, their economic profit was the same as their accounting profit.

125.2.    The residual profits (or losses) for the Group were then calculated by subtracting from the consolidated economic profit the consolidated routine returns allocated to the RPEs and LREs.

125.3.    This consolidated residual profit or loss was then allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year.

126.    Each RPE's RPSM profit/loss (i.e. to which it was "entitled" under the scheme) was then calculated as the sum of its share of any residual profit or loss for a given year and its routine return.

127.    The difference between each entity's RPSM profit/loss and its economic profit (i.e. which it had actually earned) formed the basis for an adjustment to accounting profit (if necessary) for the entity in a particular year (the "transfer pricing adjustment").

**F.2.4.    Operation of RPSM from 2006 to 2009**

Routine Returns, 2006-14 January 2009

128.    From 2006 onwards the RONA routine return which RPEs had previously received was replaced and RPEs were provided first with a routine return for their distribution activities ("Distribution Return"), of an adjusted operating margin return of 1% of third party sales. The LREs and RPEs therefore were both subject

---

[6] There is a distinction to be made between accounting profit and economic profit. Accounting profit is based on accounting standards and the principles of conservatism embodied in those standards. The calculation of economic profit attempts to capture the true economic life of assets and the corresponding depreciation or amortization value to be used in this computation in a particular period. Given that Nortel's transfer pricing methodology was founded on the assumption that R&D is the primary driver of intangible profit, economic profit was used to reflect that the benefits accruing from an investment in R&D are not wholly realized in the year in which the investment is made, but over the course of a number of years in the future.

to the same routine return from 2006 onwards. They both continued to bear certain costs outside of their routine return as previously explained in paragraphs 122 and 124 above.

129.    RPEs also incurred selling, general and administrative expenses part of which, the "excess costs", were considered to benefit other Nortel Group entities outside their own respective territories ("excess central services expenses"). Costs incurred beyond that normal level would be deemed to have been incurred to support the operations of other Group entities. From 2006 onwards the RPEs received a profit mark-up of 15% on their excess central services expenses.

Residual Profit, 2006-2009

130.    Residual profits were calculated by subtracting from the Group's consolidated adjusted operating profit[7] the consolidated routine returns attributed to each of the LREs and RPEs. From 2006 onwards, residual profits were then allocated to each of the RPEs based on their relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

131.    From 2006 onwards, accounting profit was used rather than economic profit.

**F.2.5.    Master Research and Development Agreement ("MRDA")**

132.    The MRDA is an agreement between the RPEs that provides the architecture, and contractual basis, to enable the RPSM (from time to time) to be applied.

133.    The MRDA was entered into on 22 December 2004, effective from 1 January 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland (i.e. the RPEs referred to above, defined in the MRDA as "the Participants"). It covered both of the periods of time referred to above, and was amended from time to time by Addenda.

134.    The MRDA provided that:

134.1.    For and as a consequence of the performance of R&D Activity, each Participant should be entitled to receive a payment in an amount equal to

---

[7] Consolidated operating profit was adjusted to remove the operating profit or loss of certain joint venture companies, and also to deduct amortization of intangibles, gain or loss on the sale of business, restructuring and stewardship costs (see Schedule A of the MRDA, as amended by the Third Addendum to the MRDA).

the R&D Allocation determined under the RPSM, as the measure of the benefit to which it was entitled commensurate with its performance of, and contribution to, R&D Activity (Article 3(a)).

134.2.    The R&D Allocation would be computed pursuant to Schedule A (Article 3(c)). Article 3(c) also recorded that the Participants understood that the RPSM was the subject of review, discussion and negotiations with the Revenue Authorities, and that the Participants agreed *"to amend this Agreement and adjust the RPSM to the extent necessary to reflect any negotiated determination with the Revenue Authorities as to the final R&D Allocation"*.

134.3.    Article 3(d) provided, in the original MRDA, that NNL would administer the agreement and the determinations required under the RPSM with respect to its interests and the interests of the Participants, and in particular to compute the amount of any R&D Allocations due to, and payments due from, each Participant on a periodic basis. This Article was amended by the Third Addendum so as to provide that NNL agreed to administer the agreement "or cause this Agreement to be administered by a Licensed Participant or a third party".

134.4.    Any amount owing by a Participant should be due and payable in US dollars or equivalent (Article 3(f)). Any amount owing would be due and payable immediately upon written notice of its R&D Allocation from NNL, and any amount paid after 90 days after notice of its R&D Allocation would accrue interest until the date payment was made (Article 3(g)).

134.5.    Legal title to all NN Technology then in existence or thereafter to be acquired or developed would be vested in NNL. (As explained further below, beneficial title rested with the contributors to that technology in proportion to their contribution). NNL agreed to enter into licenses with each of the other Participants, but in fact profits from all territories were divided in accordance with the RPSM.

<u>The RPSM and "R&D Allocation"</u>

135.   The "RPSM" was defined in the MRDA at all material times as *"the transfer pricing methodology which establishes the fair market value of the compensation to be received by each Participant for its R&D Activity and shall have the meaning defined in Schedule A"*.

136.   Schedule A to the MRDA provided at all material times, amongst other things, that the RSPM was adopted at the request of certain Revenue Authorities as the most appropriate method for determining the arm's length compensation due to each Participant for its respective R&D Activity. "R&D Allocation" was defined as "Arm's Length R&D Allocation"

137.   Schedule A then set out the basis of calculation of residual profit, and of its division between the Participants/RPEs. Schedule A was subsequently amended, including by the Third Addendum to the MRDA to reflect the revised RPSM in fact employed from 2006 onwards.

**F.2.6.   The effect of, and rights under, the MRDA**

138.   Some key general principles underlie, and are made express in, the MRDA, and the MRDA must be construed so as to give proper effect to them.

<u>The Arm's Length Principle</u>

139.   As set out above, it is a key requirement of any transfer pricing method that it should ensure that each of the entities within the group acts at arm's length in their dealings with each other.

140.   This principle is enshrined in the MRDA, which is intended to adhere to the arm's length principle. In this regard:

140.1.   The RPSM adopted by Nortel is expressly stated in the MRDA to be a methodology which establishes fair market value compensation for each RPE's R&D activity, and the most appropriate method for determining arm's length compensation to each RPE.

140.2. '  The MRDA recognises in its terms that the RPSM may be adjusted so as to achieve an arm's length result: see Article 3(c).

141.   The MRDA is accordingly to be interpreted, so far as possible, to give effect to the arm's length principle.

<u>Beneficial Ownership of IP</u>

142.   Consistently with the arm's length principle, the MRDA confirms that the RPEs have beneficial interests in the IP created with their funding contributions (and hence the proceeds of sale of that IP). In this regard:

142.1.   Although NNL was the only legal owner of the IP created from the R&D activities of the RPEs, the MRDA expressly records that the other RPEs possess a beneficial or economic ownership of it.  As noted above, this approach continued the same beneficial ownership characteristics of the CSA which had been in operation prior to 2001.

142.2.   The Recitals to the MRDA further provide that each RPE "should benefit from its contribution to research and development activity commensurate with the value of its contribution".

142.3.   Schedule A to the MRDA provided, at all material times, that the R&D Allocation *"reflects the fact that the Participants bear the full entrepreneurial risk of the Nortel business, such as the risks attendant with the substantial and continuous development and ownership of the NN Technology. Mathematically, the RPSM accords the Participants all the upside risk in the Nortel business as well as the downside risk".*

142.4.   The Recitals to the Second Addendum to the MRDA dated 14 December 2007 confirm this again, recording that *"each Participant holds and enjoys equitable and beneficial ownership of NN Technology"* and *"this Addendum continues each Participant's rights and obligations in the NN Technology".*

143.   Accordingly, and pursuant to the express terms of the MRDA, the RPEs own the IP in the Nortel Group in proportion to their individual contribution to its creation,

assessed (on a proper construction) by reference to both direct and indirect contributions as pleaded at section F.2 of this document.[8]

### F.2.7.  Particulars of Claims arising out of the operation of Transfer Pricing

144.  To the extent that the claims set out in this section F.2 are based on breaches of fiduciary duty, the law applicable to those claims (and the existence of the relevant duties) is English law.

145.  To the extent that the claims set out in this section F.2 arise under the UK insolvency legislation, NNUK will contend that the proper law is English.

### F.2.8.  Non arm's length aspects of the RPSM

146.  NNUK sets out (subject to the reservation in 107 above) the manner in which it considers the RPSM did not comply with the arm's length principle.

Distribution Return

147.  Pursuant to the MRDA, from 2006 onwards, the RPEs had a contractual right to receive a distribution return which reflected an arm's length compensation for its distribution function. As to this:

147.1.  It was an express term of the MRDA that the routine return for each RPE from 2006 onwards would represent an arm's length compensation for each RPE's distribution function and other activities which supported revenue outside of the RPE's country of residence, which would be determined based on current industry standards and third party studies (see paragraph 3(iii) of Schedule A, as amended by the Third Addendum).

147.2.  Alternatively, a term to the above effect is to be implied into the MRDA as a necessary, obvious and reasonable to give business efficacy to the contract which was intended (and required) to be consistent with the arm's length principle.

---

[8] As set out in paragraph 214 below, if and to the extent that the MRDA did not have the result that NNUK had a beneficial interest in the IP proportionate to its contributions to it, then NNUK has claims against NNL based on breach of fiduciary duty, account of profit and unconscionable receipt which would in any event give it proprietary claims against the IP and their proceeds in the hands of NNL.

148.    RPEs (including NNUK) received, from 2006 onwards, a distribution return as part of their routine return, of an adjusted 1% operating margin return on third party sales, based on US GAAP.

149.    In breach of the MRDA, these returns were significantly less than NNUK would be entitled to as a distribution return on an arm's length, fair market value, basis. In this regard:

149.1.    A distribution return of only 1% of third party sales fails to recognise inter-company sales, significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the return. The service element of these functions in particular should have been recognised in the routine return as some of the activities carried out were for the benefit of other group entities. Accordingly, the routine return should be calculated on total operating revenue (as opposed to just third party revenue) and at a higher level than 1%. Indeed, given that the 1% margin was so low, and given that RPEs (including NNUK) would bear costs outside that margin, they were often pushed into a loss position, inconsistent with an arm's length approach.

149.2.    Prior to 2001, Nortel provided many of its distributors with a guaranteed 3% operating margin, a rate of return more consistent with an arm's length return.

149.3.    No independent distributor performing equivalent functions to NNUK would have entered into agreements on terms that it would receive the returns that NNUK in fact received.

Return for Costs of Central Services

150.    As set out in paragraph 129 above, a return of 15% was provided in the RPSM from 2006 onwards to RPEs in respect of regional central services and costs incurred by RPEs to support other Group entities outside their respective territories. However, under the RPSM for the period 2001 to 2005, although such costs were incurred by RPEs, there was no specific provision for any return to RPEs for such costs.

151.    Given the nature of the central services undertaken and given that they provided benefit to other Group entities, an independent entity in the position of NNUK would expect to be remunerated by NNL for such services on an arm's length basis in the period 2001-2005.

Restructuring Costs

152.    From 2001 onwards, the Nortel Group faced continual downsizing and restructuring costs. Prior to 2001, NNL had made decisions in relation to demand planning which had required RPEs and LREs to increase their capacity. When the downturn arose in 2000-2001, those entities were then faced with considerable restructuring costs. Restructuring costs were regularly borne by the RPEs and LREs over the course of 2001 to the Filing Date.

153.    The restructuring costs incurred by NNUK were borne entirely by NNUK. The amount of the restructuring charges incurred was so great that substantial net losses resulted.

154.    Given that these costs resulted from decisions taken by, and instructions given by, NNL, an independent party acting at arm's length would not agree to bear these costs. A proportion of such costs incurred by NNUK should have been reimbursed by NNL. A reasonable reimbursement by NNL, recognising the entities' respective risk profiles and allowing for some sharing of costs, would have been 50% for each year from 2001. However, no reimbursement was made by NNL to NNUK.

Vendor Financing Losses

155.    Vendor financing losses are losses associated with bad debts arising from vendor financing that was provided by Nortel to its customers. A credit committee within NNL made the credit decisions for the Nortel Group. However, these losses were allocated to the RPEs through the RPSM.

156.    An independent party acting at arm's length would not accept these losses, given that it did not make the credit decision itself. Such costs should have been allocated only to NNL. As such, NNL should have reimbursed NNUK in respect of these losses in order to give an arm's length result

North American headquarter and stewardship costs

157.    Pursuant to the MRDA, for the period 2006 onwards, stewardship costs were to be excluded from the calculation of the residual profit pool.

158.    However, such costs were not so excluded. Further details in this regard will be provided in due course and when available.

159.    Further, the RPSM allocated NNL's (and NNI's) corporate costs to the residual profit pool, thereby increasing the amount of loss to be shared. Given the industry decline and the sudden reduction in volume of business, the corporate costs of NNL (and NNI) would have been significantly in excess of what was necessary to oversee and manage the global Group, and in particular the EMEA region, given that EMEA had its own head office

160.    An independent party in the position of NNUK acting at arm's length would not agree to effectively bear these costs (or be charged a higher charge for services) simply because its supplier had incurred excess costs. In addition, a significant portion of these costs provided no benefit to NNUK as they duplicated the head office functionality that already existed within the region.

161.    The excess costs incurred by NNL over the period from 2001 to the Filing Date which have been included in the residual profit pool can be estimated at 50% of NNL's general and administrative costs (i.e. excluding sales and marketing and technical and operational costs), along with the 15% return on excess central services costs received by NNL for the period 2006-2008.

**F.3.    Particulars of Claims arising**

**F.3.1.    Claim for Breach of the MRDA and breach of duty**

162.    In breach of the MRDA:

162.1.    NNUK did not receive an appropriate level of routine returns in the period 2001 onwards (as set out above);

162.2.    The allocation of residual profits to NNUK was not consistent with the arm's length principle, in that, among other things, excess headquarter and stewardship costs were included in the residual profit pool, and

restructuring and vendor financing costs were not reimbursed to NNUK (as set out above).

163.    Further, NNL was responsible for administering the MDRA, made determinations with respect to NNUK's interests under the RPSM, and calculated entitlements by way of routine returns and residual profit allocations from 2001 onwards.

164.    NNL was obliged to make such determinations and calculate such entitlements so as to ensure that such entitlements were consistent with the arm's length principle.

165.    In the circumstances, NNL owed a like duty of care to NNUK.

166.    In breach of its contractual obligation, or alternatively in breach of its duty of care:

166.1.    NNL failed to calculate NNUK's routine returns in a manner consistent with the arm's length principle.

166.2.    NNL failed to reimburse any part of the restructuring costs or vendor financing losses that it had caused NNUK to incur.

166.3.    NNL allocated stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool such that those costs were effectively (and wrongfully) borne by all the RPEs, including NNUK.

167.    Further or alternatively, in breach of Article 3 of the MRDA, the sums that were recognised as owing from NNL to NNUK pursuant to the MRDA were not paid in cash but rather were added to the amount outstanding under the intercompany loan between NNL and NNUK.

Relief sought

168.    By reason of NNL's breach of the MRDA and/or of its duty of care in failing to properly reward NNUK for its routine functions, NNUK has suffered loss and damage in the amount of approximately US$327.4 million.

169.    Further, by reason of NNL's breach of the MRDA and/or of its duty of care in failing to reimburse NNUK for restructuring costs and vendor financing losses, NNL is liable to:

169.1.    reimburse to NNUK in respect of its restructuring costs for the years 2001 to 2008 in the amount of approximately US$525.3 million;

169.2.    reimburse NNUK in respect of vendor financing losses for the years 2001-2008 in the amount of approximately US$112.8 million.

170.    Further, by reason of NNL's breach of the MRDA and/or of its duty of care in allocating stewardship costs and 50% of NNL's general and administrative costs to the residual profit pool, NNUK has suffered loss and damage as follows:

170.1.    Had such costs been borne by NNL, the amounts due to NNUK over the period 2001-2008 would have been increased in an amount of approximately US$113 million, by way of decrease in residual losses to be borne by NNUK.

170.2.    By reason of NNL's failure to make such payments and/or the imposition of additional losses on NNUK, NNUK has suffered loss and damage in the amount of approximately US$113 million.

171.    Further, NNUK is entitled to and claims interest pursuant to Article 3(g) of the MRDA on:

171.1.    All amounts that were recognised as owing by way of R&D Allocation from NNL to NNUK but which were not paid in cash;

171.2.    The amounts by which such R&D Allocations should have been increased by reason of the matters set out above.

**F.3.2.    Claim for mistake**

172.    Further or alternatively, between 2006 and the Filing Date, NNUK mistakenly believed that a routine return of 1% represented fair market value, arm's length compensation for its distribution activities, and that its returns and share of residual profits had been determined on an arm's length basis. That mistaken belief was either common to NNUK and NNL or was held by NNUK and not corrected by NNL.

173.    Further, between 2001 and 2005, NNUK mistakenly believed that it was not entitled, on an arm's length basis, to a return in respect of excess central services costs or reimbursement of restructuring and/or vendor financing losses. That mistaken belief was either common to NNUK and NNL or was held by NNUK and not corrected by NNL.

174. As a result of such mistaken belief NNUK was deprived of entitlements it should properly have had or received and/or made payments to or gave credits to NNL in respect of amounts it believed to be due to NNL but which were not or ought not to have been due, and/or NNL was unjustly enriched at the expense of NNUK.

<u>Relief sought</u>

175. Accordingly, the sum of US$1,083,000,000.00 is recoverable from NNL in restitution and/or unjust enrichment.

**F.3.3.** **Claim for breach of fiduciary duty by NNL as de facto director**

176. Further, as previously stated in paragraphs 38 to 40 of section D above, NNL was a *de facto* director of NNUK.

177. In any event, NNL acted as such in relation to NNUK's participation in the RPSM by virtue of the fact that all decision making in relation to the entry into, operation of and subsequent amendment of the RPSM was in practice taken by NNL. NNUK refers to the following:

177.1. The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officers of NNL.

177.2. The decision to implement the RPSM was taken by NNL, with the involvement of NNI. NNUK was not involved in the decision whether to change from the previous costs sharing arrangements to RPSM.

177.3. Similarly, NNUK had no involvement in the creation of the RPSM model. The RPSM model was created by NNL (with the assistance of NNJ) in conjunction with Arthur Anderson as professional advisers.

177.4. NNUK was only informed of the change to the RPSM after the RPSM had been implemented.

177.5. NNUK was not involved in the decision to implement the MRDA or in the decision regarding what the terms of the MRDA would be. The terms of the MRDA were determined by NNL and NNJ, with the assistance of the lawyers Sutherland, Asbill & Brennan LLP.

177.6.  There was no arm's length negotiation of the terms of the MRDA. NNUK first received a copy of the draft MRDA in or around December 2004 by which point its terms had already been decided. NNUK was simply instructed to sign the MRDA.

177.7.  NNUK also had little involvement in the APA application processes (referred to above), beyond assisting NNL to answer information requests issued by the tax authorities. The APA application process was handled by NNL, with the assistance of NNI. Again, decision making in relation to the APA process was taken by NNL. Whilst HMRC was involved in the APA process for the period 2001 to 2005, dealings with HMRC were conducted by NNL.

177.8.  Whilst various professional advisers were retained by NNL and/or NNI to assist with the APA process, no independent professional advisers were retained to advise NNUK in respect of the APA process.

178.  Accordingly, NNL owed fiduciary duties to NNUK, including (but not limited to) the duties of the nature described in paragraph 34 above.

179.  Further, given the doubtful solvency and/or risk of insolvency of NNUK from 2000 onwards, in carrying out its fiduciary duties to NNUK, NNL was obliged at all times to consider the interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

180.  Further or alternatively, NNL was a person in accordance with whose directions or instructions the directors of NNUK were accustomed to act and, accordingly, NNL was, as a general matter, a shadow director of NNUK at all material times from around the year 2000. Given the extent to which (as set out above) NNL directed the affairs of NNUK and/or undertook the decision-making function in respect of NNUK and/or exercised control over the assets of NNUK (in particular with regard to its participation in the transfer pricing scheme operated by NNL), NNL assumed fiduciary duties to NNUK and creditors such that it owed the above duties generally and/or with regard to the operation of the transfer pricing scheme in particular.

181.  In breach of its fiduciary duties, NNL failed to ensure that NNUK received an arm's length share of residual profits and losses, in particular for the reasons set out above.

182.    In so doing, NNL acted contrary to the interests of NNUK and its creditors, and favoured its own interests over those of NNUK.

Relief sought

183.    As a result of the above breaches of fiduciary duty, NNUK has suffered loss and/or damage as set out above, in the amount of approximately US$1,083 million.

184.    NNL is accordingly liable to NNUK for damages and/or liable to compensate NNUK in equity for that amount.

185.    Further, NNL has obtained profits by virtue of its breaches of duty, in an amount to be assessed. All fiduciary gains (and/or their identifiable or traceable substitutes) were received and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for all profits to NNUK.

**F.3.4.    Claim for Unconscionable Receipt**

186.    Further or alternatively, each of the directors of NNUK owed the duties to NNUK set out in paragraphs 34 above.

187.    In the same manner as NNL (as set out in paragraph 181 above) such directors breached their duties to NNUK.

188.    As a result of the above breaches of duty NNL received approximately US$1,083 million. At all material times (and by reason of its intimate involvement in NNUK's commercial affairs, NNL was aware of this breach of fiduciary duty, assisted in it, and received such sums with such knowledge, such that the amount of approximately US$1,083 million (and/or the identifiable or traceable substitutes of such receipts) were received and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

**F.3.5.    Claim for Unauthorised return of capital**

189.    Further or alternative, the payments referred to in paragraphs 183 and 188 above represented or amounted to an unauthorised return of capital to NNL, the sole beneficial shareholder of NNUK. Such return of capital was ultra vires and incapable of ratification.

<u>Relief sought</u>

190.    In the circumstances, NNL held all such payments on constructive trust for NNUK
        and is liable to repay such sums (or their traceable proceedings and identifiable
        substitutes) to NNUK or is liable to pay damages or equitable compensation to
        NNUK and/or in any event make restitution (including on a proprietary basis) in the
        amount of US$1,083 million.

**F.3.6.    Further claims in relation to transfer pricing**

191.    Further, or alternatively, NNUK has claims in relation to transfer pricing as set out
        in this section.

192.    In connection with the claims set out below, NNL owed duties to NNUK as de facto
        director of NNUK. In this regard, all decision making in relation to the entry into,
        operation of and subsequent amendment of the RPSM was in practice taken by
        NNL. NNUK refers to the following:

    192.1.  The key individuals responsible for strategic decision making in relation to
            the Group's transfer pricing arrangements were senior employees/officers
            of NNL.

    192.2.  The decision to implement the RPSM was taken by NNL, with the
            involvement of NNI. NNUK was not involved in the decision whether to
            change from the previous costs sharing arrangements to RPSM.

    192.3.  Similarly, NNUK had no involvement in the creation of the RPSM model.
            The RPSM model was created by NNL (with the assistance of NNI) in
            conjunction with Arthur Andersen as professional advisers.

    192.4.  NNUK was only informed of the change to the RPSM after the RPSM had
            been implemented.

    192.5.  NNUK was not involved in the decision to implement the MRDA or in the
            decision regarding what the terms of the MRDA would be. The terms of
            the MRDA were determined by NNL and NNI, with the assistance of the
            lawyers Sutherland, Asbill & Brennan LLP.

192.6. There was no arm's length negotiation of the terms of the MRDA. NNUK first received a copy of the draft MRDA in or around December 2004 by which point its terms had already been decided. NNUK was simply instructed to sign the MRDA.

192.7. In so doing, NNL acted contrary to the interests of NNUK and its creditors, and favoured its own interests over those of NNUK. NNL's conduct in relation to transfer pricing constituted actionable breaches of NNL's duties as a director of NNUK.

### F.3.6.1  Unjust Enrichment

193. In addition or in the alternative to the other claims set out in this Proof of Claim, through its involvement in the transfer pricing arrangements as detailed above, NNL has been unjustly enriched at NNUK's expense.

### F.3.6.2  Oppression

194. In addition or in the alternative, NNL's conduct was, and effected a result that was, unfairly disregarded the interests of NNUK and its creditors through its involvement in the transfer pricing arrangements contrary to section 241 of the *Canada Business Corporations Act*.

<u>Relief sought</u>

195. In relation to the claims at F.3.6.1 and F.3.6.2 above, NNUK is entitled to at least the following relief:

195.1. In the event that NNUK (acting by its office-holders) elects for such a remedy, the setting aside of the relevant transactions as appropriate and in any event an order restoring NNUK to the position it would have been in but for the oppressive conduct of NNL.

195.2. Damages, or equitable compensation, in at least the amounts set out at paragraphs 183 and 188 of this proof.

195.3. Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched, in at least the amounts set out at paragraphs 183 and 188.

195.4.    Interest on all amounts due, including compound interest.

### F.3.7    Claim in respect of Transaction at an undervalue/preference

196.    Further, or alternatively, NNUK has the following claims under the UK insolvency legislation.

197.    NNUK entered administration in England and Wales on 14 January 2009;

_Relief sought_

198.    In such circumstances, the administrator of NNUK is entitled, pursuant to section 238 of the IA 1986, to an order that the position of NNUK should be restored to the position that it would have been if NNUK had not entered into a transaction at undervalue:

198.1.    Between 14 January 2007 and 14 January 2009, NNUK made payments to NNL by way of transfer pricing adjustments or "true up" payments, and/or gave credit to NNL for such amounts. Such payments were inflated by reason of NNUK not being provided with an arm's length distribution return.

198.2.    To that extent, such payments represented transactions at undervalue for the purpose of section 238(4) of the IA 1986, being transactions for which NNUK received no consideration and/or being transactions where the value of the consideration provided by NNL was, in money or in money's worth, significantly less than the value, in money or money's worth, of the consideration provided by NNUK.

198.3.    These transactions at undervalue were entered into at a relevant time for the purpose of section 238(2) of the IA 1986, having been, pursuant to section 240(1)(a) of the IA 1986, entered into with a connected person in the period of two years ending with the onset of insolvency and with the presumption contained in section 240(2) of the IA applying.

### F.4.    SUMMARY OF TRANSFER PRICING CLAIMS[9]

199.    Accordingly, NNUK claims from NNL approximately:

---

[9] Leaving aside the proprietary claims in section G below.

199.1.   US$ 327.4 million in respect of routine returns (see paragraphs 147 to 151) above);

199.2.   US$ 525.3 million in respect of restructuring costs (see paragraphs 152 to 154) above);

199.3.   US$ 112.8 million in respect of vendor financing costs (see paragraphs 155 to 156) above);

199.4.   US$ 113 million in respect of NNL and NNI's excess Head Office costs (see paragraphs 157 to 161) above);

199.5.   The interest (as yet to be assessed) due in respect of amounts recognised as owing to NNUK but added by NNL to the amount owing to NNUK under the intercompany loan rather than being paid in cash;

199.6.   Interest on the above amounts as set out above.

## G.    PROPRIETARY CLAIMS

### G.1.    The Lockbox

200.    Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds currently held pursuant to escrow agreement, to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement. NNUK advances proprietary claims which extend to (but are not limited to) assets within the Lockbox. Further:

200.1.    All claims in respect of the allocation of the Lockbox are to be dealt with pursuant to the provisions of, and procedures established under, the IFSA.

200.2.    NNUK's claim is that all such claims are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

200.3.    If, contrary, to this position, any of the claims are so subject, NNUK hereby makes claims to the assets of the Lockbox (on both a proprietary and personal basis, and without limitation), and reserves the right to add to, amend, or provide further particulars of them in the future.

200.4.    NNUK also advances the proprietary claims referred to below in relation to assets that are in NNL's hands and which fall outside the Lockbox. NNUK's position in relation to those claims is that they are proprietary and hence not claims to NNL's estate for the purposes of any proof process but claims to assets of NNUK. NNUK further contends that the appropriate time for resolving any dispute in relation to such claims is after, and in the light of, the resolution of the allocation claims to the Lockbox pursuant to the IFSA processes.

### G.2.    IP Proprietary claim

201.    NNUK's proprietary claims referred to above include the following claims in relation to IP created with funding contributions from NNUK.

202.    As set out in paragraphs 142 to 143 above, the express terms of the MRDA create beneficial interests in favour of NNUK, NNSA and NN Ireland in the IP created with the funding contributions to R&D, and the proceeds of sale of that IP.

203.    Alternatively, a term to that effect is to be implied into the MRDA, as a necessary, obvious and reasonable term in order to give the MRDA business efficacy to adhere to the arm's length principle which underlies the MRDA, comply with the purpose of the MRDA and avoid prejudicial results for the RPEs.

204.    Further or alternatively, the parties to the MRDA shared a common intention that they should each have a beneficial interest in the IP created with their respective funding contributions. In this regard:

     204.1.    That common intention is reflected in the express terms of the MRDA.

     204.2.    Moreover, the circumstances in which the MRDA was entered into make it clear that the intention behind the arrangements was that NNUK would obtain an interest in the IP commensurate to its contribution. This is also consistent with the economic rationale of a transfer pricing agreement intending to adhere to the arm's length principle.

     204.3.    NNUK refers to paragraphs 115 and 142 to 143 above in particular.

205.    In reliance on this common intention, NNUK acted to its detriment, by contributing to the creation of IP. It did so in the belief that in so acting it was acquiring a beneficial interest in such IP.

206.    Accordingly, a trust in favour of NNUK arises over the IP as a matter of law from the making of the relevant contribution. NNUK's interest in the IP is proportionate to its contributions, both direct and indirect (see paragraph 209 below).

207.    Further or alternatively, in the circumstances NNUK's contributions to the creation of IP, legal title to which was held in the name of NNL, gave rise to a resulting trust in NNUK's favour, proportionate to such contributions.

208.    Further or alternatively, in the circumstances described above, NNL acquiesced in NNUK's reasonable belief that its contributions entitled it to a proportionate beneficial interest in the IP resulting from such contributions. In the circumstances, it would be inequitable for NNL to deny that NNUK had such an interest, and it is estopped from doing so, such that the Court should give effect to such interest.

Valuation of Contributions to IP

209. NNUK's beneficial interest in the IP is proportionate to its direct and indirect contributions to the creation of such IP. In this regard:

    209.1. The parties' common intention was, as set out above, that each of them would have a beneficial interest in the IP created proportionate to their respective contributions. This is the result that is to be arrived at on a proper construction of the MRDA.

    209.2. Moreover, to the extent that the MRDA or RPSM would not have regard to indirect contributions (as set out below), that was also inconsistent with the parties' common intention and with the arm's length principle.

    209.3. If, and to the extent that, the MRDA or RPSM would have any different effect, that was inconsistent with the parties' common intention and with the arm's length principle. The MRDA was drafted by, and imposed upon the other parties by, NNL. It would not be equitable in the circumstances to have regard to its terms if and to the extent that they provide for a different result than was the common intention of the parties.

    209.4. The MRDA expressly recognises that the RPSM was subject to adjustment to achieve an arm's length result.

210. NNUK's direct contribution to the creation of IP is to be increased to take account of indirect contributions, including (in particular) inequitable, unjust, unfair or unconscionable conduct which had the effect of transferring or enabling the transfer of benefit into other entities (and in particular NNL) rather than NNUK, including benefit transferred pursuant to the following:

    210.1. The Interest-Free Loans referred to at section D above.

    210.2. The Project Swift transaction referred to at section E above.

    210.3. The amounts which should have been paid to NNUK (or the amounts paid to NNL by NNUK which should have been retained by NNUK) in order for NNUK to receive a fair market value, arm's length compensation for its distribution activities and its central services.

210.4.    The amounts which NNUK should have received by way of reimbursement of restructuring costs and vendor financing losses, as set out in paragraphs 152 to 156 and 199 above.

210.5.    The amounts by which NNUK's allocation of residual profits should have been increased (or its allocation of residual losses should have been reduced) had headquarter and stewardship costs not been wrongfully allocated to the residual profits pool.

210.6.    The amounts to which NNUK was entitled to under the MRDA (and which should have been paid in cash so as to be available for contribution to R&D) but which were instead added to the amount owing from NNL to NNUK under the Interest-Free Loans.

211.    Accordingly, NNUK is entitled to and claims a proprietary interest in all the proceeds of the IP (including profits earned therefrom and the proceeds of sale of the IP) in the hands of NNL.

212.    Further or alternatively, NNUK has a claim against NNL in respect of its proportionate share of such of the proceeds of the IP as have passed through NNL's hands.

213.    Further by reason of the receipt and retention by NNL of NNUK's property pursuant to breaches of NNL's fiduciary duties as described in the paragraphs above, NNUK is entitled as a matter of law to an equitable lien in its favour of NNUK as against NNL, which extends to all the proceeds of NNL's breach of fiduciary duty (and specifically all such assets in NNL's hands, including assets with which NNUK's property was mixed, or their substitutes). NNUK is entitled to enforce such a lien so as to secure its personal claim against NNL until restoration of NNUK's assets has been achieved. For the avoidance of doubt, any right of election as between this remedy and the enforcement of NNUK's proprietary claim is reserved.

214.    Further or alternatively, if the MRDA or RPSM were to be construed or considered in any way to preclude NNUK's proprietary claim to a beneficial interest in the IP resulting from its direct and/or indirect contributions to IP, then NNUK will contend that (i) the directors of NNUK (including NNL) were in breach of their fiduciary

duties as set out above in causing or allowing NNUK to enter into the MRDA or RPSM without ensuring that its terms ensured that NNUK would obtain or maintain a proportionate beneficial interest in the IP, and (ii) NNL is obliged to account for the profits and benefits it has thereby received, and/or holds the IP (and its proceeds) received by it as a result of the directors' breach of duty on trust for NNUK. Accordingly, in those circumstances, NNUK has the same or the like proprietary claims to the IP and its proceeds (including proceeds of sale) as set out above. Further, NNUK has alternative personal claims against NNL for the loss caused to NNUK by such breach of duty.

**G.3.    Other proprietary claims**

215.    NNUK has other proprietary claims to assets in the hands of NNL, as identified above.

*All proprietary claims – assets inside and outside the Lockbox*

216.    For the avoidance of doubt:

216.1.    To the extent that the proceeds of the IP, and/or any other assets or proceeds to which NNUK maintains its proprietary claims, are represented by sums in the "Lockbox", then NNUK asserts its proprietary claims to the appropriate proportion of, or amount in, the Lockbox

216.2.    To the extent that any of NNUK's proprietary claims to assets or proceeds (including its claim to IP and its proceeds) represented by sums in the Lockbox are not satisfied from the Lockbox, then NNUK maintains it will have a proprietary and/or personal claim to the shortfall from NNL.

216.3.    NNUK asserts its proprietary claims to assets outside the Lockbox, as well as within it.

216.4.    To the extent that any of NNUK's proprietary claims (including its claim to IP and its proceeds) are not satisfied from any other assets to which NNUK asserts a proprietary claim, then NNUK will have a proprietary and/or personal claim to the shortfall from NNL

### G.4.    Other claims to the Lockbox more generally

217.    NNUK asserts claims to the assets in the Lockbox both on the basis of the proprietary claims referred to above and more generally, including on the basis of the proper construction of the Interim Funding Settlement Agreement. As stated above, NNUK's position is that such claims to the allocation of the Lockbox are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

**H.**    **NNUK'S PENSION SCHEME FUNDING CLAIMS**

**H.1.**    **Claim**

218.    NNUK claims against NNL in respect of any and all loss or damage which it has suffered as a result of or in connection with the failure of NNUK to properly fund the Scheme (as defined below).

219.    Without in any way derogating from the generality of the claims set out in paragraph 218 above, NNUK sets out below in sections H.2 to H.8 particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has.  NNUK reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and/or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

**H.2.**    **Introduction**

220.    NNUK is the principal employer of a defined benefit pension scheme known as the Nortel Networks UK Pension Plan ("the Scheme").  The Scheme was originally established on 28 September 1949 and was inherited by the Nortel Group following its acquisition of STC plc during the period between 1987 and 1991.

221.    NNUK has been the principal employer of the Scheme since around June 2000.  The trustee of the Scheme is Nortel Networks UK Pension Trust Limited ("the Trustee").

**H.3.**    **Control over funding decisions and influence over investment strategy**

222.    At all material times:

222.1.    NNL exercised full control over NNUK's decisions as to what contributions, if any, to make to the Scheme; and

222.2.    NNL exercised, or caused NNUK to exercise, influence over the investment strategy adopted by the Trustee.

223.    In the circumstances, NNL either appreciated or ought to have appreciated that the interests of NNUK and its creditors and employees would be best served by the

rapid elimination in any funding deficit of the Scheme through contributions and by the investment of the assets of the Scheme in a relatively conservative manner.

224. NNL:

    224.1.   caused NNUK to make fewer contributions to the Scheme than it should have made;

    224.2.   did not ensure that a more conservative investment strategy was adopted.

**H.4.    Section 75 Debt**

225. On 14 January 2009, NNUK went into administration in England. This event triggered a statutory debt owed by NNUK to the Trustee pursuant to section 75 of the UK Pensions Act 1995 in the approximate amount of GBP £2,100,000,000.00 ("the Section 75 Debt").

226. The Section 75 Debt is significantly larger than it would have been if NNL had ensured:

    226.1.   NNUK made larger and/or earlier contributions to the Scheme; and/or

    226.2.   a more conservative investment strategy was adopted, investing a higher proportion of the assets of the Scheme in bonds rather than equities.

**H.5.    Breaches of duties owed by NNL as *de facto* or shadow director of NNUK**

227. For the reasons described at paragraphs 38 to 40 above, as a matter of English law, NNL was a *de facto* or shadow director of NNUK during the relevant period and, as such, owed fiduciary and other duties to NNUK.

228. Further or alternatively, in light of the facts and matters set out at paragraphs 41 to 42 above, NNL assumed the role of a *de facto* or shadow director of NNUK specifically in respect of:

    228.1.   decisions as to the timing and amount of any contributions to the Scheme; and

    228.2.   decisions as to whether and if so how to seek to influence the investment strategy adopted by the Trustee.

229.     As a *de facto* or shadow director of NNUK, NNL owed all applicable statutory, common law and fiduciary duties deriving from that role.

230.     In this regard, NNL's duties included:

    230.1.    an obligation to have regard to the interests of the employees of NNUK when exercising its powers and discretions; and

    230.2.    given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, an obligation to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.

231.     By causing NNUK to make contributions to the Scheme at a lower level than required and/or causing a relatively aggressive investment strategy to be adopted NNL acted contrary to the best interests of NNUK and otherwise in breach of the duties set out at paragraph 34 above.

**H.6.    Oppression**

232.     Further, or in the alternative, NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors through its involvement in causing NNUK to make contributions to the Scheme at a lower level than required and/or causing the Trustee to adopt and subsequently maintain a relatively aggressive investment strategy. Such conduct was in breach of section 241 of the *Canada Business Corporations Act*.

**H.7.    Losses suffered by NNUK**

233.     As a result of NNL's breaches of duty and/or oppression NNUK has suffered loss and damage.

**H.8.    Remedies**

234.     As a result of the above, NNUK would be entitled to the following relief:

    234.1.    Equitable compensation or damages.

    234.2.    Further or in the alternative, an equitable account of any profits that NNL has made as a result of the breaches of duty described above.

    234.3.    Interest calculated at the commercial rate on a compound basis.

I.      **CUSTOMER RECOGNITION**

235.    At all material times, NNL:

    235.1.   determined which Nortel entity would contract with customers, without making reference to whom would perform the obligations under the contract and whom was the entity that had procured the contract.

    235.2.   determined which Nortel entity would record and receive the revenue earned from customers.

236.    In deciding the matters in paragraph A above, NNL was primarily motivated by a desire to minimise tax that was payable on customer revenues from NNL's perspective and ultimately to maximise cash flows to Canada.

237.    As a consequence, certain Nortel entities were deprived of revenue under customer contracts which were rightfully those entities' to enjoy ("Deprived Entities"). This was not in the Deprived Entities' interest or the interests of its creditors.

238.    As previously stated above, NNL was a de facto and/or shadow director of NNUK.

239.    In any event, by reason of the matters listed above, NNL acted as a de facto director in relation to NNUK's decisions on the revenue it received in relation to customer contracts;

240.    As a consequence NNL owed fiduciary duties to NNL as set out in section D.3.1 above.

241.    From 2000 onwards, given the doubtful solvency (and/or risk of insolvency) of NNUK, the directors of NNUK were obliged to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions..

242.    To the extent that NNUK was a Deprived Entity:

    242.1.   NNL breached those fiduciary duties in not ensuring that NNUK received the revenue it was rightfully entitled to;

    242.2.   In addition or in the alternative, NNL has been unjustly enriched at NNUK's expense.

242.3.   In addition or in the alternative, NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

242.4.   In addition or in the alternative, in connection with customer recognition, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK and it was known that NNUK would be harmed by such conduct.

**I.1.**   **Losses suffered by NNUK**

243.   As a result of the above NNUK has or will have suffered loss and damage.

**I.2.**   **Remedies**

244.   As a result of the above, NNUK would be entitled to the following relief:

244.1.   Equitable compensation or damages.

244.2.   Further or in the alternative, an equitable account of any profits that NNL has made as a result of the breaches of duty described above.

244.3.   Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched.

244.4.   Interest calculated at the commercial rate described above on a compound basis.

## J.    CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS

245.    At various times prior to 14 January 2009 NNUK disposed of assets as part of various co-ordinated business sales with NNL and other Nortel entities

246.    Following those business sales, NNL allocated and/or directed the allocation amongst the Nortel entities, including NNUK, the portion of the proceeds of sale referable to each entity.

247.    Each entity was entitled to a portion of the proceeds that was actually referable to the assets that entity was selling.

248.    To the extent that NNUK did not receive from any business sale, a fair and appropriate allocation of the proceeds for the assets it has sold it has the following claims:

248.1.    A claim under the relevant sale contracts for a fair and appropriate allocation of the proceeds for the assets it has sold.

248.2.    as previously stated above, NNL was a de facto or shadow director of NNUK;

248.3.    in any event, NNL acted as a de facto director in relation to NNUK's decisions on the allocation of proceeds from business sales;

248.4.    as a consequence of the above NNL owed fiduciary duties to NNUK as set out above;  NNL also owed a duty of skill and care;

248.5.    from 2000 onwards, given the doubtful solvency (and/or risk of insolvency) of NNUK, the directors of NNUK were obliged to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions;

248.6.    NNL breached those fiduciary duties and its duty of skill and care in not ensuring that NNUK received its rightful allocation from the business sales;

248.7.    NNUK claims equitable compensation and/or damages as a consequence.

248.8.    Further or alternatively, each of the directors of NNUK owed fiduciary duties as set out above, including a duty of skill and care.

248.9.   In the same manner as NNL set out above such directors breached their duty to NNUK.

248.10.  As a result of the above breaches of duty NNL received greater proceeds from the business sales than it was entitled. At all material times (and by reason of its intimate involvement in NNUK's commercial affairs), NNL was aware of this breach of fiduciary duty and received such sums with such knowledge (and/or identifiable or traceable substitutes of such receipts) and are held on constructive trust for and on behalf of NNUK, and NNL is obliged to account for such sums to NNUK.

248.11.  Further, or in the alternative, NNUK claims equitable compensation or damages on the basis that NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

248.12.  Further, or in the alternative, NNUK mistakenly believed that the allocation it received from the various co-ordinated business sales was a fair allocation representing the assets that it had sold in that at business and/or that it was not entitled to any more than it received. That mistaken belief was either common to NNL and NNUK or was held by NNUK and not corrected by NNL.

248.13.  As a result of such mistaken belief NNUK was deprived of entitlements it should properly have received and/or made payments or gave credits to NNL which were not or ought not have been due, and/or NNL was unjustly enriched at the expense of NNUK.

248.14.  Further or in the alternative, in connection with the allocation of proceeds of business sale, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNUK, and/or (ii) where NNL's conduct was unlawful and directed towards NNUK where it was known that NNUK would be harmed by such conduct

248.15.  On the basis of the above, NNUK also claims interest on all amounts due, including compound interest.

249.     On the basis of the above, NNUK is entitled to the following relief:

249.1.   In the event that NNUK (acting by its office-holders) elects for such a remedy, the setting aside of the relevant transactions as appropriate and in any event an order restoring NNUK to the position it would have been in but for the oppressive conduct of NNL.

249.2.   Damages, or equitable compensation.

249.3.   Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched.

249.4.   Interest on all amounts due, including compound interest.

### K.    FUTURE AND CONTINGENT RIGHTS

250.    Further:

    250.1.    In the event that a claim is made or intimated against NNUK after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NNUK will assert and hereby asserts all rights of contribution and indemnity against NNL. NNUK's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NNUK reserves the right to further identify, particularise and modify all its entitlements in this respect in due course.

    250.2.    NNUK further claims in respect of any future, prospective or contingent claims against NNL that NNUK or any office-holder or future office-holder may have. NNUK reserves the right to advance any prospective, contingent or future claims which may arise or become crystallised at any time hereafter.

251.    Without in any way derogating from the above, NNUK makes the following contingent claims:

***Claims in respect of taxation and revenue***

*Tax*

252.    All relevant decisions in relation to taxation for NNUK was taken and/or directed by NNL.

253.    As previously stated above, NNL was a *de facto* director of NNUK.

254.    In any event, NNL acted *as a de facto* director in relation to NNUK's decisions in relation to NNUK's taxation affairs (alternatively a shadow director owing fiduciary obligations in that regard);

255.  As a consequence NNL owed fiduciary duties to NNUK as set out in section D.3 and a duty of skill and care.

256.  To the extent that any tax authority makes a claim against NNUK in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then:

    256.1.  NNUK claims all penalties, interest and other loss payable by NNUK as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

    256.2.  Further or alternatively:

        256.2.1.  NNL breached its fiduciary duties and its duty of skill and care in not ensuring that NNUK paid the appropriate level of taxation and/or declared the appropriate level of income for tax purposes; and/or

        256.2.2.  NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

    256.3.  Those breaches of duty and/or that oppressive conduct resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NNUK.

257.  On the basis of the above, NNUK is entitled to the following relief:

    257.1.  equitable compensation or damages as a consequence; and

    257.2.  interest on all amounts due, including compound interest.

*Revenue*

258.  To the extent that any entity makes a claim against NNUK on the basis of the over or under recording of its revenue (whether because of section I or otherwise) then:

    258.1.  NNUK claims all penalties, interest and other loss payable by NNUK as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

    258.2.  Further or alternatively:

10/32608320_2

258.2.1. NNL owed fiduciary duties to NNUK as a *de facto* director in relation to NNUK's decisions in relation to its revenue recording (alternatively as a shadow director owing fiduciary obligations in that regard). NNL also owed a duty of skill and care;

258.2.2. NNL breached its fiduciary duties and its duty of skill and care in not ensuring that NNUK was paid and recorded the revenue to which it was entitled; and/or

258.2.3. NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

258.2.4. Those breaches of duty and/or that oppressive conduct resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NNUK.

259.     On the basis of the above, NNUK is entitled to the following relief:

259.1.   equitable compensation and/or damages as a consequence;

259.2.   interest on all amounts due, including compound interest.

## L.    RESERVATION OF RIGHTS

### L.1.    Reservation regarding jurisdiction, applicable law and forum

260.    In so far as liability or quantum in respect of any claim identified in this Proof of Claim is disputed, neither the filing of this Proof of Claim nor anything in its content is to be taken as acceptance that the Canadian Court is the appropriate forum for litigating such dispute or that it has jurisdiction (or should exercise any jurisdiction) to determine the merits of the same. In the event that such a dispute arises, NNUK reserves the right to contend in respect of any of its claim that the appropriate forum for litigating such dispute is a different or foreign forum (and in particular the Courts of England and Wales). Without prejudice to the generality of the foregoing:

260.1.    NNUK reserves its right to contend that the Courts of England and Wales are the relevant jurisdiction and most appropriate forum for determining any dispute in respect of the claims in this Proof of Claim in respect of which the applicable law is English law (although NNUK refers to paragraph 260.2 below).

260.2.    For the avoidance of doubt, all claims and disputes with regard to the allocation of the "Lockbox" are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA Allocation Process").

260.3.    NNUK refers to paragraphs 7 to 11 above and 264 to 269 below in respect of its proprietary claims. NNUK also notes that the amounts recoverable pursuant to this Proof of Claim are dependent upon the outcome of the IFSA Allocation Process.

260.4.    If and to the extent that the Proof of Claims process is relevant at all to any of the claims referred to in the above paragraphs which fall to be dealt with pursuant to the IFSA Allocation Process or the Courts of England and Wales, NNUK will contend (and/or reserves the right to contend) that at the very least such process should be stayed in respect of such claims pending resolution of the substantive dispute in the appropriate forum.

261.    In so far as this Proof of Claim refers to any/or includes claims which may be brought by any office-holder of NNUK pursuant to any applicable law:

261.1.    Such reference and/or inclusion is not to be taken as acceptance that such claim is or has been a claim subject to the bar date.

261.2.    Such claim is to be read together with any Proof of Claim (or other process) submitted or commenced by any appropriate office-holder (as to which NNUK accepts that there should be no double-counting).

262.    In so far as this Proof of Claim identifies a foreign law as being applicable to the claim, NNUK's primary case is that this is the law that should be applied. However:

262.1.    In so far as the Proof of Claim is silent as to applicable law, this is not to be taken as acceptance that Canadian law is, or is necessarily, the applicable law, and NNUK reserves the right further to identify appropriate foreign law as being the law applicable to its claims.

262.2.    NNUK reserves the right to alter the law (or jurisdiction or forum) identified as being appropriate for its claims.

262.3.    For the avoidance of doubt, in so far as (by way of primary case) a proper law, forum or jurisdiction is identified other than that of Canada, NNUK reserves the right to abandon that primary case with the result that (absent the identification of some other law, forum or jurisdiction) Canadian law, jurisdiction and forum is to be treated as being applicable, and to that end all such claims in this Proof of Claim are to be treated as including a claim in the alternative based on Canadian law (and where the Courts of Canada are the appropriate forum or jurisdiction).

**L.2.    Reservation in respect of claims from NNL and alleged set-off**

263.    Nothing in this Proof of Claim is to be taken as acceptance that any claim from NNL against NNUK exists, is valid or is eligible for set off against any of NNUK's claims. Further nothing in this Proof of Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNL against NNUK is the Courts of Canada (or the proof of claims process in Canada), whether

in the context of an allegation that such claim has been or should be the subject of a set off against any claim by NNUK or otherwise.

**L.3.    Reservation in respect of proprietary claims**

264.    Any reference to NNUK's proprietary claims in this document are to be read subject (and without prejudice) to the primary contention set out in paragraph 260 above.

265.    Any reference herein to NNUK's proprietary claims is not to be read as an acceptance that those claims are required to be filed by the bar date (indeed the inclusion of any claim in this Proof of Claim is not to be taken as acceptance that such claim is or has been a claim that was, or was necessarily, required, to have been filed ahead of the bar date of 18 March 2010), or that (in the event of dispute) the appropriate forum for the resolution of any of those claims (which are not unsecured creditor claims) is the Proof of Claim process in Canada.

266.    NNUK's proprietary claims constitute claims and rights which fall outside the EMEA Claims Process, being claims in respect of property which NNL does not own.

267.    As such, NNUK's proprietary claims are included in this Proof of Claim without prejudice to NNUK's rights to claim this property in other proceedings or processes and to asserts its rights to seize this property without reference to the EMEA Claims Process.

268.    For the avoidance of doubt all references herein to NNUK's proprietary claims are to be read as including a personal claim over against NNL (both for the amount of the claims and for interest thereon) to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

269.    NNUK repeats its contention at paragraph 260.2 above that the resolution of its proprietary claims should be dealt with in the IFSA Allocation Process (at least in the first instance, and/or in so far as those proprietary claims relate to assets in the Lockbox) and that to the extent that any dispute resolution process (including any part of the Proof of Claim process) should properly be dealing with any part of those proprietary claims (and in particular proprietary claims to assets falling outside the

Lockbox), such process should be deferred until after the IFSA Allocation Process has taken place.

**L.4.    Reservation in respect of claims against other parties**

270.    For the avoidance of doubt, all claims and allegations made against NNL made in this Proof of Claim are made without prejudice to all claims and allegations that NNUK has made or may make in this Proof of Claims process or otherwise against any other person (including NNC, NNI, and any present or former officer of NNUK, NNI, or any other natural or corporate person whomsoever).

# TAB " C "

THE FOLLOWING IS EXHIBIT "C" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014

_____
COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit C – NN UK Claim filed against Nortel Networks Corporation ("NNC")**

**CANADIAN CCAA Proof of Claim**    **re Nortel Networks Corporation and others**

**❶ Name of Debtor (the "Debtor")**

Debtor: Nortel Networks Corporation

**❷ Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks UK Limited | |
| Address<br>C/O The Joint Administrators<br>Ernst & Young LLP<br>1 More London Place | Phone # |
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| London | | SE1 2AF | |

**❸ Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |
| Address | Phone # |
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹ Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked*    *(Check only if applicable)*

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | See attached |
| | | ☐ | ☐ | ☐ | ☐ Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺ Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻ Certification**

I hereby certify that:

- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

| Signature | Name<br>C.J.W. HILL |
|---|---|
| | Title<br>JOINT ADMINISTRATOR |
| Dated at<br>18/3/11 | Signed at<br>LONDON |

This space reserved for use by the Monitor

**❼ Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

Proof of Claim by Nortel Networks (UK) Limited
against Nortel Networks Corporation:


Particulars of the Claim
under section 5 of the Proof of Claim

1.  This document provides particulars of the Claim by Nortel Networks (UK) Limited ("NNUK") against Nortel Networks Corporation ("NNC") as required by section 5 of the Proof of Claim to which this document is attached.

2.  This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3.  The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of NNUK and its office-holders. NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4.  NNUK refers to, relies on, and hereby incorporates and adopts, the contents of the Proof of Claim filed by NNUK against NNL ("the NNL Proof") including the claims identified in the NNL Proof together with the relief (and quantum of the same) to which NNUK is entitled.

5.  In the NNL Proof, NNUK advances a number of claims against NNL on the basis of breach of fiduciary duty by NNL in its capacity as de facto, alternatively shadow, director of NNUK, together with related claims deriving from NNL's involvement in NNUK's decisions to enter the relevant transactions, in particular claims for:

    (a)  Unjust enrichment;

    (b)  Oppression;

    (c)  Conspiracy; and

    (d)  Contingent claims to a contribution, and claims in respect of taxation, recording of revenue and any FSD liability.

6.      NNUK advances the same claims against NNC, for the same relief, on the basis that NNC itself owed fiduciary duties to NNUK as a de facto, alternatively, shadow director of NNUK and that NNC was closely involved in and took responsibility for the management of NNUK's affairs.  In this context NNUK will rely, amongst other things, on the fact that NNC shared the same directing mind and will as NNL and that there was a co-identity in the decision-making individuals and processes at both entities.  NNUK contends that in all the circumstances the conduct of NNL as de facto or shadow director of NNUK (and its conduct more generally in respect of the management of and influence on the affairs of NNUK) can be taken to be the conduct of NNC as de facto or shadow director (or otherwise in respect of the management of and influence on the affairs) of NNUK.  NNUK accordingly refers to the matters relied in support of the above allegations against NNL as being also attributable to, or relevant to liability on the part of, NNC.

7.      Further, to the extent that NNC received (whether directly or indirectly) any of the benefits transferred from NNUK by reason of the matters set out in the NNL Proof referred to above, NNC is liable for unconscionable receipt in respect of the same, having the same knowledge as NNL. NNC was aware of the breaches of fiduciary duty, and received any such benefits with such knowledge, such that any such benefits (and/or the identifiable or traceable substitutes of such receipts) were received and are held on constructive trust for and on behalf of NNUK, and NNC is obliged to account for such sums to NNUK.

8.      NNUK further asserts against NNC its claims to the Lockbox as referred to in the NNL Proof mutatis mutandis.

9.      **This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL Proof as if all references to NNL are to be taken to be references to NNC, mutatis mutandis, including but not limited to reservations in respect of applicable law, jurisdiction and forum.**

# TAB " D "

THE FOLLOWING IS EXHIBIT "D" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014


_____
COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit D – NN UK Claim filed against the Directors & Officers of NNC & NNL**

**CANADIAN CCAA Proof of Claim**    re Nortel Networks Corporation and others

**❶ Name of Debtor (the "Debtor")** *DIRECTORS AND OFFICERS OF*
Debtor: *NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED*

**❷ Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks UK Limited | |
| **Address** <br> C/O The Joint Administrators <br> Ernst & Young LLP <br> 1 More London Place | **Phone #** <br><br> **Fax #** |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| London | | SE1 2AF | |

**❸ Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |
| **Address** | **Phone #** <br><br> **Fax #** |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹ Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

*Claims will be recorded as "Unsecured" unless the "Secured" box is checked*    *(Check only if applicable)*

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | See attached |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ |

**❺ Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻ Certification**

I hereby certify that:
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

| Signature | Name  *C.J.W HILL* |
|---|---|
| | Title *JOINT ADMINISTRATOR* |
| **Dated at** *18|3|11* | **Signed at** *LONDON* |

**❼ Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks (UK) Limited**
**against the Officers and Directors of**
**Nortel Networks Limited and Nortel Networks Corporation:**

**Particulars of the Claim and supporting documentation**
**under section 5 of the Proof of Claim**

## A: THIS DOCUMENT

1.  This document provides particulars of the Claims by Nortel Networks (UK) Limited ("NNUK") against those officers and directors of Nortel Networks Limited ("NNL") and Nortel Networks Corporation ("NNC") which, at any given time, were also de jure directors of NNUK, as required by section 5 of the Proof of Claim to which this document is attached.

2.  This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3.  The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of the NNUK and its office-holders. NNUK reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum in due course, including as a result of documentary and other information obtained from NNL, NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4.  NNUK refers to the contents of the Proofs of Claim filed by NNUK (i) against NNL ("the NNL Proof"), and (ii) against NNC ("the NNC Proof"), together, "NNL/C Proofs") and adopts and repeats the contents of the NNL/C Proofs in this Proof of Claim.

5.  In the NNL/C Proofs, NNUK advances a number of claims against NNL and/or NNC on the basis of breach of fiduciary duty by NNL and/or NNC in its capacity as de facto, alternatively shadow, director of NNUK, together with related claims deriving from NNL's and/or NNC's involvement in NNUK's decisions to enter the relevant transactions. Certain of these claims relate to the conduct of officers and directors of NNL and/or NNC who were also, at the relevant time, de jure directors of NNUK.

6.  NNUK does not accept that any claims against its de jure directors for breach of fiduciary duty (or otherwise) are claims subject to the bar date. However, they are being included in this Proof of Claim in order to protect NNUK's position in the event that such claims are deemed to be subject to the bar date on the basis that certain conduct, acts or omissions by the de jure directors of NNUK were or might be related or interlinked with (or may be said to amount to) those directors' conduct, acts or omissions as officers and/or directors of NNL and/or NNC.

7.  The Claims are still being investigated. Pending further investigation, NNUK cannot specify the names of the relevant officers and directors of NNL and/or NNC.

8.  NNUK advances the Claims for relief, on the basis that the relevant officers and/or directors of NNL and/or NNC owed fiduciary duties to NNUK as de jure directors of NNUK and breached such duties. NNUK is entitled to equitable compensation, damages or any other relief that is deemed fit. The quantum of the Claims is not capable of determination at the present time.

9.  This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL/C Proofs, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

# TAB " E "

THE FOLLOWING IS EXHIBIT "E" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014

_____
COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit E – Nortel Networks Polska Sp z.o.o. ("NN Polska")
Claim filed against NNL**

**CANADIAN CCAA Proof of Claim**   re **Nortel Networks Corporation and others**

**❶   Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Limited

**❷   Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks Polska Sp z.o.o. | |
| Address | Phone # |
| C/O The Joint Administrators | |
| Ernst & Young LLP | Fax # |
| 1 More London Place | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| London | | SE1 2AF | |

**❸   Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |
| Address | Phone # |
| | Fax # |
| | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹   Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

Claims will be recorded as "Unsecured" unless the "Secured" box is checked    (Check only if applicable)

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

See attached

Particulars of Claim

**❺   Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻   Certification**

I hereby certify that:
● I am the Creditor, or authorized Representative of the Creditor.
● I have knowledge of all the circumstances connected with this Claim.
● The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
● Complete documentation in support of this claim is attached.

| Signature | Name |
|---|---|
| | C. J. W HILL |
| | Title |
| | JOINT ADMINISTRATOR |
| Dated at    18/3/11 | Signed at    LONDON |

This space reserved for use by the Monitor

**❼   Filing of Claim**

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-842-7177 or 416-943-4438
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

Proof of Claim by Nortel Networks Polska Sp z.o.o
against Nortel Networks Limited:

Particulars of the Claim
under section 5 of the Proof of Claim

Index

| A: | Introductory section | page 2 |
|----|----------------------|--------|
| B: | Debt claims | page 4 |
| C: | Claims in respect of transfer pricing | page 5 |
| D: | Proprietary claims | page 19 |
| E | Pension funding claims | page 21 |
| F: | Claims in respect of past dispositions of business | page 21 |
| G: | Future and contingent claims | page 23 |
| H: | Reservation of rights | page 28 |

## A.    INTRODUCTORY SECTION

### A.1.    This document

1.    This document provides particulars of the Claim by Nortel Networks Polska Sp z.o.o ("NN Poland") against Nortel Networks Limited ("NNL") as required by section 5 of the Proof of Claim to which this document is attached.

2.    NN Poland was incorporated in Poland and is a limited risk distribution entity ("LRE") in the Nortel Networks Group. It is wholly owned by Nortel Networks International Finance Holdings which is owned by Nortel Networks UK ("NNUK"). NNUK is owned by NNL.

3.    This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

4.    The documentation supporting the Claims set out herein is extensive and will be provided as part of the agreed upon or court ordered process. In addition, NN Poland notes that a significant proportion of the evidence relevant to NN Poland's claims is held by NNL and has not yet been made available to NN Poland (or to the limited extent that it has been made available, is subject to confidentiality and without prejudice restrictions preventing NN Poland providing such evidence together with this Proof of Claim).

5.    The Claims and the quantum (including interest) of the same set out in this Proof of Claim represent the best current assessments on the part of NN Poland and its office-holders. NN Poland reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNL (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

### A.2.    Reservations of rights

6.    This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in this document, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

### A.3.    Proprietary claims

7.    The Claims referred to in section D of this document are proprietary claims.

8.      NN Poland's case is that in so far as its claims are proprietary claims, they attach to the assets that are the subject of them and/or their identifiable or traceable substitute (and all profits made thereon) in NNL's hands.  Such assets are in these circumstances the property of NN Poland.  NN Poland is entitled to those assets in full (failing which it is entitled to equitable compensation for their value in full, together with interest in equity on a compounded basis).  The assets which are the subject of these proprietary claims fall outside the insolvent estate of NNL, are NN Poland's, and are not available for distribution to any of NNL's creditors.

9.      In so far as NN Poland's proprietary claims are not able to be satisfied out of the assets that are properly the subject of those claims, NN Poland will have a claim against NNL for the deficiency.

10.     In this context, as explained below, NN Poland is entitled to assert an equitable lien over NNL's assets (both inside and outside the Lockbox[1]) if NNL elects to do so in respect of the diversion of resources from NN Poland as a result of the wrongful conduct of NNL.

11.     NN Poland refers further to section E below in respect of its proprietary claims.

**A.4.    Security**

12.     Save as pleaded above and the parts of this Proof of Claim to which those paragraphs refer NN Poland's claims are not secured.

---

[1] Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds held pursuant to escrow agreements ("the Lockboxes"), to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA")

**B.      DEBT CLAIMS**

13.      NN Poland has the following debt claims against NNL:

13.1.    A claim in respect of the outstanding intercompany trading debts as between the two entities.

13.2.    As at 14 January 2009, the balance of the intercompany trading debts owed by NNL to NN Poland stood at CAN$325,000.00. As such, this amount is contractually due and payable to NN Poland by NNL together with interest to be assessed to the best of NN Poland's knowledge. Alternatively, NN Poland is entitled to damages in this amount for breach of contract.

C.      **CLAIMS IN RESPECT OF TRANSFER PRICING**

**C.1.    The Claim**

14.     NN Poland claims against NNL in respect of any and all loss or damage which it has suffered (and or to assert any proprietary rights which it has) as a result of or in connection with the transfer pricing arrangements which it was subject to from 1 January 2001 to the Filing Date.

15.     Without in any way derogating from the generality of the claims set out above, NN Poland sets out below particulars of those claims and the quantum of those claims as best as it is currently able on the basis of the information that it currently has. NN Poland reserves its right to alter, add to or otherwise amend the below facts relied on in support of the claims, the nature and or quantum of the claims, including as a result of documentary and other information obtained from NNL (or others) and to the extent that expert evidence may be required in order to establish quantum.

**C.2.    Transfer Pricing**

**C.2.1.   Overview**

16.     Transfer pricing is a mechanism which is intended to ensure that intra-group trading of a multinational group is performed on a basis which (i) enables an allocation of profit across the countries in which it trades (and across the entities within the group) in a manner which replicates an arm's length situation and (ii) avoids double taxation.

17.     It is a fundamental part of transfer pricing that individual group members structure their commercial affairs on the basis that they act at arm's length in their dealings with each other ("the arm's length principle").

18.     The OECD has developed and published Guidelines ("the OECD Guidelines") detailing the approach which multinational groups should take to determine their allocation of profits, in accordance with the arm's length principle. The arm's length principle is also reflected in Article 9 of the OECD Model Tax Convention, which states that:

> "[where] conditions are made or imposed between two [associated] enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which would, but for those conditions, have accrued to one of the enterprises, but, by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly."

19.     The OECD Guidelines outline a number of different transfer pricing methods and outline a transactional profit method which is consistent with the arm's length principle, namely the "profit split method".

### C.2.2.    Transfer Pricing within the Nortel Group

20.     Prior to 2001, the Nortel Group had used a Cost Sharing Arrangement or Cost Contribution arrangement ("CSA" or "CCA") to deal with research and development ("R&D") and resulting intangibles.   From 2001, the transfer pricing methods were revised, and thereafter a residual profit split method ("RPSM") was used.

21.     These claims relate to the RPSM imposed on NN Poland and operated by the Nortel Group from 2001 to 14 January 2009.

22.     The move to an RPSM was primarily motivated by a desire to allocate more profit to NNL.  NNL was seen as a "tax haven" because it had extensive tax losses, and because Canada had a system of R&D tax credits which could shelter a greater level of profits. Under the previous cost sharing method, NNL did not derive a great deal of profit. However, using an RSPM which used R&D expenditure as the key means of allocating residual profit going forward would see much more profit allocated to NNL.

23.     Under the RPSM, the Residual profit entities ("RPEs") remained beneficial or economic owners of the intangible assets and IP that they had created and/or contributed to.

24.     The RPSM approach used by Nortel made a distinction between two types of RPSM participants.

    24.1.    "RPEs" (also sometimes referred to as "integrated entities") are those entities which had been actively engaged in R&D, but also engaged in manufacturing and distribution activities.  These included NNL, NNI, NNUK, NNSA, NN Ireland and Nortel Networks Australia Pty Ltd ("NN Australia")[2].

    24.2.    "LREs" are those entities which had not been engaged in R&D activities, but rather performed routine distribution functions, such as sales and support services, and distributing and installing Nortel products.   NN Poland is an LRE.

25.     In brief, under the RPSM arrangements from 2001 onwards:

---

[2] Until 2008 when NN Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005, and ceased to be an RPE

25.1. Both RPEs and LREs, regardless whether or not they undertook R&D activities, were first rewarded with a routine return.

25.2. These returns then formed the basis for determining the level of residual profits (or losses) attributable to the Nortel Group's intangible development activities (i.e. R&D).

25.3. The residual profits (or losses) were then divided between the RPEs only based on their proportional contribution to R&D activity.

26. Whilst Nortel adopted an RPSM throughout the period 2001 to 14 January 2009, the RPSM methodology was amended from 2006 onwards (inclusive). For this reason NN Poland claims in respect of transfer pricing are dealt with below in respect of two distinct time periods: 2001 to 2005 and 2006 to 14 January 2009.

27. There were a number of flaws in the RPSM in fact employed by the Nortel Group, with the consequence that it resulted in outcomes which did not comply with the arm's length principle, did not properly or fairly reward certain entities (including NN Poland) and resulted in an improper transfer of value to NNL.

28. In this regard, the US Inland Revenue Service ("IRS") challenged the 2001 to 2005 model. Such challenge resulted in a US$2 billion adjustment being made in favour of NNI. The IRS required that NNL decrease the amount of income reported on its Canadian income tax returns by US$2 billion, and that NNI increase the amount of income reported on its US income tax returns by US$2 billion, being US$400 million for each of the years 2001 – 2005. These adjustments were said to reflect net overpayment made by NNI to NNL for those tax years. An adjustment of this magnitude plainly calls into question the arm's length nature of that model. It also reflects the fact that the RPSM methodology employed was designed to benefit NNL at the expense of others in the group.

**C.2.3.    The operation of RPSM from 2001 to 2005**

<u>Routine Returns for LREs, 2001-2005</u>

29. Routine Returns for LREs in the period 2001-2005 were calculated using the transactional net margin method and an operating margin profit level indicator.

30. In practice, the margins used for the LREs' Routine Returns were as follows:

30.1.    In 2001, the ranges fluctuated from entity to entity, ranging from 1% to 4.8% of sales to third parties (although the majority earned less than a 2% operating margin). NN Poland earned an operating margin of 2.2%.

30.2.    In 2002, the margin was 0% on third party sales.

30.3.    In 2003-2005, the margin was 1% of third party sales.

31.    The LREs did, however, bear certain risks and costs outside of the routine return.

Routine Returns for RPEs, 2001-2005

32.    Routine Returns for RPEs for the period 2001-2005 were calculated using an adjusted return on net assets ("RONA"). The RONA return was intended to reflect the RPEs' manufacturing and related support functions, and was calculated by applying a return to short-term assets and a second return to long-term assets.

33.    The RPEs bore certain risks and costs outside of this return.

Residual Profits, 2001-2005

34.    The residual profits to be allocated to RPEs in the Period 2001-2005 were determined as follows:

34.1.    Consolidated economic profit or loss for the Group was calculated[3]. Economic profit for each RPE was calculated by adding back to each entity's operating profit all R&D expenses incurred in a particular year, and then subtracting from this figure the amortised portion of the entity's R&D capital stock for that year. As LREs did not incur R&D costs, their economic profit was the same as their accounting profit.

34.2.    The residual profits (or losses) for the Group were then calculated by subtracting from the consolidated economic profit the consolidated routine returns allocated to the RPEs and LREs.

---

[3] There is a distinction to be made between accounting profit and economic profit. Accounting profit is based on accounting standards and the principles of conservatism embodied in those standards. The calculation of economic profit attempts to capture the true economic life of assets and the corresponding depreciation or amortization value to be used in this computation in a particular period. Given that Nortel's transfer pricing methodology was founded on the assumption that R&D is the primary driver of intangible profit, economic profit was used to reflect that the benefits accruing from an investment in R&D are not wholly realized in the year in which the investment is made, but over the course of a number of years in the future.

34.3.   This consolidated residual profit or loss was then allocated to each of the RPEs on the basis of their relative proportion of consolidated R&D capital stock in a given year.

35.   Each RPE's RPSM profit or loss (i.e. to which it was "entitled" under the scheme) was then calculated as the sum of its share of any residual profit or loss for a given year and its routine return.

36.   The difference between each entity's RPSM profit and its economic profit (i.e. which it had actually earned) formed the basis for an adjustment to accounting profit (if necessary) for the entity in a particular year (the "transfer pricing adjustment").

**C.2.4.   Operation of RPSM from 2006 to 2009**

<u>Routine Returns, 2006-14 January 2009</u>

37.   From 2006 onwards the RONA routine return which RPEs had previously received was replaced and RPEs were provided first with a routine return for their distribution activities ("Distribution Return"), of an adjusted operating margin return of 1% of third party sales.  The LREs and RPEs therefore were both subject to the same routine return from 2006 onwards.  They both continued to bear certain costs outside of their routine return as previously explained above.

38.   RPEs also incurred selling, general and administrative expenses part of which, the "excess costs", were considered to benefit other Nortel Group entities outside their own respective territories ("excess central services expenses").  From 2006 onwards the RPEs received a profit mark-up of 15% on their excess central services expenses.

<u>Residual Profit, 2006-2009</u>

39.   Residual profits and losses were calculated by subtracting from the Group's consolidated adjusted operating profit[4] the consolidated routine returns allocated to each of the LREs and RPEs.  From 2006 onwards, residual profits were then allocated to each of the RPEs based on their relative proportion of Nortel's consolidated R&D expenditure over the preceding five years.

40.   From 2006 onwards, accounting profit was used rather than economic profit.

---

[4] Consolidated operating profit was adjusted to remove the operating profit or loss of certain joint venture companies, and also to deduct amortization of intangibles, gain or loss on the sale of business, restructuring and stewardship costs (see Schedule A of the MRDA, as amended by the Third Addendum to the MRDA).

**C.2.5.    Master Research and Development Agreement ("MRDA")**

41.    The MRDA is an agreement between the RPEs that provides the architecture, and contractual basis, to enable the RPSM (from time to time) to be applied.

42.    The MRDA was entered into on 22 December 2004, effective from 1 January 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland (i.e. the RPEs referred to above, defined in the MRDA as "the Participants"). It covered both of the periods of time referred to above, and was amended from time to time by Addenda.

43.    The MRDA determined the overall transfer pricing adjustments for the Nortel group.

    43.1.    The MRDA provided (in Schedule A, as substituted by the Third Addendum to the MRDA) that:

        43.1.1.    A "Functional Rate of Return" would be provided to each Participant as compensation for its distribution function and other activities that support revenue outside of the Participant's country of residence.

        43.1.2.    LREs (defined as "Nortel Distribution Entities") would be provided with a "Functional Routine Return" as compensation for their distribution function and ancillary services. This was said to be generally a nominal amount of operating earnings ranging from 0% to 4% of sales, as determined "based on current industry standards and third party studies".

        43.1.3.    The steps for calculating the R&D Allocation for each Participant were then set out.

**C.2.6.    The Distribution Agreement**

44.    NN Poland and NNL entered into a Distribution Agreement, effective as of 1 January 2001 ("the Distribution Agreement"), which set out the transfer pricing arrangements to which NN Poland was subject and provided, amongst other things, that:

    44.1.    NN Poland distributed various "NN Products" (as defined in the Distribution Agreement) in the Poland region;

    44.2.    NN Poland's distribution activities included the sale of NN Products and the provision of related services (engineering, customer support and training);

    44.3.    The parties were entering into the Distribution Agreement to set forth the terms and conditions pursuant to which the parties would ensure that NN Poland

earned a reasonable arm's length rate of return for its distribution and service-related activities;

44.4.   A "reasonable arm's length return" would be equal to an operating margin between 0% and 4%, determined using NN Poland's US GAAP financial results in US dollars;

44.5.   The reasonable arm's length return would be determined by NNL (with the assistance of NN Poland), based on relevant factors including:

44.5.1.   The functions performed by NN Poland;

44.5.2.   The risks undertaken by NN Poland;

44.5.3.   The returns employed by comparable companies to NN Poland;

44.5.4.   The concepts and directions provided by the OECD Guidelines;

44.6.   If NN Poland's actual return (based on its operating income) for a particular year was less than a reasonable arm's length rate of return, NNL would pay the difference to NN Poland.

44.7.   If NN Poland's actual return was greater than a reasonable arm's length return, NN Poland would pay the difference to NNL.

44.8.   Any amount payable by NNL to NN Poland in accordance with paragraph 44.6 above would be adjusted by transactional foreign exchange gains and losses.

44.9.   The term of the Distribution Agreement would commence on 1 January 2001, and would end on 31 December 2002, but would be automatically renewed for additional one year terms after 31 December 2002, unless terminated earlier pursuant to Article 6 of the Distribution Agreement.

**C.3.    Claims arising out of the operation of transfer pricing**

45.    There are claims set out below pursuant to both English law and Polish law.

**C.3.1.    Routine Return on Sales**

46.    As set out above, NN Poland was entitled pursuant to the Distribution Agreement to a *"reasonable arm's length return"* for its distribution and service related activities.

47.    It was also an express term of the MRDA that the routine return for each LRE would represent an arm's length compensation for its distribution function and ancillary

services, which would be determined based on current industry standards and third party studies (see paragraph 3(iii) of Schedule A, as amended by the Third Addendum).

48.    Alternatively, a term to the above effect is to be implied into the MRDA as a necessary, obvious and reasonable term to give business efficacy to the contract, which was intended (and required) to be consistent with the arm's length principle.

49.    NN Poland received routine operating margin returns of:

49.1.    2.2% on third party sales in 2001;

49.2.    0% on third party sales in 2002;

49.3.    1% on third party sales thereafter.

50.    In breach of the distribution agreement, and in breach of the MRDA and RPSM, the returns received by NN Poland over the period 2001 to the Filing Date did not represent a reasonable arm's length return for its distribution and service activities. In this regard:

50.1.    No independent distributor performing equivalent functions to NN Poland would have entered into distribution agreements on terms that it would receive the returns that NN Poland in fact received.

50.2.    A distribution return of only 1% on third party sales fails to recognise or adequately recognise significant customer intangibles, the service element performed alongside the distribution function or the risks and costs borne outside the return.

50.3.    Indeed, given that the 1% margin was so low, and given that the entities would also bear risks and costs which were excluded from the cost base in determining the 1% return, and hence fell outside that margin, LREs were often pushed into a loss position. This is also inconsistent with an arm's length approach.

50.4.    NN Poland bore the following risks in particular which an independent party acting at arm's length and receiving a return of only 1% would not be prepared to accept:

50.4.1.    Translational foreign exchange risks:

50.4.1.1.    NN Poland received payment of routine returns in US dollars and by reference to operating margins calculated in accordance with US GAAP.

50.4.1.2. An independent party in an arm's length situation would seek to be reimbursed for its revenues and costs incurred based on its local GAAP financials, and to receive payment in local currency.

50.4.1.3. Accordingly, and given the intended limited risk profile of NN Poland, it should not have been subject to the risks associated with any translational foreign exchange, or it should have received a higher return to reflect that they were subject to such risks.

50.4.2. <u>Hedging gains / losses:</u>

50.4.2.1. NN Poland was not responsible for undertaking hedging activities.

50.4.2.2. An independent party in an arm's length situation would not accept being subject to the risks and costs associated with such activities in circumstances where it was not involved in their management.

50.4.2.3. Accordingly, and given the limited risk profile of NN Poland, it should not have been subject to the risks associated with hedging activities, or it should have received a higher return to reflect that they were subject to such risks.

50.5. The tax authorities in Poland have investigated the level of returns paid to NN Poland, and they have asserted that an arm's length return would be 3%. (The tax authorities in Italy and Hungary have similarly asserted that the rate of return received by the distribution entities in those countries was not an arm's length rate of return.)

51. NN Poland's claims in relation to routine returns (as set out below) are advanced in this Proof on the basis that an arm's length return for its distribution and service activities would have been a return of 3% of sales, as has been asserted by the Polish Tax Authorities. As set out above, NN Poland reserves the right to add to and/or modify these claims and their amounts in due course, including as a result of documentary and other information obtained from NNL and to the extent that expert evidence may be required in order to establish quantum.

### C.3.2.    Restructuring Costs

52.    From 2001 onwards, the Nortel Group faced continual downsizing and restructuring costs. Prior to 2001, NNL had made decisions in relation to demand planning which had required RPEs and LREs to increase their capacity. When the downturn arose in 2000-2001, those entities were then faced with considerable restructuring costs. Restructuring costs were regularly borne by the RPEs and LREs over the course of 2001 to the Filing Date. NN Poland bore such costs and suffered significant loss as a result.

It is not consistent with the role and characterisation of NN Poland as a limited risk entity that it should bear the costs of restructuring activities, given in particular that such costs are reasonably regular in their occurrence and given that these costs resulted from decisions taken by, and instructions given by, NNL. An independent party acting at arm's length would not agree to bear these costs. In an arm's length situation, NNL would agree to reimburse a portion of the restructuring costs incurred by NN Poland. A reimbursement of 75% of restructuring costs was made in 2002 but not in other years. Accordingly, a figure of 75% is used as a basis for the claim set out below.

### C.3.3.    Claims arising

### C.3.3.A   Breach of the Distribution Agreement

53.    In breach of the Distribution Agreement, NNL failed to pay a reasonable arm's length rate of return to NN Poland, in that:

    53.1.    The routine returns attributed to NN Poland over the period from 2001 to the Filing Date did not represent a reasonable arm's length return for its distribution and service activities, for the reasons given above.

    53.2.    The result of NNL requiring NN Poland to bear restructuring costs, without reimbursing such costs (save in 2002) or increasing the routine return paid to NN Poland to cover such costs, was that NN Poland did not receive a reasonable arm's length return for its distribution and service activities, in breach of the Distribution Agreement (and would not have done so in relation to bearing restructuring costs even if it had received a return of 3% of sales, as described above).

54.    By reason of NNL's breach of the Distribution Agreement NN Poland has suffered loss and damage, for which NNL is liable, in an amount presently quantified at approximately:

54.1.    US$9.6 million, that being the difference between the return in fact attributed to NN Poland and a return of 3% of sales, over the period from 2001 to the Filing Date; and

54.2.    US$99,000, that being the additional amount which should have been reimbursed to NN Poland in respect of restructuring costs over that period.

54.3.    Interest of US$1.7 million.

**C.3.4.    Further claims in relation to transfer pricing**

55.    In connection NN Poland's further claims as set out in this section of the Proof of Claim, all decision making in relation to the entry into, operation of and subsequent amendment of the RPSM was in practice taken by NNL. NNL was acting at all times in its own best interests instead of those of NN Poland. NN Poland refers to the following:

55.1.    The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officers of NNL.

55.2.    The decision to implement the RPSM was taken by NNL, with the involvement of NNI. NN Poland was not involved in the decision whether to change from the previous costs sharing arrangements to RPSM.

55.3.    Similarly, NN Poland had no involvement in the creation of the RPSM model. The RPSM model was created by NNL (with the assistance of NNI) in conjunction with Arthur Anderson as professional advisers.

55.4.    NN Poland was only informed of the change to the RPSM after the RPSM had been implemented.

55.5.    NN Poland was not involved in the decision to enter into the Distribution Agreement or in the decision regarding what the terms of the MRDA would be. The terms of the MRDA were determined by NNL and NNI.

56.    In so doing, NNL acted contrary to the interests of NN Poland and its creditors, and favoured its own interests over those of NN Poland.

**C.3.4.A  *Unjust Enrichment***

57.    In addition or in the alternative to its claims dealt with earlier in this Proof of Claim, through its involvement in the Distribution Agreement and NN Poland's transfer pricing arrangements as detailed above, NNL has been unjustly enriched at NN Poland's expense.

**C.3.4.B** *Oppression*

58.     In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive and unfairly disregarded the interests of NN Poland and its creditors through its involvement in the Distribution Agreement and NN Poland's transfer pricing arrangements as identified above contrary to section 241 of the *Canada Business Corporations Act*.

**C.3.4.C** *Conspiracy*

59.     In addition or in the alternative, in connection with the scheme of NN Poland's entering into the Distribution Agreement and the transfer pricing arrangements as identified above, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NN Poland, and/or (ii) where NNL's conduct was unlawful and directed towards NN Poland where it was known that NN Poland would be harmed by such conduct.

**C.3.4.D   Relief sought in relation to the claims at C.3.4.A-C above**

60.     In relation to the claims at C.3.4.A-C above, NN Poland is entitled do the following relief:

      60.1.     In the event that NN Poland (acting by its office-holders) elects for such a remedy, the setting aside of the transactions referred to above as appropriate and in any event an order restoring NN Poland to the position it would have been in but for the oppressive conduct of NNL.

      60.2.     Damages, or equitable compensation

      60.3.     Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched,

      60.4.     Interest on all amounts due, including compound interest.

**C.3.4.E   Transaction at an undervalue**

61.     Further, or alternatively, NN Poland has the following claims under the UK insolvency legislation.

62.     NN Poland entered administration in England and Wales on 14 January 2009.

63.     In such circumstances, the administrator of NN Poland is entitled to, and seeks, pursuant to section 238 of the Insolvency Act 1986, an order that the position of NN Poland

should be restored to the position that it would have been if NN Poland had not entered into a transaction at undervalue:

63.1.   Between 14 January 2007 and 14 January 2009, NN Poland made payments to NNL in respect of the difference between its actual return and the routine return it was allowed by NNL;

63.2.   Such payments represented transactions at undervalue for the purpose of section 238(4) of the IA 1986, being transactions for which NN Poland received no consideration and/or being transactions where the value of the consideration provided by NNL was, in money or in money's worth, significantly less than the value, in money or money's worth, of the consideration provided by NN Poland.

63.3.   These transactions at undervalue were entered into at a relevant time for the purpose of section 238(2) of the IA 1986, having been, pursuant to section 240(1)(a) of the IA 1986, entered into with a connected person in the period of two years ending with the onset of insolvency and with the presumption contained in section 240(2) of the IA applying.

**C.3.4.F  Liability for Tax on Deemed Income**

64.   Alternatively, by reason of the following facts and matters, NNL was a dominant entity towards NN Poland and in particular imposed the transfer pricing arrangements, and Distribution Agreement, on NN Poland:

64.1.   All decision making in relation to the entry into and operation of the Distribution Agreement and the RPSM was in practice taken by NNL.

64.2.   At all material times the Nortel Group operated predominantly along business and functional lines, with control of the Nortel Group's operations highly centralised in NNL.

64.3.   The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements, including in respect of the treatment of NN Poland under such arrangements, were senior employees/officers of NNL.

64.4.    The decision to implement the RPSM was taken by NNL, with the involvement of NNI.

65.    In the circumstances, if and to the extent that the Polish Tax Authorities instigate proceedings against NN Poland seeking the payment of additional tax based on NN Poland's deemed income had the transfer pricing arrangements been conducted on an arm's length basis, then NNL is liable to reimburse NN Poland for such additional tax.

**C.3.4.G  Interest**

66.    Further, NN Poland claims interest on all sums due to it by reason of the above.

**C.4.    Summary of transfer pricing claims**

67.    Accordingly, NN Poland claims from NNL, and proves in the liquidation of NNL for approximately:

67.1.    US$9.6 million in respect of routine returns;

67.2.    US$99,000 in respect of restructuring costs;

67.3.    Interest on the above amounts.

### D.    PROPRIETARY CLAIMS

68.    NN Poland has proprietary claims to assets in the hands of NNL, as identified above.

69.    Further by reason of the receipt and retention by NNL of NN Poland's property pursuant to NNL's misconduct as described in the paragraphs above, NN Poland is entitled as a matter of law to an equitable lien in its favour of NN Poland as against NNL.   NN Poland is entitled to enforce such a lien against assets in NNL's hands so as to secure its personal claim against NNL until restoration of NN Poland's assets has been achieved. For the avoidance of doubt, any right of election as between this remedy and the enforcement of NN Poland's proprietary claim is reserved.

70.    Subsequent to the collapse of the Nortel Group, certain of the assets of Nortel entities have been realised and their proceeds held pursuant to an escrow agreement colloquially referred to as a "Lockbox", to be distributed pursuant to the mechanisms to be established under the Interim Funding Settlement Agreement.

71.    NN Poland's proprietary claims extend to (but are not limited to) assets within the Lockbox. Further:

71.1.    NN Poland asserts claims to the assets in the Lockbox both on the basis of the proprietary claims referred to above and more generally, including on the basis of the proper construction of the Interim Funding Settlement Agreement.

71.2.    NN Poland's position is that all claims in respect of the allocation of the Lockbox are to be dealt with pursuant to the provisions of, and procedures established under, the Interim Funding Settlement Agreement.

71.3.    NN Poland's position is that all such claims are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

71.4.    If, contrary, to this position, any of the claims are so subject, NN Poland hereby makes claims to the assets of the Lockbox (on both a proprietary and personal basis, and without limitation), and reserves the right to add to, amend, or provide further particulars of them in the future.

71.5.    NN Poland also advances its proprietary claims in relation to assets that are in NNL's hands and which fall outside the Lockbox. NN Poland's position in relation to those claims is that they are proprietary and hence not claims to NNL's estate for the purposes of any proof process but claims to assets of NN Poland. NN Poland further contends that the appropriate time for resolving

any dispute in relation to such claims is after, and in the light of, the resolution of the allocation claims to the Lockbox pursuant to the IFSA processes.

72.    For the avoidance of doubt:

72.1.    To the extent that any assets or proceeds to which NN Poland maintains its proprietary claims are represented by sums in the Lockbox, then NN Poland asserts its proprietary claims to the appropriate proportion of, or amount in, the Lockbox.

72.2.    To the extent that any of NN Poland's proprietary claims to assets or proceeds represented by sums in the Lockbox, or other claims to the assets in the Lockbox, are not satisfied from the Lockbox, then NN Poland maintains that it will have a proprietary and/or personal claim to the shortfall from NNL, which it hereby asserts.

72.3.    NN Poland asserts its proprietary claims to assets outside the Lockbox, as well as within it.    To the extent that any of NN Poland's proprietary claims (including its claim to IP and its proceeds) are not satisfied from any other assets to which NN Poland asserts a proprietary claim, then NN Poland will have a proprietary and/or personal claim to the shortfall from NNL, which it hereby asserts.

**D.1.    Other claims to the Lockbox more generally**

73.    NN Poland asserts claims to the assets in the Lockbox both on the basis of the proprietary claims referred to above and more generally, including on the basis of the proper construction of the Interim Funding Settlement Agreement.  As stated above, NN Poland's position is that such claims to the allocation of the Lockbox are to be dealt with outside the Proof of Claims process and are not subject to the bar date.

E.      **PENSION FUNDING CLAIMS**

74.     NN Poland has various pension scheme obligations ("the Scheme") under Polish law.

75.     At all material times NNL exercised full control over NN Poland's decisions as to the Scheme including as to what contributions, if any, to make to the Scheme.

76.     In the circumstances, NNL either appreciated or ought to have appreciated that the interests of NN Poland and its creditors and employees would be best served by the rapid elimination of the funding deficit of the Scheme and to ensure that the Scheme could meets its obligations.

77.     To the extent that there is a deficit in the Scheme then NN Poland has suffered loss and damage, which loss and damage has resulted from NNL's breach of its duties under local law in connection with the Scheme.  NN Poland consequently claims in respect of these breaches and its resulting losses against NNL.  In this context NN Poland claims equitable compensation or damages on the basis that NNL's conduct effected a result that unfairly disregarded the interests of NN Poland and its creditors contrary to section 241 of the *Canada Business Corporations Act*.  On the basis of the above, NN Poland also claims interest on all amounts due, including compound interest.

F.      **CLAIMS IN RESPECT OF PAST DISPOSITIONS OF BUSINESS**

78.     At various times prior to 14 January 2009  NN Poland disposed of assets as part of various co-ordinated business sales with NNL and other Nortel entities

79.     Following those business sales, NNL allocated and/or directed the allocation amongst the Nortel entities, including NN Poland, the portion of the proceeds of sale referable to each entity.

80.     Each entity was entitled to a portion of the proceeds that was actually referable to the assets that entity was selling.

81.     To the extent that NN Poland did not receive from any business sale, a fair and appropriate allocation of the proceeds for the assets it has sold it has the following claims:

81.1.    A claim under the relevant sale contracts for a fair and appropriate allocation of the proceeds for the assets it has sold;

81.2.    Under Polish law;

81.3. Under section 238 of the UK Insolvency Act, referred to above (providing any disposition occurred 2 years prior to 14 January 2009);

81.4. Further, or in the alternative, NN Poland claims equitable compensation or damages on the basis that NNL's conduct effected a result that unfairly disregarded the interests of NN Poland and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

81.5. Further, or in the alternative, NN Poland mistakenly believed that the allocation it received from the various co-ordinated business sales was a fair allocation representing the assets that it had sold in that at business and/or that it was not entitled to any more than it received. That mistaken belief was either common to NNL and NN Poland or was held by NN Poland and not corrected by NNL.

81.6. As a result of such mistaken belief NN Poland was deprived of entitlements it should properly have received and/or made payments or gave credits to NNL which were not or ought not have been due, and/or NNL was unjustly enriched at the expense of NN Poland.

81.7. Further or in the alternative, in connection with the allocation of proceeds of business sales, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NN Poland, and/or (ii) where NNL's conduct was unlawful and directed towards NN Poland where it was known that NN Poland would be harmed by such conduct

81.8. On the basis of the above, NN Poland also claims interest on all amounts due, including compound interest.

82. On the basis of the above, NN Poland is entitled to the following relief:

82.1. In the event that NN Poland (acting by its office-holders) elects for such a remedy, the setting aside of the relevant transactions as appropriate and in any event an order restoring Poland to the position it would have been in but for the oppressive conduct of NNL.

82.2. Damages, or equitable compensation.

82.3. Restitution (including on a proprietary basis) of all amounts by which NNL has been unjustly enriched.

82.4. Interest on all amounts due, including compound interest.

### G.    FUTURE AND CONTINGENT CLAIMS

83.    In the event that a claim is made or intimated against NN Poland after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NN Poland will assert and hereby asserts all rights of contribution and indemnity against NNL. NN Poland's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising before or after the bar date, to the fullest extent possible and without limitation. NN Poland reserves the right to further identify, particularise and modify all its entitlements in this respect in due course.

84.    NN Poland further claims in respect of any future, prospective or contingent claims against NNL that NN Poland or any office-holder or future office-holder may have. NN Poland reserves the right to advance any prospective, contingent or future claims which may arise or become crystallised at any time hereafter.

85.    Without in any way derogating from the above, NN Poland makes the following contingent claims:

*Claims in respect of taxation and revenue*

*Tax*

86.    All relevant decisions in relation to taxation for NN Poland were taken and/or directed by NNL.

87.    To the extent that any tax authority makes a claim against NN Poland in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or otherwise), then:

87.1.    NN Poland claims all penalties, interest and other loss payable by NN Poland as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

87.2.    Further or alternatively:

87.2.1.    NN Poland has claims under Polish law;

87.2.2.    NN Poland claims equitable compensation or damages on the basis that NNL's conduct effected a result that unfairly disregarded the

interests of NN Poland and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

87.3. Those breaches of duty and/or that oppressive conduct resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NN Poland.

88. On the basis of the above, NN Poland is entitled to the following relief:

88.1. equitable compensation or damages as a consequence; and

88.2. interest on all amounts due, including compound interest.

*Revenue*

89. To the extent that any entity makes a claim against NN Poland on the basis of the over or under recording of its revenue then:

89.1. NN Poland claims all penalties, interest and other loss payable by NN Poland as a loss naturally flowing from the claims (or some of them) referred to in this Proof of Claim.

89.2. Further or alternatively:

89.2.1. NNL owed fiduciary duties to NN Poland as a *de facto* director in relation to NN Poland's decisions in relation to its revenue recording (alternatively as a shadow director owing fiduciary obligations in that regard). NNL also owed a duty of skill and care;

89.2.2. NNL breached its fiduciary duties and its duty of skill and care in not ensuring that NN Poland was paid and recorded the revenue to which it was entitled; and/or

89.2.3. NN Poland has claims under Polish law;

89.2.4. NNL's conduct effected a result that unfairly disregarded the interests of NN Poland and its creditors contrary to section 241 of the *Canada Business Corporations Act*.

89.2.5. That oppressive conduct resulted in loss and damage amounting at least to the amount of any such loss suffered by NN Poland.

90. On the basis of the above, NN Poland is entitled to the following relief:

90.1. equitable compensation and/or damages as a consequence;

90.2.    interest on all amounts due, including compound interest.

### Claims in respect of FSD Liability

91.    By a Determination Notice dated 25 June 2010, the Determinations Panel ("the DP") of the UK Pensions Regulator ("the UK Regulator") determined that a Financial Support Direction ("FSD") requiring the provision of financial support to the Nortel Networks UK Pension Plan ("the UK Scheme") should be issued in respect of certain EMEA entities[5] the "EMEA Targets". NN Poland is an EMEA Target.

92.    By two References dated 23 July 2010, the EMEA Targets have referred the decision of the DP to the Upper Tribunal (Tax and Chancery Chamber). The References have not yet been heard.

93.    As well as the EMEA Targets, the Determination Notice referred to above determined that an FSD should be issued in respect of NNL. NNL have not referred the decision of the DP to the Upper Tribunal. Following an application by the TPR, the Upper Tribunal issued directions on 3 February 2011 that confirmed that FSDs can be issued by TPR as against NNC and NNL.

### The basis for and effect of an FSD

94.    The basis for and effect of an FSD are matters which are governed by English law. As a matter of English law, the power of the UK Regulator to issue an FSD is derived from section 43 of the UK Pensions Act 2004 ("the 2004 Act"). Under that section, the UK Regulator may only issue an FSD to a particular person in relation to a particular pension scheme if a number of conditions are satisfied. One of those conditions is that the UK Regulator must be of the opinion that it is reasonable to impose the requirements of the FSD on the person in question.

---

[5]    *Inter alia,* Nortel GmbH, Nortel Networks N.V., Nortel Networks S.p.A, Nortel Networks B.V., Nortel Networks Hispania S.A., Nortel Networks Polska Sp. z.o.o., Nortel Networks International Finance & Holdings B.V., Nortel Networks France S.A.S., Nortel Networks (Ireland) Limited, Nortel Networks S.A., Nortel Networks A.G., Nortel Networks O.O.O., Nortel Networks (Austria) GmbH, Nortel Networks South Africa (Proprietary) Limited, Nortel Networks Slovensko s.r.o, Nortel Networks Engineering Service Kft, Nortel Networks A.B., Northern Telecom France S.A., Nortel Networks s.r.o., Nortel Networks Portugal S.A, and Nortel Networks A.S..

95.     In deciding whether it is reasonable to impose the requirements of the FSD on a particular person, the UK Regulator is required to have regard to such matters as it considers to be relevant, including, where relevant, the following matters:

95.1.     the relationship which the person has or has had with the sponsoring employer of the pension scheme in question (including, where the person is a company, whether the person has or has had control of the employer);

95.2.     the value of any benefits received directly or indirectly by the person from the employer;

95.3.     any connection or involvement which the person has or has had with the scheme; and

95.4.     the financial circumstances of the person.

96.     The principal effect of an FSD is to require the persons to whom it is issued to secure that "financial support" for the pension scheme in question is put in place within the period specified in the FSD, and maintained in place thereafter. By section 45 of the 2004 Act, "financial support" means one or more arrangements falling within section 45(2) of the 2004 Act, the details of which are approved by a notice issued by the UK Regulator.

97.     In the event that there is non-compliance with an FSD, the UK Regulator has power under section 47 of the 2004 Act to issue a notice (a "Contribution Notice" or "CN") to any one or more of the persons to whom the FSD was issued stating that the person is under a liability to pay to the trustees or managers of the pension scheme the sum specified in the CN. The UK Regulator may only issue a CN to a particular person if it is of the opinion that it is reasonable to impose liability on the person to pay the sum specified in the CN.

*Claims against NNL*

98.     At the present time, it is not yet known:

(a)     whether any one or more of the EMEA Targets will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the trustee of the UK Scheme ("the Trustee") or otherwise provide financial support for the UK Scheme;

(b)     whether NNL and/or NNC will ultimately be required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial

support for the UK Scheme; or

(c)     if one or more of the EMEA Targets and NNL and/or NNC are ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the UK Scheme, what the relationship between their respective obligations will be.

99.     However, in the event that NN Poland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the UK Scheme, NN Poland in question will or may be entitled as a matter of English law, or alternatively as a matter of Canadian law to recover a contribution from NNL, including without limitation pursuant to the UK Civil Liability (Contribution) Act 1978, under common law, general equitable principles, under Polish law and under Canadian statute and/or by reason of breaches of the duties owed by NNL to NN Poland referred to in this Proof of Claim..

100.    In this respect it is just and equitable for NN Poland to recover from NNL having regard to the extent of NNL's responsibility for the damage in question.

*Claims against NNL on the basis of unjust enrichment and/or subrogation*

101.    Further or in the alternative, in the event that NN Poland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the UK Scheme, NN Poland will or may have claims for recoupment or contribution against NNL arising under English law, or alternatively under Canadian law, on the basis that NN Poland will have been required by compulsion of law to satisfy in whole or in part an obligation owed by NNL to the Trustee, and NNL will therefore have been unjustly enriched at the expense of NN Poland.

102.    Further or in the alternative, in the event that NN Poland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the UK Scheme, NN Poland will or may be entitled under English law, or alternatively under Canadian law, to be subrogated in whole or in part to any claim which the Trustee would otherwise have had against NNL pursuant to an FSD or CN or otherwise.

103.    Further or in the alternative, in the event that NN Poland is ultimately required pursuant to an FSD or CN to make a payment or series of payments to the Trustee or otherwise provide financial support for the UK Scheme, NNL is otherwise obliged under English

and Canadian law to repay, in whole or in part that obligation.  Full particulars of such claim are subject to the circumstances leading to the NN Poland's obligation.

## H.    RESERVATION OF RIGHTS

### H.1.    Reservation regarding jurisdiction, applicable law and forum

104.    In so far as liability or quantum in respect of any claim identified in this Proof of Claim is disputed, neither the filing of this Proof of Claim nor anything in its content is to be taken as acceptance that the Canadian Court is the appropriate forum for litigating such dispute or that it has jurisdiction (or should exercise any jurisdiction) to determine the merits of the same. In the event that such a dispute arises, NN Poland reserves the right to contend in respect of any of its claims that the appropriate forum for litigating such dispute is a different or foreign forum (and in particular the Courts of Poland, alternatively England and Wales). Without prejudice to the generality of the foregoing:

104.1.    NN Poland reserves its rights to contend that the Courts of Poland are the relevant jurisdiction and most appropriate forum for determining any dispute in respect of the claims identified above in of this Proof of Claim.

104.2.    NN Poland reserves its right to contend that the Courts of England and Wales are the relevant jurisdiction and most appropriate forum for determining any dispute in respect of the claim identified above in this Proof of Claim.

104.3.    For the avoidance of doubt, all claims and disputes with regard to the allocation of the Lockbox are to be determined in accordance with the dispute resolution mechanisms to be set up pursuant to the Interim Funding Settlement Agreement dated 9 June 2009 (the "IFSA Allocation Process").

104.4.    NN Poland refers to Section D above in respect of its proprietary claims. NN Poland also notes that the amounts recoverable pursuant to this Proof of Claim are dependent upon the outcome of the IFSA Allocation Process.

104.5.    If and to the extent that the Proof of Claims process is relevant at all to any of the claims referred to in the above paragraphs which fall to be dealt with pursuant to the IFSA Allocation Process or in the Courts of Poland, or the Courts of England and Wales, NN Poland will contend (and/or reserves the right to contend) that at the very least such process should be stayed in respect of such claims pending resolution of the substantive dispute in the appropriate forum.

105.    In so far as this Proof of Claim identifies a foreign law as being applicable to the claim, NN Poland's primary case is that this the law that should be applied. However, in so far

as the Proof of Claim is silent as to applicable law, this is not to be taken as acceptance that Canadian law is, or is necessarily, the applicable law, and NN Poland reserves the right further to identify appropriate foreign law as being the law applicable to its claims.

106.    More generally, NN Poland reserves the right to alter the law (or jurisdiction or forum) identified as being appropriate for its claims. Further, in so far as a proper law, forum or jurisdiction has been identified other than that of Canada, NN Poland reserves the right to abandon that primary case with the result that (absent the identification of some other law, forum or jurisdiction) Canadian law, jurisdiction and forum is to be treated as being applicable. To that end all such claims in this Proof of Claim are to be treated as including a claim in the alternative based on Canadian law (and where the Courts of Canada are the appropriate forum or jurisdiction).

**H.2.    Office-holder claims**

107.    In so far as this Proof of Claim refers to any/or includes claims which may be brought by any office-holder of NN Poland pursuant to any applicable law:

107.1.    Such reference and/or inclusion is not to be taken as acceptance that such claim is or has been a claim subject to the bar date.

107.2.    Such claim is to be read together with any Proof of Claim (or other process) submitted or commenced by any appropriate office-holder (as to which NN Poland accepts that there should be no double-counting).

**H.3.    Reservation in respect of set off**

108.    Nothing in this Proof of Claim is to be taken as acceptance that any claim from NNL against NN Poland exists, is valid or is eligible for set off against any of NN Poland's claims. Further nothing in this Proof of Claim is to be taken as acceptance that the appropriate forum or proper jurisdiction for considering any claim by NNL against NN Poland is the Courts of Canada (or the proof of claims process in Canada), whether in the context of an allegation that such claim has been or should be the subject of a set off against any claim by NN Poland or otherwise.

**H.4.    Reservation in respect of proprietary claims**

109.    Any reference to NN Poland's proprietary claims in this document are to be read subject (and without prejudice) to the primary contention set out above.

110.    Any reference herein to NN Poland's proprietary claims is not to be read as an acceptance that those claims are required to be filed by the bar date, or that (in the event

of dispute) the appropriate forum for the resolution of any of those claims (which are not unsecured creditor claims) is the Proof of Claim process in Canada.

111.     NN Poland's proprietary claims constitute claims and rights which fall outside the EMEA Claims Process, being claims in respect of property which NNL does not own.

112.     As such, NN Poland's proprietary claims are included in this Proof of Claim without prejudice to NN Poland's rights to claim this property in other proceedings or processes and to assert its rights to seize this property without reference to the EMEA Claims process.

113.     For the avoidance of doubt all references herein to NN Poland's proprietary claims are to be read as including a personal claim over against NNL (both for the amount of the claims and for interest thereon) to the extent that those proprietary claims are not fully satisfied out of the assets to which they attach.

114.     NN Poland repeats its contention above that the resolution of its proprietary claims should be dealt with in the IFSA Allocation Process (at least in the first instance, and/or in so far as those proprietary claims relate to assets in the Lockbox), and that to the extent that any dispute resolution process (including any part of the Proof of Claim process) should properly be dealing with any part of those proprietary claims (such as proprietary claims to assets falling outside the Lockbox), such process should be deferred until after the IFSA Allocation Process has taken place.

**H.5.     Reservation in respect of claims against other parties**

115.     For the avoidance of doubt, all claims and allegations made against NNL made in this Proof of Claim are made without prejudice to all claims and allegations that NN Poland has made or may make in this proof of claims process or otherwise against any other person (including NNC, NNI, and any present or former officer of NN Poland, NNL, NNC, NNI, or any other natural or corporate person whomsoever).

# TAB " F "

THE FOLLOWING IS EXHIBIT "F" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014


_____
COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit F – NN Polska Claim filed against NNC**

**CANADIAN CCAA Proof of Claim**    **re Nortel Networks Corporation and others**

**❶    Name of Debtor (the "Debtor")**
Debtor: Nortel Networks Corporation

**❷    Original Creditor Identification (the "Creditor")**

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks Polska Sp z.o.o. | |

| Address | Phone # |
|---|---|
| C/O The Joint Administrators | |
| Ernst & Young LLP | Fax # |
| 1 More London Place | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| London | | SE1 2AF | |

**❸    Assignee, if claim has been assigned**

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| | |

| Address | Phone # |
|---|---|
| | |
| | Fax # |
| | |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|
| | | | |

**❹    Amount of Claim**

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

Claims will be recorded as "Unsecured" unless the "Secured" box is checked        (Check only if applicable)

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | See attached |
| | | ☐ | ☐ | ☐ | ☐    Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺    Documentation**

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻    Certification**

I hereby certify that:

• I am the Creditor, or authorized Representative of the Creditor.
• I have knowledge of all the circumstances connected with this Claim.
• The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
• Complete documentation in support of this claim is attached.

This space reserved for use by the Monitor

| Signature | Name    C. J. W HILL |
|---|---|
| | Title    JOINT ADMINISTRATOR |
| Dated at    18/3/11 | Signed at    LONDON |

**❼    Filing of Claim**

This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on **SEPTEMBER 30, 2009**, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

**Proof of Claim by Nortel Networks Polska Sp. z o.o.**

**against Nortel Networks Corporation:**


**Particulars of the Claim**

**under section 5 of the Proof of Claim**

1.     This document provides particulars of the Claim by Nortel Networks Polska Sp. z o.o. ("NN Poland") against Nortel Networks Corporation ("NNC") as required by section 5 of the Proof of Claim to which this document is attached.

2.     This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3.     The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of NN Poland and its office-holders. NN Poland reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum, including as a result of documentary and other information obtained from NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4.     NN Poland refers to, relies on, and hereby incorporates and adopts, the contents of the Proof of Claim filed by NN Poland against NNL ("the NNL Proof") including the claims identified in the NNL Proof together with the relief (and quantum of the same) to which NN Poland is entitled.

5.     In the NNL Proof, NN Poland advances a number of claims against NNL on the basis of defaults by NNL in its capacity as de facto director or manager of NN Poland, or liabilities arising from NNL's conduct as such director or manager (or otherwise arising from the dominating or influential position that NNL assumed in relation to NN Poland's affairs), together with related claims deriving from NNL's involvement in NN Poland's decisions to enter the transactions complained of. These include in particular claims for:

    (a)     Unjust enrichment;

    (b)     Oppression;

    (c)     Conspiracy;

(d)    Claims in respect of breach of duty by NNL; and

(e)    Contingent claims to a contribution, and claims in respect of taxation, recording of revenue and any FSD liability.

6.    NN Poland advances the same claims against NNC, for the same relief, on the basis that NNC itself owed duties to NN Poland as a de facto director of NN Poland and that NNC was closely involved in and took responsibility for the management of NN Poland's affairs. In this context NN Poland will rely, amongst other things, on the fact that NNC shared the same directing mind and will as NNL and that there was a co-identity in the decision-making individuals and processes at both entities. NN Poland contends that in all the circumstances the conduct of NNL as de facto director of NN Poland (and its conduct more generally in respect of the management of and influence on the affairs of NN Poland) can be taken to be the conduct of NNC as de facto director (or otherwise in respect of the management of and influence on the affairs) of NN Poland. NN Poland accordingly refers to the matters relied in support of the above allegations against NNL as being also attributable to, or relevant to liability on the part of, NNC.

7.    Further, to the extent that NNC received (whether directly or indirectly) any of the benefits transferred from NN Poland by reason of the matters set out in the NNL Proof referred to above, NNC is liable for unconscionable receipt in respect of the same, having the same knowledge as NNL. NNC was aware of the breaches of fiduciary duty, and received any such benefits with such knowledge, such that any such benefits (and/or the identifiable or traceable substitutes of such receipts) were received and are held on constructive trust for and on behalf of NN Poland, and NNC is obliged to account for such sums to NN Poland.

8.    NN Poland further asserts against NNC its claims to the Lockbox as referred to in the NNL Proof mutatis mutandis.

9.      This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL Proof as if all references to NNL are to be taken to be references to NNC, mutatis mutandis, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

# TAB " G "

THE FOLLOWING IS EXHIBIT "G" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014

_____

COMMISSIONER FOR TAKING AFFIDAVITS

**Exhibit G – NN Polska Claim filed against the Directors & Officers of NNC & NNL**

CANADIAN CCAA Proof of Claim     re Nortel Networks Corporation and others

| **❶** Name of Debtor (the "Debtor") Debtor: | DIRECTORS AND OFFICERS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED |
|---|---|

**❷**   Original Creditor Identification (the "Creditor")

| Legal Name of Creditor | Name of Contact |
|---|---|
| Nortel Networks Polska Sp z.o.o. | |
| Address C/O The Joint Administrators Ernst & Young LLP 1 More London Place | Phone # |
| | Fax # |

| City London | Prov / State | Postal/Zip code SE1 2AF | e-mail |
|---|---|---|---|

**❸**   Assignee, if claim has been assigned

| Full Legal Name of Assignee | Name of Contact |
|---|---|
| Address | Phone # |
| | Fax # |

| City | Prov / State | Postal/Zip code | e-mail |
|---|---|---|---|

**❹**   Amount of Claim

The Debtor / Officer(s) / Director(s) was/were and still is/are indebted to the Creditor as follows:

Claims will be recorded as "Unsecured" unless the "Secured" box is checked     (Check only if applicable)

| Currency | Original Currency Amount | Secured | S. 136 Priority | Restructuring | If you are making a claim against an Officer or Director check the box below, and list the Officer(s) and Director(s) against whom you assert your claim |
|---|---|---|---|---|---|
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ See attached |
| | | ☐ | ☐ | ☐ | ☐ Particulars of Claim |
| | | ☐ | ☐ | ☐ | ☐ |
| | | ☐ | ☐ | ☐ | ☐ |

**❺**   Documentation

Provide all particulars of the Claim and supporting documentation, including amount, description of transaction(s) or agreement(s) giving rise to the Claim, name of any guarantor which has guaranteed the Claim, and amount of invoices, particulars of all credits, discounts, etc. claimed, description of the security, if any, granted by the affected Debtor to the Creditor and estimated value of such security, particulars of any restructuring claim.

**❻**   Certification

I hereby certify that:
- I am the Creditor, or authorized Representative of the Creditor.
- I have knowledge of all the circumstances connected with this Claim.
- The Creditor asserts this claim against the Debtor; and the Officer(s) and Director(s) as indicated above.
- Complete documentation in support of this claim is attached.

This space reserved for the Nortel Monitor

| Signature | Name C.J. W HILL |
|---|---|
| | Title JOINT ADMINISTRATOR |
| Dated at                18/3/11 | Signed at LONDON |

**❼**   Filing of Claim

**This Proof of Claim must be received by the Monitor by no later than 4:00 p.m. (prevailing Eastern Time) on SEPTEMBER 30, 2009, by prepaid ordinary mail, courier, personal delivery or electronic or digital transmission at the following address:**

Ernst & Young Inc.
222 Bay St., P.O. Box 251
Toronto-Dominion Centre
Toronto, ON  M5K 1J7
CANADA
Attention: Nortel Claims

Fax: 416-943-2808
Tel: 1-866-942-7177 or 416-943-4439
e-mail: nortel.monitor@ca.ey.com

An electronically fillable version of this form is available at www.ey.com/ca/nortel

Proof of Claim by Nortel Net Polska S.p.z.o.o (Poland)

against the Officers and Directors of

Nortel Networks Limited and Nortel Networks Corporation:

Particulars of the Claim and supporting documentation

under section 5 of the Proof of Claim

## A: THIS DOCUMENT

1.    This document provides particulars of the Claims by Nortel Net Polska S.p.z.o.o (Poland) ("NN Poland") against those officers and directors of Nortel Networks Limited ("NNL") and Nortel Networks Corporation ("NNC") which, at any given time, were also de jure directors of NN Poland, as required by section 5 of the Proof of Claim to which this document is attached.

2.    This document, together with the Proof of Claim form to which it is attached, is referred to herein as "the Proof of Claim".

3.    The Claims and the quantum of the same set out in this Proof of Claim represent the best current assessments on the part of the NN Poland and its office-holders. NN Poland reserves the right to add to and/or modify the Claims, the nature of the claims, the facts relied on in support of those claims, and their quantum in due course, including as a result of documentary and other information obtained from NNL, NNC (or elsewhere) and/or in the light of expert evidence produced in connection with the claims.

4.    NN Poland refers to the contents of the Proofs of Claim filed by NN Poland (i) against NNL ("the NNL Proof"), and (ii) against NNC ("the NNC Proof"), together, "NNL/C Proofs") and adopts and repeats the contents of the NNL/C Proofs in this Proof of Claim.

5.    In the NNL/C Proofs, NN Poland advances a number of claims against NNL and/or NNC on the basis of breach of fiduciary duty by NNL and/or NNC in its capacity as de facto, alternatively shadow, director of NN Poland, together with related claims deriving from NNL's and/or NNC's involvement in NN Poland's decisions to enter the relevant transactions. Certain of these claims relate to the conduct of officers and directors of NNL and/or NNC who were also, at the relevant time, de jure directors of NN Poland.

6.   NN Poland does not accept that any claims against its de jure directors for breach of fiduciary duty (or otherwise) are claims subject to the bar date. However, they are being included in this Proof of Claim in order to protect NN Poland's position in the event that such claims are deemed to be subject to the bar date on the basis that certain conduct, acts or omissions by the de jure directors of NN Poland were or might be related or interlinked with (or may be said to amount to) those directors' conduct, acts or omissions as officers and/or directors of NNL and/or NNC.

7.   The Claims are still being investigated. Pending further investigation, NN Poland cannot specify the names of the relevant officers and directors of NNL and/or NNC.

8.   NN Poland advances the Claims for relief, on the basis that the relevant officers and/or directors of NNL and/or NNC owed fiduciary duties to NN Poland as de jure directors of NN Poland and breached such duties. NN Poland is entitled to equitable compensation, damages or any other relief that is deemed fit. The quantum of the Claims is not capable of determination at the present time.

9.   This Proof of Claim and the Claims set out within it are submitted strictly subject to the various reservations of rights set out in the NNL/C Proofs, including but not limited to reservations in respect of applicable law, jurisdiction and forum.

# TAB " H "

THE FOLLOWING IS EXHIBIT "H" REFERRED
TO IN THE AFFIDAVIT OF ELIZABETH ALLEN PUTNAM
SWORN JANUARY ___, 2014


_____

COMMISSIONER FOR TAKING AFFIDAVITS

**EXHIBIT H:** *Excerpts From the Joint Administrators' First & Second Sets of Responses to the Consolidated Interrogatories*

The Joint Administrators' response to Interrogatory No. 50 is copied below. Relevant excerpts of the *Joint Administrators' First & Second Sets of Responses to the Consolidated Interrogatories* form part of this Exhibit H, and page references are provided below.

**The Joint Administrators response to Interrogatory No. 50**

"The Joint Administrators identify below, to the best of their knowledge, information, and belief as of the date of these Responses, all Transactions on which the claims against the Canadian Directors and the de jure Directors of the EMEA Entities are based and the Persons most knowledgeable about such Transactions. The Joint Administrators have compiled the information set forth below based on review of the limited documents and information available to them as of the date of these Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Transaction or Person is not specified below is without prejudice to the right of the Joint Administrators to later claim that such Transaction existed and supports the Joint Administrators' claims against the Directors and/or that such Person is most knowledgeable about any Transaction. The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery." [*emphasis added*]

| Transaction Listed By the Joint Administrator | Tab No. |
|---|---|
| 1. The Transfer Pricing Claims as described in the Response to Interrogatory **No. 42**. | H(VI) |
|     a.  The Persons most knowledgeable about the Transfer Pricing Claims are those listed in the Responses to Interrogatory **Nos. 5 and 6** in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013. | H(I) |
| 2. The Intercompany Loans as described in the Response to Interrogatory **No. 15**. | H(V) |
|     a.  The Persons most knowledgeable about Intercompany Loans are those listed in the Response to Interrogatory **No. 13** in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013. | H(II) |
| 3. The failure by the Directors to ensure that appropriate provision was made to meet the liabilities of the NNUK Pension Plan. | |
|     a.  The Persons most knowledgeable about this Transaction are those listed in Responses to Interrogatory **Nos. 29-30, 36-37**, and **39** in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013. | H(III) |
| 4. The appointment by NNSA of KPMG as its statutory auditor. | H(VII) |
|     a.  The Person most knowledgeable about this Transaction is: Philippe Albert-Lebrun | |
| **Miscellaneous References** | **Tab No.** |
| Interrogatory No. 50 | H(VII) |
| General Reservation of Rights in the *Joint Administrators' First Set of Responses to the Consolidated Interrogatories* | H(I) |
| General Reservation of Rights in the *Joint Administrators' Second Set of Responses to the Consolidated Interrogatories* | H(IV) |

# EXHIBIT H (I)

Exhibit H (I)

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

**THE JOINT ADMINISTRATORS' FIRST SET OF
RESPONSES TO THE CONSOLIDATED INTERROGATORIES**

Pursuant to the Discovery Plan ordered in the Order of the Honourable Mr. Justice

Morawetz, dated May 15, 2013 re: Allocation Protocol – Litigation Timetable and Discovery

Plan (the "Discovery Plan"), the court-appointed administrators and authorized foreign

representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited and

certain of its affiliates (collectively, the "EMEA Debtors"), by their undersigned lawyers, hereby

submit the following responses (the "Responses") to the Consolidated Interrogatories, dated June

20, 2013 and agreed among the Core Parties. Pursuant to an agreement among the Core Parties,

this First Set of Responses will respond to the Interrogatories directed to the EMEA Debtors and

designated as "witness identification" interrogatories.

**DEFINITIONS FOR THESE RESPONSES**

Capitalized terms used herein shall have the definition attributed to them in the

Consolidated Interrogatories.

## RESERVATION OF RIGHTS

In addition to the rights reserved in the Mutual Reservation of Rights In Lieu of Individual Objections With Respect to Consolidated Discovery Requests, dated June 20, 2013, the Joint Administrators reserve their rights as follows:

1.      By responding to the Interrogatories, the Joint Administrators do not concede that the information requested or made available is relevant or admissible as evidence. The Joint Administrators reserve any and all rights to object to the admissibility of any information or documents produced in response to the Interrogatories.

2.      These Responses are based on the limited documents and information, including information from certain legacy Nortel systems[1] and from public sources, that are presently available to the Joint Administrators. The Joint Administrators have not yet completed discovery in these proceedings. Accordingly, the Joint Administrators reserve all rights to amend, modify, supplement, or correct these Responses.

## RESPONSES TO SPECIFIC INTERROGATORIES

The Joint Administrators respond to the Interrogatories set forth below as follows:

**INTERROGATORY NO. 5**

Identify the Persons associated with You most knowledgeable about Nortel's Transfer Pricing Agreements and Transfer Pricing Arrangements, including but not limited to (i) the design, development, implementation, and operation of the RPSM; (ii) the change from the Cost Sharing Method to the RPSM; (iii) any amendments to the RPSM; (iv) the execution and negotiation of the MRDA, including its amendments; (v) the underlying calculations of costs, profits, and expenses feeding into the RPSM; (vi) consideration of the costs, profits, and expenses that should or should not be included in the RPSM; (vii) the impact of the RPSM on the EMEA Entities; and (viii) any Communications with any Tax Authority concerning the RPSM.

---

1.  These systems include "HR Reporting," which is a legacy system containing data up to a certain point in 2006, and "SAP HR," which contains data from 2006 onwards. Records of job titles on these systems are in some cases generic descriptions of seniority and are not necessarily complete.

**RESPONSE TO INTERROGATORY NO. 5**

The Joint Administrators identify below Persons who are, to the best of the Joint Administrators' knowledge, information, and belief as of the date of these Responses, most knowledgeable about Nortel's Transfer Pricing Agreements and Transfer Pricing Arrangements. The Joint Administrators have compiled the information listed below based on review of the limited documents and information available to them as of the date of these Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Person is not identified below is without prejudice to the right of the Joint Administrators to claim at a later date that such Person is most knowledgeable about Nortel's Transfer Pricing Agreements and Transfer Pricing Arrangements. The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

1. Philippe Albert-Lebrun
   Manager Treasury Operations (NNSA), 1/1/1999 – 7/31/2001
   Treasury Professional Services Europe (NNSA), 8/1/2001 – 11/30/2003
   Director, Finance & Control (NNSA), 12/1/2003 – 12/13/2003
   Finance – Treasury (NNUK), 12/1/2003 – 6/30/2008
   Financial Results Accounting (NNUK), 7/1/2008 – 3/30/2011
   Non Payroll Worker (NNUK), 4/1/2011 – 2/29/2012
   Avaya, Immeuble Central Park, 9 rue Maurice Mallet, 92445 Issy Les
   Moulineaux, Paris, France
   +33 (0)1 4094 7800

2. Ryan Smith[2]
   Director of Taxes (NNI), 11/3/2003 – 5/8/2006
   Finance – Tax (NN CALA), 11/3/2003 – 5/8/2006
   Current contact information unknown

3. Kerry Stephens
   Senior Tax Manager (NNUK), 7/2/2003 – present
   Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,

---

2. To the best of the Joint Administrators' knowledge, information, and belief, Ryan Smith was seconded to EMEA from 4/1/2006 to 3/31/2008. His role during his secondment was Leader, EMEA Tax.

Exchange House, Primrose Street, London EC2A 2EG, United Kingdom
+44 20 7374 8000

## INTERROGATORY NO. 6

Identify the Persons associated with You most knowledgeable about the Tax Documents and each subpart included in the definition of Tax Documents.

### RESPONSE TO INTERROGATORY NO. 6

The Joint Administrators identify below Persons who are, to the best of the Joint Administrators' knowledge, information, and belief as of the date of these Responses, most knowledgeable about the Tax Documents. The Joint Administrators have compiled the information listed below based on review of the limited documents and information available to them as of the date of these Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Person is not identified below is without prejudice to the right of the Joint Administrators to claim at a later date that such Person is most knowledgeable about the Tax Documents. The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

1. Kishor Badiani
   EMEA Director of Taxes (NNUK), 5/2/1997 – 5/21/2002
   Verizon UK Limited, Reading International Business Park, Basingstoke Road, Reading, RG2 6DA, United Kingdom
   +44 11 8905 5000

2. Lorraine Harper/Smeaton
   Senior Tax Manager EMEA (NNUK), 7/9/2007 – 11/27/2009
   Leader EMEA Tax (NNUK), 4/1/08 – 11/27/2009
   TalkTalk Telecom Group PLC, 11 Evesham Street, London, W11 4AR, United Kingdom
   +44 (0)20 3417 1000

3. Simon Schofield
   Senior Tax Manager (NNUK), 6/2/2003 – 5/8/2006
   Samsung Electronics, Samsung House, 1000 Hillswood Drive, Surrey, KT16

4

    0PS, United Kingdom
    +44 01932 455 000

4. Ryan Smith[3]
    Director of Taxes (NNI), 11/3/2003 – 5/8/2006
    Finance – Tax (NN CALA), 11/3/2003 – 5/8/2006
    Current contact information unknown

5. Kerry Stephens
    Senior Tax Manager (NNUK), 7/2/2003 – present
    Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
    Exchange House, Primrose Street, London, EC2A 2EG, United Kingdom
    +44 20 7374 8000

---

3. To the best of the Joint Administrators' knowledge, information, and belief, Ryan Smith was seconded to EMEA from 4/1/2006 to 3/31/2008. His role during his secondment was Leader, EMEA Tax.

# EXHIBIT H (II)

Exhibit H (II)

**INTERROGATORY NO. 13**

       Identify the Persons associated with You most knowledgeable about Intercompany Loans.

**RESPONSE TO INTERROGATORY NO. 13**

       The Joint Administrators identify below Persons who are, to the best of the Joint Administrators' knowledge, information, and belief as of the date of these Responses, most knowledgeable about Intercompany Loans.  The Joint Administrators have compiled the information listed below based on review of the limited documents and information available to them as of the date of these Responses.  Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources.  The fact that a Person is not identified below is without prejudice to the right of the Joint Administrators to claim at a later date that such Person is most knowledgeable about Intercompany Loans.  The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

       1.  Philippe Albert-Lebrun
           Manager Treasury Operations (NNSA), 1/1/1999 – 7/31/2001
           Treasury Professional Services Europe (NNSA), 8/1/2001 – 11/30/2003
           Director, Finance & Control (NNSA), 12/1/2003 – 12/13/2003
           Finance – Treasury (NNUK), 12/1/2003 – 6/30/2008
           Financial Results Accounting (NNUK), 7/1/2008 – 3/30/2011
           Non Payroll Worker (NNUK), 4/1/2011 – 2/29/2012

Avaya, Immeuble Central Park, 9 rue Maurice Mallet, 92445 Issy Les
Moulineaux, Paris, France
+33 (0)1 4094 7800

2. Orla Fitzpatrick
Tax Planning Accountant (NN Ireland), 11/26/1999 – 2/28/2001
Finance Manager Accounting & Control (NN Ireland), 3/1/2001 – 4/20/2001
Finance – Tax (NN Ireland), 3/1/2001 – 6/30/2005
Financial Operations & Control Review (Audit) (NN Ireland), 7/1/2005 –
4/30/2006
Director (NN Ireland), 2/3/2006 – 1/14/2009
Financial Accounting & Control (NN Ireland), 5/1/2006 – 4/23/2010
Ciena Corporation, Park House, 87-91 Great Victoria Street, Belfast, BT2
7AG, United Kingdom
Current telephone number unknown

3. Margaret Fraser
Senior Manager, Treasury Operations – EMEA (NNUK), 8/24/1998 – present
Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
Exchange House, Primrose Street, London, EC2A 2EG, United Kingdom
+44 20 7374 8000

4. Simon Freemantle
Director, Treasury Operations – Europe (NNUK), 10/16/2000 – 4/20/2001
Director (Nortel Networks International Finance & Holding B.V.), 4/30/2004
– present
Director (NN Ireland), 8/26/2006 – present
Director (NNUK), 3/31/2007 – present
Director (Northern Telecom PCN Limited), 12/16/2008 – present
Director (Nortel Networks Optical Components Limited), 12/17/2008 –
present
Director (Northern Telecom France SA), 1/14/2009 – 7/21/2010
Director (NNSA), 1/14/2009 – present
Director (Nortel Networks NV), 1/14/2009 – present
Director (Nortel Networks S.p.A), 1/14/2009 – present
Director (Nortel Networks BV), 1/14/2009 – present
Director (Nortel Networks Polska Sp z.o.o.), 1/14/2009 – present
Director (Nortel Networks Hispania, SA), 1/14/2009 – present
Director (Nortel Networks (Austria) GmbH), 1/14/2009 – present
Director (Nortel Networks s.r.o.), 1/14/2009 – present
Director (Nortel Networks Engineering Service Kft), 1/14/2009 – present
Director (Nortel Networks Portugal SA), 1/14/2009 – present
Director (Nortel Networks Slovensko, s.r.o.), 1/14/2009 – present
Director (Nortel Networks Romania SRL), 1/14/2009 – present
Director (Nortel GmbH), 1/14/2009 – present
Director (Nortel Networks OY), 1/14/2009 – present
Director (Nortel Networks AB), 1/14/2009 – present

Director (Nortel Networks AS), 1/14/2009 – present
Director (Nortel Networks South Africa (Proprietary) Limited), 1/14/2009 –
present
Director (Nortel Networks AG), 1/14/2009 – present
Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
Exchange House, Primrose Street, London, EC2A 2EG, United Kingdom
+44 20 7374 8000

5. Kerry Stephens
Senior Tax Manager (NNUK), 7/2/2003 – present
Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
Exchange House, Primrose Street, London, EC2A 2EG, United Kingdom
+44 20 7374 8000

6. Ian Widdowson
Finance – Tax (NNUK), 6/25/2001 – 6/30/2007
Capita Symonds/Real Estate, 71 Victoria Street, London, SW1H 0XA, United
Kingdom
+44 (0)20 7799 1525

# EXHIBIT H (III)

Exhibit H (III)

**INTERROGATORY NO. 29**

        Identify the Persons associated with You most knowledgeable about the pension plans of each EMEA Entity, including the funding of the pension plan of NNUK.

**RESPONSE TO INTERROGATORY NO. 29**

        The Joint Administrators identify below Persons who are, to the best of the Joint

Administrators' knowledge, information, and belief as of the date of these Responses, most

knowledgeable about the pension plans of each EMEA Entity.  The Joint Administrators have

compiled the information listed below based on review of the limited documents and information

available to them as of the date of these Responses. Where appropriate, the Joint Administrators

have relied upon information in legacy Nortel systems and/or information in publicly available

sources. The fact that a Person is not identified below is without prejudice to the right of the

Joint Administrators to claim at a later date that such Person is most knowledgeable about the

pension plans of each EMEA Entity. The Joint Administrators reserve the right to supplement or

amend the list below as documents and information become available in discovery.

1.  Mark Cooper
    Legal Manager (NNUK), 8/24/1998 – 9/2/2001
    Assistant General Counsel, Employment Law (NNUK), 9/3/2001 – 5/7/2006
    Leader, HR EMEA & Global Employment Law (NNUK), 1/14/2009 – present
    Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
    Exchange House, Primrose Street, London EC2A 2EG United Kingdom
    +44 20 7374 8000

2.  John Costello
    Marketing Product Line Management (NN Ireland), 9/1/1999 – 10/8/2009
    Current contact information unknown

3.  Edmond Shiel
    Operations Quality Manager (NNIR), 7/1/1998 – 4/30/2002
    Market Project Management (NNIR), 5/1/2002 – 11/18/2003, 11/22/2004 –
    12/18/2009
    Current contact information unknown

**INTERROGATORY NO. 30**

Identify the Persons associated with You most knowledgeable about the
guarantees issued by NNL to the Trustee, dated August 25, 2005, November 21, 2006 and
December 21, 2007.

**RESPONSE TO INTERROGATORY NO. 30**

To the best of the Joint Administrators' knowledge, information, and belief as of

the date of these Responses, the Persons most knowledgeable about the guarantees issued by

NNL to the Trustee, dated August 25, 2005, November 21, 2006 and December 21, 2007 were

associated with the U.S. and Canadian Nortel Entities and the Trustee, and not with the EMEA

Entities. The Joint Administrators have made this determination based on review of the limited documents and information available to them as of the date of these Responses. The fact that the Joint Administrators have not identified a Person associated with an EMEA Entity in response to this Interrogatory is without prejudice to the right of the Joint Administrators to claim at a later date that a Person associated with an EMEA Entity is most knowledgeable about the guarantees issued by NNL to the Trustee, dated August 25, 2005, November 21, 2006 and December 21, 2007. The Joint Administrators reserve the right to supplement or amend this Response as documents and information become available in discovery.

**INTERROGATORY NO. 36**

Identify the Persons associated with You most knowledgeable about the "contribution holiday" with respect to the Plan as alleged in paragraphs 139 and 216 of the UK Pension Claims Rider and paragraph 98 and 182 to 184 of the Affirmative Canadian UK Pension Claims Pleading.

**RESPONSE TO INTERROGATORY NO. 36**

The Joint Administrators identify below Persons who are, to the best of the Joint Administrators' knowledge, information, and belief as of the date of these Responses, most knowledgeable about the "contribution holiday" with respect to the Plan as alleged in paragraphs 139 and 216 of the UK Pension Claims Rider and paragraph 98 and 182 to 184 of the Affirmative Canadian UK Pension Claims Pleading. The Joint Administrators have compiled the information listed below based on review of the limited documents and information available to them as of the date of these Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Person is not identified below is without prejudice to the right of the Joint Administrators to claim at a later date that such Person is most knowledgeable about the "contribution holiday" with respect to the Plan. The Joint Administrators reserve the right to

supplement or amend the list below as documents and information become available in

discovery.

1. Angela Castles
   Vice President, Financial Services & Controller Europe (NNUK), 5/2/1997 –
   4/20/2001
   Current contact information unknown

2. Terence Faulkner
   Director, Pensions & Benefits (NNUK), 4/1/1999 – 3/31/2001
   Current contact information unknown

3. Brian Harris
   Vice President Finance & Administration PCA – Europe (NNUK), 3/4/1998 –
   4/20/2001
   Current contact information unknown

4. Gareth Pugh
   Director, Major CS Accounts (NNUK), 4/1/1999 – 2/14/2000
   Vice President Finance, Europe (NNUK), 2/15/2000 – 4/20/2001
   Leadership (NNUK), 8/22/2001 – 4/7/2002
   Director (Nortel Networks B.V.), 12/11/2001 – 12/16/2005
   Director (Nortel Networks OY), 12/31/2001 – 12/16/2005
   Director (Nortel Networks Hispania, SA), 1/8/2002 – 1/12/2006
   Director (Nortel Networks S.p.A), 3/12/2002 – 4/26/2006
   Regional Financial Business Partner (EMEA Controller) (NNUK), 4/8/2002 –
   12/17/2005
   Director (Nortel Networks AB), 4/26/2002 – 12/16/2005
   Director (NNUK), 1/17/2003 – 12/16/2005
   Director (NN Ireland), 3/28/2003 – 12/16/2005
   Fujitsu UK and Ireland, 22 Baker Street, London, W1U 3BW, United
   Kingdom
   +44 (0) 870 234 7777

**INTERROGATORY NO. 37**

Identify the Persons associated with You most knowledgeable about funding of
the Plan for the period 2002 to 2009, including without limitation, the 2006 funding agreement
and funding guarantee as alleged in paragraphs 217 to 227 of the UK Pension Claims Rider and
paragraphs 185 to 197 of the Affirmative Canadian UK Pension Claims Pleading.

**RESPONSE TO INTERROGATORY NO. 37**

The Joint Administrators identify below Persons who are, to the best of the Joint

Administrators' knowledge, information, and belief as of the date of these Responses, most

knowledgeable about funding of the Plan for the period 2002 to 2009. The Joint Administrators

have compiled the information listed below based on review of the limited documents and

information available to them as of the date of these Responses. Where appropriate, the Joint

Administrators have relied upon information in legacy Nortel systems and/or information in

publicly available sources. The fact that a Person is not identified below is without prejudice to

the right of the Joint Administrators to claim at a later date that such Person is most

knowledgeable about funding of the Plan for the period 2002 to 2009. The Joint Administrators

reserve the right to supplement or amend the list below as documents and information become

available in discovery.

1. Mark Cooper
   Legal Manager (NNUK), 8/24/1998 – 9/2/2001
   Assistant General, Counsel Employment Law (NNUK), 9/3/2001 – 5/7/2006
   Leader, HR EMEA & Global Employment Law (NNUK), 1/14/2009 – present
   Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
   Exchange House, Primrose Street, London, EC2A 2EG, United Kingdom
   +44 20 7374 800

2. Gareth Pugh
   Finance Director, Major CS Accounts (NNUK), 4/1/1999 – 2/14/2000
   Vice President Finance, Europe (NNUK), 2/15/2000 – 4/20/2001
   Leadership (NNUK), 8/22/2001 – 4/7/2002
   Director (Nortel Networks B.V.), 12/11/2001 – 12/16/2005
   Director (Nortel Networks OY), 12/31/2001 – 12/16/2005
   Director (Nortel Networks Hispania, SA), 1/8/2002 – 1/12/2006
   Director (Nortel Networks S.p.A), 3/12/2002 – 4/26/2006
   Regional Financial Business Partner (EMEA Controller) (NNUK), 4/8/2002 –
   12/17/2005
   Director (Nortel Networks AB), 4/26/2002 – 12/16/2005
   Director (NNUK), 1/17/2003 – 12/16/2005
   Director (NN Ireland), 3/28/2003 – 12/16/2005
   Fujitsu UK and Ireland, 22 Baker Street, London, W1U 3BW, United
   Kingdom
   +44 (0) 870 234 7777

**INTERROGATORY NO. 39**

Identify the Persons associated with You most knowledgeable about the Reciprocal Agreement as alleged in paragraphs 228 and 229 of the UK Pension Claims Rider and paragraphs 143 to 145 of the Affirmative Canadian UK Pension Claims Pleading.

**RESPONSE TO INTERROGATORY NO. 39**

The Joint Administrators identify below Persons who are, to the best of the Joint

Administrators' knowledge, information, and belief as of the date of these Responses, most

knowledgeable about the Reciprocal Agreement as alleged in paragraphs 228 and 229 of the UK

Pension Claims Rider and paragraphs 143 to 145 of the Affirmative Canadian UK Pension

Claims Pleading. The Joint Administrators have compiled the information listed below based on

review of the limited documents and information available to them as of the date of these

Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Person is not identified below is without prejudice to the right of the Joint Administrators to claim at a later date that such Person is most knowledgeable about the Reciprocal Agreement. The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

1. Mark Cooper
   Legal Manager (NNUK), 8/24/1998 – 9/2/2001
   Assistant General Counsel, Employment Law (NNUK), 9/3/2001 – 5/7/2006
   Leader, HR EMEA & Global Employment Law (NNUK), 1/14/2009 – present
   Joint Administrators, c/o James Norris-Jones, Herbert Smith Freehills LLP,
   Exchange House, Primrose Street, London, EC2A 2EG United Kingdom
   +44 20 7374 8000

# EXHIBIT H (IV)

Exhibit H (IV)

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED.

**THE JOINT ADMINISTRATORS' SECOND SET OF
RESPONSES TO THE CONSOLIDATED INTERROGATORIES**

Pursuant to the Discovery Plan ordered in the Order of the Honourable Mr. Justice

Morawetz, dated May 15, 2013 re: Allocation Protocol – Litigation Timetable and Discovery

Plan (the "Discovery Plan"), the court-appointed administrators and authorized foreign

representatives (collectively, the "Joint Administrators") for Nortel Networks UK Limited and

certain of its affiliates (collectively, the "EMEA Debtors"), by their undersigned lawyers, hereby

submit the following responses (the "Responses") to the Consolidated Interrogatories, dated June

20, 2013 and agreed among the Core Parties. Pursuant to an agreement among the Core Parties,

this Second Set of Responses will respond to the Interrogatories directed to the EMEA Debtors

that were not answered in the Joint Administrators' First Set of Responses to the Consolidated

Interrogatories, dated June 27, 2013.

**DEFINITIONS FOR THESE RESPONSES**

Capitalized terms used herein shall have the definition attributed to them in the

Consolidated Interrogatories.

## RESERVATION OF RIGHTS

In addition to the rights reserved in the Mutual Reservation of Rights In Lieu of Individual Objections With Respect to Consolidated Discovery Requests, dated June 20, 2013, the Joint Administrators reserve their rights as follows:

1.  By responding to the Interrogatories, the Joint Administrators do not concede that the information requested or made available is relevant or admissible as evidence. The Joint Administrators reserve any and all rights to object to the admissibility of any information or documents produced in response to the Interrogatories.

2.  These Responses are based on the limited documents and information, including information from certain legacy Nortel systems[1] and from public sources, that are presently available to the Joint Administrators. The Joint Administrators have not yet completed discovery in these proceedings. Accordingly, the Joint Administrators reserve all rights to amend, modify, supplement, or correct these Responses.

3.  The Joint Administrators do not intend to waive any privilege or right by virtue of these Responses. To the extent any Response by the Joint Administrators may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular Response only.

---

1.  These systems include "HR Reporting," which is a legacy system containing data up to a certain point in 2006, and "SAP HR," which contains data from 2006 onwards. Records of job titles on these systems are in some cases generic descriptions of seniority and are not necessarily complete.

# EXHIBIT H (V)

Exhibit H (V)

**INTERROGATORY NO. 15**

        Identify each Intercompany Loan.

**RESPONSE TO INTERROGATORY NO. 15**

        The Joint Administrators identify below, to the best of their knowledge, information, and belief as of the date of these Responses, each Intercompany Loan.  The Joint Administrators have compiled the information set forth below based on review of the documents and information available to them as of the date of these Responses.  Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems.  The fact that an Intercompany Loan or specific details of an Intercompany Loan are not identified below is without prejudice to the right of the Joint Administrators to later claim that such Intercompany Loan or such details of an Intercompany Loan existed and support the Joint Administrators' claims.  The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

## NN Ireland Intercompany Loans

1. On or about June 14, 2006, NN Ireland and NNL entered into an interest free Revolving Loan Agreement, with a maximum facility amount of €80,000,000.

   a. On or about June 16, 2006, NNL drew €80,000,000 from this facility. The Joint Administrators are not currently aware of the bank account details for this transfer.

   b. On or about July 19, 2006, NNL repaid €80,000,000 to NN Ireland. NNL transferred the funds to an NN Ireland account at Citibank London, bearing the account number 8544484. The Joint Administrators are not currently aware of the details of the bank account from which these funds originated.

2. On or about April 17, 2008, NN Ireland and NNL entered into an interest free Revolving Credit Facility in the amount of €100,000,000.

   a. On or about April 21, 2008, NNL drew the full €100,000,000 from this facility. NN Ireland made two payments of €50,000,000 each from its account at Citibank London, bearing the account number 8544484, to an NNL account at Citibank, bearing the account number 38545364.

   b. On or about April 23, 2008, NN Ireland declared a €21,608,750 dividend in favor of NNL, which was applied against the balance of the loan, reducing the balance to € 78,391,250.

   c. On or about September 30, 2008, NNL drew down an additional €20,008,750 as a purported repayment to NN Ireland of an unlawful dividend that NNL had received from NN Ireland in June 2008. This drawdown increased the loan balance to €98,400,000.

   d. On or about October 23, 2008, NNL purportedly repaid €41,716,357.15 of the loan by applying a transfer pricing adjustment receivable from NN Ireland, thereby reducing the loan balance to €56,683,642.85.

   e. On or about November 25, 2008, NNL purportedly repaid another €36,006,239.96 by again applying a transfer pricing adjustment receivable from NN Ireland, thereby reducing the loan balance to €20,677,402.89.

   f. On or about December 16, 2008, NNL purportedly discharged the remaining €20,677,402.89 of the loan by applying a partial transfer pricing adjustment receivable from NN Ireland.

NNUK Intercompany Loans

1. On or about December 10, 2003, NNUK and NNL entered into an interest free Revolving Loan Agreement with a maximum facility amount of £200,000,000.

2. On or about October 31, 2004, NNUK and NNL entered into an interest free Amended and Restated Revolving Loan Agreement with a maximum facility amount of £250,000,000.

3. On or about April 1, 2005, NNUK and NNL entered into a Revolving Loan Agreement (Interest Free) with a maximum facility amount of £350,000,000.

4. On or about December 29, 2005, NNUK and NNL entered into an Amended and Restated Revolving Loan Agreement (Interest Free) with a maximum facility amount of £500,000,000.

5. On or about December 27, 2006, NNUK and NNL entered into an Amended and Restated Revolving Loan Agreement (Interest Free) with a maximum facility amount of £500,000,000.

6. On or about September 12, 2007, NNUK and NNL entered into an Amended and Restated Revolving Loan Agreement (Interest Free) with a maximum facility amount of £600,000,000.

7. On or about September 10, 2008, NNUK and NNL entered into an Amended and Restated Revolving Loan Agreement (Interest Free) with a maximum facility amount of £250,000,000.

Each of the transfers, dates, and amounts in respect of the above-identified NNUK Intercompany Loans are identified in the table at paragraph 27 of the NNUK Claim against NNL and paragraph 62 of the NNUK Claim against NNI. The drawdowns and transfers were each recorded in the books and records of NNUK as a set-off for transfer pricing payments due to NNUK from NNL. As a result, the Joint Administrators are not currently aware of any transfers of funds between bank accounts in respect of the above-identified NNUK Intercompany Loans.

NNSA Subordinated Loan

1. On or about September 9, 2002, NNSA and NNL entered into a Subordinated Shareholder Loan Agreement, pursuant to which NNL made a subordinated loan to NNSA of €200,000,000.

   a. On or about September 9, 2002, NNSA drew €50,000,000 from this facility. The payment was debited to an NNSA account at Société Générale, bearing the account number FR7630003021900002011531 17. The Joint Administrators are not currently aware of the details of the bank account from which these funds

originated.

b. On or about September 9, 2002, NNSA drew €9,352,845.64 from this facility as a non-cash transfer in settlement of an intercompany payable.

c. On or about November 18, 2002, NNSA drew €30,000,000 from this facility. The payment was debited to an NNSA account at Société Générale, bearing the account number FR7630003021900002011153117. The Joint Administrators are not currently aware of the details of the bank account from which these funds originated.

d. On or about December 10, 2002, NNSA drew €35,000,000 from this facility. The payment was debited to an NNSA account at BNP Paribas, bearing the account number FR7630004020890002208530776. The Joint Administrators are not currently aware of the details of the bank account from which these funds originated

e. On or about December 19, 2002, NNSA drew €75,647,154.36 from this facility. The payment was debited to an NNSA account at BNP Paribas, bearing the account number 3000402089001010260676. The Joint Administrators are not currently aware of the details of the bank account from which these funds originated

f. On or about December 23, 2003, €150,000,000 of the subordinated loan was converted into equity in NNSA held by NNL, leaving a remaining balance under the facility of €50,000,000.

g. On or about February 25, 2008, NNSA repaid €25,000,000 of the balance outstanding on the loan to NNL, leaving a remaining balance of €25,000,000. The payment was debited from an NNSA account at Société Générale, bearing the account number FR7630003021900002011153117, and paid to an NNL account at Citibank, bearing the account number 38545364.

# EXHIBIT H (VI)

Exhibit H (VI)

**INTERROGATORY NO. 42**

Identify all other Transactions on which your Allocation Positions and Claims are based, and the Persons associated with You most knowledgeable about them.

**RESPONSE TO INTERROGATORY NO. 42**

The Joint Administrators identify below, to the best of their knowledge,

information, and belief as of the date of these Responses, all Transactions on which their

Allocation Positions and Claims are based, and the Persons most knowledgeable about such

Transactions. The Joint Administrators have compiled the information listed below based on

review of the limited documents and information available to them as of the date of these

Responses.  Where appropriate, the Joint Administrators have relied upon information in legacy

Nortel systems and/or information in publicly available sources.  The fact that a Transaction or

Person is not specified below is without prejudice to the right of the Joint Administrators to

claim at a later date that such Transaction existed and supports the Joint Administrators' claims

and/or that such Person is most knowledgeable about any Transaction.  The Joint Administrators

reserve the right to supplement or amend the list below as documents and information become

available in discovery.

Transfer Pricing Claims

1.  The entry into the Master Research and Development Agreement entered into on December 22, 2004, with an effective date of January 1, 2001, by NNL, NNI, NN Ireland, NNSA, NN Australia, and NNUK, as amended by:

    a.  the First Addendum of October 2005 to June 2006 (signed on various dates);

    b.  the Alcatel Amendment, with an effective date of December 30, 2006;

    c.  the Second Addendum, dated December 14, 2007, with an effective date of January 1, 2006;

    d.  the Third Addendum, undated, with an effective date of January 1, 2006;

    e.  the Fourth Addendum, undated, with an effective date of December 31, 2008;

    and transactions, including transfer pricing adjustments, purportedly conducted thereunder.

2.  The entry into the Distribution Agreements between NNL and the remaining EMEA Claimants, with effect from January 1, 2001.

The Persons most knowledgeable about the Transfer Pricing Claims are those listed in the Responses to Interrogatory Nos. 5 and 6 in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013.

# EXHIBIT H (VII)

Exhibit H (VII)

**INTERROGATORY NO. 50**

Identify all Transactions on which the claims against the Directors are based, and the Persons associated with You most knowledgeable about them.

**RESPONSE TO INTERROGATORY NO. 50**

The Joint Administrators identify below, to the best of their knowledge, information, and belief as of the date of these Responses, all Transactions on which the claims against the Canadian Directors and the *de jure* Directors of the EMEA Entities are based and the Persons most knowledgeable about such Transactions. The Joint Administrators have compiled the information set forth below based on review of the limited documents and information available to them as of the date of these Responses. Where appropriate, the Joint Administrators have relied upon information in legacy Nortel systems and/or information in publicly available sources. The fact that a Transaction or Person is not specified below is without prejudice to the right of the Joint Administrators to later claim that such Transaction existed and supports the Joint Administrators' claims against the Directors and/or that such Person is most knowledgeable about any Transaction. The Joint Administrators reserve the right to supplement or amend the list below as documents and information become available in discovery.

1. The Transfer Pricing Claims as described in the Response to Interrogatory No. 42. The Persons most knowledgeable about the Transfer Pricing Claims are those listed in the Responses to Interrogatory Nos. 5 and 6 in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013.

2. The Intercompany Loans as described in the Response to Interrogatory No. 15. The Persons most knowledgeable about Intercompany Loans are those listed in the Response to Interrogatory No. 13 in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013.

3. The failure by the Directors to ensure that appropriate provision was made to meet the liabilities of the NNUK Pension Plan. The Persons most

97

knowledgeable about this Transaction are those listed in Responses to Interrogatory Nos. 29-30, 36-37, and 39 in the Joint Administrators' First Set of Responses to the Consolidated Interrogatories, dated June 27, 2013.

4. The appointment by NNSA of KPMG as its statutory auditor. The Person most knowledgeable about this Transaction is:

> Philippe Albert-Lebrun
> Manager Treasury Operations (NNSA), 1/1/1999 – 7/31/2001
> Treasury Professional Services Europe (NNSA), 8/1/2001 – 11/30/2003
> Director, Finance & Control (NNSA), 12/1/2003 – 12/13/2003
> Finance – Treasury (NNUK), 12/1/2003 – 6/30/2008
> Financial Results Accounting (NNUK), 7/1/2008 – 3/30/2011
> Non Payroll Worker (NNUK), 4/1/2011 – 2/29/2012
> Avaya, Immeuble Central Park, 9 rue Maurice Mallet, 92445 Issy Les Moulineaux, Paris, France
> +33 (0)1 4094 7800

Date:    July 3, 2013

LAX O'SULLIVAN SCOTT LISUS LLP
SUITE 2750, 145 KING STREET WEST
TORONTO, ONTARIO  M5H 1J8

MATTHEW P. GOTTLIEB  LSUC#: 32268B
TRACY WYNNE LSUC#: 37395R
TEL:    (416) 644-5344
FAX:    (416) 598-3730

DAVIES WARD PHILLIPS & VINEBERG LLP
155 Wellington Street West
Toronto, ON  M5V 3J7

Robin B. Schwill (LSUC #38452I)
Bryan D. McLeese (LSUC #55607C)
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Nortel Networks UK Limited
(In Administration) et. al.

TO:    ATTACHED SERVICE LIST