**<u>EXHIBIT A-3</u>**

## APPENDIX O

## RESPONSE AND LIMITED OBJECTION OF THE MONITOR AND THE CANADIAN DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | **Re: Dkt. No. 12618** |

## RESPONSE AND LIMITED OBJECTION OF THE MONITOR AND THE CANADIAN DEBTORS TO THE US DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT

Ernst & Young Inc., the court-appointed monitor (the **"Monitor"**) in proceedings (the

**"Canadian Proceedings"**) under Canada's *Companies' Creditors Arrangement Act*, R.S.C.

1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial

List) (the **"Ontario Court"**), and Nortel Networks Corporation and certain of its direct and

indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel

Networks Global Corporation, and Nortel Networks International Corporation (the **"Canadian**

**Debtors"**, and with the Monitor, the **"Canadian Parties"**), hereby file this Response and

Limited Objection *to the Debtors' Motion For Entry of an Order Pursuant to 11 U.S.C. §§ 105,*

*363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the US Claims*

*Litigation Settlement Agreement by and Among the Debtors, the Creditors' Committee, the Joint*

*Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel*

---

[1] The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates (the "**Motion**").[2]

In support thereof, the Canadian Parties respectfully submit as follows:

## RESPONSE AND LIMITED OBJECTION

1.    The Canadian Parties support efforts to settle a portion of this litigation in order to distribute as much value to stakeholders as quickly as possible. However, inasmuch as the Settlement Agreement impacts the Litigation Timetable and Discovery Plan approved by the Courts as well as the protocol governing the conduct of the trial that is currently being negotiated by the Core Parties, it is important for both Courts to provide specific directions such that the Core Parties have certainty on key matters moving forward.[3] Specifically, Section 6.1 of the Settlement Agreement creates substantial uncertainty and a real risk of prejudice to the Canadian Parties at this advanced stage of the process. It provides that:

> [T]he US Debtors, the Committee, the UK Pension Parties, the Joint Administrators on behalf of the EMEA Debtors, the Liquidator on behalf of NNOCL and the EMEA Non-Filed Entities agree that they will work in good faith commencing on the date of execution of this Agreement by all of the Parties (with the exception of the US Non-Filed Entities) . . . in an effort to see if they can develop a common allocation position and other agreements related to the conduct of the trial. To that end, such Parties will use commercially reasonable best efforts during the Allocation Cooperation Period[4] to coordinate and co-operate in respect of (a) discussion of experts on allocation methodologies in connection with the Allocation Dispute and preparation of submissions and reports regarding the same; (b) remaining depositions and discovery; (c) conduct of the trial of the Allocation Dispute; (d) pre-trial motion practice and pre and post-trial briefing in respect of the Allocation Dispute; and (e) appeals, if any, from determinations

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3]    The proposed settlement of the EMEA Claims and the UK Pension Claims as against the Debtors does not in any way change the Courts' prior direction to simultaneously hear the allocation and EMEA and UK pension claims disputes or the requirement that both this Court and the Ontario Court be given the opportunity to fully consider all relevant factual and legal matters that impact on those disputes.

[4]    The "Allocation Cooperation Period" is an open-ended period that commenced upon execution of the Settlement Agreement and that ends at the discretion and election of any Settlement Party upon five (5) business days written notice of its intention to no longer seek to develop a common allocation position.

228

in respect of the Allocation Dispute at or following trial.

Settlement Agreement ¶ 6.1.

2.    In May 2013, each of the Core Parties filed opening statements setting out their positions and theories of allocation. Many decisions have been made and enormous resources have been invested based on those statements. Discovery thus far has involved the production of millions of documents and over 100 depositions. All of this has been done with an understanding of various positions as set out in the statements and based on the rigorously negotiated timelines and agreements reflected in the Litigation Timetable and Discovery Plan and related agreements which govern the conduct of this litigation and which were approved by both this Court and the Ontario Court.

3.    The *possibility* that Section 6.1 may lead to yet another allocation position or to an existing allocation position not being pursued is itself prejudicial to the Canadian Parties, and is not something presently contemplated by the Litigation Timetable and Discovery Plan. Other parties cannot effectively or efficiently prepare for trial with the risk that a new theory (or theories) might be sprung on them at any time, or that an existing theory might be "dropped" and need not ultimately be addressed.  Indeed, such actions could threaten to derail the (already twice-extended and modified) Litigation Timetable and Discovery Plan. Moreover, it is not possible to agree on the key terms of a trial protocol until there is clarity on whether the US and EMEA interests are united on allocation, or whether they will be presenting independent positions, each of which will need to be addressed by the Canadian Parties in response.

4.    The Settlement Parties cannot now, at nearly the end of fact discovery, be given *carte blanche* to develop a new theory or theories of allocation or switch to another existing theory. Therefore, the Canadian Parties request that: (i) any common allocation position

3

developed by any combination of the Settlement Parties be limited to an allocation position

previously asserted by a Core Party; and (ii) the Settlement Parties be required to disclose their

final allocation positions to the other Core Parties, this Court, and the Ontario Court no later than

January 8, 2014.

5.    The Debtors have proposed a hearing on the Motion for January 7, 2014, which

would proceed solely before this Court. In light of the substantial impact the Settlement

Agreement has on the allocation and claims dispute as a whole, the Canadian Parties request that

the Motion be heard in a joint hearing with the Ontario Court pursuant to the provisions of the

Cross-Border Insolvency Protocol approved in these cases by the Court's Order dated June 29,

2009 [Dkt. No. 990].[5]

6.    In addition to the matters addressed above, the Settlement Agreement raises other

issues that impact the rights and interests of the Canadian Parties. The Canadian Parties will

discuss these matters with the Settlement Parties in the coming weeks with a view to providing

for their resolution without the involvement of the Courts. However, should they not be resolved,

the Canadian Parties reserve the right to supplement and amend this Response and Limited

Objection to specifically address such matters and seek further relief from the Courts.

## CONCLUSION

7.    The Canadian Parties respectfully request that (i) to the extent any of the

Settlement Parties seek to develop a common allocation position as contemplated by the

Settlement Agreement, such Settlement Parties be limited to a position previously asserted by a

Core Party in its initial allocation pleadings, (ii) the Settlement Parties be required to disclose

---

[5]    Additionally, a joint hearing is appropriate because the Canadian Parties were not informed of any discussions regarding the EMEA Claims until a few minutes prior to the filing of the Motion, notwithstanding the consultation requirements of the Cross-Border Protocol on the Resolution of Claims, as approved by this Court on September 16, 2010 [Dkt. Nos. 3922 and 3956], with respect to "Material Overlapping Claims" such as the EMEA Claims.

4

their final allocation positions to the other Core Parties, this Court, and the Ontario Court no later

than January 8, 2014, and (iii) the Motion be heard jointly with the Ontario Court on a date to be

determined following consultation with the Ontario Court.

Dated: December 19, 2013
        Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/   Kathleen A. Murphy
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
1105 North Market Street, Suite 1900
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Ken Coleman
Daniel Guyder
Paul Keller
Laura Hall
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

# APPENDIX P

## SUPPLEMENTAL RESPONSE AND LIMITED OBJECTION OF THE MONITOR AND THE CANADIAN DEBTORS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
|  | (Jointly Administered) |
| Debtors. | Re: Dkt. Nos. 12618, 12686 |

## SUPPLEMENTAL RESPONSE AND LIMITED OBJECTION OF THE MONITOR AND THE CANADIAN DEBTORS TO THE US DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT

Ernst & Young Inc., the court-appointed monitor (the "**Monitor**") in proceedings (the "**Canadian Proceedings**") under *Canada's Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "**Ontario Court**," and together with this Court, the "**Courts**"), and Nortel Networks Corporation and certain of its direct and indirect subsidiaries, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation, and Nortel Networks International Corporation (the "**Canadian Debtors**," and with the Monitor, the "**Canadian Parties**"), hereby file this Supplemental Response and Limited Objection to the *Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the US Claims Litigation Settlement Agreement by and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors,*

---

[1]     The debtors in the chapter 11 cases, along with the last four digits of each such debtor's tax identification number, are: Nortel Networks Inc. (6332); Nortel Networks Capital Corporation (9620); Nortel Altsystems Inc. (9769); Nortel Altsystems International Inc. (5596); Xros, Inc. (4181); Sonoma Systems (2073); Qtera Corporation (0251); CoreTek, Inc. (5722); Nortel Networks Applications Management Solutions Inc. (2846); Nortel Networks Optical Components Inc. (3545); Nortel Networks HPOCS Inc. (3546); Architel Systems (U.S.) Corporation (3826); Nortel Networks International Inc. (0358); Northern Telecom International Inc. (6286); Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

232

*Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates* (the "**Motion**").[2]

In support thereof, the Canadian Parties respectfully submit as follows:

## SUPPLEMENTAL RESPONSE AND LIMITED OBJECTION

### A.    Overview

1.      The Canadian Parties file this Supplemental Response and Limited Objection further to their filing of the *Response and Limited Objection of the Monitor and the Canadian Debtors to the US Debtors' Motion for Entry of an Order Approving the US Claims Litigation Settlement Agreement* on December 19, 2013 (the "**Initial Response**") [Dkt. No. 12686], which accompanied their request for a joint hearing by the Courts to ensure due consideration of their concerns [Dkt. No. 12687].

2.      The Canadian Parties do not object to the proposed Settlement Agreement in principle. Nor do the Canadian Parties question the sole jurisdiction of this Court to approve the US Debtors entry into the Settlement Agreement.

3.      However, the Settlement Agreement, and in particular the Settlement Parties' agreement to work to develop a common allocation position, has a significant impact on the allocation and claims litigation pending under the Allocation Protocol approved by both this Court and the Ontario Court (the "**Allocation Protocol Litigation**").[3] In order to avoid prejudice to the Canadian Parties and the potential for further time-consuming motion practice, the Canadian Parties are requesting that as a condition to approval of the Settlement Agreement, the Courts order that an "outside date" of January 24, 2014, be established for each Settlement Party to advise whether it is adopting a common allocation position with any other Settlement Party.

---

[2]      Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3]      *See Order Entering Allocation Protocol* dated May 17, 2013 [Dkt. No. 10565].



This will provide the Canadian Parties with certainty regarding the number of competing allocation theories they will need to respond to and avoid further unnecessary expense being incurred addressing allocation theories that will ultimately not be pursued at trial.[4] In addition, the Canadian Parties request that the Courts order that the Settlement Agreement not enhance a Settlement Party's rights in respect of, or otherwise impact, any subsequent motion brought by such Settlement Party seeking leave to amend its allocation pleading. Such conditions are appropriately considered and ordered by both Courts in the context of a joint hearing insofar as they relate to the Allocation Protocol Litigation.

4.    Further, the Settlement Agreement proposes to resolve "Material Overlapping Claims"[5] against the US Debtors that, in addition to being subject to the Allocation Protocol, are the subject of the Cross-Border Protocol on the Resolution of Claims (the "**Cross-Border Claims Protocol**") approved by both this Court and the Ontario Court, which, by its terms, provides for resolution of any disputes concerning such Material Overlapping Claims to be resolved by joint hearing.[6] As detailed below, the Canadian Parties object to a provision of the US Debtors' proposed order approving the Settlement Agreement (the "**Proposed Order**") that would purport to bind non-parties to the agreement among the Settlement Parties that the Settlement Agreement does not affect claims by or against non-parties. In addition to it being

---

[4]    The Canadian Parties' Initial Response requested that an outside date of January 8, 2014, be imposed. The Canadian Parties are prepared to extend that date to January 24, 2014, being the date expert reports are due. The formal Allocation Cooperation Period commenced on December 17, 2013, giving the Settlement Parties approximately 7 weeks in total to attempt to reach a common allocation position.

[5]    That is, claims that have been filed in both these chapter 11 cases and the Canadian Proceedings by the same party, and that arise from the same claim, action, liability, property, agreement lease, debt or transaction.

[6]    See this Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol* dated September 16, 2010 [Dkt. No. 3956] (the "**Cross-Border Claims Protocol Order**"), which order, *inter alia*, approved the Cross-Border Claims Protocol, which protocol was attached as Exhibit B to the US Debtors' motion for approval of a cross-border claims protocol dated September 11, 2010 [Dkt No. 3922]. Copies of the Cross-Border Claims Protocol Order and the Cross-Border Claims Protocol as approved by the Court (and the Ontario Court) are attached hereto as Exhibit A and B, respectively.

generally inappropriate to bind non-parties to the Settlement Parties' agreement, this provision is

unnecessary to the extent it purports to affirm what is contained in the prior Order of this Court

which provides that the resolution of claims in these chapter 11 cases is without prejudice to the

rights and defenses of the Canadian Debtors and the Monitor in the Canadian Proceedings. In

accordance with the Cross-Border Claims Protocol, these disputes are also appropriately

considered and resolved at a joint hearing.[7]

5.        Finally, the Canadian Parties also object to a provision of the Settlement

Agreement which suggests that certain of its provisions supersede the IFSA and the CFSA (as

defined below), which were agreements among a broader group of parties than those who are

party to the Settlement Agreement. As the IFSA and CFSA were approved by both this Court

and the Ontario Court and the approval of both Courts is required for any material amendments

to such agreements, a joint hearing is also required to resolve this dispute.

## B.    A Joint Hearing is Appropriate to Consider the Motion and the Limited Objection of the Canadian Parties

6.        Pursuant to the Cross-Border Insolvency Protocol approved by this Court[8] and the

Ontario Court (the "**Cross-Border Protocol**"), a copy of which is attached hereto as Exhibit C,

this Court and the Ontario Court may conduct joint hearings with respect to any cross-border

matter. *See* Cross-Border Protocol, Section 12(d). The Settlement Agreement is clearly a cross-

border matter as it has a significant impact on the Allocation Protocol Litigation currently

pending before both Courts in light of the Settlement Parties' agreement to work to develop a

common allocation position, and also because it resolves claims asserted against the US Debtors

---

[7]        In addition, the claims filed by the UK Pension Parties against the US Debtors (and the parallel claims by the UK Pension Parties against the Canadian Debtors) (collectively, the "**UK Pension Claims**") are also the subject of the Allocation Protocol Litigation, so it is appropriate for disputes regarding their resolution to also be resolved via joint hearing.

[8]        The Cross-Border Insolvency Protocol was approved by the Order of this Court dated June 29, 2009 [Dkt. No. 990].

4

235

that are the subject of the Allocation Protocol Litigation, while purporting to preserve the parallel claims against the Canadian Debtors that are also the subject of the Allocation Protocol Litigation. Moreover the Settlement Agreement resolves Material Overlapping Claims as defined under the Cross-Border Claims Protocol. Disputes regarding the resolution of such claims are clearly a cross-border matter and, in any event, such disputes are expressly subject to resolution at a joint hearing pursuant to the terms of the Cross-Border Claims Protocol.

7.    In addition to the jurisdiction of both Courts to hear the Motion pursuant to Section 12 of the Cross-Border Protocol, upon any motion being filed or relief sought in either Court seeking certain specified "Requested Relief," a Core Party (as defined in the Cross-Border Protocol, which as defined includes the Monitor and Canadian Debtors) may request that the party filing the motion seek a joint hearing for the requested relief. *See* Cross-Border Protocol Section 15. The various specified forms of Requested Relief include, *inter alia*, any motion *relating* to any motion to allocate sale proceeds which are in the aggregate more than US $30 million and where at least one US Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one US Debtor and one Canadian Debtor. Given the impacts of the Settlement Agreement on the Allocation Protocol Litigation as described herein, the Motion is for Requested Relief as it *relates* to a motion to allocate sale proceeds (i.e. the joint motions of the US Debtors and the Canadian Parties to establish the Allocation Protocol that gave rise to the Allocation Protocol Litigation).

8.    The Motion is also appropriately heard at a joint hearing insofar as it relates to "Material Overlapping Claims," the resolution of which are (in part) contested by the Canadian Parties. The Courts approved the Cross-Border Claims Protocol to supplement their respective claims resolution procedures and to "[. . .] establish an efficient and consistent procedure to address the filing and resolution of claims in the Insolvency Proceedings." Cross-Border Claims

5

Protocol, Section 7. Further, the Cross-Border Claims Protocol Order specifically provides that, "[t]he Debtors' resolution of Same-Creditor Claims and Overlapping Claims (each as defined in the [Cross-Border Claims Protocol] is subject to the [Cross-Border Claims Protocol] in accordance with the terms thereof." Cross-Border Claims Protocol Order, Section 3.

9.      The claims filed by the EMEA Debtors and their administrators and liquidators against the US Debtors and Canadian Debtors (the "**EMEA Claims**")[9] that are proposed to be settled as against the US Debtors pursuant to the Settlement Agreement are "Overlapping Claims" as defined in the Cross-Border Claims Protocol in that: (i) they have been filed in both these chapter 11 cases and the Canadian Proceedings; (ii) they were filed by the same parties (i.e., the EMEA Debtors and their administrators and liquidators); and (iii) they arise from the same underlying claim, action, liability, property, agreement, lease, debt or transaction.[10] *See* Cross-Border Claims Protocol, Section 11. Further, they are further *Material* Overlapping Claims in that they assert an amount over $1 million in either jurisdiction (or are wholly or partially unliquidated) and the US Debtors have proposed to settle them for an amount equal to or greater than $1 million. *See* Cross-Border Claims Protocol, Section 17(c).

10.     By virtue of being Overlapping Claims, the EMEA Claims are subject to various provisions of the Cross-Border Claims Protocol, including provisions regarding cooperation and consultation regarding such claims between the US Debtors, on the one hand, and the Canadian

---

[9]      For ease of reference, the term "EMEA Claims" as used herein shall be taken to include claims asserted by certain non-debtor subsidiaries of the EMEA Debtors that are also the subject of the Allocation Protocol Litigation and "EMEA Debtors" shall be taken to include such non-debtor subsidiaries.

[10]      The EMEA Claims against both the US Debtors and Canadian Debtors are based on the same "underlying claim, action, liability, property, agreement, lease, debt or transaction" insofar as they are for the most based based on the alleged impropriety of certain intercompany arrangements and transactions, such as (and without limitation) Nortel's transfer pricing regime (as agreed to under the Master Research & Development Agreement) and "Project Swift." Although by their facts the claims filed by the UK Pension Parties against the US Debtors and Canadian Debtors would also be Overlapping Claims, they are expressly excluded from the definition of Overlapping Claims by virtue of Section 13(a) of the Cross-Border Claims Protocol.

Debtors and the Monitor, on the other, and provisions regarding limits on aggregate distributions.

*See* Cross-Border Claims Protocol, Sections 15-17, and 23. In addition, by virtue of being

Material Overlapping Claims, the Cross-Border Claims Protocol provides:

> [. . .] if the Monitor, the Canadian Debtors and the U.S. Debtors in accordance
> with the terms hereof cannot agree on the appropriate resolution of Material
> Overlapping Claims in each jurisdiction, then the Monitor, the Canadian Debtors
> and the U.S. Debtors shall seek *joint direction from the Judges of both the
> Canadian Court and the U.S. Court* regarding the resolution of the claims, absent
> other agreement by the Canadian Debtors, the Monitor and the U.S. Debtors.
> [emphasis added]

Cross-Border Claims Protocol, Section 17.

As such, it is appropriate that the Motion and the objections of the Canadian Parties in response

thereto be considered by both Courts. Indeed, the US Debtors are obligated under the Cross-

Border Claims Protocol to seek a joint hearing in the circumstances.

11.    In accordance with the Cross-Border Protocol, on December 19, 2013, the

Canadian Parties filed a Notice of Request for Joint Hearing [Dkt. No. 12687] (the "**Joint
Hearing Request**") in respect of the Motion. The Cross-Border Protocol provides that if a joint

hearing request is agreed to, "[. . .] the Requested Relief shall be heard at a Joint Hearing

conducted by the Courts in accordance with the procedures set forth in paragraph 12 of the

[Cross-Border Protocol] [. . .]." Cross-Border Protocol, Section 15(c). If the filing party does not

agree to seek a joint hearing, the party seeking to have the Requested Relief heard at a joint

hearing may file a notice of joint hearing dispute in both Courts whereupon the Courts may

consult with one another to determine whether a joint hearing is necessary or may otherwise

consult with the Core Parties prior to any party proceeding with the underlying Requested Relief

in the original proposed forum country. *See* Cross-Border Protocol, Section 15(d).[11]

---

[11]    In addition, where the issue of the proper jurisdiction of either Court to determine an issue is raised by an
interested party with respect to a motion filed in either Court, the Court before which such motion was initially filed

7



12.    The US Debtors have agreed to a joint hearing while purporting to reserve the right to contest the jurisdiction of the Ontario Court at such hearing. In addition to the substantive reasons outlined herein that demonstrate why a joint hearing is appropriate, the Canadian Parties contend that the US Debtors are estopped from contesting a joint hearing in respect of the Motion in light of their agreement to schedule a joint hearing.[12]

**C.     An Outside Date Needs to be Imposed by the Courts for the Settlement Parties to Advise of Whether they are Adopting Another Allocation Position**

13.    As outlined in the Initial Response, Section 6.1 of the Settlement Agreement has a significant impact on the Allocation Protocol Litigation as it provides for the Settlement Parties to work in good faith to reach a common allocation position. No outside date or other condition is imposed on such obligation; rather, a Settlement Parties' obligation to work towards developing a common allocation position ends only upon its provision of notice to the other Settlement Parties. *See* Settlement Agreement, Section 6.2.

14.    In light of the Settlement Parties agreement to enter into this open-ended Allocation Cooperation Period that began on December 17, 2013, the Canadian Parties' request that the Courts impose an outside date on the Settlement Parties' ability to adopt a common allocation position in order to prevent undue prejudice to the Canadian Parties and the other Core Parties. The imposition of this reasonable condition will ensure that the Canadian Parties and other Core Parties will not have to waste (further) limited resources addressing allocation

---

may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined, which process shall be subject to submissions by the Core Parties (which includes, among others, the US Debtors, the Canadian Debtors and the Monitor) and any interested party prior to a determination on the issue of jurisdiction being made by either Court. See Cross-Border Protocol, Sections 12(b) and 12(d).

[12]    Solely to the extent determined necessary by the Courts, this Supplemental Limited Response and Objection shall constitute the Canadian Parties' Notice of Joint Hearing Dispute in accordance with Section 15(d) of the Cross-Border Protocol, notice of same is hereby given to each of the other Core Parties, and the Canadian Parties hereby reaffirm their Joint Hearing Request as supplemented hereby and request that the Courts Order that the Motion is properly the subject of a joint hearing pursuant to the Cross-Border Protocol and the Cross-Border Claims Protocol.

positions that will ultimately not be pursued at trial. In addition, the Canadian Parties request that the Courts' order that the Settlement Agreement shall not in any way enhance a Settlement Party's rights in respect of, or otherwise impact, any motion brought by such Settlement Party seeking leave to amend its allocation pleading.[13]

15.     The Core Parties' initial allocation pleadings were filed in May 2013. Since that time, enormous resources have been spent by the Canadian Parties in a document discovery and deposition process that was guided by the content of those pleadings, including the three unique allocation positions set forth by each of the US Debtors (joined by the Official Committee of Unsecured Creditors, the Ad Hoc Group of Bondholders, Law Debenture Trust Company of New York and The Bank of New York Mellon), the EMEA Debtors and the UK Pension Parties. Further significant resources have and will continue to be spent by the Canadian Parties based on the existing allocation pleadings as the Core Parties move into the representative witness and expert phase of the discovery process that will take place over the course of the first three months of 2014 and into early April. If each of the Settlement Parties is not required to "show their cards" and adopt an allocation position in principle in the near future, there is the prospect of significant wasted expense and gamesmanship.

---

[13]     The Litigation Timetable and Discovery Plan does not contemplate amendments to a Core Party's pleadings. Rule 15 of the Federal Rules of Civil Procedure (the "**FRCP**"), made applicable in these proceedings pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that once a responsive pleading is served, a party requires the opposing party's consent or leave of the court to amend its pleading or complaint. FRCP 15(a)(2). Although leave to amend should be freely granted when justice so requires, upon a showing of undue prejudice to opposing parties, a court should not grant leave. See *Forman v. Davis*, 371 U.S. 178, 182 (1962). Under Ontario law, a Court shall grant leave to a party to amend its pleadings on such terms as are just, unless prejudice would result that could not be compensated for by costs or an adjournment (*Rules of Civil Procedure* (Ontario), Rule 26.01). The Initial Response originally requested that the Courts order that any common allocation position developed by the Settlement Parties be limited to an existing allocation position. Although the Canadian Parties maintain they would suffer significant and irremediable prejudice if a "new" allocation position were adopted at this stage of the litigation, they are prepared to reserve their rights on this issue if and until such a motion is brought to the Courts. However, the fact that the current trial date is peremptory renders the remediation of any such change in position through an adjournment problematic.

240

16.     At present, the Canadian Parties have three competing allocation cases to disprove and must use their limited time and resources accordingly. The possibility that one (or more) of the three competing allocation positions of the Settlement Parties might be "dropped" at some unspecified future date as a result of the Settlement Parties' agreement is prejudicial to the Canadian Parties given the expense they have incurred and will continue to incur developing responses to such positions. This prejudice increases with each passing day and becomes particularly acute as the Core Parties move into the expert phase of the Allocation Protocol Litigation. In particular, it is anticipated that on January 24 expert reports will be delivered in support of each of the Settlement Parties' current allocation positions, which in turn will require the delivery of rebuttal reports by the Canadian Parties' experts by February 28.[14] The Canadian Parties submit it would be unreasonable for them to incur expense responding to expert reports in support of allocation positions that will not ultimately be pursued at trial. As such, the Canadian Parties request that January 24, 2014 (being the day expert reports are delivered), be established as the outside date for the Settlement Parties to advise if they are adopting a common allocation position with any other Settlement Party.

17.     In addition to significant (and growing) wasted effort and expense if an existing allocation theory of a Settlement Party is ultimately dropped, there is the possibility of gamesmanship in the current scenario insofar as keeping all existing allocation positions of the Settlement Parties on the table necessarily divides the attention and efforts of the Canadian Parties. Although the Canadian Parties have no doubt the Settlement Parties will proceed to consider adopting a common allocation position in good faith based on their respective best interests, the mischief, controversy and litigation that would result from late in the day changes

---

[14]     Under the Litigation Timetable and Discovery Plan (as amended), expert reports are due January 24, 2013, and rebuttal expert reports are due February 28, 2014.

10

to allocation positions can be headed off now by the Courts establishing a clear outside date for the Settlement Parties to reach agreement on whatever common allocation position some or all of them may elect to adopt.[15]

18.    The Canadian Parties are cognizant that the Settlement Parties have not yet sought leave to amend their allocation pleadings. However, the Settlement Agreement as a whole, and in particular the Allocation Cooperation Period, creates the clear possibility of wholesale changes to the Settlement Parties' existing allocation positions and amendments to their allocation pleadings. Left open-ended, there is the potential for significant prejudice to the Canadian Parties and other Core Parties, additional wasted cost and effort, and further costly, time-consuming motion practice to resolve the dispute that will undoubtedly arise if a Settlement Party seeks to amend its allocation pleading and adopt another position at some unascertained future date. By imposing an outside date on the Settlement Parties to reach agreement on a common allocation position, the Courts can reduce the prejudice resulting to the Canadian Parties from wholesale changes to the Settlement Parties' allocation positions, limit the wasted expense that has and will be incurred by the Canadian Parties responding to allocation positions that will not be pursued, and avoid the mischief and litigation that would result from the Settlement Parties' adopting a common allocation position at some unascertained future date.[16]

19.    To be clear, the Canadian Parties are not looking to preclude a Settlement Party's ability to make *any* amendment to its allocation position after January 24, 2013. Rather, they seek to preclude only the wholesale change and abandonment of a Settlement Party's existing

---

[15]    In addition to significant wasted expense and gamesmanship, as noted in the Initial Response, not knowing whether the Settlement Parties will adopt a common allocation position or present independent positions significantly complicates the Core Parties' negotiations regarding a trial protocol and may make it impossible to reach agreement on such a protocol.

[16]    This timing will also still allow for representative party discovery to proceed and be completed before the reply expert reports are due on February 28, 2014 (which is the subject of another motion being heard at the January 7 joint hearing).

11

allocation position in favour of a common allocation position, which change would significantly alter the landscape of the Allocation Protocol Litigation and prejudice the Canadian Parties for the reasons described above. To the extent a Settlement Party seeks to amend its allocation pleading after January 24, 2013, to refine its position, such amendment would be subject to the usual test governing amendments.

20.    In light of the foregoing it is appropriate and necessary that the Courts impose an outside date on the Settlement Parties at this juncture. The imposition of this reasonable condition on the Settlement Parties' agreement will ensure that the Canadian Parties do not suffer undue prejudice or incur further unnecessary expenses as a result of all or some of the Settlement Parties electing to adopt a common allocation position.

**D.    Consultation Obligations of the US Debtors with the Canadian Debtors and the Monitor**

21.    With respect to the US Debtors' obligation to consult with the Monitor and the Canadian Debtors regarding the Settlement Agreement (as the US Debtors were obligated to do as the Settlement Agreement resolves Material Overlapping Claims), counsel to the Monitor and Canadian Debtors were first provided notice of the Settlement Agreement approximately ten minutes prior to the filing of the Motion. At paragraph 42 of the Motion, the US Debtors state that:

> No further notice is required under [the Cross-Border Claims Protocol], as approved by this Court on September 16, 2010 [D.I. 3922 and 3956] as the Debtors consulted with the Monitor and the Canadian Debtors in advance of filing the Motions to Dismiss and the entry of the Allocation Protocol, including in the course of three mediations, and this Court and the [Ontario Court] provided joint direction of the procedure for resolving the EMEA Claims, the French Liquidator Claim and the UK Pension Claims pursuant to the Allocation Protocol.

The Canadian Debtors and Monitor are prepared to adopt and rely upon the US Debtors' interpretation of the consultation provisions of the Cross-Border Claims Protocol provided that it

also applies to their own consultation obligations under both the Cross-Border Claims Protocol

and the Claims Resolution Order of the Ontario Court dated September 16, 2010.

**E.    Attempt to Bind Non-Parties to Agreement that Settlement does not Affect Claims
By or Against Non-Parties is Inappropriate and is Inconsistent with the Prior Order
of the Court**

22.    Notwithstanding that the EMEA Claims constitute Material Overlapping Claims,

both the Motion and the Settlement Agreement contain numerous references which provide that

the EMEA Claims as against the US Debtors are "wholly separate and distinct" from the same

claims against the Canadian Debtors. Similar language is used to describe the UK Pension

Claims as against the US Debtors relative to the same claims against the Canadian Debtors.[17]

The Canadian Parties do not agree with these characterizations.

23.    The releases and other provisions of the Settlement Agreement also make clear

the Settlement Parties' agreement that nothing in the Settlement Agreement shall: (i) constitute a

release, waiver or discharge of the EMEA Claims or UK Pension Claims as against the Canadian

Debtors; (ii) prevent or in way inhibit arguments of the EMEA Debtors or UK Pension Parties in

respect of such claims; or (iii) operate as or constitute an admission with respect to the merits of

any allegations or arguments underlying such claims. *See* Settlement Agreement, Section 4.1.

The Settlement Parties then attempt to bootstrap and expand the application of this contractual

agreement to non-parties through the Proposed Order approving the Settlement Agreement by

providing that:

> No claims by or against persons other than the Parties to the Settlement
> Agreement and the persons contemplated in the releases contained therein shall be
> affected by the Settlement Agreement.

Proposed Order, Section 4.

---

[17]    See, for instance, the Settlement Agreement at page 3, which describes the EMEA Claims and UK Pension
Claims as against the US Debtors as "wholly separate and distinct" from those claims as against the Canadian
Debtors.

24.     Although the Canadian Debtors and Monitor do not take issue with the Settlement

Parties' contractual agreement among themselves that the releases and related provisions do not

affect claims by or against non-parties, they do take issue with the attempt to bind non-parties

(the Canadian Debtors presumably being the most relevant non-parties in this regard as the other

persons against whom the EMEA Claims and UK Pension Claims are asserted) to this agreement

and submit that such relief is not appropriate and should not be granted. In addition to such relief

being inappropriate generally,[18] it is expressly contrary to the Cross-Border Claims Protocol

Order previously entered by this Court, which provides that:

> The resolution of any Overlapping Claims and Same-Creditor Claims in these
> chapter 11 cases *shall be without prejudice to the rights and defenses of the
> Canadian Debtors and the Monitor with respect to such Overlapping Claims and
> Same-Creditor Claims* in the Canadian Proceedings. [emphasis added]

Cross-Border Claims Protocol Order, Section 9.

Insofar as the noted provision of the Proposed Order would seek to limit the rights and defenses

of the Canadian Debtors (by precluding an argument that the releases granted in the Settlement

Agreement affect claims against the Canadian Debtors), it is contrary to this Court's prior order

that the resolution of claims in these cases be without prejudice to the rights and defenses of the

Canadian Debtors.[19]

25.     The question of what affect, if any, the Settlement Agreement has on the EMEA

Claims and UK Pension Claims as against the Canadian Debtors is not one that is before the

---

[18]     No basis is provided in the Motion as to why the terms of the Settlement Agreement should be imposed on
non-parties. To the extent the US Debtors or another Settlement Party subsequently provide such a basis, the
Monitor and Canadian Debtors reserve the right to reply to same.

[19]     Although as noted above the UK Pension Claims are not Overlapping Claims or Same-Creditor Claims by
virtue of being carved out of such definitions, the Canadian Debtors and Monitor submit that the same principle
should apply to the resolution of the UK Pension Claims as against the US Debtors; that is, their resolution should
be without prejudice to the rights and defenses of the Canadian Debtors and the Monitor. In any event, no basis has
been provided as to why it should be otherwise.

14

Courts and may never need to be addressed. However, the provision of the proposed Order seeking to bind non-parties to the Settlement Parties' agreement that the Settlement Agreement does not affect claims by or against non-parties is inappropriate and inconsistent with this Court's prior Order that the resolution of any claims in these chapter 11 cases is without prejudice to the rights and defenses of the Canadian Debtors and the Monitor in the Canadian Proceedings. As such, such provision should be struck.

**F.    The Settlement Agreement Cannot Supersede the IFSA or the CFSA**

26.    Finally, Section 8.9 of the Settlement Agreement provides:

For the avoidance of doubt, *unless explicitly stated herein*, this Settlement Agreement does not supersede either the IFSA or the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009, both of which remain in full force and effect. [emphasis added]

The Canadian Parties have requested that the Settlement Parties clarify the intent and meaning of this provision insofar as it contemplates the possibility that certain provisions of the Settlement Agreement may supersede the IFSA and the Final Canadian Funding and Settlement Agreement (the "**CFSA**"), which settlement was approved by the Order of this Court dated January 26, 2010 [Dkt. No. 2347]. Both of these agreements require the consent of all parties thereto (including, in both cases, the Canadian Parties) to amend and, if the amendment is material, approval of both Courts. See IFSA, Section 15; CFSA, Section 18. In addition, in the case of the CFSA, only the US Debtors and the Canadian Parties are party thereto, so it is unclear to the Canadian Parties how a provision of the Settlement Agreement could purport to supersede the CFSA. The Canadian Parties are hopeful that this issue can be resolved to their satisfaction prior to the hearing of the Motion but reserve the right to request that language be added to the requested Orders that nothing in the Settlement Agreement supersedes either the IFSA or the CFSA.

15

2446

## CONCLUSION

27.    The Canadian Parties respectfully request that: (i) each Settlement Party be required to disclose to the other Core Parties, this Court, and the Ontario Court by no later than January 24, 2014, whether it is adopting a common allocation position with any other Settlement Party; (ii) the Settlement Agreement not in any way enhance a Settlement Party's rights in respect of, or otherwise impact, any motion brought by such Settlement Party seeking leave to amend its allocation pleading; and (iii) the above-referenced provision of the Proposed Order seeking to bind non-parties to the agreement of the Settlement Parties that the Settlement Agreement does not affect claims by or against non-parties be struck.

*[Intentionally left blank]*

16



Dated: January 2, 2013
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**

/s/ Kathleen A. Murphy
Mary F. Caloway (No. 3059)
Kathleen A. Murphy
1105 North Market Street, Suite 1900
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Ken Coleman
Daniel Guyder
Paul Keller
Laura Hall
1221 Avenue of the Americas
New York, NY 10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
ken.coleman@allenovery.com
daniel.guyder@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*

248

## EXHIBIT A

249

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X

*In re*

Nortel Networks Inc., *et al.*,[1]

           Debtors.

-------------------------------------------------------------X

:   Chapter 11

:   Case No. 09-10138 (KG)

:   Jointly Administered

:   RE: D.I. 3922

## ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 502 APPROVING A
## CROSS-BORDER COURT-TO-COURT CLAIMS PROTOCOL

Upon the motion, dated September 11, 2010 (the "Motion")[2], of Nortel Networks Inc.

and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the

"Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a) and 502 of title 11 of the United State Code (the "Bankruptcy Code"), approving that

certain cross-border protocol on the resolution of claims attached thereto as Exhibit B (the

"Claims Protocol"); and adequate notice of the Motion having been given as set forth in the

Motion; and it appearing that no other or further notice is necessary; and the Court having

jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

1

and 1334; and the Court having determined that consideration of the Motion is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and approval of the Claims Protocol and the Claims

Resolution Order having been sought from the Canadian Court; and the Court having determined

that the legal and factual bases set forth in the Motion establish just cause for the relief requested

in the Motion, and that such relief is in the best interests of the Debtors, their estates, their

creditors and the parties in interest; and upon the record in these proceedings; and after due

deliberation;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Claims Protocol is approved in all respects, subject to approval of the same

by the Canadian Court, and as the Claims Protocol may be amended or supplemented in

accordance with the terms thereof.

3.      The Debtors' resolution of Same-Creditor Claims and Overlapping Claims (each

as defined in the Claims Protocol) is subject to the Claims Protocol in accordance with the terms

thereof.

4.      The Side Letters are approved in their entirety and the Debtors are authorized to

take all actions contemplated thereby.

5.      No claimant holding an Overlapping Claim or Same-Creditor Claim shall receive

aggregate distributions from the Debtors and the Canadian Debtors on account of such claim(s)

in excess of 100% of the amount of such allowed claim(s) (including any post-petition interest or

other amounts permitted under applicable law).

6.      Matters related to the manner in which distributions will be made by the Debtors

on allowed claims under the chapter 11 plans confirmed in these chapter 11 cases (including, as

2

related to the Debtors, any agreement that may be reached and approved by this Court as to distributions on Overlapping Claims) shall be governed by provisions in the Debtors' chapter 11 plans or the plan administration agreement executed in connection with the Debtors' chapter 11 plans, in either case as approved by this Court, which provisions shall be developed in consultation with the Committee and the Bondholder Group.

7.    The Debtors shall provide the Canadian Debtors and the Monitor with copies of the monthly reports on the status of claims filed against the Debtors that the Debtors provide to the Committee.

8.    The Debtors shall not agree with the Canadian Debtors or the Monitor to the resolution of a Material Overlapping Claim (other than the Bond Claims) proposed to be allowed at greater than $50 million without the prior written consent of the Committee.

9.    The resolution of any Overlapping Claims and Same-Creditor Claims in these chapter 11 cases shall be without prejudice to the rights and defenses of the Canadian Debtors and the Monitor with respect to such Overlapping Claims and Same-Creditor Claims in the Canadian Proceedings.

10.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: September 16, 2010
       Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

3

**EXHIBIT B**

## CROSS-BORDER PROTOCOL ON
## THE RESOLUTION OF CLAIMS

**Final Version**

## TABLE OF CONTENTS

PART I - BACKGROUND ......................................................................................................................... 1

    Canadian and U.S. Proceedings .......................................................................................................... 1
    Cross-Border Insolvency Protocol ..................................................................................................... 3
    Notice of Deadline and of Procedures for Filing Claims ................................................................... 4

PART II – SCOPE OF THIS CLAIMS PROTOCOL .......................................................................... 5

PART III – COOPERATION AND CONSULTATION ........................................................................ 7

PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS ......................................... 7

    Resolution of Overlapping Claims ..................................................................................................... 7
    Resolution of Same-Creditor Claims ............................................................................................... 10

PART V – THE COURTS AND THIS CLAIMS PROTOCOL ........................................................... 11

    Comity and Independence of the Courts ........................................................................................... 11
    Effectiveness; Modification .............................................................................................................. 12
    Procedure for Resolving Disputes under the Claims Protocol .......................................................... 12

PART VI - GENERAL .......................................................................................................................... 13

    Distributions on Overlapping Claims and Same-Creditor Claims .................................................... 13
    Rights to Appear and Be Heard ........................................................................................................ 13
    Preservation of Rights ....................................................................................................................... 14
    Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholders' Committee ...... 16

## CROSS-BORDER PROTOCOL ON THE
## RESOLUTION OF CLAIMS

This cross-border claims protocol (the **"Claims Protocol"**) is intended to supplement the procedures established by each of the U.S. Court and the Canadian Court with respect to the resolution of claims filed against the U.S. Debtors and the Canadian Debtors in the Insolvency Proceedings (each as defined herein).

## PART I - BACKGROUND

### *Canadian and U.S. Proceedings*

1.      On January 14, 2009, Nortel Networks Corporation and certain of its subsidiaries and affiliates (collectively, the **"Canadian Debtors"**)[1] commenced reorganization proceedings (the **"Canadian Proceedings"**) by filing an application under Canada's *Companies' Creditors Arrangement Act* (the **"CCAA"**) with the Ontario Superior Court of Justice, Commercial List (the **"Canadian Court"**) and an Order (as amended, the **"CCAA Order"**) has been granted under which (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA, and (b) Ernst & Young Inc. was appointed as monitor (the **"Monitor"**) in the Canadian Proceedings.

2.      On January 14, 2009, Nortel Networks Inc. and certain of its subsidiaries and affiliates (collectively, the **"U.S. Debtors"**)[2] commenced reorganization cases (collectively, the

---

[1]      The Canadian Debtors are:  Nortel Networks Corporation; Nortel Networks Limited; Nortel Networks Technology Corporation; Nortel Networks Global Corporation; and Nortel Networks International Corporation.

[2]      The U.S. Debtors are:  Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom

"**Chapter 11 Cases**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG).  The U.S. Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.  An official committee of unsecured creditors (the "**Creditors' Committee**") was appointed by the United States Trustee (the "**U.S. Trustee**") in these Chapter 11 Cases on January 22, 2009.  An ad hoc group of bondholders whose members have executed or in the future will execute confidentiality agreements with the Debtors (the "**Bondholder Group**") has also been organized.

3.      By Order dated January 15, 2009, the U.S. Court approved the U.S. Debtors' retention of Epiq Bankruptcy Solutions, LLC as the claims and noticing agent in the Chapter 11 Cases.

4.      The Monitor filed petitions and obtained an Order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code.  Nortel Networks Inc. also filed an application and obtained an Order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the Chapter 11 Cases as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada.  None of the U.S.

---

International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.   Nortel Networks (CALA) Inc. commenced its Chapter 11 Case on July 14, 2009.

Debtors or Canadian Debtors are applicants in both the Chapter 11 Cases and Canadian Proceedings.

5.      For convenience, (i) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the **"Debtors"**, (ii) the Chapter 11 Cases and the Canadian Proceedings shall be referred to herein collectively as the **"Insolvency Proceedings"**, (iii) the U.S. Court and the Canadian Court shall be referred to herein collectively as the **"Courts"**, and (iv) an order of the U.S. Court or the Canadian Court is referred to herein as an **"Order"**.

*Cross-Border Insolvency Protocol*

6.      An amended Cross-Border Insolvency Protocol (the **"Insolvency Protocol"**) was approved by the U.S. Court and Canadian Court pursuant to separate Orders entered by the Courts on June 29, 2009 and June 30, 2009, respectively. Nothing herein is intended to waive any party's rights under the Insolvency Protocol. To the extent of any direct and irreconcilable conflict between the Insolvency Protocol and this Claims Protocol with respect to any matter concerning claims administration and claims adjudication procedures, the term(s) of this Claims Protocol shall govern.

7.      The purpose of this Claims Protocol is to supplement the procedures established by the Courts in the Bar Date Orders (as defined herein) and in any subsequent Orders related to claims (including the claims resolution order sought by the Canadian Debtors from the Canadian Court concurrently with such Court's approval of this Claims Protocol, the **"Claims Resolution Order"**), including Excluded Claims (as defined herein), to

3

establish an efficient and consistent procedure to address the filing and resolution of claims in the Insolvency Proceedings.

### *Notice of Deadline and of Procedures for Filing Claims*

8. By Orders dated July 30, 2009 (as has been or may be supplemented, the **"Canadian Bar Order"**) and August 4, 2009 (as has been or may be supplemented, the **"U.S. Bar Order"** and together with the Canadian Bar Order, the **"Bar Date Orders"**), the Canadian Court and U.S. Court each set a deadline of September 30, 2009 at 4:00 p.m. prevailing Eastern Time (as has been or may be supplemented, the **"Bar Date"**)[3] for the filing and receipt of claims in the Insolvency Proceedings, other than (i) certain claims that were subject to a later bar date and (ii) certain claims exempted from the provisions of the Bar Date Orders (**"Excluded Claims"**).

9. As the Debtors' collective corporate structure includes 21 separate Debtor entities, the Debtors propose to implement this Claims Protocol to facilitate the resolution of claims that have been or may be filed in the Canadian Proceedings and the Chapter 11 Cases. Nothing in this Claims Protocol is intended to waive or modify the Bar Date or the protections afforded to the Debtors under the Bar Date Orders.  To the extent of any direct and irreconcilable conflict between the Bar Date Orders and this Claims Protocol with respect to any matter concerning Overlapping Claims or Same-Creditor Claims, the term(s) of this Claims Protocol shall govern.

---

[3]        In the case of Nortel Networks (CALA) Inc., by an Order dated December 2, 2009, the U.S. Court set a deadline of January 25, 2010 at 4:00 p.m. prevailing Eastern Time for the filing and receipt of claims against Nortel Networks (CALA) Inc. in the Chapter 11 Cases.

**PART II – SCOPE OF THIS CLAIMS PROTOCOL**

10.     This Claims Protocol establishes procedures that shall govern the coordination and resolution of Overlapping Claims and Same-Creditor Claims (each as defined below) filed in the Canadian Proceedings and the Chapter 11 Cases.

11.     For the purposes of this Claims Protocol, an "**Overlapping Claim**" is a claim or portion thereof that (i) has been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction. For the avoidance of doubt, the definition of Overlapping Claims shall include, but not be limited to, any (i) guarantee and indemnity claims where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction; and (ii) duplicate claims filed in both jurisdictions (claims filed in both jurisdictions by the same or affiliated party asserting the same amount and underlying liability).

12.     For the purposes of this Claims Protocol, "**Same-Creditor Claims**" are claims or portions thereof that: (i) have been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) are not an Overlapping Claim (each such claim, a "**Same-Creditor Claim**").

13.     For the purposes of this Claims Protocol, the following categories of claims shall not constitute Overlapping Claims or Same-Creditor Claims regardless of whether they would otherwise fall within the definitions of Overlapping Claims or Same-Creditor Claims:

(a)     U.K. pension claims (including, funding guarantee claims, insolvency guarantee claims, Financial Support Direction liability claims and claims by Nortel Networks U.K. Pension Trust Limited, the U.K. Pension Protection Fund, the Pensions Regulator under *The Pensions Act 2004* (U.K.) and the joint administrators of the various EMEA Debtors related to the foregoing);

(b)     claims in respect of the determination of liabilities and funded status of the Nortel Networks Negotiated Pension Plan and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and in respect of the Ontario Pension Benefits Guarantee Fund; and

(c)     the following employee-related matters:

    (i)     any procedure, protocol or methodology for calculating termination and severance pay claims and any process for any resolution of disagreements regarding contract obligations and qualifications for eligibility of such claims (including the calculation of benefits or liabilities),

    (ii)     the actuarial methods and assumptions that will be used to determine non-registered pension claims, Long Term Disability claims and benefit claims and any process for any resolution of disagreements regarding the interpretation or application of plan criteria for such claims (including the calculation of benefits or liabilities),

    (iii)     the form of an order related to Compensation Claims (including, proposed procedures relating to any bar date for claims of employees and retirees),

    (iv)     deferred compensation claims relating to the Nortel Networks U.S. Deferred Compensation Plan (to the extent not otherwise addressed by the Cross-Border Claims Protocol), and

    (v)     the Calgary employee claims contemplated by the action bearing court file number 0901-10504 in the Alberta Court of Queen's Bench.

14.    For purposes of this Claims Protocol, a "**Bond Claim**" is any claim arising from or

related to the Bondholder Trust Indenture (as defined in the Canadian Bar Order),

including claims filed by the indenture trustees.

## PART III – COOPERATION AND CONSULTATION

15.    The Canadian Debtors, the Monitor, and the U.S. Debtors shall share information with

respect to any Overlapping Claims and Same-Creditor Claims, including without

limitation by meeting on a monthly basis to review these claims.  The Canadian Debtors,

the Monitor and the U.S. Debtors shall cooperate and coordinate the collection of

information regarding Overlapping Claims and Same-Creditor Claims from the Canadian

Debtors, the U.S. Debtors and the claimants.

16.    Information exchanged between the Monitor, the Canadian Debtors and the U.S. Debtors

pursuant to this Claims Protocol may be shared by such parties with their respective

stakeholders, subject to appropriate written confidentiality agreements, and the Monitor,

the Canadian Debtors and the U.S. Debtors may consult with their respective

stakeholders with respect to all such information.  In the case of the U.S. Debtors, for the

avoidance of doubt, such stakeholders include the Creditors' Committee and the

Bondholder Group.

## PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS

### *Resolution of Overlapping Claims*

17.    The following procedures shall apply with respect to the resolution of Overlapping

Claims (other than the Bond Claims, to which Paragraph 17(e) shall apply):

7

2662

(a)     For Overlapping Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions: the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve an Overlapping Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

(b)     For Overlapping Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions:  following satisfaction of Paragraph 17(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Overlapping Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

(c)     For Overlapping Claims that either (i) assert an amount equal to or greater than $1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an amount equal to or greater than $1 million in their respective jurisdictions (the "**Material Overlapping Claims**"): if the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) agree on the appropriate

8

resolution (in each jurisdiction) with respect to any Material Overlapping Claim,
then such Material Overlapping Claim can be dealt with in accordance with the
agreed-upon approach (which may include utilizing the claims resolution
procedures applicable in each jurisdiction).

(d)     If the Monitor, the Canadian Debtors and the U.S. Debtors in accordance with the
terms hereof cannot agree on the appropriate resolution of Material Overlapping
Claims in each jurisdiction, then the Monitor, the Canadian Debtors and the U.S.
Debtors shall seek joint direction from the Judges of both the Canadian Court and
the U.S. Court regarding the resolution of the claims, absent other agreement by
the Canadian Debtors, the Monitor and the U.S. Debtors.  Written notice of the
request for court resolution of such Material Overlapping Claims along with the
materials in support of such relief shall be served no less than 10 calendar days
prior to the proposed hearing.[4]

(e)     If the Monitor and the Canadian Debtors, on the one hand, or the U.S. Debtors, on
the other hand, proposes to allow, stipulate or settle the Bond Claims (the
"**Settlement**") and, after consulting with the other party with respect to such
Settlement as provided in Paragraph 15 (and in the case of the U.S. Debtors,
Paragraph 16), the party not proposing such Settlement does not agree with such
Settlement, such party may request that the hearing to allow the Bond Claims in
the Settlement be a joint hearing.

*Resolution of Same-Creditor Claims*

18.    The following procedures shall apply with respect to the resolution of Same-Creditor Claims (except with respect to the Bond Claims):

    (a)    For Same-Creditor Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions:  the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve a Same-Creditor Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

    (b)    For Same-Creditor Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions:  following satisfaction of Paragraph 18(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Same-Creditor Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

---

[4]    In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List as posted on the Monitor's website (the "**Service List**") and on the party that filed the affected claim (and their counsel, if known).

(c)     For Same-Creditor Claims that either (i) assert an amount equal to or greater than
$1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the
Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an
amount equal to or greater than $1 million in their respective jurisdictions (the
"**Material Same-Creditor Claims**"):  if the Monitor, the Canadian Debtors and
the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the
Creditors' Committee and the Bondholder Group) agree on the appropriate
resolution (in each jurisdiction) with respect to any Material Same-Creditor
Claim, then such claim can be dealt with in accordance with the agreed-upon
approach (which may include utilizing the claims resolution procedures
applicable in each jurisdiction).

(d)     If the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S.
Debtors, after consultation with the Creditors' Committee and the Bondholder
Group) cannot agree on the appropriate resolution of Material Same-Creditor
Claims in each jurisdiction, then such claims can be resolved in each jurisdiction
in accordance with applicable claims resolution orders and procedures (including,
in the case of the Canadian Debtors and the Monitor, the Claims Resolution
Order).

## PART V – THE COURTS AND THIS CLAIMS PROTOCOL

### *Comity and Independence of the Courts*

19.     The approval and implementation of this Claims Protocol shall not divest or diminish the
U.S. Court's and the Canadian Court's respective independent jurisdiction over the

11

2066

subject matter of the Chapter 11 Cases and the Canadian Proceedings, respectively.  By approving and implementing this Claims Protocol, none of the U.S. Court, the Canadian Court, the Debtors nor any creditor or any other party in interest shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States or Canada.

### *Effectiveness; Modification*

20.     This Claims Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

21.     This Claims Protocol may not be supplemented, modified, terminated or replaced in any manner except upon approval of such modifications by both the U.S. Court and the Canadian Court after appropriate notice to all parties in interest as required under the rules of the Courts and a hearing in both Courts.  Notice of any legal proceeding to supplement, modify, terminate or replace this Claims Protocol shall be given in accordance with paragraph 28 of the Insolvency Protocol, provided that, the party giving notice shall provide no less than 10 calendar days prior written notice of such proceeding and its materials in support of such relief.[5]

### *Procedure for Resolving Disputes under the Claims Protocol*

22.     Disputes relating to the terms, intent or application of this Claims Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with paragraph 28 of the Insolvency Protocol.  In rendering a

---

[5]     In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List.

decision or Order in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision or Order after such consultation; (ii) defer to the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 of the Insolvency Protocol. Notwithstanding the foregoing, in making a decision or Order under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

## PART VI - GENERAL

### *Distributions on Overlapping Claims and Same-Creditor Claims*

23.     No claimant holding an Overlapping Claim or Same-Creditor Claim shall receive aggregate distributions from the Debtors on account of such claim(s) in excess of 100% of the amount of such allowed claim(s) (including any post-petition interest or other amounts permitted under applicable law).

### *Rights to Appear and Be Heard*

24.     The Canadian Debtors, the Monitor, the U.S. Debtors, the Creditors' Committee and the Bondholder Group shall have the right to support or object and to be heard at any hearing provided for herein in either or both of the Canadian and U.S. Courts with respect to Specific Claims (as defined in the Claims Resolution Order), Overlapping Claims or Same-Creditor Claims.

268

*Preservation of Rights*

25.     The resolution of an Overlapping Claim or a Same-Creditor Claim in one of the Chapter 11 Cases or the Canadian Proceedings shall be without prejudice to the rights and defenses of the Canadian Debtors, the Monitor or the U.S. Debtors with respect the Overlapping Claim or Same-Creditor Claim in the other jurisdiction (subject to any applicable limitations on distributions to which a creditor may be allowed to recover for its claim).

26.     Nothing in this Claims Protocol shall prejudice the right, if any, of any Debtor, the Monitor, the Creditors' Committee, the Bondholder Group or any other party in interest to dispute or assert set-offs or other defenses to any claim filed in the Insolvency Proceedings.

27.     Nothing in this Claims Protocol shall prejudice the right of any Debtor to seek, in compliance with any other Orders of the Courts and/or agreements between the Debtors, and after consultation with and prior notice to the U.S. Debtors in the case of relief sought by the Monitor or the Canadian Debtors and after consultation with and prior notice to the Canadian Debtors, the Creditors' Committee and Bondholder Group in the case of relief sought by the U.S. Debtors, a further Order or Orders of the applicable Courts (i) fixing a date by which holders of claims or interests not subject to the Bar Date Orders or the Bar Date established therein must file a proof of claim or interest or be barred from doing so, or (ii) establishing further claims procedures, including claims procedures relating to Excluded Claims and claims resolution procedures, *provided, however*, that any motion or application brought by any of the Debtors, the Monitor or any other party in interest, as applicable, with respect to the subject matter of (ii), shall

14

269

not be heard on less than ten (10) business days notice to the other Debtors, the Monitor, the Creditors' Committee and the Bondholder Group, unless otherwise ordered by the applicable Court. This Claims Protocol shall apply to all such claims unless a Court orders otherwise in accordance with the terms hereof.

28.     Nothing in this Claims Protocol shall prejudice the right of the Monitor to perform its responsibilities and obligations as required under the Canadian Proceedings, pursuant to any applicable Order of the Canadian Court including, without limitation, the Fourth Amended and Restated Initial Order dated January 14, 2009 and the Order of the Canadian Court dated August 14, 2009, or otherwise under applicable law, and the provisions of this Claims Protocol are intended by the parties and the Courts to facilitate the performance of such responsibilities and obligations by the Monitor.

29.     Except as specifically provided herein (including all deeming provisions) and except as agreed in accordance with this Claims Protocol, neither the terms of this Claims Protocol nor any actions taken pursuant to this Claims Protocol shall: (i) prejudice or affect the powers, rights, claims and defenses of the Debtors and their respective estates, the Creditors' Committee, the U.S. Trustee, the Monitor, the Bondholder Group, any of the Debtors' creditors or any of the foregoing parties' representatives or professionals under applicable law, including, without limitation, the Bankruptcy Code, the CCAA and Orders of the Courts; (ii) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States or any other applicable laws; (iii) preclude or prejudice the rights of any person (including the Debtors) to contest the validity, amount or priority of any claim, or (iv) preclude or prejudice an assertion to the Court adjudicating the claim

15

that the Court does not have jurisdiction to adjudicate the claim, or that the laws of another jurisdiction govern or affect the validity, amount or priority of a claim.

### *Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholder Group*

30.    If the Creditors' Committee shall cease to exist following the effective date of a plan of reorganization and the plan does not designate a successor to the Creditors' Committee, the consent of or consultation with the Creditors' Committee shall no longer be required for any purposes under this Claims Protocol and thereafter the Creditors' Committee will no longer be entitled to receive notices under this Claims Protocol or otherwise enforce or have any rights pursuant to this Claims Protocol.

31.    If at any time, the Bondholder Group is disbanded, the consent of or consultation with the Bondholder Group shall no longer be required for any purposes under this Claims Protocol and thereafter the Bondholder Group will no longer be entitled to receive notices under this Claims Protocol, or otherwise enforce or have any rights pursuant to this Claims Protocol.

271

**<u>EXHIBIT C</u>**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------X
                            :

*In re*                           :     Chapter 11

Nortel Networks Inc., *et al.*,[1]    :     Case No. 09-10138 (KG)

                Debtors.    :     Jointly Administered

                            :     RE: D.I. 18, 54 + 983

---------------------------------------------X

## ORDER APPROVING STIPULATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET AL., AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL

Upon consideration of the stipulation dated June 26, 2009 (the "Stipulation")[2] attached

hereto as Exhibit A between Nortel Networks Inc. and its affiliated debtors, as debtors and

debtors in possession in the above-captioned cases (the "Debtors") and the Official Committee of

Unsecured Creditors (the "Committee") to amend the cross-border court-to-court protocol

approved by the Court in the Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border

Court-to-Court Protocol [D.I. 54], and good cause appearing for the approval thereof;

IT IS HEREBY ORDERED THAT:

1.      The Stipulation is APPROVED.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Stipulation.

2.     The Amended Protocol, as attached to the Stipulation as Exhibit 1, is approved in all respects, subject to approval of the same by the Canadian Court.

3.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _June 29_ , 2009
      Wilmington, Delaware

                                    THE HONORABLE KEVIN GROSS
                                      UNITED STATES BANKRUPTCY JUDGE

2

**EXHIBIT A**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------X
                                                 :
In re                                            :   Chapter 11
                                                 :
Nortel Networks Inc., et al.,[1]                 :   Case No. 09-10138 (KG)
                                                 :
                                Debtors.         :   Jointly Administered
                                                 :
                                                 :   RE: D.I. 18, 54
                                                 :
-------------------------------------------------X
```

### STIPULATION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF NORTEL NETWORKS INC., ET AL., AMENDING THE CROSS-BORDER COURT-TO-COURT PROTOCOL

This stipulation (the "Stipulation") is by and between Nortel Networks Inc. ("NNI") and

certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors") and the

Official Committee of Unsecured Creditors (the "Committee"). The parties hereby stipulate and

agree as follows.

### Background

1.      On January 14, 2009 (the "Petition Date"), the Debtors filed voluntary petitions

for relief under chapter 11 of the Bankruptcy Code.

2.      The Debtors continue to operate their businesses and manage their properties as

debtors in possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code

(the "Bankruptcy Code").

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

3.    Also on the Petition Date, the Debtors' ultimate corporate parent Nortel Networks
Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and
together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their
Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario
Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement
Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian
Proceedings"). The Canadian Debtors continue to manage their properties and operate their
businesses under the supervision of the Canadian Court. Ernst & Young Inc., as court-appointed
Monitor in the Canadian Proceedings and as foreign representative for the Canadian Debtors (the
"Monitor"), has filed petitions in this Court for recognition of the Canadian Proceedings as
foreign main proceedings under chapter 15 of the Bankruptcy Code. On January 14, 2009, the
Canadian Court entered an order recognizing these chapter 11 proceedings as a foreign
proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order
recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the
Bankruptcy Code. In addition, at 8 p.m. (London time) on January 14, 2009, the High Court of
Justice in England placed nineteen of Nortel's European affiliates (collectively, the "EMEA
Debtors")[3] into administration under the control of individuals from Ernst & Young LLC
(collectively, the "Joint Administrators"). On May 28, 2009, at the request of the
Administrators, the Commercial Court of Versailles, France (Docket No. 2009P00492) ordered

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[3]    The EMEA Debtors include the following entities: Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

2

the commencement of secondary proceedings in respect of Nortel Networks S.A. ("NNSA"),

which consist of liquidation proceedings during which NNSA will continue to operate as a going

concern for an initial period of three months.  In accordance with the European Union's Council

Regulation (EC) No. 1346/2000 on Insolvency Proceedings, the English law proceedings remain

the main proceedings in respect of NNSA.  On June 8, 2009, Nortel Networks UK Limited

("NNUK") filed petitions in this Court for recognition of the English Proceedings as foreign

main proceedings under chapter 15 of the Bankruptcy Code.  On June 26, 2009, the Court

entered an order recognizing the English Proceedings as foreign main proceedings under chapter

15 of the Bankruptcy Code.

4.       On January 15, 2009, this Court entered an order of joint administration pursuant

to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") that

provided for the joint administration of these cases and for consolidation for procedural purposes

only [D.I. 36].

5.       On January 26, 2009, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the

"Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I.s 141, 142].  An ad

hoc group of bondholders holding claims against certain of the Debtors and certain of the

Canadian Debtors has also been organized (the "Bondholder Group").  No trustee or examiner

has been appointed in the Debtors' cases.

### The Cross-Border Court-to-Court Protocol

6.       On January 14, 2009, the Debtors filed the Debtors' Motion for Entry of an Order

Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-to-Court Protocol [D.I. 18] (the

"Cross-Border Protocol Motion") for the purpose of establishing a cross-border court-to-court

3

protocol to govern the chapter 11 and Canadian Proceedings (the "First Day Protocol"). On January 15, 2009, the Court entered the Cross-Border Protocol Order [D.I. 54]. Likewise, on January 14, 2009, the Canadian Court issued an order (the "Initial Order") granting the Canadian Debtors various forms of relief, including approval of the First Day Protocol. Initial Order at ¶ 49.

7.      Since the Petition Date, the Court has, on six occasions, approved stipulations among the Debtors and the Committee extending the Committee's time to file a motion for reconsideration of the Cross-Border Protocol Order [D.I.s 318, 466, 549, 676, 799, 900] pursuant to Rule 9013-1(m) Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). During this time, the Debtors, the Canadian Debtors and the Committee have engaged in constructive, good faith discussions regarding the terms of the First Day Protocol and possible amendments thereto. The changes reflected in the amended cross-border court-to-court protocol (the "Amended Protocol"), attached hereto as Exhibit 1, are the result of those discussions.

8.      In addition to a variety of ministerial changes, the Amended Protocol provides greater clarity on a number of issues including the right to appear and be heard, mutual recognition of the stay of proceedings entered in the U.S. and Canadian Proceedings and the contemplation of a claims protocol. Most importantly, the Amended Protocol clarifies matters for which a joint hearing between the U.S. and Canadian Courts might be necessary and sets forth procedures for obtaining such joint hearings. A blackline reflecting all amendments from the First Day Protocol to the Amended Protocol is attached to the Stipulation as Exhibit 2.

9.      As the Court is aware, the Debtors have entered into the Interim Funding and Settlement Agreement dated as of June 9, 2009 (the "Agreement") with the Canadian Debtors

4

and the EMEA Debtors, excluding Nortel Networks S.A. A joint hearing between this Court and

the Canadian Court has been scheduled for June 29, 2009 (to be continued on June 30, 2009 if

necessary) regarding the funding of NNL by NNI and other related issues addressed by the

Agreement. Obtaining court approval of the amendments to the cross-border protocol constitutes

an express condition required for the Agreement to become effective. See Agreement at ¶ 13(a).

### Stipulation

NOW, THEREFORE, the Debtors and the Committee hereby stipulate and agree that the First

Day Protocol shall be amended to incorporate the changes reflected in the Amended Protocol

attached hereto as Exhibit 1 and that the Court should approve the Amended Protocol in all

respects.

Dated: June 26, 2009
      Wilmington, Delaware

By: _____

James L. Bromley (*pro hac vice*)
Lisa Schweitzer (*pro hac vice*)
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

   - and -

Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone: (302) 658-9200

*Counsel for the Debtors
and Debtors in Possession*

By: _____

Fred S. Hodara (*pro hac vice*)
David H. Botter (*pro hac vice*)
Kenneth A. Davis (*pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000

   - and -

Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700

*Counsel to the Committee*

## EXHIBIT 1

### Amended Cross-Border Court-to-Court Protocol

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.    **Background**

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

        3.      On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

        4.      The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]    The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation,
Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity. Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

        f.      implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may:  (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

C.    **Comity and Independence of the Courts**

        7.      The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

        8.      The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.      In accordance with the principles of comity and independence recognized

herein, nothing contained herein shall be construed to:

a.      increase, decrease or otherwise modify the independence, sovereignty or
        jurisdiction of the U.S. Court, the Canadian Court or any other court or
        tribunal in the United States or Canada, including the ability of any such
        court or tribunal to provide appropriate relief on an ex parte or "limited
        notice" basis to the extent permitted under applicable law;

b.      require the U.S. Court to take any action that is inconsistent with its
        obligations under the laws of the United States;

c.      require the Canadian Court to take any action that is inconsistent with its
        obligations under the laws of Canada;

d.      require the Debtors, the Creditors Committee, the Estate Representatives
        or the U.S. Trustee to take any action or refrain from taking any action that
        would result in a breach of any duty imposed on them by any applicable
        law;

e.      authorize any action that requires the specific approval of one or both of
        the Courts under the Bankruptcy Code or the CCAA after appropriate
        notice and a hearing (except to the extent that such action is specifically
        described in this Protocol); or

f.      preclude the Debtors, the Creditors Committee, the Monitor, the U.S.
        Trustee, any creditor or other interested party from asserting such party's
        substantive rights under the applicable laws of the United States, Canada
        or any other relevant jurisdiction including, without limitation, the rights
        of parties in interest to appeal from the decisions taken by one or both of
        the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their

respective employees, members, agents and professionals shall respect and comply with the

independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the

CCAA, the Canadian Order and other applicable laws.

**D.    Cooperation**

11.    To assist in the efficient administration of the Insolvency Proceedings and

in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.    To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court.  In furtherance of the foregoing:

a.    The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.    Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.    The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.    The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings.  With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

7

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief. Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court. In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)   Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing. To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to: (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to: (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

a.   unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however,* that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

b.   upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

c.   if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

d.   if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.   **Recognition of Stays of Proceedings**

16.   The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian

Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and

applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from

the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings

and actions against the Canadian Debtors and their property under the Canadian Order (the

"Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with

the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the

Canadian Stay and any orders of the Canadian Court modifying or granting relief from the

Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other

parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay

to any particular proceeding, property, asset, activity or other matter, wherever pending or

located. Subject to paragraph 15, herein, motions brought respecting the application of the stay

of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and

determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting

the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors

shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

19.    The Debtors, the Core Parties, and any other committee that may be

appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall

have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian

Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as

creditors and other interested parties domiciled in the forum country, subject to any local rules or

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    Claims Protocol

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

13

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims

filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings.  In such

event, and in recognition of the inherent complexities of the inter-company claims that may be

asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to

negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the

Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court

and the U.S. Court for approval.  In the event that the Debtors fail to reach agreement among

such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court

seeking approval of such claims protocol as the Debtors shall determine to be in the best interest

of the Debtors and their creditors.

## H.    Retention and Compensation of Estate Representative and Professionals

22.    The Monitor, its officers, directors, employees, counsel and agents,

wherever located, (collectively the "Monitor Parties") and any other estate representatives

appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall

(subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court

with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the

retention and compensation of the Canadian Representatives; (c) the Canadian Representatives'

liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in

connection with the Insolvency Proceedings; and (d) the hearing and determination of any other

matters relating to the Canadian Representatives arising in the Canadian Proceedings under the

CCAA or other applicable Canadian law.  The Canadian Representatives shall not be required to

seek approval of their retention in the U.S. Court for services rendered to the Debtors.

Additionally, the Canadian Representatives: (a) shall be compensated for their services to the

Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.     The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order.  In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.     Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including:  (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States.  The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian

Court.

25.    Any professionals (i) retained by and being compensated solely by, or (ii)

being compensated solely by, the Canadian Debtors including in each case, without limitation,

counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to

the sole and exclusive jurisdiction of the Canadian Court.  Such Canadian Professionals:  (a)

shall be subject to the procedures and standards for retention and compensation applicable in the

Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or

orders of the Canadian Court with respect to services performed on behalf of the Canadian

Debtors; and (b) shall not be required to seek approval of their retention or compensation in the

U.S. Court.

26.    Any professionals (i) retained by, or (ii) being compensated by, the U.S.

Debtors including in each case, without limitation, counsel and financial advisors (collectively,

the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court.

Such U.S. Professionals:  (a) shall be subject to the procedures and standards for retention and

compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable

laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

approval of their retention or compensation in the Canadian Court.

27.    Subject to paragraph 19 herein, any professional retained by the Creditors

Committee, including in each case, without limitation, counsel and financial advisors

(collectively, the "Committee Professionals") shall be subject to the sole and exclusive

jurisdiction of the U.S. Court.  Such Committee Professionals:  (a) shall be subject to the

procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.     Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following: (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time. Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur. In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

**J.    Effectiveness; Modification**

30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing. Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.    Procedure for Resolving Disputes Under this Protocol**

32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above. In rendering a determination in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above. Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

      a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

      b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

c.     copies of such written advice or guidance shall be served by the applicable
       Court in accordance with paragraph 28 hereof;

d.     the Courts may jointly decide to invite the Debtors, the Creditors
       Committee, the Estate Representatives, the U.S. Trustee and any other
       affected or interested party to make submissions to the appropriate Court
       in response to or in connection with any written advice or guidance
       received from the other Court; and

e.     for clarity, the provisions of this paragraph shall not be construed to
       restrict the ability of either Court to confer as provided in paragraph 12
       above whenever it deems it appropriate to do so.

## L.     Preservation of Rights

34.     Except as specifically provided herein, neither the terms of this Protocol

nor any actions taken under the terms of this Protocol shall: (a) prejudice or affect the powers,

rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate

Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law,

including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or

(b) preclude or prejudice the rights of any person to assert or pursue such person's substantive

rights against any other person under the applicable laws of Canada or the United States.

# APPENDIX Q

## FIFTH AMENDED AND RESTATED INITIAL ORDER

299



Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

THE HONOURABLE ) WEDNESDAY, THE 14TH
)
MR. JUSTICE MORAWETZ ) DAY OF JANUARY, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
"Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FIFTH AMENDED AND RESTATED INITIAL ORDER**

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

## SERVICE

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

## APPLICATION

2.      THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

## PLAN OF ARRANGEMENT

3.      THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

## POSSESSION OF PROPERTY AND OPERATIONS

4.      THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property"). Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property. Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

5.    THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.    THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

(a)    all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)    compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

(c)    all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)    the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)    subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)    subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)    subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)    payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)    with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either

or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)    the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)   the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)  cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

(d)     if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)     without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)     the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)     payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)      without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.      THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.      THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)      any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)      all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)      any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.      THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under

306

real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month, in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.    THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

(a)    the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)    the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

**RESTRUCTURING**

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)    in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and


shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)     pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in

Case 09-10138-MFW    Doc 12755-3    Filed 01/03/14    Page 88 of 154    30 9

- 11 -

respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY**

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

## CONTINUATION OF SERVICES

17.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

## NON-DEROGATION OF RIGHTS

18.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants.  Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

## PROCEEDINGS AGAINST DIRECTORS AND OFFICERS

19.    THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be

liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.    THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.    THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN $45 million, as security for the indemnities provided in paragraph 20 of this Order as well as for fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

21A.    THIS COURT ORDERS that, to the extent that any one or more of proven Claims (as defined below), together with the fees and disbursements of legal counsel to the directors and officers of the Applicants, individually or in the aggregate, exceed the amount of CDN $45 million, each such proven Claim against such directors and officers shall be reduced *pro rata* so that the aggregate of all such proven Claims, together with the fees and disbursements of legal counsel to such directors and officers, shall not exceed the amount of CDN $45 million and such excess amounts of all such proven Claims and any other Claims are hereby and shall be forever barred, disallowed, enjoined, released, discharged and extinguished as against the directors and officers of the Applicants. Provided, however, that nothing in this paragraph 21A shall operate to release any director or officer of an Applicant in respect of such excess amount of any such Claim where, in respect of such Claim, such director or officer has actively participated in the

breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

In this paragraph 21A, "Claim" shall mean any claim (contingent, liquidated or unliquidated, proven or unproven, known or unknown) or any legal proceeding or action of any nature or kind, in these proceedings or any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever, against one or more of the directors or officers of any one or more of the Applicants relating to the failure of any of the Applicants, after the date of this Order, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or the Applicants' failure to make payments in respect of employer health tax or workers' compensation, which are or may be directly or indirectly advanced, asserted, re-asserted, refiled or made by any person, governmental or regulatory authority or other entity against one or more of the directors or officers of any one or more of the Applicants, to the extent that such Claim is not covered under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order

22.    THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.    THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

**APPOINTMENT OF MONITOR**

24.    THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the

Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Applicants' receipts and disbursements;

(b)     provide the consents contemplated herein;

(c)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)     advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

(e)     advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

(f)     assist the Applicants, to the extent required by the Applicants, with the Restructuring;

(g)     assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

(h)     have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and



- 16 -

performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)    consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)    assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)    apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)    perform such other duties as are required by this Order or by this Court from time to time.

26.    THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.    THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Ontario Environmental Protection Act*, the *Ontario Water Resources Act*, or the *Ontario Occupational Health and Safety Act* and regulations

thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.     THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.     THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.     THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.    Intentionally Deleted.

**INTERCOMPANY LOANS**

34.    THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

    (a)    the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b)      all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such  mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment  of  the  Inter-company  Reimbursement  Claim  (including  principal, interest  and  expenses)  by  the  applicable  Beneficiary  Applicant  to  the corresponding Protected Entity.

34A.   THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.   THIS COURT ORDERS that the Inter-company Charge shall also secure the Remaining Revolver Claim (as defined in the Final Canadian Funding and Settlement Agreement dated as of December 22, 2009 among, *inter alia*, the Applicants and NNI) as also evidenced by the Secured Promissory Note dated as of February 16, 2010 in the principal amount of U.S.$62,700,000 given by NNL to NNI.

36.    THIS  COURT  ORDERS  the  Inter-company  Charge  shall  be  junior,  subject  and subordinate only to the other Charges (defined below),  and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.    THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or

318

further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.    THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

**INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT**

39.    THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA. The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

**NNI LOAN**

40.    THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.    Intentionally deleted.

41A.    Intentionally deleted.

41B.    Intentionally deleted.

41C.    Intentionally deleted.

**EXCESS FUNDING CHARGE**

41D.    THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E.    THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge"). The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.    THIS COURT ORDERS that the priorities of the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge on all Property shall be as follows:

      First – the Administration Charge;

      Second – the Excess Funding Charge

      Third – the Directors' Charge; and

      Fourth -

      (a)    the Inter-Company Charge;

      (b)    the Shortfall Charge,

10

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

Fifth -

(a)     the Payments Charge (as defined in the employee Settlement Approval Order of this Court made on March 31, 2010); and

(b)     the Nortel Special Incentive Plan Charge (as defined in the order approving the Nortel Special Incentive Plan of this Court made on March 8, 2010),

which Payments Charge and Nortel Special Incentive Plan Charge shall rank *pari passu* with one another.

43.    THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.    THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

(a)     the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks

as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)     the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property, unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support

Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)     none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)     the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.     THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.     THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.     THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.     THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.     THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing.  Any such service provider shall be considered an "Assistant" hereunder.

54.     THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.     THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

**GENERAL**

56.     THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.     THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.     THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

325

59.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.


ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 25 2011

PER / PAR:    NB

3260

## SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

327

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

A.    Background

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee of bondholders (the "Bondholders Committee") has also been organized.

3. On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC, NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S. Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under which, inter alia:  (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors has been granted.

4. The Monitor filed petitions and obtained an order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian Proceedings.

---

[2] The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

B.    **Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity.  Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

      f.      implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

**C.**    <u>Comity and Independence of the Courts</u>

      7.      The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

      8.      The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

9.    In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.    The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

D.    Cooperation

11.    To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

332

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.    To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

a.    The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.    Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.    The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.    The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

333

(i)     A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)    Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief.  Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court.  In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)   Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing.  To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)    If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)     The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)    The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

334

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts.  Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to:  (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to:  (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

335

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess

of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and

one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure

statement, information circular, plan of reorganization or plan of compromise and arrangements

in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee

or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7

proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to

convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy

and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates;

(ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating

losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of

the Debtors' registered pension plans the effect of which would increase the liability of any

Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign

executory contracts having a material impact on the assets, operations, obligations, rights,

property or business of both the U.S. and Canadian estates and accounting for annual gross

revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief

from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian

Proceedings (1) involving any Material Contract or (2) to pursue actions having a material

impact on the assets, operations, obligations, rights, property or business of at least one U.S.

Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any

motion seeking to create or extend any program, plan, proposal or scheme relating to or

authorizing payments to employees where the consideration relates to non-ordinary course

incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

336

motion regarding any program, plan proposal, scheme or similar course of action related to the

wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however*, that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

E.    **Recognition of Stays of Proceedings**

    16.    The Canadian Court hereby recognizes the validity of the stay of

proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

337

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    **Rights to Appear and Be Heard**

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    **Claims Protocol**

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

339

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

H.    **Retention and Compensation of Estate Representative and Professionals**

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

340

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.     The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.     Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

341

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

342

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court or any other court.

**I.     Notice**

28.     Notice of any motion, application or other Pleading or paper (collectively the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating to matters addressed by this Protocol and notice of any related hearings or other proceedings shall be given by appropriate means (including, where circumstances warrant, by courier, telecopier or other electronic forms of communication) to the following:  (a) all creditors and interested parties, in accordance with the practice of the jurisdiction where the papers are filed or the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors Committee; the Bondholders Committee and any other statutory committees appointed in the Insolvency Proceedings and such other parties as may be designated by either of the Courts from time to time.  Notice in accordance with this paragraph shall be given by the party otherwise responsible for effecting notice in the jurisdiction where the underlying papers are filed or the proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with copies of any orders, decisions, opinions or similar papers issued by the other Court in the Insolvency Proceedings.

29.     When any cross-border issues or matters addressed by this Protocol are to be addressed before a Court, notices shall be provided in the manner and to the parties referred to in paragraph 28 above.

17

343

**J.**    <u>Effectiveness; Modification</u>

      30.    This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

      31.    This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.**    <u>Procedure for Resolving Disputes Under this Protocol</u>

      32.    Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

      33.    In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

      a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

      b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

344

        c.      copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

        d.      the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

        e.      for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.   Preservation of Rights

34.    Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall:  (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIFTH AMENDED AND RESTATED INITIAL
ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

DOCSTOR: 211210511A

345

## APPENDIX R

## ORDER APPROVING CROSS-BORDER CLAIMS PROTOCOL

346

File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE- COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | THURSDAY, THE 16TH |
| | ) | |
| JUSTICE MORAWETZ | ) | DAY OF SEPTEMBER, 2010 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION (the "Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER APPROVING CROSS-BORDER CLAIMS PROTOCOL**

THIS MOTION, made by the Applicants for an Order substantially in the form included

in the Applicants' Motion Record, was heard this day at 393 University Avenue, Toronto,

Ontario.

ON READING the Applicants' Notice of Motion, the affidavit of John Doolittle sworn on

September 10, 2010, the Fifty-Third Report of the Monitor dated September 13, 2010 (the

"Monitor's Report"), and on hearing the submissions of counsel for the Applicants, the Monitor,

and those other parties present, no one appearing for the other parties served with the Applicants'

Motion Record, although duly served as appears from the affidavit of service of Marna

McGeorge sworn September 13, 2010, filed:

1

347

- 2 -

## SERVICE

1.     THIS COURT ORDERS that the time for service of the Notice of Motion and the Motion

Record filed by the Applicants in support of this Motion be and it is hereby abridged and

validated such that the Motion is properly returnable today.

## APPROVAL OF CROSS-BORDER CLAIMS PROTOCOL

2.     THIS COURT ORDERS that the Cross-Border Claims Protocol attached hereto as

Schedule "A" is hereby approved, and that the Cross-Border Claims Protocol shall

become effective upon approval by the United States Bankruptcy Court for the District of

Delaware (the "U.S. Court") acting in the reorganization cases commenced by the U.S.

Debtors[1] under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et*

*seq*.

3.     THIS COURT ORDERS that references in this Order to the Cross-Border Claims

Protocol shall mean the Cross-Border Claims Protocol attached as Schedule "A", as such

Cross-Border Claims Protocol may be amended from time to time in accordance with its

terms.   Other capitalized terms used in paragraphs 4 through 6 of this Order shall have

the meanings given to them in the Cross-Border Claims Protocol.

---

[1] As defined in the Cross-Border Claims Protocol, being Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

2

348

- 3 -

## CROSS-BORDER CLAIMS PROTOCOL TO GOVERN CERTAIN CLAIMS

4.      THIS COURT ORDERS that the Cross-Border Claims Protocol shall govern the coordination and resolution of Overlapping Claims and Same-Creditor Claims filed in the Canadian Proceedings and the Chapter 11 Cases, in accordance with the terms of the Cross-Border Claims Protocol.  Any and all claims resolution procedures which have been or may be approved by this Court, including those contained in the Claims Resolution Order that this Court may approve today, as they relate to Overlapping Claims and Same-Creditor Claims, shall be subject to the provisions and requirements of the Cross-Border Claims Protocol.

## AGGREGATE DISTRIBUTIONS NOT TO EXCEED 100%

5.      THIS COURT ORDERS that no claimant holding an Overlapping Claim or Same-Creditor Claim shall receive aggregate distributions from the Debtors on account of such claim(s) in excess of 100% of the amount of such allowed claim(s) (including any post-filing interest or other amounts permitted under applicable law).

## GENERAL

6.      THIS COURT ORDERS that resolution of any Overlapping Claims and Same-Creditor Claims in the Canadian Proceedings shall be without prejudice to the rights and defenses of the U.S. Debtors with respect to such Overlapping Claims and Same-creditor Claims in the Chapter 11 Cases.

7.      THIS COURT ORDERS AND REQUESTS the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada (including the assistance of any court in Canada pursuant to Section 17 of the CCAA)

3

349

- 4 -

and any court or any judicial, regulatory or administrative body of the United States of America, the United Kingdom, the French Republic, the State of Israel, and the Republic of Korea, and of any other nation or state, to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

SEP 17 2010

PER / PAR:

4

Schedule "A"

**Final Version**

## TABLE OF CONTENTS

PART I - BACKGROUND ........................................................................................................1

    Canadian and U.S. Proceedings...............................................................................1

    Cross-Border Insolvency Protocol...........................................................................3

    Notice of Deadline and of Procedures for Filing Claims.........................................4

PART II – SCOPE OF THIS CLAIMS PROTOCOL .......................................................5

PART III – COOPERATION AND CONSULTATION ....................................................7

PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS ....................7

    Resolution of Overlapping Claims ..........................................................................7

    Resolution of Same-Creditor Claims.....................................................................10

PART V – THE COURTS AND THIS CLAIMS PROTOCOL ......................................11

    Comity and Independence of the Courts.................................................................11

    Effectiveness; Modification....................................................................................12

    Procedure for Resolving Disputes under the Claims Protocol...............................12

PART VI - GENERAL........................................................................................................13

    Distributions on Overlapping Claims and Same-Creditor Claims.........................13

    Rights to Appear and Be Heard..............................................................................13

    Preservation of Rights ............................................................................................14

    Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholders' Committee.......................16

351

## CROSS-BORDER PROTOCOL ON THE
## RESOLUTION OF CLAIMS

This cross-border claims protocol (the **"Claims Protocol"**) is intended to supplement the procedures established by each of the U.S. Court and the Canadian Court with respect to the resolution of claims filed against the U.S. Debtors and the Canadian Debtors in the Insolvency Proceedings (each as defined herein).

## PART I - BACKGROUND

### *Canadian and U.S. Proceedings*

1.      On January 14, 2009, Nortel Networks Corporation and certain of its subsidiaries and affiliates (collectively, the **"Canadian Debtors"**)[1] commenced reorganization proceedings (the **"Canadian Proceedings"**) by filing an application under Canada's *Companies' Creditors Arrangement Act* (the **"CCAA"**) with the Ontario Superior Court of Justice, Commercial List (the **"Canadian Court"**) and an Order (as amended, the **"CCAA Order"**) has been granted under which (a) the Canadian Debtors have been determined to be entitled to relief under the CCAA, and (b) Ernst & Young Inc. was appointed as monitor (the **"Monitor"**) in the Canadian Proceedings.

2.      On January 14, 2009, Nortel Networks Inc. and certain of its subsidiaries and affiliates (collectively, the **"U.S. Debtors"**)[2] commenced reorganization cases (collectively, the

---

[1]      The Canadian Debtors are:  Nortel Networks Corporation; Nortel Networks Limited; Nortel Networks Technology Corporation; Nortel Networks Global Corporation; and Nortel Networks International Corporation.

[2]      The U.S. Debtors are:  Nortel Networks Inc.; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; and Northern Telecom

1

352

"**Chapter 11 Cases**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. An official committee of unsecured creditors (the "**Creditors' Committee**") was appointed by the United States Trustee (the "**U.S. Trustee**") in these Chapter 11 Cases on January 22, 2009. An ad hoc group of bondholders whose members have executed or in the future will execute confidentiality agreements with the Debtors (the "**Bondholder Group**") has also been organized.

3.      By Order dated January 15, 2009, the U.S. Court approved the U.S. Debtors' retention of Epiq Bankruptcy Solutions, LLC as the claims and noticing agent in the Chapter 11 Cases.

4.      The Monitor filed petitions and obtained an Order in the U.S. Court granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code. Nortel Networks Inc. also filed an application and obtained an Order in the Canadian Court pursuant to section 18.6 of the CCAA recognizing the Chapter 11 Cases as "foreign proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of the U.S.

---

International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.  Nortel Networks (CALA) Inc. commenced its Chapter 11 Case on July 14, 2009.

Debtors or Canadian Debtors are applicants in both the Chapter 11 Cases and Canadian Proceedings.

5.      For convenience, (i) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the **"Debtors"**, (ii) the Chapter 11 Cases and the Canadian Proceedings shall be referred to herein collectively as the **"Insolvency Proceedings"**, (iii) the U.S. Court and the Canadian Court shall be referred to herein collectively as the **"Courts"**, and (iv) an order of the U.S. Court or the Canadian Court is referred to herein as an **"Order"**.

### *Cross-Border Insolvency Protocol*

6.      An amended Cross-Border Insolvency Protocol (the **"Insolvency Protocol"**) was approved by the U.S. Court and Canadian Court pursuant to separate Orders entered by the Courts on June 29, 2009 and June 30, 2009, respectively. Nothing herein is intended to waive any party's rights under the Insolvency Protocol. To the extent of any direct and irreconcilable conflict between the Insolvency Protocol and this Claims Protocol with respect to any matter concerning claims administration and claims adjudication procedures, the term(s) of this Claims Protocol shall govern.

7.      The purpose of this Claims Protocol is to supplement the procedures established by the Courts in the Bar Date Orders (as defined herein) and in any subsequent Orders related to claims (including the claims resolution order sought by the Canadian Debtors from the Canadian Court concurrently with such Court's approval of this Claims Protocol, the **"Claims Resolution Order"**), including Excluded Claims (as defined herein), to

establish an efficient and consistent procedure to address the filing and resolution of claims in the Insolvency Proceedings.

### *Notice of Deadline and of Procedures for Filing Claims*

8.      By Orders dated July 30, 2009 (as has been or may be supplemented, the **"Canadian Bar Order"**) and August 4, 2009 (as has been or may be supplemented, the **"U.S. Bar Order"** and together with the Canadian Bar Order, the **"Bar Date Orders"**), the Canadian Court and U.S. Court each set a deadline of September 30, 2009 at 4:00 p.m. prevailing Eastern Time (as has been or may be supplemented, the **"Bar Date"**)[3] for the filing and receipt of claims in the Insolvency Proceedings, other than (i) certain claims that were subject to a later bar date and (ii) certain claims exempted from the provisions of the Bar Date Orders (**"Excluded Claims"**).

9.      As the Debtors' collective corporate structure includes 21 separate Debtor entities, the Debtors propose to implement this Claims Protocol to facilitate the resolution of claims that have been or may be filed in the Canadian Proceedings and the Chapter 11 Cases. Nothing in this Claims Protocol is intended to waive or modify the Bar Date or the protections afforded to the Debtors under the Bar Date Orders.  To the extent of any direct and irreconcilable conflict between the Bar Date Orders and this Claims Protocol with respect to any matter concerning Overlapping Claims or Same-Creditor Claims, the term(s) of this Claims Protocol shall govern.

---

[3]      In the case of Nortel Networks (CALA) Inc., by an Order dated December 2, 2009, the U.S. Court set a deadline of January 25, 2010 at 4:00 p.m. prevailing Eastern Time for the filing and receipt of claims against Nortel Networks (CALA) Inc. in the Chapter 11 Cases.

355

## PART II – SCOPE OF THIS CLAIMS PROTOCOL

10.    This Claims Protocol establishes procedures that shall govern the coordination and resolution of Overlapping Claims and Same-Creditor Claims (each as defined below) filed in the Canadian Proceedings and the Chapter 11 Cases.

11.    For the purposes of this Claims Protocol, an **"Overlapping Claim"** is a claim or portion thereof that (i) has been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) arises from the same underlying claim, action, liability, property, agreement, lease, debt or transaction. For the avoidance of doubt, the definition of Overlapping Claims shall include, but not be limited to, any (i) guarantee and indemnity claims where the direct claim is filed against a debtor in one jurisdiction and the guarantee or indemnity claim is filed against a debtor in the other jurisdiction; and (ii) duplicate claims filed in both jurisdictions (claims filed in both jurisdictions by the same or affiliated party asserting the same amount and underlying liability).

12.    For the purposes of this Claims Protocol, **"Same-Creditor Claims"** are claims or portions thereof that: (i) have been filed in both the Canadian Proceedings and the Chapter 11 Cases; (ii) by the same party or by the same affiliated parties; and (iii) are not an Overlapping Claim (each such claim, a **"Same-Creditor Claim"**).

13.    For the purposes of this Claims Protocol, the following categories of claims shall not constitute Overlapping Claims or Same-Creditor Claims regardless of whether they would otherwise fall within the definitions of Overlapping Claims or Same-Creditor Claims:

(a)    U.K. pension claims (including, funding guarantee claims, insolvency guarantee claims, Financial Support Direction liability claims and claims by Nortel Networks U.K. Pension Trust Limited, the U.K. Pension Protection Fund, the Pensions Regulator under *The Pensions Act 2004* (U.K.) and the joint administrators of the various EMEA Debtors related to the foregoing);

(b)    claims in respect of the determination of liabilities and funded status of the Nortel Networks Negotiated Pension Plan and the Nortel Networks Limited Managerial and Non-Negotiated Pension Plan and in respect of the Ontario Pension Benefits Guarantee Fund; and

(c)    the following employee-related matters:

  (i)    any procedure, protocol or methodology for calculating termination and severance pay claims and any process for any resolution of disagreements regarding contract obligations and qualifications for eligibility of such claims (including the calculation of benefits or liabilities),

  (ii)    the actuarial methods and assumptions that will be used to determine non-registered pension claims, Long Term Disability claims and benefit claims and any process for any resolution of disagreements regarding the interpretation or application of plan criteria for such claims (including the calculation of benefits or liabilities),

  (iii)    the form of an order related to Compensation Claims (including, proposed procedures relating to any bar date for claims of employees and retirees),

  (iv)    deferred compensation claims relating to the Nortel Networks U.S. Deferred Compensation Plan (to the extent not otherwise addressed by the Cross-Border Claims Protocol), and

  (v)    the Calgary employee claims contemplated by the action bearing court file number 0901-10504 in the Alberta Court of Queen's Bench.

14.    For purposes of this Claims Protocol, a **"Bond Claim"** is any claim arising from or related to the Bondholder Trust Indenture (as defined in the Canadian Bar Order), including claims filed by the indenture trustees.

## PART III – COOPERATION AND CONSULTATION

15.    The Canadian Debtors, the Monitor, and the U.S. Debtors shall share information with respect to any Overlapping Claims and Same-Creditor Claims, including without limitation by meeting on a monthly basis to review these claims. The Canadian Debtors, the Monitor and the U.S. Debtors shall cooperate and coordinate the collection of information regarding Overlapping Claims and Same-Creditor Claims from the Canadian Debtors, the U.S. Debtors and the claimants.

16.    Information exchanged between the Monitor, the Canadian Debtors and the U.S. Debtors pursuant to this Claims Protocol may be shared by such parties with their respective stakeholders, subject to appropriate written confidentiality agreements, and the Monitor, the Canadian Debtors and the U.S. Debtors may consult with their respective stakeholders with respect to all such information. In the case of the U.S. Debtors, for the avoidance of doubt, such stakeholders include the Creditors' Committee and the Bondholder Group.

## PART IV – APPLICABLE PROCEDURES FOR RESOLVING CLAIMS

### Resolution of Overlapping Claims

17.    The following procedures shall apply with respect to the resolution of Overlapping Claims (other than the Bond Claims, to which Paragraph 17(e) shall apply):

7

358

(a)      For Overlapping Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions: the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve an Overlapping Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

(b)      For Overlapping Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions: following satisfaction of Paragraph 17(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Overlapping Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

(c)      For Overlapping Claims that either (i) assert an amount equal to or greater than $1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an amount equal to or greater than $1 million in their respective jurisdictions (the "**Material Overlapping Claims**"): if the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) agree on the appropriate

8

resolution (in each jurisdiction) with respect to any Material Overlapping Claim, then such Material Overlapping Claim can be dealt with in accordance with the agreed-upon approach (which may include utilizing the claims resolution procedures applicable in each jurisdiction).

(d)    If the Monitor, the Canadian Debtors and the U.S. Debtors in accordance with the terms hereof cannot agree on the appropriate resolution of Material Overlapping Claims in each jurisdiction, then the Monitor, the Canadian Debtors and the U.S. Debtors shall seek joint direction from the Judges of both the Canadian Court and the U.S. Court regarding the resolution of the claims, absent other agreement by the Canadian Debtors, the Monitor and the U.S. Debtors.  Written notice of the request for court resolution of such Material Overlapping Claims along with the materials in support of such relief shall be served no less than 10 calendar days prior to the proposed hearing.[4]

(e)    If the Monitor and the Canadian Debtors, on the one hand, or the U.S. Debtors, on the other hand, proposes to allow, stipulate or settle the Bond Claims (the "Settlement") and, after consulting with the other party with respect to such Settlement as provided in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16), the party not proposing such Settlement does not agree with such Settlement, such party may request that the hearing to allow the Bond Claims in the Settlement be a joint hearing.

9

*Resolution of Same-Creditor Claims*

18.    The following procedures shall apply with respect to the resolution of Same-Creditor Claims (except with respect to the Bond Claims):

(a)    For Same-Creditor Claims that either (i) assert an amount greater than $500,000 in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount greater than $500,000 in their respective jurisdictions:  the Canadian Debtors, the Monitor and the U.S. Debtors shall not respond to or resolve a Same-Creditor Claim without first complying with the consultation procedures set forth in Paragraph 15 (and in the case of the U.S. Debtors, Paragraph 16) above.

(b)    For Same-Creditor Claims that either (i) assert an amount less than $1 million in both jurisdictions or (ii) are wholly or partially unliquidated and the Monitor and the U.S. Debtors each propose to seek to allow, stipulate or settle for an amount less than $1 million in their respective jurisdictions:  following satisfaction of Paragraph 18(a) above, the Monitor, the Canadian Debtors and the U.S. Debtors shall be entitled to respond to the Same-Creditor Claim and seek resolution of such claim in compliance with their respective claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

---

[4]    In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List as posted on the Monitor's website (the "**Service List**") and on the party that filed the affected claim (and their counsel, if known).

(c)     For Same-Creditor Claims that either (i) assert an amount equal to or greater than $1 million in either jurisdiction or (ii) are wholly or partially unliquidated and the Monitor or the U.S. Debtors propose to seek to allow, stipulate or settle for an amount equal to or greater than $1 million in their respective jurisdictions (the **"Material Same-Creditor Claims"**):  if the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) agree on the appropriate resolution (in each jurisdiction) with respect to any Material Same-Creditor Claim, then such claim can be dealt with in accordance with the agreed-upon approach (which may include utilizing the claims resolution procedures applicable in each jurisdiction).

(d)     If the Monitor, the Canadian Debtors and the U.S. Debtors (in the case of the U.S. Debtors, after consultation with the Creditors' Committee and the Bondholder Group) cannot agree on the appropriate resolution of Material Same-Creditor Claims in each jurisdiction, then such claims can be resolved in each jurisdiction in accordance with applicable claims resolution orders and procedures (including, in the case of the Canadian Debtors and the Monitor, the Claims Resolution Order).

## PART V – THE COURTS AND THIS CLAIMS PROTOCOL

### *Comity and Independence of the Courts*

19.     The approval and implementation of this Claims Protocol shall not divest or diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the

subject matter of the Chapter 11 Cases and the Canadian Proceedings, respectively.  By approving and implementing this Claims Protocol, none of the U.S. Court, the Canadian Court, the Debtors nor any creditor or any other party in interest shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States or Canada.

### Effectiveness; Modification

20.    This Claims Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

21.    This Claims Protocol may not be supplemented, modified, terminated or replaced in any manner except upon approval of such modifications by both the U.S. Court and the Canadian Court after appropriate notice to all parties in interest as required under the rules of the Courts and a hearing in both Courts.  Notice of any legal proceeding to supplement, modify, terminate or replace this Claims Protocol shall be given in accordance with paragraph 28 of the Insolvency Protocol, provided that, the party giving notice shall provide no less than 10 calendar days prior written notice of such proceeding and its materials in support of such relief.[5]

### Procedure for Resolving Disputes under the Claims Protocol

22.    Disputes relating to the terms, intent or application of this Claims Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with paragraph 28 of the Insolvency Protocol.   In rendering a

---

[5]    In Canada, (i) such materials shall include the Monitor's Report, if any, being filed with respect to the motion, and (ii) service shall be made on the Service List.

decision or Order in any such dispute, the Court to which the issue is addressed: (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either: (i) render a binding decision or Order after such consultation; (ii) defer to the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 of the Insolvency Protocol. Notwithstanding the foregoing, in making a decision or Order under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

## PART VI - GENERAL

*Distributions on Overlapping Claims and Same-Creditor Claims*

23.    No claimant holding an Overlapping Claim or Same-Creditor Claim shall receive aggregate distributions from the Debtors on account of such claim(s) in excess of 100% of the amount of such allowed claim(s) (including any post-petition interest or other amounts permitted under applicable law).

*Rights to Appear and Be Heard*

24.    The Canadian Debtors, the Monitor, the U.S. Debtors, the Creditors' Committee and the Bondholder Group shall have the right to support or object and to be heard at any hearing provided for herein in either or both of the Canadian and U.S. Courts with respect to Specific Claims (as defined in the Claims Resolution Order), Overlapping Claims or Same-Creditor Claims.



***Preservation of Rights***

25.   The resolution of an Overlapping Claim or a Same-Creditor Claim in one of the Chapter 11 Cases or the Canadian Proceedings shall be without prejudice to the rights and defenses of the Canadian Debtors, the Monitor or the U.S. Debtors with respect the Overlapping Claim or Same-Creditor Claim in the other jurisdiction (subject to any applicable limitations on distributions to which a creditor may be allowed to recover for its claim).

26.   Nothing in this Claims Protocol shall prejudice the right, if any, of any Debtor, the Monitor, the Creditors' Committee, the Bondholder Group or any other party in interest to dispute or assert set-offs or other defenses to any claim filed in the Insolvency Proceedings.

27.   Nothing in this Claims Protocol shall prejudice the right of any Debtor to seek, in compliance with any other Orders of the Courts and/or agreements between the Debtors, and after consultation with and prior notice to the U.S. Debtors in the case of relief sought by the Monitor or the Canadian Debtors and after consultation with and prior notice to the Canadian Debtors, the Creditors' Committee and Bondholder Group in the case of relief sought by the U.S. Debtors, a further Order or Orders of the applicable Courts (i) fixing a date by which holders of claims or interests not subject to the Bar Date Orders or the Bar Date established therein must file a proof of claim or interest or be barred from doing so, or (ii) establishing further claims procedures, including claims procedures relating to Excluded Claims and claims resolution procedures, *provided, however*, that any motion or application brought by any of the Debtors, the Monitor or any other party in interest, as applicable, with respect to the subject matter of (ii), shall

14

not be heard on less than ten (10) business days notice to the other Debtors, the Monitor, the Creditors' Committee and the Bondholder Group, unless otherwise ordered by the applicable Court. This Claims Protocol shall apply to all such claims unless a Court orders otherwise in accordance with the terms hereof.

28.    Nothing in this Claims Protocol shall prejudice the right of the Monitor to perform its responsibilities and obligations as required under the Canadian Proceedings, pursuant to any applicable Order of the Canadian Court including, without limitation, the Fourth Amended and Restated Initial Order dated January 14, 2009 and the Order of the Canadian Court dated August 14, 2009, or otherwise under applicable law, and the provisions of this Claims Protocol are intended by the parties and the Courts to facilitate the performance of such responsibilities and obligations by the Monitor.

29.    Except as specifically provided herein (including all deeming provisions) and except as agreed in accordance with this Claims Protocol, neither the terms of this Claims Protocol nor any actions taken pursuant to this Claims Protocol shall: (i) prejudice or affect the powers, rights, claims and defenses of the Debtors and their respective estates, the Creditors' Committee, the U.S. Trustee, the Monitor, the Bondholder Group, any of the Debtors' creditors or any of the foregoing parties' representatives or professionals under applicable law, including, without limitation, the Bankruptcy Code, the CCAA and Orders of the Courts; (ii) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States or any other applicable laws; (iii) preclude or prejudice the rights of any person (including the Debtors) to contest the validity, amount or priority of any claim, or (iv) preclude or prejudice an assertion to the Court adjudicating the claim

15

that the Court does not have jurisdiction to adjudicate the claim, or that the laws of another jurisdiction govern or affect the validity, amount or priority of a claim.

***Discharge, Removal or Dissolution of the Creditors' Committee or the Bondholder Group***

30.    If the Creditors' Committee shall cease to exist following the effective date of a plan of reorganization and the plan does not designate a successor to the Creditors' Committee, the consent of or consultation with the Creditors' Committee shall no longer be required for any purposes under this Claims Protocol and thereafter the Creditors' Committee will no longer be entitled to receive notices under this Claims Protocol or otherwise enforce or have any rights pursuant to this Claims Protocol.

31.    If at any time, the Bondholder Group is disbanded, the consent of or consultation with the Bondholder Group shall no longer be required for any purposes under this Claims Protocol and thereafter the Bondholder Group will no longer be entitled to receive notices under this Claims Protocol, or otherwise enforce or have any rights pursuant to this Claims Protocol.

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No: 09-CL-7950

| | |
|---|---|
| | *ONTARIO*<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br>Proceeding commenced at Toronto |
| | **ORDER**<br>**(APPROVING CROSS-BORDER**<br>**CLAIMS PROTOCOL)** |
| | **OGILVY RENAULT LLP**<br>Suite 3800<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>P.O. Box 84<br>Toronto, Ontario  M5J 2Z4<br><br>**Derrick Tay LSUC#: 21152A**<br>Tel:  (416) 216-4832<br>Email: dtay@ogilvyrenault.com<br><br>**Jennifer Stam LSUC#: 46735J**<br>Tel: (416) 216-2327<br>Email: jstam@ogilvyrenault.com<br><br>Fax: (416) 216-3930<br><br>Lawyers for the Applicants |

367

**APPENDIX S**

**ORDER (US CLAIMS LITIGATION SETTLEMENT AGREEMENT)**

368

File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. JUSTICE | ) | TUESDAY, THE 7TH DAY OF |
| | ) | |
| MORAWETZ | ) | JANUARY, 2014 |
| | ) | |

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

### ORDER
(US Claims Litigation Settlement Agreement)

**ON HEARING** the motion of Nortel Networks Inc. and its affiliated debtors (the "**US**

**Debtors**") in cases pending under Chapter 11 of the United States Bankruptcy Code before the

Honourable Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware

(the "**US Court**") for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and

Bankruptcy Rules 6004(h) and 9019 Approving the US Claims Litigation Settlement Agreement by and

Among the US Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel

Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French

Liquidator, the UK Pension Parties and Certain Affiliates (the "**Motion**") pursuant to the Cross-Border

Insolvency Protocol approved by this Court in its Initial Order dated January 14, 2009 (as amended and

- 2 -

restated) and the US Court in its Order dated June 29, 2009, this day at 393 University Avenue, Toronto, Ontario.

ON READING the Motion, the Request for Joint Hearing of the Canadian Parties dated December 19, 2013, the Response and Limited Objection of the Canadian Parties dated December 19, 2013, the Supplemental Response and Limited Objection of the Canadian Parties dated January 2, 2014, and the One-Hundred and First Report of the Monitor dated January 3, 2014, and on hearing submissions of counsel to the Canadian Debtors, the Monitor, the US Debtors, the Committee, the EMEA Debtors and the UK Pension Parties, no one else appearing for any other party on the service list or core party service list although notice of the hearing was duly given as appears from the Affidavit of Service of **[Jennifer Stam]** sworn January 3, 2014, filed.

1.    **THIS COURT ORDERS** that capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Motion or the Settlement Agreement.

2.    **THIS COURT ORDERS** that each of the Parties shall be required to disclose to the other Core Parties, this Court, and the US Court by no later than January 24, 2014, whether it is adopting a common allocation position with any other Party and, if so, which allocation position is being adopted.

3.    **THIS COURT ORDERS** that the Settlement Agreement shall not in any way enhance a Party's rights in respect of, or otherwise impact, any motion brought by such Party seeking leave to amend its allocation pleading.

**MISCELLANEOUS**

4.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom

- 3 -

or elsewhere, to give effect to this Order and to assist the Canadian Debtors, the Monitor and their respective agents in carrying out the terms of this Order.   All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Canadian Debtors and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Canadian Debtors and the Monitor and their respective agents in carrying out the terms of this Order.

5.      **THIS COURT ORDERS** that each of the Canadian Debtors and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

_____

Court File No:  09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

Proceeding commenced at Toronto

### ORDER
### (US Claims Litigation Settlement Agreement)

**Goodmans LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON   M5H 2S7

Jay A. Carfagnini (LSUC#: 22293T)
Joseph Pasquariello (LSUC#: 38390C)
Christopher Armstrong (LSUC#: 55148B)
Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Page 153 of 154

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**ONE-HUNDRED FIRST REPORT OF**
**THE MONITOR DATED JANUARY**
**3, 2014**

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini** (LSUC#: 22293T)
**Jessica Kimmel** (LSUC#: 32312W)
**Peter Ruby** (LSUC#: 38439P)
**Joseph Pasquariello** (LSUC#: 38390C)
Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
**Jennifer Stam** (LSUC #: 46735J)
Tel:    (416) 862-5697
Fax:    (416) 862-7661

Lawyers for the Applicants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**RESPONDING MOTION RECORD
OF THE MONITOR AND
CANADIAN DEBTORS**
**(returnable January 7, 2014)**

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini** (LSUC#: 22293T)
**Jessica Kimmel** (LSUC#: 32312W)
**Peter Ruby** (LSUC#: 38439P)
**Joseph Pasquariello** (LSUC#: 38390C)
Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
**Jennifer Stam** (LSUC #: 46735J)
Tel:    (416) 862-5697
Fax:    (416) 862-7661

Lawyers for the Applicants