**<u>EXHIBIT B</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**BRIEF OF AUTHORITIES OF CANADIAN DEBTORS AND THE
MONITOR**

**Re: Representative Party Discovery**
**(Motion Returnable January 7, 2014)**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Jessica Kimmel LSUC#: 32312W
Peter Ruby  LSUC#: 38439P
Joseph Pasquariello  LSUC#: 37389C

Tel:   416.979.2211
Fax:  416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc. and Canadian Debtors

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#: 21152A
Jennifer Stam  LSUC#: 46735J

Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

# **INDEX**

**Tab**    **Document**

1.    *Hunter v. Ontario Society for the Prevention of Cruelty to Animals* 2013 ONSC 6638 (S.C.J.)

2.    *Besner v. Ontario* 2011 ONSC 7335 (S.C.J.)

3.    *Anderson et al v. St. Jude Medical et al,* 2007 CanLII 64140 (Ont. S.C.J.)

4.    *R. v. Judge of the General Sessions of the Peace for the County of York, Ex parte Corning Class Works of Canada Ltd* (1970), 3 CCC (2d) 204 (O.C.A.)

5.    *Stevens and O'Connell et al* 2013 ONSC 2236 (S.C.J.)

6.    *Ensign Group Inc. v. Saine*, 2007 CanLii 13931 (Ont. S.C.J.)

# TAB 1

*Case Name:*

# Hunter v. Ontario Society for the Prevention of Cruelty to Animals

**Between**
**Ralph Hunter, Plaintiff, and**
**The Ontario Society for the Prevention of Cruelty to Animals**
**and Bonnie Bishop, Defendants**

[2013] O.J. No. 4856

2013 ONSC 6638

Cornwall Court File No. 11-587

Ontario Superior Court of Justice

**R. Leroy J.**

Heard: October 11, 2013.
Judgment: October 24, 2013.

(49 paras.)

*Civil litigation -- Civil procedure -- Pleadings -- Amendment of -- Statement of claim -- Discovery -- Examination for discovery -- Range of examination -- Objections and compelling answers -- Opinion -- Questions of law -- Relevancy -- Production and inspection of documents -- Objections and compelling production -- Orders for production -- Relevancy -- Motion by defendants to have plaintiff answer questions refused at examination for discovery dismissed -- Motion by plaintiff to amend pleadings to particularize date of discoverability of claims and seeking production of various documents allowed -- Defendants' questions not fact-seeking but devoted solely to plaintiff's credibility -- Plaintiff's personal legal opinions on substantive legal issues were irrelevant -- Plaintiff granted leave to make proposed amendments which pertained to issues contained within four corners of pleadings -- Defendants' training and policy manuals relevant to remedy component of plaintiff's argument should he succeed in proving abuse of process.*

*Tort law -- Practice and procedure -- Pleadings -- Amendment -- Particulars -- Discovery -- Inspection of documents -- Scope of examination -- Motion by defendants to have plaintiff answer questions refused at examination for discovery dismissed -- Motion by plaintiff to amend pleadings to particularize date of discoverability of claims and seeking production of various documents allowed -- Defendants' questions not fact-seeking but devoted solely to plaintiff's credibility -- Plaintiff's personal legal opinions on substantive legal issues were irrelevant -- Plaintiff granted leave to make proposed amendments which pertained to issues contained within four corners of pleadings -- Defendants' training and policy manuals relevant to remedy component of plaintiff's argument should he succeed in proving abuse of process.*

Motion by the defendants to have the plaintiff answer questions refused at his examination for discovery. Motion by plaintiff to amend his pleadings to particularize the date of discoverability of his claims and seeking production of various documents. The plaintiff was claiming damages for trespass to land and chattels, conversion, negligent investigation, and Charter breaches relating to the defendants' removal of his livestock and animal cruelty charges laid against him in 2009. He asserted the questions asked during his examination for discovery were requests for his legal position on the issues raised. The defendants contended the questions were with respect to the plaintiff's knowledge, information and belief on questions of law. The plaintiff sought production of the Society's training and policy manuals, an articulation of the authority relied on by the defendants for entries to his property between 2005 and 2009, a copy of the written complaint from the public about the defendant Bishop, the particulars of the person who accompanied Bishop when she attended to serve a summons on the plaintiff, and confirmation whether board members were in consultation with animal rights organizations.

HELD: Defendants' motion dismissed; plaintiff's motion allowed in part. The defendants' questions were not fact-seeking but rather were devoted solely to the plaintiff's credibility. The plaintiff's personal legal opinions on substantive legal issues were irrelevant. The plaintiff was granted leave to make his proposed amendments. The amendment pertained to issues contained within the four corners of the pleadings. The training and policy manuals were relevant to the remedy component of the plaintiff's argument should he succeed in proving abuse of process. The fact the documents were internally generated was not, on its own, a ground to withhold production. The plaintiff was entitled to know the knowledge, information and belief the defendants had relative to the authority they relied on for entering his private property. The defendants were to provide the court with a copy of the file relating to Bishop for review. They were to provide the particulars sought regarding the individual who accompanied Bishop. The information regarding whether board members were in consultation with animal rights organizations was irrelevant and properly refused.

**Statutes, Regulations and Rules Cited:**

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B, s. 8, s. 24(1)

Limitations Act, S.O. 2002, c. 24, Schedule B,

Ontario Society for the Prevention of Cruelty to Animals Act, R.S.O. 1990, c. O.36,

Rules of Civil Procedure, Rule 1.04, Rule 26, Rule 26.01, Rule 31.06(1), Rule 31.06(2), Rule 31.08

**Counsel:**

Kurtis R. Andrews, for the Plaintiff.

Paula J. Thomas and Lorne Honickman for the Defendants.

---

## DECISION AND REASONS ON
## REFUSAL MOTION AND CROSS-MOTION

**1   R. LEROY J.**:-- The plaintiff claims that he is entitled to damages from the defendants for trespass to land and chattels, conversion, negligent investigation and as a remedy component under subsection 24(1) of the *Canadian Charter of Rights and Freedoms* arising from alleged s. 8 breaches. He asserts entitlement to punitive and aggravated damages. He is also seeking reimbursement for out of pocket expenses incurred in 2009 when the defendants removed his livestock and laid charges under the *Ontario Society for the Prevention of Cruelty to Animals Act* [the OSPCA Act]

## Part 1: Defendants' Motion

**2**    The defendants assert that during the course of his examination for discovery the plaintiff was asked questions about his knowledge, information and belief with respect to issues that are relevant and material to matters in issue in this action. They complain that plaintiff's counsel improperly intervened numerous times and tried to answer on the plaintiff's behalf and improperly refused questions.

**3**    There are eleven contested refusals as follows:

> For the plaintiff to advise whether he agrees that:

> 1.   If he had not complied with an order, it would be necessary for the OSPCA to return to check on compliance pursuant to their duties under the *OSPCA Act*.
> 2.   The OSPCA does not need a warrant when they return to check on compliance.
> 3.   The OSPCA is permitted by law to enter onto his property and knock on the door - if he has a residence on the property - and ask to check on his animals.
> 4.   It is permissible for the OSPCA to enter onto his property with the intent to knock on his door, but they might see him outside and approach him about checking his animals.

> For the plaintiff to advise:

> 5.   Whether he is aware that if the OSPCA receives a complaint from a member of the public they are required under the legislation to investigate.
> 6.   Of his knowledge and understanding of how an OSPCA inspector can legally go onto his property.
> 7.   Of his knowledge and understanding as to how an inspector for the OSPCA can come onto his property if they do not have a warrant.
> 8.   Of his knowledge and understanding of what the OSPCA is permitted to do with respect to observing an animal that may be in immediate distress.
> 9.   Of his knowledge and understanding of what it would mean if someone was trespassing on his property.
> 10.   Whether it is his understanding that in order for there to be a Certified Veterinarian, that a veterinarian would have to attend and sign a Certificate of Removal.
> 11.   Whether he understands that before horses can be removed, a veterinarian has to be there [or to advise whether he understands that one of the three ways that his animals can be removed is pursuant to a recommendation of a veterinarian who has examined the animals].

**4**    Mr. Andrews, for the plaintiff, initially refused to answer these questions. Subsequently and prior to the motion he carefully laid out the plaintiff's legal position on each question. He determined to treat each question as a request for the plaintiff's legal position on each of the issues raised.

**5**    He submits that notwithstanding Rule 31.08, when a question raised on discovery requires statement of a party's legal position, it is appropriate for counsel to answer.

**6**    He also submits that the contested questions are not framed properly and that a lay party's opinion on contested legal issues is irrelevant. Only a correct assessment of the law by the Court is relevant to the proceedings.

**7**    The defendants contend that a party on an examination for discovery is required to answer questions with respect to

his knowledge, information and belief on questions of law and/or his legal obligations.

**8**    Mr. Andrews agrees with the content of paragraphs 48 and 49 of the defendants' factum. The position of a party on a legal question is relevant to the lawsuit and declarations of legal positions narrow issues in advance of trial. The witness on an examination for discovery may be questioned about the party's position on questions of law - *Six Nations of the Grand River Band v. Canada (Attorney General)* (2000), 48 O.R. (3d) 377.

**9**    Examinations for discovery are held: (1) to enable the examining party to know the case he or she has to meet; (2) to procure admissions to enable a party to dispense with formal proof; (3) to procure admissions which may destroy an opponent's case; (4) to facilitate settlement, pre-trial procedure, and trials; (5) to eliminate or narrow issues; and (6) to avoid surprise at trial - *Ontario Bean Producers Marketing Bd. v. W.G. Thompson & Sons* (1982), 35 O.R. (2d) 711 (Div. Ct.).

**10**    Mr. Andrews would also agree with the first sentence in paragraph 50 of the defendants' factum. He disagrees with the last two sentences of that paragraph.

**11**    The issue is whether the lay plaintiff's personal knowledge, information and belief relative to legal issues in the proceeding is in and of itself relevant.

**12**    The defendant submits that the credibility of the main protagonists will be central to the trial outcome and that knowing the plaintiff's personal knowledge, information and belief on legal issues raised at discoveries is contemplated in the purposes of discovery articulated in *Ontario Bean*.

**13**    Rule 31.06(1) of the *Rules of Civil Procedure* provides that a person being examined for discovery shall answer any proper question relevant to any matter in issue. It further provides that no question may be objected to on the ground that:

> (b)    The question constitutes cross-examination, **unless** the question is directed solely to the credibility of the witness.

**14**    I distinguish between questions that have no relationship to the facts of the case and therefore are clearly related solely to credibility (e.g. "Do you have a criminal record?") and questions that are related to the matters in issue in the case (e.g. "Please provide me with the material information you rely on to support the facts asserted in paragraph (X) of your pleading" or "What is your legal position on this issue?"). Although the credibility of any witness infuses all factual issues, on a free-standing basis it is collateral.

**15**    Here, plaintiff's counsel has set out the plaintiff's legal positions. Asking the plaintiff for his personal knowledge information and belief is not fact-seeking, rather they are questions devoted solely to Mr. Hunter's credibility.

**16**    The defendant's motion is denied on all contested refusals.

**17**    The questions are legal in nature, they have been answered, the issues have been narrowed and quite apart from the distinction between semblance of relevance and relevant to a matter in issue, the plaintiff's personal legal opinions on substantive legal issues are irrelevant. These questions are an attempt to elicit a concession from the plaintiff based on defendants' theory of the case, with which there is express disagreement. These questions attempt to argue the defendants' theory through the witness. Mr. Hunter's task is to reveal his knowledge, information and belief on factual matters in dispute between the parties so the lawyers and Court can apply the correct law.

**18**    Although Rule 31.08 does not distinguish between questions seeking knowledge, information and belief in relation to facts and in relation to legal position, the jurisprudence has embraced a pragmatic response, namely that questions directed at legal position ought to be answered by the person directing the legal analysis, the lawyer. As the object is to facilitate the aims of discovery articulated in *Ontario Bean*, counsel answer is the more efficacious process -

*Six Nations* (paragraph 10).

**Part 2: Plaintiff's refusal motion**

19    The plaintiff seeks relief on his motion as follows:

> 1. He seeks to amend his reply to particularize the date of discoverability of claims in the statement of claim that occurred before May 31, 2009;
> 2. He is seeking copies of the OSPCA training manual, the OSPCA policy manual and the OSPCA tariff of boarding fees in force in July 2009;
> 3. He is seeking an order obliging the defendant to articulate the authority relied on by the defendants for entry to the plaintiff's property between 2005 and 2009;
> 4. He is seeking a copy of written complaint(s) from the public about the defendant, Bonnie Bishop;
> 5. He is seeking the name and contact information of a person who accompanied Bonnie Bishop when she attended to serve a summons on the plaintiff on date;
> 6. He is seeking confirmation whether or not board members are in consultation with, or anything along those lines, animal rights organizations; and

20    I will deal with each in order.

### Amending pleading

21    Leave is granted.

22    Rule 26 provides extremely broad authority to amend pleadings at any stage of the proceeding. Rule 26.01 states that on motion, the Court shall grant leave to amend a pleading on such terms as are just, unless prejudice would result that could not be compensated with costs or adjournment.

23    The defendants resist the amendment on the grounds that:

> 1. The relief sought in paragraph 1 of the statement of claim pertains to events in 2009 and not in the attendances between 2005 and 2008, referenced in paragraphs 9 to 13 of the statement of claim.
> 2. Any claims for damages arising from attendances prior to May 31, 2009 are statute barred.

24    The proposed amendment does no more than particularize the plaintiff's position on the reasonable discoverability of the fact that defendant agents were on his property in his absence many times between 2005 and 2009.

25    The issue of reasonable discoverability may be a matter for subsequent adjudication under the auspices of the *Limitations Act* relative to prospects for relief. For now, it pertains to issues contained within the four corners of the pleadings.

**He is seeking a copy of the OSPCA training manual, the OSPCA policy manual and the OSPCA tariff of boarding fees in force in July 2009**

**Training and Policy Manual**

26    The defendants deny relevance and assert that internal documents are not producible and that an obligation to produce is out of proportion to the importance and complexity of the issues and the amount involved.

27    Central to the theory of the plaintiff's case is the allegation that the defendants abused their statutory authority and

breached the plaintiff's *Charter* rights. The OSPCA is assigned the task of establishing qualifications, requirements and standards for inspectors and agents in its employ.

**28** The Training and Reference Manual at page 147 of the plaintiff's cross motion record does not advert to the issues that are relevant to the case at bar. That manual was apparently replaced by the OSPCA in 2010.

**29** The plaintiff is entitled to production of agent and inspector training materials dealing with process involved in entry onto private property, warrant expectations, husbandry assessment and *Charter* expectations and compliance in the exercise of their investigative, search and seizure powers, then and now, if any, as those are highly relevant to the remedy component of the argument should the plaintiff succeed in proving abuse of process.

**30** As regards the policy manual, the same analysis applies. If the plaintiff succeeds in proving abuse of process, the remedy analysis will necessarily require a consideration of OSPCS policies and how they match statutory objectives.

**31** If the document at page 147 of the cross-motion record is the only document of interest at the time, then that should be confirmed. If there are other pertinent manuals that agents and inspectors relied on for reference in the performance of their employment duties, they (it) should be produced.

**32** As regards the boarding tariff, I cannot discern any reason for withholding it. The statute contemplates full or partial indemnity for the cost of providing food, care or treatment to the animal. In the case at bar, the OSPCA charged the plaintiff the sum of $761.50 for transport and care of his animals. He is entitled to know the tariff rates and that the defendant's charges comply with spirit of the statute.

**33** Proportionality is not an issue. The fact that a document is internally generated is not, on its own, a ground to withhold production.

**He is seeking an order obliging the defendant to articulate the authority relied on by the defendants for entries to the plaintiff's property between 2005 and 2009.**

**34** The plaintiff asserts that he only became aware of the many OSPCA attendances on his property from Crown disclosures in the wake of charges laid in February 2010. Excerpts from investigator notebooks are inserted at tab 2B of the plaintiff's cross-motion record and they seem to confirm many entries onto Mr. Hunter's lands between 2005 and 2009.

**35** The defence submits that the plaintiff's demand amounts to fishing, that remedy for claims relating to that time period is barred, is disproportionate to the importance and complexity of the issues and the amount involved and amounts to a reversal of the burden of proof.

**36** The plaintiff notes that:

    1.    The plaintiff could not have known of the these attendances without the officers' notes produced on *Stinchcombe* disclosure; and

    2.    Evidence does not become statute-barred by the passage of time.

**37** The plaintiff bears the burden of persuading the Court on a balance of probabilities that his *Charter* rights or freedoms have been infringed or denied. Warrantless searches are *prima facie* unreasonable. A search will be reasonable if it is authorized by law, if the law itself is reasonable and the search is conducted in reasonable fashion. Where a search is warrantless (absence of prior judicial authorization), the burden is on the party seeking to justify the warrantless search to prove it was not unreasonable.

**38** The statute imbues defendant investigators with authority similar to police officers. The State's interest in detecting and preventing offences begins to prevail over the individual's interest in being left alone at the point where

credibly-based probability replaces suspicion. Reasonable and probable grounds to believe that an offence has been committed and there is evidence to be found at the place of the search constitutes the minimum standard consistent with s. 8 of the *Charter* for conducting a property search. Reasonable grounds for a search involves the subjective belief of the officer that the search is connected to the infraction at issue and that belief is objectively reasonable.

**39**    Once it is proven that the defendant officers entered on the plaintiff's private property, the burden shifts to the State defendant to establish reasonable and probable grounds. The plaintiff rests his case on abuse of process. He is entitled to know the knowledge, information and belief the defendants have relative to the authority they rely on for entering the plaintiff's private property.

**40**    The investigators have their notes. No one else can answer the questions. The time and expense involved in articulating the authority for entry is worthwhile. Those answers are central to the claim and its resolution.

**41**    *Charter* applications serve as proxy for the many breaches that do not come before the court. Vindication and deterrence are valid objectives in civil *Charter* cases if breaches are proven and, in all the circumstances, the court cannot condone - *Vancouver (City) v. Ward*, [2010] 2 S.C.R. 28.

**He is seeking a copy of written complaint(s) from the public about the defendant, Bonnie Bishop;**

**42**    This production request is to some extent analogous to the issues considered in *R. v. McNeil*, [2009] 1 S.C.R. 66. It would come under the aegis of being a third party document, as it does not fall within the scope of this first party disclosure package as it would if related to this investigation. In a criminal proceeding, this request for production would involve an O'Connor review - likely relevance and then judicial assessment of true relevance weighed against privacy interests. Although this is not a full answer and defence criminal matter, if the plaintiff establishes *Charter* breaches, it will be incumbent on the court to consider whether other misconduct could reasonably impact on the 24(1) remedy. Also see *Ianson v. Rukavina*, [1995] O.J. No. 420.

**43**    The defendants shall provide a copy of the file(s) in question and submit it to me for review.

**The plaintiff is seeking the name and contact information of the person who accompanied Bonnie Bishop when she attended to serve a summons on the plaintiff on date**

**44**    This question was not asked on discovery. Had it been, the defence is obliged by the rules to release this information - Rule 31.06(2). Plaintiff's counsel advises that the existence of a witness was unknown until after conclusion of examinations. Rule 1.04 trumps counsel oversight. Defendants are required to provide the particulars sought.

**The plaintiff seeks confirmation whether or not board members are in consultation with animal rights organizations or anything along those lines.**

**45**    That information is irrelevant to this proceeding and the refusal was proper.

**46**    Order to Issue:

      1.    The defendants' motion is dismissed;

      2.    The plaintiff's motion in respect to questions 1, 2, 3 and 5 above is granted;

      3.    The defendants shall deliver a copy of Ms. Bishop's complaint discipline file to my attention sealed, within 30 days for my review;

      4.    The plaintiff's motion in respect to question 6 is dismissed.

[The Court did not assign paragraph numbers 47 and 48.]

**49**    If the parties cannot agree on costs, counsel are to submit brief written submissions within 30 days.

R. LEROY J.

cp/e/qlmss/qlrdp/qljel

# TAB 2

*Case Name:*
# Besner v. Ontario

## RE: Sarah Besner et al., Plaintiffs/Moving Parties, and Her Majesty the Queen in Right of Ontario et al., Defendants/Responding Parties

[2011] O.J. No. 5851

2011 ONSC 7335

210 A.C.W.S. (3d) 334

31 C.P.C. (7th) 370

2011 CarswellOnt 14483

Court File No. 08-CV-40618

Ontario Superior Court of Justice

**Master P.E. Roger**

Heard: November 29, 2011.
Judgment: December 19, 2011.

(40 paras.)

*Civil litigation -- Civil procedure -- Discovery -- Examination for discovery -- Attendance -- Persons entitled to attend -- Motion by plaintiff for order excluding defendant police officers from being present during examination for discovery of other defendant police officers dismissed -- Plaintiff claimed against three police defendants for damages for malicious prosecution after first-degree murder charge against her was dismissed following preliminary inquiry -- Credibility was factor in claim, but was not key factor to extent that disposition of action turned on disputed evidence of two individuals -- Case was primarily about existence of reasonable grounds -- Plaintiff did not present sufficient evidence that discovery process would be threatened by presence of defendants at discovery of co-parties.*

**Statutes, Regulations and Rules Cited:**

Canadian Charter of Rights and Freedoms, 1982, R.S.C. 1985, App. II, No. 44, Schedule B, s. 7, s. 8, s. 9, s. 10

**Counsel:**

Lawrence Greenspon, counsel for the Plaintiffs/Moving Parties.

Jim Smith, counsel for the Defendants/Responding Parties.

---

## ENDORSEMENT

**1   MASTER P.E. ROGER:**-- The Plaintiffs/Moving Parties bring this motion seeking an Order to exclude the Defendant police officers from being present during the examination for discovery of the other Defendant police officers, at least until they have been examined for discovery.

Background

**2**   John Besner died on or about January 9, 2000. Firefighters responded to a fire at the Plaintiffs' barn and found the body of Mr. Besner in the remains of the barn. The police conducted an investigation and, three years after the fire, charged the Plaintiff, Sarah Besner, with first degree murder in the death of her husband, John Besner. A preliminary inquiry was conducted starting in May 2004. It involved 18 days of testimony and over 40 witnesses, including the three Defendant police officers. The preliminary inquiry judge, [2004] O.J. No. 5552, concluded that there was not sufficient evidence to put the accused Plaintiff on trial for the offence charged.

**3**   The Amended Statement of Claim seeks significant damages, essentially for malicious prosecution. It alleges, amongst others, that: the Defendants were negligent in their investigation and prosecuted when they knew or ought to have known that the Plaintiff did not commit a criminal offence; that the Defendants did not have the necessary reasonable and probable grounds to pursue the prosecution given the nature and quality of the evidence; and that the Defendants developed a faulty template of questions and drew unreasonable conclusions. It also alleges various breaches of Charter rights guaranteed pursuant to sections 7, 8, 9 and 10 of the *Charter of Rights and Freedoms*.

**4**   The Defendants (Her Majesty the Queen in Right of Ontario and three police officers) are defended by the same lawyer at the Attorney General's office and have a joint defence. They are co-parties. They allege that they conducted a thorough investigation and had reasonable grounds to charge the Plaintiff when they did so on January 15, 2003. They deny that they maliciously prosecuted the Plaintiff, negligently investigated the case or that they violated the Plaintiff's rights under the *Charter*.

**5**   The examinations for discovery of the Defendants were scheduled for October 20, 2011, at which time the parties could not agree on the issue now before the Court -whether to exclude the Defendant police officers from being present during the examination for discovery of the other Defendant police officers.

Plaintiffs' position

**6**   The Plaintiffs filed an affidavit, sworn by an articling student at the offices of their lawyer, which provides chronological information regarding the scheduling of the examinations for discovery and outlines the parties' disagreement over the issue now before the Court. It does not provide evidence relating to the alleged credibility issues. The Plaintiffs also provided a copy of the ruling made at the preliminary inquiry dealing with the exclusion of witnesses, which resulted in the officers being excluded at the preliminary inquiry in areas where their testimony overlapped.

**7**   The Plaintiffs, on this motion, argue a number of factors to be considered by the Court, including: the three defendants are members of the same police force working together on the same case; they are represented by the same lawyer; the examination for discovery of each will cover mostly the same grounds; the individual credibility of the Defendants will be a factor; at the preliminary inquiry the officers were excluded in areas where their testimony overlapped; common sense tells us that otherwise the party (ies) sitting-in might use his/her attendance to modify

(tailor) his/her evidence; the examinations for discovery are the first and likely only opportunity (considering that most cases settle) to commit the parties to testimony relevant to trial issues; the Defendants presented no evidence of prejudice to them resulting from their exclusion; and, otherwise, the risk of prejudice to the Plaintiffs is real and substantive.

**8**    The Plaintiffs argue that issues of credibility include: the Defendants' respective evidence of what each officer considered as reasonable and probable grounds and why; their respective state of mind on this evidence, with their independent recollection key to assessing their respective credibility on these issues; and whether or not there was malice. The Plaintiffs argue that even if the transcripts of the preliminary inquiry and evidence disclosed at the preliminary inquiry are available, the issues and questions in this civil action are different and, therefore, the officers should be excluded to avoid the risk that they will tailor their evidence.

<u>Defendants' position</u>

**9**    The Defendants seek the dismissal of this motion. They argue that there is no evidence that credibility will be a key component in the determination of the ultimate issues at trial. They have filed an affidavit attaching the pleadings, notes of the police officers, information to obtain a search warrant and some pages of the transcripts of the preliminary inquiry covering questions asked of the three Defendant police officers.

**10**    They argue: that these documents (over 1,400 pages of notes and a 99 page affidavit in support of the search warrant), as well as the transcripts of the preliminary inquiry, adequately protect the Plaintiffs; that the officers provided their notes and were extensively cross-examined at the preliminary inquiry on their notes and recollection of probable grounds issues; that the officers are, therefore, locked into their evidence; and that the affidavit in support of the search warrant also locks them in regarding their opinion on reasonable and probable grounds.

**11**    The Defendants argue that the issues surrounding reasonable grounds do not give rise to a sufficient credibility issue. Further, the fact that there was a preliminary inquiry distinguishes this case from others as the Plaintiffs had the opportunity to cross-examine the officers at the preliminary inquiry.

**12**    On the issue of prejudice to the excluded parties, I note that restricting the right of a party to be present at discovery may impact his right and ability to fully present his case/defence. Being present and hearing what is said by the co-parties assists the parties in fully putting forth their respective case or defence.

**13**    As these cases typically involve co-parties having common interests, the worry exists in all such cases that the evidence could be tailored. The risk that evidence might be tailored (or, if you prefer, the risk that fairness or justice is threatened) must be considered and balanced with the right of a co-party to be present to ensure that his/her case/defence is fully presented.

**14**    A corollary of granting an exclusion order is the impact it could have on the lawyer-client relationship. Invariably, parties seeking such an exclusion order seek an order that the lawyer not be allowed to tell his/her clients (who are co-parties) what the other co-parties indicated at their examination for discovery. This relief is typically granted with the exclusion order as, if an exclusion order is warranted to protect the interests of justice, this is required for the exclusion order to be effective: see for example *Lipischak v. DeWolf*, [2008] O.J. No. 4918 (S.C.).

**15**    A lawyer representing multiple plaintiffs or multiple defendants does so when the parties have common interests in the outcome of the litigation; otherwise the lawyer would be in a conflict of interest position and could not act for all co-parties. As a result, in such cases, the co-parties share a common or similar position on factual issues.

**16**    The duties of a lawyer to her clients include competent representation. Clients have a corresponding right to be afforded the opportunity to fully present their case/defence with the assistance of a lawyer, if they retained one. Competent lawyers usually meet with their clients to prepare them for their examination for discovery. Invariably, a competent lawyer will inform clients of what transpired at the examination for discovery of a co-party. This is done by

the lawyer not to tailor the evidence but to ensure that the case/defence is fully presented by the client during his or her examination.

**17**    It has been my experience that when lawyers agree that co-parties who have not yet been examined not be in attendance at the examination for discovery of other co-parties, they rarely discuss or agree that the lawyer acting for such co-parties will not inform co-parties yet to be examined of what occurred at the discovery of a co-party.

**18**    An exclusion order that restricts the right of a party to be adequately prepared by her lawyer for an up-coming discovery may, therefore, also impact a party's right to counsel in preparing her examination for discovery.

Analysis

**19**    Both parties filed excellent factums and books of authorities, squarely addressing the law on this topic. I will not specifically address each of the cases referred to me, but list them as each was considered in reaching my decision:

    Moving Parties

    *Sissons v. Olson*, [1951] B.C.J. No. 77 (C.A.)

    *Lipischak v. DeWolf*, [2008] O.J. No. 4918 (S.C.)

    *Ambrose v. Anderson*, [2011] O.J. No. 3496 (S.C.)

    *R. v. Tomlinson*, [2007] O.J. No. 4743 (S.C.)

        *Blomme v. Eastview Raquet Club and Fitness Club et al.*, [1995] O.J. No. 3441 (Gen. Div.)

        *Cardona et al v. Ospreay et al.*, [1994] O.J. No. 4424 (Gen. Div.)

        Responding Parties

        *The Estate of Sim Fai Liu v. Chau et al.*, [2004] O.J. No. 306 (C.A.)

        *Lambert v. Lomore*, [1997] A.J. No. 1205 (C.A.)

        *Solutions With Impact Inc. v. Domino's Pizza of Canada Ltd.* 2010 ONSC 630

        *Alexandridis v. Richard*, [2007] O.J. No. 1989 (S.C.)

        *Changoo v. Changoo*, [1999] O.J. No. 865 (Gen. Div.)

        *Downer v. Jacome*, [2009] O.J. No. 880 (S.C. - Master)

**20**    Examinations for discovery serve important purposes in civil litigation. They:

        a)    Allow the examining party to know the case to be met;

      b)    Procure admissions to prove certain elements of the case/defence;
      c)    Procure admissions that may destroy or undermine part of the opponent's case; and,
      d)    Serve to narrow the issues.

**21**    Considering that well over 90% of cases settle without going to trial, examinations for discovery play a most important role in how a case is settled prior to trial.

**22**    The cases recognize that parties have a prima facie right to be present during their action, including at examinations for discovery, however, that this right must not conflict with the proper conduct of the action.

**23**    In certain circumstances, usually when fairness or justice is threatened, the cases recognize that to promote the objects of an examination for discovery and to meet the ends of justice, an exclusion order may be required, in the Court's discretion. The party seeking the exclusion has the onus to show cause why the exclusion is required. What is required to show cause is fact specific and relates to protecting the interests of justice.

**24**    Factors considered include: whether the co-parties have common interests; whether the co-parties are represented by the same lawyer; whether it appears that the examinations for discovery of co-parties will cover the same grounds; whether credibility will be a factor or an issue in the case; whether evidence is likely to be tailored or parroted; whether a party is likely to be intimidated; whether the proceedings are likely to be disturbed or disrupted; whether there would be prejudice to the excluded party; and, generally, whether the ends of justice require the exclusion: see, for example, *Lambert v. Lomore;* and, *Solutions With Impact Inc. v. Domino's Pizza of Canada Ltd.*

**25**    A review of the cases reveals that the level of proof required to exclude a party from discovery varies from a light onus, with the benefit of any real doubt to the party seeking the exclusion (see, for example, para. 16 in *Sissons*) to a higher onus where mere allegations/concerns of tailoring are not enough and evidence of some strong probability of tailoring is required (see, for example, *Changoo* at para. 16).

**26**    To illustrate, consider the following statements made in *Sissons* and followed in *Lipischak* with statements made in *Lambert* and *Changoo:*

    In *Sissons v. Olson* at para 16:

        The weight of authority holds, I think, that either at a trial or on discovery a party cannot be excluded while his coparty testifies, without cause shown. But I do not think the onus of showing cause thus put on the opposite party is a heavy one; and I think the onus is lighter on discovery than at a trial, since the possibility of injustice from exclusion is more remote. Even at a trial, I think the chance of injustice being done in this way is extremely small. But in many cases the chances of injustice to the opposite party from refusal to exclude may be very substantial. I think the benefit of any real doubt should be given to the party asking for exclusion. If from the pleadings or otherwise it appears that the examinations of the coparties will cover the same ground, and that their credibility will be a factor, then it seems to me their exclusion should be ordered.

    In *Lipischak v. DeWolf* at para 38:

        I agree with the less stringent test for exclusion. Unless there is a possibility of injustice from an exclusion, the injustice from a refusal to exclude may be substantial.

In *Changoo v. Changoo* at paras 16 and 17:

> On the basis of the preponderance of authority in this province, I am satisfied that the possibility that evidence will be tailored in these circumstances is not sufficient to discharge the burden on the plaintiff - whether that burden be described in terms of the interests of justice, exceptional circumstances or, simply, cause.

> In reaching this conclusion, I do not wish to imply that my decision would be different if there was some evidence that the party whose exclusion is sought had no regard for the truth or had conspired with the parties to be examined to injure the interests of an opposing party. I have considered the question of evidence in deference to what has been said in previous cases in this court. In my opinion, each party to an action, application or motion, should be entitled to be present throughout the fact-finding process unless the circumstances are such as to indicate that there is a real risk that the proceedings will miscarry if this general rule is adhered to. Evidence that intimidation is likely to occur may be one such exceptional circumstance. I am not convinced that even a strong probability that evidence may be tailored should be treated as another.

In *Lambert v. Lomore* at paras 27 and 30:

> The fact that they are police officers renders it neither more likely nor less likely that they might "tailor" their testimony. Absent cogent evidence pointing to a reasonable apprehension of misconduct, an order for exclusion cannot be supported. Allegations in a statement of claim, without more, do not satisfy the test. That is because a carefully crafted pleading may, of itself, work a mischief by precipitating exclusion in circumstances where such a result would be wholly unjustified on the evidence. And I do not, with respect, see "community of interest" as anything more than a precarious and mistaken basis upon which to predict "tailoring" ...

> ...

> The presence of the parties at such examinations facilitates and promotes some of the enumerated objectives. That having been said, the object and purpose of an examination for discovery may, in some circumstances, be defeated unless an exclusion order is made. The onus is on the applicant seeking such an order to establish the factual underpinnings that would justify exclusion. There must be an evidentiary showing that persuades a chambers judge that an order for exclusion is necessary to ensure that the examination for discovery process will be meaningful. Put another way, the chambers judge must be satisfied, on the evidence, that exclusion is necessary for the fair and proper judicial conduct of the action. That onus is discharged when the chambers judge is satisfied, on the evidence, that there is a reasonable apprehension that the object and purpose of an examination for discovery will be defeated unless the order goes.

27      When one considers the facts in some of the above noted cases, the exclusion was granted:

> *      In *Lipischak*, the Court indicates that various credibility issues were raised by the pleadings that would be key to the resolution of the action. The action involved a dispute between neighbours with specific tortuous acts alleged and denied by the parties.

*Lipischak* adopted the less stringent test for exclusion (para. 38) and granted the exclusion. It indicates at paragraph 24:

> If a case involves a critical issue of fact, depending on its resolution largely on the evidence of two individuals, and the evidence establishes a likelihood that one would tailor his evidence if given the opportunity of bearing the evidence of the other, that might give rise to an order for exclusion.

* In *Ambrose*, dealing with nine plaintiffs alleging entitlement to share with 19 defendants in a lottery winning jackpot of $50 million, the Court granted the exclusion and notes (at para. 20) that "the outcome of the action will turn almost exclusively on findings of credibility based on viva voce testimony ..."

* In *Blomme v. Eastview Raquet Club and Fitness Club et al.,* the dispute was whether the defendants had agreed to buy the plaintiff's interests - this was alleged by the plaintiff and denied by the defendants. The plaintiff wanted to examine the two defendants separately as credibility was key to the resolution of whether or not the defendants had agreed to the alleged agreement. The Court indicated that credibility would be the main issue at trial.

* In *Solutions With Impact Inc. v. Domino's Pizza of Canada Ltd.,* the plaintiff's claim centered on the existence of an oral agreement for online pizza ordering software which it alleged was breached by Domino while Domino denied the existence of the contract. The Court noted that credibility would be of prime importance and granted the exclusion in part.

28    On the opposite side, for example, the exclusion was not granted:

* In *Sissons*, even recognizing a light onus on the moving party, an exclusion was not granted when the court was not convinced that a violation of an essential of justice was threatened.

* In *Lambert v. Lomore,* a key credibility issue was at play: whether or not police officers had assaulted the plaintiff yet the majority held that community of interest was not sufficient absent evidence "that an order for exclusion is necessary to ensure that the examination for discovery process will be meaningful." However, the dissenting judge indicated that he would not have varied the motion judge's decision to exclude the police officers because credibility was a major issue in the action (para. 57).

* In *Alexandridis v. Richard,* the main issue was a medical issue to be determined on medical evidence. The Court noted that while credibility was a factor it was not a key issue. It concluded that a possibility that evidence will be tailored is not enough in these circumstances.

29    From my review of the cases, as illustrated above, it seems that generally (although not always - see for example *Changoo* and *Lambert*) the required onus is driven principally by the extent and importance of the specific issues of credibility at play in the action and whether their resolution may determine the result of the action. As indicated in *Lipischak*, "If a case involves a critical issue of fact, depending on its resolution largely on the evidence of two individuals ..." then credibility is obviously a key factor to the disposition of the action.

30    This appears sensible and logical as what is sought to be protected is fairness or the interests of justice. These are not seriously at risk of being compromised in cases where credibility is not a key issue and there is only the possibility for tailoring of evidence should an exclusion order not be granted. Credibility is, to some extent, a factor in all civil cases. Similarly, recognizing human frailties, a possibility that the evidence of co-parties given at their examinations for

discovery might be tailored (at least to some extent) exists as well in all civil cases.

**31**    Whether or not a court should exercise its discretion and intervene to restrict the right of co-parties to be present at the examination for discovery of another co-party depends primarily on its appreciation of the risks that fairness or the interests of justice could be compromised or threatened. That risk, in most cases, is directly and proportionately related to the extent that credibility is a key factor to the disposition of the action.

**32**    Indeed, in cases where credibility is a key factor to the disposition of the action, even a possibility that the evidence could be tailored is, in some circumstances, sufficient to find that fairness or the interests of justice could be compromised unless an exclusion order is made (see, for example, *Lipischak*).

**33**    In most cases, including those where credibility is a key factor to the disposition of the action, one would rarely have strong evidence of a risk that evidence might be tailored or that the interests of justice are threatened until after the completion of examinations for discovery. By then, it would usually be too late to protect fairness.

**34**    Therefore, in cases where credibility is a key factor, balancing the interests of both parties (on one hand the parties requesting to be present to fully present their case and, on the other, those seeking the exclusion, allegedly to protect the interests of justice), might more readily, depending on the circumstances, warrant an exclusion order being made on a lesser onus, including on a possibility that the evidence will be tailored.

**35**    Whereas, in cases where credibility is but one of many factors and where, consequently, the disposition of the action is not likely to turn on a "critical issue of fact, depending on its resolution largely on the evidence of two individuals", balancing these same interests might, depending on the circumstances, warrant an exclusion order being made only upon presentation to the Court of stronger evidence that the discovery process is threatened or may otherwise be compromised.

**36**    In this case I find that although credibility is a factor, it is not a key factor to the extent that it would be in a case where, for example, the disposition of the action turned on the disputed evidence of two individuals.

**37**    This case is primarily about the existence of reasonable grounds. Although credibility will be a factor when assessing reasonable grounds and assessing each officer's independent recollection of what he/she considered as reasonable and probable grounds, as well as their respective state of mind on the evidence, it will likely not be a key factor to the overall determination of the case. Significant other evidence in the form of notes and independent witnesses will have to be considered and will likely temper whatever else the Defendants might say at their respective examination for discovery. The pleadings do not clearly raise issues of credibility and, in this case, credibility appears to be an issue just as it is generally in most civil actions.

Conclusion

**38**    Balancing the interests of the parties and considering the Court's discretion, I find in the circumstances of this case that the Plaintiffs have not presented sufficient evidence that the discovery process is threatened or that it may be compromised if the co-parties are allowed to be present at the examination for discovery of the other co-parties.

**39**    This motion is therefore dismissed.

**40**    On the issue of costs, costs sought by the Defendants if successful are limited to the nominal amount of $1,000.00. I find such an amount more than reasonable and, therefore, order the Plaintiffs to pay to the Defendants the costs of this motion in the all inclusive amount of $1,000.00 within 90 days from today. I have considered the arguments of the Plaintiffs including that costs should not be payable if she lost or should then be in the cause but I am not convinced in this case as the costs sought are extremely reasonable and as costs are sometimes required to focus the litigation exercise.

MASTER P.E. ROGER

cp/e/qlafr/qlvxw/qlprp/qljac

# TAB 3

COURT FILE NO.: 00-CV-195906CP
DATE: 20070517

## SUPERIOR COURT OF JUSTICE – ONTARIO

Proceeding under the *Class Proceedings Act, 1992*

2007 CanLII 64140 (ON SC)

RE:        YVONNE ANDERSEN on her own behalf and as Executrix of the Estate of Erik Andersen, et. al. v. ST. JUDE MEDICAL, INC. et. al.

BEFORE:    MASTER MACLEOD

COUNSEL:  James Newland and Brian Moher for the plaintiffs

             S. Gordon McKee and Jill M. Lawrie for the defendants

### REASONS FOR DECISION

[1]    Can a party being examined for discovery in Ontario be compelled to pose a series of questions to an expert? Should the answer be different if the expert is also in part a factual witness? Ought the answers to either of these questions be different in a class proceeding with class members, witnesses and parallel litigation in other jurisdictions? These questions are central to a series of discovery questions argued before me and taken under reserve.

### The nature of the action

### The series of motions

[2]    I have been dealing with a series of motions in this proceeding at the request of the class proceedings judge. I released rulings on September 15th, 2006[1], October 23rd, 2006, January 29th, 2007 and January 30th, 2007. Certain rulings from the September 15th endorsement were appealed and on November 15th, 2006 Cullity J. also released reasons varying one aspect of my September 15th decision. There are a number of motion records and supplementary motion records. I mention these other dates as a matter of record so that anyone looking for the complete disposition of the motions will understand that there are other sets of reasons dealing with different issues.

[3]    This procedure was adopted largely because of volume of material, time required to argue the motions and because the parties understood there was limited court time available. They are facing a number of deadlines. The trial of the common issues is scheduled to take place in September of this year. As a result counsel agreed to "triage" their motions and for each party to

---

[1] [2006] O.J. No. 3659; 33 C.P.C. (6th) 159 (Master)

- 2 -

argue the issues it regarded as most pressing.  It is for this reason that rulings have been released in more piecemeal fashion than might ordinarily be expected.

[4]    These particular reasons deal with questions argued by the defendants on December 1st and January 30th.[2]  I also deal with one issue from the plaintiffs' motion and I will release separate reasons on a privilege motion that the parties have requested me to deal with in writing.

**The issues in the action**

[5]    The allegations and issues in this litigation are set out in some detail in previous reasons.[3] In simplest form this is a medical products liability action in which the plaintiffs accuse the defendants of recklessly bringing a modified version of a mechanical heart valve to market and failing to recall it in a timely fashion.  The plaintiffs bring the action on their own behalf and on behalf of other affected patients and their families. While it is not the only issue, the central issue in the proceeding is whether or not St. Jude knew or ought to have known that coating heart valve sewing rings with Silzone®, a formula including silver and palladium, might result in a higher failure rate than was usual with St. Jude heart valves?

[6]    Because this is a certified class proceeding, the issues before the court in the September trial are defined with some precision. The certification order defines the common issues as follows:

1.    Did the defendants breach a duty of care owed to the Patients' class members by reason of the design, pre-market testing, regulatory compliance, manufacture, sale, marketing, distribution and recall of Silzone-coated mechanical heart valves and annuloplasty rings implanted in such members?

2.    What effect, if any, does such Silzone coating have on tissue healing?

3.    Does a Silzone coating on heart valves; or annuloplasty rings, materially increase the risk of various medical complications including, but not limited to, parvalvular leakage, thrombosis, thromboembolism, stroke, heart attacks, endocarditis or death?

4.    Do Silzone-implanted patients need additional or different medical monitoring than that for conventional mechanical heart valve patients?

5.    Should the defendants be required to implement a medical monitoring regime and, if so, what should the regime comprise and how should it be established?

6.    Is the burden of proof of causation or negligence affected by spoliation of evidence by the defendants?

---

[2] The parties were subsequently given an opportunity to make written submissions regarding caselaw I felt was relevant but had not been addressed in oral argument.
[3] see for example reasons at note 1, supra, as well as the certification decision reported at 67 O.R. (3d) 136 (S.C.J.)

2007 CanLII 64140 (ON SC)

- 3 -

7.   Does the defendants' conduct merit an award of punitive damages, and if so, in what amount?

[7]    As will be apparent from these issues, four fundamental questions are: whether or not the silver compound actually impairs healing or is otherwise dangerous; whether or not St. Jude acted reasonably given the information available to it at the time; whether St. Jude knew or ought to have known it was imprudent to bring the product to market; and whether or not St. Jude knew or ought to have known the product should be withdrawn from the market?  This casts the ambit of relevant discovery questions broadly in time because it is relevant to know the state of knowledge today concerning the toxic effects of silver or the Silzone coating as well as the state of knowledge in the scientific and medical community at relevant times.  I should also point out that one of the allegations in the pleadings is that St. Jude actually suppressed negative information from its own studies or at least was in possession of such information that it did not make available to regulators or the scientific and medical community.  From the point of view of the defendants, they are entitled to explore what evidence the plaintiffs have in this regard.

### The Discovery Regime in Ontario

[8]    The questions under reserve generally call into question the extent to which the examining party may examine or cross examine a discovery witness about the evidence of other potential witnesses. To understand the issue, it is necessary to describe certain features of Ontario discovery practice that may be less common in jurisdictions with different rules. It is worth taking a moment to do this because there is parallel litigation in other jurisdictions.[4] While the potential reach of discovery is similar in each of the jurisdictions, there are significantly different procedural rules and wide differences in discovery practice as a result.[5] Notwithstanding that there are class members in other jurisdictions, this action commenced and certified in Ontario is governed by Ontario procedural law.

[9]    In Ontario, except with leave of the court, it is only the parties that are discovered directly.  Our rules provide an election to proceed in writing or by oral examination but in practice oral discovery is prevalent.[6]  In a class proceeding there is a further statutory restriction. The Act permits discovery of the named representative plaintiffs but individual class members who are not named parties may not be examined without leave.  Frequently it will not be necessary to have members of the class other than the representative plaintiffs give evidence at the common issues trial.

---

[4] There are various actions in the United States and a series of depositions in the "MDL" – multi district litigation – see earlier reasons.

[5] For a brief summary of key similarities and differences between Ontario, Canadian jurisdictions and certain U.S. and commonwealth jurisdictions, see the Report of the Task Force on Discovery in Ontario available on the Ontario Courts web site at www.ontariocourts.ca

[6] Another important feature of our rules is the requirement for early and complete documentary disclosure by means of an affidavit of documents. See Rule 30.  In the case at bar the parties have agreed on a combination of oral discovery, written questions and use of transcripts of depositions in the United States.

2007 CanLII 64140 (ON SC)

- 4 -

[10]    Although our rules place these limits on who may be examined without a court order, the scope of discovery is broad. The pertinent rule is Rule 31.06 and in particular subrules (1), (2) and (3).[7] Pursuant to subrule (1) a party examined for discovery must answer "to the best of his or her knowledge, information and belief, any proper question relating to any matter in issue in the action or made discoverable by the rules".[8] This rule also permits the discovery witness to be cross-examined unless the question is solely directed to credibility. Subrule (2) deals with disclosure of the names and address of persons who might reasonably be expected to have knowledge of transactions or occurrences in issue in the action". This provides for disclosure of the identity and whereabouts of potential witnesses. Subrule (3) provides for disclosure of "the findings, opinions and conclusions of an expert" engaged on behalf of that party unless there is an unequivocal undertaking not to call the expert at trial. Case law establishes that disclosure of potential fact witnesses also includes disclosure of the essence of their evidence[9] and disclosure of findings and opinions of experts includes the basis for the expert's conclusions such as assumptions, documents and raw data.[10]

[11]    It therefore entirely appropriate to ask what information the party being examined has about the evidence of witnesses who are not themselves subject to discovery. To the extent the party knows the answer to the question, the evidence of that witness must be disclosed. Frequently, if the discovery witness does not know the answer, he or she will agree to obtain the information and to provide the answer.  Even if there is not such an agreement, Rule 31.09 imposes an obligation to subsequently provide information if a question answered on discovery was incorrect or incomplete or is no longer correct and complete. Thus a discovery witness who does not know what information a prospective witness may have at the time of discovery would have to disclose that evidence once it is obtained.[11] As a result, parties frequently give undertakings to use best efforts to obtain answers from witnesses, particularly those who are under their power or control. Most often this applies to employees who are fact witnesses and to experts. While such undertakings are common practice, in order to determine the motion I must consider the circumstances in which such undertakings may be demanded if they are not given voluntarily.

**Limits to Questioning in the Rules and the Jurisprudence**

[12]    With the above background it is worth summarizing the practice with respect to obtaining the evidence of witnesses as set out in the rules and the caselaw.  It is necessary in doing so to distinguish between fact witnesses and expert witnesses. In theory these are distinct roles. Factual witnesses, of course, testify to their knowledge of events or documents and with limited

---

[7] http://www.e-laws.gov.on.ca/DBLaws/Regs/English/900194a_e.htm is the web address for the Rules of Civil Procedure on line.
[8] At this stage in a class proceeding what is in issue is defined by the pleadings and by the certification order defining the common issues.  There will be issues raised by the pleadings that are not in issue in this phase of the trial.
[9] Tax Time Services Ltd. V. National Trust Co. (1991) 3 O.R. (3d) 478 (Gen.Div.)
[10] Horodynsky Farms Inc. v. Zeneca Corp. (2006) 32 C.P.C. (6th) 201; 272 D.L.R. (4th) 545 (Ont. C.A.); leave to appeal refused [2006] S.C.C.A. No. 451 (S.C.C.)
[11] Assuming the question was properly posed at the original discovery.

2007 CanLII 64140 (ON SC)

- 5 -

exceptions may only testify concerning first hand knowledge. These witnesses give evidence about what they saw or did or wrote or received and perhaps if it is relevant about their own intentions or knowledge at the time. Expert witnesses, by contrast, may have no first hand knowledge of the events in question but are called to give the court the benefit of their scientific, technical or other specialized knowledge.

[13]    In practice the world of witnesses is not so neatly divided and there are many situations in which an expert is also a fact witness. Indeed, it is common to find situations in which professional opinions formed at relevant times by one of the proposed experts form part of the factual nexus itself. Common examples are treating physicians whose diagnosis and prognosis may have determined the treatment choices made by an injured plaintiff. Engineers or architects who are responsible for design and supervision of construction projects are similar examples. When litigation ensues, these professionals may be hybrid witnesses who will testify about what actually happened and what decisions or advice they gave and may also be retained as experts for the purpose of trial.[12]  This is one of the problems that gave rise to disagreement as to the proper scope of discovery in the motion before me.

[14]    The following principles and practices may be derived from a combination of the Rules of Civil Procedure, decided cases and the Rules of Professional Conduct. While the majority of these points were not in dispute on the motion, I set them out at length. This is because I found it necessary to go back to first principles. They have informed my decision and should guide counsel in seeking consensual resolution of any further issues of this nature.

1.    A discovery witness is obligated to fully inform himself or herself about the issues in dispute and the available evidence. This includes making inquiries of employees and former employees. See *Gravlev v. Venturetek International Ltd.* (1979) 15 C.P.C. 18 (H.C.J.) and *Air Canada v. McDonnell Douglas Corporation et. al.* (1995) 22 O.R. (3d) 140 (Master)

2.    A witness is required to answer all proper questions relating to any matter in issue in the action. See Rule 31.06  "Relating to any matter in issue in the action" means any question that appears to be relevant to the issues as defined by the pleadings or by the order for trial of an issue. See *Kay v. Posluns* (1989) 71 O.R. (2d) 238 (H.C.J.) In a class proceeding, for the common issues trial, relevance is defined by the common issues informed by the pleadings and not the pleadings at large. See *11176560 Ontario Ltd. v. The Great Atlantic & Pacific Company of Canada Limited* [2003] O.J. No. 5703 (Master)

---

[12] I observe in passing that there is a distinct possibility the court might decline to hear expert testimony from such a witness or give it limited weight for two reasons. The first is that in many cases the judgment and recommendations of the witness are so tied up with the facts that the expert's professional judgment may implicitly be on trial. This gives rise to a concern that the witness will not give unbiased evidence. The second may be that the issue on which the expert might be asked to opine is the very issue the court must determine. See *Caputo v. Imperial Tobacco, supra.* in which the law on admission of expert testimony is reviewed.

2007 CanLII 64140 (ON SC)

- 6 -

3.    A discovery witness may be cross examined on his or her answers and on the affidavit of documents providing the cross examination does not go solely to credibility.  See Rule 31.06 (1).

4.    A discovery witness must disclose, if asked, the names and contact information for all persons who are likely to have information touching on the facts in issue. See Rule 31.06 (2) To the extent that the discovery witness knows what evidence any of those persons can give, this evidence must be summarized upon request. See *Tax Time Services Ltd. v. National Trust Co.* (1991) 3 O.R. (3d) 478 (Gen.Div.)

5.    Litigation privilege is designed to ensure a zone of privacy around litigation strategy and the investigative efforts of counsel. As a result it is not proper to ask what witnesses have been interviewed but compliance with Rule 31.06 (2) will have the effect of disclosing witnesses who have been interviewed and who have relevant evidence. There is a tension between the principles of disclosure and litigation privilege and on this point the rule requires disclosure. See *General Accident Assurance Co. v. Chrusz* (1999) 45 O.R. (3d) 321 (C.A.)

6.    Independent witnesses may be interviewed by either party and if they will not disclose their evidence voluntarily, assuming that evidence to be significant and important, and the tests in the rule to be met, the court may grant an order for discovery of the witness. Rule 31.10 This rule also applies to employees and former employees if obtaining the information from the discovery witness is impractical or inappropriate. See *Lana International Ltd. v. Menasco Aerospace Ltd.* (2000) 195 D.L.R. (4th) 497 (Ont. Div. Ct.) and *Famous Players Development Corp. v. Central Capital Corp.* (1991) 6 O.R. (3d) 765 (Div. Ct.) See also Rule 31.03 (2) (b)

7.    While there is "no property in a witness" and the parties may independently contact and interview witnesses who will speak to them voluntarily, the practice with respect to current employees is different. Generally the evidence of those witnesses is to be obtained through the process of discovery and if the discovery witness does not wish to put the questions to the employee a request to interview the witness must go through counsel. See Rule 4.03 (3) of the *Rules of Professional Conduct*, Law Society of Upper Canada and ch. IX, commentary 6 of the Canadian Bar Association *Code of Professional Conduct.*

8.    A similar prohibition applies in respect of treating physicians or other witnesses who are agents of the opposing party or bound to the opposing party by a duty of confidentiality.  Though confidentiality may be implicitly or explicitly waived as between the parties because of the issues raised by the litigation, the opposing party may not interview the witness without the consent of the party to whom the duty is owed or a court order. This is amongst other reasons because the witness cannot be expected to understand the boundaries of a waiver of confidentiality or

2007 CanLII 64140 (ON SC)

- 7 -

the ambit of relevance. The usual mechanism for obtaining this evidence is an undertaking by the discovery witness or else an authorization to conduct an interview with counsel present. If these options are inappropriate or impractical, the mechanism for obtaining the evidence is an order for discovery of a non party under Rule 31.10 as that is a process subject to court control. See *Lana International Ltd. v. Menasco Aerospace Ltd. supra* and *Cameron v. Louden* (1998) 21 C.P.C. (4th) 244 (Ont. Master) [13]

9.   A discovery witness may not be required to obtain specific evidence or put specific questions to potential witnesses who are neither parties nor under the control of a party nor readily accessible to that party. See *Air Canada v. McDonnell Douglas Corporation, supra.* In the case of former employees, a discovery witness need not undertake to ask them about information concerning events transpiring after the employment terminated or they ceased to act on behalf of the former employer. See *Fiba Canning Inc. v. T.R.S. Ent. Ltd.* [2003] O.J. No. 5819 (S.C.J.)

10.  Although a discovery witness may therefore be required to undertake to ascertain the evidence of a specific subset of non party witnesses in order to avoid an interview or examination of the witness, there are limits to the extent of such undertakings. These limits may have to be established on a case by case basis but as a general rule the party need not undertake to put large numbers of specific questions to the potential witness and certainly need not agree to cross examine him or her. If the evidence of the witness is so critical that fairness demands detailed disclosure of the evidence or pre-trial cross examination then it is probable that direct discovery of the witness will be more practical. See rules 31.10 and rule 31.03 (3).

11.  The provisions in the rules allowing discovery of a non party do not allow for direct discovery of an expert witness. The court may not grant an order for discovery of an expert witness retained by the opposing party for the purpose of actual or pending litigation. See Rule 31.10 (1) Our rules contain no provision for

2007 CanLII 64140 (ON SC)

---

[13] Counsel for the defendants point out that there may be regulatory restrictions or requirements, professional codes of conduct or other factors that vary depending on the location of a potential witness which may in turn affect this analysis. I agree that is so but the choice will still have to be made between undertaking, interview or examination under oath. To the extent that the law of a particular jurisdiction either prohibits or compels a witness to speak directly with counsel for a party that will be a factor in determining the most appropriate procedure and a factor in the exercise of the court's discretion. A further complication with respect to witnesses in other jurisdictions is that as they are not within the jurisdiction of this court, they cannot be compelled to submit to discovery solely by an order of the court. In that case a letter of request or letters rogatory will be required and whether or not local courts will enforce it will be subject to the domestic law where the witness resides.

- 8 -

cross examination of such experts in advance of trial but they do provide for full disclosure. [14]

12.     While the expert may not be examined for discovery, the findings, opinions and conclusions of experts engaged by the other party are discoverable unless the party being examined has a proper claim for litigation privilege, elects to rely on that privilege, and undertakes not to call the expert at trial. See rule 31.06 (3) This disclosure applies whether or not the expert has provided a written report and covers opinions and conclusions other than those set out in such a report. It should be noted however that, in addition to the discovery rule concerning experts, no expert may be called at trial unless a written report has been served well in advance of the trial date and usually by the time of the settlement conference or pre-trial. See rules 50.05, 53.03, 77.14 (6)   As a result, it is common for the parties to agree to a fixed timetable for the exchange of expert reports rather than engaging in murky discovery of hearsay opinions and findings. In the absence of an agreement however, the rules are clear that the only way to avoid disclosure of expert opinions is to undertake not to call those experts at trial. It is tricky if the expert has not yet prepared a report and the party wishes to keep open the option of calling that expert. In that case the rule requires disclosure of the expert's conclusions, opinions and findings even though they have not been reduced to writing in a report.

13.     A discovery witness may be asked about the facts relied upon, documents reviewed, observations, tests or assumptions made by the expert in reaching conclusions or making findings. See *Enterprise Excellence v. Royal Bank* (2000) 9 C.P.C. (5th) 362 (S.C.J.)

14.     Whether or not the expert has written a formal report, it is reasonable to ask a discovery witness who does not know the basis for conclusions by the expert to undertake to ask the expert what facts were relied upon, documents reviewed, observations, tests or assumptions made in reaching conclusions or making findings. Also to the extent that anything in an expert report is vague, unclear, apparently contradictory, or clearly in error, it is reasonable to ask the witness to obtain clarification on those points from the expert. This does not provide a mechanism for the expert to be cross examined.

15.     Despite the prohibition on seeking discovery of experts retained for litigation purposes, Rule 31.10 is available for discovery of treating physicians or other persons who are fact witnesses if the tests set out in the rule are met even though they may also be experts who may be called as such at trial. See *Wells (Litigation*

2007 CanLII 64140 (ON SC)

---

[14] The report of the Task Force on Discovery in Ontario recommended pre-trial discovery of experts be permitted but this has not been implemented. The only provision in our rules for pre-trial examination is if the expert may not be available for trial and in that case after a report has been served the party seeking to introduce the evidence may seek leave of the court to take the evidence in advance under Rule 36.01.

- 9 -

*Guardian of) v. Paramsothy* (1996) 32 O.R. (3d) 452 (Div. Ct.)., *Gardiner v. North* [2000] O.J. No. 2198 (S.C.J.)  In that case, if the functions may be separated, the court may order the examination limited so that the expert may not be cross examined on the expert opinion that may be given at trial. See *Cameron v. Louden, supra*

16.    While a party is certainly at liberty to do so voluntarily, a party may not be required on discovery to put different facts to his or her expert or to obtain a supplementary expert report dealing with new issues concerning which the party has not asked the expert to opine.

[15]    Before leaving this summary, it is worthwhile revisiting the purposes of discovery. This is because the court retains a degree of discretion to broaden or restrict discovery rights. What is set out in the rules is the default position which parties are expected to follow without the need for court direction. Ultimately however discovery is a court process and it proceeds under court supervision. The court has the power to restrict discovery that is onerous or abusive or to expand discovery rights if the ends of justice require it.[15] That power is specifically enunciated in various rules empowering the court to grant or withhold leave but also in the general override contained in Rule 2.03 and the general interpretive direction in Rule 1.04.  The Rules of Civil Procedure are not ends in themselves but exist to ensure the "just, most expeditious and least expensive determination of every civil proceeding on its merits."

[16]    The purposes of discovery have been variously described. The classical formulation is that found in the 1947 Court of Appeal decision in *Modriski v. Arnold.*[16]  There the court set out three purposes: to enable the examining party to know the case it has to meet; to procure admissions that will dispense with formal proof of the party's own case; and, to obtain admissions that will destroy the opponent's case. In *Bowen v. Klassen*[17], a case decided when the "new" rules had been drafted but not yet enacted, the court added to these the purposes of facilitating settlement, to facilitate pre-trial procedures and trials and to eliminate surprises at trial. Other courts have added such purposes as obtaining documents which may enable the party either to advance his own case or damage the case of the other[18] understanding the legal arguments that will be advanced by the opposing party[19] preventing the element of surprise and obtaining admissions or other information which will reduce the expense of preparing for and participating in the action.[20]  Interestingly the Task Force on Discovery in Ontario conducted a survey in which various potential benefits of discovery were ranked by litigation lawyers with

---

[15] See *1176560 Ontario Ltd. v. Great Atlantic & Pacific Company of Canada Ltd., supra* at paras. 11 & 12.

[16] *Modriski v. Arnold* [1947] 3 D.L.R. 321; see also Gravlev v. Venturetek International Ltd. (1979) 15 C.P.C. 18 (H.C.J.); *White Pine Electric Ltd. v. Compact Inc.* [2006] O.J. No. 477 (S.C.J.)

[17] Bowen v. Klassen (1980) 30 O.R. (2d) 15; 115 D.L.R. (3d) 167 (H.C.J.)

[18] Ontario (Human Rights Commission) v. Dofasco Inc. (2001) 57 O.R. (3d) 693 (C.A.)

[19] Six nations of the Grand River Band v. Canada (2000) 48 O.R. (3d) 377 (Div. Ct.)

[20] Gemini Group Automated Distribution Systems Inc. v. PWA Corp. (1993) 16 O.R. (3d) 239 (C.A.);  Lloyds Bank Canada v. Canada Life Assurance Co. (1991) 47 C.P.C. (2d) 157 (Gen.Div.)

2007 CanLII 64140 (ON SC)

- 11 -

knowledge. I believe in such a case if the plaintiffs do not wish to supply information by undertaking then the plaintiffs ought to instruct the witness to co-operate with the defendants by answering questions directly. In some cases, as in the case of the late Dr. Vas, this is not correct and both parties have interviewed the witness. Of course there is also evidence available in the form of deposition transcripts from the U.S. litigation (MDL). I am not of course intimately familiar with the contents of those depositions. Finally, there are numerous articles written by experts at relevant times in the past. Some of those articles will be encompassed in expert reports or are the basis for expert opinions for the purpose of trial. It is somewhat complicated to sort out whether the articles should therefore be treated as either findings and conclusions of the experts or whether the expert's knowledge of those articles should be treated only as factual knowledge. I have attempted to enunciate the principles underlying my rulings so that if my appreciation of the facts is in error, the parties may agree on the appropriate outcome. Failing such agreement, of course, they may approach me for clarification before taking out the formal order.

[22]    These issues are highlighted by considering the questions in relation to Dr. Costerton.

**Questions Relating to Dr. Costerton**

[23]    A large number of the questions involve Dr. Costerton who is an expert retained by the plaintiffs. As discussed above, in the case at bar a central issue will be what St. Jude knew or ought to have known about the wisdom of proceeding with the Silzone coating. The idea behind Silzone was to reduce the incidence of endocarditis; a complication that sometimes arises with accumulation of infectious bacteria on an artificial heart valve. Silver, which is known to be toxic, was expected to exhibit antibacterial properties.

[24]    Dr. Costerton was a researcher who in the late 1990s co-authored at least three papers having to do with the efficacy of silver on heart valves to combat endocarditis. Apparently the plaintiffs will be relying on two of the later papers to demonstrate the state of scientific knowledge at the relevant time. At p. 321 of an earlier article, published in May of 1998 in the *Journal of Heart Valve Disease* the authors speak of Silzone as appearing to have great promise. The later articles are less positive and indeed cast doubt on the efficacy of Silzone as an antibacterial agent. These articles are not of course opinions prepared specifically for the litigation but the later articles and the information cited in them will either be findings or conclusions of the expert or will form part of the basis for the expert's opinions prepared for trial. This opinion will support the plaintiffs' allegation that based upon the scientific knowledge at the time, St. Jude ought to have been aware of the problems or at least have been more cautious. Importantly, the plaintiffs also allege that St. Jude suppressed results in its own studies that would have or should have been cause for concern. At least one of these allegedly flawed St. Jude studies is said to have been a basis for Dr. Costerton's initial article that was optimistic about the use of Silzone.

[25]    Dr. Costerton then is an expert who also has specific factual knowledge about what studies were conducted and what literature existed at various relevant times. He also formed opinions and conclusions at the time and by publishing papers he himself contributed to shaping

2007 CanLII 64140 (ON SC)

the knowledge base. The plaintiffs have not committed to calling Dr. Costerton at trial. The defendants argue that, even if he is not called, his articles may form part of the knowledge base used by other experts who may testify and may be thus be a relevant factor in the opinions expressed by those experts. The facts existing at the time the articles were published are therefore said to be relevant. Dr. Costerton would have factual information about what studies existed at the time and the basis for conclusions in the literature he co-authored.

[26]    As I understand it Dr. Costerton has not yet written a report for the plaintiffs. The plaintiffs have however confirmed that Dr. Costerton's current views will rely on the later two articles he co-authored. Those articles may be regarded then as findings of the expert. As a further complication there is transcribed evidence of Dr. Costerton available. He has been deposed in the American MDL ("multi district litigation") and by agreement the deposition transcripts may be used in this litigation. There is not however agreement they may be used as part of the plaintiff's discovery. This means that while the parties know what evidence Dr. Costerton is likely to give in respect of questions already asked in the MDL deposition, those answers may not be read in at trial as defence evidence if he is not called.[22]

[27]    If I understood that argument correctly, the defendants are seeking to have certain answers on the record in a fashion that may be used at the trial. That is they may wish to rely on evidence given by Dr. Costerton even if he is not called. I have trouble thinking this is a practical consideration. It is true that information given by the discovery witness may be read in as part of the opposing party's case but it would remain the witnesses' evidence and not that of Dr. Costerton himself. Quite apart from whether or not it would therefore be inadmissible hearsay, of what weight could it possibly be as evidence in the defendant's case that the plaintiff says her expert who she is not calling says his view is this or that? It is of course open to the defendants to call Dr. Costerton themselves and they have his MDL evidence so they know what his answers would be. The parties could also presumably by consent agree to treat the MDL transcripts as evidence taken under Rule 36.01 if Dr. Costerton cannot or will not attend the trial.

[28]    Because of the combination of historical factual knowledge and his current position as an expert retained by the plaintiffs, the defendants have numerous questions they wish put to Dr. Costerton. They wish the plaintiffs to pose factual questions such as whether or not the articles represented the unanimous views of the three co-authors or what studies were referred to or research conducted in order to write the articles. They also have questions intended to allow them to challenge Dr. Costeron's opinions both historically and in the present. Amongst other questions the defendants have questions relating to alleged bias. For example, the defendants suspect that Dr. Costerton had been hired by a competitor of St. Jude and was trying to develop his own alternative to the Silzone heart valve when he wrote the later more critical papers. There is no doubt that most of the disputed questions, including the questions going to bias, could be put to Dr. Costerton when and if he is called at trial. The question of bias of proposed experts is a relevant consideration for the court in deciding whether or not to admit expert testimony and of

---

[22] See Rule 31.10 (5). This limitation exists because "read ins" are usually admissions. Presumably a non party cannot make an admission and should not be able to bind a party

2007 CanLII 64140 (ON SC)

- 13 -

course what weight to give it.[23]   In my view questions going to bias are clearly questions for cross examination and not properly questions to be put to the witness by way of undertaking.  In any event this is cross examination going solely to credibility and is therefore prohibited under our rules.

[29]    Dr. Costerton does not reside in Ontario but the defendant could nevertheless attempt to examine him directly with respect to factual information.  In addition they have his evidence in the MDL which can certainly be used for impeachment purposes if he is called and if he says something different.  Moreover, in certain circumstances, even if Dr. Costerton is not called, assuming a witness is called who recognizes his expertise, I expect the MDL transcript might be used in cross examination of that expert.  Further, to the extent that Dr. Costerton's answers may be found in the MDL depositions, both parties may readily familiarize themselves with Dr. Costerton's evidence from that transcript.  The plaintiff should advise if she has any reason to believe Dr. Costerton's evidence would be different than that given on the depositions but there should be no need to undertake to ask him questions that have already been answered by him under oath.

[30]    I am assuming for the purposes of these reasons that Dr. Costerton being under retainer as an expert to the plaintiffs regards himself as contractually bound not to speak directly with the defendants.  I should make it clear that there is not in our law of civil procedure anything precluding both sides from speaking to a proposed expert or jointly retaining an expert or even independently retaining the same expert.  The duty of an expert who is called at trial is not to the party who calls him or her but to the court and to the cause of the truth.  As such there is no impediment to the defendants approaching Dr. Costerton directly unless it arises because he is "employed" by the plaintiffs.  In other words the plaintiffs have a choice to make.  Either they must treat the expert as employed, in which case the proper approach is to give undertakings[24], or they must treat the expert as a witness in whom they have no property, in which case they must make it clear to the expert he is free to speak to the defendants should he choose to do so.  Even if the plaintiffs elect to give undertakings, however, there are limits to what is reasonable.  Numerous questions asked would require the plaintiff to ask Dr. Costerton to engage in a line by line analysis of his earlier writings and the information behind the articles.  Even if one or two of those questions individually would be proper questions, taken cumulatively they are in my view unreasonable.

[31]    The questions posed regarding Dr. Costerton may therefore largely be disposed of by applying the following general rules:

> a)    The plaintiff may be asked what information she has about factual evidence known to her to be known to Dr. Costerton.  In this situation however the deposition transcripts are available to both parties and clearly show his answers to the questions that were asked in the MDL.  I would not direct the

---

[23] *Caputo v. Imperial Tobacco et. al.* (2002) 25 C.P.C. (5th) 78 (Master)
[24] Another alternative of course would be to treat him as an employee and produce him to be interviewed in the presence of counsel.

2007 CanLII 64140 (ON SC)

- 14 -

2007 CanLII 64140 (ON SC)

plaintiffs to go over the same ground. It should be sufficient for the plaintiffs to advise whether or not they have any reason to believe Dr. Costerton's evidence would be any different than what he answered on his deposition if he is asked the same questions.

b)     The plaintiff may be asked to undertake to ask Dr. Costerton about factual evidence other than that contained in the deposition to the extent that he is bound to the plaintiff not to speak to the defendants by his retainer as an expert. If he is not prevented from speaking directly with the defendants by any duty to the plaintiffs then the plaintiffs are to execute an authorization and the defendants may either seek to interview him directly or may seek an order to examine him in respect of his knowledge of the facts if he will not co-operate.

c)     The plaintiff may be asked about the opinions and findings of Dr. Costerton as they relate to his retainer as a potential trial expert (unless that is they undertake not to call him at trial). If his findings include the articles he wrote then the plaintiff may be asked to pose appropriate questions to him but this does not permit him to be cross examined through the plaintiff or to engage in a line by line analysis of his writings. [25]

d)     The plaintiff need not answer questions concerning allegations that Dr. Costerton will be a biased expert as that is cross examination going to the credibility of the expert.

[32]     Some examples of specific rulings applying the above are as follows.

[33]     Q. 492 asks the plaintiff to confirm whether or not the views set out in the first paper are the views held by the authors of the paper at the relevant time. The plaintiffs initially refused the question but then simply stated that jointly authored papers may or may not represent the views of each individual author. This is a factual inquiry that does not involve an expert opinion for trial. As such it is reasonable to ask Dr. Costerton if the views set out in the first article were views he held at the time it was published. There is no reason to think the plaintiffs have any particular control or relationship with the other authors of the paper and they need not pose the same question to Dr. Darouiche or Mr. Hyde. Q. 502, 508 and 510 are similar in nature. As often happens when there is a refusal, the examining party may try to ask the same question in different ways. Obviously a single answer may encompass a number of questions and they need not be answered repetitively. Moreover, if the answers are apparent in the MDL depositions, it will be sufficient for the plaintiff to refer to the particular questions and answers in the depositions. Therefore although there are numerous specific questions about conclusions in the

---

[25] A suggestion if Dr. Costerton will be preparing a report for trial is for the the plaintiffs to immediately commit to a firm deadline. The report would of course give focus to appropriate questions. It would also be acceptable to answer undertakings to put questions to Dr. Costerton by having him address those questions in his report. I note that the 90 days prior to trial is fast approaching in any event.

- 15 -

article, each of which may be relevant, it will be sufficient to ask a global question and give global answers.

[34]    A global answer may not of course be appropriate if the plaintiffs contend that there is evidence to demonstrate that conclusions in the article were ill founded at the time the article was written.    In that case the plaintiffs will have to disclose the evidence and indicate what conclusion they believe was not accurate and / or not a reasonable conclusion at the time.  The defendants must be fair about this.  The plaintiffs may well take the view that the article accurately reported the views of the authors at the time but still contend that the conclusions in the article were ill founded because St Jude had suppressed certain information.  In fact they allege that at least one of the studies referred to in the article was a St. Jude study in which negative information was not reported.  The defendants are entitled to know what evidence they will face on this point but they are not entitled to hector the plaintiffs or through the plaintiffs to cross examine Dr. Costerton.  It is my understanding that the plaintiffs have provided full particulars of this allegation.  It is less clear that they have identified the evidence on which they will rely.

[35]    To return to first principles, the defendant is entitled to an admission by the plaintiffs that there is no evidence to dispute the conclusions made in the articles if that is in fact the case.  Further even if the plaintiffs allege that the conclusions in the article were incorrect in light of the knowledge available today, the defendants are entitled to an admission that the authors of the article – and therefore the scientific and medical community at large presumably – drew reasonable conclusions based on the studies and literature available at the time.  This is fair enough if that is the case.  But even if these are accurate answers they must still be understood in the context of an allegation that St. Jude either misinformed or withheld critical information – and the evidence to support the allegation.  What the defendants are not entitled to do in discovery is to cross examine line by line on an article to create the impression of an admission where none is actually being made.

[36]    It is reasonable as in question 511 to ask Dr. Costerton as a factual matter (again assuming he is employed or retained by the plaintiffs and they and or he would prefer he not be directly interviewed) whether he knows or has records to determine what clinical or laboratory studies or other information the authors of the article relied upon when reaching certain conclusions.  This is to determine whether or not he relied solely on the allegedly flawed St. Jude studies in forming the positive opinion.  While I allow the question, I have this caveat.  If the plaintiffs know the answer then it is to be answered.  It is also reasonable to ask Dr. Costerton if he knows the answer but I think it is not reasonable to compel the plaintiffs to retain Dr. Costerton to try to recreate his research or that of his colleagues if he does not recall the answer or have the means to find the answer readily available. I would therefore limit the inquiry to what Dr. Costerton knows or can easily answer or, if it is covered by the MDL depositions, that he has already answered. I do not order the plaintiffs to sponsor research to uncover the answer if it is not easily available. While I do not order this, it should be noted that as a practical matter, if Dr. Costerton is called at trial he will certainly face cross examination on the 1998 article so it may be in his best interest and that of the plaintiffs that he be able to answer such a question.  If he

2007 CanLII 64140 (ON SC)

- 16 -

chooses to research the matter and subsequently discovers the information, the answer would then have to be disclosed.[26]

[37]    Q. 512 – 528 are examples of line by line analysis bordering on cross examination. I will allow a general question about the accuracy of statements in the article and whether they represented the opinion or belief of Dr. Costerton or the other authors at the time. I will not order the plaintiffs to ask Dr. Costerton about specific sentences or statements in the article unless his answer is that only some of the article was believed to be accurate or reflective of the authors' opinion at the time or that it was believed accurate at the time but was based on faulty St. Jude studies. In that event, it is obvious there will be proper follow up questions requiring the plaintiffs to identify what portions of the article were not believed to be accurate and what studies are believed to have been faulty or misreported and in what particular.[27] While I will neither presuppose his answer nor rule in advance on follow up questions, I am confident that if common sense is applied, counsel can resolve the appropriate ambit of follow up based on these reasons without returning to court.

[38]    In summary, the plaintiffs must answer the following global questions if they know the answers and as a potential factual witness, the plaintiffs may be asked to undertake to ask Dr. Costerton these questions (presuming they are not already covered in the MDL deposition):

> a) Did the earlier article reflect the views and conclusions of its co-authors at the time it was written and in particular did Dr. Costerton agree with the conclusions at that time?
>
> b) Does Dr. Costerton still have available to him the original research on which the article was based and can he identify the clinical studies and papers which informed that article other than those specifically footnoted?
>
> c) What if any evidence does the plaintiff have or does Dr. Costerton have that any of the conclusions in the 1998 article were not accurate at the time or were based on studies or research that were not accurately reported?

[39]    There are certain purely factual questions. Q. 503 is an example. This questions the date an article was written as opposed to the date on which it was published. It is to be answered as the state of scientific knowledge at particular times is relevant to what St. Jude knew or ought to have known. Q. 542 is a general question that asks if there are any known misstatements of fact in the latter two articles. I regard that as overly broad and an attempt to cross examine. However there is a specific question of clarification at Q. 543. The question arises because the picture in

---

[26] See my comments above about delivering a report. I expect this point could also be covered in the report if the plaintiffs wished to ask the question.
[27] Several of those questions have already been asked and answered or the information provided of course.

2007 CanLII 64140 (ON SC)

- 17 -

the article that purports to show a Silzone heart valve is said by the defendants not to show a St. Jude heart valve. As this later article appears to form part of the findings and opinions of the expert, this is an example of a clarification to be put to an expert and is a proper question. There is an undertaking and an answer in the chart so it may be answered already but that is to be confirmed with Dr. Costerton.

[40]    There are numerous questions relating to the first article (which is not part of the expert opinion) that appear factual in nature but in reality are asking for an expert opinion. While it is difficult to draw a bright line, I consider questions such as Q. 541 which was to ask Dr. Costerton if he can identify by name wild bacterial strains that cause endocarditis and are more prevalent in humans, to require an expert opinion. This is not a proper question to put to him by way of undertaking in his capacity as a factual witness. It would of course be a proper question to ask the plaintiff if the expert (as expert) has expressed any opinion on this point as part of his findings and conclusions reported to the plaintiffs. If the expert has not expressed a conclusion on this point then the plaintiff will not be required to undertake to ask the expert for such an opinion.

[41]    Q. 562 is a request to produce a consulting agreement entered into by Dr. Costerton with Carbomedics prior to the recall. This is said to be directly relevant to bias that may be reflected in the scientific articles written by Dr. Costerton at the time. This is an example of a question that is quite probably an appropriate question for trial in relation to the qualification of the expert witness but is not a proper discovery question. It is purely an attempt to cross examine the expert on his credibility prior to trial and is therefore disallowed under the present rules.

[42]    There are questions attempting to have the discovery witness undertake to ask Dr. Costerton questions about Dr. Darouiche the second author of the articles. Dr. Darouiche has not been identified as an expert retained by the plaintiffs. It is not necessary for the plaintiffs to undertake to ask Dr. Costerton questions about the credibility of Dr. Darouiche. Dr. Darouiche is a potential fact witness and if the plaintiffs know his contact information that would have to be disclosed. It is appropriate to ask the plaintiffs to ask Dr. Costerton how to contact Dr. Darouiche if that information is not already available to the parties. While the defendants are also entitled to know the essence of Dr. Darouiche's evidence if the plaintiff knows it, the defendants are not entitled to ask if the plaintiffs have interviewed Dr. Darouiche. Although disclosure of evidence may incidentally have the effect of disclosing who has been interviewed, who the plaintiffs have decided to interview is part of their litigation strategy and is privileged. Q. 496 & 497 are therefore proper questions but the answer to 497 has been provided. The plaintiffs do not have this information. Obviously if they obtain this information the answer must be corrected. Furthermore if they obtain an opinion from Dr. Darouiche it must be disclosed unless they undertake not to call him at trial.

[43]    I turn now to questions having to do with other experts.

**Dr. Vas & Dr. Mittleman**

2007 CanLII 64140 (ON SC)

- 18 -

[44]    Drs. Vas & Mittleman authored an article about biocompatibility of silver coated catheters and both appear to have been involved in some clinical studies. They were both experts that the plaintiffs proposed to use although it appears Dr. Vas is now deceased. The defendant wishes to know what the plaintiffs know about what Dr. Vas knew or Dr. Mittleman knows. The defendant also wishes the plaintiffs to pose some questions to Dr. Mittleman. At the time of the discovery Dr. Vas was apparently still alive as the questions and the refusals presume he could be asked questions. I have dealt with the questions only as they relate to Dr. Mittleman.

[45]    With respect to Dr. Vas, I am advised he was interviewed by both parties independently. The defendants have provided a summary of their interview notes. The defendants seek the same from the plaintiff. As Dr. Vas is deceased and the interview notes may be the best available evidence, it is reasonable to have reciprocal disclosure by way of a summary and I have so ordered. I would actually go further. If the parties intend in any way to try to introduce the interview notes of the deceased expert at trial, the notes themselves should be produced on a reciprocal basis.

[46]    I am advised Dr. Mittleman remains co-operative with the plaintiff. He is therefore very much in the same situation as Dr. Costerton and the same principles will apply to his evidence. As an expert the plaintiff must undertake to ask him certain questions about his findings or opinions and can be required to obtain clarification. The plaintiff may not be required to ask him for an opinion on a new topic or to pose different hypotheticals to him. That is either cross examination of the expert or it is requesting a different expert opinion. To the extent that his clinical studies or writings make him a fact witness then the plaintiff may be required to undertake to find out his factual evidence. Again this presupposes that Dr. Mittleman is bound by employment or retainer not to talk to the defendants and that the plaintiffs are unwilling to ask Dr. Mittleman to respond directly to the defendants. If that assumption is an error then the defendants can ask him themselves and there is no basis to require the plaintiffs to give an undertaking.

**Mr. Butchart**

[47]    Mr. Butchart[28] is a world renowned cardiac surgeon located in the U.K. and is apparently another of the plaintiff's experts but is also a fact witness because he conducted an important study called "CERFS" which ran from 1997 until the end of 1999. Mr. Butchart concluded that there were adverse events associated with Silzone implants and he so advised the British Medical Device Agency. He was an early advocate for the recall of the Silzone coated products. His role is specifically pleaded in the reply and his study is a key fact in the plaintiffs' allegations against St. Jude. Like Dr. Costerton, Mr. Butchart is an expert who also is a fact witness.

[48]    Mr. Butchart was one of the authors of a paper reporting the results of the CERFS study in 2003. Mr. Butchart was deposed in the U.S. and the defendants want the plaintiffs to undertake to put numerous questions to him or to agree with certain positions. In addition to their

---

[28] The British practice I am advised is that surgeons are referred to as Mr. and not Dr.

2007 CanLII 64140 (ON SC)

- 19 -

other arguments, the defendants contend that they were asked very similar questions in respect of the papers authored by Mr. Butchart as they now seek to put to the plaintiff.

[49]    The principle difference between Mr. Butchart and Dr. Costerton is that Mr. Butchart is definitely expected to testify at the trial.  The plaintiffs have now produced a detailed expert report and undertake to serve a supplementary report.  While similar principles apply as to my rulings on Dr. Costerton, the written report brings greater specificity to the inquiries that may be made of the plaintiff regarding the opinions of the expert.

[50]    Q. 189 was from the list of written interrogatories.  The defendants wish to know if the plaintiffs agree with certain statements contained in an article.  These are to the effect that medical use of silver for its antimicrobial characteristics was an accepted medical practice or idea and it was a surprise to the researchers to find that the Silzone coated heart valves were associated with an increased rate of embolism.  There are other specific findings set out in the "Ionescu publication".  The plaintiffs are asked whether or not they agree with 16 specific statements from the article.

[51]    I agree the defendant is entitled to know if the plaintiff has evidence to show that statements such as these in the scientific literature as at the date of publication do not accurately reflect the state of knowledge at the time or no longer are accurate.  Taking into account of course the plaintiff's unproven allegations that St. Jude misreported or suppressed information, it is fair to ask which of these conclusions that may support the defence the plaintiffs believe are not accurate.  I think the form of the question – does the plaintiff class agree with the following statements – is problematic however because it asks the plaintiffs who are not experts to determine if they positively accept statements rather than asking them if they have any basis to disagree.  The part of the question that asks if the plaintiff class does not agree, advise why not and provide any facts or evidence the class relies upon in that regard is proper and I order that answered.  The plaintiffs need not give an opinion about these statements but they must disclose if they have evidence to prove whether or not they are accurate.

[52]    Q. 258P asks if the rates of failure for patients implanted with other valves than the St. Jude Silzone valves were tracked in the CERFS and if so asks the plaintiffs to produce the information.  This is a question to be put to Mr. Butchart in his capacity as a fact witness.  He may not be cross examined on either facts or expert opinion through the mechanism of undertakings but to the extent that he is an expert under retainer who cannot or will not speak with the defendants, then the plaintiff should undertake to ask him this factual question.  Of course the alternative is for the plaintiff to encourage Mr. Butchart to speak directly with the defendants.  The question is to be answered.

[53]    Q. 258L is a demand for production of data from the study in which Mr. Butchart participated.  Because his study is, as I understand it, incorporated into the expert report, the defendants are entitled to access the raw data forming part of the conclusions of the expert.  I believe the plaintiffs have agreed to produce this data and that it has been produced in the MDL. If this is the case then an answer will be forthcoming voluntarily but in any event I order the question to be answered.

2007 CanLII 64140 (ON SC)

- 20 -

2007 CanLII 64140 (ON SC)

**Monitoring**

[54]    Q. 278 ask what knowledge information or belief the plaintiff class has about the notification of class members about the recall or about the follow up, monitoring or treatment recommended for class members by their physicians.  Both I and Cullity J. dealt with this point previously.  The plaintiffs are not required to go out and survey individual class members at this time but to the extent they have this information it is to be disclosed. At this stage what is relevant to the common issues is general or statistical knowledge as opposed to the individual circumstance of each individual class member.  The need for monitoring is one of the common issues and to the extent the plaintiffs know what recommendations are being made above and beyond what might be normal for recipients of mechanical heart valves that will be relevant.

**Knowledge of other witnesses**

[55]    There are numbers of questions asking what knowledge the plaintiffs have of the knowledge of other witnesses.  As addressed above, these are proper questions providing of course they are comprehensible.  The plaintiffs seem to be having some difficulty in identifying the productions referred to by the defendants.  This should not require a motion but rather a phone call or a meeting between counsel.  An example is Question 92.  If there are issues about identifying individuals imposed by regulators in particular jurisdictions and an order of this court does not resolve the problem, the matter may be spoken to further.

[56]    There are a number of questions such as Q. 469 in which the plaintiffs are asked if they are aware of any health care professionals who believed using silver was an appropriate step to combat the risk of endocarditis.  This question is a bit unfair.  On the one hand the plaintiffs would have to disclose any relevant evidence on this point so if they know of a health care professional who espoused this view at the relevant time. On the other hand the view of, for example, an individual family physician would be derived from reading the scientific literature and is not particularly helpful or relevant.  While I would not limit the question to cardiac surgeons, the relevant question is not what individual physicians might have thought but whether there was a reputable expert other than those already identified who was promoting the use of silver on heart valves.  This is relevant because it speaks to whether or not St. Jude was acting reasonably or not and to what St. Jude knew or ought to have known about the wisdom of silver coating heart valves.  On this limited basis I order the question to be answered.

[57]    The plaintiffs object that certain questions are too broad or vague.  For example in Q. 600B the plaintiffs are asked if they have any information from Dr. Butany other than what is in his deposition transcript, his articles and the productions.  Dr. Butany is actually an expert retained by the defendants but he is also a factual witness. While the defendants are not entitled to know directly if the plaintiffs have interviewed Dr. Butany, this is a proper question.  It does not require the plaintiffs to cross reference all of the productions but simply to turn their minds to whether they have any substantial and relevant information from Dr. Butany that is not already disclosed in one of these sources.  There are other similar questions in which the defendants

- 21 -

inquire whether the plaintiffs have information from surgeons or other health professionals. The plaintiff is obliged to identify the names and contact information for witnesses who they know to have relevant evidence.

[58]    The defendants ask if the plaintiffs have any information or statements from St. Jude employees or former employees that the plaintiffs will be relying on at trial. This is a reasonable question. Obviously it does not refer to statements or information obtained from St. Jude's productions or on discovery but to independently obtained evidence. As noted above, in the case of employees or former employees the usual course is to approach such witnesses only through defence counsel so it is unlikely that any such evidence is in the hands of the plaintiffs unless it was obtained in another proceeding or through a third party or perhaps in a jurisdiction which does not have the same restrictions or practice as Ontario. Questions such as Q. 249 are to be answered.

[59]    Other specific rulings are set out in the chart at Schedule A.

**Miscellaneous**

[60]    The defendants ask for certain clarifications of answers given by the plaintiffs. For example at Q. 189 there is an answer provided by counsel but the defendants contend they do not know precisely how counsel is using the term "c.f." in the answer. I agree that clarity is important but counsel has now confirmed that when he uses "c.f." he means "refer to and compare" with another answer or document.

[61]    Q. 258 asks about the CERFS. The question is about the monitored patients in the second year. Apparently this was a "look back study". They implanted 1997 – 1998 with conventional valves and then in 1998- 1999 they implanted Silzone and the study was comparing the failure rates. The question goes to the existence or otherwise of control data. The question is whether or not events were tracked for all types of mechanical heart implants. This would help to identify if there are any "confounding factors" at work. I have ordered this question to be answered.

[62]    Q. 260 is a question in relation to AVERT. The plaintiff is asked how many patients would have had to be enrolled in order for the study not to be "underpowered" which is the criticism by their expert. It is also specifically pleaded. It is not necessary for the plaintiff to have a specific number in mind to challenge whether the AVERT study supports the conclusions of the defendants' expert. The expert who contended that it was "underpowered" will undoubtedly be asked what an appropriately powered study would look like. The objection to this question is that it requires the plaintiff to go out and retain an expert to design a proper study. This is not necessary but the plaintiff should answer the question if it is capable of being answered. It is a proper clarification to ask the expert what his basis is for reaching the conclusion the study was "underpowered".

[63]    Q. 203 asks what if any information counsel or named plaintiffs have concerning diagnosis of "pseudo endocarditis". The plaintiffs' expert refers to this and hence the relevance of this issues. Q. 269 is similar. Q. 269 seeks to clarify from earlier answers what the impact is

2007 CanLII 64140 (ON SC)

- 22 -

of the alleged incidence of pseudo endocarditis. The Wilson expert affidavit seems to differentiate between "pseudo endocarditis" and "true endocarditis". The question is to be answered if counsel has the information. Counsel need not go out and commission research to generate the information. Q. 270 and 315 are asking for an opinion. Unless the plaintiff has a view on this because they have obtained an opinion of an expert on the point these questions need not be answered.

[64]    Q. 225 & 226 ask the plaintiffs to determine what information Dr. Tyers or Butchart have provided to institutions or treating physicians in Canada or elsewhere about Silzone issues. In argument the defendants limited the inquiry to advice regarding the need for specific monitoring of patients implanted with Silzone valves. The question as asked was much broader than this and the court does not normally engage in rewriting the questions but I think it not unreasonable to allow the question to be restricted. If the question is whether or not either doctor has given advice to other doctors or institutions about the need for particular monitoring of Silzone implanted patients, I think it is a relevant question and in that restricted form I order it to be answered.

[65]    Q. 211 seeks to have the plaintiffs identify what specific warning ought to have been given to patients, physicians or institutions, when it should have been given and how the warning should have been publicized. The plaintiffs contend this is not a question asking for evidence but rather for the plaintiffs' position or theory. I do not think the plaintiffs can be tied to a particular form of words nor that the plaintiffs have the onus to describe a standard of perfection. Rather, the case the plaintiffs have to make is to demonstrate that omissions by St. Jude fell below the standard of reasonable care in all of the circumstances. Discovery questions however should be interpreted reasonably and the defendants are entitled to know what the plaintiff's witnesses are going to say would have constituted reasonable care. The plaintiff asserts a breach of the duty to warn and it is not unreasonable to ask the plaintiff how it contends the warning should have been given, when and in what form. As well the defendants are entitled to know the plaintiffs' legal theory. The question is to be answered.

[66]    Q. 384, 385, 571 and 572 are questions that ask the plaintiff what information, evidence or belief the class has about impairment of tissue healing in patients implanted with non Silzone heart valves. There is no question the plaintiff can be asked what evidence the class relies upon in support of its contention that Silzone impairs tissue healing. The plaintiffs have agreed they must produce the evidence that hearts implanted with Silzone valves suffered impairment of healing. I see no reason that the plaintiff cannot be asked to disclose if they have evidence about the failure rates in non Silzone implants due to inadequate tissue healing. This is not the same thing as asking the plaintiff to go off and generate a supplementary expert report or to unearth the information. It would be unfair however for the defendant to ask this question in cross examination at trial only to be faced with evidence the plaintiff did not disclose. The plaintiffs may be asked to disclose if they are aware of such evidence.

[67]    Q. 478 and 94 are questions about information there may be in the possession of the plaintiffs about the use of silver in the body. 94 is a specific question about a study apparently done in Europe concerning silver coated catheters. The question is whether or not the plaintiff

2007 CanLII 64140 (ON SC)

- 23 -

has been in touch with those investigators and has any information from them. The first part of the question is improper but the second part is not. The plaintiff has referred to animal and clinical studies referred to in the certification motion. There ought to be disclosure of any additional studies known to the plaintiffs. Q. 94 has been answered.

[68]    Q. 234B asks for a clarification of a statement or allegation in the plaintiffs' reply. This is whether the cited complication rates are "rates of reporting" or actual "rates of incidence". If the plaintiff has knowledge on this point it is to be answered.

[69]    Q. 272 asks what information the plaintiffs have about the techniques used by surgeons who explant heart valves. The relevance of this is the opinion of Dr. Wilson based on his examination of six explanted Silzone valves and many photographs of valves that he did not actually examine. There are techniques apparently that will retain more anular tissue than others and there may be techniques that result in removal of new growth tissue from the valve ring. It would be important in assessing the expert's opinion and findings to know if there is evidence about the techniques used in the valves that were examined or photographed. While I regard the question as a relevant evidentiary question, it appears to me to be cross examination of the expert rather than clarification. The question need not be answered.

[70]    Q. 214 asks for the plaintiff's position with respect to a statement in an article. Unless the plaintiff has posed this question to one of its experts, this appears either to require a supplementary opinion or to be an attempt to cross examine the expert. The question need not be answered.

[71]    Q. 270 and 315 deal with the issue of "pseudo endocarditis" or "non infectious endocarditis" and whether or not these exist or can exist without Silzone. The plaintiffs contend that Q. 270 was answered. Q. 315 seems to seek expert evidence.

[72]    This disposes of the questions argued by the defendant on the original motion. A complete list of the rulings is set out in the attached chart.

**Supplementary Motion**

[73]    In addition to the questions actually argued, the plaintiffs have answered or have agreed to answer certain questions as set out in a note provided to me. Counsel may incorporate those questions into the formal order when they approve the form and content. I have not set them out in a chart since the parties have a copy of the note.

[74]    The plaintiff has also agreed to pose certain follow up or additional questions to Ms. Anderson.

[75]    There remain certain questions in issue from the supplementary motion.

[76]    Q. 847 – 850, 851, 853 – 854, 855, 856 – 861, 863, 874 – 881, 923 – 929, 934, 935 – 937 & 938 – 940 are a group of questions that were originally directed to individual class members. The defendants argue that while that has been foreclosed by my September ruling and by the

2007 CanLII 64140 (ON SC)

- 24 -

decision of Cullity J., with respect to individual class members who are not named plaintiffs, the representative plaintiffs should be required to answer the questions with respect to their individual treatment and monitoring. Having regard to paragraphs 15 and 16 of Cullity J.'s reasons in particular, I am of the view these questions are proper questions to put to the individual representative plaintiffs.

[77]     The plaintiff does not disagree with this but their argument is based rather on whether or not the plaintiffs, having made production, may be forced to analyze the documents to provide answers. For example, the question is asked how often the late Mr. Andersen had a CT scan. The OHIP summary has been produced and that information is set out in the summary. Should the plaintiff be required to go to the records and perform the addition? The contrary argument is that the records are not complete or all inclusive and in any event the defendants should be entitled to the answer in a form that may be read in on discovery. I do not think it is appropriate to require the plaintiffs to perform mathematical calculations or to restate the obvious. It is reasonable however to ask proper follow up questions if a production or answer requires elaboration or clarification. I suggest this be dealt with through the additional questions to be posed to Ms. Anderson.

[78]     Q. 841 is an example of a question that is not answered by the documents. The question is about antibiotics and this will not be apparent from the OHIP records. This question is to be answered.

[79]     Q. 886 and 909 ask for some information. Q. 886 asks Ms. Frost to ask her mother if she knows who her family doctor in Vancouver was when she was growing up in the 40's and 50's. This discussion about her family doctor when she was growing up flows from a series of questions. The identity of that doctor has a semblance of relevance and is not onerous. All that is requested is an inquiry of her mother to see if she remembers the name. The question is to be answered.

[80]     Q. 909 asks if there was a test for specific organisms. This is in respect of an explanted valve examined by Dr. Wilson.  To the extent this is not obvious from the report itself then this is to be answered by asking Dr. Wilson.

[81]     The defendants have withdrawn question 911

**Privilege motion**

[82]     As noted earlier in these reasons, I have a privilege motion to deal with in writing. This will be the subject of separate reasons.

**SAS database**

[83]     On the previous motion I ordered the SAS database to be produced subject to redaction of individual patient identities. The plaintiffs sought a further ruling on whether or not there had been full compliance. At the motion however it was agreed that the plaintiffs' expert would try

2007 CanLII 64140 (ON SC)

- 25 -

to resolve this issue directly with the University of Pittsburgh.  This issue is adjourned and I remain seized of it subject of course to any directions from the class proceedings judge.

**Scheduling of further motion**

[84]    As the parties are aware, I have accepted a transfer to Ottawa and I am no longer routinely sitting in Toronto.  In fact I am currently on a family law rotation and not assigned to hear civil matters until the fall.  I was advised by counsel that the parties require another day to argue a motion but I was unable to provide them with an available date in Toronto before June.

[85]    Although I have offered counsel the option of transferring this action to another Toronto based master I was advised that they preferred I remain seized of the matter and would wait until June 25th, 2007.  This is despite the pending September trial date.  Should the parties wish to reconsider this decision or should they be directed to do so by the case management judge, they may approach Administrative Master Dash for assignment of another master.

[86]    I may be spoken to regarding costs if necessary.

_____
Master Calum U.C. MacLeod

**DATE:**        May 17, 2007

2007 CanLII 64140 (ON SC)

- 10 -

respect to specific cases. An additional benefit noted in the survey was finding a basis for impeaching an expert witness.[21]

[17]    The modern purposes of discovery may therefore be said to include disclosure, verification and admission. They may be summarized as follows:

    (a)    Disclosure of the evidence and the legal theory of the opposing party;

    (b)    Verification that all relevant documents have been produced; and

    (c)    Admissions that will narrow the issues, dispense with formal proof, or reveal deficiencies in the opponent's case.

[18]    These of course are not ends in themselves. They accomplish at least the following objectives:

    (a)    Allowing the examining party to understand the case to be met;

    (b)    Narrowing the issues that will require adjudication;

    (c)    Streamlinging pre-trial and trial procedures;

    (d)    Facilitating settlement;

    (e)    Determining if a full trial or a summary procedure may be appropriate; and

    (f)    Preparing for trial or other form of adjudication.

[19]    As noted, this must be understood in the context of the overarching purpose of the Rules of Civil Procedure and in a Class Proceeding of the purposes of the class proceeding legislation. Rules of civil procedure are designed to serve and effect justice. They do not define it. Fairness and justice require that there be a sense of balance and proportionality. There are at least three imperatives in the justice system. The imperative of fairness has to be balanced against considerations of cost and delay in proportion to the complexity of the action and the importance of the issues in dispute. This balance should be the touchstone if the court is called upon to exercise its discretion in expanding or restricting discovery rights.

### The questions in dispute on the defendants` motion

[20]    I now turn to the disputed questions. I have not dealt with every individual question in these reasons but rather have provided reasons for representative questions and have set out the individual specific rulings in Schedule A attached. As well, it is worth emphasizing that due to the volume of questions and material, I am for the most part working from the summaries in charts provided by the parties and not from transcripts. Indeed the parties themselves were working from a combination of transcripts, written interrogatories, the MDL transcripts, formal expert reports and publications that are expected to form the basis of experts reports.

[21]    As will be seen it has also been necessary to make rulings contingent on certain sets of facts. For example I am assuming that witnesses retained as experts are employed by the plaintiffs and will not consent to be interviewed by the defendants with respect to factual

---

[21] See Appendix L to the report – available on the Ontario Courts web site at www.ontariocourts.ca

2007 CanLII 64140 (ON SC)

# TAB

# 4

# Regina v. Judge of the General Sessions of the Peace for the County of York, Ex parte Corning Class Works of Canada Ltd.

[1970] O.J. No. 1729

[1971] 2 O.R. 3

16 D.L.R. (3d) 609

3 C.C.C. (2d) 204

65 C.P.R. 250

16 C.R.N.S. 329

Ontario
Court of Appeal

**Mackay, Kelly and Arnup, JJ.A.**

November 20, 1970.

H.G. Chappell, Q.C., and R.T. Howitt, for accused, appellant.

N.A. Chalmers, Q.C., for the Crown, respondent.

---

**1    ARNUP, J.A.**:-- The appellant corporation stands charged as the sole accused in an indictment presented to the presiding Judge of the General Sessions of the Peace for the County of York whereby it is charged on eight counts of resale price maintenance and attempted resale price maintenance, contrary to s. 34 [am. 1960, c. 45, s. 14] of the Combines Investigation Act, R.S.C. 1952, c. 314, as amended. The Crown served subpoenas on six employees and officers of the accused corporation, requiring them to give evidence at the trial. The accused corporation thereupon moved before Grant, J. [ [1970] 3 O.R. 398, 1 C.C.C. (2d) 74, 63 C.P.R. 212 sub nom. Corning Glass Works of Canada Ltd. v. The Queen], for an order prohibiting the presiding Judge at the sittings of the General Sessions of the Peace for the County of York from taking any proceedings in

respect to the subpoenas or their enforcement and from hearing the evidence of the witnesses and for an order quashing the subpoenas, on two grounds:

> 1. That the accused corporation "as defendant to the said charge, cannot be compelled in law to give evidence through its members of management on the trial of the charge against it".
>
> 2. To compel the witnesses to give evidence for the prosecution "is to compel the accused corporation to give evidence against itself which is contrary to law and natural justice".

**2**   In a considered and carefully reasoned judgment dated May 15, 1970, Grant, J., dismissed the application, and the accused corporation appealed to this Court. At the conclusion of the argument on behalf of the appellant we indicated that we did not require to hear counsel for the Crown, ordered that the appeal should be dismissed and stated that we were in substantial agreement with the reasons of Grant, J., but that we would give further reasons of our own. This we now proceed to do.

**3**   It was argued by the appellant that recent cases have failed to distinguish between two long-standing common law rules, which he expressed as follows: i. The absolute right of the accused to refuse to take the witness-box, on the basis that a person cannot be required to convict himself.

> ii. The qualified right of a witness to refuse to answer certain questions if the answer will tend to criminate the witness.

**4**   It was said that the learned author of Wigmore on Evidence has confused these two basic principles but that the distinction sought to be made has been dealt with by other text writers, including the authors of Phipson on Evidence and Cross, Evidence. It is true that there can be found in the older textbooks and cases two Latin maxims which are in slightly different words. The first is nemo tenetur prodere seipsum, translated by Jowitt, Dictionary of English Law, as "no one is bound to betray himself". Cross, Evidence, 3rd ed. (1967), p. 140, translates it "no one should be obliged to give himself away".

**5**   The second maxim is nemo tenetur seipsum accusare, translated by Jowitt as "no one is bound to incriminate himself".

**6**   It seems that the first maxim had particular reference to an accused person, while the second applied to any witness in the box. Although these two principles may have originally developed separately (the history is exhaustively dealt with in Wigmore on Evidence, vol. VIII (McNaughton Revision, (1961), paras. 2250-1, described by Cross, Evidence, 3rd ed. (1967), p. 227, footnote 1, as "a classic history of the rule"), the distinction between the two has in my view ceased to have any real significance since the introduction of law enabling the accused to give evidence on his own behalf (without being compelled to do so). Indeed, Phipson on Evidence, 11th ed. (1970), p. 261,

quotes the first of the foregoing maxims at the beginning of the dissertation upon the privilege against self-incrimination (which stems from the second maxim). Broom's Legal Maxims, 10th ed. (1939), p. 660, quotes only the second maxim.

7    There can be no doubt that the privilege against self- incrimination is that of a witness, and must be taken on the witness stand, after the witness has been sworn, and after a question has been put which may tend to incriminate the witness. Lord Eldon said in Paxton v. Douglas (1809), 16 Ves. Jun. 239 at p. 243, 33 E.R. 975, "... the objection is not to putting the question, but to answering it,...". Numerous cases to the same effect are quoted in Wigmore on Evidence, vol. VIII, p. 405, para. 2268, footnote 5. Wigmore goes on to say in para. 2270, pp. 413-4:

> The privilege is that of the person under examination as witness and, like all other privileges, is intended for his protection only.

It is clear that in the American Courts the privilege (now crystallized in the Fifth Amendment) has not been extended to a corporation whose officers or employees are called as witnesses against it in a criminal trial. This was pointed out by Jessup, J. [as he then was], in R. v. J.J. Beamish Construction Co. Ltd., [1966] 2 O.R. 867, [1967] 1 C.C.C. 301, 59 D.L.R. (2d) 6, 50 C.P.R. 97; affirmed [1968] 1 O.R. 5, [1968] 2 C.C.C. 5, 65 D.L.R. (2d) 260, 53 C.P.R. 43, and is again referred to by Grant, J., in the judgment under appeal. It is dealt with in Wigmore in para. 2259a.

8    As has been pointed out by Grant, J., the line of cases which have granted such a privilege to an accused corporation arose with respect to questions of production and discovery. In Webster v. Solloway, Mills & Co., [1931] 1 D.L.R. 831, 25 Alta. L.R. 8, [1930] 3 W.W.R. 445, the Appellate Division of the Supreme Court of Alberta was dealing with a claim of privilege asserted in an affidavit on production made by the manager of the Calgary office of the defendant corporation. The deponent declined to produce certain documents upon the ground of privilege, as tending to incriminate "the deponent or the defendant". Harvey, C.J.A., after noting it had been argued that this claim of privilege should be limited to natural persons and could not be taken advantage of by a corporation, said at p. 834, "On principle one cannot see any reasonable ground for the support of such view." In the very next paragraph, however, Harvey, C.J.A., went on:

> There seems little doubt that at the trial the plaintiff can call the defendant's officer and require the production of these documents ... but the rule that one cannot be compelled to criminate himself has for centuries been firmly established as a part of our common law and must be deemed to exist except so far only as it has been affected by legislation.

9    The Webster case was referred to and followed by the English Court of Appeal in Triplex Safety Glass Co. Ltd. v. Lancegaye Safety Glass (1934), Ltd., [1939] 2 K.B. 395 at p. 408. Again, however, that case dealt with interrogatories and not with proceedings at the trial. The precise point in issue in the Triplex case is made by the argument of counsel for the defendant company at p. 400:

In principle, however, it follows that as a company is open to prosecution for libel it is entitled to refuse to answer interrogatories that will criminate it. While the judgment at p. 409 concludes,

It would not be in accordance with principle that any person capable of committing, and incurring the penalties of, a crime should be compelled by process of law to admit a criminal offence.

that statement must be read in the light of the issue which was before the Court.

**10**    In my view, there are fundamental differences between evidence given on examination for discovery of a person produced by a corporation for that purpose and evidence given at trial by a witness who is an officer or employee of that corporation. On discovery, the witness literally speaks for the corporation. He has been described, as long ago as 1902, as the "mouthpiece" of the corporation: Morrison v. Grand Trunk R. Co. (1902), 5 O.L.R. 38, 2 C.R.C. 398. The term was adopted, with reference to a servant of the corporation, by Roach, J., in Fisher v. Pain et al., [1938] O.W.N. 74 at p. 76, [1938] 2 D.L.R. 753(m). As pointed out by Grant, J., if such a if such a witness does not know the answer to a relevant question, he must inform himself from others employed by the corporation or from its records. Conversely, he may be examined only as to matters coming to his knowledge as an officer of the corporation. Knowledge which he has acquired otherwise than as such officer cannot be explored: Fisher v. Pain, supra,

**11**    At the trial, a witness subpoenaed to give evidence, who happens to be a servant, officer or even president and controlling shareholder of a corporate accused, is not called upon to speak "for" the corporation. He is not its "mouthpiece". He is required to testify as to all relevant facts within his knowledge, whether those facts were acquired by him during his employment or term of office or were acquired in circumstances completely unrelated to the corporation. He is in no different position from a witness who had been in complete charge of the corporation's affairs for many years, but has retired before the charge against it was laid. Both must tell what they know, so far as it is relevant and admissible. Both are entitled to all the protection that is available to any witness, and in particular, the protection against self-incrimination found in both the Canada Evidence Act, R.S.C. 1952, c. 307, and the Ontario Evidence Act, R.S.O. 1960, c. 125.

**12**    At trial the corporation is not a witness. It is not being "self-incriminated" because one of its managers is giving damaging evidence in the witness-box.

**13**    In my view, cases decided on the obligation of a corporation to produce documents which might tend to incriminate it are also distinguishable. The production to be made is that of the corporation and not that of its officer who swears the affidavit on production. Here, too, such officer is merely the "mouthpiece", the spokesman of the written words, on behalf of and as the corporation. There is support for this view in the passage of the judgment of Rand, J., in Klein et al. v. Bell et al., [1955] S.C.R. 309 at pp. 320-1, [1955] 2 D.L.R. 513 at p. 523, which was quoted by

Jessup, J., in R. v. J.J. Beamish Construction Co. Ltd., supra, at p. 901 O.R., p. 343 C.C.C., p. 40 D.L.R., p. 139 C.P.R.

**14**    The first Canadian case dealing with the situation at trial is R. v. Bank of Montreal (1962), 36 D.L.R. (2d) 45, 39 C.R. 61 subnom. Re Bank of Montreal, 40 W.W.R. 44 sub nom. Re Bank of Montreal's Prohibition Application, where, in a prosecution against the Bank of Montreal for violation of a federal statute (the Industrial Relations and Disputes Investigation Act, R.S.C. 1952, c. 152), a subpoena was served on the superintendent of the British Columbia division of the bank, requiring him to produce certain letters and memoranda in the possession of the bank and in his custody as its officer. It was made clear that the Crown was calling him for no other purpose than to produce the documents and intended to ask him only such questions as might be necessary in their production. The objection was taken after the witness in question had been called and sworn. The Magistrate overruled the objection of counsel for the accused, whereupon a motion for prohibition was made before Hutcheson, J., who made the order requested. Hutcheson, J., agreed with the proposition submitted for the bank that the accused could not be compelled to give evidence on behalf of the prosecution or to produce documents for or to give any assistance to the prosecution in their presentation of the case against him. He then proceeded to hold at p. 48:

> That the safeguards, privileges and rights to which an accused being a natural person or individual is entitled extend to and are enjoyed by an accused corporation is, in my opinion, clear from the following authorities: R. v. Fane Robinson Ltd., 76 Can. C.C. 196 at p. 200, [1941] 3 D.L.R. 409 at pp. 412-3; Bell v. Klein, [1954] 1 D.L.R. 225 and on appeal to the Supreme Court of Canada Klein et al. v. Bell, [1955] 2 D.L.R. 513, [1955] S.C.R. 309; Webster v. Solloway, Mills & Co., supra, and Triplex Safety Glass Co. v. Lancegaye Safety Glass (1934), Ltd., supra.

**15**    Two observations must be made about this case:

> 1.    It was concerned solely with the right of the Crown to obtain documents in possession of the accused corporation by subpoenaing its employee who had the documents in his custody, as an officer of the bank. It seems clear to me that in substance and reality the custody was not that of the officer, but that of the corporation itself.
>
> 2.    The cases relied upon were all cases dealing with either production or discovery (the Fane Robinson case is on a different point).

**16**    The matter of production of documents does not arise in the instant case, because the Crown has long since seized the documents it required, under the authority of s. 41 [am. 1960, c. 45, s. 18] of the Combines Investigation Act.

**17**    In any event, if R. v. Bank of Montreal, supra, stands for the proposition that the employees of an accused corporation cannot be called to give evidence which would tend to incriminate the

accused, or that in substance the corporate accused is being thereby required to "give evidence against itself", then I respectfully do not agree with it.

**18**    In point of time, the next case in which the matter was fully argued is R. v. J.J. Beamish Construction Co. Ltd., [1966] 2 O.R. 867, [1967] 1 C.C.C. 301, 59 D.L.R. (2d) 6, 50 C.P.R. 97; affirmed [1968] 1 O.R. 5, [1968] 2 C.C.C. 5, 65 D.L.R. (2d) 260, 53 C.P.R. 43. That case is very close in its facts to the present one, since it involved a subpoena upon the sales manager of one of the accused corporations, who was called to give evidence in relation to various transactions in which he was involved in the course of his employment. Jessup, J., reviewed the authorities, went back to first principles of the law of evidence and made a ruling in the course of the trial that the witness could be compelled to testify. His reasons for judgement, given after the trial was over, stated his ruling and the reasons therefor, and concluded [at p. 903 O.R., p. 345 C.C.C., p. 42 D.L.R., p. 141 C.P.R.]:

> Since making such rulings, I have doubted their correctness and I hope the question may be dealt with by the Court of Appeal.

**19**    The last case requiring consideration is R. v. Ettenhofer Painting & Decorating Ltd., 59 D.L.R. (2d) 222, [1967] 1 C.C.C. 386, 58 W.W.R. 255. That case arose in connection with a charge laid under a provincial statute, the Construction Industry Wages Act, 1964 (Man.), c. 9. The president of the accused corporation was called as a witness against it. Monnin, J.A., for the Court, said at p. 224 D.L.R., pp. 387-8 C.C.C.:

> There is a well known and sound principle of criminal law that an individual accused cannot be compelled in law to give evidence or produce written evidence on the hearing of a charge against him. I take it that this principle applies equally to a body corporate as to an individual. It has been so expressed in the maxims nemo tenetur seipsum accusare. Recently its application to corporations was reviewed in Re Bank of Montreal (1962), 39 C.R. 61, 36 D.L.R. (2d) 45 sub nom. R. v. Bank of Montreal, 40 W.W.R. 44. An accused cannot be compelled to give evidence in the prosecution of a charge against himself, although he may voluntarily decide to testify.

**20**    Whether or not the common law privilege has been modified by provincial legislation, as Grant, J., has observed in commenting on R. v. Greenspoon Bros. Ltd., [1967] 2 O.R. 119, [1967] 3 C.C.C. 308, I prefer to leave for decision by us in a case squarely raising that point. It is sufficient to say that, holding as I have that R. v. Bank of Montreal, supra, was wrongly decided, I hold the same view, with equal respect, concerning R. v. Ettenhofer Painting & Decorating Ltd., supra, if the case intended to lay down a principle of general application that an employee or officer of an accused corporation cannot be called to give evidence against the corporation.

**21**    Two further points were advanced by the appellant. The first arose from the fact that these same witnesses were called upon to give evidence before a member of the Restrictive Trade

Practices Commission during the course of the inquiry conducted by the Director of Investigation and Research under the Combines Investigation Act. The power to compel their attendance is found in s. 17 [am. 1960, c. 45, s. 7] of that Act. Section 20(2) of the Act reads as follows:

> 20(2) No person shall be excused from attending and giving evidence and producing books, papers, records or other documents, in obedience to the order of a member of the Commission, on the ground that the oral evidence or documents required of him may tend to criminate him or subject him to any proceeding or penalty, but no such oral evidence so required shall be used or receivable against such person in any criminal proceedings thereafter instituted against him, other than a prosecution for perjury in giving such evidence.

**22**    It was argued that to require these witnesses to "give their evidence again" at the trial of the corporation was in violation of s. 20(2). Since no evidence is sought to be "used ... against such person" in the pending trial, and there are no "criminal proceedings ... instituted against him", it is obvious that the point has no merit.

**23**    However, that obvious construction leads to the second point argued, which is that, if s. 20 does not protect the corporation in these circumstances, then s. 20 is contrary to the Canadian Bill of Rights, 1960 (Can.), c. 44, and particularly s. 2(d), which provides that no federal statute shall be construed or applied so as to authorize a Court to compel a person to give evidence if he is denied protection against self-crimination or other constitutional safeguards. It was pointed out during the argument that the Canadian Bill of Rights is expressed to be one "for the recognition and protection of human rights and fundamental freedoms" and that a reading of the Canadian Bill of Rights as a whole does not indicate that "person" in s. 2(d) of that statute is intended to include a corporation. Be that as it may, I have held that a corporation did not enjoy a privilege to object to the evidence of its own employees or officers as being "self crimination" and accordingly no such right has been taken away by s. 20 of the Combines Investigation Act.

**24**    I have had some misgivings as to our right (and that of Grant, J.) to make the order requested by the appellant. Both counsel requested us to deal with the substantive issue, and it is obviously much more convenient to do so now, rather than to have the objection made at the trial after the first of the employee-witnesses is called and sworn. It may well be that, if the appellant's contention were correct, the subpoena ought to be quashed, since the Crown on that theory would have no right to call such witness at all. If, on the other hand, the objection is open only to a witness and not to his employer, the accused, it is one which can be taken only after the witness has been sworn and asked the question allegedly tending to incriminate him. In view of the conclusion we have reached, it is unnecessary to decide the question.

**25**    For these reasons, as well as those given by Grant, J., in the Court below, the appeal is dismissed.

**26**    Appeal dismissed.

**27**    NOTE: An application by the accused for leave to appeal to the Supreme Court of Canada (Martland, Judson and Spence, JJ.) from the above decision was dismissed by that Court on January 26, 1971.

G.F. Henderson, Q.C., for accused, applicant.

S.F. Sommerfeld, Q.C., for the Crown, respondent.

TAB

5

**CITATION:** Stevens and O'Connell et al, 2013 ONSC 2236
**COURT FILE NO.:** 08-41544
**DATE HEARD:** April 11, 2013

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**        Celine Stevens and Kristopher O'Connell et al

**BEFORE:**    MASTER P. E. ROGER

**COUNSEL:**   Patrick Wymes, *for the Plaintiff*
email: patrick.wymes@gmail.com
Ph: (416) 691-0606   Fax: (416) 691-0676

Jaye Hooper, *for the Defendant Kristopher O'Connell*
email: hooper@williamsmcenery.com
Ph: (613) 237-0520   Fax: (613) 237-3163

Susanne Sviergula, *for the Defendant Jessica Smith*
email: ssviergula@cavanagh.ca
Ph: (613) 569-8558   Fax: (613) 569-8668

Debbie Orth, *for the Third Party The Personal Insurance Company-*took no
position on this motion and did not attend
email: dorth@boslaw.ca
Ph: (613) 749-4700   Fax: (613) 749-470

## E N D O R S E M E N T

1. The Plaintiff brings this motion to set aside the order of a registrar, dated September 4, 2012, dismissing this action for delay. This motion is brought pursuant to Rule 37.14 of the *Rules of Civil Procedure.*

2. At the outset of this motion, the Defendants sought to strike various paragraphs from the affidavits filed by the Plaintiff and the Plaintiff sought to strike various paragraphs or the entire affidavit filed by each of the Defendants. All parties raised valid arguments why certain portions of the affidavits could be considered to be in breach of our rules of civil procedure and rules of evidence.

3. After reviewing again the various paragraphs of the affidavits and after considering the parties' arguments, I have decided not to strike any of the paragraphs and rather give them their appropriate weight.

4. I will however note that rules 4.06 and 39.01 of the *Rules of Civil Procedure* should be regularly reviewed by lawyers and more closely adhered to.

2013 ONSC 2236 (CanLII)

1

5. Indeed, affidavits should be confined to the personal knowledge of the deponent. Affidavits should not be used to argue, this should be left to oral arguments or to the factum. Affidavits should be limited to statements of facts. If information and belief information is to be provided, it should be provided in appropriate circumstances in compliance with rule 39.01 (4). The limited exception provided by that rule does not allow for absolutely everything to go in an affidavit, such as opinions or arguments. Finally, the affidavit should be limited to what is relevant.

6. By way of example for the Plaintiff, at paragraphs 22 and 23 of the affidavit of Ms. Champaigne, an assistant of the lawyer for the Plaintiff, she states that she is advised by Mr. Wymes and verily believes that to the knowledge of the Defendants.... These paragraphs will be given no weight.

7. By way of example for the Defendants, the Defendants' affidavits contain arguments that should not be in an affidavit, such as words to the effect that because no expert reports have been provided, my lawyer has been unable to assess my exposure. The foundation evidence, if any, should properly be laid out in the affidavit but any conclusion and argument should be left for the factum or better for oral arguments. How can a client properly say this in an affidavit as either a "statement of facts" or as his or her "information and belief"? Similarly, when a client says words to the effect that I believe it was a strategic decision of the Plaintiff to wait years to conduct those examinations so that our memory would fade, these are arguments, not statements of the deponent's information and belief.

Factual overview

8. The action is a personal injury action arising from a car accident on May 30, 2006. The accident involved a rear end collision. The Defendant Smith was driving the vehicle of her friend, the Defendant O'Connell on highway 417 with a G1 driver's licence. Her insurer has raised issues of coverage and was added as a third party under the provisions of the Insurance Act. Mr. O'Connell was not present when the accident happened. The Plaintiff suffers from what appears to be chronic pain and related issues.

9. The statement of claim was issued on May 15, 2008. Statements of defence were delivered on November 19, 2008 and January 22, 2009. The Defendants provided their respective draft affidavit of documents by the end of January 2009. The Plaintiff provided her affidavit of documents by January 19, 2009. The Plaintiff was examined for discovery a first time on February 2, 2009. The insurer was added as a third party on February 20, 2009 and delivered its statement of defence by March 18, 2009. The Plaintiff was examined for discovery a second time on December 11, 2009.

10. In 2010, 2011 and 2012, little happened to move this action forward. A mediation scheduled for February 2010 did not proceed. Correspondence was provided regarding a proposed settlement conference. In 2011 a status notice was issued by the court on June

2013 ONSC 2236 (CanLII)

14, 2011 and this was dealt with on consent in September 2011. Discoveries were to be completed by the end of February 2012 and the action was to be set down for trial by the end of August 2012. The lawyer for the Plaintiff provided evidence that he never received from the court a copy of that consent order. All other lawyers received the order but none brought it to his attention. An offer to settle was provided by the Plaintiff in July 2011 and the Plaintiff answered some undertakings in 2012.

11. It is the practice of this court to fax orders to out of town counsel. As indicated, all other lawyers received a copy of the order. Nonetheless, I accept for purposes of this motion that the Plaintiff never received the order of this court dated September 28, 2011.

12. However, as I indicated when this motion was argued, it was incumbent upon counsel for the Plaintiff to follow-up as required to obtain a copy of that order, either by contacting the court or opposing counsel. If you file a consent order with the court and do not receive a copy of the order within a reasonable amount of time you should inquire, particularly when the action is otherwise at risk of being dismissed. Similarly, if you file a consent order for a timetable I would strongly recommend that you immediately take steps to meet the timetable on the assumption that the order will likely be made and, again, recommend that you inquire if the order is not received in a timely manner. No evidence was provided that this was done or attempted by the lawyer for the Plaintiff.

13. The evidence of the Plaintiff is that they were working on complying with undertakings following the discovery of their client in 2009 and that the Plaintiff was experiencing difficulties obtaining and organizing the information. Little weight is given to this as this evidence should have been provided by the Plaintiff.

14. However, it appears from the correspondence attached to the affidavit that the lawyer for the Plaintiff was corresponding with the lawyer for the Third Party, providing answers to undertakings. By letter dated May 10, 2012, counsel for the Third Party wrote to counsel for the Plaintiff seeking answers to undertakings. A chart was provided asking for compliance. Another similar letter was sent July 3, 2012. By letter dated August 7, 2012, the Plaintiff provided answers to undertakings to counsel for the Third Party and by letter dated August 30, 2012, counsel for the Third Party wrote to the Plaintiff to follow-up on undertakings. The Plaintiff also attached a chart which also appears to show that the Plaintiff was answering undertakings in July, August, October and December 2010 and in July 2012.

15. It seems strange that none of the parties were focusing on what was required to comply with the consent order filed with the court in September 2011 as under this consent order examinations for discovery of the Defendants should have been completed by the end of February 2012 and the action set down for trial by the end of August 2012. Apparently, not a single letter or communication by any of the parties attempted to schedule any discovery of the Defendants.

2013 ONSC 2236 (CanLII)

3

Administrative dismissal

16. The law applicable to setting aside the order of a registrar is well established. It involves an exercise of the court's discretion to determine whether or not it is just to set aside the dismissal order considering all factors and circumstances relevant to each particular case. It's a weighing exercise to determine the result that is just in the circumstances. The court must balance the interests of the parties and those of the public's interest in the timely resolution of disputes with some flexibility between adherence to the rules and matters being determined on their merits. A contextual approach is to be adopted, not necessarily meeting each and every factor, with prejudice being a key consideration.

17. A summary of the law is provided in *Vogrin et al. v. Ticknor Estate*, 2012 ONSC 1640 at para. 32.

18. There is no question that this motion was brought promptly. This is not contested. This factor is met by the Plaintiff.

19. The Plaintiff has not sufficiently explained the delays. Although a perfect explanation or a perfect accounting of all delays is not required, in this case the explanations provided for the litigation delays are not sufficient. Some explanations were provided but more and better evidence should have been presented to explain the delays from February 2010 onwards. I find that this factor is not met by the Plaintiff.

20. Similarly, more and better evidence should have been presented to address inadvertence. However, an explanation was provided and, in the circumstances, I find that explanation somewhat convincing. I therefore find, in the circumstances of this case, that this factor is, at its worst for the Plaintiff, a neutral factor.

21. Although the evidence is not strong, I find the evidence somewhat convincing because of the Plaintiff's continued efforts to answer undertakings, evidenced by the letter of August 7, 2012. This indicates that the Plaintiff had not abandoned the action and, to the contrary, desired to continue the litigation of this action. This was certainly known of the Third Party who received this letter. This corroborates to some extent the weak explanation that the order had not been received and that through inadvertence the timeline was not met. Taken all together, it is evidence that the dismissal order was made as a result of inadvertence.

22. Although I appreciate that the onus is on the Plaintiff, both in the action to move the action along and, as well, on this motion, I note that in this case neither of the Defendants wrote to the Plaintiff to seek that this action proceed more expeditiously. I have not been provided with letters by the Defendants voicing significant concern about how this action was proceeding prior to when this action was dismissed. The conduct of the defendants

2013 ONSC 2236 (CanLII)

4

may as well be relevant. [1]

23. When Plaintiff's counsel approached counsel for the Defendants and for the Third Party in August and September 2011, counsel for the Defendants and for the Third Party sought a longer timetable than that initially proposed by the Plaintiff.    The Plaintiff initially requested a timeline extending time to January 27, 2012. Counsel for both Defendants wrote to advise that because of their respective prior commitments they required a longer timetable. None indicated any difficulty to their respective client in extending the time and ultimately the parties agreed to the timetable confirmed in the consent order of this court dated September 28, 2011, which extended the time to August 31, 2012.

24. On the question of prejudice, the Plaintiff has established that: affidavits of documents were provided; the Plaintiff was examined; that no key witness died; and that relevant documents have been secured. I find that the evidence presented by the Plaintiff rebuts the presumption of prejudice resulting from the expired limitation period.

25. The Defendants have alleged prejudice in the form of fading memory and alleged unfairness as the Plaintiff was examined in 2009 and they have not yet been examined. I find this evidence to be rather vague and unconvincing.

26. It is not clear how worst their respective memory is since February 2012 (the time that they were to be examined for discovery under the consent order) or since August 31, 2012 (the time when the action would otherwise have been set down for trial). This is not addressed in their respective affidavit. Similarly, their respective affidavit does not compare how well they could have been examined for discovery in February 2012 versus after September 2012.

27. The Defendant Smith gave a statement to her insurer which she did not review before her cross-examination and listed as privileged. The other Defendant also gave a statement. Indeed, both Defendants have been on notice and involved in this action for some time and both had ample opportunities to put their recollection to paper at an early date. (Smith's cross-examination at Q 441-443 and O'Connell at Q 83).

28. Fading memories are obviously a concern as this could prejudice a party. However, this is not a complex commercial case or a case involving many witnesses on key liability points.

29. When assessing fairness to the parties, we must carefully assess the fading memory of non-party witnesses and that of parties. The fading memory of a non-party witness might occasionally be a slightly more pressing concern to the interests of justice than that of party witnesses as parties are involved in the action usually from an early date. As a result, parties, as in this case, may occasionally have opportunities to investigate and take

---

[1] *1196158 Ontario Inc. v. 6274013 Canada Limited*, 2012 ONCA 544 at para. 29

2013 ONSC 2236 (CanLII)

5

steps to preserve memories and witnesses from an early date while non-party witnesses might not have such opportunities.

30. This action involves a rear end collision between two cars. One of the Defendants, the owner of the car, was not present. He loaned the car to his friend and the circumstances of this might be relevant to the ongoing issue of coverage. His alleged failing memory is a factor that I have considered on the issue of prejudice but I consider it, in the circumstances of this case, not to be strong evidence of prejudice. Overall, this court considers the evidence of prejudice put forth by the Defendants to be rather vague and more focused on meeting the legal test. In the circumstances, I give it little weight and, in any event, find that it does not demonstrate any sufficient prejudice that should be a concern to fairness or to the interests of justice.

31. As a result, I find that the Plaintiff has convinced the court that the Defendants have not experienced any significant prejudice in presenting their case at trial as a result of the Plaintiff's delay or as a result of steps taken following the dismissal of the action.

32. As indicated in earlier decisions, I am mindful of the importance of ensuring that our system of civil justice requires the timely disposition of actions as memories fade with time. Fairness includes the timely resolution of civil disputes with the absence of actual prejudice not always trumping the value of timeliness and efficiency, particularly where there are repeated delays. However, as explained above, I am satisfied that, in the circumstances of this case, prejudice has been sufficiently addressed by the Plaintiff and that setting aside the administrative dismissal will not impair the Defendants' ability to have a fair trial. [2]

33. It would have been preferable for the Plaintiff's evidence to come directly from the Plaintiff and directly from counsel for the Plaintiff with someone else arguing the motion. These are important motions that must be treated as such.

34. A contextual approach is to be adopted by the court, weighing relevant factors to determine what is just in the circumstances. It is not necessary for the Plaintiff to satisfy all of the *Reid* factors and all other relevant factors.

35. In this case, the evidence presented by the Plaintiff is not the strongest. More and better evidence should have been presented. However, adopting a contextual approach, I am satisfied that the Plaintiff has met most of the *Reid* factors[3] and that what is just in the circumstances is to allow this action to proceed on a very tight timeline.

36. Submissions on an acceptable litigation timetable were not made when this motion was argued. Consequently, I will not at this point make a specific order for a timetable. I will

---

[2] *1196158 Ontario Inc. v. 6274013 Canada Limited*, 2012 ONCA 544 at para. 33
[3] *Reid v. Dow Corning Corp.*, 2001 O.J. no. 2365, reversed on other grounds 2002 O.J. No. 3414

2013 ONSC 2236 (CanLII)

6

simply order the parties to schedule a case conference if they cannot agree on a timetable within the next 30 days. If a case conference is required, the parties should not wait for it to start scheduling and executing outstanding steps. For guidance, I note that this is what, subject to submissions, I might have ordered: sworn updated affidavits of documents are to be provided by all parties by May 31, 2013; any required examination for discovery of the Defendants are to be conducted by June 30, 2013; any motion on undertakings or refusals shall be served by August 31, 2013; a mediation shall be conducted as required by the rules before this action is set down for trial; and, this action shall be set down for trial by September 30, 2013.

37. The Plaintiff is not seeking costs for this motion. Considering the outcome of the motion, the nature of the motion, the evidence presented and the factors relevant to costs, outlined at rule 57, I find that a reasonable disposition of costs for this motion is to not award any costs payable forthwith and to order that the costs for this motion shall be to the Defendants in the cause. I will make such an order however with leave to the parties to make short written submissions on costs within the next 7 days (limited to three pages sent to my registrar by email) should any party wish for me to reconsider the issue of costs prior to the order being taken out.

Disposition

38. The following is therefore ordered:

    a.  The Order of the registrar dated September 4, 2012, dismissing this action for delay, is set aside.

    b.  If the parties cannot agree on a litigation timetable within the next 30 days, a case conference shall be scheduled by the Plaintiff at the earliest available date. Pending an order extending time to set this action down for trial, to be made either by way of a consent timetable to be provided to this court for signature or, failing consent, to be made by this court at a case conference to be scheduled by the Plaintiff, this action is not to be dismissed for delay under rule 48.14 prior to September 30, 2013, after which time it shall be dismissed for delay unless another order extending time is made.

    c.  The costs of this motion shall be to the Defendants in the cause with leave to the parties to make short written submissions on costs within the next 7 days (limited to three pages) should any party wish for this court to reconsider the issue of costs prior to the order being finalized.

2013 ONSC 2236 (CanLII)

_____

Master Pierre Roger

Date: April 16, 2013

# TAB 6

St. Catharines Court File No. 46084/04

SUPERIOR COURT OF JUSTICE – ONTARIO

RE:    *THE ENSIGN GROUP INC., LE GROUPE ENSIGN INC.* (plaintiffs/moving parties) v. *JEAN SAINE, representing the Estate of Joseph Saine, JEAN SAINE, LES PLACEMENTS SAINE INC., 3437400 CANADA INC., 3465098 CANADA INC., 2001325 ONTARIO INC. and EMILE SAINE* (defendants/responding parties)

BEFORE:    The Honourable Mr. Justice J.W. Quinn

COUNSEL:    Jeffrey W. Tighe,
for Emile Saine, 3437400 Canada Inc. and 3465098 Canada Inc., defendants/moving parties

A. Irvin Schein,
for the plaintiffs/responding parties

Jean Saine, representing the Estate of Joseph Saine, Jean Saine personally and Les Placements Saine Inc., defendants/responding parties, not appearing

2001325 Ontario Inc., defendant, not appearing

HEARD:    March 30, 2007, at St. Catharines

DATED:    April 16, 2007

2007 CanLII 13931 (ON SC)

## ENDORSEMENT

## INTRODUCTION

[1]    This endorsement addresses a motion by the responding parties to another motion for leave to deliver a further affidavit in the latter. In the

circumstances of this case, why is a motion for leave necessary and what are the requirements of such a motion?

## OVERVIEW

[2]   The plaintiffs moved for leave to discontinue this action ("discontinuance motion") as against the defendant, Emile Saine ("Emile") and the defendants 3437400 Canada Inc. and 3465098 Canada Inc. ("the Emile defendants") without prejudice to the right of the plaintiffs to commence an action against them in the Province of Quebec.[1]

[3]   As against the defendant, Jean Saine ("Jean"), and the defendants, Jean Saine, representing the Estate of Joseph Saine, and Les Placements Saine Inc. ("the Jean defendants"), the plaintiffs further moved for judgment ("judgment motion") pursuant to an alleged settlement agreement.

[4]   On March 22, 2007, the motions came before me for argument. I was advised by Mr. Schein, counsel for the plaintiffs, that the judgment motion had been resolved on consent and I signed an order to that effect. Thus, Jean and the Jean defendants were neither present nor represented on March 22nd.[2]

[5]   I proceeded to hear submissions in respect of the discontinuance motion. Part way through those submissions I indicated that I wished the opportunity to re-read the material they had filed and to hear from counsel again at a later time. For that purpose, the discontinuance motion was adjourned to March 30, 2007 for re-argument. In the interim, I invited

2007 CanLII 13931 (ON SC)

---

[1]     In the discontinuance motion the plaintiffs also asked for the return of monies paid into court earlier as security for costs in respect of their claim against Emile and the Emile Defendants.

[2]     The defendant, 2001325 Ontario Inc., did not appear and does not seem to be an active participant in the action.

counsel to forward to me any additional authorities that they might come upon.

[6]     Several days later, Mr. Tighe, counsel for Emile and the Emile defendants, sent word that he would be delivering a further affidavit with exhibits and transcripts for use on the discontinuance motion. As Mr. Schein objected, Mr. Tighe was informed that he would require leave to rely upon this evidence and that he was free to bring the appropriate motion ("leave motion") returnable March 30, 2007, with the discontinuance motion to be heard on another date.

[7]     Mr. Tighe brought the leave motion and it was argued March 30th. The discontinuance motion is being held in abeyance pending this endorsement disposing of the leave motion.

## BACKGROUND

[8]     In their statement of claim, the plaintiffs (described therein as Canadian-controlled corporations "undertaking various consulting, investment and development activities in Canada and Europe") request, as against Jean and the Jean defendants, declarations that certain agreements are binding contracts for the purchase and sale of lands ("Lands") located in the City of Grimsby, Ontario ("Project"). As against Emile and the Emile defendants, the plaintiffs claim substantial damages for management fees. The Project relates to the proposed construction of a golf course, hotel and winery on the Lands.

[9]     I will deal with the balance of the background by means of a chronology.

June 28, 2004                    -        The plaintiffs moved *ex parte* for an order
                                          granting leave for the issuance of certificates of

2007 CanLII 13931 (ON SC)

2007 CanLII 13931 (ON SC)

pending litigation. The motion was supported by an affidavit of Jean Philippe Ewart ("Ewart"), sworn June 28th ("Ewart affidavit"). Ewart is the founder and president of the plaintiffs. The order was granted and served on the defendants. It provided that the *ex parte* motion was to be brought back, with notice, on July 15, 2004. Certificates of pending litigation were issued and registered against the title to the Lands.

| | |
|---|---|
| July 15, 2004 | -    The *ex parte* motion was not returned as ordered, probably because the parties were discussing settlement. |
| November 2004 | -    Jean and Emile delivered affidavits in response to the Ewart affidavit. |
| December 2004 | -    The statement of claim was issued and served and Ewart delivered reply affidavits. |
| March 2005 | -    Emile was cross-examined on his affidavit, refused to answer some questions and gave undertakings regarding others. |
| April 2005 | -    Jean was cross-examined on his affidavit and gave undertakings.[3] |
| June 2005 | -    Upon motion by the defendants, the plaintiffs were ordered to pay into court a sum of money as security for costs up to and including a |

---

[3]    By this time, Emile and the Emile defendants had delivered a statement of defence and counterclaim and Jean and the Jean defendants had done likewise.

|                   |                                                                                                                                      |
| ----------------- | ------------------------------------------------------------------------------------------------------------------------------------ |
|                   | motion by the defendants to discharge the certificates of pending litigation ("CPL motion").                                         |
| July 8, 2005      | -   The CPL motion was adjourned, on consent, without a date.                                                                         |
| February 2006     | -   The defendants gave notice that they were returning the CPL motion to the motions list for March 31, 2006.                        |
| March 24, 2006    | -   The plaintiffs changed counsel to Mr. Schein.                                                                                     |
| March 31, 2006    | -   Mr. Schein obtained a consent adjournment of the CPL motion to June 26, 2006. Subsequently, the certificate of pending litigation was discharged on consent. |
| March 1, 2007     | -   The plaintiffs brought their discontinuance and judgment motions to which I have made reference.                                  |
| March 22, 2007    | -   The discontinuance motion came before me for argument. It was adjourned to March 30th at which time I heard the leave motion instead. |

[10]   In the leave motion, Emile and the Emile defendants request an order granting leave for them "to file a further affidavit and exhibits attached thereto" in the discontinuance motion.

[11]   The leave motion is supported by an affidavit sworn by a solicitor in the same law firm as Mr. Tighe ("the affidavit"). After setting out a partial history of the action, the affidavit contains these paragraphs in respect of the request for leave:

2007 CanLII 13931 (ON SC)

9.      Mr. Tighe informs me that [in the discontinuance motion] it is the intention of [Emile and the Emile defendants] to request an order that the cross-examination transcripts be considered examination for discovery transcripts for the purposes of continuing the litigation.[4] Mr. Tighe also informs me that [Emile and the Emile defendants] will have no objection to further examinations for the purpose of asking questions not covered already in the cross-examination transcript.

10.     Mr. Tighe informs me that the cross-examination transcripts and undertaking answers cover most if not all of the issues outstanding in this action. He informs me that it is the position of [Emile and the Emile defendants] that failure to utilize the cross-examination transcripts as discovery transcripts would result in significant duplication and wasted effort and time as many, if not all, of the questions already asked on the cross-examination will have to be repeated at the examinations for discovery otherwise.

11.     Mr. Tighe informs me that there have been no cross-examinations for the [discontinuance motion] of the plaintiffs. The cross-examination transcripts are available from the [CPL motion].

## DISCUSSION

## Clause 39.01(1)(4)

[12]    Clause 39.01(1)(4) of the *Rules of Civil Procedure,* R.R.O. 1990, Reg. 194, as amended, limits the kind of statements that may be contained in an affidavit used on a motion:

EVIDENCE BY AFFIDAVIT
39.01(1)(4) *Contents – Motions* – An affidavit for use on a motion may contain statements of the deponent's information and belief, if the source of the information and the fact of the belief are specified in the affidavit.

---

[4]     Although I note that there is no motion before the court requesting such relief.

2007 CanLII 13931 (ON SC)

[13]   In paragraph 1 of the affidavit, the solicitor deposes that he has "knowledge of all the facts stated in this affidavit, except where I have been informed of such facts, in which case I have stated the source of such facts and I hereby state that I believe such facts to be true."

[14]   The affidavit contains 12 paragraphs. Disregarding paragraphs 1 and 12 (the latter merely states that the affidavit is in support of the leave motion and is "for no other or improper purpose"), of the remaining 10 paragraphs, one is prefaced with the words "I am informed by Jeffrey W. Tighe" and four begin "Mr. Tighe informs me."

[15]   Although the affidavit purports to say all the things necessary for technical compliance with clause 39.01(1)(4), it is, truly viewed, the affidavit of Mr. Tighe. As such, it offends the principle that one may not be counsel on a motion in which one has sworn an affidavit, particularly an affidavit that is the sole affidavit in support of the motion. All of the material information in the affidavit comes from Mr. Tighe. On this basis alone, the leave motion must be dismissed.[5]

**Leave required to serve and file the affidavit**

[16]   Clause 39.01(3) of the *Rules of Civil Procedure* provides for limitations on the service and filing of affidavits on a motion:

> 39.01(1)(3) *Service and filing* – All affidavits to be used at the hearing in opposition to a motion or application or in reply shall be served and filed with proof of service in the court office where the motion or application is to be heard at least two days before the hearing.

---

[5]      The portions of the affidavit that merely recount the non-contentious history of the litigation are not objectionable.

2007 CanLII 13931 (ON SC)

[17]   The discontinuance motion was scheduled for argument on March 22, 2007 and, as I have explained, after hearing some submissions from counsel I called for a "re-start" on March 30th because I desired the opportunity to more closely study the material filed. However, the due date for the filing of affidavits from Mr. Tighe "in opposition to" the motion was "at least two days before" March 22nd. The adjournment to March 30th did not extend that timeframe. Once responding parties have responded to a motion, any adjournment of the motion does not create more time for serving and filing further affidavits to be used at the hearing of the motion. Consequently, in such circumstances, leave of the court is required to file a further affidavit.[6]

[18]   The meaning of "hearing" in clause 39.01(3) will be determined by the circumstances of each case but, in most instances, it will be the return date for the motion (or perhaps the first adjourned date where the motion is brought on short notice and there is insufficient time within which to respond). Although semantically it is a bit of a struggle, I think that to define "hearing" in any other fashion would be to encourage the delivery of further affidavits with each adjournment of a motion.

**Explanation required**

[19]   There must be evidence before the court clearly explaining why the affidavit (or, I suppose, more accurately, the contents of the affidavit) was not filed when Emile and the Emile defendants initially responded to the discontinuance motion. That explanation is missing. (If the need for a further

---

[6]        It should be noted that the leave and discontinuance motions are not governed by clause 39.02(2) which provides that leave is required to deliver an affidavit for use on a motion in respect of which there have been cross-examinations. There have been no cross-examinations in the leave or discontinuance motions.

2007 CanLII 13931 (ON SC)

affidavit is the result of an afterthought, this usually is not enough. Counsel, by training, are prone to afterthoughts.)

[20]    The missing explanation is sufficient, by itself, to warrant the dismissal of the leave motion.

## Intended purpose of the affidavit

[21]    I gather that the intended purpose of the affidavit is to show that the cross-examinations in respect of the CPL motion were so extensive as to reduce, if not eliminate, the need for examinations for discovery, thereby supporting the argument that the action has progressed too far to allow the plaintiffs to discontinue and start again in Quebec. Although there may be cases where the court is able to conclude that cross-examinations have rendered discoveries unnecessary or that they warrant restricting the questions to be asked on discoveries, this is not such a case. The issues here are complex and it would be unwise to place restrictions on the discoveries. Indeed, it would be an unwarranted intrusion upon the role of counsel for the court to go through the transcripts of the cross-examinations and determine what areas are open for questioning on the examinations for discovery. It would be presumptuous of me to say that a point was adequately canvassed in cross-examinations and should not be the subject of further questions on the discoveries. How am I to appreciate the nuances of the case and the strategy of counsel? After all, it is possible that some counsel are more intelligent than judges.[7]

---

[7]        Mr. Tighe cited *Royal Bank v. Lam*, 2000 CarswellOnt 4657 (Ont. Master) as authority for limiting the scope of an examination for discovery. While I do not disagree with the result in *Lam*, that case is factually and procedurally different from the one at bar and I think that its applicability should be confined to comparable situations.

[22]   I am unaware of any rule of civil procedure that authorizes the court to limit the right to, or nature or scope of, examinations for discovery in the circumstances of this case.[8] I take that as a measure of the hesitancy with which a court should approach such a task. The onus is on those seeking such relief to prove that the usual right to discovery should be restricted. Emile and the Emile defendants have not satisfied that onus.

**Affidavit not to contain argument**

[23]   Finally, it is trite law that an affidavit must not contain argument. I agree with Mr. Schein that paragraph 10 of the affidavit is largely argument and even if the affidavit were to be otherwise permitted, that paragraph should be struck out.

**CONCLUSION**

[24]   The leave motion is dismissed. Counsel should obtain a date from the trial coordinator for argument of the discontinuance motion. The costs of the leave motion may be spoken to at that time if counsel are unable to reach agreement.

_____

The Honourable Mr. Justice J.W. Quinn

RELEASED: April 16, 2007

---

[8]      Clause 20.05(3)(c) allows the court to restrict "the nature and scope of discovery" where, after a summary judgment motion, the court orders a matter to proceed to trial.

2007 CanLII 13931 (ON SC)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

---

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

Proceeding commenced at Toronto

---

**BRIEF OF AUTHORITIES OF CANADIAN
DEBTORS AND MONITOR**

**Re Representative Party Discovery**

**(RETURNABLE JANUARY 7, 2014)**

---

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Jessica Kimmel LSUC#: 32312W
Peter Ruby LSUC#: 38439P
Joseph Pasquariello LSUC#: 37389C
Tel:        416.979.2211
Fax:        416.979.1234

**Lawyers for the Monitor,
Ernst & Young Inc. and Canadian Debtors**

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5
**Derrick Tay** LSUC#: 21152A
**Jennifer Stam**  LSUC#: 46735J
Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors