**<u>EXHIBIT C</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

# FACTUM OF CANADIAN DEBTORS AND THE MONITOR

### Re: Representative Party Discovery
### (Motion Returnable January 7, 2014)

| | |
|---|---|
| **Goodmans LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| Bay Adelaide Centre | 1 First Canadian Place |
| 333 Bay Street, Suite 3400 | 100 King Street West, Suite 1600 |
| Toronto, ON  M5H 2S7 | Toronto, ON  M5X 1G5 |
| | |
| Jay A. Carfagnini  LSUC#: 22293T | Derrick Tay  LSUC#: 21152A |
| Jessica Kimmel LSUC#: 32312W | Jennifer Stam  LSUC#: 46735J |
| Peter Ruby  LSUC#: 38439P | |
| Joseph Pasquariello  LSUC#: 37389C | Tel:   416.862.5697 |
| | Fax:  416.862.7661 |
| Tel:   416.979.2211 | |
| Fax:  416.979.1234 | Lawyers for the Canadian Debtors |
| | |
| Lawyers for the Monitor, | |
| Ernst & Young Inc. and Canadian Debtors | |

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS
ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**FACTUM OF CANADIAN DEBTORS AND THE MONITOR**

**Re  Representative Party Discovery
(Returnable January 7, 2014)**

## I.    OVERVIEW

1.    Nortel Networks Inc. and its affiliated debtors (collectively, the **"U.S. Debtors"**) supported by certain other Core Parties[1] seek to avoid the Canadian style discovery of party representatives (the **"Representative Party Discovery"**) that has been, until now, an integral part of the Court approved Deposition Protocol, Litigation Timetable and Discovery Plan (all as defined below) under which the parties have been operating.

---

[1] The EMEA Debtors, the UK Pension Claimants ("UKPC"), the Official Committee of Unsecured Creditors ("Committee") and the Ad Hoc Bondholders Group ("Bondholders"), all of whom are party to or supporters of the recent settlement of claims against the US Estate.

2.      The Canadian Debtors[2] and Ernst and Young Inc., in its capacity as Monitor (the **"Monitor"**) oppose this motion for the following reasons:

    (a)      The Litigation Timetable, Discovery Plan and Deposition Protocol in this cross-border proceeding have always contemplated (and the parties have agreed) that there would be both fact witness depositions and Representative Party Discovery. The fact witness depositions have been conducted based on the understanding that Representative Party Discovery would follow;

    (b)      Discovery under Rule 31 of the Ontario *Rules of Civil Procedure* (the **"Rules"**) is legally and functionally distinct from fact witness depositions;

    (c)      The contemplated Representative Party Discovery is reasonable and not overly burdensome and, in fact, is designed to further streamline the evidence for trial (it is not limited to "gap filling" as has been asserted by the U.S. Debtors and others, but that remains one of the acknowledged objectives which has not been fully achieved by the fact witness depositions);

    (d)      Nothing has changed since the last court approved amendments to the Litigation Timetable, Discovery Plan and Deposition Protocol in terms of the contemplated extent and scope of the over 100 fact witness depositions that have occurred, and the suggestion now that Representative Party Discovery should be dispensed with in its entirety as a means of "conserving resources" is disingenuous. What has changed is the recent settlement between the EMEA Debtors and the UKPC with respect to the claims those parties have asserted against the US Debtors such that those parties no longer need Representative Party Discovery of each other in respect of those claims (and also with respect to allocation if they come to a common position). However, the Canadian Debtors and the Monitor and the Directors and Officers still have to defend against the corresponding claims in Canada. Furthermore, eliminating the Representative Party Discovery will unfairly allow the proponents of this motion maximum flexibility to develop new allocation theories (as their Settlement Agreement contemplates they will do) without the opportunity for the Canadian Debtors and Monitor to obtain essential discovery about their positions before the expert and trial evidence is finalized.

3.      The Canadian Debtors and Monitor respectfully request that this Court deny the U.S. Debtors' request to dispense with Representative Party Discovery and that appropriate adjustments be made to the current Litigation Timetable, Discovery Plan and Deposition Protocol to allow the Representative Party Discovery to occur in a time frame and

---

[2] Nortel Networks Corporation, Nortel Networks Limited, Nortel Network Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation.

manner that will enable the responses to be taken into account (if appropriate) in the rebuttal expert reports to be delivered on February 28, 2014, and in the trial affidavits that will follow.[3]

## II.   FACTS

*Background Relating to the Dispute and Procedural Orders*

4.   A detailed description of the facts relevant to the background of the insolvency proceedings is set out in the one-hundred and first report of the Monitor and the appendices thereto (the **"Monitor Report"**), filed together with this factum in accordance with the agreed upon schedule.[4]

5.   The pending joint hearings (the **"Trial"**) will decide the dispute about the allocation of over \$7.3 billion of sale proceeds as well as certain claims asserted against the Canadian Debtors (in the Canadian proceedings) by the EMEA Debtors and the UKPC (the **"Allocation Dispute"**).

        Monitor Report, para. 13

6.   On three separate occasions, in May, August and November 2013, this Court and the U.S. Court (collectively, the **"Courts"**) first approving and then twice amending a Litigation Timetable (the **"Litigation Timetable"**) and Discovery Plan (the **"Discovery Plan"**).

---

[3]  Adjustments are rendered necessary because of the timing of this motion in order to preserve to current schedule and trial date.

[4]  These respond to the affidavits in support of this motion received on December 30, 2013 (to be sworn by US counsel to the US Debtors and the EMEA Debtors) and the moving parties' and supporting facta of the Bonderholders, Committee and UK Pension Claimants received on January 2, 2014. A factum was delivered by EMEA Debtors' on January 3, 2014 (after the agreed upon deadline with little or no opportunity to review).

The latter two orders also approved and amended a Deposition Protocol (the "**Deposition Protocol**"), all of which together and with certain related Orders, agreements and relevant applicable law and procedural rules, govern the conduct of the Representative Party Discovery for the Allocation Dispute.

Monitor Report, para. 14

### Both Representative Party Discovery and Fact Depositions Have Always Been Contemplated

7.   The Litigation Timetable and Discovery Plan which form the scheduling orders of this Court and the US Court have always provided for either US Federal Rules of Civil Procedure 30(b)(6) depositions or "Ontario style" Representative Party Discovery in addition to fact witness depositions.   This provision was the result of extensive negotiations and agreement among the parties regarding the need for discoveries.

Monitor Report, paras. 15 and 16

8.   The Litigation Timetable and Discovery Plan contemplate that Representative Party Discovery will follow the completion of fact witness depositions (but will be completed prior to the exchange of expert reports and prior to the exchange of trial affidavits).

Monitor Report, para. 44

9.   This allows for the Representative Party Discovery to be informed (not replaced) by the fact witness depositions.  The Deposition Protocol elaborated on each of the various steps in the Representative Party Discovery including as follows:

   a)   *Topics:* the Deposition Protocol, *inter alia,*

      i.   set out a new timeframe for the service of limited topics (not believed to have been addressed adequately through first hand testimony of fact witness) for examination

        during Representative Party Discovery, about which the witness is expected to inform him/herself ahead of time);

    ii.  provided for an objection process to topics include a dispute resolution process;

    iii.  specified that Discovery Participants "shall not be limited in their examination of the Representative Witness to the noticed subjects" but that there was no obligation on the part of the producing party to prepare for examination on any subjects not noticed;

    iv.  provides for Rule 31 undertakings to be given and allows time for inquiries to be made so they are answered on topics not already canvassed on the fact depositions;

  b)  *Identification of Representative(s):* the Deposition Protocol specified which Core Parties would be required to produce a representative and the time frame in which representatives would have to be identified;

  c)  *Scheduling of Examinations:* the Deposition Protocol provided for the scheduling of examinations through the Scheduling Committee;

  d)  *Examinations:*

    i.  established the framework for the scheduling and conduct of examinations in connection with Representative Party Discovery;

    ii.  established the lengths of examination for the U.S. Debtors, the Canadian Debtors, the UKPC and NNUK representatives; and

    iii.  provided the time period during which examinations in connection with Representative Party Discovery would occur.

        Monitor Report, para. 22

10.    At the time the Courts approved the Deposition Protocol in August 2013, more than 110 fact witnesses had been noticed for depositions.

        Monitor Report, para. 19

11.    The U.S. Debtors were the primary proponents of a further order in September 2013 dealing with the need to provide for a means of ensuring Representative Party Discovery of each EMEA Debtor. This order was sought with full knowledge of the depositions that had been noticed.

        Monitor Report, paras. 19, 23 and 24.

12.     When the Litigation Timetable, Discovery Plan and Deposition Protocol were further amended in November 2013 more than 70 of those depositions had been conducted and the balance were scheduled to take place by mid-December, 2013.   Each time the Deposition Protocol, Limitation Timetable, and/or Discovery Plan was amended, the expectation of Representative Party Discovery was preserved and affirmed.

Monitor Report, paras. 21 and 26

13.     Indeed, on November 11, 2013, motions were jointly filed by virtually all of the parties (except the Bondholders) to amend the Deposition Protocol, Discovery Plan and Litigation Timetable to postpone the trial date that were premised in large part on the need for additional time to prepare for and conduct Representative Party Discovery (the **"November motions"**).   The November motions were approved by the Courts for the very purpose of allowing an appropriate amount of time to prepare for Representative Party Discovery following the extended date for the completion of fact witness depositions.   The order contemplated eight days of Representative Party Discovery to be concluded by January 17, 2014 (the **"November 19 Order"**).

Monitor Report, paras. 26 and 27

14.     In the supporting affidavits of Mr. Rosenthal and Ms. Tabatabai certain statements are made about the limited purpose of these discoveries as "gap fillers" that do not account for the express provisions of the Discovery Plan and Deposition Protocol or previous positions taken in these proceedings, noted above.

Affidavit of Mr. Rosenthal (unsworn), paras. 14 and 35

15.   At no time prior to or when the November motions were heard, or when the November 19 Order issued, was any suggestion ever raised by any of the parties that the Representative Party Discovery would be unduly burdensome or disproportionate, or that it should be eliminated as a cost savings measure.

> Monitor Report, paras. 26, 27, 33 and 35

### *There is an Acknowledged Distinction Between Fact Depositions and Representative Party Discovery*

16.   During the fact witness depositions, on at least two occasions after the November 19 Order (during both Mr. Ray's and Mr. McDonald's depositions), counsel for the U.S. Debtors pointed out that the fact witnesses were not appearing as party representatives, reinforcing the distinction in purpose and effect.

> Monitor Report, para. 33

17.   This distinction is also exemplified by the Bondholders' position that they would not produce any of their representatives for fact witnesses depositions because any relevant information they had could be canvassed on the Representative Party Discovery.

> Affidavit of Barbara Walancik (sworn January 3, 2014), paras. 14 - 18

18.   Further examples of the need for Representative Party Discovery as distinct from fact depositions can be found in the Bloom and Hill depositions, and their apparent lack of any direct substantive knowledge about the claims or the claims process.

> Monitor Report, para. 42

19.    Section K of the Amended Deposition Protocol provides for the use of deposition testimony as trial evidence, but does not provide that a party is bound by the evidence of any fact witness.  Consistent with this, section 6(c) of the Discovery Plan allows for the usual permitted uses at the Trial of Representative Party Discovery.

        Monitor Report, para. 22

### *The Contemplated Representative Party Discovery is NOT Unduly Burdensome*

20.    Under the original Litigation Timetable and Discovery Plan, topics for Representative Party Discovery were exchanged on July 26, 2013.  Collectively, several hundred topics (many of which were broad in nature) were served on many of the Core Parties.

        Monitor Report, para. 30

21.    As part of the Deposition Protocol, the parties agreed that they would supercede the prior notices and Representative Party Discovery topics with new ones to be delivered after the conclusion of the fact witness depositions.  The exchange of such topics was completed on December 13, 2013 (other than with respect to NNSA which was completed by agreement on December 17, 2013).

        Monitor Report, paras. 30 and 31

22.    In anticipation of this exchange of topics, counsel for the Monitor and the Canadian Debtors wrote to the other Core Parties on December 10, 2013 setting forth the objectives that the Monitor and Canadian Debtors seek to achieve through the Representative Party Discovery and to avoid any surprises at trial:

(a)    to determine if there is further evidence or facts raised by the pleadings and not yet adequately covered by first hand deposition testimony, which could be the subject of a limited number of advance preparation topics (30 topics was proposed as a significant scaling back from the previous hundreds of topics noticed);

(b)    to determine if a party accepts/adopts and/or is prepared to be bound by the evidence of fact deposition witnesses or, if not, what other evidence or facts will be relied on at trial; and

(c)    to examine on positions/assertions in pleadings.

Monitor Report, para. 34

23.    It was not until December 11, 2013 in response to this email that the U.S. Debtors formally stated that they were considering whether the Representative Party Discovery was necessary.  It was the U.S. Debtors who suggested that the advance preparation be limited to fewer than five targeted topics if they went ahead.

Monitor Report, para. 35

24.    The Monitor and Canadian Debtors proceeded in a manner consistent with the understanding and objectives set forth in their counsel's December 10 email, to serve a limited number of 30 targeted topics covering both allocation and claims, which were repeated for each party adverse to them (hence the multiple pages of repeated topics).

Monitor Report, para. 36

25.    After continuing discussions, the Monitor and Canadian Debtors offered to limit the number of "advance preparation" topics to five of the original thirty topics relating to

allocation and five of the original thirty topics on claims (with the disclosures relating to the balance of the topics being deferred to the expert reports and trial briefing process).[5]

> Monitor Report, paras. 36-38

26.   The questioning on these (or any other) topics would under any scenario have to be completed in the time allowed for under the existing procedural orders, so it cannot properly be characterized as unlimited.[6]

27.   Unbeknownst to the Monitor and the Canadian Debtors until December 17, 2013, when the U.S. Debtors filed an approval motion with the US Court, while these discussions about the Representative Party Discovery were ongoing, a settlement was being negotiated between the U.S. Debtors and the EMEA Debtors and the UKPC resolving all of the claims by the EMEA Debtors and the UKPC against the U.S. Debtors, thereby eliminating the need for those parties to examine each other for discovery about claims.[7]

> Monitor Report, para. 37

### *Eliminating Discovery is Not a Legitimate Means of Conserving Resources*

28.   The Canadian Debtors and Monitor have been continually mindful of the overall need to ensure efficiency and avoid duplication of costs as it relates to this trial process generally.

---

[5]  Contrary to what is suggested in the Rosenthal and Tabatabai Affidavits, these were not five new topics, these were a reduced and prioritized list of the original thirty topics noticed.

[6]  The Monitor's offer to put its specific questions in writing was in response to a concern raised by the US Debtors about the burden to prepare their designated representative, who they selected as someone other than their representatives who were deposed.

[7]  They also agreed to try to come to an common position on allocation which would eliminate the need for them to examine each other for discovery on allocation.

Their efforts to curtail the fact witness depositions were resisted. Now that the EMEA and UKPC Claims against the U.S. Debtors have settled, rather than working to streamline the Representative Party Discovery, it suits the interests of the U.S. Debtors and their supporters to avoid it entirely.

> Monitor Report, paras. 46, 40 and 52

29.   All proposals to further streamline the Representative Party Discovery have been rejected by the U.S. Debtors and their supporters; no meaningful alternatives have been offered.

> Monitor Report, para. 40

30.   Instead, they now argue for cost efficiencies through dispensing with a procedural safeguard that they no longer need. The Courts are being asked to deprive the Monitor and Canadian Debtors and other members of the Canadian Discovery Group of this procedural step that they have reasonably expected would be available to them in advance of finalizing their trial evidence.


## III.   LAW AND ARGUMENT

### (a)   The Purposes of "Ontario Style" Discovery Have Not Been Satisfied

31.   A party is entitled under Rule 31.03 to examine for discovery an officer, director or employee on behalf of any corporate party adverse in interest. All Core Parties (who were required to do so under the Discovery Plan and Deposition Protocol) have provisionally designated a representative to be examined for discovery on their behalf. The only exception is the Committee who has refused to designate a representative even under objection.

- 12 -

Rules 31.03, Ontario *Rules of Civil Procedure*

32.    Rule 31.06(1) of the *Rules* provides that a person being examined for discovery shall answer any proper question relevant to any matter in issue in the litigation, the scope of which is determined by the pleadings.  Rule 31.07 contemplates undertakings may be given to obtain information from others if not known to the representative.  Rule 31.08 allows questions to be answered by counsel.  Rule 31.09 requires discovery answers to be updated.

Rule 31.06(1), Ontario *Rules of Civil Procedure*

33.    Rule 31.11 allows a party to read into evidence at trial in its case against an adverse party the discovery evidence given on their behalf, but does not allow the adverse party to use that evidence at trial.

Rule 31.11, Ontario *Rules of Civil Procedure*

34.    Examinations for discovery serve multiple purposes in civil litigation.  They:

(a)    Allow the examining party to know the case to be met;
(b)    Procure admissions to prove certain elements of the case/defence;
(c)    Procure admissions that may destroy or undermine part of the opponent's case;
(d)    Serve to narrow or eliminate issues for trial; and
(e)    To avoid surprise at trial.

*Hunter v. Ontario Society for the Prevention of Cruelty to Animals,* 2013 ONSC 6638 at para. 9; *Besner v. Ontario,* 2011 ONSC 7335 at 20

35.    Disclosure of the evidence and the legal theory of the opposing party is another recognized purpose of discovery.

*Anderson et al v. St. Jude Medical et al,* 2007 CanLII 64140 (ON SC), para. 17

- 13 -

36.    The parties have already agreed to narrow the Representative Party Discovery from Federal Rule 30(b)(6) the US style hundreds of topics to "Ontario style" discoveries that build on the fact witness depositions, with a much fewer number of advance preparation topics.  That the topics are repeated for multiple parties is commensurate with the fact that each party is making its own claims and/or asserting its own positions.

37.    The topics noticed by the Canadian Deposition Group to the parties adverse in interest to its members are all designed to serve some or all of these recognized objectives.  While "gap filling" is one means of avoiding surprise at trial, "gap filling" is not the sole objective of discovery, nor is it correct to say that for all topics it has already been satisfied as the U.S. Debtors and their supporters would have the courts believe.

38.    The designated topics generally are ones not believed to have been the subject of any or adequate testimony.  If there are no (or no further) facts or documents (i.e. no gaps) that is something that the party being examined knows best in terms of the assertions that it intends to prove at trial.  Even to have on the record a statement that there are no gaps in the evidentiary record thus far is an "admission" that the examining party is entitled to have now to prepare its case for trial.

39.    Resources could be conserved if admissions could be obtained that there is no evidence to support, for example, the assertion by each of the EMEA Claimant that it subsisted in a ten year state of insolvency prior to the CCAA filing, or if admissions could be obtained that there is no ongoing tax investigation to support their contingent claim for future taxes.

See Appendix 1 for further examples

40.   The discovery objectives of securing admissions or obtaining disclosure of the legal theory cannot be served by fact witness depositions (which in this case are to be equated with trial evidence).   Under the Ontario *Rules*, a representative examined for discovery on behalf of the corporation is not considered to be testifying as a fact witness rather it has an "unique status" that is "legally different" from fact witnesses. The examples previously noted from the Ray, Bloom and Hill depositions highlight this distinction.

> At the trial, a witness subpoenaed to give evidence [in this case also on a deposition], who happens to be a servant, officer or even president and controlling shareholder of a corporate accused, is not called upon to speak "for" the corporation. He is not its "mouthpiece". He is required to testify as to all relevant facts within his knowledge, whether those facts were acquired by him during his employment or term of office or were acquired in circumstances completely unrelated to the corporation. He is in no different position from a witness who had been in complete charge of the corporation's affairs for many years, but has retired before the charge against it was laid. Both must tell what they know, so far as it is relevant and admissible...

> *R v Judge of the General Sessions of the Peace for the County of York Ex Parte Corning Glass Works of Canada Ltd* (1971), at para. 11 3 CCC (2d) 204 (OCA) [Aff'd 1971 SCR viii][8]

> Rule 31.03, Ontario *Rules of Civil Procedure*

41.   The U.S. Debtors and their supporters appear to take the position that because they are no longer concerned about the potential for surprise at trial because of the extensive depositions, discovery is no longer necessary.   Aside from the fact that their lack of concern should be properly viewed in light of their recent settlement, this argument is in any event misguided in that the multitude of fact depositions can create, rather than solve, potential uncertainties at trial because of the number of witnesses and overlapping testimony.   It also ignores the multiple functions that discovery serves in the pre-trial

---

[8]  This is consistent with the position under US law as noted in the December 22 letter filed by the Monitor and Canadian Debtors with the Delaware Court; see Exhibit P of the Rosenthal Affidavit.

stage of a proceeding. Neither the Rosenthal nor Tabatabai affidavits address the other recognized objectives of Representative Party Discovery. Their focus on the extensive fact witness depositions as a substitute for discovery overlooks the clear difference in purpose and effect of discovery and trial evidence. As American lawyers they are in no position to comment on whether the objectives of the "Ontario style" discovery that they endorsed have been met.

> Notice of Motion dated December 30, 2013, page 2 and Rosenthal Affidavit, para. 36

42.     What is being proposed in this case is that there be *no* discovery. No one is proposing that the deposition evidence be treated as discovery. That is a very different scenario from the one in the *Livent* case upon which so much reliance is placed by the US and EMEA Debtors.

**(b)     The U.S. Debtors' Position is Based on a "Phantom" Change in the Nature and Scope of the Fact Depositions**

43.     In an effort to obfuscate the undeniable fact that Representative Party Discovery were always contemplated, the U.S. Debtors now try to reconcile this with the position that Representative Party Discovery should be dispensed with because they say:

> (a)     Representative Party Discovery was contemplated *prior to* the comprehensive fact witness depositions and at a time when the parties did not have a basis to confirm whether they would ultimately be able to conduct the depositions of all the witnesses they sought to depose; and
>
> (b)     there has been "unexpectedly" broad opportunity and breadth of fact depositions, so there is no need for any additional "clean-up" discovery.
>
> Rosenthal Affidavit, paras. 15 and 16

44.     The Canadian Debtors and Monitor respectfully submit that neither of these arguments
are consistent with reality:

(a)     Representative Party Discovery has continued to be preserved throughout the
conduct of the fact witness depositions, and multiple amendments to the
Discovery Plan and Deposition Protocol as well as positions taken by the parties
have affirmatively acknowledged their continued role, most recently in
connection with the November 19 Order and at the Ray and McDonald
depositions in December; and

(b)     The parties were *fully* aware that the number of fact witness depositions would
likely exceed 100 depositions (as early as the August amendments). This was not
unexpected and until now was not raised as a potential bar to Representative Party
Discovery.

45.     The position of the Monitor and Canadian Debtors when the Courts were asked to twice
adjourn the trial date to accommodate the fact witness depositions was always informed
by the expectation of Representative Party Discovery at the end. If the Representative
Party Discovery was to be expendable as a cost savings measure or on grounds of
proportionality, this should have been considered and addressed before the fact
depositions were undertaken. It should not now be entertained after the fact when the
potential solution is entirely one-sided because nothing can now be done to contain or
conduct any differently those already completed fact depositions.

**(c)     The Canadian Debtors' and Monitor's Proposal on Representative Party Topics
Constitutes Proper Discovery**

46.     The Rosenthal Affidavit makes certain arguments dressed up as evidence about the
propriety of the noticed discovery topics. To that extent, the impugned paragraphs of the
Rosenthal Affidavit (37 to 44) should be disregarded.

*Stevens and O'Connell et al*, 2013 ONSC 2236 (Master) at paras. 3-7;

*Ensign Group Inc. v. Saine*, 2007 CanLii 13931 (Ont SCJ) at para. 23

47.    The moving parties purport to object to the scope of the questions as being overbroad. Their emphasis on 92 pages (and hundreds) of topics is misleading in that those pages are repeating the same topics for the different parties, including 24 different EMEA entities who have filed claims against Canadian estate and have asserted allocation positions. For many of these there has been little or no opportunity for depositions of fact witnesses with direct knowledge of any, or parts, of the entire ten-year period in issue.

48.    By way of example, the five topics on allocation and five topics on claims that have most recently been proposed for advance preparation are all proper topics that a party is entitled to ask on discovery in that they are properly tied to the pleadings or court filings in this or related proceedings. The chart at Appendix "1" hereto sets out the five topics on allocation and each of the five topics on claims with reference to corresponding allegations in court filings.

49.    Contrary to the assertions raised by the U.S. Debtors and their supporters, the Canadian Debtors and Monitor are not seeking "the U.S. Debtors' privileged and work product" but rather disclosure of factual evidence and documents relating to the case that it is entitled to seek under the Ontario discovery *Rules*. There is nothing improper or burdensome about this type of pre-trial disclosure.

        Rosenthal Affidavit, para. 42

50.    The Canadian Debtors and Monitor believe that they do not have adequate first hand testimony on the topics noticed from any witness currently or formerly associated with the adverse parties. If the moving parties believe otherwise they could (and notably have not) pointed to examples of which witnesses they claim have extensively testified on

these topics whose evidence they are prepared to be bound by. They are the ones seeking to dispense with the Representative Party Discovery and they bear the onus of showing why it is not needed.

51.    The proposed UKPC Claims topics are discrete and relate primarily to the claimed pension deficit, and similarly have not been addressed.

52.    The Committee's position that they should not have to answer questions about a period of time before their existence begs the issue of why they should not have to answer questions about their own allegations and pleadings. If they make allegations about things that occurred historically, they should have to explain them. The Bondholders would seemingly like to shield as well behind others and not explain the basis upon which they have affirmatively joined in or asserted positions adverse to those of the Monitor and Canadian Debtors. If these parties want "core party" status and they want the privilege of making submissions and participating at the trial then they cannot avoid the discovery obligations that accompany those privileges.

**(d)    This Motion is Strategic**

53.    The Rosenthal and Tabatabai affidavits make no reference to the settlement of the EMEA and UK Claims against the U.S. Debtors. At paragraph 32 of the Rosenthal Affidavit, Mr. Rosenthal alleges that the Canadian Debtors and Monitor asserted that "…**nothing has changed** since November 14, 2013…" when, in fact, that is not what was stated at all. The Canadian Debtors and Monitor asserted that "**all that has changed** since the November 14, 2013 joint motion is the the **U.S. Debtors have reached a settlement**".

> The U.S. Debtors have not provided any meaningful explanation for their request to alter the status quo. **All that has changed since the November 14, 2013 joint motion is that the U.S. Debtors have reached a settlement** with the EMEA Debtors and the UK Pension Claimants with respect to the claims those parties have asserted against the US estates. Without making any reference to that fundamental chance in circumstances, the U.S. Debtors suggest that the last 35 fact witness depositions were somehow sufficient to alter their position no their own need for representative party discovery, but many of those final depositions involved third parties and the majority of the approximately 105 depositions that have taken place to date have not involved parties whose testimony is binding on the parties…[emphasis added]

> Exhibit P of the Rosenthal Affidavit, Canadian Debtors and Monitor letter to the US Court dated December 22, 2013

54.    The only real change that has taken place since the November 19 Order is the settlement of EMEA and UK Pension Claims against the U.S. Debtors and their agreement to try to come to a common allocation position.  This development, not mentioned by the U.S. Debtors or their supporters, underscores the need for Representative Party Discovery. Without it (and under the current open-ended provisions of their Settlement Agreement), allocation positions could be abandoned at any time.  If there is a concern about conservation of resources, this is a perfect example of how resources could be conserved, to avoid time and expense devoted to developing trial evidence to deal with an allocation theory only to find it is later abandoned.

55.    Eliminating the Representative Party Discovery could allow these parties maximum flexibility to develop new allocation theories (something expressly contemplated by the proposed Settlement Agreement) without the opportunity for the Canadian Debtors and the Monitor to obtain essential discovery to defend these positions.

56.    Granting the request of the U.S. Debtors would deprive the Canadian Debtors, the Monitor and, for that matter, the Courts, the benefit of essential discovery required to analyze and resolve the cross-border disputes over claims and allocation, which continue

to subsist irrespective of any proposed settlement of the EMEA Debtors' and UK Pension claims against the U.S. Debtors.

## IV.    CONCLUSION

57.    Based on all of the foregoing, the Canadian Debtors and Monitor respectfully request that this Honourable Court deny the U.S. Debtors' request to dispense with Representative Party Discovery and that an order be made that will enable the Canadian Deposition Group to conduct their desired Representative Party Discovery of the parties adverse to them so that the answers are available sufficiently in advance of the February 28, 2014 due date for expert rebuttal reports (so that they can be addressed therein or in the trial evidence that follows, if and as appropriate),[9] even if the other parties have determined that they do not need to conduct any discovery.[10]

**ALL OF WHICH IS RESPECTFULLY SUBMITTED.**

January 3, 2014

---

[9]  An adjustment to the existing deadline for completion is rendered necessary by the timing of this motion.

[10]  The Monitor and Canadian Debtors have provided reformulated topics that they would be prepared to answer questions about on discovery (taking into account specific objections) and have offered to do so in writing on a reciprocal basis if the other parties decide they do want discovery of the Canadian Debtors.

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Jessica Kimmel LSUC#: 32312W
Peter Ruby  LSUC#: 38439P
Joseph Pasquariello  LSUC#: 37389C

Tel:     416.979.2211
Fax:     416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc. and Canadian Debtors

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
**Jennifer Stam**  LSUC#: 46735J

Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors



# Appendix "1"

## PART I

| Item | Allocation Topics for US Debtors' Representative Witness[1] | Reference in Court Filings |
|------|-----------------------------------------------------------|-----------------------------|
| 1 | The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[43]:  In a recital to the MRDA, it was provided that, to the extent other members or the Nortel Group performed R&D Activity which led to the creation of IP, they (referred to in the MRDA as "Licenced Participants") had "held and enjoyed equitable and beneficial ownership of certain exclusive rights" in the IP pursuant to a 1992 Cost Sharing Agreement.<br><br>**MOTION TO APPROVE ALLOCATION POSITION OF US DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**<br><br>[Page 12]:  Similarly, the MRDA specifically states on page 2 that the enhanced exclusive licenses transfer "equitable and beneficial ownership" of Nortel's IP to the Licensed MRDA Participants with respect to each Licensed MRDA Participant's exclusive geographical area (for NNI, the United States and Puerto Rico).<br><br>**RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS**<br><br>[Page 3]:  As a result, regardless of NNL's bare legal title, NNI retained economic ownership in perpetuity of the Nortel IP in the United States by virtue of its exclusive royalty-free license and enforcement rights...  This separation of bare legal title from economic ownership of the Nortel IP in the Licensed MRDA Participants' exclusive territories was deliberate and was the bedrock principle under which the Nortel group of companies operated for many years. |
| 4 | The factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licences, held by parties other than NNL. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[52]:  The bargain that was struck thus limited the licence rights to specified uses for and by specific members of the Nortel Group and they were non-assignable and personal lo those Nortel Group participants that were party to the MRDA.<br><br>**MOTION TO APPROVE ALLOCATION POSITION OF US DEBTORS AND OFFICIAL COMMITTEE OF** |

---

[1] The proposed Allocation topics for the US Debtors' Representative Witness are the same as the proposed Allocation topics for the Committee Representative Witness.

|   |   | UNSECURED CREDITORS<br><br>[Pages 10-13]: The pleadings under the heading "Intellectual Property and the "Enhanced" Exclusive Licenses":<br><br>**RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS**<br><br>[Page 12]: This exclusive license is extremely broad and encompasses, among other things, the right to sublicense Nortel IP, the right to make, offer to sell and sell Products using NN Technology, and all rights to the patents for all Nortel IP within each Licensed MRDA Participant's exclusive territory.<br><br>**THIS CORRESPONDS WITH TOPIC (2) ON THE LIST SERVED BY THE US DEBTORS' DATED DECEMBER 13, 2013, EXHIBIT A TO THE ROSENTHAL AFFIDAVIT**<br><br>Topics for Canadian Debtors Representative<br><br>2. Third-party licensing by any Nortel entity of tis intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments. |
| 9 | The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[34]: Through the Nortel Group's operating lifespan, an enormous amount of IP was developed arising from, among other things. technological discoveries and inventions. That IP was comprised of thousands of patents and patent applications as well as industrial designs, copyrights and applications, derivative works. technical know-how, drawings, reports, practices, specifications, designs, software and other documents and information. Certain of the IP was applied to the design, development and deployment of innovative communications products, systems and solutions which were made or used by members of the Nortel Group in their businesses.<br><br>[36]: R&D within the Nortel Group was undertaken by a combination of in-house developers and external alliances partnerships . and joint ventures. Functionally headquartered in Ottawa, the global R&D team carried out internal R&D in ten key centres in Canada, the U.S., the U.K., Ireland and France, as well as in other locales and through joint ventures in China and Turkey.<br><br>**MOTION TO APPROVE ALLOCATION POSITION OF US DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS**<br><br>[Page 3]: NNI conducted research and development ("R&D") in six separate facilities in the United States, located in California, Texas, North Carolina, Massachusetts, Tennessee and New York- |

- 3 -

| | | |
|---|---|---|
| | | paying $7 .2 billion for directly funded research and development from 2001 to 2009.<br><br>**RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS**<br><br>[Page 6]: All of the Selling Debtors agree that allocation should be determined based upon the assets that each Selling Debtor sold or relinquished in the Business Sales and sale of the Residual Patent Portfolio. |
| 10 | The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[45]: The MRDA expressly provides, among other things:<br><br>(i) IP, referred to in the MRDA as "NN Technology" was defined as follows:<br><br>"NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof: derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or intonation produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.<br><br>(ii) In respect of ownership of IP:<br><br>Except as otherwise specifically agreed, <u>legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement, shall be vested in NNL</u>. In consideration therefor. NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5. [emphasis added]<br><br>(iii) In respect of the license rights granted to specified subsidiaries that engaged in R&D (therein referred to as Licensed Participants), lo use IP in connection with the operation of their businesses:<br><br>To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:<br><br>(i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights <u>to make. have made, use. lease. license, offer to sell and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant</u>, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License");<br>… |

- 4 -

| | | "Products" shall mean all products, software and services |
|---|---|---|
| | | designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time <u>by, or for, any of the Participants</u>, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing .... " [emphasis added] |
| | | **RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS** |
| | | [Page 12]: This exclusive license is extremely broad and encompasses, among other things, the right to sublicense Nortel IP, the right to make, offer to sell and sell Products using NN Technology, and all rights to the patents for all Nortel IP within each Licensed MRDA Participant's exclusive territory. Based on a plain reading of Article S(a)(i), these licenses were broad and applied to all patents, which a fortiori included the residual patents sold in the Rockstar Sale. The licenses were not limited solely to NN Technology as used in Nortel Products. |
| 13 | The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property. | **RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS** |
| | | [Page 13]: Thus, even if the exclusive licenses were limited in the manner suggested by the Canadian Interests (which is not the case based on a plain reading of the MRDA), after the Business Sales nothing would have prevented the Licensed MRDA Participants from again hiring a contract manufacturer (such as Flextronics) to manufacture Nortel Products, nor would anything have prevented a Licensed MRDA Participant from using NN Technology in a product. It also bears noting that "Nortel Products" in the MRDA is defined to include products "designed, developed, manufactured or marketed" or even simply "proposed to be designed, developed, manufactured or marketed, at any time, by, or for, any" of the MRDA parties, including the Licensed MRDA Participants. Id. Art. 1(1). |

- 5 -

**PART II**

| Item | Allocation Topics for EMEA Representative Witnesses | Reference in Court Filings[2][3] |
|------|---------------------------------------------------|----------------------------------|
| 1 | The facts and documents, other than the MRDA, demonstrating NNUK's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNUK allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[43]: In a recital to the MRDA, it was provided that, to the extent other members or the Nortel Group performed R&D Activity which led to the creation of IP, they (referred to in the MRDA as "Licenced Participants") had "held and enjoyed equitable and beneficial ownership of certain exclusive rights" in the IP pursuant to a 1992 Cost Sharing Agreement.<br><br>**NNUK AMENDED PROOF OF CLAIM**<br><br>[202]: As set out in paragraphs 142 to 143 above, the express terms of the MRDA create beneficial interests in favour of NNUK, NNSA and NN Ireland in the IP created with the funding contributions to R&D, and the proceeds of sale of that IP.<br><br>[204]: Further or alternatively, the parties to the MRDA shared a common intention that they should each have a beneficial interest in the IP created with their respective funding contributions<br><br>**ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**<br><br>[Page 22]: IP was beneficially owned by the five RPE entities and, with one exception, the RPEs are entitled to an allocation of the Sale Proceeds attributable to IP in accordance with their respective beneficial ownership shares.<br><br>**RESPONDING ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**<br><br>[27]: The RPEs own the beneficial and equitable title in the IP amongst themselves in accordance with contribution to the creation of IP. |
| 3 | The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[34]: Through the Nortel Group's operating lifespan, an enormous amount of IP was developed arising from, among other things, technological discoveries and inventions. That IP was comprised of |

---

[2] NNUK and NNSA Proofs of Claim references are provided by way of example.<br>[3] Please refer to Part I for corresponding references with respect to the US Debtors' pleading references on allocation, where applicable.

|   |   |   |
|---|---|---|
|   |   | thousands of patents and patent applications as well as industrial designs, copyrights and applications, derivative works. technical know-how, drawings, reports, practices, specifications, designs, software and other documents and information. Certain of the IP was applied to the design, development and deployment of innovative communications products, systems and solutions which were made or used by members of the Nortel Group in their businesses.

[36]: R&D within the Nortel Group was undertaken by a combination of in-house developers and external alliances partnerships . and joint ventures. Functionally headquartered in Ottawa, the global R&D team carried out internal R&D in ten key centres in Canada, the U.S., the U.K., Ireland and France, as well as in other locales and through joint ventures in China and Turkey.

**ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**

[29]: The manner in which the IP was developed in the group through R&D was achieved by the contribution of all RPEs. The R&D teams were generally employees of the RPEs and worked across national boundaries. |
| 4 | The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**

[45]: The MRDA expressly provides, among other things:

(i) IP, referred to in the MRDA as "NN Technology" was defined as follows:

"NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof: derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or intonation produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(ii) In respect of ownership of IP:

Except as otherwise specifically agreed, <u>legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement, shall be vested in NNL</u>. In consideration therefor. NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5. [emphasis added]

(iii) In respect of the license rights granted to specified subsidiaries that engaged in R&D (therein referred to as Licensed Participants), lo use IP in connection with the operation of their businesses: |

|   |   | To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby: |
|---|---|---|
|   |   | (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights <u>to make. have made, use. lease. license, offer to sell and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant,</u> and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); ... "Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time <u>by, or for, any of the Participants,</u> and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing .... " [emphasis added]<br><br>**RESPONSE OF U.S. DEBTORS AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE CORE PARTIES' ALLOCATION POSITIONS**<br><br>[Page 12]: This exclusive license is extremely broad and encompasses, among other things, the right to sublicense Nortel IP, the right to make, offer to sell and sell Products using NN Technology, and all rights to the patents for all Nortel IP within each Licensed MRDA Participant's exclusive territory. Based on a plain reading of Article S(a)(i), these licenses were broad and applied to all patents, which a fortiori included the residual patents sold in the Rockstar Sale. The licenses were not limited solely to NN Technology as used in Nortel Products.<br><br>**RESPONDING ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**<br><br>[31]: Second, to the extent relevant, the licenses do include the residual patents. |
| 6 | The value attributable to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of | **NNUK AMENDED PROOF OF CLAIM**<br><br>[247]: Each entity was entitled to a portion of the proceeds that was actually referable to the assets that entity was selling.<br><br>[248]: To the extent that NNUK did not receive from any business sale, a fair and appropriate allocation of the proceeds for the assets it has sold it has the following claims... |

| | | |
|---|---|---|
| | the estates with respect thereto. | **NNSA AMENDED PROOF OF CLAIM**<br><br>[167]: Each entity was entitled to a portion of the proceeds that was actually referable to the assets that entity was selling.<br><br>[168]: To the extent that NNSA did not receive from any business sale, a fair and appropriate allocation of the proceeds for the assets it has sold it has the following claims...<br><br>**ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**<br><br>[45]: Given the different asset classes involved in the Business Sales and the differing bases (as described herein) on which such asset classes were owned by the Selling Debtors, the Business Sales require an asset based allocation methodology — in which (a) the assets that comprise the Business Sales are ascertained (being: (i) fixed assets; (ii) inventory; (iii) Customer Assets (as defined below); and (iv) IP); (b) those assets are valued and reconciled to the purchase price achieved in each Business Sale; (c) the entities which own (or are otherwise entitled to) these assets are identified; and (d) sale proceeds in respect of these assets are allocated to the entities which own (or are otherwise entitled to) the assets. |
| 7 | The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNSA contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009. | **ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS**<br><br>[41]: The RPSM also recognized that residual profits and losses of the businesses were attributable to the use of IP which had been developed through the overall R&D activity; thus it allocated those residual profits and losses to the relevant parties to the MRDA according to their relative contributions to such R&D.<br><br>**NNUK AMENDED PROOF OF CLAIM**<br><br>[209]: NNUK's beneficial interest in the IP is proportionate to its direct and indirect contributions to the creation of such IP....<br><br>**NNSA AMENDED PROOF OF CLAIM**<br><br>[112]: NNSA's beneficial interest in the IP (and its proceeds) is proportionate to its direct and indirect contributions to the creation of such IP...<br><br>[101.1]: Between 14 January 2007 and 14 January 2009, NNSA made payments to NNL by way of transfer pricing adjustments or "true up" payments, and/or gave credit to NNL for such amounts....<br><br>[102.5]: US$356,400,000 in respect of amounts paid to NNL by way of transfer pricing adjustments or "true up" payments which should not have been paid.<br><br>**ALLOCATION POSITION OF THE JOINT ADMINISTRATORS REGARDING THE ENTITLEMENT** |

- 9 -

| | | **OF THE EMEA DEBTORS TO PROCEEDS OF THE SALES OF THE BUSINESS AND RESIDUAL PATENT ASSETS**<br><br>[Page 22]: Each RPE's beneficial ownership share is determined by measuring that RPE's contribution (in the broad sense) to the development of IP.<br><br>[Para 26]: The adjustments necessary to keep the Transfer Pricing System true to the Arm's Length Principle did not happen within the Nortel Group. |

- 10 -

**PART III**

| Item | Claims Topics for EMEA Representative Witnesses | Reference in Court Filings[4] |
|------|-----------------------------------------------|-------------------------------|
| 8 | The factual and documentary basis for any challenge NNUK intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNUK for the years 2001 through 2005 inclusive corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants. | **JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**<br><br>[317]: NNL is entitled to a Compensating Adjustment from each of NNUK, NN France and NN Ireland (corresponding to the amounts paid to NNI under the MRDA after the Filing Date) in respect of prior transfer pricing payments they received as follows... |
| 9 | The current status of any ongoing (or outcome of any historical) audit by Inland Revenue (HMRC) of NNUK's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns -- or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof. | **NNUK AMENDED PROOF OF CLAIM**<br><br>K.   Future and Contingent Claims<br><br>[250]:In the event that a claim is made or intimated against NNUK after the bar date (whether on the basis of matters currently known or unknown, and whensoever occurring), NNUK will assert and hereby asserts all rights of contribution and indemnity against NNL.  NNUK's position is that such claims are not subject to this bar date but for completeness and the avoidance of doubt hereby includes all rights to contribution or indemnity in respect of all claims, liabilities, costs and expenses from any person or persons, whensoever occurring and whether arising ebfore or after the bar date, to the fullest extent possible and without limitation.  NNUK reserves the right to further identify, particularize and modify all its entitles in this respect in due course.<br><br>[250.2]: NNUK further claims in respect of any future, prospective or contingent claims against NNL that NNUK or any office-holder or future officer-holder may have.  NNUK reserves the right to advance any prospective, contingent or future claims which may arise or become crystallised at any time hereafter.<br><br>[251]: Without in any way derogating from the above, NNUK makes the following contingent claims:<br><br>*Claims in respect of taxation and revenue*<br><br>*Tax*<br><br>[256]: To the extent that any tax authority makes a claim against NNUK in relation to a failure to pay the proper level of taxation in any years (whether because of an under recording of revenue or |

---

[4] NNUK Proof of Claim references are provided by way of example.

| | | |
|---|---|---|
| | | otherwise), then: |
| | | [256.1]: NNUK claims all penalties, interest and other loss payable by NNUK as a loss naturally flowing from the claims (or some of them) refered to in this Proof of Claim. |
| | | [256.2]: Further or alternatively: |
| | | [256.2.1]: NNL breached its fiduciary duties and its duty to skill and care in not ensuring that NNUK paid the appropriate level of taxation and/or declared the appropriate level of income for tax purposes; and or |
| | | [256.2.2]: NNL's conduct effected a result that unfairly disregarded the interests of NNUK and its creditors contrary to section 241 of the Canada Business Corporations Act. |
| | | [256.3]: Those breaches of duty and/or that oppressive conducted resulted in loss and damage amounting at least to the amount of any such penalties, interest and other loss payable by NNUK. |
| 21 | The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties.  Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage.  Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the | **NNUK AMENDED PROOF OF CLAIM** <br><br> [38.4]: All major decisions about, concerning and/or by NNUK were in practice taken by NNL (including in conjunction with NNI), for example: <br><br> [38.4.1]: Intercompany lending decisions of NNUK, including whether to lend to other group entities and on what terms, were taken by NNL; <br><br> [38.4.2]: All decisions regarding the implementation, operation and subsequent amendment of the transfer pricing arrangements to which NNUK was subject were taken exclusively by NNL, with little or no consultation with the NNUK board of directors, as explained further in paragraph 177 below. <br><br> [38.4.3]: whilst pension scheme funding decisions were notionally the responsibility of the NNUK Pension Policy Committee (the "UK PFPC") all such decisions were in fact taken by NNL which controlled the funding of the NNUK Pension Plan <br><br> [38.4.4]: All decisions to upscale capacity of Nortel's subsidiaries and all subsequent decisions to reduce such capacity, thereby necessitating restructuring costs to be incurred, were taken by NNL... <br><br> [38.4.5]: All decisions in relation to the provision of vendor financing to Nortel's customers were taken by NNL, as explained further at paragraphs 155 and 156 below. <br><br> **NN POLAND PROOF OF CLAIM** <br><br> [55]: In connection NN Poland's further claims as set out in this section of the Proof of Claim, all decision making in relation to the entry into, operation of and subsequent amendment of the RPSM |

- 12 -

| | | facts and documents on which the EMEA Debtors are relying. | was in practice taken by NNL. NNL was acting at all times in its own best interest instead of those of NN Poland. NN Poland refers to the following:<br><br>[55.1]: The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officer of NNL<br><br>[55.5] NN Poland was not involved in the decision to enter into the Distribution Agreement or in the decision regarding what the terms of the MRDA would be. The terms of the MRDA were determined by NNL and NNL<br><br>[89.2.1]: NNL owed fiduciary duties to NN Poland as a *de facto* director in relation to NN Poland's decisions in relation to its revenue recording (alternatively as a shadow director owing fiduciary obligations in that regard). NNL also owed a duty of skill and care;<br><br>See also Directors & Officers Factum. |
|---|---|---|---|
| 23 | | The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts. | **ROLSTON STATEMENTS FILED**<br><br>Ms. Rolston's NNUK Witness Statement attached to the Declaration of Alan Bloom, filed in both the UK and Delaware Courts attesting to the solvency of EMEA entities as of the date of January 2009 filings and attesting to the UK as the centre of main interest (COMI) for the management supervision and decisions of each EMEA Claimant and factors connecting them to the UK (as opposed to Canada) (Exhibit 32155 to the Rolston Deposition)<br><br>Bloom deposition testimony indicating lack of any knowledge. |
| 25 | | The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements. | **NNUK AMENDED PROOF OF CLAIM**<br><br>[25]: Further, given the doubtful solvency (and/or risk of insolvency) of NNUK from 2000 onwards, in carrying out they fiduciary duties to NNUK, the directors were obligated at all times (and, from 1 October 2007, statutorily obliged pursuant to section 172(3) of the Companies Act 2006), to consider the best interests of the creditors of NNUK as paramount and to take those interests fully into account in exercising their powers and discretions.<br><br>See also paras 179 and 230, 241 for similar language. |

- 13 -

**PART IV**

| Item | Claims Topics for NNSA Representative Witnesses[5] | Reference in Court Filings |
|------|------|------|
| 8 | The factual and documentary basis for any challenge NNSA intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNSA for the years 2001 through 2005 inclusive corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants. | **JOINT RESPONSE OF THE MONITOR AND CANADIAN DEBTORS TO THE CLAIMS FILED ON BEHALF OF THE EMEA CLAIMANTS**<br><br>[317]: NNL is entitled to a Compensating Adjustment from each of NNUK, NN France and NN Ireland (corresponding to the amounts paid to NNI under the MRDA after the Filing Date) in respect of prior transfer pricing payments they received as follows... |
| 20 | The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where | **NNSA AMENDED PROOF OF CLAIM:**<br><br>[87]: NNL owed duties to NNSA as de facto director of NNSA including (and in particular) in connection with the claims set out below,. In this regard, all decision making in relation to the entry into, operation and subsequent amendment of the RPSM was in practice taken by NNL. NNSA refers to the following:<br><br>[88]: The key individuals responsible for strategic decision making in relation to the Group's transfer pricing arrangements were senior employees/officers of NNL.<br><br>[127]: NNL was a *de facto* director or manager of NNSA at all material times from about 2000, and in particular (but without limitation) acted as such in relation to the RPSM and NNSA's participation in it. As to this (and in addition to the other matters identified in this Proof):<br><br>[127.2]: NNL directed the affairs of NNSA and took positive acts of management of NNS, undertook its decision-making function, exercised a predominant influence over NNSA and/or held actual authority over the *de jure* directors of NNSA.<br><br>[127.3]: NNSA did not have actual autonomy or decision making power other than in conducting day-to-day business matters in the normal course of its business...<br><br>See also Directors & Officers Factum. |

---

[5] The proposed topics for the NNSA Representative Witness are generally the same in nature as the topics above relating to the NNUK Representative Witness. Topic No. 30 is specific to NNSA.

- 14 -

| | | |
|---|---|---|
| | Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying. | |
| 22 | The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JAs in both the UK and the US courts. | **CLEMENT STATEMENTS FILED**<br><br>Mr. Clement's NNSA and NNSAS Witness Statements filed in the UK Court attesting to the solvency of the NNSAS and NNSA entities as of the date of January 2009 filings and to the UK as the centre of main interest (COMI) for the management supervision and decisions of the NNSAS and NNSA Claimants and factors connecting them to the UK (as opposed to Canada) (Exhibits 31647 and 31649 to the Clement Deposition).<br><br>Bloom deposition testimony indicating lack of any knowledge. |
| 24 | The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements. | **NNSA AMENDED PROOF OF CLAIM**<br><br>[154.1.4]: From 2000 onwards, given the doubtful solvency (and/or risk of insolvency) of NNSA, the directors NNSA were obliged to consider the best interests of the creditors of NSSA as paramount and to take those interests fully into account in exercising their powers and discretions<br><br>See also paragraphs 161, and 168.2.4. |
| 30 | The facts and documents that demonstrate that the repayment by NNSA in 2008 of €25m of the loan from NNL was improper, including without limitation (i) the documents that show that such a partial repayment was contrary to the loan agreement including, in particular, the relevant provisions of the loan agreement itself; (ii) any facts or documents to show that NNSA was not solvent at the time the repayment was made; and (iii) any facts or documents that show that NNL imposed the repayment on NNSA and/or that NNSA approved the repayment despite it not being in NNSA's best interest to do so. | **NNSA AMENDED PROOF OF CLAIM**<br><br>[136]: On or about 9 September 2002 NNL and NNSA entered into a subordinated loan agreement under which NNL agreed to lend €200,000,000.00 to NNSA (the "2002 Subordinated Loan Agreement"). NNSA reserves its right to plead further in respect of the 2002 Subordinated Loan Agreement upon disclosure of that document. In substance, however, the parties' agreement was that the loan was made on a long-term basis. In particular:<br><br>[136.1]: No repayment date was provided for in the 2002 Subordinated Loan Agreement. Instead, it was intended that NNSA would not repay the loan until it became profitable again and would be subordinated to the rights of both secured and unsecured creditors.<br><br>[136.2]: In addition, it was provided that NNSA would not pay interest on the loan unless it was profitable and the loan was therefore classed as "quasi equity" for local French accounting |

purposes.

[136.3]: It was provided that the funds advanced under the loan agreement were subordinated to the prior repayment of any existing and future secured and unsecured creditors of NNSA.

[137]:  In or around February 2008, and contrary to the parties' intentions that the 2002 Subordinated Loan Agreement would be repaid only when NNSA was profitable, NNSA made a repayment in cash of €25,000,000.00 of the sum outstanding under the 2002 Subordinated Loan Agreement (the "February 2008 Repayment").

[139]: At the time of the February 2008 Repayment, NNSA was insolvent.

[139.1]: NNSA's financial position at the start of the fourth quarter of 2007 was such that on 30 October 2007 it was necessary for NNL to provide NNSA with a letter of support.

[139.2]: At the time of the February 2008 Repayment, NNSA was relying on the support of NNL in order to continue to trade.

[142]: At the time of the February 2008, pursuant to section 249 of the IA 1986, NNL was a person connected to NNSA by virtue of the fact that it held the entire share capital of NNSA and as such had control of NNSA.

[143.3]: In deciding to make the February 2008, NNSA was influenced by a desire to prefer NNL, for the purposes of section 239(5) of the IA 1986.[

[143.4]: In deciding to make the February 2008, in circumstances where it was under no obligation to do so and where it was not profitable, NNSA was influenced by a desire that the payment would have the effect of putting NNL into a position which, in the event of NNSA going into insolvent liquidation, was better than the position NNL would have been in had the February 2008 Repayment not been made.

[148]: In addition or in the alternative, NNL's conduct was, and effected a result that was, oppressive to and unfairly disregarded the interests of NNSA and its creditors through its involvement in the preferential February 2008 Repayment contrary to section 241 of the *Canada Business Corporations Act*.

[149]: In addition or in the alternative, in connection with the scheme of entering into the February 2008 Repayment, NNL entered into an agreement with others (including but not limited to NNI), (i) with the predominant purpose of injuring NNSA, and/or (ii) where NNL's conduct was unlawful and directed towards NNSA where it was known that NNSA would be harmed by such conduct.

- 16 -

**PART V**

| Item | Pension Topics for UKPC Representative Witness | Reference in Court Filings[6] |
|---|---|---|
| 1 | The facts and documents relating to the amount of each of the NNUK Pension Plan deficit and section 75 debt including but not limited to: (i) the basis of the calculation of each; (ii) the assumptions used in the calculation of each; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the Trustee provided to its pension advisors and consultants to enable them to calculate the deficit and section 75 debt; and (v) the liabilities used in the calculation of the deficit and section 75 debt referable to (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced. | In paragraphs 245, 256, 286 and 324(f) of their pleading, *inter alia*, Nortel Networks UK Pension Trust Limited (the "Trustee") and the Pension Protection Fund ("PPF") claim against Nortel Canada for the amount of the deficit in the NNUK Pension Scheme (the "Pension") at various times and expressed in various ways (e.g. "shortfall", "Section 75 debt", "funding deficit"). They have asserted that the Pension deficit as at the filing date, January 14, 2009 (the "Filing Date"), was £2.1 billion. They have produced only a one-line, conclusory letter from the Pension's actuary asserting this quantum. The same letter was filed with the Determinations Panel as part of the FSD proceedings that were commenced against Nortel Canada in breach of the stay of proceedings herein. The Pension actuary, Neil Mobbs, was deposed on December 6, 2013. His counsel refused to produce documents in Mr. Mobbs' possession setting out the basis for the calculation of the deficit although Mr. Mobbs admitted to having such documents. Counsel for the Trustee and the PPF objected to production of this existing information as well and then, after reconsideration, withdrew their objection. By letter dated December 12, 2013, counsel for the Monitor requested production of this information from counsel for the Trustee and the PPF. No response has been received.

The Pension actuary calculation of the Pension deficit is an issue of fact and not expert opinion. It is the foundation for the Trustee's claims and enforcement efforts. Were there no deficit, i.e. were the Pension fully funded to produce its required benefits to members, *a fortiori*, there would be no claims. The actuary confirmed that documents setting out the assumptions that underlie his calculation of the Pension deficit/s.75 debt are in his possession and hence are available to his principal the Trustee and PPF. The quantification of the Pension deficit is the key issue for damages in this case. The information is readily available to the Trustee and the PPF. |
| 2 | The facts and documents relating to the age and the amount of the benefit of pension plan members, before and after reduction. | Nortel Canada and the Monitor rely on the same paragraphs of the Affirmative Pleading of the Trustee and PPF as set out above. In addition, in paragraphs 265-269, 277-279, 282 and 291, *inter alia*, of the pleading, the Trustee and the PPF plead that the Trustee has been oppressed, that it is reasonable for Nortel Canada to be required to compensate the Trustee and PPF, and that on a comparative basis the pensioners in the UK will suffer proportionately more loss than other creditors of Nortel Group entities including Nortel Canada. The evidence in depositions of a former employee of the PPF and the Pension actuary, among others, is that under the PPF regime, male pensioners who were 65 |

---

[6] All pleading references below are to the affirmative claims pleadings of Nortel Networks UK Pension Trust Limited and the Board of the Board of the Pension Protection Fund.

|   |   | at the Filing Date and female pensioners who were 60 at that date have not had their pensioners reduced (although cost of living increases have been deferred). Other, younger pensioners may have had their pensions reduced or potentially reduced in future due to the state of under-funding of the Pension. The PPF may be required to compensate UK pensioners for a portion of any reduction that they ultimately suffer. The Monitor seeks a breakdown of the actual losses being suffered by pensioners, if any, as compared to potential costs that may be borne by the PPF. Grouped information on benefits payable to pensioners, benefit reductions imposed, and costs that may be claimed by PPF are available to the Trustee and PPF and must be proven for the PPF to advance a claim. In fact, under its statutory scheme, the PPF receives *all* funds obtained by the Trustee herein until the PPF is paid in full. By raising equitable issues, fairness, oppression, reasonableness and, especially, comparing levels of loss and need of the UK pensioners to pensioners in other jurisdictions, the Trustee and PPF have made relevant the fact that the PPF, a statutory entity, will receive the first dollars recovered on these claims and the quantum of that amount. UK pensioners may actually be suffering considerably less loss than Canadian pensioners as a result of the UK statutory scheme. The Trustee and PPF raised the comparison expressly in their pleadings as a basis for claiming equitable relief and should be required to provide relevant facts in their possession. There is a specific calculation conducted by or for the PPF to assess its position under the *Pension Act, 2004*. The Pension actuary has conducted a number of calculations of this amount as the proceedings have progressed. |
|---|---|---|
| 3 | The facts and documents relating to the mortality assumptions proposed by Trustee and the Scheme's actuary for the March 31, 2008 actuarial valuation of the Scheme and the 2005 actuarial valuation of the Scheme. | In paragraphs 302, 311, 312 and 324 of their pleading, *inter alia*, the Trustee and PPF claim against Nortel Canada a written guarantee by Nortel Networks Limited ("NNL") of the obligations of NNUK to fund the Pension under a funding agreement dated November 21, 2006. Under section 3.3 of the Funding Agreement NNUK was required to fund over time the Pension deficit determined as at March 30, 2008 calculated in a manner consistent with the calculation of the deficit in the formal actuarial valuation of the Pension that was conducted as at April 5, 2005. They claim in paragraph 302 that the amount required to be funded by NNUK under section 3.3 of the Funding Agreement was £548 million being the Pension deficit as at March 30, 2008. The evidence of the Chair of the Trustee and the Pension actuary on deposition was that the amount due under section 3.3 of the Funding Agreement was subject to agreement between the Trustee and Nortel and that as at the Filing Date no agreement had been reached on applicable mortality assumption for use at March 30, 2008 consistent with the mortality assumption used by the actuary as at April 5, 2005. Nortel Canada and the Monitor plead that no further funding of the Pension was required or allowed after the Filing Date under the provisions of the UK *Pensions Act 2004*, and that therefore there is no default or breach by NNUK for which NNL could be liable under its guarantee. In the event that the Court should hold that NNL's guarantee is applicable, the issue of quantum turns on the applicable assumptions used to calculate the deficit as at March 30, 2008 and whether they are consistent with the methods and assumptions that were used by the actuary in his valuation as at April 5, 2005. Nortel Canada and the Monitor therefore seek to understand the facts upon which the Trustee and PPF rely to |

| | | |
|---|---|---|
| | | support the deficit of £548 million as at March 30, 2008 expressly claimed in paragraph 302 of their pleading. This is not a question of expert evidence, but of the facts that will underlie possible expert evidence concerning the consistency of methods used in 2005 and asserted by the Trustee and PPF but not agreed to for March 30, 2008. |
| 4 | The facts and documents relating to the UKPC's claim that NNUK is entitled to any or all of NNSA's assets as a result of Project Swift. | In paragraphs 157 – 168, *inter alia*, of their pleading, the Trustee and PPF rely on a transaction referred to as Project Swift as a particular of the disadvantage to NNUK which they assert as grounds for a number of heads of relief including the oppression remedy and unjust enrichment. They also relied upon Project Swift before the Determinations Panel of the Pensions Regulator and before this Court in respect of their claims for an FSD. They allege as a ground of complaint at paragraphs 164 and 166(b) of their pleading that 91% of the shares of NNSA were intended to be transferred to NNUK under Project Swift and were not transferred before the Filing Date. Deposition evidence has disclosed that the deferral of the transfer of the shares of NNSA was expressly brought to the Trustee's attention before its board of directors approved Project Swift. In fact PricewaterhouseCoopers, the financial advisor to the Trustee, expressly advised the Trustee at the time that if that element of the transaction did not close, NNUK would not obtain the NNSA shares. In that case, NNUK would not pay for the shares either. The Trustee approved Project Swift with this knowledge. NNUK now asserts a claim against NNL for intercompany debt that does not reflect a decrease in the intercompany debt due from NNL that would have been implemented had NNSA's shares been transferred, yet NNUK appears to still claim that it is entitled to 91% of NNSA's shares. Moreover, in determining the "insufficiently resourced test" for the FSD claim as pleaded at paragraphs 252 to 257 of their pleading, the Trustee and PPF did not include the shares of NNSA among the resources of NNUK to be valued.<br><br>The Canadian Debtors and Monitor do not understand the basis for any assertion that Project Swift or the deferral of transfer of NNL's 91% of the shares of NNSA and NNUK's lack of payment therefor, and the contemporaneous and subsequent conduct of the parties provides any basis for complaint or legal remedy. At this stage, the Trustee and PPF ought to know the material facts upon which they rely to assert an entitlement to legal relief and the Canadian Debtors and the Monitor are entitled to know the facts and legal basis, if any, for such claims as are still being pursued, if any, concerning the shares of NNSA. |
| 5 | The facts and documents relating to the UKPC's claim regarding the FSD that (i) NNUK was insufficiently resourced as at the Relevant Time for purposes of the FSD; and (ii) it is reasonable to impose an FSD on Nortel Canada. | The FSD claim is advanced in paragraphs 245, 256, 270-273 and 325 of the pleading of the Trustee and PPF, *inter alia*. The FSD claim includes a determination that NNUK was "insufficiently resourced" as at the relevant date as expressly pleaded in paragraphs 252 to 257 *inter alia*. The Canadian Debtors and Monitor seek facts that may form the basis of later expert reports concerning the identification of the resources of NNUK as at the date identified by the Trustee and PPF and, in particular, the value they ascribe to the intellectual property of NNUK as at the relevant date and the basis therefor.<br><br>The Trustee and PPF also assert that under the FSD statutory test, it is reasonable for an FSD to issue and they rely expressly on a |

|  |  | number of alleged "benefits" they say were bestowed on the Nortel Group by NNUK. A number of alleged benefits are identified in paragraphs 270 to 273 of the pleading. UK law provides that benefits are to be determined for FSD purposes on a "net" basis, that is, net of any costs or corresponding benefits *received* by NNUK (*Lehman and Nortel* [2013] UKSC 52). None of the witnesses deposed was able to put a value on any of the benefits allegedly bestowed by NNUK on Nortel Canada or on the concomitant benefits received by NNUK in return. To the extent that the Trustee and PPF continue to rely on the benefits alleged, identification of the value of each benefit bestowed and the concomitant benefits received, i.e. the net value, will be the key factual issues for trial. There are 19 specific "benefits" listed in paragraphs 271 to 273 of their pleading  If the Trustee cannot quantify benefits bestowed and received, much trial time will be saved by eliminating these issues. Narrowing the issues pleaded is among  the very purposes of discovery under the *Rules of Civil Procedure* (Ontario). |

6283112



**SCHEDULE "A"**
**LIST OF AUTHORITIES**

1.  *Anderson et al v. St. Jude Medical et al*, 2007 CanLII 64140 (Ont. S.C.J.)

2.  *Besner v. Ontario*, 2011 ONSC 7335 at 20

3.  *Ensign Group Inc. v. Saine*, 2007 CanLii 13931 (Ont. S.C.J.)

4.  *Hunter v. Ontario Society for the Prevention of Cruelty to Animals*, 2013 ONSC 6638;

5.  *R. v. Judge of the General Sessions of the Peace for the County of York, Ex parte Corning Class Works of Canada Ltd.* (1970), 3 CCC (2d) 204 (ONCA)

6.  *Stevens and O'Connell et al*, 2013 ONSC 2236 (S.C.J.)



- 2 -

## SCHEDULE "B"

## TEXT OF STATUTES and REGULATIONS

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

## EXAMINATION FOR DISCOVERY

## WHO MAY EXAMINE AND BE EXAMINED

*Generally*

31.03 (1) A party to an action may examine for discovery any other party adverse in interest, once, and may examine that party more than once only with leave of the court, but a party may examine more than one person as permitted by subrules (2) to (8).

*On Behalf of Corporation*

(2) Where a corporation may be examined for discovery,

(a) the examining party may examine any officer, director or employee on behalf of the corporation, but the court on motion of the corporation before the examination may order the examining party to examine another officer, director or employee; and

(b) the examining party may examine more than one officer, director or employee only with the consent of the parties or the leave of the court.

*On Behalf of Partnership or Sole Proprietorship*

(3) Where an action is brought by or against a partnership or a sole proprietorship using the firm name,

(a) each person who was, or is alleged to have been, a partner or the sole proprietor, as the case may be, at a material time, may be examined on behalf of the partnership or sole proprietorship; and

(b) the examining party may examine one or more employees of the partnership or sole proprietorship only with the consent of the parties or the leave of the court.

*Requirements for Leave*

(4) Before making an order under clause (2) (b) or (3) (b), the court shall satisfy itself that,

(a) satisfactory answers respecting all of the issues raised cannot be obtained from only one person without undue expense and inconvenience; and

(b) examination of more than one person would likely expedite the conduct of the action.

### In Place of Person under Disability

(5) Where an action is brought by or against a party under disability,

    (a) the litigation guardian may be examined in place of the person under disability; or

    (b) at the option of the examining party, the person under disability may be examined if he or she is competent to give evidence,

but where the litigation guardian is the Children's Lawyer or the Public Guardian and Trustee, the litigation guardian may be examined only with leave of the court.

### Assignee

(6) Where an action is brought by or against an assignee, the assignor may be examined in addition to the assignee. R

### Trustee in Bankruptcy

(7) Where an action is brought by or against a trustee of the estate of a bankrupt, the bankrupt may be examined in addition to the trustee.

### Nominal Party

(8) Where an action is brought or defended for the immediate benefit of a person who is not a party, the person may be examined in addition to the party bringing or defending the action.

### Limiting Multiple Examinations

(9) Where a party is entitled to examine for discovery,

    (a) more than one person under this rule; or

    (b) multiple parties who are in the same interest,

but the court is satisfied that multiple examinations would be oppressive, vexatious or unnecessary, the court may impose such limits on the right of discovery as are just


## SCOPE OF EXAMINATION

### General

**31.06 (1)** A person examined for discovery shall answer, to the best of his or her knowledge, information and belief, any proper question relevant to any matter in issue in the action or to any matter made discoverable by subrules (2) to (4) and no question may be objected to on the ground that,

    (a) the information sought is evidence;

(b) the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness; or

(c) the question constitutes cross-examination on the affidavit of documents of the party being examined.

. . .

## FAILURE TO ANSWER ON DISCOVERY

### *Failure to Answer Questions*

**31.07 (1)** A party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question if,

(a) the party or other person refuses to answer the question, whether on the grounds of privilege or otherwise;

(b) the party or other person indicates that the question will be considered or taken under advisement, but no answer is provided within 60 days after the response; or

(c) the party or other person undertakes to answer the question, but no answer is provided within 60 days after the response.

### *Effect of Failure to Answer*

(2) If a party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question as described in subrule (1), the party may not introduce at the trial the information that was not provided, except with leave of the trial judge.

### *Additional Sanction*

(3) The sanction provided by subrule (2) is in addition to the sanctions provided by rule 34.15 (sanctions for default in examination).

### *Obligatory Status of Undertakings*

(4) For greater certainty, nothing in these rules relieves a party or other person who undertakes to answer a question from the obligation to honour the undertaking.

## EFFECT OF LAWYER ANSWERING

**31.08** Questions on an oral examination for discovery shall be answered by the person being examined but, where there is no objection, the question may be answered by his or her lawyer and the answer shall be deemed to be the answer of the person being examined unless, before the conclusion of the examination, the person repudiates, contradicts or qualifies the answer.

## INFORMATION SUBSEQUENTLY OBTAINED

### *Duty to Correct Answers*

**31.09 (1)** Where a party has been examined for discovery or a person has been examined for discovery on behalf or in place of, or in addition to the party, and the party subsequently discovers that the answer to a question on the examination,

    (a) was incorrect or incomplete when made; or

    (b) is no longer correct and complete,

the party shall forthwith provide the information in writing to every other party.

### *Consequences of Correcting Answers*

(2) Where a party provides information in writing under subrule (1),

    (a) the writing may be treated at a hearing as if it formed part of the original examination of the person examined; and

    (b) any adverse party may require that the information be verified by affidavit of the party or be the subject of further examination for discovery.

### *Sanction for Failing to Correct Answers*

(3) Where a party has failed to comply with subrule (1) or a requirement under clause (2) (b), and the information subsequently discovered is,

    (a) favourable to the party's case, the party may not introduce the information at the trial, except with leave of the trial judge; or

    (b) not favourable to the party's case, the court may make such order as is just

## USE OF EXAMINATION FOR DISCOVERY AT TRIAL

### *Reading in Examination of Party*

**31.11 (1)** At the trial of an action, a party may read into evidence as part of the party's own case against an adverse party any part of the evidence given on the examination for discovery of,

    (a) the adverse party; or

    (b) a person examined for discovery on behalf or in place of, or in addition to the adverse party, unless the trial judge orders otherwise,

if the evidence is otherwise admissible, whether the party or other person has already given evidence or not.

## *Impeachment*

(2) The evidence given on an examination for discovery may be used for the purpose of impeaching the testimony of the deponent as a witness in the same manner as any previous inconsistent statement by that witness.

## *Qualifying Answers*

(3) Where only part of the evidence given on an examination for discovery is read into or used in evidence, at the request of an adverse party the trial judge may direct the introduction of any other part of the evidence that qualifies or explains the part first introduced.

## *Rebuttal*

(4) A party who reads into evidence as part of the party's own case evidence given on an examination for discovery of an adverse party, or a person examined for discovery on behalf or in place of or in addition to an adverse party, may rebut that evidence by introducing any other admissible evidence.

## *Party under Disability*

(5) The evidence given on the examination for discovery of a party under disability may be read into or used in evidence at the trial only with leave of the trial judge.

## *Unavailability of Deponent*

(6) Where a person examined for discovery,

   (a) has died;

   (b) is unable to testify because of infirmity or illness;

   (c) for any other sufficient reason cannot be compelled to attend at the trial; or

   (d) refuses to take an oath or make an affirmation or to answer any proper question,

any party may, with leave of the trial judge, read into evidence all or part of the evidence given on the examination for discovery as the evidence of the person examined, to the extent that it would be admissible if the person were testifying in court.

(7) In deciding whether to grant leave under subrule (6), the trial judge shall consider,

   (a) the extent to which the person was cross-examined on the examination for discovery;

   (b) the importance of the evidence in the proceeding;

   (c) the general principle that evidence should be presented orally in court; and

   (d) any other relevant factor.

*Subsequent Action*

(8) Where an action has been discontinued or dismissed and another action involving the same subject matter is subsequently brought between the same parties or their representatives or successors in interest, the evidence given on an examination for discovery taken in the former action may be read into or used in evidence at the trial of the subsequent action as if it had been taken in the subsequent action

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

---

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (Commercial List)

Proceeding commenced at Toronto

---

### Re Representative Party Discovery
### (RETURNABLE JANUARY 7, 2014)

---

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Jessica Kimmel LSUC#: 32312W
Peter Ruby LSUC#: 38439P
Joseph Pasquariello LSUC#: 37389C
Tel:       416.979.2211
Fax:       416.979.1234

**Lawyers for the Monitor,**
**Ernst & Young Inc. and Canadian Debtors**

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5
**Derrick Tay**  LSUC#: 21152A
**Jennifer Stam**  LSUC#: 46735J
Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

6280791