Court File No.  09-CL-7950

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36 AS AMENDED

## MOTION RECORD OF THE
## CANADIAN CREDITORS' COMMITTEE ("CCC")
## (US DEBTORS' MOTION TO ELIMINATE
## REPRESENTATIVE DEPOSITIONS)
## RETURNABLE JANUARY 7, 2014

DATE:  January 3, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Ari Kaplan / Jeff Van Bakel
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
       akaplan@kmlaw.ca
       jvanbakel@kmlaw.ca

Lawyers for the Canadian Former Employees and Disabled Employees through their court appointed Representative

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / Elder C. Marques / Byron Shaw
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
       emarques@mccarthy.ca
       bdshaw@mccarthy.ca

Lawyers    for    Morneau    Shepell    Ltd.,    as
administrator  of  the  Nortel  Canada  registered
pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
       lily.harmer@paliareroland.com
       max.starnino@paliareroland.com

Lawyers  for  the  Superintendent  of  Financial
Services  as  Administrator  of  the  Pension
Benefits Guarantee Fund

Court File No.  09-CL-7950

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

## TABLE OF CONTENTS

| | |
|---|---|
| Affidavit of Barbara Walancik, sworn January 3, 2013 | 1 |

001

Court File No.  09-CL-7950

# ONTARIO

## SUPERIOR COURT OF JUSTICE

## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### AFFIDAVIT OF BARBARA WALANCIK
### (sworn January 3, 2014)

I, **Barbara Walancik,** of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.      I am an associate at the law firm of Koskie Minsky LLP, the lawyers of record for the Canadian Former Employees and Disabled Employees through their court appointed Representative and as such have knowledge of the matters to which I hereafter depose.  Where my evidence is based on information and belief, I have identified the source of that information and belief and verily believe it to be true.

2.      I swear this Affidavit in support of the Canadian Creditors' Committee (the "CCC")[1] response to the motion of the US Debtors[2] motion to further amend the

---

[1] The CCC is a committee of major creditors having claims against the Canadian Debtors, comprised of: the Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union; Morneau Shepell Ltd., as Administrator of Nortel's Canadian registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtor.

[2] Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks

Amended Litigation Timetable set out at Schedule "A" of the order of the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") dated November 19, 2013 (the "November 19 Order") to dispense with representative witness depositions. The CCC opposes this motion and supports the position of the Canadian Debtors and Monitor.

**Background**

3.      On January 14, 2009, the CCAA Court made an Initial Order granting the Canadian Debtors[3] protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"). Ernst & Young Inc. (the "Monitor") was appointed as monitor in these proceedings.

4.      Also on January 14, 2009, the US Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court").

5.      A Cross-Border Insolvency Protocol was approved by the CCAA and U.S. Courts on the Filing Date, providing the parameters within which the proceedings in the cross-border insolvency would proceed (the "Cross-Border Protocol").

6.      Also on January 14, 2009, the EMEA Debtors[4] applied for, and were granted, administration orders by the High Court of England and Wales under the United Kingdom's Insolvency Act 1986.

7.      Shortly after the Filing Date, Nortel took steps to liquidate its assets, including various lines of business.

---

Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.

[3] Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

[4] The Joint Administrator of Nortel Networks UK Limited ("NNUK") on behalf of 24 Nortel entities in Europe, the Middle East and Africa.

00ₓ

**Allocation Proceedings**

8.     By order made on March 8, 2013, the CCAA Court and the US Bankruptcy Court (together the "Courts") approved a cross-border joint trial of the dispute over approximately $9 billion in Global Assets of the Nortel Debtors and certain claims made by the EMEA Debtors and the UK Pension Trustee and the Board of the Pension Protection Fund (the "UKPC") against the Canadian Debtors and the US Debtors (the "Allocation Proceeding").[5]

9.     On April 3, 2013 and May 17, 2013, the Courts, respectively, released written reasons for their March 8, 2013 decisions and signed orders approving the Allocation Protocol.

10.    The Allocation Protocol provided trial procedures and timelines leading up to the Allocation Proceeding schedule to commence on May 12, 2014.

11.    In connection with the Allocation Protocol and Litigation Plan, each Core Party filed an Allocation Position (or filed a joinder supporting one or another Allocation Position). The positions of the Core Parties were as follows:

(a)     the US Debtors filed an Allocation Position proposing that the Global Assets be allocated amongst each Nortel Entity according to the revenue generated by that Entity (the "Revenue Allocation Theory");

(b)     the EMEA Debtors filed an Allocation Position proposing that the Global assets be allocated according to the "beneficial interest" of each Nortel Entity (the "EMEA Allocation Theory");

_____

[5] The Sale Proceeds are held in trust accounts pursuant to an Interim Funding and Settlement Agreement dated June 9, 2009 between certain of the Nortel Debtors, and $1.7 billion in cash and other assets in the possession of Nortel Debtors in various jurisdictions. The Sale Proceeds are made up of $2.8 billion from the sale of Nortel's Lines of Business, including the business units, and $4.5 billion resulting from the sale of Nortel's remaining patent portfolio (the "Residual IP") owned by Nortel's operating parent, Nortel Networks Limited. In 2011, the Residual IP was purchased by a consortium of technology companies, including Apple, RIM, Sony and Microsoft.

(c)     the UKPC filed an Allocation Position proposing that the Global assets be allocated according to a "pro rata" distribution; and,

(d)     the Ad Hoc Group of Bondholders filed an Allocation Position largely supporting the US Revenue Allocation Theory. Attached hereto and marked as **Exhibit "A"** to this my affidavit is the Opening Allocation Position of Ad Hoc Group of Bondholders dated May 16, 2013 and the Response of the Ad Hoc group of Bondholders to Allocation Positions of Other Core Parties, dated May 29, 2013.

12.    The CCC filed an Allocation Position and an Allocation Response. The CCC's Allocation Position proposes:

(i)     an "Ownership Allocation Order", effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets; and,

(ii)     in the alternative, an "Equitable Allocation Order", effecting an equitable distribution of the Global Assets, including the Sale Proceeds, so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

13.    Attached hereto and marked as **Exhibit "B"** to this my affidavit is the Allocation Position of the Canadian Creditors' Committee (the "CCC") dated May 16, 2013.

**The Bondholder Group**

14.    The CCC has not been able to examine through Fact Depositions nor document production any of the Allocation Position claims and assertions made by the Ad Hoc Group of Bondholders (the "Bondholder Group"). Every CCC request for examination of a member or representative of the Bondholder Group has been summarily denied. The Bondholder Group, while acknowledging that information "relevant to this litigation may be obtained through the deposition of a corporate representative", has consistently objected to the production of any witness for discovery, let alone a party representative

witness.  Attached hereto and marked as **Exhibit "C"** is  and email from counsel to the Ad Hoc Bondholder Group, dated August 1, 2013 confirming the above.

15.    On July 30, 2013, the CCC noticed five representatives of the Bondholder Group for deposition.  The Bondholder Group objected to all five of the proposed depositions on the basis that none of the information sought was relevant to the Allocation Proceeding. The Bondholder Group instead represented that "[a]ny information that the Ad Hoc Bondholder Group has that may be relevant to this litigation *may be obtained through the deposition of a corporate representative*, which [the CCC has] noticed, and which notice we will respond and object to in due course." This is set out in Exhibit "C".

16.    The Bondholder Group was designated by the Courts as an independent Core Party in this litigation. It has submitted allocation pleadings, assertions and positions independent of those taken by the U.S. Debtors, the U.S. Official Committee of Unsecured Creditors (the "UCC"), and the other parties to this proceeding.  It has served document requests and interrogatories, participated actively in the negotiation of, and is signatory to, the Consolidated Discovery Request of the collective Core Parties and other submissions related to the allocation dispute, and it has participated in the fact witness depositions.

17.    Attached hereto and marked as **Exhibit "D"** to this my affidavit is the Ad Hoc Group of Bondholders' Responses and Objections to the Canadian Creditors Committee's Reserved Document Request directed to the Ad Hoc Bondholders Group, Bank of New York Mellon, Wilmington Trust, and Law Debenture Trust of New York, dated July 25, 2013.

18.    Attached hereto and marked as **Exhibit "E"** to this my affidavit is the Ad Hoc Group of Bondholders' Objections to the Representative Witness Subjects served by the Canadian Allocation Group and the Canadian Claims Defendant Group, dated December 18, 2013.

19.     Attached hereto and marked as **Exhibit "F"** to this my affidavit is an email from counsel to the Ad Hoc Group of Bondholders, dated June 9, 2013.

20.     Attached hereto and marked as **Exhibit "G"** to this my affidavit is the Notice of the US Debtors' Motion approving a proposed settlement filed with the US Bankruptcy Court on December 17, 2013.

21.     Attached hereto and marked as **Exhibit "H"** to this my affidavit is the Letter dated December 22, 2013 from Kathleen A. Murphy of Buchanan Ingersoll & Rooney PC for the Monitor and Canadian Debtors.

22.     I swear this affidavit in response to the US Debtors' motion to dispense with representative party discovery and for no improper purpose.

**SWORN BEFORE ME** at the City of
Toronto, on January 3,    2014.

_____

Commissioner for taking affidavits

_____

Barbara Walancik

# TAB A

This is Exhibit............F.................referred to in the

affidavit of....Richie Walmsik.................................

sworn before me, this....5..................................

day of.........Jenuary.......................20.14....

...............................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

8

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
------------------------------------------------ x
                                          :
In re                                     :     Chapter 11
                                          :
Nortel Networks Inc., et al.,             :     Case No. 09-10138 (KG)
                                          :
                    Debtors.              :     (Jointly Administered)
                                          :
                                          :
------------------------------------------------ x
```

-   and the   -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**OPENING ALLOCATION POSITION OF *AD HOC* GROUP OF BONDHOLDERS**

9

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

RELEVANT BACKGROUND ................................................................................................3

    A.    Sale Transactions ..................................................................................................3

    B.    Ad Hoc Group of Bondholders ...........................................................................5

BONDHOLDER GROUP POSITION ON ALLOCATION..................................................6

CONCLUSION........................................................................................................................10

DOCS_DE:187482.1 61026/001

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
   No. 02-41729 (REG), (Bankr. S.D.N.Y. Jan. 3, 2007), ECF No. 12920 ..............................8, 9

*In re Beardsley*,
   38 F. Supp. 799 (D. Md. 1941) ..................................................................................9

*In re Hetzel*,
   23 F. Supp. 530 (M.D. Pa. 1938) ............................................................................10

*In re LTV Steel Co.*,
   285 B.R. 259 (Bankr. N.D. Ohio 2002) ................................................................6, 9

*In re Mannington Pottery Co.*,
   104 F. Supp. 506 (N.D. W. Va. 1952) ....................................................................10

*In re Port City Construction Co.*,
   387 F. Supp. 237 (E.D. Ark. 1975) ......................................................................7, 8

*In re Wesley Corp.*,
   18 F. Supp. 347 (D. Ky. 1937) ..................................................................................9

*In re Wilkes*,
   55 F.2d 224 (2d Cir. 1932) ........................................................................................9

*PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.*
   (2003), 68 O.R. (3d) 544 (C.A.) ................................................................................7

STATUTES

11 U.S.C. § 506(a) ......................................................................................................9

DOCS_DE:187482.1 61026/001

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY CHIEF JUDGE
AND THE HONORABLE JUSTICE GEOFFREY B. MORAWETZ OF THE ONTARIO
SUPERIOR COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group") hereby delivers its

opening allocation submission to the United States Bankruptcy Court for the District of

Delaware (the "U.S. Court") and the Ontario Superior Court of Justice (Commercial List) (the

"Canadian Court" and, together with the U.S. Court, the "Courts"):

## PRELIMINARY STATEMENT

1.      The sole question to be answered by the Courts in this allocation dispute is

remarkably straightforward:  What are the respective legal entitlements of the three main Nortel

estates—the estates of the U.S., Canadian, and EMEA Debtors[1] (collectively, the "Nortel

Estates" of the "Nortel Debtors")—to the aggregate sale proceeds that were generated by the

joint sales of substantially all of the assets of each of those estates?

2.      The answer to that question is similarly clear-cut:  each estate is entitled to

receive the fair market value of the assets it sold and the rights it relinquished in those sales—*i.e.*,

the fair market value of the particular assets and rights that comprised that particular estate's

component of that particular sale transaction.  This approach is logical, principled, and capable

of reasonable and comprehensible application by the Courts, as valuation determinations are

certainly commonplace in both U.S. and Canadian court proceedings.

3.      This straightforward approach flows from basic facts and undeniable logic:  as a

participating seller in each major Nortel asset sale, each of the Nortel Estates sold certain of its

individual assets and/or relinquished certain of its individual rights as a component of a larger

overall transaction in which the individual assets and rights of multiple estates were packaged

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the 2013
Allocation Protocol [D.I. 1013, Ex. A].

together and sold for a single, aggregate purchase price. The Courts are now being asked to determine how much of the *aggregate* sale proceeds each Nortel Estate is entitled to receive in exchange for the *individual* assets it sold and the *individual* rights it relinquished from their respective estates as components of the various sale transactions. The answer: the fair market value of the assets sold and rights relinquished.

4.       Ironically, the allocation dispute is the direct product of what was a very coordinated and pragmatic decision by the Nortel Estates to cooperate with each other in the sale of the various Nortel business lines and assets. Shortly after Nortel's commencement of global insolvency proceedings in January 2009, representatives of each of the Nortel Estates, cognizant of their fiduciary obligations to their respective estates and their respective creditors, agreed that the best way to maximize the value of each of their *individual* estates was to coordinate with one another to jointly sell *combinations* of those assets, organized by Nortel's then-existing lines of business (and later a collection of "residual" intellectual property) on an *aggregated*, enterprise-wide basis. This decision enabled each of the Nortel Estates to sell its assets without the risk of costly delays and intramural disputes.

5.       The *quid pro quo* for agreeing to participate in such coordinated, joint sales was that each of the Nortel Estates ultimately would receive that portion of the sale proceeds attributable to the assets sold (or, in the case of intellectual property licenses and similar rights, the rights being relinquished) by that particular estate in that particular transaction.

6.       Understanding that this ultimate allocation, *i.e.*, reconciling sale proceeds with specific assets sold/rights relinquished on an estate-by-estate basis, could take time and should not impede the sale transactions themselves, the Nortel Estates agreed—wisely—that this allocation would occur *after* the sale process had been completed.

2

7.      The sale process is now long completed, and the parties have been unable to agree on allocation. Consequently, it is time for the Courts to determine, and the Nortel Estates to then actually receive, the amount of sale proceeds attributable to the fair market value of the assets they respectively sold in the sale transactions. Any methodology other than fair market value would unfairly and impermissibly deprive at least one estate from realizing the full value of its own assets, while at the same time providing an improper windfall of excess value to at least one other estate. Such a result clearly is not one that can be embraced by either of the Courts.

## RELEVANT BACKGROUND

### A.    Sale Transactions

8.      In early 2009, the Nortel Debtors and their representatives determined that the best way to maximize the value of each Nortel Estate would be to sell Nortel's various lines of business and material assets (the "Sale Transactions") on an enterprise-wide basis. Subsequently, the Nortel Debtors and their representatives determined to follow the same enterprise-wide approach for the sale of Nortel's residual intellectual property (the "Nortel IP"). One potential roadblock to the multi-estate sales was the inability of the Nortel Debtors to agree to an allocation of the total proceeds received for the combined assets (the "Sale Proceeds") among the Debtors participating in the sale (the "Selling Debtors"). To avoid delaying the sales process, which could have reduced the proceeds ultimately realized, the Nortel Debtors agreed that the marketing and sale of the Nortel assets could and should proceed forthwith, despite the lack of agreement on allocation. Allocation would be reserved for a later date.

9.      Consequently, on June 9, 2009, the U.S. Debtors, the Canadian Debtors, and the Joint Administrators entered into the Interim Funding and Settlement Agreement (the "IFSA"), *inter alia* permitting the sale of Nortel's assets on an enterprise-wide basis to proceed. (*See*

3

14

IFSA [D.I. 874, Ex. B], § 12(a); *see also* Tr. of Hr'g, June 29, 2009, at 59:14-17 (referring to sale

of Nortel's carrier business with material assets in the United States, Canada, and elsewhere).)

Importantly, pursuant to the IFSA, no Nortel Debtor would be required to participate in any Sale

Transaction if that Debtor determined in good faith and in consultation with the other Selling

Debtors that the Sale Transaction would *not* be in the best economic interests of that particular

Debtor's creditors. (*Id.* at 12.e.)

10.      Pending determination of allocation among the Selling Debtors for any particular

Sale Transaction, the Sale Proceeds from that Sale Transaction would be deposited in an escrow

account for the benefit of those Selling Debtors. (*Id.* § 12.b.)[2]

11.      The IFSA, which was the result of protracted negotiations, was approved by the

U.S. Court and the Canadian Court on June 29 and 30, 2009, respectively. The UK

Administrators obtained a direction from the U.K. Court that the U.K. Administrators were at

liberty to enter into the IFSA on June 23, 2009.

12.      Beginning in November 2009, consistent with the terms of the IFSA, the Nortel

Estates, collectively, began a series of campaigns to market and sell the Nortel business lines and

assets. Over the next 20 months, the Nortel Debtors sold substantially all of their respective

businesses and material assets through a series of Sale Transactions. Each of the Sale

Transactions was the result of a vigorous, competitive, and often multi-round, bidding process.

This resulted in a highly successful sale process, generating approximately $7.5 billion in Sale

Proceeds.

13.      The reasonable expectation of the Debtors and their stakeholders, including the

Bondholder Group, in agreeing to work together to maximize the value received in the Sale

---

[2]      The proceeds from the sale of LG-Nortel, a joint venture between Nortel and the South Korean company LG Electronics, are being held in a restricted account by the Monitor of the Canadian Estates.

4

Transactions was that the Sale Proceeds would be allocated among the various Selling Debtors in

a manner that would accurately reflect the fair market value of the assets sold by each of the

Nortel Estates in such combined sale, exactly as it would have been had each estate sold its

assets and/or relinquished its rights separately.

**B.**      **Ad Hoc Group of Bondholders**

14.      The members of the Bondholder Group are parties holding bonds (the "Nortel

Bonds") issued or guaranteed by certain of the Canadian and U.S. Debtors ("Bond Obligors")

between 1988 and 2008.  The funds raised through issuance of the Nortel Bonds were used by

Nortel to finance significant business functions, including funding for the businesses and

intellectual property sold in the Sale Transactions.  As of January 14, 2009, the aggregate

principal amount outstanding under the Nortel Bonds issued or guaranteed by the Bond Obligors

was approximately $4.2 billion.  Because the Nortel bonds are obligations of both U.S. and

Canadian Debtors, the bondholders are the largest single creditor group of each of the U.S. and

Canadian Estates and have functioned as a key stakeholder of each estate throughout the Nortel

insolvency proceedings.

15.      The significant economic stake of the Bondholder Group and the integral nature

of the Bondholder Group's participation in these proceedings—and in particular in connection

with the Sale Transactions and any subsequent allocation issues—was reflected and

memorialized by the parties in the IFSA, which provides, *inter alia*, that neither the U.S. Debtors

nor the Canadian Debtors may enter into any agreement or make any determination regarding the

allocation of the Sale Proceeds without consent of the Bondholder Group.  (*See* IFSA §§

12(g)(i)-(ii), 13(b).)  Among other things, these express rights resulted in the undisputed

designation of the Bondholder Group as a Core Party in the allocation litigation.

DOCS_DE:187482.1 61026/001

16.     The Bondholder Group thus was an active and effective contributing participant in each of the Sale Transactions, continually consulting and conferring with the representatives of the Nortel Estates to ensure that the transactions were being pursued in a manner that would properly expose the assets to all relevant markets, create an open and competitive bidding process, and maximize value.

## BONDHOLDER GROUP POSITION ON ALLOCATION

17.     A lawful allocation of the Sale Proceeds must return to each of the Nortel Estates the value of the assets it sold, or rights it relinquished, in each Sale Transaction. That is, "the goal is to determine the value of an individual asset as a portion of the whole sale" and then "allocate sale proceeds between individual assets based upon each asset's portion of the total value of all the assets." *In re LTV Steel Co.*, 285 B.R. 259, 266-267 (Bankr. N.D. Ohio 2002).

18.     This allocation approach is well-reasoned and legally sound. Each Sale Transaction reflected a decision by *each Selling Debtor* to sell a portion of *its* assets for the highest or otherwise best obtainable price, as a component of a larger overall transaction. Each sale thus required agreement by representatives of *each* individual estate, in consideration of fiduciary duties to maximize the value of *their individual* estate for the benefit of *its* creditors. (*See generally* IFSA §12.e.) This comports with a fundamental principle of the legal insolvency regimes in both the US and Canada: the assets and liabilities of legally distinct entities are considered separately from one another and the value of the assets of each must be preserved for the stakeholders of each.

19.     Thus, the Sale Transactions were, as intended by the IFSA and required by applicable law, a series of active, self-interested decisions by *each* estate to maximize its *own*

6

return on the sale of its *own* assets and relinquishment of rights.[3]  Each estate is entitled to *no more* but *no less* than the fair market value of the total Sale Proceeds attributable to the assets *it* sold and the rights *it* relinquished.  Any contrary allocation would necessarily be improper, as value rightfully attributable to one estate based on the assets it sold through the Sale Transactions would be distributed unjustifiably as a windfall to another estate.

20.    Under Canadian insolvency law, any other approach to allocation would be contrary to the fundamental principle enshrined in the *Bankruptcy and Insolvency Act* (section 96) and the *Companies' Creditors Arrangement Act* (section 36.1) that a transfer of assets for less than fair market value can be declared void.  Canadian courts have confirmed that in reviewing transactions under these provisions, the court "must determine the fair market value of what the bankrupt gave up and the fair market value of what it received in the transactions." *PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544 (C.A.) at para. 18.  Therefore, proceeds rightfully attributable to one estate based on the fair market value of the assets it sold and/or rights it relinquished through the Sale Transactions must be allocated to that estate.

21.    Courts considering this issue, and issues analogous to it, uniformly agree.  For example, in *In re Port City Construction Co.*, 387 F. Supp. 237 (E.D. Ark. 1975), two estates subject to insolvency proceedings owned separate, but adjacent, parcels of real property, which were each subject to liens held by the appellant bank.  Each estate also had different general, unsecured creditors.  *Id.*  The two parcels were sold as a single, combined unit for $50,000.  *Id.*

---

[3]    Indeed, if the U.S. and Canadian Estates had determined instead that they could maximize value for themselves and their creditors through independent, one-off sales of their assets, the Nortel Estates not only would have carried on accordingly, but they arguably would have been *required* to in accordance with their respective fiduciary duties and the requirements of applicable bankruptcy law.

7

As with the Nortel combined sales, the proper allocation of the purchase price between the estates became an issue for litigation. *Id.*

22.     The bankruptcy court rejected the appellant bank's argument that allocation should have been based on the remaining balance on each estate's respective lien, determining that such an allocation "had no reasonable relation to the value of the respective parcels" and "would ignore the rights of the unsecured creditors of the bankrupts to the equity over the amount of the respective liens." *Id.* Instead, the court ordered that the sale proceeds be allocated between the estates *in proportion to the relative value of the assets purchased through the bulk sale. Id.* The value of the assets was determined by separate appraisals of the constituent parcels—$39,000 and $28,000, or 58.2% and 41.8%, respectively, of the total value sold. The court then applied these percentages to the total sale proceeds to determine the proper allocation of sale proceeds between the two estates. The appellate court affirmed the bankruptcy court's allocation over the appellant bank's objection. *Id.*

23.     Judge Robert E. Gerber of the United States Bankruptcy Court for the Southern District of New York was presented with a similar allocation question in connection with the bankruptcy of former U.S. cable/telecom giant, Adelphia Communications Corp. (*See* Bench Decision On Confirmation, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), (Bankr. S.D.N.Y. Jan. 3, 2007), ECF No. 12920.) In 2002, the entire Adelphia enterprise, including over 200 of its subsidiary entities, went into bankruptcy. In connection with the Adelphia bankruptcy, Judge Gerber approved a sale under section 363 of the U.S. Bankruptcy Code of substantially all of Adelphia's assets—sold in four aggregate parts to maximize value—that generated approximately $17.6 billion in sale proceeds. (*See generally id.* at 130-134.)

DOCS_DE:187482.1 61026/001

24.    As is the case here, the question facing Judge Gerber was how to allocate the

sale proceeds among various debtor groups (four debtor groups were established according to

their respective ownership interests in the aggregate parts sold).  Five different parties submitted

allocation proposals, each supported by expert opinion.  (*Id.*)

25.    Tellingly, *every single proposal* was premised on the return of proceeds to each

of the debtor groups according to the value that the assets sold by each debtor group contributed

to the total assets sold.  (*Id.*)  The Court ultimately did not have to choose from among the

allocation proposals because the allocation dispute was settled before it got to trial.  Nonetheless,

Judge Gerber appears to have agreed with the valuation-based approaches advocated by the

parties, noting that "I could accept any one of the proffered methodologies." (*Id.* at 134.)

26.    Several other courts have also directed the allocation of sale proceeds following

a combined sale of debtor assets in a similar fashion.[4]  *See In re LTV Steel Co.*, 285 B.R. at 267-

68 ("Courts allocate sale proceeds between individual assets based upon each asset's portion of

the total value of all the assets." (decided in the § 506(a) context[5]); *see also In re Wilkes*, 55

F.2d 224, 225 (2d Cir. 1932) (allocating proceeds based upon relative value of individual assets);

*In re Wesley Corp.*, 18 F. Supp. 347, 350-51 (D. Ky. 1937) (overruling allocation methodology

adopted in bankruptcy proceedings that allowed for payment of secured creditors in full without

relation to relative value of those creditors' interests in sale proceeds); *In re Beardsley*, 38 F.

---

[4]    Cases determining allocation of sale proceeds resulting from a consolidated sale of estate assets to secured
creditors pursuant to U.S. Bankruptcy Code § 506(a) are instructive.  Courts have used § 506(a) to allocate such sale
proceeds to secured creditors based on the value of each creditor's interest (*i.e.*, the collateral securing the creditor's
claim) in relation to the total value of all the assets sold.  *See, e.g., In re LTV Steel Co.*, 285 B.R. at 268.  The
principles underlying § 506(a) apply equally here.  Indeed, several of the cases basing allocation on § 506(a) cite to
decisions not involving § 506(a), but reflect the same predisposition to allocate sale proceeds in accordance with the
relative values contributed.  *See, e.g., id.* at 266-68 (collecting and citing cases).

[5]    Although the court in *LTV Steel Co.* directed a value-based allocation pursuant to the specifications of a
prior agreement between the parties, the court's discussion of the principles underlying an equitable allocation of
proceeds resulting from a bulk sale of assets has broader application.  Indeed, the court cited a litany of analogous
cases—none of which involved a similar agreement by the parties—as direct support for its allocation methodology.
*See In re LTV Steel Co.*, 285 B.R. at 266-68.

9

Supp. 799, 802-03 (D. Md. 1941) (allocating sale proceeds "between the realty and the

personalty on the basis of the respective appraised values"); *In re Hetzel*, 23 F. Supp. 530 (M.D.

Pa. 1938) (allocating sale proceeds based on appraised value of properties sold); *In re*

*Mannington Pottery Co.*, 104 F. Supp. 506, 519-20 (N.D. W. Va. 1952) (allocating value based

on "appraisement of the various parcels of real and personal property of the bankrupt.").

## CONCLUSION

27.      Contrary to public reporting during the mediation process, the allocation dispute

is a dispute among the Nortel Estates and not individual creditors.  The question before these

Courts in the allocation dispute is not what individual creditors of estates are entitled to from

their particular debtor(s), nor is it what claims one Nortel Estate may have against another.

Similarly, it is not a question of what assets or liabilities an estate may have *outside* of an estate's

entitlement to proceeds of the Sales Transactions.  These questions simply have nothing to do

with an appropriate determination by the Courts of an allocation of the proceeds of the Sales

Transactions among the Nortel Estates.

28.      As stated above, the determination to be made by these Courts in this allocation

dispute is what amount of the sale proceeds from each Sale Transaction should go to the

individual Nortel Estates.

29.      Simply put, the Courts should allocate the Sale Proceeds in a manner that returns

to each estate the fair market value of the assets it sold through the Sale Transactions.  The

Bondholder Group submits that this approach presents the most well-reasoned and legally

supportable method for allocating the Sale Proceeds and should be adopted by the Courts.

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the

US and Canadian Courts (i) allocate the asset sale proceeds by determining the fair market value

of each Selling Debtor's share of assets, rights and property it sold or relinquished in the Sale

Transactions; and (ii) grant such other and further relief as the Courts deem just and proper.

Dated: May 16, 2013

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (No. 2436)
Kathleen P. Makowski (No. 3648)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Thomas J. Matz
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

BENNETT JONES LLP
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone: (416) 777-5762
Facsimile: (416) 863-1716

*Attorneys for Ad Hoc Group of Bondholders*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
                                             :
In re                                        :      Chapter 11
                                             :
Nortel Networks Inc., et al.,                :      Case No. 09-10138 (KG)
                                             :
                            Debtors.         :      (Jointly Administered)
                                             :
                                             :
------------------------------------------------------------ x
```

-    and the    -

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C. 1985, C. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### RESPONSE OF *AD HOC* GROUP OF BONDHOLDERS TO ALLOCATION POSITIONS OF OTHER CORE PARTIES

## TABLE OF CONTENTS

                                                                                    **Page**

I.    PRELIMINARY STATEMENT ..................................................................1

II.   RESPONSE TO ALLOCATION POSITION OF CANADIAN DEBTORS AND
      MONITOR.................................................................................................4

      A.    The Estates Never Agreed Among Themselves to Allocate Proceeds From
            the Sale of Tangible Assets According to Net Book Value....................5

      B.    Allocation of IP Value to the Canadian Debtors Based on Nominal Legal
            Title Completely Disregards the Extensive and Valuable Licenses That
            Were Granted to the Other Nortel Entities. ...........................................7

      C.    The Value of the Exclusive Licenses Was Not Dependent Upon the
            Ongoing Operation of Nortel's Businesses.............................................9

      D.    The RPSM is Irrelevant to the Allocation of Proceeds from the Sale of
            Nortel IP...............................................................................................11

III.  RESPONSE TO ALLOCATION POSITION OF THE EMEA DEBTORS....................13

      A.    The EMEA Debtors' Approach to Valuation and Allocation Based on
            Asset Categories is Fundamentally Flawed. ........................................14

      B.    The EMEA Debtors' Proposed Method for Allocating the Nortel IP is
            Inconsistent With the Applicable Law..................................................15

            i.    Nortel IP Sale Proceeds Should Be Allocated Based on Fair
                  Market Value Principles, Not Contributions to R&D................15
            ii.   The MRDA's Cost-Based Approach for Transfer Pricing is Not
                  Relevant to Allocation of the Sale Proceeds.............................17

      C.    The EMEA Debtors' Alternative "Operation of Law" Arguments for
            Allocation of Nortel IP Are Equally Meritless. ...................................17

      D.    The EMEA Debtors Misapply Their Proposed Allocation Methodology. ............18

IV.   RESPONSE TO THE SECONDARY ALLOCATION POSITION OF CCC AND
      THE ALLOCATION POSITION OF THE UK PENSION CLAIMANTS.....................19

      A.    CCC's "*Pro Rata*" Distribution Approach is Simply a Call for Global
            Substantive Consolidation and Therefore Should Be Rejected. ............20

      B.    UK Pension Claimant's "*Pro Rata*" Approach Effects an Impermissible
            Deemed Substantive Consolidation and Therefore Should Be Rejected..............25

RESERVATION OF RIGHTS ........................................................................27

CONCLUSION............................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Armstrong Pump, Inc. v. Hartman,*
   745 F. Supp. 2d 227 (W.D.N.Y. 2010) ................................................................9

*Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107 ...............................................22

*In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) .......................22, 23

*In re Kaiser Aluminum Corp.*,
   No. 02-10429(JFK), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006)...................26

*In re LTV Steel Co.*, 285 B.R. 259 (Bankr. N.D. Ohio 2002) .....................................16

*In re Owens Corning,*
   419 F.3d 195 (3d Cir. 2005).......................................................................... passim

*Northland Properties Ltd.* B.C.J. No. 1210 (S.C.)...................................................22

*PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544
   (C.A.) ............................................................................................................16

OTHER AUTHORITIES

*Canadian Patent Law and Practice* (Toronto: Canada, 1969) at p 283 .......................9

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY CHIEF JUDGE
AND THE HONORABLE JUSTICE GEOFFREY B. MORAWETZ OF THE ONTARIO
SUPERIOR COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group")[1] hereby delivers to

the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") and the

Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and, together with

the U.S. Court, the "Courts") its response (the "Response") to the opening allocation positions of

(i) the Canadian Debtors and the Monitor; (ii) the EMEA Debtors; (iii) the CCC; and (iv) the UK

Pension Claimants:

## I.    PRELIMINARY STATEMENT

*"Sunlight is said to be the best of disinfectants."*[2]

1.    After nearly four years of squabbling and failed negotiations behind closed doors,

the parties' allocation arguments are now exposed to the public light of day.  These Courts and

the creditors of the Nortel Debtors are finally able to scrutinize and evaluate the strength of the

arguments that have kept the parties so far apart for so long and have now propelled us down the

litigation path that we are on today.  Most of the arguments prove to be incapable of survival in

the light of day to which they are now being exposed for the first time.

2.    The Courts are presented with a single, straightforward question: how much

money should each Nortel estate receive on account of the various Sale Transactions?  The

Bondholder Group submits that the answer is as straightforward as the question:  each estate is

entitled to the fair market value of the assets sold and the rights relinquished by its constituent

Debtors.  A review of the competing allocation submissions reveals that an allocation premised

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bondholder
Group's Opening Allocation Submission [D.I. 10540] and the 2013 Allocation Protocol [D.I. 1013, Ex. A].

[2]    United States Supreme Court Justice Louis D. Brandeis.

on the fair market valuation of what each Nortel Debtor actually gave up in the Sale

Transactions: (i) is the only legally and commercially sound approach to allocation; (ii) is the

only approach that is consistent with the expressed and documented intention of the parties; and

(iii) provides the Courts with the very same tool to resolve this litigation—namely, a customary

and time-tested valuation methodology—that is used every day by courts in both Canada and the

U.S. to resolve valuation disputes like these.

3.      Each of the Debtors has presented an allocation methodology that, in each case,

maximizes their own entitlement to the Sale Proceeds.  That does not mean, however, the

proposed methodologies are equally valid.  That is because in order to reach an allocation

position that maximizes their respective returns, the Canadian Debtors and EMEA Debtors have

had to stretch and reform fact and law so wildly that they settle on positions that cannot

withstand even the most cursory analysis.  Moreover, the CCC (in its alternative argument) and

UK Pension Claimants fail to suggest an "allocation" methodology altogether, instead arguing

for an unprecedented drastic remedy of global substantive consolidation that is not nearly

justified by the facts of this case.  After four years, creditors deserve a final resolution of the

allocation issue so they can receive their distributions.  Not further attempts at delay.

4.      The argument put forward by the Canadian Debtors and the Monitor (and joined,

unsurprisingly, by the CCC) that the Canadian Debtors *exclusively* own *all* of Nortel's

intellectual property and are therefore entitled to virtually *all* of the Sale Proceeds is impossible

to sustain.  That argument makes a mockery of the express terms of the MRDA—a document

that the Canadian Debtors first rely upon to assert "legal title" to all Nortel intellectual property,

but then incredibly and completely ignore when it comes to the "equitable and beneficial

ownership" and express rights granted thereunder to the U.S. Debtors and the other main Nortel

entities. That argument likewise ignores numerous other documents and facts, the consistent conduct of the parties throughout these cases, and the import of various prior rulings of these Courts. It is a "swing for the fences" approach that thoroughly strikes out.

5.    The approach of the EMEA Debtors, not surprisingly when considered against their long track record in these proceedings, is more convoluted but equally devoid of substance. It is a Rube Goldberg-contraption designed to obfuscate the facts and applicable law and leave the parties and these courts tangled in an endless loop where meritless claims are somehow spun into allocation entitlements. As discussed below, when stripped of all subterfuge, the EMEA Debtors' approach yields no substance for these Courts to consider.

6.    Although the U.S., Canadian, and EMEA Debtors differ on proposed allocation methodologies, they do all agree on the question these Courts are being asked to answer—how to allocate asset sale proceeds among the Nortel estates. Notwithstanding this global consensus, the CCC (in its alternative argument) and the UK Pension Parties fail to even propose an allocation methodology. They answer the Courts' question of "how should we allocate proceeds among the Nortel estates?" with "just don't do it." Instead, they ask the Courts to embark on an unprecedented path tantamount to global substantive consolidation, which would disregard the legal and express contractual rights of the Nortel Debtors and their respective creditors. Such a path is unsupportable in law or fact. It is not an allocation—it is a failure to allocate. It would also have the practical effect of imposing endless discovery and countless appeals on the parties, delaying distributions to creditors for years. It is apparent that the CCC and UK Pension Claimants position is an effort to further delay and leverage the litigation process. The Courts rightfully placed this matter on an expedited schedule and all of the estates and the Monitor have agreed on the question before these Courts. The CCC and UK Pension Claimants should not be

allowed to frustrate these Courts' efforts through unsupportable positions.

7.    What is left is the fair market value approach advocated by the U.S. Debtors. This approach does not require these Courts to ignore facts and their own prior rulings the way the Canadian Debtors' approach does; it does not rely on the fanciful claims to which the EMEA Debtors cling; nor does it require the Courts to apply the unprecedented legal theories urged by the CCC and the UK Pension Claimants.  Instead, this approach asks the Courts simply to provide each Nortel estate with the fair market value of what its constituent Debtors sold or relinquished in the Sale Transactions.  What the U.S. Debtors suggest is a simple, routine valuation path forward that is supportable in the law and grounded in the facts.  It is the path that will best position creditors to finally receive distributions and bring these cases to an appropriate close.

## II.    RESPONSE TO ALLOCATION POSITION OF CANADIAN DEBTORS AND MONITOR

8.    The allocation position asserted by the Canadian Debtors and the Monitor (together, the "Canadian Debtors"),[3] and joined in by the CCC, rests on three main premises:

(i)    that in connection with the Business Sales, the Nortel estates "agreed" that all tangible assets should be valued at net book value;

(ii)    that virtually all the remaining value from the Business Sales and the *entirety* of the value from the Residual IP Portfolio is attributable to intellectual property and that NNL, as the nominal owner of legal title to that intellectual property, is entitled to the entirety of that value; and

(iii)    that the exclusive, perpetual, royalty-free licenses (the "Exclusive Licenses") granted to NNI and certain of the EMEA Debtors (A) were without any value with respect to the Residual IP Portfolio or (B) with

---

[3]    The Bondholder Group understands that Wilmington Trust, National Association ("Wilmington") has adopted in full the allocation position of the Canadian Debtors.  As such, this Response is intended to apply equally to Wilmington's allocation position.  To the extent Wilmington asserts a different position or other arguments, the Bondholder Group reserves the right to supplement this Response accordingly.

respect to the Business Sales, were limited in value to the RPSM

percentage each Debtor would have had under the MRDA.

9.      None of these premises holds water.

10.     First, the Canadian Debtors are incorrect that the Nortel estates agreed among

themselves to allocate the Sale Proceeds attributable to tangible assets according to their net

book value. To the contrary, the estates specifically reserved all rights regarding allocation.

11.     Second, contrary to the Canadian Debtors' suggestion, by granting the Exclusive

Licenses pursuant to the MRDA, NNL indisputably gave the holders of such licenses *all* of the

valuable rights with respect to Nortel IP in their respective exclusive territories. Each Exclusive

License conferred upon its holder, among other things, (i) the exclusive right to exploit the

Nortel IP across its home jurisdiction; (ii) the exclusive right to sublicense to third parties; and

(iii) the ability to enforce that right through legal action. Without being able to obtain these

rights, no purchaser would have attributed significant (or any) value to the Nortel IP.

12.     Third, the Exclusive Licenses continued to retain significant value and were

plainly *not* rendered "inapplicable" upon the sale of Nortel's business lines or Residual IP

Portfolio.

13.     Fourth, contrary to the Canadian Debtors' argument, the RPSM does not "cap"

any Sale Proceeds attributable to the Exclusive Licenses of the U.S. Debtors. For these reasons,

and those described below, the Courts should reject the Canadian Debtors' allocation position.

**A.      The Estates Never Agreed Among Themselves to Allocate Proceeds From the Sale of
Tangible Assets According to Net Book Value.**

14.     The Canadian Debtors appear to suggest that the various Nortel estates

collectively agreed that proceeds from the sale of tangible assets would be allocated based on the

net book value of the tangible assets sold by each estate's constituent Debtors. This suggestion

5

is belied by the Nortel estates' explicit agreements with each other in respect of the asset sales.

While it is true that the buyers of Nortel's assets proposed allocations for tangible property, such

allocations were for the benefit of the buyers in connection with their financial reporting

requirements and tax considerations and were not negotiated or approved by the various estates

for application to the allocation of Sale Proceeds.

15.    Thus, while the Nortel estates may have *collectively* agreed with buyers that

buyers were free to allocate value in this manner for purposes of the buyers' purchase

accounting, these agreements have absolutely no bearing upon the allocation *among* the Selling

Debtors themselves.  To the contrary, the Selling Debtors made this point crystal clear by

entering into various "Side Agreements" in conjunction with the sale of Nortel's business lines in

which they unequivocally confirmed that the allocation methodology set forth in the purchase

agreements between buyer and seller "shall not in any way determine the final allocation or

distribution of proceeds from the sale of the Business or otherwise bind the Parties in respect of

the final allocation." (*See, e.g.,* Side Agreement § 3.16.)  It is wholly disingenuous for the

Canadian Debtors to turn a blind eye to the directly applicable Side Agreements and instead

argue that the unrelated agreements with the third party buyers in the Sale Transactions should

form the basis of allocation among the Nortel estates.

16.    The allocation of proceeds from the sale of Nortel's tangible and intangible assets

among the Nortel estates should be based on the fair market value of the assets sold.  Net book

value is an accounting concept that accounts for the historical acquisition cost of an asset, less

any depreciation of that asset over time and any other possible accounting adjustments.  It does

not, and is not intended to, measure how much an asset might bring if sold and, therefore, cannot

compensate the Nortel estates for the actual value of the assets and property rights that their constituent Debtors transferred in the Sale Transactions.

17.     In addition, by understating the value of the tangible assets sold by the other Selling Debtors, the Canadian Debtors' proposal would *overstate* the value of the Nortel IP to the Canadian Debtors.  This is because the Canadian Debtors claim entitlement to *all* value over and above the net book value of tangible assets—so the lower the value attributed to tangible assets, the higher the value "captured" by the Canadian Debtors via their intellectual property catch-all. The use of a straightforward fair market value approach prevents exactly this kind of accounting gamesmanship.

**B.     Allocation of IP Value to the Canadian Debtors Based on Nominal Legal Title Completely Disregards the Extensive and Valuable Licenses That Were Granted to the Other Nortel Entities.**

18.     The Canadian Debtors assert that: (i) substantially all of the value received in the Sale Transactions was attributable to intellectual property and (ii) nearly all of that value should be allocated to NNL as the holder of nominal title to that property.  (The CCC, in supporting this position, goes even further, asserting that nominal title is the *only* relevant consideration in determining how the proceeds from the sale of the Nortel IP should be allocated.)

19.     These assertions ignore a fundamental reality:  bare legal title to the Nortel IP did not provide (and could not have provided) purchasers of the Nortel IP with the most valuable rights associated with that intellectual property, because NNL's ownership of title to the Nortel IP was at all relevant times subject to the exclusive, perpetual, and royalty-free Exclusive Licenses and enforcement rights granted to NNI, NNUK, NN Ireland, and NNSA (the "Exclusive License Holders"), pursuant to the MRDA.

20.     Indeed, the Exclusive Licenses were expressly intended by the parties to the MRDA to be so all-encompassing as to grant to their holders the "equitable and beneficial

7

ownership"[4] of virtually all of the rights that drive the value of intellectual property—including

the *exclusive and perpetual rights* to use, exploit, and sublicense the Nortel IP within their

respective home jurisdictions (the United States and Puerto Rico for NNI, United Kingdom for

NNUK, Ireland for NN Ireland and France for NNSA), as well as the right to enforce these rights

through legal action.

     21.    Specifically, the MRDA transferred to the Exclusive License Holders the

following key rights in the Nortel IP (referred to in the MRDA as "NN Technology"):

- "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others" (MRDA at Art. 4(e));

- an exclusive, royalty-free right to sublicense within their home jurisdictions (*id.* at 5(a)(i));

- an exclusive, royalty-free right to "make, have made, use, lease, license, offer to sell and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant" (*id.*); and

- exclusive, royalty-free "rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how..." (*id.*).

Taken together, these provisions gave each Exclusive License Holder the perpetual right to

exploit the Nortel IP and exclude all the world—*including NNL or any purchaser of NNL's

interests*—from so-exploiting in its respective jurisdiction and the exclusive ability to effectively

transfer that exclusionary right (through sublicense) to other parties.

     22.    It is inconceivable that the IP purchasers attributed billions of dollars of value to

NNL's bare title to the Nortel IP, where such title was openly and unequivocally encumbered by

Exclusive Licenses that would contractually bar such purchasers from using, exploiting, or sub-

licensing the intellectual property across the home jurisdictions of the Exclusive License Holders.

---

[4]     MRDA at 1.

See, e.g., Armstrong Pump, Inc. v. Hartman, 745 F. Supp. 2d 227, 233 (W.D.N.Y. 2010) ("It is well-settled . . . that an assignee of a patent takes title to the patent subject to existing licenses." (citation omitted)); see also Fox on Canadian Patent Law and Practice, (Toronto: Canada, 1969) at p 283, ("An assignment cannot defeat the rights of a licensee").

23.    It was only because the Exclusive License Holders agreed to relinquish their Exclusive Licenses—and the substantial and valuable rights in the Nortel IP that the Exclusive Licenses conferred—that the value in the Nortel IP was unlocked for the benefit of third-party purchasers. Indeed, as required by these purchasers, the Exclusive License Holders each agreed to terminate their Exclusive Licenses, but solely "for the purpose of facilitating . . . the sale" of Nortel's assets (businesses and IP) and "in consideration of a right to allocation." (IFSA ¶11(a).)

24.    The proceeds from the sale of the Nortel IP should thus be allocated according to the fair market value of the Exclusive Licenses, i.e. the value attributable to the exclusive right of each Exclusive License Holder to exploit the Nortel IP in its home jurisdiction. Because the U.S. was the most valuable market in which to exploit the Nortel IP—a fact recognized by Nortel, which registered the vast majority of its patents exclusively in the U.S.—the proceeds generated from the various sales of the Nortel IP are largely attributable to the purchase of the interests and rights of NNI. The Canadian Debtors' argument that the exclusive right to use the Nortel IP in the U.S. territory (the largest market for Nortel and one of the largest markets in the world) was worthless or nearly worthless defies all common sense.

C.    **The Value of the Exclusive Licenses Was Not Dependent Upon the Ongoing Operation of Nortel's Businesses.**

25.    The Canadian Debtors contend that the Exclusive Licenses held value only insofar as the Exclusive License Holders continued to exercise their exclusive right to generate products using or embodying the Nortel IP within their geographic territories. But this position

focuses solely on one aspect of the Exclusive Licenses and completely disregards the other equally substantial and valuable rights to the Nortel IP that were conferred to each Exclusive License Holder through the MRDA—including the exclusive and perpetual right to monetize its interests in the Nortel IP through sublicenses to third parties and the right to enforce its interests in the Nortel IP through actions for infringement or misappropriation.

26.     These rights preserve for the Exclusive License Holders the essential value of what a patent provides—not simply the right to make, use, lease, offer to sell, and sell products using the intellectual property (as the Canadian Debtors suggest), but also the right to *exclude* others from doing so.  Indeed, an entire industry has developed that is dedicated to the strategic acquisition of patents not to exploit them but instead to enforce the affirmative right to sue potential infringers.  The result is that potential infringers pay top dollar for licenses to patents to avoid infringement suits.  The value inherent in each of the Exclusive License Holders' right to exclude and sublicense—as well as its right to exploit—is what the purchasers of the Residual IP Portfolio paid to acquire.  In fact, in evaluating the options for maximizing the value of the residual IP to the Nortel estates, the Nortel Debtors—*including NNL*—spent substantial time and analysis considering the formation of a new entity and creating a financial plan to do exactly that—license and litigate to monetize the value of the residual IP.

27.     Finally, the court orders and party agreements governing the Sale Transactions *expressly contemplated* that the Exclusive License Holders would be entitled to an allocation of the sale proceeds generated by the relinquishment of their Exclusive Licenses.  (*See* IFSA ¶11(a) ("Each of the US Debtors and the EMEA Debtors hereby agrees to enter into an Appropriate License Termination . . . with respect to the licenses and rights granted by NNL to such Debtors under or pursuant to the provisions of the [MRDA] . . . for the purposes of facilitating, *and in*

*consideration of a right to allocation* . . . the sale of any material assets . . .") (emphasis added);
*see also* License Termination Agmt. § 2.04.

28.     Undeterred, the Canadian Debtors argue just the opposite—that the Exclusive
Licenses should be disregarded or treated as somehow no longer existing, as though somewhere
along the line they were extinguished or terminated as part of the bankruptcy proceedings. This
challenge seeks to upset the integrity of critical and common provisions in sale orders that are the
lifeblood of chapter 11 and CCAA cases. Debtors and their creditors must know and be assured
that their contractual entitlements and property rights are not impaired or abrogated by sale
orders of property. The fact that bankruptcy or insolvency sales, as here, are accomplished free
and clear of those contractual entitlements and property rights is only true vis-à-vis the
*purchaser* of those assets, *not other claimants in the estate*. Such sales do not extinguish or
diminish creditors' entitlements and rights, but instead channel them to the proceeds of the sales
to which they attach with the same force and effect as they did to the debtors and their property
prior to the sales. The Canadian Debtors' attempts to vitiate these entitlements and rights must
not be countenanced. This is especially true here where the IFSA clearly evidences the intent
and bargain of the parties to release their Exclusive Licenses in direct exchange for an equivalent
right to an allocation of proceeds.

D.      **The RPSM is Irrelevant to the Allocation of Proceeds from the Sale of Nortel IP.**

29.     As a fallback to their assertion that they are entitled to receive 100% of any value
attributable to Nortel IP in connection with the Business Sales, the Canadian Debtors argue that
any allocation of the Sale Proceeds attributable to the relinquishment of Exclusive Licenses in
connection with the sale of Nortel's business lines would necessarily be "capped" by the RPSM
set forth in Schedule A to the MRDA. In so arguing, the Canadian Debtors attempt to repurpose
the RPSM from its intended function as a methodology to increase tax efficiencies into a formula

to allocate business value.

30.      The RPSM was a transfer pricing arrangement through which each of the

operating entities, NNL, NNI, NNUK, NNSA, and NN Ireland (collectively, the "RPS

Participants") were entitled to share in Nortel's profits (or losses) based on that RPS Participant's

relative contribution to overall research and development ("R&D") spending.  Although the

RPSM functioned to divide profits and losses when Nortel was operating as a going concern, it is

inapplicable here for several reasons.

31.      First, and most importantly, the terms of the MRDA make clear that it does not

apply.  The MRDA *expressly* states that the RPSM is not applicable in the event of a liquidation

or other sale of the Nortel business.  (*See* MRDA, Sch. A (specifically excluding "gain/loss on

the sale of business" when calculating the residual profit or loss to be divided among the RPS

Participants pursuant to the RPSM).)

32.      Second, even if the MRDA were applicable, it does not support a cost or

contribution-based approach to allocation, but rather expressly contemplated a return to each of

the Exclusive License Holders of the fair market value of their licenses.  Specifically, the MRDA

provides that if an RPS Participant retires from the MRDA, the retiring RPS Participant would

receive "the fair market value (at the time of retirement of [the participant's] Exclusive

License) . . ." (MRDA at 3-4, 9.)  Accordingly, even if this were treated as the equivalent of a

termination under the MRDA, the MRDA would mandate that the estate of each RPS Participant

receive the fair market value of its Exclusive License, not its entitlement under the RPSM.

33.      Third, pursuant to orders entered by these Courts, the U.S. Debtors no longer have

any RPSM obligation under the MRDA.  In consideration of the funding by the U.S. Debtors to

the Canadian Debtors in the Final Canadian Funding and Settlement Agreement ("FCFSA"), the

Canadian Debtors agreed that the U.S. Debtors had no further obligation to make transfer pricing payments under the MRDA or otherwise. (*See* FCFSA ¶¶ 3, 28, 29.) The Canadian Debtors' argument that the RPSM should serve as the basis for allocation of value necessarily suggests that the U.S. Debtors have further obligations to "pay" for the licenses. Even if the RPSM applied (which it does not), the FCFSA terminated any such obligation of the U.S. Debtors to the Canadian Debtors, thereby entitling the U.S. Debtors to the full value of their Exclusive License.

34.    For all of the foregoing reasons, the Courts should reject the approach to allocation proposed by the Canadian Debtors and the Monitor.

**III.    RESPONSE TO ALLOCATION POSITION OF THE EMEA DEBTORS**

35.    The EMEA Debtors offer a different but equally flawed approach to allocation of the Sale Proceeds. They first suggest separating the assets into four different categories (fixed assets, inventory, customer assets, and intangible assets), then valuing the assets within each category, and finally allocating that value among the Nortel estates. The EMEA Debtors suggest valuing these asset categories using inconsistent methodologies in an effort to "cherry pick" the value-maximizing approach for the EMEA entities in each asset category. With respect to the first three asset categories (fixed assets, inventory, and customer assets), the EMEA Debtors appear to base allocation on each estate's legal ownership rights. With respect to the fourth category, IP proceeds, the EMEA Debtors take an entirely different approach, contending that allocation should be proportional to each estate's contributions to R&D. Not content with the allocation that would result to the EMEA Debtors based on this expanded and baseless "contribution" approach, the EMEA Debtors seek to further inflate their allocation by incorporating their meritless "proprietary claims" against the U.S. and Canadian Debtors *as though they were actual contributions to R&D spending*.

36.    The EMEA Debtors' approach to allocation should be rejected on at least two

fundamental grounds. First, the EMEA Debtors' division of assets into four separate categories

for valuation and allocation purposes appears designed solely to create a construct in which each

of the individual EMEA estates can cherry-pick an allocation approach that best suits its

recovery. Second, the EMEA Debtors' approach to allocating the value of the Nortel IP based

on each estate's contribution to R&D is legally and factually unsupportable, ultimately

amounting to nothing more than a transparent attempt by the EMEA Debtors to realize value

(and, indeed, dollar for dollar value) on account of their meritless, and at best, unsecured claims.

**A.    The EMEA Debtors' Approach to Valuation and Allocation Based on Asset Categories is Fundamentally Flawed.**

37.    The proposal by the EMEA Debtors to separate the assets into four different

categories for valuation and allocation purposes is flawed because it is not consistent with the

economic reality of the Sale Transactions. Through the Sale Transactions, Nortel sold its

businesses as going concerns. As the U.S. Debtors and UCC discussed at length in their opening

allocation submission, the most common and accepted valuation methodology for valuing a

business in this situation is one based on the business's fair market value. (*See* U.S. Debtors

Opening Br. at 19-24 (citing cases).) In stark contrast, the EMEA Debtors' asset-based approach

to valuation would essentially ascertain the *liquidation* value of the business, *i.e.*, the value if it

were sold piecemeal rather than as a collective going concern. This piecemeal approach should

not be used, because it fails to reflect the manner in which Nortel's businesses were actually sold

and would lead to results that are unreliable and divorced from reality.

38.    In addition to being inapplicable to the sale of a going concern, the EMEA

Debtors' asset-based approach to valuation appears prime for abuse. Specifically, it allows the

EMEA Debtors—and potentially other parties as well—to cherry-pick ways to maximize the

value allocated to their estates under each asset category. An approach based on fair market value principles, on the other hand, avoids this problem by eliminating areas of potential gamesmanship.

39.    For all of these reasons, the Courts should decline to adopt the EMEA Debtors' asset-based approach to allocation and instead apply an approach based on the fair market value of the businesses that were sold.

**B.    The EMEA Debtors' Proposed Method for Allocating the Nortel IP is Inconsistent With the Applicable Law.**

40.    According to the EMEA Debtors, the Nortel IP proceeds should be allocated to each Nortel estate based on the direct and indirect contributions to R&D made by each estate's constituent Debtors. This approach to allocation, which is designed to create outsized allocations to the EMEA Debtors, is wholly without merit, for two separate reasons. First, as discussed in the Bondholder Group's opening brief, the proceeds from the Sale Transactions should be allocated based on the value of the Nortel IP rights relinquished by the relevant Nortel Debtors, not the costs incurred in developing those rights. Second, the MRDA, which the EMEA Debtors rely upon heavily as purported evidence of the Debtors' expectations, is inapplicable to allocation of sale proceeds by its express terms and, in any event, does not support the EMEA Debtors' position.

i.    Nortel IP Sale Proceeds Should Be Allocated Based on Fair Market Value Principles, Not Contributions to R&D.

41.    As discussed in the Bondholder Group's Opening Allocation Position, an allocation methodology based on fair market value represents the most logical and legally sound method of allocating Sale Proceeds among the Nortel estates. This approach has been widely

used by courts to accomplish allocation in similar circumstances, particularly in the insolvency

context. (*See* Bondholder Group's Opening Br. at 6-9 (citing cases, including *In re LTV Steel

Co.*, 285 B.R. 259, 267-68 (Bankr. N.D. Ohio 2002) ("Courts allocate sale proceeds between

individual assets based upon each asset's portion of the total value of all the assets.") and

*PricewaterhouseCoopers Inc. v. Olympia & York Realty Corp.* (2003), 68 O.R. (3d) 544 (C.A.)

(to decide whether a transaction by debtor may be declared void, court "must determine the fair

market value of what the bankrupt gave up and the fair market value of what it received in the

transactions.").) The same approach should be followed here. The Courts should allocate the

Sale Proceeds from the sale of the Nortel IP according to the fair market value of the rights in the

Nortel IP that the constituent Debtors relinquished in the Sale Transactions. Any other approach,

particularly the cost-based approach offered by the EMEA Debtors, is inconsistent with the

relevant jurisprudence.

42.    In addition to being without legal support, the EMEA Debtors' approach to

allocation of the Nortel IP is factually flawed. The EMEA Debtors fail to account for the

immensely valuable Exclusive Licenses that the Exclusive License Holders relinquished in the

Sales Transactions. As noted above, prior to the Sale Transactions, certain Nortel Debtors

bargained for and obtained from NNL an Exclusive License to exploit Nortel IP in its geographic

territory. These licenses were particularly valuable to the U.S. Debtors, whose Exclusive

License to exploit the Nortel IP in the U.S. market was significantly more valuable than the

licenses granted to the other Nortel Debtors to exploit the Nortel IP in other, less lucrative

markets. The EMEA Debtors' approach to allocation, however, completely ignores the

Exclusive Licenses, and provides *no* compensation to the estates in exchange for them. This

result cannot be reconciled with the legitimate expectations of the Nortel Debtors.

16

ii.    The MRDA's Cost-Based Approach for Transfer Pricing is Not Relevant to
       Allocation of the Sale Proceeds.

43.    The MRDA provides no support for the EMEA Debtors' allocation position. The

EMEA Debtors use the MRDA, and specifically the RPSM contained therein, to argue that the

Nortel Debtors intended that each of them would acquire beneficial ownership rights in the

Nortel IP based on its contributions to R&D. (EMEA Debtors Br. at 23.) At the same time,

however, the EMEA Debtors distance themselves from an actual application of the RPSM,

because they do not like the results it would bring. In addition to being internally inconsistent

(*i.e.*, suggesting that the MRDA both applies and does not apply), the EMEA Debtors' argument

must be rejected because the MRDA, by its express terms, has no relevance to allocation of sale

proceeds. (*See supra* ¶¶ 31-32 (reciting provisions of MRDA which demonstrate that it does not

apply to sale of Nortel business).) Accordingly, any attempt by the EMEA Debtors to rely on the

MRDA in support of their allocation position should be rejected.

**C.    The EMEA Debtors' Alternative "Operation of Law" Arguments for Allocation of
       Nortel IP Are Equally Meritless.**

44.    As an alternative to their flawed argument that the MRDA supplies the

appropriate allocation methodology, the EMEA Debtors resort to various equitable remedies to

purportedly demonstrate that they are entitled to a beneficial interest in the Nortel IP "by

operation of law." (EMEA Debtors Br. at 25.) These theories fail.

45.    As an initial matter, contrary to the EMEA Debtors' implicit suggestion that a fair

market value approach would somehow not be equitable, there is nothing at all inequitable about

the approach to allocation advanced by the U.S. Debtors. In fact, the fair market value approach

is the *only* approach that appropriately compensates the relevant Nortel Debtors for the value of

their Exclusive Licenses, which they bargained for under the MRDA and then later relinquished

as part of the Sales Transactions. An allocation approach based on fair market value is also

equitable because it accurately reflects the reality that the U.S. Debtors were the primary drivers of revenue throughout the Nortel Group and, therefore, should receive a substantial majority of the Sale Proceeds.

46.    In addition to the foregoing, the EMEA Debtors' arguments based on these equitable remedies should be rejected because they do no more than reiterate the baseless theories that the EMEA Debtors have advanced in their proprietary claims. These claims will be adjudicated in the separate claims litigation pending before these Courts and have no place in the allocation dispute.

47.    For these reasons, the Courts should reject the alternative argument of the EMEA Debtors that they are entitled to beneficial interests in the Nortel IP by some unsubstantiated "operation of law."

**D.    The EMEA Debtors Misapply Their Proposed Allocation Methodology.**

48.    Even if the Courts were to adopt the EMEA Debtors' contribution-based approach to allocation (which, for all of the foregoing reasons, they should not), the EMEA Debtors' flawed application of that approach must be rejected.

49.    The EMEA Debtors assert in their brief that they contributed over $1.9 billion to R&D spending, but they did not. Instead, this figure appears to assume erroneously that the EMEA Debtors will succeed on their "proprietary claims" against the U.S. and Canadian Debtors. Because these claims are utterly meritless, they should be attributed *no* value for allocation purposes.[5] Moreover, even if these claims were somehow successful, they would only result, at best, in unsecured claims against the applicable Nortel Debtors, not the dollar-for-dollar recovery that the EMEA Debtors seek to realize by improperly tying these claims to the allocation dispute.

---

[5]    The EMEA Debtors' claims against the U.S. Debtors should be dismissed for the reasons set forth in the U.S. Debtors' claim objection [D.I.10521], in which the Bondholder Group has joined [D.I. 10550].

50.    In addition to grossly overstating the value that the EMEA Debtors contributed to the development of the Nortel IP, the EMEA Debtors improperly fail to account for the U.S. Debtors' substantial direct and indirect contributions to R&D spending through (among other things) transfer pricing payments. If necessary, the Bondholder Group believes that, following discovery and trial, the evidence will show that the EMEA Debtors' contributions to R&D spending were significantly less than those of the U.S. Debtors and not nearly $1.9 billion.

IV.    **RESPONSE TO THE SECONDARY ALLOCATION POSITION OF CCC AND THE ALLOCATION POSITION OF THE UK PENSION CLAIMANTS**

51.    In their opening allocation positions, both the CCC and the UK Pension Claimants ask the Courts to abdicate their responsibility to allocate the Sale Proceeds and take the drastic, unprecedented, and legally indefensible step of wholly or partially consolidating the global Nortel estates. The CCC seeks substantive consolidation as an alternative remedy in the event the Courts reject the CCC's primary argument that the Canadian Debtors are entitled to receive all of the proceeds from the sale of the Nortel IP. The UK Pension Claimants, on the other hand, devote their entire allocation position to a request for a partial substantive consolidation that allocates the Sale Proceeds ratably to all Nortel creditors.

52.    Neither the global substantive consolidation sought by the CCC nor the partial consolidation sought by the UK Pension Claimants is legally supportable. First, no court or courts possess the authority to order substantive consolidation over the objections of creditors and one or more debtors in these cross-border, multi-entity insolvency proceedings. Second, neither the facts nor the equities support the extreme and extraordinary remedy of substantive consolidation, particularly given that it would deny many creditors, including the Bondholder Group, their bargained-for rights. Finally, the partial substantive consolidation approach

19

advanced by the UK Pension Claimants fares no better, as it represents an improper "deemed"

substantive consolidation that courts have consistently rejected.

**A.    CCC's "*Pro Rata*" Distribution Approach is Simply a Call for Global Substantive Consolidation and Therefore Should Be Rejected.**

53.    With only end-results in mind, the CCC asserts that, if the Courts refuse to hand

over all of the Sale Proceeds to the Canadian Debtors, the Courts should ignore the allocation

question plainly before them and enter an order globally consolidating the Nortel assets for *pro*

*rata* distribution among all Nortel creditors.  (CCC Brief at ¶ 5(b).)  This proposed "*pro rata*"

distribution approach is nothing more than a thinly-disguised request for these Courts to order

something that has never been done before—a non-consensual, global substantive consolidation

of multiple estates.  The CCC's approach must be rejected.

54.    First, and most importantly, the Courts do not have the authority to order or

enforce a cross-border substantive consolidation of the Nortel Debtors.  In fact, ***substantive***

***consolidation has never been ordered over a creditor's objection in a cross-border insolvency***

***proceeding.***  Further, under Canadian law, substantive consolidation has never been granted over

the objection of a debtor whose assets are to be consolidated.  Accordingly, granting substantive

consolidation in this case over the objection of, among others, the Bondholder Group, U.S.

creditors, and U.S. Debtors (and probably one or more EMEA entities) would be unprecedented

and wholly unsupportable.

55.    Second, substantive consolidation is a ***remedy*** designed to address harms caused

by debtors' disregard of corporate separateness; it may not be used offensively by any creditor

group to better its position or recovery.  *See, e.g., In re Owens Corning*, 419 F.3d 195, 211 (3d

Cir. 2005) ("While substantive consolidation may be used defensively to remedy the identifiable

harms caused by entangled affairs, it may not be used offensively").  In particular, substantive

consolidation may not be used "to disadvantage tactically a group of creditors in the plan process

or to alter creditor rights." *Id.*

56.     The CCC identifies no harm resulting from the Nortel Debtors' alleged failure to

observe corporate separateness (even if such failure could be assumed, which it cannot) that

would justify the remedy of substantive consolidation.  Instead, the CCC seeks to use substantive

consolidation as a sword to (i) dilute the recoveries of creditor groups in the United States and

EMEA in order to improve the CCC's recovery; (ii) deny the Bondholders their bargained-for

guarantee rights; and (iii) render worthless the $2 billion claim of NNI against NNL that was

agreed to post-filing and approved by the Courts.  The equitable remedy of substantive

consolidation cannot be used in this manner.  *See Owens Corning*, 419 F.3d at 199.[6]

57.     <u>Finally</u>, even if the Courts had the authority to order substantive consolidation, it

is simply not warranted in this case.  Substantive consolidation is considered an extraordinary

remedy under both U.S and Canadian law that is to be used "sparingly" and should only be

granted as a last resort when all other possible remedies have failed.  *See, e.g., Owens Corning*,

419 F.3d at 208-209, 211 ("because substantive consolidation is extreme (it may affect

profoundly creditors' rights and recoveries) and imprecise, this 'rough justice' remedy should be

rare and, in any event, one of last resort after considering and rejecting other remedies").

58.     In the Third Circuit, absent consent, a party seeking substantive consolidation

must prove either that:

---

[6]     As the Third Circuit recognized in denying substantive consolidation that was sought in order to eliminate
certain guarantee claims:

> No principled, or even plausible, reason exists to undo [the debtor's] and [the lenders']
> arms'-length negotiation and lending arrangement, especially when to do so punishes the
> very parties that conferred the prepetition benefit—a $2 billion loan unsecured by [the
> debtor] and guaranteed by others only in part.  To overturn this bargain, set in place by
> [the debtor's] own pre-loan choices of organizational form, would cause chaos in the
> marketplace, as it would make this case the Banquo's ghost of bankruptcy.

*Owens Corning*, 419 F.3d at 216.

(i) prepetition, the entities that are to be substantively consolidated disregarded their separateness so significantly that their creditors actually and reasonably relied on the breakdown of entity borders and treated them as one legal entity; or

(ii) postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Owens Corning*, 419 F.3d at 211, 212.[7] The burden of proof lies with the party seeking substantive consolidation. *Id.* at 212. Based on the allegations contained in its opening allocation position, the CCC cannot carry this burden.

59.    With respect to the first substantive consolidation factor, the relevant inquiry is whether ***creditors*** viewed Nortel as ***one legal entity*** when extending credit. *See, e.g., In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988).[8] The CCC fails to present any evidence suggesting that creditors reasonably and actually relied upon the integration of the Nortel Debtors as a single economic unit. In fact, the evidence will rebut the CCC's assertions and establish that creditors understood that each Nortel Debtor was a ***separate*** legal entity responsible for its own debts. There are substantial creditors in these cases that clearly ***did not*** view the Nortel entities as a single entity as evidenced by their pre-petition bargaining for guarantees from various Nortel entities.

60.    The guarantee rights bargained for by the Bondholder Group are a clear example. If, as the CCC contends, creditors viewed the Nortel entities as jointly responsible for each

---

[7]    Canadian courts have made reference to U.S. case law in considering when the extraordinary relief of substantive consolidation should be granted. *See, e.g., Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107; *Northland Properties Ltd. (Re)*, [1988] B.C.J. No. 1210 (S.C.). The factors for determining whether to grant substantive consolidation under Canadian law are substantially similar to those under applicable U.S. law. Under Canadian law, a proponent of substantive consolidation must show either (i) improper conduct by one or more debtors, such as fraud or misusing its corporate identity, or (ii) the debtors' financial affairs being such that it would be manifestly unfair to creditors' expectations to treat the debtors as separate legal entities. To the extent it is determined that the U.S. law analysis of substantive consolidation is not determinative of the issue under Canadian law, the Bondholder Group fully reserves its rights to make additional arguments under Canadian law.

[8]    In *Owens Corning*, the Third Circuit adopted in substance the *Augie/Restivo* substantive consolidation factors. *See* 419 F.3d at 209 (noting that Third Circuit favors the approach of *Augie/Restivo*).

other's debts, the Bondholder Group's guarantees would have been entirely redundant and unnecessary. The guarantees were not redundant, however, because creditors properly viewed NNL and NNI as separate legal entities having independent creditworthiness. That the Nortel entities may have *operated* globally across business lines and shared certain common systems and personnel, a common practice for multinational corporations, is wholly insufficient to establish that creditors viewed Nortel as a single indivisible *economic* entity.

61.   There is a similar lack of evidence to support substantive consolidation under the second factor in the analysis, which relates to the entanglement or "scrambling" of the estates' assets and liabilities. As an initial matter, contrary to the CCC's suggestions (*see* CCC Brief ¶¶ 19, 69), the fact that purchasers paid one aggregate purchase price for the Selling Debtors' assets and property rights in the Sale Transactions does not in any way evidence entanglement of the estates' assets and liabilities for purposes of substantive consolidation. The Selling Debtors determined to sell their assets and property rights on a global basis in order to maximize their value, not because they *had* to be sold in that manner.

62.   Moreover, even if there were some degree of commingling of assets and liabilities among the Nortel Debtors, it would not justify substantive consolidation in this case, because not every creditor would benefit from substantive consolidation. *See Owens Corning*, 419 F.3d at 214 ("[C]ommingling justifies consolidation only when . . . *every creditor* will benefit from the consolidation." ) (emphasis added). Indeed, *at least three creditor groups*, including the Bondholders (through the loss of their bargained-for guarantee rights), the U.S. creditors, and creditors of the vast majority of the EMEA Debtors (through the dilution of their assets) will be harmed by the significant diminution of their recoveries if substantive consolidation were

granted. Accordingly, substantive consolidation cannot be justified under the facts and circumstances of this case.

63.     The CCC suggests that this harm to creditors, including the Bondholder Group, does not preclude granting substantive consolidation because they were aware of the potential for substantive consolidation. (*See* CCC Brief ¶ 71.) The CCC does not cite any relevant case law for this premise. Further, this argument appears to rest entirely on a purported warning contained in a post-insolvency financial disclosure that substantive consolidation was possible. The CCC completely ignores, however, two obvious and important facts. First, risk factors are commonly included in financial disclosures, and the mere citing of a risk does not mean it is likely or even remotely likely. Second, and even more importantly here, the noted risk concerned only the possibility of substantive consolidation among the U.S. Debtor entities. (*Id.* ("There is a risk that an interested party . . . could request that the assets and liabilities of *NNI, or those of other U.S. Debtors*, be substantively consolidated with those of one or more *other U.S. Debtors*") (emphasis added).) The risk of the substantive consolidation *within* the U.S. estate is irrelevant to the unprecedented possibility of global substantive consolidation of multiple estates in multiple jurisdictions across the globe.

64.     Finally, the principal equitable consideration for granting substantive consolidation based on "commingling of assets and liabilities" is that substantive consolidation would benefit creditors by avoiding the cost of unscrambling those assets and liabilities. That benefit is simply not present here. Assuming *arguendo* that the CCC prevails on its alternative *pro rata* approach, the costs to the estates associated with resolving the allocation dispute will already have been substantially incurred by the time such ruling is obtained. Indeed, rather than *saving* the estates' money, substantive consolidation would likely result in considerable

additional *costs* to the estates due to, among other things, the inevitable and prolonged appeals and legal challenges by numerous creditors and debtors in multiple estates to a ruling that would be entirely unprecedented and without legal support.[9]

65.    For all of the foregoing reasons, the CCC's alternative "allocation" position must be rejected.

**B.    UK Pension Claimant's "*Pro Rata*" Approach Effects an Impermissible Deemed Substantive Consolidation and Therefore Should Be Rejected.**

66.    Similarly to the CCC, the UK Pension Claimants advocate the substantive consolidation of the Nortel Debtors—likewise cloaked as a *pro rata* approach to "allocation"—for the limited purpose of distributing only the Sale Proceeds (as opposed to *all* of the Nortel Group's assets).  This limited substantive consolidation proposed by the UK Pension Claimants fails for the same reasons that the CCC's proposal of global substantive consolidation fails: although the UK Pension Claimants suggest some overlap of business functions and operations, they fail to plead any facts suggesting that either (i) creditors viewed Nortel as a single economic unit in extending credit or (ii) the assets and liabilities of the Nortel Debtors are unduly scrambled.  The UK Pension Claimants have presented no facts that would justify the imposition of the extraordinary and extreme remedy of substantive consolidation.[10]

67.    Moreover, the "*pro rata*" approach advocated by the UK Pension Claimants is an impermissible "deemed" consolidation.  Under the UK Pension Claimants' method, the Sale Proceeds would be consolidated solely for the related purposes of allocation and valuing and

---

[9]    In addition, substantive consolidation would require all claims in all estates to be determined prior to making any distributions.  This would further delay creditors' recoveries.

[10]    The UK Pension Claimants alternatively seek a limited substantive consolidation of the Nortel Debtors under the guise of "equitable principles."  These arguments equally fail.  The UK Pension Claimants should not be allowed to use these so-called equitable principles to avoid the stringent requirements of substantive consolidation, which they cannot meet.  To the extent the Courts decide these equitable arguments may be considered on their merits (which they should not), each argument fails for reasons that the Bondholder Group reserves the right to describe more fully at trial.

satisfying creditor claims, without establishing that full substantive consolidation is warranted. The Third Circuit has expressly rejected "deemed" consolidation as inequitable,[11] especially where, as here, such consolidation is not being used as a defensive remedy but instead as an offensive strategy designed to increase the recoveries of certain creditor groups to the detriment of others, including those holding guarantee claims. Indeed, the Third Circuit addressed precisely this issue in *Owens Corning*, holding that substantive consolidation should not be used to eliminate bargained-for guarantees:

> Substantive consolidation is at its core equity. Its exercise must lead to an equitable result. "Communizing" assets of affiliated companies to one survivor to feed all creditors of all companies may to some be equal (and hence equitable). But it is hardly so for those creditors who have lawfully bargained for unequal treatment by obtaining guarantees of separate entities . . . . With no meaningful evidence supporting either test to apply substantive consolidation, there is simply not the nearly "perfect storm" needed to invoke it. Even if there were, a "deemed" consolidation—"several zip codes (if not area) codes away from anything resembling substantive consolidation,"—fails to even qualify for consideration.

419 F.3d at 216 (internal citations omitted).

68.    Accepting the UK Pension Claimants' "allocation" position would directly violate *Owens Corning* by giving effect to a thinly-veiled deemed consolidation that would have the harmful and prejudicial effect of depriving the Bondholder Group of the benefits of its guarantee rights and diluting the recoveries of other creditor groups, including the creditors of the U.S. Debtors and the EMEA Debtors. *See Owens Corning*, 419 F.3d at 216 (rejecting substantive consolidation where proponents sought substantive consolidation not as a remedy but as a

---

[11]    The only instance in which deemed consolidation has been approved by courts in the Third Circuit is where it forms part of a settlement agreement or plan of reorganization. *See, e.g., In re Kaiser Aluminum Corp.*, No. 02-10429(JFK), 2006 WL 616243, at *22 (Bankr. D. Del. Feb. 6, 2006) (approving deemed consolidation in plan of reorganization given "the absence of any creditor objection to the deemed consolidation, and . . . the overwhelming creditor support for the Plan"). Those cases have no relevance here, because the substantive consolidation proposed by the UK Pension Claimants is neither part of a plan of reorganization nor consensual.

strategy to strip certain creditors of their bargained-for guarantee rights).  As a result, like the CCC's "allocation" position, the UK Pension Claimant's "allocation" position must be rejected.

## RESERVATION OF RIGHTS

69.    The arguments set forth herein represent the Bondholder Group's initial responses to the allocation positions advanced by the other Core Parties.  The Bondholder Group reserves all rights to revise and/or supplement these responses at any time.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the US and Canadian Courts (i) allocate the Sale Proceeds by determining the fair market value of each Selling Debtor's share of assets, rights, and property it sold or relinquished in the Sale Transactions; and (ii) grant such other and further relief as the Courts deem just and proper.

Dated: May 29, 2013

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Kathleen Makowski
Laura Davis Jones (No. 2436)
Kathleen P. Makowski (No. 3648)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

MILBANK, TWEED, HADLEY & MᶜCLOY LLP
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:   (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

BENNETT JONES LLP
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone: (416) 777-5762
Facsimile: (416) 863-1716

*Attorneys for Ad Hoc Group of Bondholders*

**TAB B**

53

This is Exhibit.........................ß.......................referred to in the

affidavit of..........Barbara Walenlill...........................

sworn before me, this.......3..................................

day of..............January.........................20 11.......

A COMMISSIONER FOR TAKING AFFIDAVITS

54

Court File No. 09-CL-7950

ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**ALLOCATION POSITION OF THE
CANADIAN CREDITORS' COMMITTEE (THE "CCC")**

**TABLE OF CONTENTS**

PART I – INTRODUCTION AND RELIEF SOUGHT ............................................................3

PART II – OVERVIEW OF ALLOCATION POSITION.........................................................4

    A.      Ownership Allocation Order ...................................................................4

    B.      Equitable Allocation Order....................................................................6

PART III – PARTIES ........................................................................................................7

    A.      Debtors..................................................................................................7

    B.      Creditors...............................................................................................7

PART IV – FACTS ...........................................................................................................9

    A.      Introduction ...........................................................................................9

    B.      Innovation and Expansion ..................................................................10

    C.      Lines of Business ...............................................................................11

    D.      Role of Nortel Canada ........................................................................11

    E.      IP and R&D.........................................................................................12

    F.      Filing and Liquidation..........................................................................12

PART V – ALLOCATION POSITION OF THE CCC ........................................................14

    A.      Allocation by Ownership .....................................................................14

    B.      Allocation Pro Rata by Claims.............................................................18

PART VI – CONCLUSION...............................................................................................24

- 3 -

# PART I – INTRODUCTION AND RELIEF SOUGHT

1.     The Canadian Creditors Committee (the "**CCC**")[1] represents the interests of more than 20,000 Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who in the aggregate have asserted approximately $3 billion[2] in Claims against the Canadian Debtors.

2.     This Allocation Proceeding concerns the allocation of approximately $9 billion in Global Assets of the Nortel Debtors for distribution to Nortel's Creditors, who have collectively asserted worldwide Claims far exceeding this amount.

3.     In addition to the CCC, Creditors include the Bondholders and other general unsecured creditors in the U.S, the U.K., and EMEA.  In addition, various Nortel Debtors have asserted Intercompany Claims against one or more of the other Nortel Debtors.

4.     The Global Assets are comprised of approximately $7.3 billion in Sale Proceeds held in trust accounts pursuant to an Interim Funding and Settlement Agreement dated June 9, 2009 between certain of the Nortel Debtors (the "**IFSA**"), and $1.7 billion in cash and other assets in the possession of Nortel Debtors in various jurisdictions ("**Residual Assets**"). The Sale Proceeds are made up of $2.8 billion (the "**Business Sale Proceeds**") from the sale of Nortel's Lines of Business, including the business units (the "**Business Sales**"), and $4.5 billion (the "**Residual IP Proceeds**") resulting from the sale of Nortel's remaining patent portfolio (the "**Residual IP**") owned by Nortel's operating parent, NNL. In 2011, the Residual IP was purchased by a consortium of technology companies ("**Rockstar**"), including Apple, RIM, Sony and Microsoft (the "**Residual IP Sale**").

---

[1] Unless defined herein, all Capitalized terms have the meanings ascribed to them in the annexed Glossary of Terms (CCC Pleading).

[2] All amounts stated in this Pleading are approximate and are expressed in USD.

- 4 -

5.    For the reasons set out below, the CCC seeks the following relief:

a) an Order (the "**Ownership Allocation Order**") allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets, as set out below and as will be more particularized in advance of trial;

b) in the alternative, an Order (the "**Equitable Allocation Order**") allocating, administering and effecting the distribution of the Global Assets of the Nortel Debtors, including the Sale Proceeds, in accordance with equitable principles, so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims; and

c) such other orders or declarations as may be necessary to give effect to the Ownership Allocation Order or the Equitable Allocation Order, as applicable, including, as may be necessary, orders or directions that the Sale Proceeds and other Global Assets are only distributable in respect of valid Claims, the Global Assets be administered as if Nortel were a single consolidated estate, and all guarantees and Intercompany Claims among the Nortel Debtors be stayed and/or eliminated.

# PART II – OVERVIEW OF ALLOCATION POSITION

## A.    *Ownership Allocation Order*

6.    Nortel was a large multi-national technology enterprise headquartered in Canada, with a history dating to the nineteenth century.  Nortel was a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies.  At its peak Nortel had annual revenue of approximately $30 billion and employed approximately 93,000 people.

7.    On January 14, 2009 (the "**Filing Date**"), Nortel's Canadian Debtors, U.S. Debtors and UK/EMEA Debtors filed for protection from creditors pursuant to the

applicable insolvency statutes in their respective jurisdictions (the "**Insolvency Proceedings**")[3]. Thereafter, Nortel ceased operations as a going concern and liquidated its assets through the Business Sales and Residual IP Sale.

8.      This Allocation Proceeding addresses the issue of how the Global Assets should be allocated among the Nortel Debtors, and ultimately, distributed to Creditors.

9.      Where legal title is discernible, it should form the basis of the allocation among the Nortel Debtors. Allocation by legal title is a reasonable and principled approach that respects the legal and contractual rights of the Nortel Entities.

10.     Nortel's IP, including its patents, copyrights, trade secrets, confidential information, trademarks and other intellectual property and associated rights, was its most valuable asset and the primary driver of its profit and value. All of the value in the Residual IP Sale and a significant majority of the value in the Business Sales are attributable to IP.  At all times, title to virtually all of Nortel's IP was held by NNL.

11.     Pursuant to a Master Research and Development Agreement between NNL and certain of its subsidiaries that were Licensed Participants, effective as of January 1, 2001, (as amended, the "**MRDA**"), NNL and the Licensed Participants agreed that:

   a) legal title to Nortel IP is vested in NNL;

   b) each Licensed Participant received a Limited License to make, use, and sell Nortel products using certain NNL-owned IP on an exclusive basis in a prescribed territory, and non-exclusively elsewhere, subject to restrictions;

   c) a Licensed Participant had no right to use NNL's IP licensed to it for any other product or purpose, nor did it possess any legal ownership in such IP; and

---

[3] The Canadian Debtors obtained protection under the CCAA.  The U.S. Debtors filed voluntary petitions under Chapter 11 of the Code. NNUK and certain of its affiliates located in EMEA were granted administration orders by the High Court of England and Wales.

d) the MRDA and the Limited Licenses therein were not assignable by the Licensed Participants.

12.    The MRDA is the basis upon which Nortel determined its respective ownership (in the case of NNL) and Limited License rights (in the case of the Licensed Participants) to make use and sell Nortel products using certain NNL-owned IP. NNL relied upon the MRDA, and in particular on its terms concerning ownership of IP, when it agreed to incur liabilities in the Lines of Business.

13.    All Sale Proceeds derived from the sale of IP belong to and must be allocated to the owner of that IP, NNL. In the case of the Residual IP Sale, all of the Residual IP Proceeds belong to NNL. In the case of the Business Sales, the value of IP sold or licensed to the purchasers is primarily attributable to NNL.

14.    The Licensed Participants' limited and non-assignable right to make, use and sell Nortel products embodying the licensed technology had no value, or in the alternative, no material value in the context of the Business Sales. The CCC puts the U.S. Debtors and the UK/EMEA Debtors to the strict proof of the amount of the Sale Proceeds from IP that they may allege is attributable to Licensed Participants, if any.

15.    The remaining assets (other than IP) sold in the Business Sales should be allocated according to legal title, to the extent discernible, and otherwise in accordance with appropriate allocation principles in the context of the Business Sales. Particulars of the allocation methodology of such assets will be provided in advance of trial.

## B.    *Equitable Allocation Order*

16.    If it is concluded that legal title should not form the basis for allocation of the Sale Proceeds, because it is inappropriate, or legal title is not determinable, or for any other reason, then the only fair, reasonable, defensible and equitable alternative in light of Nortel's highly integrated and multi-national operations is to allocate the Global Assets among the Nortel Debtors in accordance with equitable principles so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

- 7 -

17.     Prior to the Filing Date ("**Pre-Filing**"), Nortel's business consisted of four interdependent, international Lines of Business that operated without regard to geographic boundaries, and across numerous corporate entities. Nortel's stakeholders, including its Creditors, disregarded individual corporate identities and treated the Nortel Debtors as a single, global concern.

18.     Subsequent to the Filing Date ("**Post-Filing**"), the sale of Nortel's assets reflected the same integrated nature of Nortel's business. With respect to the Business Sales, purchasers bought "Nortel" Lines of Business consisting of assets spread across many corporate entities in multiple jurisdictions.

19.     Failure to give effect to the parties' legal rights regarding the ownership of Nortel assets, including NNL's ownership of the IP, leaves no other justifiable method to unscramble the assets and liabilities of Nortel. Moreover, any attempt to do so would be extremely difficult and prohibitively costly and would prejudice all Creditors. In such circumstances, there would be no reasonable basis to rely upon individual corporate identities, assets and liabilities or to treat the Nortel Debtors as anything other than a single, global estate.

20.     Accordingly, if the Courts conclude they must look beyond the legal title to property and the contractual rights of the relevant Nortel Entities, they should exercise their discretion to allocate the Global Assets to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

# PART III – PARTIES

## A.     *Debtors*

21.     The Nortel Debtors consist of the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, each of which is subject to separate Insolvency Proceedings in their respective jurisdictions.

## B.     *Creditors*

22.     The CCC represents Creditors with claims against the Canadian Debtors and is made up of the following interests:

- 8 -

a) **Former Employees, Pensioners and Disabled Employees of Nortel:** These are the individual Canadian employees, from salaried staff to senior management, who helped to grow and run Nortel's global businesses. Each of the more than 20,000 former and disabled employees and pensioners (and through them, their survivors and beneficiaries) hold individual contracts of employment with Nortel, and who collectively have an interest in $2 billion in Claims in the form of cash payments owing to Nortel's Canadian pension plans. This group has an additional $1 billion of Claims in contractual health benefits and other employment-related obligations;

b) **The National Automobile, Aerospace, Transportation, and General Workers Union of Canada (CAW – Canada):** The CAW is a trade union representing over 750 members and former members, including actives, retirees, survivors, and disabled employees, under the term of individual retainers or pursuant to obligations imposed by statute;

c) **Nortel Canadian Continuing Employees:** These are approximately 3,600 active and transferred employees of Nortel's Canadian operations;

d) **Morneau Shepell Ltd., in its capacity as administrator of Nortel's two Canadian registered pension plans:** This is the arms-length fiduciary who administers the Nortel Canadian registered pension plans for the benefit of Nortel's Canadian former employees and pensioners; and

e) **The Superintendent of Financial Services for Ontario in his capacity as administrator of the PBGF:** The PBGF guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event of the insolvency of the plan sponsor, in accordance with the Ontario *Pension Benefits Act*, R.S.O. 1990, c. P.8 and applicable regulations. The PBGF is administered by the Superintendent of Financial Services and currently covers over 1,500 defined benefit plans with members and beneficiaries in Ontario.

23.    The other Creditors include:

a) Bondholders, including certain Bondholders which have formed an informal committee comprised of members who purport to represent the interests of holders of bonds issued or guaranteed by NNC, NNL, NNCC and NNI;

b) The UK Pension Claimants, who have asserted Claims and guarantees in respect of NNUK's pension plan deficit for approximately £2.1 billion (approximately $3 billion); and

c) Other unsecured creditors in the U.S. and UK/EMEA, including those in the U.S. represented by the official committee of unsecured creditors of the U.S. Debtors, appointed shortly after the Filing Date, whose current members are the U.S. Pension Benefit Guarantee Corporation and two indenture trustees for certain bond issues held by the Bondholders.

24.    In addition to the Claims and guarantees asserted by Creditors against the Nortel Debtors, a number of Intercompany Claims have been asserted among the Nortel Debtors.

25.    The Courts have yet to fully assess Nortel's global Claims among the Core Party Creditors. However, these Claims are essentially being asserted by employees, bondholders and pension interests, in Canada, the U.S. and UK/EMEA.

# PART IV – FACTS

## A.    Introduction

26.    Nortel was a Canadian corporate icon, with a rich history dating to the late 1800s. Over more than a century, Nortel grew to become a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies.

27.    Due to an inability to raise capital in the face of the collapse of financial markets in the U.S. and elsewhere beginning in 2008, Nortel commenced the Insolvency Proceedings in Canada, the U.S. and the U.K. on the same date, and ultimately ceased

operations as a going concern and liquidated its assets. Nortel's value was demonstrated by the Business Sale Proceeds and Residual IP Proceeds, which generated Sale Proceeds of approximately $7.3 billion.

## B.    Innovation and Expansion

28.    Nortel became a major innovator of intellectual property starting in the post-Second World War period. In 1961, Nortel opened a new research and development ("**R&D**") lab in Ottawa with 42 engineers, which quickly grew to 800 employees and produced a number of successful products. In 1967, Nortel introduced the SP-1 central office switch at EXPO 67, the 1967 world's fair held in Montreal. Other innovations followed, including the SA-1 community dial office, and the Precision Satellite Tracking Antenna.

29.    In the 1970s, Nortel continued to innovate in partnership with Bell Canada under the name Bell-Northern Research Ltd., with major facilities in Ottawa and smaller R&D centres in some of Nortel's Canadian manufacturing facilities.

30.    In or about 1976, Nortel invented, and later marketed, the "digital switching" technology that supported the establishment of the touch-tone telephone. In the 1990s, Nortel developed its fibre optic cable networking business. Nortel continued to innovate and transitioned from traditional landline phone technology and equipment to wireless and digital technology.

31.    Nortel's expansion continued on a global scale with the establishment of manufacturing and distribution centres in the United States and marketing subsidiaries in Europe, Asia and Latin America. Additional manufacturing, marketing and service operations were established throughout the world.

32.    At its zenith in 2000, Nortel was composed of approximately 140 corporations and joint ventures spread across North America, Europe, the Middle East, Africa, Asia, the Caribbean and Latin America and employed over 90,000 employees serving customers and carrying on business in over 150 countries.

64

## C.   *Lines of Business*

33.    Nortel operated four main Lines of Business that were globally integrated, interconnected and transcended geographic and corporate boundaries.  As at the Filing Date, Nortel's Lines of Business were as follows:

  a) Enterprise Solutions helped customers build communications networks in the areas of data, voice, and multimedia communications;

  b) Carrier Networks developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises;

  c) MEN provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth; and

  d) Global Services provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

34.    Nortel's centralized Corporate Support Group served and coordinated all four Lines of Business from Nortel's Canadian headquarters.  The Corporate Support Group included senior management who oversaw and gave direction to the Lines of Business, and also performed functions such as finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

## D.   *Role of Nortel Canada*

35.    NNL played the central role in the supervision, conduct, and accounting and reporting for Nortel's Lines of Business, which operated across several Nortel Entities.

36.    NNL and NNC were also responsible for undertaking the necessary financing that Nortel required, particularly starting in the early 2000s. Nortel made various

acquisitions in the 1990s that put increasing demands on its treasury. Although substantially all of these were share transactions, the payroll, in-process R&D and other operating expenses associated with the acquired businesses required major cash outlays that ultimately required significant debt financing. NNL and NNC undertook the necessary financing for the benefit of the entire Nortel operation.

37.    While at its peak in 2000 Nortel reported approximately $30 billion of annual consolidated revenues, this was followed swiftly by a period of rapid decline in the wake of the bursting dot-com bubble.

38.    From 2001 onwards, Nortel utilized the capital markets as a source of liquidity to fund its operations globally. NNL and NNC bore substantially all of the cost for these financings.

39.    As part of its restructuring efforts, Nortel downsized its operations including its employment base by two-thirds, such that by 2008 Nortel employed approximately 30,000 (down from approximately 90,000 in 2000).

### E.    IP and R&D

40.    Nortel's most valuable asset was its IP. Nortel deliberately vested legal title in all or substantially of all its IP in NNL.

41.    At or around the Filing Date, Nortel held approximately 9,000 patents and patent applications and over 2000 trademarks or trademark applications, the overwhelming majority of which were registered or filed in the name of NNC, NNL or their predecessor corporations.

### F.    Filing and Liquidation

42.    The Nortel Debtors commenced the Insolvency Proceedings in Canada, the United States, the United Kingdom and the EMEA region on January 14, 2009. Soon thereafter, Nortel ceased operating as a going concern and the proceedings very quickly focused on a liquidation of Nortel's assets, starting with the Business Sales.

### 1)    The Business Sales

43.    By approximately September 2010, Nortel had divested itself of most of its operating assets through the Business Sales, which included the following:

    a)  the Layer 4-7 Business Sale;

    b)  the Enterprise Business Sale;

    c)  the CDMA Business Sale;

    d)  the Packet Core Business Sale;

    e)  the MEN Business Sale;

    f)   the GSM Business Sale;

    g)  the CVAS Business Sale; and,

    h)  the MSS Business Sale.

44.    The primary assets sold in the Business Sales consisted of IP, although the sales included other assets such as fixed assets and inventory. Substantially all of the value in the Business Sales was in the IP.

### 2)    The Residual IP Sale

45.    Following the completion of the Business Sales, Nortel retained a significant portfolio of Residual IP. The Residual IP included approximately 6,000 patents and patent applications filed in Canada, the U.S. and other jurisdictions specifically in relation to wireless, wireless 4G, data networking, optical, voice, internet, service provider semiconductors and other applications.

46.    Following an auction featuring nineteen rounds of bidding, the Residual IP was purchased by the Rockstar consortium for approximately $4.5 billion.

47.    The Sale Proceeds resulting from the Business Sales and the Residual IP Sale are currently being held in escrow pending the outcome of this Allocation Proceeding.

# PART V – ALLOCATION POSITION OF THE CCC

## A.    *Allocation by Ownership*

48.    Nortel's IP portfolio included patents, industrial designs, copyrights, trademarks and associated goodwill, trade secrets and confidential information. NNL was the legal owner of all or substantially all of this IP.

49.    Prior to the Sales, Nortel and certain of its subsidiaries entered into agreements addressing the ownership and licensing of IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and such subsidiaries. This IP, together with other IP owned by NNL (including trademarks and any associated goodwill) accounts for a substantial portion of the value of the Sale Proceeds.

50.    These agreements formed the basis of a series of Advanced Pricing Agreements ("**APAs**") wherein tax authorities in various jurisdictions, including Canada, the United States and the United Kingdom, accepted and approved of Nortel's internal transfer pricing practices.

51.    Up to December 31, 2000, each subsidiary receiving a license from NNL (the "**Licensed Subsidiary**") entered into one or more bilateral cost sharing agreements (the "**Cost Sharing Agreements**") with NNL's predecessor, Northern Telecom. The Cost Sharing Agreements specified that NNL owned all IP (excluding trademarks and any associated goodwill, which were in any event predominantly owned by NNL) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries and that the Licensed Subsidiaries received a limited exclusive license, subject to specific field of use limitations. The Cost Sharing Agreements provided that:

a) Legal title including intellectual property rights to the IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries vested in and was owned solely by NNL;

b) Licensed Subsidiaries received licenses (i) to make, have made, use, and sell certain Nortel products in and for a prescribed geographic area and (ii) to use the IP described in paragraph (a) above, as necessary or appropriate in connection therewith;

c) The Nortel products that the Licensed Subsidiaries were licensed to make, use and sell were limited to products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by NNL and its subsidiaries, and all components, parts, sub-assemblies and software associated with or incorporated in such products; and

d) The licenses were, within the above scope of the license, exclusive to the Licensed Subsidiaries, royalty-free, and included a right to sublicense others in conjunction with the Licensed Subsidiaries' making, using and selling Nortel Products.

52.    The Cost Sharing Agreements between NNL and the Licensed Subsidiaries were replaced by the MRDA with effect as of January 1, 2001.

53.    Under the MRDA, the parties continued to agree that NNL would own all IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for the parties (including what was developed pursuant to the Cost Sharing Agreements), and that the Licensed Subsidiaries (referred to as "Licensed Participants" in the MRDA) would continue to receive an exclusive license subject to field of use and other limitations.

54.    The MRDA contained the following provisions related to the ownership and licensing of Nortel IP:

- Article 1(f): "NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."

- Article 1(g): "Products" means all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, enhancements or other derivatives associated with or incorporated in any of the foregoing."

- Article 4(a): "Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5."

- Article 4(d): "With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world."

- Article 4(e): "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."

- Article 5(a)(i): "To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License")."

- Article 5(a)(ii): To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor,

- 17 -

and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

- Article 14(a): This Agreement shall not be assigned by any Participant except with the written consent of the other Participants.

- Article 14(f): This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

55.    Accordingly, up to and until the completion of the Sales, rights to NN Technology (as defined in the MRDA) were owned by NNL and licensed in the manner described above.

56.    The NN Technology, together with substantially all other IP that was sold or licensed in connection with the Sales, was owned by NNL. The IP applications and registrations in connection therewith were also primarily in the name of NNL.

57.    In relation to the Residual IP Sale, the entirety of the Residual IP Proceeds belongs to NNL. The Residual IP Sale transferred title in patents owned by NNL to Rockstar, after all of Nortel's Lines of Business had been sold. None of the Licensed Participants had any right, title, or legal interest in the Residual IP and, therefore, no consideration was paid by Rockstar for the license rights of the Licensed Participants to make, use, or sell Products (as defined in the MRDA) under the Limited Licenses. The Limited Licenses thus had no value in the context of the Residual IP Sale.

58.    In relation to the Business Sales, the proceeds from the IP attributable to such sales should be allocated primarily to NNL. All or substantially all of the IP transferred in the Business Sales was owned by NNL. The Licensed Participants held Limited Licenses in respect of their own use, but had no right to assign or otherwise transfer their rights under the MRDA or the Limited Licenses granted to them therein. Accordingly, the Limited Licenses had no value, or in the alternative, no material value in the context of the Business Sales. To the extent that any amount of the Sale Proceeds can be attributed to a Limited License, it would be nominal, and in any event could not exceed, and must be much less than, the amount which a Licensed Participant could claim under the residual profit sharing methodology ("**RPSM**") provided in the MRDA, if it was applicable.

- 18 -

59.    The Business Sale Proceeds attributable to assets other than IP should be allocated to the Nortel Debtors according to legal title to the extent discernible and otherwise in accordance with appropriate valuation principles in the context of the Business Sales. Particulars of the ownership and valuation of the non-IP assets will be provided in advance of trial.

## B.    *Allocation Pro Rata by Claims*

60.    If it is concluded that legal ownership of the assets giving rise to the Sale Proceeds should not form the basis for an Order in the Allocation Proceeding, then the CCC pleads that the only fair, reasonable, defensible and equitable alternative is to allocate the Global Assets among the Nortel Debtors so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

61.    If the Court is inclined to look beyond the strict legal and contractual rights of the relevant Nortel Entities, any attempt to distinguish between the Nortel Entities for the purpose of determining an appropriate allocation quickly becomes a prohibitive exercise. This is evident from an examination of Nortel's highly integrated and multinational business.

### 1)    Nortel's Pre-Filing Experience

62.    Pre-Filing, Nortel was a highly integrated, multinational business that operated substantially without regard to corporate or geographic borders. The following features, among others, illustrate Nortel's integrated, global operations:

a) **Line of Business Organization** – for most purposes, Nortel operated according to Lines of Business. The Lines of Business spanned geographic boundaries and functioned in over a hundred corporate entities incorporated in jurisdictions throughout the world. Nortel's management and employees served dedicated Lines of Business, rather than any particular Nortel Entity. In addition, Nortel's customers, suppliers and trade creditors transacted with various Nortel Entities along Lines of Business;

b) **Regional Organization** – Nortel organized its trade, supply and customer sales according to regional "hubs", supported by Nortel personnel from various Lines of Business;

c) **Employees Served Global Businesses** – individual employees were given global identification numbers, served the global Nortel business and their work responsibilities extended beyond the Nortel Entities that employed them. Employees were dedicated to Lines of Business or the Corporate Support Group, regardless of where they resided or worked, or the jurisdiction in which their employer was incorporated. Management and employee performance was evaluated along Lines of Business. Employee incentive bonuses were calculated based on Line of Business and overall global performance, rather than the performance of individual Nortel Entities, and employees reported to the heads of the Lines of Business, who in turn reported to the global corporate head-office management (and, ultimately, to the board of directors) in Canada;

d) **Consolidated Financial Reporting** – Nortel prepared consolidated financial statements reporting on:

   i.   The financial condition of each Line of Business, including global revenue streams;

   ii.  Significant business developments worldwide, including strategic alliances and acquisitions outside Canada; and

   iii. Work-force reductions and restructuring plans implemented across Nortel's global operations.

Nortel's consolidated statements were used to evaluate Nortel's overall global performance and the Lines of Business by management, analysts, lenders, debt purchasers, investors and other stakeholders. Nortel represented that it was one entity, with one vision, one purpose and goal. The "act as one" concept was reflected in Nortel's financial reporting. While Nortel prepared

financial statements at the Nortel Entity level, these statements were prepared primarily for local tax and regulatory requirements;

e) **Centralized Cash Management** – Nortel's central treasury moved funds among the various Nortel Entities in order to fund the operations of the Lines of Business or for tax planning purposes. Some Nortel Debtors were net-users of cash and incurred intercompany debt that was recapitalized from time to time.  Nortel utilized the capital markets as a source of liquidity to fund these global operations.   However, it was the Canadian Debtors, through NNC and NNL, which bore all or substantially all of the cost of borrowing;

f) **Transfer Pricing** – Nortel adopted a series of complex transfer pricing methodologies in order to allocate profits and losses for tax purposes at arm's length from inter-company receivables and payables. Prior to 2001, Nortel's transfer pricing methodology provided for sharing of intangible property and expenses, including global R&D, pursuant to the Cost Sharing Agreements. Effective 2001, Nortel implemented its RPSM pursuant to the MRDA, for the purpose of allocating Nortel profits based upon each Participant's direct spending on R&D.[4]  The cost-sharing and RPSM transfer pricing methodologies included contractual and taxation considerations and were negotiated with various Nortel Entities and revenue authorities in jurisdictions including Canada, the U.S. and the U.K.;

g) **Centralized Management and Control with Line of Business Focus** – Nortel's operations and management were centralized. Decisions were made with a view to Nortel's global operations and across Lines of Business;

h) **Common Boards of Directors** – the same individuals were often members of multiple boards of directors of Nortel Entities. For instance, board members of NNI and NNL also sat on the boards of other Nortel Entities, and boards of

---

[4] From 2001 onward, however, Nortel experienced only losses.

directors of NNUK sat on the boards of directors of various Nortel Entities in the EMEA region;

i) **Centralized Corporate Support with Line of Business Focus** – corporate and support functions (e.g. finance, human resources, legal, treasury, accounting, R&D and information technology) were centralized and served various Nortel Entities across regions and Lines of Business. For example, Nortel's treasury group and the treasurer collected and maintained a global cash balance, which was distributed to Nortel Entities according to their need for cash at any particular time; and

j) **Corporate Debt, Financing and Other Costs** -- NNL and NNC bore the costs, among other things, of raising corporate debt and paying the interest thereon, for the benefit of the global Nortel enterprise. The remaining Nortel Entitles benefited from this financing and were funded from Nortel's centralized treasury, as noted above at subparagraph (e).

63.    Creditors and other stakeholders perceived Nortel as a single and indivisible entity called "Nortel", effectively without regard to geographic or corporate borders.

64.    For instance, Nortel held itself out to its trade creditors as a single, indivisible entity. Nortel utilized an internal purchasing system for its hardware and software production, and for products and services, using four Transaction Control Centres ("**TCCs**"). The TCCs were organized along Lines of Business and acted as "purchasing hubs" for regional sales among groups of Nortel Entities, as illustrated below:

| Line of Business | TCC Purchasing Entity | Region Purchasing For |
|---|---|---|
| **MEN** | NNL<br>NNUK | Americas<br>EMEA & APAC |
| **Enterprise – Voice** | NNL<br>NNUK | Americas & APAC<br>EMEA |
| **Enterprise – Data** | NNI<br>NNUL | Americas & APAC<br>EMEA |

| CDMA | NNL | Global |
| CVAS | NNI | Global |
| GSM | NNSA | Global |

65.    Nortel's purchasing system worked as follows:

a)    a Nortel Entity placed internal purchase orders with its regional sales office;

b)    the purchase order was automatically routed through the TCC responsible for making the purchase;

c)    the TCC contracted directly with the trade creditor to facilitate delivery of the goods to the Nortel Entity that placed the purchase order;

d)    the TCC paid the trade creditor directly;

e)    Nortel allocated the purchase to the Nortel Entity that placed the order or regional sales office through its inter-company accounts.

66.    From the perspective of trade creditors, they dealt with a single indivisible entity, "Nortel", operating through the applicable TCC. Trade creditors entered into master agreements with NNL, on behalf of all Nortel Entities.

### 2)    Nortel's Post-Filing Experience

67.    Post-Filing, the sale of Nortel's Lines of Business similarly reflected the integrated and intertwined nature of Nortel's operations.

68.    Over the course of the Insolvency Proceedings, Nortel has liquidated substantially all of its assets.

69.    Despite the best efforts of insolvency professionals to untangle the scrambled, highly-intertwined business and affairs of the Nortel Debtors, at a cost of hundreds of millions of dollars, thus far it has been impossible to do so.

70.    No Business Sale purchaser was willing to pay any material amount for any interest in any particular Nortel Debtor. Purchasers bought "Nortel" Lines of Business

including business units, consisting of assets spread across many Nortel Entities in multiple jurisdictions throughout the world.

71.     In its Post-Filing financial statements, Nortel expressly warned of the risk that the U.S. Debtors' estates might be substantively consolidated.  Under the heading "Risk Factors", Nortel stated:

> Some or all of the U.S. Debtors could be substantively consolidated.
>
> There is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors. While it has not been requested to date, we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it. If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, the ability of a U.S. Debtor that has been substantively consolidated with another U.S. Debtor to make payments required with respect to its debt could be adversely affected. For example, the rights of unsecured debt holders of NNI may be diminished or diluted if NNI were consolidated with one or more entities that have a higher amount of unsecured priority claims or other unsecured claims relative to the value of their assets available to pay such claims. [Emphasis added]

72.     Similarly, reports filed by the Monitor and Canadian Debtors during the Insolvency Proceedings have treated the assets of and claims against the Canadian Debtors as one entity within Canada.

73.     Such recognition of the potential for consolidation by the U.S. Debtors and the treatment of the Canadian Debtors on a consolidated basis inform the approach that must be applied to Nortel globally, which was even more intertwined, interrelated and impossible to unscramble.

74.     There are multiple and overlapping claims by trade creditors across the estates of the Nortel Debtors, which has given rise to the Cross-Border Claims Protocol. For instance, Flextronics Telecom Systems Ltd. ("**Flextronics**"), Nortel's largest supplier, supplied products for multiple Lines of Business, including Enterprise Solutions, Carrier Networks and MEN pursuant to master agreements entered into between Flextronics and NNL. Nortel held itself out to Flextronics, and Flextronics perceived Nortel, as a

single indivisible entity. In November 2009, Nortel agreed to pay Flextronics a certain sum in satisfaction of all Flextronics' claims against all Nortel Debtors. While the payment to Flextronics was made by NNI, the Nortel Debtors agreed to allocate the payment according to the weighted average of certain Business Sale Proceeds allocated to each of the Nortel Debtors, rather than in accordance with the debts owned by each Nortel Debtor to Flextronics. In so doing, Flextronics and Nortel Debtors effectively consolidated their claims *inter se*.

75.     As described above, employees served the global Nortel business with their work responsibilities extending beyond the individual Nortel Entities that technically employed them. Nortel intended to create a global employment relationship between its employees and the various Nortel Entities. Nortel transferred employees among the various Nortel Entities and across geographic regions without breaks in service and changes in the terms and conditions of employment.

76.     The Post-Filing experience of employees was no different. In connection with Nortel's insolvency, employees were told that their employment was being terminated by Nortel *and* its subsidiaries and signed releases in favour of the Nortel Entities.

## PART VI – CONCLUSION

77.     For the reasons set out above, the CCC seeks the Ownership Allocation Order. The most fair, reasonable and juridically justifiable approach to allocation is one based on consideration of legal title to the assets that produced the Sale Proceeds. The legal principles underlying asset ownership are common to all relevant jurisdictions. Nortel's major asset giving rise to the Sale Proceeds was its IP, which was primarily owned by NNL, and the Licensed Participants' Limited License rights had no value in the context of the Sales, or were of *de minimis* value.

78.     Absent adherence to the strict legal and contractual ownership and other rights of the relevant Nortel Entities, there is no supportable basis in law to distinguish between the Nortel Entities in determining an appropriate allocation. Any attempt to restructure the legal ownership of assets and contractual rights agreed to in the MRDA and its predecessor agreements would be prohibitively costly and would prejudice Creditors,

particularly the former and disabled employees and pensioners in Canada that helped grow and run Nortel's global business for many years.

79.     For these reasons, the CCC pleads, in the alternative to the Ownership Allocation Order, that the only fair, reasonable and equitable allocation of Nortel's Global Assets is pursuant to the Equitable Allocation Order.

80.     The benefit of a *pro rata* allocation for all Creditors outweighs any potential prejudice. For example, in the case of Bondholders, when they voluntarily undertook to purchase Nortel bonds, it was expressly disclosed that they risked elimination of the cross-border guarantees that formed part of such bonds. These were sophisticated investors who knew or ought to have known the extent of the intermingling of Nortel's assets and intertwined nature of its business across legal, operational and geographical borders. Moreover, the bonds have been actively trading Post-Filing, their acquisition costs have varied, and Bondholders have a variety of mitigation tools at their disposal not available to other Creditors, in particular employee Creditors.

81.     Nortel's employees contributed significant value on the promise that Nortel would provide them with pensions, health, disability and other benefits, on which such employees relied and depended as part of their compensation for their contributed value. Current and former employee pensions and benefits have been severely impacted during the course of the Insolvency Proceedings. Any prejudice asserted by financial creditors pales in contrast to the prejudice actually and already suffered by Nortel's retired, disabled and other former employees.

DATE: May 16, 2013

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Susan Philpott / Ari Kaplan
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
       sphilpott@kmlaw.ca
       akaplan@kmlaw.ca

Lawyers for the Canadian Former Employees and
Disabled Employees through their court appointed
Representative

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel:  416.495.3776
Fax: 416.495.3786

Email:  barry.wadsworth@caw.ca

Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON   M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel:    416.214.5213/5206
Fax:    416.214.5413/5400

Email: arthur.jacques@shibleyrighton.com
       thomas.mcrae@shibleyrighton.com

Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J. Boake
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
         jgage@mccarthy.ca
         bboake@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as administrator of
the Nortel Canada registered pension plans


**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
         lily.harmer@paliareroland.com
         max.starnino@paliareroland.com

Lawyers for the Superintendent of Financial Services
as Administrator of the Pension Benefits Guarantee
Fund

- 28 -

# GLOSSARY OF TERMS
## (CCC Pleading)[1]

"**Allocation Proceeding**" means the proceedings before the Courts with respect to the allocation of Nortel's Global Assets among the Nortel Debtors and ultimately the Creditors.

"**APAs**" is defined in paragraph 50.

"**Bondholders**" means the bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and NNCC.

"**Business Sales**" is defined in paragraph 4.

"**Business Sale Proceeds**" is defined in paragraph 4.

"**Canadian Debtors**" means Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

"**Carrier Networks**" means the Nortel line of business which developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises.

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

"**CCC**" means the Canadian Creditors Committee, a committee of major creditors having claims against the Canadian Debtors, comprised of: the Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union; Morneau Shepell Ltd., as Administrator of Nortel's Canadian registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtors.

"**Claims**" means claims against any one or more of the Nortel Debtors as at the Filing Date, without duplication (whether pursuant to a guarantee, joint liability or otherwise), excluding Intercompany Claims and claims for post-filing interest, make-whole payments and call premiums.

---

[1] All singular terms will have the same meaning in plural.

"**Code**" means the United States Bankruptcy Code, Title 11 of the United States Code.

"**Corporate Support Group**" means the centralized services that were largely coordinated from Nortel Canada's headquarters, and was made up of senior management who oversaw and gave direction to Lines of Business and performed functions which included finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

"**Cost Sharing Agreements**" is defined in paragraph 51.

"**Courts**" means the Ontario Superior Court of Justice (Commercial List) and the U.S. Court.

"**Creditors**" means all creditors having made Claims.

"**EMEA**" means the regions of Europe, Middle East and Africa where Nortel operated.

"**Enterprise Solutions**" means the Nortel line of business which helped customers build communications networks in the areas of data, voice, and multimedia communications.

"**Equitable Allocation Order**" is defined in paragraph 5(b).

"**Filing Date**" is defined in paragraph 7.

"**Flextronics**" is defined in paragraph 74.

"**Global Assets**" means the Sale Proceeds and the Residual Assets.

"**Global Services**" means the Nortel line of business which provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

"**GSM**" means the global system for mobile communications infrastructure business operated by Nortel.

"**IFSA**" is defined in paragraph 4.

"**Insolvency Proceedings**" is defined in paragraph 7.

"**Intercompany Claims**" means all claims of any Nortel Debtor against another Nortel Debtor.

"**IP**" means any and all intangible assets, including but not limited to patents, industrial designs, trade secrets, copyrights and applications and registrations thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information, and trademarks, and any associated customer contracts and goodwill.

"**Licensed Participants**" means the holders of Limited Licenses as at the Filing Date.

"**Limited License**" means the limited, royalty-free licenses that were granted by NNL to the Licensed Participants pursuant to the MRDA to make, use and sell Products and to use NN Technology as necessary or appropriate in connection therewith.

"**Licensed Subsidiaries**" is defined as paragraph 51.

"**Lines of Business**" means the Enterprise Solutions, Carrier Networks, MEN and Global Services businesses operated by Nortel.

"**MEN**" means the Nortel line of business which provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court- appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**MRDA**" is defined at paragraph 11.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor, and ultimate parent of Nortel.

"**NNI**" means Nortel Networks, Inc., a U.S. Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor, and the operating parent of Nortel.

"**NN Technology**" is defined in the MRDA and in paragraph 54.

"**NNUK**" means Nortel Networks UK Limited, a UK/EMEA Debtor.

"**Nortel**" means NNC and all of its subsidiaries and affiliates, worldwide, including any interests in any joint-ventures, and includes all Nortel Debtors and all Nortel Entities.

"**Nortel Debtors**" means the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, collectively.

"**Nortel Entity**" means any Nortel entity, including subsidiaries and affiliates.

"**Northern Telecom**" means Northern Telecom Limited, a predecessor of NNL.

"**Ownership Allocation Order**" is defined in paragraph 5(a).

"**PBGF**" means the Pension Benefits Guarantee Fund, which guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event the plan sponsor becomes insolvent, as provided by the *Pension Benefits Act,* R.S.O. 1990, c. P.8, as amended, and related regulations.

"**Post-Filing**" is defined in paragraph 18.

"**Pre-Filing**" is defined in paragraph 17.

"**Products**" is defined in the MRDA and in paragraph 54.

"**R&D**" is defined in paragraph 28.

"**Residual Assets**" is defined in paragraph 4.

"**Residual IP**" is defined in paragraph 4.

"**Residual IP Proceeds**" is defined in paragraph 4.

"**Residual IP Sale**" is defined in paragraph 4.

"**Rockstar**" is defined in paragraph 4.

"**RPSM**" is defined in paragraph 58.

"**Sale Proceeds**" means the proceeds of sale generated by the Post-Filing transactions that included the Business Sales and the Residual IP Sale, which generated approximately $7.3 billion.

"**Sales**" means the Business Sales and Residual IP Sale.

"**TCCs**" is defined in paragraph 64.

"**UK/EMEA Debtors**" means Nortel Networks UK Limited ("NNUK") Nortel Networks (Ireland) Limited; Nortel Networks S,A,; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o,; Nortel Networks Hispania, SA, Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o,; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

"**UK Pension Claimants**" means the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Debtors**" means Nortel Networks Inc., ("NNI") Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.

86

- 33 -

TO:    THE SERVICE LIST APPENDED

87

Court File No. 09-CL-7950

ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

**ALLOCATION POSITION OF THE
CANADIAN CREDITORS' COMMITTEE
(THE "CCC")**

**KOSKIE MINSKY LLP**
Mark Zigler / Susan Philpott / Ari Kaplan
Lawyers for the Canadian Former Employees and Disabled
Employees through their court appointed Representative

**CAW- CANADA LEGAL DEPARTMENT**
Barry Wadsworth
Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**NELLIGAN O'BRIEN PAYNE LLP**
Arthur O. Jacques / Thomas McRae / Steve Levitt
Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / James D. Gage / Barbara J. Boake
Lawyers for Morneau Shepell Ltd., as administrator of the
Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
Lawyers for the Superintendent of Financial Services as,
Administrator of the Pension Benefits Guarantee Fund

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-35, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, et. al.

TAB C

This is Exhibit..............C..............referred to in the

affidavit of.......Barbara Wakasile...............

sworn before me, this....5................................

day of........January....................20 14....

.........................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

**From:** Miller, Atara [mailto:AMiller@milbank.com]
**Sent:** Thursday, August 01, 2013 6:56 PM
**To:** 'Ruby, Peter'; 'nortel.monitor@ca.ey.com'; 'derrick.tay@gowlings.com';
'jennifer.stam@gowlings.com'; 'ken.coleman@allenovery.com'; 'paul.keller@allenovery.com';
'daniel.guyder@allenovery.com'; 'laura.hall@allenovery.com'; 'Joseph.Badtke-Berkow@AllenOvery.com';
'jonathan.cho@allenovery.com'; 'Nicolette.ward@allenovery.com'; 'Kathleen.murphy@bipc.com';
'mary.caloway@bipc.com'; 'tdemarinis@torys.com'; 'sbomhof@torys.com'; 'sblock@torys.com';
'agray@torys.com'; 'aslavens@torys.com'; 'jbromley@cgsh.com'; 'lschweitzer@cgsh.com';
'hzelbo@cgsh.com'; 'jrosenthal@cgsh.com'; 'dstein@cgsh.com'; 'mdecker@cgsh.com';
'lpeacock@cgsh.com'; 'jmoessner@cgsh.com'; 'nforrest@cgsh.com'; 'dqueen@cgsh.com';
'dabbott@mnat.com'; 'acordo@mnat.com'; 'rschwill@dwpv.com'; 'scampbell@dwpv.com';
'jdoris@dwpv.com'; 'lsarabia@dwpv.com'; 'mgottlieb@counsel-toronto.com'; 'twynne@counsel-
toronto.com'; 'pmichell@counsel-toronto.com'; 'adler@hugheshubbard.com';
'oxford@hugheshubbard.com'; 'tabataba@hugheshubbard.com'; 'huberty@hugheshubbard.com';
'eharron@ycst.com'; 'jdorsey@ycst.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca';
'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; Ken Rosenberg; Max Starnino; Lily Harmer; Karen Jones;
Tina Lie; Michelle Jackson; 'barry.wadsworth@caw.ca'; 'lewis.gottheil@caw.ca'; 'Arthur Jacques';
'thomas.mcrae@shibleyrighton.com'; 'janice.payne@nelligan.ca'; 'steven.levitt@nelligan.ca';
'christopher.rootham@nelligan.ca'; 'ainslie.benedict@nelligan.ca'; 'bboake@mccarthy.ca';
'jgage@mccarthy.ca'; 'emarques@mccarthy.ca'; 'psteep@mccarthy.ca'; 'skour@mccarthy.ca';
'bdshaw@mccarthy.ca'; 'kpeters@mccarthy.ca'; 'selinda.melnik@dlapiper.com';
'richard.hans@dlapiper.com'; 'timothy.hoeffner@dlapiper.com'; 'farahlisa.sebti@dlapiper.com';
'zychk@bennettjones.com'; 'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com';
'swanr@bennettjones.com'; 'zweigs@bennettjones.com'; 'bellj@bennettjones.com'; Kreller, Tom; Harris,
Jennifer; Pisa, Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Matz, Tom; Bassett, Nick;
Ruha, Gabrielle; Pojunas, Rachel; 'Shayne.kukulowicz@dentons.com'; 'Michael.wunder@dentons.com';
'ryan.jacobs@dentons.com'; 'Barbara.grossman@dentons.com'; 'fhodara@akingump.com';
'dbotter@akingump.com'; 'aqureshi@akingump.com'; 'rajohnson@akingump.com';
'bkahn@akingump.com'; 'cdoniak@akingump.com'; 'sgulati@akingump.com';
'angela.pearson@ashurst.com'; 'Antonia.croke@ashurst.com'; 'samis@rlf.com';
'bleonard@casselsbrock.com'; 'dward@casselsbrock.com'; 'bburden@casselsbrock.com';
'chorkins@casselsbrock.com'; 'ljackson@casselsbrock.com'; 'mbarrack@tgf.ca'; 'djmiller@tgf.ca';
'rlewis@tgf.ca'; 'amcewan@tgf.ca'; 'boconnor@willkie.com'; 'sadvani@willkie.com';
'ahanrahan@willkie.com'; 'sheryl.seigel@mcmillan.ca'; 'michael.riela@lw.com'; 'jsalmas@heenan.ca';
'kkraft@heenan.ca'; 'svanallen@heenan.ca'; 'craig.barbarosh@kattenlaw.com';
'david.crichlow@kattenlaw.com'; 'Karen.dine@kattenlaw.com'; 'elamek@blg.com'; 'jszumski@blg.com';
'dalowenthal@pbwt.com'; 'lbarnes@osler.com'; 'esellers@osler.com'; 'eputnam@osler.com';
'ahirsh@osler.com'; 'acobb@osler.com'; 'michael.lang@nortonrose.com'; 'amdg@hoganlovells.com';
'john.tillman@hoganlovells.com'; 'Matthew.bullen@hoganlovells.com'; 'david.graves@hogan.lovells.com';
'katherine.tallett-williams@hoganlovells.com'; 'james.norris-jones@hsf.com'; 'cdavis@bayardlaw.com';
'jalberto@bayardlaw.com'
**Cc:** 'Zarnett, Benjamin'; 'Myers, Fred'; 'Kimmel, Jessica'; 'Pasquariello, Joe'; 'Carfagnini, Jay'; 'Armstrong,
Christopher'
**Subject:** RE: Deposition List of the Monitor, Canadian Debtors, CCC, and Directors and Officers

Peter:

We object to the inclusion of members of the Ad Hoc Bondholder Group in your list of proposed
deponents. The five individuals you identified have no material knowledge relevant to this litigation. Their
depositions would waste the valuable time and resources of all parties. Any information that the Ad Hoc
Bondholder Group has that may be relevant to this litigation can be obtained through the deposition of a
corporate representative, which you have noticed, and which notice we will respond and object to in due
course.

We further object to the CCC's "addendum" insofar as it purports to request a witness from each member of the Ad Hoc Bondholder Group concerning the same topics that were the subject of the CCC's reserved document request.  As the CCC knows, we have objected to its document request on a variety of grounds as set out in our notice of objection.  We object to any depositions on these topics on the same grounds.

To be clear, as we have reiterated for months now:  the Ad Hoc Bondholder Group will not produce – whether via document productions, depositions, or otherwise – any information concerning the holdings of its members beyond what is required by Federal Rule of Bankruptcy Procedure 2019.  We will not make available any witness to testify on these topics.

**Atara Miller | Milbank**
One Chase Manhattan Plaza, New York, NY 10005
P: 212-530-5421 | F: 212-822-5421
amiller@milbank.com | www.milbank.com

# TAB D

91

This is Exhibit.........D.........................referred to in the

affidavit of....Bala  Wulann  U...............................
                               3

sworn before me, this...............................................

day of.......Janvry.............................20.|1.....

A COMMISSIONER FOR TAKING AFFIDAVITS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
----------------------------------------------------- x
                                                       :
In re                                                  :        Chapter 11
                                                       :
Nortel Networks Inc., et al.,                          :        Case No. 09-10138 (KG)
                                                       :
                    Debtors.                           :        (Jointly Administered)
                                                       :
                                                       :
                                                       :
----------------------------------------------------- x
```

-    and the    -

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

AD HOC GROUP OF BONDHOLDERS' RESPONSES AND OBJECTIONS TO THE
CANADIAN CREDITORS COMMITTEE'S RESERVED DOCUMENT REQUEST
DIRECTED TO THE AD HOC BONDHOLDERS GROUP, BANK OF NEW YORK
MELLON, WILMINGTON TRUST, AND LAW DEBENTURE TRUST OF NEW YORK

Pursuant to the Order Entering Litigation Timetable and Discovery Plan, Case No.

09-10138-KG [Docket No. 10566], Ontario Superior Court of Justice (Commercial List) Court

File No. 09-CL-7950 (the "Order"), the Ad Hoc Group of Bondholders (the "Bondholder

Group"),[1] by and through its undersigned counsel, hereby responds and objects to the Canadian

---

[1]    The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks
Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation.

Creditors Committee's Reserved Document Request Directed to the Ad Hoc Bondholders Group,
Bank of New York Mellon, Wilmington Trust, and Law Debenture Trust Of New York, dated
July 23, 2013 (the "Reserved Request"). The Bondholder Group submits these responses and
objections to the Reserved Request solely on its own behalf.

## GENERAL RESPONSES AND OBJECTIONS

  The Bondholder Group responds to the Reserved Request subject to, and without
waiving, the following responses and objections. The Bondholder Group reserves the right to
amend, revise, correct, supplement or clarify the responses and objections herein based on facts
or other information gathered at any time subsequent to the date of these responses.

  1. The Bondholder Group objects to the Reserved Request, including the definitions
and instructions incorporated by reference therein, to the extent it seeks to impose obligations on
the Bondholder Group that are inconsistent with the requirements of the Order, the Federal Rules
of Bankruptcy Procedure, the Federal Rules of Civil Procedure, the Ontario Rules of Civil
Procedure, or any other applicable rules.

  2. The Bondholder Group objects to the Reserved Request to the extent it uses the
term "Ad Hoc Bondholders Group", which has not been defined.

  3. The Bondholder Group objects to the Reserved Request, including the definitions
and instructions incorporated therein, to the extent it seeks documents or information protected
from discovery by the attorney-client privilege, the attorney work product doctrine, common
interest privilege or any other applicable privilege or protection.

  4. The Bondholder Group objects to the Reserved Request, including the definitions
and instructions incorporated therein, to the extent it seeks information that is not in the
Bondholder Group's possession, custody or control.

94

5.      All responses to the Reserved Request are provided subject to the provisions of

the Protective Order entered by the United States Bankruptcy Court for the District of Delaware

on June 11, 2013 (the "Protective Order"), including but not limited to section 18 thereof, which

provides that the inadvertent production of any document in response to the Reserved Request

shall not constitute a waiver of privilege or of any other ground for objection to discovery with

respect to such document, the information contained therein, or the subject matter thereof.

## SPECIFIC RESPONSES AND OBJECTIONS

Reserved Request

Documents sufficient to show for each holder of Nortel Entity bonds (i) on

January 14, 2009, and (ii) on the most recent date prior to production of the Documents

requested hereby, whether held directly or through funds: the identity of the holder, the amount

of each bond issue held by the holder, the date(s) the holder acquired such bonds, from whom

they were acquired and the amount(s) paid therefor.

Response to Reserved Request

Subject to and without waiving the forgoing General Responses and Objections,

the Bondholder Group specifically objects to the Reserved Request on grounds that it: (i) seeks

information that is neither relevant nor reasonably calculated to lead to the discovery of

admissible evidence; (ii) seeks information that is either not in the possession, custody or control

of the Bondholder Group or could be more easily obtained from other sources; and (iii) is unduly

burdensome, unduly prejudicial and does not accord with principles of proportionality in

discovery.  The Bondholder Group responds that it has previously disclosed all required

information responsive to the Reserved Request, in accordance with Federal Rule of Bankruptcy

Procedure 2019.  The Bondholder Group refers the Canadian Creditors Committee to the

Verified Statement of Milbank, Tweed, Hadley & McCloy LLP and Pachulski Stang Ziehl &

3

Jones LLP, Pursuant to Bankruptcy Rule 2019 [Docket No. 8204], dated August 17, 2012, and

the Supplemental Verified Statement of Milbank, Tweed, Hadley & McCloy LLP and Pachulski

Stang Ziehl & Jones LLP, Pursuant to Bankruptcy Rule 2019 [Docket. No. 11035], dated June

26, 2013.

Dated: July 25, 2013

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/
Laura Davis Jones (No. 2436)
Kathleen P. Makowski (No. 3648)
919 N. Market Street, 17th Floor, PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone: (416) 777-5762
Facsimile: (416) 863-1716

***Attorneys for Ad Hoc Group of Bondholders***

**TAB E**

96

This is Exhibit......*E*.........................referred to in the

affidavit of...*Bruke Wison M*....................................

sworn before me, this...*3*...........................

day of...*Jan*...................................20..*19*...

*[signature]*

A COMMISSIONER FOR TAKING AFFIDAVITS

97

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------- x
                                                           :
*In re*                                                    :          Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,                            :          Case No. 09-10138 (KG)
                                                           :
                                       Debtors.            :          (Jointly Administered)
                                                           :
                                                           :
---------------------------------------------------------- x

-    and the    -

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

THE AD HOC GROUP OF BONDHOLDERS' OBJECTIONS TO THE
REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP

Pursuant to the Order Entering Litigation Timetable and Discovery Plan, Case No.

09-10138-KG [D.I. 10566], Ontario Superior Court of Justice (Commercial List) Court File No.

09-CL-7950 (the "Discovery Order") and the Order Amending Litigation Schedule in Joint

Cross-Border Proceedings to Determine Allocation of Asset Sale Proceeds and Certain Claims

(the "Discovery Amendment" and together with the Discovery Order, the "Amended Discovery

Order") [D.I. 12522], the Deposition Protocol Stipulation (the "Deposition Protocol") [D.I.

11439] and the Amendment to Deposition Protocol Stipulation (the "Protocol Amendment" and

together with the Deposition Protocol, the "Amended Deposition Protocol") [D.I. 11747],[1] the

Ad Hoc Group of Bondholders (the "Bondholder Group"),[2] by and through its undersigned

counsel, hereby responds and objects to the Representative Witness Subjects Served by the

Canadian Allocation Group and the Canadian Claims Defendant Group, dated December 13,

2013, as amended on December 15, 2013 (collectively, the "Subjects"). The Bondholder Group

submits these objections to the Subjects solely on its own behalf.

## GENERAL OBJECTIONS

The Bondholder Group, along with other Core Parties, believes that any

"Representative Witness" or 30(b)(6) depositions are unnecessary in light of the more than 100

fact witness depositions that have taken place to date and would result in a waste of estate

resources. Accordingly, the Bondholder Group asserts and reserves its rights to argue to the

Courts that any such "Representative Witness" or 30(b)(6) depositions should not proceed. The

Bondholder Group provides the following General and Specific Objections in accordance with

the Amended Discovery Order subject to, and without waiving, this reservation of rights.

The Bondholder Group responds and objects generally to the Subjects as follows

(the "General Objections"):

1.      The Bondholder Group objects to the Subjects to the extent they seek to impose

obligations on the Bondholder Group that are inconsistent with the requirements of the Amended

Discovery Order, the Amended Deposition Protocol, the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Federal Rules of Civil Procedure (the "Civil Rules"), the Ontario

---

[1]     Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Amended Discovery Order and the Amended Deposition Protocol.

[2]     The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation.

99

*Rules of Civil Procedure* (the "Canadian Rules" and collectively with the Bankruptcy Rules and the Civil Rules, the "Rules"), or any other applicable rules, orders or law.

2.    The Bondholder Group objects to the Subjects to the extent they seek information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection.

3.    The Bondholder Group objects to the Subjects to the extent they are vague, ambiguous, overly broad, unduly burdensome, unduly prejudicial, oppressive, misleading, duplicative, cumulative, not susceptible to a reasoned interpretation, not reasonably particular, or would require the Bondholder Group to speculate as to the nature or scope of the information sought thereby.

4.    The Bondholder Group objects to the Subjects to the extent they are not relevant to a claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute.

5.    The Bondholder Group objects to the Subjects on the grounds that they appear calculated to annoy and harass the Bondholder Group to the extent they seek information not relevant to the Allocation dispute or outside the Bondholder Group's possession, custody or control or that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors.

6.    The Bondholder Group objects to the Subjects to the extent they violate section G(1)(a) of the Amended Deposition Protocol ("Section G(1)(a)"), which states, in relevant part, as follows:

> [A] Deposition Group may serve *a very limited number* of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first hand testimony.  Provided such subjects are

3

> *small in number and reasonable in scope*, the Representative
> Witness has a duty to prepare to testify on the designated subjects.

(emphasis added). Specifically, the Bondholder Group asserts that the Subjects are neither "very limited" in number nor "reasonable in scope" as required by Section G(1)(a).

7.      The Bondholder Group objects to the statement that the Subjects "are not believed to have been fully canvassed with the fact deposition witnesses . . . ." Each Subject has been sufficiently canvassed through the over 100 fact-witness depositions that have already been taken by the Core Parties. Any additional testimony is unnecessary and would result in a waste of resources.

8.      The Bondholder Group objects to the Subjects to the extent they assume disputed facts or legal conclusions in defining the information requested. The Bondholder Group hereby denies any such disputed facts or legal conclusions to the extent assumed by any Subject. Any response or objection by the Bondholder Group is without prejudice to this objection.

9.      The Bondholder Group objects to the Subjects to the extent they seek information that is not properly obtained in a deposition and may be more appropriately obtained through other means, including, but not limited to, expert witness testimony or written discovery.

10.     All responses to the Subjects are provided subject to the provisions of the Protective Order entered by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice on June 11, 2013, as amended, including but not limited to section 18 thereof, which provides that the inadvertent disclosure of any information in response to the Subjects shall not constitute a waiver of privilege or of any other ground for objection to discovery with respect to such information or the subject matter thereof.

11.    The Bondholder Group reserves the right to amend, revise, correct, supplement or clarify the General and Specific Objections (defined below) based on facts or other information gathered at any time subsequent to the date of these General and Specific Objections.

## SPECIFIC OBJECTIONS

Without waiving or limiting, and subject to the foregoing General Objections, which are hereby expressly incorporated by reference into each objection below, the Bondholder Group objects specifically as follows to the Subjects (the "Specific Objections"):

**Subject No. 1:**

The same subjects as those provided to the US Debtors (the "US Debtors' Subjects").

**US Debtors' Subject No. 1:**

The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

**Response to US Debtors' Subject No. 1:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the "US Debtors' understanding" of statements made in the US Debtors' allocation pleadings; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or

any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 2:**

  The facts and documents, other than the MRDA, demonstrating the ownership interests that the US Debtors allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

**Response to US Debtors' Subject No. 2:**

  In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

  Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group is willing to meet and confer regarding the scope and form of its response, if any, to US Debtors' Subject No. 2.

**US Debtors' Subject No. 3:**

  The factual and documentary basis for and scope of the alleged beneficial/equitable interest in Nortel's intellectual property held by parties other than NNL.

**Response to US Debtors' Subject No. 3:**

  In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group is willing to meet and confer regarding the scope and form of its response, if any, to US Debtors' Subject No. 3.

**US Debtors' Subject No. 4:**

The factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licences [sic], held by parties other than NNL.

**Response to US Debtors' Subject No. 4:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "licenses of Nortel's intellectual property, including any enhanced licenses" without greater specificity; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily obtained from other sources; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 5:**

        The past practices of NNL and its subsidiaries concerning the scope of the

licenses to Nortel intellectual property under the Cost-Sharing Agreements and the MRDA.

**Response to US Debtors' Subject No. 5:**

        In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it

refers to "[t]he past practices of NNL and its subsidiaries"; (ii) seeks discovery that is neither

relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery

of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside

the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and

unduly burdensome to the extent that it seeks information that may be more easily obtained from

other sources; (v) seeks information protected from discovery by the attorney-client privilege,

the attorney work product doctrine, common interest privilege or any other applicable privilege

or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 6:**

        The factual and documentary basis, other than the MRDA, demonstrating that the

Licensed MRDA Participants' agreement to have the patents and all other registered forms of

Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing

payments was in exchange for enhanced exclusive licenses that constituted effective ownership

of the IP in their respective jurisdictions, including the factual and documentary basis for

demonstrating that this choice was a conscious decision.

**Response to US Debtors' Subject No. 6:**

        In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

<u>US Debtors' Subject No. 7</u>:

The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

<u>Response to US Debtors' Subject No. 7</u>:

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is duplicative of Subject No. 6; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 8:**

        The facts and documents demonstrating the reasons why it was decided that NNL would be the registered owner of all of the NN Technology (as that term is defined in the MRDA).

**Response to US Debtors' Subject No. 8:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 9:**

        The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

**Response to US Debtors' Subject No. 9:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "intellectual property" without greater specificity; (ii) is vague and ambiguous insofar as it refers to "NNL's subsidiaries" without greater specificity; (iii) is vague and ambiguous insofar as it refers to "inventors/authors and others"; (iv) seeks information that is outside the possession, custody or control of the Bondholder Group; (v) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and

appropriately obtained from other sources; (vi) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vii) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 10:**

The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009.

**Response to US Debtors' Subject No. 10:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "Nortel's processes for the identification and development of products"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 11:**

The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

**Response to US Debtors' Subject No. 11:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "third-party products and components"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 12:**

At the time each of the lines of business were sold and when the Rockstar transaction closed, the value, including the dollar value, of the US Debtors' alleged interest in the Nortel global patent portfolio and the factual bases for those values.

**Response to US Debtors' Subject No. 12:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is more appropriately obtained through expert testimony; (ii) is vague and ambiguous insofar as it refers to "the Nortel global patent portfolio" without greater specificity; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (v)

seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 13:**

The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property.

**Response to US Debtors' Subject No. 13:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the contentions of the US Debtors in their allocation pleadings; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 14:**

The value the US Debtors attribute to intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values.

110

**Response to US Debtors' Subject No. 14:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) vague and ambiguous insofar as it refers to "intangible assets other than intellectual property"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation values attributed by the US Debtors to assets sold in the line of business sales and the Rockstar transaction; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 15:**

        The value the US Debtors attribute to tangible assets sold as part of each of the line of business sales and the factual bases supporting those values.

**Response to US Debtors' Subject No. 15:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation values attributed by the US Debtors to assets sold in the line of business sales; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 16:**

The US Debtors' position on what amounts should be allocated to each of the estates in respect of the sales of tangible assets and on what factual basis.

**Response to US Debtors' Subject No. 16:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 17:**

The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between 2001 and 2009 for directly funded research and development; (2) the amounts that NNL, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund research and development by Nortel group entities; and (4) the amounts that NNI contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

**Response to US Debtors' Subject No. 17:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding any contentions made by NNI; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 18:**

The facts and documents supporting the US Debtors' position that without the backing of NNI's balance sheet the Nortel Group's access to credit markets would not have been possible or would have been greatly reduced.

**Response to US Debtors' Subject No. 18:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the Nortel Group's access to credit markets"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and  principles of proportionality in discovery.

**US Debtors' Subject No. 19:**

The facts and documents supporting the US Debtors' position that without access to the pre-petition NNI revolving credit facility NNL would not have been able to operate.

**Response to US Debtors' Subject No. 19:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the pre-petition NNI revolving credit facility"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 20:**

        The facts and documents demonstrating the US Debtors' recognition that the best way to maximize value for creditors was to sell the Nortel Group's rights, property and other assets together in each of the line of business sales and the Rockstar transaction instead of turning it into an intellectual property licensing business, including

      a.      the facts and documents demonstrating all efforts made to determine the US Debtors' ability, after January 14, 2009, to use a contract manufacturer to manufacture products embodying Nortel intellectual property.

      b.      the facts and documents demonstrating all efforts made to determine the feasibility of sublicensing NNI's license rights under the MRDA after January 14, 2009.

      c.      the facts and documents demonstrating all efforts undertaken by the US Debtors to determine the feasibility of forming a new reorganized company or corporate group to enforce the Nortel patents.

**Response to US Debtors' Subject No. 20:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the "US Debtors' recognition" of the best way to maximize value for creditors; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any

other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 21:**

The facts and documents demonstrating which Nortel entity paid for the prosecution and maintenance of the patents in Nortel's global patent portfolio, including but not limited to patents registered in the United States.

**Response to US Debtors' Subject No. 21:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous with respect to the meaning of the word "paid"; (ii) is vague and ambiguous insofar as it refers to "the Nortel global patent portfolio" without greater specificity; (iii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iv) seeks information that is outside the possession, custody or control of the Bondholder Group; (v) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (vi) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vii) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 22:**

The facts and documents demonstrating when and under what circumstances the US Debtors came to the understanding that at the time of the Rockstar transaction the value of the US Debtors' rights with respect to Nortel's intellectual property had changed.

19

116

**Response to US Debtors' Subject No. 22:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the understanding of the US Debtors; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 23:**

        The facts and documents related to the US Debtors [sic] understanding that the sale processes put in place to dispose of the Nortel Group's assets would not succeed if a selling party could hold up a sale pending agreement on the allocation of sale proceeds.

**Response to US Debtors' Subject No. 23:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the understanding of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the