attorney work product doctrine, common interest privilege or any other applicable privilege or

protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 24:**

  The facts and documents upon which the US Debtors rely upon to assert that the

Monitor and Canadian Debtors are estopped or should not otherwise be permitted to assert

entitlement to all of the proceeds of the Rockstar transaction.

**Response to US Debtors' Subject No. 24:**

  In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group, including without limitation

information regarding the assertions of the US Debtors; (ii) is duplicative, overly broad and

unduly burdensome to the extent that it seeks information that may be more easily and

appropriately obtained from other sources, including without limitation the US Debtors; (iii)

seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and

(iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 25:**

  The facts and documents demonstrating the estimated gross and net assets of the

Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company

claims.

**Response to US Debtors' Subject No. 25:**

  In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 26:**

The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

**Response to US Debtors' Subject No. 26:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous because it uses the term "Funds," which has not been defined; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 27:**

The facts and documents that relate to any other topics designated by any other parties for this witness.

**Response to US Debtors' Subject No. 27:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; and (ii) is overly broad, unduly burdensome, unduly prejudicial, and violates Section G(1)(a) and principles of proportionality in discovery.

Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group fully reserves its rights to incorporate herein any objections to any topics or subjects designated by any other party for any witness of the Bondholder Group.

**Subject No. 2:**

The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees.

**Response to Subject No. 2:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous because it uses the terms "Nortel Bonds" and "Bonds," which have not been defined; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; (iv) violates Section G(1)(a) and principles of proportionality in discovery; (v) seeks discovery that calls for a legal conclusion; and (vi) seeks discovery that is duplicative of the information contained in the bonds issued by Nortel and any guarantees thereof.

120

**Subject No. 3:**

The expectations of the Bondholder Group with respect to any guarantees to proceeds from the line of business sales and Rockstar transaction, and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates.

**Response to Subject No. 3:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) lacks foundation and assumes facts not in evidence; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group is willing to meet and confer regarding the scope and form of its response, if any, to Subject No. 3.

**Subject No. 4:**

The Claims asserted by the Ad Hoc Group of Bondholders in In re Nortel Networks Inc. et al, case No. 09-10138 (KG) (jointly administered), including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.

**Response to Subject No. 4:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the current facts respecting such subjects"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; (iv) violates Section G(1)(a) and principles of proportionality in discovery; and (v) seeks discovery that is duplicative of the Bondholder Group's Bankruptcy Rule 2019 Statements.

Dated:  December 18, 2013

MILBANK, TWEED, HADLEY & McCLOY LLP

/s/ Andrew M. Leblanc
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463

  -and-

BENNETT JONES LLP
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762

*Attorneys for the Ad Hoc Group of Bondholders*

**TAB F**

122

This is Exhibit...............F..................referred to in the

affidavit of........Barbara  Walenik...................

sworn before me, this.........3...........................

day of............Jan.........................20 17....

...................................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

**From:** Miller, Atara [mailto:AMiller@milbank.com]
**Sent:** Sunday, June 09, 2013 3:01 PM
**To:** 'Stein, Darryl G.'; AHanrahan@willkie.com; Ruby, Peter; Lily.Harmer@paliareroland.com; nortel.monitor@ca.ey.com; derrick.tay@gowlings.com; jennifer.stam@gowlings.com; ken.coleman@allenovery.com; paul.keller@allenovery.com; daniel.guyder@allenovery.com; laura.hall@allenovery.com; Joseph.Badtke-Berkow@AllenOvery.com; jonathan.cho@allenovery.com; Nicolette.ward@allenovery.com; Kathleen.murphy@bipc.com; mary.caloway@bipc.com; tdemarinis@torys.com; sbomhof@torys.com; sblock@torys.com; agray@torys.com; aslavens@torys.com; Bromley, James L.; Schweitzer, Lisa M.; Zelbo, Howard S.; Rosenthal, Jeffrey A.; Decker, Marla; Peacock, Lauren; Moessner, Jacqueline; Forrest, Neil P.; Queen, Daniel D.; dabbott@mnat.com; acordo@mnat.com; rschwill@dwpv.com; scampbell@dwpv.com; jdoris@dwpv.com; lsarabia@dwpv.com; mgottlieb@counsel-toronto.com; twynne@counsel-toronto.com; pmichell@counsel-toronto.com; adler@hugheshubbard.com; oxford@hugheshubbard.com; tabataba@hugheshubbard.com; huberty@hugheshubbard.com; eharron@ycst.com; jdorsey@ycst.com; mzigler@kmlaw.ca; sphilpott@kmlaw.ca; akaplan@kmlaw.ca; bwalancik@kmlaw.ca; Ken.Rosenberg@paliareroland.com; Max.Starnino@paliareroland.com; Karen.Jones@paliareroland.com; Tina.Lie@paliareroland.com; michelle.jackson@paliareroland.com; barry.wadsworth@caw.ca; lewis.gottheil@caw.ca; Arthur Jacques; thomas.mcrae@shibleyrighton.com; janice.payne@nelligan.ca; steven.levitt@nelligan.ca; christopher.rootham@nelligan.ca; ainslie.benedict@nelligan.ca; bboake@mccarthy.ca; jgage@mccarthy.ca; emarques@mccarthy.ca; psteep@mccarthy.ca; bdshaw@mccarthy.ca; Melnik, Selinda; Hans, Richard; Hoeffner, Timothy; ZychK@bennettjones.com; Orzyr@bennettjones.com; finlaysong@bennettjones.com; swanr@bennettjones.com; zweigs@bennettjones.com; bellj@bennettjones.com; Kreller, Tom; Harris, Jennifer; Pisa, Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Matz, Tom; Bassett, Nick; Ruha, Gabrielle; Pojunas, Rachel; Shayne.kukulowicz@dentons.com; Michael.wunder@dentons.com; ryan.jacobs@dentons.com; Barbara.grossman@dentons.com; fhodara@akingump.com; dbotter@akingump.com; aqureshi@akingump.com; rajohnson@akingump.com; bkahn@akingump.com; angela.pearson@ashurst.com; Antonia.croke@ashurst.com; samis@rlf.com; bleonard@casselsbrock.com; dward@casselsbrock.com; bburden@casselsbrock.com; chorkins@casselsbrock.com; ljackson@casselsbrock.com; mbarrack@tgf.ca; djmiller@tgf.ca; rlewis@tgf.ca; amcewan@tgf.ca; O'Connor, Brian; Advani, Sameer; sheryl.seigel@mcmillan.ca; michael.riela@lw.com; jsalmas@heenan.ca; kkraft@heenan.ca; svanallen@heenan.ca; craig.barbarosh@kattenlaw.com; david.crichlow@kattenlaw.com; Karen.dine@kattenlaw.com; elamek@blg.com; jszumski@blg.com; dalowenthal@pbwt.com; lbarnes@osler.com; esellers@osler.com; eputnam@osler.com; ahirsh@osler.com; michael.lang@nortonrose.com; amdg@hoganlovells.com; john.tillman@hoganlovells.com; Matthew.bullen@hoganlovells.com; James.Norris-Jones@hsf.com
**Cc:** Zarnett, Benjamin; Myers, Fred; Kimmel, Jessica; jpasquariello@goodmans.ca; Carfagnini, Jay; carmstrong@goodmans.ca
**Subject:** RE: Document Requests and Interrogatories

Darryl,

Thanks for circulating a revised draft of open issues.  The Bondholder group does not and will not agree to the consolidated requests if they include the proposed RFP and interrogatory directed at the Bondholders.  Those requests seek information that is wholly irrelevant to the issues being tried.  If anyone would like to discuss further, we can be available for a call after the 7:30 CCC call.

**TAB G**

124

This is Exhibit................G................referred to in the

affidavit of..........Barbara Walcarek..........

sworn before me, this............................................

day of............May............20..14....

A COMMISSIONER FOR TAKING AFFIDAVITS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- X
                                          :
*In re*                                   :    Chapter 11
                                          :
Nortel Networks Inc., *et al.*,[1]        :    Case No. 09-10138 (KG)
                                          :
                  Debtors.                :    Jointly Administered
                                          :
                                          :    **Hearing date: January 7, 2014 at 10:00 a.m. (ET)**
                                          :    **Objections due: January 2, 2014 at 4:00 p.m. (ET)**
------------------------------------------------------- X

### NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 503(B) AND 507(A)(2) AND BANKRUPTCY RULES 6004(H) AND 9019 APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE CREDITORS' COMMITTEE, THE JOINT ADMINISTRATORS, THE EMEA DEBTORS, NORTEL NETWORKS OPTICAL COMPONENTS LIMITED, NORTEL TELECOM FRANCE SA, THE LIQUIDATOR, THE FRENCH LIQUIDATOR, THE UK PENSION PARTIES AND CERTAIN AFFILIATES

PLEASE TAKE NOTICE that the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned cases, have today filed the attached **Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(b) and 507(a)(2) and Bankruptcy Rules 6004(h) and 9019 Approving the US Claims Litigation Settlement Agreement by and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates** ("Motion").

PLEASE TAKE FURTHER NOTICE that any party wishing to oppose the entry of an order approving the Motion must file a response or objection ("Objection") if any, to the Motion with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801 on or before **January 2, 2014 at 4:00 p.m. (Eastern Time)** (the "Objection Deadline").

At the same time, you must serve such Objection on counsel for the Debtors so as to be received by the Objection Deadline.

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

       PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION WILL BE HELD ON **JANUARY 7, 2014 AT 10:00 A.M. (EASTERN TIME)** BEFORE THE HONORABLE KEVIN GROSS AT THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 6TH FLOOR, COURTROOM #3, WILMINGTON, DELAWARE 19801.  ONLY PARTIES WHO HAVE FILED A TIMELY OBJECTION WILL BE HEARD AT THE HEARING.

       IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated: December 17, 2013         CLEARY GOTTLIEB STEEN & HAMILTON LLP
      Wilmington, Delaware

                      James L. Bromley *(admitted pro hac vice)*
                      Lisa M. Schweitzer *(admitted pro hac vice)*
                      One Liberty Plaza
                      New York, New York 10006
                      Telephone:  (212) 225-2000
                      Facsimile:  (212) 225-3999

                      - and -

                      MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                          */s/ Ann C. Cordo*
                      Derek C. Abbott (No. 3376)
                      Eric D. Schwartz (No. 3134)
                      Ann C. Cordo (No. 4817)
                      Tamara K. Minott (No. 5643)
                      1201 North Market Street
                      P.O. Box 1347
                      Wilmington, Delaware 19801
                      Telephone:  (302) 658-9200
                      Facsimile: (302) 658-3989

                      *Counsel for the Debtors*
                      *and Debtors in Possession*

7855770.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
                       :

*In re*                      :     Chapter 11

                       :

Nortel Networks Inc., *et al.*,[1]      :     Case No. 09-10138 (KG)

                       :

          Debtors.      :     Jointly Administered

                       :

                       :     **Hearing Date: January 7, 2013 at 10:00 a.m. (ET)**
                       :     **Objections Due: January 2, 2014 at 4:00 p.m. (ET)**

---------------------------------------------------------X

### DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, 503(b) AND 507(a)(2) AND BANKRUPTCY RULES 6004(h) AND 9019 APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE CREDITORS' COMMITTEE, THE JOINT ADMINISTRATORS, THE EMEA DEBTORS, NORTEL NETWORKS OPTICAL COMPONENTS LIMITED, NORTEL TELECOM FRANCE SA, THE LIQUIDATOR, THE FRENCH LIQUIDATOR, THE UK PENSION PARTIES AND CERTAIN AFFILIATES

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "Debtors") hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004(h) and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) authorizing the Debtors' and the Official Committee of Unsecured Creditors' (the "Committee") entry into and approving the Agreement Settling US Claims Litigation dated

---

[1]     The debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

December 17, 2013 attached hereto as <u>Exhibit B</u> (the "<u>Settlement Agreement</u>") by and among

the Debtors, the US Non-Filed Entities (as defined below) and the Committee (together, the "<u>US</u>

<u>Interests</u>") on the one hand, and the EMEA Debtors, the EMEA Non-Filed Entities, the Joint

Administrators, Nortel Networks Optical Components Limited ("<u>NNOCL</u>"), Northern Telecom

France SA ("<u>NTF</u>"), the Liquidator (collectively with the EMEA Debtors, the EMEA Non-Filed

Entities, the Joint Administrators, NNOCL and NTF, the "<u>EMEA Parties</u>"), the French

Liquidator, the UK Pension Trustee, the PPF (together with the UK Pension Trustee, the "<u>UK</u>

<u>Pension Parties</u>"), and for purposes of Section 8.14 of the Settlement Agreement only, the Joint

Administrators, the Liquidator and the French Liquidator in their individual capacities, on the

other hand  (each as defined below, and the US Interests, the EMEA Parties, the French

Liquidator and the UK Pension Parties each being a "<u>Party</u>" and collectively, the "<u>Parties</u>") and

(ii) granting them such other and further relief as the Court deems just and proper.  In support of

this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.     The Debtors are pleased to request the approval of a comprehensive settlement

that would fully and finally resolve complex and substantial claims filed by the EMEA Parties,

the UK Pension Parties and the French Liquidator against the Debtors and settle and release

other claims between the Parties.  The Settlement Agreement represents a critical step forward

by the Parties to resolve the costly and contentious litigation amongst the Nortel affiliates.  As a

result of the compromises embodied in the Settlement Agreement and the settlement and release

of certain claims thereunder, the Debtors, the EMEA Parties and the UK Pension Parties have

simplified the disputes existing between the Parties.  The settlement also provides for the Parties

to attempt to reach agreement to work together in good faith to cooperate in the pending

litigation with respect to the allocation of the Nortel group's sale proceeds as set forth in the Settlement Agreement.

2.      The Settlement Agreement is a significant milestone for the Debtors in bringing their cases to final resolution, through the settlement and release of claims filed against the Debtors that have been the subject of years of contentious litigation and three mediations.  In the wake of the last several months of expedited and broad-sweeping discovery, the Parties seized the opportunity presented by the upcoming close of discovery to explore, and ultimately reach agreement on, the resolution of various claims by and against the Debtors, the UK Pension Parties, the French Liquidator, the EMEA Parties and certain of their affiliates.  As discussed in greater detail below, the Settlement Agreement provides marked benefits to the Debtors, the EMEA Parties and each of their creditors and stakeholders by bringing finality and certainty to the Debtors' estates with respect to claims that have been the subject of costly litigation for years and encouraging the coordination of resources and further potential cost savings with respect to the upcoming trial regarding the allocation of the various sale proceeds.

## JURISDICTION

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware (the "District Court") dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested herein are sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019.

3

## FACTUAL BACKGROUND

### A.    Procedural Background

5.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel

Networks (CALA) Inc. ("NN CALA"),[2] filed voluntary petitions for relief under chapter 11 of

the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the

"Court"), which cases are consolidated for procedural purposes only (the "Chapter 11 Cases").

The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.

6.      The Office of the United States Trustee for the District of Delaware (the "U.S.

Trustee") has appointed the Committee in respect of the Debtors [D.I.s 141, 142], and an ad hoc

group of bondholders has been organized (the "Bondholder Group").

7.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks

Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and

together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the

"Canadian Proceedings") and a monitor, Ernst & Young Inc. (the "Monitor"), was appointed by

the Canadian Court.  Also on the Petition Date, the High Court of Justice in England and Wales

(the "English Court") placed nineteen of Nortel's European affiliates, including Nortel Networks

UK Limited ("NNUK") and certain of its affiliates located in Europe, the Middle East and Africa

---

[2]      NN CALA filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009,
which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural
purposes [D.I. 1098].

[3]      The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

(collectively, the "EMEA Debtors"),[4] into administration (the "UK Proceedings") under the control of court-appointed administrators and foreign representatives (the "Joint Administrators"). On July 29, 2011, NNOCL commenced a creditors' voluntary liquidation, represented by Kerry Trigg (the "Liquidator").

8.      On May 28, 2009, NNSA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings in the Republic of France (the "French Secondary Proceedings," and together with the Chapter 11 Cases, the Canadian Proceedings and the U.K. Proceedings, the "Insolvency Proceedings") pursuant to which a liquidator, Maître Cosme Rogeau (the "French Liquidator"), and an administrator were appointed by the Commercial Court of Versailles, France (the "French Court") (Docket No. 2009P00492) for NNSA. NTF is in voluntary liquidation and the French Liquidator has been appointed Liquidateur amiable of NTF.

9.      Certain of NNI's U.S. affiliates, while being under the majority ownership of NNI, have not filed chapter 11 petitions (including their respective branches, the "US Non-Filed Entities").[5] Additionally, certain of the EMEA Debtors' affiliates have not commenced administration proceedings, but are under the control of their respective directors (the "EMEA Non-Filed Entities").[6] Other Nortel affiliates have commenced and in the future may commence additional creditor protection, insolvency and dissolution proceedings around the world.

---

[4]      The EMEA Debtors include the following entities:  NNUK, Nortel Networks S.A. ("NNSA"), Nortel Networks (Ireland) Limited ("NNIR"), Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

[5]      The U.S. Non-Filed Entities include Nortel Networks India International Inc. and Nortel Technology Excellence Centre Private Ltd.

[6]      The EMEA Non-Filed Entities include Nortel Networks AS, Nortel Networks AG and Nortel Networks South Africa (Pty) Limited.

**B.**    **The Allocation Dispute And The Mediation Process**

10.    Soon after the commencement of the Insolvency Proceedings, the various

companies comprising the Nortel group agreed to pursue an orderly and coordinated sale of the

Nortel businesses and assets.  This agreement between the Debtors, the Canadian Debtors and

certain of the EMEA Debtors was memorialized in the Interim Funding and Settlement

Agreement, dated as of June 9, 2009 (the "IFSA").[7]  Following a joint hearing on June 29, 2009,

the IFSA was approved by each of the Court [D.I. 993] and the Canadian Court.  Among other

things, the parties to the IFSA agreed not to condition the sale of Nortel's businesses and assets

on a prior agreement among the selling parties regarding the allocation of the ultimate sale

proceeds (plus accrued interest, the "Sale Proceeds") from the relevant sale transaction and to

hold all Sale Proceeds in escrow accounts until an allocation methodology is agreed upon or

resolved pursuant to the IFSA.  See IFSA, ¶¶ 12(a), (b).  With this framework in place, from

2009 to 2011, Nortel conducted an extensive series of court-approved sale transactions

generating approximately $7.5 billion in net Sale Proceeds.

11.    Over the last several years, the Debtors, the Canadian Debtors, the EMEA

Debtors, the Joint Administrators, the Committee, the Bondholder Group, the UK Pension

Parties and other key constituencies (the "Core Parties") have engaged in comprehensive

settlement discussions with respect to the allocation of the Sale Proceeds and the potential

resolution of claims filed by the EMEA Parties and the UK Pension Parties, including three

formal rounds of mediation.

12.    After the third failed mediation in January 2013, certain of the Core Parties sought

relief from the Court and the Canadian Court to approve litigation procedures to govern the

---

[7]    See Exhibit B to the Motion Pursuant to 11 U.S.C. § 105(a), § 363, § 503 and Fed. R. Bankr. P. 9019 for an
Order (A) Approving the Interim Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 874].

allocation disputes and the claims filed by the EMEA Parties and the UK Pension Parties against the Debtors and the Canadian Debtors. On April 3, 2013, this Court issued an order and opinion granting the Debtors' motion for approval of binding procedures and an expedited schedule for the cross-border resolution of the dispute concerning the allocation of the Sale Proceeds (the "Allocation Dispute"), denying the Joint Administrators' cross-motion to compel arbitration (the "Cross-Motion") and directing the Core Parties to continue negotiation of an allocation protocol consistent with the Court's opinion [D.I.s 9946, 9947] (the "US Allocation Dispute Order"). Additionally, the U.S. Allocation Dispute Order scheduled a trial to determine the allocation of the Sales Proceeds, the EMEA Claims and the UK Pension Claims, each as described below, to commence on January 6, 2014. The Canadian Court issued a parallel order and endorsement on March 8, 2013 and April 3, 2013 respectively (the "Canadian Allocation Endorsements").[8]

13.     The Joint Administrators pursued appeals of the US Allocation Dispute Order and the Canadian Allocation Endorsements in the applicable jurisdictions. On April 17, 2013, the Joint Administrators, on behalf of the EMEA Debtors, appealed as of right the order denying their Cross-Motion to compel arbitration [D.I. 10166] (the "US Appeal").[9] On December 6, 2013, the United States Court of Appeals for the Third Circuit issued an opinion affirming this Court's denial of the Cross-Motion (the "Third Circuit Decision").[10]

---

[8]     See Exhibits C and D to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I. 10414].

[9]     The Joint Administrators, on behalf of the EMEA Debtors, also sought leave from the Court to appeal the portion of the US Allocation Dispute Order regarding approval of an allocation protocol [D.I. 10244] (the "Interlocutory Appeal"). After this Court refused the Joint Administrators' request to certify the Interlocutory Appeal [D.I. 10407], the Joint Administrators sought leave with respect to the Interlocutory Appeal from the Third Circuit and the District Court, both of which denied the Joint Administrators' motions for leave. See In re Nortel Networks Inc., No 13-8055 (3d Cir. June 13, 2013); Order Denying Motion for Leave to Appeal from Order Approving Allocation Protocol, ECF No. 31, In re Nortel Networks Inc. et al., C.A. No. 13-757(LPS) (D. Del. July 23, 2013).

[10]     See In re Nortel Networks Inc., et al., No. 13-2739 (3d Cir. Dec. 6, 2013).

14.     In Canada, the Joint Administrators filed a motion for leave to appeal the

Canadian Allocation Dispute Endorsements with the Ontario Court of Appeal,[11] which was

denied on June 20, 2013 [D.I. 11256-1].  Subsequently, the Joint Administrators filed a motion

for leave to appeal the denial of the Canadian Cross-Motion to compel arbitration in the Supreme

Court of Canada (the "Canadian Motion for Leave").  The Canadian Motion for Leave remains

pending in the Supreme Court of Canada.

## C.     The US Claims Litigation

15.     As this Court is aware, the EMEA Parties and the UK Pension Parties filed

lengthy and significant proofs of claim against the Debtors asserting claims in relation to certain

intercompany loans, Nortel's transfer pricing arrangements, an alleged depletion of cash and

value from the EMEA Debtors and the purported underfunding of the Nortel Networks UK

Pension Plan (the "UK Pension Plan"), among other things.  As discussed in more detail below,

litigation of the EMEA Claims, the French Liquidator Claim and the UK Pension Claims (each

as defined below) against the Debtors (collectively, the "US Claims Litigation") has proceeded

over a span of more than three years at a substantial cost to the Debtors' estates.

### (i) THE EMEA CLAIMS, THE FRENCH LIQUIDATOR
### CLAIM AND THE NNI CLAIM

16.     On September 30, 2009, the EMEA Parties filed over three hundred proofs of

claim against NNI and the other Debtors (the "Original EMEA Claims").  The Debtors objected

to the Original EMEA Claims and filed a motion for an order requiring a more definite statement

of claim on April 1, 2011 [D.I. 5200] (the "EMEA Claims Objection").  This Court granted the

EMEA Claims Objection, ordering that the EMEA Parties provide a more definite statement of

their claims on or before June 3, 2011, absent which the Original EMEA Claims and any of the

---

[11]     See Exhibit E to Notice of Filing of Items Designated for Record on Appeal dated May 1, 2013 [D.I.
10414].

EMEA Parties' prepetition claims against the Debtors would be disallowed and expunged with prejudice [D.I.s 5402, 5588].

17.     On June 3, 2011, the EMEA Parties filed thirty-seven (37) amended proofs of claim against the Debtors (the "Amended EMEA Claims").[12]  The Amended EMEA Claims include claims asserted by the Joint Administrators on behalf of:  (i) NNUK, for nearly $2.5 billion and other contingent and unliquidated amounts (Claim No. 7786, the "NNUK Claim"); (ii) NNIR, for approximately $291 million and other contingent and unliquidated amounts (Claim No. 7774, the "NNIR Claim"); and (iii) NNSA for approximately $473 million and other contingent and unliquidated amounts (Claim No. 7785, the "NNSA Claim").[13]  Additionally, the French Liquidator filed a proof of claim on behalf of NNSA against NNI (Claim No. 7784, the "French Liquidator Claim") asserting claims for damages of approximately $473 million along with other contingent and unliquidated amounts, and NNI filed a proof of claim against NNSA in the French Secondary Proceedings (the "NNI Claim").

18.     The Amended EMEA Claims and the French Liquidator Claim assert multiple causes of action under U.S. and foreign law, primarily alleging that NNI jointly controlled Nortel's operations with NNC and NNL and allowed the improper removal of value from the EMEA Debtors and the Non-Filed EMEA Entities for the benefit of NNL and NNI through a complex series of prepetition transactions.[14]  The Amended EMEA Claims and the French

---

[12]     The Amended EMEA Claims are listed on the Debtors' claim register as proof of claim numbers 7750 through 7783 and 7785, 7786 and 7787.  Pursuant to a parallel order of the Canadian Court, the EMEA Parties and the French Liquidator filed proofs of claim against the Canadian Debtors (the "Canadian EMEA Claims").  See Notice of Submission of Proofs of Claim, dated May 18, 2011 [D.I. 5433].  The Canadian EMEA Claims are separate and distinct from the EMEA Claims and the French Liquidator Claim asserted against the Debtors in the Chapter 11 Cases.

[13]     Over 300 Original EMEA Claims that were not timely amended were disallowed and expunged with prejudice.

[14]     See, e.g., NNUK Claim ¶¶ 13, 15; NNIR Claim ¶¶ 13, 15; NNSA Claim ¶¶ 13, 15; French Liquidator Claim ¶¶ 13, 15.

Liquidator Claim also assert a substantial amount of ordinary course trading claims against the

Debtors in amounts exceeding $25 million.  The EMEA Parties may have additional claims that

have not been filed, whether through set off or otherwise, against certain of the Debtors and/or

the U.S. Non-Filed Entities for ordinary course trading debts (the "US EMEA Non-Filed

Claims," and together with any remaining Original EMEA Claims and the Amended EMEA

Claims, the "EMEA Claims").

19.    On July 15, 2011 and July 22, 2011, the Debtors and the Committee filed joint

objections and motions to dismiss the NNUK Claim, the NNIR Claim, the NNSA Claim and the

French Liquidator Claim [D.I.s 5970, 6022, 6026] (the "Motions to Dismiss").  After briefing

and oral argument, this Court granted in part and denied in part the Motions to Dismiss on March

20, 2012 [D.I. 7404] (the "US EMEA Claims Dismissal Order").  Specifically, the Court

dismissed all claims predicated on allegations that (i) NNI acted as a director or shadow director

of NNUK, NNIR, or NNSA; (ii) that NNI owed a duty of care to NNUK or NNIR; or (iii) that

NNI was liable as a result of any financial support directive or contribution notice issued in

proceedings in the United Kingdom concerning the UK Pension Plan.[15]  The remaining EMEA

Claims have been the subject of mediation, extensive discovery and discussions between the

Debtors and the EMEA Parties.  The Debtors and the Committee filed a subsequent objection to

the remaining EMEA Claims on May 14, 2013 [D.I. 10521].  The Court will not need to rule on

the merits of the objection following approval of the Settlement Agreement.

(ii) THE UK PENSION CLAIMS

20.    On September 30, 2009 (and January 25, 2010 in the case of NN CALA), the

Nortel Networks UK Pension Trust Limited (as trustee of the UK Pension Plan, the "UK Pension

---

[15]    See In re Nortel Networks, Inc., 469 B.R. 478, 485, 518 (Bankr. D. Del. 2012).

Trustee") and the Board of the Pension Protection Fund (the "PPF") filed several proofs of claim against the Debtors (the "Original UK Pension Claims").[16]

21.     In January 2010, the UK Pension Regulator ("TPR") issued a warning notice initiating administrative proceedings in the United Kingdom (the "UK Administrative Proceedings") against NNI and NN CALA regarding the alleged shortfall in the funding of the UK Pension Plan.  Subsequently, the Debtors filed a motion to enforce the automatic stay against the UK Pension Parties with respect to their participation in the UK Administrative Proceedings against NNI and NN CALA [D.I. 2441] (the "Stay Motion").  The Court granted the Stay Motion over the UK Pension Parties' objection, issuing an order (the "Automatic Stay Order") enforcing the stay and deeming the UK Administrative Proceedings "void and of no force or effect" in this Court with respect to the Debtors.[17]

22.     On June 11, 2012, the Debtors filed an objection to the Original Proofs of Claim and a motion for an order requiring a more definite statement of claim [D.I. 7818].  This Court granted the Debtors' objection on July 11, 2012 and ordered the UK Pension Parties to serve a more definite statement of their proofs of claim, along with supporting documentation, by September 5, 2012 [D.I. 7984].

23.     On September 5, 2012, the UK Pension Parties filed amended proofs of claim against NNI and NN CALA (Claim Nos. 8357 and 8358, together, the "Amended UK Pension

---

[16]     The Original UK Pension Claims are listed on the Debtors' claim register as proof of claim numbers 5573, 5574, 5575, 5576, 5577, 5578, 5579, 5580, 5581, 5582, 5583, 5584, 5585, 5586, 5587 and 6979.  The UK Pension Parties also filed proofs of claim against the Canadian Debtors (the "Canadian UK Pension Claims," and together with the Canadian EMEA Claims, the "Canadian Claims Litigation").  The Canadian UK Pension Claims are separate and distinct from the UK Pension Claims asserted against the Debtors in the Chapter 11 Cases.

[17]     Order Enforcing the Automatic Stay Against Certain Claimants With Respect to the U.K. Pension Proceedings, dated Feb. 26, 2010, ¶ 3[D.I. 2576].  The Automatic Stay Order has since been affirmed by both the District Court on March 29, 2011 and the Third Circuit on December 29, 2011.  See In re Nortel Networks, Inc., 669 F.3d 128 (3d Cir. 2011), aff'g In re Nortel Networks Inc., No. 09-10138-KG, 2011 WL 1154225 (D. Del. Mar. 29, 2011), cert. denied, 133 S. Ct. 34 (2012).

Claims," and collectively with any remaining Original UK Pension Claims, the "UK Pension

Claims").[18] The Amended UK Pension Claims purport to assert claims against each of NNI and

NN CALA in an amount of no less than $1.335 billion, alleging, among other things, that

grounds exist for NNI and NN CALA to provide financial support to satisfy NNUK's funding

obligations to the UK Pension Plan pursuant to the U.K. Pensions Act 1995 and 2004.[19] The

Amended UK Pension Claims further assert unliquidated claims related to NN CALA's allegedly

"unduly favorable treatment" under its separate transfer pricing arrangements with NNL and

NNUK's alleged "inadequate[ ] compensat[ion] for the services it provided to the Nortel

Group."[20]

24.    On May 14, 2013, the Debtors and the Committee filed an objection to the

Amended UK Pension Claims, asserting that the Amended UK Pension Claims should be

disallowed in full, including on the grounds that (i) the U.K. Pension Act should not be applied

against the Debtors both as a matter of comity and choice of law principles, (ii) the Amended UK

Pension Claims seek duplicative recovery on claims brought directly by NNUK and (iii) the UK

Pension Parties are unable to satisfy the U.K. Pension Act requirements for a financial support

direction [D.I. 10519] (the "UK Pension Claims Objection"). The UK Pension Claims

Objection is currently scheduled to be heard at the Trial (as defined below).

**D.    Current Procedural Posture Of The Allocation
        Dispute And The US Claims Litigation**

25.    On May 17, 2013, this Court entered an order approving the final allocation

protocol (the "Allocation Protocol") [D.I. 10565] and an order establishing a litigation timetable

---

[18]    The Amended UK Pension Claims state that the U.K. Pension Parties withdrew their proofs of claim filed against the Debtors other than NNI or NN CALA. See Amended U.K. Pension Claims at 1 n.2.

[19]    See id. ¶ 325.

[20]    Id.

and discovery plan setting forth procedures for discovery and other pre-trial proceedings with regard to the Allocation Dispute, US Claims Litigation and the Canadian Claims Litigation [D.I. 10566] (as amended and supplemented from time to time, the "Litigation Timetable and Discovery Plan"). The Canadian Court entered substantially similar orders on May 15, 2013.

26.    Pursuant to the Litigation Timetable and Discovery Plan, as amended, the joint trial for the Allocation Dispute, the US Claims Litigation and the Canadian Claims Litigation (the "Trial") is currently scheduled to commence on May 12, 2014 [D.I. 12522-1].  In preparation for the Trial, the Core Parties have engaged in an extensive and expedited discovery process in accordance with the Litigation Timetable and Discovery Plan.  Since May 2013, the Core Parties have collectively produced more than two million documents, conducted approximately 100 depositions in 15 cities worldwide, responded to interrogatories and have met and conferred on multiple discovery-related issues, nearly all of which were successfully resolved without requiring judicial intervention.

### E.    Summary Of The Proposed Settlement Agreement

27.    In the midst of extensive discovery, the Debtors and the EMEA Parties began a new round of discussions in an attempt to achieve a consensual resolution of the US Claims Litigation.  After vigorous negotiations, the Debtors, the Committee, the EMEA Parties, the French Liquidator and the UK Pension Parties were able to reach the primary terms of a settlement in principle finally resolving the US Claims Litigation and providing for coordination in good faith of their efforts with respect to the ongoing Allocation Dispute.  The Settlement Agreement embodies that agreement, as ultimately formalized and memorialized by the Parties.

13

28.    The Settlement Agreement provides that, subject to the approval or direction, as applicable, of this Court, the French Court, and entry of the Bedoe Order by the English Court, as provided in the Settlement Agreement, the following terms shall result:[21]

- The Allowed Claims.

  o On the Effective Date, NNI shall grant an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, in favor of the Joint Administrators, on behalf of the EMEA Parties, against NNI in the amount of $37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy (the "EMEA Allowed Claim").[22]

  o On the Effective Date, NNI shall grant an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, in favor of the UK Pension Parties against NNI in the amount of $37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy (the "UK Pension Parties' Allowed Claim" and, together with the EMEA Allowed Claim, the "Allowed Claims").

  o NNI shall pay the Allowed Claims in full in immediately available funds, without any deduction, setoff, recoupment or withholding for tax purposes, to accounts designated by the Joint Administrators and the UK Pension Parties, as applicable,  in writing, on or before three (3) business days from the Effective Date (as defined in the Settlement Agreement) (the date(s) on which payments in respect of the EMEA Allowed Claim and the UK Pension Parties' Allowed Claim are made by NNI, the "EMEA Payment Date" and the "UK Pension Payment Date" respectively).

- Canadian EMEA Claims and Canadian UK Pension Claims.  The US Interests will not oppose or object to the Filed Canadian Claims, provided, however, that nothing in the Settlement Agreement shall constitute a release or waiver or discharge of any right of the US Interests to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute.

---

[21]    This discussion is intended as a summary of the terms of the Settlement Agreement.  To the extent that the summary and the terms of the Settlement Agreement are inconsistent, the terms of the Settlement Agreement shall control.  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

[22]    All amounts provided for in the Settlement Agreement are in U.S. dollars.

141

- Allocation Dispute.

    o  Allocation Cooperation Period.  The US Debtors, the Committee, the UK
       Pension Parties, the Joint Administrators on behalf of the EMEA Debtors, the
       Liquidator on behalf of NNOCL and the EMEA Non-Filed Entities agree that
       they will work in good faith commencing on the date of execution of the
       Settlement Agreement by all of the Parties (with the exception of the US Non-
       Filed Entities) (the "Allocation Cooperation Period") in an effort to see if they
       can develop a common allocation position and other agreements related to the
       conduct of the trial.  To that end, the Parties will use commercially reasonable
       best efforts during the Allocation Cooperation Period to coordinate and co-
       operate in respect of (a) discussion of experts on allocation methodologies in
       connection with the Allocation Dispute and preparation of submissions and
       reports regarding the same; (b) remaining depositions and discovery; (c)
       conduct of the trial of the Allocation Dispute; (d) pre-trial motion practice and
       pre- and post-trial briefing in respect of the Allocation Dispute; and (e)
       appeals, if any, from determinations in respect of the Allocation Dispute at or
       following trial.

    o  Duration of the Allocation Cooperation Period.  Any Party may bring to an
       end its involvement in such cooperation arrangement with respect to the
       Allocation Dispute by providing the other Parties with five (5) business days'
       written notice of its intention to do so.  Where a Party exercises such
       termination right, the rights and obligations of all the other Parties to each
       other under section 6.1 of the Settlement Agreement shall remain and there
       will be no impact on the settlement of the US Claims Litigation or the Parties'
       obligations as provided in the other sections of the Settlement Agreement.

    o  Exchange of Information.  The US Interests, the Joint Administrators on
       behalf of the EMEA Debtors, the EMEA Non-Filed Entities, the Liquidator on
       behalf of NNOCL and the U.K. Pension Parties may continue to seek
       information, disclosure, or discovery from one another in connection with the
       Allocation Dispute pursuant to any applicable order or endorsement of the
       Court or the Canadian Court and in accordance with the terms of the
       Settlement Agreement.

    o  Nothing in the Settlement Agreement shall create any affirmative obligation
       on the part of the US Interests, the EMEA Parties or the UK Pension Parties to
       support any particular legal or valuation theories in respect of the Allocation
       Dispute, nor shall it prevent such Parties from advocating any particular legal
       or valuation theories in respect of the Allocation Dispute.  Furthermore,
       subject to Section 5 of the Settlement Agreement, nothing in the Settlement
       Agreement shall create an affirmative obligation on the part of the US
       Interests, the EMEA Parties or the UK Pension Parties in respect of the
       Canadian Claims Litigation.

15

- Withdrawal of Claims and No Further Claims.

  o On the EMEA Payment Date, the US EMEA Filed Claims shall be deemed withdrawn, with prejudice, and the US EMEA Non-Filed Claims shall be deemed waived. The EMEA Parties shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to matters resolved in the Settlement Agreement.

  o On the UK Pension Payment Date, the US UK Pension Claims shall be deemed withdrawn, with prejudice, and the UK Pension Parties shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

  o On the Effective Date, the US French Liquidator Claim shall be deemed withdrawn, with prejudice, and the French Liquidator shall be forever barred from asserting against any of the Debtors or any of the U.S. Non-Filed Entities in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

  o Upon completion of the payments in respect of the Allowed Claims, the NNI Claim shall be deemed withdrawn, with prejudice, and the US Non-Filed Claims shall be deemed waived. The Debtors and the U.S. Non-Filed Entities shall be forever barred from asserting against any of the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the Joint Administrators, the French Liquidator or the UK Pension Parties in any forum any further claims arising from or related to the matters resolved in the Settlement Agreement.

- Appeals.

  o U.S. Appeal. From the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, agree that they shall not appeal from or seek reconsideration of the Third Circuit Decision.

  o Dismissal of the Canadian Motion For Leave. Promptly following the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, shall discontinue the Canadian Motion for Leave.

  o US EMEA Claims Dismissal Order. NNUK, NNIR and NNSA will not take any steps to appeal or otherwise challenge the US EMEA Claims Dismissal Order.

  o Allocation Dispute. For the avoidance of any doubt, nothing in Section 3 of the Settlement Agreement concerning waiver of appeals shall prevent or in any way inhibit the Parties from pursuing any appeal or making any

arguments whatsoever in respect of the determinations reached by the Canadian and/or US Court following trial of the Allocation Dispute.

- Releases.

  o The US EMEA Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, and (to the extent under the control of the Liquidator or the Joint Administrators (as the case may be)) the respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing, shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US EMEA Claims or the facts and circumstances that were alleged to provide a basis for the US EMEA Claims.

  o The US UK Pension Releases.  Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the UK Pension Parties and (to the extent under the control of the UK Pension Parties) their respective current and former affiliates, subsidiaries, shareholders (but not including any member of the Nortel Group) and the employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the

definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the UK Pension Parties, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US UK Pension Claims or the facts and circumstances that were alleged to provide a basis for the US UK Pension Claims.

o   The US French Liquidator Releases. Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the French Liquidator, on behalf of NNSA and NTF, and (to the extent under the control of the French Liquidator) their respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which the French Liquidator, on behalf of NNSA and NTF, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US French Liquidator Claim or the facts and circumstances that were alleged to provide a basis for the US French Liquidator Claim.

o   The U.S. Releases. Subject to Sections 4.1 and 4.2 of the Settlement Agreement, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the US Interests, and (to the extent under the control of the US Entities) their respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing shall release and forever discharge the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the UK Pension Parties, the Joint Administrators, the Liquidator, and the French Liquidator, in their respective representative capacities, and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated,

18

which the US Interests now have, had, may have had or hereafter may have however so arising.

    o  For the avoidance of doubt, the Releases shall include releases in respect of any and all claims in respect of costs, expenses and fees (including, but not limited to, attorneys' fees, experts' fees, and other professional fees) incurred by any of the Parties in connection with the US EMEA Claims, the US UK Pension Claims, the US French Liquidator Claim and the US Appeal.

- **Limitation of Releases.**

    Nothing in the Settlement Agreement shall constitute a release or waiver or discharge (in whole or in part) of (i) the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation; (ii) any claims of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NNOCL against the current or former directors and officers (in their capacities as such) of the Canadian Debtors; (iii) any claims of the EMEA Debtors and/or EMEA Non-Filed Entities and/or NTF and/or NNOCL against the current or former directors and officers (in their capacities as such) of the EMEA Debtors or the EMEA Non-Filed Entities or NTF or NNOCL (including for the avoidance of any doubt any such directors or officers even if they were also directors or officers of any of the US Debtors or the Canadian Debtors); (iv) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (v) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute; or (vi) any claim of the UK Pension Parties against any of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator or any defence that the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator might have against any claim of the UK Pension Parties.

    o  Nothing in the Settlement Agreement shall prevent or in any way inhibit the EMEA Parties, the French Liquidator or the UK Pension Parties from making any arguments in respect of, or pursuing any appeal of any determinations of the Court or the Canadian Court with respect to the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation. Furthermore, nothing in the Settlement Agreement shall operate as or constitute any admission with respect to the merits of any allegations or arguments underlying the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or the Canadian Claims Litigation.

o For the avoidance of doubt, nothing in the Settlement Agreement shall constitute a release or waiver or discharge of any rights created under the Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of the Settlement Agreement, nor shall the Settlement Agreement be used, referred to or contended by any Party to have any relevance or probative value in connection with any claims not released herein.

• Effectiveness with Respect to the US Non-Filed Entities. The Execution of the Settlement Agreement by the US Non-Filed Entities prior to the Effective Date is a condition to the effectiveness of the Settlement Agreement solely with respect to each of the US Non-Filed Entities. Upon execution of the Settlement Agreement, the US Non-Filed Entities shall be Parties to the Settlement Agreement for the benefits provided and the burdens imposed by the provisions of the Settlement Agreement expressed to be conferred on or given to the US Non-Filed Entities. For the avoidance of doubt, the condition of the effectiveness of the Settlement Agreement as to the US Non-Filed Entities shall not constitute a condition to the effectiveness of the Settlement Agreement with respect to the US Debtors, the Committee, the EMEA Parties, the UK Pension Parties, or the French Liquidator.

## RELIEF REQUESTED

29.     By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and 9019, entry of an order (i) authorizing the Debtors' and the Committee's entry into and approving the Settlement Agreement (the "Settlement Order") and (ii) granting them such other and further relief as the Court deems just and proper.

## BASIS FOR RELIEF

30.     The relief requested in this Motion is authorized by sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

31.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease the property of the estate outside of the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b). Section 363 applies when an agreement involves the disposition of the estate's

assets in such a way that it ventures beyond an ordinary course transaction. See Myers v. Martin (In re Martin), 91 F.3d 389, 394-95 (3d Cir. 1996).

32.    The use or transfer of estate property under Section 363 must be supported by a sound business purpose. Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Decora Indus., Inc., No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991); Travelers Cas. & Sur. Co. v. Future Claimants Representative, Civil Action No. 07-2785 (FLW), 2008 WL 821088, at *4 (D.N.J. Mar. 25, 2008). A court determining whether a sound business purpose justifies the transaction "should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." In re Montgomery Ward Holding Corp., 242 B.R. at 153-54 & n.1 (quoting In re Lionel Corp., 722 F.2d at 1071). In addition, a debtor must show that the transaction has been proposed in good faith, that adequate and reasonable notice has been provided and that it is receiving fair and reasonable value in exchange. See In re Decora Indus., Inc., 2002 WL 32332749, at *2; In re Del. & Hudson Ry. Co., 124 B.R. at 176.

33.    Bankruptcy Rule 9019 provides, in pertinent part, that, "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Citing this authority, the Third Circuit has emphasized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, [c]ompromises are favored in bankruptcy." In re Martin, 91 F.3d at 393 (second alteration in original) (internal quotation marks omitted) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)); see also In re

World Health Alts., Inc., 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy"). And courts in this District have recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. See, e.g., In re Coram Healthcare Corp., 315 B.R. 321, 329 (Bankr. D. Del. 2004).

34.    Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "'the compromise is fair, reasonable, and in the interest of the estate.'" In re Marvel Entm't Grp., Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997)). Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 425 (1968). The court need not be convinced that the settlement is the best possible compromise in order to approve it. In re Coram Healthcare Corp., 315 B.R. at 330. Rather, the court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Travelers Cas. & Sur. Co., 2008 WL 821088, at *5 (citing Aetna Cas. & Sur. Co. v. Jasmine, Ltd. (In re Jasmine, Ltd.), 258 B.R. 119 (D.N.J. 2000)); see also In re Coram Healthcare Corp., 315 B.R. at 330.

35.    The Third Circuit has set out four criteria for a bankruptcy court to consider when evaluating a settlement proposal (the "Martin Factors"): "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." In re Martin, 91 F.3d at 393 (citing In re Neshaminy Office Bldg. Assocs., 62 B.R. 798, 803 (E.D. Pa. 1986)); see also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002); In re eToys, Inc., 331 B.R. 176, 198 (Bankr. D. Del. 2005).

36.    The Debtors respectfully submit that the Settlement Agreement squarely satisfies

each of the requirements under section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

The Settlement Agreement is proposed in the Debtors' business judgment as a good faith means

to avoid the costs and uncertainty associated with continuing what has been a contentious and

time-consuming litigation of the EMEA Claims, the French Liquidator Claim and the UK

Pension Claims.  The Settlement Agreement should be approved as a compromise that is in the

best interests of the Debtors, their estates, their creditors and other stakeholders.

37.    The Settlement Agreement will fully and finally resolve the US Claims Litigation,

providing the Parties with certainty in respect of substantial and intricate claims that have been

asserted against the Debtors and removes a significant remaining impediment to resolution of the

Chapter 11 Cases.  As demonstrated by the length of time that the US Claims Litigation has been

pending and the substantial costs that have been borne by the Parties to date, the Parties are

willing to litigate their disputes to conclusion absent a settlement.  While the Debtors are

confident in their legal position with respect to the US Claims Litigation, such litigation carries

with it inherent uncertainties and material costs with no guarantee that a better result could be

achieved through further litigation for the Debtors or their creditors than the terms of the

proposed settlement.

38.    In the event that the Settlement Agreement is not approved, the Parties will

continue to pursue the US Claims Litigation, including the completion of further discovery,

litigation of the US Appeal, to the extent it is further pursued, and preparation for the Trial, with

no assurance as to how the courts will ultimately rule on the various litigation issues at stake or

the length of time such proceedings will extend.  By contrast, the settlement of the US Claims

Litigation in accordance with the terms of the Settlement Agreement fairly balances the Parties'

23

likelihood of success on the merits and eliminates any risk regarding the ultimate resolution of these disputes. Resolving such uncertainty is particularly important here to avoid saddling the Parties with further legal fees and costs related to the US Claims Litigation and to simplify the issues to be litigated at the upcoming Trial. The Settlement Agreement also advances the interests of the EMEA Debtors and the UK Pension Parties by providing for allowed claims against NNI and the immediate payment of the settlement amount in cash, such that these parties are certain of receiving a recovery on their claims and can determine the value of the settlement with certainty. By contrast, in the pursuit of further litigation, these parties face the risk of not knowing the amount and priority of the recovery (if any) they could obtain against the Debtors.

39.     Finally, the Settlement Agreement was heavily negotiated and is the result of years of arm's-length settlement discussions and mediation sessions that preceded the most recent settlement efforts. The Settlement Agreement fully and finally resolves the EMEA Claims, the French Liquidator Claim and the UK Pension Claims in an amount that is fair and reasonable given the benefits of reaching a final settlement and the balancing of all the various risks and considerations, and the full release of other claims the Parties may hold against each other. The Settlement Agreement provides the further benefit of the Parties' agreement to cooperate in future litigation activities with respect to the Allocation Dispute, as described in the agreement itself. Further, as evidenced by it being a Party to the Settlement Agreement, the Committee supports the resolution embodied therein.

40.     In light of the foregoing, the Debtors respectfully submit that the Settlement Agreement satisfies sections 105(a) and 363 of the Bankruptcy Code, as well as the requirements of Bankruptcy Rule 9019.

## WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

41.     The Debtors also request that the Court waive the stay imposed by Bankruptcy

Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other

than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the

Debtors seek in this Motion is necessary for the Debtors to preserve value for their estates.

Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed

by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate

relief.

## NOTICE

42.     Notice of the Motion has been given via electronic transmission, first class mail,

hand delivery or overnight mail to (i) the Core Parties; (ii) the U.S. Trustee; and (iii) the general

service list established in these chapter 11 cases. The Debtors also will provide notice of this

Motion on the docket in the Canadian Proceedings. No further notice is required under that

certain Cross-Border Protocol on the Resolution of Claims, as approved by this Court on

September 16, 2010 [D.I. 3922 and 3956] as the Debtors consulted with the Monitor and the

Canadian Debtors in advance of filing the Motions to Dismiss and the entry of the Allocation

Protocol, including in the course of three mediations, and this Court and the Canadian Court

provided joint direction of the procedure for resolving the EMEA Claims, the French Liquidator

Claim and the UK Pension Claims pursuant to the Allocation Protocol. Accordingly, the Debtors

submit that under the circumstances no other or further notice is necessary.

## NO PRIOR REQUEST

43.    No prior request for the relief sought herein has been made to this or any other

court.

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached as Exhibit A hereto; and

(iii) grant such other and further relief as it deems just and proper.

Dated: December 17, 2013          CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Wilmington, Delaware
                                  Howard S. Zelbo (admitted *pro hac vice*)
                                  James L. Bromley (admitted *pro hac vice*)
                                  Jeffrey A. Rosenthal (admitted *pro hac vice*)
                                  Lisa M. Schweitzer (admitted *pro hac vice*)
                                  One Liberty Plaza
                                  New York, New York 10006
                                  Telephone:  (212) 225-2000
                                  Facsimile:  (212) 225-3999

                                       - and -

                                  MORRIS, NICHOLS, ARSHT & TUNNELL LLP


                                  */s/ Ann C. Cordo*
                                  Derek C. Abbott (No. 3376)
                                  Eric D. Schwartz (No. 3134)
                                  Ann C. Cordo (No. 4817)
                                  1201 North Market Street
                                  P.O. Box 1347
                                  Wilmington, Delaware 19801
                                  Telephone:  (302) 658-9200
                                  Facsimile:  (302) 658-3989

                                  *Counsel for the Debtors*
                                  *and Debtors in Possession*

## EXHIBIT A

### Proposed Settlement Order

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------X
          :

*In re*              :

Nortel Networks Inc., *et al.*,[23]  :

        Debtors.   :

              :
---------------------------------------------------------X

Chapter 11

Case No. 09-10138 (KG)

Jointly Administered

**RE: D.I. _____**

## ORDER APPROVING THE US CLAIMS LITIGATION SETTLEMENT AGREEMENT BY AND AMONG THE DEBTORS, THE CREDITORS' COMMITTEE, THE JOINT ADMINISTRATORS, THE EMEA DEBTORS, NORTEL NETWORKS OPTICAL COMPONENTS LIMITED, NORTEL TELECOM FRANCE SA, THE LIQUIDATOR, THE FRENCH LIQUIDATOR, THE UK PENSION PARTIES AND CERTAIN AFFILIATES

Upon the motion dated December 17, 2013 (the "Motion"), of Nortel Networks Inc. and

certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (the

"Debtors"), for entry of an order, as more fully described in the Motion, pursuant to sections

105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 6004(h) and

9019, (i) authorizing the Debtors' and the Committee's entry into and approving the Settlement

Agreement[24] attached to the Motion as Exhibit B, and (ii) granting them such other and further

relief as the Court deems just and proper; and the Court having determined that adequate notice

---

[23]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the U.S. Debtors and their petitions are available at http://dm.epiq11.com/nortel.

[24]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion and/or the Settlement Agreement.

of the Motion has been given as set forth in the Motion; and that no other or further notice is

necessary; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference

from the District Court dated February 29, 2012; and the Court having determined that

consideration of the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the

Court having determined that the Debtors have demonstrated sound business justifications for

entering into the Settlement Agreement and the legal and factual bases set forth in the Motion

and presented on the record establish just cause for the relief requested in the Motion; and taking

into account the complexity of the claims being settled by the Settlement Agreement and the

costs of resolving such claims by litigation, the Settlement Agreement and the related relief

requested in the Motion is fair, reasonable and in the best interests of the Debtors, their estates,

their creditors and the parties in interest;[25] and upon the record in these proceedings; and after

due deliberation;

 IT IS HEREBY ORDERED THAT:

1. The Motion is **GRANTED**.

2. The Debtors and the Committee are authorized to enter into the Settlement

Agreement, and the Settlement Agreement is approved in its entirety.

3. The Debtors are authorized pursuant to sections 105 and 363 of the Bankruptcy

Code and Bankruptcy Rule 9019, to enter into the Settlement Agreement and to take any and all

actions that may be reasonably necessary or appropriate to perform their obligations arising

under the Settlement Agreement, including without limitation the allowance and payment of the

Allowed Claims as administrative claims pursuant to section 503 of the Bankruptcy Code and

---

[25] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as
findings of fact to the fullest extent of the law. <u>See</u> Fed. R. Bankr. P. 7052.

156

entitled to priority under section 507(a)(2) of the Bankruptcy Code, in accordance with the terms

of the Settlement Agreement, and to enforce their rights arising under the Settlement Agreement.

4.      The allowance and payment of the Allowed Claims shall be in full and final

settlement of all EMEA Claims, French Liquidator Claims and UK Pension Claims.  For the

avoidance of doubt, and notwithstanding this paragraph, nothing in the Settlement Agreement

shall constitute a release, waiver or discharge of any rights created under the Settlement

Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or

events occurring or actions taken after the date of the Settlement Agreement.  No claims by or

against persons other than the Parties to the Settlement Agreement and the persons contemplated

in the releases contained therein shall be affected by the Settlement Agreement.  Furthermore,

nothing in the Settlement Agreement creates any affirmative obligation on the part of the Parties

to support any particular legal or valuation theories in respect of the Allocation Dispute, nor shall

it prevent any Party from advocating any particular legal or valuation theories in respect of the

Allocation Dispute.

5.      Upon the EMEA Payment Date, the US EMEA Filed Claims shall be deemed

withdrawn, with prejudice, and the US EMEA Non-Filed Claims shall be deemed waived.  Upon

the UK Pension Payment Date, the US UK Pension Claims shall be deemed withdrawn with

prejudice.  Upon the Effective Date, the US French Liquidator Claim shall be deemed withdrawn

with prejudice.  Upon completion of the payments made in respect of the Allowed Claims, the

NNI Claim shall be deemed withdrawn, with prejudice, and the US Non-Filed Claims shall be

deemed waived.

6.      Promptly following the Effective Date, the Joint Administrators, on behalf of the

EMEA Debtors, shall discontinue the Canadian Motion for Leave.

3

7.      The failure specifically to describe or include any particular provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such a provision, it being the intent of this Court that the Settlement Agreement be approved in its entirety.

8.      The Debtors, the Debtors' claim agent, Epiq Bankruptcy Solutions, LLC, and the Clerk of the Court are authorized to take all necessary and appropriate actions to give effect to the Settlement Agreement.

9.      Notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) the terms of this Order shall be immediately effective and enforceable upon its entry, (ii) the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and (iii) the Debtors may, in their discretion and without further delay, take any action and perform any act authorized under this Order.

10.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2014
       Wilmington, Delaware          _____
                                     THE HONORABLE KEVIN GROSS
                                     CHIEF UNITED STATES BANKRUPTCY JUDGE

4

158

## EXHIBIT B

**Proposed Settlement Agreement**

### AGREEMENT SETTLING US CLAIMS LITIGATION

This agreement (the "Settlement Agreement") is entered into by and among Nortel Networks Inc. ("NNI"), certain of NNI's United States affiliates listed on Schedule A and Nortel Networks CALA, Inc. ("NN CALA") (collectively, the "US Debtors"), the entities listed on Schedule B (including their respective branch offices, the "US Non-Filed Entities" and, together with the US Debtors, collectively referred to herein as the "US Entities"), the Official Committee of Unsecured Creditors of the US Debtors (the "Committee" and, together with the US Entities, the "US Interests"), Nortel Networks UK Limited ("NNUK") and the entities listed on Schedule C hereto (collectively, the "EMEA Debtors"), the entities listed on Schedule D hereto (the "EMEA Non-Filed Entities"), Nortel Networks Optical Components Limited ("NNOCL"), Northern Telecom France SA ("NTF"), the Joint Administrators (as defined below), the Liquidator (as defined below, collectively with the EMEA Debtors, the EMEA Non-Filed Entities, NNOCL, NTF and the Joint Administrators (the "EMEA Parties")), the French Liquidator (as defined below), Nortel Networks UK Pension Trust Limited (as trustee, the "UK Pension Trustee," of the Nortel Networks UK Pension Plan, the "UK Pension Plan") and the Board of the Pension Protection Fund (the "PPF" and, together with the UK Pension Trustee, the "UK Pension Parties" (and with the US Interests, the EMEA Parties, the French Liquidator and the UK Pension Parties each being a "Party" and collectively, the "Parties")). The Joint Administrators, the Liquidator and the French Liquidator in their individual capacities shall also be party to this Settlement Agreement solely for the purposes of Section 8.14 and references to the Parties shall be construed accordingly.

### RECITALS

On January 14, 2009 (the "Filing Date"), the US Debtors other than NN CALA filed voluntary petitions for protection under chapter 11 ("Chapter 11") of title 11 of the United States Code (the "Bankruptcy Code") before the United States Bankruptcy Court for the District of Delaware (respectively, the "US Court" and together with the NN CALA Proceeding (defined below), the "US Proceedings"). On July 14, 2009, NN CALA filed a voluntary petition for protection under Chapter 11 before the US Court (the "NN CALA Proceeding"). On January 22, 2009, the Office of the United States Trustee for the District of Delaware appointed the Committee in respect of the U.S. Debtors.

The US Non-Filed Entities have not filed Chapter 11 petitions and are under majority ownership of NNI.

On the Filing Date, the EMEA Debtors commenced administration proceedings (the "UK Proceedings") before the High Court of Justice in London, England (the "English Court"), represented by Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson, and Stephen John Harris (the "EMEA Administrators"), and in the case of Nortel Networks (Ireland) Limited ("NNIR") only, Alan Robert Bloom and David Martin Hughes (the "NNIR Administrators"), serving as administrators in the UK Proceedings (the EMEA Administrators

and the NNIR Administrators collectively, the "Joint Administrators"). On July 29, 2011, NNOCL commenced a creditors' voluntary liquidation, represented by Kerry Trigg (the "Liquidator").

The EMEA Non-Filed Entities have not commenced administration proceedings, but are under the control of their respective directors as identified on Schedule D.

Subsequent to the Filing Date, Nortel Networks S.A. ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) 1346/2000 on Insolvency Proceedings in the Republic of France (the "French Secondary Proceedings") pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court (the "French Court") (Docket No. 2009P00492) for NNSA.

NTF is in voluntary liquidation. Maître Cosme Rogeau (the "French Liquidator") has been appointed Liquidateur amiable of NTF and Mandataire Liquidateur of NNSA.

On the Filing Date, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL") and certain of NNC's and NNL's Canadian affiliates (collectively, the "Canadian Debtors") commenced creditor protection proceedings before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (respectively, the "Canadian Proceedings" and "CCAA") in connection with which Ernst & Young Inc. was appointed monitor (the "Monitor").

Prior to the Filing Date, the US Debtors, the EMEA Debtors, the Canadian Debtors, the EMEA Non-Filed Entities, the US Non-Filed Entities and certain other non-filed entities around the world were part of the Nortel group of companies (the "Nortel Group") of which NNC was the ultimate corporate parent.

In the US Proceedings, the Joint Administrators on behalf of the EMEA Debtors, NNOCL, NTF and the EMEA Non-Filed Entities timely filed proofs of claim against certain of the US Debtors and such claims are designated on the US Debtors' official claims register as claim numbers 7750 through 7783 and 7785, 7786 and 7787 (as supplemented or amended, including on or about June 3, 2011, and collectively with any and all other claims filed by the EMEA Parties against the US Debtors, the "US EMEA Filed Claims").

In the US Proceedings, the French Liquidator timely filed a proof of claim on behalf of NNSA against NNI and such claim is designated on the US Debtors' official claims register as claim number 7784 (as supplemented or amended, and together with any and all other claims filed by the French Liquidator against the US Debtors, the "US French Liquidator Claim").

In the US Proceedings, the UK Pension Parties timely filed certain proofs of claim on behalf of the UK Pension Trustee and the PPF against NNI and NN CALA and such claims are designated on the US Debtors' official claims register as claim numbers 8357 and 8358 (as supplemented or amended, including on or about September 5, 2012, and collectively with any and all other

2

claims filed by the UK Pension Parties against the US Debtors, the "US UK Pension Claims"). For the avoidance of doubt, the US UK Pension Claims referred to herein shall not include any allegations made against any member of the Nortel Group other than the US Entities, and do not impact in any manner the Canadian UK Pension Claims, as defined herein.

In July 2011, the US Debtors and the Committee jointly objected to and moved to dismiss the US EMEA Filed Claims of NNUK, NNIR and NNSA and the French Liquidator Claim. Certain of those US EMEA Filed Claims were dismissed by Order of the US Court dated March 20, 2012 [D.I. 7404] (the "US EMEA Claims Dismissal Order").

On May 14, 2013, the US Debtors and the Committee jointly objected to the US UK Pension Claims.

The EMEA Parties may have the right to allege certain claims, whether through set off or otherwise, against the US Non-Filed Entities and/or claims against certain of the US Debtors for ordinary course trading claims (the "US EMEA Non-Filed Claims" and, together with the US EMEA Filed Claims, the "US EMEA Claims").

In the French Secondary Proceedings, NNI timely filed a proof of claim against NNSA (the "NNI Claim").

The US Entities have not filed, but may have the right to allege, certain claims, whether through set off or otherwise, against the EMEA Debtors, as to which the final date for the filing of claims (a "bar date") has yet to be established (the "US Non-Filed Claims" and, together with the NNI Claim, the "US Claims").

The EMEA Parties, the French Liquidator and the UK Pension Parties have claims against one or more of the Canadian Debtors, including, but not limited to, claims in the Canadian Proceedings (the "Canadian EMEA Claims", the "Canadian French Liquidator Claims" and the Canadian UK Pension Claims" respectively), which claims are wholly separate and distinct from the US EMEA Claims, the US French Liquidator Claim and the US UK Pension Claims referenced herein.

After the Filing Date, the US Debtors, the EMEA Parties and the Canadian Debtors cooperated in selling businesses and assets by Nortel Group entities that raised over US$7,500,000,000 in sale proceeds, upon which interest has accrued (the "Sale Proceeds"), with respect to which each Nortel Group entity that satisfied the definition of "Nortel Seller" (as set forth in the Interim Funding and Settlement Agreement dated on or about June 9, 2009 [D.I. 5308-1] (the "IFSA")) is entitled to participate in the allocation of the Sale Proceeds.

The allocation of the Sale Proceeds among the various Nortel Sellers is the subject of litigation pending before the US Court and the Canadian Court (the "Allocation Dispute"), with such litigation having been ordered by the US Court by an Order dated April 3, 2013 [D.I. 9947] (as supplemented by further orders, collectively, the "US Allocation Dispute Order") and directed

162

by endorsements of the Canadian Court dated March 8, 2013 and April 3, 2013 (the "Canadian Allocation Endorsements").

The EMEA Debtors have maintained that the Allocation Dispute must be arbitrated and have filed an appeal of the US Allocation Dispute Order (the "US Appeal"), with respect to which the United States Court of Appeals for the Third Circuit issued an Opinion and Judgment on December 6, 2013 (the "Third Circuit Decision"), and have filed a motion for leave to appeal the Canadian Allocation Endorsements to the Supreme Court of Canada (the "Canadian Motion for Leave").

The US EMEA Claims, the US French Liquidator Claim and the US UK Pension Claims are the subject of litigation pending before the US Court (the "US Claims Litigation").

The Canadian EMEA Claims, the Canadian French Liquidator Claims and the Canadian UK Pension Claims that have been filed in the Canadian Proceedings (the "Filed Canadian Claims") are the subject of litigation pending before the Canadian Court (the "Canadian Claims Litigation").

The US Court and the Canadian Court have entered separate orders providing that the trials of the Allocation Dispute, the US Claims Litigation and the Canadian Claims Litigation will be conducted before both Courts commencing on or about May 12, 2014.

The Parties all acknowledge and agree that the ultimate outcome of the US Claims Litigation is uncertain, that appeals in respect of such litigation are likely, that the cost of such litigation is both substantial and burdensome on each of the Parties, that such cost will continue to increase absent a final and binding resolution of the US Claims Litigation and that the nature of the allegations and the position of the US Debtors in respect of the matters underlying the US Claims Litigation are very different from the nature of the allegations against and the position of the Canadian Debtors in respect of the matters underlying the Canadian Claims Litigation. Settlement of the US Claims Litigation will facilitate a narrowing of the issues in dispute and minimize the ongoing substantial costs of litigation. It will also permit the Parties to focus on the Allocation Dispute, and will permit the EMEA Parties, the French Liquidator and the UK Pension Parties to focus on the Canadian EMEA Claims, the Canadian French Liquidator Claims and the Canadian UK Pension Claims. As such the Parties have agreed to settle finally the US Claims Litigation and to settle and release additional claims on the terms and conditions set forth in this Agreement.

NOW THEREFORE, IN LIGHT OF THE FOREGOING RECITALS, AND FOR GOOD AND VALUABLE CONSIDERATION, THE VALUE OF WHICH IS HEREBY AGREED, THE PARTIES HEREBY FURTHER AGREE, SUBJECT TO THE SATISFACTION OF ALL CONDITIONS SET FORTH HEREIN THAT:

**1.    INTERPRETATION**

1.1.    The Recitals set forth above form an integral part of this Settlement Agreement and are incorporated fully herein.

**2.    THE ALLOWED CLAIMS**

2.1.    On the Effective Date (as defined below):

2.1.1.    the Joint Administrators, on behalf of the EMEA Parties, shall have an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, against NNI in the amount of US$37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy Code (the "EMEA Allowed Claim"); and

2.1.2.    the UK Pension Parties shall have an allowed administrative expense priority claim, pursuant to section 503 of the Bankruptcy Code, against NNI in the amount of US$37,500,000 at a level of priority afforded under section 507(a)(2) of the Bankruptcy Code (the "UK Pension Parties' Allowed Claim" and, together with the EMEA Allowed Claim, the "Allowed Claims").

2.2.    NNI shall pay the EMEA Allowed Claim in full in immediately available funds, without any deduction, setoff, recoupment or withholding for tax purposes to an account designated by the Joint Administrators in writing, on or before three (3) business days from the Effective Date (for purposes of this Settlement Agreement, a business day is a day that banks are open for business in New York, New York) (the date on which payment in respect of the EMEA Allowed Claim is made by NNI, the "EMEA Payment Date").

2.3.    NNI shall pay the UK Pension Parties' Allowed Claim in full in immediately available funds, without any deduction, setoff, recoupment or withholding for tax purposes to an account designated by the UK Pension Parties in writing, on or before three (3) business days from the Effective Date (the date on which payment in respect of the EMEA Allowed Claim is made by NNI, the "UK Pension Payment Date").

**3.    WITHDRAWAL AND DISMISSAL OF CLAIMS AND APPEALS**

3.1.    On the EMEA Payment Date, the US EMEA Filed Claims shall be deemed withdrawn, with prejudice, and the US EMEA Non-Filed Claims shall be deemed waived and the EMEA Debtors, the EMEA Non-Filed Entities, NNOCL, NTF, the Joint Administrators and the Liquidator shall be forever barred from asserting against any of the US Entities in any forum any further claims arising from or related to the matters herein resolved.  The US Debtors' claims register shall be amended to reflect this withdrawal.

3.2.    For the avoidance of any doubt, NNUK, NNIR and NNSA agree that they will not take any steps to appeal or otherwise challenge the US EMEA Claims Dismissal Order.

3.3.    On the UK Pension Payment Date, the US UK Pension Claims shall be deemed withdrawn, with prejudice, and the UK Pension Parties shall be forever barred from asserting against any of the US Entities in any forum any further claims arising from or related to the matters herein resolved. The US Debtors' claims register shall be amended to reflect this withdrawal.

3.4.    On the Effective Date, the US French Liquidator Claim shall be deemed withdrawn, with prejudice, and the French Liquidator shall be forever barred from asserting against any of the US Entities in any forum any further claims arising from or related to the matters herein resolved. The US Debtors' claims register shall be amended to reflect this withdrawal.

3.5.    Upon completion of the payments made pursuant to Sections 2.2 and 2.3, the NNI Claim shall be deemed withdrawn, with prejudice, and the US Non-Filed Claims shall be deemed waived and the US Entities shall be forever barred from asserting against any of the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the Joint Administrators, the French Liquidator or the UK Pension Parties in any forum any further claims arising from or related to the matters herein resolved.

3.6.    From the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, agree that they shall not appeal from or seek reconsideration of the Third Circuit Decision.

3.7.    Promptly following the Effective Date, the Joint Administrators, on behalf of the EMEA Debtors, shall discontinue the Canadian Motion for Leave.

3.8.    For the avoidance of any doubt, nothing in this Section 3 concerning waiver of appeals shall prevent or in any way inhibit the Parties from pursuing any appeal or making any arguments whatsoever in respect of the determinations reached by the Canadian and/or US Court following trial of the Allocation Dispute.

4.    **RELEASES**

4.1.    Nothing in this Settlement Agreement (in particular in Section 3, this Section 4, or Section 5) shall constitute a release or waiver or discharge (in whole or in part) of (i) the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation; (ii) any claims of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NNOCL against the current or former directors and officers (in their capacities as such) of the Canadian Debtors; (iii) any claims of the EMEA Debtors and/or EMEA Non-Filed Entities and/or NTF and/or NNOCL against the current or former directors and officers (in their capacities as such) of the EMEA Debtors or the EMEA Non-Filed Entities or NTF or NNOCL (including for the avoidance of any doubt any

6

such directors or officers even if they were also directors or officers of any of the US Debtors or the Canadian Debtors); (iv) any right of any Party to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute; (v) any claim, right or entitlement of any Party to Sale Proceeds in the Allocation Dispute; or (vi) any claim of the UK Pension Parties against any of the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator or any defence that the EMEA Debtors and/or the EMEA Non-Filed Entities and/or NTF and/or NNOCL and/or the Joint Administrators and/or the French Liquidator might have against any claim of the UK Pension Parties. Nothing in this Settlement Agreement shall prevent or in any way inhibit the EMEA Parties, the French Liquidator or the UK Pension Parties from making any arguments in respect of, or pursuing any appeal of any determinations of the Canadian and/or US Court with respect to the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or in respect of the Canadian Claims Litigation.    Furthermore, nothing in this Settlement Agreement shall operate as or constitute any admission with respect to the merits of any allegations or arguments underlying the Canadian EMEA Claims, the Canadian French Liquidator Claims or the Canadian UK Pension Claims or the Canadian Claims Litigation.

4.2.    For the avoidance of any doubt, nothing in this Settlement Agreement shall constitute a release or waiver or discharge of any rights created under this Settlement Agreement, any claim of any Party to enforce such rights, or a release of any claims for facts or events occurring or actions taken after the date of this Settlement Agreement, nor shall this Settlement Agreement be used, referred to or contended by any Party to have any relevance or probative value in connection with any claims not released herein.

4.3.    **EMEA Debtors, Joint Administrators, Liquidator, NNOCL and EMEA Non-Filed Entities**: Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her representative capacity, and the Joint Administrators in their representative capacities, and (to the extent under the control of the Liquidator or the Joint Administrators (as the case may be)) the respective current and former affiliates, subsidiaries, employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing, release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the EMEA Debtors, each of the EMEA Non-Filed Entities, NNOCL, the Liquidator in her

7

representative capacity, and the Joint Administrators in their representative capacities, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US EMEA Claims or the facts and circumstances that were alleged to provide a basis for the US EMEA Claims (the "US EMEA Releases").

4.4.  **UK Pension Parties**: Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, each of the UK Pension Parties and (to the extent under the control of the UK Pension Parties) their respective current and former affiliates, subsidiaries, shareholders (but not including any member of the Nortel Group) and the employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns (but for greater certainty not including any member of the Nortel Group other than the US Entities) from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which each of the UK Pension Parties, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US UK Pension Claims or the facts and circumstances that were alleged to provide a basis for the US UK Pension Claims (the "US UK Pension Releases").

4.5.  **French Liquidator**: Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the French Liquidator, on behalf of NNSA and NTF, and (to the extent under the control of the French Liquidator) their respective current and former affiliates, subsidiaries,  employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing release and forever discharge the US Interests and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which the French Liquidator, on behalf of NNSA and NTF, now have, had, may have had or hereafter may have however so arising, including, but not limited to, claims arising from or related to the US French Liquidator Claim or the facts and circumstances that were alleged to provide a basis for the US French Liquidator Claim (the "US French Liquidator Releases").

4.6. **US Interests**:  Subject to Sections 4.1 and 4.2, on the Effective Date, and without the need for additional documentation or the entry of any additional orders, the US Interests, and (to the extent under the control of the US Entities) their respective current and former affiliates, subsidiaries,  employees, officers, directors, agents, advisors, attorneys, representatives, successors and assigns of the foregoing release and forever discharge the EMEA Debtors, the EMEA Non-Filed Entities, NTF, NNOCL, the UK Pension Parties, the Joint Administrators, the Liquidator, and the French Liquidator, in their respective representative capacities, and their employees, officers, directors, agents, advisors, attorneys, successors and assigns from any and all liability for claims, defenses, demands, liabilities, obligations, damages, actions, contribution, subrogation, causes of action, setoffs, recoupments, costs and expenses (including, without limitation, attorneys' or other fees or expenses), the foregoing terms to be construed as broadly as possible and to include the definition of "claim" provided in Section 101(5) of the Bankruptcy Code, whether known or unknown, past or present, fixed or contingent, liquidated or unliquidated, which the US Interests now have, had, may have had or hereafter may have however so arising (the "US Releases," and together with the US EMEA Releases, the US UK Pension Releases and the US French Liquidator Releases, the "Releases").

4.7. For the avoidance of any doubt, the Releases shall include releases in respect of any and all claims in respect of costs, expenses and fees (including but not limited to attorneys' fees, experts' fees, and other professional fees) incurred by any of the Parties in connection with the US EMEA Claims, the US UK Pension Claims, the US French Liquidator Claim and the US Appeal.

5.    **CANADIAN EMEA CLAIMS AND CANADIAN UK PENSION CLAIMS**

5.1. In light of the settlement and withdrawal of the US EMEA Claims and the US UK Pension Claims against the US Debtors, the US Interests agree that they will not hereafter oppose or object to the Filed Canadian Claims, provided, however, that nothing herein shall constitute a release or waiver or discharge of any right of the US Interests to assert or defend against any allocation position or advance or defend against any arguments as to entitlement to Sale Proceeds in the Allocation Dispute.

6.    **ALLOCATION DISPUTE**

6.1. Each of the US Debtors, the Committee, the UK Pension Parties, the Joint Administrators on behalf of the EMEA Debtors, the Liquidator on behalf of NNOCL and the EMEA Non-Filed Entities recognize that the Allocation Dispute will continue notwithstanding this settlement of the US Claims Litigation.  In light of this fact, the US Debtors, the Committee, the UK Pension Parties, the Joint Administrators on behalf of the EMEA Debtors, the Liquidator on behalf of NNOCL and the EMEA Non-Filed Entities agree that they will work in good faith commencing on the date of execution of this Agreement by all of the Parties (with the exception of the US Non-Filed Entities) (the "Allocation Cooperation Period") in an effort to see if they can develop a common allocation position

and other agreements related to the conduct of the trial.  To that end, such Parties will use commercially reasonable best efforts during the Allocation Cooperation Period to coordinate and co-operate in respect of (a) discussion of experts on allocation methodologies in connection with the Allocation Dispute and preparation of submissions and reports regarding the same; (b) remaining depositions and discovery; (c) conduct of the trial of the Allocation Dispute; (d) pre-trial motion practice and pre and post-trial briefing in respect of the Allocation Dispute; and (e) appeals, if any, from determinations in respect of the Allocation Dispute at or following trial.

6.2.  Any Party may bring to an end its involvement in the co-operation arrangement under Section 6.1 (including at any time following execution of this Agreement and prior to the Effective Date) by providing the other Parties with five (5) business days' written notice of its intention to do so.  Where a Party exercises its rights to end its involvement pursuant to this Section 6.2, the rights and obligations of all the other Parties to each other under Section 6.1 shall remain, and such termination of a Party's rights and obligations under Section 6.1 shall have no impact on the settlement of the US Claims Litigation or the Parties' obligations as provided in the other Sections of this Agreement.

6.3.  The foregoing shall not create any affirmative obligation on the part of the US Interests, the Joint Administrators, the EMEA Debtors, the EMEA Non-Filed Entities, the Liquidator, NNOCL or the UK Pension Parties to support any particular legal or valuation theories in respect of the Allocation Dispute, nor shall it prevent any of them from advocating any particular legal or valuation theories in respect of the Allocation Dispute.

6.4.  Subject to Section 5 hereof in respect of the US Interests, the foregoing shall not create any affirmative obligation on the part of the US Interests, the EMEA Parties or the UK Pension Parties in respect of the Canadian Claims Litigation.

6.5.  The obligations of the Parties in this Section 6 and the Parties' compliance, non-compliance or alleged non-compliance with any of those obligations shall in no way affect the rights and obligations of any of the Parties set out in any other sections of this Agreement (in particular, NNI's obligations under Section 2 in respect of the Allowed Claims and the Parties' obligations in Sections 3 and 4).

6.6.  Nothing in this Settlement Agreement shall affect the rights of the US Interests, the Joint Administrators on behalf of the EMEA Debtors, the EMEA Non-Filed Entities, the Liquidator on behalf of NNOCL or the UK Pension Parties to seek information, disclosure, or discovery from one another in connection with the Allocation Dispute pursuant to any applicable order or endorsement of the US Court or the Canadian Court, provided that, prior to issuance of any formal or informal process, demand or request, counsel for the US Interests, the Joint Administrators on behalf of the EMEA Debtors and the EMEA Non-Filed Entities, the Liquidator on behalf of NNOCL and the UK Pension Parties shall consult in good faith with respect to any information or disclosure sought and cooperate to the extent reasonable as agreed in such consultations.

## 7.    EFFECTIVENESS

7.1.    The agreements, acknowledgments and obligations contained herein are expressly contingent upon, and shall become effective only upon the occurrence of all of the conditions to effectiveness below in this Section 7 (each a "Condition" and collectively, the "Conditions," the date on which the last of the Conditions provided in Sections 7.2, 7.3, 7.4 and 7.5, is satisfied, the "Effective Date"), provided, however, that the occurrence of the Condition provided in Section 7.6 shall only be a condition to the effectiveness of this Settlement Agreement solely with respect to the US Non-Filed Entities.

7.2.    **US Court Approval**.  Approval of the US Debtors' entry into and performance under this Settlement Agreement by Final Order in the US Proceeding is a condition to the effectiveness of this Settlement Agreement.  The US Debtors will move promptly for, and use their commercially reasonable best efforts to obtain, approval of this Settlement Agreement under Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (respectively, "Rule 9019(a)," and the "Bankruptcy Rules"), which will include a request for waiver of the fourteen (14) day stay set forth in Bankruptcy Rule 6004(h) (the "9019 Motion").  The other Parties agree to use their best efforts to support the US Debtors in obtaining US Court approval of this Settlement Agreement.  "Final Order" shall mean an order or judgment of the US Court, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing has been filed or, if filed, remains pending, provided, however, that no order shall fail to be a final order solely because of the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure, Rule 9024 of the Bankruptcy Rules, any similar local bankruptcy rule or any similar state statute or rule may be filed with respect to such order.  The EMEA Debtors and the UK Pension Parties shall have an opportunity to review the draft motion materials to be filed by the US Debtors, which will not be served or filed with the Court until the EMEA Debtors and the UK Pension Parties have approved the contents of same.

7.3.    **English Court Approval**.  If the Joint Administrators choose to seek directions from the English Court in relation to the Joint Administrators, on behalf of the EMEA Debtors, entering into and performing under this Settlement Agreement, the Joint Administrators shall do so by December 20, 2013 and the US Debtors, the French Liquidator and the UK Pension Parties agree to use commercially reasonably best efforts to support the Joint Administrators in obtaining approval of this Settlement Agreement, provided, however, that such requirement may be waived by the Joint Administrators if the Joint Administrators decide that they do not wish to seek directions from the English Court.

7.4.    **Beddoe Order**.  The UK Pension Parties require an order of the English Court (a "Beddoe Order") as a condition to the effectiveness of this Settlement Agreement with respect to

the UK Pension Parties. The UK Pension Parties shall file materials seeking a Beddoe Order no later than December 20, 2013, and shall use their commercially reasonable best efforts to obtain such approval. The Joint Administrators, on behalf of the EMEA Debtors, and the US Debtors agree to use their commercially reasonable best efforts to support the UK Pension Parties in obtaining approval of this Settlement Agreement, provided, however, that the US Debtors and the Joint Administrators' support is dependent upon having received and approved the relevant pleadings, submissions and materials (but for the avoidance of doubt, nothing in this Settlement Agreement shall oblige the UK Pension Parties to provide any pleadings, submissions or other materials connected with the seeking of the Beddoe Order to any other Party). The UK Pension Parties will use their commercially reasonable best efforts to secure the support of The Pensions Regulator to the execution of this Settlement Agreement by the UK Pension Parties and will provide such evidence as may be available to the US Debtors and Joint Administrators of any such support, and will likewise communicate any such support to the English Court.

7.5. **French Court Approval**. The French Liquidator represents that approvals of the French Supervisory Judge (*Juge-commissaire*) appointed for NNSA and of the French Court are required in order for the French Liquidator, on behalf of NNSA, to enter into and perform under this Settlement Agreement. The French Liquidator shall file materials for such purposes by no later than December 20, 2013 and shall use his commercially reasonable best efforts to obtain such approvals and the Joint Administrators, on behalf of the EMEA Debtors, the US Debtors, and the UK Pension Parties agree to use their commercially reasonable best efforts to support the French Liquidator in obtaining approval of this Settlement Agreement.

7.6. **Execution by the US Non-Filed Entities**. The Execution of the Settlement Agreement by the US Non-Filed Entities prior to the Effective Date is a condition to the effectiveness of this Settlement Agreement solely with respect to each of the US Non-Filed Entities. Upon execution of this Settlement Agreement, the US Non-Filed Entities shall be Parties to this Settlement Agreement for the benefits provided and the burdens imposed by the provisions of this Settlement Agreement expressed to be conferred on or given to the US Non-Filed Entities. For the avoidance of doubt, nothing in this Section 7.6 shall constitute a condition to the effectiveness of this Settlement Agreement with respect to the US Debtors, the Committee, the Joint Administrators, the EMEA Debtors, the EMEA Non-Filed Entities, NNOCL, the Liquidator, the UK Pension Parties, or the French Liquidator.

8. **MISCELLANEOUS**

8.1. **Administrative Expenses/Expenses of Administration**. The obligations under Section 2 of this Settlement Agreement shall constitute administrative expenses/expenses of administration of each of the US Debtors under section 503 of the US Bankruptcy Code.

8.2. **Binding Effect**. This Settlement Agreement, the order of the US Court, and, if applicable, the orders of the English and/or French Courts,   approving the entry into and

performance under this Settlement Agreement by, respectively, the US Debtors and the UK Pension Parties, shall be binding upon any successors or assigns of the Parties.

8.3.  **Claims Register**.  The US Debtors, the US Debtors claims' agent, Epiq Bankruptcy Solutions, LLC, and the Clerk of the US Court shall take all necessary and appropriate actions to give effect to this Settlement Agreement.

8.4.  **Confidentiality**.  Unless otherwise agreed by the Parties, the substance and existence of this Settlement Agreement shall be kept strictly confidential until the filing of a motion with the US Court and the English Court to seek approval of this Settlement Agreement, provided, however, that: (i) the US Interests shall have the right to have discussions regarding the Settlement Agreement with representatives of the ad hoc group of bondholders participating in the US Proceedings; (ii) the UK Pension Parties shall have the right to have discussions regarding the Settlement Agreement with the representative beneficiary and his advisors in the context of the English Court proceedings and for the purposes of discussions with The Pensions Regulator as contemplated by Section 7.4 hereof.

8.5.  **Costs and Expenses**.  Each Party agrees to bear its own costs, expenses and attorneys' fees incurred in connection with the negotiations related to and preparation of this Settlement Agreement and to not seek from each other reimbursement of any such costs, expenses or attorneys' fees.

8.6.  **Further Assurances**.  The Parties will cooperate in good faith to effectuate the terms of this Settlement Agreement.

8.7.  **Governing Law**.  Save as provided in Section 8.14, this Settlement Agreement shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

8.8.  **Individual Enforcement**.  Notwithstanding the fact that a Party executes this Settlement Agreement on behalf of another Party, each and every Party shall be entitled to enforce this Settlement Agreement as though they had each individually executed the Settlement Agreement.

8.9.  **Integration**.  This Settlement Agreement constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous written or oral communications, understandings, and agreements with respect to the subject matter hereof.  This Settlement Agreement may not be amended, supplemented or modified except by a written instrument executed by each of the Parties to this Settlement Agreement.  For the avoidance of doubt, unless explicitly stated herein, this Settlement Agreement does not supersede either the IFSA or the Final Canadian Funding and Settlement Agreement dated as of December 23, 2009, both of which remain in full force and effect.

8.10. **Non-Severability**.  Subject to the provisions of Sections 6.2, 6.5 and 7.6, each of the provisions of this Settlement Agreement is an integrated, essential and non-severable part of this Agreement.

8.11. **Jurisdiction**.  The Parties agree to the exclusive jurisdiction of the US Court and the United States District Court for the District of Delaware in respect of any dispute arising out of or in connection with this Settlement Agreement or its subject matter or formation.

8.12. **Manner of Execution**.  The Parties may execute this Settlement Agreement in counterparts, each of which shall be an original, and all executed counterparts shall collectively be deemed to be one and the same instrument.  Facsimile or pdf signatures shall be deemed original signatures, and the Parties may exchange signature pages via mail, courier, facsimile or email.

8.13. **No Admissions**.  Each Party acknowledges and agrees that nothing in this Settlement Agreement constitutes an admission or concession in respect of any legal issue raised in any claim asserted by any of the Parties hereto or any defense raised in connection therewith by any of the Parties.

8.14. **No Personal Liability of the Joint Administrators, the Liquidator and the French Liquidator**.  The Joint Administrators are a Party to this Settlement Agreement:  (a) as agents of the respective EMEA Debtors of which they are administrators; and (b) in their own capacities solely for taking the benefit of the statutory charges under Paragraph 99(3) of Schedule B 1 of the United Kingdom Insolvency Act 1986 and enforcing the obligations of the US Debtors hereunder.  Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Joint Administrators in their personal capacities (and not as agents for any of the EMEA Debtors) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English courts.  None of the Joint Administrators, their firm, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

The Liquidator is a Party to this Agreement: (i) as an agent of NNOCL in such appointed capacity; and (ii) in their own capacity solely for taking the benefit of this Section and enforcing the obligations of the other Parties to this Agreement.  Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the Liquidator in their personal capacity (and not as agent for NNOCL) under this Agreement shall be governed exclusively by English law and subject to the exclusive jurisdiction of the English Courts.  None of the Liquidator, its firm, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel group company to observe,

perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

The French Liquidator is a Party to this Agreement: (i) as an agent of NNSA and NTF in such appointed capacity; and (ii) in his own capacity solely for taking the benefit of this Section and enforcing the obligations of the other Parties to this Agreement. Notwithstanding anything else to the contrary herein, any claim, action or proceeding against the French Liquidator in his personal capacity (and not as agent for NNSA or NTF) under this Agreement shall be governed exclusively by French law and subject to the exclusive jurisdiction of the French Courts. None of the French Liquidator, its firm, partners, employees, advisors, representatives or agents shall incur any personal liability whatsoever whether on their own part or in respect of any failure on the part of any Nortel group company to observe, perform or comply with any of its obligations under this Agreement or under or in relation to any associated arrangements or negotiations.

8.15. **No Third-Party Beneficiaries**.  This Settlement Agreement is not intended to, and shall not, create rights in any person or entity not a Party hereto.

8.16. **No Transfer of Claims between Parties and Authority**.  Each of the US Interests, the Joint Administrators, the EMEA Debtors, the EMEA Non-Filed Entities, NNOCL, the Liquidator, the UK Pension Parties and the French Liquidator, on behalf of NNSA, represents that it has not sold, assigned or otherwise transferred their respective claims being released pursuant to this Settlement Agreement to a third party, that each has full power and authority to enter into this Settlement Agreement and that it will not sell, assign or otherwise transfer their respective claims prior to the order of the US Court approving this Settlement Agreement becoming final and non-appealable, and thereafter, only on written notice to the US Debtors and where the transferee signs a written undertaking in favor of the US Debtors agreeing to be bound by this Settlement Agreement.

8.17. **Non-Effectiveness**.  In the event this Settlement Agreement does not become effective, the Parties reserve all of their rights and defenses with respect to the claims resolved by this Settlement Agreement and this proposed settlement shall not constitute an admission by any Party regarding the validity of the claims or defenses resolved by this Settlement Agreement or that they have any liability in connection with such claims or defenses.

8.18. **Participation in Drafting**.  Each Party (except for the US Non-Filed Entities and the EMEA Non-Filed Entities) represents and warrants that it has participated in the drafting and preparation of this Settlement Agreement and has been represented by sophisticated and experienced counsel in so doing.  In any construction of this Settlement Agreement, the Settlement Agreement shall not be construed for or against any Party, but the same shall be construed fairly according to its plain meaning.

174

8.19. **Representative Capacity**.   Each person executing this Settlement Agreement in a representative capacity represents and warrants that he or she is empowered to do so.

8.20. **Simultaneous Occurrence**.   All material acts provided hereunder that are to occur on the Effective Date are deemed to occur simultaneously.

8.21. **Successors and Assigns**.   This Settlement Agreement shall inure to the benefit of, and shall be binding upon, each Party and its respective agents, successors and assigns.

[*Signature Pages to Follow*]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Parties have executed this Settlement Agreement.

**NORTEL NETWORKS INC.**

By: _____

Name: John Ray

Title: Principal Officer

**ARCHITEL SYSTEMS (U.S.) CORPORATION**

By: _____

Name: John Ray

Title: Principal Officer

**CORETEK, INC.**

By: _____

Name: John Ray

Title: Principal Officer

**NORTEL ALTSYSTEMS INC.**

By: _____

Name: John Ray

Title: Principal Officer

**NORTEL ALTSYSTEMS INTERNATIONAL INC.**

By: _____

Name: John Ray

Title: Principal Officer

**NORTEL NETWORKS APPLICATIONS**
**MANAGEMENT SOLUTIONS INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS CABLE SOLUTIONS INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS CAPITAL CORPORATION**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS HPOCS INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS INTERNATIONAL INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS OPTICAL COMPONENTS INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTHERN TELECOM INTERNATIONAL INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**QTERA CORPORATION**

By:_____
Name:  John Ray
Title:  Principal Officer

**SONOMA SYSTEMS**

By:_____
Name:  John Ray
Title:  Principal Officer

**XROS, INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

**NORTEL NETWORKS (CALA) INC.**

By:_____
Name:  John Ray
Title:  Principal Officer

178

**NORTEL NETWORKS INDIA INTERNATIONAL INC.**


By:_____
Name:  Luis Fernando Guerra Sanz
Title:  President


**NORTEL TECHNOLOGY EXCELLENCE CENTRE
PRIVATE LTD**


By:_____
Name:  Luis Fernando Guerra Sanz
Title:  Director

**THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF NORTEL NETWORKS INC., ET. AL.**

**BY: AKIN GUMP STRAUSS HAUER & FELD LLP,
AS COUNSEL TO THE COMMITTEE AND
AUTHORIZED SIGNATORY AND NOT IN ITS
INDIVIDUAL CAPACITY**

By: _____
Name: Fred S. Hodara
Title: Partner

180

SIGNED by ALAN ROBERT BLOOM in his own
capacity and on behalf of the JOINT
ADMINISTRATORS without personal liability as
provided in Section 8.14 of this Settlement
Agreement and solely for the benefit of the
provisions of this Settlement Agreement
expressed to be conferred on or given to the Joint
Administrators

By:_____

Name:  Alan Robert Bloom

Title:  Joint Administrator


in the presence of:


Witness signature


Name:  Dan Mindel

Address:  1 More London Place


SIGNED for and on behalf of NORTEL NETWORKS        )
UK LIMITED (in administration) by A R Bloom as     )
Joint Administrator (acting as agent and without   )
personal liability) in the presence of:            )
                                                    )


Witness signature


Name:  Dan Mindel                    )
Address:  1 More London Place        )


Signature Page to Agreement Settling US Claims Litigation

SIGNED for and on behalf of NORTEL NETWORKS     )
NV (in administration) by _A R Bloom_ as Joint     )
Administrator (acting as agent and without       )
personal liability) in the presence of:          )
                                                  )

Witness signature

Name: Dan Mindel                                  )
Address: 1 More London Place                      )

SIGNED for and on behalf of NORTEL               )
NETWORKS SPA (in administration) by              )
_A R Bloom_ as Joint Administrator               )
(acting as agent and without personal liability) )
in the presence of:                              )

Witness signature

Name: Dan Mindel                                  )
Address: 1 More London Place                      )

SIGNED for and on behalf of NORTEL               )
NETWORKS (IRELAND) LIMITED (in                   )
administration) by _A R Bloom_ as Joint          )
Administrator (acting as agent and without       )
personal liability) in the presence of:          )

Witness signature

Name: Dan Mindel                                  )
Address: 1 More London                            )
          Place                                   )

Signature Page to Agreement Settling US Claims Litigation

182

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS FRANCE S.A.S.** (in administration)            )
by ~~A.R.Bloom~~ acting as ~~authorised~~                 )
~~representative for~~ _____ as Joint                  )
Administrator (acting as agent and without                )
personal liability) in the presence of:                   )

Witness signature

Name: Dan Mindel                                          )
Address: 1 More London Place                             )

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS S.A.** (in administration and                  )
secondary proceedings) by A R Bloom as                    )
Joint Admin (acting as agent and without                  )
personal liability) in the presence of:                   )

Witness signature

Name: Dan Mindel                                          )
Address: 1 More London Place                             )

**SIGNED** for and on behalf of **NORTEL**                )
**NETWORKS BV** (in administration) by                    )
A R Bloom as Joint Administrator (acting                  )
as agent and without personal liability) in the           )
presence of:                                              )

Witness signature

Name: Dan Mindel                                          )
Address: 1 More London                                   )
                        Place

Signature Page to Agreement Settling US Claims Litigation

SIGNED for and on behalf of NORTEL )
NETWORKS POLSKA SP Z.O.O. (in )
administration) by _AR Bloom_ as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

Witness signature

Name: Dan Mindel )
Address: 1 More London Place )

SIGNED for and on behalf of NORTEL )
NETWORKS HISPANIA S.A. (in administration) )
by _A R Bloom_ as Joint Administrator )
(acting as agent and without personal liability) )
in the presence of: )

Witness signature

Name: Dan Mindel )
Address: 1 More London Place )

SIGNED for and on behalf of NORTEL )
NETWORKS (AUSTRIA) GMBH (in )
administration) by _A R Bloom_ as Joint )
Administrator (acting as agent and without )
personal liability) in the presence of: )

Witness signature

Name: Dan Mindel )
Address: 1 More London )
Place )

184

SIGNED for and on behalf of NORTEL            )
NETWORKS PORTUGAL SA (in administration)      )
by _A R Bloom_ as Joint Administrator         )
(acting as agent and without personal liability)  )
in the presence of:                           )


Witness signature

Name: _Dan Mindel_                            )
Address: _1 More London Place_                )

SIGNED for and on behalf of NORTEL GMBH (in   )
administration) by _A R Bloom_ as Joint       )
Administrator (acting as agent and without    )
personal liability) in the presence of:       )


Witness signature

Name: _Dan Mindel_                            )
Address: _1 More London Place_               )

SIGNED for and on behalf of NORTEL            )
NETWORKS SLOVENSKO S.R.O. (in                 )
administration) by                            )
_A R Bloom_                                   )
as Joint Administrator (acting as agent and   )
without personal liability) in the presence of:  )


Witness signature

Name: _Dan Mindel_                            )
Address: _1 More London_                      )
         _Place_                              )

Signature Page to Agreement Settling US Claims Litigation

SIGNED for and on behalf of NORTEL
NETWORKS S.R.O. (in administration) by                        )
A R Bloom                                                     )
as Joint Administrator (acting as agent and                   )
without personal liability) in the presence of:               )

Witness signature

Name: Dan Mindel                                              )
Address: 1 More London Place                                  )

SIGNED for and on behalf of NORTEL
NETWORKS ROMANIA S.R.L. (in                                   )
administration) by                                            )
A R Bloom                                                     )
as Joint Administrator (acting as agent and                   )
without personal liability) in the presence of:               )

Witness signature

Name: Dan Mindel                                              )
Address: 1 More London Place                                  )

SIGNED for and on behalf of NORTEL
NETWORKS AB (in administration) by                            )
A R Bloom   as Joint Administrator (acting                    )
as agent and without personal liability) in the               )
presence of:                                                  )

Witness signature

Name: Dan Mindel                                              )
Address: 1 More London                                        )
                 Place

186

SIGNED for and on behalf of NORTEL          )
NETWORKS ENGINEERING SERVICE KFT (in        )
administration) by _A R Bloom_ as Joint     )
Administrator (acting as agent and without  )
personal liability) in the presence of:     )

Witness signature

Name: Dan Mindel
Address: 1 More London Place          )

SIGNED for and on behalf of NORTEL          )
NETWORKS OY (in administration) by          )
_A R Bloom_ as Joint Administrator (acting  )
as agent and without personal liability) in the )
presence of:                                )

Witness signature

Name: Dan Mindel
Address: 1 More London Place          )

SIGNED for and on behalf of NORTEL          )
NETWORKS INTERNATIONAL FINANCE &            )
HOLDING BV (in administration) by           )
_A R Bloom_ as Joint Administrator (acting  )
as agent and without personal liability) in the )
presence of:                                )

Witness signature

Name: Dan Mindel
Address: 1 More London Place

SIGNED for and on behalf of NORTEL
NETWORKS AS by DAVID QUANE
in the presence of:

)
)
)
)
)

Witness signature

Name: DEIRDRE LARKIN
Address: SOLICITOR
THE SQUARE
GORT
CO. GALWAY.

)
)

SIGNED for and on behalf of NORTEL
NETWORKS AG by DAVID QUANE
in the presence of:

)
)
)
)
)

Witness signature

Name: DEIRDRE LARKIN
Address: SOLICITOR
THE SQUARE,
GORT,
CO. GALWAY.

)
)
)

188

**SIGNED** for and on behalf of **NORTEL**
**NETWORKS SOUTH AFRICA (PTY) LIMITED** by
DAVID DUANE in the presence of:

)
)
)
)
)

Witness signature

)
Name:  DEIRDRE LARKIN )
Address:  SOLICITOR )
The Square,
Oct
CO. GALWAY.

**SIGNED** by Maître Cosme ROGEAU in his own
capacity solely for taking the benefit of this Section
8.14 of this Settlement Agreement and enforcing
the obligations of the other Parties to this
Agreement as provided in Section 8.14 of this
Settlement Agreement

By:_____

Name:  Cosme Rogeau

Title:  Mandataire Liquidateur/Liquidateur Amiable

in the presence of:

Witness signature

____L A U F E R_____

Name:

Address:  26 Au Hoche  78 000 Versailles

**SIGNED** for and on behalf of **NORTEL**                    )
**NETWORKS SA** (in administration and
secondary proceedings) by Maître Cosme
ROGEAU as Mandataire Liquidateur (acting as
agent and without personal liability and subject
to approval by Order of the French *Juge-*
*commissaire* and to confirmation by Judgment
of the Versailles (France) *Tribunal de*
*Commerce*) in the presence of:

                                                              )
                                                              )
                                                              )
                                                              )

Witness signature

____L A U F E R_____                             )

Name:                                                        )

Address:  26 Au  Hoche  78 000  versailles

190

SIGNED for and on behalf of **NORTHERN
TELECOM FRANCE SA (in voluntary liquidation)**
by Maître Cosme ROGEAU as Liquidateur
amiable, acting as agent and without personal
liability, In the presence of:

)
)
)
)
)
)



Witness signature

.......L. AUER....................

Name:

Address: 26 Rue Hoche 78000 Versailles

)
)
)

SIGNED for and on behalf of NORTEL            )
NETWORKS OPTICAL COMPONENTS LIMITED           )
(in liquidation) by Kerry Trigg, as liquidator )
(acting as agent and without personal liability )
as provided for by section 8.14 of this       )
Settlement Agreement), in the presence of:     )

Witness signature

Name: _Dan Mindel_                             )
Address: _1 Moe Lodn Place_                    )

SIGNED by KERRY TRIGG in her own capacity
without personal liability as provided in Section
8.14 of this Settlement Agreement and solely for
the benefit of the provisions of this Settlement
Agreement expressed to be conferred on her as
provided by Section 8.14 of this Settlement
Agreement

By:_____

Name:  Kerry Trigg
Title: Liquidator

in the presence of:

Witness signature

Name: _Dan Mindel_
Address: _1 Moe Lodn Place_

192

**NORTEL NETWORKS UK LTD PENSION TRUST LIMITED**

By: _D W Davies_____
Name: D W DAVIES
Title: CHAIRMAN

**THE BOARD OF THE PENSION PROTECTION FUND**


By:_____
Name:
Title:

Signature Page to Agreement Settling US Claims Litigation

193

**NORTEL NETWORKS UK LTD PENSION TRUST LIMITED**

By:_____
Name:
Title:

**THE BOARD OF THE PENSION PROTECTION FUND**

By:_____
Name: MALCOLM WEIR
Title: HEAD OF RESTRUCTRING + INSOLVENCY.

Signature Page to Agreement Settling US Claims Litigation

## SCHEDULE A

### The US Debtors

Nortel Networks Inc.

Architel Systems (U.S.) Corporation

CoreTek, Inc.

Nortel Altsystems Inc. (previously "Alteon WebSystems, Inc.")

Nortel Altsystems International Inc. (previously "Alteon WebSystems International, Inc.")

Nortel Networks Applications Management Solutions Inc.

Nortel Networks Cable Solutions Inc.

Nortel Networks Capital Corporation

Nortel Networks (CALA) Inc.

Nortel Networks HPOCS Inc.

Nortel Networks International Inc.

Nortel Networks Optical Components Inc.

Northern Telecom International Inc.

Qtera Corporation

Sonoma Systems

Xros, Inc.

**<u>SCHEDULE B</u>**

**The US Non-Filed Entities**

Nortel Networks India International Inc.

Nortel Technology Excellence Centre Private Ltd

## SCHEDULE C

### The EMEA Debtors

Nortel Networks UK Limited (In Administration)

Nortel Networks (Ireland) Limited (In Administration)

Nortel Networks S.A. (In Administration)

Nortel Networks NV (In Administration)

Nortel Networks SpA (In Administration)

Nortel Networks BV (In Administration)

Nortel Networks Polska Sp. z.o.o. (In Administration)

Nortel Networks Hispania, SA (In Administration)

Nortel Networks (Austria) GmbH (In Administration)

Nortel Networks, sro (In Administration)

Nortel Networks Engineering Service Kft (In Administration)

Nortel Networks Portugal SA (In Administration)

Nortel Networks Slovensko, sro (In Administration)

Nortel Networks Romania Srl (In Administration)

Nortel GmbH (In Administration)

Nortel Networks Oy (In Administration)

Nortel Networks AB (In Administration)

Nortel Networks International Finance & Holding BV (In Administration)

Nortel Networks France S.A.S. (In Administration)

## SCHEDULE D

**The EMEA Non-Filed Entities**

| The EMEA Non-Filed Entities | Relevant Officers of the EMEA Non-Filed Entities |
| --- | --- |
| Nortel Networks AS | David Quane and Simon Freemantle (Directors) |
| Nortel Networks AG | David Quane and Simon Freemantle (Directors) |
| Nortel Networks South Africa (Pty) Limited | David Quane and Simon Freemantle (Directors) |

# TAB H

198

This is Exhibit.................. M ..................referred to in the

affidavit of...... Robin Wilinski ...........................................

sworn before me, this............. 3 ................................

day of............. May .........................20 19 .........

..........................................................................
A COMMISSIONER FOR TAKING AFFIDAVITS

## Buchanan Ingersoll ∧ Rooney PC
### Attorneys & Government Relations Professionals

**Kathleen A. Murphy**
302 552 4214
kathleen.murphy@bipc.com

1105 North Market Street
Suite 1900
Wilmington, DE  19801-1228
T 302 552 4200
F 302 552 4295
www.buchananingersoll.com

December 22, 2013

The Honorable Kevin Gross
United States Bankruptcy Court
District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re: *In re Nortel Networks, Inc., et al.*, Case No. 09-10138 (KG)

Dear Chief Judge Gross:

We write on behalf of the Monitor and the Canadian Debtors in response to the letter filed with this Court by counsel to the US Debtors on December 20, 2013 [Dkt. No. 12688], seeking relief to dispense with the "representative witness" stage of the discovery plan and litigation schedule which has been approved by this Court and Justice Morawetz, and in response to each of the letters in support thereof filed by counsel to the Joint Administrators of the EMEA Debtors [Dkt. No. 12693] and the Official Committee of Unsecured Creditors [Dkt. No. 12694].

*Overview of Position*

Notwithstanding (a) the extensive negotiations and prior agreements among the Core Parties regarding the need for the representative party discovery (b) the positions asserted in these proceedings by the US Debtors regarding their entitlement to such representative party discovery, at least while the EMEA Debtors were resisting such representative party discovery and (c) this Court and the Canadian Court having sanctioned the use of representative party discovery as an integral stage of discovery before any trial in this matter, the US and EMEA Debtors seek to change the existing litigation timetable and discovery plan which form part of scheduling orders of this Court and the Canadian Court (amended as recently as a month ago on consent to provide for the completion of the representative party discovery by January 17, 2014) to now preclude the Monitor and Canadian Debtors from engaging in any representative party discovery on any topic. Despite the Canadian Debtors' and the Monitor's attempts to present proposals to reach agreement on a further narrowed scope for representative party discovery, including substituting live witness testimony with written interrogatories on a more limited number of the designated topics (with the disclosures relating to the balance of the topics being deferred to the expert reports and trial briefing process), the US Debtors and the other supporting parties now seek to dispense with the use of *any* representative witnesses, all under the guise of conserving resources based on their

December 22, 2013
Page - 2 -

assertion that the other discovery and witness testimony completed to date is sufficient *for all parties* and all purposes for litigating and resolving the claims and allocation disputes.

From the commencement of the discovery process, it has been contemplated that there would be representative party discovery as an integral part of the discovery process.[1] The basic right to engage in such representative party discovery has not been in dispute and it has consistently been something that the Canadian parties (including the Monitor and Canadian Debtors) have insisted upon.[2] Each time the litigation timetable and discovery plan was amended, representative party discovery was preserved. The extension of the litigation schedule submitted by joint motion of all Core Parties (except the Bondholders) on November 11, 2013 and approved by the Courts was sought for the very purpose of allowing an appropriate amount of time to prepare for the representative party discovery following the extended date for the completion of fact depositions and contemplated eight days of representative party discovery. The Canadian Debtors, the Monitor and other parties in interest have relied on the Courts' orders, and their ability at this stage in the agreed, court-approved schedule, to engage in representative party discovery.

For the avoidance of doubt, the Canadian Debtors and the Monitor have been continually mindful of the overall need to ensure efficiency and avoid duplication of costs as it relates to this trial process generally. Indeed, the Canadian Debtors and Monitor have made proposals to the US Debtors and others to narrow the scope of the representative party discovery and the overall costs to the estates, including re-formulating the topics that they themselves were served with in order to ensure that they are clear and capable of being addressed in a meaningful way.[3] Most recently, for example, the Monitor and Canadian Debtors offered to reduce the total number of topics to five topics on allocation and five on the claims asserted by the EMEA Debtors against the Canadian estates and to allow the parties to respond to questions by way of written responses, which would be submitted by January 17, 2014. The other parties, in contrast, have not articulated the basis for objection to any single topic designated for them (with the time for doing so under the litigation timetable and discovery plan having now passed [4]) and

---

[1]    The discovery process initially encompassed both US Federal Rules of Civil Procedure 30(b)(6) depositions and Ontario Rules of Civil Procedure Rule 31 examinations for discovery, as set forth in section 6 of the Discovery Plan.

[2]    The discovery process under the Ontario rules permits questioning about any matter in issue in the litigation, the scope of which is determined by the submissions/pleadings. The purpose of such discovery is to "obtain factual information/admissions relevant to Allocation . . . or Canadian Claims". *Discovery Plan* [Dkt. No. 10566 at 9]. The representative party discovery was intentionally sequenced to occur after fact witness depositions but before expert reports and submission of fact evidence was to be finalized. The parties agreed to dispense with 30(b)(6) examinations and the notices that had been exchanged which contained hundreds of designated topics by each party under the original discovery protocol and instead to conduct "Ontario style" representative party discovery after the fact depositions so that the information learned in the fact depositions could be taken into account in the representative party discovery.

[3]    Email of December 19, 2013 to the Core Party Service List and follow up email of December 21, 2013 to the Core Party Service List (attached hereto). The proposals are designed to make the completion of the trial evidence (both expert and affiants) more efficient.

[4]    It is noteworthy that:

    a) the US Debtors purport to object to the scope of the questions and the total number but neglect to mention that there are 30 or *fewer* topics designated for each representative witness and they are repeated on allocation and on claims – their emphasis on 92 pages of questions is misleading in that most of the pages are

December 22, 2013
Page - 3 -

instead take the extraordinary position that because they have determined that they do not need or want to conduct representative party discovery of other parties, that the Canadian Monitor and the Canadian Debtors (and other Canadian interests) should be bound by their determination and deprived of their right to do so. That the US Debtors and other supporting parties have rejected all of these proposals without offering any meaningful alternative casts serious doubts on their stated motivations here simply to ensure efficiency and reduced costs.

The fact is that because the US Debtors and other supporting parties have recently proposed to settle the EMEA Debtors' and UK Pension Claimants claims against the US Debtors, these parties now seek to eliminate altogether the representative party discovery to obtain a strategic advantage in the allocation litigation. Eliminating representative party discovery will allow these parties maximum flexibility to develop new allocation theories (something expressly contemplated by the proposed settlement agreement) without the opportunity for the Canadian Debtors and the Monitor to obtain essential fact discovery to defend these positions. As discussed below, granting the request of the US Debtors would deprive the Canadian Debtors, the Monitor and, for that matter, the Courts, the benefit of essential discovery required to analyze and resolve these cross-border disputes over claims and allocation, irrespective of any proposed settlement of the EMEA Debtors' and UK Pension claims against the US Debtors.

***The Evolution and Preservation of Representative Party Discovery in These Proceedings***

From the commencement of discovery, either Federal Rules of Civil Procedure 30(b)(6) depositions or representative party discovery have been contemplated as an integral part of the process of this litigation

---

repeating the same topics on either allocation or claims for the different parties, including 24 different EMEA entities who have filed claims against the Canadian estate, for many of which there has been little or no opportunity for fact depositions. It was expressly contemplated that the representative party discovery would take into account testimony covered in the fact depositions and be used to identify the facts or documents pertaining to a particular subject (tied to the pleadings) that a party relies upon not otherwise disclosed in the fact deposition process – now the US Debtors claim that the very process that they agreed to and advocated is too burdensome and offer no alternative;

   b) the only purported objection that the EMEA Debtors make in their submission in support of the US Debtors is that they should not have to respond to 561 broad subjects – which are in reality 30 or fewer subjects for each EMEA Debtor that has made a multitude of claims in the Canadian estate and taken an interdependent position on allocation, and they offer no basis on which they should not be required to disclose the factual and documentary basis upon which they base their assertions – if they are aware of nothing beyond what has been disclosed through the fact deposition testimony and exhibits then surely it would not impose a disproportionate burden for them to state that on the record particularly given the offer for it to be done in writing; and

   c) the UCC in its letter to the Court in support of the US Debtors' position [Dkt. No. 12694] purports to object because the topics listed for them (derived from their own submission/ pleading or positions they themselves have adopted) relate to matters that pre-date the UCC's formation and matters that will probably be the subject of expert testimony – if that is their response to the topics designated for them - namely that they have no knowledge of any facts or documents in support of their position on allocation beyond what may be disclosed in the expert reports to be delivered on January 24, 2014 - then the Monitor and Canadian Debtors are entitled to have that on the record and binding, and surely it would not impose a disproportionate burden for them to state that on the record particularly given the offer for it to be done in writing;

December 22, 2013
Page - 4 -

and the basic right to engage in such depositions has not been in dispute. Each time the schedule was amended representative party discovery was contemplated.

Throughout the discovery process, the parties have worked cooperatively to narrow the scope of representative party discovery. Initially, the parties collectively served hundreds of topics for examination under Rule 30(b)(6) of the Federal Rules of Civil Procedure. It was the US Debtors who encouraged the other parties to forego traditional Rule 30(b)(6) depositions in favor of a modified Canadian representative party discovery approach.[5] The fact that the parties ultimately agreed to narrow the depositions from hundreds of topics to eight days of depositions is a significant curtailment in scope and demonstrated the parties' efforts to conduct discovery as efficiently and expediently as possible.

The US Debtors have themselves sought to expand the scope of the representative party discovery. The EMEA Debtors initially contemplated producing one representative witness for all of the EMEA entities making claims against the US estates. The US Debtors strenuously objected and urged this Court to require the EMEA Debtors to provide a representative witness for *each* EMEA entity claimant. Ultimately, the parties reached a compromise position and this Court and the Canadian Court amended the deposition protocol to reflect that the EMEA Debtors were not obliged to designate a different representative witness for each EMEA entity claimant, but that "[n]o specific time limits shall be placed on these Representative Depositions at this time. . . ."[6] This revised language reflected the careful consideration of the parties of the need to strike an appropriate balance between minimizing duplication of efforts and costs and ensuring the parties have the opportunity to engage in meaningful representative party discovery. The agreement amongst the parties, as endorsed by the Courts, to engage in a significantly narrowed version of representative party discovery, should not be eviscerated at this late stage.

Moreover, at the time the most recent joint motion to amend the litigation schedule was made, premised in large part on the need for additional time to prepare for and conduct representative party discovery, the parties were fully aware that the number of fact witness depositions would likely exceed 100 depositions, but at no point did any of the parties moving for the extension suggest that the number of fact depositions completed should foreclose the opportunity for representative party discovery. This Court should not allow the US Debtors to waste the Court and parties' resources by forcing the re-litigation of previously resolved discovery issues, particularly where they jointly proposed the existing schedule to the Court only a little more than a month ago.

---

[5]    Letter to the Honorable Kevin Gross on behalf of the US Debtors [Dkt. No. 11575 at 8]. The US Debtors represented to this Court in this letter that: "[a]t our suggestion, the core parties all agreed to forego traditional Rule 30(b)(6) examinations and instead utilize a modified Canadian representative party discovery approach whereby each party would put a witness for a one or two day examination (parties who did not file a pleading were excepted)." As the US Debtors stated, the only exception to the agreement to engage in party representative party discovery was for those parties that did not file a pleading. This limited exception makes sense and comports with the essential goal of Rule 30(b)(6) depositions: to allow a party to know the basis of the claims made against them before their trial evidence is finalized.

[6]    *Order Resolving Certain Discovery Disputes and Denying Related Relief* [Dkt. No. 11762 at 3].

December 22, 2013
Page - 5 -

The US Debtors have not provided any meaningful explanation for their request to alter the *status quo*. All that has changed since the November 14, 2013 joint motion is that the US Debtors have reached a settlement with the EMEA Debtors and the UK Pension Claimants with respect to the claims those parties have asserted against the US estates.[7] Without making any reference to that fundamental change in circumstances, the US Debtors suggest that the last 35 fact witness depositions were somehow sufficient to alter their position on their own need for representative party discovery, but many of those final depositions involved third parties and the majority of the approximately 105 depositions that have taken place to date have not involved parties whose testimony is binding on the parties. In all of the prior depositions, even those of officers of the parties, the deponents appeared in their individual capacity. In fact, inquiry into the bases for the parties' positions was forestalled—at the deposition of John Ray, the principal officer of the US Debtors, his counsel objected on grounds of privilege to questions relating to the US Debtors' allocation position because "[h]e's not here either as a representative witness, nor is he here to give our legal theories or positions in this case."

### *The Monitor and Canadian Debtors Have Made Reasonable Efforts to Curtail Costs and Streamline the Process*

In the spirit of compromise, on December 19, 2013, following the deadline for objections to the representative party topics, the Monitor and Canadian Debtors offered to further narrow the scope of the representative party discovery with the aim of minimizing any potential burden on the parties and witnesses. The Monitor and Canadian Debtors offered to reduce the total number of topics to five topics on allocation and five on the claims asserted by the EMEA Debtors against the Canadian estates (with the disclosures relating to the balance of the topics being deferred to the expert reports and trial briefing process) and to allow the parties to respond to questions by way of written responses, which would be provided by January 17, 2014. This proposal accomplishes the goals of the current litigation timetable and discovery plan, which is to complete certain aspects of the representative party discovery in advance of the completion of expert witness reports and trial affidavits.[8] It is a meaningful benchmark in the pre-trial process to have disclosure of and admissions from opposing parties and this is built into the current litigation timetable and discovery plan. The Monitor and Canadian Debtors' proposal to limit the number of topics for discovery in advance of expert reports and the trial briefing was in response to the US Debtors' suggestion that would be a manageable number of topics to deal with in the timeframe.[9] The Canadian Debtors' and Monitor's proposal that written responses could be provided to questions was a direct response to the concern professed by counsel to the US Debtors that there would be insufficient time to prepare representative witnesses for live testimony.

---

[7]        *See Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(B) and 507(A)(2) and Bankruptcy Rules 6004(H) and 9019 Approving the US Claims Litigation Settlement Agreement By and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates* [Dkt. No. 12618].

[8]        Under the current schedule initial reports are due January 24, 2014 and reply reports are due February 28, 2014. The dates for the trial briefing process are still being discussed by the parties.

[9]        December 21, 2013 email from Jennifer Stam (attached hereto) delineating the proper topics for each Core Party.

December 22, 2013
Page - 6 -

Despite these efforts made by the Monitor and Canadian Debtors to find middle ground, the US Debtors continue to claim that they could not possibly be prepared for any narrowed version of representative party discovery, even though the current dates were heavily negotiated and agreed upon previously and specifically endorsed by this Court and the Canadian Court. In response to repeated conversations about the scope of the representative party discovery, dating back more than ten days prior to the US Debtors' filing of its letter raising this issue with the Court, neither the US Debtors nor any other party that has endorsed their position have offered a meaningful alternative to the position that all representative party discovery should be eliminated.

The US Debtors claim their request to prevent the parties from engaging in representative party discovery is based on a desire to conserve the resources of the estate. As explained above, the scope of these depositions has already been significantly curtailed. The US Debtors made no similar entreaties to reduce expenses while conducting over 105 fact witness depositions around the globe over a three-month period. It is reasonable to expect the currently scheduled eight days of representative party discovery, which will take place in two central locations, will be far more cost-efficient.[10] Further, the Monitor's and Canadian Debtors' compromise offer to narrow the scope to five topics and to allow written responses to questions as opposed to live testimony would further reduce costs.

*Representative Party Discovery Is Essential to Fair and Efficient Trial Preparation*

To the extent that the US Debtors believe they have obtained all the testimony necessary for their case and they do not require any further discovery, they are entitled to reduce costs and increase efficiencies by electing to not proceed with the discovery topics that they noticed to other Core Parties.[11] However, the present effort to foreclose other parties from conducting representative party discovery is contrary to the goals of discovery.[12] It is fundamental that all parties have a right to know the basis of the contentions and facts that opposing parties intend to present at trial. To that end, the discovery process is based on the fundamental goal of preventing surprise at trial. As counsel to the US Debtors represented to this Court

---

[10]    Considering that the US Debtors' primary counsel incurred approximately $9.3 million in fees and expenses in a single month, it strains credulity to allege that eliminating, at most, eight days of representative party discovery will represent a substantial savings in the aggregate. *See Fifty-Eighth Interim Application of Cleary Gottlieb Steen & Hamilton LLP, As Attorneys for Debtors and Debtors-In-Possession, for Allowance of Interim Compensation and for Interim Reimbursement of All Actual and Necessary Expenses Incurred for the Period October 1, 2013 Through October 31, 2013*, [Dkt. No. 12502] (seeking compensation of $9,327,407.50 for the month of October as "actual, reasonable and necessary").

[11]    In light of their repeated assertions that representative party discovery is unnecessary, it is unclear why the US Debtors have themselves noticed topics for the Canadian discovery group. *See* US Deposition Group's December 13, 2013, letter enumerating deposition topics (attached to the US Debtors' December 20, 2013, letter to this Court raising the present discovery dispute) (claiming that US Debtors believe the depositions are unnecessary, but that they are providing topics "to avoid any claim of waiver."). It is unclear how the US Debtors could be concerned about a claim of waiver when they are simultaneously claiming that representative party discovery is unnecessary in its entirety.

[12]    The US Debtors' entreaties to this Court to consider the volume and type of discovery available to a "typical Canadian litigant" in a "typical Canadian litigation" are wholly irrelevant given the procedural posture of this case. Even if it were a relevant consideration, a typical Canadian litigant would, if nothing else, be entitled to representative party discovery.

December 22, 2013
Page - 7 -

just three months ago, any particular circumstance unique to this case "is not a reason to deprive the US Debtors of their basic right to depose a party representative for each Claimant."[13]   And as counsel for the US Debtors further noted back in September: "[i]t is axiomatic that each EMEA Claimant must participate fully in the discovery process.  This includes, at the most basic level, identifying and producing for deposition witnesses associated with each Claimant who are knowledgeable on key topics raised in the Claims and a party representative of each Claimant."[14]   The US Debtors' letter seeking a complete end to representative party discovery process fails to explain why these axioms no longer apply.

The Monitor and Canadian Debtors previously agreed to forego interrogatories as well as the standard Rule 30(b)(6) depositions.  The representative party discovery remained as the only defensive discovery tool available in this case.  Cooperative efforts have been made to narrow the scope of the representative party discovery and to allow written responses in lieu of presenting a live witness.  However, foreclosing the opportunity to obtain any representative party discovery would be extremely prejudicial, particularly in the circumstances of this litigation.  The discovery process, including the more than 105 fact witness depositions that have been conducted to date, has been based in material part on the understanding that parties would have the opportunity to partake in representative party discovery.  This understanding influenced not only who would be deposed, but also whether to reserve lines of questioning for party representatives.[15]

Representative witnesses have "a unique status" that is "substantially different" from fact witnesses because a representative witness "testifies as the entity, not as an individual." *Ethypharm SA France v. Abbott Labs.*, 271 F.R.D. 82, 90 (D. Del. 2010) (quoting *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01 CIV. 3016(AGS)(HB), 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002) (internal quotation marks omitted)).  Eliminating the parties' ability to engage in discovery that binds the parties would ignore this fundamental difference between these types of witnesses.  A representative witness "is not simply testifying about matters within his or her personal knowledge, but rather is speaking for the corporation about matters to which the corporation has reasonable access." *Oy v. Verizon Servs. Corp.*, No. 12–715–CJB, 2013 WL 5675516, at *2 (D. Del. Oct. 15, 2013) (citing *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*, No. 09–CV–0663 (JCJ), 2011 WL 1636985, at *1 (D. Del. Apr. 29, 2011)).  Particularly here, where the fact witnesses only have personal knowledge of facts that occurred during a discrete period of time, and which often occurred over ten years ago, having the opportunity to understand the parties' positions and the facts supporting those positions is essential.

---

[13]      Letter to The Honorable Kevin Gross on behalf of the US Interests [Dkt. No. 11707 at 5].

[14]      *Id.* at 1 (emphasis in original).

[15]      For example, when the Monitor and Canadian Debtors noticed depositions of certain individuals, the Ad Hoc Committee of Bondholders objected on the grounds that the individuals noticed did not have knowledge of the claims for which their testimony was sought and that the testimony would be better addressed in the representative party discovery.  August 1, 2013 email from Atara Miller on behalf of the Bondholders to the Core Party Service List (attached hereto).

December 22, 2013
Page - 8 -

The Monitor and Canadian Debtors respectfully request that this Court reject any entreaties to alter the litigation schedule by eliminating representative party discovery.  We hope to continue to negotiate with our counterparties to agree on a reasonable alternative that does not prejudice any party, but we continue to believe that the Canadian Debtors' and Monitor's proposal to reduce the number of topics to five and to allow all responses to be in writing strikes the appropriate balance.

Very truly yours,

/s/ *Kathleen A. Murphy*

Kathleen A. Murphy (No. 5215)

KAM/
1027550-001116

Rajan, Claire:BK (DC)

| | |
|---|---|
| **From:** | Stam, Jennifer <Jennifer.Stam@gowlings.com> |
| **Sent:** | Thursday, December 19, 2013 4:52 PM |
| **To:** | (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; Guyder, Daniel:BK (NY); Cho, Jonathan:BK (NY); Badtke-Berkow, Joseph:BK (NY); Coleman, Ken:BK (NY); Hall, Laura R:LT (NY); Ward, Nicolette:LT (NY); Keller, Paul B.:LT (NY); (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Marla Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y) Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; (Gowlings) Derrick Tay; (Gowlings) Jennifer Stam; (Heenan) John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) D.J. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thornton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer |

**To:**              Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey
**Cc:**              Anderson, Michel
**Subject:**         Nortel: Representative Witness Depositions

**Categories:**      Copied to Virtual File


The Monitor and the Canadian Debtors do not agree with the position that the representative party examinations should be dispensed with in their entirety. We understand that there is an objection to the extent of information that a given representative might have to absorb and come prepared to address based on the subjects that we designated. While we remain of the view that the designated subject areas are entirely appropriate for purposes of discovery/representative party examinations under both Ontario and US procedure, in order to address that objection so that we obtain meaningful answers in the available time, the Monitor and Canadian Debtors would be prepared to agree to cap the number of subject areas that would be dealt with through the representative party examinations in January in advance of the trial briefing process (we are thinking along the lines of capping for this purpose our designated subject areas to a maximum of 5 for allocation and 5 for claims), some or all of which we would be prepared to consider dealing with in writing (with the specific questions to be formalized by an agreed upon date) on the condition that we have agreement that the responses will be provided by January 17, 2014. The Monitor and Canadian Debtors would similarly be prepared to answer questions in writing within your designated subject areas (subject to the noted objections which we remain willing to meet and confer with you about). This proposal assumes that the identification of facts and documents for the balance of our designated subject areas will be addressed through a trial briefing procedure that would entail exhibits, affidavits, reply affidavits and deposition designations being exchanged in sequence and concluded in early May in advance of the May 12, 2014 trial commencement date. If this is an agreeable way of proceeding please confirm and we will identify the questions that would remain designated from our lists for this purpose. All rights continue to be reserved.

**Jennifer Stam**
Partner
T 416-862-5697
jennifer.stam@gowlings.com

**gowlings**
_____

**Gowling Lafleur Henderson LLP**
**Lawyers • Patent and Trade-mark Agents**
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, Ontario
M5X 1G5 Canada
T 416-862-7525  F 416-862-7661
**gowlings.com**



IMPORTANT NOTICE: This message is intended only for the use of the individual or entity to which it is addressed. The message may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Gowlings immediately by email at postmaster@gowlings.com. Thank you.

**Nixdorf, Mark:BK (NY)**

| | |
|---|---|
| **From:** | Stam, Jennifer <Jennifer.Stam@gowlings.com> |
| **Sent:** | Saturday, December 21, 2013 10:53 PM |
| **To:** | Stam, Jennifer; (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; Guyder, Daniel:BK (NY); Cho, Jonathan:BK (NY); Badtke-Berkow, Joseph:BK (NY); Coleman, Ken:BK (NY); Hall, Laura R:LT (NY); Ward, Nicolette:LT (NY); Keller, Paul B.:LT (NY); (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Marla Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; Tay, Derrick; Stam, Jennifer; (Heenan) John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) D.J. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thornton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; |

| To: | (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey |
| Cc: | Anderson, Michel |
| Subject: | RE: Nortel: Representative Witness Depositions |
| Attachments: | EMEA Debtors Topics for the Canadian Debtors-TOR_LAW-8323829-v2.DOC; US Debtors Topics for Cdn Debtors (revised)-TOR_LAW-8324669-v1.DOC; Blackline (US Debtors Topics for Cdn Debtors)-TOR_LAW-8324701-v1.DOC; Blackline (EMEA Debtors Topics to Cdn Debtors)-TOR_LAW-8324702-v1.DOC |

Further to the email sent on behalf of the Canadian Debtors and the Monitor at 4:54 pm on Thursday December 19 , 2013 following our  meet and confer earlier that day, we wish to delineate the particular topics for each Core Party  for whom we have designated representative party topics which ones we would include in the cap of 5 about which we would like to be able to ask questions in the time frame contemplated by the Amended Discovery Plan (with the disclosures about the remaining topics to be covered in the trial briefing process).  The US Debtors asked and were provided with their topics previously but we are including them again in this listing for completeness (we note that no others have asked what the topics would be).

US Debtors on allocation : 1, 4, 9, 10, 13 [Note these topics do not include those that relate to the separate allocation theory of the CCC]
Bondholders and UCC on allocation: same topics as for US Debtors –parties to advise of any additional or different responses that they have to the responses of the US Debtors [Note these topics do not include those that relate to the separate allocation theory of the CCC]
All EMEA Debtors on allocation: 1, 3, 4, 6, 7  (or corresponding questions if numbering is different for any particular claimant)
Northern Ireland, NNOCL, South Africa: 1,2,3, 4, 5
All EMEA Debtors (except NNSA) on claims: 8,9,21,23,25
NNSA on claims: 8,20,22,24,30
UKPC: 1, 2, 5, 6, 10

For ease of reference, we also attach two schedules which re-state the topics designated by the US Debtors and EMEA Debtors for the Canadian Debtors so as to reflect the objections that we delivered in respect of those topics and sets forth any concerns we have about the clarity and/or scope of what may be asked about.

---

**From:** Stam, Jennifer
**Sent:** December-19-13 4:52 PM
**To:** (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; (Allen & Overy) Daniel Guyder; (Allen & Overy) Jonathan Cho; (Allen & Overy) Joseph Badtke-Berkow; (Allen & Overy) Ken Coleman; (Allen & Overy) Laura Hall; (Allen & Overy) Nicolette Ward; (Allen & Overy) Paul Keller; (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Marla Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y) Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; (Gowlings) Derrick Tay; (Gowlings) Jennifer Stam; (Heenan)

2

John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) D.J. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thronton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey

**Cc:** Anderson, Michel

**Subject:** Nortel: Representative Witness Depositions

The Monitor and the Canadian Debtors do not agree with the position that the representative party examinations should be dispensed with in their entirety. We understand that there is an objection to the extent of information that a given representative might have to absorb and come prepared to address based on the subjects that we designated. While we remain of the view that the designated subject areas are entirely appropriate for purposes of discovery/representative party examinations under both Ontario and US procedure, in order to address that objection so that we obtain meaningful answers in the available time, the Monitor and Canadian Debtors would be prepared to agree to cap the number of subject areas that would be dealt with through the representative party examinations in January in advance of the trial briefing process (we are thinking along the lines of capping for this purpose our designated subject areas to a maximum of 5 for allocation and 5 for claims), some or all of which we would be prepared to consider dealing with in writing (with the specific questions to be formalized by an agreed upon date) on the condition that we have agreement that the responses will be provided by January 17, 2014. The Monitor and Canadian Debtors would similarly be prepared to answer questions in writing within your designated subject areas (subject to the noted objections which we remain willing to meet and confer with you about). This proposal assumes that the identification of facts and documents for the balance of our designated subject areas will be addressed through a trial briefing procedure that would entail exhibits, affidavits, reply affidavits and deposition designations being exchanged in sequence and concluded in early May in advance of the May 12, 2014 trial commencement date. If this is an agreeable way of proceeding please confirm and we will identify the questions that would remain designated from our lists for this purpose. All rights continue to be reserved.

Jennifer Stam
Partner
T 416-862-5697
jennifer.stam@gowlings.com

**gowlings**

Gowling Lafleur Henderson LLP
Lawyers • Patent and Trade-mark Agents
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, Ontario
M5X 1G5 Canada
T 416-862-7525  F 416-862-7661
gowlings.com

*December 21, 2013*

**EMEA Debtors Topics for the Canadian Debtors**

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors. Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1. The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.

2. The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.

3. The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.

4. The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between NNL and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.

5. Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard. **[Note to the EMEA Debtors: we will need further clarification about what is intended about on this topic beyond what was produced as part of the Global IP or Lazard productions before the Canadian Debtors can determine whether they can respond to this topic.]**

---

[1] The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

*December 21, 2013*

**US Debtors' Topics for the Canadian Debtors**

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors.  Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1.      Statements made by any Canadian Debtor or the Monitor, to government authorities (including tax authorities), debt-rating agencies, underwriters, or any entity evaluating the credit worthiness of NNL and pre-petition and post-petition potential asset purchasers regarding ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any participant in the Master Research & Development Agreement.

2.      Third-party licensing by any Nortel entity of its patents (other than commercial licenses granted in the ordinary course of business), including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments other than any patent license agreements that were produced or disclosed to potential purchasers during the post-petition sale transactions for the lines of business and residual patents. **[Note to the US Debtors: The additional language is intended to avoid the re-production of all of the license agreements which were produced in the sales data rooms.  However, we will still need to understand what is intended by this topic before the Canadian Debtors can determine whether they will be able to respond to this topic.]**

3.      The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4.      Internal valuations of Nortel intellectual property prepared after 2001 by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel other than in connection with divestitures, acquisitions, joint ventures, or other transactions with a value of less than US$100 million.

---

[1] The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

**US Debtors' Topics for the Canadian Debtors**

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors. Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1.  Statements made by ~~Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities;~~ any Canadian Debtor or the Monitor, to government authorities (including tax authorities), debt-rating agencies, underwriters, or any entity evaluating the credit- worthiness of NNL~~,~~ and pre-petition and post-petition potential asset purchasers regarding ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any participant in the Master Research & Development Agreement.

2.  Third-party licensing by any Nortel entity of its ~~intellectual property~~patents (other than commercial licenses granted in the ordinary course of business), including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments~~,~~ other than any patent license agreements that were produced or disclosed to potential purchasers during the post-petition sale transactions for the lines of business and residual patents. **[Note to the US Debtors: The additional language is intended to avoid the re-production of all of the license agreements which were produced in the sales data rooms. However, we will still need to understand what is intended by this topic before the Canadian Debtors can determine whether they will be able to respond to this topic.]**

3.  The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4.  Internal valuations of Nortel intellectual property prepared after 2001 by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel~~,~~ other than in connection with

---

[1]  The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

divestitures, acquisitions, joint ventures, or other transactions with a value of less than US$100 million.

**Rajan, Claire:BK (DC)**

| | |
|---|---|
| **From:** | Miller, Atara <AMiller@milbank.com> |
| **Sent:** | Thursday, August 01, 2013 6:56 PM |
| **To:** | 'Ruby, Peter'; 'nortel.monitor@ca.ey.com'; 'derrick.tay@gowlings.com'; 'jennifer.stam@gowlings.com'; Coleman, Ken:BK (NY); Keller, Paul B.:LT (NY); Guyder, Daniel:BK (NY); Hall, Laura R:LT (NY); Badtke-Berkow, Joseph:BK (NY); Cho, Jonathan:BK (NY); Ward, Nicolette:LT (NY); 'Kathleen.murphy@bipc.com'; 'mary.caloway@bipc.com'; 'tdemarinis@torys.com'; 'sbomhof@torys.com'; 'sblock@torys.com'; 'agray@torys.com'; 'aslavens@torys.com'; 'jbromley@cgsh.com'; 'lschweitzer@cgsh.com'; 'hzelbo@cgsh.com'; 'jrosenthal@cgsh.com'; 'dstein@cgsh.com'; 'mdecker@cgsh.com'; 'lpeacock@cgsh.com'; 'jmoessner@cgsh.com'; 'nforrest@cgsh.com'; 'dqueen@cgsh.com'; 'dabbott@mnat.com'; 'acordo@mnat.com'; 'rschwill@dwpv.com'; 'scampbell@dwpv.com'; 'jdoris@dwpv.com'; 'lsarabia@dwpv.com'; 'mgottlieb@counsel-toronto.com'; 'twynne@counsel-toronto.com'; 'pmichell@counsel-toronto.com'; 'adler@hugheshubbard.com'; 'oxford@hugheshubbard.com'; 'tabataba@hugheshubbard.com'; 'huberty@hugheshubbard.com'; 'eharron@ycst.com'; 'jdorsey@ycst.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca'; 'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; 'ken.rosenberg@paliareroland.com'; 'max.starnino@paliareroland.com'; 'lily.harmer@paliareroland.com'; 'karen.jones@paliareroland.com'; 'tina.lie@paliareroland.com'; 'michelle.jackson@paliareroland.com'; 'barry.wadsworth@caw.ca'; 'lewis.gottheil@caw.ca'; 'Arthur Jacques'; 'thomas.mcrae@shibleyrighton.com'; 'janice.payne@nelligan.ca'; 'steven.levitt@nelligan.ca'; 'christopher.rootham@nelligan.ca'; 'ainslie.benedict@nelligan.ca'; 'bboake@mccarthy.ca'; 'jgage@mccarthy.ca'; 'emarques@mccarthy.ca'; 'psteep@mccarthy.ca'; 'skour@mccarthy.ca'; 'bdshaw@mccarthy.ca'; 'kpeters@mccarthy.ca'; 'selinda.melnik@dlapiper.com'; 'richard.hans@dlapiper.com'; 'timothy.hoeffner@dlapiper.com'; 'farahlisa.sebti@dlapiper.com'; 'zychk@bennettjones.com'; 'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com'; 'swanr@bennettjones.com'; 'zweigs@bennettjones.com'; 'bellj@bennettjones.com'; Kreller, Tom; Harris, Jennifer; Pisa, Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Matz, Tom; Bassett, Nick; Ruha, Gabrielle; Pojunas, Rachel; 'Shayne.kukulowicz@dentons.com'; 'Michael.wunder@dentons.com'; 'ryan.jacobs@dentons.com'; 'Barbara.grossman@dentons.com'; 'fhodara@akingump.com'; 'dbotter@akingump.com'; 'aqureshi@akingump.com'; 'rajohnson@akingump.com'; 'bkahn@akingump.com'; 'cdoniak@akingump.com'; 'sgulati@akingump.com'; 'angela.pearson@ashurst.com'; 'Antonia.croke@ashurst.com'; 'samis@rlf.com'; 'bleonard@casselsbrock.com'; 'dward@casselsbrock.com'; 'bburden@casselsbrock.com'; 'chorkins@casselsbrock.com'; 'ljackson@casselsbrock.com'; 'mbarrack@tgf.ca'; 'djmiller@tgf.ca'; 'rlewis@tgf.ca'; 'amcewan@tgf.ca'; 'boconnor@willkie.com'; 'sadvani@willkie.com'; 'ahanrahan@willkie.com'; 'sheryl.seigel@mcmillan.ca'; 'michael.riela@lw.com'; 'jsalmas@heenan.ca'; 'kkraft@heenan.ca'; 'svanallen@heenan.ca'; 'craig.barbarosh@kattenlaw.com'; 'david.crichlow@kattenlaw.com'; 'Karen.dine@kattenlaw.com'; 'elamek@blg.com'; 'jszumski@blg.com'; 'dalowenthal@pbwt.com'; 'lbarnes@osler.com'; 'esellers@osler.com'; 'eputnam@osler.com'; 'ahirsh@osler.com'; 'acobb@osler.com'; 'michael.lang@nortonrose.com'; 'amdg@hoganlovells.com'; 'john.tillman@hoganlovells.com'; 'Matthew.bullen@hoganlovells.com'; 'david.graves@hogan.lovells.com'; 'katherine.tallett-williams@hoganlovells.com'; |

| | |
|---|---|
| **To:** | 'james.norris-jones@hsf.com'; 'cdavis@bayardlaw.com'; 'jalberto@bayardlaw.com' |
| **Cc:** | 'Zarnett, Benjamin'; 'Myers, Fred'; 'Kimmel, Jessica'; 'Pasquariello, Joe'; 'Carfagnini, Jay'; 'Armstrong, Christopher' |
| **Subject:** | RE: Deposition List of the Monitor, Canadian Debtors, CCC, and Directors and Officers |
| | |
| **Categories:** | Copied to Virtual File |

Peter:

We object to the inclusion of members of the Ad Hoc Bondholder Group in your list of proposed deponents. The five individuals you identified have no material knowledge relevant to this litigation. Their depositions would waste the valuable time and resources of all parties. Any information that the Ad Hoc Bondholder Group has that may be relevant to this litigation can be obtained through the deposition of a corporate representative, which you have noticed, and which notice we will respond and object to in due course.

We further object to the CCC's "addendum" insofar as it purports to request a witness from each member of the Ad Hoc Bondholder Group concerning the same topics that were the subject of the CCC's reserved document request. As the CCC knows, we have objected to its document request on a variety of grounds as set out in our notice of objection. We object to any depositions on these topics on the same grounds.

To be clear, as we have reiterated for months now: the Ad Hoc Bondholder Group will not produce – whether via document productions, depositions, or otherwise – any information concerning the holdings of its members beyond what is required by Federal Rule of Bankruptcy Procedure 2019. We will not make available any witness to testify on these topics.

Atara Miller | **Milbank**
One Chase Manhattan Plaza, New York, NY 10005
P: 212-530-5421 | F: 212-822-5421
amiller@milbank.com | www.milbank.com

**From:** Ruby, Peter [mailto:pruby@goodmans.ca]
**Sent:** Tuesday, July 30, 2013 11:55 PM
**To:** 'nortel.monitor@ca.ey.com'; 'derrick.tay@gowlings.com'; 'jennifer.stam@gowlings.com';
'ken.coleman@allenovery.com'; 'paul.keller@allenovery.com'; 'daniel.guyder@allenovery.com';
'laura.hall@allenovery.com'; 'Joseph.Badtke-Berkow@AllenOvery.com'; 'jonathan.cho@allenovery.com';
'Nicolette.ward@allenovery.com'; 'Kathleen.murphy@bipc.com'; 'mary.caloway@bipc.com'; 'tdemarinis@torys.com';
'sbornhof@torys.com'; 'sblock@torys.com'; 'agray@torys.com'; 'aslavens@torys.com'; 'jbromley@cgsh.com';
'lschweitzer@cgsh.com'; 'hzelbo@cgsh.com'; 'jrosenthal@cgsh.com'; 'dstein@cgsh.com'; 'mdecker@cgsh.com';
'lpeacock@cgsh.com'; 'jmoessner@cgsh.com'; 'nforrest@cgsh.com'; 'dqueen@cgsh.com'; 'dabbott@mnat.com';
'acordo@mnat.com'; 'rschwill@dwpv.com'; 'scampbell@dwpv.com'; 'jdoris@dwpv.com'; 'lsarabia@dwpv.com';
'mgottlieb@counsel-toronto.com'; 'twynne@counsel-toronto.com'; 'pmichell@counsel-toronto.com';
'adler@hugheshubbard.com'; 'oxford@hugheshubbard.com'; 'tabataba@hugheshubbard.com';
'huberty@hugheshubbard.com'; 'eharron@ycst.com'; 'jdorsey@ycst.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca';
'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; 'ken.rosenberg@paliareroland.com'; 'max.starnino@paliareroland.com';
'lily.harmer@paliareroland.com'; 'karen.jones@paliareroland.com'; 'tina.lie@paliareroland.com';
'michelle.jackson@paliareroland.com'; 'barry.wadsworth@caw.ca'; 'lewis.gottheil@caw.ca'; Arthur Jacques;
'thomas.mcrae@shibleyrighton.com'; 'janice.payne@nelligan.ca'; 'steven.levitt@nelligan.ca';
'christopher.rootham@nelligan.ca'; 'ainslie.benedict@nelligan.ca'; 'bboake@mccarthy.ca'; 'jgage@mccarthy.ca';
'emarques@mccarthy.ca'; 'psteep@mccarthy.ca'; 'skour@mccarthy.ca'; 'bdshaw@mccarthy.ca'; 'kpeters@mccarthy.ca';
'selinda.melnik@dlapiper.com'; 'richard.hans@dlapiper.com'; 'timothy.hoeffner@dlapiper.com';
'farahlisa.sebti@dlapiper.com'; 'zychk@bennettjones.com'; 'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com';
'swanr@bennettjones.com'; 'zweigs@bennettjones.com'; 'bellj@bennettjones.com'; Kreller, Tom; Harris, Jennifer; Pisa,
Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Miller, Atara; Matz, Tom; Bassett, Nick; Ruha, Gabrielle;
Pojunas, Rachel; 'Shayne.kukulowicz@dentons.com'; 'Michael.wunder@dentons.com'; 'ryan.jacobs@dentons.com';
'Barbara.grossman@dentons.com'; 'fhodara@akingump.com'; 'dbotter@akingump.com'; 'aqureshi@akingump.com';
'rajohnson@akingump.com'; 'bkahn@akingump.com'; 'cdoniak@akingump.com'; 'sgulati@akingump.com';

'angela.pearson@ashurst.com'; 'Antonia.croke@ashurst.com'; 'samis@rlf.com'; 'bleonard@casselsbrock.com';
'dward@casselsbrock.com'; 'bburden@casselsbrock.com'; 'chorkins@casselsbrock.com'; 'ljackson@casselsbrock.com';
'mbarrack@tgf.ca'; 'djmiller@tgf.ca'; 'rlewis@tgf.ca'; 'amcewan@tgf.ca'; 'boconnor@willkie.com'; 'sadvani@willkie.com';
'ahanrahan@willkie.com'; 'sheryl.seigel@mcmillan.ca'; 'michael.riela@lw.com'; 'jsalmas@heenan.ca'; 'kkraft@heenan.ca';
'svanallen@heenan.ca'; 'craig.barbarosh@kattenlaw.com'; 'david.crichlow@kattenlaw.com'; 'Karen.dine@kattenlaw.com';
'elamek@blg.com'; 'jszumski@blg.com'; 'dalowenthal@pbwt.com'; 'lbarnes@osler.com'; 'esellers@osler.com';
'eputnam@osler.com'; 'ahirsh@osler.com'; 'acobb@osler.com'; 'michael.lang@nortonrose.com';
'amdg@hoganlovells.com'; 'john.tillman@hoganlovells.com'; 'Matthew.bullen@hoganlovells.com';
'david.graves@hogan.lovells.com'; 'katherine.tallett-williams@hoganlovells.com'; 'james.norris-jones@hsf.com';
'cdavis@bayardlaw.com'; 'jalberto@bayardlaw.com'
**Cc:** Zarnett, Benjamin; Myers, Fred; Kimmel, Jessica; Pasquariello, Joe; Carfagnini, Jay; Ruby, Peter; Armstrong,
Christopher
**Subject:** Deposition List of the Monitor, Canadian Debtors, CCC, and Directors and Officers

### Deposition Witnesses To Be Deposed by the Canadian Parties

Pursuant to the Litigation Timetable and Discovery Plan, the Monitor, Canadian Debtors, Directors and Officers
and CCC (collectively, the "Canadian Parties") together give notice that they will depose the following
witnesses in the Allocation proceeding and EMEA Canadian Claims proceeding as applicable.

| Name | Location |
| --- | --- |
| Albert-Lebrun, Phillipe | France |
| Badiani, Kishhor | UK |
| Barton, Ian | (Likely UK) |
| Cianciolo, Chris | USA (Massachusetts) |
| Clement, Michel | France |
| Clive Gilchrist | UK |
| Collins, Malcolm | UK |
| Culina, Rosanne | Ontario |
| Drinkwater, David | Ontario |
| Edwards, Darryl | UK |
| Fraser, Maggie | UK |
| Freemantle, Simon | UK |
| Gardiner, Kenneth | UK |
| Gill, Dara | UK |
| Goldschmid, Paul | King Street Capital Management LP |
| Harper, Lorraine (Smeaton) | UK |
| Henderson, Wally | USA (Georgia) |
| Herenstein, Andrew | Monarch Alternative Capital LP |
| Jensen, Eric | USA |
| Kay, David | Tenor Capital Management |
| McColgan, Gillian | USA (Massachusetts) |
| Morgan, Iain | UK |
| Pugh, Gareth | UK |
| Riedel, George | USA (Massachusetts) |
| Rolston, Sharon | UK |
| Smith, Ryan | USA |

| Name | Location |
|------|----------|
| Stephens, Kerry | UK |
| Stevenson, Katherine | Ontario |
| Tananbaum, Steve | Goldentree Asset Management |
| Waida, Christian | UK |
| Widdowson, Ian | UK |
| Zinman, Jon | Solus Alternative Asset Management LP |

The Canadian Parties reserve their rights to change this list and do not waive any of their rights.

**Additional Individuals The Canadian Parties May Choose to Depose or Participate in Their Depositions**

The Canadian Parties also anticipate that they may choose to depose or participate in the depositions of the following individuals whose names appear on a Core Party's trial witness list. To the extent any trial witnesses and/or deponents are removed from the witness and/or deponent lists of a Core Party, the Canadian Parties each reserve the right to depose those individuals.

Additional Trial Witnesses Listed by the US Debtors

- William Donovan
- Michael Orlando
- John Ray
- Chris Ricaurte
- Elizabeth Smith
- Mark Weisz
- Jeff Wood

Additional Trial Witnesses Listed by the EMEA Debtors

- Simon Brueckheimer
- Geoffrey Hall
- Peter Newcombe

Additional Trial Witnesses Listed by the UKPC

- Simon Brueckheimer
- David Davies
- Terence Faulkner
- Geoffrey Hall
- John Hern
- Andrew Howard
- Andrew Jeffries
- Peter Newcombe
- Nigel Rees
- Timothy Watkins

**Addendum from the CCC**

Last week the CCC received significant additional production from the Ad Hoc Bondholders Group.  To the extent possible, we have identified Group members likely to have knowledge of the relevant issues.  In addition, the CCC requests the production of a witness from each of the individual members of the Ad Hoc Bondholders Group to testify concerning: (i) the purchase, sale, assignment or redemption of the Nortel Bonds, (ii) the analysis of their investment in the Nortel Bonds, and (iii) the terms of the Nortel Bonds, including the guarantees and the enforceability of the guarantees.  The CCC will work with counsel to identify the appropriate member witness and to avoid duplication of witnesses.


**Peter Ruby**
Goodmans LLP


416.597.4184
goodmans.ca

---

***** Attention *****

This communication is intended solely for the named addressee(s) and may contain information that is privileged, confidential, protected or otherwise exempt from disclosure. No waiver of confidence, privilege, protection or otherwise is made. If you are not the intended recipient of this communication, please advise us immediately and delete this email without reading, copying or forwarding it to anyone.


===============================================================

IRS Circular 230 Disclosure: U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.
===============================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-35, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, et. al.

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at TORONTO

**AFFIDAVIT OF BARBARA WALANCIK**
(sworn January 3, 2014)

**KOSKIE MINSKY LLP**
Mark Zigler / Ari Kaplan / Jeff Van Bakel
Lawyers for the Canadian Former Employees and Disabled
Employees through their court appointed Representatives

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / Elder C. Marques / Byron Shaw
Lawyers for Morneau Shepell Ltd., as administrator of the
Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
Lawyers for the Superintendent of Financial Services as
Administrator of the Pension Benefits Guarantee Fund

222

650824v1