Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT
ACT, R.S.C. 1985, c. C-36, AS AMENDED

**BRIEF OF AUTHORITIES OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")
(US DEBTORS' MOTION TO ELIMINATE
REPRESENTATIVE DEPOSITIONS)
RETURNABLE JANUARY 7, 2014**

DATE:  January 3, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Ari Kaplan / Jeff Van Bakel
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
        akaplan@kmlaw.ca
        jvanbakel@kmlaw.ca

Lawyers for the Canadian Former
Employees and Disabled Employees
through their court appointed
Representative

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / Elder C. Marques / Byron
Shaw
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
        emarques@mccarthy.ca
        bdshaw@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as
administrator of the Nortel Canada
registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN
LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo
Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email:
ken.rosenberg@paliareroland.com
lily.harmer@paliareroland.com
max.starnino@paliareroland.com

Lawyers for the Superintendent of
Financial Services as Administrator of
the Pension Benefits Guarantee Fund

# INDEX

## INDEX OF AUTHORITIES

1. *Ontario v. Rothmans*, [2011] OJ No 1896 (S.C.J)
2. *Six Nations of the Grand River Band v. Canada (Attorney General)*, 48 OR (3d) 377 (Div. Ct.)
3. *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, [2008] OJ No 4517 (S.C.J.)
4. Fed. R. Bankr. P. 2019 and Notes of Advisory Committee

# TAB 1

*Case Name:*
# Ontario v. Rothmans Inc.

**Between**
**Her Majesty the Queen in Right of Ontario, Plaintiff, and**
**Rothmans Inc., Rothmans, Benson & Hedges Inc., Carreras**
**Rothmans Limited, Altria Group, Inc., Philip Morris U.S.A.**
**Inc., Philip Morris International, Inc., JTI-MacDonald Corp.,**
**R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco**
**International Inc., Imperial Tobacco Canada Limited, British**
**American Tobacco p.l.c., B.A.T Industries p.l.c., British**
**American Tobacco (Investments) Limited and Canadian**
**Tobacco Manufacturers' Council, Defendants**

[2011] O.J. No. 1896

2011 ONSC 2504

5 C.P.C. (7th) 112

2011 CarswellOnt 2916,

Court File No. 09-CV-387984

Ontario Superior Court of Justice

**P.M. Perell J.**

Heard: April 5-7, 2011.
Judgment: April 26, 2011.

(187 paras.)

*Civil litigation -- Civil procedure -- Applications and motions -- Appeals -- From Masters' decisions*
*-- Appeal by three foreign defendants from a master's decision, allowed -- The master's decision*
*directed the appellants to answer certain questions which the appellants had refused to answer*
*while being cross-examined on their affidavits in support of their motion challenging the Ontario*
*court's jurisdiction over the underlying matter -- The master erred in determining the scope of*
*proper questions, in effect treating the cross-examinations as if they were examinations for discov-*

*ery -- The master further erred in his approach to the proportionality principle, erroneously con-*
*cluding that an expansionary approach was advisable -- Rules of Civil Procedure.*

Appeal by three defendants from a master's decision regarding the appellants' refusal to give under-
takings during their cross-examinations for questions for which they did not know the answers. The
appellants were companies incorporated pursuant to the laws of the United Kingdom. In the under-
lying action, in which the Crown sought $50 billion in damages for the cost of health care benefits
from tobacco-related disease or the risk of tobacco-related disease that had been or was anticipated
would be paid by the Crown for insured persons, the appellants challenged the jurisdiction of the
Ontario court. In support of their motion, the appellant companies introduced sworn affidavits. In
each case, the facts set out in the affidavit were based on the deponent's personal knowledge and on
information and belief based on company records. The majority of the questions each of the depo-
nents refused to answer related to documents the Crown had found on public web sites and from
other sources relating the appellants' involvement in intentionally misleading the public about the
harmful and addictive effects of smoking. The Crown sought to have the authenticity and reliability
of these documents acknowledged by the appellants. Some of the documents in question were over
50 years old. The deponents refused to give undertakings during their cross-examinations to ques-
tions for which they did not know the answers. The master found that that the questions relating to
the documents were integral to the jurisdictional challenge raised by the appellants and ordered the
appellants to answer a majority of the questions.

HELD: Appeal allowed and the master's decision was set aside. The master erred by treating the
cross-examination of the deponents as if they were being examined for discovery. Here, answering
questions and follow-up questions about events that covered a 60-year period were inherently diffi-
cult and finding answers would be difficult even if the person being examined had actually partici-
pated in the events those many years ago. The master paid no heed too those inherent difficulties or
to the passage of time. The master erred by essentially ignored the distinction between examinations
for discovery, where the rule was that the witness inform him or herself, and cross-examinations on
affidavits where the obligation to be informed about the evidence of others was the exception rather
than the rule. The master further erred in his application of the "equality of arms" principle, which
led him to order that all relevant evidence be provided unless it was unduly onerous to do so. In do-
ing so, the master departed from the adversarial system into an inquisitorial system. The master also
erred in his treatment of the proportionality principle, taking an expansionary approach, which led
him to the same conclusion that all relevant evidence had to be produced.

**Statutes, Regulations and Rules Cited:**

Limitations Act, 2002, S.O. 2002, c. 24, Schedule B, s. 6

Rules of Civil Procedure, Rule 1.04(1), Rule 1.04(1.1), Rule 17.02, Rule 17.02(h), Rule 17.02(o),
Rule 29.1, Rule 29.1.03(2), Rule 29.2, Rule 29.2.03, Rule 30, Rule 31, Rule 31.06, Rule 31.06(1),
Rule 31.06(2), Rule 31.06(3), Rule 31.06(4), Rule 31.07, Rule 31.11, Rule 32, Rule 33, Rule
37.10(10), Rule 39.01(1), Rule 39.01(4), Rule 39.01(5), Rule 39.02(1), Rule 53.01(1)

Tobacco Damages and Health Care Costs Recovery Act, 2009, S.O. 2009, c. 13, s. 2, s. 6, s. 10

**Counsel:**

Ronald Carr, John Kelly, and Kevin Hille, for the Plaintiff.

Charles Scott and Shaun Laubman, for the Defendant, B.A.T Industries p.l.c.

Chris Rusnak, for the Defendant, Carreras Rothmans Limited.

Craig Dennis, for the Defendant, British American Tobacco (Investments) Limited.

---

## REASONS FOR DECISION

P.M. PERELL J.:--

### A. *Introduction*

**1**    This is an appeal from a Master's order on a refusals motion. The Master's decision and the appeal pose questions about the nature and scope of a cross-examination for an application or motion. Some of the questions posed are infrequently asked, and some of the traditional answers require reconsideration because of the recent amendments to the *Rules of Civil Procedure* and its codification of the proportionality principle. This appeal requires answers to such questions as:

* What are the determinants of a proper question on a cross-examination for an application or a motion?
* In determining whether an examination question is proper, is there a difference among cross-examination on an affidavit, examinations for discovery, and cross-examination at trial?
* In determining whether a cross-examination question is proper, does it matter if the deponent is testifying from personal knowledge or if the deponent is testifying based on information and belief?
* What role, if any, does the proportionality principle play in determining whether a cross-examination question (as opposed to an undertaking) is proper?
* How informed must a deponent be or become if he or she is cross-examined on an affidavit for an application or motion?
* What is the role of undertakings on a cross-examination of a deponent as contrasted with undertakings on an examination for discovery?
* When may an undertaking be requested?
* When may an answer to a refused undertaking be compelled?
* What role, if any, does the proportionality principle play in determining whether an undertaking on a cross-examination of a deponent may be demanded?

**2**    These fundamental questions arise in the case at bar because in a humongous action in which Her Majesty the Queen in the Right of Ontario ("the Crown") seeks to recover $50 billion, two deponents for three defendants refused to give undertakings during their cross-examinations to questions for which they did not know the answers.

**3**      The deponents swore their affidavits in support of motions to stay the Crown's action on the grounds that this court does not have jurisdiction over the foreign defendants. The Crown cross-examined the deponents and treated the refusals to give undertakings as refusals to answer questions. The Crown moved for answers to the refused undertakings, and after a three-day hearing, the Master ordered that (a) Richard Cordeschi, the deponent for British American Tobacco (Investments) Limited ("Investments"), answer 68 (of approximately 100) questions; (b) Nicola Snook, the deponent for B.A.T. Industries p.l.c. ("Industries"), answer 13 (of 16) questions; and (c) Richard Cordeschi, the deponent for Carreras Rothmans Limited ("Carreras"), answer 18 (of 26) questions.

**4**      For the Reasons that follow, I allow the appeal, and I dismiss the Crown's refusal motion in its entirety.

## B. *Methodology*

**5**      In additional to describing the factual background, the Master's judgment, and the standard of review of a Master's order on a refusals motion, to address the questions posed on these appeals by Investments, Industries, and Carreras, it is necessary to describe, among other things, the law of civil procedure about: proper questions on examinations, including cross-examinations on affidavits, examinations for discovery, and examinations at trial; the role of undertakings; and the use that may be made of the transcripts of examinations on motions and at trials.

**6**      As will appear, it is my opinion that the Master made errors in applying and developing the law in these areas, and he made errors in the exercise of his discretion to order that undertakings be given and answered. By and large, the Crown's requests for undertakings was an attempt to engage in a premature examination for discovery.

**7**      As it will also appear from the discussion below, in order to analyze whether the Master's approximately 100 rulings were right or wrong, it is necessary to calibrate for the Defendants' jurisdiction motions, the legal tools used to determine whether a question or undertaking asked for on a cross-examination is a proper question.

**8**      In the case at bar, an important ingredient of the arguments of both sides was their competing positions about the scope of a cross-examination of a deponent for a party who is challenging whether the court has jurisdiction over the party and their competing positions about the role of undertakings.

**9**      In order for me to address the competing arguments and to calibrate the legal tools for the case at bar, it is necessary to describe the parameters for relevancy for questions for the jurisdiction motion that will eventually be heard by Justice Conway, who is case managing the action.

**10**      A key insight of these Reasons for Decision is what is a proper question depends upon factors or legal metrics that have different measures at different stages of a proceeding. Thus, what is a proper question at an examination for discovery or later at the trial of the merits of the cause of action or defence may not be a proper question at a cross-examination of a deponent on an application or a motion.

**11**      Practically speaking, this appeal requires me to consider the parties' positions about the refused undertakings and unanswered questions *de novo*. Where the appellants challenge the Master's decision about the relevancy of the question underlying the request for an undertaking, it is necessary for me to assess relevancy *de novo*. Where the appellants succeeded in demonstrating that the

Master had erred in principle about discretionary matters associated with compelling a party to give and answer an undertaking, it is necessary for me to assess the exercise of discretion *de novo*.

12      Thus, to answer the various questions posed by Investments, Industries, and Carreras' appeals, I have organized these Reasons for Decision into the following sections:

> \*     Introduction
> \*     Methodology
> \*     Factual Background
>
>> \*     The Crown's Action against Tobacco Manufacturers
>> \*     The Nature of the Defendants' Jurisdiction Motion
>> \*     Investments' Challenge to the Court's Jurisdiction
>> \*     Industries' Challenge to the Court's Jurisdiction
>> \*     Carreras' Challenge to the Court's Jurisdiction
>> \*     The Crown's Reply to the Challenges
>> \*     The Cross Examinations
>
> \*     The Master's Decision
> \*     Standard of Appellate Review
> \*     The Law of Examinations
>
>> \*     Introduction
>> \*     Examination at Trial
>> \*     Examination for Discovery
>> \*     Examination of Deponent for Motions and Applications
>
> \*     The Role of Proportionality
> \*     "Onerous Searches" and the Availability of Search Engines
> \*     The Master's Use of Internet Searches
> \*     The Determination of Investments' Appeal
> \*     The Determination of Industries' Appeal
> \*     The Determination of Carreras' Appeal
> \*     Conclusion

### C. *Factual Background*

### 1. The Crown's Action against Tobacco Manufacturers

13      Pursuant to the *Tobacco Damages and Health Care Costs Recovery Act, 2009*, S.O. 2009, c. 13, **Her Majesty the Queen in Right of Ontario ("the Crown")** sues Rothmans Inc., Rothmans, Benson & Hedges Inc., **Carreras Rothmans Limited ("Carreras")**, Altria Group, Inc., Philip Morris U.S.A. Inc., Philip Morris International, Inc., JTI-MacDonald Corp., R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco International Inc., Imperial Tobacco Canada Limited, British American Tobacco p.l.c., **B.A.T Industries p.l.c. ("Industries")**, **British American Tobacco (Investments) Limited ("Investments")**, and Canadian Tobacco Manufacturers' Council.

**14**    Under s. 2 of the Act, the Crown has a cause of action against a manufacturer to recover the cost of health care benefits caused or contributed to by a tobacco related wrong. "Manufacturer" "cost of health care benefits" "health care benefits" and "tobacco related wrong" are all defined terms under the Act. The Crown's action is for damages of $50 billion for the cost of health care benefits from tobacco related disease or the risk of tobacco related disease that have been paid or will be paid by the Crown for insured persons.

**15**    Under s. 6 of the Act, an action commenced by the Crown within two years after s.6 comes into force cannot be barred under the *Limitations Act, 2002* or any other Act.

**16**    Section 10 of the *Tobacco Damages and Health Care Costs Recovery Act, 2009* gives the Act retroactive effect. Section 10 states:

> 10.    When brought into force under section 13, a provision of this Act has the retroac-
> tive effect necessary to give the provision full effect for all purposes including
> allowing an action to be brought under subsection 2 (1) arising from a tobacco
> related wrong, whenever the tobacco related wrong occurred.

**17**    On September 29, 2009, the Crown commenced its action against 14 domestic and foreign entities in the tobacco industry. The Crown pleads that all the Defendants are "manufacturers" under the Act.

**18**    The Defendants Investments, Industries, and Carreras are companies incorporated pursuant to the laws of the United Kingdom with registered offices in London, England.

**19**    In its Statement of Claim, the Crown alleges that Investments and Industries were lead companies in the "BAT Group," which was one of four multinational tobacco enterprises, whose member companies directly or indirectly manufactured and promoted cigarettes sold in Ontario and throughout the world. Imasco Limited and Imperial Tobacco Limited, now the Defendant Imperial Tobacco Canada Limited, were members of the BAT Group.

**20**    Between 1902 to 1976, Investments was the ultimate parent corporation of a group of subsidiaries and associated companies that were known as the BAT Group. Between 1976 and 1998, after a reverse takeover, the ultimate parent became Industries, which was always a non-operating holding company with diverse investments in financial services, retail, cosmetics, pulp and paper, and tobacco. In 1998, the defendant British American Tobacco p.l.c. became the ultimate parent, and Industries became and remains an intermediate holding company with holdings in Investments and, until March 2000, in Imasco Limited, now Imperial Tobacco Canada Limited.

**21**    The domestic Defendant, Imperial Tobacco Canada Limited was created through the amalgamation of Imperial Tobacco Limited and Imasco Ltd., and it is a company incorporated under the laws of Canada with a registered office in Montreal, Quebec.

**22**    In its Statement of Claim, the Crown alleges that by 1950, the Defendants knew or ought to have known that smoking cigarettes could cause or contribute to disease and that by 1970, the Defendants knew or ought to have known that exposure to second hand smoke could cause or contribute to disease.

**23**    It is alleged, among other things, that the Defendants: (a) suppressed scientific and medical data which revealed the serious health risks of smoking; (b) misinformed the public as to the harm of both smoking and of exposure to cigarette smoke; (c) targeted children and adolescents in their

advertising, promotional, and marketing activities for the purpose of inducing children and adolescents in Ontario to start or to continue to smoke; and (d) participated in a misleading campaign to enhance their own credibility and diminish the credibility of health authorities and anti-smoking groups for the purpose of reassuring smokers that cigarettes were not as dangerous as authorities were saying.

24    The Crown alleges that all the Defendants participated, over several decades, in an international conspiracy to mislead the public and the government in Ontario and elsewhere about the harmful effects and addictiveness of tobacco. As a result of the removal of the limitation period, the Crown's action spans events that go as far back as the early 1950s.

25    The Crown alleges that the Defendants intentionally circulated false and misleading information and resisted health warnings long after their internal research revealed the deleterious effects of smoking. The Crown further alleges that the Defendants suppressed research regarding the hazards of smoking and resisted efforts, even from within the industry, to develop a potentially safer cigarette for fear of what such research would imply about the industry's product.

26    The Crown alleges that the Defendants advanced their conspiracy through committees, conferences, and meetings that were organized, convened, and attended by senior personnel of Industries and Investments and by their Canadian subsidiaries. And it alleges that the BAT Group Defendants directed how Imperial and Imasco should vote at meetings of the Canadian Tobacco Manufacturers Council, including the approval of funding for research on smoking and health issues.

27    The Crown alleges that Industries and Investments prepared policies on smoking and health and distributed written policy directives about smoking and health to their subsidiaries, including Imperial and Imasco.

28    In its Statement of Claim, the Crown alleges that Carreras was a lead company in the Rothmans Group. It is alleged that Carreras directed or co-ordinated the Rothmans Group's common policies on smoking and health by preparing and distributing statements which set out the Rothmans Group's position on smoking and health issues.

29    The Crown alleges that between late 1953 and the early 1960s, the Lead Companies formed or joined several research organizations including the Tobacco Industry Research Council, renamed the Council for Tobacco Research in 1964, the Centre for Co-operation in Scientific Research Relative to Tobacco, and the Tobacco Research Council. It is alleged that the Lead Companies conspired with the research organizations to distort the research and to publicize misleading information to undermine the truth about the link between smoking and disease with the intent of misleading the public and the Crown into believing that there was a medical or scientific controversy about whether smoking caused addiction and disease.

30    In its Statement of Claim, the Crown alleges that in June, 1977, the Lead Companies, and some or all of the Defendants with international interests, met in England to establish the International Committee on Smoking Issues ("ICOSI") for the purposes, among others, of: resisting government efforts to provide adequate warnings about smoking and disease; disseminating false and misleading information regarding the risks of smoking; suppressing research regarding the risks of smoking; and advancing a public relations program with the object of promoting cigarettes, protecting cigarettes from attack based upon health risks, and reassuring smokers, the public and authorities in Ontario and other jurisdictions that smoking was not hazardous.

**31**    The Crown alleges that in furtherance of the various conspiracies, Investments and Industries organized committees, conferences and meetings attended by senior personnel including those of Imperial Tobacco Limited and Imasco Limited to direct or co-ordinate the BAT Group's common policies on smoking and health. The committees included the Chairman's Policy Committee, the Research Policy Group, the Scientific Research Group, the Tobacco Division Board, the Tobacco Executive Committee, and the Tobacco Strategy Review Team (which later became known as the Tobacco Strategy Group).

**32**    It is alleged that Investments and Industries directed or co-ordinated the BAT Group's common policies on smoking and health by preparing and distributing to the members of the BAT Group, including Imperial Tobacco Limited and Imasco Limited, written directives and communications including "Smoking Issues: Claims and Responses", "Consumer Helplines: How To Handle Questions on Smoking and Health and Product Issues", "Smoking and Health: The Unresolved Debate", "Smoking: The Scientific Controversy", "Smoking: Habit or Addiction?", and "Legal Considerations on Smoking and Health Policy".

**33**    With respect to Carreras, the Crown alleges that Carreras directed the Rothmans Group's policies on smoking and health and prepared and distributed statements to its Canadian subsidiaries that set out the Rothmans Group's position on smoking and health issues. It is alleged that Carreras also directed how Rothmans of Pall Mall Canada Limited (predecessor to the Rothmans Defendants in this action) would vote at meetings of the Canadian Tobacco Manufacturers Council and was directly involved in the approval of research proposals about smoking and health issues.

**34**    The Crown served Investments, Industries, and Carreras with its Statement of Claim without leave for service *ex juris*. It relied on rules 17.02 (g), (h), (o) and (p), which state:

SERVICE OUTSIDE ONTARIO WITHOUT LEAVE

17.02 A party to a proceeding may, without a court order, be served outside Ontario with an originating process or notice of a reference where the proceeding against the party consists of a claim or claims, ....

*Tort Committed in Ontario*

(g)    in respect of a tort committed in Ontario;

*Damage Sustained in Ontario*

(h)    in respect of damage sustained in Ontario arising from a tort, breach of contract, breach of fiduciary duty or breach of confidence, wherever committed;

*Necessary or Proper Party*

(o)    against a person outside Ontario who is a necessary or proper party to a proceeding properly brought against another person served in Ontario;

*Person Resident or Carrying on Business in Ontario*

(p)    against a person ordinarily resident or carrying on business in Ontario;

## 2. The Nature of the Defendants' Jurisdiction Motion

**35**    In January 2010, of the Defendants, six foreign corporations moved to challenge the jurisdiction of the Ontario courts. (This appeal involves three of the six Defendants.)

**36**    None of the foreign Defendants attorned to the court's jurisdiction, and their motion challenged whether the Ontario court should assume jurisdiction over them.

**37**    As will be explained below, the nature of a motion is a factor in determining whether questions on a cross-examination of a deponent for the motion are proper. The nature of the motion will determine what questions are relevant and is a factor in determining whether refused undertakings should be answered.

**38**    For the present purposes of addressing the appeal from the Master's rulings, it is, therefore, necessary to briefly describe the law about challenging the jurisdiction of the court in Ontario.

**39**    In *Van Breda v. Village Resorts Ltd.*, [2010] O.J. No. 402 (C.A.), leave to appeal granted, [2010] SCCA No. 174 (S.C.C.), the Court of Appeal recalibrated the law on the court's jurisdiction over foreign defendants as it had been described in *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (C.A.) and four companion cases: *Lemmex v. Bernard* (2002), 60 O.R. (3d) 54 (C.A.); *Gajraj v. DeBernardo* (2002), 60 O.R. (3d) 68 (C.A.); *Sinclair v. Cracker Barrel Old Country Store Inc.* (2002), 60 O.R. (3d) 76 (C.A.); *Leufkens v. Alba Tours International Inc.* (2002), 60 O.R. (3d) 84 (C.A.).

**40**    The test for whether an Ontario court has jurisdiction *simpliciter* is whether there is a real and substantial connection between the matter and the parties and Ontario: *Muscutt v. Courcelles, supra*; *Van Breda v. Village Resorts Ltd., supra*. The test is not rigid but rather is a flexible test that captures the ideas that there are limits to the jurisdiction of a domestic court, which should not overreach, and that the decision not to exercise jurisdiction must ultimately be guided by the requirements of order, efficiency and fairness, not a mechanical counting of contacts or connections: *Van Breda v. Village Resorts Ltd., supra*, at paras. 43-46.

**41**    A variety of factors, none of which are in and of themselves determinative, are weighed to determine whether Ontario has jurisdiction *simpliciter*. The weight to be given to any of the factors will depend upon the circumstances of the particular case. As outlined in *Muscutt v. Courcelles* but as later explained, refined and modestly simplified in *Van Breda v. Village Resorts Ltd.*, the factors include:

*     the connection, if any, between Ontario and the plaintiff's claim;
*     the connection, if any, between Ontario and the defendant;
*     unfairness, if any, to the defendant if the Ontario court assumes jurisdiction;
*     unfairness, if any, to the plaintiff if the Ontario court does not assume jurisdiction;
*     the involvement of others, if any, in the suit;
*     the Ontario court's willingness to recognize and enforce an extra-provincial judgment made on the same jurisdictional basis;

      \*    whether the case is interprovincial or international in nature; and,

      \*    comity and standards of jurisdiction, recognition and enforcement prevailing elsewhere.

**42**    In *Van Breda v. Village Resorts Ltd.*, for the determination of jurisdiction *simpliciter*, the Court introduced a category-based presumption based on the rules for service *ex juris* under the *Rules of Civil Procedure*; namely rule 17.02.

**43**    With the exceptions of subrules 17.02(h) ("damages sustained in Ontario") and (o) ("a necessary or proper party"), if a case falls within one of the connections listed in rule 17.02, a real and substantial connection for the purposes of assuming jurisdiction against the defendant shall be presumed to exist: *Van Breda v. Village Resorts Ltd.*, *supra*, at paras. 71-80.

### 3. <u>Investments' Challenge to the Court's Jurisdiction</u>

**44**    In support of their motions challenging this court's jurisdiction, Investments and Carreras filed affidavits sworn by Richard Cordeschi. Mr. Cordeschi is the corporate secretary of Investments and one of two directors of Carreras. Having graduated from the Institute of Chartered Secretaries and Administrators, he holds the professional designation of chartered secretary.

**45**    In his affidavit in support of Investments' motion, Mr. Cordeschi deposes that the facts set out in the affidavit are based on personal knowledge and on information in Investments company records that he believes to be true.

**46**    Mr. Cordeschi deposes that Investments is a limited company under the laws of England and Wales incorporated in 1902 with a registered office in London, England. He states that until 1976, it was the ultimate parent company of various subsidiary, affiliate, and associated companies engaged in various businesses including the tobacco business. In 1976, after a reverse takeover, Industries became the parent corporation and Investments became an intermediate holding company for all of the tobacco operating subsidiaries.

**47**    Based on his own knowledge and based on inquiries and searches of Investments company's records, Mr. Cordeschi deposed that Investments never researched, manufactured, packaged, promoted, advertised, or distributed tobacco products or other products in Ontario. It did not authorize any agents to research, manufacture, package, promote, advertise, or distribute tobacco products or other products in Ontario. It did not act as an agent for any subsidiary that researched, manufactured, packaged, promoted, advertised, or distributed tobacco products or other products in Ontario. It has never had any assets in Ontario. It has never owned, leased, or possessed property in Ontario. It has never been registered extra-provincially in Ontario and has never been licensed to conduct and has never conducted business in Ontario. It has no offices, employees, records, place of business, bank account, telephone listing, or mailing address in Ontario. It has never been assessed nor paid taxes in Ontario.

**48**    Further, Mr. Cordeschi deposed that Investments has never been a member of the Ad Hoc Committee on Smoking and Health or the Canadian Tobacco Manufacturers Council.

**49**    He states that beginning in 1912 until 1981, Investments had a shareholder's interest in Imperial Tobacco Company of Canada, which was renamed Imasco Limited and later became Imperial Tobacco Canada Limited. Investments shareholding was as high as 83% but declined to less than 50% when it sold its remaining shares. Investments and Imasco operated as separate corporations,

and Mr. Cordeschi deposes that Investments never participated in the day-to-day management and control of Imasco and never directed Imasco how to vote in committees of the Canadian manufacturers or at meetings of the Canadian Tobacco Manufacturers Council. He states that Investments never gave Imasco express or implied authority to act as its agent and Investments never had expressed or implied authority as an agent for Imasco.

#### 4. Industries' Challenge to the Court's Jurisdiction

**50**     In support of its motion challenging the court's jurisdiction, Industries filed an affidavit sworn by Nicola Snook. She is Industries' corporate secretary. She deposes that the facts in the affidavit are based on personal knowledge and information in Industries company's records that she believes to be true.

**51**     In her affidavit, Ms. Snook deposed that Industries is a public limited company, incorporated under the laws of England and Wales with its registered office in London, England. It is a holding company with all its assets in the United Kingdom.

**52**     Ms. Snook deposes that Investments and its agents have never commissioned research in relation to, manufactured, produced, assembled, marketed, packaged, sold, shipped, promoted, advertised, or distributed tobacco products sold or intended for sale anywhere. It does not derive revenues from the manufacture or sale of tobacco products anywhere. It has no connections with Ontario or ever held assets in Ontario. It has never been licensed or qualified to conduct, or conducted business in Ontario or registered extra-provincially in Ontario. It has never maintained a place of business in Ontario or had any office, employees, records, or representatives in Ontario. It has never owned, leased, used, or possessed any real or personal property of any kind within Ontario or had any bank account, mailing address or telephone listing in Ontario. It has never been assessed nor paid taxes in Ontario. It has never contracted to supply any goods (including tobacco products) or services in Ontario or advertised or promoted tobacco products, or any other goods or products, sold or intended for sale in Ontario.

**53**     In her affidavit, Ms. Snook deposes that Industries was never a member of any of the international organizations named in the Statement of Claim nor has it ever had any role in, or any involvement with, any of the committees, conferences, and written "directives" and communications associated with it as alleged in the Statement of Claim.

**54**     Ms. Snook deposes that Industries neither organized nor attended Group Research Conferences as alleged in the Statement of Claim. Industries did, however, have a representative on the Tobacco Strategy Review Team and its successor, the Tobacco Strategy Group, which was made up of senior executives of the principal tobacco operating company, just as the Financial Services Strategy Review Team included senior executives of financial services companies.

**55**     Ms. Snook deposes that Industries' top executive body was the Chairman's Policy Committee, which had oversight over Industries' holdings around the world. She states that this committee managed Industries but did not control or manage the day-to-day operational activities or policies of any of Industries' subsidiaries or associates.

**56**     In her affidavit, Ms. Snook states that the only document referred to in paragraph 138 of the Crown's Statement of Claim that was an Industries' document is the "Legal Considerations on Smoking and Health Policy." She denies that this document was a means to direct, control, or manage the day-to-day operations of policies of Imasco.

## 5. Carreras' Challenge to the Court's Jurisdiction

**57**     In his affidavit on behalf of Carreras, Mr. Cordeschi deposed that the facts set out were based on his personal knowledge and on information contained in Carreras' annual reports and accounts for the years ended March 31, 1984 through December 31, 2008.

**58**     Mr. Cordeschi's affidavit is only seven paragraphs in length. His evidence is found in paragraph 6, which I will set out in full. Paragraph 6 states:

> 6.     [Carreras] is a non-trading, non-operating company that carries on no business of any kind. Since March 1984, the company has been dormant in accordance with the meaning ascribed to the term in the United Kingdom *Companies Act 1985,* c.6 and the United Kingdom *Companies Act 2006* c. 46 (which superseded the *Companies Act 1985* as of April 2008 insofar as dormant companies are concerned), and its functions have been limited to meeting the statutory requirements imposed on dormant companies incorporated in England, such as filing annual reports and accounts.

## 6. The Crown's Reply to the Challenges and its Request for Admissions

**59**     In response to the motions by the six foreign defendants, including Investments, Industries, and Carreras, the Crown delivered an affidavit from Fabian Esprit, who is a law clerk with the Ministry of the Attorney General.

**60**     In his affidavit, Mr. Esprit, among other things, deposed that he retrieved documents from public websites including the websites of: (a) Imperial Tobacco Canada Limited; (b) the London Stock Exchange; (c) SEDAR (System for Electronic Document Analysis and Retrieval); (d) and Tobacco.org and (e) the Legacy Tobacco Documents Library of the University of California, San Francisco.

**61**     In his affidavit, Mr. Esprit indicated that as a result of his searches, he had learned that after the settlement of litigation in the United States against members of the tobacco industry, the Defendants had established two repositories for tobacco industry documents, one of which was in Guildford, England, for the BAT Group of companies.

**62**     Mr. Esprit stated that he had obtained many documents from the Legacy Tobacco Documents Library. Those documents were exhibits to his affidavit.

**63**     Before Mr. Cordeschi's cross-examination, the Crown served a Notice of Examination that required him to produce, at the examination, 120 documents of Investments and 12 documents of Carreras that had been located by Mr. Espirt.

**64**     By letter dated October 28, 2010, John Kelly, a lawyer for the Crown, wrote Investments' lawyer, Craig Dennis, and requested that Mr. Cordeschi admit the authenticity of the documents that had been retrieved by Mr. Esprit. Mr. Kelly's letter stated:

> I am asking you to review the list of documents and the brief of documents with your client prior to cross-examinations for the purpose of determining whether your client on behalf of [Investments] and [Carreras] is prepared to admit the au-

thenticity of the documents. This admission would be without prejudice to the right of your clients to continue to take the position that they have not attorned to the jurisdiction of Ontario. By "authenticity" I mean that the documents were authored by the persons who purported to author them and received by the persons who purported to receive them. To the extent that documents refer to meetings, we are asking for admissions that, as far as [Investments] and Carreras are concerned, the persons referred to as employees, officers, directors or servants of the said corporations noted in attendance at the said meetings were, in fact, in attendance at said meetings.

**65**     By letter dated November 30, 2010, Craig Dennis, Investments' lawyer, responded to Mr. Kelly's letter and in particular to Mr. Kelly's request that Investments admit the authenticity of the listed documents. Mr. Dennis refused this request, but did provide some information. His letter stated:

> While we are willing to work constructively with you to streamline the cross-examination, your request presents some practical difficulties. First, we have determined to this point that the following documents in Schedule A are not documents from [Investments] files: [17 documents]. Second, the remaining documents date in the main from the 1950s, 1960s, 1970s and 1980s. Only a small number date from the 1990s and the most recent of those is from 1992. With documents of this vintage, it is not obvious to my client or me how to go about making the determinations you have asked for. Nor is it obvious, particularly in the context of a jurisdiction motion, that there can be an obligation to do so. ....

> In consequence, [Investments] does not admit the authenticity as you have defined the term or any of the documents listed. Without conceding the relevance of any of the documents, and for the purposes of this motion only, what we have been able to determine is that the following documents in Schedule A appear to be unedited copies (or portions of copies) of documents from [Investments] files: [97 documents].

**66**     A copy of Mr. Kelly's letter of October 28, 2010 was forwarded to Mr. Rusnak, a lawyer for Carreras, who replied by letter dated November 26, 2010. Mr. Rusnak disputed that there was an obligation to make the requested admissions in the context of a jurisdiction motion and that there were practical problems. Mr. Rusnak wrote as follows:

> [Carreras] is a UK company that has been dormant for over 25 years. Similarly all the documents in your Schedule B were, on their face, prepared more than 25 years ago. Mr.Cordeschi, on the other hand, has held his position as director of [Carreras] since September 25, 2009. His role with the company since that time has been to carry out those tasks required of a director of a dormant company in the UK. Mr. Cordeschi's affidavit simply sets out [Carreras'] status as a dormant company since 1984 based upon documents filed in the United Kingdom with Companies' House, the official UK government register of UK companies. Mr. Cordeschi understandably has no knowledge of who authored or received the

documents in your schedule B, or whether the documents accurately record meeting attendances. Mr. Cordeschi also has no information on the whereabouts of any of the individuals referenced in the documents or whether any of them are even still alive.

67    By letter dated November 29, 2010, Mr. Kelly replied to Mr. Rusnak's letter. In his letter, Mr. Kelly wrote the following:

> You are undoubtedly aware that we are not confined in our questioning to the matters raised in Mr. Cordeschi's affidavit. We are entitled to cross-examine on all matters relevant to the issue of jurisdiction including these documents. In addition, as an affiant being put forward on behalf [of Carreras], Mr. Cordeschi has an obligation to take reasonable steps to inform himself of issues on the motion for the purposes of the cross-examination. Mr. Cordeschi has not indicated that he is unable to obtain access to these documents and to make efforts to enquire as to their authenticity. It is obvious that these documents are business records within the meaning of the *Civil Evidence Act* and that they formed part of previous litigation in with the B.A.T. group of companies have been involved. Your client has had ample opportunity to make the appropriate inquiries and if he fails to do so, his failure will be subject to the appropriate motion.

68    Before Ms. Snook's cross-examination, the Crown served a Notice of Examination that required her to produce, at the examination, 127 documents of British-American Tobacco p.l.c. and Industries that had been located by Mr. Esprit. By letter dated October 22, 2010, Ronald Carr, counsel for the Crown, wrote Industries' lawyer, Charles Scott, and requested that Ms. Snook admit the authenticity of the documents that had been retrieved by Mr. Esprit. Mr. Carr's letter stated:

> In order to expedite the cross-examinations, we would request your client's admission as to the authenticity of the above documents. By authenticity we mean that: (a) the document was executed or authored by the person to whom the document purports to be signed or written, (b) the document was prepared on or shortly after the date that appears on the document, and (d) the document is a true copy of the original. In regard to documents that purport to record the minutes of a meeting or report on a meeting held, that (e) the meeting was held on or about the date set out in the document and (f) the persons said to be in attendance were present at such meeting.

69    Mr. Scott replied by letter dated November 26, 2010, and he stated:

> You have asked for a series of admissions in respect of the documents listed in your letter. While we are prepared to work with you to streamline Industries cross-examination, Industries will not be admitting the authenticity, as you have defined the term, or any of the documents listed in our letter in advance of Ms. Snook's cross-examination. In the context of a jurisdiction motion, I do not believe that there is any obligation on Industries to provide the advance admissions you seek. Moreover, your request presents some very real practical difficulties. The documents date from the 1970s, 1980s and 1990s; accordingly, I do not see

how, on any realistic and proportional basis, Ms. Snook or Industries could possibly go about making the determinations you seek.

We can advise, however, that only the following documents, identified in your October 22 letter and attached as Exhibit I to the Esprit Affidavit, appear to be unedited copies (or, in some cases portions of copies) of documents that have been located in Industries' files (using the Esprit Exhibit I tab numbers): ... [58 documents].

### 7. The Cross-Examinations

**70**    Mr. Cordeschi was cross-examined on his affidavits for Investments in London, England, on December 7 and 8, 2010. The following day, he was cross-examined on his affidavit for Carreras.

**71**    As Investments' witness, Mr. Cordeschi was asked 846 questions, and as Carreras' witness, he was asked 184 questions. The Crown eventually sought answers from Mr. Cordeschi to approximately 100 questions from the cross-examination on behalf of Investments, and the Crown sought answers to 26 questions from his cross-examination on behalf of Carreras.

**72**    Ms. Snook, who was Industries' witness, was cross-examined on December 15, 2010. She was asked 691 questions. She answered all but 42, which questions were either taken under advisement or refused. Of the questions taken under advisement, 12 were subsequently answered in writing. The Crown eventually sought answers from Ms. Snook for 16 refusals.

**73**    All the cross-examinations focused on the documents from the Legacy Archive. The majority of questions refused by the appellants relate to these documents.

**74**    In light of the refusals, on January 26, 2011, the Crown brought a motion to compel Ms. Snook and Mr. Cordeschi to re-attend to answer these questions.

### D. *The Master's Decision*

**75**    In this section of my Reasons, I will simply describe the Master's decision, which is reported as *Ontario v. Rothmans Inc*. 2011 ONSC 1083 (Master). Later in these Reasons, I will explain where I think he erred in his analysis or application of the applicable law.

**76**    After some preliminary remarks about the nature of the refusals motion before him (paras. 1-15), the Master reviewed the *Tobacco Damages and Health Care Costs Recovery Act* (paras. 16-31). He thought this analysis provided the framework for the case, and he considered the review to be helpful in determining the appropriate approach to determining the refusals motion.

**77**    After reviewing the Act, the Master came to several operative conclusions about aspects of his approach to the refusals motion. At paragraphs 28 to 31 of his judgment, he stated, with my emphasis added:

28.    It is my view that the foregoing section clearly demonstrates the intent of the legislature to permit recovery of damages in this case regardless of how long ago the tobacco related wrong, may have occurred. I thus find arguments by the foreign defendants, that the subject information is very old and perhaps difficult to locate, to not be of much assistance. **After hearing all counsel, it was my con-**

> clusion that if I were satisfied documentation might exist, it ought to be looked for, if it was otherwise producible.

29.   One of the rationales for our present limitations statute was that memories fail, witnesses die and documentation may be very difficult to locate. One of the arguments for implementing a limitation period normally made is that ought to be a cut-off point so that parties may dispose of records rather than having to retain them perpetually to guard against being exposed to the threat of litigation.

30.   Here I see the statutory provision in Section 6 as clearly electing to over-ride such objections. The balance between the ability to recover the health care costs as preventing recovery due to the age of the claims has clearly been tipped by the legislature.

31.   **As a consequence the age of the information sought has largely been discounted in my analysis.**

**78**   The Master then turned to whether the notion of "proportionality," which has expressly been introduced as a factor in the Rules of Civil Procedure had a role to play in his approach to the refusal's motion (paras. 32-36). He quoted rule 1.04 (1) and new subrule 1.04 (1.1.), which read:

> General Principle

> 1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

> (1.1)   In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

**79**   Noting that in England, Lord Woolf had made the concept of proportionality an important feature in the reform of civil procedure in England, the Master quoted Chapter 1 of Lord Woolf's 1995 Report, *Access to Justice*, in its entirety.

**80**   In that chapter, Lord Woolf noted that "a system of civil justice is essential to the maintenance of a civilized society" and that "effective access to the enforcement of rights and the delivery of remedies depends on an accessible and effective system of civil litigation."

**81**   In his report, Lord Woolf stated that the basic principles of a civil justice system to provide access to justice were that: (a) it should deliver just results; (b) it should be fair and seen to be fair by ensuring equal access to assert or defend their legal rights regardless of their resources and by providing each litigant with an adequate opportunity to state the case and answer the opponent's case; its procedures and costs should be proportionate to the nature of the issues involved; (d) it should deal with cases with reasonable speed; (e) it should be understandable to those who use it; (f) it should be responsive to the needs of those who use it; (g) it should provide as much certainty as the nature of particular cases allows; and (h) it should be effective: adequately resourced and organized so as to give effect to the previous principles.

**82**   In para. 35 of his judgment, the Master, then quoted the following passage from Chapter 5 of Lord Woolf's report:

The overall aim of my Inquiry is to improve access to justice by reducing the in-equalities, cost, delay and complexity of civil litigation and to introduce greater certainty as to timescales and costs. My specific objectives are:

(a)     to provide appropriate and proportionate means of resolving disputes;
(b)     to establish "equality of arms" between the parties involved in civil cases;
(c)     to assist the parties to resolve their disputes by agreement at the earliest possible date; and
(d)     to ensure that the limited resources available to the courts can be deployed in the most effective manner for the benefit of everyone involved in civil litigation.

**83**      The Master then concluded this portion of his judgment by setting out another operative conclusion about his approach to the refusals motion. In paragraph 36, he stated with my emphasis added:

36.     How do I establish **"equality of arms"** between these parties with respect to the presentation of their respective positions on the jurisdiction motions which po-tentially could end this litigation with respect to some or all of the foreign de-fendants? In my view that potentiality **requires a somewhat different approach than in cases where the cross-examination is with respect to a motion at an interlocutory stage of the related action**.

**84**      The Master then noted (paras. 37-49) the substance of the motions for which Investments, Industries, and Carreras had filed their affidavits was to challenge the jurisdiction of the court in Ontario and that they relied on s. 106 of the *Courts of Justice Act* which provides that "a court, on its own initiative or on motion by any person, whether or not a party, may stay any proceeding in the court on such terms as are considered just."

**85**      He noted that Investments, Industries, and Carreras did not attorn to the jurisdiction and that these Defendants submitted that there was no real and substantial connection between the causes of action pleaded and the forum of Ontario, service outside of Ontario is not authorized, and having regard to all aspects of the action, order and fairness would render it unfair for the court to assume jurisdiction.

**86**      Considering the substance of the motions, the Master came to two more operative conclu-sions about the appropriate approach to the refusals motion. These conclusions are set out in para-graphs 46 and 49 of his judgment, which state, with my emphasis added:

46.     **The determination of whether a stay is just should surely be made on as complete a relevant record as is available**.
49.     On what basis is the Court to determine the issue of what will constitute an order as is just in the circumstances of this unique case? Is there an adequate founda-tion to determine the "justness" of the position asserted in the affidavit in sup-port? **In my view, a proportional approach involves considering all reasona-bly available relevant evidence**, in attempting to achieve the just, most expedi-tious and least expensive determination of *this* civil proceeding *on its merits*.

87      The next portion of the Master's judgment (paras. 50-55) comes under the title "Admissions Sought," and this section includes independent Internet research by the Master. It is the position of Investments, Industries, and Carreras, that the Master made a serious error in relying on his own Internet research and in formulating his approach to the refusals motion by reference to what he learned. For present purposes, I will let these paragraphs speak for themselves, and I will discuss their significance, if any, later. Paragraphs 50-55 state:

> 50.    "The Man Who Knew Too Much" was an influential article on the tobacco industry "whistle-blower" Jeffrey Wigand, written by journalist Marie Brenner for the May 1996 issue of *Vanity Fair* magazine. The article was subsequently adapted into the 1999 film *The Insider*, which tells the controversial true story of a *60 Minutes* television series segment, as seen through the eyes of Wigand.

> 51.While portions of the film were unquestionably fictionalized, the movie ends accurately with "a series of title cards appear stating that a $246 billion settlement was made by tobacco companies with Mississippi and other States". [http://en.wikipedia.org/wiki/The_Insider_(film)]

> 52 As part of those settlements the companies agreed to the establishment of document repositories of materials obtained during the various U.S. actions.

> 53 Prior to the cross examination of each deponent counsel for the Crown wrote to the individual counsel opposite with respect to documents that Ontario intended to put to each witness on their Cross examinations. The portion of that letter dealing with the repository read in part:

>> "With respect to the BATCo documents, they were taken from the Legacy Tobacco web-site, which as you know is a compilation of documents taken from the repository created by your client in Guildford, England and the repository in Minnesota which repositories were created as a result of the litigation in the United States between Minnesota Blue Cross and Blue Shield of. Minnesota. and, among others, British American Tobacco . (Investments) Limited and B.A.T. Industries plc. These documents were, as I understand it, admitted into evidence and accepted by the Court in that litigation and accordingly, should not be difficult for your client to identify."

> 54.    The request of counsel related to the attempt to obtain an acknowledgement of the reliability of various documents relating to each of the four foreign defendants. In part, the request read:

>> "... I am asking you to review the list of documents and the brief of documents with your client prior to cross-examinations for the purpose of determining whether your client on behalf of British American Tobacco (Investments) Ltd. ("BATCo") and Carreras Rothmans Limited ("Carreras") is prepared to admit the authenticity of the documents. This admission would be without prejudice to the right of your clients to continue to take

the position that they have not attorned to the jurisdiction of Ontario. By "authenticity", I mean that the documents were authored by the persons who purported to author them and received by the persons who purported to receive them. To the extent that documents refer to meetings, we are asking for admissions that, as far as BATCo and Carreras are concerned, the persons referred to as employees, officers, directors or servants of the said corporations noted as in attendance at the said meetings were, in fact, in attendance at the said meetings.

55.    In as much as these documents appeared in some cases to be over 50 years old, the desirability of obtaining such admissions from the Crown's position is obvious.

**88**    In the next two sections of his judgment (paras. 56-63), the Master considered the nature of the responses given by the Defendants to the Crown's requests for undertakings. He noted that the Defendants general position was to refuse to obtain the information and that to the extent, the Defendants had volunteered information, it was not very helpful to the Crown. He noted that the Defendants had justified their refusals for a catalogue of reasons including the irrelevancy of the questions and the disproportionate and onerous efforts that would be required to obtain the information being sought.

**89**    In the following paragraphs from para. 63 to para. 79, the Master reviewed the case law about refusals motions to set out the relevant principles and to explain what would be his approach to the disputed questions that Investments, Industries, and Carreras had refused to answer. In this regard, he referred to: Master MacLeod's decision in *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Master); Justice Pierce's judgment in *Bot Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (S.C.J.), Justice Rosenberg's judgment in *Mutual Life Assurance Co. of Canada v. Buffer Investments Inc.* (1985), 52 O.R. (2d) 335 (H.C.J.); and Master Beaudoin's judgment in *BASF Canada Inc. v. Max Auto Supply (1986) Inc.*, [1998] O.J. No. 3676 (Master). (All of these judgments are mentioned below in my own analysis of the scope of cross-examinations on an affidavit for an application or motion.)

**90**    The Master's analysis of the case law led him to the following operative conclusions about the appropriate approach to the refusals motion, which are found in paragraphs 67, 69, 71, 76, and 78, which state, with my emphasis added:

67.    **It seems to me that the nature of the action and the statutory foundation for the causes of action asserted must be taken into account in determining what ought to be involved in establishing what are "reasonable inquiries" in order to answer "proper" questions.**

69.    I believe that my role in this case requires **a careful exercise of my discretion in the highly unusual environment of this litigation**, to determine whether further enquiry along the lines attempted by counsel for the Crown is necessary or reasonable.

71.    While it was not raised as a real issue before me, I think in cases such as this where the witnesses are outside the country and have specifically, not attorned, to the jurisdiction of Ontario courts, the issue of the power to bind the witnesses is

potentially of concern. I adopt, for the purposes of my directions, Master Mac-leod's approach:

> "In a note above, I observed that the witnesses are not themselves parties to the motion and in the case of the American experts they are not presently within the jurisdiction of the court. A ruling that the witness answer a question or carry out inquiries therefore should be taken to be an order to the defendants to use their best efforts to cause the witness to answer and to provide particulars of why that cannot be done if they are unable to do so. Naturally, if the defendants are unable to obtain the full co-operation of the witnesses, that may be a factor to be weighed by the judge in deciding whether or not to admit the evidence and what weight is to be given to it if it is admitted."

76. **I think the parallel to an affidavit of merits is of some assistance in this case**. Under the Specially Endorsed Writ regime, which was formerly part of the Rules in Ontario, a default judgment could be obtained against a defendant (for example, on a collection matter) unless a meaningful affidavit was filed setting out, with particularity the defences relied upon. Here the foreign defendants seek to bring the action [sic, the motion] to block, *ab initio* the plaintiff's potential recovery, filing affidavits which only tangentially speak to the merits. **I am not satisfied that it is fair or appropriate to the court charged with assessing whether there is a "real" and substantial connection to not have as much relevant information as possible**. I am guided by the judgment of Justice Rosenberg in recognizing **the court has inherent jurisdiction to see that all relevant evidence is before it on a motion such as this, and so long as it is not unduly oppressive to order that the information be obtained.**

78. My analysis of these cases leads me to a number of factors to be weighed with respect to each refusal: (1) Is it this issue raised in the affidavit of the deponent? (2) If not, is the question in a bona fide way being directed to an issue on the motion, or to the credibility of the witness?" (3) Is the question fair?

91    In paragraphs 80 -100 and in the accompanying refusals charts, the Master completed his judgment by providing his general rationale for his rulings and his specific rulings for the questions for which Investments, Industries, and Carreras had refused to provide answers.

92    By way of describing his general rationale, the Master indicated that he regarded questions about whether documents were sent to Imperial or Imasco as an essential area of inquiry in determining whether there is real and substantial connection with these Canadian companies at any point in time. He said questions about the Defendants company's policies and about their document retention systems were relevant to the issues on the jurisdiction motion.

93    He was not impressed with the Defendants' argument that millions of document pages would have to be searched. He said that it was likely that the Defendants had modern document management systems. However, since he did not have evidence one way or the other, he thought that the appropriate approach was to order the questions to be answered, but to permit the Defendants to return with evidence that finding the answers would indeed be unduly onerous. He said that since he was seized of the matter, he would be available to rule "on the fly" on whether the search was un-

duly onerous. (I foreshadow here to note that the parties disagree about the Master's approach to the use of document retrieval technology based on the presence or possible presence of this technology to the Defendants.)

**94**    The Master stated that he rejected the Defendants' argument that they should not be asked to make inquiries about documents that could more readily be made to another party. He said that given the nature of the motion, the Defendants should answer the questions.

**95**    By way of summary of the Master's Reason for Decision, the Master's approach was as follows. The nature of the action and the statutory foundation for the causes of action must be taken into account in determining what are proper questions and reasonable inquiries. This case required a careful exercise of discretion because it was highly unusual. A court charged with assessing whether there is a "real" and substantial connection should have as much relevant information as possible. The determination of whether a stay is justified requires as complete a record as is available, and in this case, a proportional approach involves considering all reasonably available relevant evidence. In order to establish equality of arms, this case required a somewhat different approach from normal. If a document was relevant and might exist, it ought to be looked for regardless of its age. The court has inherent jurisdiction to see that all relevant evidence is before it on a motion such as this jurisdiction motion, and so long as it is not unduly oppressive, the court should order that the information be obtained.

### E. *Standard of Appellate Review*

**96**    This being an appeal from a Master's order on a refusals motion, it is necessary to consider the standard of appellate review for such orders. This consideration is necessary because the standard of review will guide the approach to reviewing the Master's decision and to determining whether Investments, Industries, and Carreras have shown grounds for setting aside the Master's order.

**97**    A Master's decision will be interfered with on appeal if the Master made an error of law or exercised his or her discretion on the wrong principles or misapprehended the evidence such that there is a palpable and overriding error. Where the Master has erred in law, the proper standard of review is correctness. See *Zeitoun v. Economical Insurance Group, Group* (2008), 91 O.R. (3d) 131 (Div. Ct.) at paras. 40-41, aff'd, (2009), 96 O.R. (3d) 639 (C.A.).

**98**    When considering whether a refused question should be answered, the Master has to determine whether the question is relevant, which is a matter of law, and whether the question is proper, which is a matter of discretion: *Republic Bank of New York (Canada) v. Normart Management Ltd.*, (1996) 31 O.R. (3d) 14 (Ont. Gen. Div.).

**99**    In a few instances, Investments, Industries, and Carreras challenge the Master's assessment of relevancy, which is a legal question subject to the correctness standard. In the main, however, they challenge the Master's discretionary decisions about undertakings, which is a question about whether the Master made an error in principle in the exercise of his discretion.

**100**    Practically speaking, insofar as Investments, Industries, and Carreras challenge the Master's decision' about relevancy, I must determine *de novo* whether the Master was right or wrong.

**101**    Practically speaking, if the Appellants first demonstrate that the Master erred in principle in the exercise of his discretion, then I must determine *de novo* how the court should exercise its discretion.

**102**     In order for me to determine whether the Master did err in principle, it is necessary to examine the law about undertakings and about proper questions on a cross-examination of a deponent.

**103**     However, that law can only be understood by also discussing the law about examinations at trial and at examinations for discovery. That discussion follows in the next several sections of these Reasons for Decision.

### F. *The Law of Examinations*

#### 1. Introduction

**104**     As I noted at the outset of these Reasons, this appeal poses questions about the fundamental nature of a cross-examination for a motion. The argument on this appeal very much focused on the scope of a cross-examination on an affidavit delivered for use on a motion, and the Master examined this matter at some length in his judgment. I shall make my own analysis to explain why I agree with some but not of all of the Master's analysis and conclusions. It is my ultimate conclusion that the Master erred in principle.

**105**     As will appear below, in my opinion, the Master erred by treating the cross-examinations of Mr. Cordeschi and Ms. Snook for the pending jurisdiction motion as if they were being examined for discovery where a party is obliged to inform himself or herself about the matters in issue in the action. He further erred by misapplying the "equality of arms" principle, which led him to ordering that all relevant evidence be provided unless it was unduly onerous to do so. And he erred in his treatment of the proportionality principle which led him to the same conclusion that all relevant evidence be produced.

**106**     In this part of my Reasons for Decision, I will describe, compare, and contrast the *Rules of Civil Procedure,* the law of evidence, and the jurisprudence about: (a) examinations at trial; (b) examinations for discovery; and (c) examinations of a deponent swearing an affidavit for an application or motion. In the next section of these Reasons, I will consider the role of the proportionality principle.

**107**     The analysis of the law of examinations is necessary to explain my conclusions about the Master's errors in principle.

#### 2. Examination at Trial

**108**     At trial, oral evidence (evidence *viva voce*) is the general rule. Rule 53.01 (1) provides:

> *Oral Evidence as General Rule*
>
> 53.01 (1) Unless these rules provide otherwise, witnesses at the trial of an action shall be examined orally in court and the examination may consist of direct examination, cross-examination and re-examination.

**109**     At trial, jurisprudence about the law of evidence applies to a witness' examinations and determines the scope of the examination. In other words, the law of evidence determines what are proper questions and what testimony is admissible as evidence.

**110**     Relevance is the key determinate for the admissibility of evidence at trial. Evidence that is not logically probative of a fact requiring proof (a fact in issue) is inadmissible. To be probative, the

evidence must increase or decrease the probability of the truth of a fact. See: *R. v. Morris*, [1983] 2 S.C.R. 190; *R. v. Cloutier*, [1979] 2 S.C.R. 709.

**111**     At trial, subject to numerous exceptions, hearsay evidence is not admissible. In technical terms, evidence of an out of court statement repeated in court for the purposes of establishing the truth of the statement is inadmissible hearsay. Hearsay is not evidence of the witness' own experiences, observations, or perceptions and subject to the hearsay exceptions, the hearsay declarant is not a substitute for the genuine witness of the events. The essential defining feature of hearsay are: (1) the statement is adduced as proof of its contents; and (2) the opportunity for a contemporaneous cross-examination of the actual speaker is absent. See *R. v. Khelawon*, [2006] 2 S.C.R. 787.

**112**     At trial, privileged communications are inadmissible. The two major privileges, among many, are lawyer and client privilege and litigation privilege. See: *Solosky v. Canada*, [1980] 1 S.C.R. 821; *Descôteaux v. Mierzwinski*, [1982] 1 S.C.R. 860; *General Accident Assurance Co. v. Chrusz* (1999), 45 O.R. (3d) 321 (C.A.); *Blank v. Canada (Minister of Justice)*, [2006] 2 S.C.R. 319.

**113**     For present purposes, it is important to note that while cross-examination is regarded as a powerful tool of advocacy in the adversarial system of justice and a powerful tool in determining the truth, the cross-examining party at trial runs a risk by asking questions. The evidence elicited by cross-examination may be harmful to his or her case. This risk is also present for cross-examinations on affidavits for motions and applications. However, in contrast, as noted below, the examiner at an examination for discovery may question without risk because under rule 31.11, the examining party controls the use of the examination for discovery at trial.

**114**     For reasons that will also emerge below, it is also important to note that undertakings do not play a role at trial. If a witness does not know the answer to a question in cross-examination at trial, the witness will not be required to undertake to obtain the answer. As noted in several cases about the scope of examinations for discovery, a witness at an examination for discovery is obliged to inform himself or herself and to offer hearsay evidence but this is different from a witness at trial, who cannot "be ordered off the witness-stand to inform himself of the knowledge of his servants" or others. As Justice Middleton noted in *Van Horn v. Verrall* (1911), 20 O.W.R. 775 at p. 775 about discovery witnesses:

> As a witness [at trial] the party must confine himself to his knowledge. On examination [for discovery] he not only may but must give his information.

See the discussion of this point in W.B. Williston & R.J. Rolls, *The Law of Civil Procedure* (Toronto: Butterworths, 1970) at pp. 787-99.

**115**     That the evidence of a trial witness becomes a part of the trial record and that a witness at trial is not required to answer undertakings has tactical and substantive significance in the context of an adversarial system of adjudication, where the parties and not the court determine how to present the opposing cases.

**116**     For example, at trial, a party may decide to prove his or her case without calling a particular witness because that particular witness might disclose harmful evidence. The court may draw an adverse inference from the failure to call the witness, but it is ultimately for the party to assess the risks of calling a witness and of not calling a witness.

**117**     It is not for the court to take these decisions from the parties by compelling the witness to testify or by compelling another witness to undertake to inform himself or herself about what the absent witness would have said or what the absent witness knew or did not know.

**118**     I make these points because it helps me to explain why the application of the "equality of arms" principle as used by the Master was an error in principle. It was a departure from the adversarial system into an inquisitorial system of adjudication to demand that all relevant information be presented to the court. I agree with the Master that the court has an inherent jurisdiction to require the parties to disclose evidence, and while a case can be made for expanding the court's inquisitorial powers, particularly in areas of family law and child welfare law, it is an error in principle to take the case away from the parties in order to introduce equality of arms or to require as complete a record as possible.

### 3. Examination for Discovery

**119**     A party has a right to an examination for discovery of his or her opponent.

**120**     In J.W. Morden and P.M. Perell, *The Law of Civil Procedure in Ontario* (1st ed.) (Toronto: LexisNexis, 2010), at p. 487 I describe the purposes of an examination for discovery as follows:

> The examinations for discovery provide an opportunity to define the issues that are contested and uncontested and to move forward in the proof or disproof of contested facts. In *Modriski v. Arnold*, [1947] O.J. No. 132 (C.A.), the Court of Appeal stated that the purposes of production and discovery are: (1) to enable the examining party to know the case he or she has to meet; (2) to enable the examining party to obtain admissions that will dispense with formal proof of his or her case; and (3) to obtain admissions that will undermine the opponent's case.

> In *Ontario Bean Producers Marketing Bd. v. W.G. Thompson & Sons* (1982), 35 O.R. (2d) 711 (Div. Ct.), the Divisional Court elaborated and extended the various aims of discovery. The Court noted the following purposes for examinations for discovery: (1) to enable the examining party to know the case he or she has to meet; (2) to procure admissions to enable a party to dispense with formal proof; (3) to procure admissions which may destroy an opponent's case; (4) to facilitate settlement, pre-trial procedure, and trials; (5) to eliminate or narrow issues; and (6) to avoid surprise at trial.

**121**     An examination for discovery is similar to a cross-examination in the sense that it is an examination by one opponent of another. It is not an examination-in-chief, and the scope of the examination of the person being examined is determined by the *Rules of Civil Procedure*.

**122**     As already noted above, the use of the evidence from an examination for discovery does not become evidence at trial, unless the examining party decides to use the evidence against the adverse party by reading in portions of the transcript of the examination. Rule 31.11 states:

> USE OF EXAMINATION FOR DISCOVERY AT TRIAL *Reading in Examination of Party*

31.11 (1) At the trial of an action, a party may read into evidence as part of the party's own case against an adverse party any part of the evidence given on the examination for discovery of,

(a)     the adverse party; or

(b)     a person examined for discovery on behalf or in place of, or in addition to the adverse party, unless the trial judge orders otherwise,

if the evidence is otherwise admissible, whether the party or other person has already given evidence or not.

*Impeachment*

(2)     The evidence given on an examination for discovery may be used for the purpose of impeaching the testimony of the deponent as a witness in the same manner as any previous inconsistent statement by that witness.

*Qualifying Answers*

(3)     Where only part of the evidence given on an examination for discovery is read into or used in evidence, at the request of an adverse party the trial judge may direct the introduction of any other part of the evidence that qualifies or explains the part first introduced.

*Rebuttal*

(4)     A party who reads into evidence as part of the party's own case evidence given on an examination for discovery of an adverse party, or a person examined for discovery on behalf or in place of or in addition to an adverse party, may rebut that evidence by introducing any other admissible evidence. ....

123     As befits the purposes of examination for discovery, the rules for examinations for discovery are different from the rules for examinations at trial. The scope of an examination for discovery is prescribed by rule 31.06, which states:

SCOPE OF EXAMINATION

*General*

31.06 (1) A person examined for discovery shall answer, to the best of his or her knowledge, information and belief, any proper question relevant to any matter in issue in the action or to any matter made discoverable by subrules (2) to (4) and no question may be objected to on the ground that,

(a)     the information sought is evidence;

(b)     the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness; or

(c)    the question constitutes cross-examination on the affidavit of documents of the party being examined.

*Identity of Persons Having Knowledge*

(2)    A party may on an examination for discovery obtain disclosure of the names and addresses of persons who might reasonably be expected to have knowledge of transactions or occurrences in issue in the action, unless the court orders otherwise.

*Expert Opinions*

(3)    A party may on an examination for discovery obtain disclosure of the findings, opinions and conclusions of an expert engaged by or on behalf of the party being examined that are relevant to a matter in issue in the action and of the expert's name and address, but the party being examined need not disclose the information or the name and address of the expert where,

(a)    the findings, opinions and conclusions of the expert relevant to any matter in issue in the action were made or formed in preparation for contemplated or pending litigation and for no other purpose; and

(b)    the party being examined undertakes not to call the expert as a witness at the trial.

*Insurance Policies*

(4)    A party may on an examination for discovery obtain disclosure of,

(a)    the existence and contents of any insurance policy under which an insurer may be liable to satisfy all or part of a judgment in the action or to indemnify or reimburse a party for money paid in satisfaction of all or part of the judgment; and

(b)    the amount of money available under the policy, and any conditions affecting its availability.

(5)    No information concerning the insurance policy is admissible in evidence unless it is relevant to an issue in the action.

*Divided Discovery*

(6)    Where information may become relevant only after the determination of an issue in the action and the disclosure of the information before the issue is determined would seriously prejudice a party, the court on the party's motion may grant leave to withhold the information until after the issue has been determined.

**124**    The basic scope of an examination for discovery is set out in rule 31.06 (1) with rules 31.06 (2), 31.06 (3), and 31.06 (4) extending the scope of the examination. These rules overcome

restrictions that had developed in the case law under the former *Rules of Practice*. Particularly important changes are found in paragraphs (a) and (b) of rule 31.06 (1), which stipulate that no question may be objected to on the grounds that the information sought is evidence or that the question constitutes cross-examination, unless the question is directed solely to the credibility of the witness.

**125** The notion of proportionality is a factor in determining the scope of an examination for discovery. I discuss this factor later in these Reasons for Decision.

**126** For the context of examinations for discovery, the *Rules of Civil Procedure* recognizes questions, questions taken under advisement, and undertakings.

**127** Rule 31.07 provides sanctions for the failure to answer questions, questions taken under advisement, which are treated as refusals, and undertakings. Rule 31.07 states:

FAILURE TO ANSWER ON DISCOVERY *Failure to Answer Questions*

31.07 (1) A party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question if,

(a)  the party or other person refuses to answer the question, whether on the grounds of privilege or otherwise;

(b)  the party or other person indicates that the question will be considered or taken under advisement, but no answer is provided within 60 days after the response; or

(c)  the party or other person undertakes to answer the question, but no answer is provided within 60 days after the response.

*Effect of Failure to Answer*

(2)  If a party, or a person examined for discovery on behalf of or in place of a party, fails to answer a question as described in subrule (1), the party may not introduce at the trial the information that was not provided, except with leave of the trial judge.

*Additional Sanction*

(3)  The sanction provided by subrule (2) is in addition to the sanctions provided by rule 34.15 (sanctions for default in examination).

*Obligatory Status of Undertakings*

(4)  For greater certainty, nothing in these rules relieves a party or other person who undertakes to answer a question from the obligation to honour the undertaking.

**128** The *Rules of Civil Procedure* recognize that undertakings may be given on examinations for discovery and also on cross-examinations on affidavits. This recognition is found in the procedure for a refusals motion, where under rule 37.10 (10), the parties are obliged to deliver a refusals

and undertakings chart for "undertakings given on an examination or cross-examination." Rule 37.10 (10) states:

*Refusals and Undertakings Chart*

37.10 (10) On a motion to compel answers or to have undertakings given on an examination or cross-examination satisfied,

(a)   the moving party shall serve on every other party to the motion and file with proof of service, in the court office where the motion is to be heard, at least seven days before the hearing, a refusals and undertakings chart (Form 37C) that sets out,

    (i)   the issue that is the subject of the refusal or undertaking and its connection to the pleadings or affidavit,

    (ii)   the question number and a reference to the page of the transcript where the question appears, and

    (iii)   the exact words of the question; and

(b)   the responding party shall serve on the moving party and every other party to the motion and file with proof of service, in the court office where the motion is to be heard, at least four days before the hearing, a copy of the undertakings and refusals chart that was served by the moving party completed so as to show,

    (i)   the answer provided, or

    (ii)   the basis for the refusal to answer the question or satisfy the undertaking.

**129**     The case law has developed the following principles about the scope of the questioning on an examination for discovery:

    *   The scope of the discovery is defined by the pleadings; discovery questions must be relevant to the issues as defined by the pleadings: *Playfair v. Cormack* (1913), 4 O.W.N. 817 (H.C.J.).

    *   The examining party may not go beyond the pleadings in an effort to find a claim or defence that has not been pleaded. Overbroad or speculative discovery is known colloquially as a "fishing expedition" and it is not permitted. See *Cominco Ltd. v. Westinghouse Can. Ltd.* (1979), 11 B.C.L.R. 142 (C.A.); *Allarco Broadcasting Ltd. v. Duke* (1981), 26 C.P.C. 13 (B.C.S.C.).

    *   Under the former case law, where the rules provided for questions "relating to any matter in issue," the scope of discovery was defined with wide latitude and a question would be proper if there is a semblance of relevancy: *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (H.C.J.); *Air Canada v. McConnell Douglas Corp.* (1995), 22 O.R. (3d) 140 (Master), aff'd (1995), 23 O.R. (3d) 156 (Gen. Div.). The recently amended rule changes "relating

> to any matter in issue" to "relevant to any matter in issue," which suggests a modest narrowing of the scope of examinations for discovery.
>
> \* The extent of discovery is not unlimited, and in controlling its process and to avoid discovery from being oppressive and uncontrollable, the court may keep discovery within reasonable and efficient bounds: *Graydon v. Graydon* (1921), 67 D.L.R. 116 (Ont. S.C.) at pp. 118 and 119 *per* Justice Middleton ("Discovery is intended to be an engine to be prudently used for the extraction of truth, but it must not be made an instrument of torture ..."); *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (H.C.J.) at p. 246; *Ontario (Attorney General) v. Ballard Estate* (1995), 26 O.R. (3d) 39 (C.A.) at p. 48 ("The discovery process must also be kept within reasonable bounds."); *671122 Ontario Ltd. v. Canadian Tire Corp.*, [1996] O.J. No. 2539 (Gen. Div.) at paras. 8-9; *Caputo v. Imperial Tobacco Ltd.*, [2003] O.J. No. 2269 (S.C.J.). The court has the power to restrict an examination for discovery that is onerous or abusive: *Andersen v. St. Jude Medical Inc.*, [2007] O.J. No. 5383 (Master).
>
> \* The witness on an examination for discovery may be questioned for hearsay evidence because an examination for discovery requires the witness to give not only his or her knowledge but his or her information and belief about the matters in issue: *Van Horn v. Verrall* (1911), 3 O.W.N. 439 (H.C.J.); *Rubinoff v. Newton*, [1967] 1 O.R. 402 (H.C.J.); *Kay v. Posluns* (1989), 71 O.R. (2d) 238 (H.C.J.).
>
> \* The witness on an examination for discovery may be questioned about the party's position on questions of law: *Six Nations of the Grand River Indian Band v. Canada (Attorney General)* (2000), 48 O.R. (3d) 377 (S.C.J.).

**130**    The Defendants' refusals in the case at bar to give undertakings did not occur during an examination for discovery, and it is necessary to explain why I have considered the law in this area. I have done so because it allows me to make the following seven points that are pertinent to resolving the parties' arguments about whether in the context of a cross-examination for a motion, the Master erred in ordering the refused undertakings to be answered.

**131**    First, while the undertakings were requested on a cross-examination for a motion, the *Rules of Civil Procedure* recognize that undertakings may be given during a cross-examination of a deponent for an application or motion. Thus, to answer a question posed at the outset of these Reasons for Decision, an undertaking may be requested during cross-examinations on affidavits and during examinations for discovery. However, requests for undertakings are not available at trial.

**132**    Second, the court can compel undertakings to be given on examinations for discovery because the person examined is required under the *Rules of Civil Procedure* to inform himself or herself about the matters in issue.

**133**    Third, the extent to which the court can compel undertakings to be given on a cross-examination is less clear. If the deponent confines his or her evidence to personal knowledge, there is no apparent basis to compel him or her to obtain information about what others know about the case. For an application, the information would be hearsay and not admissible for contentious matters. Moreover, compelling the evidence raises concerns that the adversarial system has been replaced by an inquisitorial system.

**134**    Fourth, if a deponent does provide information based on information and belief, there would appear to be a basis to compel him or her to give undertakings, at least with respect to that information.

**135**    Fifth, the Master's rulings in the case at bar about the undertakings might have been correct had the refusals been made in the context of an examination for discovery where the party being examined is obliged to inform himself or herself about the matters in issue. It is, however, my conclusion in the case at bar that the refusals were appropriate in the context of a cross-examination and that it was wrong to compel answers to the refused undertakings. (I wish to make it clear that nothing in these Reasons should be taken as a ruling one way or another about the propriety of the same questions should this action reach examinations for discovery.)

**136**    Sixth, in the case at bar, it appears that the in furtherance of achieving an "equality of arms" the Master treated the matter of undertakings as if they were requested on an examination for discovery, which I regard as an error in principle.

**137**    Seventh, in a submission, with which I agree, Investments, Industries, and Carreras argue that the problem in the case at bar is not just about answering the particular undertaking but rather the problem is the burden of responding to the inevitable follow-up questions. Imposing this burden may be appropriate in the context of examinations for discovery, but they submit it is not appropriate in the context of their jurisdictional motion.

### 4. <u>Examination of Deponent for Motions and Applications</u>

**138**    I turn now to the law directly applicable to the case at bar, the law about the scope of cross-examinations of deponents for applications and motions.

**139**    On motions and applications, evidence usually is not presented to the court orally (*viva voce*). Rather, the evidence is presented by an affidavit and by reference to the transcript of the cross-examination of the deponent of the affidavit. Rule 39.01 (1) states:

EVIDENCE BY AFFIDAVIT

*Generally*

> 39.01 (1) Evidence on a motion or application may be given by affidavit unless a statute or these rules provide otherwise.

**140**    Unlike the situation at trials, where, generally speaking, hearsay evidence is not admissible, the Rules of Civil Procedure permit some hearsay evidence in the deponent's affidavit. The Rules permit a deponent to testify on information and belief. Thus, hearsay is permitted on motions, and a very limited use of hearsay is permitted on applications. For motions, rule 39.01 (4) provides:

> *Contents -- Motions*

> 39.01 (4) An affidavit for use on a motion may contain statements of the deponent's information and belief, if the source of the information and the fact of the belief are specified in the affidavit.

For applications, hearsay evidence is permitted only for non-contentious facts. Rule 39.01 (5) provides:

*Contents -- Applications*

39.01 (5) An affidavit for use on an application may contain statements of the deponent's information and belief with respect to facts that are not contentious, if the source of the information and the fact of the belief are specified in the affidavit."

**141**     Under rule 39.02, an adverse party may cross-examine a deponent who has sworn an affidavit for a motion or application. Rule 39.02 (1) provides:

EVIDENCE BY CROSS-EXAMINATION ON AFFIDAVIT *On a Motion or Application*

39.02 (1) A party to a motion or application who has served every affidavit on which the party intends to rely and has completed all examinations under rule 39.03 may cross-examine the deponent of any affidavit served by a party who is adverse in interest on the motion or application.

**142**     Case law has determined what are proper questions for a cross-examination on an affidavit. Once again, relevancy is a key determinant of a proper question, and relevancy is determined by reference to the matters in issue in the motion in respect of which the affidavit has been filed and by the matters put in issue by the deponent's statements in the affidavit. The scope of the cross-examination for an application or motion only coincidentally will be commensurate with the scope of an examination for discovery.

**143**     The case law has developed the following principles about the scope of the cross-examination of a deponent for an application or motion:

* The scope of a cross-examination of a deponent for an application or motion is narrower than an examination for discovery: *BOT Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (S.C.J.) at para. 6.
* A cross-examination is not a substitute for examinations for discovery or for the production of documents available under the *Rules of Civil Procedure: BOT Construction (Ontario) Ltd. v. Dumoulin, supra* at para. 7; *Westminer Canada Holdings Ltd. v. Coughlan*, [1989] O.J. No. 252 (Master), aff'd [1989] O.J. No. 3038 (H.C.J.).
* The examining party may not ask questions on issues that go beyond the scope of the cross-examination for the application or motion: *Thomson v. Thomson*, [1948] O.W.N. 137 (H.C.J.); *Toronto Board of Education Staff Credit Union Ltd. v. Skinner*, [1984] O.J. No. 478 (H.C.J.) at para. 12; *Westminer Canada Holdings Ltd. v. Coughlan*, [1989] O.J. No. 3038 (H.C.J.).
* The questions must be relevant to: (a) the issues on the particular application or motion; (b) the matters raised in the affidavit by the deponent, even if those issues are irrelevant to the application or motion; or (c) the credibility and reliability of the deponent's evidence: *Superior Discount Limited v. N. Perlmutter & Company; Superior Finance Company v. N. Perlmutter*

& *Company*, [1951] O.W.N. 897 (Master) at p. 898; *Re Lubotta and Lubotta* [1959] 0.W.N. 322 (Master); *Wojick v. Wojick*, [1971] 2 O.R. 687 (H.C.J.); *Toronto Board of Education Staff Credit Union Ltd. v. Skinner*, [1984] O.J. No. 478 (H.C.J.) at para. 11; *BASF Canada Inc. v. Max Auto Supply (1986) Inc.*, [1998] O.J. No. 3676 (Master) at paras. 6, 10-11; *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Master) at paras. 14-15; *BOT Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (S.C.J.) at para. 4; *Shannon v. BGC Partners LP*, 2011 ONSC 1415 (Master) at para. 8.

* If a matter is raised in, or put in issue by the deponent in his or her affidavit, the opposite party is entitled to cross-examine on the matter even if it is irrelevant and immaterial to the motion before the court: *Wojick v. Wojick and Donger*, [1971] 2 O.R. 687 (H.C.J.), at p. 688; *Ferring Inc. v. Richmond Pharmaceuticals Inc.* [1996] O.J. No. 621 (Div. Ct.) at paras. 14 and 15; *Logan v. Canada (Minister of Health)*, [2001] O.J. No. 6289 (Master); *Guestlogix Inc. v. Hayter*, 2010 ONSC 5570 at para. 16.

* The proper scope of the cross-examination of a deponent for an application or motion will vary depending upon the nature of the application or motion: *Blum v. Sweet Ripe Drink Inc.* (1991), 47 C.P.C. (2d) 263 (Ont. Master); *Moyle v. Palmerston Police Services Board* (1995), 25 O.R. (3d) 127 (Div. Ct.).

* A question asked on a cross-examination for an application or motion must be a fair question: *Superior Discount Ltd. v. N. Perlmutter & Co.*, [1951] O.W.N. 897 (Master) at p. 898; *Canadian Bank of Commerce (CIBC) v. Molony*, [1983] O.J. No. 221 (H.C.J.) at para. 3; *Seaway Trust Co. v. Markle*, [1988] O.J. No. 164 (Master); *BASF Canada Inc. v. Max Auto Supply (1986) Inc.*, [1998] O.J. No. 3676 (Master) at para. 6. (See discussion below.)

* The test for relevancy is whether the question has a semblance of relevancy: *Re Lubotta and Lubotta* [1959] O.W.N. 322 (Master); *Rodriques v. Madill*, [1985] O.J. No. 1666 (Master).

* The scope of cross-examination in respect to credibility does not extend to a cross-examination to impeach the character of the deponent: *Moyle v. Palmerston Police Services Board* (1995), 25 O.R. (3d) 127 (Div. Ct.).

* The deponent for an application or motion may be asked relevant questions that involve an undertaking to obtain information, and the court will compel the question to be answered if the information is readily available or it is not unduly onerous to obtain the information: *Bank of Montreal v. Carrick* (1974), 1 O.R. (2d) 574 (Master), aff'd *ibid* p. 574n (H.C.J.); *Mutual Life Assurance Co. of Canada v. Buffer Investments Inc.* (1985), 52 O.R. (2d) 335 (H.C.J.) at paras. 9-13; *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Master) at paras. 42, 56; *BOT Construction (Ontario) Ltd. v. Dumoulin*, [2007] O.J. No. 4435 (S.C.J.) at para. 8; *Hinke v. Thermal Energy International Inc.*, 2011 ONSC 1018 (Master) at paras. 36-37.

* The deponent for a motion or application who deposes on information and belief may be compelled to inform himself or herself about the matters

deposed: *Rabbiah v. Deak*, [1961] O.W.N. 280 (Master); *Caputo v. Imperial Tobacco Ltd.*, [2002] O.J. No. 3767 (Master) at paras. 42, 46.

**144**     There are some subtle points about these principles that are worth noting. First, although the case law establishes that a cross-examination question must be "fair," the nature of fairness is not explained in the case law. This principle would appear to be the source of the court's jurisdiction to stop abusive questioning and questioning designed to discomfort a witness but having little probative value. In my opinion, the fairness principle would also provide the court with the jurisdiction to stop a party from using a cross-examination in a way that disturbed the fairness of the procedure or the fairness of the adversary system under which justice is administered in Ontario.

**145**     In what is perhaps a related point, relying on Justice Lax's decision in *Schreiber v. Mulroney* (2007), 87 O.R. (3d) 643 (S.C.J.), the Defendants argued that it would be unfair to compel answers to undertakings of a deponent on a jurisdictional motion precisely because the court's jurisdiction over the Defendants had not been established. I did not find this argument helpful for the circumstances of the case at bar, and I disregarded it in coming to my decision on this appeal. The *Schreiber* case concerned a situation where the plaintiff Schreiber served a summons to examine the defendant Mulroney to gather evidence to refute Mr. Mulroney's motion challenging the jurisdiction of the Ontario court. In the case at bar, the circumstances are different. Ms. Snook and Mr. Cordeschi voluntarily provided evidence, and exposed themselves to cross-examination. I do not think it unfair that they be examined having regard to the broad ambit of issues that arise for a jurisdictional motion. The question remains, however, whether the Master made an error in principle about the refused undertakings in the circumstances of this case which are different than in the *Schreiber* case.

**146**     Another subtle point is associated with undertakings. The problem about undertakings concerns when they can be compelled. If an undertaking is voluntarily given, then it simply must be honoured. As already noted earlier, that there is no prohibition against an examining party asking for an undertaking, and there is no preventing a deponent from volunteering an undertaking as a way to answer a proper question, and, as noted above, the rules recognize that undertakings may be given on both examinations for discovery and on cross-examinations of deponents.

**147**     Indeed, a deponent might be quite happy to give an undertaking to provide evidence that he or she omitted to provide in the affidavit. In asking for an undertaking, the examining party runs the risk associated with cross-examinations that the answer to a question may not help his or her case, and unlike evidence from an examination for discovery, the examining party does not control what use can be made of the transcript from a cross-examination of a deponent for an application or motion.

**148**     It is also worth emphasizing that one of the more important principles to be applied for a refusals motion is the principle that the scope of the cross-examination will vary depending upon the nature of the motion or application. Thus, questions about the merits of the action or application may not be within the scope of a particular motion. For example, in *Seaway Trust Co. v. Markle*, [1988] O.J. No. 164 (Master), on a refusals motion, Master Sandler held that questions about the merits were not proper for a motion to amend the statement of claim to add new parties.

**149**     The above being the main principles applicable to determining the scope of questioning on a cross-examination for an application or motion, what conclusions can be drawn for the Master's decision in the case at bar?

**150** With a few exceptions, which I note in the undertakings charts below, I discern no errors about the relevancy of the requested undertakings. In my opinion, the questions were relevant to a jurisdictional motion where the fundamental issue is whether there is a real and substantial connection with Ontario and the defendants and the subject matter of the action.

**151** In my opinion, the Master, however, did err in determining the scope of proper questions. As the authorities above reveal, the scope of a cross-examination of a deponent is not the same as the scope of an examination for discovery. In the case at bar, the Master made the scope of the cross-examination co-extensive with an examination for discovery. Indeed, it is arguable that based on his approach to proportionality, discussed below, and in pursuit of the "equality of arms" principle, he enlarged the scope beyond what even might be available on an examination for discovery.

**152** It is also my opinion that the Master erred by failing to apply the principle that a deponent may be asked questions that involve an undertaking to obtain information if the information is readily available or it is not unduly onerous to obtain the information. In the case at bar, the Master essentially ignored this principle. Even assuming that sophisticated state of the art search engines were available to the Defendants, answering questions and follow-up questions about events that covered a 60-year period are inherently difficult and finding answers would be difficult even if the person being examined had actually been a participant or witness to the events those many years ago, which was not the case for Mr. Cordeschi or Ms. Snook. The Master, however, expressly paid no heed to the difficulties inherent with the passage of time.

**153** The Master also essentially ignored the distinction between examinations for discovery, where the rule is that the witness inform himself or herself, and cross-examinations on affidavits where the obligation to be informed about the evidence of others is the exception rather than the rule

## G. *The Role of Proportionality*

**154** The recent amendments to the *Rules* added new Rule 29.2 (Proportionality in Discovery).

**155** Rule 29.2.03 requires the court to consider a variety of factors associated with the idea of proportionality when making a determination of whether a party or other person must answer or produce a document in an affidavit of documents, for an examination for discovery, for an inspection of property, for a medical examination or for an examination for discovery by written questions. The rule states:

> CONSIDERATIONS *General*
>
> 29.2.03 (1) In making a determination as to whether a party or other person must answer a question or produce a document, the court shall consider whether,
>
> (a) the time required for the party or other person to answer the question or produce the document would be unreasonable;
>
> (b) the expense associated with answering the question or producing the document would be unjustified;
>
> (c) requiring the party or other person to answer the question or produce the document would cause him or her undue prejudice;

(d)   requiring the party or other person to answer the question or produce the document would unduly interfere with the orderly progress of the action; and

(e)   the information or the document is readily available to the party requesting it from another source.

*Overall Volume of Documents*

(2)   In addition to the considerations listed in subrule (1), in determining whether to order a party or other person to produce one or more documents, the court shall consider whether such an order would result in an excessive volume of documents required to be produced by the party or other person.

**156**    It is notable that the proportionality principle for discovery is not made to apply to cross-examinations, which suggests that the rule makers appreciated that cross-examinations were not meant to be a substitute for the discovery process, where the proportionality principle definitely has an important role to play.

**157**    In the case at bar because the Master essentially treated the cross-examination as if it were an examination for discovery or because he regarded proportionality as relevant to his determination of the scope of proper questions and undertakings for a cross-examination on an affidavit filed for a very important motion, he considered the proportionality principle to be applicable. As noted above, he quoted rule 1.04 (1) and new subrule 1.04 (1.1.), which state:

*General Principle*

1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

(1.1)  In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

**158**    In my opinion, the Master erred in principle in his approach to the proportionality principle.

**159**    The proportionality principle is a manifestation of the policy of frugality that led to the introduction of the simplified procedure to the *Rules of Civil Procedure*. To use a metaphor, the normal *Rules of Civil Procedure* are the Cadillac of procedure, an expensive vehicle with all the accessories. However, not all actions or applications require such an expensive vehicle, and a Chevrolet, a serviceable, no frills vehicle, will do just fine for many cases, and it will provide access to justice and judicial economy.

**160**    Proportionality is a parsimonious principle. In *Javitz v. BMO Nesbityt Burns Inc.*, 2011 ONSC 1332 at para. 28, Justice Pepall noted that the proportionality principle was introduced because the system of justice was under severe strain because cases were taking too long and costing too much for litigants. In the passage quoted by the Master from Chapter 5 of Lord Woolf's report, Lord Woolf said that his overall aim was to "improve access to justice by **reducing** the inequities, cost, delay, and complexity of civil litigation." In *Abrams v. Abrams*, 2010 ONSC 2703 at para. 70,

Justice D.M. Brown, stated: "Proportionality signals that the old ways of litigating must give way to new ways which better achieve the general principle of securing the "just, most expeditious and least expensive determination of every proceeding on its merits."

**161**    In the case at bar, however, because of his concern about Lord Woolf's ideal of an "equality of arms," and because of the strategic importance he gave to the jurisdictional motion, the Master concluded that proportionality could have an expansive influence and thus the jurisdictional motion in an action with an enormous claim called for a Rolls-Royce of procedure, where the court should have as much relevant information as possible, as complete a record as is available, and all reasonably available relevant evidence regardless of its age or the difficulties associated with finding it.

**162**    In adopting this approach, the Master departed from his own views, with which I agree and would endorse, expressed in *Warman v. National Post Co.* 2010 ONSC 3670 (Master), where he stated at paras. 84-86:

> [84] The time has come to recognize that the "broad and liberal" default rule of discovery has outlived its useful life. It has increasingly led to unacceptable delay and abuse. Proportionality by virtue of the recent revisions has become the governing rule. 84. To the extent that there remains any doubt of the intention of the present rules I see no alternative but to be explicit.

> 85.    Proportionality must be seen to be the norm, not the exception -- the starting point, rather than an afterthought. Proportionality guidelines are not simply "available". The "broad and liberal" standard should be abandoned in place of proportionality rules that make "relevancy" part of the test for permissible discovery, but not the starting point.

> 86.    If embraced by the courts, parties and their counsel, such proportionality guidelines offer hope that the system can actually live up to the goal of securing for the average citizen "a just, speedy and inexpensive determination" of his or her case

**163**    In my opinion, an expansionary approach to proportionality is wrong. A parsimonious proportionality principle provides a useful tool for cases large and small. The base line is that the *Rules of Civil Procedure* are designed for cases of all sizes, but the proportionality principle allows the court to downsize the procedure and still do justice for the parties. If downsizing is not procedurally fair then the normal rules should apply to the proceedings without augmentation.

**164**    If adopted as a precedent, the Master's approach of treating proportionality as having an expansionary influence destroys the parsimony of the proportionality principle and allows the argument that because a case is important or the claim large, there should be more procedure not less procedure. The proportionality principle would lose its utility for large cases, such as class proceedings and other public interest litigation, where justice can be done by reducing not expanding the procedure. The proportionality principles yields an "equality of arms" by arms reduction and is not meant to prompt an arms race. In my opinion, in this particular case, the Master erred in principle in his treatment of the proportionality principle.

### H. *"Onerous Searches" and the Availability of Search Engines*

**165**    The factums and quite a bit of time during the argument of the appeal was dedicated to the issue of whether the Master erred in his approach to the issue of whether an undertaking would be

unduly onerous having regard to the availability or possible availability of search engines or document retrieval technology.

**166**　　That this became a hotly contested issue arose, in part, because neither party foresaw the need of providing any evidentiary basis for making or refuting a submission that an undertaking demanded during a cross-examination of a deponent would or would not be unduly onerous.

**167**　　In the case at bar, I do not think that the Master's approach to this issue was wrong. As I understand what he did, he presumed that the technology was available to the Defendants, and he ordered the refused undertakings to be answered but without prejudice to the Defendants returning to substantiate that their answering the undertakings would indeed be unduly onerous. This approach appears to have been used in other cases, and it seems a reasonable exercise of the court's discretion.

**168**　　That said, for future cases, it is my opinion that a party who objects to giving an undertaking during a cross-examination for an application or motion because it would be unduly onerous to answer it should not be required to provide evidence of his or her search capabilities (or absence of them) on any subsequent refusals motion.

**169**　　It would be counterproductive to the due process of a proceeding to make an issue to be adjudicated whether a party had the capability to answer undertakings demanded during a cross-examination with the attendant issues of whether the party has document management and retrieval technology and also the human resources to intelligently and responsible operate the technology.

**170**　　The issue of a party's litigation management resources could easily become an expensive, time consuming, and unproductive distraction, particularly because the needs of every case would be different. Moreover, making an issue of a party's capability would mean that a refusal's motion would entail cross-examinations of deponents for the refusals motion and further delay in the proceedings. As it is, a refusals motion is a meta-motion about obtaining information for an application or motion. Requiring an evidentiary basis for adjudicating a party's capability to answer undertakings would introduce a meta-meta motion.

**171**　　Rather than making assumptions or requiring after-the-fact evidence of whether a party has information management technology, the better approach is prospective. This approach is already envisioned by the *Rules of Civil Procedure,* where the availability of information technology can be addressed prospectively as part of the preparation for the examinations for discovery. In other words, the availability of search engines and other information retrieval technology should inform the party's discovery plans that are required by the *Rules of Civil Procedure*. It is as an aspect of the discovery plans that the parties can address the technology that is available or that might become available to facilitate documentary discovery and the examinations for discovery.

**172**　　Where a party to an action intends to obtain evidence by the discovery of documents (Rule 30), by examinations for discovery (Rule 31), by inspection of property (Rule 32), by a medical examination (Rule 33) or by examination for discovery by written questions, the parties must agree to a discovery plan in accordance with rule 29.1. Under rule 29.1.03(2), "[t]he discovery plan shall be agreed to before the earlier of, (a) 60 days after the close of pleadings or such longer period as the parties may agree to; and (b) attempting to obtain the evidence." If the parties fail to agree, the court has the jurisdiction to impose a discovery plan: *Telus Communications Co. v. Sharp*, 2010 ONSC 2878 (Master).

**173**     The time spent on this issue during the argument of the appeal demonstrates how counter-productive it would be to make the outcome of a refusals motion depend on whether a party had offered evidence for the refusals motion and proven his or her search incapabilities as a justification for not giving an undertaking.

**174**     The examination of the issue also demonstrated the problems of treating a cross-examination as if it were an examination for discovery.

## I. *The Master's Use of Internet Searches*

**175**     In their factums mainly, but also during the argument of the appeals, Investments, Industries, and Carreras made much of the Master's reference to Internet materials and information from television and the media about the history of tobacco litigation in the United States.

**176**     With respect, the Defendants' efforts here to establish grounds of appeal are to make a mountain out of a mole hill.

**177**     The Master's comments, which comprise three paragraphs of his lengthy judgment, only modestly augmented what Mr. Esprit had disclosed in his affidavit and what the Crown had disclosed in its correspondence about where the Crown had uncovered the documents to be presented to Mr. Cordeschi and Ms. Snook for authentication.

**178**     I see no need to explore the law about judicial notice or about a reasonable apprehension of bias based on the Master's use of this material from popular culture. The Master's rulings were not based on any reliance on this material, and his comments play no role in my own rulings.

## J. *The Determination of Investments' Appeal*

**179**     For the above Reasons, it is my opinion that the Master made several errors in principle and his decision should be set aside in its entirety.

**180**     I have completed my own analysis of the undertakings requested from Mr. Cordeschi as Investments' deponent for the jurisdictional motion. In my opinion, the refusals were proper. My discrete rulings are set out in the following chart:

| Reference | Questions | Investments' Response | Master's Disposition | Ruling |
|---|---|---|---|---|
| Cordeschi (Investments)<br><br>p.30-1 Q63 | Produce a copy of BAT Investments' records management policy whereby all business records are retained | The question regarding the "BAT Investments' records management policy" is irrelevant to the motion and is tantamount to discovery. | Answer | **Premature discovery request - Refusal upheld** |
| Cordeschi (Investments)<br><br>p.33 Q71 | Produce any document retention policies that predate BAT Investments' existing policy | The question is irrelevant to the motion and is tantamount to discovery in the action generally. | For Past 40 Years | **Premature discovery request - Refusal upheld** |
| Cordeschi (Investments)<br><br>pp.42-3 Q101 | To advise to whom shares of Imasco referred to at paragraph 12 of his affidavit were transferred in 1981 | This question is irrelevant to the issues on the motion, as the entity to which the shares were transferred is not a party. | Answer | **Withdrawn by Crown** |
| Cordeschi (Investments)<br><br>p.68 Q172<br><br>Vol. 6A-61 | Enquire whether there are any records that indicate whether Imperial Tobacco Canada was one of the operating companies of the BAT group as described in the document | This question is unduly onerous and disproportionate in that the document is over 40 years old and it is not clear who the author is. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.77 Q193<br><br>Vol.6A-64 | Advise whether the reference to sending the reports to research centres in the group included sending the report to Imperial Tobacco Canada | This question is unduly onerous and disproportionate. The report is over 30 years old and the purported author, Dr. Felton, is no longer employed by Investments. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | **Premature discovery request - Refusal upheld** |
| Cordeschi (Investments) | Confirm from BATCo/Investments' records that RM Gibb was an employee of Imperial | This question is unduly onerous and disproportionate in that Mr. Cordeschi should | Answer | **Premature discovery request –** |

| | | | | |
|---|---|---|---|---|
| p.79 Q196<br><br>Vol. 6A-13 | Tobacco Canada | not be required to confirm employment of someone who purportedly worked at a company other than Investments. The question would more properly be directed to Imperial. | | **Refusal upheld** |
| Cordeschi (Investments)<br><br>p.86 Q210<br><br>Vol.6A-56 | Confirm that Mr. Wade and Mr. Dunn were with Imperial Tobacco in Canada | The question is unduly onerous and disproportionate in that Mr. Cordeschi should not be required to confirm employment of someone who purportedly worked at a company other than BATCo or Investments. This question is more properly directed to someone from Imperial. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.89 Q218<br><br>Vol.6A-67 | To advise if Cordeschi becomes aware of information that Dr. Blackman and Dr. Heard are not from BATCO/INVESTMENTS, and Gibb and Dunn are not from Imperial as indicated in the document | The form of the question is objectionable as it assumes facts that have not been established in the evidence. Drs. Blackman and Heard will be addressed by Q 210. Beyond that, the question is also unduly onerous and disproportionate in that Mr. Cordeschi should not be required to confirm employment of someone who purportedly worked at a company other than Investments. The question would more properly be directed to Imperial. | Answer to best of ability | **Premature discovery request - Refusal upheld** |
| Cordeschi (Investments)<br><br>p.94 Q230<br><br>Vol. 6A-69 | Enquire into whether the reference in the letter dated Feb. 10, 1984 to biologists in the BAT Group include the biologists at Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the document is almost 30 years old and its author no longer works with Investments, if he ever did. | Answer | **Premature discovery request - Refusal upheld** |
| Cordeschi (Investments) | Advise whether the SJ Green referenced as chairman of the | This question is irrelevant to the issues on the motion. Even if | Advise if any information | **Premature discovery request -** |

| | | | | |
|---|---|---|---|---|
| p.118 Q293<br><br>Vol.6A-88 | conference is Dr. Green from BATCo/Investments | it were not irrelevant, it is unduly onerous and disproportionate in that the document is 43 years old. Further, it is unlikely that any author is still employed by Investments. | he is not | **Refusal upheld** |
| Cordeschi (Investments)<br><br>p.119 Q294<br><br>Vol.6A-88 | Advise whether LC Laporte reported as present at the conference is LC Laporte from BATCo/Investments | This question is unduly onerous and disproportionate in that the conference in question took place 43 years ago and the employees who attended of Investments that attended this conference are no longer employed by Investments. | Advise if any information he is not | **Premature discovery request -<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.121 Q304<br><br>Vol. 6A-89 | Enquire whether the reference to "individual companies" on page 13, paragraph 13 of the document includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate given that this document is 42 years old. Further, it is unlikely that any author is still employed by Investments | Answer | **Premature discovery request —<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.121 Q305<br><br>Vol. 6A-89 | Confirm that RS Wade listed as an attendee of the Kronberg conference is from Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that it asks Mr. Cordeschi to confirm the employment of someone who is not employed by Investments. The question would more properly be directed to Imperial. | Advise if any information he is not | **Premature discovery request -<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.124 Q314<br><br>Vol.6A-10 | Confirm that the author of the report, Dr. Green, is the Dr. SJ Green from BATCo/Investments | This question is unduly onerous and disproportionate in that the document is 37 years old and Dr. S.J. Green is no longer employed by Investments. | Advise if any information he is not | **Premature discovery request -<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.128-9 Q333<br><br>Vol.6A-10 | Enquire whether the reference to "number ones" in the document refers to chief executive officers of the BAT companies in May 1974 | The question is unduly onerous and disproportionate in that the document is 37 years old. Further, it is unlikely that any author is still employed by Investments. | Answer | **Premature discovery request -<br>Refusal upheld** |

| | | | | |
|---|---|---|---|---|
| Cordeschi (Investments)<br><br>p.131 Q344<br><br>Vol.6A-14 | Confirm that Mr. Ricard and Mr. P. Pare from Imperial Tobacco Canada attended the conference at Chewton Glen | This question is unduly onerous and disproportionate given that Mr. Cordeschi is being asked about employees from Imperial Tobacco Canada and not Investments. The question would more properly be directed to Imperial. | Advise if any information they did not attend | **Premature discovery request -<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.133 Q350<br><br>Vol. 6A-14 | Enquire whether the reference to "major companies in the tobacco division" in the statement "to keep fully informed those responsible for the major companies in Tobacco Division where this area presents a continuing problem and to this end to exchange ideas and current thinking of the managements concerned", found on page 2, paragraph 1 of the document, includes Imperial Tobacco Canada | This question is unduly onerous and disproportionate given that this document is over 35 years old and the author is not indicated. | Answer | **Premature discovery request –<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.135 Q357<br><br>Vol.6A-93 | Confirm that reference to various attendees from Canada at the Group Research Conference in Montreal, April 5-9, 1976 – Mr. R.M. Gibb, Mr. R. S. Wade, Mr. S. Candlish – were from Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that it refers to a document that is 35 years old and asks Mr. Cordeschi to confirm the employment of someone who is not employed by Investments. The question would more properly be directed to Imperial. | Advise if any information they were not | **Premature discovery request –<br>Refusal upheld** |
| Cordeschi (Investments)<br><br>p.137 Q363<br><br>Vol.6A-93 | Enquire whether reference to companies in the statement at page 4, paragraph 10 of the document – "the need was identified for further development of the central Milbank advisory service on smoking and health matters. In particular, a capability of fairly rapid reaction to enquiries and a broad and anticipatory | The question is unduly onerous and disproportionate given that the author of the document is not indicated and the document is 35 years old. | Answer | **Premature discovery request –<br>Refusal upheld** |

| | approach similar to that developed by the Group's North American competitors was desired. Companies were asked to set out and detail their suggestions in this field" - includes Imperial Tobacco Canada | | | |
|---|---|---|---|---|
| Cordeschi (Investments)<br><br>p.143 Q384<br><br>Vol. 6A-18 | Enquire whether the reference to companies in the statement at page 2280, number 5 of the document – "it is necessary for companies to ensure that national governments are presented with a balanced view of the industry's economic benefits and also with alternative arguments, a positive approach and a credible position by companies must be pursued" - includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate given that the author of the document is not indicated and the document is 31 years old. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.145 Q389<br><br>Vol. 6A-19 | Enquire whether the reference to companies at page 5 of the document includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is 30 years old and there is no indication as to who authored the document. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.145 Q391<br><br>Vol.6A-19 | Enquire whether the reference regarding lead companies at page 22 of the document includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is 30 years old and there is no indication as to who authored the document. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.148 Q400<br><br>Vol.6B-96 | Enquire whether the reference to an upcoming scientists meeting in March 1983 includes scientists from Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is likely around 28 years old and there is no indication as to who authored the document. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>pp.153-4<br><br>Vol. 6B-100 | Enquire whether the reference to CAC companies on page 4 of the document refers to chairman's advisory companies, what that means, and whether that | The question is unduly onerous and disproportionate in that the document is likely over 20 years old. Further, it is unlikely that any author is still | Answer | **Premature discovery request – Refusal upheld** |

| | | | | |
|---|---|---|---|---|
| | includes Imperial Tobacco Canada | employed by Investments. | | |
| Cordeschi (Investments)<br><br>p.157 Q424<br><br>Vol.6A-11 | Enquire whether statement referring to group companies already dealing with the smoking and health issue includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the document is likely at least a decade old and the author is not indicated. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.159 Q429<br><br>Vol.6B-103 | Enquire whether the document entitled "Consumer Help Lines" was sent to Imperial Tobacco Canada | This question is unduly onerous and disproportionate in that the author of the document is not indicated. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>pp.159-60 Q431<br><br>Vol.6B-103 | Enquire whether statement referencing procedures to be followed by "all companies" includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate in that the author is not indicated. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.160 Q432<br><br>Vol.6B.-104 | Enquire whether document entitled "Environmental Tobacco Smoke: Improving the Quality of Public Debate" was published by BATCo/Investments and on which date | This question is irrelevant to the issues on the motion. Even if it were not irrelevant, it is unduly onerous and disproportionate in that if a BATCo employee did produce this document, it is highly likely that that employee is no longer with BATCo given the passage of time. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.161 Q433<br><br>Vol.6B-104 | Enquire whether the document entitled "Environmental Tobacco Smoke: Improving the Quality of Public Debate" was sent to the BAT group of companies and, in particular, Imperial Tobacco Canada | This question is irrelevant and unduly onerous and disproportionate. Even if it were not irrelevant, this document is not dated and the author of it is not indicated. The determination of | Answer | **Premature discovery request – Refusal upheld** |

| | | | | |
|---|---|---|---|---|
| | | whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial Tobacco Canada. | | |
| Cordeschi (Investments)<br><br>p.163 Q441 | Confirm whether the document entitled "Smoking and Health: The Unresolved Debate" was produced by BATCo/Investments and, if so, when it was produced | This question is unduly onerous and disproportionate. This document is likely at least 20 years old. There is nothing to indicate who the author is. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.164 Q442<br><br>Vol.6B-105 | Enquire whether the document entitled "Smoking and Health: The Unresolved Debate" was sent to the BAT group of companies, specifically Imperial Tobacco Canada | This question is unduly onerous and disproportionate. This document is not dated and its author is not indicated. Further, the question is overly broad in that it asks whether this document was sent to Imperial Tobacco Canada but it does not specifically ask whether it was Investments that sent it to Imperial Tobacco Canada. Moreover, the determination of whether the document was sent to Imperial would require a search of millions of document pages, which may still not provide an answer. The question would more properly be directed to Imperial. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments)<br><br>p.167 Q452<br><br>Vol.6B-108 | Enquire whether the reference to "all number ones overseas" in the letter dated July 16, 1982, includes Imperial Tobacco Canada | The question is unduly onerous and disproportionate given that the document is almost 30 years old and the author is no longer employed by Investments. | Answer | **Premature discovery request – Refusal upheld** |
| Cordeschi (Investments) | Enquire whether the statement at page 3, number 7 of the document was a direction given by | The question is unduly onerous and disproportionate given that the document is | Answer | **Premature discovery request –** |