Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")
(US DEBTORS' MOTION TO ELIMINATE
REPRESENTATIVE DEPOSITIONS)
RETURNABLE JANUARY 7, 2014**

DATE:  January 3, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Ari Kaplan / Jeff Van Bakel
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
      akaplan@kmlaw.ca
      jvanbakel@kmlaw.ca

Lawyers for the Canadian Former Employees
and Disabled Employees through their court
appointed Representative

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / Elder C. Marques / Byron Shaw
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
         emarques@mccarthy.ca
         bdshaw@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as
administrator of the Nortel Canada registered
pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
         lily.harmer@paliareroland.com
         max.starnino@paliareroland.com

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**FACTUM OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")
(US DEBTORS' MOTION TO ELIMINATE
REPRESENTATIVE DEPOSITIONS)
RETURNABLE JANUARY 7, 2014**

**TABLE OF CONTENTS**

PART I – OVERVIEW OF CCC POSITION..........................................................................4

PART II – FACTS............................................................................................................6

PART III – ISSUES, LAW AND ARGUMENT.....................................................................10

    A.     Representative Depositions are not just for "clean-up"................................12

    B.     No Representative Depositions Means More Surprises at Trial................16

    C.     "Only the Canadian Parties want Representative Depositions"...................18

PART IV – RELIEF SOUGHT .........................................................................................19

# PART I – OVERVIEW OF CCC POSITION

1.     The Canadian Creditors Committee (the "CCC")[1] files this factum in response to the US Debtors'[2] motion dated December 30, 2013 (the "Motion"), joined by other Core Parties. [3]

2.     The US Debtors seek to eliminate representative witness discovery ("Representative Depositions") from the Amended Litigation Timetable[4] and modify accordingly the Discovery Plan and Deposition Protocol (together, the "Litigation Plan").

3.     The CCC opposes the Motion, supports the position of the Canadian Debtors[5] and Monitor, and submits as follows:

   a) Representative Depositions are a fundamental element of the *Rules* and a necessary and integral part of the Litigation Plan. Representative Depositions were agreed to by the Core Parties and Discovery Groups as part of the Litigation Plan. Fact Witness Depositions were conducted on the basis that Representative Depositions would follow, *inter alia*, in order to explore the positions and assertions pled by and obtain binding admissions from each Core Party;

---

[1] The CCC is comprised of the principal Canadian creditor interests in the Allocation Proceeding. The CCC represents the interests of more than 20,000 Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who in the aggregate have asserted approximately $3 billion in Claims against the Canadian Debtors.

[2] The US Debtors are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Snoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (US) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

[3] Unless stated otherwise, capitalized terms not otherwise defined herein have the definition ascribed to them in the US Debtors' Moving Factum.

[4] The current Amended Litigation Timetable is set out at Schedule "A" of the Court Order dated November 19, 2013.

[5] Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

b) The US Debtors and their supporters are resiling from the Litigation Plan, seeking to remove a key element of the trial process four months before a peremptory trial date, after they agreed to multiple adjournments of the Allocation Proceeding, and multiple amendments to the Litigation Timetable, all of which continued to provide for Representative Depositions; [6]

c) The US Debtors do not want to be bound to their Allocation Position. This strategy is tactical and transparent; after over 100 Fact Witness Depositions, the US Debtors now want to buy time and reserve their right to change their Allocation Position, all the way up to trial. The evidence adduced through the Fact Witness Depositions does not support the US Debtors' Allocation Position, and conversely, supports the CCC's Allocation Position. The Representative Depositions will thwart the US Debtors' attempt to avoid being bound by the countless facts and evidence tendered during the Fact Witness Depositions that will undoubtedly undercut their position at trial;

d) The CCC will be prejudiced if this Court eliminates Representative Depositions. The CCC is entitled to know the other parties' Allocation Positions and theories which it has to meet, in advance of expert reports, and in advance of affidavits and trial preparation. This can only happen if the parties are bound to their Allocation Positions, through Representative Depositions. The CCC relied on the Litigation Plan while participating in the Fact Witness Depositions, and in particular, relied on the Representative Depositions as scheduled; and,

e) Representative Depositions offer certainties and efficiencies of scale for the Allocation Proceeding, specifically, will streamline the trail process, bind parties to Allocation Positions, narrow issues and control litigation costs. If the US Debtors and their supporters are allowed to avoid Representative Depositions and change their Allocation Position, it will delay the Allocation

---

[6] One-Hundred First Report of the Monitor Dated January 3, 2013 at para. 14(c).

Proceeding; it will likely require a new round of pleadings, possibly more depositions, and require additional discovery that binds parties to their assertions and admissions.

# PART II – FACTS

4.    This Motion is about fundamentally changing the Litigation Plan, which culminates in a joint trial (the "Allocation Proceeding") scheduled to commence on May 12, 2014.

5.    The purpose of the Allocation Proceeding is to determine how to allocate approximately $9 billion in Global Assets of the Nortel Debtors[7] for distribution to Nortel's Creditors.[8]

6.    The Global Assets include approximately $7.3 billion in Sale Proceeds and $1.7 billion in cash and other assets in the possession of Nortel Debtors in various jurisdictions.[9]

7.    The Allocation Proceeding was scheduled pursuant to an Allocation Protocol, which was agreed to by the parties, formalized in an order and revised by the Court on several occasions. At all times, the Allocation Protocol contemplated Representative Depositions, which was agreed to by the US Debtors and EMEA Debtors on each occasion.[10]

8.    The purpose of the Allocation Protocol is to prescribe and streamline the trial procedures leading up to the Allocation Proceeding. The Allocation Protocol includes a

---

[7] The Canadian Debtors, the US Debtors and the EMEA Debtors collectively.

[8] Allocation Position of the CCC dated May 16, 2013, at paras. 2-4, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit B, Tab 1B of the CCC Motion Record.

[9] Allocation Position of the CCC dated May 16, 2013 at para. 4, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit B, Tab 1B of the CCC Motion Record.

[10] One-Hundred First Report of the Monitor Dated January 3, 2013 at para. 14.

Litigation Timetable, Discovery Plan and Deposition Protocol (together, the "Litigation Plan"). [11]

9.    In connection with the Allocation Protocol and Litigation Plan, each Core Party filed an Allocation Position (or filed a joinder supporting one or another Allocation Position). The US Debtors,[12] EMEA Debtors[13] and UKPC[14] filed Allocation Positions setting out their respective theories for allocating the Global Assets, as have the Ad Hoc Group of Bondholders.[15]

10.    The CCC filed an Allocation Position and an Allocation Response. The CCC's Allocation Position proposes:

a) an "Ownership Allocation Order", effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets; and

b) in the alternative, an "Equitable Allocation Order", effecting an equitable distribution of the Global Assets, including the Sale Proceeds, so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.[16]

_____

[11] Discovery Plan, November 19, 2013 Order amending the Discovery and Deposition Protocol, Deposition Protocol, September 20, 2013 Order amending the Discovery Plan, Affidavit of Fara Tabatabai, sworn January 2, 2014 at Exhibits A – D.

[12] The US Debtors filed an Allocation Position jointly with the Official Committee of Unsecured Creditors of the U.S. Debtors (the "UCC") proposing that the Global Assets be allocated amongst each Nortel Entity according to the revenue generated by that Entity (the "Revenue Allocation Theory"). Affidavit of Barbara Walancik, sworn January 3, 2014 at para 11(a), CCC Motion Record at Tab 1.

[13] The EMEA Debtors (being the Joint Administrator of Nortel Networks UK Limited ("NNUK") on behalf of 24 Nortel entities in Europe, the Middle East and Africa) filed an Allocation Position proposing that the Global assets be allocated according to the "beneficial interest" of each Nortel Entity (the "EMEA Allocation Theory"). Affidavit of Barbara Walancik, sworn January 3, 2014 at para 11(b), CCC Motion Record at Tab 1.

[14] The UKPC filed an Allocation Position proposing that the Global assets be allocated according to a "pro rata" distribution. Affidavit of Barbara Walancik, sworn January 3, 2014 at para 11(c), CCC Motion Record at Tab 1.

[15] The Bondholder Group filed an Allocation Position largely supporting the US Revenue Allocation Theory. Affidavit of Barbara Walancik, sworn January 3, 2014 at para 11(d) CCC Motion Record at Tab 1.

[16] Affidavit of Barbara Walancik, sworn January 3, 2014 at para. 12, CCC Motion Record at Tab 1.

11.    After the Core Parties filed their Allocation Positions, the Litigation Plan provided for documentary, witness and representative discovery.[17]

12.    From the very beginning, and throughout, the Litigation Plan contemplated that there would be Representative Depositions. Both before and during the Fact Witness Depositions, the US Debtors have consistently taken positions recognizing the necessity of and provision for Representative Depositions. For example, before the Fact Witness Depositions, the US Debtors initially sought to expand the scope of the Representative Depositions by insisting that the EMEA Debtors provide a Representative Deponent for each EMEA Entity. At the conclusion of the Fact Witness Depositions, the US Debtors noticed Representative Deposition topics for the Canadian Discovery Group and, despite this Motion, have declined to withdraw their request.[18]

13.    During the Fact Witness Depositions, parties proceeded on the basis that Fact Witness Depositions are different from Representative Depositions and the two served different purposes in connection with probing the parties' Allocation Positions and assertions pled in support thereof. For example,

    a)  at the deposition of Mr. John Ray (principal officer of the US Debtors), his counsel objected to questions relating to the US Revenue Allocation Theory, on grounds of "privilege", because Mr. Ray was not there "as a representative witness, nor is he here to give our legal theories or positions in this case";[19]

    b)  at the deposition of Mr. Murray McDonald (principal of the Monitor), Mr. Rosenthal (on behalf of the US Debtors) repeatedly asked questions concerning the "Monitor's position" on various topics. When counsel pointed

---

[17]  Discovery Plan, November 19, 2013 Order amending the Discovery and Deposition Protocol, Deposition Protocol, September 20, 2013 Order amending the Discovery Plan, Affidavit of Fara Tabatabai, sworn January 2, 2014 at Exhibits A – D.

[18]  Letter dated December 22, 2013 from Kathleen A. Murphy of Buchanan Ingersoll & Rooney PC for the Monitor and Canadian Debtors at pp. 4 and 6 (incl. Footnote 11) Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit H, CCC Motion Record at Tab 1H.

[19]  Transcript of John Ray, deposition dated December 13, 2013 at page 91, lines 4-15.

out that "you keep asking the witness whether it is the Monitor's position, and I would remind you that he is here as a fact representative; he's a fact witness", Mr. Rosenthal replied twice that he "accepts the correction";[20] and

c) at the deposition of Mr. Christopher Hill, a joint administrator of the EMEA Debtors, he stated that the assets and claims made against various EMEA Debtors have been catalogued. However, Mr. Hill was unable to provide the parties with those figures. This is necessary evidence for parties to know the case to be met and is still outstanding. Since this evidence could not be acquired through the Fact Witness Depositions, as such, a Representative Deposition is essential.[21]

14.    Moreover, the CCC has not been able to examine through Fact Witness Depositions nor document production any of the Allocation Position claims and assertions made by the Ad Hoc Group of Bondholders (the "Bondholder Group"). Every CCC request for examination of a member or representative of the Bondholder Group has been summarily denied.[22]

15.    On July 30, 2013, the CCC noticed five representatives of the Bondholder Group for deposition. The Bondholder Group objected to all five of the proposed depositions on the basis that none of the information sought was relevant to the Allocation Proceeding. The Bondholder Group instead represented that "[a]ny information that the Ad Hoc Bondholder Group has that may be relevant to this litigation *may be obtained through the deposition of a corporate representative*, which [the CCC has] noticed, and which notice we will respond and object to in due course."[23]

---

[20] Transcript of Murray McDonald, deposition dated November 26, 2013 at page 178, lines 3-21.

[21] Transcript of Christopher Hill, deposition dated December 17, 2013 at pages 77 to 89.

[22] Affidavit of Barbara Walancik, sworn January 3, 2014 at para 14, Email from Atara Miller, counsel to the Ad Hoc Bondholder Group, dated August 1, 2013 CCC Motion Record at Tab 1 and Tab 1C.

[23] Affidavit of Barbara Walancik, sworn January 3, 2014 at para 15, Email from Atara Miller, counsel to the Ad Hoc Bondholder Group, dated August 1, 2013 CCC Motion Record at Tab 1 and Tab 1C.

16.     Further, the Bondholder Group has consistently objected to any discovery directed to it, including examination of a Bondholder Group Witness respecting information the Bondholder Group is required to disclose by U.S. Federal Rule of Bankruptcy Procedure Rule 2019 ("Rule 2019").[24] It objected on the grounds that the discovery sought is not relevant to the allocation determination, generally, nor, specifically, to any other party's allocation position, or that it is simply not required by Rule 2019 to disclose the information sought. It has made these objections in written responses to document requests[25] and deposition notices,[26] and also during the course of meet and confer discussions regarding the requests at issue.[27]

17.     The Monitor has proposed a compromise proposal to conduct more limited Representative Depositions by substituting live witness testimony with written interrogatories on a more limited number of designated topics.[28]

# PART III – ISSUES, LAW AND ARGUMENT

18.     The issues on this Motion are:

    a) should the Litigation Plan be amended so as to eliminate Representative Depositions?

---

[24] Fed. R. Bankr. P. 2019 ("Rule 2019").  A copy of Rule 2019 is annexed hereto as Schedule A.

[25] Ad Hoc Group of Bondholders' Responses and Objections to the Canadian Creditors Committee's Reserved Document Request Directed to the Ad Hoc Bondholders Group, *et al.*, dated July 25, 2013, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit C, CCC Motion Record at Tab 1D.

[26] Ad Hoc Group of Bondholders' Objections to the Representative Witness Subjects Served By the Canadian Allocation Group and the Canadian Claims Defendant Group, dated December 18, 2013, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit D, CCC Motion Record at Tab 1E.

[27] Email from Atara Miller, counsel to the Ad Hoc Bondholder Group, dated June 9, 2013, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit E, CCC Motion Record at Tab 1F (stating that "the Ad Hoc Bondholder Group will not produce – whether via document productions, depositions, or otherwise – any information concerning the holdings of its members beyond what is required by Federal Rule of Bankruptcy Procedure 2019" and that it "will not make available any witness to testify on these topics"). See also, sworn January 3, Email from Atara Miller, counsel to the Ad Hoc Bondholder Group, dated August 1, 2013, Affidavit of Barbara Walancik at exhibit C, CCC Motion Record at Tab 1 and Tab 1C.

[28] One-Hundred First Report of the Monitor Dated January 3, 2014 at para. 38.

- The CCC would answer this question "no"; Representative Depositions are an integral part of this Litigation Plan, discovery to date purposefully has been restrained on the assurance of forthcoming Representative Depositions, and Representative Depositions otherwise are necessary to the Allocation Proceeding; and

b) if not, is it desirable to:

i. adopt the proposal by the Monitor and Canadian Debtors to conduct a more limited Representative Deposition regime by substituting live witness testimony with written interrogatories on a more limited number of designated topics; and

ii. direct the Bondholder Group to produce a representative witness to testify on the three topics identified in paragraph 30 below;

- The CCC would answer these questions "yes"; the CCC accepts the Monitor/Canadian Debtors' alternative Representative Deposition protocol and it is necessary and essential that the Bondholder Group put forward a witness for a Representative Deposition.

19. The US Debtors in their Notice of Motion offer three grounds in support of their Motion:

a) Representative Depositions were incorporated into the Litigation Plan before the parties conducted more than 100 witness depositions in 15 cities on three continents, comprising 99% of all witnesses, including senior executives and regional management. Therefore, there is no need for additional "clean-up" discovery by Representative Deposition, which will be burdensome and in any event is impermissible discovery;

b) No Representative Depositions are needed because there will be no surprises at trial because (i) only deposed witnesses identified in advance of trial may be a trial witnesses; (ii) expert reports will be exchanged and deposed upon in advance; and (iii) fact affidavits and exhibits will exchanged in advance; and

    c)  The other Core Parties agree to eliminate Representative Depositions, and only the Canadian Discovery Group wants them to proceed.

20.    The CCC responds to these arguments as follows.

## A.   *Representative Depositions are not just for "clean-up"*

### 1) General Legal Principles

21.    The law in this area is straightforward. The US Debtors fundamentally mischaracterize the nature of the Representative Depositions which they now propose be abandoned. Representative Depositions are not simply for "clean-up"; they are a requirement of the *Rules* and an integral part of these Proceedings.

22.    The US Debtors rely in their factum (at para. 54) on the case *Ontario v. Rothmans Inc.*[29] *Rothmans* does not assist the US Debtors. At para. 120 (cited by the US Debtors), Perell J. describes the purpose of pre-trial discovery as follows:

> In *Modriski v. Arnold*, [1947] O.J. No. 132 (C.A.), the Court of Appeal stated that the purposes of production and discovery are: (1) to enable the examining party to know the case he or she has to meet; (2) to enable the examining party to obtain admissions that will dispense with formal proof of his or her case; and (3) to obtain admissions that will undermine the opponent's case.
>
> In *Ontario Bean Producers Marketing Bd. v. W.G. Thompson & Sons* (1982), 35 O.R. (2d) 711 (Div. Ct.), the Divisional Court elaborated and extended the various aims of discovery. The Court noted the following purposes for examinations for discovery: (1) to enable the examining party to know the case he or she has to meet; (2) to procure admissions to enable a party to dispense with formal proof; (3) to procure admissions which may destroy an opponent's case; (4) to facilitate settlement, pre-trial procedure, and trials; (5) to eliminate or narrow issues; and (6) to avoid surprise at trial.

23.    Perell J. also observes that "the scope of the questioning on an examination for discovery" includes the witness being "questioned about the party's position on questions of law."[30]

---

[29] *Ontario v. Rothmans Inc.*, [2011] OJ No 1896 (SCJ) at para. 120, leave to appeal denied [2011] OJ No 2811, CCC Brief of Authorities at Tab 1.

24.     The requirement for binding representative discovery is reflected in the Ontario *Rules of Civil Procedure*, which provides that a party will be bound by evidence given by a representative of a corporate party.[31]

25.     In short, pre-trial discovery is meant to bind a party to "state what [its] current legal position is."[32]

26.     The US Debtors' Motion is designed to frustrate this discovery objective. Fact Witness Depositions and Representative Depositions serve different functions in the Litigation Plan. One is not a substitute for the other, nor can it be. Fact Witness Depositions were intended to offer first-hand accounts based on personal knowledge with respect to matters at issue in the Allocation Proceeding. The Fact Witness Depositions were not intended to be the mechanisms through which the parties explain and bind themselves to their Allocation Positions and assertions contained therein. Fact witnesses were not required to inform themselves of any facts beforehand or give undertakings, and were not obligated to answer any questions that explained or bound a party to any claim, pled assertion or admission.

27.     All parties knew that there would be Fact Witness Depositions followed by Representative Depositions, and as stated above, the Fact Witness Depositions were conducted on the express basis that there would be Representative Depositions afterward.

28.     In any event, The Representative Depositions are not burdensome and in fact the opposite is true. The Representative Depositions, as proposed by the Monitor and the Canadian Debtor, will not cause undue expense and will yield significant benefit to the parties for the following reasons:

---

[30] *Ibid.* at para. 129, citing *Six Nations of the Grand River Band v. Canada (Attorney General)* (2000), 48 OR (3d) 377 (Div. Ct.) [ "*Six Nations*"].

[31] Rule 31.03(2) at Schedule A and see *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, [2008] O.J. No. 4517 at para. 8, CCC Brief of Authorities at Tab 3.

[32] *Six Nations*, supra, at para. 14, CCC Brief of Authorities at Tab 2.

a) the Representative Deponents will be bound by their admissions, the process is efficient and will reduce the number of issues remaining in dispute or that may be uncertain at the Allocation Proceeding;

b) the process is cost-effective in how the Representative Depositions are conducted, in that the parties can – and have – negotiated limits on them (e.g. the Monitor's compromise proposal, adopted by the CCC); and,

c) any Core Party who does not require any evidence adduced through a Representative Deposition need not seek a Representative Deposition of another party, and need not attend or participate in any Representative Deposition sought of another party.

### 2) Need for Bondholder Group Representative Deponent

29.     The CCC has sought Representative Deposition testimony from the Bondholder Group. This would be the *only* opportunity afforded the parties on important topics the Bondholder Group itself has conceded as relevant in its own Allocation Position,[33] and as such deposition should proceed without further delay.

30.     The Canadian Discovery Group has sought discovery of the Bondholder Group Representative only on the following topics:

a) The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees;

b) The expectations of the Bondholder Group with respect to any guarantees to proceeds from the Business Sales and Residual IP Sale (i.e. Rockstar transaction), and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates; and

---

[33] Opening Allocation Position of Ad Hoc Group of Bondholders, dated May 16, 2013 and the Response of the *Ad Hoc* group of Bondholders to Allocation Positions of Other Core Parties, dated May 29, 2013, Affidavit of Barbara Walancik, sworn January 3, 2014 at para 11(d) and Exhibit A, CCC Motion Record at Tab 1 and Tab 1A.

c)  The Claims asserted by the Ad Hoc Group of Bondholders in *re Nortel Networks Inc. et al.*, case No. 09-10138 (KG) (jointly administered) [the US Debtors' chapter 11 cases], including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.[34]

31.    These topics directly address the positions taken and assertions made by the Bondholder Group in its Allocation Position. That the Bondholder Group has itself raised these issues in its submission to the Courts is clear evidence of their relevance to the Allocation Proceeding. These topics are also directly addressed in the CCC's Allocation Position.

32.    For example, in its responsive allocation pleading, the Bondholder Group asserts that in purchasing bonds, its members relied on the terms of those bonds, most notably the so-called "guarantee rights".[35] The Bondholder Group asserted such reliance in direct opposition to the CCC's stated Allocation Position. But the CCC has not been able to test the factual assertions made relevant by the Bondholder Group itself because no member or representative of the Bondholder Group has agreed to provide testimony on the guarantees or the Bondholder Group's assertions respecting them.

33.    In defense of its stonewalling, the Bondholder Group has asserted that parties may only pursue what is covered by the statutory disclosure requirements expressly listed in Rule 2019.[36] To the contrary, Rule 2019 sets forth required disclosures -- it does not limit discovery. Indeed, the advisory committee notes to Rule 2019 make clear that "although the rule no longer requires the disclosure of the precise date of

---

[34] Unsworn Affidavit of Jeffrey A. Rosenthal, Exhibit C.

[35] Response of *Ad Hoc* Group of Bondholders to Allocation Positions of Other Core Parties, ¶¶ 59-65 (U.S. Dkt. No. 10694), Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit A, CCC Motion Record at Tab 1A.

[36] Fed. R. Bankr. P. 2019 ("Rule 2019").  A copy of Rule 2019 is annexed hereto as Schedule A.

acquisition or the amount paid for disclosable economic interests, nothing in this rule precludes either the discovery of that information or its disclosure when ordered by the court pursuant to authority outside this rule."[37]  Nor can Rule 2019 shield Bondholder Group members from deposition questioning about matters asserted on their behalf in litigation pleadings.

34.    The CCC appropriately and justifiably seeks to question the Bondholder Group not only about the matters it has disclosed under Rule 2019, but also about the required disclosures under Rule 2019(c)(2)(C) that it has not made, as well about the information and analysis the Bondholder Group asserts was performed to support member post-bankruptcy transactions in the bonds. Nothing in Rule 2019 or any other bankruptcy or civil procedure rule precludes such questioning.

35.    In summary, eliminating Representative Depositions for Fact Witness Depositions is unworkable and unfair and is no substitute for the binding testimony in advance of trial to which the CCC and other Canadian parties are entitled.

**B.    No Representative Depositions Means More Surprises at Trial**

36.    The US Debtors insist that eliminating Representative Depositions will not result in "surprises" at trial.

37.    These assurances are not sufficient nor are they to be believed. First, the US Debtors have demonstrated by this very motion that they are capable of any kind of "trial by ambush". As discussed above, the US Debtors only brought this Motion after they agreed to adjournments of the trial and amendments to the Litigation Timetable. Each iteration of the Litigation Timetable provided for Representative Depositions. Now, approximately four months before the peremptory trial date, the US Debtors seek to abandon the Representative Depositions altogether.

---

[37] Fed. R. Bankr. P. 2019, advisory committee's notes to 2011 amendments, CCC Brief of Authorities at Tab 4.

38.     Second, the US Debtors and the EMEA Debtors are planning for more surprises at trial and have exacerbated this concern by their proposed settlement.[38] Specifically, the proposed settlement permits the US Debtors and the EMEA Debtors not to be bound by *any* Allocation Position, admission or assertion. The US Debtors want to reserve their right to change/amend their Allocation Position, all the way up to trial.[39]

39.     The trial processes consistently ordered by the Courts,[40] beginning in June 2011, was to adopt pre-trial rules in order to conduct a fair and predictable Allocation Proceeding. The process intended to streamline a pleading, document, discovery and trial regime built on the work of the parties since January 2009.

40.     The parties accomplished this through the Litigation Plan, which was a negotiated solution contemplating a discovery regime consisting of three stages: documentary discovery, followed by Fact Witness Depositions, followed by Representative Depositions.

41.     If Representative Depositions are eliminated and the US Debtors are permitted to avoid any binding position, it will almost for certain again delay the trial, require a new round of pleadings, and possibly more depositions and discoveries. The suggestion in the US Debtors' factum that the parties will not be surprised at trial because the US Debtors have suggested they will but forward their allocation position in their pre-trial memorandum is simply absurd. This contention disregards the value and purpose of conducting depositions to test the parties' positions that will be put forward at trial.

---

[38] The US Debtors and EMEA Debtors have proposed to settle approximately $5 Billion in inter-company EMEA Claims against the US Debtors, for $75 Million. See Exhibit B to the Notice of Debtors' Motion, dated December 17, 2013 at para. 2, Affidavit of Barbara Walancik, sworn January 3, 2014 at Exhibit G, CCC Motion Record at Tab 1G.

[39] *Ibid* at para. 6.1.

[40] The Ontario Superior Court of Justice (Commercial List) and the United States Bankruptcy Court for the District of Delaware.

### C.    "Only the Canadian Parties want Representative Depositions"

42.    The US Debtors maintain that since the non-Canadian Core Parties agree to eliminate Representative Depositions, and only the Canadian Discovery Group wants them to proceed, therefore, they should not proceed in the Canadian Court.

43.    The US Debtors motion should be seen for what it is: after participating in over 100 Fact Witness Depositions, the US Debtors and the EMEA Debtors have little evidentiary foundation supporting their Allocation Positions. Through their proposed settlement, these two Debtors are now seeking to avoid any accountable process to bind them to any Allocation theory, or for that matter, any assertion or admission, in the hope that something else will stick by the end of the Allocation Proceeding.

44.    The Fact Witness Depositions have produced strong fact evidence, which will be adduced at trial, demonstrating that:

a) Pre- and Post-Filing, the Nortel Entities and their senior management, employees, service professionals and third parties widely acknowledged that ownership of Nortel's IP forming most of the Sale Proceeds rests with the Canadian parent, Nortel Networks Limited;

b) there is little, if any, basis supporting the US "Revenue" Allocation theory or EMEA's "Beneficial Interest" theory; and

c) there is a principled basis for supporting the CCC's Equitable Allocation Order, in the alternative to any other Core Party's Allocation Position. The CCC is entitled to probe this Allocation theory and bind other Core Parties to certain assertions in support thereof.

45.    The Bondholders wish to eliminate Representative Depositions because, as stated, they have refused to produce any witnesses for Fact Witness Depositions and are now attempting to avoid any accountable process to bind them to the merits of their own Allocation Position and their assertions in opposition to the Allocation theories of other parties contained in their Allocation Responses.

46.    In summary, this Motion is not about "efficiencies". The US Debtors and EMEA Debtors are resiling from an agreed upon process, re-affirmed multiple times by the

Courts, and have re-written the litigation history. This Motion is transparently about changing the rules very late in the game after considerable time and costs have been expended, thereby creating uncertainty in the trial process, all in order to reactively buy time to adapt to the US/EMEA's weakened positions as we approach the Allocation Proceeding.

## PART IV – RELIEF SOUGHT

47.   For the reasons set out above, the CCC seeks an order:

a)  dismissing the US Debtors' motion;

b)  adopting the Monitor's proposal for conducting Representative Depositions;

c)  ordering the Bondholders' to put forward a representative witness for a Representative Deposition; and

d)  awarding costs of this motion.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 3rd day of January, 2014.

As Agent for Counsel to the
Canadian Creditor Interests

_Per. Ari Kaplan_

## SCHEDULE "A"
## RELEVANT LEGISLATION

**Courts of Justice Act, R.S.O. 1990, c. C.43, Regulation 194.**
**Rule 31.03(2)**

WHO MAY EXAMINE AND BE EXAMINED
Generally

31.03 (1) A party to an action may examine for discovery any other party adverse in interest, once, and may examine that party more than once only with leave of the court, but a party may examine more than one person as permitted by subrules (2) to (8). R.R.O. 1990, Reg. 194, r. 31.03 (1); O. Reg. 438/08, s. 28 (1).

On Behalf of Corporation

(2) Where a corporation may be examined for discovery,

(a) the examining party may examine any officer, director or employee on behalf of the corporation, but the court on motion of the corporation before the examination may order the examining party to examine another officer, director or employee; and

(b) the examining party may examine more than one officer, director or employee only with the consent of the parties or the leave of the court. O. Reg. 132/04, **s. 7.**

---

**USCS Bankruptcy R 2019**

(a) Definitions. In this rule the following terms have the meanings indicated:
  (1) "Disclosable economic interest" means any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest.
  (2) "Represent" or "represents" means to take a position before the court or to solicit votes regarding the confirmation of a plan on behalf of another.

(b) Disclosure by groups, committees, and entities.
  (1) In a chapter 9 or 11 case, a verified statement setting forth the information specified in subdivision (c) of this rule shall be filed by every group or committee that consists of or represents, and every entity that represents, multiple creditors or equity security holders that are (A) acting in concert to advance their common interests, and (B) not composed entirely of affiliates or insiders of one another.
  (2) Unless the court orders otherwise, an entity is not required to file the verified statement described in paragraph (1) of this subdivision solely because of its status as:
    (A) an indenture trustee;
    (B) an agent for one or more other entities under an agreement for the extension of credit;
    (C) a class action representative; or

(D) a governmental unit that is not a person.

(c) Information required.  The verified statement shall include:
  (1) the pertinent facts and circumstances concerning:
    (A) with respect to a group or committee, other than a committee appointed under § 1102 or § 1114 of the Code [11 USCS § 1102 or 1114], the formation of the group or committee, including the name of each entity at whose instance the group or committee was formed or for whom the group or committee has agreed to act; or
    (B) with respect to an entity, the employment of the entity, including the name of each creditor or equity security holder at whose instance the employment was arranged;
  (2) if not disclosed under subdivision (c)(1), with respect to an entity, and with respect to each member of a group or committee:
    (A) name and address;
    (B) the nature and amount of each disclosable economic interest held in relation to the debtor as of the date the entity was employed or the group or committee was formed; and
    (C) with respect to each member of a group or committee that claims to represent any entity in addition to the members of the group or committee, other than a committee appointed under § 1102 or § 1114 of the Code [11 USCS § 1102 or 1114], the date of acquisition by quarter and year of each disclosable economic interest, unless acquired more than one year before the petition was filed;
  (3) if not disclosed under subdivision (c)(1) or (c)(2), with respect to each creditor or equity security holder represented by an entity, group, or committee, other than a committee appointed under § 1102 or § 1114 of the Code [11 USCS § 1102 or 1114]:
    (A) name and address; and
    (B) the nature and amount of each disclosable economic interest held in relation to the debtor as of the date of the statement; and
  (4) a copy of the instrument, if any, authorizing the entity, group, or committee to act on behalf of creditors or equity security holders.

(d) Supplemental statements.  If any fact disclosed in its most recently filed statement has changed materially, an entity, group, or committee shall file a verified supplemental statement whenever it takes a position before the court or solicits votes on the confirmation of a plan. The supplemental statement shall set forth the material changes in the facts required by subdivision (c) to be disclosed.

(e) Determination of failure to comply; sanctions.
  (1) On motion of any party in interest, or on its own motion, the court may determine whether there has been a failure to comply with any provision of this rule.
  (2) If the court finds such a failure to comply, it may:
    (A) refuse to permit the entity, group, or committee to be heard or to intervene in the case;
    (B) hold invalid any authority, acceptance, rejection, or objection given, procured, or received by the entity, group, or committee; or
    (C) grant other appropriate relief.

## SCHEDULE "B"

1.  *Ontario v. Rothmans*, [2011] OJ No 1896 (S.C.J)
2.  *Six Nations of the Grand River Band v. Canada (Attorney General)*, 48 OR (3d) 377 (Div. Ct.)
3.  *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, [2008] OJ No 4517 (S.C.J.)
4.  Fed. R. Bankr. P. 2019 and Notes of Advisory Committee

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-35, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, et. al.

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at TORONTO

---

**FACTUM OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")
(US DEBTORS' MOTION TO ELIMINATE
REPRESENTATIVE DEPOSITIONS)
RETURNABLE JANUARY 7, 2014**
(sworn January 3, 2014)

---

**KOSKIE MINSKY LLP**
Mark Zigler / Ari Kaplan / Jeff Van Bakel
Lawyers for the Canadian Former Employees and Disabled
Employees through their court appointed Representative

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / Elder C. Marques / Byron Shaw
Lawyers for Morneau Shepell Ltd., as administrator of the
Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
Lawyers for the Superintendent of Financial Services as
Administrator of the Pension Benefits Guarantee Fund