**Exhibit A**

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**AFFIDAVIT OF JEFFREY A. ROSENTHAL**

I, Jeffrey A. Rosenthal, of the City of New York, in the State of New York in the United
States of America, MAKE OATH AND SAY:

1.  I am a partner of the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel to Nortel
    Networks Inc. and its affiliated debtors[1] (collectively, the "US Debtors").  Except as
    otherwise indicated, I have knowledge of the matters to which I hereinafter depose.
    Where in my Affidavit I rely on information provided to me by other persons, I state the
    source of that information and in each case I believe that the information is true.

2.  I swear this Affidavit in support of the motion of the US Debtors for an order (the
    "Amending Order") further amending the Amended Litigation Timetable set out at
    Schedule "A" of the order of the Court dated November 19, 2013 (the "November 19

---

[1] The US Debtors are Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel
Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks
Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc.,
Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc.,
Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

- 2 -

Order") to dispense with representative witness depositions. The US Debtors also seek conforming amendments to each of the Allocation Protocol, the Litigation Timetable and Discovery Plan and the Deposition Protocol (each, as defined in the November 19 Order).

## BACKGROUND

### Nortel's Insolvency Proceedings

3. On January 14, 2009, this Court made an Initial Order granting Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation (collectively, the "Canadian Debtors") protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA"), and, among other things, appointing Ernst & Young Inc. as monitor in these proceedings.

4. Also on January 14, 2009, the US Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the US Bankruptcy Court.

5. Also on January 14, 2009, this Court granted an Order pursuant to Section 18.6(4) of the CCAA recognizing the Chapter 11 cases as "foreign proceedings" in Canada and giving effect to the automatic stay under the Bankruptcy Code in Canada.

6. Also on January 14, 2009, the High Court of England and Wales placed nineteen of Nortel's European affiliates (the "EMEA Debtors"), including Nortel Networks UK Limited ("NNUK"), into administration (the "Administration Proceedings") under the control of individuals from Ernst & Young LLP (the "Joint Administrators").

7. On February 27, 2009, the US Bankruptcy Court granted petitions recognizing the CCAA proceedings as "foreign main proceedings" pursuant to Chapter 15 of the Bankruptcy Code.

8. On June 26, 2009, the US Bankruptcy Court granted a petition recognizing the Administration Proceeding of NNUK as a "foreign main proceeding" pursuant to Chapter 15 of the Bankruptcy Code.

- 3 -

9. On January 31, 2011, the US Bankruptcy Court granted petitions recognizing the Administration Proceedings of the other EMEA Debtors as "foreign main proceedings" pursuant to Chapter 15 of the Bankruptcy Code.

### *The Allocation Protocol*

10. On April 3, 2013 and May 17, 2013, this Court and the US Bankruptcy Court, respectively, signed orders approving the Allocation Protocol. The Allocation Protocol set forth procedures for determining: (i) the allocation of sale proceeds among the Canadian Debtors, the US Debtors and the EMEA Debtors; (ii) certain claims by the EMEA Debtors against the Canadian Debtors and the US Debtors; and (iii) certain claims by the UK Pension Trustee and the Board of the Pension Protection Fund (the "UK Pension Claimants") against the Canadian Debtors and the US Debtors.

11. On May 15, 2013 and May 17, 2013, this Court and the US Bankruptcy Court, respectively, signed orders approving the Litigation Timetable and Discovery Plan pursuant to the Allocation Protocol.

12. On August 27, 2013 and August 26, 2013, this Court and the US Bankruptcy Court, respectively, made orders modifying the schedule set out in the Litigation Timetable and approving the Deposition Protocol.

13. On November 19, 2013 and November 27, 2013, this Court and the US Bankruptcy Court, respectively, made orders further modifying the schedule set out in the Litigation Timetable.

## THE REPRESENTATIVE DEPOSITION PROCESS

### *Purpose of Representative Depositions*

14. The Litigation Timetable and Discovery Plan originally contemplated that the parties would conduct Representative Depositions (as defined in the Deposition Protocol) after the completion of fact witness depositions. The Deposition Protocol contemplated that a party could serve a list setting forth "a very limited number of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony." The topics for

- 4 -

Representative Depositions were to be "small in number and reasonable in scope," and any undertakings arising from these depositions were to be limited to matters "not already the subject of first-hand deposition testimony obtained from a knowledgeable fact witness." Accordingly, and as acknowledgd by the parties throughout their negotiation of the Deposition Protocol, the purpose of the Representative Depositions was to "fill the gaps," if any, remaining after the close of fact witness discovery. The parties anticipated that such gaps might exist in the event the parties were unable to obtain testimony from witnesses with first hand knowledge of pertinent facts, particularly because most witnesses no longer worked for and were no longer under the control of any Nortel entity.

15. Representative Depositions were incorporated into the Litigation Timetable and Discovery Plan prior to the commencement of fact discovery and at a time when the parties did not have a basis to confirm whether they would ultimately be able to conduct the depositions of all of the witnesses they sought to depose, many of whom were no longer associated with the various Nortel affiliates. As noted above, it was this concern – and the corresponding potential need to fill in any remaining gaps – that animated the parties' agreement to conduct Representative Depositions.

16. As the parties neared the completion of the more than 100 fact depositions they ultimately conducted, and prior to the delivery of any topics for Representative Depositions, the US Debtors proposed that the Core Parties agree to dispense with Representative Depositions. The US Debtors noted that in light of the unexpectedly broad opportunity each party had for fact discovery of percipient witnesses, including former employees of Nortel entities and other third parties, Representative Depositions were unnecessary and that going forward with such depositions would result in a waste of resources. The particular bases for that position were set out in correspondence later sent to the US Bankruptcy Court and to this Court, as discussed below.

17. I am unaware of any Core Party other than the Monitor, the Canadian Debtors, the CCC, and the Directors and Officers who has disagreed with the US Debtors' proposal.

- 5 -

*Noticing of Topics for Representative Depositions*
*According to the Litigation Timetable*

18. Because there was no agreement among all of the Core Parties whether to dispense with Representative Depositions, on December 13, 2013 (the deadline in the Litigation Timetable, as amended), while reserving their right to argue that Representative Depositions were unnecessary and should not be required, the US Debtors sent a letter listing a limited number of advance topics for Representative Depositions of the Canadian Debtors Representative (four topics), the CCC Representative (also four topics) and the Wilmington Trust Representative (three topics). The advance topics designated by the US Debtors were narrow in scope and limited in number. The US Debtors made it clear in their letter that they continued to believe Representative Depositions were unnecessary and inappropriate and should therefore not occur. A copy of the US Debtors' letter setting out their advance topics is attached to my Affidavit as Exhibit "A".[2]

19. A letter sent by counsel to the Joint Administrators set out, on behalf of the EMEA Debtors and the UK Pension Claimants, their concurrence with the US Debtors' position that there was no further need for Representative Depositions and included five advance topics for a deposition of the Canadian Debtors' Representative in the event such Depositions nonetheless went forward. This letter is attached to my Affidavit as Exhibit "B".

20. On December 13, 2013, the Canadian Allocation Group delivered a 92-page pleading containing, among other things, 27 broad-ranging topics for the deposition of the US Debtors' Representative. The 92-page pleading was amended on December 15, 2013, and the amended pleading is attached to my Affidavit as Exhibit "C" (together with a supplement, dated December 17, 2013, in respect of the French affiliate, NNSA). The Canadian Allocation Group's pleading purported to require each representative witness to

---

[2] In the US Debtors' letter, they reserved their right to examine each party's representative on "any topic, as applicable to that party, designated by that party to representatives of any of the U.S. Interests."

- 6 -

prepare in advance of his or her deposition to testify on all of the topics directed to his or her party, an impossible task given their breadth.[3]

### *Objections to Noticed Topics*

21. In accordance with the Deposition Protocol, on December 18, 2013, the Core Parties delivered objections to the Representative Deposition topics noticed by other Core Parties. The objections timely made by the US Debtors are attached as Exhibit "D" to my Affidavit, and the objections timely delivered by counsel for the Joint Administrators on behalf of the EMEA Debtors and the UK Pension Claimants are attached as Exhibit "E" to my Affidavit. Objections to the topics noticed by the Canadian Allocation Group were also timely delivered by the Ad Hoc Group of Bondholders (Exhibit "F" to my Affidavit) and by the Unsecured Creditors Committee of the US Debtors (the "UCC") (Exhibit "G" to my Affidavit).

22. Separate objections were delivered by the Monitor and Canadian Debtors to the U.S. Debtors (Exhibit "H" to my Affidavit) and to the EMEA Debtors and the UK Pension Claimants (Exhibit "I" to my Affidavit), and by the CCC (Exhibit "J" to my Affidavit).

23. Each of the Core Parties' objections articulated the basis for their objections to the Representative Deposition topics through either general objections for all of the topics, specific objections for each of the topics, or both. The US Debtors, for example, stated that the Monitor and Canadian Debtors' topics were "unreasonable in number relative to the time limitation for the examination," that the topics had "an impermissibly broad scope," and that the subjects were "inappropriate for a representative deposition." These objections conformed to the possible bases for objections identified in the Deposition Protocol itself, which stated that objections may be made "in the event a party designates an unreasonable number of subjects relative to the time limitations for the examination, subjects of an impermissibly broad scope or subjects inappropriate for a Representative Deposition."

---

[3] While the Monitor and Canadian Debtors have sought to downplay the scope of their 92-page pleading (which itself was incomplete insofar as they later supplemented it and added topics for UK Pension Claimaints), they do seek testimony from the other parties on, collectively, every topic in their 92-page pleading irrespective of repetition among parties, and thus the total scope and expense of the representative witness depositions needs to be measured in the aggregate based upon all of the Monitor's and Canadian Debtors' topics.

- 7 -

24. In their December 22, 2013 letter to the US Bankruptcy Court (identified below as Exhibit "P" to my Affidavit), the Monitor and the Canadian Debtors state that all of the other parties "have not articulated the basis for objection to any single topic designated for them (with the time for doing so under the litigation timetable and discovery plan having now passed)."  In fact, the objections attached as Exhibit D reflect that the US Debtors (as well as other Core Parties, as memorialized in the other exhibits referenced above) objected to the other Core Parties' topics by timely delivering to the other parties on December 18, 2013 objections consistent with the Deposition Protocol.

25. Following the exchange of topics and objections, described above, on December 19, 2013 the Canadian Allocation Group served 17 topics on the UK Pension Claimants (Exhibit "K" to my Affidavit).  On that same date, Wilmington Trust delivered an objection to the US Debtors' topics  (Exhibit "L" to my Affidavit).

## AMENDING ORDER IS REQUIRED

### *Dispute Brought to the Attention of the Courts*

26. Pursuant to the US Bankruptcy Court's direction that the parties may bring discovery disputes to the US Bankruptcy Court's attention by letter, after meeting and conferring unsuccessfully throughout the week following service on December 13 of the representative topics by the Monitor and Canadian Debtors, the US Debtors raised the dispute regarding Representative Depositions in a letter to the US Bankruptcy Court on December 20, 2013 (the "December 20 Letter").

27. The December 20 Letter sets out the factual bases for the relief sought by the US Debtors on this motion, and the reasons why it is appropriate to dispense with Representative Depositions in light of the discovery process that has taken place to date in this litigation and the pre-trial steps to be completed.  I affirm that the factual statements in the December 20 Letter are true and correct to the best of my knowledge.  A copy of the December 20 Letter is attached as Exhibit "M" to my Affidavit, and was previously delivered to this Court on December 20, 2013 in connection with booking the December 23, 2013 chambers appointment in connection with, among other things, this discovery dispute.

- 8 -

28. Further correspondence was delivered to the US Bankruptcy Court on December 20, 2013 by the EMEA Debtors and the UCC (Exhibits "N" and "O" to my Affidavit), and by the Monitor and Canadian Debtors and by the CCC on December 22, 2013 (Exhibits "P" and "Q" to my Affidavit). The US Debtors delivered a second letter to the US Bankruptcy Court on December 23, 2013 (Exhibit "R" to my Affidavit).

## *Representative Depositions Are Unnecessary and Unduly Burdensome*

29. As set out in the December 20 Letter, the Litigation Timetable and Discovery Plan in this litigation contemplated fact depositions followed by Representative Depositions that were a hybrid of Ontario and U.S. procedural rules and were designed to enable the Core Parties to obtain testimony on factual subjects as to which the witnesses with first-hand knowledge were either unknown or unavailable for deposition.

30. In addition to the production of more than two million documents, the discovery that has occurred to date has included over 100 witness depositions taken in more than 15 cities on three continents in less than three months.

31. Approximately 99% of all former Nortel employees, officers or directors and pension trustees that the Core Parties sought to depose ultimately testified. The deposed witnesses included one of Nortel's former Chief Executive Officers, several Chief Financial Officers, and numerous Treasurers, general counsels, senior executives in the tax and treasury departments, present and former directors of various Nortel affiliates, senior intellectual property lawyers, merger and acquisition executives and pension trustees. Deposed witnesses also included two EMEA joint administrators, two representatives of the Monitor, the US principal officer and the French liquidator.

32. In their December 22, 2013 letter (Exhibit "P"), the Monitor and Canadian Debtors assert that nothing has changed since the November 14, 2013 joint motion to amend the Litigation Timetable, at which time the US Debtors still contemplated that Representative Depositions might be appropriate, and that many of the depositions since then have involved third parties. To the contrary, since November 14, 2013, nearly one-third of all depositions have been conducted. These included the depositions of current representatives of the various Nortel estates such as representatives of the Canadian

- 9 -

Monitor, two Joint Administrators, the French Liquidator and NNI's Principal Officer. In addition, since November 14, 2013, the parties have deposed several senior former officers and employees of various Nortel entities, including former senior NNUK officers with respect to NNUK's claims against the Canadian Debtors and US Debtors (Simon Freemantle and Sharon Rolston), all four of the former NNSA officers currently residing in France that the Core Parties sought to depose (Messrs. Clement, Lesur, Debon and Lebrun), former senior officers from NNL responsible for tax and transfer pricing matters (Peter Look and John Doolittle), a former senior employee from NNL also involved in tax and transfer pricing matters, and outside legal advisors to Nortel entities on tax and transfer pricing matters (Scott Wilkie and Giovanna Sparagna). In other words, numerous factual gaps that still remained as of November 14, 2013 were filled by depositions of percipient witnesses in the subsequent month.

33. I understand that the fact discovery that has occurred in connection with the pending litigations far exceeds the examinations that typically occur in Canadian litigation. When I posed the question during a meet and confer telephone conference on December 18, 2013, no Canadian counsel could recall another Canadian case where 100 fact depositions had been taken.

34. In addition to the depositions of fact witnesses produced by the Core Parties, examinations also have been taken and documents have been obtained from numerous third parties, including financial and other advisors.

35. The gap-filling measure of representative witness depositions has been rendered unnecessary by the breadth of witnesses made available for examination, such that there is no longer any need for an additional "clean-up" process. The Monitor and the Canadian Debtors have not explained what information they believe is missing from the evidence they have sought to obtain through the fact witness depositions or the document productions.

36. Not only has the deposition discovery of fact witnesses been extensive and complete, but any possible concern about the potential for "surprise" at trial has been addressed by the Deposition Protocol and by ongoing negotiations that have required or will require:

- 10 -

(i) identification of potential trial witnesses at the outset prior to the commencement of depositions and a corresponding prohibition against a party calling any witness who has not been deposed; (ii) exchange of expert reports and expert depositions; and (iii) pre-trial filing of fact affidavits and the designation of exhibits and deposition testimony to be used at trial. Thus, no evidence may be offered at trial that has not been identified by the parties to each other prior to trial (indeed, under our latest proposal, prior to the submission of pre-trial briefs).

***The Monitor and Canadian Debtors' Proposed Alternative Is Even More Unnecessary and Burdensome than the Existing Representative Depositions and Its Topics Are In Any Event Improper***

37. Contrary to the suggestion in their December 22, 2013 letter that they have made multiple "proposals" that would "narrow the scope of the representative party discovery and the overall costs to the estates," the Monitor and Canadian Debtors have offered only one such proposal. This proposal, described in the December 22, 2013 letter, is "to reduce the total number of topics to five topics on allocation and five on the claims asserted by the EMEA Debtors against the Canadian estates . . . and to allow the parties to respond to questions by way of written responses, which would be provided by January 17, 2014." This proposal would not reduce the burden of the examinations on the other Core Parties but, rather, would create a new process that is more burdensome than the Monitor and Canadian Debtors' original topics for examination.

38. While the Monitor and Canadian Debtors have now proposed to limit the number of allocation topics to five, their proposed topics are extremely overbroad and, in fact, subsume most of the 27. Further, the Monitor and Canadian Debtors propose to be permitted to ask an unlimited number of questions on each broad topic. Moreover, the nature of their topics themselves is improper, as they appear to seek specific identification months before trial of all evidence, including all documents, that each Core Party will rely upon in support of their case and claims or to refute positions that may be taken by the Monitor and the Canadian Debtors.

- 11 -

39. Thus, the Monitor and Canadian Debtors purport to "reduce" their original 27 topics for the US Debtors by limiting themselves to an undefined and unlimited number of questions on the following five topics:

    (a)    The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

    (b)    The factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licenses, held by parties other than NNL.

    (c)    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

    (d)    The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009.

    (e)    The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property.

40. These five topics are no less broad than the Monitor and Canadian Debtors' original 27 topics for the US Debtors because they purport to include all "the facts and documents" underlying each of the listed broad topics relating to the historic intellectual property and "products" practices of the various Nortel affiliates. Each of the broad examination topics does not attempt to fill discrete gaps remaining after the voluminous fact discovery conducted to date because they were unable to depose percipient witnesses, but rather seeks an exhaustive compilation of all facts and documents the US Debtors may rely upon in support of their own allocation arguments as well as facts and documents the US Debtors may use to counter facts and arguments that the Monitor and Canadian Debtors have raised or may attempt to prove at trial, including without limitation historical conduct of the Nortel entities with respect to intellectual property and products.

- 12 -

41. Under the Litigation Timetable to which the parties agreed, the US Debtors (like all parties) have until shortly before trial to review the extensive record and ascertain which documents and testimony they believe support their position. The Monitor and Canadian Debtors, however, seek to overturn entirely the carefully negotiated schedule and accelerate from April/May to January or February the duty of the US Debtors (and other Core Parties) to put their "pens down" nearly four months before trial and finalize and specifically and exhaustively identify the factual evidence upon which they may rely with respect to the broadly described subjects at trial. It would be extremely onerous and simply unworkable for the parties, in such a short time-frame, to exhaustively identify each document and other facts based on the millions of pages of documents produced and facts gathered at the over 100 deposition taken over the last few months.

42. During the negotiations regarding the Allocation Protocol, the Monitor and Canadian Debtors never suggested that they would seek to use Representative Depositions as a means to obtain the US Debtors', or any other Core Party's, trial work product or to force the US Debtors, or any other Core Party, to distill from produced documents and deposition transcripts the facts they intend to rely on at trial months before trial is scheduled to commence and months before agreed-upon procedures would require the disclosure of direct testimony affidavits and pre-trial designation of exhibits and deposition testimony that parties intend to rely on at trial. Not only was this strategy not part of the discussion relating to Representative Depositions, it is improper as it would require the US Debtors (and other Core Parties) to disclose not merely facts about a specific transaction or event, but the US Debtors' privileged and work product analysis of those facts, the testimony obtained and the relevance of such information to the issues in dispute.

43. If it was accepted or is imposed notwithstanding that the Monitor and Canadian Debtors have never filed their own motion or sought relief from the Litigation Timetable, Discovery Protocol or Deposition Protocol to make any such alteration (and, to the contrary, advised our co-counsel last week that they did not intend to seek any affirmative relief from the Courts), the Monitor and Canadian Debtors' new proposal would place an even more severe burden on the US Debtors than the Representative

- 13 -

Deposition procedure set forth in the Allocation Protocol (if not amended) for an additional reason. To the extent Representative Depositions were permitted under the existing procedures (which the US Debtors contend have been rendered unnecessary and no longer appropriate), the existing Representative Depositions procedure would permit the parties to answer the questions by way of undertaking 60 days after the depositions took place and would also permit the parties to object to improper questions. The new Monitor and Canadian Debtor proposal would require the US Debtors to consent to examinations on topics to which the US Debtors have already objected as overly broad and unduly burdensome, would dispense with any motion practice on those objections and would instead require that any written responses to the questions be provided by January 17, 2014, less than one month after such topics were proposed by the Monitor and Canadian Debtors (without accounting for the holidays during this period). Even were this extended by a month or so, the proposed deadline for "pens down" would be impossible.

44. The US Debtors have produced a substantial volume of documents, provided numerous witnesses for deposition competent to testify to all relevant matters and will be providing appropriate pre-trial submissions, including witness affidavits, prior to trial. The Monitor and the Canadian Debtors have not offered any basis for their new proposal which increases, rather than decreases, the burden of Representative Depositions. Instead, Representative Depositions should be dispensed with entirely because they have been rendered unnecessary as a result of the exhaustive factual discovery that has already occurred.

SWORN before me at the City of New
York in the State of New York, this _6th_
day of _January_, _2014_.

_____

A Commissioner for taking affidavits.

Timothy Nessit
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

JEFFREY A. ROSENTHAL

- 14 -

# TAB A

This is Exhibit "A" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this
6th day of January, 2014.

A commissioner, etc.

Timothy Nessen
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial: +1 212 225 2025
E-Mail: mdecker@cgsh.com

December 13, 2013

<u>VIA EMAIL TO THE CORE PARTIES SERVICE LIST</u>

Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
<u>Nortel Networks Corporation, et al.: Court File No 09-CL-7950</u>

To all Core Parties:

Pursuant to the Deposition Protocol, we write on behalf of the U.S. Deposition Group to notify each Core Party as to specific topics on which the U.S. Debtors will conduct representative examinations of each Core Party listed below, to the extent such depositions occur.  In accordance with Section G(1)(c) of the Deposition Protocol, the U.S. Deposition Group is not limited in their examinations to the topics listed herein, but barring objection, the designated representatives have an obligation to be prepared to testify on the specified topics.

As we have conveyed, it is our position that representative depositions are unnecessary, inappropriate and a waste of resources in light of the extensive discovery to date. While we identify topics to avoid any claim of waiver, this letter is served with an express reservation of all rights, including our right to seek judicial relief to modify the existing Deposition Protocol to eliminate representative depositions.

Subject to the foregoing reservation of rights, the U.S. Interests hereby designate the following topics:

CLEARY GOTTLIEB STEEN & HAMILTON LLP OR AN AFFILIATED ENTITY HAS AN OFFICE IN EACH OF THE CITIES LISTED ABOVE.

[NEWYORK 2830407_5]

Core Parties Service List, p. 2

## <u>Topics for Canadian Debtors Representative</u>

1) Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and pre-petition and post-petition potential asset purchasers.

2) Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.

3) The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4) Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.

## <u>Topics for CCC Representative</u>

1) The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The justification for listing in response to Interrogatory Number 42 each transaction, arrangement and event identified therein and how each such transaction, arrangement and event supports the CCC's Allocation Position.

4) Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

Core Parties Service List, p. 3

## Topics for Wilmington Trust Representative

1) The terms of the Indenture dated November 30, 1988 between NNL and the Bank of New York Mellon ("Indenture") and the expected financial result to note holders under different allocation scenarios.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The understanding of Wilmington Trust or its predecessors regarding liability of any Nortel entity under the Indenture beyond the terms of the Indenture and any communications regarding same.

In addition, all party representatives should be prepared to address any topic, as applicable to that party, designated by that party to representatives of any of the U.S. Interests.

We look forward to continuing to discuss the scope and necessity of these examinations, including the possibility of foregoing live examinations in favor of an efficient written exchange with any of the core parties above.

Best regards,

/ Marla A. Decker /

Marla A. Decker

# TAB B

This is Exhibit "B" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this
6th Day of January, 2014 .

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 13, 2013

**VIA EMAIL TO ALL CORE PARTIES**

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

    *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Counsel:

        As we have previously advised, the Joint Administrators[1] and U.K. Pension Claimants believe that, given the more than 100 fact witness depositions that the parties have taken to date and the millions of documents that the parties have produced, representative witness examinations are unnecessary and cannot be justified in light of the substantial additional expenses and other resources that would be required to prepare for them, conduct them, and comply with the resulting undertakings. Subject and without prejudice to this position, to preserve their rights in the event that representative witness examinations go forward, the Joint Administrators and U.K. Pension Claimants hereby give notice to the Canadian Debtors of the following subjects on which they would seek representative witness testimony.

        1.     The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.

        2.     The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.

        3.     The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.

---

1. Unless otherwise indicated, capitalized terms used herein shall have the same meaning as in the Joint Administrators' and U.K. Pension Claimants' Rule 30(b)(6) Deposition Notices dated July 26, 2013.

4.  The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between Nortel and the Internal Revenue Service and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.

5.  Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard.

*** 

The Joint Administrators and U.K. Pension Claimants reserve all rights, including with respect to the appropriate scope and use of any representative witness examinations that are ultimately conducted.

Sincerely,

/s/ Neil J. Oxford

2

# TAB C

This is Exhibit "C" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

- and –

Court File No. 09-CL-7950

### ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## AMENDED REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP

**(December 13, 2013)**
**(December 15, 2013)**

1

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## <u>Subjects for the Representative Witness of the US Debtors</u>

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

2.    The facts and documents, other than the MRDA, demonstrating the ownership interests that the US Debtors allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

3.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest in Nortel's intellectual property held by parties other than NNL.

4.    The factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licences, held by parties other than NNL.

5.    The past practices of NNL and its subsidiaries concerning the scope of the licenses to Nortel intellectual property under the Cost-Sharing Agreements and the MRDA.

6.    The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

7.    The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The facts and documents demonstrating the reasons why it was decided that NNL would be the registered owner of all of the NN Technology (as that term is defined in the MRDA).

9.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

10.  The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009.

11.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

12.  At the time each of the lines of business were sold and when the Rockstar transaction closed, the value, including the dollar value, of the US Debtors' alleged interest in the Nortel global patent portfolio and the factual bases for those values.

13.  The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property.

14.  The value the US Debtors attribute to intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values.

15.  The value the US Debtors attribute to tangible assets sold as part of each of the line of business sales and the factual bases supporting those values.

16.  The US Debtors' position on what amounts should be allocated to each of the estates in respect of the sales of tangible assets and on what factual basis.

17.  The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between 2001 and 2009 for directly funded research and development; (2) the amounts that NNL, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund research and development by Nortel group entities; and (4) the amounts that NNI contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

18. The facts and documents supporting the US Debtors' position that without the backing of NNI's balance sheet the Nortel Group's access to credit markets would not have been possible or would have been greatly reduced.

19. The facts and documents supporting the US Debtors' position that without access to the pre-petition NNI revolving credit facility NNL would not have been able to operate.

20. The facts and documents demonstrating the US Debtors' recognition that the best way to maximize value for creditors was to sell the Nortel Group's rights, property and other assets together in each of the line of business sales and the Rockstar transaction instead of turning it into an intellectual property licensing business, including .

    a. the facts and documents demonstrating all efforts made to determine the US Debtors' ability, after January 14, 2009, to use a contract manufacturer to manufacture products embodying Nortel intellectual property.

    b. the facts and documents demonstrating all efforts made to determine the feasibility of sublicensing NNI's license rights under the MRDA after January 14, 2009.

    c. the facts and documents demonstrating all efforts undertaken by the US Debtors to determine the feasibility of forming a new reorganized company or corporate group to enforce the Nortel patents.

21. The facts and documents demonstrating which Nortel entity paid for the prosecution and maintenance of the patents in Nortel's global patent portfolio, including but not limited to patents registered in the United States.

22. The facts and documents demonstrating when and under what circumstances the US Debtors came to the understanding that at the time of the Rockstar transaction the value of the US Debtors' rights with respect to Nortel's intellectual property had changed.

23. The facts and documents related to the US Debtors understanding that the sale processes put in place to dispose of the Nortel Group's assets would not succeed if a selling party could hold up a sale pending agreement on the allocation of sale proceeds.

24. The facts and documents upon which the US Debtors rely upon to assert that the Monitor and Canadian Debtors are estopped or should not otherwise be permitted to assert entitlement to all of the proceeds of the Rockstar transaction.

25. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

26.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

27.    The facts and documents that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for the Representative Witness of the Ad Hoc Group of Bondholders

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The same subjects as those provided to the US Debtors.

2.    The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees.

3.    The expectations of the Bondholder Group with respect to any guarantees to proceeds from the line of business sales and Rockstar transaction, and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates.

4.    The Claims asserted by the Ad Hoc Group of Bondholders in In re Nortel Networks Inc. et al, case No. 09-10138 (KG) (jointly administered), including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for the Representative Witness of the UCC

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The same subjects as those provided to the US Debtors.

7

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNUK Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The facts and documents, other than the MRDA, demonstrating NNUK's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNUK allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.  The value NNUK attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.  The facts and documents evidencing  (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNUK contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any challenge NNUK intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNUK for the years 2001 through 2005 inclusive corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.  The current status of any ongoing (or outcome of any historical) audit by Inland Revenue (HMRC) of NNUK's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10. The facts and documents that establish any expectations that NNUK will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11. The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12. The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13. The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16. The factual and documentary basis for any claims arising from the treatment of UK pension obligations under US GAAP for the purposes of transfer pricing and that entitle NNUK or Nortel Networks UK Pension Trust Limited or the PPF to any relief. On what basis was NNUK or the NNUK Pension Scheme worse off by the treatment of all Nortel

9

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

pension plans under US GAAP for transfer pricing purposes? On what basis and upon what evidence is a claim made that any funds (or lower losses) that might be claimed for NNUK would have altered the position of NNUK or the NNUK Pension Scheme as at the date of insolvency.

17.  The facts that support the claim that NNUK pension funding should have been pooled or otherwise funded or compensated for by entities other than NNUK by means of the transfer pricing methodology or otherwise in the RPS.

18.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

19.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

20.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

21.  The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22. The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNUK.

23. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

24. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

25. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

26. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

27. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

28. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "W" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized return of capital.

29. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.  The facts and documents demonstrating Funds and other financial accommodations,
including, without limitation, lines of credit and guarantees, received by the Estate from
NNL/NNC from January 1, 2000 to present and how such receipts were characterized and
booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Germany Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Germany attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Germany's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Germany will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "E" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the destructive intervention/breach of capital maintenance rules.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.   The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Austria Representative Witness

The **Canadian Deposition Group** provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Austria attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Austria's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Austria will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "F" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the breach of capital maintenance rules.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Ireland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The facts and documents, other than the MRDA, demonstrating NN Ireland's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NN Ireland allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.    The value NN Ireland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.    The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NN Ireland contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.    The factual and documentary basis for any challenge NN Ireland intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NN Ireland for the years 2001 through 2005 inclusive

21

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Ireland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10.   The facts and documents that establish any expectations that NN Ireland will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.   The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.   The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.   The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.   The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NN Ireland by means of the transfer pricing methodology or otherwise in the RPS.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

17.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18.   The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

19.   The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20.   The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

21.   The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NN Ireland.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

23. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "G" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized return of capital.

28. The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

~~12.    The facts that support the claim that the pension funding should have been pooled or otherwise funded or compensated for by entities other than NNUK by means of the transfer pricing methodology or otherwise in the RPS.~~

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

### Subjects for NN Sweden Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Sweden attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Sweden's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Sweden will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "H" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Holland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.     The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.     The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.     The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.     The value NN Holland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.     The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Holland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.     The facts and documents that establish any expectations that NN Holland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations a

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

31

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.   The facts and documents that support any claims for resulting trust, constructive trust or
      any other claims for proprietary estoppel or equitable claims and that disclose the
      particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate the factual components of the pleaded
      requirements for certain foreign law assertions disclosed in Schedule "I" of the Joint
      Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the
      EMEA Claimants with respect to the mismanagement.

22.   The facts and documents demonstrating the estimated gross and  net assets of the Estate
      available for distribution to creditors, without recourse to the allocation proceeds, and the
      best estimate of valid claims (by creditor category) against the Estate, excluding inter-
      company claims.

23.   The facts and documents demonstrating Funds and other financial accommodations,
      including, without limitation, lines of credit and guarantees, received by the Estate from
      NNL/NNC from January 1, 2000 to present and how such receipts were characterized and
      booked by the Estate.

24.   The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Hungary Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Hungary attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Hungary's tax filings tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Hungary will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

34

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until January 2009, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "J" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NNSAS Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NNSAS attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSAS's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns -- or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NNSAS will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  ~~The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.~~

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.  The facts and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them,

39

and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of the events now complained about.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   <u>The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "K" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.</u>

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.   The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Spain Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value NN Spain attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Spain's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.   The facts and documents that establish any expectations that NN Spain will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made

43

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.  The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.  The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.  The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.  Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.  The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.  The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "L" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNIF Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NNIF attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNIF's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NNIF will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

46

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "M" of the Joint Response of the Monitor and the Canadian Debtors to the Claims.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Belgium Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Belgium attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Belgium's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Belgium will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or
any other claims for proprietary estoppel or equitable claims and that disclose the
particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded
requirements for certain foreign law assertions disclosed in Schedule "N" of the Joint
Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the
EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate
available for distribution to creditors, without recourse to the allocation proceeds, and the
best estimate of valid claims (by creditor category) against the Estate, excluding inter-
company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations,
including, without limitation, lines of credit and guarantees, received by the Estate from
NNL/NNC from January 1, 2000 to present and how such receipts were characterized and
booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Finland Representative Witness

The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Finland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Finland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Finland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.  The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.  The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "O" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.  The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Poland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Poland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Poland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Poland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

60

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "P" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Portugal Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Portugal attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Portugal's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Portugal will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Q" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and  net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Romania Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Romania attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Romania's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Romania will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "R" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Czech Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Czech attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Czech's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Czech will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.   The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.   The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.   The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "T" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

<u>NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.</u>

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Slovakia Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Slovakia attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Slovakia's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Slovakia will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.  The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

76

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "U" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24. The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Italy Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Italy attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Italy's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Italy will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "V" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

81

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Switzerland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.      The value NN Switzerland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of (HMRC) of NN Switzerland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.      The facts and documents that establish any expectations that NN Switzerland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should
be reimbursed and the basis for calculating the amounts for each year and any
corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for
customer revenues, the details of which customers, the dates and amounts of associated
revenues claimed, which other entity received the claimed revenues and the basis for
adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in
vendor financing arrangements for Nortel customers and that demonstrate that it was that
it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting
practice was unfair to that the party and the basis on which it claims to have been unable
to represent itself and its interests in respect of the practice, or that would be indicative of
any deficiencies with respect to the party's financial statements or audits.

12. ~~The facts and documents that demonstrate that a particular financial or accounting~~
~~practice was unfair to that the party and the basis on which it claims to have been unable~~
~~to represent itself and its interests in respect of the practice, or that would be indicative of~~
~~any deficiencies with respect to the party's financial statements or audits.~~

12. The facts and documents relating to the amount of any alleged deficit or amount owing in
respect of the pension plan, including but not limited to: (i) the basis of the calculation of
such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
potential costs of annuitizing member's benefits; (iv) the information that the pension
trustee or administrator provided to its pension advisors and consultants to enable them to
calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
(a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
pensioners whose pensions have been reduced.

13. The facts that establish any different amounts claimed to be owing and/or payable to or
by them to NNL than what is set forth in Schedule "B" to the Joint Response of the
Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and
the basis, if any, for claiming that amounts said to be "owing" to the party is anything
other than an unsecured debt.

14. The facts that form the basis for and calculation of the amount of any claims relating to
the allocation of proceeds or any other aspect of past dispositions of businesses including
the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew,
Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts
or transactions alleged to have been approved or not approved, and (iii) any other conduct
by EMEA BOD's (including which BOD, which members, when, at what meeting and/or

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     <u>The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "X" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.</u>

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Norway Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Norway attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Norway's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Norway will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.   The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.   The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.   The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of

87

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events ~~now complained about~~.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Y" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

     NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks (Northern Ireland) Limited

### Representative Witness

The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company lisencing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks (Northern Ireland) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks Optical Components Limited

## Representative Witness

The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks Optical Components Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks South Africa (pty) Limited

### Representative Witness

The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value Nortel Networks South Africa (pty) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

- and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**NNSA REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 17, 2013)**

1

## Subjects for NNSA Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The facts and documents, other than the MRDA, demonstrating NNSA's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNSA allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.   The value NNSA attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.   The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNSA contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.   The factual and documentary basis for any challenge NNSA intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNSA for the years 2001 through 2005 inclusive

2

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSA's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.    In particular but without limitation, the facts or documents related to any audit by any taxation authority including (i) communication with the French tax authority regarding the sufficiency of the documentation to establish the basis for the MRDA during the time in which the RPS method was in force but before the formal execution of the MRDA and (ii) communication with the French tax authority related to a proposed transfer pricing agreement for NNSA.

10.    The facts and documents that establish any expectations that NNSA will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.    The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.    The factual and documentary basis for any claim that NNSA did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that NNSA was worse off on a net basis for having done so.

15.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to NNSA and the basis on which NNSA claims to have been

unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.    The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NNSA by means of the transfer pricing methodology or otherwise in the RPS.

17.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing members' benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by NNSA to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to NNSA are anything other than an unsecured debt.

19.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

4

21.    The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA.  Specifically, and without limitation, the facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA as asserted in the Commercial Court of Versailles (the "French Proceeding"), including (i) documents or facts to support any allegations made against Jean-Marie Lesur and Darryl Edwards; (ii) documents of facts to support the French Liquidator's decision not to name certain other directors of NNSA (*e.g.*, Michel Clement, Pascal Debon, Alain Biston, Sharon Rolston and/or Simon Freemantle) in the Summons to Appear issued in the French Proceeding; (iii) any documents filed in relation to any procedural steps taken in the French Proceeding, including, in particular, any documents in support of or opposition to a stay of same; and (iv) any evidence not yet produced in this proceeding on which the French Liquidator intends to rely in the French Proceeding.

22.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JAs in both the UK and the US courts.

23.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "S" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

5

28.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

30.   The facts and documents that demonstrate that the repayment by NNSA in 2008 of €25m of the loan from NNL was improper, including without limitation (i) the documents that show that such a partial repayment was contrary to the loan agreement including, in particular, the relevant provisions of the loan agreement itself; (ii) any facts or documents to show that NNSA was not solvent at the time the repayment was made; and (iii) any facts or documents that show that NNL imposed the repayment on NNSA and/or that NNSA approved the repayment despite it not being in NNSA's best interest to do so.

6

# TAB D

This is Exhibit "D" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.
Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial  +1 212 225 2086
E-Mail:  jrosenthal@cgsh.com

December 18, 2013

Peter Ruby
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto M5H 2S7

Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
     Nortel Networks Corporation, et al.: Court File No. 09-CL7950

Dear Peter:

On behalf of the U.S. Debtors, we write to formally object to the topics listed in your December 13, 2013 letter for a representative deposition of the U.S. Debtors. Wholly apart from our position that representative depositions generally are inappropriate, unnecessary and would result in a significant waste of the parties' time and resources in this litigation, we object to the topics themselves as being unreasonable in number relative to the time limitation for the examination, subjects of an impermissibly broad scope and subjects inappropriate for a representative deposition. We would be pleased to meet and confer with you further regarding our objections.

Subject to the foregoing, in the event the courts order the U.S. Debtors to appear for a representative deposition, we designate Tim Ross as our witness for appearance on January 14 or 15. This designation is with a full reservation of the U.S. Debtors' rights, including our objections to representative depositions generally and the Canadian Group's topics specifically.

Very truly yours,

Jeffrey A. Rosenthal

cc:  all Core Parties

# TAB E

This is Exhibit "E" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this 6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 18, 2013

**VIA EMAIL TO ALL CORE PARTIES**

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

     *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Counsel,

        We write on behalf of the Joint Administrators to object to the Representative Witness Subjects that the Canadian Deposition Group served on the Joint Administrators on December 13, 2013 (as amended on December 15, 2013) and December 17, 2013 (the "Canadian Deposition Group Subjects"). Contrary to the Deposition Protocol, the Canadian Deposition Group Subjects are not "small in number," "reasonable in scope," or limited to topics on which "no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony." Further, the Canadian Deposition Group Subjects are "inappropriate for a Representative Deposition." We are prepared to meet and confer with the Canadian Deposition Group regarding our objections.

        As previously advised, it is the Joint Administrators' position that it is now clear that proceeding with representative witness examinations at this stage of the case would be extremely wasteful (in the millions of dollars) and entirely unnecessary. Subject to the foregoing, in the event that the Courts order the Joint Administrators to produce a representative witness, we designate Robin Jowitt as our representative witness for appearance on dates during the week of January 13, 2014. The Joint Administrators reserve all rights, including with respect to our objections to representative witness examinations generally and the Canadian Deposition Group Subjects specifically.

        Sincerely,

        /s/ Neil J. Oxford

New York   ᴑ   Washington, D.C.   ᴑ   Los Angeles   ᴑ   Miami   ᴑ   Jersey City   ᴑ   Kansas City   ᴑ   Paris   ᴑ   Tokyo

# TAB F

This is Exhibit "F" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

# MILBANK, TWEED, HADLEY & McCLOY LLP

INTERNATIONAL SQUARE BUILDING

1850 K STREET, NW. SUITE 1100

WASHINGTON, D.C. 20006

202-835-7500
FAX: 202-835-7586

**NEW YORK**
212-530-5000
FAX: 212-530-5219

**LOS ANGELES**
213-892-4000
FAX: 213-629-5063

**LONDON**
44-20-7615-3000
FAX: 44-20-7615-3100

**FRANKFURT**
49-69-71914-3400
FAX: 49-69-71914-3500

**MUNICH**
49-89-25559-3600
FAX: 49-89-25559-3700

ANDREW M. LEBLANC
PARTNER
DIRECT DIAL NUMBER
202-835-7574
FAX: 202-263-7574
E-MAIL: aleblanc@milbank.com

**BEIJING**
8610-5969-2700
FAX: 8610-5969-2707

**HONG KONG**
852-2971-4888
FAX: 852-2840-0792

**SINGAPORE**
65-6428-2400
FAX: 65-6428-2500

**TOKYO**
813-5410-2801
FAX: 813-5410-2891

**SÃO PAULO**
55-11-3927-7700
FAX: 55-11-3927-7777

December 18, 2013

**VIA EMAIL**

Peter Ruby
GOODMANS LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto M5H 2S7

Re:  In re Nortel Networks Inc., et al., Case No. 09-10138
     Nortel Networks Corporation, et al.: Court File No. 09-CL7950

Dear Peter:

On behalf of the Ad Hoc Group of Bondholders (the "Bondholder Group"), we write in response to your Amended Representative Witness Subjects, served on December 15, 2013, and the request contained therein for a representative deposition of the Bondholder Group (the "Deposition Request").

As we informed you previously, the Bondholder Group agrees with the position of the U.S. Debtors and other Core Parties that representative depositions are inappropriate, unnecessary and would result in a significant waste of time and resources, particularly given that the parties have already taken over 100 fact-witness depositions in this case. Separately, we object to the subjects set forth in the Deposition Request (the "Subjects") on a number of grounds, including that they are unreasonable in number relative to the time limitation for the examination, of an impermissibly broad scope, on topics inappropriate for a representative deposition, and inconsistent with the terms of the Amended Deposition Protocol Stipulation [D.I. 11747]. Enclosed with this letter is a copy of our formal objections to each of the Subjects.

Subject to the foregoing, in the event the courts order the Bondholder Group to respond to the Deposition Request, we would be willing to meet and confer regarding the appropriate subject matter and form of the Bondholder Group's responses. If the Bondholder Group is ultimately required to produce a witness for deposition, we would designate Michael Katzenstein of FTI Consulting as our witness. Mr. Katzenstein is available for deposition on

Peter Ruby
December 18, 2013
Page 2


January 15, 2014 from 9 a.m. to 4 p.m. This designation is with a full reservation of the Bondholder Groups' rights, including our objections to representative depositions generally and the Subjects specifically.

Very truly yours,

Andrew M. Leblanc

cc:  all Core Parties

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

———————————————————————— x
                                                    :
*In re*                                             :      Chapter 11
                                                    :
Nortel Networks Inc., *et al.*,                     :      Case No. 09-10138 (KG)
                                                    :
                            Debtors.                :      (Jointly Administered)
                                                    :
                                                    :
———————————————————————— x

-    and the    -

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

THE AD HOC GROUP OF BONDHOLDERS' OBJECTIONS TO THE
REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP

         Pursuant to the Order Entering Litigation Timetable and Discovery Plan, Case No.

09-10138-KG [D.I. 10566], Ontario Superior Court of Justice (Commercial List) Court File No.

09-CL-7950 (the "Discovery Order") and the Order Amending Litigation Schedule in Joint

Cross-Border Proceedings to Determine Allocation of Asset Sale Proceeds and Certain Claims

(the "Discovery Amendment" and together with the Discovery Order, the "Amended Discovery

Order") [D.I. 12522], the Deposition Protocol Stipulation (the "Deposition Protocol") [D.I.

11439] and the Amendment to Deposition Protocol Stipulation (the "Protocol Amendment" and

together with the Deposition Protocol, the "Amended Deposition Protocol") [D.I. 11747],[1] the

Ad Hoc Group of Bondholders (the "Bondholder Group"),[2] by and through its undersigned

counsel, hereby responds and objects to the Representative Witness Subjects Served by the

Canadian Allocation Group and the Canadian Claims Defendant Group, dated December 13,

2013, as amended on December 15, 2013 (collectively, the "Subjects"). The Bondholder Group

submits these objections to the Subjects solely on its own behalf.

## GENERAL OBJECTIONS

The Bondholder Group, along with other Core Parties, believes that any

"Representative Witness" or 30(b)(6) depositions are unnecessary in light of the more than 100

fact witness depositions that have taken place to date and would result in a waste of estate

resources. Accordingly, the Bondholder Group asserts and reserves its rights to argue to the

Courts that any such "Representative Witness" or 30(b)(6) depositions should not proceed. The

Bondholder Group provides the following General and Specific Objections in accordance with

the Amended Discovery Order subject to, and without waiving, this reservation of rights.

The Bondholder Group responds and objects generally to the Subjects as follows

(the "General Objections"):

1.    The Bondholder Group objects to the Subjects to the extent they seek to impose

obligations on the Bondholder Group that are inconsistent with the requirements of the Amended

Discovery Order, the Amended Deposition Protocol, the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the Federal Rules of Civil Procedure (the "Civil Rules"), the Ontario

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Amended Discovery Order and the Amended Deposition Protocol.

[2]    The Bondholder Group consists of bondholders that hold claims issued or guaranteed by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Inc., and Nortel Networks Capital Corporation.

*Rules of Civil Procedure* (the "Canadian Rules" and collectively with the Bankruptcy Rules and the Civil Rules, the "Rules"), or any other applicable rules, orders or law.

2.    The Bondholder Group objects to the Subjects to the extent they seek information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection.

3.    The Bondholder Group objects to the Subjects to the extent they are vague, ambiguous, overly broad, unduly burdensome, unduly prejudicial, oppressive, misleading, duplicative, cumulative, not susceptible to a reasoned interpretation, not reasonably particular, or would require the Bondholder Group to speculate as to the nature or scope of the information sought thereby.

4.    The Bondholder Group objects to the Subjects to the extent they are not relevant to a claim or defense of any party and not reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute.

5.    The Bondholder Group objects to the Subjects on the grounds that they appear calculated to annoy and harass the Bondholder Group to the extent they seek information not relevant to the Allocation dispute or outside the Bondholder Group's possession, custody or control or that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors.

6.    The Bondholder Group objects to the Subjects  to the extent they violate section G(1)(a) of the Amended Deposition Protocol ("Section G(1)(a)"), which states, in relevant part, as follows:

> [A] Deposition Group may serve *a very limited number* of subjects
> on which it believes no fact witness currently or formerly
> associated with the party producing the Representative Witness has
> provided adequate first hand testimony.  Provided such subjects are

3

*small in number and reasonable in scope*, the Representative
Witness has a duty to prepare to testify on the designated subjects.

(emphasis added). Specifically, the Bondholder Group asserts that the Subjects are neither "very limited" in number nor "reasonable in scope" as required by Section G(1)(a).

7.    The Bondholder Group objects to the statement that the Subjects "are not believed to have been fully canvassed with the fact deposition witnesses . . . ." Each Subject has been sufficiently canvassed through the over 100 fact-witness depositions that have already been taken by the Core Parties. Any additional testimony is unnecessary and would result in a waste of resources.

8.    The Bondholder Group objects to the Subjects to the extent they assume disputed facts or legal conclusions in defining the information requested. The Bondholder Group hereby denies any such disputed facts or legal conclusions to the extent assumed by any Subject. Any response or objection by the Bondholder Group is without prejudice to this objection.

9.    The Bondholder Group objects to the Subjects to the extent they seek information that is not properly obtained in a deposition and may be more appropriately obtained through other means, including, but not limited to, expert witness testimony or written discovery.

10.    All responses to the Subjects are provided subject to the provisions of the Protective Order entered by the United States Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice on June 11, 2013, as amended, including but not limited to section 18 thereof, which provides that the inadvertent disclosure of any information in response to the Subjects shall not constitute a waiver of privilege or of any other ground for objection to discovery with respect to such information or the subject matter thereof.

11.    The Bondholder Group reserves the right to amend, revise, correct, supplement or clarify the General and Specific Objections (defined below) based on facts or other information gathered at any time subsequent to the date of these General and Specific Objections.

**SPECIFIC OBJECTIONS**

Without waiving or limiting, and subject to the foregoing General Objections, which are hereby expressly incorporated by reference into each objection below, the Bondholder Group objects specifically as follows to the Subjects (the "Specific Objections"):

**Subject No. 1:**

The same subjects as those provided to the US Debtors (the "US Debtors' Subjects").

**US Debtors' Subject No. 1:**

The facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase "equitable and beneficial ownership" as used in the MRDA and the term "economic ownership" as used in the US Debtors' allocation pleadings.

**Response to US Debtors' Subject No. 1:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the "US Debtors' understanding" of statements made in the US Debtors' allocation pleadings; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or

5

any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 2:**

    The facts and documents, other than the MRDA, demonstrating the ownership interests that the US Debtors allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

**Response to US Debtors' Subject No. 2:**

    In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

    Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group is willing to meet and confer regarding the scope and form of its response, if any, to US Debtors' Subject No. 2.

**US Debtors' Subject No. 3:**

    The factual and documentary basis for and scope of the alleged beneficial/equitable interest in Nortel's intellectual property held by parties other than NNL.

**Response to US Debtors' Subject No. 3:**

    In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and

unduly burdensome to the extent that it seeks information that may be more easily and

appropriately obtained from other sources, including without limitation the US Debtors; (iii)

seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and

(iv) violates Section G(1)(a) and principles of proportionality in discovery.

       Subject to and without waiving the foregoing General and Specific Objections,

the Bondholder Group is willing to meet and confer regarding the scope and form of its response,

if any, to US Debtors' Subject No. 3.

**US Debtors' Subject No. 4:**

       The factual and documentary basis for and scope of licenses of Nortel's

intellectual property, including any enhanced licences [sic], held by parties other than NNL.

**Response to US Debtors' Subject No. 4:**

       In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it

refers to "licenses of Nortel's intellectual property, including any enhanced licenses" without

greater specificity; (ii) seeks information that is outside the possession, custody or control of the

Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it

seeks information that may be more easily obtained from other sources; (iv) seeks information

protected from discovery by the attorney-client privilege, the attorney work product doctrine,

common interest privilege or any other applicable privilege or protection; and (v) violates

Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 5:**

      The past practices of NNL and its subsidiaries concerning the scope of the licenses to Nortel intellectual property under the Cost-Sharing Agreements and the MRDA.

**Response to US Debtors' Subject No. 5:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "[t]he past practices of NNL and its subsidiaries"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily obtained from other sources; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 6:**

      The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

**Response to US Debtors' Subject No. 6:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 7:**

> The factual and documentary basis, other than the MRDA, demonstrating that the Licensed MRDA Participants' agreement to have the patents and all other registered forms of Nortel IP filed in NNL's name and to share the cost of global R&D through transfer pricing payments was in exchange for enhanced exclusive licenses that constituted effective ownership of the IP in their respective jurisdictions, including the factual and documentary basis for demonstrating that this choice was a conscious decision.

**Response to US Debtors' Subject No. 7:**

> In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is duplicative of Subject No. 6; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 8:**

The facts and documents demonstrating the reasons why it was decided that NNL would be the registered owner of all of the NN Technology (as that term is defined in the MRDA).

**Response to US Debtors' Subject No. 8:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 9:**

The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

**Response to US Debtors' Subject No. 9:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "intellectual property" without greater specificity; (ii) is vague and ambiguous insofar as it refers to "NNL's subsidiaries" without greater specificity; (iii) is vague and ambiguous insofar as it refers to "inventors/authors and others"; (iv) seeks information that is outside the possession, custody or control of the Bondholder Group; (v) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and

appropriately obtained from other sources; (vi) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vii) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 10:**

The facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009.

**Response to US Debtors' Subject No. 10:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "Nortel's processes for the identification and development of products"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 11:**

The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

11

**Response to US Debtors' Subject No. 11:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "third-party products and components"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 12:**

At the time each of the lines of business were sold and when the Rockstar transaction closed, the value, including the dollar value, of the US Debtors' alleged interest in the Nortel global patent portfolio and the factual bases for those values.

**Response to US Debtors' Subject No. 12:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is more appropriately obtained through expert testimony; (ii) is vague and ambiguous insofar as it refers to "the Nortel global patent portfolio" without greater specificity; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (v)

seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 13:**

The facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property.

**Response to US Debtors' Subject No. 13:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the contentions of the US Debtors in their allocation pleadings; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 14:**

The value the US Debtors attribute to intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values.

**Response to US Debtors' Subject No. 14:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) vague and ambiguous insofar as it refers to "intangible assets other than intellectual property"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation values attributed by the US Debtors to assets sold in the line of business sales and the Rockstar transaction; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 15:**

The value the US Debtors attribute to tangible assets sold as part of each of the line of business sales and the factual bases supporting those values.

**Response to US Debtors' Subject No. 15:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation values attributed by the US Debtors to assets sold in the line of business sales; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 16:**

The US Debtors' position on what amounts should be allocated to each of the estates in respect of the sales of tangible assets and on what factual basis.

**Response to US Debtors' Subject No. 16:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 17:**

The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between 2001 and 2009 for directly funded research and development; (2) the amounts that NNL, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund research and development by Nortel group entities; and (4) the amounts that NNI contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

**Response to US Debtors' Subject No. 17:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding any contentions made by NNI; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 18:**

      The facts and documents supporting the US Debtors' position that without the backing of NNI's balance sheet the Nortel Group's access to credit markets would not have been possible or would have been greatly reduced.

**Response to US Debtors' Subject No. 18:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the Nortel Group's access to credit markets"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work

16

product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 19:**

The facts and documents supporting the US Debtors' position that without access to the pre-petition NNI revolving credit facility NNL would not have been able to operate.

**Response to US Debtors' Subject No. 19:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the pre-petition NNI revolving credit facility"; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the positions of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 20:**

The facts and documents demonstrating the US Debtors' recognition that the best way to maximize value for creditors was to sell the Nortel Group's rights, property and other assets together in each of the line of business sales and the Rockstar transaction instead of turning it into an intellectual property licensing business, including

a.     the facts and documents demonstrating all efforts made to determine the US Debtors' ability, after January 14, 2009, to use a contract manufacturer to manufacture products embodying Nortel intellectual property.

b.     the facts and documents demonstrating all efforts made to determine the feasibility of sublicensing NNI's license rights under the MRDA after January 14, 2009.

c.     the facts and documents demonstrating all efforts undertaken by the US Debtors to determine the feasibility of forming a new reorganized company or corporate group to enforce the Nortel patents.

**Response to US Debtors' Subject No. 20:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the "US Debtors' recognition" of the best way to maximize value for creditors; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any

other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 21:**

        The facts and documents demonstrating which Nortel entity paid for the prosecution and maintenance of the patents in Nortel's global patent portfolio, including but not limited to patents registered in the United States.

**Response to US Debtors' Subject No. 21:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous with respect to the meaning of the word "paid"; (ii) is vague and ambiguous insofar as it refers to "the Nortel global patent portfolio" without greater specificity; (iii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iv) seeks information that is outside the possession, custody or control of the Bondholder Group; (v) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (vi) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vii) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 22:**

        The facts and documents demonstrating when and under what circumstances the US Debtors came to the understanding that at the time of the Rockstar transaction the value of the US Debtors' rights with respect to Nortel's intellectual property had changed.

**Response to US Debtors' Subject No. 22:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the understanding of the US Debtors; (iv) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (v) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (vi) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 23:**

        The facts and documents related to the US Debtors [sic] understanding that the sale processes put in place to dispose of the Nortel Group's assets would not succeed if a selling party could hold up a sale pending agreement on the allocation of sale proceeds.

**Response to US Debtors' Subject No. 23:**

        In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group, including without limitation information regarding the understanding of the US Debtors; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iv) seeks information protected from discovery by the attorney-client privilege, the

attorney work product doctrine, common interest privilege or any other applicable privilege or

protection; and (v) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 24:**

    The facts and documents upon which the US Debtors rely upon to assert that the

Monitor and Canadian Debtors are estopped or should not otherwise be permitted to assert

entitlement to all of the proceeds of the Rockstar transaction.

**Response to US Debtors' Subject No. 24:**

    In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group, including without limitation

information regarding the assertions of the US Debtors; (ii) is duplicative, overly broad and

unduly burdensome to the extent that it seeks information that may be more easily and

appropriately obtained from other sources, including without limitation the US Debtors; (iii)

seeks information protected from discovery by the attorney-client privilege, the attorney work

product doctrine, common interest privilege or any other applicable privilege or protection; and

(iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 25:**

    The facts and documents demonstrating the estimated gross and net assets of the

Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company

claims.

**Response to US Debtors' Subject No. 25:**

    In addition to the foregoing General Objections, the Bondholder Group

specifically objects to this Subject on grounds that it: (i) seeks information that is outside the

possession, custody or control of the Bondholder Group; (ii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources, including without limitation the US Debtors; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 26:**

The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

**Response to US Debtors' Subject No. 26:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous because it uses the term "Funds," which has not been defined; (ii) seeks information that is outside the possession, custody or control of the Bondholder Group; (iii) is duplicative, overly broad and unduly burdensome to the extent that it seeks information that may be more easily and appropriately obtained from other sources; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

**US Debtors' Subject No. 27:**

The facts and documents that relate to any other topics designated by any other parties for this witness.

**Response to US Debtors' Subject No. 27:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous; and (ii) is overly broad, unduly burdensome, unduly prejudicial, and violates Section G(1)(a) and principles of proportionality in discovery.

      Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group fully reserves its rights to incorporate herein any objections to any topics or subjects designated by any other party for any witness of the Bondholder Group.

**Subject No. 2:**

      The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees.

**Response to Subject No. 2:**

      In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous because it uses the terms "Nortel Bonds" and "Bonds," which have not been defined; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; (iv) violates Section G(1)(a) and principles of proportionality in discovery; (v) seeks discovery that calls for a legal conclusion; and (vi) seeks discovery that is duplicative of the information contained in the bonds issued by Nortel and any guarantees thereof.

**Subject No. 3:**

   The expectations of the Bondholder Group with respect to any guarantees to proceeds from the line of business sales and Rockstar transaction, and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates.

**Response to Subject No. 3:**

   In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) lacks foundation and assumes facts not in evidence; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; and (iv) violates Section G(1)(a) and principles of proportionality in discovery.

   Subject to and without waiving the foregoing General and Specific Objections, the Bondholder Group is willing to meet and confer regarding the scope and form of its response, if any, to Subject No. 3.

**Subject No. 4:**

   The Claims asserted by the Ad Hoc Group of Bondholders in In re Nortel Networks Inc. et al, case No. 09-10138 (KG) (jointly administered), including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.

**Response to Subject No. 4:**

In addition to the foregoing General Objections, the Bondholder Group specifically objects to this Subject on grounds that it: (i) is vague and ambiguous insofar as it refers to "the current facts respecting such subjects"; (ii) seeks discovery that is neither relevant to the claims or defenses of any party nor reasonably calculated to lead to the discovery of admissible evidence relating to the Allocation dispute; (iii) seeks information protected from discovery by the attorney-client privilege, the attorney work product doctrine, common interest privilege or any other applicable privilege or protection; (iv) violates Section G(1)(a) and principles of proportionality in discovery; and (v) seeks discovery that is duplicative of the Bondholder Group's Bankruptcy Rule 2019 Statements.

Dated:  December 18, 2013

**MILBANK, TWEED, HADLEY & M^cCLOY LLP**

/s/ Andrew M. Leblanc
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463

 -and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762

*Attorneys for the Ad Hoc Group of Bondholders*

25

# TAB G

This is Exhibit "G" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



**Akin Gump**

STRAUSS HAUER & FELD LLP

Abid Qureshi
+1 212.872.8027/fax: +1 212.872.1002
aqureshi@akingump.com

December 18, 2013

VIA E-MAIL

Peter Ruby
Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto M5H 2S7

Re:    In re Nortel Networks Inc., et al., Case No. 09-10138
       Nortel Networks Corporation, et al., Court File No. 09-CL7950

Dear Peter:

On behalf of the Official Committee of Unsecured Creditors of the US Debtors ("UCC"), we write in response to the representative witness topics noticed on December 13, 2013 (as amended on December 15, 2013) for testimony from the UCC. As we have previously informed you, we believe that representative witness depositions are entirely unnecessary given the very extensive discovery process that, over the past four months, has resulted in well over 100 fact depositions. Moreover, the agreed Discovery Plan provides that a Deposition Group may serve representative party deposition notices only on **"a very limited number of subjects on which it believes no fact witness currently or formerly associated with the party producing the Representative Witness has provided adequate first-hand testimony"**. The Monitor and Canadian Debtors have not adhered to this restriction in our negotiated Discovery Plan, and instead have adopted a scattershot approach that is inappropriate.

Furthermore, as you know, the UCC came into existence post-petition, pursuant to the U.S. Bankruptcy Code, and therefore cannot put forth a percipient witness to events that took place prior to January 22, 2009. Additionally, a number of the noticed representative witness topics concern matters that are properly the subject of expert reports and expert testimony, disclosure of which is already provided for in our amended litigation schedule. Finally, many of the proposed topics call for testimony on matters that are clearly protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine and thus inappropriate for representative witness testimony.



**Akin Gump**
STRAUSS HAUER & FELD LLP

Peter Ruby
Goodmans LLP
December 18, 2013
Page 2

In light of the foregoing, the UCC does not believe it is necessary or appropriate to designate a person who will sit for a representative witness deposition. We are, of course, available to meet and confer on this matter and will participate in the call that is scheduled for tomorrow.

Sincerely,

Abid Qureshi

cc: all Core Parties

# TAB H

This is Exhibit "H" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

ALLEN & OVERY

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

Marla A. Decker
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

| | |
|---|---|
| Tel | 212 610 6300 |
| Fax | 212 610 6399 |
| Direct line | 212 610 6414 |
| Personal fax | 212 610 6399 |

paul.keller@allenovery.com

Our ref         /0017242-0000008 NY:18434047.1

December 18, 2013

*In re Nortel Networks Inc., et al., Case No. 09-1-138*
*Nortel Networks Corporation, et al.:  Court File No. 09-CL-7950*

Re:    **Objections to the Representative Topics Served on the Canadian**
        **Deposition Group by the US Deposition Group**

Dear Ms. Decker:

Below please find the Canadian Debtors and the Monitor's objections to the representative topics served by the US Deposition Group.

**Topic No. 1:  Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and prepetition and post-petition potential asset purchasers.**

**RESPONSE TO TOPIC 1:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from

disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and

immunities. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning

"affiliated entities" and "any employee, advisor or representative" over which neither the Canadian Debtors or

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

the Monitor have any custody or control. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning the broad categories of the "MRDA" and "transfer pricing", which cover a nine year time period, as well as information from four other third-parties. The Canadian Debtors and the Monitor object to the extent this topic seeks information beyond the information maintained by the Canadian Debtors and the Monitor with respect to statements made by them concerning ownership of intellectual property or intellectual property license rights.

**Topic No. 2: Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.**

**RESPONSE TO TOPIC 2:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every license of intellectual property and to the extent it seeks information relating to Commercial Licenses as described in the Rockstar Agreement or licenses of intellectual property other than patents.

**Topic No. 3: The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.**

**RESPONSE TO TOPIC 3:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 4: Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.**

**RESPONSE TO TOPIC 4:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks expert discovery prior to Court ordered date for such disclosures. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every divesture, acquisition or transaction.

*        *        *

Finally, the Canadian Debtors and the Monitor further object to the extent the US Debtors intend to seek information from the Canadian Debtors and the Monitor on topics and subject matter beyond the topics enumerated above.

Very truly yours,

Paul B. Keller
Partner

# TAB I

This is Exhibit "I" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

ALLEN & OVERY

December 18, 2013

Neil J. Oxford
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004-1482

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

| | |
|---|---|
| Tel | 212 610 6300 |
| Fax | 212 610 6399 |
| Direct line | 212 610 6414 |
| Personal fax | 212 610 6399 |

paul.keller@allenovery.com

Our ref          /0017242-0000008 NY:18433045.1

*In re Nortel Networks Inc. et al., Case No. 09-10138 (KG) (Bankr. D. Del.)*

*In the Matter of Nortel Networks Corporation et al.,*
<u>*Court File No. 09-CL-7950 (Ontario Superior Court of Justice*</u>

Re:     **Objections to the Representative Topics Served on**
        <u>**the Canadian Deposition Group by the Joint Administrators and the U.K. Pension Claimants**</u>

Dear Mr. Oxford:

Below please find the Canadian Debtors and the Monitor's objections to the Representative Topics served by the Joint Administrators and the U.K. Pension Claimants.

**Topic No. 1.:  The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.**

**RESPONSE TO TOPIC 1:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent that this information has been provided through the testimony of the witnesses deposed and the documents produced to date. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 2:  The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.**

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

**RESPONSE TO TOPIC 2:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent that this information has been provided through the testimony of the witnesses deposed and the documents produced to date. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 3: The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.**

**RESPONSE TO TOPIC 3:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent that this information has been provided through the testimony of the witnesses deposed and the documents produced to date. The Canadian Debtors and the Monitor further object to this request to the extent it seeks information from either of them that is not in their possession, custody or control. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 4: The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between Nortel and the Internal Revenue Service and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.**

**RESPONSE TO TOPIC 4:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent that this information has been provided through the testimony of the witnesses deposed and the documents produced to date. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 5: Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard.\**

**RESPONSE TO TOPIC 5:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent that this information has been provided through the testimony of the witnesses deposed and the documents produced to date. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks expert discovery prior to the Court ordered date for such disclosures. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

Very truly yours,

Paul B. Keller
Partner

# TAB J

This is Exhibit "J" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassan
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

Court File No.  09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**


IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

- and-

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------- X
                                                           :
*In re*                                                    :    Chapter 11
                                                           :
Nortel Networks Inc., *et al.*,[1]                         :    Case No. 09-10138 (KG)
                                                           :
                    Debtors.                               :    Jointly Administered
                                                           :
                                                           :
---------------------------------------------------------- X


**RESPONSES AND OBJECTIONS OF THE CCC TO THE**
**US DEPOSITION GROUP'S AND US DEBTORS'**
**TOPICS FOR CCC REPRESENTATIVE**

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

The Canadian Creditors Committee (the "CCC"), by and through its undersigned counsel and pursuant to, *inter alia,* the Deposition Protocol, submits these objections (the "Objections") to the US Deposition Group's and US Debtors' (collectively, the "US Group") December 13, 2013 Topics for CCC Representative (the "Topics"). The CCC reserves all rights.

## GENERAL OBJECTIONS

The following General Objections are incorporated into each of the CCC's Objections to the US Group's individual topics.

1.    The CCC objects to the Topics, to the extent they seek information that is in the possession, custody or control of the requesting party. The Canadian Debtors, US Debtors, and UK/EMEA Debtors (collectively, the "Nortel Debtors") conducted the liquidation of Nortel's assets via the sale of Nortel's lines of business, including the business units (the "Business Sales") and the sale of Nortel's remaining patent portfolio to Apple, RIM, Sony and Microsoft (the "Residual IP Sale"). The Nortel Debtors operated the Nortel Entities as going concerns including interacting with employees and creditors, conducted the post-filing bidding process and ultimate sales, maintain all related financial records, and possess license agreements and all other relevant contracts. It is therefore unreasonable for the US Group to seek this same information from the CCC, which, in any event, does not possess such information.

2.    The CCC objects to the Topics to the extent they seek information that was previously provided by a fact witness currently or formerly associated with the CCC.

3.    The CCC objects to the Topics to the extent they seek information from persons or entities other than the CCC.

4.    The CCC objects to the Topics to the extent that they are overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent that they are unreasonable un scope pursuant to the Deposition Protocol.

5.     The CCC objects to the Topics to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, proprietary, financial or trade secret protections, the business strategies privilege, the right to privacy, confidentiality doctrines, any protective order, or any other privilege and/or immunity, and which is not subject to an appropriate protective order entered into by the parties and approved by the Court.    The inadvertent disclosure of any protected or privileged information shall not operate as a waiver of any privileges or protections.

6.     The CCC objects to the Topics to the extent they attempt or purport to impose obligations beyond those imposed or authorized by the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware, or any other applicable rules, orders, or protocols.

7.     The CCC objects to the Topics to the extent they do not contain a reasonable time limitation, on the grounds that any such Topic is overbroad, unduly burdensome, oppressive, vague, and/or ambiguous.

8.     By providing a representative witness to testify regarding any of the Topics, the CCC does not admit the relevance or admissibility of any of the testimony provided but instead reserves the right to object to the relevance and admissibility of any such testimony.

9.     These General Objections will be deemed to be continuing throughout the responses that follow, whether or not expressly referred to therein.    The stating of additional or other specific objections shall not constitute a waiver or limitation of these General Objections.

Subject to and without waiver of these General Objections, the CCC objects as follows:

## OBJECTIONS TO THE US GROUP'S
## TOPICS FOR CCC REPRESENTATIVE

TOPIC NO. 1  The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 2, 4, 7). Further, to the extent the Topic seeks information regarding the "financial condition" of any CCC constituent, whether of creditor groups or of an individual court-appointed representative, the CCC objects to the Topic. The CCC also objects to the terms "financial condition" and "legal relationship" as vague and ambiguous. Subject to and without waiving the foregoing Objections, the CCC will produce a representative witness to testify regarding the identity of constituent creditor groups of the CCC and the legal relationship between any Nortel entity to each such creditor group.

TOPIC NO. 2  Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 3, 4, 7). The CCC further objects to this Topic as vague and ambiguous. To the extent the CCC has relevant information, and subject to the foregoing Objections, the CCC will produce a representative witness to testify regarding certain creditors' perception of Nortel as a single and indivisible entity, as alleged in paragraphs 63, 64, 66, and 74 of its allocation position.

TOPIC NO. 3 The justification for listing in response to Interrogatory Number 42 each transaction, arrangement, and event identified therein and how each such transactions, arrangement and event supports the CCC Allocation Position.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 4, 6). The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process. To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

TOPIC NO. 4 Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 4, 6). The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process. To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

Dated: December 18, 2013

**CANADIAN CREDITORS COMMITTEE**

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, Ontario  M5H 3E5

Mark Zigler
Susan Philpott
Ari Kaplan
Barbara Walancik

Email:   mzigler@kmlaw.ca
Tel:     416.595.2090
Fax:     416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:     416.595.2104
Fax:     416.204.2882

Email:   akaplan@kmlaw.ca
Tel:     416.595.2087
Fax:     416.204.2875

Email:   bwalancik@kmlaw.ca
Tel:     416.542.6288
Fax:     416.204.2906

Lawyers for the Former Employees of Nortel
and LTD Beneficiaries

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Karen Jones
Tina Lie
Michelle Jackson

Email:   ken.rosenberg@paliareroland.com
Tel:     416.646.4304
Fax:     416.646.4301

Email:   max.starnino@paliareroland.com
Tel:     416.646.7431
Fax:     416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:     416.646.4326
Fax:     416.646.4301

Email:   karen.jones@paliareroland.com
Tel:     416.646.4339
Fax:     416.646.4301

Email:   tina.lie@paliareroland.com
Tel:     416.646.4332
Fax:     416.646.4301

Email:   michelle.jackson@paliareroland.com
Tel:     416.646.7470
Fax:     416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email: barry.wadsworth@caw.ca
lewis.gottheil@caw.ca

Tel.:    416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham
Ainslie Benedict

Email: janice.payne@nelligan.ca
steven.levitt@nelligan.ca
christopher.rootham@nelligan.ca
ainslie.benedict@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email: arthur.jacques@shibleyrighton.com
Tel:    416.214.5213
Fax:    416.214.5413

Email : thomas.mcrae@shibleyrighton.com
Tel :    416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario M5K 1E6

Barbara J. Boake
James D. Gage
Elder C. Marques
Paul Steep
Byron Shaw

E-mail: bboake@mccarthy.ca
Tel:    416.601.7557
Fax:    416.868.0673

Email: jgage@mccarthy.ca
Tel:    416.601.7539
Fax:    416.686.0673

Email: emarques@mccarthy.ca
Tel:    416.601.7822
Fax:    416.686.0673

Email: psteep@mccarthy.ca
Tel:    416.601.7998
Fax:    416.686.0673