Email:  bdshaw@mccarthy.ca
Tel:    416.601.8256
Fax:    416.686.0673

Lawyers for Morneau Shepell Limited

**DLA PIPER**
1201 N. Market Street
Suite 2100
Wilmington, Delaware 19801

Selinda A. Melnik
Richard Hans
Timothy Hoeffner
Farah Lisa Whitley-Sebti

Email:  selinda.melnik@dlapiper.com
Tel:    302.468.5650
Fax:    302.778.7914

Email:  richard.hans@dlapiper.com
Tel:    212.335.4530
Fax:    212.884.8730

Email:  timothy.hoeffner@dlapiper.com
Tel:    212.656.3341
Fax:    215.606.3341

Email:  farahlisa.sebti@dlapiper.com
Tel:    212.335.4829
Fax:    212.884.8529

U.S. Lawyers for the Canadian Creditors
Committee

# TAB K

This is Exhibit "K" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

**Timothy Nassau**
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

- and –

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**UKPC REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 19, 2013)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for UKPC Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:[1]**

1.    The facts and documents relating to the amount of each of the NNUK Pension Plan deficit and section 75 debt including but not limited to: (i) the basis of the calculation of each; (ii) the assumptions used in the calculation of each; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the Trustee provided to its pension advisors and consultants to enable them to calculate the deficit and section 75 debt; and (v) the liabilities used in the calculation of the deficit and section 75 debt referable to (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

2.    The facts and documents relating to the age and the amount of the benefit of pension plan members, before and after reduction.

3.    The facts and documents relating to the quantum of the PPF claim.

4.    The facts and documents relating to the UKPC's position that NNUK failed to follow a recommendation made by the NNUK Pension Plan's actuary in a manner that violated the Scheme's Trust Deed or Rules or any statute or other UK law or regulation or made a funding commitment that it failed to fulfill.

5.    The facts and documents relating to the mortality assumptions proposed by Trustee and the Scheme's actuary for the March 31, 2008 actuarial valuation of the Scheme and the 2005 actuarial valuation of the Scheme.

6.    The facts and documents relating to the UKPC's claim that NNUK is entitled to any or all of NNSA's assets as a result of Project Swift.

7.    The facts and documents relating to the UKPC's claim that NNUK or Nortel Canada acted in bad faith, oppressively, or otherwise improperly during the negotiations that lead to the 2002, 2003 and 2004 funding contributions, the 2005 Interim Funding Agreement, the 2006 Long Term Funding or the negotiations regarding the 2008 actuarial valuation of the Scheme.

8.    The facts and documents relating to the investment performance of the Scheme assets each year from 2002 through 2008, as a whole and by asset category.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Joint Response Of The Monitor And Canadian Debtors To The Claims By The UK Pension Trustee and PPF re: UK Pension Scheme

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

9.   The facts and documents relating to the UKPC's involvement in FSD proceedings before
the Determinations Panel including, but not limited to: (i) all communications that the
Trustee had with tPR; (ii) any work that the Trustee retained PwC to undertake with
respect to the FSD proceedings; (iii) tPR's selection of June 30, 2008 as the Relevant
Time; and (iv) any communications among any of the UKPC, PwC and the tPR with
respect to seeking a contribution notice against Nortel Canada.

10.   The facts and documents relating to the UKPC's claim that NNUK was insufficiently
resourced as at the Relevant Time for purposes of the FSD.

11.   The facts and documents relating to the UKPC's claim that it is reasonable to impose an
FSD on Nortel Canada.

12.   The facts and documents relating to the potential imposition of a Contribution Notice on
Nortel Canada;

13.   The facts and documents relating to the UKPC's claim that NNUK provided benefits to
Nortel Canada whose value exceeded the benefits that Nortel Canada provided to NNUK;

14.   The facts and documents relating to the UKPC's claim that the RPSM failed to
adequately take into account NNUK's restructuring costs, pension obligations and the
Reciprocal Agreement, and that such alleged failures had an adverse impact on the
funding contributions made by NNUK to the Scheme or otherwise harmed the Scheme;.

15.   The facts and documents relating to any documents or information provided by the
Trustee to any experts that the Trustee or tPR retained to submit reports to the
Determinations Panel in connection with the FSD proceedings including, but not limited
to the reports of Ronald Bowie, Gary Squires and Brian Becker.

16.   The facts and documents relating to the UKPC's claim that they have standing to
commence this claim.

17.   The facts and documents that disclose why the claims predicated on events that occurred
more than two years before the proofs of claim were filed in the Canadian CCAA
proceedings were not made within two years of these events.

6275522

TAB L

This is Exhibit "L" referred to .
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this
6ᵗʰ day of January 2014

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



Katten Muchin Rosenman LLP
575 Madison Avenue
New York, NY 10022-2585
212.940.8800 tel
212.940.8776 fax
www.kattenlaw.com

DAVID A. CRICHLOW
david.crichlow@kattenlaw.com
(212) 940-8941 direct
(212) 940-8776 fax

December 19, 2013

<u>Via Email</u>

Marla A. Decker, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

**Re:**   **In re: Nortel Networks Inc., et al., Case No. 09-10138**
**Nortel Networks Corporation, et al.: Court File No. 09-CL7950**

Dear Marla:

  On behalf of Wilmington Trust, we write in response to your letter of December 13 requesting a representative deposition of Wilmington Trust and designating certain topics for that deposition (the "Deposition Topics"). Thank you for agreeing to give us an extra day to respond with our designation and objections, while we attempted to resolve our differences about this process in advance of providing a witness designation.

  The U.S. Debtors have stated that representative depositions in this matter are unnecessary, inappropriate and a waste of resources, in light of the extensive fact witness depositions that have been conducted to date. Nevertheless, in the event that the representative party depositions proceed despite the U.S. Debtors' objections, you requested a Wilmington Trust representative and set forth the proposed Deposition Topics. In light of Wilmington Trust's role as a post-petition, successor Indenture Trustee, and its specific answers to your prior interrogatories, we believe that a representative deposition of a Wilmington Trust designee would be unnecessary, and would result in a waste of time, effort and costs that you purportedly wish to avoid.

  Separately, Wilmington Trust objects to the Deposition Topics on multiple grounds, including but not limited to the following: First, with respect to Topic 1, which requires a representative witness to discuss the terms and conditions of the relevant Indenture, the request is unnecessarily burdensome, as the Indenture is an integrated agreement, which speaks for itself, and the terms of which are not in controversy in the Allocation Proceeding. Second, Wilmington Trust also objects to Topics 1 and 3 to the extent they intend to elicit evidence regarding previous Trustees and their actions. We note that BNY Mellon was the Indenture Trustee at the relevant times, would be the best source for such evidence, and is a member of the Unsecured

AUSTIN   CENTURY CITY   CHARLOTTE   CHICAGO   HOUSTON   IRVING   LOS ANGELES
NEW YORK   ORANGE COUNTY   SAN FRANCISCO BAY AREA   SHANGHAI   WASHINGTON, DC
LONDON: KATTEN MUCHIN ROSENMAN UK LLP
A limited liability partnership including professional corporations

Marla A. Decker, Esq.
December 19, 2013
Page 2


Creditors' Committee of the U.S. Estates.  Finally, Wilmington Trust objects to Topic 2 to the extent that this topic has been, or will be, explored with other deponents of creditor entities during the Allocation Proceeding.

Subject to the foregoing, in the event the courts order Wilmington Trust to respond to the Deposition Topics, we would be willing to meet and confer regarding the appropriate subject matter and form of Wilmington Trust's responses.  If Wilmington Trust is ultimately required to produce a witness for deposition, we would designate Steven Cimalore as our witness. Mr. Cimalore is available for deposition on Friday, January 17 in Wilmington, Delaware.  This designation is made with full reservation of Wilmington Trust's rights, including our objections to a representative deposition of Wilmington Trust generally and the Deposition Topics specifically.

Very truly yours,

David A. Crichlow

DAC/vjb


cc:    All Core Parties

# TAB M

This is Exhibit "M" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this
6ᵗʰ day of January, 2014.

A commissioner, etc.
Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899–1347

302 658 9200
302 658 3989 Fax

Derek C. Abbott
302 351 9357
302 425 4664 Fax
dabbott@mnat.com

December 20, 2013

**VIA ELECTRONIC FILING AND
HAND-DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 N. Market St., 6th Floor
Wilmington, DE  19801

Re: *In re: Nortel Networks Inc., et al.*, Case No. 09-10138 (KG)

Dear Judge Gross:

We write on behalf of the U.S. Debtors to request a joint hearing with the Canadian Court with respect to "representative witness" depositions in this litigation. For the reasons set forth below, the U.S. Debtors respectfully submit that given the comprehensive discovery that has occurred to date, representative witness depositions are unnecessary, and would impose undue expense on all of the Nortel Debtor estates with little to no corresponding benefit. It is our understanding that all of the Core Parties other than those in the Canadian Discovery Group agree that representative witness depositions should not proceed. We regret the need to send this letter, and have only done so after our numerous efforts to persuade counsel for the Canadian Monitor (including on separate calls yesterday morning, afternoon and night) have been unsuccessful.

By way of background, the original Discovery Protocol in this litigation contemplated fact depositions followed by representative witness depositions. The representative witness depositions were designed to be a hybrid of the Rule 30(b)(6) process in the United States and the traditional representative witness deposition procedure in Canada. Notably, this hybrid procedure was intended as a "clean up" process to enable the parties to obtain testimony on factual subjects as to which the percipient witnesses with first-hand knowledge were either unknown or unavailable for deposition.

The Honorable Kevin Gross
December 20, 2013
Page 2

It is our understanding that in typical Canadian litigation, fact witnesses are not commonly deposed and certainly not 100 of them;[1] instead, each party offers one representative to testify as to the party's position. Topics are not disclosed in advance and undertakings are common in which a party provides missing information in writing at a later date. Our Rule 30(b)(6) process, of course, entails the advance disclosure of specified topics and imposes a duty upon the witness to prepare to testify on such topics.

When the Discovery Protocol was negotiated, the parties faced the daunting task of deposing numerous former Nortel employees and other potential witnesses around the world within a narrow window of less than three months. The parties also knew that many of these witnesses were outside the subpoena power of the courts in the United States or Canada. If these witnesses did not appear voluntarily, the parties would then have to resort to the time consuming and burdensome process of obtaining letters rogatory. Given the time constraints and other logistical concerns, it appeared likely that the parties would be unable to obtain testimony from a substantial number of these witnesses. Accordingly, the parties envisioned that the representative witness deposition process would be a gap-filling measure in the event they were unable to obtain depositions from a significant number of these witnesses.

Remarkably, due to the collective efforts of all Core Parties, approximately 99% of all former Nortel employees, officers or directors and pension trustees that the Core Parties sought to depose ultimately testified. These witnesses included one of Nortel's former Chief Executive Officers, several Chief Financial Officers, and numerous Treasurers, general counsels, senior executives in the tax and treasury departments, present and former directors of various Nortel affiliates, senior intellectual property lawyers, merger & acquisition executives, pension trustees and many others, including two EMEA joint administrators, two representatives of the Canadian monitor, the U.S. principal officer and the French liquidator. In all, more than 100 witnesses were deposed in more than 15 cities on three continents in less than three months.

In the face of such wide-ranging deposition discovery of the witnesses with first-hand knowledge of the events underlying this litigation, it has become self-evident to nearly every Core Party that further depositions of party representatives to obtain their second-hand account – not based on personal knowledge – of facts is unnecessary and would be a tremendous waste of time and resources. There can be no doubt that the cost to all estates of proceeding with representative depositions (including preparation time, travel expenses and responding to undertakings) would be substantial.

Not only has deposition discovery of fact witnesses been extensive and complete, but any possible concern about the potential for a surprise witness at trial has been eliminated in

---

[1]    Indeed, when we posed the question to our Canadian colleagues from all of the Core Parties during a telephone conference yesterday, nobody could recall being involved in a Canadian litigation where that has ever occurred.

The Honorable Kevin Gross
December 20, 2013
Page 3

the Discovery Protocol. The Protocol expressly required parties to identify potential trial witnesses at the outset and prohibits a party from calling any witness who has not been deposed.

As a result of the foregoing, we recently proposed to the other Core Parties eliminating the representative witness depositions so the parties could save millions of dollars in additional expenses and focus their resources on expert reports and trial preparation. The EMEA Debtors, UKP Pension Claimants, Official Committee of Unsecured Creditors and Ad Hoc Bondholders Group all readily agreed with our suggestion. Only the Canadian Discovery Group has refused to so agree.[2]

In several Monitor reports recently filed with the Canadian Court (including with respect to their own recent joint request for an extension of the trial date), the Canadian Monitor has expressed concerns about the expense of this litigation and its alleged desire to contain litigation costs. We are thus surprised that the Canadian Discovery Group alone will not agree to the sensible cost-saving measure of eliminating representative depositions given the extraordinary and extensive discovery that has occurred to date.

In the past, the U.S. Debtors have successfully spearheaded efforts to avoid the need to judicial intervention regarding discovery objections. For example, after the Canadian Discovery Group had served 747 document requests (compared to 248 by the U.S. Group and 211 by the EMEA Group), the U.S. Debtors took it upon themselves to draft, and persuade the other Core Parties to accept following lengthy negotiations, a set of 140 common requests in order to avoid significant motion practice.

Similarly, the Canadian Discovery Group served 158 interrogatories, compared to 97 for the EMEA and U.S. Groups combined. As with the document requests, the U.S. Debtors undertook significant time and expense to draft a consolidated set of interrogatories (which resulted in a negotiated set of 54) so as to avoid the need to burden the Courts with motions.

Unfortunately, this time we are unable to persuade the Canadian Discovery Group to agree to sensible restraints on the discovery process. Last Friday, the parties exchanged topics on which they desired the representative witnesses to prepare in advance of their depositions. While the U.S. Discovery Group and the EMEA Discovery Group served 2 ½-page and 1 ½ - page letters, respectively, with an aggregate total of 16 topics to all other parties combined (with an express reservation of rights to move the Courts to eliminate representative depositions), the

---

[2]    We recognize that the parties' request to extend the trial filed on November 14, 2013 contemplated representative witness depositions in January. However, since that date, 35 more witnesses have been deposed, thus making it clear to us (and, we believe, every Core Party other than those in the Canadian Discovery Group) that this would be an unnecessary and wasteful exercise.

The Honorable Kevin Gross
December 20, 2013
Page 4

Canadian Discovery Group served a pleading with 92 pages of topics.[3]  These documents are annexed.

The Canadian Discovery Group's 92 pages of topics include 27 all-encompassing subjects specifically directed to the U.S. Debtors. They are extraordinarily overbroad and unduly burdensome.  Whereas the U.S. Discovery Group (without prejudice to its position that no representative depositions were needed) identified four specific topics directed to the Canadian Debtors – consisting specifically of "[s]tatements made... to any third party" regarding certain subjects, "[t]hird-party licensing," "[t]he practice of prosecuting or defending patents in litigation" and "[i]nternal valuations of Nortel intellectual property" – the Canadian Discovery Group has demanded that the U.S. representative witness identify four months before trial the "factual and documentary basis" for nearly every U.S. allocation position and defense against the Canadian allocation position.  We invite Your Honor to peruse pages 2-5 of the attached Canadian pleading as, in our view, it seeks an inappropriate and enormously burdensome exercise.

The extremely broad designation of 92 pages of topics by the Canadian Discovery Group seeking "any and all evidence" on every potential subject violates both the spirit (streamlining and narrowing discovery whenever possible) and the letter of the Discovery Protocol entered by the Courts.   Section G(1)(a) is unambiguous: "a Deposition group may serve a very limited number of subjects" and prohibits a party from designating "an unreasonable number of subjects relative to the time limitations for the examination, subjects of an impermissibly broad scope or subjects inappropriate for a Representative Deposition."  The Canadian Discovery Group's topic lists contravene all of these prohibitions.  They underscore why representative witness depositions are unnecessary, inappropriate and a waste of estate resources given all that has transpired in deposition discovery thus far.

Further, the Canadian Debtors and Monitor have objected to each and every one of the four topics served by the U.S. Discovery Group (and also to each of the five topics served by the EMEA Discovery Group).  The Canadian Creditors Committee – which has likewise objected to every one of the four topics directed at it – has served an objection that highlights why the depositions sought by the Canadian Discovery Group is improper.  In the words of the CCC, some of the topics directed to it are "improper request[s] to supplement interrogatory responses via the representative witness process. To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time."  It is impossible to review the Canadian Group's topics and not reach the same conclusion

---

[3]     The Canadian Discovery Group was not finished.  After amending their requests Sunday to add several more topics, they served six more pages with 30 additional topics on one of the EMEA Debtors this past Tuesday. Just yesterday, they served an additional set of 17 topics upon the U.K. Pension Claimants after asserting that they had been inadvertently omitted from their 92-page document last Friday.

The Honorable Kevin Gross
December 20, 2013
Page 5

drawn by the CCC itself. We annex hereto copies of the Canadian Monitor's and Debtors' and the CCC's respective responses, as they preview for the Courts what an objection-riddled, lawyer-driven exercise these depositions will be if they are permitted to proceed.

In requesting that the Canadian Discovery Group take a practical and cost-effective approach at this stage of the proceedings, we recognize that representative witness depositions are the norm in Canadian litigation, and that the parties did contemplate conducting such depositions here. Notwithstanding that, litigants – particularly in insolvency proceedings – have an ongoing obligation to continually assess at all stages the discovery obtained and the necessity of further discovery relative to its costs. Typical Canadian litigants do not have the opportunity to depose over 100 fact witnesses, and thus representative depositions serve as critical means to learn a party's factual contentions and the supporting evidence. Here, given the breadth of deposition discovery from the over 100 percipient witnesses themselves, it would be inappropriate to force the estates to incur millions of dollars of additional costs collectively on representative depositions.

Following extensive efforts by the U.S. Debtors to avoid seeking judicial relief, last night the Canadian Debtors and Monitor proposed substituting representative witness depositions for written responses to questions on five allocation and five claims topics per party by January 17. While we were initially hopeful that it could form the basis for an amicable resolution, after disclosure by the Canadian Debtors and Monitor of the five topics on which they desire responses from the U.S. Debtors (but not the questions themselves), it became apparent that the proposed solution could be even more burdensome than representative depositions.4 The parties are in the process of negotiating a detailed pre-trial exchange of witness affidavits,

---

4    The all-encompassing topics on which the Canadian Discovery Group seeks written responses from the U.S. Debtors (which were already the subject of numerous depositions) in just a few weeks are:

1. "[t]he facts and documents, other than the MRDA, demonstrating the US Debtors' understanding of the phrase 'equitable and beneficial ownership' as used in the MRDA and the term 'economic ownership' as used in the US Debtors' allocation pleadings"
2. "[t]he factual and documentary basis for and scope of licenses of Nortel's intellectual property, including any enhanced licences, held by parties other than NNL"
3. "[t]he facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others"
4. "[t]he facts and documents demonstrating Nortel's processes for the identification and development of products, including as they varied over time before and after January 14, 2009"
5. "[t]he facts and documents underlying the contention of the US Debtors that they could have generated value from the intellectual property sold in the Rockstar transaction in the absence of a sale of that intellectual property."

The Honorable Kevin Gross
December 20, 2013
Page 6

expert reports, deposition designations and exhibits such that each party's case will be fully revealed before pre-trial memoranda are submitted and trial begins. Given the volume of discovery, including millions of documents produced (the review of which remains ongoing), it is simply impossible to be able to list all of our ultimate factual and documentary support now rather than on or close to the schedule negotiated in the Discovery Protocol and Litigation Timetable (i.e., in the weeks leading up to trial).

Given the upcoming holidays and the anticipated commencement of representative depositions shortly thereafter, we feel compelled to raise this with the Court at this time and we look forward to addressing this at the Court's earliest convenience. Of course, we do not expect that our dialogue with the Canadian Debtors and Monitor will end and are committed to continuing our efforts to reach an amicable resolution to obviate the need for court involvement. Our Canadian co-counsel is concurrently providing a copy of this letter to Justice Morawetz. Together with our colleagues in Canada, we ask that the Courts set a briefing schedule and joint hearing to consider the request to modify the Discovery Protocol to eliminate representative witness depositions.

While we hope the other litigants will refrain from attempting to proceed with representative witness depositions while the Courts consider this issue, we reserve the right to seek interim relief from the Court if any party seeks to proceed without the Courts having had a fair opportunity to rule on this issue. We hope and trust that this will be unnecessary.

Respectfully submitted,

Derek C. Abbott

cc:    All Core Parties (via email)

7367556

**Amended Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Sunday, Dec. 15)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
|  | (Jointly Administered) |
| Debtors. |  |

- and –

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## AMENDED REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP

**(December 13, 2013)**
**(December 15, 2013)**

1

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for the Representative Witness of the US Debtors

**The Canadian Deposition Group provides notice that the above referenced party
representative is expected to have informed himself or herself of the relevant facts,
including documentary support, known or available to that party, if any (through its
existing or former employees, officers and directors as the case may be) relating to the
following subjects, which are not believed to have been fully canvassed with the fact
deposition witnesses:**

1.    The facts and documents, other than the MRDA, demonstrating the US Debtors'
understanding of the phrase "equitable and beneficial ownership" as used in the MRDA
and the term "economic ownership" as used in the US Debtors' allocation pleadings.

2.    The facts and documents, other than the MRDA, demonstrating the ownership interests
that the US Debtors allegedly had in any of the intellectual property sold in the line of
business sales and in the Rockstar transaction.

3.    The factual and documentary basis for and scope of the alleged beneficial/equitable
interest in Nortel's intellectual property held by parties other than NNL.

4.    The factual and documentary basis for and scope of licenses of Nortel's intellectual
property, including any enhanced licences, held by parties other than NNL.

5.    The past practices of NNL and its subsidiaries concerning the scope of the licenses to
Nortel intellectual property under the Cost-Sharing Agreements and the MRDA.

6.    The factual and documentary basis, other than the MRDA, demonstrating that the
Licensed MRDA Participants' agreement to have the patents and all other registered
forms of Nortel IP filed in NNL's name and to share the cost of global R&D through
transfer pricing payments was in exchange for enhanced exclusive licenses that
constituted effective ownership of the IP in their respective jurisdictions, including the
factual and documentary basis for demonstrating that this choice was a conscious
decision.

7.    The factual and documentary basis, other than the MRDA, demonstrating that the
Licensed MRDA Participants' agreement to have the patents and all other registered
forms of Nortel IP filed in NNL's name and to share the cost of global R&D through
transfer pricing payments was in exchange for enhanced exclusive licenses that
constituted effective ownership of the IP in their respective jurisdictions, including the
factual and documentary basis for demonstrating that this choice was a conscious
decision.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.   The facts and documents demonstrating the reasons why it was decided that NNL would
     be the registered owner of all of the NN Technology (as that term is defined in the
     MRDA).

9.   The facts and documents demonstrating how and to what extent intellectual property was
     assigned to NNL by NNL's subsidiaries, inventors/authors and others.

10.  The facts and documents demonstrating Nortel's processes for the identification and
     development of products, including as they varied over time before and after January 14,
     2009.

11.  The scope and use of third-party products and components used or embodied in Nortel
     products and the marketing of third party Original Equipment Manufacturer products by
     Nortel.

12.  At the time each of the lines of business were sold and when the Rockstar transaction
     closed, the value, including the dollar value, of the US Debtors' alleged interest in the
     Nortel global patent portfolio and the factual bases for those values.

13.  The facts and documents underlying the contention of the US Debtors that they could
     have generated value from the intellectual property sold in the Rockstar transaction in the
     absence of a sale of that intellectual property.

14.  The value the US Debtors attribute to intangible assets other than intellectual property
     sold as part of each of the line of business sales and the Rockstar transaction, including
     without limitation goodwill and customer relationships, and all factual bases for those
     values.

15.  The value the US Debtors attribute to tangible assets sold as part of each of the line of
     business sales and the factual bases supporting those values.

16.  The US Debtors' position on what amounts should be allocated to each of the estates in
     respect of the sales of tangible assets and on what factual basis.

17.  The facts and documents evidencing: (1) the $7.2 billion NNI contends it paid between
     2001 and 2009 for directly funded research and development; (2) the amounts that NNL,
     NN Ireland, NNUK, and NNSA paid for direct funding of research and development
     from 2001 and 2009; (3) the amounts that NNI contends were paid by NNL to NN
     Ireland, NNUK, and NNSA in the form of transfer pricing adjustment payments to fund
     research and development by Nortel group entities; and (4) the amounts that NNI
     contends were paid in transfer pricing adjustments under the Nortel transfer pricing
     model between 2001 and 2009.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

18. The facts and documents supporting the US Debtors' position that without the backing of NNI's balance sheet the Nortel Group's access to credit markets would not have been possible or would have been greatly reduced.

19. The facts and documents supporting the US Debtors' position that without access to the pre-petition NNI revolving credit facility NNL would not have been able to operate.

20. The facts and documents demonstrating the US Debtors' recognition that the best way to maximize value for creditors was to sell the Nortel Group's rights, property and other assets together in each of the line of business sales and the Rockstar transaction instead of turning it into an intellectual property licensing business, including

    a.   the facts and documents demonstrating all efforts made to determine the US Debtors' ability, after January 14, 2009, to use a contract manufacturer to manufacture products embodying Nortel intellectual property.

    b.   the facts and documents demonstrating all efforts made to determine the feasibility of sublicensing NNI's license rights under the MRDA after January 14, 2009.

    c.   the facts and documents demonstrating all efforts undertaken by the US Debtors to determine the feasibility of forming a new reorganized company or corporate group to enforce the Nortel patents.

21. The facts and documents demonstrating which Nortel entity paid for the prosecution and maintenance of the patents in Nortel's global patent portfolio, including but not limited to patents registered in the United States.

22. The facts and documents demonstrating when and under what circumstances the US Debtors came to the understanding that at the time of the Rockstar transaction the value of the US Debtors' rights with respect to Nortel's intellectual property had changed.

23. The facts and documents related to the US Debtors understanding that the sale processes put in place to dispose of the Nortel Group's assets would not succeed if a selling party could hold up a sale pending agreement on the allocation of sale proceeds.

24. The facts and documents upon which the US Debtors rely upon to assert that the Monitor and Canadian Debtors are estopped or should not otherwise be permitted to assert entitlement to all of the proceeds of the Rockstar transaction.

25. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

26.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

27.    The facts and documents that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for the Representative Witness of the Ad Hoc Group of Bondholders

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The same subjects as those provided to the US Debtors.

2.  The terms of the Nortel Bonds, including the guarantees of the Bonds and the enforceability of such guarantees.

3.  The expectations of the Bondholder Group with respect to any guarantees to proceeds from the line of business sales and Rockstar transaction, and to the Nortel assets available to satisfy creditors, and the Bondholder Group's expectations of priority relative to other creditors in each of the US and Canadian Estates.

4.  The Claims asserted by the Ad Hoc Group of Bondholders in In re Nortel Networks Inc. et al, case No. 09-10138 (KG) (jointly administered), including but not limited to the subjects addressed in any Bankruptcy Rule 2019 Statements regarding membership of the Bondholder Group and member holdings of the bonds, and the current facts respecting such subjects as of the deposition of the Bondholder Group representative witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for the Representative Witness of the UCC

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed himself or herself of the relevant facts, including documentary support, known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following subjects, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The same subjects as those provided to the US Debtors.

7

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNUK Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The facts and documents, other than the MRDA, demonstrating NNUK's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNUK allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.    The value NNUK attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.    The facts and documents evidencing  (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNUK contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.     The factual and documentary basis for any challenge NNUK intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNUK for the years 2001 through 2005 inclusive corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.     The current status of any ongoing (or outcome of any historical) audit by Inland Revenue (HMRC) of NNUK's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10.    The facts and documents that establish any expectations that NNUK will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.    The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.    The factual and documentary basis for any claims arising from the treatment of UK pension obligations under US GAAP for the purposes of transfer pricing and that entitle NNUK or Nortel Networks UK Pension Trust Limited or the PPF to any relief. On what basis was NNUK or the NNUK Pension Scheme worse off by the treatment of all Nortel

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

pension plans under US GAAP for transfer pricing purposes? On what basis and upon what evidence is a claim made that any funds (or lower losses) that might be claimed for NNUK would have altered the position of NNUK or the NNUK Pension Scheme as at the date of insolvency.

17.   The facts that support the claim that NNUK pension funding should have been pooled or otherwise funded or compensated for by entities other than NNUK by means of the transfer pricing methodology or otherwise in the RPS.

18.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

19.   The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

20.   The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

21.   The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22.   The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNUK.

23.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

24.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

25.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

26.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

27.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

28.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "W" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized return of capital.

29.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Germany Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Germany attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Germany's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Germany will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "E" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the destructive intervention/breach of capital maintenance rules.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Austria Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Austria attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Austria's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Austria will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "F" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the breach of capital maintenance rules.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for NN Ireland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The facts and documents, other than the MRDA, demonstrating NN Ireland's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NN Ireland allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.  The value NN Ireland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.  The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK, and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NN Ireland contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.  The factual and documentary basis for any challenge NN Ireland intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NN Ireland for the years 2001 through 2005 inclusive

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Ireland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

10.     The facts and documents that establish any expectations that NN Ireland will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.     The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

15.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.     The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NN Ireland by means of the transfer pricing methodology or otherwise in the RPS.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

17. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

19. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

21. The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NN Ireland.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

22. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

23. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26. The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27. The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "G" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized return of capital.

28. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

30.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Sweden Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Sweden attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Sweden's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Sweden will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

~~12.     The facts that support the claim that the pension funding should have been pooled or otherwise funded or compensated for by entities other than NNUK by means of the transfer pricing methodology or otherwise in the RPS.~~

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "H" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for NN Holland Representative Witness

The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NN Holland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Holland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NN Holland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations a

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "I" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the mismanagement.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

33

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Hungary Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Hungary attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Hungary's tax filings tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Hungary will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.      The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.     The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until January 2009, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "J" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NNSAS Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NNSAS attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSAS's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NNSAS will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. ~~The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.~~

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14. The facts and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them,

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of the events now complained about.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "K" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Spain Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Spain attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Spain's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Spain will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "L" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24. The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NNIF Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value NNIF attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNIF's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.  The facts and documents that establish any expectations that NNIF will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should
        be reimbursed and the basis for calculating the amounts for each year and any
        corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
        customer revenues, the details of which customers, the dates and amounts of associated
        revenues claimed, which other entity received the claimed revenues and the basis for
        adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
        vendor financing arrangements for Nortel customers and that demonstrate that it was that
        it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
        practice was unfair to that the party and the basis on which it claims to have been unable
        to represent itself and its interests in respect of the practice, or that would be indicative of
        any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
        respect of the pension plan, including but not limited to: (i) the basis of the calculation of
        such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
        potential costs of annuitizing member's benefits; (iv) the information that the pension
        trustee or administrator provided to its pension advisors and consultants to enable them to
        calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
        (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
        deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
        pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing
        and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
        Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
        EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
        the party is anything other than an unsecured debt and/or they are alleged to owe the
        Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims
        relating to the allocation of proceeds or any other aspect of past dispositions of businesses
        including the following noted in the particulars of the proofs of claims: sales to
        AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not
        made, (ii) contracts or transactions alleged to have been approved or not approved, and
        (iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
        at what meeting and/or by which resolution) in breach of de facto director or de jure
        and/or shadow director duties. Identification of the individual Directors & Officers
        against whom claims are being asserted, and in respect of each such individual, which
        decisions, contracts, transactions or other conduct are the subject of the claims made
        against them, and by which EMEA entity or entities (collectively, the "Impugned
        Conduct"). Identification of the damages alleged to have been suffered as a result of the

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.  The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.  The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.  The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.  Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.  The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.  The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "M" of the Joint Response of the Monitor and the Canadian Debtors to the Claims.

22.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Belgium Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Belgium attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Belgium's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Belgium will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith,
oppressively, or otherwise improperly in respect of such pension plan.

8.  The factual and documentary basis for any claim that restructuring costs incurred should
be reimbursed and the basis for calculating the amounts for each year and any
corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for
customer revenues, the details of which customers, the dates and amounts of associated
revenues claimed, which other entity received the claimed revenues and the basis for
adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in
vendor financing arrangements for Nortel customers and that demonstrate that it was that
it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting
practice was unfair to that the party and the basis on which it claims to have been unable
to represent itself and its interests in respect of the practice, or that would be indicative of
any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in
respect of the pension plan, including but not limited to: (i) the basis of the calculation of
such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
potential costs of annuitizing member's benefits; (iv) the information that the pension
trustee or administrator provided to its pension advisors and consultants to enable them to
calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
(a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing
and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
the party is anything other than an unsecured debt and/or they are alleged to owe the
Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims
relating to the allocation of proceeds or any other aspect of past dispositions of businesses
including the following noted in the particulars of the proofs of claims: sales to
AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not
made, (ii) contracts or transactions alleged to have been approved or not approved, and
(iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
at what meeting and/or by which resolution) in breach of de facto director or de jure
and/or shadow director duties. Identification of the individual Directors & Officers
against whom claims are being asserted, and in respect of each such individual, which
decisions, contracts, transactions or other conduct are the subject of the claims made
against them, and by which EMEA entity or entities (collectively, the "Impugned
Conduct"). Identification of the damages alleged to have been suffered as a result of the
Impugned Conduct, including the amount of such damages and the EMEA Debtor or
Debtors alleged to have suffered such damage. Where Impugned Conduct has already
been the subject of examination during previous depositions, confirmation that there are
no other facts or documents in respect of such Impugned Conduct on which the EMEA
Debtors are relying. Where Impugned Conduct has not been the subject of examination
during previous depositions, particulars of the facts and documents on which the EMEA
Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to
light after the Rolston and Clement statements filed in connection with the UK COMI
application in 2009 that is relied upon to contradict or supersede any matters that were
attested to in those statements or in the accompanying filings of the JA's in both the UK
and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred
more than two years before the proofs of claim were filed in the Canadian CCAA
proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency,
or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at
any given date from any time after January 1999 until November/December 2008, and
that establish when this state arose and for how long it persisted to the extent the
contention is predicated on circumstances other than liabilities exceeding assets and/or
the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be
specified) period prior to any alleged date of insolvency that are claimed to have
"preferred" the Canadian Debtors over other creditors and be subject to review or
scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "N" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Finland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.      The value NN Finland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Finland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.      The facts and documents that establish any expectations that NN Finland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

54

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.    The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "O" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Poland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value NN Poland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Poland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.   The facts and documents that establish any expectations that NN Poland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

8. The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9. The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.     The facts and documents that support any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "P" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the disguised dividend.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.     The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Portugal Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value NN Portugal attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Portugal's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.    The facts and documents that establish any expectations that NN Portugal will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.   The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.   The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.  The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.  The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.  The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.  The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.  The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.  The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Q" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Romania Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.      The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.      The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.      The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.      The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.      The value NN Romania attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.      The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Romania's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.      The facts and documents that establish any expectations that NN Romania will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.  The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.  The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10. The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11. The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12. The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13. The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14. The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15. The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "R" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Czech Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Czech attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Czech's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Czech will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt and/or they are alleged to owe the Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16. The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17. The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18. The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19. Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20. The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21. The facts and documents that establish the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "T" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants with respect to the unauthorized distribution of profit.

22. The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23. The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

NNL/NNC from January 1, 2000 to present and how such receipts were characterized and
booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

### Subjects for NN Slovakia Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.     The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.     The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.     The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.     The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.     The value NN Slovakia attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.     The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Slovakia's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.     The facts and documents that establish any expectations that NN Slovakia will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or
otherwise improperly in respect of such pension plan.

8.     The factual and documentary basis for any claim that restructuring costs incurred should
be reimbursed and the basis for calculating the amounts for each year and any
corresponding transfer pricing adjustment claimed for that year.

9.     The factual and documentary basis for any claim that it did not get appropriate credit for
customer revenues, the details of which customers, the dates and amounts of associated
revenues claimed, which other entity received the claimed revenues and the basis for
adjusting for these revenues outside of the transfer pricing arrangements.

10.    The factual and documentary basis for any claims arising from having participated in
vendor financing arrangements for Nortel customers and that demonstrate that it was that
it was worse off on a net basis for having done so.

11.    The facts and documents that demonstrate that a particular financial or accounting
practice was unfair to that the party and the basis on which it claims to have been unable
to represent itself and its interests in respect of the practice, or that would be indicative of
any deficiencies with respect to the party's financial statements or audits.

12.    The facts and documents relating to the amount of any alleged deficit or amount owing in
respect of the pension plan, including but not limited to: (i) the basis of the calculation of
such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
potential costs of annuitizing member's benefits; (iv) the information that the pension
trustee or administrator provided to its pension advisors and consultants to enable them to
calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
(a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
pensioners whose pensions have been reduced.

13.    The facts and documents that demonstrate any different amounts claimed to be owing
and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
the party is anything other than an unsecured debt and/or they are alleged to owe the
Canadian Debtors.

14.    The factual and documentary basis for and calculation of the amount of any claims
relating to the allocation of proceeds or any other aspect of past dispositions of businesses
including the following noted in the particulars of the proofs of claims: sales to
AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

75

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

15.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "U" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.   The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for NN Italy Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Italy attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Italy's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Italy will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations and in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

8.      The factual and documentary basis for any claim that restructuring costs incurred should
        be reimbursed and the basis for calculating the amounts for each year and any
        corresponding transfer pricing adjustment claimed for that year.

9.      The factual and documentary basis for any claim that it did not get appropriate credit for
        customer revenues, the details of which customers, the dates and amounts of associated
        revenues claimed, which other entity received the claimed revenues and the basis for
        adjusting for these revenues outside of the transfer pricing arrangements.

10.     The factual and documentary basis for any claims arising from having participated in
        vendor financing arrangements for Nortel customers and that demonstrate that it was that
        it was worse off on a net basis for having done so.

11.     The facts and documents that demonstrate that a particular financial or accounting
        practice was unfair to that the party and the basis on which it claims to have been  unable
        to represent itself and its interests in respect of the practice, or that would be indicative of
        any deficiencies with respect to the party's financial statements or audits.

12.     The facts and documents relating to the amount of any alleged deficit or amount owing in
        respect of the pension plan, including but not limited to: (i) the basis of the calculation of
        such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the
        potential costs of annuitizing member's benefits; (iv) the information that the pension
        trustee or administrator provided to its pension advisors and consultants to enable them to
        calculate of such amounts; and (v) the liabilities used in the calculation of such amounts
        (a) discretionary pension benefit increases awarded in the years 1995 and following, (b)
        deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d)
        pensioners whose pensions have been reduced.

13.     The facts and documents that demonstrate any different amounts claimed to be owing
        and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint
        Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the
        EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to
        the party is anything other than an unsecured debt and/or they are alleged to owe the
        Canadian Debtors.

14.     The factual and documentary basis for and calculation of the amount of any claims
        relating to the allocation of proceeds or any other aspect of past dispositions of businesses
        including the following noted in the particulars of the proofs of claims: sales to
        AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.     The facts and documents that demonstrate (i) decisions alleged to have been made or not
        made, (ii) contracts or transactions alleged to have been approved or not approved, and
        (iii) any other conduct by EMEA BOD's (including which BOD, which members, when,
        at what meeting and/or by which resolution) in breach of de facto director or de jure
        and/or shadow director duties. Identification of the individual Directors & Officers
        against whom claims are being asserted, and in respect of each such individual, which
        decisions, contracts, transactions or other conduct are the subject of the claims made
        against them, and by which EMEA entity or entities (collectively, the "Impugned

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.     The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.     The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

18.     The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.     Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.     The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.     The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "V" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.     The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

23.     The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Switzerland Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1. The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2. The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3. The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4. The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5. The value NN Switzerland attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6. The current status of any ongoing (or outcome of any historical) audit by any taxation authority ~~of (HMRC)~~ of NN Switzerland's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7. The facts and documents that establish any expectations that NN Switzerland will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

~~12.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.~~

12.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.   The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.   The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.   The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.   The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.   The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.   The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.   Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.   The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.   The facts and documents that demonstrate factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "X" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

## Subjects for NN Norway Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the other inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value NN Norway attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NN Norway's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.

7.   The facts and documents that establish any expectations that NN Norway will rely on as the basis for its oppression remedy claims relating to its participation in the Distribution Agreement and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

8.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

9.    The factual and documentary basis for any claim that it did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

10.   The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that it was that it was worse off on a net basis for having done so.

11.   The facts and documents that demonstrate that a particular financial or accounting practice was unfair to that the party and the basis on which it claims to have been unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

12.   The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate of such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

13.   The facts that establish any different amounts claimed to be owing and/or payable to or by them to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to the party is anything other than an unsecured debt.

14.   The facts that form the basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM, (and any others).

15.   The facts that establish (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties. Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage. Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying. Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

16.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JA's in both the UK and the US courts.

17.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events now complained about.

18.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from any time after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

19.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

20.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

21.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "Y" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

22.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

23.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from

Representative Witness Subjects Served by the
Monitor and the Canadian Debtors

> NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

24.    The facts that relate to any other topics designated by any other parties for this witness.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks (Northern Ireland) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.  The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company lisencing agreements.

2.  The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.  The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.  The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.  The value Nortel Networks (Northern Ireland) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.  The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.  The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks Optical Components Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.   The value Nortel Networks Optical Components Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.   The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.   The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for Nortel Networks South Africa (pty) Limited

### Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.    The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the inter-company licensing agreements.

2.    The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

3.    The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

4.    The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

5.    The value Nortel Networks South Africa (pty) Limited attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

6.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding intercompany claims.

7.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

**NNSA Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Tuesday, Dec. 17)**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

– and –

Court File No. 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

**NNSA REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP**

**(December 17, 2013)**

## Subjects for NNSA Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (including through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**

1.   The facts and documents, other than the MRDA, demonstrating NNSA's understanding of the phrase "equitable and beneficial ownership" as used in the ownership interests that NNSA allegedly had in any of the intellectual property sold in the line of business sales and in the Rockstar transaction.

2.   The factual and documentary basis for and scope of the alleged beneficial/equitable interest and licence in Nortel's intellectual property by parties other than NNL, and the past practices of NNL and its subsidiaries concerning the scope of the licenses to intellectual property under the Cost-Sharing Agreements and the MRDA.

3.   The facts and documents demonstrating how and to what extent intellectual property was assigned to NNL by NNL's subsidiaries, inventors/authors and others.

4.   The facts and documents demonstrating Nortel's processes for the identification and development of products, as they varied over time before and after January 14, 2009.

5.   The scope and use of third-party products and components used or embodied in Nortel products and the marketing of third party Original Equipment Manufacturer products by Nortel.

6.   The value NNSA attributes to tangible assets and intangible assets other than intellectual property sold as part of each of the line of business sales and the Rockstar transaction, including without limitation goodwill and customer relationships, and all factual bases for those values, and what amounts should be allocated to each of the estates with respect thereto.

7.   The facts and documents evidencing (1) the amounts that NNL, NNI, NN Ireland, NNUK and NNSA paid for direct funding of research and development from 2001 and 2009; and (2) the amounts that NNSA contends were paid in transfer pricing adjustments under the Nortel transfer pricing model between 2001 and 2009.

8.   The factual and documentary basis for any challenge NNSA intends to make to the entitlement of NNL to a Compensating Adjustment for the excess transfer pricing payments credited to NNSA for the years 2001 through 2005 inclusive

2

corresponding to the $2 billion amount credited to NNI for those same years under the MRDA and particularized in paragraph 317 of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants.

9.    The current status of any ongoing (or outcome of any historical) audit by any taxation authority of NNSA's tax filings and/or the tax authority's challenges of the transfer pricing adjustments, routine returns reflected therein, the basis or alleged basis therefor including challenges to the routine returns – including distribution returns – or any other element of the transfer pricing reflected therein, and the position taken in response thereto and any actual payments or expected payments of taxes, interest or penalties to the taxation authority and the basis for the calculation thereof.    In particular but without limitation, the facts or documents related to any audit by any taxation authority including (i) communication with the French tax authority regarding the sufficiency of the documentation to establish the basis for the MRDA during the time in which the RPS method was in force but before the formal execution of the MRDA and (ii) communication with the French tax authority related to a proposed transfer pricing agreement for NNSA.

10.    The facts and documents that establish any expectations that NNSA will rely on as the basis for its oppression remedy claims relating to its participation in the MRDA and transfer pricing arrangements, including the circumstances giving rise to, the particulars of and the identity of the individuals who held those expectations as well as in relation to any allegation or claim that Nortel Canada acted in bad faith, oppressively, or otherwise improperly in respect of such pension plan.

11.    The factual and documentary basis for the allegation that stewardship (head office) costs should have been excluded from RPS calculation from 2006 onwards and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

12.    The factual and documentary basis for any claim that restructuring costs incurred should be reimbursed and the basis for calculating the amounts for each year and any corresponding transfer pricing adjustment claimed for that year.

13.    The factual and documentary basis for any claim that NNSA did not get appropriate credit for customer revenues, the details of which customers, the dates and amounts of associated revenues claimed, which other entity received the claimed revenues and the basis for adjusting for these revenues outside of the transfer pricing arrangements.

14.    The factual and documentary basis for any claims arising from having participated in vendor financing arrangements for Nortel customers and that demonstrate that NNSA was worse off on a net basis for having done so.

15.    The facts and documents that demonstrate that a particular financial or accounting practice was unfair to NNSA and the basis on which NNSA claims to have been

3

unable to represent itself and its interests in respect of the practice, or that would be indicative of any deficiencies with respect to the party's financial statements or audits.

16.    The facts that support the claim that pension funding should have been pooled or otherwise funded or compensated for by entities other than NNSA by means of the transfer pricing methodology or otherwise in the RPS.

17.    The facts and documents relating to the amount of any alleged deficit or amount owing in respect of the pension plan, including but not limited to: (i) the basis of the calculation of such amounts; (ii) the assumptions used in the calculation of such amounts; (iii) the potential costs of annuitizing members' benefits; (iv) the information that the pension trustee or administrator provided to its pension advisors and consultants to enable them to calculate such amounts; and (v) the liabilities used in the calculation of such amounts (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

18.    The facts and documents that demonstrate any different amounts claimed to be owing and/or payable to or by NNSA to NNL than what is set forth in Schedule "B" to the Joint Response of the Monitor and Canadian Debtors to the Claims Filed on behalf of the EMEA Claimants and the basis, if any, for claiming that amounts said to be "owing" to NNSA are anything other than an unsecured debt.

19.    The factual and documentary basis for and calculation of the amount of any claims relating to the allocation of proceeds or any other aspect of past dispositions of businesses including the following noted in the particulars of the proofs of claims: sales to AASTRA, Andrew, Bookham, Breconridge, Metasolv, STM (and any others).

20.    The facts and documents that demonstrate (i) decisions alleged to have been made or not made, (ii) contracts or transactions alleged to have been approved or not approved, and (iii) any other conduct by EMEA BOD's (including which BOD, which members, when, at what meeting and/or by which resolution) in breach of de facto director or de jure and/or shadow director duties.  Identification of the individual Directors & Officers against whom claims are being asserted, and in respect of each such individual, which decisions, contracts, transactions or other conduct are the subject of the claims made against them, and by which EMEA entity or entities (collectively, the "Impugned Conduct"). Identification of the damages alleged to have been suffered as a result of the Impugned Conduct, including the amount of such damages and the EMEA Debtor or Debtors alleged to have suffered such damage.  Where Impugned Conduct has already been the subject of examination during previous depositions, confirmation that there are no other facts or documents in respect of such Impugned Conduct on which the EMEA Debtors are relying.  Where Impugned Conduct has not been the subject of examination during previous depositions, particulars of the facts and documents on which the EMEA Debtors are relying.

4

21.    The facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA.  Specifically, and without limitation, the facts and documents that demonstrate the timing and source of evidence to support the issuance of claims or threatened and tolled claims against individually named directors of NNSA as asserted in the Commercial Court of Versailles (the "French Proceeding"), including (i) documents or facts to support any allegations made against Jean-Marie Lesur and Darryl Edwards; (ii) documents of facts to support the French Liquidator's decision not to name certain other directors of NNSA (e.g., Michel Clement, Pascal Debon, Alain Biston, Sharon Rolston and/or Simon Freemantle) in the Summons to Appear issued in the French Proceeding; (iii) any documents filed in relation to any procedural steps taken in the French Proceeding, including, in particular, any documents in support of or opposition to a stay of same; and (iv) any evidence not yet produced in this proceeding on which the French Liquidator intends to rely in the French Proceeding.

22.    The timing and source of discovery and particulars of any "new" evidence that came to light after the Rolston and Clement statements filed in connection with the UK COMI application in 2009 that is relied upon to contradict or supersede any matters that were attested to in those statements or in the accompanying filings of the JAs in both the UK and US courts.

23.    The facts and documents that explain why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

24.    The circumstances of alleged insolvency, near insolvency threats or risks of insolvency, or being in the zone of insolvency, or in doubtful solvency, or poor financial condition at any given date from after January 1999 until November/December 2008, and that establish when this state arose and for how long it persisted to the extent the contention is predicated on circumstances other than liabilities exceeding assets and/or the existence of a going concern note in audited financial statements.

25.    Any transactions with the Canadian Debtors said to have been undertaken within a (to be specified) period prior to any alleged date of insolvency that are claimed to have "preferred" the Canadian Debtors over other creditors and be subject to review or scrutiny as a result of that timing.

26.    The facts and documents that form the basis for any claims for resulting trust, constructive trust or any other claims for proprietary estoppel or equitable claims and that disclose the particular basis for any equitable or proprietary claim being pursued.

27.    The facts and documents that demonstrate the factual components of the pleaded requirements for certain foreign law assertions disclosed in Schedule "S" of the Joint Response of the Monitor and the Canadian Debtors to the Claims Filed on Behalf of the EMEA Claimants.

28.    The facts and documents demonstrating the estimated gross and net assets of the Estate available for distribution to creditors, without recourse to the allocation proceeds, and the best estimate of valid claims (by creditor category) against the Estate, excluding inter-company claims.

29.    The facts and documents demonstrating Funds and other financial accommodations, including, without limitation, lines of credit and guarantees, received by the Estate from NNL/NNC from January 1, 2000 to present and how such receipts were characterized and booked by the Estate.

30.    The facts and documents that demonstrate that the repayment by NNSA in 2008 of €25m of the loan from NNL was improper, including without limitation (i) the documents that show that such a partial repayment was contrary to the loan agreement including, in particular, the relevant provisions of the loan agreement itself; (ii) any facts or documents to show that NNSA was not solvent at the time the repayment was made; and (iii) any facts or documents that show that NNL imposed the repayment on NNSA and/or that NNSA approved the repayment despite it not being in NNSA's best interest to do so.

**UKPC Representative Witness Subjects Served by the Canadian Allocation Group and the Canadian Claims Defendant Group (Thursday, Dec. 18)**

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

- and –

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

## UKPC REPRESENTATIVE WITNESS SUBJECTS SERVED BY THE CANADIAN
## ALLOCATION GROUP AND THE CANADIAN CLAIMS DEFENDANT GROUP

**(December 19, 2013)**

1

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

## Subjects for UKPC Representative Witness

**The Canadian Deposition Group provides notice that the above referenced party representative is expected to have informed him/herself of the relevant facts and documents known or available to that party, if any (through its existing or former employees, officers and directors as the case may be) relating to the following topics, which are not believed to have been fully canvassed with the fact deposition witnesses:**[1]

1.     The facts and documents relating to the amount of each of the NNUK Pension Plan deficit and section 75 debt including but not limited to: (i) the basis of the calculation of each; (ii) the assumptions used in the calculation of each; (iii) the potential costs of annuitizing member's benefits; (iv) the information that the Trustee provided to its pension advisors and consultants to enable them to calculate the deficit and section 75 debt; and (v) the liabilities used in the calculation of the deficit and section 75 debt referable to (a) discretionary pension benefit increases awarded in the years 1995 and following, (b) deferred pensioners, (c) pensioners whose basic benefits are being paid in full, and (d) pensioners whose pensions have been reduced.

2.     The facts and documents relating to the age and the amount of the benefit of pension plan members, before and after reduction.

3.     The facts and documents relating to the quantum of the PPF claim.

4.     The facts and documents relating to the UKPC's position that NNUK failed to follow a recommendation made by the NNUK Pension Plan's actuary in a manner that violated the Scheme's Trust Deed or Rules or any statute or other UK law or regulation or made a funding commitment that it failed to fulfill.

5.     The facts and documents relating to the mortality assumptions proposed by Trustee and the Scheme's actuary for the March 31, 2008 actuarial valuation of the Scheme and the 2005 actuarial valuation of the Scheme.

6.     The facts and documents relating to the UKPC's claim that NNUK is entitled to any or all of NNSA's assets as a result of Project Swift.

7.     The facts and documents relating to the UKPC's claim that NNUK or Nortel Canada acted in bad faith, oppressively, or otherwise improperly during the negotiations that lead to the 2002, 2003 and 2004 funding contributions, the 2005 Interim Funding Agreement, the 2006 Long Term Funding or the negotiations regarding the 2008 actuarial valuation of the Scheme.

8.     The facts and documents relating to the investment performance of the Scheme assets each year from 2002 through 2008, as a whole and by asset category.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Joint Response Of The Monitor And Canadian Debtors To The Claims By The UK Pension Trustee and PPF re: UK Pension Scheme

Representative Witness Subjects Served by the
Monitor and Canadian Debtors

9.  The facts and documents relating to the UKPC's involvement in FSD proceedings before the Determinations Panel including, but not limited to: (i) all communications that the Trustee had with tPR; (ii) any work that the Trustee retained PwC to undertake with respect to the FSD proceedings; (iii) tPR's selection of June 30, 2008 as the Relevant Time; and (iv) any communications among any of the UKPC, PwC and the tPR with respect to seeking a contribution notice against Nortel Canada.

10. The facts and documents relating to the UKPC's claim that NNUK was insufficiently resourced as at the Relevant Time for purposes of the FSD.

11. The facts and documents relating to the UKPC's claim that it is reasonable to impose an FSD on Nortel Canada.

12. The facts and documents relating to the potential imposition of a Contribution Notice on Nortel Canada;

13. The facts and documents relating to the UKPC's claim that NNUK provided benefits to Nortel Canada whose value exceeded the benefits that Nortel Canada provided to NNUK;

14. The facts and documents relating to the UKPC's claim that the RPSM failed to adequately take into account NNUK's restructuring costs, pension obligations and the Reciprocal Agreement, and that such alleged failures had an adverse impact on the funding contributions made by NNUK to the Scheme or otherwise harmed the Scheme;.

15. The facts and documents relating to any documents or information provided by the Trustee to any experts that the Trustee or tPR retained to submit reports to the Determinations Panel in connection with the FSD proceedings including, but not limited to the reports of Ronald Bowie, Gary Squires and Brian Becker.

16. The facts and documents relating to the UKPC's claim that they have standing to commence this claim.

17. The facts and documents that disclose why the claims predicated on events that occurred more than two years before the proofs of claim were filed in the Canadian CCAA proceedings were not made within two years of these events.

6275522

**US Deposition Group's Letter regarding Representative Witness Topics (Friday, Dec. 13)**

CLEARY GOTTLIEB STEEN & HAMILTON LLP

ONE LIBERTY PLAZA
NEW YORK, NY 10006-1470
(212) 225-2000
FACSIMILE (212) 225-3999
WWW.CLEARYGOTTLIEB.COM

WASHINGTON, DC · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

Writer's Direct Dial: +1 212 225 2025
E-Mail: mdeckeri@cgsh.com

December 13, 2013

<u>VIA EMAIL TO THE CORE PARTIES SERVICE LIST</u>

  Re: In re Nortel Networks Inc., et al., Case No. 09-10138
    <u>Nortel Networks Corporation. et al.: Court File No 09-CL-7950</u>

To all Core Parties:

    Pursuant to the Deposition Protocol, we write on behalf of the U.S. Deposition Group to notify each Core Party as to specific topics on which the U.S. Debtors will conduct representative examinations of each Core Party listed below, to the extent such depositions occur. In accordance with Section G(1)(c) of the Deposition Protocol, the U.S. Deposition Group is not limited in their examinations to the topics listed herein, but barring objection, the designated representatives have an obligation to be prepared to testify on the specified topics.

    As we have conveyed, it is our position that representative depositions are unnecessary, inappropriate and a waste of resources in light of the extensive discovery to date. While we identify topics to avoid any claim of waiver, this letter is served with an express reservation of all rights, including our right to seek judicial relief to modify the existing Deposition Protocol to eliminate representative depositions.

    Subject to the foregoing reservation of rights, the U.S. Interests hereby designate the following topics:

[NEWYORK 2830407_5]

Core Parties Service List, p. 2

### Topics for Canadian Debtors Representative

1) Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and pre-petition and post-petition potential asset purchasers.

2) Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.

3) The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4) Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.

### Topics for CCC Representative

1) The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The justification for listing in response to Interrogatory Number 42 each transaction, arrangement and event identified therein and how each such transaction, arrangement and event supports the CCC's Allocation Position.

4) Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

[NEWYORK 2830407_5]

Core Parties Service List, p. 3

### Topics for Wilmington Trust Representative

1) The terms of the Indenture dated November 30, 1988 between NNL and the Bank of New York Mellon ("Indenture") and the expected financial result to note holders under different allocation scenarios.

2) Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

3) The understanding of Wilmington Trust or its predecessors regarding liability of any Nortel entity under the Indenture beyond the terms of the Indenture and any communications regarding same.

In addition, all party representatives should be prepared to address any topic, as applicable to that party, designated by that party to representatives of any of the U.S. Interests.

We look forward to continuing to discuss the scope and necessity of these examinations, including the possibility of foregoing live examinations in favor of an efficient written exchange with any of the core parties above.

Best regards,

/ Marla A. Decker /

Marla A.  Decker

**EMEA's Letter regarding Representative Witness Topics (Friday, Dec. 13)**

# Hughes
# Hubbard

Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 13, 2013

**VIA EMAIL TO ALL CORE PARTIES**

Re:  *In re Nortel Networks Inc. et al.*, Case No. 09-10138 (KG) (Bankr. D. Del.)

    *In the Matter of Nortel Networks Corporation et al.*, Court File No. 09-CL-7950 (Ontario Superior Court of Justice)

Dear Counsel,

        As we have previously advised, the Joint Administrators[1] and U.K. Pension Claimants believe that, given the more than 100 fact witness depositions that the parties have taken to date and the millions of documents that the parties have produced, representative witness examinations are unnecessary and cannot be justified in light of the substantial additional expenses and other resources that would be required to prepare for them, conduct them, and comply with the resulting undertakings. Subject and without prejudice to this position, to preserve their rights in the event that representative witness examinations go forward, the Joint Administrators and U.K. Pension Claimants hereby give notice to the Canadian Debtors of the following subjects on which they would seek representative witness testimony.

        1.      The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.

        2.      The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.

        3.      The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.

---

1.    Unless otherwise indicated, capitalized terms used herein shall have the same meaning as in the Joint Administrators' and U.K. Pension Claimants' Rule 30(b)(6) Deposition Notices dated July 26, 2013.

New York ▪ Washington, D.C. ▪ Los Angeles ▪ Miami ▪ Jersey City ▪ Kansas City ▪ Paris ▪ Tokyo

4.      The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between Nortel and the Internal Revenue Service and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.

5.      Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard.

***

The Joint Administrators and U.K. Pension Claimants reserve all rights, including with respect to the appropriate scope and use of any representative witness examinations that are ultimately conducted.

Sincerely,

/s/ Neil J. Oxford

2

**Objections to the Representative Topics Served on the Canadian Deposition Group by the US Deposition Group (Thursday, Dec. 18)**

# ALLEN & OVERY

Marla A. Decker
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006-1470

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

| | |
|---|---|
| Tel | 212 610 6300 |
| Fax | 212 610 6399 |
| Direct line | 212 610 6414 |
| Personal fax | 212 610 6399 |

paul.keller@allenovery.com

Our ref        /0017242-0000008 NY:18434047.1

December 18, 2013

*In re Nortel Networks Inc., et al., Case No. 09-1-138*
*Nortel Networks Corporation, et al.: Court File No. 09-CL-7950*

Re:    **Objections to the Representative Topics Served on the Canadian**
**Deposition Group by the US Deposition Group**

Dear Ms. Decker:

Below please find the Canadian Debtors and the Monitor's objections to the representative topics served by the US Deposition Group.

**Topic No. 1: Statements made by Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities, including tax authorities, debt-rating agencies, underwriters, or any entity evaluating the credit-worthiness of NNL, and prepetition and post-petition potential asset purchasers.**

**RESPONSE TO TOPIC 1:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from

disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and

immunities. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning

"affiliated entities" and "any employee, advisor or representative" over which neither the Canadian Debtors or

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practise in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Athens, Bangkok, Beijing, Belfast, Bratislava, Brussels, Bucharest (associated office), Budapest, Casablanca, Doha, Dubai, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Istanbul, Jakarta (associated office), London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Perth, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Sydney, Tokyo, Warsaw and Washington, D.C.

the Monitor have any custody or control. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to the extent it seeks information concerning the broad categories of the "MRDA" and "transfer pricing", which cover a nine year time period, as well as information from four other third-parties. The Canadian Debtors and the Monitor object to the extent this topic seeks information beyond the information maintained by the Canadian Debtors and the Monitor with respect to statements made by them concerning ownership of intellectual property or intellectual property license rights.

**Topic No. 2:  Third-party licensing by any Nortel entity of its intellectual property, including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments.**

**RESPONSE TO TOPIC 2:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every license of intellectual property and to the extent it seeks information relating to Commercial Licenses as described in the Rockstar Agreement or licenses of intellectual property other than patents.

**Topic No. 3:  The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.**

**RESPONSE TO TOPIC 3:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings.

**Topic No. 4:  Internal valuations of Nortel intellectual property by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel.**

**RESPONSE TO TOPIC 4:**

The Canadian Debtors and the Monitor object to this topic to the extent it seeks information protected from disclosure by the attorney-client privilege, work product immunity, as well as other applicable privileges and immunities. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks expert discovery prior to Court ordered date for such disclosures. The Canadian Debtors and the Monitor further object to this topic to the extent it seeks information that is not reasonably available to them, and thus is unduly burdensome. The Canadian Debtors and the Monitor further object to the extent it seeks to obligate them to review and analyze materials that have not otherwise been produced in these proceedings. The Canadian Debtors and the Monitor further object to this topic as overly broad and ambiguous to the extent it seeks information concerning every divesture, acquisition or transaction.

*      *      *

Finally, the Canadian Debtors and the Monitor further object to the extent the US Debtors intend to seek information from the Canadian Debtors and the Monitor on topics and subject matter beyond the topics enumerated above.

Very truly yours,

Paul B. Keller
Partner

**Responses and Objections of the CCC to the US Deposition Group's and US Debtors'
Topics for CCC Representative (Thursday, Dec. 18)**

Court File No.  09-CL-7950

***ONTARIO***
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

- and-

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------X
                                    :
*In re*                             :    Chapter 11
                                    :
Nortel Networks Inc., *et al.*,[1]  :    Case No. 09-10138 (KG)
                                    :
                    Debtors.        :    Jointly Administered
                                    :
                                    :
                                    :
-------------------------------------------------------X

RESPONSES AND OBJECTIONS OF THE CCC TO THE
US DEPOSITION GROUP'S AND US DEBTORS'
TOPICS FOR CCC REPRESENTATIVE

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332). Nortel Networks Capital Corporation (9620). Nortel Altsystems Inc. (9769). Nortel Altsystems International Inc. (5596). Xros. Inc. (4181). Sonoma Systems (2073). Qtera Corporation (0251). CoreTek. Inc. (5722). Nortel Networks Applications Management Solutions Inc. (2846). Nortel Networks Optical Components Inc. (3545). Nortel Networks HPOCS Inc. (3546). Architel Systems (U.S.) Corporation (3826). Nortel Networks International Inc. (0358). Northern Telecom International Inc. (6286). Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226). Addresses for the Debtors can be found in the Debtors' petitions. which are available at http://chapter11.epiqsystems.com/nortel.

EAST\67072396.1

The Canadian Creditors Committee (the "CCC"), by and through its undersigned counsel and pursuant to, *inter alia*, the Deposition Protocol, submits these objections (the "Objections") to the US Deposition Group's and US Debtors' (collectively, the "US Group") December 13, 2013 Topics for CCC Representative (the "Topics"). The CCC reserves all rights.

## GENERAL OBJECTIONS

The following General Objections are incorporated into each of the CCC's Objections to the US Group's individual topics.

1.      The CCC objects to the Topics, to the extent they seek information that is in the possession, custody or control of the requesting party. The Canadian Debtors, US Debtors, and UK/EMEA Debtors (collectively, the "Nortel Debtors") conducted the liquidation of Nortel's assets via the sale of Nortel's lines of business, including the business units (the "Business Sales") and the sale of Nortel's remaining patent portfolio to Apple, RIM, Sony and Microsoft (the "Residual IP Sale"). The Nortel Debtors operated the Nortel Entities as going concerns including interacting with employees and creditors, conducted the post-filing bidding process and ultimate sales, maintain all related financial records, and possess license agreements and all other relevant contracts. It is therefore unreasonable for the US Group to seek this same information from the CCC, which, in any event, does not possess such information.

2.      The CCC objects to the Topics to the extent they seek information that was previously provided by a fact witness currently or formerly associated with the CCC.

3.      The CCC objects to the Topics to the extent they seek information from persons or entities other than the CCC.

4.      The CCC objects to the Topics to the extent that they are overly broad, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, and to the extent that they are unreasonable in scope pursuant to the Deposition Protocol.

5.     The CCC objects to the Topics to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, proprietary, financial or trade secret protections, the business strategies privilege, the right to privacy, confidentiality doctrines, any protective order, or any other privilege and/or immunity, and which is not subject to an appropriate protective order entered into by the parties and approved by the Court. The inadvertent disclosure of any protected or privileged information shall not operate as a waiver of any privileges or protections.

6.     The CCC objects to the Topics to the extent they attempt or purport to impose obligations beyond those imposed or authorized by the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States Bankruptcy Court for the District of Delaware, or any other applicable rules, orders, or protocols.

7.     The CCC objects to the Topics to the extent they do not contain a reasonable time limitation, on the grounds that any such Topic is overbroad, unduly burdensome, oppressive, vague, and/or ambiguous.

8.     By providing a representative witness to testify regarding any of the Topics, the CCC does not admit the relevance or admissibility of any of the testimony provided but instead reserves the right to object to the relevance and admissibility of any such testimony.

9.     These General Objections will be deemed to be continuing throughout the responses that follow, whether or not expressly referred to therein. The stating of additional or other specific objections shall not constitute a waiver or limitation of these General Objections.

Subject to and without waiver of these General Objections, the CCC objects as follows:

## OBJECTIONS TO THE US GROUP'S
## TOPICS FOR CCC REPRESENTATIVE

TOPIC NO. 1  The identity of constituent creditor groups of the CCC, the financial condition of each, including specifically but not limited to recent financial audits and reports and the legal relationship between any Nortel entity to each such creditor group.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 2, 4, 7). Further, to the extent the Topic seeks information regarding the "financial condition" of any CCC constituent, whether of creditor groups or of an individual court-appointed representative, the CCC objects to the Topic. The CCC also objects to the terms "financial condition" and "legal relationship" as vague and ambiguous. Subject to and without waiving the foregoing Objections, the CCC will produce a representative witness to testify regarding the identity of constituent creditor groups of the CCC and the legal relationship between any Nortel entity to each such creditor group.

TOPIC NO. 2  Any alleged confusion by creditors of a Nortel entity as to which Nortel entity was the debtor.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 3, 4, 7). The CCC further objects to this Topic as vague and ambiguous. To the extent the CCC has relevant information, and subject to the foregoing Objections, the CCC will produce a representative witness to testify regarding certain creditors' perception of Nortel as a single and indivisible entity, as alleged in paragraphs 63, 64, 66, and 74 of its allocation position.

TOPIC NO. 3 The justification for listing in response to Interrogatory Number 42 each transaction, arrangement, and event identified therein and how each such transactions, arrangement and event supports the CCC Allocation Position.

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 4, 6). The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process. To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

TOPIC NO. 4 Subjects identified in interrogatories for which the CCC responded that an answer could not be provided because the parties were in the "early stage in the discovery process."

RESPONSE:

The CCC objects to this Topic. (*See* General Objections 1, 2, 4, 6). The CCC further objects to this Topic as an improper request to supplement interrogatory responses via the representative witness process. To the extent the CCC has a continuing obligation to supplement and/or update its interrogatory responses, it will do so at the appropriate time.

Dated: December 18, 2013

**CANADIAN CREDITORS COMMITTEE**

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Suite 501
250 University Avenue
Toronto, Ontario  M5H 3E5

Mark Zigler
Susan Philpott
Ari Kaplan
Barbara Walancik

Email:  mzigler@kmlaw.ca
Tel:    416.595.2090
Fax:    416.204.2877

Email:  sphilpott@kmlaw.ca
Tel:    416.595.2104
Fax:    416.204.2882

Email:  akaplan@kmlaw.ca
Tel:    416.595.2087
Fax:    416.204.2875

Email:  bwalancik@kmlaw.ca
Tel:    416.542.6288
Fax:    416.204.2906

Lawyers for the Former Employees of Nortel
and LTD Beneficiaries

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Karen Jones
Tina Lie
Michelle Jackson

Email:  ken.rosenberg@paliareroland.com
Tel:    416.646.4304
Fax:    416.646.4301

Email:  max.starnino@paliareroland.com
Tel:    416.646.7431
Fax:    416.646.4301

Email:  lily.harmer@paliareroland.com
Tel:    416.646.4326
Fax:    416.646.4301

Email:  karen.jones@paliareroland.com
Tel:    416.646.4339
Fax:    416.646.4301

Email:  tina.lie@paliareroland.com
Tel:    416.646.4332
Fax:    416.646.4301

Email:  michelle.jackson@paliareroland.com
Tel:    416.646.7470
Fax:    416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:  barry.wadsworth@caw.ca
        lewis.gottheil@caw.ca

Tel.:   416.495.3776
Fax:    416.495.3786

Lawyers for all active and retired Nortel
employees represented by the CAW-Canada


**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham
Ainslie Benedict

Email:  janice.payne@nelligan.ca
        steven.levitt@nelligan.ca
        christopher.rootham@nelligan.ca
        ainslie.benedict@nelligan.ca

Tel:    613.231.8245
Fax:    613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA
as at January 14, 2009


**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:  arthur.jacques@shibleyrighton.com
Tel:    416.214.5213
Fax:    416.214.5413

Email:  thomas.mcrae@shibleyrighton.com
Tel :   416.214.5206
Fax :   416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee


**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage
Elder C. Marques
Paul Steep
Byron Shaw

E-mail:  bboake@mccarthy.ca
Tel:     416.601.7557
Fax:     416.868.0673

Email:   jgage@mccarthy.ca
Tel:     416.601.7539
Fax:     416.686.0673

Email:   emarques@mccarthy.ca
Tel:     416.601.7822
Fax:     416.686.0673

Email:   psteep@mccarthy.ca
Tel:     416.601.7998
Fax:     416.686.0673

Email:   bdshaw@mccarthy.ca
Tel:     416.601.8256
Fax:     416.686.0673

Lawyers for Morneau Shepell Limited

**DLA PIPER**
1201 N. Market Street
Suite 2100
Wilmington, Delaware 19801

Selinda A. Melnik
Richard Hans
Timothy Hoeffner
Farah Lisa Whitley-Sebti

Email:   selinda.melnik@dlapiper.com
Tel:     302.468.5650
Fax:     302.778.7914

Email:   richard.hans@dlapiper.com
Tel:     212.335.4530
Fax:     212.884.8730

Email:   timothy.hoeffner@dlapiper.com
Tel:     212.656.3341
Fax:     215.606.3341

Email:   farahlisa.sebti@dlapiper.com
Tel:     212.335.4829
Fax:     212.884.8529

U.S. Lawyers for the Canadian Creditors
Committee

# TAB N

This is Exhibit "N" referred to in the affidavit of JEFFREY A. ROSENTHAL, sworn before me, this 6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726
hugheshubbard.com

December 20, 2013

**VIA ELECTRONIC FILING**
**AND HAND DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 North Market Street, Sixth Floor
Wilmington, Delaware 19801

> Re:    *In re Nortel Networks Inc., et al.*, Case No. 09-10138 (KG)

Dear Judge Gross:

   We write on behalf of the Joint Administrators for the EMEA Debtors in support of the U.S. Debtors' letter to Your Honor of today's date.

   The EMEA Debtors share the U.S. Debtors' view that, in light of all the other discovery that has taken place, it would not be useful or appropriate to proceed with the "representative depositions" contemplated in the Litigation Timetable and Discovery Plan. We adopt the positions taken by the U.S. Debtors, and support their request that a joint hearing be scheduled in order to address this issue before the EMEA Debtors are required to incur the huge burden and expense of preparing a witness to provide testimony on the 561 broad subjects the Canadian Debtors have directed to the EMEA Debtors.

      Respectfully submitted,

      Derek J.T. Adler

New York  ■  Washington, D.C.  ■  Los Angeles  ■  Miami  ■  Jersey City  ■  Kansas City  ■  Paris  ■  Tokyo

# TAB O

This is Exhibit "O" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017



**Akin Gump**

STRAUSS HAUER & FELD LLP

Abid Qureshi
+1 212.872.8027/fax: +1 212.872.1002
aqureshi@akingump.com

December 20, 2013

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 N. Market Street, 6th Floor
Wilmington, DE 19801

Re:  *In re: Nortel Networks, Inc., et al.*, Case No. 09-10138 (KG);
*Nortel Networks Corporation, et al.*, Court File No. 09-CL7950

Your Honor:

On behalf of the Official Committee of Unsecured Creditors of the US Debtors ("UCC"), we write in support of the letter submitted to the Court today by the US Debtors with respect to "representative witness" depositions in this litigation (D.I. #12688). The UCC joins the US Debtors' position that representative witness depositions are unnecessary. The extensive discovery process to date, including more than 100 fact depositions taken across the globe, have provided the Core Parties more than ample opportunity to thoroughly explore the relevant factual questions in these cases. Representative witness depositions would be unnecessarily duplicative, burdensome, and an extraordinary waste of time and resources given the vast discovery record already developed in these cases.

We further note that the requests directed by the Monitor and the Canadian Debtors to the UCC are particularly inapposite given their emphasis on events that pre-date the UCC's formation on January 22, 2009, and on matters that will properly be the subject of expert testimony. We join in the US Debtors' other objections and support their request for a joint hearing.

Respectfully submitted,

Abid Qureshi

cc: all Core Parties

# TAB P

This is Exhibit "P" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nason
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

# Buchanan Ingersoll ∧ Rooney PC
Attorneys & Government Relations Professionals

1105 North Market Street
Suite 1900
Wilmington, DE 19801-1228

Kathleen A. Murphy
302 552 4214
kathleen.murphy@bipc.com

T 302 552 4200
F 302 552 4295
www.buchananingersoll.com

December 22, 2013

The Honorable Kevin Gross
United States Bankruptcy Court
District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re: *In re Nortel Networks, Inc., et al.*, Case No. 09-10138 (KG)

Dear Chief Judge Gross:

We write on behalf of the Monitor and the Canadian Debtors in response to the letter filed with this Court by counsel to the US Debtors on December 20, 2013 [Dkt. No. 12688], seeking relief to dispense with the "representative witness" stage of the discovery plan and litigation schedule which has been approved by this Court and Justice Morawetz, and in response to each of the letters in support thereof filed by counsel to the Joint Administrators of the EMEA Debtors [Dkt. No. 12693] and the Official Committee of Unsecured Creditors [Dkt. No. 12694].

*Overview of Position*

Notwithstanding (a) the extensive negotiations and prior agreements among the Core Parties regarding the need for the representative party discovery (b) the positions asserted in these proceedings by the US Debtors regarding their entitlement to such representative party discovery, at least while the EMEA Debtors were resisting such representative party discovery and (c) this Court and the Canadian Court having sanctioned the use of representative party discovery as an integral stage of discovery before any trial in this matter, the US and EMEA Debtors seek to change the existing litigation timetable and discovery plan which form part of scheduling orders of this Court and the Canadian Court (amended as recently as a month ago on consent to provide for the completion of the representative party discovery by January 17, 2014) to now preclude the Monitor and Canadian Debtors from engaging in any representative party discovery on any topic. Despite the Canadian Debtors' and the Monitor's attempts to present proposals to reach agreement on a further narrowed scope for representative party discovery, including substituting live witness testimony with written interrogatories on a more limited number of the designated topics (with the disclosures relating to the balance of the topics being deferred to the expert reports and trial briefing process), the US Debtors and the other supporting parties now seek to dispense with the use of *any* representative witnesses, all under the guise of conserving resources based on their

California :: Delaware :: Florida :: New Jersey :: New York :: Pennsylvania :: Virginia :: Washington, DC

December 22, 2013
Page - 2 -

assertion that the other discovery and witness testimony completed to date is sufficient *for all parties* and all purposes for litigating and resolving the claims and allocation disputes.

From the commencement of the discovery process, it has been contemplated that there would be representative party discovery as an integral part of the discovery process.[1] The basic right to engage in such representative party discovery has not been in dispute and it has consistently been something that the Canadian parties (including the Monitor and Canadian Debtors) have insisted upon.[2] Each time the litigation timetable and discovery plan was amended, representative party discovery was preserved. The extension of the litigation schedule submitted by joint motion of all Core Parties (except the Bondholders) on November 11, 2013 and approved by the Courts was sought for the very purpose of allowing an appropriate amount of time to prepare for the representative party discovery following the extended date for the completion of fact depositions and contemplated eight days of representative party discovery. The Canadian Debtors, the Monitor and other parties in interest have relied on the Courts' orders, and their ability at this stage in the agreed, court-approved schedule, to engage in representative party discovery.

For the avoidance of doubt, the Canadian Debtors and the Monitor have been continually mindful of the overall need to ensure efficiency and avoid duplication of costs as it relates to this trial process generally. Indeed, the Canadian Debtors and Monitor have made proposals to the US Debtors and others to narrow the scope of the representative party discovery and the overall costs to the estates, including re-formulating the topics that they themselves were served with in order to ensure that they are clear and capable of being addressed in a meaningful way.[3] Most recently, for example, the Monitor and Canadian Debtors offered to reduce the total number of topics to five topics on allocation and five on the claims asserted by the EMEA Debtors against the Canadian estates and to allow the parties to respond to questions by way of written responses, which would be submitted by January 17, 2014. The other parties, in contrast, have not articulated the basis for objection to any single topic designated for them (with the time for doing so under the litigation timetable and discovery plan having now passed[4]) and

---

[1]    The discovery process initially encompassed both US Federal Rules of Civil Procedure 30(b)(6) depositions and Ontario Rules of Civil Procedure Rule 31 examinations for discovery, as set forth in section 6 of the Discovery Plan.

[2]    The discovery process under the Ontario rules permits questioning about any matter in issue in the litigation, the scope of which is determined by the submissions/pleadings. The purpose of such discovery is to "obtain factual information/admissions relevant to Allocation . . . or Canadian Claims". *Discovery Plan* [Dkt. No. 10566 at 9]. The representative party discovery was intentionally sequenced to occur after fact witness depositions but before expert reports and submission of fact evidence was to be finalized. The parties agreed to dispense with 30(b)(6) examinations and the notices that had been exchanged which contained hundreds of designated topics by each party under the original discovery protocol and instead to conduct "Ontario style" representative party discovery after the fact depositions so that the information learned in the fact depositions could be taken into account in the representative party discovery.

[3]    Email of December 19, 2013 to the Core Party Service List and follow up email of December 21, 2013 to the Core Party Service List (attached hereto). The proposals are designed to make the completion of the trial evidence (both expert and affiants) more efficient.

[4]    It is noteworthy that:

a) the US Debtors purport to object to the scope of the questions and the total number but neglect to mention that there are 30 or *fewer* topics designated for each representative witness and they are repeated on allocation and on claims – their emphasis on 92 pages of questions is misleading in that most of the pages are

December 22, 2013
Page - 3 -

instead take the extraordinary position that because they have determined that they do not need or want to conduct representative party discovery of other parties, that the Canadian Monitor and the Canadian Debtors (and other Canadian interests) should be bound by their determination and deprived of their right to do so. That the US Debtors and other supporting parties have rejected all of these proposals without offering any meaningful alternative casts serious doubts on their stated motivations here simply to ensure efficiency and reduced costs.

The fact is that because the US Debtors and other supporting parties have recently proposed to settle the EMEA Debtors' and UK Pension Claimants claims against the US Debtors, these parties now seek to eliminate altogether the representative party discovery to obtain a strategic advantage in the allocation litigation. Eliminating representative party discovery will allow these parties maximum flexibility to develop new allocation theories (something expressly contemplated by the proposed settlement agreement) without the opportunity for the Canadian Debtors and the Monitor to obtain essential fact discovery to defend these positions. As discussed below, granting the request of the US Debtors would deprive the Canadian Debtors, the Monitor and, for that matter, the Courts, the benefit of essential discovery required to analyze and resolve these cross-border disputes over claims and allocation, irrespective of any proposed settlement of the EMEA Debtors' and UK Pension claims against the US Debtors.

### *The Evolution and Preservation of Representative Party Discovery in These Proceedings*

From the commencement of discovery, either Federal Rules of Civil Procedure 30(b)(6) depositions or representative party discovery have been contemplated as an integral part of the process of this litigation

---

repeating the same topics on either allocation or claims for the different parties, including 24 different EMEA entities who have filed claims against the Canadian estate, for many of which there has been little or no opportunity for fact depositions. It was expressly contemplated that the representative party discovery would take into account testimony covered in the fact depositions and be used to identify the facts or documents pertaining to a particular subject (tied to the pleadings) that a party relies upon not otherwise disclosed in the fact deposition process – now the US Debtors claim that the very process that they agreed to and advocated is too burdensome and offer no alternative;

    b) the only purported objection that the EMEA Debtors make in their submission in support of the US Debtors is that they should not have to respond to 561 broad subjects – which are in reality 30 or fewer subjects for each EMEA Debtor that has made a multitude of claims in the Canadian estate and taken an interdependent position on allocation, and they offer no basis on which they should not be required to disclose the factual and documentary basis upon which they base their assertions – if they are aware of nothing beyond what has been disclosed through the fact deposition testimony and exhibits then surely it would not impose a disproportionate burden for them to state that on the record particularly given the offer for it to be done in writing; and

    c) the UCC in its letter to the Court in support of the US Debtors' position [Dkt. No. 12694] purports to object because the topics listed for them (derived from their own submission/ pleading or positions they themselves have adopted) relate to matters that pre-date the UCC's formation and matters that will probably be the subject of expert testimony – if that is their response to the topics designated for them - namely that they have no knowledge of any facts or documents in support of their position on allocation beyond what may be disclosed in the expert reports to be delivered on January 24, 2014 - then the Monitor and Canadian Debtors are entitled to have that on the record and binding, and surely it would not impose a disproportionate burden for them to state that on the record particularly given the offer for it to be done in writing;

December 22, 2013
Page - 4 -

and the basic right to engage in such depositions has not been in dispute. Each time the schedule was amended representative party discovery was contemplated.

Throughout the discovery process, the parties have worked cooperatively to narrow the scope of representative party discovery. Initially, the parties collectively served hundreds of topics for examination under Rule 30(b)(6) of the Federal Rules of Civil Procedure. It was the US Debtors who encouraged the other parties to forego traditional Rule 30(b)(6) depositions in favor of a modified Canadian representative party discovery approach.[5] The fact that the parties ultimately agreed to narrow the depositions from hundreds of topics to eight days of depositions is a significant curtailment in scope and demonstrated the parties' efforts to conduct discovery as efficiently and expediently as possible.

The US Debtors have themselves sought to expand the scope of the representative party discovery. The EMEA Debtors initially contemplated producing one representative witness for all of the EMEA entities making claims against the US estates. The US Debtors strenuously objected and urged this Court to require the EMEA Debtors to provide a representative witness for *each* EMEA entity claimant. Ultimately, the parties reached a compromise position and this Court and the Canadian Court amended the deposition protocol to reflect that the EMEA Debtors were not obliged to designate a different representative witness for each EMEA entity claimant, but that "[n]o specific time limits shall be placed on these Representative Depositions at this time. . . ."[6] This revised language reflected the careful consideration of the parties of the need to strike an appropriate balance between minimizing duplication of efforts and costs and ensuring the parties have the opportunity to engage in meaningful representative party discovery. The agreement amongst the parties, as endorsed by the Courts, to engage in a significantly narrowed version of representative party discovery, should not be eviscerated at this late stage.

Moreover, at the time the most recent joint motion to amend the litigation schedule was made, premised in large part on the need for additional time to prepare for and conduct representative party discovery, the parties were fully aware that the number of fact witness depositions would likely exceed 100 depositions, but at no point did any of the parties moving for the extension suggest that the number of fact depositions completed should foreclose the opportunity for representative party discovery. This Court should not allow the US Debtors to waste the Court and parties' resources by forcing the re-litigation of previously resolved discovery issues, particularly where they jointly proposed the existing schedule to the Court only a little more than a month ago.

---

[5]        Letter to the Honorable Kevin Gross on behalf of the US Debtors [Dkt. No. 11575 at 8]. The US Debtors represented to this Court in this letter that: "[a]t our suggestion, the core parties all agreed to forego traditional Rule 30(b)(6) examinations and instead utilize a modified Canadian representative party discovery approach whereby each party would put a witness for a one or two day examination (parties who did not file a pleading were excepted)." As the US Debtors stated, the only exception to the agreement to engage in party representative party discovery was for those parties that did not file a pleading. This limited exception makes sense and comports with the essential goal of Rule 30(b)(6) depositions: to allow a party to know the basis of the claims made against them before their trial evidence is finalized.

[6]        *Order Resolving Certain Discovery Disputes and Denying Related Relief* [Dkt. No. 11762 at 3].

December 22, 2013
Page - 5 -

The US Debtors have not provided any meaningful explanation for their request to alter the *status quo.* All that has changed since the November 14, 2013 joint motion is that the US Debtors have reached a settlement with the EMEA Debtors and the UK Pension Claimants with respect to the claims those parties have asserted against the US estates.[7] Without making any reference to that fundamental change in circumstances, the US Debtors suggest that the last 35 fact witness depositions were somehow sufficient to alter their position on their own need for representative party discovery, but many of those final depositions involved third parties and the majority of the approximately 105 depositions that have taken place to date have not involved parties whose testimony is binding on the parties. In all of the prior depositions, even those of officers of the parties, the deponents appeared in their individual capacity. In fact, inquiry into the bases for the parties' positions was forestalled—at the deposition of John Ray, the principal officer of the US Debtors, his counsel objected on grounds of privilege to questions relating to the US Debtors' allocation position because "[h]e's not here either as a representative witness, nor is he here to give our legal theories or positions in this case."

### *The Monitor and Canadian Debtors Have Made Reasonable Efforts to Curtail Costs and Streamline the Process*

In the spirit of compromise, on December 19, 2013, following the deadline for objections to the representative party topics, the Monitor and Canadian Debtors offered to further narrow the scope of the representative party discovery with the aim of minimizing any potential burden on the parties and witnesses. The Monitor and Canadian Debtors offered to reduce the total number of topics to five topics on allocation and five on the claims asserted by the EMEA Debtors against the Canadian estates (with the disclosures relating to the balance of the topics being deferred to the expert reports and trial briefing process) and to allow the parties to respond to questions by way of written responses, which would be provided by January 17, 2014. This proposal accomplishes the goals of the current litigation timetable and discovery plan, which is to complete certain aspects of the representative party discovery in advance of the completion of expert witness reports and trial affidavits.[8] It is a meaningful benchmark in the pre-trial process to have disclosure of and admissions from opposing parties and this is built into the current litigation timetable and discovery plan. The Monitor and Canadian Debtors' proposal to limit the number of topics for discovery in advance of expert reports and the trial briefing was in response to the US Debtors' suggestion that would be a manageable number of topics to deal with in the timeframe.[9] The Canadian Debtors' and Monitor's proposal that written responses could be provided to questions was a direct response to the concern professed by counsel to the US Debtors that there would be insufficient time to prepare representative witnesses for live testimony.

---

[7]    *See Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, 503(B) and 507(A)(2) and Bankruptcy Rules 6004(H) and 9019 Approving the US Claims Litigation Settlement Agreement By and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates* [Dkt. No. 12618].

[8]    Under the current schedule initial reports are due January 24, 2014 and reply reports are due February 28, 2014. The dates for the trial briefing process are still being discussed by the parties.
[9]    December 21, 2013 email from Jennifer Stam (attached hereto) delineating the proper topics for each Core Party.

December 22, 2013
Page - 6 -

Despite these efforts made by the Monitor and Canadian Debtors to find middle ground, the US Debtors continue to claim that they could not possibly be prepared for any narrowed version of representative party discovery, even though the current dates were heavily negotiated and agreed upon previously and specifically endorsed by this Court and the Canadian Court. In response to repeated conversations about the scope of the representative party discovery, dating back more than ten days prior to the US Debtors' filing of its letter raising this issue with the Court, neither the US Debtors nor any other party that has endorsed their position have offered a meaningful alternative to the position that all representative party discovery should be eliminated.

The US Debtors claim their request to prevent the parties from engaging in representative party discovery is based on a desire to conserve the resources of the estate. As explained above, the scope of these depositions has already been significantly curtailed. The US Debtors made no similar entreaties to reduce expenses while conducting over 105 fact witness depositions around the globe over a three-month period. It is reasonable to expect the currently scheduled eight days of representative party discovery, which will take place in two central locations, will be far more cost-efficient.[10]  Further, the Monitor's and Canadian Debtors' compromise offer to narrow the scope to five topics and to allow written responses to questions as opposed to live testimony would further reduce costs.

### *Representative Party Discovery Is Essential to Fair and Efficient Trial Preparation*

To the extent that the US Debtors believe they have obtained all the testimony necessary for their case and they do not require any further discovery, they are entitled to reduce costs and increase efficiencies by electing to not proceed with the discovery topics that they noticed to other Core Parties.[11]  However, the present effort to foreclose other parties from conducting representative party discovery is contrary to the goals of discovery.[12]  It is fundamental that all parties have a right to know the basis of the contentions and facts that opposing parties intend to present at trial. To that end, the discovery process is based on the fundamental goal of preventing surprise at trial. As counsel to the US Debtors represented to this Court

---

[10]     Considering that the US Debtors' primary counsel incurred approximately $9.3 million in fees and expenses in a single month, it strains credulity to allege that eliminating, at most, eight days of representative party discovery will represent a substantial savings in the aggregate. *See Fifty-Eighth Interim Application of Cleary Gottlieb Steen & Hamilton LLP, as Attorneys for Debtors and Debtors-In-Possession, for Allowance of Interim Compensation and for Interim Reimbursement of All Actual and Necessary Expenses Incurred for the Period October 1, 2013 Through October 31, 2013,* [Dkt. No. 12502] (seeking compensation of $9,327,407.50 for the month of October as "actual, reasonable and necessary").

[11]     In light of their repeated assertions that representative party discovery is unnecessary, it is unclear why the US Debtors have themselves noticed topics for the Canadian discovery group. *See* US Deposition Group's December 13, 2013, letter enumerating deposition topics (attached to the US Debtors' December 20, 2013, letter to this Court raising the present discovery dispute) (claiming that US Debtors believe the depositions are unnecessary, but that they are providing topics "to avoid any claim of waiver."). It is unclear how the US Debtors could be concerned about a claim of waiver when they are simultaneously claiming that representative party discovery is unnecessary in its entirety.

[12]     The US Debtors' entreaties to this Court to consider the volume and type of discovery available to a "typical Canadian litigant" in a "typical Canadian litigation" are wholly irrelevant given the procedural posture of this case. Even if it were a relevant consideration, a typical Canadian litigant would, if nothing else, be entitled to representative party discovery.

December 22, 2013
Page - 7 -

just three months ago, any particular circumstance unique to this case "is not a reason to deprive the US Debtors of their basic right to depose a party representative for each Claimant."[13]  And as counsel for the US Debtors further noted back in September: "[i]t is axiomatic that each EMEA Claimant must participate fully in the discovery process.  This includes, at the most basic level, identifying and producing for deposition witnesses associated with each Claimant who are knowledgeable on key topics raised in the Claims and a party representative of each Claimant."[14]  The US Debtors' letter seeking a complete end to representative party discovery process fails to explain why these axioms no longer apply.

The Monitor and Canadian Debtors previously agreed to forego interrogatories as well as the standard Rule 30(b)(6) depositions.  The representative party discovery remained as the only defensive discovery tool available in this case.  Cooperative efforts have been made to narrow the scope of the representative party discovery and to allow written responses in lieu of presenting a live witness.  However, foreclosing the opportunity to obtain any representative party discovery would be extremely prejudicial, particularly in the circumstances of this litigation.  The discovery process, including the more than 105 fact witness depositions that have been conducted to date, has been based in material part on the understanding that parties would have the opportunity to partake in representative party discovery.  This understanding influenced not only who would be deposed, but also whether to reserve lines of questioning for party representatives.[15]

Representative witnesses have "a unique status" that is "substantially different" from fact witnesses because a representative witness "testifies as the entity, not as an individual." *Ethypharm SA France v. Abbott Labs.*, 271 F.R.D. 82, 90 (D. Del. 2010) (quoting *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, No. 01 CIV. 3016(AGS)(HB), 2002 WL 1835439 (S.D.N.Y. Aug. 8, 2002) (internal quotation marks omitted)).  Eliminating the parties' ability to engage in discovery that binds the parties would ignore this fundamental difference between these types of witnesses.  A representative witness "is not simply testifying about matters within his or her personal knowledge, but rather is speaking for the corporation about matters to which the corporation has reasonable access." *Oy v. Verizon Servs. Corp.*, No. 12–715–CJB, 2013 WL 5675516, at *2 (D. Del. Oct. 15, 2013) (citing *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*, No. 09–CV–0663 (JCJ), 2011 WL 1636985, at *1 (D. Del. Apr. 29, 2011)).  Particularly here, where the fact witnesses only have personal knowledge of facts that occurred during a discrete period of time, and which often occurred over ten years ago, having the opportunity to understand the parties' positions and the facts supporting those positions is essential.

---

[13]     Letter to The Honorable Kevin Gross on behalf of the US Interests [Dkt. No. 11707 at 5].

[14]     *Id.* at 1 (emphasis in original).

[15]     For example, when the Monitor and Canadian Debtors noticed depositions of certain individuals, the Ad Hoc Committee of Bondholders objected on the grounds that the individuals noticed did not have knowledge of the claims for which their testimony was sought and that the testimony would be better addressed in the representative party discovery.  August 1, 2013 email from Atara Miller on behalf of the Bondholders to the Core Party Service List (attached hereto).

December 22, 2013
Page - 8 -


The Monitor and Canadian Debtors respectfully request that this Court reject any entreaties to alter the litigation schedule by eliminating representative party discovery.  We hope to continue to negotiate with our counterparties to agree on a reasonable alternative that does not prejudice any party, but we continue to believe that the Canadian Debtors' and Monitor's proposal to reduce the number of topics to five and to allow all responses to be in writing strikes the appropriate balance.

Very truly yours,

/s/ *Kathleen A. Murphy*

Kathleen A. Murphy (No. 5215)

KAM/
1027550-001116

**Rajan, Claire:BK (DC)**

| | |
|---|---|
| **From:** | Stam, Jennifer <Jennifer.Stam@gowlings.com> |
| **Sent:** | Thursday, December 19, 2013 4:52 PM |
| **To:** | (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; Guyder, Daniel:BK (NY); Cho, Jonathan:BK (NY); Badtke-Berkow, Joseph:BK (NY); Coleman, Ken:BK (NY); Hall, Laura R:LT (NY); Ward, Nicolette:LT (NY); Keller, Paul B.:LT (NY); (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Marla Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y) Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; (Gowlings) Derrick Tay; (Gowlings) Jennifer Stam; (Heenan) John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) DJ. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thronton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer |

1

| | |
|---|---|
| **To:** | Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey |
| **Cc:** | Anderson, Michel |
| **Subject:** | Nortel: Representative Witness Depositions |
| | |
| **Categories:** | Copied to Virtual File |

The Monitor and the Canadian Debtors do not agree with the position that the representative party examinations should be dispensed with in their entirety. We understand that there is an objection to the extent of information that a given representative might have to absorb and come prepared to address based on the subjects that we designated. While we remain of the view that the designated subject areas are entirely appropriate for purposes of discovery/representative party examinations under both Ontario and US procedure, in order to address that objection so that we obtain meaningful answers in the available time, the Monitor and Canadian Debtors would be prepared to agree to cap the number of subject areas that would be dealt with through the representative party examinations in January in advance of the trial briefing process (we are thinking along the lines of capping for this purpose our designated subject areas to a maximum of 5 for allocation and 5 for claims), some or all of which we would be prepared to consider dealing with in writing (with the specific questions to be formalized by an agreed upon date) on the condition that we have agreement that the responses will be provided by January 17, 2014. The Monitor and Canadian Debtors would similarly be prepared to answer questions in writing within your designated subject areas (subject to the noted objections which we remain willing to meet and confer with you about). This proposal assumes that the identification of facts and documents for the balance of our designated subject areas will be addressed through a trial briefing procedure that would entail exhibits, affidavits, reply affidavits and deposition designations being exchanged in sequence and concluded in early May in advance of the May 12, 2014 trial commencement date. If this is an agreeable way of proceeding please confirm and we will identify the questions that would remain designated from our lists for this purpose. All rights continue to be reserved.

Jennifer Stam
Partner
T 416-862-5697
jennifer.stam@gowlings.com



Gowling Lafleur Henderson LLP
Lawyers • Patent and Trade-mark Agents
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, Ontario
M5X 1G5 Canada
T 416-862-7525 F 416-862-7661
gowlings.com



IMPORTANT NOTICE: This message is intended only for the use of the individual or entity to which it is addressed. The message may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify Gowlings immediately by email at postmaster@gowlings.com. Thank you.

**Nixdorf, Mark:BK (NY)**

| | |
|---|---|
| **From:** | Stam, Jennifer <Jennifer.Stam@gowlings.com> |
| **Sent:** | Saturday, December 21, 2013 10:53 PM |
| **To:** | Stam, Jennifer; (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; Guyder, Daniel:BK (NY); Cho, Jonathan:BK (NY); Badtke-Berkow, Joseph:BK (NY); Coleman, Ken:BK (NY); Hall, Laura R:LT (NY); Ward, Nicolette:LT (NY); Keller, Paul B.:LT (NY); (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Marla Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; Tay, Derrick; Stam, Jennifer; (Heenan) John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) D.J. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thronton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; |

**To:**  (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey
**Cc:**  Anderson, Michel
**Subject:**  RE: Nortel: Representative Witness Depositions
**Attachments:**  EMEA Debtors Topics for the Canadian Debtors-TOR_LAW-8323829-v2.DOC; US Debtors Topics for Cdn Debtors (revised)-TOR_LAW-8324669-v1.DOC; Blackline (US Debtors Topics for Cdn Debtors)-TOR_LAW-8324701-v1.DOC; Blackline (EMEA Debtors Topics to Cdn Debtors)-TOR_LAW-8324702-v1.DOC

Further to the email sent on behalf of the Canadian Debtors and the Monitor at 4:54 pm on Thursday December 19, 2013 following our meet and confer earlier that day, we wish to delineate the particular topics for each Core Party for whom we have designated representative party topics which ones we would include in the cap of 5 about which we would like to be able to ask questions in the time frame contemplated by the Amended Discovery Plan (with the disclosures about the remaining topics to be covered in the trial briefing process). The US Debtors asked and were provided with their topics previously but we are including them again in this listing for completeness (we note that no others have asked what the topics would be).

<u>US Debtors on allocation</u>: 1, 4, 9, 10, 13 [Note these topics do not include those that relate to the separate allocation theory of the CCC]
<u>Bondholders and UCC on allocation</u>: same topics as for US Debtors –parties to advise of any additional or different responses that they have to the responses of the US Debtors [Note these topics do not include those that relate to the separate allocation theory of the CCC]
<u>All EMEA Debtors on allocation</u>: 1, 3, 4, 6, 7  (or corresponding questions if numbering is different for any particular claimant)
<u>Northern Ireland, NNOCL, South Africa</u>: 1,2,3, 4, 5
<u>All EMEA Debtors (except NNSA) on claims</u>: 8,9,21,23,25
<u>NNSA on claims</u>: 8,20,22,24,30
<u>UKPC</u>: 1, 2, 5, 6, 10

For ease of reference, we also attach two schedules which re-state the topics designated by the US Debtors and EMEA Debtors for the Canadian Debtors so as to reflect the objections that we delivered in respect of those topics and sets forth any concerns we have about the clarity and/or scope of what may be asked about.

---

**From:** Stam, Jennifer
**Sent:** December-19-13 4:52 PM
**To:** (Akin Gump) Abid Qureshi; (Akin Gump) Brad M. Kahn; (Akin Gump) Christine Doniak; (Akin Gump) David Botter; (Akin Gump) Fred Hodara; (Akin Gump) Jackie Yecies; (Akin Gump) Robert Johnson ; (Akin Gump) Sunny Gulati; (Allen & Overy) Daniel Guyder; (Allen & Overy) Jonathan Cho; (Allen & Overy) Joseph Badtke-Berkow; (Allen & Overy) Ken Coleman; (Allen & Overy) Laura Hall; (Allen & Overy) Nicolette Ward; (Allen & Overy) Paul Keller; (Ashurst) Angela Pearson; (Ashurst) Antonia Croke; (Bayard) Charlene D. Davis; (Bayard) Justin Alberto; (Bennett Jones ) Jonathan Bell; (Bennett Jones) Gavin Finlayson; (Bennett Jones) Kevin Zych; (Bennett Jones) Richard Orzy; (Bennett Jones) Richard Swan; (Bennett Jones) Sean Zweig; (Borden) Edmond Lamek; (Borden) James Szumski; (Buchanan Ingersoll) Kathleen Murphy; (Buchanan Ingersoll) Mary Caloway; (Cassels) Bill Burden; (Cassels) Bruce Leonard; (Cassels) Christopher Horkins; (Cassels) David S. Ward; (Cassels) Lara Jackson; (CAW) Barry Wadsworth; (CAW) Lewis Gottheil; (Cleary) Dan Queen; (Cleary) Darryl Stein; (Cleary) Howard Zelbo; (Cleary) Jacqueline Moessner; (Cleary) James Bromley; (Cleary) Jeffrey Rosenthal; (Cleary) Jodi Erickson; (Cleary) Lauren Peacock; (Cleary) Lisa Schweitzer; (Cleary) Maria Decker; (Cleary) Neil Forrest; (Davies Ward) James Doris; (Davies Ward) Louis Sarabia; (Davies Ward) Robin Schwill; (Davies Ward) Sean Campbell; (Dentons) Barbara Grossman; (Dentons) Michael Wunder; (Dentons) Ryan Jacobs; (Dentons) Shayne Kukulowicz; (DLA Piper) Richard Hans; (DLA Piper) Farah Lisa Whitley-Sebti; (DLA Piper) Jason Gerstein; (DLA Piper) Selinda Melnik; (DLA Piper) Timothy Hoeffner; (E&Y) Monitor; (Goodmans) Alan Mark; (Goodmans) Ben Zarnett; (Goodmans) Chris Armstrong; (Goodmans) Fred Myers; (Goodmans) Jay Carfagnini; (Goodmans) Jessica Kimmel; (Goodmans) Joseph Pasquariello; (Goodmans) Peter Ruby; (Gowlings) Derrick Tay; (Gowlings) Jennifer Stam; (Heenan)

John Salmas; (Heenan) Kenneth Kraft; (Heenan) Sara-Ann Van Allen; (Hogan Lovells) Angela Dimsdale Gill; (Hogan Lovells) David Graves; (Hogan Lovells) John Tillman; (Hogan Lovells) Katherine Tallett-Williams; (Hogan Lovells) Matthew Bullen; (Hughes Hubbard) Charles Huberty; (Hughes Hubbard) Derek Adler; (Hughes Hubbard) Fara Tabatabai; (Hughes Hubbard) Neil Oxford; (Katten) Craig Barbarosh; (Katten) David Crichlow; (Katten) Karen Dine; (Koskie) Ari Kaplan; (Koskie) Barbara Walancik; (Koskie) Mark Zigler; (Koskie) Susan Philpott; (Latham & Watkins) Michael Riela; (Lax O'Sullivan) Matthew Gottlieb; (Lax O'Sullivan) Paul Michell; (Lax O'Sullivan) Tracy Wynne; (McCarthy) Barbara Boake; (McCarthy) Byron Shaw; (McCarthy) Elder Marques; (McCarthy) James Gage; (McCarthy) Kelly Peters; (McCarthy) Paul Steep; (McCarthy) Sharon Kour; (McMillan) Sheryl Seigel; (Milbank) Albert Pisa; (Milbank) Andrew LeBlanc; (Milbank) Atara Miller; (Milbank) Gabrielle Ruha; (Milbank) Jennifer Harris; (Milbank) Michael Hirschfeld; (Milbank) Nick Bassett; (Milbank) Rachel Pojunas; (Milbank) Samir Vora; (Milbank) Thomas Kreller; (Milbank) Tom Matz; (Morris Nichols) Annie Cordo; (Morris Nichols) Derek Abbott; (Nelligan) Ainslie Benedict; (Nelligan) Christpher Rootham; (Nelligan) Janice Payne; (Nelligan) Steven Levitt; (Norton Rose) Michael Lang; (Osler) Adam Hirsh; (Osler) Alexander Cobb; (Osler) Betsy Putnam; (Osler) Edward Sellers; (Osler) Lyndon Barnes; (Paliare) Jacqueline Cummins; (Paliare) Karen Jones; (Paliare) Ken Rosenberg; (Paliare) Lily Harmer; (Paliare) Max Starnino; (Paliare) Michelle Jackson; (Paliare) Tina Lie; (Patterson) Daniel Lowenthal; (Richards Layton) Christopher Samis; (Shibley) Arthur Jacques; (Shibley) Thomas McRae; (Thornton Grout) D.J. Miller; (Thornton Grout) John Finnigan; (Thornton Grout) Michael Barrack; (Thronton Grout) Andrea McEwan; (Thronton Grout) Rebecca Lewis; (Torys) Adam Slavens; (Torys) Andrew Gray; (Torys) Scott Bomhof; (Torys) Sheila Block; (Torys) Tony DeMarinis; (Willkie Farr) Andrew Hanrahan; (Willkie Farr) Brian O'Connor; (Willkie Farr) Sameer Advani; (Young Conaway) Ed Harron; (Young Conaway) John Dorsey
Cc: Anderson, Michel
**Subject:** Nortel: Representative Witness Depositions

The Monitor and the Canadian Debtors do not agree with the position that the representative party examinations should be dispensed with in their entirety. We understand that there is an objection to the extent of information that a given representative might have to absorb and come prepared to address based on the subjects that we designated. While we remain of the view that the designated subject areas are entirely appropriate for purposes of discovery/representative party examinations under both Ontario and US procedure, in order to address that objection so that we obtain meaningful answers in the available time, the Monitor and Canadian Debtors would be prepared to agree to cap the number of subject areas that would be dealt with through the representative party examinations in January in advance of the trial briefing process (we are thinking along the lines of capping for this purpose our designated subject areas to a maximum of 5 for allocation and 5 for claims), some or all of which we would be prepared to consider dealing with in writing (with the specific questions to be formalized by an agreed upon date) on the condition that we have agreement that the responses will be provided by January 17, 2014. The Monitor and Canadian Debtors would similarly be prepared to answer questions in writing within your designated subject areas (subject to the noted objections which we remain willing to meet and confer with you about). This proposal assumes that the identification of facts and documents for the balance of our designated subject areas will be addressed through a trial briefing procedure that would entail exhibits, affidavits, reply affidavits and deposition designations being exchanged in sequence and concluded in early May in advance of the May 12, 2014 trial commencement date. If this is an agreeable way of proceeding please confirm and we will identify the questions that would remain designated from our lists for this purpose. All rights continue to be reserved.

Jennifer Stam
Partner
T 416-862-5697
jennifer.stam@gowlings.com

gowlings

Gowling Lafleur Henderson LLP
Lawyers • Patent and Trade-mark Agents
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, Ontario
M5X 1G5 Canada
T 416-862-7525  F 416-862-7661
gowlings.com



*December 21, 2013*

### EMEA Debtors Topics for the Canadian Debtors

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors. Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1. The circumstances surrounding the partial repayment in or around February 2008 of the NNL-NNSA subordinated loan.

2. The circumstances surrounding the negotiation and drafting of the Insolvency Guarantee dated December 21, 2007 and provided by NNL to the Nortel Networks UK Pension Trust Limited, including the exclusion of administration from the definition of "Insolvency Event" within that document.

3. The conception, proposal, negotiation, and documentation of the Third Addendum to the MRDA and Schedule A thereto.

4. The negotiation, reporting, and purported application to the EMEA Entities of the settlement(s) between NNL and Canada Revenue Agency that resulted in a $2 billion adjustment in favor of NNI in or around January 2010.

5. Post-petition models for valuing or assessing the potential revenues from (a) the intellectual property assets sold in the Residual Patents Sale or any portion thereof, or (b) a Residual IP Co., which were prepared by, with, or at the request of Nortel, the Global IP Law Group, or Lazard. **[Note to the EMEA Debtors: we will need further clarification about what is intended about on this topic beyond what was produced as part of the Global IP or Lazard productions before the Canadian Debtors can determine whether they can respond to this topic.]**

---

[1] The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

*December 21, 2013*

## US Debtors' Topics for the Canadian Debtors

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors. Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1.  Statements made by any Canadian Debtor or the Monitor, to government authorities (including tax authorities), debt-rating agencies, underwriters, or any entity evaluating the credit worthiness of NNL and pre-petition and post-petition potential asset purchasers regarding ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any participant in the Master Research & Development Agreement.

2.  Third-party licensing by any Nortel entity of its patents (other than commercial licenses granted in the ordinary course of business), including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments other than any patent license agreements that were produced or disclosed to potential purchasers during the post-petition sale transactions for the lines of business and residual patents. **[Note to the US Debtors: The additional language is intended to avoid the re-production of all of the license agreements which were produced in the sales data rooms. However, we will still need to understand what is intended by this topic before the Canadian Debtors can determine whether they will be able to respond to this topic.]**

3.  The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4.  Internal valuations of Nortel intellectual property prepared after 2001 by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel other than in connection with divestitures, acquisitions, joint ventures, or other transactions with a value of less than US$100 million.

---

[1] The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

**US Debtors' Topics for the Canadian Debtors**

The Canadian Debtors[1] shall respond to specific questions identified on the following topics provided that with respect to all such topics, the Canadian Debtors shall only be required to: (a) review document productions made as of December 20, 2013; (b) review deposition testimony made as of December 20, 2013; and (c) make reasonable inquiries of current and former employees of the Canadian Debtors. Further, the Canadian Debtors shall not be required to respond to the extent that response would require disclosure of information covered by attorney-client privilege, work product immunity or any other applicable privileges and immunities.

1.    Statements made by ~~Nortel Networks Limited ("NNL") or any affiliated entity or any employee, advisor or representative thereof (including, but not limited to, the Monitor, E&Y U.S. and E&Y Canada, Horst-Frisch and Oslers) to any third party regarding the Master Research and Development Agreement ("MRDA"), transfer pricing, ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any MRDA participant, including but not limited to, government authorities.~~any Canadian Debtor or the Monitor, to government authorities (including tax authorities), debt-rating agencies, underwriters, or any entity evaluating the credit- worthiness of NNL~~,~~ and pre-petition and post-petition potential asset purchasers regarding ownership (including with respect to economic, beneficial and/or legal ownership) of intellectual property or intellectual property license rights of any participant in the Master Research & Development Agreement.

2.    Third-party licensing by any Nortel entity of its ~~intellectual property~~patents (other than commercial licenses granted in the ordinary course of business), including with respect to which Nortel entity had the right to and did engage in such licensing activity and which Nortel entity recognized revenue on royalty payments~~.~~ other than any patent license agreements that were produced or disclosed to potential purchasers during the post-petition sale transactions for the lines of business and residual patents. [Note to the US Debtors: The additional language is intended to avoid the re-production of all of the license agreements which were produced in the sales data rooms. However, we will still need to understand what is intended by this topic before the Canadian Debtors can determine whether they will be able to respond to this topic.]

3.    The practice of prosecuting or defending patents in litigation, including decisions with respect to which Nortel entities should participate and/or bear financial risk with respect to the litigation.

4.    Internal valuations of Nortel intellectual property prepared after 2001 by estate, by business line in whole or in part and the methods used in such valuations, whether conducted by third parties or by Nortel personnel~~.~~ other than in connection with

---

[1] The "Canadian Debtors" are Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

divestitures, acquisitions, joint ventures, or other transactions with a value of less than US$100 million.

**Rajan, Claire:BK (DC)**

| | |
|---|---|
| **From:** | Miller, Atara <AMiller@milbank.com> |
| **Sent:** | Thursday, August 01, 2013 6:56 PM |
| **To:** | 'Ruby, Peter'; 'nortel.monitor@ca.ey.com'; 'derrick.tay@gowlings.com'; 'jennifer.stam@gowlings.com'; Coleman, Ken:BK (NY); Keller, Paul B.:LT (NY); Guyder, Daniel:BK (NY); Hall, Laura R:LT (NY); Badtke-Berkow, Joseph:BK (NY); Cho, Jonathan:BK (NY); Ward, Nicolette:LT (NY); 'Kathleen.murphy@bipc.com'; 'mary.caloway@bipc.com'; 'tdemarinis@torys.com'; 'sbomhof@torys.com'; 'sblock@torys.com'; 'agray@torys.com'; 'aslavens@torys.com'; 'jbromley@cgsh.com'; 'lschweitzer@cgsh.com'; 'hzelbo@cgsh.com'; 'jrosenthal@cgsh.com'; 'dstein@cgsh.com'; 'mdecker@cgsh.com'; 'lpeacock@cgsh.com'; 'jmoessner@cgsh.com'; 'nforrest@cgsh.com'; 'dqueen@cgsh.com'; 'dabbott@mnat.com'; 'acordo@mnat.com'; 'rschwill@dwpv.com'; 'scampbell@dwpv.com'; 'jdoris@dwpv.com'; 'lsarabia@dwpv.com'; 'mgottlieb@counsel-toronto.com'; 'twynne@counsel-toronto.com'; 'pmichell@counsel-toronto.com'; 'adler@hugheshubbard.com'; 'oxford@hugheshubbard.com'; 'tabataba@hugheshubbard.com'; 'huberty@hugheshubbard.com'; 'eharron@ycst.com'; 'jdorsey@ycst.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca'; 'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; 'ken.rosenberg@paliareroland.com'; 'max.starnino@paliareroland.com'; 'lily.harmer@paliareroland.com'; 'karen.jones@paliareroland.com'; 'tina.lie@paliareroland.com'; 'michelle.jackson@paliareroland.com'; 'barry.wadsworth@caw.ca'; 'lewis.gottheil@caw.ca'; 'Arthur Jacques'; 'thomas.mcrae@shibleyrighton.com'; 'janice.payne@nelligan.ca'; 'steven.levitt@nelligan.ca'; 'christopher.rootham@nelligan.ca'; 'ainslie.benedict@nelligan.ca'; 'bboake@mccarthy.ca'; 'jgage@mccarthy.ca'; 'emarques@mccarthy.ca'; 'psteep@mccarthy.ca'; 'skour@mccarthy.ca'; 'bdshaw@mccarthy.ca'; 'kpeters@mccarthy.ca'; 'selinda.melnik@dlapiper.com'; 'richard.hans@dlapiper.com'; 'timothy.hoeffner@dlapiper.com'; 'farahlisa.sebti@dlapiper.com'; 'zychk@bennettjones.com'; 'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com'; 'swanr@bennettjones.com'; 'zweigs@bennettjones.com'; 'bellj@bennettjones.com'; Kreller, Tom; Harris, Jennifer; Pisa, Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Matz, Tom; Bassett, Nick; Ruha, Gabrielle; Pojunas, Rachel; 'Shayne.kukulowicz@dentons.com'; 'Michael.wunder@dentons.com'; 'ryan.jacobs@dentons.com'; 'Barbara.grossman@dentons.com'; 'fhodara@akingump.com'; 'dbotter@akingump.com'; 'aqureshi@akingump.com'; 'rajohnson@akingump.com'; 'bkahn@akingump.com'; 'cdoniak@akingump.com'; 'sgulati@akingump.com'; 'angela.pearson@ashurst.com'; 'Antonia.croke@ashurst.com'; 'samis@rlf.com'; 'bleonard@casselsbrock.com'; 'dward@casselsbrock.com'; 'bburden@casselsbrock.com'; 'chorkins@casselsbrock.com'; 'ljackson@casselsbrock.com'; 'mbarrack@tgf.ca'; 'djmiller@tgf.ca'; 'rlewis@tgf.ca'; 'amcewan@tgf.ca'; 'boconnor@willkie.com'; 'sadvani@willkie.com'; 'ahanrahan@willkie.com'; 'sheryl.seigel@mcmillan.ca'; 'michael.riela@lw.com'; 'jsalmas@heenan.ca'; 'kkraft@heenan.ca'; 'svanallen@heenan.ca'; 'craig.barbarosh@kattenlaw.com'; 'david.crichlow@kattenlaw.com'; 'Karen.dine@kattenlaw.com'; 'elamek@blg.com'; 'jszumski@blg.com'; 'dalowenthal@pbwt.com'; 'lbarnes@osler.com'; 'esellers@osler.com'; 'eputnam@osler.com'; 'ahirsh@osler.com'; 'acobb@osler.com'; 'michael.lang@nortonrose.com'; 'amdg@hoganlovells.com'; 'john.tillman@hoganlovells.com'; 'Matthew.bullen@hoganlovells.com'; 'david.graves@hogan.lovells.com'; 'katherine.tallett-williams@hoganlovells.com'; |

1

**To:** 'james.norris-jones@hsf.com'; 'cdavis@bayardlaw.com'; 'jalberto@bayardlaw.com'
**Cc:** 'Zarnett, Benjamin'; 'Myers, Fred'; 'Kimmel, Jessica'; 'Pasquariello, Joe'; 'Carfagnini, Jay'; 'Armstrong, Christopher'
**Subject:** RE: Deposition List of the Monitor, Canadian Debtors, CCC, and Directors and Officers

**Categories:** Copied to Virtual File

Peter:

We object to the inclusion of members of the Ad Hoc Bondholder Group in your list of proposed deponents. The five individuals you identified have no material knowledge relevant to this litigation. Their depositions would waste the valuable time and resources of all parties. Any information that the Ad Hoc Bondholder Group has that may be relevant to this litigation can be obtained through the deposition of a corporate representative, which you have noticed, and which notice we will respond and object to in due course.

We further object to the CCC's "addendum" insofar as it purports to request a witness from each member of the Ad Hoc Bondholder Group concerning the same topics that were the subject of the CCC's reserved document request. As the CCC knows, we have objected to its document request on a variety of grounds as set out in our notice of objection. We object to any depositions on these topics on the same grounds.

To be clear, as we have reiterated for months now: the Ad Hoc Bondholder Group will not produce – whether via document productions, depositions, or otherwise – any information concerning the holdings of its members beyond what is required by Federal Rule of Bankruptcy Procedure 2019. We will not make available any witness to testify on these topics.

Atara Miller | **Milbank**
One Chase Manhattan Plaza, New York, NY 10005
P: 212-530-5421 | F: 212-822-5421
amiller@milbank.com | www.milbank.com

**From:** Ruby, Peter [mailto:pruby@goodmans.ca]
**Sent:** Tuesday, July 30, 2013 11:55 PM
**To:** 'nortel.monitor@ca.ey.com'; 'derrick.tay@gowlings.com'; 'jennifer.stam@gowlings.com'; 'ken.coleman@allenovery.com'; 'paul.keller@allenovery.com'; 'daniel.guyder@allenovery.com'; 'laura.hall@allenovery.com'; 'Joseph.Badtke-Berkow@AllenOvery.com'; 'jonathan.cho@allenovery.com'; 'Nicolette.ward@allenovery.com'; 'Kathleen.murphy@bipc.com'; 'mary.caloway@bipc.com'; 'tdemarinis@torys.com'; 'sbomhof@torys.com'; 'sblock@torys.com'; 'agray@torys.com'; 'aslavens@torys.com'; 'jbromley@cgsh.com'; 'lschweitzer@cgsh.com'; 'hzelbo@cgsh.com'; 'jrosenthal@cgsh.com'; 'dstein@cgsh.com'; 'mdecker@cgsh.com'; 'lpeacock@cgsh.com'; 'jmoessner@cgsh.com'; 'nforrest@cgsh.com'; 'dqueen@cgsh.com'; 'dabbott@mnat.com'; 'acordo@mnat.com'; 'rschwill@dwpv.com'; 'scampbell@dwpv.com'; 'jdoris@dwpv.com'; 'lsarabia@dwpv.com'; 'mgottlieb@counsel-toronto.com'; 'twynne@counsel-toronto.com'; 'pmichell@counsel-toronto.com'; 'adler@hugheshubbard.com'; 'oxford@hugheshubbard.com'; 'tabataba@hugheshubbard.com'; 'huberty@hugheshubbard.com'; 'eharron@ycst.com'; 'jdorsey@ycst.com'; 'mzigler@kmlaw.ca'; 'sphilpott@kmlaw.ca'; 'akaplan@kmlaw.ca'; 'bwalancik@kmlaw.ca'; 'ken.rosenberg@paliareroland.com'; 'max.starnino@paliareroland.com'; 'lily.harmer@paliareroland.com'; 'karen.jones@paliareroland.com'; 'tina.lie@paliareroland.com'; 'michelle.jackson@paliareroland.com'; 'barry.wadsworth@caw.ca'; 'lewis.gottheil@caw.ca'; Arthur Jacques; 'thomas.mcrae@shibleyrighton.com'; 'janice.payne@nelligan.ca'; 'steven.levitt@nelligan.ca'; 'christopher.rootham@nelligan.ca'; 'ainslie.benedict@nelligan.ca'; 'bboake@mccarthy.ca'; 'jgage@mccarthy.ca'; 'emarques@mccarthy.ca'; 'psteep@mccarthy.ca'; 'skour@mccarthy.ca'; 'bdshaw@mccarthy.ca'; 'kpeters@mccarthy.ca'; 'selinda.melnik@dlapiper.com'; 'richard.hans@dlapiper.com'; 'timothy.hoeffner@dlapiper.com'; 'farahlisa.sebti@dlapiper.com'; 'zychk@bennettjones.com'; 'orzyr@bennettjones.com'; 'finlaysong@bennettjones.com'; 'swanr@bennettjones.com'; 'zweigs@bennettjones.com'; 'bellj@bennettjones.com'; Kreller, Tom; Harris, Jennifer; Pisa, Albert A.; Vora, Samir; Leblanc, Andrew; Hirschfeld, Michael; Miller, Atara; Matz, Tom; Bassett, Nick; Ruha, Gabrielle; Pojunas, Rachel; 'Shayne.kukulowicz@dentons.com'; 'Michael.wunder@dentons.com'; 'ryan.jacobs@dentons.com'; 'Barbara.grossman@dentons.com'; 'fhodara@akingump.com'; 'dbotter@akingump.com'; 'aqureshi@akingump.com'; 'rajohnson@akingump.com'; 'bkahn@akingump.com'; 'cdoniak@akingump.com'; 'sgulati@akingump.com';

'angela.pearson@ashurst.com'; 'Antonia.croke@ashurst.com'; 'samis@rlf.com'; 'bleonard@casselsbrock.com';
'dward@casselsbrock.com'; 'bburden@casselsbrock.com'; 'chorkins@casselsbrock.com'; 'ljackson@casselsbrock.com';
'mbarrack@tgf.ca'; 'djmiller@tgf.ca'; 'rlewis@tgf.ca'; 'amcewan@tgf.ca'; 'boconnor@willkie.com'; 'sadvani@willkie.com';
'ahanrahan@willkie.com'; 'sheryl.seigel@mcmillan.ca'; 'michael.riela@lw.com'; 'jsalmas@heenan.ca'; 'kkraft@heenan.ca';
'svanallen@heenan.ca'; 'craig.barbarosh@kattenlaw.com'; 'david.crichlow@kattenlaw.com'; 'Karen.dine@kattenlaw.com';
'elamek@blg.com'; 'jszumski@blg.com'; 'dalowenthal@pbwt.com'; 'lbarnes@osler.com'; 'esellers@osler.com';
'eputnam@osler.com'; 'ahirsh@osler.com'; 'acobb@osler.com'; 'michael.lang@nortonrose.com';
'amdg@hoganlovells.com'; 'john.tillman@hoganlovells.com'; 'Matthew.bullen@hoganlovells.com';
'david.graves@hogan.lovells.com'; 'katherine.tallett-williams@hoganlovells.com'; 'james.norris-jones@hsf.com';
'cdavis@bayardlaw.com'; 'jalberto@bayardlaw.com'
**Cc:** Zarnett, Benjamin; Myers, Fred; Kimmel, Jessica; Pasquariello, Joe; Carfagnini, Jay; Ruby, Peter; Armstrong,
Christopher
**Subject:** Deposition List of the Monitor, Canadian Debtors, CCC, and Directors and Officers

### Deposition Witnesses To Be Deposed by the Canadian Parties

Pursuant to the Litigation Timetable and Discovery Plan, the Monitor, Canadian Debtors, Directors and Officers
and CCC (collectively, the "Canadian Parties") together give notice that they will depose the following
witnesses in the Allocation proceeding and EMEA Canadian Claims proceeding as applicable.

| Name | Location |
| --- | --- |
| Albert-Lebrun, Phillipe | France |
| Badiani, Kishhor | UK |
| Barton, Ian | (Likely UK) |
| Cianciolo, Chris | USA (Massachusetts) |
| Clement, Michel | France |
| Clive Gilchrist | UK |
| Collins, Malcolm | UK |
| Culina, Rosanne | Ontario |
| Drinkwater, David | Ontario |
| Edwards, Darryl | UK |
| Fraser, Maggie | UK |
| Freemantle, Simon | UK |
| Gardiner, Kenneth | UK |
| Gill, Dara | UK |
| Goldschmid, Paul | King Street Capital Management LP |
| Harper, Lorraine (Smeaton) | UK |
| Henderson, Wally | USA (Georgia) |
| Herenstein, Andrew | Monarch Alternative Capital LP |
| Jensen, Eric | USA |
| Kay, David | Tenor Capital Management |
| McColgan, Gillian | USA (Massachusetts) |
| Morgan, Iain | UK |
| Pugh, Gareth | UK |
| Riedel, George | USA (Massachusetts) |
| Rolston, Sharon | UK |
| Smith, Ryan | USA |

| Name | Location |
|------|----------|
| Stephens, Kerry | UK |
| Stevenson, Katherine | Ontario |
| Tananbaum, Steve | Goldentree Asset Management |
| Waida, Christian | UK |
| Widdowson, Ian | UK |
| Zinman, Jon | Solus Alternative Asset Management LP |

The Canadian Parties reserve their rights to change this list and do not waive any of their rights.

**Additional Individuals The Canadian Parties May Choose to Depose or Participate in Their Depositions**

The Canadian Parties also anticipate that they may choose to depose or participate in the depositions of the following individuals whose names appear on a Core Party's trial witness list. To the extent any trial witnesses and/or deponents are removed from the witness and/or deponent lists of a Core Party, the Canadian Parties each reserve the right to depose those individuals.

Additional Trial Witnesses Listed by the US Debtors

- William Donovan
- Michael Orlando
- John Ray
- Chris Ricaurte
- Elizabeth Smith
- Mark Weisz
- Jeff Wood

Additional Trial Witnesses Listed by the EMEA Debtors

- Simon Brueckheimer
- Geoffrey Hall
- Peter Newcombe

Additional Trial Witnesses Listed by the UKPC

- Simon Brueckheimer
- David Davies
- Terence Faulkner
- Geoffrey Hall
- John Hern
- Andrew Howard
- Andrew Jeffries
- Peter Newcombe
- Nigel Rees
- Timothy Watkins

**Addendum from the CCC**

Last week the CCC received significant additional production from the Ad Hoc Bondholders Group. To the extent possible, we have identified Group members likely to have knowledge of the relevant issues. In addition, the CCC requests the production of a witness from each of the individual members of the Ad Hoc Bondholders Group to testify concerning: (i) the purchase, sale, assignment or redemption of the Nortel Bonds, (ii) the analysis of their investment in the Nortel Bonds, and (iii) the terms of the Nortel Bonds, including the guarantees and the enforceability of the guarantees. The CCC will work with counsel to identify the appropriate member witness and to avoid duplication of witnesses.

**Peter Ruby**
Goodmans LLP

416.597.4184
goodmans.ca

.

***** Attention *****

This communication is intended solely for the named addressee(s) and may contain information that is privileged, confidential, protected or otherwise exempt from disclosure. No waiver of confidence, privilege, protection or otherwise is made. If you are not the intended recipient of this communication, please advise us immediately and delete this email without reading, copying or forwarding it to anyone.

================================================================

IRS Circular 230 Disclosure: U.S. federal tax advice in the foregoing message from Milbank, Tweed, Hadley & McCloy LLP is not intended or written to be, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed regarding the transactions or matters addressed. Some of that advice may have been written to support the promotion or marketing of the transactions or matters addressed within the meaning of IRS Circular 230, in which case you should seek advice based on your particular circumstances from an independent tax advisor.
================================================================

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

# TAB Q

This is Exhibit "Q" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this

6th day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 1917



DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
www.dlapiper.com

Selinda A. Melnik
selinda.melnik@dlapiper.com
T  302.468.5650
F  302.778.7914

December 22, 2013


The Honorable Kevin Gross
Chief Judge, United States Bankruptcy Court
For The District of Delaware
824 North Market Street, 6th Floor
Wilmington, Delaware 19801

Re: *In re Nortel Networks, Inc., et al.*, Case No. 09-10138 (KG)

Dear Chief Judge Gross:

The Canadian Creditors Committee (the "CCC") supports and joins in the response of the Monitor and Canadian Debtors [Dkt. No. 12696] to the letter filed with this Court by counsel to the U.S. Debtors on December 20, 2013 [Dkt. No. 12688], seeking relief to dispense with the "representative witness" stage of the discovery plan and litigation schedule which has been approved by this Court and Justice Morawetz, and to each of the letters in support thereof filed by counsel to the Joint Administrators of the EMEA Debtors [Dkt. No. 12693] and the Official Committee of Unsecured Creditors [Dkt. No. 12694]

The CCC also writes to highlight two points

First, contrary to the assertions of the parties asking the Court to eliminate agreed depositions of party representative witnesses, the CCC has *not* had "*ample opportunity to thoroughly explore*" the factual questions relevant to the positions and assertions pled by such parties.  Nor would the representative witness depositions be "*unnecessarily duplicative.*"  The CCC has not had the opportunity to explore topics relevant to pled positions and assertions such parties insisted be reserved for examination of party representative witnesses, including through objection to questions on such topics on that basis during the course of general depositions.

Moreover, the Ad Hoc Committee of Bondholders (the "Bondholder Group") has to date failed to produce any witnesses for deposition in this proceeding.  Indeed, as indicated in the e-mail of Atara Miller dated August 1, 2013, appended to the response of the Monitor and Canadian Debtors [Dkt. No. 12696], the Bondholder Group declined to produce any of five noticed fact witnesses for deposition on the stated basis that "[a]ny information that the Ad Hoc Bondholder Group has that may be relevant to this litigation may be obtained though the deposition of a corporate representative, which you have noticed, and which notice we will respond and object to in due course."  The topics identified for deposition by the Canadian Discovery Group address positions taken by the Bondholder Group in their Allocation Statement and Bankruptcy Rule 2019 Statements, including, without limitation, disclosures required by Bankruptcy Rule 2019(c)(2)(C).  The CCC has sought to resolve the Bondholder Group's continued objection to deposition of a representative witness.  Unfortunately, rather than participating in a meet and



The Honorable Kevin Gross
December 22, 2013
Page Two

confer session to discuss the basis for their objections at a time suggested by counsel for the Bondholder Group, counsel simply failed to call in at the suggested time.

Second, representative witness depositions on the terms proposed by the Monitor and Canadian Debtors would not be "*burdensome, and an extraordinary waste of time and resources.*" In addition to the narrowed five topics identified by the Monitor and Canadian Debtors, the CCC is willing to narrow its topics for the U.S. Debtors to two. In exchange, the CCC would be willing to answer questions posed by the U.S. Debtors on two of their identified topics pursuant to the protocol suggested by the Monitor and Canadian Debtors. Indeed, unlike the U.S. Debtors, the CCC offered to make a witness available to testify on certain topics identified in the U.S. Debtors' request for a representative witness.

Accordingly, the CCC joins with the Monitor and Canadian Debtors in respectfully requesting that the Court reject elimination of party representative discovery.

Respectfully submitted,

DLA PIPER LLP

By: *[s] Selinda A. Melnik*
    Selinda A. Melnik (DE Bar No. 4032)

*U.S. Counsel to the Canadian Creditors Committee*

cc: The Core Parties Service List

# TAB R

This is Exhibit "R" referred to
in the affidavit of JEFFREY A.
ROSENTHAL, sworn before me,
this
6ᵗʰ day of January, 2014.

A commissioner, etc.

Timothy Nassau
Notary Public, State of New York
No. 01NA6283365
Qualified in Kings County
Certificate on file with New York County
My Commission Expires June 3, 2017

## MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE 19899-1347

302 658 9200
302 658 3989 FAX

DEREK C. ABBOTT
302 351 9357
302 425 4664 FAX
dabbott@mnat.com

December 23, 2013

**VIA ELECTRONIC FILING AND
HAND-DELIVERY**

The Honorable Kevin Gross
United States Bankruptcy Court
for the District of Delaware
824 N. Market St., 6th Floor
Wilmington, DE 19801

    Re: *In re: Nortel Networks Inc., et al.*, Case No. 09-10138 (KG)

Dear Judge Gross:

On behalf of the U.S. Debtors, we wish to respond briefly to the letters yesterday from the Monitor and Canadian Debtors and the CCC.

We understand that the Monitor and Canadian Debtors do not intend to seek expedited briefing of the dispute regarding representative witness depositions or to force the parties to proceed with these depositions prior to this Court's and the Canadian Court's consideration of and ruling on the issue. Accordingly, we will not burden the Court with our detailed response at this time and will wait for an orderly briefing schedule to be set.

We do, however, wish to register at this time our objection to the suggestion by the Monitor and Canadian Debtors that the parties be required to respond in a matter of weeks in writing to all-encompassing questions that essentially seek identification months before trial of all evidence, including all documents, supportive of their case. This process, which will require the parties, in an impossible time-frame, to complete their review of the millions of pages of documents produced and to review the over 100 deposition transcripts to identify all evidence is unworkable and, indeed, more onerous than the representative witness depositions, which themselves, we submit, are unnecessary in the context of this case. We have produced all relevant documents, provided numerous witnesses for deposition competent to testify to all relevant matters and will be providing appropriate pre-trial submissions including witness affidavits prior to trial. The new procedure that the Monitor and the Canadian Debtors are now seeking to inject into this process is as unnecessary as the representative depositions and even more burdensome.

The Honorable Kevin Gross
December 23, 2013
Page 2

     The US Debtors reserve all rights to respond more fully to the positions of the Monitor and the Canadian Debtors and the CCC after a briefing schedule is set, including to correct the many misstatements in Ms. Murphy's letter.

     We will of course continue to seek an amicable resolution with our Canadian colleagues and will report further to the Courts if there are any developments in that regard.

     Respectfully submitted,

     /s/ *Derek C. Abbott*

     Derek C. Abbott

DCA/alc
7870843

cc:    All Core Parties (via email)

Court File No. 09-CL-7950

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST
Proceeding commenced at TORONTO

AFFIDAVIT OF JEFFREY A. ROSENTHAL

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON M5K 1N2
Tel: 416.865.0040
Fax: 416.865.7380

**Sheila Block** (LSUC#: 14089N)
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc. and
the other US Debtors

J5873-2001 16405970.1