# In The Matter Of:

*Bankruptcy Court for the District of Delaware*
*In Re: Nortel Networks Inc., et al.*

---

*Hearing*
*January 7, 2014*

---

*Wilcox & Fetzer, Ltd.*
*1330 King Street*
*Wilmington, DE   19801*
*email: depos@wilfet.com, web: www.wilfet.com*
*phone:  302-655-0477, fax:  302-655-0497*



Original File hrng010713Nortel.lm.txt
Min-U-Script® with Word Index

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                    ) OFFICIAL
                          ) TRANSCRIPT
NORTEL NETWORKS, INC.,     )
et al.,                   ) Case No. 09-10138
                          ) (KG)
          Debtors.        )


                          United States Bankruptcy
                          Courtroom No. 1
                          824 Market Street
                          Wilmington, Delaware
                          Tuesday, January 7, 2014
                          11:15 a.m.


BEFORE: THE HONORABLE KEVIN GROSS
        United States Bankruptcy Judge


        JUSTICE GEOFFREY B. MORAWETZ, Canadian
        Court (Via Videoconference)




            TRANSCRIPT OF PROCEEDINGS



_____
              WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
              (302) 655-0477
              www.wilfet.com



WILCOX & FETZER LTD
Registered Professional Reporters
(302) 655-0477
www.wilfet.com

1      THE COURT:  Good morning,
2 everyone.  Please be seated.  And I am glad you
3 were all able to get here.
4      Oh, I feel so much smarter just
5 sitting here.  I know Judge Shannon will
6 understand why I said that.
7      MR. ABBOTT:  Good morning, Your
8 Honor.
9      THE COURT:  Good morning,
10 Mr. Abbott.
11      MR. ABBOTT:  Derek Abbott here on
12 behalf of --
13      ELECTRONIC RECORDING OPERATOR:
14 Your Honor, we are having difficulties.
15      (Discussion off the record.)
16      CANADIAN COURT:  Judge Gross, are
17 you hearing us in Toronto?
18      THE COURT:  Very clearly.  But we
19 are not seeing you.
20      CANADIAN COURT:  Well, that's
21 probably even better.
22      THE COURT:  No.  It is a big
23 disappointment to me, Justice Morawetz.
24      CANADIAN COURT:  Well, I hear your



1   video and picture well, as is the audio.  So I

2   think we should probably start again.  Counsel

3   in both courts, this is a hearing that has been

4   conducted --

5            THE COURT:  Justice Morawetz,

6   please forgive the interruption, but we are not

7   being able to record this quite yet.  We are

8   having to reboot.

9            CANADIAN COURT:  Okay.  You let me

10  know when you are ready.

11           THE COURT:  Thank you.

12           (Discussion off the record.)

13           THE COURT:  Mr. Abbott had a good

14  suggestion, and that is, we do have Ms. Brown

15  in the courtroom, who is a court reporter, and

16  we will make her transcript the official

17  transcript of this hearing so that we don't

18  have to delay Justice Morawetz any further or

19  any of you.  And so I am designating this

20  transcript that Ms. Brown is preparing as the

21  official transcript so that we can then

22  proceed.

23           MR. ABBOTT:  Thank you, Your

24  Honor.  Your Honor, we understood -- or I am



1   sorry.  Justice Morawetz.

2             CANADIAN COURT:  We just have to

3   have the usual preliminary, Mr. Abbott, that

4   this hearing is being conducted in accordance

5   with the provisions of the cross-border

6   protocol previously approved by both courts.

7   Judge Gross and I have had a discussion to deal

8   with procedural matters to address the

9   scheduling for today.  It is my understanding

10  that you are going to commence with the

11  settlement approval motion with submissions in

12  your court and then followed by the

13  representative depositions motion.

14             With that, please start,

15  Mr. Abbott.

16             MR. ABBOTT:  Thank you, Your

17  Honor.  With that, I will cede the podium to

18  Mr. Bromley, who I understand will present the

19  settlement motion.

20             THE COURT:  Very well.  Thank you.

21             Mr. Bromley, you have had a chance

22  to warm up?

23             MR. BROMLEY:  Yes, Your Honor.

24             THE COURT:  All right, good.



1           MR. BROMLEY:  Good morning, Your

2    Honor.  Happy New Year.  Happy New Year to

3    Justice Morawetz as well.  Thank you very much

4    for your accommodation in dealing with the

5    train delay that we had today.  We were on the

6    earliest train that left, and as we were just

7    mentioning, we did get to see the Delaware

8    River frozen.

9           THE COURT:  You and George

10   Washington.

11          MR. BROMLEY:  Exactly, exactly.

12   So, Your Honor, we are here today to really

13   argue a milestone motion in these cases.  We

14   have been before you for several years on all

15   sorts of issues, but probably --

16          THE COURT:  We can hand out

17   five-year pins, Justice Morawetz noted.

18          MR. BROMLEY:  That's a good idea.

19   And you know, Your Honor, that we have fought

20   vigorously with the EMEA Joint Administrators

21   and with the representatives of the UK pension

22   parties not just in this court but up to the

23   Third Circuit twice.  And we have been through

24   a heavy fall of depositions and discovery.  We

1  exchanged millions of documents.  We have spent

2  thousands of hours working on this litigation.

3  And we are happy to say that what we have been

4  able to do over the course of a couple of weeks

5  at the end of the year is reach a comprehensive

6  settlement with the Joint Administrators and

7  with the UK pension parties.

8              I won't bother the Court with a

9  detailed explanation of each part of the

10  settlement agreement.  I know we have a lot on

11  the calendar today and we already are starting

12  late.  But I would like to focus on a couple of

13  things.

14              In the Third Circuit, the standard

15  for approval under Rule 9019(a) is established

16  by the Martin case.  And what we are looking

17  for is whether or not the settlement is fair

18  and reasonable to the debtors and their

19  creditors, in the best interests of their

20  estates.  There are three factors or four

21  factors that we have to worry about under the

22  Martin case.  The first is the probability of

23  success on the merits.

24              With respect to this litigation,

1   Your Honor, we have been fighting it out for

2   years, and I think it is fair to say that we

3   would continue to fight for years, so the

4   probability of success, I think, is a draw on

5   this one.  We certainly believe that the claims

6   that have been asserted against the U.S.

7   estates are without merit, and we have said

8   that over and over again.  And because we are

9   here on settlement day does not mean that we

10  still don't believe that.  But it is important

11  in light of the expense and the time that we

12  have spent on this to recognize that there is a

13  time to settle, and we believe the time is now

14  for these claims.

15          Difficulty in collection is the

16  second.  These are claims against us, not by

17  us, so we don't have to worry about that one.

18          Third is the complexity of the

19  litigation, the expense and the inconvenience

20  and delay.  I think that if you looked up

21  complexity of litigation, expense,

22  inconvenience and delay in the dictionary, you

23  would see all of our faces there.

24  Unfortunately, or fortunately, I think that

1   what we have been able to do over the past

2   several months with our colleagues in the

3   United Kingdom is recognize, again, that it is

4   the time to settle these claims.

5                    And that brings us to the final

6   standard, which is the paramount interest of

7   creditors.  You know, litigation is not a

8   sport.  Litigation is a last resort.  And as we

9   have gone through these last few months in

10  discovery and deposition, we have been focusing

11  on the trial that will still be coming on other

12  issues, including, importantly, allocation.

13  But we have also been focusing on the strengths

14  and weaknesses of these claims.  And, you know,

15  I think there is a lesson to be learned here

16  and that these depositions and conversations

17  that we have relating to them don't simply have

18  to be about litigation.  They can also be about

19  settlement.  And sometimes, you know, the

20  smallest indication means that a door is

21  opening.

22                    And we, I think, went through a

23  fair amount of conversations in the context of

24  this settlement where there was a lot of

1  baggage that had to be cleared out, suspicion

2  and concern, and because we have said some

3  strong things about each other.  I have stood

4  before you and said some strong, colorful

5  things about my colleagues here.  But that

6  didn't mean that we couldn't sit down and come

7  to a conclusion, because it is the best result

8  for our creditors and the best result for the

9  creditors in the United Kingdom.  And it is for

10  that reason that we are here today.

11        So I think with respect to the

12  standard under Rule 9019, I think that we have

13  aced it, so to speak.  I don't think there is

14  any argument here that can be made, and,

15  indeed, the limited objection that has been

16  made does not challenge any of the bona fides

17  of the settlement from the Martin standard.  So

18  I think on that hopefully we are all agreed.

19        The next issue, though, is there

20  have been concerns raised by the Canadian

21  Monitor.  And frankly, I think those concerns

22  took us all by surprise.  Several of them, I am

23  happy to report, I think we have resolved, the

24  concerns about whether or not this settlement

1  agreement was in any way going to override the

2  IFSA or the CFSA.  God forbid that we ever

3  override the IFSA.  And believe me, the

4  language that we had crafted in drafting the

5  settlement agreement was truly intended to make

6  sure that everyone felt comfortable about that.

7  But I think we have come to a resolution with

8  the Monitor's counsel that they are comfortable

9  at this point as well.

10              There was also some concern about

11  the scope of the releases.  We truly had

12  drafted those releases to specifically make

13  clear that nothing we were doing here was to

14  release anything else anywhere else.  But there

15  were concerns raised, so we have revised the

16  order, and we heard on our way down on the

17  train that counsel to the Monitor is

18  comfortable with the revisions to the order as

19  it relates to the releases.

20              I won't speak too much about the

21  concerns of the Monitor at this point.  I will

22  make a couple of comments and then let them

23  speak, and we can respond.  But I think it is

24  important to recognize that what we are trying

1  to do here is to simplify everything.  It is

2  true that a lot of money and time has been

3  spent with respect to litigation over

4  allocation and allocation theories.

5  Unfortunately, we are not at a point where we

6  can say that we can settle allocation.  And

7  this is an open invitation to the Monitor and

8  to the Canadian Creditors' Committee to have

9  the same sorts of conversations with us and

10 with the EMEA debtors and the UK pension

11 parties that we have been able to have that

12 brought this settlement before this Court.  It

13 is not our job to simply go full force, not

14 like an Amtrak train but, say, a locomotive

15 that might have operated under another

16 management, full force towards litigation.

17 What we need to do is to recognize that one of

18 the purposes of discovery is not to simply put

19 all the soldiers on the field but to recognize

20 that there are openings within the discovery

21 process that let people understand where the

22 weaknesses and strengths in their arguments

23 might be and where it is actually in the best

24 interests of everyone involved to sit down and

1  resolve things.  So that is an invitation that

2  we make, and it is a heartfelt one.  We have

3  had a long history of successful engagement,

4  and we would hope that there is an opportunity

5  to have those conversations to resolve

6  everything.  But the fact is we have resolved

7  quite a bit.

8            And nothing that we are resolving

9  here today has any negative impact whatsoever

10  on the allocation exercise.  The fact that we

11  are willing to sit down with those who have

12  been incredibly entrenched opponents and reach

13  an agreement on a number I think is a wonderful

14  thing.  But it is also, I think, a wonderful

15  thing that we are willing to and able to sit

16  down and try to simplify the allocation

17  exercise.

18            I think the Canadian debtors and

19  Monitor have fundamentally misunderstood the

20  provisions of the settlement agreement as they

21  relate to the purpose of trying to coordinate

22  allocation positions.  We have no intention to

23  try to create any allocation positions out of

24  whole cloth.  There is no intention whatsoever

1   to try to do anything that counts as mischief

2   or gamesmanship.  What we are trying to do in a

3   cooperative manner is to see whether or not the

4   allocation positions that we have put forth and

5   the UK pension parties have put forth and the

6   EMEA parties have put forth can be coordinated

7   and reconciled to a certain extent that would

8   allow us to go forward in the allocation

9   litigation in a more efficient and effective

10  manner.  This is not intended to be a surprise.

11  It is not intended to be a trap.  It is

12  intended to be an attempt to simplify things.

13              So when we read, I think, with

14  some discomfort the positions of the Monitor,

15  we were -- you know, a little bit of the wind

16  was taken out of the sails of the effort to

17  settle.  But the fact of the matter is, Your

18  Honor, what we have is a schedule in place.  We

19  have never said we are going to deviate from

20  that schedule in terms of putting in position

21  papers with our expert reports.  Everyone needs

22  to put in their expert reports on the appointed

23  date, the 24th of January.  Everyone, the

24  Monitor, the CCC, us, the UK pension parties,

1    Joint Administrators, everyone needs to do

2    that, and everyone needs to be upfront with

3    what they are going to say, so that we can all

4    go forward and litigate this in as effective a

5    way as possible.  But it is not the time to try

6    to put any kind of artificial deadlines or

7    conditions on the willingness of enemies, if

8    you will, to try to figure out how to resolve

9    something.

10               I think if we took the position of

11   the Monitor and took it out to its logical

12   extent, we would not have any further

13   settlement conversations whatsoever.  We would

14   simply litigate this to conclusion and wait for

15   an order from both you and Justice Morawetz.

16   And I respectfully submit that that would be

17   something that would be inappropriate and

18   contrary to the interests of the estates in all

19   of the jurisdictions.

20               So, Your Honor --

21               THE COURT:  Do I understand that

22   there are multiple allocation -- I don't

23   know -- protocols among the various parties in

24   Canada?



1           MR. BROMLEY:   Well, there are

2   three separate allocation theories that have

3   been advanced by the Canadian parties -- and

4   they can obviously disagree once they speak --

5   one of which says that effectively all of the

6   intellectual property of Nortel was owned by

7   the Canadian estate, and therefore, all of the

8   proceeds of the patent sale, for instance, the

9   4-1/2 billion, would go all to the Canadian

10   estates and only the Canadian estates.   I

11   should note that that theory was only first

12   proposed and made public to us or any of the

13   parties at the time that the first allocation

14   submissions were made after the final mediation

15   had ended.   So that is a relatively new theory.

16           The other has to do with a theory

17   again espoused by the Canadian Monitor and

18   debtors that the MRDA, the master research and

19   development agreement, has a schedule with

20   respect to certain interests and splits, that

21   that should control.

22           And third is the position of the

23   CCC, which we have used as a shorthand as a

24   substantive consolidation of all the estates.

1  I think their exact line, which is a pro rata

2  equitable distribution amongst all the parties,

3  I think that's a synonymous definition.  They

4  have said that it is not.  We have not fully

5  understood the lack of symmetry between the

6  two.

7          THE COURT:  And the fact is that

8  in all of this settlement being proposed, the

9  settlement proponents remain separate and

10  individual parties, with the right to argue

11  separate theories.

12          MR. BROMLEY:  The purpose -- the

13  agreement is very clear, Your Honor, that we

14  have agreed that we will sit down and talk.  We

15  have not agreed on anything yet.  And frankly,

16  that is why I think also when we are looking at

17  this, the concerns raised and the proposal to

18  condition the relief on certain conditions

19  being imposed by Your Honor are inappropriate.

20  There has been no relief sought at this time to

21  put in any kind of additional materials, and if

22  anything ever is required in that regard, we

23  will live and die on the rules of submitting.

24  But there is nothing before the Court right

1  now.

2             We have simply agreed we will sit

3  down and have a conversation.  And believe me,

4  those conversations are going to be serious.

5  They are going to be comprehensive, and they

6  are going to involve everyone who needs to be

7  involved from our side, the Creditors'

8  Committee and the UK pension parties.  We are

9  all going to sit down to work on this.  But we

10  have not said that we are marching off

11  together.  Now, we might.  And I think actually

12  it would be better if we did.  But at this

13  point we have simply agreed to sit down and

14  have a conversation.

15             And it is, frankly, our hope that,

16  you know, the exercise over the past couple of

17  months to get to where we are has generated

18  enough trust and goodwill that we can

19  collectively come to a common or mostly common

20  position.  But it is not like we are going to

21  be grabbing anything out of thin air.  That's

22  just, frankly, a silly concern.  It is just not

23  there.

24             And so from our perspective, Your



1   Honor, the U.S. debtors have had a single

2   theory.  We have had that single theory from

3   the very first meeting we have had with the

4   Canadian debtors in the spring of 2010.  And we

5   have not deviated from that theory, and we

6   don't intend to.

7                Now, the other thing that should

8   be noted is that when the EMEA debtors

9   submitted their materials in this proceeding,

10  the allocation proceeding, post-mediation, they

11  indicated in their papers that they thought

12  that the theory espoused by the U.S. debtors

13  was as good a theory as they could come up with

14  as an alternative theory.  So it has frankly

15  already been stated and out there for a long

16  time that the U.S. theory is something that the

17  EMEA debtors have intended to pursue as an

18  alternative theory.

19                So where we are is, you know, we

20  are going to take a very complex set of trial

21  issues and reduce them substantially.  We are

22  going to, in effect, for Your Honor focus this

23  almost entirely on allocation.  We are going to

24  remove the burden of enormous claims that have

 1   been made both by the Joint Administrators and

 2   the pension parties, the U.S. estates, and that

 3   will, we believe, substantially eliminate risks

 4   of appeal.  The pending appeal, well, the Third

 5   Circuit did decide to uphold, but any right of

 6   certiorari will be waived.  There is, you know,

 7   a motion for leave to appeal to the Canadian

 8   Supreme Court with respect to whether or not

 9   there is an arbitration agreement.  That will

10   be withdrawn.  And we will have full and final

11   settlement of the claims, with payment made,

12   allowances of administrative claims, total

13   claim amounts of $75 million, and payments made

14   as soon as our conditions are satisfied.

15             And I should note we have been

16   informed by our colleagues from the UK pensions

17   that the Court approval, the so-called Beddoes

18   court approval in the UK has been obtained.  We

19   understand that the French court approval has

20   been obtained.  There is a condition that

21   allows the Joint Administrators to seek

22   direction from the UK court but in their

23   discretion to seek that direction, and they are

24   not going to seek direction, we have been

1  informed, and so their right to seek direction

2  has passed in terms of the time line.  That is

3  exactly the same process that we undertook

4  other than the Beddoes court approval with

5  respect to IFSA.

6              Oh, I am sorry.  We have been

7  told -- I misstated.  The French court will be

8  heard on Thursday.

9              THE COURT:  Okay.

10             MR. BROMLEY:  There is a

11  preliminary approval and then there is a final

12  approval.

13             So where we stand today, Your

14  Honor, is, you know, there is a trial date that

15  has been set for May.  The good news is that,

16  assuming that the settlement is approved, the

17  trial will be substantially simplified.  It is

18  our hope that, you know, the conversations that

19  we have committed to have will proceed in good

20  faith and could lead to a further

21  simplification of the trial.

22             And again, you know, the

23  invitation to have those conversations with our

24  Canadian colleagues is open.  All they need to

```
 1    do is to contact any one of us, and they know

 2    how to do it, and we are hopeful that we will

 3    hear from them.

 4              So on that, Your Honor, from the

 5    U.S. debtors' perspective, those are our

 6    submissions.  I think Mr. Qureshi wanted to say

 7    something.

 8              THE COURT:  Of course, I should

 9    hear from other proponents of the settlement

10    before I here from the objectors.

11              Mr. Qureshi.

12              MR. QURESHI:  Good morning, Judge

13    Gross --

14              THE COURT:  Good morning.

15              MR. QURESHI:  -- and Justice

16    Morawetz.  Abid Qureshi, of Akin Gump Strauss

17    Hauer & Feld, on behalf of the Official

18    Committee of Unsecured Creditors.  I will be

19    very brief.

20              First, Your Honor, with respect to

21    the merits of the settlement itself, from the

22    perspective of creditors, whose paramount

23    interests should be taken into regard, of

24    course, we believe they have been.  The
```



1  debtors, the U.S. debtors, the EMEA debtors,

2  the UK pension parties I think should all be

3  congratulated for this settlement.  It is a

4  wonderful achievement in these cases and one

5  that is wholeheartedly supported by the

6  creditors.

7                I do want to respond or address

8  briefly the objections that have been raised by

9  the Monitor and the Canadian debtors to make

10  just one point, and I will rise again --

11                THE COURT:  Yes.

12                MR. QURESHI:  -- if anything

13  further needs to be addressed.  But that is,

14  Your Honor, that what is contemplated in the

15  settlement agreement, having further

16  discussions to see if a common allocation

17  position can be achieved, that is something

18  that if it were not addressed in this

19  settlement agreement is something that we all

20  hope would happen regardless.  It is what is

21  supposed to happen in a litigation.  As the

22  discovery takes place, the documents are

23  exchanged, the depositions get taken, people

24  begin to understand the strengths and

1  weaknesses of their positions, and compromise

2  that is not possible at the outset of those

3  proceedings is possible later.  And as Your

4  Honor has seen again and again, sometimes those

5  compromises happen on the courthouse steps or,

6  indeed, during the trial itself.

7            THE COURT:  And agreement is not a

8  precondition of settlement either.

9            MR. QURESHI:  Absolutely not.

10  Absolutely not.  And what the Monitor and the

11  Canadian debtors are proposing in their limited

12  objection, Your Honor, is to place shackles

13  around all of us and effectively lock us in to

14  positions today so that there can be no further

15  settlement discussions, and that is absolutely

16  antithetical to what we should all be working

17  to achieve here.  And so we think that type of

18  relief is entirely inappropriate.  Indeed,

19  there is no basis for it outside of the

20  settlement agreement.  In other words, if our

21  settlement agreement were silent, there would

22  certainly be no ability for the Monitor and for

23  the Canadian debtors to prevent the parties,

24  whether on the eve of trial or two months

1  before trial or during the trial, from

2  achieving consensus and presenting Your Honors

3  with a common position.

4           So that's all I have for now, Your

5  Honor.  Thank you.

6           THE COURT:  All right.  Thank you,

7  Mr. Qureshi.

8           Yes, Mr. Adler, good to see you.

9           MR. ADLER:  Good to see you.  It

10 is Derek Adler for the Joint Administrators and

11 the EMEA debtors.

12          THE COURT:  Yes.

13          MR. ADLER:  Good morning, Your

14 Honor.  And there isn't really much to add.

15 Mr. Bromley and Mr. Qureshi have summarized the

16 reasons why this is good for everyone very

17 well.  And I would like to say that we are

18 happy to put prior disputes behind us and stand

19 here in a more cooperative relationship with

20 the U.S. debtor and with the Creditors'

21 Committee.  And all the things that Mr. Bromley

22 has said about that are true.  We really do

23 have the groundwork now for working together in

24 good faith, based on a recognition of the



1    commonality of interests that the U.S. and the

2    EMEA debtors really have.

3              Mr. Bromley alluded briefly to the

4    Canadian position here, and it really is the

5    big remaining issue in the case, which is the

6    Canadian position that they are entitled to 100

7    percent of the $4-1/2 billion from the residual

8    IP sale.  Obviously, that is something that the

9    EMEA debtors and the U.S. debtors dispute very

10   wholeheartedly, that you would give all of that

11   money without any recognition of the

12   contributions to the creation of the IP that

13   all of the other debtors made over the years or

14   without any recognition of the licenses that

15   had to be terminated in order to make that sale

16   of the residual IP.  The theories that the U.S.

17   and EMEA have are quite compatible in many

18   respects, and we do look forward to working

19   together to try and pursue them in a common and

20   cooperative way in whatever form that may take.

21              As Mr. Bromley says, any concerns

22   about the impact that the settlement will have

23   on the schedule are premature and are

24   unfounded.  We are confident we will adhere to

1   the current schedule.  We believe that the

2   existing rules give us whatever latitude we

3   might need, if necessary, and we don't see any

4   need to seek to amend or so on.  But we don't

5   anticipate needing to change the schedule.  We

6   are quite serious about adhering to it.

7                So unless there is something that

8   comes up further, I will sit down.

9                THE COURT:  No, Mr. Adler.  Thank

10  you, sir.  Thank you.

11               Mr. O'Connor, I am trying to

12  remember if you are -- yes, you are here in

13  support of the settlement.

14               MR. O'CONNOR:  In support of the

15  settlement, yes, as strange as that may seem.

16               Thank you, Your Honor.  There is

17  really very little for me to add.  I certainly

18  concur with all of the statements made by my

19  colleagues.  I just want to emphasize that from

20  the concerns of the Canadians, that we settled

21  our claims.  We have agreed to sit down and to

22  try to reach a common ground on allocation, but

23  if we are unable to do that, we have reserved

24  fully our right to pursue an independent

1  allocation theory.  We hope our discussions

2  will be successful and we can continue to

3  narrow the issues before the Courts.  Thank

4  you.

5             THE COURT:  Thank you,

6  Mr. O'Connor.  Much appreciated.

7             Anyone else wish to be heard in

8  support of the settlement?

9             (There was no response.)

10             THE COURT:  All right.  I think

11  then Ms. Murphy.  Mr. Coleman.

12             Ms. Murphy, good morning to you.

13             MS. MURPHY:  Good morning, Your

14  Honor.  Kathleen Murphy, of Buchanan Ingersoll

15  & Rooney, on behalf of the Monitor.  I would

16  like to introduce my co-counsel, Ken Coleman,

17  who will make the argument.

18             THE COURT:  Thank you.

19  Mr. Coleman, good morning.  Good to see you

20  again.

21             MR. COLEMAN:  Good morning, Your

22  Honor.  Good to see you again.  You know, it is

23  cold enough outside, and it feel a little

24  draftier here right now.



1               Your Honor, Mr. Bromley said that

2   this simplifies everything and this does not

3   have any negative consequences.  You know, it

4   doesn't simplify everything.  It does have

5   negative consequences.  But the good news is

6   that those consequences can be fixed.

7               In the abstract, all other things

8   being equal, settlements are good.  Even

9   interim partial settlements are good.  Okay?

10              THE COURT:  Sure.

11              MR. COLEMAN:  But this is not a

12  case where all other things are equal.  We

13  don't object to the economic terms of this

14  settlement.  We don't object to ordinary-course

15  amendments that might occur from now until the

16  time of trial.  We are concerned about

17  wholesale changes that might occur by reason of

18  the agreement of the settling parties to work

19  together to develop a common allocation

20  position.  It does affect how the other parties

21  conduct themselves in the short time left

22  between now and trial.  There are limited

23  resources available, and there is the money

24  that would otherwise be available to distribute

1    to creditors that needs to be spent dealing

2    with the allocation positions that have been

3    taken that were set out at the beginning of the

4    case in May.  Our position was set out at the

5    beginning of the case in May.  It is not a new

6    position.  What might have been said or might

7    not have been said during the course of the

8    mediation is, of course, confidential and has

9    no bearing on this.  We put our cards on the

10   table at the beginning.

11             Had this agreement to work

12   together to possibly come up with a new theory

13   and possibly dispense with old theories, had

14   that come up a year ago, before this process

15   started, before the train, to keep with the

16   analogy, had left the station, and allocation

17   pleadings had been filed and discovery had

18   commenced and millions of dollars had been

19   spent, that would be a different story.  It

20   would be unlikely to be prejudicial.  But now,

21   of course, we are in a much different

22   circumstance.

23             THE COURT:  Well, let me ask you,

24   because as I look at this, what the I will call

1   the Canadian parties are concerned about is

2   that there is this agreement to try to agree.

3   And as anyone knows, such an agreement would

4   not be enforceable in a court.  They didn't

5   even have to say anything about it in their

6   papers but did.

7                 MR. COLEMAN:  Yes.  It is curious

8   in that way, Your Honor.  And that kind of

9   leads us to our second point.  You know, it is

10  such a vague statement.  Good-faith efforts to

11  try to reach some common understanding.  It is

12  vague.  It is unenforceable.  Why is it there?

13                Our other point that we wanted to

14  make is that this settlement agreement and the

15  Courts' endorsement of it by approving it

16  through court orders should not form the basis

17  for any further amendment.  We should not be in

18  a position where an amendment is requested,

19  leave to amend is requested sometime in the

20  future.  And we object on the basis that it is

21  a material, fundamental change way too late in

22  the game to be allowed.

23                And the response is, well, we told

24  you back in December and January that we were

1    working towards this, and there is a settlement

2    agreement.  Of course, we had this hearing, and

3    the Courts approved it.  So we do not want the

4    existence of this agreement or Your Honor's or

5    Justice Morawetz's orders with respect to this

6    agreement to form the basis to justify any

7    further amendment.  And that was the language

8    that we requested to the effect that this

9    settlement agreement would not enhance

10   anybody's rights with respect to amendments.

11            So I agree, I mean, and I agree

12   with the comments made earlier, that in the

13   ordinary course people compromise positions and

14   in the ordinary course people amend their

15   pleadings, and we have rules and regulations

16   that govern that and that attempt to protect

17   people from amendments.

18            What we don't ordinarily have is

19   an agreement in the context of a litigation

20   like this, which I think everyone agrees is

21   unique, where people have spent enormous

22   resources dealing with the guideposts, you

23   know, under the guideposts that had been set in

24   May that everybody responded to and that

1  everybody planned their discovery around, where

2  a theory could be disposed of at any time from

3  now until trial or even during trial, for that

4  matter, completely disposed of.  So we would

5  spend our remaining time, including experts and

6  preparation for trial, working towards

7  something that as a strategic matter they may

8  decide to announce they are disposing of at any

9  time in the future:  A month from now, two

10  months from now, three months from now.

11             Likewise, they may decide to

12  create, despite the comforting comments by

13  Mr. Bromley that there is no intention to

14  create something out of whole cloth.

15  Unfortunately, there is nothing in the

16  agreement, nothing in the proposed order, that

17  guards against this.

18             THE COURT:  Well, it provides for

19  it on the other hand.  It allows it.

20             MR. COLEMAN:  It allows it.

21             THE COURT:  Right.

22             MR. COLEMAN:  It absolutely

23  allows --

24             THE COURT:  It clearly does allow.



1    What I am saying is I don't think I am

2    approving anything that permits the amendment

3    that you are concerned about.  It would have to

4    come back to me and to Justice Morawetz to

5    accomplish it.

6              MR. COLEMAN:  But at the same time

7    they say they are not taking any position with

8    respect to whether or not Rule 15 or any other

9    rule would govern any such amendment.  So we

10   have got to have some rules of the road here.

11   At the moment we have none.  The only thing we

12   have is the possibility that there might be a

13   common position that fundamentally changes the

14   landscape and fundamentally alters the

15   investment of time, material and money that

16   other parties have devoted to this process.

17             So I say that there is a fix to

18   this, Your Honor.  There are two fixes.  One I

19   think is dead easy and shouldn't be

20   controversial, and that is that this settlement

21   agreement does not enhance anyone's rights with

22   respect to seeking leave to amend any pleading

23   at any time.  That should be easy.

24             Second, to the extent that the

1   settling parties have a common position or

2   intend to reach a common position, they have an

3   obligation to inform the Courts, because Your

4   Honors are equally interested in this, inform

5   the Courts and inform the other parties of that

6   common position by a date.  We thought January

7   24 made good sense.  It is a logical date.  The

8   expert reports are due on that date.  People

9   will spend time immediately after the filing of

10  those reports with their experts to prepare

11  rebuttal reports.  So if we don't know what we

12  are dealing with by then, we are wasting time

13  and money which could otherwise be devoted to

14  paying creditors.

15              The other thing that is going on

16  now, Your Honor, is people are trying to have

17  conversations about a trial protocol, some

18  pretty basic things like how much time does

19  your position have in court; how many witnesses

20  do you have, both fact witnesses and expert

21  witnesses.  Now, we are supposed to file a

22  protocol, I believe, on the 20th and have a

23  hearing before Your Honors on the 29th.

24              THE COURT:  Yes, that's right.

1                MR. COLEMAN:   Okay.   So if we are

2    dealing with the prospect that the EMEA

3    interests and the U.S. interests are one

4    interest, do they get twice the amount of time

5    as the Canadian parties?  Do they get twice the

6    number of expert witnesses and fact witnesses?

7    Do they get to cross-examine each other's

8    witnesses?  So how do we deal with that?   How

9    do we deal with that problem now?

10               These are immediate, practical

11   concerns that affect this final plan.  And we

12   don't have a lot of time left because I think

13   the Courts have made it crystal clear that we

14   are starting this finally on May 12.  So if we

15   have a situation where some new theory emerges

16   or we have wasted some time on an old theory

17   because it has been disposed of and we are a

18   month or two from now, how are we to fix that

19   prejudice when we are, in fact, starting the

20   trial on the 12th?  That's our fundamental

21   problem with this.

22               THE COURT:   But if they have to

23   come to court and request an amendment and at

24   least as far as Rule 15, whether it applies or

1   doesn't apply -- and that has not been

2   determined, of course.  But one of the critical

3   factors in making a determination of that

4   amendment is whether or not it will result in

5   prejudice.

6                  MR. COLEMAN:  Correct.

7                  THE COURT:  So there will still be

8   that opportunity to make that argument.

9                  MR. COLEMAN:  Correct, Your Honor.

10  I think out of fairness to the process, out of

11  a sense of obligations to the Courts and

12  fairness to the parties, if there is a common

13  position here, it needs to be announced at the

14  earliest possible date.  We thought that

15  January 24 made sense.  It seems to make sense

16  based on their papers because they say that

17  our -- they even say in their reply papers that

18  our position becomes moot -- I am paraphrasing,

19  but our position becomes moot after the 24th

20  because that's their position.

21                  Now, if that's what we are saying

22  here, that our concern evaporates as of the

23  24th, then I think we are all on the same page.

24  But I don't know that that's what we are

1    saying, Your Honor.  I mean, there is a

2    footnote to that effect.

3                    THE COURT:  Yes, I saw that.  And

4    I certainly recognize, and I know that they

5    recognize, these other milestones in the case

6    that will be impacted.

7                    MR. COLEMAN:  Pardon me.  I didn't

8    mean to speak over you, Your Honor.

9                    THE COURT:  That's all right,

10   Mr. Coleman.

11                   MR. COLEMAN:  I mean, if we are

12   locking in positions, say, for ordinary-course

13   amendments from and after that date, that's

14   what we are looking for here.  And if it is

15   clear, if it is clear from this record that

16   this settlement agreement is not going to form

17   the basis for some supercharged amendment

18   right, then I think we are in a better

19   position.

20                   But I think, you know, despite the

21   rhetoric around this, Your Honor, I think that

22   our position is sympathetic and understandable,

23   and I think Your Honor sees the point.

24                   THE COURT:  Sure.



```
1                   MR. COLEMAN:  Thank you.

2                   THE COURT:  Thank you, sir.

3                   Mr. Bromley.  Oh, thank you, thank

4     you.

5                   Any other objections or any other

6     parties wish to be heard at this time?

7                   (There was no response.)

8                   THE COURT:  All right.

9     Mr. Bromley.

10                  MR. BROMLEY:  Your Honor, if I can

11    briefly respond to Mr. Coleman.

12                  THE COURT:  Yes, sir.

13                  MR. BROMLEY:  You know, I

14    certainly respect Mr. Coleman's views in most

15    circumstances, but here I have to say I am

16    fundamentally confused.  There is nothing in

17    the motion and there is nothing in the

18    settlement agreement that even touches in the

19    barest way on the concept of there being some

20    supercharged right to a presumption with

21    respect to a hypothetical future motion to

22    amend.  There is nothing at all.  We have

23    simply said we are going to sit down and talk.

24    We didn't have to -- I think it is true we
```



1    didn't have to say.

2              But I am concerned that there is a

3    level of paranoia here that kind of covers the

4    surface.  Why did we put it in there?  It is a

5    gesture of good faith of all of the parties who

6    have been at each other's throats over a period

7    of three or four years that we are going to sit

8    down and it is going to be something that is

9    true.  It is going to be something that is done

10   in good faith.  These were critical elements of

11   the negotiation.  Sometimes you have to say to

12   somebody who doesn't fully trust you, "I will

13   do it and I will put it in writing."  Okay?  It

14   is nothing more than that.

15              The idea that it is somehow in

16   there for some ulterior motive is really the

17   farthest thing from the truth.  It was

18   important for the three parties, for the U.S.

19   interests, for the UK pension parties --

20   particularly for the UK pension parties, I can

21   note -- and for the Joint Administrators that

22   we were all going to sit down and talk about

23   allocation theories.

24              THE COURT:  Let me say this to



1  you, and I don't know whether it is out of line

2  for me, and I am not asking for you to even nod

3  yes or no, Mr. Bromley.  When I read it, it

4  seemed to me to be "Hey, Canadians, let's sit

5  down and have some serious settlement

6  discussions because we may be forming a united

7  front here."  That's all.

8              MR. BROMLEY:  I won't comment.

9              There was a phrase that

10  Mr. Coleman used that was particularly

11  concerning to me.  He referenced a strategic

12  pursuit of, in effect, a noncredible theory

13  that we would use in some way to occupy time

14  and money and then drop at the last minute.

15  That is quite surprising that that's even a

16  concern.

17              I mean, the substantive way that

18  litigation proceeds is that you are constantly

19  reviewing your positions, and if it becomes

20  clear that you don't have a winning position on

21  a particular point, it would seem to me that

22  according to Mr. Coleman's logic, we are duty-

23  bound to take it to the final decision.  And no

24  one should be doing that.  But in particular,

1  the Canadian interests should be living to that

2  exact same rule.

3          If today the CCC stood up and said

4  our pro rata substantive consolidation

5  distribution to all creditors theory was gone,

6  I can tell you that we have spent tens of

7  millions of dollars defending against that

8  claim, and I would be happy if they stood up

9  and said it so that I wouldn't have to spend

10  another dime to defend against that claim.  And

11  if they come to an epiphany the day before

12  trial and we have nevertheless spent time in

13  expert discovery and the day before trial they

14  say, "We are not going to pursue that," I would

15  still say thank you very much.  That would be a

16  good thing.  Right?

17          The idea that there is going to be

18  some theory that we are going to be locked into

19  and it is like, you know, we have got -- we

20  have locked all the ICBMs in and we have all

21  got to press the button.  It just doesn't make

22  any sense.  So the idea that we can't try to

23  resolve this thing doesn't work.

24          The question of the trial protocol

1  and twice the amount of time and all of those

2  issues, none of that is before the Court.  We

3  have not asked for any relief.  We are not

4  walking away from any burden that we would have

5  as movants if we ever decide to move.  And the

6  Canadian interests should not be moving away

7  from their burdens as well.

8          THE COURT:  Well, I think there is

9  an easy answer to that argument, frankly, and

10  it is this.  As you indicated, Mr. Bromley,

11  there is no reason the parties on the day

12  before trial could not have reached an

13  agreement on the protocol theory that they wish

14  to submit to the Courts.  And we would have sat

15  down at that point and revised the protocol,

16  the trial protocol.  In fact, the Court should

17  be encouraging the parties to sit down to try

18  and settle matters.

19          MR. BROMLEY:  You know, Your

20  Honor, Mr. Zelbo and I have worked together for

21  a long time.  One thing that we -- a venture we

22  had was in the context of another Canadian

23  insolvency proceeding where we represented the

24  Canadian debtors in a trial in Chicago.  There

1  was a CCAA case that had been filed in Toronto

2  before Justice Farley, and there was an

3  enormous claim that needed to be resolved.  And

4  it was determined, rather than to try to

5  conduct a joint trial, that it should take

6  place in Chicago.  We conducted expedited

7  discovery.  Hundreds of millions of dollars

8  were at issue.  And the ability to confirm a

9  plan was really on the cusp because of this

10  claim.  We settled that case while the jury was

11  out.

12            Now, I remember I was sitting in

13  the back row, and back then I had to sit in the

14  back row, and Mr. Zelbo was at counsel table,

15  and he scurried back to me and he said, "Get on

16  the phone back to New York.  We have got to

17  settle this thing."  And then after, you know,

18  we said, you know, our guy went.  He comes up

19  and says, "Forget it."  Well, the fact was is

20  we did settle it.  We settled it during the

21  jury deliberations.  And when the jury came in,

22  the judge said, "I would like to thank you for

23  your service, but you are released."  And, you

24  know, this is what the jury foreperson --

1  (indicating)  "What?"

2              And you know what, Your Honor?

3              MR. ZELBO:  It was actually a

4  verdict, came in a sealed envelope.

5              MR. BROMLEY:  In a sealed

6  envelope.  And it was a good thing for everyone

7  involved that we had gone all the way to that

8  end but still were able to settle the case.  So

9  it is not --

10             THE COURT:  I have written

11 decisions where the parties settled immediately

12 before I was prepared to release the decision.

13 But I didn't say, "No.  You have got to read

14 the decision."

15             MR. BROMLEY:  "Do you know the

16 work I put into this thing?"

17             But, Your Honor, what we are

18 talking about here -- look, there is something

19 that is different.  We are moving into a

20 different phase.  Fact discovery is concluded.

21 We are going to be moving into expert

22 discovery.  We have deadlines.  We have a

23 schedule.  We have to put in expert reports.

24 What we are doing here is trying to simplify



1   things.

2                    And, you know, I do get a sense

3   that there is a concern among the Canadian

4   parties that they were not expecting this

5   result.  And, you know, from my perspective,

6   that's a good thing.  We have taken to heart,

7   all of us, the concerns that have been

8   expressed about the complications, the time,

9   the expense, and we just knocked heads to get

10  this thing done.  And that is why we are here.

11  And there is nothing about the result that we

12  have achieved that would require it to be --

13  the approval of that to be conditioned in any

14  way whatsoever.  If we want to come back and

15  have the right to do that, we will bear the

16  burden as movants and we will deal with the

17  standard that we have to deal with, if

18  necessary.  But --

19                    THE COURT:  So in effect, what

20  Mr. Coleman was arguing was that there might be

21  something in here; that this doesn't enhance

22  the rights of the parties on amendment, but it

23  could just as easily say it does not enhance or

24  limit, it seems to me.  I mean, that is really

1  the result of the settlement as proposed.

2  There is no enhancement; there is no

3  limitation.

4              MR. BROMLEY:  We have not asked

5  for any enhancement.  We have not added that it

6  limits.  I mean, I am concerned about adding

7  any conditional language because we have not

8  asked for it.  We have not said a word about

9  it.  It is a product of a fertile imagination

10  that has generated that request.  We would

11  think that that is not --

12              THE COURT:  I wasn't proposing

13  that language.  I was simply saying that in

14  effect, we are -- it is neutral as to that

15  issue.

16              MR. BROMLEY:  And believe me, we

17  spent an awful lot of time making sure that we

18  were being as neutral as possible.  You know,

19  maybe we needed a Swiss representative --

20              THE COURT:  No.

21              MR. BROMLEY:  -- but we did our

22  best.

23              THE COURT:  We have enough

24  representatives.



```
1                    MR. BROMLEY:  Yes, I think we do.
2    So that, you know, I don't think we need
3    that --
4                    THE COURT:  I don't know if
5    Mr. Coleman would like to address some of my
6    concerns.  And I was not making light of your
7    point, Mr. Coleman, believe me.  I am very
8    sympathetic to the concerns that your clients
9    may have.
10                   MR. COLEMAN:  I don't offend
11   easily, Your Honor.  I have been around long
12   enough.
13                   THE COURT:  Okay.
14                   MR. COLEMAN:  Your Honor, you
15   know, it would be helpful, to put it mildly,
16   enormously helpful, if both Courts would
17   encourage the settling parties to get on with
18   this process of their settlement and, if there
19   is a common allocation position, to announce it
20   at the earliest possible date, because the
21   prejudice is obvious, I think, despite the
22   noise and rhetoric around it.  So that's what
23   we would urge, Your Honor.
24                       And we think with respect to the
```

1  other point that we care about, we think this

2  record is clear.  Whether or not it is in the

3  order, we think the record is clear that this

4  settlement agreement and any order authorizing

5  it does not affect any party's rights to amend

6  their pleading.  It doesn't enhance it, and as

7  Your Honor put it, it doesn't impair it.

8              THE COURT:  That's right.  That's

9  exactly right, Mr. Coleman.

10             MR. COLEMAN:  Thank you very much.

11             THE COURT:  Thank you, sir.

12             I think that concludes the

13  arguments here, and I guess the settlement,

14  frankly, is before my Court, but I don't know

15  if anyone in Canada wishes to be heard at this

16  time.

17             CANADIAN COURT:  Is there any

18  party who wishes to be heard or to speak?

19             (There was no response.)

20             CANADIAN COURT:  Nobody is rising,

21  Judge Gross.

22             THE COURT:  All right.  Shall we

23  take a brief adjournment and discuss, as our

24  protocol provides?



```
1              CANADIAN COURT:  Yes, we will take
2    10 or 15 minutes, but we will advise the
3    parties when we are ready to resume.
4              THE COURT:  Absolutely.  So you
5    will have an adequate recess.  Thank you.
6              (Recess taken.)
7              THE COURT:  Thank you, everyone.
8    Please be seated.
9              Justice Morawetz, we can see you
10   now.
11             CANADIAN COURT:  We are now in
12   reverse, because you are a blank screen.
13             THE COURT:  Well, now you are the
14   lucky folks.
15             Justice Morawetz and I have
16   conferred regarding the settlement, and I will
17   announce right up front that I am approving the
18   settlement, and I am approving it as submitted
19   to the Court, with the minor revision that I
20   have not quite seen on the release language I
21   think that Mr. Bromley had referred to, and I
22   will look at that, of course --
23             MS. SCHWEITZER:  Your Honor --
24             THE COURT:  Yes.
```



1           MS. SCHWEITZER:  The revised order

2    is attached to our reply brief.

3           THE COURT:  Oh, it is.

4           MS. SCHWEITZER:  But we have a

5    copy to hand up.  We merely took out the one

6    sentence that the Canadians requested, but we

7    can hand it up.

8           THE COURT:  Very well.  Thank you.

9    Okay.  Then clearly I approve the settlement

10   without any hesitation.

11          MR. BROMLEY:  May I approach, Your

12   Honor?

13          THE COURT:  Please.  Thank you,

14   Mr. Bromley.

15          You know, first of all, you know,

16   often judges are asked to opine on a settlement

17   in a case in which they don't have a lot of

18   involvement, because the parties have pretty

19   much litigated, and it comes before the Court,

20   and the judge is learning a little bit more

21   about the case in the course of the settlement

22   hearing.  That clearly is not the case here.  I

23   am intimately familiar with the claims which

24   are being settled, and I think that that

1  certainly gives me great comfort in being able

2  to say that the settlement is clearly fair and

3  reasonable.  It is for a sound business

4  purpose.  It meets all of the requirements that

5  Mr. Bromley so ably recited under Rule 9019 as

6  decided by the Third Circuit in the Martin

7  case, and the issues have been tested on

8  appeal.  Therefore, that is also further

9  support for my decision to approve the

10  settlement.  And it is clearly fair, reasonable

11  and in the best interests of the estate.

12            As far as its fairness and

13  reasonableness, courts in this circuit are only

14  required to determine that it is within the

15  range of settlement, at the low end of the

16  range of settlement, and that is certainly met

17  on these terms.  So I am going to approve the

18  settlement.

19            As far as the condition that the

20  Monitor raised and other parties in Canada

21  raised, I hope that my comments are comforting,

22  that this settlement neither enhances nor

23  limits the parties' rights to amend.  And if --

24  and it is an if at this point.  And that

1  certainly should not stand in the way of the

2  settlement or cause the Court to revise its

3  terms.

4           So on that basis, I will be

5  pleased to sign the order.  And I guess this is

6  subject to Justice Morawetz's recognition of

7  that order of settlement.

8           CANADIAN COURT:  Ms. Block, is

9  there going to be a formal motion brought by

10  the U.S. debtors to have this order of Judge

11  Gross recognized?  Mr. Bomhof?

12           MR. BOMHOF:  We haven't scheduled

13  anything yet, Your Honor, but we would like

14  to make a motion -- (inaudible).

15           CANADIAN COURT:  If you wish,

16  please deal with all the other parties, but it

17  would be my hope that it can be dealt with on a

18  (inaudible) basis.

19           MR. BOMHOF:  Thank you, Your

20  Honor.

21           THE COURT:  And let me just add, I

22  really want to congratulate everyone.  And

23  obviously, I have the best lawyers in this

24  case, in these cases, and they fought very hard



1  and fairly and professionally but very

2  zealously, and that certainly tests the terms

3  of the settlement as well.

4            MR. ADLER:  Thank you, Your Honor.

5            MR. BROMLEY:  Thank you, Your

6  Honor.

7            THE COURT:  And I guess that

8  brings us now to our second issue of the day.

9            Mr. Abbott.

10           MR. ABBOTT:  Derek Abbott, Your

11  Honor, for the debtors.  It does.  And I am not

12  sure if you and Justices Morawetz have

13  discussed how that matter would proceed.  I

14  believe our principal argument will be by

15  Ms. Block in the Canadian court, so we are at

16  your pleasure, Your Honor.

17           THE COURT:  And let me just say,

18  you know, there is a massive amount of

19  supporting documentation submitted to me and I

20  believe to Justice Morawetz as well, and I have

21  to tell you I have read through the papers

22  extensively.  So I don't think that you need to

23  necessarily argue at the beginning, but let's

24  see how things proceed on a somewhat limited-



1   argument basis.

2              CANADIAN COURT:   Okay.   With that,

3   Judge Gross, Ms. Block is at the dais, and

4   please commence.

5              MS. BLOCK:   Justice Morawetz,

6   Judge Gross, may it please both Courts, on

7   behalf of the U.S. debtors, seeking to dispense

8   with representative deposition by and of them.

9              CANADIAN COURT:   I am just going

10  to stop you for a moment.   I am getting a

11  feedback here of about 1-1/2 seconds.   Is there

12  a way to turn down the volume while Ms. Block

13  is making her submissions?

14             THE COURT:   Would that be on our

15  end that we should turn down the volume?

16             CANADIAN COURT:   Well, we are

17  going to do it right here, so that that should

18  deal with it, I hope.   (Pause)

19             Please commence.

20             MS. BLOCK:   Those depositions had

21  been agreed at the beginning of the discovery

22  process.   As Judge Gross made clear on the

23  hearing of November 19, the Courts, hopefully

24  the parties will continue to assess the



1    necessity of these massive depositions.  And

2    now knowing what we know, we are asking to be

3    relieved of the burden.  And what we know

4    includes --

5              THE COURT:  I am sorry.  Justice

6    Morawetz, we have lost the sound from you.

7              CANADIAN COURT:  Well, I was

8    trying to eliminate the feedback.  I guess I

9    succeeded.

10              All right.  We will just carry on

11    and suffer through the feedback.

12              MS. BLOCK:  Three key points:  The

13    tremendous cost, the extensive discovery

14    afforded to all parties through 108

15    depositions.  I resisted bringing up the nine

16    feet of four-to-a-page transcripts in eight and

17    a half bankers' boxes of all of the discovery

18    we have done, 22,000 pages, almost 3 million

19    documents.

20              And the third key fact is that

21    there is no gap identified in relation to the

22    U.S. debtors by those seeking to engage further

23    in this extraordinary process.  And we are now

24    asking that fact discovery is enough and that

1    the U.S. estate be (inaudible) this process.

2              Now, our position would be

3    different if there were crucial fact witnesses

4    who had remained out of reach.  But 99 percent

5    of all the witnesses sought by all the parties

6    showed up and were deposed, something that was

7    not assured when we all embarked on the

8    process.  And our position would be different

9    to the extent that there were legitimate gaps

10   at the beginning of the discovery process, so

11   that a party would be going into trial blind,

12   not knowing the facts from the U.S. debtors'

13   witnesses, but (inaudible) that is not the

14   case.  We have been given no specifics

15   regarding U.S. debtors' factual evidence that

16   the Canadians say they were not able to obtain

17   if they chose through questioning a firsthand

18   witness.

19              There will be no surprises at

20   trial since, unlike the usual procedure in

21   Ontario courts, all trial witnesses will file

22   affidavit evidence with their affirmative

23   evidence.  That is not an even practice here.

24   All trial witnesses will be deposed.  Never the

1    case in an Ontario matter.  Expert reports,

2    expert depositions by opposing parties will

3    have been exchanged and conducted prior to

4    trial.  Exhibits to be relied on at trial will

5    have been identified and disclosed.  The

6    deposition testimony from 108 witnesses prior

7    to trial will have been identified and

8    produced.

9             There will be no evidence that is

10   not identified by a party as part of its

11   affirmative case.  Exhibits, depo testimony,

12   any additional affidavit testimony and expert

13   evidence, nothing will be undisclosed or

14   unknown to the parties.

15            When it comes to the parties',

16   quote, positions, there will also be a further

17   exchange of pretrial briefs.  So where each

18   party stands, what each party is asking for

19   will be set out in black and white, not

20   typically done in our trials.  So our

21   respective submissions, themes, theories, will

22   all be disclosed.  Indeed, they have been

23   disclosed throughout the pleadings.  Each party

24   participating in the allocation process dispute

1    had to file opening submissions.  We have a

2    bundle of them here.

3              And our opening position, which

4    was required to be styled as allocation

5    position, was to set out under the order the

6    material facts, the legal bases for the

7    allocation position being advanced.  And we

8    filed a reply allocation submission, as did

9    everyone else.

10             In view of all this, to justify

11   what would inevitably be multimillions of

12   dollars to be expended on representative

13   depositions, the Monitor of all parties, in my

14   respectful submission, should be obliged to say

15   what crucial surprise will be lurking if no

16   representative depositions are allowed of the

17   U.S. estate where they can ask X, Y, or Zed.

18   We need to know what, what do they need to

19   know.  The Monitor, who should be at least as

20   concerned as the U.S. debtors about cost,

21   cost/benefit, proportionality, whether

22   multimillion-dollar expense is necessary with

23   the deprivation consequent to creditors, the

24   Monitor should be disposing what issue is it

1  that needs addressing by the U.S. debtors

2  through a representative deposition.

3            I have given the Registrar a brief

4  compendium, and I am hopeful that Judge Gross

5  has a copy of it.  And let me just quickly, in

6  the interest of time, go through it.  Let's

7  look at what the Canadian interests and Monitor

8  says is the reason for this tremendous expense

9  and effort.  In Compendium Tab 1 I have given

10  you paragraph 2 from the Monitor's addendum,

11  which sets out their reasons.  The first point

12  is that rep depos have been agreed.  That is

13  true.  It is not the point.  The point is where

14  are we now.

15            CANADIAN COURT:  Well, why is it

16  not?  It has been agreed to.  And we are at

17  January 7.  The trial is on May 12.  The

18  process has gone back many months, presumably

19  agreed to at the outset.  Why is it no longer

20  an issue?

21            MS. BLOCK:  It was agreed to at

22  the outset.  And if you turn to Tab 2, you can

23  see the evidence, and it is the only evidence

24  you have on on why it was agreed to.

1    Mr. Rosenthal's affidavit at paragraph 14 talks

2    about the deposition protocol, where there was

3    to be a very limited number of subjects on

4    which it was believed no fact witness provided

5    adequate testimony.  Topics were to be small in

6    number and reasonable in scope.  And at

7    paragraph 15 he describes -- well, in paragraph

8    14 still he describes that during the

9    negotiation the purpose was to fill gaps if any

10   remained after the close of fact witness

11   discovery.  The parties anticipated such gaps

12   might exist in the event the parties were

13   unable to obtain testimony from witnesses with

14   firsthand knowledge of the pertinent facts,

15   particularly because most no longer work for or

16   were under the control of any Nortel entity.

17   It wasn't clear that 99 percent of them

18   (inaudible) scattered all over the world would,

19   in fact, be available.

20           So prior to the commencement,

21   where the parties didn't have a basis to

22   confirm they (inaudible) would be able

23   ultimately to conduct the depositions of all

24   the witnesses that (inaudible) the parties have

1    chosen, there was this concern about the

2    potential to fill gaps.  But as he says in

3    paragraph 16, unexpectedly, we had this broad

4    opportunity for fact discovery of firsthand

5    witnesses.  So all that had been agreed was

6    agreed at the outset, when nobody knew how this

7    was going to go.

8                There is no failure of

9    knowledgeable witnesses.  Ones chosen by all

10    the parties all showed up.  And if you look at

11    Tab 3, and Judge Gross, you will see

12    (inaudible) a list of the witnesses who

13    testified.  You have all kinds of witnesses

14    from IP, from legal, from engineering, from

15    accounting, from executive, from finance, from

16    management, from all over.  And they came, 108

17    of them.

18                The second reason that is cited at

19    Tab 1 by my friends is they want a Rule 31

20    examination for discovery.  They say deposition

21    practice in the U.S. isn't the same as our

22    practice.  Again, that is true.  But we have

23    Rule 31-type discovery because we limit access

24    to witnesses:  One pretrial discovery per side

1    of a person who has to go and ask the fact

2    witnesses what they know about an issue.   And

3    that's because we are prevented from requiring

4    fact witnesses to come and answer questions

5    directly.   Here, of course, we were given

6    extraordinary access to the very witnesses Rule

7    31 prevents us from questioning.   So to say

8    after having 108 witnesses, the very ones each

9    party chose to examine, that having those

10   witnesses to question to our hearts' content,

11   that now we need someone who does not have

12   firsthand knowledge to come and testify on the

13   same subject matters, essentially give hearsay

14   on top of what already have been or could have

15   been examined on, saying you have given me a

16   6,000-square-foot house, but I want a one-room

17   hut.   Let's spend millions of dollars so

18   (inaudible) my 400 square feet of space is an

19   absurd point.   We got way more than what we

20   were (inaudible).

21              The third point that they come

22   back to is that their questions are reasonable

23   and limited.   And my submission is it is

24   entirely the opposite.

```
1                    And the fourth point made
2    (inaudible) the same point as number one that
3    the depositions had been agreed, and they say
4    it is disingenuous to say that dispensing with
5    them is a means of conserving resources.  That
6    dispensing with them will save massive costs is
7    self-evident on its face and is a point that
8    both judges have been making.  The burn rate on
9    these depositions is a cause of distress to the
10   Courts, very legitimately, and the next phase
11   will also be multimillions of dollars.
12                    The Monitor --
13                    CANADIAN COURT:  Is that something
14   that has just come to everybody's attention?
15                    MS. BLOCK:  No.  Everyone has been
16   extremely concerned about the costs --
17                    CANADIAN COURT:  Suddenly,
18   suddenly, three months or four months before.
19                    MS. BLOCK:  If we don't have -- if
20   there were a need, sir, I would not be standing
21   here telling you not -- asking you not to
22   dispose of these.  If there were a need, as I
23   say, if there were crucial witnesses missing,
24   if there were crucial facts, the gaps in the
```

1  facts, we wouldn't be asking for this.  But
2  nothing has been identified.
3              We are told that (inaudible) are
4  looking for maximum flexibility to develop new
5  allocation theories.  You have already heard
6  those submissions of Mr. Bromley.  I will not
7  repeat them.  The same factual basis for the
8  claims by both EMEA and the U.S. estate on the
9  threshold issue that the beneficial ownership
10  of the IP rested with various Nortel entities
11  such as the U.S., NNI, such as NNUK, et cetera,
12  and that therefore the entire amount of the
13  residual IP patent sale is not for the Canadian
14  estate, that is not at play at all.  Both are
15  saying that they have a different way of
16  valuing, but on January 24 we will see the
17  expert reports, and there has been no new
18  theory.  There will (inaudible) in my
19  submission, it is unreasonable to suggest that
20  there will be.
21              On the issue of the very limited
22  and small in number and reasonable scope of
23  questions, I have given you at Tab 5 of the
24  compendium the 27 topics that were served.

1            CANADIAN COURT:  Is that the 27

2    that has now been pared down to five?

3            MS. BLOCK:  Yes.  And at Tab 6 you

4    will see the five.  They have incorporated the

5    27 in these five.  And I won't go through all

6    of them, but let me just give you an example.

7    If you took a look at the second page of Tab 6,

8    to Item No. 9, the U.S. estate (inaudible) not

9    for a gap point or for the provision that

10   somehow mooted my friends in questioning the

11   108 witnesses.  They want the facts and

12   documents.  Notice it isn't some facts or some

13   documents.  They are saying all facts, all

14   documents, demonstrating how and to what extent

15   intellectual property, patents, copyrights,

16   trademarks, was assigned to NNL by NNL

17   subsidiaries, inventors, authors and others.

18   So here we have NNL as the assignee.  It must

19   know where it received them from.  It must know

20   to what extent those assignments were, from

21   whom they obtained them.  What is the issue

22   they need to ask NNI about?  Where is the gap

23   in their knowledge?  What is the surprise they

24   are worried about?  How would NNI know answers

 1   to how NNL was assigned IP by the 40 or 80

 2   subsidiaries around the world.  What is the

 3   point?  This isn't gap-filling evidence.

 4              And you can go through each of --

 5   I am happy to go through all of them, if you

 6   wish, but I am mindful of your desire to be --

 7   your very valid point that you have read this

 8   material and that we should get on with the

 9   argument.

10              At Tab 7 you will see in the

11   submissions made on behalf of the Monitor to

12   Judge Gross in Ms. Murphy's letter of December

13   22, at page 3, my friends say, "Eliminating

14   representative party discovery will allow these

15   parties maximum flexibility to develop new

16   allocation theories (something expressly

17   contemplated by the proposed settlement

18   agreement)" -- that is not accurate -- "without

19   the opportunity for the Canadian Debtors and

20   the Monitor to obtain essential fact discovery

21   to defend these positions."  So "granting the

22   request of the U.S. Debtors would deprive the

23   Canadian Debtors, the Monitor and, for that

24   matter, the Courts, the benefit of essential

1    discovery required to analyze and resolve these

2    cross-border disputes over claims and

3    allocation. . . ."

4              This provides no information.   It

5    is a conclusory, broad, vague assertion.   And

6    you can scour the record and you will not find

7    the gaps that need to be filled at great

8    expense to everybody.   At least 12 lawyers

9    sitting around in a room in New York for eight

10   days or four days there and four days here, at

11   tremendous expense, to fill what?   To fill what

12   gap?

13             And that takes me to Tab 10,

14   which, of course, is our proportionality --

15   sorry.   Tab 8.   Pardon me.   Our proportionality

16   rule.

17             CANADIAN COURT:   Back up for a

18   second.   Is that the contemplated time line,

19   eight days?

20             MS. BLOCK:   Eight days, yes.

21             CANADIAN COURT:   And how many days

22   have been spent examining the parties to date?

23             MS. BLOCK:   We have been doing it

24   for three (inaudible).   108.   We did several on



1   every day.  So we sometimes did three a day, so

2   I haven't done a day count, but (inaudible).

3                    And what happened, part of the

4   expense of a case like this is that you have to

5   deploy so many people, and then you have to

6   talk to each other so they are not stepping on

7   each other's toes even on their own side, so --

8                    CANADIAN COURT:  I am just trying

9   to get a sense of the eight now that are

10  required.

11                   MS. BLOCK:  It is going to be

12  eight days.  And as I say, typically, at the

13  depositions I was at, there would be at least

14  12 people around the room, lawyers.

15                   CANADIAN COURT:  So is it fair to

16  say it is something that could be addressed

17  through cost sanctions?

18                   MS. BLOCK:  Could you require

19  someone to pay back --

20                   CANADIAN COURT:  At the end of

21  this whole process, is it something that the

22  U.S. court and this court could address through

23  cost sanctions?

24                   MS. BLOCK:  Yes, theoretically it



1    could be done through cost sanctions.  I have

2    not experienced a lot of effective control of

3    matters through cost sanctions.

4                    And it is not just the eight days.

5    If, in fact, we are to prepare all facts, all

6    documents on all of these topics which have

7    already been explored, if what that really

8    means is we are fishing through 22,000 pages of

9    transcript and 3 million documents, documents

10   we are still reviewing, the costs of that are

11   massive.  So it is not just the eight days and

12   the at least 12 lawyers and the legions of

13   people behind each of those 12 lawyers that

14   have been preparing them.  It is the amount of

15   time you would have to spend getting your

16   witnesses ready, which is an extensive process.

17                    So if we had effective cost

18   sanctions, if you actually got paid for every

19   cent that you spent or billed, but you don't.

20   Certainly under our system you don't.  The cost

21   (inaudible) scales do not.  And so when I say

22   theoretically, the answer, the effectual answer

23   (inaudible) is theoretically, yes.

24                    So I was moving to the



1    proportionality test, sir.  And I have given

2    you Rule 29.  And it is a point both you and

3    Judge Gross have consistently urged upon the

4    parties.  And if you look at Tab 9, you can see

5    that my friends on behalf of the Monitor filed

6    these principles before you on the EMEA motion

7    regarding the E&Y documentation.

8    Proportionality is a governing tool the courts

9    use to downsize proceedings.  Justice can be

10   done in large cases by reducing, not expanding

11   the procedure.  Proportionality is consistent

12   with a contextual and constrained approach by

13   the courts (inaudible).  It militates against

14   the further expansion of production in this

15   case and the cost that such production would

16   occasion.  By any measure, reduction of

17   discovery in the allocation dispute to date has

18   been extensive.  It is unprecedented in the

19   context of a CCAA proceeding.

20          And, of course, the Monitor was

21   reporting because of this the costs have

22   significantly (inaudible) before that and notes

23   the Courts' concern about that point.  And

24   paragraph 47 talks about the Courts'

1  jurisdiction under both the CCAA to exercise

2  its discretion to control the discovery

3  process.  And that's what I am here asking from

4  this Court and from Judge Gross, to exercise

5  the discretion to not keep rolling this train

6  down the tracks when there is no need.  If

7  there were a need, I wouldn't be standing here.

8              CANADIAN COURT:  Do the parties on

9  the other side, the Monitor and the Canadian

10  debtors, the CCC, share your view that

11  (inaudible) these examinations?

12              MS. BLOCK:  Turn to Tab 10, if you

13  will, in the compendium, sir, and you will see

14  the objections.  We listed four topics, not 27.

15  We listed four right from the outset.  And the

16  CCC's objections to our four are that they seek

17  information that is in the possession, custody

18  or control of the requesting party.  Going for

19  a moment back to the NNL assignee questions,

20  NNL being the assignee, why would we know all

21  of that information?

22              Item 2, to the extent they seek

23  information that was previously provided by a

24  fact witness, they have not identified one area

1  in one examination where they asked and were

2  unable to get in that nine feet of transcripts

3  that we have, four to a page, they didn't

4  identify one that they couldn't get information

5  from about (inaudible).  And they seek

6  information from persons other than CCC.

7              No. 4, overly broad, burdensome,

8  not reasonably calculated to lead to the

9  discovery of admissible evidence and

10  unreasonable in scope.

11              No. 5, information protected by

12  work product doctrine.  And this is an

13  important point, sir, because what my friends

14  are really looking for is tell us everything

15  you are relying on, everything you have

16  analyzed, everything you have compiled, when

17  108 people have testified to the underlying

18  facts, when we made our pleadings, when we are

19  making affidavits of trial witnesses, we will

20  be collecting the exhibits we are relying on,

21  the deposition testimony we will be putting

22  forward, and when we will be briefing

23  (inaudible) in openings, written openings, well

24  in advance of the trial, that's work product

1  documents.  And to say we have to do it now,

2  three months before trial, we are not ready

3  now.  We are still reading 3 million documents.

4              Then 6, they attempt to or purport

5  to impose obligations beyond those imposed by

6  the federal rules of bankruptcy, the local

7  rules, et cetera, and any other rules.  Our

8  rules do not require us to prepare the case for

9  the other side.  They have to look at the

10  (inaudible) facts and make their choices.  We

11  make our choices, and there will be full

12  disclosure (inaudible) our protocol.  But to

13  say we have to do it by January 8 in these

14  depositions, that's not the reason.  That's not

15  the (inaudible).  Sorry.  I am digging a lot

16  into the protocol.

17              And then does not contain a

18  reasonable time limitation, overbroad,

19  burdensome, oppressive, vague, ambiguous.  You

20  read their questions and you will see they are

21  all from the beginning of time tell us

22  everything about every Nortel entity about X.

23              And I can show you past the flip

24  sheet the Monitor's objections to our four

1  topics.  It is at page 7 of Tab 10 --

2              CANADIAN COURT:  Yes.

3              MS. BLOCK:  -- in the compendium.

4  Seeks information protected from disclosure by

5  work product immunity.  They don't want to tell

6  us the same thing, what documents they are

7  choosing, what facts they have compiled, what

8  they are relying on.  That will come in time,

9  when we have had our own opportunity to examine

10  their witnesses at length.

11              Seeks information concerning

12  affiliated entities.  Well, they are asking

13  questions about how do all Nortel's

14  subsidiaries assign to NNL, to themselves.

15              Information not reasonably

16  (inaudible), unduly burdensome.  Information

17  concerning the broad categories of the MRDA,

18  transfer pricing, which cover a nine-year

19  period.  Their questions cover from the

20  beginning of time to the filing of the CCAA.

21  So -- and all of their (inaudible) I did

22  underline everything that is the same, the same

23  reasons.

24              And I have given you at Tab 11 or



1  10 the Livent case, where clearly there was a

2  great deal of discovery, 69 days.  There was

3  also the evidence from the trial, the criminal

4  trial witnesses.  And I have highlighted the

5  portions in that case that show you that

6  discovery is discovery of facts, and they have

7  had ample opportunity to review the facts.  As

8  the (inaudible) master said, the ground has

9  been plowed numerous times, and neither side is

10  going to (inaudible) what the other side's case

11  is about.  And that is the point.  Nothing,

12  there is no guesswork allowed.

13           The experts will be revealed

14  tomorrow, and we will be fully briefing the

15  case from all of the information that all of us

16  have been reflecting on and reviewing.  And,

17  indeed, when the extension was obtained in the

18  trial timetable, the point was made we still

19  have to do all these fact depositions.  And

20  before we get to the rep depositions, we should

21  figure out what is left.  So we had -- November

22  14 we had 35 fact depositions still to go.  And

23  now that we have got a whole 108 in the pan, we

24  can see what is left.  And with respect to the

```
 1   U.S. debtors, there is nothing left.
 2              So to make us spend millions
 3   getting witnesses prepared and preparing and
 4   then sitting through (inaudible) days more of
 5   discovery is not consistent with the
 6   proportionality principle.  It is not
 7   consistent with the urging we have had from the
 8   Courts, rightful urging, to get on with getting
 9   this thing tried.  And the cost/benefit would
10   be overwhelmingly in favor of the motion to
11   stay (inaudible) because nothing will come out
12   and certainly nothing that won't come out
13   before trial, if the trial proceeds as agreed
14   and will be agreeing that requires that full
15   (inaudible).
16              Those are my submissions.
17              CANADIAN COURT:  Thank you.
18              MR. CALVIN:  Good afternoon, Your
19   Honor.  I am Peter Calvin.  I am here
20   representing the UCC.
21              Good afternoon, Judge Gross.
22              THE COURT:  Good afternoon.
23              MR. CALVIN:  I just have a few
24   very brief submissions to make in support of
```

1    the submissions made by Ms. Block.

2                    And my first submission is that

3    the discovery process that was agreed upon and

4    implemented in this case was a unique process

5    that was tailored for this case.  It was not

6    one that followed the Ontario Rules of Civil

7    Procedure.  It was one that was designed and

8    agreed upon for this case.  And that discovery

9    provided for different types of information to

10   be provided at different times.

11                   And as Ms. Block pointed out, it

12   is extremely unusual to have depositions of

13   fact witnesses as occurred here, and that

14   discovery has been successful and it has been

15   completed.  And in my submission, what is

16   really being sought here as part of the

17   representative deposition request is not the

18   gap-filling which was contemplated and provided

19   for factual evidence but is to accelerate the

20   time for the parties to commit themselves to

21   positions with respect to the evidence to be

22   provided at trial.  But that was provided for

23   by agreement of the parties, approved by the

24   Court, in a litigation timetable, and that type

1  of information, so-called no-surprise discovery

2  or reliance discovery, that information is to

3  be provided in April of this year to enable the

4  parties to review the thousands and thousands

5  of documents, discovery transcripts, and decide

6  which exhibits they are going to rely upon,

7  which deposition excerpts they are going to

8  rely upon, and to provide what is (inaudible)

9  in my experience in Canadian litigation, to

10  provide in advance of trial affidavits from

11  witnesses.  So the issue of a (inaudible) in my

12  submission has been adverted to by the parties

13  and will be accomplished through the procedures

14  that have been agreed upon.

15            Now, with respect to my client,

16  the UCC, there are no gap-filling questions

17  that can be properly asked.  The relevant facts

18  occurred before the UCC was formed, and so

19  there are no knowledgeable witnesses that can

20  be put forward by the UCC to supplement the

21  factual record that has already been

22  established.  My submission, therefore, is that

23  it would be quite improper for my client to be

24  held to accelerate its work to specify the

1  facts it relies upon, the exhibits that it

2  relies upon, and to provide the information

3  that the parties have already agreed will be

4  provided through expert reports, through

5  witness affidavits and through identification

6  of exhibits and transcript excerpts according

7  to the litigation timetable.

8            Those are my submissions.

9            CANADIAN COURT:  Thank you.

10 Mr. Gottlieb.

11            MR. GOTTLIEB:  Thank you, Your

12 Honor.  Good afternoon.  Judge Gross, I will

13 adopt the submissions made before me and will

14 endeavor not to repeat them.  I will emphasize

15 (inaudible) from the EMEA perspective.

16            The first point, as said by my

17 friends before, it is important to take this

18 motion in context, which is this is a unique

19 proceeding that we have before us with unique

20 procedures that have been put in place.  It has

21 been a fluid process.  It has not been a

22 stagnant process where what was decided at one

23 point has not changed over the proceedings.

24 That is not the way this has happened.



1              The parties have consistently

2    looked at what has happened in the past, what

3    (inaudible) before it.  (Inaudible) needs to be

4    made, and changes have been made.  We have come

5    into court on several occasions (inaudible) and

6    the Court made changes.  Some we have agreed

7    to, the parties by themselves, to these

8    changes.  So Justice Morawetz, when you put it

9    to Ms. Block why now, at this stage, in my

10   respectful submission, you are constantly

11   looking as counsel and, respectfully, the Court

12   to see where things are and where they have

13   been and what needs to be done.

14              At the time when we finish the

15   depositions and look at what has transpired in

16   the past and then look at what we have to

17   resolve of the past and what we have the task

18   (inaudible) ahead of us to get this case to

19   trial in May, it is our respectful submission

20   that what has happened in the past makes the

21   representative depositions unnecessary at this

22   point.  And we should all take (inaudible ) the

23   Courts balance the steps and consider the

24   cost/benefit, as Ms. Block says.

1                  So can there be special benefits

2    from stages in the litigation?  Of course, but

3    they have to be balanced with the cost and

4    time.  And in this particular piece of

5    litigation, where we have great tasks ahead of

6    us between now and May 12, very significant

7    costs have been expended uncovering the factual

8    bases in this case, the question is, in our

9    respectful submission, would it be more

10   beneficial to do representatives depositions at

11   this point or less beneficial.  And in our

12   respectful submissions, it clearly tips in

13   favor of dispensing with them at this point in

14   time.

15                  And in order to properly balance

16   this, the cost of those and the time of those

17   is important to know.  It is a very significant

18   process ahead of us if we go forward with

19   representative depositions, and I will

20   illustrate why.  But it is not just the

21   (inaudible) of the multiple party.  Given the

22   questions asked if they stood, there is a

23   (inaudible) big (inaudible), as Ms. Block said,

24   of significant records, that would take a

1  period of time.  But then the process that has

2  been put in place, you may recall, provides for

3  undertakings to be given (inaudible).  Again,

4  if the (inaudible) stood, in my respectful

5  submission -- they can't because they violate

6  the protocol rules.  But if they stood, the

7  time period required to answer those would be

8  far more time than we have left in this case

9  and a tremendous expense.

10            So I stress the point because it

11  is not a short process ahead or an inexpensive

12  process ahead even when compared to what has

13  happened in the past.  It is a very significant

14  process before Court.  And as this matter is

15  fluid, we should look constantly to see where

16  we can cut costs, as the Court has suggested,

17  streamline procedures, as the Court has

18  suggested.  And in our respectful submission,

19  supporting this motion, we believe that's

20  appropriate at this time.  That's my first

21  point.

22            The second point is again from

23  (inaudible), the Canadian interests have had

24  ample opportunity and have used the opportunity

1  to know the case backwards and forwards,

2  (inaudible) the case that they have to meet,

3  and they have examined, had the opportunity to

4  examine over 105 witnesses prior to trial and

5  will have the opportunity to see the experts'

6  reports and examine the experts prior to trial,

7  and see the experts' direct evidence --

8           CANADIAN COURT:  You have covered

9  that.  Anything new?

10           MR. GOTTLIEB:  So the point I

11  wanted to make -- sorry.  I didn't mean to

12  interrupt.

13           CANADIAN COURT:  Anything new?

14  Because I think the submissions of Ms. Block

15  were very, very thorough, and as indicated, we

16  have had the opportunity to review the parties'

17  submissions.  Is there anything new?

18           MR. GOTTLIEB:  I appreciate that.

19  So what I would like to do is focus in on the

20  particular facts regarding EMEA (inaudible).

21  Ms. Block referred to the allocation papers.

22  That is dealt with.

23           With respect to the claims by EMEA

24  against the Canadian interests, including the

 1  directors and officers -- and in the directors

 2  and officers' motion records some of the claims

 3  are put in -- there can be no doubt whatsoever

 4  that (inaudible) claims are extremely detailed.

 5  Proofs of claims were filed that went step to

 6  step as to the allegations made, the legal

 7  basis of the claim and the factual allegation.

 8  The Canadian Monitor asked for particulars of

 9  those, and 110 pages of particulars were

10  provided.  And that's a very important

11  (inaudible) to consider, in our respectful

12  submission, because that was in the phase

13  before the depositions began.  So all of the

14  Canadian (inaudible) knew very well what the

15  case, what it was about (inaudible), so that

16  they could conduct the depositions with that

17  framework in mind.  So there is no question

18  that they had the (inaudible) opportunity to

19  meet the EMEA case.

20          And what I am going to ask Your

21  Honor and Judge Gross to do is if you can turn

22  up the affidavit from Fara Tabatabai, and the

23  affidavit itself, if you go to page

24  (inaudible).

1              CANADIAN COURT:  Yes.

2              MR. GOTTLIEB:  And I am sorry,

3    Judge Gross.  I assume you have it unless you

4    tell me otherwise.

5              THE COURT:  Yes.

6              MR. GOTTLIEB:  Thank you very

7    much.  This is, again, related to the affidavit

8    that lists all of the (inaudible) former

9    employees or otherwise, including the Joint

10   Administrators.  And it doesn't take long if

11   you scan down the list and look at the names,

12   but more importantly, on the right side, you

13   see that every possible part of the business

14   was examined on where there was an opportunity.

15   You had treasury, legal, scientists, directors,

16   officers.  It is quite a daunting list.

17              And you will also see, for

18   example, if you turn over to page 11 through

19   14, Simon Freemantle, you see the positions

20   that Mr. Freemantle held over time for all the

21   different entities, directorships.  So there

22   was an opportunity and the opportunity was

23   used.

24              So the point is the case was well



1 | set out in pleadings (inaudible) and
2 | examinations of 39 (inaudible) 44 EMEA
3 | (inaudible) witnesses were examined, with the
4 | case being known.  So there can be no question
5 | whatsoever that the Canadian interests,
6 | including the directors and officers, had the
7 | opportunity to examine after knowing
8 | (inaudible).  That's my second point.
9 | And therefore, as Ms. Block said,
10 | (inaudible) further examination now of one
11 | representative, and that wasn't the purpose of
12 | the representative depositions, as you know
13 | from the orders that this Court granted.
14 | And the final point that I will
15 | make that will show why the depositions being
16 | sought are not appropriate here, in our
17 | respectful submission, is if you go to the list
18 | past the EMEA representatives, that is at Tab I
19 | of the same affidavit.  And in the top right
20 | corner there is page numbers of 124.  Page 9 of
21 | 124 is the place to go.
22 | And as you know, you will recall
23 | from our materials, there were over 90 pages of
24 | questions asked of the EMEA interests at large.

1  The only one I am showing you now is the first

2  30 questions asked with respect to NNUK in

3  particular.  And see what is being asked by the

4  Canadians and read what is in bold at the top

5  of the page, because that is important.  "The

6  Canadian (inaudible) provides notice that the

7  above-referenced party is (inaudible) to have

8  informed him or herself (inaudible) that

9  party" -- that is 2.8 million documents and 105

10  transcripts or more -- "if any, including

11  through its existing or former employees,

12  officers, directors, as the case may be,

13  related to the following topics, which are not

14  believed to have been fully answered by the

15  fact deposition witnesses."

16          And same with the U.S.  Question

17  No. 1:  "The facts and documents other than the

18  MRDA demonstrating NNUK's understanding of the

19  phrase 'equitable and beneficial ownership' as

20  used and the ownership interest that NNUK

21  allegedly had in the intellectual property."

22          That question is asking for the

23  entire evidentiary record to be reviewed and

24  known by the representative and that that

1    representative is expected to answer questions

2    dealing with (inaudible) topic possible

3    equitable and beneficial ownership.  And the

4    Canadian interests are asking that that happen

5    now and that the answers are (inaudible) that

6    undertakings be given for anything.  That

7    question, Your Honor, is one that is maintained

8    by the Canadian interests even in its

9    pared-down version.

10                   And I want to just hand up to you,

11   Your Honor, because it was improperly marked as

12   Tab J of the same affidavit.  This is the

13   letter given by the Canadian interests in

14   response to the EMEA five topics.  And as

15   Ms. Block (inaudible), the answers that the

16   Canadian debtors give and the Canadian

17   interests give fly, with great respect, right

18   in the face of the position they are taking

19   here.  If you look at Topic No. 1 that the EMEA

20   interests put forward, it is an incredibly

21   narrow and specific question:  Circumstances

22   surrounding the partial repayment (inaudible)

23   of 2008 of the NNL, NNSA (inaudible).  There

24   was a payment made in February 2008 with

1  respect to a (inaudible), and that is the

2  subject.

3           And the answer given is "The

4  Canadian debtors and the Monitor object to this

5  topic to the extent it seeks information

6  protected from disclosure by attorney-client

7  privilege, work product immunity, as well as

8  other applicable privileges."  Just like

9  Ms. Block said, they won't show us their case.

10  They won't do the same for us.

11           And then the Canadian debtors,

12  Your Honor, further object to the extent that

13  this information has been provided through the

14  testimony of the witnesses deposed and the

15  documents provided to date.  That's exactly

16  what they are seeking in the question in the

17  broadest terms from the EMEA interests.  They

18  ask for all evidence (inaudible) regarding

19  beneficial ownership, and we had 105 witnesses,

20  the vast majority of them asked about that

21  question.

22           So the position taken by the

23  Canadian debtors (inaudible) on this flies

24  against the argument they are making here.

1  They do not need the extra (inaudible), and

2  given the cost/benefit analysis, in our

3  respectful submission, they are not necessary

4  and appropriate at this time, and now is the

5  time to review that point.

6           And subject to any questions Your

7  Honor or Judge Gross may have, those are my

8  submissions.

9           CANADIAN COURT:  Thank you.

10          MR. GOTTLIEB:  Thank you very

11  much.

12          MS. MILLER:  Good afternoon, Your

13  Honor, Judge Gross.  D. J. Miller, Thornton

14  Grout, Canadian counsel for the UK pension

15  claimants.  My submissions will be very brief

16  and will not duplicate what has gone before.

17  My submissions are focused on the unique

18  position that the UK pension plans are in in

19  this proceeding and are limited to three main

20  points.

21          The first is to consider the

22  actual interests of the parties that are before

23  the Court on this motion.  The second is the

24  Courts' ability to control its own process, and



1   the third is the fact (inaudible) to be

2   considered in determining the litigation

3   schedule (inaudible).

4            Turning first to the actual

5   interests of the parties that are before the

6   Court and in particular the UK pension

7   claimants' interests relative to those other

8   parties, it is trite to say (inaudible)

9   claimants have been in a veritable hurricane of

10  litigation storm over the last six months.  Our

11  client was the only core party in this

12  proceeding that had virtually no access to any

13  of the documents when this proceeding was

14  commenced.  That included the 40,000 documents

15  in the Merrill database, which we finally

16  received the end of June.  Since July it has

17  been on the receiving end of almost 3 million

18  documents.  At the same time that it was

19  receiving these documents, including hundreds

20  of thousands of documents that occurred while

21  the depositions (inaudible) were taking place.

22            Unlike the estates that were

23  actually producing (inaudible) that had been in

24  possession of the documents for years, our

1    clients were (inaudible) digesting them,

2    preparing for depositions and providing their

3    own documents in discovery in productions

4    through the last six months.

5                    The UK pension claimants is one of

6    only two parties in the entire proceeding who,

7    in addition to having (inaudible) the

8    allocation issues, have the positive burden of

9    (inaudible) their clients in this proceeding.

10   No other core party bears that burden.  So the

11   UK pension claimants are, in fact, in a unique

12   position (inaudible) very briefly to provide

13   (inaudible).

14                   Clearly, the UK pension

15   (inaudible) is not an estate.  They are,

16   however, either the largest or the second

17   largest creditor in the global (inaudible)

18   Nortel.  The UK pension plan beneficiaries are

19   40,000 former (inaudible) of Nortel who have a

20   current deficit in the pension plan of

21   approximately $4 billion.  The UK --

22                   CANADIAN COURT:  Stick to the

23   facts.  Judge Gross and I are very, very

24   familiar with the history of this matter --

1                MS. MILLER:  I appreciate --

2                CANADIAN COURT:  -- and I think

3    you are probably better off to direct your

4    submissions to what is really before the Court

5    today as opposed to this.

6                MS. MILLER:  The only point on

7    that, Your Honor, is that unlike many who are

8    actually in the courtroom who are making

9    submissions on this issue, the UK pension

10   claimants have a very direct economic interest

11   in the outcome of the litigation.  And I will

12   get into that (inaudible).  It is a critical

13   point in considering actual (inaudible) parties

14   in this litigation.

15                When we look at the economic

16   (inaudible) of the parties, the bondholders

17   described the pretrial discovery in their

18   factum as a no-stone-unturned litigation

19   strategy.  And I know that Your Honor and Judge

20   Gross are aware of the extraordinary fees that

21   have been incurred just since April of last

22   year in this litigation.  But it is against

23   that backdrop of the fees that our client, the

24   UK claimants, support the motion of the U.S.

1    debtors and other core parties to amend the

2    litigation (inaudible) to dispense with further

3    depositions.

4             A scorched-earth litigation

5    strategy should not be permitted, particularly

6    where it is not the parties' own money that is

7    being spent.  The parties that are before the

8    Court (inaudible) need to dispense with these

9    additional (inaudible) are creditors with a

10   real economic interest.  Those creditors that

11   support (inaudible) have aggregate claims well

12   in excess of $10 billion (inaudible).  Those

13   creditors with (inaudible) economic interest

14   have come together to request that the Courts

15   not permit the further (inaudible) out of the

16   funds available to the core creditors by way of

17   recovery.

18            By contrast, Your Honor, and not

19   to put too fine a point on it, the Monitor and

20   the Canadian debtors, who are represented by

21   (inaudible) no less than six lawyers in the

22   courtroom today, support further depositions.

23   Neither of those parties' economic interest in

24   the outcome of the litigation is simply not

1  (inaudible).  This is a liquidating CCAA

2  proceeding where every single dollar spent is a

3  zero-sum game.

4           CANADIAN COURT:  I have made that

5  point on numerous occasions, and I really think

6  our time is best spent not reviewing the

7  history.  We are familiar, Judge Gross -- I can

8  speak for him, I am quite certain, on this

9  point -- we both are very familiar with the

10  past five years.

11           MS. MILLER:  Thank you, Your

12  Honor.  And I appreciate that you are and you

13  and Judge Gross easily have a much longer

14  history in this proceeding than our firm has.

15           The illustration that (inaudible)

16  goes to the economic interests of the parties

17  is simply by way of context.  But the second

18  point that we wish to make in terms of

19  controlling the process in the court is this:

20  A lot of the submissions on this motion have

21  centered around a proportionality concept under

22  the rules of civil procedure.  But

23  fundamentally, this is also an insolvency

24  proceeding governed by the CCAA.  The legal

1  test and standard approved for proving claims

2  in a CCAA proceeding, including contingent

3  claims, are well established, and that test

4  does not (inaudible) the Court a scorched-earth

5  litigation approach at all costs.  Our client

6  accepts that it has a burden and is required to

7  prove its claims in the proceeding, and it has

8  participated in the process in order to do

9  that.  But that being said, the additional

10  burdens that would be placed on our client in

11  having to effectively prepare the (inaudible)

12  case for it in responding to the claims that

13  our client has the burden of meeting are simply

14  unreasonable and they bear no relationship to

15  the test that our client is required to meet in

16  order to prove (inaudible) the CCAA.

17         I would also invite the Court in

18  considering whether it is appropriate to

19  control the process by amending the litigation

20  schedule to consider and compare how the

21  situation in dealing with the Canadian claims

22  litigation might be different if this wasn't a

23  liquidation with no company, no employees, and

24  no obligation.  Would a company seeking to

1  restructure actually take the position that
2  written guaranties given to one of its pension
3  plans were unenforceable?  Would professionals
4  in (inaudible) scorched-earth litigation
5  approach if an operating company managing its
6  cash resources received their accounts every
7  month for payment?  And I would submit to Your
8  Honor that it shouldn't be any different in the
9  case of a liquidation just because there
10  happens to be no client and a large pot of
11  money.
12          In the letter that was sent to
13  Judge Gross on December 22 by the Monitor,
14  which is found at Tab P of the U.S. debtors'
15  motion record, the Monitor suggests that the
16  desire to curtail these representative witness
17  depositions is in order to obtain a strategic
18  advantage in the allocation litigation.  From
19  the perspective of the UK pension claimants,
20  there is simply no basis to that allegation,
21  and I would like to give the following
22  illustration.
23          As you heard earlier in the
24  submissions, the CCC supports the Monitor's

1  position on the necessity for further

2  depositions.  The CCC's proposed topics are

3  directed at the bondholders and are in

4  furtherance of the CCC's alternate allocation

5  position, which is a pro rata (inaudible)

6  division.  The CCC's alternate allocation

7  position, which is the pro rata distribution,

8  is actually the primary allocation position of

9  our clients, as set out in the allocation

10  pleadings.  There is absolutely no strategic

11  advantage to our client in trying to curtail

12  efforts by the CCC to pursue any information in

13  the court (inaudible) its pro rata equitable

14  allocation.  The reality is that our client

15  simply doesn't believe that there is any

16  corresponding benefit to be gained in incurring

17  the extraordinary costs involved in undertaking

18  that process.

19            So finally, Your Honor, in

20  response to your question why now are costs

21  suddenly an issue, the only response to that is

22  that if not now, when.  The parties have been

23  virtually buried in a litigation schedule

24  involving depositions on many continents.  And

1  in further answer to your question as to

2  whether this can't be addressed by way of cost

3  sanctions, that goes directly to the submission

4  on the economic interests of the parties.  It

5  can't be addressed by cost sanctions because

6  most of the parties in this proceeding are not

7  paying their own costs.  Most of the parties in

8  this courtroom are funded out of the very funds

9  that are the creditor recovery.  So a cost

10 sanction to try and control this subsequently,

11 in my respectful submission, is just not

12 available in this case.

13            So subject to any questions that

14 you or Judge Gross may have, those are my

15 submissions.

16            CANADIAN COURT:  Thank you.

17            Mr. Swan.

18            MR. SWAN:  Good afternoon, Justice

19 Morawetz, Judge Gross.  It is Richard Swan, on

20 behalf of the informal noteholder group.  We

21 have filed a factum which sets out our position

22 in some detail.  I am going to refer to two

23 paragraphs of it, so I would ask that you turn

24 it up.  It has a white cover.



1               CANADIAN COURT:  I actually have

2    two, so I will look at both at the same time.

3               MR. SWAN:  Perhaps you have Judge

4    Gross's copy.  I don't know.  I am going to

5    refer to paragraphs 23 and 25.  And let me

6    begin by saying that the noteholder group

7    supports the position of the U.S. debtors to

8    dispense with representative witness

9    examinations.  They are unnecessary, and that

10   point is made (inaudible) when one looks at the

11   topics that are going to be examined upon.

12               And if you look at paragraph 23 of

13   the noteholders' factum which summarizes --

14   this is the stripped-down or supposedly

15   stripped-down list of five topic areas -- you

16   will see that all five of those topic areas

17   seek the broad, overarching question of please

18   tell us all facts and all information upon

19   which you rely in respect of the (inaudible)

20   issues that are listed.  In other words, this

21   is going to turn into not only eight days of

22   examination but weeks of an undertaking-answer

23   process and a safari of hundreds of lawyers or

24   dozens of lawyers through documents and

1  depositions to list facts and documents and

2  evidence relied on.  And just when that process

3  is finished or perhaps even before it is

4  finished, the parties will be called on to file

5  their trial briefs that set out much of this

6  information, set out all of the positions,

7  include affidavits.  This is a completely

8  unnecessary undertaking.

9           And it is interesting when one

10  looks at the response to the (inaudible)

11  questions that were (inaudible) the U.S. debtor

12  to the Monitor, to the CCC, that Ms. Block took

13  you to, they objected to virtually everything

14  as being irrelevant and unnecessary.  You can't

15  have it both ways.

16           Now, let me address specifically

17  the fact that these five questions or these

18  five topics, because they are much more than

19  questions, are addressed at the noteholder

20  group.  The noteholder group was formed after

21  this proceeding began, and no one in the

22  noteholder group could possibly have any

23  information about any of the underlying

24  firsthand knowledge.  There is just nothing

1    that could be sought from our client on which

2    they would have any firsthand knowledge here.

3    So really this is just a fishing question and a

4    facts and documents.

5           Let me turn now to paragraph 25 of

6    the noteholders' factum, because the CCC and

7    the CCC alone (inaudible) the Canadian debtor

8    have sought to add the additional topic of the

9    noteholders.  And let me turn to those, because

10   it is apparent that there could be no useful

11   information obtained on any of these topic

12   areas.  The first listed in paragraph 5(a) is

13   the terms of the bonds, including the

14   guaranties of the bonds, and the

15   enforceability --

16           CANADIAN COURT:  Mr. Swan, I will

17   reiterate again we have read the material.

18   There is no need to read paragraph 25.

19           MR. SWAN:  I won't read it.

20           CANADIAN COURT:  We have the point

21   made to date.

22           MR. SWAN:  So with respect to

23   25(a), that's a legal question.  What are the

24   terms of the trust indentures and the

1    guaranties?  Nothing could be obtained from a

2    witness on that point, and they say what they

3    say.

4              The second topic area (inaudible)

5    relates to the expectation of the noteholder

6    group with respect to assets available and

7    priority.  Well, it is difficult to conceive

8    specifically how the expectations of a

9    particular witness in terms of recovery would

10   be relevant to an asset allocation exercise

11   between estates.  It just couldn't bear any

12   relevance in terms of the matter that is

13   asserted.

14             And there is a reference in the

15   noteholders' pleadings to bargained-for

16   (inaudible).  But all that that refers to are

17   the terms of the trust indentures and

18   guaranties.  Those are the bargained-for

19   (inaudible).  So there is nothing to be gained

20   by any examination on these subject areas.

21             And the final group are the claims

22   asserted by the bondholders group.  Well, this

23   isn't a trial to determine the validity of the

24   bondholders' claims.  No one has challenged

1   those claims, by the way.  This is an

2   allocation trial, and the claims could bear no

3   relevance to any allocation.

4              Included within this is a request

5   to determine the acquisition price and

6   acquisition dates of the notes by specific

7   noteholders.  What possible relevance could

8   that information have to an allocation trial?

9   It could not.  And it is sought for the purpose

10  of creating a bit of a scene, a moment of some

11  drama, if they could.

12             And I should say that aside from

13  the fact that it is simply not relevant, there

14  is extensive public information available in

15  terms of what prices bonds were trading at over

16  the entire period.  So there is nothing to be

17  gained by this further exercise.

18             So in my respectful submission on

19  behalf of the noteholders, there is nothing

20  material nor relevant and certainly nothing

21  proportional to be gained from any further

22  examination here, and for that reason, the

23  noteholders support the U.S. debtors' position

24  that the representative witness examinations

1   should be dispensed with.

2                    And I note that Ms. Miller, on

3   behalf of the UK pension parties, specifically

4   acknowledged that they saw -- even though they

5   assert a substantial consolidation position,

6   they see no benefit from the further questions

7   that the CCC or topic areas (inaudible) in

8   relation to substantial consolidation, so there

9   is some relevance to be gained from it.

10                   CANADIAN COURT:  Okay.  Thank you.

11                   MS. KIMMEL:  Your Honor, Judge

12  Gross, I will endeavor to proceed (inaudible)

13  with respect to not rehashing things that are

14  in the materials.  I just want to try to

15  respond to some of the things that were said

16  this morning.  I think --

17                   CANADIAN COURT:  Well, (inaudible)

18  Ms. Block's submission.  What she was able to

19  do was not just take into account (inaudible)

20  comments around those written submissions.  And

21  obviously, what she said should be the focus of

22  where you should go.

23                   MS. KIMMEL:  Yes, and that is my

24  intention.  Thank you.



1              We all agree that there is a

2     unique hybrid procedure that we are dealing

3     with here that involves a series of U.S.-style

4     depositions which the parties have agreed are

5     trial evidence, subject to designations and

6     objections.  But this hybrid procedure also

7     includes material Rule 31 discovery.  And the

8     parties have conducted themselves until now

9     with the expectation that that is the way the

10    case is going to unfold.

11             And the distinct objectives of

12    Rule 31 Ontario discovery, Rule 31 discovery,

13    are embodied in the deposition protocol that we

14    have.  And I am going to ask Your Honor to turn

15    that up, and Judge Gross as well if you have

16    it.  It is, among other places, in the

17    responding motion record of the Monitor and the

18    Canadian debtors at Appendix B.

19             CANADIAN COURT:  Which one is

20    that?

21             MS. KIMMEL:  It is Appendix B,

22    which is a court order of this court attaching

23    the deposition protocol, and then motion record

24    page 84, typed page 14 (inaudible), which is

1   the deposition protocol.  Would you like an

2   extra copy, Your Honor?  We have it.

3              CANADIAN COURT:  That would

4   probably be better.  We appreciate that not all

5   of these filings came in on time.  I don't know

6   whether this one did or didn't.

7              MS. KIMMEL:  So when looking at

8   the hybrid procedure that has been agreed to,

9   and just so that everyone has it securely in

10  front of them, Section G of the deposition

11  protocol contemplates representative party

12  depositions/examinations for discovery under

13  Rule 31 of the Ontario Rules of Civil

14  Procedure.  And it speaks of how they will be

15  conducted, and it provides for four

16  subparagraphs.  The first one deals with what

17  my friends opposite keep referring to as

18  gap-filling at least at some level, and that is

19  the parties agreed to take into account all

20  that has happened previously in the depositions

21  and the pleadings and then determine if there

22  were a limited number of subjects where there

23  had not been adequate firsthand deposition

24  testimony.  And it sets out a procedure for

1   delivery and exchange of those topics and for

2   objections, including a meet-and-confer to

3   discuss the objections, to try to narrow the

4   subjects, and only if necessary to come to the

5   Court.  And that is all provided for in

6   subparagraph 1(a) of Section G of the

7   deposition protocol.

8            Now, what has happened here is

9   that we have been stalled because rather than

10  dealing with the omnibus objections that all

11  parties have served on each other with the

12  usual (inaudible) language, the parties moving

13  here today have decided that they would like to

14  seek relief dispensing with these examinations

15  altogether.  So we haven't yet (inaudible)

16  through the rest of this protocol for

17  (inaudible) objections, in my submission.

18           Now, more importantly, for the

19  purposes of today, I think the Courts should

20  (inaudible) directed specifically to the next

21  page, which is at subparagraph (c).  This is

22  the part of the deposition protocol that isn't

23  mentioned in any of the affidavits that were

24  filed by the moving parties and that the

1  Monitor says (inaudible) the full answer to

2  much of what they have submitted to these

3  Courts.  What the protocol says in Section (c)

4  is that the discovery participants shall not be

5  limited in their examination of the

6  representative witness to the noticed subject,

7  the gap-filling subject.  That is not the full

8  extent of these discoveries.  What it goes on

9  to say is that the representative witness does

10  not have to prepare, and then it provides for

11  the (inaudible) undertakings in Section (d).

12         Now, why that is important is tied

13  into the purposes of discovery, which is amply

14  demonstrated in (inaudible) that we have put

15  before the Courts, and that is that discovery

16  is about learning the position of the other

17  side, obtaining admissions, being entitled to

18  ask questions about legal theories and

19  positions that have been pleaded, and all of

20  that is embodied in our deposition protocol,

21  Section G.

22         And it is the position of the

23  Monitor and the Canadian debtors, to answer

24  your question, Your Honor, we do not share the

1  view that the depositions to date have fully

2  achieved the objectives that were set forth not

3  only in Section G of the protocol but that are

4  recognized under the Ontario rules.  And

5  specifically, what we are missing here is the

6  bridge.  We have bookends.  We have the

7  depositions.  We have a clear directive and

8  understanding among all the parties that we are

9  to take those into account in determining what

10  needs to be (inaudible) on the discoveries.

11  And then we have the trial briefing process,

12  with experts, affidavits, submissions.

13              What is supposed to happen

14  (inaudible) is the Ontario Rule 31 opportunity

15  to get (inaudible) the will inform the evidence

16  that we will be filing, that will inform the

17  expert reports, and that will allow us to

18  narrow the issues for the Courts.  That is what

19  we are trying to do.  We need the bridge to

20  complete that process efficiently and

21  effectively, and it is entirely consistent with

22  what the parties contemplated (inaudible) and

23  the Ontario (inaudible) contemplate as well.

24              Now, I did submit a case which I

1   think --

2             CANADIAN COURT:  Before you go to

3   that, one of the points that Ms. Block and

4   others made was that at the time the protocol

5   was developed, it was not known how many fact

6   witnesses would (inaudible), which was 99

7   percent, 108.  Does that not change things?

8   Does that not impact on what could possibly be

9   out there?

10            MS. KIMMEL:  Well, there is two

11  answers to that.  The first is that that is not

12  entirely (inaudible) in that when this

13  deposition protocol was agreed to in August,

14  the parties had already noticed over 110

15  witnesses for deposition.  And while some

16  people may be surprised that we actually

17  completed that, I don't think that it is fair

18  to say that everyone is.  And we certainly were

19  back to the Court two or three times in the

20  intervening period with reports, to my view,

21  that we were making good progress in an effort

22  to complete those depositions, and we were very

23  successful.  But the idea that it wasn't

24  contemplated is not an accurate



1    characterization, because all -- over 110

2    depositions had been noticed before we even

3    came to the Court with this deposition

4    protocol.  And so while someone may say, well,

5    they were surprised they were all completed, we

6    cannot say that it was not within the

7    contemplation of the parties that it would be.

8              The other important (inaudible) is

9    actually in the deposition protocol as well as

10   under our rules, and that is if you turn to

11   page 85 of the record, page 16 in the

12   deposition protocol, paragraph 4.

13             THE COURT:  Yes.

14             MS. KIMMEL:  Everybody recognizes

15   in this room prior case law, and it wasn't

16   clear under the case law (unaudible) stated

17   expressly in this protocol that the depositions

18   do not serve the same purpose as discovery.

19   The depositions are stated in here to be

20   separate from the representative party

21   discovery.  If you read the last sentence of

22   paragraph 4, representative depositions must

23   occur separate from fact depositions.  And why

24   is that?  Because (inaudible) have the same

1    functional purpose (inaudible).

2                    In this case we concede that the

3    depositions will count as trial evidence.

4    Anybody can use them as their trial evidence,

5    subject to rulings on objections.  That governs

6    and actually instructs counsel into how to ask

7    questions, what questions to ask, what

8    questions not to ask of a fact deposition

9    witness.

10                   Another point that has been made

11   that is an important distinction is that fact

12   deposition witnesses are not obliged to answer

13   questions outside of their direct knowledge.

14   So a fact deposition witness can't be asked

15   about (inaudible) positions.  And, in fact, we

16   noted in our report that objections were made

17   in the course of the fact depositions where

18   parties were being asked about positions as

19   opposed to matters within their knowledge.

20                   I am jumping ahead a little bit

21   because this is a good place to make the point.

22   You heard from the noteholders and the UCC that

23   their representatives don't have any direct

24   knowledge, and that is, in fact, illustrative

1   of why you needed discovery of them.  You can't

2   depose them -- in fact, they refuse to be

3   deposed -- on the basis of what they were told

4   directly, but you can ask them what they rely

5   on, what supports the contention in their

6   joinder of the affirmative pleadings that we

7   set out in our schedule.

8               And so there is a distinction

9   between these two different types of

10  examinations.  It has been respected in the way

11  in which the depositions were conducted, and it

12  further reinforces why we need the limited

13  discovery that we have provided for in the

14  protocol.

15              Now, there is one case that I want

16  to direct Your Honor to, if you have our brief

17  of authorities.  It is the brief of authorities

18  of the Canadian debtors and the Monitor, and it

19  is the case at Tab 3.

20              CANADIAN COURT:  Do you have a

21  page number?

22              MS. KIMMEL:  It is starting at

23  page 20 of that case, which is Andersen and

24  St. Jude's Medical --



1               CANADIAN COURT:  Are those pages

2   numbered in the --

3               MS. KIMMEL:  In the record?  I

4   don't believe the brief of authorities has a

5   continuous page number.  Mr. Armstrong has an

6   extra copy, if you would like, Your Honor.

7               CANADIAN COURT:  Thank you.

8   (inaudible) together in accordance with the

9   protocol (inaudible).  I don't know if there

10  will be a next time (inaudible)

11              Andersen, was it?

12              MS. KIMMEL:  Andersen vs. St. Jude

13  Medical.

14              CANADIAN COURT:  Tab 3?

15              MS. KIMMEL:  Yes.  So what I would

16  like to do is make a couple of illustrative

17  points about Ontario discovery and how it

18  briefly aligns with what it is that we are

19  seeking to do in this case and that was

20  provided for in our protocol.

21              This of course, is a class action

22  where there was some motion practice in advance

23  of the trial of common issues.  And what I

24  would like to direct you to at first is

1   paragraph 57, dealing with a series of

2   different questions that were being objected

3   to.  I commend just (inaudible) paragraph 16,

4   which actually is a very good overview of the

5   recognized purposes of discovery in Ontario,

6   which, in fact, embraced some of the objectives

7   that Mr. Bromley was speaking of this morning.

8                    CANADIAN COURT:  Which paragraph?

9                    MS. KIMMEL:  That was paragraph

10  16.

11                   CANADIAN COURT:  16; okay.

12                   MS. KIMMEL:  But where I would

13  like to take Your Honor for illustration is

14  paragraph 57.

15                   CANADIAN COURT:  I am at 57.

16                   MS. KIMMEL:  So one of the

17  requests that was being asked on this motion

18  and that the Court ruled upon was if you read

19  at the beginning of paragraph 57, Question

20  600(b), the plaintiffs are asked if they have

21  any information from Dr. Butany other than what

22  is in his deposition transcript, his articles

23  and the production.  And this particular

24  witness was a fact witness.  He was also an

1   expert, and he had been examined previously in

2   the case.

3            And what the Court said here is

4   that "While the defendants are not entitled to

5   know directly if the plaintiffs had interviewed

6   him, this question as articulated," which I say

7   is by way of analogy similar to many of the

8   questions my friends opposite complain about,

9   "this question is proper.  It does not require

10  the plaintiffs to cross-reference all of the

11  productions but simply to turn their minds to

12  whether they have any substantial and relevant

13  evidence from him that is not already disclosed

14  in these sources."  And then they go on to talk

15  about (inaudible).

16           And I do this by analogy because

17  although I concede that this is something that

18  should be part of the meet-and-confer that will

19  follow if the representative party discovery is

20  to continue, as we hope it will, it isn't

21  correct to say that you can't ask someone do

22  you have any other information.  People make

23  assertions in pleadings and are expected to

24  have some idea of what it is that they were

1    (inaudible) on when they made them and/or

2    (inaudible) in the course of the case.  And

3    this isn't a case of solicitor's work product.

4    It is not a case of pens down or anything like

5    that.  It is a proper line of questioning under

6    Ontario discovery practice.

7                 Another proper line of discovery

8    is illustrated in this case in paragraph 65 on

9    page 22.  So (inaudible) equate that first

10   (inaudible) to the gap-filling, tell us if you

11   have anything else that hasn't already been

12   disclosed.  Paragraph 65 (inaudible) directive

13   of Ontario Rule 31 of discovery doesn't have

14   under our protocol, and that is the question as

15   asked was to identify what warning (inaudible)

16   had been given based on a pleading that had

17   been made.  And the plaintiffs (inaudible) to

18   this because they said it is not asking for

19   factual evidence but rather for the plaintiffs'

20   position or theory.  And after you skip over

21   the (inaudible) about (inaudible) having a

22   reasonable interpretation of discovery

23   questions, which is what I would (inaudible) is

24   part of our meet-and-confer process, it goes on

1   to say that "The plaintiffs assert a

2   (inaudible) duty to warn, and it is not

3   unreasonable to ask the plaintiff how it

4   contends the warning should have been given and

5   in what form.  As well the defendants are

6   entitled to plaintiffs' legal theory.  The

7   question is to be answered."

8              In my submission, this is exactly

9   the type of question that is contemplated by

10  subparagraph (c) in Section G of the protocol

11  that I took Your Honor to earlier.  These are

12  the bridges that we need to inform our trial

13  evidence.

14              And I now just want to deal very

15  briefly with the question of proportionality.

16  In my submission, proportionality has been

17  built into the deposition protocol already.

18  This proportionality doesn't mean that you

19  don't get any discovery in a (inaudible).

20  There is no authority that my friends put

21  forward to support that contention.  In my

22  submission, although there have been over 100

23  depositions, they are not (inaudible) answers

24  that have been adopted by any party thus far,

1    and we are entitled to explore whether they are

2    prepared to (inaudible) answers of their former

3    employees.  We are entitled to seek the

4    admissions that we want or that we can, and we

5    are entitled to explore their (inaudible).

6              Why do I say proportionality has

7    been built into the discovery part?  And I am

8    using discovery in the Ontario Rule 31 sense,

9    but the discovery part of our protocol is that

10   it has been limited to seven hours on the

11   record per party on an (inaudible) allocation

12   within each of the discovery groups.

13             Now, my friends suggested that it

14   is eight days.  It is actually less because I

15   presume that the U.S. debtors and the EMEA

16   debtors don't need to examine each other on

17   claims.  But the number of days is limited in

18   the sense that, taking the position of the

19   Monitor and the Canadian debtors, we get

20   (inaudible) to conduct an examination of the

21   U.S. debtors on these types of issues and seven

22   hours plus some time that is built into the

23   November 19 order with respect to the EMEA

24   debtors.  This is not a 69-day discovery, like

1    Livent.  This is a limited bridge which takes

2    into account, to the extent it can, what has

3    happened before and informs what is to follow.

4                    Now, I just want to come to one

5    last point, which is what do we want.  We want

6    the opportunity to conduct this examination,

7    and we respectfully submit that the way that

8    should be (inaudible) given where we are today

9    is that the motion should be dismissed, that

10    the parties should be directed to meet and

11    confer, as the deposition protocol requires we

12    do, to try to work through the objections in a

13    meaningful way.  We have started that process.

14    At Appendix K we tried to articulate how the

15    questions or subjects would be addressed that

16    we received.  And then the parties should

17    attempt to work out a schedule that will allow

18    this to occur before the rebuttal reports of

19    experts, (inaudible) which is on February 28.

20    And in my submission, that can be done.

21                    We can, given the opportunity for

22    undertakings, if we complete the representative

23    party discoveries by the end of the week of

24    February 3, whatever undertakings are given can

1  be completed, and all of that can inform the

2  last round of experts (inaudible) and then can

3  still be used to inform the trial evidence.  So

4  in my submission, the comments from some of the

5  other counsel that we don't have time, in my

6  submission, we do have time, and that the

7  parties should be directed, as the November 19

8  order requires us to do, to meet and confer to

9  try to work out a schedule that will allow

10  (inaudible).

11          We have also offered to do this in

12  writing.  If the other parties want to work on

13  a proposal to deal with written as opposed to

14  prepping witnesses for oral (inaudible), we are

15  very much open to that as part of our meet-and-

16  confer process as well.

17          And so I will, to avoid taking any

18  more of the Courts' time, I will simply commend

19  you the appendix that we included in our

20  schedule, which attempts to provide the very

21  (inaudible) context in which the question

22  (inaudible) focused on for purposes of these

23  discoveries (inaudible) at Appendix A, Appendix

24  1 of our packet.  What we have done is we have

1  taken the five by example.  And these topics

2  are no different than the original.  They were

3  all in the original (inaudible).  We have just

4  reduced the list for the purpose of this

5  exercise.  If you look at Appendix 1, the very

6  first one is the one that Ms. Block used by way

7  of example and that others have as well, and

8  that is, we have asked about facts and

9  documents demonstrating the understanding of

10  equitable and beneficial ownership or equal

11  economic ownership.  And we have shown you

12  where those phrases are used in the case.  And

13  the question is tell us what is your

14  understanding of what you (inaudible).  And we

15  have provided the references to the pleadings

16  in the chart.  Your Honor, would you like to

17  have --

18              CANADIAN COURT:  I have actually

19  made some notes (inaudible).  Okay.

20              MS. KIMMEL:  What is important

21  about this question is the part of this that my

22  friends glossed over when they were (inaudible)

23  to you about it, and that is that the question

24  when you read it says, "The facts and documents

1    other than the MRDA demonstrating the

2    understanding of the phrase" -- and I won't

3    read all of it into the record -- "used in the

4    U.S. allocation (inaudible)."  For reference we

5    have also given you the (inaudible) in the EMEA

6    pleadings as well, which have been, of course,

7    adopted by joinder by the UCC and the

8    noteholders.

9              And in our submission, this is an

10   entirely appropriate line of inquiry.  It is

11   consistent with the objectives and the

12   protocol.  And to the extent that my friends

13   (inaudible) about some generality in here,

14   that's what the meet-and-confer process is

15   intended to accomplish.

16             I can do that for all of the

17   examples, but I won't, because I don't want to

18   take the Courts' time, and that's why we have

19   included that in the charge.

20             I will make one comment about the

21   questions for the UKPC which are in the last

22   charge in Part 5, because their questions are

23   different.  We have provided detailed references

24   to their pleadings that give rise to these

1  questions, and I can tell you that they are

2  factual underpinnings (inaudible) matters that we

3  can expect the experts will be dealing with.  And

4  in our submission, they are entirely appropriate.

5  But I draw those to the Courts' attention because

6  they are a little bit different than the ones

7  that you see in the charts for the other parties.

8                    CANADIAN COURT:  This is page

9  (inaudible)?

10                    MS. KIMMEL:  It starts at page 16,

11 Part 5.  And just to close out on the claims

12 questions for the EMEA entities, I am going to

13 allow Mr. Barnes to speak to the particular

14 example that we have brought in the chart that

15 pertains to the (inaudible) but also very

16 clearly pertains to the Monitor and Canadian

17 debtors as well.

18                    The issue with the EMEA claimants

19 is simply the same but exacerbated, because the

20 allocation (inaudible) are the same.  But we

21 then have to contend with 24 claimants who have

22 made very general claims, (inaudible) claim,

23 many of whose representatives have not been

24 examined even from a fact deposition

1  perspective.  But regardless, given the

2  ten-year span of doubtful insolvency that is

3  the underpinning of their case, to say that we

4  have had an opportunity to examine on every

5  single one of these issues for every single one

6  of these claimants, I don't think -- you didn't

7  hear that submission from them and they

8  couldn't possibly make it.

9         There is a lot of ground that

10  needs to be focused on the EMEA claims, and we

11  would like the opportunity, as the protocol

12  contemplates, for us to do that.  And

13  Mr. Barnes will speak more specifically by way

14  of illustration on one or two points that we

15  highlighted in the chart.  For your reference,

16  it is under the exemplary for NNUK that begins

17  on page 10 and 23, and it is Question 21.

18         And unless the Court has any

19  further questions arising from the submissions

20  of others are my own that (inaudible) to

21  address, I will turn to Mr. Barnes.

22         CANADIAN COURT:  Thank you.

23  Mr. Barnes.

24         MR. BARNES:  Thank you, Your



1  Honor, Judge Gross.  Justice Morawetz, I am

2  just going to hand up to you the motion record,

3  which is an extra copy of the affidavits.  It

4  is identical, but you have may have seen from

5  the covering note that Ms. Putnam was

6  traveling, so unfortunately, she was unable to

7  execute it until the weekend.

8           First of all, I adopt the

9  submissions of my friend Ms. Kimmel and am

10  supporting her position that the motion to

11  dispense with the representative examination be

12  dismissed.

13           Now, let me remind both Courts, my

14  clients are in a unique position.  You have

15  heard other --

16           CANADIAN COURT:  (inaudible).

17           MR. BARNES:  Well, let me tell you

18  the distinct position that they are in.  They

19  are the only individuals before this Court that

20  are being sued personally for $9 billion.  They

21  are personally liable.  There is a broader

22  dispute about allocation.  There is a broader

23  dispute about entitlement.  But these

24  individuals are personally liable if the claims

1   succeed against them.

2            The 21 EMEA debtors filed proofs

3   of claim against the D's and O's.  Each of the

4   claims follow the standard format.  The EMEA

5   debtors refer to allegations of breach of duty

6   asserted against NNI or -- pardon me -- NNC and

7   NNL and says that certain of those allegations

8   lie against the drafters.  The impugned act or

9   omissions are not identified.  In fact, the

10  individuals are not identified.  And we are

11  told that the claims are developed.  And you

12  will see this if you look at page 98 of my

13  book.  I would just ask you just to note that

14  in the margin that you will find what I have

15  said in paragraph 5 on page 98, the last full

16  sentence in paragraph No. 5.

17            CANADIAN COURT:  Yes.

18            MR. BARNES:  Certain of these

19  claims -- they don't tell us which ones, but

20  certain of these claims relate to the conduct

21  of my clients.  We then go over and we find in

22  paragraph No. 7 that the claims are still being

23  investigated and pending further investigation,

24  they cannot specify the names of the

1  (inaudible) officers and directors that are

2  implicated.  So a director by reading a proof

3  of claim is unable to ascertain whether he or

4  she is having a claim asserted against them,

5  and if, in fact, a claim is being asserted

6  against them, what is the nature of that claim.

7          Subsequent to the delivery of this

8  proof of claim, there was an exchange of

9  written interrogatories.  And those were

10  interrogatories that once again provide little

11  guidance on which individual directors are

12  being targeted and whether, in fact, additional

13  claims are, in fact, being asserted.

14          So with that in mind, prior to the

15  start of the depositions, it was agreed that

16  there would be two types of depositions -- you

17  have heard about that -- the factual

18  depositions and the representative depositions.

19  And on behalf of my clients, we participated in

20  a very limited number of fact depositions

21  where, in fact, my clients were being deposed

22  as personal defendants.  So if you think about

23  it, examining my clients with respect to

24  personal liability and my clients are being

1   bound by those answers because they are

2   individuals.

3             Given the fact that we were doing

4   two types of depositions, asking a fact witness

5   what the theory of the EMEA claim might be and

6   what director they think they targeted would

7   not be a particularly useful exercise, because

8   it would be speculation on the part of the fact

9   witness and not binding on the EMEA entity.

10            So we have been told by EMEA that

11  they are developing their theory of the case

12  against my clients during the discovery

13  process, and now is the time for us to be

14  entitled through the representative process to

15  find out what that case is, if, in fact, there

16  is a case, so a defense can be mounted.

17            And as I think was stated by

18  Ms. Kimmel, in November of 2013 before the

19  Court (inaudible) 70 depositions have been

20  concluded.  And one of the (inaudible) was to

21  allow for these representative examinations to

22  be proper preparation.  It wasn't until

23  December 11 that there was any suggestion that

24  representative depositions were going to be

1   dispensed with.

2            Now, I don't think there is any

3   disagreement.  I heard Mr. Gottlieb use these

4   words.  But the first principle of discovery is

5   to know the case that you have to meet.  And

6   that's really what I am here asking you for.  I

7   don't even know what directors are being sued.

8   I act for a number of directors who served on

9   different boards at different times, attended

10  different meetings, and had different levels of

11  knowledge.  Litigation in this jurisdiction and

12  I am sure in the U.S. is not supposed to be a

13  puzzle.  I am not supposed to have to plow

14  through 120 depositions and try and figure out

15  what it is somebody may have done wrong.

16            And my friend Ms. Block relies on

17  the Livent case, and I ask you to look at

18  paragraph 39 of that case.  It is (inaudible)

19  even when Master Short (inaudible) recognizing

20  the (inaudible), which is a very important

21  distinction from what is being brought before

22  you.  The fact depositions in this case do not

23  bind the EMEA entities.  Master Short was

24  dealing with a deposition (inaudible) of

1  discovery.  It did bind the parties.  That was

2  a case as to whether (inaudible).

3              But if you look at paragraph 39 of

4  Master Short, he said, "In my view this type of

5  response more than satisfies the need to

6  provide a summary that contains a fair degree

7  of detail addressing the normal journalistic

8  questions related to who, what, where, when,

9  why and how."  (Inaudible) I don't even know

10  who, let alone the rest of them.

11              And so what I am asking for, and

12  as I state, to embark on this exercise I have

13  got to go to 120 depositions and ask everybody

14  to speculate on what EMEA has in mind when 29

15  entities filed claims against, you know, 200

16  directors and officers which (inaudible) boil

17  down (inaudible) because (inaudible) employees

18  (inaudible) more limited number don't know much

19  about anything that they are complaining about.

20              So then we talk about

21  proportionality (inaudible) before we can talk

22  about it in terms of Mr. Gottlieb, which he

23  says which is more beneficial or less

24  beneficial.  There can't be anything more

1  prejudicial than a group of people that have

2  been sued for $9 billion and not have an

3  understanding of the case that they have to

4  meet.  People talk about, well, we are going to

5  be making (inaudible), we are getting

6  affidavits.  We can't even (inaudible) the

7  foreign solicitor to inquire about foreign law

8  because we don't know what it is that is being

9  complained about.  So by denying these

10  representative examinations, in fact, any

11  suggestion that this is streamlining the

12  process (inaudible) to further delay.

13           So Ms. Kimmel took you to a page

14  in her factum that set out (inaudible) that we

15  are seeking answers to, and if I can ask you to

16  just turn that back up again.  And it was page

17  11 of Exhibit 1.  And I agree with Ms. Kimmel.

18  I mean, this is not intended to be an onerous

19  or burdensome task.  Surely if EMEA has a

20  legitimate claim against either the Canadian

21  debtors or against the D's and O's, (inaudible)

22  the type of question that is set out in page 11

23  in paragraph 29.  Identification of the

24  individual directors and officers against whom

1    claims are being asserted.  You either have a

2    claim or you don't have a claim.  And in

3    respect of each such individual, which

4    decisions, contracts, transactions or other

5    (inaudible) subject to the claims being made

6    against them.  Surely by this stage in the

7    litigation we should know the answer to those

8    questions.  And if they haven't gotten any,

9    then abandon them.  But we should be entitled

10   to know at this stage what the answers to those

11   fundamental questions are.

12                (Inaudible) basic tenet of

13   discovery could not be obtained from the fact

14   witnesses, for reasons that I have explained.

15   Everyone contemplated until December 11 that we

16   were going to have representative examinations.

17   And whatever you want to put on it, this is

18   gap-filling at its very basic level or whatever

19   nomenclature you put on it.  But it might be

20   gap-filling to know who is being sued and for

21   what.

22                So I think under any test, whether

23   proportionality or the beneficial test that

24   Mr. Gottlieb was referring to, these

1  representative examinations must proceed in

2  order to allow a proper defense to be mounted

3  to these claims.  As I say, my clients are

4  unique.  They have actual skin in this game,

5  and they want to be able to amount a proper

6  defense.

7            So for those reasons, I support

8  that the motion by Ms. Block should be

9  dismissed (inaudible) representative.  But I do

10 stress that I am, like Ms. Kimmel, prepared to

11 make this (inaudible) as long as I get the

12 answers.

13            CANADIAN COURT:  Thank you.

14            Mr. Rosenberg.

15            MR. ROSENBERG:  Thank you.

16            CANADIAN COURT:  You are carrying

17 a lot of material.

18            MR. ROSENBERG:  I do not --

19            CANADIAN COURT:  What can there be

20 left to say?

21

22            MR. ROSENBERG:  I don't want to be

23 the one separating us from this beautiful

24 winter day.



1                   Justice Morawetz and Justice

2    Gross, I am here on behalf of the CCC.  I

3    support the submissions of the Canadian debtors

4    and Monitor.  And more to the point, with

5    respect to their factum, Your Honor, as you are

6    aware, that we have two basic positions.  One I

7    will call the ownership position, that we are

8    consistent and on all fours with the Canadian

9    Monitor, and with respect to those submissions

10   of the Canadian Monitor we have an identical

11   position.  And I will be restricting my

12   submissions to two substantial factual matters

13   (inaudible).  And the second is our pro rata

14   case (inaudible) is our second allocation

15   (inaudible).  I also support the submission of

16   (inaudible) Mr. Barnes with respect to dismiss

17   this U.S. (inaudible).

18                   Your Honor, to get right to the

19   point, we have prepared our case on the basis

20   there will be representative discoveries.  My

21   friends opposite have talked about hurricanes,

22   safari (inaudible) a deluge of questions,

23   taking all the principles (inaudible).  We

24   believe everything that we have asked is

1    relevant or intend to ask will be relevant,

2    material and (inaudible), and more to the

3    point, Your Honor, motions determinative of the

4    validity or appropriateness of the questions we

5    have not yet asked.  All we are asking for is

6    the process we agreed to, the parties agreed

7    to, the Court approved, the Court (inaudible)

8    amended be stuck to.

9              Your Honor, I would like to take

10   you to our motion record, Tab C, that deals

11   specifically with the question of the CCC's

12   expectations with respect to these (inaudible)

13   discoveries, and in exchange --

14             CANADIAN COURT:  (Inaudible) Is it

15   on the same (inaudible) as Ms. Kimmel's

16   materials?

17             MR. ROSENBERG:  Oh, it is?  Oh, I

18   am sorry.

19             CANADIAN COURT:  Which number?

20             MR. ROSENBERG:  I point to page 89

21   to 91.

22             CANADIAN COURT:  (Inaudible).

23   Sorry.  The further you are away from the

24   microphone, the more feedback I get.



1          MR. ROSENBERG:  What I am looking

2  for is an email from Atara Miller, or in the

3  context of this email Miller Atara, dated

4  August 1 --

5          CANADIAN COURT:  Can you give me a

6  bit of a hint as to what is the number in the

7  top right-hand corner?

8          MR. ROSENBERG:  89, Your Honor.

9          CANADIAN COURT:  So it reduces the

10  exercise to 230 pages.  89.

11          MR. ROSENBERG:  To put this in

12  context, Your Honor, the CCC has always

13  expected and relied upon the opportunity to

14  examine corporate representatives.  This was an

15  exchange in August, prior to the fact

16  depositions, with the bondholders' counsel.

17  She is responding to Peter Ruby.  Peter Ruby

18  wrote to P&L on behalf of the Canadian

19  discovery group.  But these questions and the

20  affidavit in support (inaudible) states this.

21  These are CCC questions to the bondholders

22  about how this case is (inaudible) with respect

23  to documents, fact depositions, and these very

24  corporate or representative discovery

1  depositions we are talking about.  But

2  concurrently you will see the entire list is

3  aware of this debate.

4             And Ms. Miller on behalf of the

5  bondholders responds to our request that they,

6  given the interests of time, be asked for

7  documentation to be produced, fact witnesses to

8  be produced, and let's see what their response

9  is.  On the record with prejudice they say, "We

10  object to the inclusion of members of the Ad

11  Hoc Bondholder Group in your list of proposed

12  deponents.  The five individuals you identified

13  have no material knowledge relevant to this

14  litigation.  Their depositions would" --

15             (At this point the videoconference

16  connection to Canada terminated.)

17             THE COURT:  Let's take a

18  ten-minute break.

19             (Recess taken.)

20             THE COURT:  Thank you, everyone.

21  You may be seated.  Justice Morawetz, we are

22  back in our courtroom here, sir --

23             CANADIAN COURT:  Thank you, Judge

24  Gross.  And, Mr. Rosenberg, I am going to ask



1   you actually to do a little bit of a replay --

2              MR. ROSENBERG:  Yes, Your Honor.

3              CANADIAN COURT:  -- for Judge

4   Gross's benefit.  Apparently, you did get cut

5   off halfway through your submissions, and I

6   indicated to him that you were referencing

7   paragraphs I believe 89 and 90 in your

8   materials.

9              MR. ROSENBERG:  Yes.  Thank you,

10  Your Honor.  Judge Gross, I had taken Justice

11  Morawetz and your court originally (inaudible)

12  communication broke to page 89 of our motion

13  record, which is Exhibit C, the affidavit of

14  Barbara Walancik.  And to briefly summarize,

15  this is the email in August, August 1, 2013,

16  from Atara Miller at Milbank Tweed, the

17  bondholder representative, to Peter Ruby, at

18  Goodmans, on behalf of the Canadian (inaudible)

19  group, and it was with respect to certain

20  questions that were put or certain issues put

21  to the bondholders regarding -- and I should

22  say these are the cross-border bonds and

23  (inaudible) bonds, about $4 billion of bonds --

24  about fact deposition, document production, and

1  corporate or representative party discoveries,

2  the very issue in the motion today.  And

3  although it is addressed to Peter (inaudible)

4  these are -- and there is no dispute over

5  this -- questions of the CCC to the

6  bondholders, and they relate to directly to the

7  issues in this motion.  And in particular, it

8  is the CCC's position that we have always

9  anticipated these representative witness

10  discoveries, planned for them, and the first we

11  have heard that the bondholders won't appear is

12  in mid-December of 2013.

13          In advancing the protocol issues

14  in the litigation timetable, we asked for

15  production of fact witnesses, documents, et

16  cetera.  This is the bondholders' response.

17  "We object to the inclusion of members of the

18  Ad Hoc Bondholder Group in your list of

19  proposed deponents.  The five individuals you

20  identified have no material knowledge relevant

21  to this litigation.  Their depositions would

22  waste valuable time and resources of all

23  parties.  (inaudible) information that the Ad

24  Hoc Bondholder Group has that may be relevant

1   to this litigation can be obtained through the

2   deposition of a corporate representative, which

3   notice we will respond and object to in due

4   course."  I will just stop there.

5               This motion is not to determine

6   whether questions are valid or not valid.  The

7   purpose of this motion is whether these

8   corporate representative discoveries will

9   proceed at all.  And since August we have

10  (inaudible) on the basis we would have a chance

11  to examine a corporate representative of the

12  bondholders.  And just to make that point

13  clear, they want $4 billion (inaudible)

14  principal, interest and other relief

15  (inaudible) billions (inaudible) property

16  around the world.  They are a material

17  participant.  Their position is in this email

18  they have no fact witnesses to be deposed.  In

19  fact, none were deposed, no bondholder

20  representative of the 100-plus that you have

21  heard about.

22               Going on, Ms. Miller states the

23  bondholders' position is as follows:  "We

24  further object to the CCC's addendum insofar as

1   it purports to request a witness from each of

2   the Ad Hoc Bondholder Group concerning the same

3   topics that were subject of the CCC (inaudible)

4   document request.  As the CCC knows, we

5   objected to its document request on a variety

6   of grounds, as set out in our Notice of

7   Objection.  We object to any depositions on

8   this topic on the same ground."

9           Again, (inaudible) no bondholder

10  representatives were produced during these fact

11  depositions.

12          Ms. Miller goes on to say, "To be

13  clear, as we have reiterated for months, the Ad

14  Hoc Bondholder Group will not produce, either

15  via document productions, deposition or

16  otherwise, any information concerning the

17  holdings of its members beyond what is required

18  by the Federal Rule of Bankruptcy Procedure

19  2019.  We will not make available any witnesses

20  to testify on these topics."

21          The email (inaudible) deal with it

22  in the corporate representative discoveries are

23  to take place.  Your Honor, that is when we are

24  dealing with it.

1                    I would like you, if you have it,

2     to turn up -- I have taken it from Ms. Block's

3     motion record.  I want to take the Court to

4     (inaudible) we are asking -- or excuse me.

5     Issues or subjects (inaudible) on these

6     representative depositions.  If you have

7     Ms. Block's motion record before you, if you

8     turn to Tab A, the first 12 or 13 pages are the

9     affidavit of Mr. Rosenthal.  Then if you turn,

10    Exhibit A is a Hughes Hubbard letter, and then

11    we get to the actual subjects for the

12    representative witnesses.  And on page 2 to 5

13    is the U.S. subjects, and page 6 are the

14    bondholders.

15                    I may be able to find it for you

16    very quickly, Your Honor.  Unfortunately, the

17    record itself is (inaudible).  Here it is.  Tab

18    C.  Excuse me.  Tab C.

19                    CANADIAN COURT:  All right.

20                    MR. ROSENBERG:  And if you turn to

21    page 2, you will see subjects for the

22    representative witnesses of the U.S. debtors.

23    And just to foreshadow where I will be going

24    next, page 6, subjects for the ad hoc group of

1  bondholders.

2           Judge Gross, I am not sure when I

3  was cut off.  I have to (inaudible) that we

4  adopted the Canadian Monitor's and Mr. Barnes'

5  submissions.  The CCC has two allocation

6  positions.  With respect to the IP (inaudible)

7  position, our submissions are identical to the

8  Monitor.

9           Now only dealing with the

10 bondholder issues and our so-called pro rata

11 case, your Honor, you will see that at the top

12 of page 2 it says subject for the

13 representative witnesses of the U.S. debtors.

14 "The Canadian Deposition Group provides notice

15 that the Representative Parties are" quote

16 "expected to have informed him or herself of

17 the relevant facts, including documentary

18 support," et cetera, "with respect to these

19 issues," not questions or subject matter.

20           I would like to turn to page 4,

21 Question 25.

22           CANADIAN COURT:  25.

23           MR. ROSENBERG:  This is

24 simplistic, but let's assume Questions 1



1  through 24 are the IP case.  In terms of

2  proportionality and pro rata case, we have

3  asked the U.S. estate, quote, "the facts and

4  documents demonstrating the estimated gross and

5  (inaudible) of the estate available for

6  distribution to creditors without recourse to

7  the allocation (inaudible) the best estimate of

8  valid claims by creditor category against the

9  estate, excluding intercompany (inaudible)."

10  There are a couple of requests (inaudible).

11           For the benefit of the Court, I

12  (inaudible) asked all of the EMEA countries the

13  exact same question.  There is Slovenia,

14  Finland, France, the UK, Greece, Europe,

15  (inaudible).  I am not going to take you to the

16  pleading.  If Mr. (inaudible) wants to call our

17  case a sub con case, a pro rata case, our

18  position to the Court will be at some

19  (inaudible) as an alternative argument take the

20  claims, excluding intercompany claims, take the

21  assets and come up with an equitable number.

22  In order to understand the context of that, we

23  believe it is necessary for the Court to have

24  information from each of the countries, each of

1  the estates where a claim (inaudible) has run

2  or will be run as to what their claim is.  It

3  is hardly onerous.  I adopt all the submissions

4  of Ms. Kimmel and Mr. Barnes on this point.

5            The fact depositions were not

6  about binding the estates in the true Canadian

7  discovery fashion.  And, in fact, in our factum

8  we identified three examples of when the U.S.

9  estate (inaudible) confirmed (inaudible) the

10  fact witnesses do not bind the estates.  And we

11  also gave an example of our questioning of an

12  EMEA administrator who said he didn't know the

13  answer to our questions about -- with precision

14  about the claims process in the estate.  And we

15  always believed that's the (inaudible)

16  representative witnesses.

17            Your Honors, if you turn to page

18  6, I move to the bondholders.  You have heard

19  arguments about proportionality relative to a

20  $4 billion claim, and you know we have an

21  equitable distribution case.  And we believe it

22  is a relevant and material piece of information

23  for the Court to know what the bondholders

24  bought, at what price.  They have told us --

1   (inaudible) was very forthright -- they will

2   object to those questions.  But we have the

3   right to ask those questions, and we believe we

4   have a right to answer the question.  Today is

5   not the place to (inaudible).

6               So in terms of the questions we

7   have asked the bondholders, there is three

8   (inaudible) subject areas.  Number one says

9   refer to the questions asked of the U.S.

10  debtors, and then three additional questions:

11  The terms of the Nortel bonds, including the

12  guaranties and the enforceability of such

13  guaranties.  We intend to ask them questions

14  about that.  We intend to ask them in Question

15  3 about their expectations, and then in 4,

16  certain claims.  In our submission, Your Honor,

17  they are all proper questions of Canadian

18  discovery.

19               And to that point, Your Honor, the

20  last place I am now going to ask you to go to

21  is our brief of authorities, Tab 1, nature and

22  purpose of examination for discovery.  As much

23  as I like Mr. Rosenthal (inaudible) the

24  deposition process, the purpose of this case is

1  not to test against what his understanding of
2  gap-filling meant and his (inaudible).  The
3  Court approved the protocol.  The parties
4  signed the protocol.  The Court doesn't need
5  Mr. Rosenthal's evidence to interpret a
6  document it approved.  And what it approved was
7  a Canadian-type discovery.
8              And in paragraph 120 at Tab 1,
9  paragraph 120 of the Rothmans case, Justice
10  Perell sets out Ontario Bean Producers
11  Marketing case.  Why do we want discovery and
12  why is Ms. Block's suggestion that, well, we
13  are going to have affidavits from the parties.
14  We are going to have opening positions.  The
15  purpose of discovery is not to give parties the
16  opportunity to further their own case.  The
17  purpose is for adverse parties to interrogate
18  the case.
19              And in the Bean Producers case six
20  points were identified.  "The Court noted the
21  following purposes for examination for
22  discovery:  (1) to enable the examining party
23  to know the case he or she has to meet; (2) to
24  procure admissions to enable a party to

1   dispense with formal proof; (3) to procure

2   admissions which may destroy an opponent's

3   case; (4) to facilitate settlement, pretrial

4   procedure, and trials; (5) to eliminate or

5   narrow issues; and (6) to avoid surprise at

6   trial."

7           Your Honor, the EMEA parties

8   suggest that each one of those purposes are now

9   irrelevant in this case.  The CCC's position is

10   they are all relevant.  This case more than any

11   other that is before this Court, a 7 to $9

12   billion cross-border international case, we now

13   need to bind the parties to their positions.

14   The bondholders have made it clear that they

15   now don't want to be bound to anything.

16           If I could turn the Court's

17   attention to page 29 of the decision, the last

18   bullet point above paragraph 130, Swan asked

19   rhetorically why is it even relevant to ask

20   questions about guaranties and matters of law.

21   The law is clear in Canada (inaudible).  The

22   witness on examination for discovery may be

23   questioned about the parties' position on

24   questions of law.  There is a $4 billion claim

1  by the bondholders.  Once before the trial

2  starts, Your Honor, we would like to be able to

3  ask them questions on our terms on what we

4  think the relevant issues are.

5           If I can ask the Court to turn to

6  Tab 4.  There is discussion in the material

7  about Rule 219 in the United States.  Rule

8  2019.  Sorry.  This excerpt from LexisNexis

9  deals with that, deals with disclosure

10  regarding creditors and equity security holders

11  in Chapter 9 and Chapter 11 cases.

12           If I can ask the Courts to turn to

13  page 3, you will see in our material there are

14  two sentences that are highlighted.  "Although

15  the rule no longer requires the disclosure of

16  the precise date of acquisition or the amount

17  paid (inaudible) economic interests, nothing in

18  this rule precludes either the discovery of

19  that information or its disclosure when ordered

20  by the court pursuant to the authority outside

21  this rule."

22           Since August we have been waiting

23  to ask these questions of the representative

24  (inaudible) party examinations.  We have

1  planned accordingly, relying on the protocol,

2  and we believe it would be prejudicial and

3  unfair in the extreme at this stage to change

4  the rules on the CCC.  The bondholders should

5  be required to continue to participate in the

6  process that they agreed to.

7            Your Honor, those are our

8  submissions.

9            CANADIAN COURT:  Thank you.

10  Ms. Block.

11            MS. BLOCK:  Thank you, Justice

12  Morawetz, Judge Gross.  Ms. Kimmel said that

13  there weren't going to be eight days of

14  depositions; it would probably be less.  In

15  fact, that is not the case.  There are, just as

16  with the fact depositions, there are going to

17  be multiple depositions on various days.  So

18  there are two days (inaudible), two for UKP,

19  one for CCC, one for UCC, one for the

20  bondholders, and then there is a plug number of

21  maybe three for the other (inaudible).  That is

22  15 days of discovery.  If it is two days to

23  prep a witness plus a day for the witness and

24  there is ten lawyers around the room -- that's



1    a modest estimate -- times 15, that's 450 more

2    days.  And the costs that would be sanctioned,

3    they come from the estate.  You are depriving

4    the legitimate creditors by saying, well, we

5    can (inaudible).

6            CANADIAN COURT:  I will just

7    observe that any arguments dealing with costs

8    and expenditures and number of witnesses, 3

9    million documents, the allocation of

10   responsibility I would think is broad, all over

11   this room, all over the United States courts.

12   All parties have to take some responsibility.

13           MS. BLOCK:  I accept that, sir.  I

14   think that's a very valid point.  And here we

15   are trying to make a difference, and we are

16   asking for the Court to exercise its discretion

17   to help us do that.

18           So my first point in reply is that

19   my friends say, well, (inaudible) Rule 31

20   discovery (inaudible).  My friend Ms. Kimmel

21   took you to the protocol and showed you Section

22   G, told you about (inaudible), that it is not

23   just limited to (inaudible) subjects, but (c)

24   and (d) have to be read together.  And (d) says

1    that any undertaking required in accordance

2    with Rule 31 have to be about things that have

3    not been subject to the fact depositions.  So

4    (c) and (d) are of a piece.  They talk about

5    Rule 31 and they are talking about gaps.  And

6    the only evidence you have -- and you have been

7    very clear with all of us that we are to brief

8    these motions appropriately, with proper

9    evidence.  The only evidence you have is

10   Mr. Rosenthal's evidence.

11            When my friend stands up and says,

12   well (inaudible) entirely accurate when you

13   asked Ms. Kimmel about the protocol, at that

14   time you didn't know how many would show up.

15   She was not entirely accurate.  We had noticed

16   113 depositions.  The evidence you have is that

17   nobody knew how many of these people scattered

18   all over, no longer working for any of the

19   Nortel entities, would actually show up.  That

20   is the evidence.

21            The second point I make is that my

22   friend says discovery is about (inaudible) the

23   position of the other side and obtaining

24   admissions.  And she says we are missing a

1   bridge.  We have the trial briefing process,

2   yes, but in between we have the Rule 31

3   opportunity to get admissions that will inform

4   and narrow the issues for the Court.  There is

5   no gap.  She gave you no gap.  What she wants

6   to do is to do it all over again, having had

7   108 witnesses.  That's what we are trying to

8   do, she said.  We need the bridge, these

9   admissions.

10           Well, in a Rule 31 case you do

11  have to get admissions.  If you have got a case

12  with a board of directors and you have got one

13  representative of the company and there were

14  crucial meetings, that representative

15  (inaudible) go and talk to each one of the

16  board of director members:  What happened at

17  this meeting, what notes, who said what, and

18  then you give all that evidence.  That's a Rule

19  31 process.

20           When you have the 108, you don't

21  need the 31 process.  You have been able to ask

22  (inaudible) admission as to fact; i.e., when

23  you entered the intersection, what color was

24  the light.  You have been able to ask the 108

1    witnesses what color was the light.  You have

2    got all the admissions as to the facts that you

3    need from all of them you chose were the

4    critical witnesses to be spoken to.

5              Other admissions under Rule 31 are

6    when you aren't going to lay out the facts.  So

7    if someone is willing to admit negligence but

8    says I didn't cause the harm they are claiming,

9    the damage, you don't have to prove through

10   facts the negligence because you have got an

11   admission.  We are not in that kind of a case.

12   We are in a fact case, and they have had all

13   the fact witnesses.

14              The third point my friend made is

15   she said, well, the Rule 31 representative

16   depositions will count as trial evidence and

17   that instructs counsel how to ask the

18   questions.  Because we weren't doing that kind

19   of examination, we decided not to ask certain

20   questions.  Is she suggesting -- and I am not

21   sure she is.  But if she is suggesting that the

22   Monitor is taking the tactical position,

23   saying, "Well, yes, we did have 108 witnesses,

24   but we decided because it wouldn't be binding

1    or it wouldn't be trial evidence not to ask a

2    question so that we could wait until we asked

3    it under this one, and then if we didn't like

4    the answer, we wouldn't put it forward," a

5    monitor cannot take that position.  A monitor

6    is an officer of the court.  A monitor

7    shouldn't be afraid of what a fact witness with

8    personal knowledge knows.  So if they held

9    back, if that's what she was saying -- I am not

10   sure if she was -- that is not basis on which

11   to say these depositions have to go forward.

12             She also told you, sir, that a

13   fact witness can't be asked about a position.

14   Well, if a witness of mine is asked about a

15   position, I say, "Read my pleadings."  In this

16   case, I would say read my submission, which

17   gives you the legal bases and all of the facts,

18   material facts we rely on.  You have got our

19   position.  And, indeed, you will be getting a

20   further articulation of it in the opening

21   briefs that will be provided.  And normally you

22   just walk into court and open orally.  But this

23   is going to be done.  There is no need for

24   positions.

1            The other point a couple of my

2   friends have made is that, well, (inaudible)

3   answers that bind a party.  Each of the parties

4   before trial has to identify -- has to, first

5   of all, put in their trial evidence through

6   sworn affidavits, so that's binding, and then

7   they have to identify all the exhibits

8   (inaudible).  They have to identify all the

9   deposition testimony they are going to rely

10  upon, and all of that is before the two judges,

11  all of those facts.  And they are either

12  accepted by the judges or they rejected by the

13  judges.  That's how we will be bound by the

14  evidence.  We are identifying it and then we

15  will be bound by it.

16            My friend says, well, this really

17  isn't all that onerous, even though it is 450

18  lawyer days of prep, and that is not even

19  counting the undertakings if, in fact, it were

20  onerous.  It is not really that onerous.  She

21  cited St. Jude and said these are typical

22  questions, you know, do you have anything else

23  to say.  That's what we are doing here.

24  That's -- you know, at this expense.  That's

1   kabuki.  That's the Japanese ceremonial dance

2   of, you know, anything else, anything else.

3   No.  You have been sitting here for weeks; you

4   have got it.  That can't be what we are doing

5   here.  Surely we wouldn't need it for that

6   purpose.  There is no gap, and therefore, there

7   is no right under the protocol.

8            Let me make a point about my

9   friend Mr. Barnes and the directors and

10  officers.  All the submissions were about the

11  EMEA claims.  The U.S. estate has nothing to do

12  with the EMEA claims.  We have settled our EMEA

13  claims; never had anything to do with the

14  claims against directors and officers.  So even

15  if you found some reason to allow certain

16  representative depositions, (inaudible) not

17  engage the U.S. estate.  You can save a lot of

18  money for creditors by releasing us from this

19  process.

20           Mr. Zelbo from Cleary Gottlieb has

21  a two-minute submission on U.S. (inaudible)

22  these kind of depositions.  I don't know if you

23  want to hear him before you hear from

24  Mr. Gottlieb.

1          CANADIAN COURT:  The only problem,
2    the only thing I see as a problem is that
3    neither Judge Gross nor I know who wants to
4    make submissions in the U.S. courts.
5          MS. BLOCK:  I see.
6          CANADIAN COURT:  We will complete
7    the Canadian submissions on that.
8          MS. BLOCK:  Fine.
9          CANADIAN COURT:  There will be
10   time to --
11         MS. BLOCK:  Ms. Miller did explain
12   her point to me, 90 seconds.  And it better
13   come from her.  And Mr. Gottlieb, he has got to
14   deal with EMEA.  I am not doing a thing.
15         CANADIAN COURT:  Well, why don't
16   we hear from Ms. Miller first.
17         MS. MILLER:  Ninety seconds
18   (inaudible).
19         Your Honor, Ms. Kimmel pointed you
20   to Appendix 1, which was annexed to the
21   Monitor's factum, which was a chart-form
22   summary of various matters.  And she correctly
23   pointed out that unlike the first 58 pages of
24   that appendix, which relate to the other



1   parties, the section of the appendix that

2   relates to the UK pension claimants is, in her

3   words, somewhat different.  It is actually

4   fundamentally different.

5              And I won't ask you to go through

6   that now, but if Your Honor could note when you

7   are reviewing the pages that she referred you

8   to, pages 16 to 19, that unlike the first 15

9   pages that precede it, which have specific

10  verbatim liftings from pleadings and court

11  documents filed, pages 16 to 19 (inaudible) of

12  the UK pension claimants contain whole pages

13  (inaudible) of unsworn testimony, evidence,

14  that has been annexed as an appendix to a

15  factum.  But I just lodge that by way of reply,

16  that Ms. Kimmel has referred to that and

17  directed Your Honor to read those provisions.

18              Secondly, just by way of reply,

19  the Canadian debtors and the Monitor through

20  the course of those 108 depositions have

21  deposed trustees of the pension plan, actuaries

22  retained by the pension plan, financial

23  advisors (inaudible), former NNUK directors and

24  a number of other parties (inaudible) by the

1   pension plan.  They have had every opportunity

2   to ask questions of those parties.  The pension

3   plans in question are not (inaudible).  This is

4   not an arm's-length third-party unknown claim.

5   These are the company's own pension plans.

6               Finally, Your Honor, as the last

7   five seconds of my 90 seconds, the expert

8   protocol provides that all documents which any

9   expert has been (inaudible) to or has been

10   provided by the party will be specifically

11   listed and referenced.  And so much of what the

12   Canadian debtors and the Monitor have requested

13   in terms of the (inaudible) form part of the

14   expert (inaudible).  Every single document that

15   they might have had access to will be

16   specifically referenced in that disclosure.

17               Those are my reply submissions.

18               CANADIAN COURT:  Thank you.

19               Mr. Gottlieb.

20               MR. GOTTLIEB:  Thank you.  With

21   your permission, Your Honor, Judge Gross, I

22   will just make a reply with respect to the EMEA

23   debtors, obviously, subject to any questions

24   you have.

1                CANADIAN COURT:  (inaudible).

2                MR. GOTTLIEB:  The allegations and

3     suggestions made by Ms. Kimmel (inaudible)

4     claims made by EMEA are very general

5     (inaudible) discussed that early.  You see the

6     proofs of claim in the D's and O's material.

7     So, Your Honor, I am obviously not going to

8     turn you now, but if you go through those

9     claims, there is no reading of them that can

10    say they are general at all.  They are very

11    specific as to what the allegations are and the

12    legal basis for them.

13               And again, I remind the Court

14    (inaudible) particulars and gave 110 pages of

15    particulars.  So it really can't (inaudible) be

16    that they are general claims.  They trace

17    through (inaudible) individual claim being

18    made, the factual underpinning and the legal

19    basis for them.

20               With respect to Mr. Barnes'

21    statement that the directors don't know the

22    claims, I again say with great respect to my

23    friend Mr. Barnes that is unfair as well

24    because what you have to do in the way it was

1    drafted explicitly is -- and again, this is in

2    the D&O motion record, Your Honor, and

3    (inaudible) turn it up now, but you can look at

4    it.  The directors and officers claim refers to

5    a claim made against the company, the relevant

6    companies, so you read them together.  And the

7    claim made against the company outlines, again,

8    to a very specific degree what the allegations

9    (inaudible) are, how the damages (inaudible),

10   the conduct and the directors and officers that

11   are (inaudible).

12            At the time of pleading the

13   claims, as you will recall, there were not

14   documents exchanged.  Not all the information

15   available (inaudible) as to who the directors

16   and officers were.  But as Mr. Barnes said, and

17   I say conceded generally, it is not the whole

18   body of directors and officers.  It is a very

19   specific group of overlapping directors.  There

20   is no one who knows who they are than

21   Mr. Barnes' clients.  They know what boards

22   (inaudible) they were (inaudible).  Look at the

23   claims with respect to (inaudible), it is very

24   specific what the claims are.

1               And then following up on

2  Ms. Block's last point that it is partially in

3  my submissions and a whole bunch of places in

4  our written argument, all of that will be

5  disclosed.  It is not a secret.  It is a matter

6  of timing that we are talking about and that's

7  it.  There is no one that will go to trial

8  here, including the directors and officers,

9  without knowing the allegations made and the

10 basis for the claims against them, based on the

11 evidence that has already been adduced through

12 the affidavits and the (inaudible) and the

13 expert testimony and the (inaudible).  So the

14 suggestion that they don't know the claims

15 against them, in my respectful submission, is

16 not true.  It is just a matter of timing.  And

17 therefore, there is no reason to deal with the

18 expense (inaudible) and I stress beyond

19 expense, Your Honor, time-consuming process of

20 the representative discoveries.  We have got a

21 tight timeframe.

22               CANADIAN COURT:  17-1/2 weeks.

23               MR. GOTTLIEB:  Well aware of that.

24 And I take that strongly and seriously.  There

1  is a lot to do in that, and we all know that,

2  and this will not help that process.

3            The final point I make, Your Honor

4  and Judge Gross, and I won't take you to it, my

5  friends Ms. Kimmel and specifically

6  Mr. Rosenberg said this is an examination under

7  Rule 31.  It is an examination for discovery

8  under Rule 31.  That is just factually wrong.

9            When you read G under the

10  deposition protocol, it expressly says what

11  type of deposition this is, and it is not an

12  examination for discovery under our rules.  It

13  is to be very greatly restricted.  Ms. Block

14  says all you have to do is read (a), (c) and

15  (d) together and you see that it is a

16  completely different kettle of fish than our

17  discovery is.  That's not what this was

18  supposed to be, but that is what is trying to

19  be and is why we say it should not be going

20  ahead at that time, given where we are and what

21  has transpired beforehand.  So (inaudible).

22            We have one matter that I need to

23  address as just a housekeeping matter.  We

24  attached as exhibits to the affidavit we filed,

1  two-volume set, two (inaudible) that are to be

2  confidential and therefore should not at this

3  time be part of the public record.  They have

4  been filed in this court, Your Honor.  They

5  have been filed in the U.S.  What I am going to

6  ask -- all the parties, of course, are entitled

7  to it.  What I am going to ask is that we pull

8  back that record and resubmit it with those

9  documents --

10            CANADIAN COURT:  Is it filed?

11            MR. GOTTLIEB:  It is.

12            CANADIAN COURT:  It is filed.  You

13  can deal with that at a subsequent time.  I am

14  not going to take Judge Gross's time with that.

15            MR. GOTTLIEB:  Okay.  Thank you.

16  And again, it is an issue for Judge Gross's

17  court as well because we did file --

18            CANADIAN COURT:  We will deal with

19  (inaudible) then.

20            MR. GOTTLIEB:  And I apologize for

21  that.  Thank you.

22            MR. SWAN:  On behalf of the

23  noteholders --

24            CANADIAN COURT:  What I would like



1  to do, Mr. Gottlieb, is put it under protective

2  order so it is not going to get back into the

3  public domain (inaudible).

4              MR. GOTTLIEB:  Thank you, Your

5  Honor.

6              CANADIAN COURT:  Mr. Swan.

7              MR. SWAN:  Thank you, Justice

8  Morawetz and Judge Gross.  Mr. Rosenberg tried

9  to make some moment of Ms. Miller's email, but

10  the fact of the matter is that that email makes

11  very clear that the position was that all of

12  those subject areas or potential subject areas

13  were not relevant, would be objected to, and it

14  makes that very clear.  No challenge was

15  brought at that time to that position that was

16  taken.

17              And the key point that arises is

18  that we have now seen the three topic areas

19  that the CCC wishes to examine on.  They are

20  the ones that I have reviewed and Mr. Rosenberg

21  reviewed.  And none of them are relevant

22  (inaudible) to an EMEA estate allocation

23  (inaudible).  At their highest, they relate to

24  a claim (inaudible) question involving the

1 bond, and so far as we are aware, no one has

2 challenged the validity of those claims, just

3 in the same way that this proceeding doesn't

4 involve a challenge to the CCC claims, this

5 particular interest.

6          And to give you an example,

7 Mr. Rosenberg, although he referred to his

8 topic area of the terms of the bonds and

9 guaranties, he didn't identify a single

10 question that one might relevantly ask about

11 the terms of such bonds or guaranties.  They

12 are a legal document.  They (inaudible).  Thank

13 you.

14          CANADIAN COURT:  Okay.  Judge

15 Gross, over to you.

16          THE COURT:  All right.  I believe

17 it was Mr. Zelbo who wanted to be heard.

18          Mr. Zelbo, good afternoon.

19          MR. ZELBO:  Good afternoon.  Good

20 afternoon, Justice Morawetz.  As my colleague

21 noted earlier, I will be brief.  I am not sure

22 if two minutes was exactly accurate, but

23 hopefully, I will be under five minutes.

24          THE COURT:  Do you see how fast

```
 1   those quarterbacks take them off the field in
 2   just two minutes?  It is a lot of time.
 3                MR. ZELBO:  It is true, except for
 4   my Dallas Cowboys, who did not seem to achieve
 5   that goal; in fact, the opposite.  Okay.
 6                I really want to make this point,
 7   which is that there is evidence, and the only
 8   evidence in the record -- I am not going to
 9   rehash it -- is that the parties intended
10   gap-filling.  And if you read the protocol
11   Section (a), (c) and (d) together, not (c)
12   alone, to pick up on what Mr. Gottlieb was just
13   saying, you will see that, because it is a
14   sandwich; right?  You have got (a) says you can
15   only ask people to prepare for topics in
16   advance on things that aren't already covered
17   or couldn't have been covered with the fact
18   witnesses.  Then (c) says you can ask
19   questions, but, of course, the representative
20   is not going to have knowledge of any answers
21   unless they were prepared in advance, because
22   that's just the nature of this piece.  We don't
23   have percipient fact witnesses of the debtor
24   now, U.S. debtor.  So you go to undertakings.
```

1              THE COURT:  Right.

2              MR. ZELBO:  And the undertakings

3    say, okay, so you ask questions, you ask --

4    obviously, (c) was meant for gap-filling

5    questions that you chose not to ask to prepare

6    in advance, because it says when you come out

7    the back end, the only undertakings you get

8    again are gap-filling questions.

9              So the only purpose of these

10   depositions -- you don't even need

11   Mr. Rosenthal's affidavit.  I think it is

12   unrebutted.  I think it is powerful.  And he is

13   not talking about subjective intent.  He is

14   talking about what the parties discussed.

15             THE COURT:  And discussed with the

16   Court in oral argument.

17             MR. ZELBO:  Exactly.  And so if

18   there was any ambiguity in these provisions, I

19   think Mr. Rosenthal's affidavit is powerful and

20   unrebutted:  That this was a gap-filling

21   exercise.

22             And the problem -- there is a

23   reason for that, too, because if you go beyond

24   gap-filling in the context of this case, what

1  you are really doing is seeking attorney --
2  what you are really doing is seeking attorney
3  work product.
4            And let me turn to the letter of
5  the Monitor's U.S. counsel from December 22,
6  which was in the compendium at Tab 7 that my
7  colleague handed up earlier.  I am just going
8  to read one sentence from it, Your Honors.
9  This is what they say we need the
10 representative depositions for, which is not
11 gap-filling, and I think that is the purpose of
12 it.  "It is fundamental that all parties have a
13 right to know the basis of the contentions and
14 the facts that opposing parties intend to
15 present at trial."  Okay?
16            There are only two ways to look at
17 that.  First of all, they have the basis of our
18 contentions.  They have our opening allocation
19 briefs.  Remember, the only thing we are
20 involved now is on allocation.  They have our
21 opening allocation briefs.  They are going to
22 get a pretrial allocation brief.  They are
23 going to get exhibit lists.  They are going to
24 get exhibit designations.  They are going to

1   get direct testimony by witness affidavit.

2   They will know the basis of our contentions.

3                  They have the facts in the case.

4   We have taken a ton of discovery.  They have

5   the facts.  What they are asking for -- what

6   are they asking for?  They want a deposition

7   where we are going to be required to marshal

8   this massive discovery, put it on a silver

9   platter for them and serve it to them:  Here is

10  what we are going to rely on at trial for our

11  direct case from all of this discovery which

12  you have access to, too, and here is, frankly,

13  the facts we are going to rely on to rebut your

14  case.  That is not appropriate discovery in the

15  U.S.

16                  Now, we have cited a case that

17  dealt with a 30(b)(6) deposition, District

18  Council of New York, United States vs. District

19  Council of New York, 1992, from Magistrate

20  Judge Katz, which relies on a Third Circuit

21  opinion, Spork, which talks about the

22  compilation work product privilege.  You can't

23  ask opposing counsel to do your job.  You can't

24  ask opposing counsel to compile all the

1    evidence and mass it together and tell them how

2    they are going to present their case.  Of

3    course, there is time for that.  At trial you

4    present your case.  Here there won't be any

5    surprises because of all the safeguards we have

6    built in.

7              THE COURT:  And all the pretrial

8    materials that will be filed.

9              MR. ZELBO:  Exactly.  And indeed,

10   in that case what the plaintiff asked the

11   government to do was put their investigator for

12   30(b)(6).  Now, the investigator, just like our

13   representative deposition, will have no

14   knowledge of facts; I assure you of that.  We

15   don't have any percipient witnesses.

16             What the Court said is "So what

17   you really want is that investigator to get

18   taught by counsel" -- right? -- "about what is

19   in the discovery, what facts you are going to

20   rely on at trial, what the legal theories are,

21   what you are going to argue at trial."  The

22   Court said no, that's -- you are just asking

23   for the attorney's work product.  And the Court

24   said I think in words that are apt here, "I

1   think the government has done enough.  No

2   Rosetta Stone is necessary to unlock their

3   mysteries.  Defendant and his counsel can read

4   them and determine which documents pertain to

5   an allegation and to what degree, directly or

6   indirectly."

7              So in our mind, because the

8   Canadian interests have not identified any

9   gaps, any factual evidence they could have

10  sought, tried to seek and couldn't get, because

11  they failed to do that, the whole point in the

12  representative deposition has gone away.  And

13  if what they are really asking us to do is sit

14  here and prepare a witness with no knowledge so

15  they can go through all that evidence, can you

16  imagine how long it is going to take us to go

17  through all these transcripts, all these

18  exhibits, prepare some witness who knows

19  nothing about this case, to say, "When they ask

20  you this question, here are the documents you

21  have to say we are going to rely on at trial"?

22              I know we are 17-1/2 weeks away

23  from trial, but I assure you we are not ready

24  for trial today.  We are not going to be ready

1  in January, and we are not going to be ready in

2  February.

3                Expert reports are coming on

4  January 24.  I assume Canada will submit

5  affirmative expert reports.  The United States

6  will and EMEA.  Those will set forth the

7  allocation positions.  There is not going to be

8  any mysteries to be unlocked.  They are going

9  to be there.  And I assume everybody is going

10  to do that in good faith.

11                I don't think these depositions

12  add anything other than a huge amount of

13  expense and fights over work product that can

14  be avoided.

15                Thank you, Your Honor.

16                THE COURT:  Thank you, Mr. Zelbo.

17                Yes, Mr. LeBlanc.  I do have

18  concerns about the argument pertaining to the

19  bondholders.

20                MR. LeBLANC:  Yes, Your Honor.

21  Again, for the record, Andrew LeBlanc, of

22  Milbank Tweed, on behalf of the bondholders.

23                Your Honor, I don't want to repeat

24  what Mr. Swan said up in Canada, so I am going



1  to just try to address two very distinct

2  topics.  And the first is Ms. Miller's email,

3  and I know there was some discussion of that by

4  Mr. Swan, but I just want to expand upon that;

5  and then second, the suggestion that is made in

6  the CCC's submissions that we have in some

7  respect not complied with Rule 2019 and that

8  this is an appropriate -- the use of

9  representative depositions is an appropriate

10  forum to get to that question.

11          First, in talking about

12  Ms. Miller's email, when the Court looks at

13  that -- and I am not going to turn the Court to

14  it because I have it in a different form than

15  it was referenced to before.  But it is

16  important, I think, to look at the email to

17  which Ms. Miller was responding.  And just to

18  set the stage -- and we made this point in our

19  papers -- we have been -- the CCC has asked for

20  the prices which we paid for the bonds and the

21  dates of purchase throughout this proceeding.

22  They asked for it through document requests, to

23  which we objected.  They asked for it through

24  interrogatories, to which we objected.  They

1  asked for it from percipient witnesses, to

2  which we objected.  They then asked for it from

3  representative witnesses.

4           Your Honor, Mr. Rosenberg said up

5  in Canada that the time -- it is not now the

6  time to decide whether these are relevant.

7  That's absolutely correct, because we made

8  clear on August 1 that we were never going to

9  produce these documents because we didn't

10  perceive them to be relevant.  If they thought

11  the topic was relevant, the time to have

12  brought that to the Courts' attention was back

13  in August, when we made that objection, or even

14  before then, when we objected to the document

15  request that sought the same information.

16           Now, the email to which Ms. Miller

17  was responding actually begins by saying -- and

18  this is the CCC addendum to that email, which

19  is part of the same package -- "Last week the

20  CCC received significant additional production

21  from the Ad Hoc Bondholders Group."  So even in

22  that, Your Honor, we have the numbers in our

23  paper.  We produced almost 400,000 pages of

24  documents.  We have been an active participant

1    in the discovery process.  But the fact is our

2    clients are not percipient witnesses to any of

3    the events that are underlying this allocation

4    dispute.

5              Now, there are -- we certainly

6    were part of the sale process.  We were part of

7    processes like that.  But nobody has asked

8    those questions of us.  The representative

9    deposition topics don't seek that information

10   from us.  Instead what they seek, for example,

11   is information about the debtors' business

12   operations, all facts and documents about the

13   debtors.  Those are not questions that are

14   properly propounded upon a group of bondholders

15   like my clients.

16             So, Your Honor, it is simply --

17   and it is important, I think, to look at the

18   context in which Ms. Miller was responding,

19   because she then says, "We are not going to

20   produce these documents, and we want to be

21   clear, we are never going to produce these

22   documents."  She did it to everybody in the

23   case, to that wide list of recipients, to make

24   it clear to everybody that if anyone thought it

1    was relevant to get that information from us,

2    you should bring it to the Courts' attention,

3    seek to compel that information, not wait until

4    January and submit it as a basis to get

5    representative depositions that should

6    otherwise be discarded with or not used as part

7    of this process.  It simply isn't a relevant

8    question for the Court to consider.

9              And, Your Honor, I think it is

10   important to just think about the relevance

11   generally of the question.  Now, just to give

12   you a hypothetical, if, for example, our

13   clients paid 90 cents for the bonds, then to

14   make this relevant, the CCC would have to be in

15   a position to say, well, because their clients

16   paid 90 cents for the bonds as opposed to 100

17   cents or 80 cents or 70 cents, or maybe

18   somebody did pay 50 cents for a block of bonds,

19   because of that fact, you should allocate X

20   percent of the lockbox, of the proceeds to

21   either the Canadian estate or the EMEA estate

22   or the U.S. estate.  Your Honor, you can never

23   connect those two things.  You simply can't.

24              There is no relevance of the price

1  at which our clients paid for their bonds to

2  the questions that have to be addressed because

3  -- and this is something -- and I don't want to

4  dwell on it because Mr. Swan made this point

5  well in Canada.  The issues before the Court as

6  part of this process are how to allocate these

7  proceeds.  This is not the time to determine

8  whether there is an objection to the bond

9  claims in the U.S., whether there is an

10 objection to the bond claims in Canada, whether

11 there is an objection to the bond claims

12 anywhere.  That is a separate process.  When we

13 talk about the claims and the allocation, the

14 claims that we are talking about are the ones

15 that are being tried in connection with this

16 process, and those are the ones that were

17 settled earlier today.  The claims of the UKP

18 and EMEA that were settled in the U.S. and the

19 claims against the Canadian interests, those

20 are the claims that are being adjudicated.  The

21 claims of the U.S. interests -- or the claims

22 of the bondholders, rather, against the U.S.

23 estates or the Canadian estates, those aren't

24 at issue here.

1          Now, I think it is important, Your

2    Honor, also to just correct the record with

3    respect to an issue, because there was an

4    allegation in the CCC's factum that the

5    bondholders have failed to comply with Rule

6    2019.  Now, Your Honor may recall -- this is a

7    little trip down memory lane.  It will be for

8    Mr. Bromley as well.  But my first

9    appearance on behalf of this --

10          THE COURT:  He is younger than I

11    am, so he can probably remember.

12          MR. LeBLANC:  My first appearance

13    on behalf of this very group of creditors, Your

14    Honor, was at the first day of hearings in

15    these cases some four-plus years ago now.  So

16    we have been part of these cases for more than

17    four years.  To the extent that anybody with

18    standing had an issue with our 2019, they could

19    have brought it to the Courts' attention.  This

20    is not the correct forum to bring any issue

21    with the 2019 statements that we filed.  This

22    isn't the right forum to do it.

23          Now, the CCC, of course, doesn't

24    have standing to bring an objection to our 2019

1   filed in the U.S. proceeding.  They don't have

2   claims against the U.S. estates.  That's the

3   Canadian-only creditors don't have claims

4   against the U.S. estates.  But more

5   importantly, there is a submission -- I think

6   this is important for Justice Morawetz to

7   understand as well.  There is a statement in

8   the CCC's submission that we failed to comply

9   with 2019(c)(2)(c), which is a very specific

10  provision of Rule 2019, and that is simply

11  factually and legally wrong.  2019, Federal

12  Rule of Bankruptcy Procedure 2019(c)(2)(c)

13  reads -- and the text of the statute is

14  actually provided in the CCC's factum -- "With

15  respect to each member of a group or

16  committee" -- and this is the important part --

17  "that claims to represent an entity in addition

18  to the members of the group or committee, then

19  you must provide the date of acquisition by

20  quarter and year of each disclosable economic

21  interest."

22              There is no assertion and, in

23  fact, our 2019 statement, which is filed in the

24  U.S. court at Docket 11035, in paragraph 3

1  disclaims that we are representing anybody

2  other than the $2.22 billion worth of bonds

3  that we represent that are identified as

4  economic interests on the addendum to our 2019.

5  So, Your Honor, Rule 2019(c)(2)(c) simply is

6  inapplicable to the 2019 statement filed by us.

7  And I didn't want Justice Morawetz in

8  particular, because this is a unique U.S. law

9  issue, to be misled into believing that we

10  failed in any way to comply with 2019.  Even if

11  we had, this isn't the right forum to do it.

12  And it certainly doesn't suggest that we should

13  have representative depositions, with all the

14  cost and expense associated with it, because

15  they complain about our 2019 statement, but

16  more importantly, even their complaint is

17  without merit.

18            So, Your Honor, we support the

19  position of the U.S. interests, the EMEA

20  interests, the UCC, and all the other parties

21  that have suggested that we dispense with

22  representative depositions.  I know Justice

23  Morawetz doesn't like to hear it, but I think

24  we have a little bit more credibility with

1   respect to trying to rein in the costs here,

2   because we have from Day One sought to rein in

3   the costs here.  When he we appeared in

4   November, we asked not to extend the trial

5   because we were concerned about the costs.  We

6   continue to be concerned about the costs.  And

7   it is clear to us, having experienced the

8   discovery process, that the continuation of the

9   discovery process through these depositions

10  would be a complete waste of time and a

11  complete waste of resources that, frankly, come

12  from our backs more than anybody else's.

13              And the allocation of costs

14  between estates or sanction wouldn't help us

15  because we, of course, are the largest claimant

16  here in the U.S. and the largest claimant

17  against Canada.  So a cost sanction really

18  wouldn't help us in any respect.

19              So we would suggest, Your Honor,

20  that we finally put an end to the fact

21  deposition or fact discovery portion of this

22  and we move on to get this case to trial, if

23  that's where it has to go.

24              Unless the Court has any

1   questions, I thank Your Honor for the time.

2                THE COURT:  Thank you,

3   Mr. LeBlanc.

4                Anybody else on the brief side?

5                MR. ADLER:  Just very briefly,

6   Your Honor.

7                THE COURT:  Yes, yes, Mr. Adler.

8                MR. ADLER:  Just very briefly,

9   Your Honor and Justice Morawetz, I won't add to

10  the very able submissions that have been made

11  in favor of the motion already.  It is quite

12  clear that there is no attempt to get facts

13  here through this process.  It is strictly what

14  we would call contention interrogatories --

15                THE COURT:  Yes, that's --

16                MR. ADLER:  -- in a context where

17  because of the procedure, no one will be

18  surprised.

19                The point I want to respond to is

20  the suggestion that this is a case where the

21  U.S. and EMEA and the other parties supporting

22  this motion are ganging up for some kind of

23  tactical advantage.  That is completely -- it

24  makes no sense whatsoever.  Nobody has



1  explained why that would be the case.  In fact,

2  we are forgoing the use of the same disclosure

3  device ourselves.  We are offering to forgo it.

4  It is a mutual renunciation of whatever could

5  be gotten through that process.

6            In fact, we had served subjects on

7  the Canadians where we actually do think the

8  factual record -- we still have some factual

9  questions where we could present our case

10  better if we got answers to those questions.

11  But our view is that it is disproportionate to

12  proceed with this discovery device for all of

13  the time that it would take, the money that it

14  would take, the distraction that we would

15  suffer.  It is disproportionate, and therefore,

16  we are prepared to forgo it in exchange for not

17  having to bear those burdens in relation to the

18  other parties as well.  But there is no game

19  plan, again, no tactical advantage to be gained

20  for us by that.

21            Unless you have any questions,

22  that's all I will say.

23            THE COURT:  Just this question.

24  If the Court ruled against the motion to



1  prohibit these depositions, would the EMEA

2  debtors and other debtors also insist on

3  proceeding with their representative

4  depositions?

5              MR. ADLER:  No, absolutely not.  I

6  am sorry.  Say that again.  If you rule -- we

7  would.  We would comply with Ms. Kimmel's

8  suggestion to meet and confer about the best

9  way of getting the answers.  And, in fact, for

10 some of the questions that we have, it may be

11 more efficient to have a kind of interrogatory

12 process or send us a letter and get us an

13 answer.  There may be other ways to get answers

14 to some of the very limited number of questions

15 that we have.

16             THE COURT:  Thank you, Mr. Adler.

17 Thank you.

18             MR. PULTMAN:  Good afternoon, Your

19 Honor.  Jacob Pultman, of Allen & Overy, on

20 behalf of the Canadian Monitor.

21             THE COURT:  Yes, sir, yes.

22             MR. PULTMAN:  And it is my first

23 opportunity to be before you.

24             THE COURT:  It is good to have you



1   here.

2            MR. PULTMAN:  Thank you, Your

3   Honor.  And I would speak briefly in response

4   to comments made by Mr. Zelbo.

5            THE COURT:  Okay.

6            MR. PULTMAN:  First, with respect

7   to the question of the nature of the

8   examinations and the nature of the motion that

9   is before us, it is not a motion in which we

10  are here asking Your Honor for something that

11  is new.  It is not something that we are here

12  asking for anything.  It is an effort now at

13  the very end of discovery to change the playing

14  field.  It is to take the deposition protocol

15  that everyone agreed to at the beginning of the

16  process and dispense with a portion of it.  And

17  it is an important portion of it.

18            As Your Honor has heard and as

19  Justice Morawetz has heard in Canada, there are

20  a tremendous number of reasons why things are

21  important, and it is not just gap-filling.  Why

22  do I say it is not just gap-filling?  Well,

23  there was discussion that this is all about

24  gap-filling.  Well, there were a list of issues

1    that we provided in our factum in Canada.

2    There were a list of issues that we provided to

3    all counsel that detailed what it was in

4    particular we were asking about.

5              And this is not the case that was

6    cited from the District Court in New York in

7    which someone is asking a private investigator

8    the equivalent questions you would ask the

9    lawyer in the case.  It is a question of

10   stringing the facts together in a

11   representative fashion, meaning binding the

12   party by those facts to those legal theories.

13   It is not simply the notion of saying what are

14   the facts.

15              And there was something of an

16   allegation -- I believe it was made by the

17   U.S., and I believe it related to the question

18   of did we consciously omit or fail to ask

19   questions so that we could save them for

20   tactical purposes.  The answer to that I can

21   say emphatically, the answer to that is

22   absolutely not.  There was no tactical effort.

23   There was nothing strategic about the questions

24   we asked them the sense of, did we withdraw or

1   hold back from asking questions so we could

2   beat up some person who was acting as a lawyer

3   essentially, was an investigator.

4           The purpose of the representative

5   depositions, whether they have been called as I

6   heard today a sandwich or a bridge, whether

7   they were discovery, they were agreed by the

8   parties, signed by Your Honor, signed by

9   Justice Morawetz, for the purpose of giving the

10  parties the ability to connect the facts to the

11  legal theories and hold the parties to them.

12  And that's what we are here to ensure goes

13  forward.

14          We know a good number of the

15  facts.  We have had 105 depositions.  We have

16  had millions of pages exchanged.  But the

17  parties are unwilling to stand behind them.

18  And we pointed out two different instances in

19  which we said questions were asked but would

20  they stand behind them as a party.  And it has

21  been very clear that that's not what they were

22  willing to do in depositions.  There were

23  responses that he is just an individual

24  testifying.  You can't bind the party to that

1    testimony.  What we are looking to do is take

2    the opportunity that was granted to us under

3    the deposition protocol to do exactly that:  To

4    hold them to that position, hold them to those

5    facts, and to apply those facts to fill the

6    gaps.

7                 THE COURT:  Let me ask you this

8    question, because you made a reference that you

9    didn't withhold questions to beat up a person

10   acting as a lawyer or a private investigator.

11   That to me indicates that that's the context in

12   which you are taking these depositions, as if

13   you were deposing the lawyer or the private

14   investigator.

15                 MR. PULTMAN:  And I appreciate

16   that, Your Honor, and I can tell you that is

17   not the way we are intending to take these

18   depositions.  We are intending to take the

19   depositions under the Ontario protocol of the

20   Ontario Rule 31, which Ms. Kimmel gave you in

21   great detail and provided Justice Morawetz in

22   great detail.

23                 When we started, we asked for the

24   equivalent 30(b)(6) depositions and were told

1   the parties wouldn't agree to the equivalent of

2   Rule 30(b)(6) depositions; go through the

3   Ontario process, the representative

4   depositions.  And it is for that reason that I

5   would defer with great respect to my colleague

6   in Canada, who explained in great detail the

7   purpose of those depositions.  I refer and

8   incorporate also the comments made by counsel

9   for the CCC and counsel as well Mr. Barnes, who

10  spoke quite eloquently about the need to have

11  these representative depositions with respect

12  to the D's and the O's, the directors and

13  officers who don't have the ability to connect

14  the dots.

15          And for all those reasons, Your

16  Honor, we believe that living up to what the

17  parties agreed to at the outset, what Your

18  Honor and Justice Morawetz signed onto at the

19  outset is very important and should not be

20  dispensed with.

21          A final point with respect to

22  costs, which is we have heard a lot today about

23  costs.  I think Your Honor gets a very clear

24  picture that it is not simply that this is not

1  a major cost.  It is that by comparison, this

2  is an important point of our deposition

3  protocol.  It is an important point of

4  discovery.  It is an important point of being

5  ready for trial.  And by comparison in that

6  notion, it is not a tremendous cost.

7           With that, Your Honor, I will

8  defer to my colleagues in Canada.

9           THE COURT:  Thank you.  Thank you.

10           MR. PULTMAN:  Thank you, Your

11  Honor.

12           THE COURT:  Good to have you here.

13  Good to see you.

14           Mr. Zelbo.

15           MR. ZELBO:  Unless somebody

16  else --

17           THE COURT:  Oh, I am sorry.  Good

18  afternoon.

19           MR. HOEFFNER:  Good afternoon.

20  Almost good evening.

21           THE COURT:  Almost.  But it is

22  still going to be cold outside, so you still

23  have to dodge it.

24           MR. HOEFFNER:  It is going to be



1   cold out there, so I cut my hair so I would be
2   ready for the cold weather.
3            I am Tim Hoeffner, from DLA Piper.
4   I just want to make a couple of brief points.
5            THE COURT:  Yes.
6            MR. HOEFFNER:  The suggestion that
7   the CCC waived continuing to pursue the issues
8   that were raised on behalf of the bondholder
9   request for depositions is really absurd to me.
10  Again, we relied on the representation in that
11  email saying that we should pursue this in the
12  course of the representative depositions.
13  That's why we are here today.  We made a
14  decision to pass on it in the context of fact
15  witnesses.  We decided to wait until the
16  representative witness depositions, so we are
17  here today.  We are pursuing it.  We still
18  think it is valid.
19            Secondly, there has been a lot of
20  argument on their side about the relevance of
21  the issues that were raised in our notice.  I
22  find that also absurd.  The issues relating to
23  the expectations of creditors, expectations of
24  bondholders, come directly out of their

1  allocation statement.  And I would refer

2  specifically to paragraphs 59 to 65.  It is all

3  there.  It is all there.  The guaranties were

4  not redundant because creditors properly viewed

5  NNL and NNI as separate legal entities, having

6  independent creditworthiness.  The CCC fails to

7  present any evidence suggesting that creditors

8  reasonably and actually relied upon the

9  integration of the Nortel debtors as a single

10  economic unit.  In fact, the evidence will

11  rebut the CCC's assertions and establish that

12  creditors understood that each Nortel debtor

13  was a separate legal entity responsible for its

14  own debts.  It goes on and on.

15           We want to test those allegations.

16  That is why we made this request.  It is very

17  focused.  They have not produced a single

18  witness, not one, nada, zero.  We want one

19  witness who can speak to three very specific

20  issues that come directly out of their

21  pleading, out of their allocation statement.

22  We think the issues relating to the trading go

23  to these very points about what they were

24  relying upon and what they viewed as important.

1    We want to test it.

2                    2019, an important point there,

3    2019, there is no equivalent in Canada.  And

4    the other important point that came out that

5    Mr. Rosenberg identified today, he read the

6    advisory notes to 2019.  2019 makes it very

7    clear it does not address discovery.  So it is

8    a separate issue.

9                    I just wanted to make those three

10   points.  Unless there is any further questions,

11   I have been quiet, sitting in the back.

12                   THE COURT:  You sure have.  Thank

13   you.

14                   MR. HOEFFNER:  And I am trying.

15                   THE COURT:  Thank you, sir.  Thank

16   you.

17                   Anyone else?

18                   (There was no response).

19                   THE COURT:  Are you still there,

20   Justice Morawetz?

21                   CANADIAN COURT:  I am, sir.

22                   THE COURT:  All right.  Oh,

23   Mr. Zelbo.

24                   MR. ZELBO:  Yes.



```
 1                   THE COURT:  Oh, that's right.  I
 2   am sorry.
 3                   MR. ZELBO:  Thank you.
 4                   THE COURT:  That's right.  We took
 5   Mr. Hoeffner before you.  I apologize.
 6                   MR. ZELBO:  I know it has been a
 7   long day, but I just want to respond to
 8   Mr. Pultman's comments about living up to the
 9   parties' agreement.  That is what we are trying
10   to do.  We believe the agreement is clear as
11   written, that it was just a gap-filling
12   exercise.
13                   I heard lots of things from
14   Mr. Pultman about what the parties agreed to or
15   what the negotiations were.  I think he said
16   the parties agreed to give up 30(b)(6)
17   depositions and instead pursue under Rule 31 of
18   the Civil Procedure for Ontario, without any
19   modifications apparently.
20                   Mr. Pultman said this the first
21   time he showed up in the case.  I can also tell
22   you he was not present during one second of the
23   negotiations.  My partner, Mr. Rosenthal, led
24   the negotiations with the U.S. debtor, has put
```

1  in an affidavit.  Ms. Tabatabai for the EMEA

2  put in an affidavit.  She was leading the

3  negotiations or was one of the leaders.  She

4  put in an affidavit.  Those are the only

5  firsthand affidavits that these courts have as

6  to what the parties discussed during the

7  negotiations that led to the language which we

8  contend makes clear this was a gap-filling

9  exercise.

10             Now, what I heard from

11  Mr. Pultman --

12             THE COURT:  A fact gap-filling

13  exercise --

14             MR. ZELBO:  Correct.

15             THE COURT:  -- or that it was not

16  an effort to bind the parties.

17             MR. ZELBO:  Well, I will get to

18  that.

19             THE COURT:  Yes.

20             MR. ZELBO:  I want to get to that

21  point right now.  It is certainly -- they never

22  negotiated for a deposition for admissions --

23  right? -- for binding admissions of a party

24  representative.  The facts are what the facts



1   are, and then they will be argued from those

2   facts.  But having a representative come in and

3   be cross-examined on parties' admissions, to

4   get admissions and then to torture that witness

5   about those admissions, that's not the purpose

6   of deposition discovery of party

7   representatives and certainly is not what the

8   U.S. debtors thought they were agreeing to.  It

9   was never, ever requested during the

10  negotiations, and there is no evidence to the

11  contrary, and the protocol, the agreed-upon

12  protocol doesn't say that.

13              And moreover, in terms of the

14  statement by Mr. Pultman, which is a different

15  point on binding, one of the things he said,

16  well, you know, that's all fine, but a lot of

17  the witnesses we deposed are former employees,

18  so you are just going to tell me you are not

19  bound by them.  Well, you know, we did offer to

20  try to deal with that issue, and Mr. Rosenthal

21  had set forth in the letter from Mr. Abbott you

22  got on January 6, Mr. Rosenthal had offered,

23  saying, you know, the U.S. debtors suggested

24  they would likely be willing to adopt the

 1   testimony of any of the witnesses they produced

 2   and offered for the Monitor and Canadian

 3   debtors to present a compilation of such

 4   testimony for which the U.S. debtors' binding

 5   adoption was sought.

 6              Now, the Canadian debtors and

 7   Monitor don't want to do that.  They can go

 8   through all those depositions transcripts.  We

 9   don't have to do the work for them.  And if

10   they want to say, "Look, this witness said X,

11   this witness said Y, but it is a former

12   employee.  Are you standing by that?" we can

13   talk about that if that's their concern.

14              But the notion that we are going

15   to cross-examine a representative witness to

16   connect dots which we connected in our pretrial

17   papers and at trial and in our affidavits and

18   our exhibits or to gain party admissions, that

19   was never agreed to and was never the purpose

20   of these depositions.

21              Thank you, Your Honor, unless the

22   Courts have any questions.

23              THE COURT:  I think we have to

24   adjourn.

 1                    MR. ZELBO:  Okay.  Thank you, Your

 2  Honors.

 3                    THE COURT:  Thank you, Mr. Zelbo.

 4                    Justice Morawetz, I think we are

 5  finished in Delaware.

 6                    CANADIAN COURT:  All right, sir.

 7  Perhaps we will take a five or ten-minute break

 8  and we will have our conference.

 9                    THE COURT:  Very well.  Thank you.

10  We stand in recess.

11                    (Recess taken.)

12                    THE COURT:  You may be seated,

13  everyone.  Thank you.

14                    Justice Morawetz, I am on the

15  bench.

16                    CANADIAN COURT:  Okay.  Thank you,

17  Judge Gross.  Counsel in Toronto and in

18  Wilmington, we thank you for the very, very

19  detailed submissions today.  Judge Gross and I

20  are going to review this matter between now and

21  tomorrow.  We do obviously recognize that there

22  is urgency in getting a ruling on this.  There

23  will be a telephonic hearing tomorrow at 3:00

24  p.m., at which time a decision will be provided



1   by this Court and by Judge Gross in Delaware.

2                    Are there any further questions

3   for tonight?

4                    (There was no response.)

5                    CANADIAN COURT:  Judge Gross,

6   anything further at your end?

7                    THE COURT:  That's all, except to

8   wish everyone a good, warm trip home.

9                    CANADIAN COURT:  And I assume that

10  between the two courts, that counsel will have

11  the appropriate call-in numbers for tomorrow.

12                   THE COURT:  Yes.

13                         - - -

14                   (Court adjourned at 4:15 p.m.)

15                         - - -

16

17

18

19

20

21

22

23

24



1                          CERTIFICATE

2                  I, LORRAINE B. MARINO, Registered

3    Diplomate Reporter, Certified Realtime Reporter and

4    Delaware Notary Public, do hereby certify that the

5    foregoing pages numbered 2 through 203 contain a

6    true and correct transcription of the proceedings

7    as stenographically reported by me at the hearing

8    in the above cause before the United States

9    Bankruptcy Court for the District of Delaware, on

10   the date therein indicated.

11                  The portions of this transcript

12   reporting the proceedings in the Canadian Court

13   reflect the problematic video and audio

14   connections, with gaps in the audio transmission as

15   well as inaudible portions, and therefore may not

16   be accurate and complete.

17                  IN WITNESS WHEREOF I have hereunto set

18   my hand at Wilmington, this 9th day of January,

19   2014.

20

21           *Lorraine B. Marino, RDR*

22

                    /s/Lorraine B. Marino, RDR, CRR
23                   Registered Diplomate Reporter,
                     Certified Realtime Reporter
24                    and Delaware Notary Public

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 206 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

**$**

**$10 (1)** 94:12
**$2.22 (1)** 184:2
**$4 (5)** 92:21
140:23 142:13
147:20 150:24
**$4-1/2 (1)** 25:7
**$75 (1)** 19:13
**$9 (3)** 127:20
133:2 150:11

**A**

**abandon (1)**
134:9
**ABBOTT (13)** 2:7,
10,11,11 3:13,
23 4:3,15,16
53:9,10,10
200:21
**Abid (1)** 21:16
**ability (5)** 23:22
43:8 90:24
191:10 193:13
**able (17)** 2:3 3:7
6:4 8:1 11:11
12:15 44:8
51:1 56:16
60:22 105:18
135:5 144:15
151:2 155:21,
24 186:10
**ably (1)** 51:5
**about (122)** 6:21
7:17 8:18,18
9:3,5,24 10:6,
10,20 24:22
25:22 26:6
28:16 30:1,5
33:3 34:17
39:22 44:18
45:8,11 46:6,
8 48:1 50:21
54:11 58:20
60:2 61:1
62:2 63:16

65:22,24
70:23,24 72:5
73:22,22
74:13 75:11
84:15 89:20
101:23 109:16,
18 113:15,18
115:17 117:8,
15 118:21
123:8,21,23
124:13,20
127:22,23
129:17,22
132:19,19,20,
22 133:4,7,9
136:21 138:22
139:1 140:23,
24 142:21
147:6,13,14,
19 148:14,15
150:20,23
151:7 153:22
154:2,4,5,13,
22 157:13,14
159:8,10
165:6 169:10
171:13,14
173:21 174:18
175:19 176:18
177:11 179:11,
12 180:10
181:13,14
184:15 185:5,
6 188:9
189:23 190:4,
23 193:10,22
195:20 196:23
198:8,14
200:5 201:13
**above (1)** 150:18
**above-referenced (1)**
87:7
**Absolutely (9)**
23:9,10,15
32:22 49:4
98:10 178:7
188:5 190:22
**abstract (1)** 28:7

**absurd (3)** 62:19
195:9,22
**accelerate (2)**
77:19 78:24
**accept (1)** 153:13
**accepted (1)**
158:12
**accepts (1)** 96:6
**access (5)** 61:23
62:6 91:12
162:15 173:12
**accommodation (1)**
5:4
**accomplish (2)**
33:5 124:15
**accomplished (1)**
78:13
**accordance (3)**
4:4 115:8
154:1
**according (2)**
40:22 79:6
**accordingly (1)**
152:1
**account (4)**
105:19
107:19 110:9
121:2
**accounting (1)**
61:15
**accounts (1)** 97:6
**accurate (5)**
66:18 111:24
154:12,15
169:22
**aced (1)** 9:13
**achieve (2)**
23:17 170:4
**achieved (3)**
22:17 45:12
110:2
**achievement (1)**
22:4
**achieving (1)** 24:2
**acknowledged (1)**
105:4
**acquisition (4)**
104:5,6

151:16 183:19
**act (2)** 128:8
131:8
**acting (2)** 191:2
192:10
**action (1)** 115:21
**active (1)** 178:24
**actual (5)** 90:22
91:4 93:13
135:4 144:11
**actually (22)**
11:23 17:11
44:3 69:18
91:23 93:8
97:1 98:8
100:1 111:16
112:9 113:6
116:4 120:14
123:18 140:1
154:19 161:3
178:17 183:14
187:7 196:8
**actuaries (1)**
161:21
**Ad (7)** 139:10
141:18,23
143:2,13
144:24 178:21
**add (6)** 24:14
26:17 52:21
102:8 176:12
186:9
**added (1)** 46:5
**addendum (4)**
59:10 142:24
178:18 184:4
**adding (1)** 46:6
**addition (2)** 92:7
183:17
**additional (8)**
16:21 57:12
94:9 96:9
102:8 129:12
148:10 178:20
**address (9)** 4:8
22:7 47:5
68:22 101:16
126:21 166:23

177:1 197:7
**addressed (9)**
22:13,18
68:16 99:2,5
101:19 121:15
141:3 181:2
**addressing (2)**
59:1 132:7
**adduced (1)**
165:11
**adequate (3)**
49:5 60:5
107:23
**adhere (1)** 25:24
**adhering (1)** 26:6
**adjourn (1)**
201:24
**adjourned (1)**
203:14
**adjournment (1)**
48:23
**adjudicated (1)**
181:20
**Adler (12)** 24:8,9,
10,13 26:9
53:4 186:5,7,
8,16 188:5,16
**administrative (1)**
19:12
**administrator (1)**
147:12
**Administrators (8)**
5:20 6:6 14:1
19:1,21 24:10
39:21 85:10
**admissible (1)**
72:9
**admission (2)**
155:22 156:11
**admissions (16)**
109:17 120:4
149:24 150:2
154:24 155:3,
9,11 156:2,5
199:22,23
200:3,4,5
201:18
**admit (1)** 156:7

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 207 of 249
Bankruptcy Court for the District of Delaware                     Hearing
In Re: Nortel Networks Inc., et al.                        January 7, 2014

**adopt (4)** 79:13
  127:8 147:3
  200:24
**adopted (3)**
  119:24 124:7
  145:4
**adoption (1)**
  201:5
**advance (6)**
  72:24 78:10
  115:22 170:16,
  21 171:6
**advanced (2)**
  15:3 58:7
**advancing (1)**
  141:13
**advantage (4)**
  97:18 98:11
  186:23 187:19
**adverse (1)**
  149:17
**adverted (1)**
  78:12
**advise (1)** 49:2
**advisors (1)**
  161:23
**advisory (1)** 197:6
**affect (3)** 28:20
  35:11 48:5
**affidavit (18)**
  56:22 57:12
  60:1 84:22,23
  85:7 86:19
  88:12 138:20
  140:13 144:9
  166:24 171:11,
  19 173:1
  199:1,2,4
**affidavits (13)**
  72:19 78:10
  79:5 101:7
  108:23 110:12
  127:3 133:6
  149:13 158:6
  165:12 199:5
  201:17
**affiliated (1)** 74:12
**affirmative (4)**

  56:22 57:11
  114:6 176:5
**afforded (1)** 55:14
**afraid (1)** 157:7
**after (10)** 15:14
  34:9 36:19
  37:13 43:17
  60:10 62:8
  86:7 101:20
  118:20
**afternoon (12)**
  76:18,21,22
  79:12 90:12
  99:18 169:18,
  19,20 188:18
  194:18,19
**again (29)** 3:2
  7:8 8:3 15:17
  20:22 22:10
  23:4,4 27:20,
  22 61:22 82:3,
  22 85:7
  102:17 129:10
  133:16 143:9
  155:6 163:13,
  22 164:1,7
  167:16 171:8
  176:21 187:19
  188:6 195:10
**against (34)** 7:6,
  16 32:17 41:7,
  10 70:13
  83:24 89:24
  93:22 128:1,3,
  6,8 129:4,6
  130:12 132:15
  133:20,21,24
  134:6 146:8
  149:1 159:14
  164:5,7
  165:10,15
  181:19,22
  183:2,4
  185:17 187:24
**aggregate (1)**
  94:11
**ago (2)** 29:14
  182:15

**agree (6)** 30:2
  31:11,11
  106:1 133:17
  193:1
**agreed (35)** 9:18
  16:14,15 17:2,
  13 26:21
  54:21 59:12,
  16,19,21,24
  61:5,6 63:3
  76:13 77:3,8
  78:14 79:3
  80:6 106:4
  107:8,19
  111:13 129:15
  137:6,6 152:6
  189:15 191:7
  193:17 198:14,
  16 201:19
**agreed-upon (1)**
  200:11
**agreeing (2)**
  76:14 200:8
**agreement (33)**
  6:10 10:1,5
  12:13,20
  15:19 16:13
  19:9 22:15,19
  23:7,20,21
  28:18 29:11
  30:2,3,14
  31:2,4,6,9,19
  32:16 33:21
  37:16 38:18
  42:13 48:4
  66:18 77:23
  198:9,10
**agrees (1)** 31:20
**ahead (7)** 80:18
  81:5,18 82:11,
  12 113:20
  166:20
**air (1)** 17:21
**Akin (1)** 21:16
**aligns (1)** 115:18
**all (167)** 2:3
  4:24 5:14
  7:23 9:18,22

  11:19 14:3,18
  15:5,7,9,24
  16:2,8 17:9
  20:24 22:2,19
  23:13,16 24:4,
  6,21 25:10,13
  26:18 27:10
  28:7,12 36:23
  37:9 38:8,22
  39:5,22 40:7
  41:5,20,20
  42:1 44:7
  45:7 48:22
  50:15 51:4
  52:16 55:10,
  14,17 56:5,5,
  7,21,24 57:22
  58:10,13
  60:18,23 61:5,
  9,10,13,16
  64:14 65:5,13,
  13 66:5 69:5,
  5,6 71:20
  73:21 74:13,
  21 75:15,15,
  19 80:22
  84:13 85:8,20
  89:18 96:5
  100:16,18,18
  101:6 103:16
  106:1 107:4,
  19 108:5,10
  109:19 110:8
  112:1,5
  117:10 122:1
  123:3 124:3,
  16 127:8
  136:8,23
  137:5 141:22
  142:9 144:19
  146:12 147:3
  148:17 150:10
  153:10,11,12
  154:7,18
  155:6,18
  156:2,3,12
  157:17 158:5,
  7,8,10,11,17

  159:10 162:8
  163:10 164:14
  165:4 166:1,
  14 167:6
  168:11 169:16
  172:12,17
  173:11,24
  174:5,7
  175:15,17,17
  179:12 184:13,
  20 187:12,22
  189:23 190:3
  193:15 196:2,
  3 197:22
  200:16 201:8
  202:6 203:7
**allegation (5)**
  84:7 97:20
  175:5 182:4
  190:16
**allegations (8)**
  84:6 128:5,7
  163:2,11
  164:8 165:9
  196:15
**allegedly (1)**
  87:21
**Allen (1)** 188:19
**allocate (2)**
  180:19 181:6
**allocation (62)**
  8:12 11:4,4,6
  12:10,16,22,
  23 13:4,8
  14:22 15:2,13
  18:10,23
  22:16 26:22
  27:1 28:19
  29:2,16 39:23
  47:19 57:24
  58:4,7,8 64:5
  66:16 67:3
  70:17 83:21
  92:8 97:18
  98:4,6,8,9,14
  103:10 104:2,
  3,8 120:11
  124:4 125:20

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 208 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

127:22 136:14
145:5 146:7
153:9 168:22
172:18,20,21,
22 176:7
179:3 181:13
185:13 196:1,
21

**allow (10)** 13:8
32:24 66:14
110:17 121:17
122:9 125:13
130:21 135:2
159:15

**allowances (1)**
19:12

**allowed (3)**
30:22 58:16
75:12

**allows (4)** 19:21
32:19,20,23

**alluded (1)** 25:3

**almost (6)** 18:23
55:18 91:17
178:23 194:20,
21

**alone (3)** 102:7
132:10 170:12

**already (14)** 6:11
18:15 62:14
64:5 69:7
78:21 79:3
111:14 117:13
118:11 119:17
165:11 170:16
186:11

**also (25)** 8:13,
18 10:10
12:14 16:16
51:8 57:16
63:11 75:3
85:17 95:23
96:17 106:6
116:24 122:11
124:5 125:15
136:15 147:11
157:12 182:2
188:2 193:8

195:22 198:21

**alternate (2)** 98:4,
6

**alternative (3)**
18:14,18
146:19

**alters (1)** 33:14

**although (5)**
117:17
119:22 141:3
151:14 169:7

**altogether (1)**
108:15

**always (3)**
138:12 141:8
147:15

**ambiguity (1)**
171:18

**ambiguous (1)**
73:19

**amend (8)** 26:4
30:19 31:14
33:22 38:22
48:5 51:23
94:1

**amended (1)**
137:8

**amending (1)**
96:19

**amendment (9)**
30:17,18
31:7 33:2,9
35:23 36:4
37:17 45:22

**amendments (4)**
28:15 31:10,
17 37:13

**among (4)** 14:23
45:3 106:16
110:8

**amongst (1)** 16:2

**amount (9)** 8:23
35:4 42:1
53:18 64:12
69:14 135:5
151:16 176:12

**amounts (1)**
19:13

**ample (2)** 75:7
82:24

**amply (1)** 109:13

**Amtrak (1)** 11:14

**analogy (3)**
29:16 117:7,
16

**analysis (1)** 90:2

**analyze (1)** 67:1

**analyzed (1)**
72:16

**and/or (1)** 118:1

**Andersen (3)**
114:23
115:11,12

**Andrew (1)**
176:21

**annexed (2)**
160:20 161:14

**announce (3)**
32:8 47:19
49:17

**announced (1)**
36:13

**another (5)**
11:15 41:10
42:22 113:10
118:7

**answer (18)** 42:9
62:4 69:22,22
82:7 88:1
89:3 99:1
109:1,23
113:12 134:7
147:13 148:4
157:4 188:13
190:20,21

**answered (2)**
87:14 119:7

**answers (15)**
65:24 88:5,
15 111:11
119:23 120:2
130:1 133:15
134:10 135:12
158:3 170:20
187:10 188:9,
13

**anticipate (1)** 26:5

**anticipated (2)**
60:11 141:9

**antithetical (1)**
23:16

**Anybody (5)**
113:4 182:17
184:1 185:12
186:4

**Anyone (5)** 27:7
30:3 48:15
179:24 197:17

**anything (25)**
10:14 13:1
16:15,22
17:21 22:12
30:5 33:2
52:13 83:9,13,
17 88:6 118:4,
11 132:19,24
150:15 158:22
159:2,2,13
176:12 189:12
203:6

**anywhere (2)**
10:14 181:12

**apologize (2)**
167:20 198:5

**apparent (1)**
102:10

**Apparently (2)**
140:4 198:19

**appeal (4)** 19:4,
4,7 51:8

**appear (1)**
141:11

**appearance (2)**
182:9,12

**appeared (1)**
185:3

**Appendix (11)**
106:18,21
121:14 122:19,
23,23 123:5
160:20,24
161:1,14

**applicable (1)**
89:8

**applies (1)** 35:24

**apply (2)** 36:1
192:5

**appointed (1)**
13:22

**appreciate (5)**
83:18 93:1
95:12 107:4
192:15

**appreciated (1)**
27:6

**approach (4)**
50:11 70:12
96:5 97:5

**appropriate (10)**
82:20 86:16
90:4 96:18
124:10 125:4
173:14 177:8,
9 203:11

**appropriately (1)**
154:8

**appropriateness (1)**
137:4

**approval (9)** 4:11
6:15 19:17,18,
19 20:4,11,12
45:13

**approve (3)** 50:9
51:9,17

**approved (9)** 4:6
20:16 31:3
77:23 96:1
137:7 149:3,6,
6

**approving (4)**
30:15 33:2
49:17,18

**approximately (1)**
92:21

**April (2)** 78:3
93:21

**apt (1)** 174:24

**arbitration (1)** 19:9

**area (3)** 71:24
103:4 169:8

**areas (9)** 100:15,
16 102:12

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 209 of 249

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                         January 7, 2014

103:20 105:7
148:8 168:12,
12,18
**argue (4)** 5:13
16:10 53:23
174:21
**argued (1)** 200:1
**arguing (1)** 45:20
**argument (13)**
9:14 27:17
36:8 42:9
53:14 54:1
66:9 89:24
146:19 165:4
171:16 176:18
195:20
**arguments (4)**
11:22 48:13
147:19 153:7
**arises (1)** 168:17
**arising (1)** 126:19
**arm's-length (1)**
162:4
**Armstrong (1)**
115:5
**around (12)**
23:13 32:1
37:21 47:11,
22 66:2 67:9
68:14 95:21
105:20 142:16
152:24
**articles (1)**
116:22
**articulate (1)**
121:14
**articulated (1)**
117:6
**articulation (1)**
157:20
**artificial (1)** 14:6
**ascertain (1)**
129:3
**aside (1)** 104:12
**ask (51)** 29:23
58:17 62:1
65:22 84:20
89:18 99:23

106:14 109:18
113:6,7,8
114:4 117:21
119:3 128:13
131:17 132:13
133:15 137:1
139:24 148:3,
13,14,20
150:19 151:3,
5,12,23
155:21,24
156:17,19
157:1 161:5
162:2 167:6,7
169:10 170:15,
18 171:3,3,5
173:23,24
175:19 190:8,
18 192:7
**asked (42)** 42:3
46:4,8 50:16
72:1 78:17
81:22 84:8
86:24 87:2,3
89:20 113:14,
18 116:17,20
118:15 123:8
136:24 137:5
139:6 141:14
146:3,12
148:7,9
150:18 154:13
157:2,13,14
174:10 177:19,
22,23 178:1,2
179:7 185:4
190:24 191:19
192:23
**asking (26)** 40:2
55:2,24 57:18
63:21 64:1
71:3 74:12
87:22 88:4
118:18 130:4
131:6 132:11
137:5 144:4
153:16 173:5,
6 174:22

175:13 189:10,
12 190:4,7
191:1
**assert (2)** 105:5
119:1
**asserted (8)** 7:6
103:13,22
128:6 129:4,5,
13 134:1
**assertion (2)** 67:5
183:22
**assertions (2)**
117:23 196:11
**assess (1)** 54:24
**asset (1)** 103:10
**assets (2)** 103:6
146:21
**assign (1)** 74:14
**assigned (2)**
65:16 66:1
**assignee (3)**
65:18 71:19,
20
**assignments (1)**
65:20
**associated (1)**
184:14
**assume (5)** 85:3
145:24 176:4,
9 203:9
**assuming (1)**
20:16
**assure (2)**
174:14 175:23
**assured (1)** 56:7
**Atara (3)** 138:2,
3 140:16
**attached (2)** 50:2
166:24
**attaching (1)**
106:22
**attempt (5)** 13:12
31:16 73:4
121:17 186:12
**attempts (1)**
122:20
**attended (1)**
131:9

**attention (6)**
63:14 125:5
150:17 178:12
180:2 182:19
**attorney (2)**
172:1,2
**attorney-client (1)**
89:6
**attorney's (1)**
174:23
**audio (1)** 3:1
**August (9)**
111:13 138:4,
15 140:15,15
142:9 151:22
178:8,13
**authorities (4)**
114:17,17
115:4 148:21
**authority (2)**
119:20 151:20
**authorizing (1)**
48:4
**authors (1)** 65:17
**available (10)**
28:23,24
60:19 94:16
99:12 103:6
104:14 143:19
146:5 164:15
**avoid (2)** 122:17
150:5
**avoided (1)**
176:14
**aware (5)** 93:20
136:6 139:3
165:23 169:1
**away (5)** 42:4,6
137:23 175:12,
22
**awful (1)** 46:17

---

**B**

**back (23)** 30:24
33:4 43:13,13,
14,15,16
45:14 59:18

62:22 67:17
68:19 71:19
111:19 133:16
139:22 157:9
167:8 168:2
171:7 178:12
191:1 197:11
**backdrop (1)**
93:23
**backs (1)** 185:12
**backwards (1)**
83:1
**baggage (1)** 9:1
**balance (2)**
80:23 81:15
**balanced (1)** 81:3
**bankers' (1)** 55:17
**bankruptcy (3)**
73:6 143:18
183:12
**Barbara (1)**
140:14
**barest (1)** 38:19
**bargained-for (2)**
103:15,18
**Barnes (13)**
125:13
126:13,21,23,
24 127:17
128:18 136:16
147:4 159:9
163:23 164:16
193:9
**Barnes' (3)** 145:4
163:20 164:21
**based (4)** 24:24
36:16 118:16
165:10
**bases (3)** 58:6
81:8 157:17
**basic (4)** 34:18
134:12,18
136:6
**basis (23)** 23:19
30:16,20 31:6
37:17 52:4,18
54:1 60:21
64:7 84:7

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

97:20 114:3
136:19 142:10
157:10 163:12,
19 165:10
172:13,17
173:2 180:4
**Bean (2)** 149:10,
19
**bear (5)** 45:15
96:14 103:11
104:2 187:17
**bearing (1)** 29:9
**bears (1)** 92:10
**beat (2)** 191:2
192:9
**beautiful (1)**
135:23
**because (76)** 7:8
9:2,7 29:24
34:3 35:12,17
36:16,20 40:6
43:9 46:7
47:20 49:12
50:18 60:15
61:23 62:3
70:21 72:13
76:11 82:5,10
83:14 84:12
87:5 88:11
97:9 99:5
101:18 102:6,
9 108:9 112:1,
24 113:21
117:16 118:18
120:14 124:17,
22 125:5,19
130:1,7
132:17 133:8
156:10,18,24
163:24 167:17
170:13,21
171:6,23
174:5 175:7,
10 177:14
178:7,9
179:19 180:15,
19 181:2,4
182:3 184:8,

14 185:2,5,15
186:17 192:8
196:4
**becomes (3)**
36:18,19
40:19
**Beddoes (2)**
19:17 20:4
**been (126)** 3:3
5:14,23 6:3
7:1,6 8:1,10,
13 9:15,20
11:2,11 12:12
15:3 16:20
18:15 19:1,15,
18,20,24 20:6,
15 21:24 22:8
29:2,6,7,17,
18 31:23
35:17 36:1
39:6 43:1
45:7 47:11
51:7 54:21
56:14 57:3,5,
7,22 59:12,16
61:5 62:14,15
63:3,8,15
64:2,17 65:2
67:22,23 69:7,
14 70:18 75:9,
16 77:14,14
78:12,14,21
79:20,21,21
80:4,13 81:7
82:2 87:14
89:13 91:9,17,
23 93:21
98:22 107:8,
23 108:9
109:19 112:2
113:10 114:10
117:1 118:11,
16,17 119:4,
16,22,24
120:7,10
124:6 125:23
130:10,19
133:2 151:22

154:3,6
155:21,24
159:3 161:14
162:9,9
165:11 167:4,
5 170:17
177:19 178:24
182:16 186:10
191:5,21
195:19 197:11
198:6
**before (58)** 5:14
9:4 11:12
16:24 21:10
24:1 27:3
29:14,15
34:23 41:11,
13 42:2,12
43:2 44:12
48:14 50:19
63:18 70:6,22
73:2 75:20
76:13 78:18
79:13,17,19
80:3 82:14
84:13 90:16,
22 91:5 93:4
94:7 101:3
109:15 111:2
112:2 121:3,
18 127:19
130:18 131:21
132:21 144:7
150:11 151:1
158:4,10
159:23 177:15
178:14 181:5
188:23 189:9
198:5
**beforehand (1)**
166:21
**began (2)** 84:13
101:21
**begin (2)** 22:24
100:6
**beginning (10)**
29:3,5,10
53:23 54:21

56:10 73:21
74:20 116:19
189:15
**begins (2)**
126:16 178:17
**behalf (20)** 2:12
21:17 27:15
54:7 66:11
70:5 99:20
104:19 105:3
129:19 136:2
138:18 139:4
140:18 167:22
176:22 182:9,
13 188:20
195:8
**behind (4)** 24:18
69:13 191:17,
20
**being (39)** 3:7
4:4 16:8,19
28:8 38:19
46:18 50:24
51:1 58:7
71:20 77:16
86:4,15 87:3
94:7 96:9
101:14 109:17
113:18 116:2,
17 127:20
128:22 129:5,
12,13,21,24
131:7,21
133:8 134:1,5,
20 163:17
181:15,20
194:4
**believe (27)** 7:5,
10,13 10:3
17:3 19:3
21:24 26:1
34:22 46:16
47:7 53:14,20
82:19 98:15
115:4 136:24
140:7 146:23
147:21 148:3
152:2 169:16

190:16,17
193:16 198:10
**believed (3)** 60:4
87:14 147:15
**believing (1)**
184:9
**bench (1)** 202:15
**beneficial (10)**
64:9 81:10,
11 87:19 88:3
89:19 123:10
132:23,24
134:23
**beneficiaries (1)**
92:18
**benefit (5)** 66:24
98:16 105:6
140:4 146:11
**benefits (1)** 81:1
**best (10)** 6:19
9:7,8 11:23
46:22 51:11
52:23 95:6
146:7 188:8
**better (7)** 2:21
17:12 37:18
93:3 107:4
160:12 187:10
**between (9)** 16:5
28:22 81:6
103:11 114:9
155:2 185:14
202:20 203:10
**beyond (4)** 73:5
143:17 165:18
171:23
**big (3)** 2:22
25:5 81:23
**billed (1)** 69:19
**billion (12)** 15:9
25:7 92:21
94:12 127:20
133:2 140:23
142:13 147:20
150:12,24
184:2
**billions (1)**
142:15

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 211 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

bind (7) 131:23
132:1 147:10
150:13 158:3
191:24 199:16
binding (8) 130:9
147:6 156:24
158:6 190:11
199:23 200:15
201:4
bit (9) 12:7
13:15 50:20
104:10 113:20
125:6 138:6
140:1 184:24
black (1) 57:19
blank (1) 49:12
blind (1) 56:11
Block (41) 52:8
53:15 54:3,5,
12,20 55:12
59:21 63:15,
19 65:3 67:20,
23 68:11,18,
24 71:12 74:3
77:1,11 80:9,
24 81:23
83:14,21 86:9
88:15 89:9
101:12 111:3
123:6 131:16
135:8 152:10,
11 153:13
160:5,8,11
166:13 180:18
Block's (5)
105:18 144:2,
7 149:12 165:2
board (2) 155:12,
16
boards (2) 131:9
164:21
body (1) 164:18
boil (1) 132:16
bold (1) 87:4
Bomhof (3)
52:11,12,19
bona (1) 9:16
bond (4) 169:1

181:8,10,11
Bondholder (10)
139:11
140:17 141:18,
24 142:19
143:2,9,14
145:10 195:8
bondholders (25)
93:16 98:3
103:22 138:21
139:5 140:21
141:6,11
142:12 144:14
145:1 147:18,
23 148:7
150:14 151:1
152:4,20
176:19,22
178:21 179:14
181:22 182:5
195:24
bondholders' (4)
103:24
138:16 141:16
142:23
bonds (15)
102:13,14
104:15 140:22,
23,23 148:11
169:8,11
177:20 180:13,
16,18 181:1
184:2
book (1) 128:13
bookends (1)
110:6
both (16) 3:3 4:6
14:15 19:1
34:20 47:16
54:6 63:8
64:8,14 70:2
71:1 95:9
100:2 101:15
127:13
bother (1) 6:8
bought (1)
147:24
bound (6) 40:23

130:1 150:15
158:13,15
200:19
boxes (1) 55:17
breach (1) 128:5
break (2) 139:18
202:7
bridge (6) 110:6,
19 121:1
155:1,8 191:6
bridges (1)
119:12
brief (15) 21:19
48:23 50:2
59:3 76:24
90:15 114:16,
17 115:4
148:21 154:7
169:21 172:22
186:4 195:4
briefing (4) 72:22
75:14 110:11
155:1
briefly (10) 22:8
25:3 38:11
92:12 115:18
119:15 140:14
186:5,8 189:3
briefs (5) 57:17
101:5 157:21
172:19,21
bring (3) 180:2
182:20,24
bringing (1) 55:15
brings (2) 8:5
53:8
broad (6) 61:3
67:5 72:7
74:17 100:17
153:10
broader (2)
127:21,22
broadest (1)
89:17
broke (1) 140:12
Bromley (37)
4:18,21,23
5:1,11,18

15:1 16:12
20:10 24:15,
21 25:3,21
28:1 32:13
38:3,9,10,13
40:3,8 42:10,
19 44:5,15
46:4,16,21
47:1 49:21
50:11,14 51:5
53:5 64:6
116:7 182:8
brought (7)
11:12 52:9
125:14 131:21
168:15 178:12
182:19
Brown (2) 3:14,
20
Buchanan (1)
27:14
built (4) 119:17
120:7,22 174:6
bullet (1) 150:18
bunch (1) 165:3
bundle (1) 58:2
burden (8) 18:24
42:4 45:16
55:3 92:8,10
96:6,13
burdens (3) 42:7
96:10 187:17
burdensome (4)
72:7 73:19
74:16 133:19
buried (1) 98:23
burn (1) 63:8
business (3) 51:3
85:13 179:11
Butany (1)
116:21
button (1) 41:21

**C**

calculated (1)
72:8
calendar (1) 6:11

call (4) 29:24
136:7 146:16
186:14
called (2) 101:4
191:5
call-in (1) 203:11
CALVIN (3)
76:18,19,23
came (6) 43:21
44:4 61:16
107:5 112:3
197:4
can (76) 3:21
5:16 8:18
9:14 10:23
11:6,6 13:6
14:3 15:4
17:18 22:17
23:14 27:2
28:6 38:10
39:20 41:6
49:9 50:7
52:17 58:17
59:22 66:4
67:6 70:4,9
73:23 75:24
78:17,19 81:1
82:16 84:3,21
86:4 95:7
113:4 114:4
120:4 121:2,
20,21,24
122:1,2
124:16 125:1,
3 130:16
132:21 133:15
135:19 138:5
142:1 151:5,
12 153:5
159:17 163:9
164:3 167:13
170:14,18
175:3,15,15
176:13 180:22
182:11 190:20
192:16 196:19
198:21 201:7,
12

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 212 of 249
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                    January 7, 2014

**Canada (16)**
14:24 48:15
51:20 139:16
150:21 176:4,
24 178:5
181:5,10
185:17 189:19
190:1 193:6
194:8 197:3
**CANADIAN (161)**
2:16,20,24
3:9 4:2 9:20
11:8 12:18
15:3,7,9,10,
17 18:4 19:7
20:24 22:9
23:11,23 25:4,
6 30:1 35:5
41:1 42:6,22,
24 45:3 48:17,
20 49:1,11
52:8,15 53:15
54:2,9,16
55:7 59:7,15
63:13,17
64:13 65:1
66:19,23
67:17,21 68:8,
15,20 71:8,9
74:2 76:17
78:9 79:9
82:23 83:8,13,
24 84:8,14
85:1 86:5
87:6 88:4,8,
13,16,16 89:4,
11,23 90:9,14
92:22 93:2
94:20 95:4
96:21 99:16
100:1 102:7,
16,20 105:10,
17 106:18,19
107:3 109:23
111:2 114:18,
20 115:1,7,14
116:8,11,15
120:19 123:18

125:8,16
126:22 127:16
128:17 133:20
135:13,16,19
136:3,8,10
137:14,19,22
138:5,9,18
139:23 140:3,
18 144:19
145:4,14,22
147:6 148:17
152:9 153:6
160:1,6,7,9,
15 161:19
162:12,18
163:1 165:22
167:10,12,18,
24 168:6
169:14 175:8
180:21 181:19,
23 188:20
197:21 201:2,
6 202:6,16
203:5,9
**Canadian-only (1)**
183:3
**Canadians (6)**
26:20 40:4
50:6 56:16
87:4 187:7
**Canadian-type (1)**
149:7
**cannot (3)** 112:6
128:24 157:5
**cards (1)** 29:9
**care (1)** 48:1
**carry (1)** 55:10
**carrying (1)**
135:16
**case (111)** 6:16,
22 25:5 28:12
29:4,5 37:5
43:1,10 44:8
50:17,21,22
51:7 52:24
56:14 57:1,11
68:4 70:15
73:8 75:1,5,

10,15 77:4,5,
8 80:18 81:8
82:8 83:1,2
84:15,19
85:24 86:4
87:12 89:9
96:12 97:9
99:12 106:10
110:24 112:15,
16 113:2
114:15,19,23
115:19 117:2
118:2,3,4,8
123:12 126:3
130:11,15,16
131:5,17,18,
22 132:2
133:3 136:14,
19 138:22
145:11 146:1,
2,17,17,17
147:21 148:24
149:9,11,16,
18,19,23
150:3,9,10,12
152:15 155:10,
11 156:11,12
157:16 171:24
173:3,11,14,
16 174:2,4,10
175:19 179:23
185:22 186:20
187:1,9 190:5,
9 198:21
**cases (7)** 5:13
22:4 52:24
70:10 151:11
182:15,16
**cash (1)** 97:6
**categories (1)**
74:17
**category (1)**
146:8
**cause (3)** 52:2
63:9 156:8
**CCAA (8)** 43:1
70:19 71:1
74:20 95:1,24

96:2,16
**CCC (30)** 13:24
15:23 41:3
71:10 72:6
97:24 98:12
101:12 102:6,
7 105:7 136:2
138:12,21
141:5 143:3,4
145:5 152:4,
19 168:19
169:4 177:19
178:18,20
180:14 182:23
193:9 195:7
196:6
**CCC's (13)**
71:16 98:2,4,
6 137:11
141:8 142:24
150:9 177:6
182:4 183:8,
14 196:11
**cede (1)** 4:17
**cent (1)** 69:19
**centered (1)**
95:21
**cents (6)** 180:13,
16,17,17,17,18
**ceremonial (1)**
159:1
**certain (12)** 13:7
15:20 16:18
95:8 128:7,18,
20 140:19,20
148:16 156:19
159:15
**certainly (17)** 7:5
23:22 26:17
37:4 38:14
51:1,16 52:1
53:2 69:20
76:12 104:20
111:18 179:5
184:12 199:21
200:7
**certiorari (1)** 19:6
**cetera (4)** 64:11

73:7 141:16
145:18
**CFSA (1)** 10:2
**challenge (3)**
9:16 168:14
169:4
**challenged (2)**
103:24 169:2
**chance (2)** 4:21
142:10
**change (5)** 26:5
30:21 111:7
152:3 189:13
**changed (1)**
79:23
**changes (5)**
28:17 33:13
80:4,6,8
**Chapter (2)**
151:11,11
**characterization (1)**
112:1
**charge (2)**
124:19,22
**chart (1)** 123:16
125:14 126:15
**chart-form (1)**
160:21
**charts (1)** 125:7
**Chicago (1)**
42:24 43:6
**choices (2)**
73:10,11
**choosing (1)** 74:7
**chose (4)** 56:17
62:9 156:3
171:5
**chosen (2)** 61:1,9
**Circuit (6)** 5:23
6:14 19:5
51:6,13 173:20
**circumstance (1)**
29:22
**circumstances (2)**
38:15 88:21
**cited (4)** 61:18
158:21 173:16
190:6

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 213 of 249
Hearing
January 7, 2014
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Civil (4) 77:6
95:22 107:13
198:18
claim (28) 19:13
41:8,10 43:3,
10 84:7
125:22 128:3
129:3,4,5,6,8
130:5 133:20
134:2,2 147:1,
2,20 150:24
162:4 163:6,
17 164:4,5,7
168:24
claimant (2)
185:15,16
claimants (12)
90:15 91:9
92:5,11 93:10,
24 97:19
125:18,21
126:6 161:2,12
claimants' (1) 91:7
claiming (1) 156:8
claims (74) 7:5,
14,16 8:4,14
18:24 19:11,
12 26:21
50:23 64:8
67:2 83:23
84:2,4,5
94:11 96:1,3,
7,12,21
103:21,24
104:1,2
120:17 125:11,
22 126:10
127:24 128:4,
11,19,20,22
129:13 132:15
134:1,5 135:3
146:8,20,20
147:14 148:16
159:11,12,13,
14 163:4,9,16,
22 164:13,23,
24 165:10,14
169:2,4 181:9,

10,11,13,14,
17,19,20,21,
21 183:2,3,17
class (1) 115:21
clear (29) 10:13
16:13 35:13
37:15,15
40:20 48:2,3
54:22 60:17
110:7 112:16
142:13 143:13
150:14,21
154:7 168:11,
14 178:8
179:21,24
185:7 186:12
191:21 193:23
197:7 198:10
199:8
cleared (1) 9:1
clearly (10) 2:18
32:24 50:9,22
51:2,10 75:1
81:12 92:14
125:16
Cleary (1) 159:20
client (12) 78:15,
23 91:11
93:23 96:5,10,
13,15 97:10
98:11,14 102:1
clients (18) 47:8
92:1,9 98:9
127:14 128:21
129:19,21,23,
24 130:12
135:3 164:21
179:2,15
180:13,15
181:1
close (2) 60:10
125:11
cloth (2) 12:24
32:14
co-counsel (1)
27:16
cold (4) 27:23
194:22 195:1,2

Coleman (25)
27:11,16,19,
21 28:11 30:7
32:20,22 33:6
35:1 36:6,9
37:7,10,11
38:1,11 40:10
45:20 47:5,7,
10,14 48:9,10
Coleman's (2)
38:14 40:22
colleague (3)
169:20 172:7
193:5
colleagues (6)
8:2 9:5 19:16
20:24 26:19
194:8
collecting (1)
72:20
collection (1) 7:15
collectively (1)
17:19
color (2) 155:23
156:1
colorful (1) 9:4
come (29) 9:6
10:7 17:19
18:13 29:12,
14 33:4 35:23
41:11 45:14
62:4,12,21
63:14 74:8
76:11,12 80:4
94:14 108:4
121:4 146:21
153:3 160:13
171:6 185:11
195:24 196:20
200:2
comes (4) 26:8
43:18 50:19
57:15
comfort (1) 51:1
comfortable (3)
10:6,8,18
comforting (2)
32:12 51:21

coming (2) 8:11
176:3
commence (3)
4:10 54:4,19
commenced (2)
29:18 91:14
commencement (1)
60:20
commend (2)
116:3 122:18
comment (2) 40:8
124:20
comments (9)
10:22 31:12
32:12 51:21
105:20 122:4
189:4 193:8
198:8
commit (1) 77:20
committed (1)
20:19
Committee (6)
11:8 17:8
21:18 24:21
183:16,18
common (15)
17:19,19
22:16 24:3
25:19 26:22
28:19 30:11
33:13 34:1,2,
6 36:12 47:19
115:23
commonality (1)
25:1
communication (1)
140:12
companies (1)
164:6
company (6)
96:23,24
97:5 155:13
164:5,7
company's (1)
162:5
compare (1)
96:20
compared (1)

82:12
comparison (2)
194:1,5
compatible (1)
25:17
compel (1) 180:3
compendium (6)
59:4,9 64:24
71:13 74:3
172:6
compilation (2)
173:22 201:3
compile (1)
173:24
compiled (2)
72:16 74:7
complain (2)
117:8 184:15
complained (1)
133:9
complaining (1)
132:19
complaint (1)
184:16
complete (6)
110:20
111:22 121:22
160:6 185:10,
11
completed (4)
77:15 111:17
112:5 122:1
completely (4)
32:4 101:7
166:16 186:23
complex (1) 18:20
complexity (2)
7:18,21
complications (1)
45:8
complied (1)
177:7
comply (4) 182:5
183:8 184:10
188:7
comprehensive (2)
6:5 17:5
compromise (2)

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 214 of 249

Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    January 7, 2014

23:1 31:13

**compromises (1)**
23:5

**con (1)** 146:17

**concede (2)**
113:2 117:17

**conceded (1)**
164:17

**conceive (1)**
103:7

**concept (2)**
38:19 95:21

**concern (9)** 9:2
10:10 17:22
36:22 40:16
45:3 61:1
70:23 201:13

**concerned (9)**
28:16 30:1
33:3 39:2
46:6 58:20
63:16 185:5,6

**concerning (5)**
40:11 74:11,
17 143:2,16

**concerns (13)**
9:20,21,24
10:15,21
16:17 25:21
26:20 35:11
45:7 47:6,8
176:18

**concluded (2)**
44:20 130:20

**concludes (1)**
48:12

**conclusion (2)** 9:7
14:14

**conclusory (1)**
67:5

**concur (1)** 26:18

**concurrently (1)**
139:2

**condition (3)**
16:18 19:20
51:19

**conditional (1)**
46:7

**conditioned (1)**
45:13

**conditions (3)**
14:7 16:18
19:14

**conduct (8)**
28:21 43:5
60:23 84:16
120:20 121:6
128:20 164:10

**conducted (7)** 3:4
4:4 43:6 57:3
106:8 107:15
114:11

**confer (4)**
121:11 122:8,
16 188:8

**conference (1)**
202:8

**conferred (1)**
49:16

**confident (1)**
25:24

**confidential (2)**
29:8 167:2

**confirm (2)** 43:8
60:22

**confirmed (1)**
147:9

**confused (1)**
38:16

**congratulate (1)**
52:22

**congratulated (1)**
22:3

**connect (4)**
180:23
191:10 193:13
201:16

**connected (1)**
201:16

**connection (2)**
139:16 181:15

**consciously (1)**
190:18

**consensus (1)**
24:2

**consequences (3)**

28:3,5,6

**consequent (1)**
58:23

**conserving (1)**
63:5

**consider (5)**
80:23 84:11
90:21 96:20
180:8

**considered (1)**
91:2

**considering (2)**
93:13 96:18

**consistent (6)**
70:11 76:5,7
110:21 124:11
136:8

**consistently (2)**
70:3 80:1

**consolidation (4)**
15:24 41:4
105:5,8

**constantly (3)**
40:18 80:10
82:15

**constrained (1)**
70:12

**contact (1)** 21:1

**contain (2)** 73:17
161:12

**contains (1)** 132:6

**contemplate (1)**
110:23

**contemplated (8)**
22:14 66:17
67:18 77:18
110:22 111:24
119:9 134:15

**contemplates (2)**
107:11 126:12

**contemplation (1)**
112:7

**contend (2)**
125:21 199:8

**contends (1)**
119:4

**content (1)** 62:10

**contention (3)**

114:5 119:21
186:14

**contentions (3)**
172:13,18
173:2

**context (15)** 8:23
31:19 42:22
70:19 79:18
95:17 122:21
138:3,12
146:22 171:24
179:18 186:16
192:11 195:14

**contextual (1)**
70:12

**continents (1)**
98:24

**contingent (1)**
96:2

**continuation (1)**
185:8

**continue (6)** 7:3
27:2 54:24
117:20 152:5
185:6

**continuing (1)**
195:7

**continuous (1)**
115:5

**contracts (1)**
134:4

**contrary (2)**
14:18 200:11

**contrast (1)** 94:18

**contributions (1)**
25:12

**control (8)** 15:21
60:16 69:2
71:2,18 90:24
96:19 99:10

**controlling (1)**
95:19

**controversial (1)**
33:20

**conversation (2)**
17:3,14

**conversations (9)**
8:16,23 11:9

12:5 14:13
17:4 20:18,23
34:17

**cooperative (3)**
13:3 24:19
25:20

**coordinate (1)**
12:21

**coordinated (1)**
13:6

**copy (6)** 50:5
59:5 100:4
107:2 115:6
127:3

**copyrights (1)**
65:15

**core (4)** 91:11
92:10 94:1,16

**corner (2)** 86:20
138:7

**corporate (7)**
138:14,24
141:1 142:2,8,
11 143:22

**Correct (7)** 36:6,
9 117:21
178:7 182:2,
20 199:14

**correctly (1)**
160:22

**corresponding (1)**
98:16

**cost (18)** 55:13
58:20 68:17,
23 69:1,3,17,
20 70:15 81:3,
16 99:2,5,9
184:14 185:17
194:1,6

**cost/benefit (4)**
58:21 76:9
80:24 90:2

**costs (19)** 63:6,
16 69:10
70:21 81:7
82:16 96:5
98:17,20 99:7
153:2,7 185:1,

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 215 of 249
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                      January 7, 2014

3,5,6,13
193:22,23

**could (31)** 18:13
20:20 32:2
34:13 42:12
45:23 62:14
68:16,18,22
69:1 84:16
101:22 102:1,
10 103:1
104:2,7,9,11
111:8 134:13
150:16 157:2
161:6 175:9
182:18 187:4,
9 190:19 191:1

**couldn't (6)** 9:6
72:4 103:11
126:8 170:17
175:10

**Council (2)**
173:18,19

**Counsel (20)** 3:2
10:8,17 43:14
80:11 90:14
113:6 122:5
138:16 156:17
172:5 173:23,
24 174:18
175:3 190:3
193:8,9
202:17 203:10

**count (3)** 68:2
113:3 156:16

**counting (1)**
158:19

**countries (2)**
146:12,24

**counts (1)** 13:1

**couple (8)** 6:4,
12 10:22
17:16 115:16
146:10 158:1
195:4

**course (28)** 6:4
21:8,24 29:7,
8,21 31:2,13,
14 36:2 49:22

50:21 62:5
67:14 70:20
81:2 113:17
115:21 118:2
124:6 142:4
161:20 167:6
170:19 174:3
182:23 185:15
195:12

**COURT (280)** 2:1,
9,16,18,20,22,
24 3:5,9,11,
13,15 4:2,12,
20,24 5:9,16,
22 6:8 11:12
14:21 16:7,24
19:8,17,18,19,
22 20:4,7,9
21:8,14 22:11
23:7 24:6,12
26:9 27:5,10,
18 28:10
29:23 30:4,16
32:18,21,24
34:19,24
35:22,23 36:7
37:3,9,24
38:2,8,12
39:24 42:2,8,
16 44:10
45:19 46:12,
20,23 47:4,13
48:8,11,14,17,
20,22 49:1,4,
7,11,13,19,24
50:3,8,13,19
52:2,8,15,21
53:7,15,17
54:2,9,14,16
55:5,7 59:15
63:13,17 65:1
67:17,21 68:8,
15,20,22,22
71:4,8 74:2
76:17,22
77:24 79:9
80:5,6,11
82:14,16,17

83:8,13 85:1,
5 86:13 90:9,
23 91:6 92:22
93:2,4 94:8
95:4,19 96:4,
17 98:13
99:16 100:1
102:16,20
105:10,17
106:19,22,22
107:3 108:5
111:2,19
112:3,13
114:20 115:1,
7,14 116:8,11,
15,18 117:3
123:18 125:8
126:18,22
127:16,19
128:17 130:19
135:13,16,19
137:7,7,14,19,
22 138:5,9
139:17,20,23
140:3,11
144:3,19
145:22 146:11,
18,23 147:23
149:3,4,20
150:11 151:5,
20 152:9
153:6,16
155:4 157:6,
22 160:1,6,9,
15 161:10
162:18 163:1,
13 165:22
167:4,10,12,
17,18,24
168:6 169:14,
16,24 171:1,
15,16 174:7,
16,22,23
176:16 177:12,
13 180:8
181:5 182:10
183:24 185:24
186:2,7,15

187:23,24
188:16,21,24
189:5 190:6
192:7 194:9,
12,17,21
195:5 197:12,
15,19,21,22
198:1,4
199:12,15,19
201:23 202:3,
6,9,12,16
203:1,5,7,9,
12,14

**courthouse (1)**
23:5

**courtroom (5)**
3:15 93:8
94:22 99:8
139:22

**courts (32)** 3:3
4:6 27:3 31:3
34:3,5 35:13
36:11 42:14
47:16 51:13
54:6,23 56:21
63:10 66:24
70:8,13 76:8
80:23 94:14
108:19 109:3,
15 110:18
127:13 151:12
153:11 160:4
199:5 201:22
203:10

**Courts' (10)**
30:15 70:23,
24 90:24
122:18 124:18
125:5 178:12
180:2 182:19

**Court's (1)**
150:16

**cover (3)** 74:18,
19 99:24

**covered (3)** 83:8
170:16,17

**covering (1)**
127:5

**covers (1)** 39:3

**Cowboys (1)**
170:4

**crafted (1)** 10:4

**create (3)** 12:23
32:12,14

**creating (1)**
104:10

**creation (1)** 25:12

**credibility (1)**
184:24

**creditor (3)** 92:17
99:9 146:8

**creditors (25)**
6:19 8:7 9:8,
9 21:18,22
22:6 29:1
34:14 41:5
58:23 94:9,10,
13,16 146:3
151:10 153:4
159:18 182:13
183:3 195:23
196:4,7,12

**Creditors' (3)**
11:8 17:7
24:20

**creditworthiness (1)**
196:6

**criminal (1)** 75:3

**critical (4)** 36:2
39:10 93:12
156:4

**cross-border (4)**
4:5 67:2
140:22 150:12

**cross-examine (2)**
35:7 201:15

**cross-examined (1)**
200:3

**cross-reference (1)**
117:10

**crucial (5)** 56:3
58:15 63:23,
24 155:14

**crystal (1)** 35:13

**curious (1)** 30:7

**current (2)** 26:1

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 216 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

92:20
**curtail (2)** 97:16
98:11
**cusp (1)** 43:9
**custody (1)** 71:17
**cut (4)** 82:16
140:4 145:3
195:1

**D**

**D&O (1)** 164:2
**dais (1)** 54:3
**Dallas (1)** 170:4
**damage (1)** 156:9
**damages (1)**
164:9
**dance (1)** 159:1
**database (1)**
91:15
**date (15)** 13:23
20:14 34:6,7,
8 36:14 37:13
47:20 67:22
70:17 89:15
102:21 110:1
151:16 183:19
**dated (1)** 138:3
**dates (2)** 104:6
177:21
**daunting (1)**
85:16
**day (13)** 7:9
41:11,13
42:11 53:8
68:1,1,2
135:24 152:23
182:14 185:2
198:7
**days (21)** 67:10,
10,10,19,20,
21 68:12 69:4,
11 75:2 76:4
100:21 120:14,
17 152:13,17,
18,22,22
153:2 158:18
**dead (1)** 33:19

**deadlines (2)**
14:6 44:22
**deal (16)** 4:7
35:8,9 45:16,
17 52:16
54:18 75:2
119:14 122:13
143:21 160:14
165:17 167:13,
18 200:20
**dealing (15)** 5:4
29:1 31:22
34:12 35:2
88:2 96:21
106:2 108:10
116:1 125:3
131:24 143:24
145:9 153:7
**deals (4)** 107:16
137:10 151:9,9
**dealt (3)** 52:17
83:22 173:17
**debate (1)** 139:3
**debtor (7)** 24:20
101:11 102:7
170:23,24
196:12 198:24
**debtors (66)** 6:18
11:10 12:18
15:18 18:1,4,
8,12,17 22:1,
1,1,9 23:11,
23 24:11 25:2,
9,9,13 42:24
52:10 53:11
54:7 55:22
58:20 59:1
66:19,22,23
71:10 76:1
88:16 89:4,11,
23 94:1,20
100:7 106:18
109:23 114:18
120:15,16,19,
21,24 125:17
128:2,5
133:21 136:3
144:22 145:13

148:10 161:19
162:12,23
179:13 188:2,
2 196:9 200:8,
23 201:3,6
**debtors' (7)** 21:5
56:12,15
97:14 104:23
179:11 201:4
**debts (1)** 196:14
**December (6)**
30:24 66:12
97:13 130:23
134:15 172:5
**decide (6)** 19:5
32:8,11 42:5
78:5 178:6
**decided (6)** 51:6
79:22 108:13
156:19,24
195:15
**decision (7)**
40:23 44:12,
14 51:9
150:17 195:14
202:24
**decisions (2)**
44:11 134:4
**defend (2)** 41:10
66:21
**Defendant (1)**
175:3
**defendants (3)**
117:4 119:5
129:22
**defending (1)** 41:7
**defense (3)**
130:16 135:2,
6
**defer (2)** 193:5
194:8
**deficit (1)** 92:20
**definition (1)** 16:3
**degree (3)** 132:6
164:8 175:5
**Delaware (3)** 5:7
202:5 203:1
**delay (5)** 3:18

5:5 7:20,22
133:12
**deliberations (1)**
43:21
**delivery (2)**
108:1 129:7
**deluge (1)**
136:22
**demonstrated (1)**
109:14
**demonstrating (5)**
65:14 87:18
123:9 124:1
146:4
**denying (1)** 133:9
**deploy (1)** 68:5
**depo (1)** 57:11
**deponents (2)**
139:12 141:19
**depos (1)** 59:12
**depose (1)** 114:2
**deposed (9)** 56:6,
24 89:14
114:3 129:21
142:18,19
161:21 200:17
**deposing (1)**
192:13
**deposition (50)**
8:10 54:8
57:6 59:2
60:2 61:20
72:21 77:17
78:7 87:15
106:13,23
107:1,10,23
108:7,22
109:20 111:13,
15 112:3,9,12
113:8,12,14
116:22 119:17
121:11 125:24
131:24 140:24
142:2 143:15
145:14 148:24
158:9 166:10,
11 173:6,17
174:13 175:12

179:9 185:21
189:14 192:3
194:2 199:22
200:6
**depositions (106)**
4:13 5:24
8:16 22:23
54:20 55:1,15
57:2 58:13,16
60:23 63:3,9
68:13 73:14
75:19,20,22
77:12 80:15,
21 81:10,19
84:13,16
86:12,15
91:21 92:2
94:3,22 97:17
98:2,24 101:1
106:4 107:20
110:1,7
111:22 112:2,
17,19,22,23
113:3,17
114:11 119:23
129:15,16,18,
18,20 130:4,
19,24 131:14,
22 132:13
138:16,23
139:1,14
141:21 143:7,
11 144:6
147:5 152:14,
16,17 154:3,
16 156:16
157:11 159:16,
22 161:20
171:10 172:10
176:11 177:9
180:5 184:13,
22 185:9
188:1,4 191:5,
15,22 192:12,
18,19,24
193:2,4,7,11
195:9,12,16
198:17 201:8,

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 217 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

20

**depositions/examinations (1)**
107:12

**deprivation (1)**
58:23

**deprive (1)** 66:22

**depriving (1)**
153:3

**Derek (3)** 2:11
24:10 53:10

**described (1)**
93:17

**describes (2)**
60:7,8

**designating (1)**
3:19

**designations (2)**
106:5 172:24

**designed (1)** 77:7

**desire (2)** 66:6
97:16

**despite (3)** 32:12
37:20 47:21

**destroy (1)** 150:2

**detail (5)** 99:22
132:7 192:21,
22 193:6

**detailed (5)** 6:9
84:4 124:23
190:3 202:19

**determination (1)**
36:3

**determinative (1)**
137:3

**determine (7)**
51:14 103:23
104:5 107:21
142:5 175:4
181:7

**determined (2)**
36:2 43:4

**determining (2)**
91:2 110:9

**develop (3)**
28:19 64:4
66:15

**developed (2)**
111:5 128:11

**developing (1)**
130:11

**development (1)**
15:19

**deviate (1)** 13:19

**deviated (1)** 18:5

**device (2)** 187:3,
12

**devoted (2)**
33:16 34:13

**dictionary (1)** 7:22

**did (24)** 5:7
17:12 19:5
30:6 39:4
43:20 46:21
58:8 67:24
68:1 74:21
107:6 110:24
132:1 140:4
156:23 160:11
167:17 170:4
179:22 180:18
190:18,24
200:19

**didn't (19)** 9:6
30:4 37:7
38:24 39:1
44:13 60:21
72:3 83:11
107:6 126:6
147:12 154:14
156:8 157:3
169:9 178:9
184:7 192:9

**die (1)** 16:23

**difference (1)**
153:15

**different (27)**
29:19,21
44:19,20 56:3,
8 64:15 77:9,
10 85:21
96:22 97:8
114:9 116:2
123:2 124:23
125:6 131:9,9,
10,10 161:3,4
166:16 177:14

191:18 200:14

**difficult (1)** 103:7

**difficulties (1)** 2:14

**Difficulty (1)** 7:15

**digesting (1)** 92:1

**digging (1)** 73:15

**dime (1)** 41:10

**direct (9)** 83:7
93:3,10
113:13,23
114:16 115:24
173:1,11

**directed (5)** 98:3
108:20 121:10
122:7 161:17

**direction (4)**
19:22,23,24
20:1

**directive (2)**
110:7 118:12

**directly (8)** 62:5
99:3 114:4
117:5 141:6
175:5 195:24
196:20

**director (3)** 129:2
130:6 155:16

**directors (23)**
84:1,1 85:15
86:6 87:12
129:1,11
131:7,8
132:16 133:24
155:12 159:9,
14 161:23
163:21 164:4,
10,15,18,19
165:8 193:12

**directorships (1)**
85:21

**disagree (1)** 15:4

**disagreement (1)**
131:3

**disappointment (1)**
2:23

**discarded (1)**
180:6

**disclaims (1)**

184:1

**disclosable (1)**
183:20

**disclosed (6)**
57:5,22,23
117:13 118:12
165:5

**disclosure (8)**
73:12 74:4
89:6 151:9,15,
19 162:16
187:2

**discomfort (1)**
13:14

**discoveries (11)**
109:8 110:10
121:23 122:23
136:20 137:13
141:1,10
142:8 143:22
165:20

**discovery (99)**
5:24 8:10
11:18,20
22:22 29:17
32:1 41:13
43:7 44:20,22
54:21 55:13,
17,24 56:10
60:11 61:4,20,
23,24 66:14,
20 67:1 70:17
71:2 72:9
75:2,6,6 76:5
77:3,8,14
78:1,2,5 92:3
93:17 106:7,
12,12 107:12
109:4,13,15
112:18,21
114:1,13
115:17 116:5
117:19 118:6,
7,13,22
119:19 120:7,
8,9,12,24
130:12 131:4
132:1 134:13

138:19,24
147:7 148:18,
22 149:7,11,
15,22 150:22
151:18 152:22
153:20 154:22
166:7,12,17
173:4,8,11,14
174:19 179:1
185:8,9,21
187:12 189:13
191:7 194:4
197:7 200:6

**discretion (4)**
19:23 71:2,5
153:16

**discuss (2)** 48:23
108:3

**discussed (5)**
53:13 163:5
171:14,15
199:6

**Discussion (6)**
2:15 3:12 4:7
151:6 177:3
189:23

**discussions (4)**
22:16 23:15
27:1 40:6

**disingenuous (1)**
63:4

**dismiss (1)**
136:16

**dismissed (3)**
121:9 127:12
135:9

**dispense (9)**
29:13 54:7
94:2,8 100:8
127:11 150:1
184:21 189:16

**dispensed (3)**
105:1 131:1
193:20

**dispensing (4)**
63:4,6 81:13
108:14

**dispose (1)** 63:22

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 218 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

disposed (3) 32:2,
4 35:17
disposing (2)
32:8 58:24
disproportionate (2)
187:11,15
dispute (7) 25:9
57:24 70:17
127:22,23
141:4 179:4
disputes (2)
24:18 67:2
distinct (3)
106:11
127:18 177:1
distinction (3)
113:11 114:8
131:21
distraction (1)
187:14
distress (1) 63:9
distribute (1)
28:24
distribution (5)
16:2 41:5
98:7 146:6
147:21
District (3)
173:17,18
190:6
division (1) 98:6
DLA (1) 195:3
Docket (1)
183:24
doctrine (1) 72:12
document (9)
140:24 143:4,
5,15 149:6
162:14 169:12
177:22 178:14
documentary (1)
145:17
documentation (3)
53:19 70:7
139:7
documents (43)
6:1 22:22
55:19 65:12,

13,14 69:6,9,
9 73:1,3 74:6
78:5 87:9,17
89:15 91:13,
14,18,19,20,
24 92:3
100:24 101:1
102:4 123:9,
24 138:23
141:15 146:4
153:9 161:11
162:8 164:14
167:9 175:4,
20 178:9,24
179:12,20,22
dodge (1) 194:23
dollar (1) 95:2
dollars (6) 29:18
41:7 43:7
58:12 62:17
63:11
domain (1) 168:3
done (13) 39:9
45:10 55:18
57:20 68:2
69:1 70:10
80:13 121:20
122:24 131:15
157:23 175:1
door (1) 8:20
dots (2) 193:14
201:16
doubt (1) 84:3
doubtful (1) 126:2
down (25) 9:6
10:16 11:24
12:11,16
16:14 17:3,9,
13 26:8,21
38:23 39:8,22
40:5 42:15,17
54:12,15 65:2
71:6 85:11
118:4 132:17
182:7
downsize (1) 70:9
dozens (1)
100:24

Dr (1) 116:21
drafted (2) 10:12
164:1
drafters (1) 128:8
draftier (1) 27:24
drafting (1) 10:4
drama (1) 104:11
draw (2) 7:4
125:5
drop (1) 40:14
D's (4) 128:3
133:21 163:6
193:12
due (2) 34:8
142:3
duplicate (1)
90:16
during (11) 23:6
24:1 29:7
32:3 43:20
60:8 130:12
143:10 198:22
199:6 200:9
duty (2) 119:2
128:5
duty- (1) 40:22
dwell (1) 181:4

## E

E&Y (1) 70:7
each (26) 6:9
9:3 35:7 39:6
57:17,18,23
62:8 66:4
68:6,7 69:13
108:11 120:12,
16 128:3
134:3 143:1
146:24,24
150:8 155:15
158:3 183:15,
20 196:12
earlier (6) 31:12
97:23 119:11
169:21 172:7
181:17
earliest (3) 5:6

36:14 47:20
early (1) 163:5
easily (3) 45:23
47:11 95:13
easy (3) 33:19,
23 42:9
economic (13)
28:13 93:10,
15 94:10,13,
23 95:16 99:4
123:11 151:17
183:20 184:4
196:10
effect (6) 18:22
31:8 37:2
40:12 45:19
46:14
effective (4) 13:9
14:4 69:2,17
effectively (4)
15:5 23:13
96:11 110:21
effectual (1) 69:22
efficient (2) 13:9
188:11
efficiently (1)
110:20
effort (6) 13:16
59:9 111:21
189:12 190:22
199:16
efforts (2) 30:10
98:12
eight (11) 55:16
67:9,19,20
68:9,12 69:4,
11 100:21
120:14 152:13
either (8) 23:8
92:16 133:20
134:1 143:14
151:18 158:11
180:21
ELECTRONIC (1)
2:13
elements (1)
39:10
eliminate (3) 19:3

55:8 150:4
Eliminating (1)
66:13
eloquently (1)
193:10
else (11) 10:14,
14 27:7 58:9
118:11 158:22
159:2,2 186:4
194:16 197:17
else's (1) 185:12
email (13) 138:2,
3 140:15
142:17 143:21
168:9,10
177:2,12,16
178:16,18
195:11
embark (1)
132:12
embarked (1) 56:7
embodied (2)
106:13 109:20
embraced (1)
116:6
EMEA (54) 5:20
11:10 13:6
18:8,17 22:1
24:11 25:2,9,
17 35:2 64:8
70:6 79:15
83:20,23
84:19 86:2,18,
24 88:14,19
89:17 120:15,
23 124:5
125:12,18
126:10 128:2,
4 130:5,9,10
131:23 132:14
133:19 146:12
147:12 150:7
159:11,12,12
160:14 162:22
163:4 168:22
176:6 180:21
181:18 184:19
186:21 188:1

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 219 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

199:1

**emerges (1)**
35:15

**emphasize (2)**
26:19 79:14

**emphatically (1)**
190:21

**employee (1)**
201:12

**employees (6)**
85:9 87:11
96:23 120:3
132:17 200:17

**enable (3)** 78:3
149:22,24

**encourage (1)**
47:17

**encouraging (1)**
42:17

**end (12)** 6:5
44:8 51:15
54:15 68:20
91:16,17
121:23 171:7
185:20 189:13
203:6

**endeavor (2)**
79:14 105:12

**ended (1)** 15:15

**endorsement (1)**
30:15

**enemies (1)** 14:7

**enforceability (2)**
102:15 148:12

**enforceable (1)**
30:4

**engage (2)**
55:22 159:17

**engagement (1)**
12:3

**engineering (1)**
61:14

**enhance (5)** 31:9
33:21 45:21,
23 48:6

**enhancement (2)**
46:2,5

**enhances (1)**

51:22

**enormous (3)**
18:24 31:21
43:3

**enormously (1)**
47:16

**enough (6)**
17:18 27:23
46:23 47:12
55:24 175:1

**ensure (1)**
191:12

**entered (1)**
155:23

**entire (5)** 64:12
87:23 92:6
104:16 139:2

**entirely (9)** 18:23
23:18 62:24
110:21 111:12
124:10 125:4
154:12,15

**entities (8)** 64:10
74:12 85:21
125:12 131:23
132:15 154:19
196:5

**entitled (10)** 25:6
109:17 117:4
119:6 120:1,3,
5 130:14
134:9 167:6

**entitlement (1)**
127:23

**entity (5)** 60:16
73:22 130:9
183:17 196:13

**entrenched (1)**
12:12

**envelope (2)**
44:4,6

**epiphany (1)**
41:11

**equal (3)** 28:8,
12 123:10

**equally (1)** 34:4

**equate (1)** 118:9

**equitable (7)**

16:2 87:19
88:3 98:13
123:10 146:21
147:21

**equity (1)** 151:10

**equivalent (4)**
190:8 192:24
193:1 197:3

**espoused (2)**
15:17 18:12

**essential (2)**
66:20,24

**essentially (2)**
62:13 191:3

**establish (1)**
196:11

**established (3)**
6:15 78:22
96:3

**estate (20)** 15:7
51:11 56:1
58:17 64:8,14
65:8 92:15
146:3,5,9
147:9,14
153:3 159:11,
17 168:22
180:21,21,22

**estates (17)** 6:20
7:7 14:18
15:10,10,24
19:2 91:22
103:11 147:1,
6,10 181:23,
23 183:2,4
185:14

**estimate (2)**
146:7 153:1

**estimated (1)**
146:4

**et (4)** 64:11
73:7 141:15
145:18

**Europe (1)**
146:14

**evaporates (1)**
36:22

**eve (1)** 23:24

**even (29)** 2:21
28:8 30:5
32:3 36:17
38:18 40:2,15
56:23 68:7
82:12 88:8
101:3 105:4
112:2 125:24
131:7,19
132:9 133:6
150:19 158:17,
18 159:14
171:10 178:13,
21 184:10,16

**evening (1)**
194:20

**event (1)** 60:12

**events (1)** 179:3

**ever (4)** 10:2
16:22 42:5
200:9

**every (10)** 68:1
69:18 73:22
85:13 95:2
97:6 126:4,5
162:1,14

**everybody (8)**
31:24 32:1
67:8 112:14
132:13 176:9
179:22,24

**everybody's (1)**
63:14

**everyone (22)** 2:2
10:6 11:24
13:21,23 14:1,
2 17:6 24:16
31:20 44:6
49:7 52:22
58:9 63:15
107:9 111:18
134:15 139:20
189:15 202:13
203:8

**everything (11)**
11:1 12:6
28:2,4 72:14,
15,16 73:22

74:22 101:13
136:24

**evidence (45)**
56:15,22,23
57:9,13 59:23,
23 66:3 72:9
75:3 77:19,21
83:7 89:18
101:2 106:5
110:15 113:3,
4 117:13
118:19 119:13
122:3 149:5
154:6,9,9,10,
16,20 155:18
156:16 157:1
158:5,14
161:13 165:11
170:7,8 174:1
175:9,15
196:7,10
200:10

**evidentiary (1)**
87:23

**exacerbated (1)**
125:19

**exact (3)** 16:1
41:2 146:13

**Exactly (10)** 5:11,
11 20:3 48:9
89:15 119:8
169:22 171:17
174:9 192:3

**examination (17)**
61:20 72:1
86:10 100:22
103:20 104:22
109:5 120:20
121:6 127:11
148:22 149:21
150:22 156:19
166:6,7,12

**examinations (12)**
71:11 86:2
100:9 104:24
108:14 114:10
130:21 133:10
134:16 135:1

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

151:24 189:8

**examine (10)**
62:9 74:9
83:4,6 86:7
120:16 126:4
138:14 142:11
168:19

**examined (7)**
62:15 83:3
85:14 86:3
100:11 117:1
125:24

**examining (3)**
67:22 129:23
149:22

**example (9)** 65:6
85:18 123:1,7
125:14 147:11
169:6 179:10
180:12

**examples (2)**
124:17 147:8

**except (2)** 170:3
203:7

**excerpt (1)** 151:8

**excerpts (2)** 78:7
79:6

**excess (1)** 94:12

**exchange (6)**
57:17 108:1
129:8 137:13
138:15 187:16

**exchanged (5)**
6:1 22:23
57:3 164:14
191:16

**excluding (2)**
146:9,20

**excuse (2)** 144:4,
18

**execute (1)** 127:7

**executive (1)**
61:15

**exemplary (1)**
126:16

**exercise (16)**
12:10,17
17:16 71:1,4

103:10 104:17
123:5 130:7
132:12 138:10
153:16 171:21
198:12 199:9,
13

**Exhibit (5)**
133:17
140:13 144:10
172:23,24

**Exhibits (10)** 57:4,
11 72:20 78:6
79:1,6 158:7
166:24 175:18
201:18

**exist (1)** 60:12

**existence (1)** 31:4

**existing (2)** 26:2
87:11

**expand (1)** 177:4

**expanding (1)**
70:10

**expansion (1)**
70:14

**expect (1)** 125:3

**expectation (2)**
103:5 106:9

**expectations (5)**
103:8 137:12
148:15 195:23,
23

**expected (4)** 88:1
117:23 138:13
145:16

**expecting (1)** 45:4

**expedited (1)** 43:6

**expended (2)**
58:12 81:7

**expenditures (1)**
153:8

**expense (15)**
7:11,19,21
45:9 58:22
59:8 67:8,11
68:4 82:9
158:24 165:18,
19 176:13
184:14

**experience (1)**
78:9

**experienced (2)**
69:2 185:7

**expert (21)** 13:21,
22 34:8,20
35:6 41:13
44:21,23 57:1,
2,12 64:17
79:4 110:17
117:1 162:7,9,
14 165:13
176:3,5

**experts (8)** 32:5
34:10 75:13
83:6 110:12
121:19 122:2
125:3

**experts' (2)** 83:5,
7

**explain (1)**
160:11

**explained (3)**
134:14 187:1
193:6

**explanation (1)** 6:9

**explicitly (1)**
164:1

**explore (2)** 120:1,
5

**explored (1)** 69:7

**expressed (1)**
45:8

**expressly (3)**
66:16 112:17
166:10

**extend (1)** 185:4

**extension (1)**
75:17

**extensive (4)**
55:13 69:16
70:18 104:14

**extensively (1)**
53:22

**extent (13)** 13:7
14:12 33:24
56:9 65:14,20
71:22 89:5,12

109:8 121:2
124:12 182:17

**extra (4)** 90:1
107:2 115:6
127:3

**extraordinary (4)**
55:23 62:6
93:20 98:17

**extreme (1)** 152:3

**extremely (3)**
63:16 77:12
84:4

---

**F**

**face (2)** 63:7
88:18

**faces (1)** 7:23

**facilitate (1)** 150:3

**fact (90)** 12:6,10
13:17 16:7
34:20 35:6,19
42:16 43:19
44:20 55:20,
24 56:3 60:4,
10,19 61:4
62:1,4 66:20
69:5 71:24
75:19,22
77:13 87:15
91:1 92:11
101:17 104:13
111:5 112:23
113:8,11,14,
15,17,24
114:2 116:6,
24 125:24
128:9 129:5,
12,13,20,21
130:3,4,8,15
131:22 133:10
134:13 138:15,
23 139:7
140:24 141:15
142:18,19
143:10 147:5,
7,10 152:15,
16 154:3

155:22 156:12,
13 157:7,13
158:19 168:10
170:5,17,23
179:1 180:19
183:23 185:20,
21 187:1,6
188:9 195:14
196:10 199:12

**factors (3)** 6:20,
21 36:3

**facts (50)** 56:12
58:6 60:14
63:24 64:1
65:11,12,13
69:5 72:18
73:10 74:7
75:6,7 78:17
79:1 83:20
87:17 92:23
100:18 101:1
102:4 123:8,
24 145:17
146:3 156:2,6,
10 157:17,18
158:11 172:14
173:3,5,13
174:14,19
179:12 186:12
190:10,12,14
191:10,15
192:5,5
199:24,24
200:2

**factual (14)**
56:15 64:7
77:19 78:21
81:7 84:7
118:19 125:2
129:17 136:12
163:18 175:9
187:8,8

**factually (2)**
166:8 183:11

**factum (12)**
93:18 99:21
100:13 102:6
133:14 136:5

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 221 of 249
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                         January 7, 2014

147:7 160:21
161:15 182:4
183:14 190:1
**fail (1)** 190:18
**failed (4)** 175:11
182:5 183:8
184:10
**fails (1)** 196:6
**failure (1)** 61:8
**fair (8)** 6:17 7:2
8:23 51:2,10
68:15 111:17
132:6
**fairly (1)** 53:1
**fairness (3)**
36:10,12
51:12
**faith (5)** 20:20
24:24 39:5,10
176:10
**fall (1)** 5:24
**familiar (4)** 50:23
92:24 95:7,9
**far (6)** 35:24
51:12,19 82:8
119:24 169:1
**Fara (1)** 84:22
**Farley (1)** 43:2
**farthest (1)** 39:17
**fashion (2)** 147:7
190:11
**fast (1)** 169:24
**favor (3)** 76:10
81:13 186:11
**February (4)**
88:24 121:19,
24 176:2
**federal (3)** 73:6
143:18 183:11
**feedback (4)**
54:11 55:8,
11 137:24
**feel (2)** 2:4
27:23
**fees (2)** 93:20,23
**feet (3)** 55:16
62:18 72:2
**Feld (1)** 21:17

**felt (1)** 10:6
**fertile (1)** 46:9
**few (2)** 8:9
76:23
**fides (1)** 9:16
**field (3)** 11:19
170:1 189:14
**fight (1)** 7:3
**fighting (1)** 7:1
**fights (1)** 176:13
**figure (3)** 14:8
75:21 131:14
**file (5)** 34:21
56:21 58:1
101:4 167:17
**filed (20)** 29:17
43:1 58:8
70:5 84:5
99:21 108:24
128:2 132:15
161:11 166:24
167:4,5,10,12
174:8 182:21
183:1,23 184:6
**filing (3)** 34:9
74:20 110:16
**filings (1)** 107:5
**fill (5)** 60:9 61:2
67:11,11 192:5
**filled (1)** 67:7
**final (10)** 8:5
15:14 19:10
20:11 35:11
40:23 86:14
103:21 166:3
193:21
**finally (5)** 35:14
91:15 98:19
162:6 185:20
**finance (1)** 61:15
**financial (1)**
161:22
**find (6)** 67:6
128:14,21
130:15 144:15
195:22
**fine (3)** 94:19
160:8 200:16

**finish (1)** 80:14
**finished (3)**
101:3,4 202:5
**Finland (1)**
146:14
**firm (1)** 95:14
**first (37)** 6:22
15:11,13 18:3
21:20 50:15
59:11 77:2
79:16 82:20
87:1 90:21
91:4 102:12
107:16 111:11
115:24 118:9
123:6 127:8
131:4 141:10
144:8 153:18
158:4 160:16,
23 161:8
172:17 177:2,
11 182:8,12,
14 188:22
189:6 198:20
**firsthand (8)**
56:17 60:14
61:4 62:12
101:24 102:2
107:23 199:5
**fish (1)** 166:16
**fishing (2)** 69:8
102:3
**five (15)** 65:2,4,
5 88:14 95:10
100:15,16
101:17,18
123:1 139:12
141:19 162:7
169:23 202:7
**five-year (1)** 5:17
**fix (2)** 33:17
35:18
**fixed (1)** 28:6
**fixes (1)** 33:18
**flexibility (2)** 64:4
66:15
**flies (1)** 89:23
**flip (1)** 73:23

**fluid (2)** 79:21
82:15
**fly (1)** 88:17
**focus (4)** 6:12
18:22 83:19
105:21
**focused (4)**
90:17 122:22
126:10 196:17
**focusing (2)** 8:10,
13
**folks (1)** 49:14
**follow (3)** 117:19
121:3 128:4
**followed (2)** 4:12
77:6
**following (4)**
87:13 97:21
149:21 165:1
**follows (1)**
142:23
**footnote (1)** 37:2
**forbid (1)** 10:2
**force (2)** 11:13,
16
**foreign (2)** 133:7,
7
**foreperson (1)**
43:24
**foreshadow (1)**
144:23
**Forget (1)** 43:19
**forgive (1)** 3:6
**forgo (2)** 187:3,
16
**forgoing (1)** 187:2
**form (7)** 25:20
30:16 31:6
37:16 119:5
162:13 177:14
**formal (2)** 52:9
150:1
**format (1)** 128:4
**formed (2)** 78:18
101:20
**former (7)** 85:8
87:11 92:19
120:2 161:23

200:17 201:11
**forming (1)** 40:6
**forth (6)** 13:4,5,
6 110:2 176:6
200:21
**forthright (1)**
148:1
**fortunately (1)**
7:24
**forum (4)** 177:10
182:20,22
184:11
**forward (11)** 13:8
14:4 25:18
72:22 78:20
81:18 88:20
119:21 157:4,
11 191:13
**forwards (1)** 83:1
**fought (2)** 5:19
52:24
**found (2)** 97:14
159:15
**four (12)** 6:20
39:7 63:18
67:10,10
71:14,15,16
72:3 73:24
107:15 182:17
**four-plus (1)**
182:15
**fours (1)** 136:8
**fourth (1)** 63:1
**four-to-a-page (1)**
55:16
**framework (1)**
84:17
**France (1)**
146:14
**frankly (9)** 9:21
16:15 17:15,
22 18:14 42:9
48:14 173:12
185:11
**Freemantle (2)**
85:19,20
**French (2)** 19:19
20:7

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

**friend (9)** 127:9
131:16 153:20
154:11,22
156:14 158:16
159:9 163:23
**friends (16)**
61:19 65:10
66:13 70:5
72:13 79:17
107:17 117:8
119:20 120:13
123:22 124:12
136:21 153:19
158:2 166:5
**front (3)** 40:7
49:17 107:10
**frozen (1)** 5:8
**full (8)** 11:13,16
19:10 73:11
76:14 109:1,7
128:15
**fully (6)** 16:4
26:24 39:12
75:14 87:14
110:1
**functional (1)**
113:1
**fundamental (4)**
30:21 35:20
134:11 172:12
**fundamentally (6)**
12:19 33:13,
14 38:16
95:23 161:4
**funded (1)** 99:8
**funds (2)** 94:16
99:8
**further (34)** 3:18
14:12 20:20
22:13,15
23:14 26:8
30:17 31:7
51:8 55:22
57:16 70:14
86:10 89:12
94:2,15,22
98:1 99:1
104:17,21

105:6 114:12
126:19 128:23
133:12 137:23
142:24 149:16
157:20 197:10
203:2,6
**furtherance (1)**
98:4
**future (3)** 30:20
32:9 38:21

**G**

**gain (1)** 201:18
**gained (6)** 98:16
103:19 104:17,
21 105:9
187:19
**game (4)** 30:22
95:3 135:4
187:18
**gamesmanship (1)**
13:2
**ganging (1)**
186:22
**gap (7)** 55:21
65:9,22 67:12
155:5,5 159:6
**gap-filling (21)**
66:3 77:18
78:16 107:18
109:7 118:10
134:18,20
149:2 170:10
171:4,8,20,24
172:11 189:21,
22,24 198:11
199:8,12
**gaps (9)** 56:9
60:9,11 61:2
63:24 67:7
154:5 175:9
192:6
**gave (4)** 147:11
155:5 163:14
192:20
**general (4)**
125:22 163:4,

10,16
**generality (1)**
124:13
**generally (2)**
164:17 180:11
**generated (2)**
17:17 46:10
**George (1)** 5:9
**gesture (1)** 39:5
**get (47)** 2:3 5:7
17:17 22:23
35:4,5,7
43:15 45:2,9
47:17 66:8
68:9 72:2,4
75:20 76:8
80:18 93:12
110:15 119:19
120:19 135:11
136:18 137:24
140:4 144:11
155:3,11
168:2 171:7
172:22,23,24
173:1 174:17
175:10 177:10
180:1,4
185:22 186:12
188:12,13
199:17,20
200:4
**gets (1)** 193:23
**getting (8)** 54:10
69:15 76:3,8
133:5 157:19
188:9 202:22
**give (14)** 25:10
26:2 62:13
65:6 88:16,17
97:21 124:24
138:5 149:15
155:18 169:6
180:11 198:16
**given (25)** 56:14
59:3,9 62:5,
15 64:23 70:1
74:24 81:21
82:3 88:6,13

89:3 90:2
97:2 118:16
119:4 121:8,
21,24 124:5
126:1 130:3
139:6 166:20
**gives (2)** 51:1
157:17
**giving (1)** 191:9
**glad (1)** 2:2
**global (1)** 92:17
**glossed (1)**
123:22
**go (34)** 11:13
13:8 14:4
15:9 59:6
61:7 62:1
65:5 66:4,5
75:22 81:18
84:23 86:17,
21 105:22
111:2 117:14
128:21 132:13
148:20 155:15
157:11 161:5
163:8 165:7
170:24 171:23
175:15,16
185:23 193:2
196:22 201:7
**goal (1)** 170:5
**God (1)** 10:2
**goes (7)** 95:16
99:3 109:8
118:24 143:12
191:12 196:14
**going (95)** 4:10
10:1 13:19
14:3 17:4,5,6,
9,20 18:20,22,
23 19:24
34:15 37:16
38:23 39:7,8,
9,22 41:14,17,
18 44:21
51:17 52:9
54:9,17 56:11
61:7 68:11

71:18 75:10
78:6,7 84:20
99:22 100:4,
11,21 106:10,
14 125:12
127:2 130:24
133:4 134:16
139:24 142:22
144:23 146:15
148:20 149:13,
14 152:13,16
156:6 157:23
158:9 163:7
166:19 167:5,
7,14 168:2
170:8,20
172:7,21,23,
23,24 173:7,
10,13 174:2,
19,21 175:16,
21,24 176:1,7,
8,9,24 177:13
178:8 179:19,
21 194:22,24
200:18 201:14
202:20
**gone (6)** 8:9
41:5 44:7
59:18 90:16
175:12
**Good (54)** 2:1,7,
9 3:13 4:24
5:1,18 18:13
20:15,19
21:12,14 24:8,
9,13,16,24
27:12,13,19,
19,21,22 28:5,
8,9 34:7 39:5,
10 41:16 44:6
45:6 76:18,21,
22 79:12
90:12 99:18
111:21 113:21
116:4 169:18,
19,19 176:10
188:18,24
191:14 194:12,

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

13,17,19,20
203:8

**Good-faith (1)**
30:10

**Goodmans (1)**
140:18

**goodwill (1)** 17:18

**got (20)** 33:10
41:19,21
43:16 44:13
62:19 69:18
75:23 132:13
155:11,12
156:2,10
157:18 159:4
160:13 165:20
170:14 187:10
200:22

**gotten (2)** 134:8
187:5

**Gottlieb (23)**
79:10,11
83:10,18 85:2,
6 90:10 131:3
132:22 134:24
159:20,24
160:13 162:19,
20 163:2
165:23 167:11,
15,20 168:1,4
170:12

**govern (2)** 31:16
33:9

**governed (1)**
95:24

**governing (1)** 70:8

**government (2)**
174:11 175:1

**governs (1)** 113:5

**grabbing (1)**
17:21

**granted (2)**
86:13 192:2

**granting (1)** 66:21

**great (10)** 51:1
67:7 75:2
81:5 88:17
163:22 192:21,

22 193:5,6

**greatly (1)** 166:13

**Greece (1)**
146:14

**Gross (44)** 2:16
4:7 21:13
48:21 52:11
54:3,6,22
59:4 61:11
66:12 70:3
71:4 76:21
79:12 84:21
85:3 90:7,13
92:23 93:20
95:7,13 97:13
99:14,19
105:12 106:15
127:1 136:2
139:24 140:10
145:2 146:4
152:12 160:3
162:21 166:4
168:8 169:15
202:17,19
203:1,5

**Gross's (4)** 100:4
140:4 167:14,
16

**ground (4)** 26:22
75:8 126:9
143:8

**grounds (1)** 143:6

**groundwork (1)**
24:23

**group (24)** 99:20
100:6 101:20,
20,22 103:6,
21,22 133:1
138:19 139:11
140:19 141:18,
24 143:2,14
144:24 145:14
164:19 178:21
179:14 182:13
183:15,18

**groups (1)**
120:12

**Grout (1)** 90:14

**guaranties (10)**
97:2 102:14
103:1,18
148:12,13
150:20 169:9,
11 196:3

**guards (1)** 32:17

**guess (4)** 48:13
52:5 53:7 55:8

**guesswork (1)**
75:12

**guidance (1)**
129:11

**guideposts (2)**
31:22,23

**Gump (1)** 21:16

**guy (1)** 43:18

### H

**hair (1)** 195:1

**half (1)** 55:17

**halfway (1)** 140:5

**hand (6)** 5:16
32:19 50:5,7
88:10 127:2

**handed (1)** 172:7

**happen (5)**
22:20,21
23:5 88:4
110:13

**happened (9)**
68:3 79:24
80:2,20 82:13
107:20 108:8
121:3 155:16

**happens (1)**
97:10

**Happy (7)** 5:2,2
6:3 9:23
24:18 41:8
66:5

**hard (1)** 52:24

**hardly (1)** 147:3

**harm (1)** 156:8

**Hauer (1)** 21:17

**He (28)** 40:11
43:15,15,18

60:7,8 61:2
116:24 117:1
129:3 132:4,
22 147:12
149:23 160:13
169:7,9
171:12,13
182:10,11
185:3 191:23
197:5 198:15,
21,22 200:15

**heads (1)** 45:9

**hear (8)** 2:24
21:3,9 126:7
159:23,23
160:16 184:23

**heard (22)** 10:16
20:8 27:7
38:6 48:15,18
64:5 97:23
113:22 127:15
129:17 131:3
141:11 142:21
147:18 169:17
189:18,19
191:6 193:22
198:13 199:10

**hearing (9)** 2:17
3:3,17 4:4
31:2 34:23
50:22 54:23
202:23

**hearings (1)**
182:14

**hearsay (1)** 62:13

**heart (1)** 45:6

**heartfelt (1)** 12:2

**hearts' (1)** 62:10

**heavy (1)** 5:24

**held (3)** 78:24
85:20 157:8

**help (4)** 153:17
166:2 185:14,
18

**helpful (2)** 47:15,
16

**her (7)** 3:16
54:13 127:10

133:14 160:12,
13 161:2

**here (83)** 2:3,5,
11 5:12 7:9
8:15 9:5,10,
14 10:13 11:1
12:9 21:10
23:17 24:19
25:4 26:12
27:24 33:10
36:13,22
37:14 38:15
39:3 40:7
44:18,24
45:10,21
48:13 50:22
54:11,17
56:23 58:2
62:5 63:21
65:18 67:10
71:3,7 76:19
77:13,16
86:16 88:19
89:24 102:2
104:22 106:3
108:8,13
110:5 112:19
117:3 124:13
131:6 136:2
139:22 144:17
153:14 158:23
159:3,5 165:8
173:9,12
174:4,24
175:14,20
181:24 185:1,
3,16 186:13
189:1,10,11
191:12 194:12
195:13,17

**herself (2)** 87:8
145:16

**hesitation (1)**
50:10

**Hey (1)** 40:4

**highest (1)**
168:23

**highlighted (3)**

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 224 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

75:4 126:15
151:14

**him (7)** 87:8
95:8 117:6,13
140:6 145:16
159:23

**hint (1)** 138:6

**his (6)** 116:22,
22 149:1,2
169:7 175:3

**history (4)** 12:3
92:24 95:7,14

**Hoc (7)** 139:11
141:18,24
143:2,14
144:24 178:21

**HOEFFNER (6)**
194:19,24
195:3,6
197:14 198:5

**hold (4)** 191:1,
11 192:4,4

**holders (1)**
151:10

**holdings (1)**
143:17

**home (1)** 203:8

**Honor (132)** 2:8,
14 3:24,24
4:17,23 5:2,
12,19 7:1
13:18 14:20
16:13,19 18:1,
22 20:14 21:4,
20 22:14 23:4,
12 24:5,14
26:16 27:14,
22 28:1 30:8
33:18 34:16
36:9 37:1,8,
21,23 38:10
42:20 44:2,17
47:11,14,23
48:7 49:23
50:12 52:13,
20 53:4,6,11,
16 76:19
79:12 84:21

88:7,11 89:12
90:7,13 93:7,
19 94:18
95:12 97:8
98:19 105:11
106:14 107:2
109:24 114:16
115:6 116:13
119:11 123:16
127:1 136:5,
18 137:3,9
138:8,12
140:2,10
143:23 144:16
145:11 148:16,
19 150:7
151:2 152:7
160:19 161:6,
17 162:6,21
163:7 164:2
165:19 166:3
167:4 168:5
176:15,20,23
178:4,22
179:16 180:9,
22 182:2,6,14
184:5,18
185:19 186:1,
6,9 188:19
189:3,10,18
191:8 192:16
193:16,18,23
194:7,11
201:21

**Honors (6)** 24:2
34:4,23
147:17 172:8
202:2

**Honor's (1)** 31:4

**hope (9)** 12:4
17:15 20:18
22:20 27:1
51:21 52:17
54:18 117:20

**hopeful (2)** 21:2
59:4

**hopefully (3)** 9:18
54:23 169:23

**hours (3)** 6:2
120:10,22

**house (1)** 62:16

**housekeeping (1)**
166:23

**how (35)** 14:8
21:2 28:20
34:18,19 35:8,
8,18 53:13,24
61:6 65:14,24
66:1 67:21
74:13 96:20
103:8 107:14
111:5 113:6
115:17 119:3
121:14 132:9
138:22 154:14,
17 156:17
158:13 164:9
169:24 174:1
175:16 181:6

**however (1)**
92:16

**Hubbard (1)**
144:10

**huge (1)** 176:12

**Hughes (1)**
144:10

**Hundreds (3)**
43:7 91:19
100:23

**hurricane (1)** 91:9

**hurricanes (1)**
136:21

**hut (1)** 62:17

**hybrid (3)** 106:2,
6 107:8

**hypothetical (2)**
38:21 180:12

---

**I**

**ICBMs (1)** 41:20

**idea (6)** 5:18
39:15 41:17,
22 111:23
117:24

**identical (3)**

127:4 136:10
145:7

**identification (2)**
79:5 133:23

**identified (15)**
55:21 57:5,7,
10 64:2 71:24
128:9,10
139:12 141:20
147:8 149:20
175:8 184:3
197:5

**identify (6)** 72:4
118:15 158:4,
7,8 169:9

**identifying (1)**
158:14

**ie (1)** 155:22

**IFSA (3)** 10:2,3
20:5

**illustrate (1)** 81:20

**illustrated (1)**
118:8

**illustration (4)**
95:15 97:22
116:13 126:14

**illustrative (2)**
113:24 115:16

**imagination (1)**
46:9

**imagine (1)**
175:16

**immediate (1)**
35:10

**immediately (2)**
34:9 44:11

**immunity (2)** 74:5
89:7

**impact (3)** 12:9
25:22 111:8

**impacted (1)** 37:6

**impair (1)** 48:7

**implemented (1)**
77:4

**implicated (1)**
129:2

**important (28)**
7:10 10:24

39:18 72:13
79:17 81:17
84:10 87:5
109:12 112:8
113:11 123:20
131:20 177:16
179:17 180:10
182:1 183:6,
16 189:17,21
193:19 194:2,
3,4 196:24
197:2,4

**importantly (5)**
8:12 85:12
108:18 183:5
184:16

**impose (1)** 73:5

**imposed (2)**
16:19 73:5

**improper (1)**
78:23

**improperly (1)**
88:11

**impugned (1)**
128:8

**inapplicable (1)**
184:6

**inappropriate (3)**
14:17 16:19
23:18

**inaudible (304)**
52:14,18
56:1,13 60:18,
22,24 61:12
62:18,20 63:2
64:3,18 65:8
67:24 68:2
69:21,23
70:13,22
71:11 72:5,23
73:10,12,15
74:16,21 75:8,
10 76:4,11,15
78:8,11 79:15
80:3,3,5,18,
22 81:21,23,
23 82:3,4,23
83:2,20 84:4,

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 225 of 249
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

11,14,15,18,
24 85:8 86:1,
2,3,8,10 87:6,
7,8 88:2,5,15,
22,23 89:1,18,
23 90:1 91:1,
3,8,21,23
92:1,7,9,12,
13,15,17,19
93:12,13,16
94:2,8,9,11,
12,13,15,21
95:1,15 96:4,
11,16 97:4
98:5,13
100:10,19
101:10,11
102:7 103:4,
16,19 105:7,
12,17,19
106:24 108:12,
15,17,20
109:1,11,14
110:10,14,15,
22,23 111:6,
12 112:8,24
113:1,15
115:8,9,10
116:3 117:15
118:1,2,9,10,
12,15,17,21,
21,23 119:2,
19,23 120:2,5,
11,20 121:8,
19 122:2,10,
14,21,22,23
123:3,14,19,
22 124:4,5,13
125:2,9,15,20,
22 126:20
127:16 129:1
130:19,20
131:18,19,20,
24 132:2,9,16,
17,17,18,21
133:5,6,12,14,
21 134:5,12
135:9,11

136:13,14,15,
16,17,22,23
137:2,7,12,14,
15,22 138:20,
22 140:11,18,
23 141:3,23
142:10,13,15,
15 143:3,9,21
144:4,5,17
145:3,6 146:5,
7,9,10,12,15,
16,19 147:1,9,
9,15 148:1,5,
8,23 149:2
150:21 151:17,
24 152:18,21
153:5,19,20,
22,23 154:12,
22 155:15,22
158:2,8
159:16,21
160:18 161:11,
13,23,24
162:3,9,13,14
163:1,3,5,14,
15,17 164:3,9,
9,11,15,22,22,
23 165:12,13,
18 166:21
167:1,19
168:3,22,23,
24 169:12
**include (1)** 101:7
**included (4)**
91:14 104:4
122:19 124:19
**includes (2)** 55:4
106:7
**including (13)**
8:12 32:5
83:24 85:9
86:6 87:10
91:19 96:2
102:13 108:2
145:17 148:11
165:8
**inclusion (2)**
139:10 141:17

**inconvenience (2)**
7:19,22
**incorporate (1)**
193:8
**incorporated (1)**
65:4
**incredibly (2)**
12:12 88:20
**incurred (1)** 93:21
**incurring (1)**
98:16
**indeed (7)** 9:15
23:6,18 57:22
75:17 157:19
174:9
**indentures (2)**
102:24 103:17
**independent (2)**
26:24 196:6
**indicated (4)**
18:11 42:10
83:15 140:6
**indicates (1)**
192:11
**indicating (1)** 44:1
**indication (1)** 8:20
**indirectly (1)**
175:6
**individual (6)**
16:10 129:11
133:24 134:3
163:17 191:23
**individuals (6)**
127:19,24
128:10 130:2
139:12 141:19
**inevitably (1)**
58:11
**inexpensive (1)**
82:11
**inform (9)** 34:3,4,
5 110:15,16
119:12 122:1,
3 155:3
**informal (1)** 99:20
**information (38)**
67:4 71:17,
21,23 72:4,6,

11 74:4,11,15,
16 75:15 77:9
78:1,2 79:2
89:5,13 98:12
100:18 101:6,
23 102:11
104:8,14
116:21 117:22
141:23 143:16
146:24 147:22
151:19 164:14
178:15 179:9,
11 180:1,3
**informed (4)**
19:16 20:1
87:8 145:16
**informs (1)** 121:3
**Ingersoll (1)**
27:14
**inquire (1)** 133:7
**inquiry (1)** 124:10
**insist (1)** 188:2
**insofar (1)** 142:24
**insolvency (3)**
42:23 95:23
126:2
**instance (1)** 15:8
**instances (1)**
191:18
**Instead (2)**
179:10 198:17
**instructs (2)**
113:6 156:17
**integration (1)**
196:9
**intellectual (3)**
15:6 65:15
87:21
**intend (6)** 18:6
34:2 137:1
148:13,14
172:14
**intended (8)** 10:5
13:10,11,12
18:17 124:15
133:18 170:9
**intending (2)**
192:17,18

**intent (1)** 171:13
**intention (4)**
12:22,24
32:13 105:24
**intercompany (2)**
146:9,20
**interest (11)** 8:6
35:4 59:6
87:20 93:10
94:10,13,23
142:14 169:5
183:21
**interested (1)** 34:4
**interesting (1)**
101:9
**interests (36)**
6:19 11:24
14:18 15:20
21:23 25:1
35:3,3 39:19
41:1 42:6
51:11 59:7
82:23 83:24
86:5,24 88:4,
8,13,17,20
89:17 90:22
91:5,7 95:16
99:4 139:6
151:17 175:8
181:19,21
184:4,19,20
**interim (1)** 28:9
**international (1)**
150:12
**interpret (1)** 149:5
**interpretation (1)**
118:22
**interrogate (1)**
149:17
**interrogatories (4)**
129:9,10
177:24 186:14
**interrogatory (1)**
188:11
**interrupt (1)** 83:12
**interruption (1)** 3:6
**intersection (1)**
155:23

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

intervening (1)
111:20
interviewed (1)
117:5
intimately (1)
50:23
into (23) 21:23
41:18 44:16,
19,21 56:11
73:16 80:5
93:12 100:21
105:19 107:19
109:13 110:9
113:6 119:17
120:7,22
121:2 124:3
157:22 168:2
184:9
introduce (1)
27:16
inventors (1)
65:17
investigated (1)
128:23
investigation (1)
128:23
investigator (7)
174:11,12,17
190:7 191:3
192:10,14
investment (1)
33:15
invitation (3) 11:7
12:1 20:23
invite (1) 96:17
involve (2) 17:6
169:4
involved (5)
11:24 17:7
44:7 98:17
172:20
involvement (1)
50:18
involves (1) 106:3
involving (2)
98:24 168:24
IP (9) 25:8,12,
16 61:14

64:10,13 66:1
145:6 146:1
irrelevant (2)
101:14 150:9
issue (9) 9:19
25:5 43:8
46:15 53:8
58:24 59:20
62:2 64:9,21
65:21 78:11
93:9 98:21
125:18 141:2
167:16 181:24
182:3,18,20
184:9 197:8
200:20
issues (29) 5:15
8:12 18:21
27:3 42:2
51:7 92:8
100:20 110:18
115:23 120:21
126:5 140:20
141:7,13
144:5 145:10,
19 150:5
151:4 155:4
181:5 189:24
190:2 195:7,
21,22 196:20,
22
Item (2) 65:8
71:22
itself (4) 21:21
23:6 84:23
144:17

**J**

Jacob (1) 188:19
January (11)
13:23 30:24
34:6 36:15
59:17 64:16
73:13 176:1,4
180:4 200:22
Japanese (1)
159:1

job (2) 11:13
173:23
joinder (2) 114:6
124:7
Joint (9) 5:20
6:6 14:1 19:1,
21 24:10
39:21 43:5
85:9
journalistic (1)
132:7
Jude (2) 115:12
158:21
Jude's (1) 114:24
Judge (50) 2:5,
16 4:7 21:12
43:22 48:21
50:20 52:10
54:3,6,22
59:4 61:11
66:12 70:3
71:4 76:21
79:12 84:21
85:3 90:7,13
92:23 93:19
95:7,13 97:13
99:14,19
100:3 105:11
106:15 127:1
139:23 140:3,
10 145:2
152:12 160:3
162:21 166:4
167:14,16
168:8 169:14
173:20 202:17,
19 203:1,5
judges (5) 50:16
63:8 158:10,
12,13
July (1) 91:16
jumping (1)
113:20
June (1) 91:16
jurisdiction (2)
71:1 131:11
jurisdictions (1)
14:19

jury (4) 43:10,
21,21,24
just (81) 2:4 4:2
5:6,22 17:22,
22 22:10
26:19 41:21
45:9,23 52:21
53:17 54:9
55:10 59:5
63:14 65:6
68:8 69:4,11
76:23 81:20
88:10 89:8
93:21 97:9
99:11 101:2,
24 102:3
103:11 105:14,
19 107:9
116:3 119:14
121:4 123:3
125:11 127:2
128:13,13
133:16 142:4,
12 144:23
152:15 153:6,
23 157:22
161:15,18
162:22 165:16
166:8,23
169:2 170:2,
12,22 172:7
174:12,22
177:1,4,17
180:10,11
182:2 186:5,8
187:23 189:21,
22 191:23
195:4 197:9
198:7,11
200:18
Justice (40) 2:23
3:5,18 4:1 5:3,
17 14:15
21:15 31:5
33:4 43:2
49:9,15 52:6
53:20 54:5
55:5 70:9

80:8 99:18
127:1 136:1,1
139:21 140:10
149:9 152:11
168:7 169:20
183:6 184:7,
22 186:9
189:19 191:9
192:21 193:18
197:20 202:4,
14
Justices (1) 53:12
justify (2) 31:6
58:10

**K**

kabuki (1) 159:1
Kathleen (1)
27:14
Katz (1) 173:20
keep (3) 29:15
71:5 107:17
Ken (1) 27:16
kettle (1) 166:16
key (3) 55:12,
20 168:17
KIMMEL (29)
105:11,23
106:21 107:7
111:10 112:14
114:22 115:3,
12,15 116:9,
12,16 123:20
125:10 127:9
130:18 133:13,
17 135:10
147:4 152:12
153:20 154:13
160:19 161:16
163:3 166:5
192:20
Kimmel's (2)
137:15 188:7
kind (9) 14:6
16:21 30:8
39:3 156:11,
18 159:22

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 227 of 249
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                        January 7, 2014

186:22 188:11

**kinds (1)** 61:13

**Kingdom (2)** 8:3
9:9

**knew (3)** 61:6
84:14 154:17

**knocked (1)** 45:9

**knowing (4)** 55:2
56:12 86:7
165:9

**knowledge (15)**
60:14 62:12
65:23 101:24
102:2 113:13,
19,24 131:11
139:13 141:20
157:8 170:20
174:14 175:14

**knowledgeable (2)**
61:9 78:19

**known (3)** 86:4
87:24 111:5

**knows (5)** 30:3
143:4 157:8
164:20 175:18

**L**

**lack (1)** 16:5

**landscape (1)**
33:14

**lane (1)** 182:7

**language (7)**
10:4 31:7
46:7,13 49:20
108:12 199:7

**large (3)** 70:10
86:24 97:10

**largest (4)** 92:16,
17 185:15,16

**last (16)** 8:8,9
40:14 91:10
92:4 93:21
112:21 121:5
122:2 124:21
128:15 148:20
150:17 162:6
165:2 178:19

**late (2)** 6:12
30:21

**later (1)** 23:3

**latitude (1)** 26:2

**law (7)** 112:15,
16 133:7
150:20,21,24
184:8

**lawyer (5)**
158:18 190:9
191:2 192:10,
13

**lawyers (9)**
52:23 67:8
68:14 69:12,
13 94:21
100:23,24
152:24

**lay (1)** 156:6

**lead (2)** 20:20
72:8

**leaders (1)** 199:3

**leading (1)** 199:2

**leads (1)** 30:9

**learned (1)** 8:15

**learning (2)**
50:20 109:16

**least (6)** 35:24
58:19 67:8
68:13 69:12
107:18

**leave (3)** 19:7
30:19 33:22

**LeBlanc (5)**
176:17,20,21
182:12 186:3

**led (2)** 198:23
199:7

**left (9)** 5:6
28:21 29:16
35:12 75:21,
24 76:1 82:8
89:8 97:21

**legal (17)** 58:6
61:14 84:6
85:15 95:24
102:23 109:18
119:6 157:17

163:12,18
169:12 174:20
190:12 191:11
196:5,13

**legally (1)** 183:11

**legions (1)** 69:12

**legitimate (3)**
56:9 133:20
153:4

**legitimately (1)**
63:10

**length (1)** 74:10

**less (5)** 81:11
94:21 120:14
132:23 152:14

**lesson (1)** 8:15

**letter (7)** 66:12
88:13 97:12
144:10 172:4
188:12 200:21

**level (3)** 39:3
107:18 134:18

**levels (1)** 131:10

**LexisNexis (1)**
151:8

**liability (1)**
129:24

**liable (2)** 127:21,
24

**licenses (1)** 25:14

**lie (1)** 128:8

**liftings (1)** 161:10

**light (4)** 7:11
47:6 155:24
156:1

**like (37)** 6:12
11:14 17:20
24:17 27:16
31:20 34:18
41:19 43:22
47:5 52:13
68:4 83:19
89:8 97:21
107:1 108:13
115:6,16,24
116:13 118:4
120:24 123:16
126:11 135:10

137:9 144:1
145:20 148:23
151:2 157:3
167:24 174:12
179:7,15
184:23

**likely (1)** 200:24

**Likewise (1)**
32:11

**limit (2)** 45:24
61:23

**limitation (2)** 46:3
73:18

**limited (17)** 9:15
23:11 28:22
60:3 62:23
64:21 90:19
107:22 109:5
114:12 120:10,
17 121:1
129:20 132:18
153:23 188:14

**limited- (1)** 53:24

**limits (2)** 46:6
51:23

**line (7)** 16:1
20:2 40:1
67:18 118:5,7
124:10

**liquidating (1)**
95:1

**liquidation (2)**
96:23 97:9

**list (13)** 61:12
85:11,16
86:17 100:15
101:1 123:4
139:2,11
141:18 179:23
189:24 190:2

**listed (5)** 71:14,
15 100:20
102:12 162:11

**lists (2)** 85:8
172:23

**litigate (2)** 14:4,
14

**litigated (1)** 50:19

**litigation (39)** 6:2,
24 7:19,21
8:7,8,18 11:3,
16 13:9 22:21
31:19 40:18
77:24 78:9
79:7 81:2,5
91:2,10 93:11,
14,18,22 94:2,
4,24 96:5,19,
22 97:4,18
98:23 131:11
134:7 139:14
141:14,21
142:1

**little (10)** 13:15
26:17 27:23
50:20 113:20
125:6 129:10
140:1 182:7
184:24

**live (1)** 16:23

**Livent (3)** 75:1
121:1 131:17

**living (3)** 41:1
193:16 198:8

**local (1)** 73:6

**lock (1)** 23:13

**lockbox (1)**
180:20

**locked (2)** 41:18,
20

**locking (1)** 37:12

**locomotive (1)**
11:14

**lodge (1)** 161:15

**logic (1)** 40:22

**logical (2)** 14:11
34:7

**long (8)** 12:3
18:15 42:21
47:11 85:10
135:11 175:16
198:7

**longer (5)** 59:19
60:15 95:13
151:15 154:18

**look (27)** 25:18

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

29:24 44:18
49:22 59:7
61:10 65:7
70:4 73:9
80:15,16
82:15 85:11
88:19 93:15
100:2,12
123:5 128:12
131:17 132:3
164:3,22
172:16 177:16
179:17 201:10
**looked (2)** 7:20
80:2
**looking (9)** 6:16
16:16 37:14
64:4 72:14
80:11 107:7
138:1 192:1
**looks (3)** 100:10
101:10 177:12
**lost (1)** 55:6
**lot (17)** 6:10
8:24 11:2
35:12 46:17
50:17 69:2
73:15 95:20
126:9 135:17
159:17 166:1
170:2 193:22
195:19 200:16
**lots (1)** 198:13
**low (1)** 51:15
**lucky (1)** 49:14
**lurking (1)** 58:15

**M**

**made (57)** 9:14,
16 15:12,14
19:1,11,13
25:13 26:18
31:12 34:7
35:13 36:15
54:22 63:1
66:11 72:18
75:18 77:1

79:13 80:4,4,
6 84:6 88:24
95:4 100:10
102:21 111:4
113:10,16
118:1,17
123:19 125:22
134:5 150:14
156:14 158:2
163:3,4,18
164:5,7 165:9
177:5,18
178:7,13
181:4 186:10
189:4 190:16
192:8 193:8
195:13 196:16
**Magistrate (1)**
173:19
**main (1)** 90:19
**maintained (1)**
88:7
**major (1)** 194:1
**majority (1)** 89:20
**make (40)** 3:16
10:5,12,22
12:2 22:9
25:15 27:17
30:14 36:8,15
41:21 52:14
73:10,11 76:2,
24 83:11
86:15 95:18
113:21 115:16
117:22 124:20
126:8 135:11
142:12 143:19
153:15 154:21
159:8 160:4
162:22 166:3
168:9 170:6
179:23 180:14
195:4 197:9
**makes (6)** 80:20
168:10,14
186:24 197:6
199:8
**making (10)** 36:3

46:17 47:6
54:13 63:8
72:19 89:24
93:8 111:21
133:5
**management (2)**
11:16 61:16
**managing (1)** 97:5
**manner (2)** 13:3,
10
**many (12)** 25:17
34:19 59:18
67:21 68:5
93:7 98:24
111:5 117:7
125:23 154:14,
17
**marching (1)**
17:10
**margin (1)**
128:14
**marked (1)** 88:11
**Marketing (1)**
149:11
**marshal (1)** 173:7
**Martin (4)** 6:16,
22 9:17 51:6
**mass (1)** 174:1
**massive (5)**
53:18 55:1
63:6 69:11
173:8
**master (5)** 15:18
75:8 131:19,
23 132:4
**material (17)**
30:21 33:15
58:6 66:8
102:17 104:20
106:7 135:17
137:2 139:13
141:20 142:16
147:22 151:6,
13 157:18
163:6
**materials (7)**
16:21 18:9
86:23 105:14

137:16 140:8
174:8
**matter (16)** 13:17
32:4,7 53:13
57:1 66:24
82:14 92:24
103:12 145:19
165:5,16
166:22,23
168:10 202:20
**matters (9)** 4:8
42:18 62:13
69:3 113:19
125:2 136:12
150:20 160:22
**maximum (2)**
64:4 66:15
**May (33)** 20:15
25:20 26:15
29:4,5 31:24
32:7,11 35:14
40:6 47:9
50:11 54:6
59:17 80:19
81:6 82:2
87:12 90:7
99:14 111:16
112:4 127:4
131:15 139:21
141:24 144:15
150:2,22
182:6 188:10,
13 202:12
**maybe (3)** 46:19
152:21 180:17
**me (45)** 2:23
3:9 10:3 17:3
26:17 29:23
33:4 37:7
39:24 40:2,4,
11,21 43:15
45:24 46:16
47:7 51:1
52:21 53:17,
19 59:5 62:15
65:6 67:13,15
79:13 85:4
100:5 101:16

102:5,9
127:13,17
128:6 138:5
144:4,18
159:8 160:12
172:4 192:7,
11 195:9
200:18
**mean (12)** 7:9
9:6 31:11
37:1,8,11
40:17 45:24
46:6 83:11
119:18 133:18
**meaning (1)**
190:11
**meaningful (1)**
121:13
**means (3)** 8:20
63:5 69:8
**meant (2)** 149:2
171:4
**measure (1)**
70:16
**mediation (2)**
15:14 29:8
**Medical (2)**
114:24 115:13
**meet (9)** 83:2
84:19 96:15
121:10 122:8
131:5 133:4
149:23 188:8
**meet-and- (1)**
122:15
**meet-and-confer (4)**
108:2 117:18
118:24 124:14
**meeting (3)** 18:3
96:13 155:17
**meetings (2)**
131:10 155:14
**meets (1)** 51:4
**member (1)**
183:15
**members (5)**
139:10
141:17 143:17

Case 09-10138-MFW     Doc 12801     Filed 01/09/14     Page 229 of 249

Bankruptcy Court for the District of Delaware                                                    Hearing
In Re: Nortel Networks Inc., et al.                                                      January 7, 2014

155:16 183:18

**memory (1)** 182:7

**mentioned (1)** 108:23

**mentioning (1)** 5:7

**merely (1)** 50:5

**merit (2)** 7:7 184:17

**merits (2)** 6:23 21:21

**Merrill (1)** 91:15

**met (1)** 51:16

**microphone (1)** 137:24

**mid-December (1)** 141:12

**might (16)** 11:15, 23 17:11 26:3 28:15,17 29:6, 6 33:12 45:20 60:12 96:22 130:5 134:19 162:15 169:10

**Milbank (2)** 140:16 176:22

**mildly (1)** 47:15

**milestone (1)** 5:13

**milestones (1)** 37:5

**militates (1)** 70:13

**MILLER (18)** 90:12,13 93:1,6 95:11 105:2 138:2,3 139:4 140:16 142:22 143:12 160:11,16,17 177:17 178:16 179:18

**Miller's (3)** 168:9 177:2,12

**million (7)** 19:13 55:18 69:9 73:3 87:9 91:17 153:9

**millions (7)** 6:1 29:18 41:7 43:7 62:17

76:2 191:16

**mind (4)** 84:17 129:14 132:14 175:7

**mindful (1)** 66:6

**minds (1)** 117:11

**mine (1)** 157:14

**minor (1)** 49:19

**minute (1)** 40:14

**minutes (4)** 49:2 169:22,23 170:2

**mischief (1)** 13:1

**misled (1)** 184:9

**missing (3)** 63:23 110:5 154:24

**misstated (1)** 20:7

**misunderstood (1)** 12:19

**modest (1)** 153:1

**modifications (1)** 198:19

**moment (5)** 33:11 54:10 71:19 104:10 168:9

**money (10)** 11:2 25:11 28:23 33:15 34:13 40:14 94:6 97:11 159:18 187:13

**Monitor (50)** 9:21 10:17,21 11:7 12:19 13:14, 24 14:11 15:17 22:9 23:10,22 27:15 51:20 58:13,19,24 59:7 63:12 66:11,20,23 70:5,20 71:9 84:8 89:4 94:19 97:13, 15 101:12 106:17 109:1,

23 114:18

120:19 125:16 136:4,9,10 145:8 156:22 157:5,5,6

161:19 162:12 188:20 201:2,7

**Monitor's (7)** 10:8 59:10 73:24 97:24 145:4 160:21 172:5

**month (3)** 32:9 35:18 97:7

**months (13)** 8:2, 9 17:17 23:24 32:10,10 59:18 63:18, 18 73:2 91:10 92:4 143:13

**moot (2)** 36:18, 19

**mooted (1)** 65:10

**Morawetz (35)** 2:23 3:5,18 4:1 5:3,17 14:15 21:16 33:4 49:9,15 53:12,20 54:5 55:6 80:8 99:19 127:1 136:1 139:21 140:11 152:12 168:8 169:20 183:6 184:7, 23 186:9 189:19 191:9 192:21 193:18 197:20 202:4, 14

**Morawetz's (2)** 31:5 52:6

**more (29)** 13:9 24:19 39:14 50:20 62:19 76:4 81:9 82:8 85:12 87:10 101:18 108:18 122:18

126:13 132:5, 18,23,24

136:4 137:2, 24 150:10 153:1 182:16 183:4 184:16, 24 185:12 188:11

**moreover (1)** 200:13

**morning (13)** 2:1, 7,9 5:1 21:12, 14 24:13 27:12,13,19, 21 105:16 116:7

**most (4)** 38:14 60:15 99:6,7

**mostly (1)** 17:19

**motion (4)** 4:11, 13,19 5:13 19:7 38:17,21 52:9,14 70:6 76:10 79:18 82:19 84:2 90:23 93:24 95:20 97:15 106:17,23 115:22 116:17 121:9 127:2, 10 135:8 137:10 140:12 141:2,7 142:5, 7 144:3,7 164:2 186:11, 22 187:24 189:8,9

**motions (2)** 137:3 154:8

**motive (1)** 39:16

**mounted (2)** 130:16 135:2

**movants (2)** 42:5 45:16

**move (3)** 42:5 147:18 185:22

**moving (6)** 42:6 44:19,21

69:24 108:12, 24

**MRDA (4)** 15:18 74:17 87:18 124:1

**much (20)** 2:4 5:3 10:20 24:14 27:6 29:21 34:18 41:15 48:10 50:19 85:7 90:11 95:13 101:5,18 109:2 122:15 132:18 148:22 162:11

**multimillion-dollar (1)** 58:22

**multimillions (2)** 58:11 63:11

**multiple (3)** 14:22 81:21 152:17

**Murphy (4)** 27:11, 12,13,14

**Murphy's (1)** 66:12

**must (5)** 65:18, 19 111:22 135:1 183:19

**mutual (1)** 187:4

**my (97)** 4:9 9:5 26:18 27:16 45:5 47:5 48:14 51:9,21 52:17 58:13 61:19 62:18, 23 64:18 65:10 66:13 70:5 72:13 76:16 77:2,15 78:9,11,15,22, 23 79:8,16 80:9 82:4,20 86:8 90:7,15, 17 99:11,14 104:18 105:23 107:17 108:17

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 230 of 249
Bankruptcy Court for the District of Delaware    Hearing
In Re: Nortel Networks Inc., et al.    January 7, 2014

111:20 117:8
119:8,16,20,
21 120:13
121:20 122:4,
5 123:21
124:12 126:20
127:9,13
128:12,21
129:19,21,23,
24 130:12
131:16 132:4
135:3 136:11,
20 153:18,19,
20 154:11,21
156:14 157:15,
16 158:1,16
159:8 162:7,
17 163:22
165:3,15
166:4 169:20
170:4 172:6
179:15 182:8,
12 188:22
193:5 194:8
195:1 198:23

**mysteries (2)**
175:3 176:8

**N**

**nada (1)** 196:18
**names (2)** 85:11
128:24
**narrow (6)** 27:3
88:21 108:3
110:18 150:5
155:4
**nature (5)** 129:6
148:21 170:22
189:7,8
**necessarily (1)**
53:23
**necessary (7)**
26:3 45:18
58:22 90:3
108:4 146:23
175:2
**necessity (2)**

55:1 98:1
**need (34)** 11:17
20:24 26:3,4
47:2 53:22
58:18,18
62:11 63:20,
22 65:22 67:7
71:6,7 90:1
94:8 102:18
110:19 114:12
119:12 120:16
132:5 149:4
150:13 155:8,
21 156:3
157:23 159:5
166:22 171:10
172:9 193:10
**needed (3)** 43:3
46:19 114:1
**needing (1)** 26:5
**needs (12)** 13:21
14:1,2 17:6
22:13 29:1
36:13 59:1
80:3,13
110:10 126:10
**negative (3)** 12:9
28:3,5
**negligence (2)**
156:7,10
**negotiated (1)**
199:22
**negotiation (2)**
39:11 60:9
**negotiations (6)**
198:15,23,24
199:3,7 200:10
**neither (4)** 51:22
75:9 94:23
160:3
**neutral (2)** 46:14,
18
**never (10)** 13:19
56:24 159:13
178:8 179:21
180:22 199:21
200:9 201:19,
19

nevertheless (1)
41:12
**New (18)** 5:2,2
15:15 29:5,12
35:15 43:16
64:4,17 66:15
67:9 83:9,13,
17 173:18,19
189:11 190:6
**news (2)** 20:15
28:5
**next (5)** 9:19
63:10 108:20
115:10 144:24
**nine (2)** 55:15
72:2
**Ninety (1)** 160:17
**nine-year (1)**
74:18
**NNC (1)** 128:6
**NNI (5)** 64:11
65:22,24
128:6 196:5
**NNL (10)** 65:16,
16,18 66:1
71:19,20
74:14 88:23
128:7 196:5
**NNSA (1)** 88:23
**NNUK (5)** 64:11
87:2,20
126:16 161:23
**NNUK's (1)** 87:18
**Nobody (5)**
48:20 61:6
154:17 179:7
186:24
**nod (1)** 40:2
**noise (1)** 47:22
**nomenclature (1)**
134:19
**noncredible (1)**
40:12
**none (4)** 33:11
42:2 142:19
168:21
**nor (3)** 51:22
104:20 160:3

**normal (1)** 132:7
**normally (1)**
157:21
**Nortel (10)** 15:6
60:16 64:10
73:22 92:18,
19 148:11
154:19 196:9,
12
**Nortel's (1)** 74:13
**no-stone-unturned (1)**
93:18
**no-surprise (1)**
78:1
**note (7)** 15:11
19:15 39:21
105:2 127:5
128:13 161:6
**noted (5)** 5:17
18:8 113:16
149:20 169:21
**noteholder (6)**
99:20 100:6
101:19,20,22
103:5
**noteholders (7)**
102:9 104:7,
19,23 113:22
124:8 167:23
**noteholders' (3)**
100:13 102:6
103:15
**notes (5)** 70:22
104:6 123:19
155:17 197:6
**nothing (26)**
10:13 12:8
16:24 32:15,
16 38:16,17,
22 39:14
45:11 57:13
64:2 75:11
76:1,11,12
101:24 103:1,
19 104:16,19,
20 151:17
159:11 175:19
190:23

**Notice (6)** 65:12
87:6 142:3
143:6 145:14
195:21
**noticed (4)** 109:6
111:14 112:2
154:15
**notion (3)**
190:13 194:6
201:14
**November (6)**
54:23 75:21
120:23 122:7
130:18 185:4
**now (83)** 7:13
17:1,11 18:7
24:4,23 27:24
28:15,22
29:20 32:3,9,
10,10 34:16,
21 35:9,18
36:21 43:12
49:10,11,13
53:8 55:2,23
56:2 59:14
62:11 65:2
68:9 73:1,3
75:23 78:15
80:9 81:6
86:10 87:1
88:5 90:4
98:20,22
101:16 102:5
106:8 108:8,
18 109:12
110:24 114:15
119:14 120:13
121:4 127:13
130:13 131:2
145:9 148:20
150:8,12,15
161:6 163:8
164:3 168:18
170:24 172:20
173:16 174:12
178:5,16
179:5 180:11
182:1,6,15,23

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 231 of 249
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

189:12 199:10,
21 201:6
202:20

**number (23)**
12:13 35:6
60:3,6 63:2
64:22 107:22
114:21 115:5
120:17 129:20
131:8 132:18
137:19 138:6
146:21 148:8
152:20 153:8
161:24 188:14
189:20 191:14

**numbered (1)**
115:2

**numbers (3)**
86:20 178:22
203:11

**numerous (2)**
75:9 95:5

---

**O**

**object (11)** 28:13,
14 30:20 89:4,
12 139:10
141:17 142:3,
24 143:7 148:2

**objected (8)**
101:13 116:2
143:5 168:13
177:23,24
178:2,14

**objection (8)** 9:15
23:12 143:7
178:13 181:8,
10,11 182:24

**objections (13)**
22:8 38:5
71:14,16
73:24 106:6
108:2,3,10,17
113:5,16
121:12

**objectives (4)**
106:11 110:2

116:6 124:11

**objectors (1)**
21:10

**obligation (2)**
34:3 96:24

**obligations (2)**
36:11 73:5

**obliged (2)** 58:14
113:12

**observe (1)** 153:7

**obtain (4)** 56:16
60:13 66:20
97:17

**obtained (8)**
19:18,20
65:21 75:17
102:11 103:1
134:13 142:1

**obtaining (2)**
109:17 154:23

**obvious (1)** 47:21

**obviously (8)**
15:4 25:8
52:23 105:21
162:23 163:7
171:4 202:21

**occasion (1)**
70:16

**occasions (2)**
80:5 95:5

**occupy (1)** 40:13

**occur (4)** 28:15,
17 112:23
121:18

**occurred (3)**
77:13 78:18
91:20

**O'Connor (3)**
26:11,14 27:6

**off (7)** 2:15 3:12
17:10 93:3
140:5 145:3
170:1

**offend (1)** 47:10

**offer (1)** 200:19

**offered (3)**
122:11
200:22 201:2

**offering (1)** 187:3

**officer (1)** 157:6

**officers (15)** 84:1
85:16 86:6
87:12 129:1
132:16 133:24
159:10,14
164:4,10,16,
18 165:8
193:13

**officers' (1)** 84:2

**official (3)** 3:16,
21 21:17

**often (1)** 50:16

**old (2)** 29:13
35:16

**omissions (1)**
128:9

**omit (1)** 190:18

**omnibus (1)**
108:10

**once (3)** 15:4
129:10 151:1

**one (68)** 7:5,17
11:17 12:2
15:5 21:1
22:4,10 33:18
35:3 36:2
40:24 42:21
50:5 61:24
63:2 71:24
72:1,4 77:6,7
79:22 86:10
87:1 88:7
92:5 97:2
100:10 101:9,
21 103:24
106:19 107:6,
16 111:3
114:15 116:16
121:4 123:6,6
124:20 126:5,
5,14 130:20
135:23 136:6
148:8 150:8
152:19,19,19
155:12,15
157:3 164:20

165:7 166:22
169:1,10
172:8 185:2
186:17 196:18,
18 198:22
199:3 200:15

**one-room (1)**
62:16

**onerous (5)**
133:18 147:3
158:17,20,20

**Ones (7)** 61:9
62:8 125:6
128:19 168:20
181:14,16

**only (26)** 15:10,
11 33:11
51:13 59:23
87:1 91:11
92:6 93:6
98:21 100:21
108:4 110:3
127:19 145:9
154:6,9 160:1,
2 170:7,15
171:7,9
172:16,19
199:4

**Ontario (18)**
56:21 57:1
77:6 106:12
107:13 110:4,
14,23 115:17
116:5 118:6,
13 120:8
149:10 192:19,
20 193:3
198:18

**onto (1)** 193:18

**open (4)** 11:7
20:24 122:15
157:22

**opening (7)** 8:21
58:1,3 149:14
157:20 172:18,
21

**openings (3)**
11:20 72:23,

23

**operated (1)**
11:15

**operating (1)** 97:5

**operations (1)**
179:12

**OPERATOR (1)**
2:13

**opine (1)** 50:16

**opinion (1)**
173:21

**opponents (1)**
12:12

**opponent's (1)**
150:2

**opportunity (27)**
12:4 36:8
61:4 66:19
74:9 75:7
82:24,24 83:3,
5,16 84:18
85:14,22,22
86:7 110:14
121:6,21
126:4,11
138:13 149:16
155:3 162:1
188:23 192:2

**opposed (4)** 93:5
113:19 122:13
180:16

**opposing (4)**
57:2 172:14
173:23,24

**opposite (5)**
62:24 107:17
117:8 136:21
170:5

**oppressive (1)**
73:19

**oral (2)** 122:14
171:16

**orally (1)** 157:22

**order (22)** 10:16,
18 14:15
25:15 32:16
48:3,4 50:1
52:5,7,10

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.                                    Hearing
January 7, 2014

58:5 81:15
96:8,16 97:17
106:22 120:23
122:8 135:2
146:22 168:2

**ordered (1)**
151:19

**orders (3)** 30:16
31:5 86:13

**ordinarily (1)**
31:18

**ordinary (2)**
31:13,14

**ordinary-course (2)**
28:14 37:12

**original (2)** 123:2,
3

**originally (1)**
140:11

**O's (4)** 128:3
133:21 163:6
193:12

**other (64)** 8:11
9:3 15:16
18:7 20:4
21:9 23:20
25:13 28:7,12,
20 30:13
32:19 33:8,16
34:5,15 37:5
38:5,5 48:1
51:20 52:16
68:6 71:9
72:6 73:7,9
75:10 87:17
89:9 91:7
92:10 94:1
100:20 106:16
108:11 109:16
112:8 116:21
117:22 120:16
122:5,12
124:1 125:7
127:15 134:4
142:14 150:11
152:21 154:23
156:5 158:1
160:24 161:24

176:12 184:2,
20 186:21
187:18 188:2,
13 197:4

**others (4)** 65:17
111:4 123:7
126:20

**other's (3)** 35:7
39:6 68:7

**otherwise (6)**
28:24 34:13
85:4,9 143:16
180:6

**our (143)** 7:23
8:2 9:8 10:16
11:13 13:21
17:7,15,24
19:14,16
20:18,23 21:5
23:20 26:21,
24 27:1 29:4,
9 30:9,13
32:5 35:20
36:17,18,19,
22 37:22 41:4
43:18 46:21
48:23 50:2
53:8,14 54:14
56:2,8 57:20,
20 58:3 61:21
62:10 67:14,
15 69:20
71:16 72:18
73:7,11,12,24
74:9 80:19
81:8,11 82:18
84:11 86:16,
23 90:2 91:10,
24 93:23 95:6,
14 96:5,10,13,
15 98:9,11,14
99:21 102:1
109:20 112:10
113:16 114:7,
16 115:20
118:14,24
119:12 120:9
122:15,19,24

124:9 125:4
136:13,14,19
137:10 139:5,
22 140:12
143:6 145:7,
10 146:16,17
147:7,11,13
148:16,21
151:3,13
152:7 157:18
159:12 165:4
166:12,16
172:17,18,20
173:2,10
174:12 175:7
177:18 178:22
179:1 180:12
181:1 182:18,
24 183:23
184:4,15
185:12 187:9,
11 190:1
194:2 195:21
201:16,17,18
202:8

**ourselves (1)**
187:3

**out (53)** 5:16
7:1 9:1 12:23
13:16 14:8,11
17:21 18:15
29:3,4 32:14
36:10,10 40:1
43:11 50:5
56:4 57:19
58:5 59:11
75:21 76:11,
12 77:11 86:1
94:15 98:9
99:8,21 101:5,
6 107:24
111:9 114:7
121:17 122:9
125:11 130:15
131:14 133:14,
22 143:6
149:10 156:6
160:23 171:6

191:18 195:1,
24 196:20,21
197:4

**outcome (2)**
93:11 94:24

**outlines (1)** 164:7

**outset (7)** 23:2
59:19,22 61:6
71:15 193:17,
19

**outside (5)** 23:19
27:23 113:13
151:20 194:22

**over (32)** 6:4 7:8,
8 8:1 11:3
17:16 25:13
37:8 39:6
60:18 61:16
67:2 79:23
83:4 85:18,20
86:23 91:10
104:15 111:14
112:1 118:20
119:22 123:22
128:21 141:4
153:10,11
154:18 155:6
169:15 176:13

**overarching (1)**
100:17

**overbroad (1)**
73:18

**overlapping (1)**
164:19

**overly (1)** 72:7

**override (2)** 10:1,
3

**overview (1)**
116:4

**overwhelmingly (1)**
76:10

**Overy (1)** 188:19

**own (10)** 68:7
74:9 90:24
92:3 94:6
99:7 126:20
149:16 162:5
196:14

**owned (1)** 15:6

**ownership (7)**
64:9 87:20
88:3 89:19
123:10,11
136:7

**ownership' (1)**
87:19

---

**P**

---

**P&L (1)** 138:18

**package (1)**
178:19

**packet (1)** 122:24

**page (38)** 36:23
65:7 66:13
72:3 74:1
84:23 85:18
86:20,20 87:5
106:24,24
108:21 112:11,
11 114:21,23
115:5 118:9
125:8,10
126:17 128:12,
15 133:13,16,
22 137:20
140:12 144:12,
13,21,24
145:12,20
147:17 150:17
151:13

**pages (16)** 55:18
69:8 84:9
86:23 115:1
138:10 144:8
160:23 161:7,
8,9,11,12
163:14 178:23
191:16

**paid (6)** 69:18
151:17 177:20
180:13,16
181:1

**pan (1)** 75:23

**paper (1)** 178:23

**papers (9)** 13:21

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 233 of 249
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

18:11 30:6
36:16,17
53:21 83:21
177:19 201:17

**paragraph (30)**
59:10 60:1,7,
7 61:3 70:24
100:12 102:5,
12,18 112:12,
22 116:1,3,8,
9,14,19 118:8,
12 128:15,16,
22 131:18
132:3 133:23
149:8,9
150:18 183:24

**paragraphs (4)**
99:23 100:5
140:7 196:2

**paramount (2)** 8:6
21:22

**paranoia (1)** 39:3

**paraphrasing (1)**
36:18

**Pardon (3)** 37:7
67:15 128:6

**pared (1)** 65:2

**pared-down (1)**
88:9

**part (24)** 6:9
57:10 68:3
77:16 85:13
108:22 117:18
118:24 120:7,
9 122:15
123:21 124:22
125:11 130:8
162:13 167:3
178:19 179:6,
6 180:6 181:6
182:16 183:16

**partial (2)** 28:9
88:22

**partially (1)** 165:2

**participant (2)**
142:17 178:24

**participants (1)**
109:4

**participate (1)**
152:5

**participated (2)**
96:8 129:19

**participating (1)**
57:24

**particular (13)**
40:21,24
81:4 83:20
87:3 91:6
103:9 116:23
125:13 141:7
169:5 184:8
190:4

**particularly (5)**
39:20 40:10
60:15 94:5
130:7

**particulars (4)**
84:8,9
163:14,15

**parties (124)**
5:22 6:7
11:11 13:5,6,
24 14:23 15:3,
13 16:2,10
17:8 19:2
22:2 23:23
28:18,20 30:1
33:16 34:1,5
35:5 36:12
38:6 39:5,18,
19,20 42:11,
17 44:11 45:4,
22 47:17 49:3
50:18 51:20
52:16 54:24
55:14 56:5
57:2,14 58:13
60:11,12,21,
24 61:10
66:15 67:22
70:4 71:8
77:20,23 78:4,
12 79:3 80:1,
7 90:22 91:5,
8 92:6 93:13,
16 94:1,7

95:16 98:22
99:4,6,7
101:4 105:3
106:4,8
107:19 108:11,
12,24 110:8,
22 111:14
112:7 113:18
121:10,16
122:7,12
125:7 132:1
137:6 141:23
145:15 149:3,
13,15,17
150:7,13
153:12 158:3
161:1,24
162:2 167:6
170:9 171:14
172:12,14
184:20 186:21
187:18 191:8,
10,11,17
193:1,17
198:14,16
199:6,16

**parties' (8)** 51:23
57:15 83:16
94:6,23
150:23 198:9
200:3

**partner (1)**
198:23

**party (32)** 48:18
56:11 57:10,
18,18,23 62:9
66:14 71:18
81:21 87:7,9
91:11 92:10
107:11 112:20
117:19 119:24
120:11 121:23
141:1 149:22,
24 151:24
158:3 162:10
190:12 191:20,
24 199:23
200:6 201:18

**party's (1)** 48:5

**pass (1)** 195:14

**passed (1)** 20:2

**past (10)** 8:1
17:16 73:23
80:2,16,17,20
82:13 86:18
95:10

**patent (2)** 15:8
64:13

**patents (1)** 65:15

**Pause (1)** 54:18

**pay (2)** 68:19
180:18

**paying (2)** 34:14
99:7

**payment (3)**
19:11 88:24
97:7

**payments (1)**
19:13

**pending (2)** 19:4
128:23

**pens (1)** 118:4

**pension (29)**
5:21 6:7
11:10 13:5,24
17:8 19:2
22:2 39:19,20
90:14,18 91:6
92:5,11,14,18,
20 93:9 97:2,
19 105:3
161:2,12,21,
22 162:1,2,5

**pensions (1)**
19:16

**people (18)**
11:21 22:23
31:13,14,17,
21 34:8,16
68:5,14 69:13
72:17 111:16
117:22 133:1,
4 154:17
170:15

**per (2)** 61:24
120:11

**perceive (1)**
178:10

**percent (5)** 25:7
56:4 60:17
111:7 180:20

**percipient (4)**
170:23
174:15 178:1
179:2

**Perell (1)** 149:10

**Perhaps (3)**
100:3 101:3
202:7

**period (6)** 39:6
74:19 82:1,7
104:16 111:20

**permission (1)**
162:21

**permit (1)** 94:15

**permits (1)** 33:2

**permitted (1)** 94:5

**person (3)** 62:1
191:2 192:9

**personal (3)**
129:22,24
157:8

**personally (3)**
127:20,21,24

**persons (1)** 72:6

**perspective (7)**
17:24 21:5,
22 45:5 79:15
97:19 126:1

**pertain (1)** 175:4

**pertaining (1)**
176:18

**pertains (2)**
125:15,16

**pertinent (1)**
60:14

**Peter (5)** 76:19
138:17,17
140:17 141:3

**phase (3)** 44:20
63:10 84:12

**phone (1)** 43:16

**phrase (3)** 40:9
87:19 124:2

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

**phrases (1)**
123:12

**pick (1)** 170:12

**picture (2)** 3:1
193:24

**piece (4)** 81:4
147:22 154:4
170:22

**pins (1)** 5:17

**Piper (1)** 195:3

**place (12)** 13:18
22:22 23:12
43:6 79:20
82:2 86:21
91:21 113:21
143:23 148:5,
20

**placed (1)** 96:10

**places (2)**
106:16 165:3

**plaintiff (2)** 119:3
174:10

**plaintiffs (5)**
116:20 117:5,
10 118:17
119:1

**plaintiffs' (2)**
118:19 119:6

**plan (8)** 35:11
43:9 92:18,20
161:21,22
162:1 187:19

**planned (3)** 32:1
141:10 152:1

**plans (4)** 90:18
97:3 162:3,5

**platter (1)** 173:9

**play (1)** 64:14

**playing (1)**
189:13

**pleaded (1)**
109:19

**pleading (6)**
33:22 48:6
118:16 146:16
164:12 196:21

**pleadings (15)**
29:17 31:15

57:23 72:18
86:1 98:10
103:15 107:21
114:6 117:23
123:15 124:6,
24 157:15
161:10

**Please (10)** 2:2
3:6 4:14 49:8
50:13 52:16
54:4,6,19
100:17

**pleased (1)** 52:5

**pleasure (1)**
53:16

**plow (1)** 131:13

**plowed (1)** 75:9

**plug (1)** 152:20

**plus (2)** 120:22
152:23

**pm (2)** 202:24
203:14

**podium (1)** 4:17

**point (86)** 10:9,
21 11:5 17:13
22:10 30:9,13
37:23 40:21
42:15 47:7
48:1 51:24
59:11,13,13
62:19,21 63:1,
2,7 65:9 66:3,
7 70:2,23
72:13 75:11,
18 79:16,23
80:22 81:11,
13 82:10,21,
22 83:10
85:24 86:8,14
90:5 93:6,13
94:19 95:5,9,
18 100:10
102:20 103:2
113:10,21
121:5 136:4,
19 137:3,20
139:15 142:12
147:4 148:19

150:18 153:14,
18 154:21
156:14 158:1
159:8 160:12
165:2 166:3
168:17 170:6
175:11 177:18
181:4 186:19
193:21 194:2,
3,4 197:2,4
199:21 200:15

**pointed (4)** 77:11
160:19,23
191:18

**points (9)** 55:12
90:20 111:3
115:17 126:14
149:20 195:4
196:23 197:10

**portion (3)**
185:21
189:16,17

**portions (1)** 75:5

**position (71)**
13:20 14:10
15:22 17:20
22:17 24:3
25:4,6 28:20
29:4,6 30:18
33:7,13 34:1,
2,6,19 36:13,
18,19,20
37:19,22
40:20 47:19
56:2,8 58:3,5,
7 88:18 89:22
90:18 92:12
97:1 98:1,5,7,
8 99:21 100:7
104:23 105:5
109:16,22
118:20 120:18
127:10,14,18
136:7,11
141:8 142:17,
23 145:7
146:18 150:9,
23 154:23

156:22 157:5,
13,15,19
168:11,15
180:15 184:19
192:4

**positions (24)**
12:22,23
13:4,14 23:1,
14 29:2 31:13
37:12 40:19
57:16 66:21
77:21 85:19
101:6 109:19
113:15,18
136:6 145:6
149:14 150:13
157:24 176:7

**positive (1)** 92:8

**possession (2)**
71:17 91:24

**possibility (1)**
33:12

**possible (9)** 14:5
23:2,3 36:14
46:18 47:20
85:13 88:2
104:7

**possibly (5)**
29:12,13
101:22 111:8
126:8

**post-mediation (1)**
18:10

**pot (1)** 97:10

**potential (2)** 61:2
168:12

**powerful (2)**
171:12,19

**practical (1)** 35:10

**practice (5)**
56:23 61:21,
22 115:22
118:6

**precede (1)** 161:9

**precise (1)**
151:16

**precision (1)**
147:13

**precludes (1)**
151:18

**precondition (1)**
23:8

**prejudice (4)**
35:19 36:5
47:21 139:9

**prejudicial (3)**
29:20 133:1
152:2

**preliminary (2)**
4:3 20:11

**premature (1)**
25:23

**prep (2)** 152:23
158:18

**preparation (2)**
32:6 130:22

**prepare (9)**
34:10 69:5
73:8 96:11
109:10 170:15
171:5 175:14,
18

**prepared (7)**
44:12 76:3
120:2 135:10
136:19 170:21
187:16

**preparing (4)**
3:20 69:14
76:3 92:2

**prepping (1)**
122:14

**present (8)** 4:18
172:15 174:2,
4 187:9 196:7
198:22 201:3

**presenting (1)**
24:2

**press (1)** 41:21

**presumably (1)**
59:18

**presume (1)**
120:15

**presumption (1)**
38:20

**pretrial (7)** 57:17

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 235 of 249
Bankruptcy Court for the District of Delaware                                                    Hearing
In Re: Nortel Networks Inc., et al.                                                    January 7, 2014

61:24 93:17
150:3 172:22
174:7 201:16
**pretty (2)** 34:18
50:18
**prevent (1)** 23:23
**prevented (1)** 62:3
**prevents (1)** 62:7
**previously (4)** 4:6
71:23 107:20
117:1
**price (3)** 104:5
147:24 180:24
**prices (2)**
104:15 177:20
**pricing (1)** 74:18
**primary (1)** 98:8
**principal (2)**
53:14 142:14
**principle (2)** 76:6
131:4
**principles (2)**
70:6 136:23
**prior (9)** 24:18
57:3,6 60:20
83:4,6 112:15
129:14 138:15
**priority (1)** 103:7
**private (3)** 190:7
192:10,13
**privilege (2)** 89:7
173:22
**privileges (1)** 89:8
**pro (9)** 16:1
41:4 98:5,7,
13 136:13
145:10 146:2,
17
**probability (2)**
6:22 7:4
**probably (7)** 2:21
3:2 5:15 93:3
107:4 152:14
182:11
**problem (5)** 35:9,
21 160:1,2
171:22
**procedural (1)** 4:8

**procedure (14)**
56:20 70:11
77:7 95:22
106:2,6 107:8,
14,24 143:18
150:4 183:12
186:17 198:18
**procedures (3)**
78:13 79:20
82:17
**proceed (8)** 3:22
20:19 53:13,
24 105:12
135:1 142:9
187:12
**proceeding (21)**
18:9,10
42:23 70:19
79:19 90:19
91:12,13 92:6,
9 95:2,14,24
96:2,7 99:6
101:21 169:3
177:21 183:1
188:3
**proceedings (3)**
23:3 70:9
79:23
**proceeds (5)**
15:8 40:18
76:13 180:20
181:7
**process (64)**
11:21 20:3
29:14 33:16
36:10 47:18
54:22 55:23
56:1,8,10
57:24 59:18
68:21 69:16
71:3 77:3,4
79:21,22
81:18 82:1,11,
12,14 90:24
95:19 96:8,19
98:18 100:23
101:2 110:11,
20 118:24

121:13 122:16
124:14 130:13,
14 133:12
137:6 147:14
148:24 152:6
155:1,19,21
159:19 165:19
166:2 179:1,6
180:7 181:6,
12,16 185:8,9
186:13 187:5
188:12 189:16
193:3
**processes (1)**
179:7
**procure (2)**
149:24 150:1
**produce (4)**
143:14 178:9
179:20,21
**produced (7)**
57:8 139:7,8
143:10 178:23
196:17 201:1
**Producers (2)**
149:10,19
**producing (1)**
91:23
**product (10)** 46:9
72:12,24 74:5
89:7 118:3
172:3 173:22
174:23 176:13
**production (6)**
70:14,15
116:23 140:24
141:15 178:20
**productions (3)**
92:3 117:11
143:15
**professionally (1)**
53:1
**professionals (1)**
97:3
**progress (1)**
111:21
**prohibit (1)** 188:1
**proof (3)** 129:2,

8 150:1
**Proofs (3)** 84:5
128:2 163:6
**proper (8)** 117:9
118:5,7
130:22 135:2,
5 148:17 154:8
**properly (4)**
78:17 81:15
179:14 196:4
**property (4)** 15:6
65:15 87:21
142:15
**proponents (2)**
16:9 21:9
**proportional (1)**
104:21
**proportionality (16)**
58:21 67:14,
15 70:1,8,11
76:6 95:21
119:15,16,18
120:6 132:21
134:23 146:2
147:19
**proposal (2)**
16:17 122:13
**proposed (8)**
15:12 16:8
32:16 46:1
66:17 98:2
139:11 141:19
**proposing (2)**
23:11 46:12
**propounded (1)**
179:14
**prospect (1)** 35:2
**protect (1)** 31:16
**protected (3)**
72:11 74:4
89:6
**protective (1)**
168:1
**protocol (54)** 4:6
34:17,22
41:24 42:13,
15,16 48:24
60:2 73:12,16

82:6 106:13,
23 107:1,11
108:7,16,22
109:3,20
110:3 111:4,
13 112:4,9,12,
17 114:14
115:9,20
118:14 119:10,
17 120:9
121:11 124:12
126:11 141:13
149:3,4 152:1
153:21 154:13
159:7 162:8
166:10 170:10
189:14 192:3,
19 194:3
200:11,12
**protocols (1)**
14:23
**prove (3)** 96:7,
16 156:9
**provide (8)** 78:8,
10 79:2 92:12
122:20 129:10
132:6 183:19
**provided (24)**
60:4 71:23
77:9,10,18,22,
22 78:3 79:4
84:10 89:13,
15 108:5
114:13 115:20
123:15 124:23
157:21 162:10
183:14 190:1,
2 192:21
202:24
**provides (9)**
32:18 48:24
67:4 82:2
87:6 107:15
109:10 145:14
162:8
**providing (1)** 92:2
**proving (1)** 96:1
**provision (2)** 65:9

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 236 of 249
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                      January 7, 2014

183:10

**provisions (4)** 4:5
12:20 161:17
171:18

**public (4)** 15:12
104:14 167:3
168:3

**pull (1)** 167:7

**PULTMAN (11)**
188:18,19,22
189:2,6
192:15 194:10
198:14,20
199:11 200:14

**Pultman's (1)**
198:8

**purchase (1)**
177:21

**purport (1)** 73:4

**purports (1)** 143:1

**purpose (22)**
12:21 16:12
51:4 60:9
86:11 104:9
112:18 113:1
123:4 142:7
148:22,24
149:15,17
159:6 171:9
172:11 191:4,
9 193:7 200:5
201:19

**purposes (8)**
11:18 108:19
109:13 116:5
122:22 149:21
150:8 190:20

**pursuant (1)**
151:20

**pursue (8)** 18:17
25:19 26:24
41:14 98:12
195:7,11
198:17

**pursuing (1)**
195:17

**pursuit (1)** 40:12

**put (38)** 11:18

13:4,5,6,22
14:6 16:21
24:18 29:9
39:4,13 44:16,
23 47:15 48:7
78:20 79:20
80:8 82:2
84:3 88:20
94:19 109:14
119:20 134:17,
19 138:11
140:20,20
157:4 158:5
168:1 173:8
174:11 185:20
198:24 199:2,4

**Putnam (1)** 127:5

**putting (2)** 13:20
72:21

**puzzle (1)** 131:13

## Q

**quarter (1)**
183:20

**quarterbacks (1)**
170:1

**question (48)**
41:24 62:10
81:8 84:17
86:4 87:16,22
88:7,21 89:16,
21 98:20 99:1
100:17 102:3,
23 109:24
116:19 117:6,
9 118:14
119:7,9,15
122:21 123:13,
21,23 126:17
133:22 137:11
145:21 146:13
148:4,14
157:2 162:3
168:24 169:10
175:20 177:10
180:8,11
187:23 189:7

190:9,17 192:8

**questioned (1)**
150:23

**questioning (5)**
56:17 62:7
65:10 118:5
147:11

**questions (83)**
62:4,22
64:23 71:19
73:20 74:13,
19 78:16
81:22 86:24
87:2 88:1
90:6 99:13
101:11,17,19
105:6 109:18
113:7,7,8,13
116:2 117:8
118:23 121:15
124:21,22
125:1,12
126:19 132:8
134:8,11
136:22 137:4
138:19,21
140:20 141:5
142:6 145:19,
24 147:13
148:2,3,6,9,
10,13,17
150:20,24
151:3,23
156:18,20
158:22 162:2,
23 170:19
171:3,5,8
179:8,13
181:2 186:1
187:9,10,21
188:10,14
190:8,19,23
191:1,19
192:9 197:10
201:22 203:2

**quickly (2)** 59:5
144:16

**quiet (1)** 197:11

**quite (11)** 3:7
12:7 25:17
26:6 40:15
49:20 78:23
85:16 95:8
186:11 193:10

**quote (3)** 57:16
145:15 146:3

**Qureshi (9)** 21:6,
11,12,15,16
22:12 23:9
24:7,15

## R

**raised (8)** 9:20
10:15 16:17
22:8 51:20,21
195:8,21

**range (2)** 51:15,
16

**rata (9)** 16:1
41:4 98:5,7,
13 136:13
145:10 146:2,
17

**rate (1)** 63:8

**rather (4)** 43:4
108:9 118:19
181:22

**reach (6)** 6:5
12:12 26:22
30:11 34:2
56:4

**reached (1)** 42:12

**read (25)** 13:13
40:3 44:13
53:21 66:7
73:20 87:4
102:17,18,19
112:21 116:18
123:24 124:3
153:24 157:15,
16 161:17
164:6 166:9,
14 170:10
172:8 175:3
197:5

**reading (3)** 73:3
129:2 163:9

**reads (1)** 183:13

**ready (9)** 3:10
49:3 69:16
73:2 175:23,
24 176:1
194:5 195:2

**real (1)** 94:10

**reality (1)** 98:14

**really (27)** 5:12
24:14,22 25:2,
4 26:17 39:16
43:9 45:24
52:22 69:7
72:14 77:16
93:4 95:5
102:3 131:6
158:16,20
163:15 170:6
172:1,2
174:17 175:13
185:17 195:9

**reason (11)** 9:10
28:17 42:11
59:8 61:18
73:14 104:22
159:15 165:17
171:23 193:4

**reasonable (8)**
6:18 51:3,10
60:6 62:22
64:22 73:18
118:22

**reasonableness (1)**
51:13

**reasonably (3)**
72:8 74:15
196:8

**reasons (7)**
24:16 59:11
74:23 134:14
135:7 189:20
193:15

**reboot (1)** 3:8

**rebut (2)** 173:13
196:11

**rebuttal (2)** 34:11

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 237 of 249
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

121:18

**recall (4)** 82:2
  86:22 164:13
  182:6
**received (5)**
  65:19 91:16
  97:6 121:16
  178:20
**receiving (2)**
  91:17,19
**recess (5)** 49:5,6
  139:19 202:10,
  11
**recipients (1)**
  179:23
**recited (1)** 51:5
**recognition (4)**
  24:24 25:11,
  14 52:6
**recognize (8)**
  7:12 8:3
  10:24 11:17,
  19 37:4,5
  202:21
**recognized (3)**
  52:11 110:4
  116:5
**recognizes (1)**
  112:14
**recognizing (1)**
  131:19
**reconciled (1)**
  13:7
**record (30)** 2:15
  3:7,12 37:15
  48:2,3 67:6
  78:21 87:23
  97:15 106:17,
  23 112:11
  115:3 120:11
  124:3 127:2
  137:10 139:9
  140:13 144:3,
  7,17 164:2
  167:3,8 170:8
  176:21 182:2
  187:8
**RECORDING (1)**

2:13

**records (2)** 81:24
  84:2
**recourse (1)**
  146:6
**recovery (3)**
  94:17 99:9
  103:9
**reduce (1)** 18:21
**reduced (1)** 123:4
**reduces (1)** 138:9
**reducing (1)**
  70:10
**reduction (1)**
  70:16
**redundant (1)**
  196:4
**refer (6)** 99:22
  100:5 128:5
  148:9 193:7
  196:1
**reference (4)**
  103:14 124:4
  126:15 192:8
**referenced (4)**
  40:11 162:11,
  16 177:15
**references (2)**
  123:15 124:23
**referencing (1)**
  140:6
**referred (5)**
  49:21 83:21
  161:7,16 169:7
**referring (2)**
  107:17 134:24
**refers (2)** 103:16
  164:4
**reflecting (1)**
  75:16
**refuse (1)** 114:2
**regard (2)** 16:22
  21:23
**regarding (7)**
  49:16 56:15
  70:7 83:20
  89:18 140:21
  151:10

**regardless (2)**
  22:20 126:1
**Registrar (1)** 59:3
**regulations (1)**
  31:15
**rehash (1)** 170:9
**rehashing (1)**
  105:13
**rein (2)** 185:1,2
**reinforces (1)**
  114:12
**reiterate (1)**
  102:17
**reiterated (1)**
  143:13
**rejected (1)**
  158:12
**relate (5)** 12:21
  128:20 141:6
  160:24 168:23
**related (4)** 85:7
  87:13 132:8
  190:17
**relates (3)** 10:19
  103:5 161:2
**relating (3)** 8:17
  195:22 196:22
**relation (3)** 55:21
  105:8 187:17
**relationship (2)**
  24:19 96:14
**relative (2)** 91:7
  147:19
**relatively (1)**
  15:15
**release (3)** 10:14
  44:12 49:20
**released (1)**
  43:23
**releases (3)**
  10:11,12,19
**releasing (1)**
  159:18
**relevance (7)**
  103:12 104:3,
  7 105:9
  180:10,24
  195:20

**relevant (24)**
  78:17 103:10
  104:13,20
  117:12 137:1,
  1 139:13
  141:20,24
  145:17 147:22
  150:10,19
  151:4 164:5
  168:13,21
  178:6,10,11
  180:1,7,14
**relevantly (1)**
  169:10
**reliance (1)** 78:2
**relied (5)** 57:4
  101:2 138:13
  195:10 196:8
**relief (6)** 16:18,
  20 23:18 42:3
  108:14 142:14
**relies (4)** 79:1,2
  131:16 173:20
**relieved (1)** 55:3
**rely (10)** 78:6,8
  100:19 114:4
  157:18 158:9
  173:10,13
  174:20 175:21
**relying (5)** 72:15,
  20 74:8 152:1
  196:24
**remain (1)** 16:9
**remained (2)**
  56:4 60:10
**remaining (2)**
  25:5 32:5
**remember (4)**
  26:12 43:12
  172:19 182:11
**remind (2)**
  127:13 163:13
**remove (1)** 18:24
**renunciation (1)**
  187:4
**rep (2)** 59:12
  75:20
**repayment (1)**

88:22

**repeat (3)** 64:7
  79:14 176:23
**replay (1)** 140:1
**reply (8)** 36:17
  50:2 58:8
  153:18 161:15,
  18 162:17,22
**report (2)** 9:23
  113:16
**reporter (1)** 3:15
**reporting (1)**
  70:21
**reports (15)**
  13:21,22
  34:8,10,11
  44:23 57:1
  64:17 79:4
  83:6 110:17
  111:20 121:18
  176:3,5
**represent (2)**
  183:17 184:3
**representation (1)**
  195:10
**representative (75)**
  4:13 46:19
  54:8 58:12,16
  59:2 66:14
  77:17 80:21
  81:19 86:11,
  12 87:24 88:1
  97:16 100:8
  104:24 107:11
  109:6,9
  112:20,22
  117:19 121:22
  127:11 129:18
  130:14,21,24
  133:10 134:16
  135:1,9
  136:20 138:24
  140:17 141:1,
  9 142:2,8,11,
  20 143:22
  144:6,12,22
  145:13,15
  147:16 151:23

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 238 of 249
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    January 7, 2014

155:13,14
156:15 159:16
165:20 170:19
172:10 174:13
175:12 177:9
178:3 179:8
180:5 184:13,
22 188:3
190:11 191:4
193:3,11
195:12,16
199:24 200:2
201:15
**representatives (9)**
5:21 46:24
81:10 86:18
113:23 125:23
138:14 143:10
200:7
**represented (2)**
42:23 94:20
**representing (2)**
76:20 184:1
**request (13)**
35:23 46:10
66:22 77:17
94:14 104:4
139:5 143:1,4,
5 178:15
195:9 196:16
**requested (6)**
30:18,19
31:8 50:6
162:12 200:9
**requesting (1)**
71:18
**requests (3)**
116:17
146:10 177:22
**require (4)** 45:12
68:18 73:8
117:9
**required (12)**
16:22 51:14
58:4 67:1
68:10 82:7
96:6,15
143:17 152:5

154:1 173:7
**requirements (1)**
51:4
**requires (4)**
76:14 121:11
122:8 151:15
**requiring (1)** 62:3
**research (1)**
15:18
**reserved (1)**
26:23
**residual (3)** 25:7,
16 64:13
**resisted (1)** 55:15
**resolution (1)** 10:7
**resolve (6)** 12:1,
5 14:8 41:23
67:1 80:17
**resolved (3)** 9:23
12:6 43:3
**resolving (1)** 12:8
**resort (1)** 8:8
**resources (6)**
28:13 31:22
63:5 97:6
141:22 185:11
**respect (49)** 6:24
9:11 11:3
15:20 19:8
20:5 21:20
31:5,10 33:8,
22 38:14,21
47:24 75:24
77:21 78:15
83:23 87:2
88:17 89:1
100:19 102:22
103:6 105:13
120:23 129:23
134:3 136:5,9,
16 137:12
138:22 140:19
145:6,18
162:22 163:20,
22 164:23
177:7 182:3
183:15 185:1,
18 189:6

193:5,11,21
**respected (1)**
114:10
**respectful (13)**
58:14 80:10,
19 81:9,12
82:4,18 84:11
86:17 90:3
99:11 104:18
165:15
**respectfully (3)**
14:16 80:11
121:7
**respective (1)**
57:21
**respects (1)** 25:18
**respond (7)**
10:23 22:7
38:11 105:15
142:3 186:19
198:7
**responded (1)**
31:24
**responding (6)**
96:12 106:17
138:17 177:17
178:17 179:18
**responds (1)**
139:5
**response (14)**
27:9 30:23
38:7 48:19
88:14 98:20,
21 101:10
132:5 139:8
141:16 189:3
197:18 203:4
**responses (1)**
191:23
**responsibility (2)**
153:10,12
**responsible (1)**
196:13
**rest (2)** 108:16
132:10
**rested (1)** 64:10
**restricted (1)**
166:13

**restricting (1)**
136:11
**restructure (1)**
97:1
**resubmit (1)**
167:8
**result (6)** 9:7,8
36:4 45:5,11
46:1
**resume (1)** 49:3
**retained (1)**
161:22
**revealed (1)**
75:13
**reverse (1)** 49:12
**review (5)** 75:7
78:4 83:16
90:5 202:20
**reviewed (3)**
87:23 168:20,
21
**reviewing (5)**
40:19 69:10
75:16 95:6
161:7
**revise (1)** 52:2
**revised (3)** 10:15
42:15 50:1
**revision (1)** 49:19
**revisions (1)**
10:18
**rhetoric (2)** 37:21
47:22
**rhetorically (1)**
150:19
**Richard (1)** 99:19
**right (45)** 4:24
16:10,24 19:5
20:1 24:6
26:24 27:10,
24 32:21
34:24 37:9,18
38:8,20 41:16
45:15 48:8,9,
22 49:17
54:17 55:10
71:15 85:12
86:19 88:17

136:18 144:19
148:3,4 159:7
169:16 170:14
171:1 172:13
174:18 182:22
184:11 197:22
198:1,4
199:21,23
202:6
**rightful (1)** 76:8
**right-hand (1)**
138:7
**rights (5)** 31:10
33:21 45:22
48:5 51:23
**rise (2)** 22:10
124:24
**rising (1)** 48:20
**risks (1)** 19:3
**River (1)** 5:8
**road (1)** 33:10
**rolling (1)** 71:5
**room (5)** 67:9
68:14 112:15
152:24 153:11
**Rooney (1)** 27:15
**Rosenberg (20)**
135:14,15,18,
22 137:17,20
138:1,8,11
139:24 140:2,
9 144:20
145:23 166:6
168:8,20
169:7 178:4
197:5
**Rosenthal (5)**
144:9 148:23
198:23 200:20,
22
**Rosenthal's (5)**
60:1 149:5
154:10 171:11,
19
**Rosetta (1)** 175:2
**Rothmans (1)**
149:9
**round (1)** 122:2

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

**row (2)** 43:13,14
**Ruby (3)** 138:17,
17 140:17
**Rule (44)** 6:15
9:12 33:8,9
35:24 41:2
51:5 61:19,23
62:6 67:16
70:2 106:7,12,
12 107:13
110:14 118:13
120:8 143:18
151:7,7,15,18,
21 153:19
154:2,5 155:2,
10,18 156:5,
15 166:7,8
177:7 182:5
183:10,12
184:5 188:6
192:20 193:2
198:17
**ruled (2)** 116:18
187:24
**rules (16)** 16:23
26:2 31:15
33:10 73:6,7,
7,8 77:6 82:6
95:22 107:13
110:4 112:10
152:4 166:12
**ruling (1)** 202:22
**rulings (1)** 113:5
**run (2)** 147:1,2

**S**

**safari (2)** 100:23
136:22
**safeguards (1)**
174:5
**said (49)** 2:6 7:7
9:2,4 13:19
16:4 17:10
24:22 28:1
29:6,7 38:23
41:3,9 43:15,
18,22 46:8

75:8 79:16
81:23 86:9
89:9 96:9
105:15,21
117:3 118:18
128:15 132:4
147:12 152:12
155:8,17
156:15 158:21
164:16 166:6
174:16,22,24
176:24 178:4
191:19 198:15,
20 200:15
201:10,11
**sails (1)** 13:16
**sale (5)** 15:8
25:8,15 64:13
179:6
**same (30)** 11:9
20:3 33:6
36:23 41:2
61:21 62:13
63:2 64:7
74:6,22,22
86:19 87:16
88:12 89:10
91:18 100:2
112:18,24
125:19,20
137:15 143:2,
8 146:13
169:3 178:15,
19 187:2
**sanction (3)**
99:10 185:14,
17
**sanctioned (1)**
153:2
**sanctions (7)**
68:17,23
69:1,3,18
99:3,5
**sandwich (2)**
170:14 191:6
**sat (1)** 42:14
**satisfied (1)** 19:14
**satisfies (1)** 132:5

**save (3)** 63:6
159:17 190:19
**saw (2)** 37:3
105:4
**saying (16)** 33:1
36:21 37:1
46:13 62:15
64:15 65:13
100:6 153:4
156:23 157:9
170:13 178:17
190:13 195:11
200:23
**scales (1)** 69:21
**scan (1)** 85:11
**scattered (2)**
60:18 154:17
**scene (1)** 104:10
**schedule (14)**
13:18,20
15:19 25:23
26:1,5 44:23
91:3 96:20
98:23 114:7
121:17 122:9,
20
**scheduled (1)**
52:12
**scheduling (1)** 4:9
**SCHWEITZER (3)**
49:23 50:1,4
**scientists (1)**
85:15
**scope (4)** 10:11
60:6 64:22
72:10
**scorched-earth (3)**
94:4 96:4
97:4
**scour (1)** 67:6
**screen (1)** 49:12
**scurried (1)** 43:15
**sealed (2)** 44:4,5
**seated (4)** 2:2
49:8 139:21
202:12
**second (18)** 7:16
30:9 33:24

53:8 61:18
65:7 67:18
82:22 86:8
90:23 92:16
95:17 103:4
136:13,14
154:21 177:5
198:22
**Secondly (2)**
161:18 195:19
**seconds (5)**
54:11 160:12,
17 162:7,7
**secret (1)** 165:5
**Section (10)**
107:10 108:6
109:3,11,21
110:3 119:10
153:21 161:1
170:11
**securely (1)** 107:9
**security (1)**
151:10
**see (44)** 5:7
7:23 13:3
22:16 24:8,9
26:3 27:19,22
49:9 53:24
59:23 61:11
64:16 65:4
66:10 70:4
71:13 73:20
75:24 80:12
82:15 83:5,7
85:13,17,19
87:3 100:16
105:6 125:7
128:12 139:2,
8 144:21
145:11 151:13
160:2,5 163:5
166:15 169:24
170:13 194:13
**seeing (1)** 2:19
**seek (15)** 19:21,
23,24 20:1
26:4 71:16,22
72:5 100:17

108:14 120:3
175:10 179:9,
10 180:3
**seeking (9)**
33:12 54:7
55:22 89:16
96:24 115:19
133:15 172:1,2
**Seeks (3)** 74:4,
11 89:5
**seem (3)** 26:15
40:21 170:4
**seemed (1)** 40:4
**seems (2)** 36:15
45:24
**seen (4)** 23:4
49:20 127:4
168:18
**sees (1)** 37:23
**self-evident (1)**
63:7
**send (1)** 188:12
**sense (11)** 34:7
36:11,15,15
41:22 45:2
68:9 120:8,18
186:24 190:24
**sent (1)** 97:12
**sentence (4)** 50:6
112:21 128:16
172:8
**sentences (1)**
151:14
**separate (9)** 15:2
16:9,11
112:20,23
181:12 196:5,
13 197:8
**separating (1)**
135:23
**series (2)** 106:3
116:1
**serious (3)** 17:4
26:6 40:5
**seriously (1)**
165:24
**serve (2)** 112:18
173:9

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 240 of 249
**Bankruptcy Court for the District of Delaware**                                              **Hearing**
In Re: Nortel Networks Inc., et al.                                                    **January 7, 2014**

**served (4)** 64:24
  108:11 131:8
  187:6
**service (1)** 43:23
**set (20)** 18:20
  20:15 29:3,4
  31:23 57:19
  58:5 86:1
  98:9 101:5,6
  110:2 114:7
  133:14,22
  143:6 167:1
  176:6 177:18
  200:21
**sets (4)** 59:11
  99:21 107:24
  149:10
**settle (8)** 7:13
  8:4 11:6
  13:17 42:18
  43:17,20 44:8
**settled (8)** 26:20
  43:10,20
  44:11 50:24
  159:12 181:17,
  18
**settlement (59)**
  4:11,19 6:6,
  10,17 7:9
  8:19,24 9:17,
  24 10:5 11:12
  12:20 14:13
  16:8,9 19:11
  20:16 21:9,21
  22:3,15,19
  23:8,15,20,21
  25:22 26:13,
  15 27:8 28:14
  30:14 31:1,9
  33:20 37:16
  38:18 40:5
  46:1 47:18
  48:4,13 49:16,
  18 50:9,16,21
  51:2,10,15,16,
  18,22 52:2,7
  53:3 66:17
  150:3

**settlements (2)**
  28:8,9
**settling (3)** 28:18
  34:1 47:17
**seven (2)**
  120:10,21
**several (5)** 5:14
  8:2 9:22
  67:24 80:5
**shackles (1)**
  23:12
**Shall (2)** 48:22
  109:4
**Shannon (1)** 2:5
**share (2)** 71:10
  109:24
**she (25)** 105:18,
  21 127:6
  129:4 138:17
  149:23 154:15,
  24 155:5,5,8
  156:15,20,21,
  21 157:9,10,
  12 158:20
  160:22 161:7
  179:19,22
  199:2,3
**sheet (1)** 73:24
**short (5)** 28:21
  82:11 131:19,
  23 132:4
**shorthand (1)**
  15:23
**should (53)** 3:2
  15:11,21 18:7
  19:15 21:8,23
  22:2 23:16
  30:16,17
  33:23 40:24
  41:1 42:6,16
  43:5 52:1
  54:15,17
  58:14,19,24
  66:8 75:20
  80:22 82:15
  94:5 104:12
  105:1,21,22
  108:19 117:18

  119:4 121:8,9,
  10,16 122:7
  134:7,9 135:8
  140:21 152:4
  166:19 167:2
  180:2,5,19
  184:12 193:19
  195:11
**shouldn't (3)**
  33:19 97:8
  157:7
**show (6)** 73:23
  75:5 86:15
  89:9 154:14,19
**showed (4)** 56:6
  61:10 153:21
  198:21
**showing (1)** 87:1
**shown (1)** 123:11
**side (11)** 17:7
  61:24 68:7
  71:9 73:9
  75:9 85:12
  109:17 154:23
  186:4 195:20
**side's (1)** 75:10
**sign (1)** 52:5
**signed (4)** 149:4
  191:8,8 193:18
**significant (5)**
  81:6,17,24
  82:13 178:20
**significantly (1)**
  70:22
**silent (1)** 23:21
**silly (1)** 17:22
**silver (1)** 173:8
**similar (1)** 117:7
**Simon (1)** 85:19
**simplification (1)**
  20:21
**simplified (1)**
  20:17
**simplifies (1)** 28:2
**simplify (5)** 11:1
  12:16 13:12
  28:4 44:24
**simplistic (1)**

  145:24
**simply (24)** 8:17
  11:13,18
  14:14 17:2,13
  38:23 46:13
  94:24 95:17
  96:13 97:20
  98:15 104:13
  117:11 122:18
  125:19 179:16
  180:7,23
  183:10 184:5
  190:13 193:24
**since (5)** 56:20
  91:16 93:21
  142:9 151:22
**single (9)** 18:1,2
  95:2 126:5,5
  162:14 169:9
  196:9,17
**sit (17)** 9:6
  11:24 12:11,
  15 16:14 17:2,
  9,13 26:8,21
  38:23 39:7,22
  40:4 42:17
  43:13 175:13
**sitting (6)** 2:5
  43:12 67:9
  76:4 159:3
  197:11
**situation (2)**
  35:15 96:21
**six (4)** 91:10
  92:4 94:21
  149:19
**skin (1)** 135:4
**skip (1)** 118:20
**Slovenia (1)**
  146:13
**small (2)** 60:5
  64:22
**smallest (1)** 8:20
**smarter (1)** 2:4
**so-called (3)**
  19:17 78:1
  145:10
**soldiers (1)** 11:19

**solicitor (1)** 133:7
**solicitor's (1)**
  118:3
**some (46)** 9:2,4
  10:10 13:14
  30:11 33:10
  34:17 35:15,
  16 37:17
  38:19 39:16
  40:5,13 41:18
  47:5 65:12,12
  80:6 84:2
  99:22 104:10
  105:9,15
  107:18 111:15
  115:22 116:6
  117:24 120:22
  122:4 123:19
  124:13 146:18
  153:12 159:15
  168:9 175:18
  177:3,6
  182:15 186:22
  187:8 188:10,
  14 191:2
**somebody (4)**
  39:12 131:15
  180:18 194:15
**somehow (2)**
  39:15 65:10
**someone (6)**
  62:11 68:19
  112:4 117:21
  156:7 190:7
**something (24)**
  14:9,17
  18:16 21:7
  22:17,19 25:8
  26:7 32:7,14
  39:8,9 44:18
  45:21 56:6
  63:13 66:16
  68:16,21
  117:17 181:3
  189:10,11
  190:15
**sometime (1)**
  30:19

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 241 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

**sometimes (4)**
8:19 23:4
39:11 68:1
**somewhat (2)**
53:24 161:3
**soon (1)** 19:14
**sorry (13)** 4:1
20:6 55:5
67:15 73:15
83:11 85:2
137:18,23
151:8 188:6
194:17 198:2
**sorts (2)** 5:15
11:9
**sought (11)**
16:20 56:5
77:16 86:16
102:1,8 104:9
175:10 178:15
185:2 201:5
**sound (2)** 51:3
55:6
**sources (1)**
117:14
**space (1)** 62:18
**span (1)** 126:2
**speak (11)** 9:13
10:20,23 15:4
37:8 48:18
95:8 125:13
126:13 189:3
196:19
**speaking (1)**
116:7
**speaks (1)**
107:14
**special (1)** 81:1
**specific (9)** 88:21
104:6 161:9
163:11 164:8,
19,24 183:9
196:19
**specifically (12)**
10:12 101:16
103:8 105:3
108:20 110:5
126:13 137:11

162:10,16
166:5 196:2
**specifics (1)**
56:14
**specify (2)** 78:24
128:24
**speculate (1)**
132:14
**speculation (1)**
130:8
**spend (6)** 32:5
34:9 41:9
62:17 69:15
76:2
**spent (14)** 6:1
7:12 11:3
29:1,19 31:21
41:6,12 46:17
67:22 69:19
94:7 95:2,6
**splits (1)** 15:20
**spoke (1)** 193:10
**spoken (1)** 156:4
**Spork (1)** 173:21
**sport (1)** 8:8
**spring (1)** 18:4
**square (1)** 62:18
**St (3)** 114:24
115:12 158:21
**stage (5)** 80:9
134:6,10
152:3 177:18
**stages (1)** 81:2
**stagnant (1)**
79:22
**stalled (1)** 108:9
**stand (6)** 20:13
24:18 52:1
191:17,20
202:10
**standard (7)** 6:14
8:6 9:12,17
45:17 96:1
128:4
**standing (5)**
63:20 71:7
182:18,24
201:12

**stands (2)** 57:18
154:11
**start (3)** 3:2
4:14 129:15
**started (3)** 29:15
121:13 192:23
**starting (4)** 6:11
35:14,19
114:22
**starts (2)** 125:10
151:2
**state (1)** 132:12
**stated (4)** 18:15
112:16,19
130:17
**statement (9)**
30:10 163:21
183:7,23
184:6,15
196:1,21
200:14
**statements (2)**
26:18 182:21
**states (6)** 138:20
142:22 151:7
153:11 173:18
176:5
**station (1)** 29:16
**statute (1)** 183:13
**stay (1)** 76:11
**step (2)** 84:5,6
**stepping (1)** 68:6
**steps (2)** 23:5
80:23
**Stick (1)** 92:22
**still (17)** 7:10
8:11 36:7
41:15 44:8
60:8 69:10
73:3 75:18,22
122:3 128:22
187:8 194:22,
22 195:17
197:19
**Stone (1)** 175:2
**stood (6)** 9:3
41:3,8 81:22
82:4,6

**stop (2)** 54:10
142:4
**storm (1)** 91:10
**story (1)** 29:19
**strange (1)** 26:15
**strategic (5)** 32:7
40:11 97:17
98:10 190:23
**strategy (2)**
93:19 94:5
**Strauss (1)** 21:16
**streamline (1)**
82:17
**streamlining (1)**
133:11
**strengths (3)** 8:13
11:22 22:24
**stress (3)** 82:10
135:10 165:18
**strictly (1)** 186:13
**stringing (1)**
190:10
**stripped-down (2)**
100:14,15
**strong (2)** 9:3,4
**strongly (1)**
165:24
**stuck (1)** 137:8
**styled (1)** 58:4
**sub (1)** 146:17
**subject (19)** 52:6
62:13 89:2
90:6 99:13
103:20 106:5
109:6,7 113:5
134:5 143:3
145:12,19
148:8 154:3
162:23 168:12,
12
**subjective (1)**
171:13
**subjects (11)**
60:3 107:22
108:4 121:15
144:5,11,13,
21,24 153:23
187:6

**submission (37)**
58:8,14
62:23 64:19
77:2,15 78:12,
22 80:10,19
81:9 82:5,18
84:12 86:17
90:3 99:3,11
104:18 105:18
108:17 119:8,
16,22 121:20
122:4,6 124:9
125:4 126:7
136:15 148:16
157:16 159:21
165:15 183:5,8
**submissions (44)**
4:11 15:14
21:6 54:13
57:21 58:1
64:6 66:11
76:16,24 77:1
79:8,13 81:12
83:14,17 90:8,
15,17 93:4,9
95:20 97:24
99:15 105:20
110:12 126:19
127:9 136:3,9,
12 140:5
145:5,7 147:3
152:8 159:10
160:4,7
162:17 165:3
177:6 186:10
202:19
**submit (7)** 14:16
42:14 97:7
110:24 121:7
176:4 180:4
**submitted (4)**
18:9 49:18
53:19 109:2
**submitting (1)**
16:23
**subparagraph (3)**
108:6,21
119:10

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 242 of 249
Bankruptcy Court for the District of Delaware                    Hearing
In Re: Nortel Networks Inc., et al.                        January 7, 2014

subparagraphs (1) 107:16

Subsequent (2) 129:7 167:13

subsequently (1) 99:10

subsidiaries (3) 65:17 66:2 74:14

substantial (4) 105:5,8 117:12 136:12

substantially (3) 18:21 19:3 20:17

substantive (3) 15:24 40:17 41:4

succeed (1) 128:1

succeeded (1) 55:9

success (2) 6:23 7:4

successful (4) 12:3 27:2 77:14 111:23

Suddenly (3) 63:17,18 98:21

sued (4) 127:20 131:7 133:2 134:20

suffer (2) 55:11 187:15

suggest (4) 64:19 150:8 184:12 185:19

suggested (5) 82:16,18 120:13 184:21 200:23

suggesting (3) 156:20,21 196:7

suggestion (9) 3:14 130:23 133:11 149:12 165:14 177:5

186:20 188:8 195:6

suggestions (1) 163:3

suggests (1) 97:15

summarize (1) 140:14

summarized (1) 24:15

summarizes (1) 100:13

summary (2) 132:6 160:22

supercharged (2) 37:17 38:20

supplement (1) 78:20

support (16) 26:13,14 27:8 51:9 76:24 93:24 94:11,22 104:23 119:21 135:7 136:3, 15 138:20 145:18 184:18

supported (1) 22:5

supporting (4) 53:19 82:19 127:10 186:21

supports (3) 97:24 100:7 114:5

supposed (6) 22:21 34:21 110:13 131:12, 13 166:18

supposedly (1) 100:14

Supreme (1) 19:8

sure (11) 10:6 28:10 37:24 46:17 53:12 131:12 145:2 156:21 157:10 169:21 197:12

Surely (3)

133:19 134:6 159:5

surface (1) 39:4

surprise (5) 9:22 13:10 58:15 65:23 150:5

surprised (3) 111:16 112:5 186:18

surprises (2) 56:19 174:5

surprising (1) 40:15

surrounding (1) 88:22

suspicion (1) 9:1

Swan (14) 99:17, 18,19 100:3 102:16,19,22 150:18 167:22 168:6,7 176:24 177:4 181:4

Swiss (1) 46:19

sworn (1) 158:6

symmetry (1) 16:5

sympathetic (2) 37:22 47:8

synonymous (1) 16:3

system (1) 69:20

---

**T**

---

Tab (27) 59:9, 22 61:11,19 64:23 65:3,7 66:10 67:13, 15 70:4 71:12 74:1,24 86:18 88:12 97:14 114:19 115:14 137:10 144:8, 17,18 148:21 149:8 151:6 172:6

Tabatabai (2) 84:22 199:1

table (2) 29:10 43:14

tactical (5) 156:22 186:23 187:19 190:20,22

tailored (1) 77:5

take (37) 18:20 25:20 40:23 43:5 48:23 49:1 79:17 80:22 81:24 85:10 97:1 105:19 107:19 110:9 116:13 124:18 137:9 139:17 143:23 144:3 146:15, 19,20 153:12 157:5 165:24 166:4 167:14 170:1 175:16 187:13,14 189:14 192:1, 17,18 202:7

taken (14) 13:16 21:23 22:23 29:3 45:6 49:6 89:22 123:1 139:19 140:10 144:2 168:16 173:4 202:11

takes (3) 22:22 67:13 121:1

taking (8) 33:7 88:18 91:21 120:18 122:17 136:23 156:22 192:12

talk (12) 16:14 38:23 39:22 68:6 117:14 132:20,21 133:4 154:4 155:15 181:13 201:13

talked (1) 136:21

talking (8) 44:18 139:1 154:5 165:6 171:13, 14 177:11 181:14

talks (3) 60:1 70:24 173:21

targeted (2) 129:12 130:6

task (2) 80:17 133:19

tasks (1) 81:5

taught (1) 174:18

telephonic (1) 202:23

telling (1) 63:21

ten (1) 152:24

tenet (1) 134:12

ten-minute (2) 139:18 202:7

tens (1) 41:6

ten-year (1) 126:2

terminated (2) 25:15 139:16

terms (23) 13:20 20:2 28:13 51:17 52:3 53:2 89:17 95:18 102:13, 24 103:9,12, 17 104:15 132:22 146:1 148:6,11 151:3 162:13 169:8,11 200:13

test (9) 70:1 96:1,3,15 134:22,23 149:1 196:15 197:1

tested (1) 51:7

testified (2) 61:13 72:17

testify (2) 62:12 143:20

testifying (1) 191:24

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

testimony (15)
  57:6,11,12
  60:5,13 72:21
  89:14 107:24
  158:9 161:13
  165:13 173:1
  192:1 201:1,4
tests (1) 53:2
text (1) 183:13
than (26) 20:4
  39:14 43:4
  62:19 72:6
  82:8 87:17
  94:21 95:14
  101:18 108:9
  116:21 123:2
  124:1 125:6
  132:5 133:1
  150:10 164:20
  166:16 176:12
  177:14 182:10,
  16 184:2
  185:12
Thank (76) 3:11,
  23 4:16,20
  5:3 24:5,6
  26:9,10,16
  27:3,5,18
  38:1,2,3,3
  41:15 43:22
  48:10,11 49:5,
  7 50:8,13
  52:19 53:4,5
  76:17 79:9,11
  85:6 90:9,10
  95:11 99:16
  105:10,24
  115:7 126:22,
  24 135:13,15
  139:20,23
  140:9 152:9,
  11 162:18,20
  167:15,21
  168:4,7
  169:12 176:15,
  16 186:1,2
  188:16,17
  189:2 194:9,9,

10 197:12,15,
  15 198:3
  201:21 202:1,
  3,9,13,16,18
their (74) 6:18,
  19 11:22
  13:22 16:1
  18:9,11 19:22
  20:1 23:1,11
  30:5 31:14
  32:1 34:10
  36:16,17,20
  42:7 47:18
  48:6 56:22
  59:11 62:22
  65:23 68:7
  73:10,20
  74:10,19,21
  89:9 92:2,9
  93:17 97:6
  99:7 101:5
  109:5 113:4,
  13,19,23
  114:5 117:11
  120:2,5
  124:22,24
  126:3 130:11
  136:5 139:8,
  14 141:21
  142:17 147:2
  148:15 149:16
  150:13 158:5
  168:23 174:2,
  11 175:2
  180:15 181:1
  184:16 188:3
  195:20,24
  196:20,21
  201:13
them (62) 8:17
  9:22 10:22
  18:21 21:3
  25:19 54:8
  58:2 60:17
  61:17 63:5,6
  64:7 65:6,19,
  21 66:5 69:14
  79:14 81:13

89:20 92:1
  107:10 113:4
  114:1,2,4
  118:1 126:7
  128:1 129:4,6
  132:10 134:6,
  9 141:10
  148:13,14
  151:3 156:3
  163:9,12,19
  164:6 165:10,
  15 168:21
  170:1 173:9,9
  174:1 175:4
  178:10 190:19,
  24 191:11,17,
  20 192:4,4
  200:19 201:9
themes (1) 57:21
themselves (5)
  28:21 74:14
  77:20 80:7
  106:8
theoretically (3)
  68:24 69:22,
  23
theories (13)
  11:4 15:2
  16:11 25:16
  29:13 39:23
  57:21 64:5
  66:16 109:18
  174:20 190:12
  191:11
theory (25) 15:11,
  15,16 18:2,2,
  5,12,13,14,16,
  18 27:1 29:12
  32:2 35:15,16
  40:12 41:5,18
  42:13 64:18
  118:20 119:6
  130:5,11
There (212) 6:20
  7:12,23 8:15,
  24 9:13,19
  10:10,14
  11:20 12:4,24

14:22 15:1
  16:20,24
  17:23 18:15
  19:6,9,20
  20:10,11,14
  23:14,19,21
  24:14 26:7,16
  27:9 28:22,23
  30:2,12 31:1
  32:13,15
  33:12,17,18
  36:7,12 37:1
  38:7,16,17,19,
  22 39:2,4,16
  40:9 41:17
  42:8,11,24
  43:2 44:18
  45:3,11,20
  46:2,2 47:18
  48:17,19 52:9
  53:18 54:11
  55:21 56:3,9,
  19 57:9,16
  60:2 61:1,8
  63:20,22,23,
  24 64:17,18,
  20 67:10
  68:13 71:6,7
  73:11 75:1,2,
  12 76:1 78:16,
  19 81:1,22
  83:17 84:3,17
  85:14,21 86:4,
  20,23 88:23
  97:9,20 98:10,
  15 101:24
  102:10,18
  103:14,19
  104:13,16,19
  105:8 106:1
  107:21,22
  111:9,10
  114:8,15
  115:9,22
  119:20,22
  126:9 127:21,
  22 129:8,16
  130:15,23

131:2 132:24
  135:19 136:20
  141:4 142:4
  146:10,13
  148:7 150:24
  151:6,13
  152:13,15,16,
  18,20,24
  155:4,13
  157:23 159:6,
  6 160:9 163:9
  164:13,19
  165:7,17,24
  170:7 171:18,
  22 172:16
  174:3,4 176:7,
  9 177:3 179:5
  180:24 181:8,
  9,11 182:3
  183:5,7,22
  186:12 187:18
  188:13 189:19,
  23,24 190:2,
  15,22,23
  191:22 195:1,
  19 196:3,3
  197:2,3,10,18,
  19 200:10
  202:21,22
  203:2,4
therefore (9) 15:7
  51:8 64:12
  78:22 86:9
  159:6 165:17
  167:2 187:15
They (227) 8:18
  10:8 12:20
  14:3 15:4,4
  16:3 17:5,5
  18:10,11,13
  19:23 20:24
  21:1,24 25:6
  30:4 32:7,8,
  11 33:7,7
  34:2 35:4,5,7,
  22 36:16,17
  37:4 41:8,11,
  13 42:13 45:4

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 244 of 249
**Bankruptcy Court for the District of Delaware**                                                    **Hearing**
In Re: Nortel Networks Inc., et al.                                                                **January 7, 2014**

50:17 52:24
56:16,17
57:22 58:17,
18 60:22
61:16,19,20
62:2,21 63:3
64:15 65:4,11,
13,21,22,23
68:6 71:16,22,
24 72:1,3,4,5
73:4,9,20
74:5,6,7,8,12
75:6 78:6,7
80:12 81:3,22
82:5,5,6 83:2,
3 84:16,18
88:18 89:9,10,
16,17,24 90:1,
3 92:15 96:14
100:9 101:13,
18 102:2
103:2,2
104:11 105:4,
4,6 107:14
108:13 109:2
112:5,5 114:2,
3,4 116:20
117:12,14,24
118:1,18
119:23 120:1
123:2,22
125:1,4,6
126:7 127:18,
18,20 128:19,
24 130:1,6,6,
11 132:19
133:3 134:8
135:4,5 139:5,
9 141:6
142:13,16,18
147:24 148:1,
17 150:10,14
152:6 153:3
154:4,5 156:8,
12 157:8
158:7,8,9,11,
12 162:1,15
163:10,10,16,

16 164:20,21,
22 165:14
167:3,4
168:19,23
169:11,12
170:21 172:9,
17,18,20,21,
22,23,24
173:2,3,4,5,6,
6 174:2 175:9,
11,13,15,19
176:8 177:22,
23,24 178:2,
10 179:10
182:18 183:1
184:15 191:5,
7,7,20,21
196:17,23,24
199:21 200:1,
8,24 201:1,7,
10

**thin (1)** 17:21

**thing (19)** 12:14,
15 18:7 33:11
34:15 39:17
41:16,23
42:21 43:17
44:6,16 45:6,
10 74:6 76:9
160:2,14
172:19

**things (21)** 6:13
9:3,5 12:1
13:12 24:21
28:7,12 34:18
45:1 53:24
80:12 105:13,
15 111:7
154:2 170:16
180:23 189:20
198:13 200:15

**think (88)** 3:2
7:2,4,20,24
8:15,22 9:11,
12,13,18,21,
23 10:7,23
12:13,14,18
13:13 14:10

16:1,3,16
17:11 21:6
22:2 23:17
27:10 31:20
33:1,19 35:12
36:10,23
37:18,20,21,
23 38:24 42:8
46:11 47:1,2,
21,24 48:1,3,
12 49:21
50:24 53:22
83:14 93:2
95:5 105:16
108:19 111:1,
17 126:6
129:22 130:6,
17 131:2
134:22 151:4
153:10,14
171:11,12,19
172:11 174:24
175:1 176:11
177:16 179:17
180:9,10
182:1 183:5
184:23 187:7
193:23 195:18
196:22 198:15
201:23 202:4

**Third (11)** 5:23
6:14 7:18
15:22 19:4
51:6 55:20
62:21 91:1
156:14 173:20

**third-party (1)**
162:4

**Thornton (1)**
90:13

**thorough (1)**
83:15

**though (3)** 9:19
105:4 158:17

**thought (6)** 18:11
34:6 36:14
178:10 179:24
200:8

**thousands (4)** 6:2
78:4,4 91:20

**three (19)** 6:20
15:2 32:10
39:7,18 55:12
63:18 67:24
68:1 73:2
90:19 111:19
147:8 148:7,
10 152:21
168:18 196:19
197:9

**threshold (1)** 64:9

**throats (1)** 39:6

**throughout (2)**
57:23 177:21

**Thursday (1)** 20:8

**thus (1)** 119:24

**tied (1)** 109:12

**tight (1)** 165:21

**Tim (1)** 195:3

**time (84)** 7:11,
13,13 8:4
11:2 14:5
15:13 16:20
18:16 20:2
28:16,21 32:2,
5,9 33:6,15,
23 34:9,12,18
35:4,12,16
38:6 40:13
41:12 42:1,21
45:8 46:17
48:16 59:6
67:18 69:15
73:18,21 74:8,
20 77:20
80:14 81:4,14,
16 82:1,7,8,
20 85:20 90:4,
5 91:18 95:6
100:2 107:5
111:4 115:10
120:22 122:5,
6,18 124:18
130:13 139:6
141:22 154:14
160:10 164:12

166:20 167:3,
13,14 168:15
170:2 174:3
178:5,6,11
181:7 185:10
186:1 187:13
198:21 202:24

**time-consuming (1)**
165:19

**timeframe (1)**
165:21

**times (5)** 75:9
77:10 111:19
131:9 153:1

**timetable (4)**
75:18 77:24
79:7 141:14

**timing (2)** 165:6,
16

**tips (1)** 81:12

**today (24)** 4:9
5:5,12 6:11
9:10 12:9
20:13 23:14
41:3 93:5
94:22 108:13,
19 121:8
141:2 148:4
175:24 181:17
191:6 193:22
195:13,17
197:5 202:19

**toes (1)** 68:7

**together (14)**
17:11 24:23
25:19 28:19
29:12 42:20
94:14 115:8
153:24 164:6
166:15 170:11
174:1 190:10

**told (10)** 20:7
30:23 64:3
114:3 128:11
130:10 147:24
153:22 157:12
192:24

**tomorrow (4)**

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 245 of 249
Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.
Hearing
January 7, 2014

75:14 202:21, 23 203:11

**ton (1)** 173:4

**tonight (1)** 203:3

**took (10)** 9:22 14:10,11 50:5 65:7 101:12 119:11 133:13 153:21 198:4

**tool (1)** 70:8

**top (5)** 62:14 86:19 87:4 138:7 145:11

**topic (13)** 88:2, 19 89:5 100:15,16 102:8,11 103:4 105:7 143:18 168:18 169:8 178:11

**Topics (17)** 60:5 64:24 69:6 71:14 74:1 87:13 88:14 98:2 100:11 101:18 108:1 123:1 143:3, 20 170:15 177:2 179:9

**Toronto (3)** 2:17 43:1 202:17

**torture (1)** 200:4

**total (1)** 19:12

**touches (1)** 38:18

**towards (3)** 11:16 31:1 32:6

**trace (1)** 163:16

**tracks (1)** 71:6

**trademarks (1)** 65:16

**trading (2)** 104:15 196:22

**train (6)** 5:5,6 10:17 11:14 29:15 71:5

**transactions (1)** 134:4

**transcript (7)** 3:16, 17,20,21 69:9 79:6 116:22

**transcripts (6)** 55:16 72:2 78:5 87:10 175:17 201:8

**transfer (1)** 74:18

**transpired (2)** 80:15 166:21

**trap (1)** 13:11

**traveling (1)** 127:6

**treasury (1)** 85:15

**tremendous (6)** 55:13 59:8 67:11 82:9 189:20 194:6

**trial (75)** 8:11 18:20 20:14, 17,21 23:6,24 24:1,1 28:16, 22 32:3,3,6 34:17 35:20 41:12,13,24 42:12,16,24 43:5 56:11,20, 21,24 57:4,4, 7 59:17 72:19, 24 73:2 75:3, 4,18 76:13,13 77:22 78:10 80:19 83:4,6 101:5 103:23 104:2,8 106:5 110:11 113:3, 4 115:23 119:12 122:3 150:6 151:1 155:1 156:16 157:1 158:4,5 165:7 172:15 173:10 174:3, 20,21 175:21, 23,24 185:4, 22 194:5 201:17

**trials (2)** 57:20

150:4

**tried (5)** 76:9 121:14 168:8 175:10 181:15

**trip (2)** 182:7 203:8

**trite (1)** 91:8

**true (9)** 11:2 24:22 38:24 39:9 59:13 61:22 147:6 165:16 170:3

**truly (2)** 10:5,11

**trust (4)** 17:18 39:12 102:24 103:17

**trustees (1)** 161:21

**truth (1)** 39:17

**try (20)** 12:16, 23 13:1 14:5, 8 25:19 26:22 30:2,11 41:22 42:17 43:4 99:10 105:14 108:3 121:12 122:9 131:14 177:1 200:20

**trying (16)** 10:24 12:21 13:2 26:11 34:16 44:24 55:8 68:8 98:11 110:19 153:15 155:7 166:18 185:1 197:14 198:9

**turn (28)** 54:12, 15 59:22 71:12 84:21 85:18 99:23 100:21 102:5, 9 106:14 112:10 117:11 126:21 133:16 144:2,8,9,20 145:20 147:17 150:16 151:5,

12 163:8 164:3 172:4 177:13

**Turning (1)** 91:4

**Tweed (2)** 140:16 176:22

**twice (4)** 5:23 35:4,5 42:1

**two (30)** 16:6 23:24 32:9 33:18 35:18 92:6 99:22 100:2 111:10, 19 114:9 126:14 129:16 130:4 136:6, 12 145:5 151:14 152:18, 18,22 158:10 167:1 169:22 170:2 172:16 177:1 180:23 191:18 203:10

**two-minute (1)** 159:21

**two-volume (1)** 167:1

**type (6)** 23:17 77:24 119:9 132:4 133:22 166:11

**typed (1)** 106:24

**types (5)** 77:9 114:9 120:21 129:16 130:4

**typical (1)** 158:21

**typically (2)** 57:20 68:12

---

**U**

---

**UCC (8)** 76:20 78:16,18,20 113:22 124:7 152:19 184:20

**UK (27)** 5:21 6:7 11:10 13:5,24 17:8

19:16,18,22 22:2 39:19,20 90:14,18 91:6 92:5,11,14,18, 21 93:9,24 97:19 105:3 146:14 161:2, 12

**UKP (2)** 152:18 181:17

**UKPC (1)** 124:21

**ulterior (1)** 39:16

**ultimately (1)** 60:23

**unable (5)** 26:23 60:13 72:2 127:6 129:3

**unaudible (1)** 112:16

**uncovering (1)** 81:7

**under (31)** 6:15, 21 9:12 11:15 31:23 51:5 58:5 60:16 69:20 71:1 95:21 107:12 110:4 112:10, 16 118:5,14 126:16 134:22 156:5 157:3 159:7 166:6,8, 9,12 168:1 169:23 192:2, 19 198:17

**underline (1)** 74:22

**underlying (3)** 72:17 101:23 179:3

**underpinning (2)** 126:3 163:18

**underpinnings (1)** 125:2

**understand (8)** 2:6 4:18 11:21 14:21 19:19 22:24

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 246 of 249
Bankruptcy Court for the District of Delaware                                    Hearing
In Re: Nortel Networks Inc., et al.                                    January 7, 2014

146:22 183:7

**understandable (1)**
37:22

**understanding (9)**
4:9 30:11
87:18 110:8
123:9,14
124:2 133:3
149:1

**understood (3)**
3:24 16:5
196:12

**undertaking (3)**
98:17 101:8
154:1

**undertaking-answer (1)**
100:22

**undertakings (9)**
82:3 88:6
109:11 121:22,
24 158:19
170:24 171:2,7

**undertook (1)** 20:3

**undisclosed (1)**
57:13

**unduly (1)** 74:16

**unenforceable (2)**
30:12 97:3

**unexpectedly (1)**
61:3

**unfair (2)** 152:3
163:23

**unfold (1)** 106:10

**Unfortunately (5)**
7:24 11:5
32:15 127:6
144:16

**unfounded (1)**
25:24

**unique (10)**
31:21 77:4
79:18,19
90:17 92:11
106:2 127:14
135:4 184:8

**unit (1)** 196:10

**United (7)** 8:3
9:9 40:6

151:7 153:11
173:18 176:5

**unknown (2)**
57:14 162:4

**unless (2)** 26:7
85:3 126:18
170:21 185:24
187:21 194:15
197:10 201:21

**unlike (5)** 56:20
91:22 93:7
160:23 161:8

**unlikely (1)** 29:20

**unlock (1)** 175:2

**unlocked (1)**
176:8

**unnecessary (4)**
80:21 100:9
101:8,14

**unprecedented (1)**
70:18

**unreasonable (4)**
64:19 72:10
96:14 119:3

**unrebutted (2)**
171:12,20

**Unsecured (1)**
21:18

**unsworn (1)**
161:13

**until (9)** 28:15
32:3 106:8
127:7 130:22
134:15 157:2
180:3 195:15

**unusual (1)** 77:12

**unwilling (1)**
191:17

**up (41)** 4:22
5:22 7:20
18:13 26:8
29:12,14 41:3,
8 43:18 49:17
50:5,7 55:15
56:6 61:10
67:17 84:22
88:10 99:24
106:15 127:2

133:16 144:2
146:21 154:11,
14,19 164:3
165:1 170:12
172:7 176:24
178:4 186:22
191:2 192:9
193:16 198:8,
16,21

**upfront (1)** 14:2

**uphold (1)** 19:5

**upon (17)** 70:3
77:3,8 78:6,8,
14 79:1,2
100:11,18
116:18 138:13
158:10 177:4
179:14 196:8,
24

**urge (1)** 47:23

**urged (1)** 70:3

**urgency (1)**
202:22

**urging (2)** 76:7,8

**us (129)** 2:17
7:6,16,17 8:5
9:22 11:9
13:8,24 15:12
18:1,12,16
19:2 21:1,5
22:1 23:13,13
24:18,20 25:1,
9,16 26:2
30:9 35:3
39:18 45:7
52:10 53:8
54:7 55:22
56:1,12,15
58:17,20 59:1
61:21 62:7
64:8,11 65:8
66:22 68:22
72:14 73:8,21
74:6 75:15
76:1,2 79:19
80:18 81:6,18
87:16 89:9,10
93:24 97:14

100:7,18
101:11 104:23
110:17 118:10
120:15,21
122:8 123:13
124:4 126:12
128:19 130:13
131:12 135:23
136:17 144:13,
22 145:13
146:3 147:8,
24 148:9
153:17 154:7
159:11,17,18,
21 160:4
167:5 170:24
172:5 173:15
175:13,16
179:8,10
180:1,22
181:9,18,21,
22 183:1,2,4,
24 184:6,8,19
185:7,14,16,
18 186:21
187:20 188:12,
12 189:9
190:17 192:2
198:24 200:8,
23 201:4

**use (6)** 40:13
70:9 113:4
131:3 177:8
187:2

**used (10)** 15:23
40:10 82:24
85:23 87:20
122:3 123:6,
12 124:3 180:6

**useful (2)**
102:10 130:7

**using (1)** 120:8

**US-style (1)** 106:3

**usual (3)** 4:3
56:20 108:12

**V**

**vague (4)** 30:10,
12 67:5 73:19

**valid (6)** 66:7
142:6,6 146:8
153:14 195:18

**validity (3)**
103:23 137:4
169:2

**valuable (1)**
141:22

**valuing (1)** 64:16

**variety (1)** 143:5

**various (4)** 14:23
64:10 152:17
160:22

**vast (1)** 89:20

**venture (1)** 42:21

**verbatim (1)**
161:10

**verdict (1)** 44:4

**veritable (1)** 91:9

**version (1)** 88:9

**via (1)** 143:15

**video (1)** 3:1

**videoconference (1)**
139:15

**view (6)** 58:10
71:10 110:1
111:20 132:4
187:11

**viewed (2)** 196:4,
24

**views (1)** 38:14

**vigorously (1)**
5:20

**violate (1)** 82:5

**virtually (3)**
91:12 98:23
101:13

**volume (2)** 54:12,
15

**vs (2)** 115:12
173:18

**W**

**wait (4)** 14:14
157:2 180:3

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 247 of 249
**Bankruptcy Court for the District of Delaware**                                    **Hearing**
In Re: Nortel Networks Inc., et al.                                        **January 7, 2014**

195:15

**waiting (1)**
151:22

**waived (2)** 19:6
195:7

**Walancik (1)**
140:14

**walk (1)** 157:22

**walking (1)** 42:4

**want (44)** 22:7
26:19 31:3
45:14 52:22
61:19 62:16
65:11 74:5
88:10 105:14
114:15 119:14
120:4 121:4,5,
5 122:12
124:17 134:17
135:5,22
142:13 144:3
149:11 150:15
159:23 170:6
173:6 174:17
176:23 177:4
179:20 181:3
184:7 186:19
195:4 196:15,
18 197:1
198:7 199:20
201:7,10

**wanted (5)** 21:6
30:13 83:11
169:17 197:9

**wants (3)** 146:16
155:5 160:3

**warm (2)** 4:22
203:8

**warn (1)** 119:2

**warning (2)**
118:15 119:4

**Washington (1)**
5:10

**waste (3)** 141:22
185:10,11

**wasted (1)** 35:16

**wasting (1)** 34:12

**way (34)** 10:1,

16 14:5 25:20
30:8,21 38:19
40:13,17 44:7
45:14 52:1
54:12 62:19
64:15 79:24
94:16 95:17
99:2 104:1
106:9 114:10
117:7 121:7,
13 123:6
126:13 161:15,
18 163:24
169:3 184:10
188:9 192:17

**ways (3)** 101:15
172:16 188:13

**we (644)** 2:14,
18 3:2,6,7,14,
16,17,21,24
4:2 5:5,5,6,7,
12,13,16,19,
23,24 6:1,3,3,
10,11,16,21
7:1,2,5,7,8,9,
11,13,17 8:1,
8,10,13,17,22
9:2,6,10,12,
18,23 10:2,4,
7,11,13,15,16,
23,24 11:5,5,
6,11,17 12:2,
2,4,6,8,10,15,
22 13:2,4,13,
15,18,18,19
14:3,10,12,13
15:23 16:4,13,
14,14,16,22
17:2,2,8,9,10,
11,12,13,17,
18,20 18:2,3,
4,5,19,19,21,
23 19:13,16,
18,24 20:3,6,
13,19 21:2,2,
24 22:19
23:16,17
24:17,22

25:18,24,24
26:1,2,3,4,5,
20,21,23,23
27:1,2 28:12,
14,16 29:9,21
30:13,17,20,
23,24 31:2,3,
8,15,18 32:4
33:9,11,11
34:6,11,11,12,
21 35:1,8,9,
11,13,14,16,
17,18,19
36:14,21,23,
24 37:11,14,
18 38:22,23,
24,24 39:4,7,
22 40:6,13,22
41:6,12,14,18,
19,19,20,22
42:2,3,4,5,14,
21,21,23 43:6,
10,16,18,20,
20 44:7,17,19,
21,22,22,23,
24 45:6,9,10,
11,14,15,16,
17 46:4,5,7,8,
10,14,16,17,
19,21,23 47:1,
2,23,24 48:1,
1,3,22 49:1,2,
3,9,11 50:4,5,
6 52:12,13
53:15 54:15,
16 55:2,2,3,6,
10,18,23 56:7,
14 58:1,7,18
59:14,16 61:3,
22,23 62:3,5,
11,19,19
63:19 64:1,3,
16 65:18 66:8
67:23,24 68:1
69:5,8,10,17
71:14,15,20
72:3,18,18,19,
20,21,22 73:1,

2,3,10,13
74:9 75:14,18,
20,20,21,22,
23,23 76:7
79:19 80:4,6,
14,16,17,22
81:5,18 82:8,
15,16,19
83:15 89:19
91:15 93:15
95:7,9,18
99:20 102:17,
20 106:1,2,13
107:2,4 108:9,
15 109:14,24
110:5,6,6,7,8,
11,16,19,19
111:16,18,21,
22 112:2,5
113:2,15
114:6,12,13
115:18 117:20
119:12 120:1,
3,4,4,4,19
121:5,5,7,8,
11,13,14,16,
21,22 122:5,6,
11,14,19,24,
24 123:3,8,11,
14 124:4,18,
23 125:2,14,
20 126:3,10,
14 128:10,21,
21 129:19
130:3,10
132:20,21
133:4,5,6,8,
14 134:7,9,15
136:6,7,10,19,
23,24 137:4,5,
6 139:1,9,21
141:8,10,14,
17 142:3,9,10,
23 143:4,7,13,
19,23 144:4,
11 145:3
146:2,22
147:8,10,14,

2,3,10,13
74:9 75:14,18,
20,20,21,22,
23,23 76:7
79:19 80:4,6,
14,16,17,22
81:5,18 82:8,
15,16,19
83:15 89:19
91:15 93:15
95:7,9,18
99:20 102:17,
20 106:1,2,13
107:2,4 108:9,
15 109:14,24
110:5,6,6,7,8,
11,16,19,19
111:16,18,21,
22 112:2,5
113:2,15
114:6,12,13
115:18 117:20
119:12 120:1,
3,4,4,4,19
121:5,5,7,8,
11,13,14,16,
21,22 122:5,6,
11,14,19,24,
24 123:3,8,11,
14 124:4,18,
23 125:2,14,
20 126:3,10,
14 128:10,21,
21 129:19
130:3,10
132:20,21
133:4,5,6,8,
14 134:7,9,15
136:6,7,10,19,
23,24 137:4,5,
6 139:1,9,21
141:8,10,14,
17 142:3,9,10,
23 143:4,7,13,
19,23 144:4,
11 145:3
146:2,22
147:8,10,14,

20,21 148:2,3,
3,6,13,14
149:11,12,14
150:12 151:2,
3,22,24 152:2
153:4,14,15
154:7,15,24
155:1,2,7,8
156:11,12,18,
19,23,24
157:2,2,3,4,
18 158:13,14,
14,23 159:4,5,
12 160:6,16
165:6,20
166:1,19,20,
22,23,24
167:7,17,18
168:18 169:1
170:22 172:9,
19 173:4,7,10,
13,16 174:5,
14 175:21,22,
23,24 176:1
177:6,18,19,
20,23,24
178:2,7,8,9,
13,14,22,23,
24 179:5,6,19,
20,21 181:12,
14 182:16,21
183:8 184:1,3,
9,11,12,18,21,
24 185:2,3,4,
5,5,15,19,20,
22 186:14
187:2,3,6,7,8,
9,10,14,16
188:6,7,10,15
189:9,11
190:1,2,4,18,
19,24,24
191:1,12,14,
15,15,18,19
192:1,17,18,
23,23 193:16,
22 195:10,11,
13,13,15,16,

Case 09-10138-MFW    Doc 12801    Filed 01/09/14    Page 248 of 249

Bankruptcy Court for the District of Delaware
In Re: Nortel Networks Inc., et al.

Hearing
January 7, 2014

17,17 196:15,
16,18,22
197:1 198:4,9,
10 199:7
200:17,19
201:8,12,14,
16,23 202:4,7,
8,10,18,21
**weaknesses (3)**
8:14 11:22
23:1
**weather (1)** 195:2
**week (2)** 121:23
178:19
**weekend (1)**
127:7
**weeks (5)** 6:4
100:22 159:3
165:22 175:22
**went (3)** 8:22
43:18 84:5
**weren't (2)**
152:13 156:18
**whatever (6)**
25:20 26:2
121:24 134:17,
18 187:4
**whatsoever (7)**
12:9,24
14:13 45:14
84:3 86:5
186:24
**white (2)** 57:19
99:24
**whole (8)** 12:24
32:14 68:21
75:23 161:12
164:17 165:3
175:11
**wholeheartedly (2)**
22:5 25:10
**wholesale (1)**
28:17
**whose (2)** 21:22
125:23
**wide (1)** 179:23
**willing (5)** 12:11,
15 156:7

191:22 200:24
**willingness (1)**
14:7
**Wilmington (1)**
202:18
**wind (1)** 13:15
**winning (1)** 40:20
**winter (1)** 135:24
**wish (7)** 27:7
38:6 42:13
52:15 66:6
95:18 203:8
**wishes (3)** 48:15,
18 168:19
**withdraw (1)**
190:24
**withdrawn (1)**
19:10
**withhold (1)** 192:9
**within (6)** 11:20
51:14 104:4
112:6 113:19
120:12
**without (9)** 7:7
25:11,14
50:10 66:18
146:6 165:9
184:17 198:18
**witness (36)**
56:18 60:4,
10 71:24 79:5
97:16 100:8
103:2,9
104:24 109:6,
9 113:9,14
116:24,24
130:4,9 141:9
143:1 150:22
152:23,23
157:7,13,14
173:1 175:14,
18 195:16
196:18,19
200:4 201:10,
11,15
**witnesses (68)**
34:19,20,21
35:6,6,8 56:3,

5,13,21,24
57:6 60:13,24
61:5,9,12,13,
24 62:2,4,6,8,
10 63:23
65:11 69:16
72:19 74:10
75:4 76:3
77:13 78:11,
19 83:4 86:3
87:15 89:14,
19 111:6,15
113:12 122:14
134:14 139:7
141:15 142:18
143:19 144:12,
22 145:13
147:10,16
153:8 155:7
156:1,4,13,23
170:18,23
174:15 178:1,
3 179:2
195:15 200:17
201:1
**wonderful (3)**
12:13,14 22:4
**word (1)** 46:8
**words (5)** 23:20
100:20 131:4
161:3 174:24
**work (21)** 17:9
28:18 29:11
41:23 44:16
60:15 72:12,
24 74:5 78:24
89:7 118:3
121:12,17
122:9,12
172:3 173:22
174:23 176:13
201:9
**worked (1)** 42:20
**working (7)** 6:2
23:16 24:23
25:18 31:1
32:6 154:18
**world (3)** 60:18

66:2 142:16
**worried (1)** 65:24
**worry (2)** 6:21
7:17
**worth (1)** 184:2
**writing (2)** 39:13
122:12
**written (8)** 44:10
72:23 97:2
105:20 122:13
129:9 165:4
198:11
**wrong (3)**
131:15 166:8
183:11
**wrote (1)** 138:18

---

**Y**

**Year (7)** 5:2,2
6:5 29:14
78:3 93:22
183:20
**years (9)** 5:14
7:2,3 25:13
39:7 91:24
95:10 182:15,
17
**York (5)** 43:16
67:9 173:18,
19 190:6
**younger (1)**
182:10

---

**Z**

**zealously (1)** 53:2
**Zed (1)** 58:17
**Zelbo (24)** 42:20
43:14 44:3
159:20 169:17,
18,19 170:3
171:2,17
174:9 176:16
189:4 194:14,
15 197:23,24
198:3,6
199:14,17,20

202:1,3
**zero (1)** 196:18
**zero-sum (1)** 95:3

---

**1**

---

**1 (15)** 59:9
61:19 87:17
88:19 122:24
123:5 133:17
138:4 140:15
145:24 148:21
149:8,22
160:20 178:8
**10 (6)** 49:2
67:13 71:12
74:1 75:1
126:17
**100 (3)** 25:6
119:22 180:16
**100-plus (1)**
142:20
**105 (4)** 83:4
87:9 89:19
191:15
**108 (14)** 55:14
57:6 61:16
62:8 65:11
67:24 72:17
75:23 111:7
155:7,20,24
156:23 161:20
**11 (7)** 74:24
85:18 130:23
133:17,22
134:15 151:11
**1-1/2 (1)** 54:11
**110 (4)** 84:9
111:14 112:1
163:14
**11035 (1)** 183:24
**113 (1)** 154:16
**12 (8)** 35:14
59:17 67:8
68:14 69:12,
13 81:6 144:8
**120 (4)** 131:14
132:13 149:8,9

Case 09-10138-MFW   Doc 12801   Filed 01/09/14   Page 249 of 249

**Bankruptcy Court for the District of Delaware**
In Re: Nortel Networks Inc., et al.

**Hearing**
**January 7, 2014**

**124 (2)** 86:20,21
**12th (1)** 35:20
**13 (1)** 144:8
**130 (1)** 150:18
**14 (5)** 60:1,8
   75:22 85:19
   106:24
**15 (7)** 33:8
   35:24 49:2
   60:7 152:22
   153:1 161:8
**16 (8)** 61:3
   112:11 116:3,
   10,11 125:10
   161:8,11
**17-1/2 (2)**
   165:22 175:22
**19 (5)** 54:23
   120:23 122:7
   161:8,11
**1992 (1)** 173:19
**1a (1)** 108:6

**2**

**2 (7)** 59:10,22
   71:22 144:12,
   21 145:12
   149:23
**2.8 (1)** 87:9
**20 (1)** 114:23
**200 (1)** 132:15
**2008 (2)** 88:23,
   24
**2010 (1)** 18:4
**2013 (3)** 130:18
   140:15 141:12
**2019 (18)**
   143:19 151:8
   177:7 182:6,
   18,21,24
   183:10,11,23
   184:4,6,10,15
   197:2,3,6,6
**2019c2c (3)**
   183:9,12
   184:5
**20th (1)** 34:22

**21 (2)** 126:17
   128:2
**219 (1)** 151:7
**22 (4)** 66:13
   97:13 118:9
   172:5
**22,000 (2)** 55:18
   69:8
**23 (3)** 100:5,12
   126:17
**230 (1)** 138:10
**24 (6)** 34:7
   36:15 64:16
   125:21 146:1
   176:4
**24th (3)** 13:23
   36:19,23
**25 (5)** 100:5
   102:5,18
   145:21,22
**25a (1)** 102:23
**27 (4)** 64:24
   65:1,5 71:14
**28 (1)** 121:19
**29 (4)** 70:2
   132:14 133:23
   150:17
**29th (1)** 34:23

**3**

**3 (14)** 55:18
   61:11 66:13
   69:9 73:3
   91:17 114:19
   115:14 121:24
   148:15 150:1
   151:13 153:8
   183:24
**3:00 (1)** 202:23
**30 (1)** 87:2
**30b6 (5)** 173:17
   174:12 192:24
   193:2 198:16
**31 (22)** 61:19
   62:7 106:7,12,
   12 107:13
   110:14 118:13

**120:8** 153:19
   154:2,5 155:2,
   10,19,21
   156:5,15
   166:7,8
   192:20 198:17
**31-type (1)** 61:23
**35 (1)** 75:22
**39 (3)** 86:2
   131:18 132:3

**4**

**4 (7)** 72:7
   112:12,22
   145:20 148:15
   150:3 151:6
**4:15 (1)** 203:14
**40 (1)** 66:1
**40,000 (2)** 91:14
   92:19
**400 (1)** 62:18
**400,000 (1)**
   178:23
**4-1/2 (1)** 15:9
**44 (1)** 86:2
**450 (2)** 153:1
   158:17
**47 (1)** 70:24

**5**

**5 (8)** 64:23
   72:11 124:22
   125:11 128:15,
   16 144:12
   150:4
**50 (1)** 180:18
**57 (4)** 116:1,14,
   15,19
**58 (1)** 160:23
**59 (1)** 196:2
**5a (1)** 102:12

**6**

**6 (8)** 65:3,7
   73:4 144:13,

**24** 147:18
   150:5 200:22
**6,000-square-foot (1)**
   62:16
**600b (1)** 116:20
**65 (3)** 118:8,12
   196:2
**69 (1)** 75:2
**69-day (1)**
   120:24

**7**

**7 (6)** 59:17
   66:10 74:1
   128:22 150:11
   172:6
**70 (2)** 130:19
   180:17

**8**

**8 (2)** 67:15
   73:13
**80 (2)** 66:1
   180:17
**84 (1)** 106:24
**85 (1)** 112:11
**89 (5)** 137:20
   138:8,10
   140:7,12

**9**

**9 (4)** 65:8 70:4
   86:20 151:11
**90 (6)** 86:23
   140:7 160:12
   162:7 180:13,
   16
**9019 (2)** 9:12
   51:5
**9019a (1)** 6:15
**91 (1)** 137:21
**98 (2)** 128:12,15
**99 (3)** 56:4
   60:17 111:6