# Exhibit A

Court File No.  09-CL-7950

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## SUBMISSIONS OF NORTEL NETWORKS UK PENSION TRUST LIMITED
AND THE BOARD OF THE PENSION PROTECTION FUND (the "UKPC") ON THE
TRIAL PROTOCOL

January 23, 2014

**THORNTON GROUT FINNIGAN LLP**
Barristers and Solicitors
100 Wellington Street West
Suite 3200
Toronto, ON   M5K 1K7

**John L. Finnigan (LSUC# 24040L)**
**Rebecca L. Lewis (LSUC # 61146S)**
Tel:    416-304-1616
Fax:    416-304-1313

Lawyers for Nortel Networks UK Pension Trust
Limited and the Board of the Pension Protection Fund

Court File No.  09-CL-7950

*ONTARIO*
## SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**SUBMISSIONS OF NORTEL NETWORKS UK PENSION TRUST LIMITED
AND THE BOARD OF THE PENSION PROTECTION FUND (the "UKPC") ON THE
TRIAL PROTOCOL**

### OVERVIEW OF THE UK PENSION CLAIMANTS' POSITION

1.    The UKPC seeks confirmation that the trial of the claims of the UKPC (the "**UKPC Canadian Claims**") against the Canadian Debtors remain separate and will follow sequentially the trial on allocation issues, as confirmed by prior Orders of the Court. UKPC also seeks clarification that the twenty day trial limit reflected in this Court by Endorsement dated November 19, 2013 applies only to the allocation portion of the trial. In the alternative, the UKPC requests that a motion be scheduled to determine the overall duration of the trial on proper evidence as to the appropriate length of time required, taking into account both the allocation and claims aspects.

2.    In the event that a sequential trial on the claims following allocation is not intended to be implemented in accordance with prior Orders of the Court, the UKPC submits that the trial time should be extended and conducted on the terms of the Trial Protocol filed by the US Debtors on January 24, 2013. The UKPC reserves all its rights and remedies in respect of any pre-trial orders or directions which may be made including the right to bring a formal motion in respect of trial procedures and all appeal rights.

3.    The litigation of the UKPC Canadian Claims is, and always has been, a separate proceeding from the allocation dispute and the UKPC's (now settled) claim against the U.S. Debtors. This fact has been recognized in previous Orders of this Court.

4.    The UKPC Canadian Claims are also separate and distinct, both factually and legally, from the EMEA claims that have been asserted against the Canadian Debtors. In addition, the EMEA claims are subject to the EMEA Claims Process Order of January 14, 2011, whereas the UKPC Canadian Claims are not.

5.    The hearing of the UKPC's Canadian Claims before this Court will:

(a)    have different factual and expert evidence from the allocation dispute;

(b)    involve different parties than the allocation dispute;

(c)    involve a different onus of proof than that which applies to all Core Parties under the allocation dispute;

(d)    not involve the US Court as it has no jurisdiction over the CCAA Claims; and

(e)    exclude all Core Parties other than the Canadian Claims Defendants as other parties have no standing to contest the CCAA Claims.

- 3 -

6.   The evidence that is common to the allocation trial and the UKPC Canadian Claims trial can be admitted in the latter, but that is no justification for ramming the "square peg" trial of the UKPC Canadian Claims into the "round hole" of the allocation trial.

7.   The UKPC seek protection of their fundamental right to a fair trial on their complex multi-billion dollar claim.  That includes the right to lead its affirmative case, challenge the defence case and reply as it sees fit in order to achieve the Court's desire to hear these cases as quickly and efficiently as reasonably possible, consistent with a fair trial.  This can best be accomplished by ensuring that the UKPC Canadian Claims trial is separate from the trial of the allocation issues and that only those parties with a legal right to participate in that separate trial can do so.

***Prior Orders Establish that the UKPC Canadian Claim is a Separate Litigation***

8.   By Order dated April 3, 2013, this Court approved the Allocation Protocol and directed as follows:

"3.   THIS COURT DIRECTS that:

a) the trial under the Allocation Protocol will commence on January 6, 2014; and

b) the trial will commence with the allocation issues <u>and continue thereafter</u> with the EMEA Canadian Claims and the UK Pension Canadian Claims."

**Order dated April 3, 2013 (Tab 1)**

9.   By Order dated May 15, 2013, this Court approved the implementation of a litigation timetable and discovery plan in accordance with the proposal filed by the US Debtors and supported by the EMEA Debtors.  The Court recognized that there were three separate

proceedings being jointly managed by this Court and the US Bankruptcy Court for the District of Delaware (the "**US Court**").

**Order dated May 15, 2013 (Tab 2)**

10.    The submissions of the U.S. Debtors filed in connection with the April 17, 2013 joint hearing for consideration of the competing litigation timetables and discovery plans contained the following:

> "3.    First, as this Court has acknowledged, the Allocation, US Claims and Canadian Claims are three distinct sets of litigations with their own procedural rules and involve different parties, and even if they are coordinated, they can only be decided independently by the respective Courts having jurisdiction over each of the separate sets of claims or disputes. The Monitor's proposed timetable and discovery and deposition plan (the "Monitor's Proposals"), however, makes no differentiation between three separate litigations and on the contrary, expressly bundles the three sets of proceedings and do not take into account the applicable procedural regime for each of the litigations.  To ignore this distinction could cause unintended consequences.

> 4.    While discovery for each of these three litigations can and should be coordinated for efficiency and certain evidence may be heard at a joint hearing before the US and Canadian Courts, this cannot mean that three litigations can or should be treated as one for all purposes.  This is especially true in light of the EMEA Debtors' appellate challenge to the jurisdiction of the US and Canadian Courts over the Allocation dispute, whereas they do not dispute that jurisdiction by the respective Courts is proper for the US and Canadian Claims.

> 5.    Moreover, the Monitor's Proposals would include constituencies like the CCC and the Canadian Director and Officers – who are not parties to the US Claims, let alone even parties in interest to these Chapter 11 proceedings – as participants in the US Claims litigation.  This would afford them the right to seek discovery on those claims, be heard on those claims, and otherwise assert rights coextensive to those held by the parties to those claims, and well beyond the rights actual US creditors would and do have with respect to the US Claims.  Only "a party in interest" "may raise and may appear and may be heard on any issue" before this Court  11 U.S.C. § 1109(b).  As the Third Circuit has noted, the party in interest requirement is "effectively coextensive" with standing under Article III of the Constitution. *In re Global Industrial Technologies, Inc.,* 645 F.3d 201, 201-11 (3d Cir. 2011).  Merely because some parties have a stake in other

Nortel proceedings does not mean that they have a (i) specific – and not merely conjectural or hypothetical – injury that is (ii) traceable to the US Claims and would be (iii) redressed by a favorable decision. *See In re W.R. Grace & Co.*, 475 B.R. 34, 177 (D. Del. 2012) (listing the three requirements for constitutional standing). This Court has recognized that there is no statutory or judicial support to conclude that a creditor of a creditor, much less a group like the CCC that represents creditors of an equity-holder, has standing in a bankruptcy case. *See, e.g., In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487-88 (Bankr. D. Del. 1994) (referring to "numerous cases" that hold the same)." (emphasis added)

**Argument of the U.S. Debtors on April 17 Joint Hearing (Tab 3)**

11.     This Court wrote in its Endorsement dated May 3, 2013 on the motion to approve a litigation timetable and discovery plan as follows:

> **SCHEDULING**
>
> "14.     The position put forth by the EMEA Claimants is accepted. Fact discovery is to last 4.5 months and be completed by September 27, 2013. Expert discovery lasts 1.5 months and is to be completed by December 5, 2013.
>
> 15.     In making this determination, I have taken into account that the EMEA Claimants and the U.K. Pension Claimants are major creditors in the global Nortel insolvency and it is necessary to ensure that they have the full opportunity to put forth their case, within the confines of the trial schedule.
>
> **SEPARATE LITIGATIONS**
>
> 16.     The proposal of the U.S. Debtors [confirming three separate litigations] is accepted. Although a joint trial will be conducted, this does not alter the fact that the U.S. Court and this court are separate and the independent jurisdiction and different procedural rules of each court need to be respected." (emphasis added)

**Endorsement dated May 3, 2013 (Tab 4)**

12.     Accordingly, this Court has already determined that:

(a)     the UKPC Canadian Claims are a "separate litigation" from the allocation dispute and the (now settled) claims of UKPC (and EMEA) against the U.S. Debtors; and

(b)     the UKPC are major creditors of the Nortel Group and "it is necessary to ensure that they have the full opportunity to put forth their case."

13.     On November 19, 2013, on a consent motion to extend the litigation timetable, the Court on its own initiative and without any evidence before it on the number of witnesses, experts or other facts affecting the length of trial, ordered that the trial date would be fixed on a pre-emptory basis for May 12, 2014.  It also provided that the trial would be for a maximum of four weeks, or twenty trial days.  This Endorsement did not indicate whether the twenty trial days applied to allocation alone, or allocation followed by the claims litigation.

14.     The UKPC had no prior notice that the length of trial was to be addressed on November 19, 2013.  The Court did not have the benefit of submissions on the manner in which the separate litigations should be adjudicated, the time that should be allotted to each case or a myriad of other procedural and substantive issues which will arise in the context of the first attempt to conduct a joint trial involving Canadian and American Courts.

15.     Counsel to the UKPC wrote to the Court on November 19, 2013 to outline our concerns with the imposition of a pre-emptory twenty day trial without the benefit of prior notice or submissions.  All rights were reserved.

**Letter dated November 19, 2013 to Justice Morawetz from Michael Barrack (Tab 5)**

16.     The approved Amended Litigation Timetable appended to the Court's Order dated November 19, 2013 contained the following term dealing with the length of trial:

"5.    <u>Trial Logistics</u>

a)    the Core Parties shall meet and confer as soon as possible (but in any event no later than the week of December 16, 2013) with a view to attempting to reach consensus with respect to a proposal for the conduct of the trial, including the:

i)    material to be served/filed on April 10, 2014 and April 17, 2014;

ii)    the feasibility of providing the Courts with an agreed statement of facts; and

iii)    <u>the proposed length of trial.</u>" (emphasis added)

**Order dated November 19, 2013 (Tab 6)**

17.    Accordingly, the November 19, 2013 Order imposing the twenty day trial limit contemplated that the parties would have further discussions about the length of the trial. The parties have engaged and are scheduled to continue to engage in numerous discussions ("**Meet and Confers**") in person and by phone on the trial protocol including the length of trial.

18.    In connection with the parties' submission of proposals for the conduct of the trial, as provided for in the November 19, 2013 Order, the UKPC avails itself of this opportunity to make its submissions on trial procedure regarding allocation followed by the claims litigation, and trial length.

## CLAIMS FOLLOW ALLOCATION

19.    The UKPC have asserted the Canadian Claims in a 91 page Affirmative Claims Pleading. In summary, the UKPC seek:

- 8 -

(a)     an appropriate contribution for the shortfall in the UK Pension Plan based on the *U.K. Pension Act, 2004* and the availability of a Financial Support Direction ("**FSD**") requiring NNL/NNC to contribute to the shortfall;

(b)     enforcement of written guarantees (the "**Guarantees**") given by NNL in favour of the UKPC as follows:

     (i)     £491,750,000 under the Funding Guarantee;

     (ii)    US$150,000,000 under the Insolvency Guarantee;

(c)     restitution for unjust enrichment in the amount of approximately US$1,866,500,000; and

(d)     damages for oppression.

20.     The FSD claim involves a four part test under the *UK Pension Act, 2004* as follows:

(a)     the Scheme Test;

(b)     the Target Test;

(c)     the Insufficiently Resourced Test; and

(d)     the Reasonableness Test.

21.     Each of these tests has its own factual requirements.  UKPC will be adducing evidence relating to these tests, including evidence on:

(a)     the amount required to purchase an annuity to meet the obligations of the Plan;

(b)     the value of NNUK's "Resources";

(c)     the value of NNC/NNL's "Resources";

- 9 -

(d)    the relationship between NNUK/NNL/NNC including the degree of control exerted by NNL/NNC over NNUK over a number of years;

(e)    the value of benefits received by NNC/NNL from NNUK from 2001-2009;

(f)    the operation and NNUK of Nortel's transfer pricing policy between 2001-2009;

(g)    the involvement of NNC/NNL with the Plan; and

(h)    the financial circumstances of NNL/NNC.

22.    The Guarantees are governed by and construed in accordance with UK law, and the FSD claim is based on the provisions of a UK statute. Expert evidence on these matters will be required.

23.    The Canadian Debtor and Monitor have denied the claims of the UKPC in their entirety, including on the written Guarantees. To date, there have been no admissions on any of the facts in UKPC's pleading. As such, the UKPC are obliged to prove each and every fact they allege.

24.    UKPC's claim on the FSD is unique to the claims litigation and has no overlap with the allocation trial or the claims asserted by any other party including EMEA. Proof on the claims to enforce the Guarantees is also unique to the claims litigation and does not overlap with the allocation issues or the claims asserted by any other party including EMEA.

25.    While the UKPC acknowledge that there may be some overlap in the documentary and factual evidence adduced for the allocation hearing with the evidence required for hearing some aspects of the UKPC Canadian Claims, there are fact witnesses whose testimony

will be restricted to the UKPC Canadian Claims.  The UKPC agrees that evidence should not be repeated and acknowledges that to the extent that documents and testimony of witnesses in the allocation hearing also deal with the issues in the UKPC Canadian Claims hearing, that evidence should be admitted as evidence in the that hearing.  The UKPC do not suggest that any witness should have to appear twice.

26.     In addition, the UKPC currently intends to rely on expert testimony of several witnesses whose evidence is only relevant to the UKPC Canadian Claims and does not overlap in any respect with the allocation issues.

27.     Accordingly, there is fact and expert evidence that will only relate to the UKPC Canadian Claims.  This evidence should be heard in a separate, later hearing from the allocation hearing.

28.     In summary, the trial of the UKPC Canadian Claims should be addressed separately after the allocation trial (as provided for in prior Orders of the Court) for the following reasons:

(a)     some of the evidence will not overlap with the allocation trial;

(b)     the parties on the Allocation and UKPC Canadian Claims trials are different;

(c)     as set out in the US Debtors' materials and as adopted by this Court in its Endorsement on May 3, 2013, the coordination of the proceeding and discovery across the separate trials was done for convenience and efficiency purposes;[1]

---

[1] US Debtors Statement in Support of the Proposed Litigation Timetable and Discover Plan dated April 23, 2013.

(d)    there is no legal or other basis for the US Court or the US Parties to participate in the trial of the UKPC Canadian Claims, nor is it appropriate or efficient; and

(e)    a different burden of proof exists on the trial of the UKPC Canadian Claim in the CCAA[2] from the balance of probabilities onus that will govern the decision on the Allocation dispute.

29.    The UKPC Canadian Claim is a separate litigation, has been recognized as such by the Court and should continue to be treated as such.

## THE LENGTH OF THE TRIAL IS INADEQUATE TO ADJUDICATE THE ALLOCATION DISPUTE AND THE UKPC CLAIMS

### *Number of Witnesses not yet known*

30.    The twenty day trial limit was set without the benefit of submissions from any party including the UKPC and without the parties or the Court knowing how many fact and expert witnesses will be called at trial.

31.    It is respectfully submitted that without knowing how many witnesses will be called, their identity and how much time the parties estimate they need to cross-examine the witnesses, no one can know with any confidence how long will be needed to have a fair trial on the issues.  As the UKPC bears the onus to prove its claims, it cannot be deprived of a meaningful opportunity to discharge that onus.

32.    The parties are working in good faith to identify and limit the documents and fact and expert witnesses they intend to rely on at trial.

---

[2] *Re Air Canada*, 2004 CarswellOnt 3320 (Ont SCJ).

33.   The documents will be drawn from a population of almost 3 million documents produced over a four month period while examinations were taking place.   Under the draft trial protocol currently under discussion, the parties will begin designating documents for trial on April 11, 2014 and conclude on May 2, 2014.

34.   The fact witnesses for trial will be culled from over 100 former and existing employees and consultants who were deposed in the fall of 2013.   Under the current draft trial protocol, fact witnesses will be identified on March 31, 2014 with trial affidavits to be exchanged between April 11 and 25, 2014.

35.   The identity of expert witnesses was disclosed on January 8, 2014, with the exception of the Canadian Debtors and Monitor as to anticipated rebuttal experts which remain unknown both as to the number and identity.   Initial expert reports are due January 24, 2014.   Rebuttal expert reports are due February 28, 2014, at which time UKPC will know the total number of experts intended to be relied by the other parties.   Experts who will testify at trial will be identified by April 11, 2014.

36.   The parties will be in a much better position to estimate the amount of time they need to make their cases after these disclosures have been made. The UKPC suggests that the trial length estimates should be revisited in mid March and again in mid April when the parties will be better informed about the identity and number of witnesses to be called at trial and the substance of their testimony.

*The Twenty Day Trial Limit*

37.  The draft trial protocol under discussion among the parties is based on a Court imposed twenty day trial limit.  If that was intended to cover both allocation and claims (which remains an open issue), at six hours per day, there will be 120 hours of trial to be divided between allocation and claims.  The actual division of time between allocation and claims is unresolved.

38.  The trial protocol proposed by the Monitor and Canadian Debtors contemplates the inclusion, *inter alia*, of the following (for both allocation and claims) in the 120 hours: (a) opening statements; (b) fact witnesses; and (c) expert witnesses.

39.  Hypothetically, if the trial time was split equally between allocation and claims, 60 hours would be set aside for each:

(a)  on allocation each of the three allocation groups could have only 20 hours (three days and two hours) to complete their opening, direct evidence and all cross-examinations; and

(b)  on claims each of EMEA, the UKPC and the Canadian Claims Defendants could have only 20 hours (three days and two hours) to complete presentation of their cases in respect of the distinct (factually and legally) claims of EMEA and the UKPC respectively.

*Fact Witnesses for Trial*

40.  Proposed trial witnesses were originally identified in July, 2013.  The consolidated list of Core Party trial witnesses for both allocation and claims included 41 fact witnesses to be

called at trial. This was before any depositions were conducted. The population of possible trial witnesses is now greater than 41.

41.     While it is anticipated that this number will be reduced for trial, it is reasonable to estimate that for the allocation and claims hearings there will be at least 15-20 fact witnesses who testify.

42.     Under the current proposed trial protocol, there will be 30 minutes of direct examination of fact witnesses from the leading allocation group followed by cross examination from each of the other allocation groups that are adverse in interest. For claims, this process will have to be revised to address the different groups that have standing in the Claims hearing.

43.     If it is assumed that each fact witness will take 3-4 hours of trial time on average to complete, 45-80 hours of trial time will be consumed by fact witness testimony alone.

*Expert Witnesses for Trial*

44.     On January 8, 2013, the Core Parties provided the list of experts they intended to rely upon for the trial. The consolidated list of all the expert witnesses includes 40 experts to be relied upon at trial. The Canadian Debtor and Monitor have not yet identified rebuttal expert witnesses on the Claims (or how many they expect to call) but the total number of expert witnesses is expected to be greater than 40.

45.     It is contemplated in the trial protocol under discussion by the Core Parties that not all experts will give live testimony at trial. As a matter of due process, the UKPC considers that the imposition of any arbitrary cap on the number of experts permitted to give live testimony in connection with the UKPC Canadian Claims would be inappropriate.

However, if it is assumed that some form of accommodation can be reached such that 3-5 expert witnesses per Core Party will testify live at trial, there will be 12-20 experts testifying.

46. For each expert witness, there is an opportunity for direct examination and cross examination by parties adverse in interest.

47. If the parties can complete the evidence of each testifying expert in 5-6 hours of trial time, this will consume an additional 60-120 hours of trial time.

48. The range of trial time required for fact and expert witnesses based on even the rough conservative estimates used above is expected to significantly exceed the 120 hours of trial time proposed by the Court. Further, time for opening statements must be added to this estimate.

*Time Allocations Must Be Proportional*

49. The Court has the inherent power to control its process and ensure a fair trial. The exercise of the Court's inherent power is informed by the principle of proportionality. The amount of time given to the parties to present their case should be proportionate to the importance and complexity of the issues and the amount involved. (Rule 1.04(1.1)), *Abrams v. Abrams,* 2010 ONSC 2703 (CanLII) at paras 32, 40).

50. This proceeding is a complex, multi-jurisdictional commercial case involving the first joint trial of the Canadian and US Courts. The parties are disputing entitlement to over $8 billion in sales proceeds in the allocation trial. The case is of manifest importance to Nortel's stakeholders including over 60,000 pensioners in the U.K., Canada and the U.S.

51.     The UKPC have advanced multi-billion dollar claims on behalf of over 40,000 former Nortel employees in the UK.  This claim cannot fairly be presented in a handful of trial days.  On the assumptions set out above (assuming an equal split of time for allocation and claims), the UKPC would have only three days and two hours to prove its multi-billion dollar claim.  This is not enough time and bears no proportionality to the hundreds of millions of dollars in professional fees that have been incurred by the Core Parties since April, 2013 in preparing for this trial. Based on their current assessment, the UKPC estimates that they will need 10-12 trial days to make their affirmative case on the UKPC Canadian Claims.

52.     It is noted that other recent cases on the Commercial List of less complexity and involving lesser amounts in dispute, without the multi-jurisdictional aspects of this case, have been allocated longer trials than twenty days .  For example:

(a)     *Barclays Bank PLC v. Metcalfe & Mansfield et al,* 2001 ONSC 5008 (Newbould J).  Action for damages of $1.2 billion for breach of contract – 50 day trial;

(b)     *Nova Growth v. Kepinski et al* 99-CL-3473.  Action for breach of contract and misrepresentation relating to ownership of Niagara Falls Casino .  Trial ongoing before Newbould J. set for 75 days;

(c)     *Alfano v. Piersanti,* 2010 ONSC 4853 - $25 million claim for fraud and misrepresentation – 8 ½ months; and,

(d)     *Livent v. Deloitte,* 04-CL-5321 – Claim for damages for auditor negligence – 70 plus days heard April – October 2013.

53.   It is respectfully requested that:

(a)   the Court confirm that the trial of the UKPC Canadian Claims will remain separate and follow the trial of the allocation dispute in accordance with prior Orders of this Court;

(b)   the Court confirm that the twenty day trial limit established by the Court only applies to the allocation portion of the trial, with the claims litigation to follow thereafter. As noted above, the UKPC submits that twenty days is not enough trial to try the allocation issues; or

(c)   in the alternative, the allocation trial commence on May 12, 2014 followed by the claims trial as directed by the Courts, with the length of trial to be considered after the witnesses have been disclosed and the parties can better determine how much time they need.

January 24, 2014                    **ALL OF WHICH IS RESPECTFULLY SUBMITTED**

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West
Suite 3200
Toronto, Ontario
M5K 1K7

**John L. Finnigan (LSUC# 24040L)**
**Rebecca L. Lewis (LSUC # 61146S)**
Tel:   416-304-1616
Fax:   416-304-1313

Lawyers for Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund

# TAB 1

File No. 09-CL-7950

## ONTARIO
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| THE   HONOURABLE   MR.   JUSTICE | ) | WEDNESDAY, THE 3RD DAY OF |
|---|---|---|
| | ) | |
| MORAWETZ | ) | APRIL, 2013 |
| | ) | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## O R D E R
### (Allocation Protocol)

**THIS MOTION** made by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the **"Canadian Debtors"**) for an Order approving an allocation protocol in substantially the form attached as Schedule "A" to their Notice of Motion dated May 31, 2011 was heard June 7, 2011 and March 7, 2013.

**ON READING** the Affidavit of Michael Joseph Lang sworn June 1, 2011 and the exhibits thereto, the Compendium of the Canadian Debtors, the Sixty-Seventh Report of Ernst & Young Inc. in its capacity as Court-appointed Monitor (the **"Monitor"**) dated June 2, 2011 and the appendices thereto, the Affidavit of Natasha De Cicco sworn April 25, 2011 and the exhibits thereto, the Affidavit of Kevin

- 2 -

Francis Lloyd sworn May 31, 2011 and the exhibits thereto, the Compendium of the Canadian Creditors Committee (the "**CCC**"), the Affidavit of Tai-Heng Cheng dated May 31, 2011 and the exhibits thereto, the Affidavit of Natasha De Cicco sworn June 3, 2011 and the exhibits thereto, the Affidavit of David M. Lindsey sworn June 3, 2011 and the exhibits thereto, the Affidavit of Natasha DeCicco sworn June 6, 2011 and the exhibits thereto, the Second Affidavit of Tai-Heng Cheng sworn June 6, 2011, the Affidavit of Debra Bilous sworn June 6, 2011 and the exhibits thereto, the Second Affidavit of David M. Lindsey sworn June 7, 2011, the Affidavit of Geoffrey Boddy sworn June 1, 2011 and the exhibits thereto and the Affidavit of Sara-Ann Van Allen sworn March 4, 2013 and the exhibits thereto and on hearing the submissions of counsel for the Canadian Debtors, the Monitor, the members of the CCC, the Joint Administrators of Nortel Networks UK Limited and the other EMEA Debtors, the Trustee of the Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund (collectively, the "**UK Pension Parties**"), the former directors and officers of Nortel Networks Corporation and Nortel Networks Limited, Nortel Networks Inc. and certain of its affiliates in US Chapter 11 bankruptcy proceedings (collectively, the "**US Debtors**"), Wilmington Trust, National Association, the Bank of New York Mellon, the Informal Nortel Noteholders Group, the Official Committee of Unsecured Creditors of the US Debtors, and Law Debenture Trust Company of New York, this Court having issued an Endorsement dated March 8, 2013 and Reasons for Decision dated this day:

1.      **THIS COURT ORDERS** that the allocation protocol in the form appended as Schedule "A" to this Order (the "**Allocation Protocol**") is approved. Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the Allocation Protocol.

- 3 -

2.    **THIS COURT ORDERS** that in addition to the Core Parties named in the Allocation Protocol, the Core Parties will include any additional party designated as a Core Party by Orders of both this Honourable Court and the US Court.

3.    **THIS COURT DIRECTS** that:

      a.  the trial under the Allocation Protocol will commence on January 6, 2014; and

      b.  the trial will commence with the allocation issues and continue thereafter with the EMEA Canadian Claims and the UK Pension Canadian Claims.

4.    **THIS COURT ORDERS** that the Canadian Debtors and the Monitor are authorized to take all steps necessary to carry out and give effect to the terms of the Allocation Protocol and this Order.

5.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Canadian Debtors, the Monitor and their respective agents in carrying out the terms of this Order.    All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Canadian Debtors and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Canadian Debtors and the Monitor and their respective agents in carrying out the terms of this Order.

6.    **THIS COURT ORDERS** that each of the Canadian Debtors and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body,

- 4 -

wherever located, for the recognition of this Order and for assistance in carrying out the terms of this

Order.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

MAY 13 2013

Schedule "A"

# ALLOCATION PROTOCOL

1. <u>Purpose</u>. The purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the allocation of the Sale Proceeds among the Selling Debtors[1] ("<u>Allocation</u>," and any hearing regarding same, an "<u>Allocation Protocol Hearing</u>," and any discovery regarding same, "<u>Allocation Protocol Discovery</u>"). Subject to paragraphs 5 and 6 hereof, creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("<u>Intercompany Claims</u>") are not governed by this Allocation Protocol. All Intercompany Claims between the U.S. Debtors and Canadian Debtors shall be determined in accordance with the Cross-Border Protocol and the Cross-Border Claims Protocol. All other Intercompany Claims shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claim is made.

2. <u>Participants</u>. Each of the Selling Debtors, the Committee, the Bondholder Group, the Monitor, the Joint Administrators, the French Liquidator, the CCC, the Indenture Trustees, the UK Pension Claimants, and the Directors and Officers and such other parties as the U.S. Court and the Canadian Court may direct (collectively, the "<u>Core Parties</u>," and each individually, a "<u>Core Party</u>") and their authorized representatives shall have the right to participate fully in (a) any and all Allocation Protocol Hearings before the U.S. and Canadian Courts arising under or relating to this Allocation Protocol, and (b) any and all Allocation Protocol Discovery conducted in connection therewith. The foregoing is without prejudice to (x) the right of any other party in interest to file written submissions in support of or in opposition to any theory of allocation advanced at any Allocation Protocol Hearing before the U.S. and Canadian Courts or request permission to become a Core Party and fully participate in the foregoing, which request shall be made by motion on notice to the Core Parties for cause shown to both the U.S. and Canadian Courts, or (y) the power of the U.S. and Canadian Courts to adopt procedures to manage the Allocation Protocol Hearings and related proceedings.

3. <u>Cross-Border Protocol</u>. Any and all Allocation Protocol Hearings shall proceed in accordance with the Cross-Border Protocol, unless otherwise ordered by the U.S. and Canadian Courts.

4. <u>Procedures</u>. The U.S. and Canadian Courts will determine the procedures that will govern the Allocation Protocol Hearings and related Allocation Protocol Discovery. After hearing the procedural submissions of the Core Parties and taking into account the discovery already conducted to date in connection with the non-binding mediation sessions, the Allocation Protocol Discovery and Allocation Protocol Hearings shall proceed in an expeditious manner.

    a. <u>Pleadings</u>. The Core Parties will exchange pleadings, which they shall be entitled to amend, from time to time, in accordance with the usual practice of the U.S. and

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in Appendix A.

Canadian Courts. There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation.

b. <u>Fact Discovery</u>. The U.S. and Canadian Courts will facilitate the Core Parties' exchange of fact discovery by determining the following:

    i. the deadline for, and acceptable manners of service of, reasonable requests for the production of non-privileged documents on any other Core Party;

    ii. the deadline for objections to any Core Party's document requests;

    iii. the deadline for identification of fact witnesses and number of fact witnesses allowed;

    iv. the process for compelling attendance of fact witnesses at depositions; and

    v. the deadline for completion of depositions, the number of depositions permitted, and the location of and time allowed for such depositions for each Core Party.

c. <u>Experts</u>. The U.S. and Canadian Courts shall facilitate expert discovery by determining the following:

    i. the deadline for and format of expert reports (including exhibits);

    ii. the deadline for and format of rebuttal expert reports (including exhibits); and

    iii. the deadline for completion of expert depositions and the time allowed for such expert deposition.

d. <u>Joint Conferences</u>. The U.S. and Canadian Courts shall be available for joint conferences to resolve any discovery disputes among the Core Parties and to receive updates as to the status of the proceedings. The U.S. and Canadian courts will determine when joint conferences may be set.

e. <u>Joint Hearings</u>. The U.S. and Canadian Courts shall have joint hearings on the merits. The U.S. and Canadian Courts shall determine:

    i. the rules governing the joint hearing on the merits;

    ii. the date(s) for an evidentiary hearing on the merits (after the close of fact and expert discovery and after the completion of written submissions) and the rules governing such hearing, during which opening and closing statements shall be made and cross-examination and redirect examination of fact and expert witnesses shall take place; and

    iii. the procedure for requesting or setting joint conferences as necessary to resolve any discovery disputes among the Core Parties or to receive updates to the status of the proceedings.

    f.  <u>Written Submissions.</u>  The U.S. and Canadian Courts will determine:

        i.  the deadline for and format of opening submissions (including exhibits);

        ii.  the deadline for and format of fact affidavits, if any, to accompany the opening submissions, which shall constitute the direct testimony of each fact witness;

        iii.  the deadline for and format of reply submissions (including exhibits); and

        iv.  the deadline for and format of fact affidavits, if any, to accompany the reply submissions.

5.  <u>EMEA Claims.</u>  Certain Intercompany Claims have been made by the EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor and by Nortel Networks AG and Nortel Networks AS against (a) the U.S. Debtors (the "EMEA U.S. Claims"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors and the Directors and Officers (the "EMEA Canadian Claims" (and together with the EMEA U.S. Claims, the "EMEA Claims")).  The Canadian Debtors and the Directors and Officers may file motions with the Canadian Court to dismiss the EMEA Canadian Claims.

6.  <u>UK Pension Claims.</u>  Certain claims have been made by the UK Pension Claimants against (a) the U.S. Debtors (the "UK Pension US Claims"), to which the U.S. Debtors intend to file responsive pleadings, and (b) the Canadian Debtors (the "UK Pension Canadian Claims" (and together with the UK Pension US Claims, the "UK Pension Claims")).  The Canadian Debtors may file motions with the Canadian Court to dismiss the UK Pension Canadian Claims.

7.  <u>Decisions.</u>  The U.S. and Canadian Courts will (a) hold simultaneously (i) the Allocation Protocol Hearings, (ii) hearings before the U.S. Court on the merits of any remaining EMEA U.S. Claims and UK Pension US Claims, and (iii) hearings before the Canadian Court on the merits of any remaining EMEA Canadian Claim and UK Pension Canadian Claims, provided, however, that the U.S. and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims and/or UK Pension US Claims or only EMEA Canadian Claims and/or UK Pension Canadian Claims, and (b) issue their respective decisions on (i), (ii) and (iii).  The trial for this matter is scheduled to commence on January 6, 2014.  The trial will begin with the Allocation issues and continue thereafter with remaining issues to be addressed in this Allocation Protocol, including EMEA Claims and UK Pension Claims.

8.  <u>Appeals.</u>  The Core Parties shall have their usual rights of appeal from all interlocutory and final decisions of the U.S. and Canadian Courts.

## Appendix A

**Bondholder Group:** The ad hoc group of bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation

**Canadian Court:** Ontario Superior Court of Justice (Commercial List)

**Canadian Debtors:** Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), and Nortel Networks Global Corporation., Nortel Networks International Corporation and Nortel Networks Technology Corporation

**CCC:** the ad hoc committee of major creditors having claims only against the Canadian Debtors comprised of: the former and disabled Canadian employees of the Canadian Debtors through their court-appointed representatives (the "Representatives for the Former and Disabled Employees"); the Canadian Auto Workers Union (the "CAW"); Morneau Shepell Ltd. as Administrator of Nortel's Canadian registered pension plans ("Morneau"); Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund (the "Ontario Superintendent"); and the court-appointed representatives of the current and transferred employees of the Canadian Debtors ("Nortel Continuing Employee Committee")

**Committee:** The Official Committee of Unsecured Creditors in the chapter 11 cases of the U.S. Debtors

**Cross-Border Protocol:** Schedule A to the "Initial Order and Endorsement," entered by Canadian Court on January 14, 2009, as amended by Schedule A to the "Fifth Amended and Restated Initial Order," entered by the Canadian Court on February 15, 2011; and Exhibit B to the "Order Pursuant to 11 U.S.C. §§ 105(a) Approving Cross-Border Court-To-Court Protocol," entered by U.S. Court on January 15, 2009, as amended by Exhibit 1 to the "Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., et al., Amending the Cross-Border Court-to-Court Protocol," entered by the US Court on June 29, 2009

**Cross-Border Claims Protocol:** Schedule A to the "Order Approving Cross-Border Claims Protocol," entered by Canadian Court on September 16, 2010; and Schedule B to the "Debtors' Motion for Entry of an Order Approving a Cross-Border Protocol on the Resolution of Claims," granted by the U.S. Court on September 16, 2010 pursuant to the "Order Pursuant to 11 U.S.C. §§ 105(a) and 502 Approving a Cross-Border Court-to-Court Claims Protocol"

**Directors and Officers:** Certain individuals as former directors and officers of NNC and/or NNL represented by Osler, Hoskin & Harcourt, LLP

**EMEA Debtors:** Nortel Networks UK Limited ("NNUK"), Nortel Networks (Ireland) Limited; Nortel Networks S.A. ("NNSA"); Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

**French Liquidator:** Cosmé Rogeau, who has been appointed Liquidator for NNSA under French secondary proceedings, and acts jointly with the Joint Administrators with respect to NNSA.

**Indenture Trustees:** (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by Nortel Networks Limited; (b) The Bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among Nortel Networks Limited, as issuer, and Nortel Networks Corp. and Nortel Networks Inc., as guarantors, and (ii) as indenture trustee pursuant to an indenture dated as of March 28, 2007 among Nortel Networks Corp., as issuer, and Nortel Networks Limited and Nortel Networks Inc., as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trustee pursuant to a trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by Nortel Networks Limited and Nortel Networks Capital Corp. and guaranteed by Nortel Networks Limited.

**Joint Administrators:** Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited

**Monitor:** Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, in respect of the Canadian Debtors

**Selling Debtors:** Canadian Debtors, U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited

**UK Pension Claimants:** The Trustee of the NNUK Pension Plan ("UK Pension Trustee") and the Board of the Pension Protection Fund ("PPF")

**U.S. Court or US Court:** United States Bankruptcy Court for the District of Delaware

**U.S. Debtors or US Debtors:** Nortel Networks Inc. ("NNI"), Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

Court File No: 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST

Proceeding commenced at Toronto

ORDER
(Allocation Protocol)

Goodmans LLP
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON   M5H 2S7

Jay A. Carfagnini (LSUC#: 22293T)
Benjamin Zarnett (LSUC#: 17247M)
Fred Myers (LSUC#: 26301A)
Joseph Pasquariello (LSUC#: 38390C)
Christopher Armstrong (LSUC#: 55148B)
Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

# TAB 2

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | WEDNESDAY, THE 15TH DAY OF |
| JUSTICE MORAWETZ | ) | MAY, 2013 |
| | ) | |
| | ) | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION (the "Canadian Debtors")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(Allocation Protocol – Litigation Timetable and Discovery Plan)**

**WHEREAS** this Court approved an allocation protocol (the "**Allocation Protocol**")

pursuant to an Order (Allocation Protocol) dated April 3, 2013.

**WHEREAS** pursuant to an Endorsement of this Court dated April 17, 2013, a joint

hearing was convened between this Court and the United States Bankruptcy Court for the

District of Delaware to consider a litigation timetable and discovery plan in connection with the

Allocation Protocol, which hearing was heard on April 24, 2013.

**ON HEARING** the submissions of counsel for the Canadian Debtors, Ernst & Young

Inc. in its capacity as monitor of the Canadian Debtors (the "**Monitor**"), the members of the

Canadian Creditors Committee, the Joint Administrators of Nortel Networks UK Limited and the

other EMEA Debtors, the Trustee of the Nortel Networks UK Pension Trust Limited and the

Board of the UK Pension Protection Fund, the former directors and officers of Nortel Networks

Corporation and Nortel Networks Limited, Nortel Networks Inc. and certain of its affiliates in

US Chapter 11 bankruptcy proceedings, Wilmington Trust, National Association, the Bank of

New York Mellon, the Informal Nortel Noteholders Group, the Official Committee of Unsecured

Creditors of the US Debtors, and Law Debenture Trust Company of New York, this Court

having issued an Endorsement dated May 3, 2013.

1.    **THIS COURT ORDERS** that the litigation timetable and discovery plan appended as

Schedule "A" to this Order (the "**Litigation Timetable and Discovery Plan**") be implemented.

2.    **THIS COURT ORDERS** that the Canadian Debtors and the Monitor are authorized to

take all steps necessary to carry out and give effect to the Litigation Timetable and Discovery

Plan.

ENTERED AT / INSCRIT A TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO..

MAY 1 6 2013

**SCHEDULE "A"**
**(Litigation Timetable and Discovery Plan)**

US Interests and EMEA Debtors' Proposed Litigation Timetable as of May 15, 2013

## LITIGATION TIMETABLE

Pursuant to the US Court's and Canadian Court's Orders approving the Allocation Protocol, the Cross-Border Protocol, and the Cross-Border Claims Protocol, it is hereby ordered:[1]

| Due Date 2013 | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| May 16 by noon E.D.T. | Any Core Party who wishes to participate in the Allocation dispute shall serve a pleading or opening submission styled "Allocation Position of [●]" which will set out with reasonable particularity the relief sought with respect to allocation, the material facts relied upon and legal bases for the allocation position being advanced by that Core Party by noon E.D.T. on May 16, 2013 and file the same within the next business day. | The US Claims Defendant Group shall file and serve their responses to the US Claims. | Deadline for the U.K. Pension Claimants to deliver their affirmative pleading (which may be deemed by them to serve as their Dispute Notices) setting forth, with reasonable particularity, the relief sought, material facts relied upon and legal bases for their claims and the grounds upon which they seek to challenge their disallowance. |
| May 17 | Any Core Party may serve a joinder before May 17 and file the same within the next business day, provided that the joinder does not advance any new legal bases and does not rely on new material facts. | | |

---

[1]  Capitalized terms shall have the meaning ascribed to them in the Allocation Protocol and Annex A attached hereto.

| Due Date | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| May 17 | The Discovery Participants shall aim to reach agreement on a Confidentiality Stipulation and Protective Order as soon as possible. To the extent the Discovery Participants are unable to agree on a Confidentiality Stipulation and Protective Order, May 17 is the deadline for the Discovery Participants to file their versions of the Confidentiality Stipulation and Protective Order with the Courts. | | |
| May 22 | Deadline for service of limited and specific requests for production of non-privileged documents in accordance with the Discovery Plan by each of the Canadian Allocation Group, the EMEA Allocation Group, the US Allocation Group, and the Bondholder Allocation Group. | Deadline for service of limited and specific requests for production of non-privileged documents in accordance with the Discovery Plan by each of the US EMEA Claimants Group, the UK Pension Claimants, and the US Claims Defendant Group. | Deadline for service of limited and specific requests for production of non-privileged documents in accordance with the Discovery Plan by each of the Canadian EMEA Claimants Group, the UK Pension Claimants, and the Canadian Claims Defendant Group. |
| May 22 | Deadline for service of Identification Interrogatories in accordance with the Discovery Plan by each of the Canadian Allocation Group, the EMEA Allocation Group, the US Allocation Group, and the Bondholder Allocation Group, without prejudice to an Allocation Group's right to later serve contention interrogatories, as to be discussed and/or resolved by the Courts. | Deadline for service of Identification Interrogatories in accordance with the Discovery Plan by each of the US EMEA Claimants Group, the UK Pension Claimants, and the US Claims Defendant Group, without prejudice to a US Claim Party's right to later serve contention interrogatories, as to be discussed and/or resolved by the Court. | Deadline for service of Identification Interrogatories in accordance with the Discovery Plan by each of the Canadian EMEA Claimants Group, the UK Pension Claimants, and the Canadian Claims Defendant Group, without prejudice to a Canadian Claim Party's right to later serve contention interrogatories, as to be discussed and/or resolved by the Court. |

2

| Due Date 2013 | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| May 24 | Deadline for Core Party who is not in one of the Discovery Groups, and who seeks to serve document requests and/or interrogatories that are non-duplicative of those document requests and/or interrogatories already served by the Allocation Groups, to seek leave of the Court to serve such non-duplicative document requests and/or interrogatories if prior to this time, such Core Party has been unable to reach agreement with the Core Party on whom it seeks to serve the non-duplicative document requests and/or interrogatories after meeting and conferring with such Core Party in good faith. | | |

3

| Due Date 2013 | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| May 29 | The US Debtors, UCC, EMEA Debtors, Joint Administrators, Canadian Debtors, Monitor, Bondholder Group, and any other Core Party who filed an opening submission may each file and serve a response to any opposing Core Party's opening submission or designate its opening submission as a cross-response.  Each of the responses may be made individually, jointly, and/or by joining another Core Party's response. | | With respect to the Canadian Claims, each Disputing Creditor shall receive from the Monitor and the Canadian Debtors, by May 29, 2013, a response to such Disputing Creditor's Affirmative Pleading setting forth, with reasonable particularity, the grounds for the disallowance, the material facts relied upon and the legal bases for the disallowance. |
| June 3 | Deadline for supplemental document requests and identification interrogatories related to new issues raised in responsive submissions. | | |
| June 6 | In-person meet and confer between the Discovery Participants regarding the discovery requests and interrogatories served, procedures governing the production of documents, deposition procedures, and any other issues that have arisen thereof. | | |
| June 10 | Deadline for responses and objections to document requests and objections to interrogatories in accordance with the Discovery Plan. | | |
| June 10 | Subject to any objections, deadline for the recipients of document requests to commence the rolling production of documents in accordance with the Discovery Plan. | | |
| July 3 | Date by which parties served with document requests must certify to parties requesting their documents substantial progress with regard to production of documents. | | |
| July 22 | Date by which parties served with document requests must certify to parties requesting their documents substantial completion with regard to production of documents. | | |

| Due Date 2013 | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| July 24 | Deadline for identification by each Core Party of (i) its anticipated trial affiants as (non-expert) trial witnesses without prejudice to later identification, provided that other Core Parties have an opportunity to depose such witnesses before trial, and (ii) for designations of which (if any) of that Core Party's previously filed affidavits/witness statements are being relied upon as evidence at trial in accordance with the Discovery Plan. | Deadline for identification by each US Claim Party of (i) its anticipated affiants as (non-expert) trial witnesses without prejudice to later identification, provided that other US Claim Parties have an opportunity to depose such witnesses before trial, and (ii) for designations of which (if any) of that US Claim Party's previously filed affidavits/witness statements are being relied upon as evidence at trial in accordance with the Discovery Plan. | Deadline for identification by each Canadian Claim Party of (i) its anticipated affiants as (non-expert) trial witnesses without prejudice to later identification, provided that other Canadian Claim Parties have an opportunity to depose such witnesses before trial, and (ii) for designations of which (if any) of that Canadian Claim Party's previously filed affidavits/witness statements are being relied upon as evidence at trial in accordance with the Discovery Plan. |
| July 26 | Deadline to file motions to compel and/or motions for a protective order with respect to document discovery. Notwithstanding this deadline, when a dispute arises, the affected Discovery Participants shall promptly attempt to resolve any discovery disputes in good faith and once an impasse is reached, file any motions with the relevant Court(s) promptly. | | |
| July 26 | Deadline for each of the Canadian Allocation Group, the EMEA Allocation Group, and the US Allocation Group to serve on any opposing Core Party the topics on which that Core Party's representative is to be examined or deposed in accordance with the Discovery Plan. | Deadline for each of the US EMEA Claimants Group, the UK Pension Claimants, and the US Claims Defendant Group to serve on any opposing Claim Party and/or a member of the Canadian Claims Defendant Group the topics on which that Claim Party's representative is to be deposed pursuant to Rule 30(b)(6) in accordance with the Discovery Plan. | Deadline for each of the Canadian EMEA Claimants Group, the UK Pension Claimants, and the Canadian Claims Defendant Group to serve on any opposing Claim Party and/or a member of the US Claims Defendant Group the topics on which that Claim Party's representative is to be examined in accordance with the Discovery Plan. |

5

| Due Date 2013 | Allocation | US Claims | Canadian Claims |
|---|---|---|---|
| July 29 | Deadline for parties to designate witnesses to be examined or deposed, subject to later additions for the reasons set forth in the Discovery Plan. Each of (1) the Canadian Allocation Group and the Canadian Claims Defendant Group together; (2) the EMEA Allocation Group, the US EMEA Claimants Group, the Canadian EMEA Claimants Group, and the UK Pension Claimants together; and (3) the US Allocation Group and the US Claims Defendant Group together may designate a limited number of fact witnesses for examination or deposition in accordance with the Discovery Plan. Parties are encouraged to identify witnesses as early as possible in order to facilitate scheduling. | | |
| August 2 | Deadline for each Core Party that is timely served with a request under Rule 34.04 of the Ontario Rules of Civil Procedure and/or Rule 30(b)(6) of the United States Federal Rules of Civil Procedure to identify its representative for oral examination or deposition. | Deadline for each US Claim Party (other than the Committee) that is timely served with a request under Rule 30(b)(6) of the United States Federal Rules of Civil Procedure to identify its representative for deposition. | Deadline for each Canadian Claim Party that is timely served with a request under Rule 34.04 of the Ontario Rules of Civil Procedure to identify its representative for an oral examination. |
| August 5 | In-person meet and confer between the Discovery Participants regarding witnesses to be deposed or examined, deposition procedures and any other issues that have arisen. | | |
| September 13 | Deadline to identify experts and the subject matter of their reports in accordance with the Discovery Plan. | | |

| Due Date/2015 | Sidley Allocation | Sidley In Schemes | Sidley Christian Claims |
|---|---|---|---|
| September 27 | Deadline to complete witness depositions in accordance with the Discovery Plan, with a preference to finish fact witness depositions prior to any representative party examinations or Rule 30(b)(6) depositions. | Deadline to complete witness depositions in accordance with the Discovery Plan, with a preference to finish fact witness depositions prior to any Rule 30(b)(6) depositions. | Deadline to complete witness depositions and cross examinations on previously filed affidavits/witness statements being tendered as evidence for trial (with any undertakings to be answered within three weeks of each examination), in accordance with the Discovery Plan, with a preference to finish fact witness depositions prior to representative party examinations. |
| October 4 | Deadline for service of expert reports (including exhibits) in accordance with the Discovery Plan. | | |
| November 1 | Deadline for service of responding experts' reports (including exhibits) in accordance with the Discovery Plan. | | |
| Week of November 11 | Preliminary pre-trial conference. | | |
| December 6 | Deadline to complete depositions of experts in accordance with the Discovery Plan. | | |
| December 9* | Deadline to file a list of all witnesses and exhibits that each Discovery Participant intends to rely upon as part of its direct case. | | |
| December 13* | Deadline to file pre-trial motions. | | |

All dates for pre-trial submissions are subject to modification by the Courts at the preliminary pre-trial conference.

| Due Date 2013 | S(g) in Allocation | S(g) in US Claims | S(g) in Canadian Claims |
|---|---|---|---|
| December 13* | Deadline for filing of opening written submissions with the Courts. The content of such submissions will include:<br><br>a) Pre-trial briefs;<br><br>b) All fact affidavits to be used as direct testimony;<br><br>c) All exhibits to be used in a Discovery Participant's direct case; and<br><br>d) All deposition testimony to be used in a Discovery Participant's direct case. | | |
| Week of December 16,* if the Courts desire | Pre-Trial Conference(s) –<br><br>By this date, the Core Parties shall have met and conferred with an effort to reach agreement on:<br><br>a) the undisputed facts to be agreed upon for trial; and<br><br>b) the contents of document briefs for use at the Joint Hearing/ the exhibits for use at the Joint Hearing.<br><br>All Nortel documents produced by a Discovery Participant to be deemed admissible without proof of authenticity, integrity of the chain of possession or the integrity of the system of storage and retrieval unless objected to by this date on a particularized and document-by-document basis. | Pre-Trial Conference(s) –<br><br>By this date, the US Claim Parties and the Canadian Claims Defendant Group shall have met and conferred with an effort to reach agreement on:<br><br>a) the undisputed facts to be agreed upon for trial; and<br><br>b) the exhibits for use at the Joint Hearing.<br><br>All Nortel documents produced by a Discovery Participant to be deemed admissible without proof of authenticity, integrity of the chain of possession or the integrity of the system of storage and retrieval unless objected to by this date on a particularized and document-by-document basis. | Pre-Trial Conference(s) –<br><br>By this date, the Canadian Claim Parties and the US Claims Defendant Group shall have met and conferred with an effort to reach agreement on:<br><br>a) the undisputed facts to be agreed upon for trial; and<br><br>b) the contents of document briefs for use at the Joint Hearing.<br><br>All Nortel documents produced by a Core Party to be deemed admissible without proof of authenticity, integrity of the chain of possession or the integrity of the system of storage and retrieval unless objected to by this date on a particularized and document-by-document basis. |

| Due Date 2013 | Step in Allocation | Step in US Claims | Step in Canadian Claims |
|---|---|---|---|
| Begins January 6, 2014 | The US and Canadian courts will (a) hold simultaneously (i) hearings before the US and Canadian courts regarding Allocation, (ii) hearings before the US Court on the merits of any remaining US Claims, and (iii) hearings before the Canadian Court on the merits of any remaining Canadian Claims, provided, however, that the US and Canadian Courts, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only the US Claims or only the Canadian Claims, and (b) issue their respective decisions on (i), (ii), and (iii). The trial will begin with the Allocation issues and continue thereafter with remaining issues to be addressed in this Allocation Protocol, including EMEA Claims and UK Pension Claims. | | |

Any date in this Litigation Timetable may be amended by the written agreement of all Core Parties, submitted to the US Court through the filing of a certification of counsel and to the Canadian Court through the filing of a letter from the Monitor to Justice Morawetz on notice to the Core Parties. Any Core Party may also file a motion with the applicable Court or Courts to modify this Litigation Timetable upon a showing of good cause.

## ANNEX A

## DEFINITIONS

Capitalized terms used in this Litigation Timetable but not otherwise defined in this Annex A shall have the meanings ascribed to them in the Allocation Protocol.

<u>Allocation Group</u>:  Any of the Canadian Allocation Group, the EMEA Allocation Group, the US Allocation Group, or the Bondholder Allocation Group.

<u>Bondholder Allocation Group</u>:  The Bondholder Group.

<u>Canadian Allocation Group</u>:  The Canadian Debtors, the Monitor, and the CCC.

<u>Canadian Claim Party</u>:  Any party in the Canadian EMEA Claimants Group or the Canadian Claims Defendant Group, or the UK Pension Claimants.

<u>Canadian Claims</u>:  Claims made by the Canadian EMEA Claimants Group and the UK Pension Claimants against any or all of the Canadian Debtors.

<u>Canadian Claims Defendant Group</u>:  The Canadian Debtors against whom the Canadian EMEA Claimants Group and the UK Pensions Claimants have brought claims, the Directors and Officers (but only with respect to claims of the Canadian EMEA Claimants Group), and the Monitor.

<u>Canadian EMEA Claimants Group</u>:  The EMEA Debtors and/or the Joint Administrators or any other administrator of an EMEA Debtor who made claims against any or all of the Canadian Debtors or Directors and Officers, and the UK Pension Claimants who made claims against NNC and NNL.  Cosmé Rogeau, who has been appointed Liquidator for Nortel Networks SA under French secondary proceedings, acts jointly with the Joint Administrators with respect to Nortel Networks SA.

<u>Claim Group</u>:  Any of the US EMEA Claimants Group, the US Claims Defendant Group, the Canadian EMEA Claimants Group, the Canadian Claims Defendant Group, or the UK Pension Claimants.

<u>Discovery Participant</u>:  Any Core Party or party of the US EMEA Claimants Group, the US Claims Defendant Group, the Canadian EMEA Claimants Group, or the Canadian Claims Defendant Group who is participating in discovery pursuant to the Discovery Plan.

<u>Discovery Plan</u>:  The Discovery Plan that will be entered by the Courts.

10

Disputing Creditor: Any party who has delivered an Affirmative Pleading to dispute the disallowance of its claim by the Monitor and the Canadian Debtors, which shall be deemed to include the EMEA Debtors.

EMEA Allocation Group: The UK Pension Claimants, the EMEA Debtors (including Nortel Networks International Finance & Holding BV as behalf of itself and as assignee of Nortel Networks o.o.o.), and Nortel Networks Optical Components Ltd, Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited. Cosmé Rogeau, who has been appointed Liquidator for Nortel Networks SA under French secondary proceedings, acts jointly with the Joint Administrators with respect to Nortel Networks SA.

Identification Interrogatories: Interrogatories seeking identification of (i) the names, roles and last known contact information of witnesses with knowledge of information relevant to the subject matter of Allocation, EMEA Claims or UK Pension Claims, (ii) information sufficient to identify transactions upon which any positions, claims, and/or defenses of the recipient of the interrogatory rely. An interrogatory seeking the names of multiple individuals or transactions shall be considered one interrogatory for purposes of any numerical limit on the number of interrogatories.

Representatives: Directors, officers, employees, attorneys, accountants, experts, consultants, financial advisors, or agents of any of the Core Parties, US Claim Parties, or Canadian Claim Parties.

U.K. Pension Claimants: Nortel Networks UK Pension Trust Limited and the Board of the Pension Protection Fund.

US Allocation Group: The US Debtors and the Committee.

US Claims: Claims made by the US EMEA Claimants Group and the UK Pension Claimants against any or all of the US Debtors.

US Claims Defendant Group: The US Debtors against whom the US EMEA Claimants Group and the UK Pension Claimants have brought claims and the Committee.

US EMEA Claimants Group: The EMEA Debtors and/or Joint Administrators or any other administrator or liquidator of an EMEA Debtor who made claims against any or all of the US Debtors, Nortel Networks AS, Nortel Networks South Africa (Proprietary) Limited, Nortel Networks AG, Nortel Networks Optical Components Limited, Northern Telecom France SA, Northern Telecom PCN limited. Cosmé Rogeau, who has been appointed Liquidator for Nortel Networks SA under French secondary proceedings, acts jointly with the Joint Administrators with respect to Nortel Networks SA.

US Claim Party: Any party in the US EMEA Claimants Group or the US Claims Defendant Group, or the UK Pension Claimants.

11

## DISCOVERY PLAN

| | |
|---|---|
| **1. Definitions** | Capitalized terms used herein and not otherwise defined shall have the meaning ascribed in the Allocation Protocol or Litigation Timetable. |
| **2. Applicable Procedural Regime:** | In accordance with the Cross Border Protocol, the Cross-Claims Protocol and the Allocation Protocol, the following procedural regimes apply:<br><br>(1) With respect to Allocation, the Cross-Border, Cross-Claims and Allocation Protocols apply to the extent not inconsistent with this Discovery Plan, and the Commercial List Practice Direction and the *Rules of Civil Procedure* for Ontario, and the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware will apply as applicable.<br><br>(2) With respect to US Claims, the Cross-Border and Cross-Claims Protocols apply to the extent not inconsistent with this Discovery Plan, and the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware will apply as applicable.<br><br>(3) With respect to Canadian Claims, the Cross-Border Protocol, the Cross-Claims Protocols, the Claims Resolution Order, and the EMEA Claims Procedure Order apply to the extent not inconsistent with this Discovery Plan, and the Commercial List Practice Direction and the *Rules of Civil Procedure* for Ontario will apply as applicable. |
| **3. Scope of Documentary Discovery Among Discovery Participants:** | *a) Definition of Documents*<br><br>References to "Documents" are intended to cover any record that contains any type of information or data in any form and includes everything within the definition of "document" contemplated by Rule 30.01(a) of the Rules of Civil Procedure for Ontario and/or the types of documents contemplated by Rule 34 of the Federal Rules of Civil Procedure.<br><br>*b) Reasonably Accessible Documents and Proportionality*<br><br>No Discovery Participant will be required to search data sources, including applications and databases, that it reasonably understands to already be in the possession, custody, or control of the Allocation Group or Claim Group making the request, provided that a Discovery Participant shall enumerate in its response to a discovery request any data sources that are not being searched on this ground. |

Each Discovery Participant will only be required to search reasonably accessible data. A Discovery Participant who believes that responsive materials are reasonably likely to be found in a decommissioned application or in storage media that cannot be accessed without considerable burden, time or expense shall give prompt notice of this in its response to a document request, and shall meet and confer in good faith with the requesting party or parties regarding the cost and practicality of accessing such responsive materials giving attention to the principle of proportionality.

A Discovery Participant shall not be required to re-produce a document that has already been produced by another Discovery Participant and the same document shall not be required to be produced by more than one Discovery Participant.

In light of the volume of the Debtors' hard-copy documents maintained in off-site storage facilities, and the abundance of available and overlapping electronic data, no Discovery Participant will be obligated to search such hard-copy documents, and rather will produce indices of such hard-copy documents (to the extent they exist) with their responses to any document request and shall meet and confer in good faith with the requesting party or parties regarding hard-copy documents that will be made available for inspection upon request. If any such documents inspected are copied for any requesting party, all other parties shall be notified and copies shall be provided to all parties at their own expense. If any party creates an electronic version of those documents, that party shall be responsible for loading the electronic version of the document(s) onto the Merrill Lextranet database in accordance with Schedule A hereto to the extent reasonable and not overly burdensome.

*c) Previously Produced Documents*

Documents produced into the Merrill Lextranet database ("Mediation Dataroom") for the purpose of the several mediations in this proceeding may be treated as having been produced in the Allocation, US Claims and Canadian Claims litigation, and any Discovery Participant that does not already have such documents shall be provided access to this Merrill Lextranet database, subject to an appropriate confidentiality, protective and/or sealing orders from the Court(s) and a provision allowing the Discovery Participants to clawback any privileged documents that may have been produced in the mediation context or that may be inadvertently produced under this Discovery Plan. Any Discovery Participant may request the load files for the Mediation Dataroom containing metadata from Merrill in order to facilitate loading such documents on a review platform of their choosing.

*d) No Waiver of Privilege*

The fact that a document has been produced by any Discovery Participant shall not be deemed to be an admission of relevance, nor an automatic waiver of privilege where a document has been, or is, produced inadvertently and/or under circumstances where the producing party did not intend to waive privilege (for itself or any other Discovery Participant who asserts privilege over the document), and any Discovery Participant who asserts privilege over the document may ask that it be clawed back under a procedure to be provided for in a confidentiality or protective order.

*f) Document Requests*

**By no later than May 22, 2013**

For Allocation, each Allocation Group shall be entitled to serve limited reasonable requests for production of non-privileged documents, such requests to represent the coordinated effort of all Discovery Participants within the Allocation Group, on each opposing Discovery Participant; provided that the Bondholder Group, prior to making such requests, shall consult with the Canadian Allocation Group and the US Allocation Group, as applicable, to avoid duplication and undue burden. The Discovery Participants who do not belong to any Allocation Group may suggest inclusions in the document requests of an Allocation Group with similarly aligned interests. Further, such Discovery Participants who do not belong to an Allocation Group will have until May 24, 2013 to seek agreement with a Discovery Participant from whom it seeks documents and, failing agreement, to seek leave of the Courts to make additional document requests if it believes in good faith that such requests are necessary and non-duplicative.

For US Claims, each of the US EMEA Claimants Group, the UK Pension Claimants and the US Claims Defendant Group shall be entitled to serve limited and specific requests for production of non-privileged documents on each opposing US Claim Party. The US Claims Defendant Group and the Bondholder Group shall confer on such requests. In addition, the EMEA Claimants Group, the UK Pension Claimants and the US Claims Defendant Group shall be entitled to serve limited and specific requests for production of non-privileged documents on the Canadian Debtors, provided that any disputes are resolved by Canadian Court where the Canadian Debtors are the recipient of the disputed document request and by the US Court where the US Debtors are the recipient of the disputed document request. The Canadian and US Debtors' agreement to accept such discovery requests does not constitute submission to jurisdiction or a waiver of rights or defenses for any other purpose.

3

For Canadian Claims, each of the Canadian EMEA Claimants Group, the UK Pension Claimants and the Canadian Claims Defendant Group shall be entitled to serve limited and specific requests for production of non-privileged documents on each opposing Canadian Claim Party. The Canadian Claims Defendant Group and the Bondholder Group shall confer on such requests. In addition, the EMEA Claimants Group, the UK Pension Claimants and the Canadian Claims Defendant Group shall be entitled to serve limited and specific requests for production of non-privileged documents on the US Debtors, provided that any disputes are resolved by Canadian Court where the Canadian Debtors are the recipient of the disputed document request and by the US Court where the US Debtors are the recipient of the disputed document request. The Canadian and US Debtors' agreement to accept such discovery requests does not constitute submission to jurisdiction or a waiver of rights or defenses for any other purpose.

Discovery Participants will work in good faith to eliminate duplication and redundancy between Allocation document requests and US Claims/Canadian Claims document requests. Further, either by agreement or, failing such an agreement, by order of the appropriate Court or Courts, an Allocation Group or Claim Group may obtain leave to serve additional document requests upon a showing of good cause.

*g) Interrogatories*

**By no later than May 22, 2013**

For Allocation, each Allocation Group shall be entitled to serve a limited number of reasonable Identification Interrogatories, such interrogatories to represent the coordinated effort of all Discovery Participants within the Allocation Group, on each opposing Discovery Participant; provided that the Bondholder Group, prior to serving such interrogatories, shall consult with the Canadian Allocation Group and the US Allocation Group, as applicable, to avoid duplication and undue burden. The Discovery Participants who do not belong to any Allocation Group may suggest inclusions in the interrogatories of an Allocation Group with similarly aligned interests. Further, such Discovery Participants who do not belong to an Allocation Group will have until May 24, 2013 to seek agreement with a Discovery Participant on whom it wishes to serve interrogatories and, failing agreement, to seek leave of the Courts to serve additional interrogatories if it believes in good faith that such interrogatories are necessary and non-duplicative.

For US Claims, each of the US EMEA Claimants Group, the UK Pension Claimants and US Claims Defendant Group shall be entitled to serve a limited number of reasonable Identification Interrogatories on each opposing US Claim Party. The US Claims Defendant Group and the

4

Bondholder Group shall confer on such interrogatories. In addition, the EMEA Claimants Group, the UK Pension Claimants and the US Claims Defendant Group shall be entitled to serve a limited number of reasonable Identification Interrogatories on the Canadian Debtors, provided that any disputes are resolved by Canadian Court where the Canadian Debtors are the recipient of the disputed interrogatory and by the US Court where the US Debtors are the recipient of the disputed interrogatory. The Canadian and US Debtors' agreement to accept such interrogatories does not constitute submission to jurisdiction or a waiver of rights or defenses for any other purpose.

For Canadian Claims, each of the Canadian EMEA Claimants Group, the UK Pension Claimants and the Canadian Claims Defendant Group shall be entitled to serve a limited number of reasonable Identification Interrogatories on each opposing Canadian Claim Party. The Canadian Claims Defendant Group and the Bondholder Group shall confer on such interrogatories. In addition, the EMEA Claimants Group, the UK Pension Claimants and the Canadian Claims Defendant Group shall be entitled to serve a limited number of reasonable Identification Interrogatories on the US Debtors, provided that any disputes are resolved by Canadian Court where the Canadian Debtors are the recipient of the disputed interrogatory and by the US Court where the US Debtors are the recipient of the disputed interrogatory. The Canadian and US Debtors' agreement to accept such interrogatories does not constitute submission to jurisdiction or a waiver of rights or defenses for any other purpose.

Discovery Participants will work in good faith to eliminate duplication and redundancy between Allocation interrogatories and US Claims interrogatories. Further, either by agreement or, failing such an agreement, by order of the appropriate Court or Courts, an Allocation Group or Claim Group may obtain leave to serve additional Identification Interrogatories upon a showing of good cause.

The availability of contention interrogatories shall be decided by mutual agreement among the Discovery Participants at a later date, and, failing agreement, by the Court(s).

*h) Responses and Objections*

**By no later than June 10, 2013**

When objecting to any discovery request, the recipient of such discovery requests shall state the basis for objection, which may be made on any ground provided in the rules of the Applicable Procedural Regime set forth in section 2. Recipients are strongly encouraged to prepare joint objections to the same document request or interrogatories to the extent

their objections overlap.

*i) Production of Documents*

**<u>Rolling Productions of Documents Shall Commence June 10, 2013 and Shall Be Completed by July 22, 2013</u>:**

Subject to any objections made and sustained if challenged (see motions procedure below), each recipient of a document request shall produce any responsive non-privileged documents to any request made of it to all Discovery Participants by producing such documents into the Merrill Lextranet database (to the extent they overlap, responses to multiple requests may be combined or cross-referenced to each other to avoid duplication). The producing Discovery Participant shall promptly notify all Discovery Participants of the Docid range of each production.

In this same time frame, each Discovery Participant shall produce any further documents that they intend to rely upon at trial that are not already part of the mediation productions or responsive productions.

*j) Motions to Compel Document Production*

**<u>Motions to Compel Document Productions Must Be Filed by July 26, 2013</u>**

Any Discovery Participant who served document requests and who seeks to compel production of a document must do so only after meeting and conferring in good faith with the Discovery Participant against whom a motion is contemplated, and thereafter by serving a motion with supporting material, including legal argument/submissions, returnable in the applicable Court on seven business days notice on all Discovery Participants, and must establish that the ground for objection is not valid and that their position will be prejudiced in the absence of the response requested. The Discovery Participant whose objection is challenged shall respond to this motion within four business days and any other Discovery Participant whose interests are affected by the request may serve a supplementary response within two business days thereafter.

Notwithstanding this deadline, whenever a discovery dispute arises, the affected Discovery Participants shall promptly attempt to resolve the dispute in good faith and, if an impasse is reached, file any motions with the relevant Court(s) promptly.

*k) Privilege Logs*

Should a Discovery Participant withhold any document based on a claim of privilege or work product protection, the producing party shall provide a privilege log containing details about the category of documents

6

withheld, including at least the following information for each category: (a) the discovery participant asserting the privilege; (b) the subject matter of the category; (c) the date range; and (d) the author(s) and other recipients, which may be grouped by employer (such as Nortel entity or advisor or law firm). Discovery Participants may request additional information regarding categories on the privilege log in order to assess the basis for withholding and shall meet and confer on the same.

The following documents, to the extent created after the commencement of the bankruptcy proceedings, presumptively need not be included on a privilege log: (a) communications exclusively between a Discovery Participant and its outside counsel or (b) work product created by outside counsel and/or such counsel's agents.

Responsive documents which are jointly privileged as to two or more of the Discovery Participants shall be produced, but only to those Discovery Participants with whom the joint privilege is shared.

| | |
|---|---|
| **4. Format of Production of Electronic Records** | For each electronic document, the responding party shall provide the metadata specified in Schedule A, but only to the extent they can reasonably be extracted or otherwise provided in a delimited text file. |
| **5. Trial Witness Identification** | **<u>By no later than July 24, 2013</u>**<br><br>Each Discovery Participant shall identify any fact (non-expert) witnesses it anticipates calling or presenting testimony of at trial, by name, employer, title and functional role held during the time period relevant to their anticipated testimony. A Discovery Participant may identify trial witnesses not previously identified on good faith at a later date provided that any opposing Allocation Group or Claim Group has had or will have a reasonable opportunity to depose the later-identified witness before trial, regardless of the fact discovery cut-off or number of depositions taken.<br><br>Any Discovery Participant that has previously filed an affidavit or witness statement in the context of this litigation (the Ontario and Delaware proceedings) may also, at its option, choose to designate that evidence to be tendered at trial as long as the witness will be made available to be deposed and appears at trial for cross-examination. |
| **6. Oral Examinations Or Depositions** | *a) Examinations of Representatives/ 30(b)(6) Depositions*<br><br>**<u>By no later than July 26, 2013</u>**<br><br>For Allocation, each Allocation Group (other than the Bondholder Allocation Group) may serve a request under Rule 34.04 of the Ontario Rules of Civil Procedure and/or Rule 30(b)(6) of the United States |

7

Federal Rules of Civil Procedure on the solicitors or counsel of record for any opposing Discovery Participant specifying the topics, if any, on which that other Discovery Participant's representative(s) is to be examined/deposed. The Bondholder Allocation Group shall consult with the Canadian Allocation Group and the US Allocation Group regarding any requests under Rule 34.04 of the Ontario Rules of Civil Procedure and/or Rule 30(b)(6) of the United States Federal Rules of Civil Procedure it would like the US Allocation Group and the Canadian Allocation Group to serve on other Discovery Participants in accordance with the foregoing. In the event that Canadian Allocation Group and the US Allocation Group do not agree to serve such requests, the Bondholder Allocation Group may seek leave of the Court or Courts, as applicable, by motion on notice to serve its own requests for examination under Rule 34.04 of the Ontario Rules of Civil Procedure and/or depositions under Rule 30(b)(6) of the United States Federal Rules of Civil Procedure.

For US Claims, each of the US EMEA Claimants Group, the UK Pension Claimants and the US Claims Defendant Group may each serve a request under Rule 30(b)(6) of the United States Federal Rules of Civil Procedure on the counsel of record for any opposing US Claim Party specifying the topics, if any, on which the US Claim Party's representative is to be deposed. The US Claims Defendant Group and the Bondholder Group shall confer on such requests.

For Canadian Claims, each of the Canadian EMEA Claimants Group, the UK Pension Claimants and the Canadian Claims Defendant Group may each serve a request under Rule 34.04 of the Ontario Rules of Civil Procedure on the solicitors/counsel of record for any opposing Canadian Claim Party specifying the topics, if any, on which the Canadian Claim Party's representative is to be examined/deposed. The Canadian Claims Defendant Group and the Bondholder Group shall confer on such requests.

Use of (Discovery) Answers at Trial

Testimony of representatives proffered in response to requests under Ontario Rule 31.03 and/or Rule 30(b)(6) of the United States Federal Rules of Civil Procedure may be used as evidence at trial only by Discovery Participants whose interests are adverse to those of the proffering Discovery Participants on the issue for which the evidence is being used.

**By no later than August 2, 2013**

Each Discovery Participant served with a request under Rule 34.04 of the Ontario Rules of Civil Procedure and/or Rule 30(b)(6) of the United States Federal Rules of Civil Procedure shall designate a representative(s)

8

(who may, but is not required to be, a current or former officer, director or employee of that Discovery Participant) to be offered to be examined/deposed as though Rule 31.03 of the Ontario Rules of Civil Procedure applied and/or under Rule 30(b)(6) of the United States Federal Rules of Civil Procedure as applicable. All Discovery Participants shall have the right to attend such examinations/depositions.

A Discovery Participant may designate its party representative(s) under Rule 34.04 of the Ontario Rules of Civil Procedure as its witness(es) under Rule 30(b)(6) of the United States Federal Rules of Civil Procedure for a single examination/deposition of each such witness(es).

*b) Oral Examinations/ Deposition of Fact Witnesses:*

**By no later than July 29, 2013**

In addition to the aforementioned examinations/depositions pursuant to Rule 34.04 of the Ontario Rules of Civil Procedure and/or Rule 30(b)(6) of the United States Federal Rules of Civil Procedure, each Allocation Group and each Claim Group shall serve by this date notices stating the witnesses it wishes to examine or depose (which may include third parties, persons subject to the control of a Discovery Participant or both and which may be persons who have been identified as trial witnesses by another Discovery Participant, and any persons whose previously filed affidavits/witness statements have been designated by a Discovery Participant as trial evidence) in order to obtain factual information/admissions relevant to Allocation, US Claims or Canadian Claims. Each witness shall be named and his/her place of residence (if known) shall be identified. The parties shall meet as soon as practicable after this date to confer and attempt to reach agreement on the list of witnesses to be deposed and the time for examination of each witness by each party. In the absence of agreement this shall be submitted to the relevant Court(s) for decision. The attorneys for the US Debtors, the Canadian Debtors and the EMEA Debtors agree to accept requests under Rule 34.04 of the Ontario Rules of Civil Procedure and Depositions Notices the United States Federal Rules of Civil Procedure seeking to depose or examine persons under the control of their clients. All parties agree to cooperate in good faith in attempts to locate and obtain testimony from persons not under the control of any party, including through issuance of compulsory process, letters of request and other available procedures, except that no party shall be required to commence proceedings or pursue other procedures to secure testimony from witnesses that are not in its control and from which that party does not seek testimony.

The Bondholder Group shall consult with the Canadian Allocation Group and the US Allocation Group, as applicable, regarding any fact witnesses

it seeks to examine/depose.  In the event that the Canadian Allocation Group and the US Allocation Group do not intend to designate such fact witnesses that the Bondholder Group seeks to designate, the Bondholder Group may seek leave of the Court or Courts, as applicable, by motion on notice to designate such fact witnesses.

Either by agreement or, failing such an agreement, by order of the appropriate Court or Courts, an Allocation Group or Claim Group may obtain leave to designate additional fact witnesses upon a showing of good cause.

**All examinations/depositions to be completed by no later than September 27, 2013**

The relevant parties shall meet and confer and attempt to agree on the fact witnesses to be examined/deposed and on an examination/deposition schedule that contemplates the completion of all witness examinations/depositions (including any examinations/depositions for testimony preservation that the Court(s) may have granted leave to conduct) in this time frame that reflects the practicalities of examining/deposing each witness (having regard to the number of Discovery Participants examining/deposing, the subject matter of the examinations/depositions, the available time for completion of all examinations/depositions and the residence of the witness).  All Discovery Participants shall have the right to attend such examinations/depositions.

The relevant parties will attempt to schedule depositions with a preference to finish fact witness depositions prior to any representative party examinations or Rule 30(b)(6) depositions.

*c) Use of Examinations/Depositions at Trial*

Designated portions of any examination/deposition may be filed as part of the evidence that any Discovery Participant may rely upon at trial in accordance with the usual rules that apply in the Canadian and US Courts, respectively.

10

**7. Experts**

> **By no later than September 13, 2013**
>
> Each Discovery Participant that intends to rely on the opinion evidence of a qualified expert shall identify the name of its intended expert(s) and the subject matter of their expertise and intended evidence.
>
> **By no later than October 4, 2013**
>
> Each Discovery Participant shall deliver an affidavit or report from their identified expert(s) setting out his/her findings, opinions and conclusions and identifying all documents/factual evidence relied upon in attached exhibits or by Bates number if previously produced, and containing the disclosures required by the Applicable Procedural Regime set forth in section 2.
>
> Any Discovery Participant that has previously filed an affidavit or report from an expert in the context of this litigation (the Ontario and Delaware proceedings) may, at its option, choose to designate that as part of their expert evidence at trial, provided that the expert will be made available to be examined/deposed and appears at trial as set out below. If not so designated, those previously filed affidavits and/or reports shall not constitute part of the evidence at trial.
>
> Promptly after the submission of initial expert affidavits or reports, the Discovery Participants shall attempt to agree upon an expert examination/deposition schedule so that depositions can commence by November 8, 2013.
>
> **By no later than November 1, 2013**
>
> Each Discovery Participant shall have the right to deliver an affidavit or report from an expert, including a newly identified rebuttal expert, in response to one received by another Discovery Participant that addresses an issue that is adverse to the Discovery Participant's position in the Allocation, US Claims, or Canadian Claims litigation. Responses shall be permitted even if the Discovery Participant did not initially tender an expert's affidavit, if an issue is raised by an expert whose evidence is tendered by another Discovery Participant that calls for response. Responsive reports shall be limited to responding to issues on which an affirmative expert report has been proffered and shall not go beyond such issues.
>
> **By no later than December 6, 2013**
>
> As soon as practicable, the Discovery Participants shall meet and confer and attempt to agree on a schedule that contemplates the completion of all expert witness examinations/depositions between November 8, 2013 and December 6, 2013 that reflects the practicalities of examining/deposing

each witness (having regard to the number of parties examining/deposing, the subject matter of the examinations/depositions, the available time for completion of all examinations/depositions and the residence of the witness). All Discovery Participants shall have the right to attend such depositions.

A Discovery Participant may request that any expert be present at trial for cross-examination, and the affidavit or report of any expert not appearing at trial if requested to appear cannot be filed as evidence unless agreed to by all Discovery Participants adverse to the expert's position.

The affidavits and/or reports shall be filed as evidence with the court at the trial, subject only to cross-examination at trial and any applicable objections that may be made and determined at the outset of the trial and directions or rulings from the Court(s) arising therefrom. The Discovery Participant proffering the expert may elect to take a short direct examination of the expert at trial solely to introduce the expert and provide brief background or summary of the expert's report. The affidavit or report of any expert not appearing at trial cannot be filed as evidence unless agreed to by all Discovery Participants adverse to the expert's position.

<u>Communications with Experts:</u>

The experts shall not be examined/deposed about or asked to produce prior drafts of their affidavits/reports and/or their communications with the Discovery Participant who retained them or other Discovery Participants within the same Allocation Group or Claim Group, or their respective Representatives, or any other topic protected from disclosure by the Applicable Procedural Regime set forth in section 2.

With respect to Allocation and US Claims, Rule 26 of the United States Federal Rules of Civil Procedure applies to expert discovery.

| | |
|---|---|
| **8. General Procedure Applicable to All Oral Examinations/ Depositions** | <u>Length of Oral Examinations/Depositions</u><br><br>The Discovery Participants will include for discussion in the meet and confer scheduled for August 5 the Discovery Participants' proposals for limits on the length of oral examinations/depositions and the procedure for conducting such examinations/depositions.<br><br><u>Coordinating Oral Examinations/Depositions</u><br><br>Each examination/deposition shall be coordinated so that a lead examiner is identified for each group that noticed the oral examination/deposition (where an Allocation Group and Claim Group from the same jurisdiction counts as one group). Lead examiners shall work in good faith with any other lead examiners as well as other affected Discovery Participants to |

12

reflect a coordinated effort to avoid duplication of questions. For the avoidance of doubt, the US Claim Parties shall have the right to attend oral examinations/depositions that relate to the Canadian Claims, and the Canadian Claim Parties shall have the right to attend oral examinations/depositions that relate to the US Claims.

Transcripts and video taping:

All examinations/depositions shall be taken under oath in the presence of a Canadian or US certified court reporter and transcribed and the transcripts made available to all Discovery Participants, whether or not they are in attendance at the examination/deposition. At the option of any examining/deposing Discovery Participant, the examination/deposition may be video-taped but the use to which the video tape may be put shall be entirely in the discretion of the Court(s). The examining/deposing Discovery Participant(s) shall proportionally pay for the cost of the first and Court copies of the transcript and all other parties shall pay for their own copies.

Objections:

Objections may be made on any ground provided in the rules of the Applicable Procedural Regime set forth in section 2. Questions that are objected to on grounds other than privilege shall be answered under reserve of that objection. All other objections shall be preserved.

Requirement for Summons:

If a summons, subpoena or other process is required to compel the attendance at deposition of any witness, the Monitor, the US Debtors, the Joint Administrators, and the UK Pension Claimants shall reasonably assist in issuing process or otherwise procuring a witness's attendance irrespective of which Discovery Participant has sought the witness's deposition, except that no party shall be required to commence proceedings or pursue other procedures to secure testimony from witnesses that are not in its control and from which that party does not seek testimony. Neither resort to the courts of any jurisdiction for the purposes of compelling a witness's production for deposition nor conducting a deposition in any jurisdiction shall constitute attornment or consent to that jurisdiction for any other purpose.

Undertakings:

With respect to Allocation and Canadian Claims, the witness shall answer any undertakings that were agreed to on his/her examination/deposition within two weeks of the date of his/her examination/deposition, unless otherwise agreed to by the affected Discovery Participants.

**9. General Terms**

Any Discovery Participant may make a motion to the Court to compel another Discovery Participant to take the steps contemplated by the Discovery Plan or other steps, and the parties agree that the Court(s) may take the existence of the Discovery Plan into account in determining whether to grant the order sought. The Discovery Participants that are parties to such a motion may seek to justify their respective positions on the basis of, among other things, any information that was unknown or not reasonably available to that Discovery Participant at the time the Discovery Plan was entered into.

The Discovery Participants recognize that, as additional information becomes available throughout the Allocation, US Claims and Canadian Claims litigation, it may become apparent that: (a) it is impracticable or impossible for a Discovery Participant to comply with the terms of the Discovery Plan, or to do so in a time-efficient or cost-efficient manner, or (b) further steps, beyond those set out in this Discovery Plan, are required in order for a Discovery Participant to obtain access to potentially relevant documents, information or witness testimony. Each Discovery Participant agrees to notify the other Discovery Participants promptly when it reasonably believes that it will not comply with any term of the Discovery Plan or when it reasonably concludes that further steps beyond those set out in this Discovery Plan are required. The Discovery Participants agree to negotiate in good faith with respect to any amendments to the Discovery Plan requested by a Discovery Participant on that basis, and to seek the assistance of the Courts(s) when appropriate in order to resolve disputes between the Discovery Participants.

All Discovery Participants shall meet and confer in good faith without the assistance of the Court(s) in attempting to resolve any disputes in the interpretation or implementation of this Discovery Plan. Discovery Participants are required to promptly seek relief from the applicable Court or Courts if an impasse is reached in any dispute and shall not be heard to complain of any prejudice resulting from their own delay in seeking relief.

All motions or directions sought from the Court(s) pursuant to this Discovery Plan shall be brought before the following Court or Courts: with respect to Allocation, before Judge Gross of the United States Bankruptcy Court for the District Court of Delaware and Justice Morawetz of the Ontario Superior Court of Justice; with respect to US Claims, before Judge Gross; and with respect to Canadian Claims, before Justice Morawetz. The Courts shall hold regularly scheduled joint discovery conferences for discovery disputes in Allocation and those discovery disputes that affect both jurisdictions.

The EMEA Debtors' participation in the procedures addressed herein is without prejudice to their contention that Allocation should be decided by arbitration rather than the US and Canadian Courts, and shall not be

construed as a waiver of their objection to determining Allocation in accordance with the procedures set forth in the Allocation Protocol, this Discovery Plan and the Litigation Timetable.

All Discovery Participants reserve any rights they may have to object to the standing of any party to participate in any trial.

## SCHEDULE A

Format for Exchange of Productions: Productions will be exchanged by loading each production into the Merrill Lextranet database with the following objectively coded metadata, if reasonably possible, and in the following form:

| Item | Field | Field Type | Description | Format |
|------|-------|-----------|-------------|--------|
| **Document Numbering** | *Docid* | Note Text | Unique document ID number (alpha prefix followed by sequential numbering) | AA0000001 |
| | *Parentid* | Note Text | Docid for the parent e-mail or document that has an attachment associated with it | AA0000001 |
| | *Attchids* | Note Text | Docid(s) attached to Parentid | AA0000001 |
| **Fields/Coded Data for E-mails** | *Datesent* | Date | Used to identify the date that an e-mail was sent | MM/DD/YYYY As per metadata |
| | *Timesent* | Time | Time e-mail was sent | As per metadata (HH:MM:SS) |
| | *Timercvd* | Time | Time e-mail was received | As per metadata (HH:MM:SS) |
| | *To* | Multi-Entry | Name/e-mail address of the address(es) of individuals who received the e-mail | As per metadata |
| | *From* | Note Text | Name/e-mail address of the person who sent the e-mail | As per metadata |
| | *Subject* | Note Text | Contents of the subject field in the e-mail | As per metadata |
| | *Cc* | Multi-Entry | Names/e-mail address(es) of the individuals who were copied on the e-mail | As per metadata |
| | *Bcc* | Multi-Entry | Names/e-mail address(es) of the individuals who were blind-copied on the e-mail | As per metadata |
| | *Media* | Note Text | Used to identify the type of media for an attachment<br>When loading eDocs, this field will be filled in with either eMail, Attachment or eDoc<br>This field is required for loading electronic documents and attachments | As per metadata |
| **Fields/Coded Data for Attachments and Loose Electronic Documents** | *Datesvd* | Date | Date an electronic file or attachment was last saved | As per metadata |
| | *Datecrtd* | Date | Used to identify the date that an electronic file or attached document was created | As per metadata |
| | *Filetype* | Note Text | Type of file of an electronic file or attachment | As per metadata |
| | *Filename* | Note Text | File name of electronic file or attachment | As per metadata |
| | *Doclink* | Note Text | Used to link a document to the database record<br>Only to be provided for Spreadsheets since being produced in native format instead of tiff-ed images | As per metadata |
| | *Folder* | Note Text | Original folder containing path of electronic document as provided | As per metadata |
| | *Custodian* | Note Text | Person from whom document was collected | As per metadata |
| | *Media* | Note Text | Used to identify the type of media for an attachment<br>When loading eDocs, this field will be filled in with either eMail, Attachment or eDoc<br>This field is required for loading electronic documents and attachments. | As per metadata |

| Item | Field | Field Type | Description | Format |
|---|---|---|---|---|
| Fields/Coded Data for Paper Documents | *Docdate* | Date | Date of document (subjectively coded) | MM/DD/YYYY |
| | *CollectDate* | Date | Creation Date of Electronic File | MM/DD/YYYY |
| | *Source* | Note Text | Location or person from whom document was collected (subjectively coded) | |
| | *Attach#* | Note Text | Sequential number applied to attachments showing attachment sequence | .001, .002, etc. |
| | *Author* | Multi-Entry | Author(s) of document (subjectively coded) | Last name, first name [corporate affiliation] |
| | *Recip* | Multi-Entry | Recipient(s) of document (subjectively coded) | Last name, first name [corporate affiliation] |
| Fields/Coded Data for Electronic Documents (Chronological Review) | *Leaddate* | Date | Date of the parent document, populated to all attachments for use with chronological sorting while keeping document families together | MM/DD/YYYY |
| | *Leadtime* | Date | Time of the parent document, populated to all attachments for use with chronological sorting while keeping document families together

Allows for further sorting of documents dated the same day by time | HH:MM:SS |

1.    Each document shall be individually produced with a unique document ID number.

2.    For each document, the Discovery Participant shall provide a text file containing the text extracted directly from the native electronic version of that document, unless the document was redacted, is an image file, is a scanned hardcopy document, or is in another format from which text cannot be reasonably extracted. In these instances, provide a text file created using document-level optical character recognition (OCR) to the extent reasonably practicable.

3.    All images will be single page tiff format (excluding spreadsheets, Powerpoint presentations, and database files which will be provided in native format) with 300 dpi specifications to the extent practicable. Native format files to be provided in the eDocs folder.

4.    Parties will provide the following load files formatted as follows:

(a)    Image folder (single page tiff, 300 dpi);

(b)    eDocs folder (for native files);

(c)    OCR folder (with text files and a control list for loading);

(d)    data.txt or data.csv (with coded fields listed above for ESI and paper documentation); and

17

(e)     imginfo.txt or imginfo.csv or other formats at the request of the receiving party to the extent practicable.

5.      If a document and its exact duplicates are associated with the same custodian, the responding party may withhold the exact duplicates from production.  If a document and its exact duplicates are associated with different custodians, the responding party may withhold the exact duplicates from production and provide a metadata field for the produced document indicating the custodians for whom duplicates were withheld where practicable.

6.      While Discovery Participants will attempt in good faith to comply with all of the above, Discovery Participants shall produce documents and comply with the above to the extent practicable.

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
Proceeding commenced at Toronto

ORDER
(Litigation Timetable and
Discovery Plan)

**Goodmans LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON   M5H 2S7

Jay A. Carfagnini (LSUC#: 22293T)
Jessica Kimmel (LSUC#: 32312W)
Peter Ruby (LSUC#: 38439P)
Joseph Pasquariello (LSUC#: 38390C)

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

\6205385

# TAB 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------X
                                                  :
                                                  :      Chapter 11
In re                                             :
                                                  :      Case No. 09-10138 (KG)
Nortel Networks Inc., et al.,[1]                  :
                                                  :      Jointly Administered
                        Debtors.                  :
                                                  :      Re:  D.I. 10145 & 10210
                                                  :
-------------------------------------------------X
```

## DEBTORS' STATEMENT IN SUPPORT OF DEBTORS'
## PROPOSED LITIGATION TIMETABLE AND DISCOVERY PLAN

1.      The Debtors in the above-captioned cases hereby submit a statement in support of their proposed Litigation Timetable[2] and Discovery Plan (the "US Debtors' Proposals"), attached as Exhibits A and B respectively to the *Debtors' Notice of Filing of Proposed Litigation Timetable and Discovery Plan* [D.I. 10210] (the "Notice"), filed on April 19, 2013.

2.      Over the last month, the US Debtors have conferred extensively with counsel for the various Discovery Participants in the separate but coordinated Allocation, US Claims and Canadian Claim litigations regarding the proposed Litigation Timetable and Discovery Plan. The US Debtors have circulated numerous drafts and have worked in good faith

---

[1]      The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2]      Capitalized terms that are undefined shall have the meaning ascribed to them in the Allocation Protocol attached as Exhibit A to the April 15, 2013 *Certification of Counsel Regarding Allocation Protocol* [D.I. 10133] or Annex A to the Litigation Timetable, which is attached as Exhibit B to the Notice.

to suggest solutions to concerns raised.[3]  As a result, the Committee, the Bondholder Group and

the Indenture Trustees fully support the US Debtors' Proposals, and the Directors and Officers

have no objection.  Further, there are large areas of agreement between the US Debtors and the

UK Pension Claimants, the EMEA Claimants and the Monitor.  Nonetheless, three key issues

regarding scheduling and discovery remain unresolved among the various parties at the time of

this filing.  The key differences between the various proposals and the parties' positions on each

are explained below and summarized in **Exhibit A** hereto.

## Allocation, US Claims, and Canadian Claims are Three Separate Litigations

3.    First, as this Court has acknowledged, the Allocation, US Claims and

Canadian Claims are three distinct sets of litigations with their own procedural rules and involve

different parties, and even if they are coordinated, they can only be decided independently by the

respective Courts having jurisdiction over each of the separate sets of claims or disputes.  The

Monitor's proposed timetable and discovery and deposition plan (the "Monitor's Proposals"),[4]

however, makes no differentiation between the three separate litigations and on the contrary,

expressly bundles the three sets of proceedings and do not take into account the applicable

procedural regime for each of the litigations.  To ignore this distinction could cause unintended

consequences.[5]

4.    While discovery for each of these three litigations can and should be

coordinated for efficiency and certain evidence may be heard at a joint hearing before the US and

---

[3]    See the Notice for a full description of the evolution of the US Debtors' Proposals.

[4]    Blacklines of the US Debtors' Proposals compared with the Monitor's Proposals are attached as **Exhibits B and C.**

[5]    One example of the unintended consequences of the Monitor's Proposals would be that all expert reports would have to conform with both the United States Federal Rules of Civil Procedure and the Ontario Rules of Civil Procedure, and accordingly foreign law experts retained by the US Debtors to proffer evidence on foreign law in the context of the US Claims would be required to acknowledge a duty to the Canadian Court that does not exist.

Canadian Courts, this cannot mean that the three litigations can or should be treated as one for all purposes. This is especially true in light of the EMEA Debtors' appellate challenge to the jurisdiction of the US and Canadian Courts over the Allocation dispute, whereas they do not dispute that jurisdiction by the respective Courts is proper for the US and Canadian Claims.

5. Moreover, the Monitor's Proposals would include constituencies like the CCC and the Canadian Director and Officers—who are not parties to the US Claims, let alone even parties in interest to these Chapter 11 proceedings—as participants in the US Claims litigation. This would afford them the right to seek discovery on those claims, be heard on those claims, and otherwise assert rights coextensive to those held by the parties to those claims, and well beyond the rights actual US creditors would and do have with respect to the US Claims. Only "a party in interest" "may raise and may appear and be heard on any issue" before this Court. 11 U.S.C. § 1109(b). As the Third Circuit has noted, the party in interest requirement is "effectively coextensive" with standing under Article III of the Constitution. *In re Global Industrial Technologies, Inc.*, 645 F.3d 201, 210-11 (3d Cir. 2011). Merely because some parties have a stake in other Nortel proceedings does not mean that they have a (i) specific—and not merely conjectural or hypothetical—injury that is (ii) traceable to the US Claims and would be (iii) redressed by a favorable decision. *See In re W.R. Grace & Co.*, 475 B.R. 34, 177 (D. Del. 2012) (listing the three requirements for constitutional standing). This Court has recognized that there is no statutory or judicial support to conclude that a creditor of a creditor, much less a group like the CCC that represents creditors of an equity-holder, has standing in a bankruptcy case. *See, e.g., In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487-88 (Bankr. D. Del. 1994) (referring to "numerous cases" that hold the same).

3

**Reasonable Limits on Discovery**

6.      Second, the parties disagree as to how to reasonably limit discovery in light of (i) the large number of Discovery Participants and counsel in multiple jurisdictions, (ii) the need to conduct discovery in a timely and efficient manner to be ready for the January 6, 2014 trial, and (iii) the substantial number of documents already exchanged between the estates and other parties in the context of mediation on the Allocation issue. Only the US Debtors' proposal, which treats parties with aligned interests as a discovery group with rights to seek discovery akin to a single participant through collaborative discovery requests, can avoid duplicative and burdensome requests, interrogatories and depositions while ensuring each party has reasonable access to discoverable material.

7.      To illustrate, in Allocation, the US Debtors propose three primary discovery groups, each called an Allocation Group: the Canadian Allocation Group (made up of the Canadian Debtors, Monitor and CCC); the EMEA Allocation Group (made up of the UK Pension Claimants, the EMEA Debtors and certain other EMEA entities who were involved in the asset sales); and the US Allocation Group (made up of the US Debtors and the Committee). Under the US Debtors' Proposals, each of the Allocation Groups must serve one set of document requests and one set of interrogatories that reflect the collaborative effort of all of the members of the Allocation Group.  Using discovery groups means that each party cannot be served with more than three sets of document requests or interrogatories for Allocation,[6] and discovery in the US Claims and Canadian Claims would add no more than two sets of document requests and interrogatories.  Under the Monitor's Proposals, a party could receive up to ten sets of document

---

[6]      The Bondholder Allocation Group must consult with the US and Canadian Allocation Groups, as applicable, before serving document requests and/or interrogatories, and those Core Parties who are not in one of the Allocation Groups may suggest inclusions in the document requests and/or interrogatories of an Allocation Group with similarly aligned interests, and if agreement cannot be reached, seek leave of the Courts to serve their own document requests and/or interrogatories.

requests and interrogatories that are slightly different or nuanced. The parties would then need to spend extensive time reconciling, objecting to and meeting and conferring regarding each request separately, ultimately requiring the Courts to play referee between many more combinations of at-odds pairs.

8.    The US Debtors propose a group approach for depositions as well. For depositions conducted pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, each of the Allocation Groups described above collectively serves the topics on which it would like to depose another party's representative. For fact witness depositions, parties in both Allocation and US/Canadian Claims are combined such that there are three groups based on aligned interests, and each group can designate up to ten fact witnesses.[7] This limits the total number of fact witness depositions to a maximum of thirty. The Monitor's Proposals, on the other hand, allow each party to notice its own depositions under Rule 30(b)(6) and to designate up to ten fact witnesses. Under the Monitor's Proposals, over one-hundred witnesses could be deposed, which is an impossible task given the expedited time frame for these litigations.

9.    Another way the US Debtors propose to reasonably limit discovery is with respect to hard-copy documents. The US Debtors' proposed Discovery Plan provides that in light of the enormous volume (and dubious utility) of hard-copy documents maintained in off-site storage facilities and the abundance of available and overlapping electronic data, no party will be obligated to search hard-copy documents. Instead, a party has to produce only indices of hard-copy documents to the extent they exist, and thereafter will meet and confer with respect to the hard-copy document indices and may make some hard-copy documents available for inspection upon request. In the US alone, there are over two-hundred thousand boxes of

---

[7]    The Bondholders Allocation Group must consult with the US and Canadian Allocation Groups, as applicable, on all fact and 30(b)(6) depositions and may seek leave of the Court(s) if additional depositions are needed.

documents stored before the bankruptcy in approximately twenty off-site storage facilities, dating as far back as 1980. It would be the proverbial search for a needle in a haystack to search such documents. Both the Monitor and the EMEA Claimants support this position, while the UK Pension Claimants do not.

**US Debtors' Proposed Litigation Timetable Allows Necessary Time for Expert Discovery**

10.    Third, and lastly, the EMEA Claimants and UK Pension Claimants request more time in the schedule for fact discovery at the expense of expert discovery and preparation of pre-trial submissions at the close of all discovery. The US Debtors and the Monitor agree that such a schedule simply cannot work given the January 6, 2014 start date and the substantial number of experts required by a case of this complexity.

11.    The US Debtors' proposed Litigation Timetable, as well as the Monitor's proposed Litigation Timetable, requires that fact discovery be completed by August 30, 2013 and provides that expert discovery be completed by November 22, 2013. This allows approximately three-and-a-half months for fact discovery and two-and-a-half months for expert discovery. In their comments to the US Debtors' Proposals, the EMEA Claimants have proposed that fact discovery ends on September 27, 2013, and the UK Pension Claimants have proposed that fact discovery ends on September 30, 2013. The EMEA Claimants and the UK Pension Claimants thus request that the time allotted for fact discovery be extended by one month and the time allotted for expert discovery be decreased by one month.

12.    The schedules proposed by the EMEA Claimants and UK Pension Claimants are unrealistic given the number of experts required in the three litigations. The Allocation dispute is complex and involves many different areas of substantive law, many of which will require expert opinion. In addition, the EMEA Claimants and UK Pension Claimants

make allegations under the laws of many foreign nations and therefore will require experts on each of those foreign laws. Given the nature of the litigations, each estate could have over a dozen experts and will need as much time as possible for the expert reports, rebuttal expert reports and expert depositions.

13.    In sum, the US Debtors recognize that all parties have a right to discovery but assert that reasonable limits are essential in order to start trial on January 6, 2014. Any perceived limits on each party's ability to take discovery is mitigated by the fact that no party has objected to the provisions in the US Debtors' Proposals and the Monitor's Proposals that provide that all documents will be produced to a shared dataroom, which every Discovery Participant will have access to, and that all Discovery Participants will be entitled to attend and receive a transcript of every deposition. The US Debtors' proposal ensures not only that all parties have the discovery needed to litigate these disputes, but properly balances efficiency and expediency with preserving each parties' rights to meaningfully participate.

14.    For the foregoing reasons, the Debtors respectfully request the Court enter the US Debtors' proposed Litigation Timetable and Discovery Plan.

*[Remainder of Page Intentionally Left Blank]*

7

Dated: April 23, 2013
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

                - and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors
and Debtors in Possession*

**Exhibit A**

**Comparison of Parties' Litigation Timetables and Discovery Plans**

| | Scheduling | Separate Litigations | Reasonable Limitations on Discovery |
|---|---|---|---|
| **US Debtors** | • Fact discovery lasts 3.5 months and is completed by August 30.<br><br>• Expert discovery lasts 2.5 months and is completed by November 22. | • Provides for separate discovery procedures for Allocation, US Claims, and Canadian Claims, which reflects the independent jurisdiction and different procedural rules of each Court.<br><br>• Specifies which parties have standing to participate in each of the litigations. | • Provides for discovery groups, which require parties with aligned interests to serve consolidated discovery requests and notice depositions together.<br><br>• Limits discovery groups to 10 fact witness depositions, yielding a maximum of 30.<br><br>• Produces indices of hard-copy documents; may provide hard-copy documents for inspection. |
| **Monitor/ CCC** | • Same dates as US Debtors.<br><br>• Later date for the start of document discovery shortens this period by one week. | • Provides for one discovery procedure for Allocation, US Claims, and Canadian Claims.<br><br>• Allows parties without standing to propound discovery in US Claims. | • Allows each Core Party to serve discovery requests individually, increasing objections and inefficiency.<br><br>• Allows each Core Party to designate 10 fact witness depositions, yielding up to 100 or more depositions.<br><br>• Aligned with US Debtors re: hard-copy documents. |
| **EMEA Claimants** | • Fact discovery lasts 4.5 months and is completed by September 27.<br><br>• Expert discovery lasts less than 1.5 months and is completed by December 6. | • Aligned with US Debtors. | • Generally aligned with US Debtors on concept of discovery groups.<br><br>• Disagree with US Debtors that document requests should be "limited" and "reasonable."<br><br>• Disagree with US Debtors that numerical limits can be placed on depositions at this stage.<br><br>• Aligned with US Debtors re: hard-copy documents. |
| **UK Pension Claimants** | • Fact discovery lasts 4.5 months and is completed by September 30.<br><br>• Expert discovery lasts 1.5 months and is completed by December 15. | • Aligned with US Debtors. | • Generally aligned with the US Debtors on concept of discovery groups.<br><br>• Disagree with US Debtors that numerical limits can be placed on depositions at this stage.<br><br>• Disagree with US Debtors re: hard-copy documents; would require parties to search hard-copy documents. |

# TAB 4

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 2612
COURT FILE NO.: 09-CL-7950
DATE: 20130503

SUPERIOR COURT OF JUSTICE – ONTARIO
(COMMERCIAL LIST)

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

           AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:   MORAWETZ J.

COUNSEL:  D. Tay and J. Stam, for Nortel Networks Corporation

           J. Salmas, for Wilmington Trust, National Association

           Scott Bomhof and Andrew Gray, Nortel Networks Inc.

           Arthur Jacques, Nortel Continuing Employees Committee

           Michael Barrack and Bill Burden, Nortel Networks U.K. Pension Trustee and the U.K. Pension Protection Fund

           S. Kukulowicz, for the Unsecured Creditors' Committee

           Matthew Gottlieb, Tracy Wynne and Robin Schwill, for EHEA Debtors

           Mark Zigler, for the Former & Disabled Canadian Employees

           Lyndon Barnes, for the Former Directors

           J. Pasquariello, B. Zarnett and Peter Ruby, for Ernst & Young Inc., Monitor

           Paul Steep and Byron Shaw, for the Canadian Creditors' Committee

           Gavin Finlayson and Jonathan Bell, for the Noteholder Group

           Lily Harmer, for the Superintendent of Financial Institutions

HEARD:   APRIL 24, 2013

- Page 2 -

## ENDORSEMENT

[1]    On March 8, 2013, an endorsement was issued granting the allocation protocol motion of the Canadian Debtors and approving the form of allocation protocol presented by the Canadian Debtors subject to certain specified modifications. The cross-motion of the Joint Administrators seeking to direct the parties to the Interim Funding and Settlement Agreement to arbitrate the allocation dispute was dismissed.

[2]    The U.S. Court similarly granted the motion of the U.S. Debtors for approval of the allocation protocol and dismissed the cross-motion of the Joint Administrators to compel arbitration.

[3]    On April 3, 2013, I issued a further endorsement providing reasons in respect of the allocation protocol motion. On the same date, the U.S. Court issued an opinion.

[4]    The effect of the decisions of both courts is that allocation of the Nortel global sale proceeds and resolution of the claims filed by the EMEA Debtors, certain other inter-company creditors and the U.K. pension interests against the Canadian Debtors and the U.S. Debtors, respectively, will be resolved through a joint trial of this court and the U.S. Court, which trial is to commence on January 6, 2014.

[5]    On April 17, 2013, both this court and the U.S. Court scheduled this joint hearing to address a Litigation Timetable and Discovery Plan for this upcoming trial.

[6]    The joint hearing was conducted by way of video conference. His Honor Chief Judge Gross presided over the hearing in the U.S. Court. The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol, previously approved by both courts.

[7]    At the outset, a jurisdictional issue was raised as a result of a pending motion for leave to appeal and any appeal in respect of my decision of March 8, 2013 and the decision of the U.S. Court.

[8]    By agreement of the parties, nothing in the participation of the EMEA Debtors in this hearing or in complying with the allocation protocol or timetable directed by this court, shall prejudice their request for leave to appeal, or any appeal if leave is granted, from the order of this court released March 8, 2013 with reasons delivered on April 3, 2013. Any party may, however, rely in the leave to appeal or any appeal on any failure of the EMEA Debtors to expedite the leave to appeal or appeal or on the state of the proceedings under the allocation protocol at the time of the hearing of the leave to appeal or appeal.

[9]    In considering the issues relating to the Litigation Timetable and Discovery Plan, it is advisable to state the obvious. The trial is scheduled for January 6, 2014. It is the responsibility of all parties to be prepared to proceed on that date. This court expects the parties to communicate with each other, to cooperate with each other and to use their common sense in a productive way such that all parties will be prepared to commence the trial on January 6, 2014.

- Page 3 -

[10]    Having considered the various submissions provided by the parties and, referencing the comparative chart filed by the U.S. Debtors entitled "Comparison of Parties' Litigation Timetables and Discovery Plans" (attached as Schedule A, (the "Chart")), the following directions are provided.

[11]    For matters in this court, the *Rules of Civil Procedure* apply.

[12]    All parties should take specific note of Rules 1.04(1) and (1.1), 29.1 and 29.2.

[13]    At this stage of the proceedings, it is impossible to provide specific directions on certain issues that have been identified by the parties as they are hypothetical.   Some of these issues will likely result in differences between the parties that will have to be adjudicated.  To the extent that disputes arise in the weeks and months ahead, it could very well be that it will be necessary to have such disputes resolved by a judicial officer.  This issue will be given further consideration, depending on the court's schedule.   Rather, at this stage, it seems to me that it may be constructive to provide guidance in the form of a response to the Chart.

## SCHEDULING

[14]    The position put forth by the EMEA Claimants is accepted.  Fact discovery is to last 4.5 months and be completed by September 27, 2013.  Expert discovery lasts 1.5 months and is to be completed by December 6, 2013.

[15]    In making this determination, I have taken into account that the EMEA Claimants and the U.K. Pension Claimants are major creditors in the global Nortel insolvency and it is necessary to ensure that they have the full opportunity to put forth their case, within the confines of the trial schedule.

## SEPARATE LITIGATIONS

[16]    The proposal of the U.S. Debtors is accepted.  Although a joint trial will be conducted, this does not alter the fact that the U.S. Court and this court are separate and the independent jurisdiction and different procedural rules of each court need to be respected.

[17]    All parties are expected to exhibit a considerable degree of cooperation in this area.

## LIMITATIONS ON DISCOVERY

[18]    In my view, it is both necessary and appropriate to provide for discovery groups, which require parties with aligned interests to serve consolidated discovery requests and notice depositions together.  In this respect, the proposal of the U.S. Debtors is accepted.

[19]    On the issue of the number of witnesses, in my view, it is premature to impose numerical limits on depositions at this stage.  This issue may be revisited at a later stage.

- Page 4 -

## CORE PARTIES

[20]   It was noted, in submissions, that no additional parties have sought to be included as a Core Party since the release of the decisions on March 8, 2013.  No additional parties are to be granted the status of Core Party, without leave of the court.

## EMEA CLAIM

[21]   The EMEA Debtors take issue with the submission of the Canadian Debtors that new pleadings be delivered.  The EMEA Debtors have filed claims in response to the EMEA Claim Procedure Order.  The Canadian Debtors and the Monitor are to respond to the claim, as filed.

## ELECTRONIC DOCUMENTS

[22]   With respect to issues relating to the Merrill database, I can see no principled reason why all parties should not have access to the database.

[23]   With respect to document discovery to electronic documents, the Monitor and the Canadian Debtors propose to use several tools to reach a balance, including:

> (a) making use of the over 44,000 documents already produced by the parties for the purpose of mediation and stored in a Merrill Lextranet database;

> (b) providing for parties to make limited and specific document discovery requests, so as to avoid fishing expeditions, extensive document search exercises and voluminous productions – or making any further relevant documents available.

[24]   In my view this proposal represents a reasonable approach under the circumstances, taking into account the available amount of time between now and the start of the trial.  To the extent that there are unresolved issues, specific directions can be sought.

## MONITOR

[25]   In my view the parties will benefit from some general comment about the role of the Monitor.  These comments are in response to the submission of the U.K. Pension Claimants that the only party who should respond to their claim is the Monitor who should deliver a responding pleading and that cross-examinations in connection with the Canadian claim should be conducted only by the Monitor and the U.K. Pension Claimants as the parties directly interested in the resolution of the claims.

[26]   It is not necessary to provide specific directions in respect of this issue.  The role of a monitor may vary in each CCAA proceeding, but at all times, the monitor remains a court-appointed officer and whose position cannot be restricted in the manner suggested by the U.K. Pension Claimants.  If further direction is required at some point in the future on this issue, directions can be sought.

[27]   The draft Litigation Timetables and the draft Discovery Plan attached to the submissions of the Canadian Debtors are to be amended to take into account the foregoing.

- Page 5 -

[28]    Finally, all parties should recognize that it is the objective of both the U.S. Court and this court to set out a fair, effective and efficient process designed to achieve a just result on the merits within the timelines that have been allocated.  By the time the trial commences on January 6, 2014, these proceedings will have been ongoing for five years less one week.  The issues involved in this joint trial were identified by the parties several years ago.  It is time to have the issues determined with finality.


MORAWETZ J.

**Date:**  May 3, 2013

## SCHEDULE A

| | Scheduling | Separate Litigations | Reasonable Limitations on Discovery Plans |
|---|---|---|---|
| U.S. Debtors | Fact discovery lasts 3.5 months and is completed by August 30.<br><br>Expert discovery lasts 2.5 months and is completed by November 22. | Provides for separate discovery procedures for Allocation, U.S. Claims and Canadian Claims which reflects the independent jurisdiction and different procedural rules of each court.<br><br>Specifies which parties have standing to participate in each of the litigations. | Provides for discovery groups, which require parties with aligned interests to serve consolidated discovery requests and notice depositions together.<br><br>Limits discovery groups to 10 fact witness depositions, yielding a maximum of 30.<br><br>Produces indices of hard-copy documents; may provide hard-copy documents for inspection. |
| Monitor/CCC | Same end dates as U.S. Debtors.<br><br>Later date for the start of document discovery shortens this period by one week. | Provides for one discovery procedure for Allocation, U.S. Claims and Canadian Claims.<br><br>Allows parties without standing to propound discovery in US Claims. | Allows each Core Party to serve discovery requests individually, increasing objections and inefficiency.<br><br>Allows each Core Party to designate 10 fact witness depositions, yielding up to 100 or more depositions.<br><br>Aligned with U.S. Debtors re: hard-copy documents. |
| EMEA Claimants | Fact discovery lasts 4.5 months and is completed by September 27.<br><br>Expert discovery lasts less than 1.5 months and is completed by December 6. | Aligned with U.S. Debtors | Generally aligned with U.S. Debtors on concept of discovery groups.<br><br>Disagree with U.S. Debtors that document requests should be "limited" and "reasonable".<br><br>Disagree with U.S. Debtors that numerical limits can be placed on depositions at this stage.<br><br>Aligned with U.S. Debtors re: hard-copy documents. |
| U.K. Pension Claimants | Fact discovery lasts 4.5 months and is completed by September 30.<br><br>Expert discovery lasts 1.5 months and is completed by December 15. | Aligned with U.S. Debtors. | Generally aligned with the U.S. Debtors on concept of discovery groups.<br><br>Disagree with U.S. Debtors that numerical limits can be placed on depositions at this stage.<br><br>Disagree with U.S. Debtors re: hard-copy documents; would require parties to search hard-copy documents. |

# TAB 5



**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616  F 416.304.1313

Michael E. Barrack
T: 416-304-1109
E: mbarrack@tgf.ca
File No. 1595-001

November 19, 2013

**VIA EMAIL**

Justice Morawetz
Superior Court of Justice
Court House
361 University Avenue
Toronto, ON   M5G 1T3

Justice Morawetz:

Re:   *In re Nortel Networks, Inc., Case No. 09-10138 (KG)*
      **Nortel Networks Corporation, Court File No. 09-CL-7950**

As you are aware we represent the U. K. Pension Claimants in the Nortel proceeding pending before the Ontario Superior Court ("Ontario Court"); Willkie Farr represents these clients before the United States Bankruptcy Court for the District of Delaware ("Delaware Court"). In order to minimize the expense of attendance at the motions before the Courts this morning, our clients were represented only by Brian O'Connor of Willkie Farr, who attended the joint hearing by telephone. Accordingly, we have been advised of a number of events which unfolded in the course of this morning's hearing. It has been reported that the Courts addressed a number of matters in respect of which no prior notice had been given to the parties. Had there been any advance warning in the form of a notice of motion, direction from the Courts or otherwise, we would have attended before Your Honour and made submissions. Accordingly, we will address some of these matters in this letter and reserve our clients' right to be heard more fully prior to any order arising out of today's attendance being settled.

The first matter which has been reported is a request by the Courts that all fees and expenses incurred by all parties from May 1, 2013 be reported to the Monitor by the close of business today. This request was relayed to us, and our corresponding counsel in the U.K., after the close of business U.K. time (B.S.T. is five hours ahead of E.S.T.). The UK Pension Claimants have borne their own costs to this point of the proceeding unlike other Core Parties. Accordingly, we will be seeking instructions in this regard and will respond, in accordance with our instructions, by the close of business tomorrow. The Trustee of the UKPI reports to the UK *Beddoe Court* in relation to the pursuit of its claims in this process, including as to its costs and fees.

**tgf.ca**



Thornton Grout Finnigan LLP

2.

The second matter which has been reported are statements by the Courts;

- that the trial date will be fixed on a pre-emptory basis for May 12, 2014;

- the trial will be set for a maximum of four weeks;

- there will be a scheduling conference to discuss the trial on January 29; and

- there will be a pre-trial conference two weeks in advance of the trial.

If these statements are embodied in an order, such an order would constitute a significant amendment to the prior Order of the Ontario Court dated May 15, 2013 fixing a Discovery Plan and Timetable, which specifically contemplated adjustments to the schedule. Specifically, the Litigation Timetable appended to that order provides,

> "Any date in this Litigation Timetable may be amended by the written agreement of all Core Parties, submitted to the US Court through the filing of a certification of counsel and to the Canadian Court through the filing of a letter from the Monitor to Justice Morawetz on notice to the Core Parties. Any Core Party may also file a motion with the applicable Court or Courts to modify this Litigation Timetable upon a showing of good cause."

As the Court is aware, the trial of this matter is proposed to deal with the allocation dispute, Canadian Claims and U.S. Claims. No order has been made as to the manner in which each of these matters will be adjudicated, the time allotted to each matter, or a myriad of procedural and substantive issues which will arise in the context of the first attempt to conduct a joint trial involving Canadian and American courts. The Courts have not heard submissions from the parties on these matters. The Court has ordered extensive documentary and oral discovery on these issues in respect of which significant costs have been, and continue to be, incurred. A substantial number of experts are anticipated by each of the Core Parties. In all of these circumstances, we respectfully ask the Court to agree to hear submissions from the parties, after they have had the chance properly to consider these matters and report back with meaningful information as to the number of witnesses and experts likely to be involved. We believe this is in the interests of due process, allowing the parties to bring all relevant considerations before the Courts, after having had the opportunity to review and analyse them.

tgf.ca



3.

The exercise of any discretion by the Court must be preceded by appropriate due process. The parties and the Courts have invested far too many resources in this matter to have the entire trial process put in jeopardy by a ruling which fails to allow the parties to bring relevant considerations before the Courts. We have attempted to participate in these proceedings in a constructive and efficient manner. We would respectfully request the opportunity to be heard, in writing or in person, prior to any order being made amending the May 15, 2013 Order of the Ontario Court or setting the length of the trial.

Yours very truly,

**Thornton Grout Finnigan LLP**

Michael E. Barrack
MEB/slg

c.c.    Core Party Service List

**tgf.ca**

# TAB 6

Court File No: 09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 19th DAY OF |
| JUSTICE MORAWETZ | ) | NOVEMBER, 2013 |
| | ) | |
| | ) | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

ORDER
(Amendments to Litigation Timetable, Discovery Plan and Deposition
Protocol)

THIS MOTION, made by Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation (collectively, the "Canadian Debtors") jointly with Ernst & Young Inc. in its capacity as monitor (the "Monitor") of the Canadian Debtors, the U.S. Debtors, Committee, the EMEA Debtors/ Joint Administrators, the UK Pension Claimants and the CCC (all as defined in the Allocation Protocol (as defined in Schedule A hereto) and collectively, the "Moving Parties") for the relief set out in the Notice of Motion dated November 14, 2013 was heard this day at 393 University Avenue, Toronto, Ontario.

TOR_LAW\ 8296198\7

**ON READING** the one-hundredth report of the Monitor dated November 14, 2013, and on hearing submissions of counsel for the Moving Parties and the objection of the ad hoc bondholder group, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Kiran Dhillon sworn November 14, 2013, filed.

1.    THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.    THIS COURT ORDERS that capitalized terms used herein and not otherwise defined have the meaning given to them in Schedule A hereto.

3.    THIS COURT ORDERS that the terms of amendment set out in Schedule A hereto are hereby approved and the Allocation Protocol, the Litigation Timetable, the Discovery Plan and the Deposition Protocol be and they are hereby amended in accordance with such terms.

4.    THIS COURT ORDERS that the parties shall be permitted to adjust interim deadlines in the time table in accordance with the following procedures:

> a.    The Moving Parties shall meet and confer to determine whether further adjustments to the time table should be made and may upon unanimous agreement (subject to sub-paragraph (c) below), without further Order of the Court(s), propose amendments to the timetable provided that such dates shall not impact the Court ordered commencement date of the Trial;

> b.    Any objections by Core Parties to any proposed amendments shall be made within two (2) Business Days of such proposal being made to them in writing; and

c. All objections shall be resolved through a meet and confer among all the Moving Parties (or designated members) and the objector(s) within two (2) Business Days, failing which, the objector must seek relief from the Court(s) within two (2) Business Days thereafter (by letter). Absent relief from the Court(s), any changes to the time table proposed by the Moving Parties shall be effective.

MISCELLANEOUS

5. THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

6. THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

DEC - 3 2013

TOR_LAW\ 8296198\7

## SCHEDULE A
### Attached.

## SCHEDULE "A" –AMENDMENT TERMS

Capitalized terms used herein and not otherwise defined have the meaning given to them in (i) the allocation procedure protocol approved by the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") in Orders dated on or about April 3, 2013 and May 16, 2013, respectively (as amended and restated, the "**Allocation Protocol**"), (ii) the litigation timetable and discovery plan approved by the Courts in Orders dated on or about May 16, 2013 and as amended by Orders of the Courts dated on or about August 27, 2013 (as amended, the "**Litigation Timetable and Discovery Plan**"), and (iii) the Deposition Protocol as approved by the Courts in Orders dated on or about August 27, 2013 and as amended by Orders dated on or about September 20, 2013 and September 25, 2013 (as amended, the "**Deposition Protocol**") as applicable.

1.   The Allocation Protocol, Litigation Timetable and Discovery Plan and the Deposition Protocol are modified as follows:

| Deadline | Former Date | Revised Date |
|---|---|---|
| Deadline to complete witness depositions other than third party depositions (i.e., those other than current or former employees or directors of a Core Party) and Representative Witness depositions | December 13, 2013 | December 13, 2013[1] |
| Deadline for each Deposition Group to serve Representative Witness subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | 10 business days prior to the commencement of Representative Witness depositions | 5pm (EST) December 13, 2013 other than with respect to topics relating to NNSA which shall be delivered no later than 5pm (EST) on December 17, 2013 |
| Identification of Representative Witnesses by each Core Party required to produce a Representative Witness | 5 business days prior to the commencement of Representative Witness | 5pm (EST) on December 18, 2013 |

---

[1] The parties shall be permitted to extend this date to December 18, 2013 with unanimous approval of the Scheduling Committee to the extent irreconcilable conflicts prevent a witness from being scheduled by December 13, 2013 provided however, except for good cause shown, that such extension shall not impact any other deadlines or dates in the timetable including the deadlines for noticing with respect to topics for and the scheduling of Representative Witness Depositions.

7790706.2

| Deadline | Former Date | Revised Date |
|---|---|---|
| | depositions | |
| Deadline for objections to Representative Witness subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | Three business days after service of the subjects | 5pm (EST) on December 18, 2013 |
| Meet and confer of the Scheduling Committee to schedule Representative Witness Depositions | NA | December 19, 2013 and/or December 20, 2013 |
| Meet and confer regarding any objections on Representative Witness deposition subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | Within two business days of service of the objections | December 20, 2013 |
| Deadline to identify experts and the subject matter of their reports | November 27, 2013 | January 8, 2014 |
| Representative Witness depositions | December 13, 2013 | January 8, 2014 to January 17, 2014 |
| Deadline for service of expert reports | December 20, 2013 | January 24, 2014 |
| Meet and confer to discuss foreign law experts | NA | No later than January 31, 2014 |
| Deadline for Discovery Groups to provide list of available dates of their experts to the Scheduling Committee | NA | 5pm (EST) on January 31, 2014 |
| Deadline to complete third party depositions | Due date of rebuttal expert reports | February 28, 2014 (solely for witnesses for whom process was started by Sept. 30, 2013 and except for good cause shown as per the current order) |
| Deadline for service of rebuttal expert reports | January 24, 2014 | February 28, 2014 |

2

| Deadline | Former Date | Revised Date |
|---|---|---|
| Preliminary pre-trial conference | Week of February 17, 2014 | January 29, 2014 |
| Expert depositions | February 28, 2014 | March 17, 2014 to April 4, 2014 |
| Deadline to file a  list of all witnesses and exhibits that each Core Party intends to rely upon as part of its direct case | March 6, 2014 | April 10, 2014 |
| Deadline to file:<br><br>• Pre-trial motions<br><br>• Pre-trial briefs<br><br>• All fact affidavits to be used in direct case<br><br>• All exhibits to be used in direct case<br><br>• All deposition testimony to be used in direct case | March 14, 2014 | April 17, 2014 for service with filing on the following business day |
| Pre-trial conference | Week of March 17, 2014 (if the Courts desire) | Between April 21 and April 28, 2014 |
| Beginning of Trial | April 1, 2014 | Beginning on May 12, 2014 and continuing for 19 trial days thereafter |

2.   **Fact Witness Depositions**

    a.   Third Party Witnesses.

        i.   Notwithstanding any prior orders, absent good cause shown to the Court(s), no Core Parties shall provide any further notices to third parties for production of documents and/or depositions (other than those currently disclosed to the Scheduling Committee).

7790706.2

ii. Provided that appropriate judicial process to compel the production of documents or testimony from third parties was issued or commenced on or before September 30, 2013, or currently disclosed to the Scheduling Committee, the production of documents from such third parties and/or the depositions of such third party witnesses may be completed after the deadline for fact witness depositions, but must be completed by no later than February 28, 2014, except for good cause shown and by agreement of the Core Parties or order(s) of the Court(s).

3. **Representative Witness Examinations.**

a. The Deposition Protocol is hereby amended as follows:

i. The second sentence of paragraph G(1)(a) is amended as follows:

"At least ten business days before the commencement of Representative Depositions" is hereby deleted and replaced with the words "On or before 5pm (EST) on December 13, 2013 (other than with respect to NNSA for which the deadline shall be December 17, 2013)"

ii. The fourth sentence of paragraph G(1)(a) is amended as follows:

"objections shall be served within three business days" is hereby deleted and replaced with the words "objections shall be served no later than 5pm (EST) on December 18, 2013"

iii. The fifth sentence of paragraph G(1)(a) is amended as follows:

"applicable parties shall meet and confer in good faith ~~within two business days thereafter~~ on or about December 20, 2013 and, failing agreement, the burden shall be on the noticing party to obtain judicial relief at least two business days (in order to enable preparation) prior to the Representative Deposition"

b. On or before 5pm (EST) December 18, 2013, each Core Party that is required to

produce a Representative Witness under the Deposition Protocol shall identify their Representative Witness(es) and provide the Scheduling Committee with a list of all available deposition dates of their Representative Witness(es) for the period January 8, 2014 to January 17, 2014.

c. Representative Witness examinations will take place in accordance with the Deposition Protocol and will be scheduled between January 8, 2014 and January 17, 2014 to take place in New York or Toronto.

d. Each Core Party that is required to produce a Representative Witness under the Deposition Protocol will ensure that its Representative Witness can be produced on several pairs of days for the period January 8, 2014 to January 17, 2014.

e. The Deposition Groups will meet and confer during the week of December 16, 2013 to attempt to resolve any remaining disputes with respect to the Representative Witness depositions.

4. **Expert Witness Examinations.**

a. Expert witness examinations will take place between March 17, 2014 and April 4, 2014 in New York and Toronto.

b. Each Discovery Group will ensure that their expert witnesses can be produced for examination in either New York or Toronto on several days between March 17, 2014 and April 4, 2014 and, unless excused by the Scheduling Committee or the Courts, at a minimum

   i. each expert shall be required to offer at least 5 days on which they are available for deposition,

   ii. the deposition dates offered by the experts must be spread over at least two of the weeks; and

   iii. each Discovery Group must offer enough availability so that its experts' depositions can be scheduled equally over the three weeks of expert

depositions.

c. On or before 5pm (EST) January 31, 2014, each Discovery Group shall provide the Scheduling Committee with all available deposition dates of their experts for the period March 17, 2014 to April 4, 2014.

d. The Core Parties shall meet and confer no later than January 31, 2014 to attempt to reach agreement on the necessity of the examination of foreign law experts for deposition and trial.

5.    **Trial Logistics**

a. The Core Parties shall meet and confer as soon as possible (but in any event no later than the week of December 16, 2013) with a view to attempting to reach consensus with respect to a proposal for the conduct of the trial, including the

    i.   material to be served/filed on April 10, 2014 and April 17, 2014;

    ii.  the feasibility of providing the Courts with a statement of agreed facts; and

    iii. proposed length of the trial.

b. On or before January 20, 2014, the US Debtors, Canadian Debtors/Monitor, the EMEA Debtors and the UK Pension Claimants shall submit (either jointly or separately) their proposals for the conduct of the trial to the Courts. Other Core Parties shall be entitled to file their own proposal on or before January 20, 2014 or, alternatively, they may file a joinder to indicate support of one or more of the proposals on or before January 27, 2014.

6.    **Miscellaneous**

a. Other than as expressly modified herein, all other terms, dates, provisions in the Allocation Protocol, Litigation Timetable, Discovery Plan and all amendments thereto remain in full force and effect.

7790706.2

Court File No: 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL
NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
Proceeding commenced at Toronto

**ORDER**
**(Amendments to Litigation Timetable, Discovery
Plan and Deposition Protocol)**

GOWLING LAFLEUR HENDERSON LLP
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

Derrick Tay (LSUC #: 21152A)
Jennifer Stam (LSUC #: 46735J)
Tel:    (416) 862-5697
Fax:    (416) 862-7661

GOODMANS LLP
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

Jay A. Carfagnini (LSUC#: 22293T)
Alan Mark (LSUC#: 21772U)
Jessica Kimmel (LSUC#: 32312W)
Joseph Pasquariello (LSUC#: 38390C)
Peter Ruby (LSUC#: 38439P)
Tel: 416.979.2211
Fax: 416.979.1234

TOR_LAW\8296198\7

# TAB 7

## INTERPRETATION

*General Principle*

1.04 (1) These rules shall be liberally construed to secure the just, most expeditious and least expensive determination of every civil proceeding on its merits.

*Proportionality*

(1.1) In applying these rules, the court shall make orders and give directions that are proportionate to the importance and complexity of the issues, and to the amount involved, in the proceeding.

Abrams v. Abrams et al.

[Indexed as: Abrams v. Abrams]

102 O.R. (3d) 645

2010 ONSC 2703

Ontario Superior Court of Justice,
D.M. Brown J.
May 10, 2010

2010 ONSC 2703 (CanLII)

Civil procedure -- Case management -- Rule 77.02(2) of Rules
of Civil Procedure not stripping judges hearing matters on
Estates or Commercial Lists of inherent powers to manage
litigation before them -- Judges sitting on Toronto Region
Estates List having inherent power to case manage proceedings
-- Judge managing litigation other than under Rule 77
possessing inherent power to require that motions be brought in
writing, to require that evidence-in-chief be given by way of
affidavit and to impose time limits on length of trial -- Rules
of Civil Procedure, R.R.O. 1990, Reg. 194, Rule 77.

The applicant in a capacity and guardianship proceeding
agreed to have a judge act as the case management judge for the
proceeding. The judge issued a case management endorsement
which contained extensive directions about the remaining pre-
hearing steps in the matter. The applicant did not appeal
the endorsement, but challenged the jurisdiction of a judge
hearing applications and motions on the Estates List to case
manage litigation on the List, as rule 77.92(2) of the Rules of
Civil Procedure provides that Rule 77 (the case management
rule) does not apply to proceedings on the Toronto Region
Commercial List and Estates List.

Held, the challenge should be overruled.

 The court's inherent jurisdiction or power to regulate,
manage and control the proceedings before it co-exists with the
specific rules of practice in respect of various proceedings.
Rule 77 does not exhaust the court's power to manage litigation
before it; it simply provides a further tool, in addition to
the court's inherent powers and [page646] other powers
mentioned in the Rules, to manage a case in an effective way.
Nothing in the language of rule 77.02(2) purports to strip
judges hearing matters on the Estates or Commercial Lists of
the inherent power to case manage litigation. That case
management power includes the power to require that
interlocutory motions be brought in writing, to stipulate that
the evidence-in-chief of witnesses at the trial be given by way
of affidavit and to set the length of the trial.

Cases referred to
Marcotte v. Longueuil (City), [2009] 3 S.C.R. 65, [2009] S.C.J.
 No. 43, 2009 SCC 43, 62 M.P.L.R. (4th) 1, 311 D.L.R. (4th) 1,
 EYB 2009-164625, J.E. 2009-1852, 394 N.R. 1, consd
Other cases referred to
Abrams v. Abrams, [2008] O.J. No. 5205 (S.C.J.); Abrams v.
 Abrams, [2010] O.J. No. 787, 2010 ONSC 1254, 54 E.T.R. (3d)
 283; Baxter Student Housing Ltd. v. College Housing Co-
 operative Ltd., [1976] 2 S.C.R. 475, [1975] S.C.J. No. 84, 57
 D.L.R. (3d) 1, 5 N.R. 515, [1976] 1 W.W.R. 1, 20 C.B.R. (N.S.)
 240; Beach v. Toronto Real Estate Board, unreported, May 31,
 2009, Toronto, Doc. No. CV-08-366597 (S.C.J.); Business Depot
 Ltd. v. Genesis Media Inc. (2000), 48 O.R. (3d) 402, [2000]
 O.J. No. 1593, [2000] O.T.C. 298, 47 C.P.C. (4th) 270, 96
 A.C.W.S. (3d) 936 (S.C.J.); Connelly v. Director of Public
 Prosecutions, [1964] A.C. 1254, [1964] 2 All E.R. 401, [1964]
 2 W.L.R. 1145, 48 Cr. App. Rep. 183 (H.L.); Control & Metering
 Ltd. v. Karpowicz (1994), 17 O.R. (3d) 431, [1994] O.J. No.
 345, 23 C.P.C. (3d) 275, 45 A.C.W.S. (3d) 1218 (Gen. Div.);
 Equiprop Management Ltd. v. Harris (2000), 51 O.R. (3d) 496,
 [2000] O.J. No. 4552, 195 D.L.R. (4th) 680, 140 O.A.C. 1, 9

2010 ONSC 2703 (CanLII)

C.P.C. (5th) 323, 101 A.C.W.S. (3d) 413 (Div. Ct.); Hallman
Estate v. Cameron, [2009] O.J. No. 4001, 52 E.T.R. (3d) 29,
2009 CanLII 51192, 80 C.P.C. (6th) 139 (S.C.J.); J.B. Trust
(Trustees of) v. J.B. (Litigation guardian of) (2009), 97 O.R.
(3d) 544, [2009] O.J. No. 2693, 50 E.T.R. (3d) 50, 81 C.P.C.
(6th) 107 (S.C.J.); Mother of God Church v. Bakolis, [2005]
O.J. No. 1638, [2005] O.T.C. 295, 138 A.C.W.S. (3d) 848
(S.C.J.); Park v. Lee (2009), 98 O.R. (3d) 520, [2009] O.J.
No. 3746, 2009 ONCA 651, 254 O.A.C. 52; R. v. Felderhof
(2003), 68 O.R. (3d) 481, [2003] O.J. No. 4819, 235 D.L.R.
(4th) 131, 180 O.A.C. 288, 180 C.C.C. (3d) 498, 17 C.R. (6th)
20, 61 W.C.B. (2d) 489 (C.A.); R. v. Keating, [1973] O.J. No.
224, 11 C.C.C. (2d) 133, 21 C.R.N.S. 217 (C.A.); R. v. Oliver,
[2005] O.J. No. 596, 194 O.A.C. 284, 194 C.C.C. (3d) 92, 28
C.R. (6th) 298, 127 C.R.R. (2d) 215, 63 W.C.B. (2d) 511
(C.A.); R. v. Papadopoulos, [2005] O.J. No. 1121, 196 O.A.C.
335, 201 C.C.C. (3d) 363 (C.A.); R. v. Rose (1998), 40 O.R.
(3d) 576, [1998] 3 S.C.R. 262, [1998] S.C.J. No. 81, 166
D.L.R. (4th) 385, 232 N.R. 83, 115 O.A.C. 201, 129 C.C.C. (3d)
449, 20 C.R. (5th) 246, 57 C.R.R. (2d) 219, 40 W.C.B. (2d)
192; R. v. Snow (2004), 73 O.R. (3d) 40, [2004] O.J. No. 4309,
191 O.A.C. 212, 190 C.C.C. (3d) 317, 66 W.C.B. (2d) 357
(C.A.); R. v. Steel, [1995] A.J. No. 992, 34 Alta. L.R. (3d)
440, 174 A.R. 254, 29 W.C.B. (2d) 60 (C.A.) [Leave to appeal
to S.C.C. refused [1995] S.C.C.A. No. 533]; Western Canadian
Shopping Centres Inc. v. Dutton, [2001] 2 S.C.R. 534, [2000]
S.C.J. No. 63, 2001 SCC 46, 201 D.L.R. (4th) 385, 272 N.R.
135, [2002] 1 W.W.R. 1, J.E. 2001-1430, 94 Alta. L.R. (3d) 1,
286 A.R. 201, 8 C.P.C. (5th) 1, 106 A.C.W.S. (3d) 397

Statutes referred to

Courts of Justice Act, R.S.O. 1990, c. C.43, ss. 11, 146

Code of Civil Procedure, R.S.Q., c. C-25, art. 4.2

Substitute Decisions Act, 1992, S.O. 1992, c. 30 [as am.]

Rules and regulations referred to

Rules of Civil Procedure, R.R.O. 1990, Reg. 194, rules 1.04(1),
(1.1), 20.05(2), 30.1, 37.15(1), (1.2), 38.10(1), 50.07(1)
(c), 53.01, 77, 77.02(2), 78 [page647]

Authorities referred to

Civil Justice Reform in Action: The New Rule Amendments, CLE
program held October 14, 2009 (Toronto: Law Society of Upper
Canada, 2009)

Dockray, M.S., "The Inherent Jurisdiction to Regulate Civil
 Proceedings" (1997), 113 Law Q. Rev. 120
Ferguson, D.S., ed., Ontario Courtroom Procedure (Markham:
 LexisNexis Canada, 2008)
Hill, Casey, "The Duty to Manage a Criminal Trial" (Paper
 presented to the National Justice Institute, April 2009)
Jacob, I.H., "The Inherent Jurisdiction of the Court" (1970),
 23 Curr. Legal Probs. 23
Lesage, C.M., and Michael Code, Report of the Review of Large
 and Complex Criminal Cases Procedures (Toronto: Queen's
 Printer for Ontario, 2008)
Osborne, Coulter A., Civil Justice Reform Project: Summary of
 Findings & Recommendations (Ontario Ministry of the Attorney
 General, 2007)

2010 ONSC 2703 (CanLII)

  RULING on the power of judges hearing motions and
applications on the Toronto Region Estates List to case manage
proceedings.


  M. Teitel, for applicant S. Abrams.

  R. Swan, for J. Abrams.

  E. Hoffstein and D. Lobl, for P. Abrams.

  B. Schnurr, for Ida Abrams.


  D.M. BROWN J.: --
I. The Issue: The Inherent Power of Judges to Manage Civil
   Litigation

  [1] Do judges who hear applications and motions on the
Toronto Region Estates List possess the jurisdiction or power
to manage litigation on the List?

  [2] The applicant, Stephen Abrams, says "no."

  [3] Although Mr. Abrams did not appeal my case management

endorsement of March 1, 2010 (the "March Endorsement"), [See
Note 1 below] which contained extensive directions about the
remaining pre-hearing steps in this matter, as well as
directions about the conduct of the ordered trial of issues, at
a subsequent case-management conference on April 8, he
challenged my jurisdiction to make that endorsement and made it
quite clear that he would not co-operate in moving his
application to a trial of issues in accordance with the
directions contained in that endorsement.

[4] Stephen Abrams' position is simple: either I allow him to
litigate this proceeding under the Substitute Decisions Act,
1992, [See Note 2 below] [page648] in the way that he wants, or
he will appeal my case management directions. As I informed his
counsel at the hearing, judges do not negotiate their
jurisdiction or powers with litigants.

[5] So, in this endorsement, I will explain why judges
possess the jurisdiction and power to manage litigation on the
Toronto Region Estates List, including making specific
directions of the type that I did in the March Endorsement, and
I will defer issuing further directions in this proceeding
until either Mr. Abrams appeals my decision and the appeal is
disposed of, or the time for bringing an appeal has expired.
II. Procedural Background

[6] I set out the history of this high-conflict capacity and
guardianship proceeding in the March Endorsement. In terms of
the history of the case management of this proceeding, on the
return of a motion before me on November 9, 2009, I agreed, at
the request of the parties, including Stephen Abrams, to act as
the case management judge for this proceeding. I directed the
parties to develop a schedule for all remaining examinations.

[7] I held a case management conference on November 25, 2009,
at which time I set a timetable for the remaining examinations.
I also directed that inquiries be made about allegations that
Stephen Abrams had breached rule 30.1 [of the Rules of Civil
Procedure, R.R.O. 1990, Reg. 194] by sending certain
information about his sister to the College of Physicians and
Surgeons, and that a conference call on that issue be held on

December 10, 2009. Stephen Abrams did not object to my
jurisdiction at that time.

[8] The conference call was held on December 10, 2009.
Stephen Abrams did not object to my jurisdiction at that time.

[9] The next case-management conference was held on February
8, 2010. The parties reported that they had complied with my
directions and completed the remaining examinations in
accordance with the timetable I had imposed. The issues of
outstanding motions and the length of trial were also
discussed. Stephen Abrams did not object to my jurisdiction at
that time.

[10] A conference call was then held on February 24, 2010. My
resulting March Endorsement summarized that call and directed
counsel to co-operate and prepare a plan to adjudicate the
ordered trial of issues in this application in accordance with
certain parameters, which included
(i) completing the trial of issues within three days on
    September 27, 28 and 29, 2010; [page649]
(ii) conducting a hybrid trial, primarily relying on filed
    affidavits for a witness' evidence-in-chief, with latitude
    to conduct up to 30 minutes additional examination-in-chief
    of each party witness and the cross-examinations of each
    party witness limited to three hours in length;
(iii) filing comprehensive document briefs, factums and briefs
    of authorities in advance of the hearing;
(iv) bringing any remaining refusals motions before me by way
    of motions in writing; and
(v) preparing lists of any portions of pleadings or affidavits
    of the opposite parties to which a party objected so that I
    could consider whether any merit existed in dealing with
    such complaints prior to the trial, or whether the
    presiding judge should simply be given a list in advance of
    those portions of affidavits to which the parties took
    exception.

[11] In that endorsement, I indicated that following the
hearing on April 8, 2010, I would finalize a plan dealing with
all remaining pre-trial matters and I would fix the trial date

2010 ONSC 2703 (CanLII)

which would be peremptory to all parties.

[12] Stephen Abrams did not appeal the March Endorsement.

[13] At the conference on April 8, the respondents submitted
a joint trial plan which conformed to the parameters I had set.
Mr. Abrams submitted two plans. The first his counsel described
as conforming to my endorsement. It did not. That plan proposed
that Mr. Abrams' case would occupy 2.5 days of the hearing,
leaving 0.5 days for the respondents' case. I do not know why
Mr. Abrams even bothered filing that document given its obvious
unfairness.

[14] What Mr. Abrams really wanted was set out in the second
plan contained in his written submissions -- a ten-day trial
using only viva voce evidence, including a full day to deal
with pleadings-related issues, four days for Mr. Abrams' case,
three days for the respondents' case, a day of reply evidence
for Mr. Abrams and a day for final submissions. Again, Mr.
Abrams tilted the allocation of time in his favour.

[15] The parties also filed briefs of refusals in respect of
which they wished to bring motions. Mr. Stephen Abrams seeks to
move on
(i) about 50 refusals made by his sister, Judith Abrams, on her
    examination, with the lion's share relating to issues
    involving Ms. Abrams' employment and personal matters, five
    concerning [page650] "draft wills", eight dealing with Ida
    Abrams' capacity and treatment, and one relating to their
    father, Philip's, capacity; and
(ii) four refusals taken on the examination of Philip Abrams.
The respondents seek to move on the following refusals:
(iii) five refusals made on the examination of Stephen Abrams;
(iv) 21 refusals taken on the examination of Elizabeth Abrams,
    many dealing with issues relating to the estate planning
    undertaken by Ida and Philip Abrams;
(v) one refusal made by Rosette Rutman, the wife of Stephen
    Abrams; and
(vi) ten refusals given by Mark Wainberg, Elizabeth Abrams'
    husband, many dealing with issues relating to the estate
    planning undertaken by Ida and Philip Abrams.

2010 ONSC 2703 (CanLII)

In sum, approximately 95 refusals must be determined. Using a
very conservative estimate of five minutes of oral motion time
per refusal, two full motions days would be required to deal
with that number of refusals in the ordinary course.

[16] Finally, Stephen Abrams submitted a list of those
portions of the respondents' affidavits and pleadings that he
wished to strike out:

[QL:GRAPHIC NAME="102OR3d645-1.jpg"/]
Stephen Abrams has already examined Judith and Philip Abrams on
their affidavits. [page651]
III. Positions of the Parties
    A. Stephen Abrams

[17] In a 26-page written submission filed at the hearing,
Mr. Stephen Abrams took the following positions:
(i) the March Endorsement contained factual inaccuracies and
    media reports of that endorsement contained errors;
(ii) these reasons for decision dealing with matters raised at
    the April 8 hearing should be sealed;
(iii) judges sitting on the Toronto Region Estates List possess
    no Rules-based or inherent jurisdiction to impose case
    management, including case management in this particular
    proceeding;
(iv) even if a judge sitting on the Toronto Region Estates List
    could impose case management in a proceeding, the judge
    lacked jurisdiction
    (a) to require affidavit evidence to be used at a trial of
        issues, and
    (b) to give directions regarding the length of the trial
        and time limits for witnesses.
    B. Ida Abrams

[18] Section 3 counsel for Ida Abrams submitted that his
client does not support her son's request for a sealing order
and endorses the respondents' joint litigation plan prepared in
response to [the] March Endorsement that would see the timely
adjudication of the issues in this proceeding.
    C. Philip Abrams

2010 ONSC 2703 (CanLII)

[19] Counsel for Philip Abrams also opposed Stephen's request
for a sealing order, observed that the parties actually had
requested, back on November 9, 2009, that I act as the case
management judge in this proceeding and submitted that judges
sitting on the Estates List possess the jurisdiction to impose
the type of case management contained in the March Endorsement.
    D. Judith Abrams

[20] Counsel for Judith Abrams submitted that his client took
no formal position on the argument made by Stephen Abrams, but
(i) wanted this proceeding heard as quickly and as
expeditiously as possible, (ii) supported the respondents'
joint litigation [page652] plan and (iii) saw no justification
for a sealing order in this proceeding. Counsel submitted that
his client was pleased with the "firm hand" type of case
management imposed to date in this proceeding.
IV. Inaccuracies in Media Commentary on the March 1, 2010
    Endorsement

[21] Stephen Abrams submitted that the March Endorsement
contained factual errors and that I had misapprehended certain
matters. His written submissions contained seven pages
describing those errors. If Stephen Abrams thought that I had
erred in any findings or conclusions in my March Endorsement,
he was free to appeal my decision. He did not.

[22] Stephen Abrams also expressed concern about media
coverage of the March Endorsement, including what he contended
were inaccuracies in the reports on my decision. The court has
no control over how the media reports decisions that it
releases. If Stephen Abrams feels aggrieved by any media
coverage, he enjoys remedies at law.
V. Mr. Abrams' Request for a Sealing Order

[23] Stephen Abrams requested an order barring the media from
the April 8, 2010 hearing (none were present) and from any
other scheduling appointments and case conferences. Since no
media have shown the slightest interest in attending any case
conference or motion in this proceeding, I see no need to deal
with this request.

.

2010 ONSC 2703 (CanLII)

[24] Stephen Abrams also requested that all future case
conference memoranda be sealed, "except to the extent that they
correct alleged factual errors that this Honourable Court may
conclude were made in March 1, 2010". The other parties opposed
this request. No sealing order was requested when this
application commenced, and the public file for this proceeding
currently contains three boxes of filed materials. In J.B. Trust
(Trustees of) v. J.B. (Litigation guardian of), [See Note 3
below] I summarized the principles governing requests to seal
court files. No grounds exist in the present case to order that
future decisions of this court should be sealed. I dismiss the
request.

[25] Similarly, there is no basis to grant Stephen Abrams'
alternative request for an order "requiring the use of parties'
initials in lieu of their names in any media reports of this
case". [page653] This proceeding has been litigated under a
full-names style of cause for two years; I see no reason to
change that situation.

VI. Jurisdiction of Judges to Manage Proceedings on the Toronto
    Region Estates List
    A. The problem

[26] Mr. Abrams' primary argument challenges the
jurisdiction, or power, of judges sitting on the Toronto Region
Estates List to impose case or litigation management in a
proceeding. He submits that such judges possess neither the
inherent jurisdiction nor any authority conferred by the Rules
of Civil Procedure to do so. His argument is a straightforward
one. Both before and after January 1, 2010, the Rules provided
that Rule 77 case management in the Toronto Region did not
apply to most matters heard on the Toronto Region Estates List,
including applications for guardianship of property or persons
under the Substitute Decisions Act, 1992. In light of that
situation, Mr. Abrams argued, no judge hearing a matter on the
Toronto Region Estates List possesses the jurisdiction or power
to manage a matter on the List.

[27] To some extent, Mr. Abrams' argument does not surprise
me. The "gap" in Rule 77 became apparent as soon as the Rules
Committee approved the "new" Rules in December 2008. As I wrote

2010 ONSC 2703 (CanLII)

last fall in Hallman Estate v. Cameron [at para. 47]: [See Note 4 below]

    As to case management, Ms. Hallman is correct that a form of case management is available for proceedings on the Toronto Estates List. I say a "form" of case management because, strictly speaking, the type of case management described in Rule 77 is not available for the majority of disputes heard on the Estates List: Rule 77.01(2)(d) through to (d.0.3).

[28] That Rule 77 case management may not be available for a proceeding does not mean that case management, more broadly understood as litigation management, cannot apply. Again, I addressed this issue in Hallman [at para. 48]:

    Yet the lack of availability of Rule 77-style case management has not impeded the ability of judges sitting on the Estates List from implementing more informal ways of managing cases that appear on the List, either at the request of counsel or at the initiative of the judges. This makes sense. On-going judicial intervention is necessary in some cases to ensure that justice is done. Some parties seek such intervention, and the courts should be ready to respond to reasonable requests to ensure proper access to justice. So, too, intractable cases often require judicial management to prevent abuses of the system of justice and fairness to both parties. [page654]

[29] Mr. Abrams' submissions, however, call into question that analysis, so I propose to examine in more detail the inherent and Rules-based power of judges sitting on the Estates List to engage in the management of litigation on the List.

    B. The inherent jurisdiction or powers of a superior court of record
        B.1 The source of inherent powers

[30] What is the source of the inherent jurisdiction or powers of a superior court of record? In a seminal article, [See Note 5 below] Sir I.H. Jacob viewed the inherent jurisdiction of a court as an aspect of its general jurisdiction, consisting of a

2010 ONSC 2703 (CanLII)

set, or bundle, of powers which "derived, not from any statute
or rule of law, but from the very nature of the court as a
superior court of law, and for this reason such jurisdiction has
been called 'inherent'":

> For the essential character of a superior court of law
> necessarily involves that it should be invested with a power
> to maintain its authority and to prevent its process being
> obstructed and abused. Such a power is intrinsic in a
> superior court; it is its very life-blood, its very essence,
> its immanent attribute. Without such a power, the court would
> have form but would lack substance. [See Note 6 below]

This led Jacob to conclude that the source of these powers was
"the authority of the judiciary to uphold, to protect and to
fulfill the judicial function of administering justice according
to law in a regular, orderly and effective manner". [See Note 7
below] Jacob offered the following definition of a court's
inherent jurisdiction:

> [T]he reserve or fund of powers, a residual source of powers,
> which the court may draw upon as necessary whenever it is just
> or equitable to do so, and in particular to ensure the
> observance of the due process of law, to prevent improper
> vexation or oppression, to do justice between the parties and
> to secure a fair trial between them. [See Note 8 below]

[31] Although Jacob's definition has been accepted by the
Supreme Court of Canada and the Ontario Court of Appeal, [See
Note 9 below] his [page655] approach has been criticized by some
as too metaphysical in nature, and an alternative way of
describing the source of a court's inherent jurisdiction has
been to regard as inherent those powers which are necessary if
the court is to manage the work which has been assigned to it in
an appropriate fashion, [See Note 10 below] a sort of
jurisdiction by necessary implication kind of argument. As put
by Lord Morris of Borth-y-Gest in Connelly v. Director of Public
Prosecutions:

> There can be no doubt that a court which is endowed with a
> particular jurisdiction has powers which are necessary to
> enable it to act effectively without such jurisdiction. I

2010 ONSC 2703 (CanLII)

would regard them as powers which are inherent in its
jurisdiction. A court must enjoy such powers in order to
enforce its rules of practice and to suppress any abuses of
its process. [See Note 11 below]

[32] Whichever view one takes of how to articulate the source
of a court's inherent powers, the commentators unite in
recognizing that courts, at least superior courts of record,
enjoy inherent powers to regulate and control their own process
and proceedings other than those which are conferred on them by
legislation, including delegated legislation such as rules of
practice. [See Note 12 below] Indeed, less than two years ago,
former Chief Justice Lesage, and now Justice Code of this court,
in their Report of the Review of Large and Complex Criminal
Cases Procedures wrote:

[A]t common law "the trial judge" has significant case
management powers, both when hearing motions at the pre-trial
stage and when hearing evidence at trial. All trial courts,
whether statutory courts or superior courts, have the implied
power to control their own process and ensure a fair trial. It
is from this broad power that the common law developed an
expansive list of remedial tools designed to ensure the
fairness and effectiveness of trial processes. [See Note 13
below]

[33] Justice Casey Hill, in a recent article, [See Note 14
below] exhaustively reviewed the origins and the scope of a
judge's inherent powers to manage a criminal trial. His opening
comments apply with equal force to civil proceedings [at paras.
1-3]:

Originally cast in terms of inherent authority to control
the processes of the court and prevention of abuse of the
process, it is today recognized that [page656] a trial judge
has a duty to manage the trial process balancing fairness to
the parties as well as efficient and orderly discharge of
court process. Judicial management of litigation recognizes
that "there is more at stake than just the interests of the
accused". Management involves control, direction and
administration in the conduct of a trial. This power, settled

2010 ONSC 2703 (CanLII)

within a broad discretion, relates to the entirety of the
trial proceeding extending beyond the scope of pre-trial case
management rules designed for "effective and efficient case
management". . .

   While the criminal trial remains an adversarial process
with a division of roles between the trial judge and counsel,
the court bears responsibility for control of the trial
process, achievement of a just result, and maintenance of
respect for the administration of criminal justice. Avoidance
of delay, efficient management of limited court time and
resources, assistance to jurors to reach a verdict,
compliance with rules of court and judicial directions
designed to promote trial fairness, minimizing inconvenience,
establishing a professional and civil forum for trying a case
without distraction or personal disputes, and encouragement
of public respect for the process, all legitimize a trial
judge's authority to effectively manage a criminal trial.

   With the court's compass steadily pointed toward trial
fairness, a trial judge's obligation to the administration of
justice includes prevention of unnecessary delay or abuse of
the court's process as well as attention to conservation of
cost and resources. This is entirely consistent with
guidelines relating to judicial conduct:

   . . . judges are obliged to ensure that proceedings are
   conducted in an orderly and efficient manner and that the
   court's process is not abused. An appropriate measure of
   firmness is necessary to achieve this end. A fine balance
   is to be drawn by judges who are expected both to conduct
   the process effectively and avoid creating in the mind of a
   reasonable, fair minded and informed person any impression
   of a lack of impartiality.

                    . . . . .

The duty to hear all proceedings fairly and with patience is
not inconsistent with the duty to dispose promptly of the
business of the court.

                    . . . . .

2010 ONSC 2703 (CanLII)

In disposing of matters promptly, efficiently and fairly, a
judge must demonstrate due regard for the rights of the
parties to be heard and to have issues resolved without
unnecessary cost or delay. A judge should monitor and
supervise cases so as to reduce or eliminate dilatory
practices, avoidable delays and unnecessary costs.

[34] These inherent powers are broad. It is difficult to set
the limits upon the powers of the court in the exercise of its
inherent jurisdiction to control and regulate its process
because those limits cannot impair the need of the court to
fulfill its judicial functions in the administration of justice.
[See Note 15 below] That said, the exercise of inherent powers
must not undermine principles of procedural [page657] natural
justice or fairness. As the Court of Appeal recently pointed
out, while a trial court has the inherent jurisdiction to
control its own process, that jurisdiction does not extend to
dismissing cases without hearing the available evidence and
submissions. [See Note 16 below]

> B.2 A court's inherent powers to regulate its own
> process apply to both the trial and pre-trial
> stages of proceedings

[35] Inherent powers to control the court's process are not
confined to judges who preside at trials. Certainly on the civil
side of the court, judges possess such inherent powers at all
stages of a civil proceeding. [See Note 17 below] The scope of a
court's contemporary inherent powers to control its own
proceedings and to prevent abuse of its process necessarily
reflects the trend that has emerged in the past few decades
towards greater judicial oversight of civil proceedings. As
noted in Justice Ferguson's Ontario Courtroom Procedure:

There has been a huge change in philosophy in civil trial
procedure since the current rules came into force in 1985.

Up to that time the Rules of Practice, case law and tradition
were based on the philosophy of a classic professional
adversary system. The underlying assumption was that all
parties would be represented by informed, skilled counsel
whose professional skills and ethics would produce a fair

2010 ONSC 2703 (CanLII)

trial subject to rulings by the trial judge when the parties
asked for them. Our current rules reflect a recognition that
such an approach too often produced delay, unnecessary cost
and unfairness. [See Note 18 below]

[36] As a result of that recognition, the role of the judge in
directing a civil proceeding has changed. The Court of Appeal
has observed that the contemporary trial judge should not be
regarded "as little more than a referee who must sit passively
while counsel call the case in any fashion they please". [See
Note 19 below] Instead, a trial judge may intervene at an
appropriate time, pursuant to the court's inherent power to
control its own process, to "make directions necessary to ensure
that the trial proceeds in an [page658] orderly manner". [See
Note 20 below] A "trial judge is entitled to manage the trial
and control the procedure to ensure that the trial is effective,
efficient and fair to both sides". [See Note 21 below]

[37] So, too, judges have become more active in the pre-
hearing phases of civil litigation. As put recently by Deschamps
J. in her minority decision in Marcotte v. Longueuil (City),
"[w]hat is clear from these different sources is that the
purpose of [proportionality] is to reinforce the authority of
the judge as case manager. The judge is asked to abandon the
role of passive arbiter." [See Note 22 below] Justice Ferguson
has noted that today:

. . . the current philosophy in civil and family trials
-- and the evolving philosophy in criminal trials -- is that
the judge is not simply an independent observer who decides
procedural issues as they are raised by counsel. The judge is
now expected to manage litigation to ensure that it is
efficiently and fairly dealt with. [See Note 23 below]
Even in the context of criminal proceedings, the Court of
Appeal has recognized the power of judges to set schedules for
the hearing of pre-trial motions as part of their
responsibility of ensuring the orderly administration of
justice: "Counsel are expected to comply with the schedules set
by the court. This is no less true in criminal matters than in
civil matters." [See Note 24 below]

[38] The Alberta Court of Appeal articulated the contemporary
duties and powers of judges in the following way:

In our view, it is the unpleasant duty of the courts to see to
it that justice is not unduly delayed. Even when every party
to a proceeding seems to be content to see litigation drag on,
it is in the public interest to prevent that unhappy result.
The modern concept of case management requires a judge not
merely to see to it that every party has a fair hearing, but
also to see to it that the parties do not abuse that right.
For example, parties -- and their counsel -- should prepare
for a step in a proceeding when preparation is required in
order to move the proceedings along, and not just when it
suits their calendars or their other interests. Courts today
must decide, and give directions on, matters that unreasonably
delay proceedings. Unreasonable delay can come from prolixity,
but also hairsplitting and other techniques. Increasingly
judges in the future will be required to ration time and
effort for motions and objections in terms of the quality of
the application. [See Note 25 below] [page659]

[39] The purpose underlying this recognition of the enhanced
role of judges to manage proceedings was succinctly put in the
Lesage-Code Report:

The common law powers are very effective tools of judicial
case management because they encourage efficient, focused and
well-prepared lawyering. [See Note 26 below]

[40] This same point finds expression, in slightly different
terms, in the Ontario Rules of Civil Procedure. Judges exercise
their inherent powers to manage litigation both before and
during trial in order to achieve the two fundamental principles
identified for civil litigation in Ontario. One fundamental
principle is an end; the other, a means to that end. The end,
or objective, of the judicial management of the civil process
is to "secure the just, most expeditious and least expensive
determination of every civil proceeding on its merits": rule
1.04(1). The means to that end involves courts ensuring that
their orders and directions "are proportionate to the
importance and complexity of the issues, and to the amount

2010 ONSC 2703 (CanLII)

involved, in the proceeding": rule 1.04(1.1). These two
fundamental principles inform the contemporary inherent powers
of the Superior Court of Justice to control and manage its
civil process to achieve the due administration of justice in
each and every case.

[41] In sum, in the world of contemporary civil litigation,
judges of the Ontario Superior Court of Justice necessarily
possess the inherent power to give directions to the parties,
in appropriate cases, about the conduct and completion of both
pre-hearing and hearing steps in the proceeding, so that the
case receives a just, expeditious and least expensive
determination on its merits and that the pre-hearing and
hearing steps unfold in a proportionate manner. Such inherent
powers are necessary to enable the court to act effectively
within its jurisdiction. [See Note 27 below]

      B.3 The relationship between a court's inherent powers
          and rules of practice

[42] The Superior Court of Justice of Ontario is a superior
court of record possessing "all the jurisdiction, power and
authority historically exercised by courts of common law and
equity in England and Ontario". [See Note 28 below] As such, the
Superior Court of Justice enjoys the inherent, or necessary,
powers to regulate and control its own proceedings and to
prevent the abuse of its process. This inherent [page660] power
is recognized, in part, by s. 146 of the Courts of Justice Act,
which provides that the "jurisdiction conferred on a court . . .
shall, in the absence of express provision for procedures for
its exercise in any Act, regulation or rule, be exercised in any
manner consistent with the due administration of justice".

[43] A court may exercise its inherent jurisdiction or power
even in respect of matters that are regulated by statute or by
rules of court so long as it can do so without contravening any
statutory provision. [See Note 29 below] As put by Jacob:

The powers conferred by Rules of Court are, generally
speaking, additional to, and not in substitution of, powers
arising out of the inherent jurisdiction of the court. The
two heads of powers are generally cumulative, and not

2010 ONSC 2703 (CanLII)

mutually exclusive, so that in any given case, the court is
able to proceed under either or both heads of jurisdiction.
In Equiprop Management Ltd. v. Harris, Lang J. (as she then was)
echoed Jacob's point when she observed that the Rules generally
are considered to be in addition to, rather than in substitution
for, inherent jurisdiction. [See Note 30 below] In his article,
Dockray ventured that a court's inherent jurisdiction may
supplement, but cannot be used to lay down procedure which is
contrary to or inconsistent with, a valid rule of practice. [See
Note 31 below]

[44] The inherent powers of superior courts to prevent abuse
of their process and ensure fairness in the trial process can
only be removed by clear and precise statutory language. [See
Note 32 below] However, the inherent jurisdiction of a superior
court is not such as to empower a judge of that court "to make
an order negating the unambiguous expression of the legislative
will". [See Note 33 below]

[45] In sum, the court's inherent jurisdiction, or power, to
regulate, manage and control the proceedings before it co-
exists with the specific rules of practice in respect of
various proceedings. A court's power to control its own process
is the sum of both sets of powers. Both sets of powers may
operate together, with a court's inherent powers ceding only in
the face of clear, unambiguous [page661] statutory, or
regulatory, language that the court cannot manage its process
in a specified manner.
VII. The nature and content of litigation or case management

[46] Before dealing specifically with the issue of the powers
of judges sitting on the Estates List to manage proceedings, it
is important to stress that the concept of "case management"
for civil cases is a broad one, and the term "case management"
refers to a broad range of powers exercised by judges in the
course of managing a civil proceeding.

[47] A judge may intervene to manage a civil proceeding in a
variety of circumstances. First, judges frequently issue
directions for the further conduct or trial of a proceeding
when disposing of a motion or application. For example, a judge

2010 ONSC 2703 (CanLII)

hearing a motion, such as a motion to set aside a default
judgment, may, as part of the disposition of the motion, give
directions for further steps in the proceeding -- e.g.,
timetabling the delivery of pleadings, affidavits of documents
and the conduct of discoveries. This sort of case management
occurs daily.

[48] The Rules specifically encourage judges hearing certain
motions, such as summary judgment motions, to give extensive
case-management directions in the event they conclude the
proceeding should proceed to trial: see the extensive "check
list" of directions contained in rule 20.05(2). It is
significant that rule 20.05(2) provides that a judge should
consider when disposing of a summary judgment motion directions
regarding how the trial should be conducted -- e.g., placing
time limits on the oral examination of a witness at trial;
requiring that the evidence of a witness be given in whole or
in part by affidavit; requiring expert witnesses to meet prior
to trial and to file a joint statement setting out areas of
agreement and disagreement; and delivering concise summaries of
their opening statements prior to the commencement of trial:
rules 20.05(2)(i), (j), (k) and (l).

[49] In the case of an application, a judge possesses the
broad power to "give such directions as are just" where the
judge directs a trial of the application or any issue: rule
38.10(1). Such directions could include how the trial of the
issue should be conducted.

[50] Second, judges conducting civil pre-trial conferences
are now asked to consider issuing case-management directions
for the remaining steps in the proceeding and for the conduct
of the trial: rule 50.07(1)(c).

[51] Third, it is a well-established practice in the Toronto
Region that counsel on certain types of cases may approach
directly judges known for their expertise in a subject-matter
area for assistance and directions in managing a case.
[page662]

[52] Fourth, parties may approach certain judges well known

2010 ONSC 2703 (CanLII)

for their mediation skills in an effort to effect a settlement
of the case.

[53] Fifth, periodically a judge will have a case cross his
or her radar screen, usually during a motion, where the judge
concludes that the case falls into the category of those that
have "fallen off the rails" and requires some litigation
management in order to fulfill the fundamental objectives of
the Rules. Judges will take on such cases in order to bring
some semblance of order and proportionality back to the
proceeding.

[54] Sixth, parties to a proceeding may request formally the
appointment of a judge to hear all motions in a proceeding,
usually one of some complexity where numerous motions are
contemplated: rule 37.15(1).

[55] Seventh, parties may make a formal request for Rule 77
case management.

[56] All seven types of judicial intervention are forms of
"case management" or "litigation management", in the sense
that a judge intervenes in the proceeding prior to trial in
order to give directions for the preparation of the case for
trial, for the actual conduct of the trial, or to attempt to
resolve the proceeding. As can be seen, case or litigation
management may arise in a variety of circumstances and will
require the application of a range of management tools in order
to secure the just, most expeditious, least expensive and
proportionate determination of the proceeding on its merits. As
is also evident, Rule 77 case management represents only one of
several different ways by which a judge can manage a
proceeding. Put differently, Rule 77 case management does not
exhaust the court's power to manage litigation before it; it
simply provides a further tool, in addition to the court's
inherent powers and other powers mentioned in the Rules, to
manage a case in an effective way.

VIII. The Powers of Judges on the Estates List to Manage
    Proceedings
    A. The Toronto Region Estates List

2010 ONSC 2703 (CanLII)

[57] For administrative convenience, the non-family civil
work undertaken by the Superior Court of Justice in the Toronto
Region has been broken down into different scheduling groups or
teams: the Commercial List; Long Trials; and Civil Motions/
Short Trials. The Estates List constitutes part of the Civil
Motions/Short Trials team. Judges rotate through these areas
periodically, and the cases in each group are managed under the
same scheduling umbrella. The Estates List is not a separate
court, but simply a shorthand designation for the judge who is
assigned each week to hear motions and applications involving
estate, trust and capacity law. [page663]

    B. The availability of "case management" on the Toronto
       Region Estates List

[58] Rule 77 establishes a mechanism by which parties can
request the appointment of a case management judge or master in
Toronto, Ottawa and Essex County. Rule 77.02(2) specifies that
"this Rule does not apply to" a variety of matters,
including proceedings on the Toronto Region Commercial List and
Estates List. Pointing to that section, Stephen Abrams
submitted that because Rule 77 case management does not apply
to matters on the Estates List, judges who hear matters on the
Estates List cannot intervene to manage cases. I see no merit
in Mr. Abrams' submission for several reasons.

[59] First, I see nothing in the language of rule 77.02(2)
that purports to strip judges hearing matters on the Estates or
Commercial Lists of the inherent powers to manage litigation
before them. Rule 77.02(2) simply states that Rule 77 case
management does not apply to the Commercial List or Estates
List. As I described above, Rule 77 case management constitutes
only one of several different means by which a court can manage
a proceeding. I see no conflict between rule 77.02(2) and the
inherent powers of judges sitting on the Estates List, or
Commercial List, to manage litigation in those fora.

[60] Second, Rule 77 has a long, and somewhat tortured,
history. Its early days were reviewed by MacDonald J. in Control
& Metering Ltd. v. Karpowicz [See Note 34 below] and Business
Depot Ltd. v. Genesis Media Inc. [See Note 35 below] Suffice it
to say that an initial effort to bring all civil proceedings in

2010 ONSC 2703 (CanLII)

Toronto under a highly structured and formalized
case-flow-management system collapsed under its own weight. The
lack of resources needed to support such an initiative resulted
in greater delays in cases, exactly the opposite of the intended
result. In the Toronto Region, Rule 77 was replaced in 2005 by
the "light touch" case-management pilot project set out in Rule
78, and the "case management if necessary, but not necessarily
case management" philosophy was carried over into the amended
Rule 77 that came into effect on January 1, 2010.

[61] Historically, cases on the Commercial List and Estates
List were not rolled into the various Rules 77 and 78 case-
flow-management initiatives in the Toronto Region, I suspect
largely because both Lists had developed their own distinctive
approaches to managing their proceedings. That approach has
[page664] continued under the new Rule 77, leaving it to the
Estates List and Commercial List to craft the litigation
management practices best suited to the needs of the
proceedings on those lists.

[62] Third, Rule 77 applies only to proceedings in Toronto,
Ottawa and Essex County. The exclusion of the other judicial
regions in Ontario does not mean that judges in those regions
lack the inherent powers to manage proceedings in their
jurisdictions in accordance with local practices and resources.
In fact, in the Hallman case, I specifically noted the evidence
in the record that a defined process for securing case
management exists in Kitchener-Waterloo. [See Note 36 below] I
have no doubt that similar litigation management practices
operate in other judicial regions in Ontario, notwithstanding
the language of Rule 77.

[63] I conclude that judges sitting on the Toronto Region
Estates List, like all other judges of the Ontario Superior
Court of Justice, possess and enjoy inherent powers to manage
litigation on their lists or, to use the more popular
expression, to "case manage" their proceedings.
IX. Application of These Principles to the Present Case
   A. Stephen Abrams' alternative complaints

[64] As an alternative argument, Stephen Abrams submitted

2010 ONSC 2703 (CanLII)

that even if judges on the Estates List possessed the power to
manage litigation in some general way, three features of the
directions contained in the March Endorsement went beyond the
proper litigation management powers of a judge: (i) requiring
interlocutory motions to be brought in writing; (ii)
stipulating that the evidence-in-chief of witnesses at the
trial be given by way of affidavit; and (iii) setting the
length of the trial.

    B. The inevitability of "judicial squeezing" in case
       management

  [65] It is apparent that Mr. Abrams has challenged my
jurisdiction to make such directions because they do not accord
with the way he wishes to litigate this proceeding. Judicial
management of high-conflict cases, such as this one, involves,
at times, a certain amount of "judicial squeezing" in order to
advance the case to a hearing in a timely and proportionate
manner. Not all parties take kindly to such squeezing. But, it
is worth recalling the comments made by Master Haberman in her
decision in Mother of God Church v. Bakolis, where one party
sought the recusal of a case management master with whose
directions it did not agree: [page665]

    It is understood that, in a case managed environment, there
  will be times when the master forms an impression about how
  one party or the other has been conducting itself as a result
  of this repeated exposure. If the view is unfavourable, that,
  in and of itself, does not give rise to a basis for recusal.
  One must still meet the test that has been articulated by the
  Supreme Court of Canada. Similarly, if the master's repeated
  dealings with the parties and the issues gives rise to a
  sense that there is more merit to one side than the other,
  that, too, will not suffice to prevent further handling of
  the case. That is precisely what case management was intended
  to do -- create an expeditious and cost effective way to
  resolve all aspects of the disputes that come before the
  courts, by allowing judges/masters to become familiar with
  the case through repeated exposure. [See Note 37 below]
In other words, some amount of judicial squeezing accompanies
litigation management. If some pinching occurs, that does not
signal a lack of jurisdiction or bias, but simply a necessary

2010 ONSC 2703 (CanLII)

degree of judicial hammering to bang a case back into proper
procedural shape. The recent adoption of the principle of
proportionality signals that the sound of the judicial hammer
will only get louder.

   C. The principle of proportionality

      C.1 Its origins as an express principle in rules of
         court practice

[66] Although the principle of proportionality as a guide to
the exercise of judicial discretion in controlling the process
of the court is not a new concept, it was only earlier this
year that the principle found express statement in rule
1.04(1.1) as a foundational principle of the Rules of Civil
Procedure: "In applying these rules, the court shall make
orders and give directions that are proportionate to the
importance and complexity of the issues, and to the amount
involved, in the proceeding." In Marcotte v. Longueuil (City),
Deschamps J., in her minority reasons, outlined the genesis of
the movement to include an express principle of proportionality
in local rules of practice [at paras. 69-71]:

  The acceptance of this principle and the increased
  significance attached to it originated in Lord Woolf's report
  on reform of the civil justice system of England and Wales:
  Access to Justice -- Final Report (1996). One of the
  recommendations in that report was that greater
  proportionality be ensured between the nature of the case and
  the procedure used.

  According to Lord Woolf, one thing that can be done to
  achieve justice is to deal with each case in a way that is
  proportionate to its importance, to the amount of money
  involved, to the complexity of the issues and to the parties'
  [page666] financial positions (Final Report, at p. 275).
  The English courts have stated that the main objective of the
  new rules of procedure is to control costs, which must, where
  possible, be proportionate to the amount of money at stake.
  To this end, the parties must adopt an appropriate strategy.
  . . .

  Proportionality has been advanced as a guiding principle

2010 ONSC 2703 (CanLII)

not only in Quebec, but also in other Canadian province and
territories. For example, the British Columbia Supreme Court
amended its rules of procedure in 2005 to formally
incorporate this principle: Rule 68 -- Expedited Litigation
Project Rule . . . In British Columbia, the principle of
proportionality plays a significant role in case management:
Totol Vision Enterprises Inc. v. 689720 B.C. Ltd., 2006 BCSC
639[.] [See Note 38 below]
(Citations omitted)

[67] The inclusion of an express principle of proportionality
in the Ontario Rules of Civil Procedure resulted from the
recommendations made by the Honourable Coulter A. Osborne,
Q.C., in his 2007 report on the Civil Justice Reform Project.
In that report, he stated that "proportionality, in the context
of civil litigation, simply reflects that the time and expense
devoted to a proceeding ought to be proportionate to what is at
stake". [See Note 39 below]

      C.2 The operational scope of the principle of
          proportionality

[68] In Marcotte v. Longueuil (City), the majority and
minority of the Supreme Court of Canada agreed that the
principle of proportionality found in art. 4.2 of the Quebec
Code of Civil Procedure, R.S.Q., c. C-25 ("CCP") [See Note 40
below] offered a tool for judges to use in managing civil cases.
As put by DesChamps J. in her minority reasons: "What is clear
from these different sources is that the purpose of art. 4.2 CCP
is to reinforce the authority of the judge as case manager. The
judge is asked to abandon the role of passive arbiter." [See
Note 41 below] However, the majority and minority differed about
the operational force of the principle of proportionality. The
majority rejected the suggestion that proportionality was simply
"a principle of interpretation that confers no real power on the
courts in respect of the conduct of civil proceedings in
[page667] Quebec". [See Note 42 below] Although technically
obiter, LeBel J. offered an expansive view of the powers to
manage a case which a judge could d raw from the principle of
proportionality [at para. 43]:

    The principle of proportionality set out in art. 4.2 C.C.P.

is not entirely new. To be considered proper, a proceeding
must be consistent with it (see Y.M. Morissette, "Gestion
d'instance, proportionnalit et preuve civile: tat provisoire
des questions" (2009), 50 C. de D. 381). Moreover, the
requirement of proportionality in the conduct of proceedings
reflects the nature of the civil justice system, which, while
frequently called on to settle private disputes, discharges
state functions and constitutes a public service. This
principle means that litigation must be consistent with the
principles of good faith and of balance between litigants and
must not result in an abuse of the public service provided by
the institutions of the civil justice system. There are of
course special rules for the most diverse aspects of civil
procedure. The application of these rules will often make it
possible to avoid having recourse to the principle of
proportionality. However, care must be taken no t to deny this
principle, from the outset, any value as a source of the
courts' power to intervene in case management. From this
perspective, the effect of the principle of proportionality is
to cast serious doubts on the appropriateness of bringing
class actions to achieve the purposes being pursued in the
appellants' proceedings. [See Note 43 below]

[69] DesChamps J., for the minority, advanced a more modest
role for the principle of proportionality. Emphasizing that
proportionality is a principle, not an independent standard,
DesChamps J. argued that proportionality operated as "a rule of
assessment that does not alter the conditions set out in the
CCP", so that a judge was to apply the principle in exercising
discretion when reviewing any conditions set out in the Quebec
Code of Civil Procedure. [See Note 44 below] In sum, "this case
management function does not mean that it would be open to a
judge to prevent a party from exercising a right. However, the
judge must uphold the principle of proportionality when
considering the conditions for exercising a right." [See Note 45
below]

[70] The debate in the Marcotte case about the operative
function of proportionality in civil litigation took place in
the realm of obiter. However, I have strong concerns that the
narrower view set out in the minority reasons could see the work

2010 ONSC 2703 (CanLII)

of the principle of proportionality frustrated before it even
had a chance to start. I think that Justice Colin Campbell of
this court accurately captured the dynamic and reach of the
introduction of [page668] an express principle of
proportionality into the Rules of Civil Procedure by describing
it as a step which signals a shift in the practice and culture
of civil litigation. [See Note 46 below] While the Rules of
Civil Procedure are not often compared to the Little Red Book of
Chairman Mao popularized during China's Great Proletarian
Cultural Revolution, I do not think it an exaggeration to
characterize the recognition of proportionality in our own
Little Blue (or White) Book as a "cultural revolution" in the
realm of civil litigation. Proportionality signal s that the old
ways of litigating must give way to new ways which better
achieve the general principle of securing the "just, most
expeditious and least expensive determination of every
proceeding on its merits". These new ways need be followed by
the bar which litigates and by the bench, both in its
adjudication of contested matters and in its management of
litigation up to the point of adjudication.

[71] Before dealing with each specific objection raised by
Mr. Abrams, let me repeat that he did not appeal the March
Endorsement. More importantly, as I pointed out in the March
Endorsement, the December 19, 2008 directions order of Strathy
J. [[2008] O.J. No. 5205 (S.C.J.)] made it obvious that he
expected the trial of this proceeding to be held in 2009. It
was not due to the fault of the parties. Having ignored the
"light touch" directions of Strathy J., the parties should
not be surprised that the next judicial intervention would
possess a proportionally greater bite than the first. Or, to
put it more colloquially, if parties turn their backs on a
first set of judicial management directions, they can expect
the court to turn up the heat on the second set. Such is one
manifestation of the principle of proportionality in operation.
Against this background, let me turn to the specific objections
raised by Stephen Adams to the directions that I gave in the
March Endorsement.

   D. Motions in writing

[72] As at February 24, the parties had indicated that they

2010 ONSC 2703 (CanLII)

wished to bring refusals motions, and Mr. Stephen Abrams advised that he also wanted to bring motions to strike portions of the pleadings or affidavits of opposite parties and to vary the order of Strathy J. regarding the scope of the disclosure of his mother's financial and medical records. At the April 8 hearing, Stephen Abrams indicated that he wanted to bring several [page669] additional motions -- the appointment of an independent guardian or attorney of property for Ida Abrams during litigation; an examination de bene esse of Philip Abrams; and a determination of whether letters of Drs. McIntyre and Nusinowitz qualify as expert reports. Each case management conference seems to spawn a list of new motions which Stephen Abrams wishes to bring.

[73] In para. 36(c)(v) of the March Endorsement, I directed that I would hear the refusals motions by way of writing. Stephen Abrams submitted that I lacked the jurisdiction to require the parties to argue their motions in writing. As he put it, on a motion a party has the "absolute right to present oral argument". He wants to set aside two days for oral argument of the refusals motions.

[74] I must confess that I am puzzled by Mr. Abrams' opposition to the use of the efficient and proportionate device of hearing a refusals motion by way of writing in a managed proceeding. I used that method last year to hear refusals motions in a managed proceeding without any objection from the parties; they recognized that it operates as an effective way to deal with motions when the parties desire to proceed expeditiously to a final hearing. [See Note 47 below]

[75] More to the point, when the parties were before me on a motion on November 9, 2009, I agreed to act as the case management judge for this proceeding. Indeed, my notes for that hearing record that it was counsel for Stephen Abrams who specifically asked that the proceeding be subject to case management. Over the course of three subsequent case management conferences, I gained an understanding of the issues for adjudication in this proceeding, as well as the outstanding steps requiring completion prior to a hearing. It was in that context that I formed the view that the most efficient and

2010 ONSC 2703 (CanLII)

proportionate manner in which to deal with the refusals motions
was by way of motions in writing, and I issued directions
accordingly in my March Endorsement.

[76] Rule 37.15(1.2), which came into force on January 1,
2010, makes it clear that where a judge manages litigation
pursuant to an appointment under rule 37.15(1) to hear all
motions, the judge "may, in respect of the motions, give such
directions and make such procedural orders as are necessary to
promote the most expeditious and least expensive determination
of the proceeding". Such directions can include requiring the
parties to bring motions by way of writing. In my view, a judge
who is [page670] managing litigation other than under Rule 77
also possesses the inherent power to require written motions in
appropriate circumstances. Case management, or litigation
management, does not form part of a judge's regular work
schedule, at least not in the Toronto Region; it is largely
done "before hours" or "after hours", so to speak. Accordingly,
a judge managing a proceeding reasonably can require parties to
submit motions in writing so that the judge can more readily
accommodate those motions in h is or her schedule. To insist
that a judge managing a proceeding must hear all motions in
open court could result in significant unnecessary delays in
managing litigation since a judge sitting on the civil team in
the Toronto Region only hears motions periodically during a
term. Written motions do not prejudice parties; a written
factum can function just as effectively and fairly as oral
submissions. Refusals motions especially lend themselves to a
written hearing. Of course, the complexity of some motions
might merit an oral hearing, but the mode of hearing for a
particular motion falls within the discretion of the judge
managing the proceeding, always keeping in mind the principle
of proportionality.

[77] Consequently, I see no merit in Stephen Abrams' argument
that as the judge whom he requested manage his application I
cannot issue directions requiring that certain motions be
brought in writing.

   E. Imposing directions regarding the trial: requiring
       evidence-in-chief to be given by way of affidavit and
       imposing time limits on the length of trial

2010 ONSC 2703 (CanLII)

[78] In para. 36(c)(iii) of the March Endorsement, I gave the
following directions regarding the trial of the issues ordered
by Strathy J.:

> The trial will be a hybrid one, primarily relying on filed
> affidavits for a witness' evidence-in-chief, with latitude to
> conduct up to 30 minutes additional examination-in-chief of
> each party witness. Cross-examinations of each party witness
> shall not exceed 3 hours in length, a more than adequate
> amount of time given the extensive cross-examinations already
> conducted.

[79] Stephen Abrams submitted that requiring the use of
affidavit evidence at trial ignored "the general principle that
evidence should be submitted orally in court", which "has been
a cornerstone of our legal system for more than 200 years".
With respect, that submission ignores how civil trials have
evolved in this province in recent years.

[80] For over a decade, many trials on the Commercial List
have used "sworn witness statements to replace examination in
chief, in whole or in part, in appropriate circumstances":
[page671] Commercial List Practice Direction, para. 50. The
April 2009 Practice Direction Concerning the Estates List of the
Superior Court of Justice in Toronto adopted the practice of the
Commercial List. [See Note 48 below] Trials using a hybrid
record of written evidence-in-chief and viva voce
cross-examination routinely occur in civil and family
proceedings in the Toronto Region.

[81] On January 2, 2010, the Rules of Civil Procedure finally
caught up with this long-standing practice. The Rules now
specifically provide that a judge who directs a trial on an
unsuccessful summary judgment motion, and any judge conducting
a civil pre-trial conference, may issue directions for the
conduct of the trial, including that (i) the evidence of a
witness at trial be given in whole or part by affidavit, (ii)
any oral examination of a witness at trial be subject to a time
limit and (iii) each party deliver a concise summary of its
opening statement: rules 20.05(2)(i), (j) and (l) and 50.07(1)

2010 ONSC 2703 (CanLII)

(c). By limiting the time for oral examination of witnesses at trial, a court can set the length of the trial.

[82] Rule 53.01 states that the general rule of using viva voce evidence at a trial applies "unless these rules provide otherwise". The Rules now "provide otherwise" in order to reflect the reality that if proportionality is to have any meaning as a guiding principle, pre-hearing judges must be able to exercise some control over the length and process for the trial of the proceeding. Of course, any pre-trial directions given regarding the conduct of a trial ultimately are subject to the discretion of the judge presiding at the trial.

[83] A judge engaged in case -- or litigation -- management also possesses the inherent powers to give directions regarding the mode of giving evidence-in-chief and the length of the oral examination of any witness at trial. Such powers are a necessary incident to the judge's ability to manage the case in a proportionate manner. That rules 20.05(2) and 50.07(1)(c) do not specifically refer to judges involved in managing litigation is neither here nor there. A judge managing a case could easily direct the holding of a formal pre-trial conference and thereby engage the powers granted by rule 50.07(1)(c). To require such formality is unnecessary; a case management judge can issue such directions, as an incident of his or her inherent powers, at an appropriate stage of the case or litigation management process.

[84] For these reasons, I conclude that I possessed the jurisdiction to issue the directions contained in para. 36(c) (iii) of the March Endorsement. [page672]
X. Conclusion

[85] By way of summary, on November 9, 2009, the applicant, Stephen Abrams, requested that this proceeding be subject to case management. When he did not like the case management directions that I issued on March 1, 2010, he subsequently argued that I lacked the jurisdiction to case manage the proceeding and issue those directions. I have explained above why I do not accept his arguments.

2010 ONSC 2703 (CanLII)

[86] At the conclusion of the case management hearing on April 8, 2010, counsel for Stephen Abrams raised, as he put it, the "A-Word". In a not-so-subtle fashion, counsel suggested that should I not accede to Mr. Abrams' request to reverse my March Endorsement, his client would appeal my order. As I stated at the start of these reasons, courts do not negotiate their jurisdiction.

[87] Stephen Abrams used the hearing on April 8, which was designed to finalize a plan for the remaining steps in this proceeding, to re-argue matters that I had already decided in my March Endorsement. I cannot manage this proceeding effectively while one of the parties -- the applicant who initiated the proceeding -- contests my jurisdiction to give directions when he is dissatisfied with an order I make. Accordingly, it makes no sense to me to issue final directions for the remaining steps in this proceeding until Stephen Abrams either appeals this decision or decides that he will comply with the parameters that I set for the trial of issues in my March Endorsement.

[88] As a result, I defer setting a final plan for this proceeding until the time for an appeal has expired. I direct the parties to appear before me, in open court, for a further case management conference on Wednesday, June 16, 2010 at 9:00 a.m. If an appeal of my March Endorsement or this order remains outstanding at that time, counsel should so notify my office no later than June 14, 2010, and the June 16 hearing will be postponed until any appeal has been dealt with. If an appeal is not taken from my March Endorsement or this order, then I expect counsel to appear before me on June 16 with an agreed upon "plan to adjudicate the ordered trial of issues" in accordance with the parameters I set down in para. 36(c) of the March Endorsement. Until such time, of course, no further step may be taken in this proceeding without my leave, or the leave of an appellate court.

Order accordingly.

Notes

2010 ONSC 2703 (CanLII)

----------------

Note 1: Abrams v. Abrams, [2010] O.J. No. 787, 2010 ONSC 1254.

Note 2: S.O. 1992, c. 30.

Note 3: (2009), 97 O.R. (3d) 544, [2009] O.J. No. 2693 (S.C.J.), at paras. 7-11.

Note 4: [2009] O.J. No. 4001, 2009 CanLII 51192 (S.C.J.).

Note 5: I.H. Jacob, "The Inherent Jurisdiction of the Court" (1970), 23 Curr. Legal Probs. 23 ("Jacob").

Note 6: Ibid., at 27.

Note 7: Ibid., at 27-28.

Note 8: Ibid., at 51.

Note 9: R. v. Rose (1998), 40 O.R. (3d) 576, [1998] 3 S.C.R. 262, [1998] S.C.J. No. 81, at para. 131; R. v. Papadopoulos, [2005] O.J. No. 1121, 196 O.A.C. 335 (C.A.).

Note 10: M.S. Dockray, "The Inherent Jurisdiction to Regulate Civil Proceedings" (1997), 113 Law Q. Rev. 120 at 126.

Note 11: [1964] A.C. 1254, [1964] 2 All E.R. 401 (H.L.), at p. 1301 A.C.

Note 12: Jacob, supra, at 32; Dockray, supra, at 122.

Note 13: (Toronto: Queen s Printer for Ontario, 2008) at 70 ("Lesage-Code Report").

Note 14: "The Duty to Manage a Criminal Trial" (Paper presented to the National Justice Institute, April 2009). Citations omitted.

Note 15: Jacob, supra, at 33.

Note 16: Park v. Lee (2009), 98 O.R. (3d) 520, [2009] O.J. No. 3746 (C.A.), at p. 521 O.R.

Note 17: As observed by the Supreme Court of Canada in Western Canadian Shopping Centres Inc. v. Dutton, [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63, at para. 34: "Absent comprehensive legislation, the courts must fill the void under their inherent power to settle the rules of practice and procedure as to disputes brought before them."

Note 18: D.S. Ferguson ed., Ontario Courtroom Procedure (Markham: LexisNexis Canada, 2008) at 21 ("Ontario Courtroom Procedure").

Note 19: R. v. Felderhof (2003), 68 O.R. (3d) 481, [2003] O.J. No. 4819 (C.A.), at para. 40.

Note 20: Ibid.

Note 21: R. v. Snow (2004), 73 O.R. (3d) 40, [2004] O.J. No. 4309 (C.A.), at para. 24.

Note 22: [2009] 3 S.C.R. 65, [2009] S.C.J. No. 43, 2009 SCC 43, at para. 67.

Note 23: Ontario Courtroom Procedure, at 31-32.

Note 24: R. v. Oliver, [2005] O.J. No. 596, 194 O.A.C. 284 (C.A.), at para. 29.

Note 25: R. v. Steel, [1995] A.J. No. 992, 174 A.R. 254 (C.A.), at para. 26, leave to appeal refused [1995] S.C.C.A. No. 533 (emphasis added).

Note 26: Lesage-Code Report, supra, at 71.

Note 27: Connelly v. D.P.P., supra.

Note 28: Courts of Justice Act, R.S.O. 1990, c. C.43, s. 11.

Note 29: Jacob, supra, at 24.

2010 ONSC 2703 (CanLII)

Note 30: (2000), 51 O.R. (3d) 496, [2000] O.J. No. 4552, 195 D.L.R. (4th) 680 (Div. Ct.), at pp. 700-701 D.L.R.

Note 31: Dockray, supra, at 128.

Note 32: R. v. Rose, supra, at para. 133; R. v. Keating, [1973] O.J. No. 224, 11 C.C.C. (2d) 133 (C.A.), at pp. 135-36 C.C.C.

Note 33: Baxter Student Housing Ltd. v. College Housing Co-operative Ltd., [1976] 2 S.C.R. 475, [1975] S.C.J. No. 84, at p. 480 S.C.R.

Note 34: (1994), 17 O.R. (3d) 431, [1994] O.J. No. 345 (Gen. Div.), at paras. 13-18.

Note 35: (2000), 48 O.R. (3d) 402, [2000] O.J. No. 1593 (S.C.J.), at paras. 25-27.

Note 36: Hallman Estate, supra, at para. 49.

Note 37: Mother of God Church v. Bakolis, [2005] O.J. No. 1638, [2005] O.T.C. 295 (S.C.J.), at para. 30 (emphasis added).

Note 38: Marcotte v. Longueuil (City), supra, at paras. 69-71.

Note 39: Civil Justice Reform Project: Summary of Findings & Recommendations (Ontario Ministry of the Attorney General, 2007) at 134.

Note 40: 4.2 CCP states: "In any proceeding, the parties must ensure that the proceedings they choose are proportionate, in terms of the costs and time required, to the nature and ultimate purpose of the action or application and to the complexity of the dispute; the same applies to proceedings authorized or ordered by the judge."

Note 41: Marcotte, supra, at para. 67.

Note 42: Ibid., at para. 42.

Note 43: Ibid., at para. 43 (emphasis added).

Note 44: Ibid., at paras. 72 and 74.

Note 45: Ibid., at para. 67.

Note 46: "Proportionality" in Civil Justice Reform in Action: The New Rule Amendments, CLE program held October 14, 2009 (Toronto: Law Society of Upper Canada, 2009) at 3.

Note 47: Beach v. Toronto Real Estate Board (May 31, 2009) Toronto, Doc. No. CV-08-366597 (Ont. S.C.J.).

Note 48: See para. 65.

----------------

# TAB 8

Westlaw.

Page 1

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

Air Canada, Re

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36 AS AMENDED

AND IN THE MATTER OF SECTION 191 OF THE CANADA BUSINESS CORPORATIONS ACT, R.S.C. 1985, c. C-44 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF AIR CANADA AND THOSE SUBSIDIARIES LISTED ON SCHEDULE "A"

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36 AS AMENDED

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: August 9, 2004
Judgment: August 9, 2004
Docket: 03-CL-004932

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: Sean Dunphy, Shana Ivall for Air Canada

Peter J. Osborne, Monique Jilesen for Monitor, Ernst & Young Inc.

Larry Steinberg for C.U.P.E.

Hugh O'Reilly for I.A.M.A.W.

Gregory Azeff for G.E.C.A.S.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

Howard A. Gorman for Ad Hoc Unsecured Creditors Committee

Lyle Kanee for CAW

Subject: Insolvency

Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues

Onus is on creditor to prove its claim — Contingent unliquidated claims are determined under Companies' Creditors Arrangement Act claims process even in most complicated of litigation and even though claim may not have been initiated in court or otherwise — If, instead of providing no evidence, creditor had provided acceptable expert report, even in simplified form, on job evaluation to support its pay equity claim, then insolvent company would have had to respond to that evidence — Claims process under Act does not require that such report be precise.

### Cases considered by *Farley J.*:

*Canadian Airlines Corp., Re* (2001), 2001 ABQB 146, 2001 CarswellAlta 240, [2001] 7 W.W.R. 383, 14 B.L.R. (3d) 258, 92 Alta. L.R. (3d) 140, 294 A.R. 253 (Alta. Q.B.) — referred to

*Olympia & York Developments Ltd., Re* (March 14, 1994), Doc. B125/92 (Ont. Gen. Div. [Commercial List]) — referred to

*Shelson, Re* (2004), *(sub nom. Shelson (Bankrupt), Re)* 184 O.A.C. 161, 236 D.L.R. (4th) 591, 2004 CarswellOnt 902 (Ont. C.A.) — referred to

## Statutes considered:

*Canadian Human Rights Act*, R.S.C. 1985, c. H-6

Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

APPEAL by creditor from disallowance of contingent claim in proceedings under *Companies' Creditors Arrangement Act*.

*Farley J.:*

1      CUPE appealed the decision of July 30, 2004, rendered by Geoffrey Morawetz as Claims Officer ("CO") with

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

respect to CUPE's pay equity claim. At the end of the hearing today I dismissed the appeal and promised written reasons. These are those written reasons.

2    At paragraphs 36 and 37 of his reasons, the CO stated:

(36) CUPE's pay equity claim is a contingent claim in that it has not been successful on its merits as of the date of the commencement of Air Canada's CCAA proceedings. The contingency in question is the resolution of the pay equity complaint process underway before the Tribunal (and possibly the courts via appeals of the Tribunal's decision). As with any contingent claim, there are two fundamental aspects to the determination of the claim; namely, (i) as assessment of the happening of the contingency in question; and (ii) the quantification of the claim. If CUPE successfully discharges its onus of establishing that there is some basis to presuppose the happening of the contingency, a reasonable value must then be established for the claim (and it is common in practice to discount the aggregate value of the claim in a "best case" scenario by some reasonable percentage that reflects the risk that a less optimistic scenario may in fact result). For the reasons that follow, I find that CUPE has failed to provide any evidence to substantiate the happening of the contingency in question and that the quantification of CUPE's contingent claim would in any event be negligible.

(37) There is, in these proceedings, a Claims Procedure Order of Farley J. dated September 18, 2003, as amended by Order of Farley J. dated July 9, 2004, which provides that all creditors (including CUPE with respect to its pay equity claim for the Relevant Period) must prove their claims in accordance with the procedures set out therein. In short, CUPE has to prove its claim now, and not at some future date, and the failure to do so results in CUPE being barred from asserting such a claim at a future date. If CUPE fails to adduce sufficient evidence to substantiate its contingent pay equity claim at the present time, it is not open to CUPE to assert that some weight ought to be given to the likelihood or possibility that it may, in the future, be able to adduce sufficient evidence so as to prove its claim in respect of the Relevant Period. That is to say, I cannot conclude that there is a 50% chance (or 40%, or 30%, etc.) that CUPE will be able to substantiate its claim in the future if it has not already done so in these proceedings and that some percentage of the value of its pay equity claim ought to be allowed at this time. CUPE cannot on the one hand admit that it has no evidence to substantiate its claim at the present time and on the other hand seek to have a claim admitted by the Monitor nonetheless on the basis that it might at some date find evidence to substantiate its claim. The merits of CUPE's contingent pay equity claim must be established in these proceedings.

He went on to observe at paragraph 39:

(39) To be clear, this is not a situation in which CUPE has a valid claim, the value of which is simply uncertain or difficult to compute; rather, I find that CUPE has not proved that it has any claim at all.

Further at paragraph 40, the CO stated:

(40) ... As noted by counsel to Air Canada, there are three pre-requisite elements of a human rights complaint, without which there is no claim: (i) difference in wages; (ii) within the same establishment; and (iii) the performance of work of equal value as between the groups in question. ... But, with respect to the third criterion, I agree

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

with Air Canada that there is no evidence before me to indicate that the work performed by Flight Attendants is of equal value to the work performed by the Comparative Groups, which is the very basis of CUPE's claim. It is entirely unclear that there is any principled basis of comparison between Flight Attendants and the Comparative Groups and, in any event, no evidence before me that the outcome of such comparison establishes that there is work of equal value being performed.

3      CUPE submitted that notwithstanding my views in *Olympia & York Developments Ltd., Re*, [1994] O.J. No. 1335 (Ont. Gen. Div. [Commercial List]), that I should follow the Alberta practice as set out by Paperny, J. in *Canadian Airlines Corp., Re*, [2001] A.J. No. 226 (Alta. Q.B.) of hearing this matter on a *de novo* basis as opposed to a true appeal. Even if I were to agree with that notwithstanding the difference in practice related to Alberta Masters, I would observe that on the basis of the record before me, I would have come up with the same conclusions as the CO save and except as to what I might describe as wholehearted acceptance of his views at paragraph 46 when he describes "the intuitive appeal of Air Canada's argument with respect to the manner in which wages are determined". It is clear from his reference later in that paragraph to "yet another reason" that this argument of Air Canada was not a determinative feature. Indeed it may well be that the CO merely intended paragraph 46 to be simply a point which could be characterized as a buttressing observation on a check of reasonableness, not that there is an obligation to do so to provide a foundation for a pay equity claim. Collective bargaining is a process of give and take. Secondly I would not be of the view that as per his observation in paragraph 47 that CUPE had an obligation to lead evidence as to:

(b) more importantly, that the wage gap cannot be explained, in full or in part, by factors other than system gender discrimination (such as consideration of the factors set out in section 11(2) of the CHRA).

While it would seem to me that CUPE was not under any positive obligation to provide such evidence (that seemingly being Air Canada's role if it wished to do so), again that observation by the CO is not in my view determinative of the wage gap question.

4      See also my views in *Re Air Canada (Corporate Travel Management CTM Inc.)* and *Re Air Canada (Always Travel Inc.)* matters released August 3 and 5, 2004 respectively relying on the Court of Appeal decision in *Shelson, Re*, [2004] O.J. No. 850 (Ont. C.A.) released March 9, 2004 at paragraph 20 relating to deference notwithstanding that a matter may be decided originally on a paper record.

5      The onus is on a claimant to prove its claim. As discussed in paragraph 38 of his reasons, the CO required that "CUPE must demonstrate that its claim is not too speculative or remote, but it need not establish that success is probable". He went on to say at paragraph 39:

(39) In the present case, I am satisfied for the reasons set out below that CUPE's claim has not been proven. The claim is remote and speculative as there is no evidence to substantiate that the claim has any merit. To be clear, this is not a situation in which CUPE has a valid claim, the value of which is simply uncertain or difficult to compute; rather, I find that CUPE has not proved that it has any claim at all.

It seems to me to be an unreasonable analysis of his reasoning that would allow CUPE to advance at paragraph 46 of its factum:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2004 CarswellOnt 3320, 2 C.B.R. (5th) 23

(46) To require scientific certainty is to set up inappropriate roadblocks to the goal of the CHRA, namely to remedy discrimination...

The fact of the matter is that CUPE provided <u>no evidence</u> as to the particular case involving Air Canada (and the "merged Canadian Airlines" question) as to the third criterion.

6       It is indeed troubling that a *Canadian Human Rights Act /* pay equity case could rattle around the Commission, the Tribunal and the courts for 14 years and for this Court to be advised that it is likely to take another decade before this matter can be adjudicated to the end under that legislation. However, that process is not the one which is required to be followed in the determination of a claim under the CCAA. Contingent unliquidated claims are determined under the CCAA claims process even in the most complicated of litigation and even though a claim may not have been actually initiated in a court or otherwise. I do not wish or intend to minimize the hurdles and hoops which may be involved in the payment equity litigation in the established "ordinary course", but I would observe that if CUPE had provided an acceptable expert report on job evaluation, even if in "simplified form" (as opposed to no evidence), then Air Canada would have had to respond to that evidence. Would that report have had to be precise (apparently to the degree envisaged by parties in pay equity disputes)? The simple answer to that is that is not necessary in a CCAA claims process.

7       The appeal is dismissed. While that claim as agreed between Air Canada and CUPE only deals with the monetary aspect of the claim up to September 30, 2004, I would trust that with respect to the process otherwise continuing, that with respect to the determination of this as with any other human rights issue (which the Supreme Court of Canada has determined should be regarded as a quasi-constitutional right) such determination can be accomplished <u>with cooperation</u> in very significantly less time than a further decade. The resolution of such an important question demands nothing less.

*Appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL
NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No.:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced at **Toronto**

**SUBMISSIONS OF NORTEL NETWORKS UK
PENSION TRUST LIMITED AND THE BOARD OF
THE PENSION PROTECTION FUND (the "UKPC") ON
THE TRIAL PROTOCOL**

**THORNTON GROUT FINNIGAN LLP**
Barristers and Solicitors
100 Wellington Street West
Suite 3200
Toronto, ON   M5K 1K7

**John L. Finnigan (LSUC# 24040L)**
**Rebecca Lewis (LSUC# 61146S)**
Tel:    (416) 304-1616
Fax:    (416) 304-1313

Lawyers for the Nortel Networks UK Pension Trust
Limited and the Board of the Pension Protection Fund