**<u>EXHIBIT A</u>**

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

# REPLY OF CANADIAN DEBTORS AND THE MONITOR TO THE EMEA
# DEBTORS AND THE UKPC

**Joint Trial Protocol**
**(Pre-Trial Conference to be held on January 29, 2014)**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Alan Mark LSUC#: 21772U
Jessica Kimmel LSUC#: 32312W
Peter Ruby  LSUC#: 38439P
Joseph Pasquariello  LSUC#: 37389C

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay LSUC#: 21152A
Jennifer Stam  LSUC#: 46735J

Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**REPLY OF CANADIAN DEBTORS AND THE MONITOR TO THE EMEA**
**DEBTORS AND THE UKPC**

**Joint Trial Protocol**
**(Pre-Trial Conference to be held on January 29, 2014)**

## I.    OVERVIEW

1.    The Monitor and the Canadian Debtors file this response to the Hughes Hubbard letter

dated January 24, 2014 (the "**HH Letter**") and the submissions of the UK Pension

Claimants dated January 23, 2014 (the "**UKPC Submissions**"). Capitalized terms used

herein and not otherwise defined have the meaning given to them in submissions of the

Canadian Debtors and Monitor dated January 24, 2014.

2.    The EMEA Debtors and the UKPC raise separate and distinct issues, namely: (a) the

sequencing of the litigation on Allocation and Claims; and (b) the proposed length of the

Trial.  The requested relief regarding sequencing presupposes that the arguments and

facts underlying Allocation and Claims can be separated, which they cannot, and ignores the fact that these issues already have been resolved by the Courts. Further, the certainty of the Courts' early rulings must be maintained as they are being relied upon in the discussions the parties have had and will have on time allocations and appearance of witnesses. The attempt to revisit those issues again now should be rejected.

3.      More specifically, the Monitor and the Canadian Debtors object to the relief sought in the HH Letter and the UKPC Submissions for the following reasons:

(a)      *Sequencing:*

(i)      The Courts have ordered that there is to be a single trial (the **"Trial"**) to address both Allocation and Claims in part due to the extensive overlap in the issues, arguments and evidence between Claims and the UKPC's and EMEA Debtors' position on Allocation;

(ii)      The Proposed Trial makes provision for the Allocation and Claims issues to be briefed and argued separately since the US Court is not being asked to decide Claims, while respecting the fundamental premise underlying the Orders for a single Trial, that evidence relevant to both Allocation and Claims should only be heard once by both Courts and witnesses testifying on matters pertaining to both should not have to testify more than once; and

(iii)      The Proposed Trial Protocol already recognizes that there may be discreet areas of expert evidence relating to Claims only and provides for that possibility. To the extent it turns out in the course of the pre-trial briefing

- 4 -

process that that there is some limited fact witness testimony that addresses Claims only, the parties can address the sequencing of that in the witness scheduling arrangements (if any such affected witnesses are asked to attend at Trial to be cross-examined).

(b)    *Length*:

    (i)    The length of the Trial has already been determined;

    (ii)    The decision of the Courts to direct a 20 day trial was made less than 3 months ago and with full knowledge that the trial time would have to accommodate both Allocation and Claims;

    (iii)    It cannot be said that the Courts were unaware of the complexities of the case or the nature of the issues that were to be determined at the time when the Courts ordered a 20-day trial;

    (iv)    Since November 19, 2013 — the date when the Courts determined the current timing and sequencing of the Trial — a significant development has been the settlement of the Claims against the US Debtors. Contrary to the assertions made by the EMEA Debtors and the UKPC, however, there are no efficiencies to be gained in the proposed relief. The EMEA Debtors and the UKPC (ironically) seek more time to litigate fewer claims. Their requests and arguments are illogical; and

    (v)    The arguments made by the UKPC regarding length ignores the fact that the Core Parties have, for the most part, agreed to prove their affirmative cases in writing. Trial time will be devoted almost exclusively to limited

cross-examination of selected witnesses whose deposition testimony will already be before the Courts and oral argument.

## II.    THE COURTS HAVE ORDERED A SINGLE TRIAL TO ADDRESS BOTH ALLOCATION AND CLAIMS

### (a)    The Allocation Protocol directed there to be a single Trial

4.    The issue of the scope of the Trial has been argued and decided by the Courts.  These issues were argued both initially at the motion to seek approval of the allocation protocol that was held on June 7, 2011 (the **"2011 Hearing"**) and a subsequent hearing on March 7, 2013 (the **"2013 Hearing"** and together with the 2011 Hearing, the **"Allocation Protocol Hearings"**).

5.    At both of the Allocation Protocol Hearings, it was the position of the Canadian Debtors and the Monitor (among others) that the issue of Allocation could not be separated from the issue of Claims.[1]  This position was opposed and fully argued at that time.[2]  The Courts rejected the opposing positions when it approved the Allocation Protocol based on the form presented at the 2011 Hearing.[3]

---

[1] See, for example, the Sixty-Seventh Report of the Monitor dated June 2, 2011 (the **"67th Report"**), paras. 35-41, Appendix A hereto (without appendices). At the time of the 2011 Hearing, the proposed Allocation Protocol did not expressly include the resolution of the UKPC Claims. It was, however, the position of the Monitor and Canadian Debtors that the UKPC Claims should also be included in the Allocation Protocol, which was ultimately accepted by the Courts.

[2] See, for example, Transcript from March 7, 2013 hearing, page 57 (submissions of Derek Adler) and page 102 (submissions of Brian O'Connor), excerpts attached as Appendix B hereto.

[3] Endorsement of Justice Morawetz dated March 8, 2013, para. 1, Appendix C hereto (the **"Endorsement"**).

6.     The Allocation Protocol originally submitted at the 2011 Hearing proposed, *inter alia*, that the Courts would "hold, simultaneously, (i) a joint hearing regarding the allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively."[4]   This position was adopted by this Court.[5]   Specifically, this Court directed that:

(a)     the "Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011 and is not to be based on the protocol presented during this argument on March 7, 2013.";[6]

(b)     "the trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. pension matters";[7]

(c)     *certain* aspects of the proposed terms of the Allocation Protocol were rejected, but not those provisions that required that Allocation and Claims be heard as part of one trial.[8]

---

[4] Reasons of this Court issued on March 8, 2013, para. 14 Appendix D hereto (the **"Reasons"**)

[5] The Allocation Protocol was subject to numerous appeals in the US and Canada, all of which have either been denied, withdrawn or otherwise exhausted at this point.

[6] Endorsement, para. 1

[7] Reasons, para. 44

[8] Reasons, para. 41-43

7.      It is clear from the foregoing that although certain aspects of the argument at Trial would happen sequentially, there would be a *single* trial to determine all issues – this was ordered on evidence submitted by, among others, the Monitor and the Canadian Debtors as to the extensive overlap underlying the factual and legal basis for the EMEA Debtors' allocation position and their Claims.  The Monitor and Canadian Debtors argued at the time that the same logic applied to the UKPC Claims.[9]

**(b)      Overlap between Allocation and Claims**

8.      Both the EMEA Debtors and the UKPC concede that evidence that applies to the Allocation and the Claims need not be submitted twice or that witnesses testifying where there is overlap need only appear once.  The point of disagreement appears to be related to the extent of the overlap that is anticipated at Trial.

9.      As exemplified below, it is apparent even just based on the pleadings and the Claims (as described in the proofs of claims and supplementary documents) themselves, that the overlap on evidence will be extensive.  By way of example, the overlap includes evidence relating to:

(a)      The relationship between NNUK, NNL and NNC, including the degree of control exerted by NNL and/or NNC over NNUK over a number of years;

(b)      The value of benefits received by NNC and/or NNL from NNUK from 2001-2009 (and vice versa);

(c)      Relative contributions to R&D;

---

[9] 67th Report, paras. 38-41.

(d)     The independence of NNUK and certain boards of directors;

(e)     The control and financing of NNL;

(f)     The implementation and operation of the transfer pricing structure;

(g)     Whether various transactions relating to Project Swift and intercompany loan balances are relevant to the determination of their overall contribution to R&D and whether these are to be reflected in Allocation; and

(h)     Whether the parties to the MRDA shared a common intention to establish a beneficial ownership or other interest in the IP through their respective funding contributions.

10.     The UKPC allocation position, which requires a full understanding of the Nortel matrix and the way that Nortel operated and substantially overlaps with the EMEA Debtors' claims position and the UKPC's own claims position.  Similarly, paragraph 21 of the UKPC Submission sets out eight (8) areas where it intends to submit evidence on its Claims.  The facts relating to subparagraph 21(d) through (h) of the UKPC Submission directly overlap with facts relating to the allegations in the EMEA Claims.

11.     Further, the EMEA Debtors' clearly acknowledge that the evidence to be adduced is common to the Allocation dispute and Claims. In its Allocation pleading, for example, the EMEA Debtors specifically cross-reference to the Proof of Claims in support of its allegations that various transaction should be considered in calculating contribution of the RPEs and allocating IP.  Certain paragraphs of the Proofs of Claim are incorporated by

reference in the Allocation pleading.[10]  The Canadian Debtors and Monitor have taken a

similar approach and have also cross-referenced to their joint response to the Claims filed

on behalf of the EMEA Debtors in their Allocation pleading.  This is further support that

the parties always believed the evidence overlapped between these issues and always

intended that both the evidence and argument on Claims and Allocation be heard

together.

12.    The Monitor and the Canadian Debtors do not deny that separate proofs of claims have

been filed pursuant to different claims process/resolution orders.  This is not a new

development. The UKPC is subject to the Claims Process Order of this Court dated July

30, 2009 (as amended) and the Claims Resolution Order of this Court dated September

16, 2010 while the EMEA Debtors are subject to the EMEA Claims Resolution Order

dated January 14, 2011.[11]  There are no provisions of any of these Orders prohibiting the

resolution of the EMEA Debtors and UKPC's Claims through a single trial process. Even

if there are certain procedural differences, it does not follow that they should be heard

differently from what is contemplated by the Allocation Protocol and all of the

subsequent Orders of the Courts since that time relating to the conduct of the Trial.

---

[10] "The facts of these transactions are set out in the Particulars of Claim to the Proofs of Debt filed against the US
Debtor on June 3, 2011, *and those facts (but not the claims) are incorporated by reference herein*, in respect of
NNUK at paragraphs 2 to 84, in respect of NNIR at paragraphs 2 to 71, and in respect of NNSA at paragraphs 2 to
84. The same facts are set out in the Proof of Debt filed against the Canadian Debtor on March, 18 2011, *and those
facts (but not the claims) are incorporated by reference herein*, in respect of NNUK at paragraphs 20 to 32; 61 to
85 and 106 to 161; in respect of NNSA at paragraphs 16 to70 and in respect of NNIR at paragraphs 21 to 36 and
paragraphs 60 to 114." [emphasis added].  Allocation position of the EMEA Debtors, footnote 26.

[11] The Claims of Nortel Networks AG and Nortel Networks AS are subject to the Intercompany Claims Procedure
Order dated July 27, 2012.

Indeed, the Court has specifically rejected the EMEA Debtors' position that procedural differences cannot be overcome.[12]

13.    It is not the Canadian Debtors' and Monitor's intention to waste the Courts' time and understand that Claims need only be adjudicated in the Canadian Court given the settlement of the Claims against the US Debtors. However, the original basis for requesting that Claims and Allocation be heard together was because the Claims were of such a nature that they could not be separated from Allocation given the nature of the allegations. This was acknowledged by the Courts when they approved the Allocation Protocol based on the form presented in the 2011 Hearing and the premise remains equally valid today.

14.    The Canadian Debtors and Monitor acknowledge that the Claimants each need to prove their own Claims and that there may be a limited amount of evidence that may only relate to Claims. Indeed, the current Proposed Trial Protocol takes all of this into consideration in that it provides for:

(a)    Claimants to file their own pre-trial briefs and evidence;

(b)    Claimants to make their own opening and closing statements, conduct their own cross-examinations and file their own closing briefs; and

(c)    experts who will provide evidence on Claims matters only will be examined separately from those who provide evidence on Allocation or a combination of Allocation and Claims.

---

[12] Reasons, para. 39.

15.    The Proposed Trial Protocol is faithful to the direction of the Courts contained in the
Allocation Protocol that the trial is to commence with the Allocation issues and continue
with Claims. Allocation and Claims will have separate sequential openings and closings
and any Claims-only evidence can be sequenced to follow Allocation-only or overlapping
witnesses. It makes no sense, however, for the Claims portion of the case not to be
briefed before the start of the evidence as most of the evidence will come from witnesses
who will speak to both and those witnesses will be cross-examined on both.

16.    It has also always been understood that each Court will need to come to separate
decisions on Claims from Allocation. However, the Monitor and the Canadian Debtors
object to the proposal that there be a pre-emptive determination now that the
examinations can or should be bifurcated from the Allocation when today the overlap
issue subsists and the "claims only" evidence that they seek to separate out remain purely
hypothetical. Unless and until there is a known witness with "claims only" evidence
there is nothing further to even consider separating. If and when that situation arises
there is a means of the Core Parties' addressing it.

## III.    THE LENGTH OF THE TRIAL

17.    On November 19, 2013, the Courts expressly directed that the Trial will start on May 12,
2014 and last for no more than 20 days and this is reflected in the Amendment Orders.[13]
The invitation to the parties in their meet and confer on "Trial Logistics" to discuss the
proposed length of the trial cannot reasonably be read as an indication that the possibility

---

[13] Endorsement of this Court dated November 22, 2013, para. 1 and Order of this Court dated November 19, 2013,
Schedule A, para. 1, Appendix E hereto.

of having a longer trial was still afoot. Notwithstanding that the decision has been made, the EMEA Debtors and UKPC seek to re-open this issue and ask that additional time be allowed to hear matters relating to Claims only.

18.     The decision of the Courts was made less than three (3) months ago at a time when not less than two (2) motions and several further motions and appearances have been held before the Courts to address matters relating to the Allocation Protocol, the scheduling of the Trial and the complexities of the case.  At that time, the Courts were aware of the issues relating to this Trial from the numerous appearances in the last ten (10) months. Among other things, it was clear that millions of documents had been produced and there were likely to be over 100 fact witness depositions.[14]  It simply cannot be said that the Courts were unaware of the issues to be determined at Trial at the time this decision was made.[15]

19.     The Canadian Debtors and the Monitor submit that there is no justification for this request.  The only thing that has changed since the decision of the Courts to set the length of the Trial on November 19, 2013 is that the EMEA Debtors and the UKPC have settled their Claims with the US Debtors. As discussed above, it cannot be that *more* Trial time is required to litigate *fewer* Claims. The arguments of the EMEA Debtors and the UKPC in this regard must be rejected.

---

[14] Ninety-Eighth Report of the Monitor dated October 22, 2013, para. 112 and One-Hundredth Report of the Monitor dated November 14, 2013, both previously filed.

[15] The complaint of the UKPC that their counsel was not present when the decision was made by the Courts is both not compelling and inaccurate. US counsel was present and made submissions at the November 19 hearing and it is also irrelevant to the fact that the decision was made and the Amendment Orders were subsequently settled and signed. There can be no serious suggestion that the Orders were made ex parte.

20.    In articulating their concerns as to the length of the Trial, the UKPC ignores the fact that the Core parties have, for the most part, agreed to prove their affirmative cases in writing. Unlike many trials where there is potential for lengthy direct examination, the Core Parties' case in chief will be led entirely in writing. Parties will file the deposition excerpts of the fact witnesses they rely upon, exhibits will be filed and admitted into evidence in advance of testimony and  all trial witnesses will submit affidavits in advance. All affidavits will come from individuals who were previously deposed during the fact witness deposition process such that, at Trial, most of the examination will be in the form of cross-examination by the other Core Parties who have already examined those witnesses and are free to file deposition excerpts with the result that cross-examination at trial will be efficient and achievable in the time provided.   This is specifically noted in the Proposed Trial Protocol in footnotes 12 and 14.[16]

21.    The UKPC argue that the until the identity and number of anticipated fact and expert witnesses appearing at trial and the expected amount of time it will take to examine them have been agreed on, it is not possible to decide on the appropriate length of the Trial (for both Allocation and Claims). They make number of assumptions that lead them to conclude that at least an additional two weeks of trial time may be required to "make their affirmative case" (without mention of the defence of that case).  It follows that what the UKPC is actually requesting is a much longer period of time once the full litigation (affirmative and defence cases) are factored in which will at least double Trial time.

_____

[16] Footnote 12 of the Proposed Trial Protocol states: "The rights of the Core Parties to examine and cross-examine are subject to the usual rules governing cross examination with respect to parties who are not adverse in interest, and are to be exercised in light of the expectation that direct evidence is to be disclosed in pre-filed affidavits." Footnote 14 is substantially the same.

22.     The Monitor and Canadian Debtors' position on the length of Trial is that the opposite is true. At some point, litigants have to accept the amount of time allocated by the courts and plan accordingly. In this case, that time has come and gone. In order to have meaningful discussions on limits on things like affidavit length and the number of witnesses appearing at Trial, the Core Parties must move forward on the basis of the amount of Trial time already ordered. These basic parameters must be established first so that the parties can then work within those parameters to establish things like limits on the number of witnesses appearing at Trial, the time allocations to the Groups and to Claimants and limits on openings and closings.

23.     Further, the UKPC fails to recognize that this Trial is taking place within multiple insolvency proceedings, that due process can be served within whatever parameters are dictated by the Courts and none of the cases cited by the UKPC are trials of the adjudication of claims taking place in the bankruptcy context.

## IV.     CONCLUSION

24.     It is crucial that there be immediate certainty as to the length of the Trial and that it is to address Allocation and Claims, all as already ordered and decided by the Courts. There are still many procedural matters pertaining to the conduct of the Trial that remain to be determined including, notably, all matters relating to the Groups and Claimants time allocations at Trial.

25.     If the Courts do extend more Trial time, it should be available for both Allocation and Claims. As the 20 days of Trial time originally ordered were available for both Allocation and Claims, so should any additional time now ordered be available.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED this 28th day of January, 2014.**


**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Alan Mark LSUC#: 21772U
Jessica Kimmel LSUC#: 32312W
Peter Ruby LSUC#: 38439P
Joseph Pasquariello LSUC#: 37389C


Tel:  416.979.2211
Fax:  416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc.


**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#: 21152A
Jennifer Stam  LSUC#: 46735J


Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

# TAB A

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF
COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION**

**SIXTY-SEVENTH REPORT OF THE MONITOR
DATED JUNE 2, 2011**

**INTRODUCTION**

1.  On January 14, 2009 (the "Filing Date"), Nortel Networks Corporation ("NNC" and
    collectively with all its subsidiaries "Nortel" or the "Company"), Nortel Networks
    Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel
    Networks International Corporation and Nortel Networks Global Corporation
    ("NNGC") (collectively the "Canadian Debtors") filed for and obtained protection
    under the *Companies' Creditors Arrangement Act* ("CCAA").  Pursuant to the Order
    of this Honourable Court dated January 14, 2009, as amended and restated (the
    "Initial Order"), Ernst & Young Inc. ("EYI") was appointed as the Monitor of the
    Canadian Debtors (the "Monitor") in the CCAA proceedings.   The stay of
    proceedings was extended to June 30, 2011 by this Honourable Court in its Order
    dated February 25, 2011.

2.  Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates concurrently filed
    voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code (the "Code") in
    the United States Bankruptcy Court for the District of Delaware (the "U.S. Court")
    on January 14, 2009 (the "Chapter 11 Proceedings").  As required by U.S. law, an

NNC-NNL11755877

\lo

- 2 -

official committee of unsecured creditors (the "Committee") was established in January, 2009.

3.     An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital Corporation has been organized and is participating in these proceedings as well as the Chapter 11 Proceedings (the "Bondholder Group"). In addition, pursuant to Orders of this Honourable Court dated May 27, 2009, July 22, 2009, and July 30, 2009, respectively, representative counsel were appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries. Each of these groups is participating in the CCAA proceedings.

4.     Nortel Networks (CALA) Inc. ("NN CALA" and together with NNI and certain of its affiliates that filed on January 14, 2009, the "U.S. Debtors") filed a voluntary petition under Chapter 11 of the Code in the U.S. Court on July 14, 2009.

5.     Nortel Networks UK Limited ("NNUK") and certain of its subsidiaries and affiliates located in EMEA (collectively the "EMEA Debtors") were granted administration orders (the "U.K. Administration Orders") by the High Court of England and Wales on January 14, 2009 (the "U.K. Proceedings"). The U.K. Administration Orders appointed Alan Bloom, Stephen Harris, Alan Hudson and Chris Hill of Ernst & Young LLP as administrators of the various EMEA Debtors, except for Nortel Networks (Ireland) Limited ("NNIreland"), to which David Hughes (Ernst & Young LLP Ireland) and Alan Bloom were appointed (collectively the "Joint Administrators").

6.     Subsequent to the filing date, Nortel Networks SA commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France pursuant to which a liquidator and an administrator have been appointed by the Versailles Commercial Court.

- 3 -

7.   Both the CCAA proceedings, in respect of the Canadian Debtors, and the English Proceedings, in respect of the EMEA Debtors, have been recognized by the U.S. Court as foreign main proceedings under Chapter 15 of the Code.

8.   Subsequent to the Filing Date, certain other Nortel subsidiaries have filed for creditor protection in the local jurisdictions in which they are located.

**PURPOSE**

9.   The purpose of this Sixty-Seventh Report of the Monitor ("Sixty-Seventh Report") is to report to this Honourable Court on the proposed Allocation Protocol and to provide the Monitor's recommendation in respect thereof.

**TERMS OF REFERENCE**

10.   In preparing this Sixty-Seventh Report, EYI has relied upon unaudited financial information, the Company's books and records, financial information prepared by the Company and discussions with the management of Nortel. EYI has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information and accordingly, EYI expresses no opinion or other form of assurance on the information contained in this Sixty-Seventh Report.

11.   Unless otherwise stated, all monetary amounts contained herein are expressed in United States dollars.

12.   Capitalized terms not defined in this Sixty-Seventh Report are as defined in the Affidavit of John Doolittle sworn on January 14, 2009, the Pre-Filing Report or previous Reports of the Monitor.

13.   The Monitor has made various materials relating to the CCAA proceedings available on its website at www.ey.com/ca/nortel. The Monitor's website also contains a dynamic link to Epiq Bankruptcy LLC's website where materials relating to the Chapter 11 Proceedings are posted.

NNC-NNL11755877_00003

- 4 -

**BACKGROUND**

*Allocation and the IFSA*

14.    As this Honourable Court well knows, over the course of the past two years, the
Canadian Debtors, along with the U.S. Debtors, the EMEA Debtors and certain other
Nortel entities, have divested themselves of Nortel's various global operating
businesses. The necessity of having various Nortel entities as "sellers" under those
transactions resulted from the fact that the businesses divested were not operated
through a dedicated legal entity, but rather on a worldwide basis across various
Nortel legal entities. Amongst other things, the Canadian Debtors held (or hold)
legal title to the intellectual property which underpinned Nortel's global businesses,
which intellectual property was and is licensed to its affiliates, in some cases on an
exclusive basis and in other cases on a non-exclusive basis.

15.    The first significant divestiture to be discussed among each of the three main estates
was the sale of Nortel's Enterprise business. At the time of initially discussing and
negotiating that sale in the late spring and early summer of 2009, it became evident
to the representatives of the various estates and certain of their stakeholders that it
would be difficult to agree on the allocation of sale proceeds amongst the various
selling parties prior to entering into a sale transaction. Accordingly, to address this
problem, and, in particular, the possibility that disagreements over allocation would
hinder the various sales processes under way to the detriment of all Nortel entities
and their respective stakeholders, the Canadian Debtors, the U.S. Debtors and the
EMEA Debtors agreed that the proceeds of any "global" sale would be deposited
into escrow pending agreement as to allocation.

16.    This agreement was documented in the Interim Funding and Settlement Agreement
among the Canadian Debtors, certain of the U.S. Debtors and the EMEA Debtors
dated June 29, 2009 (the "IFSA"), which agreement also dealt with the funding of
various costs incurred by the Canadian Debtors for the benefit of the worldwide
Nortel group that is not relevant to the present motion. A copy of the IFSA is
attached as Appendix "A" hereto. The IFSA was approved by this Honourable Court

NNC-NNL11755877_00004

- 5 -

in an Order dated June 29, 2009, a copy of which is attached as Appendix "B" hereto. The IFSA was approved by the U.S. Court on the same date.

17.    In addition to the parties' agreement that the net proceeds of any global sale were to be deposited into an escrow account, that the execution of sale documentation by a party would not be conditioned upon reaching agreement on, or establishing a binding procedure for, the allocation of sale proceeds, and that the U.S. Debtors and the EMEA Debtors would agreed to relinquish their license rights under the Master R&D Agreement in furtherance of a sale[1], the IFSA provides that:

> In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.[2]

18.    With respect to the "Protocol" referenced above, the parties agreed as follows:

> ...the Debtors shall, as soon as reasonably practicable following the execution of this Agreement, ***negotiate in good faith and attempt to reach agreement on a timely basis*** on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions (the "Interim Sales Protocol"), which Protocol shall provide binding procedures for the allocation of Sales Proceeds where the Selling Debtors in such Sale Transaction have been unable to reach agreement regarding such allocation.[3] **[emphasis added]**

19.    Over the course of the past two years, the Canadian Debtors, the U.S. Debtors and EMEA Debtors have entered into and consummated seven significant global

---

[1] IFSA, s. 11 and s. 12.

[2] IFSA, s. 12. b.

[3] IFSA, s. 12. c.

NNC-NNL11755877_00005

transactions[4] with an aggregate value of approximately \$3 billion under the framework established by the IFSA, and have entered into a stalking horse agreement to sell Nortel's patent portfolio and related assets to an affiliate of Google Inc. for \$900 million. In connection with each of those transactions, and as will be the case with the patent portfolio transaction, the relevant selling parties, the Monitor, the Committee and JPMorgan Chase Bank, N.A., as distribution agent, have entered into a distribution escrow agreement that governs the escrow and distribution of the relevant sale proceeds. A copy of the distribution escrow agreement related to the CDMA/LTE Access transaction dated November 11, 2009, is attached as Appendix "C" hereto (the "CDMA/LTE Distribution Escrow Agreement").[5] Each of the distribution escrow agreements has been approved by this Honourable Court. A copy of the Order approving the CDMA/LTE Distribution Escrow Agreement is attached as Appendix "D" hereto.

20.    The distribution escrow agreements reflect the terms of the IFSA in that sale proceeds may only be distributed as follows:

> 5.    Distribution of Escrow Funds. The Depositors, the Estate Fiduciaries and the Escrow Agent hereby agree that, until the termination of the escrow established pursuant to this Agreement, the Escrow Agent shall hold the Escrow Funds and not disburse any amounts from the Escrow Account except in accordance with the following terms and conditions:
>
> (a)    The Escrow Agent shall disburse to any person amounts from the Escrow Funds if and as so instructed pursuant to (i) a letter of direction jointly executed by the Depositors and the Estate Fiduciaries, a copy of which shall be provided by the Depositors to the Bondholder Group or

---

[4] These transactions are: the CDMA/LTE Access transaction with Telefonaktiebolaget LM Ericsson (publ) ("Ericsson"), the Enterprise transaction with Avaya Inc., the Next Generation Packet Core transaction with Hitachi Ltd., the MEN transaction with Ciena Corporation, the GSM/GSM-R transaction with Ericsson and Kapsch CarrierCom AG, the CVAS transaction with GENBAND US LLC and the MSS (Passport) transaction with Ericsson. Certain of the Canadian Debtors and the U.S. Debtors, and in one case the EMEA Debtors, have completed a number of smaller transactions, the proceeds of which are subject to similar escrow arrangements.

[5] The distribution escrow agreements for each of the other significant global sale transactions are substantially the same and contain substantially similar provisions relating to the release of escrowed sale proceeds and jurisdiction as those found in the CDMA/LTE Distribution Escrow Agreement.

- 7 -

(ii) where the Depositors have entered into the Allocation Protocol in accordance with clause 12 of the IFSA (the existence of the Allocation Protocol and the identity of the relevant dispute resolver(s) shall be set forth in a written notice jointly executed by the Depositors and delivered to the Escrow Agent), any Depositor's delivery to the Escrow Agent, with copies to the other Depositors, the Estate Fiduciaries and the Bondholder Group, of a duly authenticated copy of the binding decision made by the relevant dispute resolver(s) under that protocol regarding the allocation of sales proceeds (a "Decision") which is not stayed or subject to appeal, accompanied by a certificate from such Depositor certifying as to the finality of the Decision.[6]

21.    Further, each of the distribution escrow agreements contains a jurisdiction clause substantially similar to the following:

...EACH PARTY HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY TO THE EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE RULES OF [...] THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE AND THE ONTARIO SUPERIOR COURT OF JUSTICE, IF BROUGHT PRIOR TO THE ENTRY OF A FINAL DECREE CLOSING THE BANKRUPTCY CASES INVOLVING THE RELEVANT DEPOSITORS PENDING BEFORE SUCH COURTS, INCLUDING THE AMENDED CROSS-BORDER PROTOCOL APPROVED BY THE U.S. BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE ON JUNE 29, 2009, AND BY THE ONTARIO SUPERIOR COURT OF JUSTICE ON JUNE 29, 2009[...], WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER

---

[6] CDMA/LTE Distribution Escrow Agreement, s. 5. Each of the Approval and Vesting Orders granted by this Honorable Court in connection with the global sale transactions contain provisions which are consistent with the terms of the IFSA and the distribution escrow agreements in that it is ordered that the net sale proceeds will be paid into escrow and such sale proceeds shall not be distributed in advance of either agreement of the relevant parties or determination by a dispute resolver under a Protocol. See, for instance, Approval and Vesting Order (Enterprise Solutions Business) dated September 16, 2009, at para. 5, a copy of which is attached as Appendix "E" hereto.

- 8 -

OR OUT OF IN RESPECT OF OR IN CONNECTION
WITH THIS AGREEMENT.[7]

22. The IFSA contains the following consent to jurisdiction clause:

> To the fullest extent permitted by applicable law, each Party
> (i) agrees to submit to the non-exclusive jurisdiction of the US
> and Canadian Courts (in a joint hearing conducted under the
> Cross-Border Protocol adopted by such Court, as it may be in
> effect from time to time), for purposes of all legal proceedings
> to the extent relating to the matters agreed in this Agreement
> (but not, for the avoidance of doubt, any Transfer Pricing
> Agreement matter generally), (ii) agrees that any claim action
> or proceeding by such Party seeking any relief whatsoever to
> the extent relating to the matters agreed in this Agreement
> must be commenced in the US Court if such claim, action or
> proceeding would solely affect the US Debtors, the Canadian
> Court if such claim, action or proceeding would solely affect
> the Canadian Debtors, a joint hearing of both the Canadian
> and US Courts conducted under the Cross-Border Protocol if
> such claim, action or proceeding would affect the Canadian
> Debtors and the US Debtors or the EMEA Debtors and the
> English courts if such claim, action or proceeding would
> solely affect the EMEA Debtors...[8]

23. Contemporaneously with the presentation of the IFSA for Court approval, an
amended Cross-Border Protocol was presented for approval by the Canadian Debtors
and the U.S. Debtors (and approved by both Courts) which provided that:

> "...to the extent any motion is filed or relief is sought
> (collectively, "Requested Relief") in either [the U.S. or
> Canadian] Court relating to...any motion to allocate sale
> proceeds which are in the aggregate more than U.S. $30
> million and where at least one U.S. Debtor and one Canadian
> Debtor are parties to the related sale agreement or that
> involves assets owned by at least one U.S. Debtor and one
> Canadian Debtor...", [9]

---

[7] CDMA/LTE Distribution Escrow Agreement, s. 21.

[8] IFSA, s. 16 b.

[9] Cross-Border Protocol, s. 15. See the Supplemental Fifteenth Report of the Monitor dated June 26, 2009, a
copy of which is attached as Appendix "F" hereto.

NNC-NNL11755877_00008

- 9 -

then certain parties could, among other things, request a joint hearing.

*Protocol Negotiations*

24.  Subsequent to the execution of the IFSA, the Canadian Debtors, the Monitor, the U.S. Debtors, the EMEA Debtors and certain of their respective stakeholders commenced negotiations on a Protocol. These negotiations took place, off and on, over the course of a year, from the summer of 2009 to the early summer of 2010. During those twelve months, the parties, including the Monitor, exchanged multiple drafts, held numerous conference calls and met in person three (3) times in an attempt to resolve Protocol-related issues.

25.  After approximately a year of negotiations on a Protocol, it was evident there were a number of key issues that could not be agreed upon by the parties, the details of which are addressed in the Affidavit of Michael Joseph Lang sworn June 1, 2011 (the "Lang Affidavit"). Among these issues were the significantly differing views of the Canadian Debtors and the EMEA Debtors as to the proper scope of the dispute the parties would submit to one or more dispute resolvers for determination pursuant to a Protocol. As a result of these issues, no Protocol has been agreed to.

26.  The disagreement as regards the scope of a Protocol is based largely on the EMEA Debtors' contention that they should be able to assert claims of alleged wrongful conduct on the part of the Canadian Debtors in the allocation context. The EMEA Debtors have advanced the position that these claims would, among other things, give rise to proprietary claims to, or "beneficial ownership" of, the Canadian Debtors' share of the escrowed proceeds of sale. The claims are prefaced on substantially the same allegations that underlie the majority of the claims made against the Canadian Debtors in the proofs of claim (the "EMEA Claims") that have been delivered on behalf of the EMEA Debtors pursuant to the EMEA Claims Procedure Order made by this Honourable Court dated January 14, 2011.[10]

---

[10] For a description of the EMEA Claims, see the Sixty-Fifth Report of the Monitor dated April 28, 2011, a copy of which is attached as Appendix "G" hereto, in particular paragraphs 38 to 47 thereof.

NNC-NNL11755877_00009

- 10 -

27.   The Monitor is of the view that agreeing to permit the EMEA Debtors to advance these claims as part of the allocation process would be tantamount to permitting the exclusive jurisdiction of this Honourable Court to resolve claims against the Canadian Debtors to be usurped insofar as such claims, in essence, assert the same causes of action as are contained in the EMEA Claims. Moreover, agreeing to allow the EMEA Debtors to raise claims in the context of the allocation dispute would also unfairly give the EMEA Debtors "two kicks at the can" in that they would have the ability to, in effect, prove their claims twice: first, in the allocation process and then in the EMEA Claims process established by this Court. The views of the Monitor in this regard are consistent with the finding of this Honourable Court that the allocation of sale proceeds is distinct from the resolution of the claims filed by the EMEA Debtors against the Canadian Debtors.[11]

28.   As a result of this fundamental difference of opinion regarding the proper scope of a Protocol and the other issues identified in the Lang Affidavit, it is clear to the Monitor (and has been clear for some time) that the parties are at an impasse and that no agreement will ever be reached on a Protocol despite the good faith efforts of the Canadian Debtors and other parties to do so.

*Mediation and Documentary Discovery*

29.   The parties, nearly a year ago, agreed to focus on a consensual resolution of the global issues among them (i.e. both allocation and claims) and subsequently submitted to extensive non-binding mediation sessions over the course of eight days in November 2010 and April 2011 before retired U.S. Judge Layne Phillips. In connection with those mediation sessions, the parties disclosed an aggregate of approximately 43,000 documents in their possession through an electronic database accessible by each of the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and certain of their stakeholders. In the case of the Canadian Debtors, this process involved the review and posting of approximately 16,000 documents in their

---

[11] Endorsement of the Honourable Mr. Justice Morawetz dated February 17, 2011, at paragraph 19. A copy is attached as Appendix "H" hereto.

NNC-NNL11755877_00010

- 11 -

possession regarding Nortel's transfer pricing system and other matters relevant to the disputes among the parties. Notwithstanding the significant good faith efforts of all parties, these mediation sessions ended in failure.

30.    As a result of the parties' inability to reach a consensual global resolution and the impasse outlined above as regards a negotiated Protocol, the time has now come to implement a definitive procedure for the resolution of the allocation dispute. As discussed below, the proposed Allocation Protocol (as defined below) contemplates that the resolution of the allocation dispute will be conducted in parallel with, and in a manner complementary to, the resolution of the two other most significant issues in these CCAA proceedings: the EMEA Claims and the claims (the "U.K. Pension Claims") advanced by the Nortel Networks UK Pension Trust Limited (the trustee of the Nortel Networks UK Pension Plan) (the "U.K. Pension Trustee") and the Board of the UK Pension Protection Fund (the "PPF") against the Canadian Debtors.

## THE PROPOSED ALLOCATION PROTOCOL

31.    The Canadian Debtors seek approval of the allocation protocol attached as Schedule "A" to the draft Order included in the Canadian Debtors' Motion Record returnable June 7, 2011 (the "Allocation Protocol"). The U.S. Debtors and the Committee are also seeking approval of the Allocation Protocol by the U.S. Court. These motions will be heard by way of a joint hearing on June 7, 2011.

32.    The fundamental terms of the Allocation Protocol[12] are as follows:

    (a)    This Honourable Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the sale proceeds of the global sales amongst the various Nortel parties;

    (b)    Creditor claims, including but not limited to intercompany claims by and between any Nortel entities, their representatives or successors ("Intercompany Claims"), are not governed by the Allocation Protocol. All Intercompany Claims, with the exception of Intercompany Claims between

---

[12] The following is intended as a summary only. Reference should be made directly to the form of Allocation Protocol proposed for a complete understanding of the terms thereof.

- 12 -

the U.S. Debtors and the Canadian Debtors[13], shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any Intercompany Claims is made;

(c)     Each of the relevant Nortel selling entities (including the Canadian Debtors, the U.S. Debtors and the EMEA Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be established as "core parties" in the Allocation Protocol hearings, with full rights of participation in such hearings and any related discovery. Any other party in interest could seek to establish itself as a core party;

(d)     Certain intercompany claims have been made by the EMEA Debtors and/or the Joint Administrators against (A) the U.S. Debtors (the "EMEA U.S. Claims") and (B) the Canadian Debtors. The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA U.S. Claims. The Canadian Debtors may file motions with this Honourable Court to dismiss the EMEA Claims; and

(e)     This Honourable Court and the U.S. Court will (a) hold simultaneously (i) the Allocation Protocol hearings, (ii) hearings before the U.S. Court on the merits of any remaining claims of the EMEA Debtors advanced against the U.S. Debtors (the "EMEA US Claims"), and (iii) hearings before this Honourable Court on the merits of any remaining EMEA Claims against the Canadian Debtors, provided, however, that the U.S. Court and this Honourable Court, in their discretion, may sit separately for portions of such hearings to hear evidence or argument that is relevant to only EMEA US Claims or EMEA Claims against the Canadian Debtors; and (b) issue their respective decisions on (i), (ii) and (iii).

33.     The Monitor is of the view that the Allocation Protocol is appropriate for the following reasons.

34.     First and foremost, as discussed above, despite the parties' efforts to negotiate in good faith and attempt to reach agreement on a timely basis on a Protocol, there is clearly an impasse regarding the negotiation of a Protocol. In the absence of being able to agree on a Protocol, pursuant to the terms of the IFSA and the various escrow agreements, the sale proceeds may only be released upon the written direction (i.e.

---

[13] No process has been established for Intercompany Claims between the U.S. Debtors and the Canadian Debtors. Such Intercompany Claims and any process for calling for same are also subject to the terms of the Final Canadian Funding and Settlement Agreement dated December 23, 2009, as well as the Cross-Border Protocol and Cross-Border Claims Protocol approved in these CCAA Proceedings.

agreement) of the relevant Nortel sellers, the Monitor and the Committee, which agreement, as demonstrated by the failure of the mediation process, does not appear to be possible presently. The appropriate authorities to determine the rights and entitlement of the various Nortel parties to the global sale proceeds are this Honourable Court and the U.S. Court, as the two supervising Courts. Further, all of the parties at interest have submitted to the jurisdiction of these two Courts through both the IFSA and each of the various distribution escrow agreements entered into in connection with the escrow of the global sale proceeds.

35.     Second, as has been noted on numerous occasions, significant factual elements (e.g. Nortel's transfer pricing regime) are relevant to both the allocation dispute and the EMEA Debtors' claims against the Canadian Debtors. As such, from an efficiency standpoint, and having particular regard to the significant litigation costs that will be incurred in connection with these processes as well as further delays that would be occasioned by separate proceedings, it makes sense for the same authority to consider both the allocation dispute and the EMEA Claims rather than conducting two wholly distinct processes that, in large part, will cover much of the same factual territory on the same evidence. As noted above, as the EMEA Claims can only be resolved in the context of the claims process established by this Honourable Court, that authority must be this Honourable Court (together with the U.S. Court in the context of the allocation dispute).

36.     Third, in the event that different authorities were to resolve the allocation dispute and the EMEA Claims, there is significant risk of inconsistent decisions. Different authorities for the resolution of allocation and the EMEA Claims also creates the possibility that another authority, in the context of the allocation dispute, would determine the facts that underlie the allegations of wrongful conduct made by the EMEA Debtors against the Canadian Debtors, thereby potentially usurping the jurisdiction of this Honourable Court to hear and determine the EMEA Claims. Finally, in such a scenario, the EMEA Debtors could also seek to take "two kicks at the can", providing them with two opportunities to establish and receive value for the same alleged wrongdoings and thereby subjecting the Canadian Debtors to a

- 14 -

form of double jeopardy. Significant prejudice would flow to the Canadian Debtors and their stakeholders in these circumstances. Having this Honourable Court consider both the allocation dispute (in conjunction with the U.S. Court) and the EMEA Claims minimizes these possibilities and provides for one joint authority to finally resolve all of the outstanding issues among the parties.

37.     For the reasons outlined in paragraphs 35 and 36, the Monitor is of the view that the EMEA Claims should be resolved in conjunction with the resolution of the allocation dispute. Accordingly, as noted in paragraph 32, above, the Allocation Protocol anticipates that the claims of the EMEA Debtors against the Canadian Debtors and the U.S. Debtors will be heard simultaneously with the Allocation Protocol hearings.

38.     Although not expressly contemplated by the Allocation Protocol, the Monitor is also of the view that the claims advanced by the U.K. Pension Trustee and the PPF (whom the Monitor understands to be the majority creditors of NNUK and, potentially, certain of the other EMEA Debtors) against the Canadian Debtors must be resolved in a manner similar to the EMEA Claims. As outlined in the Sixty-Fifth Report, these claims are both significant and, importantly, cover much of the same factual territory as the EMEA Claims.[14] Similar to the situation with the EMEA Claims as outlined above, a failure to resolve these claims in conjunction with the allocation dispute, or a failure to consider them without regard to the allocation dispute and/or the EMEA Claims, would expose the Canadian Debtors to the possibility of the same alleged wrongdoings being asserted, and extracting value from the Canadian Debtors' estates, in three separate ways. In addition, the concerns outlined above with respect to the EMEA Claims regarding efficiency, preservation of scarce resources and risk of inconsistent decisions apply equally to the U.K. Pension Claims.

---

[14] See, in particular, paragraphs 19 to 34 of the Sixty-Fifth Report. The U.K. Pension Claims related to the Funding Guarantee and the Swift Guarantee (each as defined in the Sixty-Fifth Report) total approximately CAD$1.6 billion. The U.K. Pension Claims also seek to hold NNC and NNL jointly and severally liable for the estimated U.K. pension plan deficiency of approximately CAD$3.7 billion.

29

- 15 -

39.   The Allocation Protocol recognizes the need for this Honourable Court and the U.S. Court to establish procedures for the allocation hearings, including documentary and oral discovery. The Canadian Debtors and the Monitor do not seek to establish these procedures now, but do expect to return before this Honourable Court and the U.S. Court in the near future to make submissions in connection with discovery and process issues for the Allocation Protocol hearings, as well as for the EMEA Claims and the U.K. Pension Claims (as discussed below at paragraph 41).

40.   In light of the considerable discovery already undertaken by the parties in connection with the mediation as outlined above at paragraph 29 and the fact that these are insolvency proceedings, the Allocation Protocol does contemplate that discovery and the allocation hearings will proceed in an expeditious manner. The Monitor is of the view that an expeditious resolution of these matters is essential given that no significant progress towards a plan or distributions to creditors can be made in the absence of their resolution.

41.   In light of the interplay between the proposed Allocation Protocol, the EMEA Claims and the U.K. Pension Claims, and in furtherance of this Honourable Court's direction to the Canadian Debtors and the Monitor, the Monitor has commenced discussions with Canadian counsel to the Joint Administrators and the U.K. Pension Trustee and the PPF regarding, among other things, procedures for resolution of the EMEA Claims and the U.K. Pension Claims, including proposing a timeline for the resolution of same. Attached hereto at Appendix "I" are copies of the relevant correspondence, including a copy of the proposed timetable the Monitor has presented to the parties at interest. The Monitor expects to meet with these parties, along with counsel to the Canadian Debtors and counsel to the Canadian Debtors' directors and officers, in the coming days and is hopeful that the parties will have made considerable progress on agreeing to procedures and a timetable in advance of the June 7 hearing.

NNC-NNL11755877_00015

## MONITOR'S RECOMMENDATIONS

42.   With the exception of the IP transaction, the auction for which will commence on June 20, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related assets transaction – now sit in escrow awaiting the resolution of allocation.

43.   This issue, together with the resolution of the EMEA Claims and the U.K. Pension Claims, lays at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and the U.K. Proceedings. Simply put, they are matters that must be resolved before any creditor of an Applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

44.   It is evident that the parties are presently unable to resolve these issues on a consensual basis and it therefore falls within the ambit of this Honourable Court to resolve the issues in the insolvency proceeding before it.

45.   To this end, this Honourable Court has already approved of the Canadian Debtors' request to establish a claims process for EMEA Claims.[15] This process complemented the general claims process established by this Honourable Court in September 2009, and, in conjunction with the Canadian Debtors, the Monitor and certain of their stakeholders continued efforts towards establishing a compensation claims process, have provided the Canadian Debtors and the Monitor with a sense of the totality of claims against the Canadian Debtors and processes for resolving them.

---

[15] The U.S. Debtors have recently commenced a similar process.

NNC-NNL11755877_00016

- 17 -

46. The time has come to establish a procedure for the resolution of the other key variable: the portion of the global sale proceeds that will be available to the Canadian Debtors to satisfy the claims of their creditors.

47. As a result of the EMEA Debtors and their creditors comingling allocation theories with their claims against the Canadian Debtors, it is clear that resolving the allocation of proceeds must be and should be coordinated with the procedure for resolving the EMEA Claims and the U.K. Pension Claims. In particular, such claims must be resolved in conjunction with the allocation dispute so as to protect the integrity of the CCAA claims process form being ousted, and to protect from the abuses of multiple proceedings in multiple fora, including the risk of inconsistent verdicts, doubling (or tripling) up of claims, and the additional cost and delay inherent in multiple proceedings.

48. For the reasons outlined herein, the Monitor respectfully recommends that this Honourable Court approve the Allocation Protocol.

All of which is respectfully submitted this 2nd day of June, 2011.

**ERNST & YOUNG INC.**
in its capacity as Monitor of the Canadian Debtors
and not in its personal capacity

Per:

Murray A. McDonald

President

\5970962

# TAB B

32

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                          )     Case No. 09-10138(KG)
                                )     (Jointly Administered)
NORTEL NETWORKS, INC.,          )
     et al.,                    )     Chapter 11
                                )
                                )     Courtroom 3
                                )     824 Market Street
            Debtors.            )     Wilmington, Delaware
                                )
                                )     March 7, 2013
                                )     10:00 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDGE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:
For Debtors:              Morris Nichols Arsht & Tunnell, LLP
                          BY: DEREK ABBOTT, ESQ.
                          BY: ANN CORDO, ESQ.
                          1201 North Market St., 18th Floor
                          Wilmington, DE  19899-1347
                          (302) 351-9357

                          Cleary Gottlieb Steen & Hamilton
                          BY: LISA SCHWEITZER, ESQ.
                          BY: HOWARD ZELBO, ESQ.
                          BY: JAMES BROMLEY, ESQ.
                          One Liberty Plaza
                          New York, NY  10006
                          (212) 225-2000


ECRO:                     GINGER MACE

Transcription Service:    DIAZ DATA SERVICES, LLC
                          331 Schuylkill Street
                          Harrisburg, Pennsylvania 17110
                          (717) 233-6664
                          www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service

—

1  put before you by the U.S. debtor.

2         THE COURT:  The amended Protocol, I think.

3         MR. ADLER:  The amended one.

4         THE COURT:  Yes.

5         MR. ADLER:  I'm sorry.  Yes, the new one.

6         THE COURT:  Right.

7         MR. ADLER:  That's -- which is -- you know, I'm not

8  sure what they're supporting or where we are on that, but it

9  seems to be that there's diversions that wasn't present before

10 we started this.  Now, I'm going to start by pointing out the

11 elephant in the room.  The procedure that the U.S. debtor is

12 arguing for here is to intentionally engineer two simultaneous

13 parallel proceedings addressing the same subject matter,

14 producing two separate judgments which may or may not be

15 aligned which will be subject to parallel appeals with no way

16 to reconcile any inconsistencies and no guarantee of an

17 enforceable outcome anytime soon.  We've seen no precedent for

18 intentionally creating parallel proceedings like this.

19 Normally in our jurisprudence, when parallel proceedings

20 arise, that's considered something to avoid.

21        THE COURT:  Yes.

22        MR. ADLER:  A Court like Your Honor, if there are

23 two Courts that are seized of decisions about the same subject

24 matter, Your Honor would consider enjoining the foreign

25 proceeding or staying your own proceeding until the foreign

                    * *denotes audio break*.

1  proceeding is concluded and, at worst, what you wind up with
2  is a race to judgment where two people -- the two parties go,
3  you see who gets there first and who wins when they try to
4  enforce the judgment.  Here, they're trying to do this on
5  purpose.  It's not what anyone agreed to.  It's not what makes
6  sense.  I would suggest that if anybody did agree to it, it's
7  a breach of public policy.  It's a violation of public policy
8  to intentionally engineer a situation where two Courts are
9  seized of the same subject matter going on through separate
10 parallel appeals and it's the elephant in the room and no one
11 has provided a solution to this.  No one has explained why
12 that is speedy or efficient to have two parallel judgments
13 that will go through their separate appeal processes and just
14 hoping that the decisions will be the same in the first
15 instance.  Now, the -- a lot of mud, I think, has been slung
16 at the EMEA debtors.  I don't think that's at all fair.  We
17 are all here with the same interests.  We all want to make
18 distributions to our respective creditors as soon as possible.
19 Delay doesn't benefit us or anyone.  The way to resolve
20 allocation and be able to pay claims soon is through
21 arbitration.  It's binding, unlike the prior dispute
22 resolution process, the mediation which was non-binding.  This
23 is binding.  Mr. Zelbo suggested that arbitrators would have
24 difficulty dealing with the issues presented to them or would
25 have difficulty managing the parties.  The arbitrators would

* *denotes audio break.*

35

102

1  arbitration presents the only sensible and efficient way to

2  resolve this dispute.

3          Second, Your Honor, with respect to the timing of

4  how the allocation dispute gets resolved vis-a-vis the UK

5  Pension Claimants' claims.  You'll remember, Your Honor,

6  that when the U.S. Debtors moved to enforce the automatic

7  stay, one of the principal arguments that they relied on was

8  the fact that the proceedings in the UK were going to be

9  duplicative of the allocation proceeding.  And, in fact,

10  they told Your Honor at the time, that it made sense not to

11  go forward with the claims, the UK claims, because it would

12  make more sense to see how the pot allocated among all of

13  the debtors to determine whether or not it was reasonable

14  under the UK Statute to require any of the U.S. Debtors to

15  provide financial support for the pension plan.

16          Of course now, they're taking the opposite

17  approach.  Now they're saying it makes sense to have the

18  claims decided first.  And I think under the law, having one

19  -- that being one of the bases that they use to have Your

20  Honor decide to stay those proceedings, that they shouldn't

21  be heard now, to change their tune and say that those

22  proceedings should be -- should occur first.

23          Finally, Your Honor, with respect to the

24  schedule.

25          THE COURT:  Yes.

                    * denotes audio break.

# TAB C

36

CITATION: Nortel Networks Corporation, 2013 ONSC 1470
COURT FILE NO.: 09-CL-7950
DATE: 2013/03/08

**SUPERIOR COURT OF JUSTICE – ONTARIO**
(COMMERCIAL LIST)

RE: · IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS COROPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE: MORAWETZ J.

COUNSEL: *Derrick Tay and Jennifer Stam*, for Nortel Neworks Corporation

*Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

*Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

*Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

*David Ward* for PPF/Trustee

*Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

*Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

*John Salmas* for Wilmington Trust, National Association

37

- 2 -

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**      March 7, 2013

**DECISION:**   March 8, 2013

## E N D O R S E M E N T

[1]      For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded. Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]      The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule. Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]      The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

38

- 3 -

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]     The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.

Morawetz, J.

**DATE:**        March 8, 2013

# TAB D

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 1757
COURT FILE NO.: 09-CL-7950
DATE: 20130403

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

           AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:    MORAWETZ J.

COUNSEL:   D. Tay and J. Stam, for Nortel Networks Corporation

           B. Zarnett, J. Carfagnini and F. Myers, for Ernst & Young Inc., the Monitor

           M. Zigler, K. Rosenberg, A. Jacques, B. Wadsworth and E. Marques, for the Canadian Creditors Committee

           M. P. Gottlieb, J. Renihan and R. B. Schwill, for Nortel Networks UK Limited (in Administration)

           D. Ward, for the UK Pension Trustees/PPF

           A. Hirsh, for the Former Directors and Officers of Nortel Networks Corporation and Nortel Networks Limited

           A. Gray and S. Bomhof, for Nortel Networks Inc. and other U.S. Debtors

           J. Salmas, for Wilmington Trust, National Association

           S. Seigel, for the Bank of New York Mellon

           R. Swan and G. Finlayson, for the Informal Committee of Noteholders

           S. Kukulowicz, R. Jacobs, and M. Wunder, for the Unsecured Creditors' Committee

           E. Lamek, for the Law Debenture Trust Company of New York

HEARD:     March 7, 2013

ENDORSED: March 8, 2013

REASONS:   April 3, 2013

- Page 2 -

## ENDORSEMENT

### Background

[1]     On June 7, 2011, Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol (the "Allocation Protocol") for the allocation of proceeds of the sale of their assets, the assets of Nortel Networks Inc. and certain of its U.S. affiliates including Nortel Networks (CALA) Inc. (collectively, the "U.S. Debtors"), and the assets of Nortel Networks U.K. Limited and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors").

[2]     An endorsement in respect of this motion was released on June 17, 2011 (the "June 17 Endorsement"). It is attached as Schedule "A", and is incorporated by reference into this endorsement.

[3]     A further endorsement was released on June 29, 2011 (the "June 29 Endorsement"). It is attached as Schedule "B", and is incorporated by reference into this endorsement. While the mediation referenced in the June 17 Endorsement and June 29 Endorsement took place, it failed to be worthwhile and was consequently terminated by declaration of the mediator.

[4]     A further endorsement was released on March 8, 2013 (the "March 8 Endorsement"). It is attached as Schedule "C", and is incorporated by reference into this endorsement. The March 8 Endorsement approved the Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011, with reasons to follow. These are the reasons.

[5]     The parties' inability to resolve their differences is unfortunate, as approximately $9 billion, raised from various asset sales and other realizations, awaits distribution to Nortel's global creditors, and the significant time lapse is exacerbating the negative effects of the previously identified public-interest issues (see the June 29 Endorsement). The only positive development for stakeholders since June 2011 was the sale of Nortel's patent portfolio for proceeds exceeding $4 billion (substantially surpassing the $900 million estimated amount).

[6]     The sad reality for all creditors is that four years have passed from when Nortel filed for *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA") protection.

### Interim Funding and Settlement Agreement

[7]     In June 2009, the Canadian Debtors, certain U.S. Debtors, and certain EMEA Debtors (collectively, the "Debtors") entered into an Interim Funding and Settlement Agreement ("IFSA"), which provided for cooperation in the global sale of Nortel's business units.

[8]     Under the IFSA, these parties agreed to "negotiate in good faith and attempt to reach agreement on a timely basis" on a protocol (the "Protocol") for resolving disputes concerning the allocation of sale proceeds ("Sale Proceeds") from sale transactions. Importantly, for the purpose of determining this motion, the parties agreed, to the "fullest extent permitted by applicable law", that any "claim, action or proceeding" seeking "any relief whatsoever to the extent relating to the matters agreed in [IFSA]" must be commenced in the U.S. Court and the Canadian Court, in a

- Page 3 -

joint hearing of both courts under the cross-border protocol ("Cross-Border Protocol"), if such claim, action or proceeding would affect the Canadian Debtors and the U.S. Debtors or the EMEA Debtors.

[9]    Since the parties entered into the IFSA, they concluded several sales of global Nortel businesses and, in connection with these sales, they entered into escrow agreements ("Escrow Agreements"). These Escrow Agreements provided for the deposit of Sale Proceeds into escrow and the conditional distribution of the proceeds.

[10]    Significantly, under each Escrow Agreement, the parties irrevocably and unconditionally submitted to the exclusive jurisdiction of the U.S. Court and the Canadian Court, and agreed to be bound by any judgment arising "under or out of in respect of or in connection with" the Escrow Agreements.

The Protocol/Allocation Protocol

[11]    Failing to come to an agreement on a Protocol, after one-year of talks, prompted a suspension of negotiation between the parties. The parties, according to the Canadian Debtors, specifically could not agree on the scope of the dispute to be determined under a Protocol and the dispute resolution process (for example, deciding whether the resolution should take the form of an arbitral award).

[12]    The parties subsequently attempted to reach a consensual resolution on these issues through mediation; however, mediation failed twice.

[13]    The U.S. Debtors and the Official Committee of Unsecured Creditors of the U.S. Debtors (the "Committee") subsequently filed this joint motion in the U.S. Court and the Canadian Court seeking orders approving the Allocation Protocol. The Canadian Debtors concurrently filed a motion seeking approval of the proposed Allocation Protocol, which they developed in conjunction with Ernst & Young Inc. (the "Monitor"), the U.S. Debtors, the Committee and others.

[14]    The Allocation Protocol proposed the following:

  (a) The Canadian Court and the U.S. Court would establish binding procedures, including discovery, for determining the allocation of the Sale Proceeds of the global sales to the Debtors' estates;

  (b) Creditor claims, including but not limited to intercompany claims, shall be determined in accordance with the claims reconciliation process established by the Nortel entity against which any intercompany claim is made;

  (c) The relevant Nortel selling entities (including the Debtors), the Committee, the Bondholder Group, the Monitor, the Joint Administrators (defined below) and the Ad Hoc Committee of Major Creditors Having Claims Only Against the Canadian Debtors would be "core parties" in the Allocation Protocol hearings, with full rights of participation. Any other party in interest could seek to establish itself as a core party;

- Page 4 -

(d) The U.S. Debtors intend to file promptly motions with the U.S. Court to dismiss the EMEA Debtors' claims against the U.S. Debtors ("EMEA U.S. Claims"). The Canadian Debtors may file motions with the Canadian Court to dismiss the EMEA Debtors' claims against the Canadian Debtors ("EMEA Canadian Claims"); and

(e) The Canadian and U.S. Courts will hold, simultaneously, (i) a joint hearing regarding allocation of global proceeds and (ii) a hearing into unresolved EMEA Canadian Claims and EMEA U.S. Claims, provided that the Courts, in their discretion, may sit separately to hear evidence or argument that is relevant to only the Canadian or U.S. Debtors, respectively. Each Court would then issue its respective decisions.

## Party Submissions

[15]   The parties disagree on the following fundamental issues: whether an agreement to arbitrate was reached (and, correspondingly, whether the Canadian Court and U.S. Court should compel arbitration), whether the Canadian Court and U.S. Court have jurisdiction to approve the Allocation Protocol, and whether the parties negotiated the Protocol in good faith.

### Submissions of the Canadian Debtors and the Monitor

[16]   The Monitor's submissions essentially corroborate, or expand on, the following submissions of the Canadian Debtors.

[17]   Because the parties were unable to successfully negotiate a Protocol, the Canadian Debtors requests that the Canadian Court exercise its discretionary power to determine allocation issues and accordingly order the parties to direct payments from the escrow funds. Pursuant to section 5 of the IFSA, Sale Proceeds of each significant global transaction may only be distributed if instructed jointly by the depositors and estate fiduciaries (very unlikely at this point) or where the parties have entered into a Protocol (as previously mentioned, the parties could not come to an agreement); however, the distribution agent is able to distribute the proceeds if there is an "any order, judgment or decree" made or entered by any court "affecting the property deposited under th[e] Agreement".

[18]   The Canadian Debtors argue that the court lacks requisite authority to compel the parties to arbitrate their disputes because there has been no agreement to arbitrate. The parties merely agreed, pursuant to section 12(c) of the IFSA, to "negotiate in good faith and <u>attempt</u> to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds from Sale Transactions". Further, section 12(b) of the IFSA does not constitute an agreement to arbitrate because it has none of the features typically found in an enforceable commercial arbitration agreement, does not provide any methodology for an arbitration and does not reference the word "arbitration". It reads as follows:

12(b) In no case shall there be any distribution from the Escrow Account in advance of either (i) agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors.

- Page 5 -

[19]    The Canadian Debtors further argue that the parties submitted irrevocably and unconditionally to the exclusive jurisdiction of the Canadian Court and U.S. Court. For example, under their many Escrow Agreements, the parties "irrevocably submit[ed] to and accept[ed] for itself and its properties, generally and unconditionally to the exclusive jurisdiction of ... the U.S. Bankruptcy Court for the District of Delaware and the Ontario Superior Court of Justice" and agreed to be bound by any judgment "arising under or out of in respect of or in connection with" the Escrow Agreements. In addition, the parties submitted all legal proceedings seeking "any relief whatsoever" to the extent "relating to" the matters agreed in the IFSA to the exclusive joint jurisdiction of the Canadian Court and U.S. Court, pursuant to section 16(b) of the IFSA, as follows:

> 16(b) To the fullest extent permitted by applicable law, each Party...(ii) agrees that any claim, action or proceeding by such Party seeking any relief whatsoever to the extent relating to the matters agreed in this Agreement must be commenced in ... a joint hearing of both the Canadian and US Courts conducted under the Cross-Border Protocol if such claim, action or proceeding would affect the Canadian Debtors and the US Debtors or the EMEA Debtors ...

[20]    Finally, the Canadian Debtors claim that there is nothing to substantiate allegations that any party acted in bad faith. An agreement to negotiate in good faith, and attempt to reach agreement on a Protocol, does not require any party to ultimately acquiesce to an agreement.

*Submissions of the Joint Administrators of Nortel Networks U.K. Limited*

[21]    The Joint Administrators of Nortel Networks U.K. Limited (the "Joint Administrators"), acting as the court-appointed administrators and authorized foreign representatives for the EMEA Debtors, makes four submissions for dismissing this motion.

[22]    First, section 12(b) of the IFSA (articulated above) constitutes an enforceable arbitration clause to arbitrate the allocation of Sale Proceeds because it is a written agreement evidencing the intention of the parties to submit to binding *ad hoc* arbitration. In exchange for the arbitration provision, which was designed to provide protection to each of the many worldwide Nortel entities by ensuring that they would have input into the Protocol and the appointment of the dispute resolvers, the parties agreed to give up significant rights in businesses and assets to enable the sale of Nortel's global assets to be completed without delay.

[23]    While the parties' agreement to arbitrate is clear on the face of the IFSA, any possible ambiguity is resolved by reviewing the negotiating history, surrounding circumstances, various courts understanding of how the allocation was to be determined, public statements and positions taken in negotiating a Protocol.

[24]    Second, neither the Canadian Court nor the U.S. Court has the jurisdiction to determine how the proceeds of the sale of the global Nortel assets and businesses should be divided among the estates of the various Nortel Debtors around the world. It is neither proper nor feasible for

- Page 6 -

courts of two independent nations to reach, in effect, a joint decision for the following three reasons:

- such a process violates the Cross-Border Protocol;

- the Ontario Court does not have jurisdiction to allocate Sale Proceeds that were outside the U.S. and Canada by entities outside the U.S. and Canada; and

- there are practical impediments to the Courts proceeding on the basis of a joint hearing regarding the Sale Proceeds allocation.

[25]    Third, and in the alternative, the Ontario Court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. The proper role of the courts in their supervisory function in relation to the U.S. Debtors and Canadian Debtors is to require that the parties appoint an arbitration panel possessing the power to set a procedure for such arbitration.

[26]    Fourth, the parties to the IFSA made an enforceable promise to negotiate a Protocol for the arbitration procedures in good faith; counsel submits that there has been a *bona fide* failure in those negotiations.

[27]    In the Joint Administrators' supplementary submissions, counsel highlights practical problems invariably arising from the U.S. Court and Canadian Court trying to jointly address the division of assets among approximately 40 international entities. Counsel submits that it is unlikely that both courts independently will identically allocate the assets, resulting in conflicting decisions and no process for determining how to move forward. Counsel also anticipates that the inevitable appeal process is not governed by a uniform set of procedural or legal rules. The result would not only be years of litigation but potentially also two incompatible judgments, neither of which would be enforceable.

<u>Analysis and Conclusion</u>

[28]    I will assess the merits of the arguments made by all parties on the fundamental issues of divergence, in turn, before rendering my determination.

*Agreement to Arbitrate*

[29]    A common theme permeating the Joint Administrators' arguments is that the parties agreed to arbitrate. As I disagree with this underlying premise, I find many of their arguments to be inherently flawed.

[30]    Simply put, the parties agreed to enter into negotiations to agree on a Protocol; the best position of the Joint Administrators is an agreement to agree, which is unenforceable. I do not find the IFSA, or any of the documents, to be ambiguous in this regard.

[31]    A detailed review of the wording used in the Joint Administrators' argument is telling. The parties struck an <u>agreement</u> embodied in the IFSA; the parties would give up their…ownership rights in the assets to be sold in return for an <u>agreement</u> that, failing an agreement by the parties, the allocation of the sale proceeds would be decided in an arbitral form

- Page 7 -

that did not prejudice any of the parties by forcing any one of them to submit to the jurisdiction of a foreign court.

[32]   It could very well be that, from their standpoint, the asset sales were predicated on the allocation being decided by way of arbitration. However, in the IFSA, I am unable to find that the parties actually entered into an agreement to arbitrate.

[33]   Contrary to the Joint Administrators view that section 12(b) of the IFSA constitutes an enforceable arbitration clause, a plain and common-sense reading of this section leads to the conclusion that, if the objective of the provision was to create a mechanism for the distribution from the escrow account, the parties failed to achieve such objective. More particularly, section 12(b)(i) has not been met as there has been no agreement of all of the selling debtors; section 12(b)(ii) is irrelevant or inapplicable as the parties have failed to reach agreement on the terms of a Protocol.

*Court's Jurisdiction*

[34]   Conforming to the views espoused by the Canadian Debtors and the Monitor, I am satisfied that this court has discretionary authority under the CCAA to approve the Allocation Protocol. Considering, and potentially approving, the Allocation Protocol is consistent with the CCAA objectives of promoting efficiency and fairness by avoiding a multiplicity of inconsistent proceedings: *Re Muscletech Research and Development Inc.* (2006), 19 C.B.R. (5th) 54 (Ont. S.C.J.). This court's authority extends to the subject matter and the persons at issue here and this court has the authority to make the order sought approving the Allocation Protocol.

[35]   It is my view that all parties have irrevocably and unconditionally submitted to the jurisdiction of the Canadian Court and the U.S. Court.  This is established as a result of the jurisdiction clause in each of the Escrow Agreements, the filing of claims by the EMEA Debtors and section 16 of the IFSA.  In this respect, I accept the arguments put forth by the Canadian Debtors.

[36]   No compelling argument accompanied the Joint Administrators' assertion that this court has jurisdiction to order the Canadian Debtors to submit to arbitration under a panel of arbitrators. While there may be a presumption in favour of international arbitration, it presupposes that the parties have agreed to arbitrate (which is not the case in the present circumstances).

[37]   The objective of these proceedings must be, at this time, to ensure that the outcome is something that will be final and binding on all parties.  This can be accomplished, in my view, by a joint hearing of the matter with the Canadian Court and the U.S. Court.

[38]   I acknowledge the procedural difficulties identified by the Joint Administrators in their supplemental submissions, and I do not underestimate the challenges that lie ahead. However, all parties embraced joint or parallel hearings of the U.S. Court and the Canadian Court to bring forth a number of matters, most notably applications for approval of sales process and for approval of sales. Further, despite the different procedures in the U.S. Court and the Canadian Court, both courts have worked effectively with the result that billions of dollars are now available for distribution to the stakeholders.  I maintain confidence that the U.S. Court and the

- Page 8 -

Canadian Court will ensure that matters going forward are similarly dealt with in a fair and equitable manner.

[39]    Raising potential procedural issues is not sufficient to dismiss the motion of the Canadian Debtors.  Challenges of procedure will be addressed during the proceedings in the same way as procedural issues are addressed in numerous other proceedings that are brought before the court.

*Good Faith*

[40]    With respect to the Protocol negotiations, there is no shortage of conflicting viewpoints. Nevertheless, there is an overall lack of evidence either on the record, or in the parties' oral submissions, demonstrating that any party failed to negotiate the Protocol in good faith. To the contrary, there is evidence that all parties made efforts to come to a mutually beneficial agreement; as pointed out by the Canadian Debtors, failure to come to such an agreement does not necessarily evidence a lack of good faith in negotiations.

*Order*

[41]    Amendments must be made to the Allocation Protocol before it is approved, as mentioned in the March 8 Endorsement. I have specifically rejected the suggestion that there should be specified restrictions on "core parties" in the Allocation Protocol hearing; rather, I determined that certain indenture trustees should also be "core parties", and I invited suggestions as to whether there would be other "potential core parties".

[42]    I note that the U.S. Debtors filed motions with the U.S. Court to dismiss EMEA U.S. Claims, and a decision with respect to this issue has been rendered by Chief Judge Kevin Gross. The U.S. Debtors put forward an amended version of the Allocation Protocol at the March 7, 2013 hearing.  Given that substantial argument was based on the Allocation Protocol as originally presented, it is not appropriate, in my view, to consider amendments that were brought forth at the hearing which was not intended to receive new positions but rather to provide a summary of the positions previously brought forward.  The appropriate version of the Allocation Protocol to consider is the one that was previously brought before the court on June 7, 2011.

[43]    In the result, I grant the Canadian Debtors' motion and approve an amended Allocation Protocol, which incorporates the aforementioned amendments while remaining substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011. The amended Allocation Protocol must be filed with this Court for approval by April 15, 2013.

[44]    By way of directions for scheduling, the trial for this matter is scheduled to commence on January 6, 2014. The trial will begin with the allocation issues and continue thereafter with remaining issues to be addressed in the Allocation Protocol, including EMEA Claims and U.K. Pension matters.

- Page 9 -

[45]    The cross-motion of the Joint Administrators, requesting an order compelling and directing the parties to the IFSA to engage in arbitration regarding all disputes concerning the allocation of Sale Proceeds, is dismissed.

Date:   April 3, 2013

MORAWETZ J.

48

**SCHEDULE "A"**

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 3805
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110617

**SUPERIOR COURT OF JUSTICE - ONTARIO**

RE:         IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL
NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,
NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:   MORAWETZ J.

COUNSEL:  Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks
Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured
Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

**HEARD:**     June 7, 2011

## ENDORSEMENT

[46]    On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of an allocation protocol (the "Allocation Protocol").

[47]    A similar motion was also brought at the same time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[48]    The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross.   This joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[49]    Both motions had the support of all parties appearing, save for the Joint Administrators of Nortel Networks (U.K.) Limited ("NNUK") and certain of its subsidiaries and affiliates located in the EMEA (collectively, the "EMEA Debtors").

[50]    Decisions in respect of both motions are currently under reserve.

[51]    On June 13, 2011, at the request of both Judge Gross and me, a case conference was conducted by telephone. It was reported to the participants that our respective decisions relating to the aforementioned motions would be under reserve for a considerable period of time.

[52]    Certain of the issues raised in the motions have been the subject of two mediation sessions.  These mediation sessions were not successful.  It is my understanding that, in addition to the allocation issue, issues of validity of quantification of certain claims and inter-company claims were discussed.

[53]    Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors.  The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

- Page 3 -

[54]    The parties entered into negotiations for approximately one year with respect to the terms of a Protocol. After a year of negotiations, the parties were still unable to agree on certain fundamental terms of the Protocol, including, for example, the scope of the issues to be determined under the Protocol.

[55]    As a result, according to the Canadian Debtors, the Protocol negotiations were suspended and the parties agreed to reach a consensual resolution through mediation. After the mediation was declared unsuccessful, the U.S. Debtors and the Canadian Debtors, developed the proposed Allocation Protocol.

[56]    The Allocation Protocol establishes procedures and an expedited schedule for the cross-border resolution by the U.S. Court and this Court of the allocation of the proceeds from the Sale Transactions pursuant to the IFSA.

[57]    The Allocation Protocol proposes that all hearings in respect of the Allocation Protocol proceed by way of joint hearings between the U.S. Court and this Court pursuant to the cross-border protocol.

[58]    The position of the EMEA Debtors is that issues arising out of the IFSA are to be determined by a dispute resolver, in this case, an arbitrator.

[59]    In my view, pending the release of a decision on the motion, the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. The parties have exhibited an ability to cooperate and have been extremely successful in realizing significant proceeds from the sale of Nortel assets globally. However, the creation of an asset pool is not ultimate resolution of Nortel matters. These proceedings can only be concluded with a distribution of proceeds to the various creditors of Nortel globally. These proceedings were commenced on January 14, 2009. Creditors have been waiting nearly two and one-half years for a meaningful distribution. A mediation will require that the parties continue a dialogue. It is possible that tangible, positive results will flow from such mediation.

[60]    In order to assist the parties with their deliberations, I am directing that the parties engage in mediation pending my ruling. I understand that Judge Gross will be issuing a similar direction in the Chapter 11 Proceedings.

[61]    I recognize that the parties may have difficulty in reaching a consensus on a mediator. In the case conference on June 13, 2011, we asked that the parties consult with each other and provide the name of an acceptable mediator. No individual has been identified. It, therefore, falls to both Judge Gross and to me to appoint a mediator.

[62]    The mandate of the mediator is to address issues raised in the motion. It is recognized that the boundary of this mandate is not clearly defined. It seems to me that defining a precise boundary, in these circumstances, may be better left to the mediator, as it may not be possible to address the issues affecting allocation without taking into consideration issues relating to the validity and quantification of claims.

- Page 4 -

[63]    The mediator shall have the right to file periodic reports with the court detailing progress, or lack thereof, recognizing that the sessions are on a without prejudice basis.

[64]    It is my understanding that, at the mediation sessions, there were a large number of parties that participated.  While I do not take issue with the right of any party to participate in the mediation, I did observe that at the hearing of the within motion, the primary submissions were made by the Canadian Debtors, the EMEA Debtors and the Monitor.  It was also my observation that the primary submissions of parties in the Chapter 11 Proceedings were likewise concentrated among a relatively small group of counsel.  The mediation will, in all likelihood, be more effective if the number of participants is significantly reduced from the number that attended the previous sessions.  It is hoped that the parties will be able to work out the details respecting participation of the mediation.

[65]    The identity of the mediator will be provided by way of Supplementary Endorsement early next week.  The mediator shall have the ability to retain advisors and counsel as he or she deems appropriate in the circumstances and to have the expenses of such advisors and counsel paid out of the assets of Nortel.

[66]    In addition, consistent with the conclusion of the U.S. Court, the mediator is to have expanded authority, if the parties agree, to conduct a mediation/arbitration or an arbitration in respect of this matter.

[67]    To the extent that further directions are required in respect of this directed mediation, the parties can contact the Commercial List Office in order to set up a case conference.

"Morawetz J."

_____

MORAWETZ J.

**Date:**  June 17, 2011

**SCHEDULE "B"**

**CITATION:** Nortel Networks Corporation (Re), 2011 ONSC 4012
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20110629

## SUPERIOR COURT OF JUSTICE - ONTARIO

**RE:**     IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

**BEFORE:**     MORAWETZ J.

**COUNSEL:**     Alan Mark, Derrick Tay, Alan Merskey and Jennifer Stam, for Nortel Networks Corporation et al

F. Myers, J. Pasquariello and C. Armstrong, for the Monitor, Ernst & Young Inc.

Mark Zigler, Andrea McKinnon, for the Former & Disabled Employees

G. Finlayson, R. Orzy and R. Swan, for the Noteholder Group

Lily Harmer and Max Starnino, for the Superintendent

S. Seigel, for the Bank of New York Mellon

Alex MacFarlane and Abid Quereshi, for the Official Committee of Unsecured Creditors

R. Paul Steep and Elder C. Marques, for Morneau Shepell

Barry Wadsworth, for CAW-Canada

M. P. Gottlieb, R. Schwill and S. Campbell, for the Joint Administrators

Bill Burden, for the U.K. Pension Trustee

Lyndon Barnes, for the Board of Directors of Nortel

- Page 2 -

Andrew Gray and Scott Bomhof, for the U.S. Debtors

Arthur O. Jacques, for Nortel NCCE

## ENDORSEMENT

[1]     This Endorsement relates to my Endorsement of June 17, 2011. The following directions take precedence over the directions provided on June 17, 2011.

[2]     On June 7, 2011, Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") brought a motion requesting approval of a proposed protocol for the allocation of the proceeds of the sale of their assets, the assets of the U.S. Debtors (defined below) and those of Nortel Networks U.K. Limited (NNUK") and certain of its affiliates located in Europe, the Middle East and Africa (collectively, the "EMEA Debtors") (the "Allocation Protocol").

[3]     A similar motion was also brought at that time by Nortel Networks Inc. ("NNI") and certain of its U.S. affiliates (the "U.S. Debtors") in the Chapter 11 Proceedings before the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") (the "Chapter 11 Proceedings").

[4]     The hearing was conducted by video conference with the companion motion being heard in the U.S. Court before His Honor Judge Gross. The joint hearing was conducted in accordance with the provisions of the Cross-Border Protocol which was previously approved by both the U.S. Court and by this Court.

[5]     Both motions had the support of all parties appearing, save for the joint administrators of NNUK.

[6]     Allocation issues have arisen out of the Interim Funding and Settlement Agreement ("IFSA"), which was entered into in June 2009, between the Canadian Debtors, certain of the U.S. Debtors and certain of the EMEA Debtors. The IFSA provides amongst other things, for the parties cooperation in the global sales of Nortel's business units as well as for the parties to attempt to negotiate the terms of an Interim Sales Protocol ("Protocol").

[7]     To date, the parties have been unable to resolve these allocation issues on a consensual basis. This has resulted in a most unfortunate situation.

[8]     Nortel's insolvency is somewhat unique. The sale of its business units has created a sizeable asset pool. With the exception of the IP Transaction, the auction for which commenced on June 27, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures – some $3 billion currently with a minimum of a further $900 million expected to be added upon consummation of the patent portfolio and related asset transactions – now sit in escrow awaiting the resolution of allocation.

[9]    This allocation issue, together with the resolution of the EMEA claims and the U.K. pension claims, lies at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and proceedings in the United Kingdom.  As the Monitor noted in its 67th Report: "Simply put, they are matters that must be resolved before any creditor of an applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009.

[10]    The Canadian Debtors have no significant secured creditors.  The Canadian Debtors do, however, have significant unsecured creditors, most of whom are individuals who are employed or were formerly employed by Nortel.  Many of these former employees are pensioners and this group have unsecured claims for both pension and medical benefits.

[11]    There are also significant employee and former employee claims against the U.S. Debtors and the EMEA Debtors.

[12]    For many of these individuals, the delay in receiving a meaningful distribution can be significant.  It is not just a question of calculating the time value of money.  For this group of creditors, time is not on their side.

[13]    This issue is international in scope.  It is also a public-interest issue.  A protracted delay in resolving the impasse surrounding allocation is highly prejudicial to this group.

[14]    In making these comments, I do not mean to suggest that the claims of other creditor groups are not of equal significance.  The reality is, however, that the timing of a receipt of a distribution may be less critical for a financial player as opposed to an individual.

[15]    The difficulty in resolving the allocation issue that is before both the U.S. Court and this Court is, of course, complicated by the fact that it is a multi-jurisdictional issue.  There is no simple solution to the legal predicament that faces all parties.

[16]    Decisions in respect of both motions are currently under reserve.  The nature and length of the arguments presented at the motion will necessitate careful drafting and separate rulings by the U.S. Court and this Court.  Both Courts are concerned that this delay will also delay allocation proceedings and therefore distributions to creditors.  Moreover, the risk of inconsistent decisions and the uncertainty of the appellate process (with further risk of inconsistent decisions) may further delay the progress of the cases.

[17]    A protracted delay in the progress of the cases will only exacerbate an already unfortunate situation for the many individual creditors.  With extended delay comes uncertainty. For many, uncertainty brings considerable stress and a bad situation becomes even worse. Clearly, the consequences of extended litigation are not desirable.

[18]    Both Courts concluded that the parties could benefit from the appointment of a mediator so that they can continue to make progress towards the ultimate resolution of Nortel matters. Consequently, both the U.S. Court and this Court directed that the parties, who participated in the hearing on June 7, 2011, engage in mediation pending the release of decisions in both motions.  The mediator will have the authority to include such other parties as he deems appropriate, in his discretion.

- Page 4 -

[19]     The mediator has the authority, in consultation with the parties, to determine the scope of the mediation, as he deems appropriate, including, without limitation, the allocation issue in its entirety and global issues relating to allocation and claims.

[20]     The mediator is authorized to select advisors of his choosing. The reasonable fees and expenses of the advisors shall be reimbursed by the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

[21]     The particulars of the mediation are as follows:

| | |
|---|---|
| Mediator: | The Honourable Warren K. Winkler |
| | Chief Justice of Ontario |
| | Court of Appeal for Ontario |
| | Osgoode Hall |
| | 130 Queen Street West |
| | Toronto, ON |
| | M5H 2N5 |
| | |
| Timing: | To be arranged by the mediator |

[22]     Participation in this mediation is mandatory. Any agreements reached as a result of mediation will be binding on the parties.

[23]     A settlement of the dispute being mediated shall also be subject to the approval of the U.S. Court and this Court, on notice to parties in interest.

[24]     The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law. The parties shall not subpoena or otherwise require the mediator or any advisor to the mediator, to testify or produce records, notes or work product in any future proceedings, and no recording will be made of the mediation session. Evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation session. In the event that the parties do reach a settlement agreement, the terms of that settlement will be admissible in any court or arbitration proceedings required to enforce it, unless the parties agree otherwise. Information disclosed to the mediator at a private caucus shall remain confidential unless the party authorizes disclosure.

[25]     The mediator has the right, prior to the commencement of the mediation only, to communicate with Judge Gross and me, for the purposes of obtaining background information.

[26]     The mediation process shall be terminated under any of the following circumstances:

(a) by a declaration by the mediator that a settlement has been reached;

(b) a declaration by the mediator that further efforts at mediation are no longer considered to be worthwhile; or

- Page 5 -

(c) for any other reason as determined by the mediator.

[27]    The Monitor is directed to circulate a copy of this endorsement to all parties who attended on the return of the motion on June 7, 2011.

"Morawetz J."

_____

MORAWETZ J.

**Date:**    June 29, 2011

SCHEDULE "C"


**CITATION:** Nortel Networks Corporation (Re), 2013 ONSC 1470
**COURT FILE NO.:** 09-CL-7950
**DATE:** 20130308

**SUPERIOR COURT OF JUSTICE – ONTARIO**

(COMMERCIAL LIST)


RE:        IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE:    MORAWETZ J.

COUNSEL:   *Derrick Tay and Jennifer Stam*, for Nortel Networks Corporation

*Benjamin Zarnett, Fred. Myers* and *Jay Carfagnini* for Ernst & Young Inc., Monitor

*Mark Zigler, Ken Rosenberg, Arthur Jacques, Barry Wadsworth* and *Elder C. Marques* for Canadian Creditors' Committee

*Matthew P. Gottlieb, Robin B. Schwill* and *James Reinihan* for Nortel Networks UK Limited (in Administration)

*David Ward* for PPF/Trustee

*Adam Hirsh* for Former Directors & Officers of Nortel Networks Corporation and Nortel Networks Limited

*Andrew Gray* and *Scott Bomhof* for Nortel Networks Inc. and other U.S. Debtors

*John Salmas* for Wilmington Trust, National Association

- Page 2 -

*Sheryl Seigel* for the Bank of New York Mellon

*Richard Swan* and *Gavin Finlayson* for Informal Committee of Noteholders

*Shayne Kukulowicz*, *Ryan Jacobs* and *Mike Wunder* for Unsecured Creditors' Committee

*Edmond Lamek* for Law Debenture Trust Company of New York

**HEARD:**      March 7, 2013

**DECISION:**   March 8, 2013

## E N D O R S E M E N T

[1]     For reasons to follow, the motion of Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (collectively, the "Canadian Debtors") for an order approving an Allocation Protocol, substantially in the form of Schedule "A" to the motion originally returnable June 7, 2011 is granted, subject to the following modifications:

> (i) the Allocation Protocol is to be based on the protocol presented on the original return date, namely June 7, 2011, and is not to be based on the protocol presented during argument on March 7, 2013;

> (ii) the list of "core parties" referenced in paragraph (o)(iii) of the Motion Record is to be expanded. Representations were received from numerous indenture trustees on March 7, 2013. These parties are to be included as "core parties"; and

> (iii) the Monitor is directed to provide the court with a revised list of proposed "core parties" for its consideration, balancing interests of natural justice as well as the objective to resolve outstanding issues in the most expeditious and least expensive manner possible.

[2]     The Monitor is also directed to coordinate input from the parties with respect to a litigation schedule. Directions in respect of the litigation schedule will be addressed in the full reasons for this decision.

[3]     The cross motion of the Joint Administrators of Nortel Networks UK Limited, originally returnable June 7, 2011 requesting an order compelling and directing the parties to the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") to engage in arbitration

59

- Page 3 -

regarding all disputes concerning the allocation of Sales Proceeds (as defined in the IFSA), is dismissed.

[4]     The appeal period in respect of this endorsement will commence on the date when full reasons are released, which date will coincide with the release of reasons of Chief Judge Kevin Gross of the United States Bankruptcy Court for the District of Delaware.


"Morawetz J."

_____

Morawetz, J.


**DATE:**        March 8, 2013

# TAB E

CITATION: Nortel Networks Corporation (Re), 2013 ONSC 7301
COURT FILE NO.: 09-CL-7950
DATE: 20131122

**SUPERIOR COURT OF JUSTICE – ONTARIO**
**(COMMERCIAL LIST)**

RE:          IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

             AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION, Applicants

BEFORE:      MORAWETZ J.

COUNSEL:     A. Mark, J. Pasquariello and C. Armstrong, for Ernst & Young Inc., Monitor

             R. Swan and G. Finalyson, for Noteholders Group

             J. Stam, for the Canadian Debtors

             M. Zigler, for the Former & Disabled Canadian Employees

             S. Bomhof, for Nortel Networks Inc. and US Debtors

             M. Milne-Smith, for the EMEA Debtors

             K. D. Kraft, for Wilmington Trust

             P. Cavanagh and R. Jacobs, for the Unsecured Creditors Committee

             J. Galway, for Northern Trust Canada

             E. A. Putnam, for the Nortel Directors and Officers

HEARD &
ENDORSED: NOVEMBER 19, 2013

REASONS:   NOVEMBER 22, 2013


**ENDORSEMENT**

- Page 2 -

[1]    At the conclusion of the hearing on November 19, 2013, parties were informed that the trial would now start on May 12, 2014 for 20 days. These are the reasons.

[2]    The parties proposed a deferral of the trial from April 1, 2014 to April 28, 2014. Counsel to the Bondholders objected to extending the trial date at this time – but they were content to extend interim timetable dates. Other parties, including counsel to the Former Employees supported a four-week deferral.

[3]    It is apparent, having reviewed the record and hearing submissions, that maintaining a trial date of April 1, 2014 could result in a chaotic trial. I considered deferring the start of trial to April 28, 2014, but the parties could not provide any degree of certainty that April 28, 2014 would be a realistic start date. A "rolling" start date is undesirable.

[4]    In my view, it is a better approach to achieve certainty with the start date – even if an additional delay is the result.

[5]    The trial is rescheduled to start May 12, 2014, peremptory to all parties, and will run for 20 days. A trial management conference is to take place two weeks before the start of trial. A Case Management Conference is also scheduled for January 29, 2014.

[6]    The court continues to be concerned about the costs of this litigation. To this end, I am requiring comprehensive fee and disbursement summaries from all parties to the litigation. Summaries are to cover the period from May 1, 2013 to present. Mr. Armstrong – counsel to the Monitor – is to coordinate and submit the information by November 20, 2013 [Information has since been received]. Parties who are not funding the litigation from the estate must still provide this information – unless they waive all future claims for reimbursement of these fees, including reimbursement through costs claims.

MORAWETZ J.

**Date:**    November 22, 2013

62

Court File No: 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| **THE HONOURABLE MR.** | ) | **TUESDAY, THE 19th DAY OF** |
| **JUSTICE MORAWETZ** | ) | **NOVEMBER, 2013** |
| | ) | |
| | ) | |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**ORDER**
**(Amendments to Litigation Timetable, Discovery Plan and Deposition**
**Protocol)**

**THIS MOTION**, made by Nortel Networks Corporation, Nortel Networks Limited,

Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel

Networks International Corporation (collectively, the **"Canadian Debtors"**) jointly with Ernst &

Young Inc. in its capacity as monitor (the **"Monitor"**) of the Canadian Debtors, the U.S.

Debtors, Committee, the EMEA Debtors/ Joint Administrators, the UK Pension Claimants **and**

**the CCC** (all as defined in the Allocation Protocol (as defined in Schedule A hereto) and

collectively, the **"Moving Parties"**) for the relief set out in the Notice of Motion dated

November 14, 2013 was heard this day at 393 University Avenue, Toronto, Ontario.

TOR_LAW\ 8296198\7

**ON READING** the one-hundredth report of the Monitor dated November 14, 2013, and on hearing submissions of counsel for the Moving Parties and the objection of the ad hoc bondholder group, no one appearing for any other person on the service list, although served as appears from the Affidavit of Service of Kiran Dhillon sworn November 14, 2013, filed.

1.      THIS COURT ORDERS that the time for the service of the Notice of Motion and the Motion Record is hereby abridged and validated so that this Motion is properly returnable today and hereby dispenses with further service thereof.

2.      THIS COURT ORDERS that capitalized terms used herein and not otherwise defined have the meaning given to them in Schedule A hereto.

3.      THIS COURT ORDERS that the terms of amendment set out in Schedule A hereto are hereby approved and the Allocation Protocol, the Litigation Timetable, the Discovery Plan and the Deposition Protocol be and they are hereby amended in accordance with such terms.

4.      THIS COURT ORDERS that the parties shall be permitted to adjust interim deadlines in the time table in accordance with the following procedures:

> a.  The Moving Parties shall meet and confer to determine whether further adjustments to the time table should be made and may upon unanimous agreement (subject to sub-paragraph (c) below), without further Order of the Court(s), propose amendments to the timetable provided that such dates shall not impact the Court ordered commencement date of the Trial;

> b.  Any objections by Core Parties to any proposed amendments shall be made within two (2) Business Days of such proposal being made to them in writing; and

c.  All objections shall be resolved through a meet and confer among all the Moving

Parties (or designated members) and the objector(s) within two (2) Business Days,

failing which, the objector must seek relief from the Court(s) within two (2)

Business Days thereafter (by letter). Absent relief from the Court(s), any changes

to the time table proposed by the Moving Parties shall be effective.

## MISCELLANEOUS

5.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal,

regulatory or administrative body having jurisdiction in Canada, the United States, the United

Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and

their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory

and administrative bodies are hereby respectfully requested to make such orders and to provide

such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be

necessary or desirable to give effect to this Order, to grant representative status to the Monitor in

any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in

carrying out the terms of this Order.

6.      THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and are

hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative

body, wherever located, for the recognition of this Order and for assistance in carrying out the

terms of this Order.

DEC - 3 2013

MB

65

## SCHEDULE A

### Attached.

## SCHEDULE "A" –AMENDMENT TERMS

Capitalized terms used herein and not otherwise defined have the meaning given to them in (i) the allocation procedure protocol approved by the Ontario Superior Court of Justice and the United States Bankruptcy Court for the District of Delaware (the "**Courts**") in Orders dated on or about April 3, 2013 and May 16, 2013, respectively (as amended and restated, the "**Allocation Protocol**"), (ii) the litigation timetable and discovery plan approved by the Courts in Orders dated on or about May 16, 2013 and as amended by Orders of the Courts dated on or about August 27, 2013 (as amended, the "**Litigation Timetable and Discovery Plan**"), and (iii) the Deposition Protocol as approved by the Courts in Orders dated on or about August 27, 2013 and as amended by Orders dated on or about September 20, 2013 and September 25, 2013 (as amended, the "**Deposition Protocol**") as applicable.

1.  The Allocation Protocol, Litigation Timetable and Discovery Plan and the Deposition Protocol are modified as follows:

| Deadline | Former Date | Revised Date |
|---|---|---|
| Deadline to complete witness depositions other than third party depositions (i.e., those other than current or former employees or directors of a Core Party) and Representative Witness depositions | December 13, 2013 | December 13, 2013[1] |
| Deadline for each Deposition Group to serve Representative Witness subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | 10 business days prior to the commencement of Representative Witness depositions | 5pm (EST) December 13, 2013 other than with respect to topics relating to NNSA which shall be delivered no later than 5pm (EST) on December 17, 2013 |
| Identification of Representative Witnesses by each Core Party required to produce a Representative Witness | 5 business days prior to the commencement of Representative Witness | 5pm (EST) on December 18, 2013 |

---

[1] The parties shall be permitted to extend this date to December 18, 2013 with unanimous approval of the Scheduling Committee to the extent irreconcilable conflicts prevent a witness from being scheduled by December 13, 2013 provided however, except for good cause shown, that such extension shall not impact any other deadlines or dates in the timetable including the deadlines for noticing with respect to topics for and the scheduling of Representative Witness Depositions.

1

| Deadline | Former Date | Revised Date |
|---|---|---|
| | | depositions |
| Deadline for objections to Representative Witness subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | Three business days after service of the subjects | 5pm (EST) on December 18, 2013 |
| Meet and confer of the Scheduling Committee to schedule Representative Witness Depositions | NA | December 19, 2013 and/or December 20, 2013 |
| Meet and confer regarding any objections on Representative Witness deposition subjects in accordance with paragraph G(1)(a) of the Deposition Protocol | Within two business days of service of the objections | December 20, 2013 |
| Deadline to identify experts and the subject matter of their reports | November 27, 2013 | January 8, 2014 |
| Representative Witness depositions | December 13, 2013 | January 8, 2014 to January 17, 2014 |
| Deadline for service of expert reports | December 20, 2013 | January 24, 2014 |
| Meet and confer to discuss foreign law experts | NA | No later than January 31, 2014 |
| Deadline for Discovery Groups to provide list of available dates of their experts to the Scheduling Committee | NA | 5pm (EST) on January 31, 2014 |
| Deadline to complete third party depositions | Due date of rebuttal expert reports | February 28, 2014 (solely for witnesses for whom process was started by Sept. 30, 2013 and except for good cause shown as per the current order) |
| Deadline for service of rebuttal expert reports | January 24, 2014 | February 28, 2014 |

2

| Deadline | Former Date | Revised Date |
|---|---|---|
| Preliminary pre-trial conference | Week of February 17, 2014 | January 29, 2014 |
| Expert depositions | February 28, 2014 | March 17, 2014 to April 4, 2014 |
| Deadline to file a  list of all witnesses and exhibits that each Core Party intends to rely upon as part of its direct case | March 6, 2014 | April 10, 2014 |
| Deadline to file:<br><br>• Pre-trial motions<br><br>• Pre-trial briefs<br><br>• All fact affidavits to be used in direct case<br><br>• All exhibits to be used in direct case<br><br>• All deposition testimony to be used in direct case | March 14, 2014 | April 17, 2014 for service with filing on the following business day |
| Pre-trial conference | Week of March 17, 2014 (if the Courts desire) | Between April 21 and April 28, 2014 |
| Beginning of Trial | April 1, 2014 | Beginning on May 12, 2014 and continuing for 19 trial days thereafter |

2.    **Fact Witness Depositions**

      a.  Third Party Witnesses.

            i.  Notwithstanding any prior orders, absent good cause shown to the Court(s), no Core Parties shall provide any further notices to third parties for production of documents and/or depositions (other than those currently disclosed to the Scheduling Committee).

77790706.2

        ii.  Provided that appropriate judicial process to compel the production of documents or testimony from third parties was issued or commenced on or before September 30, 2013, or currently disclosed to the Scheduling Committee, the production of documents from such third parties and/or the depositions of such third party witnesses may be completed after the deadline for fact witness depositions, but must be completed by no later than February 28, 2014, except for good cause shown and by agreement of the Core Parties or order(s) of the Court(s).

3.     **Representative Witness Examinations**.

    a.  The Deposition Protocol is hereby amended as follows:

        i.  The second sentence of paragraph G(1)(a) is amended as follows:

        "At least ten business days before the commencement of Representative Depositions" is hereby deleted and replaced with the words "On or before 5pm (EST) on December 13, 2013 (other than with respect to NNSA for which the deadline shall be December 17, 2013)"

        ii.  The fourth sentence of paragraph G(1)(a) is amended as follows:

        "objections shall be served within three business days" is hereby deleted and replaced with the words "objections shall be served no later than 5pm (EST) on December 18, 2013"

        iii.  The fifth sentence of paragraph G(1)(a) is amended as follows:

        "applicable parties shall meet and confer in good faith ~~within two business days thereafter~~ on or about December 20, 2013 and, failing agreement, the burden shall be on the noticing party to obtain judicial relief at least two business days (in order to enable preparation) prior to the Representative Deposition"

    b.  On or before 5pm (EST) December 18, 2013, each Core Party that is required to

produce a Representative Witness under the Deposition Protocol shall identify their Representative Witness(es) and provide the Scheduling Committee with a list of all available deposition dates of their Representative Witness(es) for the period January 8, 2014 to January 17, 2014.

c. Representative Witness examinations will take place in accordance with the Deposition Protocol and will be scheduled between January 8, 2014 and January 17, 2014 to take place in New York or Toronto.

d. Each Core Party that is required to produce a Representative Witness under the Deposition Protocol will ensure that its Representative Witness can be produced on several pairs of days for the period January 8, 2014 to January 17, 2014.

e. The Deposition Groups will meet and confer during the week of December 16, 2013 to attempt to resolve any remaining disputes with respect to the Representative Witness depositions.

4.  **Expert Witness Examinations**.

a. Expert witness examinations will take place between March 17, 2014 and April 4, 2014 in New York and Toronto.

b. Each Discovery Group will ensure that their expert witnesses can be produced for examination in either New York or Toronto on several days between March 17, 2014 and April 4, 2014 and, unless excused by the Scheduling Committee or the Courts, at a minimum

   i.   each expert shall be required to offer at least 5 days on which they are available for deposition,

   ii.  the deposition dates offered by the experts must be spread over at least two of the weeks; and

   iii. each Discovery Group must offer enough availability so that its experts' depositions can be scheduled equally over the three weeks of expert

depositions.

c.  On or before 5pm (EST) January 31, 2014, each Discovery Group shall provide the Scheduling Committee with all available deposition dates of their experts for the period March 17, 2014 to April 4, 2014.

d.  The Core Parties shall meet and confer no later than January 31, 2014 to attempt to reach agreement on the necessity of the examination of foreign law experts for deposition and trial.

5.  **Trial Logistics**

a.  The Core Parties shall meet and confer as soon as possible (but in any event no later than the week of December 16, 2013) with a view to attempting to reach consensus with respect to a proposal for the conduct of the trial, including the

  i.   material to be served/filed on April 10, 2014 and April 17, 2014;

  ii.  the feasibility of providing the Courts with a statement of agreed facts; and

  iii. proposed length of the trial.

b.  On or before January 20, 2014, the US Debtors, Canadian Debtors/Monitor, the EMEA Debtors and the UK Pension Claimants shall submit (either jointly or separately) their proposals for the conduct of the trial to the Courts. Other Core Parties shall be entitled to file their own proposal on or before January 20, 2014 or, alternatively, they may file a joinder to indicate support of one or more of the proposals on or before January 27, 2014.

6.  **Miscellaneous**

a.  Other than as expressly modified herein, all other terms, dates, provisions in the Allocation Protocol, Litigation Timetable, Discovery Plan and all amendments thereto remain in full force and effect.

6

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**ORDER**
**(Amendments to Litigation Timetable, Discovery Plan and Deposition Protocol)**

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay (LSUC #: 21152A)**
**Jennifer Stam (LSUC #: 46735J)**
Tel:    (416) 862-5697
Fax:    (416) 862-7661

**GOODMANS LLP**
Barristers & Solicitors
333 Bay Street, Suite 3400
Toronto ON  M5H 2S7

**Jay A. Carfagnini (LSUC#: 22293T)**
**Alan Mark (LSUC#: 21772U)**
**Jessica Kimmel (LSUC#: 32312W)**
**Joseph Pasquariello (LSUC#: 38390C)**
**Peter Ruby (LSUC#: 38439P)**
Tel: 416.979.2211
Fax: 416.979.1234

TOR_LAW\ 82961958\7

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(Commercial List)**<br><br>Proceeding commenced at Toronto |
| | **Reply of the Monitor and Canadian Debtors**<br><br>**To the EMEA Debtors and UKPC**<br><br>**(Pre-Trial Conference to be held on January 29, 2014)** |
| | **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400<br>Toronto, Canada  M5H 2S7<br><br>Jay A. Carfagnini  (LSUC #: 22293T)<br>Alan Mark (LSUC #: 21772U)<br>Jessica Kimmel (LSUC #: 32312W)<br>Peter Ruby (LSUC #: 38439P)<br>Joseph Pasquariello (LSUC #: 37389C)<br><br>Tel:     416.979.2211<br>Fax:     416.979.1234<br><br>**Lawyers for the Monitor, Ernst & Young Inc.** | **Gowling Lafleur Henderson LLP**<br>Barristers & Solicitors<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto, ON  M5X 1G5<br><br>Derrick Tay (LSUC #: 21152A)<br>Jennifer Stam  (LSUC #: 46735J)<br><br>Tel:  416.862.5697<br>Fax:  416.862.7661<br><br>**Lawyers for the Canadian Debtors** |

6280791