## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------- X

| | |
|---|---|
| *In re* | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

:
:
:
:
:
:
:
:

**Hearing date:  March 18, 2014, 10:00 AM (ET)**
**Objections due:  March 11, 2014, 4:00 PM (ET)**

-------------------------------------------------------- X

### DEBTORS' MOTION FOR AN ORDER APPROVING ISSUANCE OF JOINT WRITTEN ESCROW INSTRUCTIONS AND CERTAIN MODIFICATIONS TO DEBTORS' SALE PROCEEDS ESCROW AGREEMENTS

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession, (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order substantially in the form attached hereto as Exhibit A, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (i) approving proposed final forms of the joint escrow instructions and amendments attached hereto as **Exhibits B-K** (the "Joint Instructions"); (ii) approving certain modifications to the Debtors' sale proceeds escrow agreements; and (iii) granting the Debtors such other and further relief as the Court deems just and proper.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]	The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).  Contact information for the Debtors and their petitions are available at http://dm.epiq11.com/nortel.

**Jurisdiction**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105 and 363 and of the Bankruptcy Code, and Rules 2002 and 6004 of the Bankruptcy Rules.

**Background**

3.      On January 14, 2009 (the "Petition Date"), the Debtors, other than Nortel Networks (CALA) Inc.,[2] filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, which cases are consolidated for procedural purposes only (the "Chapter 11 Cases").  The Debtors continue to operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      The Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") has appointed an Official Committee of Unsecured Creditors (the "Committee") in respect of the Debtors [D.I.s 141, 142], and an ad hoc group of bondholders has been organized (the "Bondholder Group").

5.      On the Petition Date, the Debtors' ultimate corporate parent Nortel Networks Corporation ("NNC"), NNI's direct corporate parent Nortel Networks Limited ("NNL," and together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their

---

[2]      Nortel Networks (CALA) Inc. filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on July 14, 2009, which was consolidated and is being jointly administered with the other Debtors' chapter 11 cases for procedural purposes [D.I. 1098].

Canadian affiliates (collectively, the "Canadian Debtors")[3] commenced a proceeding with the

Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors

Arrangement Act (Canada), seeking relief from their creditors and a monitor, Ernst & Young

Inc. (the "Monitor"), was appointed by the Canadian Court.  Also on the Petition Date, the High

Court of England and Wales placed nineteen of Nortel's European affiliates (collectively, the

"EMEA Debtors")[4] into administration under the control of court-appointed administrators and

foreign representatives (the "Joint Administrators").  Other Nortel affiliates have commenced

and in the future may commence additional creditor protection, insolvency and dissolution

proceedings around the world.

6.      Since the Petition Date, Nortel has sold its business units and other assets to

various purchasers.  For further information regarding these chapter 11 cases, reference may be

made to the Monthly Operating Reports filed by the Debtors and http://dm.epiq11.com/nortel.

## Relief Requested

7.      By this Motion, the Debtors seek the entry of an order: (i) approving the Joint

Instructions; (ii) approving certain modifications to the Debtors' sale proceeds escrow

agreements; and (iii) granting the Debtors such other and further relief as the Court deems just

and proper.

## Facts Relevant to the Motion

8.      In connection with the consummation of Nortel's various business and asset sales

and the Interim Funding and Settlement Agreement, dated June 9, 2009 and approved by this

---

[3]      The Canadian Debtors include the following entities:  NNC, NNL, Nortel Networks Technology
Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

[4]      The EMEA Debtors include the following entities:  Nortel Networks UK Limited, Nortel Networks S.A.,
Nortel Networks (Ireland) Limited, Nortel GmbH, Nortel Networks France S.A.S., Nortel Networks Oy, Nortel
Networks Romania SRL, Nortel Networks AB, Nortel Networks N.V., Nortel Networks S.p.A., Nortel Networks
B.V., Nortel Networks Polska Sp. z.o.o., Nortel Networks Hispania, S.A., Nortel Networks (Austria) GmbH, Nortel
Networks, s.r.o., Nortel Networks Engineering Service Kft, Nortel Networks Portugal S.A., Nortel Networks
Slovensko, s.r.o. and Nortel Networks International Finance & Holding B.V.

Court on June 29, 2009 [D.I. 993] (the "IFSA"), the Selling Debtors,[5] the Committee and the Monitor agreed that the sale proceeds would be deposited into escrow accounts and subject to escrow agreements, pending a binding determination or agreement as to how the proceeds (the "Escrow Funds") should be distributed, as more fully set forth in the IFSA.[6]

9.    In accordance with the IFSA, the Selling Debtors, the Joint Administrators, the Committee and the Monitor entered into various court-approved escrow agreements with JP Morgan Chase Bank, N.A., as escrow agent ("JP Morgan" or the "Escrow Agent") (collectively, the "Escrow Agreements") to hold the proceeds of certain asset sales.[7]  As of the date of this

---

[5]    The term "Selling Debtors" refers to any Nortel debtor that signed or acceded to the IFSA or that signed one or more of the Escrow Agreements.

[6]    The Layer 4-7 transaction was consummated prior to the signing of the IFSA; however, the escrow agreement entered into in connection with that sale (the "Layer 4-7 Escrow Agreement") similarly provides that the proceeds be held in escrow pending the Escrow Agent's receipt of consistent orders from both this Court and the Canadian Court (or a letter of direction or final decision of a court of competent jurisdiction if the bankruptcy cases have been closed).  Layer 4-7 Escrow Agreement, Mar. 19, 2009 ¶ 5.

[7]    This Court approved the Debtors' entry into certain of the Escrow Agreements by specific order and the Debtors' entry into the other Escrow Agreements in connection with its approval of the relevant sales.  *See Order Authorizing and Approving (A) Sale of Certain Non-Core Assets Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Contracts* [D.I. 539] at ¶ 18 (generally approving all provisions of the Layer 4-7 Asset Purchase Agreement, which contemplated payment of the sale proceeds into escrow); *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) Approving Debtors' Entry into the CDMA Escrow Agreement and Granting Related Relief* [D.I. 1889] ("CDMA Escrow Approval Order"); *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) (A) Approving Debtors' Entry into the Next Generation Packet Core Network Components Escrow Agreement and (B) Granting Related Relief* [D.I. 2062]; *Order Authorizing and Approving Sale of Debtors' GSM/GSM-R Free and Clear of All Liens, Claims and Encumbrances* [D.I. 2065] at ¶ 44; *Order Authorizing and Approving (A) Sale of Certain Assets of the Debtors' Metro Ethernet Networks Business Free and Clear of All Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts* [D.I. 2070] at ¶ 45; *Order Pursuant to 11 U.S.C. § 105(a) and § 363(b) (A) Approving Debtors' Entry Into the Enterprise Solutions Business Escrow Agreement and (B) Granting Related Relief* [D.I. 2167]; *Order Authorizing and Approving (A) the Sale of Certain Assets of the Debtors' Carrier Voice Over IP and Communications Solutions Business Free and Clear of All Liens, Claims and Encumbrances, and (B) the Assumption and Assignment of Certain Executory Contracts* [D.I. 2632] at ¶ 38; *Order (I) Authorizing the Sale of Certain Assets of Debtors' GSM/GSM-R Business Free and Clear of All Liens, Claims and Encumbrances; (II) Authorizing and Approving the Asset Sale Agreement; (III) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts; and (IV) Authorizing the Filing of Certain Documents Under Seal* [D.I. 3048] at ¶ 37; *Order Authorizing and Approving (A) the Sale of Certain Assets of Debtors' Multi-Service Switch (Formerly Known as 'Passport') Business Free and Clear of All Liens, Claims and Encumbrances and (B) the Assumption and Assignment of Certain Executory Contracts* [D.I. 4054] at ¶ 40; *Order Authorizing and Approving (A) the Sale of Certain Patent and Related Assets Free and Clear of All Claims and Interests, (B) the Assumption and Assignment of Certain Executory Contracts, (C) the Rejection of Certain Patent Licenses and (D) the License Non-Assignment and Non-Renewal Protections* [D.I. 5935] at ¶ 45.

Motion, the escrow accounts hold approximately $7.3 billion, the allocation of which is the subject of ongoing litigation before this Court and the Canadian Court.

10.     Each Escrow Agreement other than the Layer 4-7 Escrow Agreement provides three alternative "Permitted Investments" for the funds on deposit.  They are (1) U.S. Treasury obligations with maturities not in excess of one year, (2) money market funds invested solely in such U.S. Treasury obligations and (3) the JPMorgan Chase Bank Collateralized Money Market Deposit Account.[8]  Since the Escrow Funds were deposited into the respective escrow accounts, the Escrow Funds have been invested in the Collateralized Money Market Deposit Accounts, a money market deposit account that is collateralized by JP Morgan with U.S. Treasury obligations.[9]

11.     In November 2013, JP Morgan informed the Debtors that it intended to discontinue the relevant product for these types of escrow funds and that the Debtors and the other parties to the Escrow Agreements would be required to choose an alternative type of Permitted Investment under the Escrow Agreements or risk JP Morgan's formal resignation as Escrow Agent.  Since then, the Debtors have engaged in discussions with counsel to the Monitor and the Canadian Debtors, counsel to the EMEA Debtors, counsel to the Committee and JP Morgan regarding the type of Permitted Investment under the Escrow Agreements that would maximize the value of the Escrow Funds.  Ultimately, the relevant parties agreed that the Escrow Funds should be invested directly in U.S. Treasury bills (i.e., the first "Permitted Investment"

---

[8]     Such categories of "Permitted Investments" were agreed upon because, among other reasons, each is compliant with the requirements of 11 U.S.C. § 345(b).

[9]     Instead of providing for three alternative categories of permitted investments, the Layer 4-7 Escrow Agreement requires that JP Morgan invest the Escrow Funds in a segregated "cash compensation account."  The Debtors understand that JP Morgan has been maintaining and collateralizing the Layer 4-7 Escrow Funds in the same manner as those in the other escrow accounts.

listed above).  As a result, the Debtors respectfully seek approval of the Joint Instructions in order to implement such change.

12.     JP Morgan has advised the Debtors that its standard fee for trading, custodial and settlement fees is 1.5 basis points on the amount of money invested on an annualized basis (the "Standard Fees"), which is a change from the fees expressly contemplated by the Escrow Agreements.  Based on the amount of the Escrow Funds, such fees would be approximately $1.1 million for a one-year investing period (reduced pro rata for a shorter investing period), and would be deducted from any interest earned on the investments.  JP Morgan has agreed to waive any fees accrued in connection with any investment in tranches of U.S. Treasury bills that would exceed the yield associated with that investment, such that at no point shall its fees decrease the principal amount associated with the investment in any tranche of U.S. Treasury bills.  The Debtors respectfully seek authorization for JP Morgan to receive the Standard Fees for the services to be performed in connection with the investments identified in the Joint Instructions. This authorization is not intended to, and shall not, modify the provisions of the Escrow Agreements with respect to the payment of other costs and expenses provided for therein.

13.     JP Morgan also advised the Debtors that it will be necessary to open new accounts to accommodate the change in investment for the Escrow Funds.  Because the existing account numbers are listed in the Escrow Agreements, the Debtors respectfully seek approval of the technical amendment to the Escrow Agreements to change the account numbers, and to provide for the possibility that such an administrative change could also need to be made again in the future.

14. In addition, the Debtors seek approval of an amendment to the Layer 4-7 Escrow Agreement to authorize U.S. Treasury obligations as a Permitted Investment and to make the Permitted Investments provision consistent in all respects with the other Escrow Agreements.

15. Attached as **Exhibits B – K**, respectively, are proposed final forms of the Joint Instructions that will be issued to JP Morgan upon approval of this Court of the relief sought herein[10], with the maturity schedule attached as Exhibit A to each of the Joint Instructions redacted.

<u>**Basis for Relief**</u>

16. The Debtors seek authority pursuant to sections 105(a) and 363(b) of the Bankruptcy Code to issue the Joint Instructions to the Escrow Agent and to make the aforementioned modifications to the Escrow Agreements.

17. Section 363(b)(1) of the Bankruptcy Code permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Additionally, this Court may grant the relief requested in this Motion pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." <u>See</u> 11 U.S.C. § 105(a); <u>see also</u> <u>Gillman v. Continental Airlines (In re Continental Airlines)</u>, 203 F.3d 203, 211 (3d Cir. 2000) ("Section 105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.").

18. A debtor may enter into contracts and use estate assets, other than in the ordinary course of its business, during the pendency of its bankruptcy proceeding with the court's

---

[10]     On February 10, 2014, the Canadian Court granted a motion of the Canadian Debtors and the Monitor approving the forms of the Joint Instructions.

approval.  To obtain court approval to use property under section 363(b), the Debtors need only

demonstrate a sound business purpose for the proposed action.  See Myers v. Martin (In re

Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re

Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v.

Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153

(D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (courts have

applied the "sound business purpose" test to evaluate motions brought pursuant to section

363(b)).

19.     Under the Bankruptcy Code, the Court has "virtually unfettered discretion to

authorize the use, sale or lease, other than in the ordinary course of business, of property of the

estate."  In re Lionel Corp., 722 F.2d at 1069.

20.     A court reviews the business justifications provided by a debtor by applying the

business judgment rule.  That rule "is a presumption that in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest belief that

the action taken was in the best interests of the company."  Official Comm. of Subordinated

Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y.

1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).  The rule is based on a

presumption that the debtor's decision is reasonable.  See id.

21.     Approval of a debtor's decision to enter into a contract and use estate property

under section 363 is in harmony with a bankruptcy court's equitable powers.  Under section

105(a) of the Bankruptcy Code, bankruptcy courts have expansive equitable powers to fashion

any order or decree that preserves the value of the debtor's estate and thereby protects the

creditors' interests in distribution of a debtor's assets.  See, e.g., Bird v. Crown Convenience (In

re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy

. . . is that equitable principles govern."); In re Cooper Properties Liquidating Trust, Inc., 61 B.R.

531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has

a duty to protect whatever equities a debtor may have in property for the benefit of its creditors

as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

22.      The Debtors' decisions to alter the manner in which the Escrow Funds are

invested, issue the Joint Instructions to the Escrow Agent and make certain technical

modifications to the Escrow Agreements are grounded in sound business judgment.  First, over

the course of these Chapter 11 Cases, the Debtors and the other Selling Debtors have developed

an operating relationship with JP Morgan that has allowed for cooperation and continuity.  Given

the number of stakeholders involved, the cost and distraction associated with exploring other

alternatives to move the Escrow Funds to a new escrow agent at this stage in these proceedings

would be unwarranted.  There is no assurance that other institutions would offer more favorable

arrangements, and there could be considerable costs and resources required to negotiate and/or

document any such alternative arrangements.  Also, while the change in investment would result

in fees being charged under the Escrow Agreements, JP Morgan has voluntarily agreed to waive

any fees that would exceed the yield associated with the applicable investment, thereby ensuring

that the principal of the Escrow Funds will not be reduced by JP Morgan's fees.  Finally, all of

the other parties to the Escrow Agreements, including the Committee, have agreed to the forms

of the Joint Instructions, demonstrating that each party with an economic stake in the amount of

the Escrow Funds supports the requested changes.

23.     Accordingly, the Debtors believe that the business judgment standard has been satisfied and the Court may approve and authorize the Joint Instructions and the accompanying modifications to the Escrow Agreements.

### Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)

24.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the lease of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  See Fed. R. Bankr. P. 6004(h) advisory committee's notes.

25.     Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  See generally 10 Collier on Bankruptcy ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  Id.

26.     Subject to this Court's approval of the Joint Instructions and the certain aforementioned modifications to the Escrow Agreements, the Joint Instructions contemplate changes to the manner in which the Escrow Funds are invested for which time is of the essence. While JP Morgan has provided the Debtors and other escrow parties with time to agree to the change in arrangements, JP Morgan is interested in completing the change in investment promptly.  Accordingly, waiver of any applicable stay is appropriate in this circumstance.

## **Notice**

27.        Notice of the Motion has been given via hand delivery or first class mail to the

(i) U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the Bondholder Group; (iv)

counsel to the Monitor; (v) counsel to the Canadian Debtors; (vi) counsel to the Joint

Administrators; and (vii) the general service list established in these cases.  The Debtors submit

that under the circumstances no other or further notice is necessary.

## **No Prior Request**

28.        No prior request for the relief sought herein has been made to this or any other

court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and

the relief requested herein; (ii) enter the proposed order attached hereto as **Exhibit A**; and

(iii) grant such other and further relief as it deems just and proper.

Dated:  February 25, 2014
       Wilmington, Delaware

CLEARY GOTTLIEB STEEN & HAMILTON LLP

James L. Bromley *(admitted pro hac vice)*
Lisa M. Schweitzer *(admitted pro hac vice)*
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Ann C. Cordo*
Derek C. Abbott (No. 3376)
Eric D. Schwartz (No. 3134)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors*
*and Debtors in Possession*