**EXHIBIT A**

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## OVERVIEW OF PROPOSED AMENDMENT AND SUPPLEMENT TO THE TRIAL PROTOCOL PROVIDED BY THE CANADIAN DEBTORS AND THE MONITOR

**Amendment and Supplement to the Trial Protocol**
**(Pre-Trial Conference to be held on March 12, 2014)**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
jcarfagnini@goodmans.ca

Alan Mark LSUC#: 21772U
amark@goodmans.ca

Jessica Kimmel LSUC#: 32312W
jkimmel@goodmans.ca

Peter Ruby  LSUC#: 38439P
pruby@goodmans.ca

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#: 21152A
Derrick.tay@gowlings.com

Jennifer Stam  LSUC#: 46735J
Jennifer.Stam@gowlings.com

Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

Joseph Pasquariello  LSUC#: 37389C
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc.

# INDEX

# INDEX

**TAB NO.**                 **DESCRIPTION**

1     Written Submissions of the Canadian Debtors and the Monitor dated March 10, 2014

A     Appendix "A" -  Proposed Amendment and Supplement

B     Appendix "B"- Proposed Trial Protocol and Written Submissions of Canadian Debtors and Monitor filed in support of Original Trial Protocol dated January 24, 2014.

C     Appendix "C" - Agreed Upon Pre-Trial Management Memorandum

6305935

# TAB 1

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

# PROPOSED AMENDMENT AND SUPPLEMENT TO THE TRIAL PROTOCOL AND WRITTEN SUBMISSIONS OF CANADIAN DEBTORS AND THE MONITOR

**Amendment and Supplement to the Trial Protocol**
**(Pre-Trial Conference to be held on March 12, 2014)**

## I.   OVERVIEW

1.   The Order of this Court dated November 19, 2013 and the similar Order of the U.S. Court (the "**Amendment Orders**") contemplated that the parties would work to develop a proposed trial protocol that addressed conduct of the trial. Subsequently, the Core Parties worked to develop a joint trial protocol (the "**Original Protocol**") to govern certain procedural matters which was presented to the Courts at a pre-trial conference on January 29, 2014. The Original Protocol left certain matters still to be negotiated and determined. The Core Parties have, since then, met and conferred to discuss the remaining issues that were to be addressed in the  proposed amendment and supplement to the Original Protocol. The  proposed amendment and supplement to the Original

Protocol is attached as Appendix A hereto (the "**Proposed Amendment and Supplement**") and hereby submitted to the Ontario Court by the Canadian Debtors and the Monitor. It is being submitted contemporaneously by the US Debtors to the Delaware Court. Although the Core Parties appear to have reached consensus on certain of the matters set out in the Proposed Amendment and Supplement, certain disagreements remain and those have been identified in the footnotes and text therein, where applicable, for ease of reference.

2.     Capitalized terms used herein and not otherwise defined have the meaning given to them in the Original Protocol.


## II.    BACKGROUND

*The Original Protocol*

3.     The Original Protocol was largely consensual and was approved by the Courts. An overview of the Original Protocol is set out in the written submissions of the Monitor and Canadian Debtors filed in support of the Original Protocol and attached hereto as Appendix B. A brief description of certain of the matters that the Original Protocol addresses is as follows:

(a)     *Pre-Trial*. The schedule for exchange and filing of:

(i)     affidavits (initial and reply), expert reports (initial and reply);

(ii)     exhibit lists and fact/ expert witness designations (including a process for objections and counter designations);

      (iii)     Pre-Trial Orders and Pre-Trial Motions; and

      (iv)     Pre-Trial briefs.

  (b)    *Trial.* The order of presenting opening statements and calling and examining fact witnesses and experts as well as certain rules with respect to the same.

*The January 29 Pre-Trial Conference*

4.     At the January 29 Pre-Trial Conference, the Core Parties presented the Original Protocol to the Courts for approval subject to a few limited objections. Firstly, concerns were raised by the UK Pension Claimants regarding the 20 day trial length. Secondly, the CCC was concerned with ensuring it was ultimately guaranteed its own time for opening at trial.

5.     The Original Protocol was approved by the Courts with accompanying direction about the concerns that were raised. In particular, the Courts noted that the 20 day trial limit was not set in stone and that a request for an additional 10 to 15 days would be considered. Secondly, the Canadian Court provided some guidance on the CCC's concern. These were recorded in a pre-trial memorandum that is attached hereto as Appendix C.

## III.   THE PROPOSED AMENDMENT AND SUPPLEMENT TO THE ORIGINAL TRIAL PROTOCOL

6.     The Original Protocol deferred certain issues to subsequent discussions that were to take place prior to the pre-trial conference scheduled for March 12, 2014. The issues that remained outstanding after the Original Protocol was approved included time allocations,

limits on affidavits and briefs and numbers of witnesses and experts to appear at trial. The Parties also were to specify the proposed length of trial, having regard to the Courts' direction at the January 29 Pre-Trial Conference.

7.      The trial has been set to start on May 12, 2014.  In accordance with the Courts' request for a proposal on the trial length, the Core Parties are proposing that the trial last for 210 hours (approximately 35 days, assuming 6 hours per day). The debates about various time allocations (described in the Proposed Amendment and Supplement and hereinafter) have been framed within that overall proposed block of trial time.

## IV.    AREAS OF DISAGREEMENT AMONG THE CORE PARTIES

8.      The majority of the differences between the Core Parties are either directly or indirectly related to the issues of page numbers and time allocations.  The various parties' positions on those issues are summarized below:

| | Monitor/Cdn Debtors | US Debtors | EMEA Debtors/ Claimants | CCC | UK Pension Claimants |
|---|---|---|---|---|---|
| Affidavits (Allocation) II.A.2.(a) | - divided into 3 groups <br> - 250 pages for initial affidavits and 125 pages for responding affidavits per group | - divided into 3 groups <br> - 100 pages for initial affidavits per group and 50 pages for responding affidavits per group | Same as Monitor/ Canadian Debtors | - the same total number of pages but divided among 5 parties (rather than 3 groups) <br> - 150 pages for initial affidavits and 75 pages for responding affidavits per | Same as Monitor/ Canadian Debtors |

|  | Monitor/Cdn Debtors | US Debtors | EMEA Debtors/ Claimants | CCC | UK Pension Claimants |
|---|---|---|---|---|---|
|  |  |  |  | party |  |
| Affidavits (claims) II.A.2.(b) | - EMEA Claimants and UK Pension Claimants each get 150 pages for initial affidavits and 75 pages for reply affidavits<br><br>- Canadian Claims Defendant Group gets 300 pages for initial affidavits and 150 pages for responding affidavits | No position | The EMEA Claimants do not object to the page limits, but believe that the Canadian Claims Defendant Group should be required to split their total allocated affidavit pages between EMEA Claims and UK Pension Claims | No position | Same as EMEA Debtors/ Claimants |
| Briefs (Allocation) II.A.4.(a) | 150 pages for each Core Party that filed a pleading and 15 pages for joinders | 75 pages per Allocation Group | Same as Monitor/ Canadian Debtors | Same as Monitor/ Canadian Debtors | Same as Monitor/ Canadian Debtors |
| Briefs (Claims) II.A.4.(b) | -150 pages for each of the EMEA Claimants and UK Pension Claimants<br><br>-300 pages for the Canadian Claims Defendant Group | No position | The EMEA Claimants do not object to the page limits, but believe that the Canadian Claims Defendant Group should be required to split their total | No Position | Same as EMEA Debtors/ Claimants |

|  | Monitor/Cdn Debtors | US Debtors | EMEA Debtors/ Claimants | CCC | UK Pension Claimants |
|---|---|---|---|---|---|
|  |  |  | allocated brief pages between EMEA Claims and UK Pension Claims |  |  |
| Opening Statements (Allocation) III.B.1.(a) | 1 day in total divided as follows: - US Allocation Group/ Bondholder Allocation Group: 2.25 hours - Monitor/ Cdn Debtors: 1.5 hours - EMEA Debtors: 1.5 hours - UK Pension Claimants/CCC: 1.5 hours - other core parties: .25 hours each | Same as Monitor/ Canadian Debtors | 2 days total (proposal of Monitor/ Canadian Debtors doubled other than non-group core parties) | Same as Monitor/ Canadian Debtors | Same as Monitor/ Canadian Debtors |
| Opening Statements (Claims) III.B.1.(b) | 1 day in total divided as follows: - EMEA Claimants: 1.5 hours - UK Pension Claimants: 1.5 hours - Canadian | No position | 2 days total (proposal of Monitor/ Canadian Debtors doubled) and the Canadian Claims Defendant Group should be required to divide its | No Position | Same as Monitor/ Canadian Debtors other than the Canadian Claims Defendant Group should be required to divide its time between |

|  | Monitor/Cdn Debtors | US Debtors | EMEA Debtors/ Claimants | CCC | UK Pension Claimants |
|---|---|---|---|---|---|
|  | Claims Defendant Group: 3.0 hours |  | time between response to EMEA Claims and response to UK Pension Claims |  | EMEA Claims and UK Pension Claims |
| Time Allocation (Allocation) III.A.2.(a) | 42 hours for each of the US/ Bondholder, Canadian and EMEA Allocation Groups | Same as Monitor / Canadian Debtors | No position | Same as Monitor / Canadian Debtors | 31.5 Hours for each of the (a) US/ Bondholder Allocation Group, (b) Monitor/ Canadian Debtors, (c) EMEA Debtors and (d) UK Pension Claimants/ CCC |
| Time Allocation (Claims) III.A.2.(b) | - 21 Hours for each of the EMEA Claimants and UK Pension Claimants  - 42 hours for the Canadian Claims Defendant Group | No position | The EMEA Claimants do not object to the time allocations, but believe that the Canadian Claims Defendant Group should be required to split their total allocated time between EMEA Claims and UK Pension Claims | No Position | Same position as the EMEA Debtors/ Claimants |

9.    Aside from the disagreements over time and page limit allocations noted above, the
EMEA Debtors and the UK Pension Claimants take the position that the EMEA Claims
and UKPC Claims records are separate.  The Monitor and Canadian Debtors do not agree
given, among other reasons, the overlap in pension related claims which are one of the
four main areas of complaint in the EMEA Claims, which renders this impractical.
Further, Sections I.G and I.H of the Original Protocol already allow for the Canadian
Claims Defendant Group to file the same briefs and pre-trial orders in connection with
both EMEA Claims and UKPC Claims.[1]

10.    The Canadian Claims Defendant Group, at least as it relates to the EMEA Claims, also
includes the Directors and Officers who will require time within the Claims adjudication
and who will not agree to any such up front separation on page and time allocation.  As
long as the total allocations of pages and time for Canadian Claims defendant Group is
equal to the total aggregate allocations of pages and time to the EMEA Claimants and to
UK Pension Claimants, the Canadian Claims Defendant Group has no objection to the
split between Claimants being specified if they would like it to be, but cannot agree to
split their own allocations as is being proposed.

11.    The UK Pension Claimants have a separate proposal about creating a fourth Allocation
stream for trial time allocations for the proponents of the pro rata theory, which they
intend to address the Courts about at the March 12 Pre-Trial Conference.

---

[1] The EMEA Debtors and the UK Pension Claimants have also requested the following provision to be inserted:
"Within 3 business days following the submission of opening fact witness affidavits and 3 business days following
the submission of reply fact witness affidavits, a Core Party may adopt any affidavit submitted by another Core
Party, in which case such affidavit will be treated as affirmative evidence submitted by both the proffering Core
Party and the adopting Core Party.  Any affidavit adopted (but not submitted) by a Core Party shall not count
towards that Core Party's page limits."  This request by the EMEA Debtors and the UK Pension Claimants about the
ability to adopt another Core Party's fact evidence that is still under discussion.

- 11 -

12.     The current Proposed Amendment and Supplement represents a delicate balancing of trade-offs and compromises, heavily negotiated between all parties and some parties' positions may change, or further clarifications may be required, if these alternative proposals are to be implemented.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED this 10th day of March, 2014.**


**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
jcarfagnini@goodmans.ca

Alan Mark LSUC#: 21772U
amark@goodmans.ca

Jessica Kimmel LSUC#: 32312W
jkimmel@goodmans.ca

Peter Ruby  LSUC#: 38439P
pruby@goodmans.ca

Joseph Pasquariello  LSUC#: 37389C
jpasquariello@goodmans.ca

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc.


**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#:
21152ADerrick.tay@gowlings.com

Jennifer Stam  LSUC#: 46735J
Jennifer.Stam@gowlings.com

Tel:    416.862.5697
Fax:    416.862.7661

Lawyers for the Canadian Debtors

# TAB A

*Without Prejudice*
*Proposed Joint Draft: March 10, 2014*

<u>Amendment and Supplement to the Joint Trial Protocol</u>

## I.    Definitions

1.    This Amendment and Supplement to the Joint Trial Protocol approved by the Courts on January 29, 2014 (the "<u>Original Protocol</u>" and together with this Amendment and Supplement, the "<u>Joint Trial Protocol</u>") supplements and amends the Original Protocol.  Unless specifically amended herein, the Original Protocol shall continue to govern.

2.    Capitalized terms used herein and not otherwise defined have the meaning given to them in the Original Protocol.

## II.    Affidavits, Pre-Trial Briefs, Fact Witnesses and Experts

### A.    Limits

1.    The Core Parties shall be limited to the following restrictions in respect of affidavit page limits:[1]

a)    For Allocation, each of the Canadian Allocation Group, US Allocation Group and EMEA Allocation Group shall be entitled to up to an aggregate of [■][2] pages that they may in good faith attribute to Allocation matters in any affidavits of opening fact witnesses who they designated and up to an aggregate of [■][3] pages that they may in good faith attribute to Allocation matters in any affidavits of reply witnesses who they designated.

b)    For Claims, each of (i) the EMEA Claimants and (ii) the UK Pension Claimants shall be entitled to up to an aggregate of 150 pages that they may in good faith attribute to Claims matters in any affidavits of opening fact witnesses who they designated and up to an aggregate of 75 pages that they may in good faith attribute to Claims matters in any affidavits of  reply witnesses who they designated and the Canadian

---

[1] All references to page limits shall be based on double spaced 12 point times new roman font text and shall, for greater certainty, count all pages of narrative text and pages of any appendices or schedules attached to the affidavit but shall not include any exhibits attached to the affidavit (understanding that the rules relating to the designation of exhibits set out in the Original Protocol still apply).

[2] Proposals are as follows:

- <u>Monitor/Canadian Debtors, EMEA Debtors & UK Pension Claimants</u>: 250 pages per Allocation Group;
- <u>US Debtors</u>: 100 pages per Allocation Group; and
- <u>CCC</u>: 150 pages for each of the Canadian Debtors/ Monitor, CCC, US Allocation Group, the EMEA Debtors and the UK Pension Claimants.

[3] Proposals are as follows:

- <u>Monitor/Canadian Debtors, EMEA Debtors & UK Pension Claimants</u>: 125 pages per Allocation Group;
- <u>US Debtors</u>: 50 pages per Allocation Group; and
- <u>CCC</u>: 75 pages for each of the Canadian Debtors/ Monitor, CCC, US Allocation Group, the EMEA Debtors and the UK Pension Claimants

TOR_LAW\ 8366393\9

*Without Prejudice*
*Proposed Joint Draft: March 10, 2014*

Claims Defendant Group shall be entitled to up to an aggregate of 300 pages that they may in good faith attribute to Claims matters in any affidavits of opening fact witnesses who they designated and up to an aggregate of 150 pages that they may in good faith attribute to Claims matters in any affidavits of reply witnesses who they designated.[4]

2.      At the time of submission of an affidavit, the Parties in the Canadian and EMEA Allocation Groups who are proffering the affidavits shall provide their good faith designation on the # of pages that are addressing exclusively Claims ("Claims Only Pages"), and the balance of the pages will be attributed to that Group's Allocation limits.[5] Another Core Party may object where it believes the designation is materially incorrect within 2 business days thereafter. Parties shall attempt to resolve any objections consensually, failing which direction shall be sought from the Court(s). For greater certainty, Claims Only Pages shall not form part of the Allocation Record; however the fact that a page has not been marked as a Claims Only Page does not make it inadmissible on the Claims Record.[6]

3.      The Core Parties agree to limit the pages of their pre-trial briefs as follows:

a)      Allocation: ■[7] pages for each Core Party that filed a pleading that is not a joinder and 15 pages for each Core Party that filed a joinder pleading

b)      Claims: 150 pages for each of EMEA and UK Pension Claimants, 300 pages for the Canadian Claims Defendant Group[8]

**B.      Examination of Fact Witnesses**

1.      <u>Examination of Fact Witnesses.</u>

a)      On May 2, 2014, the Core Parties shall provide notice of any fact witness who (i) they would be entitled to cross-examine under the Joint

---

[4] The EMEA Claimants and UK Pension Claimants do not object to the page limits but believe the Canadian Claims Defendant Group should be required to split their total allocated affidavit pages between EMEA Claims and UK Pension Claims

[5] Parties shall structure their affidavits in a way that it is apparent which pages are "Claims Only" either through section headings, notations or by separate cover.

[6] The EMEA Debtors request the following provision to be inserted: "Within 3 business days following the submission of opening fact witness affidavits and 3 business days following the submission of reply fact witness affidavits, a Core Party may adopt any affidavit submitted by another Core Party, in which case such affidavit will be treated as affirmative evidence submitted by both the proffering Core Party and the adopting Core Party. Any affidavit adopted (but not submitted) by a Core Party shall not count towards that Core Party's page limits."

[7] Proposals are as follows:
- <u>Monitor/Canadian Debtors, EMEA Debtors, CCC, UK Pension Claimants</u>: 150 pages per Core Party that filed a pleading
- <u>US Debtors</u>: 75 pages per Allocation Group

[8] The EMEA Claimants and UK Pension Claimants do not object to the page limits but believe the Canadian Claims Defendant Group should split their briefs between EMEA Claims and UK Pension Claims

- 2 -

*Without Prejudice*
*Proposed Joint Draft: March 10, 2014*

Trial Protocol; but whom (ii) they do not wish to cross-examine. Subject to (b) below, to the extent that no examining party wishes to examine a witness (a "Non-Noticed Witness"), such witness does not need to appear for cross-examination at trial unless requested by either or both of the Courts.

b)    On May 5, 2014, any proffering party shall give notice of any Non-Noticed Witness who they intend to have appear at trial.

2.    Any fact witness who appears at trial may be cross-examined by any other Core Party, irrespective of whether they provided a notice under section 1(a) (to the extent such party is otherwise entitled to do so under the Joint Trial Protocol). It is understood that any cross-examination of any witness that is conducted by any Core Party that is not a party to the Claims proceedings is only part of the record in the Allocation case. Notwithstanding the foregoing, the Core Parties with standing on Claims retain the right to object to the ability of a Core Party without standing on Claims to cross-examine witnesses whose evidence relates only to Claims.

3.    <u>Location of Examinations.</u> Fact witnesses shall appear for trial in the location disclosed in accordance with Section I.A.3 of the Original Protocol, except that any fact witness who will be examined on Claims only or whose affidavit is mostly related to Claims matters (on the good faith determination of the proffering Core Party) shall appear in Toronto.

C.    **Examination of Experts (foreign law and non-foreign law)[9]**

1.    Pursuant to I.D.1 of the Original Protocol, the Core Parties agree there shall be no numerical limit on the number of experts (foreign law and non-foreign law) appearing at trial and the following paragraphs shall instead apply.

2.    <u>Examination of Experts.</u>

a)    On May 2, 2014, the Core Parties shall provide notice of any expert who (i) they would be entitled to cross-examine under the Joint Trial Protocol; but whom (ii) they do not wish to cross-examine. Subject to (b) below, to the extent that no examining party wishes to examine a witness (a "Non-Noticed Expert"), such expert does not need to appear for cross-examination at trial unless requested by either or both of the Courts.

b)    On May 5, 2014, any proffering party shall give notice of any Non-Noticed Expert who they intend to have appear at trial (it being acknowledged that all oral evidence on direct will be limited to the contents of such expert's report).

---

[9] For the purpose of this Amendment and Supplement, "foreign law experts" means those foreign law experts put forward by the EMEA Debtors and the responding experts put forward by the Canadian Claims Defendant Group.

3.      Any expert who appears at trial may be cross-examined by any other Core Party, irrespective of whether they provided a notice under section 2 (a) (to the extent such party is otherwise entitled to do so under the Joint Trial Protocol). Any cross-examination of an expert witness conducted by a Core Party that is not a party to the Claims proceeding is only part of the record in the Allocation proceeding. Notwithstanding the foregoing, the Core Parties with standing on Claims retain the right to object to the ability of a Core Party without standing on Claims to cross-examine witnesses whose evidence relates only to Claims.

4.      With respect to expert witnesses on Allocation issues, (a) the EMEA Debtors reserve the right to cross-examine any expert witnesses proffered by the UK Pension Claimants to the extent that the trial testimony of such expert is adverse to the EMEA Debtors' theory on Allocation, and (b) the UK Pension Claimants reserve the right to cross-examine any expert witness proffered by the EMEA Debtors, to the extent that the trial testimony of such expert is adverse to the UK Pension Claimants' theory on Allocation. Any such testimony shall not be admissible on the Claims record.

5.      <u>Foreign Law Experts</u>. In accordance with the Original Protocol, EMEA Claimants and the Canadian Claims Defendant Group will work in good faith to try and reach an agreement to reduce or eliminate the need for live testimony of foreign law experts at trial.

6.      <u>Location of Cross-Examination</u>: Each Core Party shall advise the others on April 11, 2014 which Court location their expert witnesses will appear in to give their testimony (whether appearing by virtue of sub-paragraph 2 (a) or (b) hereof) except that any expert witness who will be examined on Claims only related matters shall appear in Toronto.

**D.      Scheduling**

1.      On May 5, 2014, each proffering Core Party shall provide an anticipated order of their witnesses for appearance at trial and file such notice with the Courts. If changes are required to be made to the order of appearances of witnesses the proffering Core Party shall provide notice to the other Core Parties and to the Courts as soon as reasonably practicable.

**III.      Trial**

**A.      General**

1.      Total trial time will be 210 hours commencing May 12, 2014. The Core Parties agree that, subject to the Courts' direction,

a)      the trial will be conducted on all days that both Courts are open (unless during a Claims only portion of the trial);

b) the intention of the Core Parties is that the Allocation portion of the trial will end no later than June 13, 2014; and

c) the Claims portion of the trial will not start prior to June 23, 2014.

2. The time allocations will be measured in a chess clock approach and the total trial time are as follows:

a) Allocation: 42 hours shall be allocated to each of the US Allocation Group/Bondholder Allocation Group, the Canadian Allocation Group and the EMEA Allocation Group.[10]

b) Claims: each of the EMEA Claimants and UK Pension Claimants shall be entitled to 21 hours and the Canadian Claims Defendant Group shall be entitled to 42 hours.[11]

c) Where the examination of a fact witness or expert overlaps between Allocation and Claims, any cross-examining party who is participating in both Allocation and Claims shall either indicate during their examination which portions relate exclusively to Claims or within 1 business day after the completion of the examination provide their good faith estimate of the time within their examination attributable exclusively to Claims ("Claims Only Testimony"), the balance of which time shall be attributed to the Allocation time allotment. Another Core Party may object where it believes the breakdown is materially incorrect within 1 business day thereafter. Parties shall attempt to resolve any objections consensually, failing which direction shall be sought from the Court(s). Claims Only Testimony shall not form part of the Allocation Record; however the fact that testimony has not been identified as Claims Only Testimony does not make it inadmissible on the Claims Record.

d) Where more than one Core Party is required to share time, there shall be no restriction on how they decide to use or allocate their time allocations among themselves.

**B. Opening Statements**

1. The amount of time for opening statements as contemplated by II.B of the Original Protocol is as follows (to be credited against the general time allocations set forth in III.A (2)):

---

[10] This proposal is supported by the Monitor/ Canadian Debtors, US Debtors and CCC. The UK Pension Claimants propose 31.5 hours for each of the US Allocation Group/ Bondholder Allocation Group, Canadian Debtors/ Monitor, EMEA Debtors and UK Pension Claimants/CCC.

[11] The EMEA Claimants and UK Pension Claimants do not object to the page limits but believe the Canadian Claims Defendant Group should be required to split their total allocated time between EMEA Claims and UK Pension Claims

*Without Prejudice*
*Proposed Joint Draft: March 10, 2014*

a)    Allocation: [■] hours for the US Allocation Group; .25 hours for any other Core Party that is not in an Allocation Group (in accordance with II.B.2 of the Original Protocol); [■] hours for the Canadian Debtors/Monitor;[12] [■] hours for the EMEA Debtors; and [■] hours for the UK Pension Claimants/CCC; and[13]

b)    Claims: [■] hours for each of the EMEA Claimants and the UK Pension Claimants; and [■] hours for the Canadian Claims Defendant Group.[14]

## IV.   Post-Trial

### A.   Closing Arguments and Post-Trial Briefs

1.    Matters relating to closing arguments and post-trial briefs as set out in III.B of the Original Protocol shall be deferred following consultation with the Courts during or upon the conclusion of the evidentiary portion of the trial.

## V.   Miscellaneous

1.    In the event that a Core Party elects not to cross-examine a fact witness or expert at all, or on any particular statements made in their affidavit or report or their evidence in chief (and regardless of whether that witness appears at trial or not), no other Core Party may request, suggest or assert that an adverse inference should be drawn, and the Courts shall not draw any inferences, from the failure to cross-examine at all or on any particular statements made and no other Core Party may request, suggest or assert that the Court should infer, and the Courts shall not infer, that the Core Party thereby accepts the testimony of that witness or expert.

---

[12] All submissions on behalf of the Canadian Allocation Group in support of the Ownership Allocation Order will be made in this time allotment.

[13] Proposals are as follows:

- Monitor/ Canadian Debtors, US Debtors, UK Pension Claimants and CCC: 2.25 hours for the US Allocation Group/ Bondholder Allocation Group; 1.5 hours for the Canadian Debtors/ Monitor; 1.5 hours for the EMEA Debtors and 1.5 hours for the UK Pension Claimants/ CCC
- EMEA Debtors: 4.5 hours for the US Allocation Group/ Bondholder Allocation Group; 3 hours for the Canadian Debtors/ Monitor; 3 hours for the EMEA Debtors and 3 hours for the UK Pension Claimants/ CCC

[14] Proposals are as follows:

- Monitor/ Canadian Debtors and UK Pension Claimants: 1.5 hours for the EMEA Claimants; 1.5 hours for the UK Pension Claimants; 3.0 hours for the Canadian Claims Defendant Group (Subject to UK Pension Claimants position on splitting of time);
- EMEA Debtors: 3 hours for the EMEA Claimants, 3 hours for the UK Pension Claimants and 3 hours for the Canadian Claims Defendant Group on each of EMEA Claims and UK Pension Claims

# TAB B

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS*
*ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

**PROPOSED TRIAL PROTOCOL AND WRITTEN SUBMISSIONS OF**
**CANADIAN DEBTORS AND THE MONITOR**

**Joint Trial Protocol**
**(Pre-Trial Conference to be held on January 29, 2014)**

| | |
|---|---|
| **Goodmans LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| Bay Adelaide Centre | 1 First Canadian Place |
| 333 Bay Street, Suite 3400 | 100 King Street West, Suite 1600 |
| Toronto, ON  M5H 2S7 | Toronto, ON  M5X 1G5 |
| | |
| Jay A. Carfagnini  LSUC#: 22293T | Derrick Tay  LSUC#: 21152A |
| Alan Mark LSUC#: 21772U | Jennifer Stam  LSUC#: 46735J |
| Jessica Kimmel LSUC#: 32312W | |
| Peter Ruby  LSUC#: 38439P | |
| Joseph Pasquariello  LSUC#: 37389C | |
| | Tel:  416.862.5697 |
| Tel:    416.979.2211 | Fax:  416.862.7661 |
| Fax:   416.979.1234     . | |
| | Lawyers for the Canadian Debtors |
| Lawyers for the Monitor, | |
| Ernst & Young Inc | |

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF**
**COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS**
**TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED**

**PROPOSED TRIAL PROTOCOL AND WRITTEN SUBMISSIONS OF**
**CANADIAN DEBTORS AND THE MONITOR**

**Joint Trial Protocol**
**(Pre-Trial Conference to be held on January 29, 2014)**

## I.    OVERVIEW

1.    In accordance with the Order of this Court dated November 19, 2013 and the similar Order of the U.S. Court  (the "**Amendment Orders**"), the Core Parties have worked to develop a joint trial protocol to govern certain procedural matters relating to the conduct of the trial.

2.    The Core Parties have worked collaboratively and cooperatively to develop a joint proposed form of trial protocol, which is attached as Appendix A hereto (the "**Proposed**

**Trial Protocol"**) and hereby submitted by the Canadian Debtors and the Monitor.[1]   The Proposed Trial Protocol is a compromise that has been agreed to by most of the Core Parties subject to a few exceptions listed below.

3.     Capitalized terms used herein and not otherwise defined have the meaning to them in the Proposed Trial Protocol.

## II.   THE TRIAL PROTOCOL PROPOSAL

*Overview*

4.     The Proposed Trial Protocol is broken down into five (5) main sections and outlines agreement of the Core Parties on procedural matters including:

    (a)     Pre-Trial. The schedule for exchange and filing of:

        (i)      affidavits (initial and reply), expert reports (initial and reply);

        (ii)     exhibit lists and fact/ expert witness designations (including a process for objections and counter designations);

        (iii)     Pre-Trial Orders and Pre-Trial Motions; and

        (iv)     Pre-Trial briefs.

    (b)     Trial.  The order of presenting opening statements and calling and examining fact witnesses and experts as well as certain rules with respect to the same.

---

[1] In accordance with the Amendment Orders, the Core Parties agreed to amend the date for submission of proposals to the Courts to January 23, 2014 (and subsequently to January 24, 2014) in order to make further efforts to reach consensus on the proposed form of protocol.

- 4 -

(c)     Post-Trial.  The timing for the filing of post-hearing memoranda and the order of hearing of closing arguments.

(d)     Trial Location.   Matters relating to the location and conduct of the trial and acknowledgements as to the ability of counsel to appear in either Court.

(e)     Miscellaneous.   Additional miscellaneous matters. Notably, the Proposed Trial Protocol makes it clear that this has been agreed to on the assumption that all Core Parties are presenting their allocation positions as set out in their pleadings. The Proposed Trial Protocol explicitly provides that if any Core Party adopts a position that is not reflected in its pleadings, any other Core Party has the right to petition the Courts for re-allocation of time or re-ordering of presentation.

5.     Issues that have not been addressed in the Proposed Trial Protocol and which the Core Parties have agreed to defer to a future date include:

(a)     Limitations, if any, on affidavits and witnesses appearing at trial;

(b)     The number of experts (both non-foreign law and foreign law) to appear at trial (including whether it will be necessary for any foreign law experts to appear at trial); and

(c)     The trial time to be allocated to each of the Groups and/or Claimants including time limitations on opening and closing arguments.

- 5 -

*Next Steps*

6.      The Proposed Trial Protocol contemplates that the Core Parties will meet and confer on many of these outstanding issues during the month of February and will submit proposals no later than February 28, 2014.

7.      Currently, the next pre-trial conference is scheduled for the week of April 21, 2014. In connection with these further negotiations, the Core Parties would propose that the Courts (subject to their availability) schedule an interim pre-trial conference for the week of March 10, 2014.

*Objections*

8.      The Canadian Debtors and the Monitor understand that the CCC has a limited objection with respect to footnote 1 of the Proposed Trial Protocol. The Canadian Debtors and the Monitor are not aware of any other objections.

9.      The Canadian Debtors and the Monitor also note that although the EMEA Debtors and the UK Pension Claimants have agreed to the Proposed Trial Protocol, they have each filed submissions (or a letter) seeking additional trial time which they propose to be used exclusively for Claims, notwithstanding that some of the Claims issues have been settled. The Canadian Debtors and the Monitor reserve all rights to file a reply to these submissions prior to the pre-trial conference.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED this 24th day of January, 2014.**


**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

Jay A. Carfagnini  LSUC#: 22293T
Alan Mark LSUC#: 21772U
Jessica Kimmel LSUC#: 32312W
Peter Ruby LSUC#: 38439P
Joseph Pasquariello LSUC#: 37389C


Tel:  416.979.2211
Fax:  416.979.1234

Lawyers for the Monitor,
Ernst & Young Inc.


**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

Derrick Tay  LSUC#: 21152A
Jennifer Stam  LSUC#: 46735J


Tel:  416.862.5697
Fax:  416.862.7661

Lawyers for the Canadian Debtors

**APPENDIX A**

**Attached**

Proposed Joint Trial Protocol[1]

I.    **Pre-Trial Submissions**

    A.    **Fact Witness Affidavits**

        1.    By March 31, 2014,[2] the Core Parties shall disclose the names of the fact witnesses for Allocation (as defined in the Allocation Protocol) and Claims[3] from whom they will submit affidavits, which witnesses will be made available for cross-examination at trial.[4]

        2.    Opening fact witness affidavits for Allocation and Claims shall be exchanged by the Core Parties by April 11, 2014,[5] and submitted to the Courts by May 2, 2014 in connection with the joint pre-trial orders/books for Allocation and Claims for the judges as contemplated by Section I.H.

        3.    At the time of exchange of fact witness affidavits, the offering Core Party shall disclose the location at which each witness shall testify at trial.

        4.    On April 25, 2014, the Core Parties shall exchange the reply witness affidavits and submit such affidavits to the Courts by May 2, 2014 in connection with the joint pre-trial orders/books for Allocation and Claims for the judges as contemplated by Section I.H.  Except with leave of the Courts for good cause shown, or as necessary to rebut specific allegations concerning a proposed new affiant which could not have been reasonably anticipated, reply affidavits shall be

---

[1]    This proposal assumes a single trial of Allocation and Claims and is subject to change in the event of the Courts' adoption of the anticipated requests of the EMEA Claimants and the UK Pension Claimants for an increased trial length or bifurcation of the trial.  Additionally, the Litigation Timetable provides that the Bondholder Allocation Group is distinct from the allocation groups of the US, Canadian and EMEA Debtors and therefore has the right to make its own presentations to the Courts.  However, in an effort to streamline the trial proceedings, the Core Parties agree that for purposes of this Proposed Joint Trial Protocol, the Bondholder Allocation Group shall be considered part of the US Allocation Group except (i) the Bondholder Allocation Group shall have the right to submit its own pre-trial and post-trial briefs and is entitled to its own allocation of time for opening statements and closing arguments (each not to exceed 15 minutes) and (ii) in the event of disagreement between them, either the Bondholder Allocation Group or the US Allocation Group shall have the right to petition the Courts, upon a showing of good cause, for additional time to allocate at trial for witness examinations specifically for the Bondholder Allocation Group.  All other Core Parties' rights are reserved with respect to any such application by the Bondholder Allocation Group and/or the US Allocation Group.

[2]    All deadlines are to be considered to be no later than 8:30 p.m. Eastern time unless otherwise indicated.

[3]    "Claims" means the Canadian EMEA Claims and Canadian UKPC Claims as both terms are defined in the Allocation Protocol.

[4]    The Core Parties will meet and confer to discuss mutually acceptable limitations on the affidavits and those matters set out in Section II.C.4 herein with a view to submitting a joint proposal or competing proposals no later than February 28, 2014 and, subject to the availability of the Courts, with any unresolved issues to be determined by the Courts at a subsequent pre-trial conference to be convened no later than March 14, 2014.

[5]    "Claims Party" or "Claims Parties" refers to the Canadian Claims Defendant Group, the EMEA Claimants, and the UK Pension Claimants.

submitted only from witnesses who submit initial affidavits.

**B.  Deposition Designations**

1.      Deposition testimony may be submitted by any Core Party of any witness, except that deposition testimony (other than counter-designations for completeness) shall not be submitted by any Core Party of any witness from whom its Allocation Group is submitting an affidavit except that the EMEA Claimants and the UK Pension Claimants, as the case may be, may submit deposition testimony of a witness whose affidavit is submitted by the other of the EMEA Claimants and UK Pension Claimants solely with respect to their Claims.[6]

2.      Fact witness designations

a)      Initial designations shall be due by April 11, 2014.

b)      Objections to initial designations and counter-designations necessary for completeness, as well as initial supplemental designations specifically responsive to affidavit testimony, shall be due by April 25, 2014.

c)      Objections to counter-designations and initial supplemental designations, as well as final supplemental designations specifically responsive to reply affidavit testimony and counter-designations to initial supplemental designations, shall be due by April 29, 2014.

d)      Objections to final supplemental designations and counter-designations to initial supplemental designations, as well as counter-designations to final supplemental designations, shall be due by May 1, 2014.[7]

3.      Expert witness designations

a)      Designations for expert testimony shall be due April 17, 2014.

b)      Objections and counter-designations for expert testimony shall be due by April 25, 2014.

c)      Objections to counter-designations shall be due by April 30, 2014.

4.      Objections to deposition designations shall be made succinctly in writing and provided to the Courts with the final deposition designations for determination.   The time for determination of such objections will be subject to the discretion of the Courts.

---

[6]      In the event representative depositions take place, a Core Party may not offer the representative deposition testimony of any representative of itself or its Allocation Group (other than counter-designations for completeness).

[7]      Any objections to such further counter-designations shall be due by May 5, 2014 and shall result in the supplementation of the pre-trial orders.

2

5.      Any Core Party may seek leave of the Courts, for good cause shown, to permit the introduction at trial of deposition designations not included with the joint pre-trial orders/books.  This provision shall not limit any Core Party's rights under Section II.C.8.

6.      Final deposition designations and objections shall be submitted to the Courts by May 2, 2014 in connection with the joint pre-trial orders/books for Allocation and Claims for the judges as contemplated by Section I.H.

C.      **Exhibit lists**

1.      The Core Parties shall exchange exhibit lists prior to their submission to the Courts, in accordance with the following schedule:[8]

        a)      Initial exhibit designations shall be exchanged by April 11, 2014.

        b)      Objections to exhibit designations and supplemental designations shall be exchanged by April 25, 2014.

                (1)      Supplemental designations are intended to encompass a limited number of exhibits that were overlooked with initial designations or relate to another Allocation Group's or Claims Party's initial designations.

                (2)      The Courts shall have the right to exclude supplemental exhibit designations if they believe that admission would be prejudicial to any Core Party or order any other relief.

        c)      Objections to supplemental designations shall be due by April 30, 2014.

        d)      Final exhibit lists and objections shall be submitted to the Courts by May 2, 2014 in connection with the joint pre-trial orders/books for Allocation and Claims for the judges as contemplated by Section I.H.

2.      Objections to exhibits shall be made succinctly in writing and provided to the Courts with the final exhibit lists for determinations.

        a)      Barring objection, all exhibits shall be deemed admitted without having to be specifically moved into evidence at trial.

        b)      No objection shall be made to the authenticity of any exhibit or to the lack of foundational testimony necessary for its admission into evidence unless a party has a specific good faith basis to believe that the proffering party could not have laid a proper foundation with an

---

[8]      The Core Parties contemplate that prior to the pre-trial conference scheduled for January 29, 2014, they will reach final agreement on a stipulation regarding representative depositions, which will incorporate certain additional phases in the exhibit list schedule set forth herein.  In the event they do not reach such agreement, the Core Parties reserve their rights with respect to any necessary modification of the dates set forth in Sections I.C.1.b and I.I.

appropriate witness. The Core Parties reserve all rights to raise objections to the admissibility of documents to the extent they, in good faith, believe that necessary foundational testimony could not have been obtained, or as otherwise appropriate under the applicable laws or rules of evidence for reasons other than authenticity and foundation.[9] So long as notice is provided in accordance with the timeline for objections to exhibits generally, such objections may be raised by either the objecting Core Party or the proffering Core Party with the Courts as part of the Pre-Trial Motions in the manner set out in Section I.I.

3.      Any Core Party may seek leave of the Courts to permit the introduction at trial of any document that has not been designated for inclusion by any Core Party in the trial exhibit book upon a showing of good cause. In determining whether good cause has been shown, the Courts may consider, among other factors, the timeliness of the disclosure of the proposed exhibit and the underlying reasons therefore.

4.      Following the exchange of exhibit lists, the Core Parties shall confer to compile for the Courts a single set of joint exhibits whose admissibility is uncontested, along with separate sets (one for each Allocation Group and one for each Claims Party) of objected-to exhibits.

5.      Where applicable, exhibits shall be given the same number as used at depositions. Where an exhibit was marked more than one time at a deposition, one number shall be used and the Core Parties shall seek to modify other transcripts submitted to the Courts to reflect the exhibit number to be used at trial. In addition to providing the exhibit number marked at depositions, the exhibits shall also include the as-produced Document ID numbers.

**D.     Expert reports (which shall be those previously served in accordance with the Litigation Timetable)**

1.      ·· The Core Parties shall meet and confer in order to reach agreement by no later than April 4, 2014 on the number of experts (both foreign law and non-foreign law experts) each Group will be permitted to offer to testify live at trial, with the reports of its other experts being submitted without live examination.

a)      By April 11, 2014, each Allocation Group and each Claims Party shall identify those expert witnesses (non-foreign law experts and, to the extent agreement is not reached pursuant to Section 1.D.1.b below, foreign law experts) who will be testifying live and the location where they will be testifying.

b)      The Core Parties will work in good faith after the exchange of expert reports to try and reach an agreement that would allow for the

---

[9]      For the avoidance of doubt, except with respect to hearsay or other foundational objections dealt with pursuant to the foregoing, the Core Parties' rights to object to the admission of exhibits (or their weight) on other evidentiary grounds, such as improper opinion evidence, are preserved.

testimony of foreign law experts to be submitted without live testimony (through expert reports and deposition testimony). In the event that the Core Parties are unable to agree, a Core Party may designate foreign law experts to testify live at trial subject to the terms herein.

2.      The expert reports that a Core Party intends to rely upon may not be altered or supplemented after the expert has been deposed unless the expert is made available for re-deposition.

3.      In the event that a Core Party seeks to withdraw an expert, the Core Party shall provide notice in writing of its intention. If a Core Party withdraws an expert in writing prior to that expert's deposition, no other Core Party may refer to the report(s) of such an expert (including in any rebuttal report to the extent practicable) and there shall be no inference related to such expert having been withdrawn. If a Core Party withdraws an expert in writing after that expert's deposition, the other Core Parties may refer to the report(s) and/or designate portions of the deposition of such expert.

**E.     Statement of Agreed Facts**

1.      The Core Parties shall endeavor in good faith to prepare a statement of agreed facts.

**F.     Confidentiality and Protective Order**

1.      The Core Parties shall endeavor in good faith to negotiate a proposed confidentiality and protective order no later than March 31, 2014 and shall file such order (or their respective proposed versions if the Core Parties do not reach agreement) on or before April 11, 2014.

**G.     Pre-trial briefs**

1.      On May 2, 2014, the Core Parties shall serve and file pre-trial briefs. Core Parties who do not file a brief shall have until May 6, 2014 to file a joinder to the pre-trial brief of another Core Party.

2.      Pre-trial briefs on Claims and Allocation shall be separate.

**H.     Proposed pre-trial orders**

1.      The Core Parties shall jointly prepare a proposed pre-trial order on Allocation and a separate proposed pre-trial order on the EMEA Claims and the UK Pension Claims and submit such pre-trial orders to the Courts on May 2, 2014 by noon Eastern time. These orders shall contain:

a)      Any agreed upon written statement of facts;

b)      A list of all deposition designations (both fact witness designations and expert witness depositions), including the relevant excerpts, as well as all objections to any such testimony;

5

c)      A list of all exhibits designations, as well as all objections to any such exhibit designations;

d)      A single set of joint exhibits whose admissibility is uncontested, along with separate sets (one for Allocation and one for Claims) of objected-to exhibits;

e)      Copies of all fact witness affidavits of designated trial witnesses; and

f)      Copies of all expert reports.

**I.      Motions regarding matters that for good reason ought to be decided prior to trial ("Pre-Trial Motions")**

1.      Pre-Trial Motions shall be served and filed on April 17, 2014.

2.      Responses to Pre-Trial Motions shall be served and filed on April 25, 2014.

3.      Replies to Pre-Trial Motions shall be served and filed on May 2, 2014.

4.      Any Core Party may request, or oppose any request, to appear before the Courts to provide oral submissions.

**II.    Trial**

**A.      General**

1.      Total trial time is estimated at 120 hours (20 days of six hours each).  The trial time shall be utilized for (i) opening statements and (ii) presentation of witnesses in the manner permitted hereunder.

2.      The US Allocation Group shall be entitled to [●] hours, the Canadian Allocation Group shall be entitled to [●] hours, the Canadian Claims Defendant Group shall be entitled to [●] hours, the EMEA Allocation Group shall be entitled to [●] hours, the EMEA Claimants shall be entitled to [●] hours, and UK Pension Claimants shall be entitled to [●] hours.  The Core Parties defer until a future date (as set forth in Section II.C.4) a decision with respect to the foregoing allocation of time but agree that the time used by each Core Party shall be measured in a "chess clock" approach.[10]

---

[10]      The UK Pension Claimants intend to raise the issue as to whether the length of trial prescribed by the Courts applies only to the Allocation trial rather than Allocation and Claims resolution.  In this respect, the UK Pension Claimants will submit that the length of the trial is inadequate to address Allocation and Claims in a just and fair manner.  All other Core Parties reserve their rights to support or object to the position of the UK Pension Claimants.

Other Core Parties may have submissions about entitlement to separate time allocations and all rights are reserved in this regard.

a)      Each Allocation Group (and the Canadian Claims Defendant Group) shall have no restriction on how they wish to use or allocate their time allocations among members.

b)      Any Core Party that is not part of an Allocation Group shall identify the Allocation Group with whom that Core Party is most closely aligned by April 14, 2014.

**B.      Opening Statements**

1.      Opening statements on Allocation shall be limited to [●] hours for each of the Allocation Groups, to be allocated among intra-Group members in whatever manner they see fit.[11]

a)      Opening statements shall be in the following order:

(1)      EMEA Allocation Group

(2)      US Allocation Group

(3)      Canadian Allocation Group

b)      Each Core Party that is not part of an Allocation Group may present an opening statement immediately following the Allocation Group identified by that Core Party pursuant to Section II.A.2.b.  Such opening statement shall be no longer than 15 minutes.

2.      Opening statements on EMEA Claims and UK Pension Claims shall be limited to [●] hours for each of the Canadian Claims Defendant Group, the EMEA Claimants, and the UK Pension Claimants, to be allocated by intra-Group members in whatever manner they see fit.

a)      Opening statements shall be in the following order:

(1)      EMEA Claimants

(2)      UK Pension Claimants

(3)      Canadian Claims Defendant Group

**C.      Fact Witnesses[12]**

1.      No fact witness may testify who has not submitted an affidavit.

2.      Fact witnesses shall be called in the following order:

---

[11]      No single Core Party will use the entire time allotted to any Allocation Group or Claims Group for making opening or closing submissions without agreement of other members of its Allocation Group or Claims Group.

[12]      The rights of the Core Parties to examine and cross-examine are subject to the usual rules governing cross examination with respect to parties who are not adverse in interest, and are to be exercised in light of the expectation that direct evidence is to be disclosed in pre-filed affidavits.

a)    Canadian Allocation Group and Canadian Claims Defendant Group

b)    US Allocation Group

c)    EMEA Allocation Group, EMEA Claimants, and UK Pension Claimants

3.    The examination of witnesses shall be in the following order (with the proffering Group determining the order of its witnesses):

a)    For Canadian Allocation Group and Canadian Claims Defendant Group witnesses:

(1)    Canadian Allocation Group and Canadian Claims Defendant Group

(2)    US Allocation Group  (on Allocation only)

(3)    EMEA Allocation Group, EMEA Claimants, and UK Pension Claimants

b)    For US Allocation Group witnesses:

(1)    US Allocation Group

(2)    EMEA Allocation Group

(3)    Canadian Allocation Group

c)    For EMEA Allocation Group, EMEA Claimants, and UK Pension Claimants witnesses:

(1)    EMEA Allocation Group, EMEA Claimants, and UK Pension Claimants

(2)    Canadian Allocation Group and Canadian Claims Defendant Group

(3)    US Allocation Group  (on Allocation only)

4.    Re-direct and re-cross examinations shall be limited in scope to the preceding examinations since that Allocation Group or Claims Party last examined the witness and shall be conducted in the same order as the initial examinations.

5.    The Core Parties shall meet and confer in order to submit proposals to the Courts with respect to the trial schedule including (i) the time permitted for opening statements, and (ii) the division of trial time among the various Allocation Groups and/or Claims Parties.  An agreed-upon proposal, or separate proposals in the event the Core Parties fail to reach agreement, shall be submitted

to the Courts no later than February 28, 2014 so as to enable the Courts to adjudicate any disagreement at a pre-trial conference to be held no later than March 14, 2014, subject to the availability of the Courts.[13]

6.       Affidavits from fact witnesses shall serve as direct testimony; however, Core Parties shall be permitted to conduct an initial direct examination of up to 30 minutes consistent with the witness's affidavit or as appropriate to respond to the testimony of another witness, with such time being charged against the proffering Allocation Group's or Claims Party's time allocation.

7.       Core Parties that do not belong to any Allocation Group may cross-examine witnesses in conjunction with the Allocation Group identified by that Core Party pursuant to Section II.A.2.b, provided that such Core Parties shall coordinate their efforts with the members of the Allocation Group identified by that Core Party pursuant to Section II.A.2.b to the extent practicable.

8.       Fact witnesses shall only be called to testify once.  Two business days following the completion of all fact witness testimony, the Core Parties shall have the opportunity to submit additional deposition designations solely as necessary to rebut testimony of a fact witness of another Allocation Group or Claims Party (with the Core Party that proffered such fact witness(es) having the right to submit two business days later objections as well as counter-designations necessary for completeness).  A Core Party may not designate additional deposition testimony of a testifying witness without having first put the deposition testimony to the witness at trial.

a)       If challenged, the Core Party seeking to offer such supplemental deposition designations shall be required to identify the specific testimony to which each designation relates

**D.      Expert Witnesses**[14]

1.       The number of all expert witnesses (both non-foreign law and foreign law, unless an agreement has been reach that no foreign law experts need to appear at trial) to testify at trial will be chosen by each Allocation Group and Claims Party and disclosed to the other Core Parties no later than April 4, 2014, with the remaining experts testifying through written reports and deposition testimony.[15]  Each other Allocation Groups or Claims Parties shall have the right to request the live appearance and cross examination of additional expert witnesses from the other Allocation Groups or Claims Parties.

---

[13]       The proposal(s) can be either for a specific allocation of time or principles by which time would be allocated.  The allocation of any trial time to Core Parties who are not part of an Allocation Group shall be taken pro rata from all Allocation Groups.

[14]       The rights of the Core Parties to examine and cross-examine are subject to the usual rules governing cross examination with respect to parties who are not adverse in interest, and are to be exercised in light of the expectation that direct evidence is to be disclosed in pre-filed expert reports.

[15]       Subject to ability to call additional rebuttal expert witnesses.

a)  Deposition testimony may be submitted by the other Allocation Groups or Claims Parties without restriction with respect to any experts. Deposition testimony may not be offered (except proper counter-designations) by any Allocation Group or Claims Party with respect to its own expert witness it is calling as a live witness.

2.  Expert trial witnesses for Allocation and Claims shall be disclosed on April 11, 2014.

3.  Expert witnesses whose evidence is solely in respect of Allocation or a combination of Allocation and Claims ("Allocation Experts") shall be called in the following order after the examination of all fact witnesses:

a)  EMEA Allocation Group

b)  Canadian Allocation Group

c)  US Allocation Group

4.  The examination of Allocation Experts shall be in the following order (with the proffering Allocation Group determining the order of its witnesses):

a)  For EMEA Allocation Group witnesses

(1)  EMEA Allocation Group

(2)  Canadian Allocation Group

(3)  US Allocation Group

b)  For Canadian Allocation Group witnesses:

(1)  Canadian Allocation Group

(2)  US Allocation Group

(3)  EMEA Allocation Group

c)  For US Allocation Group witnesses

(1)  US Allocation Group

(2)  EMEA Allocation Group

(3)  Canadian Allocation Group

5.  Expert witnesses whose evidence is only in respect of Claims ("Claims Experts") shall be called in the following order after the examination of all

10

Allocation expert witnesses:[16]

    a)    EMEA Claimants

    b)    UK Pension Claimants

    c)    Canadian Claims Defendant Group

6.    The examination of Claims Experts shall be in the following order (with the proffering Claims Party determining the order of its witnesses):

    a)    For EMEA Claimants witnesses:

        (1)    EMEA Claimants

        (2)    Canadian Claims Defendant Group

    b)    For UK Pension Claimants witnesses:

        (1)    UK Pension Claimants

        (2)    Canadian Claims Defendant Group

    c)    For Canadian Claims Defendant Group witnesses:

        (1)    Canadian Claims Defendant Group

        (2)    EMEA Claimants

        (3)    UK Pension Claimants

7.    Re-direct and re-cross examinations shall be limited in scope to the preceding examinations since that Allocation Group or Claims Party last examined the witness and shall be conducted in the same order as the initial examinations.

8.    Core Parties that do not belong to any Allocation Group may cross-examine expert witnesses in conjunction with the Allocation Group identified by that Core Party pursuant to Section II.A.2.b, provided that such Core Parties shall coordinate their efforts with the members of the Allocation Group identified by that Core Party pursuant to Section II.A.2.b to the extent practicable.

9.    Expert reports and rebuttal reports shall serve as direct testimony; however, Core Parties shall be permitted to conduct initial direct examinations (without time restriction) consistent with the expert's reports, with such time being charged against the proffering Allocation Group's or Claims Party's time allocation.

---

[16]    For greater certainty, the UK Pension Claimants shall not be entitled to conduct an examination of EMEA Claimants' Claims Experts, and the EMEA Claimants shall not be entitled to conduct an examination of the UK Pension Claimants' Claims Experts.

E.    The evidentiary record shall be closed simultaneously for all Core Parties at the conclusion of trial.

III.    **Post-Trial**

A.    **Written Submissions**

1.    Opening post-hearing memoranda on Allocation and opening post-hearing memoranda on Claims will be filed separately.

a)    Each opening post-hearing memoranda shall be submitted four weeks after the last day of trial.  Core Parties shall have two additional business days to file a joinder to the post-hearing memoranda of another Core Party.

2.    Responsive post-hearing memoranda on Allocation and responsive post-hearing memoranda on Claims will be filed separately.

a)    Responsive post-hearing memoranda shall be submitted three weeks after the opening post-hearing memoranda.  Core Parties shall have two additional business days to file a joinder to the responsive post-hearing memoranda of another Core Party.

B.    **Closing Arguments**

1.    On [dates] [2 consecutive days], closing arguments on Allocation shall be heard.  On [date(s)], closing arguments on the EMEA Claims and UK Pension Claims shall be heard.

2.    Closing arguments on Allocation shall be limited to [●] hours for each of the Canadian Allocation Group, EMEA Allocation Group, and US Allocation Group, to be allocated by intra-Group members in whatever manner they see fit. This time shall not be charged against the trial time allocations set forth above.

a)    Closing arguments on Allocation shall be in the following order:

(1)    Canadian Allocation Group

(2)    EMEA Allocation Group

(3)    US Allocation Group

b)    Each Core Party that is not part of an Allocation Group may present a closing argument immediately following the Allocation Group identified by that Core Party pursuant to Section II.A.2.b.  Such closing argument shall be no longer than 15 minutes.  A Core Party is not obligated to present a closing argument.

c)    Allocation Groups may reserve up to 1/3 of their time for closing arguments for a single round of rebuttal arguments in the same order as

12

initial closing arguments.

3.     The available time for closing arguments on EMEA Claims will be limited to [●] hours for the EMEA Claimants and [●] hours for the Canadian Claims Defendant Group, to be allocated among Group members in whatever manner they see fit.

    a)     Closing arguments on the EMEA Claims Dispute shall be in the following order:

        (1)     EMEA Claimants

        (2)     Canadian Claims Defendant Group

    b)     The EMEA Claimants may reserve up to 1/3 of their time of closing argument for a rebuttal argument.

4.     The available time for closing arguments on the UK Pension Claims Dispute will be limited to [●] hours for the UK Pension Claimants and [●] hours for the Canadian Claims Defendant Group, to be allocated among Group members in whatever manner they see fit.

    a)     Closing arguments on the UK Pension Claims Dispute shall be in the following order:

        (1)     UK Pension Claimants

        (2)     Canadian Claims Defendant Group

    b)     The UK Pension Claimants may reserve up to 1/3 of their time for closing argument for a rebuttal argument.

## IV.    Trial Location

A.     Each Allocation Group and Claims Party shall be entitled to advance and prove its case in the location it chooses (*i.e.*, opening statement, oral evidence and closing argument).

B.     Witnesses shall testify in either Toronto or Wilmington at their election, provided notice of location is furnished at the time of the exchange of affidavits.

C.     Trial location in Toronto shall be _____.

D.     Trial location in Wilmington shall be _____.

E.     Miscellaneous

1.     When proceedings are occurring in Toronto, the US Court shall participate by live video link.

2.     When proceedings are occurring in Wilmington, the Canadian Court shall

participate by live video link.

3.      All arguments shall be presented live in the locations listed above. Witness examination may be presented in either court location and presented through video link to the other location.

4.      Each Allocation Group shall have at least one lawyer present in the courtroom participating by video link in order to ensure the smooth presentation of documentary evidence to the video linked judge.

5.      Counsel admitted in either the US Court or Canadian Court (including by *pro hac vice*) may appear and participate fully in the other courtroom as if admitted in that Court.

## V.    Miscellaneous

A.      The Core Parties hereby acknowledge the previous agreements and orders that bear on the Joint Trial, including but not limited to (i) the Cross-border Insolvency Protocol; (ii) the Cross-border Claims Protocol; (iii) the Discovery Plan; and (iv) the Deposition Protocol and amendments thereto. The Core Parties stipulate and agree that to the extent these agreements are inconsistent with this Joint Trial Protocol, the Joint Trial Protocol shall govern.

B.      The Courts shall have the right to modify this Joint Trial Protocol at their discretion for good cause so long as they conclude that such modification is not unduly prejudicial to any Core Party.

C.      In the event any of the Core Parties elects to adopt an allocation position not contained in its pleadings, any other Core Party shall have the right to petition the Courts for a re-allocation of trial time and/or a re-ordering of the trial presentation. Nothing in this provision shall relieve any Core Party of any obligation to seek leave to amend its pleadings to the extent it is otherwise required to do so by law, or to impose any obligation to seek leave to amend its pleadings if it is not otherwise required to do so by law.

D.      Core Parties shall not be obligated to prove Canadian law to the US Court or US law to the Canadian Court as an issue of fact, but shall be entitled to argue the law of either jurisdiction in their pre-trial or post-hearing memoranda.

E.      Conduct of counsel at trial

1.      For efficiency, an examining attorney may approach a witness at any time without seeking permission from the Court.

2.      Counsel may conduct examinations or cross-examinations of a witness remotely or in person. Counsel may be present in both Courts.

3.      Counsel will conduct examination from a lectern.

4.      Any objection raised by one party shall be deemed reserved by all Core

14

Parties other than those in the Allocation Group against whom the objection is asserted.

5.    Counsel who will be conducting the examination (which shall be no more than one per Core Party for each witness[17]) and counsel who will be objecting during the examination will announce themselves at the beginning of the examination. Two persons from each Allocation Group (from different Core Parties) shall be designated to make objections for each witness.

F.    Exhibits

1.    A master set of all documents and proposed exhibits listed on all Core Parties' evidence lists will be prepared for each court. Four copies of these will be prepared in binders. One copy will be provided for each judge and one copy will be provided for the witness in each courtroom.

2.    A master set of exhibits will also be prepared electronically for the Courts and distributed on CD to the Courts. The Core Parties shall coordinate on the preparation of these master exhibits lists and delivery to the Courts.

3.    Demonstrative Exhibits

a)    Any Core Party shall be permitted to use either hard copy demonstratives, computer demonstratives, or a whiteboard if desired.

b)    A Core Party shall provide a copy of any demonstratives that it intends to use during a trial day no later than 7:00 p.m. the prior day (which can be a Sunday for demonstratives to be used on a Monday).

---

[17]    A Core Party may have a second examiner exclusively for Claims-related issues.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

| | |
|---|---|
| | **ONTARIO**<br>**SUPERIOR COURT OF JUSTICE**<br>(Commercial List)<br><br>Proceeding commenced at Toronto |
| | **Proposed Trial Protocol and Written Submissions of the Monitor and Canadian Debtors**<br><br>**Trial Protocol**<br><br>(Pre-Trial Conference to be held on January 29, 2014) |
| | **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400<br>Toronto, Canada  M5H 2S7<br><br>Jay A. Carfagnini  (LSUC #: 22293T)<br>Alan Mark (LSUC #: 21772U)<br>Jessica Kimmel (LSUC #: 32312W)<br>Peter Ruby (LSUC #: 38439P)<br>Joseph Pasquariello (LSUC #: 37389C)<br><br>Tel:      416.979.2211<br>Fax:     416.979.1234<br><br>**Lawyers for the Monitor, Ernst & Young Inc.** | **Gowling Lafleur Henderson LLP**<br>Barristers & Solicitors<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto, ON  M5X 1G5<br><br>Derrick Tay  (LSUC #: 21152A)<br>Jennifer Stam (LSUC #: 46735J)<br><br>Tel:  416.862.5697<br>Fax:  416.862.7661<br><br>**Lawyers for the Canadian Debtors** |

6280791

# TAB C

File No. 09-CL-7950

**SUPERIOR COURT OF JUSTICE - ONTARIO**
**(COMMERCIAL LIST)**

RE:  IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

BEFORE:  MORAWETZ, RSJ.

COUNSEL:  A. Mark and J. Kimmel, for the Ernst & Young Inc., the Monitor

J. Stam, for Nortel Networks Corporation et. al.

S. Block and S. Bomhof, for the US Debtors

M. Gottlieb and T. Wynne, for the EMEA Debtors

M. Barrack, J. Finnigan, R. Lewis, for the UK Pension Claimants

M. Zigler and B. Walancik, for the Canadian Creditors Committee

R. Swan and G. Finlayson, for the ad hoc bondholders group

L. Barnes, for the former directors and officers of Nortel Networks Corporation and Nortel Networks Limited

S. Kukulowicz, for the unsecured creditors committee

J. Salmas, for Wilmington Trust, National Association

- 2 -

**HEARD:**    **January 29, 2014**

## PRE-TRIAL MANAGEMENT MEMORANDUM

At this jointly convened pre-trial conference which was conducted via teleconference with a parallel pre-trial conference being held in the United States Bankruptcy Court with His Honour, Judge Gross pursuant to the cross-border protocol which has previously been approved in both Courts. The Ontario and Delaware Courts approved the Joint Trial Protocol submitted by the parties, subject to the following directions and any corresponding adjustments to be incorporated into the final form to be attached to the approval orders in both jurisdictions (which may also include amendments arising out of the stipulations referred to in footnote #8):

1. In respect of the issue raised by the CCC, Justice Morawetz directed that the point will be addressed later and, following the presentations by the parties at pages 12-28 of the transcript, provided guidance as set out in the 1st paragraph of page 80 of the transcript, all of which is excerpted in Schedule A hereto.

2. In respect of the submissions and positions concerning the EMEA Debtors' and UK Pension Claimants' requests, the matters will proceed as a single trial commencing on May 12. The trial will generally address allocation issues (and issues that involves both allocation and claims) first, followed by issues related to Canadian Claims.

3. The 20 days allotted for trial are not set in stone. Additional trial time will be allocated with some time set aside to deal exclusively with the Canadian Claims of the EMEA Debtors and the UKPC. A request for up to 10 to 15 total additional trial days will be considered. The parties are to confer and advise the Courts of the specific number of trial days sought.

4. The next joint pre-trial conference will be held on March 12, 2014 at 1 pm.

## SCHEDULE A

Attached

12

1  obviously significant, the concerns that are expressed by the

2  EMEA Debtors and the UKP, but there's complete buy-in by the

3  parties that the framework that's established here in the

4  Trial Protocol is the appropriate framework and the Objectors

5  themselves don't disagree with that, which I'm quite pleased

6  to say.

7           I'll defer second to the EMEA Debtors and UKP

8  Claimants to talk about their issues since obviously it's

9  really more of a disagreement between them --

10          THE COURT:  Yes.

11          MR. ROSENTHAL:  -- and the Canadian Debtors now that

12 the U.S. Debtors have settled the claims here in the U.S.

13 Court.  But I just want to mention briefly, because I don't

14 think the Courts really need to dwell on the first Objection

15 which is that of the CCC, specifically to footnote one --

16          THE COURT:  Yes.

17          MR. ROSENTHAL:  -- and other than the first

18 sentence.  The first sentence deals with UKP and EMEA and,

19 after that, it deals with the Bondholders.  And I think, or at

20 least over the weekend when we were thinking about it at the

21 U.S. Debtors, we had conversations with the Bondholders and

22 we decided that, in many respects, it's a premature dispute

23 that we can resolve much more easily for the Courts right now

24 and agree to simply delete that entire passage of footnote

25 one, and we proposed that to the CCC yesterday and they can

13

1  speak for themselves.  But in our view, Your Honors, because

2  the parties have deferred until the late February meet-and-

3  confer and the March Conference that we're proposing for the

4  Courts, how the time between the parties would be allocated,

5  really, there's no need at this point to say how much time

6  specifically the CCC should get; how much time -- in some

7  respects, it may play out as being really an intra-Canadian

8  issue because there will be an allocation of time for the

9  Canadian group, you'll have that being divided up among its

10  members, and there's a footnote in here saying that one group

11  can't take all of the time allocated to it so, to make sure

12  that it's fair, I think the CCC, to my understanding, is that

13  they had asked that that footnote be put in.  It was put in.

14  You know, unless, of course, the members of the group all want

15  one party to take all of its time on a particular issue.  So

16  our suggestion is we could delete the rest of that footnote

17  one; we could defer the issue of whether the CCC feels that

18  they are not getting a fair amount of time out of the Canadian

19  allocation of time until the parties sit down and actually

20  talk about what the allocation of time should be.  And if

21  there's a disagreement or if they're unhappy about it, then

22  nobody's saying that any of their rights to go to the Courts

23  and say, you know, that there's some disagreement at that time,

24  nobody's saying that their rights are waived in that regard.

25  So that's our proposal.

1          THE COURT:  Okay.

2          MR. ROSENTHAL:  It takes that issue off the table

3   for today and I would just say that the only issue, therefore,

4   that the Court needs to really address would be the EMEA and

5   UKP concerns that they have expressed in their filings.

6          Obviously, I don't want to speak for the CCC and

7   I'm happy to turn over the microphone, whether it's here or

8   there to allow them to speak for themselves and I'll address

9   it at any point in time that the Courts would like, whether

10  the Courts have any comments at all on the Protocol.

11         THE COURT:  All right.  Thank you, Mr. Rosenthal.

12  It might -- yes, please.

13         MR. LEBLANC:  Good morning, Your Honor and --

14         THE COURT:  Good morning.

15         MR. LEBLANC:  -- and Mr. Justice Morawetz.  Andrew

16  Leblanc, at Milbank Tweed Hadley & McCloy, on behalf of the

17  Bondholder Group, and I just wanted to make one point.  I

18  completely agree with Mr. Rosenthal that this is an issue that

19  we can defer until later but there were comments made in the

20  submission of the CCC that I think are necessary for us to at

21  least address in some form or fashion.  I think it's important

22  for the Court to recognize that what's reflected in the Trial

23  Protocol is actually a concession by the Bondholder Group to

24  not get a separate allocation of time for the Bondholder Group

25  separately.  And what I mean by that, not because of where we

1   are situated today, but because the Trial Protocol that the

2   Courts entered in May of last year, May 17th, identified the

3   Bondholder Group as a separate allocation group.  So there was

4   the EMEA allocation group, the Canadian allocation group, the

5   U.S. allocation group, and recognizing the fact that the

6   Bondholders have claims against both Canada and the U.S. and,

7   therefore, are truly unique among the constituencies, that we

8   were a separate allocation group, a core party, who was in

9   their own allocation group.  We haven't, throughout the

10  process, and I think there hasn't been any suggestion that we

11  have, but throughout the process, we have not abused our

12  status as being a separate allocation group.  Quite to the

13  contrary, we've acted in accordance with the understanding

14  that was in place at the time.  We've acted in concert with

15  the parties with whom we share an interest.  So, at times, with

16  the Canadian Debtors, we've discussed with them their document

17  requests, and by doing so, we're able to make comments to

18  theirs instead of serving our own.  So we haven't abused the

19  fact that we're a separate allocation group, but we think by

20  right, by the fact that under the Trial Protocol that was

21  entered by this Court, we were a separate allocation group.

22  We could have demanded our own slot of time just like each of

23  the other allocation groups did because that is something that

24  this Court -- that these Courts ordered more than almost a year

25  ago now.  We didn't do that.  We made these concessions

1  to be treated the same way as other core parties who are not

2  part of an allocation group to identify the allocation group,

3  to limit it to the three Estate allocation groups, and then to

4  identify which of those allocation groups we are aligned with

5  and be part of that and to defer until another date the

6  allocation of time so that we can ensure ourselves just like

7  the Unsecured Creditors Committee here in the United States,

8  the UKP in -- with respect to the EMEA Estates.  We could

9  assure ourselves a meaningful role at trial given what we would

10 view as our unique and substantial economic interests in the

11 matter, but at the same time not take a disparate advantage of

12 the fact that we were identified as our own allocation group.

13 So the compromises that are reflected in the Proposed Protocol

14 are compromises literally that we made from the position that

15 the Courts ordered almost a year ago now and that -- I think

16 that's important to know.

17         Now, with the discussion that Mr. Rosenthal just

18 mentioned where we've agreed now to take out footnote one, in

19 light of the rest of the language and the fact that these are

20 issues that will be resolved in the coming weeks, we think it

21 really should resolve the entirety of the issue.  But our

22 understanding is that the omission of the offending language

23 of footnote one wasn't an acceptable concession on our part

24 and so we'll leave it to the CCC to state their position.  But

25 I just wanted to make those points that we have been

1   recognized from the time that the IFSA was entered in this

2   case where we were given the right to consent to an agreement

3   on allocation of sales proceeds.  We've been recognized as a

4   group that has a very distinct economic interest in these

5   matters that isn't completely aligned economically with the

6   interests of any of the other Estates, and it's for those

7   reasons that these Courts have recognized that in the May

8   Protocol of last year.

9            THE COURT:  Yes.

10           MR. LEBLANC:  And as we said, we're not even asking

11  for any advantage as a result of that at this point in time.

12  Instead, we're trying to be cooperative with every party and

13  make this trial as efficient as possible in the limited period

14  of time that the Court's allowed for it.

15           So we would agree with Mr. Rosenthal that we think

16  this is an issue that we can deal with in the coming weeks.

17  If it becomes a problem, we can address it at that time.

18           THE COURT:  All right.

19           MR. LEBLANC:  Thank you, Your Honors.

20           THE COURT:  Thank you, Mr. Leblanc.  Mr. Adler,

21  good morning.  Good to see you again.

22           MR. ADLER:  Good morning.  Good to see you, Your

23  Honor, and Justice Morawetz as well.  It's Derek Adler, for

24  the Joint Administrators and the EMEA Debtors.

25           THE COURT:  Yes.

18

1      MR. ADLER:  As Mr. Rosenthal said, we support the

2  Trial Protocol.  We think it's a terrific outline for how

3  things should go.  It lays out a plan for dealing with both

4  allocation and claims in a very efficient way.  And we've

5  just made one request that doesn't affect the substance of

6  what's in the Trial Protocol and that concerns the treatment

7  of evidence and arguments that pertain specifically to

8  claims, the remaining claims that the EMEA Debtors have

9  asserted against the Canadian Estate and then there's a --

10      JUSTICE MORAWETZ:  Mr. Adler, I hesitate to

11  interrupt, but Judge Gross, does it make more sense to finish

12  off the issues relating to the CCC that have now been

13  introduced and in the Protocol what -- that have been

14  introduced by Mr. Rosenthal and by Mr. Leblanc?

15      THE COURT:  That's -- why don't we then?  Mr.

16  Adler, if you don't mind, we'll just --

17      MR. ADLER:  Thank you, Your Honor.  That's fine.

18      THE COURT:  All right.  We'll just interrupt your

19  presentation.

20      MR. ZIEGLER:  Your Honor?

21      MR. MARK:  So, Judge Gross, good morning.  It's

22  Alan Mark for the Canadian Monitor and Debtors in Toronto,

23  and just before I hand it over to Counsel for the CCC, just a

24  couple of notes about the Protocol.

25      Firstly, as alluded to by Mr. Rosenthal, the

19

1   parties expect this week to finalize a discovery stipulation

2   regarding the representative depositions and that will result

3   in some new dates and some new process with respect to the

4   pre-trial process.  So it's our expectation that the final

5   form of the Joint Trial Protocol that will be remitted to the

6   Court for approval will be slightly different, but we don't

7   expect those issues to be controversial, but rather, just to

8   reflect a further stipulation that the parties are going to

9   enter into.

10          Secondly, I just want to note, I don't want to

11  repeat anything Mr. Rosenthal says, but as Justice Gross

12  noted, the Protocol does provide, by and large, for the cases

13  in chief to be pre-filed, in writing, with the Court.  That

14  means that we have, in the Protocol, been somewhat

15  presumptuous in setting dates for when the parties' Briefs,

16  when the exhibit lists, when the Pre-Trial Affidavits and

17  expert reports will be provided to the Court.  And another

18  consequence of that front-end loaded process is that the

19  Protocol does provide the opportunity for pre-trial

20  Objections and possibly Motions to resolve some issues before

21  the trial begins.  So I just wanted to indicate that if the

22  Courts had any questions about that proposed schedule, we're

23  happy to address them, but I just wanted to make sure the

24  Courts were aware.

25          THE COURT:  Thank you, Mr. Mark.

1            MR. ZIEGLER:  Your Honor?  It's Mark -- and Judge

2    Gross, it's Mark Ziegler in Toronto speaking for the CCC, and

3    we have Counsel in Delaware as well, but I will respond to

4    the issues that were raised by Mr. Rosenthal and by the

5    Noteholders' Counsel, Mr. Leblanc.  I think we have to step

6    back to where we were last May, when my clients also sought a

7    separate discovery group.  That request at the time was

8    denied, without prejudice, to our seeking relief at a later

9    date, should we believe it is warranted, and that's in an

10   email that Judge Gross and Justice Morawetz sent to us on May

11   15th.  I can circulate copies if you like but I think everyone

12   is familiar with that.

13            What's happened since is pretty clear.  We have

14   three Estates and behind each of the Estates, three different

15   interest groups.  They break down essentially to the

16   Noteholder groups and Pensioner groups.  And the issue here

17   is not the removal of a footnote.  It's what's in the rest of

18   the Protocol as the default position once that footnote is

19   removed.  Because essentially, although there are three major

20   interests that could be addressed through the three main

21   Estates, there is reserve in this Protocol without footnote

22   one, and particularly, I am talking about the ability to make

23   oral submissions to the Court at the opening and at the

24   closing, and you can turn off the references that they're

25   essentially Section 1(B) on opening statements on page seven

 1   and Section 3, all (B) on page 12 where it's everybody who's

 2   not part of an allocation group has at least 15 minutes to

 3   make opening submissions and closing submissions and this

 4   isn't just about 15 minutes at each end.  It's about treating

 5   all the Creditor interests equally.  If we all had to work

 6   within three allocation groups, including the Noteholders,

 7   that would be fine.  But we don't.  There is, in effect, a

 8   fourth column that gets to make submissions while we are

 9   restricted within an allocation group where we share time,

10   not just with the Canadian Debtors and the Monitor, but also

11   the Directors who have to defend claims.  This allocation

12   Protocol which you are being asked to approve today carves

13   out time as a default position for the Noteholders and the

14   Indenture Trustees of at least 15 minutes at the front end

15   and at least 15 minutes at the back end.  So it's a lovely

16   concession to take out footnote one, but if they don't tell

17   you what the default position is, you can see it's a bit of

18   slate of hands in my position.  All my clients ask is the

19   same 15-minute right and then at the back end so that they

20   don't get jammed within the allocation group.  We will do our

21   best to work within the allocation group, just as I'm sure

22   everybody else who is a party in interest will work within

23   the three allocation groups and the Noteholders have, in

24   effect, joined up with the U.S. group, which is fine.  We

25   have joined up with the Canadian group but there is one issue

1    where we differ.  We take one allocation position that is not

2    in common as an alternative position with the Monitor, that

3    being the pro-rata distribution, and it would be highly

4    prejudicial to my clients to have a Trial Protocol go forward

5    that doesn't carve out explicit time for them, yet does for

6    the parties who are most adverse in interest to them.  At

7    this stage, five years in, there are pensioner interests and

8    there are Noteholder interests.  What happened before the

9    filing; what happened at the IFSA almost doesn't matter in

10   the sense of, ultimately, this is about distributions to

11   Creditors and if that's the case, the three biggest Creditor

12   groups have got to have their time before the Court.  That's

13   all I've got to say for now.

14              JUSTICE MORAWETZ:  Thank you.

15              THE COURT:  Mr. Rosenthal, did you wish to

16   respond?

17              MR. ROSENTHAL:  Your Honor, just about one minute

18   is all I need to respond.  Just -- I just want to underscore

19   why we believe that this issue is premature.  We believe it's

20   premature for several reasons, one of which is that the

21   Canadian Monitor and Debtors support the Protocol as

22   submitted and they said, and it's reflected in the Protocol,

23   they're going to give time to the CCC.  If the CCC, after

24   February 28th when we make the next round of submissions

25   regarding allocations, thinks that they haven't gotten their

1  15 minutes or whatever amount of time that they think that

2  they want, and I agree that this is a broader issue they're

3  talking about and it really is about the trial generally, if

4  they have any complaints about how they're dividing up the

5  time with the Canadian group, that's the time that they could

6  raise it.  They say that -- by the way, it's not just the

7  Monitor and Debtors and the CCC, but you have Ds & Os as

8  well, it's actually not true.  The Canadian allocation group

9  does not include the Ds & Os.  They're only Claims Defendants

10 and the Protocol divides up the opening statements and

11 closing arguments for allocation and claims.  So when it

12 comes to the allocation opening, we contemplate the U.S. is

13 going to get a set amount of time.  We don't know what that

14 is going to be.  We'll give an opening and the UCC will give

15 an opening.  Canada will get a set amount of time and the

16 Monitor and Debtors will give an opening and the CCC will

17 give an opening.  The EMEA group will get a set amount of

18 time and we don't know what that is.  And EMEA Debtors and

19 the UKP will give an opening.  And if parties have multiple

20 theories or different theories from each other, yes, they may

21 need time to present those theories, and the other parties

22 will need a comparable amount of time to respond to the

23 ultimate theories.  But I think this is all going to be

24 something that's worked out over the next month as opposed to

25 saying today how this thing -- the CCC and the Canadian group

24

1  be.  And if Canada doesn't give the CCC their 15 minutes or

2  whatever, you'll hear it when we have the hearing in mid-

3  March, and therefore, we would suggest that either footnote

4  one stay in or come out.  Either way is fine with us.  But

5  that we ought to proceed and proceed to the next step and see

6  if there's any dispute that the Courts even need to resolve.

7           THE COURT:  Well, I haven't taken time to look,

8  but I assume that there's nothing in the Protocol, and I

9  don't remember seeing anything that would preclude the CCC

10 from making an opening and closing.

11          MR. ROSENTHAL:  Quite to the contrary, Your Honor.

12          THE COURT:  Right.

13          MR. ROSENTHAL:  There's a footnote.  I don't have

14 the footnote number handy.

15          THE COURT:  Right.

16          MR. ROSENTHAL:  But there is a footnote that

17 expressly says that without permission of the other parties

18 in their group, a party cannot take all of the time allocated

19 to it.  So, therefore, the CCC has a guaranty, and the

20 Canadian Debtors I believe have also assured them they'll get

21 time to deliver their opening.  So I think as to how much

22 that time should be, that's exactly what the next months'

23 worth of negotiations is all about.

24          THE COURT:  Okay.

25          MR. ROSENTHAL:  Thank you.

25

1          THE COURT:  Thank you, Mr. Rosenthal.  Justice

2  Morawetz, was there anyone in your Courtroom who wished to be

3  heard on this point?

4          JUSTICE MORAWETZ:  Anything further on this issue?

5  Mr. Swan.

6          MR. SWAN:  Yes, just briefly in reply on behalf of

7  the Bondholders.  Every single party here has agreed to the

8  Protocol on all of these issues with the exception of the

9  CCC.  They are the only party that's objecting.  The

10 fundamental distinction that's been identified is that in the

11 Litigation Timetable, the Bondholder group is a separate

12 allocation group.  The Bondholder group is, in effect,

13 compromising procedural rights by agreeing to this in the

14 form that it's in and as a recognition of that, footnote one

15 recognizes certain limited procedural rights guaranteeing the

16 right to make a 15-minute opening and 15-minute closing.  The

17 CCC --

18         JUSTICE MORAWETZ:  Well, is it a case that the

19 Bondholders are compromising a right or is it a case that

20 it's just being expanded for the CCC to have a right?  What

21 specific rights are the Bondholders compromised on?

22         MR. SWAN:  They're compromised on the right to

23 otherwise carry out independent examinations with separate

24 time allocated to them because they would be a separate

25 allocation group.  So the Bondholders could have asserted the

1   right as a full allocation group to have the same rights as

2   the Canadian allocation group and the U.S. allocation group.

3   They haven't done that.  They have agreed that with respect

4   to the other elements of the proceedings, that they will

5   shelter, so to speak, under the U.S. allocation group's time

6   allocation.  But with respect to this one issue, footnote one

7   recognizes that they will have an opening and a closing

8   right.  The CCC is in a different position because they are a

9   Creditor whose economic interest are perfectly aligned with

10  the Canadian allocation group in much the same way that the

11  UKPC does not have a separate defined time, separate and

12  apart from the EMEA allocation group.  Obviously, it won't

13  make an opening statement as part of EMEA allocation group,

14  but it doesn't have separate defined time, nor does the UCC,

15  separate and apart from the U.S. allocation group.  So

16  there's no reason why the CCC as a Creditor who is within an

17  allocation group should have a separate specified right that

18  is unique and elevated above any other Creditor who's part of

19  an allocation group.

20          UNKNOWN:  Your Honor, if I may reply to some new

21  arguments that have been raised?

22          JUSTICE MORAWETZ:  Briefly.

23          UNKNOWN:  I thought that footnote one was off the

24  table.  Now it's back on.  If it's back on, all we ask is the

25  same 15 minutes and the same rights to come back to the

1   Courts with the Bondholders.  This is about treating major

2   Creditors equally.  It's not about historical status that was

3   allocated before the allocation positions came out.  We all

4   want to work effectively.  We will work with the Canadian

5   allocation group.  The Noteholders have worked with the

6   American group, that's fine.  That's as it should be.  But if

7   we're going to have a carve out time for one group of

8   Creditors, there should be the same for the others.

9           THE COURT:  I used to think it was only in the

10  United States that lawyers could argue for 30 minutes over 15

11  minutes but it sounds like we share that with Canada.

12                      (Laughter)

13          MR. LEBLANC:  I'll just add how flattered we are

14  to think that we can be so influential in 15 minutes.

15          THE COURT:  Yes.

16          JUSTICE MORAWETZ:  No comment.

17                      (Laughter)

18          THE COURT:  I would suggest that, as part of the

19  spirit of compromise, we at least for the moment delete

20  without prejudice footnote one.

21          MR. LEBLANC:  And, Your Honor, we've already

22  offered that up.

23          THE COURT:  That's right.

24          MR. LEBLANC:  And we're happy to do -- this is

25  Andrew Leblanc, on behalf of the Noteholders.  We've offered

1    it and we're happy to do it.

2            THE COURT:  Thank you, Mr. Leblanc.  Justice

3    Morawetz and I will discuss that, of course, as part of our

4    discussion.  I should have said that.

5            MR. ROSENTHAL:  Just for clarification, Your

6    Honor --

7            THE COURT:  Except --

8            MR. ROSENTHAL:  -- obviously, the first sentence

9    relates to another issue.

10           THE COURT:  That's right.

11           MR. ROSENTHAL:  And it's the remainder that starts

12   with 'additionally'.

13           THE COURT:  Exactly.

14           MR. ROSENTHAL:  And I would -- footnote 11 is the

15   one that I didn't have the number at my fingertips before.

16           THE COURT:  Thank you.  Shall we now proceed with

17   the EMEA, CCC issue?

18           JUSTICE MORAWETZ:  Yes, back to I think it's Mr.

19   Adler.

20           THE COURT:  Mr. Adler had started, yes, and don't

21   hesitate to sort of re-start if you'd like, Mr. Adler, just

22   to get the flow.

23           MR. ADLER:  Thank you very much, Your Honor and

24   Justice Morawetz.  Again, it's Derek Adler, for the Joint

25   Administrators and the EMEA Debtors, and as I was saying, we

1  degree after this afternoon.

2        On the first point of, I guess Mr. Ziegler's

3  point with the CCC, that point will be addressed later.

4  However, I will assert that, certainly from my standpoint,

5  the Ontario Court would be most reluctant to foreclose that

6  party from having the opportunity to make the statements in

7  the form that Mr. Ziegler outlined.  We will look for the

8  parties to work together to see if some of the differences

9  can be narrowed, but that would be your dining principle.

10        On the second point, which was the one that was

11  the subject of the very lengthy submissions, and I don't

12  mean that in a negative way from Barrack and from Mr. Mark,

13  the -- it is one trial.  It will start with claim -- with

14  the allocation issues and the claim issues.  Realistically,

15  I think both Judge Gross and I are of the view that 20 days

16  is not something that is set in stone.  We will be looking

17  for these parties and you are now working I think in a much

18  more constructive and cooperative manner, to continue with

19  that; emphasize the word continue with that cooperation.

20  There will be additional trial time allocated.  Mr. Barrack,

21  I think you made a very valid point.  It's impossible to

22  state with certainty exactly how long this is going to take.

23  We will be looking for parties to work in the most, you

24  know, efficient and effective manner.  You know, it's not

25  going to surprise me if this is going to take an extra, you

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.*

Court File No. 09-CL-7950

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>(Commercial List)<br><br>Proceeding commenced at Toronto |

**Overview of Proposed Amendment and Supplement to the Trial Protocol Provided by the Canadian Debtors and the Monitor**

**(Pre-Trial Conference to be held on March 12, 2014)**

| | |
|---|---|
| **GOODMANS LLP**<br>Barristers & Solicitors<br>333 Bay Street, Suite 3400<br>Toronto, Canada  M5H 2S7<br><br>Jay A. Carfagnini  LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br><br>Alan Mark LSUC#: 21772U<br>amark@goodmans.ca<br><br>Jessica Kimmel LSUC#: 32312W<br>jkimmel@goodmans.ca<br><br>Peter Ruby  LSUC#: 38439P<br>pruby@goodmans.ca<br><br>Joseph Pasquariello  LSUC#: 37389C<br>jpasquariello@goodmans.ca<br><br><br>Tel:      416.979.2211<br>Fax:     416.979.1234<br><br>**Lawyers for the Monitor, Ernst & Young Inc.** | **Gowling Lafleur Henderson LLP**<br>Barristers & Solicitors<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto, ON  M5X 1G5<br><br>Derrick Tay  LSUC#: 21152A<br>Derrick.tay@gowlings.com<br><br>Jennifer Stam  LSUC#: 46735J<br>Jennifer.Stam@gowlings.com<br><br><br>Tel:  416.862.5697<br>Fax:  416.862.7661<br><br>**Lawyers for the Canadian Debtors** |

6305870