## Exhibit B



**Thornton Grout Finnigan LLP**
RESTRUCTURING + LITIGATION

Toronto-Dominion Centre
100 Wellington Street West
Suite 3200, P.O. Box 329
Toronto, ON Canada M5K 1K7
T 416.304.1616  F 416.304.1313

Michael E. Barrack
T: 416-304-1109
E: mbarrack@tgf.ca
File No. 1595-001

March 17, 2014

**VIA EMAIL**

Regional Senior Justice Morawetz
Superior Court of Justice
Court House
361 University Avenue
Toronto, ON   M5G 1T3

Regional Senior Justice Morawetz:

**Re:**   *In re Nortel Networks, Inc., Case No. 09-10138 (KG)*
**Nortel Networks Corporation, Court File No. 09-CL-7950**

We refer to our letter of March 14, 2014.  In that letter we indicated that a transcript of Wednesday's pre-trial had been ordered and would be provided to you upon our receipt of same.

We enclose herewith a copy of the transcript of that hearing.  The continuation of the submissions in the U.S. Court, after the telephone line with the Canadian Court had been disconnected, begins on page 63.

Yours very truly,

**Thornton Grout Finnigan LLP**

*"Michael Barrack"*
[electronic signature]

Michael E. Barrack

c.c.      Core Party Service List

**tgf.ca**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | Case No. 09-10138(KG) |
| | ) | (Jointly Administered) |
| | ) | |
| Nortel Networks, Inc., et.al.,) | | Chapter 11 |
| | ) | |
| | ) | Courtroom 3 |
| | ) | 824 Market Street |
| Debtors. | ) | Wilmington, Delaware |
| | ) | |
| | ) | March 12, 2014 |
| | ) | 1:00 p.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JUDGE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                    Morris Nichols Arsht & Tunnell, LLP
                               BY: DEREK ABBOTT, ESQ.
                               BY: ANN CORDO, ESQ.
                               1201 North Market St., 18th Floor
                               Wilmington, DE  19899-1347
                               (302) 351-9357

                               Cleary Gottlieb Steen & Hamilton
                               BY: JEFFREY ROSENTHAL, ESQ.
                               BY: JAMES BROMLEY, ESQ.
                               One Liberty Plaza
                               New York, NY  10006
                               (212) 225-2000

ECRO:                          GINGER MACE

Transcription Service:         DIAZ DATA SERVICES
                               331 Schuylkill Street
                               Harrisburg, Pennsylvania 17110
                               (717) 233-6664
                               www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service

APPEARANCES:
(Continued)

For the Unsecured
Creditors' Committee:        Richards Layton & Finger
                             BY: CHRISTOPHER SAMIS, ESQ.
                             One Rodney Square
                             920 North King Street
                             Wilmington, DE  19801
                             (302) 651-7531

                             Akin Gump Strauss Hauer & Feld
                             BY: FRED HODARA, ESQ.
                             BY: ROBERT JOHNSON, ESQ.
                             One Bryant Park
                             New York, NY  10035
                             (212) 872-1000

For the EMEA
Debtors, Joint
Administrators:              Hughes Hubbard & Reed LLP
                             BY: FARA TABATABAI, ESQ.
                             BY: BILL MAGUIRE, ESQ.
                             BY: NEIL OXFORD, ESQ.
                             One Battery Park Plaza
                             New York, NY  10005
                             (212) 837-6068

                             Young Conaway Stargatt & Taylor
                             BY: JAIME CHAPMAN, ESQ.
                             BY: JOHN DORSEY, ESQ.
                             Rodney Square
                             1000 North King Street
                             Wilmington, DE  19801
                             (302) 571-6000

For the Monitor:             Buchanan Ingersoll & Rooney, PC
                             BY: KATHLEEN A. MURPHY, ESQ.
                             1105 North Market St., Ste. 1900
                             Wilmington, DE  19801-1054
                             (302) 552-4214

Wilmington Trust
Indenture Trustee:           Katten Muchin Rosenman, LLP
                             BY: DAVID CRICHLOW, ESQ.
                             575 Madison Avenue
                             New York, NY
                             (212) 940-8800

```
APPEARANCES:
(Continued)

For Ad Hoc Bondholder
Group:                         Pachulski Stang Ziehl & Jones
                               BY: PETER J. KEANE, ESQ.
                               919 North Market Street
                               17th Floor
                               Wilmington, DE  19801
                               (302) 778-6462


For Canadian Creditors
Committee:                     DLA Piper, LLP, U.S.
                               BY: SELINDA A. MELNIK, ESQ.
                               919 N. Market St., Ste. 1500
                               Wilmington, DE  19801
                               (302) 468-5650


For Ad Hoc Bondholder
Group:                         Milbank Tweed Hadley & McCloy
                               BY: ANDREW LEBLANC, ESQ.
                               One Chase Manhattan Plaza
                               New York, NY  10005
                               (212) 530-5000


For UK Pension
Claimants:                     Bayard, PA
                               BY: JUSTIN R. ALBERTO, ESQ.
                               222 Delaware Ave., Ste. 900
                               Wilmington DE  19899
                               (302) 429-4226

                               Willkie Farr & Gallagher, LLP
                               BY: BRIAN O'CONNOR, ESQ.
                               BY: SAMEER ADVANI, ESQ.
                               787 Seventh Avenue
                               New York, NY  10019-6099
                               (212) 728-8000


For Law Debenture:             Morris James LLP
                               BY: STEPHEN M. MILLER, ESQ.
                               500 Delaware Avenue, Ste. 1500
                               Wilmington, DE  19801-1494
                               (302) 888-6853

                               Patterson Belknap Webb & Tyler
                               BY: DANIEL LOWENTHAL, ESQ.
                               1133 Avenue of the Americas
                               New York, NY  10036
                               (212) 336-2720
```

APPEARANCES:
(Continued)

For Ernst & Young, Inc.,
as Monitor for Canadian
Debtors:                        Allen & Overy
                                BY: LAURA HALL, ESQ.
                                BY: DANIEL GUYDER, ESQ.
                                1221 Avenue of the Americas
                                New York, NY  10020
                                (212) 610-6417

For Lead Plaintiffs:            Lowenstein Sandler, LLP
                                BY: MICHAEL ETKIN, ESQ.
                                65 Livingston Avenue & 6 Becker
                                Farm Road
                                Roseland, NJ  07068
                                (973) 597-2313

                                Cross & Simon, LLC
                                BY: CHRISTOPHER SIMON, ESQ.
                                913 North Market St., 11th Floor
                                P. O. Box 1380
                                Wilmington, DE  19899-1380
                                (302) 777-4200

TELEPHONIC APPEARANCES:

For Monitor, Ernst &
Young:                          Allen & Overy, LLP
                                BY: JOSEPH BADTKE-BERKOW, ESQ.
                                (212) 610-6300

Creditor, Official
Committee of Unsecured
Creditors:                      Akin Gump Strauss Hauer & Feld, LLP
                                BY: DAVID BOTTER, ESQ.
                                (212) 872-1055
                                BY: MATTHEW FAGEN, ESQ.
                                (212) 872-8051
                                BY: BRAD KAHN, ESQ.
                                (212) 872-8121

For Nortel Networks UK
Pension Trust:                  Hogan Lovells US, LLP
                                BY: MATTHW BULLEN, ESQ.
                                (212) 728-8881
                                BY: ANGELA DIMSDALE-GILL, ESQ.
                                (212) 728-3135

TELEPHONIC APPEARANCES:
(Continued)

For Wilmington Trust:          Katten Muchin Rosenman, LLP
                               BY: KAAREN B. DINE, ESQ.
                               (212) 940-8772


Representing Superintendent
Of Financial Services,
as Administrator:              Paliare Roland & Rosenberg
                               BY: LILY HARMER, ESQ.
                               (416) 646-4304


For Nortel Cont.
Employees:                     Shibley Righton, LLC
                               BY: ARTHUR JACQUES, ESQ.
                               (416) 214-5213


For The Bondholder
Group:                         Milbank Tweed Hadley & McCloy, LLP
                               BY: THOMAS MATZ, ESQ.
                               (212) 530-5885

For Nortel Networks,
Inc., et al., and
Canadian Nortel
Debtors:                       Cleary Gottlieb Steen & Hamilton
                               BY: JEREMY R. OPOTSKY, ESQ.
                               (212) 225-2924


For Canadian Board of
Directors:                     Osler, LLP
                               BY: BETSY PUTNAM, ESQ.
                               (416) 862-6835


For Nortel Networks,
Inc.:                          Tory's LLP
                               BY: ADAM SLAVENS, ESQ.
                               (416) 865-7333


For CAW Canada and
George Borosh, et.al.:         CAW Canada
                               BY: BARRY WADSWORTH, ESQ.
                               (416) 495-6564


For Joint
Administrators:                Herbert Smith
                               BY: JOHN WHITEOAK, ESQ.
                               (302) 571-6710

TELEPHONIC APPEARANCES:
(Continued)

| | |
|---|---|
| For UK Pension Claimants: | Thornton Grout Finnigan, LLP<br>BY: MICHAEL S. SHAKRA, ESQ.<br>(416) 304-0332 |
| For Interested Party: | Aurelius Capital Management LP<br>BY: MATTHEW A. ZLOTO<br>(646) 445-6518 |
| For Interested Party: | Dow Jones<br>BY:  JACQUELINE C. PALANK<br>(312) 750-4128 |
| For Interested Party: | Covalent Partners<br>BY: JONATHAN BARNETT, ESQ.<br>(617) 658-5527 |
| For Interested Party: | Stone Lion Capital Partners<br>BY: JUSTIN BRASS<br>(212) 846-1242 |
| For Interested Party: | Bank of America<br>BY: ESTHER CHUNG<br>(646) 855-6705 |
| For Interested Party: | Reorg Research, Inc.<br>BY: KENT COLLIER<br>(212) 257-4383 |
| For Interested Party: | Farallon Capital Management<br>BY: MICHAEL LINN<br>(415) 421-2132 |
| For Interested Party | Cassels Brock & Blackwell, LLP<br>BY: MICHAEL J. WUNDER, ESQ.<br>(416) 860-6484 |

1

1  WILMINGTON, DELAWARE, WEDNESDAY, MARCH 12, 2014 1:00 P.M.

2          THE COURT:  Justice Newbould, Kevin Gross in the

3  Courtroom.

4          JUSTICE NEWBOULD:  I'm here, and also sitting in

5  for continuity sake is Justice Morawetz.

6          THE COURT:  I hear him laughing in the background.

7                         (Laughter)

8          JUSTICE NEWBOULD:  I'm going home to shovel some

9  more snow.

10         THE COURT:  All right.  This is clearly our next

11  Pre-Trial Conference in the matter and good afternoon, Mr.

12  Abbott.

13         MR. ABBOTT:  Good afternoon, Your Honor.  Good

14  afternoon, Mr. Justice Newbould and Mr. Justice Morawetz.  We

15  are here, Your Honor, on --

16         JUSTICE NEWBOULD:  Excuse me.  Can I say something

17  before you -- excuse me.  Can I just say something before you

18  get warmed up?  We've got one hour for this.  We have to stop

19  at the end of an hour because I'm sitting in a trial today so

20  if you could all judge your comments accordingly, please.

21         MR. ABBOTT:  Thank you, Your Honor.  Your Honor, I

22  know that there was a Chapter 15 hearing set for the same

23  time.  We assume we'll take that up after the Pre-Trial?

24         THE COURT:  That's right.

25         MR. ABBOTT:  I'll cede the podium to Mr. Rosenthal

1  then who will --

2           THE COURT:  All right.  Thank you.

3           MR. ABBOTT:  -- lead for the U.S. Debtors, Your

4  Honor.

5           THE COURT:  Very well.  Thank you, Mr. Abbott.

6  Mr. Rosenthal, good afternoon.  I know we have a lot of

7  different issues to cover.

8           MR. ROSENTHAL:  Good afternoon, Your Honor.  I

9  will be as quick and efficient as can be.

10           THE COURT:  All right.  Just to recap where we

11  were earlier this year and where we are today, because I

12  think that sets the stage for things.  As you know, we were

13  before the Courts in late January --

14           THE COURT:  Yes.

15           MR. ROSENTHAL:   -- to present the Proposed Joint

16  Trial Protocol in which the parties agreed on virtually every

17  issue and we left a few issues open for today's Conference,

18  and just highlighting what we covered in January was the

19  parties had agreed on the timing and procedures for Pre-Trial

20  Affidavits, for exhibits, for deposition designations, and

21  for Briefs.  We agreed on procedures for submission of expert

22  reports, a commitment to try to prepare a common agreed-upon

23  stipulated facts and Confidentiality Order.  We discussed the

24  timing and substance of Pre-Trial Motions and detailed

25  sequencing of opening statements, fact witnesses, and experts

1  at trial and procedures for them.  We addressed post-trial

2  submissions and closing arguments and a number of other

3  miscellaneous and logistical details.

4          As a housekeeping matter, and we can deal with it

5  at the end of the hearing, the Courts approved, with an

6  amendment that was agreed upon on the record, the Joint

7  Proposed Trial Protocol but I don't believe it's yet been

8  entered by either Court.  So we'll have a Proposed Order at

9  the end of this to ask that --

10         JUSTICE NEWBOULD:  I had a question about that.  I

11 saw that in the Factum or Brief, but I wasn't quite sure how

12 that got approved by the Courts.  I haven't seen anything.

13         MR. ROSENTHAL:  Your Honor, I believe that it was

14 approved orally in the transcript of the hearings.  We were

15 making one change to footnote one to delete most of that

16 footnote as a result of a disagreement primarily between the

17 CCC and the Bondholders, and I just don't know that the

18 amended Proposed Protocol ever got formally submitted to the

19 Court for entry.

20         THE COURT:  I think that's right.  That's right,

21 Mr. Rosenthal.

22         JUSTICE NEWBOULD:  Because I sat and listened in

23 on that conference call.  I was a silent person there, and I

24 don't recall hearing any approval, but you might be right.

25         MR. ROSENTHAL:  So for the March hearing, Your

1   Honors, the parties left and agreed to meet and confer

2   further on the primary open issues, and I'm pleased to say

3   that, with some limited exceptions that will be addressed

4   today, we again were able to largely reach agreement on them.

5   And what has been submitted to this Court by the U.S. Debtors

6   and what was submitted to the Canadian Court by the Monitor

7   and Canadian Debtors is an amendment and supplement to the

8   Joint Trial Protocol, and that addresses in further detail

9   fact Affidavits and examinations, expert examinations, trial

10  time and sequencing, and opening statements.

11          And before I get to the few areas of disagreement,

12  Your Honors, I just want to spend a moment on trial

13  sequencing because, obviously, it's most critical that it be

14  acceptable to the Courts how we've decided to allocate trial

15  time.  What the parties have jointly proposed, in light of

16  the suggestion from the Courts back in January that an

17  increase from the original plan of 20 days to 30 to 35 days

18  would be acceptable to the Courts in order to accommodate

19  Claims, we have collectively decided to propose a trial that

20  begins on May 12th.  It would run consecutive weekdays that

21  are non-holidays, obviously taking a break if the Courts ever

22  decide, for scheduling purposes if they needed, we would go

23  through allocation, in which we would have actually opening

24  statements on allocation, followed by opening statements on

25  Claims, following which we would have all of the fact

1   witnesses, because there's a lot of intermingling of the fact

2   witnesses, and this is also in the January Protocol as well.

3   We would then have the allocation experts, and that would

4   close the allocation record.  The thought would be that if

5   there's an opportunity for a break between the two, I think

6   the parties that are involved with the Claims would like to

7   see there be at least some brief break to prepare for the

8   next stage, following which, I don't know that the U.S. Court

9   needs to be involved because they would then proceed with the

10  remaining time for the Claims, specifically, the Claims

11  experts for the EMEA Claims and for the UKP Claims.  Again,

12  the exact structure is set out in the January Proposed Joint

13  Protocol.

14          THE COURT:  Let me just interrupt you for one

15  moment, Mr. Rosenthal.  The openings beginning May 12 would

16  include both allocation and Claims?

17          MR. ROSENTHAL:  The parties that are involved in

18  the Claims, and as you know, the U.S. Debtors are not, the

19  parties that are involved in the Claims have said that

20  because the evidence is going to deal with both --

21          THE COURT:  Yes.

22          MR. ROSENTHAL:  -- allocation and Claims, because

23  that way witnesses won't have to be called back or anything

24  like that --

25          THE COURT:  Understood.  That's right.

1      MR. ROSENTHAL:   -- that they would like to open on

2  Claims as well rather than defer a Claims opening until

3  later.

4      THE COURT:   Good.

5      MR. ROSENTHAL:   So there are three main areas of

6  disagreement to be addressed today, Your Honors.

7      THE COURT:   Yes.

8      MR. ROSENTHAL:   First, is the U.K. Pension

9  Claimants have essentially requested that there be a fourth

10 Allocation Group for trial purposes involving the UKP and the

11 CCC, seeking a pro-rata distribution, which is the equivalent

12 of global substantive consolidation, and I would address that

13 first.

14      The second is that there is some disagreement on

15 page limits for Affidavits and Briefs, and also some

16 disagreement about the amount of time to be devoted for

17 opening statements, which I would like to address second

18 after all the parties who wish to weigh in on the first issue

19 do.

20      THE COURT:   Yes.

21      MR. ROSENTHAL:   And then the third issue is

22 primarily a disagreement between the EMEA Debtors and the

23 Canadian Debtors, and I would let one of those parties

24 present that after the first two issues are addressed.

25      So if it's okay with the Court, then I would

1   proceed right now with just a brief discussion of the UKP's

2   request.

3               THE COURT:  All right.  And obviously, the Courts

4   will have perhaps some comments, particularly on the trial

5   days because of the scheduling issue that Justice Newbould

6   has.  So we'll discuss that as well.

7               MR. ROSENTHAL:  So, Your Honor, with respect to

8   the allocation of time --

9               THE COURT:  Yes.

10              MR. ROSENTHAL:  -- our understanding had been that

11  this was resolved throughout the case and memorialized in the

12  January Joint Trial Protocol where Section 282 explicitly

13  provides that the U.S. Allocation Group shall be entitled to

14  blank hours.  The Canadian Allocation Group shall be entitled

15  to blank hours.  The Canadian Claims Defendant Group, because

16  there's a separate bucket of time for Claims, shall be

17  entitled to "X" hours.  The EMEA Allocation Group shall be

18  entitled to blank hours.  The EMEA Claimants shall be

19  entitled to blank hours.  And the U.K. Pension Claimants

20  shall be entitled to blank hours.  And that's how we've been

21  litigating this case, Your Honor, with respect to the three

22  Allocation Groups because, in fact, you really have three,

23  and only three, essential parties or groups that are vying

24  for the proceeds of the Nortel Group's assets sales.  You

25  have the U.S. Group, and obviously its Creditors that would

1    share in whatever recovery goes to the U.S. Group.

2         THE COURT:  So that covers the Committee as well as the

3    Bondholders?

4              MR. ROSENTHAL:  The Bondholders are recovering

5    from the U.S. Group --

6              THE COURT:  Right.

7              MR. ROSENTHAL:  -- and the Canadian and you've got

8    -- yes, the Unsecured Creditors here.  You've got, in Canada,

9    you've got the CCC and other Canadian Creditors, such as the

10   Bondholders there, such as the U.K. Pension Claimants have

11   Claims in Canada as well, and they would share in whatever

12   recovery goes -- in fact, the U.S. Debtors have a claim in

13   Canada.  They would share in whatever recovery goes to the

14   Canadian Estates.  And the EMEA Debtors have their own

15   Unsecured Creditors.  They have the U.K. Pension Claimants.

16   And, therefore, the division, as the parties have always been

17   working so far in this case, has been based upon the

18   Allocation Groups and those seeking an allocation to a

19   particular Group.  The U.K. Pension Claimants, just last week

20   for the first time, have proposed that there actually be a

21   fourth Allocation Group because the U.K. Pension Claimants

22   say well, they are pursuing a different theory than the EMEA

23   Debtors, one of pro-rata distribution or substantive

24   consolidation, and they say that the CCC is pursuing, as an

25   alternate, a different theory from the Canadian Monitor and

1  Debtors, which is also the same pro-rata substantive

2  consolidation, and they say that there should be a Group

3  formed of the UKP and I guess the CCC would kind of straddle

4  two different Groups, depending on which theory they're

5  advancing at a particular point in time.  And the critical

6  problem that we have with that, Your Honor, is they're not

7  adverse to the EMEA Debtors.  They may have different

8  strategies.  They may have different theories that they wish

9  to advance.  But at the end of the day, they're looking to,

10  in fact, increase the recovery to the EMEA Debtors and the

11  CCC, in pursuing that same theory.  They're doing so not

12  because of any adversity, but they're doing so for the

13  purpose of increasing the recovery.  So the breakdown still

14  needs to be the same of those parties that are seeking

15  recoveries from the lockbox proceeds.

16          The other important reason, Your Honor, why we

17  need to keep it by the Allocation Groups is that Allocation

18  Groups need to respond.  It's not merely an opportunity to

19  present -- and, in fact, the opportunity to respond to other

20  parties' theories is even more important because this trial,

21  the Direct Testimony is coming in by Affidavit.  It's the

22  opposition to these theories that need the time to be

23  explored.  The expert reports are going to come in.  Parties

24  can, if they wish, direct their own experts, but it's the

25  cross-examination that we need the time to do.  So the fact

1  that the EMEA Debtors and the U.K. Pension Claimants want to

2  advance two different theories to maximize the proceeds for

3  the EMEA Debtors means, in a sense, twice as much work for

4  the U.S. Debtors.  We're going to have to cross-examine the

5  EMEA witnesses and we're going to have to cross-examine the

6  U.K. Pension witnesses, and we're going to have to cross-

7  examine the EMA experts and the U.K. Pension experts, and the

8  Canadian Monitor and Debtor's witnesses and experts and the

9  CCC's fact witnesses and experts.  So as much as they want

10  more time to present an alternate theory, we would certainly

11  need the same amount of time.  So the Court can obviously

12  divide this if you want by saying well, we could allocate a

13  third, a third, a third to the three Estates and then have a

14  separate allocation of time for the advancement and the

15  defense of the pro-rata substantive consolidation theory.

16  We'd probably end up in that case with the U.S. Debtors

17  getting more like 40 percent of the time.  But I think, for

18  simplicity, just having a third, a third, a third makes the

19  most sense here and that's what we advocate.  And I would

20  just remind the Court, and we quoted it in the submission

21  that we made this morning, of the comments made by the CCC,

22  which does not join with the UKP in this request.  But Mr.

23  Ziegler, in the January hearing, when there was a dispute

24  over 15 minutes of time that the Bondholders wanted to

25  reserve for their opening statement, and there was a

1   disagreement, Mr. Ziegler said this is about treating major

2   Creditors equally.   It's not about historical status that was

3   allocated before the allocation positions came out.   We all

4   want to work effectively.   We will work with the Canadian

5   Allocation Group.   The Noteholders have worked with the

6   American Group.   That's fine.   That's as it should be.   But

7   if we're going to carve out time for one group of Creditors,

8   there should be the same for the others, and therefore, if

9   we're going to start having more groups than just the

10  Allocation Groups, any amount of time given to either the CCC

11  or the UKP needs to be matched by those Creditors for the

12  U.S. Estates that would be opposing these theories.   And I

13  think, with that, I can cede the podium.

14          THE COURT:   Well, let me just ask you this, Mr.

15  Rosenthal, so I'm clear.   Won't these alternative theories be

16  advanced in the affirmative Declarations and papers that are

17  already being submitted?   In other words, where the time

18  increase might arise would be in the cross-examination of

19  witnesses.

20          MR. ROSENTHAL:   Precisely, Your Honor.   There's

21  no shortage of opportunity for the theories to be presented.

22  The experts have written their reports.

23          THE COURT:   Right.

24          MR. ROSENTHAL:   They will be submitted.   The fact

25  witnesses will be submitting fact Affidavits.   While the UKP

1 would like time on their own to be able to cross-examine

2 perhaps the U.S. witnesses or any other Estates witnesses,

3 we would, likewise, need that time to cross-examine the UKP

4 witnesses and the UKP experts, and the same with the CCC,

5 without whom we would have a much more easy and efficient

6 job in this case, because we would only have to be tacking

7 the EMEA theories and the Canadian theories.  So our work

8 has increased more so, in many respects, than with the UKP,

9 and the CCC doesn't say it, but what the UKP says that they

10 need.

11 　　　　　THE COURT:  All right.  Thank you, Mr. Rosenthal.

12 　　　　　MR. ROSENTHAL:  Thank you.

13 　　　　　JUSTICE NEWBOULD:  I guess, Judge Gross, we

14 should hear from Counsel for the U.K. Pension Claimants.

15 　　　　　THE COURT:  Yes.

16 　　　　　MR. O'CONNOR:  Yes, good afternoon, Justice --

17 Judge Gross and Justice Morawetz and Justice Newbould.

18 There are a number of points I would disagree with Mr.

19 Rosenthal on, but in the interest of time and efficiency, I

20 will defer to my Canadian colleague, John Finnigan, who will

21 present the UKP's position.

22 　　　　　THE COURT:  Thank you.

23 　　　　　MR. FINNIGAN:  Thank you, Mr. O'Connor.  It's

24 John Finnigan, for the UKP, and Your Honor Judge Gross, can

25 you hear us okay?

1          THE COURT:  Very clearly.  Thank you.

2          MR. FINNIGAN:  Thank you.  So I will respond as

3   briefly as I can to Mr. Rosenthal's submissions, and we

4   disagree fundamentally, as you'll appreciate from our

5   submission that we filed on Monday, with what Mr. Rosenthal

6   has submitted this morning.  We're not advocating the

7   creation of another Allocation Group.  The Allocation Group

8   concept was created for discovery purposes, as we outlined

9   in our Brief, and it made sense for the discovery purposes.

10  We're advocating a division of trial time based on the four-

11  case theories that will actually be presented to the Courts.

12          In this case, the Allocation Groups were created

13  before the case was pleaded.  The pleadings have now

14  delineated the four positions that will be presented at

15  trial, and we say that each of those four positions should

16  have an equal opportunity to present its case at trial by an

17  equal sharing of the allocation trial time.  Now, my friend

18  characterizes our position as one of substantive

19  consolidation.  It is not.  We are not advocating that these

20  Estates be consolidated and collapsed.  Rather, what we are

21  saying that is in circumstances where Nortel operated as a

22  single business and where the different entities have for

23  themselves created a common pool of cash, the UKPC pro-rata

24  theory advocates sharing that cash by reference to the

25  unpaid Creditor Claims against each of the entities that

1  made up the one Nortel.

2          Our premise is that there's no justification for

3  a particular geographic region or entity scooping the pool

4  as advocated by the U.S. and Canada.  Pro-rata is a method

5  of allocating that common pool.  It's not a device to

6  collapse the U.S. and Canadian Estates, but rather an

7  allocation method, a methodology.

8          So on the second point, it's clear from the

9  papers, we have never agreed to a trial time allocation

10  split a third, a third, and a third, and that's because we

11  submit that this four-way split, based on the way the case

12  will actually be presented, is the more appropriate way to

13  do it.  My friend suggests that there are essentially three

14  groups of Creditors here:  U.S. Creditors, Canadian

15  Creditors, and European Creditors.  But when you examine the

16  Claims made into each of the Estates, it becomes apparent

17  that is not the case.  The U.S. Bondholders have Claims into

18  the U.S. and into Canada.  Our clients have Claims into EMEA

19  and into Canada.  The Unsecured Creditors in the U.S. have

20  Claims into the U.S. and into Canada by virtue of the $2

21  billion allowed Claim into Canada.  So this case does not

22  break down neatly in three groups with three economic

23  interests.  These claims cross over.  And so the Allocation

24  Group methodology is not the appropriate way to divide up

25  the trial.  One should have regard to the amount of work

1    that needs to be done by the parties to present their case

2    theory.   And each of the four parties has three allocation

3    theories, contesting allocation theories, it has to deal

4    with.   It will do so in varying degrees and no one in the

5    room can say that any one theory will take more or less time

6    than another.   And so we would seek an equal division of the

7    trial time so that we can deal with the adverse allocation

8    theories as we see fit.

9              Further, it is not correct to say that we're all

10   lined up with EMEA.

11             JUSTICE NEWBOULD:   Can I just ask you a question,

12   Mr. Finnigan?   You say you want equal division of time to

13   deal with this.   We've heard it's going to be cross-

14   examination.

15             MR. FINNIGAN:   Yes.

16             JUSTICE NEWBOULD:   So what are you saying?   You

17   want as much time as the others to cross-examine on the

18   other theories?

19             MR. FINNIGAN:   Yes, and that's in the context of,

20   you know, you should have some idea the size of the train

21   headed down the tracks.   There are so far, by my count, 23

22   experts on allocation who've delivered 32 reports; 10

23   experts from the U.S. on allocation.   We've got five.

24   EMEA's got three.   Canada's got five.   So the burden of

25   cross-examination, it suggests we may have a greater burden

1    of cross-examination because the U.S. has more experts than

2    we do.  But I agree with my friend that most of this trial

3    will be dealt with cross-examining the witnesses who are

4    called.  And we don't want to be constrained by having our

5    time cut in half to deal with these adverse allocation

6    theories by sharing our time with EMEA, who is advocating

7    eight different allocation theories than we are.  So that's

8    how we see it in basic fairness terms.  And also, just on a

9    more principle level, this is a litigation to divide up the

10   proceeds of the sale of assets amongst the Creditors.  These

11   Estates have been bankrupt for five years.  They haven't

12   operated for three or four years.  So this should be a

13   Creditor-driven process.  It's my client's ox who's going to

14   be gored here.  We are the 80 percent Creditor into EMEA,

15   the 93 percent Creditor into the lead European subsidiary

16   NNUK, and we, thank you very much, would like to advance our

17   own theory to maximize the dollars for our clients.  So we

18   should be the one who have a one-quarter share to advocate

19   the theory that directly impacts our economic interest.

20             THE COURT:  Mr. Rosenthal?

21             MR. ROSENTHAL:  I'll be brief, Your Honor.

22             MR. FINNIGAN:  And if could just give one further

23   point.

24             THE COURT:  I'm sorry, Mr. Finnigan.

25             JUSTICE NEWBOULD:  Well, just a second, Judge

1  Gross.   There's a plane coming in from the bench here.

2                    (Laughter)

3             MR. FINNIGIN:   We also recognize, and they

4  acknowledge, that the Canadian Creditors Committee adopts a

5  form of pro-rata theory as an alternate, and we would be

6  prepared, and we think it's appropriate, that we would share

7  some of our time with them to the extent that the one-

8  quarter time, trial time that we seek, we would share with

9  them so they can advance that theory in support as well.

10 Those are my submissions.

11            THE COURT:   It's dangerous to pause in this

12 matter.

13                    (Laughter)

14            JUSTICE NEWBOULD:   So, Mr. Rosenthal, is there

15 any reply?

16            MR. ROSENTHAL:   Yes.  Very brief, Your Honor, and

17 I believe one of my colleagues up in Canada may have a

18 couple of charts that I'd like to just hand out, with the

19 Court's indulgence, just two charts that are not -- they're

20 not to scale, that just, I think, illustrates the three

21 Estates and also the UKP's alternate theory.   May I

22 approach, Your Honor?

23            THE COURT:   Please.   Please, Mr. Rosenthal.

24 Thank you.

25            MR. ROSENTHAL:   And for my colleague in Canada,

1    it's just the first two charts that I've sent you.    Justice

2    Newbould, let me know when it would be a convenient time to

3    proceed.

4              JUSTICE NEWBOULD:    It's a convenient time.

5              MR. ROSENTHAL:    Okay.    So I've handed out these

6    two charts because I think they really fundamentally

7    illustrate what the UKP and the CCC are advocating for here

8    and why they really have one particular adversary, and these

9    are not to scale because, obviously, none of the parties are

10   advocating a one-third, one-third, one-third split.    But

11   essentially, you have the U.S., EMEA, and Canadian Debtors

12   all agreeing that fair market value is the proper way to

13   divide the assets and they have different theories as to how

14   to determine fair market value.    I'm primarily using the UKP

15   terms.    We don't necessarily adopt these terms of revenue

16   contribution, but the bare legal title we do use.    It's a

17   convenient shorthand for us.    But essentially, what the UKP

18   is doing, which is the second chart, is they are saying that

19   EMEA is selling themselves short and the CCC says Canada's

20   asking for too little.    They're saying squeeze the U.S.

21   piece; give more to the EMEA Debtors; give more to the

22   Canadian Debtors.    So if there's any party that needs equal

23   time to whatever they have to present it to oppose it, it's

24   the U.S. Debtors and the Creditors of the U.S. Debtors.

25              I want to correct one thing that my friend said,

1    by the way.   The Bondholders are not U.S. Bondholders.

2    They're actually Canadian Bondholders of Bonds that were

3    guaranteed by the U.S. Debtors, just to be technically

4    correct here.

5              JUSTICE NEWBOULD:   Mr. Rosenthal?   Mr. Rosenthal?

6              MR. ROSENTHAL:   Yes.   Yes, Justice Newbould?

7              JUSTICE NEWBOULD:   Mr. Finnigan says that the

8    number of expert Affidavits or reports that have been filed

9    for the U.S. side are far more than his Claim.   In fact,

10   he's going to need more time to cross-examine all of them.

11   So I think I'd like to hear you on that.

12             MR. ROSENTHAL:   That's an excellent question,

13   Your Honor.   We went through the expert reports of the U.K.

14   Pension Claimants and we looked at our own and we re-looked

15   at them last night, and in fact, two of them completely

16   agree with each other, and a number of other of our expert

17   reports, I'd say half of them, only have their rebuttal

18   reports that only challenge the Canadian theories; the same

19   theories that U.K. Pension people are challenging.   So I

20   don't even know if cross-examination by U.K. people would be

21   appropriate, but I certainly cannot imagine that at trial

22   the U.K. Pension Claimants are going to have any significant

23   cross-examination of most of the U.S. Debtor's experts.   We

24   only submitted three initial experts; seven rebuttal

25   experts, largely aimed at challenging Canada's theories in

1   the same way that UKP is challenging Canada's theories.   So

2   I think just adding up numbers without looking at substance

3   presents a very misleading picture.

4           I think the last thing that I would just add is

5   the UKP says well, they're only going to have half of one-

6   third of the time to present the substantive consolidation

7   theory, and I understand that my friend says it's pro-rata;

8   it's not substantive consolidation, but in fact, there is no

9   law that endorses "pro-rata".   The only legal framework is

10  substantive consolidation, and we'll obviously brief that at

11  the appropriate time.   We don't have to debate that today.

12  But the Courts will see that soon enough.

13          But in any event, it's not one-half of one-third

14  of the time.   Even if it were, we would still be entitled to

15  that amount to rebut it.   But remember, the CCC is also part

16  of the Canadian Group and they're going to be using their

17  time to advance the same alternate theory.   So you're going

18  to have part of the Canadian Group's time directed to this

19  alternate theory against the U.S.   You're going to have part

20  of the EMEA Group's time on this alternate theory against

21  the U.S.   And the U.S., with our one-third of time, are

22  going to be trying to beat back everyone, challenging the

23  EMEA's contribution theory, challenging the Canadian bare

24  legal title theory, and being the only ones to actively need

25  to challenge the substantive consolidation theory of the CCC

 1   and the UKP because they're aimed at us, as this chart

 2   shows.   And EMEA's expert report, we didn't put any pages in

 3   because we didn't want to have to deal with filing under

 4   seal because they're highly confidential at this point.   But

 5   EMEA's expert did a nice series of charts to show that under

 6   the pro-rata sub-con theory, the only party whose shares of

 7   the allocation goes down to below the lowest fair market

 8   value assessment put on by any party, the only one whose

 9   values go down is the U.S., and that's why we would need

10   time to respond to that.

11           THE COURT:  Well, let me ask this question, Mr.

12   Rosenthal.  Being of the view that fair is not always

13   Equal --

14           MR. ROSENTHAL:  Correct.

15           THE COURT:  -- is there a way to give some relief

16   to the U.K. Pension Proponents by giving some additional

17   time to the U.S. Group?

18           MR. ROSENTHAL:  I think there is, Your Honor, and

19   one thing that you can do in the alternate, but we didn't

20   want to concoct a very complicated formula, is you can say

21   of the allocation trial, "X" percent will be on the three

22   Estates' theories.

23           THE COURT:  Right.

24           MR. ROSENTHAL:  And you divide that one-third,

25   one-third, one-third.  And "Y" percent of the allocation

1    time will be devoted to any party that wants to advance the

2    sub-con theory, and that gets divided equally between the

3    Proponents, meaning CCC and UKP and the Opponents, which is

4    the U.S. Group.

5              THE COURT:  Right.

6              MR. ROSENTHAL:  Since we're the only ones

7    economically harm by that theory.  And you then combine

8    those numbers to come up with what the blended times are.

9    You can do that, you know, pretty easily, Your Honor, if you

10   wanted to do it one-third, one-third, one-third, and a 50/50

11   split.

12             THE COURT:  Right.

13             MR. ROSENTHAL:  Like I said, when you run those

14   numbers, the U.S. actually ends up with a little bit more

15   than a third, and that's perfectly fine with us if it solves

16   the problem.  We just want to make sure that we are not

17   short-changed by not having the same amount of time that we

18   have to rebut, and it's the key point that the CCC made to

19   Justice Morawetz two months ago.

20             JUSTICE NEWBOULD:  Could you just repeat this

21   alternate you just said would work?

22             MR. ROSENTHAL:  Yes.  Justice Newbould, so let's

23   say, hypothetically, you had 21 hours for the trial.

24   Obviously, it's more than that.  But if you had 21 hours,

25   you can say we're going to have this trial devote 15 of

1  those 21 hours to the Estates' theories and 6 of those 21

2  hours to pro-rata sub-con.  And then you say, okay, of the

3  15 hours, let's divide that a third, a third, a third, the

4  EMEA Debtors, the Canadian Debtors and Monitor, and the U.S.

5  Debtors.  And then we take the six hours and you say okay,

6  Proponents, UKP and CCC, get 50 percent.  That's three

7  hours.  And the U.S. Debtors and their Creditors get the

8  other 50 percent three hours.  It's a very easy way to split

9  it.  We thought that for simplicity -- like I said, a third,

10 a third, a third, because of the fact that what UKP is

11 asking for is increase the EMEA share and maybe collaterally

12 increase the Canadian share, because they're right.  They

13 settled with us their Canadian Creditors they hope.  CCC,

14 they're asking for more money for Canada than the Monitor

15 itself is asking.  So that's why the third has a logic and a

16 simplicity to it.  But we would have no objection to

17 subdividing it in those two ways that I just articulated.

18           JUSTICE NEWBOULD:  So what do you say, Mr.

19 Finnigan?

20           MR. FINNIGAN:  I've just heard it now.  I

21 [indiscernible].

22           JUSTICE NEWBOULD:  All right.  And work it out.

23 Right?  I also asked Counsel --

24           UNIDENTIFIED FEMALE:  May I make one comment

25 about that?

1          JUSTICE NEWBOULD:    Sure.

2          UNIDENTIFIED FEMALE:    I mean I'm happy for people

3   to consider that but because the CCC and the Canadian

4   Monitor and Debtors are in the same Group and filing

5   evidence together, I can foresee a potential administrative

6   difficulty with us trying to figure it all out, but I'm not

7   saying we won't attempt to, but we just have to be mindful

8   of the fact that we are adjoined with the CCC for certain

9   purposes and administratively in terms of filing.  And if we

10  start dividing up the time and we have to designate time,

11  you know, that might be one thing.  But if we start trying

12  to deal with evidence, like Affidavits and things like that,

13  it could become problematic.

14          JUSTICE NEWBOULD:    Okay.  What I was going to Ask

15  was I've never seen anything like this in my life, arguing

16  about this sort of thing, but do you all see or see no role

17  for the Trial Judges to sort of make changes as we go along

18  during the trial to achieve some sort of fairness?

19          MR. FINNIGAN:    We absolutely see a role and I

20  think we've expressed a concern throughout the -- we're very

21  concerned about the amount of data that's going to be pushed

22  at you to absorb and your ability to absorb that

23  information.  So, you know, this whole business about who's

24  going to examine which experts, we're just entering a two-

25  week phase where the experts are just now going to be

1  deposed.   And this may not be a popular idea but maybe we

2  should do those depositions and come back and have a better

3  idea of who exactly we think we want to examine at trial and

4  that may inform the time estimate.   But it's all of the

5  parties' discussions around these issues have to be subject

6  to your need to understand the case.

7               JUSTICE NEWBOULD:   Okay.

8               MR. ROSENTHAL:   Justice Newbould, if I could

9  answer your question as well?   Certainly, we see a role for

10  the Courts to manage the process and make adjustments along

11  the way as necessary.   We think that it's equally important

12  though, that at the outset, and this means well in advance

13  of trial now while we're picking trial witnesses, deciding

14  how much Affidavit evidence to put in, we need to have some

15  basic parameters to know, well, am I going to defer an

16  exanimation on this witness because I need to save my time

17  for a later witness.   And changing those numbers on the fly

18  at the trial, if it's a significant change, could cause

19  problems because parties may pass opportunities by or

20  shorten their examinations or shorten what they submit as

21  evidence in the first place.

22               So I would feel it very beneficial to have the

23  Court's guidance now, even if it's, of course, always

24  subject to the Court saying, you know, we're going to stay

25  an hour later today to finish this up and that's okay, you

1  know, obviously, Judges always have the right and that

2  discretion.

3          JUSTICE NEWBOULD:  Okay.  I think we should move

4  on.  Do you agree, Judge Gross, to the next issue?  We don't

5  have much time.  We have to be out of here in 20 minutes.

6          THE COURT:  I do agree with you, Justice

7  Newbould, and let me just say this, and I don't know whether

8  you'll agree or not, but as far as the page limitations are

9  concerned, that seems to me to be something that we don't

10 need a lot of discussion about; that you and I will take a

11 look and try and be fair and decide it.

12         JUSTICE NEWBOULD:  In my own view of page

13 limitations, if I was on one side and someone else wanted to

14 file more pages, I would say be my guest, because at some

15 point, Judges stop reading and amnesty has to come along

16 here so, you know, when people start talking about 250 pages

17 for this and that, my eyes start to glaze but that's up to

18 you folks.

19         MR. ROSENTHAL:  And, Your Honor, in many

20 respects, I do agree with that.  The only place where I

21 would disagree a little is that the proposal that the U.S.

22 opposes is for a total of 1,125 pages of Affidavits; 750

23 opening and 375 Reply Affidavits.  And the problem that we

24 face with that is whether the Judges read it or not, we

25 don't know and we've got to prepare for cross-examination on

1    a very limited amount of time and we think that the trial

2    should be much more efficient.  We say we have depositions

3    of over 100 witnesses.  We've spent a lot of money taking

4    these depositions.  We've got the exhibits.  We could put in

5    the evidence.  And we suggest that 100 pages per Group with

6    50 for Reply would result in a more efficient trial and more

7    practical given the amount of time we have.

8              The only other comment that I would make, Your

9    Honors, is the CCC has said --

10             THE COURT:  Yes.

11             MR. ROSENTHAL:  -- this ought to be done not by

12   Allocation Group, but by party, but they drop one party out,

13   which is the U.S. Creditors.  They say give 150 to the

14   Canadian Monitor and Debtors and 150 to the Chief Creditor

15   Group for Canada, the CCC.  The say give 150 to EMEA Debtors

16   and 150 to UKP, and to respond to all of that, give 150 to

17   the U.S. as a whole, and I think it has to be done by

18   Allocation Group, or if it's not, it has to be done where

19   the U.S. Group -- if we're working well with the Bondholders

20   and we're working well with the UCC, we shouldn't be

21   penalized for that by getting half the number of pages to

22   respond to our adversaries and the evidence that they're

23   putting forth against us.  So we would advocate for as low

24   limits as possible.  We think 150 is reasonable.  But

25   whatever it is, it needs to be divided up into thirds and

1   not the fifths as the CCC proposes.  The Briefs, we also

2   think that opening Briefs, it's an overview of the case.

3   It's not a detailed discussion of evidence.  We think they

4   can be done efficiently; 75 pages per Group, again.  Even if

5   that number is higher, we still think it should be per Group

6   and not per party.  The parties obviously don't have to file

7   one Brief.  They can divide it up among the parties in the

8   Group but it's per group.  And opening statements, we think

9   a day for opening is reasonable.

10             JUSTICE NEWBOULD:  Where do I find --

11             MR. ROSENTHAL:  Yes, Your Honor?  I'm sorry.

12             JUSTICE NEWBOULD:  Where do I find this issue in

13  the materials?

14             UNIDENTIFIED SPEAKER:  Page six of the Monitor's

15  Brief.  There's a chart.  It's the third item on the chart.

16             MR. ROSENTHAL:  The only thing that I would say

17  with respect to the Monitor Chart is they don't have a

18  column for the Bondholders.  They don't have a column for

19  the UCC.  And if they did, those columns would say supports

20  U.S. proposal.  So it makes us look like [indiscernible]

21  when, in fact, that's not the case.  So we would advocate

22  lower limits.  We think it absolutely needs to be on a per

23  group basis to be divided among the parties within that

24  group.  And on openings, we think one day of openings is

25  plenty.  It's just an overview and we would not drag it into

1   two days of openings for allocation.  But we leave it

2   completely to the discretion of the Courts.

3           MR. FINNIGAN:  Your Honor, may I respond?  It

4   seems that my client's name is being taken advantage of but

5   this is a trial where my client's evidence is fact-based.

6   Mr. Rosenthal's client's evidence is expert-based.  He's

7   filed ten expert reports without page limitations, without

8   any of these current limitations.  He has all sorts of

9   evidence for some issues without limitation on the basis of

10  experts or on the basis of deposition transcripts and

11  exhibits.  We're all professionals.  We know how long an

12  Affidavit to put in and we know how long to cross-examine or

13  not cross-examine.  Justice Newbould is absolutely correct

14  in that.  But what we don't want is to be jammed because

15  what happens here is our case is fact-based.  We named five

16  possible witnesses.  The Monitor and Canadian Debtors named

17  six possible witnesses.  These are people who worked for

18  Nortel and had first-hand knowledge, not experts.  The U.S.

19  Debtors, the Bond, and the UCC collectively named four fact

20  witnesses, but showed up with ten expert reports.  You can't

21  put limits on one type of evidence and then put no limits on

22  the other type.  I think the best way to deal with it,

23  frankly, would be we will govern ourselves with knowing that

24  we all have limits on what we can read.  With 150 pages

25  maximum per group that wants to put evidence in, there's

1    only five groups that said they have live witnesses to put

2    in.   The reason the UCC and the Bonds aren't on that list is

3    they didn't have any live witnesses they said they wanted to

4    put in.   The U.S. Debtors, the Canadian Debtors, the EMEA

5    Debtors, U.K. Pension, and CCC were the five parties that

6    said we have fact witnesses that we want to call at trial

7    and we, in fact, had to designate a list early on.   That

8    list will get pared down, but their evidence in chief  comes

9    in by way of Affidavit so it will shorten the trial time by

10   not having to go through it all.   It's for the convenience

11   of everyone to allow people to put their Affidavit in and

12   tell their story, rather than have a longer trial.   And to

13   say that anybody is prejudiced by that when they're filing

14   ten expert reports is, to me, somewhat disingenuous.

15              JUSTICE NEWBOULD:   Okay.   Can I ask you a

16   question?   The Briefs, the first item, Briefs, allocation,

17   are these opening Briefs?

18              UNIDENTIFIED FEMALE:   That's correct.

19              JUSTICE NEWBOULD:   All right.   Thank you.

20              MR. GOTTLIEB:   Your Honor, if I might add?   Judge

21   Gross, it's Matthew Gottlieb, for the EMEA Debtors.   Justice

22   Newbould, I'm on for the EMEA Debtors.

23              THE COURT:   Yes.

24              MR. GOTTLIEB:   Just a couple points in response,

25   and I will be brief.   With respect to the page limit of the

1    opening evidence and the rebuttal evidence, in our respectful

2    submission, the amounts put forward are the appropriate ones.

3    The amounts put forward by the U.S. are just too small.  We

4    all understand the limitations on the Court to be able to

5    read and take in, and I believe all parties will govern

6    themselves, but we do have very significant issues here in

7    this litigation.  We're talking about a lot of money and a

8    lot of complex issues and the parties will have to govern

9    themselves accordingly.  The suggestion that Mr. Rosenthal

10   made that these should be done by groups, we fundamentally

11   disagree with it.  Justice Newbould, if you consider

12   allocation alone, as you've heard this morning, EMEA has a

13   different view of allocation than the UKP.  We were in the

14   same group for certain periods.  To suggest that we should

15   have to somehow split our evidence with a group that has a

16   different theory from us, with great respect, that doesn't

17   make a lot of sense here.  There is no agreement that we will

18   equally split anything with the UKP on these time

19   allocations.  There are some specific issues, and this is

20   really just to Justice Newbould, set out in the material

21   regarding Claim time limits because the proposal of UKP and

22   EMEA is that they have a certain number of pages.  We've

23   agreed, obviously, to give Canada double that so that they

24   can respond to each of the UKP Claims and the EMEA Claims.

25   Canada would like to freely allocate its page limits as it

1   wants to.   In our respectful submission, that's obviously not

2   fair --

3          JUSTICE NEWBOULD:   So which of these proposals --

4   I'm looking at the chart.

5          MR. GOTTLIEB:   It's at page --

6          JUSTICE NEWBOULD:   Which one do you support?

7          MR. GOTTLIEB:   Page -- it depends where you start

8   with but if you want to start all the way at page six?

9          JUSTICE NEWBOULD:   Yes.

10          MR. GOTTLIEB:   The Affidavits, allocation.   We're

11   on the same page as the Monitor.   We are not on the same page

12   as the U.S. Debtor.

13          JUSTICE NEWBOULD:   Just a second.

14          MR. GOTTLIEB:   So the U.S. Debtor has given a

15   greater restriction on that.   Do you see that?   We're on the

16   same page as the Canadian Monitor on that.   With respect to

17   Claims, which is over at page seven, Your Honor, the top box,

18   we agree as to the limitation of the pages, as I believe does

19   the UKP, but the Canadian Debtors would like to freely

20   allocate their double number.   We say well, that's not fair

21   because they could allocate zero to one, full to another, and

22   therefore, you have to fight double the amount of pages.   So

23   we say it should be equal across the board on that.

24          JUSTICE NEWBOULD:   So what change would you make

25   to that box?

1          MR. GOTTLIEB:  To the Canadian box or the EMEA

2   box?

3          UNIDENTIFIED FEMALE:  I think Mr. Gottlieb has

4   moved into the third issue on this.  I thought we were

5   dealing with the second issue which has to do with the

6   absolute page limits on Affidavits and opening Briefs.  Those

7   are items one and three.

8          MR GOTTLIEB:  Yes.

9          UNIDENTIFIED FEMALE:  Those are the issues that

10  Mr. Rosenthal just addressed.

11         JUSTICE NEWBOULD:  Oh, I'm sorry.  Two is -- I'm

12  sorry.

13         UNIDENTIFIED FEMALE:  Two is a different issue.

14  That's the Claims -- whether we should have one or two

15  records in Claims.

16         MR. GOTTLIEB:  So our view, with respect to the

17  allocation is that the numbers that are put in are the

18  appropriate ones.  With respect to the time for opening

19  statements --

20         JUSTICE NEWBOULD:  So the box beside Briefs

21  allocation in the middle of page seven, you agree with that?

22         MR. GOTTLIEB:  Correct.

23         JUSTICE NEWBOULD:  All right.

24         MR. GOTTLIEB:  Thank you.  If you flip over the

25  page --

1          UNIDENTIFIED FEMALE:  We've started to indicate

2    in the columns, you'll agree -- like if you just go to the

3    top, you'll see the EMEA Debtors are set up at the top and

4    you'll indicate who supports what position.

5          MR. GOTTLIEB:  Your Honor, if you go over to page

6    eight, there's a new box regarding opening statements on

7    allocation.  We are advocating, this is EMEA, that the

8    parties take more time for their opening statements, as

9    you've heard, and I know you know this.  There's going to be

10   a very, very large record.  This trial, although we're going

11   to have live evidence, there'll be a significant amount of

12   evidence already in the record; deposition transcripts,

13   Affidavits.  You've heard a large volume of expert reports.

14          In our respectful submission, if we take more

15   time to open the case, not just us, but the parties more

16   time to open the case, we will give the Courts, both Courts,

17   a better idea of where the evidence is headed, where the

18   arguments are headed.  So our view is even though we take

19   more time to open, and I don't think anyone could reasonably

20   suggest a three-hour opening for a $7.5 billion case with

21   allocation theories and this type of evidence is too long.

22   In any other case, it wouldn't be too long.  It would be

23   quite short.  We think the Courts would benefit greatly to

24   have the parties set out their positions and their overview

25   of the evidence as it exists and that can't be done in one

1   and a half hours.  It just can't be done given the volume of

2   material.  I think the Courts will feel that they're a

3   little bit less 'unhelped' if it's that short of a time.

4        So, in our respectful submission, a three-hour opening

5   will be far more beneficial to the Courts than a shorter

6   opening where they'll be left.  As I said, we do have some

7   Claims issues with respect to allocation of time that Judge

8   Gross needn't be around for that we can talk about.

9             JUSTICE NEWBOULD:  All right.

10            UNIDENTIFIED FEMALE:  Your Honor, if I may just

11  for the Monitor and the Canadian Debtors, indicate the

12  position that we've put forward is the one that we think is

13  appropriate.  We will obviously take to heart the Court's

14  comments about the extent to which you are prepared to read

15  endless pages of Affidavits, but I echo the sentiments of

16  Mr. Ziegler with respect to the filings of the written

17  record.  The U.S. theory is an expert-based theory.  They've

18  had no limitations on the pages of expert reports and I can

19  assure you there's well in excess of 1,000 pages of expert

20  reports.  The Canadian theory is a fact-based theory.  We

21  don't like the U.S. shorthand of bare legal title.  We

22  consider it to be an ownership theory.  It's an ownership

23  theory and the CCC has their alternative theory and we have

24  really put a lot of time and attention into figuring out how

25  much we might need.  We will not use the maximum limit of

1    pages and we hear Your Honor with respect to how much any

2    one person can absorb in a written record but we do feel

3    that the proposal that we've put forward and that the other

4    parties support, other than the U.S. interest, is the

5    appropriate allocation having regard to the volume of

6    experts that you will be also contending with.

7            JUSTICE NOWBOULD:  What's next then?

8            MR. ROSENTHAL:  Your Honor, if everybody is done

9    speaking in Canada, if I can just have a moment to respond

10   to the number of comments that were made just now up in the

11   Canadian Court?  Just to be real brief.

12           The UCC and the Bondholders have not said that

13   they have no witnesses.  They've worked cooperatively with

14   us and they expect that within whatever limits the Courts

15   set, the UCC and the Bonds and the U.S. Debtors will operate

16   and we will be economical and what should not happen,

17   however, is a penalty to the U.S. Group because we're

18   working cooperatively by saying that well, those who are not

19   working cooperatively get more pages or more time to present

20   their theories than those who are working cooperatively.

21           JUSTICE NEWBOULD:  Yes, well, I don't think

22   that's going to happen.

23           MR. ROSENTHAL:  I think --

24           JUSTICE NEWBOULD:  Okay.  What's the next step?

25           MR. ROSENTHAL:  The last thing is, because of the

1  number of reports that have been floating around, we

2  submitted three affirmative expert reports, fewer than the

3  other parties.

4        What happened was, because of the breadth of the

5  Canadian reports, we submitted rebuttal reports.  Those

6  reports come in only to the extent that the initial reports

7  come in, and therefore, the fact that we have divided up our

8  rebuttals of the Canadian reports among multiple witnesses

9  instead of just having the same witnesses rebut them, it

10  doesn't create a higher volume and I just want to dispel any

11  thoughts the Court has with regard to that.

12        JUSTICE NEWBOULD:  I think we have to move on.

13        MR. ROSENTHAL:  I'm prepared to move on and I

14  thank you and I think I could cede the podium probably to

15  the EMEA Debtors to just present the third issue because it

16  concerns Claims and really doesn't concern the U.S. Debtors

17  as far as I know.

18        THE COURT:  Thank you, Mr. Rosenthal.

19        UNIDENTIFIED MALE:  And, Your Honor, we'll be

20  brief.  Mr. Finnigan and I, for the UKP, will deal with this

21  point.  If there's separate Claims proceedings, the EMEA

22  Debtors would have Claims, very significant Claims pursuant

23  to an Order of this Court, EMEA Claims procedure that was

24  given in February of 2011.  There's a large volume of Claims

25  that have been made by the EMEA Debtors.  There are then

1   separate claims that have been made by the UKP.  There are

2   some factual overlap, but they are very different claims.

3              JUSTICE NEWBOULD:  So what's the issue that needs

4   to be dealt with today?

5              UNIDENTIFIED MALE:  The only issue that needs to

6   be dealt with today is there's an acknowledgment that each

7   of EMEA and the UKP will get their own limits with respect

8   to evidence and the like.  That's not really a dispute

9   between the parties.  We also agreed that the Canadian

10  Estate, because it's dealing with the two different

11  proceedings, have to get double so if there's 150 pages,

12  then the Canadians get 300.  The Canadians have said they'd

13  like to be able to allocate that 300 pages any way they

14  wish.  So, theoretically, even though the EMEA Debtors would

15  be entitled to put in 150 pages of evidence, Canadians could

16  say they're going to put in 250 pages of evidence in

17  response, and reserve only 50 pages to deal with the UKP

18  Claims.  We simply say that's an unfair allocation.  If

19  we're allowed to put in 150 pages for our Claims of

20  evidence, they're entitled to put 150 pages max of evidence

21  in response, but they can't treat it as a [indiscernible]

22  different proceedings, based on different Claims, based on

23  different factual bases, based on different legal theories

24  and we shouldn't be disadvantaged that way.  It's a matter

25  of fairness and I believe Mr. Finnigan has the same point I

1    have outlined.

2            JUSTICE NEWBOULD:  Is this the point at the

3    bottom of page seven of his Brief?

4            UNIDENTIFIED MALE:  It's in a few different

5    places.  It's on the bottom of page seven.  It's -- sorry,

6    it's in the middle of page seven at the top, Affidavits

7    Claims.  Do you see that up there on the left side?

8    Affidavits and Claims, 150 pages, 75 rebuttal.  The

9    Canadians get 300 and 150.

10            JUSTICE NEWBOULD:  Right.

11            UNIDENTIFIED MALE:  And if you look at our

12    column, which is the third column in, we don't object to the

13    page limits but the Canadians have to get equal to each of

14    us, not a global amount to split the way it sees fit.  And

15    if you go down to the last box, it's the same --

16            JUSTICE NEWBOULD:  I don't understand the last

17    point you said.

18            UNIDENTIFIED MALE:  So the Canadians, if you look

19    over back in the left column --

20            JUSTICE NEWBOULD:  Yes.

21            UNIDENTIFIED MALE:  -- EMEA gets 150 pages for

22    initial Affidavits.  The Canadian Group gets 300 pages for

23    initial Affidavits.  The theory was --

24            JUSTICE NEWBOULD:  Well, that's because EMEA had

25    the UK Pension Plans --

1        UNIDENTIFIED MALE:  Correct.

2        JUSTICE NEWBOULD:  -- so you each get 150.

3        UNIDENTIFIED MALE:  That's exactly right.

4        JUSTICE NEWBOULD:  Right.

5        UNIDENTIFIED MALE:  The Canadians don't want to

6   say that they get 150 to respond to EMEA; 150 to respond to

7   UKP.  They want to say that they get 300 in total and they

8   can split it any way they want.

9        JUSTICE NEWBOULD:  Why do you care?

10        UNIDENTIFIED MALE:  Because it may be that I file

11  a maximum of my 150 pages for my EMEA Affidavit and they

12  file 250 pages in response to my EMEA Claims.  So they will

13  have had 100 more pages of evidence to put in and they will

14  have saved only 50 to respond to Mr. Finnigan's client's

15  Claims, the UKP.  The whole point of allocation of time like

16  this to set limits to make it fair so that one party doesn't

17  get an advantage over the other by filing far more material.

18        JUSTICE NEWBOULD:  If you see 100 extra pages as

19  an advantage.  Okay.  What other box do you --

20        UNIDENTIFIED MALE:  Go down -- well taken.  Go

21  down to the box at the bottom of the page.  It's the same

22  with the Briefs regarding Claims.  It's the exact same

23  theory.

24        JUSTICE NEWBOULD:  All right.

25        UNIDENTIFIED MALE:  And then if you flip over to

1    page nine, it's the same with respect to time allocation.

2                    JUSTICE NEWBOULD:  All right.

3                    UNIDENTIFIED MALE:  It's the exact same point on

4    all of them --

5                    JUSTICE NEWBOULD:  All right.

6                    UNIDENTIFIED MALE:  -- that we dealt with in our

7    letter as well.

8                    JUSTICE NEWBOULD:  All right.

9                    JUSTICE MORAWETZ:  Is there agreement on font

10   size and margins?

11                                (Laughter)

12                   UNIDENTIFIED FEMALE:  We've settled on New Times

13   Roman.

14                   JUSTICE NEWBOULD:  I can tell you that the

15   footprints are not going to be -- they're going to be the

16   same size as the rest of the thing I think.

17                   THE COURT:  And double-spaced footnotes, yes.

18                   JUSTICE NEWBOULD:  Okay.  So anybody else want to

19   speak on this number three issue that Mr. Gottlieb has

20   raised?

21                   MR. BARNES:  Your Honor?

22                   JUSTICE NEWBOULD:  Yes?

23                   MR. BARNES:  Linden Barnes, on behalf of the

24   Directors.  I think that everyone's striving to achieve

25   equality here.  [indiscernible] "X" many hours to assert the