## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **NORTEL NETWORKS, INC.,** *et al.,*[1] | |
| | **Case No. 09-10138 (KG)** |
| **Debtors.** | **Jointly Administered** |
| | **Objections Due:** |
| | **Hearing Date:  April 23, 2013 at** |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF  MOTION OF AD HOC COMMITTEE OF CANADIAN EMPLOYEES TERMINATED PRE-PETITION FOR ENTRY OF AN ORDER ALLOWING CLAIMS TO BE FILED AFTER THE BAR DATE
### (RELATED TO DOCUMENT NUMBERS 9362,9412, 9418, 9441)

On February 1, 2013, The Ad Hoc Committee[2] of Canadian Employees Terminated Pre-Petition ("Ad Hoc Committee" or "Movant") by and through their undersigned counsel, Rachel B. Mersky, Esquire of Monzack Mersky McLaughlin and Browder, P.A, filed a Motion pursuant to 11 U.S.C. § 501 and Fed. R. Bankr. P. 3003(c)(3) and 9006(b)(1) for leave to file proofs of claim for termination benefits after the expiration of the Bar Date (the "Motion").  The Debtors objected to the Motion and asserted the necessity of discovery to explore the claims asserted in the Motion.  The Parties entered into multiple stipulations to allow the Debtors to complete extensive discovery from each individual member of the Ad Hoc Committee which resulted in the production of multiple thousands of pages of documents.  The Debtors insisted upon discovery of a LinkedIn account that involved significant time and evaluation for a determination

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567).  Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

[2] A list of the members of the Ad Hoc Committee is attached hereto as Exhibit "A" and incorporated herein by reference.

of search terms and the creation of a methodology to meet the demands of the Debtors.  The

discovery process culminated with the completion of two weeks of depositions conducted by the

Debtors and the Unsecured Creditors Committee of fourteen (14) members of the Ad Hoc

Committee hand-selected by the Debtors after they had reviewed the complete responses and

document production from every member of the Ad Hoc Committee.  The depositions were

completed on February 14, 2014, and the transcripts have recently been reviewed by the

deponents.  The time is ripe for a judicial determination of the rights of the Ad Hoc Committee

Members to file claims for severance after the Bar Date. In light of the substantial discovery and

process demanded by the Debtors, the Ad Hoc Committee submits this Supplemental

Memorandum further elucidating the bases for the rights of its members to file claims after the

Bar Date and also to respond to the unfounded allegations set forth in the Debtors' Objection to

the Motion.

## I.       Factual Background

Now that  the extensive discovery referenced above has been completed, it is abundantly

clear that compelling grounds exists to allow the Ad Hoc Committee members the right to file

their claims against the Debtors for termination benefits after the Bar Date.  The underlying basis

giving rise to these claims is the specific language in the individual termination letters (each a

"Termination Agreement Letter" and collectively, the "Termination Agreement Letters"), which

includes the United States subsidiaries in the definition of "Corporation" – the defined obligor

responsible for paying severance.  In order to qualify for the benefits defined in the Termination

Agreement Letter, each employee was required to counter-sign the Termination Agreement

Letter, which contained a release of "the Corporation" and other consideration running to "the

Corporation" from the employee, including non-solicitation and non-disclosure.  (*See* redacted

Termination Agreement Letter attached hereto as Exhibit "B" and incorporated herein by reference). It is important to put into perspective how the underlying claims arose.

The provision in the Termination Agreement Letters that imposed liability on the Corporation for the termination benefits included *all* subsidiaries:

> As used in this letter, the term "Corporation" shall mean *Nortel Networks Corporation, its subsidiaries and affiliates*, their successors and assigns, and all of their past and present officers, directors, employees and agents (in their individual and representative capacities), in every case, individually and collectively.
>
> *See* Exhibit "B" – Termination Agreement Letter (*emphasis added*).

This identification was consistent with the way the employees always understood how the business was operated. (*See* Deposition Transcripts of Pierre Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 30, 42-43; Paul Roddick at 30-31, attached hereto as Exhibit "C" and incorporated herein by reference). The Ad Hoc Committee members each worked for a Nortel business, *i.e.*, "Nortel Networks Corporation, its subsidiaries and affiliates." The individual Nortel businesses generally included employees both in the United States and Canada, and the employees worked together without distinction between the countries or the corporate entities. (*See* Exhibit "C" – Deposition Transcripts of Pierre Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 16, 30, 42-43; Paul Roddick at 30-31). In fact, more than 45 members of the Ad Hoc Committee had direct supervisors located in the United States at the time they were terminated. (*See* Survey of Ad Hoc Committee Members attached hereto as Exhibit "D" and incorporated herein by reference). A

number of the members of the Ad Hoc Committee also supervised employees located in the United States; and some members of the Ad Hoc Committee were responsible for terminating employees in the United States. (*See* Exhibit "D" – Survey of Ad Hoc Committee Members). The Ad Hoc Committee members saw Nortel as a company without borders and based upon business lines, not a complicated lattice of corporate entities. *See* Exhibit "C" – Deposition Transcripts of Pierre Pierre Blais at 33-36; Ernie Briard at 30-32, 53-55; Michael Campbell at 31; Anthony Cinicolo at 30, 80-81,116-117; Betsy Hung at 27-28, 56; Daniel Jin-Ming Leung at 22, 33-34, 66, 80-81; Anthony Law at 22-24, 39-40; Julia Piggott at 16, 30, 42-43; Paul Roddick at 30-31).

It is also imperative to put into perspective the process that ensued in Canada after Nortel Networks Corporation and its Canadian subsidiaries commenced proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 as amended (the "Canadian Debtors" or "Canadian Proceedings"). After the filing of the Canadian Proceedings, Nortel sent a letter reflecting a Research Triangle Park, North Carolina address to terminated employees in Canada, which advised them how the Canadian Proceedings would affect them. (*See*, *e.g.*, January 28, 2009 Letter from Nortel to James Carew, attached hereto as Exhibit "E" and incorporated herein by reference (the "Research Triangle Park Letter")). The Research Triangle Park Letter explicitly directed, "In Canada, a claims process must be approved by the court before any claims can be made. Instructions on how to participate in the claims process and the appropriate forms to fill in will be mailed to all known creditors upon approval of the claims process." (*See* Exhibit "E" – the Research Triangle Park Letter – at 2.). The fact that this letter reflected a North Carolina address for "Nortel" further supports the Ad Hoc Committee members' understanding that Nortel – the entity that issued the letter – was a global company

that disregarded the physical border between the U.S. and Canada.   As such, this lack of distinction exacerbated the confusion surrounding the claims process in the U.S.

It is equally vital to consider what the Nortel employees located in Canada were told by their Court-appointed counsel in Canada regarding how to proceed with their claims.   As this Court is aware, the parallel proceedings in Canada involve foreign laws and processes that may often appear similar, but, in fact, differ in both terminology and process. Early in the Canadian proceedings, on or about June 30, 2009, the Honorable Geoffrey B. Morawetz, the Judge presiding over the Canadian Proceedings, appointed the law firm of Koskie Minsky LLP to represent all of the approximately 20,000 employees of Nortel located in Canada (*See* Order attached hereto as Exhibit "F" and incorporated herein by reference).  This appointment included approximately 300 former employees who had been terminated pre-petition with termination rights claims.  The employees terminated pre-petition based in Canada were repeatedly advised by Koskie Minsky that there would be a special claims process created for them that would be different from the general claims process for other creditors in Canada, and that and that they should wait for that process to be created.   They were repeatedly told that they should do nothing, and that they must wait for the special claims process that was going to be created for former employees employed in Canada.  (*See* Deposition Transcripts of Ernie Briard at 87-88, 125; Chris Buchanan at 113; Michael Campbell at 188; Paula Klein at 124-25; Jane Longchamps at 52-53,  attached hereto as Exhibit "G" and incorporated herein by reference).   These exhortations were also consistent with the instructions that Nortel provided in the Research Triangle Park Letter.  (*See* Exhibit E – the Research Triangle Park Letter).The process was not formalized until approximately October 2012, at which time the former employees terminated pre-petition with termination benefits were told that the Monitor would provide each former

employee with an analysis of his/her claim.  It was the Monitor that collected the termination

letters, evaluated the claims and calculated the amount of the claim. The only reason an

employee had to file anything in Canada was if he/she objected to the claims package the

Monitor sent to the claimant.

None of the Ad Hoc Committee members received actual notice of the Bar Date.  While

the Debtors assert that a total of eight members of the Ad Hoc Committee were provided with

actual notice, even this allegation is inaccurate.[3]  Specifically the Debtors claim that Michael

Campbell, Donald Ellis, David Hudson, Mark Turner, William Sung, Ernie Briard and Yvone

Lemyrer were served with notice of the Bar Date; however, these individuals deny that they

receive actual notice. Interestingly, in the case of Michael Campbell, Don Ellis, Mark Turner,

William Sung, and David Hudson, Movant has determined that there were former employees

located in the United States with the same name that may have received the notice the Debtors

refer to. Ernie Briard, specifically testified that he did not receive actual notice, and that while he

became aware of the U.S. Bar Date, he thought that it only applied to claims he had arising from

the time he actually worked in the U.S.  Mr. Briard understood that he was required to wait for

the process to be created in Canada for the work he performed while located in Canada.  (*See*

Deposition Transcript of Ernie Briard at 85-88, attached hereto as Exhibit "H" and incorporated

herein by reference).  . Ms. Lemyrer did not receive notice of the Bar Date, however it should be

noted that she was employed by Nortel in the United States from 1995-2000, in France from

2000-2003 and in Montreal from 2004 until she was terminated in 2009.  If notice was sent to

Ms. Lemyrer, it was not to her address during the last four or more years of employment with

Nortel.

---

[3] One individual identified by the Debtors, Michael McCorkle, is no longer participating as members of the Ad Hoc
Committee.

## II.    Legal Standard

### The Debtors' Failure to Provide Actual Notice Requires Allowance Of The Ad Hoc Committee Members To File Claims After The Bar Date.

The Debtors were required to give actual notice to each and every member of the Ad Hoc Committee, and their failure to do so requires that the Ad Hoc Committee members be allowed to file their claims after the Bar Date.  Due process requires that a debtor give actual notice to all known creditors.  *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478 (1988); *City of New York v. New York, N.H. & H.R. R.R. Co.*, 344 U.S. 293, 297, 73 S. Ct. 299, 97 L. Ed. 333 (1953).   "A known creditor is one whose identity is either known or 'reasonably ascertainable' by the debtor."  *In re Smith & Co.*, 413 BR 161 Bankr. D. Del. 2009).  A debtor is required to use reasonably diligent efforts focused on their own books and records.  *Chemtron Corporation v. Jones*, 72 F 3d 341 (3rd Cir. 1995); *Mennonite Bd. of Missions v. Adam*, 462 U.S. 791(1983).  A diligent search of the Debtors own books and records should have revealed the termination letters upon which the Ad Hoc Committee's claims are based.

In the present case, employees reported to supervisors across borders between the U.S. and Canada. (*See* Deposition Transcripts of Chris Buchanan at 26; Michael Campbell at 29; Paula Klein at 26-28 (inclusive of Errata Sheet); Daniel Jin-Ming Leung at 22; Betsy Hung at 25-27, 43-44, 56, Anthony Law at 23; Julia Piggott at 16, 30-32, attached hereto as Exhibit "I" and incorporated herein by reference; *see also* Exhibit "D" – Survey of Ad Hoc Committee Members at).   At the time many members of the Ad Hoc Committee were terminated, their direct supervisor was in the U.S., and some member of the Ad Hoc Committee were even terminated by their U.S. supervisors (*See* Survey of Ad Hoc Committee Members at Exhibit "D").

Furthermore, throughout the employment of many members of the Ad Hoc Committee, it was common for them to have employees and or supervisors located in the U.S.  (*See* Exhibit "I"

7

– Deposition Transcripts of Chris Buchanan at 26; Michael Campbell at 29; Paula Klein at 26-28 (inclusive of Errata Sheet); Daniel Jin-Ming Leung at 22; Betsy Hung at 25-27, 43-44, 56, Anthony Law at 23; Julia Piggott at 16, 30-32; *see also* Survey of Ad Hoc Committee Members at Exhibit "D"). The termination letters were generated by HR Shared Services for Nortel in North Carolina ("Nortel HR"). (*See* redacted Termination Agreement Letter attached as Exhibit "B"). Since Nortel HR in North Carolina was producing termination letters that included the imposition of a release of the Debtors as a condition precedent to entitlement to termination benefits, the Debtors clearly knew of the creditors and had their mailing addresses available. Accordingly, at a minimum, the creditors were reasonably ascertainable to the Debtors, and the Debtors should have sent actual notice to the members of the Ad Hoc Committee.[4] They did not. If a creditor is known to the debtor, notice by publication is not constitutionally reasonable and actual notice of the relevant bar dates must be afforded to the creditor. *See City of New York v. New York N.H. & H.R. Co.,* 344 U.S. 293, 296 (1953). As such, the failure of the Debtors to give actual notice to the members of the Ad Hoc Committee is sufficient, in and of itself, to allow these claims to be filed after the Bar Date.

**The Debtors' Failure To Provide Adequate Constructive Notice Constitutes Separate Grounds Requiring Allowance Of The Ad Hoc Committee Members To File Claims After The Bar Date.**

Under any circumstances, the Debtors had an obligation to provide even "unknown creditors" with constructive notice of the Bar Date by publication. "Due process requires notice that is reasonably calculated to reach all interested parties, reasonably conveys all the required information and permits time for a reasonable response." *Chemtron Corporation v. Jones*, 72 F

---

[4] In addition, as noted above, the Research Triangle Park Letter supports the Ad Hoc Committee's position that the Debtors could (and should) have satisfied their obligation to provide actual notice. That is, if the Debtors were able to send letters to the former Canadian employees regarding the Canadian Proceedings, they also should have sent similar letters to the same universe of individuals advising of the U.S. bankruptcy proceedings and the applicable Bar Date.

3d 341 (3rd Cir. 1995). Although the Debtors did attempt to provide notice by publication, that notice was at best confusing, and at worst, misleading. The Notice in *The Globe and Mail*, the Ottawa Newspaper specifically directed: "If you believe that you have a claim against Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation or Nortel Networks Technology Corporation (the "Canadian Debtors"), any such claims shall be filed *in and only in, the Canadian proceedings* with the court-appointed Monitor." (*See* Notice (*emphasis added*) attached hereto as Exhibit "J" and incorporated herein by reference). "If the notice is unclear, the fact that it was received will not make it adequate." *Fogel v. Zell*, 221 F.3d 955 (7th Cir. 2000). That is precisely the case here.

Even if a claimant with claims against both the Debtors and the Canadian Estates somehow became aware that the. Debtors had set a bar date, they were specifically directed not to file a claim against the Debtors for claims were being filed against Canadian Estates. In the case of the members of the Ad Hoc Committee, the members had claims against *both* the Debtors *and* the Canadian Estates. The instructions in the Notice published by the Debtors was consistent with the understanding of the members of the Ad Hoc Committee that: (1) there was a separate claims process being established in Canada that employees located in Canada had to follow, and (2) employees in Canada had to wait for that process. (*See* Exhibit "G" – Deposition Transcripts, of Michael Campbell at 188; Jane Longchamps at 52-53; Chris Buchanan at 113; Klein at 124-25; Buchanan at 113; Ernie Briard at 87-88, 125).

**Even Assuming A*rguendo*, The Debtors Provided Actual Notice Or Adequate Constructive Notice, The Ad Hoc Committee Members Should Be Permitted To File Their Claims Based On "Excusable Neglect."**

Under any circumstances the period for filing a claim should be enlarged for members of the Ad Hoc Committee. The Court can enlarge the time for filing a proof of claim where the failure to act was the result of "excusable neglect." *See*, *e.g.*, *Pioneer Inv. Servs. Corp. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 113 S.Ct. 1489 (1993) (finding counsel's failure to file a proof of claim before the bar date was attributable to excusable neglect partly due to the fact that the notice of claims bar date was not prominently announced and accompanied by an explanation of its significance). Movant respectfully submits that the Debtors' failure to provide the requisite statutory notice justifies the allowance of these late filed claims as a "simple, faultless omission," which qualifies as excusable neglect. *See Pioneer*, 507 U.S. at 388; *see also In re Spring Ford Indus., Inc.*, 2003 WL 21785960, at *2 (Bankr. E.D. Pa. July 25, 2003) (noting that claimants have no duty to inquire about what is procedurally required of them but rather may assume that they will receive effective notice).

The first prong of the excusable neglect analysis is a multi-faceted examination to determine the prejudice to the debtor. This test includes an evaluation of the size of the claim with respect to the rest of the estate, the impact on judicial administration of the estate, the existence of a filed or confirmed plan and the effect on that plan, the disruptive effect that the late filed claim would have on the plan or the economic model upon which the plan is based, and whether the plan would open the floodgates of litigation to other similar claims. *In re O'Brien Environmental Energy, Inc*., 1888 F.3d 116 (3rd. Cir. 1999). A review of these factors weighs overwhelmingly in favor of allowance of the filing of the claims. The maximum size of the total claim sought to be filed by the members of the Ad Hoc Committee is less than $18,000,000. This is insignificant to an estate which holds more than $7,000,000,000 in its lock box for

allocation and distribution.  The total percentage is marginal to the Estate.

The second and third prongs of the analysis relate to the judicial administration of the estate and the effect on a plan of reorganization.  While the Estate at issue here has been liquidated, there can be no plan of reorganization until the allocation is completed.  The Debtors have been aware of the Ad Hoc Committee members' claims since at least the summer of 2012 when counsel for the Debtors was contacted by Koskie Minsky (*see* Affidavit of Michael Campbell, attached hereto as Exhibit "K" and incorporated herein by reference) and has had more than a year since the filing of the Motion to collect extensive discovery regarding the claims.  The Debtors will be able to take the claims into consideration when drafting a plan of reorganization.

Furthermore, the *de minimis* amount constituting the entirety of the Ad Hoc Committee's claims, in proportion to the entire estate, will mean that the allowance of these claims will have little, if any, effect on the plan of reorganization.  Similarly, there can be no adverse effect on the economic model upon which a future plan is formalized for the reasons addressed above.

The Ad Hoc Committee Members' claims are based upon termination benefits afforded to each member, which have already been vetted, analyzed and approved by the Canadian Monitor, such that once the claims are permitted to be filed, there should be no need for further analysis.  The Debtors have been provided with the documentation for the claims during the extensive period of discovery.  Finally, the Debtors' argument regarding the alleged "opening of the flood gates" to similar claims is a red herring.  The Debtors have significantly benefitted by the existence of the Ad Hoc Committee, which has proceeded with these claims as a consolidated process with a single attorney representing a large body of creditors, providing all discovery requested, and dealing directly with the claimants.  Their claims arise from the special

11

circumstances of the business relationship between the members of the Ad Hoc Committee and the Debtors as reflected in the Termination Letters. The confusion regarding the claims processes applicable to the Ad Hoc Committee members arose, in pertinent part, as a result of the parallel proceedings in the U.S. and Canada, as well as the disparate representations made in the U.S. and Canada. The Research Triangle Park Letter, sent *after* the Termination Letters, only compounded the confusion because that correspondence indicated the recipients who wished to "make a claim": (1) must wait until a claims process (with no distinction between the U.S. and Canadian claims) was approved, and (2) that appropriate forms for such "claims" would be mailed "to all known creditors upon approval of the claims process" (in addition to being available on the Monitor's website). At a minimum, the vague and confusing information about the "claims" that the Debtors sent to the Ad Hoc Committee members demonstrates a good faith reason for the delay in filing claims in the U.S. , separate and apart from the Canadian Proceedings. The members of the Ad Hoc Committee are non-lawyers with "clean hands" and should be permitted to pursue their claims in the U.S.

Koskie Minsky, counsel appointed by the Canadian Court to represent all employees, was alerted to these specific possible claims in mid-2012 after discussions with the Monitor that had reviewed each claim. (*See* Exhibit "K" – Affidavit of Michael Campbell). Koskie Minsky approached the Canadian Monitor and asserted that the firm had authority under the Canadian Order to litigate the issue in the U.S. (*See* July 10, 2012 Letter of Koskie Minsky to Canadian Monitor, attached hereto as Exhibit "L" and incorporated herein by reference). Koskie Minsky expeditiously contacted Debtors' counsel and tried to reach an agreement with the Debtors regarding a tolling of the Bar Date for affected Canadian Employees identified by the Monitor, (*See* Exhibit "K" – Affidavit of Michael Campbell). When the Debtors failed to respond to

Koskie Minsky's inquiry, it was determined that the best course of action was to introduce the Employee Representatives to U.S. counsel. The Employee Representatives selected Rachel B. Mersky to serve as U.S. counsel, and they initiated a process to notify all possible claimants identified by the Canadian Monitor, and determined by Koskie Minsky, to have possible claims against the Debtors. (*See* Exhibit "K" – Affidavit of Michael Campbell). All members of this class were contacted, and the group comprising the Ad Hoc Committee is the unified block of former Canadian Employees with claims against the Debtors who have elected to proceed with the process. Consequently, it is clear that the "floodgates" are controlled, and there is little likelihood that other, similar claims will be raised as a result of this litigation.

The next factors used to evaluate excusable neglect are the length of delay and any potential impact on the proceedings. As outline above, once the Court-appointed counsel for the Canadian Employees became aware of the possible claims for the small subset of its constituency, counsel acted judiciously and notified the Court-appointed representatives, Paula Klein and Michael Campbell. (*See* Exhibit "K" – Affidavit of Michael Campbell). While the Debtors may argue that some parties may have had knowledge of the Bar Date before this timeframe, at that time there was no understanding that the former Canadian employees could file claims related to their employment while employed in Canada against the Debtors. And, the Bar Date notice itself, did not dispel this notion. (*See* Deposition Transcripts of Ernie Briard at 89; Chris Buchanan at 90; Michael Campbell at 136-144, 169-70; Betsy Hung at 44-47; Paula Klein at 101; Jane Longchamps at 57, attached hereto as Exhibit "M" and incorporated herein by reference). Finally, the delay will have no impact on the Debtors because there is no scheduled hearing on a Disclosure Statement or anything other than a rudimentary placeholder plan on file with the Court.

The next factor to consider is the reason for the delay, including whether it was within the reasonable control of the movant. In this case, the members of the Ad Hoc Committee understood that the Canadian Court had appointed counsel to represent them, and that they were required to follow a claims process that was being negotiated between the Monitor and Koskie-Minsky. As noted above, the members were repeatedly told that they were required to wait until that process was completed. (*See* Exhibit "G" – Deposition Transcripts of Ernie Briard at 87-88, 125; Chris Buchanan at 113; Michael Campbell at 188; Jane Longchamps at 52-53; Paula Klein at 124-25). Ultimately, it was the Monitor that was responsible under the Canadian process for determining the claims for the members of the Ad Hoc Committee, and during that process in mid-to-late-2012, the rights of the Ad Hoc Committee to file claims in the U.S. was discovered. (*See* Exhibit "K" – Affidavit of Michael Campbell). The members of the Ad Hoc Committee justifiably relied on their counsel and waited for the process in Canada to unfold. In that reasonable reliance, the members were unaware of their separate rights in the U.S. against the Debtors.

The final component of the excusable neglect analysis is whether the movants are acting in good faith. There is no question that the Ad Hoc Committee members have acted in good faith. The Debtors' considerable efforts to challenge the motivation of the Ad Hoc Committee and the timing of the filing are misplaced. The Debtors incorrectly assert that the timing of the Motion was somehow motivated by the early mediation attempts between the Debtors and the Canadian estates in regards to allocation. To the contrary, the only relationship between these two events – and efforts to proceed before the first, unsuccessful mediation – was Movant's counsel's concern that waiting until after the mediation might constitute an avoidable delay that would impact the excusable neglect analysis. As soon as the Court-appointed representatives of

the Canadian Employees became aware of rights to possible claims against the Debtors, they immediately began working with appointed counsel, Koskie Minsky, in an effort to fashion a stipulated extension of the Bar Date with the Debtors. When the Debtors failed to respond to this amicable attempt, counsel in the U.S. was retained. Notice was promptly given to all parties with possible claims to seek authority to file claims after the Bar Date, and the instant Motion was filed. There was no delay, even considering the difficulties involved with coordinating a group of more than 150 individuals operating as a single ad hoc committee. In short, the Ad Hoc Committee acted in good faith in its effort to preserve its members' rights in the U.S. proceedings.

The Debtors knew, or upon reasonable review of their records should have discovered, that the members of the Ad Hoc Committee had possible claims against the Debtors. In light of this, the Debtors had an obligation to provide actual notice. They did not, and for that reason alone the Motion should be granted. Further, even if actual notice was not required (and it was), the constructive notice by publication was, at a very minimum, unclear and confusing to the lay persons who now comprise the Ad Hoc Committee. Consequently, the notice by publication was inadequate, and the Members of the Ad Hoc Committee's claims should be allowed to be filed after the Bar Date. Allowing these individuals to do so is fair and equitable, and in no event prejudicial to the Debtors.

Finally, under any circumstances, the members of the Ad Hoc Committee have at all times acted in good faith and in an expeditious manner to make known to the U.S. Debtors their intent to proceed with claims in the U.S. Accordingly, even assuming *arguendo*, the Debtors' actual and/or constructive notice was adequate, the Ad Hoc Committee members' delay in seeking to file claims in the U.S. satisfies the standards for excusable neglect.

**WHEREFORE,** Movant respectfully submits that the Ad Hoc Committee's Motion be granted by this Honorable Court.

Dated:  March 27, 2014                                   MONZACK, MERSKY, MCLAUGHLIN
                                                                   AND BROWDER, P.A.


                                                                   */s/ Rachel B. Mersky*
                                                                   Rachel B. Mersky (DE #2049)
                                                                   1201 N. Orange Street, Suite 400
                                                                   Wilmington, DE  19801
                                                                   Tel:     (302) 656-8162
                                                                   Fax:     (302) 656-2769
                                                                   Email: *rmersky@monlaw.com*

                                                                   **ATTORNEY FOR AD HOC COMMITTEE
                                                                   OF CANADIAN EMPLOYEES TERMINATED
                                                                   PRE-PETITION**