# Exhibit "C"

*In Re:*
*NORTEL NETWORKS INC., et al*

*PIERRE PIERRE BLAIS*
*February 10, 2014*
*Confidential*



# Ellen Grauer
## COURT REPORTING
#### Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106217A.TXT*
Min-U-Script® with Word Index

In Re:                                    Confidential
NORTEL NETWORKS INC., et al

---

Page 33

1      **BLAIS - CONFIDENTIAL**
2    **working for Nortel, one of those companies or all**
3    **of them or -- Nortel.**
4    Q.   So you understood that you were
5    working for Nortel, and you understood that Nortel
6    had various subsidiaries and affiliates, but you
7    weren't quite sure which of those was your
8    employer?
9    **A.   I did not understand the**
10   **financial, corporate, legal relationship of all of**
11   **those various groups. I report to one of them, but**
12   **probably to many of them because they are probably**
13   **not flat. There is a structure, but you know,**
14   **eventually is there a Nortel at the top? I would**
15   **expect there is one. And so to me that is the**
16   **Nortel. Nortel Canada is just part of Nortel. So**
17   **that was --**
18   Q.   Did you --
19   **A.   That was --**
20   Q.   Oh, I'm sorry, go ahead.
21   **A.   That at least was my understanding**
22   **or is my understanding.**
23   Q.   Did you understand that you worked
24   for some Nortel entity that was based in Canada?
25   **A.   Yes.**

---

Page 34

1      **BLAIS - CONFIDENTIAL**
2    Q.   And did you understand that your
3    paycheque was paid by a Nortel entity that was
4    based in Canada?
5    **A.   My paycheque for a long time came**
6    **from Bell Northern Research, which was my original**
7    **employer at Nortel, and through all of the changes**
8    **over the years, even though I became a Nortel**
9    **employee, my paycheque for a long time was still**
10   **coming from Bell Northern Research.**
11       **At some point, the paystubs I was**
12   **receiving changed to a Nortel paystub, but it**
13   **doesn't necessarily mean that the entity that was**
14   **paying my salary was different. It might have**
15   **remained to be Bell Northern Research. I never**
16   **looked into that to determine exactly where the**
17   **money was coming from.**
18   Q.   So when your paycheque was coming
19   from Bell Northern Research, you understood that
20   that entity was based in Canada?
21   **A.   Yes.**
22   Q.   And after your paystubs started to
23   say Nortel, you knew that you were still based in
24   Canada?
25   **A.   Yes.**

---

Page 35

1      **BLAIS - CONFIDENTIAL**
2    Q.   But you weren't quite sure what
3    the particular entity was?
4    **A.   Correct.**
5    Q.   So at the time that you signed
6    this letter, who did you expect would be
7    responsible for paying the amount that is listed
8    here as the severance payment?
9    **A.   I don't believe that I had any**
10   **specific expectation as to who would be paying it.**
11   **I expected it would be paid, but not by whom. It**
12   **is quite possible that these packages are done by**
13   **other arrangements and so on, so I do not know. I**
14   **had no expectation.**
15   Q.   Do you think if you had considered
16   it, you would have assumed that it was the same
17   entity that had been paying your paycheque that
18   would pay your severance payment?
19   **A.   I can't conjecture. I don't know.**
20   Q.   So you didn't have a clear
21   understanding at the time that you signed the
22   letter of exactly who the corporation would be that
23   would be responsible for paying your letter?
24   **A.   That would be a correct**
25   **assessment.**

---

Page 36

1      **BLAIS - CONFIDENTIAL**
2    Q.   Was there anything in this letter
3    that gave you a reason to believe at the time that
4    your severance would be paid by a Nortel entity
5    based in the United States?
6    **A.   No, not specifically.**
7    Q.   Have you ever received any
8    payments under this letter?
9    **A.   I -- under this letter? I**
10   **received a payment of -- under this letter, under**
11   **the letter directly, no.**
12   Q.   Have you received some other
13   payment?
14   **A.   A number of individuals with a**
15   **claim received a $3,000 amount at some point during**
16   **the --**
17   Q.   And that was a settlement payment?
18   **A.   It is a partial settlement payment**
19   **is my understanding.**
20   Q.   Have you received any other amount
21   meant to be in payment of severance aside from that
22   $3,000?
23   **A.   As part of this settlement, there**
24   **is vacation gets paid and there is a certain**
25   **minimum amount and so on, so some of that actually**

---

*In Re:*

*NORTEL NETWORKS INC., et al*

*ERNIE BRIARD*
*February 4, 2014*
*Confidential*



**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106213B.TXT*

Min-U-Script® with Word Index

BRIARD - CONFIDENTIAL

1
2 Q. Okay.
3 A. I can't recall that exactly
4 personally, but I believe that to be the case.
5 Q. I had assumed that from your
6 testimony. I guess I shouldn't have made that
7 assumption. You don't have a recollection today of
8 what the paycheque looked like physically?
9 A. The U.S. one, I believe they had
10 an address on it and I believe the address was
11 Nashville, Tennessee. That much I do believe.
12 Q. Do you recall whether the
13 paycheques up in Canada had an address?
14 A. Oh, that's -- no, I don't recall.
15 I don't recall.
16 Q. Okay. So you're not sure whether
17 it identified the Nortel entity, you know it had a
18 Nashville address, and you know just because of
19 your general involvement in finance that there's
20 some U.S. statutory entity and you don't know what
21 it is that's actually physically paying you?
22 A. Yes, with the clarification that
23 my recollection is it had a U.S. address.
24 Q. Okay, fair enough.
25 A. But otherwise correct. Otherwise

BRIARD - CONFIDENTIAL

1
2 correct. That's correct.
3 Q. So was Steve Pusey the business
4 side guy you reported to the whole time you were in
5 Boston or did he go back to the U.K. at some point?
6 A. Was that the whole time? He ended
7 up going back to the U.K., I just don't know if it
8 was before -- I think he went back to the U.K.
9 about the same time as I was going back to Canada
10 because, remember, the bubble had burst so
11 everybody was kind of running, if you will. But he
12 was on the sales side. He was the Nortel sales VP
13 basically, senior VP, yeah.
14 Q. So what happened after Boston?
15 A. Boston, I moved back to Ottawa and
16 took an operations role working for a guy that was
17 in Raleigh, North Carolina, called Ken Crosson.
18 Q. C-R-O-S-S-E-N?
19 A. C-R-O-S-S-O-N, a great guy, I
20 learned a lot from him. As a matter of fact, just
21 to explain, to go back, how global the business
22 was, I don't know if that's important to you or
23 not, but the job that he offered me, he said Ernie,
24 you could locate yourself in one of three places,
25 he doesn't care. I said well, which three are

BRIARD - CONFIDENTIAL

1
2 those? He said you can locate yourself in Raleigh,
3 North Carolina, in Toronto, Canada, or Montreal,
4 Canada. And I said okay, thanks, and I negotiated
5 Ottawa since it was half-way in between.
6 Q. You went off the board?
7 A. I went off the board and called it
8 home. My wife said if you're going anywhere, we're
9 going to move home, enough of this moving around.
10 The kids were older and we didn't want to do that
11 to them again. And he said what the heck, half way
12 in between Montreal and Toronto.
13 Q. So you never actually worked in
14 Toronto?
15 A. Never worked in Toronto. I am one
16 of the few global Nortel people, which most of us
17 were, that never worked in Toronto.
18 Q. So is your operations role for Ken
19 Crosson in Ottawa, that was your last position?
20 A. No. So I was there, I did that
21 for a couple of years with him and that was --
22 again because of my strength doing the operations
23 role in Montreal, this was a supply chain purchase
24 procurement role, and that evolved too, to the
25 point where Ken moved on -- Ken was my finance

BRIARD - CONFIDENTIAL

1
2 boss, my line of business boss was a guy called
3 John Haydon who was originally Canadian, he spent I
4 think five years over in the U.K. and he was coming
5 back from the U.K. to take this chief operating
6 officer role in Ottawa, and I supported him as his
7 finance guy. So that was the first role.
8 And then I moved to another role which
9 was the last role I was in at Nortel, and that was
10 to go over and support the chief technology
11 officer, who was an American who had moved to
12 Ottawa to take on this role because Ottawa was the
13 hub of R&D. That's where we did -- most of the
14 people who worked in R&D worked and lived in
15 Ottawa. So that was the head office, if you will,
16 for R&D, similar to where I started.
17 So he relocated in from -- I think he
18 lived in Boston, actually, relocated in from Boston
19 to Ottawa for his stint, and I supported him. On
20 the line side, which is my main boss, and my
21 finance boss which is less -- I have less
22 interaction with the finance guy, more interaction
23 with the business guy, obviously, was a guy
24 called -- well, towards the end it was -- it was
25 John Doolittle I guess and then towards the end it

In Re:                                          Confidential
NORTEL NETWORKS INC., et al

---

**Page 53**

```
 1      BRIARD - CONFIDENTIAL
 2  A.  I was mainly concerned with how it
 3      was going to affect me.  But my understanding is
 4      that global -- we ran the company as global Nortel,
 5      we were going to break up the company as global
 6      Nortel.
 7  Q.  At some point in time you
 8      understood that that entailed, for example, a
 9      Chapter 11 bankruptcy in the United States?
10  A.  That's right.  I knew the word
11      Chapter 11 over the course of my career.  I
12      couldn't tell you that Nortel filed Chapter 11,
13      although I guess they did, for example.  I assume
14      they did, I guess.  Well, they would have had to or
15      something like a chapter -- something or other that
16      you do in the U.S.
17  Q.  Even if you don't remember being
18      aware, your operating assumption was that there
19      would be a U.S. Chapter 11?
20  A.  That's right.
21  Q.  And did you at some point become
22      aware that there were also administration
23      proceedings in Europe, given that there are
24      European entities?
25  A.  Yeah, I think I heard that over
```

**Page 54**

```
 1      BRIARD - CONFIDENTIAL
 2      the years, and I think I also heard that not all
 3      was under that but most were.
 4  Q.  Okay.  So the next thing, we'll
 5      just look at the one that's been marked Exhibit 4,
 6      and again I'll represent to you that while we just
 7      kind of -- we've marked one for convenience
 8      purposes so we don't have 10 copies of the same
 9      thing, that this was produced by your counsel with
10      an EB stamp on it.  So I'll show you Exhibit 4.
11  A.  Okay.
12  Q.  Do you recognize this letter?
13  A.  Yes, I believe so.  Yeah.  I mean,
14      I'd have to compare it to my files, but yeah.
15  Q.  We're happy to just show you.
16      And yours, obviously, the one that we've showed you
17      is kind of a blank form, but if you'd like to see
18      it --
19  A.  So you see --
20      MR. ROSENTHAL:  Let's just mark it and
21      make it easier for everybody.
22      MS. MERSKY:  Let him ask his question
23      and you can answer his question.
24      MR. ROSENTHAL:  Why don't we mark as
25      Exhibit 35, and we can staple it later, we're going
```

**Page 55**

```
 1      BRIARD - CONFIDENTIAL
 2      to mark EB101 to 102, which is a January 28th, 2009
 3      letter to you.
 4      NNI EXHIBIT NO. 35:  Letter dated
 5      January 28, 2009, stamped EB101 to
 6      EB102.
 7      BY MR. ROSENTHAL:
 8  Q.  Do you recognize Exhibit 35?
 9  A.  So these are not the same?
10  Q.  I think they are in substance the
11      same.  But obviously this one is addressed, as
12      opposed to a form letter.
13  A.  Okay.
14  Q.  Do you remember getting Exhibit
15      35?
16  A.  Like, I remember more this one
17      than this one.
18  Q.  Put aside number 4.  Like I said,
19      number 4 is just a generic letter.
20  A.  Again, I'd have to check to my --
21      I don't, you can see --
22  Q.  You can ignore 4.
23  A.  Okay.
24  Q.  35 is the one that came from your
25      files.
```

**Page 56**

```
 1      BRIARD - CONFIDENTIAL
 2  A.  Okay.
 3  Q.  And that's the one that's got your
 4      name as an addressee at the top.
 5  A.  Okay.
 6  Q.  Do you remember getting Exhibit
 7      35?
 8  A.  I do.  I do.  I do believe I do.
 9      If this is the one that's in my -- which looks like
10      this, then yes, because this is the one I kept in
11      my files.
12  Q.  What do you remember about getting
13      this letter?
14  A.  I remember it talked about CCAA
15      and the bankruptcy in Canada.  I remember it
16      striking me odd that it came from the U.S.  And I
17      remember saying I guess this is related to just to
18      firm up the details of the severance that would be
19      owed to me, I guess, and whatnot.  And then the
20      process here, what the claim process would be,
21      which I'm sure I followed, and that's what I
22      remember it to be.
23  Q.  Was this the first that you
24      learned that your non-working notice payments and
25      your severance payments would not be made as
```

*In Re:*

*NORTEL NETWORKS INC., et al*

*MICHAEL CAMPBELL*
*February 6, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106215.TXT*
Min-U-Script® with Word Index

Page 29

```
1      CAMPBELL - CONFIDENTIAL
2   date were you in that position?
3   A.  Probably two years.
4   Q.  And your title was director; is
5   that right?
6   A.  Director of OA&M product
7   management.
8   Q.  And in that position to whom did
9   you report?
10  A.  I reported to a gentleman called
11  John McCreedy.
12  Q.  What was Mr. McCreedy's title?
13  A.  Oh, crap.  He was the
14  vice-president of -- in the CVAS line of business.
15  Q.  And where was Mr. McCreedy
16  located?
17  A.  He was located in Dallas, Texas.
18  Richardson, actually.
19  Q.  And did you have any direct
20  reports to you when you were in that position?
21  A.  I did.
22  Q.  How many?
23  A.  Well, it got smaller as we went
24  along.  I would say probably 10.
25  Q.  And do you know or do you recall
```

Page 30

```
1      CAMPBELL - CONFIDENTIAL
2   where those 10 were located?
3   A.  I had some located in Toronto, I
4   had some located in Ottawa and I had some located
5   in Raleigh, North Carolina.
6   Q.  And, generally speaking, what kind
7   of functions did your direct reports perform?
8   A.  They were in the same line of
9   business as I was, so they were in the CVAS
10  business.  They did tasks that I directed them
11  relative to product management roles within that
12  business.
13  Q.  As of the time, sir, that your
14  employment with Nortel came to an end, did you have
15  any understanding of which Nortel entity employed
16  you?
17  A.  Yes, I was employed by Nortel
18  Canada.
19  Q.  And did you know whether that was
20  NNC, Nortel Networks Canada, or NNL, Nortel
21  Networks Limited?
22  A.  I did not distinguish between
23  them.  I worked for Nortel and I happened to work
24  in the Canadian locations.
25  Q.  But you understood that the entity
```

Page 31

```
1      CAMPBELL - CONFIDENTIAL
2   that employed you was a Nortel Canada entity?
3   A.  Yes.
4   Q.  And as far as you understood
5   through the course of your entire career at Nortel,
6   were you always employed by a Nortel Canada entity?
7   A.  Yes.  That's where my paycheque
8   came from.  I worked for various organizations
9   around the world.
10  Q.  Well, when you say you worked for
11  various organizations around the world, you were
12  always based in Canada, correct?
13  A.  Yes.
14  Q.  But the organizations within
15  Nortel that you worked for, I gather, had global
16  responsibilities?
17  A.  Yes, and indeed within Nortel we
18  didn't distinguish really where we worked.  It was
19  a matter we worked for lines of business that were
20  global, and we always looked at it as a total
21  Nortel, not individual organizations.
22      So I didn't feel that I had to defend
23  Nortel Canada against Nortel U.S.  We were one
24  company.
25  Q.  Understood.  But as far as you
```

Page 32

```
1      CAMPBELL - CONFIDENTIAL
2   were aware, though, you were never employed by a
3   Nortel U.S. legal entity?
4   A.  No, no.
5   Q.  Did any of your family members
6   work for Nortel?
7   A.  Unfortunately yes.
8   Q.  And tell me who that was?
9   A.  My wife was a former employee of
10  Nortel.  She was transferred to Avaya Corporation
11  as part of the sale of that asset during the asset
12  sale process.
13  Q.  And is your wife a member of the
14  NRPC?
15  A.  No, she is not, much to my
16  chagrin.
17  Q.  Has your wife, if you know, filed
18  a claim in the CCAA proceedings?
19  A.  I believe she has, yes.
20  Q.  And do you know what that claim is
21  on account of?
22  A.  Her claim is related to her
23  transitional retirement allowance.
24  Q.  And do you know the amount of that
25  claim?
```

*In Re:*

*NORTEL NETWORKS INC., et al*

*ANTHONY CINICOLO*
*February 14, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106221.TXT*
Min-U-Script® with Word Index

Page 29

CINICOLO - CONFIDENTIAL

2  out of the U.S.
3  Q.  So when you say "dotted line", do
4  you mean sort of indirect supervisor?
5  A.  Yeah, from an HR database system,
6  you know, I'm reporting to Bob, and he knew a bit
7  about what I was doing.  But ideally, the
8  day-to-day work that I do, I am reporting to that
9  executive group there that I'm basically delivering
10  projects to so that they are generating revenue
11  based on the projects that I am delivering to them,
12  and those day-to-day discussions and executive
13  meetings and status of projects, I am focussed on
14  them.  Bob is just there to kind of make sure that,
15  you know, I'm getting a paycheque, that I am doing
16  reviews and, you know, I have got the resources I
17  need if I need more help, but he is not involved
18  with the day-to-day.
19  Q.  And as a Project Manager were you
20  also based in Ottawa?
21  A.  Yes.
22  Q.  And is that the role you held when
23  you were terminated from Nortel?
24  A.  Yes.
25  Q.  Have you kept in touch with any of

Page 30

CINICOLO - CONFIDENTIAL

2  your former colleagues in the U.S., back from the
3  days that you mentioned you were doing a lot of
4  travelling in the U.S.?
5  A.  No.
6  Q.  Do you know which entity employed
7  you in 2008?
8  A.  Nortel.
9  Q.  Were you aware that at that time
10  that Nortel consisted of many different legal
11  entities in different countries around the world?
12  A.  Not really the legal entities.
13  Because we worked -- I mean, I worked with people
14  in Ireland, in the U.S., in Australia, on a daily
15  basis, it didn't matter to me what the legal
16  entities were.  We were all one family, you know,
17  of Nortel.
18  Q.  So you were not aware that Nortel
19  had different legal entities?
20  A.  From a legal perspective, no.  All
21  I know is I got money.  When we needed funding, we
22  received money from the U.S., since primarily we
23  were a design facility for Nortel and the revenue
24  typically came out of the U.S. because that was our
25  biggest market.  And the legal implications I

Page 31

CINICOLO - CONFIDENTIAL

2  really didn't know.
3  Q.  Do you recall which entity issued
4  you your paycheque?
5  A.  Nortel.
6  Q.  Did you always get paid in
7  Canadian dollars?
8  A.  Yeah, I believe so, yeah.
9  Q.  On your T-4 form, do you remember
10  what entity was your employer?
11  A.  I believe it was Nortel.
12  Q.  Did you pay income taxes to any
13  other countries?
14  A.  No.
15  Q.  Did you consider yourself on the
16  Canadian payroll?
17  A.  No.
18  Q.  You did not?
19  A.  I was on the corporate payroll.  I
20  didn't care -- like it didn't matter where the
21  cheque was coming from.  My boss could have been in
22  the U.S.  He was the guy deciding what I made.  I
23  don't know, you know, how the money flowed.
24  Q.  So if you had been asked in 2008,
25  are you on the Canadian payroll, you would have

Page 32

CINICOLO - CONFIDENTIAL

2  said I don't know?  Or what would you have said?
3  A.  I would have said I'm on the
4  Nortel payroll.  If the money is coming in from the
5  U.S. and coming to Canada and being divvied up by
6  whoever the HR system, because HR and typically
7  that is out of the U.S. in those days, I wouldn't
8  have said Canada.  Back in '86 it might have been a
9  different story, but that is the way the company
10  was structured.
11  Q.  And I'll then talk about '86, but
12  did you have any reason to believe that you were on
13  the U.S. payroll?
14  A.  Not the U.S., but again, because
15  of my management who decided what I got paid and my
16  salary and controlled the budget, I didn't know how
17  the payroll systems worked, you know, in terms of
18  what -- you know, who issued the cheques or what
19  the transfer was done to my account.
20  But all I knew is when we went into
21  meetings, if we were talking about budgets for a
22  certain project, they were typically out of the
23  U.S. bucket, right, and I know that my salary
24  probably -- because the cost of me doing that work
25  or if I had to engage other employees, that those

Page 77

1    CINICOLO - CONFIDENTIAL
2  page that is numbered 104.  Towards the bottom
3  there is a heading called "The CCAA Claims
4  Process"; do you see that?
5 A.  Yes.
6 Q.  And later in that paragraph it
7  says:
8    "It is during a Claims Process
9    that individual creditors (including
10   Pensioners and Former Employees)
11   will be required to file a Proof of
12   Claim with the Court in respect of
13   amounts they are owed by Nortel.  If
14   Nortel chooses to establish a Claims
15   Process, the company first will be
16   required to obtain Court approval of
17   a claims procedure, and a 'Claims
18   Bar Date' will be established.  All
19   creditors will be required to file
20   their claim with Nortel before the
21   Claims Bar Date."
22   Do you see that?
23 A.  Yes.
24 Q.  Are you familiar with the term
25  "claims bar date"?

Page 78

1    CINICOLO - CONFIDENTIAL
2 A.  No.
3 Q.  So to you it was a deadline to
4  file claims?  You never recalled hearing the term
5  "bar date"?
6 A.  I mean, until this whole Nortel
7  thing, I didn't have a clue what the -- I thought
8  it was making, you know, in terms of my wife
9  getting her bar, you know, like from a legal term.
10  You know, but throughout the process, I understand
11  it is a kind of a deadline, you know, to make it
12  simple.
13 Q.  On the next page, and it is
14  numbered 105 at the bottom, there is contact
15  information:
16    "[...] please contact KM by email
17    at nortel@kmlaw.ca [...]"
18    And I believe you testified earlier
19  that you didn't call KM, is that correct, at any
20  point?
21 A.  I don't believe I did directly.
22 Q.  Do you recall ever sending them an
23  email?
24 A.  I might have or, like I said,
25  through Paula, if I had any questions.

Page 79

1    CINICOLO - CONFIDENTIAL
2 Q.  Okay, why don't we take a break
3  now.
4    -- RECESSED AT 11:00 A.M.
5    -- RESUMED AT 11:09 A.M.
6    BY MS. VANLARE:
7 Q.  Next I'm going to show you Exhibit
8  15.
9 A.  (Witness Reviews Document.)
10 Q.  Do you recall receiving this
11  document or a document that looked very similar to
12  this?
13 A.  Yes.
14 Q.  The document is entitled "Your
15  Information Statement Package in the Matter of
16  Nortel Canada CCAA Proceedings"; do you see that?
17 A.  Yes.
18 Q.  What do you understand this
19  document to be?
20 A.  I understand it to be basically
21  what -- I guess what the Monitor, based on Nortel
22  records, has that is owed to me by Nortel.
23 Q.  The third paragraph on the first
24  page says:
25    "Nortel Canada's records indicate

Page 80

1    CINICOLO - CONFIDENTIAL
2  you have a Compensation Claim
3  against Nortel Canada."
4  Do you see that?
5 A.  Yes.
6 Q.  And then it says:
7    "As set out in Form A and based on
8    the personal information shown on
9    Form B of this package, your
10   aggregate Compensation Claim against
11   Nortel Canada is:"
12   And then we have redacted what follows
13  in this sort of generic form.  Do you see that?
14 A.  Yes.
15 Q.  Do you remember what you did after
16  you received this document?
17 A.  Well, I think the document had my
18  numbers and the calculations based on, you know,
19  and my personal information, and I reviewed it.
20 Q.  And did you understand that that
21  was your claim against Nortel Canada in the CCAA
22  proceedings?
23 A.  I didn't differentiate.  Again,
24  Nortel Canada records, my claim and what I had
25  signed was faxed to Raleigh, so whether it was back

Page 81

CINICOLO - CONFIDENTIAL
1  to Canada or, you know, I didn't -- you know, it
2  was through Nortel that I had the compensation
3  claim against, so this was the first time I think I
4  had seen something referencing Canada for a very
5  long time.
6  Q.  And when you are referring to this
7  reference to Canada, you are talking about the
8  sentence I had read that said:
9      "Nortel Canada's records indicate
10     you have a Compensation Claim
11     against Nortel Canada"?
12 A.  Yes.
13 Q.  Do you recall seeing that when you
14 received the letter?
15 A.  I recall just seeing it came from
16 Nortel.  I didn't differentiate again which part of
17 the corporation or subsidiary it referenced.
18 Q.  The next paragraph reads:
19     "Since Nortel Canada is insolvent
20     you will receive only a percentage
21     of the full value of your
22     Compensation Claim, in the form of
23     one or more payments of money from
24     the Nortel Canada estate."

Page 82

CINICOLO - CONFIDENTIAL
1      Do you see that?
2  A.  Yes.
3  Q.  At this point did you form an
4  understanding that you would not -- that you would
5  only receive a percentage of the value of your
6  claim?
7  A.  Yeah, begrudgingly I kind of
8  started to say, well, maybe it is not going to be
9  everything, but I still didn't understand what
10 percentage.  I don't think that was made clear.
11 Q.  At this point did you take any
12 steps to try to figure out how to increase your
13 potential percentage of recovery?
14 A.  No.  I did have questions about
15 how certain calculations were done.
16 Q.  Which calculations were those?
17 A.  So in terms of the base severance,
18 it seems that those without a contract, without a
19 severance contract were provided a larger per-week
20 severance calculation than those of us with, and I
21 didn't understand how was that possible.
22 Q.  You can set that exhibit aside.
23 A.  Okay.
24 Q.  I would like to show you next

Page 83

CINICOLO - CONFIDENTIAL
1  another exhibit.  It is Exhibit 99.  This is a
2  LinkedIn discussion that is entitled "Paula/Mike:
3  The 5.14% and 3.3 weeks per year", and it is a post
4  by Chris Buchanan dated December 4th, 2011; do you
5  see that?
6  A.  Yes.
7  Q.  Now, you had mentioned earlier
8  that you had questions relating to the fact that
9  the terms of the severance varied for employees
10 with and without a termination contract?
11 A.  Correct.
12 Q.  If you could just take a few
13 minutes and familiarize yourself with this
14 discussion, my question is, is this discussion on
15 LinkedIn related to what you just mentioned?
16 A.  Yes, it is.
17 Q.  And can you explain what this is
18 talking about in terms of the difference between
19 the two types of employees and why there was a
20 fairly lengthy discussion on this topic on
21 LinkedIn?
22 A.  I guess once we had received our
23 claims information from the Monitor through I guess
24 the personalized documents, we always understood

Page 84

CINICOLO - CONFIDENTIAL
1  there was going to be some type of claims
2  methodology that was going to be used to calculate
3  what type of severance people would get.  And I
4  guess when that methodology was shared, and that is
5  probably what was discussed in the LinkedIn, was
6  that you could see there was a differentiation
7  between those with a letter that received the
8  document stating a certain amount of severance and
9  how it was calculated -- you know, you could
10 determine how many years of service and how many
11 weeks of severance you would get based on the
12 number of years of service.
13     When you look at that information and
14 then you look at the methodology that was used to
15 calculate everyone else that didn't have a letter,
16 those folks were getting I think it was slightly
17 more weeks per year, which in turn increased their
18 severance claim versus the ones that had a written
19 formal severance letter.
20     And that was -- I was asking the
21 question, it was like, well, wait a second, you
22 know, we have this document that supposedly -- you
23 know, this severance agreement that wasn't
24 honoured, okay.  If it is a legal contract, like

Page 113

1    **CINICOLO - CONFIDENTIAL**
2  Q.  If I could ask you to turn back to
3    Exhibit 7, which I handed to you a few minutes ago.
4  **A.  7, okay.**
5  Q.  This was -- and I'll just refresh
6    your memory. This was the post by Ms. Hung where
7    she talks about seeing filed claims on the Epiq
8    website; do you see that?
9  **A.  Yes.**
10 Q.  Did you consider at this point
11   whether you might have a basis for a claim in the
12   U.S.?
13 **A.  No, I wasn't looking or even**
14   **considering that. Again, waiting for my lawyers to**
15   **get back to me. What interested me about this was**
16   **that I worked in Richardson for a month, so I**
17   **thought it was kind of funny and I had been to that**
18   **facility many times. But other than that, that is**
19   **not what I took away.**
20 Q.  She mentions that she had seen
21   claims filed by employees for the deferred salary
22   and bonus; do you see that?
23 **A.  Yes.**
24 Q.  Did you consider at any point that
25   as an employee, you could have filed claims in the

Page 114

1    CINICOLO - CONFIDENTIAL
2    U.S.?
3  **A.  Like, you know, at this point,**
4    **because again I had a severance letter, I don't**
5    **know what the situation was for those folks in the**
6    **U.S. or what process they were following, but**
7    **because I had that severance letter, because we**
8    **had -- we were -- at this time we were -- what was**
9    **it, May, when KM got awarded the -- so I was just**
10   **waiting to see like what are the next steps.**
11 Q.  Did you wonder whether any of the
12   former employees had submitted claims in the U.S.?
13 **A.  No.**
14 Q.  Why not?
15 **A.  It is just, again, waiting,**
16   **waiting to see, you know, what the story is. And**
17   **because -- again, because we had letters, and I**
18   **don't know if anyone else did. You can see there**
19   **is inconsistency in terms of how people are being**
20   **treated here, even within Canada. I mean, so I**
21   **couldn't connect the dots, right.**
22 Q.  Did you ask anybody at this point
23   to explain how the different processes worked and
24   whether you could file a claim in the U.S. as a
25   former employee?

Page 115

1    CINICOLO - CONFIDENTIAL
2  **A.  I don't recall those types of**
3    **questions coming up even in some of the webinars or**
4    **the presentations. I don't think any of those --**
5    **the only thing that I know it had to do with**
6    **certain people that worked half their life maybe in**
7    **the U.S. or somewhere else and part of their time**
8    **in Canada, and those folks had questions along**
9    **those lines.**
10 Q.  And when you say they had
11   "questions along those lines", you mean you --
12   well, let me just ask, what did you mean by that?
13 **A.  So, yeah, let me clarify. I think**
14   **those were more around pension, because some people**
15   **had pension time in the U.S. and in Canada and they**
16   **weren't sure how they were going to get their**
17   **pension, you know. Even if they were laid off and**
18   **owed severance, they had this big pension question**
19   **and, well, how is that going to work? Where does**
20   **the pension money come from?**
21 Q.  And so did I understand correctly
22   that you had heard of some people asking questions
23   about the Canadian process versus the U.S. process,
24   but your recollection is that those people were
25   typically wondering about their pensions?

Page 116

1    CINICOLO - CONFIDENTIAL
2  **A.  Yes. Yes.**
3  Q.  And do you have a pension with
4    Nortel?
5  **A.  Yes, well, I did for 23 years and**
6    **because I worked in Canada for the full 23. You**
7    **know, like for my brother, even in my brother's**
8    **case, I think he had because he had worked in**
9    **Canada and the U.S., but he got paid out back in**
10   **2000 when he left Nortel. But that is the kind**
11   **of -- you know, whoever has got the books of the**
12   **corporation, those are the kind of things they**
13   **needed to figure out, because a lot of people were**
14   **moving across the border at different times**
15   **working, you know.**
16 Q.  You had mentioned earlier that you
17   spent a lot of your career travelling to the U.S.
18   or reporting to people in the U.S.; correct?
19 **A.  Yes. Yes.**
20 Q.  So did that make you wonder
21   whether that entitled you to anything from the U.S.
22   estate?
23 **A.  I guess I didn't think, again, as**
24   **much of the U.S. estate as Nortel being the big**
25   **corporation, and once that big corporation is**

Page 117

CINICOLO - CONFIDENTIAL

1  CINICOLO - CONFIDENTIAL
2  figured out, then we'll -- you know what I am
3  saying? It wasn't like, well, that is the U.S.
4  estate. I never really looked at it that way,
5  because we were so global and we were so big and we
6  had so many employees around the world, it was
7  unreal. You don't have companies like that, you
8  know.
9  Q.  But you know, given that you
10  weren't even sure which payroll you were on, right,
11  it may have been Canada and it may have been the
12  U.S., did you do anything to figure out whether
13  that might mean that you might have a claim in the
14  U.S.?
15  A.  I never went and investigated, and
16  like I said, other than waiting to hear back from
17  the legal team on what would be the process, like
18  regardless of where the money is coming from, me
19  living here, like how do I get what is owed to me
20  based on what the corporation promised in the
21  letter of severance.
22  Q.  And again, by "corporation" you
23  are talking about, you know, Nortel Networks and
24  all --
25  A.  The big Nortel.

Page 118

1  CINICOLO - CONFIDENTIAL
2  Q.  -- and all of its subsidiaries and
3  affiliates?
4  A.  Correct.
5  Q.  And by "legal", I think you had
6  used the term "legal team", you were talking about
7  Koskie Minsky?
8  A.  Sorry, which document are you
9  talking about?
10  Q.  Oh, no, you had just said a few
11  minutes ago, and I just wanted to clarify it for
12  the record, you had said that you were waiting to
13  hear back from the legal team on what would be the
14  process. Were you referring to Koskie Minsky?
15  A.  Yes, since they were our
16  court-appointed legal team.
17  MS. MERSKY: If you are going to take a
18  break relatively soon for lunch --
19  MS. VANLARE: I was actually going to
20  suggest that we do that now.
21  -- RECESSED AT 12:02 P.M.
22  -- RESUMED AT 12:40 P.M.
23  BY MS. VANLARE:
24  Q.  Next I'm going to hand you Exhibit
25  89.

Page 119

1  CINICOLO - CONFIDENTIAL
2  A.  Okay.
3  Q.  It is another LinkedIn discussion,
4  and the title of the top post is "Mike Z. and
5  rabbits out of the hat: Nortel sale of wireless",
6  and it is by Chris Buchanan, dated June 20, 2009;
7  do you see that?
8  A.  Yes.
9  Q.  He posts a link to a Globe and
10  Mail article and he writes:
11  "As per earlier email we need to
12  watch this very carefully.
13  Specifically, how are they going to
14  handle the pensions for those
15  transferring to Nokia-Siemens. They
16  presumably have to transfer the CV
17  out - the question is at what
18  [percent]. Will this further
19  deplete the pension fund?
20  Well worth asking questions.
21  This could be beneficial or very bad
22  news..."
23  Do you see that?
24  A.  Yes.
25  Q.  And then on the next page numbered

Page 120

1  CINICOLO - CONFIDENTIAL
2  1084 there is a post by you towards the top of the
3  page?
4  A.  Yes.
5  Q.  And you write:
6  "Just as a side note to prove
7  further stupidity of Mike Z. and the
8  board, they were offered $800
9  million for CDMA by Nokia in March
10  and REFUSED IT. Did they really
11  think they could get more money and
12  why accept $200 million less only a
13  few months later....money that could
14  have paid severance, pension, etc."
15  Do you see that?
16  A.  Yes.
17  Q.  Do you remember what this
18  conversation is talking about?
19  A.  I don't remember offhand, but you
20  know, going from the trail of the discussion, I
21  guess the bits and pieces of Nortel were starting
22  to be sold off, the estate was starting to -- you
23  know, the business units were being sold off, and
24  in this case, you know, we are wondering, well, now
25  that money is flowing into the estate, does that

*In Re:*

*NORTEL NETWORKS INC., et al*

---

*BETSY HUNG*
*February 4, 2014*
*Confidential*

---



# Ellen Grauer
## COURT REPORTING
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106213A.TXT*
*Min-U-Script® with Word Index*

Page 25

1    HUNG - CONFIDENTIAL
2  supervisor was?
3  A.  PLM?  Ron Morris.  He died
4  already.
5  Q.  Sorry to hear that.
6  A.  After the Nortel ending, the
7  stress and all that stuff.
8  Q.  What did you do after PLM?
9  A.  Then I do system engineer.  I
10  think about it.
11  Q.  You mentioned you did systems
12  engineering?
13  A.  Um-hmm.
14  Q.  How long did you do that for?
15  A.  That's after the PLM so I think,
16  you know, is approximately not quite year, right?
17  Unless I had the resume with me, so let's say it
18  was 2000 and 2001.  Then in 2002 or '3 then I do
19  the system engineering.  Is same kind of product
20  because I know the product, so is -- there is many
21  details about the product that you need to engineer
22  and reliability, all this stuff.
23      So this is my last position with
24  Nortel.
25  Q.  So that was approximately 2002

Page 26

1    HUNG - CONFIDENTIAL
2  until --
3  A.  2008, yeah.
4  Q.  And all of these, you said, you
5  were located in Ottawa for all of these positions?
6  A.  But the last position was my
7  manager is in U.S.
8  Q.  Um-hmm.  So you were located in
9  Ottawa but your manager was in the U.S.?
10  A.  Yeah.
11  Q.  And that's for the systems
12  engineer?
13  A.  Systems engineer.
14  Q.  Do you remember who your manager
15  was?
16  A.  There are two manager.  One is Ian
17  Scales and then a reorganization and then is Allan
18  Clely, C-L-E-L-Y, I think so.  Can I look at it to
19  make sure I get the last name?
20  Q.  Sure.
21  A.  In the termination letter, Allan
22  Cleary, C-L-E-A-R-Y.
23  Q.  And the first individual you
24  mentioned was Ian Scales?
25  A.  Ian Scales.  He got the stroke.

Page 27

1    HUNG - CONFIDENTIAL
2  S-C-A-L-E-S, I think.
3  Q.  And you mentioned one of then was
4  located in the U.S.?
5  A.  Two of them.
6  Q.  Two of them?
7  A.  Ian Scales is in Raleigh, and
8  Allan Cleary is in Richardson.  I haven't met him.
9  I don't know how he looked like because we just
10  talked on the phone, right?
11  Q.  And how did you know where they
12  were located?
13  A.  You always -- we know, you work
14  for a boss, you know he is located in Richardson.
15  You call him, you go through the internal telephone
16  communication, yeah.
17  Q.  And before this position, systems
18  engineering, were all of your supervisors located
19  in Ottawa?
20  A.  I'm trying to think.
21  Q.  Take your time.
22  A.  So many department.  Some
23  departments sometimes in U.S. and across in Canada,
24  so sometimes you work, you really don't know about
25  all this entity, you just know you're working in

Page 28

1    HUNG - CONFIDENTIAL
2  Ottawa reporting to different entities.  Nortel is
3  just whole umbrella across the U.S. and Canada,
4  right?
5      So there is software engineering, PLM,
6  planning, and development.  Development maybe,
7  because sometimes different product and then the
8  reporting organization may be in U.S.  I can't
9  remember.  It's so far away already.
10  Q.  Do you remember receiving
11  paycheques?
12  A.  Always through the -- I don't see
13  any difference, it's always the same paycheque and
14  then it go through and then deposit to the account.
15  Q.  Do you remember receiving direct
16  deposits into your accounts?
17  A.  We always go for the deposit to
18  the direct account and you get the pay slip like
19  telling you the notice.
20  Q.  Do you remember what the pay slip
21  said?
22  A.  I have one.  Do you want me to
23  show you?
24  Q.  Sure.
25  A.  I think I have it.  Is always the

Page 53

1    HUNG - CONFIDENTIAL
2    NNI EXHIBIT NO. 28: Email chain,
3    stamped BH00021 to BH00023.
4    THE WITNESS: Will I keep this or you
5    will take it back?
6    BY MS. VANLARE:
7    Q.  We'll take it back.
8    A.  Okay.
9    Q.  If I can ask you to please turn to
10   page 2, that's 22BH.
11   A.  Okay.
12   Q.  There is an email on the bottom
13   from Betsy Hung sent January 16th, 2009?
14   A.  Yeah.
15   Q.  Is that your email?
16   A.  Hmmm.
17   Q.  If you could please vocalize.
18   A.  Yeah, that's my email.
19   Q.  Do you recall sending this email?
20   A.  Yes, I do.
21   Q.  And can you describe why you sent
22   the email?
23   A.  Because I want to make sure I am
24   included.
25   Q.  And when you say "included," what

Page 54

1    HUNG - CONFIDENTIAL
2    do you mean?
3    A.  It means the process, to be
4    included.
5    Q.  Included in the claims process?
6    A.  Yeah.
7    Q.  So at this time what was your
8    understanding of what was happening to your
9    severance payment?
10   A.  They won't give it out to me as
11   promised in the termination letter.
12   Q.  And how did you get that
13   understanding?
14   A.  Is a general bankruptcy.  Maybe --
15   oh, okay, I remember now.  One of my colleagues
16   supposed to get it Friday, and it was Thursday that
17   they declare bankruptcy and she didn't get the
18   package.
19   Q.  She didn't get the payment?
20   A.  She didn't get the payment.
21   Q.  Do you remember what the
22   colleague's name was?
23   A.  Sharon -- Sharon Ziete (ph)?  Let
24   me see.  Z-I -- I don't remember the last name.
25   Ziete.

Page 55

1    HUNG - CONFIDENTIAL
2    Q.  Okay.
3    A.  She was laid off two months before
4    me and she was -- the two-month period she stay
5    with Nortel and then she supposed to get the
6    payment Friday, but then the bankruptcy was on
7    Thursday so she didn't get it.  So that's why I
8    said oh, I'm not going to get.
9    Q.  So you understood, when you
10   learned that she didn't get her payment, you
11   understood that you were not necessarily going to
12   get your payment as well; is that correct?
13   A.  Um-hmm.  And then you have to go
14   through the process.
15   Q.  And when you say the process, you
16   mean the claims process?
17   A.  The proceeding that Ernst & Young
18   sent us in Exhibit 3.
19   Q.  And how did you learn that you had
20   to go through a claims process?
21   A.  That's the email said, you need to
22   submit a claim.  The HR -- I have to file -- now I
23   recall a little bit.  It was the minute I know
24   about it, of course what should we do, what can I
25   do, and then I called HR and they say you have to

Page 56

1    HUNG - CONFIDENTIAL
2    file a claim.
3    Then I received that letter and I send
4    email immediately.  You can see the date.
5    Q.  Um-hmm.
6    A.  And they say, in the email they
7    say you just wait and sit and wait for the
8    instruction.  You can see the date I sent out and
9    immediately I sent out to Ernst & Young, the
10   Monitor.  And the response I got, just don't worry
11   about it, just sit and wait for the instruction.
12   Q.  And when you say the response you
13   got from the Monitor, is that the response you have
14   on --
15   A.  Yeah, I quote it.
16   MS. MERSKY: Let her finish before you
17   answer so the record can be clear.
18   BY MS. VANLARE:
19   Q.  Thank you.  When you say you
20   received a response from the Monitor, do you see
21   that response here?
22   A.  In this email?  Yeah.  On page 21.
23   Q.  That's 21BH.  And is the response:
24   "Unpaid severance form a claim
25   in the CCAA proceeding.  A claim

*In Re:*
*NORTEL NETWORKS INC., et al*

*DANIEL JIN-MING LEUNG*
*February 5, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106214B.TXT*
*Min-U-Script® with Word Index*

Page 21

```
1      LEUNG - CONFIDENTIAL
2    one or two months.
3  Q.  What about before 2013?
4  A.  Not very much.
5  Q.  Could you give me an estimate of
6    about how often that would be?  Is that once a
7    month, less than that?
8  A.  No, probably once a year at most.
9  Q.  Did you receive any type of
10   notifications from the LinkedIn group, any type of
11   email?
12 A.  I did.  I believe I turned it on
13   in January just to have any updates, a news feed
14   would come into my Gmail address.
15 Q.  So prior to 2013 you did not have
16   the setting for email notifications turned on?
17 A.  Not that I recall, no.
18 Q.  And when Ms. Mersky asked you to
19   look through your documents and put some together
20   to send to her, do you recall whether you looked at
21   LinkedIn at all?
22 A.  Yes, I did.
23 Q.  Do you recall whether you sent her
24   anything from LinkedIn?
25 A.  I did, yes.
```

Page 22

```
1      LEUNG - CONFIDENTIAL
2  Q.  Do you think it was several
3    documents?
4  A.  I took one screen shot in
5    particular.  That was the screen shot that I
6    provided.
7  Q.  I would like to transition and
8    talk a little bit about your employment time with
9    Nortel.  When did you first join Nortel?
10 A.  May 2005.
11 Q.  Was that your first job out of
12   college or had you --
13 A.  Yes.
14 Q.  What position?
15 A.  So I was a global callpilot
16   support engineer, doing tier three support helping
17   Nortel's customers and troubleshooting their voice
18   messaging service.
19 Q.  Who was your supervisor in that
20   position?
21 A.  I started off, his name was Todd
22   Christie.  He was based in Canada.  He's since
23   located to Richardson, Texas to another position.
24   And I reported to Scott McCurrach who was based in
25   Richardson, Texas, pretty much for 90 percent of
```

Page 23

```
1      LEUNG - CONFIDENTIAL
2    the time I was there.
3  Q.  Where were you based when you were
4    in this position?
5  A.  Belleville, Ontario.  So a small
6    town probably two and a half hours from here and I
7    guess we were not the main Ottawa hub but we were
8    still a two or three hundred person office.
9  Q.  So you said that Todd Christie was
10   originally based in Canada.  Do you know where in
11   Canada?
12 A.  At the same office, so Belleville,
13   Ontario.
14 Q.  And then you mentioned that he
15   transferred to the Richardson office.  Did he
16   remain your supervisor after transferring?
17 A.  No, he took on another role.
18 Q.  Was Scott McCurrach your manager
19   at the same time as Todd Christie?
20 A.  So he was team lead at the time
21   and I guess he was promoted to manager soon after
22   Todd left.
23 Q.  And the entire time he was based
24   out of the Richardson office?
25 A.  Yes.
```

Page 24

```
1      LEUNG - CONFIDENTIAL
2  Q.  Were these the only two
3    supervisors that you had during your time at
4    Nortel?
5  A.  Yes.
6  Q.  So did you stay in your position
7    as the global callpilot support engineer for your
8    entire time?
9  A.  Yes, that's right.
10 Q.  Do you know which entity issued
11   your paycheque to you?
12 A.  I do not.
13 Q.  Did any of your family members
14   work for Nortel?
15 A.  No.
16 Q.  Do you have any relation to
17   someone named Priscilla Leung?
18 A.  No.
19 Q.  And you mentioned when we were
20   talking about Facebook that after you left Nortel
21   you stayed in contact with some of your former
22   colleagues from Nortel?
23 A.  Yes.
24 Q.  Did you stay in contact with
25   anyone who was based in the United States?
```

Page 33

1  **LEUNG - CONFIDENTIAL**
2  Q.  It says there:
3      "As used in this letter, the
4      term 'Corporation' shall mean Nortel
5      Networks Corporation, its
6      subsidiaries and affiliates, their
7      successors and assigns, and all of
8      their past and present officers,
9      directors, employees and agents (in
10     their individual and representative
11     capacities), in every case,
12     individually and collectively."
13     Do you have a memory of reading that
14  paragraph in particular?
15  A.  Yes.
16  Q.  You do?  What do you remember
17  about reading it?
18  A.  How I interpreted it at the time
19  was that the corporation meant Nortel in its
20  entirety.  I guess I was used to, you know, working
21  with such a team that was based in the U.S., I'm in
22  Canada, we had teammates in Turkey as well, I just
23  thought that meant Nortel and all its subsidiaries,
24  it's an overarching company.
25  Q.  So it sounds like that was

Page 34

1      LEUNG - CONFIDENTIAL
2  consistent with your view of the company at the
3  time?
4  A.  Yes.
5  Q.  And so you understood at the time
6  that Nortel had various subsidiaries and affiliates
7  within the overall Nortel structure?
8  A.  I didn't understand what it meant.
9  I just -- I knew Nortel as a whole, as just one
10  company that functions on a global scale.
11  Q.  Is it fair to say that when you
12  read through the letter you expected that the
13  amount listed for your severance would be paid to
14  you from the global Nortel company?
15  A.  Yes.
16  Q.  Do you remember when you learned
17  about Nortel's bankruptcy?
18  A.  I do recall, yes.
19  Q.  Can you tell me about that?
20  A.  I actually heard it on the news
21  first.
22  Q.  What was your reaction when you
23  heard it?
24  A.  Surprise and shock.
25  Q.  Did you have a sense that things

Page 35

1      LEUNG - CONFIDENTIAL
2  were going poorly for Nortel?
3  A.  Poorly, yes, but not to that
4  extent and not so quickly.
5  Q.  Did you follow at all the news of
6  Nortel's bankruptcy in the media after that point?
7  A.  Not very closely.
8  Q.  Why not?
9  A.  Well, I wasn't -- I had started a
10  new career at BlackBerry, at the time very
11  exciting, and I wanted to get to know about -- more
12  about the BlackBerry product.  I was also juggling
13  planning a wedding as well, so -- and moving to
14  another city.  So there was a lot going on in that
15  2008-2009 timeframe.
16  Q.  Probably that was a lot more fun
17  than the Nortel bankruptcy.  Sorry, when did you
18  start at BlackBerry?
19  A.  January 2009.
20  Q.  So going back to when you first
21  heard about Nortel's bankruptcy, you said you heard
22  about it on the news.  Do you remember what news
23  source it was, was it television, newspaper?
24  A.  I don't recall.
25  Q.  So I know you mentioned that you

Page 36

1      LEUNG - CONFIDENTIAL
2  did not follow the bankruptcy news very closely
3  going forward.  Do you think that you read anything
4  or took any interest in news of what was happening
5  with Nortel's bankruptcy?
6  A.  Aside from just hearing, reading
7  news articles or watching the news and keeping in
8  touch with my colleagues who were still there,
9  that's -- that's the extent that I kept in touch
10  with that bankruptcy filing.
11  Q.  You mentioned reading in the news.
12  Was there a particular newspaper that you followed?
13  A.  The Toronto Star.
14  Q.  Any other newspapers?
15  A.  The Globe and Mail.
16  Q.  Any others?
17  A.  Not that I recall, no.  Those are
18  the main two.
19  Q.  I think you mentioned television
20  as well.  Was there a particular news program that
21  you tended to watch?
22  A.  Yeah, CNN.
23  Q.  And then you also mentioned just
24  colleagues that you kept in contact with?
25  A.  Yes.

In Re:                                                Confidential                          DANIEL JIN-MING LEUNG
NORTEL NETWORKS INC., et al                                                                 February 5, 2014

Page 65

1      LEUNG - CONFIDENTIAL
2  A.  Yes.
3  Q.  Paula Klein posts:
4      "KM has informed us that a
5      claims process will be announced for
6      U.S. creditors tomorrow with a
7      claims bar date of September 30,
8      2009. This includes U.S. pensioner
9      and employee claims as well."
10     Did you do anything to investigate the
11     possibility of filing a claim in the U.S. before
12     the U.S. bar date?
13 A.  No.
14 Q.  We were talking a bit earlier
15     about your termination letter and the severance
16     amount that was stated in your termination letter.
17     Was it your understanding that the
18     entity that would pay you your termination would be
19     the same entity that had been paying you your
20     paycheque?
21 A.  Yes.
22 Q.  What did you understand that
23     entity to be?
24 A.  Nortel, I guess just the company.
25 Q.  Just the global Nortel?

Page 66

1      LEUNG - CONFIDENTIAL
2  A.  The global Nortel.
3  Q.  I'm sorry, just to be clear, was
4      it your understanding that the entity that would
5      pay your severance would be the same entity that
6      had been paying your paycheque?
7  A.  Yes.
8  Q.  And that was what entity?
9  A.  Nortel, the global company.
10 Q.  The global company. I'd like to
11     show you what's been marked as Exhibit 17. This is
12     a LinkedIn conversation titled "Good summary on KM
13     website of legal motions." It was posted by Paula
14     Klein on June 2nd, 2009. Paula Klein writes:
15     "This might be a good website
16     to bookmark. KM seems to be doing a
17     fairly good job of keeping this page
18     up to date."
19     And then it lists the website for KM.
20     Did you bookmark this website?
21 A.  I cannot recall if this was a
22     specific bookmark but I had a KM law website
23     bookmarked.
24 Q.  You did? And you said -- how
25     often did you visit that website?

Page 67

1      LEUNG - CONFIDENTIAL
2  A.  That one not very much. A couple
3      of times a year.
4  Q.  Do you remember ever seeing
5      anything posted on the KM website relating to U.S.
6      proceedings?
7  A.  Not specifically, no.
8  Q.  Did you ever receive news
9      bulletins that were issued by Koskie Minsky?
10 A.  In what format?
11 Q.  I'll show you an example so you
12     can see. I'm show you Exhibit 43. Does this look
13     at all familiar to you?
14 A.  It looks somewhat familiar, yes.
15 Q.  So it states at the top,
16     "Pensioners, Former Employees and Disabled
17     Employees News Bulletin." And it says:
18     "This bulletin provides a
19     weekly summary of Nortel's CCAA
20     proceedings. This news update is
21     prepared by Koskie Minsky LLP (KM)
22     in their capacity as representative
23     counsel to all pensioners, former
24     employees and disabled employees of
25     Nortel."

Page 68

1      LEUNG - CONFIDENTIAL
2      So you think you've seen something that
3      looks like this before?
4  A.  Yes.
5  Q.  Do you have any recollection of
6      where you would have seen a document that looks
7      like this?
8  A.  Probably somewhere on the KM
9      website.
10 Q.  Do you remember whether documents
11     like this were ever sent to you via email?
12 A.  No.
13 Q.  No, you don't remember, or no,
14     that didn't happen?
15 A.  Yeah, I do not recall.
16 Q.  So do you think that you might
17     have opened a document like this from time to time
18     on the KM website and reviewed it?
19 A.  Yes. Either skimmed it or looked
20     at it very quickly.
21 Q.  Would you turn to the page that's
22     marked 97 on the bottom and look at the section
23     with the bold heading titled "The Claims Process."
24     Do you see where I am?
25 A.  Yes.

Page 77

1    LEUNG - CONFIDENTIAL
2  you were still interested in following what was
3  happening on the Monitor's website?
4  A.  I can't recall specifically but I
5  guess I was only checking in periodically and
6  seeing if there's any updates on what is happening
7  in the situation.
8  Q.  Sure.  If you would, please turn
9  to page 14, and in bold heading there, more than
10  half-way down the page, it states "Update on
11  Foreign Proceedings," "Chapter 11."  Do you see
12  where I am?
13  A.  No.
14  Q.  Are you on page 14?
15  A.  Yes.
16  Q.  So do you see the heading "Update
17  on Foreign Proceedings" in the middle of the page
18  and then just underneath it in italics it says
19  "Chapter 11"?
20  A.  Yes.
21  Q.  So if you continue in that section
22  onto the next page, and look at the top of the next
23  page in item c) it states:
24     "On August 4, 2009, the U.S.
25     Debtors obtained an order

Page 78

1    LEUNG - CONFIDENTIAL
2  establishing September 30, 2009 as
3  the general bar date for certain
4  claims in the Chapter 11 cases."
5     I know these documents are lengthy and
6  that it was a long time ago, but do you have any
7  memory of reading anything related to the U.S.
8  proceedings in one of the Monitor reports that you
9  read?
10  A.  No, I do not.
11  Q.  Are you familiar with who Mike
12  Zafirovski is?
13  A.  Yes.
14  Q.  And who was that person, to your
15  knowledge?
16  A.  He was the CEO at the time I was
17  working at Nortel.
18  Q.  Do you ever remember hearing that
19  he had filed claims in the United States bankruptcy
20  proceeding?
21  A.  I do remember hearing about it.
22  Q.  What do you remember?
23  A.  That he filed, I guess, on his
24  own.
25  Q.  Where did you understand that he

Page 79

1    LEUNG - CONFIDENTIAL
2  had filed?
3  A.  I don't recall.  And this was only
4  after -- after I looked into it deeper last year,
5  in 2013.
6  Q.  So this is in 2013 that you heard
7  of this?
8  A.  Yeah.
9  Q.  So do you have any memory of
10  knowing in 2009 that he had filed a claim in the
11  United States?
12  A.  No.
13  Q.  Can we just take a quick break.  I
14  think I'm just about done but I want to shortly
15  review my outline.
16  A.  Sure.
17     -- RECESS AT 4:05 --
18     -- UPON RESUMING AT 4:11 --
19     BY MS. PARTHUM:
20  Q.  Just a few more questions for you
21  now.  When did you first believe that you might
22  have a claim against the U.S. Debtors?
23  A.  Probably in early 2013.
24  Q.  What caused you to form that
25  belief?

Page 80

1    LEUNG - CONFIDENTIAL
2  A.  I guess the input of others on the
3  LinkedIn group chat.
4  Q.  What were others saying on
5  LinkedIn that caused you to believe you may have a
6  claim against the U.S. Debtors?
7  A.  That there is a good chance
8  because of how our termination agreements were
9  worded.
10  Q.  Do you understand what it is about
11  the wording in the termination agreements that some
12  on LinkedIn thought might give you a possible claim
13  against the U.S. Debtors?
14  A.  Yes, I do know.
15  Q.  And what is that?
16  A.  That I guess the description was
17  more towards like the Nortel as listing the
18  difference subsidiary areas, I guess versus other
19  people that did not have that kind of statement in
20  their termination agreement.
21  Q.  At the time that you worked for
22  Nortel what entity did you believe employed you?
23  A.  Nortel.  I didn't know there was
24  other entities.
25  Q.  Who did you think was paying your

In Re:                                    Confidential                    DANIEL JIN-MING LEUNG
NORTEL NETWORKS INC., et al                                               February 5, 2014

Page 81

1      LEUNG - CONFIDENTIAL
2   paycheque?
3   A. Nortel, I guess the global entity.
4   Q. Did you ever have a sense that
5   living in Canada, working in Canada, that your pay
6   from Nortel was different from what people in other
7   countries received from Nortel?
8   A. No, not really, other than they
9   would probably be paid in different currencies and
10  whatnot.
11  Q. But it was your understanding at
12  the time that the entity that was paying you your
13  paycheque was the same entity that would pay your
14  colleagues in Richardson their paycheque?
15  A. Yes.
16  Q. So when you reviewed your
17  termination letter back in 2008, when you first
18  received it who did you expect would be responsible
19  for paying you the severance amounts stated in the
20  letter?
21  A. Nortel, the global entity.
22  Q. Has that view ever changed?
23  A. I guess last year.
24  Q. How did it change?
25  A. I understand that the company is

Page 82

1      LEUNG - CONFIDENTIAL
2   structured differently in different countries and
3   it was the Canadian counterpart that was, I guess,
4   paying the paycheque.
5   Q. So last year you learned that the
6   corporate structure of Nortel involved entities
7   that were based in different countries?
8   A. Yes.
9   Q. And that was the first time that
10  you came to that understanding?
11  A. Yes.
12  Q. And then learning that, in
13  combination with what people in LinkedIn were
14  saying about the termination letters, caused you to
15  believe that you had a possible claim against the
16  U.S. Debtors?
17  A. That's correct.
18  Q. Did you get any understanding of
19  why it was only in January of 2013 that you were
20  learning about the possibility of filing a claim in
21  the United States?
22  A. Not really, no. It was just
23  brought to my attention from the NRPC and I just
24  received an email saying you might be part of this
25  claim, and I just decided to sign.

Page 83

1      LEUNG - CONFIDENTIAL
2   Q. So the NRPC sent you some sort of
3   a document or email telling you?
4   A. Yes, an email.
5   Q. I'm just going to show you quickly
6   Exhibit 16. Does this look familiar to you?
7   A. Yes.
8   Q. Is this the notification from the
9   NRPC that you were referring to --
10  A. That's right.
11  Q. -- that told you you might have a
12  claim in the U.S.?
13  A. Yes.
14  Q. Were you surprised when you
15  learned that the NRPC was telling you you might
16  have a claim in the U.S.?
17  A. A little bit, yes.
18  Q. Why were you surprised?
19  A. Because I guess I didn't -- I
20  expected KM to, I guess, inform me, I thought this
21  was taken care of by KM. So this was a surprise,
22  yes.
23  Q. After you received that
24  notification, what did you do?
25  A. So I went on the LinkedIn and

Page 84

1      LEUNG - CONFIDENTIAL
2   checked out the group and see if there's any
3   activity pertaining to this.
4   Q. So is that what jump-started you
5   re-engaging with LinkedIn?
6   A. Yes.
7   Q. Did you decide right away to
8   participate?
9   A. I wanted to check out LinkedIn
10  first and just get more details around it.
11  Q. After reviewing what people were
12  saying on LinkedIn, you then made a decision --
13  A. To participate.
14  Q. -- to participate in this process?
15  A. Yes.
16  Q. Did you choose to participate in
17  the process for trying to file a claim in the
18  United States because you believed that you would
19  recover less than a hundred percent of your claim
20  in Canada?
21  A. I signed up because I thought it
22  would be faster.
23  Q. Because you'd experienced the
24  Canadian process was a bit slower than you might
25  have hoped?

*In Re:*

*NORTEL NETWORKS INC., et al*

*ANTHONY LAW*
*February 3, 2014*
*Confidential*



**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106212B.TXT*
Min-U-Script® with Word Index

**Page 21**

LAW - CONFIDENTIAL
1
2 Q. Okay.
3 A. And because I was reporting to
4 this guy for something like two months and then I
5 got -- I got laid off. But prior to that I report
6 to a guy called Derek Noble for probably two years,
7 yeah.
8 Q. When you were working at Nortel
9 were your paycheques direct deposited into your
10 bank?
11 A. That's right, yes.
12 Q. And you received each pay period a
13 stub that told you who -- I mean how much you were
14 getting that pay period?
15 A. I don't really recall. I remember
16 a long time ago we used to get those paper
17 paystubs, but I -- I frankly don't remember whether
18 in the recent years that I actually get those paper
19 pay tabs. I really don't remember.
20 Q. Each year you would get a T-4
21 form?
22 A. Yes, yes, yes.
23 Q. The T-4 form -- did the T-4 form
24 that you received list your employer as Nortel
25 Canada?

**Page 22**

1 LAW - CONFIDENTIAL
2 A. Frankly, I never pay attention to
3 it, okay? So as soon as it said Nortel and I
4 forget about it. I mean, personally, when I get
5 that paper, I read how much I am getting and that's
6 the end of it. So as long as the number match and
7 I know it comes from Nortel, that's it.
8   So we never make the differentiation --
9 I never made a differentiation between whether
10 Nortel Canada or what. In my mind I worked for
11 Nortel.
12 Q. Did you ever believe that you
13 worked for Nortel U.S.?
14 A. Again, at the time I never made a
15 differentiation, so if you asked me back at the
16 time when I was working at Nortel, it never would
17 occur to my mind which different companies that I'm
18 working for, and is not abnormal to see people
19 reporting to different people in different
20 geographic areas and we never make a
21 differentiation as to ah, you work for U.S. or you
22 work for Turkey or whatever.
23 Q. Did you ever report to anybody
24 with Nortel U.S.?
25 A. Again, I never make a

**Page 23**

1 LAW - CONFIDENTIAL
2 differentiation as to whether that person works for
3 Nortel U.S.
4 Q. Let's talk about where they were
5 located then.
6 A. Okay.
7 Q. Did you ever report to anybody
8 located in the U.S.?
9 A. Yes, I did. That was the two
10 months before I got laid off.
11 Q. During your last two months you --
12 A. That's right, that's right, yes.
13 Q. Who did you report to then?
14 A. I forgot the guy's name. I think
15 it's something with the last name of Fitzgerald.
16 But I totally forgotten his first name.
17 Q. Where is he based?
18 A. Frankly, I don't know. Because I
19 never met him, I only talked to him on the phone
20 twice, is when I was first told that there was a
21 reorganization and they are consolidating some
22 reporting, so because I am in software testing, now
23 they want to consolidate and report to this guy in
24 the U.S., and all I got is a phone call from him
25 and say okay, so this week what you are doing, and

**Page 24**

1 LAW - CONFIDENTIAL
2 then I think about once a month there is -- there
3 is a staff meeting or so, and so everybody call in,
4 a few folks in Canada call in, a few folks in the
5 U.S. call in.
6   And, by the way, we do that all the
7 time, right? We call into conference calls all the
8 time and connect to people all over the world.
9   So it never occurred to our mind who we
10 report to. It doesn't matter as far as I am
11 concerned at the time, so -- but that was it, that
12 was about it.
13   And then the last call that I had with
14 him was him laying me off, so it was like three to
15 four phone calls, so I have absolutely no idea when
16 you are talking about the differences between the
17 different companies.
18 Q. Well, if you didn't know where
19 Mr. Fitzgerald was based, what makes you think that
20 he was based in the United States?
21 A. Well, the phone number.
22 Q. Do you know what the area code was
23 that it was a U.S. --
24 A. No, I have -- frankly, if you
25 asked me to recall this phone number or whatever, I

Confidential

LAW - CONFIDENTIAL

1   I felt I understood it. At the time I felt that
2   sure, Nortel, right? But now we are in this
3   situation, of course now if you ask me, then I say
4   oh my God, now I realize that it is so complicated,
5   it's so many different entities and there are all
6   sorts of implications.
7       So if you ask me today, sure. If I
8   look back, I probably signed something that I did
9   not fully understand but at the time I thought I
10  understood it.
11  Q.  So let's take a look at the third
12  paragraph of this letter.
13  A.  Right. Yes.
14  Q.  And it says:
15      "As used in this letter, the
16      term 'corporation' shall mean Nortel
17      Networks Corporation, its
18      subsidiaries and affiliates, their
19      successors and assigns, and all of
20      their past and present officers,
21      directors, employees and agents (in
22      their individual and representative
23      capacities), in every case,
24      individually and collectively."

LAW - CONFIDENTIAL

1   A.  Yes.
2   Q.  Was it your understanding at the
3   time you signed the severance agreement that all of
4   the Nortel entities were responsible to you --
5   A.  Yes.
6   Q.  -- for your severance?
7   A.  Right.
8   Q.  That was your understanding at the
9   time?
10  A.  Again, frankly, at the time I did
11  not read this carefully, okay? I did not because
12  as soon as -- as soon as I see the term corporation
13  means Nortel Networks, great. That's all I cared
14  about.
15  Q.  Let's put aside the letter for a
16  moment.
17  A.  Okay.
18  Q.  And let's talk about what you
19  understood, whether the letter says it or not.
20  A.  Yes.
21  Q.  At the time you were terminated
22  from Nortel, was it your understanding that all of
23  the Nortel entities were responsible to you for
24  your severance?

LAW - CONFIDENTIAL

1   A.  Okay. So at the time, so my
2   concept back in those days was there is one Nortel,
3   okay, and that one Nortel includes whatever entity
4   that belongs to Nortel anywhere in the world, okay?
5       So in my mind at the time, anything
6   that associated with Nortel, they are all their
7   subsidiaries, okay, and in a layman's understanding
8   subsidiary means you own them, right, so it's
9   yours.
10      So I didn't care whether it's Nortel
11  U.S., Nortel this or that. As far as I'm
12  concerned, the Nortel company, the corporation, is
13  the whole thing, whether is a subsidiary or not.
14      So if Nortel is responsible for me,
15  that means the whole collective thing is
16  responsible for me.
17  Q.  All of the entities in the Nortel
18  Group --
19  A.  Yeah, yeah.
20  Q.  -- owed you the severance?
21  A.  That's right. That's right.
22  Q.  And that's what you understood
23  back in 2008 when you were first told that you were
24  being terminated, right?

LAW - CONFIDENTIAL

1   A.  Again, at the time my mind was not
2   that clear and, frankly, I will never think that
3   way. At the time the whole focus is, okay, Nortel
4   is going to take care of me, Nortel is going to
5   give me this money to help me transition and I have
6   to be careful not to -- not to unveil the details
7   of the agreement, I have to be careful that my next
8   job is not going to be directly competing with
9   them, if I ever find a job, right? And that's
10  about it. That was my whole understanding at the
11  time.
12  Q.  I'm just trying to get a sense of
13  whether your understanding then is the same as your
14  understanding today.
15  A.  Um-hmm.
16  Q.  And is it fair to say that your
17  understanding has always been, from the time you
18  were working at Nortel all the way until today,
19  your understanding has always been the entire
20  Nortel family owes you whatever obligations that
21  are owed to you, correct?
22  A.  So if you put it that way, so back
23  at the time of course that was my understanding,
24  okay? But now watching all these development with

*In Re:*
*NORTEL NETWORKS INC., et al*

---

*JULIA PIGGOTT*
*February 5, 2014*
*Confidential*

---



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
**www.ELLENGRAUER.com**

*Original File 106214A.TXT*
Min-U-Script® with Word Index

Page 29

PIGGOTT - CONFIDENTIAL

1  essentially were Nortel divisions.
2       From there I moved into a very specific
3  marketing team.
4  Q.  Can you again give me an
5  approximate timeframe for that?
6  A.  It was about half-way through my
7  career, so maybe '95-'96. That's approximate. And
8  I was in that team for maybe a year or two and then
9  I moved into sales.
10      Sales started off with the global
11  accounts organization, and we were charged with
12  bringing all Nortel's solutions and products out to
13  the largest customers that were headquartered in
14  Canada, so all those customers had, you know,
15  entities. CIBC for example, they're here in
16  Canada, they're in the States, they're in the
17  Caribbean, they're in the Pacific Rim, they're in
18  Europe.
19      And it was our job, all the customers
20  that the people in that team had was to look after
21  those customers globally, work with whoever we
22  needed to work with inside the company to take as
23  many products and services that we had applicable
24  to enterprise out to that customer.

Page 30

PIGGOTT - CONFIDENTIAL

1  Q.  So was that -- I'm sorry, did you
2  say that was for customers who were headquartered
3  in Canada?
4  A.  Yes.
5  Q.  Okay. And how long were you in
6  that area?
7  A.  So the organization itself kind of
8  morphed. I was there first as a sales rep and then
9  I was promoted to lead that team in Canada, and
10  then somewhere along the way we verticalized and,
11  like, finance vertical, health care vertical,
12  retail vertical, whatever. I was asked to take on
13  a finance vertical and my team were in Canada as
14  well as in north-east U.S.
15      When I was in the global accounts team,
16  I was on this vertical team, my reporting VPs were
17  in the U.S., global accounts was in Dallas, Texas,
18  the vertical leader was in -- for finance was in
19  New York.
20      At some point along the way they
21  regionalized again and then I had a team in Canada
22  reporting to a Canadian VP, and then I moved from
23  there into the channel organization and I was back
24  reporting into the U.S. The first fellow was in

Page 31

PIGGOTT - CONFIDENTIAL

1  Dallas and then the last reporting manager I had
2  was in Denver.
3  Q.  Okay.
4  A.  That's the short version.
5  Q.  So the position that you had at
6  the time of your termination, director of North
7  American distribution, you said you were in that
8  position for roughly two to three years?
9  A.  Close enough.
10 Q.  And is that within what you
11 described as the sales organization?
12 A.  Yes.
13 Q.  Was this part of the global
14 accounts organization or was it called something
15 else?
16 A.  No, I don't think global accounts
17 existed anymore at that time.
18 Q.  For those last two to three years,
19 where were you located physically?
20 A.  Physically, Brampton.
21 Q.  Okay. Who did you report to in
22 that position?
23 A.  By name? Are you asking me who by
24 name did I report to?

Page 32

PIGGOTT - CONFIDENTIAL

1  Q.  Let's start with name.
2  A.  Patrick Lewis.
3  Q.  And what was his title?
4  A.  VP of -- I don't remember.
5  Q.  And where was he located?
6  A.  Denver.
7  Q.  And how many direct reports did
8  you have during -- again, this last position where
9  you were director of North American distribution?
10 A.  Right at the end of that?
11 Q.  Sure.
12 A.  Because we were downsizing through
13 several years. Right at the end?
14 Q.  Let's start with the end, give me
15 the approximate number.
16 A.  Seven, eight.
17 Q.  And do you recall where those
18 direct reports were located?
19 A.  Denver, Atlanta, New York,
20 Toronto.
21 Q.  And throughout -- I gather if we
22 go back further in time while you were in this
23 position before the downsizing, you had more direct
24 reports, right?

Page 41

1     PIGGOTT - CONFIDENTIAL
2  Q.  I understand.  So in August of
3  2008 when you agreed to be terminated, you then
4  agreed to stay on in a transition role until -- was
5  the period fixed?  Did you know in August that you
6  would stay on until December?
7  A.  My boss, Patrick, asked me to stay
8  until the end of the year and, again, foolishly I
9  agreed.
10 Q.  Do you recall when you first got
11 this letter?
12 A.  If you're asking me if I recall
13 the date, I don't.  I imagine it was December the
14 3rd.
15 Q.  Do you recall how you received it?
16 Did somebody give it to you in person?  Was it
17 mailed to your home?
18 A.  I don't recall.
19 Q.  What did you do when you received
20 it?
21 A.  I read it.  I don't know exactly
22 what I did.  I probably read it.
23 Q.  Fair to say it was an important
24 letter for you personally?
25 A.  Yes.

Page 42

1     PIGGOTT - CONFIDENTIAL
2  Q.  Fair to say that it's a letter
3  that, given its importance, you would have read it
4  carefully?
5  A.  Yes.
6  Q.  And do you recall when you read
7  the letter whether there was anything in it that
8  you found confusing?
9  A.  I think at that time I had made
10 the decision to leave, so all I wanted to do was
11 get my money and leave and move on.
12 Q.  And did you have the opportunity
13 to ask people at Nortel any questions about the
14 content of the letter?
15 A.  Do I recall?  I don't recall.
16 Q.  Well, I'm not asking -- I'm not
17 asking if you -- well, let's break it up.
18    Did you ask any questions of anybody at
19 Nortel about this letter?
20 A.  I probably did because it was
21 revised.  I don't recall what we revised.  It was
22 five years ago.  More than five years ago.
23 Q.  So you don't know what was revised
24 or why there was a revision?
25 A.  I don't remember.

Page 43

1     PIGGOTT - CONFIDENTIAL
2  Q.  Do you recall who at Nortel you
3  would have discussed this letter with?
4  A.  I don't recall.  I would only be
5  making assumptions.
6  Q.  Well, do you know if it would have
7  been somebody in the HR organization at Nortel or
8  somebody in your organization that you worked for
9  at the time?
10 A.  It makes logical sense that I
11 spoke with my VP and HR, but I cannot recall.
12 Q.  Did you understand the contents of
13 the letter after you reviewed it?
14 A.  Generally, yes.
15 Q.  Your signature, we have
16 established at the back that is your signature.  Is
17 it fair to assume that you understood what it was
18 that was being offered to you in this letter before
19 making the decision to sign it?
20 A.  What I understood was Nortel was
21 ending my employment with the company, they were
22 paying me a certain amount of severance for the
23 years I had worked there, a certain amount of it
24 could be directed to my RRSP, my pension was going
25 to come out, I would have options on how I wanted

Page 44

1     PIGGOTT - CONFIDENTIAL
2  to receive my pension, my benefits were being
3  terminated, I didn't make the cutoff for age or
4  years of service, I had to give everything back.
5  Q.  With respect to the severance
6  component of what you just described, did you have
7  any understanding at the time that you signed this
8  letter as to which Nortel entity it was that would
9  be paying you your severance?
10 A.  No.  For me it was Nortel.  Nortel
11 was Nortel.
12 Q.  Did you, at the time that you
13 signed this letter, have any reason to believe that
14 any Nortel U.S. entities had any obligation to pay
15 you any severance?
16 A.  There was no dividing line for me.
17 Q.  Did you assume that the same
18 Nortel entity that had been paying you your
19 paycheques for all of the years that you worked
20 there would be the entity that would pay you your
21 severance?
22 A.  The understanding is Nortel was
23 paying me my paycheque, Nortel was paying me my
24 severance.
25 Q.  Let me try it this way.  I