# Exhibit "G"

*In Re:*
*NORTEL NETWORKS INC., et al*

---

*ERNIE BRIARD*
*February 4, 2014*
*Confidential*

---

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106213B.TXT*

*Min-U-Script® with Word Index*

BRIARD - CONFIDENTIAL

that you have got pension claims in the United States; fair to say?

A. **Fair to say.**

Q. So you want to make sure to know how to protect your rights?

A. **Correct.**

Q. So how did you figure out how to get the claim form and file the claim?

A. **My recollection -- I've been trying to figure out how did I know to do that. I believe, my recall, is that somebody told me about you go on the U.S., it's completely different than Canada, you go on the website and get these forms. I said okay, good, I found the website, went on the website, downloaded the forms, filled out the forms. That's how it worked.**

Q. So --

A. **You know, nobody really told me about any of that, but I knew I had to protect my U.S. pension at the time, that's what I knew. And at the time I was told that any -- if you worked in Canada, you don't -- you're not allowed to make a claim for your severance in the U.S., you have to make your severance claim in Canada.**

**BRIARD - CONFIDENTIAL**

Q. Who told you that?

A. **And that would be looked after. That was -- I don't know exactly who told me that, but I believe -- and subsequently I believe I saw it in writing that you can't do that. I believe I saw it in writing on -- help me, Rachel, with the document you showed me the other day that was -- you asked me if I'd seen it before, that's the one that confirmed the bar date, I think it's called in the U.S., the date for the -- you know, to confirm that you make sure you have all your claims in by such-and-such a date, that document confirmed it to me.**

**So whoever told me when I -- everything that I've read, which includes that piece of paper, confirmed to my mind that my severance -- I'm not, I can't, they're telling me not to put -- I even called E&Y, the Monitor, at some stage, the E&Y 1-800 number. I did everything possible to make sure that everything that I had to claim for, I could claim for.**

**And my understanding at the time was that, which now I'm finding is wrong, was that severance, if you have a Canadian claim for**

**BRIARD - CONFIDENTIAL**

**severance, you can't put that in the U.S., and I'll read to you where the document from the U.S. said exactly that.**

Q. Okay. There is a lot to ask you about. I appreciate the length of your response because it gives me things that I can kind of ask you in smaller bits and pieces to better understand.

So at some point in time you downloaded the Proof of Claim form?

A. **Yes.**

Q. You don't remember how exactly you found out where and how to do that, but you found your way there?

A. **Yes.**

Q. And did you actually get notice from the U.S. Debtors of the U.S. bar date? Or is that something that you heard through other people?

A. **I heard through other people. I subsequently have seen it, whatnot. I can't recall receiving it exactly, but everything I did get I followed exactly what they said. And now that I saw it the other day, that Rachel showed it to me, I read it thoroughly and said this makes sense to**

**BRIARD - CONFIDENTIAL**

**me because I would have read this and said tick, I've got my claim for my pension, I turn the page and I'd say click, I can't claim my severance in the U.S. so I'm comfortable now.**

Q. I'd like to break things up a little bit between the things that you heard and read before September 29th, 2009, the date of your Proof of Claim, and things that you read or heard afterwards, even to the extent that it might have confirmed things that you did before, and we'll talk about both because I want to get a sense of everything.

But I'd like to just, for purposes of these questions, kind of have a division between the two. And first of all let's just talk about leading up to September 29th, 2009.

So prior to you filing this had you gotten a notification from the U.S. about the bar date?

A. **No, I don't believe so.**

Q. And so prior to you filing the Proof of Claim, somewhere you had learned that there was this bar date by which you had to file the claim in the United States, right?

BRIARD - CONFIDENTIAL

Ernst & Young between September 29th of 2009 and January of 2013 about the propriety of filing claims for severance in the United States?
**A. No. Where I heard about it was from the NRPC flag that said if you have got this, you've got a claim.**
Q. I'm just trying to kind of close the loop and get a sense of your knowledge.
**A. No.**
Q. So between September of 2009 and January of 2013 you hadn't heard anything one way or the other further from Ernst & Young about the propriety of filing claims in the United States.
What about from other members of the LinkedIn group, between September of 2009 and January, when you got the NRPC letter, had you heard anything further from members of the group about the propriety of filing claims in the United States?
**A. No, I don't recall having any of those -- knowledge of any of that. As I mentioned earlier, I was not on a lot and I would have discarded a lot of that as just a bunch of chatter anyway. It was the NRPC that confirmed it to me**

**BRIARD - CONFIDENTIAL**

**because it came from a reliable source.**
Q. Had you heard anything from any NRPC members prior to January 2013 indicating where you could and could not file your claims?
**A. No, I don't recall that.**
Q. Had you heard anything from Koskie Minsky prior to January of 2013 about where you could or could not file your claims?
**A. No.**
Q. Had you heard anything between September of 2009 and January of 2013 from any other source about where you could or could not file your claims, up until the NRPC letter?
**A. Other than what we already went over.**
Q. Other than the stuff you spoke of from the pre-September period?
**A. Well, no, no, in that period of time too there was always the confirmation through all the sources that you're Canadian, file in Canada.**
Q. So let me ask this question. We've covered the pre-September 2009 period.
**A. Right.**

**BRIARD - CONFIDENTIAL**

Q. And then in January of 2013 you get the letter from the NRPC?
**A. Right.**
Q. So now I'm going to focus just on the period between September 2009 and prior to the NRPC letter, so for all these questions it's going to be from September 2009 to January 2013.
**A. Sure.**
Q. During that period of time did you hear anything further from Ernst & Young about where you could or could not file your claims?
**A. No, nothing further. Nothing to change the knowledge I had of how the process works and how I should file.**
Q. Well, I'm wondering either change or confirm, had you gotten any new information?
**A. No.**
Q. Positively or negatively?
**A. No, no, I got no new information. The first point was the NRPC telling me.**
Q. When you say new information, I'm also saying further information.
**A. Further, okay.**
Q. Either confirming or rejecting

BRIARD - CONFIDENTIAL

what --
**A. No, I don't recall any of that. I recall lots of chatter about the whole claims process.**
Q. Okay.
**A. And I was not -- I didn't get into any of the detail because I knew that eventually when the chatter would dissipate the truth would come up and we would find -- you know, if there is a change, then we would go and make a change.**
Q. And I just want to break down the chatter to see what it was and what we could learn about it. So we've covered the U.S. Debtors before, we just covered Ernst & Young. Koskie Minsky, any information from September 2009 to January 2013 one way or the other about where you could file your claims?
**A. No. Again, other than a Canadian claim confirmation that I received, I don't know what date that was, maybe that was in that period, I'm not sure, but that part confirmed to me that that's the claim and it's all happening through the Koskie Minsky process.**
Q. Okay. So one further fact that

*In Re:*
*NORTEL NETWORKS INC., et al*

---

*CHRIS BUCHANAN*
*February 13, 2014*
*Confidential*

---

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106220.TXT*

*Min-U-Script® with Word Index*

BUCHANAN - CONFIDENTIAL
A. **Yes.**
Q. And were you asking specifically at that time whether there was a process in place to file claims in the CCAA proceedings?
A. **It wasn't in the context of CCAA. I think it is exactly as I put here, is we were told, you know, we would have to wait until they told us what the process was, and this is now by -- this is now over six months and we still haven't been told what the process is.**
**So that is the -- and as far as I was concerned, I saw Nortel as one company and it is -- we are creditors of Nortel.**
Q. Lower down in another post from you of the same date you write:
"As I understand it U.S. creditors submitted their claims months ago!"
Do you see that?
A. **Yes.**
Q. Do you recall how you came to learn that U.S. creditors submitted their claims months ago?
A. **Again, that would be through an information session.**

**BUCHANAN - CONFIDENTIAL**
Q. At the time that you wrote this post, do you recall whether you believed that the deadline had already passed for U.S. claims to be filed in the U.S. court?
A. **No, I don't recall.**
Q. You can set that one aside, and Exhibit 10 is where I am going to go next.
Mr. Buchanan, I have handed you what we have previously marked as Exhibit 10. It is another LinkedIn thread. And just to orient you, from the very first posting you will see that it is dated June the 3rd of 2010.
A. **Uhm-hmm. Just give me a second.**
Q. Yes, of course.
A. **(Witness Reviews Document.)**
**This -- sorry, my eyes water because of the surgery, and if it starts watering a lot, I can't read properly.**
Q. Do you need to take a break?
A. **No, I'm fine. Just every now and then --**
Q. Sure.
A. **And then this photocopy is not perfect. Not blaming anybody --**

**BUCHANAN - CONFIDENTIAL**
Q. To say the least.
A. **(Witness Reviews Document.)**
**Okay, go ahead.**
Q. You will see on the second page of the document that you weigh into the conversation with the posting on June the 5th of 2010; do you see that?
A. **Yes.**
Q. And on that same page, there is a posting by Paul Roddick?
A. **Yeah.**
Q. And Mr. Roddick writes:
"It's very difficult to understand why the Cdn process is a year+ later. It makes us nervous, and nothing that's been said (e.g. KM can only work 1 thing at a time) relieves this."
And you respond in the next post:
"Exactly."
Do you see that?
A. **Yeah.**
Q. And then you write in part:
"[...] KM are under-funded to

BUCHANAN - CONFIDENTIAL
adequately represent us."
A. **Yes.**
Q. "It was OK to pay maybe $400 million in bonuses - but we are NOT adequately represented."
Why, sir, did you believe at around this time, June of 2010, that you were not adequately represented by KM?
A. **So, yeah, I need to explain the theme that was going through here. So remember, again, this is the LinkedIn group specifically representing severed -- why do they call it severed employees? It sounds like your head is being chopped off. But recently severed employees, and by this time, of course, it wasn't recently either.**
**But the issue was that KM were hired, or whatever, to represent all Nortel Canada Canadian employees, but they were representing everybody. So I made this reference earlier, so they had -- and somebody may know the numbers -- 20-odd-thousand, 25,000 retirees, and a much smaller number for us. So the concern I was actually reflecting here was that KM were spending a lot of time on processing these many thousands,**

*In Re:*
*NORTEL NETWORKS INC., et al*

---

*MICHAEL CAMPBELL*
*February 6, 2014*
*Confidential*

---

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106215.TXT*

*Min-U-Script® with Word Index*

CAMPBELL - CONFIDENTIAL
little more about the document that I don't have, if you don't mind.
**A. Sure.**
Q. Do you recall if there were any other people on that email other than you and Ms. Klein?
**A. Yes, I believe my lawyers were on that email.**
Q. Okay. And --
**A. Sorry, Koskie Minsky was on the email.**
**MS. MERSKY:** For the record, you may want to look at the privileged log to ascertain if that is an email that was -- there were specific documents identified as privileged, that privilege would be between Paula Klein, Mr. Campbell and Koskie Minsky.
To the extent that that was produced to me, I don't know for certain because I haven't got it in front of me, it may be in the privileged log, and to the extent it was a privileged communication between counsel, it is identified as such.
**BY MR. QURESHI:**
Q. In November of 2009 what did you

CAMPBELL - CONFIDENTIAL
understand Ms. Klein's role to be in connection with Nortel?
**A. Paula was an ex -- a very smart, very knowledgeable Nortel employee that I had known over the years. She undertook single-handedly the set-up of the LinkedIn, the group that we joined, and she was assisting me in my role as court-appointed representative with issues of the terminated employees specifically because we were both in that class.**
Q. Did you understand Koskie Minsky to be representing Ms. Klein at any point in time?
**A. Ms. Klein was a former employee of Nortel with a claim against the estate. My view was that she was represented by Koskie Minsky as the rest of our group was.**
Q. Okay. Do you now have -- strike that.
Do you know why in this email communication that you have described from Ms. Klein she was informing you that a bar date had been set in the U.S. of September 30th of 2009?
**A. I recall that she said that there was -- the reason why I received the email was**

**CAMPBELL - CONFIDENTIAL**
**there is an extension to the bar date. I didn't understand why the extension was there. I later found that it was for a different class of claims.**
Q. Okay.
**A. That's the entire content of the email.**
Q. Do you know why Ms. Klein would have been writing to you concerning extensions of a bar date in the U.S.?
**A. I believe she put a query into Koskie Minsky about a piece of information she had received.**
Q. Upon learning in that email exchange with Ms. Klein that a bar date had been set in the U.S. of September 30th of 2009, did you, on your personal behalf, take any steps to investigate the possibility of whether you personally should be seeking to file a claim in the U.S.?
**A. So there were two items. One was that it was after the claim date. The second one was that at that time I had no knowledge that I had any basis for a claim in the U.S.**
Q. Can I assume therefore that you

CAMPBELL - CONFIDENTIAL
took no steps to investigate whether you should seek to file a claim in the U.S. at that time?
**A. I took no steps at that point in time because I was given advice by my counsel that none was needed.**
Q. Okay. And would that also hold true in your capacity as the representative; that is that as representative you took no steps at that time to investigate the question of whether any action should be taken on behalf of former employees in Canada to pursue claims in the United States?
**A. My counsel advised me that action was not required.**
Q. And therefore none was taken?
**A. Yes.**
Q. My apologies, another LinkedIn.
**A. Number 13?**
Q. Yes, Mr. Campbell, I've handed you what's been marked as Exhibit 13, it's another LinkedIn thread. If you look at the top posting it reads, "Claims in the U.S. court - some people received a letter." That's a posting from Ms. Klein and you will see the date to be November 25th

*IN RE: NORTEL NETWORKS INC., et al*

---

*PAULA KLEIN*

*February 11, 2014*

*HIGHLY CONFIDENTIAL*

---

126 East 56th Street, Fifth Floor New York, New York 10022

PHONE: (212) 750-6434 FAX: (212) 750-1097

www.ELLENGRAUER.com

*Original File 106218.TXT*

Min-U-Script® with Word Index

Page 121

KLEIN - HIGHLY CONFIDENTIAL
**2012. That was repeated by Koskie Minsky and that was also conveyed to us by Nelligan O'Brien Payne at the very outset of the CCAA filing as well, that because we were Canadian employees, there was to be a claims process in Canada and we were to file in Canada, unless we had explicit claims in the U.S.**
**MR. ROSENTHAL:** Okay, probably a good time for a break, if that is good with you.
**MS. MERSKY:** Do you want to do lunch now?
**MR. ROSENTHAL:** I thought it was a little early for lunch.
(DISCUSSION OFF THE RECORD.)
-- RECESSED AT 11:48 P.M.
-- RESUMED AT 11:56 A.M.
**BY MR. ROSENTHAL:**
Q. Why don't we give you what has been marked as Exhibit 39. Ms. Klein, just before the break, you said that you had believed from what was said by Koskie Minsky and from the bar date notice that you were only supposed to file claims in Canada?
**A. Yes.**
Q. I think those were the two things

Page 122

KLEIN - HIGHLY CONFIDENTIAL
you cited. I don't remember if there was a third because I don't have the transcript here. But I'm showing you Exhibit 39 which is a copy of the U.S. bar date notice that was published in The Globe and Mail.
**A. Yes.**
Q. In 2009 did you ever see Exhibit 39?
**A. In The Globe and Mail?**
Q. Well, let's start out with in The Globe and Mail?
**A. No, I don't read The Globe and Mail.**
Q. Okay. Did you ever see it in any other publication?
**A. I don't recall reading it in any publication.**
Q. Do you recall going to the Epiq website for the U.S. and seeing the bar date notice?
**A. Yes.**
Q. And you did that in 2009?
**A. Yes.**
Q. Prior to the bar date itself?

Page 123

KLEIN - HIGHLY CONFIDENTIAL
**A. Yes.**
Q. And you read it?
**A. Yes.**
Q. And did you understand it at the time?
**A. Not all of it, no.**
Q. Did you talk to Koskie Minsky about it afterwards?
**A. I don't remember.**
Q. And I realize that this is -- the print is a little small on here. I presume the print in the version that you looked at on the web was a little bit easier to read?
**A. I remember seeing not this. It wasn't in this format. What I saw was a document that looked more like those -- it looked more like one of these documents.**
Q. It had a court caption?
**A. Yes.**
Q. Okay, and when you said it looked like "these", you were referring to Exhibit 78?
**A. Yes.**
Q. But Exhibit 78 is a Canadian caption.

Page 124

KLEIN - HIGHLY CONFIDENTIAL
**A. It is a Canadian one, but a U.S. version.**
Q. So it had a U.S. caption and it said "Notice of Bar Date", or something like that?
**A. Yeah, I can't remember exactly, but it was the announcement of the fact that there was a bar date and instructions on what to do if you had a claim and so forth.**
Q. And is that something that when you read that off the U.S. website that you informed people by posting to LinkedIn?
**A. I can't remember if I did.**
Q. And when you read that, you understood that if you had a claim against Nortel U.S., you needed to file that by the bar date; correct?
**A. Yes.**
Q. And you understood that from reading it, I believe you said just before the break that the bar date notice informed you that claims against Nortel Canada should not be filed in the U.S.; correct?
**A. What I remember reading was a statement in that document that said if you have a**

KLEIN - HIGHLY CONFIDENTIAL

**claim in Canada against the Canadian Debtors, that you are to file that claim in Canada and only in Canada. And therefore, I assumed that because we had a claim in Canada, we were to file it in Canada and only in Canada and we didn't have to file it in the U.S., and that was -- and that explanation or, you know, the advice that we only needed to file in Canada was given -- was also given to me by Koskie Minsky.**

Q. I am going to give you a document that will be much more easy to read. Why don't we mark as Exhibit 82 -- was it marked already? Okay, 82, and we'll give you the document. It has got an Ontario caption that says "Order (Recognition of the U.S. Claims Bar Order)", dated August 14, 2009 and it attaches a document with the U.S. caption that says "Order Establishing Deadlines for Filing Proofs of Claim".

**NNI EXHIBIT NO. 82:** "Order (Recognition of the U.S. Claims Bar Order)", dated August 14, 2009, attaching a document with the U.S. caption that says "Order Establishing Deadlines For Filing Proofs of Claim".

KLEIN - HIGHLY CONFIDENTIAL

**BY MR. ROSENTHAL:**

Q. So I'm going to direct you if you look to Schedule B of this document, because I'll represent to you that the cover, the first few pages are from a Canadian filing, but Schedule B on the next page is "Order establishing deadlines for filing proofs of claim"; do you see that? Is that the document that you saw on the Epiq website?

**A. No.**

Q. Do you remember what it was that you saw on the Epiq website?

**A. I don't think this is the document, because the one I saw wasn't an order. It wasn't an order establishing. It was a motion. Does that -- is that correct terminology?**

Q. Yes, well, typically you file a motion to get a court order, so --

**A. So I don't remember ever reading the order. I remember reading the motion.**

Q. The request for the order?

**A. Well, I guess so.**

Q. Okay.

**A. I guess that is what that is.**

Q. But if we could look at the order

KLEIN - HIGHLY CONFIDENTIAL

itself. So the order you don't recall seeing?

**A. I don't recall reading this one, no.**

Q. Okay, if you could look in the order and turn to paragraph 4 -- or 3 and 4, and 3 says:

"Subject to paragraph 21 of this Order, all claims against the Debtors", and it is defined as the U.S. Debtors, "shall be filed in, and only in, these chapter 11 cases with the Claims Agent", and that is defined herein, "in accordance with the procedures set forth in this Order."

And paragraph 4 says:

"Subject to paragraph 21 of this Order, all claims against the Canadian Debtors shall be filed in, and only in, the Canadian Proceedings with the court-appointed Monitor pursuant to the procedures approved by the Canadian Court."

Does that accurately summarize what

KLEIN - HIGHLY CONFIDENTIAL

your understanding was at the time when you reviewed the U.S. motion?

**A. I don't know. I don't understand what that means. This is the first time I'm reading this document.**

Q. Okay.

**A. So I don't understand what that means. I have never seen this document.**

Q. Okay, so let's put the document aside then. Is it your understanding from whatever the document that you read was that it said that claims against the Canadian Debtors shall only be filed in the Canadian proceedings?

**A. No. I understood it to say that if you have a claim in the Canadian proceedings, if you have a claim against the Canadian estate, then you file it only in -- if I have a claim against one of the Canadian Debtors, then we are to file it in and only in a Canadian court.**

Q. And you understood that to be you file your claim against the Canadian Debtors only in the Canadian court; correct?

**A. Say that again.**

Q. Well, you understood that to be

*In Re:*
*NORTEL NETWORKS INC., et al*

---

*JANE LONGCHAMPS*
*February 12, 2014*
*Confidential*

---

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434 FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106219A.TXT*

*Min-U-Script® with Word Index*

LONGCHAMPS - CONFIDENTIAL

**bit about the commuted value of the pensions. There was some delay with the people who held our pension. They weren't -- they were supposed to provide you with your letter of your value of your pension or something at a certain number of days after termination, and they were not doing that, and therefore, they were not holding up their legal requirements in terms of notification and allowing us to claim.**

**So I think that there -- I don't know if there was something there on that or if it was through a friend that I found that out.**

**I think I mentioned before I was really concerned about getting my commuted value of the pension out before the next actuarial valuation took the value down.**

Q. So you were interested in conversations that would have related to the commuted value of pensions?

A. **Yes.**

Q. Were there other topics that you would have been more interested in?

A. **I was at the time quite concerned about what was happening with the unfunded pension**

LONGCHAMPS - CONFIDENTIAL

**plan, the unfunded portion of the pension plan, and the fact that it wasn't considered part of, I guess, a bankruptcy creditor.**

**So I guess I was concerned a little bit legally -- or not legally, but legislatively on how the bankruptcy lineup was set up with employees at the bottom.**

Q. Did the topics that most interested you on LinkedIn change over time, or did they stay pretty focused on the commuted value of pension and what was happening with the unfunded pension plan?

A. **I would say those got dismissed pretty quickly once I got my money out, which -- or my claim in for the pension, which would have been in March/April, my interest in that died down.**

**It was obvious that I wasn't going to change the bankruptcy laws, so that died down as well.**

**My focus then was what action do I need to take, so watching for advice on when we were to claim, when we were supposed to do something.**

Q. Were there particular people who were members of the LinkedIn group whose posts you

LONGCHAMPS - CONFIDENTIAL

paid more attention to than others?

A. **Definitely Paula's.**

Q. Why Paula's?

A. **She was credible, factual, well-informed and did not get involved in what-if, you know, or how things should be as opposed to how they were. So she was probably the key person.**

Q. So in 2009, if you received an email notification that Paula Klein had posted a topic that might have information about what you needed to do in the bankruptcy, that would have been something that would interest you?

A. **I would be more likely to look at it, yes.**

Q. Would you typically post comments when you were on the LinkedIn site?

A. **Rarely, unless there was something where I thought I could add value. I wasn't interested in, again, hypothesizing or talking about what should happen.**

Q. So it would have been common for you to have read a conversation but not have contributed anything yourself?

A. **Yes.**

LONGCHAMPS - CONFIDENTIAL

Q. Were you relying principally on LinkedIn to learn about developments on the legal side of your claim, or did you seek out information that came more directly from your attorneys?

A. **What do you mean by "more directly"? Email, or --**

Q. Was LinkedIn the primary source of information that you relied on for what was happening legally in your representation?

A. **It was certainly very key. If I received a notification, like, if I received a letter, I would certainly focus on that. So anything that came to me directly I would focus on, but it was the key source of information.**

Q. Do you recall whether information was being sent to you directly from Koskie Minsky after they were appointed?

A. **I don't -- it is hard for me, because I produced everything here, it is hard for me to remember what was electronic and what was paper.**

**But I do remember on occasion going back and looking at things, saying am I supposed to do something? And I would go back and it says, you**

**know, do not do anything at this time.**

**And I seem to remember looking at more than one document, but -- so I'm assuming that maybe Koskie sent something saying there is nothing to do at this time. I'm not sure which of the documents that would have been.**

Q. Okay. Well, we'll look through more of your production later this morning.

When you were listing sources of information that you relied on in 2009 for information about Nortel's bankruptcy proceedings, one of the things that you mentioned was friends.

**A. Uhm-hmm.**

Q. Was there anyone in particular that you were referring to?

**A. Joanne Read is a very close friend of mine. She was terminated, I think -- I'm guessing January 10th. She was very -- she was more tightly linked to senior circles, I guess I would say.**

**So she was the one that had told me that she thought that they might be going into bankruptcy and concerns about the pension, commuted values. We had similar interests. She also was**





**trying to get her money out, so yes, she would be the primary one.**

Q. Is Ms. Read someone with whom you maintained contact during the process of filing claims in the Canadian bankruptcy proceeding?

**A. More socially.**

Q. Would you and Ms. Read ever communicate about what was happening with your claims here in Canada?

**A. I would sometimes call her and say, are we supposed to do anything? Have you heard anything yet? That kind of thing. But that is about it.**

Q. Is Ms. Read a member of the Ad Hoc Group, to your knowledge?

**A. I think she is, but I'm not -- I think she is, yes.**

Q. Have you and she spoken at all about the process of seeking to file claims in the United States?

**A. She is really busy, so when we get together, we don't usually talk about this. I might have mentioned to her that I was being deposed, but --**





**MS. MERSKY:** Michelle, when you are ready to take a break.

**MS. PARTHUM:** I think we can go ahead and take a break right now, actually.

-- RECESSED AT 11:05 A.M.

-- RESUMED AT 11:10 A.M.

**BY MS. PARTHUM:**

Q. I'm going to hand you what has been previously marked as Exhibit 67.

This is an email from Pierre Pierre Blais dated Friday, January 16th, 2009, sent to a large group of people.

And if you look at the final email address in that list, it says "longchampsfamily@sympatico.ca"; is that your email address?

**A. It is.**

Q. And he refers to an email sent by Paula Klein, which if you look at the very bottom of the page, you see that this is forwarding an email sent by Paula Klein.

And if you flip over to the second page, again, at the base of that list of emails, the last one is your email address.





**A. Okay.**

Q. And the notes that Paula Klein sent, it says in bold lettering "Notes From My Legal Meeting on January 16, 2009, with Ainslie Benedict of Nelligan, O'Brien & Payne".

Is this an email at the time that you think would have been of interest to you?

**A. Yes.**

Q. Was the period of time that you were considering which law firm you were interested in retaining to represent you with respect to your severance and pension claims?

**A. Yes.**

Q. Do you think that you would have read through the notes that Ms. Klein forwarded to you?

**A. Yes.**

Q. If you look at the page, there is a number 6 in the middle at the bottom, and question number 33, it is about halfway through the page, says:

"How does the Bankruptcy Protection process in Canada relate to the one in the USA (and