Exhibit "M"

*In Re:*
*NORTEL NETWORKS INC., et al*

*ERNIE BRIARD*
*February 4, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106213B.TXT*
Min-U-Script® with Word Index

Page 89

1 BRIARD - CONFIDENTIAL
2 A. That's right.
3 Q. And I can show you, if you'd like,
4 some of the LinkedIn postings and things like that
5 mentioning it, if that kind of helps jog your
6 memory as to where you might have heard it.
7 A. No, that's fine.
8 Q. Do you remember where you might
9 have heard it from?
10 A. No, I really don't.
11 Q. But from some source --
12 A. Yes.
13 Q. -- you learn there is a bar date
14 in the United States and you've got to protect your
15 rights?
16 A. I don't think it was that
17 specific.
18 Q. Okay.
19 A. It was -- you see, my whole world
20 was talking to, you know, Canadian people that knew
21 nothing about the U.S. and bar dates. I mean, I
22 don't even know what that means, really, you know.
23 What's bar?
24    So no, back then at this time, I don't
25 think anybody knew about a bar date and certainly

Page 90

1 BRIARD - CONFIDENTIAL
2 nobody was talking about U.S. claims. They were
3 all -- you know, I figured I was unique, that I had
4 to protect my U.S. pension because that's the claim
5 I had in the U.S. since my severance was not
6 claimable in the U.S., from what I was being told
7 and understood and certainly reconfirmed in writing
8 to me, so I had to make that claim through Canada,
9 and that the process, the global process would make
10 its magic on my global severance claim and make it
11 work.
12    And it says right in writing, if you're
13 making a claim in Canada do not put it in the U.S.
14 And so then I said that's fine for severance but
15 U.S. pension is quite separate and I went on the
16 website, pulled down the forms and filed it.
17 Q. Do you read the Globe and Mail?
18 A. Not very often.
19 Q. Let me show you a document and
20 we'll mark it as Exhibit 39 just to see whether
21 you've seen this before.
22    NNI EXHIBIT NO. 39: Notification
23    published in the Globe and Mail on
24    August 11, 2009.
25 BY MR. ROSENTHAL:

Page 91

1 BRIARD - CONFIDENTIAL
2 Q. This is, I'll represent to you, a
3 notification as filed that was published in the
4 Globe and Mail on August 11th, 2009. Have you ever
5 seen that before?
6 A. No, I've never seen that. That's
7 a Toronto newspaper. I live in Ottawa.
8 Q. Don't they also publish it here in
9 Ottawa?
10 A. They do publish it but it's not
11 local --
12 Q. My hotel gave me the Globe and
13 Mail this morning. Okay. So at some point in
14 time, and we'll circle back about some of these
15 documents about the bar date and see if any of them
16 jog your memory -- by the way, do you read the Wall
17 Street Journal?
18 A. No, I don't.
19 Q. So at some point you conclude you
20 need to file a Proof of Claim in the United States?
21 A. Yeah.
22 Q. You had not received any claim
23 form directly from the U.S. Debtors or a notice
24 from the U.S. Debtors but you did your own research
25 and you found your way to the claim form?

Page 92

1 BRIARD - CONFIDENTIAL
2 A. That's my recollection, that's
3 correct.
4 Q. And you wanted to be as diligent
5 as possible and include anything that you thought
6 that you had a right to include in the United
7 States, so you reached out to the -- to Ernst &
8 Young; is that true?
9 A. I can't recall exactly why I
10 reached out to Ernst & Young but I'm sure it had to
11 do with, you know, am I filing my claims
12 appropriately or not. And I believe I got
13 confidence from them and from lots of other sources
14 that what I was doing was right.
15 Q. Did you reach out to Ernst & Young
16 by email or telephone?
17 A. No, telephone. It was a 1-800
18 number I believe I called.
19 Q. And you spoke to a representative
20 on the phone?
21 A. I believe so.
22 Q. The person that you called, did
23 they call you back? How did that work? Does the
24 person who you call and picks up the phone answer
25 your question?

*In Re:*
*NORTEL NETWORKS INC., et al*

*CHRIS BUCHANAN*
*February 13, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106220.TXT*
Min-U-Script® with Word Index

Page 89

BUCHANAN - CONFIDENTIAL
severance package. I and a number of others wanted to -- felt that our best option was to withdraw from the pension plan. It even took just that, two months of getting it -- and it was Mercer was the management company -- just to get a quote on getting our pension money, because that was the only income I was going to have other than the small amount of vacation pay.

So it went on through the year being that, being a whole long list of legal issues. The following year I had surgery. Two years after that I had surgery. Somewhere in there I worked for a year with BlackBerry because I needed some income.

So no, maybe there were lots of other things I should look at, but the reality is I didn't believe that the details of what was happening in the U.S. were particularly relevant.

Q. Okay. Were you around this time in 2009 a subscriber of The Globe and Mail?
A. No.
Q. How about The Wall Street Journal?
A. No.
Q. Did you ever come to be aware that The Globe and Mail published a notice of the bar

Page 90

BUCHANAN - CONFIDENTIAL
date that had been set in the U.S. proceedings?
A. No.
Q. Was that something you ever discussed with other Nortel employees?
A. No. I have no recollection, other than you have pointed out an odd reference to that bar date, that is the only information I had.
Q. As we talked about earlier, you came to understand from the information you had been provided that there eventually would be a deadline set in Canada for claims to be filed in Canada; correct?
A. No, no, no, we were told afterwards that the process was that they would file a claim for us and we would review it.
Q. Understood.
A. So in that sense, there wasn't a bar date in the same sense as in the U.S.
Q. Well, I'm not talking about what you personally might have to -- I'm just saying we looked at some documents earlier that referenced, and this is I'm going back, and you can pull out the exhibit if you want --
A. No, I recall the Nelligan Payne

Page 91

BUCHANAN - CONFIDENTIAL
made reference --
Q. Right, exactly.
A. Yes, because the view was that we would put a claim in. That was the early view, just by default.
Q. Right, but separate and apart from who would file the claim, my question is simply did you understand after the Nelligan briefing that in terms of the process that would be followed in Canada, eventually there would be a deadline set by which people would need to either file or have filed on their behalf claims?
A. Yes.
Q. And did you ever consider whether a similar deadline would be established in the United States for claims in the U.S. bankruptcy case?
A. Yes, about the same. I don't know when I was told that, but yeah.
Q. But fair to say that around the same time you generally understood that a deadline would be set by which claims would have to be filed in the U.S. case?
A. I don't think that there was much

Page 92

BUCHANAN - CONFIDENTIAL
discussion of the U.S. at that stage. That became -- that came out more when KM came on board in May, whenever that -- May.
Q. In that last answer when you referred to KM coming on board in May, you mean May of 2009?
A. I do.
Q. Okay.
   MS. MERSKY: Is this a new exhibit?
   MR. QURESHI: It is. It is going to be 91.
   NNI EXHIBIT NO. 91: Letter written by Mr. Buchanan, dated April 19, 2013.
BY MR. QURESHI:
Q. Mr. Buchanan, I have marked as Exhibit 91 a document dated April 19 of 2013 with your name at the bottom of it. Do you recognize it?
A. I do.
Q. And what is it?
A. It is the cover letter I put with the submission to the U.S. claim.
Q. Okay. In the first paragraph of this cover letter -- and you drafted this, right?

*In Re:*
*NORTEL NETWORKS INC., et al*

MICHAEL CAMPBELL
*February 6, 2014*
*Confidential*



**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106215.TXT*
Min-U-Script® with Word Index

Page 133

1   CAMPBELL - CONFIDENTIAL
2       Do you see that?
3   A.  Um-hmm. Yes, I do, sorry.
4   Q.  At the time this affidavit was
5       prepared, do you have an understanding of what
6       issues you are referring to that relate to the
7       sub-group of terminated employees?
8   A.  Yes, I do.
9   Q.  Please provide me with that
10      understanding.
11  A.  So terminated employees are a
12      subset of the larger claimants in the Canadian
13      proceedings. They have unique situations around
14      their status within the claim process, and so
15      Paula's and my role is to identify those issues
16      around communications, around particular issues
17      that would relate to them and represent them in the
18      larger process, communications and so on.
19  Q.  When in that answer you referred
20      to the claim process, were you referring
21      specifically to the Canadian claim process?
22  A.  Up until 2012, yes.
23  Q.  Paragraph 11, you write:
24      "My role has involved a great
25      degree of communication with the

Page 134

1   CAMPBELL - CONFIDENTIAL
2       terminated employee sub-group."
3       Do you see that?
4   A.  Yes.
5   Q.  Do I understand then correctly
6       that your communications with the terminated
7       employees sub-group would have been in respect of
8       only the CCAA proceedings until the middle of 2012?
9   A.  I know that there were various
10      conversations that came up around the U.S. process,
11      but I don't believe any of my communications would
12      have been on that matter until that time. I'd have
13      to refresh myself.
14  Q.  Sure. When you say there were
15      various conversations that came up around the U.S.
16      process, what do you mean by that?
17  A.  The only thing I can recall is
18      that there may have been some conversations about a
19      bar date in the U.S.
20  Q.  Some conversations among whom?
21  A.  Members of the LinkedIn group.
22  Q.  When did you first -- well, back
23      up, sorry. Strike that.
24      Did you come to form at any point an
25      understanding concerning a bar date in the U.S.

Page 135

1   CAMPBELL - CONFIDENTIAL
2       bankruptcy proceedings?
3   A.  Yes, in November of 2009 I learned
4       through a communication that there was such a thing
5       as a bar date in the U.S.
6   Q.  Do you recall what communication
7       you learned that from?
8   A.  It was an email from Paula.
9   Q.  Was it part of a LinkedIn
10      discussion or was it a separate email from Paula?
11  A.  It was a separate email.
12  Q.  And do you know if that's an email
13      that you produced?
14  A.  I did.
15  Q.  And at the time that you received
16      that email, was that the first time you had heard
17      of a bar date in the U.S. proceedings?
18  A.  I don't recall but it was probably
19      around that time, yes.
20  Q.  And did your learning of a bar
21      date in the U.S. proceedings around November of
22      2009 have any relevance at that time to your duties
23      as a representative?
24  A.  No.
25  Q.  Why not?

Page 136

1   CAMPBELL - CONFIDENTIAL
2   A.  I wasn't aware that there was an
3       opportunity to file any claims in the U.S. We were
4       focused on understanding what we needed to do in
5       Canada, for the Canadian claims process, and we
6       were instructed by both Koskie Minsky and our --
7       and Ernst & Young to wait for the Canadian process
8       to unfold.
9   Q.  When you say you were instructed
10      by Koskie Minsky and Ernst & Young to wait for the
11      Canadian process to unfold, can you elaborate on
12      what you mean by that?
13  A.  Sure. Through various
14      communications, informal, as well as webinars that
15      everybody presented at that time.
16  Q.  Turn to paragraph 21 of your
17      affidavit, please.
18  A.  Geez, I wrote a lot.
19  Q.  Indeed. Paragraph 21 reads:
20      "As part of the review of
21      claims by the Monitor, in the spring
22      of 2012 the Monitor identified a
23      sub-group of claimants in the
24      Canadian compensation claims process
25      who had also filed claims in the

Case 09-10138-MFW   Doc 13237-14   Filed 03/27/14   Page 8 of 17

In Re:  
NORTEL NETWORKS INC., et al  
Confidential  
MICHAEL CAMPBELL  
February 6, 2014

Page 137

CAMPBELL - CONFIDENTIAL

U.S. claims process."

Q. My question to you, sir, is at what point in time did you first become aware that the Monitor identified claimants in the Canadian compensation claims process who had also filed claims in the U.S. claims process?

A. I think if you look in paragraph 26, we were informed around June 12 of 2012 that there were potential claims, and at that time we were told that the reason we were being notified was because of this group.

Q. When you say because of this group?

A. Sorry, the group that is identified in paragraph 21.

Q. The Canadian --

A. The sub-group of claimants that you mentioned earlier.

Q. I see, okay. And did you personally have any communications with the Monitor or any of the Monitor's representatives concerning those claimants who had filed claims both in Canada and the United States?

A. I did not directly. It was

Page 138

CAMPBELL - CONFIDENTIAL

through my counsel. I recall seeing a letter from Koskie Minsky to Ernst & Young on the matter. But my communication was 2012 when counsel brought the status forward to me as court representative. They also brought it forward to Don Sproule and David Archibald.

Q. So do I understand correctly then that prior to learning of this information from the Monitor in the spring of 2012, you had no knowledge of former employees having filed claims in both Canada and the United States?

A. I learned in June of 2012 that there were a number of employees that had filed, that was the point when I learned it.

Q. And that was from the Monitor?

A. Sorry?

Q. That was --

A. That was from my counsel.

Q. And your counsel in turn, as far as you know, learned that from the Monitor; is that right?

A. Yes.

Q. And at the time that you learned that, did you believe that the fact of these claims

Page 139

CAMPBELL - CONFIDENTIAL

having been filed in both Canada and the U.S. had any relevance to former Canadian employees?

A. We had a meeting in early July with counsel. They identified the information to me about the number of individuals that we thought were affected, and they indicated that a number of them were individuals in Canada that had similar language in their termination agreements.

Q. When you say "we had a meeting with counsel in early July," who is "we" and who is "counsel"?

A. "Counsel" would be Koskie Minsky and "we" is Don Sproule and David Archibald, the other court representatives.

Q. And at that time did you come to form an understanding of how many individuals had filed claims in both Canada and the U.S.?

A. No, I didn't know at that time the specific number. I found out later but I didn't know at that time.

Q. When did you find out?

A. Subsequent to June 2012.

Q. And what was that number, if you recall?

Page 140

CAMPBELL - CONFIDENTIAL

A. I seem to recall a number of around half a dozen.

Q. Okay. And in paragraph 22 you write:

"I am advised by our counsel that the Monitor drew these claimants to their attention and requested that these parallel claims be withdrawn from the U.S. claims procedure."

Do you see that?

A. Yes.

Q. Do you have an understanding of why the Monitor was requesting that these claims filed in both Canada and the U.S. be withdrawn from the U.S. process?

A. I do not.

Q. In paragraph 24 you will see a reference to approximately 300 individuals with similar severance and termination terms.

A. Um-hmm, I see that, yes.

Q. When you say in that paragraph "similar severance and termination terms," can you be more specific as to how this group of

Case 09-10138-MFW    Doc 13237-14    Filed 03/27/14    Page 9 of 17

In Re:  
NORTEL NETWORKS INC., et al
Confidential
MICHAEL CAMPBELL  
February 6, 2014

Page 141

CAMPBELL - CONFIDENTIAL

2 approximately 300 individuals had terms similar to
3 the sub-group who had filed claims in both Canada
4 and the U.S.?
5 A. I was advised by counsel that that
6 was the case. I can't be specific about individual
7 letters. I am not able to see them under NDA.
8 They're under NDA and I'm under NDA. Counsel would
9 have been able to look at them but I was not.
10 Q. So you haven't seen anybody's
11 termination letter other than your own?
12 A. Correct.
13 Q. In paragraph 25, you write:
14    "Counsel to the representatives
15    also sought advice from U.S. counsel
16    on the viability of the claims in
17    the U.S. proceeding."
18    Are you referring there, when you write
19 "counsel to the representatives," to Koskie Minsky?
20 A. Yes.
21 Q. And do you recall at what point in
22 time Koskie Minsky first sought advice from U.S.
23 counsel concerning the viability of claims in the
24 U.S. proceedings?
25 A. I don't know the specific time

Page 142

CAMPBELL - CONFIDENTIAL

2 that they did that.
3 Q. Do you know if it was before or
4 after the Monitor alerted your counsel to the fact
5 that some claims by former employees had been filed
6 in the U.S. and Canada?
7 A. I don't know the answer to that
8 question.
9 Q. In paragraph 27, you write:
10    "In and around June 2012,
11    counsel advised us about the
12    affected employees and that they had
13    received advice from U.S. counsel
14    that the claims of the affected
15    employees could potentially be
16    brought against Nortel Networks Inc.
17    in the U.S. proceedings, but that
18    there were barriers to bringing a
19    successful claim."
20    When you write that "counsel advised
21 us," is that again a reference to Koskie Minsky?
22 A. Yes, it is.
23 Q. And the reference to the "U.S.
24 counsel," do you know which U.S. counsel that's a
25 reference to?

Page 143

CAMPBELL - CONFIDENTIAL

2 A. I don't recall who it was at that
3 time, no.
4 Q. And did you come to form an
5 understanding as to why -- well, back up.
6    Did you come to form an understanding
7 that former Canadian employees could file claims or
8 seek to file claims in the U.S. proceedings?
9 A. We came to the understanding that
10 they could file in the U.S. but there were barriers
11 to bringing that claim forward.
12 Q. Let's break that up. What did you
13 understand the barriers to be?
14 A. Well, I'm not an expert on the
15 legal process in the U.S. We were advised that
16 there were some legal processes that we had to go
17 through to have the bar date raised and have our
18 claims introduced into the U.S.
19 Q. Do you have an understanding of
20 what those processes were?
21 A. At a high level.
22 Q. What is your high-level
23 understanding?
24 A. That there are -- there is a
25 motion that we have to put in front of the courts,

Page 144

CAMPBELL - CONFIDENTIAL

2 there's some tests that we have to pass and that if
3 we're successful we will be allowed to actually
4 take our claims, formulate them and submit them
5 into the U.S. debtor.
6 Q. You testified that you came to the
7 understanding that former employees of the Canadian
8 entity could file claims in the U.S. Tell me what
9 your understanding was as to why that was the case?
10 A. I'm sorry, I don't understand the
11 question.
12 Q. Sure, let me try that again. You
13 testified that around this time you came to the
14 understanding that former Canadian employees, that
15 is to say former employees of the Canadian Nortel
16 entity, could also file claims in the U.S.
17 bankruptcy proceedings, correct?
18 A. I came to the understanding that
19 there was a possibility that certain individuals
20 with language in a severance agreement could
21 possibly pursue a proceeding in the U.S., a claim
22 against the U.S. Debtor, yes.
23 Q. Tell me everything you can about
24 that understanding.
25 A. That's it. We found out that

Page 169

CAMPBELL - CONFIDENTIAL
A. Sorry, I have to go to finer reading.
Q. Sure. The exhibit includes both a declaration on the front and an attachment on the back, and referring specifically to the attachment on the back you'll see that there is a notice of deadline requiring filing of proofs of claim on or before September 30, 2009.
And you'll see in the declaration on the front page, the declaration states that this notice appeared in the Globe and Mail.
A. I see that.
Q. So do you recall ever seeing this notice in the Globe and Mail at or around this time?
A. No, definitely not.
Q. Did Koskie Minsky ever make you aware of the publication of this notice in the Globe and Mail?
A. They did not. Small print.
Q. You can set the notice aside.
A. Okay.
Q. You testified that you first became aware of the possibility of former Canadian

Page 170

CAMPBELL - CONFIDENTIAL
Nortel employees filing claims in the U.S. around the middle of 2012, correct?
A. Yes.
Q. At what point do you recall first learning of the existence of a bar date in the United States by which claims needed to be filed?
A. I received an email in November of 2009 from Paula Klein that indicated that there was such a thing as a bar date in the U.S. and that it had passed because it was September the 30th.
Q. And in July, or I should say the middle of 2012, when you first learned of the possibility of filing claims on behalf of former Canadian employees in the U.S. case, did you consider the possibility of immediately seeking leave to file such a claim?
A. So we learned in June of 2012 that there was a possibility and I instructed counsel to instigate a process to understand how we would do that, yes.
Q. And you are aware that your counsel eventually filed its motion seeking leave to file these claims in the U.S. case in February of 2013?

Page 171

CAMPBELL - CONFIDENTIAL
MS. MERSKY: Objection to the extent that the term "counsel" needs to be defined and is misleading as presented.
BY MR. QURESHI:
Q. Fair enough. Let me be more precise. Am I correct that Koskie Minsky, as far as you were aware, first learned of the possibility of Canadian former employees filing claims in the U.S. in June of 2012?
A. The Monitor learned of that event earlier in the year. 2012 is when the Monitor communicated to Koskie and Koskie communicated to us.
Q. And are you also aware that Ms. Mersky's firm filed a motion in the U.S. bankruptcy court in February of 2013 seeking leave to file late-filed claims?
A. I am.
Q. Why is it, if you know, that amount of time elapsed between your counsel, Koskie Minsky, first learning of the possibility of filing such claims and making you aware of it, and your counsel, Ms. Mersky, filing the motion?
A. Yes, I am aware of some

Page 172

CAMPBELL - CONFIDENTIAL
circumstances around that.
Q. Can you please explain what those circumstances are?
A. Sure. My recollection, and I may be off, but my recollection was that I instructed Koskie Minsky to proceed with all haste to get this process understood and to figure out how to get us U.S. counsel.
We had attempted to contact a U.S. firm in the U.S. other than Ms. Mersky's and we had been unsuccessful in getting them to respond to our requests.
After a period of time where we spent serious time and effort reviewing the situation and trying to move it forward, I told Koskie to go look for another lawyer and we engaged Rachel's firm.
Q. And do you recall when Ms. Mersky's firm was engaged?
A. I don't recall off the top of my head. Sometime prior to the filing.
Q. Do you know how far in advance of the filing?
A. I don't recall.
Q. Do you know if there exists an

*In Re:*
*NORTEL NETWORKS INC., et al*

BETSY HUNG
February 4, 2014
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106213A.TXT*
*Min-U-Script® with Word Index*

Page 41

1  HUNG - CONFIDENTIAL
2  with them. Did they do most of the talking?
3  A. Yeah.
4  Q. Did you ask any questions?
5  A. Those terminology they said, it's
6  hard for me to comprehend. So it just like oh, is
7  an information session. You sit there. But then I
8  can't remember, is so long ago that I can't
9  remember.
10 Q. When you signed this letter on
11 January 6th, 2009 what was your understanding of
12 what was going to happen next?
13 A. I am going to get the lump sum
14 with the pay with the vacation on whatever date.
15 Q. Did you have an understanding
16 about who was going to be making those payments to
17 you?
18 A. Normally we just get paycheques
19 always. I really don't understand all this behind
20 the scene, all this organization.
21 Q. So it would be the same entity
22 that gave you the paycheque would pay you the
23 severance?
24 A. I don't know all this stuff. I
25 don't know whether same entity or what. Only cares

Page 42

1  HUNG - CONFIDENTIAL
2  that the paycheque got into my account.
3  Q. But just in terms of your own
4  understanding, do you recall what your
5  understanding was?
6  A. No understanding. Just Nortel.
7  Nortel as a whole.
8  Q. So in other words, the severance
9  would be paid by every part of Nortel?
10 A. I don't know every part. Just
11 like whoever dealing with whatever, the
12 organization.
13 Q. Ms. Hung, I would like to ask you
14 to look at paragraph 3.
15 A. One, two, three. Yeah.
16 Q. It begins:
17    "As used in this letter, the
18    term 'Corporation' shall mean Nortel
19    Networks Corporation, its
20    subsidiaries and affiliates, their
21    successors and assigns, and all of
22    their past and present officers,
23    directors, employees and agents (in
24    their individual and representative
25    capacities), in every case,

Page 43

1  HUNG - CONFIDENTIAL
2  individually and collectively."
3  Do you remember reading this language?
4  A. It is typical law firm stuff that
5  means something. I read it but it's like to me is
6  a terminology that it means Nortel.
7  Q. When you say it means Nortel,
8  you're saying it means every part of Nortel?
9  A. What do you mean, every part?
10 It's Nortel as a whole, right? Is Nortel. Then I
11 don't know what it means behind. Just like Nortel.
12 Q. Did you ask anybody as to what it
13 meant?
14 A. I don't. I just say Nortel. This
15 is like I work for Nortel, Nortel.
16 Q. Did you ask the person who was --
17 A. No.
18 Q. -- in the meeting?
19 A. No.
20 Q. And you had said you didn't talk
21 to any lawyers?
22 A. No.
23 Q. What is your current understanding
24 of what this means?
25 A. My current understanding looks

Page 44

1  HUNG - CONFIDENTIAL
2  like you have Nortel U.S., Nortel Canada, Nortel
3  Asia, and it means the different entity, but to me
4  I don't differentiate all this entity. It means
5  Nortel as a whole.
6  Q. So at the time when you received
7  this letter, you understood that Nortel, the group,
8  would be paying you the severance?
9  A. I don't know the group. It's just
10 organization, the company. It's a company. I
11 don't know all this, you know, how they do it is
12 maybe for tax purposes, whatever. I really don't
13 have a clue what it means to me.
14 Q. This language also mentions
15 officers, directors, employees and agents. Did you
16 have an understanding that other individuals who
17 worked at Nortel would pay you the severance
18 amount?
19 A. To be honest, I really don't
20 understand this sentence. It's just like to me my
21 interpretation is Nortel. I repeat again, I don't
22 differentiate all this entity.
23 Q. You mentioned a few minutes ago
24 that initially your understanding was that there
25 was one organization and at some point you learned

Case 09-10138-MFW   Doc 13237-14   Filed 03/27/14   Page 13 of 17

In Re:
NORTEL NETWORKS INC., et al
Confidential
BETSY HUNG
February 4, 2014

Page 45

1    HUNG - CONFIDENTIAL
2    that there was Nortel Canada and Nortel U.S.?
3  A. Now you told me, yeah, because --
4  Q. Before today at some point you
5    learned this information?
6  A. I learned it through the NRPC
7    January -- January something, that I got a notice
8    that -- that I have a potential claim for Nortel in
9    U.S., then I am aware oh, it's different. I never
10   knew about -- the Monitor said you live in Canada,
11   then you follow the process in Canada. That's what
12   we are told.
13 Q. Let me just make sure I
14   understood. So in January, was this early -- was
15   this when Nortel just filed for bankruptcy, do you
16   know? Was it 2009?
17 A. No, January, Rachel -- can I ask
18   Rachel? When we send -- we received the notice, it
19   was January something, maybe 2000...
20 Q. Was this notice you received from
21   the NRPC?
22 A. Yeah.
23 Q. Just so the record is clear --
24 A. The one that I produce. I can't
25   remember the date.

Page 46

1    HUNG - CONFIDENTIAL
2  Q. When we say NRPC, do you mean the
3    Nortel Retirees and Former Employees Protection
4    Canada?
5  A. Yeah. The newsletter and the
6    thing about all this kind of thing, otherwise I
7    never knew about it.
8  Q. You received a newsletter?
9  A. Yeah, I produce it. Then I take
10   action immediately, the minute I knew about it.
11   Otherwise, you know...
12 Q. That was the first time you
13   learned that there was a U.S. -- a Nortel U.S. and
14   a Nortel Canada, or had you heard about that
15   before?
16 A. No, what I mean is our claim that
17   we had to -- it relate to a claim, that we have
18   potential claim and our right for that. That's the
19   first time I know about it.
20 Q. Okay.
21 A. Otherwise we think well, you go
22   through the process by the Monitor, you just sit
23   there and wait for the instruction in Canada.
24 Q. And we'll talk about the claims
25   process in a few minutes, but aside from the claims

Page 47

1    HUNG - CONFIDENTIAL
2    process, just your understanding of there being a
3    process in the U.S. and a process in Canada, do you
4    remember when you first learned that there were
5    different processes?
6  A. Is when I got the notice.
7  Q. When you got the notice from the
8    NRPC?
9  A. Yeah, and then the email.
10 Q. And then an email?
11 A. The email that I produce, right?
12   That was the email too, right? I send it to Rachel
13   and I produce, that's the one I refer to.
14    MS. VANLARE: Ms. Hung, I would like to
15   mark this as Exhibit 27.
16    NNI EXHIBIT NO. 27: Document, "Betsy
17    Hung's Response and Objections to
18    Debtors' First Set of Requests for
19    Production of Documents Directed to
20    Members of the Ad Hoc Committee of
21    Canadian Employees Terminated
22    Pre-Petition."
23    BY MS. VANLARE:
24 Q. This is --
25 A. Did I see this before?

Page 48

1    HUNG - CONFIDENTIAL
2  Q. Does this look like the collection
3    of documents that you produced?
4  A. It's the first time for me to see.
5    That's a lot of pages. I don't see anything. Oh,
6    I see. Yeah, okay. So you got my package. There
7    are many things repeated.
8  Q. Ms. Hung --
9  A. Yes.
10 Q. -- so if you see there on the
11   bottom, on the right-hand corner there are numbers,
12   it will say BH and then numbers. Do you see that?
13 A. Yeah.
14 Q. So if you turn to BH13.
15 A. 13.
16 Q. Do you see that?
17 A. Yeah.
18 Q. This is an NRPC newsletter?
19 A. Actually it's --
20    MS. MERSKY: Off the record.
21    -- OFF THE RECORD DISCUSSION --
22    BY MS. VANLARE:
23 Q. So when you mentioned the NRPC
24   newsletter a few minutes ago --
25 A. Not this one.

*IN RE: NORTEL NETWORKS INC., et al*

PAULA KLEIN
*February 11, 2014*
*HIGHLY CONFIDENTIAL*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106218.TXT*
Min-U-Script® with Word Index

Page 101

1    KLEIN - HIGHLY CONFIDENTIAL
2  A. That's okay.
3  Q. But so up until May of 2009, had
4  the LinkedIn group ever sought any advice with
5  respect to whether it had any rights in connection
6  with the U.S. proceedings?
7  A. No. We believed -- it is my
8  recollection that we believed that we only had the
9  right -- that we only -- that the way that we were
10 to file our claims was limited to the Canadian
11 proceedings, that we had a right to file our claims
12 in Canada and we did not believe that we had a
13 right to file anywhere else or take action in any
14 other jurisdiction.
15 Q. When you say "we believed", that
16 was your own personal belief?
17 A. Sorry, yes, I believed, I believed
18 and I believe others shared my view, that the only
19 option we had was to proceed in the Canadian
20 proceedings.
21 Q. And my question was did you ever
22 ask anybody, any U.S. lawyer whether you had rights
23 with respect to the U.S.?
24 A. Never asked a U.S. lawyer.
25 Q. And Nelligan was always clear to

Page 102

1    KLEIN - HIGHLY CONFIDENTIAL
2  you that their advice was only with respect to the
3  Canadian proceedings; correct?
4  A. I don't know that that was ever
5  explicitly stated, but it was certainly implied.
6  Q. Okay, and that was your perception
7  as well?
8  A. Yes.
9  Q. Now, there came a time later in
10 2009 when you learned that there was a bar date in
11 the United States; correct?
12 A. Correct.
13 Q. And you learned that what, around
14 July or so of 2009? Best recollection.
15 A. I don't know when it was, but I do
16 know it would have been very quickly after it was
17 made public.
18 Q. And in fact, there were
19 discussions within the LinkedIn group on the board
20 letting people know in case it affected them that
21 there was a U.S. bar date, right?
22 A. Yes.
23 Q. Would you say that that was fairly
24 well publicized among the LinkedIn group members
25 that the U.S. bar date issue was -- that there was

Page 103

1    KLEIN - HIGHLY CONFIDENTIAL
2  a U.S. bar date?
3  A. Yes.
4  Q. Now, with respect to the U.S. bar
5  date, it was your understanding that it only
6  applied to people who had claims against Nortel
7  U.S.; correct?
8  A. Yes.
9  Q. And that is something that you
10 also publicized on the LinkedIn group, that if you
11 have claims against the U.S., there is a U.S. bar
12 date; correct?
13 A. Yes.
14 Q. Now, at this point in time that
15 the bar date was established, Koskie Minsky was
16 formally the representative of the group?
17 A. I believe so.
18 Q. Okay. Who were your contacts at
19 Koskie Minsky at this time?
20 A. Susan Philpott, Mark Zigler and
21 Andrea McKinnon. I can't remember when Andrea
22 joined. It was primarily Ms. Philpott.
23 Q. And when you were working with
24 Nelligan, you said that people had signed a form
25 noting that you and I think Ms. Read would be kind

Page 104

1    KLEIN - HIGHLY CONFIDENTIAL
2  of the point people. Was there any kind of
3  steering committee formed of the recently severed
4  employees to work with Koskie Minsky?
5  A. No.
6  Q. Did you have direct interactions
7  with Koskie Minsky. And let's talk about the
8  period from May of 2009, let's say, to November of
9  2009.
10 A. Okay.
11 Q. Did you have any direct
12 interactions with them?
13 A. Yes.
14 Q. Could you describe your
15 interactions?
16 A. So after the representation order
17 was given to Koskie Minsky, I met with Don Sproule
18 and John Chatterly -- and I am trying to just think
19 whether there was anybody else at that meeting, I
20 think it was just the two of them -- to discuss how
21 I would be -- how I could get involved with the
22 NRPC so that there could be an orderly transition
23 of the LinkedIn group people like the RSCNE to the
24 infrastructure that was forming with the NRPC, so
25 that the terminated people could be well

*In Re:*
*NORTEL NETWORKS INC., et al*

*JANE LONGCHAMPS*
*February 12, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106219A.TXT*
*Min-U-Script® with Word Index*

Page 57

LONGCHAMPS - CONFIDENTIAL

potentially UK)? Is there a legal, binding tie between the two?"

And Paula writes her name in brackets indicating that this is her response to the question:

"Ainslie indicated they are separate processes and that from an Employment Law perspective they are very different."

Q. So was this your understanding at the time that the process in the United States for the bankruptcy was going to be separate and different from the process in Canada?

A. No, I wouldn't say that.

Q. What would you say?

A. I wouldn't say that I knew that they were completely separate processes. I thought that the process in Canada was that there was somebody represented to represent our interests as they related to Nortel globally.

So I just don't know that I would agree with the word "separate". I would have thought there was some talking or communication between the two.

Page 58

LONGCHAMPS - CONFIDENTIAL

Q. So you think when you reviewed this document and saw that Ainslie Benedict said that they were separate processes, that you would have disagreed with that?

A. I don't think I would have really noticed it, or it would have really clued into me.

Q. Were you aware that there were bankruptcy proceedings going on in the United States?

A. Yes.

Q. I'm going to hand you what has been previously marked as Exhibit 48. And I'll represent to you that this is one of the documents that you included in your production to us, but we have previously marked it as an exhibit so that is why we are using this copy.

So is this something that you received in the mail?

A. I think I received it in the mail with the Ernst & Young letter, but I'm not exactly sure if the two were together or not.

Q. And it states at the top of this notice, it says:

"Please take notice that on

Page 59

LONGCHAMPS - CONFIDENTIAL

January 14, 2009, Ernst & Young Inc., the court-appointed monitor and authorized foreign representative of Nortel Networks Corporation and certain of its direct and indirect subsidiaries [...]"

And then it lists several of the subsidiaries and defines them as the Canadian Nortel Group.

And this document refers at the bottom to the Honorable Kevin Gross of the United States Bankruptcy Court and provides information on the United States bankruptcy proceedings.

So as you said, you understood at the time that there were bankruptcy proceedings happening in the United States?

A. Yes.

Q. And this notice, which is addressed at the very top from the Bankruptcy Court from the District of Delaware, is a notice pertaining to those United States bankruptcy proceedings?

A. I'm sorry, I don't understand the

Page 60

LONGCHAMPS - CONFIDENTIAL

question.

Q. Well, this refers to the bankruptcy proceedings that were going on in the United States?

A. Yes, it references those.

Q. If you just look at the second page, the last paragraph says:

"Copies of the Chapter 15 Petitions and other filings in this case are available [...]"

And it mentions a few different locations where they are available. Number one says on the Bankruptcy Court's electronic filing system, and number two, from the Monitor through its website, and number three, upon written request to the Monitor's counsel.

Did you ever try to access any of those resources to see what was happening in the United States bankruptcy proceeding?

A. It is highly unlikely.

Q. Why do you say that?

A. Because this document was fairly technical legally, I guess, so what I understood this to mean was that our Monitor was working with