# Exhibit "G"

Case 09-10138-MFW   Doc 13240-7   Filed 03/27/14   Page 2 of 14

*In Re:*
*NORTEL NETWORKS INC., et al*

*ERNIE BRIARD*
*February 4, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106213B.TXT*
*Min-U-Script® with Word Index*

Case 09-10138-MFW   Doc 13240-7   Filed 03/27/14   Page 3 of 14

In Re:
NORTEL NETWORKS INC., et al

Confidential

ERNIE BRIARD
February 4, 2014

Page 85

1 BRIARD - CONFIDENTIAL
2 that you have got pension claims in the United
3 States; fair to say?
4 A. Fair to say.
5 Q. So you want to make sure to know
6 how to protect your rights?
7 A. Correct.
8 Q. So how did you figure out how to
9 get the claim form and file the claim?
10 A. My recollection -- I've been
11 trying to figure out how did I know to do that. I
12 believe, my recall, is that somebody told me about
13 you go on the U.S., it's completely different than
14 Canada, you go on the website and get these forms.
15 I said okay, good, I found the website, went on the
16 website, downloaded the forms, filled out the
17 forms. That's how it worked.
18 Q. So --
19 A. You know, nobody really told me
20 about any of that, but I knew I had to protect my
21 U.S. pension at the time, that's what I knew. And
22 at the time I was told that any -- if you worked in
23 Canada, you don't -- you're not allowed to make a
24 claim for your severance in the U.S., you have to
25 make your severance claim in Canada.

Page 86

1 BRIARD - CONFIDENTIAL
2 Q. Who told you that?
3 A. And that would be looked after.
4 That was -- I don't know exactly who told me that,
5 but I believe -- and subsequently I believe I saw
6 it in writing that you can't do that. I believe I
7 saw it in writing on -- help me, Rachel, with the
8 document you showed me the other day that was --
9 you asked me if I'd seen it before, that's the one
10 that confirmed the bar date, I think it's called in
11 the U.S., the date for the -- you know, to confirm
12 that you make sure you have all your claims in by
13 such-and-such a date, that document confirmed it to
14 me.
15 So whoever told me when I -- everything
16 that I've read, which includes that piece of paper,
17 confirmed to my mind that my severance -- I'm not,
18 I can't, they're telling me not to put -- I even
19 called E&Y, the Monitor, at some stage, the E&Y
20 1-800 number. I did everything possible to make
21 sure that everything that I had to claim for, I
22 could claim for.
23 And my understanding at the time was
24 that, which now I'm finding is wrong, was that
25 severance, if you have a Canadian claim for

Page 87

1 BRIARD - CONFIDENTIAL
2 severance, you can't put that in the U.S., and I'll
3 read to you where the document from the U.S. said
4 exactly that.
5 Q. Okay. There is a lot to ask you
6 about. I appreciate the length of your response
7 because it gives me things that I can kind of ask
8 you in smaller bits and pieces to better
9 understand.
10 So at some point in time you downloaded
11 the Proof of Claim form?
12 A. Yes.
13 Q. You don't remember how exactly you
14 found out where and how to do that, but you found
15 your way there?
16 A. Yes.
17 Q. And did you actually get notice
18 from the U.S. Debtors of the U.S. bar date? Or is
19 that something that you heard through other people?
20 A. I heard through other people. I
21 subsequently have seen it, whatnot. I can't recall
22 receiving it exactly, but everything I did get I
23 followed exactly what they said. And now that I
24 saw it the other day, that Rachel showed it to me,
25 I read it thoroughly and said this makes sense to

Page 88

1 BRIARD - CONFIDENTIAL
2 me because I would have read this and said tick,
3 I've got my claim for my pension, I turn the page
4 and I'd say click, I can't claim my severance in
5 the U.S. so I'm comfortable now.
6 Q. I'd like to break things up a
7 little bit between the things that you heard and
8 read before September 29th, 2009, the date of your
9 Proof of Claim, and things that you read or heard
10 afterwards, even to the extent that it might have
11 confirmed things that you did before, and we'll
12 talk about both because I want to get a sense of
13 everything.
14 But I'd like to just, for purposes of
15 these questions, kind of have a division between
16 the two. And first of all let's just talk about
17 leading up to September 29th, 2009.
18 So prior to you filing this had you
19 gotten a notification from the U.S. about the bar
20 date?
21 A. No, I don't believe so.
22 Q. And so prior to you filing the
23 Proof of Claim, somewhere you had learned that
24 there was this bar date by which you had to file
25 the claim in the United States, right?

Case 09-10138-MFW   Doc 13240-7   Filed 03/27/14   Page 4 of 14

In Re:
NORTEL NETWORKS INC., et al
Confidential
ERNIE BRIARD
February 4, 2014

Page 125

1      BRIARD - CONFIDENTIAL
2  Ernst & Young between September 29th of 2009 and
3  January of 2013 about the propriety of filing
4  claims for severance in the United States?
5  A. No. Where I heard about it was
6  from the NRPC flag that said if you have got this,
7  you've got a claim.
8  Q. I'm just trying to kind of close
9  the loop and get a sense of your knowledge.
10 A. No.
11 Q. So between September of 2009 and
12 January of 2013 you hadn't heard anything one way
13 or the other further from Ernst & Young about the
14 propriety of filing claims in the United States.
15    What about from other members of the
16 LinkedIn group, between September of 2009 and
17 January, when you got the NRPC letter, had you
18 heard anything further from members of the group
19 about the propriety of filing claims in the United
20 States?
21 A. No, I don't recall having any of
22 those -- knowledge of any of that. As I mentioned
23 earlier, I was not on a lot and I would have
24 discarded a lot of that as just a bunch of chatter
25 anyway. It was the NRPC that confirmed it to me

Page 126

1      BRIARD - CONFIDENTIAL
2  because it came from a reliable source.
3  Q. Had you heard anything from any
4  NRPC members prior to January 2013 indicating where
5  you could and could not file your claims?
6  A. No, I don't recall that.
7  Q. Had you heard anything from Koskie
8  Minsky prior to January of 2013 about where you
9  could or could not file your claims?
10 A. No.
11 Q. Had you heard anything between
12 September of 2009 and January of 2013 from any
13 other source about where you could or could not
14 file your claims, up until the NRPC letter?
15 A. Other than what we already went
16 over.
17 Q. Other than the stuff you spoke of
18 from the pre-September period?
19 A. Well, no, no, in that period of
20 time too there was always the confirmation through
21 all the sources that you're Canadian, file in
22 Canada.
23 Q. So let me ask this question.
24 We've covered the pre-September 2009 period.
25 A. Right.

Page 127

1      BRIARD - CONFIDENTIAL
2  Q. And then in January of 2013 you
3  get the letter from the NRPC?
4  A. Right.
5  Q. So now I'm going to focus just on
6  the period between September 2009 and prior to the
7  NRPC letter, so for all these questions it's going
8  to be from September 2009 to January 2013.
9  A. Sure.
10 Q. During that period of time did you
11 hear anything further from Ernst & Young about
12 where you could or could not file your claims?
13 A. No, nothing further. Nothing to
14 change the knowledge I had of how the process works
15 and how I should file.
16 Q. Well, I'm wondering either change
17 or confirm, had you gotten any new information?
18 A. No.
19 Q. Positively or negatively?
20 A. No, no, I got no new information.
21 The first point was the NRPC telling me.
22 Q. When you say new information, I'm
23 also saying further information.
24 A. Further, okay.
25 Q. Either confirming or rejecting

Page 128

1      BRIARD - CONFIDENTIAL
2  what --
3  A. No, I don't recall any of that. I
4  recall lots of chatter about the whole claims
5  process.
6  Q. Okay.
7  A. And I was not -- I didn't get into
8  any of the detail because I knew that eventually
9  when the chatter would dissipate the truth would
10 come up and we would find -- you know, if there is
11 a change, then we would go and make a change.
12 Q. And I just want to break down the
13 chatter to see what it was and what we could learn
14 about it. So we've covered the U.S. Debtors
15 before, we just covered Ernst & Young. Koskie
16 Minsky, any information from September 2009 to
17 January 2013 one way or the other about where you
18 could file your claims?
19 A. No. Again, other than a Canadian
20 claim confirmation that I received, I don't know
21 what date that was, maybe that was in that period,
22 I'm not sure, but that part confirmed to me that
23 that's the claim and it's all happening through the
24 Koskie Minsky process.
25 Q. Okay. So one further fact that

*In Re:*
*NORTEL NETWORKS INC., et al*

*CHRIS BUCHANAN*
*February 13, 2014*
*Confidential*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106220.TXT*
*Min-U-Script® with Word Index*

Case 09-10138-MFW   Doc 13240-7   Filed 03/27/14   Page 6 of 14

In Re:
NORTEL NETWORKS INC., et al

Confidential

CHRIS BUCHANAN
February 13, 2014

Page 113

1    BUCHANAN - CONFIDENTIAL
2  A.  Yes.
3  Q.  And were you asking specifically
4  at that time whether there was a process in place
5  to file claims in the CCAA proceedings?
6  A.  It wasn't in the context of CCAA.
7  I think it is exactly as I put here, is we were
8  told, you know, we would have to wait until they
9  told us what the process was, and this is now by --
10 this is now over six months and we still haven't
11 been told what the process is.
12    So that is the -- and as far as I was
13 concerned, I saw Nortel as one company and it is --
14 we are creditors of Nortel.
15 Q.  Lower down in another post from
16 you of the same date you write:
17    "As I understand it U.S. creditors
18    submitted their claims months ago!"
19    Do you see that?
20 A.  Yes.
21 Q.  Do you recall how you came to
22 learn that U.S. creditors submitted their claims
23 months ago?
24 A.  Again, that would be through an
25 information session.

Page 114

1    BUCHANAN - CONFIDENTIAL
2  Q.  At the time that you wrote this
3  post, do you recall whether you believed that the
4  deadline had already passed for U.S. claims to be
5  filed in the U.S. court?
6  A.  No, I don't recall.
7  Q.  You can set that one aside, and
8  Exhibit 10 is where I am going to go next.
9    Mr. Buchanan, I have handed you what we
10 have previously marked as Exhibit 10.  It is
11 another LinkedIn thread.  And just to orient you,
12 from the very first posting you will see that it is
13 dated June the 3rd of 2010.
14 A.  Uhm-hmm.  Just give me a second.
15 Q.  Yes, of course.
16 A.  (Witness Reviews Document.)
17    This -- sorry, my eyes water because of
18 the surgery, and if it starts watering a lot, I
19 can't read properly.
20 Q.  Do you need to take a break?
21 A.  No, I'm fine.  Just every now and
22 then --
23 Q.  Sure.
24 A.  And then this photocopy is not
25 perfect.  Not blaming anybody --

Page 115

1    BUCHANAN - CONFIDENTIAL
2  Q.  To say the least.
3  A.  (Witness Reviews Document.)
4    Okay, go ahead.
5  Q.  You will see on the second page of
6  the document that you weigh into the conversation
7  with the posting on June the 5th of 2010; do you
8  see that?
9  A.  Yes.
10 Q.  And on that same page, there is a
11 posting by Paul Roddick?
12 A.  Yeah.
13 Q.  And Mr. Roddick writes:
14    "It's very difficult to understand
15    why the Cdn process is a year+
16    later.  It makes us nervous, and
17    nothing that's been said (e.g. KM
18    can only work 1 thing at a time)
19    relieves this."
20    And you respond in the next post:
21    "Exactly."
22    Do you see that?
23 A.  Yeah.
24 Q.  And then you write in part:
25    "[...] KM are under-funded to

Page 116

1    BUCHANAN - CONFIDENTIAL
2  adequately represent us."
3  A.  Yes.
4  Q.  "It was OK to pay maybe $400
5    million in bonuses - but we are NOT
6    adequately represented."
7    Why, sir, did you believe at around
8  this time, June of 2010, that you were not
9  adequately represented by KM?
10 A.  So, yeah, I need to explain the
11 theme that was going through here.  So remember,
12 again, this is the LinkedIn group specifically
13 representing severed -- why do they call it severed
14 employees?  It sounds like your head is being
15 chopped off.  But recently severed employees, and
16 by this time, of course, it wasn't recently either.
17    But the issue was that KM were hired,
18 or whatever, to represent all Nortel Canada
19 Canadian employees, but they were representing
20 everybody.  So I made this reference earlier, so
21 they had -- and somebody may know the numbers --
22 20-odd-thousand, 25,000 retirees, and a much
23 smaller number for us.  So the concern I was
24 actually reflecting here was that KM were spending
25 a lot of time on processing these many thousands,

*In Re:*
*NORTEL NETWORKS INC., et al*

*MICHAEL CAMPBELL*
*February 6, 2014*
*Confidential*



126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106215.TXT*
*Min-U-Script® with Word Index*

Case 09-10138-MFW    Doc 13240-7    Filed 03/27/14    Page 8 of 14

In Re:
NORTEL NETWORKS INC., et al
Confidential
MICHAEL CAMPBELL
February 6, 2014

Page 185

1      CAMPBELL - CONFIDENTIAL
2  little more about the document that I don't have,
3  if you don't mind.
4  A.  Sure.
5  Q.  Do you recall if there were any
6  other people on that email other than you and
7  Ms. Klein?
8  A.  Yes, I believe my lawyers were on
9  that email.
10 Q.  Okay.  And --
11 A.  Sorry, Koskie Minsky was on the
12 email.
13      MS. MERSKY:  For the record, you may
14 want to look at the privileged log to ascertain if
15 that is an email that was -- there were specific
16 documents identified as privileged, that privilege
17 would be between Paula Klein, Mr. Campbell and
18 Koskie Minsky.
19      To the extent that that was produced to
20 me, I don't know for certain because I haven't got
21 it in front of me, it may be in the privileged log,
22 and to the extent it was a privileged communication
23 between counsel, it is identified as such.
24      BY MR. QURESHI:
25 Q.  In November of 2009 what did you

Page 186

1      CAMPBELL - CONFIDENTIAL
2  understand Ms. Klein's role to be in connection
3  with Nortel?
4  A.  Paula was an ex -- a very smart,
5  very knowledgeable Nortel employee that I had known
6  over the years.  She undertook single-handedly the
7  set-up of the LinkedIn, the group that we joined,
8  and she was assisting me in my role as court-
9  appointed representative with issues of the
10 terminated employees specifically because we were
11 both in that class.
12 Q.  Did you understand Koskie Minsky
13 to be representing Ms. Klein at any point in time?
14 A.  Ms. Klein was a former employee of
15 Nortel with a claim against the estate.  My view
16 was that she was represented by Koskie Minsky as
17 the rest of our group was.
18 Q.  Okay.  Do you now have -- strike
19 that.
20      Do you know why in this email
21 communication that you have described from Ms.
22 Klein she was informing you that a bar date had
23 been set in the U.S. of September 30th of 2009?
24 A.  I recall that she said that there
25 was -- the reason why I received the email was

Page 187

1      CAMPBELL - CONFIDENTIAL
2  there is an extension to the bar date.  I didn't
3  understand why the extension was there.  I later
4  found that it was for a different class of claims.
5  Q.  Okay.
6  A.  That's the entire content of the
7  email.
8  Q.  Do you know why Ms. Klein would
9  have been writing to you concerning extensions of a
10 bar date in the U.S.?
11 A.  I believe she put a query into
12 Koskie Minsky about a piece of information she had
13 received.
14 Q.  Upon learning in that email
15 exchange with Ms. Klein that a bar date had been
16 set in the U.S. of September 30th of 2009, did you,
17 on your personal behalf, take any steps to
18 investigate the possibility of whether you
19 personally should be seeking to file a claim in the
20 U.S.?
21 A.  So there were two items.  One was
22 that it was after the claim date.  The second one
23 was that at that time I had no knowledge that I had
24 any basis for a claim in the U.S.
25 Q.  Can I assume therefore that you

Page 188

1      CAMPBELL - CONFIDENTIAL
2  took no steps to investigate whether you should
3  seek to file a claim in the U.S. at that time?
4  A.  I took no steps at that point in
5  time because I was given advice by my counsel that
6  none was needed.
7  Q.  Okay.  And would that also hold
8  true in your capacity as the representative; that
9  is that as representative you took no steps at that
10 time to investigate the question of whether any
11 action should be taken on behalf of former
12 employees in Canada to pursue claims in the United
13 States?
14 A.  My counsel advised me that action
15 was not required.
16 Q.  And therefore none was taken?
17 A.  Yes.
18 Q.  My apologies, another LinkedIn.
19 A.  Number 13?
20 Q.  Yes, Mr. Campbell, I've handed you
21 what's been marked as Exhibit 13, it's another
22 LinkedIn thread.  If you look at the top posting it
23 reads, "Claims in the U.S. court - some people
24 received a letter."  That's a posting from Ms.
25 Klein and you will see the date to be November 25th

*IN RE: NORTEL NETWORKS INC., et al*

*PAULA KLEIN*
*February 11, 2014*
*HIGHLY CONFIDENTIAL*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106218.TXT*
*Min-U-Script® with Word Index*

Page 121

1  KLEIN - HIGHLY CONFIDENTIAL
2  2012. That was repeated by Koskie Minsky and that
3  was also conveyed to us by Nelligan O'Brien Payne
4  at the very outset of the CCAA filing as well, that
5  because we were Canadian employees, there was to be
6  a claims process in Canada and we were to file in
7  Canada, unless we had explicit claims in the U.S.
8  MR. ROSENTHAL: Okay, probably a good
9  time for a break, if that is good with you.
10  MS. MERSKY: Do you want to do lunch
11  now?
12  MR. ROSENTHAL: I thought it was a
13  little early for lunch.
14  (DISCUSSION OFF THE RECORD.)
15  -- RECESSED AT 11:48 P.M.
16  -- RESUMED AT 11:56 A.M.
17  BY MR. ROSENTHAL:
18  Q. Why don't we give you what has
19  been marked as Exhibit 39. Ms. Klein, just before
20  the break, you said that you had believed from what
21  was said by Koskie Minsky and from the bar date
22  notice that you were only supposed to file claims
23  in Canada?
24  A. Yes.
25  Q. I think those were the two things

Page 122

1  KLEIN - HIGHLY CONFIDENTIAL
2  you cited. I don't remember if there was a third
3  because I don't have the transcript here. But I'm
4  showing you Exhibit 39 which is a copy of the U.S.
5  bar date notice that was published in The Globe and
6  Mail.
7  A. Yes.
8  Q. In 2009 did you ever see Exhibit
9  39?
10  A. In The Globe and Mail?
11  Q. Well, let's start out with in The
12  Globe and Mail?
13  A. No, I don't read The Globe and
14  Mail.
15  Q. Okay. Did you ever see it in any
16  other publication?
17  A. I don't recall reading it in any
18  publication.
19  Q. Do you recall going to the Epiq
20  website for the U.S. and seeing the bar date
21  notice?
22  A. Yes.
23  Q. And you did that in 2009?
24  A. Yes.
25  Q. Prior to the bar date itself?

Page 123

1  KLEIN - HIGHLY CONFIDENTIAL
2  A. Yes.
3  Q. And you read it?
4  A. Yes.
5  Q. And did you understand it at the
6  time?
7  A. Not all of it, no.
8  Q. Did you talk to Koskie Minsky
9  about it afterwards?
10  A. I don't remember.
11  Q. And I realize that this is -- the
12  print is a little small on here. I presume the
13  print in the version that you looked at on the web
14  was a little bit easier to read?
15  A. I remember seeing not this. It
16  wasn't in this format. What I saw was a document
17  that looked more like those -- it looked more like
18  one of these documents.
19  Q. It had a court caption?
20  A. Yes.
21  Q. Okay, and when you said it looked
22  like "these", you were referring to Exhibit 78?
23  A. Yes.
24  Q. But Exhibit 78 is a Canadian
25  caption.

Page 124

1  KLEIN - HIGHLY CONFIDENTIAL
2  A. It is a Canadian one, but a U.S.
3  version.
4  Q. So it had a U.S. caption and it
5  said "Notice of Bar Date", or something like that?
6  A. Yeah, I can't remember exactly,
7  but it was the announcement of the fact that there
8  was a bar date and instructions on what to do if
9  you had a claim and so forth.
10  Q. And is that something that when
11  you read that off the U.S. website that you
12  informed people by posting to LinkedIn?
13  A. I can't remember if I did.
14  Q. And when you read that, you
15  understood that if you had a claim against Nortel
16  U.S., you needed to file that by the bar date;
17  correct?
18  A. Yes.
19  Q. And you understood that from
20  reading it, I believe you said just before the
21  break that the bar date notice informed you that
22  claims against Nortel Canada should not be filed in
23  the U.S.; correct?
24  A. What I remember reading was a
25  statement in that document that said if you have a

Page 125

KLEIN - HIGHLY CONFIDENTIAL

claim in Canada against the Canadian Debtors, that you are to file that claim in Canada and only in Canada. And therefore, I assumed that because we had a claim in Canada, we were to file it in Canada and only in Canada and we didn't have to file it in the U.S., and that was -- and that explanation or, you know, the advice that we only needed to file in Canada was given -- was also given to me by Koskie Minsky.

Q. I am going to give you a document that will be much more easy to read. Why don't we mark as Exhibit 82 -- was it marked already? Okay, 82, and we'll give you the document. It has got an Ontario caption that says "Order (Recognition of the U.S. Claims Bar Order)", dated August 14, 2009 and it attaches a document with the U.S. caption that says "Order Establishing Deadlines for Filing Proofs of Claim".

**NNI EXHIBIT NO. 82:** "Order (Recognition of the U.S. Claims Bar Order)", dated August 14, 2009, attaching a document with the U.S. caption that says "Order Establishing Deadlines For Filing Proofs of Claim".

Page 126

KLEIN - HIGHLY CONFIDENTIAL
BY MR. ROSENTHAL:
Q. So I'm going to direct you if you look to Schedule B of this document, because I'll represent to you that the cover, the first few pages are from a Canadian filing, but Schedule B on the next page is "Order establishing deadlines for filing proofs of claim"; do you see that? Is that the document that you saw on the Epiq website?
A. No.
Q. Do you remember what it was that you saw on the Epiq website?
A. I don't think this is the document, because the one I saw wasn't an order. It wasn't an order establishing. It was a motion. Does that -- is that correct terminology?
Q. Yes, well, typically you file a motion to get a court order, so --
A. So I don't remember ever reading the order. I remember reading the motion.
Q. The request for the order?
A. Well, I guess so.
Q. Okay.
A. I guess that is what that is.
Q. But if we could look at the order

Page 127

KLEIN - HIGHLY CONFIDENTIAL
itself. So the order you don't recall seeing?
A. I don't recall reading this one, no.
Q. Okay, if you could look in the order and turn to paragraph 4 -- or 3 and 4, and 3 says:
"Subject to paragraph 21 of this Order, all claims against the Debtors", and it is defined as the U.S. Debtors, "shall be filed in, and only in, these chapter 11 cases with the Claims Agent", and that is defined herein, "in accordance with the procedures set forth in this Order."
And paragraph 4 says:
"Subject to paragraph 21 of this Order, all claims against the Canadian Debtors shall be filed in, and only in, the Canadian Proceedings with the court-appointed Monitor pursuant to the procedures approved by the Canadian Court."
Does that accurately summarize what

Page 128

KLEIN - HIGHLY CONFIDENTIAL
your understanding was at the time when you reviewed the U.S. motion?
A. I don't know. I don't understand what that means. This is the first time I'm reading this document.
Q. Okay.
A. So I don't understand what that means. I have never seen this document.
Q. Okay, so let's put the document aside then. Is it your understanding from whatever the document that you read was that it said that claims against the Canadian Debtors shall only be filed in the Canadian proceedings?
A. No. I understood it to say that if you have a claim in the Canadian proceedings, if you have a claim against the Canadian estate, then you file it only in -- if I have a claim against one of the Canadian Debtors, then we are to file it in and only in a Canadian court.
Q. And you understood that to be you file your claim against the Canadian Debtors only in the Canadian court; correct?
A. Say that again.
Q. Well, you understood that to be

*In Re:*
*NORTEL NETWORKS INC., et al*

*JANE LONGCHAMPS*
*February 12, 2014*
*Confidential*



**126 East 56th Street, Fifth Floor New York, New York 10022**
**PHONE: (212) 750-6434   FAX: (212) 750-1097**
**www.ELLENGRAUER.com**

*Original File 106219A.TXT*
*Min-U-Script® with Word Index*

Case 09-10138-MFW    Doc 13240-7    Filed 03/27/14    Page 13 of 14

In Re:
NORTEL NETWORKS INC., et al

Confidential

JANE LONGCHAMPS
February 12, 2014

Page 49

1     LONGCHAMPS - CONFIDENTIAL
2  bit about the commuted value of the pensions.
3  There was some delay with the people who held our
4  pension.  They weren't -- they were supposed to
5  provide you with your letter of your value of your
6  pension or something at a certain number of days
7  after termination, and they were not doing that,
8  and therefore, they were not holding up their legal
9  requirements in terms of notification and allowing
10 us to claim.
11     So I think that there -- I don't know
12 if there was something there on that or if it was
13 through a friend that I found that out.
14     I think I mentioned before I was really
15 concerned about getting my commuted value of the
16 pension out before the next actuarial valuation
17 took the value down.
18 Q.  So you were interested in
19 conversations that would have related to the
20 commuted value of pensions?
21 A.  Yes.
22 Q.  Were there other topics that you
23 would have been more interested in?
24 A.  I was at the time quite concerned
25 about what was happening with the unfunded pension

Page 50

1     LONGCHAMPS - CONFIDENTIAL
2  plan, the unfunded portion of the pension plan, and
3  the fact that it wasn't considered part of, I
4  guess, a bankruptcy creditor.
5     So I guess I was concerned a little bit
6  legally -- or not legally, but legislatively on how
7  the bankruptcy lineup was set up with employees at
8  the bottom.
9  Q.  Did the topics that most
10 interested you on LinkedIn change over time, or did
11 they stay pretty focused on the commuted value of
12 pension and what was happening with the unfunded
13 pension plan?
14 A.  I would say those got dismissed
15 pretty quickly once I got my money out, which -- or
16 my claim in for the pension, which would have been
17 in March/April, my interest in that died down.
18     It was obvious that I wasn't going to
19 change the bankruptcy laws, so that died down as
20 well.
21     My focus then was what action do I need
22 to take, so watching for advice on when we were to
23 claim, when we were supposed to do something.
24 Q.  Were there particular people who
25 were members of the LinkedIn group whose posts you

Page 51

1     LONGCHAMPS - CONFIDENTIAL
2  paid more attention to than others?
3  A.  Definitely Paula's.
4  Q.  Why Paula's?
5  A.  She was credible, factual,
6  well-informed and did not get involved in what-if,
7  you know, or how things should be as opposed to how
8  they were.  So she was probably the key person.
9  Q.  So in 2009, if you received an
10 email notification that Paula Klein had posted a
11 topic that might have information about what you
12 needed to do in the bankruptcy, that would have
13 been something that would interest you?
14 A.  I would be more likely to look at
15 it, yes.
16 Q.  Would you typically post comments
17 when you were on the LinkedIn site?
18 A.  Rarely, unless there was something
19 where I thought I could add value.  I wasn't
20 interested in, again, hypothesizing or talking
21 about what should happen.
22 Q.  So it would have been common for
23 you to have read a conversation but not have
24 contributed anything yourself?
25 A.  Yes.

Page 52

1     LONGCHAMPS - CONFIDENTIAL
2  Q.  Were you relying principally on
3  LinkedIn to learn about developments on the legal
4  side of your claim, or did you seek out information
5  that came more directly from your attorneys?
6  A.  What do you mean by "more
7  directly"?  Email, or --
8  Q.  Was LinkedIn the primary source of
9  information that you relied on for what was
10 happening legally in your representation?
11 A.  It was certainly very key.  If I
12 received a notification, like, if I received a
13 letter, I would certainly focus on that.  So
14 anything that came to me directly I would focus on,
15 but it was the key source of information.
16 Q.  Do you recall whether information
17 was being sent to you directly from Koskie Minsky
18 after they were appointed?
19 A.  I don't -- it is hard for me,
20 because I produced everything here, it is hard for
21 me to remember what was electronic and what was
22 paper.
23     But I do remember on occasion going
24 back and looking at things, saying am I supposed to
25 do something?  And I would go back and it says, you

Case 09-10138-MFW    Doc 13240-7    Filed 03/27/14    Page 14 of 14

In Re:
NORTEL NETWORKS INC., et al
Confidential
JANE LONGCHAMPS
February 12, 2014

Page 53

1    LONGCHAMPS - CONFIDENTIAL
2    know, do not do anything at this time.
3        And I seem to remember looking at more
4    than one document, but -- so I'm assuming that
5    maybe Koskie sent something saying there is nothing
6    to do at this time. I'm not sure which of the
7    documents that would have been.
8  Q.  Okay. Well, we'll look through
9    more of your production later this morning.
10       When you were listing sources of
11   information that you relied on in 2009 for
12   information about Nortel's bankruptcy proceedings,
13   one of the things that you mentioned was friends.
14 A.  Uhm-hmm.
15 Q.  Was there anyone in particular
16   that you were referring to?
17 A.  Joanne Read is a very close friend
18   of mine. She was terminated, I think -- I'm
19   guessing January 10th. She was very -- she was
20   more tightly linked to senior circles, I guess I
21   would say.
22       So she was the one that had told me
23   that she thought that they might be going into
24   bankruptcy and concerns about the pension, commuted
25   values. We had similar interests. She also was

Page 54

1    LONGCHAMPS - CONFIDENTIAL
2    trying to get her money out, so yes, she would be
3    the primary one.
4  Q.  Is Ms. Read someone with whom you
5    maintained contact during the process of filing
6    claims in the Canadian bankruptcy proceeding?
7  A.  More socially.
8  Q.  Would you and Ms. Read ever
9    communicate about what was happening with your
10   claims here in Canada?
11 A.  I would sometimes call her and
12   say, are we supposed to do anything? Have you
13   heard anything yet? That kind of thing. But that
14   is about it.
15 Q.  Is Ms. Read a member of the Ad Hoc
16   Group, to your knowledge?
17 A.  I think she is, but I'm not -- I
18   think she is, yes.
19 Q.  Have you and she spoken at all
20   about the process of seeking to file claims in the
21   United States?
22 A.  She is really busy, so when we get
23   together, we don't usually talk about this. I
24   might have mentioned to her that I was being
25   deposed, but --

Page 55

1    LONGCHAMPS - CONFIDENTIAL
2    MS. MERSKY: Michelle, when you are
3    ready to take a break.
4    MS. PARTHUM: I think we can go ahead
5    and take a break right now, actually.
6        -- RECESSED AT 11:05 A.M.
7        -- RESUMED AT 11:10 A.M.
8    BY MS. PARTHUM:
9  Q.  I'm going to hand you what has
10   been previously marked as Exhibit 67.
11       This is an email from Pierre Pierre
12   Blais dated Friday, January 16th, 2009, sent to a
13   large group of people.
14       And if you look at the final email
15   address in that list, it says
16   "longchampsfamily@sympatico.ca"; is that your email
17   address?
18 A.  It is.
19 Q.  And he refers to an email sent by
20   Paula Klein, which if you look at the very bottom
21   of the page, you see that this is forwarding an
22   email sent by Paula Klein.
23       And if you flip over to the second
24   page, again, at the base of that list of emails,
25   the last one is your email address.

Page 56

1    LONGCHAMPS - CONFIDENTIAL
2  A.  Okay.
3  Q.  And the notes that Paula Klein
4    sent, it says in bold lettering "Notes From My
5    Legal Meeting on January 16, 2009, with Ainslie
6    Benedict of Nelligan, O'Brien & Payne".
7        Is this an email at the time that you
8    think would have been of interest to you?
9  A.  Yes.
10 Q.  Was the period of time that you
11   were considering which law firm you were interested
12   in retaining to represent you with respect to your
13   severance and pension claims?
14 A.  Yes.
15 Q.  Do you think that you would have
16   read through the notes that Ms. Klein forwarded to
17   you?
18 A.  Yes.
19 Q.  If you look at the page, there is
20   a number 6 in the middle at the bottom, and
21   question number 33, it is about halfway through the
22   page, says:
23       "How does the Bankruptcy
24       Protection process in Canada relate
25       to the one in the USA (and