# Exhibit "I"

*In Re:*
*NORTEL NETWORKS INC., et al*

CHRIS BUCHANAN
February 13, 2014
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106220.TXT*
Min-U-Script® with Word Index

Page 25

1  BUCHANAN - CONFIDENTIAL
2  effectively with the same group and my jobs just
3  changed as I went along.
4  Q.  And when you say "the same group",
5  what group was that?
6  A.  Small Business Systems.
7  Q.  Small Business Systems, and so --
8  A.  So we would do phone systems for
9  small businesses, and it started off as phone
10 systems and then it developed to applications like
11 voicemail and then it evolved to adding data, wifi
12 kind of stuff.
13 Q.  And was this a technology
14 position, for lack of a better description?
15 A.  The first, '92 to about '98 were
16 straight technology, software development, managing
17 a team, and then from that my role evolved more
18 into product strategy, working with third parties,
19 and so I evolved, you know, working with Asian
20 companies, stuff like that, working with other
21 parts in Nortel.
22 Q.  At the time you left Nortel, what
23 was your title?
24 A.  Portfolio Strategy Leader, is that
25 vague enough, for Enterprise.

Page 26

1  BUCHANAN - CONFIDENTIAL
2  Q.  Portfolio Strategy Leader for
3  Enterprise, okay.  And how long prior to your
4  departure did you have that title?
5  A.  That was the last year.
6  Q.  Just the last year?
7  A.  Yeah.
8  Q.  Okay.  And you said throughout
9  your time at Nortel you were always based in
10 Ottawa; is that right?
11 A.  Yeah.
12 Q.  And as Portfolio Strategy Leader,
13 who did you report to?
14 A.  A guy called Moni Manor, based in
15 somewhere, the U.S. somewhere, I can't remember.
16 Q.  And did you have people reporting
17 to you?
18 A.  At that stage, no, no.
19 Q.  At the time, sir, that your tenure
20 with Nortel came to an end, did you have an
21 understanding as to the entity that employed you?
22 A.  Yes and no.  I was employed -- I
23 knew that I was employed by Nortel Canada.
24 Q.  Okay.
25 A.  But in terms of payroll, for sure,

Page 27

1  BUCHANAN - CONFIDENTIAL
2  yeah, because I have moved around the company and
3  so my company payroll changed each time, but it
4  was -- I got a Canadian paycheque.
5  Q.  Okay.  So as you understood it at
6  the time of your departure, you were employed by a
7  Nortel Canadian entity?
8  A.  Yes, but only in the sense that
9  legally and financially you have to be employed by
10 a company, and I have travelled around Nortel a lot
11 internationally, so I know that there are different
12 companies have to be set up in each country.  I
13 understand that.
14 Q.  Right.
15 A.  But in terms of in that sense,
16 yes.
17 Q.  Right, so you understood that in
18 terms of your employment, you were employed by a
19 Canadian legal entity?
20 A.  Yes.
21 Q.  And even though you travelled a
22 great deal for Nortel over the years, it is your
23 understanding that you were always employed by a
24 Canadian legal entity?  You were always based in --
25 A.  Me personally, yeah, yes, because

Page 28

1  BUCHANAN - CONFIDENTIAL
2  my paycheque -- I never worked abroad on a
3  secondment or anything.  I was always based here,
4  yeah.
5  Q.  So throughout your career at
6  Nortel, you were always paid by a Canadian Nortel
7  entity?
8  A.  Yeah.
9  Q.  Did any relatives of yours work
10 for Nortel?
11 A.  No.
12 Q.  Any close friends work for Nortel?
13 A.  That is a good question.  I don't
14 know how to answer that.
15 Q.  Okay, well, let me ask --
16 A.  Can you be more specific, because
17 yes, that was a --
18 Q.  Sure, let me ask it slightly
19 differently.  Since the demise of Nortel and since
20 you left the company --
21 A.  Yeah.
22 Q.  -- have you been communicating,
23 other than as part of the LinkedIn group, have you
24 been communicating with any other former Nortel
25 employees about Nortel's bankruptcy?

*In Re:*
*NORTEL NETWORKS INC., et al*

*MICHAEL CAMPBELL*
*February 6, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106215.TXT*
Min-U-Script® with Word Index

Page 29

1      CAMPBELL - CONFIDENTIAL
2   date were you in that position?
3   A.  Probably two years.
4   Q.  And your title was director; is
5   that right?
6   A.  Director of OA&M product
7   management.
8   Q.  And in that position to whom did
9   you report?
10  A.  I reported to a gentleman called
11  John McCreedy.
12  Q.  What was Mr. McCreedy's title?
13  A.  Oh, crap.  He was the
14  vice-president of -- in the CVAS line of business.
15  Q.  And where was Mr. McCreedy
16  located?
17  A.  He was located in Dallas, Texas.
18  Richardson, actually.
19  Q.  And did you have any direct
20  reports to you when you were in that position?
21  A.  I did.
22  Q.  How many?
23  A.  Well, it got smaller as we went
24  along.  I would say probably 10.
25  Q.  And do you know or do you recall

Page 30

1      CAMPBELL - CONFIDENTIAL
2   where those 10 were located?
3   A.  I had some located in Toronto, I
4   had some located in Ottawa and I had some located
5   in Raleigh, North Carolina.
6   Q.  And, generally speaking, what kind
7   of functions did your direct reports perform?
8   A.  They were in the same line of
9   business as I was, so they were in the CVAS
10  business.  They did tasks that I directed them
11  relative to product management roles within that
12  business.
13  Q.  As of the time, sir, that your
14  employment with Nortel came to an end, did you have
15  any understanding of which Nortel entity employed
16  you?
17  A.  Yes, I was employed by Nortel
18  Canada.
19  Q.  And did you know whether that was
20  NNC, Nortel Networks Canada, or NNL, Nortel
21  Networks Limited?
22  A.  I did not distinguish between
23  them.  I worked for Nortel and I happened to work
24  in the Canadian locations.
25  Q.  But you understood that the entity

Page 31

1      CAMPBELL - CONFIDENTIAL
2   that employed you was a Nortel Canada entity?
3   A.  Yes.
4   Q.  And as far as you understood
5   through the course of your entire career at Nortel,
6   were you always employed by a Nortel Canada entity?
7   A.  Yes.  That's where my paycheque
8   came from.  I worked for various organizations
9   around the world.
10  Q.  Well, when you say you worked for
11  various organizations around the world, you were
12  always based in Canada, correct?
13  A.  Yes.
14  Q.  But the organizations within
15  Nortel that you worked for, I gather, had global
16  responsibilities?
17  A.  Yes, and indeed within Nortel we
18  didn't distinguish really where we worked.  It was
19  a matter we worked for lines of business that were
20  global, and we always looked at it as a total
21  Nortel, not individual organizations.
22      So I didn't feel that I had to defend
23  Nortel Canada against Nortel U.S.  We were one
24  company.
25  Q.  Understood.  But as far as you

Page 32

1      CAMPBELL - CONFIDENTIAL
2   were aware, though, you were never employed by a
3   Nortel U.S. legal entity?
4   A.  No, no.
5   Q.  Did any of your family members
6   work for Nortel?
7   A.  Unfortunately yes.
8   Q.  And tell me who that was?
9   A.  My wife was a former employee of
10  Nortel.  She was transferred to Avaya Corporation
11  as part of the sale of that asset during the asset
12  sale process.
13  Q.  And is your wife a member of the
14  NRPC?
15  A.  No, she is not, much to my
16  chagrin.
17  Q.  Has your wife, if you know, filed
18  a claim in the CCAA proceedings?
19  A.  I believe she has, yes.
20  Q.  And do you know what that claim is
21  on account of?
22  A.  Her claim is related to her
23  transitional retirement allowance.
24  Q.  And do you know the amount of that
25  claim?

*In Re:*
*NORTEL NETWORKS INC., et al*

BETSY HUNG
*February 4, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106213A.TXT*
Min-U-Script® with Word Index

Page 25

1  HUNG - CONFIDENTIAL
2  supervisor was?
3  A. PLM? Ron Morris. He died
4  already.
5  Q. Sorry to hear that.
6  A. After the Nortel ending, the
7  stress and all that stuff.
8  Q. What did you do after PLM?
9  A. Then I do system engineer. I
10 think about it.
11 Q. You mentioned you did systems
12 engineering?
13 A. Um-hmm.
14 Q. How long did you do that for?
15 A. That's after the PLM so I think,
16 you know, is approximately not quite year, right?
17 Unless I had the resume with me, so let's say it
18 was 2000 and 2001. Then in 2002 or '3 then I do
19 the system engineering. Is same kind of product
20 because I know the product, so is -- there is many
21 details about the product that you need to engineer
22 and reliability, all this stuff.
23    So this is my last position with
24 Nortel.
25 Q. So that was approximately 2002

Page 26

1  HUNG - CONFIDENTIAL
2  until --
3  A. 2008, yeah.
4  Q. And all of these, you said, you
5  were located in Ottawa for all of these positions?
6  A. But the last position was my
7  manager is in U.S.
8  Q. Um-hmm. So you were located in
9  Ottawa but your manager was in the U.S.?
10 A. Yeah.
11 Q. And that's for the systems
12 engineer?
13 A. Systems engineer.
14 Q. Do you remember who your manager
15 was?
16 A. There are two manager. One is Ian
17 Scales and then a reorganization and then is Allan
18 Clely, C-L-E-L-Y, I think so. Can I look at it to
19 make sure I get the last name?
20 Q. Sure.
21 A. In the termination letter, Allan
22 Cleary, C-L-E-A-R-Y.
23 Q. And the first individual you
24 mentioned was Ian Scales?
25 A. Ian Scales. He got the stroke.

Page 27

1  HUNG - CONFIDENTIAL
2  S-C-A-L-E-S, I think.
3  Q. And you mentioned one of then was
4  located in the U.S.?
5  A. Two of them.
6  Q. Two of them?
7  A. Ian Scales is in Raleigh, and
8  Allan Cleary is in Richardson. I haven't met him.
9  I don't know how he looked like because we just
10 talked on the phone, right?
11 Q. And how did you know where they
12 were located?
13 A. You always -- we know, you work
14 for a boss, you know he is located in Richardson.
15 You call him, you go through the internal telephone
16 communication, yeah.
17 Q. And before this position, systems
18 engineering, were all of your supervisors located
19 in Ottawa?
20 A. I'm trying to think.
21 Q. Take your time.
22 A. So many department. Some
23 departments sometimes in U.S. and across in Canada,
24 so sometimes you work, you really don't know about
25 all this entity, you just know you're working in

Page 28

1  HUNG - CONFIDENTIAL
2  Ottawa reporting to different entities. Nortel is
3  just whole umbrella across the U.S. and Canada,
4  right?
5     So there is software engineering, PLM,
6  planning, and development. Development maybe,
7  because sometimes different product and then the
8  reporting organization may be in U.S. I can't
9  remember. It's so far away already.
10 Q. Do you remember receiving
11 paycheques?
12 A. Always through the -- I don't see
13 any difference, it's always the same paycheque and
14 then it go through and then deposit to the account.
15 Q. Do you remember receiving direct
16 deposits into your accounts?
17 A. We always go for the deposit to
18 the direct account and you get the pay slip like
19 telling you the notice.
20 Q. Do you remember what the pay slip
21 said?
22 A. I have one. Do you want me to
23 show you?
24 Q. Sure.
25 A. I think I have it. Is always the

Page 41

1  HUNG - CONFIDENTIAL
2  with them. Did they do most of the talking?
3  A. Yeah.
4  Q. Did you ask any questions?
5  A. Those terminology they said, it's
6  hard for me to comprehend. So it just like oh, is
7  an information session. You sit there. But then I
8  can't remember, is so long ago that I can't
9  remember.
10 Q. When you signed this letter on
11 January 6th, 2009 what was your understanding of
12 what was going to happen next?
13 A. I am going to get the lump sum
14 with the pay with the vacation on whatever date.
15 Q. Did you have an understanding
16 about who was going to be making those payments to
17 you?
18 A. Normally we just get paycheques
19 always. I really don't understand all this behind
20 the scene, all this organization.
21 Q. So it would be the same entity
22 that gave you the paycheque would pay you the
23 severance?
24 A. I don't know all this stuff. I
25 don't know whether same entity or what. Only cares

Page 42

1  HUNG - CONFIDENTIAL
2  that the paycheque got into my account.
3  Q. But just in terms of your own
4  understanding, do you recall what your
5  understanding was?
6  A. No understanding. Just Nortel.
7  Nortel as a whole.
8  Q. So in other words, the severance
9  would be paid by every part of Nortel?
10 A. I don't know every part. Just
11 like whoever dealing with whatever, the
12 organization.
13 Q. Ms. Hung, I would like to ask you
14 to look at paragraph 3.
15 A. One, two, three. Yeah.
16 Q. It begins:
17    "As used in this letter, the
18    term 'Corporation' shall mean Nortel
19    Networks Corporation, its
20    subsidiaries and affiliates, their
21    successors and assigns, and all of
22    their past and present officers,
23    directors, employees and agents (in
24    their individual and representative
25    capacities), in every case,

Page 43

1  HUNG - CONFIDENTIAL
2  individually and collectively."
3     Do you remember reading this language?
4  A. It is typical law firm stuff that
5  means something. I read it but it's like to me is
6  a terminology that it means Nortel.
7  Q. When you say it means Nortel,
8  you're saying it means every part of Nortel?
9  A. What do you mean, every part?
10 It's Nortel as a whole, right? Is Nortel. Then I
11 don't know what it means behind. Just like Nortel.
12 Q. Did you ask anybody as to what it
13 meant?
14 A. I don't. I just say Nortel. This
15 is like I work for Nortel, Nortel.
16 Q. Did you ask the person who was --
17 A. No.
18 Q. -- in the meeting?
19 A. No.
20 Q. And you had said you didn't talk
21 to any lawyers?
22 A. No.
23 Q. What is your current understanding
24 of what this means?
25 A. My current understanding looks

Page 44

1  HUNG - CONFIDENTIAL
2  like you have Nortel U.S., Nortel Canada, Nortel
3  Asia, and it means the different entity, but to me
4  I don't differentiate all this entity. It means
5  Nortel as a whole.
6  Q. So at the time when you received
7  this letter, you understood that Nortel, the group,
8  would be paying you the severance?
9  A. I don't know the group. It's just
10 organization, the company. It's a company. I
11 don't know all this, you know, how they do it is
12 maybe for tax purposes, whatever. I really don't
13 have a clue what it means to me.
14 Q. This language also mentions
15 officers, directors, employees and agents. Did you
16 have an understanding that other individuals who
17 worked at Nortel would pay you the severance
18 amount?
19 A. To be honest, I really don't
20 understand this sentence. It's just like to me my
21 interpretation is Nortel. I repeat again, I don't
22 differentiate all this entity.
23 Q. You mentioned a few minutes ago
24 that initially your understanding was that there
25 was one organization and at some point you learned

Page 53

1   HUNG - CONFIDENTIAL
2   NNI EXHIBIT NO. 28: Email chain,
3       stamped BH00021 to BH00023.
4       THE WITNESS: Will I keep this or you
5   will take it back?
6       BY MS. VANLARE:
7   Q.  We'll take it back.
8   A.  Okay.
9   Q.  If I can ask you to please turn to
10  page 2, that's 22BH.
11  A.  Okay.
12  Q.  There is an email on the bottom
13  from Betsy Hung sent January 16th, 2009?
14  A.  Yeah.
15  Q.  Is that your email?
16  A.  Hmmm.
17  Q.  If you could please vocalize.
18  A.  Yeah, that's my email.
19  Q.  Do you recall sending this email?
20  A.  Yes, I do.
21  Q.  And can you describe why you sent
22  the email?
23  A.  Because I want to make sure I am
24  included.
25  Q.  And when you say "included," what

Page 54

1       HUNG - CONFIDENTIAL
2   do you mean?
3   A.  It means the process, to be
4   included.
5   Q.  Included in the claims process?
6   A.  Yeah.
7   Q.  So at this time what was your
8   understanding of what was happening to your
9   severance payment?
10  A.  They won't give it out to me as
11  promised in the termination letter.
12  Q.  And how did you get that
13  understanding?
14  A.  Is a general bankruptcy. Maybe --
15  oh, okay, I remember now. One of my colleagues
16  supposed to get it Friday, and it was Thursday that
17  they declare bankruptcy and she didn't get the
18  package.
19  Q.  She didn't get the payment?
20  A.  She didn't get the payment.
21  Q.  Do you remember what the
22  colleague's name was?
23  A.  Sharon -- Sharon Ziete (ph)? Let
24  me see. Z-I -- I don't remember the last name.
25  Ziete.

Page 55

1   HUNG - CONFIDENTIAL
2   Q.  Okay.
3   A.  She was laid off two months before
4   me and she was -- the two-month period she stay
5   with Nortel and then she supposed to get the
6   payment Friday, but then the bankruptcy was on
7   Thursday so she didn't get it. So that's why I
8   said oh, I'm not going to get.
9   Q.  So you understood, when you
10  learned that she didn't get her payment, you
11  understood that you were not necessarily going to
12  get your payment as well; is that correct?
13  A.  Um-hmm. And then you have to go
14  through the process.
15  Q.  And when you say the process, you
16  mean the claims process?
17  A.  The proceeding that Ernst & Young
18  sent us in Exhibit 3.
19  Q.  And how did you learn that you had
20  to go through a claims process?
21  A.  That's the email said, you need to
22  submit a claim. The HR -- I have to file -- now I
23  recall a little bit. It was the minute I know
24  about it, of course what should we do, what can I
25  do, and then I called HR and they say you have to

Page 56

1       HUNG - CONFIDENTIAL
2   file a claim.
3       Then I received that letter and I send
4   email immediately. You can see the date.
5   Q.  Um-hmm.
6   A.  And they say, in the email they
7   say you just wait and sit and wait for the
8   instruction. You can see the date I sent out and
9   immediately I sent out to Ernst & Young, the
10  Monitor. And the response I got, just don't worry
11  about it, just sit and wait for the instruction.
12  Q.  And when you say the response you
13  got from the Monitor, is that the response you have
14  on --
15  A.  Yeah, I quote it.
16      MS. MERSKY: Let her finish before you
17  answer so the record can be clear.
18      BY MS. VANLARE:
19  Q.  Thank you. When you say you
20  received a response from the Monitor, do you see
21  that response here?
22  A.  In this email? Yeah. On page 21.
23  Q.  That's 21BH. And is the response:
24      "Unpaid severance form a claim
25      in the CCAA proceeding. A claim

*In Re:*
*NORTEL NETWORKS INC., et al*

*DANIEL JIN-MING LEUNG*
*February 5, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106214B.TXT*
*Min-U-Script® with Word Index*

Page 21

1  LEUNG - CONFIDENTIAL
2  one or two months.
3  Q. What about before 2013?
4  A. Not very much.
5  Q. Could you give me an estimate of
6  about how often that would be? Is that once a
7  month, less than that?
8  A. No, probably once a year at most.
9  Q. Did you receive any type of
10 notifications from the LinkedIn group, any type of
11 email?
12 A. I did. I believe I turned it on
13 in January just to have any updates, a news feed
14 would come into my Gmail address.
15 Q. So prior to 2013 you did not have
16 the setting for email notifications turned on?
17 A. Not that I recall, no.
18 Q. And when Ms. Mersky asked you to
19 look through your documents and put some together
20 to send to her, do you recall whether you looked at
21 LinkedIn at all?
22 A. Yes, I did.
23 Q. Do you recall whether you sent her
24 anything from LinkedIn?
25 A. I did, yes.

Page 22

1  LEUNG - CONFIDENTIAL
2  Q. Do you think it was several
3  documents?
4  A. I took one screen shot in
5  particular. That was the screen shot that I
6  provided.
7  Q. I would like to transition and
8  talk a little bit about your employment time with
9  Nortel. When did you first join Nortel?
10 A. May 2005.
11 Q. Was that your first job out of
12 college or had you --
13 A. Yes.
14 Q. What position?
15 A. So I was a global callpilot
16 support engineer, doing tier three support helping
17 Nortel's customers and troubleshooting their voice
18 messaging service.
19 Q. Who was your supervisor in that
20 position?
21 A. I started off, his name was Todd
22 Christie. He was based in Canada. He's since
23 located to Richardson, Texas to another position.
24 And I reported to Scott McCurrach who was based in
25 Richardson, Texas, pretty much for 90 percent of

Page 23

1  LEUNG - CONFIDENTIAL
2  the time I was there.
3  Q. Where were you based when you were
4  in this position?
5  A. Belleville, Ontario. So a small
6  town probably two and a half hours from here and I
7  guess we were not the main Ottawa hub but we were
8  still a two or three hundred person office.
9  Q. So you said that Todd Christie was
10 originally based in Canada. Do you know where in
11 Canada?
12 A. At the same office, so Belleville,
13 Ontario.
14 Q. And then you mentioned that he
15 transferred to the Richardson office. Did he
16 remain your supervisor after transferring?
17 A. No, he took on another role.
18 Q. Was Scott McCurrach your manager
19 at the same time as Todd Christie?
20 A. So he was team lead at the time
21 and I guess he was promoted to manager soon after
22 Todd left.
23 Q. And the entire time he was based
24 out of the Richardson office?
25 A. Yes.

Page 24

1  LEUNG - CONFIDENTIAL
2  Q. Were these the only two
3  supervisors that you had during your time at
4  Nortel?
5  A. Yes.
6  Q. So did you stay in your position
7  as the global callpilot support engineer for your
8  entire time?
9  A. Yes, that's right.
10 Q. Do you know which entity issued
11 your paycheque to you?
12 A. I do not.
13 Q. Did any of your family members
14 work for Nortel?
15 A. No.
16 Q. Do you have any relation to
17 someone named Priscilla Leung?
18 A. No.
19 Q. And you mentioned when we were
20 talking about Facebook that after you left Nortel
21 you stayed in contact with some of your former
22 colleagues from Nortel?
23 A. Yes.
24 Q. Did you stay in contact with
25 anyone who was based in the United States?

*IN RE: NORTEL NETWORKS INC., et al*

*PAULA KLEIN*
*February 11, 2014*
*HIGHLY CONFIDENTIAL*



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106218.TXT*
Min-U-Script® with Word Index

Page 25

1  KLEIN - HIGHLY CONFIDENTIAL
2  time or NNUK or some other entity; do you recall?
3  A. My employment status didn't
4  change. I continued to be paid by the same, the
5  same way I had all along.
6  Q. Did you get your paycheques or did
7  you get your paycheques by direct deposit?
8  A. Yes.
9  Q. And the same thing happened when
10 you were in England, that they just were
11 direct-deposited into your Canadian bank account?
12 A. Yes.
13 Q. In Canadian dollars the whole
14 time?
15 A. Yes.
16 Q. Besides your year in Southgate,
17 England, was the rest of your time at NNL based
18 here in Ottawa?
19 A. Yes.
20 Q. So going backwards, prior to your
21 year in the CTO office, you said you had Senior
22 Director project management roles. Can you just
23 give me a time frame on that?
24 A. It would have been November,
25 November 2002, until 2005 maybe, 2005, sometime in

Page 26

1  KLEIN - HIGHLY CONFIDENTIAL
2  2005.
3  Q. November 2002 is when you returned
4  from your leave?
5  A. Yes.
6  Q. So what did you do between 2005
7  and 2008?
8  A. I worked as a Director of R&D for
9  various different network management products. I
10 had a platform, a research and development team
11 that developed software that was used across all of
12 the Nortel business units for network management
13 products.
14 Q. And that bridged the whole gap
15 between project management and CTO?
16 A. Yes.
17 Q. So while you were working in the
18 CTO office, did you report at all to a person named
19 Anthony Pirih?
20 A. Yes.
21 Q. And who was he?
22 A. He was my direct supervisor. He
23 was also a member of the Chief Technology Office.
24 Q. Was he your direct supervisor for
25 the entire 2008?

Page 27

1  KLEIN - HIGHLY CONFIDENTIAL
2  A. Yes.
3  Q. And where was Mr. Pirih based?
4  A. In the U.S. I can't recall
5  exactly where his office was, but he was based in
6  the U.S.
7  Q. And during the 2005 to 2008
8  period, the responsibilities you just had, did you
9  have, I take it, a variety of different bosses or
10 just one boss at that time?
11 A. I had three different bosses.
12 Q. Who were they, if you remember?
13 A. A man named David something.
14 Q. Okay.
15 A. I mean, I'm sorry, I can't for the
16 life of me remember his last name. David -- I
17 can't remember. Isn't that horrible? Kalli
18 Lefavre and Harold Graham.
19 Q. Were they all based in Ottawa?
20 A. No.
21 Q. Which ones were in Ottawa, if any?
22 A. Harold was based in Ottawa, and
23 Kalli was in Ottawa for awhile and then she moved
24 to China.
25 Q. Did you still report to her while

Page 28

1  KLEIN - HIGHLY CONFIDENTIAL
2  she was in China?
3  A. Yes.
4  Q. And what about David?
5  A. Why is he so unmemorable? I want
6  to say that he was based in Toronto, but to be
7  honest, I really don't remember much. I didn't
8  report to him for very long.
9  Q. Okay. And do you know why you
10 moved from working in R&D roles for different
11 product management lines to the CTO office?
12 A. Yes. I was selected as a person
13 with high potential to move into executive
14 positions, and I was put on a year-long
15 professional development program that gave me
16 training and coaching. And as part of that
17 program, the 14 of us who were on the program were
18 given special assignments to allow us to develop
19 professionally, and my assignment was to go work in
20 the Chief Technology Office.
21 Q. So it wasn't just 14 technology
22 people. It was kind of company-wide?
23 A. Yes.
24 Q. Were you the only one of the 14 in
25 the technology area?

```
1                           ***ERRATA***

2              ELLEN GRAUER COURT REPORTING  CO. LLC
                   126 East 56th Street, Fifth Floor
3                       New York, New York 10022
                              212-750-6434
4

5   NAME OF CASE: IN RE: NORTEL NETWORKS INC.
    DATE OF DEPOSITION: FEBRUARY 11, 2014
6   NAME OF WITNESS: PAULA KLEIN

7   PAGE  LINE  FROM     TO          REASON
```

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 27 | | | | Questions related to my Direct supervisor |
| 28 | | | | "David" — I now recall was David Ayers |
| | | | | He worked out of the office in Raleigh, NC |
| | | | | and NOT Toronto as I had indicated. |
| | | | | |
| 94 | 19 | | | I now recall that there are several other legal firms representing employee groups. |
| | | | | Mr. Barry Wadsworth represents the CAW unionized former employees and Ms. Janice Payne of Nelligan O'Brien Payne represents the continuing employees (i.e. those former employees who were part of the divestitures). |
| 126 through 128 | | | | I have gone back to the Epiq website and now understand that the document I had read was Exhibit 13-7 docket 1280 |
| 184 | | | | |

```
21

22  Subscribed and sworn before me

23  this ___ day of _____, 20__.

24  _____    _____

25  (Notary Public)     My Commission Expires:
```

```
                   A C K N O W L E D G M E N T


   STATE OF                    )
                               ) ss.:
   COUNTY OF                   )


              I, PAULA KLEIN, hereby certify that
   I have read the transcript of my testimony taken
   under oath in my deposition; that the transcript is
   a true, complete and correct record of my testimony,
   and that the answers on the record as given by me
   are true and correct. With the addition of the comments
   outlined on the ERRATA page.


                         _____
                                PAULA KLEIN


   Signed and subscribed to before
   me, this   20   day of  MARCH        , 2014.


   _____

   Notary Public, State of _____
```

*In Re:*
*NORTEL NETWORKS INC., et al*

*ANTHONY LAW*
*February 3, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106212B.TXT*
Min-U-Script® with Word Index

Page 21

LAW - CONFIDENTIAL

Q. Okay.
A. And because I was reporting to this guy for something like two months and then I got -- I got laid off. But prior to that I report to a guy called Derek Noble for probably two years, yeah.
Q. When you were working at Nortel were your paycheques direct deposited into your bank?
A. That's right, yes.
Q. And you received each pay period a stub that told you who -- I mean how much you were getting that pay period?
A. I don't really recall. I remember a long time ago we used to get those paper paystubs, but I -- I frankly don't remember whether in the recent years that I actually get those paper pay tabs. I really don't remember.
Q. Each year you would get a T-4 form?
A. Yes, yes, yes.
Q. The T-4 form -- did the T-4 form that you received list your employer as Nortel Canada?

Page 22

LAW - CONFIDENTIAL

A. Frankly, I never pay attention to it, okay? So as soon as it said Nortel and I forget about it. I mean, personally, when I get that paper, I read how much I am getting and that's the end of it. So as long as the number match and I know it comes from Nortel, that's it.
   So we never make the differentiation --
I never made a differentiation between whether Nortel Canada or what. In my mind I worked for Nortel.
Q. Did you ever believe that you worked for Nortel U.S.?
A. Again, at the time I never made a differentiation, so if you asked me back at the time when I was working at Nortel, it never would occur to my mind which different companies that I'm working for, and is not abnormal to see people reporting to different people in different geographic areas and we never make a differentiation as to ah, you work for U.S. or you work for Turkey or whatever.
Q. Did you ever report to anybody with Nortel U.S.?
A. Again, I never make a

Page 23

LAW - CONFIDENTIAL

differentiation as to whether that person works for Nortel U.S.
Q. Let's talk about where they were located then.
A. Okay.
Q. Did you ever report to anybody located in the U.S.?
A. Yes, I did. That was the two months before I got laid off.
Q. During your last two months you --
A. That's right, that's right, yes.
Q. Who did you report to then?
A. I forgot the guy's name. I think it's something with the last name of Fitzgerald. But I totally forgotten his first name.
Q. Where is he based?
A. Frankly, I don't know. Because I never met him, I only talked to him on the phone twice, is when I was first told that there was a reorganization and they are consolidating some reporting, so because I am in software testing, now they want to consolidate and report to this guy in the U.S., and all I got is a phone call from him and say okay, so this week what you are doing, and

Page 24

LAW - CONFIDENTIAL

then I think about once a month there is -- there is a staff meeting or so, and so everybody call in, a few folks in Canada call in, a few folks in the U.S. call in.
   And, by the way, we do that all the time, right? We call into conference calls all the time and connect to people all over the world.
   So it never occurred to our mind who we report to. It doesn't matter as far as I am concerned at the time, so -- but that was it, that was about it.
   And then the last call that I had with him was him laying me off, so it was like three to four phone calls, so I have absolutely no idea when you are talking about the differences between the different companies.
Q. Well, if you didn't know where Mr. Fitzgerald was based, what makes you think that he was based in the United States?
A. Well, the phone number.
Q. Do you know what the area code was that it was a U.S. --
A. No, I have -- frankly, if you asked me to recall this phone number or whatever, I

*In Re:*
*NORTEL NETWORKS INC., et al*

*JULIA PIGGOTT*
*February 5, 2014*
*Confidential*



**Ellen Grauer**
**COURT REPORTING**
Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 106214A.TXT*
*Min-U-Script® with Word Index*

Page 13

1  PIGGOTT - CONFIDENTIAL
2  client.
3      MR. QURESHI: So you're directing her
4  not to answer?
5      MS. MERSKY: Yes, I am.
6      BY MR. QURESHI:
7  Q. Okay. You, separate and apart
8  from this conversation with the group -- well, let
9  me ask another question.
10     In the conversation with the group was
11 there discussion concerning how questions should be
12 answered at the depositions?
13     MS. MERSKY: Objection to the extent
14 that you are asking specific questions regarding an
15 attorney/client privileged meeting and
16 attorney/client privileged advice.
17     MR. QURESHI: Are you directing the
18 witness not to answer?
19     MS. MERSKY: Yes.
20     BY MR. QURESHI:
21 Q. Separate and apart from the group
22 meeting, you testified that you had a separate
23 meeting with Ms. Mersky; is that right?
24 A. Correct.
25 Q. Is that just with the two of you?

Page 14

1  PIGGOTT - CONFIDENTIAL
2  A. There was one other individual.
3  Q. Who was that?
4  A. Mike Campbell.
5  Q. Okay. And when did this meeting
6  occur?
7  A. Last night.
8  Q. And what was the purpose of this
9  meeting?
10 A. To brief me on process.
11 Q. And do you have an understanding
12 as to why Mr. Campbell was present?
13 A. No.
14 Q. Who is Mr. Campbell?
15 A. Another one of the individuals in
16 the group being deposed.
17 Q. And how long did this meeting
18 last?
19 A. Maybe an hour, hour and a half.
20 Q. And did you review any documents
21 at the meeting?
22 A. We did.
23 Q. Do you recall which documents you
24 reviewed?
25 A. Some of the documents that I

Page 15

1  PIGGOTT - CONFIDENTIAL
2  provided.
3  Q. Can you identify any of them
4  specifically?
5  A. My termination letter, the initial
6  letter from, I can't remember, I think it was Ernst
7  & Young fairly early on after the CAA -- CCAA was
8  declared.
9  Q. Okay.
10 A. I think there was a letter from
11 somebody at Nortel, again fairly early in the
12 process.
13 Q. Any other documents that you
14 recall reviewing?
15 A. I think there was a webcast
16 document, one of the webcasts that KP -- no, Koskie
17 Minsky, sorry.
18 Q. So was that a transcript from a
19 webcast?
20 A. It was a copy of the chart deck.
21 Q. Okay.
22 A. I can't recall what other...
23 Q. Ms. Piggott, through the course of
24 the day I'm going to refer to a number of different
25 Nortel entities and employee entities that have

Page 16

1  PIGGOTT - CONFIDENTIAL
2  been formed, and I just want to get some
3  definitions on the table so that you and I
4  understand one another as we proceed.
5     So when I refer to Nortel Networks
6  Corporation or Nortel Networks Limited, those are
7  the two -- or two of the Nortel Canada entities.
8  Do you understand that?
9  A. I hear what you're saying, so for
10 me, I lived in Canada the entire time I worked at
11 Nortel, but it was a global company and at one
12 point I was representing Nortel globally with the
13 global accounts.
14 Q. Did you understand by which entity
15 you were employed when you worked at Nortel?
16 A. It was one Nortel. I was in the
17 sales organization and that's what we told our
18 customers. It was one Nortel. It was a global
19 company. I had reporting relationships into VPs in
20 Canada and in the U.S.
21 Q. Well, when I refer to Nortel
22 Canada in my questions, I will be referring to
23 either Nortel Networks Corporation or Nortel
24 Networks Limited, the two Canadian entities.
25    When I refer to Nortel U.S. or the U.S.

Page 29

PIGGOTT - CONFIDENTIAL

essentially were Nortel divisions.

From there I moved into a very specific marketing team.

Q. Can you again give me an approximate timeframe for that?

A. It was about half-way through my career, so maybe '95-'96. That's approximate. And I was in that team for maybe a year or two and then I moved into sales.

Sales started off with the global accounts organization, and we were charged with bringing all Nortel's solutions and products out to the largest customers that were headquartered in Canada, so all those customers had, you know, entities. CIBC for example, they're here in Canada, they're in the States, they're in the Caribbean, they're in the Pacific Rim, they're in Europe.

And it was our job, all the customers that the people in that team had was to look after those customers globally, work with whoever we needed to work with inside the company to take as many products and services that we had applicable to enterprise out to that customer.

Page 30

PIGGOTT - CONFIDENTIAL

Q. So was that -- I'm sorry, did you say that was for customers who were headquartered in Canada?

A. Yes.

Q. Okay. And how long were you in that area?

A. So the organization itself kind of morphed. I was there first as a sales rep and then I was promoted to lead that team in Canada, and then somewhere along the way we verticalized and, like, finance vertical, health care vertical, retail vertical, whatever. I was asked to take on a finance vertical and my team were in Canada as well as in north-east U.S.

When I was in the global accounts team, I was on this vertical team, my reporting VPs were in the U.S., global accounts was in Dallas, Texas, the vertical leader was in -- for finance was in New York.

At some point along the way they regionalized again and then I had a team in Canada reporting to a Canadian VP, and then I moved from there into the channel organization and I was back reporting into the U.S. The first fellow was in

Page 31

PIGGOTT - CONFIDENTIAL

Dallas and then the last reporting manager I had was in Denver.

Q. Okay.

A. That's the short version.

Q. So the position that you had at the time of your termination, director of North American distribution, you said you were in that position for roughly two to three years?

A. Close enough.

Q. And is that within what you described as the sales organization?

A. Yes.

Q. Was this part of the global accounts organization or was it called something else?

A. No, I don't think global accounts existed anymore at that time.

Q. For those last two to three years, where were you located physically?

A. Physically, Brampton.

Q. Okay. Who did you report to in that position?

A. By name? Are you asking me who by name did I report to?

Page 32

PIGGOTT - CONFIDENTIAL

Q. Let's start with name.

A. Patrick Lewis.

Q. And what was his title?

A. VP of -- I don't remember.

Q. And where was he located?

A. Denver.

Q. And how many direct reports did you have during -- again, this last position where you were director of North American distribution?

A. Right at the end of that?

Q. Sure.

A. Because we were downsizing through several years. Right at the end?

Q. Let's start with the end, give me the approximate number.

A. Seven, eight.

Q. And do you recall where those direct reports were located?

A. Denver, Atlanta, New York, Toronto.

Q. And throughout -- I gather if we go back further in time while you were in this position before the downsizing, you had more direct reports, right?