# Exhibit "K"



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTEL NETWORKS, INC., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | Jointly Administered |

## AFFIDAVIT OF MICHAEL CAMPBELL

I, Michael Campbell, of the City of Brampton, in the Province of Ontario, MAKE OATH AND SAY:

1. I am a former employee of Nortel Networks Limited and its subsidiaries (collectively, "**Nortel Canada**"). I began working as an engineer with Nortel Canada's subsidiary company Northern Telecom Canada in 1979, and was employed with Nortel Canada thereafter until the date of my termination, effective around December 2007.

2. I am one of three court-appointed representatives (the "**Representatives**") who were appointed on behalf of all former employees, including pensioners, of Nortel Canada in the Canadian proceedings. I have personal knowledge of the matters to which I hereinafter depose in this Affidavit. Where I do not possess personal knowledge, I have stated the source of my information and, in all such cases, believe it to be true.

3. I swear this Affidavit in support of the motion to lift the stay in the bankruptcy to allow the claims of certain Canadian residents to be filed against Nortel Networks Inc. ("**Nortel U.S.**") in regards to claims for termination and severance that are owed.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Alteon WebSystems, Inc. (9769), Alteon WebSystems International, Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286) and Nortel Networks Cable Solutions Inc. (0567). Addresses for the Debtors can be found in the Debtors' petitions, which are available at http://chapter11.epiqsystems.com/nortel.

A.   **Background**

4.  My participation in the insolvency began very shortly after the company commenced its proceedings in Canada under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended ("**CCAA**") and in the United States under Chapter 11 of the United States Bankruptcy Code on January 14, 2009 (the "**Filing Date**").

5.  As a recently terminated employee of Nortel Canada, I had a direct interest in the outcome of the insolvency. I am owed a number of payments from Nortel Canada, including outstanding severance and termination pay, a transitional retirement allowance, certain life, medical and dental benefits, and I am also a deferred vested member of Nortel's Managerial and Non-Negotiated Pension Plan.

6.  Several days after Nortel Canada filed for CCAA protection, I learned about a group of individuals in Ottawa who had formed the Nortel Retiree and Former Employee Protection Canada ("**NRPC**"), a committee with the mandate to protect the interests of pensioners and former employees of Nortel Canada. Shortly thereafter, a group of former colleagues and I who were based in Toronto became in contact and formed the Toronto subcommittee of the NRPC.

7.  Although I originally reached out to the NRPC as a result of my personal investment with Nortel, that focus soon shifted as I quickly became very involved with the NRPC and its protection efforts. On May 27, 2009, I, along with Donald Sproule and David Archibald, was appointed by the Ontario Court as one of the three court-appointed representatives (the "**Representatives**") for the Former Employees for the purposes of the Canadian proceedings.

8.  Since that time, I have participated in weekly conference calls with counsel to the Representatives in Canada, our financial advisors and our actuarial advisors. I also participate in weekly calls with the NRPC National Committee, where the NRPC discusses internal issues of importance to our constituency, and assesses whether issues warrant attention by the NRPC, or that of our advisors or other parties as fit.

9. My appointment as a Representative, and my participation with the NRPC thereafter, is significant because of my status as a terminated employee. Although I have been heavily involved in all aspects of the NRPC's efforts, including those that affect pensioners and survivors, my input is primarily sought on issues that affect the terminated employee sub-group.

10. Paula Klein, another member of the NRPC, is also a terminated employee of Nortel Canada. Although I and the other Representatives we were never officially established as a separate subcommittee of the NRPC, Paula and I have played a major role in spearheading issues that relate to the sub-group of terminated employees. As a former employee in the CTO Office at Nortel in Ottawa, Paula has a great degree of knowledge about the past practices and policies of Nortel, which proved to be invaluable knowledge in the assessment of matters affecting the terminated employee sub-group. As time passed, Paula and I started working together very closely to assess, raise and resolve issues that relate specifically to the terminated employee sub-group.

11. My role has involved a great degree of communication with the terminated employee sub-group. Prior to the appointment of the Representatives, Paula had established a social networking site called the LinkedIn Group for recently terminated employees of Nortel Canada, as a forum for affected former employees to communicate, ask questions and voice concerns. This LinkedIn groups has proven to be very useful and in fact has been one of the main tools that I and the other Representatives have used to reach out to our group by posting updates, and also to ensure our group's concerns are addressed by collecting comments, questions and feedback on various matters.

12. Through this method, Paula and I have become very familiar with the concerns of the terminated employee sub-group and the nature of their claims.

13. Given that the responsibility of the Representatives includes the responsibility to provide instructions to Canadian counsel for the purpose of settling or compromising claims of our constituency, I have taken my role and involvement with the terminated employee sub-group very seriously.

### B. The Canadian Compensation Claims Procedure

14. The formation and establishment of the Compensation Claims Process for claims of former employees against Nortel Networks Limited in the Canadian proceeding was developed by Ernst & Young LLP (the "**Monitor**") and Nortel Canada in consultation with the Representatives and our advisors over the summer of 2011.

15. Employee compensation claims were not included in the general creditor claims order in the Canadian proceeding of July 30, 2009. The employee compensation claims were carved out with a view to creating a separate process for these claims. I and the other Representatives discussed potential employee compensation claims processes with the Monitor on a number of occasions between fall 2009 and early spring 2011.

16. These discussions culminated in the summer of 2011 with the decision to have a separate claims process run by the Monitor, wherein the Monitor reviewed Nortel's records and produced claim forms for employees that identified, described and valued their claims. This decision was reached because of the large size of the group, the magnitude and complexity of their claims, and the need to value them all consistently. The result was the Compensation Claims Procedure Order and the Compensation Claims Methodology Order, each dated October 6, 2011.

17. The Canadian Compensation Claims Procedure differs from the procedure used to process employee claims in the U.S. proceeding. Very briefly, the Compensation Claims Procedure developed for the Canadian proceeding involved and involves the following steps:

    (a) The Monitor identified claims or potential claims against Nortel Canada by former employees during the fall of 2011;

    (b) Potential claimants were advised of their potential claims by notice during the fall of 2011;

    (c) Proofs of claim were required to be submitted to the Monitor on or before the bar date of January 6, 2012 (the "**Bar Date**");

    (d)    Review of claims, and acceptance or dispute of them by the Monitor starting in the spring of 2012;

    (e)    On October 30, 2012, the Court permitted the Monitor to review and adjudicate Requests for Correction filed in the Compensation Claims Process that were received after the Bar Date; and

    (f)    The Monitor continues to review outstanding claims under this process.

18. An overview of the Severance and Termination Pay Claims methodology is located at paragraphs 102 through 107 of the Seventy-Fifth Report of the Monitor in the Canadian proceedings, while Appendix D contains a detailed description of the methodology, as well as an aggregate severance grid and the severance grid formulae.

19. Nortel and the Monitor maintained the records of the termination packages and generated the claims based on these packages. For individuals who were terminated prior to the Filing Date and who received a termination package from Nortel Canada, the determination of their claim for termination and severance is straightforward as it is the amount of payment left outstanding in accordance with that contract.

20. For those who were terminated after the Filing Date and who did not receive a termination package, the calculation was not so straightforward. Given that Nortel had no general termination and severance pay policy that could be applied to determine the calculation for this latter group of affected individuals, it was necessary to work with our advisors to determine what was appropriate under the circumstances. Eventually, the parties reached a consensus both internally with our advisors, and ultimately with the Monitor and Nortel Canada, about what formula made sense.

21. As part of the review of claims by the Monitor, in the spring of 2012 the Monitor identified a sub-group of claimants in the Canadian Compensation Claims Process who had also filed claims in the U.S. claims process.

22. I am advised by our counsel that the Monitor drew these claimants to their attention and requested that these parallel claims be withdrawn from the U.S. claims procedure.

23. Counsel to the Representatives examined the claims of this sub-group, in particular, their claims for termination and severance payments. Counsel also requested the Monitor determine whether other former employees had similar claims against Nortel U.S. based on similar termination and severance terms in their employment contracts.

24. The Monitor determined that there were approximately 300 individuals with similar severance and termination terms. For the purpose of this motion, each moving party is, to the best of my knowledge, one of these 300 former employees of Nortel Canada terminated prior to the Filing Date and who has a claim for termination and severance pay against both Nortel Canada and Nortel U.S. (the "**Affected Employees**").

25. Counsel to the Representatives also sought advice from U.S. counsel on the viability of the claims in the U.S. proceeding.

26. In or around June 2012, counsel advised the Representatives of the status of the potential claims and size of the group of Affected Employees.

27. In and around June 2012, counsel advised us about the Affected Employees and that they had received advice from U.S. counsel that the claims of the Affected Employees could potentially be brought against Nortel Networks Inc. in the U.S. proceeding, but that there were barriers to bringing a successful claim.

28. I, and the other Representatives, instructed counsel to raise the matter with the Monitor and with counsel to Nortel U.S. in order to determine an orderly process for resolving the claims of the Affected Employees. I am advised by our counsel and believe that there were discussions among the Monitor and counsel for Nortel U.S. regarding this matter in the summer of 2012.

29. I am advised by our counsel that during the late summer, 2012 and on several occasions during the fall of 2012, counsel to the Representatives contacted counsel to Nortel U.S. proposing a tolling arrangement that would preserve the claims pending the resolution of similar claims on their merits.

30. I am advised by counsel to the Representatives that counsel to Nortel U.S. has not provided a response to this proposal.

31. By December 2012, it seemed apparent that counsel to Nortel U.S. would not respond to the proposal for a tolling arrangement, and, if I and the Affected Employees were to pursue these claims, we would be required to bring the claims directly in the U.S. proceeding.

32. In early January 2013, I and the Representatives instructed counsel to facilitate a process by which the 300 Affected Employees would receive notice of a potential claim against Nortel U.S., and to identify counsel in the U.S. who would be willing to act on behalf of any Affected Employee who wished to pursue their claim against Nortel U.S.

33. Between about January 10 and January 25, 2013 notice was sent to approximately 300 Affected Employees and approximately 176 responded by retaining U.S. counsel and instructing U.S. counsel to act on their behalf in bringing a claim in the U.S. proceeding.

D.   **Conclusion**

34. Over the past several years, we have seen a great degree of loss and hardship among Nortel's former employees. We are faced with extremely unfortunate circumstances here in that there are thousands of former employees with claims against Nortel but the assets available to satisfy those claims are radically inadequate. Our constituency will be seriously and significantly impacted by loss and compromise.

35. To-date there has not been a settlement of the allocation of the sales assets, however, I understand from my involvement in the process that the former employees in the United States are expected to be paid out at a higher dividend than those in Canada.

36. I make this Affidavit in good faith and for no improper purpose and in support of the motion to lift the stay in the bankruptcy to allow the claims of certain Canadian

residents to be filed against Nortel U.S. in regards to claims for termination and severance that are owed.

SWORN before me at the City of Oakville, in the Province of Ontario on February 1, 2013.

_____
A Commissioner for taking affidavits

Barbara Walarxik

_____
MICHAEL CAMPBELL