**<u>EXHIBIT B-1</u>**

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE** *COMPANIES' CREDITORS ARRANGEMENT ACT*,
**R.S.C. 1985, c. C-36, AS AMENDED**

**MOTION RECORD**
**(MOTION TO STRIKE EXPERT REPORTS AND TESTIMONY OF
DANIEL R. BERESKIN QC AND BRUCE W. STRATTON)**
**(returnable April 22, 2014)**

Date:  April 14, 2014

**GOODMANSLLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca
**Hannah Arthurs**  LSUC#: 55337O
harthurs@goodmans.ca

Tel:      416.979.2211
Fax:      416.979.1234

Lawyers for the Monitor

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
derrick.tay@gowlings.com
**Jennifer Stam** (LSUC #: 46735J)
Jennifer.stam@gowlings.com

Tel:    (416) 862-5697
Fax:    (416) 862-7661

Lawyers for the Canadian Debtors

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL**
**NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL**
**CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL**
**NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

## INDEX

| TAB | | PAGE NO. |
|---|---|---|
| 1 | Notice of Motion returnable April 22, 2014 | 1 |
| 2 | Affidavit of Monique Allen sworn April 14, 2014 | 24 |
| | Exhibit 1: Motion of the Monitor and Canadian Debtors for entry of an Order Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, in the alternative, granting leave to file the expert report of Sheldon Burshtein in rebuttal to the Reports of Daniel R. Bereskin QC and Bruce W. Stratton | |
| | Exhibit 2: Declaration of Jacob Pultman sworn April 11, 2014 | |
| 2(A) | A. Rebuttal Expert Report of Daniel R. Bereskin, dated February 28, 2014 | 60 |
| 2(B) | B. Rebuttal Expert Report of Bruce W. Stratton, dated February 28, 2014 | 91 |
| 2(C) | C. Expert Reply of Sheldon Burshtein to Rebuttal Reports of Daniel R. Bereskin QC and Bruce W. Stratton, dated March 24, 2014 and served March 31, 2014 (the "Burshtein Report") | 128 |
| 2(D) | D. Initial Expert Report of Dr. Timothy Reichert, dated January 24, 2014 | 229 |
| 2(E) | E. Initial Expert Report of Mark L. Berenblut and Alan J. Cox, dated January 24, 2014 | 830 |
| 2(F) | F. Initial Expert Report of Philip Green, dated January 24, 2014 | 901 |

| 2(G) | G.Initial Expert Report of Thomas Britven, dated January 24, 2014 | 1064 |
|---|---|---|
| 2(H) | H. Letter from Peter Ruby, counsel to the Movants, regarding the Burshtein Report, dated March 24, 2014 (the "March 24 Movants Letter") | 1215 |
| 2(I) | I. Letter from Peter Ruby, counsel to the Movants, regarding the Burshtein Report, dated March 30, 2014 | 1218 |
| 2(J) | J. Transcript of Deposition of Daniel R. Bereskin QC, taken on March 27, 2014 | 1221 |
| 2(K) | K. Transcript of Deposition of Bruce W. Stratton, taken on April 4, 2014 | 1270 |
| 2(L) | L. U.S. Debtors' Disclosure of Intended Expert Witnesses, submitted January 8, 2014 and dated January 8, 2013 | 1330 |
| 2(M) | M. U.K. Pension Claimants' Disclosure of Intended Expert Witnesses, dated January 8, 2014 | 1333 |
| 2(N) | N. Letter of John L. Finnigan, counsel to the U.K. Pension Claimants, dated March 25, 2014 and responding to the March 24 Movants Letter | 1340 |
| 2(O) | O. Expert Reply of Sheldon Burshtein to Rebuttal Reports of Daniel R. Bereskin QC and Bruce W. Stratton, dated and served on March 24, 2014 and subsequently modified by the Burshtein Report | 1345 |
| 2(P) | P. Letter of Sheila Block, counsel to the U.S. Debtors, dated March 25, 2014 and responding to the March 24 Movants Letter | 1447 |
| 2(Q) | Q. Letter of Matthew P. Gottlieb, counsel to the Joint Administrators of the EMEA Debtors, dated March 25, 2014 and responding to the March 24 Movants Letter | 1449 |
| 3 | The Fifth Amended and Restated Initial Order dated January 14, 2009 | 1453 |
| 4 | The Allocation Position of the Monitor and the Canadian Debtors dated May 16, 2013 | 1500 |
| 5 | Order of this Court approving the Discovery Plan and Litigation Timetable dated May 15, 2013 | 1529 |
| 6 | November 19 Order of this Court | 1562 |
| 7 | Proposed Trial Protocol and Written Submissions of the Canadian Debtors and Monitor dated January 24, 2014 | 1573 |

8        Cover letter and Pre-Trial Conference Memorandum dated January        1596
         29, 2014

9        The Protective Order of this Court dated June 11, 2013                 1618

**IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

Court File No:  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
Proceeding commenced at Toronto

**MOTION RECORD
(MOTION TO STRIKE EXPERT REPORTS AND TESTIMONY OF DANIEL R. BERESKIN QC AND BRUCE W. STRATTON)
(returnable April 22, 2014)**

**GOODMANSLLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca
**Hannah Arthurs**  LSUC#: 55337O
harthurs@goodmans.ca
Tel:     416.979.2211
Fax:     416.979.1234

Lawyers for the Monitor

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
derrick.tay@gowlings.com
**Jennifer Stam** (LSUC #: 46735J)
Jennifer.stam@gowlings.com
Tel:     (416) 862-5697
Fax:     (416) 862-7661

Lawyers for the Canadian Debtors

1

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**NOTICE OF MOTION**

**(Motion to Strike Expert Reports and Testimony of Daniel R. Bereskin QC**
**and Bruce W. Stratton)**
**(returnable April 22, 2014)**

Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology
Corporation, Nortel Networks International Corporation and Nortel Networks Global
Corporation (collectively, the "**Canadian Debtors**") together with Ernst & Young Inc. in its
capacity as monitor of the Canadian Debtors (the "**Monitor**") will make a motion to Justice
Newbould of the Commercial List court to be heard as a joint motion with the United States
Bankruptcy Court for the District of Delaware (the "**US Court**"), on April 22, 2014, at 10:00
a.m. or as soon after that time as the motion can be heard, at 393 University Avenue, Toronto,
Ontario.

**PROPOSED METHOD OF HEARING:** The motion is to be heard orally.

**THE MOTION IS FOR:**

1.  an Order striking the reports of Daniel R. Bereskin QC (the "**Bereskin Report**") and Bruce W. Stratton (the "**Stratton Report**") as well as the transcripts from their respective cross-examinations;

2.  only if the Bereskin Report and/or the Stratton Report are not struck by the US Court and/or this Court, an order granting the Monitor and the Canadian Debtors leave to file the expert report of Sheldon Burshtein (the "**Burshtein Report**"); and

3.  directions if necessary concerning any differences between the evidentiary records at trial before the US Court and this Court; and

4.  such further relief as this Honourable Court deems just.

**THE GROUNDS FOR THE MOTION ARE:**

5.  The Monitor and the Canadian Debtors rely on the grounds set out in the "Motion of the Monitor and Canadian Debtors for entry of an Order Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, in the alternative, granting leave to file the expert report of Sheldon Burshtein in rebuttal to the Reports of Daniel R. Bereskin QC and Bruce W. Stratton" attached as Exhibit 1 to the Allen Affidavit (defined below) and the declaration of Jacob Pultman sworn April 11, 2014 attached as Exhibit 2 to the Allen Affidavit;

6.  Pursuant to the Order of this Court made on November 19, 2013 which, in part, amended prior orders of this court including the litigation timetable and discovery plan, expert reports were to be exchanged on the following dates:

    (a)    January 24, 2014 – initial expert reports; and

    (b)    February 28, 2014 – rebuttal expert reports;

7.  The Bereskin Report and the Stratton Report were delivered by the US Debtors and the UK Pension Claimants respectively on February 28, 2014 as purported "rebuttal reports";

8.    Both the Bereskin Report and the Stratton Report provide opinions on matters of Ontario law and are not necessary to assist this Court and offer legal opinions as to the interpretation of the Master Research and Development Agreement. The Bereskin Report and the Stratton Report are, therefore, not admissible expert evidence in Ontario and should not be filed with this Court;

9.    Also, neither the Bereksin Report nor the Stratton Report are proper "rebuttal reports";

10.    After receiving the Bereskin Report and the Stratton Report, the Monitor and the Canadian Debtors took immediate and prudent steps to mitigate the damage arising out of the improper late filing of the Bereskin Report and the Stratton Report and on, March 24, 2014, delivered the responsive Burshtein Report;

11.    The Monitor and the Canadian Debtors have now filed a motion with the US Court requesting that the Bereskin Report and the Stratton Report be struck or, in the alternative, that the Monitor and the Canadian Debtors be granted leave to file the Burshtein Report;

12.    Well in advance of the completion of expert depositions, the Monitor and the Canadian Debtors advised the US Debtors and the UK Pension Claimants that Mr. Burshstein was available for deposition and that they would agree that he be deposed on a without prejudice basis;

13.    Neither the US Debtors nor the UK Pension Claimants have elected to depose Mr. Burshstein;

14.    In the event that the US Court allows any or all of the Bereskin Report, the Stratton Report and the Burshstein Report to be admitted in the US Court and this Court does not, there will be different evidentiary records before the two Courts with respect to which directions are sought;

*Sealing*

4

- 4 -

15.    Exhibit 1 to the Allen Affidavit as well as Exhibits A, B, C, D, E, F, G, J, K and O to the Pultman Declaration (Exhibit 2 to the Allen Affidavit) are being filed under seal pursuant to paragraph 8(b) of the Protective Order;

*Miscellaneous*

16.    Such further and other grounds as counsel may advise and this Honourable Court may permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

1.    Affidavit of Monique Allen sworn April 14, 2014 (the "**Allen Affidavit**");

2.    The Fifth Amended and Restated Initial Order dated January 14, 2009;

3.    The Allocation Position of the Monitor and the Canadian Debtors dated May 16, 2013;

4.    Order of this Court approving the Discovery Plan and Litigation Timetable dated May 15, 2013;

5.    November 19 Order of this Court;

6.    Proposed Trial Protocol and Written Submissions of the Canadian Debtors and Monitor Dated January 24, 2014;

7.    Cover Letter and Pre-Trial Conference Memorandum dated January 29, 2014;

8.    The Protective Order of this Court dated June 11, 2013; and

9.    Such further and other evidence as counsel may advise and this Honourable Court may permit.

April 14, 2014

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
**Peter Ruby**  LSUC#: 38439P
**Joseph Pasquariello** LSUC #: 38390C
**Hannah Arthurs**  LSUC#: 55337O

Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Monitor

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** (LSUC #: 21152A)
derrick.tay@gowlings.com

**Jennifer Stam** (LSUC #: 46735J)
jennifer.stam@gowlings.com
Tel:    (416) 862-5697
Fax:    (416) 862-7661

Lawyers for the Canadian Debtors

**TO:    THE CORE PARTIES SERVICE
LIST**

6

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**CORE PARTIES SERVICE LIST**
**(Allocation Litigation)**

**Updated as of March 25, 2014**

- 2 -

**CANADIAN DEBTORS**

TO:   **GOWLING LAFLEUR HENDERSON LLP**
      Suite 1600, First Canadian Place
      100 King Street West
      Toronto, Ontario  M5X 1G5

      Derrick Tay
      Jennifer Stam

      Email:   derrick.tay@gowlings.com
               jennifer.stam@gowlings.com

      Tel:   416.862.5697
      Fax:   416.862.7661

      Lawyers for the Applicants

AND   **GOODMANS LLP**
TO:   Bay Adelaide Centre
      333 Bay Street, Suite 3400
      Toronto, Ontario  M5H 2S7

      Jay Carfagnini
      Joseph Pasquariello
      Ben Zarnett
      Alan Mark
      Peter Ruby
      Jessica Kimmel
      Chris Armstrong

      Email:   jcarfagnini@goodmans.ca
               jpasquariello@goodmans.ca
               bzarnett@goodmans.ca
               amark@goodmans.ca
               pruby@goodmans.ca
               jkimmel@goodmans.ca
               carmstrong@goodmans.ca

      Tel:   416.597.4107
      Fax:   416.979.1234

      Lawyers for the Monitor, Ernst & Young Inc.

AND   **ERNST & YOUNG INC.**
TO:   Ernst & Young Tower
      222 Bay Street, P.O. Box 251
      Toronto, Ontario  M5K 1J7

      Murray McDonald
      Brent Beekenkamp

      Email:   nortel.monitor@ca.ey.com

      Tel:   416.943.3016
      Fax:   416.943.3300

AND TO:

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020

Ken Coleman
Paul Keller
Daniel Guyder
Laura Hall
Joseph Badtke-Berkow
Jonathan Cho
Nicolette Ward

| Email: | ken.coleman@allenovery.com |
|--------|----------------------------|
| Tel: | 212.610.6434 |
| Fax: | 212.610.6399 |

| Email: | paul.keller@allenovery.com |
|--------|----------------------------|
| Tel: | 212.610.6414 |
| Fax: | 212.610.6399 |

| Email: | daniel.guyder@allenovery.com |
|--------|------------------------------|
| Tel: | 212.756.1132 |
| Fax: | 212.610.6399 |

| Email: | laura.hall@allenovery.com |
|--------|---------------------------|
| Tel: | 212.756.1171 |
| Fax: | 212.610.6399 |

| Email: | Joseph.Badtke-Berkow@AllenOvery.com |
|--------|-------------------------------------|
| Tel: | 212.610.6417 |
| Fax: | 212.610.6399 |

| Email: | jonathan.cho@allenovery.com |
|--------|-----------------------------|
| Tel: | 212.756.1118 |
| Fax: | 212.610.6399 |

| Email: | Nicolette.ward@allenovery.com |
|--------|-------------------------------|
| Tel: | 212.610.6412 |
| Fax: | 212.610.6399 |

U.S. Lawyers for the Canadian Debtors

AND TO:

**BUCHANAN INGERSOLL & ROONEY**
1105 North Market Street,
Suite 1900
Wilmington, DE 19801-1054

Kathleen A. Murphy
Mary F. Caloway

| Email: | Kathleen.murphy@bipc.com |
|--------|--------------------------|
| Tel: | 302.552.4214 |
| Fax: | 302.552.4295 |

| Email: | mary.caloway@bipc.com |
|--------|-----------------------|
| Tel: | 302.552.4209 |
| Fax: | 302.552.4295 |

Local U.S. Lawyers for the Canadian Debtors

- 4 -

**U.S. DEBTORS**

AND
TO:

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, Ontario  M5K 1N2

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray
Adam Slavens

Email:    tdemarinis@torys.com
          sbomhof@torys.com
          sblock@torys.com
          agray@torys.com
          aslavens@torys.com

Tel:    416.865.0040
Fax:    416.865.7380

Canadian Lawyers for Nortel Networks Inc.

AND
TO:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

James Bromley
Lisa Schweitzer
Howard Zelbo
Jeffrey Rosenthal
Avi Luft
Inna Rozenberg
Jacqueline Moessner
Marla Decker
Matt Gurgel
Darryl Stein
Jodi Erickson

Email:    jbromley@cgsh.com
          lschweitzer@cgsh.com
          hzelbo@cgsh.com
          jrosenthal@cgsh.com
          aluft@cgsh.com
          irozenberg@cgsh.com
          jmoessner@cgsh.com
          mdecker@cgsh.com
          mgurgel@cgsh.com
          dstein@cgsh.com
          jerickson@cgsh.com

Tel:    212.225.2000
Fax:    212.225.3999

U.S. Lawyers for Nortel Networks Inc.

AND
TO:

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347

Derek Abbott
Annie Cordo

Email:    dabbott@mnat.com
Tel:    302.351.9357
Fax:    302.425.4664

Email:    acordo@mnat.com
Tel:    302.351.9459
Fax:    302.225.2559

Local U.S. Lawyers for the U.S. Debtors

- 5 -

**EMEA DEBTORS**

AND TO:
**DAVIES WARD PHILLIPS & VINEBERG LLP**
44th Floor
1 First Canadian Place
Toronto, ON  M5X 1B1

Robin B. Schwill
Sean Campbell
James Doris
Louis Sarabia

| | |
|---|---|
| Email: | rschwill@dwpv.com |
| Email: | scampbell@dwpv.com |
| Email: | jdoris@dwpv.com |
| Email: | lsarabia@dwpv.com |

Tel:     416.863.0900
Fax:    416.863.0871

Co-Counsel to the Joint Administrators of Nortel
Networks UK Limited

AND TO:
**HUGHES HUBBARD & REED**
One Battery Park Plaza
New York, NY 10004-1482

Derek Adler
Neil Oxford
Fara Tabatabai
Charles Huberty

Email:   adler@hugheshubbard.com
Tel:      212.837.6086
Fax:     212.422.4726

Email:   oxford@hugheshubbard.com
Tel:      212.837.6843
Fax:     212.422.4726

Email:   tabataba@hugheshubbard.com
Tel:      212.837.6296
Fax:     212.299.6269

Email:   huberty@hugheshubbard.com
Tel:      212.837.6045
Fax:     212.299.6045

U.S. Lawyers the Joint Administrators of Nortel
Networks UK Limited

AND TO:
**LAX O'SULLIVAN SCOTT LISUS LLP**
Counsel
Suite 1920, 145 King Street West
Toronto, Ontario  M5H 1J8

Matthew P. Gottlieb
Tracy Wynne
Paul Michell
Jessica Zhi

Email:   mgottlieb@counsel-toronto.com
Tel:      416.644.5353
Fax:     416.598.3730

Email:   twynne@counsel-toronto.com
Tel:      416.598.7835
Fax:     416.598.3730

Email:   pmichell@counsel-toronto.com
Tel:      416.644.5359
Fax:     416.598.3730

Email:   jzhi@counsel-toronto.com
Tel:      416.644.4016
Fax:     416. 598.3730

Co-Counsel to the Joint Administrators of Nortel
Networks UK Limited

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Rodney Square
1000 North King Street
Wilmington, DE 19801

Ed Harron
John Dorsey

Email:   eharron@ycst.com
Tel:      302.571.6703
Fax:     302.576.3298

Email:   jdorsey@ycst.com
Tel:      302.571.6712
Fax:     302.576.3401

Local U.S. Lawyers for the Joint Administrators of
Nortel Networks UK Limited

- 6 -

**HERBERT SMITH FREEHILLS LLP**
Exchange House
Primrose Street
London
EC2A 2EG

James Norris-Jones

Email: james.norris-jones@hsf.com
Tel: +44 20 7466 2874
Fax: +44 20 7098 4874

Counsel to the EMEA Debtors

**CANADIAN CREDITORS COMMITTEE**

AND
TO:

**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

Mark Zigler
Susan Philpott
Ari Kaplan
Barbara Walancik

| Email: | mzigler@kmlaw.ca |
| Tel: | 416.595.2090 |
| Fax: | 416.204.2877 |

| Email: | sphilpott@kmlaw.ca |
| Tel: | 416.595.2104 |
| Fax: | 416.204.2882 |

| Email: | akaplan@kmlaw.ca |
| Tel: | 416.595.2087 |
| Fax: | 416.204.2875 |

| Email: | bwalancik@kmlaw.ca |
| Tel: | 416.542.6288 |
| Fax: | 416.204.2906 |

Lawyers for the Former Employees of Nortel and LTD
Beneficiaries

AND
TO:

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
35th Floor
155 Wellington Street West
Toronto, Ontario  M5V 3H1

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Karen Jones
Tina Lie
Michelle Jackson
Jacqueline Cummins

| Email: | ken.rosenberg@paliareroland.com |
| Tel: | 416.646.4304 |
| Fax: | 416.646.4301 |

| Email: | max.starnino@paliareroland.com |
| Tel: | 416.646.7431 |
| Fax: | 416.646.4301 |

| Email: | lily.harmer@paliareroland.com |
| Tel: | 416.646.4326 |
| Fax: | 416.646.4301 |

| Email: | karen.jones@paliareroland.com |
| Tel: | 416.646.4339 |
| Fax: | 416.646.4301 |

| Email: | tina.lie@paliareroland.com |
| Tel: | 416.646.4332 |
| Fax: | 416.646.4301 |

| Email: | michelle.jackson@paliareroland.com |
| Tel: | 416.646.7470 |
| Fax: | 416.646.4301 |

| Email: | Jacqueline.cummins@paliareroland.com |
| Tel: | 416.646.7446 |
| Fax: | 416.646.4301 |

Lawyers for the Superintendent of Financial Services as
Administrator of the Pension Benefits Guarantee Fund

AND
TO:

**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

| Email: | barry.wadsworth@caw.ca |
| | lewis.gottheil@caw.ca |

| Tel.: | 416.495.3776 |
| Fax: | 416.495.3786 |

Lawyers for all active and retired Nortel employees
represented by the CAW-Canada

AND
TO:

**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

| Email: | arthur.jacques@shibleyrighton.com |
| Tel: | 416.214.5213 |
| Fax: | 416.214.5413 |

| Email : | thomas.mcrae@shibleyrighton.com |
| Tel : | 416.214.5206 |
| Fax : | 416.214.5400 |

Lawyers for The Recently Severed Canadian Nortel
Employees Committee

- 8 -

AND
TO:

**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham
Ainslie Benedict

Email:     janice.payne@nelligan.ca
           steven.levitt@nelligan.ca
           christopher.rootham@nelligan.ca
           ainslie.benedict@nelligan.ca

Tel:       613.231.8245
Fax:       613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees – Post CCAA as at
January 14, 2009

AND
TO:

**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario M5K 1E6

Barbara J. Boake
James D. Gage
Elder C. Marques
Paul Steep
Byron Shaw
Sharon Kour
Kelly Peters

E-mail:    bboake@mccarthy.ca
Tel:       416.601.7557
Fax:       416.868.0673

Email:     jgage@mccarthy.ca
Tel:       416.601.7539
Fax:       416.686.0673

Email:     emarques@mccarthy.ca
Tel:       416.601.7822
Fax:       416.686.0673

Email:     psteep@mccarthy.ca
Tel:       416.601.7998
Fax:       416.686.0673

Email:     bdshaw@mccarthy.ca
Tel:       416.601.8256
Fax:       416.686.0673

Email:     skour@mccarthy.ca
Tel:       416.601.8305
Fax:       416.686.0673

Email:     kpeters@mccarthy.ca
Tel:       416.601.8281
Fax:       416.686.0673

Lawyers for Morneau Shepell Limited

- 9 -

| AND TO: | **DLA PIPER** |

919 North Market Street
Suite 1500
Wilmington, Delaware 19801

Selinda A. Melnik
Richard Hans
Timothy Hoeffner
Farah Lisa Whitley-Sebti

| Email: | selinda.melnik@dlapiper.com |
| Tel: | 302.468.5650 |
| Fax: | 302.778.7914 |

| Email: | richard.hans@dlapiper.com |
| Tel: | 212.335.4530 |
| Fax: | 212.884.8730 |

| Email: | timothy.hoeffner@dlapiper.com |
| Tel: | 212.656.3341 |
| Fax: | 215.606.3341 |

| Email: | farahlisa.sebti@dlapiper.com |
| Tel: | 212.335.4829 |
| Fax: | 212.884.8529 |

U.S. Lawyers for the Canadian Creditors Committee

- 10 -

### INFORMAL NORTEL NOTEHOLDER GROUP

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan
Sean Zweig
Jonathan Bell
Amanda McLachlan

Email:   zychk@bennettjones.com
Tel:     416.777.5738
Fax:     416.863.1716

Email:   orzyr@bennettjones.com
Tel:     416.777.5737
Fax:     416.863.1716

Email:   finlaysong@bennettjones.com
Tel:     416.777.5762
Fax:     416.863.1716

Email:   swanr@bennettjones.com
Tel:     416.777.7479
Fax:     416.863.1716

Email:   zweigs@bennettjones.com
Tel:     416.777.6254
Fax:     416.863.1716

Email:   bellj@bennettjones.com
Tel:     416.777.6511
Fax:     416.863.1716

Email:   mclachlana@bennettjones.com
Tel:     416.777.5393
Fax:     416.863.1716

Canadian Lawyers for The Informal Nortel Noteholder
Group

AND
TO:

**MILBANK, TWEED, HADLEY McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005

Thomas R. Kreller
Jennifer P. Harris
Albert A. Pisa
Samir Vora
Andrew LeBlanc
Michael Hirschfeld
Atara Miller
Tom Matz
Nick Bassett
Gabrielle Ruha
Rachel Pojunas

Email:   TKreller@milbank.com
Tel:     213.892.4463
Fax:     213.629.5063

Email:   JHarris@milbank.com
Tel:     212.530.5475
Fax:     212.530.5219

Email:   APisa@milbank.com
Tel:     212.530.5319
Fax:     212.530.5219

Email:   svora@milbank.com
Tel:     213.892.4595
Fax:     213.629.5063

Email:   aleblanc@milbank.com
Tel:     202.835.7574
Fax:     202.263.7574

Email:   mhirschfeld@milbank.com
Tel:     212.530.5832
Fax:     212.822.5832

Email:   amiller@milbank.com
Tel:     212.530.5421
Fax:     212.822.5421

Email:   tmatz@milbank.com
Tel:     212.530.5885
Fax:     212.822.5885

Email:   nbassett@milbank.com
Tel:     202.835.7546
Fax:     202.263.7546

Email:   gruha@milbank.com
Tel:     212.530.5155
Fax:     212.822.5155

Email:   rpojunas@milbank.com
Tel:     202.835.7551
Fax:     202.263.7551

U.S. Lawyers for The Informal Nortel Noteholder Group

- 11 -

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

AND TO:
**CASSELS BROCK & BLACKWELL LLP**
Suite 2100, Scotia Plaza
40 King Street West
Toronto, ON  M5H 3C2

Shayne Kukulowicz
Michael Wunder
Ryan Jacobs

Email:   skukulowicz@casselsbrock.com
         mwunder@casselsbrock.com
         rjacobs@casselsbrock.com

Tel:    416.869.5300
Fax:    416.360.8877

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND TO:
**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara
David H. Botter
Abid Qureshi
Robert A. Johnson
Brad M. Kahn
Christine Doniak
Joseph Sorkin
Jacqueline Yecies

Email:   fhodara@akingump.com
         dbotter@akingump.com
         aqureshi@akingump.com
         rajohnson@akingump.com
         bkahn@akingump.com
         cdoniak@akingump.com
         jsorkin@akingump.com
         jyecies@akingump.com

Tel:    212.872.1000
Fax:    212.872.1002

U.S. Lawyers for the Official Committee of Unsecured
Creditors

AND TO:
**ASHURST LLP**
Boardwalk House
5 Appold Street
London, EC2A 2HA
United Kingdom

Angela Pearson
Antonia Croke

Email:   angela.pearson@ashurst.com
         antonia.croke@ashurst.com

Tel:    +44 (0)20 7638 1111
Fax:    +44 (0)20 7638 1112

U.K. Lawyers for the Official Committee of Unsecured
Creditors

AND TO:
**RICHARDS LAYTON & FINGER, P.A.**
920 North King Street
Wilmington, DE  19801

Christopher Samis

Email:   samis@rlf.com
Tel:    302.651.7845
Fax:    302.498.7845

Local U.S. Lawyers for the Official Committee of
Unsecured Creditors

`

- 12 -

**UK PENSION PROTECTION FUND AND NORTEL NETWORKS UK PENSION TRUST LIMITED**

AND
TO:

**THORNTON GROUT FINNIGAN LLP**
Suite 3200, 100 Wellington Street West
P.O. Box 329
Toronto-Dominion Centre
Toronto, ON  M5K 1K7

Michael Barrack
D.J. Miller
Rebecca Lewis
Andrea McEwan
John Finnigan
Michael Shakra

Email:    mbarrack@tgf.ca
Tel:      416.304.1109
Fax:      416.304.1313

Email:    dimiller@tgf.ca
Tel:      416.304.0559
Fax:      416.304.1313

Email:    rlewis@tgf.ca
Tel:      416.304.0603
Fax:      416.304.1313

Email:    amcewan@tgf.ca
Tel:      416.304.0596
Fax:      416.304.1313

Email:    jfinnigan@tgf.ca
Tel:      416.304.0558
Fax:      416.304.1313

Email:    mshakra@tgf.ca
Tel:      416.304.0332
Fax:      416.304.1313

Co-Counsel to the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND
TO:

**BAYARD, P.A.**
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

Charlene D. Davis
Justin Alberto

Email:    cdavis@bayardlaw.com
          jalberto@bayardlaw.com

Tel:      302.655.5000
Fax:      302.658.6395

Local U.S. Lawyers for the UK Pension Protection Fund
and Nortel Networks UK Pension Trust Limited

AND
TO:

**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A.

Brian O'Connor
Sameer Advani
Andrew Hanrahan

Email:    boconnor@willkie.com
Tel:      (212) 728-8251
Fax:      (212) 728-9251

Email:    sadvani@willkie.com
Tel:      (212) 728-8587
Fax:      (212) 728-9587

Email:    ahanrahan@willkie.com
Tel:      (212) 728-8170
Fax:      (212) 728-9170

US Counsel for the UK Pension Protection Fund and
Nortel Networks UK Pension Trust Limited

AND
TO:

- 13 -

**THE BANK OF NEW YORK MELLON**

AND
TO:
**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M5J 2T3

Sheryl E. Seigel

Email:  sheryl.seigel@mcmillan.ca
Tel:      416.307.4063
Fax:      416.365.1719

Canadian Lawyers for The Bank of New York Mellon

AND
TO:
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email:   michael.riela@lw.com

Tel :      212.906.1373
Fax :     212.751.4864

U.S. Lawyers for The Bank of New York Mellon

- 14 -

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

AND
TO:

**DENTONS CANADA LLP**
77 King Street West
Suite 400
Toronto, Ontario
M5K 0A1

John Salmas
Kenneth Kraft

Email:  John.Salmas@dentons.com
Tel:  416.863.4737
Fax:  416.863.4592

Email:  Kenneth.Kraft@dentons.com
Tel:  416.863.4374
Fax:  416.863.4592

Canadian Lawyers for Wilmington Trust, National
Association

AND
TO:

**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, NY  10022-2585

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine

Email:  craig.barbarosh@kattenlaw.com
Tel:  212.940.8665
Fax:  212.940.8776

Email:  david.crichlow@kattenlaw.com
Tel:  212.940.8941
Fax:  212.940.8776

Email:  Karen.dine@kattenlaw.com
Tel:  212.940.8772
Fax:  212.940.8776

U.S. Lawyers to Wilmington Trust, National
Association

- 15 -

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
40 King Street West
Toronto, ON  M5H 3Y4

Edmond F. B. Lamek
James Szumski

| | |
|---|---|
| Email: | elamek@blg.com |
| Tel: | 416.367.6311 |
| Fax: | 416.361.2436 |

| | |
|---|---|
| Email: | jszumski@blg.com |
| Tel: | 416.367.6310 |
| Fax: | 416.682.2811 |

Lawyers for Law Debenture Trust Company of New York

AND
TO:

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY  10036

Daniel A. Lowenthal

| | |
|---|---|
| Email: | dalowenthal@pbwt.com |
| Tel: | 212.336.2720 |
| Fax: | 212.336.1253 |

U.S. Lawyers for Law Debenture Trust Company of New York

- 16 -

**BOARDS OF DIRECTORS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED**

AND   **OSLER HOSKIN AND HARCOURT LLP**
TO:   100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, Ontario  M5X 1B8

Lyndon Barnes
Edward Sellers
Betsy Putnam
Adam Hirsh
Alexander Cobb

Email:   lbarnes@osler.com
esellers@osler.com
eputnam@osler.com
ahirsh@osler.com
acobb@osler.com

Tel:   416.362.2111
Fax:   416.862.6666

Lawyers for the Boards of Directors of Nortel Networks
Corporation and Nortel Networks Limited

**COURTESY COPIES:**

AND TO:  **NORTON ROSE FULBRIGHT LLP**
Suite 3800, Royal Bank Plaza
South Tower, 200 Bay Street
P.O. Box 84
Toronto, ON  M5J 2Z4

Michael Lang

Email:  michael.lang@nortonrosefulbright.com

Tel:  416.216.3939
Fax:  416.216.3930

AND TO:  **HOGAN LOVELLS INTERNATIONAL LLP**
Atlantic House
Holborn Viaduct
London  EC1A 2FG
United Kingdom

Angela Dimsdale Gill
John Tillman
Matthew Bullen
David Graves
Katherine Tallett-Williams

Email:  amdg@hoganlovells.com
john.tillman@hoganlovells.com
Matthew.bullen@hoganlovells.com
david.graves@hoganlovells.com
katherine.tallett-williams@hoganlovells.com

Tel:  +44 20 7296 2000
Fax:  +44 20 7296 2001

| | |
|---|---|
| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION | Court File No.:09-CL-7950 |

| |
|---|
| **ONTARIO**<br><br>**SUPERIOR COURT OF JUSTICE**<br>Proceeding Commenced at Toronto |
| **NOTICE OF MOTION**<br>**(returnable April 22, 2014)** |
| **GOODMANSLLP**<br>Barristers & Solicitors<br>Bay Adelaide Centre<br>333 Bay Street, Suite 3400<br>Toronto, ON  M5H 2S7<br><br>**Jay A. Carfagnini** LSUC#: 22293T<br>jcarfagnini@goodmans.ca<br>**Peter Ruby** LSUC#: 38439P<br>pruby@goodmans.ca<br>Joseph Pasquariello LSUC #: 38390C<br>jpasquariello@goodmans.ca<br>**Hannah Arthurs** LSUC#: 55337O<br>harthurs@goodmans.ca<br><br>Tel:    416.979.2211<br>Fax:    416.979.1234<br>Lawyers for the Monitor<br><br>**GOWLING LAFLEUR HENDERSON LLP**<br>Barristers & Solicitors<br>1 First Canadian Place,<br>100 King Street West, Suite 1600<br>Toronto ON M5X 1G5<br><br>**Derrick Tay** (LSUC #: 21152A)<br>derrick.tay@gowlings.com<br>**Jennifer Stam** (LSUC #: 46735J)<br>Jennifer.stam@gowlings.com<br>Tel:    (416) 862-5697<br>Fax:    (416) 862-7661<br><br>Lawyers for the Canadian Debtors |

6319760

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL**
**NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL**
**CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**AFFIDAVIT OF MONIQUE ALLEN**
**(Sworn April 14, 2014)**

**(Motion to Strike Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W.**
**Stratton)**

           **I, MONIQUE ALLEN,** of the City of Toronto, in the Province of Ontario,
**MAKE OATH AND SAY**:

1.      I am a law clerk with the law firm of Goodmans LLP, counsel to Ernst & Young Inc. in
its capacity as Monitor in this matter.  As such, I have personal knowledge of the matters
to which I hereinafter depose in this Affidavit.  Where I do not possess personal
knowledge, I have stated the source of my information and, in all such cases, believe it to
be true.

2.      Attached to this affidavit are copies of the following documents:

      (a)    <u>Exhibit 1</u>:    Motion of the Monitor and Canadian Debtors for entry of an Order
Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce
W. Stratton or, in the alternative, granting leave to file the expert report of
Sheldon Burshtein in rebuttal to the Reports of Daniel R. Bereskin QC and Bruce
W. Stratton;

(b)    Exhibit 2:    Declaration of Jay Pultman sworn April 11, 2014 (the "**Pultman Declaration**"), attaching the following Exhibits:

    (i)    Exhibit A:    Rebuttal Expert Report of Daniel R. Bereskin, dated February 28, 2014.

    (ii)    Exhibit B:    Rebuttal Expert Report of Bruce W. Stratton, dated February 28, 2014.

    (iii)    Exhibit C:    Expert Reply of Sheldon Burshtein to Rebuttal Reports of Daniel R. Bereskin QC and Bruce W. Stratton, dated March 24, 2014 and served March 31, 2014 (the "**Burshtein Report**").

    (iv)    Exhibit D:    Initial Expert Report of Dr. Timothy Reichert, dated January 24, 2014.

    (v)    Exhibit E:    Initial Expert Report of Mark L. Berenblut and Alan J. Cox, dated January 24, 2014.

    (vi)    Exhibit F:    Initial Expert Report of Philip Green, dated January 24, 2014.

    (vii)    Exhibit G:    Initial Expert Report of Thomas Britven, dated January 24, 2014.

    (viii)    Exhibit H:    Letter from Peter Ruby, counsel to the Movants, regarding the Burshtein Report, dated March 24, 2014 (the "**March 24 Movants Letter**").

    (ix)    Exhibit I:    Letter from Peter Ruby, counsel to the Movants, regarding the Burshtein Report, dated March 30, 2014.

    (x)    Exhibit J:    Transcript of Deposition of Daniel R. Bereskin QC, taken on March 27, 2014.

    (xi)    Exhibit K:    Transcript of Deposition of Bruce W. Stratton, taken on April 4, 2014.

    (xii)    Exhibit L:    U.S. Debtors' Disclosure of Intended Expert Witnesses, submitted January 8, 2014 and dated January 8, 2013.

    (xiii)    Exhibit M:    U.K. Pension Claimants' Disclosure of Intended Expert Witnesses, dated January 8, 2014.

    (xiv)    Exhibit N:    Letter of John L. Finnigan, counsel to the U.K. Pension Claimants, dated March 25, 2014 and responding to the March 24 Movants Letter.

(xv)     <u>Exhibit O</u>:    Expert Reply of Sheldon Burshtein to Rebuttal Reports of Daniel R. Bereskin QC and Bruce W. Stratton, dated and served on March 24, 2014 and subsequently modified by the Burshtein Report.

(xvi)     <u>Exhibit P</u>:    Letter of Sheila Block, counsel to the U.S. Debtors, dated March 25, 2014 and responding to the March 24 Movants Letter.

(xvii)     <u>Exhibit Q</u>:    Letter of Matthew P. Gottlieb, counsel to the Joint Administrators of the EMEA Debtors, dated March 25, 2014 and responding to the March 24 Movants Letter.

3.    Exhibit 1 and as well as Exhibits A, B, C, D, E, F, G, J, K and O to the Pultman Declaration are being filed under seal pursuant to paragraph 8(b) of the Protective Order.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario on this 14th day of April, 2014.

_____
Commissioner for Taking Affidavits or Notary Public

Tamryn Jacobson

_____
Monique Allen

## EXHIBIT 1

**Motion of the Monitor and the Canadian Debtors for Entry of an Order Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, in the alternative, Granting Leave to File the Report of Sheldon Burshtein in Rebuttal to the Reports of Daniel R. Bereskin QC and Bruce W. Stratton**

**Please See Docket Number 13317**

<u>**EXHIBIT 2**</u>

**Declaration of Jacob S. Pultman and Exhibits**

**Please See Docket Number 13318**



Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

THE HONOURABLE ) WEDNESDAY, THE 14TH
)
MR. JUSTICE MORAWETZ ) DAY OF JANUARY, 2009

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION (the
"Applicants")

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**FIFTH AMENDED AND RESTATED INITIAL ORDER**

THIS APPLICATION, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "CCAA") was heard this day at 330 University Avenue, Toronto, Ontario.

ON READING the affidavit of John Doolittle sworn January 14, 2009 (the "Doolittle Affidavit") and the Exhibits thereto, the affidavit of John Doolittle sworn June 22, 2009 (the "June Affidavit") and the Exhibits thereto, the report dated January 14, 2009 of Ernst & Young Inc. ("E&Y"), the proposed monitor, and on hearing the submissions of counsel for the Applicants, counsel for the boards of directors of Nortel Networks Corporation and Nortel Networks Limited, counsel for E&Y, counsel for Export Development Canada ("EDC"), Flextronics

Telecom Systems Ltd., no one else appearing on this Application and on reading the consent of E&Y to act as the Monitor,

**SERVICE**

1.    THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged so that this Application is properly returnable today and hereby dispenses with further service thereof.

**APPLICATION**

2.    THIS COURT ORDERS AND DECLARES that each of the Applicants is a "debtor company" to which the CCAA applies.

**PLAN OF ARRANGEMENT**

3.    THIS COURT ORDERS that each of the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "Plan") between, *inter alia*, such Applicant and one or more classes of its secured and/or unsecured creditors as it deems appropriate.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.    THIS COURT ORDERS that each of the Applicants shall remain in possession and control of its current and future assets, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "Property").  Subject to further Order of this Court, each of the Applicants shall continue to carry on business in a manner consistent with the preservation of its business (the "Business") and Property.  Each of the Applicants shall be authorized and empowered to continue to retain and employ the employees, consultants, agents, experts, brokers, accountants, legal counsel, financial advisors and such other persons (collectively "Assistants") currently retained or employed by such Applicant, with liberty to retain such further Assistants as such Applicant deems reasonably necessary or desirable for the Business or to carry out the terms of this Order or for the purposes of the Plan.

5.      THIS COURT ORDERS that the Applicants shall be entitled to continue to utilize the central cash management system currently in place as described in the Doolittle Affidavit or replace it with another substantially similar central cash management system (the "Cash Management System") and that any present or future bank or banks providing the Cash Management System shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Applicants of funds transferred, paid, collected or otherwise dealt with in the Cash Management System; shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Applicants, pursuant to the terms of the documentation applicable to the Cash Management System; and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under the Plan with regard to any claims or expenses it may suffer or incur in connection with the provision of the Cash Management System.

6.      THIS COURT ORDERS that each of the Applicants, either on its own behalf or on behalf of another Applicant, shall be entitled but not required to pay the following expenses whether incurred prior to, on or after the date of this Order:

    (a)     all outstanding and future wages, salaries and employee benefits (including, but not limited to, employee medical and similar benefit plans, relocation and tax equalization programs, the Incentive Plan (as defined in the Doolittle Affidavit) and employee assistance programs), current service, special and similar pension benefit payments, vacation pay, commissions and employee and director expenses, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

    (b)     compensation to employees in respect of any payments made to employees prior to the date of this Order by way of the issuance of cheques or electronic transfers, which are subsequently dishonoured due to the commencement of proceedings under the CCAA;

(c)    all outstanding and future amounts owing to or in respect of individuals working as independent contractors in connection with the Business;

(d)    the fees and disbursements of any Assistants retained or employed in accordance with paragraph 4 hereof;

(e)    subject to the consent of the Monitor, amounts owing by one of more of the Applicants in respect of its Customer Programs (as defined in the Doolittle Affidavit);

(f)    subject to consent of the Monitor, amounts owing by one or more of the Applicants to any other Nortel Company (as defined in the Doolittle Affidavit) in order to settle their inter-company accounts and make inter-company loans in the ordinary course of business, including as a result of the Nortel Companies' Transfer Pricing Model (as defined in the Doolittle Affidavit); and

(g)    subject to the consent of the Monitor, amounts owing to the Applicants' carriers and warehousemen.

7.    THIS COURT ORDERS that, except as otherwise provided to the contrary herein, each of the Applicants shall be entitled but not required to pay all reasonable expenses incurred by it in carrying on the Business in the ordinary course on and after the date of this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers insurance) and maintenance and security services;

(b)    payment for goods or services actually supplied to the Applicants on or after the date of this Order;

(c)    with the written approval of the Monitor, the posting of additional cash collateral into existing cash collateral accounts (collectively, and together with the cash collateral posted as at February 10, 2009, the "LC Cash Collateral") held by either

-5-

or both of ABN AMRO Bank N.V., Canada Branch ("ABN") and Royal Bank of Canada ("RBC") as additional and continuing security for existing, renewed and new letters of credit, letters of guarantee, surety bonds, and similar instruments (collectively, "LCs") issued (whether before or after January 14, 2009) for the account of or requested by the Applicants or any of them to third parties pursuant to the existing letter of credit agreements between the Applicants and ABN and RBC and any amendments thereto made with the written approval of the Monitor, and for any foreign exchange losses incurred by ABN and its correspondent banks, if any, under LCs issued in currencies other than Canadian dollars, U.S. dollars, British pounds sterling and Euros, on the following basis:

(i)     the posting of such additional cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(ii)    the aggregate of all cash collateral that may be posted (inclusive of the cash collateral posted as at February 10, 2009) in respect of LCs issued in Canadian dollars, U.S. dollars, British pounds sterling and Euros shall not exceed the amount of U.S.$40 million (converting Canadian dollars at the Bank of Canada's Noon spot exchange rate for any day), provided that the LC Banks shall have no liability in the event that cash collateral is posted in an amount that exceeds such maximum and the validity of their claims with respect to any or all of the LC Cash Collateral shall not be limited, lessened or otherwise impaired in any way as a result of such excess; and

(iii)   cash collateral may be posted in respect of LCs issued by ABN in any other currencies in such amounts as are required by the provisions of the applicable letter of credit agreement, including any amendments thereto made with the written approval of the Monitor as security for ABN's exposure to foreign exchange losses;

(d)     if the same is not guaranteed by EDC, payment of any indebtedness of the Applicants to the LC Banks (as defined in paragraph 10A hereof) when due under the LC Agreements (as defined in paragraph 10A hereof) by way of set-off and transfer of LC Cash Collateral posted as at January 14, 2009 or posted thereafter pursuant to the LC Agreements and subparagraph (c) above;

(e)     without limiting (d), payment of costs and expenses of the LC Banks in connection with the amendment and enforcement of rights under the LC Agreements and any related guarantee bonds issued by EDC if so provided for under an applicable LC Agreement, whether incurred before or after February 10, 2009, including by way of set-off and transfer of LC Cash Collateral;

(f)     the posting of cash collateral in favour of Export Development Canada ("EDC") (collectively, the "EDC Cash Collateral") pursuant to the second amended and restated short-term support agreement between Nortel Networks Limited ("NNL") and EDC dated April 24, 2009, as amended by the amending agreement between NNL and EDC dated June 18, 2009, and the cash collateral agreement between NNL and EDC dated June 18, 2009 and any further amendments to the foregoing made with the written approval of the Monitor (collectively, the "EDC Support Agreements"), on the basis that the EDC Support Agreements are hereby ratified and approved and the posting of such cash collateral is for the purposes of paragraph 10 hereof specifically permitted herein and authorized hereby and shall not and will not constitute a fraudulent preference, fraudulent conveyance, oppressive conduct, settlement or other challengeable, voidable or reviewable transaction under any applicable law;

(g)     payment of any indebtedness of NNL to EDC under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral posted as at June 29, 2009 or posted thereafter pursuant to the EDC Support Agreements and subparagraph (f) above; and

(h)     without limiting (g), payment of costs and expenses of EDC provided for under the EDC Support Agreements by way of set-off or transfer of EDC Cash Collateral, to the extent provided for in the EDC Support Agreements.

7A.     THIS COURT ORDERS that no provision of this Order shall require EDC to provide its approval for any proposed amendments to any of the LC Agreements pursuant to any agreement between EDC and any of the LC Banks.

8.     THIS COURT ORDERS that the each of the Applicants shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "Sales Taxes") required to be remitted by such Applicant in connection with the sale of goods and services by such Applicant, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province or Territory thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by such Applicant.

9.     THIS COURT ORDERS that until such time as an Applicant delivers a notice in writing to repudiate a real property lease in accordance with paragraph 11(c) of this Order (a "Notice of Repudiation"), each Applicant shall pay all amounts constituting rent or payable as rent under

real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated by such Applicant and the landlord from time to time ("Rent"), for the period commencing from and including the date of this Order, monthly on the first day of each month, in advance (but not in arrears). On the date of the first of such payment, any arrears relating to the period commencing from and including the date of this Order shall also be paid. Upon delivery of a Notice of Repudiation, such Applicant shall pay all Rent due for the notice period stipulated in paragraph 11(c) of this Order, to the extent that Rent for such period has not already been paid.

10.     THIS COURT ORDERS that, except as specifically permitted herein, each of the Applicants is hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by such Applicant to any of its creditors as of this date unless such payments have been approved by the Monitor; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of its Property; and (c) to not grant credit or incur liabilities except in the ordinary course of business unless such obligation has been approved by the Monitor.

10A.    THIS COURT ORDERS that, notwithstanding paragraph 10 hereof,

     (a)     the existing letter of credit agreements between the Applicants and ABN, RBC and Citibank, N.A. acting through its Canadian branch ("Citibank") and any amendments thereto made after January 14, 2009 with the written approval of the Monitor, together with any agreements entered into by the Applicants or any of them with any other lenders with the written approval of the Monitor providing letter of credit facilities or similar facilities to the Applicants or any of them (including those which may be the subject of EDC guarantee bonds issued pursuant to the EDC Support Facility) (collectively, the "LC Agreements"), and the issuance or renewal of LC's pursuant thereto by ABN, RBC, Citibank and any other lenders (collectively, the "LC Banks"), together with any payments made by the Applicants or EDC with respect thereto; and

(b)    the EDC Support Agreements and any amendments thereto made after June 18, 2009 with the written consent of the Monitor, together with any payments made by NNL with respect thereto,

are specifically permitted herein and authorized hereby and shall not and will not constitute fraudulent preferences, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law

10B.    THIS COURT ORDERS that, notwithstanding any other provision in this Order, no LC Bank shall be required to issue a letter of credit to the Applicants or any of them and EDC shall not be required to provide any Secured Support to the Applicants or any of them.

**RESTRUCTURING**

11.    THIS COURT ORDERS that each of the Applicants shall, have the right to:

(a)    permanently or temporarily cease, downsize or shut down any of its business or operations and to dispose of redundant or non-material assets not exceeding CDN$10,000,000 in any one transaction or CDN$50,000,000 in the aggregate, subject to paragraph (c), if applicable;

(b)    terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate and to deal with the consequences thereof in the Plan or on further order of the Court;

(c)    in accordance with paragraphs 12 and 13, vacate, abandon or quit the whole but not part of any leased premises and/or repudiate any real property lease and any ancillary agreements relating to any leased premises, on not less than seven (7) days notice in writing to the relevant landlord on such terms as may be agreed upon between the Applicant and such landlord, or failing such agreement, to deal with the consequences thereof in the Plan;

(d)    repudiate such of its arrangements or agreements of any nature whatsoever, including, without limitation, any of its deferred compensation, or bonus plans, change of control plans, stock options or restructured stock unit plans and

shareholder rights plans whether oral or written, as such Applicant may deem appropriate on such terms as may be agreed upon between such Applicant or any one of them and such counter-parties, or failing such agreement, to deal with the consequences thereof in the Plan; and

(e)     pursue all avenues of refinancing and offers for material parts of its Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing or any sale (except as permitted by subparagraph (a), above);

all of the foregoing to permit the Applicants to proceed with an orderly restructuring of the Business (the "Restructuring").

12.     THIS COURT ORDERS that each of the Applicants shall provide each of the relevant landlords with notice of such Applicant's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal. The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes such Applicant's entitlement to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and such Applicant, or by further Order of this Court upon application by such Applicant on at least two (2) days notice to such landlord and any such secured creditors. If such Applicant repudiates the lease governing such leased premises in accordance with paragraph 11(c) of this Order, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in paragraph 11(c) of this Order), and the repudiation of the lease shall be without prejudice to such Applicant's claim to the fixtures in dispute.

13.     THIS COURT ORDERS that if a Notice of Repudiation is delivered, then (a) during the notice period prior to the effective time of the repudiation, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the Applicants and the Monitor 24 hours' prior written notice, and (b) at the effective time of the repudiation, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the Applicants in

respect of such lease or leased premises and such landlord shall be entitled to notify the Applicants of the basis on which it is taking possession and to gain possession of and re-lease such leased premises to any third party or parties on such terms as such landlord considers advisable, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

**NO PROCEEDINGS AGAINST THE APPLICANTS OR THE PROPERTY**

14.    THIS COURT ORDERS that until and including February 13, 2009 or such later date as this Court may order (the "Stay Period"), no proceeding or enforcement process in any court or tribunal (each, a "Proceeding") shall be commenced, or continued against or in respect of any of the Applicants or the Monitor, or affecting the Business or the Property, except with the written consent of the affected Applicant and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the affected Applicant or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

15.    THIS COURT ORDERS that during the Stay Period, all rights and remedies of any individual, firm, corporation, governmental body or agency, or any other entities (all of the foregoing, collectively being "Persons" and each being a "Person") against or in respect of the Applicants or the Monitor, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the affected Applicant and the Monitor, or leave of this Court, provided that nothing in this Order shall (i) empower the Applicants to carry on any business which the Applicants are not lawfully entitled to carry on, (ii) exempt the Applicants from compliance with statutory or regulatory provisions relating to health, safety or the environment, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

**NO INTERFERENCE WITH RIGHTS**

16.    THIS COURT ORDERS that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right,

contract, agreement, licence or permit in favour of or held by the Applicants, except with the written consent of the Applicants and the Monitor, or leave of this Court.

**CONTINUATION OF SERVICES**

17.    THIS COURT ORDERS that during the Stay Period, all Persons having oral or written agreements with the Applicants or with third parties on behalf of the Applicants, or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, employment agency services, insurance, transportation services, utility, leasing or other services to the Business or to any of the Applicants, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the applicable Applicant and that such Applicant shall be entitled to the continued use of its current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case that the normal prices or charges for all such goods or services received after the date of this Order are paid by such Applicant, in accordance with normal payment practices of such Applicant, as applicable, or such other practices as may be agreed upon by the supplier or service provider and the affected Applicant and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

18.    THIS COURT ORDERS that, notwithstanding anything else contained herein, no creditor of the Applicants shall be under any obligation after the making of this Order to advance or re-advance any monies or otherwise extend any credit to the Applicants. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

19.    THIS COURT ORDERS that during the Stay Period, and except as permitted by subsection 11.5(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Applicants with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Applicants whereby the directors or officers are alleged under any law to be

liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Applicants, if one is filed, is sanctioned by this Court or is refused by the creditors of the Applicants or this Court.

## DIRECTORS AND OFFICERS

20.    THIS COURT ORDERS that each of the Applicants shall indemnify its directors and officers from all claims, costs, charges and expenses relating to the failure of such Applicant, after the date hereof, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or for the Applicants' failure to make payments in respect of employer health tax or workers' compensation which they sustain or incur by reason of or in relation to their respective capacities as directors and/or officers except to the extent that, with respect to any officer or director, such officer or director has actively participated in the breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

21.    THIS COURT ORDERS that the directors and officers of the Applicants shall be entitled to the benefit of and are hereby granted a charge (the "Directors' Charge") on the Property, which charge shall not exceed an aggregate amount of CDN $45 million, as security for the indemnities provided in paragraph 20 of this Order as well as for fees and disbursements of their legal counsel. The Directors' Charge shall have the priority set out in paragraphs 42 and 44 herein.

21A.    THIS COURT ORDERS that, to the extent that any one or more of proven Claims (as defined below), together with the fees and disbursements of legal counsel to the directors and officers of the Applicants, individually or in the aggregate, exceed the amount of CDN $45 million, each such proven Claim against such directors and officers shall be reduced *pro rata* so that the aggregate of all such proven Claims, together with the fees and disbursements of legal counsel to such directors and officers, shall not exceed the amount of CDN $45 million and such excess amounts of all such proven Claims and any other Claims are hereby and shall be forever barred, disallowed, enjoined, released, discharged and extinguished as against the directors and officers of the Applicants. Provided, however, that nothing in this paragraph 21A shall operate to release any director or officer of an Applicant in respect of such excess amount of any such Claim where, in respect of such Claim, such director or officer has actively participated in the

breach of any related fiduciary duties or has been grossly negligent or guilty of wilful misconduct.

In this paragraph 21A, "Claim" shall mean any claim (contingent, liquidated or unliquidated, proven or unproven, known or unknown) or any legal proceeding or action of any nature or kind, in these proceedings or any subsequent receivership or bankruptcy proceedings or in any other proceedings or in any other forum whatsoever, against one or more of the directors or officers of any one or more of the Applicants relating to the failure of any of the Applicants, after the date of this Order, to make payments of the nature referred to in subparagraphs 6(a), 6(b), 8(a), 8(b) and 8(c) of this Order or the Applicants' failure to make payments in respect of employer health tax or workers' compensation, which are or may be directly or indirectly advanced, asserted, re-asserted, refiled or made by any person, governmental or regulatory authority or other entity against one or more of the directors or officers of any one or more of the Applicants, to the extent that such Claim is not covered under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order

22.    THIS COURT ORDERS that, notwithstanding any language in any applicable insurance policy to the contrary, (a) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (b) each of the Applicants' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 20 of this Order.

23.    THIS COURT ORDERS that each of NNC's and NNL's directors shall be entitled to receive remuneration in cash on a current basis at current compensation levels (less an overall U.S.$25,000 reduction) notwithstanding the terms of, or elections made under, the Directors' Compensation Plan.

**APPOINTMENT OF MONITOR**

24.    THIS COURT ORDERS that E&Y is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the Property and the Applicants' conduct of the

Business with the powers and obligations set out in the CCAA or set forth herein and that each of the Applicants and its officers, directors, and Assistants shall advise the Monitor of all material steps taken by such Applicant pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations.

25.     THIS COURT ORDERS that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Applicants' receipts and disbursements;

(b)     provide the consents contemplated herein;

(c)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(d)     advise the Applicants in their preparation of the Applicants' cash flow statements and any other reporting to the Court or otherwise;

(e)     advise the Applicants in their development of the Plan or Plans and any amendments to such Plan or Plans;

(f)     assist the Applicants, to the extent required by the Applicants, with the Restructuring;

(g)     assist the Applicants, to the extent required by the Applicants, with the holding and administering of creditors' or shareholders' meetings for voting on the Plan or Plans;

(h)     have full and complete access to the books, records and management, employees and advisors of the Applicants and to the Business and the Property to the extent required to perform its duties arising under this Order;

(i)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and

performance of its obligations under this Order including, without limitation, one or more entities related to or affiliated with the Monitor;

(j)     consider, and if deemed advisable by the Monitor, prepare a report and assessment on the Plan or Plans;

(k)     assist the Applicants with respect to any insolvency proceedings commenced by or with respect to any other Nortel Company (as defined in the Doolittle Affidavit) in any foreign jurisdiction (collectively, "Foreign Proceedings") and report to this Court, as it deems appropriate, on the Foreign Proceedings with respect to matters relating to the Applicants;

(l)     apply as the foreign representative of the Applicants, for recognition of these proceedings as "Foreign Main Proceedings", pursuant to Chapter 15 of the United States Bankruptcy Code, 11 U.S.C. §101 (the "U.S. Bankruptcy Code") or similar legislation in any other jurisdiction; and

(m)     perform such other duties as are required by this Order or by this Court from time to time.

26.     THIS COURT ORDERS that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

27.     THIS COURT ORDERS that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "Possession") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the *Ontario Environmental Protection Act*, the *Ontario Water Resources Act*, or the *Ontario Occupational Health and Safety Act* and regulations

thereunder (the "Environmental Legislation"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

28.    THIS COURT ORDERS that that the Monitor shall provide any creditor of the Applicants with information provided by the Applicants in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Applicants is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicants may agree.

29.    THIS COURT ORDERS that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment and the fulfilment of its duties or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

30.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, counsel to the Applicants and counsel to directors shall be paid their reasonable fees and disbursements incurred both before and after the making of the Order, in each case at their standard rates and charges, by the Applicants as part of the costs of these proceedings. Each of the Applicants is hereby authorized and directed to pay the accounts of the Monitor, counsel for the Monitor, counsel for the Applicants and counsel to directors on a weekly basis and, in addition, each of the Applicants is hereby authorized to pay to: (a) the Monitor and its Canadian and U.S. counsel a retainer in the aggregate amount of CDN$750,000; and (b) counsel to the Applicants a retainer in the amount of CDN$750,000 (collectively, the "Retainers") to be held by them as security for payment of their respective fees and disbursements outstanding from time to time.

31.    THIS COURT ORDERS that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

32.    THIS COURT ORDERS that the Monitor, counsel to the Monitor, if any, and the Applicants' counsel shall be entitled to the benefit of and are hereby granted a charge (the "Administration Charge") on the Property, which charge shall not exceed an aggregate amount of $5,000,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Monitor and such counsel, both before and after the making of this Order in respect of these proceedings.  The Administration Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**EDC**

33.    Intentionally Deleted.

**INTERCOMPANY LOANS**

34.    THIS COURT ORDERS to the extent that an Applicant receives a post-filing inter-company loan or other transfer (including goods and services) from a Chapter 11 Entity (as defined in the Doolittle Affidavit) (including as a result of the Applicants' cash management system or otherwise) (each such Applicant, a "Beneficiary Applicant"), and such post-filing inter-company loan or other transfer is made (each an "Advance") by a Chapter 11 Entity (together with NNL for the purposes of paragraph 34A below, a "Protected Entity"), then, subject to the limitations set forth in this paragraph:

    (a)    the Protected Entity shall have a proven and valid claim against such Beneficiary Applicant for the amount of such Advance (each, an "Inter-company Reimbursement Claim"), which Inter-company Reimbursement Claim shall bear interest at a rate agreed between the applicable Beneficiary Applicant and Protected Entity from time to time for the period in accordance with past practice; and

(b)     all of the Property of the Beneficiary Applicant, is hereby charged by a mortgage, lien and security interest (such mortgage, lien and security interest, "Inter-company Charge") in favour of each of the Protected Entities as security for payment of the Inter-company Reimbursement Claim (including principal, interest and expenses) by the applicable Beneficiary Applicant to the corresponding Protected Entity.

34A.   THIS COURT ORDERS that the Inter-Company Charge shall also secure any Advances made by NNL to Nortel Networks Technology Corporation ("NNTC") on or after January 14, 2009 and that NNL shall be a "Protected Entity" and NNTC shall be a "Beneficiary Applicant" in respect of such Advances.

35.   THIS COURT ORDERS that the Inter-company Charge shall also secure the Remaining Revolver Claim (as defined in the Final Canadian Funding and Settlement Agreement dated as of December 22, 2009 among, *inter alia*, the Applicants and NNI) as also evidenced by the Secured Promissory Note dated as of February 16, 2010 in the principal amount of U.S.$62,700,000 given by NNL to NNI.

36.   THIS COURT ORDERS the Inter-company Charge shall be junior, subject and subordinate only to the other Charges (defined below), and any other future charges against such Beneficiary Applicant that, by the Court order creating them, are expressly stated to be senior to the Inter-company Charges entered after notice and a hearing.

37.   THIS COURT ORDERS that pending further order of this Court, an Inter-company Charge shall be a "silent" charge and the Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Inter-company Reimbursement Claim held by such party, including, without limitation, as to seeking relief from the stay granted hereunder, or seeking any sale, foreclosure, realization upon repossession or liquidation of any Property of a Beneficiary Applicant, or taking any position with respect to any disposition of the Property, the business operations, or the reorganization of a Beneficiary Applicant. An Inter-company Charge automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that Property subject to such Inter-company Charge is sold or otherwise disposed of in accordance with the terms of this Order or

further order of this Court after notice and a hearing, with respect to the effect of an Inter-company Charge on any sale of Property by any Beneficiary Applicant.

38.     THIS COURT ORDERS that the Beneficiary Applicants may sell Property, in accordance with the terms of this Order or further order of this Court after notice and a hearing, in each case free and clear of any Inter-company Charge, with such Inter-company Charge attaching to the proceeds of sale in the same priority and subject to the same limitations and restrictions as existed in respect of the Property sold.

## INTERIM GROUP SUPPLIER PROTOCOL AGREEMENT

39.     THIS COURT ORDERS that the Applicants be and are hereby authorized to enter into a group supplier protocol agreement (the "Interim GSPA") substantially in the form attached as Exhibit "C" to the Doolittle Affidavit which agreement shall be effective upon the appointment of the Administrators in the United Kingdom, and the Applicants are hereby authorized to perform each of their obligations, if any, under the Interim GSPA.  The obligations of the Applicants under the Interim GSPA shall be secured by the Inter-Company Charge.

## NNI LOAN

40.     THIS COURT ORDERS that the amended and restated loan agreement entered into between NNL, as borrower, NNTC and the other Applicants as guarantors, and Nortel Networks Inc. ("NNI") as lender (the "NNI Loan Agreement"), substantially in the form attached as Exhibit "B" to the Affidavit of John Doolittle sworn March 27, 2009 providing for a revolving loan facility of up to U.S.$200 million is hereby approved and each of the Applicants is hereby directed to execute and to comply with its obligations under the NNI Loan Agreement.

41.     Intentionally deleted.

41A.    Intentionally deleted.

41B.    Intentionally deleted.

41C.    Intentionally deleted.

**EXCESS FUNDING CHARGE**

41D.    THIS COURT ORDERS that as security for NNL's obligation to repay to NNI the Contingent Payment (as defined in the Interim Funding Agreement, as defined in the June Affidavit) along with interest, if any, NNI shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Excess Funding Charge"). The Excess Funding Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**SHORTFALL CHARGE**

41E.    THIS COURT ORDERS that as security for any obligation of NNL to make the Shortfall Payments (as defined in the Interim Funding Agreement, as defined in the June Affidavit), Nortel Networks UK Limited shall be entitled to the benefit of and is hereby granted a charge on the Property (the "Shortfall Charge"). The Shortfall Charge shall have the priority set out in paragraphs 42 and 44 hereof.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

42.    THIS COURT ORDERS that the priorities of the Administration Charge, the Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge on all Property shall be as follows:

> First – the Administration Charge;
>
> Second – the Excess Funding Charge
>
> Third – the Directors' Charge; and
>
> Fourth -
>
> (a)    the Inter-Company Charge;
>
> (b)    the Shortfall Charge,

- 22 -

which Inter-company Charge and Shortfall Charge shall rank *pari passu* with one another.

Fifth -

(a)     the Payments Charge (as defined in the employee Settlement Approval Order of this Court made on March 31, 2010); and

(b)     the Nortel Special Incentive Plan Charge (as defined in the order approving the Nortel Special Incentive Plan of this Court made on March 8, 2010),

which Payments Charge and Nortel Special Incentive Plan Charge shall rank *pari passu* with one another.

43.     THIS COURT ORDERS that the filing, registration or perfection of the Administration Charge, Excess Funding Charge, the Directors' Charge, the Inter-company Charge, the Shortfall Charge, the Payments Charge and the Nortel Special Incentive Plan Charge (collectively, the "Charges") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect. Notwithstanding anything herein, the Charges shall not attach to the Retainers.

44.     THIS COURT ORDERS that each of the Charges (all as constituted and defined herein), shall subject to this paragraph 44 and to paragraph 46 herein constitute a charge on the Property secured thereunder, and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, statutory or otherwise (collectively, "Encumbrances") in favour of any Person. For greater certainty,

(a)     the Charges shall attach to the LC Cash Collateral junior in priority to any rights or Encumbrances in favour of LC Banks in respect of LC Cash Collateral and only to the extent of the rights of the Applicants to the return of any LC Cash Collateral from the LC Banks following the exercise of the rights of the LC Banks

as against any such LC Cash Collateral pursuant to the LC Agreements or section 18.1 of the CCAA, and

(b)     the Charges shall attach to the EDC Cash Collateral junior in priority to any rights or Encumbrances in favour of EDC in respect of EDC Cash Collateral and only to the extent of the rights of NNL to the return of any EDC Cash Collateral from EDC following the exercise of the rights of EDC as against any such EDC Cash Collateral pursuant to the EDC Support Agreements or section 18.1 of the CCAA

notwithstanding anything to the contrary contained in this Order.

45.     THIS COURT ORDERS that except as otherwise expressly provided for herein, or as may be approved by this Court, the Applicants shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges charging such Property, unless the Applicants also obtain the prior written consent of the Monitor and the beneficiaries of such Charges, or by further Order of this Court.

46.     THIS COURT ORDERS that none of the Charges, the LC Agreements and the EDC Support Agreements shall be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "Chargees") thereunder, the rights of the LC Banks under LC Agreements and the rights of EDC under the EDC Support shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "Agreement") which binds the Applicants, and notwithstanding any provision to the contrary in any Agreement:

(a)     the creation of the Charges, the entering into of the LC Agreements and the issuance or renewal of LC's thereunder and the entering into of the EDC Support

Agreements and the provision of Secured Support, as defined and contemplated thereunder, shall not create or be deemed to constitute a breach by any of the Applicants of any Agreement to which it is a party;

(b)    none of the Chargees, the LC Banks and EDC shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from, the creation of the Charges, the entering into of the LC Agreements or the issuance or renewal of LC's thereunder or the entering into of the EDC Support Agreements and the provision of Secured Support; and

(c)    the payments made by the Applicants pursuant to this Order and the granting of the Charges and the entering into of the LC Agreements and the EDC Support Agreements do not and will not constitute fraudulent preferences, fraudulent conveyances, oppressive conduct, settlements or other challengeable, voidable or reviewable transactions under any applicable law.

47.    THIS COURT ORDERS that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Applicants' interest in such real property leases.

**FLEXTRONICS AMENDING AGREEMENT**

48.    THIS COURT ORDERS that the Flextronics Amending Agreement in the form attached as Exhibit "B" to the Doolittle Affidavit be and is hereby approved and NNL is hereby authorized and directed to comply with its obligations thereunder.

**CROSS-BORDER PROTOCOL**

49.    THIS COURT ORDERS that the cross-border protocol, as amended, in the form attached as Schedule "A" hereto be and is hereby approved and shall become effective upon its approval by the United States Bankruptcy Court for the District of Delaware and the parties to these proceedings and any other Person shall be governed by it and shall comply with the same.

**FOREIGN PROCEEDINGS**

50.     THIS COURT ORDERS that the Monitor is hereby authorized and directed to apply for recognition of these proceedings as "Foreign Main Proceedings" in the United States pursuant to Chapter 15 of the U.S. Bankruptcy Code.

51.     THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, the United States, the United Kingdom or elsewhere, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.

52.     THIS COURT ORDERS that each of the Applicants and the Monitor be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

**SERVICE AND NOTICE**

53.     THIS COURT ORDERS that the Monitor shall, within ten (10) business days of the date of entry of this Order, send notice of this Order and the commencement of the within proceedings to the Applicants' known creditors, other than employees and creditors to which the Applicants owe less than $5,000, at their addresses as they appear on the Applicants' records, and shall promptly send a copy of this Order (a) to all parties filing a Notice of Appearance in respect of this Application, and (b) to any other interested Person requesting a copy of this Order, and the Monitor is relieved of its obligation under Section 11(5) of the CCAA to provide similar notice, other than to supervise this process. The Monitor, on behalf of the Applicants, shall, in its discretion, be entitled to engage a third party mailing service in order to assist or complete the mailing. Any such service provider shall be considered an "Assistant" hereunder.

54.    THIS COURT ORDERS that the Applicants and the Monitor be at liberty to serve this Order, any other materials and orders in these proceedings, and any notices or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal delivery or electronic transmission to the Applicants' creditors or other interested parties at their respective addresses as last shown on the records of the Applicants and that any such service or notice by courier, personal delivery or electronic transmission shall be deemed to be received on the next business day following the date of forwarding thereof, or if sent by ordinary mail, on the third business day after mailing.

55.    THIS COURT ORDERS that the Applicants, the Monitor, and any party who has filed a Notice of Appearance may serve any court materials in these proceedings by e-mailing a PDF or other electronic copy of such materials to counsels' email addresses as recorded on the Service List from time to time, in accordance with the E-filing protocol of the Commercial List to the extent practicable, and the Monitor may post a copy of any or all such materials on its website at http://www.ey.com/ca/nortel.

**GENERAL**

56.    THIS COURT ORDERS that any of the Applicants or the Monitor may from time to time apply to this Court for advice and directions in the discharge of its powers and duties hereunder.

57.    THIS COURT ORDERS that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Applicants, the Business or the Property.

58.    THIS COURT ORDERS that any interested party (including the Applicants and the Monitor) may apply to this Court to vary or amend this Order on not less than seven (7) days notice to any other party or parties likely to be affected by the order sought or upon such other notice, if any, as this Court may order.

- 27 -

59.    THIS COURT ORDERS that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard Time on the date of this Order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO.:

FEB 25 2011

PER / PAR:  NB

## SCHEDULE "A" – CROSS-BORDER PROTOCOL

**Attached.**

## CROSS-BORDER INSOLVENCY PROTOCOL

This cross-border insolvency protocol (the "Protocol") shall govern the conduct of all parties in interest in the Insolvency Proceedings (as such term is defined herein).

The Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases (the "Guidelines") attached as Schedule "A" hereto, shall be incorporated by reference and form part of this Protocol. Where there is any discrepancy between the Protocol and the Guidelines, this Protocol shall prevail.

**A.    Background**

1.    Nortel Networks Inc. ("NNI") is the wholly owned U.S. subsidiary of Nortel Networks Limited ("NNL"), the principal Canadian operating subsidiary of Nortel Networks Corporation ("NNC"). NNC is a telecommunications company headquartered in Toronto, Ontario, Canada. NNI is incorporated under Delaware law and is headquartered in Richardson, Texas.

2.    NNI and certain of its affiliates (collectively, the "U.S. Debtors"),[1] have commenced reorganization proceedings (the "U.S. Proceedings") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "U.S. Court"), and such cases have been consolidated (for procedural purposes only) under Case No. 09-10138 (KG). The U.S. Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the U.S. Proceedings. On January 22, 2009,

---

[1]    The Debtors in the U.S. Proceedings (as defined herein) are: NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., XROS, Inc., Sonoma Systems, QTERA Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc. and Nortel Networks Cable Solutions Inc.

the Office of United States Trustee (the "U.S. Trustee") appointed an official committee of

unsecured creditors (the "Creditors Committee") in the U.S. Proceeding. An ad hoc committee

of bondholders (the "Bondholders Committee") has also been organized.

    3.    On January 14, 2009, the U.S. Debtors' ultimate corporate parent NNC,

NNI's direct corporate parent NNL (together with NNC and their affiliates, including the U.S.

Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian

Debtors")[2] filed an application with the Ontario Superior Court of Justice (the "Canadian Court")

under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from

their creditors (collectively, the "Canadian Proceedings"). The Canadian Debtors have obtained

an initial order of the Canadian Court (as amended and restated, the "Canadian Order"), under

which, inter alia: (a) the Canadian Debtors have been determined to be entitled to relief under

the CCAA; (b) Ernst & Young Inc. has been appointed as monitor (the "Monitor") of the

Canadian Debtors, with the rights, powers, duties and limitations upon liabilities set forth in the

CCAA and the Canadian Order; and (c) a stay of proceedings in respect of the Canadian Debtors

has been granted.

    4.    The Monitor filed petitions and obtained an order in the U.S. Court

granting recognition of the Canadian Proceedings under chapter 15 of the Bankruptcy Code (the

"Chapter 15 Proceedings"). NNI also filed an application and obtained an order in the Canadian

Court pursuant to section 18.6 of the CCAA recognizing the U.S. Proceedings as "foreign

proceedings" in Canada and giving effect to the automatic stay thereunder in Canada. None of

the U.S. Debtors or Canadian Debtors are applicants in both the U.S. Proceedings and Canadian

Proceedings.

---

[2]   The Canadian Debtors include the following entities: NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks Global Corporation and Nortel Networks International Corporation.

3

5.    For convenience, (a) the U.S. Debtors and the Canadian Debtors shall be referred to herein collectively as the "Debtors," (b) the U.S. Proceedings and the Canadian Proceedings shall be referred to herein collectively as the "Insolvency Proceedings," and (c) the U.S. Court and the Canadian Court shall be referred to herein collectively as the "Courts", and each individually as a "Court."

**B.    Purpose and Goals**

6.    Though full and separate plenary proceedings are pending in the United States for the U.S. Debtors and in Canada for the Canadian Debtors, the implementation of administrative procedures and cross-border guidelines is both necessary and desirable to coordinate certain activities in the Insolvency Proceedings, protect the rights of parties thereto, ensure the maintenance of the Courts' respective independent jurisdiction and give effect to the doctrines of comity.  Accordingly, this Protocol has been developed to promote the following mutually desirable goals and objectives in the Insolvency Proceedings:

a.    harmonize and coordinate activities in the Insolvency Proceedings before the Courts;

b.    promote the orderly and efficient administration of the Insolvency Proceedings to, among other things, maximize the efficiency of the Insolvency Proceedings, reduce the costs associated therewith and avoid duplication of effort;

c.    honor the independence and integrity of the Courts and other courts and tribunals of the United States and Canada, respectively;

d.    promote international cooperation and respect for comity among the Courts, the Debtors, the Creditors Committee, the Estate Representatives (which include the Chapter 11 Representatives and the Canadian Representatives as such terms are defined below) and other creditors and interested parties in the Insolvency Proceedings;

e.    facilitate the fair, open and efficient administration of the Insolvency Proceedings for the benefit of all of the Debtors' creditors and other interested parties, wherever located; and

4

f.    implement a framework of general principles to address basic administrative issues arising out of the cross-border nature of the Insolvency Proceedings.

As the Insolvency Proceedings progress, the Courts may also jointly determine that other cross-border matters that may arise in the Insolvency Proceedings should be dealt with under and in accordance with the principles of this Protocol. Subject to the provisions of this Protocol, including, without limitation, those included in paragraph 15 hereof, where an issue is to be addressed only to one Court, in rendering a determination in any cross-border matter, such Court may: (a) to the extent practical or advisable, consult with the other Court; and (b) in its sole discretion and bearing in mind the principles of comity, either (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part to the other Court; or (iii) seek a joint hearing of both Courts.

C.    **Comity and Independence of the Courts**

7.    The approval and implementation of this Protocol shall not divest nor diminish the U.S. Court's and the Canadian Court's respective independent jurisdiction over the subject matter of the U.S. Proceedings and the Canadian Proceedings, respectively. By approving and implementing this Protocol, neither the U.S. Court, the Canadian Court, the Debtors nor any creditors or interested parties shall be deemed to have approved or engaged in any infringement on the sovereignty of the United States of America or Canada.

8.    The U.S. Court shall have sole and exclusive jurisdiction and power over the conduct of the U.S. Proceedings and the hearing and determination of matters arising in the U.S. Proceedings. The Canadian Court shall have sole and exclusive jurisdiction and power over the conduct of the Canadian Proceedings and the hearing and determination of matters arising in the Canadian Proceedings.

5

9.    In accordance with the principles of comity and independence recognized herein, nothing contained herein shall be construed to:

a.    increase, decrease or otherwise modify the independence, sovereignty or jurisdiction of the U.S. Court, the Canadian Court or any other court or tribunal in the United States or Canada, including the ability of any such court or tribunal to provide appropriate relief on an ex parte or "limited notice" basis to the extent permitted under applicable law;

b.    require the U.S. Court to take any action that is inconsistent with its obligations under the laws of the United States;

c.    require the Canadian Court to take any action that is inconsistent with its obligations under the laws of Canada;

d.    require the Debtors, the Creditors Committee, the Estate Representatives or the U.S. Trustee to take any action or refrain from taking any action that would result in a breach of any duty imposed on them by any applicable law;

e.    authorize any action that requires the specific approval of one or both of the Courts under the Bankruptcy Code or the CCAA after appropriate notice and a hearing (except to the extent that such action is specifically described in this Protocol); or

f.    preclude the Debtors, the Creditors Committee, the Monitor, the U.S. Trustee, any creditor or other interested party from asserting such party's substantive rights under the applicable laws of the United States, Canada or any other relevant jurisdiction including, without limitation, the rights of parties in interest to appeal from the decisions taken by one or both of the Courts.

10.   The Debtors, the Creditors Committee, the Estate Representatives and their respective employees, members, agents and professionals shall respect and comply with the independent, non-delegable duties imposed upon them, if any, by the Bankruptcy Code, the CCAA, the Canadian Order and other applicable laws.

D.    Cooperation

11.   To assist in the efficient administration of the Insolvency Proceedings and in recognizing that the U.S. Debtors and Canadian Debtors may be creditors of the others'

6

1486

estates, the Debtors and their respective Estate Representatives shall, where appropriate: (a) cooperate with each other in connection with actions taken in both the U.S. Court and the Canadian Court and (b) take any other appropriate steps to coordinate the administration of the Insolvency Proceedings for the benefit of the Debtors' respective estates.

12.     To harmonize and coordinate the administration of the Insolvency Proceedings, the U.S. Court and the Canadian Court each may coordinate activities and consider whether it is appropriate to defer to the judgment of the other Court. In furtherance of the foregoing:

a.     The U.S. Court and the Canadian Court may communicate with one another, with or without counsel present, with respect to any procedural matter relating to the Insolvency Proceedings.

b.     Where the issue of the proper jurisdiction of either Court to determine an issue is raised by an interested party in either of the Insolvency Proceedings with respect to a motion or application filed in either Court, the Court before which such motion or application was initially filed may contact the other Court to determine an appropriate process by which the issue of jurisdiction will be determined; which process shall be subject to submissions by the Debtors, the Creditors Committee, the Monitor, the Bondholders Committee (collectively the "Core Parties"), the U.S. Trustee and any interested party prior to a determination on the issue of jurisdiction being made by either Court.

c.     The Courts may, but are not obligated to, coordinate activities in the Insolvency Proceedings such that the subject matter of any particular action, suit, request, application, contested matter or other proceeding is determined in a single Court.

d.     The U.S. Court and the Canadian Court may conduct joint hearings (each a "Joint Hearing") with respect to any cross-border matter or the interpretation or implementation of this Protocol where both the U.S. Court and the Canadian Court consider such a Joint Hearing to be necessary or advisable, or as otherwise provided herein, to, among other things, facilitate or coordinate proper and efficient conduct of the Insolvency Proceedings or the resolution of any particular issue in the Insolvency Proceedings. With respect to any Joint Hearing, unless otherwise ordered, the following procedures will be followed:

1487

(i)    A telephone or video link shall be established so that both the U.S. Court and the Canadian Court shall be able to simultaneously hear and/or view the proceedings in the other Court.

(ii)   Submissions or applications by any party that are or become the subject of a Joint Hearing (collectively, "Pleadings") shall be made or filed initially only to the Court in which such party is appearing and seeking relief.  Promptly after the scheduling of any Joint Hearing, the party submitting such Pleadings to one Court shall file courtesy copies with the other Court.  In any event, Pleadings seeking relief from both Courts shall be filed in advance of the Joint Hearing with both Courts.

(iii)  Any party intending to rely on any written evidentiary materials in support of a submission to the U.S. Court or the Canadian Court in connection with any Joint Hearing (collectively, "Evidentiary Materials") shall file or otherwise submit such materials to both Courts in advance of the Joint Hearing.  To the fullest extent possible, the Evidentiary Materials filed in each Court shall be identical and shall be consistent with the procedural and evidentiary rules and requirements of each Court.

(iv)   If a party has not previously appeared in or attorned or does not wish to attorn to the jurisdiction of a Court, it shall be entitled to file Pleadings or Evidentiary Materials in connection with the Joint Hearing without, by the mere act of such filings, being deemed to have appeared in or attorned to the jurisdiction of such Court in which such material is filed, so long as such party does not request any affirmative relief from such Court.

(v)    The Judge of the U.S. Court and the Justice of the Canadian Court who will preside over the Joint Hearing shall be entitled to communicate with each other in advance of any Joint Hearing, with or without counsel being present, (1) to establish guidelines for the orderly submission of Pleadings, Evidentiary Materials and other papers and for the rendering of decisions by the Courts; and (2) to address any related procedural, administrative or preliminary matters.

(vi)   The Judge of the U.S. Court and the Justice of the Canadian Court, shall be entitled to communicate with each other during or after any joint hearing, with or without counsel present, for the purposes of (1) determining whether consistent rulings can be made by both Courts; (2) coordinating the terms upon of the Courts' respective rulings; and (3) addressing any other procedural or administrative matters.

8

1488

13.    Notwithstanding the terms of the paragraph 12 above, this Protocol recognizes that the U.S. Court and the Canadian Court are independent courts. Accordingly, although the Courts will seek to cooperate and coordinate with each other in good faith, each of the Courts shall be entitled at all times to exercise its independent jurisdiction and authority with respect to:  (a) the conduct of the parties appearing in matters presented to such Court; and (b) matters presented to such Court, including, without limitation, the right to determine if matters are properly before such Court.

14.    Where one Court has jurisdiction over a matter which requires the application of the law of the jurisdiction of the other Court, such Court may, without limitation, hear expert evidence of such law or, subject to paragraph 15 herein, seek the written advice and direction of the other Court which advice may in the discretion of the receiving Court, be made available to parties in interest.

15.    Notwithstanding anything to the contrary herein contained, to the extent any motion is filed or relief is sought (collectively, "Requested Relief") in either Court relating to:  (i) the proposed sale of assets for gross proceeds in excess of U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (ii) any motion to allocate sale proceeds which are in the aggregate more than U.S. $30 million and where at least one U.S. Debtor and one Canadian Debtor are parties to the related sale agreement or that involves assets owned by at least one U.S. Debtor and one Canadian Debtor; (iii) matters relating to the advanced pricing agreement involving both the United States and Canadian taxing authorities; (iv) matters regarding transfer pricing methodology relating to an obligation for the transfer of goods and services between one or more U.S. Debtors and one or more Canadian

9

Debtors; (v) any matter relating to alleged fraudulent conveyance or preference claims in excess of U.S. $30 million and which may have a material impact on both one or more U.S. Debtors and one or more Canadian Debtors; (vi) matters relating to any proposal or approval of a disclosure statement, information circular, plan of reorganization or plan of compromise and arrangements in either the U.S. Proceedings or the Canadian Proceedings; (vii) any motion to appoint a Trustee or Examiner in the U.S. Proceedings, any motion to convert the U.S. Proceedings to a Chapter 7 proceeding, any motion to appoint a Receiver in the Canadian Proceedings, or any motion to convert the Canadian Proceedings to a bankruptcy or proposal proceeding under the Bankruptcy and Insolvency Act (Canada); (viii) any motion to substantively consolidate the Debtors' estates; (ix) matters impacting the material tax attributes of the U.S. Debtors, including the net operating losses of the U.S. Debtors in any prior fiscal year; (x) any motion to amend the terms of any of the Debtors' registered pension plans the effect of which would increase the liability of any Debtor thereunder; (xi) any motion to assume, ratify, reject, repudiate, modify or assign executory contracts having a material impact on the assets, operations, obligations, rights, property or business of both the U.S. and Canadian estates and accounting for annual gross revenue in excess of U.S. $30 million ("Material Contracts"); (xii) any motion seeking relief from the automatic stay in the U.S. Proceedings and/or the stay of proceedings in the Canadian Proceedings (1) involving any Material Contract or (2) to pursue actions having a material impact on the assets, operations, obligations, rights, property or business of at least one U.S. Debtor and one Canadian Debtor and involving damages in excess of U.S. $30 million; (xiii) any motion seeking to create or extend any program, plan, proposal or scheme relating to or authorizing payments to employees where the consideration relates to non-ordinary course incentive performance, retention, severance, termination or such like payments; and (xiv) any

10

motion regarding any program, plan proposal, scheme or similar course of action related to the wind-down of one or more of the Debtors' businesses;

Then the following procedures shall be followed:

    a.    unless otherwise consented to by the Core Parties, any and all documents, other than any Monitor's report related to the Requested Relief, shall be filed (as applicable) and served on the Core Parties on not less than seven days notice prior to the proposed hearing date for such Requested Relief in the Court of the forum country where the party seeking the Requested Relief intends the Requested Relief to be heard; *provided, however*, that to the extent the Requested Relief is necessary to avoid irreparable harm to the Debtors and/or the Debtors' bankruptcy estates, as may be determined by the Court of the forum country where the Requested Relief is being sought or such Court otherwise determines, such documents related to the Requested Relief shall be served on the Core Parties on such reasonable notice as such Court may determine;

    b.    upon notice of such Requested Relief being provided to the Core Parties, each of the Core Parties will have not less than two business days from receipt of such notice (or such shorter period as the Court of the forum country where the Requested Relief is being sought shall determine, as set forth in paragraph 15(a) herein) to request, in writing, that the filing party seek a Joint Hearing for the Requested Relief;

    c.    if the filing party agrees to seek a Joint Hearing, the Requested Relief shall be heard at a Joint Hearing conducted by the Courts in accordance with the procedures set forth in paragraph 12 herein; and

    d.    if the filing party does not agree to seek a Joint Hearing, the party seeking to have the Requested Relief heard at a Joint Hearing may file a notice of Joint Hearing dispute in both the Court of the forum country and the Court of the non-forum country and serve notice thereof on the remaining Core Parties, whereupon the respective Courts of the forum country and the non-forum country may consult with one another in accordance with paragraphs 6 and 12 hereof, in order to determine whether a Joint Hearing is necessary or may otherwise consult with the Core Parties prior to any party proceeding with the underlying Requested Relief in the original proposed forum country.

**E.    Recognition of Stays of Proceedings**

    16.    The Canadian Court hereby recognizes the validity of the stay of proceedings and actions against the U.S. Debtors and their property under section 362 of the

11

Bankruptcy Code (the "U.S. Stay"). In implementing the terms of this paragraph, the Canadian Court may consult with the U.S. Court regarding: (i) the interpretation, extent, scope and applicability of the U.S. Stay and any orders of the U.S. Court modifying or granting relief from the U.S. Stay; and (ii) the enforcement of the U.S. Stay in Canada.

17.    The U.S. Court hereby recognizes the validity of the stay of proceedings and actions against the Canadian Debtors and their property under the Canadian Order (the "Canadian Stay"). In implementing the terms of this paragraph, the U.S. Court may consult with the Canadian Court regarding: (i) the interpretation, extent, scope and applicability of the Canadian Stay and any orders of the Canadian Court modifying or granting relief from the Canadian Stay; and (ii) the enforcement of the Canadian Stay in the United States.

18.    Nothing contained herein shall affect or limit the Debtors' or other parties' rights to assert the applicability or nonapplicability of the U.S. Stay or the Canadian Stay to any particular proceeding, property, asset, activity or other matter, wherever pending or located. Subject to paragraph 15, herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the Canadian Debtors shall be heard and determined by the Canadian Court. Subject to paragraph 15 herein, motions brought respecting the application of the stay of proceedings with respect to assets or operations of the U.S. Debtors shall be heard and determined by the U.S. Court.

F.    Rights to Appear and Be Heard

19.    The Debtors, the Core Parties, and any other committee that may be appointed by the U.S. Trustee, and the professionals and advisors for each of the foregoing, shall have the right and standing: (i) to appear and to be heard in either the U.S. Court or Canadian Court in the U.S. Proceedings or Canadian Proceedings, respectively, to the same extent as creditors and other interested parties domiciled in the forum country, subject to any local rules or

12

1492

regulations generally applicable to all parties appearing in the forum; and (ii) to file notices of appearance or other papers with the clerk of the U.S. Court or the Canadian Court in respect of the U.S. Proceedings or Canadian Proceedings, respectively; provided, however, that any appearance or filing may subject a creditor or interested party to the jurisdiction of the Court in which the appearance or filing occurs; provided further, that an appearance by the Creditors Committee in the Canadian Proceedings shall not form a basis for personal jurisdiction in Canada over the members of the Creditors Committee. Notwithstanding the foregoing, and in accordance with the policies set forth above, including, inter alia, paragraph 12 above; (i) the Canadian Court shall have jurisdiction over the Chapter 11 Representatives (as defined below) solely with respect to the particular matters as to which the Chapter 11 Representatives appear before the Canadian Court; and (ii) the U.S. Court shall have jurisdiction over the Canadian Representatives (as defined below) solely with respect to the particular matters as to which the Canadian Representatives appear before the U.S. Court.

20.    In connection with any matter in the Canadian Proceedings in which the Creditors Committee seeks to become involved and which would otherwise require the Creditors Committee to execute a confidentiality agreement, the Creditors Committee, its individual members and professionals shall not be required to execute confidentiality agreements but instead the Creditors Committee and its members shall be bound by the confidentiality provisions contained in the Creditors Committee bylaws, and the Creditors Committee's professionals shall be bound by the terms of the confidentiality agreement with the Debtors dated February 2, 2009.

G.    Claims Protocol

21.    The Debtors anticipate that it will be necessary to implement a specific claims protocol to address, among other things and without limitation, the timing, process,

13

1493

jurisdiction and applicable governing law to be applied to the resolution of intercompany claims filed by the Debtors' creditors in the Canadian Proceedings and the U.S. Proceedings. In such event, and in recognition of the inherent complexities of the inter-company claims that may be asserted in the Insolvency Proceedings, the Debtors shall use commercially reasonable efforts to negotiate a specific claims protocol, in form and substance satisfactory to the Debtors, the Monitor, and the Creditors Committee, which protocol shall be submitted to the Canadian Court and the U.S. Court for approval. In the event that the Debtors fail to reach agreement among such parties, the Debtors shall file a motion in both the Canadian Court and the U.S. Court seeking approval of such claims protocol as the Debtors shall determine to be in the best interest of the Debtors and their creditors.

**H.**    Retention and Compensation of Estate Representative and Professionals

22.    The Monitor, its officers, directors, employees, counsel and agents, wherever located, (collectively the "Monitor Parties") and any other estate representatives appointed in the Canadian Proceedings (collectively, the "Canadian Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the Canadian Court with respect to all matters, including: (a) the Canadian Representatives' tenure in office; (b) the retention and compensation of the Canadian Representatives; (c) the Canadian Representatives' liability, if any, to any person or entity, including the Canadian Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Canadian Representatives arising in the Canadian Proceedings under the CCAA or other applicable Canadian law. The Canadian Representatives shall not be required to seek approval of their retention in the U.S. Court for services rendered to the Debtors. Additionally, the Canadian Representatives: (a) shall be compensated for their services to the Canadian Debtors solely in accordance with the CCAA, the Canadian Order and other applicable

14

Canadian law or orders of the Canadian Court; and (b) shall not be required to seek approval of their compensation in the U.S Court.

23.    The Monitor Parties shall be entitled to the same protections and immunities in the United States as those granted to them under the CCAA and the Canadian Order. In particular, except as otherwise provided in any subsequent order entered in the Canadian Proceedings, the Monitor Parties shall incur no liability or obligations as a result of the Canadian Order, the appointment of the Monitor, the carrying out of its duties or the provisions of the CCAA and the Canadian Order by the Monitor Parties, except any such liability arising from actions of the Monitor Parties constituting gross negligence or willful misconduct.

24.    Any estate representative appointed in the U.S. Proceedings, including without limitation any examiners or trustees appointed in accordance with section 1104 of the Bankruptcy Code (collectively, the "Chapter 11 Representatives") shall (subject to paragraph 19) be subject to the sole and exclusive jurisdiction of the U.S. Court with respect to all matters, including: (a) the Chapter 11 Representatives' tenure in office; (b) the retention and compensation of the Chapter 11 Representatives; (c) the Chapter 11 Representatives' liability, if any, to any person or entity, including the U.S. Debtors and any third parties, in connection with the Insolvency Proceedings; and (d) the hearing and determination of any other matters relating to the Chapter 11 Representatives arising in the U.S. Proceedings under the Bankruptcy Code or other applicable laws of the United States. The Chapter 11 Representatives shall not be required to seek approval of their retention in the Canadian Court and (a) shall be compensated for their services to the U.S. Debtors solely in accordance with the Bankruptcy Code and other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek

15

approval of their compensation for services performed for the U.S. Debtors in the Canadian Court.

25.     Any professionals (i) retained by and being compensated solely by, or (ii) being compensated solely by, the Canadian Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "Canadian Professionals"), shall be subject to the sole and exclusive jurisdiction of the Canadian Court. Such Canadian Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the Canadian Court under the CCAA, the Canadian Order and any other applicable Canadian law or orders of the Canadian Court with respect to services performed on behalf of the Canadian Debtors; and (b) shall not be required to seek approval of their retention or compensation in the U.S. Court.

26.     Any professionals (i) retained by, or (ii) being compensated by, the U.S. Debtors including in each case, without limitation, counsel and financial advisors (collectively, the "U.S. Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such U.S. Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court; and (b) shall not be required to seek approval of their retention or compensation in the Canadian Court.

27.     Subject to paragraph 19 herein, any professional retained by the Creditors Committee, including in each case, without limitation, counsel and financial advisors (collectively, the "Committee Professionals") shall be subject to the sole and exclusive jurisdiction of the U.S. Court. Such Committee Professionals: (a) shall be subject to the procedures and standards for retention and compensation applicable in the U.S. Court under the

16

Bankruptcy Code and any other applicable laws of the United States or orders of the U.S. Court;

and (b) shall not be required to seek approval of their retention or compensation in the Canadian

Court or any other court.

**L.    Notice**

28.    Notice of any motion, application or other Pleading or paper (collectively

the "Court Documents") filed in one or both of the Insolvency Proceedings involving or relating

to matters addressed by this Protocol and notice of any related hearings or other proceedings

shall be given by appropriate means (including, where circumstances warrant, by courier,

telecopier or other electronic forms of communication) to the following:  (a) all creditors and

interested parties, in accordance with the practice of the jurisdiction where the papers are filed or

the proceedings are to occur; and (b) to the extent not otherwise entitled to receive notice under

clause (a) of this sentence, counsel to the Debtors; the U.S. Trustee; the Monitor; the Creditors

Committee; the Bondholders Committee and any other statutory committees appointed in the

Insolvency Proceedings and such other parties as may be designated by either of the Courts from

time to time.  Notice in accordance with this paragraph shall be given by the party otherwise

responsible for effecting notice in the jurisdiction where the underlying papers are filed or the

proceedings are to occur.  In addition to the foregoing, upon request, the U.S. Debtors or the

Canadian Debtors shall provide the U.S. Court or the Canadian Court, as the case may be, with

copies of any orders, decisions, opinions or similar papers issued by the other Court in the

Insolvency Proceedings.

29.    When any cross-border issues or matters addressed by this Protocol are to

be addressed before a Court, notices shall be provided in the manner and to the parties referred to

in paragraph 28 above.

17

1497

**J.     Effectiveness; Modification**

        30.     This Protocol shall become effective only upon its approval by both the U.S. Court and the Canadian Court.

        31.     This Protocol may not be supplemented, modified, terminated, or replaced in any manner except upon the approval of both the U.S. Court and the Canadian Court after notice and a hearing.  Notice of any legal proceeding to supplement, modify, terminate or replace this Protocol shall be given in accordance with the notice provisions set forth above.

**K.     Procedure for Resolving Disputes Under this Protocol**

        32.     Disputes relating to the terms, intent or application of this Protocol may be addressed by interested parties to the U.S. Court, the Canadian Court or both Courts upon notice in accordance with the notice provisions outlined in paragraph 28 above.  In rendering a determination in any such dispute, the Court to which the issue is addressed:  (a) shall consult with the other Court; and (b) may, in its sole and exclusive discretion, either:  (i) render a binding decision after such consultation; (ii) defer to the determination of the other Court by transferring the matter, in whole or in part, to such other Court; or (iii) seek a Joint Hearing of both Courts in accordance with paragraph 12 above.  Notwithstanding the foregoing, in making a determination under this paragraph, each Court shall give due consideration to the independence, comity and inherent jurisdiction of the other Court established under existing law.

        33.     In implementing the terms of this Protocol, the U.S. Court and the Canadian Court may, in their sole, respective discretion, provide advice or guidance to each other with respect to legal issues in accordance with the following procedures:

        a.    the U.S. Court or the Canadian Court, as applicable, may determine that such advice or guidance is appropriate under the circumstances;

        b.    the Court issuing such advice or guidance shall provide it to the non-issuing Court in writing;

18

c.      copies of such written advice or guidance shall be served by the applicable Court in accordance with paragraph 28 hereof;

d.      the Courts may jointly decide to invite the Debtors, the Creditors Committee, the Estate Representatives, the U.S. Trustee and any other affected or interested party to make submissions to the appropriate Court in response to or in connection with any written advice or guidance received from the other Court; and

e.      for clarity, the provisions of this paragraph shall not be construed to restrict the ability of either Court to confer as provided in paragraph 12 above whenever it deems it appropriate to do so.

## L.    Preservation of Rights

34.      Except as specifically provided herein, neither the terms of this Protocol nor any actions taken under the terms of this Protocol shall:  (a) prejudice or affect the powers, rights, claims and defenses of the Debtors and their estates, the Creditors Committee, the Estate Representatives, the U.S. Trustee or any of the Debtors' creditors under applicable law, including, without limitation, the Bankruptcy Code the CCAA, and the orders of the Courts; or (b) preclude or prejudice the rights of any person to assert or pursue such person's substantive rights against any other person under the applicable laws of Canada or the United States.

19

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

**FIFTH AMENDED AND RESTATED INITIAL ORDER**

**OGILVY RENAULT LLP**
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, Ontario  M5J 2Z4, Canada

**Derrick Tay LSUC#: 21152A**
Tel:  (416) 216-4832
Email: dtay@ogilvyrenault.com

**Mario Forte  LSUC#: 27293F**
Tel: (416) 216-4870
Email: mforte@ogilvyrenault.com

**Jennifer Stam LSUC #46735J**
Tel: (416) 216-2327
Email: jstam@ogilvyrenault.com
Fax: (416) 216-3930

Lawyers for the Applicants

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

### APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## ALLOCATION POSITION OF THE MONITOR AND CANADIAN DEBTORS

## PART I – INTRODUCTION AND PRELIMINARY STATEMENT

### *This Pleading*

1.    This is the allocation pleading of Ernst and Young Inc., the Monitor appointed by the Court in these proceedings (the "**Monitor**"), and of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation (the "**Canadian Debtors**").

*Preliminary Statement*

2.      Approximately U.S. $7.3 billion has been realized as proceeds from two groups of asset sales effected by members of the Nortel Group.[1]  The first group of sales (referred to below as Business Sales) involved tangible and intangible assets of, for the most part, operating Nortel businesses.  The remaining sale, the Rockstar Transaction, involved only intangible assets and was effected after all Nortel businesses had been sold.

3.      The sales were effected as contemplated by the IFSA[2] referred to below – which left for further agreement or determination how the sale proceeds were to be allocated among the sellers.  The relevant parties have failed to subsequently agree on allocation.  The Court must now determine the proper allocations, so that the Estates[3] and their creditors can benefit from the successful sales.

*The Question*

4.      Allocating the proceeds from the sales, and accrued and accruing interest thereon, requires the identification of the proper allocation question.  The Monitor and Canadian Debtors submit that the proper question is:

> **What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors[4] or**

---

[1]   The terms Nortel Group and Nortel used in this pleading are described in paragraph 9 and footnote 10 below.

[2]   The Interim Funding and Settlement Agreement referred to in paragraph 18 and footnote 15 below.

[3]   The term Estates is defined in paragraph 17 and footnote 14 below.

[4]   As described in paragraph 16.

U.S. Debtors[5], as the case may be, of property interests in the assets which were the subject matter of that transaction?

*Tangible Asset Allocation – Business Sales*

5.      The relevant property interest in the tangible assets sold in the Business Sales was ownership. The tangible assets were effectively sold for their net book values. The appropriate allocation of the portion of the proceeds of each Business Sale attributable to the tangible assets is therefore to allocate to each owner of a tangible asset sold its net book value.[6]

*Intangible Asset Allocation – Business Sales*

6.      The primary component and driver of the value of the intangible assets sold in the Business Sales was intellectual property. There were two relevant property interests in the intellectual property conveyed in the Business Sales – first, ownership, which was held by Nortel Networks Limited ("NNL"), and second certain licence rights held by certain U.S. Debtors and EMEA Debtors pursuant to the MRDA[7] referred to below which licence rights were surrendered as part of the Business Sales. The MRDA defined and limited those licence rights and set the maximum benefits that could be derived from their permitted use. The allocation of intangible assets thus involves the allocation to U.S. Debtors and EMEA

---

[5]    As described in paragraphs 15.

[6]    As described in paragraphs 27 to 29 below.

[7]    See paragraphs 30 and 37 below.

Debtors of the value of their surrendered MRDA licence rights, and the allocation to NNL as owner of the balance of the proceeds attributable to the intangible assets.[8]

*Rockstar Transaction Allocation*

7.    The intangible assets in the Rockstar Transaction were in all material respects, intellectual property. The owner of the intellectual property sold was NNL. The Rockstar Transaction took place after all Nortel businesses had been sold. As the MRDA licences of any U.S. Debtors or EMEA Debtors were, at the time of the Rockstar Transaction, inapplicable to and without value in respect to the intellectual property sold, the only relevant property interest was that of NNL, to whom those proceeds are to be allocated.[9]

*Allocation of Accrued and Accruing Interest*

8.    Accrued and accruing interest on the sale proceeds should be allocated in proportion to the allocations of proceeds for tangible and intangible assets referred to above.

## PART II - BACKGROUND

*The Nortel Group*

9.    Nortel Networks Corporation ("NNC") is a Canadian company and one of the Applicants/Canadian Debtors in this proceeding. At the time of the commencement of these

---

[8]    See paragraphs 30 to 32 below.

[9]    See paragraph 33 below.

- 5 -

proceedings NNC owned, directly or indirectly, 143 companies. NNC together with its direct
and indirect subsidiaries are sometimes referred to herein as Nortel or the Nortel Group. [10]

10.    NNC was a holding company. The major Canadian operating company in the Nortel
Group was NNL, which is also a Canadian Debtor.

11.    The Nortel Group traces its origins back to Northern Electric and Manufacturing
Company Limited, incorporated in the 1890s as an equipment provider for Canada's then-
nascent telephone system. In more recent times, the Nortel Group was focussed on the
development and provision of software and hardware technology solutions for
telecommunications environments. These included wireless communications, data
transmission networks, wired communications, internet technology, communications
software and other high-technology products and services in the communications field.

12.    At its height in 2000, NNC had a market capitalization of approximately U.S. $250
billion. Members of the Nortel Group had customers across the globe and in the aggregate
they employed a total of nearly 93,000 employees worldwide.

*Insolvency Proceedings*

13.    The burst of the high-tech 'bubble' in 2001 was followed by expanding competitive
pressures in the communications technology industry. These factors. as well as legal and
regulatory proceedings arising from accounting issues, detrimentally affected the profitability

---

[10]    Although the terms Nortel Group or Nortel are used herein to refer to the collectivity of the many different
Nortel operating and holding entities, they do not describe a legal entity but a number of affiliated legal
entities commonly described in business terms as a corporate group or enterprise.

of the business of the Nortel Group. Attempts to solve these challenges were made. These efforts were ultimately unsuccessful.

14.    On January 14, 2009, the Canadian Debtors filed for and obtained protection from this Court in this proceeding under the *Companies' Creditors Arrangement Act*.

15.    On January 14, 2009 Nortel Networks Inc. ("NNI") a U.S. Corporation and several of its U.S. affiliates[11] (collectively, the "**U.S. Debtors**") which were all members of the Nortel Group filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**U.S. Court**") for protection under Chapter 11 of Title 11 of the U.S. *Code*.

16.    Nortel Networks UK Limited ("NNUK"), and certain of its European subsidiaries and affiliates including Nortel Networks France S.A. ("**NN France**") and Nortel Networks (Ireland) Limited ("**NN Ireland**")[12] (these European Nortel entities, along with Nortel Networks AG and Nortel Networks AS[13], being collectively referred to as the "**EMEA Debtors**"), which were all also members of the Nortel Group, were granted administration orders in the U.K. on January 15, 2009, under the *Insolvency Act 1986*.

---

[11]   Including Nortel Networks (CALA) Inc. ("NN CALA"), which filed a voluntary petition on July 14, 2009.

[12]   NNUK, NN France and NN Ireland were the EMEA participants under the residual profit split method (referred to as the "RPSM") provided for under the MRDA.

[13]   Nortel Networks AG and Nortel Networks AS are both European entities that were sellers or deemed sellers in certain of the Business Sales but did not file for administration orders. They are represented by the same counsel as those EMEA Debtors that did file for administration orders and should be included in that group for the purposes of this allocation proceeding.

- 7 -

17.    As a result, there are three main estates (the "**Estates**") under insolvency proceedings:
(i) the Canadian Debtors, (ii) the U.S. Debtors, and (iii) the EMEA Debtors.[14]

*The Business Sales, The Rockstar Transaction, and The Escrowed Proceeds*

18.    On June 9, 2009, most of the Canadian Debtors, U.S. Debtors (other than NN CALA)
and EMEA Debtors entered into an Interim Funding and Settlement Agreement (the
"**IFSA**")[15] in contemplation, in part, of asset sales being made.  The IFSA provides that the
proceeds of these sales would be deposited into escrow pending agreement as to their
allocation or agreement as to a protocol for a process to determine how they should be
allocated. The IFSA was entered into and so provided in order that a sales process aimed at
the timely monetization of the assets at maximum achievable values would not be hindered
by allocation disputes among the three Estates and the numerous corporate debtors within
them.

19.    In 2009 and 2010, certain sales of assets relating to Nortel businesses ("**Business
Sales**") took place.  As a result of those sales, the value of those businesses and all assets in
connection with them was maximized and monetized.  Thereafter, no member of the Nortel
Group carried on an operating business.  The Business Sales were pursuant to the following
transactions:

---

[14]    Certain other Nortel subsidiaries also filed for creditor protection in their local jurisdictions.  For example,
on May 28, 2009 NN France commenced secondary proceedings pursuant to which an administrator and
liquidator have been appointed by the Versailles Commercial Court.

[15]    This was supplemented by a Final Canadian Funding and Settlement Agreement dated December 23, 2009
("CFSA").  The IFSA and CFSA also addressed certain other rights and obligations between the Estates,
for example arising under the MRDA.

(a)    A sale in respect of the Layer 4-7 business to Radware Ltd.;

(b)    A sale of the CDMA/LTE Access business to Telefonaktiebolaget L M Ericsson (publ.) ("**Ericsson**");

(c)    A sale of the Enterprise business to Avaya Inc.;

(d)    A sale of the Next Generation Packet Core assets to Hitachi, Ltd.;

(e)    A sale of the Metro Ethernet Networks business to Ciena Corporation;

(f)    A sale of the GSM/GSM-R business to Ericsson and Kapsch Carriercom AG;

(g)    A sale of the CVAS business to GENBAND Inc.;

(h)    A sale in respect of GSM infrastructure and solutions business in the Caribbean and Latin America to Ericsson; and

(i)    A sale of the Multi-Service Switch/Passport business to Ericsson.

20.    Following the Business Sales, a portfolio of intellectual property ("**IP**") comprised of patents and patent-related assets (such as patent applications) remained. This IP had not been assigned to purchasers in the Business Sales and was not being used by any members of the Nortel Group (other than non-material use in a wind down or transition services capacity). These patents and patent-related assets were owned by NNL. In 2011 these patents and patent-related assets were sold to Rockstar Bidco, LP (the "**Rockstar Transaction**").

21.    As contemplated by the IFSA, for the purposes of participation in the resolution of any allocation dispute, in each Business Sale and in the Rockstar Transaction NNL, NNI and

NNUK were named as sellers (or deemed to be sellers), and various other members of the Nortel Group, including other Canadian Debtors, U.S. Debtors and EMEA Debtors, were also sellers or deemed sellers in all but one of these transactions.[16]

22.     Also as contemplated by the IFSA, the sellers in each transaction collectively conveyed whatever interest, if any, they may have had in the assets being conveyed, generally without particularization as to which seller was selling a particular asset or a particular interest in an asset, and without any acknowledgement that any particular seller actually had an interest, or interest of value, in any particular asset. In the agreements for the Business Sales, the parties agreed to allocate the purchase price first to tangible assets in accordance with their net book values, with the balance of the purchase price being allocated to intangible assets—but there was generally no agreement in connection with a Business Sale as to which portion of the purchase price was to be associated with any particular intangible asset or seller. In the case of the Rockstar Transaction there was no need to differentiate between asset types as it was in all material respects comprised of intangible assets, namely the patents and patent-related assets. The absence of agreements about allocation related matters in connection with the sales referred to above was contemplated by the IFSA.

23.     Proceeding in the manner contemplated by the IFSA permitted highly advantageous asset sales to be effected. However, although the parties attempted to reach agreement after the sales on allocations or on a dispute resolution process, no agreement concerning

---

[16]   Even though the EMEA Debtors were not technically sellers in respect of the entire transaction described at paragraph 19 (h) above, they have been treated as sellers for the purpose of allocation.

- 10 -

allocation or concerning a dispute resolution process was reached under the IFSA, delaying the Estates and creditors from benefitting from the sale proceeds. By orders made on March 8, 2013 with reasons given on April 3, 2013, this Court and the U.S. Court (collectively, the "**Courts**") ruled that allocation would be determined by them, and they approved a process – the Allocation Protocol – for that determination.

### *The Amounts To be Allocated*

24.     Net proceeds of approximately U.S. $2.8 billion from the Business Sale transactions, together with accrued and accruing interest, are being held under the escrow arrangements contemplated by the IFSA. An additional amount of approximately U.S. $4.5 billion was realized from the Rockstar Transaction and, together with accrued and accruing interest, is also being held under those escrow arrangements.

### PART III – THE ISSUE FOR DETERMINATION AND SUMMARY OF POSITION

### *The Issue for Determination*

25.     The Courts are being asked to allocate, among the three Estates, the U.S. $7.3 billion proceeds of sale currently held in escrow[17] and all of the accrued and accruing interest thereon.[18]

---

[17] Subject to any post-filing agreed upon cost sharing arrangements pursuant to the various side agreements that have been entered into by the Estates. Any adjustments resulting from these various side agreements have not been applied to the proposed allocation figures set out herein. Such adjustments, which require only mechanical accounting, can be made by the relevant parties once the Court determines the allocations in this proceeding.

- 11 -

26.    The Monitor and the Canadian Debtors submit that the issue for determination in connection with the Estates' respective allocations is:

> **What portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or U.S. Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?**

Those respective portions are the allocations due to the respective Estates.

### *Summary of the Monitor and Canadian Debtors' Position*

*Business Sales Allocations*

27.    The Business Sales were, for the most part, sales of bundles of assets of operating businesses. The Business Sales involved tangible and intangible assets.

---

[18]    The Monitor and the Canadian Debtors note as follows with respect to certain specific allocation matters: (i) pursuant to the Allocation Settlement Agreement (APAC/CALA) dated June 19, 2012, and approved by this Court and the US Court, the allocation entitlements of all sellers except the Canadian Debtors, the US Debtors, the EMEA Debtors, Nortel Networks o.o.o ("Nortel Russia"), Nortel Networks Israel (Sales and Marketing) Limited and Nortel Communications and Holdings (1997) Limited (collectively, "Nortel Israel") were agreed and approximately U.S. $44.9 million was paid from the escrow accounts to satisfy such allocation entitlements; (ii) the entitlements, if any, of Nortel Russia and Nortel Israel to the sale proceeds were assigned to, in the case of Nortel Russia, Nortel Networks International Finance and Holding BV (an EMEA Debtor) and, in the case of Nortel Israel, NNI and NNUK such that those entities are entitled to any sale proceeds due to Nortel Russia and Nortel Israel, respectively; (iii) the Estates have entered into various post-filing cost sharing agreements pursuant to which they have agreed to bear a portion of specified costs in proportion to their allocation entitlement from all or certain of the sales, and for any amounts due from one Estate to another under such agreements to be paid from the sale proceeds. As such, once the Estates' allocation entitlements are determined, a "true-up" to account for such agreements will be required prior to allocation entitlements being distributed to the Estates; and (iv) there are various "non-IFSA" transactions where only one Estate was a vendor (in the case of the Canadian Debtors, for instance, the sale of the LG-Nortel joint venture, the sale of the Carling Facility, the sale of the Relay assets and the sale of the IP addresses). These transactions are not subject to the Allocation Protocol and are therefore not addressed in this pleading.

- 12 -

28.    The proceeds of sale attributable to tangible assets should be allocated to each owner of a tangible asset conveyed, in accordance with the net book value of that tangible asset. Ownership of the tangible assets is the relevant property interest, and the proceeds received in respect of those property interests are properly allocable on the basis of the net book values of those tangible assets since that was the portion of the purchase price the parties in the agreements for the Business Sales agreed to allocate to them.

29.    The Monitor and the Canadian Debtors therefore ask that the Courts allocate the sale proceeds from the sale of those tangible assets based on the net book value of that portion of the total tangible assets sold (or deemed to be sold) by entities within the following groups, aggregated as follows:

| | |
|---|---|
| Canadian Debtors: | U.S. $101,900,000 |
| U.S. Debtors: | U.S. $374,400,000[19] |
| EMEA Debtors: | U.S. $91,900,000 |

30.    The Business Sales also involved the sale of intangible assets, the key component of which was IP. The IP involved in the Business Sales was owned by NNL. Ownership is the appropriate property interest for allocation purposes; the only other property interest in the IP involved in the Business Sales were licence rights which were held pursuant to the terms of the Master R&D Agreement (the "MRDA").

[19]    The calculation of total tangible assets sold by the US Debtors includes net book value of tangible assets sold directly by the US Debtors and the equity value of the shares of Nortel Government Solutions ("NGS") and Diamondware Limited ("Diamondware") sold by the US Debtors. NGS and Diamondware were wholly-owned subsidiaries of NNI and their shares were sold as part of the Enterprise Business Sale to Avaya.

- 13 -

31.    The Monitor and the Canadian Debtors ask the Courts to allocate the proceeds attributable to the intangible assets conveyed in such Business Sales to NNL. less the value of any licences to use the IP that were at the time of each Business Sale held and being used in the operation of the businesses by certain U.S. Debtors and EMEA Debtors pursuant to the terms of the MRDA[20]. Amounts equal to the portion of sales proceeds due to the relative value of those license rights should be allocated to those U.S. Debtors and EMEA Debtors respectively.

32.    The onus of proving the value of any licence rights is on the U.S. Debtors and EMEA Debtors respectively.  However, given that the maximum amount that the U.S. Debtors and the EMEA Debtors could claim as an allocation of the proceeds of sale of intangible assets in the Business Sales is that calculated by reference to the RPSM split or share provided for under the MRDA (as explained below)[21], the maximum allocations to the relevant U.S. Debtors and EMEA Debtors would be:

---

[20]    Although Business Sales may have included other intangible assets such as customer relationships, employee relationships, etc., for various reasons, those type of intangible assets did not have a value separate and apart from the IP at the relevant time. To the extent that any U.S. Debtors or EMEA Debtors assert that they had that type of intangible asset. it is not relevant to their allocation entitlement for this reason and because the U.S. Debtors' and EMEA Debtors' entitlement to share in any future benefits that might have been derived from businesses sold if they had continued to operate them were set by the MRDA; allocating value to different intangible assets that had been deployed in those businesses does not yield any different result for the U.S. Debtors and EMEA Debtors.

[21]    Certain of the EMEA Debtors, as well as NN AG, and NN CALA, had been granted non-exclusive licences and entered into distribution agreements pursuant to which such local entities were generally provided the right to distribute Products in their territory (on a non-exclusive basis). Under those agreements, they were guaranteed reasonable arm's length rate of return based on operating margin, set at 1%. These entities were commonly referred to as "limited risk entities" or "LREs". The Monitor and the Canadian Debtors submit that these non-exclusive licences and agreements were not the subject matter of or property interests in the intangible assets conveyed in the Business Sales and the LREs are not entitled to any allocation of the proceeds on account of intangible assets.

| U.S. Debtors | 38.53% | U.S. $870,000,000 |
| EMEA Debtors, Nortel Networks AG and Nortel Networks AS | 11.63% | U.S. $262,500,000 |

with the balance (49.84%, i.e. U.S. $1,125,300,000) allocated to NNL. However, as explained in paragraphs 57 to 61 below, since those are the maximum allocations of the U.S. Debtors and EMEA Debtors, to the extent they fail to prove those allocations and their actual allocations are lower, that of NNL increases by a corresponding amount.

*Rockstar Transaction Allocation*

33.    The Rockstar Transaction was comprised in all material respects of intangible assets which were IP; in particular, patents and patent-related assets. The only property interest in the IP conveyed in the Rockstar Transaction was that of NNL, as owner.[22] The Monitor and the Canadian Debtors ask the Courts to allocate the U.S. $4.5 billion realized from the Rockstar Transaction, together with accrued and accruing interest thereon, to the Canadian Debtors.

---

[22]    There was a limited and immaterial subset of patents conveyed that were registered in the names of Nortel Group entities other than NNL; however, pursuant to the MRDA referred to and defined below, NNL was the owner of all patents.

## PART IV - ANALYSIS

### *Nortel IP, Role of R&D, MRDA and RPSM*

#### *Intellectual Property*

34.     Through the Nortel Group's operating lifespan, an enormous amount of IP was developed arising from, among other things, technological discoveries and inventions. That IP was comprised of thousands of patents and patent applications as well as industrial designs, copyrights and applications, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documents and information. Certain of the IP was applied to the design, development and deployment of innovative communications products, systems and solutions which were made or used by members of the Nortel Group in their businesses.

#### *Research and Development*

35.     The IP was the result of significant research and development ("**R&D**") activities carried on by Canadian Debtors and others. Members of the Nortel Group, in the aggregate, invested billions of dollars in R&D over the years. The most critical factor in creating value of any aspect of the Nortel Group was valuable, commercializable IP to provide customers with innovative products, systems and solutions, generated from the R&D.

36.     R&D within the Nortel Group was undertaken by a combination of in-house developers and external alliances, partnerships and joint ventures.    Functionally headquartered in Ottawa, the global R&D team carried out internal R&D in ten key centres in

Canada, the U.S., the U.K., Ireland and France, as well as in other locales and through joint

ventures in China and Turkey.

*Master R&D Agreement and the Residual Profit Split Methodology*

37.    The key contractual document which described, confirmed and defined, among other

things, the ownership and nature of the interests in the IP and the manner and extent to which

U.S. Debtors and EMEA Debtors could benefit from the carrying on of their or any

businesses of the Nortel Group (and thus from the exploitation of IP and any other intangible

assets in these businesses) was the MRDA.  The MRDA was entered into by the relevant

members of the Nortel Group, including NNL, NNI, NNUK, NN France and NN Ireland

(each a "Participant" within the meaning of the MRDA) and was effective from

January 1, 2001.[23]

38.    The MRDA was a sophisticated contractual regime, entered into expecting that it

would be adhered to by the parties thereto and that it would govern their affairs including for

taxation purposes.  Accordingly, care was taken by each party in defining and confirming the

ownership of, and nature and extent of any other interests (licence rights), in the IP, and the

allocation and sharing of the benefits of the ongoing exploitation of IP and other intangible

assets used in the operation of Nortel businesses.  The sharing method, mandated by the

MRDA was the RPSM.

---

[23]    Nortel Networks Australia Pty Limited ("NN Australia") also entered into the MRDA when it was
originally executed.  NN Australia no longer operates under the MRDA.

39.    The MRDA specifically recognized that IP was the key profit driver of Nortel's businesses.

40.    To reflect the recognition within the Nortel Group that the quantum of R&D spending was the appropriate measure to ascertain the respective shares of benefits to be derived from the use of IP in the operations of the business of members of the Nortel Group, the preamble of the MRDA stated:

> ...each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits...

41.    Consistent with this recognition, the MRDA mandated the RPSM, which had been developed by specialized, independent experts who had been tasked with analyzing the Nortel Group's business and recommending the best methodology to allocate income or loss among the members of the Nortel Group. The RPSM took into account the functional and operational realities of the members of the Nortel Group, and thus recognized that 'routine' functions, such as sales, administration, distribution and similar routine functions should be identified and compensated with routine returns. The RPSM also recognized that residual profits and losses of the businesses were attributable to the use of IP which had been developed through the overall R&D activity; thus it allocated those residual profits and losses to the relevant parties to the MRDA according to their relative contributions to such R&D. In other words, the RPSM was designed so that the total economic profit or loss earned by

each Participant (as defined in the MRDA) equalled the sum of (i) its 'routine' return for distribution, manufacturing and/or other routine functions, and (ii) its share of the 'residual' profit or loss based on its R&D contribution.

42.    Although R&D was carried out by those members of the Nortel Group who were party to the MRDA, all resulting IP, including all patents. was owned by NNL. This was a fundamental element of the binding arrangements within and among members of the Nortel Group and was expressly. authoritatively and definitively confirmed and reflected in the MRDA, and the amendments thereto, as it had been in the cost-sharing arrangements which preceded the MRDA.

43.    In a recital to the MRDA, it was provided that, to the extent other members of the Nortel Group performed R&D Activity which led to the creation of IP, they (referred to in the MRDA as "Licenced Participants") had "held and enjoyed equitable and beneficial ownership of certain exclusive rights" in the IP pursuant to a 1992 Cost Sharing Agreement. Those rights were in the nature of licence rights. The recital in the MRDA went on to provide that those Licenced Participants were intended to continue to hold and enjoy such rights. The MRDA went on to express such rights as licence rights, granted by NNL, to use product-related IP in the operation of their businesses and by such use contribute to the overall profit in which they would share as their residual profit split[24] under the MRDA. The MRDA provided it was the parties' entire agreement, thus superseding all prior agreements. The conditions, obligations, and terms of their rights in the IP, and share of the benefits to be

---

[24]    Consistent with the LRE's limited role as distributors (with no role in R&D and non-exclusive. terminable licences) they received only a flat percentage of operating margins with no guarantee of future revenues.

- 19 -

obtained from the business operations including the exploitation of licence rights in their business operations (as well as the exploitation of any other intangible assets used in the businesses) were thus prescribed by the MRDA. The value of those rights (as well as any other intangible assets), whether in the form of licences or otherwise, were thus defined and circumscribed by the conditions, obligations, terms and benefits of the MRDA.[25]

44.    The MRDA and the RPSM that it mandated thus constitute the parties' governing agreement for ownership of and licence rights in the IP, and the methodology for sharing and allocating the benefits of the exploitation of IP generated by R&D activity through business operations which were the only uses the MRDA licences permitted U.S. Debtors and EMEA Debtors, as licencees, to undertake in connection with the IP.

*The Specific Terms of the MRDA*

45.    The MRDA expressly provides, among other things:

(i)    IP, referred to in the MRDA as "NN Technology" was defined as follows:

> "NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information

---

[25]    The description of the rights of Licensed Participants under the MRDA as "equitable and beneficial ownership of certain exclusive rights under NT Technology" were intended to continue (as expressed in a recital to the MRDA) and the licence rights specifically granted by the MRDA were the same bundle of rights – the continuation of the rights was by the granting of the licence rights – and they were subject to the same terms, conditions, obligations and benefits. For the purpose of allocating a value to those rights, any difference in nomenclature is not relevant. It was at all times clear that the rights in IP which any U.S. Debtors or EMEA Debtors had were those provided for in the MRDA and subject to its terms, obligations and conditions, and all other rights in the IP were those of NNL, the legal owner of the IP and the grantor of the licence rights.

- 20 -

produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill.

(ii)     In respect of ownership of IP:

Except as otherwise specifically agreed, <u>legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement, shall be vested in NNL</u>. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5. [emphasis added]

(iii)    In respect of the license rights granted to specified subsidiaries that engaged in

R&D (therein referred to as Licensed Participants), to use IP in connection

with the operation of their businesses:

To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i)     continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights <u>to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant,</u> and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, <u>rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory,</u> and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or

- 21 -

appropriate in connection therewith ("Non-Exclusive License").

...

"Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. ..." [emphasis added]

(iv)    in respect of the non-assignability of any license:

This Agreement shall not be assigned by any Participant except with the written consent of each of the other Participants.

(v)    In respect of the parties' agreement and understanding:

In respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants.

(vi)    In respect of governing law:

This agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

(vii)    In respect of the sharing of benefits from the carrying on of operating business, including the exploitation of licenses for IP and the use of any other intangible assets:

(a)    For and as a consequence of the performance of R&D Activity, each Participant [NNL and its subsidiaries that engaged in R&D] shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM

(the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity.

(b)    Each Participant hereby accepts and agrees to make the payment determined under the RPSM in Amended Schedule A as representing such Participant's share of the R&D Allocation.

Schedule "A" of the MRDA is the RPSM which set out the steps for calculating each participant's share of operating earnings.

*The MRDA Has Been In Force At All Material Times*

46.    The parties to the MRDA implemented the RPSM effective January 1, 2001, and from that date onward, until the Business Sales, they shared ongoing benefits from the exploitation of IP and other intangible assets through their business under the terms of MRDA and the RPSM method it mandated.

47.    The MRDA was amended by specific documents over the years. The parties' bargain concerning NNL's ownership of the IP and the limits on the use and benefits the U.S. Debtors and EMEA Debtors could derive from their licence rights never changed. Indeed the parties to the MRDA expressly confirmed that those terms of the bargain remained in full force and effect. Specifically, the MRDA was amended by:

(i)    an Addendum executed by counterparts between October 18, 2005 and June 21, 2006;

- 23 -

    (ii)    Agreement with Respect to Certain Technology effective as of December 30, 2006 (specific to the closing of a particular transaction between NNL and Alcatel-Lucent the following day);

    (iii)    a second Addendum executed by counterparts in December, 2007;

    (iv)    a third Addendum executed by counterparts between December 19, 2008 and January 13, 2009; and

    (v)    a fourth Addendum executed by counterparts between January 8, 2009 and January 13, 2009.

48.    The parties have continued to rely upon the MRDA during the current insolvency proceedings, including as the basis for NNL's acceptance of a claim against it by NNI for U.S. $2 billion arising out of a compensating adjustment negotiated by the U.S. and Canadian tax authorities in relation to the MRDA, all as presented to and approved by this Court.[26]

*Allocations*

*The Defining Characteristics For Allocation Purposes of the Property Interests*

49.    As noted herein, tangible assets should not present major issues for allocation purposes.  Ownership is the relevant property interest, and net book value the appropriate allocation metric.

---

[26] This, in turn, will require corresponding adjustments to any allocation to the EMEA Debtors.

50.   As for intangible assets, based on the parties' agreement to the MRDA, all IP that was transferred in the Business Sales and the Rockstar Transactions was owned by NNL. That ownership is the relevant property interest, and provides the proper basis for allocation subject only to the value, if any, of licence rights in the IP held by the U.S. Debtors or the EMEA Debtors under the MRDA, as all other rights or interests in the IP were those of NNL.

51.   Under the MRDA, the U.S. Debtors and EMEA Debtors had a licence to use the IP to develop and make, or have made for them, Products (as defined in the MRDA) for their business operations.

52.   The bargain that was struck thus limited the licence rights to specified uses for and by specific members of the Nortel Group and they were non-assignable and personal to those Nortel Group participants that were party to the MRDA. The MRDA set a limit on the interest of the U.S. Debtors and EMEA Debtors in the IP and a limit on the benefits they could derive from their licences, alone or in combination with the deployment of any intangible assets in the operation of their businesses. It therefore also determines the maximum value that could be ascribed to their licences in the Business Sales, and renders their licences irrelevant, inapplicable and of no value in connection with the Rockstar Transaction.

53.   In other words, the MRDA, as the parties' agreement to allocate the benefits of the businesses on the basis of the RPSM, determines the maximum value for U.S. Debtors or EMEA Debtors of their licence rights and other intangible assets to the extent a licence was applicable and relevant in connection with a specific Business Sale, since (i) what was realized by the sale to a third party  simply represented the capitalized value of what might

have been realized by way of operating revenues from ongoing use of that IP and other intangible assets; and (ii) the MRDA's sharing formula determined the upper limit of what U.S. Debtors and EMEA Debtors could realize through the use of the licence and other intangible assets, and therefore limits the value of what they, as holders of licence rights could be considered to have surrendered[27]. The MRDA, and the terms of the licence it prescribes, renders any licence rights inapplicable and without value in connection with the Rockstar Transaction.

*The Rockstar Transaction*

54.    As discussed above, NNL owned the IP sold in the Rockstar Transaction. The sale of that ownership interest generated U.S. $4.5 billion of sale proceeds. As owner of the IP, NNL is entitled to those proceeds, and all interest accrued and accruing thereon, in their entirety.

55.    At the time of the Rockstar Transaction, none of the Nortel entities, and in particular the U.S. Debtors and EMEA Debtors, were carrying on business operations in their exclusive or any territory, and they had no prospect of doing so. The businesses in which they were engaged had all been sold to third parties and the full value of all assets employed in them (including, without limitation, the IP licences) maximized and realized. Accordingly, after the Business Sales the U.S. Debtors and the EMEA Debtors were not "...making, having made, using, licensing, offering to sell or selling any Products" (as defined in the MRDA), let alone Products using or embodying IP that was the subject of the Rockstar Transaction or otherwise. At the time of the Rockstar Transaction, any of the licences that the U.S. Debtors

---

[27]    In the case of the LREs, see footnote 21 above.

or EMEA Debtors had bargained for under the MRDA (which were non-assignable and limited in scope) were inapplicable, irrelevant and without value. Although certain U.S. Debtors and EMEA Debtors joined in the Rockstar Transaction as sellers or deemed sellers, as provided in the IFSA, this is not to be taken as any acknowledgement that they had transferred or surrendered any interest of value in the Rockstar Transaction.

56.     In sum, the IP sold in the Rockstar Transaction was not subject to any licence or other intangible rights of value of the U.S. Debtors on EMEA Debtors. Hence, only NNL had a valuable property interest in the IP sold; only NNL contributed IP of value to the sale. NNL is solely entitled to the proceeds of the Rockstar Transaction, and all interest accrued and accruing on those proceeds.

*The Business Sales*

57.     With respect to the value realized in the Business Sales for tangible assets, the respective entities that owned and contributed those assets to the sales are entitled to the net book value of those assets.

58.     In the Business Sales most of the value related to the intangible assets. IP was the primary intangible asset[28]; more importantly, it was the driver and key component of the value realized for intangible assets in the Business Sales.

---

[28]    The others being employees and customer relationships did not have any value separate and apart from the IP as set out in footnote 20.

- 27 -

59.    NNL owned the IP that was sold in the Business Sales. The EMEA Debtors and U.S. Debtors (as well as Canadian Debtors) that were parties to the MRDA and had engaged in R&D, were operating their businesses until the time of the Business Sales. Any licences they had under the MRDA that they were using in the businesses that were part of the Business Sales were surrendered as part of the Business Sales. Unlike the ownership interests of NNL, which were assignable and saleable, these license rights were not assignable or saleable. The U.S. Debtors and EMEA Debtors, who surrendered licence rights in the Business Sales, are entitled to a share of the proceeds of the Business Sales in excess of the net book value of the tangible assets to the extent that those non-assignable licence rights had value at the time of the Business Sales.

60.    The onus of showing their non-assignable licences had value at the time of the Business Sales rests on the U.S. Debtors and EMEA Debtors. However, the determination of that value must take into account the terms of the MRDA, which created the licences and expressly determines the maximum benefit the licence holders could derive from the operation of the businesses and the deployment and use of intangible assets therein including IP or licences for IP.

61.    To the extent that there were other intangible assets beyond IP, the interests of the U.S. Debtors and the EMEA Debtors in those intangible assets were not valuable; in any event, the maximum benefit the U.S. Debtors and the EMEA Debtors could derive from all intangible assets would be from operating their business and was thus subject to the MRDA. Accordingly, taking into account other intangible assets does not change the allocation entitlement of the U.S. Debtors and the EMEA Debtors.

- 28 -

62.    Therefore, the proceeds of the Business Sales are to be allocated as set forth in paragraphs 29 and 32 above.

## PART V – CONCLUSION

63.    The Monitor and Canadian Debtors request that the Courts give effect to the Allocation Position set forth herein. The Monitor and the Canadian Debtors reserve the right to respond to any Allocation Positions of other Core Parties.

May 16, 2013

**Goodmans LLP**
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Benjamin Zarnett LSUC#17247M
Jay A. Carfagnini  LSUC#22293T
Jessica Kimmel LSUC#32312W
Peter Ruby LSUC#38439P
Joseph Pasquariello LSUC#38390C

Tel: 416.979.2211
Fax: 416.979.1234

Lawyers for the Monitor, Ernst &
Young Inc.


**Gowling Lafleur Henderson LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario M5X 1G5

Derrick Tay LSUC#21152A
Jennifer Stam LSUC#46735J

Tel: 416.862.5697
Fax: 416.862.7661

Lawyers for the Canadian Debtors


**TO:**          Core Parties Service List

1528

Court File No: 09-CL-7950

IN THE MATTER OF THE COMPANIES' *CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto |
|  | **ALLOCATION POSITION OF THE**<br>**MONITOR AND THE CANADIAN DEBTORS** |
|  | **Goodmans LLP**<br>333 Bay Street, Suite 3400<br>Toronto, Ontario M5H 2S7<br><br>Benjamin Zarnett LSUC#17247M<br>Jay A. Carfagnini LSUC#22293T<br>Jessica Kimmel LSUC#32312W<br>Peter Ruby LSUC#38439P<br>Joseph Pasquariello LSUC#38390C<br>Tel: 416.979.2211<br>Fax: 416.979.1234<br><br>Lawyers for the Monitor, Ernst & Young Inc.<br><br>**Gowling Lafleur Henderson LLP**<br>Suite 1600, First Canadian Place<br>100 King Street West<br>Toronto, Ontario M5X 1G5<br><br>Derrick Tay LSUC#21152A<br>Jennifer Stam LSUC#46735J<br>Tel: 416.862.5697<br>Fax: 416.862.7661<br><br>Lawyers for the Canadian Debtors |

\6182351