## <u>EXHIBIT D-1</u>

Court File No. 09-CL-7950

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

### BOOK OF AUTHORITIES OF THE MONITOR AND THE CANADIAN DEBTORS

(Motion to Strike Expert Reports and Testimony of Daniel R. Bereskin QC
and Bruce W. Stratton)
(returnable April 22, 2014)

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby** LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC #: 38390C
jpasquariello@goodmans.ca
**Hannah Arthurs** LSUC#: 55337O
harthurs@goodmans.ca

Tel:    416.979.2211
Fax:   416.979.1234

Lawyers for the Monitor

**Gowling Lafleur Henderson LLP**
Barristers & Solicitors
1 First Canadian Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay** LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam** LSUC#: 46735J
jennifer.stam@gowlings.com

Tel:    416.862.7525
Fax:   416.862.7661

Lawyers for the Canadian Debtors

2

**TO:  THE CORE PARTIES SERVICE LIST**

# Index

# INDEX

1.      *R. v. Mohan,* [1994] 2 S.C.R. 9

2.      *Sopinka, Lederman & Bryant: The Law of Evidence in Canada,* 3d ed. by Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst (Markham, Ontario: LexisNexis Canada, 2009), excerpt

3.      *Walsh v. BDO Dunwoody LLP,* 2013 BCSC 1463

4.      David Vaver, *Intellectual Property Law* (Toronto: Irwin Law, 2011), excerpt

5.      *Gorgichuk Estate v. American Home Assurance Co.,* [1985] O.J. No. 1134 (Ont. H.C.J.); varied on other grounds [1988] O.J. No. 159

6.      *Merck & Co. Inc. v. Apotex Inc.,* 2010 FC 1265, aff'd 2011 FCA 363

7.      *Canadian National Railway Company v. Volker Stevin Contracting Ltd.,* 1991 CarswellAlta 8 (C.A.)

8.      *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.,* 2013 ONSC 1300, [2013] O.J. No. 1058 (S.C.J.)

9.      *Surrey Credit Union v. Wilson,* 1990 CarswellBC 94 (S.C.)



**Her Majesty The Queen**   *Appellant*

*v.*

**Chikmaglur Mohan**   *Respondent*

INDEXED AS: R. *v.* MOHAN

File No.: 23063.

1993: November 9; 1994: May 5.

Present: Lamer C.J. and La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Evidence — Admissibility — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

*Criminal law — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

Respondent, a practising pediatrician, was charged with four counts of sexual assault on four female patients, aged 13 to 16 at the relevant time, during medical examinations conducted in his office. His counsel indicated that he intended to call a psychiatrist who would testify that the perpetrator of the alleged offences would be part of a limited and unusual group of individuals and that respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The psychiatrist testified in a *voir dire* that the psychological profile of the perpetrator of the first three complaints was likely that of a pedophile, while the profile of the perpetrator of the fourth complaint that of a sexual psychopath. The psychiatrist intended to testify that the respondent did not fit the profiles but the evidence was ruled inadmissible at the conclusion of the *voir dire*.

Respondent was found guilty by the jury and appealed. The Court of Appeal allowed respondent's

**Sa Majesté la Reine**   *Appelante*

*c.*

**Chikmaglur Mohan**   *Intimé*

RÉPERTORIÉ: R. *c.* MOHAN

No du greffe: 23063.

1993: 9 novembre; 1994: 5 mai.

Présents: Le juge en chef Lamer et les juges La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci et Major.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Preuve — Admissibilité — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

*Droit criminel — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne correspondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

L'intimé, un pédiatre, fait face à quatre chefs d'accusation d'agression sexuelle commise sur quatre patientes, âgées à l'époque de 13 à 16 ans, pendant leur examen médical dans le bureau de l'intimé. Son avocat a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le psychiatre a témoigné au voir-dire que le profil psychologique de l'auteur des trois premières agressions alléguées était probablement celui d'un pédophile alors que celui de la quatrième était celui d'un psychopathe sexuel. Le psychiatre avait l'intention de témoigner que l'intimé ne correspondait pas à ces profils, mais son témoignage a été jugé inadmissible à l'issue du voir-dire.

Déclaré coupable par le jury, l'intimé a interjeté appel. La Cour d'appel a accueilli l'appel de l'intimé,

appeal, quashed the convictions and ordered a new trial. The Court of Appeal therefore found it unnecessary to deal with the Crown's sentence appeal. At issue here was the determination of the circumstances in which expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involved an examination of the rules relating to (i) expert evidence, and (ii) character evidence.

*Held*: The appeal should be allowed.

The evidence should be excluded.

### Expert Evidence

Admission of expert evidence depends on the application of the following criteria: (a) relevance; (b) necessity in assisting the trier of fact; (c) the absence of any exclusionary rule; and (d) a properly qualified expert. Relevance is a threshold requirement to be decided by the judge as a question of law. Logically relevant evidence may be excluded if its probative value is overborne by its prejudicial effect, if the time required is not commensurate with its value or if it can influence the trier of fact out of proportion to its reliability. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence. Expert evidence should not be admitted where there is a danger that it will be misused or will distort the fact-finding process, or will confuse the jury.

Expert evidence, to be necessary, must likely be outside the experience and knowledge of a judge or jury and must be assessed in light of its potential to distort the fact-finding process. Necessity should not be judged by too strict a standard. The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions. Experts, however, must not be permitted to usurp the functions of the trier of fact causing a trial to degenerate to a contest of experts.

Expert evidence can be excluded if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. The evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

annulé les déclarations de culpabilité et ordonné un nouveau procès. La Cour a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel du ministère public contre la sentence. Il faut déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière (i) de preuve d'expert, et (ii) de preuve de moralité.

*Arrêt*: Le pourvoi est accueilli.

La preuve est exclue.

### Preuve d'expert

L'admission de la preuve d'expert repose sur l'application des critères suivants: a) la pertinence; b) la nécessité d'aider le juge des faits; c) l'absence de toute règle d'exclusion; et d) la qualification suffisante de l'expert. La pertinence est une exigence liminaire déterminée par le juge comme question de droit. La preuve logiquement pertinente peut être exclue si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si son effet sur le juge des faits est disproportionné par rapport à sa fiabilité. Le facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert. La preuve d'expert ne devrait pas être admise si elle risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits, ou de dérouter le jury.

Pour être nécessaire, la preuve d'expert doit, selon toute vraisemblance, dépasser l'expérience et la connaissance d'un juge ou d'un jury et être évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. La nécessité ne devrait pas être jugée selon une norme trop stricte. La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées. Les experts ne doivent toutefois pas pouvoir usurper les fonctions du juge des faits, ce qui pourrait réduire le procès à un simple concours d'experts.

La preuve d'expert peut être exclue si elle contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. La preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

In summary, expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

## Expert Evidence as to Disposition

The Crown cannot lead expert evidence as to disposition in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. The accused, however, can adduce evidence as to disposition, but this evidence is generally limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testimony may also rely on specific acts of good conduct. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. Although the exception has been applied to abnormal behaviour usually connoting sexual deviance, its underlying rationale is based on distinctiveness.

Before an expert's opinion as to disposition is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. A finding that the scientific community has developed a standard profile for the offender who commits this type of crime will satisfy the criteria of relevance and necessity. The evidence will qualify as an exception to the exclusionary rule relating to character evidence provided the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

En résumé, la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

## Preuve d'expert quant à la prédisposition

Le ministère public ne peut produire une preuve d'expert quant à la prédisposition que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. L'accusé peut en revanche produire une preuve quant à la prédisposition, mais cette preuve se limite, en règle générale, à la preuve de la réputation de l'accusé au sein de la collectivité relativement aux traits de caractère concernés. L'accusé peut aussi invoquer dans son propre témoignage des actes particuliers de bonne conduite. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune de ces catégories. Cependant, une autre exception de portée limitée a été créée. Bien que cette exception ait été appliquée à des comportements anormaux liés usuellement à une déviance sexuelle, sa raison d'être est le caractère distinctif.

Avant d'admettre en preuve l'opinion d'un expert sur la prédisposition, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. La conclusion que la profession scientifique a élaboré un profil type du délinquant qui commet ce genre de crime satisfera aux critères de pertinence et de fiabilité. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition que le juge soit convaincu que l'opinion proposée se situe dans le domaine d'expertise du témoin expert.

<u>Application to This Case</u>

Nothing in the record supported a finding that the profile of a paedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these indicia of reliability, it could not be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury.

The similarities detailed by the judge dealt with the perpetrator's *modus operandi* of the acts subject to the individual counts. These were not matters to which the expert evidence related. Moreover, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence.

**Cases Cited**

**Considered:** *R. v. Lupien*, [1970] S.C.R. 263; *R. v. Chard* (1971), 56 Cr. App. R. 268; *Lowery v. The Queen*, [1974] A.C. 85; *R. v. Turner*, [1975] Q.B. 834; **referred to:** *R. v. Robertson* (1975), 21 C.C.C. (2d) 385; *R. v. McMillan* (1975), 23 C.C.C. (2d) 160, aff'd [1977] 2 S.C.R. 824; *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201; *R. v. Taylor* (1986), 31 C.C.C. (3d) 1; *R. v. C. (M.H.)*, [1991] 1 S.C.R. 763; *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. B.(G.)*, [1990] 2 S.C.R. 30; *Morris v. The Queen*, [1983] 2 S.C.R. 190; *R. v. Béland*, [1987] 2 S.C.R. 398; *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672; *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699; *R. v. Marquard*, [1993] 4 S.C.R. 223; *R. v. Morin*, [1988] 2 S.C.R. 345; *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, leave to appeal refused [1981] 1 S.C.R. xi; *Thompson v. The King*, [1918] A.C. 221; *R. v. Garfinkle* (1992), 15 C.R. (4th) 254.

**Statutes and Regulations Cited**

*Criminal Code*, R.S.C., 1985, c. C-46, s. 693.

<u>Application à l'espèce</u>

Rien dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence de ces indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches.

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. La preuve d'expert ne visait pas ces questions. De plus, la question de savoir si le crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert.

**Jurisprudence**

**Arrêts examinés:** *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Chard* (1971), 56 Cr. App. R. 268; *Lowery c. The Queen*, [1974] A.C. 85; *R. c. Turner*, [1975] Q.B. 834; **arrêts mentionnés:** *R. c. Robertson* (1975), 21 C.C.C. (2d) 385; *R. c. McMillan* (1975), 23 C.C.C. (2d) 160, conf. par [1977] 2 R.C.S. 824; *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201; *R. c. Taylor* (1986), 31 C.C.C. (3d) 1; *R. c. C. (M.H.)*, [1991] 1 R.C.S. 763; *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. B.(G.)*, [1990] 2 R.C.S. 30; *Morris c. La Reine*, [1983] 2 R.C.S. 190; *R. c. Béland*, [1987] 2 R.C.S. 398; *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672; *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699; *R. c. Marquard*, [1993] 4 R.C.S. 223; *R. c. Morin*, [1988] 2 R.C.S. 345; *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, autorisation de pourvoi refusée [1981] 1 R.C.S. xi; *Thompson c. The King*, [1918] A.C. 221; *R. c. Garfinkle* (1992), 15 C.R. (4th) 254.

**Lois et règlements cités**

*Code criminel*, L.R.C. (1985), ch. C-46, art. 693.

## Authors Cited

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

APPEAL from a judgment of the Ontario Court of Appeal (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, allowing an appeal from convictions by Berstein J. sitting with jury and ordering a new trial. Appeal allowed.

*Jamie C. Klukach*, for the appellant.

*Brian H. Greenspan* and *Sharon E. Lavine*, for the respondent.

The judgment of the Court was delivered by

SOPINKA J. — In this appeal we are required to determine under what circumstances expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involves an examination of the rules relating to expert and character evidence.

## I. Facts

### A. The Events

The respondent, a practising pediatrician in North Bay, was charged with four counts of sexual assault on four of his female patients, aged 13 to

## Doctrine citée

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, qui a accueilli un appel des déclarations de culpabilité prononcées par le juge Berstein, siégeant avec jury, et ordonné un nouveau procès. Pourvoi accueilli.

*Jamie C. Klukach*, pour l'appelante.

*Brian H. Greenspan* et *Sharon E. Lavine*, pour l'intimé.

Version française du jugement de la Cour rendu par

LE JUGE SOPINKA — Nous sommes appelés à déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière de preuve d'expert et de moralité.

### I. Les faits

#### A. Les événements

L'intimé, un pédiatre exerçant à North Bay, fait face à quatre chefs d'accusation d'agression sexuelle sur quatre de ses patientes, âgées à

16 at the relevant time. The alleged sexual assaults were perpetrated during the course of medical examinations of the patients conducted in the respondent's office. The complainants had been referred to the respondent for conditions which were, in part, psychosomatic in nature.

Evidence relating to each complaint was admitted as similar fact evidence with respect to the others. The complainants did not know one another. Three of them came forth independently. Following a mistrial, which was publicized, the fourth victim came forward, having heard about the other charges. Three of the four complainants had been victims of prior sexual abuse. With respect to two of them, the respondent knew about their sexual abuse at the hands of others. The alleged assaults consisted of fondling of the girls' breasts and digital penetration and stimulation of their vaginal areas, accompanied by intrusive questioning of them as to their sexual activities. All of the complainants testified that the respondent did not wear gloves while examining them internally. The respondent, who testified in his own defence, denied the complainants' evidence.

At the conclusion of the respondent's examination in chief, counsel for the respondent indicated that he intended to call a psychiatrist who would testify that the perpetrator of the offences alleged to have been committed would be part of a limited and unusual group of individuals and that the respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The Crown sought a ruling on the admissibility of that evidence. The trial judge held a *voir dire* and ruled that the evidence tendered on the *voir dire* would not be admitted.

The jury found the respondent guilty as charged on November 16, 1990. He was sentenced to nine months' imprisonment on each of the four counts, to be served concurrently, and to two years' probation. The respondent appealed his convictions and the Crown appealed the sentence. The Court of Appeal allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal found it was not neces-

l'époque de 13 à 16 ans. Les agressions sexuelles auraient été commises pendant l'examen médical des patientes dans le bureau de l'intimé. Les plaignantes lui avaient été référées pour des problèmes qui, en partie, étaient de nature psychosomatique.

La preuve relative à chaque plainte a été admise comme preuve de faits similaires à l'égard des autres. Les plaignantes ne se connaissaient pas. Trois d'entre elles ont porté plainte de façon indépendante. Après l'annulation d'un procès rendu public, la quatrième victime, ayant pris connaissance des accusations, s'est fait connaître. Des quatre plaignantes, trois avaient auparavant été victimes d'abus sexuels. En outre, l'intimé savait que deux d'entre elles l'avaient été par d'autres. Les agressions alléguées consistaient à avoir caressé les seins des filles et avoir pénétré et stimulé la région vaginale avec les doigts, et à leur avoir posé des questions indiscrètes sur leurs activités sexuelles. Toutes les plaignantes ont témoigné que l'intimé ne portait pas de gants pendant l'examen interne. L'intimé, qui a témoigné pour sa propre défense, a nié les témoignages des plaignantes.

À l'issue de l'interrogatoire principal de l'intimé, l'avocat de ce dernier a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le ministère public a demandé au juge du procès de se prononcer sur l'admissibilité de cette preuve. Ce dernier a tenu un voir-dire, à la suite duquel il a conclu à l'inadmissibilité de la preuve présentée au voir-dire.

Le 16 novembre 1990, le jury a déclaré l'intimé coupable des infractions reprochées. Il a été condamné à neuf mois d'emprisonnement relativement à chacun des quatre chefs, à purger concurremment, et à deux années de probation. L'intimé a interjeté appel des déclarations de culpabilité et le ministère public a interjeté appel de la sentence. La Cour d'appel a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un

sary to deal with the Crown's sentence appeal and refused the Crown leave to appeal.

The appellant sought leave to appeal to this Court against the decision of the Ontario Court of Appeal pursuant to s. 693 of the *Criminal Code*, R.S.C., 1985, c. C-46. On December 10, 1992 leave to appeal was granted by this Court, [1992] 3 S.C.R. viii.

### B. *The Excluded Evidence*

In the *voir dire*, Dr. Hill, the expert, began his testimony by explaining that there are three general personality groups that have unusual personality traits in terms of their psychosexual profile perspective. The first group encompasses the psychosexual who suffers from major mental illnesses (*e.g.*, schizophrenia) and engages in inappropriate sexual behaviour occasionally. The second and largest group contains the sexual deviation types. This group of individuals shows distinct abnormalities in terms of the choice of individuals with whom they report sexual excitement and with whom they would like to engage in some type of sexual activity. The third group is that of the sexual psychopaths. These individuals have a callous disregard for people around them, including a disregard for the consequences of their sexual behaviour towards other individuals. Another group would include pedophiles who gain sexual excitement from young adolescents, probably pubertal or post-pubertal.

Dr. Hill identified pedophiles and sexual psychopaths as examples of members of unusual and limited classes of persons. In response to questions hypothetically encompassing the allegations of the four complainants, the expert stated that the psychological profile of the perpetrator of the first three complaints would likely be that of a pedophile, while the profile of the perpetrator of the fourth complaint would likely be that of a sexual psychopath. Dr. Hill also testified that, if but one perpetrator was involved in all four complaints described in the hypothetical questions, he would

nouveau procès. Elle a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel de la sentence interjeté par le ministère public, et a refusé à ce dernier l'autorisation d'appeler.

L'appelante a demandé à notre Cour l'autorisation de se pourvoir contre la décision de la Cour d'appel de l'Ontario conformément à l'art. 693 du *Code criminel*, L.R.C. (1985), ch. C-46. Le 10 décembre 1992, notre Cour a accordé l'autorisation, [1992] 3 R.C.S. viii.

### B. *Les éléments de preuve écartés*

Lors du voir-dire, le Dr Hill, l'expert, a d'abord expliqué qu'il existait trois groupes généraux de personnalité possédant des traits de personnalité inhabituels du point de vue de leur profil psychosexuel. Le premier groupe comprend le psychosexuel qui souffre de maladie mentale grave (par exemple, la schizophrénie) et qui adopte à l'occasion un comportement sexuel inapproprié. Le deuxième groupe, le plus large, inclut les personnes ayant des déviations sexuelles. Les individus appartenant à ce groupe présentent des anomalies marquées quant au choix des personnes auxquelles ils relient l'excitation sexuelle et avec lesquelles ils aimeraient avoir une certaine forme d'activité sexuelle. Le troisième groupe comprend les psychopathes sexuels. Ils sont totalement insensibles à l'égard des gens qui les entourent, et indifférents aux conséquences de leur comportement sexuel envers autrui. Les pédophiles formeraient un quatrième groupe. Ils sont sexuellement excités par de jeunes adolescents qui sont vraisemblablement à l'âge pubertaire ou postpubertaire.

Le Dr Hill a qualifié les pédophiles et les psychopathes sexuels d'exemples d'individus membres d'une catégorie inhabituelle et restreinte de personnes. En réponse à des questions hypothétiques réunissant les allégations des quatre plaignantes, l'expert a déclaré que le profil psychologique de l'auteur des trois premières infractions serait probablement celui d'un pédophile, alors que le profil de l'auteur de la quatrième infraction serait probablement celui d'un psychopathe sexuel. Le Dr Hill a également témoigné que, si un seul auteur était impliqué relativement aux quatre

uniquely categorize that perpetrator as a sexual psychopath. He added that such a person would belong to a very small, behaviourally distinct category of persons. Dr. Hill was asked whether a physician who acted in the manner described in the hypothetical questions would be a member of a distinct group of aberrant persons. His answer was that such behaviours could only flow from a significant abnormality of character and would be part of an unusual and limited class. In cross-examination, Dr. Hill said: "You bring an extra abnormal, extra component for the abnormality when you talk about a physician in his or her office." According to Dr. Hill, physicians who were also sexual offenders would be a small group because not only would they be breaking the usual norms of society, but they would also be breaking out against the norms of the medical profession which are very strict given the intimate contact necessary to treat patients. It was contemplated that Dr. Hill would go on to testify "to the effect that Doctor Mohan does not have the characteristics attributable to any of the three groups in which most sex offenders fall."

## II. Judgments Below

A. *High Court of Justice* (Ruling on *Voir Dire*) (Bernstein J.)

In ruling on the admissibility of Dr. Hill's evidence, the trial judge stated the issues as follows:

One: Did the offences alleged to have been committed by the accused have unusual features which would indicate that anyone who committed them was a member of a limited and distinguishable group?

Two: Did the psychiatrist have the necessary qualifications and expertise to venture an opinion on the first issue so as to be helpful to the jury?

The trial judge noted that Dr. Hill had personally interviewed and treated three doctors who engaged in criminal sexual misconduct with their patients. He also noted that Dr. Hill admitted that

plaintes décrites dans les questions hypothétiques, il le qualifierait de psychopathe sexuel uniquement. Il a ajouté qu'une telle personne appartiendrait à un groupe très restreint de personnes distinctes du point de vue de leur comportement. On a demandé au D$^r$ Hill si un médecin agissant de la manière décrite dans les questions hypothétiques ferait partie d'un groupe distinct de personnes anormales. Il a répondu que de tels comportements ne pouvaient que découler d'une grave anomalie du caractère et feraient partie d'une catégorie inhabituelle et restreinte. En contre-interrogatoire, le D$^r$ Hill a dit: [TRADUCTION] «Vous apportez une anomalie supplémentaire, un élément supplémentaire d'anomalie lorsque vous parlez d'un médecin dans son bureau.» Selon le D$^r$ Hill, les médecins qui sont également des délinquants sexuels seraient peu nombreux parce que non seulement ils violent les normes ordinaires de la société, mais aussi les normes de la profession médicale, qui sont très strictes étant donné le contact intime inhérent au traitement des patients. On prévoyait que le D$^r$ Hill témoignerait ensuite [TRADUCTION] «que le D$^r$ Mohan ne possède pas les caractéristiques attribuables à l'un des trois groupes auxquels appartiennent la plupart des délinquants sexuels.»

## II. Les juridictions inférieures

A. *La Haute Cour de Justice* (décision relativement au voir-dire) (le juge Bernstein)

En se prononçant sur l'admissibilité du témoignage du D$^r$ Hill, le juge du procès a formulé ainsi les questions en litige:

[TRADUCTION]

(1) Les infractions imputées à l'accusé avaient-elles des caractéristiques inhabituelles indiquant que quiconque les a commises appartient à un groupe restreint et distinctif?

(2) Le psychiatre possédait-il les compétences et l'expérience nécessaires pour exprimer sur la première question une opinion qui soit utile au jury?

Le juge du procès a signalé que le D$^r$ Hill avait lui-même interrogé et traité trois médecins ayant eu un comportement sexuel criminel avec leurs patients. Il a également signalé que le D$^r$ Hill avait

he was not aware of any scientific study or literature related to the psychiatric make-up of doctors who sexually abuse their patients and that his experience with three admitted offenders who were doctors was not a sufficient basis to allow him to make any generalizations on the subject. Dr. Hill acknowledged that he, as a psychiatrist, is unable to diagnose individuals as having the distinct characteristics of a pedophile or of a homosexual until the patient has performed an overt act which suggests the existence of the characteristic.

The trial judge reviewed the case law in which the use of such psychiatric evidence had been discussed (*i.e.*, *R. v. Lupien*, [1970] S.C.R. 263; *R. v. Robertson* (1975), 21 C.C.C. (2d) 385 (Ont. C.A.); *R. v. McMillan* (1975), 23 C.C.C. (2d) 160 (Ont. C.A.); *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201 (Ont. C.A.); *R. v. Taylor* (1986), 31 C.C.C. (3d) 1 (Ont. C.A.)). From these cases, the trial judge concluded that the use of psychiatric evidence has been greatly expanded since *R. v. Lupien*. He cited the following words of Martin J.A. in *R. v. Robertson* (at p. 423):

Evidence that the offence has distinctive features which identified the perpetrator as a person possessing unusual personality traits constituting him a member of an unusual and limited class of persons would render admissible evidence that the accused did not possess the personality characteristics of the class of persons to which the perpetrator of the crime belonged.

The trial judge also relied on the following passage of *R. v. McMillan* (at p. 175):

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible.

admis qu'il ne connaissait aucune étude ou documentation scientifique relative au portrait psychiatrique des médecins qui abusent sexuellement de leurs patients, et que son expérience acquise auprès des trois délinquants reconnus, qui étaient des médecins, ne lui permettait pas de faire des généralisations sur le sujet. Le D[r] Hill a reconnu qu'à titre de psychiatre, il n'était pas en mesure de diagnostiquer chez des individus les caractéristiques distinctes d'un pédophile ou d'un homosexuel, tant que le patient n'avait pas commis d'acte manifeste pouvant indiquer l'existence de la caractéristique.

Le juge du procès a passé en revue la jurisprudence dans laquelle l'utilisation de la preuve psychiatrique a été analysée (p. ex., *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Robertson* (1975), 21 C.C.C. (2d) 385 (C.A. Ont.); *R. c. McMillan* (1975), 23 C.C.C. (2d) 160 (C.A. Ont.); *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201 (C.A. Ont.); *R. c. Taylor* (1986), 31 C.C.C. (3d) 1 (C.A. Ont.)). Fort de ces arrêts, le juge du procès a conclu que l'utilisation de la preuve psychiatrique a considérablement été élargie depuis l'arrêt *R. c. Lupien*. Il a repris les propos suivants du juge Martin de la Cour d'appel dans l'arrêt *R. c. Robertson* (à la p. 423):

[TRADUCTION] La preuve que l'infraction présente des caractéristiques distinctives qui identifient l'auteur du crime comme une personne possédant des traits de personnalité inhabituels, qui le rattachent ainsi à une catégorie inhabituelle et restreinte de personnes, rendrait admissible la preuve que l'accusé ne possédait pas les traits de personnalité propres à la catégorie à laquelle l'auteur du crime appartient.

Le juge du procès a également invoqué le passage suivant de l'arrêt *R. c. McMillan* (à la p. 175):

[TRADUCTION] Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible.

After relying on *R. v. McMillan*, the trial judge held:

> Doctor Hill is of the opinion that sexual assault is a crime committed by a distinguishable group. As I read the cases, I came to the conclusion that it is the size and the degree of distinctiveness of the "unusual and limited class of persons" which determines whether expert opinion will be helpful in defining the class and categorizing accused persons within or without the group. These days it is trite to say that a large number of men from all walks of life commit sexual offences on young women. While all may have some type of character disorder, I doubt that expert evidence regarding the normality of any given accused would be of assistance to a trier of fact absent some more distinguishing within the wide spectrum of sexual assault.

> The evidence of Doctor Hill is not sufficient, I believe, to establish that doctors who commit sexual assaults on patients are in a significantly more limited group in psychiatric terms than are other members of society. There is no scientific data available to warrant that conclusion. A sample of three offenders is not a sufficient basis for such a conclusion. Even the allegations of the fourth complainant ... are not so unusual, as sex offenders go, to warrant a conclusion that the perpetrator must have belonged to a sufficiently narrow class.

I conclude that if the evidence was received as proposed, it would merely be character evidence of a type that is inadmissible as going beyond evidence of general reputation, and does not fall within the proper sphere of expert evidence.

## B. *Ontario Court of Appeal* (1992), 8 O.R. (3d) 173

It was apparent for Finlayson J.A., who wrote the court's judgment, that the trial judge's conclusions were based on a misapprehension of the evidence of Dr. Hill. Finlayson J.A. stated that Dr. Hill did not base his opinion on case studies of the three physicians he had as patients who were accused of sexual crimes. Rather, Finlayson J.A. was of the view at p. 177 that, in concluding that the perpetrators in the hypothetical examples would fall into an unusual and limited class of persons, and that, if the perpetrator were a physician, the class into which he would fall would be even

Après avoir invoqué l'arrêt *R. c. McMillan*, le juge du procès a déclaré:

> [TRADUCTION] Selon le Docteur Hill, l'agression sexuelle est un crime commis par un groupe distinctif. Compte tenu de la jurisprudence, je conclus que c'est l'importance et le degré de distinction de la «catégorie inhabituelle et restreinte de personnes» qui détermine si l'opinion d'un expert contribuera à définir la catégorie et à inclure les accusés dans ce groupe ou à les en exclure. Il va sans dire qu'un grand nombre d'hommes de tous les milieux commettent des infractions sexuelles sur de jeunes femmes. S'il se peut que tous souffrent d'une forme de désordre mental, je doute que la preuve d'expert portant sur la normalité d'un accusé soit utile au juge des faits en l'absence d'un élément plus distinctif se situant à l'intérieur du large spectre de l'agression sexuelle.

> À mon avis, le témoignage du Docteur Hill ne suffit pas à établir que les médecins qui agressent sexuellement leurs patients forment un groupe beaucoup plus restreint sur le plan psychiatrique que les autres membres de la société. Aucune donnée scientifique ne justifie cette conclusion. Un échantillon de trois délinquants ne suffit pas comme fondement à une telle conclusion. Même les allégations de la quatrième plaignante [. . .] ne sont pas inhabituelles, en ce qui concerne les délinquants sexuels, au point de justifier la conclusion que l'auteur du crime devait appartenir à une catégorie suffisamment restreinte.

Je conclus que, si la preuve proposée était admise, elle ne serait qu'une preuve de moralité sous une forme inadmissible puisqu'elle excède la preuve de la réputation générale, et qu'elle n'entre pas dans la sphère de la preuve d'expert.

## B. *La Cour d'appel de l'Ontario* (1992), 8 O.R. (3d) 173

Il était évident pour le juge Finlayson, qui s'est prononcé au nom de la cour, que le juge du procès avait tiré des conclusions fondées sur une mauvaise compréhension du témoignage du Dʳ Hill. Le juge Finlayson a déclaré que l'opinion du Dʳ Hill ne reposait pas sur le cas des trois médecins qu'il avait traités et qui avaient été accusés de crimes sexuels. Au contraire, le juge Finlayson s'est dit d'avis, à la p. 177, que pour conclure que les auteurs, dans les exemples hypothétiques, tomberaient dans une catégorie inhabituelle et restreinte de personnes et que, si l'auteur du crime était un

narrower, Dr. Hill based his opinion on all of his experience:

With respect, I think the learned trial judge was in error, in that he ruled on the sufficiency of the evidence of Dr. Hill, not its admissibility. It was up to the jury to consider what weight should be given to the expert opinion. Crown counsel suggested on appeal that the trial judge was ruling on the qualifications of the expert witness to give the opinion that he did. I do not think that is a correct interpretation of the trial judge's reasons. Dr. Hill's qualifications are outstanding and no attempt was made at trial to challenge them. I think the trial judge was saying that Dr. Hill's personal experience in dealing with sex-offending physicians and the lack of scientific literature specific to such physicians did not justify Dr. Hill giving the opinion that he did. In my opinion, in restricting his interpretation of Dr. Hill's testimony to "doctors who commit sexual assaults on patients", the trial judge misapprehended the opinion of Dr. Hill and the broad psychiatric experience upon which it was based.

Finlayson J.A. went on to say that the evidence of Dr. Hill was admissible on two bases. On the first basis, given that similar fact evidence was admitted showing that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, Dr. Hill's testimony was admissible to show that the offences alleged were unlikely to have been committed by the same person (*R. v. C. (M.H.)*, [1991] 1 S.C.R. 763).

On the second basis, it was admissible to show that the respondent was not a member of either of the unusual groups of aberrant personalities which could have committed the offenses alleged. Referring to *R. v. Lupien, supra*, at pp. 275-78, *R. v. Robertson, supra*, at p. 425, and *R. v. McMillan, supra*, Finlayson J.A. held that it is settled law that opinion evidence showing that the accused did or did not possess the distinguishing characteristics of an abnormal group is admissible in a criminal case, where it would appear that the perpetrator of the crime alleged is a person with an abnormal propensity or disposition which stamps him or her as being a member of that special and extraordi-

médecin, la catégorie à laquelle il appartiendrait serait encore plus restreinte, le Dʳ Hill a fondé son opinion sur son expérience générale:

[TRADUCTION] Avec égards, j'estime que le juge du procès a commis une erreur puisqu'il s'est prononcé sur la suffisance du témoignage du Dʳ Hill et non sur son admissibilité. Il appartenait au jury d'apprécier la valeur de l'opinion d'expert. Le ministère public a donné à entendre en appel que le juge du procès se prononçait sur les compétences du témoin expert pour exprimer l'opinion en cause. Je ne crois pas qu'il s'agisse là d'une interprétation juste des motifs du juge du procès. Les compétences du Dʳ Hill sont remarquables et personne n'a tenté de les contester au procès. À mon avis, le juge du procès affirmait que l'expérience personnelle du Dʳ Hill acquise auprès des médecins auteurs d'infractions sexuelles, d'une part, et l'absence de documentation scientifique sur de tels médecins, d'autre part, ne permettaient pas au Dʳ Hill d'exprimer l'opinion en cause. À mon avis, en restreignant aux «médecins qui agressent sexuellement leurs patients» son interprétation de l'opinion du Dʳ Hill, le juge du procès a mal interprété celle-ci et la grande expérience psychiatrique sur laquelle elle est fondée.

Le juge Finlayson a ensuite ajouté que le témoignage du Dʳ Hill était admissible pour deux motifs. D'une part, étant donné que la preuve de faits similaires admise démontre que les actes comparés sont si inhabituels et d'une similitude si frappante qu'on ne peut attribuer celle-ci à la coïncidence, le témoignage du Dʳ Hill était admissible pour démontrer qu'il était peu probable que les infractions alléguées aient été commises par la même personne (*R. c. C. (M.H.)*, [1991] 1 R.C.S. 763).

Par ailleurs, il était admissible pour démontrer que l'intimé n'était pas membre des groupes inhabituels de personnalités anormales qui auraient pu commettre les infractions alléguées. Invoquant les arrêts *R. c. Lupien*, précité, aux pp. 275 à 278; *R. c. Robertson*, précité, à la p. 425 et *R. c. McMillan*, précité, le juge Finlayson a conclu qu'il est établi en droit que le témoignage d'opinion qui démontre que l'accusé possédait ou ne possédait pas les caractéristiques distinctives d'un groupe anormal est admissible dans une affaire criminelle lorsqu'il appert que l'auteur du crime reproché a une propension ou une prédisposition anormale qui indique qu'il est membre de cette catégorie (ou

R. *v.* MOHAN   *Sopinka J.*

nary class (or group). In this case, the psychiatrist showed that pedophiles and sexual psychopaths are members of special and extraordinary classes. Considering also the issues put to the jury in the case at bar (complex psychological issues, testimonial trustworthiness), Finlayson J.A. held that evidence of persons with professional psychiatric experience in dealing with sexual offences would be of assistance (based on: *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. Lavallee, supra; R. v. B.(G.)*, [1990] 2 S.C.R. 30).

The court allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal refused leave to the Crown's sentence appeal.

### III. Analysis

The admissibility of the rejected evidence was analyzed in argument under two exclusionary rules of evidence: (1) expert opinion evidence, and (2) character evidence. I have concluded that, on the basis of the principles relating to exceptions to the character evidence rule and under the principles governing the admissibility of expert evidence, the limitations on the use of this type of evidence require that the evidence in this case be excluded.

### (1) *Expert Opinion Evidence*

Admission of expert evidence depends on the application of the following criteria:

(a) relevance;

(b) necessity in assisting the trier of fact;

(c) the absence of any exclusionary rule;

(d) a properly qualified expert.

### (a) Relevance

Relevance is a threshold requirement for the admission of expert evidence as with all other evidence. Relevance is a matter to be decided by a judge as question of law. Although *prima facie* admissible if so related to a fact in issue that it

groupe) spéciale et extraordinaire. En l'espèce, le psychiatre a démontré que les pédophiles et les psychopathes sexuels appartiennent à des catégories spéciales et extraordinaires. Tenant compte également des questions soumises au jury en l'espèce (questions psychologiques complexes, fiabilité du témoignage), le juge Finlayson a conclu que le témoignage de personnes dotées d'une expérience psychiatrique professionnelle dans le domaine des infractions sexuelles serait utile (fondé sur: *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. Lavallee*, précité; *R. c. B.(G.)*, [1990] 2 R.C.S. 30).

La cour a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un nouveau procès. Elle n'a donc pas autorisé le ministère public à en appeler de la sentence.

### III. Analyse

L'admissibilité de la preuve écartée a été analysée en plaidoirie au regard de deux règles d'exclusion de la preuve: (1) le témoignage d'opinion d'un expert et (2) la preuve de moralité. Compte tenu des principes qui gouvernent les exceptions à la règle en matière de preuve de moralité et de ceux qui gouvernent l'admissibilité de la preuve d'expert, j'ai conclu que les restrictions imposées à l'utilisation de ce type de preuve exigent d'écarter le témoignage en l'espèce.

### (1) *Témoignage d'opinion d'un expert*

L'admission de la preuve d'expert repose sur l'application des critères suivants:

a) la pertinence;

b) la nécessité d'aider le juge des faits;

c) l'absence de toute règle d'exclusion;

d) la qualification suffisante de l'expert.

### a) La pertinence

Comme pour toute autre preuve, la pertinence est une exigence liminaire pour l'admission d'une preuve d'expert. La pertinence est déterminée par le juge comme question de droit. Bien que la preuve soit admissible à première vue si elle est à

tends to establish it, that does not end the inquiry. This merely determines the logical relevance of the evidence. Other considerations enter into the decision as to admissibility. This further inquiry may be described as a cost benefit analysis, that is "whether its value is worth what it costs." See *McCormick on Evidence* (3rd ed. 1984), at p. 544. Cost in this context is not used in its traditional economic sense but rather in terms of its impact on the trial process. Evidence that is otherwise logically relevant may be excluded on this basis, if its probative value is overborne by its prejudicial effect, if it involves an inordinate amount of time which is not commensurate with its value or if it is misleading in the sense that its effect on the trier of fact, particularly a jury, is out of proportion to its reliability. While frequently considered as an aspect of legal relevance, the exclusion of logically relevant evidence on these grounds is more properly regarded as a general exclusionary rule (see *Morris v. The Queen*, [1983] 2 S.C.R. 190). Whether it is treated as an aspect of relevance or an exclusionary rule, the effect is the same. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence.

There is a danger that expert evidence will be misused and will distort the fact-finding process. Dressed up in scientific language which the jury does not easily understand and submitted through a witness of impressive antecedents, this evidence is apt to be accepted by the jury as being virtually infallible and as having more weight than it deserves. As La Forest J. stated in *R. v. Béland*, [1987] 2 S.C.R. 398, at p. 434, with respect to the evidence of the results of a polygraph tendered by the accused, such evidence should not be admitted by reason of "human fallibility in assessing the proper weight to be given to evidence cloaked under the mystique of science". The application of this principle can be seen in cases such as *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348, in which Moldaver J. applied a threshold test of reliability to what he described, at p. 353, as "a new scientific

ce point liée au fait concerné qu'elle tend à l'établir, l'analyse ne se termine pas là. Cela établit seulement la pertinence logique de la preuve. D'autres considérations influent également sur la décision relative à l'admissibilité. Cet examen supplémentaire peut être décrit comme une analyse du coût et des bénéfices, à savoir «si la valeur en vaut le coût.» Voir *McCormick on Evidence* (3e éd. 1984), à la p. 544. Le coût dans ce contexte n'est pas utilisé dans le sens économique traditionnel du terme, mais plutôt par rapport à son impact sur le procès. La preuve qui est par ailleurs logiquement pertinente peut être exclue sur ce fondement si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si elle peut induire en erreur en ce sens que son effet sur le juge des faits, en particulier le jury, est disproportionné par rapport à sa fiabilité. Bien qu'elle ait été fréquemment considérée comme un aspect de la pertinence juridique, l'exclusion d'une preuve logiquement pertinente, pour ces raisons, devrait être considérée comme une règle générale d'exclusion (voir *Morris c. La Reine*, [1983] 2 R.C.S. 190). Qu'elle soit traitée comme un aspect de la pertinence ou une règle d'exclusion, son effet est le même. Ce facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert.

La preuve d'expert risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits. Exprimée en des termes scientifiques que le jury ne comprend pas bien et présentée par un témoin aux qualifications impressionnantes, cette preuve est susceptible d'être considérée par le jury comme étant pratiquement infaillible et comme ayant plus de poids qu'elle ne le mérite. Comme le juge La Forest l'a dit dans l'arrêt *R. c. Béland*, [1987] 2 R.C.S. 398, à la p. 434, relativement au témoignage sur les résultats d'un détecteur de mensonges produits par l'accusé, une telle preuve ne devrait pas être admise en raison de «la faillibilité humaine dans l'évaluation du poids à donner à la preuve empreinte de la mystique de la science». On a appliqué ce principe dans des décisions comme *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348, dans laquelle le juge Moldaver a appliqué un

technique or body of scientific knowledge". Moldaver J. also mentioned two other factors, *inter alia*, which should be considered in such circumstances (at p. 353):

(1) Is the evidence likely to assist the jury in its fact-finding mission, or is it likely to confuse and confound the jury?

(2) Is the jury likely to be overwhelmed by the "mystic infallibility" of the evidence, or will the jury be able to keep an open mind and objectively assess the worth of the evidence?

A similar approach was adopted in *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.), where, in ruling upon a *voir dire* concerning the admissibility of D.N.A. evidence, Flanigan J. admitted most of the evidence but excluded statistical evidence about the probability of a match between the DNA contained in samples taken from the accused and those taken from the scene of a crime. The learned judge explained:

This Court does not think that the criminal jurisdiction of Canada is yet ready to put such an additional pressure on a jury, by making them overcome such fantastic odds and asking them to weigh it as just one piece of evidence to be considered in the overall picture of all the evidence presented. There is a real danger that the jury will use the evidence as a measure of the probability of the accused's guilt or innocence and thereby undermine the presumption of innocence and erode the value served by the reasonable doubt standard. As said in the Schwartz case: "dehumanize our justice system".

I would therefore, rule admissible the D.N.A. testing evidence but not the statistic probabilities. This restriction can be easily overcome by evidence that "such matches are rare" or "extremely rare" or words to the same effect, which will put the jury in a better position to assess such evidence and protect the right of the accused to a fair trial.

It should be noted that, subsequently, other courts have rejected the distinction drawn by Flanigan J. and have admitted both DNA evidence and the evi-

critère préliminaire de fiabilité à ce qu'il a qualifié de [TRADUCTION] «nouvelle technique ou discipline scientifique» (p. 353). Le juge Moldaver a également mentionné deux facteurs, entre autres, qui devraient être considérés dans de telles circonstances (à la p. 353):

[TRADUCTION]

(1) La preuve est-elle susceptible de faciliter la tâche de recherche des faits du jury, ou susceptible de l'embrouiller et de le dérouter?

(2) Le jury est-il susceptible d'être écrasé par l'«infaillibilité mystique» de la preuve, ou sera-t-il capable de garder l'esprit ouvert et d'en apprécier objectivement la valeur?

Un point de vue semblable a été adopté dans la décision *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.) où, se prononçant sur un voir-dire concernant l'admissibilité de la preuve d'ADN, le juge Flanigan a admis la plus grande partie de la preuve en excluant toutefois les statistiques sur la probabilité que l'ADN prélevé sur des échantillons recueillis sur l'accusé concorde avec celui prélevé sur la scène du crime. Le juge s'est exprimé ainsi:

[TRADUCTION] Notre Cour ne croit pas que la juridiction criminelle au Canada soit prête à imposer une pression supplémentaire aux membres du jury en exigeant d'eux qu'ils surmontent des obstacles aussi énormes et qu'ils la pondèrent comme un simple élément de preuve à examiner dans le cadre de l'ensemble de la preuve produite. Il y a un danger réel que le jury utilise la preuve comme une mesure de la probabilité de la culpabilité ou de l'innocence de l'accusé et que cela mine la présomption d'innocence et la valeur que présente la norme du doute raisonnable. Comme on l'a dit dans l'affaire Schwartz, «déshumaniser notre système de justice».

Je déclarerais par conséquent admissible la preuve de l'analyse d'A.D.N., mais pas les probabilités statistiques. Cette restriction peut facilement être surmontée par la preuve qu'«une telle concordance est rare» ou «extrêmement rare» ou par une formulation de ce genre, ce qui permettra au jury de mieux apprécier la preuve en question et protégera le droit de l'accusé à un procès équitable.

Il y a lieu de signaler que, par la suite, d'autres tribunaux ont rejeté la distinction établie par le juge Flanigan et ont admis tant la preuve d'ADN que la

dence regarding statistical probabilities of a match. (See, *e.g.*, *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). I rely on *R. v. Bourguignon*, *supra*, simply to illustrate the mode of approach adopted there and leave the specific issue decided by Flanigan J. to be considered when it arises.

#### (b) Necessity in Assisting the Trier of Fact

In *R. v. Abbey*, *supra*, Dickson J., as he then was, stated, at p. 42:

> With respect to matters calling for special knowledge, an expert in the field may draw inferences and state his opinion. An expert's function is precisely this: to provide the judge and jury with a ready-made inference which the judge and jury, due to the technical nature of the facts, are unable to formulate. "An expert's opinion is admissible to furnish the Court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of the expert is unnecessary" (*Turner* (1974), 60 Crim. App. R. 80, at p. 83, *per* Lawton L.J.)

This pre-condition is often expressed in terms as to whether the evidence would be helpful to the trier of fact. The word "helpful" is not quite appropriate and sets too low a standard. However, I would not judge necessity by too strict a standard. What is required is that the opinion be necessary in the sense that it provide information "which is likely to be outside the experience and knowledge of a judge or jury": as quoted by Dickson J. in *R. v. Abbey*, *supra*. As stated by Dickson J., the evidence must be necessary to enable the trier of fact to appreciate the matters in issue due to their technical nature. In *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672, at p. 684, this Court, quoting from *Beven on Negligence* (4th ed. 1928), at p. 141, stated that in order for expert evidence to be admissible, "[t]he subject-matter of the inquiry must be such that ordinary people are unlikely to form a correct judgment about it, if unassisted by persons with special knowledge". More recently, in *R. v. Lavallee*, *supra*, the above passages from *Kelliher* and *Abbey* were applied to admit expert

preuve relative aux probabilités statistiques d'une concordance. (Voir, p. ex., *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). Je m'appuie sur l'arrêt *R. c. Bourguignon*, précité, seulement pour illustrer la méthode adoptée dans cette affaire et je laisse la question précise tranchée par le juge Flanigan à considérer quand elle sera soulevée.

#### b) La nécessité d'aider le juge des faits

Dans l'arrêt *R. c. Abbey*, précité, le juge Dickson, plus tard Juge en chef, a dit à la p. 42:

> Quant aux questions qui exigent des connaissances particulières, un expert dans le domaine peut tirer des conclusions et exprimer son avis. Le rôle d'un expert est précisément de fournir au juge et au jury une conclusion toute faite que ces derniers, en raison de la technicité des faits, sont incapables de formuler. [TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire» (*Turner* (1974), 60 Crim. App. R. 80, à la p. 83, le lord juge Lawton).

Cette condition préalable est fréquemment reprise dans la question de savoir si la preuve serait utile au juge des faits. Le mot «utile» n'est pas tout à fait juste car il établit un seuil trop bas. Toutefois, je ne jugerais pas la nécessité selon une norme trop stricte. L'exigence est que l'opinion soit nécessaire au sens qu'elle fournit des renseignements «qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury»: cité par le juge Dickson, dans *Abbey*, précité. Comme le juge Dickson l'a dit, la preuve doit être nécessaire pour permettre au juge des faits d'apprécier les questions en litige étant donné leur nature technique. Dans l'arrêt *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672, à la p. 684, notre Cour, citant *Beven on Negligence* (4e éd. 1928) à la p. 141, a déclaré que la preuve d'expert était admissible si [TRADUCTION] «l'objet de l'analyse est tel qu'il est peu probable que des personnes ordinaires puissent former un jugement juste à cet égard sans l'assistance de personnes possédant des connaissances spéciales». Plus récemment, dans

evidence as to the state of mind of a "battered" woman. The judgment stressed that this was an area that is not understood by the average person.

As in the case of relevance, discussed above, the need for the evidence is assessed in light of its potential to distort the fact-finding process. As stated by Lawton L.J. in *R. v. Turner*, [1975] Q.B. 834, at p. 841, and approved by Lord Wilberforce in *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699, at p. 718:

"An expert's opinion is admissible to furnish the court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of an expert is unnecessary. In such a case if it is given dressed up in scientific jargon it may make judgment more difficult. The fact that an expert witness has impressive scientific qualifications does not by that fact alone make his opinion on matters of human nature and behaviour within the limits of normality any more helpful than that of the jurors themselves; but there is a danger that they may think it does."

The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions.

There is also a concern inherent in the application of this criterion that experts not be permitted to usurp the functions of the trier of fact. Too liberal an approach could result in a trial's becoming nothing more than a contest of experts with the trier of fact acting as referee in deciding which expert to accept.

These concerns were the basis of the rule which excluded expert evidence in respect of the ultimate issue. Although the rule is no longer of general application, the concerns underlying it remain. In light of these concerns, the criteria of relevance and necessity are applied strictly, on occasion, to exclude expert evidence as to an ultimate issue.

l'arrêt *R. c. Lavallee*, précité, les passages précités des arrêts *Kelliher* et *Abbey* ont été appliqués pour admettre une preuve d'expert sur l'état d'esprit d'une femme «battue». On a souligné qu'il s'agissait là d'un domaine que la personne ordinaire ne comprend pas.

Comme la pertinence, analysée précédemment, la nécessité de la preuve est évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. Comme le lord juge Lawton l'a remarqué dans l'arrêt *R. c. Turner*, [1975] Q.B. 834, à la p. 841, qui a été approuvé par lord Wilberforce dans l'arrêt *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699, à la p. 718:

[TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire. Dans un tel cas, si elle est exprimée dans un jargon scientifique, elle rend la tâche de juger plus difficile. Le seul fait qu'un témoin expert possède des qualifications scientifiques impressionnantes ne signifie pas que son opinion sur les questions de la nature et du comportement humains dans le cadre de la normalité est plus utile que celle que des jurés eux-mêmes; ces derniers risquent toutefois de croire qu'elle l'est.»

La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées.

Il y a également la crainte inhérente à l'application de ce critère que les experts ne puissent usurper les fonctions du juge des faits. Une conception trop libérale pourrait réduire le procès à un simple concours d'experts, dont le juge des faits se ferait l'arbitre en décidant quel expert accepter.

Ces préoccupations sont le fondement de la règle d'exclusion de la preuve d'expert relativement à une question fondamentale. Bien que la règle ne soit plus d'application générale, les préoccupations qui la sous-tendent demeurent. En raison de ces préoccupations, les critères de pertinence et de nécessité sont à l'occasion appliqués strictement

Expert evidence as to credibility or oath-helping has been excluded on this basis. See *R. v. Marquard*, [1993] 4 S.C.R. 223, *per* McLachlin J.

### (c) The Absence of any Exclusionary Rule

Compliance with criteria (a), (b) and (d) will not ensure the admissibility of expert evidence if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. For example, in *R. v. Morin*, [1988] 2 S.C.R. 345, evidence elicited by the Crown in cross-examination of the psychiatrist called by the accused was inadmissible because it was not shown to be relevant other than as to the disposition to commit the crime charged. Notwithstanding, therefore, that the evidence otherwise complied with the criteria for the admission of expert evidence it was excluded by reason of the rule that prevents the Crown from adducing evidence of the accused's disposition unless the latter has placed his or her character in issue. The extent of the restriction when such evidence is tendered by the accused lies at the heart of this case and will be discussed hereunder.

### (d) A Properly Qualified Expert

Finally the evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

In summary, therefore, it appears from the foregoing that expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

pour exclure la preuve d'expert sur une question fondamentale. La preuve d'expert sur la crédibilité ou la justification a été exclue pour ce motif. Voir l'arrêt *R. c. Marquard*, [1993] 4 R.C.S. 223, les motifs du juge McLachlin.

### c) L'absence de toute règle d'exclusion

Le respect des critères a), b) et d) n'assurera pas l'admissibilité de la preuve d'expert si celle-ci contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. Ainsi, dans l'arrêt *R. c. Morin*, [1988] 2 R.C.S. 345, la preuve obtenue par le ministère public en contre-interrogatoire du psychiatre cité par l'accusé a été jugée inadmissible parce qu'il n'avait pas été établi qu'elle était pertinente autrement que relativement à la propension à commettre le crime reproché. En dépit du fait que la preuve respectait par ailleurs les critères d'admissibilité de la preuve d'expert, elle a donc été exclue sur le fondement de la règle qui interdit au ministère public de produire une preuve de la propension de l'accusé à moins que ce dernier n'ait mis sa moralité en jeu. La portée de la restriction, lorsqu'une telle preuve est produite par l'accusé, est au cœur même de la présente affaire, et sera analysée ci-après.

### d) La qualification suffisante de l'expert

Enfin, la preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

En résumé, il ressort donc de ce qui précède que la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

(2) *Expert Evidence as to Disposition*

In order to decide what principles should govern the admissibility of this kind of evidence, it is necessary to consider the limitations imposed by the rules relating to character evidence, having regard to the restrictions imposed by the criteria in respect of expert evidence.

I have already referred to *R. v. Morin*, wherein an unanimous court decided that the Crown cannot lead such evidence in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. As I stated, at p. 371:

> In my opinion, in order to be relevant on the issue of identity the evidence must tend to show that the accused shared a distinctive unusual behavioural trait with the perpetrator of the crime. The trait must be sufficiently distinctive that it operates virtually as a badge or mark identifying the perpetrator. The judgment of Lord Hailsham in *Boardman*, quoted above, provides one illustration of the kind of evidence that would be relevant.

Conversely, the fact that the accused is a member of an abnormal group some of the members of which have the unusual behavioural characteristics shown to have been possessed by the perpetrator is not sufficient. In some cases it may, however, be shown that all members of the group have the distinctive unusual characteristics. If a reasonable inference can be drawn that the accused has those traits then the evidence is relevant subject to the trial judge's obligation to exclude it if its prejudicial effect outweighs its probative value. The greater the number of persons in society having these tendencies, the less relevant the evidence on the issue of identity and the more likely that its prejudicial effect predominates over its probative value.

When, however, the evidence is tendered by the accused, other considerations apply. The accused is permitted to adduce evidence as to disposition both in his or her own evidence or by calling witnesses. The general rule is that evidence as to character is limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testi-

(2) *Preuve d'expert quant à la prédisposition*

Pour déterminer les principes qui devraient gouverner l'admissibilité de ce genre de preuve, il faut considérer les restrictions imposées par les règles relatives à la preuve de moralité, eu égard aux restrictions imposées par les critères relatifs à la preuve d'expert.

J'ai cité plus haut l'arrêt *R. c. Morin* dans lequel notre Cour unanime a décidé que le ministère public ne peut produire une telle preuve en premier lieu que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. Comme je l'ai mentionné, à la p. 371:

> À mon avis, pour être pertinente relativement à la question de l'identité, la preuve doit tendre à démontrer que l'accusé partageait avec l'auteur du crime un trait de comportement distinctif inhabile. Le trait doit être distinctif au point d'agir presque comme une étiquette ou une marque qui identifie l'auteur du crime. L'extrait précité des motifs de lord Hailsham dans l'arrêt *Boardman* donne un exemple du genre de preuve qui serait pertinente.

Inversement, l'appartenance de l'accusé à un groupe anormal dont certains membres présentent des caractéristiques de comportement inhabituelles que possédait l'auteur du crime, n'est pas suffisante. Dans certains cas, cependant, il peut être démontré que tous les membres du groupe ont les caractéristiques distinctives inhabituelles. Si on peut raisonnablement en déduire que l'accusé possède ces traits, la preuve est alors pertinente sous réserve de l'obligation du juge du procès de l'exclure si son effet préjudiciable l'emporte sur sa valeur probante. Plus le nombre de personnes dans la société présente ces tendances, moins la preuve est pertinente relativement à la question de l'identité et plus il est vraisemblable que son effet préjudiciable soit supérieur à sa valeur probante.

Néanmoins, lorsque la preuve est celle de l'accusé, d'autres facteurs entrent en jeu. L'accusé peut produire une preuve sur la prédisposition tant par son propre témoignage que par celui d'autres témoins. Suivant la règle générale, la preuve de moralité se limite à la preuve de la réputation de l'accusé au sein de la collectivité relativement au trait de caractère concerné. L'accusé peut toutefois

mony, however, may rely on specific acts of good conduct. See *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, at p. 348; leave to appeal refused, [1981] 1 S.C.R. xi. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. I propose to examine the extent of this exception.

In England, with the exception of non-insane automatism, expert psychiatric and psychological evidence is not admissible to show the accused's state of mind unless it is contended that the accused is abnormal in the sense of suffering from insanity or diminished responsibility. In *R. v. Chard* (1971), 56 Cr. App. R. 268, the trial judge refused to allow medical evidence that the accused who was not alleged to be suffering from a disease of the mind lacked the necessary *mens rea*. In the Court of Appeal, Roskill L.J. stated at p. 271 that it was "not permissible to call a witness, whatever his personal experience, merely to tell the jury how he thinks an accused man's mind — assum[ing] a normal mind — operated at the time of the alleged crime . . . ."

In *Lowery v. The Queen*, [1974] A.C. 85 (P.C.), such evidence was admitted when tendered by one co-accused against another. It was a case involving the sadistic murder of a young girl. Lowery and King were both charged, and it was obvious that one, the other, or both of them were guilty. In this context, King sought to prove that he feared Lowery and that Lowery dominated him. The Privy Council held that the trial judge acted properly in allowing King to call a psychiatrist to swear that he was less likely to have committed the crime than Lowery. That is, character evidence tendered by a psychiatrist was held to be admissible. Lord

invoquer dans son propre témoignage des actes particuliers de bonne conduite. Voir *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, à la p. 348; autorisation de pourvoi refusée, [1981] 1 R.C.S. xi. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune des catégories concernées. Une autre exception de portée limitée a toutefois été créée. Je propose d'en examiner l'étendue.

En Angleterre, à l'exception de l'automatisme non fondé sur l'aliénation mentale, la preuve d'expert psychiatrique et psychologique n'est pas admissible pour démontrer l'état d'esprit de l'accusé, sauf si on fait valoir qu'il est anormal parce qu'il souffre d'aliénation mentale ou de responsabilité amoindrie. Dans l'arrêt *R. c. Chard* (1971), 56 Cr. App. R. 268, le juge du procès a refusé d'accueillir la preuve médicale portant que l'accusé, dont on n'alléguait pas qu'il souffrait d'une maladie mentale, n'avait pas la *mens rea* requise. En Cour d'appel, le lord juge Roskill a déclaré, à la p. 271, qu'il était [TRADUCTION] «interdit de citer un témoin, quelle que soit son expérience personnelle, simplement pour dire au jury comment il pense que l'esprit de l'accusé — en suppos[ant] qu'il ait un esprit normal — fonctionnait à l'époque du crime reproché . . .»

Dans l'arrêt *Lowery c. The Queen*, [1974] A.C. 85 (C.P.), un témoignage semblable, rendu par un coaccusé contre l'autre, a été admis. L'affaire portait sur le meurtre sadique d'une jeune fille. Lowery et King étaient tous deux accusés, et il était évident que l'un ou l'autre, ou les deux, étaient coupables. C'est dans ce contexte que King a cherché à établir qu'il craignait Lowery et que ce dernier exerçait sur lui sa domination. Le Conseil privé a conclu que le juge du procès avait agi correctement en permettant à King d'appeler un psychiatre pour témoigner sous serment qu'il était moins susceptible d'avoir commis le crime que Lowery. La preuve de moralité produite par un psychiatre a ainsi été jugée admissible. Lord

Morris of Borth-y-Gest of the Privy Council stated, at p. 103:

Lowery and King were each asserting that the other was the completely dominating person at the time Rosalyn Nolte was killed: each claimed to have been in fear of the other. In these circumstances it was most relevant for King to be able to show, if he could, that Lowery had a personality marked by aggressiveness whereas he, King, had a personality which suggested that he would be led and dominated by someone who was dominant and aggressive . . . . Not only however was the evidence which King called relevant to this case: its admissibility was placed beyond doubt by the whole substance of Lowery's case.

Moreover, in *R. v. Turner, supra,* the accused unsuccessfully pleaded provocation in answer to a charge of murder of his girlfriend whom he alleged that he had killed in a fit of rage caused by her sudden confession of infidelity. He appealed on the grounds that the trial judge had wrongly refused to admit the evidence of a psychiatrist. That psychiatrist was to testify to the effect that the accused was not mentally ill, that he had a great affection toward the victim and that he deeply regretted his act of murder. The evidence was rejected on the basis that it was not the proper subject of expert evidence. As for *Lowery v. The Queen,* it was confined to its own facts.

C. Tapper in *Cross on Evidence* (7th ed. 1990), at p. 492, reconciled *Lowery v. The Queen* and *R. v. Turner* using a principled approach:

Juries do not need to be told that normal men are liable to lose control of themselves when their women admit to infidelity, but they require all the expert assistance they can get to help them determine which of two accused has the more aggressive personality.

Tapper then proceeded to reconcile the two cases using a more technical approach:

Another way of reconciling the cases would be to treat the fact that Lowery had put his character in issue as crucial to the decision of the Privy Council, the psychiatric evidence then being admissible to impugn the credibility of his testimony. Unfortunately we are left with-

Morris of Borth-y-Gest du Conseil privé a dit, à la p. 103:

[TRADUCTION] Lowery et King ont tous deux fait valoir que l'autre était le dominateur absolu à l'époque du meurtre de Rosalyn Nolte: tous deux ont soutenu avoir craint l'autre. Dans ces circonstances, il était tout à fait opportun pour King de pouvoir démontrer, s'il en était capable, que Lowery avait une personnalité marquée par l'agressivité alors que lui-même, King, avait une personnalité indiquant qu'il serait mené et dominé par une personne dominante et agressive [. . .] Toutefois, non seulement la preuve que King a produite était-elle pertinente quant à la présente affaire, mais son admissibilité a été placée au-dessus de tout doute par la substance de la preuve de Lowery.

En outre, dans l'arrêt *R. c. Turner,* précité, l'accusé a plaidé sans succès la provocation en défense à l'accusation du meurtre de son amie qu'il alléguait avoir tuée dans un excès de rage provoqué par sa confession inattendue d'infidélité. Il a interjeté appel pour le motif que le juge du procès avait refusé à tort d'admettre le témoignage d'un psychiatre. Ce dernier devait témoigner que l'accusé n'était pas mentalement malade, qu'il ressentait une grande affection à l'endroit de la victime et qu'il regrettait sincèrement d'avoir commis le meurtre. Le témoignage a été rejeté sur le fondement qu'il ne relevait pas de la preuve d'expert. Quant à l'affaire *Lowery c. The Queen,* elle a été confinée à ses propres faits.

C. Tapper dans *Cross on Evidence* (7e éd. 1990), à la p. 492, a concilié les arrêts *Lowery c. The Queen* et *R. c. Turner,* en s'aidant d'une conception fondée sur les principes:

[TRADUCTION] Il n'est pas nécessaire de dire aux jurés que des hommes normaux peuvent perdre leur maîtrise de soi lorsque leurs femmes avouent leur infidélité, mais il convient de leur fournir toute l'aide experte possible afin de déterminer lequel des deux accusés est le plus agressif.

Tapper a ensuite concilié les deux affaires en recourant à une conception plus technique:

[TRADUCTION] On peut concilier les deux affaires également en faisant du fait que Lowery a mis sa moralité en jeu un élément déterminant de la décision du Conseil privé, la preuve psychiatrique étant alors admissible pour attaquer la crédibilité de son témoignage. Malheu-

out any guidance on the subject from the Court of Appeal who contented themselves with saying that *Lowery*'s case was decided on its special facts.

With respect to the development of the exception in Canada, *R. v. Lupien, supra*, is a good starting point. It involved a respondent who was convicted of attempting to commit an act of gross indecency, and whose defence was that he lacked the requisite intent to commit the act because he thought his companion was a woman. He sought to prove his "lack of intent" by tendering psychiatric evidence which showed that he reacted violently against any type of homosexual activity and, therefore, could not have knowingly engaged in an act of gross indecency. Ritchie J. concluded, at pp. 277-78, that the evidence was admissible for the following reasons:

> I am far from saying that as a general rule psychiatric evidence of a man's disinclination to commit the kind of crime with which he is charged should be admitted, but the present case is concerned with gross indecency between two men and I think that crimes involving homosexuality stand in a class by themselves in the sense that the participants frequently have characteristics which make them more readily identifiable as a class than ordinary criminals. See *Reg. v. Thompson* [(1917), 13 Cr. App. R. 61 at 81]. In any event, it appears to me that the question of whether or not a man is homosexually inclined or otherwise sexually perverted is one upon which an experienced psychiatrist is qualified to express an opinion and that if such opinion is relevant it should be admitted at a trial such as this even if it involves the psychiatrist in expressing his conclusion that the accused does not have the capacity to commit the crime with which he is charged.

It is this passage that created the abnormal group exception which is often sought to be applied to various contexts other than the homosexual context.

The Ontario Court of Appeal, and specifically Martin J.A., further looked into this exception of proving the disposition of the accused through psychiatric evidence in the following two cases: *R. v. McMillan, supra*, aff'd [1977] 2 S.C.R. 824, and *R. v. Robertson, supra*.

reusement, nous sommes laissés sans autre assistance à cet égard que la simple déclaration de la Cour d'appel portant que l'affaire *Lowery* a été décidée en fonction de ses faits propres.

L'arrêt *R. c. Lupien*, précité, est un bon point de départ de l'évolution de l'exception au Canada. Déclaré coupable d'avoir tenté de commettre un acte de grossière indécence, l'intimé plaidait qu'il n'avait pas l'intention requise pour commettre l'acte, parce qu'il croyait que son compagnon était une femme. Il a tenté d'établir son «absence d'intention» en produisant une preuve psychiatrique démontrant qu'il réagissait violemment à tout genre d'activité homosexuelle et que, par conséquent, il ne pouvait avoir sciemment commis un acte de grossière indécence. Le juge Ritchie a conclu à l'admissibilité de la preuve pour les motifs suivants (aux pp. 277 et 278):

> Je suis loin de poser comme règle générale que la preuve psychiatrique des prédispositions d'une personne à ne pas commettre le genre de crime dont il est accusé doit être admise, mais dans cette affaire-ci il s'agit de grossière indécence entre deux hommes et je pense que les crimes relatifs à l'homosexualité sont dans une catégorie à part, en ce sens que leurs auteurs possèdent souvent des caractéristiques qui les rendent collectivement plus facilement identifiables que les criminels ordinaires. Voir *Regina v. Thompson* [(1917), 13 Cr. App. R. 61 à 81]. De toute façon, il me paraît qu'un psychiatre est qualifié pour exprimer un avis sur la question de savoir si un homme est prédisposé à l'homosexualité, ou autrement sexuellement perverti. Si un tel avis est pertinent, il doit être recevable dans un procès comme celui-ci, même s'il amène le psychiatre à exprimer l'avis que l'inculpé ne possède pas la capacité de commettre le crime dont il est accusé.

C'est ce passage qui a créé l'exception relative au groupe anormal que l'on tente fréquemment d'appliquer dans des contextes autres que celui de l'homosexualité.

La Cour d'appel de l'Ontario, et en particulier le juge Martin, a examiné plus amplement l'exception qui consiste à démontrer la prédisposition de l'accusé à l'aide de la preuve psychiatrique, dans les deux affaires suivantes: *R. c. McMillan*, précité, conf. par [1977] 2 R.C.S. 824, et *R. c. Robertson*, précité.

*R. v. McMillan* involved an accused who was charged with the murder of his infant child and whose defence was that it was in fact his wife and not he who killed the child. The trial judge allowed the accused to call a psychiatrist who testified that the accused's wife had a psychopathic personality disturbance with brain damage. This psychiatric evidence showed that a third party, the accused's wife, was more likely to have committed the crime because of her abnormal personality/disposition. Martin J.A., speaking for the Court, found that disposition to commit a crime is generally relevant since it goes to the probability/propensity of the person doing or not doing the act charged. He then referred to *R. v. Lupien*, at p. 169, as creating the following exception:

One of the exceptions to the general rule that the character of the accused, in the sense of disposition, when admissible, can only be evidenced by general reputation, relates to the admissibility of psychiatric evidence where the particular disposition or tendency in issue is characteristic of an abnormal group, the characteristics of which fall within the expertise of the psychiatrist.

After having noted the applicability of *R. v. Lupien*, Martin J.A. engaged in a lengthy discussion of the exception and in fact extended *R. v. Lupien*. This extension, at pp. 173-75 of *R. v. McMillan*, was affirmed by the Supreme Court of Canada:

I do not consider that, because the crime under consideration was not one that could only be committed by a person with a special or abnormal propensity, psychiatric evidence with respect to Mrs. McMillan's disposition, was, therefore, inadmissible, in the circumstances of this case.

All evidence to be admissible must, of course, be relevant to some issue in the case. Psychiatric evidence with respect to the personality traits or disposition of a person, whether of the accused or another, may be admissible for different purposes. While those purposes are not mutually exclusive, evidence which is relevant for one purpose may not be for another.

Dans l'affaire *R. c. McMillan*, l'accusé était inculpé du meurtre de son jeune enfant. Il plaidait que c'était en fait sa femme, et non lui, qui avait tué l'enfant. Le juge du procès a permis à l'accusé d'appeler un psychiatre qui a témoigné que l'épouse de l'accusé souffrait d'un trouble psychopathique de la personnalité et de lésions cérébrales. Cette preuve psychiatrique a démontré qu'un tiers, l'épouse de l'accusé, était plus susceptible d'avoir commis le crime en raison de sa personnalité et de sa prédisposition toutes deux anormales. Exprimant l'opinion de la Cour, le juge Martin a conclu que la prédisposition à commettre un crime est généralement pertinente puisqu'en ce qui concerne la perpétration de l'acte reproché, elle vise la propension et la probabilité. Il a ensuite indiqué que l'arrêt *R. c. Lupien*, à la p. 169, créait l'exception suivante:

[TRADUCTION] L'une des exceptions à la règle générale suivant laquelle, lorsqu'elle est admissible, la moralité de l'accusé (dans le sens de la prédisposition) ne peut être démontrée que par la preuve de la réputation générale, porte sur l'admissibilité de la preuve psychiatrique lorsque la prédisposition ou la propension en question est propre à un groupe anormal, dont les caractéristiques relèvent de l'expertise du psychiatre.

Après avoir noté l'applicabilité de cet arrêt, le juge Martin a longuement analysé l'exception et il a en fait élargi la portée de l'arrêt *R. c. Lupien*. Cette expansion, aux pp. 173 à 175 de l'arrêt *R. c. McMillan*, a été confirmée par la Cour suprême du Canada:

[TRADUCTION] Je ne considère pas que, du fait qu'il ne s'agit pas d'un crime qui n'aurait pu être commis que par une personne dotée d'une propension particulière ou anormale, la preuve psychiatrique relative à la prédisposition de M^me McMillan était par conséquent inadmissible dans les circonstances de l'espèce.

Pour être admissible, toute preuve doit évidemment être pertinente relativement à certaines questions soulevées dans l'affaire. La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, peut être admissible à différentes fins. Si ces fins ne sont pas mutuellement exclusives, la preuve pertinente quant à une fin peut ne pas l'être quant à une autre.

Psychiatric evidence with respect to the personality traits or disposition of an accused, or another, is admissible provided:

(a) the evidence is relevant to some issue in the case;

(b) the evidence is not excluded by a policy rule;

(c) the evidence falls within the proper sphere of expert evidence.

One of the purposes for which psychiatric evidence may be admitted is to prove identity when that is an issue in the case, since psychical as well as physical characteristics may be relevant to identify the perpetrator of the crime.

Where the offence is of a kind that is committed only by members of an abnormal group, for example, offences involving homosexuality, psychiatric evidence that the accused did or did not possess the distinguishing characteristics of that abnormal group is relevant either to bring him within, or to exclude him from, the special class of which the perpetrator of the crime is a member. In order for psychiatric evidence to be relevant for that purpose, the offence must be one which indicates that it was committed by a person with an abnormal propensity or disposition which stamps him as a member of a special and extraordinary class.

Psychiatric evidence with respect to the personality traits or disposition of the accused, or another, if it meets the three conditions of admissibility above set out, is also admissible, however, as bearing on the *probability* of the accused, or another, having committed the offence.

It would appear that it was upon this latter ground that the psychologist's evidence was held to be admissible in *Lowery v. The Queen, supra*, although the features of the offence in that case were sufficiently indicative of the possession of an abnormal propensity by the perpetrator, that the expert evidence might have been relevant to the issue of identity as well. Since in that case the evidence was offered by the accused King, it was not excluded by the policy rule which prevents the prosecution from introducing evidence to prove that the accused by reason of his criminal propensities is likely to have committed the crime charged. Both accused in *Lowery v. The Queen* had psychopathic personalities (although the features of King's psychopathic personality were

La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est admissible à trois conditions:

a) la preuve est pertinente quant à une question soulevée dans l'affaire;

b) la preuve n'est exclue par aucune règle de principe;

c) la preuve entre dans le domaine de la preuve d'expert.

La preuve psychiatrique peut être admise entre autres pour établir l'identité lorsque cet élément est soulevé dans l'affaire, puisque des caractéristiques tant psychiques que physiques peuvent être pertinentes relativement à l'identification de l'auteur du crime.

Lorsque l'infraction est de celles qui sont commises uniquement par les membres d'un groupe anormal, par exemple les infractions relatives à l'homosexualité, la preuve psychiatrique que l'accusé possédait ou non les caractéristiques distinctives de ce groupe anormal est pertinente relativement à son inclusion dans la catégorie particulière dont l'auteur du crime fait partie, ou à son exclusion. Pour que la preuve psychiatrique soit pertinente quant à cette fin, l'infraction doit indiquer qu'elle a été commise par un individu doté d'une propension ou d'une prédisposition anormale qui le désigne comme faisant partie d'une catégorie spéciale et extraordinaire.

Si elle satisfait aux trois conditions d'admissibilité énoncées ci-dessus, la preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est toutefois également admissible comme portant sur la *probabilité* que l'accusé ou une autre personne ait commis l'infraction en cause.

Il semble que ce soit pour ce dernier motif que le témoignage du psychologue a été jugé admissible dans l'arrêt *Lowery c. The Queen*, précité, bien que les caractéristiques de l'infraction dans cette affaire aient suffisamment indiqué une propension anormale de l'auteur du crime pour que la preuve d'expert ait pu être pertinente relativement à la question de l'identité également. Puisque dans cette affaire la preuve a été produite par l'accusé King, elle n'a pas été exclue par la règle de principe qui interdit à la poursuite d'introduire une preuve pour établir qu'en raison de sa propension criminelle, l'accusé est susceptible d'avoir commis le crime reproché. Les deux accusés dans l'affaire *Lowery c. The Queen* ayant des personnalités de psychopathes (bien que les caractéristiques de la personnalité psychopathique de King soient moins marquées que celles de

less severe than Lowery's) and hence their personality traits fell within the proper sphere of expert evidence.

Where the crime under consideration does not have features which indicate that the perpetrator was a member of an abnormal group, psychiatric evidence that the accused has a normal mental make-up but does not have a disposition for violence or dishonesty or other relevant character traits frequently found in ordinary people is inadmissible. The psychiatric evidence in the circumstances postulated is not relevant on the issue of identity to exclude the accused as the perpetrator any more than the possession of violent or dishonest tendencies by the accused or a third person would be admissible to identify the accused or the third person as the perpetrator of the crime.

"So common a characteristic is not a recognisable mark of the individual." (*Per* Lord Sumner in *Thompson v. Director of Public Prosecutions* (1918), 26 Cox C.C. 189 at p. 199.)

While such evidence is relevant as bearing on the probability of the accused having committed the crime, the psychiatric evidence proffered in such circumstances really amounts to an attempt to introduce evidence of the accused's good character, as a normal person, through a psychiatrist. Such evidence does not fall within the proper sphere of expert evidence and is subject to the ordinary rule applicable to character evidence which, in general, requires the character of the accused to be evidenced by proof of general reputation.

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible. [Emphasis in original.]

The evidence of the psychiatrist was held to be admissible.

Martin J.A. elaborated on the reasoning set out above in *R. v. Robertson, supra.* That case involved a 16-year-old accused charged with bru-

Lowery), leurs traits de caractère entraient dans le domaine de la preuve d'expert.

Lorsque le crime en cause ne présente aucune caractéristique indiquant que l'auteur faisait partie d'un groupe anormal, la preuve psychiatrique que l'accusé a une constitution mentale normale, mais qu'il n'a pas de prédisposition à la violence ou à la malhonnêteté ou d'autres traits de caractère pertinents que possèdent fréquemment les personnes ordinaires, est inadmissible. Dans les circonstances énoncées, la preuve psychiatrique n'est pas plus pertinente relativement à la question de l'identité en vue de déterminer que l'accusé n'est pas l'auteur du crime que ne serait admissible la preuve que l'accusé ou un tiers a une tendance violente ou malhonnête en vue de déterminer que l'accusé ou le tiers est l'auteur du crime.

«Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu.» (Les motifs de lord Sumner dans l'arrêt *Thompson c. Director of Public Prosecutions* (1918), 26 Cox C.C. 189, à la p. 199.)

Si une telle preuve est pertinente parce qu'elle porte sur la probabilité que l'accusé ait commis le crime, la preuve psychiatrique produite dans de telles circonstances équivaut réellement à une tentative d'introduire une preuve de la bonne moralité de l'accusé, comme une personne normale, par l'entremise d'un psychiatre. Une telle preuve n'entre pas dans le domaine de la preuve d'expert. Elle est assujettie à la règle ordinaire en matière de preuve de moralité qui, en général, requiert que la moralité de l'accusé soit démontrée au moyen de la preuve de sa réputation générale.

Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible. [En italique dans l'original.]

Le témoignage du psychiatre a été jugé admissible.

Le juge Martin a commenté le raisonnement énoncé ci-dessus dans l'arrêt *R. c. Robertson*, précité, où l'accusé de 16 ans était inculpé d'avoir tué

tally murdering a nine-year-old girl by kicking her. The defence sought to introduce expert psychiatric evidence to show that a propensity for violence or aggression was not a part of the accused's psychological make-up. This tended to rebut evidence led by the Crown as to the accused's violent character. Martin J.A. summed up, at p. 426:

> While the judgment of Ritchie, J., deals only with the admissibility of psychiatric evidence with respect to disposition in offences involving homosexuality, there would appear to be no logical reason why such evidence should not be admitted on the same principle in other cases where there is evidence tending to show that, by reason of the nature of the offence, or its distinctive features, its perpetrator was a person who, in the language of Lord Sumner, was a member of "a specialized and extraordinary class", and whose psychological characteristics fall within the expertise of the psychiatrist, for the purpose of showing that the accused did not possess the psychological characteristics of persons of that class. Obviously, where such evidence is adduced by the accused, the prosecution is entitled to call psychiatric evidence in order to rebut the evidence introduced by the defence.

In my view, however, the judgment of Ritchie, J., in *R. v. Lupien*, *supra*, provides no support for a conclusion that, in the case of ordinary crimes of violence, psychiatric evidence is admissible to prove that the accused's psychological make-up does not include a tendency or disposition for violence.

Martin J.A. further stated, at pp. 429-30:

> In my view, psychiatric evidence with respect to disposition or its absence is admissible on behalf of the defence, if relevant to an issue in the case, where the disposition in question constitutes a characteristic feature of an abnormal group falling within the range of study of the psychiatrist, and from whom the jury can, therefore, receive appreciable assistance with respect to a matter outside the knowledge of persons who have not made a special study of the subject. A *mere* disposition for violence, however, is not so uncommon as to constitute a feature characteristic of an abnormal group falling within the special field of study of the psychiatrist and permitting psychiatric evidence to be given of the absence of such disposition in the accused. [Emphasis in original.]

brutalement à coups de pied une fille de neuf ans. La défense avait tenté d'introduire une preuve psychiatrique d'expert pour démontrer que la constitution psychologique de l'accusé n'indiquait aucune propension à la violence ou à l'agression. Cette preuve visait à réfuter la preuve introduite par le ministère public au sujet de la nature violente de l'accusé. Le juge Martin a résumé à la p. 426:

> [TRADUCTION] Si les motifs du juge Ritchie ne portent que sur l'admissibilité de la preuve psychiatrique relative à la prédisposition à commettre des infractions relatives à l'homosexualité, il ne paraît exister aucune raison logique de ne pas admettre une telle preuve en se fondant sur le même principe dans d'autres affaires où la preuve tend à démontrer qu'en raison de la nature de l'infraction ou de ses caractéristiques distinctives, son auteur faisait partie, dans les termes de lord Sumner, d'une «catégorie spéciale et extraordinaire», dont les caractéristiques psychologiques relèvent du domaine d'expertise du psychiatre, dans le but de démontrer que l'accusé ne possédait pas les caractéristiques psychologiques propres aux personnes de cette catégorie. De toute évidence, lorsqu'une telle preuve est produite par l'accusé, la poursuite peut produire une preuve psychiatrique pour la réfuter.

À mon avis, toutefois, l'opinion du juge Ritchie dans *R. c. Lupien*, précité, n'offre aucun appui à la conclusion que, dans le cas de crimes ordinaires de violence, la preuve psychiatrique est admissible pour démontrer que la constitution psychologique de l'accusé n'inclut aucune tendance ou prédisposition à la violence.

Le juge Martin a ajouté aux pp. 429 et 430:

> [TRADUCTION] À mon avis, la preuve psychiatrique relative à la prédisposition ou à son absence est admissible pour le compte de la défense si elle est pertinente relativement à une question soulevée dans l'affaire, lorsque la prédisposition en question constitue un élément caractéristique d'un groupe anormal qui entre dans le domaine d'étude du psychiatre, et duquel le jury peut donc recevoir une aide appréciable à l'égard d'une question qui se situe à l'extérieur de la connaissance des personnes qui n'ont pas étudié le sujet. Une *simple* prédisposition à la violence n'est toutefois pas inhabituelle au point de constituer un élément caractéristique d'un groupe anormal qui entre dans le domaine particulier d'étude du psychiatre et qui permet que la preuve psychiatrique de l'absence d'une telle prédisposition chez l'accusé soit produite. [En italique dans l'original.]

Given this reasoning, Martin J.A. concluded that the crime was not specially marked and so the conditions for the admissibility of psychiatric evidence were not met.

A useful summary of the principles that emerge from the cases is made by Alan W. Mewett, "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29, at pp. 35-36, of his article where he points out the various contexts in which an accused can tender character evidence by way of an expert:

There are thus three basic requirements that must be met before such psychiatric evidence can even be considered as potentially admissible. First, it must be relevant to an issue. Second, it must be of appreciable assistance to the trier of fact and third, it must be evidence that would otherwise be unavailable to the ordinary layman without specialized training, but these requirements only set forth the general requirements for the admissibility of expert testimony.

Once these hurdles have been passed, a number of different scenarios may be postulated. The crime may be an "ordinary" one (which I take to mean a crime for which no special mental characteristics on the part of the perpetrator would be required) and the accused is an "ordinary" person; the crime may be an "ordinary" one, but the accused an "extraordinary" person (*i.e.*, having some peculiar mental make-up that would tend to show that he would not commit that "ordinary" crime; the crime may be "extraordinary", but the accused "ordinary"; or the crime may be "extraordinary" and the accused "extraordinary", in a different direction.

In the first scenario, the evidence is irrelevant because it is simply not probative of anything. In the second it is probative and admissible but only if the extraordinary characteristic of the accused tends to show that he would not commit an ordinary crime of that nature (such as a homosexual being charged with a heterosexual offence). In the third, if it is shown that the crime is such that it could only, or in all probability would only, be committed by a person having identifiable peculiarities that the accused does not possess, it would be admissible. In the last scenario, the situation is the same provided that the difference in the abnormalities tends to exclude the accused from the probable group of perpetrators.

Suivant ce raisonnement, le juge Martin a conclu que le crime n'était pas spécialement marqué, et que les conditions d'admissibilité de la preuve psychiatrique n'étaient donc pas remplies.

Alan W. Mewett, dans un article intitulé «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29, aux pp. 35 et 36, résume utilement les principes qui ressortent de la jurisprudence. Il souligne les différents contextes dans lesquels un accusé peut produire une preuve de moralité par l'entremise d'un expert:

[TRADUCTION] Il faut donc satisfaire à trois exigences fondamentales pour que la preuve psychiatrique puisse même être considérée comme peut-être admissible. Premièrement, elle doit être pertinente relativement à une question en litige. Deuxièmement, elle doit apporter une aide appréciable au juge des faits et troisièmement, elle ne pourrait être obtenue autrement par le profane ordinaire qui ne possède aucune formation spécialisée. Ces conditions ne font toutefois qu'énoncer les exigences générales d'admissibilité du témoignage d'expert.

Une fois surmontés ces obstacles, différents scénarios peuvent être posés. Le crime peut être «ordinaire» (ce qui à mon avis signifie un crime pour lequel aucune caractéristique mentale particulière n'est requise chez l'auteur du crime) et l'accusé, une personne «ordinaire»; le crime peut être «ordinaire», et l'accusé, une personne «extraordinaire» (c'est-à-dire que sa constitution mentale particulière tendrait à démontrer qu'il ne commettrait pas ce crime «ordinaire»); le crime peut être extraordinaire, mais l'accusé «ordinaire»; ou le crime et l'accusé peuvent tous deux être «extraordinaires», dans un sens différent.

Dans le premier scénario, la preuve n'est pas pertinente parce qu'elle ne prouve simplement rien. Dans le second, elle n'est probante et admissible que si la caractéristique extraordinaire de l'accusé tend à établir qu'il ne commettrait pas un crime ordinaire de cette nature (comme l'homosexuel accusé relativement à une infraction de nature hétérosexuelle). Dans le troisième, s'il est démontré que le crime est tel qu'il ne pourrait être ou, selon toutes les probabilités, ne serait commis que par une personne ayant des caractéristiques identifiables que l'accusé ne possède pas, elle serait admissible. Dans le dernier scénario, la situation est identique, pour autant que la différence entre les éléments anormaux tende à exclure l'accusé du groupe probable d'auteurs.

I question whether use of the terms "abnormal" and "normal" is the best way to describe the concept that underlies their use. The term "abnormal" is derived from the English cases in which it usually connotes the mental state of insanity or diminished responsibility. See *R. v. Chard*, *supra*, at p. 270. The basic rationale of these cases is that "normal" human behaviour is a matter which a judge or jury can assess without the assistance of expert evidence. Canadian cases have extended the exception to include what has been described as sexually deviant behaviour. See Rosemary Pattenden, "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92, at p. 100. The rationale underlying this extension is the relevance of the evidence based on the distinctiveness of the behavioural traits of either the putative perpetrator of the crime or the accused. This distinctiveness tends to exclude the accused from the category of persons that could or would likely commit the crime.

There are other reasons why the use of the term "abnormal" is no longer satisfactory. Even in medical circles there are differing views as to what constitutes abnormality. See Pattenden, *supra*, at p. 100, and David C. Rimm and John W. Sommervill, *Abnormal Psychology* (1977), at pp. 31 and 32. Moreover, it imports a value judgment on the lifestyle of some groups in society. This is aptly illustrated by considering the statement of Lord Sumner in *Thompson v. The King*, [1918] A.C. 221, at p. 235:

The evidence tends to attach to the accused a peculiarity which, though not purely physical, I think may be recognized as properly bearing that name. Experience tends to show that these offences against nature connote an inversion of normal characteristics which, while demanding punishment as offending against social morality, also partake of the nature of an abnormal physical property. A thief, a cheat, a coiner, or a housebreaker is only a particular specimen of the genus rogue, and, though no doubt each tends to keep to his own line of business, they all alike possess the by no means extraordinary mental characteristic that they propose somehow to get their livings dishonestly. So common a

Je me demande si les termes «anormal» et «normal» sont la meilleure façon de décrire le concept qui sous-tend leur utilisation. Le terme «anormal» découle des affaires survenues en Angleterre, et dans lesquelles il dénote ordinairement l'état mental d'aliénation mentale ou de responsabilité amoindrie. Voir l'arrêt *R. c. Chard*, précité, à la p. 270. Selon le raisonnement qui sous-tend ces affaires, le comportement humain «normal» est une question que le juge ou le jury peut apprécier sans l'aide de la preuve d'expert. Au Canada, on a étendu l'exception pour y inclure ce qui a été qualifié de comportement sexuel déviant. Voir Rosemary Pattenden, «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92, à la p. 100. Cet élargissement est motivé par la pertinence de la preuve fondée sur le caractère distinctif des traits de comportement soit de l'auteur putatif du crime, soit de l'accusé. Ce caractère distinctif tend à exclure l'accusé de la catégorie de personnes qui pourraient commettre le crime ou qui seraient susceptibles de le commettre.

Il existe d'autres raisons pour lesquelles l'utilisation du terme «anormal» n'est plus satisfaisante. Même dans les milieux médicaux, il existe des opinions contradictoires quant à ce qui constitue l'anormalité. Voir Pattenden, *op. cit.*, à la p. 100, et David C. Rimm et John W. Sommervill, *Abnormal Psychology* (1977), aux pp. 31 et 32. En outre, le terme en question implique un jugement de valeur sur le style de vie de certains groupes de la société. Cela est bien illustré dans la déclaration de lord Sumner dans l'arrêt *Thompson c. The King*, [1918] A.C. 221, à la p. 235:

[TRADUCTION] La preuve tend à attacher à l'accusé une caractéristique qui, bien que n'étant pas purement physique, peut, à mon avis, être reconnue comme portant à juste titre ce nom. L'expérience tend à démontrer que ces infractions contraires à la nature dénotent une inversion de caractéristiques normales qui, bien qu'elles commandent une punition parce qu'elles offensent la moralité sociale, tiennent également d'une propriété physique anormale. Le voleur, le tricheur, le faux monnayeur ou le cambrioleur n'est qu'un modèle particulier du genre escroc, et bien qu'il ne fasse pas de doute que chacun tend à s'en tenir à son propre domaine, ils possèdent tous la caractéristique mentale aucunement extraor-

characteristic is not a recognizable mark of the individual. Persons, however, who commit the offences now under consideration seek the habitual gratification of a particular perverted lust, which not only takes them out of the class of ordinary men gone wrong, but stamps them with the hall-mark of a specialized and extraordinary class as much as if they carried on their bodies some physical peculiarity.

The difficulty in defining what is abnormal was recently referred to by McCarthy J.A. in *R. v. Garfinkle* (1992), 15 C.R. (4th) 254. At pages 256-57, speaking for the court, he stated:

What dispositions are to be classified as abnormal, as outside ordinary human experience, for the purpose of admitting psychiatric evidence may be a difficult question. A disposition for sadism is clearly abnormal. Dispositions for violence (short of sadism or something akin thereto), or for dishonesty, are clearly too common to be classified as abnormal. In sexual offences, classification is less easy. However, it seems to me that, whether it be called pedophilia or something else, a disposition in an adult to use boys of 10 and 11 for sexual gratification must be classified as abnormal. Accordingly, in the present case, psychiatric evidence is admissible to show that Garfinkle does not have such a disposition.

In my opinion, the term "distinctive" more aptly defines the behavioural characteristics which are a pre-condition to the admission of this kind of evidence.

How should the criteria for the admission of this type of evidence be applied? I find the following statement of Professor Mewett, *supra*, at p. 36, to be an apt characterization of the nature of the decision which the trial judge must make:

The categorization of crimes into the "ordinary" and the "extraordinary" is therefore a legal question to be determined by the judge, as is the "normality" or "abnormality" of the accused — to the despair, no doubt, of psychiatrists. But admissibility of evidence is a legal question and depends primarily upon relevance, that is, upon its

dinaire qu'ils se proposent d'une façon ou d'une autre de gagner leur vie malhonnêtement. Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu. Toutefois, les auteurs des infractions qui sont en cause en l'espèce recherchent la gratification habituelle d'une certaine luxure pervertie, qui non seulement les exclut de la catégorie des hommes ordinaires qui se sont écartés du droit chemin, mais indique également qu'ils appartiennent à une catégorie spéciale et extraordinaire, tout autant que si leur corps était marqué par un trait physique particulier.

La difficulté à déterminer ce qui est anormal a récemment été mentionnée par le juge McCarthy de la Cour d'appel dans l'arrêt *R. c. Garfinkle* (1992), 15 C.R. (4th) 254. Aux pages 256 et 257, s'exprimant au nom de la cour, il a déclaré:

[TRADUCTION] La question de savoir quelles prédispositions doivent être qualifiées d'anormales, d'étrangères à la nature humaine ordinaire, dans le but d'admettre la preuve psychiatrique, peut être difficile à trancher. Une prédisposition au sadisme est manifestement anormale. Les prédispositions à la violence (sauf le sadisme ou quelque chose de semblable) ou à la malhonnêteté sont manifestement trop communes pour être qualifiées d'anormales. Les infractions sexuelles sont plus difficiles à classer. Toutefois, qu'on l'appelle pédophilie ou autre, il me semble que la prédisposition chez un adulte à utiliser des garçons de 10 et 11 ans pour obtenir une gratification sexuelle doit être qualifiée d'anormale. En conséquence, en l'espèce, la preuve psychiatrique est admissible pour démontrer que Garfinkle n'a pas une telle prédisposition.

À mon avis, le terme «distinctif» définit mieux les caractéristiques de comportement qui sont une condition préalable à l'admission de cette forme de preuve.

Comment les critères d'admission de cette preuve devraient-ils être appliqués? À mon avis, les propos suivants du professeur Mewett, précité, à la p. 36, qualifient bien la nature de la décision que le juge du procès doit prendre:

[TRADUCTION] La classification des crimes comme «ordinaires», ou «extraordinaires», est donc une question de droit, comme l'est la «normalité» ou l'«anormalité» de l'accusé — au désespoir, sans doute, des psychiatres. Mais, l'admissibilité de la preuve est une question de droit et dépend principalement de sa perti-

assistance to the trier of fact in his inference-drawing process, and this is governed, not by expertise, but by common sense and experience; words like "ordinary", "extraordinary" or "abnormal" are not meant to be scientific expressions but assessments of relevance and are thus clearly within the domain of the judge.

Before an expert's opinion is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, as Professor Mewett suggests, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. Put another way: Has the scientific community developed a standard profile for the offender who commits this type of crime? An affirmative finding on this basis will satisfy the criteria of relevance and necessity. Not only will the expert evidence tend to prove a fact in issue but it will also provide the trier of fact with assistance that is needed. Such evidence will have passed the threshold test of reliability which will generally ensure that the trier of fact does not give it more weight than it deserves. The evidence will qualify as an exception to the exclusionary rule relating to character evidence, provided, of course, that the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

(3) *Application to This Case*

I take the findings of the trial judge to be that a person who committed sexual assaults on young women could not be said to belong to a group possessing behavioural characteristics that are sufficiently distinctive to be of assistance in identifying the perpetrator of the offences charged. Moreover,

nence, c'est-à-dire de l'aide qu'elle apporte au juge des faits en lui permettant de tirer des conclusions. Cette question repose non pas sur l'expertise, mais sur le bon sens et l'expérience; des mots tels «ordinaire», «extraordinaire» ou «anormal» ne sont pas destinés à être des expressions scientifiques, mais plutôt des appréciations de la pertinence. Par conséquent ils relèvent clairement du domaine du juge.

Avant d'admettre en preuve l'opinion d'un expert, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, comme le professeur Mewett l'indique, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. En d'autres termes, la profession scientifique a-t-elle élaboré un profil type du délinquant qui commet ce genre de crime? Une conclusion affirmative sur ce fondement satisfera aux critères de pertinence et de fiabilité. Non seulement la preuve d'expert tendra à prouver un fait en litige, mais elle offrira aussi au juge des faits l'aide dont il a besoin. Une telle preuve aura satisfait au critère préliminaire de la fiabilité qui fera généralement en sorte que le juge des faits ne lui accorde pas plus de poids qu'elle ne le mérite. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition bien sûr que le juge du procès soit convaincu que l'opinion exprimée se situe dans le domaine d'expertise du témoin expert.

(3) *Application à l'espèce*

À mon sens, le juge du procès a conclu qu'on ne peut dire de la personne qui a commis des agressions sexuelles sur de jeunes femmes qu'elle appartient à un groupe possédant des caractéristiques de comportement suffisamment distinctives pour faciliter l'identification de l'auteur des infrac-

R. v. MOHAN   *Sopinka J.*

the fact that the alleged perpetrator was a physician did not advance the matter because there is no acceptable body of evidence that doctors who commit sexual assaults fall into a distinctive class with identifiable characteristics. Notwithstanding the opinion of Dr. Hill, the trial judge was also not satisfied that the characteristics associated with the fourth complaint identified the perpetrator as a member of a distinctive group. He was not prepared to accept that the characteristics of that complaint were such that only a psychopath could have committed the act. There was nothing to indicate any general acceptance of this theory. Moreover, there was no material in the record to support a finding that the profile of a pedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these *indicia* of reliability, it cannot be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury. Given these findings and applying the principles referred to above, I must conclude that the trial judge was right in deciding as a matter of law that the evidence was inadmissible.

The Court of Appeal also supported the admissibility of the evidence on the basis that Dr. Hill's evidence tended to rebut alleged similarities between the evidence on the respective counts. On this point, Finlayson J.A. stated at p. 178:

Where, as here, the Crown alleges that the probative value of the similar fact evidence arises from the circumstance that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, the defence is equally entitled to lead evidence as to features of the alleged acts which demonstrate dissimilarities . . . .

tions reprochées. En outre, le fait que l'auteur allégué du crime est un médecin n'a pas facilité la question parce qu'il n'existe aucune preuve acceptable indiquant que les médecins qui commettent des agressions sexuelles tombent dans une catégorie distinctive à laquelle se rattachent des caractéristiques identifiables. En dépit de l'opinion du Dr Hill, le juge du procès n'était pas non plus convaincu que les caractéristiques reliées à la quatrième plainte identifiaient l'auteur comme membre d'un groupe distinctif. Il n'était pas disposé à accepter que les caractéristiques de cette plainte étaient telles que seul un psychopathe pouvait avoir commis l'acte. Rien ne démontre que cette théorie soit généralement acceptée. Par ailleurs, aucun document dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence d'indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches. Compte tenu de ces conclusions, et appliquant les principes mentionnés ci-dessus, je dois conclure que le juge du procès a conclu à juste titre que, du point de vue juridique, la preuve était inadmissible.

La Cour d'appel avait aussi conclu à l'admissibilité de la preuve pour le motif que le témoignage du Dr Hill tendait à réfuter les similitudes alléguées entre la preuve relative aux divers chefs. À cet égard, le juge Finlayson a dit à la p. 178:

[TRADUCTION] Lorsque, comme en l'espèce, le ministère public allègue que la valeur probante de la preuve de faits similaires naît du fait que les actes comparés sont si inhabituels et d'une similitude si frappante que cette similitude ne peut être attribuée à la coïncidence, la défense a elle aussi le droit de produire une preuve relative aux caractéristiques des actes allégués qui démontrent des différences . . .

R. c. MOHAN *Le juge Sopinka*

The judgment of the Court of Appeal was not supported on this ground either in the respondent's factum or in the oral argument.

The use to which the jury could put the evidence was explained by the trial judge in his charge to the jury. The key passage in the charge in this respect was the following:

> If you conclude when considering any of the specific counts that evidence relating to any or all of the other counts is so similar that common sense dictates the relevancy of such evidence to one or more of the issues I mentioned earlier, then you may not must, draw the inferences to which I have referred. [Emphasis added.]

The similarities, which were detailed by the judge, were with respect to the *modus operandi* of the perpetrator of the acts which were the subject of the individual counts. No objection was taken to this aspect of the charge. This use of the similar fact evidence relates to a different issue from the subject matter of the proposed evidence of Dr. Hill. As discussed above, the dissimilarities addressed in Dr. Hill's proposed evidence are not as to *modus operandi* but rather with respect to the comparative psychological make-up of the respondent on the one hand and the alleged perpetrator of the acts charged, on the other. Furthermore, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence. As stated by the trial judge, it is a matter of common sense.

I would allow the appeal, set aside the judgment of the Court of Appeal, restore the convictions and remit the matter to the Court of Appeal for disposition of the sentence appeal.

*Appeal allowed.*

*Solicitor for the appellant: The Ministry of the Attorney General, Toronto.*

Le jugement de la Cour d'appel n'a pas été appuyé à cet égard ni dans le mémoire de l'intimé, ni dans les débats.

Dans son exposé au jury, le juge du procès a expliqué l'utilisation que le jury pouvait faire de la preuve. Le passage clé de l'exposé à cet égard est le suivant:

> [TRADUCTION] Si vous déterminez, après avoir considéré un des chefs d'accusation, que la preuve relative à un ou à l'ensemble des autres chefs est semblable au point que le bon sens commande la pertinence d'une telle preuve quant à l'une ou plusieurs questions que j'ai mentionnées précédemment, vous pouvez alors tirer les conclusions que j'ai mentionnées. [Je souligne.]

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. Aucune objection n'a été soulevée sur cet aspect de l'exposé. Cette utilisation de la preuve de faits similaires porte sur une question différente de l'objet du témoignage proposé du Dr Hill. Comme cela est indiqué plus haut, les différences dont traitait la preuve proposée par le Dr Hill ne concernaient pas le *modus operandi* mais plutôt la constitution psychologique du requérant comparée à celle de l'auteur des actes allégués. En outre, la question de savoir si le crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert. Comme le juge du procès l'a dit, c'est une question de bon sens.

Je suis d'avis d'accueillir le pourvoi, d'infirmer le jugement de la Cour d'appel, de rétablir les déclarations de culpabilité et de renvoyer l'affaire à la Cour d'appel pour qu'elle tranche l'appel de la sentence.

*Pourvoi accueilli.*

*Procureur de l'appelante: Le ministère du Procureur général, Toronto.*

R. *v.* MOHAN

*Solicitors for the respondent: Greenspan, Humphrey, Toronto.*

*Procureurs de l'intimé: Greenspan, Humphrey, Toronto.*



# THE LAW OF EVIDENCE IN CANADA

## THIRD EDITION

Alan W. Bryant
Justice of the Superior Court of Justice for Ontario

Sidney N. Lederman
Justice of the Superior Court of Justice for Ontario

Michelle K. Fuerst
Justice of the Superior Court of Justice for Ontario

2009



LexisNexis®

[T]here is a growing consensus that while expert evidence on the ultimate credibility of a witness is not admissible, expert evidence on human conduct and the psychological and physical factors which may lead to certain behaviour relevant to credibility, is admissible, provided the testimony goes beyond the ordinary experience of the trier of fact.[370]

Opinion evidence is also receivable to explain behaviour that might otherwise appear to be inconsistent with sexual abuse or inconsistent with the complainant's testimony of sexual abuse.[371] In both scenarios, the expert evidence is capable of supporting the credibility of the witness.[372] The expert witness may not testify, however, that he or she believes the child witness is telling the truth since such evidence contravenes the rule against oath-helping.[373] Since this distinction is very fine,[374] it requires the trial judge to instruct the trier of fact on the limited use of the evidence.

**§12.154** The rationale for the admissibility of this type of evidence is that certain aspects of human behaviour which are important to the fact-finder's assessment of credibility may not be understood by the layperson and hence require elucidation by experts in human behaviour.[375] Even though the opinion deals with a matter at the core of the dispute between the parties and it is relevant to the witness' credibility, it is not excluded.[376]

**§12.155** Questions of domestic law as opposed to foreign law are not matters upon which a court will receive opinion evidence.[377] In *R. v. Century 21 Ramos Realty Inc.*,[378] the sole principal of a real estate company was charged with income tax evasion as a result of appropriation of property belonging to the

---

[370]  *Ibid.*, at 249 (S.C.R.); *R. v. J. (F.E.)* (1990), 53 C.C.C. (3d) 64, at 70, [1989] O.J. No. 2724 (Ont. C.A.); *R. v. Millar* (1989), 49 C.C.C. (3d) 193, [1989] O.J. No. 829 (Ont. C.A.).

[371]  *R. v. Marquard*, [1993] 4 S.C.R. 223, 85 C.C.C. (3d) 193, at 228-29, [1993] S.C.J. No. 119 (S.C.C.); *R. v. C. (R.A.)* (1990), 57 C.C.C. (3d) 522, [1990] B.C.J. No. 1366 (B.C.C.A.); *R. v. R. (D.)*, [1996] 2 S.C.R. 291, [1996] S.C.J. No. 8 (S.C.C.).

[372]  *R. v. B. (F.F.)*, [1993] 1 S.C.R. 697, 79 C.C.C. (3d) 112, at 135, [1993] S.C.J. No. 21 (S.C.C.), where Iacobucci J. held that the evidence "would tend to prove the truthfulness of the witness, rather than the truth of the witness's statements".

[373]  *R. v. D. (D.)*, [2000] 2 S.C.R. 275, [2000] S.C.J. No. 44, at para. 19 (S.C.C.); *R. v. Marquard*, [1993] 4 S.C.R. 223, [1993] S.C.J. No. 119 (S.C.C.); *R. v. R. (D.)*, [1996] 2 S.C.R. 291, [1996] S.C.J. No. 8 (S.C.C.); see also *R. v. R. (S.)* (1992), 8 O.R. (3d) 679, [1992] O.J. No. 1126 (Ont. C.A.) re: anticipatory impeachment.

[374]  *R. v. K. (A.)* (1999), 45 O.R. (3d) 641, [1999] O.J. No. 3280, at paras. 95-96 (Ont. C.A.).

[375]  *R. v. Marquard*, [1993] 4 S.C.R. 223, 85 C.C.C. (3d) 193, at 229, [1993] S.C.J. No. 119 (S.C.C.).

[376]  *R. v. R. (D.)*, [1996] 2 S.C.R. 291, [1996] S.C.J. No. 8 (S.C.C.); *R. v. Burns*, [1994] 1 S.C.R. 656, 89 C.C.C. (3d) 193, at 201, [1994] S.C.J. No. 30 (S.C.C.); *Khan v. College of Physicians and Surgeons of Ontario* (1992), 9 O.R. (3d) 641, [1992] O.J. No. 1725 (Ont. C.A.).

[377]  Kenneth S. Broun (ed.), *McCormick on Evidence*, 6th ed. (St. Paul: Thomson West Publishing, 2006), Vol. 1, at 62-63; 2 Wigmore, *Evidence* (Chadbourn rev., 1979), §§ 564-566, at 776-79.

[378]  (1987), 58 O.R. (2d) 737, [1987] O.J. No. 178 (Ont. C.A.), leave to appeal refused (1987), 62 O.R. (2d) ix (S.C.C.).

company. An issue at trial was the taxation year when the appropriation took place. The Crown called an employee of Revenue Canada to give expert evidence as to when the accused had appropriated the property. The Ontario Court of Appeal held that such evidence was inadmissible:

> It was a question of law for the judge as to what constitutes an appropriation. It was for the judge to determine, in compliance with the legal definition, if and when an appropriation took place. This was not something on which an expert witness could give evidence.[379]

**§12.156** The case law illustrates that there are certain subject matters which go to the very heart of judicial decision-making and courts remain wary of expert witnesses providing advice as to how they should decide issues such as whether a witness is telling the truth or the meaning of English words. Perhaps it is just a matter of sensitivity over the way in which the expert gives his or her evidence. For example, a court would be loath to receive explicit evidence from an expert that an accused is guilty or innocent or that a defendant was negligent or not, or that an individual was insane or not. However, it will readily receive evidence which is not so direct but which, if accepted, inescapably leads to that conclusion. For example, it would appear that an expert can testify that the perpetrator of a crime had distinctive mental or physical characteristics and that the accused's mental make-up fell within the distinct group of offenders; or that with respect to a particular activity a certain standard of conduct was required and that anything below it amounted to negligence and that in the expert's opinion the defendant's conduct fell below the standard of care; or that the individual's behaviour exhibited abnormal traits which could lead one to the conclusion that the individual was not mentally balanced; or that a child's behaviour was consistent with being sexually abused.

**§12.157** In the final analysis, the closer the experts' testimony approaches an opinion on the ultimate issue, the stricter the courts will apply the requirements of reliability and necessity before admitting such evidence.[380] This is so because the evidence then begins to overlap not only the fact-finding function of the court but the legal analysis that must be applied to the facts in rendering the ultimate decision.

**§12.158** It is now generally said that if expert testimony is rejected it is excluded not because of any "ultimate issue" doctrine, but because such evidence is superfluous and the court can just as readily draw the necessary inference

---

[379] *Ibid.*, at 752 (O.R.). In *Teskey v. Canadian Newspapers Co.* (1989), 68 O.R. (2d) 737, [1989] O.J. No. 828 (Ont. C.A.), the Ontario Court of Appeal held that an expert's views on the Rules of Professional Conduct would be admissible since they are not rules of law but rather reflect what members of the profession have decided is proper or improper.

[380] *R. v. Mohan*, [1994] 2 S.C.R. 9, 89 C.C.C. (3d) 402, at 415, [1994] S.C.J. No. 36 (S.C.C.).

case by relying on *prima facie* proof, and when this has been shaken by his adversary, adducing confirmatory evidence: *Jacobs v. Tarleton* (1848), 11 Q.B. 421, 116 E.R. 534 . . . The rule is now so well settled that it requires no further elaboration. It is important in the trial of actions, whether before a jury or a Judge alone, that this rule should be observed. A defendant is entitled to know the case which he has to meet when he presents his defence and it is not open to a plaintiff under the guise of replying to reconfirm the case which he was required to make out in the first instance or take the risk of non-persuasion.[347]

**§16.189** Should reply evidence be excluded if the point in respect of which contradictory evidence is sought to be adduced in reply arose in cross-examination of the other parties' witnesses, rather than their evidence-in-chief? In *Mersey Paper Co. v. Queens (County)*,[348] the Nova Scotia Court of Appeal considered this to be an unjustifiable technical distinction. It is submitted that, at least in civil cases, it would depend on whether the matter was part of the plaintiff's case and one which might have been adduced in the plaintiff's case in chief. A plaintiff cannot leave part of its case until cross-examination of the defendant's witnesses and then, when that goes badly, make up for it in reply. In criminal cases, the question must be resolved by determining whether the matter was in the possession of the Crown and is relied on as probative of guilt. A trial judge has a discretion to admit evidence in reply concerning an issue that was of only marginal importance during the Crown's case in chief, but which took on added significance as a result of defence evidence.[349]

**§16.190** In *Krause v. R.*,[350] McIntyre J. gave the following summary of the limits of permissible reply evidence:

> The plaintiff or the Crown may be allowed to call evidence in rebuttal after completion of the defence case, where the defence has raised some new matter or defence which the Crown has had no opportunity to deal with and which the Crown or the plaintiff could not reasonably have anticipated. But rebuttal will not be permitted regarding matters which merely confirm or reinforce earlier evidence adduced in the Crown's case which could have been brought before the defence was made. It will be permitted only when it is necessary to insure that at the end of the day each party will have had an equal opportunity to hear and respond to the full submissions of the other.
>
> . . .
>
> Where something new emerges in cross-examination, which is new in the sense that the Crown had no chance to deal with it in its case-in-chief (i.e., there was

---

[347] [1967] 1 O.R. 18, at 21, [1966] O.J. No. 1067 (Ont. C.A.). See also *B.F. Goodrich Canada Ltd. v. Mann's Garage Ltd.* (1959), 21 D.L.R. (2d) 33, [1959] N.B.J. No. 16 (N.B.Q.B.).

[348] (1959), 18 D.L.R. (2d) 19, [1959] N.S.J. No. 9 (N.S.C.A.).

[349] *R. v. P. (G.)* (1996), 31 O.R. (3d) 504, [1996] O.J. No. 4286 (Ont. C.A.); *R. v. Melnichuk*, [1997] 1 S.C.R. 602, [1997] S.C.J. No. 36 (S.C.C.); *R. v. Terceira* (1998), 123 C.C.C. (3d) 1, [1998] O.J. No. 428 (Ont. C.A.), affd [1999] 3 S.C.R. 866, [1999] S.C.J. No. 74 (S.C.C.).

[350] [1986] 2 S.C.R. 466, 29 C.C.C. (3d) 385, [1986] S.C.J. No. 65 (S.C.C.). See also *R. v. Biddle*, [1995] 1 S.C.R. 761, 36 C.R. (4th) 321, at 328-34 [1995] S.C.J. No. 22 (S.C.C.).

no reason for the Crown to anticipate that the matter would arise), and where the matter is concerned with the merits of the case (i.e., it concerns an issue essential for the determination of the case) then the Crown may be allowed to call evidence in rebuttal.[351]

**§16.191** Although the authorities are not entirely clear on this point, the better view is that reply evidence that conforms with the principles stated above can be adduced as of right.

## B.   Reopening the Case

**§16.192** The rule against "splitting one's case" is normally associated with the permissible limits of reply evidence. It is also germane to an application by the Crown in a criminal trial to reopen its case. The Supreme Court of Canada has said that applications to adduce rebuttal evidence and to reopen the case are "close cousins but not identical twins".[352] In *R. v. G. (S.G.)*,[353] the Supreme Court pointed out that it was the rules of the adversarial system that justify the admission of reply evidence. On an application to reopen, however, the Crown must not only demonstrate that the proposed evidence is material to an issue that is properly part of the Crown's case, it must also explain why the evidence was not led earlier, and justify this departure from the normal rules of the adversarial process.

**§16.193** There is, however, a discretionary power vested in the trial judge to allow a party to reopen its case to introduce evidence, notwithstanding that it may not be the proper subject of reply.[354]

**§16.194** A widely accepted formulation of the extent of the discretion in criminal cases was made in *R. v. Coombs*, where Robertson J.A. said:

> From these authorities and others I think that it is clear that the Judge in each case has a discretion with regard to the admission of evidence in rebuttal and that in exercising his discretion he should not generally allow such evidence to

---

[351] *Krause v. R., ibid.*, at 391 (C.C.C.). See also *R. v. Lawes*, [1997] 3 S.C.R. 694, [1997] S.C.J. No. 88 (S.C.C.) permitting rebuttal evidence to counter an alibi defence.

[352] *R. v. G. (S.G.)*, [1997] 2 S.C.R. 716, [1997] S.C.J. No. 70 (S.C.C.).

[353] *Ibid.*

[354] *B.F. Goodrich Canada Ltd. v. Mann's Garage Ltd.* (1959), 21 D.L.R. (2d) 33, [1959] N.B.J. No. 16 (N.B.Q.B.); *Devlin v. Crocker* (1850), 7 U.C.R. 398, [1850] O.J. No. 40 (U.C.Q.B.); *R. v. Markadonis*, [1935] S.C.R. 657, [1935] 2 D.L.R. 105, at 112, [1935] S.C.J. No. 43 (S.C.C.); *R. v. Parkin*, [1922] 66 D.L.R. 175, at 201, [1922] M.J. No. 3 (Man. C.A.); *Williams v. Davies* (1833), 1 Cr. & M. 464, 149 E.R. 481 (Ex. Ct.); *Neary v. Fowler* (1869), 7 N.S.R. 495 (N.S.C.A.); *R. v. Crippen*, [1911] 1 K.B. 149, [1908-10] All E.R. Rep. 390 (C.C.A.); *R. v. Briden*, [1960] O.R. 362, at 365, [1960] O.J. No. 543 (Ont. C.A.).



# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:   *Walsh v. BDO Dunwoody LLP,*
2013 BCSC 1463

Date: 20130813
Docket: S104826
Registry: Vancouver

Between:

**Glenn Walsh**

Plaintiff

And

**BDO Dunwoody LLP BDO Canada SRL and
Jas Butalia**

Defendants

Before: The Honourable Madam Justice Fitzpatrick

## Reasons for Judgment

| | |
|---|---|
| Counsel for the Plaintiff: | B.G.N. McLean<br>J.K.R. Bienvenu |
| Counsel for the Defendants: | D.B. Wende<br>E. Clough |
| Place and Date of Trial/Hearing: | Vancouver, B.C.<br>July 16, 2013 |
| Place and Date of Judgment: | Vancouver, B.C.<br>August 13, 2013 |

2013 BCSC 1463 (CanLII)

2013 BCSC 1463 (CanLII)

### Introduction

[1]     This action involves a complex yet unsuccessful tax planning strategy that was implemented by the plaintiff, Glenn Walsh, for the 1998 taxation year, on the advice of the defendants (who I will collectively call "BDO"). Mr. Walsh alleges that due to the negligent advice and/or breach of contract and fiduciary duty of BDO, an interest deduction was not available in that taxation year, causing him to lose approximately $16 million.

[2]     BDO has defended the action in part on the basis that Mr. Walsh cannot prove that "but for" the actions taken by Mr. Walsh arising from the tax strategy, this interest expense would have been deductible. Many of the issues arise in this respect by reason of certain provisions of the *Income Tax Act*, R.S.C. 1985, c. 1 (the "*ITA*").

[3]     In advance of the trial scheduled to be heard in October 2013, Mr. Walsh seeks a ruling that an expert opinion of the Honourable C. Michael Ryer be admitted for the purposes of the trial. The parties have agreed that this application should be brought at this time so as to ensure that enough time is available to address all issues at trial, including this expert opinion, if it is admitted.

[4]     BDO objects to the admissibility of Mr. Ryer's report on a number of bases.

### Background

[5]     Earlier this year, Mr. Justice Voith decided an application in this action: *Walsh v. BDO Dunwoody LLP*, 2013 BCSC 392. He succinctly outlined the background facts as follows:

> [3]     The following central facts are either not in dispute or have been conceded, for the purposes of this application alone, by the defendants.
>
> [4]     Mr. Walsh is a businessman who owned or controlled various companies. Mr. Butalia is a chartered accountant and was a partner of the defendant BDO Dunwoody. Mr. Butalia had overseen Mr. Walsh's personal and corporate financial matters since at least 1982.
>
> [5]     In 1997 and 1998, Mr. Butalia developed a tax plan (the "Plan") that was intended to shelter approximately $47 million of income for Mr. Walsh in 1998. The details of the Plan are, for present purposes, unimportant. But the

gist of the Plan was described by Justice Woods of the Tax Court in *Grant v. Canada*, 2006 TCC 373 at para. 3, aff'd 2007 FCA 174, a decision which pertains to another of Mr. Butalia's clients:

> The general concept of a departure trade is to create interest deductions that reduce tax of an individual who is planning to emigrate from Canada. The departing taxpayer borrows money from a financial institution and incurs interest which is deductible in part for the period prior to the departure. The borrowed money is simultaneously reinvested with the same financial institution and the taxpayer earns interest that is not taxable because it is received after the taxpayer has terminated Canadian residence.

[6]     It is important that Mr. Butalia told Mr. Walsh that, though he believed the Plan complied with the *Income Tax Act*, R.S.C. 1985, c.1 (5th Supp.) (the "*ITA*"), there were some risks associated with it. He told Mr. Walsh that the Plan was aggressive, that it would draw the attention of the Canada Revenue Agency (the "CRA") and that the CRA might challenge the Plan under the General Anti-Avoidance Rule ("GAAR") or other provisions of the *ITA*.

[7]     The Plan, as described above, required that the plaintiff borrow a substantial amount of money in 1998 in order to have an interest payment that could be deducted from Mr. Walsh's 1998 income. The Plan was implemented in 1998 and Mr. Walsh, on Mr. Butalia's instructions, became a non-resident on December 29, 1998. Mr. Walsh paid interest on the moneys he had borrowed on December 31, 1998.

[8]     In 2001, the CRA began to challenge the Plan and, in a letter dated September 5, 2002, the CRA asserted that the Plan was:

> (a)  a sham contrary to the General Anti-Avoidance Rule (section 245 of the *ITA*); and

> (b)  invalid as the interest paid was not deductible against Mr. Walsh's income because:

>> (i)     the interest had not been earned for a business purpose in accordance with section 20(1)(c) of the *ITA*;

>> (ii)     Mr. Walsh had departed Canada on December 29, 1998, two days before paying $47 million in interest on the moneys he had borrowed and so he was no longer a resident of Canada when the interest was paid as required under both sections 20(1)(c) and 114 of the *ITA*.

[9]     In 2002, the CRA issued a $45 million reassessment to Mr. Walsh. Mr. Butalia retained Mr. Joel Nitikman, a tax specialist with the law firm of Fraser Milner Casgrain, to act on behalf of both Mr. Walsh and the defendant BDO Dunwoody. Mr. Butalia and Mr. Nitikman had a long standing relationship. Mr. Butalia has apparently retained Mr. Nitikman in order to obtain his input on the Plan and in relation to other matters. On June 6, 2003, Mr. Nitikman prepared a Notice of Objection on behalf of Mr. Walsh.

[10]     On January 13, 2003, Mr. Walsh and Mr. Nitikman met for approximately 1 1/2 hours. The defendants placed considerable emphasis on

2013 BCSC 1463 (CanLII)

this meeting and I will return to its significance. The CRA formally confirmed
its reassessment on June 4, 2004.

[11]   In approximately July or August 2004, Mr. Walsh retained Mr. Stewart,
then a tax lawyer with Bennett Jones in Calgary, to assume conduct of his
personal tax problems with the CRA. Mr. Stewart had already been acting for
some time on behalf of various companies that Mr. Walsh owned or
controlled and that had reassessments issued to them by the CRA for various
tax years.

[6]   As described by Voith J., Mr. Walsh advances the claim against BDO on the
basis that the Plan (as defined above) was flawed, in that it required Mr. Walsh to
leave Canada on December 29, 1998. The timing of his departure from Canada later
resulted in the interest expense not being deductible pursuant to s. 114 of the *ITA*.
This has been described by the parties and the court as the "Departure Date Issue":
para. 12.

[7]   BDO pleads in its Further Amended Response to Civil Claim:

18.   In point of law, the onus rests upon Walsh to prove on the balance of
probability that "but for" the actual date of departure of December 29, 1998 by
Walsh, the Departure Strategy would have resulted in the Interest Expense
being deductible from his 1998 income under the *Income Tax Act*.

[8]   In substance, BDO contends that even if Mr. Walsh had been advised of and
implemented a strategy to deduct the interest and lessen his taxes so as to avoid the
consequences of s. 114 of the *ITA*, that strategy would have failed in any event
because Canada Revenue Agency ("CRA") would have mounted challenges
pursuant to other provisions of the *ITA*, notably:

   a)   s. 20, which requires that the interest must have been earned for a
        business purpose; and

   b)   s. 245, the General Anti-Avoidance Rule (or as it is colloquially known,
        "GAAR").

[9]   As such, BDO says that Mr. Walsh suffered no loss by reason of the advice or
actions of BDO. In addition, BDO also raises what I will call the "s. 20" and "GAAR"

2013 BCSC 1463 (CanLII)

issues in relation to the allegation that the claims brought by Mr. Walsh are statute barred regardless of their merit.

## Mr. Ryer's Opinion

[10]    Mr. Ryer has provided a written opinion dated March 14, 2013.

[11]    At the outset, I emphasize that there is no question concerning Mr. Ryer's legal expertise in the area of tax law. Mr. Ryer has been a practicing lawyer in Canada for almost 40 years, with most of his practice having been in that field. In the 1990s, he was the coordinator of the national tax practice for Bennett Jones LLP. He was also the head of Bennett Jones LLP's tax department from 1999 to 2004. In 2006, Mr. Ryer was appointed to the Federal Court of Appeal. He sat on the court until 2009. Following his resignation from the court, in 2010, he joined Deloitte Tax Law LLP, where he remains as counsel.

[12]    In addition, Mr. Ryer's opinion is in conformance with the requirements of Rule 11–2 of the *Supreme Court Civil Rules,* which requires that he provide the necessary certification confirming that his duty is to assist the court rather than advocate for any party in the litigation.

[13]    Mr. Ryer was asked to address a number of matters in his opinion. In particular, he was asked to provide his opinion on whether BDO had met the standard of care of a reasonably competent Canadian income tax advisor. That issue was not addressed in the subject opinion. Rather, Mr. Ryer's opinion before me addressed what he described as the "basic income tax issues". In particular, the issues addressed in the subject opinion were whether arguments by CRA, including those relating to s. 20 and GAAR (described as the "Crown Arguments"), would have prevented Mr. Walsh from claiming the interest deduction in any event.

[14]    Mr. Ryer in his opinion sets out a substantial factual background, along with assumptions upon which his opinion is based. He reviews the relevant statutory provisions under the *ITA* and then sets out the relevant case law relating to those

2013 BCSC 1463 (CanLII)

provisions, including Supreme Court of Canada jurisprudence. His opinion is therefore squarely on the interpretation of domestic law, namely the *ITA*.

[15]    The opinion also sets out Mr. Ryer's conclusions on the application of that law in relation to the assumed facts, had the Crown Arguments been advanced in the Tax Court of Canada and perhaps addressed on appeal before the Federal Court of Appeal. His opinion is in a form that would easily translate into reasons for judgment of the Federal Court of Appeal.

[16]    Mr. Ryer concludes that the Crown's Arguments would have failed. He says that Mr. Walsh would more than likely have been entitled to claim the interest deduction because the requirements of s. 20 would have been met. Further, in his opinion, GAAR would more likely than not have been inapplicable to deny the interest deduction to Mr. Walsh.

### The *Mohan* Principles and *Abbey* Analysis

[17]    No decision concerning the admissibility of an expert report is complete without reference to the principles set out by Mr. Justice Sopinka in *R. v. Mohan*, [1994] 2 S.C.R. 9. At p. 20, the Court held that the admission of expert evidence depends on the application of the following criteria:

    a)  relevance;

    b)  necessity in assisting the trier of fact;

    c)  the absence of any exclusionary rule; and

    d)  a properly qualified expert.

[18]    In *R. v. Abbey*, 2009 ONCA 624, leave to appeal ref'd [2010] S.C.C.A. No. 125 (S.C.C.), Mr. Justice Doherty suggested an analytical framework within which to consider the *Mohan* principles. He articulated a two-step process for the admissibility of expert opinion evidence:

    a)  The first step involves a "rules based" consideration of various pre-conditions to admissibility that will yield a "yes" or "no" answer (paras. 76-82), as follows:

2013 BCSC 1463 (CanLII)

i.    the proposed opinion must relate to a subject matter that is properly the subject of expert opinion evidence;

ii.   the witness must be qualified to give the opinion;

iii.  the proposed opinion must not run afoul of any exclusionary rule apart entirely from the expert opinion rule; and

iv.   the proposed opinion must be "logically relevant" to a material issue. This requirement was later described as requiring that "the evidence have a tendency as a matter of human experience and logic to make the existence or non-existence of a fact in issue more or less likely than it would be without that evidence" (para. 82).

b)   The second step involves the role of the court as "gatekeeper" and requires the exercise of judicial discretion (paras. 76-96). In this phase, the court must consider the "legal relevance" of the opinion evidence and weigh the costs and benefits associated with admitting it. The "benefit" side will require consideration of the probative potential of the evidence, within which the reliability of the opinion will be considered. Also included in this analysis will be a consideration of the "necessity" of admitting this type of evidence. The "cost" side will consider risks associated with the evidence, including time, prejudice and confusion.

[19]    Decisions after *Mohan* have confirmed the importance of this "gatekeeper" function. The court should not default to simply admitting this evidence, with a more critical view to be given in the context of deciding what weight will be given to it. In *R. v. J.-L.J.*, 2000 SCC 51 at para. 28, Mr. Justice Binnie stated:

> [28]    ... the Court has emphasized that the trial judge should take seriously the role of "gatekeeper". The admissibility of the expert evidence should be scrutinized at the time it is proffered, and not allowed too easy an entry on the basis that all of the frailties could go at the end of the day to weight rather than admissibility.

2013 BCSC 1463 (CanLII)

See also *Gutbir v. University Health Network, Nicholson,* 2010 ONSC 6394 at paras. 21-22.

[20]    In *R. v. Aitken,* 2012 BCCA 134, leave to appeal ref'd [2012] S.C.C.A. No. 481 (S.C.C.), Hall J.A., speaking for the court, adopted the analytical framework of the *Mohan* principles formulated by Doherty J.A. in *Abbey:* paras. 70-81.

[21]    BDO concedes that two of the pre-conditions under the *Abbey* analysis are satisfied, namely, that Mr. Ryer has the qualifications required to give his opinion and that his opinion is "logically relevant" to the material issue of whether the Plan would have survived the Crown Arguments, including GAAR. BDO takes the position, however, that the other two pre-conditions are not met, in that Mr. Ryer's opinion is not properly the subject of expert opinion evidence and it runs afoul of an exclusionary rule. In essence, BDO says that Mr. Ryer's opinion is on the question of domestic law (i.e. the *ITA*), which the courts have traditionally not admitted.

[22]    In the alternative, BDO says that Mr. Ryer's opinion should be rejected under the second part of the *Abbey* analysis for two reasons: firstly, it is not legally relevant because it is not necessary; and secondly, it is not reliable given Mr. Ryer's impartiality, since he is counsel in the same law firm that is acting for Mr. Walsh in respect of various income tax issues arising from the Plan.

**The Authorities**

[23]    The Canadian authorities on the issue, both before and after *Mohan* and *Abbey,* are decidedly against admitting Mr. Ryer's opinion. It purports to "educate" the court on the interpretation of domestic law and it suggests what the court's conclusions should be in applying that law to the facts that might be found at trial.

[24]    A statute of Canada is not to be proven in evidence before our courts. Section 18 of the *Canada Evidence Act,* R.S.C. 1985, c. C-5 provides, "[j]udicial notice shall be taken of all Acts of Parliament, public or private, without being specially pleaded". Mr. Walsh conceded that inherent in this provision is the notion that trial judges are "experts" on domestic law and have no need for expert assistance.

2013 BCSC 1463 (CanLII)

[25]    The parties have referred me to a number of cases on this issue, the majority of which arise in the field of tax, which is admittedly a complex area of the law.

[26]    I will begin with the authorities relied upon by BDO.

[27]    The issue in *R. v. Century 21 Ramos Realty Inc. and Ramos* (1987), 58 O.R. (2d) 737 (C.A.), leave to appeal ref'd (1987), 62 O.R. (2d) ix (S.C.C.), was whether the court had properly admitted expert evidence on a tax issue. The principal of a real estate company was charged with income tax evasion as a result of appropriation of property belonging to the company. The taxation year in which the appropriation took place was an issue at trial. The Crown called an employee of Revenue Canada to give expert evidence as to when the accused had appropriated the property. The trial judge accepted the opinion into evidence, and acquitted the accused. On the initial appeal, the court also relied on that opinion evidence, but concluded that the accused should be convicted. At 751-752, the Ontario Court of Appeal determined that the opinion should not have been admitted:

> With respect, we do not believe that the witness Claerhout should have been permitted to give an opinion as to when the appropriation occurred. It was a question of law for the judge as to what constitutes an appropriation. It was for the judge to determine, in compliance with the legal definition, if and when an appropriation took place. This was not something on which an expert witness could give evidence.

[28]    Other pre-*Mohan* authorities from British Columbia have also rejected expert reports that opined on the interpretation of a contract, which was a question of law (*Emil Anderson Const. Co. v. B.C. Ry. Co.* (1987), 15 B.C.L.R. (2d) 28 at 32 (S.C.)), and that provided conclusions of law arising in a construction dispute (*Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.* (1988), 29 B.C.L.R. (2d) 127 at 128 (S.C.)).

[29]    Another tax issue, namely, the application of GST, was considered in *Eco-Zone Engineering Ltd. v. Grand Falls - Windsor (Town)*, 2000 NFCA 21. The trial judge had admitted an opinion from a chartered accountant because the tax issue was "highly complex" and it might be "outside the experience and knowledge of a

2013 BCSC 1463 (CanLII)

judge and jury": para. 12. Following *Mohan*, the court on appeal held that the opinion should not have been admitted:

> [15]    What the parties did not directly address before this Court, is the long accepted view that courts do not accept opinion evidence on questions of domestic law (as opposed to foreign law). This is part of the principle that courts do not accept expert evidence on the ultimate issue which is for the court to decide, which was referred to by the appellant. Though one could perhaps say that there has been a relaxation of the rule regarding opinion on the ultimate issue, there is little support for the admissibility of expert opinion regarding domestic law. ... [citing] ... *R. v. Century 21 Ramos Realty Inc. and Ramos* ...

> [16]    I see no basis upon which to announce the death of the rule against the admissibility of expert evidence as to domestic law. The opinions of the expert as to whether the GST was an excise tax or a sales tax should not have been admitted.

[30]    In *Canada Safeway v. Her Majesty the Queen*, 2002 MBQB 59, the Manitoba Court of Queen's Bench, following *Century 21 Ramos* and *Eco-Zone Engineering*, struck an affidavit which contained an opinion on the meaning and interpretation of corporate capital tax legislation: paras. 31-48.

[31]    In *Royal Bank of Canada v. Société Générale (Canada)*, [2005] O.J. No. 2200 (S.C.J.), Ground J. refused to allow portions of an expert report that contained an analysis of Canadian and English law and also an opinion as to how the motion should be decided. The court stated, "I believe it to be settled law that the courts in Ontario do not accept expert evidence as to domestic law and I know of no precedent to the contrary": para. 1.

[32]    The issue also arose in another tax case, *Syrek v. Canada*, 2009 FCA 53, which involved an appeal from the Tax Court of Canada. The Tax Court admitted an opinion from a lawyer on the enforceability of a separation agreement, which led to the further conclusion that there was no liability to pay "spousal support" in accordance with the *ITA*: paras. 13-14. On appeal, the court held that the judge should not have relied on this evidence:

> [28]    The questions asked of Ms. Ashenbrenner and the answers she provided in regard thereto were clearly directed, in my respectful view, to an issue of law which the Judge had to decide. It is trite law that questions of law are not questions in respect of which courts will admit opinion evidence. In

2013 BCSC 1463 (CanLII)

The Law of Evidence in Canada, John Sopinka & Sidney N. Lederman & Alan M. Bryant, 2d ed. (Toronto and Vancouver: Butterworths) at page 640, paragraph 12.83, the learned authors say:

Questions of domestic law as opposed to foreign law are not matters upon which a court will receive opinion evidence.

[29]    In support of the above proposition, the learned authors refer to the decision of the Ontario Court of Appeal in *R. v. Century 21 Ramos Realty Inc.* (1987), 58 O.R. (2d) 737 at 752, where the Court stated the principle as follows:

It was a question of law for the judge as to what constitutes an appropriation. It was for the judge to determine, in compliance with the legal definition, if and when an appropriation took place. This was not something on which an expert witness could give evidence.

[30]    Consequently, it was wrong for the Judge to rely, even if only in part, on the opinion of Ms. Ashenbrenner with respect to whether the Agreement was enforceable or whether the appellant was bound by its terms.

[33]    It is no small irony on this application that *Syrek* was decided by the Federal Court of Appeal at the same time that Mr. Ryer was sitting on that court.

[34]    The decision in *Eco-Zone Engineering* was followed in *4145356 Canada Limited v. The Queen*, 2010 TCC 613, where the court disallowed certain evidence that the taxpayer proposed to read in. In that case, the evidence was replete with opinions of domestic law and whether particular provisions of the *ITA* applied. The court stated that "questions of domestic law are for argument, not testimony": para. 5.

[35]    In addition, Mr. Walsh's position is not supported by the leading textbook authority: Alan W. Bryant, Sidney N. Lederman & Michelle K. Fuerst, *The Law of Evidence in Canada*, 3d ed. (Markham: LexisNexis Canada Inc., 2009) [*The Law of Evidence in Canada*]. At p. 832, the authors bluntly state:

§12.155    Questions of domestic law as opposed to foreign law are not matters upon which a court will receive opinion evidence.

[36]    Mr. Walsh was not able to refer to any case where an opinion such as that of Mr. Ryer was admitted into evidence. He argues that all of the above cases simply reject this type of evidence out of hand, without providing a cogent and principled analysis of the *Mohan* criteria or the *Abbey* analysis. He suggests that the issue

must be viewed and analyzed through the lens of the *Mohan* criteria, and that in doing so, there are valid reasons here to admit Mr. Ryer's opinion.

[37]    In further support, Mr. Walsh relies upon three cases, each a decision of Madam Justice Southin while she was either sitting in this Court or in the British Columbia Court of Appeal. It is worth noting that Southin J.A. does not refer to the *Mohan* criteria or the *Abbey* analysis in making her comments in these cases.

[38]    The first decision is *Doncaster et al. v. Smith* (1985), 65 B.C.L.R. 173 (S.C.). Southin J. (as she then was) was addressing allegations that a receiver had failed to take certain steps to avoid paying certain taxes. At 180-181, Southin J. stated:

> Strictly speaking, expert evidence of the domestic law of this country is not admissible. The classic rule is that evidence may be adduced of foreign law which is considered a fact but not of domestic law. However, as the Income Tax Act of Canada is so complicated that the Honourable John Crosbie, now Attorney General for Canada, once commented, "even a witch doctor can't read it", perhaps the courts should relax the rule and permit expert evidence on the Act and its effect. Without taking it upon myself to relax the rule, I adopt the statement as setting out the relevant considerations and the effect of an amalgamation.

[39]    It is important to note that the "statement" which was considered by the court on the applicable income tax law was admitted by consent of both parties. In addition, as was noted by the court in *Eco-Zone Engineering* at para. 15, the decision was overturned on appeal without reference to Southin J.'s *dicta*: (1987), 40 D.L.R. (4th) 746 (B.C.C.A.).

[40]    The second case is *Webster v. Ernst & Young*, 2003 BCCA 95. The plaintiff lawyers appealed the dismissal of their action against the defendant chartered accountants for negligent tax and accounting advice relating to the departure by the lawyers from their previous law firm. Faced with complex calculations of the applicable tax, Southin J.A. stated:

> [101]   To my mind what ought to have been put before the learned trial judge at the first or the second trial were *pro forma* tax returns for each of the appellants for the years in issue calculating their taxes on the footing they practised as a partnership of individuals and not of personal law corporations.

2013 BCSC 1463 (CanLII)

> [102]   I do not say that as a matter of law expert evidence was required for such *pro forma* returns. The *Income Tax Act* is a public Act and, in theory, if the facts are known, the calculation of tax is simply a matter of proper application by the court of the statute.
>
> [103]   But the reality is that the Act is of such complexity that the practice has developed of experts, usually chartered accountants, being called to inform the court of <u>the incidence of tax</u> arising from known facts.
>
> [Emphasis added.]

[41]    These comments were not adopted or endorsed by Saunders J.A. in her separate reasons concurring in the result, nor in the dissenting reasons of Thackray J.A.

[42]    The third and final decision is *Coggins v. Insurance Corp. of British Columbia* (1997), 151 D.L.R. (4th) 244 (B.C.C.A.). The court was to determine, for the purpose of the Regulations under the *Insurance (Motor Vehicle) Act*, what was "payable" under the *Workers Compensation Act*. The court noted that the appellant in that case conceded that expert evidence on how the Workers' Compensation Board operated under the legislation was admissible. Southin J.A., speaking for the entire court, discussed the same potential approach suggested in *Doncaster* and *Webster*:

> [20]    A similar problem arises when there is an issue as to <u>the incidence of income tax</u> under the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.), of Canada. As it is a public general act and judges are obliged to take judicial notice of it, its application to any given set of facts is a matter of law. <u>In theory, expert evidence is not admissible on what the law of this country is. Nonetheless, because the *Income Tax Act* is so complicated, expert evidence from time to time is called in the courts of this Province on a question of incidence of tax although such evidence would not, I should think, be admitted before a tribunal deciding an issue between the Crown and the taxpayer on the amounts payable by the taxpayer to the Crown.</u>
>
> [21]    In my opinion, it is both artificial and impractical to expect a judge to treat this question of what is "payable" as a matter of law in which the judge applies his own grasp of the sections of the *Workers Compensation Act* to the facts which he has already found.
>
> [22]    It is artificial because a judge should not be required to pretend that he or she does not know what he or she does know, namely, that the Workers Compensation Board, because of s. 96 of that Act, is a law unto itself. The statute may require it to pay according to the facts but as its decisions are immune from review its awards are, in reality, discretionary. In the real world, no one would say that a sum which may or may not be awarded is "payable". One would only say it is "payable" when the tribunal with the discretion to make the determination says so.

> [23]    It is impractical to do as counsel submits because, like the *Income Tax Act*, the *Workers Compensation Act* is a complex statute with which the judges generally have had little experience. Thus, it is my opinion that a trial judge faced with this problem is entitled not only to look at the statute but also to listen to the experts and make the best judgment which he or she can of what, had the injured plaintiff applied for workers compensation, he or she would have been awarded.
>
> [Emphasis Added]

[43]    Mr. Walsh submits that Southin J.A.'s comments in *Webster* and *Coggins* are binding authorities on the issue before me. He says that while the comments of Southin J.A. may be *obiter*, they are not "sufficiently tangential" to the disposition of the case to be other than binding on this Court: see *R. v. Wilson*, 2012 BCCA 517 at paras. 40-42, applying *R. v. Henry*, 2005 SCC 76 at para. 57.

[44]    With respect, Mr. Walsh's position as to the binding effect of Southin J.A.'s comments takes the matter too far.

[45]    Southin J.'s comments in *Doncaster* make it clear that she was in no way purporting to relax any "rule" relating to the admission of such evidence. In fact, she said exactly the opposite. And again, the parties had consented to that evidence being admitted, so the case is hardly persuasive authority on the point.

[46]    In *Coggins*, Southin J.A. was discussing a legislative regime that was within the purview of a specialized tribunal that exercised its discretion in determining certain matters. The issue did not relate to the interpretation of a statute such as the *ITA* here, where no exercise of discretion is involved. Mr. Walsh's suggested analogy, that Mr. Ryer's opinion on how the Tax Court of Canada would decide the *ITA* arguments is equivalent to admitting evidence on how the Workers' Compensation Board decides matters, has no merit. The Tax Court does not exercise discretion in the interpretation of the *ITA*; it interprets the legislation in light of a plain reading of the statute and a review of the jurisprudence, just as this Court would do.

[47]    The more relevant and, in my view, helpful comments of Southin J.A. arise in *Webster*, where she discusses potential evidence about the "incidence of tax":

2013 BCSC 1463 (CanLII)

para. 103. This phrase is repeated in *Coggins* at para. 20. It is clear from that comment and the earlier comment in *Webster* at para. 101 about *pro forma* tax returns that she is referring to the *calculation* of tax payable, not the interpretation of the income tax provisions in issue. In the *Concise Oxford Dictionary*, "incidence" is defined in part as "the way in which the burden of a tax falls upon the population".

[48]    This type of evidence was also discussed by the court in *Eco-Zone Engineering* at para. 14. The court noted that one aspect of the opinion was an explanation of the mechanics of the application of the GST and how it worked in practice. There was no dispute between the parties as to the admissibility of that evidence. The court commented that this was more in the nature of a factual description than the rendering of an opinion on the interpretation of legislation.

[49]    As will be discussed below, this narrower approach to admitting expert opinion evidence on certain issues accords with the requirement of "necessity" set out in *Mohan*. These are technical matters more in the nature of finding facts that are not likely to be understandable to a judge or a judge and jury. Moreover, in today's day and age, these types of calculations are more likely to be completed by using a computer program than by other methods.

**Is There an Exclusionary Rule?**

[50]    As stated earlier, BDO argues that Mr. Ryer's evidence on the law flies in the face of an exclusionary rule and that as such, the simple answer to its admissibility per *Abbey* is "no".

[51]    None of the above cases address the issue of admissibility of opinion evidence on domestic law or the application of that law within the context of the *Mohan* criteria or the *Abbey* approach to the criteria. Southin J. in *Doncaster* referred to the principle as a "rule" even before *Mohan*. Although the court in *Eco-Zone Engineering* also referred to the "rule" against admissibility and *Mohan*, it is not clear whether this was a "bright line" exclusionary rule under the first step later identified in *Abbey* or whether this was within the context of the discretionary "gatekeeper" analysis.

[52]    *Mohan* makes clear that these other exclusionary rules are separate and apart from the opinion rule itself: p. 25. The example cited there was the rule against the admission of character evidence. See also *R. v. Morin*, [1988] 2 S.C.R. 345. Other examples may arise as a result of requirements relating to expert evidence arising under the *Evidence Act*, both federal and provincial, or applicable court rules (for example, *Supreme Court Civil Rule* 11-6, which provides notice requirements for delivery of reports for the purposes of trial).

[53]    That *Mohan* has signalled a new and principled approach to the introduction of expert evidence is evident, at least in part, from the tolling of the death knell for the oft-quoted "rule" that the opinion must not address the "ultimate issue": p. 24. Even in those circumstances, the opinion is not excluded on a preliminary "rule" basis, but rather is addressed within the context of legal relevance or the cost/benefit analysis.

[54]    BDO's arguments against the admission of Mr. Ryer's report are not separate and apart from the opinion rule itself. Accordingly, I accept that Mr. Ryer's opinion is not inadmissible on the basis of the pre-conditions identified in *Abbey's* first step.

[55]    In my view, the arguments both for and against Mr. Ryer's opinion are best viewed in the context of *Abbey's* second step, that is, the legal relevance analysis.

### The *Mohan/Abbey* Analysis

[56]    I begin by addressing the requirement of "necessity".

[57]    It is trite to state that the admissibility issue must be considered after determining the nature and scope of the opinion. In *Mohan* at p. 23, Sopinka J. adopted the comments of Dickson J. (as he then was) in *R. v. Abbey*, [1982] 2 S.C.R. 24 at 42:

> With respect to matters calling for special knowledge, an expert in the field may draw inferences and state his opinion. An expert's function is precisely this: to provide the judge and jury with a ready-made inference which the judge and jury, due to the technical nature of the facts, are unable to formulate. "An expert's opinion is admissible to furnish the Court with scientific information which is likely to be outside the experience and

2013 BCSC 1463 (CanLII)

> knowledge of a judge or jury. If on the proven facts a judge or jury can form
> their own conclusions without help, then the opinion of the expert is
> unnecessary" (*Turner* (1974), 60 Crim. App. R. 80, at p. 83, *per* Lawton L.J.)
>
> [Emphasis added.]

[58]  Arguments against admitting opinions on domestic law are usually advanced
on the basis that the expert will usurp the function of the judge or that the expert's
opinion will go the "ultimate issue". In *Mohan* at p. 24, the Court recognized that
these are legitimate concerns which should be considered in the court's
"gatekeeper" role:

> There is also a concern inherent in the application of this criterion that experts
> not be permitted to usurp the functions of the trier of fact. Too liberal an
> approach could result in a trial's becoming nothing more than a contest of
> experts with the trier of fact acting as referee in deciding which expert to
> accept.
>
> These concerns were the basis of the rule which excluded expert evidence in
> respect of the ultimate issue. Although the rule is no longer of general
> application, the concerns underlying it remain. In light of these concerns, the
> criteria of relevance and necessity are applied strictly, on occasion, to
> exclude expert evidence as to an ultimate issue.

[59]  Both of the above concepts no longer strictly apply, since the exclusion of
such testimony is more accurately reasoned on the basis that the trier of fact would
have no difficulty arriving at a proper conclusion in the absence of such evidence:
*Fisher v. The Queen*, [1960] 130 C.C.C. 1 at 19 (Ont. C.A.), aff'd [1961] S.C.R. 535.
In some cases, it is said that such evidence is superfluous. Within the "cost/benefit"
analysis found in the most recent *Abbey* decision, if a trier of fact is fully equipped to
decide the matter without the opinion, then there is no benefit: para. 94.

[60]  Hall J.A. in *Aitken* also adopted a strict approach to the admission of expert
evidence which would offend the "ultimate issue rule":

> [81]  *Abbey* indicates that the scope of expert evidence must be
> appropriately limited to make sure that the proposed opinion does not go
> directly to the ultimate issue in the case and thus present the jury with a
> ready-made inference of guilt (paras. 65 and 70). Constraining expert opinion
> evidence in this fashion responds to the concern identified in *Mohan* that
> "experts not be permitted to usurp the functions of the trier of fact" (p. 24). As
> stated by Major J. in *R. v. D.D.*, 2000 SCC 43, [2000] 2 S.C.R. 275, "Faced
> with an expert's impressive credentials and mastery of scientific jargon, jurors

2013 BCSC 1463 (CanLII)

are more likely to abdicate their role as fact-finders and simply attorn to the opinion of the expert in their desire to reach a just result" (para. 53).

[61]    The Court in *Mohan* described the concept of necessity as falling somewhere beyond "helpful" but less than absolute "necessity": p. 23. The court in *Abbey* described the range as falling between the "essential and the unhelpful": para. 95.

[62]    Sopinka J. stated in *Mohan* at p. 25 that "[t]he closer the evidence approaches an opinion on the ultimate issue, the stricter the application of this principle". I would acknowledge at this point that there are cases where the court has allowed expert testimony on matters approaching the ultimate issue. Many of these authorities are discussed in *The Law of Evidence in Canada* at pp. 826-834. One type of such expert testimony may arise in relation to the standard and practices of a particular industry, including the practice of law: see *Surrey Credit Union v. Willson* (1990), 45 B.C.L.R. (2d) 310 at 314 (S.C.). Indeed, Mr. Ryer refers to being asked to provide such an opinion as to whether the defendants satisfied their professional obligations to Mr. Walsh in this case.

[63]    What then is the court to make of Mr. Ryer's current opinion in the context of this case? I have already stated that his opinion quite directly includes a summary of the applicable statutory provisions of the *ITA* and the relevant jurisprudence concerning the interpretation of those provisions. Further, it includes his opinion on how that law should be applied to certain assumed facts in coming to a decision on the Crown Arguments advanced by BDO in its defence.

[64]    It is not difficult to conclude, however, that his opinion is directed at core judicial functions of this Court in deciding this matter following the trial and after finding the facts – that is, identifying the applicable law, both statute and jurisprudence, interpreting and understanding that law, and applying it to the facts as found.

[65]    Mr. Walsh argues the very delicate issue of whether this Court "needs" Mr. Ryer's assistance. In substance, the opinion appears to have been prepared on the assumption that the judge assigned to the matter (now me) would have little

knowledge of tax law. Indeed, there are few issues before this Court dealing with the intricacies of tax law, such as are regularly addressed in the specialized Tax Court of Canada. However, there are former and current judges of this Court who do have far greater knowledge of tax law than other judges, and I suspect that this opinion would not have been put forward if those judges were assigned to the matter. As the judge recently assigned to hear the trial, the parties appear to be aware of my background, which was not in tax law. Even so, is the opinion "necessary" for the purpose of coming to a decision?

[66]    BDO submits that Mr. Walsh is implicitly advancing the notion that this Court is not capable of understanding the *ITA* and the eight Supreme Court of Canada cases Mr. Ryer refers to in coming to a proper conclusion of law; rather, the court must be told what the law is, and the appropriate result upon the facts.

[67]    The argument that the opinion is necessary for the proper disposition of this case raises the issue of the very functioning of the court. The British Columbia Supreme Court is a court of general and inherent jurisdiction, in that it hears a variety of matters, including criminal, family, motor vehicle, insolvency, judicial review, and the like. Judges appointed to our Court come from all walks of legal life, and many will have been practicing in specialized fields for many years before their appointment. As far as I am aware, there is no such being as an all-knowing or omniscient judge who is an "expert" in all of the areas of law that might arise in cases that come before this Court.

[68]    If a matter comes before a judge who has little or no experience in the area, the judge is not expected to throw up his or her hands and announce an inability to decide the matter without the benefit of an expert lawyer who does have experience. To do so would be an abdication of the judicial function. The parties and the public must have the confidence that every judge has the capability to decide each and every case fairly and adequately and in accordance with the law. This concern was raised in an article entitled "Expert Legal Testimony" (1984) 97:3 Harv. L. Rev. 797 (the *"Review"*), relied on by Mr. Walsh. At p. 810 of that article, in relation to the

admission of such expert evidence, the author concedes that "[t]he image of the judiciary and public confidence in the legal system are genuine concerns".

[69]    The judge must, if necessary, be educated on the applicable law by counsel, the self-represented parties, or on personal initiative, and must apply that law to the facts. It goes without saying that the judges in our Court of Appeal, and even in the Supreme Court of Canada, similarly come from various legal backgrounds and have different levels of expertise in various areas, yet they preside over a variety of cases without difficulty and without the benefit of expert opinion evidence on the law. It is quite evident even from Mr. Ryer's opinion that many complex tax cases are decided by the judges on the Supreme Court of Canada, who I dare say are all not "experts" in tax law.

[70]    There are also practical difficulties with the court accepting such opinion evidence given the way trials are scheduled in this Court. While a judge may be assigned to a longer trial (such as in this case), it is more often than not that the judge is not assigned until just prior to the trial. This recognizes the reality that many matters settle on the eve of trial, so there is usually some uncertainty which matters will need to be heard the following week. In that event, the parties will hardly be in a position to determine the "expertise" of their judge so as to decide whether such expert advice is "necessary". Even so, any such evidence would be inadmissible at that time, since no reports would have been delivered within the time frames under the *Rules*.

[71]    Even more troublesome is how a party would determine in advance just how much "need" a judge may require. Would the parties, if they could, seek the assignment of a judge well in advance and then seek to "interview" the judge? This would all lead to an awkward and unseemly exercise of determining the knowledge of the judge on the legal issue, which exercise is premised on the assumption that the judge is incapable of understanding the law in question even after able submissions of counsel.

2013 BCSC 1463 (CanLII)

[72]    In support of his argument on necessity, Mr. Walsh relies on further comments found in the *Review*. The authors argue against the apparent U.S. rule that there is a blanket prohibition of expert legal testimony. Apropos in this case, the author states at p. 805:

> Whereas expert testimony on the meaning of a provision of the Internal Revenue Code may not be necessary in a case before the Tax Court, a state or federal district court judge who rarely ventures into the complexities of the Code may well require assistance in finding and construing the applicable provisions.

[73]    Mr. Walsh argues that there are advantages to obtaining Mr. Ryer's opinion. as evidence, as opposed to receiving his views of the law via argument as counsel. He cites the *Review* at pp. 806-808:

> The use of expert testimony has several potential advantages over the conventional adversary presentation of legal argument. One advantage stems from the distinction, which exists at least in theory, between an expert witness and an advocate for a party. As an advocate, an attorney may raise any colorable argument to advance his client's cause. Whether he believes in the validity of his argument is irrelevant. An expert, however, takes an oath of truthfulness and thus may testify only to what he *believes* is true. The primary concern of the expert witness should be to help the judge arrive at the proper interpretation of the law rather than to advance the interpretation that best serves one of the litigants. The judicial system may therefore benefit from allowing experts to educate the judge on the applicable law instead of vesting this responsibility exclusively in counsel.
>
> Ultimately, the helpfulness of expert legal testimony in comparison to an adversary presentation of the same information depends to a large extent on the way expert witnesses actually behave — whether they testify to their own understanding of what the law is or should be, predict what a court would hold the law to be, or, under the guise of impartiality, merely advocate their party's position in the most persuasive way possible. If expert legal witnesses present their best understanding of the current state of the law, the benefits of admitting their testimony will outweigh the potential dangers. If an expert provides a biased interpretation, however, the benefits from a fuller discussion of the law will not outweigh the potential harm of giving partisan testimony the imprimatur of impartiality and truthfulness. Judge Learned Hand observed that "[a]rgument is argument whether in the box or at the bar, and its proper place is the last." How experts in fact behave, of course, is an empirical matter; a study of expert witnesses' actual performance could help courts to make a more informed policy judgment about such testimony.
>
> But even if the content of expert legal testimony differs little from that of argument, the manner of an expert's testimony still offers certain advantages over the manner of advocacy. Expert testimony can be more narrative and less argumentative than an adversarial presentation of the same information;

the expert can focus on telling his story rather than on persuading the judge. Thus, the expert can establish himself as a collaborator with, rather than an advocate before, the judge. In addition, the judge can focus the testimony on the issues about which he is most concerned. Expert legal testimony thus passes the threshold helpfulness hurdle and should be admitted, absent any affirmative reasons for excluding it.

[Citations omitted.]

[74]    With respect, I see little merit in these supposed benefits said to arise by Mr. Ryer presenting his opinion as evidence. Whether he testifies that he *believes* his opinion is correct does little to elevate its fundamental purpose, which is to persuade me of his view of the law – which also happens to be the fundamental purpose of counsel's submissions. In addition, he is hardly a "collaborator" with the court. Rather, he has been retained by Mr. Walsh to prepare his opinion and present it to the court in support of Mr. Walsh's case. He is not the court's own expert, as might be appointed under Rule 11-5.

[75]    As earlier stated, I am aware that Mr. Ryer has certified his obligation to assist the court under Rule 11-2. But there is realistically only one reason why his opinion is being put forward: to persuade me to adopt his interpretation of the law and to decide the *ITA* issues in favour of Mr. Walsh.

[76]    It is further argued that the *ITA* is a complex piece of legislation, which conclusion is uncontroversial. It is said that Mr. Ryer, with his experience, can provide the court with assistance in terms of the subtleties and nuances arising in respect of the statutory provisions. Mr. Walsh argues that the court would benefit from Mr. Ryer advising how he would decide the issue had he still been sitting on the Federal Court of Appeal, such that the court will then be able to decide the issues more "readily" and "efficiently".

[77]    This argument also fails, again because it touches on the core judicial function which will fall to the sitting judge after the trial. It is incorrect to suggest that the judge will, after hearing Mr. Ryer's direct testimony and cross-examination, simply accept or reject his opinion without further consideration of the applicable law.

2013 BCSC 1463 (CanLII)

A competing opinion from the defence addressing the same issues would no doubt follow. The same comment applies to this opinion.

[78]    It is suggested that trial time will be saved by having these legal experts testify. I disagree. In fact, the opposite is the case, as I will discuss below.

[79]    Accordingly, admitting Mr. Ryer's opinion does not mean that the judge will not be required to read the relevant statutory provisions and the jurisprudence and give some thought to how the issues should be decided. There are no "efficiencies" gained by admitting this evidence.

[80]    What then of the "costs" under the *Abbey* cost/benefit analysis?

[81]    The fact that this will be a judge alone trial avoids any obvious issues of prejudice or potential confusion in the minds of the jury resulting from potential discrepancies between the expert testimony on the law and the judge's instructions on the law. No doubt a jury hearing such testimony might wonder why this evidence was necessary if the judge was the only person to instruct them on the applicable law. The clear inference is that the judge is not competent to determine the law on his or her own. A judge hearing the matter without a jury would, of course, be in a better position to disregard any expert testimony that is not of assistance to the court.

[82]    However, other cost considerations arise if this type of evidence is allowed even in a judge alone trial: *The Law of Evidence in Canada* at p. 826. In *Abbey*, the court stated:

> [91]    In addition to the risk that the jury will yield its fact finding function, expert opinion evidence can also compromise the trial process by unduly protracting and complicating proceedings. Unnecessary and excessive resort to expert evidence can also give a distinct advantage to the party with the resources to hire the most and best experts ...

[83]    This concern is a very real one here. As noted above, if Mr. Ryer's opinion is admitted, BDO will no doubt obtain its own expert. As a result, it can be expected that substantial trial time will be spent putting the experts on the stand and having

2013 BCSC 1463 (CanLII)

both cross-examined by opposing counsel for some time on their legal opinions. How this cross-examination on the law would be effective remains to be seen.

[84]    Furthermore, in any event, in substance, these same opinions are going to be repeated in closing submissions. Ground J. made the same observation in *Société Générale*:

> [4]    There is the additional consideration that, if the court should admit an affidavit of an expert on domestic law, the responding party would undoubtedly retain its own expert in domestic law with contrary views as to the law and there would be the unseemly and totally inappropriate process of cross examination of experts on the very questions of domestic law that are to be decided by the court.

[85]    Conducting trials is already an expensive exercise. To expect parties to now engage duelling experts, at great cost, to opine on the law for the "benefit" of the judge adds to this burden.

[86]    Finally, it bears repeating that Mr. Ryer's opinion goes well beyond an elucidation of the relevant statutory provisions and the applicable jurisprudence. He purports to answer the very questions that are in issue in this action. It was not explained to me in any way why, even if Mr. Ryer was able to "educate" the court on what he considers to be complex tax law, the court needed his further input on what is unquestionably described as the "ultimate issue".

[87]    I conclude that Mr. Ryer's opinion is not "necessary" in the circumstances of this case. It does not assist the court in arriving at a decision. I say this both in terms of determining the applicable law and applying that law to the facts which might be found at trial. It is not outside the competence of judges of this Court to determine the applicable domestic law and apply it.

[88]    In my view, the authorities cited above which have rejected this type of evidence, while not necessarily expressing it in this fashion, have all impliedly addressed the matter within the "cost/benefit" analysis that arises from *Mohan* and *Abbey*. In that respect, the evidence has been rejected as unnecessary or

2013 BCSC 1463 (CanLII)

superfluous, since the judges of those courts were well able to determine the law
and decide the issues.

[89]    In my view, there is no blanket exclusionary rule against such evidence. As
Doherty J.A. notes in *Abbey*, each case is unique; different trial judges may exercise
their discretion differently: para. 79. Nevertheless, I consider that the issues that
arise in relation to this type of evidence will inevitably dictate that the circumstances
where such evidence is appropriate will be rare. That conclusion is consistent with
the statement in *Mohan* at p. 25, concerning the strict application of the principles in
relation to evidence such as this.

[90]    Potential and specific examples in the tax field where the court might consider
such evidence are found in *Eco-Zone Engineering* and *Webster*, both of which
addressed a more factual issue involving the complex calculation of tax or, as
Southin J.A. called it, the "incidence of tax". Again, no authority has been cited to me
in which this type of opinion evidence was allowed on the issue of the *interpretation*
of a federal or provincial statute which either did not involve the exercise of
discretion (per the unique facts in *Coggins*) or where the parties did not consent
(such as in *Doncaster*).

[91]    A further issue arises within the legal relevance or "cost/benefit" analysis as to
whether there is any positive "benefit" or "probative value" to admitting Mr. Ryer's
opinion due to his relationship to Mr. Walsh. In *Abbey* at para. 87, Doherty J.A.
stated that reliability concerns may arise in part based on the extent to which the
expert is shown to be impartial and objective.

[92]    BDO says that Mr. Ryer is not a properly qualified expert because he lacks
the independence necessary to provide an opinion before the court here.

[93]    The factual background of this issue is as follows. Throughout his
representation of Mr. Walsh and his companies, from 2002 until sometime after April
2010 when he joined Deloitte Tax Lawyers LLP of Calgary, Curtis Stewart was a
lawyer at Bennett Jones LLP in Calgary. Mr. Stewart, who is still a member of

Deloitte Tax Lawyers LLP, remains counsel for Mr. Walsh and his companies. It is apparent that Mr. Walsh intends to call Mr. Stewart as a witness at the trial. BDO expects that his credibility will likely be in issue.

[94]    Mr. Stewart's evidence is expected to address his retainer with Mr. Walsh, by which he became aware of the Notice of Objection prepared by another tax lawyer. The Notice of Objection included a response to CRA on the s. 114 *ITA* issue and the Departure Date Issue. Mr. Stewart was privy to communications with both CRA and that other lawyer regarding the possible settlement of Mr. Walsh's issues.

[95]    Mr. Stewart was also retained by Mr. Walsh in July 2004 to file the tax appeal, in which he specifically addressed the Departure Date Issue and the application of s. 114 of the *ITA*. He continued as counsel and settled that appeal with the Crown in April 2010.

[96]    Moreover, he acted for Mr. Walsh in respect of a 1999 Notice of Reassessment. It appears that those issues were settled in January 2013.

[97]    Finally, between December 2012 and April 2013, Mr. Stewart made an application for relief to CRA (known as a "Fairness Application") to have the interest component of Mr. Walsh's 1998 Assessment cancelled. I am advised that Mr. Walsh has not yet heard from CRA in relation to the Fairness Application.

[98]    Bennett Jones LLP were also engaged by Mr. Walsh between the summer of 2003 through to at least May 31, 2004 to assist him in determining whether he should make an assignment into bankruptcy in response to the 1998 Notice of Reassessment.

[99]    As indicated above, Mr. Ryer practiced tax law at Bennett Jones LLP from 1977 to 2006. Between 2003 and 2004, he was the "Head of Tax Department of Bennett Jones". Further, since 2010, Mr. Ryer has been counsel to Deloitte Tax Law LLP.

2013 BCSC 1463 (CanLII)

[100]  Accordingly, it is apparent that Mr. Ryer was a partner of Bennett Jones LLP during the same time that Mr. Stewart, also of Bennett Jones LLP, was providing Mr. Walsh with advice on the various tax issues. Other members of the same firm were also providing other advice to Mr. Walsh during this time frame. Moreover, Mr. Stewart, who is a partner in the same firm in which Mr. Ryer is counsel, currently continues to act for Mr. Walsh in respect of various tax matters relevant to the subject issues.

[101]  In *United City Properties Ltd v. Tong,* 2010 BCSC 111 at para. 37, Romilly J. found that potential or actual bias or lack of independence must be considered as part of the admissibility issue, not as a matter of weight, in accordance with the *Mohan* criteria. He adopted the approach to consider bias or potential bias in the context of the legal relevance criteria and specifically, whether any bias outweighs the probative value of the evidence: para. 65. There is no blanket prohibition against such evidence, however, even if bias is shown from the outset. Rather, the judge must weigh the degree of bias in each case. Assuming that the *Mohan* criteria are satisfied, the court may then address the weight to be given to the admitted evidence.

[102]  Following *Tong,* the court in *Abbott and Haliburton Company v. WBLI Chartered Accountants,* 2013 NSCA 66 found that the mere appearance or even existence of a conflict due to personal, professional or institutional relationships does not disqualify an expert under the *Mohan* criteria: paras. 111-125. Put another way, a party is not required, as a pre-condition to admissibility, to prove independence or a lack of bias: para. 161.

[103]  In *Beazley v. Suzuki Motor Corporation,* 2010 BCSC 480, the plaintiff objected to certain expert evidence on the basis that there was a reasonable apprehension of bias due to the defence expert's previous employment with the defendant. Mr. Justice Goepel declined to exclude the report, and concluded that the admissibility of the report would be determined at trial on a *voir dire*:

> [20]    Canadian courts appear to have taken different positions on the issue of whether an expert witness' bias or perceived bias will disqualify him or her

2013 BCSC 1463 (CanLII)

from giving evidence at trial. Some courts have held that for expert evidence to be admissible, the expert must be seen to be absolutely neutral and objective. Other courts have concluded that a lack of objectivity, neutrality and independence are matters that only impact the weight to be afforded that expert. Romilly J. in *United City Properties Ltd. v. Tong*, 2010 BCSC 111 at paras. 35-68, has exhaustively reviewed the jurisprudence.

[21]     The cases are not easily reconciled. Where there is a personal relationship between the proposed expert and the party, where the expert has been personally involved in the subject matter of the litigation or where the expert has a personal interest in the outcome, the expert has not been allowed to testify. Examples of such cases are *Fellowes, McNeil v. Kansa General International Insurance Co.* (1998), 40 O.R. (3d) 456 (Gen. Div.); *Royal Trust Corporation of Canada v. Fisherman* (2000), 49 O.R. (3d) 187 (Sup. Ct. J.); *Bank of Montreal v. Citak*, [2001] O.J. No. 1096 (Sup. Ct. J.); and *Kirby Lowbed Services Ltd. v. Bank of Nova Scotia*, 2003 BCSC 617. In cases where the relationship between the expert and the party is more institutional in nature, the evidence has been admitted subject to weight. Examples of such cases are *R. v. Klassen*, 2003 MBQB 253 and *R. v. Inco Ltd.* (2006), 80 O.R. (3d) 594 (Sup. Ct. J.).

[104]   It is not alleged that Mr. Ryer is, in fact, biased or impartial. Nor is it alleged that he was in any way involved in the giving of tax advice to Mr. Walsh during his tenure at either Bennett Jones LLP or Deloitte Tax Law LLP. While BDO suggests that, as a result of the close proximate relationship between Mr. Ryer and Mr. Walsh, Mr. Ryer may have an interest in the outcome of this litigation, there is no evidence to that effect.

[105]   Nor is the allegation, as in *Tong*, that Mr. Ryer's alleged bias is only "institutional". Rather, BDO submits that Mr. Ryer, as a member of the law firm retained by Mr. Walsh in related proceedings against CRA and the Crown, cannot reconcile his fiduciary duty to Mr. Walsh with his obligation to assist the court, even to the detriment of Mr. Walsh. This is said to give rise to two concerns: firstly, whether on cross-examination Mr. Ryer may be asked to comment on the actions of Mr. Stewart in a critical manner; and secondly, whether Mr. Ryer can be seen not to be partial to his firm's client's case. The submission is that a lawyer's obligations to an existing client of a law firm in which he practices cannot be squared as against his certification under the Rule that he will assist the court and not act as an advocate of Mr. Walsh. Indeed, the recent decision in *Canadian National Railway Co. v. McKercher LLP*, 2013 SCC 39 highlights, as the Supreme Court of Canada

2013 BCSC 1463 (CanLII)

has done in earlier cases, the ongoing duty of loyalty and obligations of members of a law firm to avoid conflicts of interest, albeit with respect to acting for different clients.

[106]  These are, in my view, valid concerns that would have to be properly addressed by the court if Mr. Ryer's opinion was to be considered for admission. It is not, however, necessary for me to decide the bias or independence issue at this point, as it is my conclusion that Mr. Ryer's opinion does not meet the "necessity" requirement, per *Mohan*, in any event. Needless to say, these arguments, if decided in BDO's favour, would only have served to reinforce my conclusion that the opinion is not admissible, as it relates to the interpretation and application of domestic law.

[107]  Nevertheless, even if I had been satisfied that the admission of Mr. Ryer's opinion was "necessary", notwithstanding the allegations of bias, it would have been open to me to admit Mr. Ryer's opinion and allow such issues to be explored on a *voir dire* at the trial (similar to what was done in *Beazley*), or alternatively, consider the matter in terms of weight.

[108]  I have already noted that Mr. Ryer appears to have been asked to provide an opinion on the professional standard of care that was expected of the defendants in relation to Mr. Walsh. If such an opinion arises in this case, then I wish to make clear that any issues arising from the allegation of bias or lack of independence on the part of Mr. Ryer should not be considered as having been decided on this application.

## Conclusion

[109]  The application to admit Mr. Ryer's opinion as expert opinion evidence at the trial is dismissed. Costs of the application are awarded to the defendants in any event of the cause.

"Fitzpatrick J."

2013 BCSC 1463 (CanLII)



ESSENTIALS OF
CANADIAN LAW

# INTELLECTUAL PROPERTY LAW

## COPYRIGHT · PATENTS · TRADE-MARKS

### SECOND EDITION

## DAVID VAVER

Professor of Intellectual Property Law,
Osgoode Hall Law School, York University
Emeritus Professor of Intellectual Property &
Information Technology Law, University of Oxford

*2011*



and to record title in national IP registries, which then operate as a rough public database of who holds some of what in the IP world.[4]

This framework ought to be flexible enough to accommodate changes in practice that respond to new distribution and communication methods. The Internet, for example, provides opportunities for freelance authors to deal directly with users without the intervention of middlemen like publishers, record companies, or art dealers. In this milieu, speedy standard click-on licences are more common than signed transfers of rights.

Other deals may be harder to conclude. A researcher may find that a subject she wants to pursue is strewn with patents and that her project falls outside any relevant user right.[5] Getting every right-holder's consent may be costly or impossible. Pooling and cross-licensing patents may work, but only for those with something attractive to pool and license. So the area may have to be left vacant or be under-explored. The so-called tragedy of the commons, where a resource is depleted by overuse, can dissolve into a tragedy of the anti-commons, where too many blocking rights lead to under-use.[6]

The framework has other snags. Management provisions vary among IP regimes nationally and internationally. In Canada, the IP statutes use different language to deal with transfer, licensing, registration, and cancellation, even where these concepts are and should be identical. Traps await those who deal with multiple IP rights and assume that the same framework provisions regulate them nationally.[7] Problems escalate where deals are international.

# B. ASSIGNMENTS AND LICENCES

## 1) Interpretation

What right is assigned or licensed is a matter of negotiation, and the ordinary principles of contract interpretation apply to the result. Inter-

---

4    The database is far from complete. Few copyrights are registered, the performing rights societies do not put their inventory online (they need respond only to reasonable requests: *Copyright Act*, R.S.C. 1985, c. C-42, s. 67 [*C Act*]), and no registry exists for trade secrets or common law trade-marks. But see S. McJohn, "Patents: Hiding from History" 24 Santa Clara Computer & High Tech. L.J. 961 (2008), on the usefulness of patent records.

5    See section H, "Users' Rights: Free Use," in chapter 3.

6    M. Heller & R. Eisenberg, "Can Patents Deter Innovation? The Anticommons in Biomedical Research" 280:5364 Science 698 (1998); compare R. Epstein & B. Kuhlik, "Is There a Biomedical Anticommons?" 27 Regulation 54 (Summer 2004).

7    But see section B(3)(b), "Buying and Selling Rights," in this chapter.

pretation is not necessarily a neutral exercise, nor do the same principles apply worldwide. In copyright and patents, for example, continental European judges often favour individual authors or inventors over distributors, construing grants of rights strictly against the grantee and leaving new uses under the control of the grantor (often the author or inventor). Some Canadian courts are similarly inclined,[8] but the trend is hardly strong or universal. For example, media distributors with an eye towards electronic delivery and future means of exploitation may ask freelancers to sign contracts that contain a clause transferring "all now or hereafter existing rights of every kind and character whatsoever pertaining to said work, whether or not such rights are now known, recognized or contemplated for all purposes whatsoever" to the distributor. Will Canadian courts "construe" this in a limited way, or will they hold it to mean that the grantor has relinquished all control over the work forever in favour of the distributor?[9]

Freelancers have not fared very well in such disputes in common law jurisdictions.[10] Courts purport to apply "neutral" principles of contract interpretation but often ignore the reality that most distribution contracts are written by and for distributors. Interpreting contracts neutrally works best where both parties have equal knowledge and power; otherwise neutrality, applied to unequals, simply produces more inequality. That lesson is continually relearned by those enmeshed in the boilerplate contracts common to the movie and music industry. Contracts that deal only with existing technologies are often extended to a new technology by treating it as just an extension or development—effectively, the old thing in a new guise. Thus, the grantor of performing rights under a document signed when cinema was unknown found the grantee automatically had the film rights when movies appeared; grantors of motion picture rights acquired during the silent era often found they had also magically transferred the talking picture rights when "talkies" came along; and the sale of motion picture rights in 1939 was

---

8   E.g., *Bishop v. Stevens*, [1990] 2 S.C.R. 467 [*Bishop*]; *Marquis v. DKL Technologies Inc.* (1989), 24 C.I.P.R. 289 at 295–96 (Que. S.C.); *Comstock Canada v. Electec Ltd.* (1991), 38 C.P.R. (3d) 29 at 51*ff.* (Fed. T.D.) [*Comstock*] (patents and designs).

9   For example, *Muller v. Walt Disney Productions Inc.*, 871 F. Supp. 678 (S.D.N.Y. 1994).

10  E.g., *Campbell Connelly & Co. v. Noble*, [1963] 1 W.L.R. 252 (Ch.) (English contract assigning full copyright in all countries of musical work together with "all rights he now has or may hereafter become entitled to" includes U.S. reversion rights and (*obiter*) any new rights later enacted anywhere in the world); G. D'Agostino, "Copyright Treatment of Freelance Work in the Digital Era" 19 Santa Clara Computers & High Tech. L.J. 37 (2002).



*Indexed as:*

## Gorgichuk Estate v. American Home Assurance Co.

Between
Helen Gorgichuk, Executrix of the Estate of Peter Gorgichuk,
late of the City of Sudbury, in the Regional Municipality of
Sudbury, plaintiffs, and
American Home Assurance Company, defendant

[1985] O.J. No. 1134

14 C.C.L.I. 32

5 C.P.C. (2d) 166

[1985] I.L.R. 7618

[1985] I.L.R. para. 1-1984 at 7618

No. 2589/82

Ontario Supreme Court - High Court of Justice
Non-Jury Sittings - Sudbury, Ontario

**Sutherland J.**

Heard: April 18 and 19, 1985.
Judgment: April 19, 1985.

(29 pp.)

**Counsel:**

B. Holub, for the plaintiffs.
P. Samworth, for the defendant.

**1    SUTHERLAND J.:--** This action arises out of the unfortunate death of Peter Gorgichuk, late of Sudbury who died in Barbados from injuries sustained in a collision on February 12th, 1982 between the bus in which he and the plaintiff his wife were passengers and another motor vehicle.

**2**    The plaintiff aged 52 is the sole executrix and beneficiary of Peter Gorgichuk's estate. She has two children aged 32 and 33 respectively.

**3**    The defendant is the issuer of a contract of insurance, specifically Master Group Insurance Policy GTP 900 90 60 which I shall hereafter refer to as "the policy". The policy was issued by the defendant to the named insured Sun Tours Limited, a wholesaler of packaged vacation tours. The policy provides coverage for those customers of Sun Tours Limited who qualify and who opted to purchase the insurance coverage as an extra when they purchased a packaged tour.

**4**    At the beginning of the trial and with the consent of the defendant, the Statement of Claim was amended to increase from $40,000.00 to $45,000.00 the basic amount claimed by the defendant.

**5**    The defendant had served a jury notice and a jury was duly selected. After closer perusal and consideration of the record and a number of authorities and documents submitted in advance by counsel for the defendant, I became concerned that the issues between the parties had narrowed markedly, and that there was at most a very small element of act in the mixed question of fact and law remaining to be decided. After preliminary discussions with counsel before trial and after submissions in court in the absence of the jury, I decided, with the acquiescence of counsel for the defendant who had filed the jury notice and without strenuous objection from counsel on behalf of the plaintiff, to strike the jury notice. In fairness to the position of counsel for the plaintiff, it should be stated that he conceded that there was not going to be more evidence than I had already contemplated in our preliminary discussions. So he stated that if it was highly probable that I would strike the jury notice he would prefer that it be done early instead of late in the proceedings. That is what I meant by the "absence of strenuous objection".

**6**    Before turning to the agreed facts on the evidence, I wish to record a ruling as to the admissibility of opinion evidence from a proposed expert witness, namely the Chairman of the English Department of Laurentian University who was proposed to have been called on behalf of the plaintiff to provide an opinion as to various matters of English grammar and syntax and specifically as to the applicability of modifiers and various nouns in one of the coverage provisions of the policy. I do not wish to suggest that such witness would not also have provided opinion as to less central matters, but it was my understanding, given the crucial significance of Clause 2 in the description of Coverage 1A in the policy, that the proposed expert's evidence would have related principally to that Clause 2.

**7**    Counsel for the defendant objected to the admission of testimony from such proposed expert on two main grounds, the first of which was that the notice required under Rule 53.03 of the Rules of Civil Procedure had not been given on time or in a form fully complying with such rule. It was submitted on this ground that the defendant would be taken by surprise.

**8**    The second ground of objection is more radical or fundamental, namely that it has long been a core part of the judicial function in relation to the interpretation of contracts and other documents, to consider as part of established rules and canons of construction rules of grammar and syntax in all their aspects.

**9**    With respect to the first ground of objection, it should be noted that until shortly before April 15, 1985, the day upon which the jury for this action was selected, the day upon which these assizes commenced, the plaintiff and all other interested parties believed, and had reason to believe, that this action would follow a criminal trial expected to begin on April 15 and to last for two weeks. It was also a fact that this action stood fairly Ear down the list of non-jury actions purportedly ready for trial in Sudbury.

**10**    On April 11, counsel for the plaintiff mailed to counsel for the defendant a notice of intention to call the expert in question. A copy of the notice was delivered in Sudbury to counsel for the defendant on April 15 as counsel for the plaintiff did not believe the mails would have delivered the other one to her by that time.

**11**    Rule 53.03 states as follows:

> "53.03(1) A party who intends to call an expert witness at trial shall, not less than 10 days before the commencement of the trial, serve on every other party to the action a report, signed by the expert, setting out his or her name, address and qualifications and the substance of his or her proposed testimony.

> (2) No expert witness may testify, except with leave of the trial judge, unless sub-rule (1) has been complied with."

**12**    Counsel for the defendant also objected to the content of the report stating that it was insufficient in that it did not adequately specify in accordance with sub-rule 53.03(1) the relevant qualifications of the proposed expert, nor set forth an adequate summary of the evidence to be given by him. I note that under sub-rule 53.03, the document which can be served is not called a notice, it is called a report. It is obviously another example of the general thrust of the new rules to provide full disclosure before trial.

**13**    But for the second objection, I would have been inclined to exercise my discretion under sub-rule (2) to admit the opinion evidence because the plaintiff had, along with all other parties, been caught by the sudden collapse of the criminal and civil lists and had responded promptly to the changed circumstances by giving the notice as aforesaid.

**14**    As to the objection with regard to the qualifications of the proposed expert: for all the breadth of English studies, his status as chairman of a university English Department and the language of the plaintiff's letter combined provide the defendant with disclosure which although not ideal, did

provide counsel with a good general idea of the nature of the evidence and opinions proposed to be tendered by the expert.

15    However, it must be said that there was not full technical compliance with the requirements of Rule 53.03, and I do not wish my gentle words above to suggest that that rule should not in general be complied with and complied with rigour.

16    The second objection raised is an issue of more fundamental importance. The case was perceived to be one principally of the interpretation of the insurance document. Certainly many of the non-interpretative elements could very well have been the subject of agreed facts. It was not expected, and indeed the case proved to be, that there would be significant or extensive evidence of background or surrounding circumstances adduced through parties to the agreement as aids to the interpretation of the written material. The interpretation of documents is a core judicial function, although authorities were cited on behalf of the plaintiff to show that extrinsic evidence is admissible to aid in the interpretation of documents prima facie ambiguous and to provide background even in the absence of any manifest ambiguity. None of such authorities related to proposed testimony that dealt not with the background or source of a particular document but with general rules of English grammar and syntax.

17    The proposed evidence being of quite a general nature and, therefore, there being an element of prejudice to the defendant and some risk to the future process of the courts, if matters such as English grammar and syntax were to become expertised and diligent counsel were to form the impression that it was necessary when contract documents were to be interpreted to match the experts in the English language that may have been put forth by another party, I held that in the circumstances the proposed expert evidence was not admissible.

18    The bus in which Peter Gorgichuk sustained fatal injuries was transporting him, the plaintiff and others to the Grantley Adams International Airport, Barbados from their hotel in Barbados at the end of their 14 day vacation.

19    The Gorgichuks' vacation had been purchased from Sun Tours Limited and arranged through the Eaton's Travel in Sudbury. The vacation package included a two week stay at a facility known as Golden Anchorage which is part of a vacation resort village on the west coast of Barbados, air transport to and from Barbados by way of Air Canada and at least all ground transportation and package handling to and from the airport in Barbados.

20    The Gorgichuks purchased as an option available to them when they purchased their package tour travel, insurance under a group policy. Before the Gorgichuks left on their vacation they received a travel insurance certificate, a copy of which was admitted as Exhibit 2, which had been issued under the group policy by Tourist Insurance Agency Ltd. of Toronto, who were acting as agents for the defendant. Neither the plaintiff nor her deceased husband saw the original or had a copy of the group insurance policy prior to the death of Peter Gorgichuk.

21    The insurance certificate, however, incorporates the policy by reference. The said travel insurance certificate included under the heading "Accidental Death & Dismemberment" various related definitions and the following statements:

> "Pays (for loss occurring within 200 days from date of accident) the principal sum (up to $45,000.00) for loss of life, loss of both hands, both feet; entire sight of both eyes, one hand and one foot; one hand or one foot and entire sight of one eye; pays one-half the principal sum for loss of one hand, one foot; or entire sight of one eye."

22    Then under the heading "TYPE OF COVERAGE" is set out the following:

| "TYPE OF COVERAGE | PRINCIPAL SUM |
|---|---|
| Common Carrier Flights | $45,000 |
| -or- Other Public Conveyances | $15,000 |
| -or- Comprehensive Coverage | $ 5,000 |

> These three types of coverage are mutually exclusive, i.e. no more than one type of coverage is payable in event of a covered accident."

23    At the opening of trial, counsel for the plaintiff advised that the following additional admissions of fact had been made on behalf of the defendant and were agreed to by the plaintiff, namely:

> "(1) The death of Peter Gorgichuk had resulted from injuries suffered by him in the said accident in Barbados on February 12, 1982;
>
> (2)    The said Master Policy issued by the defendant was in effect at the time of the accident;
>
> (3)    Peter Gorgichuk deceased was at the material time an 'insured person' within the meaning of the policy; and

(4)    The defendant admitted close to the beginning of trial that the plaintiff is entitled under the policy to the coverage described in paragraph 1b on page 4 of the policy, namely to a payment in the basic amount of $15,000.00."

24    It is not challenged that the plaintiff gave timely notice of a claim under the insurance policy. After the filing of proofs of claim and other required information, copies of which were admitted as Exhibit 5, Tourist Insurance Agency Ltd. as an agent for the defendant sent a form letter to the plaintiff with which was enclosed a cheque payable to the Estate of Mr. Peter Gorgichuk in the amount of $5,549.31 being a death benefit under Coverage 1c of the coverages of the policy, plus the sum of $549.31 for repatriation of the deceased. The cheque in question was stated on its face to represent payment in full and so was not cashed and, in fact, was returned to the said agents by or on behalf of the plaintiff.

25    The admission at or shortly before trial that a payment of $15,000.00 is payable under the policy vindicates the action of the plaintiff in refusing to accept the lesser payment.

26    There has been admitted as Exhibit 3 a notarial copy of Letters Probate of the Last Will and Testament of the late Peter Gorgichuk which Will appointed the plaintiff sole executrix and made her sole beneficiary of the Estate.

27    It is provided in the policy that in the event of loss of life of the insured person, benefits payable under the insurance policy shall be payable to the Estate of the insured person.

28    The Master Group Policy provides, as was indicated briefly in the travel insurance certificate admitted as Exhibit 2, three mutually exclusive types of accident insurance coverage under paragraphs 1a, 1b and 1c respectively. Those paragraphs state as follows:

"COVERAGE 1a COMMON CARRIER FLIGHT INSURANCE INDEMNITY

When injury sustained by the Insured Person while and in consequence of riding as a passenger (and not as a pilot, operator or crew member) in, including boarding or alighting from:

1)    Any aircraft operated by a concern organized and licensed to operate such aircraft for the carriage of passengers for hire; or

2)    Any airport limousine or bus or surface vehicle substituted by the airline, results in any of the losses stated in the 'Schedule of Losses' within 100 days from the date of the accident, the Company will pay the portion, as stated in the 'Schedule of Losses', of the Sum Insured stated in the 'Schedule of Benefits' applicable to this Coverage.

## COVERAGE 1b PUBLIC CONVEYANCE INSURANCE INDEMNITY

When injury sustained by the Insured Person while and in consequence of riding as a passenger (and not as a pilot, operator or crew member) in, including boarding or alighting from any air, excluding charter aircraft), land or water conveyance of a concern organized and licensed to operate such conveyance for the carriage of passengers for hire, results in any of the losses stated in the 'Schedule of Loss' within 100 days from the date of the accident; the Company will pay that portion, as stated in the 'Schedule of Losses', of the Sum Insured stated in the 'Schedule of Benefits' applicable to this Coverage.

Benefits under this Coverage 1b shall not be payable if loss occurs as provided for under Coverage 1a.

## COVERAGE 1c 24-HOUR ACCIDENT INSURANCE INDEMNITY

When injury sustained by the Insured Person anywhere in the world, results in any of the losses stated in the 'Schedule of Losses' within 100 days from the date of the accident, the Company will pay that portion, as stated in the 'Schedule of Loss', of the Sum Insured stated in the 'Schedule of Benefits' applicable to this Coverage.

Benefits under this Coverage Ic shall not be payable if loss occurs as provided for under Coverage 1a or 1b."

**29**     The above mentioned cheque was forwarded on the assumption that the applicable coverage was that referred to as Coverage 1c above. The admission made by the defendant shortly before the commencement of the trial was that Coverage 1b above was applicable to the exclusion of 1c Coverage, and accordingly that the basic sum of $15,000.00 was payable with respect to the death of the late Mr. Gorgichuk. The plaintiff asserts that Coverage 1a described above is the applicable coverage and accordingly that the sum of $45,000.00 became payable on the death of the late Mr. Gorgichuk.

**30**     The whole issue between the parties was the proper interpretation of Clause No. 2 in the above quoted Coverage 1a in the policy. As quoted above Coverage 1a indemnifies against injury sustained by an injured person while or in consequence of riding as a passenger including boarding or alighting from:

"1)    Any aircraft operated by a concern organized and licensed to operate such
aircraft for the carriage of passengers for hire; or

2)    Any airport limousine or bus or surface vehicle substituted by the airline."

**31**    The essence of the plaintiff's contention is that the Coverage 1a extends to any airport
limousine or to any bus (or alternatively any airport bus) whether or not such airport limousine, bus
or airport bus was substituted by the airline, and that the coverage extends to any surface vehicle
substituted by the airline.

**32**    Based upon the evidence of Mr. Daniel, the Secretary of the Barbados Transport Co-op
Society Ltd., the owner of the vehicle in which the late Mr. Gorgichuk was a passenger when he
sustained the injuries leading to his death, and based upon many dictionary descriptions of the word
"limousine" and "bus" as provided by counsel for the plaintiff and some others duly provided by
counsel for the defendant, and based upon a photograph of the vehicle, which photograph was
admitted as Exhibit 10, I find that the 25 passenger vehicle which Mr. Gorgichuk was riding when
he was injured was an "airport limousine" and also an "airport bus" and also a "bus" within the
meaning of the physical descriptions intended by those terms as used in Clause 2 of the above
quoted Coverage 1a of the policy.

**33**    The essence of the plaintiff's position is thus that the $45,000.00 indemnity is payable because
the deceased met his death while riding as a passenger in such a type of vehicle. The plaintiff argues
that the words "substituted by the airline" apply to modify the words "surface vehicle," only. The
plaintiff concedes that surface vehicles that are not airport limousines or airport buses or buses and
that are substituted by the airline would typically be substituted not for other ground transportation
but for air transportation. The plaintiff's second line of argument is that the language in Coverage 1a
is ambiguous and, therefore, should be construed contra proferentem.

**34**    The essence of the defendant's argument with respect to Coverage 1a is that the words
"substituted by the airline" modify all types of vehicles referred to in Clause 2 of Coverage 1a and
that since the vehicle in which the late Mr. Gorgichuk sustained injuries leading to his death, is not
substituted by the airline, the accident is not within the indemnity provided for by Coverage 1a but
is within the lesser, $15,000.00, indemnity provided for by Coverage 1b.

**35**    I find as a fact that the vehicle was owned and operated by Barbados Transport Co-op Society
Ltd. under a contract, a copy of which is admitted as Exhibit 9, with Sun Tours Limited. The
vehicle was not "substituted by the airline" or in any other way provided by any airline.

**36**    It is the contention of the defendant that in the ordinary course ground transportation is not
provided by air carriers and that this fact coupled with the title of Coverage 1a that is "Common
Carrier Flight Insurance" and coupled with the plain meaning of Clause Number 2, results in a
situation where Coverage 1a should be found to refer clearly to situations at which the ground
transportation is substituted by the airline, not for other ground transportation but for air
transportation, as for example where an airport is fogged in and passengers are bused to another

airport from which they commence their flight.

**37** It was acknowledged that in cases of flights to island destinations, surface transportation substituted by an airline could consist of transportation by ship or boat.

**38** I find that the air carrier, Air Canada, had, in fact, nothing to do with the ground transportation arrangements with respect to the bus in question. But that such arrangements were contracted for by Sun Tours Limited. With reference to the question of reliance by the Gorgichuks, I note that the Travel Insurance Certificate does not repeat the alleged ambiguities of Clause 2 under Coverage 1a. The Certificate states as I had indicated before the coverages in summary form, as stated above, with the $45,000.00 principal sum being clearly identified for coverage relating to the Common Carrier Flights. The $15,000.00 coverage was identified with "Other Public Conveyances".

**39** Neither the late Mr. Gorgichuk nor the plaintiff examined the policy. As a matter of fact none of the alleged ambiguities of Clause 2 of the Coverage 1a could be said to have come to the minds of the Gorgichuks. I mention this with reference to the possibility of a reliance argument. It is not central to the interpretation point with which we are primarily concerned.

**40** I have had the benefit of extensive and helpful submissions upon the law and upon documentation related to the vacation package but largely peripheral to the issue. The airline ticket provides that Air Canada can substitute other air carriers or other common carriers or other equipment where necessary. The exclusions and limitations of liability provided for in the tickets in their terms and conditions and in the Warsaw Convention are not otherwise relevant.

**41** The law cited to me, including excerpts from MacGillivray and Parkington on Insurance Law, (6 ed.) (1975) as to the nature of insurance contracts and as to the rules for the interpretation of such contracts, to the effect that, except where statutes or special provisions require otherwise, insurance contracts are to be read as other contracts and given their plain meaning, proved helpful but quite unexceptional and noncontroversial.

**42** I have accepted the submissions of counsel for the plaintiff based upon Industrial and Technical Press v. Jack Canuck Publishing Co. Limited (1920) 17 O.W.N. 409 and Mills v. Continental Bag and Paper Co. (1918) 44 O.L.R. 71, the latter being a decision of our Court of Appeal, to the effect that words in an insurance policy that are not specifically defined are to be given their ordinary meanings. In that regard, the many dictionary definitions of "limousine" and "bus" provided by the plaintiff's counsel were provided to support the proposition that the vehicle in question was of the physical kind described in Clause 2 of Coverage 1a.

**43** There were submissions by both counsel as to the doctrine and rule and instruction known as contra proferentem. The defendant's counsel presented the majority judgment of the Honourable Mr. Justice Estey in the Supreme Court of Canada in the decision Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Company (1979) 112 D.L.R. (3d) 49. The defendant also referred to the last mentioned case as authority for the proposition that an insurance contract,

like all other insurance contracts, should be viewed and construed as a whole.

**44** I turn to the core issue which is the interpretation of Clause 2 under Coverage 1a appearing at page 4 of the policy. It is my opinion and interpretation that the words "substituted by the airline" apply to all of the types of transportation referred to in Clause 2. In my view, that is the construction that accords best with the policy as a whole. It is not one that has to be strained for on the plain meaning of the language. It accords best with the scheme of coverages reflected in the Travel Certificate. It accords best with the heading on Coverage 1a as "Common Carrier Flight Insurance", and in my view, it makes the best business sense in that it preserves the same amount of indemnity in respect of accidents incurred upon the flight or upon transportation provided as substitution for the flight. The construction that seems to me most reasonable also avoids anomaly when considered with reference to the lesser coverage provided under the paragraph headed "Coverage 1b Public Conveyance Insurance". As admitted, the injuries fall clearly within the last mentioned coverage unless they were taken out by being in the Coverage 1a.

**45** Clause 2 in the Coverage 1a is not in my opinion ambiguous and so the narrow circumstances in which the contra proferentem doctrine might apply, do not arise.

**46** Accordingly there will be judgment for the plaintiff on the basis that the coverage provided for in paragraph 1b of page 4 in the policy, namely a basic amount of $15,000.00 is payable. There will be interest thereon at the Judicature Act rate as to which may be able to be of assistance.

**47** MISS SAMWORTH: My lord, I have some submissions to make as to the rate that should be.

**48** HIS LORDSHIP: Very well. I will just leave it for the moment. I am prepared to accept submissions as to interest and I note that the judgment should also give you judgment for certain non-contested incidental payments under the policy. I should be spoken to about interest. I may be spoken to about such other payments, if counsel cannot agree with respect to them. I invite submissions of counsel as to costs and I can do that now or in a moment or two if you like?

---

REPORTER'S NOTE: There were submissions by both counsel as to interest and costs.

**49** HIS LORDSHIP: I have now had the benefit of submissions with respect to costs. It was pointed out by counsel for the plaintiff that under the provisions of subsection 138(4) of the Courts of Justice Act, the provisions of the former Judicature Act R.S.O. 1980 c. 223 are applicable with respect to pre-judgment interest. Counsel for the defendant did not disagree with that submission. Under the provisions of the Judicature Act pre-judgment interest is payable at a rate representing the primary rate existing for the month preceding the month from which interest is found to commence to be payable. The plaintiff is suggesting a compromise rate of 15% per annum and asserts that the period for which the interest should run under the policy the period after notice was given, should be March 1982. As to the timing, the plaintiff demonstrates from documents that proof of loss

elements were forwarded to the insurer or its agents under date March 15, 1982 and asks me to find that in fact it would have arrived by March 19th, 1982, which in this case is not an unreasonable proposition.

**50**    Counsel for the defendant is concerned not only with the date from which interest should commence to run, but also with its rate. Dealing firstly with the date of commencement of interest, counsel for the defendant points out that in certain of the elements of the Proof of Loss there was a reference to a vehicle that could have been interpreted as being vehicle owned by Sun Tours Limited itself and not a public conveyance. Had that been the case, it would have thrown the claim out of the 1b Coverage and into the 1c Coverage. It would have meant that the payment of $5,000.00 plus peripheral other small claims was not relevant to the policy. Counsel for the plaintiff drew to my attention a Proof of Claim document under date March 15, 1982 which included the word "bus" in describing the accident in which the deceased, Mr. Gorgichuk, sustained the injuries that led to his death.

**51**    In my view, there was sufficient notice to the insurer to justify commencement of the interest on March 19, 1982. I would be most uncomfortable with a situation if a mass marketed insurance scheme covering the possibility of injuries in distant countries imposed a high burden of accuracy upon the Proof of Claim obligations of a person insured under a group policy. On the facts in this case, I find that there was a sufficient Proof of Claim to have at the very least put the insurer or its agents on notice and that it is accordingly right and just that the interest should commence on March 19, 1982.

**52**    With regard to the matter of rate, counsel for the defendant points out that for none of the time since the date has the rate been higher than the 15% claimed, and that an average of interest rates prevailing in the interval would have been 11.38%. Such counsel suggests that an appropriate rate that I might adopt at my discretion under the provisions of subsection 36(6) of the Adjudicator Act would be 11.5% per annum.

**53**    By way of reply, counsel for the plaintiff argued from a document in the possession of the plaintiff, who was in court, which appeared to show that she had been making investments at that time on which she earned 17%. Although that is not evidence, it, along with the assertion that the actual rates at, March 19, 1982 were higher, to wit 16.5% to 17%, and that the 15% already represented an element of compromise, caused him to assert strongly that the interest rate should not be less than 15% per annum.

**54**    Counsel for the defendant drew my attention to the position taken by the Honourable Mr. Justice Craig in McCann v. B & M Renovating et al. (1983) 34 C.P.C. 188 wherein a tort case involving a jury verdict, Craig, J. having regard to the fact that in the interval since the Notice of Claim had been given, there had been wide fluctuations in interest rates, struck a lower rate than that which would have been called for under the formula provided for in subsection 36(3) of the former Judicature Act.

**55**    I have absolutely no quarrel with that decision, as a decision on the facts of that case. In the circumstances where there has been the Proof of Loss that referred to the word "bus" in the circumstances making the 1b category appear to be applicable and where, after considerable travail, that much of the position has been vindicated, I think we are dealing with a situation, particularly as between a group insured person and an insurer, that is quite different from the situation of an unliquidated claim arising as a result of a tort action.

**56**    Accordingly, I am unwilling to reduce the formula interest, rate by more than the amount already conceded by the plaintiff. In exercising my discretion, I order that the judgment herein shall bear interest from March 19, 1982 at the rate of 15% per annum.

**57**    I think we are now in a position, if you are willing, to discuss costs.

---

REPORTER'S NOTE: Further submissions by both counsel as to interest rate.

**58**    HIS LORDSHIP: I have had further submissions from counsel for the plaintiff to the effect that the 15% interest rate should follow through as post-judgment interest until the time of payment. Notwithstanding that the claim is a liquidated claim, I decline to exercise my discretion under the Courts of Justice Act to, depart from the usual rule with regard to post-judgment interest, which rule the parties can discuss and settle with the Registrar.

--- Court recessed 12:00 p.m.

------

--- Court resumed 12:15 p.m.

---

REPORTER'S NOTE: There were submissions by both counsel as to costs.

**59**    HIS LORDSHIP: On the issue of costs, I am informed that there was payment in and an offer of settlement which offer was in an amount radically less than the amount of the judgment I have just pronounced. Apart from the exercising of discretion, the ordinary rule would be that the plaintiff would have her costs. It is urged upon me in a strong and effective presentation by counsel for the defendant that although there was a radical shortfall with respect to the offer of settlement, such shortfall was very small compared to the difference in the real issue at the trial which was the difference as to which category of coverage was applicable under the policy.

**60**    Counsel for the plaintiff in an articulate and feeling presentation outlined various matters to do with the history of this action and fact the plaintiff had been required to obtain, at considerable expense through counsel in Barbados, affidavit evidence as to matters which he asserted could fairly

have been admitted on behalf of the defendants, or if more had been required, still dealt with on the basis of original or supplemental affidavit material. Counsel for the plaintiff also asserted that not only was a jury notice served, but also an affidavit suggesting the need to cross-examine representatives of the transportation company in Barbados in order to determine not only the relationship of that company to the vehicle involved in the accident, but also the relationship between that company and Sun Tours Limited. It was submitted to me on behalf of the defendant that a great difficulty was experienced in getting any information out of Sun Tours Limited. I note that Sun Tours Limited while nominal and the face insured under the group policy in question, was operating functionally as a vendor or agent or contractor of insurance business for the defendant. I find it very difficult to accept that some informal information channel could not very well have been opened to obtain sufficient, if not all, of the details of a neon-party's business. Sufficient information by way of affidavit or letter or otherwise could have moved the defendant a long, way along the path, and would not have required the expenditure of the money and of counsel's time in relation to getting what would normally be thought of as routine proof of loss matters established in or by witnesses from Barbados. Counsel for the defendant has helpfully agreed that funds that were advanced by the defendant to finance the attendance in Canada of the witness Daniels called by the plaintiff, he being the Secretary of the transportation company, would not be sought to be recovered by the defendant if the order for costs were to go in the defendant's favour.

**61**    It was also pointed out by counsel for the defendant that with respect to the jury notice there were conversations in November of 1984 in which counsel for the plaintiff was far from displeased that there would be a jury, and in fact had seemed to have worked himself around to a position that he was positively happy that there would be a jury. I am satisfied that the plaintiff made serious efforts to try to have factual matters established on the basis of affidavits and keep costs down.

**62**    I am aware, and should note, that on the main issue of this litigation, the plaintiff was not successful although she ends up with a judgment for more than the amount paid in or offered. For costs not to follow the event requires the exercise of a discretion. The plaintiff is a widow who has been put to considerable difficulty in relation to this claim. I am not satisfied that the intermediate positions adopted by the defendant are such that their whole effect is removed by the acknowledgedly more constructive and helpful attitude of Miss Samworth in the latter stages of the preparation for and the brief conduct of this trial.

**63**    Accordingly, in all the circumstances I decline to exercise jurisdiction and make an order of costs departing from the usual rules. There will be an order for costs on a party and party basis in favour of the plaintiff for the trial and all preliminary matters that were reserved to be determined by the trial judge.

**64**    I wish to put on the record a summary or at least a repeat of the general tenor of some remarks I made at the end of the submissions of counsel in this case. I then stated and I very much believe that I have been greatly aided by the quality and calibre of the presentations made in this matter by both counsel. It would have been remiss for me not to have included on the record some indication

Page 14

of the gratitude and admiration that I expressed earlier.

qp/s/mes

*Indexed as:*

# Gorgichuk Estate v. American Home Assurance Co.

**Between**
**Helen Gorgichuk, Executrix of the Estate of Peter Gorgichuk,**
**late of the City of Sudbury, in the Regional Municipality of**
**Sudbury, Plaintiff (Appellant), and**
**American Home Assurance Company, Defendant (Respondent)**

[1988] O.J. No. 159

27 O.A.C. 157

30 C.C.L.I. 51

[1988] I.L.R. 8836

[1988] I.L.R. para. 1-2283 at 8836

8 A.C.W.S. (3d) 335

C.A. No. 318/85

Supreme Court of Ontario - Court of Appeal
Toronto, Ontario

**Zuber, Grange and Finlayson JJ.A.**

Heard: February 16, 1988
Judgment: February 19, 1988

*Insurance (Accident and sickness) Interpretation -- Modifying words at end of list of nouns*
*referring to last noun -- Appeal allowed.*

This was an appeal by the plaintiff from a decision reported at 1982] I.L.R. 1-1984 in which she
was awarded $15,000 under a group policy of accident insurance. She claimed that she was entitled
to $45,000 under another section of the policy. The plaintiff and her husband purchased a vacation
package which contained group insurance. On their return home they were picked up by a bus

chartered by the tour operator to take them to the airport in Barbados for the return flight. On this trip the bus was involved in an accident in which the plaintiff's husband sustained fatal injuries. Under "Common Carrier Flight Insurance" coverage there was $45,000 coverage for injury resulting from the insured being a passenger in any aircraft or in "any airport limousine or bus or surface vehicle substituted by the airline". Otherwise, the indemnity was $15,000 under the "Public Conveyance Insurance". The trial judge found that the words "substituted by the airline" applied to limousine and bus and that since the bus was not substituted by the airline, the Common Carrier Flight Insurance did not apply.

HELD: The appeal was allowed. The majority found that the words "substituted by the airline" applied only to the preceding noun "surface vehicle". If the coverage were restricted to the flight or to surface transportation substituted for the flight there would be little point in mentioning airport bus or limousine at all.

John I. Laskin, for the Appellant.
Philippa G. Samworth, for the Respondent.

---

Reasons for judgment delivered by Zuber J.A., allowing the appeal; concurred in by Finlayson J.A. Dissenting reasons for judgment delivered by Grange J.A.

**ZUBER J.A.** (orally):-- This is an appeal by the plaintiff from a judgment of Mr. Justice Sutherland awarding the plaintiff the sum of $15,000. The plaintiff is the sole executrix and beneficiary under the will of her late husband Peter Gorgichuk. In 1982 the plaintiff and her late husband purchased from Eaton's Travel in Sudbury a Suntours packaged vacation tour which included air fare, accommodation, ground transportation, baggage handling, and insurance. The plaintiff and her husband left Toronto on January 29, 1982 for Barbados and were scheduled to return to Toronto on February 12, 1982.

On Feburary 12, the plaintiff and her husband were picked up by a bus chartered by Suntours to take them to the airport in Barbados for the return flight. On this trip to the airport the bus was involved in a collision and tragically Peter Gorgichuk was seriously injured and later died.

The defendant is the issuer of a contract of insurance No. GTP900-90-60. The policy was issued to Suntours Limited, a wholesaler of packaged vacation tours, and provided coverage for those customers who elected to buy the coverage when paying for the packaged tour. It is agreed that Peter Gorgichuk was an insured under this policy and that it was in effect on February 12, 1982. This policy in addition to other things provides the following:

COVERAGE 1a COMMON CARRIER FLIGHT INSURANCE

INDEMNITY

When injury sustained by the Insured Person while and in consequence of riding as a passenger (and not as a pilot, operator or crew member) in, including boarding or alighting from:

1) any aircraft operated by a concern organized and licensed to operate such aircraft for the carriage of passengers for hire; or

2) any airport limousine or bus or surface vehicle substituted by the airline,

results in any of the losses stated in the 'Schedule of Losses' within 100 days from the date of the accident, the Company will pay the portion, as stated in the 'Schedule of Losses', of the Sum Insured stated in the 'Schedule of Benefits' applicable to this Coverage.

COVERAGE 1b PUBLIC CONVEYANCE INSURANCE

INDEMNITY

When injury sustained by the Insured Person while and in consequence of riding as a passenger (and not as a pilot, operator or crew member) in, including boarding or alighting from any air (excluding charter aircraft), land or water conveyance of a concern organized and licensed to operate such conveyance for the carriage of passengers for hire, results in any of the losses stated in the 'Schedule of Losses' within 100 days from the date of the accident, the Company will pay that portion, as stated in the 'Schedule of Losses', of the Sum Insured stated in the 'Schedule of Benefits' applicable to this Coverage. Benefits under this Coverage 1b shall not be payable if loss occurs as provided for under Coverage 1a.

Without repeating more of the contents of this policy it is sufficient to say that coverage under "1a Common Carrier Flight Insurance" leads to an indemnity of $45,000; whereas, coverage under "1b Public Conveyance Insurance Indemnity" leads to an indemnity of only $15,000. The plaintiff claims to be indemnified under coverage 1a in the sum of $45,000 and the defendant resists this contention. The defendant, however, concedes that there is coverage under section 1b which would lead to an indemnity of $15,000.

The learned trial judge found that the vehicle in which Peter Gorgichuk was riding when the accident occurred qualified as either an airport limousine, an airport bus or as simply a bus within the meaning of clause 2 of 1a under "Common Carrier Flight Insurance." It is the plaintiff's position that once it is established that her husband was injured while a passenger in an airline limousine or a bus pursuant to para. 2 of the "Common Carrier Flight Insurance" she is then entitled to succeed.

The learned trial judge, however, denied her recovery on the basis of the "Common Carrier Flight Insurance" scale. He found that the limousine or bus was operated regularly under - contract to Suntours and was not a bus or a limousine that was "substituted by the airline" and then concluded as follows:

> I turn to the core issue which is the interpretation of Clause 2 under Coverage 1a appearing at page 4 of the policy. It is my opinion and interpretation that the words "substituted by the airline" apply to all of the types of transportation referred to in Clause 2. In my view, that is the construction that accords best with the policy as a whole. It is not one that has to be strained for on the plain meaning of the language. It accords best with the scheme of coverages reflected in the Travel Certificate. It accords best with the heading on Coverage 1a as "Common Carrier Flight Insurance", and in my view, it makes the best business sense in that it preserves the same amount of indemnity in respect of accidents incurred upon the flight or upon transportation provided as substitution for the flight. The construction that seems to me most reasonable also avoids anomaly when considered with reference to the lesser coverage provided under the paragraph headed "Coverage 1b public Conveyance Insurance". As admitted, the injuries fall clearly within the last mentioned coverage unless they were taken out by being in the Coverage 1a.

> Clause 2 in the Coverage 1a is not in my opinion ambiguous and so the narrow circumstances in which the contra proferentem doctrine might apply, do not arise.

Mr. Justice Finlayson and I disagree with this conclusion. In our view the "Common Carrier Flight Insurance" is intended to cover the whole trip and, more specifically, while the insured is a passenger in the aircraft or in the airport limousine or bus or while being carried on other surface transportation substituted by the airline. In our view, these are distinct and separate categories and the term "substituted by the airline" applies only to the preceding noun "surface vehicle". If the coverage were restricted to the flight or to surface transportation substituted for the flight there would be little point in mentioning airport bus or limousine at all. Clause 2 would then simply read: "any surface vehicle substituted for the aircraft".

The majority of this Court is therefore of the opinion that the trial judge was in error and that the

appellant has established that she is entitled to an indemnity of $45,000. In the result, therefore, the appeal will be allowed and the judgment of the trial judge will be varied to increase the amount awarded from $15,000 to $45,000. My brother Grange will deliver separate reasons of his own.

There is a cross-appeal in this matter by the American Home Assurance Company which relates to both the issue of costs and the rate of pre-judgment interest. In view of our disposition of the appeal, the cross-appeal with respect to costs becomes moot. With respect to the pre-judgment interest rate, we are not prepared to interfere with the discretion of the trial judge who found the appropriate rate to be 15%. The cross-appeal is therefore dismissed.

The appellant, Helen Gorgichuk, is of course entitled to her costs at trial as awarded by the trial judge. In addition to her trial costs she is also entitled to the costs of the appeal and of the cross-appeal.

ZUBER J.A.
FINLAYSON J.A.:-- I agree.

GRANGE J.A. (dissenting):-- While, perhaps, clause 2 of coverage 1a of the policy is not happily worded, I cannot interpret that clause otherwise than did the trial judge, namely that "substituted by the airline" modifies all vehicles referred to in the clause and I would adopt his reasons for reaching that conclusion. The bus in which the insured was fatally injured was not substituted by the airline. His indemnity must therefore fall under coverage 1b. I would have dismissed the appeal.

GRANGE J.A.