## **EXHIBIT D-3**

2011 FCA 363
Federal Court of Appeal

Apotex Inc. v. Merck & Co.

2011 CarswellNat 6152, 2011 FCA 363, [2011] F.C.J. No. 1866,
102 C.P.R. (4th) 321, 215 A.C.W.S. (3d) 194, 430 N.R. 66

## Apotex Inc., Appellant and Merck & Co. Inc. and Merck Frosst Canada Ltd., Respondents Apotex Fermentation Inc., Respondent

Apotex Fermentation Inc., Appellant and Merck & Co. Inc. and
Merck Frosst Canada Ltd., Respondents Apotex Inc., Respondent

David Stratas J.A., Johanne Gauthier J.A., John. M. Evans J.A.

Heard: November 28, 2011
Judgment: December 19, 2011
Docket: A-9-11, A-11-11

Proceedings: affirming *Apotex Inc. v. Merck & Co.* (2010), 2010 CarswellNat 5009, 381 F.T.R. 162 (Eng.), *(sub nom. Merck & Co. v. Apotex Inc.)* 91 C.P.R. (4th) 1, 2010 FC 1265 (F.C.)

Counsel: Mr. H. Radomski, Mr. Ben Hackett, for Appellant in action A9-11
Mr. Andrew Reddon, Mr. Steven Mason, Mr. David Tait, for Respondent, Merck & Co. Inc., Merck Frosst Canada Ltd. in action A-9-11
Mr. Patrick Riley, Mr. John Myers, for Respondent, / Appellant Apotex Fermentation Inc. in action A-11-11
Mr. Andrew Brodkin, Mr. Ben Hackett, Mr. Jerry Topolski, for Respondent, Apotex Inc. in action A-11-11

Subject: Intellectual Property; Civil Practice and Procedure

**Table of Authorities**

Cases considered by *Johanne Gauthier J.A.*:

*Blatch v. Archer* (1774), 98 E.R. 969, 1 Cowp. 63 (Eng. K.B.) — referred to

*Browne v. Dunn* (1893), 6 R. 67 (U.K. H.L.) — considered

*Housen v. Nikolaisen* (2002), 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, 286 N.R. 1, [2002] 7 W.W.R. 1, 2002 CarswellSask 178, 2002 CarswellSask 179, 2002 SCC 33, 30 M.P.L.R. (3d) 1, 219 Sask. R. 1, 272 W.A.C. 1, [2002] 2 S.C.R. 235 (S.C.C.) — followed

*Levesque v. Comeau* (1970), [1970] S.C.R. 1010, 16 D.L.R. (3d) 425, 5 N.B.R. (2d) 15, 1970 CarswellNB 14, 1970 CarswellNB 14F (S.C.C.) — followed

*R. c. Jolivet* (2000), [2000] 1 S.C.R. 751, 2000 SCC 29, 2000 CarswellQue 805, 2000 CarswellQue 806, *(sub nom. R. v. Jolivet)* 254 N.R. 1, 33 C.R. (5th) 1, *(sub nom. R. v. Jolivet)* 185 D.L.R. (4th) 626, *(sub nom. R. v. Jolivet)* 144 C.C.C. (3d) 97 (S.C.C.) — followed

Apotex Inc. v. Merck & Co., 2011 FCA 363, 2011 CarswellNat 6152

2011 FCA 363, 2011 CarswellNat 6152, [2011] F.C.J. No. 1866, 102 C.P.R. (4th) 321...

   *Waxman v. Waxman* (2004), 2004 CarswellOnt 1715, 44 B.L.R. (3d) 165, 186 O.A.C. 201 (Ont. C.A.) — followed

   *Weatherford Canada Ltd. v. Corlac Inc.* (2011), 2011 FCA 228, 2011 CarswellNat 2835, 2011 CAF 228, 95 C.P.R.
   (4th) 101, 2011 CarswellNat 3714, 422 N.R. 49 (Fed. C.A.) — followed

**Statutes considered:**

*North American Free Trade Agreement Implementation Act*, S.C. 1993, c. 44
      s. 3 — referred to

*Patent Act*, R.S.C. 1985, c. P-4
      s. 55.1 [en. 1993, c. 2, s. 4] — considered

**Treaties considered:**

*North American Free Trade Agreement, 1992*, C.T.S. 1994/2; 32 I.L.M. 296,612
      Article 1709 ¶ 11 — referred to

**Regulations considered:**

*Patent Act*, R.S.C. 1985, c. P-4
      *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133

      s. 8 — referred to

APPEAL by defendants from judgment reported at *Apotex Inc. v. Merck & Co.* (2010), 2010 CarswellNat 5009, 381 F.T.R.
162 (Eng.), (sub nom. *Merck & Co. v. Apotex Inc.)* 91 C.P.R. (4th) 1, 2010 FC 1265 (F.C.), allowing action by plaintiff for
patent infringement.

*Johanne Gauthier J.A.:*

1    These appeals are from a judgment of Justice Snider of the Federal Court who found that Apotex Inc. (Apotex) and Apotex
Fermentation Inc. (AFI) had infringed Merck & Co. Inc.'s (Merck) Canadian Patent Number 1,161,380 (the '380 Patent).

2    This patent, which expired in 2001, covered a method for making lovastatin using a microorganism of the genus *Aspergillus
terreus* (AFI-1). More specifically, the judge found that the appellants were liable for damages with respect to the Apo-lovastatin
products made from the first commercial batch produced in Canada by AFI (batch CR0157) and from the 294 batches of
lovastatin produced by Blue Treasure (BT) in China after March 1998.

3    The judge's reasons ([*Apotex Inc. v. Merck & Co.*] 2010 FC 1265 (F.C.)) are detailed and comprehensive (226 pages).
It is clear that she had a firm grasp of the voluminous and complex evidence presented to her during the 35-day trial where
she also dealt with Apotex' own action against Merck pursuant to section 8 of the *Patented Medicine (Notice of Compliance)
Regulations*, SOR/93-133 as amended in SOR/98-166.

4    The judge based her conclusion that the process used to produce AFI batch CR0157 was infringing on the expert evidence
of Dr. Davis. She found that his test results, which indicated that the Apo-lovastatin tablets made from this batch contained
AFI-1 DNA, were reliable and credible. She expressly rejected Apotex' experts' theory of contamination (paragraph 454).

Apotex Inc. v. Merck & Co., 2011 FCA 363, 2011 CarswellNat 6152

2011 FCA 363, 2011 CarswellNat 6152, [2011] F.C.J. No. 1866, 102 C.P.R. (4th) 321...

5    With respect to the 294 batches of lovastatin produced in China by BT, she considered, under the general title "Infringement — the Circumstantial Case", the six points enumerated at paragraph 209 of her reasons. The judge indicated that she was persuaded that:

> a. The documents presented as BT batch records were not business records and were not reliable and trustworthy evidence of the use of AFI-4 (*C. fuckelii* microbe used in another method then recently patented by Apotex), because they had been fabricated at least with respect to "*any* information that could identify the strain of [microbe] used" [emphasis added] (paragraph 242).

> b. The evidence before her established that BT had enough of the media ingredient referred to as Polyglycol P-2000 (P-2000) to carry out the AFI-1 process. However, on the assumption that there was no further evidence available in that respect, there was insufficient evidence to establish that BT had a quantity of P-2000 sufficient to carry out the non-infringing AFI-4 process which required 10-20 times more of this ingredient.

> c. BT had a financial motivation not to use the non-infringing process. It had the means to produce lovastatin with the infringing AFI-1 process and the opportunity to use that process as soon as Dr. Jerry Su, an AFI representative, left China at the end of October 1997.

> d. Mr. Luo, the Deputy Plant Manager at BT, lied in two articles published in 2000 and 2002 and fabricated his testimony to cover up the use of the AFI-1 process at a time when BT was supposed to be using only the AFI-4 process. His behaviour supports Merck's contention that BT was using the AFI-1 process at least at the time when BT made the experiments referred to in the above-mentioned articles (paragraphs 327 and 335).

6    Apotex and AFI make particular submissions concerning these findings. I deal with these submissions below. For present purposes, I find that each of these findings is supported by the evidence before the judge and was open to her to make.

7    In addition, the judge made conditional findings responding to Merck's alternative arguments made in the event that a reviewing court found the BT batch records to be reliable evidence. The alternative nature of these arguments appears clearly from paragraph 244 of her reasons. It is not unusual in long and complex cases such as this one for judges to make findings in the alternative. However, as the judge ruled the batch records to be unreliable and the appellants have not contested this finding, all her comments on this alternative argument are *obiter*.

8    Merck argued that it was not necessary to discuss the appellants' various arguments if the Court accepts its position that the judge erred in her interpretation of section 55.1 of the *Patent Act*, RSC 1985, c P-4 (or section 39.2 of the old Act) by refusing to place upon Apotex the burden of persuading her that BT's process did not infringe the '380 patent.

9    At the hearing, Apotex suggested that it would not be appropriate for this Court to decide this issue in this case, for the judge did not have the benefit of full arguments on this issue. In particular, Apotex notes that the reference to subsection 1709(11) of *NAFTA* and section 3 of the *North American Free Trade Agreement Implementation Act*, SC 1993, c 44 were not brought to her attention.

10    I agree that this issue is better left for another day. The burden of proof is not determinative of this appeal. However, nothing in these reasons should be taken as endorsing the judge's analysis of section 55.1 which, as mentioned, was made on an incomplete record.

### AFI's CR0157 Batch

11    AFI submits that the judge erred in concluding that the AFI-1 DNA detected by Dr. Davis was not the result of contamination during this expert's experiments because she failed to consider substantial relevant evidence (their own expert evidence, their lay witnesses' evidence, as well as their batch records which were accepted as business records).

12    Essentially, AFI invites this Court to reweigh all the evidence with respect to this particular batch. It did not point to any particular error in the 36 pages devoted to the analysis of *all* the expert evidence.

13    Even though the judge refers to the testimony of AFI's lay witnesses in other parts of her judgment, AFI appears to suggest that it can be inferred from her "failure" to state specifically that the evidence of Dr. Davis convinced her, on a balance of probabilities, "despite the evidence of these lay witnesses and AFI batch records", that she did not consider this evidence.

14    In *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235 (S.C.C.) [*Housen*] (at paragraph 46) the Supreme Court of Canada made it clear that the trial judge is presumed to have considered all the information on the record and that the simple failure to rely expressly on, or to mention, some of the contradictory evidence in the reasons is insufficient proof to reverse such presumption.

**BT's Post-February 1998 Batches**

*(i) AFI's Submissions*

15    I am not persuaded that AFI demonstrated the existence of a palpable and overriding error in this finding of fact of the judge.

16    Turning now to the finding with respect to the batches made in China for exportation to Canada starting in March 1998, AFI raises two issues which, in its view, vitiate the judge's ultimate finding of fact that this material was more likely than not to have been made using the AFI-1 process. First, it states that the judge erred in not finding that the RC-14 impurity levels of the batches made during that period were consistent with the continued use of AFI-4 to make this lovastatin. Second, AFI argues that the judge erred in her assessment of Mrs. Hu's evidence which supported the use of AFI-4 during the said period. More particularly, AFI states that the judge gave no weight to the testimony of this witness and failed to adequately explain why she disbelieved Mrs. Hu, especially considering that, contrary to the rule in *Browne v. Dunn* (1893), 6 R. 67 (U.K. H.L.), the credibility of this witness with respect to the microorganism use for the fermentation at BT at that time was not challenged on this point and she was given no opportunity to explain her position.

17    I do not agree. As to the RC-14 levels, not only has AFI failed to rebut the presumption that this evidence was considered, but it is clear from the reasons (paragraphs 194-198) that the judge was alert and alive to this issue. As noted in *Waxman v. Waxman* (2004), 186 O.A.C. 201, 44 B.L.R. (3d) 165 (Ont. C.A.), [*Waxman*] at paragraph 344, the fact that a judge does not re-discuss particular evidence presumably means that she did not find it significant enough to warrant further discussion. AFI failed to demonstrate a palpable error, let alone an overriding one.

18    The principles applicable to the review of credibility findings by an appellate court were recently summarized in *Weatherford Canada Ltd. v. Corlac Inc.*, 2011 FCA 228 (Fed. C.A.) at paragraphs 89-91. The judge explained in sufficient detail why she did not find Mrs. Hu's testimony to be credible. AFI has not established that the judge misapprehended her testimony or that this is one of those rare cases that warrant this Court's intervention on a credibility finding.

*(ii) Apotex' Submissions*

19    Before discussing the many issues raised by Apotex with respect to the finding of infringement based on the post-February 1998 batches of lovastatin manufactured by BT, I shall reiterate some basic principles.

20    First, to succeed in their attack, the appellants had to establish that the errors they raised, individually or taken together, constitute not only a clear and obvious error (palpable) but more importantly, one that is overriding.

21    The following statement of the Ontario Court of Appeal in *Waxman* at paragraph 297 is particularly apposite here:

An "overriding" error is an error that is sufficiently significant to vitiate the challenged finding of fact. Where the challenged finding of fact is based on a constellation of findings, the conclusion that one or more of those findings is founded on a "palpable" error does not automatically mean that the error is also "overriding". The appellant must demonstrate that

Apotex Inc. v. Merck & Co., 2011 FCA 363, 2011 CarswellNat 6152

2011 FCA 363, 2011 CarswellNat 6152, [2011] F.C.J. No. 1866, 102 C.P.R. (4th) 321...

the error goes to the root of the challenged finding of fact such that the fact cannot safely stand in the face of that error [reference omitted].

22      Second, the deference accorded to a trial judge with respect to simple findings of facts also applies to inferences she draws from the evidence. In *Housen*, the Supreme Court of Canada describes the numerous reasons why this is so, including that where evidence exists that may support the inference, a review of the inference involves a reweighing of the evidence (paragraphs 19-25).

23      Third, as Apotex spent some time trying to explain how the proceeding and the trial evolved, most of which was disputed by Merck, it is useful to reiterate, as was done in *Waxman* at paragraph 293, the wisdom of the policy favouring appellate deference, especially in long trials where:

[t]he trial judge saw the witnesses and heard the evidence unfold in a narrative with a beginning, a middle, and an end. Our system of litigation is predicated on the belief that it is through the unfolding of the narrative in the testimony of witnesses that the truth will emerge. This court is not presented with a narrative, but instead with a description or summary of that narrative from the trial judge in her reasons, and from counsel in their written and oral arguments. The descriptions provided by counsel are not designed to tell a story, but rather to support an argument. Of necessity, and in keeping with their forensic role, counsel's description of the narrative at trial is selective and focuses on parts of the narrative or on a particular interpretation of a part of the narrative.

24      Apotex submits that the judge made several errors in processing the evidence before her. First and most important, it says the judge made a fundamental error of law by relying on the BT batch records that she had already rejected to reach certain conclusions. She then relied on these conclusions to make her final finding that it could be inferred from the totality of the evidence that BT was using the infringing process (paragraphs 339-340). According to Apotex, this error is extricable from the facts and vitiates her conclusion with respect to the fermentation duration and recorded titres, the availability of P-2000, as well as her determination that BT had the means to produce lovastatin with the infringing process commencing in March 1998.

25      In the same vein, Apotex argues that the judge also improperly relied on other documents that had never been filed to establish the truth of their content, including one that she had expressly refused to rely upon to support one of its arguments with respect to the titres (paragraph 292 of the reasons).

26      Second, Apotex submits that the judge erred in law when she drew an adverse inference that there was no further evidence supporting AFI's suggestion that BT could have bought more P-2000 from other sources because she did not have evidence that Mr. Zhou, the BT general manager in March 1998, was within the appellants' exclusive control. According to Apotex, there was no evidence that the appellants could even bring Mr. Zhou to testify, especially considering that as of 2009 he was no longer the general manager of BT. He had been replaced by Mr. Xu who Merck should have been able to compel to testify when he came to Canada at some point during the trial. Also, Mr. Luo was equally available to Merck for questioning.

27      Thirdly, Apotex says that the judge erred in law by reaching a conclusion of fact as to the attributes of the microorganism used for the production of lovastatin from March 1998 onward, as well as by drawing technical inferences in the absence of expert evidence permitting her to do so. According to Apotex, Merck's own expert, Dr. Lazure, had mentioned in her report that she could not establish from the BT batch records which microorganism was used in the process.

28      Apotex raises other errors described in its memorandum and its outline of arguments that need not be summarized here for, in general, they simply amount to an invitation to reweigh the evidence. It argues that once all of the judge's errors are corrected, the evidence only supports a finding of continued use of the AFI-4 process, since all that is left from the judge's reasons is an opportunity to infringe, and what Apotex refers to as the "Chinese articles".

*(iii) Analysis*

29      Apotex' first argument is based on the premise that the judge misconstrued Merck's arguments. As mentioned earlier at paragraph 7 above, her comments in paragraph 244 of her reasons clearly indicate that she did not. She repeated, at paragraph

Apotex Inc. v. Merck & Co., 2011 FCA 363, 2011 CarswellNat 6152

2011 FCA 363, 2011 CarswellNat 6152, [2011] F.C.J. No. 1866, 102 C.P.R. (4th) 321...

270, that her conclusions with respect to fermentation duration were conditional on the acceptance of the batch records. She did not need to repeat this each and every time she referred to the said batch records and dealt with the parties' position based on this documentary evidence, which she had so clearly and definitely put aside as unreliable.

30    I am not persuaded that the judge based her ultimate finding of infringement on her alternative findings, especially those dealing with the fermentation duration and titres reflected in the batch records and on which Apotex put a particular emphasis.

31    That said, and even though the transfer of technology with respect to the AFI-1 process to BT clearly establishes that BT had the means to make lovastatin using the infringing process, the judge's finding with respect to the "means" is the most vulnerable of her findings. After dealing with the parties' arguments based on the batch records, as well as exhibits TX-76 and TX-94 (her final conclusion in that respect is at paragraph 315), she does not explain her conclusion at paragraph 316.

32    However, I am not satisfied that this is an overriding error. Putting aside an erroneous finding that Merck had established on a balance of probabilities that BT had the "means" is not the same as a finding that BT did *not* have such means. There was ample other evidence on which it was open to the judge to find that BT was using the infringing process from March 1998 onward.

33    To conclude my assessment of Apotex' arguments relating to the batch records, I note that the reference to the quantity of P-2000 required to run the fermentation batches in paragraph 253 does not vitiate the judge's findings under the heading of "P-2000". There was sufficient evidence in the file for the judge to conclude that the quantity of P-2000 necessary to complete the production of lovastatin, using the AFI-4 process, was vastly superior to the quantity shipped to BT by AFI. There was simply no need for the judge to quantify the exact amount required.

34    Apotex' second argument is also ill-founded. In my view, this issue does not raise an extricable error of law, but at best a question of mixed fact and law. The law with respect to such adverse inferences is well settled. The principle applied by the Supreme Court of Canada in *Levesque v. Comeau*, [1970] S.C.R. 1010 (S.C.C.) was not new (*Blatch v. Archer* (1774), 1 Cowp. 63, 98 E.R. 969 (Eng. K.B.) at page 65) and was recently discussed by the Supreme Court of Canada in *R. c. Jolivet*, 2000 SCC 29, [2000] 1 S.C.R. 751 (S.C.C.) at paragraphs 25-28. It must be applied with caution and depends entirely on the specific facts of the case. Such inference is not mandated and remains a matter of discretion for the trier of facts.

35    The judge notes at paragraph 258 of her reasons that "there are obviously people associated with [BT] who could have provided evidence of additional purchases of P2000, if such purchases had taken place." She viewed that evidence as particularly important and relevant to determine whether, as argued by the appellants, the AFI-4 process had been used.

36    In the unique circumstances of this case, I am not persuaded that such witnesses (Mr. Zhou was only an example and was not meant to limit the statement) were not under the exclusive control of AFI who was the largest shareholder in the joint venture with BT. It is clear that BT had provided documentary evidence as well as witnesses (Mr. Luo and Mrs. Hu) to support the appellants' case and they were willing to assist them: see Alan W. Bryant, Sydney N. Lederman and Michelle K. Fuerst, *Sopinka, Lederman & Bryant: The Law of Evidence in Canada*, 3 rd ed. (Toronto: LexisNexis Canada Inc., 2009) at paragraph 6.449.

37    Apotex did not adduce any evidence establishing that under Chinese law these witnesses or BT's documentary evidence, not already in the possession of the appellants, could be compelled.

38    The judge was better acquainted with all these issues than this Court and she was clearly of the view that, at least with respect to other relevant facts, the appellants — AFI in particular — had presented obstacles to uncovering those facts (paragraph 201 of the reasons). As noted at the hearing, Mr. Luo, despite his senior position at BT, claimed to be unaware of any matter that did not fall directly under his supervision (paragraph 229 of the reasons). There is no indication that Merck knew or ought to have known that he was in charge of purchases, if indeed he was.

39    Apotex has not demonstrated a palpable and overriding error in the judge's inference-finding process or in her conclusion in that respect.

Apotex Inc. v. Merck & Co., 2011 FCA 363, 2011 CarswellNat 6152

2011 FCA 363, 2011 CarswellNat 6152, [2011] F.C.J. No. 1866, 102 C.P.R. (4th) 321...

40    Turning now to the third error of law alleged by Apotex, it is clear that Dr. Lazure's comments did not support Apotex' point of view in any way. In fact, these comments reinforce the conclusion that the BT batch records were unreliable for they should have contained information enabling an expert to identify which microorganism was used in the process. Be it as it may, this evidence is not particularly relevant, nor is the alleged error, given that the judge's findings with respect to the titres, fermentation durations, and the "means" need not be discussed further for they are *obiter*. In my view, they had no impact on the judge's ultimate finding at paragraphs 339 and 340.

41    Leaving aside the judge's alternate findings, as well as her conclusion with respect to the "means", I am of the opinion that the judge could reasonably infer from the totality of the evidence before her that BT had manufactured lovastatin using the infringing AFI-1 process during the relevant period. The appellants have not demonstrated any overriding error in that respect. There was sufficient evidence to support the judge's finding.

42    For these reasons, I would dismiss the appeal with costs.

*John. M. Evans J.A.:*

I agree

*David Stratas J.A.:*

I agree

*Appeal dismissed.*

End of Document          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

1991 CarswellAlta 8
Alberta Court of Appeal

Canadian National Railway v. Volker Stevin Contracting Ltd.

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167, 8 W.A.C. 39

## CANADIAN NATIONAL RAILWAY COMPANY v. VOLKER STEVIN CONTRACTING LTD. and CANADIAN INDEMNITY COMPANY; TED SIMON, STEVENSON WILLS MATTHEWS, BENJAMIN VAUGHN YALLOP and WILLIAM E. JUBIEN (Third Parties)

Harradence, Stratton and Côté JJ.A.

Heard: November 12, 1991
Judgment: November 25, 1991
Docket: Doc. Edmonton Appeal 9103-0076-AC

Counsel: *C.P. Clarke, Q.C.,* and *G.A. Harding,* for appellant.
*M.J. Bondar,* for respondents.

Subject: Contracts

**Table of Authorities**

**Cases considered:**

*Catre Industries Ltd. v. Alberta* (1989), 36 C.L.R. 169, 63 D.L.R. (4th) 74, 99 A.R. 321 (C.A.) [leave to appeal to S.C.C. refused (1990), 105 A.R. 254, 108 N.R. 170] — *referred to*

*Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.,* [1991] 4 W.W.R. 251, 53 B.C.L.R. (2d) 180, 44 C.L.R. 88, 7 C.C.L.T. (2d) 177, 1 B.L.R. (2d) 188 (C.A.) — *considered*

*Gorgichuk Estate v. American Home Assurance Co.* (1985), 5 C.P.C. (2d) 166, 14 C.C.L.I. 32, [1985] I.L.R. 1-1984, varied on other grounds [1988] I.L.R. 1-2283, 30 C.C.L.I. 51, 27 O.A.C. 157 (C.A.) — *referred to*

*Green Elm Holdings v. J.H. Hogg & Associates Ltd.* (1983), 31 Alta. L.R. (2d) 88, 7 C.L.R. 159 (C.A.) — *distinguished*

*Moncton (City) v. Aprile Contracting Ltd.* (1980), 29 N.B.R. (2d) 631, 66 A.P.R. 631 (C.A.) — *referred to*

*R. v. Walter Cabott Construction Ltd.* (1975), 44 D.L.R. (3d) 82, varied (1975), 69 D.L.R. (3d) 542, (sub nom. *Walter Cabott Construction Ltd. v. Canada*) 12 N.R. 285 (Fed. C.A.) — *considered*

*Temar Construction Ltd. v. West Hill Redevelopment Co.* (1986), 21 C.L.R. 156 (Ont. H.C.)*referred to*

*Warden Construction Co. v. Grimsby (Town)* (1983), 2 C.L.R. 69 at 93 (Ont. C.A.) — *distinguished*

Appeal from judgment of Matheson J., (1990), 42 C.L.R. 150, 111 A.R. 116, dismissing action and allowing counterclaim.

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8
1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

**Per curiam (Written memorandum of judgment):**

One C.N. rail line links part of the Northwest Territories to the rest of Canada. At one point just inside Alberta, the rail line originally crossed a small valley on a timber trestle. Then later the C.N. put large metal culverts near the bottom, and dumped fill, mostly sand, on top. They covered the old trestle, so that the rail line now runs on an artificial embankment, mostly of sand. After some years the culverts became squashed so they would not carry sufficient water, threatening a washout. They were big enough that a person could walk inside and observe their deformation and consequent closure. The C.N. decided to have one culvert rebuilt, and the other one abandoned and replaced by a new culvert nearby. The C.N. bought and supplied the disassembled pieces of metal culvert. The C.N. called for tenders and specified that the new culvert had to be installed by tunnelling through the embankment without interruption of rail service above, and had to be completed by the end of winter. The C.N. expressly left other aspects of method of construction to the contractor [appeal from (1990), 42 C.L.R. 150, 111 A.R. 116].

Neither the C.N. nor Volker Stevin had any tunnelling experience. But a tunnelling company which could not secure a bond big enough for this job persuaded Volker Stevin to bid on this job and to subcontract all the tunnelling out to the tunnelling company. Volker Stevin did bid and got the job, and signed the contract with the C.N. The tunnelling company elected to use the shield method of tunnelling, but that did not work, and very little was done to build the new culvert. Volker Stevin terminated the subcontract, and the C.N. terminated the main contract. C.N. hired a different tunnelling company, Janod, which later successfully completed the job. It used chemical grouting to firm up the soil, and poling plates instead of portions of a shield. Volker Stevin's expert testified, and the trial judgment seems to find, that that was an excellent solution to the problem. The new job cost more that the old contract amount, so the C.N. sued Volker Stevin, which defended and counterclaimed, and third partied some C.N. officials.

The trial judgment dismissed C.N.'s suit, awarded Volker Stevin damages under its counterclaim, and dismissed Volker Stevin's third party claim. C.N. was ordered to pay costs of Volker Stevin and the third parties. C.N. appeals.

The reasons for judgment of the trial court are lengthy, but these appear to be their essential steps in reasoning:

(a) the contract called for "conventional" tunnelling methods, and forbade a change in the character of the soil;

(b) the contract excluded the possibility of problems in the embankment, other than the old wooden trestle, and said that the soil's structural integrity was basically adequate;

(c) "conventional" tunnelling methods would not work, because they would allow too much deflection, and chemical grouting was not a "conventional" tunnelling method, so the tunnel ultimately built was not that originally contracted for;

(d) the law excuses a builder under the present circumstances as the work called for by the contract is impossible or very difficult, or would not last long.

It is curious that some of the scientific and engineering witnesses gave opinions on the nature and types of construction contracts, and on how to interpret certain clauses in this contract. The trial judgment quotes some of that evidence, and seems to rely upon it. But these are legal matters which must be submitted to the court as argument. It is not a subject for evidence, or weighing of the qualifications of the person who submits it. The contract here contains very little jargon or technical matters, and is composed almost entirely of ordinary English. It is for the court itself to interpret that; even a professor of English should not testify on that point: *Gorgichuk Estate v. American Home Assurance Co.* (1985), 5 C.P.C. (2d) 166, 14 C.C.L.I. 32, [1985] I.L.R. 1-1984 (at pp. 7619, 7620), varied on other grounds [1988] I.L.R. 1-2283, 30 C.C.L.I. 51, 27 O.A.C. 157 (C.A.). Therefore, still less can a scientist or engineer testify about the meaning of ordinary English.

We have considerable doubts whether proposition (d) above, or any part of it, is correct in law. But our views respecting steps (a) to (c), set out below, make that academic. No more need be said about (d).

We attach as an appendix [post, p. 177] a number of the most relevant portions of the building contract between C.N. and Volker Stevin. It appears to us impossible to say that the contract called for "conventional" tunnelling methods, and forbade chemical

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

grouting. The contract says many times that tunnelling methods are to be proposed by the builder: see supplementary general conditions 1.14(d), 1.26, 2.9(b); general conditions 3, 19, 44; instructions to bidders, paras. 8 and 9. Indeed Volker Stevin first told C.N. that it would investigate soil conditions further with a pilot hole and then tunnel using either the advancing shield method, or chemical freezing. (Its officer testified at trial that the word "chemical" was an error, but the author of that letter did not testify.) Later Volker Stevin elected the shield method. Besides the need to install the metal lining provided by the C.N., we see no restriction in the contract on method of tunnelling. No one showed us any evidence that Volker Stevin in fact interpreted the contract as calling for "conventional" tunnelling methods. No one from the tunnelling subcontractor testified. Therefore, even if *Warden Construction Co. v. Grimsby (Town)* (1983), 2 C.L.R. 69 at 93 (Ont. C.A.), is correctly decided, it is irrelevant.

What is more, we read supplementary general condition 2.9(k) as encouraging the use of chemical grouting or other similar methods, whether or not they may be considered "conventional." It says to combat any unstable soil, the contractor is to "employ sheathing; timbering; shoring, poling plates, spiling, grouting or other means necessary to maintain the structural integrity of the soil." It is common ground that the whole problem here was "unstable soil conditions." The second contractor, Janod, later successfully used poling plates and chemical grouting. It is suggested that "grouting" in para. (k) just means filling in the gap around the metal liner, and does not mean the extensive chemical process ultimately used by Janod. As paras. (m) and (n) unconditionally call for grouting, irrespective of the presence of unstable soil, we doubt that interpretation. But in any event, cl. (k) specifically calls for "other means necessary," so plainly the items enumerated in (k) are but examples, and the opposite of exclusive.

During the appeal, Volker Stevin suggested that para. (k) was confined to temporary methods during construction. We see nothing there to limit it that way. Some of the examples given sound neither temporary nor readily removable. Nor is there any need to remove them. Nor does the contract guarantee that the metal liner alone will support unstable soil.

It is suggested that when Janod injected large quantities of chemicals into the soil to harden it around the tunnel, they destroyed the soil's character, so that it became a kind of concrete, and so was no longer soil. And in turn it is suggested that that contradicted the original contract, and so both showed that the original contract was impossible, and that what C.N. now sues for is a different job entirely. We disagree. Paragraph (k) does not speak of preserving the soil, still less preserving its chemical or geological nature. Why one would want to preserve the nature of unstable soil we cannot fathom. If there is any doubt in construing a contract, one should prefer the interpretation which makes sense and advances the objects of the contract. What para. (k) expressly says to "maintain" is the "structural integrity of the soil." The "structural integrity" means its shape and maybe its cohesion. Patently that is what timbering would preserve. And obviously slumping or flow or fall of unstable soil is the evil a tunneller must guard against.

Nor does the word "maintain" mean to avoid all change. The new *Oxford English Dictionary* includes among the definitions of "maintain" these:

> 4. a. To keep up, preserve, cause to continue in being (a state of things, a condition or activity, etc.); to keep vigorous, effective, or unimpaired; to guard from loss or derogation ...

> 5. a. To cause to continue in a specified state, relation, or position ...

> 11. To back up, stand, give one's support to, defend, uphold (a cause, something established, one's side or interest, etc. ...)

> 13. To hold, keep, defend (a place, position, possession) against hostility or attack, actual or threatened ... 1660 F. Brooke tr. *LeBlanc's Trav.* 15 There are four avenues cut through the Mountain, easie to be maintained.

It is also relevant to note one of its definitions of "maintenance":

> 3. The action of keeping in effective condition, in working order, in repair, etc.; the keeping up of (a building, light, institution, body of troops, etc.) by the supply of funds or needful provision; the state or fact of being so kept up; means or provision for keeping up.

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

Instructions to "maintain the structural integrity" of a fire department or police force would not forbid replacement of any officers. On the contrary, the instructions plainly imply that any officers killed or disabled or retired are to be replaced at once. Instructions to maintain the structural integrity of a bridge plainly imply that corroded or cracked beams are to be replaced at once with new strong ones, not kept in place until the bridge falls down. That is so even if a number of the beams are already corroded or cracked at the time that the instruction is given.

The reasons for judgment say (with apparent approval) that one of the expert witnesses referred to supplementary general condition 2.9(c) and "was of the view that the absence of clear indications of problems related to any other aspects of tunnelling or methods excludes the possibility of other problems." That flies in the face of the clear words of para. (k), just discussed at length. What is more, everyone knew that the embankment was artificial, and had been built by piling sand and other fill over tho old culverts and old trestle. And everyone knew that the new construction was to repair one old culvert and totally replace the other, because they had deformed and become squashed shut.

The contract documents repeatedly call on the builder to attend at the scene and thoroughly acquaint itself with subsurface and other conditions: see supplementary general condition 1.13, general condition 44, form of tender, and annex B to tender. Volker Stevin argued that their inspection was for site access and cost assessment, not for problem diagnosis, but we can read no such limitations into those clauses: see especially supplementary general condition 2.9(d). The tender certifies that Volker Stevin had inspected, and its counsel told us that its tunnelling subcontractor had also inspected conditions onsite before Volker Stevin bid. Volker Stevin's senior vice-president testified that Volker Stevin left it to its proposed tunnelling subcontractor to study the plans and specifications with care. What is more, the old culverts were taller than a person, and one could enter them and view their deformation, cracking, and squashed ends. Volker Stevin argued that their assumption of risk in general condition 44 arose only if they did not inspect. But in fact it arose if they did not inspect everything; the clause is clear.

In oral argument before us, counsel for Volker Stevin repeatedly abandoned any claim for misrepresentation by C.N. (as distinguished from non-disclosure). Given supplementary general condition 1.13 and general condition 44, that abandonment is not surprising.

The reasons for judgment point out that supplementary general condition para. 2.9(k) begins "If areas of unstable soil conditions are encountered ..." The reasons say that "that would infer that the structural integrity of the soil was basically adequate," and that only some areas might not be. For the reasons just given, we reject that suggestion. Nor does it flow in English grammar or logic.

It will be seen that the reasons for judgment imply a number of terms which are nowhere in the express words of the contract documents, and indeed contradict the express words in varying degrees. This contract expressly excludes implying any obligation on C.N.'s part which is not expressly imposed by the contract: general condition 4. Even if the contract did not say that, the ordinary law restricts when one may imply a term in a contract, and forbids implying a term contrary to express terms: *Catre Industries Ltd. v. Alberta* (1989), 36 C.L.R. 169, 63 D.L.R. (4th) 74, 99 A.R. 321 (C.A.), especially at pp. 84-86, 88 [D.L.R.]. It is doubtful that a construction contract implies a warranty by the owner that the work can be carried out or the result achieved: see *Temar Construction Ltd. v. West Hill Redevelopment Co.* (1986), 21 C.L.R. 156 (Ont. H.C.), at pp. 168-69, and cases cited, and *Moncton (City) v. Aprile Contracting Ltd.* (1980), 29 N.B.R. (2d) 631, 66 A.P.R. 631 (C.A.), at p. 667.

Volker Stevin puts a great deal of emphasis upon supposed design defects here. But if there is no implied warranty by the owner that the design will work, then the significance of such defects either disappears or reverses itself. And when the contract leaves construction method up to the builder, then he in effect becomes one of the designers.

In our view, the contract was clear, and put on Volker Stevin the problem of how to bore and maintain a tunnel, and all risk that that might prove expensive or difficult. Volker Stevin and its tunnelling subcontractor inspected the scene at C.N.'s express demand, and C.N. were not tunnelling experts, so we cannot even see any unfairness, were that relevant. Volker Stevin did not have to bid. If they did bid, they could choose any price which they wanted, and allow in it for any contingencies which they wished. They chose to gamble that they could put in the low bid and still make money, and they lost: see the *Catre* case, at p. 91, and cases there cited.

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

During the second day of the appeal, Volker Stevin raised another argument. They suggested that C.N. was wrong not to pass on to prospective bidders a site report which C.N had obtained about the problem from the manufacturer of the metal tunnel lining. They framed that claim in tort, not contract. We see a number of obstacles to that claim:

(a) It is not pleaded in the statement of defence, or counterclaim, or particulars; the only thing at all close is a brief plea of misrepresentation, abandoned before us.

(b) It seems contrary to common sense that the law of torts should impose between contracting parties (or their employees) a duty the very opposite of that which they have imposed between themselves by their contract. The contract here says ad nauseam that the builder must make his own assessment of conditions, not rely on C.N.'s information, and must bear all risk of difficulties or cost overruns from unforeseen conditions on the site: see supplementary general conditions 1.10, 1.13.

(c) The authority cited to us is a lone sentence in *R. v. Walter Cabott Construction Ltd.* (1975), 44 D.L.R. (3d) 82 at 98 (Fed. T.D.). The facts there were rather unusual. Mahoney J. cited no authority for that legal proposition. As the law already has categories of contracts where disclosure is and is not required between parties negotiating a contract, the best which can be said of the sentence relied on is that it is far too broad. The Federal Court of Appeal reversed that part of the decision of Mahoney J. Without setting out a general rule, Pratte J. held that there was no duty in tort there beyond the duties in contract, and the rest of the court concurred on that point: (1975), 69 D.L.R. (3d) 542, *(sub nom. Walter Cabott Construction Ltd. v. Canada)* 12 N.R. 285, at pp. 545-46, 549 [D.L.R.].

(d) Volker Stevin relies upon *Green Elm Holdings v. J.H. Hogg & Associates Ltd.* (1983), 31 Alta. L.R. (2d) 88, 7 C.L.R. 159 (C.A.). That was a suit by an *owner* against the subdesigner to whom the designer hired by the plaintiff owner had delegated part of the design. The design could be built and was built, but did not suffice for the plaintiff owner's purposes. That case has nothing to do with the present situation, and no general statements of law are found there. There is apparently no authority at the appellate level in the Commonwealth making an owner's designers liable in tort to the *builder*, and in one case the British Columbia Court of Appeal would not find such a duty of care: *Edgeworth Construction Ltd. v. N.D. Lea & Associates Ltd.*, [1991] 4 W.W.R. 251, 53 B.C.L.R. (2d) 180, 44 C.L.R. 88, 7 C.C.L.T. (2d) 177, 1 B.L.R. (2d) 188.

(e) The manufacturer's report not given to Volker Stevin was not a scientific analysis of geological or subsoil conditions. It did not analyze instability of the soil itself. (That was in other material which C.N. did give Volker Stevin.) Instead portions of the manufacturer's report on which Volker Stevin relied on appeal covered three things:

(i) a description of what was evident to the naked eye of anyone who entered the two old culverts;

(ii) a discussion in common-sense terms (with no evidence of advanced technical knowledge) of what could and could not have caused the culvert's obvious deformation;

(iii) an educated guess that compacting or backfilling during the original entombment of the old trestle played a role in the deformation.

We cannot see that C.N. had any unusual or peculiar knowledge which cried out to be revealed, especially to Volker Stevin, who knew the basic facts anyway, or to its tunnelling subcontractor which had more tunnelling knowledge than did C.N.

Therefore, we need not consider whether C.N.'s employees could take advantage of an exculpatory clause in C.N.'s contract had they themselves been guilty of misrepresentation or actionable non-disclosure.

There was a great deal of evidence on a number of points which appear to us irrelevant, and we will not recite that evidence.

We heard no dispute about the amounts involved in the suit. When counsel for the plaintiff C.N. was leading Mr. Yallop's evidence at trial on amount, counsel for the defendant Volker Stevin said that quantum was not in issue, and C.N.'s counsel dropped that line of evidence. On appeal Volker Stevin's counsel raised the question of quantum, but desisted when reminded of this. He conceded that C.N.'s computations are right. Nor did we hear any suggestions that the defendant bonding company

was in any different legal position than the defendant Volker Stevin. They appear here, and appeared at trial, by the same counsel. At the end of oral argument we announced that the appeal would be allowed. We promised reasons to follow, which are found above. We allow the main suit for the amounts suggested by C.N. at trial, and dismiss the counterclaim. The third party notice becomes academic.

After we announced that the appeal was allowed, we heard argument on costs. Counsel for Volker Stevin said that when he had won at trial, he had got costs on double col. 6 up to the date of the losing party's offer of settlement, and at four times col. 6 thereafter. He suggested that turnabout would be fair play, and counsel for C.N. did not object. Nor did C.N. object to his reminder that Volker Stevin was to get costs in any event of an earlier procedural appeal, to be set off against the main costs. We adopt that suggestion for costs in Queen's Bench and on appeal. C.N. should recover costs of second counsel, and no limiting rule should apply. If any more details need to be worked out, or directions are useful, any member of the panel may give them before or after entry of formal judgment.

## APPENDIX — Supplementary General Conditions #1

### 1.4 Work included

The work included in the contract consists of furnishing all equipment, tools, and labour necessary for sorting, loading, hauling and installation of tunnel liner and multiplate culverts, disposal of excavated material, channel relocation, backfill of existing culvert, supply and install shoring as required, end treatment hold down devices, and any and all work ordered by the Engineer necessary to complete this work as shown on the drawings and specified herein.

### 1.7 Procedure of construction

The Contractor shall study all drawings, so as to become familiar with the conditions under which the Contract will have to be carried out.

The Contractor shall carry out all work in such a way and sequence that all work covered under the Contract shall be completed by the completion date specified. The site shall be left in a neat and tidy condition.

### 1.8 Basis of tendering (Cont'd.)

Unless otherwise stated in this specification, the unit prices above referred to shall include all labour, scaffolding, tools, implements, machinery, service and materials constructed in place and shall include all overhead, profit and supervision and the entire cost of all permits, certificates, Sales Tax, Provincial Sales Tax, Provincial Labour Taxes, Workers' Compensation, Public Liability and Property Damage, Surety Bond, Royalties, and any and all other costs of a like nature to which the work is liable.

### 1.10 Allowance for working conditions

The Contractor shall take into consideration all of the precautions, conditions and limitations of every kind which may affect the work or his operations, and he must allow for same in the various Unit Prices or lump sums submitted.

### 1.12 Contractor to show ability to do work

Before the award of the contract, any tenderer may be required to show to the satisfaction of the Engineer that he has, or can obtain, the necessary and proper equipment, tools, facilities and means, and that he has the experience, ability and financial resources to perform the work within the time specified and in a satisfactory or workmanlike manner.

### 1.13 Visiting the site

The Contractor shall visit the site before submitting his tender in order to thoroughly acquaint himself with all local conditions under which he will be called upon to carry out the work coming under his contract.

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8
1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

The Contractor acknowledges that he has satisfied himself as to the nature and location of the work, the general and local conditions, particularly those bearing upon transportation, disposal, handling and storage of materials, availability of labour, water, electric power, roads and uncertainties of weather, or similar physical conditions at the site, the conformation and con ditions of the ground, the character of equipment and facilities needed preliminary to and during the prosecution of the work or the cost thereof under this Contract.

The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of any and all surface and subsurface materials, including streams and ground water, to be encountered. The Contractor has considered all exploratory work done by or for the Railway, as well as information presented by the Drawings and Specifications made a part of this Contract. Any failure of the Contractor, to acquaint himself with all the available information will not relieve him from responsibility for performing the work. Representations made but not so expressly stated and for which liability is not expressly assumed by the Railway in the Contract and for information on or opinions concerning soils and subsurface conditions or other matters furnished by or for the Railway or for any understanding, opinions, or representations made or so expressed by any of its officers or agents during or prior to the execution of this Contract, shall be deemed only for the information of the Contractor and the Contractor shall have no claim against the Railway resulting from such information.

### 1.14 Work schedule

The Contractor shall submit, with his tender documents, a schedule or diagram showing the dates on which all activities will be commenced and finished and to which the Contractor is prepared to work and stand by bearing in mind that the completion date must not be altered. The Contractor shall indicate, in his schedule, his expected progress in increments of not more than one week.

Within 14 days after the award of the contract, the contractor shall submit to the Engineer for approval a detailed work schedule in increments of not more than one week.

The detailed work schedule shall:

(d) Clearly indicate the construction periods and sequences of operations of each item of work in sufficient detail so the Engineer can determine the feasibility of the program.

Approval by the Engineer of the Contractor's detailed construction program shall in no way be construed to relieve the Contractor of any of his duties or responsibilities under this contract.

### 1.24 Intent of plans and specifications (Cont'd.)

If the Contractor, in the course of the work, finds any discrepancy between the specifications, the plans and the physical conditions of the locality, or any errors or omissions in the plans, it shall be his duty to immediately inform the Engineer in writing, and the Engineer shall promptly verify the same. Any work done after such discovery, until authorized, will be done at the Contractor's risk.

Specifications shall take precedence over the drawings. Figures on the drawings shall take precedence over scaled measurements; details shall take precedence over drawings made to a smaller scale.

### 1.26 Construction methods and prosecution of work

As far as it is consistent with the nature of the work and the results to be attained, the order and methods of prosecuting the work will be left to the discretion of the Contractor, with whom the responsibility for such order and methods shall rest; provided, however, that the Engineer shall have the right at all times to prescribe and control such order and methods with a view to the safety and to the rapid and economical construction of the work.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

If the Contractor fails, in the opinion of the Engineer, to carry on the work with sufficient diligence and skill, or his delegated representative having jurisdiction fails to co-operate with all trades and the Engineer, as aforementioned to ensure completion in accordance with the Contract, the Engineer may take whatever steps he considers necessary under Clauses 22 and Page A5, of Annex "A", General Conditions attached.

**1.27 Maintenance and guarantee**

The Contractor will be held absolutely responsible for the care of the work and whatever appertains thereto from commencement of same to its final completion and acceptance.

All work performed under this contract, unless otherwise specified, shall be guaranteed by the Contractor for a period of one year from the date of final acceptance of work by the Railway, during which period of one year the Contractor shall, immediately on receipt of notice in writing from the Railway, and at his own expense, make good all defects of whatever nature which may develop during that period.

In the event of the Contractor refusing or neglecting to do so, the Railway may employ some other person or persons to make good any such defects, loss or damage, and the expense of employing such person or persons to make good any such defects, loss, or damage, shall be charged to and paid by the Contractor.

**1.62 Addenda to specification**

Should any bidder find discrepancies in or omissions from the contract drawings or specifications, or be in doubt as to their meaning, he shall notify the Engineer who will forthwith interpret the true intent and if necessary issue addenda to specifications stating the true intent and purpose of the contract drawings or specifications relative thereto. Upon award of contract, said addenda shall become an integral part of the contract.

**Supplementary General Conditions — #2**

**2.2 Work included**

The work consists of furnishing all plant, labour and equipment to install structural plate corrugated steel pipe, tunnel liner plate, anchoring and stiffening systems, excavation and disposal, backfill existing culvert and install end treatment.

All work shall be carried out by personnel skilled in this type of installation.

**2.3 Scope of the work**

The scope of the works is as follows:

(b) Under the closure of the railway traffic for a continuous period of ten days excavate for, install and backfill grade for the 2450 mm. Structural plate corrugated steel pipe including the installation of the adapter to provide connection to the proposed 2400 mm tunnel liner plate installation; and the removal of the existing damaged culvert section now in place.

(c) With the rail traffic in continuous service install 2400 mm tunnel liner plate through an existing structural plate corrugated steel pipe to connect onto the installation described in paragraph (b).

(d) Install a new tunnel liner plate installation of 4200 mm diameter.

**2.4 Material (Cont'd.)**

(c) All other materials including anchors, grout, sand bags and miscellaneous iron will be supplied by the contractor.

**2.9 Installation of 4200 mm tunnel liner plate**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8
1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

(a) A new 4200 mm diameter tunnel liner plate is required to be installed through the railway grade as shown on the drawings.

(b) The Contractor shall submit with his form of tender the construction method and procedures he intends to use to accomplish this installation.

(c) The Contractor is to be aware of the existence of an old timber trestle within the limits of his installation. Piling and timber will be encountered during the tunnelling operation.

(d) The soil information contained on the contract drawing was obtained by the railway in June of 1985. It is the responsibility of the contractor in using this information to ensure that it is suitable for their purposes and to supplement it as they consider necessary.

(e) The Contractor is to pay particular attention to the fact that his tunnelling operation will be carried out during the operation of the railway. The Contractor is to ensure that his operations do not jeopardize the structural integrity of the railway grade and track.

(f) The tunnel liner plate culvert shall be assembled and installed according to the ring makeup drawing and manufacturers recommendations.

(g) Tunnel liner plates are to be installed in such a manner as to have the grout holes located every third ring at the two, four, six, eight, and ten o'clock positions.

(i) Installation shall begin at the outlet end of the structure and shall proceed continuous to the inlet end.

(j) Excavation shall be kept to a minimum. It shall be advanced ahead of the tunnel liner installation in relationship to the structural makeup of the soil encountered and at no time shall it exceed 600 mm.

(k) If areas of unstable soil conditions are encountered the contractor shall employ sheathing; timbering; shoring, poling plates, spiling, grouting or other means necessary to maintain the structural integrity of the soil.

(l) Excavation material gained by the tunnelling operation may be disposed of on railway property at a site approved by the Engineer.

(m) Grouting shall be carried out via each grout hole provided and shall be carried out immediately after each ring sectionals installed not exceeding 4 hours after installation or as directed by the Engineer.

(n) Grouting shall be done to ensure that all voids are filled taking care that no shifting or deformation occurs to the liner during this operation due to excessive pressure.

**2.10 Basis of payment (4200 mm Tunnel Liner Plate)**

The Unit Prices shall also include the cost of all pumping, bailing, shoring, etc. and the furnishing of all necessary pumps, tools and equipment required to keep the work area dry.

*CN Contract*

*Work to be done.*

*Time for completion.*

III. The Contractor shall forthwith commence the work provided for by the said Contract, shall diligently execute the respective portions thereof according to the Contract and on or before the following dates, namely:

February 23, 1986

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

shall deliver the same to the Railway completed in every particular to the satisfaction of the Engineer.

*Payments.*

IV. (1) The Railway covenants with the Contractor, that the Contractor having in all respects complied with the provisions of the Contract, will be paid for and in respect of the work the price or the various prices set out in the schedule of prices embodied in the said accepted tender, (Annex "B"), and any other sums of money properly payable under the terms of the Contract.

*Interpretation of the Contract.*

VII. (a) If there is any discrepancy or conflict between the provisions of this Agreement and the General Conditions (Annex "A"), this Agreement shall govern.

(b) If there is any discrepancy or conflict between the General Conditions (Annex "A") and Annexes "B" and "C", the provisions of the General Conditions (Annex "A") shall govern.

**General Conditions**

*Interpretation.*

1. In the Contract:

(a) "work" or "works" shall, unless the context otherwise requires, mean the whole of the work and materials, matters and things required to be done furnished and performed by the Contractor in or under this Contract;

*Included and incidental works*

3. The price or each respective price and amount of money stipulated in the schedule of prices embodied in the accepted tender (Annex "B") and in any Engineer's certificate issued pursuant to Clause 13 or 14 of these General Conditions includes and determines the full compensation to the Contractor for not only the particular description of work and materials mentioned therein but also all and every kind of planning, labour, supervision, materials, machinery, plant, equipment, civil and other works and things of whatsoever nature required for the full execution, completion and delivery, in accordance with the Contract, of the work. All of such incidental facilities and services shall be provided by the Contractor without further expense to the Railway. In case of any dispute as to what work, materials and/or incidental facilities or services are included in the work contracted for, or in the said schedule and certificates, or any item thereof, the decision of the Engineer shall be final and conclusive.

*Implied contracts negatived.*

4. No implied obligation of any kind whatsoever, by or on behalf of the Railway shall arise or be implied from anything in the Contract contained, nor from any position or situation of the parties at any time, it being clearly understood that the express covenants and agreements herein contained made by the Railway, shall be the only covenants and agreements upon which any rights against the Railway may be founded.

*Quality.*

8. The works shall be constructed of the best materials of their several kinds, and carried on and completed in the best and most workmanlike manner, and in the manner required by, and in strict conformity with, the Contract, as defined in Article II of the Agreement, all to the complete satisfaction of the Engineer.

*Extra work.*

14. (1) The Engineer may from time to time, before the final acceptance of the works, order in writing extra work to be done. The price for such work shall be determined by the Engineer who may either fix a unit price or a lump sum price, or may, if he so

elects, provide that the price shall be determined by the actual cost, which will include additional costs for Surety Bond, Public Liability and Property Damage Insurance, Workmen's Compensation Insurance, Provincial Labour Tax, Provincial Sales Tax, and other costs of a like nature that may be imposed upon the Contractor by Federal or Provincial laws, to which shall be added ten per cent to cover general expense and superintendence, profits, contingencies, use of tools (other than Contractor's plant), Contractor's risk and liability. If the Contractor shall perform any work or furnish any material which is not provided for in the Contract, or which was not authorized in writing by the Engineer, the Contractor shall receive no compensation for such work or material so furnished, and does hereby release and discharge the Railway from any liability therefor.

*Covenants herein apply to Extra Work.*

16. All alterations, changes or extra work so ordered, shall, except as otherwise expressly provided, fall within and be governed by the terms and conditions of this Contract, in like manner and to the same extent as the works originally contracted for.

*Delays.*

19. The Contractor shall not be entitled to make any claim or demand, nor bring any action or suit against the Railway for any damage which he may sustain by reason of any delay in the progress of the work.

*Defective work or material.*

*May require removal or re-execution.*

*Non-compliance by Contractor.*

20. Should the Contractor use or employ, or intend to use or employ, in or about the works, any tools, plant, materials, equipment, or things which, in the opinion of the Engineer, are not in accordance with the provisions of the Contract or are for any reason unsuitable for the works, or should the Engineer consider that any work is for any reason improperly, defectively, or insufficiently executed or performed, the Engineer may order the Contractor to remove the same and to use and employ proper tools, plant, materials, equipment, or things, or to properly re-execute and perform such work, as the case may be; should the Contractor not commence within twenty-four hours to carry out and comply with the said order or orders with all due diligence, the Engineer may at any time thereafter execute, or cause to be executed, the orders so given by him, and the Contractor shall, on demand, pay to the Railway all costs, damages, and expenses incurred by the Engineer in respect thereof, or occasioned to the Railway by reason of non-compliance by the Contractor with any such orders, or the Railway may retain and deduct the amount of such costs, damages and expenses from any amounts then or thereafter payable to the Contractor.

*Insufficient workmen, plant, etc.*

*Work not proceeding with due diligence.*

*Engineer may provide additional at Contractor's expense.*

*Repayment by Contractor.*

22. If the Engineer shall at any time consider the number of workmen, quantity of machinery, tools, plant, equipment, or of proper materials or things, respectively employed or provided by the Contractor on or for the said works, to be insufficient for the advancement of such works, or any part thereof, toward the completion within the time limited in respect thereof, or that the works are, or some part thereof is, not being carried on with due diligence, the Engineer may, in writing, order the Contractor to employ or provide such additional workmen, machinery, tools, plant, equipment, materials or things as he may think necessary, and in case the Contractor shall not, within three days, or such other longer period as may be fixed by any such order, in all respects comply therewith, the Engineer may provide and employ such additional workmen, machinery, tools, plant, equipment, material and things respectively or employ a sub-contractor, or sub-contractors as he may think proper, and may pay in respect of such additional workmen such wages, Workmen's Compensation assessments, fringe benefits and all other things and benefits of a similar nature, as may be applicable, and for such additional machinery, tools, plant, equipment,

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

materials and things respectively and to such sub-contractor or sub-contractors such prices as he may think proper, and all such amounts so paid shall be repaid on demand by the Contractor, or the same may be retained and deducted out of any sum that may then or thereafter be due from the Railway to the Contractor. The Contractor shall employ the additional sub-contractor, or sub-contractors, workmen, machinery, tools, plant, equipment, materials and things so provided and employed by the Engineer, in the diligent advancement of the works; the workmen so provided being thereafter exempt from discharge or removal by the Contractor without the consent and approval of the Engineer. In the event that the Engineer provides and employs additional workmen or employs a sub-contractor or sub-contractors, such shall thereupon be deemed to be the workmen of the Contractor or sub-contractors of the Contractor for the purposes of this Contract.

*Default or delay by Contractor.*

*May take work out of the Contractor's hands.*

*Materials, etc. subject to lien.*

*Power of sale.*

*Set off against damages.*

23. In case the Contractor makes default in the prompt commencement or in the diligent prosecution of any of the works or parts or portions thereof to be performed or that may be ordered, under the Contract, to the satisfaction of the Engineer, the Engineer may give a general notice in writing to the Contractor that he, the Contractor, has made such default. Should the Contractor during six (6) days (excluding Sundays) from the giving of such notice fail to remedy such default or delay to the satisfaction of the Engineer, or should the Contractor make default in completion of the works, or any portion thereof, within the time limited with respect thereto, in or under the Contract, or should the Contractor become insolvent or bankrupt, or aban don the work or any part thereof, or otherwise should he fail to observe and perform any of the provisions of this Contract then, and in any of such cases, the Engineer may forthwith within such further time as he deems reasonable and without prior notice or other proceedings whatsoever take all the work, or any portion or portions thereof, out of the Contractor's hands, and may employ such means as he may see fit to complete the works, or any such portion or portions thereof so taken over, or to partly complete or advance the same, and in such case the Contractor shall be chargeable with, and remain liable for, all loss and damages which may be suffered by the Railway by reason of such default, or the non-completion by the Contractor of the works, and shall also be liable to the Railway for the cost of doing any such work over and above the contract price therefor, and no objection or claim shall be made by the Contractor on account of the ultimate cost of the work so taken for any reason proving greater than, in the opinion of the Contractor, it should have been. All or any part of such loss and damages may be chargeable by the Railway against and may be deducted from any monies accruing or owing to the Contractor from time to time and any remainder thereof shall be recoverable from the Contractor. All materials and things whatsoever, and all machinery, tools, plant and equipment and all licenses, powers and privileges, acquired, possessed or provided by the Contractor for the purposes of the works, or by the Engineer under the provisions of the Contract, shall be subject to a lien or pledge in favor of the Railway for all purposes incidental to the completion of the works; and the Railway may use, exercise and employ the same in such completion, and may sell, or otherwise dispose of, the whole or any portion of such materials and things, machinery, tools, plant and equipment at forced sale prices, and may retain the proceeds of such sale or disposition and all other amounts then or thereafter payable by the Railway to the Contractor under the Contract, on account of or in part satisfaction of any loss or damage which it may sustain or may have sustained by reason aforesaid.

*Waiver negatived.*

43. No condoning, excusing, or overlooking by the Railway, or by any person acting on its behalf, on previous occasions, of breaches or defaults similar to that for which any action is taken, or power exercised, or forfeiture is claimed or enforced against the Contractor, shall be taken to operate as a waiver of any provisions of the Contract, nor to defeat, affect or prejudice in any particular the rights of the Railway hereunder.

*Contractor's information.*

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.      12

Canadian National Railway v. Volker Stevin Contracting Ltd., 1991 CarswellAlta 8

1991 CarswellAlta 8, [1991] A.J. No. 1054, 120 A.R. 39, 1 Alta. L.R. (3d) 167...

*Contractor's investigation of every condition of work before execution of Contract.*

44. The Contractor declares that in tendering for the works and in entering into the Contract he has either investigated for himself the character of the work and all local conditions that might affect his tender or his acceptance of the work, or that not having so investigated, he is willing to assume and does hereby assume all risk of conditions arising or developing in the course of the work which might or could make the work, or any items thereof, more expensive in character, or more onerous to fulfil, than was contemplated or known when the tender was made or the Contract signed. The Contractor also declares that he did not and does not rely upon information furnished by any method, whatsoever, by the Railway or its officers or employees, being aware that any information from such sources was and is approximate and speculative only, and was not in any manner warranted or guaranteed by the Railway.

**Instructions to Bidders — Paras. 8 and 9**

The tenderer shall submit with his tender a construction schedule and method of operation to install the 2450 mm structural plate corrugated steel pipe and a construction method and procedure to install the 4200 mm tunnel liner plate as called for in the specifications.

This document must not be detached from the "Form of Tender" as it constitutes a part of the contract.

**Form of Tender — Paras. 1 and 2**

```
                                             Annex "B"
                                             ---------
                               FT3425-256.8-1.2
                   Canadian National Railway Company
                            form of tender
                 for the installation of tunnel liner plate
                   culverts at lutose creek -- km 413.36
                   (mile 256.85) meander river subdivision
                         near steen river, alberta
```

VOLKER STEVIN CONTRACTING LTD., the undersigned, hereby offer and agree to furnish all and every kind of labour, scaffolding, tools, implements, machinery, plant, services and materials that may be required to execute and complete, in a satisfactory and workmanlike manner, all the work required to complete the above project in accordance with Plans and Specifications attached hereto and exhibited, and such further details as may be furnished from time to time during progress of the work.

*Volker Stevin Contracting Ltd.*, have examined the Plans, Specifications, Instructions to Bidders, the Site and Existing Conditions, and have ascertained all necessary particulars with regard to the work and upon acceptance of this tender _____ prepared to enter into a contract in the form exhibited with the said Specifications, for the performance of the work for the Unit Prices given below:

*[Graphic not reproduced].*

*Appeal allowed.*

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    15



*Case Name:*

# Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.

**Between**
**Stetson Oil & Gas Ltd., Plaintiff, and**
**Stifel Nicolaus Canada Inc., Defendant**

[2013] O.J. No. 1058

2013 ONSC 1300

Court File No. CV-08-7809-00CL

Ontario Superior Court of Justice
Commercial List

**F.J.C. Newbould J.**

Heard: January 9-11, 16, 18, 21-24, 28 and February 5, 2013.
Judgment: March 1, 2013.

(177 paras.)

*Contracts -- Nature of contract -- What constitutes -- Intention to create legal obligations -- Action for breach of contract allowed -- Plaintiff entered into a bought deal underwriting agreement with defendant contained in a signed letter agreement under which defendant agreed to purchase for resale subscription receipts in capital of plaintiff -- Defendant did not close agreement when it was unable to sell its position at a profit before entering into underwriting agreement -- Letter agreement constituted binding agreement -- Language of engagement letter and inclusion of arbitration clause indicated an intention that it was a binding agreement.*

*Contracts -- Terms -- Express terms -- Exclusion clauses -- Primary obligation -- Liability for breach -- Force majeure -- Action for breach of contract allowed -- Plaintiff entered into a bought deal underwriting agreement with defendant contained in a signed letter agreement under which defendant agreed to purchase for resale subscription receipts in capital of plaintiff -- Defendant not entitled to rely on the out provisions in the underwriting agreement -- Defendant never attempted to negotiate an underwriting agreement before it failed to close the transaction as required by engagement letter -- Defendant never purported to rely on these clauses until trial.*

*Contracts -- Remedies -- Damages -- Duty to mitigate -- Amount -- Consequences of breach -- Action for breach of contract allowed -- Plaintiff entered into a bought deal underwriting agreement with defendant contained in a signed letter agreement under which defendant agreed to purchase for resale subscription receipts in capital of plaintiff -- Defendant did not close underwriting agreement --- rd damages of conttuing a binding ahgreement.-- Lehe entered into ges. he arefuthat ent. letter closed, less the amount per share received by the plaintiff from the financing transaction with a third party plus interim financing costs.*

*Damages -- In contract -- Breach of contract -- Loss of profits -- Consequent to breach -- Plaintiff entered into a bought deal underwriting agreement with defendant contained in a signed letter agreement under which defendant agreed to purchase for resale subscription receipts in capital of plaintiff -- Defendant did not close underwriting agreement --- rd damages of conttuting a binding ahgreement.-- Lehe entered into ges. he arefuthat ent. ment with the defendant contained in a signed letter agreement under which the defendant agreed to purchase for resale 45,454,600 subscription receipts in the capital of the plaintiff. The defendant did not close the agreement when it was unable to sell its position at a profit before entering into the underwriting agreement. The plaintiff then made an agreement with Canaccord Capital for financing at a higher cost than the agreement with the defendant. The plaintiff sought as damages from the defendant the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs. The defendant argued that the engagement letter was not a binding agreement. It also argued it was entitled to rely on the out clauses of the agreement and the indemnification provisions which prevented the plaintiff from suing fro damages.*

HELD: Action allowed. Judgment for plaintiff for $16,042,669. The engagement letter was a binding agreement. The language of this engagement letter indicated an intention that it was a binding agreement. The inclusion of an arbitration clause was also a clear indication that a binding agreement was made. The parties' conduct indicated that they understood that it was a binding agreement and relied on the agreement being binding. The defendant was also not entitled to rely on the out provisions in the underwriting agreement. The defendant never attempted to negotiate an underwriting agreement before it failed to close the transaction as required by the engagement letter. At no time did the defendant purport to rely on these clauses. They were first raised during this litigation. Even if the out clauses relied on were applicable, there were no facts presented that would have entitled the defendant to rely on them. The indemnification provision in the engagement letter did not prevent the plaintiff from suing the defendant for damages other than the fees paid to thee defendant. The steps taken by the plaintiff to mitigate its damages by entering into the agreement with Canaccord were reasonable. The appropriate measure of damages was the amount per share that the plaintiff would have received from the defendant had the engagement letter closed, less the amount per share received by the plaintiff from the Canaccord transaction. The plaintiff was also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have been required had the defendant not breached the engagement letter.

**Counsel:**

*William J. Burden, Arthur Hamilton and Lara Jackson,* for the Plaintiff.

*Joseph Groia, Kellie Seaman* and *David Sischy* for the Defendant.

---

### REASONS FOR JUDGMENT

**1    F.J.C. NEWBOULD J.:--** The plaintiff Stetson Oil & Gas Ltd. ("Stetson") sues for breach of a "bought deal" underwriting agreement contained in a signed letter agreement (the "engagement letter") under which Thomas Weisel Partners Canada Inc. ("Weisel")[1] agreed to purchase for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel did not close the agreement. Stetson then made an agreement with Canaccord Capital Corporation for financing which resulted in gross proceeds to Stetson of $12,000,000 for the issuance of 60,000,000 units (each consisting of a share and warrant) at 20 cents per unit. Stetson claims damages for breach of contract against Weisel, being the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs.

**2**    For the reasons that follow, the action is allowed and Stetson is entitled to judgment against Weisel for $16,042,669 and interest.

**Pertinent History**

**3**    Stetson is a junior oil and gas exploration company which trades on the TSX Venture Exchange.[2] Weisel at material times operated as an investment bank and securities dealer specializing in the growth sectors of the economy.

**4**    In June, 2008 Stetson made a proposal to the Fort Berthold Tribe of North Dakota to lease tribal lands to explore in the Bakken Formation in North Dakota. In 2008 the Bakken was one of the hottest oil and gas plays in the United States, due in part to new horizontal fracturing technology that allows for exploration and development in property that under conventional techniques could not be profitably explored. The Bakken in North Dakota and Saskatchewan has the potential to become a world class producer of oil and gas. Today it produces over 700,000 barrels of oil a day, mostly in North Dakota.

**5**    Stetson needed to raise funds in order to pursue the Bakken opportunity. Stetson's market capitalization at the time was $15 to $20 million

**6**    Stetson wanted to raise funds through a bought deal financing because it wanted a guarantee

with no financing risk. In a bought deal, the underwriter agrees to purchase the issuer's securities at a fixed price and takes the risk of selling them in the market at a profit. A bought deal in this respect is fundamentally different from an agency or best efforts underwriting in which an underwriter makes best efforts to sell the securities of the issuer but provides no guarantee of the amount or value of the securities that will be sold. The issuer takes the market risk.

7    Stetson began canvassing the underwriting market in June, 2008 in anticipation of acquiring the lease rights in the Bakken. Mr. Stan Bharti, the founder and Chairman of Forbes & Manhattan, a very successful resource merchant bank, had been a director of Stetson since 2006. Forbes & Manhattan and Mr. Bharti had existing investment banking relationships with, among others, Canaccord and Macquarie Capital Markets Inc., but had no relationship with Weisel.

8    Weisel was very interested in doing business with Mr. Bharti as he was viewed as a very successful businessman who had been involved in many successful start-up ventures. When Weisel learned of his involvement in Stetson and Stetson's interest in the Bakken play in North Dakota, Weisel reached out to Mr. Bharti and Stetson. They viewed Mr. Bharti as the key decision maker for Stetson.

9    Mr. Alex Wylie of Calgary acted as the lead banker for Weisel in dealing with Stetson. Mr. Alec Rowlands of Weisel had known Mr. Bharti since 1993 and he and Mr. Wylie agreed to pursue Mr. Bharti and Stetson. Meetings were arranged for the president of Stetson, Mr. Bill Ward, to meet with Mr. Wylie and after that there were a number of meetings between Stetson and Weisel.

10    Weisel had detailed research coverage on the Bakken play. It had extensively analyzed Kodiak Oil & Gas Corp. ("Kodiak"), a successful oil exploration company with lands near the lands that Stetson was pursuing. After his meeting with Mr. Ward, Mr. Wylie sent him several research reports Weisel had done on Kodiak and on another company involved in the Bakken named Tristar Oil & Gas.

11    Weisel promoted its expertise and knowledge of the Bakken formation as something that would be of assistance to Stetson. Messrs. Wylie and Rowlands told Mr. Bharti that they and their analysts knew the Bakken well, and that Weisel wanted to get involved in the deal and to build a relationship with Mr. Bharti and Forbes & Manhattan.

12    Weisel understood from discussions with Mr. Bharti and Mr. Said, another director of Stetson, that Stetson was looking to raise $25 million through a bought deal and that it could be expected that obtaining an underwriting agreement would be a competitive situation. There is no question but that Weisel was very anxious to get the business. An internal Weisel e-mail of July 4, 2008 from Mr. Wylie was indicative of this:

Stetson is a Stan Bhardhi [sic] company with assets in the Bakken ...

...

> They are ging [sic] to want a bought deal ... Stan's last deal out here was a few
> weeks back for Vast...Niko took a big chunk ... apparently they had $75MM in
> orders on a $25MM deal ... Stan is going to be the decision maker on this ... they
> will have a syndicate but you need to put up a deal to get in the game on this one
> ...

**13**    Vast Exploration was a company in the Forbes & Manhattan group and the reference to it was
to a recent financing for Vast that had received $75 million in orders for a limited $25 million
financing.

**14**    On July 7, shortly after Mr. Ward met with the sales force of Weisel in Toronto, Mr. Wylie
said in another internal Stetson e-mail that Stan Bharti was clearly the decision maker and that Mr.
Rowlands "has the best relationship with Stan and he needs to start working him over". Mr. Wylie's
evidence that all he was indicating was that he wanted Weisel to be prepared in case Stetson won
the lands was not convincing. More indicative of Weisel's frame of mind was an e-mail from Mr.
Rowlands to Mr. Bharti of July 9 which said "... this is a deal we want to lead, we believe that our
coverage of the Bakken and the US players in the area will benefit Stetson, let's talk today, when are
u available?" On the same day Mr. Wylie e-mailed Mr. Said of Stetson and said "The firm is very
enthusiastic about getting behind the Stetson story and will be putting up a deal to Stetson once you
are ready for bids."

**15**    The lease sought by Stetson required approval by the Tribal Council which was expected in
early July. On July 11, 2008 Stetson announced that it had received Tribal Council approval to the
lease of 8,570 acres of what were referred to as tribal lands that were adjacent to another 4,500
acres of freehold lands that it was leasing, subject to approval of the Bureau of Indian Affairs.

**16**    On that day, the Commitment Committee of Weisel met and decided to offer 50 cents a share
on a bought deal that would see Stetson receive $25 million less fees to Weisel. Mr. Wylie called
Mr. Bharti and Mr. Said and said that Weisel was prepared to deliver a bought deal letter at 50 cents
a share. Mr. Bharti said that 50 cents was not enough and proposed 55 cents. The Commitment
Committee of Weisel met a second time and agreed to the price of 55 cents a share.

**17**    At 8:53 p.m. on July 11, 2008, Weisel e-mailed a signed engagement letter from Mr. Wylie to
Mr. Bharti and others. In the e-mail, Mr. Wylie outlined the terms of the "bought deal letter",
including the following:

> Syndicate: 65% TWP [Weisel], 35% Canaccord - the deal is not subject to
> syndication

**18**    This arose as a result of discussions between Messrs. Bharti and Mr. Said of Stetson and

Messrs. Rowlands and Wylie of Weisel who knew that Forbes & Manhattan had a close relationship with Canaccord and that Canaccord was very interested in the financing. Canaccord had been the lead banker for oil and gas deals that Forbes & Manhattan had done. Weisel thought that it would be easier to obtain Mr. Bharti's agreement to use Weisel for the financing if Weisel offered some of the deal to Canaccord. In early discussions Weisel had said to Mr. Bharti that if Stetson wanted syndication they could do that. Syndication means that the underwriter brings in other underwriters to reduce its liability or risk. Weisel told Mr. Bharti that if he felt syndication was important because of his relationships with other bankers, they would be open to it.

**19**    The engagement letter stated that the deal was not subject to syndication, and all Weisel witnesses confirmed that the deal did not require that Canaccord participate in it and that Weisel was quite prepared to proceed with the deal alone. It is quite clear that the participation of Canaccord was not required, or even asked for, by Weisel. Weisel told Mr. Bharti that their first preference was to go without any syndication. Mr. Bharti told Weisel that if Canaccord agreed, he would like to see Canaccord in the syndicate because of their long-term relationship and over the week-end after the engagement letter was sent by Weisel, he told them that he would like to see Canaccord with 40% rather than 35% but that it would be entirely up to Weisel how they would structure the syndicate.

**20**    Over the week-end there were communications between Mr. Gleeson, Stetson's in-house counsel, and Mr. Wylie of Weisel regarding terms of the engagement letter. Some terms were changed. On Sunday, July 13, 2008 at 11:11 pm Mr. Gleeson e-mailed to Mr. Wylie a copy of the engagement letter signed by him on behalf of Stetson. The terms had been changed somewhat from the previous version signed and sent by Weisel on July 11, 2008.

**21**    The engagement letter provided that Weisel, as the Lead Underwriter, would on a bought deal basis purchase by way of private placement for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel was granted an option to purchase an additional 9,091,000 subscription receipts for 55 cents each. Each subscription receipt was to be automatically exchanged for one common share of Stetson upon approval of the Bureau of Indian Affairs to the lease of the 8,570 acres already approved by the Tribal Council.

**22**    One of the terms of the engagement letter was that it was subject to reconfirmation by 5 a.m. Calgary time on July 14, 2008. It is apparently quite common if a bought deal is done at night that there must be reconfirmation in the morning. That is done to give a party time to react to something that may happen overnight before the morning. In this case Mr. Wylie of Weisel reconfirmed the deal at 5 a.m. Calgary time in a call to Mr. Said of Stetson.

**23**    Shortly before 7 a.m. Toronto time Mr. Pocrnic of Weisel telephoned Canaccord to invite Canaccord to participate in a syndicate. He recalls little of the discussion. A few minutes later he got a call back from Canaccord saying they were going to pass on the transaction. Mr. Wylie called

Mr. Said who suggested he call Genuity as Genuity had indicated late on Sunday evening that if Canaccord did not participate, which Genuity thought highly remote, Genuity would certainly play a syndicate role. Mr. Pocrnic then spoke to the head of institutional sales at Genuity who indicated they would not participate. Mr. Wylie informed Mr. Said of this and said that Weisel was going ahead with the marketing of the deal.

24    At 7:31 a.m. Toronto time, Weisel released a press release announcing on behalf of Stetson that Stetson had entered into an agreement with Weisel as lead underwriter on behalf of a syndicate of underwriters to purchase on a bought deal private placement basis 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. In the parlance of the underwriting market, the deal at that point went "live".

25    On July 13, Weisel advised its sales and trading personnel that it would be going live on a bought deal for Stetson the next morning at 7:30 a.m. Weisel intended and expected to sell the entire bought deal by 9:15 am, within two hours of announcing the deal, and fifteen minutes before the TSX opened at 9:30am. This was consistent with both the timelines for a bought deal in Weisel's Deal Book, the guide used by Weisel to conduct its business. Mr. Wylie testified that once Canaccord backed out, Weisel was not sure that the entire position would sell by the opening of the market that day. I have some trouble with that evidence. Mr. Wylie had said that putting a provision in the engagement letter that the deal was not subject to syndication had been intended to show a sign of strength on the part of Weisel and that Weisel did not need Canaccord in the deal but could do it alone.

26    Weisel was not able to sell any of its position in Stetson on the 13th. Mr. Rowlands, the managing director of institutional equity sales for Weisel, said that at the same time the Stetson press release was issued to announce the bought deal with Weisel, Shell Canada announced it was going to buy Duvernet Oil, an oil and gas play in Alberta, for $6.5 billion dollars. Most of the people Weisel wanted to talk to were shareholders of either Shell or Duvernet and it was very difficult to get them on the telephone as they were pre-occupied with the larger deal. There was no suggestion that the fact that Canaccord was not part of the syndicate was any impediment to the deal. Mr. Rowlands kept Mr. Bharti informed on a daily basis that week and for the first half of the week told Mr. Bharti that they were confident that the deal would be sold.

27    However, by July 17, 2008 Weisel had managed to place only $2 million of its position. Mr. Bharti's evidence, which I accept, was that in his experience involving 30 or 40 bought deals, they can sell out in one hour, sometimes in two or three days and usually are always sold out in the first four or five days. He said it was that it was in no one's interest for a bought deal to be a hung deal, meaning for the underwriters to be holding the stock. The market would understand that the stock could not be sold and it would hurt the price of the stock.

28    Mr. Bharti offered later that month to have Aberdeen, a Forbes & Manhattan fund, buy $2

million of Weisel's position if the rest was sold, and said that Stetson was open to discussions if Weisel wanted to change some terms to help them resell the deal. He testified that he made it clear to Weisel that Stetson needed the money by the end of July or early August to meet their obligations, that Stetson had to be pragmatic, and that if Weisel came back with a proposal that would help them sell the deal, for example with a different price or incentives, Stetson would be open to looking at. Weisel never came back with any new fixed proposal before closing.

29    The engagement letter provided that the deal was to close on July 31, 2008. On that date Stetson was to receive the agreed amount from Weisel. However, on July 28, 2008 Weisel's lawyers wrote to Stetson's lawyers and said that Weisel did not intend to close the deal on July 31, 2008. No reason was provided.

30    By letter of July 31, 2008 e-mailed on August 1, 2008, Stetson's lawyers wrote to Weisel's lawyers and said that Stetson "agrees to allow the extension of the closing past July 31, 2008 to a later date that reasonably coincides with the Corporation's capital expenditure requirements". There had been no request for an extension from Weisel and it cannot be said that the extension was made by agreement with Weisel. Mr. Bharti's evidence, which I accept, was that Stetson had no choice but to state that there was an extension as Weisel had gone silent and had not said why they would not close or provided new terms. He said that Stetson had commitments and that its business was in jeopardy. Because they had had some discussion on terms, he felt an extension would give time to perhaps come to new terms that would allow them to fulfill their commitments. He said he had to be practical and pragmatic and was trying to look for a solution. Mr. Said's evidence, which I also accept, was to the same effect.

31    A press release announcing the extension was made on August 8th. Mr. Bharti's evidence, which I accept, was that they had not heard back from Weisel regarding the extension letter and they had statutory disclose requirements to announce the extension contained in the July 31, 2008 letter e-mailed the following day. Mr. Said testified that Stetson was stuck because of the failure of Weisel to close the transaction and that announcing anything other than that the deal was extended would be terrible for Stetson. He said that there was no agreement with Weisel about the extension. I accept that evidence. I do not accept the evidence of Mr. Wylie that he had discussions with Mr. Bharti and Mr. Said regarding the extension or that Weisel agreed or participated in extended the closing. There was no discussion in the conversation between Stetson and Weisel people on August 1, 2008 about any extension of the closing. Weisel had no interest or intention of closing the deal reached in the engagement letter. It sought a new deal for much less and for terms more favourable to it.

32    Around the time of the extension, Mr. Bharti received a call from Mr. Lionel Conacher, the president and chief operating office of Weisel, who was based in San Francisco at the time. They met in Toronto on August 13, 2008. They differ as to what exactly was said. I viewed Mr. Bharti as having the better recollection, but it is perhaps unimportant. No new agreement was reached. On August 14, 2008 Weisel offered to make a debt investment of $8 million in return for a release of its

obligations under the engagement letter. On August 18, 2008 the solicitors for Stetson replied that Stetson would not release Weisel from the terms of the engagement letter and that if Weisel did not fulfill its obligations, it would take action.

33   As early as August 1, 2008 Stetson began to consider alternatives to the Weisel deal. On that day they received a proposal from First Energy that was not acceptable. They went to Canaccord and Macquarie for advice. Canaccord suggested considering a strategic partner and Mr. Said met with Crescent Point at Canaccord's suggestion. However Mr. Said testified that Stetson had no leverage and Crescent Point knew they had a financing problem. No agreement was made. They also met with Tristar and although it looked promising at the outset, Tristar knew that Stetson had no leverage and in Mr. Said's words, were trying to squeeze Stetson. Tristar knew that if Stetson did not get financing, they could go themselves to the Tribal Council and get the lands themselves.

34   Eventually Stetson signed an agreement with Canaccord effective August 28, 2008 pursuant to which Canaccord agreed to provide a $12 million financing on a "best efforts" basis in exchange for 60,000,000 units, each unit consisting of a share and warrant of Stetson, at 20 cents per unit. In addition, Stetson agreed to issue approximately 85 million preferred shares to every existing shareholder of Stetson who would be entitled to "the proceeds of any final judgment or settlement monies paid to and received by the Corporation in connection with its claim against Thomas Weisel ...". The preferred shares were the idea of Canaccord as a sweetener to assist the sale of the Stetson shares.

35   Mr. Said testified that Canaccord was doing Stetson, and particular Mr. Bharti, a favour. He testified that Stetson was tainted because of the failed bought deal and that Canaccord were uncertain what they could do. Stetson trusted Canaccord would do its best. I accept this evidence.

36   The Canaccord financing closed on September 17, 2008 for net proceeds to Stetson of $11,215,928.92 after fees paid to Canaccord.

37   Before the closing, Stetson had to obtain two bridge loans from Longford Energy Inc., a public company that is a member of the Forbes & Manhattan group, to make lease payments that had become due. These bridge loans and the associated fees ($100,000) and accrued interest ($33,559) were repaid from the proceeds received on closing of the Canaccord financing.

38   There were not sufficient funds from the Canaccord financing for Stetson to undertake its development in the Bakken. Another $23 or $24 million was needed. Mr. Ward, the president of Stetson, thought a strategic partner was needed and he canvassed potential parties. Eventually a proposal was made in early October 2008 by Red Willow Great Plains, LLC. Red Willow was a business enterprise of the Southern Ute Indian Tribe with sizeable oil and gas production.

39   Under the Red Willow deal, Stetson assigned 50% of its oil and gas mineral rights in the allotment lands and 60% of its rights in the tribal lands to Red Willow. In exchange, Red Willow agreed to pay for Stetson's first $3,500,000 of drilling costs and also to pay for its share of all land,

drilling and exploration costs, to provide its considerable technical expertise and to act as the operator of the programme.

40    Eventually only one well was drilled before Red Willow decided not to proceed further, and the project was terminated and the leases lost. During the trial, a ruling was made refusing a motion by Weisel to amend its pleading to rely on the Red Willow transaction and subsequent activity under it, and thus geological evidence regarding the leased lands and their economic potential was not led.

### Was there a binding agreement?

41    Weisel takes the position that the engagement letter was not a binding agreement, but only an agreement to agree, and that before there could be a binding agreement, there had to be an underwriting agreement signed by the parties prior to closing.

42    The principles to be considered in assessing whether the parties entered into a binding agreement or merely agreed to agree were recently discussed by Pepall J. (as she then was) in *UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2008), 45 B.L.R. (4th) 105 at paras. 40 to 43; aff'd (2009), 95 O.R. (3d) 93 (C.A.). I take from her discussion the following principles:

  (a)   The test as to whether there was *consensus ad idem* is an objective one. The parties will be found to have reached a meeting of the minds where it is clear to the objective reasonable bystander, in light of all the material facts, that the parties intended to contract and the essential terms of that contract can be determined within a reasonable degree of certainty.

  (b)   The investigation to determine whether a reasonable observer would think that two parties intended to contract extends to all the circumstances of the agreement. This has been held to include words and conduct, future actions and representations by both parties and reliance. This determination frequently involves an assessment of the credibility of witnesses

  (c)   An agreement is not incomplete simply because it calls for some further agreement between the parties or because it provides for the execution of a further formal document. It is a question of construction whether the execution of the further contract is a condition or term of the bargain, or whether it is a mere expression of the desire of the parties as to the manner in which the transaction already agreed to will in fact go through.

43    In *Canada Square Corp. v. VS Services Ltd.* (1981), 34 O.R. (2d) 250 (C.A.), which involved an issue as to whether a letter sufficed to make a binding agreement or required a formal contract, Morden J.A. cited Professor Waddams for the proposition that subsequent conduct of the parties, while not conclusive and to be looked at with caution, may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date. He also cited Corbin on Contracts for the proposition that the fact that

the parties have acted by rendering some substantial performance or by taking other material action in reliance upon their existing expressions of agreement is itself a circumstance bearing upon the question of completeness of their agreement.

44    Morden J.A. also said, quoting Cardozo J., that it is important to consider, as a part of the context of the document, "the genesis and aim of the transaction".

45    There are a number of provisions in the engagement letter that suggest it constitutes a binding agreement. There is also a provision requiring an underwriting agreement to be made prior to closing. Included are the following provisions:

> Thomas Weisel Partners Canada Inc. ("Thomas Weisel" or the "Lead Underwriter"), hereby offers, on a "bought deal" basis by way of private placement, to purchase for resale ...

> ## 1. Terms of Engagement

> ... The Offer shall be open for acceptance by the Company until 10 a.m. (Calgary time) on July 13, 2008 unless otherwise extended ... and is subject to reconfirmation prior to 5 a.m. (Calgary time) on July 14, 2008. Upon the reconfirmation of this engagement letter, the Company authorizes Thomas Weisel to disseminate the press release attached in Schedule C ... The Company agrees upon reconfirmation of this engagement letter to have the trading of its securities halted, if necessary, ...

> ## 3. Underwriting Agreement

> The definitive terms of this agreement will be governed by a formal underwriting agreement to be entered into prior to closing of the purchase by Thomas Weisel (the "Underwriting Agreement") in respect of the Offering. The Underwriting Agreement will be negotiated in good faith between the Company and Thomas Weisel, on behalf of the Underwriters, and will contain representations, warranties, covenants, conditions (including, without limitation, the delivery of certificates of responsible officers of the Company on behalf of the Company, and legal opinions from counsel to the Company regarding relevant corporate and securities matters with respect to the Offering, and the principal subsidiaries and properties of the Company, together with other relevant corporate and securities matters, acceptable to Thomas Weisel and its counsel), indemnity and termination provisions (including without limitation, standard "due

diligence-out", "disaster-out", "material adverse change-out", and "regulatory-out" rights) customary in agreements of this type and will be consistent in all material respects with this letter agreement, unless otherwise agreed between the parties.

### 5. Indemnification

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. Such indemnity shall be executed and delivered to Thomas Weisel on the execution of this agreement. The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. This agreement and the indemnity provisions contained in Schedule B shall enure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties, and the obligations and liabilities assumed in the agreement and in the indemnity contained in Schedule B shall be binding upon their respective successors and assigns, ...

### 8. Other matters

(e)    Any dispute arising out of this agreement (including any Schedule) will exclusively be submitted to an arbitrator for binding and conclusive resolution. ...3

### 9. Acceptance

Please confirm that the foregoing is in accordance with the Company's understanding by signing and returning the attached duplicate copy of this letter, which shall thereupon constitute a binding agreement between the Company and Thomas Weisel. (Underlining added)

46    The language of this engagement letter certainly indicates an intention that it be a binding agreement. It states so expressly in paragraph 9 and the expression "this agreement" is referred to many times. The provision in paragraph 3 calling for the negotiation of an underwriting agreement does not state that until there is such an underwriting agreement there is no binding agreement between the parties.

**47** The inclusion of an arbitration clause is a clear indication that a binding agreement was made. Otherwise there would be no purpose in an arbitration provision. The same is the case with respect to the indemnity provided in the engagement letter.

**48** What is the "genesis and aim" of the transaction? It was a bought deal underwriting transaction that was intended to be acted upon within hours of the signing of the engagement letter. The time for acceptance by Stetson of the offer contained in the engagement letter was very short. The price of 55 cents per share (or subscription receipt) had been settled by Weisel after taking into account the trading price of Stetson's shares late on the afternoon of Friday, July 11, 2008 with the intention that if the engagement letter was signed by Stetson the deal would go "live" before the opening of the markets on Monday morning, and if normal events occurred, would be sold out shortly thereafter.

**49** The engagement letter was to be reconfirmed by Weisel by 5 a.m. Calgary time, Monday morning, which it was. There would be no need for a reconfirmation if there were no binding agreement. Weisel intended to thereupon contact Canaccord to offer them part of the Stetson position that it had agreed to underwrite, which it did, and to issue the press release announcing the agreement by the parties to a bought deal, which it did. All of this before the market opened in Toronto at 9:30 a.m. Weisel then met with a number of its institutional clients to try to sell them a position. Weisel could not have taken these steps if it thought that it had no binding agreement with Stetson. It would make no commercial sense to view things differently.

**50** The form of the engagement letter was a standard form used by Weisel, and any substantive changes had to be approved by its Commitment Committee. The form of the letter was contained in Weisel's Deal Book, the guide used by Weisel to conduct its business. That Deal Book also contained the following statement about the engagement letter:

> "The engagement letter specifies the terms of the deal and serves as the primary agreement defining the obligations of the dealer to the issuer and vice versa."

**51** Mr. Wylie, the lead banker for Weisel on this transaction, agreed on cross-examination that the statement was a correct statement at the time the engagement letter was signed. That is, Weisel itself acted on the basis that the engagement letter was the primary agreement that defined the obligations of Stetson and Weisel. While the test as to whether there was a binding agreement is not a subjective test, this evidence is consistent with what a reasonable observer would consider to have occurred, i.e. that a binding agreement had been made by the parties. The same can be said for the lack of evidence of any Weisel witness that the engagement letter was not a binding agreement. No Weisel witness testified that Weisel acted as it did on the basis that the engagement letter was not a binding agreement or that the engagement letter was viewed by them as not being a binding agreement.

**52** There are other indications that Weisel understood that it was making a binding agreement. Mr. Wylie testified that at the first meeting of the Weisel Commitment Committee dealing with

Stetson on July 11, 2008, the thrust of the conversation was that Weisel had to be confident in putting up the firm's capital that the deal "would sell" in the market place, i.e. not that they would be committing capital only after they had gone to the market and learned that the deal had sold, but before.

53   After Weisel had gone to the market and had difficulty in selling its position, Mr. Conacher, the president and chief operating officer of Weisel, e-mailed Mr. Poernic, the managing director and head of syndication and equity capital markets in Toronto, and others at Weisel on July 19, 2008. He stated:

> Nick - I'd like to have a review first thing on Monday of exactly which accounts we've approached on Stetson, which ones are outstanding, which accounts are likely buyers of the deal and for you to review the action plan for the coming week. I think we should include Seth and/Mo in the discussion so that we make sure we are thinking about ALL possible alternatives to get off this liability. This is by far the most important thing we need to do between now and month end and I want to make sure that we are utilizing all of the Firm's resources to manage this situation. Going forward I want a full daily report that includes all of the above. I want a full Court press on this. Nobody goes on vacation until this deal is sold. If people are on vacation, call them back. (Underlining added)

54   This was a clear indication that Weisel was acting on an understanding that it had a liability to Stetson and that it wanted to sell out the position before it was required to close the deal with Stetson on July 31, 2008. No reasonable observer could view it otherwise.

55   Stetson clearly acted on the basis that it had a binding agreement with Weisel and it relied on the agreement being binding. Stetson consented to the press release announcing the bought deal to be released in its name on July 14, 2008 and Stetson personnel attended the meetings set up by Weisel with prospective purchasers in accordance with the terms of the engagement letter. No reasonable observer would expect Stetson to have done these things if there was no binding agreement.

56   This is not a case such as two U.S. cases relied upon by Weisel[4] in which the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement.

57   Weisel contends that its offer was subject to due diligence and the execution of an underwriting agreement, and that was an indication that a formal agreement was necessary, absent which the engagement letter was merely an agreement to agree. However, this is not what the language of the engagement letter says.

58   So far as due diligence is concerned, the engagement letter stated that "completion of the offering was subject to due diligence to be completed prior to the closing", which was to be on July

31, 2008, a little over two weeks after the engagement letter was open for acceptance and long after it was expected that the Stetson position would have been sold by Weisel. Due diligence was not a condition for the offer in the engagement letter and its acceptance to be binding, but a potential reason for Weisel not to close the transaction if there were material matters undisclosed at the time of the acceptance of the engagement letter affecting Stetson's affairs.

59    So far as the requirement for an underwriting agreement is concerned, it was also something to be negotiated prior to closing. The engagement letter did not state that it was a condition of the engagement letter being binding. It is ironic that such reliance is made by Weisel of the need for an underwriting agreement. Weisel made no attempt at all to negotiate one, and a request by Stetson's solicitors on July 24, 2008 to Weisel's solicitors for a draft of the underwriting agreement went unanswered.

60    While the engagement letter contemplated that an underwriting agreement would be made prior to closing, the underwriting agreement, in the language of Parker J. in *Hatzfeldt-Wildenburg v. Alexander*, [1912] 1 Ch. 284, quoted by Judson J. in *Calvan Consolidated Oil & Gas Co. v. Manning*, [1959] S.C.R. 253 at page 5, was not a condition of the bargain but rather it was an expression of the desire of the parties as to the manner in which the transaction already agreed to was to go through.

61    Stetson called as an expert witness Mr. Stephen Halperin, a lawyer practising at the Toronto law firm of Goodmans LLP, where he is a partner, member of the firm's executive committee and co-chair of the corporate securities group. Mr. Halperin was called to give evidence as to how a "Reasonable Market Actor" would view the engagement letter in the circumstances of this case. His Reasonable Market Actor was a proxy for how he believed a reasonably sophisticated participant in an underwriting process would have construed the situation. His qualifications as an expert witness were not challenged by Mr. Groia, but surprisingly in light of that concession, the weight to be placed on his evidence is now challenged on the basis that he has little experience in what he testified to.

62    Mr. Halperin was an impressive witness. It is the case that he is a highly regarded lawyer in his field, which no doubt was the reason why he was not challenged as an expert, but it is also the case that he has had business experience in the area and dealings in his career with the issues involved in this case. He has been involved in a variety of significant transactions in the areas of corporate finance and mergers and acquisitions and as acted for both issuers and underwriters. In his capacity as a director, he has participated in probably 6 private placements and has been involved in bought deals. He is currently a member of the OSC's Senior Securities Lawyers Advisory Group and is a past member of the OSC's Securities Advisory Committee. It was evident throughout his testimony that he is very knowledgeable and I accept his views without qualification.

63    Mr. Halperin was clear to say that he was not offering a legal opinion as to whether the engagement letter constituted a binding contract, but an opinion of whether a Reasonable Market

Actor would consider the engagement letter to be a binding agreement. I expressed some concern that he was trespassing on the purview of the judge who is to decide this issue, but was reminded that as the case law has developed, particularly in *R. Mohan*, [1994] 2 S.C.R. 9, the rule which excluded expert evidence on the ultimate issue before a court is no longer of general application, although the concerns underlying it remain.

64    In determining whether expert evidence is a necessity in assisting the trier of fact, what is required is that the opinion be necessary in the sense that it provides information which is likely to be outside the experience and knowledge of a judge or jury. See *R v. Mohan* at para. 26.

65    It is Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I appreciate that Mr. Halperin does not purport to opine on the legal meaning of the engagement letter but rather how a Reasonable Market Actor would view it. In that sense, he is looking at it from the perspective of a reasonable man, or put differently, from the perspective of what objectively can be taken from the engagement letter and the surrounding circumstances. That however is not really something that is outside the experience and knowledge of a judge. It is commonplace for judges to consider whether parties have arrived at a meeting of the minds to form a binding contract. The tests for doing so are contained in the jurisprudence, some of which I have referred to.

66    Mr. Levy, who filed an expert report on behalf of Weisel and who testified at the trial, referred in his report to the engagement letter as a letter of intent. He stated in his report that the letter of intent "is an agreement" used within the Canadian securities industry to set the intended terms, conditions and indemnifications of a financing. On cross-examination, Mr. Levy said he agreed with the statement in the Weisel Deal Book that the engagement letter serves as the primary agreement defining the obligations of the dealer and issuer. Thus in that regard his evidence on this point was not inconsistent with Mr. Halperin's opinion.

67    In the circumstances I decline to rely on Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I also decline to rely on Mr. Levy's statement that the engagement letter was an agreement. These are not matters for which evidence is necessary in order for a judge understand and deal with the issue.

**Applicability of the "out clauses"**

68    The engagement letter provided in paragraph 5 that the definitive terms of "this" agreement would be governed by a formal underwriting agreement to be entered into prior to closing of the purchase, to be negotiated in good faith between the parties, and that the underwriting agreement would contain certain terms, including standard "due diligence out", "disaster out", "material adverse change-out", and "regulatory out" rights customary in agreements of this type, to be consistent in all material respects with "this" letter agreement.

69    In the first offer from Weisel sent to Stetson, the word "broad" preceded the out clauses. This

word was changed in the final signed engagement letter at the request of Mr. Gleeson of Stetson to "standard", so that the clauses were to be standard out clauses customary in agreements of this type.

70     Weisel contends that the inclusion of the out provisions in the underwriting agreement was a fundamental term of its participation in the financing and that it would not have committed to any obligation with respect to the financing unless an agreement explicitly included standard out clauses. Two things can be said to that argument. First, Weisel did commit to the obligation by reason of the language and provisions in the engagement letter that I have already discussed. Second, the engagement letter in paragraph 5 provided that what was to be contained in the underwriting agreement regarding out clauses were to be standard provisions customary in agreements of this type. Presumably Weisel must have been satisfied with this description.

71     Weisel relies on two of the clauses in its closing argument, being the "material adverse change-out" and "disaster out" clauses. In my view, it is not open for Weisel to rely on these clauses.

72     First, Weisel never attempted to negotiate an underwriting agreement before it failed to close the transaction on July 31, 2008 as required by the engagement letter. The Weisel Deal Book checklist for bought deals in which Weisel was the lead underwriter required Weisel to draft an underwriting agreement with legal counsel. Counsel for Stetson's request for Weisel's draft underwriting agreement went unanswered. Therefore there was no agreement containing these out clauses that Weisel could rely on in refusing to close.

73     Second, at no time did Weisel purport to rely on these clauses. They were first raised during this litigation. The form of clauses relied on by Weisel as being the standard clauses were by their language to be available to Weisel to refuse to close the transaction (i) if Weisel came to the opinion that the conditions in them were not met and (ii) written notice to that effect was given prior to the time of closing. When Weisel announced through its lawyers on July 28, 2008 that it did not intend to close on July 31, 2008, no suggestion was made by its lawyers that Weisel had formed the opinion that it had a right to refuse to close because of any out clause nor was anything said by anyone at Weisel to anyone at Stetson that it was relying on any out clause in deciding not to close on July 31, 2008.

74     Mr. Levy, Weisel's expert witness, in discussing the out clauses, stated that if Weisel determined as a result of its ongoing review of the Bakken project that the potential profitability had been materially reduced as a result of an oil price decline (which Weisel relied on at the trial), Weisel could consider termination by use of the due diligence out clause and/or the material change out clause. While I disagree with Mr. Levy's opinion that these clauses could have been relied on by Weisel, it is noteworthy that he said that before considering termination of the agreement, Weisel had to first make a determination after reviewing the Stetson Bakken project that its profitability had been materially reduced. Weisel had made no review of Stetson's Bakken project after signing the engagement letter nor had it made any determination that its profitability had been reduced

before it announced that it was not going to close on July 31, 2008 as required by the engagement letter. Thus even according to Weisel's own expert, there was no basis to be purporting to rely on the out clauses.

75    Mr. Levy's opinion reflects the two clauses relied on by Weisel. The clauses require that in order to terminate its obligations, the underwriter must form an opinion prior to the time of closing that the conditions in the clause have occurred and must give written notice of its exercise of the rights contained in the clauses. None of that occurred in this case.

76    The standard material adverse change out clause relied on by Weisel provides:

> If, after the date hereof and prior to the Time of Closing, there shall occur any material change or change in a material fact which, in the reasonable opinion of the Underwriters (or any of them), would be expected to have a significant adverse effect on the market price or value of the Securities, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing.

77    The standard disaster out clause relied on by Weisel provides:

> The obligations of the Underwriter (or any of them) to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

78    Weisel argues that oil price changes were sufficient to enable it to rely on these clauses. It points to no evidence, and there is none, that prior to July 31, 2008 it formed an opinion required by the material change out clause that oil price changes would be expected to have a significant adverse effect on the market price or value of the Stetson securities. Nor is there any evidence that prior to July 31, 2008 Weisel formed an opinion required by the disaster out clause that because of oil price changes there had developed, occurred or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which seriously adversely affected, or involved, or would seriously affect, or involve, the financial markets or the business, operations or affairs of Stetson.

79    Nor did Weisel give written notice that it was terminating its obligations under the engagement letter because of the out clauses. On August 1, 2008 there was a conference call

participated in by Messrs. Bharti and Said and others on behalf of Stetson and by Messrs. Conacher, Wylie, Rowlands and others on behalf of Weisel. During that call there was nothing said by anyone on behalf of Weisel about the price of oil, or the state of the markets or the Stetson share price, and nothing was said about using any out clause to terminate their obligations under the engagement letter.

**80**    This argument of Weisel that the out clauses entitle it to deny liability to Stetson because of oil price declines is nothing more than a *post facto* attempt to rely on something said to fall within the material adverse change and disaster out clauses. It is supported by no plausible evidence. No Weisel witness testified that Weisel refused to close because of any drop in oil prices.

**81**    When one looks at the oil prices changes, they can hardly be said to rise to the level that would support any reasonable opinion that the out clauses now relied on by Weisel permitted the termination of the engagement letter.

**82**    Weisel argues that as at July 14, 2008, the price of oil reached a near-peak price of $145.16 per barrel. As at September 5, 2008, the price of oil had dropped to $106.47 per barrel, representing a 27% drop in less than two months and said to be the first substantive material decline in oil prices since December 2006.

**83**    However, Stetson was an exploration play and the daily price of oil was of less importance than for an oil producer. Stetson would likely have not been in production for four years. The evidence of Mr. Bharti, which I accept, was that with an exploration play such as Stetson's project, short term price movements were not important when compared to the long term view on oil pricing and that the long term view of oil was bullish with oil prices staying at or above $80 to $85 per barrel. Mr. Said's evidence, which I also accept, was to the same effect. What was of importance to Stetson, and fully recognized by Weisel, was that oil prices would not likely drop below the forecasted oil prices used in their future value models.

**84**    In its various reports at relevant times, Weisel used conservative oil prices much below market prices in forecasting future values of oil plays. Also, Mr. Wylie, the lead banker for Weisel on this transaction, acknowledged that oil by nature has a high beta, i.e. high volatility and that he would look at pricing over a one or two month period to give him a trend line. It was only two weeks after the deal went live on July 14, 2008 that Weisel through its lawyers said on July 28, 2008 that it would not close on July 31, 2008.

**85**    On March 12, 2008, Weisel prepared a research report in respect of Kodiak Oil & Gas Corp. Under the heading Unproven Resource Potential, Weisel stated that it estimated Kodiak's unproven Bakken resource potential based on a number of assumptions. The assumption for oil was an average NYMEX oil price of $75 per barrel and an average realized oil price of $65 per barrel. Kodiak was also an exploration play in the Bakken and no drilling had yet occurred. On the day of its report the spot price for WTI oil closed at $109.86.

86    On April 25, 2008, Weisel prepared a research report with respect to another Bakken player, TriStar Oil & Gas Ltd, an oil producer, and used as commodity prices in its valuation a WTI price of $110 per barrel for 2008 and $100 per barrel for 2009. On that day, April 25, 2008, the WTI spot price for oil closed at $132.99.

87    On May 21, 2008, Weisel produced another research report on Kodiak. In its net asset value sensitivity analysis, it used three price point cases - the low case at $75 per barrel, the mid-range case at $85 per barrel, and the high case at $95 per barrel. On May 21, 2008 the WTI spot price for oil closed at $132.99.

88    In an investor presentation dated July 3, 3008 which was provided to Weisel shortly afterwards, Stetson used initial production price assumptions in its two forecasted cases of WTI $90 and $115 per barrel. On that date, the spot price for WTI oil closed at $145.31. After this report was made to the Weisel sales team on July 8, 2008, Mr. Wylie told Stetson that Weisel was very enthusiastic about Stetson and would be putting up a deal to Stetson once it was ready for bids. By July 10, 2008 Weisel had prepared a presentation to be used by its sales team that used the same price assumptions of $90 and $115 that Stetson had used. On July 28, 2008, the date that Weisel's lawyers advised Stetson that it would not close, the spot price for TWI oil closed at $124.72.

89    Throughout July, Weisel's equity sales team used its sales presentation in trying to market the Stetson position. As well, Weisel continued to promote Stetson as being similar to Kodiak. On July 21, 2008 Weisel sent to potential equity investors the two Kodiak reports of March 12 and 21 which contained the price assumptions already referred to. On that date Weisel was valuing the Stetson shares, which it had agreed to purchase for 55 cents, at $1.50. It would hardly be right for Weisel to now take the position that the oil prices had dropped to the point that the material adverse market and disaster out clauses were applicable when at the same time it was marketing its Stetson position with oil price forecast assumptions that were lower than the then current price of oil.

90    What also belies Weisel's argument on oil pricing is how it reacted to oil pricing at relevant times. On July 3, 2008, oil closed at its highest price to date, at $145.31 per barrel. However, in the next two trading days, oil retreated by more than $9 per barrel to close on July 8 at a price of $136.06 per barrel. July 8 was the day Stetson made its presentation to Weisel's sales desk. There is no evidence that anyone within Weisel, whether connected with the sales desk or otherwise, registered any concern about the drop in the price of oil and it was after this presentation that Mr. Wylie stated, in an e-mail to Mr. Said of Stetson that Weisel was very enthusiastic about getting behind the Stetson story and would be putting up a deal to Stetson once Stetson was ready for bids.

91    In light of all of this, it is not surprising that no one from Weisel testified that Weisel refused to close because of any drop in oil prices. To have asserted that would not have been plausible or reasonable.

92    Mr. Rowlands did testify that the markets began to turn around negatively at about the time that oil prices hit their high. Both he and Mr. Conacher testified that the markets were buoyant

leading up to the engagement letter but that by the end of July (Mr. Conacher) or third week of July (Mr. Rowlands), they had turned negative. This evidence was given to support a case that it was oil pricing that caused a turn in the markets. I have considerable doubt about the admissibility of this evidence, which is opinion evidence.

93    Mr. Rowlands also asserted that by July 28 the decline in oil pricing from July 14th was a reflection of a growing concern for the debt crisis. I do not think he had any qualifications to make such a statement. He was a trader of stocks, not an economist or someone trained in the analysis of markets and the cause and effect of factors on those markets.

94    In any event, I think the evidence of Mr. Rowlands and Mr. Conacher on these issues is unreliable. Their assertions were made baldly, with no objective evidence given by them to support them. While they testified in chief that the markets were buoyant at the time of the engagement letter, in fact the major indices such as the TSX, the Dow and the S & P 500 were down considerably since their highs earlier in the year. Mr. Conacher could not recall the date of the major economic event that year, the collapse of Lehman Brothers that occurred on September 15, 2008 and he acknowledged that it had an immense impact on the financial markets. The world financial markets, of course, suffered from the debt crisis much earlier than July, 2008, as witness the collapse of the asset backed commercial paper market in 2007. I do not accept the implication of their evidence that the failure of Weisel to sell its position in Stetson was caused by the price of oil starting to drop shortly after the engagement letter was agreed on the evening of July 13, 2008.

95    In my view, and I so find, even if the out clauses relied on by Weisel were applicable, there were no facts present that would have entitled Weisel to rely on them or that entitle Weisel to rely on them in this trial.

   (i)    **Material adverse change out clause**

96    On the premise, however, that the out clauses were a part of the agreement between the parties, I will consider material adverse change out and disaster out clauses as they are the two clauses relied on by Weisel.

97    In this connection the expert opinions of Mr. Halperin and Mr. Levy must be considered. What would be considered to be standard material adverse change or disaster out clauses is something that is not within the knowledge of a judge and is the proper purview of expert evidence. For the reasons that follow, I prefer the evidence of Mr. Halperin rather than Mr. Levy.

98    The engagement letter provided that the underwriting agreement was to contain "a standard material adverse change-out ... customary in agreements of this type". I assume, although it is not clear, that "agreements of this type" refers to a bought deal by way of a private placement. A material adverse change out provision is referred to in the jargon of the industry as a "MAC out" provision.

**99**    The handbook of the Investment Industry Association of Canada (IIAC), which sets out the standard features of an underwriting agreement and the particular wording that "parties in the business have come to expect", contains a "material change out" clause that would be applicable to both a bought deal and an agency best efforts deal. It says that "material change out" clause means a provision substantially in the following form:

> If, after the date hereof and prior to the Time of Closing, there shall occur any <u>material change or change in a material fact</u> which, in the reasonable opinion of the Underwriters (or any of them), <u>would be expected to have a significant adverse effect on the market price or value of the Securities</u>, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing. (Underlining added).

**100**    There are two other MAC out clauses in the record that apply to agency agreements and not bought deals. I view them as not determinative, although the one in the Weisel Deal Book is some indication of what Weisel would want in a negotiated material adverse change out clause.[5]

**101**    The IIAC material change out clause does not define what is meant by material change or change in a material fact. These are not loose terms but have particular meaning in the securities industry.

**102**    Mr. Halperin's opinion is that MAC out clauses in the securities underwriting context (again subject to the specific language of the relevant provision) would typically be expected to be interpreted by reference to the legal definition of "material change" in the *Securities Act* (Ontario) and comparable provisions under other Canadian provincial securities legislation, which define a "material change", in pertinent part, as: "a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer ... ". He went on to say:

> In my experience, "MAC out" provisions in underwriting agreements tend to be based upon the statutory definition of material change (adding the adjective "adverse"). Thus, in the underwriting context, Reasonable Market Actors would expect that a "MAC out" would be available to the underwriter in the event of a change in the business, operations or capital of the issuer of the securities that would rise to the level of a defined material change, with the change "trigger" being the price or value of the issuer's securities, without regard to whether the change is permanent or transformational.

**103**    Mr. Halperin went on to say that there is some debate and uncertainty as to whether a MAC out in this context only gives rise to an underwriter termination right if the MAC out is specific to the issuer as opposed to being of general application. Mr. Halperin said that the issue is sometimes addressed through specific drafting of the provision in the underwriting agreement. In this case

Weisel never attempted to negotiate an underwriting agreement.

**104**   Mr. Halperin's opinion is that in the absence of drafting specificity, the Reasonable Market Actor would derive some guidance on the issue from two sources, being National Policy 51-201 of the Canadian Securities Administration dealing with disclosure standards for reporting issuers and a decision of the Supreme Court of Canada in *Kerr v. Danier Leather Inc.* [2007] 3 S.C.R. 331 which he said became well known in the business community.

**105**   National Policy 51-201 states that it is only external developments that have a direct effect on a business not generally experienced by other business in the same industry that require disclose of changes, as follows:

> Companies are not generally required to interpret the impact of external political, economic and social developments on their affairs. However, if an external development will have or has had a direct effect on the business and affairs of a company that is both material and uncharacteristic of the effect generally experienced by other companies engaged in the same business or industry, the company is urged to explain, where practical, the particular impact on them. For example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, such companies should make an announcement.

**106**   In *Danier*, the trial judge held that a significant change in weather patterns was not a change in the business of *Danier* and thus not a material change within the definition of material change in the Securities Act. The Supreme Court agreed with that finding and pointed out that the distinction between a material fact and a material change was deliberate. Binnie J. stated:

> The distinction between "material change" and "material fact" is deliberate and policy-based, as explained by a former chairman of the O.S.C.:

> The term "material fact" is necessary when an issuer is publishing a disclosure document, such as a prospectus or a take-over bid circular, where all material information concerning the issuer at a point in time is published in one document which is convenient to the investor. The term "material change" is limited to a change in the business, operations or capital of the issuer. This is an attempt to relieve reporting issuers of the obligation to continually interpret external political, economic and social developments as they affect the affairs of the issuer, unless the external change will result in a change in the business, operations or capital of the issuer, in which case, timely disclosure of the change must be made.

**107**    Thus the purport of Mr. Halperin's opinion is that absent a specific contractual provision to the contrary, a Reasonable Market Actor would consider that a standard material adverse change out clause would require a change to the business of Stetson and not a change in oil pricing generally in order for Weisel to attempt to rely on the clause.

**108**    Weisel takes the position that a MAC out clause as contained in the IIAC form of clause is applicable and that any material change in oil prices is not required to have an effect on the business of the issuer, in this case Stetson. This position is somewhat ironic as the form of MAC out clause in Weisel's Deal Book for an agency agreement restricts its applicability to a material change in the business of the issuer, and one would think that in any negotiations that clause would be the starting position for Weisel and accepted by Stetson. The language of the engagement letter was changed between the first draft and the signed letter to change the out clauses to be included in the underwriting agreement from "broad" to "standard" out clauses.[6] No evidence was given as to what that difference would be so far as a material adverse change out clause is concerned, but it suggests that perhaps the clause would have been restricted to changes to the business of Stetson rather than to the industry in general.

**109**    Weisel says that there is a distinction between materiality in a legislative context and in contractual context, and that the objectives behind legislative provisions to protect the public are different from contractual objectives. It relies on the following passage from *Inmet Mining Corp. v. Homestake Canada Inc.*, 2002 BCSC 61, 2002:

> There is an important distinction to be made between the tests for materiality that the courts have applied in cases of legislated disclosure, such as that found in the Securities Act, Real Estate Act, etc., and the test for materiality in a contract. In the former cases the tests have to be more objective because the legislation is aimed at protection of the general public. It would be impossible to know what would affect the mind of every purchaser. By contrast, the parties to a contract have the opportunity to tailor make their own terms and a purchaser is able to build in its own protections. In a contract the court is bound to use a more subjective standard in determining what was material and adverse to a particular purchaser's decision to buy. (Underlining added)

**110**    I take the point of the underlined passage relied on by Weisel. However, unlike the situation posited in *Inmet*, there was no material adverse change out clause tailored by Weisel. Another case relied on by Weisel, *Mull v. Dynacare Inc.*, (1998), 44 B.L.R. (2d) 211 makes clear that whether the defendant purchaser could refuse to close because of changes to the business being acquired was to be determined on the wording of the agreement. See Sanderson J. at paras. 113 to 125.

**111**    In this case, where there was no material adverse change out clause negotiated by the parties, other than a reference in the engagement letter to the parties negotiating in good faith an underwriting agreement that was to contain a standard material change out clause, I accept the

opinion of Mr. Halperin that a Reasonable Market Actor would be guided by the provisions that he referred to in thinking that a material adverse change out clause would restrict changes to those that materially affected Stetson rather than just affecting businesses in the industry generally.

**112**    There is another reason why Mr. Halperin considered this to be so, and it has to do with the difference between a market out clause and a material adverse change out clause.

**113**    A market out clause allows an underwriter to refuse to close if the securities to be acquired by the underwriter cannot be marketed profitably. A typical clause is contained in the IIAC Handbook as follows:

> If, after the date hereof and prior to the Time of Closing, the state of financial markets in Canada or elsewhere where it is planned to market the Securities is such that, in the reasonable opinion of the Underwriters (or any of them), the Securities cannot be marketed profitably, any Underwriter shall be entitled, at its option, to terminate its obligations under this agreement by notice to that effect given to the Company at or prior to the Time of Closing.

**114**    All witnesses agreed that a bought deal cannot contain a market out clause. This is because a principal element of a bought deal is that the market risk is transferred to the underwriter on the execution of the agreement. Whether the underwriter will be able to sell the securities for more than it paid to the issuer is entirely the risk of the underwriter. For that reason a market out clause is never contained in a bought deal agreement, and is inconsistent with a bought deal.

**115**    Mr. Halperin's opinion, which I accept, is that Reasonable Market Actors would understand that, on balance, in the context of a "bought deal" arrangement where there is axiomatically no "market out" in favour of the underwriter, the MAC out clause should not be construed so as to effectively provide the underwriters with a "market out" by another name. Stetson contends that that is what Weisel is effectively doing in this case by arguing that because it could not sell its Stetson position profitably, it should be relieved of its obligation to purchase the Stetson shares (or subscription receipts). I agree with Stetson on this point. What Weisel says would fall within a MAC out clause would also fall within a market out clause.

**116**    This notion that a MAC out clause should not be construed so as to effectively provide an underwriter with a market out clause is particularly important in this case in which no specific MAC out clause was negotiated. I would not construe the language of a "standard material adverse change out clause" contained in the engagement letter as to be negotiated by the parties as permitting a market out clause by another name. No reasonable market actor would think otherwise.

**117**    Finally, even if the form of MAC out clause contended by Weisel should govern, I do not think that it would be of assistance to Weisel. That is because any change would have to be material, and in my view the evidence on this point is against Weisel.

**118** First, Weisel knew that the price of oil was very volatile, that it had a high beta. It could not possibly think that when it reached an all-time high that it would stay there. The oil prices during the second half of July, 2008 continued to be above the assumed pricing used by Weisel in its analysis of the share price of Stetson as well as other companies such as Kodiak, and no witness testified that at the time it was thought that the oil pricing would drop below those levels.

**119** Second, Weisel did not believe that the oil pricing had materially affected the value of Stetson. On July 21, 2008 Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, said in an internal engagement letter-mail that based on the Stetson land package and a comparison to the Kodiak Bakken lands "we come to a valuation of approximately $1.50 per share (with $.31 in cash)." When this is compared to the 55 cents per share that Weisel agreed to pay Stetson, it hardly can be said that if there were an adverse change by reason of the oil price movements, it was material to the risk that Weisel had taken on, or that it would be reasonable to conclude that the change would expect to have a significant adverse effect on the market price or value of the Stetson shares.

**120** It is significant, in my view, that there is no evidence that the reasons given to Weisel by prospective purchasers of the Stetson position for not wanting to purchase Stetson shares was any concern for oil pricing. Mr. Pocrnic prepared an account tracking document that listed the feedback Weisel sales personnel had received from various accounts concerning the Stetson offering. A significant majority of the feedback from those accounts that had passed on the Stetson offering reported "too small", and Mr. Pocrnic confirmed that this feedback referred to Stetson's market capitalization size or size of the deal. None of the feedback listed in the account tracking maintained by Mr. Pocrnic, and distributed by e-mail on July 23, disclosed any account that expressed concern about the current price of oil.

**121** Mr. Levy in his report referred to the WTI spot price of oil on July 11, 2008 of $144.96 and on August 15, 2008 of $113.46, a drop of 21.73%. He then referred to five corporations in the energy sector and compared their share prices on July 11, 2008 and August 15, 2008, which had a drop in trading of between 7.56 % and 58.62%. He then stated that it was his opinion that:

      (i)    If Weisel determined as a result of its ongoing review of the Bakken project, that the potential profitability had been materially reduced as a result of the oil price decline, they could consider termination by use of the due diligence out clause and/or the material change out clause.

      (ii)   If Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then the material change out clause and/or the disaster out clause could be considered.

**122** I have considerable concerns with Mr. Levy's opinions. It was unclear whether Mr. Levy had any or much relevant experience in bought deals, or what that experience was. He acknowledged that he is not an expert in the oil and gas industry. He is now a consultant but when in business was

involved in areas of management, compliance and supervision.

**123**   Of considerable concern are the five corporations he chose for his comparison to oil price declines. It is clear that he knew very little of these corporations and he admitted he did no analysis to determine if the companies were comparable to Stetson. On cross-examination he said he did not say they were true comparables. He acknowledged that many factors affect share prices and that he did not look at the individual companies to consider what other factors might have affected their share prices. His use of the date of August 15, 2008 was not explained other than a reference in his report to negotiations going on between Stetson and Weisel at the time. It was July 31, 2008 that was the date for closing and it was three days earlier on July 28, 2008 that Weisel announced through its lawyers that it was not going to close.

**124**   Mr. Levy acknowledged that the failure of a bought deal would be viewed as a negative for the Stetson share price. The expectation was that the Stetson position would be closed on the day it went live on July 14, 2008. As time passed and the position had not sold, Mr. Bharti's evidence, which I accept was that the failure was viewed as a negative for Stetson. The Stetson shares closed at 60 cents on Friday, July 11, 2008 when Weisel made its offer at 55 cents, and on July 14, 2008, the date that the deal went live. By July 28, 2008 when Weisel announced it was not going to close on July 31, 2008, the closing price of the Stetson shares had drifted down to 44 cents at the close on light volume. It is possible that the slide was because of the bought deal going awry. It may have been because of falling oil prices, although if that were the case it would mean the market was not valuing the exploration play on a longer term basis, or any other factor that causes share prices to go up or down. Two days later the shares closed on July 30, 2008 at fifty cents.

**125**   Mr. Levy in my view had no basis to state, as he did, that the price decline in oil from July 11 to August 15, 2008 "had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities, many of which suffered material declines in prices." He was not qualified to express such an opinion and his analysis (or lack of analysis) did not support it. Nor did he have a basis to state that Weisel could rely on a market adverse change out clause or a disaster out clause. He did say, which I have previously discussed, that in order for Weisel to rely on such clauses, it would have had to consider the issues referred to in those clauses, which Weisel did not do.

**126**   Mr. Halperin's opinion was that Reasonable Market Actors would not have an expectation that a bought deal underwriter would be entitled to terminate its commitment by invoking standard disaster out or MAC out provisions solely on the basis of a decline in the price of oil which neither results in or leads to a serious deterioration in financial markets generally, nor affects the issuer in question in a manner disproportionate to its effect upon other entities in the issuer's industry sector. I accept that opinion. I am not prepared to find on the evidence that any decline in oil prices at the relevant times led to a serious deterioration in financial markets generally, nor affected Stetson in a manner disproportionate to its effect upon other entities in Stetson's sector. Weisel has not established those things.

**127**    In all the circumstances, I find that Weisel may not rely on a material adverse change out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**(ii)    Disaster out clause**

**128**    Weisel relies on a form of disaster out clause contained in the IIAC Handbook:

> The obligations of the Underwriter to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

**129**    Weisel asserts that the 27% drop in oil price from July 14, 2008 to September 5, 2008 and the 62% drop in the value of Stetson's common shares in the same time period entitled Weisel to terminate any obligations it had under the engagement letter pursuant to the disaster-out clause.

**130**    Even assuming that Weisel formed the necessary opinion and acted pursuant to a disaster out clause, which I have held it did not, I cannot accept the argument that it had grounds to act under such a clause.

**131**    The relevant date is not September 5, 2008, but July 28 or the latest July 31, 2008. The drop in oil from July 14 to July 31, 2008 was from $145.16 to $124.17, or approximately 14.5% and the price of the shares of Stetson during that period declined from 60 cents to 50 cents, or 16.67%.

**132**    On what basis can one conclude that the drop in the price of oil of 14.5% was a major financial occurrence of national or international consequence that seriously adversely affected or involved the financial markets or the business, operations or affairs of Stetson? There was no evidence to support such an assertion. With oil having a high beta, or volatility, one would expect prices to go up or down and even Mr. Wylie said he would want to look at a longer period of over one or two months to see a trend line. I have already disregarded the assertion of Mr. Levy that the price decline in oil from July 11 to August 15, 2008 had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities.

**133**    Mr. Halperin's opinion is that a disaster out clause in the underwriting context is generally understood by Reasonable Market Actors to be somewhat analogous to a *force majeure* provision in other contractual contexts. The clause contemplates termination of an underwriting obligation, and Reasonable Market Actors would expect that it could only be invoked, in the event of a catastrophic "macro" event, circumstance or change in law of national or international general application which

is not specific to a particular issuer or (except in the most extraordinary circumstances) industry. That opinion is consistent with the IIAC form of disaster out clause and I accept it.

134   Mr. Halperin further opined that most significantly, in the context of a "bought deal" arrangement which is typified by the absence of a "market out" provision, Reasonable Market Actors would have an expectation that a disaster out clause would not be used by, or interpreted as being available to, underwriters to terminate commitments, in the absence of a "disaster" properly so called, on the basis solely of facts and circumstances that affect the state of the financial markets such that the underwriters have determined that the underwritten securities, in the language of standard "market out" provisions, cannot be marketed profitably. I accept that opinion as well.

135   Without discussing any of the specifics of the disaster out clause contained in the IIAC Handbook, Mr. Levy asserted:

> If however, Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then in our opinion, as to CSI practice that termination under the due diligence out clause, the material change out clause and/or the disaster out clause could be considered.

136   Weisel made no analysis or determination that the exploration relating to Stetson's Bakken leases was no longer viable. But even had it done so, Mr. Levy has not explained how the oil price decline reached the level required by the disaster out clause. I do not accept his opinion that the disaster out clause could be considered.

137   In all the circumstances, I find that Weisel may not rely on a disaster out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**Indemnity agreement**

138   Section 5 of the engagement letter provided, in part:

> **5. <u>Indemnification</u>**
>
> The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. ... The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. ...

139   What those more comprehensive indemnity provisions would have been in the underwriting agreement is unknown as there was no underwriting agreement.

**140**  Schedule B contained an indemnity provision, portions of which are as follows:

> In connection with the engagement (the "Engagement") of Thomas Weisel
> Partners Canada Inc. ("Thomas Weisel") pursuant to an engagement letter (the
> "Engagement Letter") between Thomas Weisel and Stetson Oil & gas Ltd. (the
> "Company") dated July 11, 2008, the Company agrees to indemnify and hold
> harmless Thomas Weisel and other members of the syndicate formed in
> connection with the Engagement, and any of their respective affiliates (herein
> referred to collectively as the "Underwriters") and the Underwriters' respective
> directors, officers, employees, partners, each other person, if any, controlling any
> of the Underwriters or any of their respective subsidiaries and each shareholder
> of the Underwriters (collectively, the "Indemnified Parties" and individually, an
> Indemnified party"), from and against any and all losses (other than lost profits),
> claims (including shareholder actions, derivative or otherwise), actions, suits,
> proceedings, damages, liabilities or expenses of whatever nature or kind, joint or
> several, including the aggregate amount paid in reasonable settlement of any
> actions, suits, proceedings, investigation or claims and the reasonable fees,
> expenses and taxes of their counsel that may be incurred for advising with
> respect to and/or defending any action, suit, proceedings, investigation or claim
> that may be made or threatened against any Indemnified Party or in enforcing
> this indemnity (collectively the "Claims") to which any Indemnified Party may
> become subject or otherwise involved in any capacity insofar as the Claims relate
> to, are caused by, result from, arise out of or are based upon, directly or
> indirectly, the Engagement whether performed before or after the Company's
> execution of the Engagement Letter and to reimburse each Indemnified Party
> forthwith, upon demand, for any legal or other expenses reasonably incurred by
> such Indemnified Party in connection with any Claim. The Company agrees that
> in no event will any Indemnified Party be liable or obligated in any manner for
> any damages (including, without limitation, actual, consequential, exemplary or
> punitive damages or lost profits) in excess of fees actually received by Thomas
> Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and
> the Company agrees not to seek or claim any such damages or profits in any
> circumstance. (Underlining added)

**141**  Weisel contends that the underlined words prevent Stetson from suing Weisel for more than
the fees actually received by Weisel, which in this case were nothing as Weisel did not close the
transaction. Thus, if it is the case that Weisel breached the engagement letter by failing to close,
Weisel reads the indemnity provision to prevent Stetson from suing Weisel for breach of contract.

**142**  The issue therefore is to interpret this contractual provision. The principles of contract
interpretation are well known and were recently summarized by Winkler C.J.O. in *Salah v.
Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 at para. 16 as follows:

16. The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole -- like a complex commercial transaction -- and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.

**143** I do not read Schedule B as being the only relevant provision. Paragraph 5 of the engagement letter is also part of the agreement, and it provides that Stetson agrees to indemnify the underwriters in accordance with Schedule B. One cannot read paragraph 5 in any way other than that what was intended by the parties was an indemnity.

**144** The language of Schedule B is hardly a model of draftsmanship. The portions relied on by Weisel are not all of its contents. Its form is contained in Weisel's Deal Book and was apparently drafted by its outside counsel (not Mr. Groia's firm). The language is prolix, difficult to follow and unclear.

**145** The language of Schedule B provides that the indemnified parties include Weisel, any other underwriter who becomes a member of the syndicate and the directors, employees, partners, etc. of Weisel or other syndicate underwriters. It contains many clauses typical of indemnities, including requirements to notify Stetson of a claim made against an indemnified party and the right of Stetson to approve any settlement of a claim. Down to the underlined portion of the quoted part of Schedule B relied on by Weisel, it is relatively clear that the indemnity refers to losses etc. caused to an indemnified party by some third party other than the indemnified party. That is the nature of an indemnity.

**146** For ease of reference, the last sentence of the quoted part of Schedule B states:

The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees

actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.

**147**    By agreeing that an indemnified party will not be liable or obligated for any damages in excess of fees received by Weisel, the Company, being Stetson, could not literally restrict what a third party could successfully claim against an indemnified party, and that could not have been the purpose of that provision. Stetson argues, and I tend to agree, that in the context of an indemnity given to an indemnified party, the provision means (i) that Stetson must pay to the indemnified party any liability of the indemnified party to a third party in excess of the fees actually received by Weisel and (ii) Stetson may not sue or claim against any such third party any amount in excess of those fees. Thus if Weisel were the indemnified party in any situation, the issuer, in this case Stetson, would have to indemnify Weisel against any liability it had to a third party in excess of the fees received by Weisel and Stetson could not sue the third party for anything in excess of those fees.

**148**    The reference in the provision limiting liability to the amount of fees actually received by Weisel pursuant to the engagement letter suggests that the provision is intended to apply only if the engagement letter has been closed. Weisel could not have actually received any fees if the engagement letter did not close. Mr. Groia in argument said that if Weisel were found to be in breach of agreement, it would not object to a judgment against it in the amount of the fees that it would have received had the agreement closed. However, that would be providing a result not in accordance with the language of the agreement. The concession, however, was a reflection I believe of the difficulty in arguing that Schedule B means that a breach of agreement by Weisel results in no damages payable to Stetson.

**149**    There is another provision in Schedule B that lends support to the interpretation of the provision as not applying to a claim by Stetson against Weisel for failure to close the engagement letter. Schedule B contains the following:

> The foregoing indemnity shall not apply to the extent that a court of competent jurisdiction in a final judgment that has become non-appealable shall determine that such losses, expenses, claims, actions, damages or liabilities to which the Indemnified Party may be subject were caused by the negligence or wilful misconduct of the Indemnified Party.

**150**    This provision clearly would mean that if Weisel is the indemnified party, it may not be indemnified for something caused by its negligence or wilful misconduct. Wilful means intentional as opposed to accidental. Misconduct is defined in the Concise Oxford English Dictionary as "unacceptable or improper behaviour". The American Heritage Dictionary includes in its definition of misconduct "Behaviour not conforming to prevailing standards or laws; impropriety". Businessdictionary.com defines wilful misconduct as "Conscious or intentional disregard of the

rights or the safety of others; misconduct in which an individual is doing what he or she intends to do".

**151**    It is hard to think that wilful misconduct could not include intentional breach of contract. Breach of contract is certainly unacceptable and improper in the eyes of the law and it disregards the rights of the other party to the contract. The sense of the provision that the indemnity does not cover damages caused by Weisel's negligence or wilful conduct is clear. If Weisel was involved in such conduct as found by a court, it is not entitled to be indemnified. In this case, Weisel has been involved in intentional breach of contract by not closing the engagement letter on July 31, 2008 and thus the provision relied on by Weisel, even if it did otherwise prevent Stetson from suing Weisel, could not apply.

**152**    Mr. Groia argued that the provision dealing with wilful misconduct does not apply to the provision Weisel relies on regarding damages in excess of the fees actually received by Weisel. This is because, he says, the provision dealing with wilful misconduct begins by stating that the foregoing "indemnity" shall not apply if there is wilful misconduct, whereas the provision regarding damages in excess of fees is not an indemnity. The reason why this latter provision is not an indemnity, he says, is because it refers to "damages", which is to be distinguished from a Claim that is the subject of the indemnification in the lengthy paragraph that precedes the sentence Weisel relies on.

**153**    This interpretation appears to me to be a completely strained and artificial interpretation, one that might be made by wordsmiths but which lacks any commercial or common sense. Technically it ignores the definition of "Claim" in the indemnity that includes the word "damages". The sentence relied on by Weisel begins with the words "The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any "damages"... in excess of fees actually received ...". This is a reference obviously to a claim for damages and it is part of the indemnity provisions contained in the paragraph. The provision regarding wilful misconduct begins with the words "The foregoing indemnity shall not apply ...". There is no basis to say that "the foregoing indemnity" was anything but the indemnity provision contained earlier in Schedule B, including the sentence dealing with no liability or obligation in excess of fees received by Weisel.

**154**    There is another reason why the clause should not prevent Stetson from suing Weisel in this case. One of the principles of contract interpretation as summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc., supra,* is that a court should interpret a contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. It would be a commercial absurdity to conclude that the parties intended that Weisel would have a free pass to break the contract by not closing it without any liability. That would make no commercial sense, and any such result would have to be expressly and explicitly stated in the agreement. In my view, the language of the paragraph 5 of the engagement letter and Schedule B is not so explicit.

155    Finally, Stetson points out that the arbitration provision dealing with disputes between Stetson and Weisel provides that the arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. Stetson contends that the arbitration provision is the only provision dealing directly with claims between the parties, that it is an indication that the parties directed their minds to what damages the arbitrator could not award, and that there is no limitation of damages against Weisel to its fees received.[7] Weisel contends that the arbitration clause is not the only provision in the agreement dealing with claims between the parties and there is nothing in the arbitration provision that affects, limits or supersedes the indemnity agreement in Schedule B.

156    I think there is force to this argument of Stetson. The parties directed their mind in the arbitration clause to the kinds of damages that could not be awarded. There was no limitation of the damages that could be awarded against Weisel to only the fees received by Weisel. I recognize that it is a general arbitration clause, and if the provision in Schedule B clearly and explicitly provided that Weisel could not be sued by Stetson for its breach of contract when it had not received any fees, that might survive in spite of the language of the arbitration provision. However in my view it does not so explicitly provide.

157    Weisel led evidence from some if its witnesses as to what protection was sought by the indemnity agreement. In my view, this evidence does not affect the issue. While there may have been some ambiguity in the language of Schedule B, any such ambiguity could be resolved without the need to consider extrinsic evidence. In any event, evidence of Weisel's intentions regarding an indemnity would be inadmissible. See Geoff R. Hall, *Canadian Contractual Interpretation,* 2d ed. (LexisNexus) at 2.4.3.

158    In the result, any damages suffered by Stetson are not to be reduced to nil by reason of Weisel not actually receiving any fees.

**Damages**

159    Stetson claims damages based on the difference between the 55 cents per share that Weisel agreed to pay and the 20 cents per share that Canaccord paid, after taking into account the extra shares that Stetson had to sell to Canaccord, plus expenses incurred in obtaining the interim loans pending the Canaccord underwriting.

160    Losses recoverable for breach of contract are limited to those that will put the injured party in the same position as he or she would have been in had the wrongdoer performed the contract. See *Baud Corp., N.V. v. Brook,* [1979] 1 S.C.R. 633 at para. 18. What are the damages that a seller of an asset may be entitled to on a breach by the purchaser to complete the purchase? The authorities make clear that the seller is entitled to the difference between the contract price and the market price subject to the obligation of the seller to take reasonable steps to mitigate the loss by selling on the market. See S.M. Waddams, *The Law of Damages,* Looseleaf, (Canada Law Book, November 2012) at para. 13.110. See also *Jamal v. Moola Dawood, Sons & Co.,* [1916] 1 A.C. 175 (P.C.)

**161**    Normally the seller has an obligation to mitigate damages by selling on the date of the breach for the best price possible. But that is not always the case if the shares could not be sold on that date. In *Leitch Transport Ltd. v. Neonex International Ltd.*, [1979] O.J. No. 1093 (C.A.) the defendant Neonex failed to purchase a large block of shares of Maple Leaf Mills Limited, a public company trading on the Toronto Stock Exchange. It was not realistic to sell the shares on the stock exchange on the date of the breach, but rather the block had to be sold to an investment dealer who would make a secondary offer. It was held that the law permits a realistic approach to valuation and does not insist upon an arbitrary sale on the date of the breach. The Court stated:

> Under a contract for the sale of shares in a company upon a breach by the
> purchaser, the measure of damages is the difference between the contract price
> and the market price at the date of the breach; the seller has, however, an
> obligation to mitigate damages by selling the shares for the best price obtainable
> on that date: *Jamal v. Moolla Dawood & Sons & Co.* [1916] A.C. 175. Since
> Maple Leaf was a public company whose shares traded on the TSE, the market
> price would ordinarily be the price at which the shares were trading on the
> Exchange on the date of the breach. Here, however, because of the limited
> market for the shares and the large quantity that was being sold under the
> contract, it was not possible to sell the shares on the Exchange. In these
> circumstances, the law permits a realistic approach to the valuation of shares and
> does not insist upon an arbitrary sale on the date of the breach: *Hooper v. Herts*,
> [1906] 1 Ch. 549. We agree with the trial judge that the only realistic way to
> have disposed of the directly held shares was to sell them to a broker or
> investment dealer who would have made a secondary offering of them, and that
> the amount which could have been obtained by such a sale constituted the market
> price in this case.

**162**    See also *Treaty Group Inc. v. Drake International Inc.* (2007), 86 O.R. (3d) 366 (C.A.), and *Johnson v. Agnew*, [1980] A.C. 367. In the latter case, in a passage adopted in *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415, Lord Wilberforce stated:

> (2)    The general principle for the assessment of damages is compensatory, i.e., that
> the innocent party is to be placed, so far as money can do so, in the same position
> as if the contract had been performed. Where the contract is one of sale, this
> principle normally leads to assessment of damages as at the date of the breach --
> a principle recognised and embodied in section 51 of the Sale of Goods Act
> 1893. But this is not an absolute rule: if to follow it would give rise to injustice,
> the court has power to fix such other date as may be appropriate in the
> circumstances.

**163**    Weisel contends that the shares of Stetson traded at fifty cents on or about July 31, 2008, five cents less than what Weisel had agreed to pay, and therefore if damages for breach of contract are to

be awarded, the damages should be limited to five cents per share on the 45,454,600 shares that Weisel agreed to purchase, for damages of $2,272,730.

164    Apart from the fact that the shares of Stetson traded on July 31, 2008 at a closing price of 45 cents, which on the argument of Weisel would double the damages to approximately $4.5 million, this argument is completely unrealistic. Stetson was a company with a very small market cap. The volume of shares of Stetson that traded that day was 56,000. No one suggests that Stetson could have issued 45,454,600 shares and sold them that day on the TSX. To suggest that such a large block of stock had a market value that day equal to what a minute fraction of those shares traded for defies common sense and no evidence was led to support this value for such a large block of stock.

165    Stetson had to consider how to proceed to raise the money it was supposed to have received from Weisel, including obtaining advice from Canaccord and Macquarie, and negotiating with other companies such as Crescent Point and Tristar. Stetson had been damaged by the failure of the bought deal to close and did not have a lot of leverage. After canvassing the market it was able to conclude an underwriting on a best efforts basis with Canaccord, which was uncertain as to what could be done but was doing Stetson and Mr. Bharti a favour.

166    The steps taken by Stetson to mitigate their damages by entering into the agreement with Canaccord were reasonable. Taking into account the principles discussed in *Leitch Transport Ltd. v. Neonex International Ltd.* and *Johnson v. Agnew,* the appropriate measure of damages in my view is the amount per share that Stetson would have received from Weisel had the engagement letter closed on July 31, 2008 less the amount per share received by Stetson from the Canaccord transaction.

167    Mr. Groia contended at the end of the trial that the Bakken project for Stetson had no prospect of success as after only one well was drilled, Red Willow decided not to proceed further. He contends therefore that had Weisel provided funding under the engagement letter, Stetson would have ended up with nothing, and thus will gain a windfall if successful in this action. This issue has already been the subject of a ruling I made after the first week of trial refusing leave to the defendant to amend its pleading. Evidence regarding the feasibility of the project was not led as a result, and during argument Mr. Groia conceded that as no expert evidence was called, I was in no position to be making a finding that the property had no prospect of success.

168    In any event, the authorities make clear, as discussed, that the damages for failure to purchase shares is the difference between the purchase price and the value of the shares at the time of the breach, subject to an obligation to mitigate and to a discretion as to the appropriate date. What the plaintiff would have done with its money had it been received under the contract, or what it did with the replacement money, is not relevant.

169    In principle as well, I do not think the argument of Weisel is correct. Suppose instead of issuing equity shares, Stetson had agreed to borrow the necessary funds from a lender at say 5% interest but after the lender reneged, Stetson was only able to borrow the money at 10% interest.

Suppose Stetson then took all of the borrowed money and drilled nothing but empty wells and ended up with nothing. Stetson still would have suffered damages to the tune of the extra 5% in interest payments it had to pay for the loan. In this case, Stetson had to issue shares at 20 cents instead of 55 cents. It received less for its shares than it would have had Weisel not breached its contract. It has suffered those damages.

**170**    At the opening of trial Weisel contended that it was not Stetson that would suffer any damages but rather the holders of the preferred shares issued at the time of the Canaccord financing on the advice of Canaccord as a sweetener to entice the market to accept the Stetson shares sold by Canaccord. These holders will be entitled to the proceeds of any final judgment or settlement money paid to Stetson for this action. This argument was not pursued at the conclusion of the case. In any event, there is nothing to it. What Stetson does with its money is its business. Whether it pays the money from the judgment to its bankers, its common shareholders or its preferred shareholders is irrelevant.

**171**    Stetson acknowledges that there are two possible ways that its damages can be calculated. The first is based on the difference between the 55 cents that Weisel was to pay to purchase the Stetson shares and the 20 cents that Canaccord agreed to pay, which is 35 cents, multiplied by the 45,454,600 shares provided for in the bought deal. This results in an award of $15,909,110. Stetson contends that damages should be calculated on a per share, rather than an aggregate basis so that Weisel does not obtain the benefit of the fact that Stetson was required to sell 14,545,400 more shares for lower proceeds under the Canaccord transaction. Stetson had to sell these additional shares and is entitled to consideration for that fact.

**172**    The second method is to calculate damages on an aggregate basis, which would simply involve taking the difference between the $25,000,030 contract price that Weisel was to pay Stetson under the engagement letter and the $12 million Stetson received from the Canaccord transaction, which results in an award of $13,000,030.

**173**    I agree with Stetson that the first method is the appropriate method as it reflects the fact that it had to sell far more shares to Canaccord than it would have to Weisel. It is not in a company's interest to issue more shares than necessary to obtain equity financing. Weisel did not argue otherwise and, as discussed, contended that the damages, if to be awarded, should be on the same basis as the first method chosen by Stetson, albeit by using five cents a share rather than 35 cents.

**174**    Stetson is also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have been required had Weisel not breached the engagement letter. The interim loans were repaid from the money received from Canaccord. These expenses were incurred by Stetson to mitigate its loss and totaled $133,559.

**175**    Stetson is therefore entitled to judgment for $15,909,110 and $133,559, totalling $16,042,669.

176    Stetson is entitled to interest. No argument was made as to what basis interest should be awarded. If interest cannot be agreed, Stetson may make written submissions within 10 days and Weisel will have a further 10 days to make submissions.

177    Stetson is entitled to its costs. If these cannot be agreed, Stetson may make written submissions within 10 days, including a cost outline in accordance with the rules, and Weisel will have a further 10 days to make submissions.

F.J.C. NEWBOULD J.

cp/e/qlrpv/qlrdp/qlced

1 At the conclusion of the trial, the name of the defendant was changed from Thomas Weisel Partners Canada Inc. to Stifel Nicolaus Canada Inc. For ease of reference, the defendant will be referred to as Weisel.

2 Statements of fact in these reasons are findings of fact unless stated otherwise.

3 The parties agreed to litigate rather than arbitrate this dispute.

4 *Health & Community Living, Inc. v. Goldis Financial Group, Inc.*, 1998 WL 117928 at *4 (E.D.N.Y March 13, 1998) and *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F.Supp. 2d 361 (2003).

5 Weisel has a material adverse change out clause in its Deal Book precedent for an agency agreement. The clause applies only to a change in the business of the issuer. In the Canaccord agency agreement made by Stetson with Canaccord, it contains a material adverse change clause that applies to a material adverse change or change to a material fact that could have a material adverse effect on the business of Stetson or the market price of the offered units. The evidence indicates that in an agency agreement less attention is paid to the language of a material change out provision as the underwriter is not obliged to buy the position of the issuer but only make best efforts to sell the position on behalf of the issuer. Mr. Halperin's opinion, which I accept, is that the Canaccord agreement should not be looked at in considering the issues in this case.

6 Schedule A to the engagement letter is an "indicative term sheet", which contains in summary form the terms of the offer. It refers to "broad" rather than "standard" out clauses. No evidence was given why there was this difference between the engagement letter and Schedule A. One can perhaps infer that it was overlooked when the change was made to

paragraph 3 of the engagement letter. However, the indicative term sheet was a document intended to be given by Weisel to any underwriter who joined the syndicate, and presumably would have been the subject of negotiations between Weisel and the particular underwriter. It was not argued that the out clauses so far as Stetson and Weisel are concerned should have been "broad" out clauses.

7 This argument was made by correspondence following the conclusion of oral argument. Weisel contends that it was improper for Stetson to make the argument in this manner without giving counsel for Weisel advance notice. It may have been preferable for Mr. Burden to have given advance notice to Mr. Groia, but I fail to see what difference that would have made. It would have been counter-productive to have an oral hearing on this point, and Mr. Groia does not suggest he wanted an oral hearing. He made his reply argument by letter. Mr. Groia also contended that by his letter, Mr. Burden was attempting to file new evidence about the arbitration provision. I do not understand that. It is not a matter of evidence but an argument about the proper interpretation of the agreement, which in this case is a legal rather than an evidentiary matter.



Surrey Credit Union v. Willson, 1990 CarswellBC 94

1990 CarswellBC 94, [1990] B.C.W.L.D. 980, [1990] B.C.J. No. 766...

1990 CarswellBC 94
British Columbia Supreme Court

Surrey Credit Union v. Willson

1990 CarswellBC 94, [1990] B.C.W.L.D. 980, [1990] B.C.J. No. 766, 20 A.C.W.S. (3d) 524, 45 B.C.L.R. (2d) 310

# SURREY CREDIT UNION v. WILLSON et al.

McColl J.

Judgment: April 2, 1990
Docket: Vancouver No. C884047

Counsel: *A.P. Seckel, D.G.G. Cowper* and *H.A. Lowe,* for plaintiff.
*R.J. Hordo, C.J. Ross* and *H.A. Mickelson,* for Thorne Riddell and Clarkson Gordon.

Subject: Evidence

Table of Authorities

Cases considered:

*Emil Anderson Const. Co. v. B.C. Ry. Co.,* 15 B.C.L.R. (2d) 28, [1987] 5 W.W.R. 523 (S.C.) — *referred to*

*Hennessy v. Rothman* (1988), 26 B.C.L.R. (2d) 322 (S.C.) — *referred to*

*Mazur v. Moody* (1987), 14 B.C.L.R. (2d) 240 (S.C.) — *referred to*

*Midland Bank Trust Co. v. Hett Stubbs & Kemp,* [1979] Ch. 384, [1978] 3 W.L.R. 167, [1978] 3 All E.R. 571 — *applied*

*Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.* (1988), 29 B.C.L.R. (2d) 127 (S.C.) — *applied*

*Sengbusch v. Priest* (1987), 14 B.C.L.R. (2d) 26 (S.C.) — *referred to*

*Vancouver Community College v. Phillips Barratt* (1988), 26 B.C.L.R. (2d) 296, 29 C.L.R. 268 (S.C.) — *applied*

Statutes considered:

Evidence Act, R.S.B.C. 1979, c. 116

s. 10 [am. 1981, c. 10, ss. 19, 20; 1989, c. 51, s. 20]

Ruling on admissibility of expert's report.

*McColl J.:*

1    This is a ruling on the admissibility of an expert report tendered through the witness Lawrence S. Rosen, C.A., during the course of trial.

Surrey Credit Union v. Willson, 1990 CarswellBC 94

1990 CarswellBC 94, [1990] B.C.W.L.D. 980, [1990] B.C.J. No. 766...

2     In this action the plaintiff ("S.C.U.") seeks to recover judgment against two chartered accounting firms charged with the audit of the financial statements of Northland Bank ("Northland") in the fall of 1984. Northland was a chartered bank operating in Western Canada, principally out of the city of Calgary in Alberta. In the spring of 1985 S.C.U. purchased, under a private placement, debentures in Northland for the price of $7,500,000. It is alleged that in purchasing the debentures S.C.U. relied upon the financial statements of Northland audited by the defendant accounting firms, confirming the financial viability of Northland. In fact, Northland "collapsed" on 1st September 1985.

3     The plaintiff alleges that the audit performed by the defendants was negligent in that it failed to adhere to generally accepted auditing standards within the profession.

4     Dr. Rosen has been tendered as a witness on behalf of the plaintiff to give expert evidence of the standards which the profession, of which he is a member, deems appropriate in the performance of an audit. Rosen has already testified as to his qualifications. In a ruling already made at trial I held that he was capable of giving the evidence for which he has been tendered as a witness.

5     Counsel for the defendants now objects to the written report of Rosen tendered in these proceedings pursuant to s. 10 of the Evidence Act.

6     The objections to the report are many and substantial. They fall into five principle categories:

7     1. The report contains opinion evidence outside of the expertise or qualifications of the witness;

8     2. The report is essentially argument rather than opinion and not within the confines of the territory in respect of which an expert is entitled to opine;

9     3. The report contains conclusions of fact upon evidence in respect of which it is the function of the trial judge alone to determine;

10     4. The report contains large passages which are irrelevant, superfluous, or simply of no assistance to the trial judge and touch upon areas referred to in para. 3 above; and

11     5. The report contains many passages which in fact are neither comments nor opinions on the standard of care, the area in respect of which the author is tendered as an expert.

12     Finally, counsel for the defendants argues, in any event, the report contains opinions of the author concerning the negligence of the defendants which is the very issue before the trial judge and is therefore not admissible in these proceedings.

13     The report exceeds 200 pages in length. Dr. Rosen, from the outset, stipulates the sources which he used both as to his opinion as to standards of the profession and his assumptions of facts upon which he opined as to the failure of the defendants to meet those standards in the performance of the audit or audits in question.

14     Much of what the defendants say is objectionable about the report is well founded. During the course of argument on the issue I was at some pains to point out the considerable difficulties I had with the report myself having, at the urging of counsel, read the report prior to hearing counsel's submissions on the issue. On the whole it must be said that the report is so defective in respect to the many issues raised by counsel for the defence that it cannot be admitted in its present form.

15     I reach this conclusion without in any way intending to impeach the intentions of Dr. Rosen or counsel, upon whose request the report was prepared. Nor do I intend at this stage to comment on those matters upon which Dr. Rosen has given an opinion in those areas in accordance with the purpose for which he is tendered.

16     I think it useful to restate, in simplistic terms, the legal reasoning behind the court's view of the limitations of its reception of expert opinion. I start off by stating that while I initially had serious reservations concerning the giving of expert opinion at

Surrey Credit Union v. Willson, 1990 CarswellBC 94

1990 CarswellBC 94, [1990] B.C.W.L.D. 980, [1990] B.C.J. No. 766...

all in this case I am quite satisfied that the nature of the case makes it appropriate that I should hear from an expert or experts in the profession of accounting and in particular with respect to the subdiscipline of that profession, auditing. That is the purpose for which Dr. Rosen is being called. It is right and proper that in examining the conduct of the defendants in this action I should have the assistance of an eminent and well respected member of the profession who can tell me what the standards of that profession are. Here I find it helpful to adopt what Oliver J. said on the subject in *Midland Bank Trust Co. v. Hett Stubbs & Kemp*, [1979] Ch. 384, [1978] 3 W.L.R. 167, [1978] 3 All E.R. 571 at 582:

> Clearly, if there is some practice in a particular profession, some accepted standard of conduct which is laid down by a professional institute or sanctioned by common usage, evidence of that can and ought to be received.

17    The evidence which Dr. Rosen is capable of giving and to which he ought to be confined is not really technical in nature. Rather, as a member of a particular discipline or profession, he is able to tell the court something of the nature of the standards imposed upon all members of that profession in the performance of their duties; and in this particular instance, something of the special additional duties imposed upon those members in the performance of an audit. Those are matters peculiar to that profession which non-members are not qualified to give.

18    In the present case the plaintiff alleges that the defendants failed to meet the generally accepted auditing standards acknowledged, it says, universally by that profession in Canada. The plaintiff is entitled to lead evidence as to those standards. Dr. Rosen has the qualifications to do so.

19    Secondly, having established the standards, Dr. Rosen is also entitled to give an opinion, based upon facts or assumptions communicated to him as to whether or not certain acts or omissions occurring in the performance of an audit would be regarded within the profession as breaches of those standards. He is not, however, entitled to give an opinion as to the legal duty imposed by those standards or whether or not the breach of a standard is actionable at law. Those are matters beyond his competence as an expert: *Midland Bank*.

20    This type of evidence can take two forms, a statement of opinion based upon hypothetical facts or a statement of opinion regarding facts or assumptions of facts concerning the case which have been communicated to him. In either case he is bound to communicate to the defendants the sources of those facts or assumptions of fact. They need not be (indeed in my view are not required to be) part of the opinion itself. What he cannot do is to make findings of fact himself. That is the exclusive role of the trial judge: see *Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.* (1988), 29 B.C.L.R. (2d) 127 (S.C.); *Emil Anderson Const. Co. v. B.C. Ry. Co.*, 15 B.C.L.R. (2d) 28, [1987] 5 W.W.R. 523 (S.C.); and *Hennessy v. Rothman* (1988), 26 B.C.L.R. (2d) 322 (S.C.).

21    Further he cannot make findings of law. That also is within the exclusive jurisdiction of the trial judge. In that respect while he may be able to give his opinion that an act or omission constitutes a failure to comply with a standard in the profession he cannot go that one step further and conclude that such a failure constitutes negligence. It is for the trial judge upon his or her conclusion as to the facts to determine whether or not negligence has been proven: *Hennessy v. Rothman; Emil Anderson Const. v. B.C. Ry. Co.*

22    Finally, every expert should avoid arguing the case, a matter which is more properly left in the hands of counsel: *Sengbusch v. Priest* (1987), 14 B.C.L.R. (2d) 26; *Vancouver Community College v. Phillips Barratt* (1988), 26 B.C.L.R. (2d) 296, 29 C.L.R. 268 (S.C.); and *Quintette Coal Ltd. v. Bow Valley Resource Services Ltd.*

23    The purpose of eliciting expert opinion in the first place is to enable the trial judge to understand evidence within the peculiar field in which an issue arises. If the field is one of general knowledge or within ordinary human experience no expert testimony would be necessary at all: *Mazur v. Moody* (1987), 14 B.C.L.R. (2d) 240 (S.C.). Where expert testimony is tendered it should be tendered in an objective and impartial manner so that the court can place some reliance upon it.

24    All of the foregoing seems to have caused confusion in the minds of some experts as to the purpose of giving evidence, the nature of the opinion, its contents and how little or how much ought to be said. The reason for this is that the experts, usually having been retained by one of the disputants, are often misled or misinformed as to the true purpose and limitations of expert

opinion. To add to this difficulty is the perception that because the law requires a person rendering an opinion to disclose the sources of his information or facts upon which the opinion is based, that the opinion itself should contain in minute detail those sources and assumptions. I do not understand that to be the case at all. What is required is that the expert must disclose those sources so that those who do not agree with the opinion will have the opportunity to test the reliability of the opinion itself or indeed to put to the expert facts or assumptions not previously known to the person offering the opinion which may alter, change or amend the opinion itself.

25    Expert opinions will be rendered inadmissible when they are nothing more than the reworking of the argument of counsel participating in the case. Where an argument clothed in the guise of an expert's opinion is tendered it will be rejected for what it is. That is precisely what happened in *Vancouver Community College v. Phillips Barratt*. In that case the evidence demonstrated that the expert had revised his report several times at the suggestion of and in consultation with counsel. Finch J. held that the revisions went beyond mere clarification and rejected the opinion. In the present case counsel for the plaintiff, acknowledging some of the difficulties with the Rosen report, stated he did not want Dr. Rosen to run afoul of the objections raised in the *Vancouver College* case. Quite frankly I think that is taking the observations of Finch J. well beyond what he intended. There can be no criticism of counsel assisting an expert witness in the preparation of giving evidence. Where the assistance goes to form as opposed to the substance of the opinion itself no objection can be raised. It would be quite unusual in a case of this complexity if counsel did not spend some time in the preparation of witnesses before they were called to give evidence. It is no less objectionable to engage in the same process where the witness to be called is an expert. Indeed had the process been followed here much of the objectionable material might have been avoided.

26    In my view, where it is intended that an expert be called for the purposes of expressing an opinion, the limits of that opinion should be explained to the witness so that there is a full understanding of the role that witness is about to embark upon in the proceedings.

27    There is a dichotomy in the trial of a technical or highly complex case where expert opinion is expected to be a significant part of the evidence. Inevitably the expert is called precisely because he or she has a deeper or more profound understanding of the circumstances in which the non-technical evidence is to be read. To the casual observer, if not the participants in the trial itself, the expert, being the most knowledgeable person on the subject, might well be regarded as the very person who is best able to decide the issues in dispute. But that is not the case.

28    It is open to parties in a dispute to agree to have the dispute heard and tried by experts. Where, as here, they choose not to do so the dispute is heard by a trial judge who alone is charged with deciding issues of fact and law. This process may in the long run be slower and indeed more tedious. However as Spencer J. said in the *Quintette Coal* case (at p. 128): "[A judge] may not permit an expert to assume those functions nor to argue the case as if he were counsel ... they are beyond his [the expert's] role."

29    The present case will, of necessity, require a detailed tracing of the events which lead to this action. That will require both viva voce evidence and a close scrutiny of the many many documents exhibited during the trial and on examinations for discovery. That however is the role of counsel throughout the trial. Once an expert treads into this territory the opinion of that expert will lose precisely the objectivity it is intended to have in order to assist the trial judge.

30    I now turn to the report itself. To begin with, it is far too long and too filled with objectionable material of the nature I have described. A trial judge will of necessity regard with some scepticism a report of this length. One of the purposes of expert opinion is to illuminate, as simply as possible, the point the expert wishes to drive home. The more prolix the opinion the more likely it is to defeat the purpose for which it is tendered.

31    I have read with some attention the decision of Spencer J. in the *Quintette Coal* case. He seems to have been facing almost identical objections upon the tendering of an expert report having previously held that the expert was qualified to give an opinion. I propose to follow in this instance what he did on that occasion — that is to reject the tendered report and require Dr. Rosen to restate his opinion in an acceptable form. In reaching this conclusion I must observe, on the whole, that in spite of the many objectionable flaws I do not find that the report is without merit. Its problem appears to be that it has gone beyond the

**Surrey Credit Union v. Willson, 1990 CarswellBC 94**

1990 CarswellBC 94, [1990] B.C.W.L.D. 980, [1990] B.C.J. No. 766...

realms of mere expert opinion and has frequently intruded into areas beyond the author's expertise and into matters reserved for counsel and the trial judge.

32    I have gone on at some length in the hope that Dr. Rosen, understanding the purpose, is now in a position to rewrite his opinion in such a way as to make it an acceptable piece of evidence.

33    It is not the function of either the court (nor indeed of counsel) to rewrite the report and I do not propose to do so. Aside from what I have already said I would add the following comments in an attempt to assist:

34    1. He may give evidence of the standards of his profession which relate to the issues in dispute;

35    2. When he has been provided with facts, assumptions or hypothetical facts, he may offer an opinion as to whether they conform to the standards of which he has given evidence;

36    3. Where he has given an opinion upon facts made known to him he is bound to disclose those facts and how they came to his attention;

37    4. Where he has made assumptions he is bound to explain the basis upon which those assumptions have been made;

38    5. In the event that contrary expert opinions are put to him he may explain why, in his view, his opinion should be accepted over others;

39    6. He may not make conclusive findings of fact on issues in dispute and may not offer an opinion as to how the law should apply to any of those facts; and

40    7. He may not give an opinion on the merits of the plaintiff's claim.

41    I have not dealt specifically with the many objections raised in the course of argument. They are too many. Aside from that, counsel had the opportunity of my direct comments on specific issues in the course of argument. I will say this however, that the first part of Rosen's report which deals specifically with auditing standards is not objectionable. The report becomes objectionable when he begins to opine upon facts and the relationship between those facts and his opinion of standards. If Dr. Rosen can rewrite his report so that the first part provides an opinion as to standards and the second part provides an opinion as to what kind of conduct might be regarded as a departure from those standards both as to specific knowledge which he has and assumptions he has made the report should meet the objections raised in these proceedings.

*Report to be rewritten.*

End of Document    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Court File No. 09-CL-7950

IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS
GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL
NETWORKS TECHNOLOGY CORPORATION

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding Commenced at Toronto

BOOK OF AUTHORITIES

| | |
|---|---|
| **Goodmans LLP** | **Gowling Lafleur Henderson LLP** |
| Barristers & Solicitors | Barristers & Solicitors |
| Bay Adelaide Centre | 1 First Canadian Place |
| 333 Bay Street, Suite 3400 | 100 King Street West, Suite 1600 |
| Toronto, ON M5H 2S7 | Toronto, ON M5X 1G5 |
| | |
| **Jay A. Carfagnini** LSUC#: 22293T | **Derrick Tay** LSUC#: 21152A |
| jcarfagnini@goodmans.ca | derrick.tay@gowlings.com |
| **Peter Ruby** LSUC#: 38439P | **Jennifer Stam** LSUC#: 46735J |
| pruby@goodmans.ca | jennifer.stam@gowlings.com |
| **Joseph Pasquariello** LSUC #: 38390C | |
| jpasquariello@goodmans.ca | Tel:    416.862.5697 |
| **Hannah Arthurs** LSUC#: 55337O | Fax:    416.862.7661 |
| harthurs@goodmans.ca | |
| | Lawyers for the Canadian Debtors |
| Tel:    416.979.2211 | |
| Fax:    416.979.1234 | |
| | |
| Lawyers for the Monitor | |

6519848