# Exhibit C

Court File No: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**BRIEF OF AUTHORITIES OF**
**NORTEL NETWORKS INC.**
**AND THE OTHER US DEBTORS**
**(Joint Administrators' Motion for Production of Documents)**

Date: April 16, 2014

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON  M5K 1N2

Fax:  416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors

16938376.1

## INDEX OF AUTHORITIES

1.   *Philip Services Corp. (Receiver of) v. Ontario Securities Commission (2005), 77 O.R. (3d) 209*

2.   *Cellco P'ship v. Certain Underwriters at Lloyd's London, CIV.A. 05-3158 (SRC), 2006 WL 1320067 (D.N.J. May 12, 2006)*

3.   *In re Teleglobe Communications Corp., 493 F.3d 345 (3d Cir 2007)*

# TAB 1

Case 09-10138-MFW    Doc 13348-3    Filed 04/16/14    Page 5 of 76

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

2005 CarswellOnt 3934
Ontario Superior Court of Justice (Divisional Court)

Philip Services Corp. (Receiver of) v. Ontario (Securities Commission)

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16
C.P.C. (6th) 193, 202 O.A.C. 201, 28 O.S.C.B. 9673, 77 O.R. (3d) 209

# Philip Services Corp. (Receiver of) (Appellant) and Ontario Securities Commission (Respondent)

O'Driscoll, Lane, Linhares de Sousa JJ.

Heard: March 22-24, 2005
Judgment: August 25, 2005
Docket: 15/05

Proceedings: reversed *Philip Services Corp., Re* ((2004)), None given., 27 O.S.C.B. 10003, 50 B.L.R. (3d) 201 ((Ont. Securities Comm.))

Counsel: David R. Byers, Bradley M. Davis for Appellant
Karen Manarin, Judy E. Cotte for Respondent

Subject: Evidence; Corporate and Commercial; Securities; Constitutional; Insolvency; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Evidence --- Documentary evidence --- Privilege as to documents --- Solicitor and client privilege --- Waiver**

Company was preparing to launch public offering when one of its senior officers W admitted that he had embezzled millions of dollars --- Company relieved W of his duties and accepted promissory note from him --- Company decided not to disclose W issue in documents filed with Ontario Securities Commission (OSC) and US Securities and Exchange Commission (SEC) --- Director C made notes at subsequent audit committee meeting at which legal advice was discussed with auditors --- Company was de-listed after public offering and sought bankruptcy protection --- OSC staff investigated adequacy of company's disclosure for its public offering --- Company and auditor produced C's notes while auditor also produced legal advice --- Company and some former officers and directors were charged with failing to make full disclosure of material facts concerning W issue and another issue --- OSC found that company had waived solicitor-client privilege over material provided to its auditor --- Company appealed --- Appeal allowed; redetermination ordered --- OSC's finding that privileged material was provided to auditor in its capacity as auditor was supported by evidence and upheld --- OSC erred when it found that disclosing legal advice to auditor constituted unlimited waiver of solicitor-client privilege --- Waiver was limited to purposes of audit as company was statutorily required to disclose privileged material --- Extending scope of that disclosure to world would be contrary to Supreme Court of Canada authorities dealing with solicitor-client privilege --- Privilege over legal advice was to be maintained unless respondents themselves put legal advice in issue --- OSC's finding that company lost privilege over C's notes was upheld as company produced them to OSC staff without claiming privilege, C was cross-examined on them, they were made exhibit, and they were released to SEC on consent.

**Evidence --- Documentary evidence --- Privilege as to documents --- Solicitor and client privilege --- Documents revealed to third parties**

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

Company was preparing to launch public offering when one of its senior officers W admitted that he had embezzled millions of dollars — Company relieved W of his duties and accepted promissory note from him — Company decided not to disclose W issue in documents filed with Ontario Securities Commission (OSC) and US Securities and Exchange Commission (SEC) — Director C made notes at subsequent audit committee meeting at which legal advice was discussed with auditors — Company was de-listed after public offering and sought bankruptcy protection — OSC staff investigated adequacy of company's disclosure for its public offering — Auditor produced legal advice to OSC staff — Company and some former officers and directors were charged with failing to make full disclosure of material facts concerning W issue and another issue — OSC found that company had waived solicitor-client privilege over material provided to its auditor — Company appealed — Appeal allowed; redetermination ordered — OSC erred when it found that disclosing legal advice to auditor constituted unlimited waiver of solicitor-client privilege — Waiver was limited to purposes of audit as company was statutorily required to disclose privileged material — Auditor was not statutorily authorized to ignore solicitor-client privilege so its unauthorized disclosure could not be permitted to alter that status — OSC's finding that company did not take reasonable steps to protect privilege was based on erroneous conclusion regarding scope of waiver — No reason was shown to permit damage to escalate by permitting legal advice to be used by those who had this material as result of error — Fact that auditor put legal advice in issue in other litigation with company could not create waiver of privilege by company in this litigation.

### Securities and commodities --- Commissions and exchanges — Hearings and appeals — Evidence

Company was preparing to launch public offering when one of its senior officers W admitted that he had embezzled millions of dollars — Company relieved W of his duties and accepted promissory note from him — Company decided not to disclose W issue in documents filed with Ontario Securities Commission (OSC) and US Securities and Exchange Commission (SEC) — Director C made notes at subsequent audit committee meeting at which legal advice was discussed with auditors — Company was de-listed after public offering and sought bankruptcy protection — OSC staff investigated adequacy of company's disclosure for its public offering — Company and auditor produced C's notes while auditor also produced legal advice — Company and some former officers and directors were charged with failing to make full disclosure of material facts concerning W issue and another issue — OSC found that company had waived solicitor-client privilege over material provided to its auditor — Company appealed — Appeal allowed; redetermination ordered — Findings of fact were subject to standard of reasonableness while determination regarding privilege was subject to standard of correctness — OSC's finding that privileged material was provided to auditor in its capacity as auditor was supported by evidence and upheld — OSC erred when it found that disclosing legal advice to auditor constituted unlimited waiver of solicitor-client privilege — Waiver was limited to purposes of audit — OSC's finding that company lost privilege over C's notes was upheld as company produced them to OSC staff without claiming privilege — OSC's finding that company did not take reasonable steps to protect privilege over legal advice was based on erroneous conclusion regarding scope of waiver — No reason was shown to permit damage to escalate by permitting legal advice to be used by those who had this material as result of error.

### Table of Authorities

#### Cases considered by *Lane J.*:

*Bank Leu AG v. Gaming Lottery Corp.* (1999), 1999 CarswellOnt 3365, 43 C.P.C. (4th) 73 (Ont. S.C.J.) — considered

*British Coal Corp. v. Dennis Rye Ltd. (No. 2)* (1988), [1988] 3 All E.R. 816 (Eng. C.A.) — considered

*Cineplex Odeon Corp. v. Canada (Attorney General)* (1994), 26 C.P.C. (3d) 109, (sub nom. *Cineplex Odeon Corp. v. Minister of National Revenue)* 114 D.L.R. (4th) 141, 94 D.T.C. 6407, [1994] 2 C.T.C. 293, 1994 CarswellOnt 1026 (Ont. Gen. Div.) — considered

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

*Committee for Equal Treatment of Asbestos Minority Shareholders v. Ontario (Securities Commission)* (2001), 2001 SCC 37, 2001 CarswellOnt 1959, 2001 CarswellOnt 1960, 24 O.S.C.B. 3641, 29 Admin. L.R. (3d) 1, 199 D.L.R. (4th) 577, *(sub nom. Asbestos Corp., Société nationale de l'Amiante & Quebec (Province), Re)* 269 N.R. 311, 14 B.L.R. (3d) 1, 146 O.A.C. 201, [2001] 2 S.C.R. 132 (S.C.C.) — followed

*Descôteaux c. Mierzwinski* (1982), [1982] 1 S.C.R. 860, 28 C.R. (3d) 289, 1 C.R.R. 318, 44 N.R. 462, 141 D.L.R. (3d) 590, 70 C.C.C. (2d) 385, 1982 CarswellQue 13, 1982 CarswellQue 291 (S.C.C.) — followed

*Hearn v. Rhay* (1975), 68 F.R.D. 574 (U.S. Dist. Ct. Wash.) — referred to

*Interprovincial Pipe Line Inc. v. Minister of National Revenue* (1995), 95 D.T.C. 5642, 22 B.L.R. (2d) 147, 102 F.T.R. 141, [1996] 1 F.C. 367, 1995 CarswellNat 1151, 1995 CarswellNat 1310 (Fed. T.D.) — considered

*Lloyds Bank Canada v. Canada Life Assurance Co.* (1991), 47 C.P.C. (2d) 157, 1991 CarswellOnt 411 (Ont. Gen. Div.) — considered

*P.I.P.S.C. v. Canadian Museum of Nature* (1995), 63 C.P.R. (3d) 449, 102 F.T.R. 7, *(sub nom. P.I.P.S.C. v. Canada (Director of the Canadian Museum of Nature))* [1995] 3 F.C. 643, 1995 CarswellNat 1280, *(sub nom. Insitut professionnel de la fonction publique du Canada v. Canada)* 1995 CarswellNat 1281 (Fed. T.D.) — considered

*Pezim v. British Columbia (Superintendent of Brokers)* (1994), 4 C.C.L.S. 117, [1994] 2 S.C.R. 557, 114 D.L.R. (4th) 385, *(sub nom. Pezim v. British Columbia (Securities Commission))* 168 N.R. 321, [1994] 7 W.W.R. 1, 92 B.C.L.R. (2d) 145, 22 Admin. L.R. (2d) 1, 14 B.L.R. (2d) 217, *(sub nom. Pezim v. British Columbia (Securities Commission))* 46 B.C.A.C. 1, *(sub nom. Pezim v. British Columbia (Securities Commission))* 75 W.A.C. 1, 1994 CarswellBC 232, 1994 CarswellBC 1242 (S.C.C.) — considered

*R. v. Lavallee, Rackel & Heintz* (2002), *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* [2002] 3 S.C.R. 209, 2002 SCC 61, 2002 D.T.C. 7267 (Fr.), 2002 D.T.C. 7287 (Eng.), 3 C.R. (6th) 209, [2002] 4 C.T.C. 143, 216 D.L.R. (4th) 257, *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* 167 C.C.C. (3d) 1, 4 Alta. L.R. (4th) 1, *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* 96 C.R.R. (2d) 189, [2002] 11 W.W.R. 191, *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* 217 Nfld. & P.E.I.R. 183, *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* 651 A.P.R. 183, *(sub nom. Lavallee, Rackel & Heintz v. Canada (Attorney General))* 292 N.R. 296, 312 A.R. 201, 281 W.A.C. 201, 2002 CarswellAlta 1818, 2002 CarswellAlta 1819 (S.C.C.) — followed

*R. v. McClure* (2001), 2001 SCC 14, 2001 CarswellOnt 496, 2001 CarswellOnt 497, 151 C.C.C. (3d) 321, 195 D.L.R. (4th) 513, 40 C.R. (5th) 1, 266 N.R. 275, [2001] 1 S.C.R. 445, 142 O.A.C. 201, 80 C.R.R. (2d) 217 (S.C.C.) — referred to

*Smith v. Jones* (1999), 1999 SCC 16, 1999 CarswellBC 590, 1999 CarswellBC 591, 169 D.L.R. (4th) 385, *(sub nom. Jones v. Smith)* 60 C.R.R. (2d) 46, 132 C.C.C. (3d) 225, 22 C.R. (5th) 203, *(sub nom. Jones v. Smith)* 236 N.R. 201, *(sub nom. Jones v. Smith)* 120 B.C.A.C. 161, *(sub nom. Jones v. Smith)* 196 W.A.C. 161, [1999] 1 S.C.R. 455, 62 B.C.L.R. (3d) 209, [1999] 8 W.W.R. 364 (S.C.C.) — referred to

*Susan Hosiery Ltd. v. Minister of National Revenue* (1969), [1969] 2 Ex. C.R. 27, [1969] C.T.C. 353, 69 D.T.C. 5278, 1969 CarswellNat 296 (Can. Ex. Ct.) — considered

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

*Syncrude Canada Ltd. v. Babcock & Wilcox Canada Ltd.* (1992), 10 C.P.C. (3d) 388, 135 A.R. 21, 33 W.A.C. 21, 1992 CarswellAlta 337 (Alta. C.A.) — considered

*Tilley v. Hails* (1993), 12 O.R. (3d) 306, 18 C.P.C. (3d) 381, 1993 CarswellOnt 433 (Ont. Gen. Div.) — followed

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1997), 32 O.R. (3d) 575, 1997 CarswellOnt 1268, *(*sub nom. *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 31 O.T.C. 267 (Ont. Gen. Div. [Commercial List]) — considered

*United States v. Arthur Young & Co.* (1984), 84-1 U.S.T.C. 83,670, 465 U.S. 805, 104 S.Ct. 1495, 79 L.Ed.2d 826, Fed. Sec. L. Rep. P 99,721 (U.S. N.Y.) — considered

## Statutes considered:

*Business Corporations Act*, R.S.O. 1990, c. B.16
    s. 153 — considered

    s. 153(5) — referred to

    s. 153(5)-153(7) — referred to

    s. 153(6) — referred to

    s. 153(7) — referred to

    s. 258 — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    s. 170(1) — referred to

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11
    Generally — referred to

    s. 8 — referred to

*Criminal Code*, R.S.C. 1985, c. C-46
    s. 488.1 [en. R.S.C. 1985, c. 27 (1st Supp.), s. 71] — referred to

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
    Generally — referred to

*Securities Act*, R.S.O. 1990, c. S.5
    Generally — referred to

    s. 9(5) — referred to

    s. 11 — referred to

    s. 127 — referred to

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

APPEAL by company from decision of Ontario Securities Commission finding that company had waived solicitor-client privilege with respect to legal advice.

*Lane J.*:

1    The appellant ("Philip") appeals from the decision of the Ontario Securities Commission ("Commission") dated December 7, 2004, finding that Philip had waived privilege in respect of ten documents (collectively "the Documents") described in five classes: Legal Opinions; Skadden Letters; Stikeman Letter; Soule Notes and Caisse Notes. With respect to the first three classes, the Commission decided that Philip had waived privilege by providing them to its auditor, Deloitte & Touche LLP ("Deloitte"), without cautioning Deloitte that they were privileged or requesting the maintenance of confidentiality. As to the Caisse Notes and the Soule Notes, the Commission decided that they were not privileged but had they been privileged it had been waived when they were given to the Staff of the Commission ("Staff").

2    Because of the dual role of the Commission as both investigator and regulator, I will adopt the terminology used by the parties and refer to the Commission when it acted as investigator/prosecutor as "Staff" and to the Commission in its decision-making role as "the Commission".

**Background**

3    Philip Services Corp. was a multi-national company, listed on the Toronto Stock Exchange and other exchanges. In the late summer and fall of 1997, it was preparing to launch a public offering of 20 million common shares, 15 million of which were to be sold in the United States and 5 million in Canada and internationally. The offering was intended to raise approximately (U.S.) $364 million.

4    In September, 1997, a senior officer and Board Member of Philip, Robert Waxman, admitted to the senior management of Philip that he had fraudulently diverted at least $2 million, and perhaps as high as $20 million, of company funds for his own benefit (the "Waxman Issue"). As a result of this disclosure, Philip obtained the Legal Opinions in October of 1997, advising as to whether Philip had an obligation to disclose the Waxman Issue in the pending prospectus. Philip did not disclose the Waxman Issue in the prospectus.

5    On November 6, 1997, Philip filed with the Commission the prospectus, audited financial statements for the years ended 1995 and 1996, and unaudited financial statements for the first nine months of 1997. At the same time, Philip filed a Registration Statement with the United States Securities and Exchange Commission (the "SEC"). None of these documents referred to the Waxman Issue.

6    In January 1998, two months after the public offering, Philip made the first of a series of announcements that significantly reduced Philip's earnings as set out in its audited 1995 and 1996 financial statements, and substantially altered its 1997 financial picture. Following these disclosures, the price of the Philip shares dropped dramatically. Philip was subsequently de-listed and sought bankruptcy protection.

7    In May 1998, Staff commenced an investigation, authorized by the Commission under s. 11 of the Act, into the adequacy of the disclosure made by Philip in support of the public offering. Staff was concerned that Philip was aware of the Waxman Issue and other negative financial information in November 1997 but chose not to disclose it until after the public offering was completed.

8    A Summons to produce documents was served by Staff on Philip and another on Deloitte and each responded. In response to the summons dated July 15, 1998, Deloitte assembled 324 files. Staff attended at the location where the files were stored at various times, including on September 1 to 4, 1998 and August 30 to September 30, 1999, to review and copy documents. In addition, Deloitte also sent copies of documents to Staff on various occasions.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

9    On August 28, 1998, in response to the summons, Philip made disclosure of a number of documents to Staff, including a copy of the Caisse Notes. On September 30, 1998, Philip produced another group of documents, which included a second copy of the Caisse Notes. Connie Caisse was the Director of Corporate Accounting for Philip.

10    Between September 1 and September 4, 1998 Staff obtained copies of the Soule Notes and the Caisse Notes from Deloitte, pursuant to Staff's review of the documents produced by Deloitte.

11    The Legal Opinions were provided to Staff in a letter dated December 17, 1999, from Deloitte's U.S. legal counsel, enclosing them. The letter stated that the documents were responsive to the Summons, and went on to state that,

> Some of these documents were only recently uncovered. Others were maintained in a privileged file, but upon our review of that file, we have determined that the documents produced herewith are not privileged. Thus, you should disregard the "Privileged & Confidential" stamp that appears on some of these documents. In addition, you will note that many of these documents are duplicative of documents that have previously been produced to you (and there may also be multiple copies of some document within this production); nevertheless, we believed it was best to err on the side of producing multiple copies.

**The Main Proceeding**

12    On August 30, 2000, a Notice of Hearing and Statement of Allegations was issued by the Commission against Philip and seven of its former officers and directors under section 127 of the *Securities Act*, in which Staff alleged failure by the defendants to make full, true and plain disclosure of material facts concerning, inter alia, the Waxman Issue, including the amount of his personal benefit, the fact that Mr. Waxman had been relieved of his duties, and the taking of a promissory note from him. Staff also alleged that the management was aware, prior to the Prospectus filing, that developments, largely in the Metals Division, would lead to a restructuring charge which had largely been identified and quantified by late summer of 1997, but which was not disclosed in the Prospectus filed November 6, 1997. The Allegations contain what are alleged to be quotations from certain legal opinions received by Philip prior to the filing date. Portions are underlined in an apparent effort to show that the defendants knew that these two matters should have been reported as material events. The Allegations conclude that Philip and certain officers failed to advise the Underwriters and the public of the facts as to the Waxman Issue and were aware at the filing of the prospectus of the charges to be taken by Philip in respect of the Metals Division, which made the financial statements misleading.

13    Within the Proceeding begun on August 30, a hearing was held to determine the issues as to solicitor-client privilege in certain documents.

**The Disputed Documents**

14    The following ten documents are the subject of the appeal:

> (a) Letter from Brice Voran, Shearman & Sterling to John Warren, Borden & Elliot;

> (b) Borden & Elliot letter to Colin Soule, Senior Vice-President, General Counsel and Corporate Secretary, Philip Services Corp.;

> (c) Letter from Brice Voran, Shearman & Sterling, to John Warren, Borden & Elliot;

> (d) Internal Shearman & Sterling memorandum from Nancy Bertrand to Brice Voran and Richard Price re: disclosure requirements;

> (e) Letter from Paul Mingay, Borden & Elliot, to Colin Soule, Philip Services Corp.;

> (f) Colin Soule's handwritten notes from the audit committee meeting of Philip Services Corp. held on April 23, 1998 (the "Soule Notes");

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

(g) Fax memorandum to Colin Soule, Philip Environmental Inc from Christopher Morgan of Skadden, Arps, Slate, Meagher and Flom LLP re: Letter to SEC relating to Pro Formas;

(h) Fax memorandum to Marvin Boughton of Philip Environmental Inc from Christopher Morgan of Skadden, Arps, Slate, Meagher and Flom LLP re: financial statement for inclusion in forms F-4;

(i) Connie Caisse's handwritten notes of audit committee meeting of Philip Services Corp held on January 19, 1998 (the "Caisse Notes"); and

(j) Letter to Colin Soule re: special matter from David R. Byers of Stikeman Elliott LLP (the "Stikeman Letter").

15    Documents (a) to (e) (collectively, the "Legal Opinions") were prepared for Philip by the law firms of Borden & Elliot and Shearman & Sterling for the purpose of providing legal advice to Philip concerning Philip's disclosure obligations.

16    Documents (g) and (h) (collectively, the "Skadden Letters") were prepared by the law firm of Skadden, Arps, Slate, Meagher and Flom LLP for the purpose of providing legal advice to Philip concerning Philip's filings with the U.S. Securities and Exchange Commission.

17    The Soule Notes and the Caisse Notes are the notes made by their respective authors of communications between Philip's in-house counsel, Colin Soule, and Philip's Audit Committee at Committee meetings.

18    The Stikeman Letter was prepared by the law firm of Stikeman Elliott for the purpose of providing Philip with advice on responding to potential questions from the press and analysts concerning Philip's restatement of its financial statements.

19    The Commission held that the disputed documents were no longer privileged and were to be disclosed to the respondents other than Philip. Philip appeals.

**Standard of Review**

20    Pursuant to s. 9 of the Securities Act, [1], a party may appeal a final decision of the OSC to the Divisional Court:

s. 9(5) Where an appeal is taken under this section, the court may by its order direct the Commission to make such decision or to do such other act as the Commission is authorized and empowered to do under this Act or the regulations and as the court considers proper, having regard to the material and submissions before it and to this Act and the regulations, and the Commission shall make such decision or do such act accordingly.

21    The statutory right of appeal under the Act is not limited. In fact, the powers of the Court on appeal are quite broad, which might lead one to infer that little deference should be paid to the Commission. However, the Supreme Court of Canada in *Pezim v. British Columbia (Superintendent of Brokers)* [2], dealt in detail with the appropriate standard of review to be applied when reviewing administrative tribunals generally, and securities commissions in particular.

22    The Supreme Court explained the range of possible standards to be applied, and the criteria for deciding which standard to use. It concluded that a securities commission is a highly specialized tribunal with policy-making authority derived from statute and broad discretion to determine what conduct is in the public interest. The Court said:

Consequently, even where there is no privative clause and where there is a statutory right of appeal, the concept of the specialization of duties requires that deference be shown to decisions of specialized tribunals on matters which fall squarely within the tribunal's expertise.

In the case at bar, the Commission's primary role is to administer and apply the Securities Act. It also plays a policy development role. Thus, this is an additional basis for deference.

Thus, on precedent, principle and policy, I conclude as a general proposition that the decisions of the Commission, falling within its expertise, warrant judicial deference.

23    The position of the Supreme Court with respect to the deference that should be shown to securities commissions was confirmed in the recent case of *Committee for Equal Treatment of Asbestos Minority Shareholders v. Ontario (Securities Commission)*[3] . In that decision, Justice Iacobucci, for the Court, said, at pp. 152-153:

The OSC is a specialized tribunal with a wide discretion to intervene in the public interest and that the protection of the public interest is a matter falling within the core of the OSC's expertise. Therefore, although there is no privative clause shielding the decisions of the OSC from review by the courts, that body's relative expertise in the regulation of the capital markets, the purpose of the Act as a whole and s. 127(1) in particular, and the nature of the problem before the OSC, all militate in favour of a high degree of curial deference. However, as there is a statutory right of appeal from the decision of the OSC to the courts, when this factor is considered with all the other factors, an intermediate standard of review is indicated. Accordingly, the standard of review in this case is one of reasonableness.

24    Philip submitted that the Commission's application of the law of privilege is to be reviewed on a standard of correctness. Staff agreed, but submitted that findings of fact and factual inferences should be reviewable on a standard of reasonableness. In our view, the position of Staff is correct. Some deference is due to the Commission even on a paper record, as here, having regard to its statutory role as primary finder of fact. But in respect to the major issue before it, the Commission has no advantage, relative to the Court, in its understanding of the common law of privilege, and the court is entitled to substitute its view of the law for the view of the Commission.

**Factual Review: The Legal Opinions**

25    We have already seen that the Legal Opinions came to Staff from Deloitte after a review of whether they were privileged by Deloitte's lawyers. Since legal advice is commonly privileged, it is necessary to explore the circumstances of the disclosure of the Legal Opinions by Philip to Deloitte. They came into the hands of Deloitte from Philip as a result of an Audit Committee meeting. Messrs. Ron McNeill and Alan Kesler of Deloitte were involved in the audit of Philip. They attended a meeting of the Philip audit committee on January 19, 1998. Ms. Caisse was also present and made the Caisse Notes. At that meeting, management presented a summary of the Waxman Issue and Deloitte immediately advised Philip to obtain legal advice as to whether Philip was required to publicly disclose the Waxman Issue. In response, Deloitte was told by Mr. Soule that legal advice on that issue had already been obtained and the Legal Opinions had been received in or around September of 1997. Howard Beck, the Chairman of the audit committee, directed that Deloitte and the audit committee should be provided with a copy of the Legal Opinions.

26    Mr. Kesler was examined by the SEC and he explained how Deloitte was provided with a copy of the Legal Opinions. His evidence is as follows:[4]

. . . In the course of that meeting, we being members of — representatives of — Deloitte & Touche, and I can't recall whether I raised or Ron McNeill [another partner at Deloitte] raised it, but we apprised the audit committee and members of management that we believed their obligations, reporting obligations were relative to the discovery of a significant event, public disclosure of a significant event and our responsibilities when becoming aware of what we believed was a significant event in respect to how they reacted to the discovery of such circumstances. And we advised them that it was our — in our judgment, these matters indicated that they should immediately seek outside legal counsel, that they should consult with their SEC legal counsel as to what those reporting obligations were because we believed that was a legal interpretation as opposed to an accounting obligation but that we had specific responsibilities as auditors in regards to it but that we wanted them to consult immediately with external legal counsel.

In discussion which ensued from that advice we became aware that they had already sought legal counsel previously and it was made clear that that legal advice had been sought when the company first became aware of issues with Bob Waxman,

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

again, in that September time frame. Best of my recollection, that was the first knowledge I had of the existence of any such previous consultation with external legal counsel, and I requested copies of the consultation that had been made and the results of that consultation immediately and continued to press that I believed it was appropriate since there were now many new facts and circumstances which had come to the attention of management that at a minimum, that it was appropriate that they consult again. So following the meeting I was provided with copies of the responses which had been received from external legal counsel...

27    From this evidence, it appears that the Legal Opinions were given to Deloitte in their capacity as auditors, and the Commission so found at paragraphs 69 and 70:

We find as a fact that at the time that Deloitte learned of and requested the Legal Opinions, Deloitte was acting in their role as auditor and not in an expert capacity for the purposes of seeking, receiving or implementing legal advice for Philip. In fact, it is clear from the deposition of Kesler, that Kesler, acting in his role as auditor, believed it was in the company's best interests for Philip to continue to solicit legal advice. Kesler does not indicate that Deloitte was asked or offered to play any role whatsoever in furtherance of the solicitation of legal advice. Kesler makes it clear that it was Deloitte who asked for the Legal Opinions, not Philip who gave them with instructions to provide input for further solicitation.

Deloitte was not consulted on the first round of legal advice. Deloitte only learned of the Legal Opinions well after the fact of non-disclosure in the prospectus. We do not accept Philip's position that Deloitte was involved in the 'continuum' of the provision of legal advice since Deloitte only learned of the Legal Opinions after the issuance of the prospectus.

28    The Commission went on to find that Deloitte also acted at all subsequent times in the capacity of auditor, received the documents free of any warning that they were released for a limited purpose only and that Philip's decision, (presumably as conveyed by Audit Committee Chairman Beck) to release the Legal Opinions to Deloitte was informed and voluntary.

29    Philip submitted that the documents given to Deloitte as a result of the meeting of the Audit Committee were "provided to Deloitte in its expert capacity for the purposes of seeking, receiving or implementing legal advice regarding Philip's affairs." The findings of the Commission are inconsistent with this submission and we must give deference to the Commission's findings of fact if there is evidence to support them. The evidence of Mr. Kesler provides such a foundation and, accordingly, we proceed on the basis that the documents in question were given to Deloitte in its capacity as auditor and not otherwise. That brings us to the heart of this part of the case: What is the effect of giving privileged documents to your auditor? Does the privilege, or any part of it survive?

**Law of Privilege**

30    The place of beginning of any discussion of the privilege attached to solicitor and client communication is *Descôteaux* [5], where the Supreme Court determined that solicitor-client privilege is a substantive rule of law and not a rule of evidence, and set out the way in which courts are to approach conflicts between the privilege and other principles of law: (page 875)

1. The confidentiality of communications between solicitor and client may be raised in any circumstances where such communications are likely to be disclosed without the client's consent.

2. Unless the law provides otherwise, when and to the extent that the legitimate exercise of a right would interfere with another person's right to have his communications with his lawyer kept confidential, the resulting conflict should be resolved in favour of protecting the confidentiality.

3. When the law gives someone the authority to do something which, in the circumstances of the case, might interfere with that confidentiality, the decision to do so and the choice of means of exercising that authority should be determined with a view to not interfering with it except to the extent absolutely necessary in order to achieve the ends sought by the enabling legislation.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

4. Acts providing otherwise in situations under paragraph 2 and enabling legislation referred to in paragraph 3 must be interpreted restrictively.

31    Philip submitted that it follows from these passages that where the right of an auditor to demand information from the audited company and its officers and directors is exercised in relation to documents which are privileged, the resulting disclosure must be treated as limited to the purpose for which the statute grants the right to obtain disclosure. I will return to this submission after considering certain jurisprudence relied on by the parties.

32    In its reasons, the Commission referred to two important cases, one in Ontario, *Cineplex*[6] and one, *Arthur Young*[7] in the U.S. Supreme Court, (cited at length in *Cineplex*) on the disclosure of privileged documents to auditors.

33    In *Cineplex*, the firm of Peat Marwick Thorne ("Peat") acted through its tax department as tax advisors of Cineplex and, through its audit department as the external auditor. Outside solicitors created documents for the purpose of giving legal advice to Cineplex and met with in-house counsel and Peat's tax team to whom they gave the documents for the purpose of Peat assisting in the giving of the legal advice. Subsequently, some of the documents were provided to the audit team by Ms. Levine, a member of the tax team, without instructions to do so from the client and without any intention to waive the privilege. Haley J. held that the general principle was clear: information and advice passing between client and accountant was not privileged. However, these documents were privileged in the hands of Ms. Levine because they were received by her as agent of the client in obtaining legal advice for the client. These circumstances brought the receipt of the documents within the exception to the general rule enunciated by the Exchequer Court of Canada in *Susan Hosiery*[8], where the accountant is using his skill as an accountant in acting as the agent of the client to obtain legal advice.

34    Haley J. went on to discuss the different situation of the auditor in passages that are obiter, in that the documents were given to assist the accountant in providing legal advice and not as auditor, but are nevertheless of importance:

Peats as external auditor for the applicant corporation is governed by the guidelines set out in the handbook of the Canadian Institute of Chartered Accountants. The auditor is called upon to give an objective opinion of the fairness and accuracy of the financial statements prepared by the management of the corporation. Ms. Levine agreed that the auditor must maintain an independence from the management of the corporation in performing the audit. The auditor's report is prepared for the shareholders of the corporation as opposed to the management.

If such an audit were conducted by another firm of chartered accountants there would be no question that they would be third parties in relation to the corporation and disclosures to those auditors would constitute waiver of privilege subject to certain limited exceptions which I will discuss later. Is the function of the audit by the same accounting firm sufficiently different from that of the tax team in the same firm, acting as agent for the client, that the audit team must be notionally treated as a third party for consideration of waiver of privilege?

In my view the answer is yes. If the tax team provided advice to the client or to its solicitor that advice would not be privileged. It is only in the very limited situation where the tax team provides [page146] information to the solicitor for the purpose of the client's receiving legal advice that the privilege can be maintained. This is not the creation of an accountant-client privilege but the acknowledgement of an extension of solicitor-client privilege through the principles of agency. If advice given by the tax team, which cannot be protected by the agency because it is not given for the purpose of obtaining legal advice, turns up in the auditor's file it is clearly not privileged.

35    She then considered the U.S. law:

The position of the independent certified public accountant acting as auditor was considered by the Supreme Court of the United States in *U.S. v. Arthur Young & Co.*, 84-1 U.S.T.C. 83,670. In that case privilege was claimed by the client in tax accrual work papers prepared by the accounting firm in the course of its audit. In finding that there was no privilege in the work papers the court commented on the role of the auditor at p. 83,765:

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

Nor do we find persuasive the argument that a work-product immunity for accountants' tax accrual work papers is a fitting analogue to the attorney work-product doctrine established in *Hickman v. Taylor*, supra. The Hickman work-product doctrine was founded upon the private attorney's role as the client's confidential advisor and advocate, a loyal representative whose duty it is to present the client's case in the most favourable possible light. An independent certified public accountant performs a different role. By certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client. The independent public accountant performing this special function owes ultimate allegiance to the corporation's creditors and stockholders, as well as to investing public. This "public watchdog" function demands that the accountant maintain total independence from the client at all times and requires complete fidelity to the public trust. To insulate from disclosure a certified public accountant's interpretation of the [page147] client's financial statements would be to ignore the significance of the accountant's role as a disinterested analyst charged with public obligations.

36    Haley J. continued:

It is this difference in function and duty owed that leads me to conclude that the audit team of Peats is in a notional third party position vis-a-vis the rest of the firm. While as a consequence accounting firms may have to take steps to isolate those documents which come to it as agent of the client for the purpose of the client's obtaining legal advice I do not think that will necessarily create chaos in the accounting firm. It may instead underline the anomalous position in which an auditor is placed if he is also part of the firm rendering accounting advice to the corporate client whose financial statements are being audited.

37    At page 150, concluding her reasons, Haley J. wrote:

It appears from the practice in the United States outlined in an article "Lawyers' Responses to Audit Inquiries and the Attorney-Client Privilege", Arthur B. Hooker; in (1980), 35 Bus. Law. 1021, that auditors will often request, privileged documents from clients or their attorneys in the course of the audit. To the extent that these disclosures are necessary to permit the independent auditor to fulfil his obligations the client will be required to waive the privilege.

38    It is important to observe that the decision in *United States v. Arthur Young & Co.* was not a case involving privileged documents handed over to the auditor, but rather involved a claim of "work-product privilege" of the kind enjoyed by lawyers for their litigation files, claimed for the auditor's working papers. The difference in function between the lawyer and the auditor led the U.S. Supreme Court to reject the analogy and deny the privilege. The case is not directly applicable to the case at bar as the two privileges are quite different.

39    Since the decision in *Cineplex*, Haley J.'s reasons have been considered in several cases. One of interest is the decision of Noel J. in *Canadian Museum* [9] where the Museum had laid off seven employees and the Union published a report criticizing the Museum's management and handling of funds. In response, the Museum ordered a forensic audit to be prepared by Peat Marwick Thorne, ("PMT"), accountants, in order to support potential legal action against the authors of the Union report. The President of the Museum referred to the PMT report before a Parliamentary Committee as likely to discredit the Union report. At a meeting of the Museum Audit committee at which representatives of the Auditor General were present, it was proposed that a copy of the PMT report be given to the Auditor General, the statutory external auditor of the Museum. This was done to enable the Auditor General to answer any questions about the issues. When the Union brought proceedings to obtain the PMT report, the Museum asserted privilege. The Union contended that the Museum had waived its privilege by voluntarily disclosing the PMT report to the Auditor General.

40    Noel J. reviewed the passages in *Cineplex* that I have referred to, including the reference the practice in the United States at page 150, and at page 456, he commented:

The reason behind such a practice is obvious. Because of the higher duty which they owe to the shareholders, external auditors are bound to disclose otherwise privileged information which comes to their attention and which may have a

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

material impact on the financial statements under audit so that the release of such information to the auditors is a de facto abandonment of the privilege by the client.

The Auditor General is by law the auditor of the Museum. [See Note 4 below] As such his responsibilities and functions are essentially the same as those of external auditors. He acts as a "public watchdog" which demands in turn that he maintain total independence at all times. He owes no fidelity to the entities which he is called upon to audit. His only obligation in relation to any given audit is to state for the benefit of the responsible minister and Parliament whether the statements audited present information fairly in accordance with stated accounting principles on a basis consistent with prior years together with any reservations he may have. [See Note 5 below]

Note 4: Museums Act, S.C. 1990, c. 3, s. 30. Note 5: Auditor General Act, s.

Keeping the foregoing in mind, I believe that the Auditor General must be looked upon as a third party vis-à-vis the government entities that he is called upon to audit. In terms of the privilege, it is also apparent that the disclosure of an otherwise privileged document to the Auditor General in the course of an audit is wholly inconsistent with an intent to maintain the privilege and as such amounts to a waiver. The mere fact that the Auditor General cannot be confined by a privilege belonging to the entity which he is called upon to audit, [See Note 6 below] and that he must indeed make use of relevant and material information that comes to his attention in the fulfilment of his statutory mandate clearly establishes that the voluntary release of information to the Auditor General must be understood as a waiver of privilege by all those concerned.

41    Staff submitted that these cases support the view that the voluntary giving of a privileged document to the auditor by the person possessing the privilege must be understood to be a complete waiver of the privilege. I am not so sure that they go that far. Noel J's comments that auditors are "bound to disclose otherwise privileged information", can equally be read as confined to a waiver for the purposes of the audit, if one limits the duty to disclose to the requirements of the law and auditing standards, as I think it must be. There is no free-standing duty on auditors to make public disclosure of everything they learn that might interest the criminal or tax authorities; their duties arise from their role as auditors as governed by law and professional obligations.

42    Philip submits:

However, given Philip's statutory obligation to cooperate with its auditor, and the public policy rationale for encouraging full and frank disclosure by a company to its auditors, it is respectfully submitted that a company should not be required to waive solicitor-client privilege for all purposes over a document where the document is provided to an auditor in its capacity as auditor.

43    In support of this submission, Philip refers to the *Ontario Business Corporations Act* [10] ("OBCA"), the legislation that governed Philip's affairs throughout the material time. The OBCA expressly recognizes the important nature of the relationship between an auditor and the officers and directors of a company by making mandatory the provision of documents to an auditor (the failure of which is subject to sanction of fine or imprisonment). Section 153(5) to (7) of the OBCA provides, as follows:

**Right of access**

(5) Upon the demand of an auditor of a corporation, the present or former directors, officers, employees or agents of the corporation shall furnish such,

(a) information and explanations; and

(b) access to records, documents, books, accounts and vouchers of the corporation or any of its subsidiaries,

as are, in the opinion of the auditor, necessary to enable the auditor to make the examination and report required under this section and that the directors, officers, employees or agents are reasonably able to furnish.

**Furnishing information**

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 13348-3    Filed 04/16/14    Page 17 of 76

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

(6) Upon the demand of the auditor of a corporation, the directors of the corporation shall,

    (a) obtain from the present or former directors, officers, employees and agents of any subsidiary of the corporation the information and explanations that the present or former directors, officers, employees and agents are reasonably able to furnish and that are, in the opinion of the auditor, necessary to enable the auditor to make the examination and report required under this section; and

    (c) furnish the information and explanations so obtained to the auditor.

**Idem**

    (7) Any oral or written communication under this section between the auditor or former auditor of a corporation and its present or former directors, officers, employees or agents or those of any subsidiary of the corporation, has qualified privilege. [11]

44    Philip emphasizes that the statute creates a compulsion to disclose to the auditor which is inconsistent with the concept that disclosure to the auditor is voluntary and so forms the basis for an implied waiver of privilege for all purposes. Whether the statute is formally invoked or not, company and auditor alike are aware of it and the company must be deemed to have acted under it, as a form of practical compulsion.

45    In further support of the existence of a limited waiver, Philip referred to *Interprovincial Pipe Line* [12] where Gibson J. of the Federal Court dealt with the issue of the waiver of privilege in the context of demands for production of documents under the *Income Tax Act*. By coincidence, *Interprovincial* and *Canadian Museum* were decided virtually simultaneously, the former on October 13, 1995 and the latter on October 5, 1995. Neither refers to the other. In *Interprovincial* the documents included (a) notes prepared by external auditors during their audit and (b) documents exchanged between the Edmonton and Toronto offices of the auditors relating to advice given by them to outside counsel for the client in order that those counsel could advise the client.

46    In *Interprovincial*, the Federal Court held that the provision of a privileged document to an auditor must be considered a limited waiver of privilege, not a waiver of privilege for all purposes. Interprovincial was governed by the *Canada Business Corporations Act* ("CBCA") which contains, in section 170(1), provisions similar to those of section 153 of the OBCA discussed above, which require a company to furnish its auditor with whatever documents are requested. Gibson J. referred to the substantive rule of privilege as set out in *Descôteaux*, supra, and concluded that the statutory obligation to furnish documents to an auditor must be read in a manner that does not interfere with any claim of solicitor-client privilege except to the extent absolutely necessary to achieve the ends sought by the legislation. He held, at page 380:

    It was clearly the applicants' intent to disclose the legal opinions that it had received for a limited purpose only, namely to assist in the conduct of the audit and examination of its financial statements. It made the legal opinions available in accordance with its duty to assist that can be drawn from subsection 170(1) of [the CBCA]. It would be contrary to public policy if the applicants' action in making the legal opinions available for audit purposes "had the effect of automatically removing the cloak of privilege which would otherwise be available to them" on an audit by the respondent. This conclusion is, I am satisfied, consistent with the propositions ... that have been enunciated by the Supreme Court of Canada and consistent with a strict interpretation of the impact on solicitor-client privilege of subsection 170(1) of the [CBCA]. If Parliament had intended there to be a secondary purpose in section 170(1) ... beyond the primary purpose of accuracy in financial reporting, it was open to it to enunciate that purpose ... Since Parliament did not do so, it would be inappropriate, and indeed contrary to the principles enunciated in *Descoteaux*, to interpret subsection 170(1) more broadly than necessary to achieve the end clearly sought to be served.

47    It is true, as urged by Staff, that in *Interprovincial*, the giving of the documents was accompanied by statements intended to protect privilege. In my view that does not affect the basis of the decision, that disclosure to the auditors for their purposes is

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

not properly disclosure to the world, because of the great importance of the solicitor-client privilege to the proper functioning of the legal system. The documents were sought by Mr. Kesler because Deloitte was the auditor and were given to him in that capacity. It would be contrary to the basis of the decisions in *Descôteaux*, supra, and *Lavallee*, infra, to extend the scope of that disclosure to the world.

48    In the English case of *British Coal* [13] the Court of Appeal dealt with a case of litigation privilege in which documents prepared for a civil action, and therefore privileged, were given to the police to assist them in their investigation of possible criminal fraud arising from the same facts. The police laid charges and produced the documents to the accused as part of their disclosure. The accused were acquitted and sought to use the documents in the civil action. The judge required the return of the documents and enjoined the accused/defendants from using them. The defendants appealed alleging that the privilege had been waived by disclosure to the police. The court dismissed the appeal. The act of disclosure of the documents to the police to assist in the criminal case could not objectively be regarded as a waiver of any rights in the civil case. The plaintiff acted in pursuance of a duty to assist in the conduct of the criminal proceedings and it would be contrary to public policy if the plaintiff's act had the effect of automatically removing the "cloak of privilege which would otherwise be available to them in the civil litigation for which the cloak was designed."

49    While *British Coal* deals with a different form of the privilege, the acceptance of the concept of a limited waiver is of interest in the present case.

50    In *Lavallee, Rackel & Heintz* [14], the Supreme Court dealt with whether section 488.1 of the *Criminal Code*, which authorizes a procedure for determining issues of privilege in the context of seizure of documents from a person's solicitor, infringed section 8 of the *Charter*. The court divided on the issue, but both Arbour J. for the majority and LeBel J. for the minority, agreed that solicitor and client privilege must be strictly upheld. Arbour J. reviewed the prior jurisprudence holding that the privilege has "long been regarded as fundamentally important to our justice system" [15] and that the privilege "must be as close to absolute as possible to ensure public confidence and retain relevance. As such, it will only yield in certain clearly defined circumstances, and does not involve a balancing of interests on a case-by-case basis." [16] Arbour J. also observed (at paragraph 20) that Lamer J. in *Descôteaux* (supra) had applied the minimal impairment test, limiting the breach of solicitor-client privilege to "what is strictly inevitable". At page 241, Arbour J. wrote:

> Indeed, solicitor-client privilege must remain as close to absolute as possible if it is to retain relevance. Accordingly, this court is compelled in my view to adopt stringent norms to ensure its protection. Such protection is ensured by labeling as unreasonable any legislative provision that interferes with solicitor-client privilege more than is absolutely necessary. In short, in the specific context of law office searches for documents that are potentially protected by solicitor-client privilege, the procedure set out in s.488.1 will pass *Charter* scrutiny if it results in a "minimal impairment" of solicitor-client privilege.

51    While the present case does not involve a *Charter* challenge, the message from the Supreme Court jurisprudence is clear: restrictions on solicitor-client privilege to attain other important societal objectives are to be closely scrutinized and restricted to what is absolutely necessary for the competing objective so as to achieve the minimal necessary impairment of solicitor-client privilege. It would follow, therefore, that section 153 of the OBCA cannot be read as authorizing the auditor to ignore the solicitor-client privilege with which the documents are impressed in his hands by their nature as Legal Opinions and the limited use that may be made of them.

52    Accepting the above as the guiding principle, I turn to the case at hand. Auditors, in pursuit of their important public function of ensuring the fairness of the presentation of the accounts of public companies, have the right to obtain whatever documentation they require, which may, as here, involve the production to them of documents as to which the client claims solicitor-client privilege. Auditors are not in the family of the client; they are third parties. Ordinarily the voluntary production of privileged documents to third parties is a waiver of the claim for solicitor-client privilege. Clearly, the auditor must be free to use the documents for the purposes of the audit without limitation. The auditor may ask the client to publish them or a summary of them in a note to the financial statements if that is required for a fair presentation, failing which the auditor, in a serious case, will likely feel obliged to resign, a serious and public event for a company regulated by a securities commission. But the

WestlawNext。CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

mere possession of the documents does not give the auditor the right to publish them in the financial statement, never mind otherwise. The financial statements are the clients; the auditor's right is to withhold the certificate. To what extent do these functions require that the waiver of solicitor-client privilege by the client be for all purposes at all future times?

53     The appellant Philip submits at paragraph 65 of its factum:

> 65. There is a strong public policy rationale for protecting privileged documents from further disclosure when such documents are provided to a company's auditors as part of the conduct of the legislatively prescribed audit process. To conclude otherwise would lead to an improper result; public companies would be required to weigh the need to engage in full and frank disclosure with their auditors with the risk that associated legal advice will become a matter of public record. Where public policy dictates, it is open to the court to find that the waiver of privilege should be circumscribed, not a waiver for all purposes.

54     On the other hand, respondent Staff assert at paragraph 70 of their factum

> 70. The fact that auditors have a public duty beyond that of the companies they audit reveals why this Court should reject Philip's argument (paragraphs 59-66 of its factum) that the law should be changed to recognize the concept of limited waiver and allow companies, in these circumstances, to share privileged documents with their auditor without waiving privilege. (It should be noted that Philip did not make this argument before the Commission. Therefore, this Court does not have the benefit of the Commission's decision and expertise regarding the role of an auditor.) Contrary to Philip's assertion, it would be against public policy to allow a company to prevent auditors from disclosing or acting upon information or documents provided to them that reveal wrongdoing or fraud in the companies they audit, on the grounds of privilege. Such a policy would allow companies to conceal such wrongdoing from their shareholders, and prevent auditors from complying with their own independent obligations to report such wrongful conduct.

55     Philip's submissions speak to the company weighing the need for frank disclosure to the auditor as opposed to the chance that their information will become public. That may in practice be the case where the company is less than appropriately forthcoming. In my view, the effect of section 153 of the OBCA is that there is no weighing that is appropriate; the company must in any event disclose what the auditor seeks. That is part of the basis for confining the extent of the waiver. The submissions of Staff assume that the limited waiver of the privilege for the purposes of the audit will prevent the auditors from making disclosures revealing fraud that they otherwise would make. But the purposes of the audit are those established by law or by the standards of the auditing profession, and to the extent that the law or those standards require that auditors report to the shareholders, or to anyone else, on any matter, the waiver will extend to that matter. To come to the Waxman Issue in particular, the auditors would be able to use the disclosed documents as an aid to judging the need for amendments or notes to financial statements, the need for further examination of the company's financial controls, the need for amendments to certificates appended to financial statements filed with regulators, any need for reporting to insurers, any requirement for reporting to licensing authorities, and so forth.

56     It was submitted that a limited waiver would place auditors in an impossible position: they would have the document but be unable to use it. For the reasons set out above, I disagree. The auditor has the scope to use the document across the full range of auditor responsibilities. Whether the auditor could disclose the contents of the document in the course of explaining why they were resigning the account seems a red herring. With a regulated public company, the resignation of the auditor accompanied by a refusal to certify the accounts is the kind of weapon that renders the disclosure of legal advice redundant.

57     In my view, there is no necessity, in order to achieve the societal objective of fair financial statements certified as fair by fully informed auditors, that the waiver go beyond the auditors. By definition, the waiver enables the auditors to comply with the full scope of their audit standards. To hold that the waiver is broader than that, is to sanction a more than "minimal impairment" of this privilege which is fundamentally important to our justice system. In my view, the jurisprudence prevents finding that the Legal Opinions, once given to the auditors in that capacity for their purposes, were thereby made available to be handed over to the Commission for its purposes. That the statute compelling production to the auditors was not directly invoked

**Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934**

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

seems to me to be irrelevant: it was there in the background. Even if the statute did not exist, the fundamental importance of solicitor-client privilege would dictate the narrow waiver rather than the broad.

58    In my view, the Commission erred when it found that the giving of the Legal Opinions to Deloitte constituted an unlimited waiver of the solicitor-client privilege.

**Discussion of the Legal Opinions at the Audit Committee**

59    The Commission found, at paragraphs 74 to 79, that the Deloitte representatives were present at the Audit Committee meetings of January 19, 1998 and April 23, 1998, as part of the audit team and they received the documents in question, other than the Caisse Notes, to assist Deloitte in their audit function. Further, the Commission found that the disclosure made as to the Legal Opinions at the meeting of January 19, itself constituted a waiver of the privilege even before the documents themselves were handed over. The Caisse Notes, the Commission said, provided evidence that the substance of the Legal Opinions was discussed in the presence of the Deloitte people and so the privilege was waived. These are findings of fact, save as to the conclusion on the waiver point, and deserve deference. There is evidence in the record from which these conclusions can be reached either directly or by logical inference, and I accept the facts as found.

60    As the meeting was for audit purposes and the Deloitte representatives were present as part of the audit team, it follows that the oral disclosures of the contents of the Legal Opinions were made on the same basis as the delivery of the Legal Opinions themselves: to the auditor for audit purposes. There is no reason the treat the two kinds of disclosure, oral and documentary, differently. In my view, the privilege was waived to the same extent in each case: for the purposes of the audit and not beyond.

**Protecting Privilege**

61    The Commission notes that there was no evidence before it that the documents provided to Deloitte, other than the Legal Opinions, were provided with an intention that privilege be retained; indeed there was no evidence as to how Deloitte obtained them. The Commission inferred that Philip did not regard those documents as privileged or, if it did, that Philip intended to waive the privilege by permitting the documents to come into Deloitte's possession to inform Deloitte of pertinent information in performing its audit role. In my view, given that Deloitte was the auditor, the only reasonable inference is that Deloitte received these documents in that role. It follows that the privilege was waived, but, as with the Legal Opinions, only to the extent necessary to enable the auditor to carry out its function. Philip did protect its privilege on the occasion of giving the documents to Deloitte, to the extent it was necessary to do so, by giving the documents on that occasion only to its auditors, thereby limiting the scope of the waiver.

**The Caisse Notes and the Soule Notes**

62    Ms. Caisse was Director of Corporate Accounting and made notes of the proceedings at the Audit Committee meeting of January 19, 1998. Mr. Soule was General Counsel and made notes at the Audit Committee meeting of April 28, 1998. The notes contain evidence of some of the matters discussed at those meetings, including references to the Legal Opinions. Philip refers to these notes as the "memorialization of communications between Philip's house counsel and the Audit committee." It seems to me that these Notes, to the extent that they reveal legal advice, are privileged except that the privilege was waived by the presence of the Deloitte people, but only to the extent necessary for the audit function that the Deloitte people were performing.

63    However, Philip did not list the Caisse Notes in its letter itemizing its claims for privilege and actually produced them to Staff in two batches of documents in response to the Summons. In addition, Ms. Caisse was cross-examined on them and they were made an exhibit. They were also released to the SEC on consent. Mr. Beck was also cross-examined, the Caisse Notes were made an exhibit and questions were answered as to whether the Board had ever discussed the point of whether the Waxman Issue should be disclosed because of the management integrity aspect referred to in the Shearman and Sterling letter and deferred by that firm to the Board for decision. The Commission found that, on these facts, there was no privilege left and there was ample evidence to support the finding.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

64    The Soule Notes were also produced, but in a redacted form excising the notes about the content of legal advice provided to the Audit Committee by Mr. Soule. There was no evidence as to how these notes, made by Philip's General Counsel at an Audit Committee meeting, came into the possession of Deloitte. When Deloitte included the Soule Notes on a list of Philip documents in Deloitte's possession, Philip instructed Deloitte not to produce them. The Soule Notes record the discussion of legal issues and are prima facie privileged. The privilege was waived when the discussion took place in the presence of Deloitte representatives, but only to the extent necessary for Deloitte's purposes as auditors. Any subsequent delivery of the Soule Notes to Deloitte ought not to affect the scope of the waiver. In view of the importance of confining interference with the solicitor-client privilege to the most minimal intrusion, delivery of these Notes to Deloitte should be presumed to have been in furtherance of the existing relationship, i.e. in performance of its audit role. The Commission found in its reasons at paragraph 84 that one interpretation of the presence of these documents in Deloitte's files was exactly that. In my view, that interpretation must be adopted in these facts to achieve minimal intrusion.

**Other Documents**

65    The Skadden Letters and the Stikeman Letter were found by the Commission to be prima facie privileged, but were found in the files of Deloitte without any evidence as to why they got there. However, on their face they relate to the same issue that led Philip to give other related documents to Deloitte, which leads to an inference that they were probably delivered to Deloitte for the same purpose as the others. Again, in view of the importance of the privilege and the pressing public interest in confining interference with it to the most minimal intrusion, the documents should be presumed to have been delivered in furtherance of the audit function of Deloitte.

**Delivery to Staff by Deloitte**

66    Philip submits that, if the Legal Opinions, the Stikeman Letter, the Skadden Letters and the Soule Notes remained privileged at the time that Philip provided them to Deloitte, the subsequent production of these documents by Deloitte cannot impact on the strength of those privilege claims. As stated above, this court must determine whether the individual purportedly waiving the legal right to privilege possessed the requisite authority to make such a waiver. The disclosure of privileged documents to Staff by Deloitte does not waive privilege in the documents, as Deloitte lacked the requisite authority to waive privilege over the documents.

67    In support of this submission, Philip refers to the decision of the Alberta Court of Appeal in *Syncrude* [17] where the court dealt with alleged waiver of privilege. Privileged documents turned up ten years after they had been created for the plaintiff in the possession of one of the defendants. There was no direct evidence of how they got there, but former counsel for that defendant had recorded when arranging the documents for the case, that these had come from a binder of documents given to one Kutner, who had been engaged by the parties jointly to investigate the facts. There were submissions made as to the lack of evidence, but the court cut to the chase:

> What is more, the gap in the evidence is about a point which seems to us largely irrelevant. Why or how or with what intent Mr. Kutner may have let the papers get into the hands of Bechtel really does not matter. Clearly Mr. Kutner had no authority to act as the plaintiff's agent to waive privilege. If anything, the all-party agreement would suggest the opposite. Privilege can only be waived by the party (client) owning it or his agent, not by strangers. That is elementary law. And waiver is the issue, for it is now clear that mere loss of physical control over documents does not destroy privilege.

68    Equally clearly, Deloitte had no authority to act as the agent of Philip to waive the privilege, which still attached to these documents in its possession. Philip gave Deloitte no specific authority to waive privilege. Nor can there be an implied authority, for the audit responsibilities of the auditor do not normally require the surrender of the client's privileged documents to third parties for their purposes and not for the purpose of the audit responsibilities of Deloitte. The mere possession of the documents did not carry the authority to waive the privilege. The fact that the Disputed Documents largely came into the possession of Staff via an unauthorized disclosure by Deloitte undermines their usefulness in the hands of Staff.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

**Disclosure in the Course of This Litigation: Implied Waiver**

69     I have already observed that the Statement of Allegations in this present Proceeding contains extracts from some of the Legal Opinions. Presumably, Staff put these extracts in the Statement because Staff believed that the documents were no longer privileged. But whatever the reasoning, if the documents were still privileged, this unauthorized publication cannot be permitted to alter that status. That would be entirely contrary to the authority of the Supreme Court discussed above that solicitor-client privilege is of central importance to the administration of justice and is to be protected from impairment.

70     Privilege can be lost in the course of litigation where the party with the privilege seeks to take an unfair advantage by, in effect, using the existence of legal advice as a shield against the opposite party, but resisting the disclosure of that advice. As usual, one cannot have it both ways. But the party having the privilege is the one who can, in this fashion, lose it. Such a waiver can occur even in the absence of any actual intention to waive. A party may act in such a fashion as to make it unfair for that party to continue to maintain the privilege. But the opposite party may not, by referring to the legal advice given to the party with the privilege, thereby put the privileged advice in issue.

71     In *Lloyds Bank Canada v. Canada Life Assurance Co.* [18], the motion judge reviewed a number of cases on the effect of putting a party's state of mind in issue, and concluded that the privilege is not always waived where the state of mind is in issue. She commented at page 168:

> Certainly, it will not be waived where it is the person who seeks the information that has raised the question of reliance.

72     She continued by referring to Wigmore [19]:

> A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation. There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final.

73     As the Bank had pleaded that, in making certain loans to a subsidiary of the defendant, it had relied upon comfort letters received from the defendant on which it sought to make the defendant liable for the default of the subsidiary, the motion judge required the Bank to answer whether it had received legal advice on the security offered by the comfort letters. The Bank had put in issue its reliance and the reasonableness of this reliance was an issue as to which the advice was highly pertinent.

74     In the present case, there is no document equivalent to a pleading by any of the respondents in which reliance on the Legal Opinions might formally be put in issue, but some persons have been cross-examined. In its reasons the Commission acknowledges the absence of any certainty as to what defence will be mounted by the respondents. It suggests that it therefore is legitimate to consider what has been said by the officers and directors at the time of the prospectus in their depositions before the regulators here and in the U.S. On the same point, Staff submits that "all of the directors and officers, including the respondents, justify their actions by asserting either that they relied on the Legal Opinions, or they relied on what they had been told about the Legal Opinions." Their factum contains several paragraphs outlining the evidence of various former officers and directors as to discussions involving the Legal Opinions prior to the finalizing of the prospectus. Of the several persons examined, only Mr. Soule, Mr. Hoey and Mr. Allan Fracassi are actually parties to the Proceeding. In my view, the non-parties examined cannot, by anything they may say, put the Opinions in issue in the case against any respondent.

75     Much of the evidence to which Staff refers us and which the Commission reasons cite, was evidence that the officers and directors of Philip in the pre-prospectus period were interested to learn about the Opinions and discussed them with each other, although very few actually read them; perhaps only Mr. Soule on whom the others relied to explain the situation to them. Mr. Beck said he did not even know they had been obtained until after the prospectus was filed. This evidence has nothing to do with possible waiver by implication. That would arise when the respondent(s) take the position in these proceedings that their decision not to disclose the Waxman Issue was justified by the Legal Opinions.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

76      Philip submits that the question of waiver by implication depends upon how the respondents answer the allegations in the Statement that the Waxman Issue should have been disclosed in the prospectus. The issue is "whether Philip has put the content of the Legal Opinions into issue by asserting in this proceeding that it relied on the Legal Opinions to justify a course of action taken by it prior to the issuance of the prospectus." [emphasis in original]

77      Put another way, the waiver of privilege is implied if and when Philip or an individual respondent submits that it or he was justified in not disclosing the Waxman Issue because it or he had received legal advice that it was not necessary to do so. By relying on the opinion, the client waives the privilege. But if Philip defends the allegations on some other basis, such as that the thefts were not of material amount or the resignation of Robert Waxman was not a material change, without reliance on the Legal Opinions, the opinions may well not be in issue and the privilege might be maintained.[20] That is a matter for the Commission when the defence is put forward and the evidence as to the decision not to disclose is heard.

78      Staff are not entitled to use the Opinions to attempt to prove the state of mind of a respondent unless that respondent has put the Opinions in issue by relying on them or has put his state of mind in issue in circumstances creating an implied waiver of the privilege. None of the former officers and directors cross-examined answered questions about the content of the Legal Opinions; all claimed privilege, a position inconsistent with waiver.

79      At paragraph 105 of its reasons, the Commission states that some former officers and directors "stated they relied on" the Legal Opinions, but counsel for Philip submitted that no such statements were made. The only example in the reasons is a statement quoted from the transcript of Mr. Hoey that Mr. Soule had indicated that whoever he was seeking counsel from had concurred with Deloitte's view as to reporting obligations. It seems clear that there was no "Deloitte's view" until January 1998, which makes it clear that this cannot be a report of a conversation prior to the filing of the prospectus. Counsel for Philip asserted that no evidence existed of any reliance on the Legal Opinions by way of defence to the allegations in this proceeding, and we were not taken to any.

80      In one passage of his transcript, Mr. Fracassi said that he asked Colin Soule to seek advice; that Mr. Soule got advice and "gave me what the conclusion was or what his opinion and advice was to me. I then made a decision with all of that information and we moved on." What Mr. Fracassi did not say was that he acted in accordance with the Legal Opinions or in accordance with Mr. Soule's advice or on neither. Nor was he pressed in the examination to state if he did or did not rely on the Legal Opinions and act accordingly. Yet that is what he must say to defend himself on the basis of reliance on them.

81      Staff submitted that Philip "cannot assert good faith reliance on the Legal Opinions, and at the same time fail to disclose the Legal Opinions upon which they relied. It would be demonstrably unfair and inconsistent to allow Philip to prevent the Commission and all other parties from exploring the issue and the Legal Opinions." I agree entirely with that statement of the law, but in my opinion the Commission acted prematurely in applying that reasoning when there is no actual claim in the depositions by any respondent that he acted in reliance upon the Legal Opinions.

82      Staff relied on the decision of Winkler J. in *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*,[21] where he found that,

> The combined effect **of the pleadings, the opening statement of the plaintiff and the evidence is**, according to the defendants, that the Bank has placed in issue its state of mind regarding the strength and enforceability of comfort letters. The plaintiff, they assert, has pleaded reliance on the conduct of the defendants, when they knew, or ought reasonably to have known, through the advice of their legal department, that comfort letters were not binding. The consequence, they assert, is that the plaintiff has waived by implication any solicitor-client privilege it may have held over the legal advice or knowledge which gave rise to that state of mind. I agree with those submissions. [emphasis added]

83      The difficulty with applying that case to the present one is that there is as yet in this case no pleading by the party with the privilege, no opening statement by that party and no evidence on behalf of Philip and several respondents. The Commission, in its reasons, acknowledges that the defence to be submitted by the respondents is as yet unknown. In the light of the importance

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

of the solicitor-client privilege, it is surely premature and unfair to declare the privilege lost by inference from the statements of non-parties and the fact that some respondents have admitted discussions at the time of the prospectus about the Opinions having been received and what was said in second-hand conversations about their content. The *Toronto Dominion Bank* case illustrates what is needed to place the Opinions in issue in the proceeding and the material before us falls short of that.

84    When the hearing on the merits of these allegations takes place, it may be that there will be persons who will seek to defend themselves on the basis of reliance on the Legal Opinions or on a particular view of the law, as to which knowledge of the content of the Legal Opinions would be relevant[22]. If so, the Commissioners hearing the case will need to rule on the waiver issue. At the present, I cannot see any basis in the evidence for finding that any respondent has, as yet, defended himself on the basis that he relied on the Legal Opinions in making the decision not to disclose. Accordingly there has not yet been any implied waiver of the privilege.

**Disclosure in the Course of this Litigation: Unscrambling the Egg**

85    In paragraph 64 of their factum, Staff submit:

> 64. In this case, the Legal Opinions have already been published in Staff's Statement of Allegations and in the civil litigation between Philip and Deloitte. In addition, the content of the Legal Opinions has been put in evidence through the introduction of the Caisse and Soule Notes into evidence. The Commission properly concluded that Philip has waived privilege to such an extent it would be impossible to "undo what has been done." As stated by the Commission,

> Philip failed to take reasonable steps to preserve privilege and, as a consequence of Philip's action and inaction, knowledge of the Legal Opinions and their contents has become widespread. Therefore, any privilege not otherwise lost would have been lost as a consequence of the failure of Philip to take reasonable steps to prevent such knowledge from becoming widespread.

86    The above finding of the Commission that Philip failed to take reasonable steps to preserve its privilege must, in large measure, be based on the erroneous finding that by giving the Legal Opinions to Deloitte, or perhaps by omitting to state on that occasion that the privilege was still applicable, Philip had lost the privilege in all events. Philip cannot be blamed for the unauthorized disclosures made by Deloitte, although Philip did produce the Caisse Notes itself. Nor can Philip be saddled with the responsibility for the action of the Staff in putting the text of two of the Opinions into the Statement of Allegations when they had received the documents from someone with no authority to waive the privilege. In these circumstances, the finding of fact as to reasonable steps is suspect, to say the least, and seems to arise in large measure from an error in law. Accordingly, the court is not bound to accept the Commission's finding of these facts.

87    Is it, as Staff allege, too late for Philip to claim privilege because it is impossible to undo what has been done? Obviously, those who have read the Opinions are not going to forget what they have read, so Philip's position has been damaged. But there is no reason to permit the damage to escalate by permitting those documents to be used by those who have them as if Philip had actually or impliedly waived the privilege when no waiver has occurred. When Staff obtained the Legal Opinions from Deloitte, Staff should have sought direction on notice to Philip as to how to treat these documents. Use of them by Staff prior to the final disposition of proceedings to determine the issue of privilege, (that is, these proceedings) cannot be used as evidence that the privilege has been lost. In *Tilley v. Hails*[23], the court said:

> [W]here [privileged] communications are disclosed either inadvertently or through improper conduct by a party, that party's solicitors are not entitled to make use of the documents in the litigation. [...] The surreptitious delivery of confidential material cannot be sanctioned. [...]

> As noted in the Royal Bank of Canada case, supra, the ethical and proper course of action where lawyers come into possession of privileged documents which privilege may not have been waived, is to enquire whether the documents were intended to be disclosed and if necessary, to test the issue of privilege in court.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

It is clear that mere loss of physical custody does not terminate the privilege.

88    The submission of Staff that their own publication of the Opinions, in the face of the principles enunciated in *Tilley*, can affect the privileged nature of the documents is contrary to reason and principle. That the Opinions have been put in issue by Deloitte in its litigation with Philip is also not a matter that can create a waiver of the privilege by Philip in this litigation.

**Fairness of the Trial: Full Answer and Defence**

89    Counsel for Staff submits that:

> ... fairness dictates that for the purposes of the hearing into this matter, the parties must be permitted to explore whether the Respondents and representatives of Philip acted in good faith upon the advice of legal counsel. Philip, at paragraph 74 of its factum, quotes Wigmore on the issue of implied waiver, who stated that "regard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also the element of fairness and consistency." This is consistent with Mr. Justice Ground's decision in *Bank Leu Ag v. Gaming Lottery Corp.* The Commission relied on the following quote from Mr. Justice Ground's decision:

> > When determining whether privilege should be deemed to have been waived, the court must balance the interests of full disclosure for the purposes of a fair trial against the preservation of solicitor client and litigation privilege. Fairness to a party facing a trial has become a guiding principle in Canadian law. Privilege will be deemed to have been waived where the interests of fairness and consistency so dictate or when a communication between a solicitor and client is legitimately brought into issue in an action. When a party places its state of mind in issue and has received legal advice to help form that state of mind, privilege will be deemed to be waived with respect to such legal advice.

> *Bank Leu AG v. Gaming Lottery Corp.*, (1999), 43 C.P.C. (4 [th]) (Ont. Sup Crt.) at p. 77

90    *Bank Leu AG v. Gaming Lottery Corp.* [1999 CarswellOnt 3365 (Ont. S.C.J.)] was a motion regarding the production of privileged documents. One issue was whether the privilege had been impliedly waived by the client when it had asserted breach of duty on the part of its solicitors in failing to warn it of certain risks in a transaction. Ground J. held that such an assertion was a deemed waiver of the privilege that otherwise protected all documents relating to advice given to the client as to the risks involved in the transaction. The statement that "privilege will be deemed to have been waived when the interests of fairness and consistency so dictate" must be taken in context: the client had asserted a breach of duty by the lawyers and could not complain if their communications with him were thereby rendered no longer privileged. Ground J. was not asserting, as I read the case, any general principle that fairness over-rides the privilege where it is the opposite party and not the client who wishes to put the legal advice into issue.

91    Staff also submitted that permitting Philip to maintain the privilege would hamper the search for truth for two reasons. The first was the importance of the Opinions in assessing the credibility of the Deloitte witnesses. The second was the impact of non-disclosure on the right of the respondents to make full answer and defence. The short answer to the first is that privilege often hampers the search for truth, as Wigmore [24] acknowledges, but it is nevertheless an important principle in the administration of justice that persons consulting lawyers have total confidence in the privacy of their disclosures, so long as they do not themselves put the advice in issue. As to the second, the respondents will no doubt be better judges of that than Staff or this court.

**Conclusions**

92    In summary, I conclude that all of the Disputed Documents were prima facie privileged; that the provision of copies to Deloitte in its capacity as auditor did not waive the privilege for all purposes, but only to the extent necessary to enable Deloitte to carry out its audit functions; that delivery by Deloitte to Staff of those documents received from Philip was unauthorized and incapable of defeating the privilege; that Staff has not established any implied waiver by Philip by reason of the evidence given in this proceeding by the respondents or by other former officers and directors of Philip as no one has asserted as yet that the Legal Opinions were relied on by him in deciding not to disclose the Waxman Issue; that the use of the Opinions by Staff in

**Philip Services Corp. (Receiver of) v. Ontario (Securities..., 2005 CarswellOnt 3934**

2005 CarswellOnt 3934, [2005] O.J. No. 4418, 13 B.L.R. (4th) 69, 16 C.P.C. (6th) 193...

this proceeding and by Deloitte in other actions cannot be a waiver by Philip of its privilege or otherwise affect that privilege; and that, except for the Caisse Notes [25], all the Disputed Documents remain privileged and may not be used or relied on by Staff as matters stand at this time. The caveat just expressed is meant to make it clear that developments during the hearing may alter the situation and may require rulings based on fresh developments.

93    For these reasons, I would allow the appeal, set aside the order of the Commission and, pursuant to section 9(5) of the Act, direct the Commission to decide the motion in accordance with these reasons. It would follow that the references to the content of and quotations from the Legal Opinions in the Allegations should be removed. Costs should follow the event and may be the subject of written submissions.

*Appeal allowed; redetermination ordered.*

Footnotes

1    R.S.O. 1990, c. S. 5.

2    [1994] 2 S.C.R. 557 (S.C.C.).

3    [2001] 2 S.C.R. 132 (S.C.C.)

4    Transcript of Examination of Alan Kesler by SEC, held February 24, 2000

5    *Descôteaux c. Mierzwinski*, [1982] 1 S.C.R. 860 (S.C.C.).

6    *Cineplex Odeon Corp. v. Canada (Attorney General)* (1994), 114 D.L.R. (4th) 141 (Ont. Gen. Div.).

7    *United States v. Arthur Young & Co.*, 84-1 U.S.T.C. 83,670 (U.S. N.Y. 1984) AT 83,765; U.S. Supreme Court.

8    *Susan Hosiery Ltd. v. Minister of National Revenue*, [1969] C.T.C. 353, [1969] 2 Ex. C.R. 27 (Can. Ex. Ct.).

9    *P.I.P.S.C. v. Canadian Museum of Nature*, [1995] 3 F.C. 643 (Fed. T.D.)

10    Ontario Business Corporations Act, R.S.O. 1990, c. B.16, ss. 153 and 258

11    This appears to be a reference to the qualified privilege recognized in defamation law and to be intended to protect persons who give material to auditors from retaliatory defamation actions. It does not create or affect any privilege in the documents themselves.

12    *Interprovincial Pipe Line Inc. v. Minister of National Revenue* (1995), [1996] 1 F.C. 367 (Fed. T.D.) at paras. 16-18.

13    *British Coal Corp. v. Dennis Rye Ltd. (No. 2)*, [1988] 3 All E.R. 816 (Eng. C.A.)

14    *R. v. Lavallee, Rackel & Heintz*, [2002] 3 S.C.R. 209 (S.C.C.).

15    *Smith v. Jones*, [1999] 1 S.C.R. 455 (S.C.C.) at para. 45 (Cory J.)

16    *R. v. McClure*, [2001] 1 S.C.R. 445 (S.C.C.) (Major J. for the court), para. 35.

17    *Syncrude Canada Ltd. v. Babcock & Wilcox Canada Ltd.*, [1992] A.J. No. 1234 (Alta. C.A.)

18    *Lloyds Bank Canada v. Canada Life Assurance Co.* (1991), 47 C.P.C. (2d) 157 (Ont. Gen. Div.)

19    *Wigmore on Evidence* vol. 8 (1961) at 635.

20    This passage is not intended to be exhaustive of the circumstances in which the Legal Opinions might become admissible.

21    *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1997), 32 O.R. (3d) 575 (Ont. Gen. Div. [Commercial List]), at 589

22    This passage is not intended to be exhaustive of all possible ways in which the Legal Opinions could become admissible.

23    (1993), 12 O.R. (3d) 306 (Ont. Gen. Div.)

24    8 Wigmore par. 2285 at 527, as cited in *Hearn v. Rhay*, 68 F.R.D. 574 (U.S. Dist. Ct. Wash. 1975)

25    See paragraph 63, supra.

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**TAB 2**

Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)
(Cite as: 2006 WL 1320067 (D.N.J.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.
CELLCO PARTNERSHIP d/b/a Verizon Wireless,
Plaintiff,
v.
CERTAIN UNDERWRITERS AT LLOYD'S
LONDON, Certain Subscribing London Market
Insurance Companies and John Doe Insurance
Companies 1-100, Defendants.

Civil Action No. 05-3158 (SRC).
May 12, 2006.

Philip R. Sellinger, Greenberg Traurig, LLP,
Florham Park, NJ, for Plaintiff.

Thomas F. Quinn, Brian J. Whiteman, Wilson,
Elser, Moskowitz, Edelman & Dicker, LLP,
Newark, NJ, for Defendants.

## MEMORANDUM OPINION

HUGHES, Magistrate Judge.

*1 This matter comes before the Court upon Motion by Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Plaintiff") to compel production of documents, [Docket Entry # 11], returnable April 17, 2006, and upon Motion by Defendants Certain Underwriters at Lloyd's London and Certain Subscribing London Market Insurance Companies ("Defendants"), [Docket Entry # 12], also returnable April 17, 2006. The Court reviewed the written submissions of the parties, conducted oral argument on April 11, 2006 and reviewed the subject documents *in camera*. For the reasons set forth below, Plaintiff's Motion to Compel production of documents is denied and Defendants' Motion to Compel production of documents is granted in part and denied in part.

## I. *BACKGROUND AND PROCEDURAL HISTORY*

In July 2003, Defendants issued an insurance policy to Plaintiff with an inception date of July 1, 2003, expiring July 1, 2004. Aon became Plaintiff's insurance broker soon thereafter. On April 13, 2004, Aon provided notice to Defendants that Plaintiff was making a claim based on one of its former employee's misappropriation of and theft of its PIN numbers and calling cards, with a calculated loss by Plaintiff of $21,266,185. In July 2004, Defendants informed Plaintiff that it was declining coverage under Plaintiff's Commercial Crime Policy. In September 2004, Defendants reiterated their denial of Plaintiff's claim.

In response, Plaintiff filed a declaratory action and breach of contract action in New Jersey State Court, arguing that its claims were wrongfully denied. The action was removed to this Court on diversity grounds. Subsequently, on or about September 28, 2005, Defendants served discovery requests upon Plaintiff. Plaintiff provided responses to the document requests and also provided a privilege log. Pursuant to FED.R.CIV.P. 26(b)(5), Plaintiff withheld a number of documents prepared by, transmitted to, or that summarize communications with brokers at Aon, claiming the documents are protected by attorney-client and/or work-product privilege. After a number of conferences between the parties, fifteen (15) documents remain in dispute.

Plaintiff also served its discovery requests upon Defendants. In so doing, Plaintiff sought all documents related to the investigation and handling of [Plaintiff's] claim. In response, Defendants withheld a number of documents claiming attorney-client and work-product privileges. Plaintiff claims these documents were improperly withheld; arguing that Defendants obtained outside counsel, Wilson, Elser, Moskowitz, Edelman & Dicker LLP ("Wilson Elser") to investigate and handle Plaintiff's claim. Thus, anything related to this investigation, Plaintiff argues, was done as routine and ordinary business practices, and thus falls

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)
(Cite as: 2006 WL 1320067 (D.N.J.))

outside the purview of protected communications under the attorney-client or work-product privilege.

## II. DISCUSSION

### A. Attorney-Client Privilege

Communications between an attorney and client are protected by the attorney-client privilege. The purpose of this privilege is to promote frank discussions between a client and his/her attorney to allow the attorney to best represent the client. *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

*2 The privilege provides that:

communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has privilege to (a) to refuse to disclose any such communication, and (b) prevent his lawyer from disclosing it, and (c) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the lawyer, or (ii) in a manner not reasonably to be anticipated, or (iii) as a result of a breach of the lawyer-client relationship, or in the course of a recognized confidential or privileged communications between the client and such witness....

N.J.R.E. 504.

However, this privilege is not unconditional. It can be waived if the privileged information is communicated to outside parties. *United States v. Rockwell Int'l*, 897 F.2d 1255, 1265 (3d Cir.1990). However, the presence of any third party does not automatically constitute a waiver of the privilege. For example, "communications between corporate counsel and company personnel are privileged so long as the information is relayed for the purpose of obtaining legal counsel." *Andritz Sprout-Bauer, Inc., v. Beazer East, Inc.*, 174 F.R.D. 609, 633 (M.D.Pa.1997) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 394-95, 101 S.Ct. 677, 685, 66

L.Ed.2d 584 (1981)). Similarly, "disclosure to agents retained by counsel to assist him or her in advising the client and handling legal matters does not operate as a waiver. The privilege attaches to agents and representatives of counsel whose services are necessary for effective representation of the client's interests." *Id.* at 632 (quoting *X Corp. v. Doe*, 805 F.Supp. 1298 (E.D.Va.1992)).

As noted, the presence of an agent or interpreter does not automatically waive the attorney-client privilege. To protect the privilege, the party claiming a third party as an agent,

bears the burden of showing that the person in question worked at the direction of the lawyer, and performed tasks relevant to the client's obtaining legal advice, while responsibility remained with the lawyer. Morever, when the third party is a professional, such as an accountant, capable of rendering advice independent of the lawyer's advice to the client, the claimant must show that the third party served some specialized purpose in facilitating the attorney-client communications and was essentially indispensable in that regard.

2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence P 503(a)(3) [01] at 503-31 to 38 (1993). In considering the parameters of the agency exception to the wavier of attorney-client privilege, the Second Circuit Court of Appeals determined that conversations between counsel and a tax specialist, retained to help counsel understand the consequences of a pending client action, did not serve a specialized purpose in facilitating the attorney-client relationship. *United States v. Ackert*, 169 F.3d 136, 139 (2d Cir.1999). While noting that *United States v. Kovel*, 296 F.2d 918 (2d Cir.1961) found the presence of an "interpreter" in an attorney-client meeting did not constitute waiver of the privilege, *id.* at 922, the Second Circuit distinguished the role of the tax specialist whom an attorney consulted for clarification on the tax consequences of its clients' actions. *Ackert*, 169 F.3d at 139. The Court found that while the attorney interviewed the specialist to gain

Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)
(Cite as: 2006 WL 1320067 (D.N.J.))

information to better advise his client, "the privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.... [A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client." *Id.* at 139.

*3 Therefore, just because a communication between an attorney and a specialist prove helpful to the attorney's representation of his/her client does not mean that the communications are necessarily privileged. However, the "inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between the attorney and the client." *Id.* The Third Circuit Court of Appeals, in analyzing the clergy/communicant privilege found that "as is the case with the attorney-client privilege, the presence of third parties, if essential to and in furtherance of the communication, should not void the privilege." *In re Grand Jury Investigations,* 918 F.2d 374, 384 (3rd Cir.1990). Further, the Court found that

the constructional rule that evidentiary privileges should be narrowly construed, that recognition of the clergy-communicant privilege in this circumstance depends upon whether the third party's presence is essential to and in furtherance of a communication to a member of the clergy. As is the case with consultants between attorneys and clients, the presence of multiple parties, unrelated by blood or marriage, during discussions with a member of the clergy may, but will not necessarily, defeat the condition that communications be made with a reasonable expectation of confidentiality in order for the privilege to attach.

*Id.* at 386.

### 1. Plaintiff's Communications with Aon

### a. Attorney-Client Relationship

Plaintiff claims that Aon provided legal counsel to Plaintiff despite its designation as an insurance broker. Plaintiff relies, in part, on the fact that John Morrissey, an employee of Aon who worked on Plaintiff's claim, is a licensed attorney and acted in that role while assisting Plaintiff with its claims. However, given the factual circumstances surrounding the relationship between Aon and Plaintiff, the Court cannot find that either an explicit nor implicit attorney-client relationship existed between Plaintiff and Aon.

First, no retainer agreement existed. While the lack of a retainer agreement is not dispositive, it is a factor to consider in determining whether an attorney-client relationship existed. Second, the parties acknowledge that Aon was originally hired as an insurance broker. While Plaintiff claims their role changed throughout the course of their relationship, Plaintiff has not demonstrated how or when that relationship changed. Finally, while Mr. Morrissey is a licensed attorney, that does not automatically transform any professional relationship he has into an attorney-client relationship. More specifically, in his correspondence with Plaintiff, Mr. Morrissey clearly states that the information he is providing is not intended to be legal advice. This also demonstrates that neither Aon nor Plaintiff could have reasonably believed that an attorney-client relationship existed or that they had an expectation of confidentiality surrounding their communications. Given the above, the Court cannot find that either an explicit or implicit attorney-client relationship existed, thus the attorney-client privilege does not apply.

### b. Aon's role as an Agent

*4 In the alternative, Plaintiff claims that Aon acted as an agent/interpreter for Plaintiff and Plaintiff's Counsel and therefore, their communications with Plaintiff and Plaintiff's counsel remain confidential. However, Aon's role in providing information and advice to Plaintiff is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)
**(Cite as: 2006 WL 1320067 (D.N.J.))**

more closely related that of the tax specialist in *Ackert. Ackert,* 169 F3d at 139. As mentioned the Court found that the specialist assisted the attorney in determining the best advice to provide his clients on tax-related issues. The Court also found that this did not rise to the level of agent/interpreter as it did not serve a specialized purpose in facilitating the attorney-client relationship, despite it having aided in the attorney's representation of his client. The same is true here. Aon did not act as an agent of the attorney or Plaintiff for purposes of providing or interpreting legal advice. While the information and advice provided may have proved helpful, it was not needed to interpret complex issues in order to provide competent legal advice or to facilitate the attorney-client relationship. Therefore, Aon's communication between it and Plaintiff or Plaintiff's counsel is not protected by the attorney-client privilege under this theory.

**2. *Defendants Communications with Wilson Elser***

Like Plaintiff, Defendants have withheld documents based on attorney-client privilege. Plaintiff's oppose such claim, arguing that Wilson Elser did not serve as counsel to Defendants, but, rather served as an independent investigator of Plaintiff's coverage claim. Plaintiff further claims that because such work is done in the ordinary course of the insurance business, it is not protected by the attorney-client privilege even though Wilson Elser provides legal counsel in other contexts. Plaintiff also claims that the lack of any documents which indicate an independent investigation of their claim by Defendants supports their argument that Wilson Elser must have performed this function.

However, after reviewing the documents submitted for *in camera* review, it is apparent to the Court that Wilson Elser was retained as legal counsel and provided such counsel to the Defendants. The documents do not suggest that Wilson Elser performed any independent investigation of Plaintiff's claim, but rather provided legal advice regarding its claim, including strategy for addressing any potential challenges to

Defendants' declination of such claim. Thus, the communications between Defendants and Wilson Elser fall within the purview of attorney-client privilege and need not be produced to Plaintiff.

**B. *Work-Product Privilege***

Both Plaintiff and Defendants claim that their documents are also protected by the work-product privilege. This doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *In re Cendant Corp. Sec. Litig.,* 343 F.3d 658, 661-63 (3d Cir.2003) *(discussing, Fed.R.Civ.P.* 26(b)(3)) (citations omitted). As with the attorney-client privilege, the work-product privilege can be waived. *Maertin v. Armstrong World Indus.,* 172 F.R.D. 143, 148 (D.N.J.1997) (citing *United States v. Nobles,* 422 U.S. 225, 238 (1975)). Waiver will not apply if the documents were "prepared in anticipation of litigation." *See, United States v. Rockwell Int'l,* 89 F.2d 1255, 1266 (3d Cir.1990).

*\*5 To determine if documents meet this standard, the Court should look to "whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Martin v. Bally's Park Place Hotel & Casino,* 983 F.2d 1252, 1258 (3d Cir.1993) (citing *Rockwell,* 897 F.2d at 1266) (citation omitted). The mere possibility of future litigation is insufficient to meet this test. *Leonen v. Johns-Manville,* 135 F.R.D. 94, 96 (D.N.J.1990). In addition, documents prepared in the ordinary course of business will not be shielded by the work-product privilege. *Rockwell,* 897 F.2d at 1266.

*1. Plaintiff and AonWork Product*

In the present case, the Court finds that litigation was reasonably anticipated by the parties once Defendants denied Plaintiff's claim for coverage on July 8, 2004. While Plaintiff claims that they could have anticipated litigation prior to this date, based on Defendants prior history of

Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)
**(Cite as: 2006 WL 1320067 (D.N.J.))**

denying similar claims, such conclusion is not reasonable given the factual circumstances of the case. Thus, any documents prepared prior to this date, cannot reasonably be understood to be "prepared in anticipation of litigation" and will not be protected by the work-product privilege.

Given that litigation could reasonably be anticipated after the declination of Plaintiff's claim on July 8, 2004, there are several documents which the Court finds need not be produced to Defendants. These documents discuss legal advice by plaintiff's in-house counsel, were prepared in anticipation of litigation and should be protected from disclosure, despite not being protected under the attorney-client privilege. After conducting an *in camera* review, the Court finds that Plaintiff must only produce the following documents, as they were either not prepared by or sent to legal counsel, were prepared prior to the date where litigation could reasonably be anticipated, or they do not involve legal advice or strategy in the pending suit: 1) VZW-INS 042087; 2) VZW-INS 042064; 3) VZW-INS 042145-042150 and 4) VZW-INS 042054-042055.

*2. Defendants and Wilson Elser-Work Product*
As mentioned above, Defendants' communications with Wilson Elser are protected by the attorney-client privilege. In addition, a number of documents are also protected under the work-product privilege. For example, the communications between Wilson Elser and Defendants after the June 8, 2004 declination of coverage, when Defendants could have reasonably anticipated litigation, are protected by the work-product privilege. The documents do not concern the routine investigation of the claim, but rather the strategy for dealing with Plaintiff's anticipated challenge to the declination of coverage.

**III. *CONCLUSION***
For the reasons stated herein, Plaintiff's Motion to Compel discovery is denied. The Court finds that Wilson Elser was retained to provide legal counsel to Defendants regarding Plaintiff's allegations that

its claim for coverage was improperly denied. The Court further finds that Plaintiff cannot establish that Aon served as legal counsel to Plaintiff, despite the fact that one of Aon's employees is a licensed attorney. Rather, the Court finds that Aon served as Plaintiff's Insurance Broker, but that such role did not elevate it to agent/interpreter for Plaintiff's attorney or Plaintiff, which would have protected communications between Aon and Plaintiff or Plaintiff's counsel from disclosure. However, the Court also finds that certain of Plaintiff's documents were prepared by Plaintiff's counsel in anticipation of litigation, contain legal advice, and as such are shielded from discovery by the work-product privilege. An appropriate Order accompanies this Memorandum Opinion.

D.N.J.,2006.
Cellco Partnership v. Certain Underwriters at Lloyd's London
Not Reported in F.Supp.2d, 2006 WL 1320067 (D.N.J.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**TAB 3**

Page 1

493 F.3d 345
(Cite as: 493 F.3d 345)

▷

United States Court of Appeals,
Third Circuit.
In re TELEGLOBE COMMUNICATIONS
CORPORATION, et al, Debtor
Teleglobe USA Inc.; Optel Communications Inc.;
Teleglobe Holdings (U.S.) Corporation; Teleglobe
Marine (U.S.) Inc.; Teleglobe Holding Corp.; Teleglobe
Telecom Corporation; Teleglobe Investment Corp.;
Teleglobe Submarine, Teleglobe Submarine Inc.;
Official Committee of Unsecured Creditors of
Teleglobe Communications Corporation; Teleglobe
Communications Corporation; Teleglobe Luxembourg,
LLC; Teleglobe Puerto Rico Inc.
v.
BCE Inc.; Michael T. Boychuk; Marc A. Bouchard;
Serge Fortin; Terence J. Jarman; Stewart Verge; Jean C.
Monty; Richard J. Currie; Thomas Kierans; Stephen P.
Skinner; H. Arnold Steinberg, Appellants
Vartec Telecom, Inc., Defendants/Intervenor in District
Court.

No. 06-2915.
Argued Jan. 8, 2007.
Filed July 17, 2007.
As Amended Oct. 12, 2007.

**Background:** Chapter 11 debtor subsidiaries brought
adversary proceeding alleging breach of contract,
breach of fiduciary duties, estoppel, and
misrepresentation relating to manner in which
controlling corporation ceased funding debtors'
corporate parent. District court withdrew its automatic
reference to bankruptcy court. The United States
District Court for the District of Delaware, Sue L.
Robinson, Chief Judge, 2006 WL 2567880, ordered
production of documents withheld on basis of attorney-
client privilege. Controlling corporation took
interlocutory appeal.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge,
held that:
(1) Court of Appeals had jurisdiction under collateral

order doctrine to review interlocutory order from
district court which required party to produce
documents to which attorney-client privilege had been
asserted;
(2) Court of Appeals could rely on Delaware authority
in reaching its conclusions;
(3) Delaware would decide choice-of-law dispute only
when proffered legal regimes actually conflicted on
relevant point;
(4) Delaware courts would apply adverse litigation
exception to attorney-client privilege in all situations;
(5) controlling corporation did not waive argument that
it and debtors had not been jointly represented on any
matter relevant to debtor's case;
(6) judicial admission doctrine was not applicable to
statements by controlling corporation on any joint
representation of corporation and debtor subsidiaries;
(7) judicial estoppel doctrine was not applicable to
equivocal statements by controlling corporation on any
joint representation of corporation and debtor
subsidiaries; and
(8) implied prospective waiver in favor of debtor
subsidiaries did not arise.

Remanded.

West Headnotes

**[1] Bankruptcy 51 ⬤⟳3040.1**

51 Bankruptcy
    51IX Administration
        51IX(A) In General
            51k3040 Examination and Discovery
                51k3040.1 k. In general. Most Cited Cases
    Parties with an interest in the bankruptcy estate
may conduct discovery into matters affecting the estate.
Fed.Rules Bankr.Proc.Rule 2004, 11 U.S.C.A.

**[2] Privileged Communications and Confidentiality
311H ⬤⟳123**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

Page 2

Attorney
311Hk123 k. Corporations, partnerships, associations, and other entities. Most Cited Cases
(Formerly 410k199(2))

When a corporation's shareholders attempt to bring a derivative suit on behalf of the corporation against its directors for breaching their fiduciary duties, the shareholders can invade the corporation's attorney-client privilege upon showing "good cause."

**[3] Privileged Communications and Confidentiality 311H ⟲123**

311H Privileged Communications and Confidentiality
311HIII Attorney-Client Privilege
311Hk120 Parties and Interests Represented by Attorney
311Hk123 k. Corporations, partnerships, associations, and other entities. Most Cited Cases
(Formerly 410k199(2))

Where a corporation seeks advice from legal counsel, and the information relates to the subject of a later suit by a minority shareholder in the corporation, the corporation is not entitled to claim the lawyer-client privilege as against its own shareholder, absent some special cause.

**[4] Bankruptcy 51 ⟲3768**

51 Bankruptcy
51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3766 Decisions Reviewable
51k3768 k. Interlocutory orders; collateral order doctrine. Most Cited Cases

Under the collateral order doctrine, an immediate appeal lies if the following elements are met: (1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment.

**[5] Bankruptcy 51 ⟲3768**

51 Bankruptcy

51XIX Review
51XIX(B) Review of Bankruptcy Court
51k3766 Decisions Reviewable
51k3768 k. Interlocutory orders; collateral order doctrine. Most Cited Cases

Privilege issue was sufficiently separate from merits of suit, and thus Court of Appeals had jurisdiction under collateral order doctrine to review interlocutory order from district court which required party to produce documents to which attorney-client privilege had been asserted, since Court could concern itself with extent to which parties were jointly represented by counsel and effect any joint representation had on party's ability to shield documents from disclosure and Court did not have occasion to consider issues that lay at heart of case such as existence, content, and alleged breach of contract between parties.

**[6] Bankruptcy 51 ⟲3047(2)**

51 Bankruptcy
51IX Administration
51IX(A) In General
51k3040 Examination and Discovery
51k3047 Scope and Extent of Inquiry
51k3047(2) k. Privilege. Most Cited Cases

Court of Appeals could rely on Delaware authority in reaching its conclusions with regard to its review of interlocutory order from district court which required party to produce documents to which attorney-client privilege had been asserted, rather than law of Canada, since party who was proponent of Canada law did not inform Court of conflict, it cited Delaware law extensively, and it conceded that law in Canada was not materially different than Delaware. Restatement (Second) of Conflicts of Laws § 139.

**[7] Action 13 ⟲17**

13 Action
13II Nature and Form
13k17 k. What law governs. Most Cited Cases

As predicted by Court of Appeals, Delaware would follow practice of federal system and most states and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

decide choice-of-law dispute only when proffered legal regimes actually conflicted on relevant point. Restatement (Second) of Conflicts of Laws § 139.

**[8] Privileged Communications and Confidentiality 311H ☞158**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk157 Communications Through or in Presence or Hearing of Others; Communications with Third Parties
        311Hk158 k. In general. Most Cited Cases
    (Formerly 410k206)
    If persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the attorney-client privilege does not attach. Restatement (Third) of the Law Governing Lawyers § 68.

**[9] Privileged Communications and Confidentiality 311H ☞168**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk168 k. Waiver of privilege. Most Cited Cases
    (Formerly 410k219(3))
    The scope of the waiver of the attorney-client privilege for improper behavior is only as broad as necessary to remedy any unfair advantage.

**[10] Privileged Communications and Confidentiality 311H ☞122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
        311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
    (Formerly 410k199(2))
    While written agreements limiting the scope of a joint representation might be preferable for purposes of the attorney-client privilege, nothing requires this so long as the parties understand the limitations.

**[11] Privileged Communications and Confidentiality 311H ☞122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
        311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
    (Formerly 410k199(2))
    For purposes of the attorney-client privilege, the keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully, in addition to the content of the communications themselves, any testimony from the parties and their attorneys on those areas.

**[12] Privileged Communications and Confidentiality 311H ☞122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
        311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
    (Formerly 410k199(2))
    When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for purposes of the attorney-client privilege; hence the privilege protects those communications from compelled disclosure to persons outside the joint representation.

**[13] Privileged Communications and Confidentiality 311H ☞122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
        311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
    (Formerly 410k199(2))
    To be eligible for continued protection under the

493 F.3d 345
**(Cite as: 493 F.3d 345)**

community-of-interest attorney-client privilege, the communication must be shared with the attorney of the member of the community of interest; sharing the communication directly with a member of the community may destroy the privilege.

**[14] Privileged Communications and Confidentiality 311H ⬤⟶122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
        (Formerly 410k199(2))
    Because the common-interest attorney-client privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as a post hoc justification for a client's impermissible disclosures.

**[15] Privileged Communications and Confidentiality 311H ⬤⟶122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
        (Formerly 410k199(2))
    The common-interest attorney-client privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies.

**[16] Privileged Communications and Confidentiality 311H ⬤⟶122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases

(Formerly 410k199(2))
    The members of the community of interest must share at least a substantially similar legal interest for the community-of-interest attorney-client privilege to apply.

**[17] Privileged Communications and Confidentiality 311H ⬤⟶122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
        (Formerly 410k199(2))
    The community-of-interest attorney-client privilege applies only when clients are represented by separate counsel; thus, it is largely inapplicable to disputes that revolve around corporate family members' use of common attorneys, such as centralized in-house counsel.

**[18] Privileged Communications and Confidentiality 311H ⬤⟶122**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk120 Parties and Interests Represented by Attorney
            311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
        (Formerly 410k199(2))
    As predicted by Court of Appeals, Delaware courts would apply adverse litigation exception to attorney-client privilege in all situations, even those in which joint clients were wholly owned by same person or entity.

**[19] Corporations and Business Organizations 101 ⬤⟶1526(3)**

101 Corporations and Business Organizations
    101VI Shareholders and Members
        101VI(B) Rights and Liabilities as to Corporation and Other Shareholders or Members

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

101k1522 Nature of Relation
   101k1526 Duty of Shareholders or
Members to Other Shareholders or Members
    101k1526(3) k. Controlling or majority
shareholders and minority shareholders in general. Most
Cited Cases
 (Formerly 101k182.3)
 Whoever controls the corporate subsidiary must
seek to maximize its economic value with requisite care
and loyalty if the subsidiary is not wholly owned, in the
interest of protecting minority shareholders.

**[20] Corporations and Business Organizations 101**
**⬥1645**

101 Corporations and Business Organizations
 101VI Shareholders and Members
  101VI(D) Liability for Corporate Debts and Acts
   101k1643 Nature and Grounds in General
    101k1645 k. Parent and subsidiary
corporations. Most Cited Cases
 (Formerly 101k215)
 Whoever controls the corporate subsidiary must
seek to maximize its economic value with requisite care
and loyalty if the subsidiary is insolvent, in the interest
of protecting the subsidiary's creditors.

**[21] Privileged Communications and Confidentiality**
**311H ⬥123**

311H Privileged Communications and Confidentiality
 311HIII Attorney-Client Privilege
  311Hk120 Parties and Interests Represented by
Attorney
   311Hk123 k. Corporations, partnerships,
associations, and other entities. Most Cited Cases
 (Formerly 410k199(2))
 In the context of a corporation's claim of attorney-
client privilege, intra-group information sharing does
not implicate the disclosure rule.

**[22] Antitrust and Trade Regulation 29T ⬥544**

29T Antitrust and Trade Regulation
 29TVI Antitrust Regulation in General
  29TVI(B) Cartels, Combinations, Contracts, and
Conspiracies in General
   29Tk542 Participants
    29Tk544 k. Parent and subsidiary; sister
corporations. Most Cited Cases
 Corporate parents and their wholly owned
subsidiaries cannot constitute a "combination" or
"conspiracy" of two or more persons under the Sherman
Act. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.

**[23] Corporations and Business Organizations 101**
**⬥1037**

101 Corporations and Business Organizations
 101II Disregarding Corporate Entity; Piercing
Corporate Veil
  101k1035 Reasons and Justifications
   101k1037 k. Justice and equity in general.
Most Cited Cases
 (Formerly 101k1.4(2))
 Delaware courts respect entity separateness unless
doing so would work inordinate inequity.

**[24] Privileged Communications and Confidentiality**
**311H ⬥123**

311H Privileged Communications and Confidentiality
 311HIII Attorney-Client Privilege
  311Hk120 Parties and Interests Represented by
Attorney
   311Hk123 k. Corporations, partnerships,
associations, and other entities. Most Cited Cases
 (Formerly 410k199(2))

**Privileged Communications and Confidentiality**
**311H ⬥158**

311H Privileged Communications and Confidentiality
 311HIII Attorney-Client Privilege
  311Hk157 Communications Through or in
Presence or Hearing of Others; Communications with
Third Parties
   311Hk158 k. In general. Most Cited Cases
 (Formerly 410k199(2))
 In the context of a claim of attorney-client
privilege, sharing an attorney-parent communication
with an officer of the parent in her capacity as officer of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

the parent does not break confidence, even though she is also a director or officer of a subsidiary; thus, this sort of information sharing is not a disclosure for purposes of the disclosure rule.

**[25] Privileged Communications and Confidentiality 311H ☞123**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by Attorney
         311Hk123 k. Corporations, partnerships, associations, and other entities. Most Cited Cases
   (Formerly 410k199(2))
   When a parent company directs its subsidiaries' employees to provide information to its in-house counsel that is critical to their representation of the parent, the communication may be privileged because of in-house counsel's representation of the parent alone, thus obviating any need for these attorneys to represent the subsidiary as well.

**[26] Privileged Communications and Confidentiality 311H ☞122**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by Attorney
         311Hk122 k. Common interest doctrine; joint clients or joint defense. Most Cited Cases
   (Formerly 410k199(2))
   In the context of the attorney-client privilege, attorneys and clients may limit the scope of a joint representation in a sophisticated manner, subject to conflict rules; nothing requires construing the scope of a joint representation more broadly than the parties to it intend.

**[27] Bankruptcy 51 ☞3044**

51 Bankruptcy
   51IX Administration
      51IX(A) In General
         51k3040 Examination and Discovery

           51k3044 k. Production of documents. Most Cited Cases
   Issue was raised, of whether debtors were, or needed to be, parties to joint representation between controlling corporation and corporate parent for Chapter 11 debtor subsidiaries for production of documents to be ordered, and thus controlling corporation did not waive argument that it and debtors had not been jointly represented on any matter relevant to debtor's case against controlling corporation alleging breach of contract, breach of fiduciary duties, estoppel, and misrepresentation, where controlling corporation stated unequivocally that its in-house attorneys never represented debtors on anything related to restructuring of corporate parent.

**[28] Bankruptcy 51 ☞3770**

51 Bankruptcy
   51XIX Review
      51XIX(B) Review of Bankruptcy Court
         51k3770 k. Presentation of grounds for review. Most Cited Cases
   A party must raise an issue before the district court in order to press it on appeal; to raise an issue, a party must present it with sufficient specificity to allow the court to pass on it.

**[29] Evidence 157 ☞207(1)**

157 Evidence
   157VII Admissions
      157VII(A) Nature, Form, and Incidents in General
         157k206 Judicial Admissions
           157k207 In General
              157k207(1) k. In general. Most Cited Cases
   Judicial admission doctrine was not applicable to statements by controlling corporation on any joint representation of corporation and debtor subsidiaries, in debtor's case against corporation alleging breach of contract, breach of fiduciary duties, estoppel, and misrepresentation, since statements were never unequivocal; all references to joint representation of corporation and subsidiaries were couched in alternative

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

language and to extent that corporation admitted that it was obligated to turn over documents related to joint representation on matter of common interest, such admission appeared more like statement of legal theory or position than statement about issue of fact.

**[30] Evidence 157 ☞207(1)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in General
            157k206 Judicial Admissions
                157k207 In General
                    157k207(1) k. In general. Most Cited Cases
    To be binding, judicial admissions must be unequivocal; similarly, they must be statements of fact that require evidentiary proof, not statements of legal theories.

**[31] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases
    Judicial estoppel prevents a party from playing fast and loose with the courts by adopting conflicting positions in different legal proceedings or different stages of the same proceeding.

**[32] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases
    Judicial estoppel requires (1) a clear inconsistency and (2) that the party estopped obtain an unfair advantage from that inconsistency.

**[33] Estoppel 156 ☞68(2)**

156 Estoppel
    156III Equitable Estoppel
        156III(B) Grounds of Estoppel
            156k68 Claim or Position in Judicial Proceedings
                156k68(2) k. Claim inconsistent with previous claim or position in general. Most Cited Cases
    Judicial estoppel doctrine was not applicable to equivocal statements by controlling corporation on any joint representation of corporation and debtor subsidiaries, in debtor's case against corporation alleging breach of contract, breach of fiduciary duties, estoppel, and misrepresentation, since corporation's position throughout had been that it turned over documents that arose out of joint representation between corporation and debtor's corporate parent and that its attorneys did not jointly represent debtors.

**[34] Privileged Communications and Confidentiality 311H ☞168**

311H Privileged Communications and Confidentiality
    311HIII Attorney-Client Privilege
        311Hk168 k. Waiver of privilege. Most Cited Cases
    (Formerly 410k219(3))
    Implied prospective waiver in favor of debtor subsidiaries did not arise as to whatever documents district court might have concluded were part of joint representation attorney-client privilege between controlling corporation and debtors' corporate parent, where controlling corporation agreed to produce documents that fell within its understanding of joint representation, not masses of documents that court eventually found to fall within that category, and controlling corporation was not seeking improper benefit by selectively disclosing documents.

**[35] Privileged Communications and Confidentiality 311H ☞168**

311H Privileged Communications and Confidentiality

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

311HIII Attorney-Client Privilege
      311Hk168 k. Waiver of privilege. Most Cited
Cases
      (Formerly 410k219(3))
      As predicted by Court of Appeals, Delaware
Supreme Court would follow bilateral control rule of
Restatement of the Law Governing Lawyers that
corporate parent of debtor subsidiaries could not
unilaterally waive co-client attorney-client privilege as
to communications involving controlling corporation, in
debtor's case against corporation alleging breach of
contract, breach of fiduciary duties, estoppel, and
misrepresentation, where debtors sought documents
produced for controlling corporation allegedly as part of
joint representation of controlling corporation and
debtors' corporate parent. Restatement (Third) of the
Law Governing Lawyers § 75 comment.

**[36] Privileged Communications and Confidentiality
311H ☞20**

311H Privileged Communications and Confidentiality
      311HI In General
      311Hk20 k. Waiver of privilege. Most Cited
Cases
      (Formerly 410k219(1))
      In discovery disputes, implied waivers are
construed narrowly, and a party is only forced to
produce documents under a prospective waiver theory if
it agrees to disclose only favorable privileged
documents while keeping for itself the unfavorable ones
to gain an advantage in litigation.

**[37] Privileged Communications and Confidentiality
311H ☞122**

311H Privileged Communications and Confidentiality
      311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by
Attorney
      311Hk122 k. Common interest doctrine; joint
clients or joint defense. Most Cited Cases
      (Formerly 410k199(2))
      In the parent-subsidiary context, a joint
representation attorney-client privilege arises only when
common attorneys are affirmatively doing legal work

for both entities on a matter of common interest.

**[38] Privileged Communications and Confidentiality
311H ☞123**

311H Privileged Communications and Confidentiality
      311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by
Attorney
      311Hk123 k. Corporations, partnerships,
associations, and other entities. Most Cited Cases
      (Formerly 410k199(2))
      Issue of whether communications between outside
counsel and controlling corporation on divestiture
issues remained protected by attorney-client privilege
was not affected by viewing of documents by conflicted
in-house counsel or by their violation of fiduciary duty
to share information with subsidiary, since controlling
corporation reasonably expected that those
communications would be privileged.

**[39] Privileged Communications and Confidentiality
311H ☞122**

311H Privileged Communications and Confidentiality
      311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by
Attorney
      311Hk122 k. Common interest doctrine; joint
clients or joint defense. Most Cited Cases
      (Formerly 410k199(2))
      When an attorney errs by continuing to represent
two clients despite their conflicts, the clients, who
reasonably expect their communications to be secret,
are not penalized by losing their privilege.

**[40] Privileged Communications and Confidentiality
311H ☞122**

311H Privileged Communications and Confidentiality
      311HIII Attorney-Client Privilege
      311Hk120 Parties and Interests Represented by
Attorney
      311Hk122 k. Common interest doctrine; joint
clients or joint defense. Most Cited Cases
      (Formerly 410k199(2))

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

Communications outside the scope of the joint representation or common interest remain subject to the attorney-client privilege.

**[41] Privileged Communications and Confidentiality 311H ☞154**

311H Privileged Communications and Confidentiality
   311HIII Attorney-Client Privilege
      311Hk154 k. Criminal or other wrongful act or transaction; crime-fraud exception. Most Cited Cases
     (Formerly 410k201(2))
   Invocation of the crime-fraud exception to the attorney-client privilege requires that the plaintiff make a prima facie showing of evidence supporting the elements of the exception.

**[42] Corporations and Business Organizations 101 ☞2831**

101 Corporations and Business Organizations
   101XI Insolvency and Receivers
     101XI(A) Insolvency in General
       101k2831 k. What constitutes corporate insolvency. Most Cited Cases
     (Formerly 101k537)
   Under Delaware law, whether a corporation is insolvent, and when it becomes so, are an issues of fact.

**[43] Corporations and Business Organizations 101 ☞2831**

101 Corporations and Business Organizations
   101XI Insolvency and Receivers
     101XI(A) Insolvency in General
       101k2831 k. What constitutes corporate insolvency. Most Cited Cases
     (Formerly 101k537)
   Under Delaware law, a corporation is insolvent if it has: (1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business.

**[44] Corporations and Business Organizations 101 ☞1841**

101 Corporations and Business Organizations
   101VII Directors, Officers, and Agents
     101VII(D) Rights, Duties, and Liabilities as to Corporation and Its Shareholders or Members
       101k1840 Fiduciary Duties as to Management of Corporate Affairs in General
       101k1841 k. In general. Most Cited Cases
     (Formerly 101k310(1))
   Under Delaware law, a fiduciary ordinarily has the obligation, protected by the business judgment rule, to manage the affairs of a corporation in such a way as to maximize its economic value; it does not have a duty to guarantee or bail out a corporate family member when it loses money.

**[45] Bankruptcy 51 ☞3790**

51 Bankruptcy
   51XIX Review
     51XIX(B) Review of Bankruptcy Court
       51k3789 Determination and Disposition; Additional Findings
       51k3790 k. Remand. Most Cited Cases
   Appellees' failure to raise issue on appeal did not waive it for consideration on remand.

**[46] Corporations and Business Organizations 101 ☞3188**

101 Corporations and Business Organizations
   101XIII Foreign Corporations
     101XIII(A) In General
       101k3186 Subjection to Requirements as Imposed by State of Incorporation; What Law Governs
       101k3188 k. Internal affairs doctrine in general. Most Cited Cases
     (Formerly 101k640)
   Federal common law does not apply to disputes about corporations' internal affairs.

**[47] Corporations and Business Organizations 101 ☞3188**

101 Corporations and Business Organizations
   101XIII Foreign Corporations
     101XIII(A) In General

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

101k3186 Subjection to Requirements as Imposed by State of Incorporation; What Law Governs
101k3188 k. Internal affairs doctrine in general. Most Cited Cases
(Formerly 101k640)
Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders.

**[48] Federal Civil Procedure 170A ⬭1278**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1278 k. Failure to respond; sanctions. Most Cited Cases
Preventing a party from asserting the attorney-client privilege is a legitimate sanction for abusing the discovery process; however, it can be imposed only if the district court finds bad faith, wilfulness, or fault.

**[49] Privileged Communications and Confidentiality 311H ⬭123**

311H Privileged Communications and Confidentiality
311HIII Attorney-Client Privilege
311Hk120 Parties and Interests Represented by Attorney
311Hk123 k. Corporations, partnerships, associations, and other entities. Most Cited Cases
(Formerly 410k199(2))

**Privileged Communications and Confidentiality 311H ⬭168**

311H Privileged Communications and Confidentiality
311HIII Attorney-Client Privilege
311Hk168 k. Waiver of privilege. Most Cited Cases
(Formerly 410k219(3))
Controlling corporation could be compelled to produce documents under adverse-litigation exception to co-

client attorney-client privilege, in lawsuit brought by debtor subsidiaries of parent corporation, which also was subsidiary, against controlling corporation alleging breach of contract, breach of fiduciary duties, estoppel, and misrepresentation, only if controlling corporation and debtors were jointly represented by same attorneys on matter of common interest that was subject-matter of those documents; debtors' corporate parent could not unilaterally waive co-client privilege that attached to documents that involved controlling corporation and were created in course of joint representation.

*351 Pauline K. Morgan, Esquire, John T. Dorsey, Esquire, Margaret B. Whiteman, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Stuart J. Baskin, Esquire, Jaculin Aaron, Esquire, Shearman & Sterling, New York, NY, Stephen J. Marzen, Esquire (Argued), Shearman & Sterling, Washington, D.C., for Appellants.

Gregory V. Varallo, Esquire, C. Malcom Cochran, IV, Esquire (Argued), Chad M. Shandler, Esquire, Richards, Layton & Finger, Wilmington, DE, Philip A. Lacovara, Esquire, Andrew Tauber, Esquire, Mayer, Brown, Rowe & Maw, Washington, D.C., for Appellees.

Mark I. Levy, Esquire, Kilpatrick Stockton, Washington, D.C., Susan Hackett, Esquire, Senior Vice President and General Counsel, Association of Corporate Counsel, Washington, D.C., David C. Frederick, Esquire, Robert A. Klinck, Esquire, Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington, D.C., for Amici-Appellants.

Before: McKEE, AMBRO and FISHER, Circuit Judges.

OPINION OF THE COURT
AMBRO, Circuit Judge.

TABLE OF CONTENTS

I. Facts and Procedural History                                    353

493 F.3d 345
(Cite as: 493 F.3d 345)

| | | |
|---|---|---|
| A. | The Parties and Underlying Causes of Action | 353 |
| B. | The Privilege Dispute | 354 |
| II. Jurisdiction | | 357 |
| III. Choice of Law | | 358 |
| IV. Summary of the Law | | 359 |
| A. | The Attorney-Client Privilege | 359 |
| B. | The Disclosure Rule | 361 |
| C. | Privileged Information Sharing | 362 |
| | 1.  The Co-Client (or Joint-Client) Privilege | 362 |
| | 2.  The Community-of-Interest (or Common-Interest) Privilege | 363 |
| D. | The Exception for Adverse Litigation | 366 |
| E. | When Joint Representation Goes Awry: The *Eureka* Principle | 368 |
| F. | Putting It All Together: Parents, Subsidiaries, and the Modern Corporate Counsel's Office | 369 |
| | 1.  Intra-group Information Sharing: Parents and Subsidiaries as Joint Clients | 369 |
| | 2.  Keeping Control of the Privilege | 372 |
| | 3   When Conflicts Arise | 373 |
| V. Issues on Appeal | | 374 |
| A. | Whether the Debtors Are Entitled to Documents Generated in the Course of a BCE/Teleglobe Joint Representation | 374 |
| | 1.  Whether BCE's Concession in the Bankruptcy Court Prevents it from Arguing that the Debtors are not Entitled to the Disputed Documents | 374 |
| |    a.    Background | 374 |
| |    b.    Merits | 376 |
| |       i. Issue Waiver | 376 |
| |       ii. Judicial Admission | 377 |
| |       iii. Judicial Estoppel | 377 |
| |       iv. Implied Prospective Waiver of the Privilege | 378 |
| | 2.  Whether the Community-of-Interest Privilege Entitles the Debtors to the Documents as a Matter of Law | 378 |
| | 3.  Whether Teleglobe's Waiver of the Privilege for the Debtors' Benefit in the Canadian Insolvency Proceedings Entitles them to the Documents | 379 |
| | 4.  Conclusion and Remand | 380 |
| B. | The Effect of Funneling Documents Through BCE's In-House Counsel | 380 |
| VI. Potential Alternate Sustaining Grounds | | 383 |
| A. | The Fiduciary Exception to the Attorney-Client Privilege | 383 |
| B. | Affirming as a Discovery Sanction | 386 |
| VII. Conclusion | | 386 |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*352** This is a twist on a classic corporate divorce story. It begins much as Judge Richard Cudahy's "classic corporate love story": "Company A meets Company B. They are attracted to each other and after a brief courtship, they merge." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 232 (3d Cir.2004). Sadly, it does not last. Not long after Company A acquires Company B, they start taking risks together, some of which go terribly wrong. After only a year or so, Company B is steeped in debt, and, not surprisingly, Company A begins to "los[e] that lovin' feelin'."[FN1] It leaves Company B, explaining that it simply must do so in order to save itself. Jilted and out of money, Company B promptly turns to that shelter for abandoned corporations, the bankruptcy system.

FN1. The Righteous Brothers, *You've Lost That Lovin' Feelin'*, on YOU'VE LOST THAT LOVIN' FEELIN' (Phillies Records 1965).

In bankruptcy, Company B's children (subsidiaries), also in the shelter of bankruptcy, become indignant, and they sue Company A for all manner of ills relating to the break-up. Here, we deal not with the merits of the action, but with a pre-trial dispute over corporate documents. Everyone agrees that the attorney-client privilege protects these documents against third parties. The wrinkle is that they **\*353** were produced by and in communication with attorneys who represented the entire corporate family back when they all got along.

The question, then, is whether Company A may assert the privilege against its former family members. Because we conclude that the District Court's factual findings do not support setting aside the parent company's privilege in this case, we vacate its order compelling production and remand for further proceedings.

## I. Facts and Procedural History

### A. The Parties and Underlying Causes of Action

This action began with a complaint brought in a Chapter 11 bankruptcy case. The debtors ("Debtors") are the wholly owned United States subsidiaries of a Canadian telecommunications company formerly known as Teleglobe, Inc. ("Teleglobe"). Teleglobe and the Debtors are undergoing reorganization in Ontario in accordance with the Canadian Companies' Creditors Arrangement Act (the "Arrangement Act"), a form of bankruptcy protection similar to Chapter 11. In addition, the Debtors (but not Teleglobe), all but one[FN2] of which are Delaware corporations, are simultaneously undergoing Chapter 11 reorganization in the District of Delaware. Until recently, Teleglobe was a wholly owned subsidiary of Bell Canada Enterprises, Inc. ("BCE"), Canada's largest telecommunications company.[FN3]

FN2. One is a Puerto Rico corporation.

FN3. As a result of the Canadian reorganization process, Teleglobe, now known as VSNL International Canada, operates as a subsidiary of VSNL, a telecommunications company organized in India, which itself is owned by the Tata Group, an Indian conglomerate.

In 2000, BCE, which had previously owned a 23% minority stake in Teleglobe, purchased all its remaining shares (directly and indirectly through subsidiaries), thus taking control of the company. According to the Debtors, in late 2000 BCE directed Teleglobe to accelerate the development of a fiberoptic network called GlobeSystem. BCE pledged its financial support to the project and caused Teleglobe and its subsidiaries (the Debtors) to borrow some $2.4 billion from banks and bondholders. The bond debt was guaranteed by one of the Debtors. Teleglobe exhausted its funding in 2001, and in November of that year BCE approved an additional $850 million equity infusion for Teleglobe and its subsidiaries. These monies were to be disbursed at the sole discretion of Jean Monty, then Chairman and CEO of BCE as well as Chairman and CEO of Teleglobe. BCE announced its intention to continue funding Teleglobe in December 2001.

About this time BCE began working on what personnel referred to as Project X-a comprehensive reassessment of BCE's plans for Teleglobe. Lurking in

493 F.3d 345
(Cite as: 493 F.3d 345)

the background was BCE's declining confidence in GlobeSystem's ultimate potential.[FN4] In the course of Project X, BCE considered a variety of options, including maintaining its funding in the hope that GlobeSystem *354 would be profitable, restructuring Teleglobe in such a way that it could continue as a viable subsidiary, and simply cutting off funding (which would send Teleglobe and its subsidiaries into a liquidating bankruptcy). In early April 2001, BCE publicly announced that it was reassessing its funding of Teleglobe; just a few weeks later, it ceased its funding, effectively abandoning Teleglobe. GlobeSystem was not operational, and so Teleglobe had no means of paying back its multi-billion dollar debt. Consequently, within weeks Teleglobe and the Debtors filed for Arrangement Act relief in Canada, and the Debtors also filed for Chapter 11 relief in Delaware.

> FN4. As stock market junkies may recall, Teleglobe was but one of many victims of the "telecom meltdown" of 2000-2001. In the late 1990s deregulation in the United States and Europe touched off a rush to build new telecom infrastructure. Like so many other companies in that period, Teleglobe spent much debt capital to build fiberoptic lines around the world. Because of the ensuing glut of infrastructure, prices tumbled, and Teleglobe, along with a host of other over-leveraged telecom firms, went bankrupt. *See, e.g.,* Peter Elstrom & Heather Timmons, *Telecom Meltdown,* BUSINESSWEEK, Apr. 23, 2001, at 100; Gordon Pitts, *When Friends Do Business with Each Other,* GLOBE & MAIL (CANADA), Apr. 27, 2002, at B1.

For BCE's role in funding and then abandoning the GlobeSystem project, the Debtors sued it in this adversary proceeding.[FN5] They assert several causes of action, including breach of contract, breach of fiduciary duties, estoppel, and misrepresentation (whether fraudulent or negligent). All claims relate to the manner in which BCE ceased funding Teleglobe, the Debtors' corporate parent. Debtors' theme is that BCE reneged on binding commitments to fund Teleglobe and

fraudulently or negligently induced Teleglobe and the Debtors to continue incurring debt in reliance on those commitments, thus harming, *inter alia,* Teleglobe, the Debtors, and the Debtors' creditors. Moreover, they allege that BCE, as the controlling shareholder of Teleglobe and the Debtors while those entities were insolvent, breached its fiduciary duties to the Debtors.

> FN5. At one time the committee of unsecured creditors (the "Creditors' Committee"), appointed under 11 U.S.C. § 1102(a)(1), was also a plaintiff; it, however, has been dissolved with the confirmation of the Debtors' plan of reorganization.

**B. The Privilege Dispute**

[1] In the District of Delaware Bankruptcy Court, the Debtors and the Creditors Committee began exploring through Rule 2004 [FN6] discovery the possibility of suing BCE for the manner in which it abandoned Teleglobe and the Debtors. In response to discovery requests, BCE marked 98 documents as protected by a "common interest privilege." [FN7] When the creditors moved to compel production, BCE responded that the documents were privileged because "BCE attorneys consulted with attorneys, officers, or employees of Teleglobe, Inc. or its subsidiaries to discuss or provide legal advice in matters where BCE and Teleglobe, Inc. (or its subsidiaries) shared a common legal interest." App. at A01110. BCE further stated that the "privilege will continue to exist until the Debtors file a litigation against BCE." *Id.*

> FN6. Federal Rule of Bankruptcy Procedure 2004 allows parties with an interest in the bankruptcy estate to conduct discovery into matters affecting the estate.

> FN7. We assume that BCE meant to invoke the joint-client privilege, rather than the common-interest privilege. We explain the difference in Part IV.C, *infra.*

At a hearing in the Bankruptcy Court, BCE-in keeping with the theme of its argument-agreed to produce (even without the filing of a suit) the "common

interest" documents to the Debtors, seemingly agreeing that they fell within the scope of their shared interest, and the Bankruptcy Court entered an order to that effect. BCE did not specifically admit that it was required to produce the documents; it merely agreed to do so. It continued to maintain, however, that the rest of the documents designated as privileged represented advice provided solely to it and were not part of any joint representation with Teleglobe or the Debtors. It is unclear*355 from the record exactly what the 98 "common interest" documents contained that BCE agreed to produce, but the privilege logs reflect that they primarily consisted of documents created by BCE's in-house counsel on the subject of Teleglobe's financing and restructuring. At the same time, the privilege log (exclusive of the 98 "common interest" documents) lists many other documents reflecting legal advice on Project X matters that BCE claimed-then and now-were intended as advice solely to it and not as part of any joint representation. *See generally* App. at A00967-A01091.

[2][3] Once the Debtors and Creditors' Committee filed their suit against BCE, the District Court withdrew its automatic reference to the Bankruptcy Court and began handling the suit itself. The District Court held an initial discovery conference at which BCE reasserted that it had produced all of the documents that it thought were generated as a result of a BCE/Teleglobe/Debtors joint representation and that the documents it was withholding reflected advice provided to and intended solely for BCE. App. at A00264-65. The Debtors did not press the joint representation/common interest point at that time, nor did they argue for a broader scope of the joint representation/common interest than BCE had admitted; rather, they focused on an extension of the "conflicted fiduciary" line of cases, *see* Part VI.A, *infra*. App. at A00262-63.

> FN8. In brief, these cases provide that when a corporation's shareholders attempt to bring a derivative suit on behalf of the corporation against its directors for breaching their fiduciary duties, the shareholders can invade the corporation's privilege upon showing "good

cause." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103-04 (5th Cir.1970). A more expansive view of the rule is phrased thus: "where a corporation seeks advice from legal counsel, and the information relates to the subject of a later suit by a minority shareholder in the corporation, the corporation is not entitled to claim the [lawyer-client] privilege as against its own shareholder, absent some special cause." *Valente v. PepsiCo, Inc.*, 68 F.R.D. 361, 367 (D.Del.1975). As detailed in Part VI.A, Delaware courts have followed *Garner* but declined broadly to apply *Valente*.

The District Court ended up referring the discovery dispute to a Special Master-C.J. Seitz, Jr., Esquire. In its initial written response to the Debtors' motion to compel production before the Special Master, BCE stated that it had, in response to the Bankruptcy Court's Rule 2004 order, "produced to the Debtors all the documents that were protected by a common interest." App. at A0197. BCE further stated that it had reviewed all of the documents on the privilege log and that the only documents that remained designated as privileged were those "reflect[ing] the provision of legal work solely to BCE." *Id.*

The Debtors then expanded their argument by contending that the scope of the joint representation was broader than BCE admitted. Specifically, they claimed that various attorneys represented all of the entities on the matters of BCE's decision to cease funding Teleglobe and Teleglobe's resulting restructuring. BCE, on the other hand, claimed that it retained its own attorneys to advise it on those matters. The Special Master found that the Debtors had not met their burden of proving an exception to the attorney-client privilege. The evidence, he concluded initially, merely showed that BCE's in-house counsel represented Teleglobe and the Debtors occasionally; it did not show a broad joint representation as to the abandonment of Teleglobe. Recognizing, however, that the Debtors did not trust BCE's representation that the documents marked as privileged reflected advice provided solely to BCE, the Special Master ordered a 50-document audit by his *in*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*camera* *356 review to ensure the accuracy of BCE's representations.

The Special Master also rejected the Debtors' conflicted fiduciary argument, noting that the Delaware Court of Chancery has refused to adopt it in its broader form. *Deutsch v. Cogan,* 580 A.2d 100, 105 (Del.Ch.1990) ("Although neither the *Garner* nor *Valente* case is binding on this Court, Delaware courts have consistently followed *Garner* and declined to broadly apply *Valente.*") (citations omitted). More importantly, the Special Master forestalled any further "conflicted fiduciary"-style argument by ruling that neither Teleglobe nor the Debtors' boards were conflicted in any sense because all of their duties flowed back up to BCE (and not, as the Debtors argued, to their creditors). *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."). The Special Master, however, did not make an express finding of fact on when the Debtors became insolvent (or entered the amorphous [FN9] "zone of insolvency"), reasoning instead that there was no way to get from the Debtors' directors owing fiduciary duties to creditors of the Debtors on one hand to BCE owing a duty to those creditors on the other.

> FN9. A footnote from the Delaware Supreme Court's latest opinion on a related issue explains that this "zone" is yet ill-defined: "In light of its ultimate ruling, the Court of Chancery did not attempt to set forth a precise definition of what constitutes the 'zone of insolvency.' Our holding in this opinion also makes it unnecessary to precisely define a 'zone of insolvency.' " *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, at n. 20, 2007 WL 1453705, at n. 20 (Del.2007).

According to the Special Master, "[s]hortly after the Debtors made their selection of documents for *in camera* review, the wheels started coming off [BCE's] privilege wagon." App. at A0030. Before the review, BCE withdrew its privilege assertion for six of the 50 documents that the Debtors selected. Then, the Special Master determined that three of the documents did not involve the provision of legal advice at all, and three lent credence to the Debtors' argument that BCE attorneys jointly represented BCE and Teleglobe on the issue of BCE's abandonment. After the initial *in camera* review, BCE withdrew the privilege assertion for still more documents.

Having reviewed 44 documents *in camera,* the Special Master issued a supplemental decision in which he concluded that BCE's revised privilege claims and his review of documents *in camera* "raised serious questions about" the reliability of the privilege log, whether BCE attorneys jointly represented BCE and Teleglobe on the abandonment issue, whether the documents withheld reflected legal advice provided solely to BCE, and whether the documents withheld were in fact privileged. App. at A0031. He ordered BCE to review and revise the privilege log and to submit *all* purportedly privileged documents to him for *in camera* review.

BCE culled its privilege log to just over 1,000 documents. Then, between the submission of the revised privilege log and the submission of the actual documents, BCE withdrew the assertion of privilege for over 100 additional documents. BCE still wasn't finished; while the *in camera* review proceeded, it withdrew its assertion of privilege in four separate letters to the Special Master, covering well over 100 more documents.

One of the issues raised by the Debtors in supplemental briefing was BCE's apparent*357 over-designation of privileged documents. According to the Debtors, this was substantial enough to merit wholesale disclosure of the documents on BCE's privilege log as a discovery sanction. The Special Master agreed that BCE "failed the audit in multiple ways-withdrawing documents before *in camera* review, claiming privilege over documents that did not reflect legal advice, and claiming privilege over documents where it appeared that BCE in-house attorneys and outside counsel jointly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

represented BCE, Teleglobe, or the Debtors on matters of common interest."

In his final decision, the Special Master declined to impose disclosure as a discovery sanction. But he nonetheless reversed himself and ordered the production of all of the documents on the privilege log. Having reviewed some 800 documents *in camera,* he found that they "revealed a broad legal representation of both BCE and Teleglobe by BCE's in-house attorneys relating to Teleglobe's restructuring alternatives." App. at A0047-48. He further found that all of the documents on the privilege log were disclosed to BCE's in-house counsel, which made them discoverable because those attorneys were jointly representing Teleglobe and could not, therefore, withhold the documents from it. *Id.* at A0055. He applied this reasoning even to documents produced by outside counsel hired only to work for BCE.[FN10]

> FN10. Specifically, the Special Master concluded that the law firms Strikeman Elliot and Shearman & Sterling produced at least some documents for the sole benefit of BCE, but he ordered the production of those documents because they were shared with BCE's in-house attorneys, who were jointly representing it and Teleglobe.

The District Court affirmed the Special Master's decision and ordered BCE to turn over to the Debtors all of the documents. BCE argued that the Special Master's finding of a broad joint representation between it and Teleglobe was irrelevant because he had not found a joint representation between it and the Debtors. Unless the Debtors were a party to the joint representation, BCE argued, they could not invade its privilege. The Court rejected this argument on three grounds: (1) BCE made a binding agreement to disclose all communications generated as part of a BCE/Teleglobe joint representation, and so finding a joint representation between the two was all that was needed; (2) the Debtors, as wholly owned subsidiaries of Teleglobe, were parties to the joint representation as a matter of law; and (3) even the documents that fell outside of the joint representation (*i.e.,* were produced

by outside counsel) must be disclosed because they were shared with BCE's in-house attorneys, who jointly represented Teleglobe.

## II. Jurisdiction

[4][5] This is an appeal from an interlocutory order. Nevertheless, we have jurisdiction under the collateral order doctrine, which provides an exception to the finality requirement of 28 U.S.C. § 1291. Under it, an immediate appeal lies if the following elements are met: "(1) the order from which the appellant appeals conclusively determines the disputed question; (2) the order resolves an important issue that is completely separate from the merits of the dispute; and (3) the order is effectively unreviewable on appeal from a final judgment." *In re Ford Motor Co.,* 110 F.3d 954, 958 (3d Cir.1997) (citing *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.,* 32 F.3d 851, 860 (3d Cir.1994)).

Here, the first and third prongs are clearly met, as the District Court ordered the production of some 800 documents currently in dispute. *See In re Ford Motor Co.,* 110 F.3d at 958 (holding that the first *358 prong is met when a district court orders the production of documents). Once documents are disclosed, any dispute over their privileged status is effectively moot and unreviewable, as the very purpose of the privilege is frustrated by compelled disclosure. *Id.* at 963 ("[T]he limited assurance that the protected material will not be disclosed at trial 'will not suffice to ensure free and full communication by clients who do not rate highly a privilege that is operative only at the time of trial.' " (quoting *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC,* 964 F.2d 159, 165 (2d Cir.1992))).

The only question, then, is whether the privilege issue is sufficiently separate from the merits of the suit. It is, as we have no occasion to consider the issues that lie at the heart of the case: the existence, content, and alleged breach of any contract between BCE, Teleglobe, and/or the Debtors; the content and fraudulent or negligent nature of any representations made by BCE; and the alleged breach by BCE of fiduciary duties it purportedly owed to the Debtors. Rather, we concern ourselves with the extent to which BCE, Teleglobe, and the Debtors were jointly represented by counsel and the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

effect any joint representation has on BCE's ability to shield documents from disclosure. In this context, we have little trouble concluding that we have jurisdiction over this appeal.

## III. Choice of Law

[6] BCE argues that Canadian law should govern all aspects of this appeal; the Debtors, on the other hand, argue for Delaware law. As a federal court exercising jurisdiction over state-law claims, we apply the choice-of-law rules of Delaware, the forum state. *Hammersmith v. TIG Ins. Co.,* 480 F.3d 220, 226 (3d Cir.2007).

"Delaware courts look to the Restatement (Second) of Conflict of Laws for guidance in choice of law disputes." *Gloucester Holding Corp. v. U.S. Tape & Sticky Prods., LLC,* 832 A.2d 116, 124 (Del.Ch.2003). Here, § 139 of the Restatement applies:

(1) Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum.

(2) Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect.

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139 (1971).

[7] These provisions presuppose a conflict between the law of the forum state and the law of the state with the most significant relationship. This is because courts typically wade into choice-of-law determinations when those laws truly conflict. *See Huber v. Taylor,* 469 F.3d 67, 74 (3d Cir.2006) (citing *On Air Entm't Corp. v. Nat'l Indem. Co.,* 210 F.3d 146, 149 (3d Cir.2000)). While there are no reported Delaware cases on this point, we predict that Delaware would follow the practice of the

federal system and most states, and decide a choice-of-law dispute only when the proffered legal regimes actually conflict on a relevant point.

BCE argues for Canadian law here, but concedes that it has found no relevant conflict of Canadian with Delaware law.[FN11] *359 This undercuts BCE's argument, particularly given that the Restatement favors the admission of evidence when the law of the forum state so requires; thus, if applying Canadian law will safeguard the privilege, it is BCE's responsibility not only to highlight the legal conflict, but also to point to "some special reason" favoring protection. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 139 cmts. c & d. As BCE has not informed us of a conflict, cites Delaware law extensively (with comparatively few Canadian decisions noted), and concedes that the law in Canada is not materially different than Delaware, we rely on Delaware authority in reaching our conclusions. *See Huber,* 469 F.3d at 74.

> FN11. In oral argument before our Court, BCE's counsel stated that BCE and he "don't think there's a difference" between Delaware and Canadian law on the issues presented by this appeal.

We recognize that BCE has informed us of a true conflict on an issue the Debtors raise as an alternate sustaining ground-namely, whether the Debtors are entitled to the disputed documents under the fiduciary exception to the attorney-client privilege. Though that exception is well-entrenched in Delaware law, it does not exist in Canada. We deal with this issue more fully in Part VI.A.

## IV. Summary of the Law

This appeal raises core questions about the proper operation of a corporate family's centralized in-house legal department. Because answering those questions requires delving into a variety of concepts related to the co-client (or joint-client) privilege, its exceptions, its scope, and a lawyer's ethical obligations, a summary of relevant law sets the backdrop.

We begin with a basic review of the attorney-client

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

privilege-and how it has been adapted to accommodate the corporate client. We continue with a discussion of how disclosing otherwise privileged communications to third parties waives the privilege. Next, we explore two oft-confused privileges: (1) the co-client (or joint-client) privilege, which applies when multiple clients hire the same counsel to represent them on a matter of common interest, FN12 and (2) the community-of-interest (or common-interest) privilege, which comes into play when clients with separate attorneys share otherwise privileged information in order to coordinate their legal activities. Neither the co-client nor community-of-interest privilege is effective in adverse litigation between the former clients, so we next discuss the contours of the adverse-litigation exception. Then, we explore how courts deal with joint representations that go wrong because of impermissible attorney conflicts of interest. Finally, we put all of these doctrines together to address how they interact in the modern corporate in-house counsel's office.

> FN12. Though the term "common interest" is used in describing both the co-client and community-of-interest privileges, these privileges are distinct. See Part IV.C.2, infra.

## A. The Attorney-Client Privilege

The attorney-client privilege protects communications between attorneys and clients from compelled disclosure. It applies to any communication that satisfies the following elements: it must be "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68 (2000). "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation. Id. § 70.

The attorney-client privilege is the oldest of the common-law privileges. Klitzman, Klitzman & Gallagher v. Krut, 744 F.2d 955, 960 (3d Cir.1984). Like all privileges, it is an exception to the common-law maxim that the public has a right to " 'every*360 man's evidence.' " United States v. Bryan, 339 U.S.

323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950) (quoting 8 J. WIGMORE, EVIDENCE § 2192 (3d ed.1940)). Though initially confined to communications made in anticipation of litigation, American courts rejected that limitation at the outset. PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 1:12 (2d ed.1999) (hereinafter "RICE") (citing, e.g., Parker v. Carter, 18 Va. 273, 4 Munf. 273, 1814 WL 667, at *9 (1814) ("The court is also of [the] opinion[ ] that [the privilege] is not confined to facts disclosed, in relation to suits actually depending at the time, but extends to all cases in which a client applies ... to his counsel or attorney ... for his aid in the line of his profession.")). This is because so confining the privilege would discourage clients from seeking the advice of counsel before problems arise. Parker, 1814 WL 667, at *9.

As the Supreme Court has noted more recently, the purpose of the attorney-client privilege

> is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); accord The Queen v. McClure, [2001] 1 S.C.R. 445, at ¶¶ 32-33 (Can.2001); Deutsch v. Cogan, 580 A.2d at 104. Because the privilege carries through policy purposes-encouraging attorney-client communication to enhance compliance with the law and facilitating the administration of justice, the Supreme Court has not applied it mechanically. Upjohn, 449 U.S. at 392, 101 S.Ct. 677. It is essential that parties be able to determine in advance with a high degree of certainty whether communications will be protected by the privilege. Id. at 393, 101 S.Ct. 677; see also Deutsch, 580 A.2d at 106.

As common-law courts developed the privilege in an age in which clients were almost exclusively natural

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

persons, more modern courts sought to adapt it to the now ubiquitous corporate client. For more than a century, common-law courts have recognized that communications between corporate clients and their attorneys are indeed privileged. *See Radiant Burners, Inc. v. Am. Gas Ass'n,* 320 F.2d 314, 319 & n. 7 (7th Cir.1963) (citing English cases dated as early as 1833, and American cases as early as 1885, for the proposition that corporations can assert the attorney-client privilege).

Because corporations act through human agents, the question of whose communications with the corporation's attorneys are entitled to protection comes up often. RICE § 4:11. In *Upjohn* the Supreme Court rejected the so-called "control group theory"-that only communications between high-level managers and corporate attorneys merit protection. 449 U.S. at 392, 101 S.Ct. 677. Instead, it held that when a corporation's managers require its employees to give information to its attorneys in the course of providing legal advice, those communications also are protected. *Id.* at 396, 101 S.Ct. 677. This serves the policy goals of the privilege-to enhance compliance with the law and facilitate the administration of justice-by encouraging open communication between attorneys and clients. *Id.* at 389, 394, 101 S.Ct. 677.

The lesson for us is that it is important not to confuse these overarching policy goals with the means of achieving them. Communication between counsel and client *361 is not, in and of itself, the purpose of the privilege; rather, it only protects the free flow of information *because* it promotes compliance with law and aids administration of the judicial system. *Cf. United States v. Zolin,* 491 U.S. 554, 563, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (explaining that attorney-client communication facilitating fraud is not privileged because that sort of communication impedes the administration of justice). Thus, following *Upjohn*'s lead in not applying the privilege mechanically does not counsel in favor of applying the privilege anytime it might increase the flow of information; rather, *Upjohn* counsels a more nuanced inquiry into whether according a type of communication protection is likely to

encourage *compliance-enhancing* communication that makes our system for resolving disputes more operable.

**B. The Disclosure Rule**

[8] A communication is only privileged if it is made "in confidence." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 68. In other words, if persons other than the client, its attorney, or their agents are present, the communication is not made in confidence, and the privilege does not attach. The disclosure rule operates as a corollary to this principle: if a client subsequently shares a privileged communication with a third party, then it is no longer confidential, and the privilege ceases to protect it. *See* DEL. R. EVID. 510. This is because the act of disclosing signals that the client does not intend to keep the communication secret. RICE § 9:28. In addition, it prevents clients from engaging in strategic selective disclosure. *United States v. Bernard,* 877 F.2d 1463, 1465 (10th Cir.1989). The privilege does, after all, hinder the truth-seeking process, and so we carefully police its use. *United States v. Doe,* 429 F.3d 450, 453 (3d Cir.2005).[FN13]

> FN13. In stating that we construe the privilege strictly, we do not mean that it is disfavored. As *Upjohn, McClure,* and *Deutsch* indicate, the attorney-client privilege is integral to the functioning of our legal system. Recognizing, however, that it limits the truth-seeking process, we carefully monitor it to prevent its abuse.

[9] Disclosing a communication to a third party unquestionably waives the privilege. A harder question is whether the waiver also ends the privilege as to any related but not disclosed communications. In answering this question, our touchstone is fairness. *See Tackett v. State Farm Fire & Cas. Ins. Co.,* 653 A.2d 254, 259 (Del.1995); *see also Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1426 n. 12 (3d Cir.1991). When one party takes advantage of another by selectively disclosing otherwise privileged communications, courts broaden the waiver as necessary to eliminate the advantage. *Zirn v. VLI Corp.,* 621 A.2d 773, 781-82 (Del.1993) ("The purpose

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

underlying the rule of partial disclosure is one of fairness to discourage the use of the privilege as a litigation weapon."); *see also* RICE § 9:31. Extending the waiver, however, is not a punitive measure, so courts do not imply a broader waiver than necessary to ensure that all parties are treated fairly.[FN14] *See* RICE 9:31. Moreover, when the disclosure does not create an unfair advantage, courts typically limit the waiver to the communications actually disclosed. *See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.* ), 348 F.3d 16, 24-25 (1st Cir.2003); *cf. Westinghouse*, 951 F.2d at 1427 n. 14.

> FN14. This is not to say that district courts may not separately impose disclosure as a sanction for improper behavior; it merely means that the scope of the waiver is only as broad as necessary to remedy any unfair advantage.

**\*362 C. Privileged Information Sharing**

**1. The Co-Client (or Joint-Client) Privilege**

It is often expedient for two or more people to consult a single attorney. The rules of professional conduct allow a lawyer to serve multiple clients on the same matter so long as all clients consent, and there is no substantial risk of the lawyer being unable to fulfill her duties to them all. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 128-31. Just as in single-client representation, the lawyer and co-clients[FN15] begin their relationship when the co-clients convey their desire for representation, and the lawyer consents. *Id.* § 14. Like single-client representation, nothing prevents joint representation from arising by implication but, as a District Court in Maryland recently noted, courts must be careful not to imply joint representations too readily:

> FN15. We use the terms "co-clients" and "joint clients" interchangeably. Both refer to multiple clients engaging one or more common attorneys to represent them on a matter of interest to all.

What the Court takes exception to is [the plaintiff's]

effort to ... argue, in effect, that a joint representation of Party A and Party B may somehow arise through the expectations of Party B alone, despite Party A's views to the contrary. This position is untenable, because it would ... allow the mistaken (albeit reasonable) belief by one party that it was represented by an attorney ... to serve to infiltrate the protections and privileges afforded to another client.
*Neighborhood Dev. Collaborative v. Murphy,* 233 F.R.D. 436, 441-42 (D.Md.2005) (internal citations and quotation marks deleted). Moreover, as the Restatement details, it is important to remember that

clients of the same lawyer who share a common interest are not necessarily co-clients. Whether individuals have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances.

Co-client representations must also be distinguished from situations in which a lawyer represents a single client, but another person with allied interests cooperates with the client and the client's lawyer.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75 cmt. c (internal cross-references omitted).

Once begun, a co-client representation generally continues until a client discharges the lawyer or the lawyer withdraws. *Id.* § 31. In addition, numerous courts have recognized that the relationship may terminate by implication. *Fed. Deposit Ins. Corp. v. Ogden Corp.,* 202 F.3d 454, 463 (1st Cir.2000) ("A joint attorney-client relationship remains intact until it is expressly terminated or until circumstances arise that readily imply *to all the joint clients* that the relationship is over.") (emphasis in original); *see also Flynt v. Brownfield, Bowen, & Bally,* 882 F.2d 1048, 1051 (6th Cir.1989) (holding that terminating attorney-client relationship requires "conduct dissolving the essential mutual confidence" between them); *In re Dow,* 132 B.R. 853, 858 (Bankr.S.D.Ohio 1991) (same). In particular, a joint representation terminates when it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

becomes clear to all parties that the clients' legal interests have diverged too much to justify using common attorneys. RICE § 2:4 (citing *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 167 F.Supp.2d 128, 129 (D.Mass.2001)).

[10] While it is permissible for lawyers and clients to limit the scope of representation in a single-client representation, *see* \*363RESTATEMENT (THIRD) OF THE LAW GOVERN ING LAWYERS § 19, it is particularly common in co-client situations because of the limited congruence of the clients' interests. As the Restatement notes, a co-client relationship is limited by "the extent of the legal matter of common interest." *Id.* § 75 cmt. c. While written agreements limiting the scope of a joint representation might be preferable, nothing requires this so long as the parties understand the limitations.

[11] The District Court for the Northern District of California noted in *Sky Valley Ltd. P'ship v. ATX Sky Valley Ltd.,* 150 F.R.D. 648, 652-53 (N.D.Cal.1993), that a wide variety of circumstances are relevant to the determination of whether two or more parties intend to create a joint-client relationship, particularly how the parties interact with the joint attorneys and with each other. These same circumstances are relevant to determining the scope of any joint representation.[FN16] The keys to deciding the scope of a joint representation are the parties' intent and expectations, and so a district court should consider carefully (in addition to the content of the communications themselves) any testimony from the parties and their attorneys on those areas. As explained in section D of this Part, finding too broad the scope of a joint representation gives the parties more control over each other's ability to waive the privilege than they intended, and it subjects them to losing it in litigation with one another.

FN16. The *Sky Valley* Court's list of more than 20, often overlapping, factors strikes us as excessive; thus we do not repeat them here.

[12] When co-clients and their common attorneys communicate with one another, those communications are "in confidence" for privilege purposes. Hence the

privilege protects those communications from compelled disclosure to persons outside the joint representation. Moreover, waiving the joint-client privilege requires the consent of all joint clients. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(2). A wrinkle here is that a client may unilaterally waive the privilege as to its own communications with a joint attorney, so long as those communications concern only the waiving client; it may not, however, unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients.[FN17] *Id.* at cmt. e.

FN17. As the Reporter's Note in the Restatement laments, the caselaw on this point is not as uniform as one would hope. *Id.* § 75 Reporter's Note cmt. e. The divergence seems to rest on difficulties in understanding the following statement from Wigmore's treatise: "Where the consultation was had by *several clients jointly,* the waiver should be joint for joint statements, and neither could waive for the disclosure of the other's statements; yet neither should be able to obstruct the other in the disclosure of the latter's *own* statements." 8 J. WIGMORE, EVIDENCE § 2328 (J. McNaughton rev.1961) (second emphasis added). Obtuse as this statement may seem, we believe that the Restatement's interpretation of it is sensible and, in any event, correctly states the law in Delaware. *Cf. Interfaith Hous. Del., Inc. v. Town of Georgetown,* 841 F.Supp. 1393, 1402 (D.Del.1994) (predicting that one common-interest client's waiver of the privilege does not waive it on behalf of all common-interest clients).

2. The Community-of-Interest (or Common-Interest) Privilege[FN18]

FN18. Because the issues in our case involve clients of the same attorneys, not clients with separate counsel, which would call for a community-of-interest analysis, the rest of this section may seem surplusage. But because the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

District Court (erroneously) ruled that the Debtors and BCE were in a "community of interest," we examine the contours of that privilege. Indeed, much of the caselaw confuses the community-of-interest privilege (which is the same as the "common-interest privilege," see RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76 Reporter's Note cmt.b.) with the co-client privilege. Thus it is important to detail the community-of-interest privilege for the purpose of explaining how it and the co-client privilege differ, and why only the latter applies in this case.

Recognizing that it is often preferable for co-defendants represented by different attorneys in criminal proceedings to coordinate*364 their defense, courts developed the joint-defense privilege. In its original form, it allowed the attorneys of criminal co-defendants to share confidential information about defense strategies without waiving the privilege as against third parties. Moreover, one co-defendant could not waive the privilege that attached to the shared information without the consent of all others.[FN19] Later, courts replaced the joint-defense privilege, which only applied to criminal co-defendants, with a broader one that protects all communications shared within a proper "community of interest," whether the context be criminal or civil.[FN20] RICE § 4:35; see also Andrew R. Taggart, *Parent-Subsidiary Communications & the Attorney-Client Privilege*, 65 U. CHI. L.REV.. 315 (1998). Thus, the community-of-interest privilege allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others. It applies in civil and criminal litigation, and even in purely transactional contexts. RICE § 4:35; RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76.

FN19. For a history of the joint-defense privilege, see generally Craig S. Lerner, *Conspirators' Privilege & Innocents' Refuge: A New Approach to Joint Defense Agreements*, 77 NOTRE DAME L.REV. 1449, 1480-90

(2002).

FN20. According to the Restatement, the community-of-interest privilege has completely replaced the old joint-defense privilege for information sharing among clients with different attorneys. Thus, courts should no longer purport to apply the joint-defense privilege. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76 Reporter's Note cmt. b.

[13] Two aspects of the modern community-of-interest privilege are noteworthy. First, to be eligible for continued protection, the communication must be shared with the *attorney* of the member of the community of interest. *Cf. Ramada Inns, Inc. v. Dow Jones & Co.*, 523 A.2d 968, 972 (Del.Super.Ct.1986) (emphasizing that the relevant Delaware evidentiary rule protects communications disclosed to an attorney). Sharing the communication directly with a member of the community may destroy the privilege.[FN21] Second, all members of the community must share a common legal interest in the shared communication. RICE § 4:35. Delaware Rule of Evidence 502(b)(3), which sets out the State's version of the community-of-interest privilege, incorporates both requirements (that the clients' separate attorneys share information and that the clients have a common legal interest):

FN21. Neither the Restatement nor Professor Rice emphasize this requirement, though it appears in the plain text of the relevant Delaware evidentiary rule, and Professor Rice acknowledges it. See DEL R. EVID. 502(b)(3); RICE § 4:35 & n. 44.1.

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications[,] made for the purpose of facilitating the rendition of professional legal services to the client ... [,] by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

DEL. R. EVID. 502(B)(3).

[14][15] The requirement that the clients' separate attorneys share information (and not the clients themselves) derives from the community-of-interest privilege's roots in the old joint-defense privilege, which (to repeat) was developed to allow *attorneys* to coordinate their *365 clients' criminal defense strategies. *See Chahoon v. Commw.,* 62 Va. 822, 21 Gratt. 822, 1871 WL 4931, at *11 (1871). Because the common-interest privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as a *post hoc* justification for a client's impermissible disclosures. The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies.

Similarly, the congruence-of-legal-interests requirement ensures that the privilege is not misused to permit unnecessary information sharing. In a leading case, a District Court in South Carolina explained the contours of the requirement:

A community of interest exists among different persons or separate corporations where they have an identical legal interest with respect to the subject matter of a communication between an attorney and a client concerning legal advice. The third parties receiving copies of the communication and claiming a community of interest may be distinct legal entities from the client receiving the legal advice and may be a non-party to any anticipated or pending litigation. The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.

*Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C.1974).

[16] The Restatement takes a more flexible approach than *Duplan* toward the similarity and types of interests that qualify as "common": "[T]he common interest ... may be either legal, factual, or strategic in character. The interests of the separately represented clients need not be entirely congruent." RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76 cmt. e. Professor Rice criticizes *Duplan*'s strictness and cites a few cases announcing that the interest need not be identical (though maintaining, contrary to the Restatement, that the interest must be legal, rather than "factual or strategic"). RICE § 4:36 (citing, *e.g., SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 524-25 (D.Conn.1976) (Newman, J.) (holding that legal interests must be "demonstrably common" or the clients must have a "substantial" risk of shared exposure to justify privileged information-sharing)). Rice, however, still recognizes *Duplan* as the leading approach. *Id.* ("This ... standard ... coined in *Duplan* ... has been widely followed."). The Delaware courts seem not to have taken a position on whether the common legal interest must be identical, and we need not resolve the congruence-of-legal-interests question here. For our purposes, it is sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest.

[17] We conclude with two points of caution. First, the privilege only applies when clients are represented by separate counsel. Thus, it is largely inapplicable to disputes like this one that revolve around corporate family members' use of common attorneys (namely, centralized in-house counsel).[FN22] Second, while the Restatement *366 (confusingly) uses the term "common interest" to describe the congruence of the parties' interests in both co-client and community-of-interest situations, the concepts are not the same. *Compare* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(1) ("If two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that ... relates to matters of *common interest* is privileged as against third persons."), *with id.* § 76(1) ("If two or more clients with a *common interest* in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

matter, a communication of any such client ... is privileged as against third persons."); *cf. id.* § 76 cmt. e & Reporter's Note cmt. b (explaining that co-client and community-of-interest situations differ). In particular, because co-clients agree to share all information related to the matter of common interest with each other and to employ the same attorney, their legal interests must be identical (or nearly so) in order that an attorney can represent them all with the candor, vigor, and loyalty that our ethics require. *See Ogden,* 202 F.3d at 461. In the community-of-interest context, on the other hand, because the clients have separate attorneys, courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer.

> FN22. This means that BCE's invocation of the "common interest" privilege in the Bankruptcy Court was out of place, as BCE has never asserted that the parties were represented by separate counsel who properly shared information. Confusing as this area of law is, parties asserting the privilege (who, incidentally, bear the burden of proving it applies) are expected to explain themselves with more precision than BCE has throughout this litigation.

**D. The Exception for Adverse Litigation**

[18] The great caveat of the joint-client privilege is that it only protects communications from compelled disclosure to parties outside the joint representation. When former co-clients sue one another, the default rule is that all communications made in the course of the joint representation are discoverable. DEL. R. EVID. § 502(d)(6); RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75(2). This rule has two bases: (1) the presumed intent of the parties, and (2) the lawyer's fiduciary obligation of candor to both parties. *Id.* § 75 cmt. d. According to the Restatement, it is permissible for co-clients to agree in advance to shield information from one another in subsequent adverse litigation, though the drafters concede finding no direct authority for that proposition.[FN23] *Id.* Reporter's Note

cmt. d.

> FN23. Indeed, the only case we have found dealing with such an agreement is *In re Mirant Corp.,* 326 B.R. 646, 652 (Bankr.N.D.Tex.2005) (applying Georgia law), in which the Bankruptcy Court refused to give it effect. We have no occasion here to predict whether Delaware courts would enforce such agreements.

BCE argues that the default rule should be flipped when the joint clients are a parent company and its wholly owned subsidiary–*i.e.,* courts should assume that communications generated in the course of the joint representation are *not* discoverable in adverse litigation. BCE's rationale is that no parent would want its subsidiary to be able to invade the privilege in subsequent litigation, and so courts should not presume that intent. Moreover, because parents and wholly owned subsidiaries share the same interests, the parent's intent (to shield information) effectively controls.

[19][20] Delaware courts have recognized that parents and their wholly owned subsidiaries have the same interests because all of the duties owed to the subsidiaries flow back up to the parent. *Cf. Anadarko,* 545 A.2d at 1174 ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated **\*367** only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."). While we normally assume that a corporation's primary interest is in maximizing its economic value, the only interest of a wholly owned subsidiary is in serving its parent. *Id.* at 1174. That doing so may not always involve maximizing the subsidiary's economic value is of little concern. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 192 (Del.Ch.2006).[FN24] If the subsidiary is not wholly owned, however, in the interest of protecting minority shareholders we revert to requiring that whoever controls the subsidiary seek to maximize its economic value with requisite care and loyalty. *See id.* at 192 n. 66. Similarly, if the subsidiary is insolvent, we require the same in the interest of protecting the subsidiary's creditors. *Id.* at 204 n. 96 (approving *In re*

493 F.3d 345
(Cite as: 493 F.3d 345)

*Scott Acquisition Corp.*, 344 B.R. 283, 286 (Bankr.D.Del.2006) (holding that the fiduciary duties of directors of an insolvent wholly owned subsidiary inure to the benefit of the subsidiary's creditors)); *see also N. Am. Catholic Programming Found.*, 930 A.2d at 101-02, 2007 WL 1453705, at *7 ("[T]he creditors of an *insolvent* corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties. The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value. Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation. Individual creditors of an insolvent corporation have the same incentive to pursue valid derivative claims on its behalf that shareholders have when the corporation is solvent.") (emphasis in original) (internal citations and quotation marks omitted)).

> FN24. As Vice Chancellor Strine noted in that case, there is nothing wrong (or even unusual) about a parent causing its solvent wholly owned subsidiary to act in a way that benefits the corporate family but harms the individual subsidiary. He explained:

>> Assume for a moment that Trenwick [parent] itself never went bankrupt. Imagine further that it had bought another insurer and pledged a key asset of Trenwick America [subsidiary] as security for the purchase price. The purchase goes wrong and causes Trenwick to become less profitable, but not insolvent. To satisfy its creditors, Trenwick causes Trenwick America to sell the key pledged asset and uses the proceeds to pay off the acquisition debt. As a result, Trenwick America is less profitable and less valuable. In this scenario, *even though the course of events posed no prospect of benefit for Trenwick America when it is conceived solely as an entity, there would be nothing troubling about it from a fiduciary*

*perspective.* Rather, the scenario would involve a garden-variety situation when a parent corporation used the asset value of one of its wholly-owned subsidiaries to help it finance and absorb the down-side of the parent's larger business strategy.

> *Trenwick*, 906 A.2d at 192 (emphasis added).

In the context of a joint attorney representing a parent and its solvent wholly owned subsidiary, BCE's argument that we should flip the normal default rule (that all information shared in the course of a joint representation is not privileged in subsequent adverse litigation between the former joint clients) has some appeal, as it probably is more in line with the typical parent company's intent. But because parent-subsidiary relationships often change, having opposite default rules for wholly owned, solvent subsidiaries, and not-wholly owned or insolvent subsidiaries, seems unwieldy. In the course of a joint representation, a subsidiary could go from being wholly owned and solvent to majority-owned or insolvent (or both). Under those circumstances, it is not clear which default rule BCE would have us apply. Because of the need for clarity and certainty*368 in privilege law, *see Upjohn*, 449 U.S. at 393, 101 S.Ct. 677, creating multiple, ever-shifting default rules would be unwise. Simply following the default rule against information shielding creates simpler, and more predictable, ground rules.

Moreover, BCE's argument overlooks the joint attorney's fiduciary obligations to both parties. In undertaking a joint representation, the prospective joint attorney must always consider whether she can fulfill her duties to each co-client. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 128-31. When the co-clients desire to shield information from one another, this inquiry becomes more difficult in light of the prospective joint attorney's duty of candor to each. *See id.* § 60 cmt. *l.* In situations in which the subsidiary may become either partially owned or insolvent, a prospective joint attorney would have to consider her ability not only to counsel both clients, but to do so in the face of an information-shielding agreement that could harm one of them. Thus applying

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

the default rule against information shielding, absent an affirmative agreement to shield, makes good sense. The rule is widely accepted and dovetails with the joint attorney's duty of candor.

We predict that Delaware courts would apply the adverse litigation exception in all situations, even those in which the joint clients are wholly owned by the same person or entity.

**E. When Joint Representation Goes Awry: The *Eureka* Principle**

The Restatement's conflicts rules provide that when a joint attorney sees the co-clients' interests diverging to an unacceptable degree, the proper course is to end the joint representation. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121 cmts. e(1)-(2). As the Court of Appeals for the D.C. Circuit noted in *Eureka Inv. Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C.Cir.1984) (*per curiam*), courts are presented with a difficult problem when a joint attorney fails to do that and instead continues representing both clients when their interests become adverse. *Id.* at 937-38. In this situation, the black-letter law is that when an attorney (improperly) represents two clients whose interests are adverse, the communications are privileged against each other notwithstanding the lawyer's misconduct. *Id.*; *see also* 8 J. WIGMORE, EVIDENCE § 2312 (McNaughton rev. ed.1961).

The context of the *Eureka* case was the joint representation of an insured and insurer. Over the course of the litigation, the parties began to disagree. The insured, a developer trying to effect a condo conversion, wanted to settle in order to get its conversion plans back on track. The title insurer, on the other hand, wanted to continue opposing liability and would not agree to within-policy-limits settlement terms. Having decided that the insurer's refusal to settle was tortious, the insured entered into a unilateral settlement with its adversaries and promptly sued the insurer for indemnification and consequential damages. The trouble was that the insured continued to use the joint attorneys throughout the process, relying on their advice in deciding to enter into a unilateral settlement and to sue the insurer. Thus, upon filing its action, the

insurer sought discovery of the insured's communications with the joint attorneys in the hope that those communications would support the affirmative defense of non-cooperation. The insurer argued that because those communications were generated during the attorneys' joint representation of the parties on the claim against the insured, they were discoverable in an action between the joint clients.

The Court rejected the insurer's argument, holding instead that "[t]he policy **\*369** behind [the co-client privilege]-to encourage openness and cooperation between joint clients-does not apply to matters known at the time of communication not to be in the common interest of the attorney's two clients." *Eureka*, 743 F.2d at 937. It emphasized that both the insured and the joint attorneys thought that they had begun a separate, individual representation of the insured on the insurance bad-faith claim that was distinct from the underlying liability action, calling these understandings "crucial." *Id.* Noting the attorneys' potential ethical violations, the Court concluded that they were of no moment: "[C]ounsel's failure to avoid a conflict of interest should not deprive the client of the privilege. The privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable." *Id.* at 938. Though not yet explicitly adopted by the Delaware courts, the *Eureka* principle is widely accepted. *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 60 cmt. *l.*; RICE § 4:33.

**F. Putting It All Together: Parents, Subsidiaries, and the Modern Corporate Counsel's Office**

"A striking development in the legal profession ... has been the rapid growth in both importance and size of in-house, or corporate, counsel." Abram Chayes & Antonia Chayes, *Corporate Counsel and the Elite Law Firm*, 37 STAN. L.REV.. 277, 277 (1985). The roles of in-house counsel are many, *e.g.*, overseeing the corporation's compliance with myriad regulatory regimes. The primary advantages of in-house (rather than outside) counsel are the breadth of their knowledge of the corporation and their ability to begin advising senior management on important transactions at the earliest possible stage, often well before anyone would

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

think to hire a law firm. *See id.* at 280-81; Carl D. Liggio, *The Changing Role of Corporate Counsel*, 46 EMORY L.J. 1201, 1208 (1997). While there is much debate over how corporate counsel should go about promoting compliance with law (*e.g.*, the usefulness of "noisy withdrawal" requirements versus going up the corporate chain with concerns), both sides of the debate seem to see in-house counsel as the "front lines" of the battle to ensure that compliance while preserving confidential communications. *Compare* William W. Horton, *A Transactional Lawyer's Perspective on the Attorney-Client Privilege: A Jeremiad for* Upjohn, 61 BUS. LAW. 95 (2005), *with* Letter from Susan P. Koniak, Roger C. Cramton & George M. Cohen (endorsed by named academics) to Securities and Exchange Commission (Dec. 17, 2002), available at http:// www. sec. gov/ rules/ proposed/ s 74502/ skoniak 1. htm. Because in-house counsel are crucial and clear rules are needed to sort out attorney-client privilege problems (particularly for corporate groups), this section sets out how the various principles we have discussed apply to a parent company's in-house counsel.

## 1. Intra-group Information Sharing: Parents and Subsidiaries as Joint Clients

[21] Because parent companies often centralize the provision of legal services to the entire corporate group in one in-house legal department, it is important to consider how the disclosure rule affects the sharing of information among corporate affiliates. Recognizing that any other result would wreak havoc on corporate counsel offices, courts almost universally hold that intra-group information sharing does not implicate the disclosure rule. This result is unquestionably correct. The cases, however, vary in how they reach the result. The *Glidden* case, which both parties cite, illustrates the conceptual muddle:

The universal rule of law, expressed in a variety of contexts, is that the parent and subsidiary share a community of *370 interest, such that the parent (as well as the subsidiary) is the "client" for purposes of the attorney-client privilege. *See Crabb v. KFC Nat'l Management Co.*, No. 91-5474, 1992 WL 1321 (6th Cir. Jan.6, 1992) (" 'The cases clearly hold that a

corporate 'client' includes not only the corporation by whom the attorney is employed or retained, but also parent, subsidiary and affiliate corporations.' " (quoting *United States v. AT & T*, 86 F.R.D. 603, 616 (D.D.C.1979))). Consequently, disclosure of legal advice to a parent or affiliated corporation does not work a waiver of the confidentiality of the document, because of the complete community of interest between parent and subsidiary. *Id.* at *2. Numerous courts have recognized that, for purposes of the attorney client privilege, the subsidiary and the parent are joint clients, each of whom has an interest in the privileged communications. *See, e.g., Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y.1989); *Medcom Holding Co. v. Baxter Travenol Lab.*, 689 F.Supp. 841, 842 (N.D.Ill.1988).

*Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 472-73 (W.D.Mich.1997) (applying Delaware law). In the above-quoted paragraph, the Court calls the members of the corporate family a single client and joint clients-all in the same breath. Moreover, it invokes the community-of-interest privilege, which we explained in section C of this Part, *supra*, applies only when the parties have separate counsel. In quoting *Glidden*, we do not mean to single out that Court for criticism, for there are many cases that reach the result of non-waiver of privilege without persuasively explaining how.

Courts typically offer versions of three arguments for not construing the sharing of communications within the corporate family as a waiver: (1) the members of the corporate family comprise one client, *see, e.g., Glidden*, 173 F.R.D. at 472; *United States v. Am. Tel. & Tel. Co.*, 86 F.R.D. 603, 616 (D.D.C.1979); (2) the members of the corporate family are joint clients, *see, e.g., Glidden*, 173 F.R.D. at 473; *Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y.1989); *Medcom*, 689 F.Supp. at 842; and (3) the members of the corporate family are in a community of interest with one another. *See, e.g., Glidden*, 173 F.R.D. at 472; *see generally* JOHN K. VILLA, CORPORATE COUNSEL GUIDELINES § 1:22(C) (2006) (discussing community-of-interest and joint-client rationales); RICE § 4:24 & n. 54 (discussing various rationales for not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

applying the disclosure rule). Of these three rationales, we believe only the second withstands scrutiny.

[22] Within the wholly owned corporate family, it superficially makes sense to hold, as BCE urges, that the family is really one client for purposes of the privilege and that the privilege is held exclusively by the parent because all fiduciary duties flow to the parent. Indeed, in other contexts courts have treated parents and their wholly owned subsidiaries as one entity. For example, parents and their wholly owned subsidiaries cannot constitute a "combination" or "conspiracy" of two or more persons under the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 772, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). The Supreme Court reasoned that parents and subsidiaries could not effectively "agree" for Sherman Act purposes because

[a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without *371 a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.... [I]n reality a parent and a wholly owned subsidiary always have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

*Id.* at 771-72, 104 S.Ct. 2731 (internal citations and quotation marks omitted). Applying similar logic, courts have held that a parent cannot tortiously interfere with its subsidiary's contracts merely by directing the subsidiary to breach the agreements. *Boulevard Assocs. v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1036 (2d Cir.1995) (applying Connecticut law).

BCE also points out that Congress has recently pushed members of corporate families to act more in concert with one another by requiring the officers of

public companies to certify each quarter that they "have designed such internal controls to ensure that material information relating to the issuer and its consolidated subsidiaries is made known to such officers by others within those entities." 15 U.S.C. § 7241(a)(4)(B). According to SEC regulations, the general rule is that majority-owned subsidiaries must be consolidated for purposes of financial reporting. 17 C.F.R. § 210.3A-02(a). Thus our regulatory structure also treats the corporate family as a unified enterprise for at least some purposes.

[23] On the other hand, treating members of a corporate family as one client fails to respect the corporate form. It is a bedrock principle of corporate law in Delaware and elsewhere that courts must respect entity separateness unless doing so would work inordinate inequity. *Pauley Petroleum, Inc. v. Cont'l Oil Co.,* 43 Del.Ch. 516, 239 A.2d 629, 633 (1968); *see also In re Owens Corning,* 419 F.3d 195, 211 (3d Cir.2005) (concluding that courts must "respect entity separateness absent compelling circumstances calling equity ... into play"). By structuring its various activities by forming separate corporations, a parent company realizes numerous benefits, not the least of which are the liability shields. With that structure comes the responsibility to treat the various corporations as separate entities. In a tort suit, for example, it is doubtful that we would treat the Debtors, Teleglobe, and BCE as one entity.

We acknowledge that a core concept of *Copperweld* and *Boulevard Associates* is that when a legislature seeks to attach conspiracy-like liability,[FN25] it rarely means to include the garden-variety situation in which one who controls a corporation directs that corporation to do something. After all, a corporation can *only* act at the direction of whoever controls it, and we do not think of every corporate action as a "conspiracy." These decisions, though, are tethered to the statutes (or common-law causes of action) they interpret,[FN26] and do not give us license to disregard entity separateness in other contexts. Thus they are inapplicable here.

FN25. By this we mean statutes or common-law causes of action that impose additional

liability on bad behavior when two or more entities act in concert, usually to account for the additional danger that acting in concert engenders.

FN26. Indeed, there are conspiracy-type statutes that *do* attach liability to parent-subsidiary actions. *See, e.g., Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989) (holding that RICO liability attaches to intracorporate conspiracies).

Put simply, BCE wants to have it both ways: it wants us to view the corporate group as a single client, and it wants the controlling entity to own the privilege in *372 perpetuity. But the Supreme Court held in *Commodity Futures Trading Commission v. Weintraub,* 471 U.S. 343, 350, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985), that control of the privilege passes with control of the corporation, so it is unclear (even accepting BCE's theory) that it is the initial corporate parent who should control the privilege unilaterally once the group breaks up. In any event, absent some compelling reason to disregard entity separateness, in the typical case courts should treat the various members of the corporate group as the separate corporations they are and not as one client.

The community-of-interest rationale does not fit as a matter of black-letter law because the community-of-interest privilege only comes into play when parties are represented by separate counsel, which often is not the case for parents and subsidiaries. *See* Part IV.C.2, *supra.* Moreover, the community-of-interest privilege only applies when those separate attorneys disclose information to one another, not when parties communicate directly. *Id.* Finally, it assumes too much to think that members of a corporate family necessarily have a substantially similar *legal* interest (as they must for the community-of-interest privilege to apply, *see id.*) in *all* of each other's communications. Thus, holding that parents and subsidiaries may freely share documents without implicating the disclosure rule because of a deemed community of interest stretches, we believe, the community-of-interest privilege too far.

It makes the most sense, then, to rest not applying the disclosure rule to many intra-group disclosures on the ground that the members of the corporate family are joint clients. This reflects both the separateness of each entity and the reality that they are all represented by the same in-house counsel (whether that counsel typically takes up office with the parent or with a subsidiary).

**2. Keeping Control of the Privilege**

[24] In its *amicus* brief, the Association of Corporate Counsel ("ACC") has as a theme a parent company's desire to keep control of the attorney-client privilege. One particular ACC (and BCE) concern is that disclosures to parent/subsidiary cross-directors risk creating broad joint representations that subsidiaries can use to invade the parent's privilege in subsequent adverse litigation. Not so. In thinking about these situations, courts should keep in mind the definition of disclosure. For purposes of the disclosure rule, a disclosure occurs when the parent shares an otherwise confidential attorney-parent communication with an officer, director, or agent of a subsidiary *in that capacity. See* DEL. R. EVID. 510. Courts recognize corporate officers' and directors' ability to sit on multiple boards by " 'chang[ing] hats.' " *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (quoting *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 779 (5th Cir.1997)). Thus it does not break confidence to share an attorney-parent communication with an officer of the parent in her capacity as officer of the parent, even though she is also a director or officer of a subsidiary. Because this sort of information sharing is *not* a disclosure for purposes of the disclosure rule, courts need not bother trying to apply a joint representation analysis to save the privilege in these situations, nor should they use such "disclosures" to find a joint representation with the relevant subsidiary.

[25][26] A similar concern is that courts may find too broad of a joint representation, which in a spin-off situation ends up allowing the subsidiary to invade the parent's privilege. When, for example, in-house counsel of the parent seek information from various subsidiaries in order to complete the necessary public filings, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345

(Cite as: 493 F.3d 345)

scope of the joint representation is typically*373 limited to making those filings correctly. It does not usually involve jointly representing the various corporations on the substance of everything that underlies those filings. FN27 Contrary to the Debtors' argument, it is permissible (subject, of course, to conflict rules) for attorneys and clients to limit the scope of a joint representation in a sophisticated manner; nothing requires construing the scope of a joint representation more broadly than the parties to it intend.

> FN27. Indeed, in some of these circumstances in-house counsel may not need to represent the subsidiaries at all. When a parent company directs its subsidiaries' employees to provide information to its in-house counsel that is critical to their representation of the parent, the communication may be privileged under *Upjohn* because of in-house counsel's representation of the parent alone, thus obviating any need for these attorneys to represent the subsidiary as well. *See Admiral Ins. Co. v. U.S. Dist. Ct. for the Dist. of Ariz.,* 881 F.2d 1486, 1493 n. 6 (9th Cir.1989); *see also Upjohn,* 449 U.S. at 394, 101 S.Ct. 677.

**3. When Conflicts Arise**

It is inevitable that on occasion parents and subsidiaries will see their interests diverge, particularly in spin-off, sale, and insolvency situations. When this happens, it is wise for the parent to secure for the subsidiary outside representation. Maintaining a joint representation for the spin-off transaction too long risks the outcome of *Polycast,*FN28 125 F.R.D. at 49, and *Medcom,*FN29 689 F.Supp. at 844-both cases in which parent companies were forced to turn over documents to their former subsidiaries in adverse litigation-not to mention the attorneys' potential for running afoul of conflict rules. That the companies should have separate counsel on the matter of the spin-off transaction, however, does not mean that the parent's in-house counsel must cease representing the subsidiary on all other matters. After all, spin-off transactions can be in the works for months (or even years), and during that time it is proper (and obviously efficient) for in-house

counsel to continue to represent the subsidiary (jointly or alone) on other matters.

> FN28. The privilege dispute in *Polycast* followed the sale of a wholly owned subsidiary. Before the sale, Uniroyal (the seller) and its subsidiary were jointly represented by in-house counsel. After the sale, Polycast (the buyer) sued Uniroyal for allegedly misrepresenting the subsidiary's financial condition. It sought the production of notes taken by the subsidiary's officer during a phone conversation with in-house counsel. The District Court ordered production because the subsidiary, now in Polycast's control, waived the joint privilege in its favor. 125 F.R.D. at 51. As we explain in Part V.A.3, *infra,* we do not agree with much of the *Polycast* Court's reasoning.

> FN29. The facts and result of *Medcom* are substantially similar to those of *Polycast.* Essentially, the acquirer of a subsidiary sued the seller/parent for misrepresentation related to the sale, and sought production of documents produced while the subsidiary and seller/parent were jointly represented by in-house counsel. 689 F.Supp. at 842. As with *Polycast,* we disagree with much of the *Medcom* Court's reasoning, which we explain in Part V.A.3, *infra.*

Once conflicts begin coming to the surface, the question of when to acquire separate counsel is often difficult. As *Medcom* and *Polycast* demonstrate, from the perspective of protecting the privilege the best answer is that once the parties' interests become sufficiently adverse that the parent does not want future controllers of the subsidiary to be able to invade the parent's privilege, it should end any joint representation on the matter of the relevant transaction. *Polycast,* 125 F.R.D. at 49; *Medcom,* 689 F.Supp. at 844. This standard is, of course, only relevant if the parties have already begun a joint representation on that transaction; if they have *374 not, then the parent has nothing to fear as far as the privilege goes (though other concerns,

493 F.3d 345
(Cite as: 493 F.3d 345)

such as their fiduciary duties to their subsidiaries, may argue in favor of separating counsel).

In sum, in-house counsel have available numerous means to protect a parent company's privilege. By taking care not to begin joint representations except when necessary, to limit the scope of joint representations, and seasonably to separate counsel on matters in which subsidiaries are adverse to the parent, in-house counsel can maintain sufficient control over the parent's privileged communications.

## V. Issues on Appeal

### A. Whether the Debtors Are Entitled to Documents Generated in the Course of a BCE/Teleglobe Joint Representation

The District Court ruled that any documents generated out of a BCE/Teleglobe joint representation are subject to discovery by the Debtors. BCE argues that the Court erred because the Debtors were not a party to any such joint representation. (BCE admits that its attorneys jointly represented it and Teleglobe on some matters; it denies that they jointly represented it and the Debtors.) Indeed, the Court did not enter a factual finding that any attorney jointly represented both BCE and any of the Debtors.[FN30] Rather, the Court ruled that the Debtors were entitled to the product of any BCE/Teleglobe joint representation because BCE had conceded this point. Alternatively, it noted the Debtors, as Teleglobe's wholly owned subsidiaries, were entitled to the disputed documents as a matter of law, and in any event Teleglobe waived the privilege for the Debtors' benefit in the Canadian insolvency proceedings. We address all three grounds.

> FN30. We understand that the Debtors argue otherwise. We note, however, that the Special Master wrote that "there was a joint representation by BCE's attorneys of BCE *and Teleglobe* relating to a matter of common interest." App. at A0047 (emphasis added). Similarly, in affirming the Special Master, the District Court described his finding as a "joint representation of BCE *and Teleglobe* by in-

house counsel for BCE...." App. at A0013 (emphasis added). Because Teleglobe and the Debtors are separate entities, we cannot read these statements as finding that the Debtors were also jointly represented.

### 1. Whether BCE's Concession in the Bankruptcy Court Prevents it from Arguing that the Debtors are not Entitled to the Disputed Documents
#### a. Background

The District Court determined that BCE made a binding concession that it would produce all documents arising out of any BCE/Teleglobe joint representation and waived any argument that the Debtors are not entitled to those documents. Given the convoluted nature of the record, it is important to understand what BCE argued at each stage of the litigation.

The first reference to joint representation came from BCE itself; in a related proceeding before the Bankruptcy Court, BCE opposed a motion to compel production of various documents to the Creditors' Committee in the course of a Rule 2004 investigation. In its opposition brief, BCE stated that "BCE attorneys consulted with attorneys, officers, or employees of Teleglobe, Inc. or its subsidiaries to discuss or provide legal advice in matters where BCE and Teleglobe Inc. (or its subsidiaries) shared a common legal interest." App. at A01110. Furthermore, BCE declared that "such common interest privilege[FN31] will continue*375 to exist until the Debtors file a litigation against BCE." App. at A01110. At the hearing, BCE stipulated that its in-house counsel, Michel Lalande, held documents relating to "two types of matters." App. at A0172. The first category of documents "was where the common interest was involved." App at A0172. The second category comprised documents in which "Mr. Lalande was counseling ... BCE alone." App. at A0172. The Bankruptcy Court ordered BCE to produce to the Debtors and Creditors' Committee "the common interest documents." App. at A0172. Indeed, BCE agreed to do so. In the course of the hearing, however, the parties never homed in on what the "common interest" was.

> FN31. We reiterate that the term "common-interest privilege" is inapt here, as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

that term typically refers to the community-of-interest privilege. What BCE appears to have been asserting is a co-client privilege. *See supra* Part IV.C.

The issue came up again when the Debtors filed suit. In front of the District Court (before it referred discovery matters to the Special Master), BCE stated in its initial brief in opposition to the motion to compel production that "documents were produced pursuant to the Bankruptcy Court's Order because they were subject to the common interest privilege. Those documents were shared with [various attorneys and accountants representing the Debtors]." App. at A0218. At the first hearing before the District Court, BCE described the situation thus: "[T]here were some places where BCE attorneys clearly worked with what they conceived of as the common interest of Teleglobe and BCE. And there were areas of common interest. Judge Walrath said ... produce them.... We did." App. at A00264. Again, none of these statements sets out a definition or clarified the perceived scope of the "common interest."

Another round of briefing followed the District Court's reference to the Special Master. At a hearing before the Special Master, the Debtors' attorney went through BCE's Rule 2004 privilege log and summarized that BCE claimed a "common-interest privilege" on documents covering the following subjects: "Teleglobe financing, financial transaction between Teleglobe and BCE, issuance and redemption of preferred shares ... [,][r]efinancing of bank facilities ..., developing Teleglobe financial statements, ... public disclosures, .... [and] Teleglobe restructuring." App. at A00496-97. He further stated that "[BCE] claims a common interest on Project X, and so on.... [H]aving claimed common interests and having assigned lawyers to effectively represent both sides of the common interest, it would seem to us to be inconsistent now to say that we can't have all documents relating to the common interests[,] particularly when we're talking about documents that were reviewed and considered by our fiduciaries." App. at A00497.

BCE responded that its in-house counsel provided limited legal services to Teleglobe on an *ad hoc* basis

and that BCE's in-house counsel did not serve the Debtors at all because they had their own counsel in Reston, Virginia. App. at A00497. As to Project X, BCE responded that in-house counsel Michel Lalande and Martine Turcotte provided very limited advice to Teleglobe on its public filings, its management representation letters, its board resolutions, and its engagement letter with an investment bank. App. at A00498. Moreover, BCE argued that this advice was limited in scope and all other Project X advice was provided solely to and for the benefit of BCE. In sum, BCE argued that "what [is reflected on the privilege log] is BCE-privileged advice, not advice ... where BCE has a common interest with [Teleglobe], not advice given to [Teleglobe] or [the Debtors,] if there is any." App. at A00503.

**\*376** Recognizing that there was a dispute whether the documents on the privilege log reflected advice provided solely to BCE (and thus outside of the scope of any joint representation), the Special Master ordered an audit of 50 documents to "see if I can satisfy myself that they are what you [BCE] term exclusively related to advice provided to BCE." App. at A00505. To clarify the issue, the Special Master asked: "[Y]ou've [BCE] given them [the Debtors] the documents that deal with advice provided [to Teleglobe], by lawyers who might have been representing both BCE and [Teleglobe] at the same time, but have not given them documents that may have addressed [Teleglobe], but were only involved with advice given to BCE?" App. at A00505. BCE counsel responded, "That's correct." App. at A00505.

After the Special Master ordered production of all of the documents, BCE clearly raised, in its brief in opposition to the Debtors' motion in the District Court to affirm and adopt the Special Master's decision, the issue of its obligation to turn over documents arising from its and Teleglobe's joint representation by BCE in-house counsel. App. at A00826. This was probably a reaction to the Special Master's finding that the joint representation was so broad in scope that it covered all advice rendered on Project X. In other words, BCE had not objected to producing the "common interest" documents so long as its understanding of the narrow

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

scope of the common interest prevailed, but when the Special Master found a broad scope, it asserted that it need not produce the common-interest documents at all. The District Court rejected this argument out-of-hand, finding that BCE was bound by its concession in the Bankruptcy Court that it would produce to the Debtors and the Creditors' Committee all of the documents of common interest to BCE and Teleglobe. FN32

> FN32. BCE also told the Bankruptcy Court that if its attorneys jointly represented BCE and the Debtors on a matter related to this case, it would produce any documents that arose out of that representation. But BCE claims that its attorneys did not in fact jointly represent those parties on any related matter, and the District Court did not find otherwise. Thus the issue is whether the Court's finding that BCE attorneys did jointly represent BCE and Teleglobe is sufficient to support its production order in favor of the Debtors.

**b. Merits**

BCE should not, the Debtors argue, be able to raise now the issue of whether they and BCE were part of a joint representation. They base this contention on issue waiver, judicial admission, and judicial estoppel grounds. We address each, as well as whether BCE's waiver of the privilege in the Bankruptcy Court prospectively waived it as to any documents found to be within the scope of a BCE/Teleglobe joint representation.

**i. Issue Waiver**

[27][28] Our longstanding rule is that a party must raise an issue before the District Court in order to press it on appeal. FN33 To raise an issue, a party must present it with sufficient specificity to allow the court to pass on it. *See Keenan v. City of Philadelphia,* 983 F.2d 459, 471 (3d Cir.1992); *accord Shell Petroleum, Inc. v. United States,* 182 F.3d 212, 218 (3d Cir.1999) ("A party ... must unequivocally put its position before the trial court at a *377 point and in a manner that permits the court to consider its merits."). At oral argument before the Special Master, BCE stated unequivocally that its in-house attorneys never represented the Debtors

on anything related to Teleglobe's restructuring. The Special Master was skeptical of this assertion, and asked the Debtors to respond to it. They stated that they were entitled to documents generated through a BCE/ Teleglobe joint representation because they, as third-level wholly owned subsidiaries, were members of the same community of interest (once again, an instance where someone conflates the community-of-interest privilege with the co-client privilege). This exchange properly put before the Special Master the issue of whether the Debtors were (or needed to be) parties to the BCE/Teleglobe joint representation for production to be ordered. Moreover, BCE again raised the issue in its objections to the Special Master's decision. App. at A00826. With this context, we cannot conclude BCE waived contending that it and the Debtors were not jointly represented on any matter relevant to this case.

> FN33. As the Court of Appeals for the Federal Circuit has noted, when a district court employs a special master, it may be that the parties must, to avoid waiver, raise all relevant issues before the master. *See Harris Corp. v. Ericsson, Inc.,* 417 F.3d 1241, 1263 (Fed.Cir.2005). Because we conclude that BCE did properly raise before the Special Master whether its attorneys jointly represented the Debtors, we need not decide here whether a party must raise all issues before a special master to preserve them.

**ii. Judicial Admission**

[29][30] The Debtors argue, however, that BCE's statement to the Bankruptcy Court that it would turn over to the Debtors (and the Creditors' Committee) the "common interest" documents arising out of the BCE/ Teleglobe joint representation was a binding judicial admission. To be binding, admissions must be unequivocal. *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972). Similarly, they must be statements of fact that require evidentiary proof, not statements of legal theories. *Id.*

Applying those principles, BCE's statements on any joint representation of BCE and the Debtors were never unequivocal. All references to a joint representation of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

BCE and the subsidiaries were couched in alternative language. *See, e.g.,* App. at A01110 ("BCE attorneys consulted with attorneys, officers, or employees of Teleglobe, Inc. *or* its subsidiaries to discuss or provide legal advice in matters where BCE and Teleglobe, Inc. ( *or* its subsidiaries) shared a common legal interest." (emphases added)). To the extent that BCE admitted that it was obligated to turn over documents related to a joint representation on a matter of common interest, such an admission appears more like a statement of a legal theory or position than a statement about an issue of fact. Thus the judicial admission doctrine is not applicable.

### iii. Judicial Estoppel

[31][32][33] Judicial estoppel prevents a party from "playing fast and loose with the courts" by adopting conflicting positions in different legal proceedings (or different stages of the same proceeding). *Delgrosso v. Spang & Co.,* 903 F.2d 234, 241 (3d Cir.1990) (internal quotation marks and citations omitted). Here, the Debtors claim that BCE's position that its attorneys never jointly represented it and the Debtors is impermissible because BCE relied on the joint representation in the Bankruptcy Court to assert a claim of privilege and because it induced the Bankruptcy Court and Special Master to rely on its concession that common-interest documents had been produced, only changing its position when the Special Master found its representations untrue. Judicial estoppel requires (1) a clear inconsistency and (2) that the party estopped obtain an unfair advantage from that inconsistency. *In re Armstrong World Indus., Inc.,* 432 F.3d 507, 517-18 (3d Cir.2005). This case looks more like a legitimate disagreement over the scope of any joint representation (mixed with a dose of sloppiness) than it does a bad faith attempt to mislead the courts. BCE's position throughout has *378 been that it has turned over the documents that arose out of a BCE/Teleglobe joint representation. It told the Bankruptcy Court-in equivocal terms-that there *may* have been a BCE/ Debtors joint representation (and if so, it agreed to turn over any such documents). In front of the Special Master, BCE's counsel specifically stated that its attorneys did not jointly represent the Debtors, and it

has maintained that position since. In this limited context, that BCE was "playing fast and loose" with the courts appears too strong a statement. Perhaps it was being hyper-technical, and indeed up against the "too close for cricket" line, but that is as far as we can conclude on the record before us.

### iv. Implied Prospective Waiver of the Privilege

[34][35] To repeat, in the Bankruptcy Court BCE agreed to produce to the Debtors and the Creditors' Committee what it termed the "common interest" documents to resolve a discovery dispute. It did not explain the scope of the common interest, but it did agree to produce the documents. BCE views the Debtors' contention that it may not now assert the privilege over other documents alleged to arise from the same joint representation as an implied prospective waiver argument. That analysis makes some sense.

[36] In discovery disputes, implied waivers are construed narrowly, *In re Lott,* 424 F.3d 446, 453 (6th Cir.2005), and a party is only forced to produce documents under a prospective waiver theory if it agrees to disclose only favorable privileged documents while keeping for itself the unfavorable ones to gain an advantage in litigation. *See Westinghouse,* 951 F.2d at 1426 n. 12 ("When a party discloses a portion of otherwise privileged materials while withholding the rest, the privilege is waived only as to those communications actually disclosed, unless a partial waiver would be unfair to the party's adversary. If partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-sided story to the court, the privilege will be waived as to all communications on the same subject."); *accord Tackett,* 653 A.2d at 260 (holding that Delaware courts will only find a prospective waiver when a party uses partial disclosure as a weapon).

On the record here, it appears that BCE agreed to produce documents that fell within *its* understanding of the BCE/Teleglobe joint representation, not the masses of documents that the Special Master eventually found to fall within that category. Moreover, the Debtors have not argued that BCE is seeking an improper benefit by selectively disclosing documents. Thus we find no

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

implied prospective waiver in favor of the Debtors as to whatever documents a court might conclude were part of a BCE/Teleglobe joint representation.

## 2. Whether the Community-of-Interest Privilege Entitles the Debtors to the Documents as a Matter of Law

[37] The District Court also ruled that the Debtors were entitled to the documents as a member of BCE's community of interest. But as explained in Part IV.F. 1, *supra,* it is not the case that parents and subsidiaries are in a community of interest as a matter of law. Moreover, the community-of-interest privilege only applies to parties represented by separate counsel, *see* Part IV.C.2, *supra.* Even some of the cases that the Debtors cite suggest more nuance than they admit. *See, e.g., In re S. Air Transp., Inc.,* 255 B.R. 706, 711 (Bankr.S.D.Ohio 2000) ("Parent and subsidiary corporations *generally* share a common interest, and may, *in appropriate circumstances,* be considered a single *379 client for purposes of the attorney-client privilege." (emphases added)). The majority-and more sensible-view is that even in the parent-subsidiary context a joint representation only arises when common attorneys are affirmatively doing legal work for both entities on a matter of common interest. *See, e.g., Polycast,* 125 F.R.D. at 49 (finding a joint representation when a parent's officer and general counsel affirmatively advised subsidiary on how to comply with merger agreement to which parent and subsidiary were both parties). A broader rule would wreak havoc because it would essentially mean that in adverse litigation a former subsidiary could access all of its former parent's privileged communications because the subsidiary was, as a matter of law, within the parent entity's community of interest.

## 3. Whether Teleglobe's Waiver of the Privilege for the Debtors' Benefit in the Canadian Insolvency Proceedings Entitles them to the Documents

The Debtors argue that they are entitled to any documents generated in the course of the BCE/ Teleglobe joint representation because Teleglobe, through its Plan Administrator in the Canadian insolvency proceedings, has waived the attorney-client

privilege in their favor.[FN34] The question before us is whether one party to a joint representation (Teleglobe) may unilaterally waive the privilege and thereby force the other (BCE) to turn over documents generated in the course of the joint representation to third parties (the Debtors). Put differently, the question is whether the co-client privilege is subject to a unilateral control rule (either co-client may waive the privilege unilaterally and thus force the other to turn over documents produced during the course of the joint representation to third parties) or a bilateral control rule (both clients must agree to waive the privilege in order for the waiver to take effect). The general answer is bilateral control. As explained in Part IV.D, *supra,* this rule is in the Restatement:

> FN34. That Teleglobe's Plan Administrator purported to waive the privilege in the Debtors' favor is not disputed. What is disputed is whether she had the authority under the Arrangement Act to do so. Because we hold that, under both Delaware and Canadian law, Teleglobe cannot waive the privilege without BCE's consent in any event, we need not pass on the legal validity of Teleglobe's purported waiver.

[I]n the absence of an agreement with co-clients to the contrary, each co-client may waive the privilege with respect to that co-client's own communications with the lawyer, so long as the communication relates only to the communicating and waiving client. One co-client does not have authority to waive the privilege with respect to another co-client's communications to their common lawyer. If a document or other recording embodies communications from two or more co-clients, all those co-clients must join in a waiver, unless a nonwaiving co-client's communication can be redacted from the document.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 75 cmt. e. The Delaware District Court has predicted that Delaware law accords with this principle. *Interfaith Hous. of Del.,* 841 F.Supp. at 1402, and the Delaware Court of

Chancery (albeit in an unpublished decision) has agreed. *Tenneco Auto., Inc. v. El Paso Corp.,* 2001 WL 1456487, at *2 (Del.Ch.2001). Canadian law on this point is the same. *Ashburton Oil Ltd. v. Sharp,* 67 B.C.L.R.2d 64, ¶ 24 (B.C.1992).

The cases the Debtors cite are not explicitly contradictory. *In re Grand Jury Subpoenas,* 902 F.2d 244, 248 (4th Cir.1990), for instance, deals with the transfer *380 of the subsidiary's own privilege from old to new management, not with joint representation. Three other cases the Debtors cite- *Bass Public Co. v. Promus Cos.,* 868 F.Supp. 615 (S.D.N.Y.1994), *Polycast,* and *Medcom*-are muddier, as there are statements in all three that seem to disagree with the Restatement. *See Bass,* 868 F.Supp. at 621 (stating that the bilateral control rule only applies if the two clients are actual or potential co-defendants); *Polycast,* 125 F.R.D. at 50 (same); *Medcom,* 689 F.Supp. at 844-45 (same).[FN35] At the same time, none of the three decisions actually violated the Restatement. In *Bass,* one of the plaintiffs was the subsidiary (*i.e.,* the joint client); it therefore was entitled to everything generated in the course of the joint representation as a matter of right. *Bass,* 868 F.Supp. at 617. In *Polycast* and *Medcom,* the disputed communications were between the subsidiary and the joint attorneys; thus the subsidiary could waive the privilege by itself. *Medcom,* 689 F.Supp. at 844; *Polycast,* 125 F.R.D. at 48. Here, however, we have third parties seeking documents produced for BCE (allegedly) part of a BCE/Teleglobe joint representation. Under these circumstances, we predict that the Delaware Supreme Court would follow the Restatement rule (as accepted by both the Delaware Court of Chancery and the federal District of Delaware Court) that Teleglobe alone cannot waive the privilege as to communications involving BCE.

> FN35. The problem is that *Bass, Polycast,* and *Medcom* all treat the old joint-defense privilege (which applied only to actual codefendants in criminal litigation), *see* Part IV.C, *supra,* as a doctrine separate from the co-client and community-of-interest privileges. Those cases

accord *only* joint-defense clients (again, actual co-defendants) the protection of the bilateral control rule (that neither co-client may unilaterally waive the privilege). *See also* Taggart, 65 U. CHI. L.REV.. at 320 (arguing against the bilateral control rule). The Restatement has rejected this approach; it now treats the joint-defense privilege as obsolete and applies the bilateral control rule to the broader community-of-interest privilege. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 76 cmts. b. & g. Moreover, the *Bass, Polycast,* and *Medcom* approach is inconsistent with even relatively old understandings of the co-client privilege. *See, e.g.,* 8 J. WIGMORE, EVIDENCE § 2328 (J. McNaughton rev.1961) (explaining that co-clients are *always* subject to the bilateral control rule). To the extent that *Bass, Polycast,* and *Medcom* are at odds with the Restatement, we apply the latter.

### 4. Conclusion and Remand

Ordering the production of documents on the privilege log must be predicated on a factual finding that BCE and the Debtors were parties to a joint representation. Because there is no such finding on record, we remand for further factfinding on this issue. On remand, that factfinding should consider § 14 of the Restatement, which details how a lawyer/client relationship arises, and our discussion in Part IV.C, *supra,* on the existence and scope of a co-client relationship.

### B. The Effect of Funneling Documents Through BCE's In-House Counsel

The District Court held that because BCE funneled all of the contested documents through in-house counsel who were jointly representing Teleglobe, all of those documents are discoverable to the Debtors as part of the BCE/Teleglobe joint representation. This ruling applied even to documents produced by outside counsel that did not represent Teleglobe (or the Debtors). As an initial matter, the District Court's reasoning cannot survive our determination in section A of this Part that whether

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

BCE and Teleglobe were jointly represented does not matter without an **\*381** additional finding that the Debtors were also parties to that representation. Still, we examine the Special Master and District Court's reasoning because it may be relevant on remand.

In reaching his decision on this issue, the Special Master relied primarily on *In re Mirant Corp.,* 326 B.R. 646, 651 (Bankr.N.D.Tex.2005). In that case, a parent company and its wholly owned subsidiary formally engaged the Troutman Sanders law firm to represent them jointly with regard to the sale of 20% of the subsidiary's stock. *Id.* at 648. The Court held that the subsidiary/debtor could obtain documents arising out of the joint representation despite the fact that the engagement letter stipulated that the parties agreed that their individual communications with the joint attorneys would be privileged against one another. *Id.* at 652. That holding is off point here because it did not speak to whether documents *outside of the scope of the joint representation* and provided by outside attorneys are brought within that scope merely because they pass through in-house counsel who are jointly representing the subsidiary as well as the parent; rather, it dealt only with documents produced within the scope of the joint representation by the joint attorneys.

[38] Here, the *Eureka* principle seems most apt: when BCE took the trouble of hiring outside counsel to provide advice only to it on divestiture issues, it reasonably expected that those communications would be privileged. Whether BCE in-house counsel should have refused to look at the documents because of their own conflicts is, under *Eureka,* beside the point, as is whether its in-house counsel had a fiduciary duty to share information with Teleglobe. 743 F.2d at 937-38. (Not to be forgotten is that BCE's in-house counsel also had a duty to keep its communications confidential.)

[39][40] The guiding principle of *Eureka* is that when an attorney errs by continuing to represent two clients despite their conflicts, the clients-who reasonably expect their communications to be secret-are not penalized by losing their privilege. *Id.* Indeed, *Eureka* is merely one in a line of cases that hold that communications outside the scope of the joint

representation or common interest remain privileged. *See, e.g., CSX Transp., Inc. v. Lexington Ins. Co.,* 187 F.R.D. 555, 560 (N.D.Ill.1999) (holding that documents outside the scope of the common interest need not be disclosed); *Stratagem,* 153 F.R.D. at 543 (same); *Pittston Co. v. Allianz Ins. Co.,* 143 F.R.D. 66, 69-71 (D.N.J.1992) (same); *Carey-Canada Inc. v. Aetna Cas. & Sur. Co.,* 118 F.R.D. 250, 251 (D.D.C.1987) (same).

The District Court relied primarily on policy analysis: it noted that forcing BCE to choose between (1) allowing in-house counsel to filter the information from outside counsel while losing the privilege, and (2) maintaining the privilege by not working directly with outside counsel, is "harsh." App. at A0015. It stated, however, that the result was required by the law of the adverse-litigation exception to the joint-client privilege, and that BCE could have protected itself by clearly terminating any representation of Teleglobe by its in-house lawyers when it began reconsidering its funding of Teleglobe.

The *Mirant* Court also engaged in policy analysis that the Debtors endorse:

Even were there merit in the arguments of Troutman and [the parent company] TSC, the court would be most reluctant to deny Debtors the requested discovery for reasons of public policy. It is black-letter law that the attorney-client privilege is meant to foster open communications between attorney and client.... In a bankruptcy case, the **\*382** need for investigation is far more acute than is any concern for attorney-client communications.... Debtors, acting as fiduciaries for the benefit of their creditors, are pursuing an investigation which is important not only to those who may have lost money as a result of Debtors' demise. It is critical that both those who purchased Mirant's (and its subsidiaries') securities and the public have confidence that potential liability of TSC (and Troutman) has been thoroughly explored. That Debtors sought chapter 11 relief less than two and one half years after TSC completed their divestiture is reason enough to raise concern that all might not have been right in the transactions between TSC and Mirant.... Given the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

short time between divestiture and commencement of these chapter 11 cases and given the pre-divestiture history of Debtors' problems, it is essential to the integrity of the chapter 11 process that no stone be left unturned in ensuring satisfactory completion of Debtors' investigation.

326 B.R. at 654-55 (citations omitted).

In a similar vein, the Debtors argue that BCE created and controlled this situation, *i.e.,* it tried to have it both ways by having in-house counsel work primarily for BCE while still jointly representing Teleglobe. Because of its control over the situation, the Debtors argue, BCE should not be heard to complain about the legal ramification of losing its privilege against producing documents. They further contend that BCE could have obtained outside counsel for Teleglobe at any time and ceased its joint representation, and because it did not do so, it must relinquish its documents.

[41] As noted, the District Court here conceded that this result was harsh, as did the *Mirant* Court. Both, however, seemed to believe that allowing the privilege to stand would make it too easy for parent companies to hide their wrongdoing. This truth-seeking rationale, however, is a problem because the privilege is admittedly not truth-seeking. *United States v. Liebman,* 742 F.2d 807, 810 (3d Cir.1984) ("It does not advance resolution of the issue to argue ... that the attorney-client privilege is an obstacle to the search for the truth." (internal citations and quotations marks omitted)). Moreover, Delaware abrogates the privilege in the face of serious wrongdoing facilitated by the attorney through the crime/fraud exception. DEL. R. EVID. § 502(d)(1) ("There is no privilege under this rule ... [i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud."). This reflects a policy choice that, absent well-founded allegations not only of serious wrongdoing but of serious wrongdoing *facilitated by the attorney,* the privilege should stand. Here, the Debtors do not appear to have alleged that BCE's attorneys aided any wrongdoing. Moreover,

invoking the crime-fraud exception requires that the plaintiff make a *prima facie* showing of evidence supporting the elements of the exception. *In re Grand Jury Investigation,* 445 F.3d 266, 274 (3d Cir.2006). While that showing is not onerous, it is necessary, for "a mere charge of wrongdoing will [not] ... put the privilege to flight." *Clark v. United States,* 289 U.S. 1, 14, 53 S.Ct. 465, 77 L.Ed. 993 (1933) (Cardozo, J.). The adverse-litigation exception to the joint-client privilege should not be a back-door means of destroying the attorney-client privilege on the basis of alleged wrongdoing; if the Debtors had wanted to lay to rest the privilege on those grounds, they should have asserted the crime-fraud exception directly and allowed the District Court to pass on whether they could make the required *prima facie* showing.

In addition, *Eureka* counsels that it is the scope of the joint representation-not **\*383** whether communications were shared with joint attorneys-that is dispositive. 743 F.2d at 937-38. If the communications were outside the scope of the joint representation, then sharing them with a conflicted joint attorney is of no moment, even if the conflicted attorney acted improperly in accepting the communications. *Id.* If the communications were within the scope, then they are discoverable. *Id.* at 937. Either way, the fact that documents prepared by outside counsel were shared with in-house counsel does not have the significance that the District Court and Special Master attached to it. What we believe is significant is that, on remand, the District Court needs to determine whether any attorneys jointly represented BCE and the Debtors on a matter of common interest. If they did, then any documents within the scope of that joint representation are discoverable.

*Amicus curiae* ACC fears that invoking *Eureka* implies that in-house counsel act improperly when they review documents from outside counsel. Not so. Here we have a finding of fact that BCE's in-house counsel jointly represented BCE and Teleglobe on *all* issues relating to Teleglobe's ultimate spin-off. If that finding is correct, then it was bad judgment for BCE's in-house attorneys to take part in outside counsel's separate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

representation of BCE on the same issues if it still wanted the shield of the attorney-client privilege. We note, however, that the factual finding gives us pause. As we detailed in Part IV.F, *supra,* parent-subsidiary joint representations are typically quite narrow in scope. Still, we have not reviewed all of the documents that the Special Master and District Court did, so we can neither affirm nor vacate that finding on the record before us—and we need not because the Debtors' status as third parties to any BCE/Teleglobe joint representation makes its scope irrelevant as a matter of law.

We agree with ACC that a rule forcing parent companies to choose between relinquishing the privilege on one hand and relinquishing any control over their subsidiaries makes little sense. If the parent chooses to forgo the use of its in-house counsel on an important transaction, then it loses the advisors that know the most about its legal health. If it chooses to cut off its subsidiary, then it risks liability when the subsidiary and parent do not operate in tandem. Putting that choice in the context of this case, it appears that BCE spent some four months deciding what to do with Teleglobe. Over the course of Project X, it considered a variety of options that did not involve abandoning Teleglobe. Moreover, during this time it was still responsible for reviewing Teleglobe's public filings. Thus for BCE's in-house counsel to cut Teleglobe off would have been an expensive and risky proposition. Similarly, given that BCE was in the process of making a very serious business decision with important legal implications, to deprive it of its in-house counsel simply so that those attorneys could continue to advise Teleglobe on other matters seems overly harsh.

To prevent this outcome, it is important for in-house counsel in the first instance to be clear about the scope of parent-subsidiary joint representations. By properly defining the scope, they can leave themselves free to counsel the parent *alone* on the substance and ramifications of important transactions without risking giving up the privilege in subsequent adverse litigation.

## VI. Potential Alternate Sustaining Grounds

### A. The Fiduciary Exception to the Attorney-Client

## Privilege

Before the Special Master and in supplemental briefing, the Debtors argue that *384 they should be allowed access to the disputed documents under the fiduciary exception to the attorney-client privilege as articulated in *Garner v. Wolfinbarger,* 430 F.2d 1093 (5th Cir.1970). The core holding of *Garner* is as follows:

The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Garner,* 430 F.2d at 1103-04. Garner thus allows shareholders of a corporation to invade the corporation's privilege in order to prove fiduciary breaches by those in control of the corporation upon showing good cause.

As the Debtors note, while the Delaware Supreme Court has never adopted *Garner,* the Court of Chancery has adopted and applied it in numerous decisions. Indeed, Vice Chancellor Lamb wrote that "Delaware courts follow the approach outlined in *Garner.*" *Grimes v. DSC Comm. Corp.,* 724 A.2d 561, 568 (Del.Ch.1998) (citing *Deutsch v. Cogan,* 580 A.2d 100, 105 (Del.Ch.1990) ("Delaware courts have consistently followed *Garner.*")).

In *Deutsch,* the Court of Chancery extended *Garner* to a situation in which cashed-out minority shareholders of a subsidiary sought to abrogate the attorney-client privilege of the parent company's controlling shareholder in a dispute over a merger transaction that the minority shareholders contended was not fundamentally fair. 580 A.2d at 102-03. The Court held that *Garner* applied by analogy because the parent's controlling shareholder, as the entity in fact controlling

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

the subsidiary, owed the minority shareholders fiduciary duties. *Id.* at 107. Therefore, in a dispute over compliance with those duties, the minority shareholders could-upon showing good cause-overcome the privilege with regard to documents related to the challenged transaction. *Id.* at 108.

The Debtors' argument here is similar: because BCE controlled the Debtors while they were insolvent, it owed fiduciary duties to the Debtors of which their creditors (not BCE) were the primary beneficiaries. *See generally N. Am. Catholic Programming Found.,* 930 A.2d at 101-02, 2007 WL 1453705, at *7. Thus, in this dispute, in which the Debtors are asserting a breach of those duties for the benefit of their creditors, the Debtors should be able to put aside the privilege upon showing good cause. It is possible that Delaware courts would extend the *Garner* fiduciary exception to a situation like this one. The key, however, is insolvency. If the Debtors were not insolvent (or in that hazy "zone of insolvency," *see supra* note 9) at the time of the otherwise privileged communications, then BCE was the only beneficiary of the Debtors' success, and it could not, therefore, breach its fiduciary duty to itself.

[42][43] Whether a corporation is insolvent, and when it becomes so, are issues of fact. *Trenwick,* 906 A.2d at 195. Under Delaware law, a corporation is insolvent if it has: "1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof, or 2) an inability to meet maturing obligations as they fall due in the ordinary course of business." *Prod. Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 782 (Del.Ch.2004) (Strine, V.C.) (internal citations and quotation marks omitted). Here, both parties seem *385 to agree that the Debtors were all deeply in debt with no significant revenue stream other than BCE's funding. The dates on which each Debtor became insolvent, however, are issues of fact that we cannot resolve here.

[44] In addition, the Debtors' argument appears to have a significant deficiency: they must have a colorable claim of breach of fiduciary duty to show "good cause." *Garner,* 430 F.2d at 1104. Even if BCE owed the Debtors and their creditors fiduciary duties, it

seems a stretch to argue that BCE's decision not to fund Teleglobe implicated those duties. A fiduciary ordinarily has the obligation (protected by the business judgment rule) to manage the affairs of a corporation in such a way as to maximize its economic value; it does not have a duty to guarantee or bail out a corporate family member when it loses money. *Trenwick,* 906 A.2d at 205. As Vice Chancellor Strine noted in *Trenwick,* insolvency does not render a corporation's fiduciaries guarantors of that corporation's success; rather, it merely expands the universe of people with standing to assert a beneficial interest in the fiduciaries' obligation to maximize the value of the corporation. FN36 *Id.* Whether BCE would continue to infuse Teleglobe and the Debtors with funding seems, at least at first glance, entirely BCE's decision. Still, we do not have the entire record before us, and so we leave this issue for the District Court to resolve in the first instance.

FN36. In *Trenwick,* the Vice Chancellor put to rest the notion that there is such a thing as a cause of action for so-called "deepening insolvency" in Delaware law. 906 A.2d at 205. This effectively prevents extending our holding in *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 347 (3d Cir.2001), in which we decided that the cause of action exists in Pennsylvania, to Delaware cases (and supersedes those few Delaware District and Bankruptcy Court cases that have done so).

[45] Mopping up, BCE advances seven arguments against applying *Garner* in this situation, most of which are unavailing. First, it argues that *Garner* does not apply to work product. This is correct, but as we do not know how many of the 800 different documents currently in dispute contain work product, we must leave this issue for the District Court to resolve on remand. Second, BCE (the appellant) argues that the Debtors (the appellees) have abandoned the *Garner* argument. The cases it cites, however, are off the mark because they address the *appellant's* obligation to raise all grounds for reversal. *See Simmons v. City of*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
(Cite as: 493 F.3d 345)

*Philadelphia*, 947 F.2d 1042, 1066 (3d Cir.1991) (Opinion of Becker, J., announcing the judgment of the Court); *Inst. for Scientific Info., Inc. v. Gordon & Breach, Sci. Publishers, Inc.*, 931 F.2d 1002, 1011 (3d Cir.1991). It is firmly established that we may *affirm* on any ground supported by the record, so the *Debtors'* failure to raise the issue does not waive it. *Azubuko v. Royal*, 443 F.3d 302, 303 (3d Cir.2006). Moreover, the issue has yet to be addressed by the District Court, and it remains open on remand.

[46][47] Third and fourth, BCE argues that *Garner* has been rejected by Canadian courts and never adopted by our Court. As a matter of federal common law, it is correct that we have not always applied *Garner, see Wachtel v. Health Net, Inc.*, 482 F.3d 225, 233 (3d Cir.2007), but neither party argues that federal common law governs this dispute.[FN37] As to the Canadian *386 law argument, we doubt that Canadian law would apply to this issue, as the Debtors are Delaware corporations.[FN38] Under the internal affairs doctrine, anyone controlling a Delaware corporation is subject to Delaware law on fiduciary obligations to the corporation and other relevant stakeholders. *See In re Topps Co. S'holders Litig.*, 924 A.2d 951, 960 (Del.Ch.2007) (Strine, V.C.) (explaining that the law of fiduciary obligations is one of the most important ways a state regulates a corporation's internal affairs); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 306. Moreover, if Delaware law favors admission of the evidence, then BCE must show some "special reason" why that should not be given effect. *Id.* § 139(2); *see also Carlton Invs., Inc. v. TLC Beatrice Int'l Holdings, Inc.*, No. C.A. 13950, 1996 WL 33167792, at *2 (Del.Ch. Sept.27, 1996). Still, because we ultimately conclude that we cannot apply *Garner* here without knowing when the Debtors became insolvent, we will not conduct a full-scale choice-of-law analysis.

> FN37. Federal common law does not apply to disputes about corporations' internal affairs. *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del.2005) ("It is now well established that only the law of the state of incorporation governs and determines issues relating to a corporation's internal affairs.").

> FN38. This is the only issue on which BCE argues that there is a true conflict of law, *see* Part III, *supra.*

Fifth and sixth, BCE argues that *Garner* cannot be extended to this situation because (1) BCE owed the Debtors no fiduciary duties, and (2) *Garner* does not permit subsidiaries to invade the privilege of indirect corporate parents. The answer to both arguments is that BCE, as the ultimate owner of more than half (and, indeed, all) of the Debtors' voting power, owed them the duties of care and loyalty. *See Weinstein Enters. v. Orloff*, 870 A.2d 499, 507 (Del.2005). If the Debtors were solvent, then all duties flowed back up to BCE as the only party with a legitimate interest in the Debtors' success. If that were the case, then BCE is correct that it effectively owed the Debtors no duties. However, if the Debtors were insolvent, then their creditors also had a legitimate interest in their success. *See N. Am. Catholic Programming Found.*, 930 A.2d at 101-02, 2007 WL 1453705, at *7. With multiple stakeholders, BCE's duties of care and loyalty would come into play in the same way that the directors' duties did in *Garner*, and its attorney-client privilege could be set aside by showing good cause.

Finally, BCE argues that the Debtors cannot show good cause. As BCE concedes in the next breath, however, it is not for us to determine whether they can show good cause in the first instance; so we leave the issue open on remand.

**B. Affirming as a Discovery Sanction**

[48] The Debtors urge us to affirm the District Court's order as a sanction for BCE's penchant for designating too many documents as privileged. We cannot do so at this time for the simple reason that the District Court did not impose such a sanction. To be sure, both the Special Master and District Court expressed displeasure with BCE's litigation conduct, but neither expressly penalized that behavior, and so we have no sanction order to review. We do note that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

493 F.3d 345
**(Cite as: 493 F.3d 345)**

preventing a party from asserting the attorney-client privilege is a legitimate sanction for abusing the discovery process, and we do not foreclose that remedy on remand. Disclosure is a serious sanction, but one that may be imposed only if the District Court finds bad faith, wilfulness, or fault. *See Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assur. Soc'y of U.S.,* 406 F.3d 867, 877-80 (7th Cir.2005).

### VII. Conclusion

[49] We hold that the District Court may only compel BCE to produce disputed **\*387** documents because of the adverse-litigation exception to the co-client privilege, *see* Part IV.D, *supra,* if it finds that BCE and the Debtors were jointly represented by the same attorneys on a matter of common interest that is the subject-matter of those documents. Finding that BCE and Teleglobe were jointly represented is not enough, as Teleglobe cannot unilaterally waive the co-client privilege that attaches to documents that involve BCE and were created in the course of the joint representation. Moreover, BCE has not waived the argument, and it is not in some "community of interest" with the Debtors as a matter of law. In addition, that documents prepared by outside counsel were funneled through in-house counsel for both BCE and Teleglobe is of no moment. Following *Eureka,* what matters is the scope of any joint representation: documents within the scope are discoverable; documents outside it are not, irrespective of whether they were improperly funneled through joint attorneys.

On remand, then, the primary issue is whether any attorneys jointly represented BCE and the Debtors on a matter of common interest. Also open on remand are the issues of discovery sanctions and whether the *Garner* fiduciary exception-currently extant in Delaware-applies in this case.

Because of the need to resolve this privilege dispute efficiently so that the underlying litigation can proceed, this panel of our Court will continue to review any additional privilege-related appeals.

C.A.3 (Del.),2007.
In re Teleglobe Communications Corp.

493 F.3d 345

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

16938376.1

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION,
NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceeding commenced at TORONTO

**BRIEF OF AUTHORITIES OF**
**NORTEL NETWORKS INC.**
**AND THE OTHER U.S. DEBTORS**
**(Joint Administrators' Motion for Production of**
**Documents)**

**TORYS LLP**
79 Wellington St. W., Suite 3000
Box 270, TD Centre
Toronto, ON M5K 1N2

Fax: 416.865.7380

**Sheila Block** (LSUC#: 14089N)
Tel: 416.865.7319
Email: sblock@torys.com

**Scott A. Bomhof** (LSUC#: 37006F)
Tel: 416.865.7370
Email: sbomhof@torys.com

**Andrew Gray** (LSUC#: 46626V)
Tel: 416.865.7630
Email: agray@torys.com

**Adam M. Slavens** (LSUC#: 54433J)
Tel: 416.865.7333
Email: aslavens@torys.com

Lawyers for Nortel Networks Inc.
and the other U.S. Debtors