Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD OF THE CANADIAN CREDITORS' COMMITTEE**

(Motion to Strike Expert Reports and Testimony of Daniel R. Bereskin QC)

**(Returnable on a date to be set by the court)**

April 21, 2014

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Susan Philpott / Ari Kaplan
Tel:  416.595.2090
Fax: 416.204.2877

Lawyers for the Canadian Former Employees and
Disabled Employees through their court appointed
Representative

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel:  416.495.3776
Fax: 416.495.3786

Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON   M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel: 416.214.5213/5206
Fax:416.214.5413/5400

Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J. Boake
Tel:  416.601.7998
Fax: 416.868.0673

Lawyers for Morneau Shepell Ltd., as administrator
of the Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension Benefits
Guarantee Fund

# INDEX

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**MOTION RECORD OF THE CANADIAN CREDITORS' COMMITTEE**

(Motion to Strike Expert Report of Daniel R. Bereskin QC)

**INDEX**

| TAB | DESCRIPTION |
| --- | --- |
| 1. | Notice of Motion |
| 2. | Allocation Position of the Canadian Creditors' Committee |
| 3. | Canadian Creditors' Committee Response to Core Parties' Opening Allocation Positions |
| 4. | Notice of Filing in the U.S. Debtors' Chapter 11 Cases of the Objection of the UK Pension Claimants to Motion by the Monitor and Canadian Debtors to Shorten Notice with Respect to Motion to Strike the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, In the Alternative, Granting Leave to File The Expert Report of Sheldon Burshtein |

# TAB 1

Court File No. 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**NOTICE OF MOTION**

**(Returnable on a date to be set by the Court)**

The Canadian Creditors' Committee (the "**CCC**") will make a motion to the Honourable Justice Newbould of the Commercial List to be heard as a joint motion with the United States Bankruptcy Court for the District of Delaware (the "**US Court**"), on a date to be set by the Courts, at 10:00 am or as soon after that time as the motion can be heard, at 330 University Avenue, Toronto, Ontario.

**PROPOSED METHOD OF HEARING:** The motion is to be heard orally.

**THE MOTION IS FOR:**

1.      An Order striking the expert report of Daniel R. Bereskin (the "**Bereskin Report**") as well as the transcript of his deposition;

2.      Only if the Bereskin Report is not struck by this Court and/or the US Court, an Order granting leave to the Monitor and Canadian Debtors to file the expert report of Sheldon Burshtein in response to the Bereskin Report;

3.      Directions if necessary concerning any differences between the evidentiary records at trial before this Court and the US Court;

4.      Costs of this motion; and

5.      Such further relief as may be required in the circumstances and this Honourable Court deems just.

**THE GROUNDS FOR THE MOTIONS ARE:**

1.      The CCC adopts the grounds set out in the Notice of Motion of the Monitor and Canadian Debtors;

2.      The Bereskin Report is inadmissible evidence on the domestic law of Canada;

3.      In addition, the Bereskin Report is improper rebuttal;

4.      Rules 25.11, 37 and 53.08 of the *Rules of Civil Procedure*; and

5.      Such further and other grounds as counsel may advise and this Honourable Court permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE** will be used at the hearing of the motion:

1.      The materials contained within the Motion Record of the Monitor and Canadian Debtors;

2.      The Opening Allocation Position of the CCC;

3.      The Notice of Filing in the U.S. Debtors' Chapter 11 Cases of the Objection of the UK Pension Claimants to Motion by the Monitor and Canadian Debtors to Shorten Notice with Respect to Motion to Strike the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, In the Alternative, Granting Leave to File The Expert Report of Sheldon Burshtein; and

4.      Such further and other evidence as counsel may advise and this Honourable Court may permit.

- 3 -

April 21, 2013

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON
M2H 3H9

Barry Wadsworth
Tel:     (416) 495-3776
Fax:     (416) 495-3786
Email:  Barry.Wadsworth@caw.ca

Counsel for the Canadian Autoworkers

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, Ontario
M5H 3R3

Mark Zigler/Susan Philpott
Tel:     (416) 595-2090
Fax:     (416) 204-2877
Email:  mzigler@kmlaw.ca
Email: sphilpott@kmlaw.ca

Counsel for The Canadian Former Employees
and Disable Employees through their Court
Appointment Representatives

**MCCARTHY TETRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto, ON M5K 1E6

R. Paul Steep/James Gage/Barbara Boake
Tel:     (416) 362-1812
Fax:     (416) 868-0673
Email:  jgage@mccarthy.ca
Email:  bboake@mccarthy.ca

Counsel for Morneau Shepell Ltd., as
administrator of the Nortel Canadian registered
pension plans

**PALIARE ROLAND ROSENBERG**

250 University Avenue, Suite 501
Toronto, Ontario
M5H 3E5

Ken Rosenberg/Lily Harmer/Max Starnino
Tel:     (416) 646-4300
Fax:     (416) 646-4301
Email:  ken.rosenberg@paliareroland.com
Email:  lily.harmer@paliareroland.com
Email:  max.starnino@paliareroland.com

Counsel for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

**SHIBLEY RIGHTON LLP**

250 University Avenue
Suite 700
Toronto, Ontario
M5H 3E5

Arthur O. Jacques
Tel:     (416) 214-5213
Fax:     (416) 214-5413
Email:  arthur.jacques@shibleyrighton.com

Counsel for active and transferred employees of
Nortel Canada

# TAB 2

Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE

(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

**ALLOCATION POSITION OF THE
CANADIAN CREDITORS' COMMITTEE (THE "CCC")**

- 2 -

# TABLE OF CONTENTS

PART I – INTRODUCTION AND RELIEF SOUGHT ...........................................................3

PART II – OVERVIEW OF ALLOCATION POSITION.........................................................4

    A.    Ownership Allocation Order .................................................................4

    B.    Equitable Allocation Order...................................................................6

PART III – PARTIES .........................................................................................................7

    A.    Debtors....................................................................................................7

    B.    Creditors.................................................................................................7

PART IV – FACTS .............................................................................................................9

    A.    Introduction ...........................................................................................9

    B.    Innovation and Expansion .................................................................10

    C.    Lines of Business ................................................................................11

    D.    Role of Nortel Canada ........................................................................11

    E.    IP and R&D ............................................................................................12

    F.    Filing and Liquidation ........................................................................12

PART V – ALLOCATION POSITION OF THE CCC ...........................................................14

    A.    Allocation by Ownership ...................................................................14

    B.    Allocation Pro Rata by Claims...........................................................18

PART VI – CONCLUSION.................................................................................................24

# PART I – INTRODUCTION AND RELIEF SOUGHT

1.      The Canadian Creditors Committee (the "**CCC**")[1] represents the interests of more than 20,000 Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who in the aggregate have asserted approximately $3 billion[2] in Claims against the Canadian Debtors.

2.      This Allocation Proceeding concerns the allocation of approximately $9 billion in Global Assets of the Nortel Debtors for distribution to Nortel's Creditors, who have collectively asserted worldwide Claims far exceeding this amount.

3.      In addition to the CCC, Creditors include the Bondholders and other general unsecured creditors in the U.S, the U.K., and EMEA. In addition, various Nortel Debtors have asserted Intercompany Claims against one or more of the other Nortel Debtors.

4.      The Global Assets are comprised of approximately $7.3 billion in Sale Proceeds held in trust accounts pursuant to an Interim Funding and Settlement Agreement dated June 9, 2009 between certain of the Nortel Debtors (the "**IFSA**"), and $1.7 billion in cash and other assets in the possession of Nortel Debtors in various jurisdictions ("**Residual Assets**"). The Sale Proceeds are made up of $2.8 billion (the "**Business Sale Proceeds**") from the sale of Nortel's Lines of Business, including the business units (the "**Business Sales**"), and $4.5 billion (the "**Residual IP Proceeds**") resulting from the sale of Nortel's remaining patent portfolio (the "**Residual IP**") owned by Nortel's operating parent, NNL. In 2011, the Residual IP was purchased by a consortium of technology companies ("**Rockstar**"), including Apple, RIM, Sony and Microsoft (the "**Residual IP Sale**").

---

[1] Unless defined herein, all Capitalized terms have the meanings ascribed to them in the annexed Glossary of Terms (CCC Pleading).

[2] All amounts stated in this Pleading are approximate and are expressed in USD.

- 4 -

5.    For the reasons set out below, the CCC seeks the following relief:

 a) an Order (the "**Ownership Allocation Order**") allocating, administering and effecting the distribution of the Sale Proceeds to the Nortel Debtors holding title to the assets sold, according to the value of such assets, as set out below and as will be more particularized in advance of trial;

 b) in the alternative, an Order (the "**Equitable Allocation Order**") allocating, administering and effecting the distribution of the Global Assets of the Nortel Debtors, including the Sale Proceeds, in accordance with equitable principles, so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims; and

 c) such other orders or declarations as may be necessary to give effect to the Ownership Allocation Order or the Equitable Allocation Order, as applicable, including, as may be necessary, orders or directions that the Sale Proceeds and other Global Assets are only distributable in respect of valid Claims, the Global Assets be administered as if Nortel were a single consolidated estate, and all guarantees and Intercompany Claims among the Nortel Debtors be stayed and/or eliminated.

# PART II – OVERVIEW OF ALLOCATION POSITION

## A.    *Ownership Allocation Order*

6.    Nortel was a large multi-national technology enterprise headquartered in Canada, with a history dating to the nineteenth century. Nortel was a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies. At its peak Nortel had annual revenue of approximately $30 billion and employed approximately 93,000 people.

7.    On January 14, 2009 (the "**Filing Date**"), Nortel's Canadian Debtors, U.S. Debtors and UK/EMEA Debtors filed for protection from creditors pursuant to the

- 5 -

applicable insolvency statutes in their respective jurisdictions (the "**Insolvency Proceedings**")[3]. Thereafter, Nortel ceased operations as a going concern and liquidated its assets through the Business Sales and Residual IP Sale.

8.     This Allocation Proceeding addresses the issue of how the Global Assets should be allocated among the Nortel Debtors, and ultimately, distributed to Creditors.

9.     Where legal title is discernible, it should form the basis of the allocation among the Nortel Debtors. Allocation by legal title is a reasonable and principled approach that respects the legal and contractual rights of the Nortel Entities.

10.    Nortel's IP, including its patents, copyrights, trade secrets, confidential information, trademarks and other intellectual property and associated rights, was its most valuable asset and the primary driver of its profit and value. All of the value in the Residual IP Sale and a significant majority of the value in the Business Sales are attributable to IP. At all times, title to virtually all of Nortel's IP was held by NNL.

11.    Pursuant to a Master Research and Development Agreement between NNL and certain of its subsidiaries that were Licensed Participants, effective as of January 1, 2001, (as amended, the "**MRDA**"), NNL and the Licensed Participants agreed that:

    a) legal title to Nortel IP is vested in NNL;

    b) each Licensed Participant received a Limited License to make, use, and sell Nortel products using certain NNL-owned IP on an exclusive basis in a prescribed territory, and non-exclusively elsewhere, subject to restrictions;

    c) a Licensed Participant had no right to use NNL's IP licensed to it for any other product or purpose, nor did it possess any legal ownership in such IP; and

---

[3] The Canadian Debtors obtained protection under the CCAA. The U.S. Debtors filed voluntary petitions under Chapter 11 of the Code. NNUK and certain of its affiliates located in EMEA were granted administration orders by the High Court of England and Wales.

- 6 -

d) the MRDA and the Limited Licenses therein were not assignable by the Licensed Participants.

12.    The MRDA is the basis upon which Nortel determined its respective ownership (in the case of NNL) and Limited License rights (in the case of the Licensed Participants) to make use and sell Nortel products using certain NNL-owned IP. NNL relied upon the MRDA, and in particular on its terms concerning ownership of IP, when it agreed to incur liabilities in the Lines of Business.

13.    All Sale Proceeds derived from the sale of IP belong to and must be allocated to the owner of that IP, NNL. In the case of the Residual IP Sale, all of the Residual IP Proceeds belong to NNL. In the case of the Business Sales, the value of IP sold or licensed to the purchasers is primarily attributable to NNL.

14.    The Licensed Participants' limited and non-assignable right to make, use and sell Nortel products embodying the licensed technology had no value, or in the alternative, no material value in the context of the Business Sales. The CCC puts the U.S. Debtors and the UK/EMEA Debtors to the strict proof of the amount of the Sale Proceeds from IP that they may allege is attributable to Licensed Participants, if any.

15.    The remaining assets (other than IP) sold in the Business Sales should be allocated according to legal title, to the extent discernible, and otherwise in accordance with appropriate allocation principles in the context of the Business Sales. Particulars of the allocation methodology of such assets will be provided in advance of trial.

## B.    Equitable Allocation Order

16.    If it is concluded that legal title should not form the basis for allocation of the Sale Proceeds, because it is inappropriate, or legal title is not determinable, or for any other reason, then the only fair, reasonable, defensible and equitable alternative in light of Nortel's highly integrated and multi-national operations is to allocate the Global Assets among the Nortel Debtors in accordance with equitable principles so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

- 7 -

17.      Prior to the Filing Date ("**Pre-Filing**"), Nortel's business consisted of four interdependent, international Lines of Business that operated without regard to geographic boundaries, and across numerous corporate entities. Nortel's stakeholders, including its Creditors, disregarded individual corporate identities and treated the Nortel Debtors as a single, global concern.

18.      Subsequent to the Filing Date ("**Post-Filing**"), the sale of Nortel's assets reflected the same integrated nature of Nortel's business. With respect to the Business Sales, purchasers bought "Nortel" Lines of Business consisting of assets spread across many corporate entities in multiple jurisdictions.

19.      Failure to give effect to the parties' legal rights regarding the ownership of Nortel assets, including NNL's ownership of the IP, leaves no other justifiable method to unscramble the assets and liabilities of Nortel. Moreover, any attempt to do so would be extremely difficult and prohibitively costly and would prejudice all Creditors. In such circumstances, there would be no reasonable basis to rely upon individual corporate identities, assets and liabilities or to treat the Nortel Debtors as anything other than a single, global estate.

20.      Accordingly, if the Courts conclude they must look beyond the legal title to property and the contractual rights of the relevant Nortel Entities, they should exercise their discretion to allocate the Global Assets to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

# PART III – PARTIES

## A.      *Debtors*

21.      The Nortel Debtors consist of the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, each of which is subject to separate Insolvency Proceedings in their respective jurisdictions.

## B.      *Creditors*

22.      The CCC represents Creditors with claims against the Canadian Debtors and is made up of the following interests:

a) **Former Employees, Pensioners and Disabled Employees of Nortel:** These are the individual Canadian employees, from salaried staff to senior management, who helped to grow and run Nortel's global businesses. Each of the more than 20,000 former and disabled employees and pensioners (and through them, their survivors and beneficiaries) hold individual contracts of employment with Nortel, and who collectively have an interest in $2 billion in Claims in the form of cash payments owing to Nortel's Canadian pension plans. This group has an additional $1 billion of Claims in contractual health benefits and other employment-related obligations;

b) **The National Automobile, Aerospace, Transportation, and General Workers Union of Canada (CAW – Canada):** The CAW is a trade union representing over 750 members and former members, including actives, retirees, survivors, and disabled employees, under the term of individual retainers or pursuant to obligations imposed by statute;

c) **Nortel Canadian Continuing Employees:** These are approximately 3,600 active and transferred employees of Nortel's Canadian operations;

d) **Morneau Shepell Ltd., in its capacity as administrator of Nortel's two Canadian registered pension plans:** This is the arms-length fiduciary who administers the Nortel Canadian registered pension plans for the benefit of Nortel's Canadian former employees and pensioners; and

e) **The Superintendent of Financial Services for Ontario in his capacity as administrator of the PBGF:** The PBGF guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event of the insolvency of the plan sponsor, in accordance with the Ontario *Pension Benefits Act*, R.S.O. 1990, c. P.8 and applicable regulations. The PBGF is administered by the Superintendent of Financial Services and currently covers over 1,500 defined benefit plans with members and beneficiaries in Ontario.

- 9 -

23.     The other Creditors include:

a) Bondholders, including certain Bondholders which have formed an informal committee comprised of members who purport to represent the interests of holders of bonds issued or guaranteed by NNC, NNL, NNCC and NNI;

b) The UK Pension Claimants, who have asserted Claims and guarantees in respect of NNUK's pension plan deficit for approximately £2.1 billion (approximately $3 billion); and

c) Other unsecured creditors in the U.S. and UK/EMEA, including those in the U.S. represented by the official committee of unsecured creditors of the U.S. Debtors, appointed shortly after the Filing Date, whose current members are the U.S. Pension Benefit Guarantee Corporation and two indenture trustees for certain bond issues held by the Bondholders.

24.     In addition to the Claims and guarantees asserted by Creditors against the Nortel Debtors, a number of Intercompany Claims have been asserted among the Nortel Debtors.

25.     The Courts have yet to fully assess Nortel's global Claims among the Core Party Creditors. However, these Claims are essentially being asserted by employees, bondholders and pension interests, in Canada, the U.S. and UK/EMEA.

# PART IV – FACTS

## A.     Introduction

26.     Nortel was a Canadian corporate icon, with a rich history dating to the late 1800s. Over more than a century, Nortel grew to become a world leader in digital telecommunications technology, operating several Lines of Business and developing a catalogue of patents and next-generation applications in wireless 4G/LTE, data networking, optical, voice, internet, and semiconductor technologies.

27.     Due to an inability to raise capital in the face of the collapse of financial markets in the U.S. and elsewhere beginning in 2008, Nortel commenced the Insolvency Proceedings in Canada, the U.S. and the U.K. on the same date, and ultimately ceased

operations as a going concern and liquidated its assets. Nortel's value was demonstrated by the Business Sale Proceeds and Residual IP Proceeds, which generated Sale Proceeds of approximately $7.3 billion.

## B.    *Innovation and Expansion*

28.    Nortel became a major innovator of intellectual property starting in the post-Second World War period. In 1961, Nortel opened a new research and development ("**R&D**") lab in Ottawa with 42 engineers, which quickly grew to 800 employees and produced a number of successful products. In 1967, Nortel introduced the SP-1 central office switch at EXPO 67, the 1967 world's fair held in Montreal. Other innovations followed, including the SA-1 community dial office, and the Precision Satellite Tracking Antenna.

29.    In the 1970s, Nortel continued to innovate in partnership with Bell Canada under the name Bell-Northern Research Ltd., with major facilities in Ottawa and smaller R&D centres in some of Nortel's Canadian manufacturing facilities.

30.    In or about 1976, Nortel invented, and later marketed, the "digital switching" technology that supported the establishment of the touch-tone telephone. In the 1990s, Nortel developed its fibre optic cable networking business. Nortel continued to innovate and transitioned from traditional landline phone technology and equipment to wireless and digital technology.

31.    Nortel's expansion continued on a global scale with the establishment of manufacturing and distribution centres in the United States and marketing subsidiaries in Europe, Asia and Latin America. Additional manufacturing, marketing and service operations were established throughout the world.

32.    At its zenith in 2000, Nortel was composed of approximately 140 corporations and joint ventures spread across North America, Europe, the Middle East, Africa, Asia, the Caribbean and Latin America and employed over 90,000 employees serving customers and carrying on business in over 150 countries.

## C.   *Lines of Business*

33.     Nortel operated four main Lines of Business that were globally integrated, interconnected and transcended geographic and corporate boundaries.  As at the Filing Date, Nortel's Lines of Business were as follows:

a) Enterprise Solutions helped customers build communications networks in the areas of data, voice, and multimedia communications;

b) Carrier Networks developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises;

c) MEN provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth; and

d) Global Services provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

34.     Nortel's centralized Corporate Support Group served and coordinated all four Lines of Business from Nortel's Canadian headquarters.  The Corporate Support Group included senior management who oversaw and gave direction to the Lines of Business, and also performed functions such as finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

## D.   *Role of Nortel Canada*

35.     NNL played the central role in the supervision, conduct, and accounting and reporting for Nortel's Lines of Business, which operated across several Nortel Entities.

36.     NNL and NNC were also responsible for undertaking the necessary financing that Nortel required, particularly starting in the early 2000s. Nortel made various

acquisitions in the 1990s that put increasing demands on its treasury. Although substantially all of these were share transactions, the payroll, in-process R&D and other operating expenses associated with the acquired businesses required major cash outlays that ultimately required significant debt financing. NNL and NNC undertook the necessary financing for the benefit of the entire Nortel operation.

37.    While at its peak in 2000 Nortel reported approximately $30 billion of annual consolidated revenues, this was followed swiftly by a period of rapid decline in the wake of the bursting dot-com bubble.

38.    From 2001 onwards, Nortel utilized the capital markets as a source of liquidity to fund its operations globally. NNL and NNC bore substantially all of the cost for these financings.

39.    As part of its restructuring efforts, Nortel downsized its operations including its employment base by two-thirds, such that by 2008 Nortel employed approximately 30,000 (down from approximately 90,000 in 2000).

### E.    IP and R&D

40.    Nortel's most valuable asset was its IP. Nortel deliberately vested legal title in all or substantially of all its IP in NNL.

41.    At or around the Filing Date, Nortel held approximately 9,000 patents and patent applications and over 2000 trademarks or trademark applications, the overwhelming majority of which were registered or filed in the name of NNC, NNL or their predecessor corporations.

### F.    Filing and Liquidation

42.    The Nortel Debtors commenced the Insolvency Proceedings in Canada, the United States, the United Kingdom and the EMEA region on January 14, 2009. Soon thereafter, Nortel ceased operating as a going concern and the proceedings very quickly focused on a liquidation of Nortel's assets, starting with the Business Sales.

- 13 -

### 1)    The Business Sales

43.    By approximately September 2010, Nortel had divested itself of most of its operating assets through the Business Sales, which included the following:

  a)  the Layer 4-7 Business Sale;

  b)  the Enterprise Business Sale;

  c)  the CDMA Business Sale;

  d)  the Packet Core Business Sale;

  e)  the MEN Business Sale;

  f)  the GSM Business Sale;

  g)  the CVAS Business Sale; and,

  h)  the MSS Business Sale.

44.    The primary assets sold in the Business Sales consisted of IP, although the sales included other assets such as fixed assets and inventory. Substantially all of the value in the Business Sales was in the IP.

### 2)    The Residual IP Sale

45.    Following the completion of the Business Sales, Nortel retained a significant portfolio of Residual IP. The Residual IP included approximately 6,000 patents and patent applications filed in Canada, the U.S. and other jurisdictions specifically in relation to wireless, wireless 4G, data networking, optical, voice, internet, service provider semiconductors and other applications.

46.    Following an auction featuring nineteen rounds of bidding, the Residual IP was purchased by the Rockstar consortium for approximately $4.5 billion.

47.    The Sale Proceeds resulting from the Business Sales and the Residual IP Sale are currently being held in escrow pending the outcome of this Allocation Proceeding.

# PART V – ALLOCATION POSITION OF THE CCC

## A.    *Allocation by Ownership*

48.    Nortel's IP portfolio included patents, industrial designs, copyrights, trademarks and associated goodwill, trade secrets and confidential information. NNL was the legal owner of all or substantially all of this IP.

49.    Prior to the Sales, Nortel and certain of its subsidiaries entered into agreements addressing the ownership and licensing of IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and such subsidiaries. This IP, together with other IP owned by NNL (including trademarks and any associated goodwill) accounts for a substantial portion of the value of the Sale Proceeds.

50.    These agreements formed the basis of a series of Advanced Pricing Agreements ("**APAs**") wherein tax authorities in various jurisdictions, including Canada, the United States and the United Kingdom, accepted and approved of Nortel's internal transfer pricing practices.

51.    Up to December 31, 2000, each subsidiary receiving a license from NNL (the "**Licensed Subsidiary**") entered into one or more bilateral cost sharing agreements (the "**Cost Sharing Agreements**") with NNL's predecessor, Northern Telecom. The Cost Sharing Agreements specified that NNL owned all IP (excluding trademarks and any associated goodwill, which were in any event predominantly owned by NNL) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries and that the Licensed Subsidiaries received a limited exclusive license, subject to specific field of use limitations. The Cost Sharing Agreements provided that:

   a) Legal title including intellectual property rights to the IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for NNL and the Licensed Subsidiaries vested in and was owned solely by NNL;

b) Licensed Subsidiaries received licenses (i) to make, have made, use, and sell certain Nortel products in and for a prescribed geographic area and (ii) to use the IP described in paragraph (a) above, as necessary or appropriate in connection therewith;

c) The Nortel products that the Licensed Subsidiaries were licensed to make, use and sell were limited to products, software and services manufactured or marketed, or proposed to be manufactured or marketed, at any time by NNL and its subsidiaries, and all components, parts, sub-assemblies and software associated with or incorporated in such products; and

d) The licenses were, within the above scope of the license, exclusive to the Licensed Subsidiaries, royalty-free, and included a right to sublicense others in conjunction with the Licensed Subsidiaries' making, using and selling Nortel Products.

52.    The Cost Sharing Agreements between NNL and the Licensed Subsidiaries were replaced by the MRDA with effect as of January 1, 2001.

53.    Under the MRDA, the parties continued to agree that NNL would own all ·IP (excluding trademarks and any associated goodwill) produced or conceived as a result of R&D by or for the parties (including what was developed pursuant to the Cost Sharing Agreements), and that the Licensed Subsidiaries (referred to as "Licensed Participants" in the MRDA) would continue to receive an exclusive license subject to field of use and other limitations.

54.    The MRDA contained the following provisions related to the ownership and licensing of Nortel IP:

- Article 1(f): "NN Technology" shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill."

- Article 1(g): "Products" means all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, enhancements or other derivatives associated with or incorporated in any of the foregoing."

- Article 4(a): "Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL. In consideration therefor, NNL agrees to enter into an Exclusive License and a Non-Exclusive License with each of the Licensed Participants as set forth in Article 5."

- Article 4(d): "With respect to patentable inventions and copyrightable property encompassed by NN Technology whether in existence at the Effective Date or acquired subsequent to the Effective Date by any Participant pursuant to this Agreement, NNL shall have the exclusive right but not the obligation to file and prosecute the applications in its name for patents, copyrights, mask works, industrial designs, and all other registered forms of intellectual property encompassed by such NN Technology in every country of the world."

- Article 4(e): "Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by others."

- Article 5(a)(i): "To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License")."

- Article 5(a)(ii): To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor,

and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

- Article 14(a): This Agreement shall not be assigned by any Participant except with the written consent of the other Participants.

- Article 14(f): This Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada.

55.   Accordingly, up to and until the completion of the Sales, rights to NN Technology (as defined in the MRDA) were owned by NNL and licensed in the manner described above.

56.   The NN Technology, together with substantially all other IP that was sold or licensed in connection with the Sales, was owned by NNL. The IP applications and registrations in connection therewith were also primarily in the name of NNL.

57.   In relation to the Residual IP Sale, the entirety of the Residual IP Proceeds belongs to NNL. The Residual IP Sale transferred title in patents owned by NNL to Rockstar, after all of Nortel's Lines of Business had been sold. None of the Licensed Participants had any right, title, or legal interest in the Residual IP and, therefore, no consideration was paid by Rockstar for the license rights of the Licensed Participants to make, use, or sell Products (as defined in the MRDA) under the Limited Licenses. The Limited Licenses thus had no value in the context of the Residual IP Sale.

58.   In relation to the Business Sales, the proceeds from the IP attributable to such sales should be allocated primarily to NNL. All or substantially all of the IP transferred in the Business Sales was owned by NNL. The Licensed Participants held Limited Licenses in respect of their own use, but had no right to assign or otherwise transfer their rights under the MRDA or the Limited Licenses granted to them therein. Accordingly, the Limited Licenses had no value, or in the alternative, no material value in the context of the Business Sales. To the extent that any amount of the Sale Proceeds can be attributed to a Limited License, it would be nominal, and in any event could not exceed, and must be much less than, the amount which a Licensed Participant could claim under the residual profit sharing methodology ("**RPSM**") provided in the MRDA, if it was applicable.

- 18 -

59.    The Business Sale Proceeds attributable to assets other than IP should be allocated to the Nortel Debtors according to legal title to the extent discernible and otherwise in accordance with appropriate valuation principles in the context of the Business Sales. Particulars of the ownership and valuation of the non-IP assets will be provided in advance of trial.

B.    *Allocation Pro Rata by Claims*

60.    If it is concluded that legal ownership of the assets giving rise to the Sale Proceeds should not form the basis for an Order in the Allocation Proceeding, then the CCC pleads that the only fair, reasonable, defensible and equitable alternative is to allocate the Global Assets among the Nortel Debtors so as to effect a *pro rata* distribution among Creditors, rateably by valid Claims.

61.    If the Court is inclined to look beyond the strict legal and contractual rights of the relevant Nortel Entities, any attempt to distinguish between the Nortel Entities for the purpose of determining an appropriate allocation quickly becomes a prohibitive exercise. This is evident from an examination of Nortel's highly integrated and multinational business.

1)    **Nortel's Pre-Filing Experience**

62.    Pre-Filing, Nortel was a highly integrated, multinational business that operated substantially without regard to corporate or geographic borders. The following features, among others, illustrate Nortel's integrated, global operations:

a) **Line of Business Organization** – for most purposes, Nortel operated according to Lines of Business. The Lines of Business spanned geographic boundaries and functioned in over a hundred corporate entities incorporated in jurisdictions throughout the world. Nortel's management and employees served dedicated Lines of Business, rather than any particular Nortel Entity. In addition, Nortel's customers, suppliers and trade creditors transacted with various Nortel Entities along Lines of Business;

b) **Regional Organization** -- Nortel organized its trade, supply and customer sales according to regional "hubs", supported by Nortel personnel from various Lines of Business;

c) **Employees Served Global Businesses** -- individual employees were given global identification numbers, served the global Nortel business and their work responsibilities extended beyond the Nortel Entities that employed them. Employees were dedicated to Lines of Business or the Corporate Support Group, regardless of where they resided or worked, or the jurisdiction in which their employer was incorporated. Management and employee performance was evaluated along Lines of Business. Employee incentive bonuses were calculated based on Line of Business and overall global performance, rather than the performance of individual Nortel Entities, and employees reported to the heads of the Lines of Business, who in turn reported to the global corporate head-office management (and, ultimately, to the board of directors) in Canada;

d) **Consolidated Financial Reporting** -- Nortel prepared consolidated financial statements reporting on:

   i.  The financial condition of each Line of Business, including global revenue streams;

   ii. Significant business developments worldwide, including strategic alliances and acquisitions outside Canada; and

   iii. Work-force reductions and restructuring plans implemented across Nortel's global operations.

Nortel's consolidated statements were used to evaluate Nortel's overall global performance and the Lines of Business by management, analysts, lenders, debt purchasers, investors and other stakeholders. Nortel represented that it was one entity, with one vision, one purpose and goal. The "act as one" concept was reflected in Nortel's financial reporting. While Nortel prepared

financial statements at the Nortel Entity level, these statements were prepared primarily for local tax and regulatory requirements;

e) **Centralized Cash Management** – Nortel's central treasury moved funds among the various Nortel Entities in order to fund the operations of the Lines of Business or for tax planning purposes. Some Nortel Debtors were net-users of cash and incurred intercompany debt that was recapitalized from time to time. Nortel utilized the capital markets as a source of liquidity to fund these global operations. However, it was the Canadian Debtors, through NNC and NNL, which bore all or substantially all of the cost of borrowing;

f) **Transfer Pricing** – Nortel adopted a series of complex transfer pricing methodologies in order to allocate profits and losses for tax purposes at arm's length from inter-company receivables and payables. Prior to 2001, Nortel's transfer pricing methodology provided for sharing of intangible property and expenses, including global R&D, pursuant to the Cost Sharing Agreements. Effective 2001, Nortel implemented its RPSM pursuant to the MRDA, for the purpose of allocating Nortel profits based upon each Participant's direct spending on R&D.[4] The cost-sharing and RPSM transfer pricing methodologies included contractual and taxation considerations and were negotiated with various Nortel Entities and revenue authorities in jurisdictions including Canada, the U.S. and the U.K.;

g) **Centralized Management and Control with Line of Business Focus** – Nortel's operations and management were centralized. Decisions were made with a view to Nortel's global operations and across Lines of Business;

h) **Common Boards of Directors** – the same individuals were often members of multiple boards of directors of Nortel Entities. For instance, board members of NNI and NNL also sat on the boards of other Nortel Entities, and boards of

---

[4] From 2001 onward, however, Nortel experienced only losses.

directors of NNUK sat on the boards of directors of various Nortel Entities in the EMEA region;

i) **Centralized Corporate Support with Line of Business Focus** – corporate and support functions (e.g. finance, human resources, legal, treasury, accounting, R&D and information technology) were centralized and served various Nortel Entities across regions and Lines of Business. For example, Nortel's treasury group and the treasurer collected and maintained a global cash balance, which was distributed to Nortel Entities according to their need for cash at any particular time; and

j) **Corporate Debt, Financing and Other Costs** -- NNL and NNC bore the costs, among other things, of raising corporate debt and paying the interest thereon, for the benefit of the global Nortel enterprise. The remaining Nortel Entitles benefited from this financing and were funded from Nortel's centralized treasury, as noted above at subparagraph (e).

63.    Creditors and other stakeholders perceived Nortel as a single and indivisible entity called "Nortel", effectively without regard to geographic or corporate borders.

64.    For instance, Nortel held itself out to its trade creditors as a single, indivisible entity. Nortel utilized an internal purchasing system for its hardware and software production, and for products and services, using four Transaction Control Centres ("**TCCs**"). The TCCs were organized along Lines of Business and acted as "purchasing hubs" for regional sales among groups of Nortel Entities, as illustrated below:

| Line of Business | TCC Purchasing Entity | Region Purchasing For |
|---|---|---|
| **MEN** | NNL<br>NNUK | Americas<br>EMEA & APAC |
| **Enterprise – Voice** | NNL<br>NNUK | Americas & APAC<br>EMEA |
| **Enterprise – Data** | NNI<br>NNUL | Americas & APAC<br>EMEA |

- 22 -

| CDMA | NNL | Global |
| CVAS | NNI | Global |
| GSM | NNSA | Global |

65.    Nortel's purchasing system worked as follows:

    a) a Nortel Entity placed internal purchase orders with its regional sales office;

    b) the purchase order was automatically routed through the TCC responsible for making the purchase;

    c) the TCC contracted directly with the trade creditor to facilitate delivery of the goods to the Nortel Entity that placed the purchase order;

    d) the TCC paid the trade creditor directly;

    e) Nortel allocated the purchase to the Nortel Entity that placed the order or regional sales office through its inter-company accounts.

66.    From the perspective of trade creditors, they dealt with a single indivisible entity, "Nortel", operating through the applicable TCC. Trade creditors entered into master agreements with NNL, on behalf of all Nortel Entities.

    2)    **Nortel's Post-Filing Experience**

67.    Post-Filing, the sale of Nortel's Lines of Business similarly reflected the integrated and intertwined nature of Nortel's operations.

68.    Over the course of the Insolvency Proceedings, Nortel has liquidated substantially all of its assets.

69.    Despite the best efforts of insolvency professionals to untangle the scrambled, highly-intertwined business and affairs of the Nortel Debtors, at a cost of hundreds of millions of dollars, thus far it has been impossible to do so.

70.    No Business Sale purchaser was willing to pay any material amount for any interest in any particular Nortel Debtor. Purchasers bought "Nortel" Lines of Business

including business units, consisting of assets spread across many Nortel Entities in multiple jurisdictions throughout the world.

71.    In its Post-Filing financial statements, Nortel expressly warned of the risk that the U.S. Debtors' estates might be substantively consolidated.  Under the heading "Risk Factors", Nortel stated:

> Some or all of the U.S. Debtors could be substantively consolidated.
>
> There is a risk that an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of NNI, or those of other U.S. Debtors, be substantively consolidated with those of one or more other U.S. Debtors. While it has not been requested to date, we cannot assure you that substantive consolidation will not be requested in the future, or that the U.S. Court would not order it. If litigation over substantive consolidation occurs, or if substantive consolidation is ordered, the ability of a U.S. Debtor that has been substantively consolidated with another U.S. Debtor to make payments required with respect to its debt could be adversely affected. For example, the rights of unsecured debt holders of NNI may be diminished or diluted if NNI were consolidated with one or more entities that have a higher amount of unsecured priority claims or other unsecured claims relative to the value of their assets available to pay such claims. [Emphasis added]

72.    Similarly, reports filed by the Monitor and Canadian Debtors during the Insolvency Proceedings have treated the assets of and claims against the Canadian Debtors as one entity within Canada.

73.    Such recognition of the potential for consolidation by the U.S. Debtors and the treatment of the Canadian Debtors on a consolidated basis inform the approach that must be applied to Nortel globally, which was even more intertwined, interrelated and impossible to unscramble.

74.    There are multiple and overlapping claims by trade creditors across the estates of the Nortel Debtors, which has given rise to the Cross-Border Claims Protocol. For instance, Flextronics Telecom Systems Ltd. ("**Flextronics**"), Nortel's largest supplier, supplied products for multiple Lines of Business, including Enterprise Solutions, Carrier Networks and MEN pursuant to master agreements entered into between Flextronics and NNL. Nortel held itself out to Flextronics, and Flextronics perceived Nortel, as a

single indivisible entity. In November 2009, Nortel agreed to pay Flextronics a certain sum in satisfaction of all Flextronics' claims against all Nortel Debtors. While the payment to Flextronics was made by NNI, the Nortel Debtors agreed to allocate the payment according to the weighted average of certain Business Sale Proceeds allocated to each of the Nortel Debtors, rather than in accordance with the debts owned by each Nortel Debtor to Flextronics. In so doing, Flextronics and Nortel Debtors effectively consolidated their claims *inter se*.

75.     As described above, employees served the global Nortel business with their work responsibilities extending beyond the individual Nortel Entities that technically employed them. Nortel intended to create a global employment relationship between its employees and the various Nortel Entities. Nortel transferred employees among the various Nortel Entities and across geographic regions without breaks in service and changes in the terms and conditions of employment.

76.     The Post-Filing experience of employees was no different. In connection with Nortel's insolvency, employees were told that their employment was being terminated by Nortel *and* its subsidiaries and signed releases in favour of the Nortel Entities.

# PART VI – CONCLUSION

77.     For the reasons set out above, the CCC seeks the Ownership Allocation Order. The most fair, reasonable and juridically justifiable approach to allocation is one based on consideration of legal title to the assets that produced the Sale Proceeds. The legal principles underlying asset ownership are common to all relevant jurisdictions. Nortel's major asset giving rise to the Sale Proceeds was its IP, which was primarily owned by NNL, and the Licensed Participants' Limited License rights had no value in the context of the Sales, or were of *de minimis* value.

78.     Absent adherence to the strict legal and contractual ownership and other rights of the relevant Nortel Entities, there is no supportable basis in law to distinguish between the Nortel Entities in determining an appropriate allocation. Any attempt to restructure the legal ownership of assets and contractual rights agreed to in the MRDA and its predecessor agreements would be prohibitively costly and would prejudice Creditors,

- 25 -

particularly the former and disabled employees and pensioners in Canada that helped grow and run Nortel's global business for many years.

79.     For these reasons, the CCC pleads, in the alternative to the Ownership Allocation Order, that the only fair, reasonable and equitable allocation of Nortel's Global Assets is pursuant to the Equitable Allocation Order.

80.     The benefit of a *pro rata* allocation for all Creditors outweighs any potential prejudice. For example, in the case of Bondholders, when they voluntarily undertook to purchase Nortel bonds, it was expressly disclosed that they risked elimination of the cross-border guarantees that formed part of such bonds. These were sophisticated investors who knew or ought to have known the extent of the intermingling of Nortel's assets and intertwined nature of its business across legal, operational and geographical borders. Moreover, the bonds have been actively trading Post-Filing, their acquisition costs have varied, and Bondholders have a variety of mitigation tools at their disposal not available to other Creditors, in particular employee Creditors.

81.     Nortel's employees contributed significant value on the promise that Nortel would provide them with pensions, health, disability and other benefits, on which such employees relied and depended as part of their compensation for their contributed value. Current and former employee pensions and benefits have been severely impacted during the course of the Insolvency Proceedings. Any prejudice asserted by financial creditors pales in contrast to the prejudice actually and already suffered by Nortel's retired, disabled and other former employees.

DATE:  May 16, 2013

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Susan Philpott / Ari Kaplan
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
        sphilpott@kmlaw.ca
        akaplan@kmlaw.ca

Lawyers for the Canadian Former Employees and
Disabled Employees through their court appointed
Representative


**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel: 416.495.3776
Fax: 416.495.3786

Email:  barry.wadsworth@caw.ca

Lawyers for the Canadian Autoworkers Union


**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON  M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel:    416.214.5213/5206
Fax:    416.214.5413/5400

Email: arthur.jacques@shibleyrighton.com
        thomas.mcrae@shibleyrighton.com

Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J. Boake
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
          jgage@mccarthy.ca
          bboake@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as administrator of
the Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
          lily.harmer@paliareroland.com
          max.starnino@paliareroland.com

Lawyers for the Superintendent of Financial Services
as Administrator of the Pension Benefits Guarantee
Fund

# GLOSSARY OF TERMS
## (CCC Pleading)[1]

"**Allocation Proceeding**" means the proceedings before the Courts with respect to the allocation of Nortel's Global Assets among the Nortel Debtors and ultimately the Creditors.

"**APAs**" is defined in paragraph 50.

"**Bondholders**" means the bondholders that hold claims issued and/or guaranteed by NNC, NNL, NNI, and NNCC.

"**Business Sales**" is defined in paragraph 4.

"**Business Sale Proceeds**" is defined in paragraph 4.

"**Canadian Debtors**" means Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

"**Carrier Networks**" means the Nortel line of business which developed wireless networking technology for mobile smartphones, cell phones and other wireless devices for sale to cable operators and to other service providers who offered mobile voice, data and multimedia communications services to individuals and enterprises.

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

"**CCC**" means the Canadian Creditors Committee, a committee of major creditors having claims against the Canadian Debtors, comprised of: the Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union; Morneau Shepell Ltd., as Administrator of Nortel's Canadian registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtors.

"**Claims**" means claims against any one or more of the Nortel Debtors as at the Filing Date, without duplication (whether pursuant to a guarantee, joint liability or otherwise), excluding Intercompany Claims and claims for post-filing interest, make-whole payments and call premiums.

---

[1] All singular terms will have the same meaning in plural.

"**Code**" means the United States Bankruptcy Code, Title 11 of the United States Code.

"**Corporate Support Group**" means the centralized services that were largely coordinated from Nortel Canada's headquarters, and was made up of senior management who oversaw and gave direction to Lines of Business and performed functions which included finance, treasury, legal, accounting, human resources and governance, information technology and manufacturing.

"**Cost Sharing Agreements**" is defined in paragraph 51.

"**Courts**" means the Ontario Superior Court of Justice (Commercial List) and the U.S. Court.

"**Creditors**" means all creditors having made Claims.

"**EMEA**" means the regions of Europe, Middle East and Africa where Nortel operated.

"**Enterprise Solutions**" means the Nortel line of business which helped customers build communications networks in the areas of data, voice, and multimedia communications.

"**Equitable Allocation Order**" is defined in paragraph 5(b).

"**Filing Date**" is defined in paragraph 7.

"**Flextronics**" is defined in paragraph 74.

"**Global Assets**" means the Sale Proceeds and the Residual Assets.

"**Global Services**" means the Nortel line of business which provided management and professional services to help customers design and deploy multi-vendor, multi-technology networks for wireline and wireless carriers, cable operators and mobile virtual network operations.

"**GSM**" means the global system for mobile communications infrastructure business operated by Nortel.

"**IFSA**" is defined in paragraph 4.

"**Insolvency Proceedings**" is defined in paragraph 7.

"**Intercompany Claims**" means all claims of any Nortel Debtor against another Nortel Debtor.

"**IP**" means any and all intangible assets, including but not limited to patents, industrial designs, trade secrets, copyrights and applications and registrations thereof, derivative works, technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information, and trademarks, and any associated customer contracts and goodwill.

"**Licensed Participants**" means the holders of Limited Licenses as at the Filing Date.

"**Limited License**" means the limited, royalty-free licenses that were granted by NNL to the Licensed Participants pursuant to the MRDA to make, use and sell Products and to use NN Technology as necessary or appropriate in connection therewith.

"**Licensed Subsidiaries**" is defined as paragraph 51.

"**Lines of Business**" means the Enterprise Solutions, Carrier Networks, MEN and Global Services businesses operated by Nortel.

"**MEN**" means the Nortel line of business which provided high-speed carrier grade Ethernet transport capabilities and optical networking solutions for data-intensive video, including internet video, residential broadcast TV, video-on-demand and new wireless multimedia requiring increasing bandwidth.

"**Monitor**" means Ernst & Young Inc. in its capacity as the court- appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**MRDA**" is defined at paragraph 11.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor, and ultimate parent of Nortel.

"**NNI**" means Nortel Networks, Inc., a U.S. Debtor.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor, and the operating parent of Nortel.

"**NN Technology**" is defined in the MRDA and in paragraph 54.

"**NNUK**" means Nortel Networks UK Limited, a UK/EMEA Debtor.

"**Nortel**" means NNC and all of its subsidiaries and affiliates, worldwide, including any interests in any joint-ventures, and includes all Nortel Debtors and all Nortel Entities.

"**Nortel Debtors**" means the Canadian Debtors, the U.S. Debtors and the UK/EMEA Debtors, collectively.

"**Nortel Entity**" means any Nortel entity, including subsidiaries and affiliates.

"**Northern Telecom**" means Northern Telecom Limited, a predecessor of NNL.

"**Ownership Allocation Order**" is defined in paragraph 5(a).

"**PBGF**" means the Pension Benefits Guarantee Fund, which guarantees pension benefits of Ontario members and beneficiaries under covered single-employer defined benefit plans in the event the plan sponsor becomes insolvent, as provided by the *Pension Benefits Act,* R.S.O. 1990, c. P.8, as amended, and related regulations.

"**Post-Filing**" is defined in paragraph 18.

"**Pre-Filing**" is defined in paragraph 17.

"**Products**" is defined in the MRDA and in paragraph 54.

"**R&D**" is defined in paragraph 28.

"**Residual Assets**" is defined in paragraph 4.

"**Residual IP**" is defined in paragraph 4.

"**Residual IP Proceeds**" is defined in paragraph 4.

"**Residual IP Sale**" is defined in paragraph 4.

"**Rockstar**" is defined in paragraph 4.

"**RPSM**" is defined in paragraph 58.

"**Sale Proceeds**" means the proceeds of sale generated by the Post-Filing transactions that included the Business Sales and the Residual IP Sale, which generated approximately $7.3 billion.

"**Sales**" means the Business Sales and Residual IP Sale.

"**TCCs**" is defined in paragraph 64.

"**UK/EMEA Debtors**" means Nortel Networks UK Limited ("NNUK") Nortel Networks (Ireland) Limited; Nortel Networks S,A,; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o,; Nortel Networks Hispania, SA, Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o,; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV and Nortel Networks France S.A.S.

"**UK Pension Claimants**" means the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware.

- 32 -

"**U.S. Debtors**" means Nortel Networks Inc., ("NNI") Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.

- 33 -

TO:    THE SERVICE LIST APPENDED

Court File No. 09-CL-7950

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-35, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, et. al.

ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceeding commenced at Toronto

ALLOCATION POSITION OF THE
CANADIAN CREDITORS' COMMITTEE
(THE "CCC")

**KOSKIE MINSKY LLP**
Mark Zigler / Susan Philpott / Ari Kaplan
Lawyers for the Canadian Former Employees and Disabled
Employees through their court appointed Representative

**CAW- CANADA LEGAL DEPARTMENT**
Barry Wadsworth
Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**NELLIGAN O'BRIEN PAYNE LLP**
Arthur O. Jacques / Thomas McRae / Steve Levitt
Lawyers for active and transferred employees of
Nortel Canada

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / James D. Gage / Barbara J. Boake
Lawyers for Morneau Shepell Ltd., as administrator of the
Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
Lawyers for the Superintendent of Financial Services as
Administrator of the Pension Benefits Guarantee Fund

# TAB 3

Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE

(COMMERCIAL LIST)


IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,

R.S.C. 1985, c. C-36, AS AMENDED


AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF

NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,

NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS

INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY

CORPORATION


APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT

ACT, R.S.C. 1985, c. C-36, AS AMENDED


**CANADIAN CREDITORS' COMMITTEE (THE "CCC")
RESPONSE TO CORE PARTIES' OPENING ALLOCATION POSITIONS**

**TABLE OF CONTENTS**

PART I – GENERAL RESPONSE AND OVERVIEW ........................................................... 3

PART II – SPECIFIC RESPONSES TO CORE PARTY POSITIONS............................... 7

    A.     Response to US Interests................................................................................ 7

    B.     Response to EMEA Debtors..........................................................................10

    C.     Response to UK Pension Claimants .............................................................14

- 3 -

# PART I – GENERAL RESPONSE AND OVERVIEW

1.      The Canadian Creditors Committee (the "CCC")[1] responds to the opening allocation positions, submissions and pleadings filed on May 16, 2013 by the following Core Parties:

   a) the US Debtors, UCC, Bondholder Group and related joinders (the "US Interests");

   b) the EMEA Debtors;

   c) the UK Pension Claimants;

   d) the Monitor and Canadian Debtors; and

   e) Wilmington Trust, National Association.

2.      Unless as otherwise expressly admitted or stated herein, the CCC denies the assertions by all other Core Parties and puts them to the strict proof thereof.

3.      The CCC repeats and relies on its request for an **Ownership Allocation Order**. In response to the opening positions of the other Core Parties:

   a) all Core Parties agree that a substantial majority of the Sale Proceeds is attributable to IP transferred in the Sales;

   b) all Core Parties acknowledge (and no Core Party disputes) that NNL is the legal title holder of substantially all of the IP sold, pursuant to long-standing agreements among Nortel Entities;

   c) the Monitor, Canadian Debtors and Wilmington Trust agree with the CCC that the substantial majority of Sale Proceeds attributable to IP must be allocated to NNL. The Limited Licenses surrendered by the

---

[1]  Unless defined herein, all capitalized terms have the meanings ascribed to them in the Glossary of Terms annexed to the Allocation Position of the CCC filed on May 16, 2013.

- 4 -

    Licensed Participants had no value in the context of the Residual IP Sale and a limited amount at best is attributable to the Limited Licenses in the context of the Business Sales;

d) the US Interests and the EMEA Debtors fundamentally mischaracterize the rights of the Licensed Participants and significantly overstate the amounts attributable to the Limited Licenses relinquished in connection with the Sales;

e) the US Interests place undue emphasis on the concept of fair market value. The fair market value of Nortel's assets has already been determined by the purchasers of the Residual IP and the Lines of Business and approved by the Courts and Nortel. The issue in this Allocation Proceeding is how to allocate the Sale Proceeds, the substantial majority of which is attributable to IP owned by NNL;

f) the other Core Parties knew that NNL owned the IP. They knew this even as they engaged with NNL in the credit and commercial marketplace, Pre-Filing and Post-Filing; and

g) the attempts by certain Core Parties to create an ownership interest in the IP where none before existed directly contradicts the MRDA, a contract on which such Core Parties otherwise rely.

4.    The CCC relies on and repeats its request, in the alternative, for an **Equitable Allocation Order**. In response to the opening positions of the other Core Parties:

a) if the Courts determine that legal title should not form the basis for allocation of the Sale Proceeds, the only fair, reasonable, defensible and equitable remedy is to allocate the Global Assets among the Nortel Debtors so as to effect a distribution to Creditors rateably by valid Claims;

b) the UK Pension Claimants' position is allocation through "equitable distribution" based on a "universal treatment of the proven creditors'

claims" [UK, paras. 58-59]. This position is substantially aligned with the CCC's alternative request for an Equitable Allocation Order;

c)  the US Interests and the EMEA Debtors make numerous statements directly supportive of the CCC's Equitable Allocation Order;

d)  the US Interests further assert that an "enterprise-wide" approach was necessary to effect the Business Sales because the business units disregarded geographic and corporate boundaries within the Nortel multinational corporate enterprise group;

e)  the framework, operations and dealings among Nortel's multinational enterprise group are directly aligned with decisions of US, UK and Canadian courts sustaining enterprise group substantive consolidation, and with proposals being considered for adoption by international governmental and multi-governmental bodies including the EU Parliament, UNCITRAL, the World Bank and the IMF. The US Interests do not address this law and policy in their multinational enterprise group position;

f)  in asserting that they "contributed" to Nortel's overall value and, therefore, that the Sale Proceeds should be allocated in a manner that ignores the parties' bargained-for contractual rights and obligations, the US Interests directly reject their own contention that the individual Nortel Entities' "separate and legally distinct" nature must be respected;

g)  a number of Core Parties suggest that the Courts should allocate some or all of the Sale Proceeds based on the Nortel Debtors' direct or indirect contribution to Nortel's IP[2]. It would be prohibitive, if not impossible to allocate the Sale Proceeds on this basis;

---

[2] EMEA Debtors, para. 32: R&D was "interrelated and coordinated" and "the RPEs created and exploited IP on a joint and collective basis"; US Debtors/UCC, p. 10: "substantial R&D also was

h) throughout their pleadings, the US Interests and EMEA Debtors make bald assertions without pleading any facts in support thereof, let alone facts pleaded with particularity[3]. The CCC rejects these bald contentions, has pleaded facts in its opening allocation position (the "CCC Allocation Position") refuting many of them, and will establish those and additional negating facts at trial;

i) the information provided to purchasers of the Bonds and to other Nortel investors reflects Nortel as a global enterprise, not each Nortel Entity's specific operations. Indeed, the financial statements relied upon by the US Debtors/UCC to support "separateness" expressly caution that they are not representative of each Nortel Entity's operations and cannot be relied upon for such purposes;

j) contrary to the assertion by the US Debtors and UCC [US, p.26], none of the US Debtors' general unsecured creditors, including bondholders, is entitled in whole or in part in accordance with legal or equitable principles to any claims for Post-Filing interest, make whole payments, or any similar claims; and

k) Core Party Wilmington Trust National Association wholly supports and adopts the CCC's Allocation Position, namely, the Ownership Allocation Order and, in the alternative, the Equitable Allocation Order. Wilmington Trust is an indenture trustee and financial creditor of NNL. This creditor's support for the CCC Allocation position is a complete answer to the statement of the US Debtors and UCC [p.4] that "those

---

conducted by Nortel's United States [and EMEA] affiliates".

[3] For example, "NNI alone provided credit support for substantially all of the Nortel group's public debt" [US, p.3]; "That Nortel was a multinational enterprise comprised of separate legal entities was recognized and relied on, repeatedly, by the financial markets and key counterparties" [US, p.6]; and the US Debtors' creditors must be "paid in full, including with post-petition interest" [US, p.26].

that lend money" expected that NNI would be the driver of Nortel's value.

5.      In summary, the facts of this case including the facts pleaded by the other Core Parties support the CCC Allocation Position. If the Courts are unable to allocate the Sale Proceeds based upon the parties' express legal and contractual rights concerning ownership of assets, equitable consolidation should be ordered.

# PART II – SPECIFIC RESPONSES TO CORE PARTY POSITIONS

## A.      Response to US Interests

6.      The US Interests instruct the Courts that they *must* allocate the Sale Proceeds to each of the Nortel Debtors according to the fair market value of assets and rights relinquished in the Sales [US, opening paragraph]. The US Interests then immediately ask the Courts to ignore the legal ownership of such assets and rights and to fabricate US Debtor ownership based on inappropriate, inaccurate and incomplete methodologies.

7.      The US Debtors/UCC erroneously characterize the Limited Licenses held by NNI as "enhanced" and akin to legal ownership of IP. In fact, the Limited Licenses held by the Licensed Participants were subject to very specific field of use limitations set out in the MRDA and described in the CCC's opening Allocation Position at paragraphs 11-12 and 53-55.

8.      The Limited Licenses were exclusive licenses for the use of NN Technology.  As with any license, the Limited Licenses did not confer any interest or property in the patent licensed. Simply put, the Limited Licenses permitted NNI to perform the acts specified in the license, coupled with a covenant by NNL not to allow any other person permission to do the same act for the duration of the license. There is no support for the proposition that the Limited Licenses

conferred legal or proprietary interests in the NN Technology, or were "enhanced" in any way.

9.     The US Debtors/UCC erroneously state [p.12] that NNL's interest in the IP rights of the Licensed Participants "is indirect and a function of the value of NNL's equity ownership". This is patently false. NNL's interest in the IP was direct and expressly set out in s. 4 of the MRDA. Section 4 of the MRDA provided that "[l]egal title to any and all NN Technology" vested in NNL. The Limited Licenses simply granted leave to the Licensed Participants to make, use and sell Nortel products embodying the NN Technology exclusively in prescribed territories and non-exclusively elsewhere.[4]

10.    The US Debtors/UCC state throughout their Allocation Position that substantially all of the patents transferred in the Residual IP Sale were registered in the United States.[5] The jurisdiction in which patents were registered is irrelevant to the allocation of the Residual IP Proceeds.

11.    As described at paragraphs 13, 45-47 and 57 of the CCC's Allocation Position, the Residual IP Sale involved the sale of Nortel's residual patent portfolio separate from Nortel's Lines of Business. NNL held legal title to substantially all of the patents transferred in the Residual IP Sale regardless of where they were registered, and this was the substance of what Rockstar purchased. As the non-assignable Limited Licenses were merely to make, use

---

[4]   At page 12, footnote 12 of their Allocation Position, the US Interests rely on s. 9(b) of the MRDA in support of their contention that the Licensed Participants "owned" the Nortel IP in their respective jurisdictions. Section 9(b) of the MRDA provides no support for this contention. Section 9(b) simply provides that "upon expiry or termination of the MRDA, each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and in particular, the rights granted to it in Article 5 as though this Agreement had continued."

[5]   The US Interests also rely on NNI's alleged historical contributions to R&D and the location in which patents are filed in support of their claim to "the substantial majority" of the Sale Proceeds. The jurisdiction in which a patent is filed bears no relationship to and is not indicative of any contribution by entities in that jurisdiction towards the development of technology covered by that patent. For example, technology can be invented in one jurisdiction and the patents could be filed in another for commercial purposes.

and sell Nortel products embodying the licensed technology, Rockstar did not pay any consideration in respect of the relinquishing of these licenses.[6]

12.    At pages 2-3 and 14-17 of their Allocation Position, the US Debtors/UCC point to NNI's alleged contributions to revenue, cash flow, R&D funding and credit support for debt financing.[7] The US Interests have overstated their contributions by including both R&D and transfer pricing payments made by NNI. More fundamentally, these contributions do not bear on the ownership of the IP or the portion of the Sale Proceeds, if any, attributable to the Limited Licenses relinquished by NNI in the Sales. As discussed above and in the CCC's Allocation Position, the Limited Licenses held by the Licensed Participants had no value, or no material value, in the context of the Sales.

13.    The US Debtors/UCC rely [pp. 13-14] on s. 11 of the MRDA in support of their assertion that the Licensed Participants are entitled to "fair market value" for the Limited Licenses surrendered on exiting from the MRDA. In fact, the MRDA expressly provided that these Insolvency Proceedings would *not* trigger an automatic termination as currently proposed by the US Debtors/UCC. As the US Debtors/UCC concede [p. 13, footnote 13], the Fourth Addendum to the MRDA dated December 31, 2008 expressly provided that "notwithstanding anything to the contrary in the Agreement, in the event of the occurrence of an event described at Section 11(c)(iv) [bankruptcy, insolvency, receivership or liquidation] no Participant affected by such event shall be automatically terminated from participation in the Agreement."

14.    The US Debtors/UCC misstate the issue in this Allocation Proceeding. The issue is not whether FMV is applicable, but rather, how to allocate the Global Assets among the Nortel Entities.

---

[6] It is noteworthy that the EMEA Debtors contend at paragraphs 77 and 81 of their Allocation Position that the Residual IP was purchased by Rockstar for strategic reasons.

[7] At pages 3 and 26-27 of their Allocation Position, the US Debtors/UCC reference NNI's alleged transfer pricing payments and its R&D expenses between 2001 and 2009.

15.    As stated in the CCC Allocation Position, ownership of all or substantially all of the Sales Proceeds can be determined:

a)  NNL invented the digital switching technology that breathed life into Nortel in the 1970s; and,

b)  as reflected in the agreements that have governed Nortel's operations since the time of the formation of NNI (f/k/a Northern Telecom, Inc.) in the 1970s, NNL has owned all IP subject only to Limited Licenses that were of no value in the context either the Residual IP Sale or the Business Sale.

16.    As a result of the foregoing:

a)  all of the proceeds of the Residual IP Sale are allocable to NNL, in the same way that if legal ownership is respected, (i) NNI is entitled to the cash in its bank account as of the Filing Date and to the proceeds of sale of the Richardson facility in Texas, and (ii) NNUK is entitled to the cash in its bank account on the Filing Date and the proceeds of sale of the Maidenhead facility in England;

b)  the Sale Proceeds derived from the Business Sales attributable to IP (which is the majority thereof) are also primarily allocable to NNL; and

c)  the portion of the Sale Proceeds derived from the Business Sales attributable to assets other than IP are allocable among the Nortel Debtors in accordance with legal title to the extent discernible and otherwise in accordance with appropriate valuation principles.

## B.    *Response to EMEA Debtors*

17.    The EMEA Debtors claim entitlement to the Sale Proceeds on the basis of beneficial ownership and equitable principles including resulting trust, unjust enrichment and proprietary estoppel. As explained below, these arguments have no merit.

18.    The CCC denies that the EMEA Debtors are entitled to the Sale Proceeds claimed and puts the EMEA Debtors to the strict proof thereof.

### 1)    "Beneficial Ownership"

19.    The EMEA Debtors claim that the Sale Proceeds attributable to IP should be allocated to NNL and the Licensed Participants on the basis of "beneficial ownership", determined by measuring relative contributions of Nortel Debtors to R&D. While the EMEA Debtors reject the strict application of RPSM as a construct to allocate the Sale Proceeds, they nonetheless contend that arm's length transfer pricing principles should apply.

20.    The RPSM was a transfer pricing methodology which was implemented by Nortel to allocate the costs and benefits of R&D conducted by Nortel, on an arm's length basis. Neither the RPSM nor the arm's length principle determined the ownership of Nortel's IP or the allocation of the Sale Proceeds attributable thereto. As discussed above and in the CCC's Allocation Position, legal title to any and all NN Technology was indivisible and vested exclusively in NNL. The Licensed Participants held no legal or proprietary interest in the NN Technology by virtue of their contributions to R&D. The alleged contributions of NNUK, NNIR and NNSA to Nortel's R&D (which are not admitted) therefore have no relevance to the allocation of the Sale Proceeds.

21.    At paragraphs 53-54 of their Allocation Position, the EMEA Debtors rely upon the recitals to the MRDA in support of their claim to Sale Proceeds attributable to IP. There is no merit to this position. The recitals do not override the operative provisions regarding legal title to NN Technology and the specific field of use limitations of the Limited Licenses in s. 5 of the MRDA[8] and do not create any legal or proprietary interest in IP in favour of the EMEA Debtors and do not support their claims.[9]

---

[8] The EMEA Debtors concede that the MRDA was not "a document designed to dictate allocation of the sale proceeds on the disposal of any of the Nortel businesses" (para. 52).

[9] The first recital, relied upon by the EMEA Debtors at paragraph 53 of their Allocation Position, reads as follows:

WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its

- 12 -

## 2)    Resulting Trust

22.    Contrary to the allegations of the EMEA Debtors at paragraphs 59-60 of their Allocation Position, the presumption of resulting trust has no application. Such an interest cannot arise as it would contradict the express terms of the MRDA, which terms were intended to apply to the Licensed Participants. There was also no gratuitous transfer of assets by NNUK, NNIR or NNSA to NNL at any time.

23.    Title to the IP was not held by NNL in trust for the benefit of the Licensed Participants and the Licensed Participants did not contribute to the acquisition of title to NNL's IP. The Licensed Participants held non-assignable Limited Licenses to make, use or sell Nortel products embodying the licensed technology only and had no legal or proprietary interest that would give rise to a resulting trust.

24.    The Licensed Participants signed onto the MRDA and its predecessor agreements and received access to NN Technology, in exchange for, among other things, the vesting of IP in NNL. The Licensed Participants received access to NN Technology, the opportunity to share in profits generated by that technology through the RPSM, and the benefits of being part of a stronger and more competitive corporate enterprise group.

---

contribution to that R&D activity in the context in the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits. [Underlining added.]

This recital makes clear that the RPSM was chosen by Nortel as the best available arm's length measure for the purposes of pricing intercompany R&D. The recital does not suggest that ownership of Nortel's IP is split based on the Participant's relative contributions to R&D.

At paragraph 54 of their Allocation Submission, the EMEA Debtors rely upon a recital in an addendum to the MRDA dated December 14, 2007, which stated that "(i) each Participant holds and enjoys equitable and beneficial ownership of NN Technology; and (ii) this addendum continues each Participants' rights and obligations in the NN Technology." This recital was not made as an amendment to the MRDA and therefore does not have contractual force to modify the substance of the MRDA. The Third Addendum to the MRDA effective January 1, 2006 did not contain this recital. Furthermore, and in any event, any equitable or beneficial interest possessed by the Licensed Participants under the MRDA would have been limited to the Limited Licenses themselves and did not give rise to a legal or proprietary interest in the NN Technology.

- 13 -

### 3)    Unjust Enrichment

25.      There has been no unjust enrichment as alleged at paragraphs 61-66 of the Allocation Position of the EMEA Debtors. There was no agreement or common intention that NNUK, NNIR and NNSA would obtain a "beneficial interest" in IP by reason of their contributions to R&D. The agreement and common intention was expressed in the clear language of the MRDA, pursuant to which legal title to the NN Technology vested exclusively in NNL. NNL was not enriched and NNUK, NNIR and NNSA did not suffer any corresponding detriment by reason of the relative contributions of the parties to R&D. In fact, NNUK, NNIR and NNSA specifically benefited from the royalty-free Limited Licenses granted by NNL to make, use and sell Nortel products embodying the licensed technology, as illustrated by the significant cash reserves available to those Nortel Entities as at the Filing Date.

26.      In any event, the express agreement of NNUK, NNIR and NNSA to vest any and all NN Technology in NNL constitutes a juristic reason for any enrichment, which enrichment is specifically denied.

27.      There is no basis in law or in equity to impose a constructive trust.

### 4)    Proprietary Estoppel

28.      The EMEA Debtors' claims based on proprietary estoppel at paragraphs 67-68 of their Allocation Position have no merit. NNL did not encourage NNUK, NNIR or NNSA to believe that it would obtain a proprietary interest in the NN Technology. There was no detrimental reliance by NNUK, NNIR or NNSA to the knowledge of NNL and NNL did not take unconscionable advantage of NNUK, NNIR or NNSA.

### 5)    Alleged Non-Arm's Length Transactions

29.      The CCC specifically denies the EMEA Debtors' allegations of non-arm's length transactions, including the allegations contained in paragraphs 69-73 of their Allocation Position and puts the EMEA Debtors to the strict proof thereof.

### 6)     Value of Non-IP Assets

30.     The CCC specifically denies that the EMEA Debtors are entitled to the amounts claimed in respect of fixed assets and inventory and customer assets sold in the Business Sales and puts the EMEA Debtors to the strict proof thereof.

## C.   *Response to UK Pension Claimants*

31.     The CCC agrees with and supports the allocation position of the UK Pension Claimants to the extent that it is consistent with and supportive of the Equitable Allocation Order proposed by the CCC. The CCC denies the balance of the UK Pension Claimants' submissions.

32.     The CCC accepts and agrees with the UK Pension Claimants that:

a) Nortel was run as one global business, with operations that spanned corporate and geographic borders;

b) Nortel was highly integrated and operated as one global enterprise;

c) employees involved in research and development, manufacturing support, distribution, and other functions, collaborated to meet customer demands associated with each of the Lines of Business, and revenues booked by a particular Nortel Entity were the product of this collaborative effort; and

d) stakeholders dealt with Nortel as a group, and not with individual Nortel entities.

33.     The UK Pension Claimants are wrong when they suggest that it was recognized as part of the Sales that the IP was owned jointly by more than one debtor, and when they assert that ownership of the Sales Proceeds cannot be determined. To the contrary, title to the Sale Proceeds and to the IP in particular is determinable, as described above at paras. 15-16 and in the CCC Allocation Position.

34.     What was recognized as part of the Sales was that the Lines of Business crossed corporate and geographic borders, no purchaser was interested in buying part of a Line of Business, and the expedient and value maximizing

- 15 -

approach was to complete the Sales and postpone disputes over the allocation of the proceeds.

35.     The UK Pension Claimants are wrong to the extent that they suggest that NNUK or the pensions sponsored by NNUK were dealt with unfairly in the Nortel enterprise.  In particular and without limitation:

a)  NNUK contributed very little to Nortel's global enterprise.  In the early 1990s, Nortel's Canadian parent made a number of acquisitions as part of its plan to expand into the European market, including the acquisition of STC Plc ("STC"), at a cost of approximately $2.5 billion in cash.  Nortel's plan was to use STC's existing business as a platform to market Nortel's superior digital switching technology in England, including to STC's existing customer British Telecom.  Unfortunately, the plan was not effective.  STC's lasting contribution to Nortel has turned out to be a large legacy pension obligation, and the public debt issued to finance the $2.5 billion acquisition;

b)  the NNUK Pensions were not dealt with wrongfully or even unfairly by Nortel;

c)  the NNUK Pensions were administered by the U.K. Pension Fund Policy Committee (the "UK PFPC"), which was comprised mainly and perhaps entirely of NNUK employees.  For example, Gareth Pugh, who is mentioned in the UK Pension Claimants' pleading, chaired the UK PFPC for a period time. Mr. Pugh was a UK resident, a former STC employee, and the controller for EMEA;

d)  the decision to take contribution holidays in respect of the NNUK pension plan was:

i.   made by the UK PFPC in consultation with its actuary, Watson Wyatt, which was completely independent from Nortel and from the actuary for any other plans administered by Nortel;

ii.  in accordance with applicable pension regulations, having regard to the financial position of the pension plan at the time;

   iii. consistent with the treatment of the Canada and the US pension plans, in respect of which contribution holidays were also taken at that time; and,

   iv. not contentious;

 e) furthermore, it should not be overlooked that *voluntary* contributions to the NNUK pension plan were made in or about 2002-2003, at a financially difficult time for the Nortel group;

 f) the UK Pension Claimants' assertion that NNUK did not operate as an independent freestanding business and lacked corporate independence misses the point: none of Nortel Entities operated as an independent freestanding business and all of the Nortel Entities lacked corporate independence. The Nortel Entities, including each of NNUK, NNSA, NNI, and NNL legitimately and properly worked in common cause to support the objectives of the Lines of Business;

 g) NNC and NNL did not order Nortel's affairs to ensure that NNI remained financially strong in order to make NNI appear to be a credit worthy guarantor of NNC and NNL debt. NNI was a credit worthy guarantor because it was one of the North American operating entities (where the debt was raised), but did not directly hold any of Nortel's debt; and

 h) the "financial assurances" allegedly provided by the Canadian Debtors to the UK Pension Claimants were restricted to the terms of the limited guarantees of the amounts owing to the NNUK pension plan, the enforceability of which is not admitted by the CCC.

36.   The CCC recognizes that an allocation consistent with the contracts that governed Nortel might generate a result that is more favourable to some creditors than others. To the extent that the UK Pension Claimants are suggesting that the Courts exercise their equitable discretion to prevent that

result by ordering an allocation resulting in a common recovery to all Nortel creditors (as would be the case if the Nortel Debtors were substantively consolidated), the CCC supports the UK Pension Claimants' position.

37.     The Courts should not deprive the Canadian Debtors and their creditors of the benefit of Nortel's contractual framework including the ownership of its IP and simultaneously impose the burden of the other contracts on the Canadian Debtors which would allow other stakeholders the benefits of all of their asserted claims, such as the UK Pension Guarantee, the Bond guarantees, and the cash generated by operations.

- 18 -

DATE:  May 29, 2013

**KOSKIE MINSKY LLP**
20 Queen Street West, Suite 900
Toronto, ON  M5H 3R3

Mark Zigler / Susan Philpott / Ari Kaplan
Tel:  416.595.2090
Fax: 416.204.2877

Email: mzigler@kmlaw.ca
       sphilpott@kmlaw.ca
       akaplan@kmlaw.ca

Lawyers for the Canadian Former Employees
and Disabled Employees through their court
appointed Representative

**CAW-CANADA LEGAL DEPARTMENT**
205 Placer Court
Toronto, ON  M2H 3H9

Barry Wadsworth
Tel:  416.495.3776
Fax: 416.495.3786

Email:  barry.wadsworth@caw.ca

Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**w/ NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, ON   M5H 3E5

Arthur O. Jacques/ Thomas McRae
Co-Counsel: Janice Payne / Steve Levitt
Tel:    416.214.5213/5206
Fax:    416.214.5413/5400

Email: arthur.jacques@shibleyrighton.com
      thomas.mcrae@shibleyrighton.com

Lawyers for active and transferred employees
of Nortel Canada

**McCARTHY TÉTRAULT LLP**
TD Bank Tower, Suite 5300
Toronto Dominion Centre
66 Wellington Street West
Toronto ON M5K 1E6

R. Paul Steep / James D. Gage / Barbara J.
Boake
Tel:  416.601.7998
Fax: 416.868.0673

Email: psteep@mccarthy.ca
        jgage@mccarthy.ca
        bboake@mccarthy.ca

Lawyers for Morneau Shepell Ltd., as
administrator of the Nortel Canada registered
pension plans


**PALIARE ROLAND ROSENBERG
ROTHSTEIN LLP**
155 Wellington Street West, 35th Floor
Toronto, ON  M5V 3H1

Ken Rosenberg / Lily Harmer / Massimo
Starnino
Tel:  416.646.4300
Fax: 416.646.4301

Email: ken.rosenberg@paliareroland.com
        lily.harmer@paliareroland.com
        max.starnino@paliareroland.com

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension
Benefits Guarantee Fund

- 20 -

TO:    THE SERVICE LIST APPENDED

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-35, AS AMENDED

Court File No. 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, et. al.

---

**ONTARIO SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

Proceeding commenced at Toronto

---

**CCC RESPONSE TO CORE PARTIES'
OPENING ALLOCATION POSITIONS**

---

**KOSKIE MINSKY LLP**
Mark Zigler / Susan Philpott / Ari Kaplan
  Lawyers for the Canadian Former Employees and Disabled
  Employees through their court appointed Representative
**CAW- CANADA LEGAL DEPARTMENT**
Barry Wadsworth
  Lawyers for the Canadian Autoworkers Union
**SHIBLEY RIGHTON LLP**
**NELLIGAN O'BRIEN PAYNE LLP**
Arthur O. Jacques  / Thomas McRae / Steve Levitt
  Lawyers for active and transferred employees of
  Nortel Canada
**McCARTHY TÉTRAULT LLP**
R. Paul Steep / James D. Gage / Barbara J. Boake
  Lawyers for Morneau Shepell Ltd., as administrator of the
  Nortel Canada registered pension plans
**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
  Lawyers for the Superintendent of Financial Services as
  Administrator of the Pension Benefits Guarantee Fund

# TAB 4

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND
NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, C. C-36, AS AMENDED

NOTICE OF FILING IN THE U.S. DEBTORS' CHAPTER 11 CASES OF THE
*OBJECTION OF THE UK PENSION CLAIMANTS TO MOTION BY THE MONITOR AND*
*CANADIAN DEBTORS TO SHORTEN NOTICE WITH RESPECT TO MOTION TO*
*STRIKE THE EXPERT REPORTS AND TESTIMONY OF DANIEL R. BERESKIN QC*
*AND BRUCE W. STRATTON OR, IN THE ALTERNATIVE, GRANTING LEAVE TO FILE*
*THE EXPERT REPORT OF SHELDON BURSHSTEIN*

April 16, 2014

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West
Suite 3200
Toronto, ON   M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
Email: mbarrack@tgf.ca
**John L. Finnigan** (LSUC# 24040L)
Email: jfinnigan@tgf.ca
**D. J. Miller** (LSUC# 34393P)
Email: djmiller@tgf.ca
**Andrea McEwan** (LSUC# 53781P)
Email: amcewan@tgf.ca
**Rebecca Lewis** (LSUC# 61146S)
Email: rlewis@tgf.ca

Tel:    416-304-1616
Fax:    416-304-1313
Co-Counsel to the UK Pension Protection Fund
and Nortel Networks UK Pension Trust Limited

Court File No. 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT**
**OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND**
**NORTEL NETWORKS TECHNOLOGY CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, C. C-36, AS AMENDED**

**NOTICE OF FILING IN THE U.S. DEBTORS' CHAPTER 11 CASES OF THE**
***OBJECTION OF THE UK PENSION CLAIMANTS TO MOTION BY THE MONITOR AND***
***CANADIAN DEBTORS TO SHORTEN NOTICE WITH RESPECT TO MOTION TO***
***STRIKE THE EXPERT REPORTS AND TESTIMONY OF DANIEL R. BERESKIN QC***
***AND BRUCE W. STRATTON OR, IN THE ALTERNATIVE, GRANTING LEAVE TO FILE***
***THE EXPERT REPORT OF SHELDON BURSHSTEIN***

Pursuant to paragraph 19 of the Cross-Border Insolvency Protocol and in furtherance of the Allocation Protocol, the Litigation Timetable and the Discovery Plan, The UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, the "**UK Pension Claimants**") hereby file the attached *Objection of the UK Pension Claimants to Motion by the Monitor and Canadian Debtors to Shorten Notice with Respect to Motion to Strike the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, in the Alternative, Granting Leave to file The Expert Report of Sheldon Burshstein* (the "**Objection**") in the within proceedings.  The Objection has also been filed with the United States Bankruptcy Court for the District of Delaware in the U.S. Debtors' cases under chapter 11 of title 11 of the United States Code (the "**U.S. Court**").

- 2 -

The UK Pension Claimants have not sought to have the Rebuttal Report of Bruce W. Stratton, dated April 11, 2014 (the "**Stratton Report**"), admitted in the Canadian Court. The Stratton Report is an expert opinion on Canadian law for the benefit of the U.S. Court. As a consequence, the motion to strike the Stratton Report in the Canadian Court is unnecessary and a waste of resources. The motion to strike as it relates to the Stratton Report is properly before Judge Gross in the U.S. Court. Similarly, the alternative relief sought for leave to deliver the untimely Burshtein Report is an issue for the U.S. Court as the Burshtein Report is also an opinion on Canadian law.

April 16, 2014

**Thornton Grout Finnigan LLP**
Barristers and Solicitors
100 Wellington Street West
Suite 3200
Toronto, ON   M5K 1K7

**Michael E. Barrack** (LSUC# 21941W)
Email: mbarrack@tgf.ca
**John L. Finnigan** (LSUC# 24040L)
Email: jfinnigan@tgf.ca
**D. J. Miller** (LSUC# 34393P)
Email: djmiller@tgf.ca
**Andrea McEwan** (LSUC# 53781P)
Email: amcewan@tgf.ca
**Rebecca Lewis** (LSUC# 61146S)
Email: rlewis@tgf.ca

Tel:    416-304-1616
Fax:    416-304-1313

Co-Counsel to the UK Pension Protection Fund
and Nortel Networks UK Pension Trust Limited

**TO:    CORE PARTIES SERVICE LIST ATTACHED**

Court File No.  09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. c-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS**
**CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION,**
**NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,**
**R.S.C. 1985, c. C-36, AS AMENDED**

**CORE PARTIES SERVICE LIST**
**(Allocation Litigation)**

**Updated as of March 26, 2014**

- 2 -

**CANADIAN DEBTORS**

TO: **GOWLING LAFLEUR HENDERSON LLP**
Suite 1600, First Canadian Place
100 King Street West
Toronto, Ontario  M5X 1G5

Derrick Tay
Jennifer Stam

Email:    derrick.tay@gowlings.com
          jennifer.stam@gowlings.com

Tel:      416.862.5697
Fax:      416.862.7661

Lawyers for the Applicants

AND
TO: **GOODMANS LLP**
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario  M5H 2S7

Jay Carfagnini
Joseph Pasquariello
Ben Zarnett
Fred Myers
Peter Ruby
Jessica Kimmel
Chris Armstrong

Email:    jcarfagnini@goodmans.ca
          jpasquariello@goodmans.ca
          bzarnett@goodmans.ca
          fmyers@goodmans.ca
          pruby@goodmans.ca
          jkimmel@goodmans.ca
          carmstrong@goodmans.ca

Tel:      416.597.4107
Fax:      416.979.1234

Lawyers for the Monitor, Ernst & Young Inc.

AND
TO: **ERNST & YOUNG INC.**
Ernst & Young Tower
222 Bay Street, P.O. Box 251
Toronto, Ontario  M5K 1J7

Murray McDonald
Brent Beekenkamp

Email:    nortel.monitor@ca.ey.com

Tel:      416.943.3016
Fax:      416.943.3300

- 3 -

AND     **ALLEN & OVERY LLP**
TO:     1221 Avenue of the Americas
        New York, NY 10020

        Ken Coleman
        Paul Keller
        Daniel Guyder
        Laura Hall
        Joseph Badtke-Berkow
        Jonathan Cho
        Nicolette Ward

        Email:   ken.coleman@allenovery.com
        Tel:     212.610.6434
        Fax:     212.610.6399

        Email:   paul.keller@allenovery.com
        Tel:     212.610.6414
        Fax:     212.610.6399

        Email:   daniel.guyder@allenovery.com
        Tel:     212.756.1132
        Fax:     212.610.6399

        Email:   laura.hall@allenovery.com
        Tel:     212.756.1171
        Fax:     212.610.6399

        Email:   Joseph.Badtke-Berkow@AllenOvery.com
        Tel:     212.610.6417
        Fax:     212.610.6399

        Email:   jonathan.cho@allenovery.com
        Tel:     212.756.1118
        Fax:     212.610.6399

        Email:   Nicolette.ward@allenovery.com
        Tel:     212.610.6412
        Fax:     212.610.6399

        U.S. Lawyers for the Canadian Debtors

AND     **BUCHANAN INGERSOLL & ROONEY**
TO:     1105 North Market Street,
        Suite 1900
        Wilmington, DE 19801-1054

        Kathleen A. Murphy
        Mary F. Caloway

        Email:   Kathleen.murphy@bipc.com
        Tel:     302.552.4214
        Fax:     302.552.4295

        Email:   mary.caloway@bipc.com
        Tel:     302.552.4209
        Fax:     302.552.4295

        Local U.S. Lawyers for the Canadian Debtors

- 4 -

## U.S. DEBTORS

| | |
|---|---|
| AND<br>TO: | **TORYS LLP**<br>79 Wellington St. W., Suite 3000<br>Box 270, TD Centre<br>Toronto, Ontario  M5K 1N2 |

Tony DeMarinis
Scott Bomhof
Sheila Block
Andrew Gray
Adam Slavens

Email:  tdemarinis@torys.com
sbomhof@torys.com
sblock@torys.com
agray@torys.com
aslavens@torys.com

Tel:  416.865.0040
Fax:  416.865.8730

Canadian Lawyers for Nortel Networks Inc.

| | |
|---|---|
| AND<br>TO: | **CLEARY GOTTLIEB STEEN & HAMILTON LLP**<br>One Liberty Plaza<br>New York, NY 10006 |

James Bromley
Lisa Schweitzer
Howard Zelbo
Jeffrey Rosenthal
Darryl Stein
Marla Decker
Lauren Peacock
Jacqueline Moessner
Neil Forrest
Dan Queen

Email:  jbromley@cgsh.com
lschweitzer@cgsh.com
hzelbo@cgsh.com
jrosenthal@cgsh.com
dstein@cgsh.com
mdecker@cgsh.com
lpeacock@cgsh.com
jmoessner@cgsh.com
nforrest@cgsh.com
dqueen@cgsh.com

Tel:  212.225.2000
Fax:  212.225.3999

U.S. Lawyers for Nortel Networks Inc.

| | |
|---|---|
| AND<br>TO: | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br>1201 North Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, DE  19899-1347 |

Derek Abbott
Annie Cordo

Email:  dabbott@mnat.com
Tel:  302.351.9357
Fax:  302.425.4664

Email:  acordo@mnat.com
Tel:  302.351.9459
Fax:  302.225.2559

Local U.S. Lawyers for the U.S. Debtors

**EMEA DEBTORS**

| | |
|---|---|
| AND TO: | **DAVIES WARD PHILLIPS & VINEBERG LLP**<br>44th Floor<br>1 First Canadian Place<br>Toronto, ON  M5X 1B1 |

Robin B. Schwill
Sean Campbell
James Doris
Louis Sarabia

Email:   rschwill@dwpv.com
Email:   scampbell@dwpv.com
Email:   jdoris@dwpv.com
Email:   lsarabia@dwpv.com

Tel:     416.863.0900
Fax:     416.863.0871

Co-Counsel to the Joint Administrators of Nortel Networks UK Limited

| | |
|---|---|
| AND TO: | **HUGHES HUBBARD & REED**<br>One Battery Park Plaza<br>New York, NY 10004-1482 |

Derek Adler
Neil Oxford
Fara Tabatabai
Charles Huberty

Email:   adler@hugheshubbard.com
Tel:     212.837.6086
Fax:     212.422.4726

Email:   oxford@hugheshubbard.com
Tel:     212.837.6843
Fax:     212.422.4726

Email:   tabataba@hugheshubbard.com
Tel:     212.837.6296
Fax:     212.299.6269

Email:   huberty@hugheshubbard.com
Tel:     212.837.6045
Fax:     212.299.6045

U.S. Lawyers the Joint Administrators of Nortel Networks UK Limited

| | |
|---|---|
| AND TO: | **LAX O'SULLIVAN SCOTT LISUS LLP**<br>Counsel<br>Suite 1920, 145 King Street West<br>Toronto, Ontario  M5H 1J8 |

Matthew P. Gottlieb
Tracy Wynne
Paul Michell

Email:   mgottlieb@counsel-toronto.com
Tel:     416.644.5353
Fax:     416.598.3730

Email:   twynne@counsel-toronto.com
Tel:     416.598.7835
Fax:     416.598.3730

Email:   pmichell@counsel-toronto.com
Tel:     416.644.5359
Fax:     416.598.3730

Co-Counsel to the Joint Administrators of Nortel Networks UK Limited

**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Rodney Square
1000 North King Street
Wilmington, DE 19801

Ed Harron
John Dorsey

Email:   eharron@ycst.com
Tel:     302.571.6703
Fax:     302.576.3298

Email:   jdorsey@ycst.com
Tel:     302.571.6712
Fax:     302.576.3401

Local U.S. Lawyers for the Joint Administrators of Nortel Networks UK Limited

- 6 -

**CANADIAN CREDITORS COMMITTEE**

AND
TO:
**KOSKIE MINSKY**
20 Queen Street West
Suite 900
Toronto, Ontario  M5H 3R3

Mark Zigler
Susan Philpott
Ari Kaplan
Barbara Walancik

Email:   mzigler@kmlaw.ca
Tel:      416.595.2090
Fax:      416.204.2877

Email:   sphilpott@kmlaw.ca
Tel:      416.595.2104
Fax:      416.204.2882

Email:   akaplan@kmlaw.ca
Tel:      416.595.2087
Fax:      416.204.2875

Email:   bwalancik@kmlaw.ca
Tel:      416.542.6288
Fax:      416.204.2906

Lawyers for the Former Employees of Nortel and
LTD Beneficiaries

AND
TO:
**PALIARE ROLAND ROSENBERG ROTHSTEIN
LLP**
Suite 501
250 University Avenue
Toronto, Ontario  M5H 3E5

Kenneth T. Rosenberg
Massimo (Max) Starnino
Lily Harmer
Karen Jones
Tina Lie
Michelle Jackson

Email:   ken.rosenberg@paliareroland.com
Tel:      416.646.4304
Fax:      416.646.4301

Email:   max.starnino@paliareroland.com
Tel:      416.646.7431
Fax:      416.646.4301

Email:   lily.harmer@paliareroland.com
Tel:      416.646.4326
Fax:      416.646.4301

Email:   karen.jones@paliareroland.com
Tel:      416.646.4339
Fax:      416.646.4301

Email:   tina.lie@paliareroland.com
Tel:      416.646.4332
Fax:      416.646.4301

Email:   michelle.jackson@paliareroland.com
Tel:      416.646.7470
Fax:      416.646.4301

Lawyers for the Superintendent of Financial
Services as Administrator of the Pension Benefits
Guarantee Fund

- 7 -

| | | | | |
|---|---|---|---|---|
| AND<br>TO: | **CAW-CANADA**<br>Legal Department<br>205 Placer Court<br>Toronto, Ontario M2H 3H9 | | AND<br>TO: | **SHIBLEY RIGHTON LLP**<br>Barristers and Solicitors<br>250 University Avenue, Suite 700<br>Toronto, Ontario M5H 3E5 |

AND
TO:
**CAW-CANADA**
Legal Department
205 Placer Court
Toronto, Ontario M2H 3H9

Barry E. Wadsworth
Lewis Gottheil

Email:   barry.wadsworth@caw.ca
            lewis.gottheil@caw.ca

Tel.:      416.495.3776
Fax:      416.495.3786

Lawyers for all active and retired Nortel employees
represented by the CAW-Canada

AND
TO:
**NELLIGAN O'BRIEN PAYNE LLP**
Barristers and Solicitors
50 O'Connor Street
Suite 1500
Ottawa, Ontario  K1P 6L2

Janice B. Payne
Steven Levitt
Christopher Rootham
Ainslie Benedict

Email:   janice.payne@nelligan.ca
            steven.levitt@nelligan.ca
            christopher.rootham@nelligan.ca
            ainslie.benedict@nelligan.ca

Tel:      613.231.8245
Fax:      613.788.3655

Lawyers for the Steering Committee of Nortel
Canadian Continuing Employees -- Post CCAA as
at January 14, 2009

AND
TO:
**SHIBLEY RIGHTON LLP**
Barristers and Solicitors
250 University Avenue, Suite 700
Toronto, Ontario M5H 3E5

Arthur O. Jacques
Thomas McRae

Email:   arthur.jacques@shibleyrighton.com
Tel:       416.214.5213
Fax:      416.214.5413

Email :  thomas.mcrae@shibleyrighton.com
Tel :     416.214.5206
Fax :    416.214.5400

Lawyers for The Recently Severed Canadian
Nortel Employees Committee

AND
TO:
**McCARTHY TETRAULT LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto, Ontario  M5K 1E6

Barbara J. Boake
James D. Gage
Elder C. Marques
Paul Steep
Byron Shaw

E-mail:  bboake@mccarthy.ca
Tel:      416.601.7557
Fax:      416.868.0673

Email:   jgage@mccarthy.ca
Tel:      416.601.7539
Fax:      416.686.0673

Email:   emarques@mccarthy.ca
Tel:      416.601.7822
Fax:      416.686.0673

Email:   psteep@mccarthy.ca
Tel:      416.601.7998
Fax:      416.686.0673

Email:   bdshaw@mccarthy.ca
Tel:      416.601.8256
Fax:      416.686.0673

Lawyers for Morneau Shepell Limited

- 8 -

AND **DLA PIPER**
TO:      919 North Market Street
         Suite 1500
         Wilmington, Delaware 19801

         Selinda A. Melnik
         Richard Hans
         Timothy Hoeffner

         Email:    selinda.melnik@dlapiper.com
         Tel:      302.468.5650
         Fax:      302.778.7914

         Email:    richard.hans@dlapiper.com
         Tel:      212.335.4530
         Fax:      212.884.8730

         Email:    timothy.hoeffner@dlapiper.com
         Tel:      212.656.3341
         Fax:      215.606.3341

         U.S. Lawyers for the Canadian Creditors
         Committee

## INFORMAL NORTEL NOTEHOLDER GROUP

AND
TO:

**BENNETT JONES LLP**
1 First Canadian Place
Suite 3400
Toronto, Ontario  M5X 1A4

Kevin Zych
S. Richard Orzy
Gavin Finlayson
Richard Swan
Sean Zweig
Jonathan Bell

Email:   zychk@bennettjones.com
Tel:      416.777.5738
Fax:      416.863.1716

Email:   orzyr@bennettjones.com
Tel:      416.777.5737
Fax:      416.863.1716

Email:   finlaysong@bennettjones.com
Tel:      416.777.5762
Fax:      416.863.1716

Email:   swanr@bennettjones.com
Tel:      416.777.7479
Fax:      416.863.1716

Email:   zweigs@bennettjones.com
Tel:      416.777.6254
Fax:      416.863.1716

Email:   bellj@bennettjones.com
Tel:      416.777.6511
Fax:      416.863.1716

Canadian Lawyers for The Informal Nortel
Noteholder Group

AND
TO:

**MILBANK, TWEED, HADLEY McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY  10005

Thomas R. Kreller
Jennifer P. Harris
Albert A. Pisa
Samir Vora
Andrew LeBlanc
Michael Hirschfeld
Atara Miller
Tom Matz
Nick Bassett
Gabrielle Ruha
Rachel Pojunas

Email:   TKreller@milbank.com
Tel:      213.892.4463
Fax:      213.629.5063

Email:   JHarris@milbank.com
Tel:      212.530.5475
Fax:      212.530.5219

Email:   APisa@milbank.com
Tel:      212.530.5319
Fax:      212.530.5219

Email:   svora@milbank.com
Tel:      213.892.4595
Fax:      213.629.5063

Email:   aleblanc@milbank.com
Tel:      202.835.7574
Fax:      202.263.7574

Email:   mhirschfeld@milbank.com
Tel:      212.530.5832
Fax:      212.822.5832

Email:   amiller@milbank.com
Tel:      212.530.5421
Fax:      212.822.5421

Email:   tmatz@milbank.com
Tel:      212.530.5885
Fax:      212.822.5885

Email:   nbassett@milbank.com
Tel:      202.835.7546
Fax:      202.263.7546

Email:   gruha@milbank.com
Tel:      212.530.5155
Fax:      212.822.5155

Email:   rpojunas@milbank.com
Tel:      202.835.7551

- 10 -

Fax:    202.263.7551

U.S. Lawyers for The Informal Nortel Noteholder
Group

- 11 -

## THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

AND
TO:

**CASSELS BROCK & BLACKWELL LLP**
Suite 2100, Scotia Plaza
40 King Street West
Toronto ON, M5H 3C2

**R. Shayne Kukulowicz**
**Michael J. Wunder**
**Ryan Jacobs**

Email:   skukulowicz@casselsbrock.com
         mwunder@casselsbrock.com
         rjacobs@casselsbrock.com

Tel:    416 860 6463
Fax:   416 640 3176

Canadian Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**AKIN GUMP STRAUSS HAUER & FELD LLP**
One Bryant Park
New York, NY  10036

Fred S. Hodara
David H. Botter
Abid Qureshi
Robert A. Johnson
Brad M. Kahn

Email:   fhodara@akingump.com
         dbotter@akingump.com
         aqureshi@akingump.com
         rajohnson@akingump.com
         bkahn@akingump.com

Tel:    212.872.1000
Fax:   212.872.1002

U.S. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**ASHURST LLP**
Boardwalk House
5 Appold Street
London, EC2A 2HA
United Kingdom

Angela Pearson
Antonia Croke

Email:   angela.pearson@ashurst.com
         Antonia.croke@ashurst.com

Tel:    +44 (0)20 7638 1111
Fax:   +44 (0)20 7638 1112

U.K. Lawyers for the Official Committee of
Unsecured Creditors

AND
TO:

**RICHARDS LAYTON & FINGER, P.A.**
920 North King Street
Wilmington, DE  19801

Christopher Samis

Email:   samis@rlf.com
Tel:    302.651.7845
Fax:   302.498.7845

Local U.S. Lawyers for the Official Committee of
Unsecured Creditors

- 12 -

**UK PENSION PROTECTION FUND AND NORTEL NETWORKS UK PENSION TRUST LIMITED**

AND
TO:

**THORNTON GROUT FINNIGAN LLP**
Suite 3200, 100 Wellington Street West
P.O. Box 329
Toronto-Dominion Centre
Toronto, ON  M5K 1K7

Michael Barrack
D.J. Miller
John Finnigan
Rebecca Lewis
Andrea McEwan

Email:    mbarrack@tgf.ca
Tel:       416.304.1109
Fax:       416.304.1313

Email:    djmiller@tgf.ca
Tel:       416.304.0559
Fax:       416.304.1313

Email:    jfinnigan@tgf.ca
Tel:       416.304.0558
Fax:       416.304.1313

Email:    rlewis@tgf.ca
Tel:       416.304.0603
Fax:       416.304.1313

Email:    amcewan@tgf.ca
Tel:       416.304.0596
Fax:       416.304.1313

Co-Counsel to the UK Pension Protection Fund
and Nortel Networks UK Pension Trust Limited

AND
TO:

**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099, U.S.A.

Brian O'Connor
Sameer Advani
Andrew Hanrahan

Email:    boconnor@willkie.com
Tel:       (212) 728-8251
Fax:       (212) 728-9251

Email:    sadvani@willkie.com
Tel:       (212) 728-8587
Fax:       (212) 728-9587

Email:    ahanrahan@willkie.com
Tel:       (212) 728-8170
Fax:       (212) 728-9170

US Counsel for the UK Pension Protection Fund
and Nortel Networks UK Pension Trust Limited

**THE BANK OF NEW YORK MELLON**

AND
TO:

**McMILLAN LLP**
Brookfield Place
181 Bay Street, Suite 4400
Toronto, Ontario, M5J 2T3

Sheryl E. Seigel

Email:  sheryl.seigel@mcmillan.ca
Tel:      416.307.4063
Fax:     416.365.1719

Canadian Lawyers for The Bank of New York
Mellon

AND
TO:

**LATHAM & WATKINS LLP**
885 Third Avenue
New York, NY 10022-4834

Michael J. Riela

Email:  michael.riela@lw.com

Tel :   212.906.1373
Fax :  212.751.4864

U.S. Lawyers for The Bank of New York Mellon

- 14 -

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

| | | | |
|---|---|---|---|
| AND TO: | **DENTONS CANADA LLP**<br>Barristers and Solicitors<br>77 King Street West<br>Suite 400<br>Toronto, Ontario M5K 0A1 | AND TO: | **KATTEN MUCHIN ROSENMAN LLP**<br>575 Madison Avenue<br>New York, NY 10022-2585 |

DENTONS CANADA LLP column:

John Salmas
Kenneth Kraft

Email:  John.Salmas@dentons.com
Tel:     416.863.4737
Fax:    416.863.4592

Email:  Kenneth.Kraft@dentons.com
Tel:     416.863.4374
Fax:    416.863.4592

Canadian Lawyers for Wilmington Trust, National Association

KATTEN MUCHIN ROSENMAN LLP column:

Craig A. Barbarosh
David A. Crichlow
Karen B. Dine

Email:  craig.barbarosh@kattenlaw.com
Tel:     212.940.8665
Fax:    212.940.8776

Email:  david.crichlow@kattenlaw.com
Tel:     212.940.8941
Fax:    212.940.8776

Email:  Karen.dine@kattenlaw.com
Tel:     212.940.8772
Fax:    212.940.8776

U.S. Lawyers to Wilmington Trust, National Association

- 15 -

**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

AND
TO:

**BORDEN LADNER GERVAIS LLP**
Barristers and Solicitors
40 King Street West
Toronto, ON  M5H 3Y4

Edmond F. B. Lamek
James Szumski

Email:    elamek@blg.com
Tel:       416.367.6311
Fax:      416.361.2436

Email:    jszumski@blg.com
Tel:       416.367.6310
Fax:      416.682.2811

Lawyers for Law Debenture Trust Company of New
York

AND
TO:

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY  10036

Daniel A. Lowenthal

Email:    dalowenthal@pbwt.com
Tel:       212.336.2720
Fax:      212.336.1253

U.S. Lawyers for Law Debenture Trust
Company of New York

- 16 -

**BOARDS OF DIRECTORS OF NORTEL NETWORKS CORPORATION AND NORTEL NETWORKS LIMITED**

AND
TO:

**OSLER HOSKIN AND HARCOURT LLP**
100 King Street West
1 First Canadian Place
Suite 6100
P.O. Box 50
Toronto, Ontario  M5X 1B8

Lyndon Barnes
Edward Sellers
Betsy Putnam
Adam Hirsh
Alexander Cobb

Email:    lbarnes@osler.com
          esellers@osler.com
          eputnam@osler.com
          ahirsh@osler.com
          acobb@osler.com

Tel:      416.362.2111
Fax:      416.862.6666

Lawyers for the Boards of Directors of Nortel
Networks Corporation and Nortel Networks Limited

**COURTESY COPIES:**

| | | | | |
|---|---|---|---|---|
| AND TO: | **NORTON ROSE CANADA LLP**<br>Suite 3800, Royal Bank Plaza<br>South Tower, 200 Bay Street<br>P.O. Box 84<br>Toronto, ON  M5J 2Z4 | | AND TO: | **HOGAN LOVELLS INTERNATIONAL LLP**<br>Atlantic House<br>Holborn Viaduct<br>London  EC1A 2FG<br>United Kingdom |

AND
TO:   **NORTON ROSE CANADA LLP**
       Suite 3800, Royal Bank Plaza
       South Tower, 200 Bay Street
       P.O. Box 84
       Toronto, ON  M5J 2Z4

       Michael Lang

       Email:   michael.lang@nortonrose.com

       Tel:   416.216.3939
       Fax:   416.216.3930

AND
TO:   **HOGAN LOVELLS INTERNATIONAL LLP**
       Atlantic House
       Holborn Viaduct
       London  EC1A 2FG
       United Kingdom

       Angela Dimsdale Gill
       John Tillman
       Matthew Bullen

       Email:   amdg@hoganlovells.com
                john.tillman@hoganlovells.com
                Matthew.bullen@hoganlovells.com

       Tel:   +44 20 7296 2000
       Fax:   +44 20 7296 2001

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------- x

In re:                                            :    Chapter 11
                                                  :
                                                  :    Case No. 09-10138 (KG)
Nortel Networks Inc., *et al.*,[1]                :
                                                  :    Jointly Administered
                          Debtors.                :
                                                  :
                                                  :    **Re: Docket No. 13319**

------------------------------------------------- x

### OBJECTION OF THE UK PENSION CLAIMANTS TO MOTION BY THE MONITOR AND CANADIAN DEBTORS TO SHORTEN NOTICE WITH RESPECT TO MOTION TO STRIKE THE EXPERT REPORTS AND TESTIMONY OF DANIEL R. BERESKIN QC AND BRUCE W. STRATTON OR, IN THE ALTERNATIVE, GRANTING LEAVE TO FILE THE EXPERT REPORT OF SHELDON BURSHTEIN

Nortel Networks UK Pension Trust Limited (the "Trustee") and the Board of the Pension

Protection Fund (the "PPF," and together with the Trustee, the "U.K. Pension Claimants"),

hereby object (the "Objection") to the *Motion For Entry Of An Order Under 11 U.S.C. §§ 102(1)*

*And 105(a), Fed. R. Bankr. P. 9006 And Bankr. D. Del. L.R. 9006-1(e) Shortening Notice For*

*Motion Of The Monitor And Canadian Debtors For Entry Of An Order Striking The Expert*

*Reports And Testimony Of Daniel R. Bereskin QC And Bruce W. Stratton Or, In The Alternative,*

*Granting Leave To File The Expert Report Of Sheldon Burshtein In Rebuttal To Reports Of*

*Daniel R. Bereskin QC And Bruce W. Stratton*, dated April 11, 2014 [D.I. 13319] (the "Motion to

Shorten") filed by the Monitor of Nortel Networks Corporation (the "Monitor") and certain of its

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332) ("NNI"), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226) ("NN CALA").

Canadian direct and indirect subsidiaries (collectively, the "Canadian Debtors") in proceedings under Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended, pending before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court").

In support of this Objection, the U.K. Pension Claimants, by and through their undersigned counsel, respectfully state as follows:

1.      Both the Motion to Shorten and the underlying Motion to Strike[2] the rebuttal expert report of Bruce W. Stratton (the "Stratton Rebuttal Report") or, in the alternative, leave to file a purported "reply" report of Sheldon Burshtein lack merit and should be denied.  The U.K. Pension Claimants will address the myriad substantive flaws in the Motion to Strike in a separate filing.  The focus of this Objection is the Motion to Shorten.  Simply put, the Monitor and Canadian Debtors have not come close to meeting their heavy burden of justifying an expedited schedule for resolution of their belated (and blatantly tactical) Motion to Strike.[3]

2.      The Monitor and Canadian Debtors concede that they were served with the allegedly "improper" Stratton Rebuttal Report on February 28, 2014, the deadline for rebuttal reports set forth in the litigation schedule approved by this Court and the Canadian Court in November 2013 [D.I. 12522].  (Mot. to Shorten ¶¶ 5-6.)  Although the Monitor and Canadian Debtors now contend that it is "critical" for the parties to have an "early determination" of the issues raised by their Motion to Strike (*id.* ¶ 13), they offer no explanation as to why they chose

---

[2]  *Motion of the Monitor and Canadian Debtors for Entry of an Order Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton or, in the Alternative, Granting Leave to File the Expert Report of Sheldon Burshtein in Rebuttal to Reports of Daniel R. Bereskin QC and Bruce W. Stratton,* dated April 11, 2014 [D.I. 13317].

[3]  The Monitor and Canadian Debtors' Motion To Strike also seeks an order striking the rebuttal expert report of Daniel R. Bereskin QC submitted on behalf of the U.S. Debtors.  The U.K. Pension Claimants understand that the U.S. Debtors object to the Motion to Shorten, and we join and incorporate herein the arguments set forth in the U.S. Debtors' objection.

to wait *six weeks* before bringing that motion.   That lack of diligence alone is a sufficient basis for this Court to exercise its discretion to deny the Motion to Shorten.

3.     Nor have the Monitor and Canadian Debtors identified any "exigencies justifying shortened notice" as required by Local Rule 9006-1(e).  Rather, any purported "exigency" is solely the product of their own dilatoriness in pursuing relief.  On March 30, 2014, the Monitor notified the parties that it "intends to make a motion with respect to the Bereskin, Stratton and Burshtein Reports." (Exhibit A, March 30, 2014 Letter from Peter Ruby.)   Yet, notwithstanding the supposed urgency that the Motion to Shorten now contends, they were was content to let another *14 days* go by before filing the Motion to Strike.

4.     The *bona fides* of the timing of the Motion to Strike and the Motion to Shorten is called into question when contrasted with the procedures negotiated and adopted by the Monitor and the U.K. Pension Claimants (and the EMEA Debtors) for the service of additional expert reports in the Claims proceedings.   In those proceedings, the U.K. Pension Claimants objected to the Monitor and Canadian Debtors' service of purported "rebuttal" expert reports on February 28, 2014 addressing Claims issues that were known to them since at least May 2012.  Thereafter, the U.K. Pension Claimants engaged in protracted negotiations with the Monitor and Canadian Debtors that resulted in a detailed schedule governing the service of reply expert reports by the U.K. Pension Claimants and depositions of those experts.  Plainly, the Monitor and Canadian Debtors knew the proper way to preserve their right to serve a reply report and it is telling that they did not at any point during those negotiations give any indication that they were contemplating filing a new expert report in response the Stratton Rebuttal Report.

5.     Moreover, granting the relief sought in the Motion to Shorten would significantly prejudice the U.K. Pension Claimants.  The parties are in the final weeks of intense preparation

for the complex allocation trial that is scheduled to commence on May 12, 2014 and continue thereafter over a 6-week period.  As the Court recently noted in denying a request by the Ad Hoc Committee of Canadian Employees Terminated Pre-Petition to schedule oral argument on a motion for leave to file claims, "[t]he Court and the parties engaged in the [Allocation] trial are concentrating their full attention on the trial."  (Order Denying Request For Oral Argument At This Time, dated March 31, 2014 [D.I. 13250].)  Indeed, the next two weeks are among the busiest in the trial timetable with numerous filing deadlines relating to fact and expert evidence as well as the occurrence of two major religious holidays.  In short, the schedule contemplated by the Motion to Shorten could not be more disruptive, and it would be the height of unfairness to force the U.K. Pension Claimants to divert resources from their critical trial preparations to brief a substantive motion seeking to exclude one of their expert witnesses on an expedited basis.

6.    To the extent the Court is inclined to shorten the notice period provided under the Local Rules, the U.K. Pension Claimants respectfully request that the Court permit objections to the Motion to Strike to be filed on or before April 23, 2014 and that argument on the motion be heard at a date thereafter that is convenient for the Courts.

## RESERVATION OF RIGHTS

7.    The U.K. Pension Claimants reserve their rights to amend or supplement this Objection and to file further and additional objections to the Motion to Strike.

## CONCLUSION

WHEREFORE, the U.K. Pension Claimants respectfully request that the Court

deny the Motion to Shorten or, in the alternative, order that objections to the Motion to Strike

shall be filed on or before April 23, 2014.


Dated: April 15, 2014
      Wilmington, Delaware

                    BAYARD, P.A.

                    */s/ Justin R. Alberto*
                    Charlene D. Davis (No. 2336)
                    Justin Alberto (No. 5126)
                    222 Delaware Avenue, Suite 900
                    Wilmington, Delaware 19899
                    Telephone: (302) 655-5000
                    Facsimile: (302) 658-6395
                    Email: cdavis@bayardlaw.com
                              jalberto@bayardlaw.com

                    -and-

                    WILLKIE FARR & GALLAGHER LLP
                    Brian E. O'Connor
                    Sameer Advani
                    Andrew Hanrahan
                    787 Seventh Avenue
                    New York, New York 10019
                    Tel: (212) 728-8000
                    Fax: (212) 728-8111

                    *Counsel for the Nortel Networks UK Pension Trust*
                    *Limited and the Board of the Pension Protection*
                    *Fund*

*11729762*

# **EXHIBIT A**

# Goodmans LLP

Barristers & Solicitors

Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Ontario M5H 2S7

Telephone: 416.979.2211
Facsimile: 416.979.1234
goodmans.ca

Direct Line: 416.597.4184
pruby@goodmans.ca

March 30, 2014

**Via Email**

TO:    **THE CORE PARTIES SERVICE LIST**

Dear Counsel:

RE:    **Nortel Networks Corporation, et. al.:  Burshtein Report**

We received, on March 25, 2014, correspondence on behalf of the US Debtors, the EMEA Debtors and UKP, taking the position that the Burshtein Report should not be admitted or filed.

We note that it is the US Debtors and UKP that did not follow the negotiated expert report timetable.  As noted in our letter of March 24, 2014, those parties did not deliver reports from Messrs Bereskin or Stratton on January 24, 2014.  The reports delivered by them on February 28, 2014 are not Rebuttal Reports, which were the only reports to be delivered on February 28, 2014.

According to Mr. Finnigan's letter, "Mr. Stratton's report is submitted to provide expertise on Canadian law to the US Bankruptcy Court."  Since there was no initial report purporting to be an expert report on Canadian law for the US Bankruptcy Court, the Stratton Report is clearly not a "rebuttal."  The same is true of Mr. Bereskin's Report.

Further, Ms. Block's letter also says that a "report on domestic Canadian law" is inadmissible in a Canadian Court.    Clearly Mr. Bereskin's report and Mr. Stratton's report would be inadmissible by the standard Ms. Block herself articulates.

The Bereskin and Stratton Reports came as a complete surprise to the Monitor on February 28, 2014.    Reports which are asserted to be inadmissible in the Canadian Court by those propounding them and which are not responsive to any Initial Reports were clearly not expected to be delivered as "rebuttal" reports.  Despite being surprised by these reports, and reserving all its rights, the Monitor, in less time than provided for rebuttal reports, arranged for the preparation of and served the Burshtein Report.  It did so given that evidentiary and inadmissibility rulings have been deferred and given that it appears, despite the assertions of inadmissibility, that UKP and the US Debtors intend to try to make use of Stratton and Bereskin Reports; depending on their admissibility rulings, the Courts should have the benefit of a full record on the Canadian law topic.

# Goodmans LLP

Page 2

With respect to the now passed depositions of Messrs. Malackowski and Reichert, neither is a lawyer and neither could offer a Canadian law interpretation of the MRDA. Their depositions are not relevant to the issue addressed in the March 25 letters. Mr. Bereskin had a fair opportunity to consider the Burshtein Report before his deposition and we note in this regard that the US Debtors did not seek to postpone his deposition.

Important differences exist between the steps taken in the Claims Proceeding with respect to what the UKP calls "sur-reply" expert reports and the present situation. The references to the Claims Proceeding arrangements in the March 25 correspondence is decidedly off-point.

The Monitor intends to make a motion with respect to the Bereskin, Stratton and Burshtein Reports. While reserving all its rights, the Monitor continues to be willing to make Mr. Burshtein available to be deposed on a convenient date in the next few weeks. He would be deposed under reservation of rights (as all witnesses are deposed). Any party that chooses not to depose him makes that choice at its own peril.

Yours truly,

GOODMANS LLP

Peter Ruby
PDR/umr

6312068

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETOWKRS TECHNOLOGY CORPORATION

Court File No.:  09-CL-7950

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

Proceedings commenced at **Toronto**

NOTICE OF FILING IN THE U.S. DEBTORS' CHAPTER 11 CASES OF THE OBJECTION OF THE UK PENSION CLAIMANTS TO MOTION BY THE MONITOR AND CANADIAN DEBTORS TO SHORTEN NOTICE WITH RESPECT TO MOTION TO STRIKE THE EXPERT REPORTS AND TESTIMONY OF DANIEL R. BERESKIN QC AND BRUCE W. STRATTON OR, IN THE ALTERNATIVE, GRANTING LEAVE TO FILE THE EXPERT REPORT OF SHELDON BURSHSTEIN

**Thornton Grout Finnigan LLP**
3200 – 100 Wellington Street West
Toronto, ON   M5K 1K7
**Michael E. Barrack** (LSUC# 21941W) / Email:  mbarrack@tgf.ca
**John L. Finnigan** (LSUC# 54040L) / Email:  jfinnigan@tgf.ca
**D.J. Miller** (LSUC# 34393P) / Email:  djmiller@tgf.ca
**Andrea McEwan** (LSUC# 52781P) / Email:  amcewan@tgf.ca
Rebecca Lewis / Email:  rlewis@tgf.ca Tel: 416-304-1616
Fax:    416-304-1313

Co-Counsel to the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,*
R.S.C. 1985, c. C-35, AS AMENDED

Court File No: 09-CL-7950

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS
CORPORATION, et. al.

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS
AMENDED

---

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at TORONTO

---

**MOTION RECORD OF THE CANADIAN CREDITORS COMMITTEE**

---

**KOSKIE MINSKY LLP**
Mark Zigler / Susan Philpott / Ari Kaplan
mzigler@kmlaw.ca
  Lawyers for the Canadian Former Employees and Disabled
  Employees through their court appointed Representative

**McCARTHY TÉTRAULT LLP**
R. Paul Steep / James D. Gage / Barbara J. Boake
psteep@mccarthy.ca
  Lawyers for Morneau Shepell Ltd., as administrator of the
  Nortel Canada registered pension plans

**PALIARE ROLAND ROSENBERG ROTHSTEIN LLP**
Ken Rosenberg / Lily Harmer / Massimo Starnino
ken.rosenberg@paliareroland.com
  Lawyers for the Superintendent of Financial Services as
  Administrator of the Pension Benefits Guarantee Fund

**UNIFOR LEGAL DEPT.**
Barry Wadsworth
barry.wadsworth@unifor.org
  Lawyers for the Canadian Autoworkers Union

**SHIBLEY RIGHTON LLP**
**NELLIGAN O'BRIEN PAYNE LLP**
Arthur O. Jacques  / Thomas McRae / Steve Levitt
arthur.jacques@shibleyrighton.com
  Lawyers for active and transferred employees of
  Nortel Canada