# EXHIBIT B

# Report on Patent Enforcement in China

**Prepared by the U.S. Patent and Trademark Office**

## INTRODUCTION

China has risen to become the United States' second largest trading partner, and the largest outside of the North American Free Trade Agreement area, providing new business opportunities for U.S. companies.  In 2010, the United States exported nearly $113 billion of goods and services to China, up nearly 33% from 2009.[1]  As U.S. companies look to take advantage of the growing U.S.-China commercial relationship, U.S. rights holders are increasingly seeking to protect and enforce their intellectual property rights (IPR) in China.  Ensuring that China's IPR regime works in a fair, transparent, and timely manner for U.S. rights holders is a top priority for the U.S. Government.

To that end, the U.S. Patent and Trademark Office (USPTO), in coordination with the U.S. Intellectual Property Enforcement Coordinator's office and in close collaboration with other U.S. Government agencies, continues to engage in efforts to identify and assess the challenges that U.S. rights holders are facing with China's judicial and administrative enforcement systems, and has conducted several roundtable meetings with stakeholders and published two Federal Register Notices[2] to solicit input on problems rights holders have experienced and recommendations on ways to improve the system.  USPTO received numerous comments, both during the roundtables and in response to the Federal Register Notice.  This report summarizes those comments and identifies steps that the U.S. Government is taking to address IPR protection and enforcement in China.

## SUMMARY OF U.S. RIGHTS HOLDERS' VIEWS

U.S. rights holders and other representatives of U.S. industry generally noted the importance of China as a growing market for U.S. companies that rely on intellectual property (IP) and the need for China's patent regime, and IP regime more generally, to provide a reliable, transparent, and fair system that encourages and protects innovation, regardless of the nationality or location of the creator/innovator.  Commenters noted the improvements that China has made in protecting IP, but also stressed the need for further progress in certain, key areas particular to enforcing IPR.  This report groups the comments into five general areas and then summarizes U.S. industry input regarding each area:

1. China's patent legal regime;
2. Rule of law problems;

---

[1] http://www.trade.gov/mas/ian/build/groups/public/@tg_ian/documents/webcontent/tg_ian_003364.pdf; http://www.bea.gov/international/xls/tab2a.xls
[2] Request for Comments on Intellectual Property Enforcement in China, 76 Fed. Reg. 64075 (Oct. 17, 2011), available at http://www.gpo.gov/fdsys/pkg/FR-2011-10-17/pdf/2011-26757.pdf; Extension of Comment Period Regarding Comments on Intellectual Property Enforcement in China, 76 Fed. Reg. 76389 (Dec. 7, 2011), available at http://www.gpo.gov/fdsys/pkg/FR-2011-12-07/pdf/2011-31305.pdf.

3. Evidence collection, recognition, and preservation;
4. Effectiveness and enforcement of remedies; and
5. Administrative enforcement.

## China's Patent Legal Regime

### Utility Model Patents

Numerous commenters expressed concerns about the lack of substantive examination of Utility Model patent applications.  Commenters indicated that U.S. rights holders have experienced instances where Chinese companies have applied for and obtained Utility Model patents covering products sold by a U.S. rights holder and then assert such Utility Model patents against the foreign rights holder.  This results directly from the lack of substantive examination of Utility Model patent applications.  Commenters provided several rights holders and other U.S. industry representatives voiced significant concerns with China's Utility Model patent system.[3]

Commenters also indicated that foreign inventors who file through the PCT are prohibited from applying for both a Utility Model patent and invention patent simultaneously; this prohibition significantly disadvantages foreign inventors who rely on the PCT to file patent applications around the world.[4]

While Chinese companies often avail themselves of the protection afforded through Utility Model patents, U.S. rights holders are much less likely to utilize China's Utility Model patent system.  Commenters suggested that this is due in part to the lack of awareness and familiarity by U.S. rights holders with this system and difficulties experienced in attempting to obtain Utility Model patents through international filing mechanisms, such as the Patent Cooperation Treaty (PCT).[5]

Commenters suggested that U.S. rights holders would benefit from incorporating Utility Model patents into their patent acquisition strategy, and that the U.S. and Chinese Governments should undertake efforts to better inform U.S. rights holders of the availability, benefits, and limitations of China's Utility Model patents.  Those commenters suggested that China allow foreign

---

[3] A Utility Model patent is available in China for any new technical solution relating to a product's shape, structure, or a combination thereof, which is fit for practical use and entitles the patent holder to prevent others from making, selling, offering to sell, or importing the product covered by the patent.  Unlike applications for Invention patents, which are examined for novelty, non-obviousness and utility, SIPO does not conduct a full, substantive examination of applications for Utility Model patents; instead, SIPO conducts a more limited "preliminary examination."  Utility Model patents are valid for ten years, beginning on the date the application is filed.

[4] A dual-filing strategy, allowable under Chinese law, provides the applicant with a level of protection through a Utility Model patent while the Invention patent application is being substantively examined.  While foreign and domestic inventors may pursue both types of patent simultaneously by filing separate, domestic (Chinese) applications, a foreign applicant using the PCT filing process is unable to do so.

[5] The PCT, administered by the World Intellectual Property Organization (WIPO), provides a mechanism through which an inventor can seek patent protection for an invention in any number of contracting states by filing an "international" application in the patent of office of the contracting state in which the inventor is a national or resident.  *See* http://www.wipo.int/pct/en/treaty/about.html.

applicants to apply for both a Utility Model patent and an Invention patent under the PCT, with the understanding that the Utility Model patent will be abandoned once the Invention patent is granted.

Commentators recommendations to help address this concern, including creating an opposition proceeding specifically for Utility Model patents, penalizing applicants who apply for Utility Model patents in bad faith (e.g., knowing filing an application for another's invention), and eliminating any subsidies that incentivize filing Utility Model patent applications.

### Issues Related to Pharmaceutical and Similar Products

Several commenters identified the lack of an effective patent linkage system and pre-market infringement as impediments to effectively enforcing patents in China. In particular, commenters indicated that although Chinese law requires applicants for marketing approval for pharmaceutical products to identify relevant and unexpired patents in applications for marketing approval (filed with China's State Food and Drug Administration (SFDA)), the system has significant shortcomings that diminish if not eliminate its efficacy. Commenters cited the lack of a mechanism to ensure that an applicant seeking marketing approval for a pharmaceutical product has completely and accurately identified all relevant current patents in its marketing approval application. Commenters specifically noted that the lack of such a mechanism results in incomplete or inaccurate patent references in applications for marketing approval, leading to SFDA granting marketing approval to potentially infringing products. This concern is exacerbated by the lack of a mechanism to promptly notify patent owners that applications for potentially infringing pharmaceutical products are pending with SFDA. Commenters recommended that China develop a mechanism for identifying patents that are relevant to applications for marketing approval for pharmaceutical products, including by notifying the owners of patents that are relevant to such applications. SFDA would then withhold marketing authorization while any allegations of patent infringement are resolved.

Commenters in the pharmaceutical field also noted that there is confusion as to whether Chinese courts will allow a patent holder to initiate infringement litigation against a generic or follow-on pharmaceutical product prior to actual market entry. Unlike in the United States, which provides a cause of action to sue prior to market entry based on the act of seeking marketing approval, commenters indicated that Chinese courts usually require a generic pharmaceutical product to be on the market in order to constitute infringement. Commenters recommended that Chinese law explicitly distinguish between the generation of data for marketing approval (a non-infringing act) from submission of that data for the marketing approval and subsequently entering the market (a potentially infringing act), thereby allowing patent holders to initiate infringement litigation based on submission of data for marketing approval and providing an avenue to prevent infringing products from entering the market.

### Manufacturing for Export Only

Finally, with regard to substantive patent issues, multiple commenters raised concerns about the difficulty experienced in enforcing patent rights against goods that are exported. According to these commenters, Chinese law requires a sale within China in order to constitute infringement

3

and Chinese manufacturers are "taking advantage" of this loophole by manufacturing products within China but only exporting those goods and not selling any within China's market.  This hinders U.S. rights holders' ability to stop allegedly infringing, and potentially harmful, goods from leaving China and entering U.S. and third country markets.

**Rule of Law Problems**

A significant portion of comments received concerned broad rule of law principles.  Overall, commenters stressed that an effective patent system that encourages innovation must incorporate transparency, certainty, fairness/impartiality, and consistency.

**Transparency**

Multiple commenters identified several areas where transparency of China's patent enforcement mechanisms could be enhanced.  Commenters indicated that a Chinese court must formally "accept" a case before actual litigation will commence; commenters note, however, that there are no clear guidelines outlining what information and evidence a complainant should present to the court in order for the court to accept the case.  This creates confusion on the part of the complainant and inhibits enforcement efforts.  Furthermore, commenters indicated that courts may alert parties of a decision to accept or reject a case orally instead of in writing.  Such decisions are not appealable, often leaving parties with no explanation as to why a case was rejected and no avenue for reconsideration.  Commenters recommend that China clearly articulate, in writing, what information and evidence must be submitted in order for a court to accept a patent infringement case, and institutionalize a requirement that decisions to accept or reject a case be in writing, include articulated reasoning explaining a decision to reject a case, and be appealable to the next highest level court in that jurisdiction.

Commenters indicated that Chinese courts do not consistently provide case schedules that delineate when parties must present evidence and arguments to the opposing side.  This has resulted in confusion and parties being "caught by surprise" regarding an upcoming or lapsed deadline that was not clearly articulated by the court.  Commenters recommended that courts provide to all parties a clear case schedule that identifies when parties must present evidence and arguments, which would allow all parties to efficiently and effectively allocate their resources and develop a litigation strategy, a benefit to all parties involved in the case.

Regarding orders related to evidence, commenters identified difficulties regarding evidence collection and preservation[6] and concerns that confidential information submitted to the court and/or opposing parties would not be adequately protected from disclosure.

Various commenters also indicated that courts do not consistently publish final decisions.  Selective publication of final decisions creates confusion regarding the interpretation of Chinese law and makes it difficult for future litigants to create strong legal arguments based on successful, prior arguments.  This can lead to more and/or longer litigation that could have been

---

[6] This concern will be discussed in greater detail in the section below elaborating on concerns related to evidence collection, recognition, and preservation.

avoided if parties had insight into Chinese courts' interpretation of Chinese law.[7]  Commenters recommended that Chinese courts publish all judicial decisions, preferably online.

### Discriminatory Treatment

Numerous commenters articulated the perception that China's patent system, including enforcement mechanisms, benefits Chinese companies at the expense of U.S. and other foreign companies.  Included within this perception are concerns about judicial impartiality and requests for bribes Specifically, commenters indicated that U.S. rights holders perceive that some Chinese judges display local protectionism in favor of local defendants and, perhaps relatedly, there is a lack of judicial independence from political interference.  Evidencing these concerns, commenters cited instances of courts engaging in *ex parte* communication with one side concerning the case, conferring with appellate courts prior to issuing a ruling, or merely reciting the arguments of one party as the analysis for a final decision.  Commenters recommended that China revise the Judges Law (1995) to strengthen the authority and independence of the judiciary; impose and enforce strict penalties for engaging in *ex parte* communications or discussions with appellate judges concerning the merits of a case; increase internal enforcement of rules for ethical violations; and impose and enforce serious penalties for soliciting, offering, or accepting bribes.  Commenters further suggested that China cooperate with the United States to develop capacity building workshops on international norms of judicial conduct.

## Evidence Collection, Recognition, and Preservation

Commenters raised several problems regarding evidentiary issues in enforcing patents in Chinese courts, noting that this area has become more difficult for U.S. rights holders.  In general, commenters would like to see an enforcement regime that incorporates stronger and more transparent rules governing evidence collection and preservation, and suggested that a national, comprehensive Evidence Law addressing the below issues would help to promote a stronger enforcement system in China.

### Evidence Collection

One prominent concern cited is China's lack of a robust system for evidentiary discovery.  U.S. rights holders have experienced significant difficulty obtaining necessary evidence from the opposing party, making it tough to prove infringement.  While China's Civil Procedure Law appears to authorize Chinese courts to seek evidence, commenters indicate that this authorization is seldom used and has proven inadequate.  Commenters would like to see more robust rules of discovery, preferably contained in a national, comprehensive Evidence Law.  In addition, commenters would like to see Chinese courts compel evidence where one party is uncooperative, and impose sanctions on parties that fail to comply with evidentiary orders.

---

[7] It is necessary to note that unlike a common law system like the United States, a civil law system like China does not provide the same precedential value to court decisions.  Thus, while court decisions may be instructive in understanding Chinese law and certain arguments that were successful, it is necessary to caution that courts are not bound by prior decisions within the same jurisdiction.

Commenters also voiced concern with the process for obtaining evidence preservation orders. Rights holders often request a preservation order to ensure that opposing parties do not destroy relevant evidence or continue to engage in allegedly infringing activity. Commenters noted that while Chinese law does provide a mechanism for obtaining evidence preservation orders, this mechanism has thus far proven inadequate and overly burdensome. U.S. rights holders report that they must meet a high threshold in order to obtain a preservation order. Specifically, rights holders report that the amount of information required to meet this threshold is both unclear and inconsistently applied. It is also reported that most courts require substantial evidence that infringement is ongoing or imminent before granting a preservation order; rights holders find it exceptionally difficult to meet this threshold as the evidence that would prove imminent or ongoing infringement is often the very evidence that is sought through discovery and a preservation order. Compounding these problems is the often-experienced ineffectiveness of court orders due to non-compliance by opposing parties. Commenters recommended that Chinese law clearly establish what information and evidence must be submitted in order to obtain an evidence preservation order, and that the threshold for such orders be reasonable.

### Evidence Introduction and Review

Many commenters raised difficulties with introducing evidence from outside of China and through expert testimony. Commenters report that U.S. rights holders find it very difficult to introduce evidence obtained in a foreign country. Chinese courts often refuse foreign evidence unless that evidence was first notarized by a notary in the foreign country where such evidence was obtained and then legalized by a Chinese embassy or consulate in that country. This results in a significant financial and time burden to U.S. rights holders.[8] Commenters also identified unclear rules for submitting translations of evidence that is originally in a foreign language and requirements to submit evidence through live testimony. Commenters recommended that China ease its notarization and legalization requirements, including by joining the "Hague Convention Abolishing the Requirement of Legalisation for Foreign Public Documents"[9] and/or by easing the requirement to legalize foreign evidence by, for example, eliminating the need to notarize and legalize foreign evidence.[10] Commenters further recommended clear rules on the submission of translations of foreign-language evidence and on introducing evidence through live testimony.

Commenters also indicated that U.S. rights holders have faced significant difficulties in introducing technical evidence in court proceedings, which significantly hinders the effectiveness of a patent enforcement regime that often necessarily involves highly technical and complex issues. According to multiple commenters, Chinese courts generally do not accept results of analytical tests of allegedly infringing products that were produced by foreign testing institutions, regardless of the established technical capacity of these institutions. Instead, U.S. rights holders are required to turn to sanctioned Chinese institutions to conduct tests. This

---

[8] Although not reported in comments regarding patent enforcement, the USPTO has heard from U.S. rights holders that various embassies/consulates have used arbitrary reasons to deny legalization and consularization requests.
[9] http://www.hcch.net/upload/conventions/txt12en.pdf.
[10] Commenters also recognized an intermediary option of generally accepting foreign evidence without the need for notarization and legalization unless there is reasonable doubt as to the authenticity and/or content of the evidence.

requirement has hindered U.S. rights holders' ability to present necessary analytical evidence, and has also raised concerns about independence/conflict of interest. Specifically, commenters indicated that U.S. rights holders have been denied the ability to present analytical evidence establishing infringement because there exist no Chinese testing institutions with the capacity/expertise to perform the necessary technical analysis or the Chinese institution with such capacity/expertise refuses to conduct such analysis. Compounding this, U.S. rights holders have also been denied the opportunity to introduce testimony by "outside" experts.

Commenters report that Chinese courts often do not permit testimony from expert witnesses other than those who are "court-sanctioned"; such court-sanctioned experts often may not have the familiarity with a particular technology to adequately opine on infringement in a given area of technology. Commenters also called into question the independence of certain court-sanctioned experts. Further complicating enforcement efforts, commenters report that U.S. rights holders are provided with little, if any, opportunity to impeach, question, or cross-examine these court-sanctioned experts. To remedy these hardships, commenters recommended that parties be allowed to introduce evidence through experts of their choosing and have the opportunity to fully cross-examine experts of other parties, leaving it to the court to decide a case based on this process. China should also clarify the rules, qualifications, and operating procedures for courts' use of experts.

Finally, commenters raised concerns about Chinese courts' dismissal of evidence without sufficient reasoning. Commenters indicated that U.S. rights holders have experienced instances where a court has dismissed evidence and merely stated that such evidence was "unreliable". Commenters would like to see consistency among Chinese courts in determining the relevance, sufficiency and weight of evidence, including through clear standards and guidelines for submitting and reviewing evidence.

## **Effectiveness and Enforcement of Remedies**

Commenters raised a number of concerns with the ability of successful litigants to obtain and enforce effective remedies. Commenters recognized that in order to effectively foster innovation, patent owners must be able to obtain meaningful relief in the event of patent infringement; such relief must not only serve as a monetary remedy for the patent holder, but also serve as a deterrent to prospective infringers. Commenters generally raised concerns with three aspects of China's system for remedies: insufficient monetary damages; overly burdensome requirements to obtain injunctions; and difficulty enforcing awards.

### **Insufficient Monetary Damages**

Commenters report that it is extremely difficult to obtain monetary damages that are sufficient to compensate patent holders for losses, let alone act as a deterrent to would-be infringers. Commenters indicate that in practice, Chinese courts revert to a method of damage assessment that has a ceiling of approximately $156,000 (1 million RMB). While various methods of damage calculation are available to Chinese courts,[11] commenters indicated that evidentiary

---

[11] One commenter detailed that Chinese law provides four methods for calculating damages:
　1. Actual losses suffered by the patent holder;

7

hurdles (see aforementioned evidentiary problems) make it nearly impossible for U.S. rights holders to gather sufficient evidence to establish damages under other methodologies that might allow for higher damages awards.  Commenters also noted that since Chinese law does not treat the exportation of goods to be an act of infringement, rights holders are disallowed from including exported goods in calculating lost profits or other forms of damage.[12]  In addition to those recommendations provided related to evidence collection, recognition, and preservation, commenters also suggest that China should lower the burden of proof for damages, increase the maximum damages allowed under Chinese law (above the 1 million RMB cap under the fourth method of damages calculation), and provide a mechanism for imposing punitive damages and recovery of attorney's fees in instances of willful infringement.

### Difficulties Obtaining Injunctions

Commenters identified difficulties in obtaining injunctions, both preliminary and permanent, under Chinese law.  Commenters stressed that injunctions are an essential component of an effective patent enforcement regime.  As previously noted, commenters representing pharmaceutical rights holders recommended that China provide an avenue to prevent infringing pharmaceutical products from entering the market; the lack of ability to obtain injunctions prior to market entry significantly hinders effective enforcement opportunities.  Lack of clarity as to when injunctive relief may not be available, for example when a court may deem a patented invention was "essential" to a local economy, further decreases the ability of rights holders to understand and effectively use China's patent enforcement mechanisms.

Commenters also indicated that while Chinese law does provide for preliminary injunctions, the experience of U.S. rights holders is that preliminary injunctions are very rarely granted.  According to commenters, the standard that must be met in order to obtain a preliminary injunction is exceptionally difficult to meet.  A party seeking a preliminary injunction must prove both infringement and irreparable harm; this is a difficult standard to meet not only because of the difficulty experienced in collecting evidence, but there is little guidance on how to establish "irreparable harm."  Commenters also referenced a statement by China's Supreme People's Court that cautions lower courts against issuing preliminary injunctions in cases involving "complicated" technologies.  Commenters further identified a requirement that a court rule on a preliminary injunction request within 48 hours as a factor that significantly impacts the ability of patent holders to receive a preliminary injunction.  As patent infringement allegations often involve complex issues, the combination of these three factors serve as a significant deterrent to courts' granting preliminary injunctions in many patent infringement cases.  Commenters suggest that China lower the threshold for obtaining a preliminary injunction (e.g., adopt a "likelihood of success" standard), publish clear guidance on what evidence a rights

---

2. Profits suffered earned by the infringer through infringing activities;
3. "Reasonable" licensing fee; and
4. Court determined damages (capped at 1 million RMB).

[12] One commenter even noted that where a Chinese manufacturer produces infringing goods and both sells those goods within China and exports the goods to other countries, Chinese courts will only allow a successful rights holder to calculate damages based on those goods sold within China (i.e., the rights holder cannot include those goods that were exported).

holder must submit to obtain a preliminary injunction, and provide a longer period of time to decide on petitions for a preliminary injunction.

### Enforcing Court Orders

Many commenters identified problems enforcing court orders, including orders related to evidence and orders for damages or injunctive relief. Rights holders may be wary of providing sensitive information during litigation if they lack confidence that such information will remain confidential, which may have a detrimental impact on their ability to effectively enforce their patent rights. Commenters further noted that Chinese courts lack the power to hold uncooperative parties in contempt, or where such power does exist, courts often refuse to exercise it and compel cooperation.

Numerous commenters raised concerns about the difficulties rights holders have experienced in enforcing a judgment rendered by a Chinese court. Several commenters specifically stressed problems that U.S. rights holders face enforcing a judgment when the losing party relocates and/or changes its official company name. It has been the experience of various U.S. rights holders that a Chinese company that has lost an infringement suit will seek to avoid enforcement by relocating to a different province, reincorporating under a different name, and/or liquidating most or all of its assets (often transferring them to a related entity). According to commenters, this problem is exacerbated by the fact that enforcement of most orders for damages and injunctions is not automatic; a winning party must apply to an enforcement tribunal in order to compel an unresponsive losing party to comply with such orders. Commenters stressed that although courts may impose fines and/or jail time for failure to comply with court orders, imposition of a significant fine or jail time is rarely imposed, resulting in little deterrent effect.

Commenters recommended that Chinese law impose sanctions, including criminal liability, on parties that fail to comply with court orders. Where such sanctions do exist, commenters recommended that fines be increased and that significant fines and jail time be imposed, so as to serve as a deterrent. Commenters further suggest that Chinese law ensure that a court order attach to, and run with, the losing company and/or its executives, allowing for enforcement against entities that receive assets transferred to related entities; this would help avoid losing parties avoiding or delaying enforcement of court orders by relocating, changing names, and/or transferring assets.

## Administrative Enforcement

Finally, commenters raised concerns with China's system of administrative enforcement. One commenter explicitly complimented China's administrative enforcement mechanism for patents, noting that local patent bureaus typically act quickly and sensibly and indicating that certain U.S. rights holders have found this mechanism generally positive. This commenter, and others, did, however, identify specific aspects of the administrative enforcement mechanism that are subject to abuse against legitimate rights holders. Specifically, commenters noted that the low threshold for initiating an invalidation action with SIPO[13] and the lack of application of *res judicata* and

---

[13] Invalidation actions are administered by the Patent Review Board, a unit within SIPO.

estoppel principles[14] can result in legitimate patent holders defending against numerous, and often duplicative, invalidation actions. Commenters noted that U.S. rights holders have experienced situations where they have faced multiple invalidation actions on the same patent; in some instances these challenges assert similar claims and were initiated by the same challengers who were previously unsuccessful in invalidating the patent. Commenters recommended that SIPO promulgate rules that would apply principles of *res judicata* and estoppel to invalidation actions.

Other commenters noted that the administrative enforcement system has not proven effective for U.S. rights holders. These commenters cited the lack of resources, technical expertise, and investigatory powers necessary to handle complex matters. For example, local patent offices have expressed hesitation adjudicating complex pharmaceutical patent infringement matters and, according to commenters, lack the authority to require compliance with their orders, leaving suspected infringers free to ignore orders for evidence/information. Furthermore, local patent offices lack the authority to award monetary damages and can only impose injunctions; they also lack the authority to impose sanctions for failure to comply with the injunctions, however, necessitating application to a court for enforcement of the administrative order. Commenters recommended that local patent office personnel be provided enforcement power and be otherwise provided with the necessary authority and training to handle complex patent infringement allegations.

## STEPS THE U.S. GOVERNMENT IS TAKING

The U.S. Government places a high priority on ensuring that our trading partners maintain an effective system for protecting and enforcing all forms of IPR, including patent rights. As one of the United States' most significant trading partners, ensuring that China maintains an effective IPR protection and enforcement system is an area of high importance. In particular, through the USPTO and other government agencies, the United States identifies specific areas of China's IPR regime that could be improved through bilateral engagement, including agreement on specific outcomes under the IPR Working Group of the U.S.-China Joint Commission on Commerce and Trade (JCCT) and the U.S.-China Strategic & Economic Dialogue (S&ED), and capacity building efforts.

The IPR Working Group has proven to be a successful forum for bilateral engagement with China on IPR matters, including matters involving IPR enforcement. Prior outcomes affecting IPR enforcement include a commitment by China to study methods to combat online copyright piracy, China's agreement to adopt legal measures clarifying the liability for trademark infringement of landlords and other "secondary" infringers in Chinese markets, an announcement of the establishment of a permanent, high-level leadership structure to better coordinate IPR enforcement efforts across the government, assurances that China would impose strict administrative penalties on Internet infringers, and agreements to engage in various IPR enforcement-related cooperative activities and programs. The information provided by U.S.

---

[14] Under *res judicata* and estoppel principles, courts and quasi-judicial bodies will reject a subsequent claim or pleading based on the same issue that was central to a matter that was previously decided by a court or quasi-judicial body. This helps avoid instances where rights holders must constantly defend their rights against duplicative, and often frivolous, litigation.

rights holders and other commenters will help guide the U.S. proposals through the IPR Working Group for outcomes and cooperative efforts on patent and other IPR enforcement issues, and will also serve to influence dialogue under other bilateral engagement mechanisms under the JCCT and the S&ED that incorporate discussions on IP and commercial rule of law issues.

The USPTO also conducts various cooperative programs with Chinese IP agencies, both under and outside of the IPR Working Group. The comments received will help the USPTO identify specific areas for cooperation through technical exchanges, including exchanges between judicial officials from both sides, and information-sharing programs. Through cooperative programs such as these, the USPTO looks to highlight changes that China could make to enhance the IPR enforcement mechanisms in China, to the benefit of all parties who avail themselves of these mechanisms, including U.S. rights holders. The USPTO will also continue to explore cooperative activities with universities, non-governmental organizations, international organizations, and private sector participants that will facilitate advancement of IPR enforcement mechanisms, including by strengthening commercial rule of law in China. In particular, the USPTO will look to facilitate exchanges between U.S. and Chinese judges involved in IP cases.

In recognition of the usefulness of the comments received during this process and of other input on IPR enforcement matters, the USPTO intends to convene regular meetings with representatives from the U.S. business community to solicit information in this area. In particular, the USPTO will seek updates on civil, administrative, and enforcement issues, including specifically the concerns summarized in this report, and feedback on the effectiveness of U.S. Government engagement with China on those issues. As part of this process, the USPTO will work with U.S. rights holders to gather statistics on the effectiveness of China's IPR enforcement mechanisms and the ability of foreign rights holders to effectively utilize those mechanisms.