Court File No: 09-CL-7950

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re*: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

# BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS (PRE-TRIAL BRIEF – ALLOCATION)

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett** LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby** LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON  M5X 1G5

**Derrick Tay** LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam** LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5697
Fax:    (416) 862-7661
*Lawyers for the Canadian Debtors*

Dated:  May 2, 2014

**BUCHANAN INGERSOLL & ROONEY PC**

919 North Market Street, Suite 1500
Wilmington, Delaware 19801

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**ALLEN & OVERY LLP**

1221 Avenue of the Americas
New York, NY  10020

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

---

[1] The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9620), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components Inc. (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226).

**TO:    THE CORE PARTIES SERVICE LIST**

# Index

i

## BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS
## (PRE-TRIAL BRIEF – ALLOCATION)

| Tab | Authority |
|-----|-----------|
| 1. | *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336 (Fed. Cir. 2001), cert. denied 535 U.S. 906 (2002) |
| 2. | *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust,* 2007 ONCA 205 |
| 3. | *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 |
| 4. | *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 |
| 5. | Bruce Ziff, *Principles of Property Law*, 5th ed. (Toronto: Thomson Reuters Canada, 2010) |
| 6. | *Black's Law Dictionary*, 9th ed. |
| 7. | *Heap v. Hartley* (1889), 42 Ch.D. 461 |
| 8. | *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907 |
| 9. | *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581 |
| 10. | *Euro-Excellence Inc. v. Kraft Canada Inc.,* 2007 SCC 37 |
| 11. | *Re Elliott Estate,* [1962] O.J. No. 164 |
| 12. | *PUC Distribution Inc. v. Brascan Energy Marketing Inc.,* 2008 ONCA 176, leave to appeal refused 2008 CarswellOnt 5591 (SCC) |
| 13. | *1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003] O.J. No. 1468 |
| 14. | *Re: Axelrod*, [1994] O.J. No. 2277 |
| 15. | Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) |
| 16. | *Lac Minerals v. Corona*, [1989] S.C.J. No. 83 |
| 17. | *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 |
| 18. | *Gallen v. Allstate Grain Co.,* [1984] B.C.J. No. 1621 (C.A.); leave to appeal to SCC refused, [1984] S.C.C.A. No. 171 |
| 19. | *Cunningham v. Hamilton* (1995), 169 A.R. 132 at para. 4 (C.A.) |
| 20. | *Meditrust Healthcare Inc. v. Shoppers Drug Mart (2002)*, 26 O.R. (3d) 786 (C.A.) |
| 21. | *Martin v. Astrazeneca Pharmaceuticals PLC*, 2012 ONSC 2744; aff'd 2013 ONSC 1169 (Div. Ct.) |
| 22. | *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc*, [2013] EWHC 2608 (Ch. D.) |





**HILGRAEVE CORPORATION, Plaintiff-Appellant, v. SYMANTEC CORPORA-TION, Defendant-Cross Appellant.**

**00-1373, 00-1374**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**265 F.3d 1336; 2001 U.S. App. LEXIS 20496; 60 U.S.P.Q.2D (BNA) 1291**

**September 17, 2001, Decided**

**SUBSEQUENT HISTORY:**    [**1] Rehearing and Rehearing En Banc Denied November 6, 2001, Reported at: 2001 U.S. App. LEXIS 26125. Certiorari Denied March 4, 2002, Reported at: 2002 U.S. LEXIS 1420.
Rehearing denied by, Rehearing, en banc, denied by Hilgraeve Corp. v. Symantec Corp., 2001 U.S. App. LEXIS 26125 (Fed. Cir., Nov. 6, 2001)
Writ of certiorari denied Symantec Corp. v. Hilgraeve Corp., 535 U.S. 906, 152 L. Ed. 2d 144, 122 S. Ct. 1206, 2002 U.S. LEXIS 1420 (2002)
Motion granted by, Motion to strike denied by Hilgraeve Corp. v. Symantec Corp., 212 F.R.D. 345, 2003 U.S. Dist. LEXIS 677 (E.D. Mich., 2003)
On remand at, Summary judgment denied by, Summary judgment granted by Hilgraeve, Inc. v. Symantec Corp., 2003 U.S. Dist. LEXIS 11999 (E.D. Mich., July 9, 2003)

**PRIOR HISTORY:**    Appealed from: United States District Court for the Eastern District of Michigan. Judge Paul V. Gadola.
Hilgraeve Corp. v. Symantec Corp., 90 F. Supp. 2d 850, 2000 U.S. Dist. LEXIS 4120 (E.D. Mich., 2000)

**DISPOSITION:**    AFFIRMED-IN-PART, VACAT-ED-IN-PART, AND REMANDED.

**COUNSEL:** Ernie L. Brooks, Brooks & Kushman P.C., of Southfield, Michigan, argued for plaintiff-appellant. With him on the brief were Thomas A. Lewry, Robert C.J. Tuttle, John E. Nemazi, and Frank A. Angileri.

Martin C. Fliesler, Fliesler Dubb Meyer & Lovejoy LLP, of San Francisco, California, argued for defendant-cross appellant. With him on the brief were Burt Magen, and Sarah Barone Schwartz. Of counsel was Dennis J. Le-vasseur, Bodman Longley & Dahling LLP, of Detroit, Michigan.

**JUDGES:** Before RADER, Circuit Judge, PLAGER, Senior Circuit Judge, and DYK, Circuit Judge.

**OPINION BY:** DYK

**OPINION**

[*1338]   DYK, *Circuit Judge.*

Hilgraeve Corp. ("Hilgraeve") appeals from the decision of the United States District Court for the Eastern District of Michigan granting the motion of Symantec Corp. ("Symantec") for summary judgment of non-infringement for U.S. Patent No.  5,319,776 (" '776 patent"). *Hilgraeve Corp. v. Symantec Corp.*, 90 F. Supp. 2d 850 (E.D. Mich. 2000). Symantec cross-appeals the district court's grant of summary judgment [**2]  for Hilgraeve that Symantec is not licensed to use the invention claimed in the '776 patent. *Hilgraeve Corp. v. Symantec Corp.*, 1999 U.S. Dist. LEXIS 22970, Civ. Action No. 97-40370 (E.D. Mich. Jun. 28, 1999) ("License Defense Order").

We vacate the district court's grant of summary judgment of non-infringement of the '776 patent and generally affirm the district court's grant of summary judgment that Symantec did not license the '776 patent. We find that questions of material fact exist as to whether the limitations of the '776 patent claims are found in the methods performed by the accused products, and that Hilgraeve did not transfer any rights to practice the '776 patent.

BACKGROUND

Hilgraeve filed suit against Symantec in the Eastern District of Michigan for infringement of the '776 patent on September 15, 1997. On the same day, Hilgraeve filed a separate suit against McAfee Associates, [*1339] Inc. for infringement of the '776 patent, also in the Eastern District of Michigan. The cases were not consolidated. In the McAfee case, the district court's grant of summary judgment of non-infringement, *Hilgraeve Corp. v. McAfee Associates, Inc.*, 70 F. Supp. 2d 738 (E.D. Mich. 1999) ("*McAfee I* [**3] "), was vacated and remanded by this court because, under the agreed claim construction, questions of material fact existed about the operation of the accused device, 224 F.3d 1349, 55 U.S.P.Q.2D (BNA) 1656 (Fed. Cir. 2000) ("*McAfee II*").

The '776 patent relates to computer virus detection software. The software scans a digital data file for viruses as the file is transferred to a storage medium. If the software detects a virus prior to storing the file, it automatically blocks storage of the file. The software may be used, for example, to scan a file for viruses as the file is transferred from a floppy disk to a hard disk of a computer system, or as the file is transferred over the Internet from one computer system to a storage medium of another computer system.

The '776 patent contains 20 claims. Independent claims 1 and 18, which are at issue on this appeal, read as follows:

> 1. In a system for transferring digital data for storage in a computer storage medium, a method of screening the data *as it is being transferred* and automatically inhibiting the storage of screened data containing at least one predefined sequence, comprising the steps of:
>
> causing a [**4] quantity of digital data resident on a source storage medium to be transferred to a computer system having a destination storage medium;
>
> receiving and screening the transferred digital data *prior to storage on the destination storage medium* to determine if at least one of a plurality of predefined sequences are present in the digital data received; and
>
> in response to said screening step:
>
> (a) automatically causing the screened digital data to be stored on said destination storage medium if none of the plurality

of predefined sequences are present, and

> (b) automatically inhibiting the screened digital data from being stored on said destination storage medium if at least one predefined sequence is present.

18. A method of preventing the spread of computer viruses to a computer having a storage medium, comprising the steps of:

> *simultaneously searching* for a plurality of virus signatures, each of which comprising an identifiable digital sequence, *while said computer is receiving a stream of digital data for storage on said storage medium*;
>
> providing an indication of the detection of a virus from said searching step; and
>
> automatically [**5] inhibiting the storage of said digital stream on said storage medium if any of said virus signatures have been detected.

'776 patent, col. 17, ll. 9-29 and col. 18, ll. 45-57 (emphases added to pertinent terms).

Because these claims require the inhibition of "storage," the district court was required to construe the meaning of the word "storage" in the patent. The district court construed "storage" as occurring "when the incoming digital data is sufficiently present on the destination storage medium so that any viruses contained in the data can spread and infect the computer system." *Hilgraeve*, 90 F. Supp. 2d at 857.

Hilgraeve contended that several Symantec products, including pcANYWHERE TM and Norton Antivirus TM ("NAV"), infringe [*1340] the '776 patent

265 F.3d 1336, *; 2001 U.S. App. LEXIS 20496, **;
60 U.S.P.Q.2D (BNA) 1291

under this claim construction. In other words, Hilgraeve alleged that the accused products screen incoming digital data for viruses during transfer and before "storage" on the destination storage medium. In contrast, Symantec contended that its products do not infringe because they screen for viruses only after the data have been "stored" on the destination storage medium. Thus, the critical issue was whether [**6] the accused products screen for viruses before or after the data become sufficiently present on the storage medium so that viruses contained in the data could spread and infect the computer system.

To resolve this issue on summary judgment the district court relied on testimony of Symantec's expert witness about how the accused products operate and on statements made by Hilgraeve and its expert that it agreed with the overview offered by Symantec's expert about how the accused products operate. *Hilgraeve*, 90 F. Supp. 2d at 858-59. Upon accepting Symantec's view of how the products operate, the district court found that the accused products "first allow the incoming digital data to be stored as a whole on the destination storage medium before it is scanned. Virus screening is performed only after the incoming digital data has been fully transferred and stored." *Id.* at 859. The district court held that "because there is no dispute about how the accused products operate, there is no genuine issue as to any material fact concerning whether Defendant's accused products literally infringe the '776 Patent" and granted summary judgment for Symantec. *Id.*

[**7] Before the district court, Symantec also asserted the affirmative defense to Hilgraeve's infringement claim that it had acquired a license to use the patent under a complex series of transactions involving Delrina Corp. and its subsidiaries. On June 30, 1993, Delrina Corp., Delrina (Delaware) (a subsidiary of Delrina Corp.), and Hilgraeve executed a Technology Transfer Agreement under which Delrina Corp. paid Hilgraeve $ 1.45 million, and Hilgraeve transferred certain rights to its software, allegedly including the technology at issue in this suit, to Delrina (Delaware). The Technology Transfer Agreement states that it is governed by the laws of the Province of Ontario, Canada. On the same day, Delrina (Canada) (also a subsidiary of Delrina Corp.) and Delrina (Delaware) entered into a Software Development and Cost Sharing Agreement (the "SDCS Agreement") to govern the shared development of software by the parties. In July 1995, Symantec acquired Delrina Corp. On March 30, 1996, Delrina (Canada) licensed its intellectual property to Symantec. On March 2, 1999, Delrina (Delaware) entered into an agreement with Symantec to directly transfer rights to the technology transferred by Hilgraeve [**8] to Delrina (Delaware) on June 30, 1993.

The district court granted Hilgraeve's motion for summary judgment that Symantec did not have a license to the '776 patent prior to March 2, 1999, because Symantec had failed to establish that Delrina (Delaware) transferred any rights to the '776 patent to Delrina (Canada) or Delrina Corp., and Symantec therefore failed to show that it acquired any rights to the '776 patent through the 1995 acquisition of Delrina Corp. License Defense Order, slip op. at *14. As to events after March 2, 1999, the district court denied both Hilgraeve's and Symantec's motions for summary judgment regarding Symantec's licensing defense, finding that the March 2, 1999, agreement raised a general issue of material fact as to whether Symantec had acquired a license to the '776 patent through the March 2, 1999 agreement. *Id.* After granting Symantec's motion for summary judgment of non-infringement, the district court denied all [*1341] other pending motions in the case without prejudice, and dismissed the case. *Hilgraeve*, 90 F. Supp. 2d at 859.

DISCUSSION

I. *Jurisdiction and Standard of Review*

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295 [**9] (a)(1). Summary judgment is properly granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 46 U.S.P.Q.2D (BNA) 1752, 1755 (Fed. Cir. 1998). We review a district court's grant of a motion for summary judgment without deference. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315, 47 U.S.P.Q.2D (BNA) 1272, 1275 (Fed. Cir. 1998).

A patent infringement analysis requires two steps. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1476, 45 U.S.P.Q.2D (BNA) 1498, 1500 (Fed. Cir. 1998). "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Id.* (quoting *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576, 27 U.S.P.Q.2D (BNA) 1836, 1839 (Fed. Cir. 1993)). Claim construction is a matter of law that is reviewed without deference. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456, 46 U.S.P.Q.2D (BNA) 1169, 1174 (Fed. Cir. 1998) [**10] (en banc). Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353, 48 U.S.P.Q.2D (BNA) 1674, 1676 (Fed. Cir. 1998). "Thus, summary judgment of non-infringement can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encom-

passed by the claims." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304, 51 U.S.P.Q.2D (BNA) 1161, 1165 (Fed. Cir. 1999).

We review the construction of a license agreement without deference and interpret the licensing agreement under the law governing the agreement, here Ontario law. *See Studiengesellschaft Kohle, m.b.H. v. Hercules, Inc.*, 105 F.3d 629, 632, 41 U.S.P.Q.2D (BNA) 1518, 1521 (Fed. Cir. 1997) (citing *Cyrix Corp. v. Intel Corp.*, 77 F.3d 1381, 1384, 37 U.S.P.Q.2D (BNA) 1884, 1887 (Fed. Cir. 1996)).

## II. *Claim Construction Issues*

As noted above, this is our second case involving the '776 patent. In *McAfee II*, we accepted the claim construction of "storage" urged by both parties and adopted by the district [**11] court in *McAfee I*. That claim construction differs slightly from the claim construction adopted below in the district court in this case in that the *McAfee II* claim construction views "storage" as occurring "when the incoming digital data is sufficiently present on the destination storage medium, *and accessible by the operating system or other programs*, so that any viruses contained in the data can spread and infect the computer system." *McAfee II*, 224 F.3d at 1351 (emphasis added to differing language).

Symantec argues that "storage" should not be construed to occur when data become "accessible by the operating system or other programs," *Hilgraeve*, 90 F. Supp. 2d at 857, or when "any viruses contained in the data can spread and infect the computer system," but that "storage" should be construed to occur when the data become physically present (i.e., magnetically recorded) on the storage medium.

We need not decide here whether our claim construction in *McAfee II* is binding on us in this case as a matter of [*1342] *stare decisis*. Our decision in *McAfee II* was precedential, but it merely adopted the district court's claim construction [**12] in *McAfee I* based on the parties' agreement that the district court's claim construction was correct. We have independently considered the issues of claim construction and conclude that the construction of "storage" in *McAfee II* is indeed correct.

The '776 patent distinguishes prior art virus scanning programs because they "do not automatically prevent the virus from being stored on the medium in the first place, hence they cannot totally prevent the virus from attacking or spreading." '776 patent, col. 1, ll. 51-54. Thus, "storage" of the virus is identified with the virus's ability to spread and infect the computer system. A virus may not spread or infect the computer system, however, unless it is accessed by the operating system or other pro-

grams. Given this, we agree with the *McAfee II* court that "storage" occurs "when the incoming digital data [are] sufficiently present on the destination storage medium and accessible by the operating system or other programs so that any viruses contained in the data can spread and infect the computer system." [1] *McAfee II*, 224 F.3d at 1351.

    1   The parties also dispute whether "destination storage medium" as used in claim 1 and "storage medium" as used in claim 18 mean the ultimate destination of the digital data or whether the terms may be construed to include an intermediate storage medium. In accordance with the definition of "storage" we have adopted, we conclude that "storage medium" refers to any storage medium of the computer system, if the data, when stored on the medium, are accessible to the operating system or other programs, such that viruses in the data can spread and infect the computer system.

[**13]   III. *Infringement*

Symantec contends that even under our claim construction it does not infringe. Hilgraeve argues that questions of material fact remain regarding the operation of the accused devices and hence infringement. [2] We conclude here that the conflicting affidavits of the parties' experts leave material fact questions unanswered, just as we held in a somewhat similar context in *McAfee II*.

    2   While the parties, and the district court's decision, speak of the accused devices as infringing, more properly the allegation is that the operation of the devices directly infringes the method claims at issue, or that the sale of the devices induces customers to infringe the method claims.

The district court based its summary judgment of non-infringement on the testimony of Symantec's expert, Dr. Melvin, who opined on the operation of the accused products, and on statements made by Hilgraeve and its expert, Dr. Geske, agreeing with portions of Dr. Melvin's testimony. The experts, however, did not in fact [**14] agree.

The experts described the operation of the accused products in different ways. Symantec's expert, Dr. Melvin, described the operation of NAV as occurring in a sequence of steps. In this sequence, first (step one) a file is transferred for storage onto the destination storage medium. This transfer includes opening a new file on the storage medium and recording incoming data into the new file. Second (step two), the application causing the transfer makes a request to the operating system to close the file containing the transferred data. Third (step three),

Case 09-10138-MFW   Doc 13453   Filed 05/02/14   Page 11 of 271

Page 5

265 F.3d 1336, *; 2001 U.S. App. LEXIS 20496, **;
60 U.S.P.Q.2D (BNA) 1291

the operating system closes the file. Fourth (step four), after the file is closed, the Symantec product invokes the NAV Scan Engine to test the file for the presence of a virus. Symantec's expert alleged that after the third step and before the fourth step, the file is recorded on the storage medium and accessible to the operating system and other programs - and therefore [*1343] "stored," and that since this occurs before the file is scanned for viruses, Symantec's products do not infringe. Hilgraeve's expert, Dr. Geske, stated that although he agreed with Dr. Melvin's "overview" of how the accused products operate, in his opinion [**15] there were critical points in Dr. Melvin's analysis that did not correspond with the behavior of the NAV as it executes. Critically, Dr. Geske interpreted the testimony of Mr. Cohen, the Chief Architect of the Symantec accused products, to mean that the accused products impose a barrier in the computer system's file system which prevents all programs and the operating system from accessing the transferred file until it is processed and screened for viruses. Thus, Dr. Geske disputed that the file becomes accessible to the operating system and other programs between steps three and four.

Symantec's expert sought to prove that a file becomes accessible to the operating system or other programs before it is scanned for viruses by the NAV Scan Engine by running four tests. Hilgraeve's expert asserted that these tests do not prove that Symantec's products do not infringe, and that even if they showed that the products do not infringe under the test circumstances, they do not prove non-infringement under normal operating conditions.

We agree that tests of an accused device under unusual conditions are not necessarily relevant to an infringement analysis. For example, in determining whether [**16] a product claim is infringed, we have held that an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation. See Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 832, 20 U.S.P.Q.2D (BNA) 1161, 1171 (Fed. Cir. 1991); Key Pharms., Inc. v. Hercon Labs. Corp., 981 F. Supp. 299, 310 (D. Del. 1997), aff'd, 161 F.3d 709, 48 U.S.P.Q.2D (BNA) 1911 (Fed. Cir. 1998); Huck Mfg. Co. v. Textron, Inc., 1975 U.S. Dist. LEXIS 12539, 187 U.S.P.Q. (BNA) 388, 408 (E.D. Mich. 1975) ("The fact that a device may be used in a manner so as not to infringe the patent is not a defense to a claim of infringement against a manufacturer of the device if it is also reasonably capable of a use that infringes the patent."); cf. High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc., 49 F.3d 1551, 1556, 33 U.S.P.Q.2D (BNA) 2005, 2009 (Fed. Cir. 1995) (finding that an accused device does not infringe if it does not infringe in its normal configuration, even if it

may be altered into an infringing configuration under unusual circumstances). [**17] So too the sale of a device may induce infringement of a method claim, even if the accused device is capable of non-infringing modes of operation in unusual circumstances.

In the first test, Symantec's expert downloaded an infected file from a web page on the Internet to a storage disk of a computer running NAV and the Windows 95 TM operating system. After the file arrived at the computer, but before the NAV was able to scan and delete the file, he shut off power to the computer. When he turned the computer on again he was able to access the file with a utility program of Windows 95. In the second test, Dr. Melvin also downloaded an infected file from a web page to a storage disk of a computer running NAV, but he restarted the computer instead of shutting off its power, prior to scanning by NAV. When the computer restarted, he was able to access the file. Symantec alleges that these two tests show that the file is stored on the computer's storage medium prior to scanning. Even if that is true as a factual matter under the circumstances of the tests, the tests are not probative of infringement during normal operation of the accused products. Because the '776 patent claims require "automatically [**18] inhibiting" the storage [*1344] of the virus, as we said in McAfee II when considering similar tests, "a test disabling the automatic capabilities of [the accused product] is not probative of whether [the accused product] may infringe in the automatic mode." McAfee II, 224 F.3d at 1354.

In Dr. Melvin's third test, he downloaded an infected file to a computer running both NAV and McAfee's anti-virus screening program, VirusScan TM . VirusScan intercepted and examined the file before NAV screened it for viruses, which according to Dr. Melvin, showed that the file was accessible by other programs prior to screening by NAV. While this third test may demonstrate that the infected file is accessible to VirusScan before it is screened by NAV, it is not clear from this test that the virus can spread and infect the computer system before it is screened by NAV, especially since both NAV and VirusScan are intended to prevent the spread of viruses. Moreover, as with the first two tests, whether or not the accused products infringe when operated in conjunction with another anti-virus product - perhaps an unusually redundant mode of operation - does not answer the question whether [**19] they infringe while operating alone.

In his fourth test, Dr. Melvin loaded into memory NAV and a special program for intercepting a particular file while the file is being downloaded and redirecting the file to the computer's storage medium. When Dr. Melvin then downloaded the particular file, which contained a virus, it was intercepted and redirected to the

storage medium by the special program before it could be screened by NAV for viruses. That this test may prove that the functionality of the accused products can be defeated to avoid infringement does not prove non-infringement of the products under normal operating conditions.

Thus, we find the tests inconclusive on the issue of infringement. Because the record shows the existence of genuine issues of material fact concerning the interaction of the accused devices with the operation system and other programs, the district court erred in granting summary judgment of non-infringement.

IV. *Symantec's Licensing Defense*

Symantec urges that even if we vacate the district court's grant of summary judgment of non-infringement, the judgment can be affirmed on an alternative ground, namely that Symantec was licensed to practice [**20] the patent. We cannot agree.

The district court held that Symantec had no license defense for the period prior to March 2, 1999, because the purported transfer of patent rights from Delrina (Delaware) to Delrina (Canada) under the June 30, 1993 SDCS agreement was ineffective. While the district court appears to have been correct, we believe that there is a more fundamental defect in Symantec's license defense argument - Delrina (Delaware) itself never acquired a transferable license to practice the '776 patent, and Delrina (Delaware) therefore could not sub-license the '776 patent either before March 2, 1999, or thereafter.

Unless the '776 patent was licensed under the June 30, 1993 Agreement, Symantec agrees that it could not acquire a license. Symantec also admits that there is no express language in the June 30, 1993 Technology Transfer Agreement licensing or transferring rights to the '776 patent or any other Hilgraeve patent. Instead, Symantec points to language in the paragraph 2.1 of the Agreement providing that "HILGRAEVE sells, conveys, assigns and transfers to DELRINA DELAWARE and to HILGRAEVE, as joint tenants and not as tenants in common, all copyright rights in the Software, [**21] " and that Hilgraeve acknowledged in paragraph 9.1 that as part of the transfer "HILGRAEVE [*1345] has also agreed to transfer the necessary know-how and technical expertise to DELRINA DELAWARE with respect to the Software." On the basis of this language, Symantec urges us to find that:

> 'Software' is more than source code and object code. . . . When read in conjunction with the . . . 'know-how' and 'technical expertise' transferred to Delrina (Delaware), Delrina (Delaware) essen-

tially acquired Hilgraeve's entire knowledge base with respect to [Hilgraeve's] products. Since the Software included in-transit anti-virus features, Delrina acquired Hilgraeve's knowledge base with respect to those in-transit anti-virus features and could use that knowledge base as it pleased."

In summary, Symantec urges us to find that "the Technology Transfer Agreement covered the technology in this case, which is allegedly covered by the '776 Patent."

Whatever the definition of "knowledge base" proposed by Symantec, we cannot conclude that rights to the '776 patent were transferred by the Technology Transfer Agreement. Under Ontario law, "effect must first be given to the intention of the parties, [**22] to be gathered from the words they have used . . . ." *Consol.* Bathurst Exp. Ltd. v. Mut. Boiler & Mach. Ins. Co., 1 S.C.R 888, 888 (Can. 1980). When the language of a contract is clear and unambiguous, only the contract is considered for interpretation, not extrinsic evidence. *Indian Molybdenum v. The King*, 3 D.L.R. 497, 502 (Can. 1951). Here, the contract provided for Hilgraeve to transfer "all copyright rights in the Software," but failed to mention the transfer of patent rights. From the terms of the contract we cannot conclude that the parties intended to transfer any patent rights. Symantec relies on *Allan v. Bushnell T.V. Co., Ltd.*, 1 D.L.R. (3d) 534, 539 (Ont. High Ct. 1968) for the proposition that "unexpressed terms [are implied] to implement [the] parties' presumed intention." *Allan*, however, stated that

> the presumption is against the adding to contracts of terms which the parties have not expressed. The general presumption is that the parties have expressed every material term . . . . But . . . there may be cases where obviously some term must be implied if the intention of the parties is not to be defeated, some term [**23] of which it can be predicated that 'it goes without saying', some term not expressed but necessary to give to the transaction such business efficacy as the parties must have intended.

*Id. Allan* was a case involving a contract between a broadcasting company and a news service in which the unexpressed term which was implied in the contract was that the news to be supplied to the company by the service had to be "accurate." Here, we cannot say (and it does not "go without saying") that where the contract

provided for the transfer of copyrights in the software, but failed to mention the transfer of patent rights, that we must imply such a term to the contract. The contract has a business efficacy without adding this unexpressed term to it.

Moreover, in the subparagraph immediately following the paragraph 2.1 pertaining to the transfer of copyrights, the contract refers to other intellectual property rights. In paragraph 2.2, the parties agreed that Hilgraeve "shall not assert against DELRINA DELAWARE, any other intellectual property right, including patent rights, it has or may have in the future, with respect to the production, copying, licensing of the Software, or the [**24] exercise by DELRINA DELAWARE of any rights transferred hereunder." Since the contract specifically mentions patent rights in paragraph 2.2, we cannot say that the omission of mention of patent rights in paragraph 2.1, which transferred rights to [*1346] copyrights in the Software, was accidental or that the transfer of patent rights is implicit anywhere the contract. *Cf. State Contracting & Eng'g Corp. v. Florida*, 258 F.3d 1329, 59 U.S.P.Q.2D (BNA) 1498 (Fed. Cir. 2001) (applying Florida law to construe an agreement).

Symantec also contends that the covenant not to sue for patent infringement in paragraph 2.2 is equivalent to a freely transferable license to the patent. This court has stated that "licenses are considered as nothing more than a promise by the licensor not to sue the licensee." *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1577, 42 U.S.P.Q.2D (BNA) 1119, 1127 (Fed. Cir. 1997). The covenant not to sue in paragraph 2.2 does not grant a *transferable* license to the patent.

CONCLUSION

Therefore, we vacate the district court's grant of summary judgment of non-infringement, generally affirm the district court's grant of summary judgment that Symantec [**25] did not license the '776 patent prior (but without limiting our holding to the period before March 2, 1999), and remand for further proceedings consistent with this opinion.

AFFIRMED-IN-PART,     VACATED-IN-PART, AND REMANDED.

COSTS

No costs.

 LexisNexis®

SYMANTEC CORPORATION v. HILGRAEVE CORPORATION

01-1140

SUPREME COURT OF THE UNITED STATES

535 U.S. 906; 122 S. Ct. 1206; 152 L. Ed. 2d 144; 2002 U.S. LEXIS 1420; 70 U.S.L.W. 3551

March 4, 2002, Decided

**PRIOR HISTORY:**    [**1]   Reported below: 2001 U.S. App. LEXIS 20496.
Hilgraeve Corp. v. Symantec Corp., 265 F.3d 1336, 2001 U.S. App. LEXIS 20496 (Fed. Cir., 2001)

**JUDGES:** Rehnquist, Stevens, O'Connor, Scalia, Kennedy, Souter, Thomas, Ginsburg, Breyer.

**OPINION**

[*1207]   Petition for writ of certiorari to the United States Court of Appeals

for the Federal Circuit denied.



*Case Name:*

# Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust

**Between**
**Ventas, Inc., 2124678 Ontario Inc., and 2124680 Ontario**
**Inc., Applicants (Respondents in Appeal), and**
**Sunrise Senior Living Real Estate Investment Trust,**
**Sunrise REIT Trust, Sunrise REIT GP, Inc., Sunrise**
**Senior Living Inc., and Health Care Property Investors,**
**Inc., Respondents (Appellants in Appeal)**
**And between**
**Sunrise Senior Living Real Estate Investment Trust,**
**Sunrise REIT Trust, and Sunrise REIT GP, Inc.,**
**Applicants (Appellants in Appeal), and**
**Ventas SSL Ontario II, Inc. (Formerly 2124678 Ontario**
**Inc.), Ventas SSL Ontario I, Inc. (Formerly 2124680**
**Ontario Inc.), Ventas Inc., Sunrise Senior Living,**
**Inc., and Health Care Property Investors, Inc.,**
**Respondents (Respondents in Appeal) (Ventas Inc.**
**and numbered companies) (Appellant by Cross-Appeal)**
**(Health Care Property Investors, Inc.)**

[2007] O.J. No. 1083

2007 ONCA 205

85 O.R. (3d) 254

222 O.A.C. 102

29 B.L.R. (4th) 312

56 R.P.R. (4th) 163

156 A.C.W.S. (3d) 95

2007 CarswellOnt 1705

Dockets: C46790 and C46791

Ontario Court of Appeal
Toronto, Ontario

**R.A. Blair, J.L. MacFarland and H.S. LaForme JJ.A.**

Heard: March 20, 2007.
Judgment: March 23, 2007.

(69 paras.)

*Corporations and associations law -- Sale of a business -- Asset purchase agreement -- Conditions and warranties -- Restrictive covenants -- Appeal by trust and potential purchaser of trust's assets from decision concluding trust was precluded from considering or accepting bid from potential purchaser dismissed -- Trust and plaintiff purchaser entered into purchase agreement -- Agreement precluded trust from negotiating other bids and obliged trust to enforce existing standstill agreements -- Potential purchaser made post-auction bid, exceeding plaintiff purchaser's bid -- Trust held to be unable to consider or accept bid -- Fact plaintiff purchaser negotiated better terms in its standstill agreement did not render potential purchaser's agreement unenforceable -- Trust's shareholders still entitled to vote on plaintiff purchaser's bid, such that court's decision did not prevent trust from maximizing shareholder value.*

Appeal by Sunrise and HCPI from a decision concluding Sunrise was precluded from considering or accepting a post-auction bid for its assets by HCPI. Sunrise owned and invested in seniors communities. It decided to sell its assets. All bidding parties were required to enter into confidentiality agreements, as well as standstill agreements preventing bidders from attempting unsolicited takeover bids. Ventas' standstill agreement differed from HCPI's, in that Ventas' agreement would terminate at the end of the auction process. HCPI's standstill agreement did not contain this term. Ventas and HCPI were the two bidders asked to participate in the final round of an auction. Sunrise waived the standstill agreements for Ventas and HCPI for the purpose of further negotiations, and informed both companies they should not assume the winning bid was assured of acquiring the assets. HCPI withdrew from the auction process. Ventas' bid of $15 per unit succeeded, and was to be put to Sunrise's shareholders on March 30, 2007. Ventas and Sunrise entered a purchase agreement for all of Sunrise's assets, subject to subsequent third-party unsolicited bids. Sunrise was allowed to accept such bids if they were financially superior to Ventas' bid. Sunrise was precluded from participating in discussions or negotiations for acquisition proposals, and was bound to enforce existing standstill agreements. HCPI subsequently put forward a post-auction bid for $18 per unit. Ventas took the position Sunrise breached its confidentiality agreement, by permitting HCPI to communicate with another potential bidder, SSL. Ventas did not assert HCPI was in breach of its standstill agreement because Ventas assumed it contained the same

termination clause as Ventas' standstill agreement. Sunrise applied to court for an interpretation of the purchase agreement it had with Ventas. Ventas then learned of the terms of the HCPI standstill agreement, and brought an application for a declaration Sunrise was required to enforce it. The judge found Sunrise had agreed with Ventas that it would continue to enforce standstill agreements, that HCPI's bid was in breach of its standstill agreements, and therefore unacceptable. Sunrise's application was dismissed as moot in light of the judge's decision on Ventas' application.

HELD: Appeal dismissed. The purchase agreement between Sunrise and Ventas precluded Sunrise from considering HCPI's post-auction bid. The enforcement of standstill agreements by Sunrise was an important purpose of the purchase agreement, negotiated by Ventas to protect its position with respect to competition from unsuccessful bidders in the auction. The fact Ventas was more skillful than HCPI in negotiating its standstill agreement did not render HCPI's agreement unenforceable. The court's interpretation of the purchase agreement was not inconsistent with Sunrise's obligation to maximize shareholder value. Sunrise's shareholders were still entitled to reject the Ventas bid when they voted on March 30.

**Appeal From:**

On appeal from the Order of Justice Sarah E. Pepall of the Superior Court of Justice dated March 6, 2007.

**Counsel:**

Peter F.C. Howard and Eliot Kolers for the Appellants (Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, and Sunrise REIT GP Inc.).

Jeffrey S. Leon and Derek J. Bell, for the Appellants (Health Care Property Investors, Inc.).

Mark A. Gelowitz and Laura K. Fric, for the Respondents (Ventas, Inc. and numbered companies).

Luis G. Sarabia and Cynthia Spry, for the Respondent Sunrise Senior Living Inc.

---

The judgment of the Court was delivered by

**R.A. BLAIR J.A.:--**

**OVERVIEW**

**1**    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the

United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid - after it knew what Ventas had offered - "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4    Hence the urgency of this appeal.

5    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

6    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

**FACTS**

8    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

9    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

**10**   In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

**11**   Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

**12**   Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

**13**   On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

**14**   Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

**15**   On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

**16**   On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

**17**   On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

**18**    The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however - after learning of the HCPI Proposal - Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

**19**    On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

**20**    The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

## THE PROVISIONS OF THE AGREEMENT

**21**    Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

> 4.4(1) <u>Following the date hereof, Sunrise REIT shall not</u>, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

> (i)    <u>solicit</u>, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or <u>proposals</u> regarding, or other action that constitutes, or may reasonably be <u>expected to lead to, an actual or potential</u>

<ul>
<li>Acquisition Proposal,</li>
</ul>

(ii)   participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,

(iii)   approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv)   accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v)   withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2)   Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i)   the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii)   such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

(3)   Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (that did not

result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i)    it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii)    the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

(iii)    a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv)    if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v)    if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4)    If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5)    Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of

section 4.4.

(6)     During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7)     Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8)     Sunrise REIT shall

(i)      ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii)     immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii)    require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition

Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv)    terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v)    <u>not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties</u>.

22    The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a)    is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b)    in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c)    would, if consummated in accordance with its terms, result in a transaction

> more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

## ANALYSIS

**23**    The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

**24**    Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated - without reproducing in full the relevant passages from her reasons (paras. 29-34) in full - she held that a commercial contract is to be interpreted,

    (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;[1]

    (b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;[2]

    (c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties;[3] and (to the extent there is any ambiguity in the contract),

    (d)    in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[4]

**25**    The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

    a)    by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

    b)    by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

**26**    I do not agree.

The Application Judge's Reasoning

**27**    The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

> 35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

> 36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[Footnote omitted.]

<u>The Scheme and Interpretation of Section 4.4</u>

**28**    I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills - unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction - and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

**29**    From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available - one worth the risk of rejecting the Ventas proposal - they may well vote to reject the Ventas proposal at their meeting on March 30.

**30**    The language used by the parties in the Purchase Agreement supports this interpretation.

**31**    Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

**32**    As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (that are not in breach of the provisions of section 4.4) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3) - 4.4(7)).[5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

      (v)    not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise

REIT and any third parties ...

**33**   Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party that is not in breach of section 4.4 of the Agreement.

**34**   Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) - "notwithstanding anything contained in Section 4.4(1)" - do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

**35**   In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

<u>The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)</u>

**36**   Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) - namely, sections 4.4(8)(ii) and (iii) - refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

**37**   There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise - whether made before or after the close of the auction - constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

**38**    Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case - whether a prior bidder or not - from continuing to participate in the bidding process.

**39**    It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal[6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

**40**    Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

> 4.4(1) Following the date hereof, Sunrise REIT shall not ...

> (ii)    participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

**41**    Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

**42**    Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

<u>An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible",</u>
<u>and Accords with the Fiduciary Obligations of the Sunrise Trustees</u>

**43**    Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

**44**    In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

<u>The Factual Matrix</u>

**45**    Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken, supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

**46**    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

a)    the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;

b)    the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;

c)    Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

d)    Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

e)    Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

**47**    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such

matters. Here, the experienced Commercial List judge was exercising a function common to that role - the interpretation of a commercial contract - and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

**48**    At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

> 38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

> 39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

**49**    I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

**50**    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken, supra*, at para. 27:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make

good business sense to one party would not necessarily do so for the other.

**51**    The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

**52**    As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

**53**    On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid - or, in this case, the Trustees - have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755, at 768 and 774 (Gen. Div.). That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

**54**    It is not necessary - nor would it be wise, in my view - to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communications, Inc. v. QVC Network Inc.* 637 A. 2d 34 (Del. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A. 2d 95 at 105 (Del. Ch. 1999). That is not what happened in this case.

**55**    The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

**56**    An auction process is well-accepted as being one - although only one - "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Maple Leaf Foods Inc. v. Schneider Corp.* (1999), 42 O.R. (3d) 177 at 200 (C.A.). Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize

value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

**57**    It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

**58**    Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... the Board is not prevented from ...". I would not ascribe to it the expanded role that HCPI proposes.

The Meaning of "*Bona Fide*"

**59**    The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

**60**    There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*.[7] She

found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

**61**    In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated - particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) - I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

Miscellaneous

**62**    Two additional points were made by the appellants, but need not be dealt with at length.

**63**    First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

**64**    Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

**The HCPI Cross-Appeal**

**65**    HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application was moot.

**66**    I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

**CONCLUSION**

**67**    For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

**68**    If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

**69**    In closing, I would like to thank all counsel for their able presentations and assistance.

R.A. BLAIR J.A.
J.L. MacFARLAND J.A.:-- I agree.
H.S. LaFORME J.A.:-- I agree.

1 *B.G. Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 at 770 (C.A.).

2 *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 at para. 403 (Ont. Gen. Div.), aff'd (1999), 45 O.R. (3d) 417 (C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 at para. 26 (C.A.); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at 166-68 [*Eli Lilly*].

3 *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 25-27 (C.A.) [*Kentucky Fried Chicken*].

4 *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901; *Kentucky Fried Chicken, ibid.*

5 The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

6 That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

7 2d ed., *s.v.* "bona fide".



*Case Name:*
# Eli Lilly & Co. v. Novopharm Ltd.; Eli Lilly & Co. v. Apotex Inc.


**Novopharm Limited, appellant;**
**v.**
**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
**and**
**The Minister of National Health and Welfare, respondent.**
**And between**
**Apotex Inc., appellant;**
**v.**
**Eli Lilly and Company and Eli Lilly Canada Inc., respondents,**
**and**
**The Minister of National Health and Welfare, respondent.**

[1998] S.C.J. No. 59

[1998] A.C.S. no 59

[1998] 2 S.C.R. 129

[1998] 2 R.C.S. 129

161 D.L.R. (4th) 1

227 N.R. 201

J.E. 98-1562

80 C.P.R. (3d) 321

1998 CanLII 791

80 A.C.W.S. (3d) 871

1998 CarswellNat 1061

1998 CarswellNat 1062

File Nos.: 25402, 25348.

Supreme Court of Canada

1998: January 21 / 1998: July 9.

**Present: L'Heureux-Dubé, Gonthier, Cory, McLachlin,
Iacobucci, Major and Bastarache JJ.**

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Patents -- Infringement -- Sublicensing -- Licensee agreeing to supply patented medicine to unlicensed third party -- Licence expressly prohibiting sublicensing -- Breach of licence terms grounds for termination of licence -- Whether supply agreement between licence holder and third party a sublicence or having legal effect of creating a sublicence.*

*Agency -- Supply agreement -- Licensed party to obtain patented bulk medicine for unlicensed party -- Whether licensed party acting as agent of unlicensed party in carrying out contractual obligations.*

*Patents -- Notice of allegation (NOA) -- Proper date for assessing NOA.*

*Jurisdiction -- Declaratory relief -- Whether declaration should issue as to patent holder's failure to show notice of allegation unjustified or that it was entitled to terminate compulsory licence -- Whether appropriate to declare that supply agreement not constituting sublicence or transfer of compulsory licence.*

*Patents -- Medicine -- Reformulation of patented product -- Bulk medicine reformulated into final-dosage form -- Whether reformulation of patented product amounting to infringement of patent.*

Eli Lilly and Co. ("Eli Lilly") owned the Canadian patents for nizatidine and for its manufacturing process. It alone held a notice of compliance (NOC) to produce and market certain final-dosage forms of the medicine. Novopharm held a compulsory licence, obtained under the Patent Act (the "Act") as it existed prior to February, 1993, which permitted it to use the patented process to make nizatidine for the preparation or production of medicine and to import and/or sell medicine made by the process. The licence stipulated that it was non-transferable, prohibited Novopharm from granting any sublicence, and provided Eli Lilly with the option to terminate the licence upon any breach of its terms.

In anticipation of the 1993 amendments to the Act, which radically altered the procedures for the

issuance of NOCs and eliminated the compulsory licensing regime entirely, Novopharm and Apotex entered a "supply agreement" in November, 1992. The agreement provided that, where one party held a licence for a patented medicine for which the other did not, the licensed party would obtain, at the request and direction of the unlicensed party, specified quantities of that medicine, and supply it to the unlicensed party at cost plus a four per cent royalty. In April, 1993, Apotex commenced efforts to obtain a NOC for certain final-dosage forms of nizatidine, and issued a notice of allegation ("NOA") alleging that no claim for nizatidine or for its use would be infringed. In support of this allegation, Apotex relied upon the licence issued to Novopharm and the "mutual understanding" with Novopharm. On the same date, Apotex notified Novopharm of its intention to request Novopharm to supply it with nizatidine. However, Apotex also indicated that, because it did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased.

Eli Lilly and Eli Lilly Canada Inc. ("Eli Lilly Canada") brought an application (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348 (Apotex #1)), under s. 6(1) of the Patented Medicines (Notice of Compliance) Regulations (the "Regulations"), for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under the amended Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import nizatidine for consumption in Canada. On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence, alleging that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. The Federal Court --Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence but nonetheless granted the prohibition order on the grounds that, because the reformulation of nizatidine for consumption in Canada would infringe Eli Lilly's patent, the NOA was not justified. The Federal Court of Appeal dismissed Apotex's appeal, but on the grounds that the agreement did constitute a sublicence.

In July 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to nizatidine and relied on its own compulsory licence as the basis for the non-infringement of the patents. Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402 (the Novopharm proceeding)), requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way. The application was dismissed at trial but this decision was reversed by the Federal Court of Appeal.

The issue common to both appeals is whether the agreement between Apotex and Novopharm constituted a sublicence, such as to justify Eli Lilly's purported termination of Novopharm's compulsory licence. If it did, then the NOAs issued by both Novopharm and Apotex were not

justified and the requested prohibition order should issue. Each appeal also raises other discrete issues. Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which the NOA proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

Held: The appeals should be allowed.

A sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. By the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. Thus, for Novopharm to have granted a sublicence to Apotex, it must have granted, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence. This may have been accomplished either by virtue of some express provision or provisions of the agreement, or by virtue of its actual legal effect (even if this runs contrary to the subjective intentions of the parties).

The ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination. It is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. Here, there was no ambiguity to the contract entered into between Apotex and Novopharm and further interpretive aids were therefore unnecessary. The evidence as to the subjective intentions of the principals at the time of drafting was thus inadmissible by virtue of the parol evidence rule especially since it did not go to the circumstances surrounding the making of the contract.

Nothing in the wording of the document suggested that the parties intended to grant sublicences to each other. Rather, every indication was that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. While no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But there was no indication that Apotex acquired any

other independent rights under the compulsory licence. In fact, such an interpretation would be inconsistent with the combined effect of certain express provisions of the agreement.

To prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed. The sale of a licensed article, while it does transfer to the purchaser the rights of use and alienation, does not have the automatic effect of constituting the purchaser a sublicensee; thus, the fact that a third party enjoys these rights cannot alone be indicative of the existence of a sublicence. Any number of ways exist in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. The rights of use and alienation can only be determinative of the existence of a sublicence where there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type. Where the rights of the unlicensed party are derived from a sale of licensed material, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted. This situation was plainly contemplated by the supply agreement here, under which the only way Apotex could acquire bulk nizatidine was by purchasing it from Novopharm, not directly from Novopharm's supplier.

Further, because legitimate transfers were to take place between separate entities, dealing at arm's length, the contemplated transactions could not be characterized, ex ante, as shams. While it was theoretically possible that the agreement could be implemented in an infringing way, it had not yet been implemented at all and thus any suggestion of infringement was speculative. The agreement did not, on its face or in its actual legal effect, amount to a sublicence.

The degree of control likely to be exercised by Apotex over the acquisition of nizatidine would not result in a situation where Novopharm in reality would be acting as Apotex's agent. Nor would Novopharm, because of its allegedly standing in the shoes of Apotex, become an unlicensed entity. Under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations.

Given that the agreement was properly characterized as a supply agreement and given that the agreement had not been implemented at the material time, it was not necessary to decide if the Federal Court of Appeal erred in applying its decision in Apotex #1 to its decision in Novopharm.

Since the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued (see Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare, S.C.C., No. 25419 (Apotex #2)),

Novopharm's NOA was not premature and therefore unjustified. Pursuant to s. 39.14 of the Patent Act, it was entitled to manufacture the medicine itself or through Canadian agents seven years after the date of the issue of the first NOC to Eli Lilly Canada. As this seven-year period had expired before the date the application was heard, Novopharm was entitled, as of the date of hearing, to manufacture or have made the drug for its own use, for sale for consumption in Canada. The NOA did not specify that the nizatidine was to be imported and not produced in Canada, and so, at the date of hearing, there existed at least one non-infringing way for Apotex to obtain the necessary medicine.

In light of its other findings, it was not necessary for the Court to grant declaratory relief to the effect that Eli Lilly failed to show either that the NOA was not justified, or that it was entitled to terminate the compulsory licence. Moreover, in light of the limited nature of these judicial review proceedings, it would be inappropriate for this Court to declare conclusively, and for purposes other than those of these appeals, that the supply agreement did not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex. Accordingly, the requested declaratory relief was denied.

Absent express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he or she sees fit, so long as such dealings do not infringe the rights conferred by the patent. The reformulation of nizatidine into final-dosage form would not have the effect of creating a new article, such as to infringe Eli Lilly's patent. Rather, reformulation is more akin to repackaging the substance into a commercially usable form, which is not a violation of any rights under the patents. The right of use and sale which Apotex would acquire inherently, through its acquisition of nizatidine from Novopharm, encompasses the right to use and sell things produced with this nizatidine, including capsules in final-dosage form. This is, in reality, the only practical use of bulk medicine in the hands of a purchaser, which may explain why reformulation was implicitly contemplated by the compulsory licence held by Novopharm. Apotex therefore would not infringe the patents held by Eli Lilly simply by selling the medicine in the form contemplated by the NOA. This is particularly so when the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the formulation of bulk medicine according to the patented process. Nothing in the reformulation process can be seen as infringing upon this right. Thus, in the absence of some express prohibition in the compulsory licence, the right to reformulate should be seen as inherent to the purchaser's right to deal with licensed material as he or she sees fit. Eli Lilly accordingly failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

**Cases Cited**

Distinguished: E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985); referred to: Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193; Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129; David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588; Consolidated-Bathurst Export Ltd. v. Mutual

Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888; Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133, rev'd in part [1995] 2 F.C. 723; Carey v. United States, 326 F.2d 975 (1964); Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519; Lampson v. City of Quebec (1920), 54 D.L.R. 344; Joy Oil Co. v. The King, [1951] S.C.R. 624; Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497; Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605; Gillette v. Rea (1909), 1 O.W.N. 448; Betts v. Willmott (1871), L.R. 6 Ch. App. 245; Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (1993); Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (1996); Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302; National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336; Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, aff'g [1969] 1 Ex. C.R. 529; Rucker Co. v. Gavel's Vulcanizing Co. (1985), 7 C.P.R. (3d) 294.

**Statutes and Regulations Cited**

Food and Drug Regulations, C.R.C., c. 870, s. C.08.004.
Patent Act, R.S.C., 1985, c. P-4, s. 39(4), 39.11 [ad. c. 33 (3rd Supp.), s. 15], 39.14 [idem].
Patent Act Amendment Act, 1992, S.C. 1993, c. 2, s. 11(1).
Patented Medicines (Notice of Compliance) Regulations, SOR/93-133, ss. 4(1), 5, 6, 7.

**Authors Cited**

Fox, Harold G. The Canadian Law and Practice Relating to Letters Patent for Inventions, 4th ed. Toronto: Carswell, 1969.
Fridman, G. H. L. The Law of Contract in Canada, 3rd ed. Scarborough, Ont.: Carswell, 1994.
Melville, Leslie W. Forms and Agreements on Intellectual Property and International Licensing, vol. 1, 3rd ed. rev. New York: West Group, 1997 (loose-leaf updated August 1997, release 29).

APPEAL (Eli Lilly and Co. v. Novopharm Ltd., S.C.C., No. 25402) from a judgment of the Federal Court of Appeal (1996), 67 C.P.R. (3d) 377, 197 N.R. 291, [1996] F.C.J. No. 576 (QL), allowing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 181, 91 F.T.R. 161, [1995] F.C.J. No. 238 (QL), granting an application for judicial review and prohibiting the Minister from issuing a notice of compliance. Appeal allowed.

APPEAL (Eli Lilly and Co. v. Apotex Inc., S.C.C., No. 25348) from a judgment of the Federal Court of Appeal (1996), 66 C.P.R. (3d) 329, 195 N.R. 378, [1996] F.C.J. No. 425 (QL), dismissing an appeal from a judgment of McGillis J. (1995), 60 C.P.R. (3d) 206, 91 F.T.R. 181, [1995] F.C.J. No. 237 (QL), dismissing an application for judicial review. Appeal allowed.

Harry B. Radomski, Richard Naiberg and David Scrimger, for the appellant Apotex Inc.
Donald N. Plumley, Q.C., Mark Mitchell and Stephanie Chong, for the appellant Novopharm Limited.

Anthony G. Creber and David Watson, Q.C., for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.

Solicitors for the appellant Apotex Inc.: Goodman, Phillips & Vineberg, Toronto.
Solicitors for the appellant Novopharm Limited: Ridout & Maybee, Toronto.
Solicitors for the respondents Eli Lilly and Company and Eli Lilly Canada Inc.: Gowling, Strathy & Henderson, Ottawa.

---

The judgment of the Court was delivered by

**1    IACOBUCCI J.**:-- A single agreement entered into by Novopharm Limited ("Novopharm") and Apotex Inc. ("Apotex"), competitors in the pharmaceutical industry, has given rise to litigation resulting in no fewer than three appeals to this Court. In addition to the two instant cases, which I shall refer to as "Novopharm" and "Apotex #1", reasons in Apotex Inc. v. Merck Frosst Canada Inc., [1998] 2 S.C.R. 193 ("Apotex #2"), are also being released today. The issue common to all three is whether the agreement in question constitutes a simple supply agreement, as alleged by the two parties to the agreement, or, as alleged by the various respondents, a sublicence to exercise the rights acquired by Novopharm pursuant to compulsory licences obtained prior to recent changes to the legislative regime which governs patented medicines. This determination is key to the resolution of the issues in these appeals because, as shall be discussed, the grant of a sublicence by Novopharm could justify the termination by the patentee of the compulsory licence in question and render the supply agreement useless.

**2**    Owing to the intertwining nature of the lower court decisions in Novopharm and Apotex #1, I shall deal with these two appeals in one set of reasons. In addition to the common issue of interpretation, each case raises a number of other issues, which I shall endeavour to deal with appropriately as they arise.

I.    Background

A. The Patents and the Compulsory Licence

**3**    Prior to February, 1993, there existed in Canada a compulsory licensing regime with respect to patents for pharmaceuticals. Under s. 39(4) of the Patent Act, R.S.C., 1985, c. P-4, as it then existed, in respect of any patent intended or capable of being used for medicine or for the preparation or production of medicine, any person could make an application for a licence:

> 39.... (4)... (a) where the invention is a process, to use the invention for the preparation or production of medicine, import any medicine in the preparation or

> production of which the invention has been used or sell any medicine in the
> preparation or production of which the invention has been used, or
>
> (b)    where the invention is other than a process, to import, make, use or sell the
> invention for medicine or for the preparation or production of medicine. . . .

According to the terms of s. 39(4), the Commissioner of Patents was obliged to grant to the
applicant a licence to do the things specified in the application unless there existed a good reason
not to grant such licence.

4    These appeals relate to two Canadian patents owned by Eli Lilly and Company ("Eli Lilly") in
respect of the medication nizatidine: one in respect of the medicine itself and one in respect of the
process by which the medicine is made. On December 31, 1987, the Department of National Health
and Welfare granted a notice of compliance ("NOC") to Eli Lilly Canada Inc. ("Eli Lilly Canada"),
pursuant to s. C.08.004 of the Food and Drug Regulations, C.R.C., c. 870, thereby permitting Eli
Lilly Canada to market 150 mg and 300 mg final-dosage form capsules of nizatidine for
consumption in Canada. To date, no other company has been issued a NOC in respect of nizatidine.

5    On January 17, 1990, Novopharm applied under s. 39(4) of the Patent Act for a compulsory
licence under the patents owned by Eli Lilly. The application was vigorously contested by Eli Lilly,
but, it was found that none of the objections constituted a valid reason to refuse the application and
the Commissioner of Patents accordingly granted the licence, as he was obliged to do under the Act
as it then existed. The licence, which, unless validly terminated by Eli Lilly (a very contentious
issue in the instant appeals), is still in force, permits Novopharm to use the patented process to make
nizatidine for the preparation or production of medicine, and to import and/or sell medicine made
by the process. It also permits Novopharm to make, use, sell and import either or both of the
invention for medicine and the invention for the preparation or the production of medicine. The
royalty rate to be paid by Novopharm to Eli Lilly Canada on sales of the medicine in final-dosage
form is fixed at six percent of the selling price. The Commissioner of Patents, in a decision dated
October 21, 1991, found that the licence is not restricted to the forms of medicine listed by
Novopharm in its application, as such "would place unnecessary limits on [Novopharm's]
operations under the licence".

6    Certain other specific terms and conditions of the licence are also relevant. Paragraph 1
contains terms and conditions pertaining to the calculation of royalties for the sale of nizatidine to
arm's length purchasers and contemplates the sale of the medication by Novopharm in both
final-dosage and bulk forms, stipulating royalty rates for each. Novopharm is also required, under
paragraphs 3 and 4, to obtain quarterly statements showing the descriptions, quantities, net selling
prices and royalty computations resulting from the operations of arm's length purchasers of the
medicine, non-arm's length purchasers of the medicine in final-dosage form, and any subsequent
non-arm's length purchasers from the latter.

**7**    Paragraph 9 of the licence, which is of paramount importance to this appeal, provides Eli Lilly with the option to terminate the licence upon any breach of its terms by Novopharm by giving notice in writing. In the event that Novopharm fails to rectify the breach within 30 days, the licence is terminated automatically. However, under paragraph 10, if Novopharm disputes the breach by written notice to Eli Lilly, the licence is not terminated pending adjudication by the courts or arbitration as agreed upon by the parties. Finally, paragraph 12 stipulates that the licence is non-transferable, and that Novopharm is prohibited from granting "any sublicence".

      B.    The Supply Agreement Between Novopharm and Apotex

**8**    On November 27, 1992, Novopharm and Apotex entered into what they described as a "supply agreement", in anticipation of proposed changes to the Patent Act, then embodied in Bill C-91. It was expected that this bill, if passed, would both eliminate the then-existing compulsory licensing regime and threaten the existing licences and licence applications of both companies. The agreement was drafted, apparently without the advice of counsel, by Dr. Bernard Sherman, the president of Apotex, and Mr. Leslie Dan, the president of Novopharm, and reads as follows:

> WHEREAS THE Federal Government has introduced Bill C-91 which, if passed, would eliminate compulsory licensing under the Patent Act,

> AND WHEREAS Apotex and Novopharm have various licences and licence applications pending which are threatened by Bill C-91,

> AND WHEREAS, depending on the cut-off dates that will pertain when Bill C-91 is finalized, it is expected that the parties hereto each may hold valid licences for products for which the other may not hold valid licences, details of which cannot be predicted at this time,

> AND WHEREAS for their mutual benefit in relation to other competitors, the parties wish to ensure that they have available for use licences on the maximum number of products,

> AND WHEREAS the parties have thus agreed that they will share their rights under licences for any product for which only one of the parties may hold a useable licence,

> NOW THEREFORE in consideration of the premises and the mutual covenants and other good and valuable consultations, receipt of which is hereby

acknowledged, the parties hereto agree as follows:

1.    At any time subsequent to the date upon which Bill C-91 or any Bill derived therefrom is enacted and proclaimed, for any product for which one party (hereinafter the "licensed" party) shall hold a useable licence and the other party (hereinafter called the "unlicensed party") shall not, the licensed party shall, at the request of the unlicensed party, use its licence for the benefit of the unlicensed party in the manner hereinafter set out.

2.    In the event that the licence is a licence to import, the licensed party shall import from such source, in such quantity, and on such terms as the unlicensed party shall direct, and shall resell the imported goods to the unlicensed party at the cost thereof together with such royalties as shall be payable under the terms of the licence.

3.    In the event that the licence is a licence to manufacture in Canada, the licensed party shall enter into such contracts with Canadian chemical manufacturers as the unlicensed party shall direct for the manufacture of the relevant material and shall sell the manufactured materials to the unlicensed party at the cost thereafter together with such royalties as shall be payable under the terms of the licence.

4.    In the event that the licensed party has a source of material from which it imports or in the event that the licensed party is producing the material under a licence to manufacture, and in the event that it is not possible for the unlicensed party to find another source from which to import, or at which to arrange for the manufacture of material, then the licensed party shall supply material to the unlicensed party from the licensed party's source at a price equal to the fair market price of the material together with such royalties as shall be payable under the terms of the licence. Any disagreement as to fair market price shall be settled by binding arbitration.

5.    In addition to the payments provided for in paragraphs 2, 3 and 4 hereof, the unlicensed party shall pay to the licensed party a fee equal to 4% of the unlicensed party's net sales of product covered by any unexpired patent included in the licensed party's licence and purchased from the licensed party.

Within 60 days of the end of each quarter year the unlicensed party shall deliver to the licensed party payment of the fee on sales made during the previous quarter along with a statement certified by an independent auditor setting out the quantities sold, the net dollar sales, and the fee payable thereon.

6.    The licensed party shall comply with the terms of the licence.

7.    The licensed party shall not be excused from performing any act as directed by

the unlicensed party pursuant to paragraphs 2 or 3 or 4 hereof, on the grounds that there is doubt as to whether or not the licence has remained in force or permits the requested acts, nor on the basis of litigation or threatened litigation by the patentee, provided that the unlicensed party shall undertake to defend any lawsuit against the licensed party resulting from such act and hold the licensed party harmless for the costs of such lawsuit any damage award arising therefrom.

8.     For greater clarity, the foregoing paragraphs shall not be limiting, and the licensed party shall cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence, so long as the licensed party is held harmless from any such use.

9.     The unlicensed party shall resell any product purchased from the licensed party only under its own label and shall not sell the product for resale under a label other than that of the unlicensed party.

10.    Neither party will engage in preventing or blocking the accessability [sic] of HPB clearance of any raw material affecting present and future pharmaceutical products.

11.    This agreement shall expire on December 31, 1994 unless extended by mutual agreement.

12.    Notwithstanding paragraph 11 hereof, if Bill C-91 is passed into law with an amendment that permits companies to continue to apply for and obtain compulsory licenses for any product for which a licence was issued to any one or more licence [sic] prior to December 20, 1991, then this agreement shall be terminated.

13.    Notwithstanding paragraph 11 hereof, in relation to any specific licence in respect of which the unlicensed party shall have on or before December 31, 1994, advised the licensed party of an intention to utilize such licence, this agreement shall continue in force until expiry of the last patent covered by such licence.

**9**   On February 15, 1993, most of the provisions of the Patent Act Amendment Act, 1992, S.C. 1993, c. 2, were proclaimed into force. On March 12, 1993, the Patented Medicines (Notice of Compliance) Regulations, SOR/93-133 (the "Regulations"), came into force and radically altered the procedures governing the issuance of NOCs, strengthening the monopoly position of the patentee by eliminating the compulsory licensing scheme and curtailing the ability of generic drug companies to obtain approval to market a patented medicine until the expiry of all relevant product and use patents. The new NOC regime is lucidly summarized in the following excerpt from the judgment of Teitelbaum J. in Glaxo Wellcome Inc. v. Canada (Minister of National Health and Welfare) (1997), 75 C.P.R. (3d) 129 (F.C.T.D.), at pp. 131-32:

A NOC, which formally authorizes a drug to be sold, is issued by the Minister after a drug manufacturer has complied on two fronts. The first element of compliance concerns the overall safety and efficacy of the drug: (see regulation C.08.004 of the Food and Drug Regulations, C.R.C. 1978, c. 870). The second element of compliance figures on the drug manufacturer's non-infringement of certain patents embodied in the drug. This second, rather more unexpected, patent-related requirement came into existence after changes to the compulsory licensing regime. Formerly, under a compulsory license, a generic drug manufacturer could obtain a licensed supply of a patented drug from the patent owner. The NOC process did not then concern itself with questions of patent infringement. However, with the abolition of compulsory licenses under the Patent Act Amendment Act, 1992, ... (the "Patent Act") the regime for obtaining NOCs also changed. Generic drug manufacturers now seeking NOCs must file what is called a Notice of Allegation under Section 5 of the Regulations.

...

In effect, under Subsection 5(3) of the Regulations, in a "Notice of Allegation", the generic drug manufacturer, "the second person", signals its compliance with the patents embodied in a medicine. Under Section 4 of the Regulations, the patent owner or licensee, usually a brand name drug manufacturer like the applicants, submits a list of the patents that contain claims for the medicine itself or the use of the medicine. Under Section 3 of the Regulations, the Minister compiles the patent lists into a public document called the "Patent Register".

**10**   As required under s. 4(1) of the new Regulations, Eli Lilly Canada submitted a patent list, dated April 6, 1993, to the Minister of National Health and Welfare, which included the patents for nizatidine for which it held the NOC.

**11**   Apotex commenced efforts to obtain a NOC for 150 mg and 300 mg capsules of nizatidine under the new scheme, and accordingly sent a letter to Eli Lilly Canada, dated April 28, 1993, which constituted a Notice of Allegation ("NOA") as required by s. 5(3)(b) of the Regulations. In the NOA, Apotex alleged that no claim for the patented medicine itself or for the use of the medicine would be infringed by its making, constructing, using or selling the specified nizatidine capsules. In support of this allegation, Apotex relied upon the licence issued to Novopharm for nizatidine and upon the "mutual understanding" whereby Novopharm, the licensed party, would supply Apotex with raw materials obtained pursuant to its licence. Apotex stated that it had given Novopharm notice of its intention to obtain nizatidine, and undertook not to obtain, use, or sell any nizatidine other than from Novopharm until such time as the patents had expired.

**12**   The letter of intention referred to, also dated April 28, 1993, indicated that, because Apotex

did not yet have a NOC to permit it to market nizatidine in Canada, it could not provide Novopharm with any specifics as to its requirements, but that it would advise in due course as to the required quantity and the manufacturer from whom the nizatidine should be purchased. Although Apotex did apparently locate a source for the nizatidine, it had not, by the date of the hearing of this appeal, disclosed the identity of the source to Novopharm, and the evidence remained sealed as confidential information.

**13**    Eli Lilly and Eli Lilly Canada brought an application, under s. 6(1) of the Regulations, for an order prohibiting the Minister from issuing a NOC to Apotex at all or, alternatively, until after December 31, 1997, ten years after the issuance of the NOC to Eli Lilly Canada, which, under s. 39.11 of the Patent Act, would be the first date on which Apotex, without a NOC, would be entitled to import the patented medicine for consumption in Canada. This application forms the basis of the litigation in Apotex #1, upon which I shall elaborate shortly.

**14**    On July 15, 1993, Eli Lilly purported to exercise its option to terminate Novopharm's compulsory licence by providing 30 days' notice in writing to Novopharm. In support of the notice of termination, Eli Lilly alleged that Novopharm had breached the terms of the licence by granting a sublicence to Apotex. Novopharm denied this allegation, stating that the commercial agreement into which it had entered with Apotex did not constitute a sublicence or any transfer of rights under the licence. Novopharm apprised the Commissioner of Patents of the purported termination and its having disputed the allegations of breach.

C. The Novopharm Proceeding

**15**    On July 30, 1993, Novopharm issued a NOA in support of its own application for a NOC in relation to 150 mg and 300 mg capsules of nizatidine. It relied on its own compulsory licence as the basis for the non-infringement of the patents owned by Eli Lilly. On September 15, 1993, Eli Lilly and Eli Lilly Canada brought an application before the Federal Court--Trial Division, requesting a prohibition order to enjoin the Minister from issuing the requested NOC to Novopharm, on the grounds that Novopharm's licence had been terminated and that Novopharm could not, therefore, obtain the bulk medicine in a non-infringing way.

**16**    Meanwhile, Eli Lilly also brought a separate application in the Ontario Court of Justice (General Division), seeking a declaration that Novopharm's licence was terminated by virtue of its granting a sublicence to Apotex, contrary to the terms of the licence. Forget J. found that that court had concurrent jurisdiction with the Federal Court--Trial Division to grant the relief sought but, applying the convenient forum test, held that the matter ought to be decided by the Federal Court in the context of the prohibition proceedings. Eli Lilly and Eli Lilly Canada then brought an interlocutory motion in the Federal Court to amend the originating notice of motion by adding a claim for declaratory relief. Pinard J. dismissed the motion, stating that, in dealing with the originating notice of motion (i.e., the prohibition application), the Court had jurisdiction to make an incidental finding that the compulsory licence in question had been terminated, which would be

sufficient to justify an order prohibiting the Minister from issuing a NOC.

**17**   On July 20, 1993, Mr. Dan of Novopharm wrote to Dr. Sherman of Apotex, stating that the two companies did not have an agreement to transfer licences or to sublicence, and asking Apotex to refrain from claiming in its applications for NOCs that licences would be transferred. He confirmed that the supply agreement contemplated that Novopharm would supply Apotex, as a third party customer, with specific licensed products, but stipulated that Novopharm never intended to create a sublicence, given that such would be "contrary to the standard conditions of all compulsory licenses". Dr. Sherman responded by letter the next day, stating that Apotex had never suggested that any transfer of rights or sublicensing would occur, only that Novopharm would be supplying materials to Apotex, as a third-party purchaser.

**18**   Mr. Dan also filed an affidavit concerning his intentions as to the nature of the agreement with Apotex. On cross-examination, he testified that Novopharm and Apotex had intended to create a supply agreement, and that the statement in the preamble as to sharing of rights was improperly worded. He further testified that Apotex had not yet requested Novopharm to supply it with nizatidine, but that, if and when a request was made to obtain nizatidine from a foreign source, it would be Novopharm which would approach various sources, obtain quotations, import the bulk material, and finally sell it to Apotex on the terms agreed upon with the supplier. He stated that, if there was only one supplier for a given medicine, the accepted commercial practice would be that "if we have access, they should have access". Also, responding to a question concerning provisions of the Patent Act which would prohibit the importation and manufacture of nizatidine until December 31, 1997 and December 31, 1994, respectively, Mr. Dan asserted that "[w]e have to abide by the regulations".

**19**   McGillis J. of the Federal Court--Trial Division dismissed Eli Lilly's application for judicial review, finding that the agreement between Novopharm and Apotex did not constitute a sublicence, that the licence, therefore, could not be terminated on that ground by Eli Lilly, and, accordingly, that Eli Lilly had failed to prove that Novopharm's notice of allegation was not justified. This decision was reversed by a unanimous panel of the Federal Court of Appeal, which, relying on its earlier decision in Apotex #1, infra, held that a sublicence had in fact been conferred by virtue of the supply agreement.

D. The Apotex #1 Proceeding

**20**   In cross-examination on the hearing of the application for a prohibition order in Apotex #1, the background of which is detailed above, Dr. Sherman of Apotex testified that the supply agreement with Novopharm did not enable Apotex to import or manufacture nizatidine, but only to require Novopharm to import or manufacture the medicine under the terms of its licence and to sell the material to Apotex. He testified that Apotex would in fact be acquiring the nizatidine from Novopharm and, if the NOC were granted, formulating it into 150 mg and 300 mg capsules for sale in Canada. He was of the view that this would not constitute an infringement of Eli Lilly's patents,

given that no further licence would be necessary once the licensed material was purchased from Novopharm. However, he did appear to make reference at one point to Apotex's "having rights" under the licence.

**21**    Relying on her analysis in Novopharm, McGillis J. of the Federal Court--Trial Division found that the supply agreement between Novopharm and Apotex did not constitute a sublicence. Nonetheless, she granted the prohibition order on the basis that Apotex's allegations of non-infringement were not justified, as its formulation of nizatidine capsules for consumption in Canada would infringe Eli Lilly's patents.

**22**    The Federal Court of Appeal, Pratte J.A. dissenting, dismissed Apotex's appeal, but on different grounds. It found that, despite the parties' apparent intention to avoid conferring sublicences on one another, this was in fact the legal effect of the written contract which they had completed. Therefore, Novopharm's licence was properly terminated and thus Apotex had no non-infringing means by which to obtain the nizatidine. While it was not necessary to decide the question, it was nevertheless unanimously held, contrary to the view of McGillis J., that Apotex's reformulation of nizatidine into final-dosage form would not have infringed the patents.

    II.    Relevant Statutory Provisions

**23**    Patent Act, R.S.C., 1985, c. P-4

> 39.11 (1) Subject to this section but notwithstanding anything in section 39 or in any licence granted under that section, no person shall under a licence granted under that section in respect of a patent for an invention pertaining to a medicine, regardless of when the licence was granted, have or exercise any right,

> (a)    where the invention is a process, to import the medicine in the preparation or production of which the invention has been used, if the medicine is for sale for consumption in Canada; or

> (b)    where the invention is other than a process, to import the invention for medicine or for the preparation or production of medicine, if the medicine is for sale for consumption in Canada.

> (2) The prohibition under subsection (1) expires in respect of a medicine

> ...

> (c)    ten years after the date of the notice of compliance that is first issued in respect of the medicine where that notice of compliance is issued after June 27, 1986.

39.14 (1) Notwithstanding anything in section 39 or in any licence granted under that section, where the notice of compliance that is first issued in respect of a medicine is issued after June 27, 1986, no person shall, under a licence granted under that section in respect of a patent for an invention pertaining to the medicine, have or exercise any right,

(a)    where the invention is a process, to use the invention for the preparation or production of medicine, or

(b)    where the invention is other than a process, to make or use the invention for medicine or for the preparation or production of medicine

for sale for consumption in Canada, until the expiration of seven years after the date of that notice of compliance.

Patented Medicines (Notice of Compliance) Regulations, SOR/93-133

5. (1) Where a person files or, before the coming into force of these Regulations, has filed a submission for a notice of compliance in respect of a drug and wishes to compare that drug with, or make a reference to, a drug that has been marketed in Canada pursuant to a notice of compliance issued to a first person in respect of which a patent list has been submitted, the person shall, in the submission, with respect to each patent on the patent list,

(a)    state that the person accepts that the notice of compliance will not issue until the patent expires; or

(b)    allege that

(i)    the statement made by the first person pursuant to paragraph 4(2)(b) is false,

(ii)    the patent has expired,

(iii)    the patent is not valid, or

(iv)    no claim for the medicine itself and no claim for the use of the medicine would be infringed by the making, constructing, using or selling by that person of the drug for which the submission for the notice of compliance is filed.

(2) Where, after a second person files a submission for a notice of compliance, but before the notice of compliance is issued, a patent list is submitted or amended in respect of a patent pursuant to subsection 4(5), the second person shall amend the submission to include, in respect of that patent, the statement or allegation that is required by subsection (1).

(3) Where a person makes an allegation pursuant to paragraph (1)(b) or subsection (2) the person shall

(a)   provide a detailed statement of the legal and factual basis for the allegation; and

(b)   serve a notice of the allegation on the first person and proof of such service on the Minister.

6. (1) A first person may, within 45 days after being served with a notice of an allegation pursuant to paragraph 5(3)(b), apply to a court for an order prohibiting the Minister from issuing a notice of compliance until after the expiration of one or more of the patents that are the subject of an allegation.

(2) The court shall make an order pursuant to subsection (1) in respect of a patent that is the subject of one or more allegations if it finds that none of those allegations is justified.

(3) The first person shall, within the 45 days referred to in subsection (1), serve the Minister with proof that an application referred to in that subsection has been made.

(4) Where the first person is not the owner of each patent that is the subject of an application referred to in subsection (1), the owner of each such patent shall be made a party to the application.

7. (1) The Minister shall not issue a notice of compliance to a second person before the latest of

(a)   the expiration of 30 days after the coming into force of these

Regulations,

(b)  the day on which the second person complies with section 5,

(c)  subject to subsection (3), the expiration of any patent on the patent list that is not the subject of an allegation,

(d)  subject to subsection (3), the expiration of 45 days after the receipt of proof of service of a notice of any allegation pursuant to paragraph 5(3)(b) in respect of any patent on the patent list,

(e)  subject to subsections (2), (3) and (4), the expiration of 30 months after the receipt of proof of the making of any application referred to in subsection 6(1), and

(f)  the expiration of any patent that is the subject of an order pursuant to subsection 6(1).

(2) Paragraph (1)(e) does not apply if at any time, in respect of each patent that is the subject of an application pursuant to subsection 6(1),

(a)  the patent has expired; or

(b)  the court has declared that the patent is not valid or that no claim for the medicine itself and no claim for the use of the medicine would be infringed.

(3) Paragraphs (1)(c), (d) and (e) do not apply in respect of a patent if the owner of the patent has consented to the making, constructing, using or selling of the drug in Canada by the second person.

(4) Paragraph (1)(e) ceases to apply in respect of an application referred to in subsection 6(1) if the application is withdrawn or is finally dismissed by the court.

(5) A court may shorten or extend the time limit referred to in paragraph (1)(e) in respect of an application where the court has not yet made an order pursuant to subsection 6(1) in respect of that application and where the court finds that a party to the application failed to reasonably cooperate in expediting the application.

III.   Judicial History

A. Novopharm Ltd. v. Eli Lilly and Co.

(1)    Federal Court--Trial Division (1995), 60 C.P.R. (3d) 181

**24**    As a preliminary matter, McGillis J. considered the nature of the proceedings before the court. She observed that an application for prohibition under s. 6(1) of the Regulations is a judicial review proceeding which is intended to determine expeditiously whether a NOC should be issued. In this connection, she referred to David Bull Laboratories (Canada) Inc. v. Pharmacia Inc., [1995] 1 F.C. 588 (C.A.), where Strayer J.A. held that the issues to be decided in such proceedings are of a limited or preliminary nature, only for the limited purpose above stated, and that, if a full trial of validity or infringement issues is required, it is to be obtained in the usual way, by commencing an action.

**25**    Turning to the question of whether the allegations of non-infringement made by Novopharm in requesting the NOC were justified, McGillis J. noted that, since Novopharm's position was premised on its licence, the key issue was the proper interpretation to be given the November, 1992 agreement between Apotex and Novopharm. If the agreement was in substance a sublicence, then the licence would have been properly terminated by Eli Lilly, and Novopharm would have been left with no non-infringing way in which to obtain the medication for which the NOC was requested.

**26**    Relying on the decision of this Court in Consolidated-Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co., [1980] 1 S.C.R. 888, McGillis J. identified the task at hand (at p. 197) as ascertaining the "true intent of the parties at the time of the entry into the contract". She rejected the submissions by Eli Lilly that the evidence of Mr. Dan, both in his affidavit and his cross-examination, as to his intention at the time the supply agreement was drafted, was inadmissible on the basis of the parol evidence rule. In her view, Mr. Dan was entitled to tender direct evidence concerning his intention at the time of drafting. As to the exchange of letters between Mr. Dan and Dr. Sherman, McGillis J.A. declined to rule on their admissibility, inasmuch as even if they were admissible, she would have accorded them no weight on the basis that they were written to clarify the intent of the parties long after the supply agreement had been signed, and apparently only in response to the threatened termination of the licence held by Novopharm.

**27**    With regard to the intentions of Mr. Dan at the time of drafting, McGillis J. concluded on the basis of his direct evidence that he intended to enter into a supply agreement with Apotex. However, she recognized (at p. 199) the need to examine the agreement as a whole in order to determine whether the words used by the parties reasonably expressed their intent, bearing in mind that "a sublicence could only have been created if Novopharm granted some or all of its rights under the licence to Apotex". In her view, at p. 199, the true nature of the agreement was that of "a supply agreement dressed up to look like a sublicence". In other words, despite the presence in the supply agreement of wording which might tend to suggest the conferral of a sublicence, the actual operative provisions of the agreement did not amount to the granting of any of Novopharm's licensed rights to Apotex.

**28**    In the view of McGillis J., the plain fact that the supply agreement contemplated Novopharm's

entering into contracts with third parties at the direction of Apotex did not itself amount to a sublicence. Indeed, if the licensed rights had in fact been sublicensed to Apotex, Novopharm's continued involvement in the transactions would have been unnecessary. On balance, McGillis J. was of the view that none of the provisions of the agreement conferred any of Novopharm's licensed rights upon Apotex, and that paragraph 6, by stipulating that the licensed party must comply with the terms of its licence, including the prohibition against sublicensing, strongly suggested that the parties did not intend to create a sublicence.

29    Therefore, McGillis J. found that no sublicence was granted by Novopharm to Apotex. In her view, this interpretation served to promote the true intent of the parties at the time of entry into the supply agreement and to produce a sensible commercial result from their perspective, which she viewed as an important interpretive goal, based on Consolidated-Bathurst, supra. Indeed, she stated that to find that a sublicence had been created would have defeated the parties' entire objective in entering into the supply agreement, as the compulsory licences could then have been terminated by the patentees. She also stipulated that, even had she not considered the extrinsic evidence given by Mr. Dan as to his intention, she would have reached the same conclusion based on the plain wording of the agreement as a whole. On this basis, McGillis J. concluded that Eli Lilly and Eli Lilly Canada had failed to establish, on a balance of probabilities, that the allegation of Novopharm in its NOA was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she dismissed the application for a prohibition order.

30    As to the question of whether the licence had been terminated, McGillis J. declined jurisdiction to decide this matter, despite the earlier orders of Forget J. and Pinard J. She felt bound by the subsequent ruling in David Bull Laboratories, supra, that the court lacks jurisdiction, in the context of a judicial review proceeding to determine an application for a prohibition order of this kind, to determine ancillary or incidental questions which pertain solely to the rights of two private parties. However, in the event that she was wrong in this conclusion, she expressed the opinion that her finding that Novopharm had not granted a sublicence to Apotex necessarily led to the conclusion that the licence had not been breached.

(2)    Federal Court of Appeal (1996), 67 C.P.R. (3d) 377

31    In oral reasons delivered from the bench, Stone J.A. (MacGuigan and McDonald JJ. A. concurring) dismissed the appeal. The appeal was heard three weeks after the hearing of the appeal in Apotex #1, infra, and at the hearing, the court invited submissions as to the possible application of that decision to the outcome of the instant appeal. Eli Lilly argued that the decision was dispositive, in that the court there held that the supply agreement contravened the sublicensing prohibition in the compulsory licence, and that, by notice, Eli Lilly had succeeded in terminating the licence. For its part, Novopharm argued that the decision should not be applied because the facts of the instant appeal differed materially from the facts in the previous case, and also because, while a decision on a prohibition order application binds the parties to the specific litigation, it has little precedential value for other cases.

**32**    The court held that, while the previous decision was not res judicata, it was nonetheless binding on the court unless it could be distinguished on its facts or was manifestly wrong owing to the failure of the court to consider a relevant legal rule. The latter was not alleged. As to the former, while the court recognized that there were some factual differences and that some of the evidence which was before the court in Apotex #1 was not part of the record in the instant case, the same compulsory licence and the same supply agreement were at issue and in evidence in both cases. To the extent that it was unaffected by evidence unique to its own record, the analysis of the supply agreement in Apotex #1 could therefore be applied to Novopharm. While it was true that paragraph 6 of the supply agreement required Novopharm to act in compliance with the terms of its licence, the court concluded that this clause was to be read together with the other clauses of the agreement, leading to the conclusion that a sublicence had indeed been granted. Accordingly, the appeal was allowed.

B. Apotex Inc. v. Eli Lilly and Co.

      (1)    Federal Court--Trial Division (1995), 60 C.P.R. (3d) 206

**33**    In this proceeding, the basis for Eli Lilly's claim of non-justification was that Novopharm's licence for nizatidine had been terminated by virtue of its grant of a sublicence to Apotex, and that Apotex therefore had no non-infringing way of obtaining the bulk nizatidine in order to formulate the capsules that were the subject of the NOC request. Alternatively, it was argued that the formulation of the capsules would itself constitute an infringement of Eli Lilly's patent rights.

**34**    In concluding in Novopharm, supra, that the arrangement between Apotex and Novopharm was not a sublicence but merely a supply agreement, McGillis J. had considered the evidence of Mr. Dan of Novopharm concerning his intent at the time he drafted the agreement with Dr. Sherman. While this evidence was not part of the record in the instant matter, McGillis J. had indicated in Novopharm that she would have reached the same conclusion even without considering that evidence. Accordingly, she was of the view that her conclusion as to the nature of the agreement in Novopharm applied equally to the case at bar.

**35**    Turning, then, to the question of whether the formulation of capsules from the bulk material would infringe Eli Lilly's patent rights, McGillis J. considered the decision of MacKay J. in Merck & Co. v. Apotex Inc. (1994), 59 C.P.R. (3d) 133 (F.C.T.D.), and agreed with his conclusion that this processing activity would in fact constitute an infringement, as "an unlicensed third party purchaser acquires none of the exclusive rights granted to a patentee merely by virtue of the fact that he has purchased bulk material from a licensed supplier" (p. 218).

**36**    Therefore, McGillis J. found that Eli Lilly had established, on a balance of probabilities, that the allegation of non-infringement made by Apotex in its notice of allegation was not justified within the meaning of s. 6(2) of the Regulations. Accordingly, she allowed the application for judicial review and prohibited the Minister from issuing a NOC to Apotex until after the expiry of Eli Lilly's patents.

(2) Federal Court of Appeal (1996), 66 C.P.R. (3d) 329

    (a)   MacGuigan J.A. (Robertson J.A. concurring)

**37**   In reviewing the facts and the evidence, MacGuigan J.A. observed that, on several occasions, Dr. Sherman had emphasized that all decisions under the supply agreement would be made by Apotex and communicated to Novopharm. Apotex's stated intention was to deal with a Canadian manufacturer, independent of Novopharm, and it in fact refused to communicate to Novopharm the identity of this manufacturer until such was convenient for Apotex. But Dr. Sherman insisted that Novopharm, not Apotex, would purchase the material and sell it to Apotex, within the terms of its licence.

**38**   MacGuigan J.A. noted that the conclusion of McGillis J. in Novopharm as to the proper characterization of the Apotex-Novopharm agreement was premised, to some extent, on the evidence of Mr. Dan as to his intention at the time the agreement was drafted. He observed not only that this evidence did not form part of the record in the case before him, but also that any direct evidence as to the intention of the parties was to be excluded from consideration under the parol evidence rule. In his view, the question as to the meaning of the agreement was a legal one which was to be determined from its text. Although McGillis J. had made clear that she would have reached the same conclusion even absent the extrinsic evidence, MacGuigan J.A. observed that she also appeared to have been influenced in her decision by two particular legal propositions: that a sublicence could only have been created if Novopharm had granted some or all of its rights under the licence to Apotex, and that, when interpreting a contract, courts should favour an interpretation which promotes a sensible commercial result: see Consolidated-Bathurst, supra.

**39**   MacGuigan J.A. relied on the decision of the Delaware Supreme Court in E.I. du Pont de Nemours & Co. v. Shell Oil Co., 227 USPQ 233 (1985) ("du Pont"), which, although it dealt with somewhat different facts, considered what was in his view essentially the same type of transaction, that is, one in which the patented product was produced not for the licensed party but for an unlicensed party. In that case, the court, relying on Carey v. United States, 326 F.2d 975 (Ct. Cl. 1964), held that the test for a sublicence is whether the production of the licensed item is by or for the use of the original licensee or the alleged sublicensee, and concluded that the application of this test revealed a sublicence in a situation where an unlicensed party purported to manufacture a patented item as the agent of the licensee, only to purchase the item from the licensee immediately upon its manufacture, each transfer of property being nothing more than a paper transaction.

**40**   In the view of MacGuigan J.A., a similar form of "legerdemain" occurred in the present case. He found that, under the supply agreement, the separate contracts between Novopharm and its suppliers and Novopharm and Apotex were to be maintained only to avoid a direct contractual link between Apotex and the suppliers. He viewed this as a matter of form only. Because Apotex was in reality the directing mind, with Novopharm using its licence for Apotex's benefit, he found that the arrangement between the two was, contrary to the view of McGillis J., "a sublicence dressed up to

look like a supply agreement" (p. 338). While he recognized that the subjective intention of the parties was to avoid creating a sublicence, he found that this was at odds with the objective intention of the document they executed. The legal effect of the contract, in other words, was to create a sublicence.

**41**    MacGuigan J.A. also found that, in accordance with his reading of Consolidated-Bathurst, supra, any consideration of whether this interpretation would promote a "sensible commercial result" must be accorded only a "tertiary status", behind the "primary" rule of interpretation -- the objective analysis of the actual words used by the parties -- and the application of the contra proferentum doctrine to interpret any ambiguity against the drafting party. In his view, at p. 338, the primary rule governed in the present case, as there was no ambiguity in "the words they used, as I interpret the reality behind them".

**42**    Therefore, MacGuigan J.A. dismissed Apotex's appeal, finding that Novopharm's licence had been properly terminated by Eli Lilly. Although he found it unnecessary to decide the issue of infringement by formulation, he stated that he would have agreed with the reasons of Pratte J.A. on the matter.

      (b)    Pratte J.A., dissenting

**43**    Pratte J.A. differed from the majority on the issue of contractual interpretation. In his view, there was nothing obscure in the text of the supply agreement such as to require further interpretation. Although both the intention and the effect of the contract was to afford the parties, as far as possible, the same benefits they would have obtained under mutual sublicences, the supply agreement did not provide for the granting of any sublicence. As to Eli Lilly's contention that the agreement did not disclose the true nature of the arrangement -- that each party would give sublicences to each other and then, for the sake of appearances, act as the sublicensee's agent in procuring the drug -- there was, in the view of Pratte J.A. at p. 342, "absolutely no evidence that the parties ever intended to enter into such a surrealistic arrangement". In his view, Eli Lilly had not succeeded in proving that the arrangement was a sham merely by showing that the parties could have obtained the same advantages by entering into a different agreement. Therefore, he concluded that Novopharm had not breached the terms of its licence.

**44**    Turning to the question of non-infringement by Apotex's actual activities, Pratte J.A. was of the view, at pp. 342-43, that "Apotex, by purchasing from Novopharm bulk nizatidine manufactured or imported by that company under its compulsory licence, would acquire the right to use that drug and, as an incident of that right, the right to make capsules from it". He found that, by selling a patented article, a patentee transfers the ownership of that article to the purchaser. The patentee no longer has any right with respect to the article, and the purchaser, as the new owner, "has the exclusive right to possess, use, enjoy, destroy or alienate it" (p. 343) without fear of infringing the vendor's patent. The patentee, in other words, has impliedly renounced his exclusive right of use and sale. In the view of Pratte J.A., with whom the majority concurred on this point, the same

principles apply to the sale of a patented article by a licensee who is entitled by the licence to sell without restrictions, and therefore, Apotex was entitled to make capsules from the nizatidine obtained from Novopharm without infringing Eli Lilly's patent. For these reasons, Pratte J.A. would have allowed the appeal.

IV.    Issues

**45**    As I have already stated, the issue common to both appeals is whether the supply agreement between Apotex and Novopharm constituted a sublicence, such as to justify the termination by Eli Lilly of Novopharm's compulsory licence for nizatidine. If it did, then the NOAs issued by both Novopharm and Apotex were not justified and the requested prohibition order should issue. However, each appeal also raises other discrete issues, which I shall consider in turn.

**46**    Specifically, in the Novopharm proceeding, this Court is asked to determine: (1) whether the Federal Court of Appeal erred in applying its decision in Apotex #1 to the Novopharm appeal, whether as res judicata or otherwise; (2) whether Novopharm's NOA was not justified, regardless of whether its compulsory licence was terminated by breach, because the licence did not permit the activities which it proposed; and (3) whether the Federal Court had the jurisdiction to grant declaratory relief on a limited judicial review proceeding of this type. In Apotex #1, it is further alleged that, apart from the primary issue of infringement, Apotex's proposed reformulation of the nizatidine into final-dosage form would itself constitute an infringement of the patents held by Eli Lilly, and that the prohibition order should therefore have issued regardless of whether or not the supply agreement constituted a sublicence.

V.    Analysis

A. The Agreement Between Apotex and Novopharm

**47**    The primary argument advanced by Eli Lilly is that the supply agreement constituted the grant of a sublicence by Novopharm to Apotex in direct violation of paragraph 12 of Novopharm's compulsory licence for nizatidine. It is undisputed that such a breach would, pursuant to paragraph 8 of the licence, entitle Eli Lilly to terminate the licence, which would in turn preclude Novopharm from manufacturing, using, importing or selling nizatidine without infringing Eli Lilly's patent. In this event, neither Novopharm's nor Apotex's NOA would be justified.

(1)    The Nature of a Sublicence

**48**    Relatively little argument was directed at defining what a sublicence is. As a general matter, a sublicence amounts to a grant by a licensee of certain licensed rights to a third party, the sublicensee. That is, the licensee in effect transfers or licenses some or all of his or her rights to the sublicensee, which means that the sublicence has similar incidents to the primary licence, including the right to exercise independently certain rights enjoyed by the licensee pursuant to its licence. It has been said, in fact, that "a sublicence is simply another name for the indirect granting of a

licence": see Leslie W. Melville, Forms and Agreements on Intellectual Property and International Licensing, vol. 1 (3rd ed. rev. 1997 (loose-leaf)), at sec. 3.18.

**49**    To understand the nature of a sublicence, then, it is first necessary to appreciate the nature of a licence. In Harold G. Fox, The Canadian Law and Practice Relating to Letters Patent for Inventions (4th ed. 1969), the concept is expressed as follows (at p. 285):

> A licence, even though exclusive, does not give the licensee all the rights of the patentee. A licence does not set up rights as between the licensee and the public, but only permits him to do acts that he would otherwise be prohibited from doing. He obtains merely a right of user. But a licence is a grant of a right and does not merely confer upon the licensee a mere interest in equity. A licence is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the licence, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that licence, would be an infringement of the right of the person who gives the licence. A licence gives no more than the right to do the thing actually licensed to be done. [Emphasis added.]

In other words, by the grant of a licence, the patentee grants to the licensee the right to act in a certain way vis à vis the patented article, a right which, but for the licence, the licensee would not enjoy. The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the licence.

**50**    Moreover, I should note, as an aside, that, unless the intention is expressed or implied in the licence, a licensee is not at liberty to grant a sublicence without the permission of the licensor: see, for example, Howard and Bullough, Ld. v. Tweedales and Smalley (1895), 12 R.P.C. 519, at p. 528. This may be viewed as an effort by the law to protect the property rights of the owner of the property, notwithstanding that the exclusive nature of these rights has been compromised by the granting of a licence. Thus, even without the express prohibition against sublicensing in the compulsory licence, Novopharm would not have been permitted to grant a sublicence to Apotex. The effect of the express prohibition, however, in the context of this licence as a whole, is that the grant of a sublicence by Novopharm would occasion a breach which could lead to the termination of the compulsory licence at the instance of Eli Lilly.

**51**    For Novopharm to have granted a sublicence to Apotex by means of the supply agreement, it must have transferred some or all of its rights under its compulsory licence to Apotex. Simply put, the question comes down to this: did Novopharm grant to Apotex, either expressly or impliedly, the right to do something which Apotex would otherwise be prohibited from doing, and which Novopharm was permitted to do only by virtue of its compulsory licence for nizatidine? This may have occurred in one of two ways: either some express provision or provisions, apparent on the face

of the agreement, may reveal that the intentions of the parties was to create a sublicensing arrangement, or the legal effect of the document may be such that a sublicence was created in spite of the parties' contrary intentions. I will examine each of these possibilities in turn.

(2)   Contractual Interpretation and the Intentions of the Parties

**52**   In order to ascertain whether the supply agreement conferred or had the effect of conferring a sublicence upon Apotex, it is first necessary to consider the proper approach to the interpretation of such a contract, and, in particular, the evidence which may be considered in this respect. In Consolidated-Bathurst, supra, at p. 901, Estey J., writing for himself and Pigeon, Dickson, and Beetz JJ., offered the following analysis:

> Even apart from the doctrine of contra proferentem as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

**53**   From this passage emerge a number of important principles of contractual interpretation. Not all of these, however, apply to the instant appeal. One which surely does not is the doctrine of contra proferentem. Contra proferentem operates to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party. When both parties are in agreement as to the proper interpretation of the contract, however, it is not open to a third party to assert that contra proferentem should be applied to interpret the contract against both contracting parties. Indeed, a third party has no basis at all upon which to rely upon contra proferentem: see G. H. L. Fridman, The Law of Contract in Canada (3rd ed. 1994), at p. 471. Therefore, I would, as a preliminary matter, reject the suggestion that the doctrine should apply to read any ambiguity in the contract against the drafting parties, in this case both Novopharm and Apotex.

**54**   The trial judge appeared to take Consolidated-Bathurst to stand for the proposition that the ultimate goal of contractual interpretation should be to ascertain the true intent of the parties at the time of entry into the contract, and that, in undertaking this inquiry, it is open to the trier of fact to admit extrinsic evidence as to the subjective intentions of the parties at that time. In my view, this

approach is not quite accurate. The contractual intent of the parties is to be determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time. Evidence of one party's subjective intention has no independent place in this determination.

**55**    Indeed, it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face. In the words of Lord Atkinson in Lampson v. City of Quebec (1920), 54 D.L.R. 344 (P.C.), at p. 350:

> . . . the intention by which the deed is to be construed is that of the parties as revealed by the language they have chosen to use in the deed itself .... [I]f the meaning of the deed, reading its words in their ordinary sense, be plain and unambiguous it is not permissible for the parties to it, while it stands unreformed, to come into a Court of justice and say: "Our intention was wholly different from that which the language of our deed expresses. . . ."

**56**    When there is no ambiguity in the wording of the document, the notion in Consolidated-Bathurst that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words. This is consistent with the following dictum of this Court, in Joy Oil Co. v. The King, [1951] S.C.R. 624, at p. 641:

> . . . in construing a written document, the question is not as to the meaning of the words alone, nor the meaning of the writer alone, but the meaning of the words as used by the writer.

**57**    In my view, there was no ambiguity to the contract entered into between Apotex and Novopharm. No attempt was made to disguise the true purpose of the arrangement, or the circumstances surrounding its drafting. Clearly, the agreement was meant to minimize the deleterious effects of the amendments to the Patent Act, which were expected to and did eventually place severe restrictions on the former scheme of compulsory licensing, by maximizing the access of each party to as wide a variety of patented medicines as possible. This was to be accomplished by obliging each party to obtain such material for the other in the event that one party possessed a licence which the other lacked and could no longer readily obtain. All of this is evident on a plain reading of the recitals to the supply agreement. Leaving aside the question of circumventing the legislation, which has no bearing on the interpretation of the contract, the parties' intentions are clear on the face of the agreement. Accordingly, it cannot properly be said, in my view, that the supply agreement contains any ambiguity that cannot be resolved by reference to its text. No further interpretive aids are necessary.

**58** More specifically, there is no need to resort to any of the evidence tendered by either Apotex or Novopharm as to the subjective intentions of their principals at the time of drafting. Consequently, I find this evidence to be inadmissible by virtue of the parol evidence rule: see Indian Molybdenum Ltd. v. The King, [1951] 3 D.L.R. 497 (S.C.C.), at pp. 502-3.

**59** Moreover, even if such evidence were required, that is not the character of the evidence tendered in this case, which sheds no light at all on the surrounding circumstances. It consisted only of the subjective intentions of the parties: Mr. Dan's subjective intention at the time of drafting and Dr. Sherman's subjective intention to implement the agreement in a certain way.

**60** Therefore, I am of the opinion that the trial judge erred, in the Novopharm proceeding, in considering the evidence of Mr. Dan as to his intention at the time the contract was made. However, I am also cognizant of her clear statement that she would have reached the same conclusion even without considering the evidence and thus I would not reject her interpretation of the supply agreement for this reason alone. Appropriately, McGillis J. did not appear to consider the evidence of Dr. Sherman in Apotex #1, although the same cannot be said for MacGuigan J.A. in his disposition of that case. Indeed, he seemed to have been influenced heavily by this evidence, which necessarily casts doubt on the validity of his conclusions.

**61** Having established that no extrinsic evidence is admissible, what does the text of the agreement say about the intentions of the parties? Despite the somewhat strident submissions to the contrary by Eli Lilly, one thing which it most assuredly does not say is that, pursuant to its terms, Apotex is entitled to the independent use of any compulsory licence owned by Novopharm for its own benefit. Nor does it say that Apotex is entitled to exercise any right enjoyed by Novopharm pursuant to any such licence. Rather, it simply provides, in paragraph 1, that Novopharm will, at the direction of Apotex, "use its licence for the benefit of" Apotex. To my mind, this does not satisfy the definition of a sublicence, as previously set out. The only right acquired by Apotex pursuant to this provision is the right to require Novopharm to exercise its licensed rights in a particular way, that is, to enable it to set in motion and benefit from Novopharm's exercise of its own rights to obtain and sell certain patented medicines. Apotex acquires no right to obtain these medicines independently of Novopharm. Indeed, it remains abundantly clear that Novopharm is still the only party actually entitled to act pursuant to the licence.

**62** Thus, it is really of no consequence that the agreement gives Apotex the right to direct Novopharm as to who should make the medicine, from whom it should be purchased, and at what price, or that Novopharm is contractually obliged to follow these directions. Nor does it matter that Novopharm is to receive a royalty for supplying to Apotex the licensed materials so obtained. In some ways, these provisions create nothing more than an elaborate agreement to agree. That is, the agreement sets out a procedure by which the unlicensed party may require the licensed party to enter into another agreement, one of purchase and sale, the specific terms of which may be set substantially by the unlicensed party except that the licensed party is always entitled to the same rate of return: four percent of the cost of the material sold. In this way, the royalty does no more

than assure the licensed party a certain margin of profit in consideration of its role in these anticipated future transactions. The arguments of the respondent notwithstanding, I do not see how this can be indicative of either an intention to confer, or the actual conferral of, a sublicence.

**63**    It is true that, in the recitals, the parties refer to a mutual intention to "share their rights", which itself might well be taken to suggest an intention to create a sublicence. However, this provision must be read in light of the rest of the agreement, which clearly discloses the intention not to create a sublicence. In particular, the requirement in paragraph 6 that the licensed party comply with the terms of its licence militates against the conclusion that the parties intended by the agreement to grant sublicences to one another. It simply would not be possible for Novopharm to grant a sublicence while still complying with the terms of its compulsory licence for nizatidine, given the express prohibition in that licence against the conferral of sublicences. On the evidence, there is no reason to conclude that Novopharm intended to breach both the supply agreement and its compulsory licence by granting a sublicence to Apotex.

**64**    Moreover, I do not read paragraph 7 of the agreement, which provides that "[t]he licensed party shall not be excused from performing any act as directed by the unlicensed party ... on the grounds that there is doubt as to whether or not the licence ... permits the requested acts" (emphasis added), provided also that the unlicensed party is obliged to defend the licensed party from any ensuing litigation, as either permitting or requiring the conferral of a sublicence in this case. If paragraph 6 is to have any meaning at all, it must at least be seen as prohibiting acts which would be in clear violation of the licence held by the licensed party. I can conceive of no clearer violation than the conferral of a sublicence. There is no "doubt" as to whether the licence permits such an act; rather, it is expressly prohibited by paragraph 12 of the licence. Consequently, I do not believe that paragraph 7 has any application in the circumstances; certainly, it does not oust the effect of paragraph 6.

**65**    Paragraph 8, which requires the licensed party to "cooperate fully with the unlicensed party and follow the directions of the unlicensed party to enable the unlicensed party to enjoy the use of the licence to the same extent that would be possible if the unlicensed party itself held such licence" (emphasis added), is admittedly an unusual and arguably unfortunately worded clause. Indeed, if anyone were to question whether the supply agreement was actually drafted without the benefit of counsel, as asserted by both Novopharm and Apotex, this paragraph would stand as cogent evidence in support of that claim. However, it too must be read in light of the rest of the agreement, which simply does not permit the unlicensed party to "enjoy the use of the licence" in the active sense, that is, to actually use it. Rather, it permits only indirect enjoyment: the enjoyment of the licensed party's use of the licence. It is certainly true that the licensed party is obliged to follow the directions of the unlicensed party and to take all legal steps possible to enable the unlicensed party to benefit from the existence of the license, when requested. However, this stops short of actually permitting the unlicensed party to exercise licensed rights independently of the licensed party, which is the essence of a sublicence.

**66**   In short, I can find nothing in the wording of the document to suggest that the parties intended to grant sublicences to each other. Rather, every indication is that they intended to establish a commercial arrangement whereby the unlicensed party would enjoy the right to require the licensed party to use its various licences for the benefit of the unlicensed party by acquiring, potentially at the direction of the unlicensed party, and subsequently reselling to the unlicensed party, various patented medicines. Indeed, it is worth noting that the creation of sublicences really would not have been in the parties' commercial interests, as this would have justified the termination of the various compulsory licences held by each company and thereby not only rendered the supply agreement itself useless but also jeopardized the business operations of both. While it is true, as submitted by Eli Lilly, that no express words of grant are required to create a sublicence, clearly the supply agreement, to have this character, must have transferred to Apotex more than simply the right to compel Novopharm to use its licence in a given way. But it is apparent that, in the context of the agreement as a whole, this is all that was meant by sharing rights.

(3)   The Legal Effect of the Supply Agreement

**67**   Eli Lilly contends that the legal effect of the agreement was that a sublicence was granted by each party to the other, despite what they may have intended. In light of the foregoing analysis, however, I do not see how this argument can be sustained. Apotex and Novopharm intended to create a specific type of supply agreement, not a sublicence, and I believe they succeeded in doing so. However, to the extent that Eli Lilly's argument may be premised upon some confusion as to the distinction between a sublicence and an ordinary agreement of purchase and sale, that distinction does merit some brief examination at this stage.

(i)   Sublicence Versus Purchase and Sale

**68**   By virtue of its compulsory licence, Novopharm is entitled to manufacture and/or import bulk nizatidine, subject to the temporal restrictions imposed by the Patent Act, and to sell the nizatidine so obtained to Apotex or any other third party. Apotex, having acquired the nizatidine from Novopharm, would then be free to use it in any way that did not infringe the patents held by Eli Lilly. Thus, no sublicence could have been created by an agreement that was confirmatory of these rights and simply conferred upon Apotex the additional right to require Novopharm to acquire and sell to it bulk nizatidine at a certain rate. In other words, to prove the existence of a sublicence, it must be established that the agreement was, in substance if not form, more than merely an elaborate arrangement under which future contracts for purchase and sale might be completed.

**69**   As I have said, a sublicence requires the conferral of licensed rights by a licensee upon a third party, the sublicensee. This may create some confusion between a sublicence and an ordinary contract of purchase and sale, though, as a third party may acquire similar rights under each of these arrangements. That is, just as a sublicensee can obtain the rights to use and sell a patented article if this right is enjoyed by the licensee and transferred accordingly, so too is the sale by a licensee of a patented article presumed to give the purchaser the right "to use or sell or deal with the goods as the

purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, [1906] 1 Ch. 605, at p. 610; see also Gillette v. Rea (1909), 1 O.W.N. 448 (H.C.); Betts v. Willmott (1871), L.R. 6 Ch. App. 245. In other words, unless otherwise stipulated in the licence, a licensee is generally entitled to pass to a purchaser the right to use or resell the patented article without fear of infringing the patent.

70     But the sale of a licensed article obviously does not have the automatic effect of constituting the purchaser a sublicensee, and thus the fact that a third party enjoys rights of use and alienation cannot alone be indicative of the existence of a sublicence. Indeed, as Apotex points out, both the case law and common sense disclose any number of ways in which a licensee can sell a licensed article to a third party with the complete range of ordinary incidents of ownership, without constituting that party a sublicensee. These range from the ordinary casual purchase to the licensee's manufacturing, at the purchaser's instigation and direction, and according to the purchaser's own design specifications, products which incorporate the subject matter of the licence: see Intel Corp. v. ULSI System Technology Inc., 995 F.2d 1566 (Fed. Cir. 1993).

71     Thus, practically speaking, the rights of use and alienation can only be determinative of the existence of a sublicence in cases in which it is clear that no transfer of property rights has occurred, i.e., that there has been no sale of the licensed article to the third party. In such a case, a right of use could only be derived from a sublicence of some type, and an untrammelled right of alienation could not be enjoyed at all, as it would be impossible for a third party to transfer good title without first having any proprietary right in the article. Where the rights of the unlicensed party are derived from a sale of licensed material, however, it would be misleading to rely on the rights of use and alienation as a basis for the conclusion that a sublicence has been or is to be granted.

72     In the present case, it is plainly the latter situation which is contemplated by the supply agreement between Novopharm and Apotex. Under the agreement, any right Apotex might enjoy to sell nizatidine would obviously emanate from its first having purchased such material from Novopharm. As I have stated, the possibility that the material might be acquired by Novopharm at and subject to Apotex's direction is of no consequence. What is important, rather, is that the supply agreement in no way permits Apotex to exercise rights licensed to Novopharm in order to manufacture, or otherwise acquire independently, patented material for which it is not itself licensed. If the agreement were in substance a sublicence, Novopharm's involvement would be entirely unnecessary; Apotex could deal directly with the manufacturer or exporter of the material, or manufacture the drugs itself. But no such rights in fact exist under the supply agreement.

73     A number of recent U.S. cases support the view that establishing the existence of a sublicence in situations analogous to the one before us will typically depend on demonstrating that the unlicensed party is exercising the licensee's right to manufacture or import the licensed material. For example, in Intel, supra, it was held that the sale of microchips by the licensee, Hewlett-Packard ("HP"), to a third party, ULSI, did not constitute a sublicence, notwithstanding that the chips were built by HP according to the design and specifications of ULSI and were then resold by ULSI. The court in that case did acknowledge, however, that HP's empowering ULSI to make the chips itself

would have constituted a sublicence.

**74**    In the instant appeals, the Federal Court of Appeal relied on du Pont, supra, for the proposition that, in effect, a sublicence is created whenever a patented product is made for the benefit of the unlicensed party rather than the licensee. However, with respect, I view du Pont as readily distinguishable from the cases before us, and do not, in any event, believe that it stands for the legal principle propounded. In du Pont, it was more significant that the unlicensed party actually manufactured the licensed article, allegedly as the agent of the licensee, only then to "purchase" the article from the licensee immediately upon its manufacture. This arrangement was characterized by the Delaware Supreme Court as a sham, and rightfully so. The only factor which distinguished it from an overt situation of an unlicensed party's manufacturing a patented article strictly for its own benefit was a series of paper transactions carried out between a subsidiary corporation and its parent for the purpose of obscuring the true character of the arrangement.

**75**    But the situation is manifestly different in a case where the manufacturer and the end user are embodied in two different legal personnae, and legitimate transfers of property do, in fact, take place. In Cyrix Corp. v. Intel Corp., 77 F.3d 1381 (Fed. Cir. 1996), the licensed party agreed to supply a third party with microprocessors which it was entitled to manufacture pursuant to a licence conferred upon it by the patentee. The licensed party, in turn, had the processors made by another corporation (affiliated but not a subsidiary), which then sold them to the licensed party for resale to the third party. It was argued that this arrangement constituted in essence a sublicence granted by the licensed party to the third-party manufacturer, and that the licensed party's "have made" rights under the licence extended only to the manufacture of goods for its own benefit. The court rejected this argument, finding that the licensed party was entitled to have the licensed products made by an agent and to resell them as it saw fit. It distinguished du Pont, supra, on the basis that the manufacturer and the end user were two completely separate entities, and so the arrangement could not be characterized as a sham.

**76**    In my view, Cyrix is much more closely analogous than du Pont to the instant appeal, a case in which two arm's-length companies, one licensed and the other unlicensed, have contracted for the prospective purchase and sale of patented goods. They have agreed that the licensed party, in this case Novopharm, will, at and according to the direction of the unlicensed party, Apotex, either manufacture or import the goods, acquire property rights in them, and sell them to Apotex. The only real difference is that, where in Cyrix the licensee presumably had the chips made on such terms as would ensure that a profit would be earned on the agreement of purchase and sale previously completed with the third party, in the present circumstances, the profit of which Novopharm is assured is based not on its arrangement with its supplier, but from the guaranteed four percent royalty payable by Apotex. This distinction alone cannot transform the supply agreement into a sublicence.

**77**    Because the supply agreement has not yet been implemented, the evidence certainly does not establish that this is a case where the unlicensed party is manufacturing the goods itself, as in du

Pont. Consequently, I need not decide whether a sublicence would be granted in this hypothetical situation. Indeed, it has not been argued, and I cannot simply presume that the supply agreement has been or is intended to be carried out in this manner. Moreover, I note again that the supply agreement expressly provides, in paragraph 6, that the licensed party must comply with the terms of the licence, which, inter alia, precludes it from granting sublicences. Therefore, while it is theoretically possible that this arrangement could someday be implemented in a way that would result in the grant of a sublicence, it must be presumed for the present purposes that, if the agreement is ever actually acted upon, the parties will act in accordance with the law.

**78**    Pursuant to the terms of the contract as it stands, Apotex is simply permitted to direct Novopharm to the third party manufacturer which it favours and with whom it has negotiated terms, which would then oblige Novopharm to deal with that manufacturer and acquire the patented medicine on the terms negotiated. Despite this considerable degree of control by Apotex, it remains the case that separate entities are involved, that Apotex is in no way ultimately responsible for the supply of the goods that Novopharm will eventually sell to it, and that a legitimate and de facto transfer of property must occur between Novopharm and the third party before any proprietary rights can be acquired by Apotex. Therefore, only if Apotex's designation of a preferred source or manufacturer would necessarily render it a sublicensee of Novopharm would the agreement between the two companies amount to a breach of the terms of the compulsory licence. Since it is possible for Apotex to exercise this contractual right without the benefit of licensed rights transferred to it by Novopharm, it would be incorrect to say that the supply agreement necessarily infringes the licence.

**79**    As I have already made clear, Apotex enjoys no rights of its own under the licence as a consequence of the supply agreement with Novopharm, regardless of the parties' apparent intention to "share their rights". At bottom, the agreement amounts to nothing more than an agreement to agree, a mutual obligation for the parties to enter into future contractual arrangements with one another. Neither the text of the agreement nor the manner in which the parties purported to implement it supports the conclusion that it is in substance a sublicence.

      (4)    The Agency Argument

**80**    In the alternative, Eli Lilly submitted that the supply agreement ought to be interpreted as a sublicence because the degree of control likely to be exercised by Apotex over the acquisition of nizatidine would result in a situation where Novopharm in reality would be acting as Apotex's agent. Novopharm would not be acting on its own behalf in the acquisition but rather on behalf of Apotex, which would imply that Apotex has acquired licensed rights from Novopharm. As a variation on this theme, it is suggested that Novopharm would in effect be unlicensed to make these acquisitions because it would be standing in the shoes of Apotex, an unlicensed entity. The latter submission, then, stands as an alternative to the sublicence argument, and remains even if the supply agreement is not considered a sublicence.

**81**    To my mind, both forms of this argument must fail, for one very simple reason. It is abundantly clear that, under the supply agreement, any contractual relations that might be established for the purchase of nizatidine would be between Novopharm and the third-party supplier. Apotex would not be a party to the contract; Novopharm would not be entering into the contract "on behalf of" Apotex in any sense. The notion of an agent's entering into contractual relations with the third party is inimical to the entire concept of agency, which contemplates the agent's binding the principal, not itself, to contractual relations and obligations. The completion of a contract between Novopharm and a third-party supplier would prevent the formation of an agency relationship because, even if contemplated, such a relationship could not be embodied by a transaction which resulted in the completion of a contract between the third party and the agent rather than the principal.

(5)    Conclusion as to the Nature of the Supply Agreement

**82**    The arrangement entered into by Apotex and Novopharm is not a sublicence. Regardless of the level of control that might be exercised by Apotex over arranging and facilitating the acquisition of licensed materials for its own benefit, no actual acquisition is itself possible without the involvement of Novopharm. The agreement does not grant Apotex the right to do independently of Novopharm anything which only Novopharm is licensed to do, nor does it purport or disclose any contractual intent to do so. In other words, no licensed rights are transferred by Novopharm to Apotex. Thus, the substance of the arrangement, while perhaps resulting in an unconventional commercial situation, is ultimately inconsistent with the grant of a sublicence. To the extent that the Federal Court of Appeal held otherwise, it was, with respect, in error.

**83**    That is not to say, however, that it would be impossible to implement the agreement in such a manner as to create a sublicence. For example, while I need not decide this hypothetical issue, I would again observe that, if the domestic supplier from which Apotex directed Novopharm to obtain the nizatidine were found to be Apotex itself, the agreement would likely be seen as a sham, just as in du Pont, supra. Similarly, if Novopharm were to be less than vigilant in enforcing the terms of the agreement and permit Apotex to contract directly with a third party supplier for the purchase of nizatidine, this relaxation of terms might well be shown to result in the effective conferral of a sublicence. But these are hypotheticals, not our facts. Indeed, there can be no possible evidence in this case of the manner in which the agreement was implemented by the parties because, at the time of the hearing, it had not been implemented at all. On the other hand, if the agreement has subsequently been implemented so as to create a sublicence, or if it is so implemented in the future, it would certainly then be open to the patentee to move to terminate the compulsory licence or to seek whatever other relief might be appropriate under the Patent Act or otherwise. However, this has no bearing on the justification of the NOAs here at issue.

**84**    Accordingly, I would emphasize that the conclusions reached in this case should not be taken to characterize every supply agreement similar to the one here at issue as insulating the parties to it from any allegation of sublicensing. Rather, this decision is to be substantially confined to its facts:

a case in which an agreement has been entered into between companies dealing at arm's length, which is not on its face a sublicence, and which had not been implemented at any time material to the litigation. Depending on the implementation of the agreement, the identities of the parties, or any number of other distinguishing factors, it is entirely possible that a different result might be reached on the specific facts of another case.

B. Other Issues in the Novopharm Appeal

> (1)    Did the Federal Court of Appeal Err in Applying its Decision in Apotex #1 to its Decision in Novopharm?

**85**    Novopharm submits that, even if the supply agreement were properly interpreted by the Federal Court of Appeal as conferring a sublicence upon Apotex, it nonetheless should not be considered a sublicence for the purposes of the Novopharm appeal. The reason advanced for this distinction is that nothing on the face of the agreement can be seen as constituting a sublicence, and, whereas the conclusion of the court in Apotex #1 may have been premised in part on Dr. Sherman's evidence as to the manner in which Apotex expected the agreement to be implemented, no steps had actually been taken to implement the agreement. Thus, it is argued that, while it might have been open to the court to grant the requested prohibition order in Apotex #1 if Dr. Sherman's proposed implementation would have resulted in the conferral of a sublicence, this evidence was not before the court in Novopharm and, in fact, was inconsistent with Mr. Dan's evidence as to his understanding of the agreement. To the extent that the Federal Court of Appeal failed to take into consideration this material evidentiary difference, it is suggested, this constituted an error of law.

**86**    It is certainly true that each case must be considered on its own facts, and I have already expressed the view that the implementation of the agreement in a certain way might well result, hypothetically, in the creation of a sublicence. As such, I agree that it would have been inappropriate for the Federal Court of Appeal to apply its decision in the first appeal to the second, whether as res judicata or otherwise, without considering any material factual differences which might have existed between the two cases. However, in light of my earlier conclusion as to the character of the supply agreement, together with the fact that the agreement had not been implemented at the material time, it is not necessary to decide this issue. None of the parol evidence considered by the Federal Court of Appeal has had any bearing on the conclusions I have reached.

> (2)    Was Novopharm's Notice of Allegation Premature and Therefore not Justified?

**87**    Even the unequivocal conclusion as to the character of the supply agreement does not put the Novopharm matter to rest. Still to be determined is whether, as alleged by Eli Lilly, Novopharm's NOA was not justified regardless of whether its compulsory licence for nizatidine was successfully terminated.

**88**    Pursuant to s. 39.11(2)(c) of the Patent Act, Novopharm was prohibited from importing, under

its compulsory licence, medicine in respect of which a previous NOC had been granted after June 27, 1986, until 10 years after the date of the issuance of that NOC. While this section was repealed by the Patent Act Amendment Act, 1992, s. 11(1) of that Act provides that licences granted under the former s. 39 prior to December 20, 1991, continue in effect according to their terms, and ss. 39 to 39.14 of the former Act continue to apply to such licences as if those sections had not been repealed.

**89**    A NOC in respect of nizatidine was granted to Eli Lilly Canada on December 31, 1987. Accordingly, it is submitted by Eli Lilly that Novopharm's NOA, which was issued on July 30, 1993, could not have been justified before December 31, 1997, the first date on which it would have been entitled, under its compulsory licence, to import nizatidine. Thus, Eli Lilly argues that, even if no sublicence was granted and the termination of Novopharm's licence was not therefore justified, Novopharm would nonetheless have infringed Eli Lilly's patents if it had received a NOC for nizatidine, as it had no non-infringing way in which to obtain the bulk medicine.

**90**    However, this submission appears to ignore the fact that Novopharm's NOA does not seem to disclose any specific intention to import the nizatidine. Rather, the request was for a NOC to make, construct, use, and/or sell nizatidine in 150 mg and 300 mg capsules. No mention was made of how Novopharm proposed to obtain the bulk medicine, and no evidence was led to suggest that it was to be imported. Indeed, while Mr. Dan acknowledged in his written answers to undertakings on cross-examination that, at the time of the hearing, Novopharm's suppliers were located outside of Canada, he also indicated that Novopharm was aware of the prohibition against its importing nizatidine before December 31, 1997, and intended to abide by the relevant provisions of the Patent Act. Further, he indicated that Novopharm might locate a Canadian supplier between December 31, 1994, and December 31, 1997, and expressly disavowed any intention to import nizatidine prior to the latter date.

**91**    Pursuant to s. 39.14 of the Patent Act, Novopharm was entitled to use the patented invention for the preparation or production of medicine -- that is, to manufacture the medicine itself or through Canadian agents -- after the expiration of seven years after the date of the issue of the first NOC to Eli Lilly Canada. This seven-year period expired on December 31, 1994, and while Novopharm served its NOA on Eli Lilly Canada on July 30, 1993, the application was not heard until January 30, 1995. Thus, as of the date of hearing, Novopharm was entitled to manufacture or have made the drug for its own use, for sale for consumption in Canada.

**92**    In Apotex #2, supra, the companion to the instant appeals, I have held that the appropriate date for assessment of a NOA, where a prohibition order is sought by a patentee, is the date of hearing and not the date on which the NOA was issued. Accordingly, I cannot conclude that Novopharm's NOA was premature and therefore not justified. As of the date of hearing, it did indeed have a non-infringing way to obtain bulk nizatidine, and, in the absence of evidence to the contrary, I presume that its intention was, as Mr. Dan asserted, to operate within the restrictions of the Patent Act by obtaining the medicine either from a Canadian supplier or not at all.

(3)     Jurisdiction to Grant Declaratory Relief

**93**     The final issue to be determined with respect to the Novopharm appeal is whether this Court has the jurisdiction, on a summary judicial review proceeding concerning an application for a prohibition order against the issuance of a NOC, to grant declaratory relief. Specifically, Novopharm asks that this Court declare: (1) that Eli Lilly has failed to show that the notice of allegation was not justified; (2) that Eli Lilly has failed to show that it was entitled to terminate the compulsory licence; and (3) that the supply agreement does not constitute a sublicence or a transfer of the compulsory licence from Novopharm to Apotex.

**94**     In my view, the first two requests are unnecessary. The finding that the supply agreement was not a sublicence necessarily leads to the conclusion, at least for the purposes of this appeal, that Eli Lilly was not entitled to terminate Novopharm's compulsory licence. Indeed, no other breach was alleged, such as to trigger paragraph 9 of the licence. Similarly, this finding, in combination with the finding that Novopharm's NOA was not premature, leads to the conclusion that Eli Lilly has failed to show that the NOA was not justified. I can see no reason to grant what would be superfluous declaratory relief on these issues, when all that is necessary is to determine whether or not the Federal Court of Appeal erred by granting the prohibition orders as requested.

**95**     As for the third request, I am of the view that it would be inappropriate for this Court to grant the requested relief in light of the nature of these proceedings. As McGillis J. correctly observed, the summary judicial review that is to be conducted on an application for a prohibition order under the Regulations is highly fact-specific and is generally considered to be binding only on the parties in the specific litigation. This is only appropriate, given the limited nature of the proceedings, the question that is to be answered, and the record generated for this limited purpose. In Merck Frosst Canada Inc. v. Canada (Minister of National Health and Welfare) (1994), 55 C.P.R. (3d) 302 (F.C.A.), at pp. 319-20, Hugessen J.A. made this point in the following terms, with which I agree:

> In determining whether or not the allegations are "justified" (s. 6(2)), the court must then decide whether, on the basis of such facts as have been assumed or proven, the allegations would give rise in law to the conclusion that the patent would not be infringed by the respondent.

> In this connection, it may be noted that, while s. 7(2)(b) seems to envisage the court making a declaration of invalidity or non-infringement, it is clear to me that such declaration could not be given in the course of the s. 6 proceedings themselves. Those proceedings, after all, are instituted by the patentee and seek a prohibition against the Minister; since they take the form of a summary application for judicial review, it is impossible to conceive of them giving rise to a counterclaim by the respondent seeking such a declaration. Patent invalidity, like patent infringement, cannot be litigated in this kind of proceeding.

[Emphasis added.]

**96**    This point was reinforced more recently by Strayer J.A. in David Bull Laboratories, supra, at p. 600:

> If the Governor in Council had intended by these Regulations to provide for a final determination of the issues of validity or infringement, a determination which would be binding on all private parties and preclude future litigation of the same issues, it surely would have said so. This Court is not prepared to accept that patentees and generic companies alike have been forced to make their sole assertion of their private rights through the summary procedure of a judicial review application. As the Regulations direct that such issues as may be adjudicated at this time must be addressed through such a process, this is a fairly clear indication that these issues must be of a limited or preliminary nature. If a full trial of validity or infringement issues is required this can be obtained in the usual way by commencing an action. [Emphasis added.]

**97**    While the relief requested of the Federal Court of Appeal in these cases touched on issues pertaining to the infringement and/or invalidity of the actual patents, not the effect of an external agreement, I believe that the reasoning involved is also applicable to the Novopharm appeal. The nature of the inquiry on this judicial review proceeding requires only a determination as to whether or not the NOA was justified in the circumstances of this case. While this necessarily entails a decision as to whether, in these particular circumstances, the supply agreement constituted a sublicence and thus justified the termination of the licence, this is not to be taken as a final decision on the nature of the agreement for all purposes. For this Court to make a binding declaration concerning the private rights and obligations of the parties to the agreement would go well beyond the limited scope of the proceeding. Accordingly, I would deny the declaratory relief requested by Novopharm.

C. Other Issues in the Apotex #1 Appeal

>    (1)    Would the Reformulation of Nizatidine by Apotex into Final-dosage Form Infringe the Patent Held by Eli Lilly?

**98**    Even assuming that the supply agreement did not constitute a sublicence, that Novopharm's licence remains in force, and that Apotex is therefore able to purchase bulk nizatidine under the supply agreement as a third-party purchaser, the possibility remains that the use to which Apotex proposes, in its NOA, to put the drug would infringe Eli Lilly's patent. In this vein, Eli Lilly submits that the Federal Court of Appeal erred in holding that the formulation of final-dosage capsules by Apotex would not infringe the patent. Specifically, it is submitted that the rights of use and sale that are inherent in the unrestricted purchase of a licensed article do not permit the making of a new article.

**99**    In the Federal Court of Appeal, Pratte J.A., with whom the majority agreed on this point, disposed of this argument in the following concise and useful passage, at p. 343 with which I agree:

> If a patentee makes a patented article, he has, in addition to his monopoly, the ownership of that article. And the ownership of a thing involves, as everybody knows, "the right to possess and use the thing, the right to its produce and accession, and the right to destroy, encumber or alienate it".... If the patentee sells the patented article that he made, he transfers the ownership of that article to the purchaser. This means that, henceforth, the patentee no longer has any right with respect to the article which now belongs to the purchaser who, as the new owner, has the exclusive right to possess, use, enjoy, destroy or alienate it. It follows that, by selling the patented article that he made, the patentee impliedly renounces, with respect to that article, to [sic] his exclusive right under the patent of using and selling the invention. After the sale, therefore, the purchaser may do what he likes with the patented article without fear of infringing his vendor's patent.

> The same principles obviously apply when a patented article is sold by a licensee who, under his licence, is authorized to sell without restrictions. It follows that, if Apotex were to purchase bulk Nizatidine manufactured or imported by Novopharm under its licence, Apotex could, without infringing Lilly's patents, make capsules from that substance or use it in any other possible way. [Emphasis added.]

**100**    Perhaps the principles underlying this well-founded statement of the law merit some brief elaboration at this stage. As I have already noted in connection with the distinction between a sublicence and an ordinary agreement of purchase and sale of a patented or licensed article, the sale of a patented article is presumed to give the purchaser the right "to use or sell or deal with the goods as the purchaser pleases": see Badische Anilin und Soda Fabrik v. Isler, supra, at p. 610. Unless otherwise stipulated in the licence to sell a patented article, the licensee is thus able to pass to purchasers the right to use or resell the article without fear of infringing the patent. Further, any limitation imposed upon a licensee which is intended to affect the rights of subsequent purchasers must be clearly and unambiguously expressed; restrictive conditions imposed by a patentee on a purchaser or licensee do not run with the goods unless they are brought to the attention of the purchaser at the time of their acquisition: see National Phonograph Co. of Australia, Ltd. v. Menck, [1911] A.C. 336 (P.C.).

**101**    Therefore, it is clear that, in the absence of express conditions to the contrary, a purchaser of a licensed article is entitled to deal with the article as he sees fit, so long as such dealings do not infringe the rights conferred by the patent. On this score, Eli Lilly alleges that the reformulation of nizatidine would in this case exceed the scope of the rights obtained by the purchaser because it

would constitute not simply the resale of the material purchased, but rather, the creation of a new article in violation of Eli Lilly's patent. However, I can find no basis, either in the evidence or in the case law cited by Eli Lilly, for this submission. In my view, the reformulation of nizatidine into final-dosage form does not have the effect of creating a new article. Rather, it is more akin to repackaging the substance into a commercially usable form, which I do not view as violating any rights under the patents.

**102**    No specific evidence was led in the instant appeal concerning the nature of the process by which bulk medicine is reformulated into final-dosage form. However, in Merck & Co. v. Apotex Inc., supra, at p. 155, MacKay J. offered a useful summary of the process. While it is possible that the process employed in the reformulation of nizatidine may differ slightly from the reformulation of the medicine at issue in that case, namely enalapril maleate, the gist of MacKay J.'s description is nonetheless apposite: the basic patented compound at issue, that is, the bulk medicine produced by the patentee or licensee, remains unchanged throughout the reformulation process. It exists in the same chemical form in the final-dosage product as in the bulk product. However, the two products are substantially different, in that the bulk form is essentially a powder without other form or shape, while the final-dosage form is a coloured tablet, consisting of the bulk medicine and other ingredients and shaped in a form associated with a particular dosage. Indeed, in the view of MacKay J., the process so described was such a significant transformation that the final-dosage form of enalapril maleate sold by Apotex was not protected by s. 56 of the Patent Act, which authorizes the use and sale of a "specific" patented article by a party who purchased, constructed, or acquired the article before the patent application became open to the inspection of the public. In other words, MacKay J. was unwilling to accept that the final-dosage form was the same "specific article" as the bulk enalapril maleate purchased by Apotex prior to the date on which Merck's patent application became open for inspection.

**103**    However, this conclusion was rejected by the Federal Court of Appeal, in a judgment reported at [1995] 2 F.C. 723. At p. 738, MacGuigan J.A., writing for a unanimous court, expressed the view that "the right to use or sell the 'specific article, etc.' is independent of the form in which the invention is purchased: any form of the invention may be used or sold within the immunity conferred by s. 56" (emphasis in original). In so holding, MacGuigan J.A. relied on the following statement of Hall J. in Libbey-Owens-Ford Glass Co. v. Ford Motor Co. of Canada, Ltd., [1970] S.C.R. 833, at p. 839, affirming the judgment of Thurlow J. (as he then was) in the court below (reported at [1969] 1 Ex. C.R. 529):

> The question in this case is with respect to the extent of the meaning of "using" and it arises because with respect to "vending" the right of the owner of the specific machine or other thing is expressed as that of vending it, not as that of vending its output. However, it is obvious that in the case of a machine designed for the production of goods, there would really be no worthwhile protection allowed by s. 58 [now s. 56] if the owner could not put it to the only use for which it is usable without being liable for infringement. [Emphasis

added.]

**104**    Accordingly, MacGuigan J.A. concluded, at p. 741, that:

> The use and sale of the product of a machine, particularly if production is the
> only possible use of the machine, is accorded protection under section 56 as a use
> of the machine itself. . . . In my view, use must be given the same sense in the
> case of a chemical invention. [Emphasis added.]

**105**    The Merck & Co. v. Apotex Inc. decision highlights the fact that there is really no
commercial use for bulk medicine other than its reformulation into final-dosage form, for
consumption by the ultimate consumer. In order to realize any utility from the acquisition, then, the
purchaser must take steps to convert it into this commercially usable form. In my view, MacGuigan
J.A.'s conclusion that the right to use and sell an article includes the right to use and sell things
produced with the article, though reached in the specific context of a s. 56 defence, applies with
equal force to the case at bar. That is, the right of use and sale which Apotex would acquire
inherently, through its acquisition of nizatidine from Novopharm, must be seen as encompassing the
right to use and sell things produced with this nizatidine, including capsules in final-dosage form. It
follows, therefore, that Apotex would not infringe the patents held by Eli Lilly simply by selling the
medicine in the form contemplated by the NOA. This is particularly so when, as in the case at bar,
the exclusive rights enjoyed by the patentee under the patent are limited, in essence, to the
formulation of bulk medicine according to the patented process. Nothing in the reformulation
process can be seen as infringing upon this right.

**106**    Any doubt as to this conclusion of non-infringement must, in my view, be eliminated by an
examination of Novopharm's compulsory licence, which specifically contemplates the sale of the
licensed material in bulk form by providing a formula for calculating royalties on product thus sold.
As I see it, because there is no other practical use for bulk medicine, this must also be taken to
contemplate and implicitly permit the reformulation of the product by the purchaser into
final-dosage form. This conclusion is only reinforced, in my view, by the fact that the contemplated
royalty rates are based on the amounts received by subsequent purchasers in consideration of the
sale of final-dosage forms to the retail trade. Had the Commissioner of Patents intended to restrain
such use of the medication, he would have provided for this expressly, or, at least, would not have
specifically delineated the procedure that is to compensate the patentee for such use.

**107**    Therefore, Eli Lilly is incorrect to assert that the reformulation proposed by Apotex would
either have to be carried out pursuant to a sublicence granted by Novopharm, which would justify
the termination of Novopharm's compulsory licence and, therefore, the sublicence, or would be
entirely unauthorized and infringe Eli Lilly's patents. The better view, as I have stated, is that the
right to reformulate is premised on the inherent right of an owner of property to deal with that
property as he or she sees fit. In the absence of some express term in the compulsory licence,
prohibiting purchasers of bulk nizatidine from Novopharm from reformulating it into final-dosage

form, the weight of the case law supports the view that Apotex, having validly acquired the bulk medicine, would be free to reformulate it for resale without fear of infringing any right under Eli Lilly's patents.

**108**   I would emphasize, however, that this conclusion is in no way premised upon, and should not be taken to have any bearing on, the well-established rules concerning the acceptable limits on the repair of a patented article: see, for example, Rucker Co. v. Gavel's Vulcanizing Ltd. (1985), 7 C.P.R. (3d) 294 (F.C.T.D.). Here, we are not considering the repair of a patented article, but its resale in a somewhat different form. I would also add that I am unconvinced by the authorities cited by Eli Lilly in support of the proposition that the rights of the purchaser do not include the right to reformulate.

**109**   In light of the foregoing, I am in agreement with Pratte J.A. and the majority of the Federal Court of Appeal, and conclude that the reformulation of the bulk nizatidine into final-dosage form would not infringe Eli Lilly's patent. Accordingly, I conclude that Eli Lilly has failed in its various efforts to establish that Apotex's NOA was not justified and that a prohibition order should thus be issued.

    VI.   Disposition

        A.    Novopharm Ltd. v. Eli Lilly and Co.

**110**   For the foregoing reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Federal Court--Trial Division, with costs to the appellant throughout. However, I would deny the appellant's request for declaratory relief.

        B.    Apotex Inc. v. Eli Lilly and Co.

**111**   Also for the foregoing reasons, and after a full consideration of the factual differences existing between the two appeals considered herein, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and dismiss the application for an order of prohibition. The appellant shall have its costs throughout.



*Case Name:*

# Merck & Co. v. Apotex Inc.

**Between**
**Merck & Co. Inc. and Merck Frosst Canada Ltd.,**
**Plaintiffs/Defendants by Counterclaim, and**
**Apotex Inc. and Apotex Fermentation Inc.,**
**Defendants/Plaintiffs by Counterclaim**

[2010] F.C.J. No. 1646

2010 FC 1265

381 F.T.R. 162

91 C.P.R. (4th) 1

Docket T-1272-97

Federal Court
Toronto, Ontario

**Snider J.**

Heard: February 1-4, 8-11, 16-19, 22, 24, March 1-5, 8,
10-11, 16-19, 22-25, 29-31, April 1, 15 and May 17-21, 2010.
Confidential reasons for judgment: December 9, 2010.
Public reasons for judgment: December 22, 2010.

(644 paras.)

*Intellectual property law -- Patents -- Infringement -- Defences to infringement -- Invalidity of patent -- Remedies -- Damages -- Procedure -- Evidence -- Burden of proof -- Action by Merck against Apotex for patent infringement allowed in part -- Merck had valid patent to produce anti-cholesterol compound using particular microorganism -- Apotex rebutted presumption of infringement by disclosing its process to produce compound using different microorganism -- Apotex actually infringed patent -- Circumstantial evidence showed Chinese exporter of compound to Apotex could not have produced compound by non-infringing means -- One batch of compound produced in Canada for Apotex also contained infringing microorganism -- Merck entitled to*

*damages, not accounting of profits, because years passed before action tried -- Patent Act, ss. 2, 27, 39, 43, 44, 45, 55, 55.2, 57, 59, 60, 61, 78.1, 78.2.*

Action by Merck against Apotex, alleging patent infringement. Merck obtained a patent for the first statin for sale in Canada for treating elevated cholesterol, in 1984. The product-by-process patent to lovastatin when made with a microorganism, Aspergillus terreus, expired in 2001. Merck's inventors relied on other compounds already used to treat high cholesterol, and research by others, in developing the process. In 1993, Apotex applied for a Notice of Compliance for its generic version of lovastatin. It denied it would infringe Merck's patent, because Apotex would use a process involving the use of a different microorganism, Coniothyrium fuckelii. Apotex developed the process in Winnipeg, and insisted on its use in a source factory operated in China. Merck applied for a prohibition order. Apotex's application was stayed. When the stay expired, a Notice of Compliance was issued to Apotex in March 1997. Apotex started selling lovastatin in Canada. It imported lovastatin from the Chinese company and also produced lovastatin in Winnipeg. Merck claimed Apotex infringed its patent through the use of infringing Aspergillus terreus, through the salting of non-infringing lovastatin with infringing lovastatin, through manufacturing one batch of infringing lovastatin in Winnipeg, and with some other small amounts of infringing product made there. Apotex denied any infringement, and claimed Merck's patent was invalid.

HELD: Action allowed in part. Merck was entitled to damages sustained as a consequence of Apotex's infringement of Merck's patent by one batch of lovastatin produced in Winnipeg and all batches produced after March 1998 in China. Merck, as named patentee, had standing to bring the action. The patent referred to the process for producing four identified compounds of lovastatin by a fermentation process using a strain of Aspergillus terreus capable of producing the desired compounds, which were useful as antihypercholesteremic agents. The patent was not invalid for lack of utility. The use of lovastatin for the treatment of high cholesterol was soundly predicted by Merck's inventors, the first inventors of the compound. Despite a concurrent application by other inventors, the Merck patent was valid because the other application was not patentable. Apotex rebutted the presumption of infringement by disclosing the process it used to produce lovastatin by using Coniothyrium fuckelii. Merck's patent was infringed by some of the lovastatin produced in China for Apotex. Batch records from the Chinese factory were not originals, as these were destroyed in 2003, while the litigation was ongoing. The court was not convinced the new batch records were reliable. Other records indicated the Chinese facility did not have sufficient quantities of an anti-foaming agent on hand to produce lovastatin in a non-infringing manner, and that after March 1998, its fermentation times were consistent with the use of the infringing process. The Chinese producer had a financial motivation to use the infringing process because it was cheaper. DNA testing on one batch of lovastatin produced in Winnipeg for Apotex also showed Aspergillus terreus was used. There was no reasonable basis for concluding the DNA test results were contaminated. Merck was not entitled to an accounting of profits given the length of time it took the action to proceed to trial.

**Statutes, Regulations and Rules Cited:**

Copyright Act, R.S.C. 1927, c. 532, s. 20(3)(b)

Federal Courts Act, S.C. 2002, c. 8, s. 36, s. 37

Federal Courts Rules, SOR/98-106, s. 107, s. 153

Food and Drug Regulations, C.R.C. 1978, c. 869,

Food Drug and Cosmetic Act, 21 U.S.C, c

Patent Act, R.S.C. 1985, c. P-4, s. 2, s. 27, s. 27(1), s. 27(3), s. 39(1), s. 39(2), s. 43, s. 43(1), s. 43(1)(b), s. 43(2), s. 43(4), s. 43(5), s. 44, s. 45, s. 53, s. 55, s. 55(1), s. 55.2(1), s. 55.2(6), s. 57, s. 59, s. 60(1), s. 61, s. 61(1), s. 61(1)(a), s. 61(1)(b), s. 78.1, s. 78.2

Patented Medicines (Notice of Compliance) Regulations, SOR/ 98-166, s. 6(1), s. 8

**Counsel:**

Andrew J. Reddon, Glynnis P. Burt, David Tait, William H. Richardson and Ariel Neuer, for the Plaintiffs.

Harry Radomski, Jerry Topolski, Ben Hackett, David Scrimger and, for the Defendant Apotex Inc.

John A. Myers, G. Patrick S. Riley, Nicole D.S. Merrick and Rodrique C. Roy, for the Defendant Apotex Fermentation Inc.

J. Alan Aucoin, Anthony M. Prenol, Antonio Turco and Athar K. Malik, for the Former Third Party, Biogal Pharmaceutical, Works Ltd.

---

### PUBLIC REASONS FOR JUDGMENT
#### (Confidential Reasons for Judgment issued on December 9, 2010)

SNIDER J.:--

# I. Introduction

    A.   *Overview*

**1**     The subject of this litigation is the drug lovastatin, sold in Canada under the trade name MEVACOR since 1988 by Merck Frosst Canada Inc. (or its successor, Merck Frosst Canada Ltd. (Merck Frosst), one of the Plaintiffs in this action). MEVACOR was the first commercialized "statin" sold in the Canadian market and is used for the treatment of elevated blood cholesterol. Until January 31, 2001, when the patent expired, MEVACOR was the subject of Canadian Patent No. 1,161,380 ('380 Patent) issued January 31, 1984 to Merck & Co., Inc. (Merck & Co.), the other Plaintiff in this action. Stated briefly, the '380 Patent is a product-by-process patent to lovastatin when made with a micro-organism known as *Aspergillus terreus* (also referred to as *A. terreus*). Merck Frosst sells MEVACOR in Canada under licence from Merck & Co. In these reasons, I will refer to Merck Frosst and Merck & Co., collectively, as "Merck" or the "Plaintiffs".

**2**     In March 1997, Apotex Inc., one of the Defendants in this action, began selling its brand of lovastatin tablets in Canada (Apo-lovastatin). The active pharmaceutical ingredient (API) that remains in dispute in this litigation was made either by Apotex Fermentation Inc. (AFI), the other Defendant in this action, in Winnipeg, Manitoba, or by Qingyuan Blue Treasure Pharmaceuticals Co. Ltd. (Blue Treasure), in China. In these reasons, I will refer to Apotex Inc. and AFI, collectively, as "Apotex" or the "Defendants".

**3**     Merck claims that the Defendants infringed the '380 Patent:

> *     through the use of infringing API that was made in China and shipped from Blue Treasure to AFI;
> *     through the "salting" of non-infringing lovastatin with infringing lovastatin;
> *     through the manufacturing of one batch of infringing API (batch CR0157) in Winnipeg by AFI; and
> *     with some other small amounts of infringing product made in Winnipeg by AFI.

**4**     The Defendants claim that there has been no infringement of the '380 Patent and that, in any event, the '380 Patent is invalid. Further, they argue that Merck & Co. has no standing to bring this action, having assigned all of its interest in the '380 Patent to an affiliate, Merck and Company, Incorporated (MACI).

**5**     The application leading to the '380 Patent was filed in Canada on June 11, 1980. According to s. 78.1-78.2 of the present *Patent Act*, R.S.C. 1985, c. P-4, as amended, patent applications filed before October 1, 1989, are to be dealt with under the provisions of the *Patent Act* as they read immediately before that date. Accordingly, references in these reasons to the *Patent Act* [referred to as the *Patent Act* or the *Act* ], unless specifically noted otherwise, will be to the *Act* as it stood immediately prior to October 1, 1989.

    B.     *Summary of issues and conclusions*

**6**    Very briefly, although there are a myriad of subsidiary issues, the key questions to be addressed in this proceeding are as follows:

    1.    Does Merck & Co. have standing to bring this action?
    2.    Have the Defendants infringed the '380 Patent?
    3.    Is the '380 Patent valid?

**7**    As explained in these reasons, I have concluded that:

    1.    Merck & Co. has standing to bring this action;
    2.    The '380 Patent was infringed; and
    3.    The '380 Patent is valid.

**8**    As a result, the claims of the Plaintiffs will be allowed, to the extent described below, and the counterclaims of the Defendants will be dismissed.

**9**    Finally, by way of introduction, I note that this trial is subject to a bifurcation order dated November 14, 2003 (Bifurcation Order). Accordingly, the question of damages will be considered in a subsequent proceeding.

    C.    *Background to this litigation*

**10**    For almost ten years after its introduction into the Canadian market, Merck enjoyed its patent for MEVACOR without challenge. In 1993, Apotex Inc. tried to enter the market with a generic version of lovastatin and, to that end, applied to the Minister of Health for a Notice of Compliance (NOC) pursuant to the relevant provisions of the *Patented Medicines (Notice of Compliance) Regulations*, SOR/93-133, as amended by SOR/98-166 [*PMNOC Regulations* or the *Regulations* ]. Apotex alleged that it would not infringe the '380 Patent, as it would not be using a process to produce lovastatin that would fall within the scope of the patent.

**11**    As permitted by the *Regulations*, in April 1993, Merck filed an application with this Court to prohibit the Minister from issuing an NOC to Apotex Inc. A key feature of the *PMNOC Regulations* is the imposition of a statutory stay upon the filing of an application for prohibition until a determination can be made as to whether the "second person" - in this case, Apotex Inc. - was justified in its claims that its generic drug would not infringe any existing patents. Section 6(1) of the *Regulations*, as they were at that time, automatically prohibited the Minister from issuing an NOC to Apotex Inc. for up to 30 months.

**12**    The statutory stay expired on December 1, 1996, without any hearing before the Court on the merits of the prohibition application. Merck Frosst Canada Inc. sought an extension of the stay. In an oral judgment dated March 26, 1997, [1997] F.C.J. No. 344, Justice Rothstein (then a judge with the Federal Court, Trial Division) refused to extend the time period or to issue a prohibition order. An NOC was issued to Apotex Inc. on March 27, 1997.

**13**    Following the issuance of the NOC and a series of Court challenges, two actions were commenced:

> 1.    Merck commenced this action against Apotex Inc. and Apotex Fermentation Inc. (AFI) for patent infringement (Court File T-1272-97). The statement of claim was filed on June 12, 1997.
> 2.    By statement of claim filed June 29, 2001, Apotex Inc. seeks compensation from Merck under s. 8 of the *PMNOC Regulations* (Court File No. T-1169-01).

**14**    In 2001, Apotex Inc. commenced a third party claim against Biogal Pharmaceutical Works Ltd. (Biogal) in Court File No.T-1272-97. The subject matter of the third party claim was 300 kg of bulk lovastatin acquired by Apotex Inc. from Biogal pursuant to a Supply Agreement. In its third party claim, Apotex Inc. claimed that, in the event that the '380 Patent is held to be valid and infringed, Biogal was liable for any relief that may have been awarded against Apotex Inc. Biogal participated in the T-1272-97 litigation until a settlement was reached among the parties to this litigation. By Court Order dated May 28, 2010, the Plaintiffs' claims against Apotex Inc. and AFI in the Amended Fresh as Amended Statement of Claim and referenced in paragraphs 36 and 67-73 therein relating to lovastatin supplied by Biogal to Apotex Inc. were dismissed.

**15**    Both actions were heard together in a trial that commenced on February 1, 2010. These Reasons deal only with the issues in Court File No. T-1272-97 - Merck's claim of infringement and Apotex's counterclaim of patent invalidity. Separate Reasons for Judgment and Judgment have been issued contemporaneously with these Reasons in Court File No. T-1169-01, [2010] F.C.J. No. 1645.

**16**    During the 35-day evidentiary phase of this trial, many witnesses appeared, both as expert and fact witnesses. In Appendix A, I have set out a brief overview of the expert and fact witnesses who appeared during the trial and the areas to which they testified. For the expert witnesses, I have set out a very short description of their education and experience in the areas for which this Court found each of them to be qualified. More detailed references to the witnesses' evidence and testimony are contained in the appropriate sections of these reasons.

## II. <u>Table of Contents</u>

**17**    To assist the reader, the following sets out a Table of Contents for these Reasons with paragraph numbers for each heading

I.      Introduction ..................................................................... 1 – 16
        A.      Overview ................................................................. 1 - 5
        B.      Summary of issues and conclusions ......................... 6 - 9
        C.      Background to this litigation ............................... 10 - 16
II.     Table of Contents ........................................................... 17
III.    Background ................................................................. 18 - 39
        A.      The '380 Patent and Statins.................................. 18 - 24
        B.      History of AFI/Blue Treasure Production ............... 25 - 39
IV.     Standing ................................................................... 40 - 56
V.      Claims Construction ................................................. 57 - 130
        A.      Principles of Claims Construction ....................... 57 - 62
        B.      The hypothetical skilled person ........................... 63 - 67
        C.      The Patent Specification..................................... 68 - 81
        D.      The claims in issue............................................. 82 - 87
        E.      The meaning of "a microfungus of genus
                Aspergillus in Claim 1 ...................................... 88 - 99
        F.      The meaning of "isolating the products"......................... 100 - 109

G.   *Inclusion of non-producing strains*.....................................110 - 121

H.   *The promised use of the '380 Patent*.................................122 - 126

I.   *Summary on Claims Construction*.....................................127 - 130

VI.   **Infringement – Background**.............................................**131 - 188**

A.   *Introduction* ........................................................................131 - 133

B.   *Burden*................................................................................134 - 186

C.   *Summary of Merck's case on infringement* ......................187 - 188

VII.   **Infringement – the Circumstantial Case** .................**189 - 360**

A.   *Blue Treasure "Salting"*.....................................................189 - 208

B.   *Infringement by Blue Treasure from*

     *March 1998* ........................................................................209 - 335

     (1)   Batch Records .........................................................211 - 249

     (2)   P2000....................................................................250 - 259

     (3)   Fermentation Duration...........................................260 - 270

     (4)   Increased Titres .....................................................271 - 294

     (5)   Motivation, Means and Opportunity.....................295 - 320

          (a)   *Motivation*.................................................296 - 310

          (b)   *Means* ........................................................311 - 316

          (c)   *Opportunity*................................................317 - 320

     (6)   Blue Treasure Conduct ..........................................321 - 335

C.   *Conclusion on Blue Treasure Circumstantial Evidence* ..336 - 342

D.   *AFI Batch CRO 157*..........................................................343 - 360

VIII.   **Infringement – the DNA Evidence** .............................**361 - 463**

A.   *Introduction* ........................................................................361 - 369

B.   *Nexus between the samples tested and the allegedly*

     *infringing lovastatin* .........................................................370 - 377

C.   *Reproducibility of the testing in the*

     *Davies lab* .........................................................................378 - 390

D.   *Failure of Dr. Davies to find C. fuckelii DNA in the*

     *tablets from Batch CR0157*...............................................391 - 395

E.   *DNA evidence and the Apotex Experts*............................396 - 422

     (1)   What is Ancient DNA?..........................................402 - 404

     (2)   Is DNA derived from a pharmaceutical product

          degraded or fragmented? .......................................405 - 410

     (3)   Can one compare how DNA derived from

          a pharmaceutical product is fragmented to how

          DNA from "ancient DNA" is degraded?..............411 - 414

     (4)   Are the opinions of the Defendants' experts

          relevant to fragmented DNA .................................415 - 422

F.   *Contamination* ..................................................................423 - 444

     (1)   Dr. Davies ............................................................425 – 430

     (2)   Dr. Taylor ..............................................................431 - 439

     (3)   Dr. Gilbert.............................................................440 - 444

|   | G. | | *Other criticisms of Dr. Davies's opinion* | 445 - 463 |
|   |   | (1) | Lack of knowledge | 449 - 451 |
|   |   | (2) | Incomplete Report & Lack of Disclosure | 452 - 457 |
|   |   | (3) | Unexpected results | 458 - 463 |
| IX. | | | **Infringement – Conclusion** | **464 - 466** |
| X. | | | **Validity** | **467 - 609** |
|   | A. | | *Introduction* | 467 - 468 |
|   | B. | | *Overbreadth* | 469 - 475 |
|   | C. | | *Utility* | 476 - 532 |
|   |   | (1) | General Principles | 476 - 485 |
|   |   | (2) | The '380 Patent | 486 - 488 |
|   |   | (3) | Lack of Utility | 489 - 495 |
|   |   | (4) | Sound Prediction | 496 - 532 |
|   |   |   | (a) *The Factual Basis* | 498 - 511 |
|   |   |   | (b) *Line of Reasoning* | 512 - 519 |
|   |   |   | (c) *Disclosure* | 520 - 532 |
|   | D. | | *First Inventorship/Missed Conflict* | 533 - 609 |
|   |   | (1) | Introduction | 533 - 534 |
|   |   | (2) | Legal Principles | 535 - 540 |
|   |   | (3) | Was there a missed conflict | 541 - 558 |
|   |   | (4) | Did the Endo application disclose the invention of the '380 Patent? | 559 - 562 |
|   |   | (5) | Red Yeast Rice/Anticipation | 563 - 609 |
|   |   |   | (a) *Principles of Anticipation* | 563 - 569 |
|   |   |   | (b) *Background on Red Yeast Rice* | 570 - 571 |
|   |   |   | (c) *Legal Consequences of lovastatin in Red Yeast Rice* | 572 - 583 |
|   |   |   | (d) *Evidence of lovastatin in Red Yeast Rice prior to the priority date* | 584 - 598 |
|   |   |   | (e) *Disclosure of lovastatin in Red Yeast Rice* | 599 - 609 |
| XI. | | | **Conclusion** | **610 - 642** |
|   | A. | | *Damages or Profits* | 610 - 624 |
|   | B. | | *Exemptions from Liability* | 625 - 637 |
|   | C. | | *Conclusion* | 638 - 642 |
| **Appendix A – List of Witnesses** | | | | **A1 – A11** |
| **Appendix B – Claims 1 to 8 and 13 to 15 of the '380 Patent** | | | | **B1 – B4** |

III. **Background**

    A.    *The '380 Patent and Statins*

**18**    Lovastatin, as made by the process of the '380 Patent, is an example of a medicinally-valuable drug that is produced by a process of fermentation. In very simple terms, the laboratory begins with a micro-organism - in this case, *Aspergillus terreus*- and, through increasingly larger fermentations carried out in very controlled settings, manufactures the API of interest.

**19**    The '380 Patent relates to "hypocholesteremic products from the cultivation of a microfungus of the species <u>Aspergillus</u>." Dr. Antonio Gotto provided very helpful background information on the role of "hypocholesteremic" medications, such as lovastatin, in the treatment of cardiovascular disease. In addition to being qualified because of his stature as a professor of medicine, Dr. Gotto's experience as a treating physician during the 1970s and 1980s was directly relevant to the matters before me.

**20**    Atherosclerosis is a type of cardiovascular disease that occurs when cholesterol and other substances build up in the walls of arterial blood vessels to form plaque. Over time, the build-up of plaque thickens and hardens the arterial walls restricting the flow of blood from the heart. Heart attacks and strokes may follow.

**21**    The build-up of plaque is promoted by low density lipoproteins (referred to as LDL or "bad" cholesterol). According to Dr. Gotto, the relationship between reducing "bad" cholesterol and reducing the risk of cardiovascular disease has been known for over 20 years. Thus, a primary goal of medicine is to lower LDL cholesterol. The class of drugs known as "statins" are of great assistance in achieving this goal.

**22**    In Dr. Gotto's words (Gotto Expert Report, Exhibit 2, paras. 24, 38):

> It was only with the discovery of statins - starting with lovastatin (MEVACOR (R)) in the late 1970s - that treatment of elevated cholesterol became much more effective.
>
> ...
>
> The single most significant discovery to date for the treatment of cholesterol was the discovery of lovastatin in the late 1970s.

**23**    Dr. Gotto described how statins work to lower cholesterol. Statins reduce the production of cholesterol by the liver. Specifically, statins block the liver enzyme known as HMG-CoA reductase (hydroxyl-methylglutaryl-coenzyme A reductase); hence, statins are known as HMG-CoA reductase

inhibitors. Dr. Gotto made the general comment that "statins changed medical practice" (Gotto Expert Report, Exhibit 2, para. 50). No one disagreed with this opinion.

**24**    Lovastatin, as manufactured and sold by Merck (or its predecessors in interest) under the trade name MEVACOR, was the first commercially-available statin.

B.    *History of AFI/Blue Treasure Production*

**25**    An important part of the story for this litigation is how Apotex Inc. became interested in lovastatin and how Apotex Inc., AFI and the Blue Treasure Joint Venture became involved.

**26**    Dr. Bernard Sherman is currently the Chairman and Chief Executive Officer of Apotex Inc., a company that he founded in 1973. During his oral testimony, Dr. Sherman described Apotex Inc. in the following terms:

> It's a pharmaceutical manufacturer, the largest in Canada today. We produce primarily generic pharmaceutical products, but also some innovative products. We have huge dosage form manufacturing facilities. We are vertically integrated. We have chemical plants. We spend enormously on research and development, the largest in Canada, and we have divisions in many countries around the world and factories in many countries, including chemical plants.

**27**    Apotex Inc. recognized the significance of the lovastatin market. Dr. Sherman described lovastatin, in 1993, as "one of the biggest selling drugs in the country at the time, close to $100 million a year".

**28**    Of particular relevance to this litigation, Dr. Sherman told the Court how his company's version of lovastatin became entangled with a suddenly-changed regulatory regime in 1993. Until 1993, it was possible for a generic company to obtain a compulsory licence to allow it to produce a generic equivalent of a patented medicine. The original intent of Apotex Inc. was to obtain a compulsory licence to use *Aspergillus terreus* to make lovastatin. According to Dr. Sherman, in 1993, the licence regime and licences issued under it were cancelled. They were replaced with the *PMNOC Regulations* outlined by Dr. Sherman as follows:

> In 1993, not only were the licences - the licence regime eliminated, including retroactive cancellation of some licences - one applicable to this case - but, in addition to that, a new regime was instituted, called the Patented Medicines (Notice of Compliance) Regulations, pursuant to which patentees or first persons, persons who had approval for the original brand, could list patents which they purported were relevant to a product; and, if they listed the patent, then a generic applicant, a second person, cannot get federal approval until the requirements of those regulations are satisfied, which means that the second person has to serve a notice of allegation in which it is alleged that the patent will not be infringed or is

invalid. Then, within 45 days, if the patentee or first person institutes a prohibition application, which almost always happens, there is a delay in federal approval until that matter is resolved, which can take a very long time.

**29**   A relationship of interest to this case is that of Apotex Inc. and AFI. In the mid-1980s, Apotex Inc. contracted with ABI Biotechnology Inc. (ABI) in Winnipeg to develop and manufacture certain fermented products. Ultimately, the assets of ABI were bought by Apotex Inc. and the company was renamed as AFI. Through AFI, Apotex Inc. gained the capacity to manufacture products using fermentation processes. AFI added to the vertical integration of the Apotex family of business entities.

**30**   AFI was to be the source of the API lovastatin. As described in detail by Dr. Lasure, in her Expert Report (Exhibit 48), and by Dr. David Cox, during his testimony, the following steps were taken by AFI:

> \*   AFI acquired Merck's deposited strains of *Aspergillus terreus* from the American Tissue Culture Collection (ATCC), including a strain designated ATCC 20542.
> \*   ATCC 20542 was then mutated by UV mutagenesis twice to create a mutant strain of ATCC 20542.
> \*   AFI designated the strain as BN-2-70 and the process for manufacturing lovastatin using this strain as AFI-1.
> \*   Between 1991 and 1995, AFI developed a commercial scale fermentation process for making lovastatin using AFI-1 - that is, using *Aspergillus terreus*.

**31**   In 1992, Dr. Sherman testified that, anticipating the intent of the government, Apotex began to look for a non-infringing process. Apotex "had to find a microbe that would produce lovastatin that was not *Aspergillus terreus*". In her Expert Report, Dr. Lasure summarized the context and the results of this search:

> \*   On June 25, 1988, the Journal of Antibiotics published an article entitled "The Synthesis of Compactin (ML-236B) and Monacolin K in fungi" written by Dr. Akira Endo et al. Dr. Endo reported on fungal strains capable of producing Monacolin K (known now to be lovastatin), including *Phoma* species M4452.
> \*   In June 1992, a sample of *Phoma* Sp. M4452 was sent to AFI by Dr. Endo.
> \*   For the next six months or so, AFI took steps in its laboratories to confirm and develop the production of lovastatin from the Endo sample. The process was initially referred to as *Phoma* #4; later designated as "AFI-4".
> \*   By May 1993, a sample of the AFI-4 product was confirmed to be *Coniothyrium fuckelii* (also referred to as *C. fuckelli*).

    \*     Apotex Inc. filed a patent for the AFI-4 process - a process for making lovastatin using *Coniothyrium fuckelii* - that subsequently issued as United States Patent No. 5,409,820 on April 25, 1995.

**32**    As described by a number of witnesses, including Dr. Cox and Ms. Lori Christofalos, AFI's production of AFI-4 lovastatin and shipments to Apotex Inc. can be divided into three phases:

    1.    Phase 1 occurred between June 1996 and August 1997, during which all production was done solely at AFI facilities in Winnipeg. The finished API was shipped to Apotex Inc., beginning with the shipment of batch CR0157 on December 2, 1996.

    2.    In Phase 2, Blue Treasure (discussed below) manufactured approximately 70 batches of technical-grade lovastatin. The product was then shipped to AFI for processing into API and shipment to Apotex Inc. Phase 2 lasted from about mid-1997 to January 1998.

    3.    Phase 3 consisted of approximately 294 batches of API-grade lovastatin manufactured entirely at Blue Treasure after March 1998. The product was sent to AFI, where "some testing" was carried out, and then shipped to Apotex Inc. This phase continued until October 1999, with the last shipment received at AFI on March 2, 2000.

**33**    The joint venture company known as Qingyuan Blue Treasure Pharmaceuticals Co. Ltd. (Blue Treasure or Blue Treasure Joint Venture) is a critical component of this litigation. Dr. David Cox, President and Chief Executive Officer of AFI from September 1994 to September 1997, provided a clear and helpful background about this joint venture. Dr. Cox was on the Board of Directors of Blue Treasure during the same period.

**34**    Blue Treasure was formed pursuant to a Joint Venture Contract dated January 25, 1994 among Qingyuan New North River Pharmaceutical Co. Ltd. (New North River), Zuhai Special Economic Zone Lizhu Pharmaceutical Group Co. Ltd., Sichuan Industrial Institute of Antibiotics, AFI and BIOTECS. AFI held a 42.5% share of the Blue Treasure Joint Venture. As set out in clause 4.01 of the Joint Venture Contract, the purpose of the Blue Treasure Joint Venture was as follows:

    The purpose of the Joint Venture is to renovate and operate the Factory, to purchase or otherwise obtain all necessary raw materials and equipment required for the production of the Products, and to produce, market, distribute and sell Products at a profit to customers both in China and abroad.

**35**    In 1994, New North River was already an operational pharmaceutical facility with capacity for carrying out fermentation processes. Under the Joint Venture Contract, New North River contributed a portion of its facilities located on its property to the Blue Treasure Joint Venture.

**36**    As defined in the Joint Venture Contract, "Products" meant "the drug Lovastatin as Bulk

Products and Finished Products". Dr. Cox stated that the Blue Treasure Joint Venture "was set up to produce and distribute and sell Lovastatin in the Chinese domestic market". AFI's main contribution to the Blue Treasure Joint Venture was the organism that produced lovastatin. Dr. Sherman told the Court that the decision to move the production of lovastatin to Blue Treasure was made for the following reasons: [Blue Treasure] had capacity there, and we wanted to move the production for Canada out of Winnipeg, both to bring costs down and to free up Winnipeg to go on for other things that would be needed later.

**37**    In the spring of 1995, AFI transferred to Blue Treasure the information and knowledge it had developed to manufacture lovastatin made from *Aspergillus terreus*. Among the things transferred to Blue Treasure were: a document setting out the process for producing lovastatin from *Aspergillus terreus*, entitled "Scale-up Process to 15000L Fermenter"; and, 25 vials of strain BN-2-70 from seed bank A18-378, and 5 rice cultures from batch #CF0057 (shipped to Blue Treasure on May 15, 1995). Blue Treasure began producing lovastatin, using the AFI-1 process, in 1996.

**38**    In about April 1997, AFI determined that it would transfer the AFI-4 technology to Blue Treasure together with a guarantee that AFI would purchase the lovastatin from Blue Treasure, provided that the lovastatin was all made by the AFI-4 process and that "the Blue Treasure facility be exclusively dedicated to AFI-4". The terms of this arrangement were set out in a letter agreement dated April 16, 1997 between AFI and Blue Treasure. Dr. Cox described the impact of the AFI-4 transfer as "transformative in a positive way". The transfer of AFI-4 to Blue Treasure was made with very explicit instructions that the lovastatin purchased by Apotex was to be produced exclusively with the AFI-4 *Coniothyrium fuckelii* strain, with no possibility of contamination from *Aspergillus terreus* (see, for example, letter dated September 12, 1997 from Mr. Fowler to Mr. Zhou). Problems quickly arose. These problems are discussed later in Section VII of these reasons.

**39**    From 1997 to 1999, AFI imported lovastatin from Blue Treasure in accordance with the terms of the Blue Treasure Joint Venture. The lovastatin API was then sold to Apotex Inc.

## IV. <u>Standing</u>

**40**    The first issued raised by Apotex is the standing of Merck & Co. to bring this action.

**41**    The authority of a party to claim damages for patent infringement is found in s. 55(1) of the *Patent Act*.

> 55.(1) Any person who infringes a patent is liable to the patentee and to all persons claiming under him for all damages sustained by the patentee or by any person, by reason of the infringement.
>
> * * *
>
> 55.(1) Quiconque viole un brevet responsable, envers le breveté et envers toute

> personne se réclamant du breveté, des tous dommages-intérêts que cette violation
> a fait subir au breveté ou à cette autre personne.

**42**    The term "patentee" is defined in s. 2 of the *Patent Act* to mean "the person for the time being
entitled to the benefit of a patent".

**43**    The '380 Patent was granted to Merck & Co. In 1985, Merck & Co. entered into a License
Agreement with Merck Frosst (the 1985 License Agreement), granting an non-exclusive licence to
Merck Frosst. That Agreement was amended, effective January 1, 1989, to add the '380 Patent.
Subsequently, as of January 1, 1992, Merck & Co. entered into an agreement (the MACI
Agreement) with Merck and Company, Incorporated (MACI) pursuant to which Merck & Co., as
Licensor, granted to MACI, as Licensee:

> A permanent and exclusive royalty-free license for the Intellectual Property
> which Licensor owns or hereinafter acquires, but for any outstanding licenses for
> the Intellectual Property which already granted pursuant to the License
> Agreement, dated January 1, 1985, and amendments thereto between Merck &
> Co., Inc. and Merck Frosst Canada Inc.

**44**    Apotex does not dispute Merck Frosst Canada Ltd.'s standing in this action, as the successor in
interest to Merck Frosst Canada Inc. However, Apotex submits that Merck & Co. has no standing to
bring this action, having assigned all of its interest in the '380 Patent to MACI pursuant to the
MACI Agreement. Apotex asserts that, as of November 1992, MACI had the "full and unrestricted
benefit of the '380 Patent". Merck & Co. lost all benefit of the patent and, as a result, the right to
damages under s. 55 (1) of the *Patent Act*. Apotex argues that, although the agreement is entitled
"License Agreement", a review of the words of the agreement demonstrates that the intent of the
parties to the MACI Agreement was to convey the entire right, title and interest in the '380 Patent to
MACI.

**45**    Apotex submits that agreements which take the form of a licence, but nevertheless convey all
of the substantive rights in a patent, have consistently been held to constitute an effective
assignment or transfer of that patent. In support of this argument, Apotex relies on a line of
jurisprudence of courts in the United States and the United Kingdom (*Merck & Co., Inc. v. Francis
R. Smith*, 261 F.2d 162 at 164 (3rd Cir. 1958); *Vaupel Textilmaschinen KG v. Meccanica Euro
Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991); *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372,
1377-78 (Fed. Cir. 2000); *Guyot v. Thompson* [1894] R.P.C. 541 at 554 (C.A.)[*Guyot*]).

**46**    I do not find the authorities relied on by Apotex to be of any assistance. Except in the case of
*Guyot*, above, a decision of the High Court of Justice - Chancery Division, the Courts in those cases
were considering the effect of agreements in the context of U.S. patent law. I do not see how they
could guide this Court in determining the meaning of the terms of and, if necessary, the intent of the
parties to the MACI Agreement. I did not have the benefit of an expert in U.S. law opining as to
whether the MACI Agreement would constitute a transfer of all of the rights of the patent to MACI

under applicable U.S. law. Moreover, the facts in *Guyot*, where an exclusive assignee was attempting to enforce the terms of an Indenture, are simply too remote from the question before me.

**47**    Rather, I would look at this issue in the context of the Canadian law of contracts. As I understand the state of the Canadian law of contracts, the express language of the parties to a contract is the core of their contractual obligations. Where the words of a contract are clear and unambiguous, a court need not look beyond those clear words to determine its intent and effect.

**48**    Apotex was unable to point me to a single Canadian case that supports its position. Nevertheless, I would agree that the title of the License Agreement would not be determinative <u>if</u> there is clear and persuasive evidence that Merck & Co. intended to convey all of its rights in the '380 Patent to MACI, retaining nothing to itself. Whether this is so or not will depend on an examination of the words of the MACI Agreement and the facts and circumstances surrounding the MACI Agreement.

**49**    In this case, the express language of clause 2 of the MACI Agreement uses the word "license". On its face, the MACI Agreement only grants a "license". The Supreme Court of Canada in *Domco Industries Ltd., v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 at p.912, 66 C.P.R. (2d) 46, adopted the comments of Fry L.J. at p. 470, in *Heap v. Hartley* (1889), 42 Ch. D. 461:

> An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But <u>it confers like any other license, no interest or property in the thing</u>. [Emphasis added.]

**50**    I also note the language of certain clauses in the MACI Agreement that refer to rights retained by Merck & Co. For example, clause 3 provides the Licensor with the rights to inspect the Licensee's facilities. Under clause 5.2, the Licensee is to supply the Licensor with a detailed description of any disclosure of "licensed know-how" to any governmental authority. In my view, retention of rights such as these is inconsistent with an intention to transfer all rights under the patent.

**51**    In support of its position, Apotex points to a recital to the MACI Agreement:

> WHEREAS, the Licensor desires to grant the Licensee a permanent and exclusive license with respect to its <u>remaining</u> right, title and interest in and to the rights which it has acquired with respect to such intellectual property as a contribution to the capital of the Licensee. [Emphasis added.]

Apotex relies on the Supreme Court of Canada decision in *Dukart v. Surrey (District)*, [1978] 2 S.C.R 1039 at p.1052-53, 86 D.L.R. (3d) 609 [*Dukart* cited to S.C.R] as support for its submission that, where the words of a recital manifest a clear intention, the Courts have inferred that the parties intended that these words be given effect.

**52**    The case of *Dukart* does not assist Apotex. *Dukart* involved the grant of an "easement" and the question of the true intentions of the parties. In that case, the body of the agreement contained no language with respect to the extent of the rights granted under the agreement. The recital clause was used by the Supreme Court to provide the necessary meaning to the agreement.

**53**    The case before me is different in that provisions in the body of the MACI Agreement speak to the intent of the agreement and the scope of the "transfer" from Merck & Co. to MACI. The use of a recital or preamble as an interpretative aid must always be approached with caution. As pointed out by Justice Abella (as she then was) in *Lay v. Lay* (2000), 47 O.R. (3d) 779, 184 D.L.R. (4th) 652 (Ont. C.A.) at paragraph 12, leave to appeal to SCC refused, [2000] S.C.C.A. No. 369 (QL), 264 N.R. 398 (note):

> There is no doubt that an introduction or a preamble can provide interpretative assistance, but I see no basis for accepting the novel proposition that its terms can triumph over those in the body of the contract.

**54**    In my view, the words of the MACI Agreement establish the creation of a licence and not a conveyance of all rights in the '380 Patent. The use of the word "remaining" in the recital does not "triumph over" the words of the agreement. This is sufficient to defeat the argument of Apotex.

**55**    However, even if I accept that there may be ambiguity in the MACI Agreement, I am satisfied that the parties to the MACI Agreement did not intend to convey the entire right, title and interest in the '380 Patent. One indication of the intent of the parties to an agreement is the behaviour of the parties. If the MACI Agreement is not clear on its face, it is of assistance to examine the behaviour of the parties after the execution of the agreement. Was the behaviour of Merck & Co., from November 1992, consistent with a company who had given up its entire right, title, estate and interest in the '380 Patent? Clearly, the answer is "no". If there had been such intent, why would Merck & Co. commence and pursue this litigation for 13 years in its own name? Further, why would Merck & Co. remain as the named patentee on the '380 Patent?

**56**    I am satisfied that the MACI Agreement did not operate as a conveyance of the entire right, title and interest of Merck & Co. to MACI. Merck & Co. has standing to bring this action.

## V. Claims Construction

    A.    *Principles of Claims Construction*

**57**    The first step in a patent suit is to construe the claims, in accordance with principles that are well-established in the jurisprudence (see, for example, *Whirlpool Corp. v. Camco Inc*., 2000 SCC 67, [2000] 2 S.C.R. 1067 [*Whirlpool* ]). This jurisprudence teaches that claims are to be interpreted in a purposive way in order "to achieve fairness and predictability and to define the limits of the monopoly" (*Dimplex North America Ltd. v. CFM Corp.*, 2006 FC 586, 292 F.T.R. 38 at para. 49 [*Dimplex* ], aff'd 2007 FCA 278, 60 C.P.R. (4th) 277).

**58**    Construction of the claims is a matter for the Court to determine. The Court is called on to determine, on an objective basis, what a hypothetical skilled person would have understood the invention to mean (*Whirlpool,* above, at paras. 45, 53). Where a patent is of a highly technical nature, the person skilled in the art will be someone possessing a high degree of expert scientific knowledge in the particular field of art to which the patent relates (*Aventis Pharma Inc. v. Apotex Inc.*, 2005 FC 1283, 278 F.T.R. 1 [*Ramipril I (FC)* ]; *Apotex Inc. v. Syntex Pharmaceuticals International Ltd et al* (1999), 166 F.T.R. 161 at para. 38, [1999] F.C.J. No. 548 (QL)(F.C.T.D.).

**59**    Where necessary, the whole of the patent, and not only the claims, should be interpreted (*Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 at para. 25; *Eli Lilly Canada Inc. v. Novopharm Ltd.*, 2007 FC 596, 58 C.P.R. (4th) 214 at para. 103). The Court should construe the claims in light of the description in the specification, assisted by experts as to the meaning of technical terms if such terms cannot be understood by the Court from reading the specification (*Shire Biochem Inc. v. Canada (Minister of Health)*, 2008 FC 538, 328 F.T.R. 123 at para. 22 [*Shire* ]; *Whirlpool,* above, at para. 45).

**60**    It is also important to recognize that purposive construction should be directed at the points in dispute between the parties (*Shire*, above, at para. 22).

**61**    Lastly, as the '380 Patent was issued under the old *Patent Act*, all claims at issue are to be construed as of the date the patent was granted and issued (*Pfizer Canada Inc. v. Canada (Minister of Health)*, 2005 FC 1725, 285 F.T.R. 1 at para. 36). For the '380 Patent, that date is January 31, 1984.

**62**    With these overarching principles in mind, I turn to the patent in question.

B.    *The hypothetical skilled person*

**63**    As noted, claims must be construed from the view of a hypothetical skilled person. Thus, as a preliminary matter, I must define what attributes would be held by our hypothetical skilled person.

**64**    In its final written argument, Apotex described the person to whom the '380 Patent is addressed as follows:

> The skilled addressee of the '380 Patent is a notional person having a thorough knowledge of cultivating fungal micro-organisms. Such a person may have an advanced degree, such as a Ph.D., in biochemistry, mycology or industrial biochemical processes and several years of related practical experience in an industrial setting. The skilled addressee would also include pharmaceutical formulators, and medical and organic chemists interested in using the compounds of the alleged invention to treat hyperlipemia and hypercholesteremia.

**65**    Given the nature of this product-by-process patent, I believe that experience and knowledge

related to fungal micro-organisms is fundamental. This expertise would, in my view, include both academic qualifications and technical experience. Identification of micro-organisms, developing, recognizing and identifying productive strains and growing cultures in appropriate media for commercialization are all aspects of the '380 Patent with which the skilled addressee must be familiar. I agree with Dr. Clardy when he states (Clardy Expert Report, Exhibit 17, para. 25):

> ... [F]ermenting fungi to obtain secondary metabolites requires experience beyond ordinary academic training and because isolating natural products from fermentations requires the interplay of chemistry, biosynthesis and biological assays beyond formal academic training.

**66**    Since the invention consists of processes for preparing compounds that are targeted to lower serum cholesterol, the skilled person would have sufficient knowledge of medical and organic chemistry to be able to understand cholesterol biosynthesis. This expertise could be acquired through academic training or clinical practice.

**67**    With these remarks on some of the skills necessary, I accept Apotex's description of the person to whom the '380 Patent is addressed.

    C.    *The Patent Specification*

**68**    I begin with a brief overview of the patent specification.

**69**    The '380 Patent is what is commonly described as a product-by-process patent. That is, the inventors do not make a specific (or *per se*) claim to the compound lovastatin; rather, they claim the product lovastatin and three other compounds when the compounds are made by the processes described in the patent. The '380 Patent is entitled "HYPOCHOLESTEREMIC FERMENTATION PRODUCTS AND PROCESS OF PREPARATION". As set out in the summary:

> This invention relates to hypocholesteremic products from the cultivation of a microfungus of the species <u>Aspergillus</u>. More specifically, it relates to compounds of the formulae:

I

II

III

IV

as well as pharmaceutically acceptable salts and lower alkyl and substituted alkyl esters of the carboxylic acids in which the possible substituent is phenyl, dimethylamino or acetylamino. The invention also relates to a process of cultivating the microfungus and isolating from the medium a hypocholesteremic compound of the above structures. These new compounds have excellent properties of inhibiting cholesterol biosynthesis and are useful against hypercholesteremia and hyperlipemia.

**70**    I was assisted in understanding the chemical structures of, and relationship amongst, the four compounds identified in this summary (and set out in claim 1) by Drs. Lasure, Clardy and Samson.

**71**    Compound I is the marketed product named lovastatin. Compound II is dihydro-lovastatin. It differs from lovastatin (Compound I) only in relation to the bonds in the double ring structure. Compounds I and II are both lactones, meaning that the ring at the top right of the structure is closed. Compound III is the open acid or hydroxy acid form of Compound I and Compound IV is the open acid or hydroxy acid form of Compound II. Each of Compounds III and IV has an open ring at the top with a COOH (carboxyl) group.

**72**    At p. 2 of the patent description, the inventors disclose, as prior art, the work and patents of Endo and others related to the compound compactin:

Recently, Endo et al., described (U.S. 4,049,495 and 3,983,140) a fermentation product obtained by cultivation of a micro-organism of the genus <u>Penicillium</u> and isolation from the medium. They called it ML 236 B and determined its structure together with two related compounds 236 A and 236 C. Its structure, under the name compactin, was also determined by A.G. Brown, T.C. Smale, T.J. King, <u>J. Chem. Soc.</u> (Perkin I) 1165 (1975). This compound has been found to be an inhibitor, in vivo, of the biosynthesis of cholesterol.

**73**    The inventors then distinguish their invention from that of the prior art.

We have found that unexpectedly, the cultivation of a micro-organism very different from that employed by Endo, a microfungus of the genus <u>Aspergillus</u>, produces new substances that are also very potent inhibitors of the biosynthesis of cholesterol in mammals. We have further found that these substances comprise principally the new compounds I, II, III and IV, of the above structures, accompanied by only traces of other compounds. These new compounds are much more potent inhibitors of cholesterol synthesis <u>in vivo</u> than is the compound, ML236B described by Endo.

**74**    In short, the patent specification discloses that the inventors of this patent built on the existing work of Endo and others in relation to the anti-cholesterol properties of compactin. They discovered that the Compounds I, II, III and IV, cultivated from "a microfungus of the genus *Aspergillus*", rather than from the genus *Penicillium*, were more potent inhibitors of cholesterol synthesis *in vivo* than compactin.

**75**    At p. 3 of the patent specification, the inventors state that, "The compounds of this invention are highly useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans."

**76**    Beginning on p. 4, the inventors begin their more detailed description of how this invention relates to a process for producing the identified compounds. From the experts, I have learned that the method of production of the '380 Patent is described as a "fermentation". Dr. Lasure described this as follows (Lasure Expert Report, Exhibit 48, para. 20):

Unlike more traditional processes by which chemists may synthesize chemical compounds in a laboratory or a factory using controlled chemical reactions in vitro, the process disclosed in the '380 Patent is a biological process involving the use of a specific fungus that synthesizes lovastatin in vivo when that fungus is grown in or under certain conditions which the '380 Patent calls a "fermentation".

**77**    The inventors describe their use of two sample micro-organisms from the culture collection of Merck and Co., referred to as MF-4833 and MF-4845. These two micro-organisms were placed on deposit with the American Type Culture Collection (ATCC) and assigned accession numbers

ATCC 20541 and ATCC 20542 respectively. It is clear that the inventors are not limiting their invention to the use of these two micro-organisms.

> Although the use of these is described in connection with the process of this invention, other organisms of the genus Aspergillus including mutants of the above ones are also capable of producing these novel compounds and their use is contemplated in carrying out the process of this invention.

**78**   In the paragraph that follows, the inventors disclose that:

> The morphological characteristics of the micro-organisms MF-4833 and MF-4845 have been found to be those of the genus Aspergillus. Using the criteria specified in the standard authority

> ... and by comparison with known species, it has been determined that both strains are Aspergillus terreus.

**79**   Beginning at the bottom of p. 5, the process of fermentation is described, with reference to such matters as illustrative media, optimal temperature ranges and the pH of nutrient media suitable for growing the culture. More detail is provided regarding fermentation scaling, from the initial culture in small flasks to the large-scale fermentation tanks. Once the fermentation broth is made, the reader is instructed that the compounds are conveniently isolated from the fermentation broth as lactones I and II or, alternatively, as salts of Compounds III and IV. Other methods of yielding the compounds of the invention are disclosed.

**80**   The physico-chemical properties of the compounds are set out starting at p.8. At p. 9-10, the inventors set out their belief, "with a considerable degree of certainty", the stereo chemical structures of Compounds I and III. Similar data and stereo chemical structures of Compounds II and IV are described at p. 11-12.

**81**   The specification, from p. 13 to 43, illustrates the "invention" with 27 examples.

> D.   *The claims in issue*

**82**   Merck, as it outlined in a response to a demand for particulars dated July 8, 1998, alleged that claims 1 to 8, 10, 11, 13 to 16, 18 and 19 of the '380 Patent were infringed by the Defendants. Merck specifically stated that it was not relying upon every claim in the '380 Patent.

**83**   In their Statements of Defence and Counterclaim, Apotex asserts that all of the claims of the '380 Patent are invalid. Subsequent submissions of the parties lead me to the conclusion that, at this stage, the only claims still in issue - and that require construction - are claims 1 to 8 and 13 to 15. I have set out claim 1 in full below. The remaining claims are included in Appendix B to these

reasons.

1.    A process of producing the compounds of structural formulae:

I

II

III

IV

which compromises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products and when desired converting said products to their corresponding pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methyl-glucamine, lysine, arginine or ornithine.

**84**    The disagreement between the parties focuses on aspects of claim 1. The proper construction of the other claims at issue flow from a resolution of the construction of claim 1. That is, a proper

construction of claim 1 will be determinative of the main points in dispute for the remainder of the claims in issue, claims 2 to 8 and 13 to 15.

**85**    The areas of disagreement between Apotex and Merck are the following:

> 1.    What is the meaning of the phrase "a micro-organism of genus *Aspergillus terreus*" in claim 1?
> 2.    What is the meaning of the word "isolating" in claim 1?
> 3.    Does the '380 Patent promise that all strains of *Aspergillus terreus* will be capable of producing the four compounds of the invention?
> 4.    What is the promised use of the claimed invention?

**86**    The final two construction issues relate to the "promise" of the '380 Patent. The question of what is promised - or not - by the '380 Patent is primarily relevant to the question of the utility of the patent. However, it is an analysis that logically forms part of the '380 Patent claims construction.

**87**    Generally, ascertaining the promise of a patent is an exercise that requires the assistance of expert evidence (*Bristol-Myers Squibb Co. v. Apotex Inc.*, 2007 FCA 379, [2007] F.C.J. No. 1579 (QL) at para. 27). This is because the promise should be properly defined, within the context of the patent as a whole, through the eyes of a person of skill in the art.

> E.    *The meaning of "a microfungus of genus Aspergillus terreus" in claim 1*

**88**    The first construction issue raised by Apotex relates to the proper interpretation of the words "a micro-organism of the genus *Aspergillus terreus*" in claim 1.

**89**    Claim 1 speaks to a process for producing four compounds "which comprises fermenting a nutrient medium <u>with a micro-organism of the genus *Aspergillus terreus*</u> ...." Apotex argues that, on a proper interpretation of claim 1, a skilled person would read the words "genus *Aspergillus terreus*" as referring to all micro-organisms in the genus *Aspergillus*. Merck asserts that claim 1 is limited to micro-organisms of the species *Aspergillus terreus*.

**90**    The nomenclatures used in the '380 Patent would be understood by any high school biology student (and even this judge) as part of the binomial system of naming living organisms. All living organisms are named according to a hierarchy of classifications. The hierarchy is as follows:

> (i)     Kingdom
> (ii)    Phylum
> (iii)   Class
> (iv)    Order
> (v)     Family
> (vi)    Genus
> (vii)   Species

In accordance with the accepted binomial convention, living organisms are identified by using the name of the genus (capitalized) together with the name of the species within the genus (lower case).

**91**    There is no such genus as *Aspergillus terreus*. As I have learned from the experts in this case, Drs. Clardy, Lasure and Samson, the well-established rules of taxonomy dictate that *Aspergillus* is a genus and that *Aspergillus terreus* is a species within the genus *Aspergillus*. As submitted by the parties, the use of the term "genus *Aspergillus terreus*" in claim 1 can mean one of two things:

    (a)    the inventors were claiming only those compounds made with micro-organisms of the <u>species</u> *Aspergillus terreus,* and inadvertently used the term "genus" in place of "species" (Merck's position); or,

    (b)    the inventors were claiming compounds produced from any micro-organism falling within the <u>genus</u> *Aspergillus* (Apotex's position).

**92**    Even without expert assistance, it appears to me that the first option provides the preferable interpretation. There is no question that the skilled reader would recognize *Aspergillus terreus* as a species - that is, a subset of the genus *Aspergillus*. The skilled reader would assume that the inventors intended that claim1 include only the micro-organisms of the genus *Aspergillus* that belong to the species *terreus*. To read the phrase as including all species within the genus *Aspergillus* would ignore the plain meaning of the term *terreus*, as used in the claim.

**93**    Not only does my construction of the words accord with common sense, it is consistent with the opinions of Drs. Lasure and Clardy. In the view of Dr. Clardy (Clardy Expert Report, Exhibit 17, para. 33):

    ... [T]he words *Aspergillus terreus* were in January 1984 and remain today words which, by definition, mean and would be read by the skilled person to describe a subset or sub-category of *Aspergillus* that is not and cannot include the entire *Aspergillus* genus.

**94**    Initially, Dr. Samson expressed a different interpretation of this phrase and concludes that (Samson Expert Report, Exhibit 109, para. 37):

    ... [B]ased on the repeated references in the patent to the use of a micro-organism of the "genus *Aspergillus*" and from the balance of my review of the '380 Patent described above, it is my opinion that a person skilled in the are would have concluded that the inventors did not intend to place any limits on the micro-organisms that can be used in the process other than that they be from the genus *Aspergillus*.

**95**    I acknowledge that the disclosure or specification of the '380 Patent makes a number of references to the "genus *Aspergillus*". Nevertheless, the key problem with Dr. Samson's interpretation of the phrase "genus *Aspergillus terreus*" in claim 1 is that it ignores completely the

word "*terreus*". If I were to accept Dr. Samson's opinion, I would be expanding the claim from "*Aspergillus terreus*" to the much broader designation of "*Aspergillus*". As Dr. Samson stated, there are over 250 species that fall within the genus *Aspergillus* (Samson Expert Report, Exhibit 109, para. 17).

**96**    Dr. Samson's approach to claims construction is contrary to the teachings of the Supreme Court in *Whirlpool*, above, at paragraph 52, where Justice Binnie refers to the statement of Taschereau J. in *Metalliflex Ltd. v. Rodi & Wienenberger AG* (1960), [1961] S.C.R. 117 (S.C.C.), at p. 122:

> The claims, of course, must be construed with reference to the entire specifications, and the latter may therefore be considered in order to assist in apprehending and construing a claim, but <u>the patentee may not be allowed to expand his monopoly specifically expressed in the claims "by borrowing this or that gloss from other parts of the specifications"</u>. [Emphasis added.]

**97**    During cross-examination, Dr. Samson appeared to have qualified or changed his opinion. Specifically, he agreed that "the inclusion of the word '*terreus*' in claim 1 excludes all other species of *Aspergillus* including *niger* and *nidulus* and *oryzae* and the other 246 [species]."

**98**    Moreover, when read in its entirety, the specification is consistent with the limitation of the invention to micro-organisms of the species *Aspergillus terreus*. For example, the inventors disclose the use of micro-organisms MF-4833 and MF-4845; these are examples of *Aspergillus terreus* and not of some other species within the genus *Aspergillus*.

**99**    In summary on this point, the words of claim 1 make it very clear that the patentee is not claiming compounds made with any of the 250 species of *Aspergillus*; rather, the boundary of the invention, as claimed, includes the four identified compounds when made with a single species - *Aspergillus terreus*. The use of the word "genus" before "*Aspergillus terreus*" may have been a simple inconsequential error by the drafters or the patentee may have intended the word "genus" to modify only the word "*Aspergillus*" and not the entire phrase "*Aspergillus terreus*". Regardless, given the specificity of the term "*Aspergillus terreus*", the use of the word "genus" would not change the meaning ascribed to the phrase by the skilled addressee.

     F.    *The meaning of "isolating the products"*

**100**    The second construction issue concerns that part of claim 1 which states that the process of producing the compounds "comprises fermenting a nutrient medium with a micro-organism of the genus *Aspergillus terreus* and <u>isolating the products</u> ...".

**101**    The parties disagree on the meaning of the phrase "isolating the products". Apotex submits that claim 1 requires the production of all four of the compounds, that claim 2 requires the production of both Compound I and II (the lactones) and that claim 5 requires the production of

both Compound III and IV (the hydroxy acids). In other words, Apotex argues that, for purposes of the claims, the compounds must be separated from each other, purified and crystallized before they are "isolated". Merck submits that "isolating" simply means separating the compounds from the fermentation broth and does not require the compounds to be purified or crystallized.

**102**    The term "isolating" is not defined in the patent. Therefore, it is necessary to review the specification to determine what meaning was reasonably intended by the inventors.

**103**    Example 1 of the '380 Patent is entitled "Preparation of Compounds I and III". The inventors first set out a procedure for fermenting a particular culture of *Aspergillus terreus*. At the end of this step, the skilled person would have a fermentation broth that is "set aside for isolation of the product". After the fermentation is completed, the next step is the "Isolation of Compound I". This involves separating the broth solids from the broth liquids, extracting the liquids using a mixture of solvents and extracting the solids. The resulting extracts are combined and concentrated to 15 ml of crude extract. There is no purification or crystallization described as part of the "Isolation of Compound I". Further, the next step - "Testing of Compound I" - is carried out on the crude extract. There is no further purification or crystallization carried out before the testing.

**104**    In reviewing the examples of the patent, I note that Examples 3, 4 and 5 all refer to isolation without any purification or crystallization.

**105**    From the specification, I conclude that the inventors meant the term "isolating" to simply refer to separating the compounds from the broth. This was the interpretation given to the term "isolating" by Dr. Clardy who opined that (Clardy Expert Report, Exhibit 17, para. 102):

> In the '380 Patent "isolating" does not necessarily require complete separation or purification of the active compounds. The concept of "isolating the products" of a fermentation as those words are used in the patent requires getting the products out of the fermentation broth. The products do not necessarily have to be isolated from one another nor be crystalline, nor be completely purified. All of this would be understood by the skilled person reading the patent in January 1984. I note that the "Isolation of Compound I" in Example 6 is more complex and includes the further purification and crystallization of a specific fraction containing Compound I, but example 1 makes clear that such steps are optional and not necessarily required for "isolating" as that word is used in the patent.

**106**    Dr. Samson provided a contrary view. In his Reply Expert Report, Dr. Samson opines as follows (Samson Reply Expert Report, Exhibit 11, para. 41):

> The '380 Patent says that the compounds are extracted or isolated from the fermentation broth as "hypocholesteremic compounds" (see page 2, lines 4 to 7). This would have been understood by a person skilled in the art to mean that the invention requires that the compounds be removed from the fermentation broth

and isolated from any other compound in the broth, and then purified and crystallized so that they can be useful as "hypocholesteremic compounds".

**107**    I have difficulty with Dr. Samson's understanding of the term "isolating". Foremost, this interpretation ignores much of the content of the specification that describes the testing of the crude extract. During cross-examination, Dr. Samson acknowledged that, in some of the examples, there was no purification, separation or crystallization prior to testing. Nevertheless, he clung - unreasonable, in my view - to the opinion that the skilled person would presume that "isolation" or "isolating" includes the steps of extraction, crystallization and separation.

**108**    Beyond the disclosure of the '380 Patent, the interpretation proposed by Merck is also supported by the reading of claim 1 in the context of the other claims - in particular claim 13. The general process is set out in claim 1. Claim 13 is a claim to a compound selected from Compounds I, II, III and IV. Had the inventors intended claim 1 to require a separation of each compound from the others, they could have used similar language of selection. The use of the phrase "isolating the products" rather that "isolating each product" is a strong indication, for the skilled reader, that the inventors did not intend that each of the compounds be separated from each other, purified and crystallized.

**109**    In sum, I am satisfied that, on a proper claims construction, the words "isolating the products" in claim 1 do not require that the relevant compounds be separated from each other, purified or crystallized prior to testing.

G.    *Inclusion of non-producing strains*

**110**    For the third construction question, Apotex submits that, whether the Court construes the phrase "genus *Aspergillus terreus*" in claim 1 to include all micro-organisms or fungi within the genus *Aspergillus* or just those within the species *Aspergillus terreus*, the '380 Patent promises that all such micro-organisms can be used to produce the compounds in the Patent. Merck, on the other hand, asserts that the person skilled in the art would know - and eliminate from coverage of the '380 Patent - any strain or fungus that cannot produce the claimed compounds.

**111**    Neither claim 1 nor the specification explicitly states that the '380 Patent excludes non-producing strains of *Aspergillus terreus*. The question to be determined is whether the skilled addressee, in 1984, would know that the claims of the '380 Patent are limited to the producing strains of *Aspergillus terreus*.

**112**    An essential element of the invention embodied in the '380 Patent is the production of particular compounds through the process of fermentation or cultivation of fungi. As described by Dr. Lasure, who has extensive experience working with such micro-organisms, "a culture of *Aspergillus terreus* is a living sample of a fungus from that species" (Lasure Expert Report, Exhibit 48, para. 60). Thus, within species, there are variations.

**113**    Dr. Sorensen described the organic compounds that are produced by fungi as "secondary metabolites". "Secondary metabolites" are compounds produced as a result of the metabolic function of the initial fungal micro-organism during the fermentation process (Sorensen Expert Report, Exhibit 132, para. 6). While Dr. Clardy opined that "in the general case it was expected that a particular isolate from a producing species would be expected to produce a given metabolite," he cautioned that there is always a possibility of non-production, for a number of reasons, all of which would have been known in 1984 (Clardy Expert Report, Exhibit 17, paras. 39-41):

> *    fungi can be intentionally mutated to disrupt the genes responsible for making a metabolite;
> *    fungi can lose a producing ability over time because of subculturing, or mishandling, or reasons that are never understood;
> *    some fungi in a producing species simply do not have production capability, although Dr. Clardy thought that this would be unusual except where the isolates have been maintained by serial subculturing;
> *    fungi tend to change randomly, especially when stored and maintained artificially by scientists;
> *    if during subculturing, a sample of a variant is taken for further growth, and especially if there is repeated subculturing, the fungus can become one in which a characteristic of the parent culture is lost; and
> *    physical deterioration of the fungus will lead to loss of specific metabolic functions.

**114**    Dr. Clardy summed up the situation as follows (Clardy Expert Report, Exhibit 17, para. 42):

> It was part of the common knowledge of the skilled person in 1984 and such a person would have known, with virtual certainty, that among the many isolates (or strains) of a given species there would inevitably be found isolates that have lost the capacity to produce a particular metabolite under particular conditions, or in some rare cases, that never had an ability to produce the metabolite at all.

**115**    Dr. Samson did not share this opinion. In his view, the skilled person would interpret the claims as including the production by *Aspergillus* of <u>all</u> four identified compounds (Samson Expert Report, Exhibit 110, para. 52). He disagreed that the exclusion of non-producing strains was implicit. However, during cross-examination, he acknowledged that the opinions of Drs. Lasure and Clardy were "both scientific opinions that a reasonable person of ordinary skill in the art could have reached in January 1984".

**116**    Dr. Samson, during cross-examination, also agreed that the person of ordinary skill in 1984 would have been fully aware that not every strain in a species will make a given metabolite. Even more specifically, Dr. Samson acknowledged that, in 1984, a skilled person reading the claims of the '380 Patent would know that there are strains of *Aspergillus terreus* that would not produce

lovastatin.

**117**    In sum, I prefer the opinions of both Drs. Lasure and Clardy to the effect that a skilled person would know, from his or her general knowledge, that:

> (a)    there are many variations in the micro-organisms within the species *Aspergillus terreus*, such that not every micro-organism within the species will necessarily provide the desired results and that some testing and routine experimentation will be required; and
>
> (b)    the term "nutrient medium", as used within the patent description, would include the media used in the examples and other media that, upon routine testing, would result in the desired compounds.

**118**    In light of this general knowledge, Drs. Clardy and Lasure were both of the opinion that the skilled person would recognize - even without an explicit limitation in the claims - that the claims of the '380 Patent exclude non-producing strains of *Aspergillus terreus*. The use of the word "producing" in claim 1 tells the skilled person that non-producing strains are excluded, even though the explicit words are not used.

**119**    Further support for the conclusion reached by Drs. Clardy and Lasure is contained within the disclosure. In addition to the disclosure of the structure of the compounds and the therapeutic activity of the compounds, the skilled person is provided with examples of the media and conditions that could be used.

**120**    Moreover, the skilled person would also bring to his or her laboratory "bench", a set of skills used routinely. In light of the nature of fungi and their use in the pharmaceutical industry, it appears logical to me that the skilled person would have extensive experience with the types of experimentation and testing that are used to identify and optimize producing micro-organisms. During cross-examination, Dr. Samson confirmed that a number of experiments, known in 1984, could have been performed simultaneously, in a short period of time, to identify the producing micro-organisms. He agreed that about 300 shake flask experiments could be run at one time. The skilled person could rapidly screen a large numbers of isolates of *Aspergillus terreus* to determine which strains are producing. Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

**121**    Having considered the evidence of the three experts, I am persuaded that the opinions of Drs. Lasure and Clardy on this point are to be preferred to that of Dr. Samson. An implicit requirement that non-producing strains are excluded from the coverage of claim 1 is "being neither benevolent nor harsh but rather seeking a construction which is reasonable and fair to both patentee and public" (*Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.*, [1981] 1 S.C.R. 504 at p.520, 56 C.P.R. (2d) 145 [*Consolboard* cited to S.C.R.]). I do not accept Apotex's assertion that the '380 Patent states, implies or promises that all strains of *Aspergillus terreus* will be capable of producing

the four compounds of the claimed invention.

H.    *The promised use of the '380 Patent*

**122**    As a final construction issue, Apotex submits that the '380 Patent makes the explicit promise that the four compounds identified in claim 1 are "highly useful as anti-hypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

**123**    The "promise" of the '380 Patent appears to be clearly set out in at least two places in the specification. In the "Summary of the Invention", at p. 2 of the patent, the patentees state that:

> These new compounds have excellent properties of inhibiting cholesterol biosynthesis and are useful against hypercholesteremia and hyperlipemia.

**124**    A slightly more detailed promise is found at p. 3, where the patentees explain that:

> The compounds of this invention are highly useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans.

**125**    Dr. Samson's opinion is that the detailed statement in the patent (p.3) expresses the promise of the '380 Patent (Samson Expert Report, Exhibit 110, para. 25). Although Dr. Lasure did not directly respond to the question of what was the promise of the patent, she described the uses of the '380 Patent to include the following (Lasure Expert Report, Exhibit 48, para. 21):

> With respect to uses, the '380 Patent discloses that the four compounds (and salts and esters of them) can be used to inhibit cholesterol biosynthesis, can be used against hypercholesteremia (high levels of cholesterol in the blood) and hyperlipidemia (high levels of lipids in the blood) and can be used as antifungal agents (to kill or inhibit growth of fungi on plants).

Anti-fungal properties have not been referred to by Apotex in this matter. The issue for this trial is focused on the medical use.

**126**    Based on the words of the specification and supported by the opinions of Drs. Lasure and Samson, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

I.    *Summary on Claims Construction*

**127**    Considering the words of the claims of the '380 Patent and the specification and guided by the expert testimony, the relevant claims of the patent should be construed in the following manner:

    \*      Claim 1 is a claim to a process for producing the four identified compounds by a fermentation process using the range of nutrient media and conditions described in the specification (or as would be generally known to the skilled person), following which the compounds are isolated or extracted from the fermentation broth by any of

        the known means identified in the specification (or as would be generally known to the skilled person). Of particular relevance to this litigation:

      -     the micro-organism or fungus to be used is a strain of the species *Aspergillus terreus*, excluding those strains that are unable to produce the desired compounds and excluding micro-organisms from other species within the genus *Aspergillus*; and

      -     after the fermentation stages of the process, the resulting broth may contain any or all of the four compounds.

**128**    With this construction of claim 1, the construction of claims 2 to 8 follows. Each of these claims is a "subset" of claim 1, whereby the claim is restricted to:

    \*      the process of producing only Compounds I and II (claim 2) or Compounds III and IV (claim 5);

    \*      the process of producing the identified compounds using a particular originating micro-organism (claim 3 and 6); and

    \*      the process of producing the identified compounds using certain operational requirements (claims 4, 7 and 8).

**129**    Claim 13 claims any one of the four identified compounds (the same compounds as described in claim 1) when made by the process of claim 1 "or by an obvious chemical equivalent". Claim 14 is a similar claim to either Compound I or II when made by the process of claim 2 "or by an obvious chemical equivalent". Claim 15 claims each of Compound III and IV when made by the process of claim 5 "or by an obvious chemical equivalent".

**130**    Finally, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

## VI. **Infringement - Background**

    A.   *Introduction*

**131** Having established the proper construction of the relevant claims of the '380 Patent, I now turn to the question of infringement.

**132** Section 44 of the *Patent Act* confers on a patentee and his legal representatives "the exclusive right, privilege and liberty of making, constructing, using and vending to others to be used the invention" of a patent. Merck claims that the Defendants infringed their rights under the '380 Patent by the production of lovastatin using the *Aspergillus terreus* micro-organism. Specifically, Merck claims infringement in three different scenarios:

1.    infringement through the manufacture (during Phase 1 of production described above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157;

2.    infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI, when Blue Treasure was allegedly "salting" the lovastatin shipments with infringing *Aspergillus terreus* lovastatin; and

3.    infringement from March 1998, when Blue Treasure was allegedly shipping lovastatin manufactured with *Aspergillus terreus*.

**133** Subject to the possible exceptions of regulatory or experimental use, the making, constructing, using or vending lovastatin using *Aspergillus terreus* would be an infringement of the '380 Patent. Thus, if Merck can satisfy the Court that certain volumes of lovastatin made from the product received from Blue Treasure were manufactured from or contained, through "salting", *Aspergillus terreus* lovastatin, infringement has been established. Similarly, if Merck can persuade the Court that batch CR0157 contained lovastatin manufactured from *Aspergillus terreus*, infringement has been proved.

B.    *Burden*

**134** The first point to be made is that proof of infringement is subject to the civil standard of proof. Merck's burden - whatever it may be - is met if infringement can be shown on a balance of probabilities. Stated in different words, Merck will succeed if it is more likely than not that infringement occurred.

**135** It is trite law that the party alleging infringement bears the burden of proving infringement (see *Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, [2004] 1 S.C.R. 902 at para. 29 [*Monsanto* ]). However, consideration must be given to the scheme of the *Patent Act* and, in particular, to s. 39(2). Under the *Patent Act* applicable to this action, s. 39(1) provides that:

39.    **Naturally occurring substances intended for food or medicine --** (1) In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification shall not include claims for the

resulting food or medicine itself, except when prepared or produced by or significantly derived from the methods or processes of manufacture particularly described and claimed. [1987, c. 41, s. 14]

\* \* \*

39.    **Procédés Microbiologiques Naturels --** (1) Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués.

[1987, ch. 41, art. 14 ]

**136**    This provision is followed by s. 39(2) which states that:

(2)    In an action for infringement of a patent where the invention relates to the production of a new substance, any substance of the same chemical composition and constitution shall, in the absence of proof to the contrary, be deemed to have been produced by the patented process.

\* \* \*

(2)    Dans une action en contrefaçon de brevet où l'invention porte sur la production d'une substance nouvelle, toute substance formée des mêmes composants et éléments chimiques est, en l'absence de preuve contraire, réputée avoir été produite par la procédé breveté.

**137**    On its face, s. 39(2) applies to the facts before me. In Merck's opinion, the '380 Patent is to an invention that relates to the production of lovastatin - a "new substance". The lovastatin produced in any of Phases 1, 2 or 3 of the Defendants' manufacturing is a substance with the same chemical composition and constitution as that produced by the process of the '380 Patent. As such, s. 39(2) would apply and, absent proof to the contrary, such lovastatin would be deemed to be produced by the process of the '380 Patent. With respect to lovastatin manufactured as part of Phase 1 (except for batch CR0157), Merck accepts that there is "proof to the contrary". However, Merck asserts that, for lovastatin that is contained in batch CR0157 and all production sourced from Blue Treasure, s. 39(2) applies and the production must be deemed to be made from *Aspergillus terreus*, thereby infringing the '380 Patent.

**138**    The dispute between the parties centres on the meaning of the words "new substance" in s. 39(2).

**139**    Merck argues that the substances (Compounds I-IV) claimed in the '380 Patent are new and novel and s. 39(2) is engaged. While there is no definition of "new", the word appears in s. 2 under the definition of "invention". As such, for patent purposes, "new" could mean novelty, or a product that has not been anticipated.

**140**    Apotex submits that the definition of newness has to be determined in light of patent legislation as a whole. Where a word has a meaning in one section, it ought to be the same in every section within a document, absent legislative intent to show that the word can have various meanings. In line with this argument, Apotex's counsel, in final argument, acknowledged that ss. 2 and 39(2) use the word "new". However, the word does not appear in provisions that deal specifically with novelty (anticipation): ss. 61, 27, 43. Thus, one cannot say that "new" equates with "anticipation".

**141**    According to Apotex, the interpretation of "new" must fit into the context of s. 39(2) and its commonsense purpose. In oral submissions, Apotex argued that the purpose of s. 39(2) (and its presumption of infringement) was:

> [...] to deal with the impossibility of a plaintiff, when it comes to a process in a product-by-process claiming form, not being able, absent proof from the defendant of what that process is, to challenge the infringing nature of that process.

**142**    In line with this purpose, once another process is disclosed for the same product, the "newness" of the substance *per se* no longer exists. Apotex also asserted that newness can be lost in a number of other ways: prior commercialization, disclosure and use of the substance.

**143**    On the facts of this case, Apotex notes that the application that resulted in Canadian Patent No. 1,129,794 (the '794 Patent or the Endo Patent) related to the claims for lovastatin and was filed in Canada before the '380 Patent. The '794 Patent also had an earlier priority and issue date. It publicly describes an alternate process to create lovastatin. In Apotex's view, the same can be said for lovastatin created from Red Yeast Rice.

**144**    As argued by the parties, there is no direct case law on the interpretation of "new" in s. 39(2). It is helpful to return to first principles of statutory interpretation.

**145**    The starting point of my analysis is the general principle clearly stated by the Supreme Court in *Rizzo & Rizzo Shoes Ltd., Re*, [1998] 1 S.C.R. 27 at paragraph 21, 154 D.L.R. (4th) 193 (See also *Bell ExpressVu Ltd. Partnership v. Rex*, 2002 SCC 42, [2002] 2 S.C.R. 559 at para. 26, and cases cited therein):

> [...] Elmer Driedger in Construction of Statutes (2nd ed. 1983) best encapsulates the approach upon which I prefer to rely. He recognizes that statutory interpretation cannot be founded on the wording of the legislation alone. At p. 87

he states:

> Today there is only one principle or approach, namely, the words of an Act are to
> be read in their entire context and in their grammatical and ordinary sense
> harmoniously with the scheme of the Act, the object of the Act, and the intention
> of Parliament.

**146**    *Sullivan on the Construction of Statutes*, 5th ed. (Markham, Ont.: LexisNexis, 2008)
(*Sullivan*) comments on the modern principles as articulated by Driedger (p. 3):

> The court must adopt an interpretation that is appropriate. An appropriate
> interpretation is one that can be justified in terms of (a) its plausibility, that is, its
> compliance with the legislative text; (b) its efficacy, that is, its promotion of
> legislative intent; and (c) its acceptability, that is, the outcome complies with
> accepted legal norms; it is reasonable and just.

**147**    Furthermore, in relation to the textual analysis of legislation, there are a number of relevant
principles: (a) the presumption of consistent expression (*Sullivan*, above, pp. 214-23), and (b) the
presumption of coherence (*Sullivan*, above, pp. 223-25).

**148**    Under the principle of consistent expression, it is presumed that the legislature uses language
carefully and consistently within the same statute. As such, same words presumptively have the
same meanings. On the flip side, one can infer, from the use of different words or a different form
of expression, that a different meaning was intended by drafters. This principle was highlighted by
the Federal Court of Appeal in *Peach Hill Management Ltd. v. Her Majesty the Queen* (2000), 257
N.R. 193 at paragraph 12, G.S.T.C. 45: "When an Act uses different words in relation to the same
subject such a choice by Parliament must be considered intentional and indicative of a change in
meaning or a different meaning."

**149**    According to *Sullivan* (pp. 221-22), the strength of this presumption varies. Highly technical
statutes and terms that play a key role in the legislative scheme are strongly presumed to have the
same meaning throughout. For example the definition of "income" in taxation legislation was
considered to be a key term in *Mattabi Mines Ltd. v. Ontario (Minister of Revenue)*, [1988] 2 S.C.R.
175, 53 D.L.R. (4th) 656. The presumption of consistent expression is also strong when the repeated
words contribute to a noticeable pattern.

**150**    This presumption, however, can be weakened when one examines the context surrounding
the words: "Identical words may not have identical meanings once they are placed in different
contexts and used for different purposes. This is particularly true of general or abstract words" (see
*Sullivan*, p. 222; *Jevco Insurance Co. v. Pilot Insurance Co.* (2000), 49 O.R. (3d) 760, [2000] O.J.
No. 2259 (QL) (Ont. Sup. Ct.)).

**151**    The other relevant principle is the presumption of coherence. Here, one presumes that provisions of the same legislation are meant to work together logically as parts of a functioning whole.

> The parts are presumed to fit together logically to form a rational, internally consistent framework; and because the framework has a purpose, the parts are also presumed to work together dynamically, each contributing something toward accomplishing the intended goal. [...] It is presumed that the body of legislation enacted by a legislature does not contain contradictions or inconsistencies, that each provision is capable of operating without coming into conflict with any other (*Sullivan*, above, p. 223).

**152**    In applying these principles, the question is: does "new" in s. 39(2) mean "new" in the ordinary sense, or in the sense of novelty? In other words, to displace the application of s. 39(2), does Merck have to prove that the substance of the product-by-process claim in the '380 Patent was novel, or simply that it was not known before?

**153**    For the reasons that follow, I interpret the word "new" to simply mean a substance that was not previously known or used, rather than novelty.

**154**    First, within the context of ss. 2 and 39(2), "new" has been used as an adjective. According to the *Gage Canadian Dictionary* (W.S. Avis et al. (ed) (1983), Gage Educational Publishing Co., Toronto), at p. 766, "new" is defined as "not existing before". *Black's Law Dictionary* (6th ed.) (St. Paul, Minn.: West Publishing Co, 1990), at p. 1042 describes "new" as follows:

> [...] this word may denote novelty, or the condition of being previously unknown or of recent or fresh origin, but ordinarily it is a purely relative term and is employed in contrasting the date, origin, or character of one thing with the corresponding attributes of another thing of the same kind or class.

> In order to be "new", as the word is used in the patent laws, the achievement must be either one that produces an unusual or improved or advanced result, which was unknown to the same prior art at the time of the claimed invention; or the achievement must be one that produced an old result in an unusual and substantially more efficient, or economical way. [Emphasis added.]

**155**    As seen above, the ordinary meaning of "new" can equate to novelty or simply a condition of being previously unknown. It is a word that is "purely relative" in nature.

**156**    Second, I turn to the contextual meaning of the word "new" within the *Patent Act*. While there is no dispute that patent legislation is highly technical, does the word "new" carry a specific and technical meaning? Is it used in a way that creates a noticeable pattern? Is there a presumption

of consistency? My answer to these questions is "no".

**157**     "New" in ss. 2 and 39(2) is relative as well; in both instances, the word is used as an adjective to describe different things. Under s. 2, "new" describes how an "art" or "improvement" can rise to the level of an invention. The notion of novelty is part and parcel of this interpretation.

**158**     On the other hand, in s. 39(2), legislators are not describing what constitutes an invention. This provision relates solely to infringement and novelty is not directly at issue. Further, the word "new" is not employed to determine if an "art" or "improvement" constitutes an invention. It merely describes a "substance" or a "product" in a product-by-process claim. There is no requirement that the "substance" be inventive. Section 39(2) deals with the claims in a product-by-process patent. In such claims, the substance cannot be divorced from its process (see s. 39(1) of the *Patent Act*). Accordingly, in a product-by-process claim, whether the substance is novel is not determinative. It is the process of producing the substance that must be novel, new, and inventive. In the context of a product-by-process claim, "new" does not necessitate a novel (not-anticipated) substance.

**159**     Third, this interpretation is consistent with the rest of the legislative scheme and avoids internal inconsistencies. If "new" described a novel substance or medicine as the invention *per se*, it would contradict s. 39(1) of the *Act*.

**160**     Applying this to the case at hand, the claimed invention is not lovastatin, but lovastatin created through the process of fermenting the organism *Aspergillus terreus*. It is clear from s. 39(1) of the *Act* that the patentee cannot merely claim lovastatin, a medicinal substance, as the invention. Lovastatin is merely the product of the product-by-process claim in the '380 Patent.

**161**     Fourth, ss. 27, 43, and 61, which relate to questions of novelty, have no mention of the word new.

**162**     Fifth, the jurisprudence supports the interpretation of "new" which means not previously known. According to Justice Nadon, in *Eli Lilly and Co. v. Nu-Pharm Inc.* (1994), 54 C.P.R. (3d) 145 at para. 32, [1994] F.C.J. No. 225 (QL) (F.C.T.D.)[*Eli Lilly and Co. v. Nu-Pharm Inc.* cited to C.P.R.], the presumption of infringement does not arise until the plaintiff has satisfied a minimum evidentiary burden that the substances in question are "new substances". This means that the initial burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances". The burden is not on Apotex to show that the substances are not new or are anticipated. Since the burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances", to equate "new" with the test of "novelty" would lead to an illogical result. Under the scheme of Canadian patent law, defendants to an infringement action have the burden to prove anticipation (a subset of invalidity). Thus, to have the patentee prove novelty under s. 39(2) would contradict fundamental principles of patent law.

**163**     In sum, "new" is a highly relative term and its definition is dependent on its context. Within the context of s. 39(2) of the *Act*, "new substance" means a substance that was not previously

known.

**164**    With respect to the '380 Patent, the question is whether Compounds I-IV were previously known, or are they simply "old" products? In other words, even if anticipation is not established by the lovastatin produced by Red Yeast Rice or by the Endo Patent, can lovastatin be said to have been sufficiently "known", and thus, successfully undermine the "newness" of the substance in the '380 Patent? The answer to these questions is found in the claims construction.

**165**    Claim 1 of the '380 Patent clearly states that it is "a process of producing the compounds of the structural formulae [Compounds I-IV]". While the parties acknowledge that Compound I, lovastatin, is identical to the structure in Dr. Endo's '794 Patent, claim 1 does not solely fence out Compound I, but also II, III, and IV. The Defendants presented no evidence that Dr. Endo knew of, or used, Compounds II, III, and IV. Further, there is no evidence that lovastatin produced by Red Yeast Rice contains Compounds II, III and IV.

**166**    Accordingly, I agree with Merck's argument that the combination of substances produced (Compounds I-IV) is new. There is no evidence that either the Endo Patent or the fermentation of traditional Red Yeast Rice would produce such a combination.

**167**    In light of the above, I conclude that s. 39(2) is engaged.

**168**    The question that follows is this: If s. 39(2) applies, what is the interpretation of "in the absence of proof to the contrary"? Does it mean that Apotex has an evidentiary burden and that, once this burden is met, the persuasive burden returns to the Plaintiffs to establish infringement? Or does it mean that the persuasive burden is established and therefore Apotex must disprove infringement?

**169**    Merck argues that s. 39(2) mandates that the persuasive burden of proof remains with Apotex to show non-infringement. This is supported by the language in the provision - infringement is deemed "in the absence of proof to the contrary". According to Merck, this is different from the presumption of validity, which is weakly worded as merely "in the absence of evidence to the contrary". Merck relies on *Apotex Inc. v. Tanabe* (1994), 59 C.P.R. (3d) 38 at paragraph 92, [1994] O.J. No. 2613 (QL) (Ont. Gen. Div.) [*Apotex v. Tanabe* cited to C.P.R.] to interpret the language in s. 39(2) as creating an onus that it "is not simply an obligation to adduce some evidence to the contrary". Rather, "proof to the contrary" is a "much higher onus than the onus simply to adduce some evidence to the contrary" (*Apotex v. Tanabe*, above, at para. 92). Thus, Merck concludes that s. 39(2) is a provision that deems, rather than presumes, infringement. Consequently, in Merck's view, the persuasive burden is on Apotex to prove non-infringement. I disagree.

**170**    Section 39(2) of the *Act* creates a presumption of infringement that confers on Apotex an evidentiary burden to rebut infringement. There is no support for Merck's argument that s. 39(2) deems infringement and puts the persuasive burden on Apotex.

**171** *Hughes & Woodley on Patents*, 2nd ed., looseleaf (Markham, ON: LexisNexis Canada, 2005) at paragraph 45 states that s. 39(2) creates a presumption of infringement:

> This provision creates a presumption of infringement, but, only once an applicant has satisfied a minimum evidentiary burden, establishing that the substances in question are "new" and identical. These provisions, however, may permit the Court to give a broader interpretation of the claims than a mere purposive construction. This is to be contrasted with section 45 of the Patent Act which provides for a presumption of validity in the absence of "evidence" to the contrary. Speculation, as to alternative processes that may have been used to produce the product, falls short of the required evidence to the contrary. [Emphasis added; see also *Eli Lilly and Co. v. Nu-Pharm Inc.*, above.]

**172**    The text notes that, compared to the validity presumption (rebuttable on an evidentiary basis), the presumption of infringement is stronger. This can be supported by Justice Campbell's decision in *Apotex v. Tanabe* (above, at para. 92). While Justice Campbell held that "proof to the contrary" necessitates a higher standard than "evidence to the contrary", he does not go so far as to say that "proof to the contrary" equates to a persuasive burden to prove a fact on a balance of probabilities. As such, comparing the presumptions of validity and infringement, there is only a difference in degree rather than nature of the burden.

**173**    Justice Gibson, in *Abbott Laboratories v. Canada (Minister of Health)*, 2004 FC 1349, 260 F.T.R. 276 at para. 101 [*Abbott Laboratories* ], examined the words "in the absence of proof to the contrary" in s. 6(6) of the *Regulations*:

> (6)    For the purposes of an application referred to in subsection (1), if a second person has made an allegation under subparagraph 5(1)(*b*)(iv) or (2)(*b*)(iv) in respect of a patent and the patent was granted for the medicinal ingredient when prepared or produced by the methods or processes of manufacture particularly described and claimed in the patent, or by their obvious chemical equivalents, it shall be considered that the drug proposed to be produced by the second person is, in the absence of proof to the contrary, prepared or produced by those methods or processes. [Emphasis added.]

**174**    According to Justice Gibson, this provision deals with product-by-process claims, and also creates a presumption that the patent will be infringed. Despite the strong words of "in the absence of proof to the contrary", Justice Gibson was clear that there is no shift in the persuasive burden (*Abbott Laboratories*, above, above, at para. 101).

**175**    The Supreme Court, in *Circle Film Enterprises Inc. v. Canadian Broadcasting Corp.,* [1959] S.C.R. 602 at p.604, 31 C.P.R. 57 [*Circle Film* cited to S.C.R], considered similar words in s. 20(3)(b) of the *Copyright Act*, R.S.C. 1927, c. 532: "The author of the work shall, unless the contrary is proved, be presumed to be the owner of the copyright." In seeking to characterize the

words in s. 20(3)(b), Justice Judson stated (*Circle Film*, above, at p. 606):

> I take the operation of a presumption of this kind to be as stated by Wigmore on Evidence, 3rd ed., s. 2491(2):
>
>> It must be kept in mind that the peculiar effect of a presumption "of law" (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent. <u>If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule.</u> [Emphasis added.]

**176**    In sum, I conclude that the phrase "in the absence of proof to the contrary", in s. 39(2), amounts to an evidentiary burden to rebut the presumption of infringement.

**177**    Following this, a number of questions are raised: what is an evidentiary burden? Also, what do the Defendants in this case have to prove in order to meet their evidentiary burden and rebut the presumption of infringement?

**178**    On the definition of evidentiary burden, the Federal Court of Appeal in *Hoffmann-La Roche Ltd. v. Canada (Minister of Health and Welfare)* (1996), 70 C.P.R. (3d) 206 at para. 8, 205 N.R. 331 [*Hoffmann-La Roche* cited to C.P.R.] stated:

> [...] the "persuasive burden" or the "legal burden", is the burden of establishing a case to the civil standard of proof. By contrast, the <u>"evidential burden" consists of the burden of putting an issue in play and means that a party has the responsibility to ensure that there is sufficient evidence of the existence or non-existence of a fact or an issue on the record to pass the threshold for that particular fact or issue.</u> Nu-Pharm, supra, per Stone J.A., at page 33. [Emphasis added.]

**179**    According to the Supreme Court of Canada in *R. v. Fontaine*, 2004 SCC 27, [2004] 1 S.C.R. 702 at paragraph 11 [*Fontaine* ], the "evidentiary burden" is not a burden of proof. It is a legal question left for the judge to determine whether "there is some evidence upon which a properly instructed jury could reasonably decide the issue" (*Fontaine*, above, at para. 13). In making such a determination, "the judge does not evaluate the quality, weight or reliability of the evidence" (*Fontaine*, above, at para. 12).

**180**    Justice Wetston in *Pharmacia Inc. v. Canada (Minister of National Health and Welfare)* (1995), 60 C.P.R. (3d) 328 at paragraph 28, 92 F.T.R. 253 (F.C.T.D.) [*Pharmacia* cited to C.P.R.], held that the presumption of infringement is bolstered by the common law presumption. According

to *Pharmacia*, the common law presumption is (above, at para. 20):

> [...] where the subject-matter of an allegation lies particularly within the
> knowledge of one of the parties, that party must prove it. In this instance, the
> applicants submit that only the respondent knows the precise composition and
> process to be used in making their product.

**181**    The Court of Appeal in *Hoffmann-La Roche* set out the test for establishing the common law
presumption: (a) the defendant asserted no facts to support allegations of non-infringement; (b) the
evidence of non-infringement lay peculiarly within the knowledge of the defendant; and (c) the
plaintiff had no other available means to access such evidence (above, at para. 8).

**182**    Combining principles of the evidentiary burden, the common law presumption and s. 39(2), I
conclude that Apotex's burden is to show that it used a non-infringing process to create lovastatin,
and that this process was disclosed to Merck. At this time, the Court should not assess the quality,
weight or reliability of the evidence, but merely ask if there is sufficient evidence to put the issue in
play.

**183**    I find that Apotex, by its disclosure of the AFI-4 process (fermenting *Coniothyrium fuckelii*
to produce lovastatin), has met its evidentiary burden to rebut the presumption of s. 39(2). Merck
has accepted that the non-infringing AFI-4 process was used at the AFI plant in Winnipeg to
produce lovastatin (except for CR0157). Because Apotex has met its evidentiary burden, the
presumption of infringement has been rebutted. In the words of Wigmore, "... the presumption
disappears as a rule of law and the case is in the jury's hands free from any rule" (*Circle Film*,
above, at p. 606). The persuasive burden of proof is back with Merck.

**184**    By way of summary, the burden within s. 39(2) of the *Act* is as follows:

> a)    Merck has the evidentiary burden to prove its substance is "new" in order
>        to engage s. 39(2);
> b)    Apotex then has the evidentiary burden to prove a viable alternative
>        process existed to create lovastatin that does not infringe the '380 Patent -
>        if this is done, the presumption of law is lifted; and finally,
> c)    Merck has the persuasive burden to prove infringement.

**185**    On the facts of this case, I am persuaded that the '380 Patent involves a "new substance"
thereby engaging s. 39(2). Apotex has established that a viable alternative exists that does not
infringe the '380 Patent. Accordingly, Merck has the persuasive burden to satisfy me, on a balance
of probabilities, that Apotex's sale of lovastatin, manufactured by Blue Treasure lovastatin or out of
batch CR0157, was made by a process that infringed the '380 Patent.

**186**    I turn now to consider whether Merck has met its burden. In my view they have, with respect
to some of the lovastatin manufactured by Blue Treasure and lovastatin that originated from AFI

batch CR0157.

    C.    *Summary of Merck's case on infringement*

**187**    As noted above, Merck claims infringement of the '380 Patent in three different scenarios:

    1.    infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI, when Blue Treasure was allegedly "salting" the lovastatin shipments with infringing *Aspergillus terreus* lovastatin;

    2.    infringement from March 1998, when Blue Treasure was allegedly shipping lovastatin manufactured with *Aspergillus terreus*; and

    3.    infringement through the manufacture (during Phase 1 of production described above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157.

**188**    I will deal with each of these scenarios separately.

## VII. **Infringement - the Circumstantial Case**

    A.    *Blue Treasure "Salting"*

**189**    Merck asserts that Blue Treasure was "salting" its earlier shipments of lovastatin with infringing AFI-1 lovastatin. In simple terms, Merck submits that Blue Treasure was "diluting" its AFI-4 lovastatin with AFI-1 lovastatin, thereby infringing the '380 Patent with each and every shipment of lovastatin to AFI.

**190**    On March 18, 2010, Merck received a copy of an e-mail, dated September 8, 1997 purportedly from Dr. Su to his "managers" at AFI. In the e-mail, Dr. Su wrote that "before the switchover, [Blue Treasure] ... produced 296.6 kg #1 product". This 296.6 kg product is the basis of Merck's salting argument. The Defendants have not provided evidence as to how this quantity of AFI-1 lovastatin was sold or disposed of.

**191**    Does the failure of Blue Treasure to account for this quantity of AFI-1 lovastatin lead to a finding, on a balance of probabilities, that this lovastatin ended up being shipped to Canada as a "salted" mixture with non-infringing AFI-4?

**192**    Merck argues that, absent evidence of the whereabouts of the entire 296.6 kg, the reasonable inference is that all or part of that quantity of AFI-1 lovastatin was used to "salt" the AFI-4 lovastatin. By salting the Winnipeg shipments with infringing lovastatin, Merck asserts that Blue Treasure was able to sell the more cheaply-made lovastatin where payment was priced, on a kilogram basis, on the more costly AFI-4 lovastatin. Blue Treasure was also thereby able to dispose of its aging inventory of infringing lovastatin that could not be moved on the domestic Chinese

market. According to Merck, if there were an innocent explanation for Blue Treasure's disposition of the infringing lovastatin, AFI would have provided it; none has come.

**193**    In addition to the Defendants' failure to provide sufficient information on the disposal of 296.6 kg of AFI-1 lovastatin, Merck points to two other key factors which, in their view, support the allegation of "salting". The first point is the evidence that demonstrates the difficulty that Blue Treasure was having selling lovastatin into the Chinese or other foreign markets at a reasonable profit. (This evidence is discussed at some length in the section of these reasons dealing with "motivation".)

**194**    Moreover, Merck refers to AFI's concern that unusually low levels of RC-14 were found in the first two shipments of lovastatin from Blue Treasure. Merck argues that AFI had been worried enough about the possibility of "adulteration" that Dr. Su was sent to Blue Treasure to investigate and supervise the Blue Treasure lovastatin productions. No determination was ever made by Dr. Su about the reason for the unusually low levels of RC-14 in the shipments of AFI-4 lovastatin. Merck appears to argue that the RC-14 level could be explained if the shipment to AFI had been, in fact, a mixture of AFI-1 and AFI-4 lovastatin.

**195**    In a letter dated August 11, 1997, Dr. Cox advised Mr. Zhou that:

> I was very disappointed to learn that 2 out of 3 batches of lovastatin made by the new AFI process had failed our quality control, partly because your people had unilaterally made changes to our process.

**196**    The most worrying problem with the lovastatin batches was the low levels of a compound known as RC-14. In a letter from Mr. Alexander (Sandy) Fowler (Finance Manager at AFI) to Mr. Zhou dated September 12, 1997, Mr. Fowler described the "puzzle" as follows:

> Our scientists are very concerned in regard to the low levels of RC14 in certain of the batches produced at Blue Treasure. At [AFI], we have never produced AFI-4 lovastatin with such low RC14. In fact, in our experience, the "signature" of AFI-4 is a higher level of RC14.

**197**    Low levels of RC-14 were characteristic of AFI-1. Thus, it is clear that the real concern was whether the AFI-4 lovastatin was being produced using AFI-1 or was being contaminated in some way by the *Aspergillus terreus* strain. During his oral testimony, Dr. Cox was very direct in his testimony about the lack of trust between AFI and Blue Treasure. The decision was made by AFI to send Dr. Jerry Su to Blue Treasure to work with the management team (see letter dated August 18, 1997 from Dr. Cox to Mr. Zhou).

**198**    Dr. Jerry Su was the Group Leader of Research & Development at AFI from September 1996 to December 1998. Dr. Su arrived in China on August 28, 1997 and remained there until the end of October 1997. As set out in his "Report on the work at Blue Treasure", dated November 13, 1997,

his primary task was to ensure that Blue Treasure maintained all fermentation free of contamination from the *Aspergillus terreus* strain. He investigated the low levels of RC-14 but, even after his time in China and his examination of a number of possible reasons, the cause of low RC-14 levels in two batches was still a "puzzle". Nevertheless, Dr. Su appeared to be satisfied that the runs conducted while he was at Blue Treasure would meet the quality control standards at AFI.

**199**    Together, Merck submits, all of this evidence is consistent with a finding that, on a balance of probabilities, Blue Treasure was mixing infringing AFI-1 lovastatin with the AFI-4 lovastatin that was being shipped to AFI from Blue Treasure.

**200**    In terms of the technical feasibility of salting, Merck relies on the statement of Dr. Cox who testified that there is nothing difficult about salting:

> Q.    You understood, at the time, doctor, that Lovastatin made from one process could be made and mixed with Lovastatin made using another process; you understood that was a technical feasibility?
>
> A.    It's very straightforward. You put them together and mix them.

**201**    I agree with Merck that the Defendants - in particular AFI - have presented obstacles to uncovering relevant facts related to the amount of AFI-1 lovastatin actually produced and sold by Blue Treasure. Once the e-mail of Dr. Su came to light on March 18, 2010, Merck sought and was granted, on consent, an opportunity for further discovery of Mr. Fowler. Mr. Fowler has been the Finance and Administration Manager at AFI since 1996. Questions related to this lovastatin were put to Mr. Fowler and taken under advisement by counsel for AFI. AFI refused to provide confirmation of the 296.6 kg quantity (Undertaking #2319). In Undertaking #2320, AFI was also asked, in respect of the 296.6 kg product:

> To advise full particulars, when it was made, what happened to it, who it was sold to, for how much and financial benefits to AFI and Apotex.

**202**    All of this information was refused. Although Apotex refers to some evidence on the record that directionally supports legitimate sales of AFI-1 lovastatin, the information is far from complete or clear.

**203**    In spite of my serious concerns about the unwillingness or inability of the Defendants to provide evidence concerning the alleged 296.6 kg product, I have problems with Merck's argument on this point.

**204**    My first concern is that I have little evidence that Blue Treasure produced 296.6 kg of AFI-1 lovastatin. In Dr. Su's e-mail, there is the reference that, "before the switchover, [Blue Treasure] ... produced 296.6 kg #1 product". There is no indication in the e-mail of where this number came from. Contrary to the assertion by Merck, the e-mail does not "prove" the existence of 296.6 kg of infringing lovastatin.

**205**     The second problem is that I have no evidence, beyond the cryptic statement of Dr. Cox, as to how salting could be carried out. No expert spoke to the practice. As noted by counsel for Apotex in final argument:

> ... there was no evidence led as to how you put together AFI-1 material with AFI-4 material, whether the appearance and composition of technical grade lovastatin, colour wise, physical characteristics, crystallinity, whether that is comparable.

**206**     In addition, I have no confirmation from anyone that low levels of RC-14 could be explained by salting. That question could have been posed to any number of witnesses by Merck and was not. The closest discussion on the record occurred during the cross-examination of Mr. Fowler. Mr. Fowler was questioned at length about why Dr. Su was sent to China. Specifically, the concern that Blue Treasure had switched the organisms was put to Mr. Fowler. His response included a vague reference to the possibility of "contamination or mixing of product":

> The concern from my perspective was that there not be any mix-up or errors resulting in a contamination or mixing of product, that sort of thing. Certainly, in everybody's mind there was a possibility of some mix-up, and that's what we wanted to get to the bottom of.

This statement is certainly not sufficient for me to conclude that AFI believed that "salting" was going on at Blue Treasure.

**207**     I conclude that it is possible that Blue Treasure used some of the alleged 296.6 kg of AFI-1 lovastatin to "salt" the AFI-4 lovastatin being shipped to AFI. However, on the evidence before me, I have insufficient evidence about how that could have been done from a technical perspective. Nor do I have any evidence that AFI believed that "salting" might have been the reason for the low levels of RC-14.

**208**     In short, Merck has failed to persuade me, on a balance of probabilities, that any quantities of lovastatin were salted with infringing lovastatin.

  B.     *Infringement by Blue Treasure from March 1998*

**209**     As I understand Merck's argument on infringement after March 1998, the key reasons why I should find that the lovastatin manufactured by Blue Treasure and sold to AFI for sale in Canada, was produced using a process that infringed the '380 Patent are as follows:

> \*     The Batch Records (referred to below) produced by Blue Treasure to demonstrate the use of the non-infringing AFI-4 process for producing lovastatin are not genuine.
>
> \*     The Defendants failed to provide evidence that Blue Treasure acquired sufficient

quantities of a compound known as P2000 with which to carry out fermentations with the *Coniothyrium fuckelii* micro-organism.

\* The reduction in the duration of fermentation, beginning in March 1998, is unexplained except by the use of the infringing process.

\* The increase in the quantities of titres, beginning in March 1998, is unexplained except by the use of the infringing process.

\* Blue Treasure had the motivation, the means and the opportunity to produce lovastatin with the less expensive, more efficient AFI-1 infringing process.

\* The conduct of Blue Treasure before and during this trial is consistent with infringement.

**210**    In addition to the above - much of which consists of circumstantial evidence - Merck asserts that it has direct evidence of infringement through the DNA evidence put forward by Dr. Julian Davies.

(1)    Batch Records

**211**    Standard pharmaceutical industry practice requires that detailed and exact records be kept of all steps in the production of pharmaceutical products. In this trial, the Defendants put forward 364 documents as true photocopies of the batch records for 364 fermentation batches of lovastatin made at Blue Treasure (the Batch Records). There is no doubt that, if the Batch Records (all of which are contained in Exhibit 149) can be believed, they are direct evidence that Blue Treasure was using the non-infringing AFI-4 process and not a process using *Aspergillus terreus*. However, the issue is whether I can believe that the Batch Records are reliable, or even truthful, in some important aspects. Quite simply, I cannot.

**212**    The first problem with the Batch Records is that they are not the original working records from the batches. The original Batch Records, together with every single related document and working paper, were destroyed in 2003. All that is before this Court are photocopies of what is alleged to be the original batch records.

**213**    The Batch Records were introduced into evidence by Mrs. Quifen Hu. Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. From 1991 to 1994, she was the Manager of the Intermediates Department at New North River in China. Since 1995, Mrs. Hu's responsibilities have mainly related to maintaining the seed bank at Blue Treasure and initializing the fermentation process for the production of lovastatin.

**214**    Each of the 364 Batch Records is substantially the same in format; each appears to be a pre-printed form with data and other entries written by hand. They reflect fermentations that began on May 27, 1997, with batch no. CF-403-97001, and ran until the fermentation of batch no. CF-410-99166, which began on September 29, 1999.

**215**    Parts 1.1 and 1.2 are entitled "Production Record of Lovastatin Fermentation". The list of

ingredients of the medium is printed on the form and the quantities used are hand written in the appropriate space. Information on the pH adjustment and the steps for inoculation of the seed flasks are documented. The final step described is the culture of a second seed flask.

**216**    Parts 2 to 14 of each batch record set out the scale-up of fermentation from the final step of Part 1.2 to Part 13, which is entitled the "Production Fermenter", where the final product is fermented. Along the way, increasingly larger fermenters are prepared and then inoculated with the seed media from the previous stage.

**217**    The only place that the initiating or seed micro-organism is described is in Parts 1.1 and 1.2. The batch no. is recorded on the cover sheet of each batch record and on most pages, and always begins with the letters "CF". Presumably, this means that the particular run is being carried out with *Coniothyrium fuckelii*. In addition, each of the 364 Batch Records is pre-printed with an entry that identifies the production strain as "*Coniothyrium fuckelii* AFI-4 85-42". For Parts 2 to 14, no strain is identified.

**218**    Mrs. Hu was responsible for overseeing the process to the end of Part 1.2. After that, the production steps were within the responsibility of the Fermentation Production Department, where Mr. Dingjun Luo (whose testimony is referred to later in these Reasons) worked.

**219**    The first point to make about the Batch Records is that they do not qualify as business records that can be accepted for the truth of their contents as an exception to the hearsay rule of evidence.

**220**    Since *Ares v. Venner*, [1970] S.C.R. 608 at p. 363, 12 C.R.N.S. 349, the common law in Canada has recognized that certain records:

> ... made contemporaneously by someone having personal knowledge of the matters then being recorded and under a duty to make the entry or record should be received in evidence as *prima facie* proof of the facts stated therein.

**221**    The common law has been codified in s. 30(1) of the *Canada Evidence Act*, R.S.C. 1985, c. C-5:

> Where oral evidence in respect of a matter would be admissible in a legal proceeding, a record made in the usual and ordinary course of business that contains information in respect of that matter is admissible in evidence under this section in the legal proceeding on production of the record.

> * * *

> Lorsqu'une preuve orale concernant une chose serait admissible dans une procédure judiciaire, une pièce établie dans le cours ordinaire des affaires et qui

> contient des renseignements sur cette chose est, en vertu du présent article,
> admissible en preuve dans la procédure judiciaire sur production de la pièce

**222**    The evidentiary record on the Batch Records is, to put it bluntly, a mess. One thing that I can say with certainty is that the Batch Records reflected in Exhibit 149 were not made contemporaneously with the fermentations to which they ostensibly relate. I need only compare these Batch Records to those produced as part of the production runs at AFI. The AFI records contain numerous corrections and deletions. From the writing styles, it is clear that a number of persons completed the documents at various stages of each fermentation. In contrast, the Batch Records do not contain a single strike-out or correction; they, as described by counsel for Merck, are "pristine". This would be unheard of in any production facility.

**223**    As I understand it, AFI acknowledged, late in the trial, that the staff at Blue Treasure completed unilingual Chinese work sheets on the plant floor and that, subsequently, the data collected was transposed into bilingual batch records. Other evidence, provided through an Undertaking, is that Mr. Luo confirmed that unilingual sheets "did exist and that information from those sheets ... were transferred into the bilingual batch record".

**224**    If these are not business records, the question becomes: how much, if any, weight should be given to the Batch Records?

**225**    Three witnesses provided testimony on the Batch Records - Mr. Dingjun Luo, Mrs. Hu and Dr. Jerry Su.

**226**    The best evidence of how the Batch Records were created, and by whom, was provided by Dr. Jerry Su. As noted earlier, from September 1996 to December 1998, Dr. Su was the Group Leader of Research & Development at AFI. He has not worked for AFI since that time. Dr. Su was quite firm in his recollection, having spent long hours at the Blue Treasure plant observing and taking notes as to the daily operations. The following flows from Dr. Su's testimony:

> \*    Blue Treasure maintained two sets of batch records. There were no "unilingual worksheets" for part of the process, only the original Chinese language batch records, which Dr. Su called the "first set" of batch records. These were used on the plant floor and entries were made therein by operators.
>
> \*    The first set of batch records was collected and the data therein were copied out, by hand, into a "second set" of bilingual batch records.
>
> \*    Dr. Su sat next to, and witnessed, the person copying the batch records, but did not see whether the information was accurately being copied.
>
> \*    The person who copied the data into the second set of batch records (apparently the originals of the ones before the Court) was Mr. Luo, Manager of the Production and Technology Department.
>
> \*    Dr. Su did not recall ever seeing Mrs. Hu signing any of the Batch Records.

**227**    I have no reason to disbelieve Dr. Su and, where there is conflicting testimony from Mrs. Hu or Mr. Luo, I prefer the testimony of Dr. Su. At present, Dr. Su has no connection with AFI or Blue Treasure and no motive to fabricate his evidence. His explanation of the transfer of data from the original working documents is logical and consistent with the form of the Batch Records that make up Exhibit 149.

**228**    Mr. Luo's testimony was presented by AFI in an attempt to validate the Batch Records as reliable documents. Mr. Luo is currently Deputy General Manager with Blue Treasure. He first joined Blue Treasure, as a technician, in 1995. In 1996, he described his position at Blue Treasure as Head of Production and Technology.

**229**    Mr. Luo was a very difficult witness. AFI's counsel admitted, in oral final argument, that there were problems with Mr. Luo's testimony. As the evidentiary record with respect to the Chinese Journal Articles demonstrates (see para. 322 of these reasons), Mr. Luo was prepared to fabricate evidence when it served his purpose. His testimony was replete with poor memory of matters that ought to have been known to him. In spite of his senior position at Blue Treasure, he claimed to be unaware of any matter that did not fall directly under his supervision. His evidence on the subject of the Batch Records was particularly problematic.

**230**    When cross-examined on the question of the second set of Batch Records, Mr. Luo was unequivocal:

> Q.    Thank you, sir. Did you tell the lawyers that there was a unilingual Chinese worksheet from which data were copied into a second set of batch records?
> A.    There is no such first set and second set of records.
> Q.    Did you tell the lawyers that a unilingual worksheet, containing the parameters mentioned in a letter from February, were prepared and that those data were copied into the second set of batch records which have been produced in the litigation? Did you tell the lawyers that?
> A.    No.

**231**    The problem is that Mr. Luo provided a different and conflicting explanation about the Batch Records, recorded as a response to Undertaking # 6585:

> Mr. Luo advised that it was the operators that transferred information from the unilingual worksheets into the bilingual English/Chinese batch record. He would then check the bilingual batch record to ensure that it was accurate and that no information was missing.

**232**    As demonstrated by these examples and other portions of the record, the evidence of Mr. Luo with respect to the Batch Records lacks credibility.

**233**    Another witness who spoke about the Batch Records was Mrs. Hu. Apotex submits that I

should accept Mrs. Hu as a reliable witness. I find that difficult to do.

234    Mrs. Hu was an evasive and difficult witness. Her testimony on the Batch Records was no less confusing than that of Mr. Luo. Repeatedly, she refused to acknowledge matters that should have been within her knowledge. She was lead extensively through her direct testimony. In general, her testimony in chief was a reading of the Batch Records. Mrs. Hu's recollection of making lovastatin with *Coniothyrium fuckelii* from May 1997 to October 1999 and her testimony with respect to the Batch Records were not consistent and did not stand up on cross-examination.

235    When taken to the cover page of the batch record for the first run of AFI-4, Mrs. Hu testified that she signed the original of this batch record on May 26, 1997, the date reflected on the record. Similarly, she testified that she signed each and every one of the 364 Batch Records on the date that the various operations were performed. She vehemently and - in my view - illogically clung to her testimony that she herself signed the record on each and every day. Mrs. Hu also testified that there were no unilingual Chinese records and that she had never seen anyone writing numbers on a separate work sheet for copying into the batch records later. This, of course, is not what the Court was told by Dr. Su. Moreover, her testimony that there were no unilingual or working records is inconsistent with the "pristine" appearance of the Batch Records in Exhibit 149.

236    Mrs. Hu may well have signed at the appropriate spots in Parts 1.1 and 1.2 of the reconstructed Batch Records. She may well have believed that Parts 1.1 and 1.2 of the Batch Records accurately reflected what she had done at that stage of the fermentation runs. However, I find, as a matter of fact, that she did not do so contemporaneously with the fermentation runs. Rather, she signed the pages after Mr. Luo had completed the forms. It is difficult to say whether Mrs. Hu, whose testimony demonstrated no understanding of the English language, was even able to read what was printed and written on the forms or took the time to compare the information on the original operational records to the headings and data that appeared in Parts 1.1 and 1.2 of the Batch Records. The original records could have helped corroborate her testimony; sadly, they were destroyed. Most significantly, Mrs. Hu's testimony does not reliably establish which runs, if any, were made using AFI-4, in spite of the use of the identifier "*Coniothyrium fuckelii* AFI-4 85-42" on each of the Batch Records.

237    In sum, I am not persuaded that the Batch Records contain the original data from the 364 fermentations allegedly carried out by Blue Treasure; rather, they were transcribed from the originals, most likely by Mr. Luo.

238    Another area of concern regarding the Batch Records was the destruction of the original documents in January 2003. The fact that the original batch records were destroyed six years into this litigation by Blue Treasure, a joint venture in which the Defendants are partners, raises a serious concern. Were they destroyed, as asserted by Merck, to hide evidence of the actual production methods?

239    Mrs. Hu's testimony on why the original batch records were destroyed was inconsistent and

illogical. According to Mrs. Hu, she was the person who authorized the destruction of the originals. She testified that she did so pursuant to a Chinese GMP policy (apparently entitled "Guidance for Industry - Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients"). However, when questioned about the policy, it was clear that she did not have even the most basic understanding of the policy. Mrs. Hu was unable to recall clearly any of the details related to the destruction. She could not remember clearly the last time she signed a request for destruction. Finally, the copy of the GMP Policy presented to the Court was apparently brought into effect in April 2003 - three months <u>after</u> the alleged destruction. I am left without any reasonable explanation as to why the original records were destroyed.

**240**    I find that the original batch records were destroyed for reasons that cannot be determined, thereby leaving me unable to confirm any of the information contained in the Batch Records.

**241**    Moreover, any further confirmation of how and when the Batch Records were actually prepared is impossible. Mr. Brian Lindblom, recognized by the Court as an expert in forensic document examination, provided helpful opinions regarding this issue. Mr. Lindblom examined the Batch Records and, in his Expert Report, provided the following list of relevant tests that he would have performed on the original documents had they been available to him (Lindblom Expert Report, Exhibit 66, para. 19):

> (a)    whether the paper used in the original batch record was in fact available at the time the documents were allegedly made;
>
> (b)    whether all of the inks used in the original batch record were in fact available at the time the documents were allegedly made;
>
> (c)    whether the ink has been on the document for the amount of time indicated by the date of the batch record;
>
> (d)    whether a single ink had been used for a batch record supposedly completed by numerous people over many days (in which one would expect to find more that one ink type);
>
> (e)    whether and perhaps when alterations had been made to documents which might suggest some type of fabrication;
>
> (f)    whether the documents were in fact completed in the chronological fashion suggested by the time line set out in the batch records (this can be determined through examination of indentations); and
>
> (g)    whether more than one person completed the handwriting on the batch record (as one would expect for a process which occurred over many days).

**242**    I conclude that the Batch Records are not reliable or trustworthy evidence that the fermentation runs that took place at Blue Treasure after March1998 were using the AFI-4 process to produce lovastatin. The pre-printed forms could have easily referred to *Coniothyrium fuckelii* as the production strain, even if a strain of *Aspergillus terreus* was used. The data could readily have been changed to cover up the use of the AFI-1 infringing process. Indeed, the lack of credibility of the

two Blue Treasure witnesses leads me to conclude that it is more likely than not that the Batch Records were fabricated, at least with respect to any information that could identify the strain of micro-organism used.

**243**    The Batch Records and the testimony of Mr. Luo and Mrs. Hu are critical underpinnings of the Defendants' defence to the allegation of infringement. In my view, the Batch Records contain data about the fermentations that are not consistent with that defence.

**244**    Apotex asserts that Merck's argument that the Batch Records should not be relied on is inconsistent with Merck's use of the data to highlight the problems with the titres, the use of P2000 and the reduction in fermentation duration. I do not find the position of Merck, when explained in oral argument, to be inconsistent. I believe that what Merck is saying is that the Batch Records should be completely rejected. In the absence of reliable records on the fermentations, Merck asserts that the Defendants have no defence to the allegation of infringement. However and alternatively, Merck argues, if the Batch Records are to be believed, the data demonstrates that Blue Treasure must have been using the infringing AFI-1 process after March 1998.

**245**    On a final note, the Defendants submit that I should exercise caution in assessing the credibility of Mrs. Hu and Mr. Luo. In particular, they point to the existence of cultural differences that could account for the behaviour or demeanour of these witnesses.

**246**    This concern about applying "western" standards to an assessment of credibility was considered, in a criminal context, by the Ontario Court of Appeal in the case of *R. v. E.(T.)*, 2007 ONCA 891, [2007] O.J. No. 4952 (QL) [*R. v. E.(T.)* ]. In that case, the trial judge stated that he did not believe the accused, relying heavily on the demeanour of the accused during his testimony. The Court of Appeal at paragraph 5, in finding that the judge erred, stated as follows:

> The appellant contends that the trial judge's references to the appellant's apparent passivity and to his failure to make eye contact with the other witnesses at the trial constitute erroneous use of demeanour evidence. We agree. As the trial judge himself observed, accused persons can react differently in a stressful criminal trial. Without explaining why, and without acknowledging the effect of cultural background on demeanour (the appellant was born and raised in Sudan), the trial judge equated passivity and an absence of eye contact with witnesses with rejection of the appellant's credibility and, ultimately, his testimonial denial of committing the offence. This equation is, in our view, a misconceived and improper linkage.

**247**    In the criminal context, there is a significant difference in burden and standard of proof. The Crown, in *R. v. E.(T.)*, bore the burden of proving all of the elements of the alleged offence beyond a reasonable doubt. It was open to the Crown to put forward expert evidence on cultural background; had it done so, the outcome in the Court of Appeal's decision might have differed. Further, it appears, from reading the judgment of the Court of Appeal, that the trial judge placed

much of his reliance on the demeanour of the accused; as noted by the Court of Appeal, the trial judge "equated" demeanour with rejection of the accused's credibility.

**248**    In the case before me, Mrs. Hu and Mr. Luo are the Defendants' witnesses. They were put forward expressly to respond to the claim by Merck that Blue Treasure was, at least in part, using the infringing AFI-1 process. During their appearances, I was never alerted to the fact that any cultural background issues would alter how they presented themselves. Nor did the Defendants put forward any expert testimony on what these alleged "cultural differences" could be. In fact, beyond a general caution, the Defendants make no attempt to describe what particular attributes would affect the testimony or to describe what specific aspects of their demeanour reflect a cultural difference. In the circumstances, I can see no reason why I should not rely on demeanour (within reason and not solely) in assessing their credibility.

**249**    Having said this, however, I am aware that both Mrs. Hu and Mr. Luo testified through an interpreter. Even with competent translation (which we had in this trial), I can appreciate that there may be times where the witnesses could have become frustrated with the inability to testify directly. This frustration was readily apparent with Mrs. Hu - less so with Mr. Luo. In those situations, the answers may not have been as clear as they could have been. I have taken that into account.

(2)    P2000

**250**    The evidence before me is that the compound known as Polyglycol P2000 (P2000) was an essential ingredient in the AFI-4 process. As I understand it, foaming created by the fermentation process negatively affects the production levels. When P2000 was added to the fermenters it acted as an anti-foaming agent and increased the titres dramatically. Without P2000, it is fair to say that the production of lovastatin using *Coniothyrium fuckelii* would not be commercially viable.

**251**    Dr. Connors, an expert witness who provided the Court with his understanding of the history of the AFI-4 process at AFI, spoke in superlatives about the decision to add P2000 to the process. According to Dr. Connors, the addition of P2000 to the fermentation medium in March 1995 was a key breakthrough in the development of the AFI-4 process at AFI:

> This is March of 1995. This is really the big break in the project. I will take you to, under tab 63, AFI production 4-39, the very first one. This is when you are glad to be a scientist. This is when you are glad that you chose science. This, again, is culture 115 57, and this is the first data that suggests that adding P2000 in larger amounts than what you would normally add it gives you a dramatic increase in the production of Lovastatin with this culture.
>
> You can see through the top row of data that day six, day seven, day eight titers, 300 mgs per litre. If you increase the P2000 up to two percent or 20 mls per litre, by day eight you have almost 1.6 grams per litre. Spectacular. I mean, this is

incredible.

> You can see, also, more importantly too, or just as important, that this is a dose dependant manner. As you increase the concentration of P2000 incrementally, you see a concomitant increase in the titer of Lovastatin as well. So this was a very good result. This was something that really broke the project open for them.

[Emphasis added.]

**252**    The increased amount of P2000 needed for the AFI-4 process as compared to the AFI-1 process is dramatic - in the order of 10 to 20 times more is required for the AFI-4 process. Mr. Scott Primrose is a senior research scientist at AFI. In 1993, he was working in the microbiology laboratory of AFI, where much of his work focussed on the development of non-infringing lovastatin - that is, the AFI-4 process. He confirmed that the AFI-1 process required about 1/20th of the amount of P2000. Dr. Sailer described the amount of P2000 used for the AFI-4 process as "very unusual":

> Typically amount of anti-foam used for fermentation it's like point two percent and in this case was two percent, 10 times more. [Emphasis added.]

**253**    Merck submits that Blue Treasure did not have sufficient quantities of P2000 to complete 364 runs of the AFI-4 process. Merck calculated that Blue Treasure would have needed 73,338 kg of P2000 to run 364 fermentation batches. This calculation was not disputed by the Defendants. Blue Treasure also needed P2000 for other projects, including for the production of compactin and AFI-1 lovastatin.

**254**    How much P2000 did Blue Treasure have? According to the evidence, between May 1, 1997 and June 9, 1998, AFI made 10 shipments of P2000 to Blue Treasure for a total of 27,784.80 kg. This would have been far short of the 73,338 kg needed to run the AFI-4 process, but certainly sufficient to supply the AFI-1 process. Approximately 5 to 10% of the amount of P2000 is needed for the AFI-1 process. How did Blue Treasure obtain the remaining P2000 that it needed? There really was no answer to that question.

**255**    Dr. Connors speculated as follows:

> The balance of the P2000 could have come from someplace else. Might have been the amount they started with. Perhaps this was the amount of raw material that Winnipeg provided, and P2000 was sourced through some local vendor. P2000 is not an unusual chemical. It's a commodity, and could very well be available in China. I don't know for sure.

**256**    The Defendants assert that, after July 1998, Blue Treasure began to source its own raw materials, including P2000. Mr. Fowler, speaking to this issue during his testimony, stated that "after the fifth order [for P2000] Blue Treasure was able to purchase its own raw materials". However, Mr. Fowler provided nothing beyond speculation that Blue Treasure was accessing P2000 from other markets; he had no personal knowledge of how that might have happened or if, indeed, it did.

**257**    Beyond the speculation of Dr. Connors and Mr. Fowler, I have nothing that speaks to Blue Treasure's acquisition of the required quantities of P2000. I have seen no invoices or shipment statements to back up the Defendants' assertions in this regard.

**258**    The missing P2000 is extremely important. Without sufficient quantities of P2000, Blue Treasure could not have produced AFI-4 lovastatin throughout the entire 364 runs. There are obviously people associated with Blue Treasure who could have provided evidence of additional purchases of P2000, if such purchases had taken place. For example, Mr. Zhou was the Plant Manager at the relevant time. Of those who might have been able to assist the Court, only Mr. Luo was called as a witness and he was not asked about P2000. In the circumstances, I will presume that the evidence that could have been provided by the witnesses from Blue Treasure, who were not called to testify, would have adversely affect the Defendants' case (see *Levesque v. Comeau*, [1970] S.C.R. 1010, 16 D.L.R. (3d) 425). In other words, I will assume that Blue Treasure has no further evidence that it ever purchased enough P2000 to carry out the 364 fermentations using the AFI-4 process.

**259**    In the absence of evidence to the contrary, it is not unreasonable to believe that Blue Treasure was not using the AFI-4 process as the Defendants claim. On the other hand, I have evidence that the Blue Treasure had sufficient P2000 - 27,784.80 kg - to carry out the fermentations using the AFI-1 infringing process. I have persuasive evidence - albeit circumstantial - that supports a conclusion that Blue Treasure was using the infringing AFI-1 process to produce lovastatin.

(3)    Fermentation Duration

**260**    One of Merck's arguments focuses on the notion of "fermentation duration". As discussed in the background section of these reasons, the production of lovastatin requires fermentation over a period of time. It is self-evident to say that a manufacturer will try to produce the largest volume of final product over the least amount of time. For example, in general, producing 100 units of material over 10 days is economically more efficient than producing the same 100 units over 12 days.

**261**    Production of lovastatin is reported in "titres" (also "titers") - that is, the concentration of a solution as determined by titration, usually measured in units of mg/L or g/L.

**262**    Dr. Mila Sailer explained "fermentation duration" as the interaction of a number of factors. Dr. Sailer was a fact witness presented to the Court by AFI. Dr. Sailer worked as a natural product chemist with AFI, and was involved in the production of lovastatin in October 1996 when AFI

started its first commercial production of lovastatin from *Coniothyrium fuckelii*. Dr. Sailer explained that production of a product such as lovastatin requires consideration of a number of factors:

> There is a number of factor which is to be considered when you, when you want to optimize the production of the facility, fermentation facility. So, for instance, you have to look on the production curve doing the fermentation run, you have to look on a capacity of the seed train which is used for inoculation of production vessels. You have to look on the capacity of the downstream equipment. You have to look on, for instance, on impurity profile during the fermentation run, which can change. You have to look on cost of the media.

**263**    Under the notion of the "production curve", Dr. Sailer spoke about fermentation durations and confirmed that often there is a trade-off between titres and fermentation times. Sometimes, he said "it's not the best to ... go for maximum titres"; rather, "sometimes it's much better to shorten the time and do a higher number of fermentation[s]". While Dr. Sailer was not presented as an expert, his testimony codifies common sense when it comes to a general view of the factors affecting production.

**264**    The experience of AFI, in its Winnipeg facilities, during the period between August 1996 and August 1997, was that 76 batches of AFI-4 were run with an average fermentation duration of 11 days. In other words, the optimization spoken of by Dr. Sailer for AFI-4 was reached by an 11-day fermentation.

**265**    As we know, Blue Treasure began its runs of AFI-4 in June 1997. About 70 runs were made at Blue Treasure between June 1997 and October 1997. If the Batch Records are to be believed, although there is significant fluctuation, the average fermentation duration during that period was about 11 days. This was an expected result, given the experience of AFI with the AFI-4 process in Winnipeg.

**266**    Blue Treasure shut down its production of lovastatin from October 1997 to March 1998. Other than 17 runs that took place between December 1997 and January 1998, there was no production of lovastatin in this period. Upon resumption of production in March 1998, the fermentation duration was immediately lower and eventually stabilized at nine days.

**267**    These data were depicted by a graph, in Exhibit 83, prepared by Merck and presented to, and discussed by, a number of witnesses. What could account for the change in the fermentation duration?

**268**    Merck's explanation for the reduction in the fermentation duration after the plant shutdown is that Blue Treasure began to use the infringing AFI-1 process, instead of the AFI-4 process, to produce lovastatin.

**269**    The graph was first presented to Dr. Cox during cross-examination. Dr. Cox, whose testimony was very credible and trustworthy, agreed with counsel for Merck that Exhibit 83 showed that the AFI's 11-day fermentation duration for AFI-4 was roughly consistent with the fermentation duration experienced by Blue Treasure up until the plant shutdown. He also agreed that the graph in Exhibit 83 depicted an average nine-day fermentation duration after the resumption of production at Blue Treasure in March 1998. Finally, and most importantly, Dr. Cox confirmed that the AFI-1 process transferred to Blue Treasure could be run in nine days.

**270**    In my view, the decrease in fermentation duration after the Blue Treasure plant shutdown is more likely to have occurred with the production of AFI-1 lovastatin than with the production of AFI-4 lovastatin. Thus, even if the Batch Records are accepted as reliable evidence of the production runs, the data with respect to fermentation duration are consistent with the use of the AFI-1 process and not the non-infringing AFI-4 process.

(4)    Increased Titres

**271**    Fermentation duration is not the only variable to be considered in the economics of producing lovastatin. The amount of production or titres from each fermentation batch is of equal significance. Related to this issue is the role of Amicase in the fermentation medium. The AFI-4 process transferred to Blue Treasure required the use of a compound in the medium called Amicase. As I understand it, Amicase is an enzyme that is used as a catalyst in a chemical reaction. Dr. Connors testified that, "If you take out Amicase, then you get less lovastatin."

**272**    Amicase was an expensive ingredient and the evidence suggests that Blue Treasure was taking steps to try to avoid its use. In a memorandum dated October 23, 1997 to Dr. Xinfa Xiao and Dr. David He, both employees of AFI, Mr. Huigen Xu, of Blue Treasure, explained that, when Blue Treasure tested fermentation without Amicase, they "did not find any effect on the product quality". However, the same memorandum reports a reduction in titres of 9.75% at the 12,800 L fermentation stage. Mr. Fowler confirmed that, although a loss of productivity of 9.75% was the result of removing Amicase from the medium, Blue Treasure could achieve a cost savings of about $224.00 US per kilogram by its elimination.

**273**    From about January 1998, Blue Treasure produced lovastatin without using Amicase. One would logically expect that thereafter there would be a reduction in titres as reflected in the memorandum of October 23, 1997. That does not appear to have been the case.

**274**    In Exhibit 103, Merck's counsel attempted to pull together all of the information on titres. This exhibit was prepared from Exhibit 149 (a complete set of the Blue Treasure Batch Records), and presented in graphical format in Exhibit 83. During three periods, the average titres recorded by Blue Treasure showed the following:

Period                                                        Average titres

|  | (g/ml) |
| --- | --- |
| June 7, 1997 to October 27, 1997 | 2.3 (n = 53 runs) |
| December 8, 1997 to January 11, 1998 | 2.0 (n = 17 runs) |
| March 7, 1998 to October 7, 1999 | 2.2 (n = 292 runs) |

**275**    The chart demonstrates that there was a drop in titres of about 13% for the period December 8, 1997 to January 11, 1998. However, the titres increased, after the Blue Treasure plant shutdown, to a level approximately equal to the runs made with Amicase. The obvious question is this: in the post-March 1998 period, how could Blue Treasure have obtained production levels without Amicase consistent with those with Amicase?

**276**    Merck submits that the only reasonable explanation is that after March 7, 1998, Blue Treasure was using the AFI-1 process and not the AFI-4 process.

**277**    In final oral argument, Apotex refers to a sub-set of the Batch Records to argue that there is no evidence that the omission of Amicase resulted in a reduction in titres. For support of this statement, they refer to Table A of Exhibit 156, listing "All L4-39-581 Fermentations Pre-March 1998." Apotex points out that the average titres of the three runs with Amicase are actually lower than in the 12 runs listed in Table A that were run without Amicase:

> The point is, using the same time point from the data, when you remove Amicase at nine days, you have a significantly better titre performance. So the argument, the argument that you would expect titres to go down, because they did remove Amicase in the later runs in March and following, is not borne out by this document which my friend put forward as Exhibit 156. It shows exactly the opposite.

**278**    The problem with Apotex's submissions on this point is that the average of titres with Amicase highlighted by Apotex was based on an average of only three runs (September 24, 1997, September 26, 1997 and October 17, 1997). Apotex then compares this extremely small sample size against another small sample of 12 runs. In my view, the averages used by Apotex are based on a sub-set of the Batch Records from which relative conclusions as to titres for the entire Batch Records cannot be made.

**279**    I prefer the information set out in Exhibit 103, which demonstrates an increase in titres of 13%. I accept that this is inconsistent with the omission of Amicase.

**280**    Even discounting the effect of the omission of Amicase, there are inexplicable changes in production levels after the plant shutdown. This change in titres can be viewed in the context of L4-39-581, one particular strain of *Coniothyrium fuckelii* allegedly used both before and after the plant shutdown. From the Blue Treasure Batch Records, we can track the runs that Blue Treasure claims it used for this particular strain. Merck counsel prepared Exhibit 156 from the Batch Records. Table A of Exhibit 156 is a summary of the Batch Records for all runs using the L4-39-581 strain prior to the plant shutdown. Between September 24, 1997 and January 11, 1998, 15 fermentations were carried out. Although these batches ran for a duration of 11 days, we can calculate the hypothetical titres at nine days from the records. If these batches had been run for nine days, the average (arithmetic mean) titre would have been 1719 mg/L. Table B of Exhibit 156 consists of information from the Blue Treasure Batch Records for the alleged runs using the L4-39-581 strain after the plant shutdown. From March 7, 1998 to April 23, 1998, 19 runs were performed with an average fermentation duration of 8.3 days and an average titre of 2109 mg/L. This shows an increase of over 20% in titres.

**281**    This increase is dramatic. Allegedly using the same strain of *Coniothyrium fuckelii*, L4-39-581, Blue Treasure managed to increase the productivity of the fermentation by over 20%. What explanation is there for the increase? Merck submits that the only reasonable explanation is that, for the runs after the plant shut down, Blue Treasure was <u>not</u> using a strain of *Coniothyrium fuckelii*, but was using a strain of *Aspergillus terreus*.

**282**    In support of its belief, Merck referred to the testimony of Dr. Connors who was presented with scatter graphs representing the variations in titres among the Blue Treasure runs. Dr. Connors agreed that "one possible explanation" for a variation in titres before and after the plan shut down, could be the micro-organism or fungus used, when the medium and the process are kept constant. Dr. Connors did not specify what other explanations there could have been other than to say that something had to be different:

> What did you do in the middle that you didn't do on either side? I wouldn't necessarily say the culture has to be different, but something is different, obviously.

Dr. Connors provided no further assistance to the Court on what could explain the differences.

**283**    The data replicated in some of the exhibits produced by Merck's counsel from the Batch Records show that the variability in titres between runs diminished over time. I can accept, as a matter of common sense, the comments of Dr. Cox who explained that, "with the passage of time and the practice and the reproducibility and the adherence to the [Standard Operating Practices] and the ironing out of the problems", there would be more consistency in titres. However, this does not account for the dramatic and immediate change in titres in evidence before me.

**284**    The only witness presented by the Defendants who could speak to the dramatic change in titres was Mr. Luo. He was on the plant floor during the relevant times. According to the Defendants, Mr. Luo indicated that other changes to the fermentation conditions could result in a change of titres. Mr. Luo spoke about possible changes to aeration, pressure, the media and agitation, and about increased familiarity with the process. However, when Mr. Luo's testimony is examined, only one explanation - increased agitation - is really offered. And, I have difficulty with that explanation.

**285**    Exhibit 156 was presented to Mr. Luo during cross-examination. He was asked what could have explained the increased titres after the plant shutdown. Mr. Luo testified that a 23% jump could be justified as follows:

> A 23 percent jump, it's not necessarily like by changing the [strains]. It can also be changed by optimizing the fermentation conditions of the medium.

> ... There is lots of factors. It is not only the strain.

> As the staff, the production staff, get more familiarized with the production procedure and techniques, and then they get improvement on that, it will also change.

> So even for the same strain and the different batches, even for the same strain, the different batches may also have a different - like, a different result in titre.

**286**    When questioned, Mr. Luo suggested that a change in aeration could improve production. However, he was unable to point to any change in aeration from the pre-shutdown runs to the post-shutdown runs.

**287**    Mr. Luo explicitly agreed that there was no change in pressure.

**288**    With respect to a change in medium, Mr. Luo was questioned about the removal of Amicase. His explanation was bewildering. While he acknowledged that removing Amicase would probably reduce the titres, he stated that the removal of Amicase would not necessarily reduce titres. This runs counter to other testimony on the issue and to common sense.

**289**    At the end of the line of cross-examination on the issue of increased titres, the only possibly concrete suggestion from Mr. Luo was that increased agitation during the fermentation could account for the 23% rise in titres.

**290**    Apotex argues that a change in agitation could indeed explain the change in titres. Apotex

first refers to production parameters set out in Exhibit 49 where a cultivation condition of "agitation between 100 and 130 (depending on DO)" is set out for AFI-1. In contrast, Apotex notes that the agitation described in the Batch Records for AFI-4 is closer to 170. Moreover, Apotex points to Exhibit 94, an AFI comparative report where it is reported in section 5.5 that, "for most of fermentation time, less vigorous agitation is needed for AFI-1 compared to AFI-4."

**291**    I give no weight to the information contained in Exhibit 49 referred to by Apotex. First, the document appears to have been produced no later than spring of 1995 as part of the transfer of technology related to AFI-1 lovastatin from AFI to Blue Treasure. I have no idea of what the ultimate instructions followed were and no explanation of why an agitation of 100 to 130 should be used. I also observe that the document is made subject to the note that:

> This is a preliminary document and <u>many process parameters including agitation,</u> aeration, media volumes, cultivation durations, feeding amounts and frequencies etc. <u>are subject to additional adjustments during the validation runs.</u>

> [Emphasis added.]

Beyond the Batch Records, I have no information on what the actual agitation levels for AFI-1 in production were or should have been. This document does not assist me.

**292**    I also give no weight to the statement contained in section 5.5 of Exhibit 94. Exhibit 94 is an untitled document that was produced by AFI during the pre-trial litigation. The document appears to relate to differences between the AFI-1 and AFI-4 processes. It was referred to by counsel for Merck during cross-examination of Dr. Sailer. Dr. Sailer described the document as "some kind of R & D report possibly" and admitted that he had never seen the document. Although Dr. Sailer was questioned on some of the contents of this document, I have no idea who is the author of this document or whether section 5.5 is accurate.

**293**    That leaves Apotex's analysis of the Batch Records as the only support for the increased agitation argument. I acknowledge that there appears, in general, to be an increase in agitation after the plant shutdown. However, I have no reliable evidence that would support Mr. Luo's statement that an increase in agitation explains the dramatic increase in titres.

**294**    This leaves me with no credible explanation for the post-shutdown increase in titres other than a change in organism. Thus, even if the Batch Records are accepted as reliable evidence of the production runs, the data with respect to titres are consistent with the use of the AFI-1 process and not the non-infringing AFI-4 process. In spite of the removal of Amicase and a decrease in fermentation duration, Blue Treasure managed to obtain increased titres. The only explanation consistent with the evidence before me is that Blue Treasure was using a different micro-organism - *Aspergillus terreus*.

(5)    Motivation, Means and Opportunity

**295**    Supporting the arguments above, Merck also submits that Blue Treasure had the motive, means and opportunity to make and ship infringing lovastatin to AFI.

(a)    *Motivation*

**296**    First, Merck asserts that Blue Treasure had a significant financial motivation to make infringing lovastatin that it would then sell to AFI. A number of facts certainly appear to support this argument:

> *    the financial difficulties prior to the introduction of AFI-4;
> *    the problems with the production of lovastatin using AFI-4; and
> *    the inability of Blue Treasure to make a profit at the Blue Treasure Joint Venture contract price.

**297**    Financial problems at Blue Treasure appear to have existed even before the production of AFI-4 lovastatin. As we know, Blue Treasure was expected to sell AFI-1 lovastatin in China or other foreign markets. The Minutes of the 6th Meeting of the Board of Blue Treasure held August 26-27, 1996 described the difficult market conditions in China and indicated serious financial problems at Blue Treasure. At that time, unpaid loans and utilities bills would leave Blue Treasure with no funds to produce the planned lovastatin. Dr. Cox, during cross-examination, acknowledged that, at that time, the outlook was not "very promising".

**298**    A concern for Blue Treasure from early 1997 was the challenge of selling into the Chinese market. In a memorandum, dated March 7, 1997, Mr. Zhou referred to the "less than satisfactory" sales of lovastatin in China and commented as follows:

> In domestic market, there is a fierce rivalry market of Bulk Lovastatin course price to decline. As far as we know, ZeJing province Hai Mei Pharm. Offered the price of Bulk Lovastatin is RMB thirty-two thousand [approximately $3,900 US as confirmed by Mr. Fowler (T4565)] for one kg. If we do that, we will difficult to subsist. [Emphasis added.]

**299**    Mr. Fowler, who was responsible for financial matters at AFI during the relevant times, confirmed that RMB 32,000 would convert to approximately US $3900. In the absence of any other evidence on the pricing economics, I accept that Blue Treasure's "break even" price for the sale of lovastatin was about US $3900.

**300**    The financial difficulties of Blue Treasure apparently were worsened by the refusal of AFI to provide higher-yielding strains of *Aspergillus terreus*. In the same memorandum referred to above, Mr. Zhou "urgently" requested that AFI provide it with an improved strain or "super fungus". Since Mr. Zhou did not testify at the trial, I can only assume that he believed that a better strain of

*Aspergillus terreus* would have helped Blue Treasure's dire financial situation. AFI did not respond to this request from Blue Treasure. Dr. Cox acknowledged the refusal:

> Q.    You had a contract, after having given them that strain, which obliged you to give them all of the improvements, correct?
>
> A.    Correct.
>
> Q.    You were withholding that, despite your certain knowledge of their financial situation?
>
> A.    Yes
>
> Q.    And despite the contractual obligations?
>
> A.    If they were able to sell material with the old strain we might have considered doing that. There's no point in transferring a high performing strain when they can't sell the bulk material.

**301**    The decision to send the AFI-4 micro-organism to Blue Treasure was made, at least in part, to allow Blue Treasure to make non-infringing lovastatin that it could sell on the Canadian market. In spite of this, the evidence before me shows that Blue Treasure had some difficulties with producing lovastatin with the strain of AFI-4 sent by AFI. The result was that the financial picture for Blue Treasure did not improve.

**302**    Blue Treasure's experience with AFI-4 was troubled. Wide fluctuations in batch-to-batch titres were observed at Blue Treasure prior to March 1998. As acknowledged by Dr. Cox, running a plant economically and efficiently requires a range of variability within acceptable limits; variability outside the acceptable range would make it harder to earn a profit. A memorandum, dated August-13, 1997, from Mr. Zhou to Dr. Cox highlighted the difficulty:

> Because the fermentation viscosity of new AFI process have a <u>great fluctuation</u>, some equipment in downstream didn't suit for the new technology and brought <u>many difficult for downstream</u>.

> [Emphasis added.]

**303**    Blue Treasure also experienced difficulties with some of the AFI-4 strains provided by AFI. In a memorandum dated October 20, 1997, Mr. Zhou noted that a replacement strain for L4-42-581 showed only 50% of the productivity and:

> Therefore, it can't be used for production. Also the strain L4-39-581 was not satisfactory for production: titers of shake flask test and fermentation showed more than 20% productivity reduction will occur if Strain L4-39-581 is used compared to that of Strain L4-42-581. This will certainly affect margin of cost and price.

**304**    Mr. Zhou requested that AFI send "100 frozen vials of L4-42-581 or vials with similar productivity or higher". The request for more vials of L4-42-581 was repeated by Dr. Su in an e-mail dated October 19, 1997. As confirmed by Mr. Primrose, a shipment of seed vials that included 10 vials of L4-42-581 was sent by AFI to Blue Treasure on August 4, 1998. I have no other evidence of any response to the request of Blue Treasure for a better AFI-4 strain.

**305**    Apotex asserts that the fact that Blue Treasure was requesting additional information and a better AFI-4 strain is inconsistent with Merck's hypothesis that Blue Treasure was, in fact, using the infringing process after March 1998. Given that Mr. Zhou, the author of most of the memoranda relied on by Apotex, did not testify in this trial, I have no way of determining whether Apotex's theory is believable.

**306**    As noted above, Blue Treasure was concerned about being able to subsist with pricing of about US $3900 per kg for *Aspergillus terreus* lovastatin. Considerable evidence was produced at trial to demonstrate that the costs of producing AFI-4 would be higher and that the profit margins even smaller.

**307**    As stated in a lengthy AFI Monthly Scientific Report, dated July 3, 1997, in which the AFI-1 and AFI-4 processes were compared, "The calculated cost of production of AFI-1 was significantly less than the production costs for AFI-4." The same document stated that the media ingredients were the single most significant cost factor.

**308**    The offer to transfer the AFI-4 process to Blue Treasure and to purchase AFI-4 lovastatin was outlined in a letter dated April 10, 1997 from Dr. Cox to Mr. Zhou. As confirmed by Dr. Cox, Blue Treasure initially asked for US $6000 per kg. AFI agreed to pay only US $4500 to US $5000, depending on the average titres. A price of US $4500 would be about $600 to $700 over Blue Treasure's "break even" price of US $3900 per kg. However, the margin would have been significantly eroded by the added costs of the AFI-4 media ingredients and by having to meet AFI's 0.2% RC-14 specification. Moreover, over the course of the batches sold to AFI, the purchase price dropped to US $3300 per kg.

**309**    The result is that, if Blue Treasure had been using the AFI-4 process, it would have been losing significant amounts of money for each kilogram of product shipped to AFI. Blue Treasure could not have made a profit by selling AFI-4 lovastatin to AFI at the price AFI paid. However, the evidence of Mr. Fowler was that, once Blue Treasure began to use the AFI-4 process, they "worked their way out of the financial difficulties and became profitable". Quite simply, there is no evidence on the record that explains how Blue Treasure could have turned a profit using the AFI-4 process.

**310**    I conclude that Blue Treasure had financial motivation to use the AFI-1 process instead of the non-infringing - but more costly - AFI-4 process.

(b)    *Means*

**311**    The ability or means of Blue Treasure to produce the quantities of AFI-1 lovastatin depends, at least to some extent, on the availability of the appropriate strains of AFI-1.

**312**    Apotex argues that it was not shown that Blue Treasure had such a strain. Apotex refers to the production master batch records provided to Blue Treasure as part of the *Aspergillus terreus* technology transfer. In production, the strain showed titres generally below the 1.5 g/L level. Not only was the titre level well below 2.0 g/L reflected in the Batch Records, but the stated fermentation time was 12 to 15 days - a longer period than reported in any of the post-March 1998 runs. Merck does not agree.

**313**    Merck submits that Blue Treasure was in possession of a high-producing strain of AFI-1 giving it the means to make additional AFI-1 lovastatin with the very titres reflected in the Batch Records after March 1998 when the average titres were about 2.2 g/L. The reference to this strain is contained in the Management Report for the 6th Meeting of the Board of Directors of the Blue Treasure Joint Venture held on August 26-28, 1996. In that document, at paragraph 1.3, the titres are stated to be 2300 to 2500 mg/L. Moreover, a document entitled "Historical review of Lovastatin production improvement *Aspergillus* sp. and *Conioth[y]rium fuckelii* strains in R&D Biology" states that AFI achieved up to 5100 mg/L. When Mrs. Hu was asked whether Blue Treasure had an AFI-1 strain that produced titres in the range of 2300 to 2500 mg/L, she claimed to be unable to know what the question was about. This response is surprising given Mrs. Hu's responsibilities for the security of various strains of both AFI-1 and AFI-4 and for inoculating the initial fermentations for each batch.

**314**    With respect to fermentation duration, the evidence of Dr. Cox was that the AFI-1 strain transferred could be run in nine days.

**315**    Although there appears to be some contradictory evidence, I conclude that it is more likely than not that Blue Treasure had a strain of AFI-1 that could have met the titres and fermentation durations reflected in the Batch Records after March 1998.

**316**    I am persuaded that Blue Treasure had the means to produce lovastatin with the infringing AFI-1 process.

(c)    *Opportunity*

**317**    The final element examined by Merck is opportunity.

**318**    As described earlier in these reasons, Dr. Jerry Su was sent to Blue Treasure to investigate certain problems with the initial AFI-4 runs. Dr. Su arrived in China on August 25, 1997 and returned to Winnipeg on October 31, 1997. Dr. Su expressed his opinion that the runs he observed were carried out in accordance with the Standard Operating Procedure for AFI-4. However, as confirmed by Mr. Fowler, after Dr. Su's departure in October 1997, no one was ever sent from AFI to assess the production. AFI apparently assumed that Blue Treasure would follow the instructions

that had been provided in spite of earlier problems.

**319**    AFI also missed another chance to identify the micro-organism used by Blue Treasure. As confirmed by Ms. Christofalos, with each shipment of product to AFI, Blue Treasure sent a sample consisting of a mycelial or fungal cake. Dr. Connors opined that such product could have been subjected to DNA testing for the presence of the non-infringing *Coniothyrium fuckelii*. However, the fungal cake was never tested and was, unfortunately, destroyed during the course of this litigation.

**320**    Blue Treasure had the opportunity to revert to manufacturing AFI-1 as soon as Dr. Su left at the end of October 1997.

(6)    <u>Blue Treasure Conduct</u>

**321**    Merck submits that the behaviour of Blue Treasure raises serious doubts about the Defendants' allegations that there has been no infringement. One of the most serious and disturbing stories involves two articles published in the Chinese Journal of Antibiotics. Merck argues that these two articles are direct evidence that Blue Treasure used *Aspergillus terreus* to manufacture lovastatin, most likely in late 1997. Furthermore, the behaviour of Blue Treasure's employee, Mr. Luo, in association with the articles, provides evidence that Blue Treasure is prepared to go to great lengths to cover up its infringing activities.

**322**    In early 1999, an article entitled "Optimization of Formula for Lovastatin Fermentation Medium through Uniform Design" was published in the Chinese Journal of Antibiotics, February 1999, Vol. 24, No. 1 (referred to as Article #1). One of the authors of this article was listed as "LUO Dingjun". Mr. Luo who appeared as a witness in this trial is the same Mr. Luo who wrote this article. As set out in the abstract of Article #1, the authors were presenting a method of optimizing a fermentation medium for producing lovastatin. In summary terms, the authors conducted experiments to ascertain the effectiveness of replacing two "extremely expensive" raw materials - Peptone and Amicase - in the fermentation medium with domestically produced raw materials. One of the replacement products was a fish powder, giving rise to a reference, during this trial, to the experiments as the "fish powder experiments".

**323**    Article #1, in its abstract, contains the following sentence:

> The company [Blue Treasure] has imported patented lovastatin production technology from Canada, with the fermentation medium formula being a United States patented (patent number 5409820) formula.

**324**    The reference to "patent number 5409820" is most likely a reference to United States Patent No. 5, 409, 820 issued to Apotex Inc. on April 25, 1995. This patent claims a process for making lovastatin using *Coniothyrium fuckelii*. In spite of this reference at the beginning of Article #1, there is no further reference to *Coniothyrium fuckelii*. Indeed, the article explicitly states that the fish

powder experiments were conducted on the "Lovastatin-producing strain *Aspergillus terreus* BN 270-001." There is no reference in Article #1 to the use of a *Coniothyrium fuckelii* strain of lovastatin. The article also describes Guangdong Blue Treasure Pharmaceutical Co. Ltd. as the company who was producing lovastatin in China and the company that was interested in the lowering of the costs of the fermentation medium for lovastatin.

**325**    A second article, entitled "A Study Regarding Lovastatin-Producing Strain Protoplast Mutation and Fermentation Formula Optimization," was published in the Chinese Journal of Antibiotics, October 2000, Vol. 25, No. 5 (referred to as Article #2). Mr. Luo was also one of the authors of this article. The purpose of Article #2, as reflected in the abstract, was to produce a high-yield strain of lovastatin "by mutating lovastatin-producing strain protoplasts" and optimizing the fermentation culture medium formula. Once again, the authors listed, as the strain used for their experiments, "lovastatin-producing strain *Aspergillus terreus* (BN 270-053)". In Article #2, there is no mention of the US Patent.

**326**    Dr. Luo testified that the shake flask experiments (referred to in Article #1 and #2) were performed at Blue Treasure's microbiology lab.

**327**    These articles raise a strong inference that, at the time of the experiments, Blue Treasure was producing lovastatin from *Aspergillus terreus* at its facility.

**328**    Mr. Luo was asked about the two journal articles during his examination-in-chief. In response to a question on the purpose of publication, Mr. Luo responded that:

> Getting this paper published is mainly for the technicians being able to get certified. Basically it's a kind of when you come to a profession new to get certified, certification.

**329**    Mr. Luo was unable to remember clearly when the experiments were run, but he thought that they were carried out in 1997 "between summer and fall of that year". Mr Luo further testified as follows:

> Q.    Where was these experiments conducted?
> A.    These experiments are done at Blue Treasure's micro-biology laboratory.
> A.    Specifically what strain was used I can't remember so clearly, but looking through this article probably I used number 4 strain.
> Q.    Why does it say Aspergillus terreus was used?
> A.    Because at that time due to the confidentiality reasons I don't want to leak the secrets about AFI-4 strain.

**330**    I find Mr. Luo's testimony related to these two articles to be astounding. First, it is simply incomprehensible that a group of scientists would fabricate a journal article to hide the identity of the *Coniothyrium fuckelii* fungus. Beyond a bald assertion, Mr. Luo presented no cogent reasons as

to why the use of *Coniothyrium fuckelii* would have been confidential.

**331**    I also question Mr. Luo's testimony with respect to when the experiments were conducted. His lack of memory is surprising. Mr. Luo has known about the significance of these articles for some time and yet was unable to recall the dates of the experiments. He could have refreshed his memory in a number of ways before testifying. Instead, he expressed the view that the experiments were done in the period of time before the use of the AFI-4 process. His faulty memory, in my view, is consistent with fabrication, by Mr. Luo, of what organism was being used at Blue Treasure in the time leading up to the publication of the articles.

**332**    The two articles contain other references that discredit Mr. Luo's claims. First, the strain used for the articles was described as BN 270-053. In the opinion of Dr. Lasure, this was a reference to the 53rd isolate of *Aspergillus terreus* BN-2-70. This is the same strain obtained from AFI as AFI-1 (Lasure Expert Report, Exhibit 48, para. 242).

**333**    The second area of disconnection relates to the ability of the strains of *Coniothyrium fuckelii* used in AFI-4 to sporulate. The evidence of Dr. Cox was to the effect that, in his experience working at AFI, the strain of *Coniothyrium fuckelii* transferred to Blue Treasure had lost the ability to produce spores during fermentation:

> Q.    All right. You know that at some point Coniothyrium fuckelii ceased sporulating at AFI?
> A.    Yes, I believe so.
> Q.    That makes it harder to prepare and maintain consistent seed banks from generation to generation?
> A.    A little bit, yeah.
> Q.    That cessation of sporulation is a property of the organism?
> A.    Not of the organism, no, it was an effect of the mutagenic strain improvement program that AFI performed.
> Q.    The non sporulating character became intrinsic to Coniothyrium fuckelii as a result of that program, is that fair?
> A.    That strain of Coniothyrium fuckelii, yes.
> Q.    Right.
> A.    It's not an inherent characteristic of the species.
> Q.    Got it. Never a problem that was encountered with Aspergillus terreus?
> A.    No.

[Emphasis added.]

**334**    In spite of the information that the AFI-4 strain sent to Blue Treasure could not sporulate, in Article #2, at section 1.2.3, the authors explicitly report as follows:

> Investigation of strain-producing capacity: The spores on the mature PDA slants

are washed, inoculated onto a rice culture medium, and cultured for 7 days, yielding mature rice spores.

**335**    In sum, Mr. Luo's explanation about why he lied in the two articles is not believable. Mr. Luo fabricated his testimony before this Court to cover up the use of *Aspergillus terreus* at a time when Blue Treasure was supposed to have been exclusively using the AFI-4 process. The better explanation for these two articles and Mr. Luo's testimony is that the fish powder experiments were carried out on lovastatin using AFI-1. I find that, on a balance of probabilities, the experiments were carried out with the AFI-1 process (that is, with *Aspergillus terreus*). It follows that the two articles support Merck's claims that Blue Treasure was using *Aspergillus terreus* to make lovastatin and thus infringing the '380 Patent.

 C. *Conclusion on Blue Treasure Circumstantial Evidence*

**336**    Most of the foregoing evidence could be characterized as circumstantial evidence and requires that I draw inferences to reach the conclusion that, on a balance of probabilities, there was infringement.

**337**    With respect to the drawing of inferences, Apotex argues that I must avoid relying on alleged inferences that are no more than speculation. I agree.

**338**    Obviously, there is a difference between reasonable inference and pure conjecture. The Federal Court of Appeal provided the following comments in an appeal of an immigration judicial review, in *Minister of Employment and Immigration v. Satiacum* (1989), 99 N.R. 171 at p. 179, [1989] F.C.J. No. 505 (QL)(F.C.A.):

> The common law has long recognized the difference between reasonable inference and pure conjecture. Lord Macmillan put the distinction this way in **Jones v. Great Western Railway Co.** (1930), 47 T.L.R. 39 at 45, 144 L.T. 194 at 202 (H.L.):
>
> > The dividing line between conjecture and inference is often a very difficult one to draw. A conjecture may be plausible but it is of no legal value, for its essence is that it is a mere guess. An inference in the legal sense, on the other hand, is a deduction from the evidence, and if it is a reasonable deduction it may have the validity of legal proof. The attribution of an occurrence to a cause is, I take it, always a matter of inference.
>
> In **R. v. Fuller** (1971), 1 N.R. 112 at 114, Hall J.A. held for the Manitoba Court of Appeal that "[t]he tribunal of fact cannot resort to speculative and conjectural conclusions." Subsequently a unanimous Supreme Court of Canada expressed

itself as in complete agreement with his reasons: [1975] 2 S.C.R. 121 at 123, 1 N.R. 110 at 112.

**339**     In the case before me, I am satisfied that I am not relying on conjecture or mere guess; rather, the deduction from the totality of the evidence that Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process is reasonable and logical.

**340**     Given the extent of the evidence before me and the lack of alternative, reasonable explanations for much of that evidence, I find that Merck has satisfied its burden to show that it is more likely than not that, from March 1998, Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process. The lovastatin was then delivered to AFI for ultimate sale into the Canadian market. This constituted infringement of the '380 Patent.

**341**     This conclusion stands without any reference to the DNA evidence. That is, regardless of whether the DNA evidence presented by Merck constitutes reliable evidence of direct infringement, I find that any amount of lovastatin manufactured and sold in Canada that used lovastatin produced by Blue Treasure after March 1998 infringed the '380 Patent.

**342**     The DNA evidence is dealt with in section VIII of the Reasons.

   D.     *AFI Batch CR0157*

**343**     Merck no longer claims that all of the lovastatin produced in Winnipeg by AFI infringed the '380 Patent. However, Merck continues to assert that one batch of lovastatin - referred to as CR0157 - contained lovastatin that was made using the process protected by the '380 Patent.

**344**     Batch CR0157 consisted of 12.57 kg of USP-grade lovastatin. It was manufactured at AFI in Winnipeg and sent directly to the attention of Dr. Barry Sherman at Apotex Inc. on December 2, 1996. It was the first batch of AFI-4 lovastatin shipped to Apotex Inc.

**345**     The batch history reflects that CR0157 was the final crystallization of CR0151 which, in turn, was a recrystallization of CR0149. CR0149 was the crystallization of three extraction batches: CR0117, CR0145 and CR0144. The "genealogy" of batch CR0157 was confirmed by Dr. Sailer, during his examination-in-chief, and is depicted in Figure 1 below.

**Figure 1**



**346**    The essence of Merck's argument is that CR0157 was a combined batch of non-infringing and infringing lovastatin. The key evidence relied on by Merck is:

(1)    AQA 94 Batch Records (referred to as AQA 94) show that CR0157 was "AFI#1,4 FLAGGED contains top secret material" which would indicate it was a mixture of *Aspergillus terreus* and *Coniothyrium fuckelii* lovastatin;

(2)    Some of the batches that ultimately resulted in batch CR0157 (specifically CR0151, CR0117, CR0144 and CR0149) show significant alterations that

increased the weights of lovastatin from those initially recorded.

(3)     The DNA testing carried out by Dr. Davies demonstrated that tablets of Apo-lovastatin tested positive for *Aspergillus terreus* and negative for *Coniothyrium fuckelii*.

**347**    In my view, for the reasons that follow, neither of the first two arguments is persuasive on its own. However, the direct evidence of *Aspergillus terreus* in tablets made from the CR0157 batch was uncontradicted and provides direct evidence of infringement.

**348**    As part of the trial record, the Defendants produced AFI's batch records. These records were obviously produced contemporaneously with the fermentations to which they refer and were kept in AFI's normal course of business. In contrast to the Batch Records for Blue Treasure, the AFI batch records are acceptable as business records. In other words, the AFI batch records are *prima facie* proof of the facts stated therein.

**349**    However, it does not follow that every document, produced by AFI, that looks like a business record meets the strict criteria to be admitted into evidence as a business records. This is particularly true with the document referred to as AQA 94 and relied on by Merck.

**350**    AQA 94 is a one-page document consisting of a list of 56 batch numbers with brief notations. The entry of interest is at line 11:

CR0157 AFI#1,4 FLAGGED contains top secret material.

**351**    The document was introduced to Dr. Cox who was unable to identify it or to provide any testimony that could have assisted the Court. Ms. Christofalos was asked about the document during her examination-in-chief.

Q.    Are you able to identify this document?
A.    This looks like one of our internal, well, it is one of our internal record-keeping documents where we just have made an index of a bunch of documents that is going into a box.
Q.    Do you know what purpose was made for it?
A.    Just for filing purposes.
Q.    Do you know when it was made?
A.    We started this exercise late 99. I would, that's my recollection, late 99.
Q.    Can you tell the Court who made it?
A.    Could have been any number of people, most likely our records clerks.

**352**    Although Ms. Christofalos admitted that she did not prepare the document, she expressed her view that the list was merely an identification of boxes of documents. Further, Ms Christofalos provided what, in my view, was a reasonable explanation of why there was the reference to "AFI#1,4" in the document:

    \*    The person making this list would have looked at the first page of the actual Interim Production Batch Record and would only have seen "Product Name: lovastatin USP" and "Product Part Number: 6000".

    \*    Part number 6000 applied to lovastatin made with either AFI-1 (*At*) or AFI-4 (*Cf*), thus leading to the entry listing both.

    \*    The reason why the error was never corrected was because these lists were not control documents.

**353**    With all respect to Merck, I fail to see how this document of dubious origin can be strong circumstantial evidence of an infringing product in a batch of lovastatin. Dr. Cox was clearly unaware of AQA 94. Ms. Christofalos's explanation was simply that this was an index of documents. She did not prepare the list and was unsure of who could have prepared it. The list of documents was only made in 1999 - more than two years after batch CR0157 was manufactured. Unlike the AFI batch records, AQA 94 does not qualify as a business record. I do not accept it for the truth of its contents - in particular, that CR0157 was a mixture of infringing and non-infringing lovastatin. In light of the lack of connection between AQA 94 and the "genealogy" of CR0157, I give no weight to this document.

**354**    The only remaining argument of Merck (other than the DNA evidence) relates to some apparent anomalies surrounding the weight of the three preliminary batches that ultimately became part of CR0157. In making this argument, Merck refers to the batch records for three antecedent downstream batches: CR0151, CR0117 and CR0144. In each case, a document that forms part of the batch records shows a manual change to the originally-recorded weight of the material obtained. In each case the weight was increased. In Merck's submission, the augmentation is consistent with the addition of infringing lovastatin to the batch.

**355**    In response, the Defendants attempted to provide an explanation for these discrepancies through the evidence of Dr. Sailer and Ms. Christofalos.

**356**    Dr. Sailer clarified that the antecedent weights going into CR0157 cannot simply be added up, as it is a weight loss process.

    Q.    Right. Well again, I don't have any errors to complain about there either. The only point I guess I'm conceding, and I want to make sure I understand that I have it right, is that we can't simply add together these three numbers?

    A.    We can because the batch 151 was generated from batch CR0149 and those two errors which we see in the material coming to batch CR0149, which you said it's plus 11.2 plus 1.2 kilograms, generated certain quantity.

    Q.    Right.

    A.    As a starting material for the next batch 151. During the next batch when they tried to discharge it they have to correct it because they discharge extra 3.8 kilograms, which actually doesn't matter at all because if they didn't discharge it,

we will dissolve it anyway and mix it with the 11.11 kilograms to generate 14.8 kilograms of product, which was starting material for the batch 157 of the final product.

Q.   All right.

**357**   Further, at a later date, extra lovastatin was found that had been captured in the filter, which was not initially observed by the operators. It was subsequently recorded. Dr. Sailer points out that the crossed out weights were the result of mistakes by inexperienced technicians.

Q.   All right. So let's go to tab three, page 82. Have you got that page?

A.   Yes.

Q.   And I'm seeing a table one crude Lovastatin obtained, do you see that?

A.   Yes, I do.

Q.   And I see the first listing is CR0117?

A.   I can see it.

Q.   But I see the net weight is 3.8 kilograms.

A.   Yes.

Q.   What explanation, if any, do you have for the Court for that?

A.   I have similar explanation. This is first batch which was filtered on this equipment, NF 1, and this is what they found when actually they dismantled the screen, they dropped the bottom and they found there was still product there. I know it should be recorded here but as I said it was first batch. And yeah, we didn't have really experience. We were quite new crew there, so yeah, it's missing, missing note that additional 1.2 kilogram was found on the screen.

**358**   Finally, I observe that the corrections to the records were made some eight days after the original entry. When asked about the delay, Dr. Sailer was unable to provide a response.

**359**   While the explanations given by Dr. Sailer and Ms. Christofalos <u>could</u> provide a sufficient answer for the discrepancy, they are only that - an explanation or hypothesis. Their answers do not explain why there was an eight-day delay in changing the document or provide a fulsome explanation of how the process of making lovastatin would "lose weight".

**360**   In sum, I am left with unanswered questions on the make-up of batch CR0157. Since the batch was never tested by Apotex, I have no direct evidence that the batch was not *Aspergillus terreus* lovastatin. However, in the submission of Merck, I do have direct evidence that tablets from the CR0157 batch were made from infringing lovastatin. Merck makes this argument based on the DNA testing results of Dr. Davies. That evidence is considered in section VIII of these Reasons.

## VIII. <u>Infringement - the DNA Evidence</u>

A.   *Introduction*

**361**    Merck's case on the direct evidence of infringement rests on the DNA testing carried out on behalf of Dr. Julian Davies in his laboratory at the University of British Columbia (referred to as the Davies Lab). Merck relies on the Expert Report and testimony of Dr. Davies to assert that there is direct evidence that lovastatin manufactured by Blue Treasure and lovastatin contained in AFI batch CR0157 contained *Aspergillus terreus*, thereby infringing the '380 Patent.

**362**    Dr. Davies received and tested three samples of lovastatin, consisting of: (a) three vials of white powder and one vial of brown powder, purporting to be samples from Blue Treasure provided through the services of Mr. Ted Kavowras; and (b) Apo-lovastatin tablets made from AFI batch CR0157.

**363**    Two sets of experiments were carried out at the Davies Lab on the same samples - the first in 2003 and another in 2007. In 2003, the experiments were performed by Karen Lu, a senior technician for the Davies Lab. In 2007, Grace Yim, a Ph.D candidate in the Davies Lab, assisted Karen Lu in performing the experiments.

**364**    In 2003, the experimental procedure involved a number of steps: DNA was extracted from the samples; specific primers diagnostic of the fungi region in DNA were chosen from the published literature; the primers were used to amplify the DNA in a nested polymerase chain reaction (nested PCR); the amplified DNA was subjected to gel electrophoresis; and then the gel was stained and analyzed under ultra-violet (UV) light for the presence of DNA. The UV light analysis highlighted the presence of bands which correlated to 130 base pairs (bp). These bands were determined to be a positive "hit" for *Aspergillus terreus* DNA. The bands were extracted from the gel and sent to a lab which specializes in DNA sequencing. The Davies Lab compared the results of the DNA sequencing to the sequence for *Aspergillus terreus* DNA that is located in the database at the National Institute for Biotechnology Information. This comparison confirmed that the DNA "hit" in the lovastatin samples was, in fact, *Aspergillus terreus* DNA.

**365**    In 2007, the Davies Lab repeated the experiments with a modified procedure and tested for the presence of both *Aspergillus terreus* and *Coniothyrium fuckelii* DNA. Again, a positive result was only found for *Aspergillus terreus*.

**366**    The combination of the experiments performed in 2003 and 2007 resulted in 13 positive findings of *Aspergillus terreus* DNA, and no positive findings of *Coniothyrium fuckelii* DNA. Based on these results, Dr. Davies opined that the fungus responsible for producing the lovastatin in the samples tested by the Davies Lab was *Aspergillus terreus*.

**367**    The first general and critical consideration is that the burden that falls on Merck is one of a balance of probabilities. That is, Merck succeeds if I am satisfied that it is more likely than not that the samples tested contained *Aspergillus terreus* DNA.

**368**    A number of issues arise with respect to the DNA evidence presented through Dr. Davies:

1.   Is there a nexus between the Blue Treasure samples tested and the Blue Treasure lovastatin that is alleged to infringe the '380 Patent?

2.   Should the results of the testing in the Davies Lab be rejected because they were not reproducible by Dr. Poinar?

3.   Does the failure of Dr. Davies to find *C. fuckelii* DNA in the tablets from batch CR0157 support Apotex's position that his DNA evidence is unreliable?

4.   Is "ancient DNA" the same as, or analogous to, the DNA that would be found in the samples tested by Dr. Davies?

5.   Should the results of the testing in the Davies Lab be rejected because the *Aspergillus terreus* DNA found in the Davies Lab was the result of contamination by exogenous DNA?

6.   Should the weight to be given to Dr. Davies's Expert Report and his opinions be reduced due to:

   a)   the inability to describe elements of the experiments reported in his Expert Report;

   b)   the incomplete reporting of the experiments conducted in the Davies Lab;

   c)   the failure to disclose the majority of tests relied on; or

   d)   the failure to use negative extraction controls?

**369**   To this list, I would add the issue of the weight to be given to the opinions of the experts put forward by Apotex - Drs. Gilbert, Poinar and Taylor. Should the narrow expertise of these witnesses reflect on the weight to be given to, or the relevance of, their opinions?

   B.   *Nexus between the samples tested and the allegedly infringing lovastatin*

**370**   An assessment of the DNA evidence in this case necessarily begins with the source of the samples that were tested in the Davies Lab. The presence of *Aspergillus terreus* in the samples only establishes infringement if the samples were obtained: (a) from lovastatin that was manufactured by Blue Treasure during the relevant time period; or, (b) from Apo-lovastatin tablets whose source was AFI batch CR0157.

**371**   I begin with the three vials of white powder and one vial of brown powder allegedly obtained from Blue Treasure. In 2000, a law firm representing Merck hired Mr. Ted Kavowras to obtain samples of Blue Treasure lovastatin. Mr. Kavowras has an investigative consulting firm based in China called Panoramic Consulting. Most of his investigations are done undercover. Mr. Kavowras has considerable experience obtaining evidence used in civil litigation.

**372**   Mr. Kavowras testified that, using the alias of "Mr. Garcia", he approached Blue Treasure to obtain lovastatin samples. In October 2000 and January 2001, he obtained samples from an employee of Blue Treasure. Samples, from two batches, were delivered in a sealed package with a

corresponding certificate of analysis for each of the two samples - recorded as batch numbers 200012016 and 200012015. During his testimony at trial, Mr. Kavowras confidently identified the exhibits produced as the samples that he obtained from Blue Treasure. The samples were transported in carry-on luggage that accompanied Mr. Kavowras and were stored in his office in a secure location.

**373**   Merck presented Ms. Giuliani to speak to the delivery chain from the hands of Mr. Kavowras to Dr. Davies. The samples were delivered to Ms. Giuliani who stored them in the company vault, and arranged for their delivery to Dr. Davies. Dr. Davies testified that the samples he received were in "perfect" condition.

**374**   The evidence presented by Merck shows that the chain of evidence was intact and that the samples delivered to Dr. Davies were in an unaltered form.

**375**   Apotex does not take issue with the transmittal of the samples to Dr. Davies. However, the problem is that these samples were taken from Blue Treasure between 2000 and 2001. There is no clear evidence that these samples were samples of the Blue Treasure lovastatin manufactured during the relevant time period from 1997 to 1999. Merck has failed to persuade me that the samples are representative of the lovastatin made, sold and distributed by Apotex Inc. Without the link of the samples taken by Mr. Kavowras to the lovastatin produced by Blue Treasure during the 1997 to 1999 period, I am unable to conclude that any DNA evidence from Dr. Davies can establish infringement.

**376**   The situation with respect to the Apo-lovastatin tablets is different. There is no dispute that the source of the tablets tested was AFI batch CR0157. Thus, if I conclude, on a balance of probabilities, that the CR0157 tablets tested in the Davies Lab contained the DNA of *Aspergillus terreus* that was not the result of contamination of the samples, infringement has been demonstrated.

**377**   Moreover, if I am wrong in my conclusion with respect to the lack of nexus in the Blue Treasure samples, the question before me would be whether the evidence establishes that those Blue Treasure samples contained the DNA of *Aspergillus terreus* that was not, on a balance of probabilities, the result of contamination. If it does, infringement has been demonstrated.

C.   *Reproducibility of the testing in the Davies Lab*

**378**   Apotex argues that I should reject the testing done in the Davies Lab because Dr. Poinar was unable to reproduce his results.

**379**   In addition to being asked to provide his opinion on Dr. Davies's work, Dr. Poinar was retained by counsel for Apotex to design and carry out experiments with the same materials that were tested in the Davies Lab. Dr. Poinar tested 12 lovastatin samples made by AFI or Blue Treasure. For control purposes, Dr. Poinar's experiments included lovastatin samples that were

known to have been produced with *Aspergillus terreus.* According to Apotex, Dr. Poinar used an extraction method that was essentially the same as Dr. Davies's protocol. Dr. Poinar concluded that: "both *A. terreus* and *C. fuckelii* DNA were absent in all samples tested". By way of apparent explanation, Dr. Poinar observed that (Poinar Expert Report, Exhibit 135, p.15 "conclusion"):

> The sample processing and/or extraction steps are too lossful to permit detection of trace amounts of DNA from the source fungus (neither *A. terreus* or *C.fuckelii* was detected in samples of known origin).

**380**    In other words, Dr. Poinar concluded that it is impossible to obtain detectable amounts of DNA from pharmaceutical fungal products using the experimental methods employed by Dr. Davies.

**381**    Apotex relies on the evidence of Dr. Poinar to draw the conclusion that any positive results observed by Dr. Davies were as a result of contamination, not endogenous DNA.

**382**    It appears that Dr. Poinar approached his experiments with the opinion that it is unlikely that DNA would survive (Poinar Expert Report, Exhibit 135, para. 62):

> ... a careful examination of the entire procedure for the fermentation, extraction, recrystalization and purification of lovastatin makes it unlikely that DNA would survive this procedure.

During his oral testimony, he restated this view:

> So it is surprising, although certainly not impossible, that DNA would actually then survive that.

**383**    Given Dr. Poinar's initial starting bias, is there any doubt that his experiments would fail to find DNA? It appears to me that there is a real risk that Dr. Poinar brought a confirmational bias to his laboratory work. In other words, I question whether Dr. Poinar carried out the experiments to confirm his thesis that DNA would not be present, rather than with an open, independent mind.

**384**    Even putting aside my concern about Dr. Poinar's approach to the experiments, I have serious problems with his experimental methods and results.

**385**    The first concern relates to Dr. Poinar's experiences with the *Aspergillus terreus* assay. On this issue, Dr. Gilbert, accepted as an expert in the area of microbial genetics and microbiology, was of great assistance to the Court. During cross-examination, Dr. Gilbert was shown certain of the data from Dr. Poinar's experiments. In particular, he was shown two sets of qPCR data. Without knowing (as we do now) whether the information came from the *Coniothyrium fuckelii* assay or the *Aspergillus terreus* assay, he was asked to comment on various aspects of those data. The first series of slides consisted of data from the *Coniothyrium fuckelii* assay. Dr. Gilbert described the

various melting curves as "very good-looking" and "pretty nice". With respect to the *Coniothyrium fuckelii* series of slides, he agreed that the data reflected an "experiment in which the PCR reactions [are] well behaved and as expected" and that the reaction was "running well". Dr. Gilbert acknowledged that the standard curve for the *Coniothyrium fuckelii* assay was typical of "a PCR reaction that is running well and predicatively as expected". The gel samples shown to Dr. Gilbert were described as "pretty much a textbook example".

**386**   The situation changed dramatically when Dr. Gilbert was shown the *Aspergillus terreus* data. For example, whereas the efficiency for one of the *Coniothyrium fuckelii* slides was described as 93.5%, the efficiency of a standard curve for an *Aspergillus terreus* assay was only 70%. Dr. Gilbert opined that the experimenter was "having problems with his quantification" and that "possibly", he was having problems with the primers, reactants or inhibition, problems that were not apparent in the *Coniothyrium fuckelii* assay.

**387**   Overall, Dr. Gilbert agreed that, even apart from quantification, the stochasticity, randomness and unexpected results were an indication that the *A. terreus* experiment did not run as well or as smoothly as the *Coniothyrium fuckelii* assay. He also acknowledged that the data supported this conclusion.

**388**   The necessary corollary of Dr. Gilbert's opinion is that Dr. Poinar's results are reliable regarding the absence of *C. fuckelii* but that they cannot be used as a basis to rule out the presence of *A. terreus*.

**389**   The next problem with Dr. Poinar's work is that he did not employ the same methods that were carried out in the Davies Lab. Using a single round of PCR, Dr. Poinar was unable to get any hits with the *A. terreus* primers at the 0.1 copy level. However, he was able to get a hit using Dr. Davies's nested PCR reaction. Despite the possibility that it would confirm Dr. Davies's results and despite success at the 0.1 copy level with Dr. Davies's protocol, Dr. Poinar did not attempt to reproduce or run a single sample through Dr. Davies's entire nested PCR protocol. Finally, Dr. Poinar agreed with the following premise put to him in cross-examination:

> Q.   You can't, based on your experiments, rule out the possibility that if you had done his experiment, reproduced his experiment, you might have found terreus?
> A.   No.

**390**   Based on the evidence before me, I cannot conclude that Dr. Davies's work is not reproducible.

   D.   *Failure of Dr. Davies to find C. fuckelii DNA in the tablets from batch CR0157*

**391**   As noted above, Dr. Davies found *A. terreus* DNA in the tablets from AFI batch CR0157 but did not find any *C. fuckelii* DNA in the tablets. On its face, this appears to be inconsistent with Merck's theory that batch CR0157 was likely a mix of *Coniothyrium fuckelii* lovastatin and

*Aspergillus terreus* lovastatin. In final argument, Apotex stated that this alleged inconsistency "is fundamentally fatal to any reliance upon the Davies [Lab] testing", and described its position as follows:

> [Dr. Davies] did not find CF when he should have, but he found AT when he should not have. The AT could only, in that scenario, have been exogenous AT.
>
> ....
>
> The other alternative on CR0157 is that it is a mixture. Some AT lovastatin was thrown into the mix, but much of it, most of it, I believe, even on that scenario, was CF lovastatin.
>
> So on that scenario, it contains both CF and AT lovastatin. Dr. Davies should have detected AT and he should have detected CF. He still didn't detect CF under that scenario, which calls into question his testing and calls into question whether the DNA survives, and indicates that the AT that he did find, again, must be exogenous DNA, because he didn't find the CF.

**392**    The position of Apotex is based on what I believe is an incorrect assumption. A failure to find a particular micro-organism through DNA testing is not determinative that the micro-organism is not present. On the other hand, assuming appropriate laboratory procedures and no contamination, a finding of a specific micro-organism is strong evidence that the micro-organism is present in the sample. This was acknowledged by Dr. Poinar during his cross-examination:

> Q... . If you want to say to someone, Look, in my opinion, DNA is absent from this sample, the actual -- the scientifically correct proposition is, always, DNA is absent from this sample to a state of detection limit; correct?

A.    That's correct.

Q.    But the flip side of the coin for the positive finding, it is not the same in science. In science you can say, I found terreus in this sample. I don't know how much was there, but I amplified it?

A.    Hmm hmm.

Q.    So to that extent, the positive finding is different from what you need to prove the negative?

A.    As long as all the proper precautions are put into place. So had all of the extraction controls and PCR controls been there, then the possibility would exist; that's correct.

**393**    For example, we know that Dr. Poinar did not find any *A. terreus* DNA in any of the samples that he tested. Yet, we also know that there were lovastatin samples provided to Dr. Poinar - in addition to the samples in issue - that clearly contained *Aspergillus terreus* DNA. Nevertheless, Dr. Poinar was unable to confirm the presence of this micro-organism. As discussed above, I have rejected Dr. Poinar's presumption that DNA cannot be found in such samples. It follows that his conclusion that *Aspergillus terreus* DNA was not present in the samples is incorrect; *Aspergillus terreus* DNA was present and Dr. Poinar simply did not use adequate experimental methods to find the DNA.

**394**    Applying this analysis to Dr. Davies, I conclude that the failure of Dr. Davies to find *Coniothyrium fuckelii*, even if it existed in batch CR0157, does not mean his finding with respect to *Aspergillus terreus* cannot be relied on. It certainly does <u>not</u> follow, as asserted by Apotex, that the DNA found by Dr. Davies in AFI batch CR0157 must be exogenous.

**395**    A large caveat must be introduced at this point. I have rejected Apotex's reliance on either Dr. Poinar's inability to find *Coniothyrium fuckelii* or *Aspergillus terreus* or Dr. Davies's failure to find *Coniothyrium fuckelii* DNA in the CR0157 tablets. However, that does not necessarily mean that I will accept Dr. Davies's conclusions. As stated by Dr. Poinar, "all the proper precautions" must be in place before one can rely on the results of the DNA testing. That brings me to the key issue with respect to the DNA evidence relied on by Merck: Is the DNA evidence reliable? Stated differently, were "proper precautions" used in the Davies Lab? Any discussion of this question must begin with the opinions of the experts put forward by the Defendants in response to Dr. Davies's DNA evidence.

E.    *DNA evidence and the Apotex Experts*

**396**    Apotex's response to the DNA evidence rests on the criticisms of Dr. Davies's work provided by three experts - Drs. Gilbert, Poinar and Taylor.

**397**    Dr. Taylor was qualified to provide opinions to the Court as an expert mycologist, and microbiologist with particular expertise in fungal DNA evolution and fungal DNA PCR amplifications. Dr. Taylor opined on Dr. Davies's Expert Report and DNA testing results, particularly with respect to the possibility of contamination in the Davies Lab.

**398**    Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA. His expert testimony and report deal with the issue of infringement. He explains the problems with the use of ancient or degraded DNA (referred to as ancient DNA). Dr. Gilbert was asked to examine Dr. Davies's laboratory notebooks, and comment on whether the conclusions generated were justified by the methods used.

**399**    Dr. Poinar was qualified as an expert in the extraction and characterization of low copy and degraded DNA. Dr. Poinar reviewed the experiments performed by the Davies Lab, and (discussed above) attempted to replicate the results through testing of his own. Dr. Poinar was asked to answer

two general questions: first, whether or not the experimental design of Dr. Davies matched the rigour necessary for an ancient DNA or low template sample project; second, whether Dr. Davies's data support his hypothesis that *Aspergillus terreus* DNA was found in samples of lovastatin from the Defendants.

**400**    As a general rule of evidence, witnesses may not give opinion evidence, but may only testify as to the matters within their knowledge, observation and experience. An exception to this rule applies to expert witnesses. Experts are necessary to assist the Court in scientific matters that would not normally be within the knowledge of the judge. However, before accepting the opinion evidence, the trier of fact must determine the admissibility of the evidence in accordance with four criteria: relevance, necessity in assisting the trier of fact, the absence of an exclusionary rule and a properly qualified expert (*R v. Mohan,* [1994] 2 S.C.R. 9, 114 D.L.R. (4th) 419).

**401**    In this case, Drs. Taylor, Gilbert and Poinar appear to satisfy three of the four criteria. However, given the narrowness of their experience and the focus of their opinions on ancient DNA, I seriously question the relevance of their opinions. This is true for all three experts, although more so with respect to Dr. Poinar and Dr. Gilbert. While the level of my concern does not lead me to conclude that all of their opinion evidence is inadmissible, it does reflect on the weight that should be given to their opinions. The key problem exists with the characterization of the DNA tested by Dr. Davies as ancient DNA.

      (1)    <u>What is Ancient DNA?</u>

**402**    The first question is: what is ancient DNA? On the record before me, there is no clear definition of this term. However, each of the Defendants' experts provided insights on how to understand what ancient DNA is:

      *    Dr. Poinar stated that (Poinar Expert Report, Exhibit 135, para. 2):

> The study of ancient DNA is the retrieval and meticulous characterization of DNA sequences from samples which are assumed to be heavily degraded, in low copy numbers and typically stemming from forensic, fossil, sub-fossil, archeological, and palenontological remains.

      *    Dr. Gilbert stated that (Gilbert Expert Report, Exhibit 130, para. 8):

> I have been involved in the analysis of a range of materials that contain degraded DNA, and/or low copy number modern DNA. These include ancient bone and tooth material, often dating back tens of thousands of years in age, hair shaft and root, nail, horn, skin (both tanned into leather

and dried), mummified soft tissues, feather, eggshell, ancient plant seeds and leaves, formalin and Bouin's solution fixed soft tissues, historic blood samples, feces, urine, soil, ice and honey.

\*      Dr. Taylor stated that (Taylor Expert Report, Exhibit 124, para. 25) :

> This scarcity of DNA in the lovastatin samples makes analysis of DNA from these samples akin to analysis of DNA from archeological samples, the field of research referred to above as "ancient DNA". A key complication of ancient DNA research is the high likelihood of contamination of the sample with DNA from modern sources of by DNA that has been amplified by PCR from modern DNA, unless the necessary precautions are taken.

**403**    There is a clear gap in these opinions - they fail to provide a comprehensive analysis of how DNA was degraded in the process of making a pharmaceutical product, or even how to compare the DNA in ancient DNA to DNA derived from a pharmaceutical product. Without this evidence, I am unable to compare the evidence presented on ancient DNA to evidence presented by Dr. Davies.

**404**    Dr. Taylor made a sweeping statement in his report that "the scarcity of DNA ... is akin to archaeological samples". In the absence of a comprehensive analysis, this is neither a convincing statement nor a scientific one. What is the basis for his knowledge that the DNA in lovastatin is scarce? Where is the evidence that shows us that these two types of DNA can be considered analogous? Without something further, I do not see how it can be logical to compare the level of DNA available from ancient bone and tooth material to DNA derived from a pharmaceutical product.

(2)    Is DNA derived from a pharmaceutical product degraded or fragmented?

**405**    The next step is to consider the condition or state of DNA derived from a pharmaceutical product. During the trial, there was some controversy over the semantics of whether the DNA derived from the lovastatin samples, and tested by Dr. Davies, was "fragmented" or "degraded". Apotex argues that Dr. Davies specifically described the DNA that was the subject of his experiments as "degraded DNA". Although this is correct, Dr. Davies provided a sufficient explanation of what was meant by the use of this term in his Expert Report.

**406**    During his oral testimony, Dr. Davies described the process whereby the fungal DNA in lovastatin is fragmented during industrial processing. He explained that DNA is released by the cells which expose the DNA to shearing forces in the fermentation machine. This was not contested. The issue was whether these shearing forces would cause "fragmentation" or "degradation". Dr. Davies was asked about this during cross-examination:

Q.    You just told me a few moments ago that there would be fragments or, the word that you didn't like to use, degradation; would I be right that you would agree with this, that although some of the DNA survives in the pharmaceutical process involved here, there, unquestionably, would be some DNA that would be degraded during the process?

A.    In the case of a fermentation process, I think I mentioned this before, during fermentation and particularly at the end, cells begin to LYSE, they break and they release DNA. That DNA is going to be sheared; it's going to be exposed to shearing forces of the big stirrers that are used in the fermentation. And shearing will break DNA.

For one thing, Aspergillus DNA often has a lot of protein bound to it which might stabilize it, but we planned our experiments with the expectation that the DNA was going to be sheared. It would never shear down to almost nothing.

**407**    In his report, Dr. Davies uses the word "degraded" when referring to the DNA which was the subject of his experiments. However, during oral testimony, Dr. Davies clarified that he equates the word "degraded" to "fragmented" - which is the word he should have used in his Expert Report. Dr. Davies explained that fragmentation is a normal process that occurs to all DNA which is outside a cell. He did not intentionally refer to "degradation" as synonymous with the process that results in ancient DNA.

Q.    You talk about the difficulties your lab experienced, you say:"I underscored the difficulty in obtaining DNA from pharmaceutical samples."And then you should read it, but go to the sentence that begins, "although some DNA survives the process."

A.    Yes.

Q.    It says:

"There is unquestionably some DNA that is degraded during the process."Do you accept that as correct, that's your view?

A.    I do.

THE COURT: Is that because you equate the word degraded with fragmented?

THE WITNESS: Yes. This is different.

THE COURT: Let me get here to paragraph 63. When you use the word "degraded" in paragraph 63, do you mean fragmented?

THE WITNESS: I mean a very general process.

THE COURT: Is there something beside fragmentation that you mean by the word degraded in that paragraph?

THE WITNESS: Yes, Your Honour. There are enzymes, chemicals, in the reaction in the fermenter that could chemically modify the DNA.

**408** Dr. Davies goes on to opine that there is no clear evidence that the *A. terreus* DNA is "degraded" (in terms of the ancient DNA reference) during the fermentation process.

Q.    Going back to my question, do you not agree with this, that a though some DNA survives the fermentation, purification process, that there, unquestionably, would be some DNA that is degraded during the process?

A.    If we buy degradation, we're talking about chemical reactions, and I would say yes, it's possible.

Q.    Not unquestionable?

A.    I don't know, you see. Nobody's ever looked. You've got a fermenter with things DNA has never seen and you're stirring it up. I don't know anybody is going to look to see what the DNA would be like and how it was broken. We didn't look at the fermenter. We only looked at the powder.

**409** In my view, Dr. Davies's explanation is clear as to why DNA derived from a pharmaceutical process could be considered to be "fragmented" but not "degraded".

**410** So, what does this mean to me? Apotex's experts assume that the DNA tested by the Davies Lab was "degraded" in the same manner that ancient DNA is degraded. I do not agree. The only relevant evidence presented before me on this issue was that of Dr. Davies. I conclude that the DNA tested by Dr. Daves is considered to be "fragmented" but not "degraded".

(3)    Can one compare how DNA derived from a pharmaceutical product is fragmented to how DNA from "ancient DNA" is <u>degraded?</u>

**411** After considering the evidence on what is ancient DNA, I will now consider whether DNA derived from a pharmaceutical product that is "fragmented" can accurately be referred to as ancient

DNA. I conclude that it cannot.

**412**   In my view, it does not logically flow to compare DNA from "ancient bone and tooth material, often dating back tens of thousands of years" to DNA from *Aspergillus terreus* which has been processed into a pharmaceutical product. This is true especially in light of understanding that the subject DNA is not "degraded" in the same manner.

**413**   Without specific expert evidence on this, it is not logical to compare the two. The Defendants' experts provide no relevant evidence on this point. However, Dr. Davies explicitly states that one cannot compare ancient DNA to DNA derived by a pharmaceutical process.

> Q.   Tell me what you understand the words "ancient DNA" to mean to at least those that use the expression?"
>
> A.   As I understand it, it is DNA being isolated from remnants of earlier civilization, animals, from earlier stages, things of that type, and looking for DNA from those samples and trying to identify them. So the sequencing of some old human genomes recently. I don't know if that's called ancient DNA or not.
>
> Q.   In your description of it, would I be correct that the DNA one has in the context that you've given me for in ancient DNA, is DNA that is either low copy number DNA or degraded DNA?
>
> A.   Depends how you define degraded.
>
> Q.   How would you define degraded?
>
> A.   I think there are two kinds of degradation.
>
> Q.   What are they?
>
> A.   One is that the DNA can be broken to give very low molecular weight fragments which makes it more difficult to do a PCR.
>
> **...**
>
> Q.   On the last sentence, the process of cleaving that you talked about in that sentence, that causes, according to your sentence, further degradation, not a new but further suggestion that the earlier process that you described, the purification steps earlier, causes degradation, and that leads to further degradation through the cleavage from the enzymes, correct?
>
> A.   That is correct. What I should have said is that <u>the DNA is really modified and broken up in a horrible way, and there would be very little intact chromosomal DNA but there would be fragments, and some of those would not work in PCR because they'd be modified further. That's the difference between this and ancient DNA</u>, and things like that.
>
> Q.   I don't know what you mean by that. What do you mean by ancient DNA?
>
> A.   It's DNA from million year old remains and things of this type.
>
> Q.   You're suggesting that that DNA is not fragmented and not degraded and not

broken up?

A.    It's everything. It's even worse. <u>So the techniques used for ancient DNA are really very specific, and it's not the same as this.</u>

Q.    Because it's even more extreme and ancient DNA versus what you encountered here?

A. Yes, cosmic rays have been acting on it for a long time. But as I think I mentioned right at the beginning, <u>one of the biggest problems with what they call ancient DNA is the question of desiccation, and desiccation causes quite severe damage to DNA.</u>

[Emphasis added.]

**414**    Dr. Davies provides his expert opinion that DNA that has been hit with cosmic rays for thousands of years - DNA that scientists did not think even existed until a few short years ago - cannot be compared with DNA that has been processed into a pharmaceutical product. I agree with him.

(4)    Are the opinions of the Defendants' experts relevant to fragmented DNA from <u>pharmaceutical products?</u>

**415**    Having concluded that ancient DNA is not comparable to DNA derived from a pharmaceutical product, I turn to a consideration of whether the opinions presented by the Defendants' experts extend beyond the field of ancient DNA. In other words, can the opinions of any of the experts assist the Court in gaining a different understanding of the DNA testing from fungal pharmaceutical compounds than what was provided by Dr. Davies?

**416**    In my view, none of the experts has provided me with the necessary link between ancient DNA and the DNA in issue. Apotex has failed to satisfy me that the evidence of these experts is relevant to the issues before me.

**417**    Dr. Waldo Taylor was the only expert (other than Dr. Davies) whose expertise extended beyond the field of ancient DNA. During his examination-in-chief, he stated the following:

Q.    I just want to ask you about the expression "ancient DNA". Can you describe what you understand that to mean?

A.    Sure. As I mentioned, when the PCR reaction became available it was possible to examine DNA and biological specimens, or really any specimen, where DNA was wanting, where it was scarce. So that field has grown and it encompasses people who study ancient DNA, who study DNA that survives in the fossil specimens, things like Neanderthal bones or organisms in amber. It includes

forensic studies where there's a little amount of DNA associated with some social interaction that you'd like to study. It includes <u>the study that we're concerned with today, trying to identify the organism that produced a pharmaceutical compound</u>.

[Emphasis added.]

**418**    However, during his cross-examination Dr. Taylor acknowledged that he was not fully aware of "the whole story" of how the lovastatin samples tested in the Davies Lab were treated or prepared.

**419**    Dr. Taylor's opinions are seriously undermined by his admission that he lacks understanding of how the relevant pharmaceutical compounds have been prepared or treated. It is inadequate for an expert to explicitly state that the subject DNA is comparable to ancient DNA when he does not know the scientific basis for this comparison.

**420**    Neither Dr. Gilbert nor Dr. Poinar offered their opinions on how, if at all, fragmented DNA from a pharmaceutical compound could be treated as ancient DNA.

**421**    According to Dr. Gilbert, there are millions of scientists in the world who have access to, use or rely upon PCR data; yet, there were only a "handful of people on the earth" who are qualified to undertake the kind of ancient DNA analysis Apotex promotes. It would have been more helpful to the Court (and relevant to the issues of this case) if Apotex had presented DNA experts who operated outside this "handful of people on the earth".

**422**    In sum, I have difficulty with the opinions of the Apotex experts. Their opinions are based on an assumption that Dr. Davies's work and opinion could be evaluated against the same standards, protocols and norms as would be used by the "handful of people on the earth" with an expertise in ancient DNA. I am not satisfied that this assumption is correct. This problem informs my evaluation of the criticisms levelled at Dr. Davies's work. The Apotex experts are providing their opinions through a very narrow prism that is only marginally relevant - at best - to the issues before me.

F.    *Contamination*

**423**    As we know, Dr. Davies had 13 hits for *Aspergillus terreus* DNA from three different samples. In their arguments, the Defendants raise many, many problems with Dr. Davies's opinion, his testimony at the trial and the procedures and results from the Davies Lab. I have considered all of their concerns. The most serious allegation is the risk that the *Aspergillus terreus* DNA found in the samples tested was the result of contamination by exogenous *Aspergillus terreus*. In other words, the Defendants submit that the risk of contamination in the Davies Lab was so high that I cannot accept the DNA testing evidence of Dr. Davies as reliable.

**424**    As all of the experts would agree, contamination is always a serious risk in DNA testing. I

acknowledge the risk. The question for this Court is whether the risk of contamination makes it more likely than not that Dr. Davies's *Aspergillus terreus* DNA findings are false.

>    (1)    Dr. Davies

**425**    Dr. Davies was clearly aware of the risk of contamination. Dr. Davies addressed the issue of laboratory contamination on several occasions during his testimony and in his Expert Report. Dr. Davies stated (Davies Expert Report, Exhibit 55, para. 77):

>    I do not consider contamination to be a likely explanation to account for the presence of *Aspergillus terreus*. For example, if our laboratory was contaminated, I would have expected to see *Aspergillus terreus* amplicons in the negative controls. However, this was not the case.

**426**    Dr. Davies cautioned that there is always a possibility of a contamination while carrying out a PCR reaction with DNA. However, during his oral testimony, he insisted that, "[the Davies Lab] took every possibility to avoid contamination. We're not forensic scientists, but we can work clean."

**427**    Dr. Davies likened the scenario of contamination in the subject experiments to "the chance that lightening would hit you." He explained that his two investigators, Grace Yim and Karen Lu, were extremely careful workers and precautions were taken to prevent contamination, including:

>    *    working in a sterilized area to kill bacteria and fungi that could be a source of contamination;
>    *    autoclaving the micro-pipets and tips to sterilize and prevent cross-experiment contamination;
>    *    operating in a UV-radiated, stainless steel biosafety hood to purify the incoming air and allow for easy cleaning of the hood; and
>    *    utilizing experiments with zero DNA controls, and following the protocol that the experiment would be repeated if contamination was found in the zero DNA control.

**428**    Dr. Davies was convinced that contamination was not responsible for the results of these experiments. He opined that the fact that the Davies Lab never found *Coniothyrium fuckelii* or any other fugus of the genus *Aspergillus* (other than *terreus*) as a contaminant, was evidence to support his assertion that contamination was not responsible. Dr. Davies observed that it was hard to believe that, if contamination had been present in the experiments, it would only be found in the form of *Aspergillus terreus*.

**429**    Lastly, as Dr. Davies most poignantly stated, "DNA doesn't fly" or "float around in the air".

**430**    Against the backdrop of Dr. Davies's expert testimony, I turn to the evidence of the experts produced by Apotex. In general, as discussed above, the Apotex experts brought a very narrow

perspective to the question of contamination. All three imposed incredibly high standards on the work of DNA laboratories and began with the assumption that Dr. Davies was dealing with DNA that was akin to ancient DNA that might be found in the 1000-year old remains of extinct animals. Quite simply, these experts imposed an overall standard on the DNA testing performed by the Davies Lab that is not reasonable in the circumstances. Two experts - Dr. Taylor and Dr. Gilbert - were particularly stubborn in their opinions on contamination in the Davies Lab.

(2)    Dr. Taylor

**431**    Dr. Taylor equated the analysis of the tested lovastatin to an "analysis of DNA from archaeological samples" (Taylor Expert Report, Exhibit 124, para. 25). For the reasons expressed earlier, I am of the view that this assumption is flawed, or unsupported by the record.

**432**    Directly following from this assumption, Dr. Taylor expressed the view that a "substantial risk of contamination" could come from two sources: (a) cultures of *Aspergillus terreus* which were used by Merck to produce lovastatin; or, (b) *Aspergillus terreus* DNA that was PCR amplified in the Davies Lab.

**433**    Dr. Taylor concluded that (Taylor Expert Report, Exhibit 124, para. 28):

> If Dr. Davies did in fact detect *Aspergillus terreus* DNA, then his own laboratory practices very likely caused his samples to become contaminated with such DNA from *Aspergillus terreus* cultures or from DNA that been PCR amplified from *Aspergillus terreus* DNA.

**434**    During cross-examination, Dr. Taylor stated that the most likely source of contamination was *Aspergillus terreus* DNA from PCR amplifications in the Davies Lab. This theory was discussed with Dr. Gilbert during cross-examination. Dr. Gilbert explained why the amplified material posed more of a risk; it is because the "PCR part" would "be more concentrated" with DNA. However, as the evidence shows, the strains of both *Aspergillus terreus* and *Coniothyrium fuckelii* were present in the Davies Lab at the relevant time. Dr. Gilbert also confirmed that the risk of contamination from the control DNA from *Aspergillus terreus* or *Coniothyrium fuckelii* was equivalent, even though the DNA concentration would differ. Yet, Dr. Davies found *Aspergillus terreus* DNA in 13 experiments but never documented a single instance of *Coniothyrium fuckelii*. How could it be that amplified *Aspergillus terreus* DNA would cause contamination but not the *Coniothyrium fuckelii* DNA? Dr. Gilbert repeatedly refused to accept the possibility that zero findings of *Coniothyrium fuckelii* DNA should reassure the experimenter that contamination by *Aspergillus terreus* was not probable. I find his denials to be unhelpful and, frankly, illogical. Thus, Merck submits, Dr. Taylor's theory does not withstand examination. I agree. Zero findings of *Coniothyrium fuckelii* demonstrates the weakness in the theory that contamination would, more likely than not, occur from *Aspergillus terreus* DNA that was amplified by PCR in the Davies Lab.

**435**    Another theory of contamination presented by Dr. Taylor was the possibility of airborne

spores. I do not accept this as likely in the Davies Lab. The use of a biosafety hood with purified air would dramatically reduce the possibility of such contamination. Further, Dr. Taylor acknowledged that he had never studied the ability to amplify from a single spore of *Aspergillus terreus* and admitted that it was speculative to conclude that a single spore would amplify by PCR.

**436**    A final concern of Dr. Taylor relates to his reading of the various "gels" that recorded the experimental results. Dr. Taylor noted a "milestone" on the gels. Dr. Taylor observed the following (Taylor Expert Report, Exhibit 124, para. 33):

> ... Dr. Davies' laboratory records from 2007 confirm that DNA was amplified from the lovastatin samples using coniothyrium fuckelii specific primers, thus indicating the presence of coniothyrium fuckelii DNA in the sample. However, Dr. Davies did not mention this in his affidavit. Accordingly, Dr. Davies' failure to acknowledge coniothyrium fuckelii as the potential source organism, based on his erroneous assertion that no coniothyrium fuckelii DNA was found, was not warranted.

**437**    In other words, Dr. Taylor was of the opinion that Dr. Davies had positive findings of *Coniothyrium fuckelii* that were overlooked or never reported. I agree that an unreported instance of *Coniothyrium fuckelii* would be a critical contention with respect to the possibility of contamination and also with respect to Dr. Davies's conclusion that there was no *Coniothyrium fuckelii* DNA found in any of the samples tested. However, examination of Dr. Taylor's statement and observations by Dr. Gilbert and Dr. Poinar diminish the significance of this observation.

**438**    During his cross-examination, Dr. Taylor acknowledged that his conclusion that this was *Coniothyrium fuckelii* was speculative; he agreed that the first amplification of DNA using a *C. fuckelii* primer may have been *Coniothyrium fuckelii* DNA or "may be OJ Simpson's DNA". Dr. Poinar agreed that, based on the data, one could not conclude that the band observed by Dr. Taylor was a band of *Coniothyrium fuckelii* DNA. When Dr. Gilbert was asked about the existence of any bands that were the correct size for *Coniothyrium fuckelii* using the *Coniothyrium fuckelii* specific primers, Dr. Gilbert responded that there were "zero" such bands.

**439**    Viewed as a whole, I do not find that Dr. Taylor's opinions regarding contamination are supported by the record.

(3)    Dr. Gilbert

**440**    Dr. Gilbert provided his expert opinion that "contamination presents a serious challenge to the data generated by Dr. Davies's team". I do not believe that anyone would disagree with this statement. However, Dr. Gilbert continues to express his view that, "as a result, his results cannot be viewed as reliable."

**441**    The first problem that I have with Dr. Gilbert's opinion is that it is directed to his field of

specialization - the fields of ancient DNA and forensic genetics. In his Expert Report, Dr. Gilbert refers to samples that "were millions of years old". His entire opinion is premised on the assumption - unexplained, in my view - that Dr. Davies was working with degraded DNA that was comparable to ancient DNA. As discussed above, I am not persuaded that this is a meaningful comparison.

**442**    Moreover, the contamination theory posited by Dr. Gilbert (and Drs. Taylor and Poinar) is that exogenous *Aspergillus terreus* resulted in the positive findings by the Davies Lab. Thus, unless the experts can identify a credible source of the exogenous *Aspergillus terreus* DNA, the theory does not stand up to scrutiny. Upon cross-examination, Dr. Gilbert acknowledged that there was no evidence that contaminants, if they existed in the Davies Lab, were *Aspergillus terreus*.

**443**    Further, how has Dr. Gilbert measured or defined the term "reliable"? Can the possibility of contamination explain away every one of the 13 "hits"? Does the risk of contamination make it more likely than not that *Aspergillus terreus* does not exist in the samples? Or, is contamination merely a possibly?

**444**    In sum, I am not persuaded that the risk of contamination in the Davies Lab rises to the level where, on a balance of probabilities, I cannot rely on the results obtained and opined on by Dr. Davies.

G.    *Other criticisms of Dr. Davies's opinion*

**445**    The Defendants levelled a number of other criticisms at the work of Dr. Davies. Specifically, the Defendants submit that the following principles must be followed to determine whether the Court should ignore the expert evidence of Dr. Davies:

> \*    Where an expert's conclusion is not appropriately explained and supported, it may properly be given no weight by the trier of fact (*Backman v. Canada* (1999), 178 D.L.R. (4th) 126 at para. 34, 246 N.R. 309 (F.C.A.)).
> \*    Likewise, for a Court to accept an expert's opinion, the trier of fact must know the facts and/or assumptions upon which the expert has based his or her opinion (*Johnson & Johnson v. William H. Rorer, (Canada) Ltd.* (1980), 48 C.P.R. (2d) 58 at para. 7, [1980] F.C.J. No. 200 (QL) (F.C.T.D.)).
> \*    Where those facts turn out to be inaccurate or incomplete, the weight given to an expert's opinion may be significantly reduced (*Misik (E.) v. M.N.R.*, [1993] 1 C.T.C. 2360 at p. 2373, [1993] T.C.J. No. 13 (QL) (T.C.C.)).

**446**    In support of their position that the opinion of Dr. Davies should be rejected, the Defendants point to "spurious bands" seen on some of the "gels". These bands, in the view of the Defendants, demonstrate that Dr. Davies's opinion was inaccurate.

**447**    In principle, I agree with the Defendant's argument that an expert should: (1) appropriately explain their conclusions; (2) inform the Court of the underlying facts and/or assumptions; and (3)

provide accurate and complete information. If unable to do so, it should be expected that the weight of their opinion will be significantly reduced.

**448**    However, I believe that the Defendants are misapplying these principles to the opinions given by Dr. Davies.

(1)    Lack of knowledge

**449**    I agree with the Defendants that there were aspects of the experiments performed in the Davies Lab that Dr. Davies was unable to describe to the Court. However, the critical question is whether his knowledge of the technical aspects of the experiments was fundamental to his expert opinion. I do not think it was.

**450**    If one accepts that someone is an expert in their field (as the Defendants did in the case of Dr. Davies), the parties must provide the Court with a clear understanding of what their expertise is. A problem arose in this case because of a misunderstanding between what constitutes being an expert in the science of microbiology and an expert in performing the technical experiments of microbiology. There obviously was confusion of what was expected of Dr. Davies. Dr. Davies obtained his Ph.D in 1956, and reached professor emeritus status in 1997. He is unquestionably an expert in his field. One does not rise to that level at a Canadian university without having outstanding accomplishments in an area of expertise. However, it is not surprising that someone like Dr. Davies, who is in charge of a laboratory with many students and technicians, is not personally performing the experiments and may not be knowledgeable on all of the technical aspects of the experimental procedure. Obviously (and somewhat critically of Dr. Davies), I am of the view that Dr. Davies should have prepared better for his testimony. However, unless the lack of knowledge goes the heart and substance of Dr. Davies's opinion, I would not be persuaded to reject that opinion.

**451**    The Defendants agreed, after reviewing his Expert Report, and before his oral testimony, that Dr. Davies was an expert in microbiology and microbial genetics. That expertise includes the use of DNA techniques for studying microbes. That expertise - and not the minutia of laboratory procedures - was the focus of his opinion. I do not agree with the Defendants that Dr. Davies's lack of knowledge of some the technical aspects of the experiments should necessarily lead this Court to the conclusion that the evidence is unreliable.

(2)    Incomplete Report & Lack of Disclosure

**452**    The Defendants argue that Dr. Davies was incorrect and incomplete in his report of, and conclusions as to, the majority of the experiments disclosed. I agree that Dr. Davies's notebooks and conclusions were incomplete. However, the determinative question is whether the missing information is fundamental to his expert opinion. I do not believe it was.

**453**    The Defendants refer to the following incidents of incompleteness:

* In 2003, experiments 13, 19 and 20 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 20 or 85% of all experiments were not disclosed.

* In Karen Lu's 2007 work, experiments 7, 8, 18, 20, 22, 23 and 24 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 24 or approximately 71% of all experiments were not disclosed.

* In Grace Yim's 2007 work, experiments 32, 33, 35 and 36 are disclosed. The inference is that at least 8 other experiments are not disclosed. Thus, 8 of 12 or approximately 67% of all experiments were not disclosed.

* In total, 42 or 54 experiments, or 78% of all experiments were not disclosed.

**454**    The Defendants submit that Dr. Davies provided an incomplete picture of the experiments performed by only providing selected pages for litigation. The Defendants allege that Dr. Davies erred by providing only the pages that "would bear on the conclusion", and not all of the pages that were relevant. The Defendants further argue that Dr. Davies provided an erroneous explanation for withholding the notebook pages because "the non-disclosed experiments did not bear on the conclusion 'in any significant way'". I do not agree with the Defendants that this was an erroneous explanation.

**455**    During cross-examination, Dr. Davies testified that the reason he did not disclose all of the pages relating to all of the experiments performed in his lab was that this was not "routine" procedure for a scientist. When preparing evidence to support a publication, it is "routine" for a scientist to provide only the pages that support the conclusion that the scientist has opined. There was no malice or bad faith in Dr. Davies's lack of disclosure.

> Q.    You deprived a reader of coming to a different conclusion about the sufficiency or the relevance of the experiments included and not included, correct?
>
> A.    No, I don't think so. May I make the point that when one publishes a scientific paper, you have to publish a logical sequence of events, and you publish the results, and you then interpret the results based on the experiments? This was not a scientific paper. Things were much simpler here than that. I believe we gave you a continuum. We selected some experiments. Some of them were experiments that didn't work that well, but you got an idea as to what was going on. I don't see anything wrong with that.

**456**    During cross-examination, Dr. Davies was presented with a chart, prepared by counsel, representing the missing information. Throughout the cross-examination, I was unable to observe any missing notes or details that would have had a material impact on the overall opinion of Dr. Davies. When asked about the chart during cross-examination, Dr. Poinar stated that all documents need to be put forward. However, he also acknowledged that, in this case, the data depicted in the chart meant little, if anything, to the conclusions being drawn by Dr. Davies.

**457**   I do not agree with the Defendants that the decision of Dr. Davies to exclude certain pages
must result in a conclusion that his evidence is unreliable. What is important is that the opinions of
the expert not be contradicted or otherwise weakened by any missing information. By not putting
forward all of the notebook pages, Dr. Davies ran the risk of not being able to substantiate his
opinions. However, in this case, as admitted by Dr. Poinar, the missing information is not relevant
to the overall conclusion. Accordingly, while I would have preferred that Dr. Davies had provided a
more complete picture of the experiments performed, I do not consider that his opinion to be fatally
flawed by his failure to do so.

(3)   Unexpected results

**458**   The Defendant's argue that Dr. Davies obtained unexpected results and therefore his work
cannot be relied upon. At the heart of their argument is the presence of "spurious bands" that only
became visible upon dramatic enlargement of a photograph of the gel that was stained and analyzed
under UV light for the presence of the PCR amplified DNA

**459**   The Defendants argue that the experiments of Dr. Davies were flawed because, upon
investigation of the laboratory notebooks, extra bands could be seen on the gel pictures. The
Plaintiffs, on the other hand, argue that any evidence involving "photoshopped" gels should not be
considered or given any weight by this Court. I agree with the Plaintiffs on this point.

**460**   When presented with the greatly enlarged photographs, Dr. Davies commented that the gel
photographs were manipulated by the Defendants. Dr. Davies stated:

> Your photo shopping is up to some amazing magnification ... people do this to
> public papers sometimes and I think it's unrealistic. It's not what you see on the
> actual gel. This is not the actual gel. This is a doctored gel in my opinion ... You
> can find many bands on PCR gels that you would not see by eye. You would not
> see by other detections if you photo shopped them up in some way. I am just very
> concerned about this, and I find it difficult to draw what I would consider to be
> sound conclusions

**461**   I agree with Dr. Davies. The original photographs of the gels are highly technical and -
frankly - confusing to this judge. How can I be certain that taking those already confusing
depictions and enlarging them to this extraordinary scale does not bear a risk of introducing
photographic ghosts, shadows or other images that did not originally exist? I have no evidence that
such distortion of the original evidence would not introduce errors or unreliable results.

**462**   Even if I were to accept that there are faint bands that were not seen in the original gels or
referred to by Dr. Davies, none of this evidence accounts for Dr. Davies's findings of *Aspergillus
terreus* in the lovastatin samples.

**463**   Overall, the presence of the spurious bands, or the impact of the photoshopped pictures, does

not lead me to the conclusion that the results of the experiment were flawed.

## IX. **Infringement - Conclusion**

**464**    My overall conclusion is that Dr. Davies's testing results are reliable and credible evidence that the lovastatin samples tested in his laboratory contained *Aspergillus terreus* DNA. I have rejected the contamination theory of Apotex.

**465**    I am satisfied that the lovastatin tablets tested originated from AFI batch CR0157. The DNA evidence satisfies me that, on a balance of probabilities, the Defendants infringed the '380 Patent with the manufacture and sale of any product from AFI batch CR0157.

**466**    The situation with respect to the Blue Treasure samples is different. As noted earlier in these reasons, I am not persuaded that Merck has demonstrated a nexus between the samples tested in the Davies Lab and the allegedly infringing product. Thus, I do not accept the DNA evidence as direct evidence of infringement by the lovastatin produced by Blue Treasure. Nevertheless, the remaining evidence presented by Merck with respect to the Blue Treasure lovastatin strongly supports the conclusion that there was infringement. This is discussed earlier in these reasons. If I am wrong with respect to the lack of nexus, then I would conclude that the DNA evidence is evidence of direct infringement, a conclusion that would strengthen - but not change - my earlier finding of infringement.

## X. **Validity**

A.    *Introduction*

**467**    Having determined the issues of claims construction and infringement, I now turn to the issue of validity. In their counterclaims, each of the Defendants assert that the '380 Patent is invalid. If they are correct, there will be no question of infringement; the Defendants cannot infringe an invalid patent.

**468**    In an infringement action, the patentee benefits from the presumption of validity (s. 45 of the *Patent Act* and s. 43(2) of the *Patent Act* currently in force). Thus, Apotex bears the burden of proving, on a balance of probabilities, that the '380 Patent is invalid. As of the close of argument in this trial, the following remained as Apotex's grounds of invalidity:

>    *    All of the disputed claims, except for claims 3 and 6, are invalid because they are overly broad.
>    *    Certain of the claims are invalid because they could not demonstrate utility. In particular:

>        -    claims 1, 2, 5 and 13 to 15 demonstrate a lack of utility, in that not all of

the compounds included in the claims are useful in fulfilling the promise of the '380 Patent; and

-        the utility of the claimed subject matter, including pharmaceutical utility, demonstrates a lack of sound prediction, in that the inventor could not predict, as of the Canadian filing date, that the compounds claimed would fulfil the utility promised by the '380Patent.

*        Claims 13 to 15 are invalid because of prior use or anticipation by the existence of lovastatin in a traditional Asian product known as "Red Yeast Rice".

*        The claims are invalid because Merck was not the first to invent lovastatin.


B.      *Overbreadth*

**469**    Apotex argues that the claims of the '380 Patent, other than claims 3 and 6, are "overbroad" because they claim processes that were not invented by the named inventors. In their submission, the invention, as claimed, comprises numerous strains or species which were not tested or evaluated by the inventors to determine, as of the priority date, whether they were capable of producing the compounds.

**470**    A patent which claims more than what has been invented can be found to be invalid as being overly broad. The concept of "overbreadth" has been referred to in a number of cases before our Court. In support of its position, Apotex relies on the case of *Biovail Pharmaceuticals Inc. v. Canada (Minister of National Health and Welfare)*, 2005 FC 9, [2005] F.C.J. No. 7 (QL) [*Biovail* ]. In *Bioval*, above, at paragraph 61, Justice Harrington described the notion of "covetous claiming" as follows:

If the inventor claims more than he should, he loses everything.

His fences must be clearly placed in order to give the necessary warning and he must not fence in any property that is not his own. [Thorsen P. in *Minerals Separation North American Corp. v. Noranda Mines Ltd.*, [1947] Ex. C.R. 306 at page 52, as quoted in *Free World Trust*, supra, at para. 14]

**471**    In *Biovail*, above, the patent in issue (a patent for a controlled-release pharmaceutical tablet) disclosed only one sustained-release mechanism, referred to as an osmotic process, using a compound known as HPMC as the carrier. The generic company was using a different mechanism and compound - a hydrogel process using a compound known as HPC as the carrier. Justice Harrington's key finding was that the patent was not infringed because the inventors only contemplated the osmotic process, and not the hydrogel process, which was a substantially different process. However, in the alternative, Justice Harrington considered that, if the claims were to be

construed to include the hydrogel process, "the patent was invalid for covetous claiming" (*Biovail*, above, at para. 60).

**472**    *Biovail*, in my view, does not support Apotex's submission on overbreadth. Unlike the patent in *Biovail*, the '380 Patent's claims and disclosure make reference to all producing species of *Aspergillus terreus*. The question of whether the inventors could extrapolate their laboratory results from the specific samples tested is a question of sound prediction and not of overbreadth.

**473**    Apotex also relies on *Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 [*Eli Lilly Raloxifene (FC)* ], aff'd 2009 FCA 97, 78 C.P.R. (4th) 388, a decision in respect of a patent that claimed the use of raloxifene in the treatment of osteoporosis and bone loss. At paragraphs 179-182, Justice Hughes discussed the assertion that the claims were overly broad. Key to his conclusion that the claims were overly broad was the "disconnect" between the disclosure and the claims in the patent. The disclosure limited the osteoporosis and bone loss to that without the adverse effects of estrogen therapy. In all but one of the claims in issue, there was no limitation to the use of the drug for bone loss due to estrogen-related causes. Thus, Justice Hughes concluded that all but one of the claims in issue were overly broad. The issue of overly broad claims was not overturned by the Court of Appeal.

**474**    In my view, *Eli Lilly Raloxifene (FC)*, above, does not support an argument that the claims of the '380 Patent are overly broad. In the patent before me, the disclosure is consistent with the claims in issue. Contrary to the submissions of Apotex, the disclosure of the '380 Patent is not limited to the two strains of *Aspergillus terreus* that were used in the experimentation by Merck that lead to the invention.

**475**    In brief, on Apotex's claim of overbreadth, I conclude that this argument, on the facts of this case, is more properly a question of sound prediction - in particular, both the factual basis for the prediction and the sufficiency of the disclosure.

C.    *Utility*

(1)    General Principles

**476**    Apotex submits that the '380 Patent is invalid on the grounds that:

1.    the impugned claims lack actual utility, in that certain strains of *Aspergillus terreus* have been shown to be unable to produce any of the claimed compounds; and

2.    as of the relevant date, the inventors could not soundly predict that the claimed compounds would have the utility promised by the '380 Patent.

**477**    Section 2 of the *Patent Act* defines an invention as something that is "new and useful". From

this comes the concept of "utility".

**478**    A number of principles associated with the law of utility are well established in the jurisprudence. To begin, the overarching concept is that, as of the relevant date, there must have been a demonstration of utility of the invention or, lacking that, a sound prediction of utility based on the information and science available at the time of the prediction (see, for example, *Merck & Co. v. Apotex Inc.*, 2005 FC 755, 41 C.P.R. (4th) 35 at para. 121; *Pfizer Canada Inc. v. Apotex Inc.*, 2007 FC 26, 306 F.T.R. 254 at paras. 36-40, aff'd 2007 FCA 195, 60 C.P.R. (4th) 177, leave to appeal to SCC refused, [2007] S.C.C.A. No. 371 (QL), 381 N.R. 399 (note)).

**479**    Apotex bears the burden on this issue of validity. To demonstrate lack of utility, Apotex must show "that the invention will not work, either in the sense that it will not operate at all or, more broadly, that it will not do what the specification promises that it will do" (*Consolboard*, above, at p. 525).

**480**    For many patents in the pharmaceutical field, the inventors will not yet have demonstrated that the invention "works", as of the relevant date. In such cases, the inventors rely on the concept of "sound prediction". The doctrine of sound prediction can be relied upon by an inventor to justify patent claims whose utility has not actually been demonstrated, but can be soundly predicted based upon the information and expertise available (*Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77, [2002] 4 S.C.R. 153 at para. 56 [*Wellcome AZT* ]). A party challenging the utility of a patent based on sound prediction must demonstrate that the prediction was not sound or that there is evidence of a lack of utility. As stated in *Wellcome AZT*, above, at paragraph 56:

> If a patent sought to be supported on the basis of sound prediction is subsequently challenged, the challenge will succeed if, *per* Pigeon J. in *Monsanto Co. v. Commissioner of Patents*, [1979] 2 S.C.R. 1108, at p. 1117, the prediction at the date of application was not sound, or, irrespective of the soundness of the prediction, "[t]here is evidence of lack of utility in respect of some of the area covered".

**481**    The relevant date is the date of the filing of the Canadian patent application (*Ramipril I (FC)*, above, at paras. 88-96). For the '380 Patent, that date is June 11, 1980.

**482**    Where the specification does not promise a specific result, no particular level of utility is required - a "mere scintilla" of utility will suffice (H.G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed., 1969), at p.153). However, as stated in *Consolboard*, above, where the specification sets out an explicit "promise", utility must be measured against that promise (see, for example, *Pfizer Canada Inc. v. Canada (Minister of Health)*, 2008 FCA 108, 67 C.P.R. (4th) 23 at para. 53 [*Pfizer Atorvastatin (FCA)* ]). In other words, does the invention do what the patent promises it will do? The question to consider is whether, at the date of filing, the patentee had sufficient information upon which to base the promise. If not, the patentee must have had sufficient information upon which to make a sound

prediction of the promise.

**483**    At paragraph 70 of *Wellcome AZT*, above, the Supreme Court of Canada articulated a three-part test that must be satisfied in order to establish that a sound prediction has been made by the an inventor. The three elements of the test are:

    1.   there must be a factual basis for the prediction;

    2.   the inventor must have an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis; and

    3.   there must be proper disclosure.

**484**    To be sound, a prediction does not need to amount to certainty, as it does not exclude the risk that some compounds within the area claimed may, at some later time, prove to be devoid of utility.

**485**    With these principles in mind, I turn to the '380 Patent and the evidence before me.

    (2)   The '380 Patent

**486**    As of the relevant date of June 11, 1980 (the Canadian filing date), Merck had made, but not tested, the compounds for which the process is claimed. In other words, it was not relying on actual utility but on its prediction that the four compounds would have utility.

**487**    As noted, sound prediction must be measured against the promise of the patent, where one is explicitly expressed or may be implied. The promise of the '380 Patent is discussed in Section V of these Reasons. To review, I have concluded the following:

    1.   The '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce the four compounds of claim 1 or the compounds identified in the other disputed claims.

    2.   The patent does promise that the compounds produced by the fermentation process identified in the patent are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

**488**    I will measure the utility of the '380 Patent against these two promises.

    (3)   Lack of Utility

**489**    Apotex claims that it has presented empirical evidence of inutility of claims 1, 2 and 5. This assertion of inutility is founded on testing, by Drs. Sorenson and Samson, that demonstrated that not all strains of micro-organisms within the genus *Aspergillus* or - more narrowly - within the species *Aspergillus terreus* are capable of producing the claimed compounds.

**490**    Dr. Sorensen was asked, by counsel for AFI, to investigate the ability of different strains of *Aspergillus terreus* to produce lovastatin. He was instructed to use fermentation conditions and

media contemplated or specifically taught in the '380 Patent. He designed experiments involving four different strains of *Aspergillus terreus*. Two of those strains (referred to as A18 and R99) were strains which had previously been shown to produce Compound I. The other two strains (referred to as UAMH 7844 and UAMH 9313) were obtained by Dr. Sorensen from the University of Alberta Microfungus Collection and Herbarium (UAMH). In simple terms, Dr. Sorensen's results were as follows:

> * lovastatin (Compound1) was detected in the A18, R99 and UAMH 9313 extracts;
> * lovastatin was not detected in the UAMH 7844 extract; and
> * no quantifiable quantities of dihydrolovastatin (Compound II) were detected in any of the four extracts.

**491**    Similar results were obtained by Dr. Samson, who also carried out testing of certain micro-organisms at the request of counsel for AFI. Dr. Samson found that:

> * A18, R99 and a strain identified as Merck ATCC 20542 produced lovastatin;
> * a strain identified as *Aspergillus terreus* IBT 20944 produced no detectable quantities of lovastatin; and
> * a strain identified as *Aspergillus alabamensis* (which, according to Dr. Samson, would have been classified as *Aspergillus terreus* in 1984) produced no detectable quantities of lovastatin.

**492**    Witnesses presented by Merck did not dispute the core of these findings. Dr. Alberts, one of the named inventors, acknowledged that not all *Aspergillus terreus* strains tested by Merck produced lovastatin. Dr. Lasure agreed that some strains of *Aspergillus terreus* would not produce lovastatin. In Apotex's view, the result must be that claims 1, 2 and 5, and each of the dependent product claims 13 to 15, are invalid since they include embodiments that will not achieve the promised result.

**493**    The problem with this argument is that Apotex relies on a construction and promise of the '380 Patent with which I do not agree. During final argument, Apotex conceded that their assertion is established assuming that "my friend's construction is not adopted".

**494**    For the reasons expressed in my analysis of proper claims construction, I have concluded that: (a) the claims only include micro-organisms that fall within the species *Aspergillus terreus*; (b) the '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce lovastatin; and, (c) none of claims 1, 2 and 5 requires that all four (or two, where applicable) compounds be produced from each fermentation. Thus, it is irrelevant that Drs. Sorenson and Samson found strains of *Aspergillus terreus* which were incapable of producing lovastatin and that other strains could only produce lovastatin (Compound I).

**495**    Apotex has failed to meet its burden to demonstrate that "[t]here is evidence of lack of utility in respect of some of the area covered" (*Wellcome AZT*, above, at para. 56).

(4)    Sound Prediction

**496**    As noted above, Apotex may satisfy its burden of showing a lack of utility even where it cannot demonstrate inutility. Its burden can be met by demonstrating, on a balance of probabilities, that the prediction of the inventors was not sound. I turn now to a consideration of whether the three elements of the test for sound prediction, as set out in *Wellcome AZT*, above, have been met.

**497**    In determining that the requirements for sound prediction had been met, the Court in *Wellcome AZT* found that the factual basis for the sound prediction of a new use compound rested upon the *in vitro* test results of AZT against the HIV in a human cell line along with Glaxo's data on AZT, including animal tests (above, para. 72). The line of reasoning was found to be Glaxo's knowledge of the mechanism for the reproduction of a retrovirus.

(a)    *The Factual Basis*

**498**    The question of sound prediction is one of fact (*Wellcome AZT*, above, at para. 71). The inventors must be able to show that, at the relevant time, they were in possession of a factual basis upon which they could articulate the desired result. The perspective being examined at this stage is a subjective one. The knowledge, activities and endeavours of the inventors themselves must be considered.

**499**    In this case, Merck's key witness was Mr. Alfred W. Alberts, one of the named inventors of the '380 Patent. In credible testimony, Mr. Alberts told the "story" of the invention that became the '380 Patent.

**500**    The '380 Patent story began in 1975, when Mr. Alberts arrived at Merck and began working in the area that was called "basic research". He established a new department within that domain, a department that was called "biochemical regulation". The mandate of the department was to take a rational approach to the development of new drugs. Mr. Alberts described the approach as follows:

> The approach that I was brought in to do was to go and do a - go back to the beginning, find the -- to break down the system, find the key targets for the disease, and then start from there with discovering -- hopefully discovering compounds that affect the disease process by working at the very simple, basic level, and then moving up from there to animal studies.

**501**    One area of research for the department was cholesterol biosynthesis. According to Mr. Alberts, it was well known, by 1975, that cholesterol was intimately involved with the atherosclerotic process. The pathway of cholesterol biosynthesis was understood in 1975 and was described by Mr. Alberts as follows:

> The pathway of cholesterol biosynthesis is very complex. This is just a brief summary highlighting the salient features of the process.

It starts with a simple two carbon compound known as acetate and which is basically the salt of vinegar.

It's activated to a compound known as acetyl coenzyme A/acetyl CoA.

Then in a series of steps, three acetyl CoA units are joined together to form the compound known as hydroxymethylglutaryl coenzyme A/HMG-CoA, which is converted by an enzyme known as HMG CoA reductase to mevalonic acid. And I will refer -- sometimes refer to it as mevalonic acid or the salt form, which is mevalonate. And this six carbon compound in a series of condensations ends up as the 30 carbon compound, squalene, which is then modified into the 27 carbon sterol lipid cholesterol.

**502**    The Merck scientists were the first to isolate mevalonic acid - described by Mr. Alberts as "the potential missing link in the cholesterol pathway".

**503**    Based on their knowledge of this pathway, the Merck scientists were looking for compounds that could break this chain. One part of the biosynthesis that was of interest was the hydroxy-methylglutaryl-coenzyme A reductase (known as HMG-CoA reductase) stage. The scientists understood that, if a compound could inhibit or blocked the synthesis of cholesterol at the HMG-CoA reductase stage, there would be no conversion of: (a) HMG CoA reductase to mevalonic acid; (b) mevalonic acid to squalene; and, (c) squalene to cholesterol.

**504**    The Merck scientists first became aware of compounds that inhibited HMG-CoA reductase in early 1976, when:

We received at Merck a correspondence from a representative in Japan who came across a newly issued, newly published patent in Japan describing an inhibitor of HMG-CoA reductase known as ML-236B and also became known as Compactin.

**505**    A sample of compactin was received from Sankyo Company in Japan. In addition, Dr. Akira Endo of the Sankyo Company visited Merck on August 26, 1977. According to notes of the meeting, Dr. Endo presented data with respect to ML-236B (compactin). It was stated that the compound "inhibits de novo cholesterol biosynthesis and reduces serum cholesterol when administered orally [in rats]." This compound operated as an HMG-CoA reductase inhibitor.

**506**    The goal was clearly to develop a compound that would be as good as or better than compactin. Beginning in January 1978, the Merck scientists introduced a new *in vitro* assay, the

HMG-CoA reductase assay. This allowed the measurement of the inhibition of HMG-CoA reductase by any tested micro-organism. ML-236B (compactin) was the benchmark against which the activity of organisms from the Merck chemical library were measured. Between January 1978 and November 1978, none of a large number of tested micro-organisms met the goal.

**507**    As reflected in the laboratory notebooks and in Mr. Alberts's testimony, November 7, 1978 was a turning point. In the first week of November 1978, Mr. Alberts's group received samples 18 and 19 (F 4683 and F 4684), both of which demonstrated inhibitory activity in the HMG-CoA reductase assay.

**508**    From that point, the most important steps can be summarized as follows.

> *    On November 27, 1978, Mr. Alberts strongly recommended that Merck further pursue "the isolation and characterization of the inhibitory component in F 4683 for use as a potential hypocholesterolemic agent".
> *    In December 1978, another sample - F 4797 - was found to have inhibitory activity that was tenfold higher than the first culture, F 4683.
> *    On February 12, 1979, the structure of lovastatin, the lactone (L-154,803), was recorded by Dr. Albers-Schonberg; the structure was similar to compactin.
> *    On February 12, 1979, Dr. Otto Hensens identified and recorded the structure of the open dihydroxy acid form of lovastatin.
> *    On February 13, 1979, Ms. Chen assayed the two samples used to identify the structures above and confirmed that they were inhibitory.
> *    On February 16, 1979, Mr. Alberts signed the Merck Confidential Memorandum of Invention (referred to below).
> *    On August 1, 1979, the structure of the natural dihydro (Compound II of the '380 Patent) was identified and recorded by Dr. Otto Hensens, having been found active in the HMG-CoA reductase assay on July 31, 1979.
> *    On August 2, 1979, a hydrolyzed version of the natural dihydro, being the open hydroxyl acid (Compound IV of the '380 Patent), was assayed and also found to be active in the HMG-CoA reductase assay.

**509**    On February 16, 1979, Dr. Alberts completed a "Confidential Memorandum of Invention", on behalf of the inventors. This Memorandum summarizes the work of the inventors. The structure of Compound I, a "homolog" of ML-236B (compactin), "produced by an *Aspergillus*" is described. The inventors explicitly note the utility or proposed use of the invention as "hypocholesteremic, antifungal". As of the date of the Memorandum, the inventors had found that the compound had "*in vitro* potency similar to ML-236B as inhibiting HMG-CoA reductase."

**510**    Apotex's main criticism of Merck's work relates to what was not done by the Merck scientists. Apotex submits that, because there was no testing of the compounds on humans before the Canadian filing date, Merck was missing a critical piece of factual information. In Apotex's

view, without this information, the inventors did not have an adequate factual basis for the prediction that the compounds would be "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans." However, when cross-examined on this issue, Mr. Alberts was clear as to how Merck reached its prediction, even though human trials had not taken place by the Canadian filing date.

> Q.    Based on the test results that you had obtained, the in vivo animal test results you'd obtained, would you not agree that you could not reliably predict that Lovastatin was going to be an effective treatment for hypercholesteremia in humans?
>
> A.    The only way I could answer that is with any drug before it's been tested in humans, whether it's Lovastatin, whether it's an antibiotic, no matter what it is, you can not reliably predict it's going to work in humans until you put it into the humans, and that is irrespective of the drug.
>
> Q.    In terms of these particular models, these animal results, is it not fair to say that these animal models, as a predictor of activity in humans, could not be relied upon to make a sound an assessment of its potential effectiveness?
>
> A.    There was enough -- let me go to one animal model that was a good predictor there, and that's the dog, because the dog responds very nicely to the other cholesterol lowering drug, cholestyramine; in fact, it's one of the few models that responds to cholestyramine. Humans respond to cholestyramine. Rats do not respond to cholestyramine. Dogs do. Humans do. So there was a reasonable assumption that a drug that did not lower cholesterol in the rats would conceivably work in humans and based on the biology, based on the biochemistry of the system, it was a reasonable prediction that it would work and based on our knowledge of Compactin. So we had a whole body of evidence that suggested it would work.

**511**    I agree with Mr. Alberts; the inventors had a whole body of evidence that suggested that the compounds would work in humans. The inventors had an adequate factual basis for their predictions.

> (b)    *Line of Reasoning*

**512**    I next consider whether Apotex has shown that there was no articulable line of reasoning from which the desired results could be inferred from the factual basis. The question is: given the experimentation and laboratory results that formed the factual basis together with information drawn from the prior art, could Merck reasonably infer that the compounds would meet the promise of being "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans"?

**513**    There was little expert evidence produced by either side that speaks directly to the question

of sound prediction or the line of reasoning. Some assistance was provided by Dr. Gotto, who described his own observations and the findings of scientists in the mid to late 1970s which demonstrated the link between high cholesterol and atherosclerosis.

**514**    It was also known at the relevant time that HMG-CoA was the enzyme in the liver responsible for making cholesterol.

**515**    Obviously, an essential element in the chain is an understanding of cholesterol biosynthesis. No expert presented an alternative to Mr. Alberts's description of the biosynthesis pathway. It follows, from an understanding of cholesterol biosynthesis, that a compound that can prevent the completion of this pathway - at any stage - will have a good chance of preventing the formation of cholesterol. Thus, it would have been part of the line of reasoning for the development of all statins, such as lovastatin, that a compound that could inhibit HMG-CoA *in vivo* could be predicted to lower cholesterol in humans.

**516**    The next step in the chain of reasoning is the key element - that is, compactin. The Merck inventors knew about the behaviour of compactin. Compactin works on the cholesterol biosynthesis at the HMG CoA reductase stage; it inhibits or prevents the enzyme from producing mevalonic acid. From the disclosure contained in the Endo Patent, the Merck scientists had knowledge of the *in vivo* activity of compactin.

**517**    The inventors also knew that the structure of the compounds that they had developed from fermentation of *Aspergillus terreus* was similar to the structure of compactin. It was not unreasonable for the inventors to predict that a compound with a similar structure to compactin would have similar inhibitory properties. Strengthening this prediction, the Merck scientists also had their own *in vitro* testing data that demonstrated activity. All of this information was available to the inventors of the '380 Patent as of February 12, 1979. This reasoning was confirmed by Dr. Gotto during cross-examination:

> Q.    Let me ask you this. If in 1979 a compound had been found that could inhibit HMG-CoA reductase in a cell culture in vitro, would one be able to know whether or not that compound would be effective in treating atherosclerosis, hyperlipidemia or those kinds of diseases in humans?
> A.    Based on the knowledge that one had about Compactin, yes.

**518**    In my view, an articulable line of reasoning has been demonstrated. In other words, by February 12, 1979, the inventors of the '380 Patent could soundly predict that the compounds of the invention would provide treatment for hypercholesteremia in humans based on the known *in vivo* activity of the closely-related compound, compactin, and Merck's own *in vitro* data. In other words, there was an articulable line of reasoning from which the desired result - lowering of cholesterol in humans - could be inferred from the factual basis. This was over a year in advance of the Canadian filing date of June 11, 1980.

**519**    Moving forward from February 1979, the Merck scientists were able to add even more information to support the articulable line of reasoning. By July 1979, Merck had supplementary *in vivo* data that confirmed cholesterol synthesis inhibition in rats. Well in advance of the Canadian filing date, Merck had obtained positive results in dogs. This information, while not essential to the sound prediction as of the Canadian filing date, certainly provides additional support for the prediction.

(c)    *Disclosure*

**520**    The final element of sound prediction is "disclosure". The question is: in the '380 Patent, has Merck provided disclosure of the factual basis and the line of reasoning? I believe that it has.

**521**    In *Eli Lilly Canada Inc. v. Apotex Inc.*, 2009 FCA 97, 78 C.P.R. (4th) 388 at para. 18, leave to appeal to SCC refused, [2009] S.C.C.A. No. 219 (QL), 401 N.R. 400 (note)) [*Eli Lilly Raloxifene (FCA)* ], the Court of Appeal (referring to *Wellcome AZT*, above) stated that, "where the claimed invention had not yet actually been reduced to practice, the patent must provide a disclosure such that a person skilled in the art, given that disclosure, could have as the inventors did, soundly predicted that the invention would work once reduced to practice."

**522**    Apotex's argument of inadequate disclosure involves two discrete areas: the first is the adequacy of disclosure of factual underpinnings of the invention, and the second is the adequacy of disclosure of methods for producing the claimed compounds from strains of *Aspergillus*.

**523**    With respect to the first argument, Apotex asserts that many of the facts that were stated by Dr. Alberts to form the basis of the inventors' prediction of utility were not disclosed in the patent. Specifically, Apotex submits as follows:

However, the only data disclosed in the '380 Patent that could form a "factual basis" for the predicted utility of the compounds as anti-hypercholesteremic agents are the tests reported in the examples. None of these tests evaluated the capacity of a test compound to lower serum cholesterol levels in mammals or humans. None of the compounds is shown to have been tested in an animal model to determine whether it lowered serum cholesterol. There is no reference or explanation of the rate-limiting role of the HMG-CoA reductase enzyme. There is no disclosure of the knowledge that Merck acquired from its work with compactin, and no disclosure of any relationship between the compounds of the invention and cholestyramine, or why (and how) the properties of cholestyramine would inform a prediction of utility. There is also no data about the toxicology, pharmacokinetics or bioavailability of the compounds that would enable the skilled addressee to predict that the compounds could be effectively administered

and tolerated by humans over the identified range of dosage strengths.
Accordingly, virtually all of the "facts" Dr. Alberts stated formed the basis of the
inventors' prediction of utility are not disclosed.

**524**    The first problem with Apotex's argument is that it is based on a requirement that the patent
disclose data to support the promise. The question of whether or not a patentee has obtained enough
data to substantiate its invention is an irrelevant consideration with respect to the application of
subsection 27(3) of the *Act*. The Court is concerned with the sufficiency of the disclosure, not the
sufficiency of the data underlying the invention (*Pfizer Atorvastatin* (*FCA*), above, at para. 56).

**525**    Apotex also refers to the animal testing carried out by Merck in 1979. Reference is made to
the testimony of Mr. Alberts where he agreed that the testing of dogs led Merck to believe that
lovastatin would result in cholesterol reduction in humans. The '380 Patent does not disclose this
testing. Thus, Apotex submits that the failure to disclose the existence and results of such tests
establishes that there is insufficient information disclosed in the '380 Patent to justify the prediction.
I do not agree with either Apotex's characterization of Mr. Alberts's testimony or the inference that
they draw.

**526**    Apotex relies on *Eli Lilly Raloxifene (FC)*, above. In that case, Justice Roger Hughes, the
trial judge, found, as a matter of fact, that Merck had placed reliance on a paper published before
the Canadian filing date (the Hong Kong study). Justice Hughes concluded that the requirement for
disclosure had not been met; the Court of Appeal agreed in *Eli Lilly Raloxifene FCA,* above, at
paragraph 17. As noted by the Court of Appeal in *Eli Lilly Raloxifene FCA*, at paragraph 15, "As
the prediction was made sound by the Hong Kong study, this study had to be disclosed." In my
view, the situation before me is distinguishable.

**527**    I agree that the cross-examination of Mr. Alberts resulted in a list of facts and information
that the inventors of the '380 Patent knew as of the Canadian filing date. One of the areas of interest
relates to the dog studies carried out in 1979. Apotex pounces on this information as something that
ought to have been disclosed in the '380 Patent in order to justify the sound prediction. However, I
do not understand the jurisprudence to teach that the patent specification must disclose absolutely
everything that that the inventor knew up to the relevant date. In *Eli Lilly Raloxifene (FC)*, above,
without disclosure of the Hong Kong study, a skilled person would not have had sufficient
information to understand the justification for the prediction. We must examine the specification to
determine whether, with the information disclosed (even if there was more information available
and undisclosed), a skilled person could have soundly predicted that the invention would work once
reduced to practice.

**528**    In the case of the '380 Patent, the question is whether sufficient information was disclosed to
allow the skilled person to soundly predict that the compounds of the invention would be "useful as
antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in
humans".

**529**    What was disclosed in the '380 Patent? The '380 Patent contains the following disclosures:

   *    the association between atherosclerosis and high cholesterol (p. 2, lines 11-15);
   *    the utility of inhibiting cholesterol biosynthesis (p. 2, lines 14-16);
   *    prior art consisting of US patents for compactin, a fermentation product obtained from the genus *Penicillium*, which compound was found to be an inhibitor, *in vivo*, of the biosynthesis of cholesterol (p. 2, lines 17-26);
   *    the discovery by the inventors of the '380 Patent that compounds produced from *Aspergillus* are more potent inhibitors of cholesterol synthesis *in vivo* than compactin (p. 2, lines 28-33; p. 3, lines 1-5);
   *    the fact that HMG-CoA reductase inhibition is the relevant means of inhibiting cholesterol biosynthesis (p. 14, lines 30-35);
   *    the structure of lovastatin and the other compounds (p. 9, 10, 11 and 12);
   *    *in vitro* HMG-CoA reductase inhibition by lovastatin, (p. 14, line 30; p. 15, line 6; p. 24, lines 7-8; p. 25, lines 10-12; p. 42, lines 1-13); and
   *    *in vivo* inhibition of cholesterol synthesis by Compound II (p. 42, lines 15-25).

**530**    Taken as a whole, I am not persuaded that there was inadequate disclosure. A skilled person would conclude that the '380 Patent sufficiently discloses the factual basis and the line of reasoning to soundly predict that the claimed compounds would be useful in the treatment of high cholesterol. In other words, as required by the jurisprudence, the '380 Patent discloses the factual basis and line of reasoning for its promise. The prediction was made sound by the information disclosed; the disclosure of other information within the knowledge of the inventors was not essential to the prediction.

**531**    The second of Apotex's submissions is that the '380 Patent fails to disclose the methods for determining which strains of the genus *Aspergillus* will produce the desired compounds. As discussed in the section of these reasons on claims construction, I have concluded that the patent only claims compounds produced from *Aspergillus terreus* and, further, that it does not promise that lovastatin can be produced from all strains of *Aspergillus terreus*. Apotex argues that, even on this narrower construction and promise, Merck was required to disclose the methods for identifying producing strains. Apotex argues that the specification does not disclose this information and that to find the producing strains would require excessive and inventive experimentation by the skilled person.

**532**    The courts have recognized that "routine trials and experiments not amounting to new inventions might be required to put [an invention] into practice" (*Proctor & Gamble Co. v. Bristol-Myers Ltd.* (1978), 39 C.P.R. (2d) 145 at para. 51, [1978] F.C.J. No. 812 (QL) (F.C.T.D.); see also, *Mobil Oil Corp. v. Hercules Canada Inc.* (1995), 63 C.P.R. (3d) 473, [1995] F.C.J. No. 1243 (QL) (F.C.A.)); *Aventis Pharma Inc. v. Apotex Inc.* 2005 FC 1283, 43 C.P.R. (4th) 161 at para. 207). The evidence before me does not support Apotex's assertion that inventive experimentation would be required to find producing strains of *Aspergillus terreus*. I have already discussed this

issue (see paragraphs 57 to 130) under claims construction. To repeat, I am satisfied that the skilled person could use well-known techniques to rapidly screen a large number of isolates of strains of *Aspergillus terreus* to determine which strains are producing. Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

### D.    *First Inventorship/Missed Conflict*

#### (1)    Introduction

**533**    Apotex submits that the Merck inventors were not the first inventors of the compound lovastatin as claimed in the '380 Patent and that, therefore, the '380 Patent should be invalidated on the basis that the "invention" of the '380 Patent was known or used as of the date of filing the patent application. In so arguing, Apotex recognizes that it must overcome the requirements of the *Patent Act*.

**534**    The patent application that resulted in the issuance of the '380 Patent was patent application No. 353, 777 filed with the Patent Office on June 11, 1980 (the Monaghan Application). Apotex submits that the Monaghan Application disclosed the invention of lovastatin and ought to have been placed into conflict with patent application No. 345, 983 (the Endo Application), which was filed with the Patent Office on February 19, 1980. The Endo Application ultimately resulted in the issuance of the '794 Patent.

#### (2)    Legal Principles

**535**    Prior to 1989, the overall scheme under the *Patent Act* was one of first to invent. By contrast, the scheme under the *Patent Act* currently in force can be described as first to file. The notion of first inventorship is embodied in s. 27(1) of the *Act*:

> 27. (1) Subject to this section, any inventor or legal
> representative of an inventor of an invention that was

> (a)    not known or used by any other person before he invented it,
> (b)    not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and
> (c)    not in public use or on sale in Canada for more than two years prior to his application in Canada,

> may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other

requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

* * *

Sous réserve des autres dispositions du présent article, l'auteur de toute invention ou le représentant légal de l'auteur d'une invention peut, sur présentation au commissaire d'une pétition exposant les faits, appelée dans la présente loi "le dépôt de la demande", et en se conformant à toutes les autres prescriptions de la présente loi, obtenir un brevet qui lui accorde l'exclusive propriété d'une invention qui n'était pas :

a)    connue ou utilisée par une autre personne avant que lui-même l'ait faite;

b)    décrite dans un brevet ou dans une publication imprimée au Canada ou dans tout autre pays plus de deux ans avant la présentation de la pétition ci-après mentionnée;

c)    en usage public ou en vente au Canada plus de deux ans avant le dépôt de sa demande au Canada.

**536**    Recognizing that more than one person might claim inventorship to similar or overlapping subject matters, Parliament provided means for identifying and resolving such a conflict. To begin, s. 43(1) of the *Act* defines when a conflict exists:

Conflict between two or more pending applications exists

(a)    when each of them contains one or more claims defining substantially the same invention; or

(b)    when one or more claims of one application describe the invention disclosed in one of the other applications

* * *

Se produit un conflit entre deux ou plusieurs demandes pendantes dans les cas suivants:

a)    chacune d'elles contient une ou plusieurs revendications qui définissent substantiellement la même invention;

b)    une ou plusieurs revendications d'une même demande décrivent l'invention divulguée dans l'autre ou les autres demandes

The balance of s. 43 sets out the procedures for declaring and dealing with a conflict.

**537**    While s. 27(1) gives the right to a patent to the first inventor, the *Act* also contemplates that legal proceedings may be brought with respect to the validity of patents (see the *Patent Act*, starting at s. 53). In particular, s. 59 of the *Act* permits a defendant (such as Apotex) in a patent infringement action to plead "any fact or default which by this *Act* or by law renders the patent void." Under s. 60(1) of the *Act*, a patent or any claim in a patent may be "declared invalid or void by the Federal Court ... at the instance of any interested person."

**538**    However, when the validity of a patent is being challenged on the question of inventorship, s. 61(1) is a limiting or qualifying provision. In the case before me, s. 61(1)(b) is relevant:

> No patent or claim in a patent shall be declared invalid or void on the ground that, before the invention therein defined was made by the inventor by whom the patent was applied for, it had already been known or used by some other person, unless it is established that

> (b)    that other person had, before the issue of the patent, made an application for patent in Canada on which conflict proceedings should have been directed;

> * * *

> Aucun brevet ou aucune revendication dans un brevet ne peut être déclaré invalide ou nul pour la raison que l'invention qui y est décrite était déjà connue ou exploitée par une autre personne avant d'être faite par l'inventeur qui en a demandé le brevet, à moins qu'il ne soit établi que, selon le cas :

> b)    cette autre personne avait, avant la délivrance du brevet, fait une demande pour obtenir au Canada un brevet qui aurait dû donner lieu à des procédures en cas de conflit;

**539**    As stated in s. 61(1)(b), no patent will be declared invalid on the grounds of prior inventorship by some other person <u>unless</u> the challenging party can establish that the other person had, before the issue of the patentee's patent, made an application for a patent in Canada <u>on which conflict proceedings should have been directed.</u> Stated in other words, a party may only successfully raise inventorship as an issue if: (a) the invention in the patent or claim had already "been known or used by some other person"; (b) the other person made a patent application for this prior invention in Canada; or (c) "conflict proceedings should have been directed". The interpretation of s. 61(1)(b) was the subject of discussion in the case of *Laboratoires Servier v. Apotex Inc.*, 2008 FC 825, 67 C.P.R. (4th) 241 [*Servier FC* ] .

**540**    Thus, the threshold question to be answered is whether, on the facts before me, there was a "missed conflict". In other words, should conflict proceedings have been directed between the Endo Application and the Monaghan Application? If there was no missed conflict, Apotex is precluded, by s. 61(1)(b), from challenging the validity of the '380 Patent on the grounds of prior inventorship.

(3)    Was there a missed conflict

**541**    The Endo Application was filed on February 19, 1980; the Endo Patent was issued on August 17, 1982. The Monaghan Application was filed on June 11, 1980; the '380 Patent was issued on January 31, 1984. Conflict could have been declared only during the co-pendency of the two applications; that is, between June 11, 1980 and August 17, 1982.

**542**    A review of the case or file history for the '380 Patent provides us with the sequence of events leading to the issuance of the patent.

**543**    As filed, claims 1 to 7 of the Monaghan Application were claims to processes for producing certain compounds. However, claim 8 was for Compounds I and II alone and claim 9 was for Compounds III and IV alone. Claims 10 to 19 were claims to salts, esters and compounds all of which were dependent on claims 8 or 9. While claims 1 to 7, as filed, were product-by-process claims, claims 8 to 19 did not contain process restrictions; they were what is referred to as *per se* claims. The problem with *per se* claims is that they were not permissible under the *Patent Act*, as it existed at the relevant time. Specifically, s. 41(1) (later, s. 39(1)) of the *Patent Act*, as it stood in 1982) stated that:

> In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification shall not include claims for the resulting food or medicine itself, except when prepared or produced by or significantly derived form the methods or processes of manufacture particularly described and claimed. [Emphasis added.]

> * * *

> Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués.

> [Non souligné dans l'original.]

In simple terms, the inventors of the Monaghan Application could never have received a patent that included claims 8 to 19, as originally filed.

**544** In a letter from the Patent Office dated November 10, 1982 (Office Action), counsel for the Monaghan Application was advised of the problem:

> The claims of this application are governed by Section 41(1) of the Patent Act. In the case of a substance intended for food or medicine and prepared by a chemical process, an application must have a patentable process claim, and any product claim must be in process-dependent form and of the same scope as the process claim. Amendment or cancellation of claims 8-19 is required.

**545** The response to the Office Action was received by the Patent Office on February 9, 1983. Amended claims 1 through 20 were substituted for the non-allowable claims 8 to 19. Evidently, the Commissioner of Patents agreed with the submission that the Monaghan Application now contained "claims conforming with the requirements of section 41(1)"; the '380 Patent was issued on January 31, 1984.

**546** Each of Apotex and Merck put forward an expert to speak to the practices of the Patent Office at the relevant times. Both Mr. Robert Barrigar (put forward by Merck) and Mr. Robert Hirons (put forward by Apotex) have been registered patent agents in Canada for a long time. Both have extensive knowledge of Canadian patent prosecution and practice between 1980 and 1982, and are knowledgeable about practices of the Commissioner of Patents at that time. I accepted the qualifications of each to speak to these matters.

**547** Both experts agreed that a declaration of conflict would not have been made between two pending applications when each application contained process-dependent claims for the same compound made using different processes. Accordingly, the question of missed conflict could only have arisen between claims 8 to 19, as originally filed, of the Monaghan Application and some or all of the claims of the Endo Application.

**548** Mr. Hirons opined that the requirements of s. 43(1)(b) of the *Patent Act* were satisfied and a conflict, as defined in that provision, existed between the two applications (Hirons Expert Report, Exhibit 117, para. 13). Mr. Hirons pointed out that, during the period of co-pendency, the compound claims in the Monaghan Application were not restricted by process. Thus, in his view, a conflict between the two applications necessarily existed. In other words, one or more of claims 8 to 19 of the Monaghan Application described the invention disclosed in the Endo Application and, as a result, the Commissioner should have commenced conflict proceedings.

**549** Frankly, this is, to a large degree, a legal opinion and not one for which I need the assistance of an expert. That being said, I do not disagree with Mr. Hirons's conclusion that a conflict, as defined in s. 43(1)(b), existed as between the two applications. Moreover, Mr. Hirons's description of how conflict proceedings were conducted, once directed, is not inaccurate.

**550**     However, Mr. Hirons fails to answer the question of whether "conflict proceedings <u>should</u> have been directed". He assumes that the existence of a conflict automatically requires the Commissioner to direct conflict proceedings. The mere existence of a conflict at the application stage does not, in my view, automatically mean that conflict proceedings should have been directed.

**551**     In responding to this question, I refer first to the procedures described in s. 43, in respect of the legal requirements of the *Patent Act*. Sections 43(2) to 43(4) deal with procedures to be followed <u>before</u> a conflict is declared. I accept that, when a s. 43(1) conflict exists, s. 43(2) sets out a mandatory procedure to be followed.

> Procedure to be followed before conflict is declared

> (2) When the Commissioner has before him two or more applications referred to in subsection (1), he shall

> (a)    notify each of the application of the apparent conflict and transmit to each of them a copy of the conflicting claims, together with a copy of this section; and
> (b)    give to each applicant the opportunity of inserting the same or similar claims in his application within a specified time.

> * * *

> Procédure à suivre avant déclaration de conflit

> (2)    Lorsque le commissaire a devant lui deux ou plusieurs de ces demandes, il doit :

> a)    notifier à chacun des demandeurs le conflit apparent, et transmettre à chacun d" eux une copie des revendications concurrentes, ainsi qu'une copie du présent article;
> b)    procurer à chaque demandeur l'occasion d'insérer dans sa demande les mêmes revendications ou des revendications similaires, dans un délai spécifié.

**552**     In this case, assuming that claims 9 to 19 of the Monaghan Application, as originally filed, were in conflict with some or all of the claims in the Endo Application, the Commissioner was required to follow the procedure set out in s. 43(2) of the *Act*. He did not do so in this case. However, these are steps to be taken before the declaration of conflict to determine if there should be a <u>formal</u> declaration. Thus, even if the Commissioner erred by not complying with the mandatory provision, any such error would be of no moment if, at the end of the day, there was no need to make a formal declaration of conflict. The next step - the formal declaration - is set out in s. 43(5):

Formal declaration of conflict

(5)    Where the subject matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications, the Commissioner shall require each applicant to file in the Patent Office, in a sealed envelope duly endorsed, within a time specified by him, an affidavit of the record of invention, which affidavit shall declare

    (a)    the date at which the idea of the invention described in the conflicting claims was conceived;

    (b)    the date on which the first drawing of the invention was made;

    (c)    the date when and the mode in which the first written or oral disclosure of the invention was made; and

    (d)    the dates and nature of the successive steps subsequently taken by the inventor to develop and perfect the invitation from time to time up to the date of the filing of the application for patent.

* * *

Déclaration formelle de conflit

(5)    Si l'objet des revendications visées au paragraphe (3) est reconnu brevetable et que les revendications concurrentes sont maintenues dans les demandes, le commissaire exige de chaque demandeur le dépôt, au Bureau des brevets, dans une enveloppe scellée portant une suscription régulière, dans un délai qu'il spécifie, d'un affidavit du relevé de l'invention. L'affidavit déclare :

    a)    la date d laquelle a été conçue l'idée de l'invention décrite dans les revendications concurrentes;

    b)    la date laquelle a été fait le premier dessin de l'invention;

    c)    la date i laquelle a été faite 1a première divulgation écrite ou orale de !'invention et la manière dont elle a été faite;

    d)    les dates et la nature des expériences successives que l'inventeur a pratiquées par la suite afro de développer et mettre graduellement an point cette invention jusqu'à la date du dépôt de la demande de brevet,

**553**    Of critical importance, this provision establishes that the conflict proceedings described in s. 43(5) and the balance of s. 43 only apply "where the subject-matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications."

**554**    Relating the file history to the co-pendency period between the Endo Application and the Monaghan Application, at no time between June 11, 1980 and August 17, 1982 was the Monaghan Application in a patentable form. Quite simply the potentially-conflicting *per se* claims of the Monaghan Application were not patentable; claims 8 to 19 did not contain claims that met the requirements of the *Patent Act*. The subject matter of claims 8 to 19 was <u>not</u> patentable. In short, during the co-pendency period, there was no obligation on the Commissioner to declare a conflict.

**555**    My understanding of s. 43 of the *Patent Act* is consistent with the practices of the Patent Office. Mr. Barrigar, using his experience and knowledge of processes in the Patent Office, provided his opinion on how, in practical terms, the Patent Office would have dealt with the two patent applications. This portion of his Expert Report and his oral testimony were very helpful. In brief, the Patent Office would not, faced with unpatentable claims, have initiated conflict proceedings. Rather, the practice of the Patent Office was as described by Mr. Barrigar (Barrigar Expert Report, Exhibit 44, para. 18):

> Based on my experience, and consistent with the provisions of the "Old Act", it was the uniform practice of the Patent Office in the period 1980 to and including 1984 to implement conflict practice in the context of the Patent Act as a whole. As discussed more fully below, this meant that only claims satisfying the other requirements of the Act and applicable Patent Rules were placed in conflict. It was the practice of the Patent Office to endeavour to dispose of all other claiming issues before declaring any conflict, so that if possible it would not be necessary to conduct conflict proceedings. Conflict proceedings constituted a drain on Patent Office resources and delayed issue of patents.

**556**    Thus, while the Commissioner may "technically" have been required to comply with ss. 43(2) to 43(4) of the *Act*, his failure to do so is without consequence where, as in this case, the requirements to pursue the conflict in formal proceedings, as set out in s. 43(5), were not met. Even Mr. Hirons finally agreed, on cross-examination that:

> There are very good policy reasons why the Commissioner of Patent would not want to launch or commence conflict proceedings in respect of claims that everybody knows cannot be issued in the form they are written.

**557**    Apotex asserts that the practice of resolving apparent conflicts, by requiring the applicant to amend all or part of the specification to remove objectionable claims, should have no bearing on the right to invoke s. 61 of the *Patent Act*. I disagree. Where a patent application contains claims that can never result in a patent, there is no conflict to declare.

**558**    In summary on this issue, I am satisfied that, on the facts of this case, there was no requirement to direct conflict proceedings between the Endo Application and the Monaghan Application. There was no missed conflict and Apotex is precluded, by s. 61(1)(b) of the *Act*, from challenging the validity of the '380 Patent on the grounds of prior inventorship.

(4)   Did the Endo application disclose the invention of the '380 Patent?

**559**   If I am incorrect in my conclusion that Apotex is precluded from challenging the validity on the grounds of prior inventorship, I turn to the question of whether the Endo Application and Patent disclose the same invention as that of the '380 Patent.

**560**   The Endo Application and Patent clearly refer to a substance called "Monacolin K". As set out in claim 1, the Endo Patent claims:

> A process for preparing Monacolin K, which process comprises cultivating a Monacolin K-producing micro-organism of the genus *Monascus* in a culture medium therefore.

**561**   It is accepted that Monacolin K is lovastatin. However, as discussed earlier in these Reasons, an essential feature of the claims of the '380 Patent is that the lovastatin be made using a strain of the species *Aspergillus terreus*. The invention is lovastatin when made by fermentation of *Aspergillus terreus* and does not include lovastatin made with other micro-organisms. *Monascus* is a different genus from *Aspergillus*. Accordingly, the two applications that included allowable claims did not contain one or more claims defining substantially the same invention. Moreover, neither application described the invention disclosed in the other application.

**562**   Thus, even if I accept that there was a missed conflict, the invention of the '380 Patent is not the same as that of the Endo Application or Patent. Apotex has not persuaded me that the invention of the '380 Patent was known or used by Dr. Endo prior to the filing date of the Monaghan Application.

(5)   Red Yeast Rice/Anticipation

**563**   Apotex submits that claims 13 to 15 of the '380 Patent are invalid pursuant to the principles of "anticipation by prior use". Briefly stated, Apotex's argument is that the compound lovastatin (also known as Monacolin K) was known and used in the form of traditional Red Yeast Rice long before the priority date of the '380 Patent or any earlier date of invention. Thus, Apotex alleges that the presence of lovastatin in any Red Yeast Rice product before the priority date of the '380 Patent was anticipatory of claims 13 to 15. In this section, I will use the term "Red Yeast Rice" to refer to the products, including rice, that are made with the substance known as red yeast.

(a)   *Principles of Anticipation*

**564**   The concept of anticipation arises from s. 27(1) of the *Patent Act*. Subsection 27(1) permits any inventor to file an application for an invention that was "not known or used by any other person before he invented it". This requirement is echoed in s. 61(1)(a), which allows the Court to invalidate any patent or claim(s) if another person had "disclosed or used the invention in such a manner that it had become available to the public". In short, the *Patent Act* requires that the subject

matter of a claim must not have been disclosed to the public before the claim date.

565     The guiding jurisprudence on the legal test of anticipation is found in the Supreme Court of Canada decision in *Apotex v. Sanofi-Synthelabo*, 2008 SCC 61, [2008] 3 S.C.R. 265 [*Sanofi-Synthelabo* ]. At paragraphs 23-27, the Supreme Court teaches that the issue of whether an invention is anticipated by the prior art requires that the Court have regard to two questions:

1.    Was the subject matter of the invention disclosed to the public by a single disclosure?
2.    If there has been such a clear disclosure, is the working of the invention enabled by that disclosure?

566     At the first step of the analysis, the Supreme Court provided the following guidance (*Sanofi-Synthelabo*, above, at para. 25):

> When considering the role of the person skilled in the art in respect of disclosure, the skilled person is "taken to be trying to understand what the author of the description [in the prior patent] meant" (para.32). At this stage, there is no room for trial and error or experimentation by the skilled person. He is simply reading the prior patent for the purposes of understanding it.

567     Once disclosure has been made, the question of enablement was described by the Supreme Court (*Sanofi-Synthelabo*, above, at para 27):

> Once the subject matter of the invention is disclosed by the prior patent, the person skilled in the art is assumed to be willing to make trial and error experiments to get it to work. While trial and error experimentation is permitted at the enablement stage, it is not at the disclosure stage. For purposes of enablement, the question is no longer what the skilled person would think the disclosure of the prior patent meant, but whether he or she would be able to work the invention.

568     In *Abbott Laboratories v. Canada (Minister of Health)*, 2008 FC 1359, 337 F.T.R. 17 [*Abbott Clarithromycin (FC)* ], aff'd 2009 FCA 94, 387 N.R. 347, Justice Hughes undertook a helpful survey of the law of anticipation as it exists after *Sanofi-Synthelabo*, above. He summarized the legal requirements for anticipation as follows (*Abbott Clarithromycin (FC)*, above, at para. 75):

> For there to be anticipation there must be both disclosure and enablement of the claimed invention.

> 1.    The disclosure does not have to be an "exact description" of the claimed invention. The disclosure must be sufficient so that when read by a person

    skilled in the art willing to understand what is being said, it can be understood without trial and error.

2.    If there is sufficient disclosure, what is disclosed must enable a person skilled in the art to carry out what is disclosed. A certain amount of trial and error experimentation of a kind normally expected may be carried out.

3.    The disclosure when carried out may be done without a person necessarily recognizing what is present or what is happening.

4.    If the claimed invention is directed to a use different from that previously disclosed and enabled then such claimed use is not anticipated. However if the claimed use is the same as the previously disclosed and enabled use, then there is anticipation.

5.    The Court is required to make its determinations as to disclosure and enablement on the usual civil burden of balance and probabilities, and not to any more exacting standard such as quasi-criminal.

6.    If a person carrying out the prior disclosure would infringe the claim then the claim is anticipated.

**569**    The date for assessment of anticipation is June 15, 1979, the priority date of the '380 Patent.

    (b)   *Background on Red Yeast Rice*

**570**    It is undisputed that Red Yeast Rice (or similar products containing red yeast, such as red yeast bean curd) has been used produced and consumed in Asian countries for hundreds of years. Dr. Scott Harding, an expert witness presented by Apotex, described the uses of Red Yeast Rice in (mainly) Chinese culture as follows (Harding Expert Report, Exhibit 115, para. 15):

    [Red Yeast Rice] has traditionally been used as a specialty food, as a dye or food pigment and as a natural remedy for gastrointestinal infections and diseases of the blood.

**571**    According to Dr. Harding, more recently, Red Yeast Rice has been marketed as a product that can lower lipid levels and reduce cardiovascular risk.

    (c)   *Legal Consequences of lovastatin in Red Yeast Rice*

**572**    The expert testimony of Dr. Harding is to the effect that Red Yeast Rice is not and was not produced from *Aspergillus terreus*. Dr. Harding opined that traditional Red Yeast Rice was produced through fermentation of certain strains of species from the genus *Monascus*.

**573**    Since Red Yeast Rice does not involve the use of *Aspergillus terreus* in any way, it cannot have been an anticipatory disclosure of the process claims of the '380 Patent. As discussed in the section of these reasons on claims construction, claims 1 to 12 are process claims in which producing strains of *Aspergillus terreus* are fermented to produce certain compounds (including

lovastatin as Compound I). Apotex does not assert the argument of anticipation against claims 1 to 12; rather it limits it argument to the product-by-process claims 13 to 15.

**574**   Claim 13 is a claim to any one of Compounds I to IV, when prepared by the process defined in claim 1 or by an obvious chemical equivalent. Claim 14 is a claim to one of Compound I or II, when prepared by the process defined in claim 2 or by an obvious chemical equivalent and claim 15 is a claim to one of Compound III or IV, when prepared by the process defined in claim 5, or by an obvious chemical equivalent. Earlier in these reasons, I construed claims 13 to 15 to require that, as an essential element, the product (be it Compound I, II, III or IV) is produced by the process defined in the earlier claims. Specifically, the compounds of claims 13 to 15 <u>must</u> be made from the fermentation of a species of *Aspergillus terreus*.

**575**   For the moment, I will assume that lovastatin could be found in Red Yeast Rice as of the priority date. I accept the opinion of Dr. Harding that Red Yeast Rice is a result of the fermentation of species within the genus *Monascus*. If the allegedly anticipatory product - lovastatin found in Red Yeast Rice - is produced from something other than *Aspergillus terreus*, it cannot, in my view, meet the legal test for anticipation. Stated in terms of the test, Red Yeast Rice does not meet the first requirement that the prior invention must disclose the subject matter of claims 13 to 15.

**576**   Apotex responds to this analysis by asserting that a product-by-process claim is a claim to the product. In the words of Apotex:

> Where the product was previously known and a new process for making it has been discovered, the only invention that can be claimed is the process because the product is not "new". Thus, a product-by-process claim can be anticipated by prior disclosure of the product but not of the process.

Apotex relies on the Supreme Court decision in *Hoffmann-LaRoche Ltd. v. Canada (Commissioner of Patents)*, [1955] S.C.R. 414, 23 C.P.R. 1 [*Hoffmann-LaRoche 1955* cited to S.C.R.] for this submission.

**577**   I acknowledge that the *Hoffmann-LaRoche 1955* decision does appear to support Apotex's position. *Hoffmann-LaRoche 1955* involved an application for a patent that claimed a new process for making a known substance called aldehyde, as well as aldehyde when made by that process. The Commissioner of Patents granted the claim for the new process for making aldehyde, but not the claim for aldehyde made by that process. The inventor appealed to the Exchequer Court, without success (*Hoffmann-La Roche Ltd. v. Canada (Commissioner of Patents)* (1953), [1954] Ex. C.R. 52, 19 C.P.R. 80), and then to the Supreme Court of Canada, again without success. In his brief reasons for dismissing the appeal, Chief Justice Cartwright, speaking on behalf of four of five of the justices, stated: "There being nothing new about the product, the appellant is not entitled to obtain a patent therefore even on the basis of a process dependent product claim" (*Hoffmann-LaRoche 1955*, above, at p.415). Little analysis is offered in the single page of Chief Justice Cartwright's reasons.

**578**    I admit to having considerable difficulty in understanding how the conclusion in *Hoffmann-LaRoche 1955* can fit with the protection offered by the *Patent Act*. It seems illogical to me that a process for making a substance can be novel and thus patentable but that a claim for the product when made by that process is automatically not patentable. I understand that situations could exist that would invalidate the product-by-process claim. For example (without limitation):

> \*    a product-by-process claim could be challenged on the basis that the substance, <u>when made by the described process</u>, was anticipated or obvious; or
>
> \*    an earlier patent or disclosure is to the product made by any means (although, of course, this could not have happened with the '380 Patent since, at that time, *per se* claims were not permitted).

However, where the substance is only claimed when made by a particular process and where the making of the product by that particular process is novel, the boundaries of the claim are well delineated. I cannot see why the claim would automatically be invalidated simply because someone else has claimed the same product made by a different process.

**579**    Finally, I observe that the Supreme Court in *Hoffmann-LaRoche 1955* implicitly accepted the validity of the claims to "a new and useful process for manufacture of an aldehyde". There is, in my view, no principled reason why, if the product-by-process claim is invalidated, the new process for making the known substance is not also invalid.

**580**    There has been little jurisprudence in which the principle in *Hoffmann-LaRoche 1955*. However, what little there has been over the last 65 years does not, it seems, directly contradict the Supreme Court decision. *Hoffmann-LaRoche 1955* was recently considered by the Federal Court of Appeal in *Abbott Laboratories v. Canada (Minister of Health)*, 2007 FCA 153, 59 C.P.R. (4th) 30 (*Abbott Clarithromycin (FCA)*), where Justice Sharlow observed at paragraph 15 that, "There is no jurisprudence that casts any doubt on the correctness of the principle stated in *Hoffmann.*"

**581**    The Court of Appeal also had occasion to examine the applicability of *Hoffmann-LaRoche 1955* in *Bayer AG v. Apotex Inc.*, 2001 FCA 263, 14 C.P.R. (4th) 263 [*Bayer Ciproflaxin* ]. In that case, Apotex Inc. appealed from an order prohibiting the Minister of National Health and Welfare from issuing to it an NOC under the *Regulations*. Apotex alleged that Bayer's Canadian patents for ciprofloxacin were invalid because Bayer had already applied in another country for a patent on the same drug. The inventions were substantially the same but used a different synthesis process. Apotex Inc. relied on *Hoffmann-LaRoche 1955* for the proposition that the differences in the process for the making of the drug were not "legally relevant" (*Bayer Ciproflaxin*, above, at para. 15). In rejecting this argument, Justice Evans, speaking for the Court, commented as follows (*Bayer Ciproflaxin*, above, at para. 16):

> In our view, however, that case is readily distinguishable from the case at bar. In particular, the issue in Hoffmann-La Roche, supra, was whether the patent application satisfied the requirement in paragraph 28(1)(b) of the Patent Act that

a patent may only be obtained for an invention to the extent that it contains an element of novelty. This is not the question before us. What we must decide is whether the inventions that are the subject of the Chilean and Canadian patents are the same invention. And, as counsel for Bayer points out in his memorandum, <u>Apotex did not allege in any of its notices of allegations that the product by process patent obtained in Canada for ciprofloxacin was invalid because ciprofloxacin had already been invented, and that the use of the malonic ester synthesis process to produce an intermediate could not therefore render the invention novel.</u> [Emphasis added.]

**582**   In summary, it appears that I must accept the holding of *Hoffmann-LaRoche 1955*. In contrast to the situation before Justice Evans in *Bayer Ciproflaxin*, Apotex has clearly argued that the product-by-process claims are invalid because the substance - lovastatin or Monacolin K - had already been invented. Paraphrasing the words of Justice Sharlow in *Abbott Clarithromycin (FCA)*, above, for the purposes of applying the *Hoffmann-LaRoche 1955* principle, lovastatin is "known" as of June 15, 1979, if a hypothetical claim for its invention would fail on the ground of anticipation or lack of novelty.

**583**   Apotex submits that the existence of Red Yeast Rice - a substance known for centuries - would satisfy this test. The issue is whether the product lovastatin, as described in the '380 Patent, however made, was anticipated by Red Yeast Rice.

(d)   *Evidence of lovastatin in Red Yeast Rice prior to the priority date*

**584**   The first question is whether the evidence before me establishes that Red Yeast Rice was a source of lovastatin before the priority date. If it does not, then the claim of anticipation must fail. However, if I am persuaded that, on a balance of probabilities, Red Yeast Rice, prepared by traditional methods, contained lovastatin, I will continue on to consider whether there was both disclosure and enablement.

**585**   In Dr. Harding's opinion, there is ample scientific literature that indicates that Red Yeast Rice and similar products "produced in solid phase fermentation and using strains of *Monascus* that were traditionally employed, have appreciable levels of Monacolin K [lovastatin] and are effective in lowering blood cholesterol *in vivo*" (Harding Expert Report, Exhibit 115, para. 52). Dr. Harding concludes that, "people have consumed Monacolin K for centuries."

**586**   Dr. Harding stated that the amount of Monacolin K in Red Yeast Rice will vary depending on the fermentation conditions used. It follows (and Dr. Harding did not disagree) that not all Red Yeast Rice contains Monacolin K.

**587**   In addition to his literature search, Dr. Harding tested two different samples of Red Yeast Rice products that he bought from Asian specialty markets in Winnipeg and Toronto. His conclusion was that both samples contained low, but detectable, levels of Monacolin K.

**588**    I will begin with the results from Dr. Harding's tests on two commercial samples of Red Yeast Rice. Even if those samples did contain measurable quantities of lovastatin (Monacolin K) (which I am prepared to accept), these samples were produced well after the priority date of the invention of the '380 Patent. They tell us nothing about the existence of lovastatin in Red Yeast Rice at any time prior to 1979. Moreover, beyond representations on the packaging, we have no evidence as to how these commercial products were produced and whether the lovastatin found in the samples resulted from traditional methods of fermentation.

**589**    As described by Dr. Harding, the modern techniques of producing Red Yeast Rice would differ from traditional methods:

> The modern techniques would employ things like flasks and control environments. Traditionally these things were fermented in boxes or bamboo plates, containers, in open areas, and the temperature was controlled either by fanning or ensuring no direct sunlight, these sorts of things, but also by mixing the rice to uniformly distribute the yeast to get the full colour and the final product through every kernel of rice, but it's also to reduce the temperature.

**590**    In his Expert Report, Dr. Harding also notes that, while traditional and modern production practices are quite similar, "modifications [have] been introduced into modern production to enhance the production of the desired metabolites" (Harding Expert Report, Exhibit 115, para. 28).

**591**    Dr. Havel, an expert presented to the Court by Merck, also commented that:

> Samples collected in January to April 1998, 12 years after the Negishi paper, may have been produced under conditions which were not, I believe, we can consider truly traditional red yeast rice on or before 1980.

**592**    In my view, Dr. Harding's opinion that the two samples he tested were prepared in accordance with traditional methods is speculative. The results of Dr. Harding's tests on two Red Yeast Rice samples cannot be used to reliably demonstrate that, before the priority date, Red Yeast Rice contained lovastatin.

**593**    I have similar difficulties with the literature referenced by Dr. Harding in his Expert Report. One article was cited as Negishi et al, "Productivity of Monacolin K in the genus Monascus species" (referred to as Negishi). Negishi reports having tested 124 *Monascus* strains in total. Almost all of the species were isolated from several different red yeast food products. Negishi used modern techniques to carry out the experiments, and found that 17 strains of five species were capable of producing Monacolin K. The initial problem that I have with this paper is that it post-dates, by many years, the priority date of the '380 Patent. I have no information on how the Red Yeast Rice samples were collected and whether these same products would have been available in the years before 1979.

**594**    Another reference by Dr. Harding was a 2001 journal article by Heber et al, entitled "An Analysis of Nine Proprietary Chinese Red Yeast Rice Dietary Supplements: Implications of Variability in Chemical Profile and Contents" (referred to as Heber). Heber purchased nine different commercially available dietary Red Yeast Rice supplements and found total Monacolin K content from 0% to 0.58%. While the paper may demonstrate that a few samples of Red Yeast Rice products collected and tested for purposes of the paper contained measurable amounts of Monacolin K, they do not establish that lovastatin existed in Red Yeast Rice prior to 1979.

**595**    The only possible link between testing that occurred after 1979 and the potential for the production of lovastatin from Red Yeast Rice prior to that date would be the production methods. Dr. Harding appears to base his overall opinion that traditional Red Yeast Rice has contained Monacolin K throughout the centuries on the observed similarities between traditional and modern production methods. If it can be established that the production methods used in both periods were the same, it may be possible to extrapolate post-1979 results to pre-1979 samples of Red Yeast Rice.

**596**    Dr. Harding testified in cross-examination that, of the seven pieces of prior art cited in his report, only two dealt with the fermentation of Red Yeast Rice prior to 1979.

**597**    However, upon closer examination, there were significant differences in the traditional methods of producing Red Yeast Rice and those that would produce lovastatin, including:

> *    traditional Red Yeast Rice was most likely be fermented at temperatures in excess of 30oC where lovastatin cannot be produced;
> *    there is an inverse relationship between the amount of pigment-producing ability and the amount of lovastatin-producing ability in Red Yeast Rice; and
> *    the modern strains of Red Yeast Rice provide no information about whether the traditional Red Yeast Rice produced lovastatin.

The evidence is strong that the production of lovastatin is very dependent on the temperature of fermentation. Although Negishi reported that 17 of 50 samples of the *Monascus* species produced Monacolin K, they also reported that Monacolin K was produced only when the fungi were grown at 25 degrees C. As observed by Negishi, "under conditions of incubation at 30 to 37 degrees C, those Monacolin K-producing strains lost their capability of producing Monacolin K ...". The '380 Patent teaches the reader to incubate the *A. terreus* fungus at 28 degreesC, a temperature at which *Monascus* would likely be incapable of producing lovastatin.

**598**    In sum, I am not persuaded that the evidence demonstrates that lovastatin was contained in Red Yeast Rice prior to the priority date. It follows that Apotex has not satisfied its burden of demonstrating that Red Yeast Rice anticipates lovastatin.

(e)    *Disclosure of lovastatin in Red Yeast Rice*

**599**    In the event that I am wrong in this conclusion, I will assume that lovastatin was contained in at least some samples of Red Yeast Rice prior to the relevant date. The question is whether this satisfies the requirement of disclosure. In my view, as discussed in the following, Apotex has not persuaded me that the subject matter of the invention - lovastatin - was disclosed to the public by Red Yeast Rice.

**600**    The evidence demonstrates that, if Red Yeast Rice contained lovastatin, it did not do so under all conditions of fermentation. That is, prior to June 15, 1979, not every Red Yeast Rice product contained lovastatin. Further, it is also evident that persons who produced or used Red Yeast Rice were unaware that it contained lovastatin.

**601**    Apotex argues that *Calgon Carbon Corp. v. North Bay (City)*, 2008 FCA 81, 64 C.P.R. (4th) 337 at paragraph 8 and *Baker Petrolite Corp. v. Canwell Enviro-Industries Ltd.*, 2002 FCA 158, 17 C.P.R. (4th) 478 at paragraphs 35, 42 [*Baker Petolite* ] stand for the proposition that the extent or duration of the prior use or sale is not important; that disclosure to "even one member of the public" destroys the novelty of a chemical product. Thus, Apotex submits, the existence of lovastatin, in even one sample of Red Yeast Rice, as of the priority date would be anticipatory of the compound claimed in the '380 Patent.

**602**    I disagree with Apotex's assertion that the existence of lovastatin in even one sample of Red Yeast Rice is sufficient to demonstrate disclosure. I think that Apotex confuses "disclosure to one member of the public" as stated in *Baker Petrolite*, above, at paragraph 42, with "one disclosure". If the prior art invariably or predictably discloses the compound, there may well be anticipation. However, where the existence of the compound alleged to be anticipatory cannot be reasonably or consistently predicted from a large universe of possibilities, I cannot see how this could possibly meet the test for disclosure. Anticipation must be more than an accidental presence of a compound.

**603**    Not only does Apotex's argument appear illogical to me, it is not supported by the jurisprudence. In *Abbott Clarithromycin* (*FCA*), above, at paragraph 22, the Court of Appeal considered the argument of Abbott that a skilled person must have certain knowledge regarding the prior art.

> Abbott argues that a person skilled in the art who heated clarithromycin Form I by the known technique would not and could not know that clarithromycin Form II had been created, unless they also knew that the heating process had to be stopped before the substance reached its melting point at 225 degrees C. In my view, the absence of that knowledge is legally irrelevant. The undisputed evidence is that clarithromycin Form II would have been present if the heating technique had been followed. There were well established analytical techniques that would have disclosed its presence if anyone had cared to look at the appropriate moment. [Emphasis added.]

**604**    In the case before me, I have no such evidence that lovastatin would have been present in

Red Yeast Rice. Indeed the evidence, as disclosed in the literature cited (for example, Negishi and Heber), is that lovastatin was present only in a very few samples.

**605**   Apotex also argues that the fact that no one, including the skilled person, ever recognized that Red Yeast Rice contained lovastatin is not relevant. Apotex submits that the Federal Court of Appeal, in *Abbott Laboratories v. Canada (Minister of Health)*, 2006 FCA 187, 56 C.P.R. (4th) 387 at paragraphs 15-23, refers to the principle, outlined by Lord Hoffmann in *BV v. Smithkline Beecham plc*, [2005] UKHL 59, [2006] 1 All ER 685 [*Synthon BV* ], that a patent is disclosed even though the author or maker of the prior art was not aware that he was doing so. Apotex refers to *Synthon BV*, above, at paragraphs 22-23 for support on this point.

**606**   I agree with Apotex that the cited passage of the House of Lords decision in *Synthon BV*, above, does contain a reference to the fact that an awareness of infringement is not a requirement. However, an examination of the entire passage clarifies the context in which those remarks were made. As stated by Lord Hoffmann in *Synthon BV*, above, at paragraphs 22-23:

> ... the matter relied upon as prior art must disclose subject matter which, if performed, would necessarily result in an infringement of the patent... . But patent infringement does not require that one should be aware that one is infringing: "whether or not a person is working [an] ... invention is an objective fact independent of what he knows or thinks about what he is doing": *Merrell Dow Pharmaceuticals Inc v H N Norton & Co Ltd* [1996] RPC 76, 90. It follows that, whether or not it would be apparent to anyone at the time, whenever subject-matter described in the prior disclosure is capable of being performed and is such that, if performed, it must result in the patent being infringed, the disclosure condition is satisfied. The flag has been planted, even though the author or maker of the prior art was not aware that he was doing so.

> Thus, in *Merrell Dow,* the ingestion of terfenadine by hay-fever sufferers, which was the subject of prior disclosure, necessarily entailed the making of the patented acid metabolite in their livers. It was therefore an anticipation of the acid metabolite, even though no one was aware that it was being made or even that it existed. But the infringement must be not merely a possible or even likely consequence of performing the invention disclosed by the prior disclosure. It must be necessarily entailed. If there is more than one possible consequence, one cannot say that performing the disclosed invention will infringe. The flag has not been planted on the patented invention, although a person performing the invention disclosed by the prior art may carry it there by accident or (if he is aware of the patented invention) by design. Indeed, it may be obvious to do so. But the prior disclosure must be construed as it would have been understood by the skilled person at the date of the disclosure and not in the light of the

subsequent patent. As the Technical Board of Appeal said in *T/396/89 UNION CARBICE/high tear strength polymers* [1992] EPOR 312 at para 4.4:

> "It may be easy, given a knowledge of a later invention, to select from the general teachings of a prior art document certain conditions, and apply them to an example in that document, so as to produce an end result having all the features of the later claim. However, success in so doing does not prove that the result was *inevitable*. All that it demonstrates is that, given knowledge of the later invention, the earlier teaching is capable of being adapted to give the same result. Such an adaptation cannot be used to attack the novelty of a later patent."

**607**    An understanding of this passage demonstrates that Apotex has selectively read the comments of Lord Hoffmann, omitting a key consideration. I agree with Apotex that an awareness that the prior art discloses the anticipatory invention is not a requirement of disclosure. Justice Hughes made that point in *Abbott Clarithromycin (FC)*, above, at paragraph 75. However, while supporting the argument of Apotex, the passage from *Synthon BV*, above, makes it very clear that the disclosure requirement is only met where infringement <u>must</u> occur when the prior art is practised. Paraphrasing the words of Lord Hoffmann, the flag of anticipatory disclosure is not planted on the patent in question unless the prior disclosure would necessarily result in an infringement of the patent.

**608**    Applied to the situation before me, Red Yeast Rice only satisfies the disclosure requirement of the test for anticipation if it can be said to necessarily produce lovastatin. As we know from the evidence, that is definitely not the case. Indeed, the evidence before me is that the existence of lovastatin in Red Yeast Rice would be a very rare event.

**609**    In conclusion on this issue, I do not accept Apotex's submission that lovastatin was anticipated by Red Yeast Rice.

## XI. <u>Conclusion</u>

**610**    As noted at the beginning of these reasons, this litigation was subject to the Bifurcation Order. Thus, the matter proceeded to trial without requiring the parties to adduce evidence at trial on any issue of fact pertaining to the following:

1. the extent of infringement, if any, by the Defendants of the '380 Patent;
2. the amount of damages suffered, if any, by the Plaintiffs as a result of any such infringement; or
3. the amount of profits earned by the Defendants from any such infringement.

**611**    According to the terms of the Bifurcation Order, the determination of whether the Plaintiffs

are entitled to elect to recover profits was to be determined by the trial judge. In final arguments, Merck submitted that it wished to elect to recover profits. Apotex objected.

A.   *Damages or Profits*

**612**   Once a patentee has successfully demonstrated infringement, the Court has the discretion to grant the patentee's choice of remedies - either damages (pursuant to s. 55 of the *Patent Act*) or an accounting of profits (pursuant to s. 57 of the *Patent Act*). Merck wishes to elect an accounting of profits and asks this Court to so direct. Apotex argues that I should not exercise my discretion in this case.

**613**   While both damages and accounting of profits are intended to provide compensation to a wronged plaintiff, the fundamental principles underlying the two remedies and the practical considerations are substantially different.

**614**   The object of an award of damages is to make good any loss suffered by the plaintiff as a result of the defendant's infringement of the patent. Quantification of the award is based on the losses suffered by the plaintiff; any gains realized by the defendant because of its wrongdoing are not relevant. On the other hand, an accounting of profits is based on the premise that the defendant, by reason of its wrongful conduct, has improperly received profits which belong to the plaintiff. The objective of the award is to restore those actual profits to their rightful owner, the plaintiff, thereby eliminating whatever unjust enrichment has been procured by the defendant. Calculation is based on the profits wrongfully gained by the defendant; any other losses suffered by the plaintiff are irrelevant.

**615**   An accounting of profits is not an easy calculation. As was stated by the late Justice Paul Rouleau, of this Court, when speaking about such an accounting in *Beloit Canada Ltd. v. Valmet-Oy.* (1993), 55 C.P.R. (3d) 433 at para. 3, [1994] F.C.J. No. 682 (F.C.T.D.)(QL), rev'd in part 61 C.P.R. (3d) 271, [1995] F.C.J. No. 733 (QL)(F.C.A.), leave to appeal to S.C.C. refused, [1995] S.C.C.A. No. 388 (QL), 64 C.P.R. (3d) vi:

> This was undoubtedly a most expensive, lengthy and difficult reference and one which clearly underlines the pitfalls of granting the remedy of an accounting of profits other than in exceptional and appropriate circumstances and after due deliberation by the court.

**616**   In spite of practical difficulties, the Federal Court of Appeal in *Beloit Canada Ltd. v. Valmet Oy* (1992), 45 C.P.R. (3d) 116 at para. 10, [1992] F.C.J. No. 825 (QL), stated that it could:

> ...see no reason in principle why a patentee, whose property has been wrongly appropriated through infringement, should not recover all the profits, direct and indirect, derived by the infringer from his wrongful infringement.

**617**    It is necessary for a party seeking an equitable remedy, such as profits, to show some basis for the exercise of equity (*Janssen-Ortho Inc. v. Novopharm Ltd.*, 2006 FC 1234, 57 C.P.R. (4th) 6 at para. 132, aff'd 2007 FCA 217, 59 C.P.R. (4th) 116 leave to appeal to S.C.C. refused, [2007] S.C.C.A. No. 442 (QL), 383 N.R. 397 (note); *Servier FC*, above, at para. 507).

**618**    Merck submits that it can demonstrate a basis for an election of profits. Specifically, it puts forward the following factors:

> \*    The Plaintiffs have not committed any inequitable conduct which would disentitle them to equitable relief.
>
> \*    The Plaintiffs did not delay in commencing the litigation. The infringement action was commenced on June 12, 1997, within 3 months of Apotex Inc. receiving an NOC for Apo-lovastatin.
>
> \*    The Defendants could not have doubted that the Plaintiffs would pursue an infringement action given the lengthy history of prior lovastatin litigation.
>
> \*    The reasons why the litigation took years to prosecute are not, Merck submits, reasons to disentitle the Plaintiffs to equitable relief:
>
> > -    the long and complicated facts of the cases: we are dealing with a process patent, where the acts of infringement are conducted in secret, requiring the Plaintiffs to attempt to prove infringement through a long discovery process and repeated motions for productions;
> > -    AFI's history of use of *Aspergillus terreus* to make lovastatin going back to 1991 to 1999;
> > -    the transfer of *Aspergillus terreus* and AFI-1 technology to Blue Treasure in 1995 and its use;
> > -    the filing of a statement of claim in T-1169-01;
> > -    Apotex Inc.'s refusal to agree to consolidate the two proceedings for discovery meaning that the Plaintiffs had to repeat to a large extent the discovery from the infringement action;
> > -    the patent expiry on January 31, 2001, thereby capping the period of infringement as of that date; and
> > -    two years of the delay due to the length of the trial requested.
>
> \*    Delay in the action is a factor that is more related to the complicated facts of the proceeding rather than the diligence of the Plaintiffs.

**619**    While I agree with Merck that it has not committed any inequitable conduct that would disentitle them from the equitable remedy of profits, other factors weigh against such a remedy in this case.

**620**    A factor that causes me serious concern is the time that this matter took to come to trial. Merck attempts to distance itself from any decisions that resulted in the delay of this trial for almost thirteen years. I cannot accept that the Defendants and the Federal Court bear all of the responsibility for the delay. The consequence of this delay is, inevitably, that reaching back to the period between 1997 and 2001 to assess Apotex profits would be exceedingly difficult.

**621**    The difficulty in assessing profits is further exacerbated by the complexities of the commercial arrangements that involved not only AFI and Apotex Inc., but also Blue Treasure and Biogal. Merck consented to the settlement involving Biogal's interests on May 28, 2010.

**622**    An additional layer of complexity comes from the fact that Merck does not assert that all of the lovastatin that was produced during the 1997 to 2001 period infringed the '380 Patent. On the Canadian-produced material by AFI, except for the batch referred to as CR0157, there is no assertion of infringement. I have also concluded that Merck has not made out its case for infringement with respect to all of the Blue Treasure productions.

**623**    Dissecting Apotex's profits to account for the Biogal settlement and the non-infringing production would be a complex undertaking.

**624**    Balancing the factors in this case, I am not persuaded that I ought to exercise my discretion and permit the Plaintiffs to elect an accounting of profits. The Plaintiffs will be entitled to their damages. Specifically, a hearing under ss. 107 and/or 153 of the *Federal Courts Rules*, SOR/98-106 [*Federal Courts Rules* ] shall be conducted to determine: the extent of infringement by the Defendants of the '380 Patent; and, the amount of damages suffered by the Plaintiffs as a result of such infringement.

      B.    *Exemptions from Liability*

**625**    Related to the issue of damages is the question of whether any volumes of lovastatin produced by Apotex should be exempt from a finding of infringement. Apotex relies on s. 55.2(1) of the *Patent Act* (post October 1, 1989) to submit that it should not be held liable for any infringement relating to its experimental and regulatory uses of lovastatin.

**626**    Exemptions from liability are founded in s. 55.2(1) of the *Patent Act* (post October 1, 1989). That provision states that:

> 55.2(1) It is not an infringement of a patent for any person to make, construct, use or sell the patented invention solely for uses reasonably related to the development and submission of information required under any law of Canada, a province or a country other than Canada that regulates the manufacture, construction, use or sale of any product

* * *

> 55.2(1) Il n'y a pas contrefaçon de brevet lorsque l'utilisation, la fabrication, la construction ou la vente d'une invention brevetée se justifie dans la seule mesure nécessaire à la préparation et à la production du dossier d'information qu'oblige à fournir une loi fédérale, provinciale ou étrangère réglementant la fabrication, la construction, l'utilisation ou la vente d'un produit.

**627**    Apotex may claim an exemption from liability for certain amounts of the infringing product, provided that it can satisfy its burden to demonstrate that the product was used for permitted purposes (such as obtaining regulatory approval or to comply with regulations) (*Merck & Co. v. Apotex Inc.*, 2006 FC 524, 53 C.P.R. (4th) 1, rev'd on other grounds 2006 FCA 323, 55 C.P.R. (4th) 1 leave to appeal to S.C.C. refused, [2006] S.C.C.A. No. 507 (QL), 370 N.R. 400 (note)).

**628**    The Canadian *Food and Drug Regulations*, C.R.C. 1978, c. 869 [*Food and Drug Regulations* ], and the United States *Food Drug and Cosmetic Act*, 21 U.S.C., as amended [*Food Drug and Cosmetic Act* ], required Apotex Inc. to retain and test samples of lovastatin on a routine basis. Apotex submits that its testing and retention of lovastatin falls within the scope of subsection 55.2(1) of the *Patent Act* and the common law exception and is therefore exempt from infringement.

**629**    Apotex submits that the evidence clearly shows that, as required by the Canadian *Food and Drug Regulations*, above, and the regulations under the U.S. *Food Drug and Cosmetic Act*, above, Apotex: (i) acquired and used bulk lovastatin, and formulations incorporating bulk lovastatin, for the purpose of obtaining permission to sell lovastatin containing pharmaceutical products in Canada and the United States; (ii) carried out in process quality control sampling of lovastatin formulations; and (iii) retained samples of bulk and finished dosage forms of lovastatin.

**630**    Mr. Barber, the Manager of the Formulations Department at Apotex Inc., and Ms. Copsey, Manager of Packaging and Director of Commercial Lab Operations at Apotex Inc., explained in detail how Apotex Inc. used lovastatin for these purposes. The business records of Apotex Inc. adduced at trial reflect those uses. Apotex submits that its use of lovastatin for these experimental and regulatory purposes is exempt from infringement under s. 55.2(1) and (6) of the *Patent Act* (post October-1989) and the common law.

**631**    Mr. Fahner was the Vice-President of Finance at Apotex Inc. during the relevant times. He compiled charts identifying the quantities of lovastatin from each lot of bulk lovastatin and finished dosage batch that were used by Apotex Inc. for each of the purposes described by Mr. Barber and by Ms Copsey, namely, the research and development work in preparation of the submission batches, the retention of API samples and the process sampling and finished goods retention. Apotex Inc. submits that the evidence establishes that the following quantities of lovastatin were used by Apotex Inc. for regulatory and experimental purposes and should be exempt from any finding of infringement:

| Use of lovastatin by Apotex Inc. | Total Quantity (in kg) |
|---|---|
| Research and Development | 59.1111 |
| Reserve Samples (API) | 22.0986 |
| In Process Samples | 6.58078 |
| Finished Goods Retained Samples | 4.2654 |

**632**    I do not understand Merck to be objecting to the exemption of these Apotex Inc. volumes from a finding of infringement. I am satisfied that the volumes set out in the above table are exempt from any finding of infringement.

**633**    AFI also conducted research and development work involving the use of the micro-organism *Aspergillus terreus* after the assets of ABI were acquired in July 1991. Initially, the work was a continuation of the work commenced by ABI in 1988 and was specifically related to obtaining a compulsory licence. Subsequently, the work involved the research and development of *Aspergillus terreus* for regulatory submissions and for eventual commercialization of *Aspergillus terreus* lovastatin. In the course of these activities, ABI, and subsequently AFI, manufactured 6.9 kg of *Aspergillus terreus* lovastatin. This was supplied to Apotex Inc. and used for research and development purposes and for regulatory submissions. AFI submits that this work is exempt from infringement. I agree.

**634**    In 1998 and 1999, AFI ran a few fermentations using *Aspergillus terreus* at the 14,000 litre scale for research and development purposes directed to market readiness upon expiry of the '380 Patent. A total of 13.45 kg was manufactured from these runs. The Defendants assert that this work is exempt from infringement. In June 2002, this material was supplied to Brantford Chemical Inc., a sister company to Apotex Inc., for development purposes in an effort to make simvastatin, another statin that is not the subject of this litigation. Apotex Inc. submits that there was no evidence at trial that the 13.45 kg was ever used to manufacture tablets for sale in Canada, or elsewhere. This work is exempt from infringement. I agree.

**635**    Merck objects to an exemption from liability for any amounts of AFI-1 lovastatin made in Winnipeg during the period 1993 to 1999. In their view, these volumes clearly infringed the '380

Patent. Moreover, through the transfer of the AFI-1 technology to Blue Treasure for commercial purposes, the infringement resulted in a loss of Merck's right to the "full enjoyment of the monopoly" (*Monsanto*, above, at para. 34). Accordingly, Merck argues, these volumes should not be the subject of any "fair dealing" exemption. In addition, Merck submits that the liability should extend to all 296.6 kg of AFI-1 lovastatin that were allegedly made by Blue Treasure.

**636**    I am not prepared to make this link. In light of the Supreme Court of Canada's decision in *Micro Chemicals Limited v. Smith Kline & French Inter-American Corp.*, [1972] S.C.R. 506, 2 C.P.R. (2d) 193 [*Micro Chemicals* ], Merck's allegation is without foundation. In the case at bar, AFI was doing exactly what the defendant did in *Micro Chemicals*. AFI was carrying out research for the purposes of improving its *Aspergillus terreus* process to ensure that the process could be used on a commercial scale. This is the type of activity that the Supreme Court held was exempt from infringement. The supply of the developed technology to Blue Treasure, who was permitted to utilize the AFI-1 process to make lovastatin for sale outside Canada, was not, in the circumstances, an act of infringement.

**637**    In sum, I am satisfied that neither the 6.9 kg nor the 13.45 kg of *Aspergillus terreus* lovastatin referred to above should attract liability. Moreover, I am not prepared to conclude that the alleged 296.6 kg of AFI-1 lovastatin that was made using the transferred AFI-1 technology infringed the '380 Patent.

C.    *Conclusion*

**638**    In conclusion, the action of the Plaintiffs will succeed, in part, and they will be entitled to an order for the recovery of damages sustained as a consequence of the Defendants' infringement of the '380 Patent by the following:

1.    all Apo-lovastatin product that was produced by AFI from AFI batch CR0157; and

2.    the 294 batches of lovastatin produced by Blue Treasure in China after March 1998 and imported into Canada.

**639**    Damages and the extent of infringement will be determined by way of a reference pursuant to Rule 153 of the *Federal Courts Rules* and in accordance with the Bifurcation Order dated November 14, 2003. The parties will be permitted to address the specific terms of a reference as to damages, by way of written submissions to be served and filed within 60 days of the date of the Judgment. The parties will have a further 15 days to serve and file reply submissions.

**640**    Merck will also be entitled to an order for prejudgment interest pursuant to ss. 36 and 37 of the *Federal Courts Act*, S.C. 2002, c. 8.

**641**    The counterclaims of the Defendants will be dismissed. Specifically, I conclude that the '380 Patent was valid and that Merck & Co. has standing to bring this action.

**642**    The question of costs was not addressed by the parties in their final submissions. Obviously, Merck, as the successful party will be entitled to costs, although the amount of those costs should reflect the specific circumstances of this trial. The parties will be given a period of time to attempt to resolve the issue of costs among themselves. I sincerely hope that the direction of this Court is not required. However, in the event that the parties cannot agree on costs, they may serve and file submissions, not to exceed ten pages in length, within 60 days of the date of the Judgment. The parties will have a further 15 days to serve a reply, any such reply not to exceed five pages.

## POSTSCRIPT

**643**    These Reasons for Judgment are un-redacted from confidential Reasons for Judgment which were issued on December 9, 2010 pursuant to the Direction dated December 9, 2010.

**644**    The Court canvassed counsel for the parties whether they had concerns if the reasons were issued to the public without redactions. On December 15, 2010 and December 17, 2010, in separate letters, the parties advised that there are no portions of the confidential Reasons for Judgment that should be redacted.

SNIDER J.

\* \* \* \* \*

## Appendix A - List of Witnesses

I.    List of Witnesses
A.    *Plaintiffs' Expert Witnesses*

(1)    Dr. Jerry Lee **Atwood**

Dr. Atwood is a professor and Chairman of the Department of Chemistry at the University of Missouri-Columbia. He obtained a Ph.D from the University of Illinois. Dr. Atwood has been the editor of several scientific publications and has published more than 640 articles in refereed journals. Dr. Atwood was qualified as an expert in organic chemistry.

On behalf of Merck, Dr. Atwood opined on issues of validity. He also compared the chemical characteristics of Compound I in the '380 Patent to the chemical characteristics of Monacolin K in the '794 Patent. Dr. Atwood responded to certain opinions expressed Dr. Robert McClelland in his Expert Report.

(2)    Mr. Robert Hubbell **Barriga** r

Mr. Barrigar is a barrister and solicitor and a registered Canadian patent agent. He obtained an LL.M Degree from Harvard Law School. He has practised in intellectual property law for 30

years. His practice involved litigation pursuant to s. 45(8) of the "old" Patent Act, including patent applications that were the subject of conflict proceedings. Mr. Barrigar was qualified in matters of patent agency and procedures in the Canadian Patent Office, including practices of the Commissioner of Patents at the relevant time.

On behalf of Merck, Mr. Barrigar provided his opinion on whether the '380 and '794 Patents would have been placed in conflict proceedings by the Canadian Patent Office.

(2)    Dr. Jon **Clardy**

Dr. Jon Clardy is a professor at the Harvard Medical School, in the Department of Biological Chemistry and Molecular Pharmacology. He has a Ph.D in Organic Chemistry. Currently, Dr. Clardy holds positions as the Co-Director, Harvard University Program in Chemical Biology; Senior Associate Member, Broad Institute of Harvard and MIT; and the Infectious Disease Initiative, Broad Institute of Harvard and MIT. Dr. Clardy was recognized as an expert in organic chemistry, medicinal chemistry, natural products chemistry, and the biosynthesis of microbial metabolites.

On behalf of Merck, Dr. Clardy opined on the construction and validity of the '380 Patent.

(3)    Dr. Julian **Davies**

Dr. Davies is a professor emeritus of Microbiology and Immunology at the University of British Columbia, where he has worked since 1992. Dr. Davies obtained his Ph.D in Organic Chemistry from the University of Nottingham. He was qualified as an expert in the area of microbial genetics and microbiology.

On behalf of Merck, Dr. Davies gave opinion evidence on issues relating to infringement of the '380 Patent. In 2003 and in 2007, samples of raw and processed lovastatin were tested under his supervision for the DNA of *Aspergillus terreus* and *Coniothyrium fuckelii*.

(4)    Dr. Antonio Marion **Gotto**

Dr. Gotto is a professor of Medicine at Cornell University. In addition to a Ph.D in Biochemistry from Oxford University, he earned an M.D. from Vanderbilt University. Dr. Gotto was qualified as an expert in the area of atherosclerosis, lipid metabolism and cardiovascular risk protection.

On behalf of Merck, Dr. Gotto gave opinion evidence on cholesterol, cardiovascular disease and the discovery and use of lovostatin.

(5)    Dr. Richard **Havel**

Dr. Richard Havel is a physician specializing in medicine, endocrinology and metabolism.

Dr. Havel is a professor emeritus at the University of California, and he has served as an editor of the American Journal of Clinical Nutrition. Dr. Havel was qualified as an expert in internal medicine, clinical nutrition, endocrinology and metabolism, specifically the treatment of patients with hyperlipidemia, hypercholesterolemia and cardiovascular disease.

On behalf of Merck, Dr. Havel gave opinion evidence on the issues surrounding red yeast rice and the '380 Patent.

(6)   Dr. Linda Lee **Lasure**

Dr. Lasure obtained a Ph.D in Genetics from the University of Syracuse. Dr. Lasure has worked for various pharmaceutical corporations, including as staff scientist at Pacific Northwest National Lab, where she established a new program to apply fungal biotechnology to the problem of efficient conversion of lignocellulosic biomass to commercial products. She has authored numerous papers, chapters and books relating to industrial microbiology and currently holds three patents related to fungal biotechnology. Dr. Lasure was qualified as an expert in industrial microbiology.

On behalf of Merck, Dr. Lasure opined on construction and infringement of the '380 Patent.

(7)   Mr. Brian **Lindblom**

Mr. Lindblom is a forensic document examiner and the founding principal of Document Examination Consultants Inc. Mr. Lindblom was qualified as an expert in forensic document examination.

On behalf of Merck, Mr. Lindblom opined on the authenticity of the documents produced by AFI that were alleged to be Blue Treasure's Batch Records.

(8)   Dr. Bernard A. **Olsen**

Dr. Olsen obtained a Ph.D in Analytical Chemistry from the University of Wisconsin, and then worked for 29 years as a senior research fellow at Eli Lilly and Company. Currently, Dr. Olsen is an independent pharmaceutical consultant. He was qualified as an expert in the area of analytical chemistry.

On behalf of Merck, Dr. Olsen analyzed 11 test samples of Red Yeast Rice using High-Performance Liquid Chromatography (HPLC). The results were compared to the HPLC results of Compounds I, II, III, and IV of the '380 Patent.

B.   *Plaintiffs' Fact Witnesses*

(1)   Dr. Alfred **Alberts**

Dr. Alberts is one of the named inventors on the '380 Patent. He testified regarding the invention of lovastatin.

### (2)    Ms. Rebecca **Gentile** (Gilbert)

Ms. Gentile (formerly Gilbert) is the Senior Stability Coordinator for Merck & Co. Her responsibilities include generating and compiling data for use in regulatory filings. She testified regarding the Red Yeast Rice project at Merck & Co.

### (3)    Mr. Ronald **Harvey**

Mr. Harvey was the Director of Marketing for Merck Frosst in 1997 (now retired). He testified regarding the marketing procedures used at Merck and the sales figures for lovastatin in 1997.

### (4)    Mr. Ted **Kavowras**

Mr. Kavowras is the Managing Director of Panoramic Consulting, an investigative business based in Hong Kong. Mr. Kavowras testified that he obtained lovastatin from Blue Treasure between 2000 and 2001.

### (5)    Ms. Donna **Kugit**

Ms. Kugit, an employee of Merck, testified regarding the samples that were packaged and shipped to Bill Richardson.

### (6)    Dr. Natalie **Lazarowych**

Dr. Lazarowych is the Chief Scientific Officer and Director of Research at Dalton. In 2003, Dalton did work for law firm McCarthy Tetrault LLP with respect to lovastatin. She testified regarding the preparation of lovastatin samples that were sent to the law firm at that time.

### (7)    Ms. Carol **Mercer**

Ms. Mercer is an administrative assistant with the IP litigation department at Merck. She testified about Merck's protocol for logging and labeling samples that are put into their database.

### (8)    Mr. Robert **Quesnel**

Mr. Quesnel is the Vice-President of Legal Affairs & General Counsel for Sanofi Aventis Canada, and was the Director of Legal Affairs at Merck Frosst Canada from 1995 to 2007. He spoke to the legal issues surrounding Apo-lovastatin.

### (9)    Mr. James P. **Richardson**

Mr. Richardson is the Director of Tax Planning for Merck Sharp and Dohme Corp., and has worked as in some capacity as an accountant for them for over 25 years. He testified regarding the license agreement, dated January 1, 1985, between Merck and Co. Inc. and Merck Frosst Canada.

(10)  Ms. Elizabeth Giuliani **Scott**

Ms. Scott was employed as in-house counsel for Merck and Co between 1998 to 2007. She testified that she communicated with, and received samples from, Mr. Kavowras.

C.    *Defendants' Expert Witnesses*

(1)    Dr. Neal **Connors**

Dr. Connors holds a Ph.D in microbiology from Ohio State University. For 17 years, Dr. Connors was an employee with Merck Research Laboratories, where he worked as a senior research biochemist and a senior investigator focusing on strain development for both fungi and bacteria. Since 2009, Dr. Connors has been the President of Phoenix BioConsulting, LLC, and provides scientific consulting services to the fermentation, industrial microbiology and biotechnology sectors. Dr. Connors was qualified as an expert in industrial microbiology.

On behalf of Apotex, Dr. Connors gave opinion evidence on the AFI-4 *Coniothyrium fuckelii* process for producing lovastatin. He responded to Dr. Lasure's opinion on the AFI-4 process for making lovastatin in commercial quantities during the period commencing April 1996.

(2)    Dr. Marcus Thomas Pius **Gilbert**

Dr. Gilbert is an associate professor at the Natural History Museum of Denmark's Centre of GeoGenetics at the University of Copenhagen. He completed a D.Phil in the Department of Zoology at the University of Oxford, where his research focused on ancient DNA analysis. He has written numerous articles on analysis of ancient DNA and also teaches on the subject. Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA.

On behalf of Apotex, Dr. Gilbert opined on infringement, specifically on the issue of ancient DNA. Dr. Gilbert replied to the Expert Report of Dr. Davies and commented on Dr. Davies's experimental results.

(3)    Dr. Scott **Harding**

Dr. Harding is an adjunct professor in the Department of Human Nutritional Science and a research associate at the Richardson Centre for Functional Foods and Nutraceuticals at the University of Manitoba. Dr Harding received a Ph.D from McGill University. He was qualified as an expert in human nutrition and metabolism.

On behalf of Apotex, Dr. Harding gave opinion evidence on the Monacolin K producing capabilities of traditional Chinese Red Yeast Rice. In addition, he replied to the Expert Reports of Drs. Havel, Clardy and Oslen.

(4)    Mr. Robert **Hirons**

Mr. Hirons is a registered patent agent in Canada with over 40 years of experience. He has been involved in the prosecution of numerous applications before the Commissioner of Patents, several of which involved conflict proceedings. Mr. Hirons was qualified as an expert in Canadian patent prosecution and practice between 1980 and 1982 and knowledgeable about the practices of the Commissioner of Patents at that time.

On behalf of Apotex, Mr. Hirons gave opinion evidence on whether the '380 Patent and the '794 patent should have been placed in conflict proceedings by the Commissioner of Patents. Mr. Hirons also replied to the Expert Report of Mr. Barrigar.

(5)    Dr. Robert Allan **McClelland**

Dr. McClelland is professor emeritus in the Department of Chemistry at the University of Toronto. His research focus is biological and medicinal chemistry, and he has received numerous research awards in Canada. Dr. McClelland was qualified as an expert in organic and medicinal chemistry.

On behalf of Apotex, Dr. McClelland opined on the construction and validity of the '380 Patent. Specifically, he compared the chemical characteristics of Monacolin K ('794 Patent) and Compound I ('380 Patent). In addition, Dr. McClelland's report replied to the Expert Report of Dr. Atwood.

(6)    Dr. Hendrik Nicholas **Poinar**

Dr. Poinar is an associate professor in the Department of Anthropology at McMaster University. He obtained a Ph.D in molecular evolutionary genetics and biomolecular anthropology from Lüdwici Maximillians Universität München. Dr. Poinar has worked in the field of ancient DNA for more than 15 years and has published 44 peer-reviewed articles on the subject. He is considered one of the founding members of the field of ancient DNA. Dr. Poinar was qualified as an expert in the extraction and characterization of low copy number and degraded DNA.

On behalf of Apotex, Dr. Poinar opined on infringement issues, specifically the experimental results of Dr. Davies. In addition, he was asked to replicate Dr. Davies's finding using similar methods.

(7)    Dr. Robert A. **Samson**

Dr. Samson received an M.Sc and Ph.D from the University of Utrecht in the Netherlands. Dr.

Samson is the head of the Department of Applied and Industrial Mycology at the CBS Fungal Biodiversity Centre in the Netherlands. His research is focused on polyphasic taxonomy of the fungal genera *Penicillium* and *Aspergillus*. He was qualified as an expert in applied and industrial mycology with specific expertise in the polyphasic taxonomy of the genus *Aspergillus*.

On behalf of Apotex, Dr. Samson opined on the construction of the '380 Patent including the classification of fungal taxonomy. He also responded to the Expert Reports of Dr. Clardy and Dr. Lasure.

(8)    Dr. John Lyle **Sorensen**

Dr. Sorensen is an assistant professor in the Department of Chemistry at the University of Manitoba. He obtained a Ph.D in Chemistry from the University of Alberta, where his research focused on the biosynthesis of lovastatin and the pathway used by *Aspergillus terreus*. Dr. Sorensen was qualified as an expert in natural products chemistry.

On behalf of Apotex, Dr. Sorensen opined on construction and validity of the '380 Patent, specifically the fermentation and media conditions contemplated by the '380 Patent. He also replied to the Expert Report of Dr. Clardy.

(9)    Dr. John Waldo **Taylor**

Dr. Taylor is a professor in the Department of Plant and Microbial Biology at the University of California at Berkeley. He has studied fungi for 37 years and fungal DNA for 30 years and published more than 160 articles relating to PCR amplification and fungal DNA. Dr. Taylor was qualified as an expert mycologist and microbiologist, with particular expertise in the area of fungal DNA evolution and fungal DNA PCR amplifications.

On behalf of Apotex, Dr. Taylor opined on infringement, specifically in response to the DNA evidence of Dr. Davies.

D.    *Defendants' Fact Witnesses*

(1)    Mr. Donald **Barber**

Mr. Barber is the Manager of the Formulations Department at Apotex Inc.. He testified regarding the general steps taken in product development at Apotex Inc. and commented on the development of Apo-lovastatin.

(2)    Ms. Lori **Christofalos**

Ms. Christofalos is the Manager of Quality Assurance Regulatory Affairs at AFI. She testified about AFI's standard operating procedures for the fermentation of cultures of *Coniothyrium fuckelii*.

(3)    Ms. Elaine **Copsey**

Ms. Copsey has worked for Apotex Inc. since 1999 as Manager of Packaging and Director of Commercial Lab Operations. She testified regarding the procedures for quality control testing at Apotex Inc., specifically the procedures for testing bulk and raw product.

(4)    Dr. David **Cox**

Dr. Cox was the President of AFI between 1994 and 1997. On behalf of AFI, he testified about the corporate background of AFI, the *Aspergillus terreus* and *Coniothyrium fuckelii* projects and the technology transfer to Blue Treasure.

(5)    Mr. Gordon **Fahner**

Mr. Fahner is the Vice President of Supply Chain and has worked at Apotex Inc. since 1989. He testified regarding the standard operating procedures for Apotex Inc. between 1997 and 2001. Specifically, he spoke about the receipt, storage and use of raw materials.

(6)    Mr. Alexander **Fowler**

Mr. Fowler has been the Finance and Administration Manger at AFI since 1996. Mr. Fowler testified regarding the financial matters relating to the technological transfer between AFI and Blue Treasure.

(7)    Mr. John **Hems**

Mr. Hems is the Director of Regulatory Affairs at Apotex Inc., where he has worked for 30 years. In his current capacity, Mr. Hems oversees the drug approval submissions to regulatory agencies. He testified that his department was responsible for the regulatory submissions made for Apo-lovastatin in the early 1990s.

(8)    Mrs. Qifen **Hu**

Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. She is responsible for receiving and testing cultures received from AFI. Mrs. Hu testified regarding the AFI-4 *Coniothyrium fuckelii* strain and the Blue Treasure batch records.

(9)    Mr. Dingjun **Luo**

Mr. Luo has been the Deputy General Manager at Blue Treasure since 1995. He testified regarding the creation, completion and approval of batch records at Blue Treasure. Mr. Luo authored two articles in the Chinese Journal of Antibiotics which describe the production of lovastatin at Blue Treasure. The articles specifically referred to *Aspergillus terreus* as the fungi source.

(10)    Mr. Scott **Primrose**

Mr. Primrose has been a senior research scientist with AFI since 1991. He testified regarding the AFI-4 process, specifically the preparation of *Coniothyrium fuckelii* seed banks and the protocols for shipping vials to Blue Treasure.

(11)    Dr. Mila **Sailer**

Dr. Sailer has been employed at AFI since 1994 as a natural product chemist and then Director of Technology. Dr. Sailer obtained a Ph.D in experimental mycology at the Institute of Microbiology at the former Czechoslovakia Academy of Science. He was involved in developing the process to create lovastatin from *Coniothyrium fuckelii*. His testimony related to the development of the AFI-4 process, the technology transfer from AFI to Blue Treasure and the differences in optimal fermentation for *Aspergillus terreus* and *Coniothyrium fuckelii*.

(12)    Dr. Bernard Charles **Sherman**

Dr. Sherman is the Founder, Executive Chairman, and Chief Executive Officer for Apotex Inc.. He has overall responsibility of the company, but focuses primarily on product development, business development and legal issues. Dr. Sherman testified regarding the formation of AFI, the development of lovastatin and the process of finding a non-infringement method to produce Apo-lovastatin. He also spoke about the joint venture with Blue Treasure.

(13)    Dr. Jerry **Su**

Dr. Su worked for AFI from 1996 to 1998 as a fermentation specialist. He was the Group Leader responsible for research and development and the fermentation of AFI-4. Dr. Su spoke about his personal experience visiting Blue Treasure in China and compared their procedures to the procedures at AFI.

E.    *Affidavit (March 1, 2010 & April 1, 2010*

(1)    Bruce **Davis**

Mr. Davis is currently employed by AFI as QC Production Support Manager and swore in his affidavit that he was asked by Lori Christofalos to send samples to a warehouse in Montreal called Warnex Inc.

(2)    Lucinda **Gordon**

Ms. Lucinda Gordon was employed by AFI from August 17, 1992 to September 24, 1998 as a microbiology technician. She swore in her affidavit that on November 3, 1997 she was asked to create an additional *Coniothyrium fuckelii* seed bank at AFI.

(3)    Leeyuan **Huang**

Mr. Huang was employed by Merck & Co. Inc as Senior Research Scientist in 1997. He swore in his affidavit that he collected various samples and provided them to Dr. Richard Monaghan of Merck & Co. Inc.

(4)    Emily **Malcolm**

Ms. Malcolm is currently a legal assistant at Goodmans LLP and swore in her affidavit that on June 9, 2009 she was given a bag labelled "Red Yeast Rice" and sent it to Taylor McCaffrey LLP in Winnipeg.

(5)    Alexander **Patrick**

Mr. Patrick was employed in the summer of 2009 by Goodmans LLP and swore in his affidavit that on June 2, 2009 he purchased a bag of produced labelled "Red Yeast Rice" at Hua Sheng Supermarket located at 293 Spadina Avenue in Toronto.

(6)    Angela **Razo**

Ms. Razo is employed as a law clerk by Apotex Inc. and swore in her affidavit that in October 2009 she was asked to collect and send a number of pharmaceutical samples to Dr. Hendrik Poinar at McMaster University in Hamilton.

(7)    Heather **Sheps**

Ms. Sheps is currently a legal assistant employed by Taylor McCaffrey LLP and swore in her affidavit regarding the circumstances of the transfer of the Red Yeast Rice product.

(8)    Sylvia **Su**

Ms. Su swore in her affidavit that she provided Ms. Lily Su a sample of a packet labelled "yeast" that she obtained from the Triangle Oriental Market located at 748 D East Chatham Street in Cary, North Carolina.

(9)    Lee Wen **Su**

Mr. Su was employed as an associate in the law firm of Olsson, Frank and Weeda in 1997. He swore that he delivered samples to Mr. Adams on May 6, 1997.

(10)    Yoshikazu **Tani** (Expert Statement)

Mr. Tani is a patent attorney and licensed patent agent with the firm of Tani & Abe, located in Tokyo and swore in his affidavit that he was asked by Apotex Inc. to review two documents

issued by the Japanese Patent Office related to an invention entitled "Novel Physiologically Active Monacolin K and the Production of Same".

(11)   <u>Xin **Wang**</u>

Ms. Wang is a research technician at the Richardson Centre for Functional Foods and Neutraceuticals and swore in her affidavit that on April 26, 2009 she purchased product labelled "Read Year Rice" at Sun Wah Herb Garden in Winnipeg.

* * * * *

**Appendix B - Claims 1 to 8 and 13 to 15 of the '380 Patent**

1.     A process of producing the compounds of structural formulae:

which compromises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products and when desired converting said products to their corresponding pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methyl-glucamine, lysine, arginine or ornithine.

2.    The process of producing the compounds of structural formulae:

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

3.    The process of Claim 2 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

4.    The process of Claim 2 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

5.    The process of producing the compounds of structural formulae:

III                                      IV

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

6.    The process of Claim 5 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

7.    The process of Claim 5 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

8.    The process of Claim 5, wherein compound III is reacted with ammonia to form the ammonium salt of compound III.

13.    A compound selected from:

I

II

III

IV

or a pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methylglucamine, lysine, arginine or ornithine, when prepared by the process defined in Claim 1 or by an obvious chemical equivalent.

14
.

A compound selected from:

I

II

when prepared by the process defined in Claim 2 or by an obvious chemical equivalent.

15.   A compound selected from:

III

IV

when prepared by the process defined in Claim 5 or by an obvious chemical equivalent.



# PRINCIPLES OF
# PROPERTY LAW
## FIFTH EDITION

by

### BRUCE ZIFF

Professor of Law

University of Alberta

**CARSWELL**®

©2010 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

ISBN 978-0-7798-2798-5 (bound)
ISBN 978-0-7798-2731-2 (pbk.)

**A cataloging record for this publication is available from Library and Archives Canada**

Composition: Computer Composition of Canada Inc.

Printed in the United States by Thomson Reuters.



THOMSON REUTERS

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

One Corporate Plaza
2075 Kennedy Road
Toronto, Ontario
M1T 3V4

Customer Relations
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5164
Fax: 1-416-298-5082
www.carswell.com
E-mail www.carswell.com/email

# 1

# THE NATURE OF PROPERTY

Oh dear me,
The warld's ill-divided.
Them that work the hardest
Are aye wi' least provided.

Mary Brooksbank[1]

## 1.  INTRODUCTION

This chapter introduces the idea of property as a legal concept. The discussion is devoted mainly to questions of definition and to a consideration of the philosophical foundations that are said to support that institution. Coming to terms with the ideologies behind private ownership rights is of some significance, given the place of property in our culture. It has been offered that "[o]ne of the major themes of Western political theory during the past 2,500 years has been controversy over the benefits and drawbacks of private ownership".[2] Just as grand is the suggestion that "[p]roperty has been at the core of most social upheavals in human history, including those of the recent past".[3]

What emerges from the examination of these fundamental ideas is, perhaps predictably, a collage of different perspectives about the meaning of private property and its *raison d'être*. The discussion that follows is of an introductory nature, and will certainly not add up to tidy solutions to the questions that are posed. It would be misleading to suggest that solving the central puzzles of property law can be easily accomplished. Instead, my objective here is to air some central issues that can then resonate throughout the remainder of the text. In the succeeding chapters I hope to show how the justifications considered here influence the composition of Canadian property law. The theoretical grounds for conferring ownership form threads that bind (or at least that might serve to bind) together the myriad property rules covered in this textbook.

## 2.  THE 'PROPERTIES' OF PROPERTY

### (a)  an introductory foray[4]

What is property? The derivation of the word is simple enough, arising from the Latin *proprietas* or "ownership," in turn stemming from *proprius*, meaning "own" or "proper." But, this ety-

---

1  See N. Buchan & P. Hall, *The Scottish Folksinger* (Glasgow: Collins, 1978) at 33-4.

2  R. Pipes, *Property and Freedom* (New York: A.A. Knopf, 1999) at xi-xii.

3  R. Vogt, *Whose Property? The Deepening Conflict Between Private Property and Democracy in Canada* (Toronto: U.T.P., 1999) at 3.

4  See further T.C. Grey, "The Disintegration of Property" in J.R. Pennock & J.W. Chapman, eds.,

2    THE NATURE OF PROPERTY

mology reveals little. Philosophers such as Aristotle, Cicero, Seneca, Grotius, Pufendorf and Locke each, in turn, have debated the meaning of this term, as later did legal luminaries such as Blackstone, Madison and Holmes, and even economists such as Coase.[5]

From an intuitive perspective the idea of property is perfectly straightforward: the term refers to those things one can own. Although it is both sensible and common to use such language, the law offers a different slant, one that tends to dwell more on the owning element. Property is sometimes referred to as a bundle of rights.[6] That characterization means that property is not in fact a thing, but rather a right, or better, a collection of rights (over things) enforceable against others.[7] Likewise, it has been said that "[t]he concept of ownership is no more than a convenient global description of different collections of rights held by persons over physical and other things".[8] Explained another way, the term property signifies a set of relationships among people that concern claims to tangible and intangible items.

The reference to *rights* reveals that property, to a legal positivist, means entitlements created by law. In Jeremy Bentham's words, "[p]roperty and law are born and die together. Before laws were made there was no property; take away laws and property ceases."[9] Under that conception, property is necessarily a legal construct, born and bred under law. However, there is no complete catalogue of the objects that are regarded as property. Likewise, the *subjects* of property, that is, those who may acquire ownership, are also part of a fluctuating class. We look to the juridical definition of property to tell us not only what may be owned, but who among the citizenry can qualify to be an owner.

Take a closer look at these ideas: first, at the notion of a bundle. This imagery suggests that property is a collection of incidents. Professor A.M. Honoré, in a classic treatment of the nature of ownership, identified eleven elements that he claimed provided the most ample conception of property to be found within a mature legal system. He said this:

Ownership comprises the right to possess, the right to use, the right to manage, the right to the income of the thing, the right to the capital, the right to security, the rights or incidents of

---

*Property: Nomos XXII* (New York: N.Y.U.Pr., 1980) 69; J.E. Penner, *The Idea of Property in Law* (Oxford: Clarendon Pr., 1997); A. Bell & G. Parchomovsky, "A Theory of Property", 90 Cornell L.Rev. 531 (2005); A. Mossoff, "What is Property? Putting the Pieces Back Together", 45 Ariz.L.Rev. 371 (2003); D. Lametti, "The Concept of Property: Relations Through Objects of Social Wealth" (2003) 53 U.T.L.J. 325; L.S. Underkuffler, *The Idea of Property: Its Meaning and Power* (Oxford: O.U.P., 2003).

5  *Klamath Irrigation Dist. v. U.S.*, 2005 W.L. 2100579 (Fed.Cl.) at 1 (*per* Allegra J.).

6  *Cf.* Penner, *supra*, note 4. It has been argued that the bundle of rights description is a phallic metaphor: see J.L. Schroeder, "Chix Nix Bundle-O-Stix: A Feminist Critique of the Disaggregation of Property", 93 Mich.L.Rev. 239 (1994).

7  See C.B. Macpherson, "The Meaning of Property" in C.B. Macpherson, ed., *Property: Mainstream and Critical Positions* (Toronto: U.T.P., 1978) at 2.

8  *Yearworth v. North Bristol N.H.S. Trust*, [2009] EWCA Civ 37, at para. 28 (*per* Lord Judge C.J.).

9  J. Bentham, *The Theory of Legislation* (Bristol: Thoemmes Pr., 2004 ed., 1802) vol. 1, at 113. Moreover, "[l]aw alone is able to create a fixed and durable possession which merits the name of property": *ibid.* at 110.

transmissibility and absence of term, the duty to prevent harm, liability to execution, and the incident of residuarity.[10]

I see this list as describing rights to: (i) possession, management and control; (ii) income and capital; (iii) transfer *inter vivos*[11] and on death; and (iv) protection under law. The "absence of [a] term", found in Honoré's list, means that rights might last forever. Furthermore, Honoré saw property in its most complete sense as involving two additional features: (v) liability to seizure (which he calls liability to execution); and (vi) prohibitions on harmful use.

The Honoré bundle contains a wide range of entitlements. Included are *claims* against others: the owner of a plot of land (which will be called Blackacre, following a tradition in writings about land law that dates back at least 400 years[12]) has the right to ask a trespasser to leave, and the interloper has a reciprocal duty to comply. An owner holds *powers* of disposal. Some entitlements are *privileges* or *liberties*, in that the owner's use cannot be abridged by others. The right to destroy property is a privilege in the sense used here. The owner of Blackacre also enjoys *immunities*, including exemptions from certain acts of expropriation.[13]

The prohibition against harmful use as a component of a plenary description of property is a controversial move.[14] This is certainly not a *right* enjoyed by an owner: instead it appears to be a subtraction from, not an element of, the largest notion of ownership imaginable. That is also true of the liability to seizure. We learn at least two things from Honoré's decision to include these features.

First, ownership usually entails duties as well as rights: the bitter accompanies the sweet.[15] Responsibilities to the public are sometimes assumed by a property owner: a person owning firearms is duty-bound to take certain precautions; a landowner is typically required to keep noxious weeds under control, *etc.* Under property law regimes it is common to find a large number of ownership-based duties scattered throughout the law.

Occasionally the obligations aspect of ownership can overwhelm the rights-based side of the ledger. In the Ontario decision of *Abeziz v. Harris Estate*, a question arose about the disposal of a corpse by an executor (*i.e.*, the person responsible for dealing with a deceased person's estate). The Court stated that

---

10  A.M. Honoré, "Ownership" in *Making Law Bind* (Oxford: Clarendon Pr., 1987) at 165.

11  An *inter vivos* transfer is one made between living persons.

12  See, *e.g.*, *Butt's Case* (1600) 7 Co.Rep. 23a, 77 E.R. 445.

13  These labels are taken from W.N. Hohfeld, "Some Fundamental Legal Conceptions as Applied in Judicial Reasoning", 23 Yale L.J. 16 (1913). An analysis of the interrelationship between the work of Hohfeld and Honoré can be found in L.C. Becker, "The Moral Basis of Property Rights" in *Nomos XXII, supra*, note 4, 187, at 190-1. *Cf.* S.R. Munzer, *A Theory of Property* (Cambridge: C.U.P., 1990) at 18.

14  See also A. Carter, *The Philosophical Foundations of Property Rights* (London: Harvester, Wheatsheaf, 1989) at 5-6; A. Ryan, *Property* (Minneapolis: U. of Minn.Pr., 1987) at 54-5.

15  See further D. Lametti, "The (Virtue) Ethics of Private Property: A Framework and Implications" in A Hudson, ed., *New Perspectives on Property Law, Obligations and Restitution* (London: Cavendish, 2004) 39; G.S. Alexander, "The Social Obligation Norm in American Property Law", 94 Cornell L.Rev. 745 (2009); H. Dagan, "The Social Responsibility of Ownership", 92 Cornell L.Rev. 1255 (2007).

4   THE NATURE OF PROPERTY

"there is no legal right in a corpse. *Rather than rights there are only obligations.* . . . The fundamental obligation is that the body be appropriately dealt with – that is, disposed of in a dignified fashion."[16] That view goes slightly too far. To carry out this duty the executor must surely have a right of possession over the corpse that is enforceable against a wrongdoer, for otherwise the executor would be unable to seek the law's aid to prevent or recover possession. Nevertheless, it is safe to say that such a possessory right is a derivative of the burial obligation, which is the primary aspect of the executor's legal connection to the body.

Second, Honoré's suggestion that the duty to prevent harm[17] is actually to be found *inside* the definition of property reminds us that not all rights of ownership are absolute. The influential English jurist William Blackstone famously described property as "that sole and despotic dominion which one man [sic] claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe".[18] That language conjures up some impressive images about property entitlements. However, few of the components that make up the bundle are totally unfettered by some qualification or limitation. Blackstone knew this perfectly well, for in his *Commentaries on the Laws of England* it is acknowledged that individual rights may be restrained by positive laws enacted in furtherance of public policy.[19] In other words, plenary property rights are resisted when they might produce unacceptable harm, defined broadly.[20]

Consider the following examples of restricted property rights. A homeowner knows that the right of privacy may be curtailed in many ways, including through a lawful search and seizure of the premises. English law now confers extensive rights to wander over designated areas of the countryside even if these are in private hands.[21] Human rights legislation prevents owners from engaging in discriminatory practices in renting, selling, as well as in the provision of services.[22] The right to destroy one's own property may generally exist during the owner's life, though a testamentary direction (*i.e.*, one contained in a will) to destroy property may not be enforceable.[23] In general, pressing societal needs and countervailing values may result in the imposition of limits on ownership rights. One

---

16  *Abeziz v. Harris Estate*, 1992 CarswellOnt 3803 (Gen.Div.) at para. 28 (*per* Farley J.) (emphasis added). See generally D. Sperling, *Posthumous Interests: Legal and Ethical Perspectives* (Cambridge: C.U.P., 2008).

17  *Supra*, note 10, at 165.

18  W. Blackstone, *Commentaries on the Laws of England* (Chicago: U. of Chi. ed. 1979, 1765-9) vol. 2, at 2.

19  *Ibid.* at 411.

20  See further A.J. van der Walt, *Property in the Margins* (Oxford: Hart, 2009).

21  *Countryside and Rights of Way Act, 2000*, c. 37, discussed in J.L. Anderson, "Britain's Right to Roam: Dedefining the Landowner's Bundle of Sticks", 19 Geo.Int'l Envtl.L.Rev. 375 (2007).

22  For an argument that this common law obligation extended to others who offered services to the public, see J.W. Singer, "No Right to Exclude: Public Accommodations and Private Property", 90 Nw.U.L.Rev. 1283 (1996) especially (for our present purposes) at 1304*ff.* See also Part 5, Chapter 10.

23  See further *Re Wishart* (1992) 46 E.T.R. 311, 1992 CarswellNB 69 (Q.B.); L.J. Strahelevitz, "The Right to Destroy", 114 Yale L.J. 781 (2005). See also K. Mackie, "Testamentary Conditions" (1998) 20 U.Q.L.J. 38, at 50-1.

might go even further: so ubiquitous are the qualifications on the owner's right of exclusion, that it may be more faithful to the idea of property to say that rights of *inclusion* by others are integral to the concept. These rights of non-owners can sometimes be justified on the same grounds that support private property rights in the first place.[24]

A thread runs through the examples mentioned above. In each instance, the imposed limitation results from some prior ownership decision. So, if I choose to purchase a gun, I am constrained as to when and how I can use it. If I choose to operate a retail business, I surrender some rights to control who may enter on my premises. I cannot discriminate on specified prohibited grounds such as race. Certain restrictions will come with the territory (literally and figuratively).[25]

Property rights can be aggregated in a host of ways. There are a variety of different bundles that the law might construct. Parliament and the courts can augment or reduce the number of incidents that apply to any particular kind of property interest. That being so, to say that something is regarded in law as property does not give us complete information as to what an owner can do. Going further, an object may be property for some purposes in the law but not for others: for example, confidential information may not be susceptible to theft according to the criminal law, even if it might be treated as property in the sphere of the private law of obligations.[26]

As well, it is sometimes fruitless to try to single out one person as *the* owner of a particular thing. The law accepts that two or more persons may co-own Blackacre; a tract of land belonging to A may be encumbered with a right of use held by B; both a landlord and a tenant have a proprietary interest in land that is held under a lease; and one person may have title to Blackacre for life, with others being entitled to possession once the life estate ends. Ownership is divisible, indeed infinitely so.[27]

Pausing here, one sees that Honoré's list does not identify an irreducible core element. It talks about the idea of property in its most robust sense, not its essential minimum element(s). Some suggest that no single attribute is required. On this account, it is all a matter of nominalism[28] – property is that which the law

---

24  See further H. Dagan, "Exclusion and Inclusion in Property", online: <http://ssrn.com/abstract=1416580>. The justifications for private property are discussed in Part 3, *infra*.

25  The analysis in this paragraph is, I believe, consistent with Larissa Katz's thesis that the exclusivity associated with ownership means the exclusive right to set the agenda as to how property is to be used, and the law therefore should enforce only the actions of others that interfere with that agenda: L. Katz, "Exclusion and Exclusivity in Property Law" (2008) 58 U.T.L.J. 275. My point here is that the agenda once set triggers certain fetters, applicable even if the owner may wish to define the agenda without such limitations.

26  *R. v. Stewart*, [1988] 1 S.C.R. 963, 1988 CarswellOnt 110. Even in a non-criminal law setting, "the ... characterization of confidential information as property is controversial": *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142, 1999 CarswellBC 77, at 169 S.C.R. (*per* Binnie J.). See further the analysis at 169 S.C.R.*ff*. Note also that title to property may pass under contract law, but not for the purposes of the criminal law: *R. v. Milne*, [1992] 1 S.C.R. 697, 1992 CarswellAlta 225.

27  See further J.W. Singer, "The Reliance Interest in Property", 40 Stan.L.Rev. 614 (1988) at 637*ff.*

28  See further T.W. Merrill, "Property and the Right to Exclude", 77 Neb.L.Rev. 730 (1998).

6    THE NATURE OF PROPERTY

decides should bear that label.[29] By contrast, some judicial decisions have suggested that certain features are essential. Hence, it has been said that a right cannot subsist as property unless it is "definable, identifiable by third parties, capable in its nature of assumption by third parties, and [has] some degree of permanence or stability".[30] A more stripped down version of the same basic idea provides that to be property, the rights must be binding on third parties and capable of being assigned. That kind of approach, called multi-variable essentialism,[31] is sound enough as a normative ideal, though it is not accurate as the law now stands.[32] The power to transfer need not always form part of the bundle,[33] and is only truly essential in the case of money or money-like holdings.[34]

It has been said that property refers to a state-enforced right of exclusion over things, good (generally) against the world. Felix Cohen concluded that the term private property describes a relationship among people that allows an owner to exclude or include others from certain activities, and that in either case the law would back up that decision.[35] Such a formulation (a form of single-variable essentialism[36]) goes a long way toward providing a helpful functional definition of property, one that emphasizes the right of *exclusion* as the essential part of the bundle. However, the power to exclude means more than the right of physical expulsion. The overarching idea is that of exclusivity: the owner holds a *monopoly* over whatever rights of use, transfer, income, *etc.*, are recognized as part of a given proprietary package. The owner gets to make these decisions; others must respect them.[37] It has been said that property law constructs not a wall but rather a gate, which an owner may open or shut according to his or her preferences.[38] This metaphor also reminds us that property creates power relationships among

---

29  The majority judgment in *Yanner v. Eaton* (1999) 201 C.L.R. 351 (H.C.) exemplifies a nominalist approach.

30  *National Provincial Bank Ltd. v. Ainsworth*, [1965] A.C. 1175, [1965] 2 All E.R. 472 (H.L.) at 1248 A.C. (*per* Lord Wilberforce). See also *Halwood Corp. Ltd. v. Chief Commissioner of Stamp Duties* (1992) 33 N.S.W.L.R. 395 (S.C.).

31  Merrill, *supra*, note 28.

32  "An interest may qualify as 'property' for some purposes even though it lacks some attributes. For example, an individual can have a 'property' right in his job yet the job is not assignable, transferable, descendible, or devisable. The 'right to publicity' is transferable during life but may not be devisable": *First Victoria National Bank v. United States*, 620 F.2d 1096 (5th Cir., 1980) at 1104 (*per* Goldberg J.).

33  See *The Queen v. Toohey* (1982) 158 C.L.R. 327 (H.C.) at 342; *Dorman v. Rodgers* (1982) 148 C.L.R. 365 (H.C.) at 374.

34  J.W. Harris, *Property and Justice* (Oxford: Clarendon Pr., 1996) at 48.

35  F. Cohen, "Dialogue on Private Property", 9 Rutgers L.Rev. 357 (1954) at 373. "Suppose we say, that is property to which the following label can be attached: To the World: Keep off X unless you have my permission, which I may grant or withhold. Signed: Private Citizen. Endorsed: The State.": *ibid.* at 374. See also K.J. Gray, "Property in Thin Air", [1991] C.L.J. 252, especially at 292*ff*; T.W. Merrill & H.E. Smith, "The Morality of Property", 48 Wm. & Mary L.Rev. 1849 (2007).

36  Merrill, *supra*, note 28.

37  See further Katz, *supra*, note 25.

38  J.E. Penner, *The Idea of Property in Law* (Oxford: Clarendon Pr., 1997) at 74.

people, a feature of ownership that surfaces again below[39] and in various places throughout the text.[40]

Helpful as Cohen's boilerplate definition is, its shortcomings should be recognized. If the right of exclusion is at the centre of property, we have already seen that property rights are not always absolute. Moreover, there is an element of relativity built into the law of property. A finder of goods has rights against the whole world except the true owner or others with a superior right. That finder does have a property right even if those with an antecedent claim cannot be excluded.[41] In addition, it is hard to imagine a property entitlement that, in fact, included only the right to exclude or include others (and not oneself) in the absolute strictest sense of that term, and nothing else. Almost all (perhaps all) property rights confer more than this bare power.

The Cohen definition, as with the others presented, is only *descriptive* of what is regarded as property, not *prescriptive*, naming those rights that should (or should not) be placed within its embrace. Nor does it easily allow property to be distinguished from other entitlements. For example, we could say that I have a right not to be harmed by the tortious conduct of others, a 'right' that I may enforce by precluding (excluding) certain actions by others. One might also say that I have a right to work and that others may not stop me from doing so. Are these property rights? Certainly these examples represent rights against the world and the sole question is whether they can be said to convey the notion of exclusion of others in a meaningful way. Is the concept of property that all-consuming?

### (b)  public and common property

Private property is often contrasted with public and common property. For public property, it is the state that possesses the power of exclusion. Is that the only difference? Arguably, the rights of enjoyment for public holdings may not be fully equivalent to those held by a private owner. There are a number of legal rules that pertain only to public holdings. Principal among these is the *Canadian Charter of Rights and Freedoms*.[42] The *Charter* applies only to state action, and can function to limit the way that the state's right of exclusion can be exercised.[43] In addition, at a normative level, the allocation of public goods should be predicated on an assessment of collective interests, which should mean that the obligations of good governance affect the way that the property is used. By and large private owners are not constrained in that way. Individuals are entitled to act in a self-seeking way when exercising their property rights.

On that view, property owned by the state is burdened with unique public obligations.[44] However, the public/private distinction is not necessarily that clear. Even within the private realm, different kinds of owners and property forms can

---

39  See Part 3(d)(ii), *infra*.
40  The notion of property as a power base is a prominent theme in Chapter 7.
41  See the discussion of the law of finders in Part 4, Chapter 4.
42  *Constitution Act, 1982*, Schedule B, Part I.
43  See further Part 5, Chapter 10.
44  See further J. Waldron, *The Right to Private Property* (Oxford: Clarendon Pr., 1988) at 40-1.



# Black's Law Dictionary®

## Ninth Edition

**Bryan A. Garner**
Editor in Chief



**WEST**®

A Thomson Reuters business

Mat #40776543
Mat #40776546—deluxe

"BLACK'S LAW DICTIONARY" is a registered trademark of Thomson Reuters.
Registered in U.S. Patent and Trademark Office.

COPYRIGHT © 1891, 1910, 1933, 1951, 1957, 1968, 1979, 1990 WEST PUBLISHING CO.
© West, a Thomson business, 1999, 2004
© 2009 Thomson Reuters
    610 Opperman Drive
    St. Paul, MN 55123
    1-800-313-9378

Printed in the United States of America
**ISBN:** 978-0-314-19949-2
**ISBN:** 978-0-314-19950-8—deluxe



*TEXT IS PRINTED ON 10% POST CONSUMER RECYCLED PAPER*



*owner of record.* See *record owner.*

*owner pro hac vice* (proh hahk vee-chay). See *bareboat charter* under CHARTER (8).

*record owner.* (1863) **1.** A property owner in whose name the title appears in the public records. **2.** STOCK-HOLDER OF RECORD.

*sole and unconditional owner.* (1871) *Insurance.* The owner who has full equitable title to, and exclusive interest in, the insured property. [Cases: Insurance ⬦2992(2).]

*special owner.* (18c) One (such as a bailee) with a quali-fied interest in property. Cf. *general owner.*

*owners' association.* (1968) **1.** The basic governing entity for a condominium or planned unit developments. o It is usu. an unincorporated association or a nonprofit corporation. [Cases: Associations ⬦1; Condominium ⬦8.] — Also termed *homeowners' association.* **2.** See *homeowners' association* under ASSOCIATION.

*owners' equity.* (1935) The aggregate of the owners' financial interests in the assets of a business entity; the capital contributed by the owners plus any retained earnings. o Owners' equity is calculated as the differ-ence in value between a business entity's assets and its liabilities. — Also termed *owner's equity; book value; net book value;* (in a corporation) *shareholders' equity; stockholders' equity.* [Cases: Taxation ⬦2545.]

> "Owner's equity is the residual claim of the owners of the business on its assets after recognition of the liabilities of the business. Owner's equity represents the amounts contributed by the owners to the business, plus the accu-mulated income of the business since its formation, less any amounts that have been distributed to the owners." Charles H. Meyer, *Accounting and Finance for Lawyers, in a Nutshell* 4 (1995).

**ownership.** (16c) The bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others. ● Ownership implies the right to possess a thing, regardless of any actual or constructive control. Ownership rights are general, permanent, and heritable. Cf. POSSESSION; TITLE (1). [Cases: Property ⬦7, 11.]

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional powers of those who use it." *Marsh v. Alabama,* 326 U.S. 501, 506, 66 S.Ct. 276, 278 (1946) (Black, J.).

> "Possession is the *de facto* exercise of a claim; ownership is the *de jure* recognition of one. A thing is owned by me when my claim to it is maintained by the will of the state as expressed in the law; it is possessed by me, when my claim to it is maintained by my own self-assertive will. Ownership is the guarantee of the law; possession is the guarantee of the facts. It is well to have both forms if possible; and indeed they normally co-exist." John Salmond, *Jurispru-dence* 311 (Glanville L. Williams ed., 10th ed. 1947).

*bare ownership.* See *trust ownership.*

*beneficial ownership.* (18c) **1.** A beneficiary's interest in trust property. — Also termed *equitable owner-ship.* [Cases: Trusts ⬦139.] **2.** A corporate share-holder's power to buy or sell the shares, though the

shareholder is not registered on the corporation's books as the owner.

*bonitary ownership* (bahn-ə-tair-ee). *Roman law.* A type of equitable ownership recognized by the praetor when the property was conveyed by an informal transfer, or by a formal transfer by one not the true owner. — Also termed *bonitarian ownership; in bonis habere.*

*complete ownership. Hist. Louisiana law.* See *perfect ownership.*

*contingent ownership.* (1886) Ownership in which title is imperfect but is capable of becoming perfect on the fulfillment of some condition; conditional own-ership.

*corporeal ownership.* (1894) The actual ownership of land or chattels.

*equitable ownership.* See *beneficial ownership* (1).

*full ownership. Hist. Louisiana law.* See *perfect own-ership.*

*imperfect ownership. Louisiana law.* Ownership of property subject to a usufruct interest held by another. See La. Civ. Code art. 478. — Also termed *naked own-ership.*

*incorporeal ownership.* (1931) The ownership of rights in land or chattels.

*joint ownership.* (18c) Undivided ownership shared by two or more persons. o Typically, an owner's interest, at death, passes to the surviving owner or owners by virtue of the right of survivorship. [Cases: Joint Tenancy ⬦1.]

*naked ownership. Louisiana law.* See *imperfect own-ership.*

*ownership in common.* (1838) Ownership shared by two or more persons whose interests are divis-ible. ● Typically their interests, at death, pass to the dead owner's heirs or successors. [Cases: Tenancy in Common ⬦1.]

*perfect ownership. Hist. Louisiana law.* The complete bundle of rights to use, enjoy, and dispose of property without limitation. — Also termed *full ownership; complete ownership.* [Cases: Property ⬦7, 11.]

*qualified ownership.* (18c) Ownership that is shared, restricted to a particular use, or limited in the extent of its enjoyment.

*trust ownership.* (1893) A trustee's interest in trust property. — Also termed *bare ownership.* [Cases: Trusts ⬦133.]

*unqualified ownership.* Absolute ownership. [Cases: Property ⬦7.]

*vested ownership.* (1867) Ownership in which title is perfect; absolute ownership.

**ownership-in-place theory.** *Oil & gas.* A characteriza-tion of oil-and-gas rights used in a majority of jurisdic-tions, holding that the owner has the right to present possession of the oil and gas in place as well as the



belief.  It is on this definition of fraud that the learned Judge in the Court below acted.

The House of Lords, as I read the opinions of the learned Lords, have held that the inaccuracy of a statement, however unreasonable, if honest and *bonâ fide*, will not support an action for deceit. I presume because it does not contain the necessary element of dishonesty.  So that if a prospectus contains a statement which 99 persons out of 100 would understand in a sense which would make it obviously inaccurate, still, if the party making it honestly believed that it bore a meaning which would make it accurate, no action would lie, the obvious inaccuracy and unreasonable belief being evidence of dishonesty, but not of themselves ground of an action.

For the reasons given by the other members of the Court I do not think there was in this case any evidence of dishonesty within the meaning of *Peek* v. *Derry* in the House of Lords (1), the burden of proving fraud or dishonesty being on the Plaintiff.  For reasons given, I also think there should not be a new trial.

Solicitors for Plaintiff: *Byrne & Lucas.*
Solicitor for Defendant: *E. T. Tadman.*

H. C. J.

C. A.
1889
GLASIER
*v.*
ROLLS.

Lopes, L.J.

---

## HEAP *v.* HARTLEY.

[1888 H. 5725.]

*Patent—Exclusive License for limited Time and Area—Right of Licensee to sue —Non-joinder of Patentee—Effect of License—Registration—Sub-Purchase —User within Area of patented Article purchased outside Area—Notice— Patents, Designs, and Trade Marks Act, 1883 (46 & 47 Vict. c. 57), ss. 23, 36, 87.*

An exclusive license is a leave to do a thing, and a contract not to allow anyone else to do the thing; but, unless coupled with a grant, it confers no more than any other license any interest or property in the thing, and the licensee has no title to sue in his own name.

A patentee of machinery, by deed duly registered under the *Patents, Designs, and Trade Marks Act*, 1883, s. 23, granted to the Plaintiff the full and exclusive license to use and exercise the patented invention within a specified district for a limited period, and covenanted during that period not to sell or to grant any license to exercise or use the invention to any

C. A.
1889
Aug. 2, 3, 5.

---

(1) 14 App. Cas. 337.

C. A.
1889
~~~
HEAP
*v.*
HARTLEY.

———

other person in the same district; and in case the patent should be in-
fringed, he covenanted to take all necessary proceedings for defending the
same, and that in default of his so doing it should be lawful for the Plaintiff
to take such proceedings in his (the patentee's) name.

The patentee afterwards sold two of the patented machines to firms out-
side the specified district, and these firms sold them to the Defendants, who
used them within the district; and it was in dispute whether or not the
Defendants had actual notice of the exclusive license at the time of their
purchase.

Upon an action brought in the County Palatine Court of *Lancaster* by the
Plaintiff in his own name, and without joining the patentee, against the
Defendants, it was *held* by the Vice-Chancellor, in dismissing the action,
first, that registration under the *Patents, Designs, and Trade Marks Act*
was not notice to all the world; secondly, that upon the evidence the
Defendants had no actual notice of the exclusive license at the time of their
purchase; thirdly, that the Defendants, being purchasers for value without
notice, were not affected by the license; and fourthly, that it was doubtful
whether an action for infringement of rights under a license could be
brought by an exclusive licensee in his own name, without joining the
patentee as co-Plaintiff:—

*Held,* by the Court of Appeal, in dismissing the appeal, first, that actual
notice had not been proved against the Defendants; secondly, that the
exclusive license, being simply an authority to do lawfully that which
would otherwise have been unlawful, and not being a license coupled with
or equivalent to a grant, did not entitle the licensee to sue in his own
name without joining the patentee; and this being so, that it was imma-
terial to consider the effect of registration under the Act of 1883.

THIS was an appeal from a decision of the Vice-Chancellor of
the County Palatine Court of *Lancaster* given on the 18th of
July, 1888, in an action by *Charles Heap,* claiming as assignee
or exclusive licensee for a particular district, of a patent, an in-
junction to restrain the Defendants *Israel Hartley* and *Edward
Hartley* from using the invention described in the patent, or any
colourable imitation thereof, within the district, or from otherwise
infringing the rights of the Plaintiff in the patent, and for
damages, an account, inspection and costs.

The invention was for improvements "in gig mills employed
in the finishing of woven fabrics," and the letters patent for it
were granted to *Charles Edward Moser* on the 30th of September,
1885, and were numbered 11,640 of 1885.

By indenture dated the 15th of November, 1886, *Moser*
granted to the Plaintiff "the full and exclusive license to use
and exercise the said patented invention at all places as well

within the borough of *Rochdale* as within the districts of the local boards of *Norden, Wardle,* and *Littleborough,* and *Milnrow,* according to the said invention, for the term of two years"; and covenanted that, subject to a right on his part to sell the invention, and to grant licenses to certain specified firms to use the same for their individual use without power of resale or transfer, he, *Moser,* would not "during the said period of two years either sell the said patented invention or grant or give any license or authority to exercise or use the same to any company, persons or person carrying on or having a place of business" in the district to which the license extended; and further, that in case the said letters patent or any extension or renewal thereof should be infringed, *Moser* should forthwith, after notice of such infringement, at his own cost, take all necessary proceedings for effectually protecting and defending the same, and in default of his so doing it should be lawful for the Plaintiff at his own cost, but in *Moser's* name, to take all necessary proceedings for effectually protecting and defending the same.

This deed was registered at the Patent Office on the 27th of November, 1886, and the period of two years mentioned therein was extended to four years by indenture dated the 12th of September, 1887, which was registered at the Patent Office on the 30th of September, 1887.

Early in the year 1888, *Moser* sold one of the machines made under his patent, which were known as "raising machines," to the *Victoria Raising Company* of *Manchester,* and another to Messrs. *Scott & Whitworth* also of *Manchester.* These two machines were on or before the 17th of February, 1888, bought from the *Victoria Raising Company* and *Scott & Whitworth* by the Defendants *Israel* and *Edward Hartley* for the purpose of a business which they carried on, or were about to carry on, in partnership at the *Victoria Mills, Littleborough,* within the district to which the Plaintiff's license extended. And these machines were temporarily put up by the Defendants in a room in the *Dearnley Mills,* also within the district, where *Stephen Hartley,* a brother of *Israel Hartley,* carried on business.

This having come to the knowledge of the Plaintiff, his solicitors wrote to the Defendants on the 23rd of February, 1888, that

CHANCERY DIVISION.    [VOL. XLII.

C. A.
1889
HEAP
v.
HARTLEY.

the purchase and user of these machines was an infringement of the Plaintiff's right as exclusive licensee within the district, and that if such user was continued proceedings would be taken against the Defendants.

The user was continued. This action was brought on the 2nd of May, 1888, and on the 10th the Plaintiff gave notice of motion for an injunction and inspection.

The evidence as to whether the Defendants before they bought the two machines had actual notice of the exclusive license granted to the Plaintiff for the district was of a conflicting character. On the part of the Plaintiff there was some evidence that at an interview between *Stephen Hartley, Israel Hartley,* and a workman named *Lord,* on the 29th of October, 1887, mention was made of "raising machines," and that on the same day *Stephen Hartley* wrote to *Moser* for one of his raising machines, afterwards receiving an answer from *Moser,* dated the 31st of October, 1887, that he was unable to send the machine, as he had given the Plaintiff the exclusive use of his patent for a certain time in *Stephen Hartley's* district; and further, that at another interview between *Stephen Hartley, Israel Hartley,* and *Lord* and his wife, in January, 1888, when mention was made of an agreement between *Moser* and the Plaintiff, one of the *Hartleys* said, "It is true enough." This was, however, denied by *Israel Hartley* in his evidence in reply, and there was no cross-examination upon the question of actual notice to the Defendants of the Plaintiff's exclusive license. This evidence is also referred to in the judgments of *Cotton* and *Fry,* L.JJ.

The motion was heard by the Vice-Chancellor of the County Palatine on the 13th of July, 1888, and having been by consent treated as the trial of the action, the Vice-Chancellor held, first, that registration, under the *Patents, &c., Act,* 1883, of an exclusive license was not in itself notice·to all the world that such a license had been granted; secondly, that, upon the evidence, the Defendants had no actual notice of the exclusive license at the time of their purchase of the machines; and thirdly, that the Defendants, being purchasers for value without notice, were not affected by the prior grant of the license to the Plaintiff. And his Honour dismissed the action, and expressed a doubt

whether an action to restrain an infringement of rights under an exclusive license could be brought and maintained by the licensee in his own name without joining the patentee as a co-Plaintiff.

The Plaintiff appealed.

*Moulton*, Q.C., and *Staffurth*, for the Appellant :—

A patentee is, according to sect. 46 of the *Patents, &c., Act*, 1883, "the person for the time being entitled to the benefit of a patent." An exclusive licensee for a particular district, whose license is duly registered under sects. 23 and 87 of the same Act, is *quâ* that district, and during the term of the license, in the position of a person to whom the patentee has given his monopoly and all his beneficial rights. He is practically an assignee *pro tanto* of the patent, and is entitled to maintain an action for infringement of his rights within the district, in his own name, and without joining the patentee: *Patents, &c., Act*, 1883, s. 36 ; *Renard* v. *Levinstein* (1) ; *Newby* v. *Harrison* (2) ; *Hassall* v. *Wright* (3) ; *Derosne* v. *Fairie* (4). Again, a patent is severable, and the assignee of a severed portion of the patent may sue for an infringement affecting that part without joining one who has an interest in another part : *Dunnicliff* v. *Mallet* (5) ; *Hassall* v *Wright*.

The patentee could not give other licenses in derogation of his own exclusive grant, and would not be entitled himself to infringe his own patent within the district.

The register has given notice to all the world of the rights of the exclusive licensee, and the Defendants with such notice have infringed those rights by using the patented invention within the district without the leave of the licensee. The permission of the patentee would be of no avail, for every license he grants must be subject to the rights already on the register. If *Moser*, when he sold these machines to the Defendants, had given them an express license to use them all over the kingdom, that license would have been a nullity as to this district, for as to that district

(1) 2 H. & M. 628.　　　　(3) Law Rep. 10 Eq. 509.
(2) 1 J. & H. 393.　　　　(4) 1 Webs. Pat. Cas. 155.
(5) 7 C. B. (N.S.) 209.

CHANCERY DIVISION.     [VOL. XLII.

C. A.
1889
~~
HEAP
*v.*
HARTLEY.

he could give no rights whatever. He, however, gave no such license or permission. The Plaintiff is the only person injured, and the only necessary Plaintiff, and the non-joinder of the patentee cannot defeat the action. If, however, there is a want of necessary parties, the objection should have been taken before. Moreover, actual notice to the Defendants is not necessary, because by the patent law the right to restrain an infringement is independent of notice, and the Defendants have infringed this patent within the district covered by the license. But upon the facts there was actual notice and knowledge of the Plaintiff's rights by the Defendants.

[They also cited *Webber* v. *Lee* (1) ; *Muskett* v. *Hill* (2).]

*Cozens-Hardy*, Q.C., and *Maberly*, for the Respondents :—

[COTTON, L.J. :—You may confine yourselves to the question of actual notice.]

The writ simply seeks an injunction for infringement of patent; there is no claim for conspiring with *Moser* to procure goods within the district. The original purchasers from whom we bought acquired their machines without any notice of the Appellant's rights as licensee, and no one who buys through an innocent person can be fixed with notice. There is no allegation of contrivance, collusion, or fraud, and even if the Respondents had notice, it was merely notice that the Appellant was licensed to do something within a limited area and time, which he could not have done without that license. But in fact there is no evidence of any notice sufficient to bind the conscience of the Defendants.

*Staffurth*, in reply, referred to *De Mattos* v. *Gibson* (3) ; *Messageries Impériales* v. *Baines* (4) ; *Catt* v. *Tourle* (5) ; *Werderman* v. *Société Générale d'Electricité* (6) ; *Holroyd* v. *Marshall* (7).

COTTON, L.J. :—

The last point argued by Mr. *Moulton* was that of notice, but I think it advisable to deal with that question first, because it

(1) 9 Q. B. D. 315.        (4) 11 W. R. 322.
(2) 5 Bing. N. C. 694.     (5) Law Rep. 4 Ch. 654.
(3) 4 De G. & J. 276.      (6) 19 Ch. D. 246.
              (7) 10 H. L. C. 191.

ought to be disposed of before we come to the question of whether an exclusive licensee can sue for an infringement of a patent.

The Vice-Chancellor has held that the Plaintiff has not made out that on which his title depended, viz., that the Defendants bought this machine with notice of the agreement which had been entered into between the Plaintiff and the patentee. In my opinion that is so; and it was for the Plaintiff to make that out, not as something which occurred incidentally, but as being the very foundation of his right to relief, unless he could establish that an exclusive licensee can, as such and independently of notice, sue a man for infringement of a patent. I will deal with that presently, but to my mind the title of the Plaintiff to relief depends upon notice, and therefore it was for him to make out to the satisfaction of the Court that the Defendants had notice. I agree that the case is one of some little suspicion, but that is not enough. The Plaintiff in this action did not originally raise any case of actual notice, but notice has come in incidentally, and in a rather awkward sort of way. The Plaintiff stated, and supported by affidavits, the agreement that was made between the patentee and himself. Then in answer to those affidavits the Defendant said, " I had no notice of this," but in cross-examination he said, " Oh, I do recollect something about it, which was mentioned to me by *Stephen Hartley.*" What is strongest against the Defendants on this point is a joint affidavit by a workman named *Lord* and his wife. But that was answered by an affidavit of one of the Defendants, and there was no cross-examination at all as regards the matters upon which the Plaintiff might have relied in order to shew notice either as to those affidavits of the *Lords*, or as to the answer by the Defendant. To my mind this is rather a striking circumstance, and in my opinion it would be wrong merely upon that, as to which there was no cross-examination, and no opportunity therefore of the Defendants giving any explanation, to hold that they had notice of the agreement that was made between the patentee and the Plaintiff.

That being so, we come to the simple question whether an exclusive licensee for a particular district can sue in his own name a person acting in alleged violation of his rights under the license, without proving as against such person notice of those

C. A.

1889

HEAP
*v.*
HARTLEY.

Cotton, L.J.

C. A.
1889
HEAP
*v.*
HARTLEY.
Cotton, L.J.

rights? My opinion is that the licensee cannot so sue. It is said that this is an exclusive license, and must be construed just in the same manner as if it had been a grant of a patent right for a limited period and for a limited space. But it is a very different thing; and some of the cases that have been referred to shew clearly the distinction between licenses which amount to a grant and licenses which do not do so. One of those cases is the ice case (*Newby* v. *Harrison* (1)), and there the Vice-Chancellor shews that where there is only a license which does not entitle the licensee to take anything away, or to acquire any property, then the license simply remains a license, that is, an authority from the person who grants it to the person who receives it, enabling him to do lawfully that which without the license he could not do; and that where there is a license which not only enables the licensee to do something lawfully which otherwise he could not do, but also enables him to acquire something or to take away something, like game, or ice, in consequence of the license, then the license amounts to a grant. That is pointedly put in the judgment of Lord *Hatherley*, then Vice-Chancellor, in this way (2):—"With regard to the word 'license,' there is some little ambiguity. It is, however, well defined in the case of *Muskett* v. *Hill* (3), and I prefer stating it in the language there cited by Chief Justice *Tindal* to giving my own. It is thus stated:—'A dispensation or license properly passes no interest, but only makes an action lawful which without it had been unlawful; as a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which, without license, had been unlawful; but a license to hunt in a man's park and carry away the deer killed to his own use, to cut down a tree in a man's ground and to carry it away the next day after to his own use, are licenses as to the acts of hunting and cutting down; but as to carrying away the deer killed and the tree cut down, they are grants.' So here, a license to enter upon a canal and take the ice is a mere license; and the right of carrying it away is a grant of the ice so to be carried away." So that points out the distinction between a license and a grant, and in my opinion the license in this case, although it is an exclusive license, and for a

(1) 1 J. & H. 393.        (2) 1 J. & H. 398.        (3) 5 Bing. N. C. 694.

C. A.

1889

HEAP
v.
HARTLEY.

Cotton, L.J.

limited time, can in no way be considered as a grant of the letters patent, but is simply a license to do that which without that license would be a violation of the monopoly of the patentee.

That this exclusive license was not intended to be a grant to the licensee of any right to sue is, I think, clear from the fact that there is in it a conditional contract that if there was any infringement either within or without the district, then the patentee would allow the licensee to use his (the patentee's) name, in order to sue the infringer. What is granted may be put thus :—" You may use this within this particular district for this particular time. I do not give you any right which will enable you to sue, but if there is any one who is violating my patent right, and therefore infringing the right which I have given to you, or doing that even without infringing the right, because he may do it outside; having regard to the license which I have granted, I will allow you to use my name, in order to sue the person who has committed such an act." If in this case any act had been done in violation of the agreement between the licensee and the patentee, then the licensee would have had the right to sue the patentee, but it is not alleged that there was any such violation. All that is contended is that an exclusive license is equivalent to a grant, and that the licensee may, without the concurrence of the patentee, or without there having been any violation of the agreement between the patentee and himself, sue the person who is infringing the rights conferred by the license. In my opinion that is wrong. That is turning that which is merely a license into something very different, namely, a grant of the whole letters patent, and in my opinion, therefore, the Plaintiff fails. I do not think it is necessary to go into the questions argued by Mr. *Moulton* as to the effect of the *Patent Act*, because if he cannot sue except in the name of the patentee, it is immaterial to consider whether the Act, by sect. 87, does render what these Defendants have done within the district an infringement or not, or an infringement against the patentee. If the Plaintiff cannot sue then it is immaterial to consider the question whether this is to be considered as a right which the patentee could not grant, and therefore as an infringement against the patentee.

C. A.

1889

HEAP
*v.*
HARTLEY.

In my opinion the judgment was right, and the appeal must be dismissed.

FRY, L.J.:—

I am of the same opinion. The Plaintiff in this case sues under an exclusive license to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his license. Now he puts his case in a two-fold manner. He says: " In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing. A license may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the license pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

Then, in the second place, the Plaintiff puts his case in this way. He says: " The exclusive license implies a contract not to grant to anybody else within the district. The Defendants took these machines with notice of that contract, and it would be unconscientious to allow them to use machines in such a manner as to violate the contract of which they had notice." Had they, then, notice of the contract? In my opinion that is not proved. I agree that there are many circumstances of suspicion; many circumstances which might make an investigation of the matter reasonable; many circumstances which I think the Plaintiff, if he had been minded, might have probed into far more deeply than he has ever attempted to do in this case. But, in fact, he did not launch his case upon the ground of notice. That, I

VOL. XLII.]          CHANCERY DIVISION.                    471

think, is not his true cause of action as he perceived it, and
understood it at the time he began his action; and on such
ragged evidence as there is of notice he has entirely failed to
satisfy me.

<div style="text-align:right">C. A.<br>1889<br>HEAP<br>v.<br>HARTLEY.</div>

Therefore I agree with the Lord Justice that this appeal fails.

LOPES, L.J.:—

I am of the same opinion.   I do not desire to add anything.

Solicitors: *H. G. Church*, agent for *Jacksons & Godby, Roch-
dale*; *Radford & Frankland*, agents for *Bowden & Walker,
Manchester*.

<div style="text-align:right">W. W. K.</div>

———

## TUCK v. SOUTHERN COUNTIES DEPOSIT BANK.

### [1888 T. 1392.]

<div style="text-align:right">C. A.<br>1889<br>KAY, J.<br>May 8, 17.<br>C. A.<br>July 30;<br>Aug. 1, 8.<br>———</div>

*Bill of Sale—Registration—Absolute Assignment—Subsequent Bill of Sale as
Security—"True Owner"—Mistake in Date of Register—"True Copy"—
Bills of Sale Act, 1878 (41 & 42 Vict. c. 31), ss. 8, 10 [Revised Ed. Statutes,
vol. xviii, p. 654]—Bills of Sale Act (1878) Amendment Act, 1882 (45 & 46
Vict. c. 43), ss. 5, 6 — Practice—Judgment—Stay of Execution—Special
Circumstances.*

The 10th section of the *Bills of Sale Act*, 1878, applies to absolute
assignments as well as to assignments by way of security.

The owner of certain household furniture in 1885 assigned it by a deed
of absolute gift to the Plaintiff, who was his wife, and the goods were soon
afterwards transferred to his son's house where the Plaintiff lived.  This
deed was not registered.  After the transfer the grantor executed another
bill of sale to the Defendants as security for a loan, which was registered.
After the death of the grantor the Defendants seized the goods, and the
Plaintiff brought an action to restrain them from dealing with or remaining
in possession of them :—

*Held*, by Cotton and Fry, L.JJ. (*dissentiente* Lopes, L.J.), that the first
bill of sale, although it ought to have been registered under sect. 10 of the
*Bills of Sale Act*, 1878, was not absolutely void, and, therefore, the grantor
was not the "true owner" of the goods at the time of his executing the
second bill of sale, and, consequently, the second bill of sale was made void
by the 5th section of the *Bills of Sale Act* (1878) *Amendment Act*, 1882,
against all persons except the grantor.  The Plaintiff was, therefore,
entitled to succeed in the action:

*Held*, by Lopes, L.J., dissenting, that the 5th section of the *Bills of Sale*



Westlaw.

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

▷

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

Armstrong Cork Canada Ltd. v. Domco Industries Ltd.

Armstrong Cork Canada Ltd. et al. v. Domco Industries Ltd. et al.

Armstrong Cork Canada Limited, Armstrong Cork Company, Armstrong Cork Industries Limited and Armstrong Cork Inter-Americas Inc., (Defendants) (Appellants) Appellants and Domco Industries Limited, (Plaintiff) (Respondent) Respondent and Congoleum-Nairn Inc., Congoleum Industries, Inc. and Congoleum Corporation, (Defendants) (Respondents) Respondents

Supreme Court of Canada

Laskin C.J.C., Martland, Ritchie, Dickson and Beetz JJ.

Judgment: June 23, 1982
Docket: 16437

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: Affirmed, 22 C.P.C. 276, 56 C.P.R. (2d) 198, 1981 CarswellNat 9, [1982] 1 F.C. 522, 1981 CarswellNat 103F (Fed. T.D.)

Counsel: Gordon F. Henderson, Q.C., David Watson, Q.C., for appellants

Donald F. Sim, Q.C., Colleen E. R. Spring, for respondent, Domco Industries Ltd.

Donald J. Wright, Q.C., Donald H. MacOdrum, for respondents, Congoleum-Nairn Inc., Congoleum Industries, Inc. and Congoleum Corporation

Subject: Intellectual Property; Property; Civil Practice and Procedure

Patents --- Actions for infringement — Remedies — Damages

Non-exclusive licensee — Patent Act, R.S.C. 1970, c. P-4, s. 57(1).

Plaintiffs C. and D. commencing infringement actions against defendant -- Plaintiff C. and defendant reaching settlement -- Plaintiff D. as non-exclusive licensee continuing action for damages -- Federal Court holding plaintiff D. entitled to continue action -- Defendant's appeal dismissed -- Statutory right to damages rendering infringer of patent liable for all damages sustained by reason of infringement by patentee or person claiming under patentee -- Non-exclusive licensee included in persons claiming under patentee within s. 57(1) -- Settlement

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Indus-
tries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

between other parties to action not extinguishing plaintiff D.'s right of action and entitlement to damages.

Patents --- Actions for infringement — Practice and procedure — Parties — Standing — Licensee

*Martland J.:*

1    The appellants (hereinafter jointly referred to as "Armstrong") appeal from two judgments of the Federal
Court of Appeal which dismissed appeals by Armstrong from the judgments of Mahoney J. at trial. Two actions
were originally commenced against Armstrong by the respondent Domco Industries Limited (hereinafter re-
ferred to as "Domco") and by the other respondents (hereinafter jointly referred to as "Congoleum"). The duplic-
ation was because of a title dispute, which is no longer material. The issues at trial were identical and the cases
were heard together. The appeals to the Federal Court of Appeal were also heard together. The judgments in that
court differ only in relation to the disposition of costs. Similarly, the appeals to this court were argued as one ap-
peal.

2    The actions were tried upon an agreed statement of facts and issues and no oral evidence was given. The
facts disclose that Congoleum is the holder of Canadian patent No. 764,004 issued on July 25, 1967, relating to a
type of chemically embossed floor covering. By an agreement dated July 8, 1966, Congoleum granted to Domco
a restricted non-exclusive right and licence to make, use and sell the products covered by the patent in Canada.
The relevant portions of this agreement are as follows:

> **Grant**
>
>     2(a) LICENSOR hereby grants to LICENSEE under the PATENT RIGHTS, subject to the terms, condi-
>     tions, and limitations hereof, a restricted nonexclusive right and license to make, use and sell said LI-
>     CENSED PRODUCTS in Canada;
>
> **Exclusive Period**
>
>     8. LICENSOR agrees that during the first five-year period from the date of this agreement, it will not
>     grant to any third party a license under said PATENT RIGHTS to manufacture floor, or felt-backed or
>     paper-backed wall covering in Canada. LICENSOR also agrees that during the first three-year period of
>     this agreement, it will not manufacture floor coverings in Canada under said PATENT RIGHTS.

3    Armstrong, at the time the patent issued, was already selling in Canada products manufactured in the
United States. On April 26, 1968, it commenced to manufacture such products in Canada. It continued to sell in
Canada products manufactured in the United States. During the period of time relevant to this action only the in-
fringer, Armstrong, and the licensee, Domco, were manufacturing the products covered by the patent in Canada.

4    In consequence of Armstrong's activities, which were carried on without any licence from Congoleum, the
actions referred to above were commenced by Congoleum and Domco as plaintiffs alleging that Armstrong had
infringed Congoleum's patent.

5    On March 9, 1976, Congoleum and Armstrong agreed to a settlement of the above litigation, as well as lit-
igation between them in the United States. Armstrong paid to Congoleum the sum of $35,000,000 in full satis-
faction of Congoleum's claims. Armstrong was given a licence for the period from the date of settlement to the
end of 1976 to enable it to effect an orderly termination of the manufacture and sale of the products.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

6      The memorandum of understanding contained the following provision:

> 4. The parties to T-476-71 and T-1209-71 will enter into minutes of consent in the form attached. Congoleum undertakes to obtain such action by its subsidiaries and affiliates and by Domco Industries, Ltd. Armstrong undertakes to obtain such action by its subsidiaries and affiliates and represents that it is authorized to take such action on behalf of Trimont Building Supplies, Ltd.

7      The references to T-476-71 and T-1209-71 are to the numbers of the two actions in the Federal Court. Domco did not agree to the release, with the result that Congoleum proceeded with the settlement as far as it could. The pleadings in the actions were amended so that Congoleum ceased to be a plaintiff and was named as a defendant. As a consequence, while Congoleum appears as a respondent in the appeal to this court, it supported the position of Armstrong. This is understandable since Congoleum, when Domco refused to be a party to the settlement, undertook to indemnify Armstrong from any claim which Domco might have in the action.

8      There is now no issue as to the validity of the Congoleum patent, nor as to the fact that Armstrong had infringed it. The real issue is as to whether Domco, as the holder of a licence to make, use and sell in Canada the products covered by the patent, can claim damages from Armstrong arising out of its infringement of that patent. This involves the interpretation and application of s. 57 of the *Patent Act*, R.S.C. 1970, c. P-4, which provides as follows:

> 57(1) Any person who infringes a patent is liable to the patentee and to all persons claiming under him for all damages sustained by the patentee or by any such person, by reason of such infringement.

> (2) Unless otherwise expressly provided, the patentee shall be or be made a party to any action for the recovery of such damages.

9      The position taken by Armstrong is that Domco as the holder of a non-exclusive licence was not entitled to invoke s-s. 57(1) because:

> (a) Domco had no claim to qualify it as a person "claiming under" the patentee;

> (b) Domco did not have any right which could be infringed; and

> (c) Domco could not sustain "damages" by reason of the patent infringement.

10      Domco contends that the Federal Court of Appeal correctly construed s-s. 57(1) and was right in holding that a licensee is a person claiming under the patentee, who has a remedy for all damages sustained by it by reason of the infringement of the patent.

11      Section 57 of the *Patent Act* first appeared as s. 55 of the *Patent Act*, 1935 (Can.), c. 32. It was in the same terms as the present section. Section 55 was a part of a new statute which repealed the earlier Act and which was enacted following representations to and hearings by a Senate committee. In determining its meaning, it is helpful to consider the state of the law prior to its enactment.

12      The predecessor of s. 57 was s. 32 of the *Patent Act*, R.S.C. 1927, c. 150. It provided as follows:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

> 32. Every person who, without the consent in writing of the patentee, makes, constructs or puts in practice any invention for which a patent has been obtained under this Act or any previous Act, or who procures such invention from any person not authorized by the patentee or his legal representatives to make or use it, and who uses it, shall be liable to the patentee or his legal representatives in an action of damages for so doing; and the judgment shall be enforced, and the damages and costs that are adjudged shall be recoverable, in like manner as in other cases in the court in which the action is brought.

13    "Legal representatives" was defined in s. 2(*c*):

> (c) "legal representatives" includes heirs, executors, administrators, guardians, curators, tutors, assigns or other legal representatives;

14    In *Electric Chain Co. v. Art Metal Works Inc. et al.*, [1933] 4 D.L.R. 240, [1933] S.C.R. 581, this court was called upon to consider the ambit of s. 32. The respondent, Dominion Art Metal Works Limited, was the Canadian subsidiary of the respondent, Art Metal Works Inc. of New Jersey, the patentee. Electric Chain Company was the infringer of the patent. Evidence disclosed that it was the Canadian company which had suffered damage by the infringement. The interest held by the Canadian company was characterized to be that of a licensee. Hughes J., who delivered the judgment of the court, approved of the decision in *Heap v. Hartley* (1889), 42 Ch.D. 461, a judgment of the Court of Appeal in England, and concluded that Dominion Art Metal Works Limited had no cause of action against the infringer.

15    The question in issue in *Heap v. Hartley* was as to whether the holder of an exclusive licence had title to sue in his own name, without joining the patentee, for infringement of the patent to which his licence related. It was held that he could not. Fry L.J., at p. 470, said:

> I am of the same opinion. The Plaintiff in this case sues under an exclusive license to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his license. Now he puts his case in a two-fold manner. He says: "In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing. A license may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the license pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

16    The issue as to the right of a licensee to sue an infringer in the light of the enactment of s. 55 of the 1935 Act was considered by this court and, on appeal, by the Privy Council in *Spun Rock Wools Ltd. v. Fiberglas Canada Ltd. et al.*, [1943] 4 D.L.R. 289, 3 C.P.R. 87, [1943] S.C.R. 547; reversed [1947] 2 D.L.R. 465, 6 C.P.R. 57, [1947] A.C. 313. The action was for infringment of a patent for alleged new and useful improvements in the production of fibres or threads from glass, slag and like meltable materials. The action failed in this court, Rand J. dissenting, on the ground that there was not invention in the claim sued upon. This decision was reversed in the Privy Council.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

17    However, the claim was also opposed on the basis that the plaintiff did not have the right to maintain the action. The plaintiff had an exclusive licence to use the patent. Three of the members of the court, Davis, Taschereau and Kerwin JJ., held that the plaintiff had a right to claim damages under s. 55. Hudson J. expressed no opinion on this issue. Rand J. did not deal with it specifically but, as he decided in favour of the plaintiff, it is clear that he held the view that a claim was available under s. 55. Kerwin J. referred to the fact that the plaintiff claimed as an exclusive licensee, but no point is made of this in the judgment of Davis J., concurred in by Taschereau J.

18    The decision of this court as to the effect of s. 55 was upheld in the Privy Council. The judgment was delivered by Lord Simonds, who said at pp. 472-3 D.L.R., pp. 65-6 C.P.R., pp. 320-1 A.C.:

> Here the question is, whether a licensee is a person claiming under the patentee. Upon this question, even if it was argued before him, the learned trial Judge can have had no doubt; for he makes no mention of it in his judgment. In the Supreme Court Davis J. (with whom Taschereau J. concurred) held that a licensee is for the purposes of the section a person claiming under the patentee. Kerwin J. came to the same conclusion, pointing out that in the 1935 Act the relevant provision was recast, the words "the patentee and all persons claiming under him" taking the place of the words "the patentee or his legal representatives", which occurred in the earlier Patent Act of 1923 and were not apt to include a licensee. Upon this question neither Hudson J. nor Rand J. expressed an opinion, but the latter Judge, who was in favour of dismissing the appeal, can have had no doubt upon the matter.

> In the face of this consensus of opinion upon a Canadian statute their Lordships would in any case hesitate to express a contrary view. But it appears to them that the statutory amendment of 1935 following upon the decision of *Electric Chain Co. v. Art Metal Works Inc.*, [1933], 4 D.L.R. 240, S.C.R. 581 points irresistibly to the conclusion that licensees are persons claiming under the patentee within the meaning of the section. The patentee by definition means the person for the time being entitled to the benefit of a patent. Section 55(1) contemplates an action not only by the person for the time being entitled to the benefit of a patent but also by any person claiming under that person. Upon the plain language of the section a licensee answers that description.

> The appellants as licensees were therefore entitled to sue for damages under s. 55.

19    No differentiation was made in these reasons as between an exclusive and a non-exclusive licence.

20    The Federal Court of Appeal considered the position of a non-exclusive licence in the case of *American Cyanamid Co. v. Novopharm Ltd.* (1972), 7 C.P.R. (2d) 61, [1972] F.C. 739. The plaintiff had a non-exclusive licence from the patentee to manufacture, have manufactured for it, use and sell certain products manufactured by the patented processes. It sued an alleged infringer of the patent. The defendant moved to strike out the statement of claim as disclosing no cause of action because the plaintiff was not a person claiming under the patentee within the meaning of s-s. 57(1).

21    All of the three members of the court were of the view that the judgment of the Privy Council in the *Fiberglas* case, *supra*, had decided that a person who is a licensee under a patent is a person claiming under the patentee within the meaning of s-s. 57(1). However, Chief Justice Jackett, dissenting on this point, was of the opinion that since a non-exclusive licence merely entitled the licensee to use the patented invention, and as this right of use is not affected by the infringement of the patent, the licensee suffered no damage from the infringe-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Indus-
tries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

ment and therefore the statement of claim disclosed no cause of action.

22      The other two members of the court did not share this view. Bastin D.J. said at pp. 83-4 C.P.R., p. 764
F.C.:

> It can hardly be questioned that the diminution in the volume of his sales due to sales by an infringer can
> result in a loss to a non-exclusive licensee. It might be argued that Parliament never contemplated compel-
> ling an infringer to compensate a non-exclusive licensee for such *de facto* damages but intended to restrict
> damages for which an infringer is liable to those of a person whose rights were directly infringed by the par-
> ticular act of infringement. On this reasoning, a bare licensee has merely permission to make use of the pat-
> ent and, unless his freedom to exercise this permission is interfered with, he cannot complain. On the other
> hand, an exclusive licensee has been granted a monopoly and an infringement of the patent directly affects
> this legal right. This may appear a logical argument but the answer is that the right of any licensee to collect
> damages is purely statutory and, if Parliament had intended to distinguish between an exclusive and a non-
> exclusive licence, it would have made this clear. Since Parliament has made no such distinction, it follows
> that all licensees should be treated alike.

Sweet D.J. said at pp. 86-7 C.P.R., pp. 767-8 F.C.:

> It would seem logical for Parliament to decide to correct the situation wherein the licensee, under such cir-
> cumstances, had no protection from and no recourse against the infringer and, in enacting s. 57(1) in its
> present form, to create, by statute, a right in the licensee against the infringer and to provide a means of en-
> forcing that right. Certainly the change was not necessary for the protection of the patentee or the assignee
> of the patent. They were already protected.

An analysis of s. 57(1) of the *Patent Act* reveals, I think, Parliament's intention to create such a right and to
provide the accompanying remedy and that it has implemented that intention and accomplished its purpose.
In this connection, the following are noted:

> 1. The expressed liability of the person who infringes both to the patentee and to all persons claiming
> under him is set out in the same subsection and in the same terms.

> 2. The words "any person who infringes a patent is liable to" relate both to the patentee and to persons
> claiming under him.

> 3. The words "for all damages sustained" relate both to the patentee and to persons claiming under him.

> 4. There is no differentiation between the liability of the infringer to the patentee and to persons claim-
> ing under him nor is there any differentiation between the nature of the rights the patentee and the per-
> sons claiming under him have against the person infringing.

It seems to me to be made manifest by the legislation that what the patentee is entitled to and what the per-
sons claiming under him are entitled to are basically the same, namely, "all damages sustained" by them re-
spectively by reason of the infringement. It would, of course, be inconceivable that the patentee with a valid
patent would not be entitled, from the person who infringes, to damages in compensation for his loss by
reason of the infringement. Having regard to the structure of s. 57(1), I am of opinion that all persons claim-
ing under the patentee, who would include non-exclusive licensees, now have the same basic right, as has

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

the patentee, namely, to recover from the person who infringes, damages in compensation for their losses by reason of the infringement.

23        A similar application to strike out a statement of claim as disclosing no cause of action, because the plaintiff who was a non-exclusive licensee in respect of the use of a patent, was seeking damages as a result of the infringement of the patent, was seeking damages as a result of the infringement of the patent, was made unsuccessfully in *Flake Board Co. Ltd. v. Ciba-Geigy Corp. et al.* (1974), 15 C.P.R. (2d) 33. Chief Justice Jackett, who presided, said (at p. 35):

> Counsel for the appellant conceded that, in so far as the application to strike out Cyanamid of Canada as a plaintiff is concerned, the appeal to this Court must be dismissed having regard to the decision of this Court in *American Cyanamid Co. v. Novopharm Ltd.* (1972), 7 C.P.R. (2d) 61, [1972] F.C. 739.

24        The appellant, who was obviously seeking a decision on the point by this court, then applied for leave to appeal to this court contending that the appeal raised a question of law as to whether the plaintiff, being merely a non-exclusive licensee, had the status to be a plaintiff, *i.e.*, whether the plaintiff was a person claiming under the patentee within the meaning of s-s. 57(1) of the *Patent Act*. Leave to appeal was refused by this court.

25        Counsel for Armstrong recognizes that both this court and the Privy Council considered that the enactment of s. 55 (now s. 57) of the *Patent Act* was as a consequence of the decision of this court in *Electric Chain Co. v. Art Metal Works Inc.* to which reference has already been made. The reference in the Privy Council, at pp. 472-3 D.L.R., p. 66 C.P.R., p. 320 A.C., already quoted, is in these terms:

> But it appears to them that the statutory amendment of 1935 following upon the decision of *Electric Chain Co. v. Art Metal Works Inc.* points irresistibly to the conclusion that licensees are persons claiming under the patentee within the meaning of the section.

26        However, he contends that s-s. 57(1) was only intended to change the law so as to provide a remedy to someone who by contract had been granted exclusive rights under a patent, *i.e.*, the holder of an exclusive licence. He also contends that the judgments in *Fiberglas* in this court and in the Privy Council go no further than that.

27        While it is true that the licensee actually under consideration in the *Fiberglas* case was said to be "the exclusive sublicensee" (or "exclusive licensee") under the patent, no information is given in any of the judgments as to the precise nature of the licence, and nothing in the reasons for judgment on this point turned on the distinction between an exclusive licensee and a non-exclusive licensee or a bare licensee. Both Mr. Justice Davis in this court delivering his and Mr. Justice Taschereau's judgment and Lord Simonds in the Judicial Committee used the general word "licensee" in delivering their judgments. It cannot be supposed that they did so intending that only an exclusive licensee was being considered, particularly when Lord Simonds defined the issue of law as being: "Here the question is, whether a licensee is a person claiming under the patentee."

28        Armstrong sought to distinguish an exclusive licence from a non-exclusive licence on the basis that the former was a grant of a part of the monopoly and that such a licensee was practically an assignee of the patent for the term of the licence with all the beneficial rights of the patentee. It is difficult to reconcile this reasoning with what was said in *Heap v. Hartley, supra* (applied by this court in the *Electric Chain Co.* case), in the pas-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 8
1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

sage which I have already quoted. I repeat from that passage the following portion which is apt in relation to Armstrong's submission:

> Now he puts his case in a two-fold manner. He says: "In the first place, as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a license. An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other license, no interest or property in the thing.

29      In my opinion, the reasons which led this court and the Privy Council to the conclusions reached in the *Fiberglas* case are as applicable to a non-exclusive licensee as to an exclusive licensee. If an exclusive licensee is a person claiming under the patentee within s-s. 57(1), and the *Fiberglas* case so holds, there is no valid basis, under the wording of the subsection, to exclude its application to a non-exclusive licensee, and there is no valid basis for interpreting the *Fiberglas* case as holding otherwise.

30      It was also contended on behalf of Armstrong that a non-exclusive licensee has no rights which can be infringed and therefore has no claim against the infringer of a patent. This was the view of Jackett C.J. in the *American Cyanamid* case. He was of the opinion that the non-exclusive licensee had only a right to use the patent, which right was not affected by its infringement.

31      This was the legal position, even in respect of an exclusive licensee, prior to the enactment of s. 55 of the 1935 Act. Section 55 was enacted to meet this difficulty and, in my opinion, it has overcome the problem. Subsection 55(1), by its terms, imposes a liability upon the infringer of a patent to the patentee and also to all persons claiming under him for all damages sustained by the patentee or any such person by reason of such infringement. It is the infringement of the patent which gives rise to a liability. If that infringement causes damage to the patentee or to any person claiming under him, the infringer must compensate for the damage sustained by reason of the infringement of the patent. A licensee relying on this subsection is not claiming against the infringer for infringement of his rights under the licence, he is claiming for the damage he has sustained in consequence of the infringement of the patent.

32      On this point, I adopt the reasons of Sweet D.J. in the *American Cyanamid* case which have already been quoted.

33      Armstrong contended that the meaning of the word "damages" in s-s. 57(1) meant loss resulting from interference with the legal rights of the claimant. "Damages", it was said, refers to pecuniary recompense given by process of law to a person for an actionable wrong that another has done to him.

34      The meaning of the word "damages" must be ascertained in respect of its use in this specific statutory provision. In s-s. 57(1) it is provided in terms that an infringer of a patent is liable for all damages sustained by reason of his infringement by a patentee or by any person claiming under him. This is a statutory obligation to pay damages and it applies in favour of any person who comes within the provisions of the subsection. In my opinion, Domco does come within the terms of the subsection.

35      Finally, Armstrong contended that the settlement made between Armstrong and Congoleum meant that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1982 CarswellNat 482, [1982] 1 S.C.R. 907, 42 N.R. 254, (sub nom. Armstrong Cork Canada Ltd. v. Domco Industries Ltd.) 136 D.L.R. (3d) 595 , 66 C.P.R. (2d) 46, J.E. 82-674

there was no longer any infringement of the patent and, that, therefore, there could not be any remaining claim by the licensee, Domco, for damages for infringement.

36     The terms of settlement did not purport to say that there had been no infringement by Armstrong of Congoleum's patent. The settlement provided for the payment by Armstrong to Congoleum of $35,000,000 "in full satisfaction of Congoleum's claims". Congoleum accepted this sum in satisfaction of its claims for damages for infringement.

37     Domco since the commencement of the proceedings has sought damages on the basis of its being a licensee. It was not a party to nor did it have any part in the settlement between Armstrong and Congoleum. It was a term of the settlement that Congoleum would obtain the release and consent from Domco in respect of its claim. When Domco would not sign the release and consent unless it received a portion of the settlement moneys, Congoleum undertook to indemnify Armstrong from any claim that Domco might have in the action.

38     Subsection 57(1) gave to Domco a statutory right of action and an entitlement to damages which Congoleum could not independently extinguish by virtue of its settlement with Armstrong.

39     For these reasons I would dismiss the appeals with costs to the respondent, Domco, against the appellant, Armstrong, and the respondent, Congoleum. As the two appeals were identical, there should be only one set of costs.

40     *Appeal dismissed.*

*Appeals dismissed with costs.*

Solicitors of record:

Solicitors for the appellants: *Gowling & Henderson*, Ottawa.

Solicitor for the respondent Domco Industries Limited: *Donald F. Sim*, Toronto.

Solicitors for the respondents Congoleum-Nairn Inc. et al.: *Hayhurst, Dale & Deeth*, Toronto.


END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works