**PART 2 OF 3 OF BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS (PRE-TRIAL BRIEF – ALLOCATION)**



ELECTRIC CHAIN COMPANY OF CANADA LIMITED (Defendant) .. } APPELLANT;

AND

ART METAL WORKS INC. AND DOMINION ART METAL WORKS, LIMITED (Plaintiffs). ............ } RESPONDENTS.

1933

*June 8, 9.
*June 28.

ON APPEAL FROM THE EXCHEQUER COURT OF CANADA

*Patent—Action for infringement—Parties—Right of action—Right to damages—Measure of damages.*

A. Co., a foreign corporation, owner of a patent, sued defendant in the Exchequer Court of Canada for infringement of it. Defendant admitted infringement, but denied that plaintiff had suffered damages. On May 31, 1932, judgment was given for plaintiff upon the pleadings, a reference being directed as to damages. The referee found special damages of $10,013.17, and general damages of $1,000. The patented articles were manufactured and sold in Canada by D. A. Co., practically all the shares of which were owned by A. Co., whose profits from D. A. Co.'s operations were only through dividends on said shares. The special damages found were based on the profit which would have been made by D. A. Co. on articles sold by defendant which the referee found would otherwise have been sold by D. A. Co. Subsequent to the referee's report, A. Co. obtained an order adding D. A. Co. as a co-plaintiff, and the Exchequer Court gave judgment to plaintiffs for $8,663.14 (reducing the special damages found by the referee but otherwise confirming his report). The defendant appealed.

*Held* (1) D. A. Co. was, upon the facts in evidence, only allowed by A. Co. to make and sell the subject of the invention. A. Co. only, and not D. A. Co., had a cause of action within the pleadings against defendant. D. A. Co., not being the "patentee" or the "legal representative" of the patentee, had no right, at any rate after the judgment of May 31, 1932, to be a party to the action. (*Patent Act,* R.S.C., 1927, c. 150, ss. 2 (*e*), 2 (*c*), 30, 32, considered; *Hussey* v. *Whitely*, 2 Fish. Pat. Cas. 120, *Heap* v. *Hartley*, 42 Ch. D. 461, cited).

*Present:*—Rinfret, Smith, Cannon, Crocket and Hughes JJ.

SUPREME COURT OF CANADA               [1933

1933
ELECTRIC
CHAIN CO.
OF CANADA
LTD.
v.
ART METAL
WORKS INC.

(2) A. Co. was not entitled to damages on the basis adopted below. There was no evidence to shew that the dividends on the stock of D. A. Co. were in fact affected by the infringement or that the value of the shares of D. A. Co., owned by A. Co., were injuriously affected in any way by the infringement. But A. Co was entitled to substantial damages for infringement, which this Court fixed at $750. (*Rainham Chemical Works Ltd.* v. *Belvedere Fish Guano Co. Ltd.*, [1921] 2 A.C. 465, at 475; *Collette* v. *Lasnier*, 13 Can. S.C.R. 563; *Meters Ltd.* v. *Metropolitan Gas Meters Ltd.*, 28 R.P.C. 157, at 163, 164; *Watson, Laidlaw & Co. Ltd.* v. *Pott, Cassels & Williamson*, S.C., (1913-1914) 18, at 31, 32; cited).

APPEAL by the defendant from the judgment of Maclean J., President of the Exchequer Court of Canada, confirming, subject to a certain reduction in the amount of special damages found, the report of the Registrar of that court upon a reference to him as to the amount of damages recoverable from the defendant for infringement of the patent in question, and adjudging that the plaintiffs recover from the defendant the sum of $8,663.14, with interest from the date of the judgment.

The material facts of the case and the questions in issue are sufficiently stated in the judgment now reported.

*R. C. H. Cassels K.C.* for the appellant.

*O. M. Biggar K.C., R. S. Smart K.C.* and *M. B. Gordon* for the respondents.

The judgment of the court was delivered by

HUGHES, J.—This action was brought in the Exchequer Court of Canada by Art Metal Works Incorporated, a New Jersey corporation, against the appellant for infringement of letters patent No. 288148 and for an injunction and other relief. The prayer when the statement of claim was filed on the 24th day of September, 1931, read in part as follows:

The plaintiff therefore claims:

(c) $1,000 damages or alternatively an account of profits as the plaintiff may elect.

On the 23rd day of November, 1931, the appellant delivered its statement of defence consisting of four paragraphs, denying that the plaintiff was the owner of the patent, denying the infringement and impeaching the patent.

On the 30th day of May, 1932, the appellant served a notice of motion for an order amending its statement of defence by striking out the whole four paragraphs above

1933

ELECTRIC
CHAIN CO.
OF CANADA
LTD.
*v.*
ART METAL
WORKS INC.

Hughes J.

mentioned and substituting therefor the following single paragraph:

The defendant admits the truth of the facts set forth in the plaintiff's statement of claim herein, but denies that the plaintiff has suffered any damages or that the defendant has made any profits from the alleged infringement.

On Tuesday, the 31st day of May, 1932, an order was made in the Exchequer Court of Canada as follows:

UPON the application of the defendant for an order permitting it to amend its statement of defence in this action by substituting for paragraphs 1 to 4 thereof the following paragraph, namely,

"The defendant admits the truth of the facts set forth in the plaintiff's statement of claim herein but denies that the plaintiff has suffered any damages or that the defendant has made any profits from the alleged infringement," upon reading the affidavit of Birger Elias Ekblad filed and the pleadings herein, and upon hearing what was alleged by counsel for both parties, This Court was pleased to order that the statement of defence be amended as prayed, counsel for defendant consenting that judgment be rendered upon the pleadings as amended, and upon reading the pleadings as so amended;

THIS COURT DOTH ORDER AND ADJUDGE that as between the plaintiff and the defendant the Letters Patent of the plaintiff, No. 288,148 bearing date the 26th day of March, 1929, for Improvements in Cigar Lighters, are valid, and infringed by the defendant.

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant, its officers, servants, workmen and agents be and they are restrained from infringing said Letters Patent owned by the plaintiff and No. 288,148, and from making, constructing, using and vending to others to be used in the Dominion of Canada the said invention as described in the specification attached to the said Letters Patent during the continuance of the said Letters Patent:

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do forthwith deliver up to the plaintiff all products or articles in the possession or control of the defendant which infringe the said Letters Patent;

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do pay to the plaintiff such damages as it may have suffered or be entitled to by reason of the infringements complained of, and doth direct that there be a reference to the Registrar of this Court to enquire into and report as to the amount of such damages, if any;

AND THIS COURT DOTH FURTHER ORDER AND ADJUDGE that the defendant do pay to the plaintiff its costs of this action forthwith after taxation thereof, and that the costs of the reference, if any, be reserved.

By the Court,

(Sgd.) "ARNOLD W. DUCLOS,"

Registrar.

The parties duly appeared before the Registrar and on the 15th day of August, 1932, the Registrar issued his report in which he found special damages of $10,013.17 and general damages of $1,000, making a total sum of $11,013.17.

584          SUPREME COURT OF CANADA          [1933

1933
ELECTRIC
CHAIN CO.
OF CANADA
LTD.
v.
ART METAL
WORKS INC.
———
Hughes J.
———

On the 18th day of November, 1932, the learned President of the Exchequer Court of Canada heard a motion to confirm the report of the Registrar and also a motion of the appellant to vary or set aside the report. On this motion, the learned President gave leave to the New Jersey corporation to amend its statement of claim so as not to restrict its claim for damages to $1,000. The learned President also gave leave to the New Jersey corporation to move to add a Canadian corporation known as Dominion Art Metal Works Limited as a party plaintiff, it appearing according to counsel for the appellant, that the evidence before the Registrar was to the effect that the New Jersey corporation did not carry on business in Canada and that it was the Canadian company, if any, that had suffered damage by the infringement.

The New Jersey corporation thereupon applied for, and on the 16th day of December, 1932, obtained, an order for the joinder of the Canadian company as a co-plaintiff.

On the 6th day of February, 1933, the learned President gave judgment in favour of the respondents, reciting the two amendments above mentioned and reducing the damages to $8,663.14 plus interest and costs.

It was argued before us by the appellant that the Exchequer Court of Canada should not have permitted an increase in the amount of the claim for damages of the New Jersey corporation, and should not have permitted the joinder of another plaintiff in view of the fact, as the appellant's counsel alleged, that the judgment of the 31st day of May, 1932, was tantamount to a consent judgment.

On the other hand, counsel for the respondents contended that the two orders permitting the amendments, respectively above mentioned, were interlocutory orders of the Exchequer Court of Canada and that no appeal lay to the Supreme Court of Canada; that, even if they were final orders, they could not then be appealed as the thirty days referred to in section 82 of the *Exchequer Court Act* had long since expired, and lastly, that the appellant had appealed only against the final judgment of the 6th day of February, 1933.

It is not necessary to consider all of these arguments, and they are recited merely in order that the history of the proceedings may be clear.

The statement of claim alleges, the judgment of the 31st day of May, 1932, recites, and the evidence before the Registrar shows that the New Jersey corporation was the owner of the patent in question.

1933

ELECTRIC
CHAIN CO.
OF CANADA
LTD.
*v.*
ART METAL
WORKS INC.

Section 2 (*e*) of the *Patent Act*, R.S.C. 1927, Chapter 150, is as follows:

Hughes J.

2. (*e*) "patentee" means the person for the time being entitled to the benefit of a patent.

Section 32 of the *Patent Act* is as follows:

32. Every person who, without the consent in writing of the patentee, makes, constructs or puts in practice any invention for which a patent has been obtained under this Act or any previous Act, or who procures such invention from any person not authorized by the patentee or his legal representatives to make or use it, and who uses it, shall be liable to the patentee or his legal representatives in an action of damages for so doing; and the judgment shall be enforced, and the damages and costs that are adjudged shall be recoverable, in like manner as in other cases in the court in which the action is brought. 1923, c. 23, s. 32.

Section 2 (*c*) of the *Patent Act* is as follows:

"Legal representatives" includes heirs, executors, administrators, guardians, curators, tutors, assigns or other legal representatives;

Section 30, subsection 1, of the *Patent Act* is as follows:

Every patent issued for an invention shall be assignable in law, either as to the whole interest or as to any part thereof, by any instrument in writing.

It was not suggested that the patent had been assigned either as to the whole interest or any part thereof to the Canadian corporation.

Subsection 2 of section 30 reads:

2. Such assignment, and every grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented, within and throughout Canada or any part thereof, shall be registered in the Patent Office in the manner from time to time prescribed by the Commissioner for such registration.

Subsection 3 provides that every assignment shall be null and void against any subsequent assignee unless duly registered.

The section does not say that every grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented within and throughout Canada or any part thereof must be in writing and the statute is silent as to the effect of non-registration. *Dalgleish* v. *Conboy* (1).

On the relationship existing between the New Jersey corporation and the Canadian corporation, the following

(1) (1876) 26 U.C.C.P. 254.

1933

ELECTRIC
CHAIN CO.
OF CANADA
LTD.

*v.*

ART METAL
WORKS INC.

——

Hughes J.

——

questions and answers in the cross-examination of Alexander Harris, secretary-treasurer of the New Jersey corporation, are relevant:

Q. Have you any agreement between the Art Metal Works Incorporated and the Dominion Art Metal Works Limited which gives them the right to manufacture under the patent of Art Metal Works Incorporated?—A. I do not believe any specific agreement exists in view of the fact that the Canadian company is wholly owned by the United States company.

Q. Just an implied agreement?—A. Yes, I think so.

Q. I suppose the Dominion Art Metal Works Limited does not pay any royalty to Art Metal Works Incorporated?—A. No, sir, it does not.

Q. The profit of Art Metal Works Incorporated is through dividends on shares of Dominion Art Metal Works Limited?—A. Yes.

This is not evidence of a " grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented within and throughout Canada or any part thereof."

It is rather evidence of a licence.

In *Hussey* v. *Whitely* (1), referred to in *Dalgleish* v. *Conboy, supra,* at page 261, the complainant had by a writen instrument granted the exclusive right to make and sell the subject of his invention, during the continuance of his patent, in twenty-three counties of Ohio, including that in which the defendants' factory was carried on, but the patentee expressly reserved to himself the right of sending machines of his own manufacture into the territory embraced in the contract. This was held to be a mere licence.

In *Heap* v. *Hartley* (2), the court considered the words which in section 2 (*e*) of our Act constitute the definition of a patentee, namely, " the person for the time being entitled to the benefit of a patent," 46-47 Victoria, chap. 57, sec. 46. In that case a patentee of machinery, by deed, granted to the plaintiff the full and exclusive licence to use and exercise the patented invention within a specified district for a limited period, and covenanted during that period not to sell or to grant any licence to exercise or use the invention to any other person in the same district; and in case the patent should be infringed, he covenanted to take all necessary proceedings for defending the same, and that in default of his so doing, it should be lawful for the plaintiff to take such proceedings in his (the patentee's) name.

(1) (1860) 2 Fish. Pat. Cas. 120.        (2) (1889) 42 Ch. D. 461.

The defendants had bought two of the patented machines from some person other than the plaintiff and were using them within the district.

An action was brought by the plaintiff in his own name and without joining the patentee against the defendants and was dismissed.

Counsel for the appellant unsuccessfully contended, page 465, that since a patentee was according to section 46 of the Patents Act, 46-47 Victoria, chapter 57, "the person for the time being entitled to the benefit of a patent," an exclusive licensee for a particular district was *quâ* that district, and during the term of the licence, in the position of a person to whom the patentee had given his monopoly and all his beneficial rights, that he was practically an assignee *pro tanto* of the patent, and was entitled to maintain an action for infringement of his rights within the district in his own name, and without joining the patentee.

The distinctions between a grant of an interest and a licence are discussed fully in the judgments of Cotton L.J., and Fry L.J. The latter said at page 470:

> The plaintiff in this case sues under an exclusive licence to use a certain invention for a certain time, and within a limited district. He sues a person who he says is using that patented invention within the district, and without his licence. * * * He says: "* * * as exclusive licensee, I am in the position of an assign of the letters patent for that district and for that term, and as an assign of letters patent, I have a right to restrain any person who is infringing within the district." That argument appears to be based on an entire error with regard to the nature of a licence. An exclusive licence is only a licence in one sense; that is to say, the true nature of an exclusive licence is this. It is a leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But it confers like any other licence, no interest or property in the thing. A licence may be, and often is, coupled with a grant, and that grant conveys an interest in property, but the licence pure and simple, and by itself, never conveys an interest in property. It only enables a person to do lawfully what he could not otherwise do, except unlawfully. I think, therefore, that an exclusive licensee has no title whatever to sue.

It appears, therefore, that only the New Jersey corporation had a cause of action within the pleadings against the appellant; and that the Canadian corporation, Dominion Art Metal Works, had no cause of action within the pleadings against the appellant.

It must follow that the Canadian corporation, not being the patentee or the legal representative of the patentee, had no right, at any rate after the judgment of the 31st day of May, 1932, to be a party to the action in the Exchequer Court of Canada at all.

1933

ELECTRIC
CHAIN CO.
OF CANADA
LTD.
*v.*
ART METAL
WORKS INC.

Hughes J.

1933

Electric
Chain Co.
of Canada
Ltd.
v.
Art Metal
Works Inc.

Hughes J.

It was not contended before us by the respondents that it was not open to the appellant after the judgment of the 31st day of May, 1932, to deny the right of the New Jersey corporation to the damages sustained either by it or by the Canadian company. This point was mentioned in the report of the Registrar, but possibly was abandoned for on the 16th day of December, 1932, the New Jersey corporation secured from the Exchequer Court of Canada an order adding the Canadian corporation as a party plaintiff.

The learned President in his preliminary reasons for judgment dated November 18, 1932, made the following among other findings:

The Canadian business of the plaintiff is carried on by a Canadian corporation, known as The Dominion Art Metal Works Ltd., with headquarters at Toronto, and this company manufactures and sells in Canada the lighter which is the subject matter of the plaintiff's patent. No formal licence apparently issued from the plaintiff to the Canadian company, but the latter was impliedly licensed to manufacture and sell in Canada, the invention covered by the plaintiff's patent. The plaintiff company own all the shares in the Canadian company, and the officers of both companies appear to be the same. No royalty was paid by the Canadian company to the plaintiff company for the use of the plaintiff's invention, and the only profit accruing to the plaintiff from the Canadian company was in the way of dividends upon the shares it held in that company. At the time material here the major portion of the business of the Canadian company consisted in the manufacture and sale of lighters.

The registrar has reported, awarding damages to the plaintiff in the sum of $11,013.17. This amount was ascertained by taking the number of lighters admittedly sold by the defendant, viz., 5,553, and multiplying that by the profit which the Canadian company ordinarily made on each lighter sold by it in Canada, viz., $1.84, which would amount to $10,217.32; the Registrar allowed an additional sum of $1,000 in the nature of general damages for injury to the business, apparently, of the Canadian company.

* * * I do not think any injustice will be done the defendant if I allow the plaintiff to amend its statement of claim in such a way as will not restrict its claim for damages to $1,000, and this I do. * * *

The most serious point raised by the defendant's counsel was that the plaintiff could not recover damages, other than nominal damages, because it was the Canadian company that suffered damage, if any damage was caused by the defendant's infringement. And this point was raised by defendant's counsel before the Registrar. All the evidence given before the Registrar was apparently directed towards showing loss of profits or damages suffered by the Canadian company. Now it would seem to me to be unfortunate, there being some damages in the offing for some one, if the issue as to the amount of damages and to whom they should go, could not be concluded in this proceeding and without further litigation, particularly as infringement has been admitted. It seems to me therefore that the question as to whether or not the Canadian company should be added as a party to the cause should be determined before I proceed further.

On the 6th day of February, 1933, the learned President in his reasons for final judgment referred to the assessment of damages by the learned Registrar as follows:

> The Registrar assessed the damages under two heads. First, he allowed $10,217.52, that amount being reached by multiplying the number of lighters sold by the defendant by $1.84, the amount of profit the Canadian company claimed to make on each lighter which it manufactured and sold, but from this amount he made a deduction of 2 per cent, representing sales which the defendant made but which the plaintiff might not have made; and he allowed $1,000 in addition to cover damages generally for loss of profits, and for disruption of business, suffered by the plaintiffs, owing to the sale of the infringing article.

Counsel for respondent contended at bar that the New Jersey corporation owned all the shares or nearly all the shares of the Canadian corporation, and that it was therefore entitled to the damages which were awarded by the learned President as owner of all, or nearly all, the shares of the Canadian corporation, and therefore as recipient of all, or nearly all, the dividends paid by the Canadian corporation.

Counsel for the respondent also contended that the case came within the decision of this Court in *Palmolive Manufacturing Co. (Ontario) Ltd.* v. *The King* (1).

There was, however, no evidence adduced before the learned Registrar to shew that the dividends on the stock of the Canadian company, if they went to the New Jersey corporation, were in fact affected by the infringement or that the value of the shares of the Canadian corporation, owned by the New Jersey corporation, were injuriously affected in any way by the infringement.

Counsel for the respondent also contended that the New Jersey corporation owned all the assets of the Canadian corporation and that through this conection the former was entitled to the damages awarded by the learned President. This contention, however, cannot be well founded in the light of the evidence of Alexander Harris above set out.

As Lord Buckmaster said in *Rainham Chemical Works Ltd.* v. *Belvedere Fish Guano Co. Ltd.* (2):

> It not infrequently happens in the course of legal proceedings that parties who find they have a limited company as debtor with all its paid-up capital issued in the form of fully-paid shares and no free capital for working suggest that the company is nothing but an alter ego for the people by whose hand it has been incorporated, and by whose action it is controlled. But in truth the Companies Acts expressly contemplate

(1) [1933] Can. S.C.R. 131.    (2) [1921] 2 A.C. 465 at 475.

1933
ELECTRIC
CHAIN CO.
OF CANADA
LTD.
*v.*
ART METAL
WORKS INC.

Hughes J.

1933

ELECTRIC
CHAIN CO
OF CANADA
LTD.
v.
ART METAL
WORKS INC.

Hughes J.

that people may substitute the limited liability of a company for the unlimited liability of the individual, with the object that by this means enterprise and adventure may be encouraged. A company, therefore, which is duly incorporated, cannot be disregarded on the ground that it is a sham, although it may be established by evidence that in its operations it does not act on its own behalf as an independent trading unit, but simply for and on behalf of the people by whom it has been called into existence.

Moreover, in *Collette* v. *Lasnier* (1), this Court held that in the circumstances of that case the profits made by the defendants were not a proper measure of damages; that the evidence furnished no means of accurately measuring the damages, but that substantial justice would be done by awarding $100.

But the New Jersey corporation is undoubtedly entitled to substantial damages for infringement. In *Meters Ltd.* v. *Metropolitan Gas Meters Ltd.* (2), Fletcher Moulton L.J., at page 163, said:

> The defendants seek to diminish the damages by a variety of affidavits intended to show that the particular purchasers for whom they manufactured these infringements were customers who would not have purchased from the plaintiffs if they had not purchased from them. I am not for a moment going to say that evidence of that kind may not be relevant, but the argument based upon it was, that where a plaintiff proves the sale of infringing instruments by the defendants he does not establish any right to damages unless he shows how many of those particular instruments would have been purchased from him if the defendant had not sold them; and the counsel for the defendants were bold enough to say that in this case of infringement on a large scale there ought to be only nominal damages.

And at page 164:

> In the assessment of damages every instrument that is manufactured or sold, which infringes the rights of the patentee, is a wrong to him, and I do not think that there is any case, nor do I think that there is any rule of law which says that the patentee is not entitled to recover in respect of each one of those wrongs.

And in *Watson, Laidlaw & Company, Limited* v. *Pott, Cassels & Williamson* (3), Lord Shaw of Dunfermline said at page 31:

> The argument is—for indeed this instance covers sufficiently the whole ground—the argument is: Here it is demonstrated that the patentees have lost no trade which they could have obtained. And under the cover of certain judicial dicta the infringers are entitled to say that the entire measure of the patentees' damage is exhausted when restoration of the *status quo ante* has been obtained.

And at page 32:

> But in addition there remains that class of business which the respondents would not have done; and in such cases it appears to me that

---

(1) (1885) 13 Can. S.C.R., 563.          (2) (1911) 28 R.P.C. 157.

(3) Session Cases (1913-1914) 18.

the correct and full measure is only reached by adding that a patentee is also entitled, on the principle of price or hire, to a royalty for the unauthorized sale or use of every one of the infringing machines in a market which the patentee if left to himself, might not have reached. Otherwise that property which consists in the monopoly of the patented articles granted to the patentee has been invaded, and indeed abstracted, and the law, when appealed to, would be standing by and allowing the invader or abstractor to go free. In such cases a royalty is an excellent key to unlock the difficulty, and I am in entire accord with the principle laid down by Lord Moulton in *Meters, Limited* (1). Each of the infringements was an actionable wrong, and although they may have been committed in a range of business or of territory which the patentee might not have reached, he is entitled to hire or royalty in respect of each unauthorized use of his property. Otherwise the remedy might fall unjustly short of the wrong.

The result is that the judgment of the 6th day of February, 1933, and the report of the Registrar dated the 15th day of August, 1932, will be vacated and set aside and in lieu thereof the New Jersey corporation will have judgment against the appellant for damages which we fix at $750 with the costs of the action down to and including the judgment of the 31st day of May, 1932, only, and the appellants will have the costs of this appeal.

*Judgment accordingly.*

Solicitor for the appellant: *G. E. Maybee.*

Solicitors for the respondents: *Smart & Biggar.*

1933
~~
ELECTRIC
CHAIN CO.
OF CANADA
LTD.
*v.*
ART METAL
WORKS INC
—
Hughes J.
—



2007 SCC 37
Supreme Court of Canada

Kraft Canada Inc. v. Euro Excellence Inc.

2007 CarswellNat 2087, 2007 CarswellNat 2088, 2007 SCC 37, [2007] 3 S.C.R. 20, [2007]
S.C.J. No. 37, 282 D.L.R. (4th) 577, 365 N.R. 332, 59 C.P.R. (4th) 353, J.E. 2007-1510

# Euro-Excellence Inc., Appellant and Kraft Canada Inc., Kraft Foods Schweiz AG and Kraft Foods Belgium SA, Respondents and Retail Council of Canada and Alliance of Manufacturers & Exporters Canada, Interveners

Abella J., Bastarache J., Binnie J., Charron J., Deschamps J., Fish J., LeBel J., McLachlin C.J.C., Rothstein J.

Heard: January 16, 2007
Judgment: July 26, 2007
Docket: 31327

Proceedings: reversing *Kraft Canada Inc. c. Euro Excellence Inc.* (2005), *(sub nom. Kraft Canada Inc. v. Euro Excellence Inc.)* [2006] 3 F.C.R. 91, 265 D.L.R. (4th) 555, 2005 FCA 427, 2005 CarswellNat 4933, [2005] A.C.F. No. 2082, 346 N.R. 104, 2005 CAF 427, 2005 CarswellNat 4619, 47 C.P.R. (4th) 113 (F.C.A.); reversing in part *Kraft Canada Inc. v. Euro Excellence Inc.* (2004), 2004 CarswellNat 5579, [2004] 4 F.C.R. 410, 252 F.T.R. 50, 33 C.P.R. (4th) 246, [2004] F.C.J. No. 804, 2004 CarswellNat 1371, 2004 FC 652 (F.C.)

Counsel: François Boscher, Pierre-Emmanuel Moyse, for Appellant
Timothy M. Lowman, Kenneth D. McKay, for Respondents
Howard P. Knopf, Elizabeth G. Elliott, for Intervener, Retail Council of Canada
R. Scott Jolliffe, James H. Buchan, for Intervener, Alliance of Manufacturers & Exporters Canada

Subject: Civil Practice and Procedure; Intellectual Property; Constitutional; Property

## Table of Authorities

### Cases considered by *Rothstein J.*:

*A & M Records of Canada Ltd. v. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354, 1984 CarswellNat 860 (Fed. T.D.) — referred to

*Architectronics Inc. v. Control Systems Inc.* (1996), 935 F.Supp. 425 (U.S. Dist. Ct. S.D. N.Y.) — referred to

*Bell ExpressVu Ltd. Partnership v. Rex* (2002), 212 D.L.R. (4th) 1, 287 N.R. 248, [2002] 5 W.W.R. 1, 166 B.C.A.C. 1, 271 W.A.C. 1, 18 C.P.R. (4th) 289, 100 B.C.L.R. (3d) 1, 2002 SCC 42, 2002 CarswellBC 851, 2002 CarswellBC 852, 93 C.R.R. (2d) 189, [2002] 2 S.C.R. 559 (S.C.C.) — referred to

*Bishop v. Stevens* (1990), 1990 CarswellNat 738, 1990 CarswellNat 1028, 72 D.L.R. (4th) 97, [1990] 2 S.C.R. 467, 31 C.P.R. (3d) 394, 111 N.R. 376 (S.C.C.) — referred to

*CCH Canadian Ltd. v. Law Society of Upper Canada* (2004), 236 D.L.R. (4th) 395, 317 N.R. 107, 30 C.P.R. (4th) 1, 2004 CarswellNat 446, 2004 CarswellNat 447, 2004 SCC 13, [2004] 1 S.C.R. 339, 247 F.T.R. 318 (note) (S.C.C.) — followed

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

*Clarke, Irwin & Co. v. C. Cole & Co.* (1960), [1960] O.R. 117, 19 Fox Pat. C. 143, 33 C.P.R. 173, 22 D.L.R. (2d) 183, 1960 CarswellOnt 129 (Ont. H.C.) — referred to

*Compo Co. v. Blue Crest Music Inc.* (1979), [1980] 1 S.C.R. 357, 1979 CarswellNat 640, 45 C.P.R. (2d) 1, 105 D.L.R. (3d) 249, *(sub nom. Blue Crest Music Inc. v. Compo Co.)* 29 N.R. 296, 1979 CarswellNat 640F (S.C.C.) — referred to

*Dictionnaires Robert Canada SCC v. Librairie du Nomade Inc.* (1987), 1987 CarswellNat 250, 11 F.T.R. 44, 16 C.P.R. (3d) 319 (Fed. T.D.) — referred to

*Fly by Nite Music Co. v. Record Wherehouse Ltd.* (1975), [1975] F.C. 386, 20 C.P.R. (2d) 263, 1975 CarswellNat 39, 1975 CarswellNat 39F (Fed. T.D.) — referred to

*Galerie d'art du Petit Champlain inc. c. Théberge* (2002), *(sub nom. Théberge v. Galerie d'art du Petit Champlain inc.)* 285 N.R. 267, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 210 D.L.R. (4th) 385, 23 B.L.R. (3d) 1, 2002 CarswellQue 306, 2002 CarswellQue 307, 2002 SCC 34, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 17 C.P.R. (4th) 161, [2002] 2 S.C.R. 336 (S.C.C.) — considered

*Kirkbi AG v. Ritvik Holdings Inc. / Gestions Ritvik Inc.* (2005), 2005 SCC 65, 2005 CarswellNat 3631, 2005 CarswellNat 3632, *(sub nom. Kirkbi AG v. Ritvik Holdings Inc.)* 341 N.R. 234, 43 C.P.R. (4th) 385, 259 D.L.R. (4th) 577, [2005] 3 S.C.R. 302 (S.C.C.) — considered

*R. Griggs Group Ltd. v. Evans (No.1)* (2003), [2004] F.S.R. 31 (Eng. Ch. Div.) — referred to

*Ritchie v. Sawmill Creek Golf & Country Club Ltd.* (2004), 2004 CarswellOnt 3525, 189 O.A.C. 282, 35 C.P.R. (4th) 163 (Ont. Div. Ct.) — considered

*Robertson v. Thomson Corp.* (2006), 2006 SCC 43, 2006 CarswellOnt 6182, 2006 CarswellOnt 6183, 353 N.R. 104, 274 D.L.R. (4th) 138, 52 C.P.R. (4th) 417, [2006] 2 S.C.R. 363, 217 O.A.C. 332 (S.C.C.) — considered

*Thomas v. Sorrell* (1673), 124 E.R. 1098, Vaugh. 330 (Eng. C.P.) — referred to

*United States Naval Institute v. Charter Communications Inc.* (1991), 936 F.2d 692 (U.S. C.A. 2nd Cir.) — referred to

**Cases considered by *Fish J.*:**

*Robertson v. Thomson Corp.* (2006), 2006 SCC 43, 2006 CarswellOnt 6182, 2006 CarswellOnt 6183, 353 N.R. 104, 274 D.L.R. (4th) 138, 52 C.P.R. (4th) 417, [2006] 2 S.C.R. 363, 217 O.A.C. 332 (S.C.C.) — considered

**Cases considered by *Bastarache J.*:**

*Astrazeneca Canada Inc. v. Canada (Minister of Health)* (2006), 2006 CarswellNat 3436, 2006 CarswellNat 3437, 2006 SCC 49, 52 C.P.R. (4th) 145, 272 D.L.R. (4th) 577, [2006] 2 S.C.R. 560, 354 N.R. 88 (S.C.C.) — considered

*Bailey v. Boccaccio* (1986), 84 F.L.R. 232, 6 I.P.R. 279 (New South Wales S.C.) — referred to

*British Leyland Motor Corp. v. Armstrong Patents Co.* (1986), [1986] A.C. 577, [1986] 1 All E.R. 850, 67 N.R. 178, [1986] F.S.R. 221 (U.K. H.L.) — referred to

Case 09-10138-MFW    Doc 13453-1    Filed 05/02/14    Page 17 of 196

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

*CCH Canadian Ltd. v. Law Society of Upper Canada* (2004), 236 D.L.R. (4th) 395, 317 N.R. 107, 30 C.P.R. (4th) 1, 2004 CarswellNat 446, 2004 CarswellNat 447, 2004 SCC 13, [2004] 1 S.C.R. 339, 247 F.T.R. 318 (note) (S.C.C.) — followed

*Galerie d'art du Petit Champlain inc. c. Théberge* (2002), (sub nom. *Théberge v. Galerie d'art du Petit Champlain inc.)* 285 N.R. 267, (sub nom. *Théberge v. Galerie d'Art du Petit Champlain inc.)* 210 D.L.R. (4th) 385, 23 B.L.R. (3d) 1, 2002 CarswellQue 306, 2002 CarswellQue 307, 2002 SCC 34, (sub nom. *Théberge v. Galerie d'Art du Petit Champlain inc.)* 17 C.P.R. (4th) 161, [2002] 2 S.C.R. 336 (S.C.C.) — considered

*Houle c. Banque Canadienne Nationale* (1990), 1990 CarswellQue 37, [1990] R.R.A. 883, 1990 CarswellQue 123, (sub nom. *Houle v. Canadian National Bank)* 74 D.L.R. (4th) 577, [1990] 3 S.C.R. 122, 35 Q.A.C. 161, 114 N.R. 161, 5 C.B.R. (3d) 1 (S.C.C.) — considered

*Kirkbi AG v. Ritvik Holdings Inc. / Gestions Ritvik Inc.* (2005), 2005 SCC 65, 2005 CarswellNat 3631, 2005 CarswellNat 3632, (sub nom. *Kirkbi AG v. Ritvik Holdings Inc.)* 341 N.R. 234, 43 C.P.R. (4th) 385, 259 D.L.R. (4th) 577, [2005] 3 S.C.R. 302 (S.C.C.) — considered

*Kraft Canada Inc. v. Euro Excellence Inc.* (2004), 2004 CarswellNat 4185, 2004 FC 832, 2004 CarswellNat 1793, 33 C.P.R. (4th) 242, 2004 CF 832 (F.C.) — referred to

*Kraft Canada Inc. v. Euro Excellence Inc.* (2004), 2004 FC 1215, 2004 CarswellNat 3018, 35 C.P.R. (4th) 193 (F.C.) — referred to

*Kraft Canada Inc. v. Euro Excellence Inc.* (2006), 2006 CarswellNat 2891, 2006 CF 453, 290 F.T.R. 127 (Eng.), 2006 FC 453, 2006 CarswellNat 911, 50 C.P.R. (4th) 425 (F.C.) — referred to

*Society of Composers, Authors & Music Publishers of Canada v. Canadian Assn. of Internet Providers* (2004), (sub nom. *SOCAN v. Canadian Assn. of Internet Providers)* 240 D.L.R. (4th) 193, 2004 SCC 45, 2004 CarswellNat 1919, 2004 CarswellNat 1920, 322 N.R. 306, (sub nom. *Socan v. Canadian Assn. of Internet Providers)* [2004] 2 S.C.R. 427, (sub nom. *SOCAN v. Canadian Assn. of Internet Providers)* 32 C.P.R. (4th) 1 (S.C.C.) — considered

*Wallace v. United Grain Growers Ltd.* (1997), 123 Man. R. (2d) 1, 159 W.A.C. 1, 152 D.L.R. (4th) 1, 1997 CarswellMan 455, 1997 CarswellMan 456, 219 N.R. 161, [1997] 3 S.C.R. 701, [1999] 4 W.W.R. 86, 36 C.C.E.L. (2d) 1, 3 C.B.R. (4th) 1, [1997] L.V.I. 2889-1, 97 C.L.L.C. 210-029 (S.C.C.) — referred to

## Cases considered by *Abella J.*:

*Bishop v. Stevens* (1990), 1990 CarswellNat 738, 1990 CarswellNat 1028, 72 D.L.R. (4th) 97, [1990] 2 S.C.R. 467, 31 C.P.R. (3d) 394, 111 N.R. 376 (S.C.C.) — referred to

*Bouchet v. Kyriacopoulos* (1964), 27 Fox Pat. C. 91, 45 C.P.R. 265, 1964 CarswellNat 32 (Can. Ex. Ct.) — referred to

*British Actors Film Co. v. Glover* (1918), [1918] 1 K.B. 299 (Eng. K.B.) — considered

*CCH Canadian Ltd. v. Law Society of Upper Canada* (2004), 236 D.L.R. (4th) 395, 317 N.R. 107, 30 C.P.R. (4th) 1, 2004 CarswellNat 446, 2004 CarswellNat 447, 2004 SCC 13, [2004] 1 S.C.R. 339, 247 F.T.R. 318 (note) (S.C.C.) — referred to

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

*Compo Co. v. Blue Crest Music Inc.* (1979), [1980] 1 S.C.R. 357, 1979 CarswellNat 640, 45 C.P.R. (2d) 1, 105 D.L.R. (3d) 249, *(sub nom. Blue Crest Music Inc. v. Compo Co.)* 29 N.R. 296, 1979 CarswellNat 640F (S.C.C.) — considered

*Dynabec Ltée c. Société d'informatique R.D.G. Inc.* (1985), 6 C.I.P.R. 185, [1985] C.A. 236, 6 C.P.R. (3d) 322, 1985 CarswellQue 95 (Que. C.A.) — referred to

*Éditions de la Table Ronde et Cousture* (1995), 1995 CarswellQue 1854 (Que. S.C.) — referred to

*Fonds Gabrielle Roy c. Éditions internationales Alain Stanké ltée* (1993), 1993 CarswellQue 1387 (Que. S.C.) — referred to

*Galerie d'art du Petit Champlain inc. c. Théberge* (2002), *(sub nom. Théberge v. Galerie d'art du Petit Champlain inc.)* 285 N.R. 267, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 210 D.L.R. (4th) 385, 23 B.L.R. (3d) 1, 2002 CarswellQue 306, 2002 CarswellQue 307, 2002 SCC 34, *(sub nom. Théberge v. Galerie d'Art du Petit Champlain inc.)* 17 C.P.R. (4th) 161, [2002] 2 S.C.R. 336 (S.C.C.) — considered

*Robertson v. Thomson Corp.* (2006), 2006 SCC 43, 2006 CarswellOnt 6182, 2006 CarswellOnt 6183, 353 N.R. 104, 274 D.L.R. (4th) 138, 52 C.P.R. (4th) 417, [2006] 2 S.C.R. 363, 217 O.A.C. 332 (S.C.C.) — referred to

**Statutes considered by *Rothstein J.*:**

*Copyright Act 1968*, No. 163, 1968
    Generally — referred to

    s. 10(1) "accessory" — considered

    s. 10(1) "infringing copy" (g) — considered

*Copyright Act, 1921*, S.C. 1921, c. 24
    Generally — referred to

*Copyright Act*, R.S.C. 1985, c. C-42
    Generally — referred to

    s. 2 "copyright" (a) — considered

    s. 2 "infringing" — referred to

    s. 2.7 [en. 1997, c. 24, s. 2] — considered

    s. 3 — considered

    s. 3(1) "copyright" (a) — referred to

    s. 13(4) — considered

    s. 13(4) [rep. & sub. 1997, c. 24, s. 10(2)] — referred to

    s. 13(5) — considered

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087
2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

    s. 13(6) — referred to

    s. 13(7) — considered

    s. 13(7) [en. 1997, c. 24, s. 10(2)] — considered

    s. 27 — considered

    s. 27(1) — considered

    s. 27(2) — considered

    s. 27(2)(a) — considered

    s. 27(2)(a)-27(2)(d) — referred to

    s. 27(2)(e) — considered

    s. 36(1) — considered

    s. 36(2) — considered

    s. 64 — considered

    s. 64(2) — referred to

    s. 64(3)(b) — considered

*Copyright Act*, 1911 (1 & 2 Geo. 5), c. 46
    Generally — referred to

*Copyright Act*, 1909
    Generally — referred to

*Copyright Amendment Act (No. 1) 1998*, No. 104, 1998
    Sched. 2 — referred to

*Copyright, Designs and Patents Act*, 1988, c. 48
    Generally — referred to

    s. 90(1) — referred to

    s. 92(1) "exclusive licence" — considered

    s. 101(1) — considered

*Copyrights Act, 1997*, 17 U.S.C.
    Generally — referred to

    Chapter 1, s. 101 "transfer of copyright ownership" — considered

*Patent Act*, R.S.C. 1985, c. P-4
    Generally — referred to

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

*Trade-marks Act*, R.S.C. 1985, c. T-13
    Generally — referred to

      s. 13(2) — referred to

**Statutes considered by *Fish J.*:**

*Copyright Act*, R.S.C. 1985, c. C-42
    Generally — referred to

**Statutes considered by *Bastarache J.*:**

*Copyright Act 1968*, No. 163, 1968
    Generally — referred to

*Copyright Act*, R.S.C. 1985, c. C-42
    Generally — referred to

      s. 2.7 [en. 1997, c. 24, s. 2] — referred to

      s. 3(1) "copyright" — referred to

      s. 13(6) — referred to

      s. 27(2) — considered

      s. 27(2)(a) — considered

      s. 27(2)(a)-27(2)(c) — referred to

      s. 27(2)(b) — considered

      s. 27(2)(c) — considered

      s. 27(2)(e) — referred to

      s. 36(1) — considered

      s. 64(3)(b) — considered

*Trade-marks Act*, R.S.C. 1985, c. T-13
    Generally — referred to

**Statutes considered by *Abella J.*:**

*Copyright Act*, R.S.C. 1985, c. C-42
    Generally — referred to

      s. 2.7 [en. 1997, c. 24, s. 2] — considered

      s. 13(4) — considered

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

s. 13(6) — considered

s. 13(5) — considered

s. 13(7) — considered

s. 27(2) — considered

s. 27(2)(a)-27(2)(c) — referred to

s. 27(2)(e) — considered

s. 36(1) — considered

s. 64(3)(b) — considered

**Words and phrases considered**

**licensee**

[Per Rothstein J. (Binnie and Deschamps JJ. concurring):] A contextual reading of the *Copyright Act* [R.S.C. 1985, c. C-42] reveals that Parliament has preserved the traditional distinction between assignees and licensees with some modification. Under the present Act, there is a distinction between "assignee", "licensee" and "exclusive licensee". An assignee possesses full ownership rights in the copyright with respect to the rights assigned. A non-exclusive licensee has no property rights in the copyright, and enjoys only contractual rights *vis-à-vis* the owner-licensor. As a result, it cannot sue for infringement. An exclusive licensee, on the other hand, has a limited property interest in the copyright. . . . this limited property interest enables the exclusive licensee to sue third parties for infringement but precludes the exclusive licensee from suing the owner-licensor for infringement.

**grant of an interest**

[Per Rothstein J. (Binnie and Deschamps JJ. concurring):] The use of the term "grant of an interest" in ss. 13(4) and 13(7) [of the *Copyright Act*, R.S.C. 1985, c. C-42] would seem to refer to the granting of a property right. This language stands out in comparison to s. 2.7, which suggests that an exclusive licence is not a "grant of an interest" but rather a non-proprietary "authorization" to do something that would otherwise amount to infringement.

. . . . .

In my view, the exclusive licensee's property interest in the copyright is limited. An exclusive licence is not a complete assignment of copyright. The owner-licensor retains a residual ownership interest in the copyright. The owner-licensor's residual ownership interest precludes it from being liable for copyright infringement. An owner-licensor is liable to its exclusive licensee for breach of the licensing agreement but not for copyright infringement.

APPEAL by unauthorized distributor from judgment reported at *Kraft Canada Inc. c. Euro Excellence Inc.* (2005), (sub nom. *Kraft Canada Inc. v. Euro Excellence Inc.)* [2006] 3 F.C.R. 91, 265 D.L.R. (4th) 555, 2005 FCA 427, 2005 CarswellNat 4933, [2005] A.C.F. No. 2082, 346 N.R. 104, 2005 CAF 427, 2005 CarswellNat 4619, 47 C.P.R. (4th) 113 (F.C.A.), allowing in part appeal from judgment ordering damages and injunction with respect to copyrighted logos.

POURVOI du distributeur non autorisé à l'encontre d'un jugement publié à *Kraft Canada Inc. c. Euro Excellence Inc.* (2005), (sub nom. *Kraft Canada Inc. v. Euro Excellence Inc.)* [2006] 3 F.C.R. 91, 265 D.L.R. (4th) 555, 2005 FCA 427, 2005 CarswellNat 4933, [2005] A.C.F. No. 2082, 346 N.R. 104, 2005 CAF 427, 2005 CarswellNat 4619, 47 C.P.R. (4th) 113 (F.C.A.),

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

ayant accueilli en partie un appel interjeté à l'encontre d'un jugement ayant accordé des dommages-intérêts et ordonné une injonction en rapport avec des logos protégés par le droit d'auteur.

*Rothstein J.:*

1      I have read the reasons of Bastarache J. While I agree with his conclusion, I am respectfully unable to agree with his analysis. I have three main concerns with his reasons.

**(1) The Concerns**

2      This Court has repeatedly adopted Driedger's approach to statutory interpretation:

> Today there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament. (E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87; see also *Bell ExpressVu Ltd. Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42 (S.C.C.), at para. 26; *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13 (S.C.C.), at para. 9.)

3      I am concerned that Bastarache J.'s approach in this case is inconsistent with this Court's approach to statutory interpretation. The "modern" or "purposive" approach requires that the words of the statute "in their grammatical and ordinary sense" be read harmoniously with the objects of the Act. It does not, however, give judges licence to substitute their policy preferences for those of Parliament. This Court has consistently held that "copyright is a creature of statute and the rights and remedies provided by the *Copyright Act* are exhaustive": see *CCH*, at para. 9; *Galerie d'art du Petit Champlain inc. c. Théberge*, [2002] 2 S.C.R. 336, 2002 SCC 34 (S.C.C.), at para. 5; *Bishop v. Stevens*, [1990] 2 S.C.R. 467 (S.C.C.), at p. 477; *Compo Co. v. Blue Crest Music Inc.* (1979), [1980] 1 S.C.R. 357 (S.C.C.), at pp. 372-73. In my respectful view, Bastarache J.'s reasons depart from this doctrine.

4      Throughout his reasons, Bastarache J. relies on a distinction between copyrighted works that are sold and works that are "merely incidental" to the item being sold. He concludes that since the Toblerone and Côte d'Or logos are merely incidental to the thing being sold (the chocolate bar), they do not receive copyright protection. I understand this distinction to be the crux of his analysis. However, I see no statutory authority for the proposition that "incidental" works are not protected by the *Copyright Act*, R.S.C. 1985, c. C-42. This Court's holding in *CCH* confirms that all artistic works receive the protection of copyright if they meet the requisite standards of "skill and judgment": *CCH*, at para. 16. The *Copyright Act* does not exempt so-called "incidental" works from its protection. Neither Bastarache J. nor any of the parties contest that the Côte d'Or and Toblerone logos resulted from exercises of skill and judgment. As such, they are legitimate subjects of copyright.

5      I note that the "incidental" approach is similar to the Australian approach to this issue. However, the Australian approach was prescribed by statute and not by judges. In 1998, the Australian Parliament made a deliberate policy decision to amend its *Copyright Act 1968*, (Cth.), No. 63, to exclude "accessories" from the domain of copyright for the purposes of parallel importation (*Copyright Amendment Act (No. 1) 1998* (Cth.), No. 104, Schedule 2). Under s. 10(1) of the Australian *Copyright Act 1968*, as amended, an infringing work includes a work that was "imported without the licence of the owner of the copyright, [and] would have constituted an infringement of that copyright if the article had been made in Australia by the importer, *but does not include: ... (g) a non-infringing accessory whose importation does not constitute an infringement of that copyright*". The Australian Act defines "*accessory*" so as to include the labels and packaging that accompany an article. The Canadian *Copyright Act*, in contrast, has not exempted accessories or incidental works from the protection of copyright, and it is not for this Court to create such an exemption.

6      Even if one were to accept that "incidental" works are not protected under Canadian copyright law, it is not apparent from Bastarache J.'s reasons when a work will be considered "merely incidental". The "reasonable consumer" test proposed at para. 94 offers little guidance on how to determine whether a work is "merely incidental". Para. 95 draws a distinction between a small logo and a larger painting of that same logo on a t-shirt. However, according to Canadian copyright law, it is skill and judgment — not the size of the work — that determines whether a work receives protection under the *Copyright Act*.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

7    To support his argument for the "incidental" approach to copyright law, Bastarache J. introduces a concept of "legitimate economic interests" to read down rights expressly granted by the *Copyright Act*. The term "legitimate economic interest" was used by this Court in *Théberge*, but in a different context. The legitimate economic interest described in *Théberge* was the right of the creator of an artistic work to receive a reward for that work. The issue in *Théberge* was whether the transferring of an artistic work from a paper backing to a canvas backing constituted reproduction contrary to the "legitimate economic interests" of the artist. Binnie J., for the majority, found that reproduction did not occur on the facts of that case. Binnie J.'s holding relied on the concepts of originality and reproduction, which are firmly rooted in the words of the *Copyright Act*.

8    In this case, Bastarache J. expands the concept of "legitimate economic interest" to exclude logos on wrappers from the domain of copyright. I find no authority in the Act or in our jurisprudence for Bastarache J.'s theory of "legitimate economic interests". As this Court has often stated, "the rights and remedies provided by the *Copyright Act* are exhaustive": *CCH*, at para. 9. I would not depart from this approach by introducing a new equitable doctrine of "legitimate economic interest" to read down the legislation.

9    I accept, of course, that the *Copyright Act* is to be given a purposive interpretation. However, I distinguish between an approach that is rooted in the words of the Act and the approach taken by my colleague Bastarache J. that involves reading words into the legislation that are at odds with Parliament's intent. Section 64 of the *Copyright Act*, which can be found, along with the other relevant provisions of the *Copyright Act*, in the Appendix, addresses the very issue that is fundamental to my colleague's approach: can a work of art appearing on a label and receiving trade-mark protection also be the subject of copyright protection? Parliament concluded that works can receive concurrent copyright and trade-mark protection.

10    To that end, Parliament adopted s. 64 of the current Act, which excludes certain functional articles from copyright protection, but affirms that copyright shall subsist in "a trade-mark or a representation thereof or a label". Parliament enacted this provision after having turned its mind to the possibility of overlap between trade-mark and copyright law. Were the Court to hold that the Kraft labels cannot be subjects of trade-mark and copyright concurrently, we would be substituting a different policy preference from that chosen by Parliament.

11    It is for this reason that I must respectfully disagree with Bastarache J.'s attempted analogy between the present case and *Kirkbi AG v. Ritvik Holdings Inc. / Gestions Ritvik Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65 (S.C.C.). In *Kirkbi*, this Court held that trade-mark law cannot be leveraged to extend protection to subjects that are ordinarily the domain of patent law. Bastarache J. suggests that *Kirkbi* stands for the further proposition that the subjects of copyright law and trade-mark law must not overlap and that because it is trade-mark law that ordinarily protects market share and goodwill, copyright holders cannot use copyright to protect their market share or the goodwill associated with their brand.

12    I do not read *Kirkbi* as underpinning a broad doctrine of copyright misuse. Although the Court in *Kirkbi* cautioned against interpreting trade-mark law in a way that undermined the *Patent Act*, R.S.C. 1985, c. P-4, the decision in that case was anchored in the language of the *Trade-marks Act*, R.S.C. 1985, c. T-13, itself and not in a vague notion of trade-mark misuse. In *Kirkbi*, this Court held that the *Trade-marks Act* had expressly incorporated the "doctrine of functionality" in s. 13(2) of the Act (para. 14). LeBel J., writing for the Court, held that "[t]his doctrine recognizes that trade-marks law is not intended to prevent the competitive use of utilitarian features of products, but that it fulfills a source-distinguishing function": *Kirkbi*, at para. 43. By incorporating the doctrine of functionality, s. 13(2) of the *Trade-marks Act* had precluded the granting of trade-mark protection to functional works, which are the subjects of patent law.

13    The difficulty in attempting to analogize this case and *Kirkbi* is that the Court in *Kirkbi* relied on a provision of the *Trade-marks Act* in order to find that there could be no overlap between trade-mark and patent. In contrast, s. 64(3)(*b*) of the *Copyright Act* permits a single work to be the subject of both copyright and trade-mark protection. In other words, Parliament has authorized an overlap between copyright and trade-mark. I do not doubt the wisdom of LeBel J.'s general statement, at para. 37 of *Kirkbi*, that it is important to bear in mind the "basic and necessary distinctions between different forms of intellectual property and their legal and economic functions". However, this guiding principle must be qualified by the proviso: except where Parliament provides otherwise. Parliament has authorized concurrent copyright and trade-mark protection for labels.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

Until it provides otherwise, the courts are bound to conclude that a logo on a chocolate bar wrapper can receive concurrent trade-mark and copyright protection.

### (2) The Purposive Approach to the Copyright Act

*Overview*

14    In my view, this case turns on a straightforward application of s. 27(2)(*e*) of the *Copyright Act*. The Kraft companies allege that Euro-Excellence Inc. is liable for secondary infringement under s. 27(2)(*e*). However, Kraft Canada Inc. has failed to establish "hypothetical infringement", which is one of the three constitutive elements required to ground a claim under s. 27(2)(*e*). For Kraft Canada to succeed, it must show that Euro-Excellence imported works that *would have infringed copyright if they had been made in Canada by the persons who made them*. It fails to do so.

15    Under the Kraft companies' argument, the putative "hypothetical infringers" (the persons who *would have infringed* copyright if they made the impugned works in Canada) are the Kraft parent companies, Kraft Foods Belgium SA ("KFB") and Kraft Foods Schweiz AG ("KFS"). But KFB and KFS are also, respectively, the owners of the Côte d'Or and Toblerone copyrights at issue in this case. The copyright itself was not assigned to Kraft Canada. Therefore, to accept the Kraft companies' argument, this Court would have to find that copyright owners can infringe their own copyright if they have licensed copyright to an exclusive licensee despite their retention of the copyright. In my view, the *Copyright Act* does not permit exclusive licensees to sue the copyright owner-licensor for infringement of its own copyright. If KFS or KFB had reproduced Kraft labels in Canada in violation of its licensing agreement with Kraft Canada, Kraft Canada's only remedy would lie in breach of contract and *not in copyright infringement*. Because a copyright owner cannot be liable to its exclusive licensee for infringement, there is no hypothetical infringement and thus no violation of s. 27(2)(*e*) in this case by Euro-Excellence.

16    Bastarache J., at para. 75, suggests that on my reading of the Act, the Kraft companies could have circumvented the purposes of the Act by calling their agreements "assignments" rather than "exclusive licences". However, the distinction between assignments and exclusive licences is important and meaningful. By granting an assignment, the copyright owner intends to bestow upon the assignee the full panoply of rights and interests reserved for copyright owners. An exclusive licence, by contrast, permits owners to convey to licensees a more limited interest in the copyright. In my respectful view, an approach that conflates exclusive licences and assignments must be rejected. By enabling copyright owners to grant an interest in copyright either by assignment or exclusive licence, Parliament intended to provide copyright owners with two qualitatively different mechanisms by which to transfer their interests in whole or in part. Disregarding the distinctions between the two would lead to an unjustifiable narrowing of the owner's options in dealing with its interest.

*Why there is no hypothetical infringement by KFS and KFB and therefore no secondary infringement by Euro-Excellence*

17    Section 27 of the *Copyright Act* describes infringement under the Act. Section 27(1) describes what is known as "primary infringement". It provides that:

> It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

Section 3 sets out the catalogue of rights that the copyright owner possesses under the Act. These rights include the sole right to produce and reproduce copies of the copyrighted work. For the purposes of this case, primary infringement would have arisen if Euro-Excellence had produced copies of the Toblerone or Côte d'Or logos.

18    But Euro-Excellence does not want to produce labels with the Toblerone or Côte d'Or logos, and the Kraft companies have not alleged that it has done so. The Kraft companies seek to enjoin Euro-Excellence from importing into Canada works that have been produced lawfully in Europe by the Kraft parent companies, KFS and KFB.

19    The Kraft companies thus allege that Euro-Excellence has engaged in "secondary infringement" by importing for sale or distribution copies of KFS and KFB's copyrighted works into Canada. Secondary infringement is dealt with under s. 27(2)

of the Act. In *CCH*, at para. 81, this Court held that three elements must be proven to establish secondary infringement: (1) a primary infringement; (2) the secondary infringer should have known that he or she was dealing with a product of infringement; and (3) the secondary infringer sold, distributed or exposed for sale the infringing goods. Perhaps the most straightforward form of secondary infringement arises when one sells a copy of an infringing work. Under s. 27(2)(*a*), "[i]t is an infringement of copyright for any person to ... sell ... a copy of a work ... that the person knows or should have known infringes copyright".

20     Section 27(2)(*e*) stands out as an apparent exception to the rule in *CCH* that secondary infringement first requires primary infringement because, unlike s. 27(2)(*a*) to (*d*), it does not require *actual* primary infringement. Instead, it requires only *hypothetical* primary infringement. Under s. 27(2)(*e*),

> It is an infringement of copyright for any person to... import...a copy of a work...that the person knows...<u>would infringe copyright if it had been made in Canada by the person who made it.</u>

Section 27(2)(*e*) substitutes hypothetical primary infringement for actual primary infringement. It is possible that the infringing imports may have been lawfully made outside of Canada. Still, they are deemed to infringe copyright if the importer has imported into Canada works that *would have infringed* copyright if those works had been made in Canada by the persons who made the works abroad.

21     The apparent purpose of s. 27(2)(*e*) is to give Canadian copyright holders an added layer of protection where the Canadian copyright holder does not hold copyright in that work in foreign jurisdictions. Section 27(2)(*e*) protects Canadian copyright holders against "parallel importation" by deeming an infringement of copyright even where the imported works did not infringe copyright laws in the country in which they were made. Without s. 27(2)(*e*), the foreign copyright holder who could manufacture the work more cheaply abroad could flood the Canadian market with the work, thereby rendering the Canadian copyright worthless. Section 27(2)(*e*) thus represents Parliament's intention to ensure that Canadian copyright holders receive their just rewards even where they do not hold copyright abroad: see, e.g., *Dictionnaires Robert Canada SCC v. Librairie du Nomade Inc.* (1987), 11 F.T.R. 44 (Fed. T.D.); *A & M Records of Canada Ltd. v. Millbank Music Corp.* (1984), 1 C.P.R. (3d) 354 (Fed. T.D.) ; *Fly by Nite Music Co. v. Record Wherehouse Ltd.*, [1975] F.C. 386 (Fed. T.D.) ; *Clarke, Irwin & Co. v. C. Cole & Co.* (1960), 33 C.P.R. 173 (Ont. H.C.).

22     On the facts of this case, the Kraft companies have not made out all of the constitutive elements of a claim under s. 27(2)(*e*). Hypothetical infringement has not been established. The Kraft companies cannot prove that the impugned works imported and distributed by Euro-Excellence *would have infringed copyright if they had been made in Canada by the persons who made them in Europe*.

23     The persons who made the impugned copies of the works in Europe were the Kraft parent companies, KFB and KFS. However, KFB and KFS would *not* have infringed copyright if they had produced the Côte d'Or and Toblerone logos in Canada.

24     This is because KFB and KFS are, respectively, the owners of the Canadian copyright in the Côte d'Or and Toblerone logos. On the Kraft companies'argument, KFB and KFS would be the hypothetical copyright infringers. The Kraft companies argue that KFB and KFS would have infringed copyright if they produced the copyrighted works in Canada because they had licensed the Toblerone and Côte d'Or copyrights to Kraft Canada. Accepting this argument would mean that KFB and KFS have infringed their own copyrights — a proposition that is inconsistent with copyright law and common sense. Under s. 27(1), infringement arises when a person, *without the consent of the owner*, does something that under the Act *only the owner has the right to do*. By definition, no person can simultaneously be owner and infringer of copyright: see also *CCH*, at para. 37.

25     The Kraft companies allege that KFB and KFS can, hypothetically, infringe copyright because they had licensed the exclusive rights to produce and reproduce the copyrighted works in Canada to Kraft Canada, their Canadian subsidiary. The Kraft companies thus assume that an exclusive licensee becomes the owner of the copyright and able to sue the licensor for infringement. This assumption is incorrect. Under the *Copyright Act*, exclusive licensees are not able to sue the owner-licensor for infringement. I arrive at this conclusion after considering the *Copyright Act*'s provisions on copyright ownership and licensing.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

*Licensing Under the Copyright Act*

26    This case turns on the nature and scope of an exclusive licensee's rights under the *Copyright Act*. An exclusive licence under copyright law exists when the following conditions are met: (a) the copyright owner (the licensor) permits another person (the licensee) to do something within the copyright; (b) the licensor promises not to give anyone else the same permission for the duration of the licence; and (c) the licensor itself promises not to do those acts that have been licensed to the licensee for the duration of the licence: *Copyright Act*, s. 2.7; see also D. Vaver, "The Exclusive Licence in Copyright" (1995), 9 *I.P.J.* 163, at pp. 164-65. The parties agree that the agreements between Kraft Canada and the Kraft parent companies are exclusive licence agreements.

27    Under the common law, a licensee does not enjoy property rights: "A licence is merely a permission to do that which would otherwise amount to trespass" (B. H. Ziff, *Principles of Property Law* (4th ed. 2006), at p. 270). In contrast, an assignee receives a property interest from the original owner and steps into the shoes of the owner with respect to those rights assigned. As the recipient of a property interest, the assignee enjoys a right against the world, including the right to sue others (including the assignor) in trespass. The licensee's rights, on the other hand, are contractual, and the licensee is empowered only to sue the owner for breach of contract; it cannot sue in trespass: Ziff, at p. 270; R. E. Megarry, *A Manual of the Law of Real Property* (8th ed. 2002), at p. 475; see also *Thomas v. Sorrell* (1673), Vaugh. 330, 124 E.R. 1098 (Eng. C.P.), at p. 1109.

28    A contextual reading of the *Copyright Act* reveals that Parliament has preserved the traditional distinction between assignees and licensees with some modification. Under the present Act, there is a distinction between "assignee", "licensee" and "exclusive licensee". An assignee possesses full ownership rights in the copyright with respect to the rights assigned. A non-exclusive licensee has no property rights in the copyright, and enjoys only contractual rights *vis-à-vis* the owner-licensor. As a result, it cannot sue for infringement. An exclusive licensee, on the other hand, has a limited property interest in the copyright. For reasons explained below, this limited property interest enables the exclusive licensee to sue third parties for infringement but precludes the exclusive licensee from suing the owner-licensor for infringement.

29    Under the Act, the nature of the assignee's interest in the copyright is clear. Section 13(5) states expressly that assignees of copyright are, with the exception of moral rights, on equal footing with the original copyright owner:

> Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

The assignee of an interest in copyright is a copyright owner, and thus enjoys rights against the world, including the right to sue the assignor for infringement. This is because the assignor is no longer the owner of the copyright with respect to the right assigned. This is further reflected by the fact that, under s. 36(2), the assignee is not required to join the assignor as co-plaintiff in an action for copyright infringement. In light of these provisions, I have no difficulty in concluding that an assignee, as a holder of a full property interest in copyright, can sue the assignor for copyright infringement.

30    The status of copyright licensees is different. Parliament has manifested its intent to preserve a distinction between assignees and licensees. There is no provision analogous to s. 13(5) that purports to put licensees or exclusive licensees on equal footing with copyright owners.

31    The Act does however elevate "exclusive licensees" above mere licensees. Exclusive licensees are not licensees in the common law sense because exclusive licensees under the Act do have a limited proprietary interest in the copyright that has been licensed to them. The rights of exclusive licensees are set out in ss. 2.7, 13(4), 13(6) and 13(7) of the Act. These provisions do not state expressly whether or not an exclusive licensee can sue the licensor for infringement. However, by necessary implication, they enable exclusive licensees to sue third parties but not the owner-licensor for copyright infringement.

32    Section 2.7 defines "exclusive licence" as "an *authorization* to do any act that is subject to copyright to the exclusion of all others including the copyright owner". The deliberate choice of the term *authorization* is inconsistent with the granting of

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

property or ownership rights. In *CCH*, at para. 38, this Court agreed that "authorize" meant "sanction, approve and countenance". This is consistent with the common law definition of licence (i.e., permission to do something that would otherwise amount to an infringement).

33    Section 36(2) further suggests that an exclusive licensee does not possess a full property interest in the copyright. Section 36(1) enables exclusive licensees to sue for infringement, but s. 36(2) states that where "a person other than the copyright owner", namely the exclusive licensee, sues for infringement, "the copyright owner must be made a party to those proceedings ...". In the present case, KFB and KFS were joined as co-plaintiffs throughout the proceedings. The requirement of joining the licensor to an infringement action suggests that the exclusive licensee does not have a full property interest in the copyright. If the exclusive licensee held a full property interest, it should not need to join the owner in an action for infringement because a property interest — which is a right against the world — implies the right to sue for infringement in one's own name.

34    I recognize that other provisions of the Act suggest that exclusive licensees can acquire a property interest in the copyright. However, I am of the opinion that the property interest so acquired is limited and does not include an interest that defeats the ownership interest of the licensor or that could constitute the licensor an infringer of its own copyright.

35    Section 13(4) states:

> The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

Section 13(7) was enacted in 1997 to clarify the meaning of s. 13(4) with respect to exclusive licensees. It states that

> For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

The use of the term "grant of an interest" in ss. 13(4) and 13(7) would seem to refer to the granting of a property right. This language stands out in comparison to s. 2.7, which suggests that an exclusive licence is not a "grant of an interest" but rather a non-proprietary "authorization" to do something that would otherwise amount to infringement.

36    The "grant of an interest" referred to in ss. 13(4) and 13(7) meant "grant of a *property* interest": *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43 (S.C.C.). At para. 56 of that case, the majority of this Court adopted the following passage from *Ritchie v. Sawmill Creek Golf & Country Club Ltd.* (2004), 35 C.P.R. (4th) 163 (Ont. Div. Ct.) , at para. 20:

> The "grant of an interest" referred to in s. 13(4) is the transfer of a property right as opposed to a permission to do a certain thing. The former gives the licensee the capacity to sue in his own name for infringement, the latter provides only a defence to claims of infringement. To the extent there was any uncertainty as to the meaning of "grant of an interest" and whether this section applied to non-exclusive licences, the issue was resolved in 1997 when the *Copyright Act* was amended to include s. 13(7). ... [Emphasis added.]

According to this Court's decision in *Robertson* , the Act permits licensors to convey a *property interest* in the copyright to the exclusive licensee. However, neither *Robertson* nor the words of the Act delineate the precise scope of the exclusive licensee's property interest.

37    In my view, the exclusive licensee's property interest in the copyright is limited. An exclusive licence is not a complete assignment of copyright. The owner-licensor retains a residual ownership interest in the copyright. The owner-licensor's residual ownership interest precludes it from being liable for copyright infringement. An owner-licensor is liable to its exclusive licensee for breach of the licensing agreement but not for copyright infringement.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

38    In para. 75, Bastarache J. suggests that I have read down the words of s. 2.7 in order to reach this conclusion. And the Kraft companies argued that the words "to the exclusion of all others including the copyright owner" means that the exclusive licensee has standing to sue the owner-licensor for infringement. I would respectfully disagree with both. Section 2.7 must be interpreted with an eye to the other provisions of the Act. Section 2.7 states:

> For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

39    An exclusive licence is an "authorization to do any act that is subject to copyright". Under s. 2 of the Act,

"copyright" means the rights described in

(a) section 3, in the case of a work,

. . . . .

Section 3 includes, *inter alia*, the right to produce and reproduce a work.

40    Section 2.7 is a definitional section, which enshrines the common law definition of exclusive licence in the *Copyright Act*. Section 2.7 defines an exclusive licence as an authorization to do any act that is a right described in s. 3 to the exclusion of all others including the copyright owner (i.e., the right to produce and reproduce a work to the exclusion of all others including the copyright owner). But it says nothing about the consequences of violating that exclusive right. Those consequences and remedies for a violation of an exclusive licence are dealt with in other provisions of the Act, e.g. ss. 27(1) and 36(1). As discussed above, when the definitional and liability provisions are read in context, the necessary conclusion is that an exclusive licensee may sue third parties for infringement, but not the owner of the copyright who is liable only for breach of contract.

41    Comparing the treatment of exclusive licensees and assignees under the Act supports this conclusion. If the exclusive licensee could sue the owner-licensor for infringement, then the rights of exclusive licensees would be identical to those of assignees. However, Parliament has clearly manifested its intent to treat exclusive licensees differently from copyright owners and assignees. First, Parliament used express language in putting assignees on equal footing with copyright owners, but refrained from doing the same with exclusive licensees (s. 13(5)). Second, unlike assignees, the exclusive licensee lacks the capacity to sue for infringement alone; it must join the owner-licensor as a party (s. 36(2)). Third, the language of s. 2.7 defining "exclusive licence" as an "authorization" suggests an interest short of ownership. These are all reasons why the Canadian *Copyright Act* should be interpreted so that an exclusive licensee's property interest in a copyright is limited, such that the exclusive licensee does not have a right against the licensor-owner for infringement of the copyright owned by the licensor-owner.

42    The U.S. and the U.K. copyright regimes are helpful in elucidating the Canadian approach. Under U.S. copyright law, exclusive licensees have the right to sue the owner-licensor for infringement. U.K. copyright law, by contrast, does not permit exclusive licensees to sue the owner-licensor for infringement.

*U.S. Copyright Law*

43    Under U.S. copyright law, "the licensor may be liable to the exclusive licensee for copyright infringement, if the licensor exercises rights that have theretofore been exclusively licensed": M. B. Nimmer and D. Nimmer, *Nimmer on Copyright* (loose-leaf ed.), vol. 3, at pp. 12-58 and 12-59; *United States Naval Institute v. Charter Communications Inc.*, 936 F.2d 692 (U.S. C.A. 2nd Cir. 1991), at p. 695; *Architectronics Inc. v. Control Systems Inc.*, 935 F.Supp. 425 (U.S. Dist. Ct. S.D. N.Y. 1996), at p. 434.

44    However, there are some notable differences between the American and the Canadian statutes. Under the U.S. Act (17 U.S.C. § 101), a "transfer of copyright ownership" is defined as

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

an assignment, mortgage, exclusive license, or any other conveyance, alienation or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

Unlike the Canadian Act, the U.S. statute appears to put exclusive licensees on equal footing with assignees. Under U.S. copyright law, there would be no functional difference between an "exclusive license" and an "assignment". The two terms had emerged from the 1909 Act, which had put assignees but not exclusive licensees on equal footing with copyright owners. That distinction has since been eliminated under the current Act: Nimmer, at pp. 10-1 to 10-22. Because exclusive licensees are equated with copyright owners, the exclusive licensee can sue for infringement as an owner, which means that it can sue even the owner-licensor for copyright infringement.

*U.K. Copyright Law*

45    Under the *Copyright, Designs and Patents Act 1988* (U.K.), 1988, c. 48, the exclusive licensee lacks the capacity to sue the copyright owner-licensor. Under s. 101(1) of the U.K. Act,

[a]n exclusive licensee has, except against the copyright owner, the same rights and remedies in respect of matters occurring after the grant of the licence as if the licence had been an assignment.

U.K. commentators have taken this provision to mean that "[t]he exclusive licensee may sue in his own name to restrain infringements occurring after the grant of the licence as if the licence had been an assignment", and that "[e]xcept as against the owner of the right he has the same rights and remedies for infringement of the right as if the licence had been an assignment": H. Laddie et al., *The Modern Law of Copyright and Designs* (3rd ed. 2000), vol. 1, at p. 905; see also L. Bently and B. Sherman, *Intellectual Property Law* (2nd ed. 2004), at pp. 254-55. Consequently, the exclusive licensee is able to sue third parties but not the owner-licensor for infringement: *R. Griggs Group Ltd. v. Evans (No.1)* (2003), [2004] F.S.R. 31, [2003] EWHC 2914 (Eng. Ch. Div.) , at para. 58.

46    Although our Act is not explicit as is the U.K. Act in this regard, a contextual reading of the Canadian Act reveals that exclusive licensees lack the capacity to sue the owner-licensor for infringement. Our Act shares a number of similarities with the U.K. Act, including common origins. In Canada, *The Copyright Act, 1921*, S.C. 1921, c. 24, the precursor to the current Act, was based largely on the British *Copyright Act, 1911*, 1&2 Geo. 5, c. 46. Since the 1921 Act was enacted, there have been successive rounds of amendments, but our provisions on licensing and assignments are more similar to that of the U.K. than to the U.S.

47    Unlike the U.S. statute, which puts exclusive licensees on equal footing with assignees, the Canadian and U.K. Acts preserve the distinction between exclusive licensees and assignees. Whereas the U.S. statute permits transfers of copyright ownership by way of exclusive licence, the U.K. Act states that a transfer of ownership in copyright can occur only "by assignment, by testamentary disposition or by operation of law, as personal or moveable property" (s. 90(1)). Similarly, s. 13(5) of the Canadian Act states that only the assignee "shall be treated for the purposes of this Act as the owner of the copyright". On their face, the Canadian and U.K. statutes do not permit transfer of copyright ownership by exclusive licence.

48    Moreover, the Canadian and U.K. Acts define exclusive licence in similar terms. Section 92(1) of the U.K. Act states:

In this Part an "exclusive licence" means a licence in writing signed by or on behalf of the copyright owner authorising the licensee to the exclusion of all other persons, including the person granting the licence, to exercise a right which would otherwise be exercisable exclusively by the copyright owner.

This definition is almost identical to s. 2.7 of the Canadian Act. These similarities between the the Canadian and U.K. Acts suggest that our Parliament has created a copyright licensing regime similar to that of the U.K. If our Parliament had wanted exclusive licensees to be able to sue the owner-licensor for infringement, it would have put exclusive licensees on equal footing with assignees (as the U.S. Congress has done under its Act) or given exclusive licensees this right in the words of the legislation. The fact that our Parliament has retained a distinction between exclusive licensees and assignees suggests that

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

exclusive licensees under our Act have a limited property interest in the copyright that falls short of ownership. The procedural machinery of the Act enables the exclusive licensee to sue third parties for infringement. However, the owner-licensor is liable to the exclusive licensee only in contract.

### (3) Application to this Case

49    To establish a claim under s. 27(2)(e) against Euro-Excellence, Kraft Canada must show that the makers of the impugned works — the Kraft parent companies - would have infringed copyright if they had made the Toblerone and Côte d'Or labels in Canada instead of Europe. Under the exclusive licence agreements, the Kraft parent companies are not permitted to produce or reproduce the copyrighted works in Canada. However, if, hypothetically, KFS were to produce a copy of a Toblerone logo in Canada, Kraft Canada's only remedy would lie in breach of contract. As owners of the Canadian copyright in the Toblerone and Côte d'Or logos, the Kraft parent companies cannot infringe their own copyright. Although Kraft Canada, as an exclusive licensee, has a property interest in the copyright that enables it to sue third parties for infringement, the Kraft parent companies retain a residual ownership interest in the copyright, which prevents Kraft Canada from suing them for infringement. Kraft Canada has thus failed to establish "hypothetical infringement", which is necessary to ground a claim against Euro-Excellence under s. 27(2)(e).

50    The Canadian *Copyright Act* does not extend protection against parallel importation to exclusive licensees. Section 27(2)(e) of the *Copyright Act*, read in context with the provisions discussed above, shows that an exclusive licensee cannot sue for secondary infringement where the licensor is the hypothetical infringer because the owner-licensor cannot infringe its own copyright and cannot be sued for copyright infringement. If Parliament decides that this result is problematic, it can amend the *Copyright Act*. In the meantime, this Court must apply the Act that Parliament has given us.

51    As there is no hypothetical primary infringement, Euro-Excellence cannot have engaged in secondary infringement. I would allow the appeal with costs in this Court and in the courts below.

*Fish J.*:

52    I agree with the reasons of Justice Rothstein and would dispose of the appeal as he suggests.

53    Had it been necessary to do so, I would have been inclined to determine whether the appellant is in any event entitled to succeed on its alternative ground relating to the integrity of Canadian law regarding intellectual property rights.

54    Kraft Foods Belgium SA and Kraft Foods Schweiz AG manufacture and sell chocolate packaged in Europe. The issue in this case is whether the *Copyright Act*, R.S.C. 1985, c. C-42, entitles them to prevent the sale in Canada of that very same chocolate, packaged exactly as it was when they sold it. Their claim that it does is based on agreements between commonly owned corporations — agreements that have more to do with a monopoly on the sale in Canada of those chocolates than with copyright protection of the "works" that appear on the package. In virtue of identical and simultaneous agreements, and for a nominal amount of $1,000 in each instance, Kraft Belgium and Kraft Schweiz granted Kraft Canada exclusive licences to use those "works".

55    I think it worth noting that the trial judge, in upholding Kraft's claim, proceeded on the assumption that "*the sole purpose of* [Kraft Belgium and Kraft Schweiz] registering copyright in Canada and then assigning rights to Kraft Canada Inc. *was to mount the very attack upon [Euro-Excellence] which is currently before this Court*" (*Kraft Canada Inc. v. Euro Excellence Inc.*, [2004] 4 F.C.R. 410, 2004 FC 652 (F.C.), at para. 44 (emphasis added)). For the true purpose of the *Copyright Act*, see *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43 (S.C.C.), at para. 69.

56    Without so deciding, I express grave doubt whether the law governing the protection of intellectual property rights in Canada can be transformed in this way into an instrument of trade control not contemplated by the *Copyright Act*.

*Bastarache J.*:

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

## 1. Introduction

57    Can a chocolate bar be copyrighted because of protected works appearing on its wrapper? In particular, can s. 27(2) of the *Copyright Act*, R.S.C. 1985, c. C-42, which prohibits parallel importation into Canada of copyrighted works, be used by the respondent Kraft Canada Inc. to prevent the appellant, Euro-Excellence Inc., from, in the words of s. 27(2), importing, for the purpose of selling, renting, distributing or trading, genuine Toblerone and Côte d'Or chocolate bars into Canada, without obscuring the logos of those chocolate bars, on the basis that the logos are copyrighted? I conclude that it cannot. Both s. 27(2) and the *Copyright Act* as a whole are about the protection of copyrighted works, not about the importation and sale of consumer goods in general. The merely incidental presence of the copyrighted works on the wrappers of the chocolate bars does not bring the chocolate bars within the protections offered by the *Copyright Act*. This appeal is allowed for the reasons set out below.

## 2. Facts

58    Kraft Foods Belgium SA ("KFB") and Kraft Foods Schweiz AG ("KFS") make Côte d'Or and Toblerone chocolate bars in, respectively, Belgium and Switzerland. Kraft Canada Inc. ("KCI") has distributed Toblerone bars in Canada as exclusive Canadian distributor since 1990. KCI was an authorized Canadian distributor of Côte d'Or bars before 1997, and in 2001 entered into an exclusive agreement to distribute the bars in Canada.

59    Euro-Excellence also imports both Toblerone and Côte d'Or bars into Canada and distributes those bars here. Beginning in 1993, Euro-Excellence was an authorized distributor of Côte d'Or bars, and for a period of approximately three years ending in 2000, Euro-Excellence was the exclusive Canadian distributor of Côte d'Or bars; that distribution contract was not renewed. Since 2000, Euro-Excellence has been importing genuine Côte d'Or bars as an unauthorized distributor. In 2001, Euro-Excellence began importing and distributing genuine Toblerone bars, also on an unauthorized basis.

60    Thus, from 2001 until the present litigation commenced, KCI was the exclusive licensed Canadian distributor of both Côte d'Or and Toblerone bars (that is, KCI had exclusive importation and distribution contracts with KFB and KFS, respectively). Notwithstanding these exclusivity agreements, Euro-Excellence continued to import and distribute both Côte d'Or and Toblerone bars which it had acquired legally in Europe. Euro-Excellence was successful enough in its distribution of the chocolate bars to give KCI cause to attempt to find a way to prevent Euro-Excellence from importing and distributing them.

61    It is not contested that KCI is the owner in Canada of the trade-marks "Côte d'Or" and "Toblerone." KCI does not rely in this dispute on its rights as trade-mark holder.

62    On October 25, 2002, KFB registered three Côte d'Or logos in Canada as copyrighted works in the artistic category. That same day, a licensing agreement between KFB and KCI was also registered, pursuant to which KCI purported to acquire

the sole and exclusive right and license in the Territory to produce, reproduce and adapt the Works or any substantial part thereof, in any material form whatever, and to use and publicly present the Works in association with the manufacture, distribution or sale in Canada of confectionary products, including, but not limited to, chocolate.

The agreement provided that KCI pay KFB $1,000 per year for the licence.

63    Also on October 25, 2002, KFS registered two Toblerone logos in Canada as copyrighted works in the artistic category, and entered into a substantially similar licensing agreement with KCI. Again, KCI was to pay $1,000 per year for the licence.

64    Armed with these new copyrights, KCI called upon Euro-Excellence to cease and desist distribution of any product to which the copyrighted works were affixed. When Euro-Excellence refused, KCI brought this action.

## 3. Judicial History

### *1. Federal Court, [2004] 4 F.C.R. 410 (F.C.), 2004 FC 652*

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

65    In the Federal Court, Harrington J. described KCI's copyright action as an "interesting strategy in an effort to thwart Euro-Excellence's distribution of" the chocolate bars (para. 4). (I will henceforth refer to the Côte d'Or and Toblerone bars collectively as "the chocolate bars" since there are no substantial differences in the treatment of the bars for the purposes of these reasons.) Harrington J. first found that at least some of the logos were original artistic works which were properly subject to copyright (paras. 34 and 37). (For simplicity's sake I will refer only to those logos from this point on.) Having made this determination, he then turned to an analysis of s. 27(2) of the Act, and held that, consistent with the modern approach to statutory interpretation, s. 27(2) gave KCI a monopoly in the use of the copyrighted logos (para. 53).

66    In response to Euro-Excellence's argument that "copyright in a work cannot be used to prevent competitive distribution of goods, or at least in circumstances such as this where the copyright works are merely ancillary to the main product", the trial judge declined to interpret the Act in such a way as to limit KCI's rights (paras. 55-60). Harrington J. referred to the Australian case of *Bailey v. Boccaccio* (1986), 84 F.L.R. 232 (New South Wales S.C.) , in which a claim similar to KCI's was allowed; he also noted that the Australian copyright legislation was thereafter amended to provide that copyright in a work is not infringed by importation of an article if the work is an accessory (such as a label or package) to the imported article. In light of the Australian history, Harrington J. found in favour of KCI:

> Although, of course, not binding, I find the Bailey's Irish Cream case persuasive and come to the same conclusion under our Act. I am not prepared to simply use the *Copyright Act* as a touchstone for an imaginative frolic of my own. The language is clear, and the very purpose of the Act is to prevent unauthorized distribution of copyrighted works. [para. 60]

67    On the basis of this logic, Harrington J. awarded KCI damages in the amount of $300,000 and an injunction restraining Euro-Excellence from selling, distributing, exposing or offering for sale any copies of the copyrighted logos. He did not enjoin Euro-Excellence from distributing the bars altogether. Instead, he held that the appropriate order was "that the product be rendered non-infringing" (para. 64).

68    Subsequent to his original order, Harrington J. refused a motion for reconsideration ( (2004), 33 C.P.R. (4th) 242, 2004 FC 832 (F.C.), ) and provided instructions on negotiations between KCI and Euro-Excellence regarding Euro-Excellence's attempts to conform to the terms of the injunction by covering the copyrighted material with opaque self-sticking plastic film ( (2004), 35 C.P.R. (4th) 193, 2004 FC 1215 (F.C.) ).

*2. Federal Court of Appeal, (2005), [2006] 3 F.C.R. 91, 2005 FCA 427 (F.C.A.)*

69    The Federal Court of Appeal refused to allow an appeal of the decision of Harrington J. Writing for Noël and Pelletier JJ.A., Justice Desjardins found that the only two issues which warranted consideration by the Court of Appeal were the interpretation of s. 27(2) of the *Copyright Act* and the appropriateness of the damages award.

70    Desjardins J.A. focussed her analysis on whether KCI's claim required proof that the copies of the works imported by Euro-Excellence would have infringed copyright had they been made in Canada. She noted that *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13 (S.C.C.), at para. 82, held that "[a]bsent primary infringement, there can be no secondary infringement", but distinguished it on the grounds that the wording of s. 27(2)(*e*) did not require proof of primary infringement abroad in order to ground a finding of secondary infringement by way of importation. In her view:

> [S]ubsection 27(2) itself provides that secondary infringement occurs when any of the things referred to in paragraphs 27(2)(*a*) to (*c*) is done, when the production or reproduction of the work in question would be an infringement if the copy had been made in Canada by the person who made it. [para. 60]

Since KCI held the exclusive right of reproduction for Canada, even as against KFB and KFS, the mere fact that KFB and KFS were entitled to reproduce the protected works abroad did not excuse Euro-Excellence of liability for importing them. Desjardins J.A.'s reasons do not address the wording of paras. (*a*) to (*c*) of s. 27(2), or the question of whether Euro-Excellence's activities had violated the terms of those paragraphs in any detail.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

71    Desjardins J.A. allowed the appeal in part and dismissed the cross-appeal. She referred the matter of damages back to the trial judge. Harrington J. heard further submissions and confirmed his original order that damages be awarded in the amount of $300,000 (2006 FC 453 (F.C.)).

## 4. Analysis

### 1. The Issue

72    The issue that needs to be determined in this appeal is the proper interpretation of s. 27(2) of the *Copyright Act*. It provides as follows:

It is an infringement of copyright for any person to

(a) sell or rent out,

(b) distribute to such an extent as to affect prejudicially the owner of the copyright,

(c) by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

(d) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(e) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

73    As the wording of the provision makes clear, KCI's claim against Euro-Excellence, which is made under para. (*e*), stands or falls on the interpretation of paras. (*a*) to (*c*). Paragraph (*e*) is violated only if the defendant can be shown to have imported the copyrighted works for the purposes of doing one of the acts set out in paras. (*a*) to (*c*).

74    Given this structure, what is needed is an interpretation of s. 27(2)(*a*) to (*c*) of the Act. At para. 9 of this Court's decision in *CCH*, the Chief Justice set out the proper approach to interpreting the *Copyright Act*:

In interpreting the scope of the *Copyright Act*'s rights and remedies, courts should apply the modern approach to statutory interpretation whereby "the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament": *Bell ExpressVu Limited Partnership v. Rex*, [2002] 2 S.C.R. 559, 2002 SCC 42, at para. 26, citing E. A. Driedger, *Construction of Statutes* (2nd ed. 1983), at p. 87.

75    Thus, to properly interpret s. 27(2), we need to turn to an examination of the scheme and object of the *Copyright Act*. My colleague Rothstein J., at para. 4 of his reasons, would require a precise statutory provision to determine the scope of the protection afforded under s. 27(2). He believes that I am introducing a concept of legitimate interests to read down rights afforded by the *Copyright Act* (para. 7), that I am even introducing a new equitable doctrine (para. 8) or trying to substitute my policy preferences to those of Parliament (para. 3). I am simply applying our rules of statutory interpretation consistently to determine legislative intent and must, in doing so, give proper attention to the legislative context by looking at the provisions under scrutiny, the Act in general and the other legislative provisions that apply to related concepts. Rothstein J. does recognize in his own reasons that this legislation has to be interpreted in its proper legislative context and that it is not true that this Act is worded in such a way that no inferences have to be made. At paras. 34, 35, and 37 for instance, he finds that an exclusive licensee's property interest is limited, and restricts the application of ss. 13(6) and 36(1), ascribing a particular meaning and scope to the word "authorization" in s. 2.7, where the legislator clearly said that an exclusive licensee could do any act that is subject to copyright to the exclusion of all others "including the copyright owner". At para. 31, he speaks of limitations on

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

the rights of exclusive licensees that are found by "necessary implication". I think the purpose of s. 27(2) is determinative and that I need not deal with the licensing issue. I would however agree with Abella J. that the language of s. 2.7 is perfectly clear (para. 114), that a grant is a grant (para. 115), and that the grant in the present case is for an exclusive licence giving the "sole and exclusive right" to the copyright (para. 123). That right can be enforced under s. 36(1). It is obvious to me that Rothstein J. must therefore be wrong when he states at para. 22 that hypothetical infringement has not been made out. The Kraft parent companies in Europe could not have made a copy of the work in Canada without infringing the copyright. Furthermore, I see no legal justification for limiting the right of the licensee to a claim in contract (para. 27); this would be a clear contradiction of the terms of s. 36(1). Still I see no point in pursuing this course when the reasons of Rothstein J. clearly imply that the purpose of the Act could be circumvented by an assignment of the copyright rather than by the granting of a licence.

## 2. The Purpose of the Copyright Act

76     In *Galerie d'art du Petit Champlain inc. c. Théberge*, [2002] 2 S.C.R. 336, 2002 SCC 34 (S.C.C.), Binnie J. set out the dual objectives of the *Copyright Act*, at paras. 30-31:

> The *Copyright Act* is usually presented as a balance between promoting the public interest in the encouragement and dissemination of works of the arts and intellect and obtaining a just reward for the creator...

> The proper balance among these and other public policy objectives lies not only in recognizing the creator's rights but in giving due weight to their limited nature.

As the Chief Justice noted in *CCH*, at para. 10, applications of the *Copyright Act* should attempt "to maintain an appropriate balance between these two goals". It is also important to keep in mind Justice Binnie's holding in *Théberge* which limits copyright protection to the "*legitimate* economic interests" of the copyright holder (para. 38 (emphasis added)).

77     The *CCH* decision recognized the "limited nature" of the rights of a copyright holder in two important ways: in its definition of originality and in its treatment of fair dealing.

78     The *Copyright Act* protects original works only. In *CCH*, the Chief Justice held that, to be considered original in the sense required by the Act, a work must be the result of "an exercise of skill and judgment" (para. 16). This standard is consistent with the purpose of the Act, in that it provides a just reward for the labour of the creator; a "creativity" standard of originality was rejected insofar as it required novelty or uniqueness for copyright protection and failed to take account of the division between copyright and patent: *CCH*, at para. 24. However the skill and judgment standard does not provide a reward for *all* types of labour: the "sweat of the brow" standard of originality was rejected in CCH because it fails to take account of the "knowledge, developed aptitude or practised ability" and "capacity for discernment or ability to form an opinion or evaluation" which are the special hallmarks of the types of labour which produce the type of works protected by the *Copyright Act* (*CCH*, at paras. 16 and 24).

79     The *CCH* decision recognized the limited nature of the rights of a copyright holder in its treatment of fair dealing, which recognized that, unlike other exceptions, fair dealing is an essential part of copyright protection, and therefore that fair dealing is constitutive of the idea of the wrong in copyright law. Not every substantial reproduction of a copyrighted work counts as an infringement of copyright. This logic is clarified by Professor Abraham Drassinower in his article "Taking User Rights Seriously", in M. Geist, ed., *In the Public Interest: The Future of Canadian Copyright Law* (2005), 462. As Drassinower writes, at p. 470, "Fair dealing stands for the proposition that responding to another's work in one's own does not mean that one's work is any less one's own. Thus the defendant who makes out the fair dealing defence is an author in her own right." This is consistent with the understanding of copyright discussed above: sometimes a substantial reproduction of a copyrighted work will not be an infringement, because copyright protection is limited to protection of legitimate economic interests which are the result of an exercise of skill and judgment, and that protection must not be extended beyond its proper limits.

80     The *CCH* decision thus confirms that in order to protect the essential balance which lies at the heart of copyright law, care must be taken to ensure that copyright protection is not allowed to extend beyond the legitimate interests of a copyright holder. Copyright will not be granted to works which are not the result of an exercise of skill and judgment, which is the special kind of

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

labour for which copyright is the appropriate protection. Similarly, once copyright is granted in a given work, the protection that it provides must not be extended beyond its natural limits, and must take proper account of user rights such as the right to deal fairly with a copyrighted work. It is useful to note here that, while copyright protection results from an action of an individual — that is, the exercise of skill and judgment in creating an original work — that protection inheres in the work created, rather than its creator. In this manner, a copyrighted work is a form of property which may be transferred or licensed to others. But the rights transferred to a licensee must be limited in the same way as those of the original creator of the work to the legitimate economic interests resulting from the exercise of skill and judgment.

81    This Court's recent decision in *Society of Composers, Authors & Music Publishers of Canada v. Canadian Assn. of Internet Providers*, [2004] 2 S.C.R. 427, 2004 SCC 45 (S.C.C.), confirms this purposive interpretation of the Act. In that case, Binnie J. wrote, at para. 116: "'Caching'is dictated by the need to deliver faster and more economic service, and should not, *when undertaken only for such technical reasons*, attract copyright liability" (emphasis added). While "caching" is certainly an instance of substantial reproduction, it is a technical process only; as such it does not consist in an attempt to appropriate the legitimate economic interests of the copyright holder, and therefore does not constitute infringement.

82    The logic of this view of copyright has also been held to extend to other forms of intellectual property. In *Kirkbi AG v. Ritvik Holdings Inc. / Gestions Ritvik Inc.*, [2005] 3 S.C.R. 302, 2005 SCC 65 (S.C.C.), LeBel J., for the Court, noted, at para. 37, the importance of "basic and necessary distinctions between different forms of intellectual property and their legal and economic functions". He then went on to review the purposes of trade-marks and patents, noting that "[p]atent rights focus on the patented product or process", but that "[i]n the case of trade-marks, the focus shifts from the product itself to the distinctiveness of its marketing": see paras. 38 and 39. This focus on the fundamental natures and purposes of different sorts of intellectual property protections and the necessary divisions between them suggests that each form of protection relies on some core normative notion which must ground the economic interests claimed. Thus, a trade-mark, which protects distinctiveness of marketing and goodwill, cannot be leveraged to extend protection to products themselves, which is usually granted by patent.

83    The approach in *Kirkbi* is consistent with the principle of statutory interpretation which requires coherent interpretation of statutes *in pari materia*: see P.-A. Côté, *The Interpretation of Legislation In Canada* (3rd ed. 2000), at pp. 342 ff. According to this principle, the *Copyright Act* ought not only to be interpreted with an eye to the internal coherence of its own scheme; it must also not be interpreted in a fashion which is inconsistent with the *Trade-marks Act*, R.S.C. 1985, c. T-13. Trade-mark law protects market share in commercial goods; copyright protects the economic gains resulting from an exercise of skill and judgment. If trade-mark law does not protect market share in a particular situation, the law of copyright should not be used to provide that protection, if that requires contorting copyright outside its normal sphere of operation. The protection offered by copyright cannot be leveraged to include protection of economic interests that are only tangentially related to the copyrighted work. This Court's decision in *Astrazeneca Canada Inc. v. Canada (Minister of Health)*, [2006] 2 S.C.R. 560, 2006 SCC 49 (S.C.C.), which was based on a simultaneous interpretation of "two regulatory systems with sometimes conflicting objectives" (para. 12), is also consistent with the principle.

84    With this view of the purpose of the Act, which provides us with a principled fulcrum on which we may undertake copyright's balance, we may turn now to an examination of the purpose of s. 27(2) of the Act.

### The Purpose of Section 27(2)(e) of the Copyright Act

85    The Act protects only the legitimate economic interests of copyright holders. It protects the economic benefits of skill and judgment; it does not protect all economic benefits of all types of labour. Section 27(2) of the Act is meant to prohibit secondary infringement resulting from the wrongful appropriation of the gains of another's skill and judgment by way of the acts enumerated in paras. (*a*) to (*c*). Conversely, other economic interests — although they may seem to be closely associated with the interests legitimately protected as emanating from that skill and judgment — are not protected. In particular, if a work of skill and judgment (such as a logo) is attached to some other consumer good (such as a chocolate bar), the economic gains associated with the sale of the consumer good must not be mistakenly viewed as the legitimate economic interests of the copyright holder of the logo that are protected by the law of copyright.

86    Thus s. 27(2)(*e*) is meant to protect copyright holders from the unauthorized importation of works which are the result of their skill and judgment. It is not meant to protect manufacturers from the unauthorized importation of consumer goods on the basis of their having a copyrighted work affixed to their wrapper, this work being merely incidental to their value as consumer goods.

87    I should note here that, contrary to what was argued before this Court at the hearing, s. 27(2) is not meant to protect manufacturers from the importation of counterfeit versions of their consumer goods. The laws of trade-mark and passing off provide protection to manufacturers who fear the importation of cheap imitations of their products with a copy of the logo of the real product affixed to them. Indeed, this protection is central to the purpose of trade-mark law, as identified by LeBel J. in *Kirkbi*, at para. 39: "Trade-marks seek to indicate the source of a particular product, process or service in a distinctive manner, so that, ideally, consumers know what they are buying and from whom." While it is certainly true that one work can be the subject of both copyright and trade-mark protection (see s. 64(3)(*b*) of the Act), it is equally certain that different forms of intellectual property protect different types of economic interests. To ignore this fact would be to ignore the "basic and necessary distinctions between different forms of intellectual property and their legal and economic functions", as noted by LeBel J. at para. 37 of *Kirkbi*.

88    This interpretation of s. 27(2) respects copyright's insistence that only *legitimate* economic interests receive copyright protection. To allow s. 27(2) to protect all interests of manufacturers and distributors of consumer goods would upset the copyright balance. Far from ensuring a "just reward" for creators of copyrighted works, it would allow a copyright to be leveraged far beyond the use intended by Parliament, allowing rights to be artificially enlarged into protection over consumer goods. This undue expansion of copyright would certainly be a failure to give heed to Binnie J.'s insistence, at para. 31 of *Théberge* , that the law give due weight to the limited nature of the rights of a copyright holder.

### 4. The Correct Interpretation of Paragraphs (a) to (c) of Section 27(2)

89    As mentioned above, para. (*e*) of s. 27(2) prohibits the importation into Canada of any copy of a work that would have infringed copyright had it been made in Canada by the person who made it, if that importation is for the purpose of doing anything referred to in paras. (*a*) to (*c*) of s. 27(2). Liability under para. (*e*) therefore relies on a finding that the defendant intended to commit on act enumerated in paras. (*a*) to (*c*), which prohibit the selling, renting out, distribution with a prejudicial effect, or dealing with by way of trade of copies of a work. How are we to interpret these prohibitions in light of the foregoing review of the purpose of s. 27(2)(*e*) and of the *Copyright Act* as a whole?

90    Paragraph (*b*) provides that "[i]t is an infringement of copyright for any person to distribute to such an extent as to affect prejudicially the owner of the copyright ... a copy of a work". Parliament's inclusion of the word "prejudicially" here is another important key to the interpretation of s. 27(2) as a whole. One can imagine many ways that the distribution of a copyrighted work could prejudicially affect the copyright holder which surely would not be considered secondary infringement. As a somewhat trivial example, consider a book containing accurate and damning portrayals of the author's family, written under a pseudonym unbeknownst to the family of the author. Distribution of copies of this book — bought in full compliance with the Act — to the author's family would certainly tend to "affect prejudicially" the owner of the copyright; nevertheless, I am sure that this situation is not intended to fall within s. 27(2)(*b*). This hypothetical situation suggests that to "affect prejudicially" a copyright holder has a more limited meaning: this phrase limits protection to the interests of the copyright holder *as author*. That is, only those distributions which affect the *legitimate* economic interests protected by copyright will be held to affect prejudicially the owner of the copyright. Economic consequences of unauthorized importation of consumer goods are not, generally speaking, the types of legitimate economic interests protected by the copyright in a work which is merely incidental to the sale or distribution of the consumer good to which it is attached. The effects of such importation do not meet the requirement of prejudice which is embedded in para. (*b*), which informs all of s. 27(2).

91    Paragraph (*a*) provides that "[i]t is an infringement of copyright for any person to sell or rent out" a copy of a work. Simply put, to sell a consumer good with a copyrighted work attached as a logo is not to sell that work. The work, *qua* work, is merely incidental to the consumer good, and thus a sale of the latter cannot be said in any real sense to be a sale of the former.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

While it is true that a logo affixed to a package can play an essential role in the sale of that package, that is the role of the logo as a trade-mark, not as a copyright. A finding that s. 27(2)(*a*) is violated requires that the work be sold as something more than a mere incident of the sale of some other item.

92    Similar logic applies to para. (*c*). It provides that it is an infringement to, "by way of trade distribute, expose or offer for sale or rental, or exhibit in public" a copy of a work. It must be noted that the modifier "by way of trade" clearly applies to all of the actions referred to in para. (*c*). This can be seen more clearly by referring to the French version of the provision which refers to "*la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial.*" When para. (*c*) is seen in this way, consistent with the purpose of the rest of s. 27(2) and the Act as a whole, it is clear that its protection is limited to those instances where the *work itself* is what is being distributed, exposed, offered for sale or exhibited in public. In other words, when the "trade" taking place, or the "*but commercial*" being sought, concerns the work itself; when the trade is a trade in some consumer good with which the work is only incidentally related, para. (*c*) is not triggered.

93    Each of paras. (*a*) to (*c*) must be interpreted in a manner consistent with the view that s. 27(2) is meant to protect authors from the unauthorized appropriation of the gains of their authorship; protection does not extend to include any and all economic gains claimed by an author or copyright owner. In each case, the wording of the provision, read in light of the purpose of s. 27(2) and the purpose of the *Copyright Act* as a whole, makes it clear that if the work in question is merely incidental to another consumer good, and it is that consumer good which is being sold or distributed, or dealt with by way of trade, s. 27(2) cannot be invoked. It is only when it is the work itself which is the subject of the sale or other commercial dealing that it can properly be said that the section applies and its protection becomes available.

94    The determination of when a work is merely incidental to a consumer good will not always be an easy one. Some factors which may be useful in making such a determination could include the nature of the product, the nature of the protected work and the relationship of the work to the product. If a reasonable consumer undertaking a commercial transaction does not think that the copyrighted work is what she is buying or dealing with, it is likely that the work is merely incidental to the consumer good.

95    Contrary to what Rothstein J. seems to argue at para. 4, the previous analysis does not suggest that the simple fact of a work being attached to a consumer good would preclude that work from copyright protection: the Act is clear that protection extends to, *inter alia*, works produced or reproduced "in any material form whatever" (s. 3(1)). The 'merely incidental' analysis goes to secondary liability under s. 27(2) only; rather than being about what is and is not copyrightable, its intention is to prevent that section from being improperly leveraged to use the *Copyright Act* as a protection of commercial interests completely unrelated to copyright's intended domain. Thus, the sale of a t-shirt with a reproduction of a painting on its front may constitute the sale of the work (the painting); on the other hand, the location of a small logo on the corner of a shirt pocket would not thereby transform an otherwise plain shirt into a copyrighted work, as the logo *qua* copyrighted work would be merely incidental to the shirt being sold (and, as noted above, any value the logo has as identifying a brand would be protected by trade-mark law, rather than by copyright). To take a slightly different example, a copyrighted instruction booklet included in the box of some consumer good would, as copyrighted work, be merely incidental to the good for the purposes of s. 27(2): see *British Leyland Motor Corp. v. Armstrong Patents Co.*, [1986] 1 All E.R. 850 (U.K. H.L.) .

## 5. Other Considerations

96    In my view, this purposive interpretation of s. 27(2), which views the provision in light of the purpose and scheme of the *Copyright Act* as a whole, is sufficient to deal with the problem of parallel importation. This interpretation means that two other arguments, raised before us by the appellant, become unnecessary. However, I think it would be useful to mention those arguments briefly.

97    The appellant argued that an attempt to extend copyright protection to prevent parallel importation of consumer goods could trigger the application of the civilian doctrine of *abus de droit*. This doctrine, which was recognized by this Court in *Houle c. Banque Canadienne Nationale*, [1990] 3 S.C.R. 122 (S.C.C.), provides that a party may not exercise a right in an unreasonable manner. (See also *Wallace v. United Grain Growers Ltd.*, [1997] 3 S.C.R. 701 (S.C.C.), at para. 145, with respect to a similar concept in the common law.) Given the analysis above, I do not see an appeal to this doctrine as necessary to resolve this issue.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

98    Similarly, the appellant argued that the newly developing American doctrine of "copyright misuse" applies to parallel importation of consumer goods. This doctrine is meant to act as a sort of equitable defence when "a copyright holder attempts to extend his copyright beyond the scope of the exclusive rights granted by Congress in a manner that violates federal antitrust law [or] the public policy embodied in copyright law": see K. Judge, "Rethinking Copyright Misuse" (2004), 57 *Stan. L. Rev.* 901, at pp. 903-4. The doctrine has been adopted by some Federal Circuit Courts of Appeal, but has not as of yet found favour at the United States Supreme Court (Judge, at pp. 902-3). As with the concept of *abus de droit*, my analysis renders an appeal to this developing doctrine unnecessary to deal with parallel importation of consumer goods. However, this is not to comment on the possible application of this doctrine in Canada; a determination on that issue is best left for another day.

### 5. Application to the Facts

99    It is clear on the facts of the appeal before us that the protected works in question — the Côte d'Or and Toblerone logos, considered as copyrighted works — cannot be seen as anything other than merely incidental to the chocolate bars to which they are affixed. Therefore, Euro-Excellence's dealings with the chocolate bars are not caught within the language of s. 27(2) of the Act. I reach this conclusion on the basis of a consideration of the role of the logos as merely incidental to the sale of the chocolate bars in general.

100    As discussed above, to be brought within the protection of s. 27(2), a copyrighted work must be more than merely incidental to the consumer good to which it is affixed. Only when that condition is satisfied can it accurately be said that it is the copyrighted work itself which is the subject of one of the activities described in paras. (*a*) to (*c*) of s. 27(2).

101    In this appeal, the logos, considered as copyrighted works, are inarguably best described as merely incidental to the chocolate bars themselves. It cannot be reasonably maintained that in the course of a commercial transaction in which a customer buys a Côte d'Or or a Toblerone chocolate bar from a merchant, the customer is actually paying for a copyrighted work. This is not a situation in which the copyrighted work, as such, is an important aspect of the consumer transaction: it is a logo on a wrapper for a product which serves to identify the product's origins, nothing more.

102    Thus it cannot be said that Euro-Excellence is selling the copyrighted works themselves, as proscribed by para. (*a*); it cannot be said that Euro-Excellence is distributing those works to the extent of prejudicing KCI's interest as author or copyright holder, as prohibited by para. (*b*), when those interests are properly limited to the legitimate economic interests protected by the Act; and it cannot be reasonably maintained that Euro-Excellence is in contravention of para. (*c*) by dealing with those works "by way of trade" once it is understood that it is the works themselves which must be dealt with by way of trade rather than the chocolate bars to which they are attached. Thus, as Euro-Excellence's importation of the Côte d'Or and Toblerone bars was not done "for the purpose of doing anything referred to in paragraphs (*a*) to (*c*)" of s. 27(2), Euro-Excellence has not violated s. 27(2)(*e*).

103    The above does not imply that the Côte d'Or or Toblerone logos are not copyrightable works. Quite the opposite: the logos have been properly registered and there is no reason to dispute the trial judge's conclusions that the logos meet the Act's originality threshold and are therefore copyrightable works. KCI, as holder of those copyrights in Canada, would surely succeed in an action for copyright infringement against a defendant who produced and distributed posters of the logos, for example. However, it is necessary to ensure that this legitimate copyright protection is not illegitimately leveraged into a protection for a market in consumer goods.

104    Similarly, I do not mean to suggest that logos play no role whatsoever in the sale of chocolate bars. So I think it is therefore useful to stress, once again, that in the s. 27(2) analysis the logos must be viewed strictly through the copyright lens *as works*. The analysis does not speak to the possibility — indeed, the certainty — that the logos, as trade-marks, can play a large role in the sale of the chocolate bars and are of great value to KCI. It is not disputed that part of the reason that a consumer buys a Côte d'Or bar or a Toblerone bar is because of the reputation and goodwill associated with each brand. But that is not a consideration which is relevant under the *Copyright Act*. It cannot be reasonably maintained that anyone buys a Côte d'Or or Toblerone because of the logos as works of art.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

105    Côte d'Or and Toblerone are chocolate bars. When a consumer buys one of these bars, the bar is exactly what he or she is buying. The logo may play a role in that transaction *qua* trade-mark, but *qua* copyright it cannot be seen as anything other than a mere incident to the chocolate bars. Thus, Euro-Excellence did nothing for the purpose of selling the logos as copyrighted works, or dealing with those works by way of trade; nor did Euro-Excellence distribute the logos as works to the extent of prejudicially affecting the legitimate interests of KCI as copyright holder. In short, Euro-Excellence did not violate or intend to violate the terms of paras. (*a*) to (*c*) of s. 27(2), and therefore cannot be found liable under s. 27(2)(*e*).

### 6. Conclusion

106    For the above reasons, the appeal should be allowed with costs in all courts.

*Abella J.*:

107    The central issue in this appeal is whether an exclusive licensee of a copyright can claim remedies under the *Copyright Act*, R.S.C. 1985, c. C-42, when the copyrighted work is displayed on the label of a product imported in circumstances envisioned by s. 27(2) of the Act.

108    Like the trial judge and the Federal Court of Appeal, it is my view that Kraft Canada Inc. has the right to seek remedies under the Act to prevent Euro-Excellence from selling or distributing the copyrighted works. Section 27(2) of the *Copyright Act* states:

> It is an infringement of copyright for any person to
>
>> (a) sell or rent out,
>>
>> (b) distribute to such an extent as to affect prejudicially the owner of the copyright,
>>
>> (c) by way of trade distribute, expose or offer for sale or rental, or exhibit in public,
>>
>> (d) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or
>>
>> (e) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),
>
> a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

109    Resolving this appeal depends on the answers to two questions. First, is the copyrighted work being "sold" or "distributed" when it is printed on the wrapper of a consumer product? Second, can an exclusive licensee in Canada claim protection against secondary infringement when the copyrighted work was produced by the owner-licensor?

110    On the first issue, I agree with the conclusion reached by Rothstein J. There is nothing in the Act to endorse a restrictive definition of "sell". Section 64(3)(*b*) of the Act extends copyright protection to trademarks and labels. When a product is sold, title to its wrapper is also transferred to the purchaser. The Act is indifferent as to whether the sale of the wrapper is important to the consumer.

111    Like Bastarache J., I agree with the trial judge that the logos are copyrighted works. I respectfully disagree with his view, however, that no infringement is made out because the elephant and bear logos are incidental to the chocolate bars and are therefore not protected by s. 27(2). To inject an exception for logos on the basis that they are "incidental" would be to introduce unnecessary uncertainty, inviting case-by-case judicial explorations into the uncharted area of what is "merely" incidental, "somewhat" incidental, or not incidental at all. Such an approach also takes insufficient account of the reality that many products are, to a significant extent, sold on the basis of their logo or packaging.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

112    Nor do I share the view that s. 27(2)(*e*), which on its face appears to me to be applicable, "protects only the legitimate economic interests of copyright holders", that is, "the unauthorized importation of works which are the result of their skill and judgment" (paras. 85-86). It seems to me, with respect, that once a work falls within s. 27(2)(*a*) to (*c*) and otherwise meets the requirements established by the Act as prerequisites to copyright protection, there is no scope for a judicially created limit to that protection based on what might — or might not — be a "legitimate economic interest". I do not believe that *Galerie d'art du Petit Champlain inc. c. Théberge*, [2002] 2 S.C.R. 336, 2002 SCC 34 (S.C.C.), stands for such a proposition.

113    The answer to the second question depends on how one defines the rights of exclusive licensees. Copyright law in Canada, as Estey J. stated in *Compo Co. v. Blue Crest Music Inc.* (1979), [1980] 1 S.C.R. 357 (S.C.C.), at pp. 372-73, is:

[N]either tort law nor property law in classification, but is statutory law. It neither cuts across existing rights in property or conduct, nor falls between rights and obligations heretofore existing in the common law. Copyright legislation simply creates rights and obligations upon the terms and in the circumstances set out in the statute.

Copyright today remains an exclusively statutory creation: *Théberge; Bishop v. Stevens*, [1990] 2 S.C.R. 467 (S.C.C.); *CCH Canadian Ltd. v. Law Society of Upper Canada*, [2004] 1 S.C.R. 339, 2004 SCC 13 (S.C.C.).

114    In my view, the clear language of the Act is determinative. "Exclusive licence" is defined in s. 2.7:

... an authorization to do any act that is subject to copyright <u>to the exclusion of all others including the copyright owner</u>, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

115    Clarification of the nature and quality of the rights enjoyed by an exclusive licensee is found in a combination of ss. 13(4), 13(6), 13(7) and 36(1) of the Act, which state:

13. ...

(4) The owner of the copyright in any work <u>may assign the right</u>, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, <u>and may grant any interest in the right by licence</u>, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

· · · · ·

(6) For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright <u>or the grant of an interest in the copyright by licence</u>.

(7) For greater certainty, it is deemed always to have been the law that a <u>grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence</u>.

· · · · ·

36. (1) Subject to this section, the owner of any copyright, or <u>any person</u> or persons *deriving any right*, title or interest by assignment or grant in <u>writing from the owner, may</u> individually for himself or herself, as a party to the proceedings in his or her own name, <u>protect and enforce any right that he or she holds</u>, and, to the extent of that right, title and interest, is <u>entitled to the remedies provided by this Act</u>.

116    Under s.13(4) and s.13(6), the owner of a copyright is free to divest itself of *any* interest in the copyright, in whole or in part, either by assignment *or* by licence: J.S. McKeown, *Fox on Canadian Law of Copyright and Industrial Designs* (4th ed. (loose- leaf)), at p. 19-24.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

117    A copyright holder's ability to alienate its interest either through licensing or assignment is perfectly consistent with the statutory scheme. Vertical and horizontal divisibility is, arguably, a hallmark of copyright: see *Bouchet v. Kyriacopoulos* (1964), 45 C.P.R. 265 (Can. Ex. Ct.) . And, as Binnie J. noted in *Théberge* , at para. 12, the economic objectives of copyright law are furthered through the transferability of either full or partial copyright interests.

118    Section 13(7) clarifies that an exclusive licence is the grant of a proprietary interest in the copyright itself: see *Robertson v. Thomson Corp.*, [2006] 2 S.C.R. 363, 2006 SCC 43 (S.C.C.), at para. 56. And s. 36(1) stipulates that any such grant of an interest in the copyright can be protected through the remedies provided in the Act.

119    The effect of s. 13(7) is to limit the distinction between the rights of assignees and exclusive licensees: McKeown, at p. 19-25 ; T. Scassa, "Using Copyright Law to Prevent Parallel Importation: A Comment on *Kraft Canada, Inc. v. Euro Excellence, Inc.*" (2006), 85 *Can. Bar. Rev.* 409, at p. 416; N. Tamaro, *The 2006 Annotated Copyright Act* (2006). The interest granted under s. 13(7) therefore includes a right, under s. 36(1), to protect that interest as against all others, including the owner-licensor, by availing itself of the remedies in the Act.

120    In other words, when the owner-licensor transfers an interest to the exclusive licensee, that licensee becomes, under the Act, the owner of a defined interest in the copyright: see *Éditions de la Table Ronde et Cousture* (Que. S.C.) , and *Dynabec Ltée c. Société d'informatique R.D.G. Inc.* (1985), 6 C.P.R. (3d) 322 (Que. C.A.).

121    Where the owner of a copyright has granted an exclusive licence, therefore, it has, to the extent of the duration, territorial scope, and terms of that licence, temporarily granted that interest in the copyright to the exclusive licensee.

122    The scope of the precise interest granted is shaped by the terms of the licensing agreement: see *Fonds Gabrielle Roy c. Éditions internationales Alain Stanké ltée*, [1993] J.Q. No. 2525 (Que. S.C.) ; and *British Actors Film Co. v. Glover*, [1918] 1 K.B. 299 (Eng. K.B.), at p. 307. In this case, the agreement stated:

> 2.01 The Licensor grants to the Licensee the sole and exclusive right and licence in the Territory to produce, reproduce and adapt the Works or any substantial part thereof, in any material form whatever, and to use and publicly present the Works in association with the manufacture, distribution or sale in Canada of confectionery products, including, but not limited to, chocolate.

123    This is the grant of the "sole and exclusive right", in Canada, to "produce", "reproduce", "adapt", "use", "distribute" and "sell" the products. These terms, read together with the rights granted to an exclusive licensee in ss. 2.7 and 13(7), as well as the rights in s. 36(1) to protect and enforce its rights and interests through remedies provided by the Act, give the exclusive licensee the right to invoke the Act for copyright infringement not only against third parties, but, as s. 2.7 confirms, against the owner-licensor as well.

124    The trial judge, not unreasonably, treated this exclusive licence as an assignment: *Kraft Canada Inc. v. Euro Excellence Inc.*, [2004] 4 F.C.R. 410, 2004 FC 652 (F.C.), at para. 39. However, even as an exclusive licence, the proprietary interest clearly extends to the production and distribution of copyrighted works in Canada.

125    I accept that exclusive licences are distinct from assignments under the Act. This difference is recognized in s. 13(5) of the Act, dealing with partial assignments of copyright:

> (5) Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

This provision is interpretive in nature, clarifying that a partial assignee enjoys complete control over what was assigned to it, while the assignor retains ownership rights in what was not assigned.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

126    As Rothstein J. notes, there is no analogous provision with respect to licensees. But, in my view, the absence of such a provision does not derogate from the rights the Act *does* unambiguously assign to exclusive licensees.

127    An exclusive licence which did not prevent others, including the owner-licensor, from performing the acts addressed in the licensing agreement, would no longer be exclusive. It would also render meaningless the statutory definition found in s. 2.7 of an exclusive licensee as the holder of rights "to the exclusion of all others *including the copyright owner*".

128    While an owner-licensor is, technically, still the owner of the copyright, it is nonetheless liable to an exclusive licensee if it breaches the copyright interest it has granted. Otherwise, the owner-licensor could continue to assert that despite having granted an exclusive interest in its copyright, it was free to compete with the exclusive licensee without fear of attack from the Act's remedial tentacles. The legislation, in my view, contradicts such immunity from the statute and, on the contrary, clearly entitles an exclusive licensee to sue for secondary infringement, even where the work was reproduced by the owner-licensor.

129    Copyright confers a limited monopoly to "produce or reproduce" the work in any material form whatever. In this case, KCI purchased the exclusive licence to the copyrighted work precisely because it wanted copyright on chocolate bar wrappers. Euro-Excellence purchased chocolate bars with labels displaying the copyrighted works; it imported those works into Canada after being notified of KCI's Canadian copyright interest; its purpose in importing the chocolate bars and the wrappers was to sell them or distribute them by way of trade. A s. 27(2)(*e*) infringement is therefore made out. KCI is entitled to the remedies provided by the Act.

130    I would dismiss the appeal and, as requested by KCI, return the matter to Harrington J. for a reassessment of damages.

*Appeal allowed.*

*Pourvoi accueilli.*

## Appendix

*Copyright Act*, R.S.C. 1985, c. C-42

[Definitions]

 2. ...

"copyright" means the rights described in

(a) section 3, in the case of a work,

. . . . .

"infringing" means

(a) in relation to a work in which copyright subsists, any copy, including any colourable imitation, made or dealt with in contravention of this Act,

(b) in relation to a performer's performance in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act,

(c) in relation to a sound recording in respect of which copyright subsists, any copy of it made or dealt with in contravention of this Act, or

(d) in relation to a communication signal in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act.

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

The definition includes a copy that is imported in the circumstances set out in paragraph 27(2)(*e*) and section 27.1 but does not otherwise include a copy made with the consent of the owner of the copyright in the country where the copy was made;

. . . . .

[Exclusive licence]

2.7. For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

. . . . .

[Copyright in works]

3. (1) For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

(a) to produce, reproduce, perform or publish any translation of the work,

. . . . .

and to authorize any such acts.

. . . . .

[Assignments and licences]

13. ...

(4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

[Ownership in case of partial assignment]

(5) Where, under any partial assignment of copyright, the assignee becomes entitled to any right comprised in copyright, the assignee, with respect to the rights so assigned, and the assignor, with respect to the rights not assigned, shall be treated for the purposes of this Act as the owner of the copyright, and this Act has effect accordingly.

[Assignment of right of action]

(6) For greater certainty, it is deemed always to have been the law that a right of action for infringement of copyright may be assigned in association with the assignment of the copyright or the grant of an interest in the copyright by licence.

[Exclusive licence]

(7) For greater certainty, it is deemed always to have been the law that a grant of an exclusive licence in a copyright constitutes the grant of an interest in the copyright by licence.

. . . . .

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087

2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

[Infringement generally]

27. (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

[Secondary infringement]

(2) It is an infringement of copyright for any person to

(a) sell or rent out,

(b) distribute to such an extent as to affect prejudicially the owner of the copyright,

(c) by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

(d) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(e) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

. . . . .

[Protection of separate rights]

36. (1) Subject to this section, the owner of any copyright, or any person or persons deriving any right, title or interest by assignment or grant in writing from the owner, may individually for himself or herself, as a party to the proceedings in his or her own name, protect and enforce any right that he or she holds, and, to the extent of that right, title and interest, is entitled to the remedies provided by this Act.

[Where copyright owner to be made party]

(2) Where proceedings referred to in subsection (1) are taken by a person other than the copyright owner, the copyright owner must be made a party to those proceedings, except

(a) in respect of proceedings taken under section 44.1, 44.2 or 44.4;

(b) in respect of interlocutory proceedings unless the court is of the opinion that the interests of justice require the copyright owner to be a party; and

(c) in any other case, if the court is of the opinion that the interests of justice do not require the copyright owner to be a party.

. . . . .

[Non-infringement of certain designs]

64. ...

(2) Where copyright subsists in a design applied to a useful article or in an artistic work from which the design is derived and, by or under the authority of any person who owns the copyright in Canada or who owns the copyright elsewhere,

(a) the article is reproduced in a quantity of more than fifty, or

Kraft Canada Inc. v. Euro Excellence Inc., 2007 SCC 37, 2007 CarswellNat 2087
2007 SCC 37, 2007 CarswellNat 2087, 2007 CarswellNat 2088, [2007] 3 S.C.R. 20...

(b) where the article is a plate, engraving or cast, the article is used for producing more than fifty useful articles,

it shall not thereafter be an infringement of the copyright or the moral rights for anyone

(c) to reproduce the design of the article or a design not differing substantially from the design of the article by

(i) making the article, or

(ii) making a drawing or other reproduction in any material form of the article, or

(d) to do with an article, drawing or reproduction that is made as described in paragraph (c) anything that the owner of the copyright has the sole right to do with the design or artistic work in which the copyright subsists.

[Exception]

(3) Subsection (2) does not apply in respect of the copyright or the moral rights in an artistic work in so far as the work is used as or for

. . . . .

(b) a trade-mark or a representation thereof or a label;

. . . . .

*Appeal allowed with costs*, MCLACHLIN C.J. *and* ABELLA J. *dissenting.*

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

---




*Indexed as:*

# Elliott Estate (Re)

**IN THE MATTER OF Consolidated Rules 611 and 612
AND IN THE MATTER OF the partnership between George Andrew
Elliott, deceased, and James L. Wedlake**

[1962] O.J. No. 164

Ontario Supreme Court - Court of Appeal
Toronto, Ontario

**Roach, Gibson and Kelly JJ.A.**

Heard: March 5 and 6, 1962.
Judgment: released June 28, 1962.

(24 pp.)

**Counsel:**

G.D. Finlayson, for the appellant.
R.L. Kellock, Q.C., and D.J. Wright, for the respondent.

---

The judgment of the Court was delivered by

**1    KELLY J.A.:**-- This is an appeal by James L. Wedlake from the Judgment of the Honourable Mr. Justice Smily, dated 17th January, 1962, upon an application for a declaration of the rights of the parties under an agreement of Partnership dated 21st June, 1954.

**2**    The facts giving rise to the application may be summarized as follows: George Andrew Elliott and James L. Wedlake had been carrying on business in partnership as hardware merchants under the terms of an agreement dated 1st October, 1937. In 1954 Elliott decided to withdraw from active participation in the business and the parties signed an agreement dated 21st June, 1954 (hereinafter referred to as the 1954 agreement). This agreement superseded the pre-existing partnership

agreement and purported to create Elliott a limited partner and Wedlake a general partner in a partnership constituted under the provisions of The Limited Partnerships Act, R.S.O. 1950, c. 208, now R.S.O. 1960, c. 215.

**3**    From 1st July, 1954 until Elliott's death on 6th August, 1955, Wedlake operated the business as the general partner; thereafter Elliott's executors and Wedlake continued in partnership, the estate purporting to be a limited partner. This arrangement prevailed until 25th May, 1961 when by mutual consent the partnership was dissolved and Wedlake liquidated the assets; after satisfying all liabilities, other than those to the partners, there remains on hand the sum of $36,608.99.

**4**    The Elliott executors applied to the Court for judgment -

> "declaring the rights of the said Executors with respect to the sum of $36,608.99 arising from the liquidation of the assets of the above named partnership and the liability of the said Wedlake to the said Executors as vendors of the interest of the said George Andrew Elliott, deceased and his estate in the said partnership under the agreement of the 21st June, 1954 with respect to the balance of the purchase price owing to the said Executors thereunder."

The Elliott executors' position may be stated as follows:

> "The 1954 agreement was an agreement by Wedlake to purchase the interest of Elliott for $90,000; at the date of dissolution $53,000 of the purchase price was unpaid; therefore the Elliott executors are entitled to the whole of the sum of $36,608.99 and are, in addition, entitled to personal judgment against Wedlake for the balance of the sum of $53,000."

**5**    Wedlake contends that the sum of $36,608.99 should be divided between himself and the Elliott executors rateably in accordance with the respective standings of the capital accounts of the two partners at the date of dissolution.

**6**    Since the memorandum of 25th May, 1961 providing for the dissolution and liquidation of the partnership does not alter the status of the parties, their respective rights must be determined by construing the 1954 agreement with assistance from such facts and circumstances as to which reference may properly be made.

**7**    In the preparation of the 1954 agreement, three main problems seem to have been in the minds of Elliott and Wedlake: (a) the termination of the former partnership and the recovery from it by Elliott of that part of his investment in excess of the amount which was carried forward as his capital in the new partnership; (b) the creation of the new partnership in which Elliott would be a limited partner within the meaning of The Limited Partnerships Act and Wedlake a general partner; (c) the ultimate purchase by Wedlake of Elliott's interest in the new limited partnership. The 1954 agreement dealt effectively with the first mentioned problem, but the economy of detail providing

for the latter two matters and the complete failure to anticipate the circumstances which now prevail has presented a situation for which the parties are unable to find any mutually acceptable solution in the 1954 agreement: hence this application.

**8**    While it is doubtful, in my opinion, if a limited partnership ever did exist between the parties, whether it did or not is not now material. The only persons who would have been affected if Elliott and his executors had been a limited partner would have been the creditors of the partnership, of which there are now none: consequently the situation as between the partners is not affected one way or the other by whether the firm is a limited or a general partnership. As I have said, the agreement purported to deal with three principal matters; it contained three recitals and eleven operative clauses, the last of which clauses is the usual omnibus clause extending the operation to the heirs, executors, administrators and assigns of the parties. Of the three recitals the first refers to the existence of the former business under the agreement of 1st October, 1937; the second states that the parties had agreed to dissolve that partnership and to enter into a limited partnership "under the provisions of the Limited Partnerships Act, R.S.O. c. 208, on the terms and conditions hereinafter set out"; the third recital which is the only one really material to the matters before the Court is as follows:

> "AND WHEREAS it is the intention of the parties hereto that the Party of the Second Part shall purchase the interest of the Party of the First Part in the said Limited Partnership in accordance with the terms hereinafter set forth in this agreement,"

Of the first ten operative clauses, clauses 1, 2 and 3 are referable only to the dissolution of the former partnership. Clauses 4, 5, 8, 9 and 10 refer solely to the formation and operation of the new limited partnership. Paragraphs 6 and 7 are the only paragraphs which have any possible reference to the purchase by Wedlake of the Elliott interest. These two paragraphs read as follows:

> "6.    Interest at 5% is to be paid to the Party of the first Part on said sum of $90,000.00 or on such capital of the Party of the First Part as may remain in the partnership from time to time, payable quarterly or as may be required, and the Party of the Second Part is also to pay the sum of Two Thousand Dollars ($2,000.00) on account of the purchase of the share of the Party of the First Part each year during the remainder of the lifetime of the Party of the First Part, such payments to be made on the 31st day of January in each year commencing January 31st, 1955.
>
> 7.    In the event of the death of the Party of the First Part during the continuance of the partnership, the personal representatives of the Party of the First Part shall continue the partnership as limited partners on the same terms and conditions as are herein contained excepting that the Party of the Second Part shall be entitled to increase the annual payment on account of the purchase of the share of the Party of the First Part to any amount desired by him on giving the personal

representatives of the Party of the First Part two (2) months' notice in writing of
the amount intended to be paid by him."

**9**    If as contended by the Elliott executors there be any enforceable contract for the sale and
purchase of the Elliott interest, it must be found in those parts of the 1954 agreement above quoted,
i.e. the third recital and clauses 6 and 7. While there can be no doubt that such an agreement must
be construed as a whole and every part must be looked at, it is however equally clear that the
operative parts of the agreement are those by which the parties are intended to be bound. The
distinction as to the purposes served by the recitals and the operative parts of a document have been
stated by Lord Warrington of Clyffe in Inland Revenue Commissioners v. Raphael and Others,
(1935) A.C. 96 at p. 135 as follows:

> "The fact is that the narrative and operative parts of a deed perform quite
> different functions, and 'intention' in reference to the narrative and the same word
> in reference to the operative parts respectively bear quite different significations.
> As appearing in the narrative part it means 'purpose'. In considering the intention
> of the operative part the word means significance or import -- 'The way in which
> anything is to be understood' (Oxford English Dictionary), supported by the
> illustration: 'The intention of the passage was sufficiently clear.'"

**10**    Considered by themselves, clauses 6 and 7, in my opinion, lack the essential ingredients of an
agreement for sale; there is no mutual undertaking to buy on the one hand and to sell on the other;
there is no purchase price stated or capable of being determined by any means specified in the
agreement; there is no obligation on the part of Wedlake to pay anything beyond the sum of $2,000
a year during the lifetime of Elliott. In my view, unless the operative parts of the agreement can be
bolstered up by the words of the third recital, the agreement fails completely to be an effective
agreement of sale of which the Elliott executors can enforce performance.

**11**    I turn therefore to consider to what extent the recital may be used to overcome the patent
deficiencies of clauses 6 and 7 and in fact of the whole operative parts of the agreement. In the first
instance it must be borne in mind that a recital is not a necessary part of a document and its use in
the interpretation of the document as a whole is strictly limited.

> "The reciting Part of a Deed is not at all a necessary Part either in Law or Equity.
> It may be made use of to explain a Doubt of the Intention and Meaning of the
> Parties but it hath no Effect or Operation. But when it comes to limit the estate,
> there the Deed is to have its Effect according to what Limitations are therein set
> forth."

Per Holt, C.J., Bath and Mountague's Case (1693) 3 Cas. in Ch. 55 at 101; 22 E.R. 963 at 991. An
oft quoted statement of the extent to which reference may be had to recitals is contained in the
judgment of Lord Esher, M.R. in Ex Parte Dawes. In Re Moon, (1886) 17 Q.B.D. 275 at p. 286:

> "Now there are three rules applicable to the construction of such an instrument. If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred."

It is to be noted that the qualifying condition for the use of a recital in the interpretation of the operative parts is that there must be ambiguity in the operative parts; in such a case the preferred meaning to be given to the operative words should be that consistent with the intention expressed in the recital, provided that the words of the operative part are by themselves capable of such an interpretation. MacKenzie v. Duke of Devonshire, (1896) App. Cas. 400; Ex Parte Dawes. In Re Moon, Supra; In re Sugden's Truts, Sugden v. Walker, (1917) 2 Ch. 92. It is essential, however, that the construction to be placed upon the operative part in the light of the recital be a construction which the words themselves of the operative part are capable of bearing. Where, however, the operative parts of a document, due to the lack of appropriate words, are incapable of a construction which will fulfil the intention expressed in recitals, the recital may not be used for the purpose of reading into the operative clause a meaning which it is incapable of conveying when considered by itself.

**12**    This is a situation presented by the 1954 agreement. So far as it purports to deal with the sale of the Elliott interest in the partnership, there is a complete absence of the provisions essential as a minimum to create an enforceable contract of sale and purchase of that interest. In short, assuming that the recital be an expression that the purpose of the agreement was immediately to enter into a contract of sale valid and enforceable between the parties, the parties did not in the operative portions to which they committed themselves carry out that purpose.

**13**    Clauses 6 and 7 are not ambiguous in the sense that they are capable of alternative constructions to choose between which the Court may be assisted by reference to the recitals. Clauses 6 and 7 are vague in the sense that by themselves they do not support a construction which would lead to establish an enforceable contract of purchase or sale. Resort to the recitals may not be had to clear up the vagueness and to incorporate words which it would be necessary to insert in order that those clauses expressed the agreement of sale and purchase sought to be found in them by the Elliott executors.

**14**    Since I consider the 1954 agreement does not embody an enforceable agreement for the sale of the Elliott interest, it follows that there remains no liability on the part of Wedlake to the Elliott executors save that resulting from the relationship of partners. Consequently the rights, if any, of the Elliott executors to the sum of the $36,608.99 are those rights which flow from the partnership created by the 1954 agreement and the conduct of the parties in the course of that partnership.

**15**    As I have already stated, I do not consider it material to the question before the Court whether this partnership be considered as a limited partnership or a general partnership.

**16**    If the 1954 agreement be not an agreement for the sale and purchase of the Elliott interest, the rights of the parties to the net proceeds of the realization of the assets of the partnership must be found either in those parts of the agreement which create the partnership or in the provisions of The Partnerships Act, which are applicable to determine the rights of the partners in the absence of any express agreement to the contrary.

**17**    The following facts are established by the material before the Court and are those from reference to which the rights of the parties must be determined.

**18**    A partnership was formed between Elliott and Wedlake on 21st June, 1954. This partnership was carried on without change of partners until the death of Elliott on 6th August, 1955; on Elliott's death the partnership was continued by the Elliott executors, along with Wedlake, until 25th May, 1961, when by mutual agreement of the partners it was dissolved and its assets were liquidated by Wedlake. After satisfying all liabilities, other than those to the partners, the net realization was $36,608.99. The 1954 agreement was singularly silent as to the rights of the partners inter se, the only significant part being clause 9, reading as follows:

> " It is agreed between the Parties hereto that the Party of the First Part shall not be entitled to any profits arising from the operation of the said business with the exception of the payments herein set forth of interest at 5% on the invested capital of the Party of the First Part and 2% increase of rent calculated on invested capital of the Party of the First Part."

**19**    For each of the fiscal years ending in 1955 to 1961 inclusive, annual statements were prepared by Wedlake and delivered to the Elliott executors. These annual statements consisted of a statement of assets and liabilities as of the 31st January, a trading statement for the year ending 31st January and a profit and loss statement for the year ending 31st January; presumably they were certified by the auditors as required by the 1954 agreement. The most recent of these statements, that of 31st January, 1961, which was identified as an exhibit to the affidavit of Thomas Norman Strong, filed on behalf of the Elliott executors, contained in the statement of assets and liabilities under the heading of "Capital" the following entries:

CAPITAL

G.A. Elliott Estate


Investment Account Jan. 31/60          78,000.00


Less Reduction                  20,000.00
                                 ---------

Balance Jan. 31/61        58,000.00

J.L, Wedlake

Investment Account
Jan. 31/60        56,049.60

Less:    Drawing
        Account    2,578.52

Loss per Profit
& Loss Account 14,262.30        16,840.82
---------            ---------
Balance Jan. 31/61        39,208.79 97,208.78

Since this statement was produced by the Elliott executors without any objection being raised as to its accuracy, I take it that it admittedly reflects the capital position as between the two partners as of its date.

**20**   On 29th March, 1961 Wedlake made to the Elliott executors a payment of $5,000 which had the effect of reducing the capital balance of the executors on the books of the partnership to $53,000.

**21**   The statement of 31st January, 1961, prepared by Wedlake and delivered to the Elliott executors and the adoption of it by the Elliott executors, creates an account stated and settled between the parties and precludes any examination of the dealings between the parties reflected by or prior to such statement. In the absence of fraud, such an account cannot be reopened in favour of a party who has acquiesced in it. Halsbury, 3rd Ed., Vol. 28, para. 1071, p. 551.

**22**   By reference to the aforementioned statements as of 31st January, 1961 the respective interests of the parties in the capital partnership is readily determinable. The Elliott executors' capital stood at $58,000 and Wedlake's capital at $39,208.78.

**23**   No doubt that state of these accounts would have changed by the date of the dissolution on 25th May, 1961, but statements as of that date prepared on the same basis as the statements of 31st January, 1961 should disclose the respective capital interests of the parties as of the date of dissolution. Since it appears that it was customary to charge any operating loss to the Wedlake interest, in arriving at the balance according to such statements the net loss for the period from 31st

January, 1961 to 25th May, 1961, according to a trading statement to be prepared in a manner similar to that appearing in the statements of the 31st January, 1961, should be deducted from the Wedlake capital interest.

**24**    There being no provision in the partnership agreement to the contrary, the rights of the parties will fall to be settled according to sec. 44 of The Partnerships Act, R.S.O. 1960, c. 288. I assume that in arriving at the net amount of $36,608.99, effect has already been given to the provisions of clause 1 and clause 2, sub-clauses (a) and (b) of sec. 44. Since the cash remaining as the sole asset of the partnership obviously is less than the combined total of the partnerships capital accounts according to the books of the partnership, it should be applied in paying to each partner rateably what is due from the firm in respect of capital according to the final statement of accounts to be prepared as above indicated. This having been done, the whole matter in issue between the partners will have been finally settled and each one will be released from any further obligation to the other.

**25**    The appeal will therefore be allowed and the judgment of 17th January, 1962 set aside and in its place judgment should be entered declaring the rights of the parties with respect to the sum of $36,608.99 arising from the liquidation of the assets of the partnership to be as I have set out in the immediately preceding paragraph, and declaring that Wedlake is under no obligation to the Elliott executors with respect to any balance of the purchase price of the interests of George Andrew Elliott and his estate in the partnership.

**26**    There should be no order as to costs either in this Court or the Court of first instance save to protect the rights of the Elliott executors to their costs out of the estate of the said George Andrew Elliott.

KELLY J.A.
 ROACH J.A.:-- I concur.
 GIBSON J.A.:-- I agree.

qp/s/cbk/sab



PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

2008 ONCA 176
Ontario Court of Appeal

PUC Distribution Inc. v. Brascan Energy Marketing Inc.

2008 CarswellOnt 1301, 2008 ONCA 176, 164 A.C.W.S. (3d) 793

# PUC DISTRIBUTION INC. (Applicant / Respondent) and BRASCAN ENERGY MARKETING INC. (Respondent / Appellant)

J. MacFarland J.A., M.J. Moldaver J.A., and S.E. Lang J.A.

Heard: February 13, 2008
Judgment: March 11, 2008
Docket: CA C46729

Proceedings: reversing *PUC Distribution Inc. v. Brascan Energy Marketing Inc.* (2006), 2006 CarswellOnt 3785 (Ont. S.C.J.) [Ontario]

Counsel: Alan H. Mark, Kelly L. Friedman for Appellant
James D.G. Douglas, Morgana Kellythorne for Respondent

Subject: Contracts; Civil Practice and Procedure

**Table of Authorities**

**Cases considered:**

*McKellar, Re* (1972), 27 D.L.R. (3d) 289, [1972] 3 O.R. 16, 1972 CarswellOnt 350 (Ont. H.C.) — referred to

*McKellar, Re* (1973), [1973] 3 O.R. 178, 36 D.L.R. (3d) 202n, 1972 CarswellOnt 449 (Ont. C.A.) — referred to

APPEAL by company of judgment reported at *PUC Distribution Inc. v. Brascan Energy Marketing Inc.* (2006), 2006 CarswellOnt 3785 (Ont. S.C.J.) [Ontario], granting municipality's appeal of arbitrator's decision.

**Per Curiam:**

**Introduction**

1     This appeal relates to the interpretation of a series of contracts for the supply of electrical power. The sole issue on appeal is whether these contracts continue to include a perpetual right to renew a supply of 5000 horsepower of electricity at a preferential rate, as originally provided in the initial 1928 contract. The arbitrator, Earl Cherniak, Q.C., held that the perpetual right to renew had been extinguished. On appeal to the Superior Court of Justice, Perell J. held that the perpetual right to renew remained extant and overturned the arbitrator's decision. For the reasons that follow, we would allow the appeal and restore the arbitrator's award, although for reasons that differ somewhat from those expressed by the arbitrator.

**Background**

*(a) The Facts*

2     The appellant, Brookfield Energy Marketing Inc., formerly known as Brascan Energy Marketing Inc., is the marketer of power for Great Lakes Power Company, Limited ("GLP") and is the assignee of the contracts at issue in this appeal. GLP was a

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

supplier of electricity to the respondent, PUC Distribution Inc. (PUC), which is the successor to the Public Utilities Commission of the City of Sault Ste. Marie.

3    In 1928, the parties entered into a written agreement (the "1928 Agreement"). GLP agreed to supply PUC with 5000 horsepower of electricity at a preferential rate (the "5000 hp block"). Specifically, paragraphs 1(a) and (b) of the 1928 Agreement provided the following:

> 1. The COMPANY [GLP] AGREES:

> > (A) To continue to reserve and to supply and deliver to the Corporation [PUC] the four thousand (4000) horsepower hereinbefore referred to, at the rate of Twenty-two Dollars ($22.00) per horse-power per annum;

> > (B) To reserve, to supply and deliver to the Corporation [PUC] one thousand (1,000) horse-power additional electric energy, within three (3) months from the execution of this agreement, the same to be delivered and to be paid for in amounts as and when used by the Corporation [PUC], at Twenty Dollars ($20.00) per horse-power per annum, for said one thousand (1,000) horsepower;

In addition to the 5000 hp block, the parties agreed that GLP would deliver an additional block of electricity at a separate price.

4    The 1928 Agreement had a term of ten years, and provided that the entire contract was renewable for three additional ten-year terms. However, it also provided that the 5000 hp block was renewable for successive ten-year terms in perpetuity, provided that written notice was given by PUC to GLP six months before the end of each term (the "perpetual renewal provision"). The terms of renewal were set out in paragraph 12 of the 1928 Agreement as follows:

> This contract shall be and remain in full force and effect for a period of ten (10) years from the date hereof and at the expiration of the said ten (10) years the Corporation [PUC] shall have the right to renew the said contract on the same terms and conditions, for a further period of ten (10) years and on the expiration of the said renewal then for further renewals of ten (10) years each up to and including a third renewal so as to make the term of this contract with renewals, optional to the Corporation [PUC], a period of forty (40) years, and *in so far as this contract refers to and deals with the blocks of power referred to in clauses "a" and "b" in paragraph 1, hereof, the Corporation [PUC] shall have the right beyond the said forty (40) year period for such further renewal periods of ten (10) years each as the Corporation [PUC], at its option, may decide to enter into.* In case of any renewal the Corporation [PUC] shall give the Company [GLP] six (6) months' notice in writing of its intention so to do.

> This agreement shall be binding upon and enure to the benefit of the parties hereto and the successors and assigns of the parties hereto. [Emphasis added.]

5    Further ten-year agreements were entered into between the parties in 1937, 1949, 1959, 1969 and 1979 regarding the provision of the 5000 hp block at the rates specified in the 1928 Agreement and the provision of an additional electricity block.

6    In 1987, PUC failed to deliver a timely notice of renewal, and therefore the 1928 Agreement lapsed with respect to the 5000 hp block.

7    However, in 1989, the parties entered into a new ten-year agreement (the "1989 Agreement") under which GLP agreed to provide electricity to meet all of PUC's needs. This included supply of the 5000 hp block at the rates specified in the 1928 Agreement, but no provision was made for any right of renewal.

8    Subsequently, in 1998, the parties entered into a further agreement (the "1998 Agreement") that amended and extended the 1989 Agreement for a further potential ten-year term (two potential renewals of five years each), dependent on the parties' agreement on rates. The 1998 Agreement expressly provided that only those provisions of the 1928 Agreement that had been incorporated by reference into the 1989 Agreement continued to exist. As with the 1989 Agreement, the 1998 Agreement made no provision for any right of renewal with respect to the 5000 hp block.

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

9    In 2003, the 1989 Agreement as amended by the 1998 Agreement came to an end when the parties could not agree on rates going forward. PUC contended that notwithstanding the termination of that agreement, the 1928 Agreement continued to exist and continued the obligation to supply the 5000 hp block at the rates specified in the 1928 Agreement in perpetuity, subject to the required notice of renewal every ten years. GLP, on the other hand, argued that the 5000 hp block component of the 1928 Agreement, including the perpetual renewal provision, expired in accordance with its terms in 1987; that the 1989 Agreement as amended by the 1998 Agreement did not provide for any further renewals; and that the parties' entire relationship ended in 2003.

*(b) The Arbitrator's Decision*

10    This dispute was heard by an arbitrator, pursuant to the parties' contractual agreement to submit disputes to arbitration. In reasons dated February 25, 2005, the arbitrator found in favour of GLP. He found that although the 1989 Agreement was ambiguous as to whether PUC had a separate and perpetual right to renew the 5000 hp block, the 1998 Agreement resolved that ambiguity and made it clear that no such right to renew continued to exist.

11    On the interpretation of the 1989 Agreement, the arbitrator found at para. 51 of his reasons:

The question to be addressed is whether the 1989 agreement, and by extension the 1998 agreement, entirely apart from the question of waiver, was intended by the parties to renew the 5,000 horsepower block as provided for in the 1928 agreement, or to acknowledge the continued independent existence of the 1928 agreement as it applied to the 5,000 horsepower block. If I was only interpreting the 1989 agreement, I would find ambiguity, because of the conflict between clause 1.0 which reads:

**1.0 Term of Agreement**

1.1 This Agreement shall commence on the first day of January, 1989, hereinafter referred to as the "Commencement Date" and, subject to paragraph 1.2 hereof, shall continue in force until December 31, 1998, unless earlier terminated in accordance with clauses 5.5 [supply of power after termination deemed not to renew] or 5.7 [right to discontinue supply to safeguard life or property or for construction, etc.] or by mutual agreement.

1.2 In the event that power is supplied by Great Lakes [GLP] to the Commission [PUC] after the expiration of the Term of this Agreement as defined above, the provisions of this Agreement shall continue in full force and effect until this Agreement is terminated by either party by giving written notice of such termination to the other party.

and those clauses of the 1989 agreement which refer to the 1928 agreement as if still extant, including the second preamble, cl. 2.1 (a), cl. 5.2 and clauses 7.3 and 7.4. On the one hand, the 1928 agreement had not been renewed in accordance with its terms prior to the 1989 agreement, and the 1989 agreement provides for termination at the end of December 31, 1998, with no renewal clause, together with the right to remove all its apparatus equipment and works at the end of the term, making it impossible to continue to supply power. On the other hand, the preamble and cl. 2.[1] (a), read with cl. 7.4, seem to acknowledge the continued existence of the 1928 agreement, at least with respect to the 5,000 horsepower block, and to allow for the existence of the 1989 agreement notwithstanding cl. 10 of the 1928 agreement, though the 1928 agreement expired by its terms in 1968, except for the 5,000 horsepower block. There was no evidence of any objective surrounding circumstances or commercial context in the 1989 time frame that would shed light on the parties' intentions to clear up this ambiguity.

12    The arbitrator then considered whether the 1998 Agreement resolved the ambiguity in the 1989 Agreement. Based on his interpretation of the 1998 Agreement, the arbitrator concluded at para. 54 of his reasons that the terms of the 1928 Agreement that were incorporated by reference into the 1989 Agreement did not include the perpetual renewal provision:

Reading the preamble to the 1998 agreement makes it clear that the 1928 agreement had been "amended and extended" by the 1989 agreement, and when the parties recited that they desired "to further amend and extend the terms of the 1989 agreement", they were incorporating into that extension and amendment the entire relationship between them, including

what remained of the 1928 agreement. That conclusion is reinforced by cl. 5, referring to "those terms of the 1928 agreement incorporated by reference therein" and by clauses 2.1(a) and 5.2 of the 1989 agreement, which had the effect of providing for the 5,000 horsepower block at the prices agreed to in 1928. The circumstances make it clear that the terms of the 1928 agreement that were incorporated in the 1989 agreement did not include the right of renewal. In the economic climate that faced them in 1998, the parties were providing for the short term, with the hope, but not necessarily the expectation, that the relationship could continue beyond the 5 year fixed term they agreed to. In 1989, they had provided for a 10 year term, but no right of renewal.

13    Moreover, the arbitrator based his conclusion on the commercial sense of the situation, noting at para. 58 of his reasons:

The interpretation advocated by the PUC ... would leave, notwithstanding the termination of the relationship, the requirement for delivery by GLP of a very small fraction of the power requirements of Sault Ste. Marie, while at the same time making it impossible for GLP to exercise its contractual right to remove its equipment, works and apparatus from the city on termination. The continuation of the 5,000 horsepower block first agreed in 1928 made commercial sense as a benefit given to the PUC while GLP was the exclusive supplier of power to Sault Ste. Marie. It made no commercial sense thereafter.

*(c) The Appeal Judge's Decision*

14    PUC appealed the arbitrator's award to the Superior Court of Justice. In reasons dated June 21, 2006, the appeal judge allowed PUC's appeal and held that the perpetual renewal right remained extant. As a result, he granted a declaration requiring GLP to sell the 5000 hp block to PUC in accordance with the rates specified in the 1928 Agreement.

15    Applying the principles of contract interpretation, the appeal judge found that there was no ambiguity in the 1989 Agreement. Rather, he held that the 1989 Agreement included both a right to the 5000 hp block, as well as the perpetual right to renew that right. The appeal judge provided the following reasons for his conclusion:

[74] The recital of the [1989 Agreement] contains the words "is now under original contract bearing date February 8, 1928," which is the identical language found in the [1969 Agreement] and the [1979 Agreement]. The recital, standing alone and supported by the contractual provisions that I will describe momentarily bring me to the conclusion that the parties intended that the [1928 Agreement] in so far as it dealt with the 5,000 units of energy continued to exist, notwithstanding that there is no evidence that PUC gave the formal written notice of renewal as required by the [1928 Agreement].

[75] As a conceptual matter, I do not think it matters whether the un-renewed [1928 Agreement] was dead and revived by the [1989 Agreement] or whether the un-renewed [1928 Agreement] was incorporated by reference into the [1989 Agreement], the continued existence of the [1928 Agreement] is in effect a promise or commitment made by the parties in the [1989 Agreement]. Conceptually, the [1928 Agreement] could exist as a separate contract or as an embedded contract within the [1989 Agreement]. The fundamental point is that the parties promised each other that GLP "is now under the [1928 Agreement]."

The appeal judge noted that this conclusion was confirmed by the recitals and by clauses 2.1(a), 5.2(a), 7.3, and 7.4 of the 1989 Agreement.

16    Having found the 1989 Agreement to be unambiguous, the appeal judge further concluded at para. 88 of his reasons that:

To the extent that the Arbitrator's conclusion is an interpretation of the [1998 Agreement], I disagree with it. In my opinion, properly interpreted, the [1998 Agreement] gave the parties the unilateral means to terminate the [1998 Agreement], but it did not give the parties the unilateral means to terminate their "relationship". In my opinion, the termination of the "relationship" would depend upon PUC releasing GLP from its obligation to supply the 5,000-unit block of energy, pursuant to the [1928 Agreement].

**Analysis**

PUC Distribution Inc. v. Brascan Energy Marketing Inc., 2008 ONCA 176, 2008...

2008 ONCA 176, 2008 CarswellOnt 1301, 164 A.C.W.S. (3d) 793

17    The sole issue on appeal is whether the appeal judge erred in interpreting the agreements between the parties as leaving the perpetual renewal provision extant.

18    For the reasons set out below, we are of the view that the appeal judge erred in failing to give adequate weight to the fact that the 1928 Agreement lapsed in respect of the 5000 hp block in 1987, when PUC failed to deliver a timely notice of renewal. Further, the appeal judge made several errors in his interpretation of the 1989 Agreement and 1998 Agreement in supporting his conclusion that the 1928 Agreement continued to exist with respect to the perpetual renewal provision. As a result, his conclusion that that provision remained extant cannot stand.

### (a) Lapse of the 1928 Agreement

19    In construing the 1989 Agreement and 1998 Agreement as he did, the appeal judge failed to give adequate weight to the fact that the provision in the 1928 Agreement regarding the 5000 hp block lapsed entirely in 1987 due to PUC's failure to give the required renewal notice. Thus, the perpetual renewal provision was no longer in effect when the parties entered into the 1989 Agreement. Accordingly, the appeal judge's reliance on the wording of the 1969 and 1979 agreements in construing the 1989 Agreement was misplaced, as the perpetual renewal provision was still in effect for those agreements. As a result, in comparing the language of the 1969 and 1979 agreements to that of the 1989 Agreement and 1998 Agreement, the appeal judge was effectively comparing apples and oranges. The intervening lapse of the 1928 Agreement in 1987 means that the 1969 and 1979 agreements cannot be equated with the later agreements for comparison purposes.

20    The error becomes especially apparent in light of the unique and highly unusual nature of the perpetual renewal provision. That provision enabled PUC to take advantage of favourable rates in perpetuity. As such, it represented a significant benefit to PUC and an equally significant detriment to GLP. In the circumstances, given the lapse of the perpetual renewal provision with respect to the 5000 hp block in 1987, we are of the view that if the parties intended to resurrect it, clear language was required. No such language exists in either the 1989 Agreement or the 1998 Agreement.

21    In so concluding, we note that waiver of the 1987 lapse is a non-issue as found by both the arbitrator and the appeal judge.

### (b) Interpretation errors

22    The appeal judge also made several specific errors in his interpretation of the 1989 Agreement that further undermine the finding that the perpetual renewal provision of the 1928 Agreement remained extant.

23    First, the appeal judge erred in his interpretation of clause 7.4 of the 1989 Agreement, which amended paragraph 10 of the 1928 Agreement. Paragraph 10 provided that "this agreement shall constitute the sole and only contract dealing with the supply of electrical energy between the parties". However, clause 7.4 of the 1989 Agreement amended paragraph 10 of the 1928 Agreement as follows:

> Paragraph 10 of the original contract bearing date February 8, 1928, hereinbefore mentioned, is hereby amended to allow the existence of this present separate contract for the supply of additional power. It is expressly understood and agreed by the parties hereto that the mentioned Paragraph 10 of earlier contract shall in no way act to jeopardize or mitigate any of the provisions of this present contract.

24    The appeal judge relied heavily on this clause to conclude that all of the terms of the 1928 Agreement were incorporated into the later agreements, including the perpetual renewal provision, unless specifically altered by the later agreements.

25    In our view, clause 7.4 of the 1989 Agreement cannot operate in the manner suggested by the appeal judge, given the unusual nature of the perpetual renewal provision and the fact that, to the knowledge of the parties, it had lapsed prior to the 1989 Agreement. Rather, clause 7.4 can be explained by the fact that other provisions of the 1928 Agreement remained extant, and to the extent that those provisions were not altered, the parties intended that they be carried forward on the same terms.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

For example, the definition provision in paragraph 2(e) of the 1928 Agreement would have been carried forward into the 1989 Agreement.

26    Second, the appeal judge erred in his reliance on clause 7.3 of the 1989 Agreement in support of his conclusion. Clause 7.3 maintained the existing rights of the parties under existing agreements. Specifically, it provided:

> It is further understood and agreed that nothing herein contained, save and except for the sale, delivery and use of power, shall affect, abridge, alter or curtail any of the existing rights of the parties hereto under any existing agreement dealing in any way with the relations of the parties hereto or any rights, benefits, or privileges of either of the parties hereto under said agreements, particularly in regard to property rights under said agreements.

27    In our view, because clause 7.3 refers to "existing rights" under an "existing agreement", it does not support the appeal's judge's conclusion. The 1928 Agreement was no longer an "existing agreement" except insofar as some of its provisions, like the definition provision in paragraph 2(e), had been carried forward in the later agreements. The perpetual renewal provision was not such a provision, hence it was not an "existing right"; rather, it was a right that had been extinguished.

28    Third, we are of the view that the appeal judge erred in his reliance on clauses 2.1(a) and 5.2(a) of the 1989 Agreement in support of his conclusion. Clause 2.1(a) provided:

> Great Lakes [GLP] agrees:
>
> > (a) To continue to reserve for and deliver to the Commission [PUC] the electrical energy hereinbefore referred to and specified in the said original contract bearing date February 8, 1928.

29    Clause 5.2(a) provided:

> The Commission [PUC] shall pay to Great Lakes [GLP] for power hereunder the aggregate of the Demand Charge for the month and the Energy Charge for the month, calculated as follows:
>
> > (a) <u>Power Supplied under the Contract dated February 28, 1928</u>
>
> 4,000 HP at the rate of $22.00 per HP per year
>
> 1,000 HP at the rate of $20.00 per HP per year

30    In our view, clauses 2.1(a) and 5.2(a) merely relate to the continued supply of the 5000 hp block and not to the perpetual renewal provision. We note that in the 1928 Agreement, the perpetual renewal provision was clearly separated from the supply provision. Accordingly, if the parties had intended to resurrect the perpetuity aspect of the 1928 Agreement, it should have been specifically referred to.

31    Finally, at a critical point in his analysis, the appeal judge appears to have relied on a recital to the 1989 Agreement that references the 1928 Agreement as evidence of a mutual promise between the parties that the 1928 Agreement was alive. This elevation of a recital to a mutual promise or operative provision was material to the interpretation reached by the appeal judge. With respect, that approach was in error: see *McKellar, Re*, [1972] 3 O.R. 16 (Ont. H.C.), at 26; aff'd [1973] 3 O.R. 178 (Ont. C.A.).

### (c) Other errors

32    In our opinion, the appeal judge's reasons disclose two other errors in his general approach to the interpretation of the agreements.

33    First, we note that PUC did not give the required notice of its intention to renew in 1997, as would have been required by the terms of the perpetual renewal provision in the 1928 Agreement. This fact also belies the appeal judge's interpretation that the perpetual renewal provision of the 1928 Agreement had been revived.

34    Second, as a matter of practical concern, on the construction given to them by the appeal judge, the 1989 Agreement and 1998 Agreement are silent as to the timing of the notice required for any future renewal and/or the manner in which the right of renewal is to be exercised. The absence of such important terms, particularly in a clause of this far-reaching nature, is in our view neither reasonable nor commercially sound. This also supports our view that the parties did not intend to resurrect the perpetual renewal provision in the 1989 Agreement and 1998 Agreement.

*(d) Conclusion*

35    Properly construed, the 1989 Agreement and 1998 Agreement did not revive the perpetual renewal provision of the 1928 Agreement in relation to the 5000 hp block. On the contrary, these agreements provided PUC with a preferential price for a fixed term only.

**Disposition**

36    Accordingly, we would allow the appeal, set aside the decision of the appeal judge and restore the award of the arbitrator.

37    The costs of the appeal and of the application for leave to appeal are awarded to the appellant in the total amount of $21,000, inclusive of disbursements and GST. Costs below should follow the disposition of this appeal.

*Appeal allowed.*

---

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2008 CarswellOnt 5591, 2008 CarswellOnt 5592, 256 O.A.C. 390 (note)...

2008 CarswellOnt 5591
Supreme Court of Canada

PUC Distribution Inc. v. Brascan Energy Marketing Inc.

2008 CarswellOnt 5591, 2008 CarswellOnt 5592, 256 O.A.C. 390 (note), 390 N.R. 398 (note)

## PUC Distribution Inc. v. Brascan Energy Marketing Inc. (now named Brookfield Energy Marketing Inc.)

Abella J., Binnie J., Rothstein J.

Judgment: September 25, 2008
Docket: 32632

Proceedings: Leave to appeal refused, 2008 ONCA 176, 2008 CarswellOnt 1301 (Ont. C.A.); Reversed, 2006 CarswellOnt 3785 (Ont. S.C.J.)

Counsel: None given

Subject: Contracts; Civil Practice and Procedure

**Per Curiam:**

1    The application for leave to appeal from the judgment of the Court of Appeal for Ontario, Number C46729, 2008 ONCA 176, dated March 11, 2008, is dismissed with costs.

---

End of Document      Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights
reserved.



*Case Name:*

# 1124980 Ontario Inc. (c.o.b. Health-Care Pharmacy) v. Liberty Mutual Insurance Co.

**Between**
**1124980 Ontario Inc., carrying on business as "Health-Care**
**Pharmacy", applicant, and**
**Liberty Mutual Insurance Company and Inco Ltd., respondents**

[2003] O.J. No. 1468

[2003] O.T.C. 333

33 B.L.R. (3d) 206

123 A.C.W.S. (3d) 65

Court File No. 02-CL-4735

Ontario Superior Court of Justice
Commercial List

**Epstein J.**

Heard: December 17, 2002.
Judgment: April 22, 2003.

(102 paras.)

*Contracts -- Assignment -- Prohibition against -- Master and servant -- Remuneration -- Benefits --*
*Insurance -- Group insurance -- Duties of insurer.*

Application by Health-Care Pharmacy for a declaration that it was entitled to receive assignments
from Inco employees of their rights to be reimbursed by the respondent, Liberty Mutual Insurance,
for prescription drug charges. The Pharmacy had refused to enter into a letter of understanding with
Inco whereby it would limit its dispensing fee. Inco instructed Liberty to refuse to recognize
assignments of benefits by its employees in favour of the Pharmacy. Liberty acknowledged the
obligation to reimburse Inco's employees directly. Inco and Liberty signed a contract setting out

reimbursement and assignment rights. Liberty advised employees that they had the right to assign payment of expenses to care providers but stated that the assignment right could be cancelled at any time. The Pharmacy entered into a provider agreement after the above letter was written. The provider agreement allowed for the assignment of reimbursement to the Pharmacy. It referred to contracts detailing the obligation of Liberty to reimburse employees.

HELD: Application dismissed. Liberty was entitled to limit the conditions under which employees could assign their right to reimbursement. Under the provider agreement, the Pharmacy was bound by the agreement between Inco and Liberty, including the provision whereby assignment rights could be curtailed.

**Statutes, Regulations and Rules Cited:**

Conveyancing and Law of Property Act, R.S.O. 1990, c. C.34, s. 53(1).
Ontario Drug Benefit Act, R.S.O. 1990, c. O.10.

**Counsel:**

Charles Scott and David E. Gruber, for the applicant.
Larry P. Lowenstein and Mahmud Jamal, for the respondents.

---

**1    EPSTEIN J.:--** At issue in this case is the applicant's right to receive an assignment of drug benefits under a series of group benefit plans for employees of Inco Ltd. Under these group benefit plans, Inco's employees, retirees and their eligible dependants are covered for prescription drugs, plus the pharmacist's customary dispensing fee, less a $0.35 deductible for each prescription. The respondent, Liberty Mutual Insurance Company, administers these plans.

**2**    The applicant, 1124980 Ontario Inc., carrying on business as Health Care Pharmacy, is a company that owns and operates a pharmacy in the Sudbury area. It seeks a declaration that it is entitled to receive assignments from those individuals covered under the various group benefit plans (the "Inco benefit plans") of their right to be reimbursed for covered prescription drug charges.

General Background

**3**    The applicant refused to enter into a letter of understanding with Inco Ltd. ("Inco") under which Inco proposed that the applicant would limit its dispensing fee charged to customers covered under the Inco benefit plans to $6.47. This is the amount charged to the government for social assistance prescription drug benefits under the Ontario Drug Benefit Act, R.S.O. 1990, c. O.10. In response to the applicant's decision not to enter into the letter of understanding, Inco instructed the Liberty Mutual Insurance Company ("Liberty Health"), to refuse to recognize assignments of benefits made

by individuals covered under the plans in favour of the applicant. Inco acknowledges the obligation to pay the cost of prescriptions and the dispensing fee the applicant and other pharmacies charge to those entitled to benefits, but it refuses to allow the right of assignment to be exercised in favour of the applicant to enable direct payment to the pharmacy.

The Facts

**4**   In setting out the facts, I have borrowed heavily from the detailed facta prepared by counsel for both parties.

    A.   The Agreements

**5**   A number of agreements are relevant to the issues raised in this proceeding.

       (i)   The Collective Agreements

**6**   Inco has approximately 4,500 active employees (3,300 of whom are unionized) and approximately 14,000 retirees in the Sudbury area. Its unionized and non-unionized employees and retirees are entitled to health care benefits, including prescription drug benefits, under their collective agreements or other employment or retirement arrangements.

**7**   The majority of Inco's unionized employees receive health care benefits pursuant to the terms of a collective agreement made between Inco and the United Steelworkers of America, Local 6500 dated June 1, 2000. Article 24 of that collective agreement provides:

> 24.01 The employees covered by this Agreement shall receive the benefits of ... a Group Plan for Prescription Drugs (providing coverage equivalent to the Liberty Health plan for prescript drugs - Formulary 2 - $0.35 deductible), ... all Plans are subject to and in accordance with the terms and conditions as set out in this Article and in the Plans, all of which ... form part of this Agreement.

**8**   A minority of Inco's unionized employees in Sudbury are covered under another collective agreement between Inco and the United Steelworkers of America, Local 6600, dated April 1, 2001. Article 20.01 of that collective agreement provides that Inco will pay the premiums for a Prescription Drugs Plan for eligible employees.

       (ii)   The Inco Sudbury Group Benefit Agreements (between Inco and Liberty Health)

**9**   In order to provide prescription drug benefits to each of its employees and retirees (hereinafter referred to as the "Covered Persons") in the Sudbury area, Inco entered into a variety of Group Benefit Plan Agreements (collectively the "Inco Sudbury Group Benefit Agreements") with Ontario Blue Cross, whose business was acquired in 1995 by Liberty Health.

**10**   These agreements set out the benefits Liberty Health provides on Inco's behalf. Each of the

Inco Sudbury Group Benefit Agreements provides, in part, as follows:

11.  A Covered Person may obtain services or supplies for which coverage is available under this agreement from any ... provider of his or her choice.

12.  Payments will be made for charges eligible as benefits for ... services or supplies upon presentation of written proof of claim satisfactory to [Liberty Health] subject to the terms and conditions of this agreement, provided that:

(a)  all or a portion of any eligible charges shall be paid directly to the provider of the ... service or supply which has an agreement with [Liberty Health], or

(b)  in the absence of an agreement with [Liberty Health], all or a portion of any eligible charges shall be paid to the provider upon the written direction of the Covered Person who is the principal certificate holder, or

(c)  payment of eligible charges other than as described in (a) and (b) above, shall be made to the Covered Person who is the principal certificate holder.

**11**    In September 1995, Liberty Health amended all its group benefit plans, including the Inco Sudbury Group Benefit Agreements. In a letter sent to all Covered Persons, Liberty advised as follows:

To reflect our current claims practices regarding assignment, we are also adding the following clause to your contract(s):

ASSIGNMENT

Liberty Mutual allows the Covered Person who is the principal certificate holder to assign the payment of eligible expense to the provider of the care, service or supply, which has an agreement with Liberty Mutual, unless otherwise stated in the provision entitled "Payment".

However, Liberty Mutual reserves the right to cancel the above right, which subsequently may be reinstated at any time.

Please retain this letter with your other group insurance documents because it serves as your notice of this contract amendment.

**12**    The applicant notes that there is no provision entitled "Payment" in the contract. In my opinion, this does not affect the arguments or the outcome in this case in any way.

> (iii)    The Administrative Services Only Agreement (between Inco and Liberty Health)

**13**    Inco and Liberty Health are also parties to an Administrative Services Only (ASO) Agreement, dated August 2002 (the "ASO Agreement"). The ASO Agreement records the financial arrangements between Liberty Health and Inco with respect to prescription drug, semi-private hospital, vision care and dental care benefits provided under the terms of, inter alia, the Inco Sudbury Group Benefit Agreements. The ASO Agreement is stated to define Inco's liability, the method of accounting for deposits, claims, expenses, taxes, interest allowances and treatment of plan surplus and deficit.

**14**    Significantly, the ASO Agreement states that if there exists a conflict between its terms and those of the Inco Sudbury Group Benefit Agreements, the terms of the ASO Agreement govern.

**15**    With regard to the services provided under the ASO Agreement, Article 4.0 states as follows:

> Liberty Health agrees to provide the services as outlined in Appendix "A" under this agreement.

**16**    Appendix "A" to the ASO Agreement provides, in relevant part, as follows:

Liberty Health agrees to provide the following services:

...

Claims Administration

* validate claimant eligibility
* adjudicate and pay claims as per Group Contracts, including cost containment cheques (DRUGCHECK) and Coordination of Benefit Provision
* conduct appropriate claims investigations
* review claims, as necessary, with providers of health services
* attempt to recover any benefit payments, incorrectly paid
* provide medical and dental consultants
* maintain claim files for the Contractholder [Inco]
* any other claim matters to which the Contractholder and Liberty Health may agree from time to time

> (iv)    The Liberty Health Provider Agreement (between Liberty Health and Health-Care Pharmacy)

**17**    In order to administer the Inco Benefit Plans that Liberty Health administers for various plan sponsors such as Inco, Liberty Health enters into direct contractual agreements with pharmacies,

such as the applicant, regarding reimbursement of drug benefits provided by the pharmacies to plan members.

**18**    Liberty Health and the applicant have entered into an agreement referred to as the Liberty Health Provider Agreement (the "Provider Agreement"), under which Liberty Health permits the applicant to receive an assignment of eligible reimbursement from plan members under the various group plans that Liberty Health administers (the "assignment"). This agreement is not specific to Inco's plans, but rather covers the many group plans Liberty Health administers on behalf of many plan sponsors. In other words, this is an umbrella agreement.

**19**    The applicant acquired the pharmacy in issue in October of 1995. Because of the change in store ownership, Liberty Health required a new Provider Agreement to be executed. Accordingly in December 1995 the applicant and Liberty Health entered into Liberty Health Provider Agreement No. 161187, Zone 041, in the standard form provided by Liberty Health.

**20**    The Provider Agreement between the applicant and Liberty Health states:

> WHEREAS Liberty Health has entered into agreements to pay for eligible PRESCRIPTION DRUGS or medicines purchased by subscribers and eligible dependants of subscribers, in accordance with the terms and conditions more particularly set forth in the said agreements which detail such benefits.

> AND WHEREAS the Pharmacy has requested Liberty Health to make payments for the said prescription drugs or medicines directly to it on the consents of the Liberty Health subscribers and their eligible dependants.

> NOW THEREFORE THIS AGREEMENT WITNESSETH, in consideration of the premises and in accordance with the terms and conditions set out on the reverse side, that Liberty Health will make the aforesaid payments to the Pharmacy and the Pharmacy agrees to abide by and perform each and every of the said terms and conditions, and as a specific condition of receiving any payment to indemnify and hold harmless Liberty Health from any claims for the said payments by its subscribers and their eligible dependants or other parties with which Liberty Health has agreed.

> AND THAT this agreement is subject to cancellation by Liberty Health without notice and by the Pharmacy on one month's written notice addressed to Liberty Health, 150 Ferrand Drive, Don Mills, Ontario, M3C 1H6 and sent by prepaid registered post.

**21**    The terms and conditions on the reverse side of the Provider Agreement deal with practical matters pertaining to the financial dealings between the applicant and Liberty Health, such as the manner in which the applicant is to submit claims to Liberty Health, the method and timing of payment, the cost of the product and responsibility for the deductible amounts. No reference is made to any of the contractual arrangements between Inco and Liberty Health.

    B.    Inco's Actions

**22**    Inco's drug plans are entirely self-funded or self-insured. Inco pays the annual drug costs directly out of its revenues. As an indication of the magnitude of these costs, for the year 2001 Inco paid $29.4 million in health care coverage under its various plans.

**23**    Inco participated in a survey in 2001 about health care costs. The results suggested that Inco's drug costs were significantly higher than comparable organizations. Given this result, and the projected increase in prescription drug costs, Inco studied ways of reducing expenses related to health benefits. To that end, in September 2001, Inco issued an "Inco Benefits Initiative Prescription Drugs Update". This document explained to the Covered Persons some of the challenges Inco faced in terms of health care costs. The document advised the recipients that Sudbury area pharmacies charged varying dispensing fees and recommended that Covered Persons use pharmacies with lower dispensing fees. The document also identified a number of Sudbury-area pharmacies with lower dispensing fees (the "preferred providers") that would be permitted to display a sign "Inco Prescription Drug Provider", but noted that plan members were not required to use any of these pharmacies.

**24**    A few months later, in April 2002, Inco sent another letter to the Covered Persons announcing that as of May 13, 2002, Liberty Health would no longer reimburse non-preferred providers directly, but would instead only reimburse the Covered Person. The exception to this new policy is where payment would still be allowed to be made directly from Liberty Health to a non-preferred provider in cases where the nearest preferred provider is located more than two kilometres from the pharmacy the Covered Person would otherwise use.

**25**    On April 16, 2002, Inco sent a letter to Sudbury-area pharmacies, including the applicant, attaching the April 2000 newsletter and a proposed letter of understanding the pharmacies were to execute if they wished to become preferred providers. The applicant did not execute such a letter of understanding.

**26**    On May 3, 2002, Inco wrote another letter to all Sudbury-area pharmacies, including the applicant, in which it set out its view that it was entitled to prevent redirection of reimbursement for goods or services billed to Liberty Health on an Inco benefit plan.

**27**    On May 5, 2002, Inco wrote to the applicant, reminding that the last date to submit letters of understanding was May 8, 2002. Then on May 10, 2002, Inco wrote the applicant and other area pharmacies that had chosen not to sign Inco's proposed letter of understanding, indicating that Inco

had instructed Liberty Health no longer to recognize assignments of benefits from these non-participating pharmacies billed to any of the relevant Inco Sudbury Group Benefit Agreements.

**28**   In response to Liberty Health's refusal to recognize assignments of benefits, the applicant and other non-participating pharmacies began submitting claims manually by correspondence, rather than electronically as had been the common practice. Included with claims submitted manually were copies of an assignment of benefits form as executed by Covered Persons or their agents. Notwithstanding the Covered Persons' execution of assignment of benefits forms, Liberty Health has been issuing payment to the Covered Person instead of to the applicant directly.

**29**   The application record contained examples of claims submitted by the applicant for which payment was made to the Covered Person notwithstanding the assignment of benefits to the applicant. In all cases, whether the claim was submitted electronically or by regular mail, Liberty has reimbursed the Covered Person directly by cheque, rather than reimbursing the applicant.

**30**   On May 29, 2002, the applicant wrote to Liberty Health to demand payment in respect of all the claims that the applicant had sent for processing. On June 21, 2002, Liberty Health replied to the applicant refusing to make payment, regardless of whether executed assignment of benefit forms had been obtained and submitted.

**31**   Against this background, the practical issue that has motivated these proceedings can be summarized as follows. Inco and Liberty Health say that as a result of the contractual relationships that govern the parties and the steps they have taken in accordance with the terms of those relationships, non-participating pharmacies, such as the applicant, are free to continue charging their usual dispensing fee and Inco will pay that fee. Non-participating pharmacies can also continue to use Liberty Health's on-line adjudication system to determine whether certain drugs are eligible under the respective plans, and they can also continue to submit claims electronically to Liberty Health on behalf of the Covered Person. However, non-participating pharmacies are required to obtain payment from the Covered Person directly, and the Covered Person must then seek reimbursement from Liberty Health. Liberty Health, on Inco's behalf, will then reimburse the Covered Person directly for the cost of the drugs and the dispensing fee.

**32**   The applicant contends that it is entitled to receive the Covered Person's assignment of the debt owed by Inco. It has entered into no agreement with Inco that limits its right to receive any such assignment. The applicant argues that rather than restricting the right to receive the assignments, the Provider Agreement between it and Liberty Health specifically provides that the applicant is entitled to be paid directly for prescription drugs and the dispensing fee.

The Issues

**33**   The following issues have been raised for determination:

　　　　　1.    Is this an appropriate case to consider granting declaratory relief?

2. Have the Covered Persons under the Inco Sudbury Group Health Agreements executed legal assignment of their entitlement to be reimbursed prescription drug costs and dispensing fees?

3. Has the right of the Covered Persons to assign their entitlement been limited by the contractual arrangements between Inco and Liberty Health? If so, does this limitation affect the applicant's right to receive payment under such assignments?

Analysis

1. Declaratory Relief

**34** The resolution of the issues raised in this proceeding primarily involves a determination of the parties' rights pursuant to the various agreements set out above. The applicant is seeking a declaration that it is the legal and absolute assignee of the claims of Covered Persons for prescriptions it filled. The decision to grant declaratory relief is within the Court's discretion. The question is whether this is an appropriate case for declaratory relief to be granted if the applicant shows it is legally entitled to the assignments.

**35** Inco and Liberty Health have described what they refer to as the "self-help" remedies the applicant has taken since Inco altered the right of assignment, such as providing customers with charge accounts and allowing them to use credit cards, and requiring the customer to settle the account with the pharmacy once he or she receives reimbursement from Liberty Health. Mr. Beradi, the principal of the applicant pharmacy, admitted on cross-examination that as of December 2, 2002 the applicant was owed only $5,000 in respect of the assignment of benefit forms Inco and Liberty Health had declared invalid. Inco and Liberty Health submit that the issues raised in this proceeding are either de minimis or are matters properly brought before the Small Claims Court. For the reasons that follow, in dealing with whether this is a proper case for declaratory relief, I do not accept the proposition that this application raises issues of such little moment.

**36** As noted above, the decision to grant declaratory relief is within the court's discretion. The principal criterion to which courts refer in the exercise of that discretion is whether there is a practical purpose to the declaration sought. If the declaration sought can be of some use, it will generally be granted, provided that there is a genuine dispute between the parties, the dispute arises from specific facts that are already in existence, and the dispute is still alive. If these considerations are satisfied, a declaration will generally issue, unless it is shown that the utility of granting the declaration is outweighed by inconvenience or embarrassment to the respondent. Such a situation rarely arises in practice because unlike injunctive relief, a declaration generally does not cause any inconvenience since it establishes the rights of the parties and resolves uncertainties.

**37** To meet the criterion of showing a practical purpose, the applicant does not have to be in a position to demonstrate that a material tangible benefit will be derived from the relief sought. Rather, the requirement of utility is satisfied if the declaration would solve a real difficulty with

which the applicant is faced. See Zamir & Woolf, The Declaratory Judgment (London: Sweet & Maxwell, 2002) at paras. 4.092, 4.119-4.120.

**38**    In this proceeding the dispute between the parties is a live one that arises from facts already in existence. Further, it is clear that a material, tangible benefit would be derived from the declaration. The resolution of the dispute over the ability of the applicant to take assignments by way of a declaration would be of practical benefit to the applicant and to others similarly situated.

**39**    The applicant continues to be out of pocket by about $5,000 on assignments taken in respect of pharmacy services rendered in May 2002, that Liberty Health has refused to recognize or pay. More importantly, owing to the position Inco and Liberty Health have taken, the applicant has been compelled to change the manner in which it does business with its customers. Established customers covered under the Inco Sudbury Group Benefit Agreements have been provided with charge accounts that they can use to pay for prescriptions dispensed to them, with their agreement to reimburse the pharmacy when they receive payment from Liberty Health. New Inco customers of the pharmacy are not afforded credit, and must pay for all their prescriptions in cash. Many of the customers of the pharmacy are elderly, and the customers have apparently expressed displeasure at these new arrangements.

**40**    While Inco and Liberty Health have suggested that the applicant could deal with the inconvenience to its customers by encouraging them to use credit cards, to do so would cause the applicant to incur credit card fees that it would not have to pay if the assignments were recognized. If I were to grant the declaration sought, the applicant could go back to the practice of taking assignments from Covered Persons, thereby avoiding the cost and inconvenience of other credit arrangements, and avoiding the reduced volume of customers Inco clearly intends to effect by way of its instruction to Liberty Health to refuse to accept such assignments. These are real, practical benefits to the applicant.

**41**    I conclude that this is an appropriate case to consider whether, on the merits of the case, the Court ought to exercise its discretion to grant the declaratory relief sought.

2.    Legal Validity of the Assignments

**42**    The right in question in this case is the right to assign. Against that background the applicant's argument started with the legal validity of the assignment itself.

**43**    The applicable legislation is the Conveyancing and Law of Property Act, R.S.O. 1990, c. C.34 ("CLPA"). Section 53(1) of the CLPA provides:

> Any absolute assignment made on or after the 31st day of December, 1897, by writing under the hand of the assignor, not purporting to be by way of charge only, of any debt or other legal chose in action of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor

would have been entitled to receive or claim such debt or chose in action is effectual in law, subject to all equities that would have been entitled to priority over the right of the assignee if this section had not been enacted, to pass and transfer the legal right to such debt or chose in action from the date of such notice, and all legal and other remedies for the same, and the power to give a good discharge for the same without the concurrence of the assignor.

**44**    Accordingly, for there to be a valid legal assignment under section 53(1) of the CLPA, four requirements must be met:

    a)    there must be debt or chose in action;
    b)    the assignment must be absolute;
    c)    the assignment must be written; and
    d)    written notice of the assignment must be given to the debtor.

**45**    It is clear from the authorities that these principles apply to assignments of proceeds payable under a policy of insurance: see Al-Qahtani-Shaw-Leonard Ltd. v. Crossworld Freight Ltd. (1987), 60 O.R. (2d) 565 at 581 (H.C.), varied (1988), 66 O.R. (2d) 256 (C.A.); Re Moore (1878) 8 Ch. D. 519 (C.A.). Where an insurer receives notice of an assignment of proceeds payable under an insurance policy, the insurer is obliged to pay the proceeds to the assignee and, although this may be pursuant to the contract with the assignor, the insurer pays out the assignor at its peril.

**46**    The evidence from both Inco and Liberty Health is that the Covered Persons are entitled to be reimbursed for the cost of prescription drugs covered under Liberty Health's formulary 2 plus the pharmacy's usual and customary dispensing fee, less a $0.35 deductible. This right to receive an indemnity under an insurance contract is a chose in action and is capable of being assigned.

**47**    The assignment of benefits form created by Liberty Health, which was used by the applicant and executed by the applicant's customers covered under the Inco Sudbury Group Health Agreements, states: "I hereby assign my benefits payable from this claim to the named provider and authorize payment directly to him/her." There is no language in the form that imposes any condition to the assignment. It is absolute.

**48**    The applicant's customers have executed the assignment of the Liberty Health benefits form and Liberty Health has received the executed forms.

**49**    Based on this analysis alone, the answer to the first question would be in the affirmative. All four requirements for a valid assignment were met. The Covered Persons did execute legal assignment to the applicant of a chose in action, namely their entitlement to be reimbursed for prescription drug costs and dispensing fees.

**50**    However, for the reasons that follow, because of Inco's actions culminating in the May 13, 2002 letter to the Covered Persons and to the Sudbury pharmacies, this previously assignable chose

in action is no longer available for assignment to the applicant, except under limited circumstances.

3.    Effect of the Contractual Arrangements on the Right of Assignment

**51**    As I have said, the key to resolving this dispute involves a determination of the effect of the contractual arrangements between Inco and Liberty Health on the Covered Persons' right to assign, and on the applicant's right to receive, payment from Liberty Health for services and products rendered to Covered Persons.

**52**    First, it is clear that whatever right a party has to assign under a contract may be negated by contract. Halsbury's Laws of England (4th ed. Reissue, 1991, vol. 6) notes at p. 58 that "[i]f there is a provision in a contract prohibiting the assignment of rights thereunder, it appears that any purported assignment will be invalid as regards to the other party to the contract." Further, the Ontario Court of Appeal in Rodaro v. Royal Bank of Canada (2002), 59 O.R. (3d) 74 recently confirmed the right to limit assignment by contract. Doherty J.A. makes this clear at para. 33 when he says that "aside from limitations imposed by statute, public policy or the terms of a specific contract, a party to an agreement may assign its rights, but not its obligations under that agreement, to a third party without the consent of the other party to the contract" [emphasis added]. See also Linden Garden Trust Ltd. v. Lenesta Ltd., [1994] 1 A.C. 85 (H.L.).

**53**    Inco and Liberty Health submit that through their contractual relationships, namely the Inco Sudbury Group Benefit Agreements, as amended in September 1995, and the ASO Agreement, they have expressly restricted the right of assignment by limiting the right of a Covered Person to give an assignment and by limiting the right of a non-participating pharmacy to receive an assignment. Inco and Liberty Health further argue that these agreements are part of the Provider Agreement, since the Provider Agreement incorporated the ASO Agreement and the Inco Sudbury Group Benefit Agreements by reference through the wording in the recitals.

**54**    The position of Inco and Liberty Health on this pivotal point can be broken down into two independent questions: (a) are the agreements between Liberty Health and Inco incorporated into the Provider Agreement by the recitals contained in that agreement?; and (b) if so, do the provisions of the contractual relationships between Inco and Liberty Health allow Liberty Health to modify the right to give and receive assignments?

(a)    The Provider Agreement and the Recitals

**55**    The position advanced by Inco and Liberty Health is that the Provider Agreement specifically states in its opening recitals that Liberty Health has entered into contracts, in particular the Inco Sudbury Group Benefit Agreements and the ASO Agreement, and that by virtue of these recitals these agreements are an integral part of the Provider Agreement. Thus, when Inco and Liberty Health change "claim matters", as they are permitted to do by the ASO Agreement, or change rights of assignment under the 1995 amendment to all of Liberty Health's group plans, these changes bind the pharmacies. In other words, Inco argues that the ASO Agreement and the group plans (in

particular the Inco benefit plans) are incorporated by reference into the Provider Agreement, and that the applicant can have no greater rights regarding assignment than the customers whose rights of assignment are dealt with in the various group plans and administered by the ASO Agreement.

56    The applicant counters with the submission that nothing turns on the recitals in the Provider Agreement. The applicant submits that in law a recital to a written instrument will not create a covenant where the operative part of the instrument contains an express covenant dealing with the same subject matter.

57    From Halsbury's Laws of England (4th ed. Reissue, 1991, vol. 12) at paras. 1509-1511 and 1515, it is settled law that recitals do not control the operative part of an instrument. Where the operative part is clear, it is treated as expressing the intention of the parties, and it prevails over any suggestion of a contrary intention afforded by the recitals. There are exceptions to this proposition, the most notable being where there is an ambiguity in the operative part.

58    I digress for a moment to consider Inco and Liberty Health's second argument on this point. In addition to pointing to the recitals, counsel for Inco and Liberty Health rely heavily on the decision in Canada (Attorney General) v. 3068529 Manitoba Ltd. (2000), 7 B.L.R. (3d) 140 (Man. Q.B.), appeal dismissed (2000), 9 B.L.R. (3d) 159 (Man. C.A.) (the "Manitoba case") in support of this part of their argument. Inco and Liberty Health seek to rely on the Manitoba case for the proposition that the terms of specific group plans and other agreements relating to the administration of benefits are incorporated by reference into the umbrella pharmacy agreements. They also argue that the Manitoba case stands for the proposition that pharmacies are bound by the terms of each of the group plans when they dispense prescription drugs to plan members.

59    In my view, the Manitoba case is distinguishable and provides little, if any, assistance in my determination of the issues raised in this application, because of the importance of the specific wording of the contracts in issue.

60    The facts in the Manitoba case were as follows. The Medical Services Branch of Health Canada provided health benefits, including prescription drugs and other non-prescription products, free of charge to First Nations and Inuit clients (the "Aboriginal Covered Persons") who did not otherwise have insurance coverage. The program was referred to as the "non-insured health benefits program" or "NIHB". An Aboriginal Covered Person provided a valid prescription at a "participating pharmacy" and the pharmacy dispensed the prescription without charge to the Aboriginal Covered Person. If no other program covered the prescription, the pharmacy then submitted a claim for payment to the NIHB program.

61    The Medical Services Branch of Health Canada did not process the claims from pharmacies directly, but instead contracted with claims processors who processed claims on its behalf. At all relevant times, Liberty Health was the payor and collector of information under the NIHB, having taken over the contractual relationship with Health Canada in 1995.

**62**   In Manitoba, those pharmacies wishing to act as providers in the NIHB were required to sign written "pharmacy agreements", which established the terms and conditions of the program and provided the mechanism by which drug claims were to be submitted for processing and payment. The report of the case suggests, without necessarily making it clear, that these pharmacy agreements were general umbrella agreements and were not specific to the NIHB, and were therefore similar to the Provider Agreement the applicant and Liberty Health entered into in the instant case.

**63**   Upon execution of a pharmacy agreement and registration in the NIHB program, each provider pharmacy was then provided with a Pharmacy Information Kit ("PIK"), a comprehensive document setting out the conditions to be met for a given benefit to be payable by Health Canada, similar to the Inco benefit plans in issue in this proceeding. The contracting pharmacy was entitled to submit claims to Liberty Health, but only pursuant to the terms and conditions set out in the PIK.

> The Manitoba Court of Queen's Bench held at para. 13 that the terms and conditions of the PIK formed an "integral part" of the pharmacy agreement, even though they were provided to the pharmacy after the pharmacy agreement was executed, because the pharmacy agreement indicated that Blue Cross (later Liberty Health) had "entered into agreements to pay for certain prescription drugs purchased by subscribers in accordance with the terms and conditions more particularly set forth in the said agreements which detailed such benefits". The Court held that this statement incorporated by reference the terms of each of the group plans administered by Liberty Health.

**64**   The issue in the Manitoba case was whether Health Canada had a right to audit the books of participating pharmacies after the pharmacy agreements had been terminated. The audit right was contained in the pharmacy agreement, as well as in the PIK. A number of pharmacies had allegedly engaged in fraudulent practices with respect to the NIHB program, and Health Canada wanted to audit the books of participating pharmacies. The pharmacy agreements with two pharmacies alleged to have engaged in fraudulent practices were terminated by Liberty Health in a letter to those pharmacies, in which Liberty Health said that it was "terminating the right of assignment of claims" under the NIHB. The Court of Queen's Bench described this communication as follows:

> On July 16, 1998, a letter was sent by Liberty Health to Arbor Drugs and Wellness Pharmacy terminating the right of assignment of claims as of the close of business on July 17, 1998. The letter from Liberty Health stated:

>> As the administrator of Health Canada [sic] health information and claims processing system for the non-insured benefits program, we wish to advise you that Liberty Health is terminating your right of assignment of claims. Effective at the close of business July 17, 1998, Liberty Health will no longer accept any claims submitted from your location on behalf of clients

covered under the non-insured health benefits program.

**65**    The Court described the termination of assignment under this program as having the legal effect of terminating the pharmacy agreement. According to the Court, the letter cancelling assignment resulted in "termination of the contract between the parties" in respect of the NIHB program.

**66**    On appeal, the Manitoba Court of Appeal confirmed that the legal effect of this letter cancelling assignment was to terminate the contract between participating pharmacies and Liberty Health in respect of the NIHB program. The Court of Appeal also held that the letter from Liberty Health had the effect of Health Canada terminating the contract. Consistent with this conclusion, the Court of Queen's Bench and the Court of Appeal found that the legal relationship between Health Canada and Liberty Health was one of agency, with Liberty Health acting as agent administering the NIHB on behalf of Health Canada. This is why Liberty Health's letter of termination stated that it was terminating the right of assignment of claims "as administrator of Health Canada", and only in respect of the NIHB program, and why the Court of Appeal held that this resulted in Health Canada terminating the contract.

**67**    To summarize, in the Manitoba case, Liberty Health sent a letter to the pharmacies terminating their right to receive assignment of benefits, and the Court held that the termination of assignment under the program had the effect of terminating the pharmacy agreement in respect of that program.

**68**    While the Manitoba case can be distinguished on a number of bases, the key distinction lies in the applicable contractual arrangements. As previously described, in the scheme the Manitoba court was considering, upon the execution of the pharmacy agreement, the pharmacy received an information package. The PIK was not an agreement involving a third party; it related directly to the relationship between the pharmacy and Liberty Health and not the relationship between Health Canada and the Aboriginal Covered Persons, nor the relationship between Liberty Health and Health Canada.

**69**    The importance of this factual distinction is that the Manitoba court was prepared to incorporate terms of the PIK, an instrument that related directly to the relationship between the pharmacy and Liberty Health, into the provider agreement. The position Inco and Liberty Health are trying to advance in the instant case is quite different. They are advancing the proposition that the terms of agreements between the two of them, agreements to which the applicant is not privy, are incorporated into the Provider Agreement.

**70**    The Manitoba case looks similar to the instant case. Indeed, it involves pharmacies, Liberty Health, a benefits program, covered persons, and sets of contracts among all the players. However, it is not the structure of relationships among the players that can make the Manitoba case similar or dissimilar to the case at bar. Rather, the wording and interpretation of the contracts must prevail. The reported version of the Manitoba case does not refer specifically to the wording of the contracts at issue, only describing at para. 11 that the pharmacy agreement in that case "established the terms

and conditions between the parties and provided for the mechanism by which prescription drug plan claims" were to be submitted. Therefore, the Manitoba case does not shed any particular light on the dispute in the instant case.

**71**    I return therefore to an examination of the Provider Agreement in light of the legal principles expressed above concerning recitals. The parties do not appear to take issue with the statement of law that a recital will not create a covenant where the operative part of the agreement contains an express covenant dealing with the same subject matter. The dispute on this point is whether the recital upon which Inco and Liberty Health rely deals with the same subject matter as the operative part of the Provider Agreement.

**72**    I repeat the terms of the recitals for ease of reference:

> WHEREAS Liberty Health has entered into agreements to pay for eligible PRESCRIPTION DRUGS or medicines purchased by subscribers and eligible dependants of subscribers, in accordance with the terms and conditions more particularly set forth in the said agreements which detail such benefits.

> AND WHEREAS the Pharmacy has requested Liberty Health to make payments for the said prescription drugs or medicines directly to it on the consents of the Liberty Health subscribers and their eligible dependants.

> NOW THEREFORE THIS AGREEMENT WITNESSETH, in consideration of the premises and in accordance with the terms and conditions set out on the reverse side, that Liberty Health will make the aforesaid payments to the Pharmacy and the Pharmacy agrees to abide by and perform each and every of the said terms and conditions, and as a specific condition of receiving any payment to indemnify and hold harmless Liberty Health from any claims for the said payments by its subscribers and their eligible dependants or other parties with which Liberty Health has agreed.

> AND THAT this agreement is subject to cancellation by Liberty Health without notice and by the Pharmacy on one month's written notice addressed to Liberty Health, 150 Ferrand Drive, Don Mills, Ontario, M3C 1H6 and sent by prepaid registered post.

**73**    A close reading of the operative part of the Provider Agreement establishes that although there are allusions to the subject matter of the recitals, there is no express covenant clearly dealing with this same subject.

**74**    For example, various clauses in the operative part of the Provider Agreement refer to the pharmacy providing "eligible prescription drugs" to "Liberty Health subscribers" under "Liberty Health agreements", and refraining from filling prescriptions for "excluded benefits". However, there is no description in the operative part of the Provider Agreement concerning who is a subscriber under what agreements, what drugs are eligible, or what benefits are excluded. This must mean that the Provider Agreement contemplates including the provisions of the various benefit plans which set out in great detail who is eligible, what portion of what drugs and services are covered, and what benefits are excluded. In other words, absent the incorporation of the benefit plans and the ASO Agreement, the rights and obligations of the parties to the Provider Agreement would be incomplete.

**75**    In my opinion, the operative part of the Provider Agreement must be read together with the recitals in order to give meaning to the instrument. Liberty Health's obligation to make payments to the applicant depends on the terms and conditions of the agreements entered into between Inco and Liberty Health that are referred to in the first recital this explains why the Provider Agreement contains a statement that Liberty Health has entered into such agreements, and why I find them to be an integral part of the Provider Agreement.

**76**    I also note that the operative paragraph in the Provider Agreement states that the agreement is being signed "in consideration of the premises", including the premise that "Liberty Health has entered into agreements to pay for eligible prescription drugs ... in accordance with the terms and conditions more particularly set forth in the said agreements that detail the benefits."

**77**    I therefore find that the applicant is bound by the terms, conditions and rules agreed upon between Inco and Liberty Health.

**78**    In this case, the Inco Sudbury Group Benefit Agreements (including the 1995 amendment) and the ASO Agreement were in place before the applicant entered into the Provider Agreement in December 1995. While the applicant argued that there is no evidence that these agreements were "brought to the table" before it signed the Provider Agreement, there is also no evidence that the applicant took any steps at that time to obtain copies of the instruments to which reference is made in the recitals in order to be informed of the contractual rights between Inco and Liberty Health.

**79**    Moreover, I note that Inco and Liberty Health are not attempting to incorporate by reference any terms of the Inco Sudbury Group Benefit Agreements or the ASO Agreement that may have changed after the Provider Agreement was entered into. The validity of incorporating terms that might have changed after the Provider Agreement was signed is therefore not at issue in the instant case.

(b)    Inco and Liberty's entitlements to alter the assignment rights of covered persons

**80**    There are two elements to the question of whether Inco and Liberty Health properly altered the assignment rights in issue. The first is whether Inco and Liberty Health acted within their proper

authority in purporting to limit the right of a Covered Person to assign the debt. The second issue is whether Inco and Liberty Health's actions restricted the applicant's right to receive an assignment. I will address each of these in turn.

(i)    1995 Amendment to Group Benefit Plans

**81**    Inco and Liberty Health submit first that the 1995 amendment to the Inco Sudbury Group Benefit Agreement provided them with the power to act as they did. For the reasons that follow, this argument is not tenable.

**82**    The Inco Sudbury Group Benefit Agreement, including the 1995 amendment, would not on its own allow Inco to achieve its desired outcome. The clear terms of the 1995 amendment give Inco, through its agent Liberty Health, the ability to cancel the assignment right in its entirety. The clause does not entitle Inco and Liberty Health to limit the right to assign to individual suppliers selectively identified by Inco or Liberty Health.

**83**    Support for this conclusion can be found in the wording of the 1995 amendment. For ease of reference, I repeat the wording of the amendment:

ASSIGNMENT

Liberty Mutual allows the Covered Persons who is the principal certificate holder to assign the payment of eligible expense to the provider of the care, service or supply, which has an agreement with Liberty Mutual, unless otherwise stated in the provision entitled "Payment".

However, Liberty Mutual reserves the right to cancel the above right, which subsequently may be reinstated at any time.

**84**    The right with which this clause deals is the right of the Covered Person to assign payment owed to him or her by Inco. Based on the wording of this clause, the Covered Person either has the right to assign, or he or she does not. There is no in between. This amendment provides Liberty Health, as Inco's agent, with the right to cancel the Covered Persons' right to assign. But the clause affords no other right to Inco and Liberty Health. On a plain reading of the clause, Inco, through its agent Liberty Health, has no ability to limit the Covered Person's right of assignment in respect only of certain specific care providers such as the applicant.

(ii)    ASO Agreement

**85**    Inco and Liberty Health also submit, however, that they cancelled the right of Covered Persons to assign payment for eligible expenses to a non-participating pharmacy such as the

applicant by agreeing to do so under the ASO Agreement. As noted above, this agreement expressly provides that Inco and Liberty Health can agree upon "any other claim matters". The only restriction is that Inco and Liberty Health must agree on these claim matters. It is plain that the parties' intention was to be able to alter their arrangements from time to time if those changes were mutually agreeable.

86     Inco and Liberty Health argue that under the ASO Agreement they agreed that after May 13, 2002 Covered Persons were no longer permitted to assign the payment of eligible expenses to non-participating pharmacies, and that they advised Covered Persons and all Sudbury area pharmacies of their agreement.

87     The applicant, in response, points out that the reference to "other claim matters" to which Inco and Liberty Health may agree from time to time is the last bullet of eight bullets in Appendix "A" to the ASO Agreement, the second of which includes Liberty Health's obligation to adjudicate and pay claims as per the various group plans. The applicant submits that a contextual interpretation of Appendix "A" to the ASO Agreement indicates that the "other claim matters" referred to in the last bullet refers to matters other than those set out in the preceding seven bullets. Accordingly, the applicant submits that "other claim matters" must refer to matters other than Liberty Health's obligation to adjudicate and pay claims submitted on behalf of Covered Persons.

88     I agree. However, I am also of the view that the right of the Covered Persons to assign their entitlement to receive payment for their expenditure for prescription drugs is a matter that is separate and distinct from Liberty Health's obligation under the second bullet point to adjudicate and pay claims as per the various group plans.

89     There is no evidence in the record of what types of decisions have been contemplated under the provision "any other claim matters" in the eighth bullet point of Appendix "A". Nor, for that matter, is there any evidence about what is meant by "adjudicate and pay claims" in the second bullet point. However, as I shall explain, "adjudicate and pay claims" is something separate and distinct from any assignment rights that might exist under the contract or at large.

90     As the situation presently stands, as a non-participating pharmacy, the applicant is entitled to use Liberty Health's on-line claim evaluation system, which is referred to as the on-line adjudication system. Currently, any pharmacy -- whether a participating pharmacy or a non-participating pharmacy such as the applicant -- has the right to use the on-line adjudication method when a Covered Person wishes to have his or her health insurance pay for the cost of a pharmacy good or service. The pharmacist enters the claim into the on-line adjudication system and receives an on-line response indicating whether (or to what extent) the particular good or service is covered by the Covered Person's health insurance plan. Any pharmacist, and presumably any service provider, is entitled to have a claim relating to his or her goods or services evaluated by Liberty Health as to coverage. This is the "adjudication" phase of the "adjudicate and pay claims" obligation under Appendix "A" of the ASO Agreement.

**91** Once the claim has been adjudicated, Liberty Health fulfils its obligation to "pay" the claim under Appendix "A" by sending a cheque either to the Covered Person directly, or, if the Covered Person is entitled to assign his or her debt, to the care provider - the "pay" phase.

**92** This set of transactions is what I take to be referred to by the obligation in the ASO Agreement to "adjudicate and pay claims". The reference to "Group Contracts" within this bullet point only modifies adjudication and payment. This is necessarily the case, since without the Group Contracts, Liberty Health would have nothing to administer on Inco's behalf.

**93** It follows that any questions about the ability to assign the debt do not fall under this second bullet point from Appendix "A". Nor is it explicitly dealt with under the any other bullet point. Assignability, therefore, must be covered under the final catch-all bullet point, which entitles the parties to the ASO Agreement (Inco and Liberty Health) to decide on "any other claim matters to which [Inco] and Liberty Health may agree from time to time". There is no indication that assignment rights would not fall under "any other claim matters".

**94** I conclude that Inco and Liberty Health, under the ASO Agreement, are entitled to set out more specifically the circumstances governing Covered Persons' rights of assignment.

**95** The second element of this question is whether Inco and Liberty Health restricted contractually the applicant's ability to receive the assignment.

**96** Inco and Liberty Health contend that Liberty Health advised the applicant that the right to receive an assignment under the Provider Agreement was terminated effective May 13, 2002. They argue that this had the effect of terminating the Provider Agreement in respect of the Inco benefit plans. They refer again to the Manitoba case, in which it was held that the plan administrator's termination of a pharmacy's right to receive an assignment had the legal effect of terminating the pharmacy agreement in respect of the particular insurance plan at issue, in that case the NIHB program.

**97** I do not agree that the same situation exists in the instant case. There is no evidence that Liberty Health intended to cancel the Provider Agreement. Rather, the evidence supports the proposition that Liberty attempted to modify or amend the Provider Agreement unilaterally. This is clear from the fact that Liberty Health purported to allow the Covered Persons to give (and therefore Liberty Health to receive) an assignment if the Covered Person lived more than two kilometres from a participating pharmacy.

**98** In any case, the right of the applicant to receive assignments is a separate and distinct question from whether the assignments from the Covered Persons were valid in the first place. If the Covered Person had no valid assignment to give, then nobody -- neither a participating pharmacy, nor a non-participating pharmacy -- could receive the assignment. Indeed, in signing the Provider Agreement, the applicant specifically "undertakes and agrees that it has in its possession valid and effective assignments of benefits" before submitting any claims to Liberty Health.

**99**    For these reasons, I conclude that Inco and Liberty Health were entitled, pursuant to the terms of the ASO Agreement, to alter the circumstances under which the Covered Persons were entitled to give an assignment. The otherwise valid assignment under the CLPA was legitimately limited by contract. The limitation prevents Covered Persons from assigning to the applicant, except in cases where the Covered Person lives more than 2 kilometres from a participating pharmacy. The applicant has no right to receive an assignment that its customer is not legally able to give.

**100**    Although Inco tried to impress upon me that its actions were motivated by a desire to reduce health care costs, I find that the intention behind the actions that brought about this proceeding was to reduce the costs of Inco's employee health care benefits and thereby increase its profits. Whatever Inco's true purpose was, the bottom line is that through the contractual relationships established in the agreements among the parties, Inco and Liberty Health reserved the right to limit the right of Covered Persons to assign reimbursement of benefits.

Conclusion

**101**    For these reasons, the application is dismissed.

**102**    Inco and Liberty Health are entitled to their costs of this proceeding. If the parties are not able to resolve the issue of costs, they may make written submissions within 30 days of the date of the receipt of these reasons.

EPSTEIN J.

cp/e/nc/qw/qlgkw



*Indexed as:*

**Axelrod (Re)**

**Re Axelrod**
**Re Seax Management Ltd.**

[1994] O.J. No. 2277

20 O.R. (3d) 133

119 D.L.R. (4th) 37

74 O.A.C. 376

17 B.L.R. (2d) 161

29 C.B.R. (3d) 74

8 P.P.S.A.C. (2d) 1

50 A.C.W.S. (3d) 897

Action No. C17764

Court of Appeal for Ontario,

**Blair, Griffiths and Arbour JJ.A.**

October 12, 1994

**Counsel:**

Symon Zuker, for appellant, Dr. Samuel S. Axelrod.

William D. Dunlop, for respondent, Medi-Dent Service.

The judgment of the court was delivered by

**1    ARBOUR J.A.**: -- This appeal involves the single issue of whether a creditor may enforce its security under a general security agreement against the patient's list and records of a dentist.

The Facts

**2**    The salient facts are not in dispute. The respondent Medi- Dent Service (Medi-Dent) is engaged in the financing of health professionals in Ontario and elsewhere in Canada. The appellant Dr. Axelrod (Axelrod) is a dental surgeon licensed to practise in Ontario. He was adjudged bankrupt on November 18, 1993. Axelrod and his wholly owned management company, which was also adjudged bankrupt, are indebted to Medi-Dent in the amount of $346,630. That indebtedness is secured by a general security agreement (GSA) entered into on February 20, 1993 which grants, inter alia, a general security interest in all of the equipment, book debts, records, files, patient lists and patient files of Axelrod's practice. The security interest was properly perfected as required by the Personal Property Security Act, R.S.O. 1990, c. P.10.

**3**    Medi-Dent views Axelrod's patient lists and files as the most valuable part of his practice. Accordingly, Medi-Dent brought a motion for an order that it is entitled to enforce its security against the patients' lists and files, subject to Axelrod's duty to protect the confidentiality of the information contained in the patient's records. Medi-Dent undertook to protect the patients' confidentiality and proposed a detailed plan to do so. The plan was essentially accepted by the motions court judge and incorporated in his order.

The Order

**4**    The motion was heard by Ground J. who gave detailed reasons for an order that Medi-Dent is entitled to enforce its GSA against Axelrod's property. His reasons are reported in Re Axelrod (1994), 16 O.R. (3d) 649, 24 C.B.R. (3d) 149 (Gen. Div.). Ground J.'s order also contained the following provisions:

--        that Medi-Dent, through its agents or representative, be permitted to carry on all or part of Axelrod's practice;

--        that Medi-Dent, to the exclusion of Axelrod, occupy the property covered by the GSA;

--        that Medi-Dent take possession of the patient lists and patient files and other records of Axelrod, and that these be transferred to a dentist licensed and qualified to practise in the Province of Ontario (the incoming dentist);

--        that the incoming dentist shall notify each patient named in the patient lists and patient files by sending to them the following letter.

Dear Patient (Name)

I wish to advise you that effective February , 1994, I have taken over the dental practice of Dr. Samuel S. Axelrod at 26 Gibbons Street, Oshawa, Ontario. All patient records remain at that location.

I look forward to continuing to treat you with the high level of dental care you have grown to expect.

If you wish to have your dental records transferred to another dentist, please call or write to me at the above address.

Yours truly,

[Qualified Dentist]

--    that Axelrod shall have the right to full access to the patient lists and files for the purpose of any matter arising under the Health Disciplines Act, R.S.O. 1990, c. H.4;

--    that Axelrod is restrained from entering the premises to which the GSA relates;

--    that Axelrod is restrained from soliciting or contacting existing patients of the dental practice.

**5**    This order reflected the conditions that Medi-Dent had proposed as a means of protecting the confidentiality interest of Axelrod's patients while enforcing its GSA against Axelrod's patient lists and files.

**6**    We were advised that the parties had agreed to a preservation of the status quo pending appeal and that the order had not yet been enforced.

The Issues

**7**    The appellant raises two issues. He argues that Ground J. erred in holding that the GSA entitled Medi-Dent to take possession of the confidential patient records. He also contends that Ground J. erred in enjoining him from contacting his own patients and in ordering that a letter be sent to the patients without reference to the new location of his practice.

**8**    The appellant does not dispute the fact that he entered into the GSA with Medi-Dent. The appellant willingly and voluntarily entered into the agreement with the respondent. There is nothing to suggest that that contract was defective or otherwise invalid. Therefore, the only live issue before

this court is whether the appellant's fiduciary obligations vis-à-vis his patients preclude him from pledging the patient list and files as security.

**9**    The relationship between doctor and patient is one that is inherently grounded in trust. McLachlin J., in Norberg v. Wynrib, [1992] 2 S.C.R. 226 at p. 271, 92 D.L.R. (4th) 449, held that, "[a]ll the authorities agree that the relationship of physician to patient . . . falls into that special category of relationships which the law calls fiduciary".

**10**    Trust is at the heart of a fiduciary relationship. As between physician and patient this trust is a function of the unequal distribution of power between the parties. The physician is possessed of expertise and knowledge, while the patient is typically in a position of vulnerability and need. McLachlin J. described the nature of this trust, at p. 272, as:

> . . . the trust of a person with inferior power that another person who has assumed superior power and responsibility will exercise that power for his or her good and only for his or her best interests.

In the present case, the appellant owes a duty to his patients to serve their best interests. "Best interests" are not strictly limited to medical needs, but also encompass privacy and confidentiality. As McLachlin J. said (at pp. 272-73):

> The beneficiary entrusts the fiduciary with information or other sources of power over the beneficiary, but does so only within a circumscribed area, for example entrusting his or her lawyer with power over his or her legal affairs or his or her physician over his or her body.

**11**    In her discussion of the physician-patient fiduciary relationship, McLachlin J. referred to McInerney v. MacDonald, [1992] 2 S.C.R. 138, 93 D.L.R. (4th) 415. That case involved a patient's right of access to the contents of her own medical file. La Forest J. accepted that the physician, institution, or clinic responsible for compiling a medical record owns the physical record. He held, however, that certain duties arose from the special relationship of trust and confidence between doctor and patient which lead to a fiduciary duty on the part of the doctor. This duty includes allowing the patient to have access to his or her own medical record. Since the information contained in a medical record originates essentially from the patient, the patient retains a beneficial interest in, and maintains control over, the information contained in the record. With respect to the fiduciary duty of confidentiality, La Forest J. said at pp. 149-50:

> In characterizing the physician-patient relationship as "fiduciary", I would not wish it to be thought that a fixed set of rules and principles apply in all circumstances or to all obligations arising out of the doctor-patient relationship. As I noted in Canson Enterprises Ltd. v. Boughton & Co., [1991] 3 S.C.R. 534, not all fiduciary relationships and not all fiduciary obligations are the same; these are shaped by the demands of the situation. A relationship may properly be

described as "fiduciary" for some purposes, but not for others. That being said, certain duties do arise from the special relationship of trust and confidence between doctor and patient. Among these are the duty of the doctor to act with utmost good faith and loyalty, and to hold information received from or about a patient in confidence. (Picard, supra, at pp. 3 and 8; Ellis, supra, at pp. 10-1 and 10-12, and Hopper, supra, at pp. 73-74). When a patient releases personal information in the context of the doctor-patient relationship, he or she does so with the legitimate expectation that these duties will be respected.

**12**    In McInerney, supra, there was no regulatory legislation governing the patient's right of access to her medical record. The Supreme Court held that, subject to the supervisory jurisdiction of the court, the patient was entitled, upon request, to inspect and copy all information contained in her medical file, and that the onus was on the physician to justify denying access.

**13**    In this case, the parallel duty of confidentiality expressed in McInerney is the subject of statutory legislation. Section 2 para. 17 of O. Reg. 853/93, made under the Dentistry Act, 1991, S.O. 1991, c. 24, states that it is professional misconduct for a dentist to give "information about a patient to a person other than the patient or his or her authorized representative except with the consent of the patient or his or her authorized representative or as required or allowed by law". Section 2 para. 17 was enacted in 1993 and is phrased more broadly than the preceding s. 37(1) para. 30 of R.R.O. 1990, Reg. 547, made under the Health Disciplines Act, supra, which merely prohibited the giving, without the patient's consent, of information concerning a patient's dental condition or any professional service performed for a patient to any person.

**14**    This case presents an apparent conflict between the dentist's commercial obligations under the GSA and his fiduciary professional obligations. The issue is essentially whether a dentist can pledge his or her proprietary interest in the patient's medical records while concurrently respecting the patients' right of confidentiality as expressed in McInerney, supra, and reflected in the regulations dealing with professional misconduct. In Josephine V. Wilson Family Trust v. Swartz (1993), 16 O.R. (3d) 268, 23 C.B.R. (3d) 88, Blair J. held that the information in dental records is confidential and that the patient has a trust-like beneficial interest in them. He was of the view that dental records cannot be pledged as an asset of a dentist, despite the fact that the physical record belongs to the dentist. If the records were used by the dentist as an asset for the purpose of raising financing, the patients' legitimate expectation of confidence, he said, could not be respected. The issue in Swartz presented itself slightly differently than it does in the present case in that the GSA did not specifically purport to apply to the patient files. The issue before Blair J. was, in part, whether the GSA should be interpreted to extend to the patient's charts and records.

**15**    Both Blair J. in Swartz, supra, and Ground J. in the present case, purported to apply the principles set out in McInerney, supra. I agree with them that there is no difference between medical and dental records with respect to a patient's right of confidentiality. Both doctors and dentists are practitioners under the Health Disciplines Act, supra. As Blair J. noted, information disclosed by a

patient to a dentist may be just as sensitive as information provided to a physician. After referring to the patient's legitimate expectation that information revealed to a dentist would be treated in confidence, Blair J. held that such expectation cannot be properly protected if the dentist is allowed to use the records as pledged assets. He said in Swartz, supra, at p. 275:

> It is an impossibility, in this context, to disengage the physical records themselves -- which the Supreme Court of Canada has said are the "property" of the practitioner -- from the contents of those records -- which give them their true character, and in which the Supreme Court of Canada has said the patient has a "trust-like beneficial interest'." In my view, while the dental records may be the physical property of the dentist, they are property affixed with an inseverable trust of confidentiality in favour of the patient. Just as trust property is not property belonging to a bankrupt, the dental records are not property which belongs to the dentist for purposes of pledging as part of his or her "undertaking, assets and property".

16    Ground J. in the present case disagreed with that conclusion. He said:

> With great respect, I have some difficulty with the concept that the relationship of trust which undoubtedly exists between doctor or dentist and patient results in the patients' files or records being analogous to trust property for purposes of the B.I.A., that is to say, property in which the bankrupt holds a bare legal title but has no beneficial interest. It seems to me that the case law already establishes that the files or records are property beneficially owned by the medical practitioner. The full use and enjoyment of that property by the medical practitioner is, however, subject to common law and statutory rights of the patient with respect to maintaining confidentiality and with respect to access. Property interests subject to certain restrictions or rights of third parties are capable of being charged. In my view, so long as such rights are preserved by the creditor realizing upon its security, that creditor ought not to be deprived of realization and enforcement rights granted pursuant to a security agreement.

17    In my respectful view, the approach taken by Ground J. is consistent with the dentist's entitlement to dispose of his or her assets while at the same time respecting his or her professional obligation to fully protect the confidential information contained in the patients' files. I see no difference between a dentist's entitlement to sell his or her practice, and a dentist's entitlement to pledge records. Both can be accomplished in a manner compatible with a dentist's professional responsibilities, as long as the dentist acts with the utmost good faith and loyalty in protecting the patient's confidence.

18    The doctor may use the records to pursue his or her self- interest, so long as it does not conflict with the duty to act in the patient's best interests. As McLachlin J. wrote in Norberg, supra,

at p. 274:

> The freedom of the fiduciary is limited by the obligation he or she has
> undertaken -- an obligation which "betokens loyalty, good faith and avoidance of
> a conflict of duty and self-interest": Canadian Aero Service Ltd. v. O'Malley,
> [1974] S.C.R. 592, at p. 606.

The dentist can only pledge his assets to the extent of his or her interest in them. A dentist who
pledges his or her patient files has a continuing duty of utmost good faith and loyalty to the patients
when the creditor executes on the security. This involves a duty on the part of the dentist who has
pledged his or her patients' records, to seek and obtain the patient's consent to the transfer of files in
execution of the security. This mirrors the duty a dentist would have if he or she were to sell his or
her dental practice.

**19**    Medi-Dent recognizes that its security is subject to the patients' consent to be treated by the
incoming dentist that it wishes to put in place taking over the appellant's practice. The appellant
argues that the pledging of his assets was illegal because it necessitates a breach of confidentiality.
This is only so, in my opinion, if he is in breach of his duty of utmost good faith and loyalty towards
his patients, and of his ethical duty to protect the confidence of his patients. The appellant pledged
his patient lists and files in order to obtain credit. He was entitled to do so, in the same way as he
was entitled to sell his practice. Superimposed on this, however, is the appellant's statutory
obligation, under s. 2 para. 17 of O. Reg. 853/93, made under the Dentistry Act, 1991, supra, not to
disclose information about a patient without the patient's consent. The appellant also faces a
contractual obligation, under the terms of the GSA, to give physical possession of his patient lists
and files to the respondent. That obligation can, in my judgment, be carried out while at the same
time protecting the confidentiality interest of the patients in the content of their files. An
incompatibility only arises if the dentist is unwilling to discharge his obligation of utmost good faith
and loyalty to his patients, in a manner consistent with the obligations that he has incurred in the
legitimate pursuit of his own financial interest.

**20**    The appellant's unwillingness to write to his patients to inform them that he will turn over
their files to a new dentist who is taking over his practice, unless he receives other instructions from
them, should not defeat the right of a bona fide creditor to execute on its security, if this can be done
with maximum protection for the confidentiality of the information contained in the patients' files.

**21**    The appellant's unwillingness to contact his patients in order to assist the respondent in
executing on its security creates an additional problem if the duty of confidentiality extends to a
duty to keep the patient's identity confidential. In other words, is the dentist duty-bound to keep the
very existence of the dentist-patient relationship confidential, except with the patient's consent, or
except when otherwise compelled by law to disclose the existence of that relationship? (See, for
example, Kiedynk v. Doe (1991), 79 Alta.. L.R. (2d) 72 (Q.B.), where a duty of confidentiality
expressed in the Hospitals Act, R.S.A. 1980, c. H-11, s. 40, was held to prohibit disclosure of the

identity of a patient.) The language of s. 2 para. 17 of O. Reg. 853/93 appears broad enough to encompass a duty to keep the dentist-patient relationship in confidence, even to another dentist, except with the consent of the patient. Without the appellant's co- operation, it would be impossible in this case to protect that confidence. This is something that the appellant may have to answer for to the appropriate authorities. Meanwhile, the best accommodation of the rights of the creditor and rights of the patients is reflected in Ground J.'s order.

**22**    It remains to consider the appellant's argument that Ground J. erred in prohibiting Axelrod from contacting those patients. In Kronick v. Lamarche-Craven, [1991] O.J. No. 907 (Gen. Div.), Somers J. referred with approval to the decision of Potts J. in Goodman v. Newman (1986), 34 B.L.R. 23, 13 C.P.R. (3d) 48 (Ont. H.C.J.). Somers J. held that after the sale of a dental practice which contained a restrictive covenant in place for three years, the vendor dentist was free to communicate with his patients, at the expiration of the period provided for in the contract, for the purpose of informing them of the new location of his practice. In both cases, it was held that patients should have a freedom of choice and not be "handcuffed" to a practice.

**23**    When a dentist sells or pledges his patient list, as the appellant did in this case, I think that he or she should be held to have parted with his or her own interest in the patient list, subject to his or her patients' rights to confidentiality and access. In my view, the patient's right to access to his or her record includes a right of access for the purpose of determining which dentist the patient wishes to consult in the future. The interest of the patient in having access to a dentist of his or her choice is adequately protected in this case, by the letter that the incoming dentist would send to the patients notifying them of the change. That letter contains no indication of whether the appellant was continuing to practise at another location. However, it invites patients to obtain their records if they wish to retain a dentist other than the one who has taken over the appellant's practice. Should patients inquire about the possibility of a continued relationship with the appellant, the incoming dentist would have to assist them by providing them with whatever information was available to him or her about the appellant's whereabouts.

**24**    The order prohibiting Dr. Axelrod from contacting his former patients is consistent with the fact that he specifically pledged not only his patient records, but also his patient list. In the circumstances of this case, I think that the order of Ground J. adequately protects the various interests at issue.

**25**    Finally, I wish to add that the central interest advanced in this case, that is the interest of the patients, was not properly represented. By arguing that the GSA violated his patients' rights, the appellant was essentially attempting to avoid the consequences of the obligations which he willingly undertook. It would have been vastly preferable to have the patients' interests independently represented, possibly through notice of the proceedings to the Royal College of Dental Surgeons. At this stage of the proceedings, however, I think that the patients' interests will be sufficiently protected by a copy of the order, as well as a copy of these reasons beings served upon the College, which will then be at liberty to act in accord with its statutory mandate.

**26**    For these reasons, I would dismiss the appeal with costs.

Appeal dismissed.




# WATERS' LAW OF TRUSTS IN CANADA

## Fourth Edition

By

### Editor-in-Chief

### Donovan W.M. Waters, Q.C.

M.A., D.C.L. (Oxon.), Ph. D. (London), LL.D. (Hons.) Victoria, McGill, F.R.S.C.
Emeritus Professor, University of Victoria, B.C., of Lincoln's Inn, Barrister at
Law, Counsel, Horne Coupar, Barristers & Solicitors, Victoria, B.C.

### Contributing Editors

### Mark R. Gillen

B.Comm. (Toronto), M.B.A. (York), LL.B. (Osgoode), LL.M. (Toronto),
Faculty of Law, University of Victoria

### Lionel D. Smith

B.Sc., LL.M. (Cantab.), D. Phil., M.A. (Oxon.),
James McGill Professor of Law, McGill University,
of the Bar of Alberta

## CARSWELL®

2012

© 2012 Thomson Reuters Canada Limited

All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein. No one involved in this publication is attempting herein to render legal, accounting, or other professional advice.

**Library and Archives Canada Cataloguing in Publication**

Waters' law of trusts in Canada / editor-in-chief, Donovan W.M.
Waters; contributing editors, Lionel D. Smith, Mark R. Gillen.—4th ed.

Previously published under title: Law of trusts in Canada / by D.W.M. Waters
Includes bibliographical references and index.
ISBN 978-0-7798-5165-2 (bound).—ISBN 978-0-7798-5166-9 (pbk.)

1. Trusts and trustees—Canada.   I. Waters, D. W. M.   II. Smith, Lionel D.   III. Gillen, Mark R., 1957-   IV. Waters, D. W. M. Law of trusts in Canada.

KE787.W38 2005 346.7105'9
C2005-901583-7
KF730.W38 2005

Composition: Computer Composition of Canada Inc.

**Printed in the United States by Thomson Reuters**

 THOMSON REUTERS

CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED

One Corporate Plaza, 2075 Kennedy Road, Toronto, Ontario M1T 3V4
**Customer Relations:**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5162
Fax 1-416-298-5094

IV.    TRUST AND CONTRACT    66
    A.    Trusts of Choses in Action    68
        1.    Situation One: Promise of Another's Promise to Benefit a Third Party as Trustee for that Third Party    68
            (a)    Evidence of Intention to Create an Express Trust    69
            (b)    The Ability of A and B to Vary the Terms of the Arrangement    73
            (c)    Policy and Possible Reform    75
            (d)    Promisee as Constructive Trustee    75
            (e)    Performance Bonds, and Labour and Materials Payment Bonds    77
        2.    Situation Two: Person Promising to Act as Trustee for Third Party on Receipt of Property    80
        3.    Situation 3: Trustee as Assignee of Contractual Rights    83
    B.    Burdening Assignee of Property Which is Subject to Contractual Rights    83
V.    TRUST AND BAILMENT    86
VI.    TRUST AND DEBT    90
VII.    TRUSTS AND POWERS    97
    A.    The Various Types of Trusts and Powers    97
    B.    Evidence of a Power, and of a Power Followed by a Trust    102
    C.    Certainty of Objects: Trust, Trust Powers, and Mere Powers    105
VIII.    TRUST AND EQUITABLE CHARGE    108
IX.    TRUST, CONDITIONAL GIFT, AND PERSONAL OBLIGATION    111

Several types of legal relationships share common features with the trust relationship while being distinct in other ways. Comparing trusts to these other concepts yields not only a better appreciation of trust relationships, but an understanding of the important practical consequences the characterization of a relationship, as trust or otherwise, can have.

# I. TRUST AND FIDUCIARY RELATIONSHIP

## A. Trustees as Fiduciaries

The hallmark of a trust is the fiduciary relationship which the trust creates between the trustee and the beneficiary. The whole purpose of a trustee's existence is to administer property on behalf of another, to hold it exclusively for the other's enjoyment. The express trustee is expected to put the interests of the trust and the beneficiaries first in his thinking whenever he is exercising the powers, or performing the duties of, his office. His duty is one of selfless service. And the object of describing a man as a resulting or constructive trustee is to emphasize that he is a person who is under the express trustee's fiduciary obligation to hold property, of which he is technically the owner, for the benefit of another.

It was in Equity that the notion of the fiduciary was first conceived, and it originated to explain the position of one who at law held title and had all the appearance of full enjoyment, but who nevertheless because of Equity's intervention had no right of personal enjoyment. Here was a man who had the capacity to bring

every proprietary and possessory action available at law, but who was personally liable to another for all he did; a man whose rights were only those of administration and disposition, and whose liability to another resulted in his holding even those rights on behalf of the other. At law such a man would have been an agent, a mere conduit for the creation of rights and duties between his principal (the trust beneficiary) and the third party (for instance, those selling to and buying from the trust), but it did not work out that way. As we have seen, Equity could not deny the doctrines of the common law, and at law the trustee was title holder and possessor. The only way around that obstacle was for Equity to impose obligations upon this person with title and possession, and the nature and scope of these obligations were spelt out in the concept of fiduciary relationship. The trustee was a fiduciary of his rights and powers; he not only exercised those rights and powers on behalf of the beneficiary, he owed to the beneficiary the utmost duty of loyalty.

The fiduciary's obligations have been defined in a number of ways by the courts and commentators,[1] but essentially it means the duty to account to another, who is the person with the right of enjoyment over the property in question, for all that one does with the property and in the office of trustee. Nothing may be done which is not directed solely towards the best interests of the trust beneficiary or beneficiaries. The ramifications of this character of the office of trustee are many. The prime outcome is that the trustee may not occupy, or permit himself to be in a position, where the duties of his office and his personal interests may conflict.[2] As far as Equity is concerned, his office is so selfless that he is not entitled to remuneration for his services, though no objection will be taken to the settlor or testator extending to the trustee a remuneration, either unsolicited or as the result of agreement.[3] He must perform his duties personally – the principle of delegation is not recognized by Equity; though, if the nature of his trust duties, given the nature of the trust property and the terms of the trust, are such that in the ordinary course of affairs businessmen would employ agents, that freedom will be extended to him.[4] But he may be liable for the agent's wrongdoing. Similarly, he is not entitled to shrug off the wrongful actions of a co-trustee on the basis that he knew nothing of what the other was doing; as a fiduciary he is responsible for all acts of trusteeship, and he therefore carries a several, as well as a joint, liability for all that is done in the name of the trust or through the exercise of the office of trustee.[5]

Over the years it has been necessary to relax somewhat this high and rigorous standard of selfless behaviour and ultimate responsibility. It has been recognized by legislatures that for Equity to impose such standards in a modern business setting is self-defeating. No one would accept the office, particularly professionals who, since the second half of the nineteenth century, have come to be in the eyes of many settlors and testators the obvious persons for trusteeship appointment. In common

---

[1] See *infra*, "Constructive Trusts", chapter 11, Part II B; Donovan W.M. Waters, *The Constructive Trust* (1964) at 68-69, and 341-43; P.D. Finn, "The Fiduciary Principle" in T.G. Youdan, ed., *Equity, Fiduciaries and Trusts* (Toronto: Carswell, 1989) at 1-56.

[2] *Infra*, chapter 18, Part II.

[3] *Infra*, chapter 22, Part II.

[4] *Infra*, chapter 18, Part I.

[5] *Infra*, chapter 25, Part III.

law Canada statute now confers upon trustees a right to a reasonable remuneration. Trustees are no longer responsible for loss caused by co-trustees, bankers, or others unless the trustee is himself guilty of some "wilful default" in the exercise of his own duties; also, trustees are permitted to allow trust moneys to remain for reasonable periods in the hands of bankers and solicitors. But, apart from these specific relaxations seeking some accommodation with the realities of business life, the full rigour of the fiduciary relationship is still imposed upon the trustee. Throughout this work we shall constantly meet some new ramification of its existence.

## B.  Other Fiduciary Relationships

Many persons other than trustees occupy offices or have duties which in some respects are similar to those of the trustee. For instance, the company director has been described as a fiduciary in the office which he holds. Agents occupy offices or discharge duties of many kinds in contemporary society, and it can be said of all agents who are handling property on behalf of others that they are in some degree fiduciaries.[6] The phrase, "in some degree", puts the finger on the problem which the law faces at this point. Apart from the express trustee, who else can properly be described as a fiduciary? Who else has such duties that the standards of behaviour required of the trustee can also be required of the man with those duties? Is there a lower fiduciary status for those whose position to a certain extent is comparable to trustees? It has not proved difficult for the law to arrive at the conclusion that, if A has property in his name which he was neither given nor otherwise intended to keep for himself he must account for it to the person who is entitled to it. If X opens a bank deposit account in the name of A and himself without further explanation, it is assumed, unless there was a close family relationship between X and A, that A is intended or will be required to account to X for all that he acquires from the account. Similarly, if Y deposits cash with B for safekeeping, and B uses that cash in his business with the result that he doubles or triples its amount, Y is entitled to that profit in addition to the original cash. But can it be said of office holders, like company directors and real estate agents, that those offices make them fiduciaries?

This has proved to be an extremely difficult question to answer. The term "fiduciary" is an abstract one describing in general terms the duty of loyalty, as it has become known in the United States, and it is therefore possible to say that a person, such as a company director, is a fiduciary without implying by that term quite the rigorous standards of behaviour required of the trustee. The executor and the administrator are truly fiduciaries; in these cases the same meaning is given to the term as it has in connection with trustees. But this may largely be due to the fact that the administration of testamentary and intestate affairs has for so long been supervised by the courts of Chancery or Equity that Equity itself treated the executor, the administrator, and the trustee as performing similar duties involving the same standard of behaviour. But, if today one describes the company director or the real estate agent as a fiduciary, it is clear that one may only be saying that in certain

---

[6] As to agents as bare trustees, see *supra*, chapter 2, Part VIII.

respects of his duty such a man is a fiduciary. In other respects, he is not. It is currently an issue how far a company director is, and ought to be, able to retain for himself property, the existence and availability of which only became known to him when he was acting as a director or because he was a director. Should it lie in his mouth to say that the board, of which he was a member, decided not to acquire the property for the company, and only thereafter did he acquire it for himself? Is a real estate company, when acting through its agents, a fiduciary towards a would-be purchaser who approaches the company because of its known expertise? When it makes statements through its agents, does the company have a fiduciary duty to demonstrate such honesty, special skill and care as a person in that specialized field ought to demonstrate? If the company is a fiduciary, then it is obligated to do so, and cannot plead the lack of contractual relationship between itself and the purchaser who relied on the advice. The problem of the real estate company *vis-à-vis* the purchaser has been solved by describing the company as a "quasi-fiduciary", which appears to be another way of saying that it is a fiduciary for the purpose of the advice it gives, since the purchaser clearly relies on the company's expert skill.[7]

## C. Fiduciary Relationships Generally

Several relationships, in addition to the relationship between trustee and beneficiary, have been generally recognized as giving rise to fiduciary obligations. These include the relationship between partners, directors and corporations, solicitors and clients, and agents and principals.[8] While these relationships are generally recognized as giving rise to fiduciary obligations, they do not invariably do so.[9] Although there

---

[7] *Bango v. Holt*, [1971] 5 W.W.R. 522, 21 D.L.R. (3d) 66 (B.C. S.C.), cited with approval in e.g., *Fletcher v. Hand* (1994), 21 Alta. L.R. (3d) 346, 156 A.R. 142 (Alta. Q.B.), additional reasons at (1994), 161 A.R. 297 (Alta. Q.B.); *Jakubke v. Sussex Group - SRC Realty Corp.* (1993), 15 C.C.L.T. (2d) 298, 31 R.P.R. (2d) 193 (B.C. S.C.); *MacDonald v. Gerristen* (1994), 156 A.R. 219, 39 R.P.R. (2d) 292 (Alta. Q.B.); and *Horncastle v. Westland Agencies (1978) Ltd.* (1985), 43 Sask. R. 305 (Sask. Q.B.). *Cf. Nunes v. Manitoba (Winnipeg District Registrar, Land Titles Office)*, 21 D.L.R. (3d) 97, [1971] 5 W.W.R. 427 (Man. Q.B.): no fiduciary relationship between co-mortgagors. In *Murray v. Tilley* (2005), 244 Nfld. & P.E.I.R. 1, however, the court held the real estate agent liable to the purchaser on the basis of a duty in tort to inform, but held that the agent was not in a fiduciary relationship with the purchaser.

[8] See, e.g., *Frame v. Smith*, [1987] 2 S.C.R. 99, 42 D.L.R. (4th) 81 (S.C.C.) at 134 [S.C.R.], at 97 [D.L.R.] (*per* Wilson J.); *International Corona Resources Ltd. v. Lac Minerals Ltd.*, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) [1989] 2 S.C.R. 574, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 61 D.L.R. (4th) 14 (S.C.C.) at 597 [S.C.R.], at 61 [D.L.R.] (*per* Sopinka J.). In Canada the courts have determined, at least in the situations there prevailing, that the Crown is a fiduciary (*Guerin v. R.*, [1984] 2 S.C.R. 335, 13 D.L.R. (4th) 321 (S.C.C.) at 384 [S.C.R.], at 341 [D.L.R.] *per* Dickson J.) *vis-à-vis* a First Nations Band, and *Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2002), 58 O.R. (3d) 417, 215 D.L.R. (4th) 496 (Ont. C.A.), additional reasons at (2002), 35 C.P.C. (5th) 203 (Ont. C.A.), leave to appeal allowed (2002), 302 N.R. 397 (note) (S.C.C.) *vis-à-vis* disabled veterans. The appeal to the S.C.C. by the Crown did not concern the fiduciary relationship decided upon in the two lower courts; see *Authorson (Litigation Guardian of) v. Canada (Attorney General)*, [2003] 2 S.C.R. 40, 227 D.L.R. (4th) 385 (S.C.C.). This decision as to the position of the Crown appears to be unique in the jurisdictions of the Commonwealth.

[9] *Per* Sopinka J. in *Lac Minerals, supra*, note 8.

140    CHAPTER 5    THE THREE CERTAINTIES

# I. INTRODUCTION

For a trust to come into existence, it must have three essential characteristics. As Lord Langdale M.R. remarked in *Knight v. Knight*,[1] in words adopted by Barker J. in *Renehan v. Malone*[2] and considered fundamental in common law Canada,[3] (1) the language of the alleged settlor must be imperative; (2) the subject-matter or trust property must be certain; (3) the objects of the trust must be certain. This means that the alleged settlor, whether he is giving the property on the terms of a trust or is transferring property on trust in exchange for consideration, must employ language which clearly shows his intention that the recipient should hold on trust. No trust exists if the recipient is to take absolutely, but he is merely put under a moral obligation as to what is to be done with the property. If such imperative language exists, it must, second, be shown that the settlor has so clearly described the property which is to be subject to the trust that it can be definitively ascertained.[4] Third, the objects of the trust must be equally and clearly delineated. There must be no uncertainty as to whether a person is, in fact, a beneficiary. If any one of these three certainties does not exist, the trust fails to come into existence or, to put it differently, is void.

The principle of the three certainties has been fundamental at least since the days of Lord Eldon, and no one today could seek to challenge the principle; the problems that exist concern the issue of what constitutes certainty.

---

[1]  (1840), 3 Beav. 148, 49 E.R. 58 (Eng. Ch.).

[2]  (1897), 1 N.B. Eq. 506 (N.B. S.C. [In Equity]).

[3]  Numerous Canadian cases have referred to the three certainties as essential to the existence of an express trust. A few relatively recent examples include *Goodman Estate v. Geffen* (1987), (sub nom. *Goodman v. Geffen*) 52 Alta. L.R. (2d) 210 (Alta. Q.B.), reversed (1989), 68 Alta. L.R. (2d) 289 (Alta. C.A.), additional reasons at (1990), 80 Alta. L.R. (2d) 289 (Alta. C.A.), reversed (1991), 80 Alta. L.R. (2d) 293 (S.C.C.), leave to appeal allowed (1989), 101 A.R. 160 (note) (S.C.C.); *Quesnel & District Credit Union v. Smith* (1987), 19 B.C.L.R. (2d) 105 (B.C. C.A.); *Bank of Nova Scotia v. Société Générale (Canada)* (1988), 58 Alta. L.R. (2d) 193 (Alta. C.A.); *Faucher v. Tucker Estate* (1993), [1994] 2 W.W.R. 1 (Man. C.A.); *Howitt v. Howden Group Canada Ltd.* (1999), 170 D.L.R. (4th) 423, 26 E.T.R. (2d) 1 (Ont. C.A.); *Canada Trust Co. v. Price Waterhouse Ltd.* (2001), 288 A.R. 387 (Alta. Q.B.); *Arkay Casino Management & Equipment (1985) Ltd. v. Alberta (Attorney General)* (1998), 227 A.R. 280, (sub nom. *Arkay Casino Ltd. v. Alberta (Attorney General)*) 64 Alta. L.R. (3d) 368, [1999] 4 W.W.R. 334 (Alta. Q.B.); *Parsons v. Cook* (2004), 238 Nfld. & P.E.I.R. 16, 7 E.T.R. (3d) 92 (N.L. T.D.); *McMillan v. Hughes* (2004), 11 E.T.R. (3d) 290 (B.C. S.C.); *Saugestad v. Saugestad*, 2006 CarswellBC 3170, 28 E.T.R. (3d) 210 (B.C. S.C.) at para. 82, reversed in part on other grounds 2008 CarswellBC 123, 37 E.T.R. (3d) 19, 77 B.C.L.R. (4th) 170 (B.C. C.A.); *Re Graphicshoppe Ltd.*, 2005 CarswellOnt 7008, 78 O.R. (3d) 401 (Ont. C.A.) at para. 10; *VanDenBussche v. Craig VanDenBussche Trust (Trustee of)*, 2009 CarswellMan 557, (sub nom. *VanDenBussche v. VanDenBussche Trust*) 247 Man. R. (2d) 174, 55 E.T.R. (3d) 179 (Man. Q.B.); and *Sun Life Assurance Co. of Canada v. Taylor* (2008), 2008 CarswellSask 678, 322 Sask. R. 153, [2009] 2 W.W.R. 286 (Sask. Q.B.).

[4]  The property interest which each beneficiary is to take must also be clearly defined. See *infra*, Part III D.

# II. CERTAINTY OF INTENTION

There is no need for any technical words or expressions for the creation of a trust.[5] Equity is concerned with discovering the intention to create a trust; provided it can be established that the transferor had such an intention,[6] a trust is set up. There are indeed certain evidentiary requirements which the law regards as mandatory for the transfer of certain kinds of property. For example, the *Statute of Frauds* in 1677, reproduced in common law Canada, required all trusts of land to be evidenced in writing, and under the wills legislation of the common law provinces and the territories a person's last will and testament must be in writing, which means, of course, that a testamentary trust must be in writing, and form part of the will.[7] But these are requirements of the law of evidence, not of the law of trusts, though, as we shall see, the effect of these statutory evidentiary rules has created a variety of problems for trust lawyers.[8]

---

[5]  See, e.g., *Royal Bank v. Eastern Trust Co.*, 32 C.B.R. 111, [1951] 3 D.L.R. 828 (P.E.I. T.D.) where it was noted that language need not be technical so long as the intention to create a trust can be inferred with certainty.

[6]  For an unusual case, see *No. 382 v. Minister of National Revenue* (1957), 16 Tax A.B.C. 274, 57 D.T.C. 48 (Can. Tax App. Bd.) at 282-3 [Tax A.B.C.]. If tax avoidance is the object of a transaction, the courts are likely to be particularly concerned with whether there was indeed an intention to create a trust, or merely a desire to give that appearance. See *Minister of National Revenue v. Ablan Leon (1964) Ltd.*, [1976] C.T.C. 506, 76 D.T.C. 6280 (Fed. C.A.). The fact that the alleged settlor of a number of trusts, purportedly created at the same time, did not know all the details of the scheme in which he was taking part, and that the amount of property initially assigned to the trustees for each trust was minimal, were found to be evidence of a desire only to create appearances. See further, *infra*, chapter 6, note 2.

The question of certainty of intention to create a trust can arise in a wide variety of contexts. One such context that has been considered on several occasions occurs where an employer seeks access to surplus pension funds. If the pension plan is construed such that the employer's contributions are to be held in trust *for the employees* then the employer will not be able to take back surplus contributions. Cases dealing with this issue include *Burke v. Hudson's Bay Co.*, 2010 CarswellOnt 7451, [2010] S.J. No. 34 (S.C.C.); *Mifsud v. Owens Corning Canada Inc.* (2004), 41 C.C.P.B. 81 (Ont. S.C.J.); *Schmidt v. Air Products of Canada Ltd.*, [1994] 2 S.C.R. 611, 3 E.T.R. (2d) 1, 115 D.L.R. (4th) 631 (S.C.C.); *LaHave Equipment Ltd. v. Nova Scotia (Superintendent of Pensions)* (1994), 121 D.L.R. (4th) 67 (N.S. C.A.); *Bathgate v. National Hockey League Pension Society* (1992), 98 D.L.R. (4th) 326 (Ont. Gen. Div.), additional reasons at (1992), 98 D.L.R. (4th) 326 at 411 (Ont. Gen. Div.), affirmed (1994), 16 O.R. (3d) 761 (Ont. C.A.), leave to appeal refused (1994), 4 E.T.R. (2d) 36 (S.C.C.); *Howitt v. Howden Group Canada Ltd.* (1997), 152 D.L.R. (4th) 185 (Ont. Div. Ct.), leave to appeal allowed (1997), 1997 CarswellOnt 4662 (Ont. C.A.), affirmed (1999), 26 E.T.R. (2d) 1 (Ont. C.A.); *Central Guaranty Trust Co. (Liquidator of) v. Spectrum Pension Plan (5) (Administrator of)* (1997), (sub nom. *Central Guaranty Trust Co. (Liquidator of) v. Spectrum Pension Plan (5)*) 149 D.L.R. (4th) 200 (N.S. C.A.); *Crownx Inc. v. Edwards* (1994), 20 O.R. (3d) 710, 120 D.L.R. (4th) 270 (Ont. C.A.).

[7]  On the requirement of writing, see chapter 7.

[8]  But for the formal requirements in cases such as those involving wills or trusts of land, no formal document is required. A trust may arise simply from the words used (see, e.g., *Lev v. Lev* (1992), 40 R.F.L. (3d) 404 (Man. C.A.); and *Bathgate v. National Hockey League Pension Society* (1992), 98 D.L.R. (4th) 326 (Ont. Gen. Div.), additional reasons at (1992), 98 D.L.R. (4th) 326 at 411 (Ont. Gen. Div.), affirmed (1994), 16 O.R. (3d) 761 (Ont. C.A.), leave to appeal refused (1994), 4 E.T.R. (2d) 36 (S.C.C.)) or from conduct or circumstances (see note 9 below and the accompanying text). In

142    CHAPTER 5    THE THREE CERTAINTIES

A trust may be construed from conduct alone,[9] but it is unlikely that such evidence will conclusively reveal the necessary intention. Words do show that intention, and they must either appear in a document which the maker regarded as final or be orally communicated to another.[10] Evidence extrinsic to words in a

---

*Armstrong v. Clarke*, 2008 CarswellBC 667, 39 E.T.R. (3d) 1, 79 B.C.L.R. (4th) 121 (B.C. C.A.), however, a person's oral statement that he would leave a house to two named persons in his will was not considered sufficient to establish an intent to create a trust. In *Saugestad v. Saugestad* (B.C. C.A.), *supra*, note 3, the conduct of an alleged secret trustee in an e-mail to his solicitor in which he acknowledged he held property in trust, together with the fact that he had transferred one-half of the estate to his nephews, was held to be sufficient evidence of the intention of the secret trustee's mother to create a trust.

[9]  Conduct in the form of a sequence of transactions or circumstances may be enough: *Northguard Financial Group v. Wah*, [1977] 3 W.W.R. 3 (B.C. S.C.). See also *Kattler v. Kattler* (1995), 132 Sask. R. 92 (Sask. Q.B.), additional reasons at (June 22, 1995), Doc. Regina Q.B. 015726/94 (Sask. Q.B.) (which mentions *Northguard* with respect to a trust potentially arising from conduct alone but then holds that a trust arose on the facts partly on conduct and partly on other evidence); *Eu v. Rosedale Realty Corp. (Trustee of)* (1997), 33 O.R. (3d) 666, 18 E.T.R. (2d) 288 (Ont. Bktcy.); *Randall v. Nicklin* (1984), 58 N.B.R. (2d) 414 (N.B. C.A.), reversing (1984), 54 N.B.R. (2d) 95 (N.B. Q.B.); and *Thomas v. Whitwell* (1991), 45 E.T.R. 75 (Alta. Q.B.). A court may also consider the circumstances surrounding a transaction alleged to give rise to an express trust. See, e.g., *Winisky v. Krivuzoff* (2003), 237 Sask. R. 213, 3 E.T.R. (3d) 147 (Sask. Q.B.). In *Bloorview Childrens Hospital Foundation v. Bloorview MacMillan Centre* (2002), 44 E.T.R. (2d) 155, 22 B.L.R. (3d) 182 (Ont. S.C.J.), additional reasons at (2002), 44 E.T.R. (2d) 175 (Ont. S.C.J.), affirmed (2002), 2002 CarswellOnt 4537 (Ont. C.A.), the court considered whether the incorporation of a foundation (to which the hospital transferred funds) with clauses limiting its objects could itself amount to the creation of a trust. Although there were other circumstances which led the court to conclude that there was no trust, the court also suggested that, particularly without the application of the doctrine of ultra vires to the foundation objects, the incorporation of the foundation alone could not amount to the creation of trust. In *Arkay Casino Management & Equipment (1985) Ltd. v. Alberta (Attorney General)*, *supra*, note 3, poker players at a casino made deposits towards a jackpot with set rules for payments out of the jackpot to specified winning poker hands. Brooker J. found that "even though there is no trust document or oral communication establishing the trust, the intention can be inferred from the players' conduct in the circumstances of this game. It seems clear from the nature of the game itself that the players, upon depositing their dollar, expected that the jackpot would go to whomever had the necessary hand. The players did not expect that the jackpot would go into the general coffers of either the casino operator or the charity. The players gave the money for a particular purpose and expected the casino operator to use it for that purpose... Under these circumstances, therefore, I am satisfied that I can infer that it was the players' intention to create an express trust with respect to the funds which they wagered and lost on the jackpot." See also *McMillan v. Hughes*, *supra*, note 3, where the circumstances and the defendant's own statements, corroborated by other witnesses, established the intention to create a trust.

[10]  Trust documentation which reveals the intention to create a trust by those documents will exclude the argument that they were mere evidence of an earlier oral trust in the same terms: *Minister of National Revenue v. Ablan Leon (1964) Ltd.*, *supra*, note 6. And an agreement to create a trust will only create a trust there and then if the agreement (a contract) is specifically enforceable: *ibid.*; *North Vancouver (Municipality) v. Macdonald* (1977), 5 B.C.L.R. 89 (B.C. S.C.). The document as a whole must be considered in addition to the specific words of bequest: *LeBlanc Estate v. Belliveau* (1986), 68 N.B.R. (2d) 145, 175 A.P.R. 145 (N.B. Q.B.); *Luscar Ltd. v. Pembina Resources Ltd.* (1995), 165 A.R. 104 (Alta. C.A.); *Canada Permanent Trust Co. v. Lasby*, 42 Sask. R. 73, [1985] 6 W.W.R. 665 (Sask. Q.B.). As to what may constitute evidence of the intent, see *Re Kayford Ltd.* (1974), [1975] 1 W.L.R. 279, [1975] 1 All E.R. 604 (Eng. Ch. Div.); *Re Japan Leasing (Europe) plc v. Shoa Leasing (Singapore) Pte Ltd.* (July 30, 1999), (Eng. Ch. Div.); and *Re Lewis's of Leicester Ltd. v. Kordengate*

document may be taken into account to resolve an ambiguity in the words[11] or where the extrinsic evidence clearly demonstrates that the words of the document do not reflect the intention of the parties.[12]

A recording or communication of a future intention to set up a trust is not enough, unless the statement of future intention was "bought" by another for valuable consideration. If the maker of the statement thus bound himself to set up a trust at a later date, that agreement or covenant is enforceable by the parties to it. But the statement of a would-be donor as to his intention for the future is not enough.[13] Nor is it enough to intend to transfer for another's benefit; the transferor must be shown

---

*Ltd.* (1995), [1995] E.W.J. No. 206 (Eng. & Wales H.C.J., 13 January 1995); and *Kattler v. Kattler* (1995), 132 Sask. R. 92 (Sask. Q.B.), additional reasons at (June 22, 1995), Doc. Regina Q.B. 015726/ 94 (Sask. Q.B.). Other documents relating to the same transaction were considered in *Re Chemainus Team Development Training Trust (Trustee of)*, 2004 CarswellBC 2853, 13 E.T.R. (3d) 203 (B.C. S.C.). In order to determine whether there was certainty of intention, when there is an absence of formal trust documentation, the court will look at the surrounding circumstances and evidence, what was actually agreed, and how the parties conducted themselves. See, e.g., *Elliott (Litigation Guardian of) v. Elliott Estate*, 2008 CarswellOnt 7448, 45 E.T.R. (3d) 84 (Ont. S.C.J.); *Byers v. Foley*, 1993 CarswellOnt 558, 16 O.R. (3d) 641 (Ont. Gen. Div.); and *Langley v. Brownjohn*, 2007 CarswellBC 2165, 62 R.P.R. (4th) 139, 35 E.T.R. (3d) 38 (B.C. S.C.).

[11] In *Water Street Pictures Ltd. v. Forefront Releasing Inc.*, 2006 CarswellBC 2476, 26 E.T.R. (3d) 197, 57 B.C.L.R. (4th) 212 (B.C. C.A.) Lowry J.A., writing for the court, discussed when a court will consider extrinsic evidence to resolve an ambiguity as to whether a trust was intended, though it was held that the words "remit" and "payable" were not ambiguous and did not indicate an intention to create a trust. The approach taken in the *Water Street Pictures* case was that, "[i]t is only when the intentions of the parties cannot be determined from the words they have chosen to employ, such that there is ambiguity, that the law permits consideration to be given to evidence of their conduct in making their agreement and in fulfilling their obligations. If it were otherwise, the certainty that is essential to documenting commercial transactions would be seriously undermined." On the use of extrinsic evidence in assessing whether there was an intention to create a trust see also, e.g., *Canada (Attorney General) v. Ristimaki*, 2000 CarswellOnt 30, 46 O.R. (3d) 721, 4 R.F.L. (5th) 167 (Ont. S.C.J.); and *Byers v. Foley*, 1993 CarswellOnt 558, 16 O.R. (3d) 641 (Ont. Gen. Div.) and *Giles v. Westminster Savings Credit Union*, 2006 CarswellBC 183, [2006] B.C.J. No. 159 (B.C. S.C.) at para. 203, affirmed 2007 CarswellBC 2071, [2007] 12 W.W.R. 579 (B.C. C.A.).

[12] In *Antle v. R.*, 2010 CarswellNat 3894, 2010 CarswellNat 4878, 61 E.T.R. (3d) 13 (F.C.A.), reconsideration refused 2012 CarswellNat 183, 2012 CarswellNat 184, [2010] S.C.C.A. No. 464 (S.C.C.), Noel J.A., writing for the court, said "it would be a surprising result if courts were bound by the formal expression of the parties and could not look to the surrounding circumstances, including the conduct of the parties, in assessing whether the intent to settle a trust is present."

[13] E.g., a father says to his son, "I intend next Monday to convey this house on trust for you, your wife, and your children." On Monday next the father has changed his mind. There is no trust. *Quaere* whether the result would be different if the son had in the interim relied on this statement of intention to his detriment.

A trust, the terms of which are only to come into effect at a future date, is perfectly valid. In such a case there is a present intention to set up a trust, the terms of the trust being that the interests under it shall take effect in the future, e.g., "$50,000 on trust for my daughter for her life to take effect on her marriage, remainder to her children equally."

In *Moropito v. Moropito Estate*, 2005 CarswellBC 2514, 20 E.T.R. (3d) 278 (B.C. S.C.), a statement by a testator that he would "remember the plaintiff in his will" or that he would buy the plaintiff a car was not considered sufficient to cause the beneficiary under the will to be considered a trustee of the estate for the plaintiff.

to have had in mind a transfer *on trust*. This means that the intention to make a gift by way of a handing over is not the intention to make a gift by way of a trust.[14]

The words employed to set up a trust, therefore, must show that the transferee is to take the property not beneficially, but for objects which the transferor describes. The words which nearly always reveal the intention are "in trust", or "as trustee for", but it is well established in common law courts, including those of Canada, that these words are neither conclusive nor indispensable.[15] On the other hand, in a series of Canadian cases, courts have made the point that there is no magic in the word "trust" and that other words may convey the same intention.[16]

---

[14] Executory trusts created by the delivery of trust property to trustees can only exist if there is an intention at the moment of transfer to create a trust: *Minister of National Revenue v. Ablan Leon (1964) Ltd.*, *supra*, note 6.

[15] See, e.g., *Canada Trust Co. v. Price Waterhouse Ltd.* (2001), 288 A.R. 387 (Alta. Q.B.); *Bullock v. Key Property Management Ltd.* (1992), 46 E.T.R. 275 (Ont. Gen. Div.), varied (1997), 33 O.R. (3d) 1 (Ont. C.A.); *McEachren v. Royal Bank* (1990), 78 Alta. L.R. (2d) 158, [1991] 2 W.W.R. 702 (Alta. Q.B.); *Mohr v. C.J.A.* (1991), 40 E.T.R. 12 (B.C. C.A.); affirming (1989), 36 E.T.R. 246 (B.C. S.C.); *Byers v. Foley*, 1993 CarswellOnt 558, 16 O.R. (3d) 641 (Ont. Gen. Div.); *Luscar Ltd. v. Pembina Resources Ltd.* (1995), 165 A.R. 104 (Alta. C.A.), leave to appeal to S.C.C. refused (1995), 31 Alta. L.R. (3d) xli (S.C.C.); *Mohr v. C.J.A.*, 1991 CarswellBC 638, 40 E.T.R. 12 (B.C. C.A.) at 13 [E.T.R.]; and *Mansell Capital Partners LLC v. Kerr*, 2005 CarswellOnt 909, 14 E.T.R. (3d) 198 (Ont. S.C.J.). In a unanimous Federal Court of Appeal decision in *Antle v. R.*, 2010 CarswellNat 4878, 61 E.T.R. (3d) 13 (F.C.A.), it was held that the court could look to extrinsic evidence to determine the true intention of the parties and accepted the trial judge's finding in the circumstances of the case that a trust was not intended even though the trust document was "clear and unambiguous" in expressing an intent to create a trust. Noel J.A. cited *Mohr v. C.J.A.*, 1991 CarswellBC 638, 40 E.T.R. 12 (B.C. C.A.) for the proposition that "while the words 'trust', 'trustees' and 'trust deed'" appeared in the agreement in question those words were not determinative of the issue since "The task of the Court is to construe the agreement against the background facts to determine 'objectively the 'aim' of the transaction'". Noel J. also noted the decision of Iacobucci J. in *Air Canada v. M & L Travel Ltd.*, 1993 CarswellOnt 568, [1993] 3 S.C.R. 787 (S.C.C.) (at para. 30) where the use of the words "in trust" in a document was referred to as "evidence of intention". See also *Fraser v. Minister of National Revenue*, 1991 CarswellNat 385, (sub nom. *Fraser v. R.*) 91 D.T.C. 5123 (Fed. T.D.).

"In trust" are words commonly found written after the name of the payee of guaranteed investment certificates, and term deposit instruments. Such an act creates an inherent ambiguity as to the intent of the investor or depositor, when no trust objects are mentioned. Did he intend the payee to be the trust beneficiary for his personal benefit, to hold on trust for implied third parties or purposes, or to hold on resulting trust for the investor or depositor (i.e., himself)?

[16] *Mulholland v. Merriam* (1873), 20 Gr. 152 (U.C. C.A.); *Cameron v. Campbell* (1882), 7 O.A.R. 361; *Kendrick v. Barkey* (1907), 9 O.W.R. 356 (Ont. H.C.); *Elgin Loan & Savings Co. v. National Trust Co.* (1903), 7 O.L.R. 1 (Ont. H.C.), affirmed (1905), 10 O.L.R. 41 (Ont. C.A.); *Re Garden*, [1931] 2 W.W.R. 849, [1931] 4 D.L.R. 791 (Alta. C.A.); *Royal Bank v. Eastern Trust Co.*, 32 C.B.R. 111, [1951] 3 D.L.R. 828 (P.E.I. T.D.). In the context of all the language of a bequest, Garrow J.A. came to the conclusion in *Canada Trust Co. v. Davis*, 1912 CarswellOnt 872, 2 D.L.R. 644, 25 O.L.R. 633 (Ont. C.A.), affirmed 1912 CarswellOnt 754, 46 S.C.R. 649, 8 D.L.R. 756 (S.C.C.) that the words "in trust", though used, did not have controlling importance, and that no trust had been created. See also *Re Dickin*, 1975 CarswellOnt 363, 7 O.R. (2d) 472, 55 D.L.R. (3d) 504 (Ont. S.C.); and *Willis (Litigation Guardian of) v. Willis Estate*, 2006 CarswellOnt 1757, 23 E.T.R. (3d) 292 (Ont. S.C.J.), affirmed 2007 CarswellOnt 4843, 33 E.T.R. (3d) 187 (Ont. C.A.).

## A. "Precatory Trusts"

### 1. Generally

The question which gives rise to most litigation is whether a testator intends to create a trust, or merely impose some kind of moral obligation upon the legatee when he bequeaths personalty or devises land in confidence that the legatee will use the property in certain ways. He may speak, for instance, of his "expectation", "fervent wish", "desire", "firm belief" or "purpose" that this will be done. Such words may give rise to what has been called "a precatory trust", though, as Rigby L.J. pointed out in the English Court of Appeal,[17] and his words have been echoed in Canada,[18] this title is awkward and incorrect; "a misleading nickname". If language, once construed, is held to intend a trust, then whether the language is precatory or otherwise, the trust which is thereby set up is the same as any other express trust, and no different rules apply.

### (a) Shift in Judicial Attitude Towards Trusts Based on Precatory Language

Prior to the latter half of the nineteenth century the courts bent over backwards to find that testamentary language of a precatory kind revealed the intention to transfer on trust.[19] By imposing a binding obligation upon the recipient of the property, the wishes of the testator were held to be safeguarded, concerning those who were to benefit from his property. Moreover, before 1830, the executor in English law took the residue of the estate beneficially, if it were not otherwise disposed of; and where it was incumbent upon the executor to respect only the wishes, hopes, desires, and belief of the testator that others would be benefited, the temptation of the executor to ignore those moral obligations was considerable. Then, in 1830, that right of the executor was statutorily taken away,[20] and thereafter, the pace picking up after 1870, the courts became gradually less inclined to discover trust intention in mere precatory words.[21] It is generally agreed that the climate of judicial attitude changed noticeably with the case of *Lambe v. Eames*[22] and Canadian

---

[17] *Williams v. Williams*, [1897] 2 Ch. 12 (Eng. Ch. Div.) at 27.

[18] *Perry v. Perry*, [1918] 2 W.W.R. 485, 40 D.L.R. 628 (Man. C.A.) at 493 [W.W.R.]; *Re Clark* (1919), 17 O.W.N. 88.

[19] See G.W. Keeton and L.A. Sheridan, *The Law of Trusts*, 12th ed. (Chichester: Rose Law Publishers, 1993) at 112 *et seq.*

[20] *Executors Act, 1830* (Eng.), 11 Geo. IV & 1 Will. IV, c. 40, s. 1, which provided that the executor should hold undisposed-of personalty (including leaseholds) on trust for the next-of-kin, unless it appeared that the testator's intention was that the executor should take beneficially. For an example of contrary intent, see *Re Melvin*, [1972] 3 W.W.R. 55, 24 D.L.R. (3d) 240 (B.C. S.C.). See further, *supra*, chapter 3, Part VII B.

[21] The first signs of new thinking appear in 1840 during the argument of *Knight v. Knight* (1840), 3 Beav. 148 (Eng. Ch.) at 165 *et seq.*; affirmed (sub nom. *Knight v. Boughton*) 8 E.R. 1195.

[22] (1871), L.R. 6 Ch. 597 (Eng. Ch.). This discussion of the change in judicial attitude was referred to with approval in *Glasspool v. Glasspool Estate*, 1998 CarswellBC 649, 22 E.T.R. (2d) 66, 53 B.C.L.R. (3d) 371 (B.C. S.C.) at para. 23, affirmed 1999 CarswellBC 151, 25 E.T.R. (2d) 8 (B.C. C.A.).

the claim of a trust for the children to be pure sham," said the court. "If there is any trust, it is for the benefit of the husband."[84]

However, if the trust is set up by the husband in circumstances that showed no intention to defeat the wife's entitlement, the court may refuse to declare the trust void. This is so even though the husband always treated the property as his own, included the trust assets in statements as to his personal assets, the trustees were his friends, and during his time as trustee he controlled the trust property. The court, concerned with these "facts", agreed with the husband's submission that it would be "turning trust law upside down" to say that the trust was a sham.[85]

## III.  CERTAINTY OF SUBJECT-MATTER

For a trust to be validly created, it must also be possible to identify clearly the property which is to be subject to the trust.[86] Moreover, even if the trust property is thus clearly defined, the shares in that property which the beneficiaries are each to take must also be clearly defined. Certainty of subject-matter as a term refers to both of these required certainties.

If the language employed provides clear evidence of the intention to create a trust, no trust can yet come into existence if it is impossible to determine what the trust property is. This is so whether the settlor purports to transfer property or declares himself trustee of his property. "The bulk of my residuary estate" is uncertain; nothing can therefore pass to the trustees or be held by the settlor as trustee.[87] But,

---

[84] *Merklinger v. Merklinger* (1992), 11 O.R. (3d) 233 (Ont. Gen. Div.) at 241-242, affirmed (1996), 30 O.R. (3d) 575 (Ont. C.A.).

[85] *Sagl v. Sagl* (1997), 31 R.F.L. (4th) 405 (Ont. Gen. Div.), additional reasons at (1997), 35 R.F.L. (4th) 107 (Ont. Gen. Div.).

[86] This concept applies to all trusts, including alleged statutory trusts. In *Green v. Ontario* (1972), [1973] 2 O.R. 396, 34 D.L.R. (3d) 20 (Ont. H.C.), the plaintiff claimed that s. 2 of the *Provincial Parks Act*, R.S.O. 1970, c. 371, imposed a statutory trust upon the province with regard to dedicated parkland in Ontario. Apart from the fact that the learned judge could find no obligation as trustee imposed on the province, nor who could be the trust beneficiary, he drew attention to the power of the province under the Act "to increase, decrease or even put an end to or 'close down' any park" (at 34 D.L.R. (3d) 31). There was, therefore, he said, no certainty of subject-matter of the alleged trust.

It is sufficient that the property be clearly identified so, for instance, a reference to "Group Insurance coverage provided by the deceased's employer, Moor Business Forms" was sufficient to identify the proceeds of a particular insurance policy. See *Shannon v. Shannon*, 1985 CarswellOnt 699, 19 E.T.R. 1 (Ont. H.C.); and similarly in *Schorlemer Estate v. Schorlemer*, 2006 CarswellOnt 8155, 29 E.T.R. (3d) 181 (Ont. S.C.J.) a reference to "any policies of life insurance on his life through his employer" was sufficient where the person had only one employer and only one policy of insurance.

Though it must be possible to identify the trust property, it is also essential, unless the trustee has given value, that the property is held in title by the trustee. Only then can there be a valid trust.

[87] Certainty of subject-matter (or of the initial trust fund assets) is an essential element in establishing the segregation of the trust fund from other property: *Palmer v. Simmonds* (1854), 2 Drew. 221, 61 E.R. 704; *Bromley v. Tryron* (1951), [1952] A.C. 265, [1951] 2 All E.R. 1058 (U.K. H.L.). Similarly, a reference to "other property" that was to be sold and the proceeds used to form the corpus of a trust was found not to be sufficiently certain because the expression "other property" was capable of several plausible interpretations in the circumstances – see *Re Romaniuk* (1986), 48 Alta. L.R. (2d) 225, 23 E.T.R. 294 (Alta. Surr. Ct.). See also *Almecon Industries Ltd. v. Anchortek Ltd.* (2004), 48 C.B.R.

as Cameron J.A. once put it, "this must be an elementary consideration, and scarcely requires authority to support it."[88] Trusts of such a kind are normally attempted to be grafted upon gifts already made – for example, "$50,000 to my wife, A, the bulk of which I entrust her to appoint between X, Y, and Z" – and the result is that, the trust having failed, the donee (A) takes the whole property.

## A. Relationship Between Certainty of Intention and Certainty of Subject-matter

More difficult questions arise when the settlor's indecisiveness as to the trust property suggests that he did not have in mind a trust obligation at all. He may have used language which, though precatory, appears *prima facie* to show trust intention, and then have left the description of the property of the alleged trust so vague that it reveals his true intention to have been to make an absolute gift with an attached moral obligation or, occasionally, to confer a conditional gift.

Sometimes there is an obvious interaction between the language communicating the intention and the description of the trust property.[89] In *Perry v. Perry*,[90] the testator divided his property between his widow and his sons, and continued, "I wish and do want that my only daughter, Edith Florence, shall inherit from her mother a share equal to that of the boys named above, and the balance to be divided in equal shares between all our children then living." The language was precatory, but questionable as to the nature of the obligation it was intending to impose. Whatever that language meant, however, the subject-matter was "inherit from her mother a share"; did this mean a share of the mother's own property or a share of the property devised to her by the testator? And, if that was uncertain, what "balance" was to be divided? Language and property description interacted, therefore, in determining the intent of the testator.[91] The property description being uncertain, this alone would render the trust void.

---

(4th) 165, 246 F.T.R. 150 (F.C.).

    The amount of the subject-matter need not be great for it to be certain – an amount of $10 was held to satisfy the requirement of certainty of subject-matter in *Re Kadar Estate* (1997), 17 E.T.R. (2d) 171 (B.C. S.C.). The initial trust property may be a gold coin, frequently employed in deeds of trust.

[88] *Perry v. Perry* [1918] 2 W.W.R. 485, 40 D.L.R. 628 (Man. C.A.) at 639 (DLR).

[89] An often quoted case is *Mussoorie Bank v. Raynor* (1882), (1881-82) L.R. 7 App. Cas. 321 (India P.C.), where Sir Arthur Hobhouse noted that uncertainty of words has a "reflex action" upon the construction of the donor's language. There the testamentary words were, "feeling confident that she will act justly to our children in dividing the same when no longer required by her."

[90] [1918] 2 W.W.R. 485, 40 D.L.R. 628 (Man. C.A.).

[91] This discussion of *Perry v. Perry* and the interaction between certainty of intention and certainty of subject-matter was referred to with approval in *Giles v. Westminster Savings Credit Union*, 2006 CarswellBC 183, [2006] B.C.J. No. 159 (B.C. S.C.) at para. 240.

# B.  Residuary Estates

An undivided interest in certain property satisfies the test,[92] as does a chose in action or an interest in a chose in action. A specific share in residuary estate is also sufficiently definite. This is demonstrably so when the trust is testamentary, because the trust, like the will, takes effect from death, and, though the executors have a period thereafter during which they may wind up the estate and ultimately are able to assess the value of the residue, nevertheless the share of residue is taken to be known at the date of death.[93] What is the position, however, when the settlor creates an *inter vivos* trust, under which his beneficiaries are to have interests in his net estate? Has the trust property to be certain both when the trust is set up and when the trust terms are to begin to operate, or need it be certain only on the latter occasion? At first blush one might have said certainty when the trust terms are to begin to operate is sufficient. After all, the purpose of a rule as to certainty of trust property is presumably so that it is possible to say at the time when beneficiaries are entitled to payments what property is to act as the fund.[94] But this is not the law, nor was it Spence J.'s view in *Re Beardmore Trusts*.[95] In that case an *inter vivos* trust[96] was set up to take effect upon the settlor's death when the trustee was to hold three-fifths of the settlor's net estate[97] for the wife for life or until remarriage, remainder for the two children of the marriage. There was no question as to trust intention, and no

---

[92]  *U.S. Trust Co. of New York v. C.I.R.*, 296 U.S. 481, 80 L. Ed. 340 (1936).

[93]  Though, of course, it may be proved that creditors of the estate have claims which prevent there being any residue. Trusts of specific property may be annihilated by abatement of the property to meet creditors' claims. Nevertheless, the law regards such trusts as having certainty of property. Why? Is it an adequate explanation that the interests of trust beneficiaries vest at death?

[94]  Certainty would have to exist when the trust is created, if the trustees have administrative duties to perform prior to any payment to a beneficiary as, e.g., in an accumulation trust.

[95]  (1951), [1951] O.W.N. 728, [1952] 1 D.L.R. 41 (Ont. H.C.). This position was also taken, following *Re Beardmore Trusts*, in *Ernst & Young Inc. v. Central Guaranty Trust Co.* (2001), 283 A.R. 325, 36 E.T.R. (2d) 200, 12 B.L.R. (3d) 72 (Alta. Q.B.) at 218-20 [B.L.R.], additional reasons at (2002), 304 A.R. 1 (Alta. Q.B.). In *Ernst & Young Inc. v. Central Guaranty Trust Co.*, the funds were to be held in trust to meet warranty obligations on warranties sold by car dealerships on behalf of a warranty provider. The trusts were set up with an initial $1 and further contributions were to be made based on subsequent actuarial assessments of amounts required to meet warranty obligations. At the start of the trust these amounts were uncertain. The decision in this *Ernst & Young* case was overturned on appeal on the basis that the issue of the validity of the trust was *res judicata* pursuant to an earlier bankruptcy proceeding order. The appeal decision noted that because it disposed of the appeal on the basis of *res judicata* it was not necessary for it to consider the trial judge's conclusions relating to the validity of the trusts. The Court of Appeal did, however, indicate it had reservations about the trial judge's conclusions on that issue. See *Ernst & Young Inc. v. Central Guaranty Trust Co.*, 2006 CarswellAlta 1479, 397 A.R. 225, 28 E.T.R. (3d) 174 (Alta. C.A.), leave to appeal refused 2007 CarswellAlta 517, 2007 CarswellAlta 518, [2007] S.C.C.A. No. 9 (S.C.C.). The *Ernst & Young* case was referred to in *Gouin v. Gouin*, 2005 CarswellAlta 972, 17 E.T.R. (3d) 264 (Alta. Q.B.), at para. 25 where it was noted that "a trust of an expectancy can be enforced where a contractual obligation has been undertaken to subject property expected to be acquired in the future to a trust" (see *infra*, chapter 6, Part II) and the court commented that it was "not entirely clear" how this was to be reconciled with the result in *Ernst & Young*.

[96]  On the separation of the settlor from his wife.

[97]  I.e., less debts, expenses and succession duties.

question as to the shares each beneficiary was to take. But one reason given by the learned judge for the voidity of the trust was that "the subject-matter of the trust is not described with sufficient exactness to permit that such matter be ascertained at the time the trust was created."[98] *Mussoorie Bank v. Raynor*,[99] which the judge cited, was in fact concerned not only with certainty of trust subject-matter, but with precatory language and the contention that an absolute gift was sought to be cut down by a gift over. The old case of *Sprange v. Barnard*[100] was also concerned with the cutting down of an absolute gift. Moreover, both cases involved testamentary trusts; but – and this may have been crucial in Spence J.'s thinking – both trusts would have been *set up* by a will yet *operate* over whatever property the immediate testamentary donee did not use during his lifetime. Therefore, Spence J. seems to have reasoned, in each of these precedents, between the date of the will taking effect and the date of the trust terms coming into operation the trust property was uncertain. Those cases, he thought, decided the case in hand.

In the light of the authorities there is much to be said for this conclusion. If the rule requiring certainty were a matter of convenience only and a trust would be valid provided the property was clearly defined when the trust terms operated, then gifts of "whatever is left" after A's death would not have failed, as they so often have, for uncertainty of trust property. But is there any reason why the law should not adopt a wait and see rule? Time will tell whether there is any property upon which the trust terms are to operate. What reason is there for striking down the trust before any beneficiary can claim anything from the trustee?[101] And if any beneficiary dies after the trust is set up, and before the terms operate, is the administration of his estate more complex than when a remainderman dies during the lifetime of the life tenant in whose favour there is a power of encroachment? The cases on testamentary trusts have been vitally concerned with trust language and the rules concerning absolute gifts, as we have seen, and *Re Beardmore Trusts* is therefore unique in that those problems were absent.[102] However, *Beardmore* exposes what can be argued to be the arbitrariness of the timing of the certainty of property rule, and on that point it may not be immune from assault.[103]

---

[98]  *Supra*, note 95, at 46 [D.L.R.]. There was no means of knowing till the settlor's death how much three-fifths of the net estate would be, and indeed it might be nothing at all if the settlor died insolvent. See also *Mordo v. Nitting*, 2006 CarswellBC 2934, [2006] B.C.J. No. 3081 (B.C. S.C.) at para. 310.

[99]  *Supra*, note 89.

[100]  (1789), 2 Bro. C.C. 585, 29 E.R. 320 (Eng. Ch.).

[101]  There were no investment or administrative duties concerning the trust property which were to be carried out prior to the death of the settlor.

[102]  Divorce or separation trusts where a spouse purports to settle future property, e.g., his future wages, salary, or his future business earnings, would be void unless consideration is given by the other spouse, as future property may only take the form of a contract to transfer. See *supra*, chapter 3, Part IV A 2. Does the net residuary estate on the death of a living settlor constitute future property?

[103]  E.g., the testator says, "$50,000 to A, and whatever is left at his death on trust for B, C and D equally." The precedents discussed earlier, Part II A 2, show that this would be argued as a life tenancy for A, remainder to B, C and D. The opposing argument would be that the gift to A is absolute and the later derogation repugnant. Either there is a trust which both takes effect and has its terms operate from the date of the $50,000 vesting in A, or there is no trust at all. In *Beardmore*, the operation of the trust terms was delayed until some time after the trust took effect. Only if such delay

## C. Use of Formula to Determine Quantum of Subject-matter

When the courts say that there must be certainty of subject-matter, they mean that the property must either be described in the trust instrument, or there must be "a formula or method given for identifying it."[104] This latter form of certainty more often occurs with fixing the quantum of beneficiaries' interests,[105] but it can occur with the whole trust property. For example, the testator may leave all his property to trustees and then require them to hold "a sufficient sum of money to produce $500 per annum" for the X hospital. Such a gift would not fail for uncertainty because, though it may be difficult to determine against the background of varying interest rates from year to year what sum will produce $500 *per annum*, the size of the annuity is quite clear and the capital required "can be approximately and easily ascertained".[106]

The point is that if the court on a request by the trustees can determine the quantum of the trust property, then the trust will not fail, but the court must have objective standards by which to determine the quantum. Should the settlor say, to amend the example just given, "a sufficient sum of money so as to produce a reasonable income for A," then difficulties can arise. The trustees have not been left to decide what in their discretion is reasonable; had they been given this discretion then an adequate formula would have been required for quantifying the trust property. In the English case of *Re Golay's Will Trust*,[107] Ungoed-Thomas J. was prepared

---

is void is there no trust at all.

In *Phillips v. Spooner* (1980), [1981] 1 W.W.R. 79, 7 E.T.R. 157 (Sask. C.A.), the deceased had entered into a separation agreement, under seal, with his first wife in which he had agreed that in certain circumstances the wife could apply to the court for half of his assets at death. He covenanted that his personal representatives would consent to such an application. Unfortunately, the Court of Appeal found no need to comment on the validity of this clause, which is not infrequently found in such agreements.

[104] G.G. Bogert and G.T. Bogert, *Handbook of the Law of Trusts*, 5th ed. (1973) at 72.

[105] E.g., "to A, B, C and D as to income, and as to capital when D attains 25, in such shares as my trustees in their sole discretion shall choose."

[106] *Crawford v. Mound Grove Cemetery Assn.*, 218 Ill. 399, 75 N.E. 998 (1905) at 1002 [N.E.] (1905, S. Ct. 111.).

[107] [1965] 1 W.L.R. 969, [1965] 2 All E.R. 660. If a testator leaves his residuary estate to his spouse, and gives to his executors or testamentary trustees the power to determine which assets shall be the property of a "spouse trust", it is arguable that a trust is only created at that moment when the first item of property is so allocated. Subsequent allocations would then be regarded as transfers to an existing trust. (For the purposes of the *Income Tax Act*, R.S.C. 1985 (5th Supp.), c. 1, s. 70(6), such allocations to a spouse trust must be completed within thirty-six months of the testator's death). In effect the testator is delegating to his executors or trustees part of the role of creating the trust.

An opposing argument is that the discretion should be seen as an adequate formula for determining the trust property, and the trust is therefore created on the moment of the testator's death, i.e., by his will. At that moment there is a conceptual certainty of trust property.

Given the trend of modern decisions, the second argument seems more likely to be upheld. The difficulty with it, however, is that, if for any reason the trustees do not allocate assets to the trust, the court may conclude that it is unable to exercise such a broad discretionary obligation in their place. On the other hand, *McPhail v. Doulton* (1970), [1971] A.C. 424, [1970] 2 All E.R. 228 (U.K. H.L.) at 457 [A.C.], at 247 [All E.R.], suggests that today the courts will go a long way towards exercising, or ensuring the exercise of, a trustee discretion in order that the trust shall not be said to fail for

nevertheless to say that, though different trustees might hold varying notions upon what is reasonable, the word "reasonable" is sufficiently objective that, on an application being made, the court can determine what the income is to be. The courts undoubtedly lean as far as possible in favour of upholding the settlor's disposition, but it is at least arguable whether this case does not lean too far. What are the criteria for determining what is reasonable income? It does not necessarily infer need; the wealthy beneficiary is not excluded.[108] And may the trustees consider the other calls that are to be made upon the trust capital, for example, the maintenance of infants who have capital interests?

In determining certainty, what the courts are looking for is the certainty of concept rather than whether it is too difficult to ascertain the subject-matter.[109] "Reasonable income" seemed to the learned judge in *Re Golay* to satisfy that test.

Of course, certainty of the property that is to be subject to an express trust can always be obtained by the settlor or testator transferring nominal property to the trustees; for instance, he settles $100 "plus such other property as shall later be added."[110] The settlor, the personal representatives, or third parties may then add this further property. However, though this familiar device secures certainty, it is of no assistance if the creator of the trust has described what shall constitute that further property, and the description lacks definition or ascertainability. No one can determine what is meant by a trust of $100 plus "the bulk of my estate", for instance; the trust will remain a trust of $100. It will indeed be sufficient, on the other hand, if the creator of the trust employs a formula; for example, he gives his executors and trustees the power to transfer to the trust of $100 such other assets from his residuary estate as they shall choose.

## D.  Certainty of Beneficial Shares

Even if the trust property is clearly defined or ascertainable, the trust will still be void and the trust property revert to the settlor if the beneficial shares in that property are not clearly defined. The classic example of such failure is *Boyce v.*

---

uncertainty. It may appoint new trustees, or require the professional preparation of a proposal for the allocation of assets to the "spouse trust".

The importance of the difference between these arguments is that s. 70(6)(b) of the *Income Tax Act*, *supra*, as amended, requires the spouse trust to be "created by the taxpayer's will". The problem can be avoided, however, if the testator in his will deputes one asset, however nominal, as spouse trust property, and then confers the above trustee discretion.

See further on the subject of discretionary powers and the doctrine of uncertainty, F.D. Baker, "Are Wills Draftsmen Misusing Discretionary Powers?" (1973-4) 1 E & T.Q. 172.

[108]  See R.E. Megarry (1965), 81 L.Q.R. 481.

[109]  *Re Gape*, [1952] Ch. 418, affirmed [1952] Ch. 743 (Eng. C.A.) (Roxburgh J.). The issue here was the certainty of a condition subsequent; "take up permanent residence in England".

[110]  The same thing can be done with a declaration of trust, when the settlor declares himself from henceforth to be a trustee of his assets for others.

*Boyce*[111] where the testator devised his four houses to his trustees on the terms that his daughter, Maria, should have one house in fee simple, "whichever she may think proper to choose or select," and the remaining houses should go to his other daughter, Charlotte, in fee simple. Maria predeceased the testator, the choosing machinery therefore broke down, and the consequence was that the trust failed and Charlotte took nothing. The property which each beneficiary was to have was uncertain.[112] Since Maria was to have one house, and Charlotte three houses, it is curious that the court could not have construed the trust as a gift to Charlotte of four houses, subject to the right of Maria to choose one of them for herself.[113]

*Sran v. Sands & Associates*[114] provides a more recent example. In a declaration of trust the settlor clearly identified lands subject to the trust but then declared in one clause that, "I hold legal and registered title to the Lands and Gurjant Singh Sran is the beneficial owner of 50% in the Lands", and in another clause that, "I do not and will not hold any beneficial interest in the Lands whatsoever and all benefits and advantages from the Lands which are received by me, the undersigned and bare trustee, are on account and for the benefit of Gurjant Singh Sran and will be delivered to Gurjant Singh Sran forthwith upon receipt [of a sum of money to be paid by Gurjant Singh Sran]." Smith J. found there was no trust since it was, "unclear whether the purported trust relate[d] to the entirety of the Property, or to 50% of it."

The quantum of property allocated to each interest may be totally vague. The testator may make a gift of specific property to trustees to distribute "such part or

---

[111] (1849), 16 Sim. 476, 60 E.R. 959. In *Re Moore*, [1901] 1 Ch. 939, a purpose trust was to end at an uncertain and unascertainable time. In *Arkay Casino Management & Equipment (1985) Ltd. v. Alberta (Attorney General)* (1998), 227 A.R. 280, (sub nom. *Arkay Casino Ltd. v. Alberta (Attorney General)*) 64 Alta. L.R. (3d) 368, [1999] 4 W.W.R. 334 (Alta. Q.B.), the share of winners of a gambling jackpot at a casino was determined by specified amounts to be paid out of the jackpot to winners holding specified types of poker hands. See also *Ernst & Young Inc. v. Central Guaranty Trust Co., supra*, note 95; *Greenwood v. Greenwood*, 2010 CarswellBC 2563, [2010] B.C.J. No. 1902 (B.C. S.C.); and *Sran v. Sands & Associates*, 2010 CarswellBC 1751, 69 C.B.R. (5th) 99 (B.C. S.C.).

[112] *Boyce v. Boyce* was referred to in *Ernst & Young Inc. v. Central Guaranty Trust Co., supra*, note 95. There the beneficiaries of purported trust included warranty holders but the court found that no one could say either at the outset nor during the currency of the purported trust that anyone could know with any certainty what warranties were outstanding or what their terms were and thus the court concluded that it was impossible to say what each putative beneficiary's share of the funds would be.

[113] It is also curious that in *Sprange v. Barnard* (1789), 2 Bro. C.C. 585, 29 E.R. 320 (Eng. Ch.), the construction was not different. £1300 was held for T.S. "for his sole use; and at his death the remaining part of what is left, that he does not want for his own wants and use, to be divided between" certain persons. Was T.S. absolutely entitled or had he an income interest only? Arden M.R. thought T.S. absolutely entitled as "the remaining part" failed for uncertainty. Would it not have met the testator's language more adequately to have found a life interest in T.S. and a power to draw on capital, with remainder divided equally among the enumerated persons?

In *Guild v. Mallory* (1983), 144 D.L.R. (3d) 603 (Ont. H.C.), the court was reluctant to reach the result suggested in *Boyce v. Boyce* where the effect was to frustrate the intended gift by the testator.

[114] 2010 CarswellBC 1751, 69 C.B.R. (5th) 99 (B.C. S.C.) at para. 64. For another example of a difficulty in determining the shares of the alleged beneficiaries of the trust, see *Giles v. Westminster Savings Credit Union*, 2006 CarswellBC 183, [2006] B.C.J. No. 159 (B.C. S.C.) at para. 203, affirmed 2007 CarswellBC 2071, [2007] 12 W.W.R. 579 (B.C. C.A.).



*Case Name:*
## Lac Minerals Ltd. v. International Corona Resources Ltd.

**Lac Minerals Ltd., appellant;**
**v.**
**International Corona Resources Ltd., respondent.**

[1989] S.C.J. No. 83

[1989] A.C.S. no 83

[1989] 2 S.C.R. 574

[1989] 2 R.C.S. 574

61 D.L.R. (4th) 14

101 N.R. 239

J.E. 89-1204

36 O.A.C. 57

44 B.L.R. 1

26 C.P.R. (3d) 97

35 E.T.R. 1

6 R.P.R. (2d) 1

16 A.C.W.S. (3d) 345

File No.: 20571.

Supreme Court of Canada

1988: October 11, 12 / 1989: August 11.

**Present: McIntyre, Lamer, Wilson, La Forest and Sopinka JJ.**

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Commercial law -- Confidentiality -- Mining companies discussing possible joint venture -- Confidential exploration results disclosed during discussions -- High potential property adjacent to lands of exploration company -- Mining company in receipt of information purchasing property for own use -- Whether or not company in breach of duty respecting confidences -- Whether or not breach of fiduciary duty -- If so, the appropriate remedy.*

*Industrial and intellectual property -- Trade secrets -- Confidentiality -- Mining companies discussing possible joint venture -- Confidential exploration results disclosed during discussions -- High potential property adjacent to lands of exploration company -- Mining company in receipt of information purchasing property for own use -- Whether or not company in breach of duty respecting confidences -- If so, the appropriate remedy.*

*Trusts and trustees -- Fiduciary duty -- Trade secrets -- Confidentiality -- Mining companies discussing possible joint venture -- Confidential exploration results disclosed during discussions -- High potential property adjacent to lands of exploration company -- Mining company in receipt of information purchasing property for own use -- Whether or not breach of fiduciary duty -- If so, the appropriate remedy.*

*Remedies -- Unjust enrichment -- Restitution -- Constructive trust -- Nature of constructive trust -- When constructive trust available.*

International Corona Resources Ltd., a junior mining company, carried out an extensive exploration program and made arrangements to attempt to acquire the Williams property. Representatives from a senior mining company, Lac Minerals, read of the test results in a public newsletter and arranged to visit the Corona property. Corona showed the Lac representatives confidential geological findings and disclosed the geological theory of the site and the importance of the Williams property. Detailed private information was left with Lac officials during further discussions about development and financing options. Corona was advised by Lac to aggressively pursue the Williams property. The matter of confidentiality was not raised.

The Lac representatives, after their visit to Corona's site, instructed their personnel to gather information on the area in question and to stake favorable claims east of the Corona property. Lac acquired the Williams property but never informed Corona at any time of its intention of acquiring that property. Later negotiations between Lac and Corona for the Williams property to be turned over to Corona failed.

Corona, after its relationship with Lac had ended, concluded various agreements with Teck Corporation. These agreements provided for a joint venture in developing a mine on the Corona property and purported to give Teck a 50 per cent interest in the fruits of Corona's lawsuit against Lac, with Teck agreeing to pay certain costs.

The trial judge concluded that Lac and Corona had not concluded a binding contract but found Lac liable under the two other possible heads of liability, breach of confidence and breach of fiduciary duty. He decided that the appropriate remedy for breach of fiduciary duty was the return of the Williams property to Corona but allowed Lac's claim for a lien for the cost of improvements, and the amounts paid to Williams excluding royalty payments. The actual amount spent by Lac on developing the property was discounted to take into account the fact that Corona, if it had not been deprived of the Williams property, would have expended less to develop the property. Both parties were given the option of undertaking a reference to determine the amount Lac had spent to develop the Williams property. Lac was ordered to transfer the property to Corona upon payment by Corona to Lac of these amounts. A reference was also ordered to determine the amount of the profits obtained by Lac from the Williams property. Lac was ordered to pay the amount of such profits to Corona with interest. Damages were assessed on the principles applicable to breach of fiduciary duty in the event that, on appeal, a court should decide that damages were the appropriate remedy.

The Court of Appeal affirmed the findings of the trial judge with respect to breach of confidence and fiduciary duty. It also confirmed the remedy but added that a constructive trust was an appropriate remedy for both the breach of confidence and fiduciary duty. The court did not deal with the appellant's attack on the assessment of damages.

Three main issues were raised in this appeal: (1) did a fiduciary relationship exist between Corona and Lac which was breached by Lac's acquisition of the Williams property? (2) did Lac misuse confidential information obtained by it from Corona and thereby deprive Corona of the Williams property? and, (3) if either question were answered affirmatively, what was the appropriate remedy?

Held (McIntyre and Sopinka JJ. dissenting in part): The appeal and cross-appeal should be dismissed.

Per La Forest J.: Lac breached a duty of confidence owed to Corona. The test for whether there has been a breach of confidence involves establishing three elements: (1) that the information conveyed was confidential; (2) that it was communicated in confidence; and (3) that it was misused by the party to whom it was communicated. Corona had communicated private, unpublished information and, although the matter of confidence had not been raised, there was a mutual understanding between the parties that they were working towards a joint venture and that valuable information was communicated to Lac under circumstances giving rise to an obligation of confidence. The information provided by Corona was the springboard that led to Lac's acquisition of the Williams property. This use had not been authorized by Corona. The receipt of confidential information in circumstances of confidence establishes a duty not to use that information for any purpose other than that for which it was conveyed. The relevant question to be asked is what is the confidee entitled to do with the information, not what is the confidee prohibited from doing with it, and the onus falls on the confidee to show that the use of the confidential information was not prohibited. If the information is used for such a prohibited purpose, the confider is entitled to a remedy to the extent of the detriment suffered.

Lac acted to Corona's detriment when it used the confidential information to acquire the Williams property which Corona would have otherwise acquired. Lac was uniquely disabled from pursuing property in the area for a period of time; this was not an unacceptable result. It could have either negotiated a relationship with Corona based on the disclosure of confidential information or it could have pursued property in the area for itself on the basis of publicly available information. Lac could not have the best of both worlds.

A constructive trust was the only just remedy here, regardless of whether this remedy was based on breach of confidence or breach of a fiduciary relationship. The remedies available under one head are those available to the other. Given a breach of a duty of confidence, the finding of a fiduciary relationship was not strictly necessary.

The law of confidence and the law relating to fiduciary obligations are not coextensive and yet are not completely distinct. A claim for breach of confidence will only be made out, however, when it is shown that the confidee has misused the information to the detriment of the confider. Fiduciary law, however, is concerned with the duty of loyalty and does not require that harm result. Duties of confidence, unlike fiduciary obligations, can arise outside a direct relationship. Another difference is that breach of confidence also has a jurisdictional base at law, and accordingly can draw on remedies available in both law and equity, whereas fiduciary obligations arise only in equity and can only draw upon equitable remedies.

The following common features provide a rough and ready guide to whether or not a fiduciary obligation should be imposed on a new relationship: (1) the fiduciary has scope for the exercise of some discretion or power; (2) the fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests; and (3) the beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

A fiduciary obligation can arise out of the specific circumstances of a relationship where fiduciary obligations would not normally be expected. One party is entitled to expect that the other will act in his interests in and for the purposes of the relationship. A fiduciary relationship does not normally arise between arm's length commercial parties. The facts here, however, supported the imposition of a fiduciary obligation which Lac breached and may be grouped under the headings: (1) trust and confidence; (2) industry practice; and, (3) vulnerability. They overlapped to some extent.

The relationship of trust and confidence that had developed between Corona and Lac merited significant weight in determining if a fiduciary obligation existed. Both parties would reasonably expect that a legal obligation would be imposed on Lac not to act in a manner contrary to Corona's interest with respect to the Williams property.

Industry practice, while not conclusive, should be given significant weight in determining what Corona could reasonably expect of Lac. The issue was not the legal effect of custom in the industry but rather the importance of the existence of a practice in the industry in determining what could reasonably be expected. The practice in the industry was premised on the disclosure of confidential

information in the context of serious negotiations and was so well known that at the very least Corona could reasonably expect Lac to abide by it. The practice was neither vague nor uncertain.

Vulnerability or its absence is not conclusive of the question of fiduciary obligation. It, however, must be considered when found in determining if the facts give rise to a fiduciary obligation. Corona was vulnerable to Lac and this vulnerability was a factor deserving of considerable weight in the identification of a fiduciary obligation. Given industry practice, Corona would not expect Lac to use this information to Corona's detriment. The fact that Corona did not protect itself with a confidentiality agreement, which would confirm what everyone knew, should not be reason to deny the existence of a fiduciary obligation. Confidentiality agreements should not be presumed where it is not established that the entering of confidentiality agreements is a common, usual or expected course of action, particularly when the law of fiduciary obligations can operate to protect the reasonable expectations of the parties. There was no reason to clutter normal business practice by requiring a contract.

Business and accepted morality are not mutually exclusive domains. Finding a breach of fiduciary obligation here would not create uncertainty in commercial law or result in ad hoc morality determining the rules of commercial conduct.

The constructive trust is but one remedy available in the law of restitution, and will only be imposed in appropriate circumstances. The Court determines whether a claim for unjust enrichment is established, and then examines whether in the circumstances a constructive trust is the appropriate remedy to redress that unjust enrichment. There is no unanimous agreement on the circumstances in which a constructive trust will be imposed. Some guidelines can, however, be suggested. First, no special relationship between the parties is necessary. Insistence on a special relationship would undoubtedly lead to relationships being created in order to justify the remedy. Secondly, the constructive trust is not reserved for situations where a right of property is recognized. That would limit the constructive trust to its institutional function, and deny to it the status of a remedy, its more important role. A pre-existing right of property need not necessarily exist when a constructive trust is ordered. The imposition of a constructive trust can both recognize and create a right of property. A proprietary remedy, however, should not be imposed whenever it is "just" to do so, unless further guidance can be given as to what those situations may be.

The issue of the appropriate remedy only arises once a valid restitutionary claim has been made out. The constructive trust awards a right in property, but that right can only arise once a right to relief has been established. The facts here supported a claim for unjust enrichment. The constructive trust awards a right in property and should only be awarded if there is reason to grant to the plaintiff the additional rights that flow from recognition of a right of property. More important here was the right of the property holder to have changes in value accrue to its account rather than to the account of the wrongdoer. The moral quality of the defendants' act may also be another consideration in determining whether a proprietary remedy is appropriate. The focus of the inquiry, however, should be upon the reasons for recognizing a right of property in the plaintiff, not on the reasons for

denying it to the defendant.

The constructive trust was the only appropriate remedy here, given the uniqueness of the Williams property, given the fact Corona would have acquired the property but for Lac's breaches of duty, and given the virtual impossibility of accurately valuing the property. The trial judge's award was confirmed.

Per Lamer J.: The evidence here, for the reasons set out by Sopinka J., did not establish the existence of a fiduciary relationship. For the reasons of La Forest and Sopinka JJ., Lac breached a duty of confidence and the proper approach in arriving at the appropriate remedy was that adopted by La Forest J.

Per Wilson J.: No ongoing fiduciary relationship arose between the parties by virtue only of their arm's length negotiations towards a mutually beneficial commercial contract for the development of the mine. A fiduciary duty, however, arose in Lac when it was made privy to the confidential information about the Williams property.

Lac's acquisition of the Williams property, which was the subject of a confidence, may also be characterized as a breach of confidence at common law with respect to the information concerning the Williams property.

When the same conduct gives rise to alternate causes of action, one at common law and the other in equity, and the available remedies are different, the Court should consider which will provide the more appropriate remedy to the innocent party and give the innocent party the benefit of that remedy. The remedy of constructive trust is available for breach of confidence as well as for breach of fiduciary duty. Here, the imposition of a constructive trust on Lac with respect to the Williams property, in contrast to an award of damages which depended on valuation techniques, was the only sure way to fully compensate Corona. It also made sure that the wrongdoer would not benefit from his wrongdoing.

Per McIntyre and Sopinka JJ. (dissenting in part): When confronted with a relationship that does not fall within one of the traditional categories, such as trustee-beneficiary, the Court must consider if the essential ingredients of a fiduciary relationship are present. A fiduciary obligation may be imposed in relationships where three general characteristics seem to exist: (1) the fiduciary has scope for the exercise of some discretion or power; (2) the fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests; and, (3) the beneficiary is peculiarly vulnerable to the fiduciary holding the discretion. This last feature is indispensable to the existence of the relationship and is very relevant here.

Equity subjects the fiduciary to its strict standards of conduct where a condition of dependency exists. Two caveats must be issued, however. Firstly, the conduct that incurs the censure of a court of equity in the context of a fiduciary duty cannot itself create the duty. And secondly, the receipt and misuse of confidential information cannot of itself create a fiduciary obligation.

No fiduciary duty arose here. The combined effect of a number of factors indicating a fiduciary relationship could not overcome the absence of an element of dependency which is essential to the finding of a fiduciary relationship. The parties here had not as yet identified the type of relationship they wanted, let alone advanced beyond the negotiation stage, and no discretionary power had been conferred on Lac to acquire the Williams property. The state of the negotiations, therefore, did not attract the principle in United Dominions Corp. v. Brian Pty. Ltd. The fact that Lac sought out Corona did not add very much to the case in favour of a finding that a fiduciary relationship existed. Corona was seeking a senior mining company and Lac responded with an expression of interest. In every commercial venture, one of the parties approaches the other. This is not an indicium of a fiduciary relationship. The arrangement as to the geochemical program should not be considered a step in the implementation of a joint venture. The evidence was too sketchy to be able to relate this activity to any proposed agreement between the parties, the nature of which itself was undetermined. The supply of confidential information is not necessarily referable to a fiduciary relationship and was therefore at best a neutral factor.

No practice in the mining industry supported the existence of a fiduciary relationship. In a contract setting, a practice that is notorious and clearly defined and relevant to the business under discussion can readily be incorporated as a term as it can readily be inferred that the parties agreed to it. It is, however, a considerable leap from this principle to erect a fiduciary relationship on the basis of such a practice. Moreover, the evidence, accepted at face value, was more consistent with the obligation of confidence.

The fact that the parties were negotiating towards a common object could not elevate the negotiations to something more. All negotiations seek to achieve a common object -- the accomplishment of the business venture for which the partnership or joint venture is sought to be formed.

The element of dependency or vulnerability was virtually lacking. There was clearly no physical or psychological dependency which attracted fiduciary duty here. A dependency of this sort between corporations, while possible, cannot exist when the dealings are between experienced mining promoters who have ready access to geologists, engineers and lawyers. If Corona placed itself in a vulnerable position because Lac was given confidential information, this dependency was gratuitously incurred. Corona could have required Lac to undertake not to acquire the Williams property unilaterally. Corona abandoned any possible contractual claim and so could not obtain contractual protection.

A breach of confidence occurred here. The information that Lac obtained from Corona was confidential. Much of it went beyond what had been disclosed to the public. This information put Lac in a preferred position vis-à-vis others with respect to knowledge of the desirability of acquiring Williams property. This information was imparted in circumstances which gave rise to an obligation of confidence. Both parties understood that they were working toward a joint venture or other business arrangement. Finally, Lac's acquisition of the Williams property was a misuse of this

information. This acquisition, at best, might not have amounted to a misuse of information had it been done subject to the understanding that it was in the context of working towards a joint venture with Corona.

The court can exercise considerable flexibility in fashioning a remedy for breach of confidence because the action does not rest solely on any one of the traditional jurisdictional bases for action -- contract, equity or property -- but is sui generis and relies on all three. There is scant jurisprudence supporting the imposition of a constructive trust over property acquired as a result of the use of confidential information. A constructive trust is ordinarily reserved for those situations where a right of property is recognized. Although confidential information has some of the characteristics of property, its foothold as such is tenuous. Unjust enrichment has been recognized as having an existence apart from contract or tort under a heading referred to as the law of restitution but a constructive trust is not the appropriate remedy in most cases. There was no reason to extend the use of the constructive trust here.

The conventional remedies for breach of confidence are an accounting of profits or damages. An injunction may be coupled with either of these remedies in appropriate circumstances. In a breach of confidence case, the focus is on the loss to the plaintiff and, as in tort actions, the particular position of the plaintiff must be examined. The object is to restore the plaintiff monetarily to the position he would have been in if no wrong had been committed and is generally achieved by an award of damages. A restitutionary remedy may be appropriate in cases involving fiduciaries because they are required to disgorge any benefits derived from the breach of trust. It would be unjust, however, to impress the whole of the property with a constructive trust when the extent of the connection between the confidential information and the acquisition of the property is uncertain.

The wrong committed by Lac was the acquisition of the Williams property for itself and to the exclusion of Corona. This was contrary to the understanding that the parties were working towards a joint venture or some other business arrangement and constituted a breach of that understanding under which the confidential information was supplied to Lac. As in contract, account must be taken of the fact that but for the breach by Lac, a joint venture agreement would likely have resulted similar to that concluded with Teck. Damages should be assessed accordingly.

**Cases Cited**

By La Forest J.

Considered: Coco v. A. N. Clark (Engineers) Ltd., [1969] R.P.C. 41; Guerin v. The Queen, [1984] 2 S.C.R. 335; Chase Manhattan Bank N. A. v. Israel-British Bank (London) Ltd., [1981] Ch. 105; Tito v. Waddell (No. 2), [1977] 3 All E.R. 129; referred to: Hospital Products Ltd. v. United States Surgical Corp. (1984), 55 A.L.R. 417; Frame v. Smith, [1987] 2 S.C.R. 99; Girardet v. Crease & Co. (1987), 11 B.C.L.R. (2d) 361; Goodbody v. Bank of Montreal (1974), 47 D.L.R. (3d) 335; United Dominions Corp. v. Brian Pty. Ltd. (1985), 59 A.L.J.R. 676; Saltman Engineering Co. v. Campbell Engineering Co. (1948), 65 R.P.C. 203; Liquid Veneer Co. v. Scott (1912), 29 R.P.C.

639; Cunliffe-Owen v. Teather & Greenwood, [1967] 1 W.L.R. 1421; Burns v. Kelly Peters & Associates Ltd. (1987), 41 D.L.R. (4th) 577; Nelson v. Dahl (1879), 12 Ch. D. 568; Norwich Winterthur Insurance (Australia) Ltd. v. Con-Stan Industries of Australia Pty. Ltd., [1983] 1 N.S.W.L.R. 461; Keech v. Sandford (1726), Sel. Cas. T. King 61, 25 E.R. 223; Central Trust Co. v. Rafuse, [1986] 2 S.C.R. 147; Fraser Edmunston Pty. Ltd. v. A.G.T. (Qld) Pty. Ltd., Queensland S.C., June 3, 1986 (Williams J.), unreported; Air Canada v. British Columbia, [1989] 1 S.C.R. 1161; Pettkus v. Becker, [1980] 2 S.C.R. 834; In re Coomber, [1911] 1 Ch. 723; Pre-Cam Exploration & Development Ltd. v. McTavish, [1966] S.C.R. 551; Seager v. Copydex, Ltd. (No. 2), [1969] 2 All E.R. 718; Hunter Engineering Co. v. Syncrude Canada Ltd., [1989] 1 S.C.R. 426; Muschinski v. Dodds (1985), 160 C.L.R. 583.

By Sopinka J. (dissenting in part)

Hospital Products Ltd. v. United States Surgical Corp. (1984), 55 A.L.R. 417; Guerin v. The Queen, [1984] 2 S.C.R. 335; Girardet v. Crease & Co. (1987), 11 B.C.L.R. (2d) 361; Frame v. Smith, [1987] 2 S.C.R. 99; Tito v. Waddell (No. 2), [1977] 3 All E.R. 129; United Dominions Corp. v. Brian Pty. Ltd. (1985), 59 A.L.J.R. 676; Cunliffe-Owen v. Teather & Greenwood, [1967] 1 W.L.R. 1421; Saltman Engineering Co. v. Campbell Engineering Co. (1948), 65 R.P.C. 203; Seager & Copydex Ltd., [1967] 1 W.L.R. 923; Coco v. A. N. Clark (Engineers) Ltd., [1969] R.P.C. 41; Nichrotherm Electrical Co. v. Percy, [1957] R.P.C. 207; Pettkus v. Becker, [1980] 2 S.C.R. 834; Nicholson v. St. Denis (1975), 8 O.R. (2d) 315; Unident v. Delong, Joyce and Ash Temple Ltd. (1981), 50 N.S.R. (2d) 1; Pre-Cam Exploration & Development Ltd. v. McTavish, [1966] S.C.R. 551; Dowson & Mason Ltd. v. Potter, [1986] 2 All E.R. 418; Talbot v. General Television Corp. Pty. Ltd., [1980] V.R. 224; General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., [1975] 2 All E.R. 173; Florence Realty Co. v. The Queen, [1968] S.C.R. 42.

**Statutes and Regulations Cited**

Courts of Justice Act, S.O. 1984, c. 11, ss. 138(1)(b), 139.

**Authors Cited**

Austin, R.P. "Commerce and Equity -- Fiduciary Duty and Constructive Trust" (1986), 6 O.J.L.S. 444.
Birks, Peter. An Introduction to the Law of Restitution. Oxford: Clarendon Press, 1985.
Birks, Peter. "Restitutionary damages for breach of contract: Snepp and the fusion of law and equity," [1987] Lloyd's Mar. & Com.L.Q. 421.
Campbell, Colin L. The Advocates' Society Journal, Aug. 1988.
Finn, Paul D. Fiduciary Obligations. Sydney: Law Book Co., 1977.

Finn, Paul D. "The Fiduciary Principle," Victoria Law School Conference Lecture, 1988.

Frankel, Tamar. "Fiduciary Law" (1983), 71 Calif. L. Rev. 795.

Fridman, G.H.L. and James G. McLeod. Restitution. Toronto: Carswells, 1982.

Gautreau, J.R. Maurice. "Demystifying the Fiduciary Mystique" (1989), 68 Can. Bar Rev. 1.

Goff of Chieveley, Robert Goff, Baron, and Gareth Jones. The Law of Restitution, 3rd ed. London: Sweet & Maxwell, 1986.

Grange, Samuel. "Good Faith in Commercial Transactions" in Commercial Law: Recent Developments and Emerging Trends. Special Lectures of the Law Society of Upper Canada. Don Mills, Ontario: De Boo, 1985.

Gurry, Francis. Breach of Confidence. Oxford: Clarendon Press, 1984.

Halsbury's Laws of England, vol. 12, 4th ed. London: Butterworths, 1975.

Kennedy, J. "Equity in a Commercial Context". In P.D. Finn, ed., Equity and Commercial Relationships. Sydney: Law Book Co., 1987.

Klinck, Dennis R. "The Rise of the 'Remedial' Fiduciary Relationship: A Comment on International Corona Resources Ltd. v. Lac Minerals Ltd." (1988), 33 McGill L.J. 600.

Lindley, Curtis Holbrook. A Treatise on the American Law Relating to Mines and Mineral Lands, 2nd ed. Reprint of 2nd ed., 1903. New York, Arno Press, 1972.

Mason, Sir Anthony. "Themes and Prospects". In Paul D. Finn, ed. Essays in Equity. Sydney: Law Book Co., 1985.

McCamus, John D. "The Role of Proprietary Relief in the Modern Law of Restitution," in The Cambridge Lectures 1987. Conference of the Canadian Institute for Advanced Legal Studies, 1987, held at the Cambridge University, England. Frank E. McArdle, ed. Montréal: Yvon Blais, 1989.

Ong, D.S.K. "Fiduciaries: Identification and Remedies" (1986), 8 U. of Tasm. L. Rev. 311. Oxford English Dictionary, vol. 19, 2nd ed. Oxford: Clarendon Press, 1989.

Shepherd, J.C. The Law of Fiduciaries. Toronto: Carswells, 1981.

Shepherd, J.C. "Towards a Unified Concept of Fiduciary
Relationships" (1981), 97 L.Q.R. 51.
Waters, D.W.M. Law of Trusts in Canada, 2nd ed. Toronto:
Carswells, 1984.
Weinrib, Ernest J. "The Fiduciary Obligation" (1975), 25 U.
of T. L.J. 1.

APPEAL from a judgment of the Ontario Court of Appeal (1987), 44 D.L.R. (4th) 592, (1987) 62
O.R. (2d) 1, dismissing an appeal from a judgment of R. Holland J. (1986), 25 D.L.R. (4th) 504, 53
O.R. (2d) 737. Appeal dismissed, McIntyre and Sopinka JJ. dissenting in part.

Earl A. Cherniak, Q.C., and J. L. McDougall, Q.C., for the appellant.
A.J. Lenczner, Q.C., R.G. Slaght, Q.C., and Larry Page, for the respondent.

Solicitors for the appellant: Fraser & Beatty, Toronto.
Solicitors for the respondent: McCarthy & McCarthy, Toronto.

---

The reasons of McIntyre and Sopinka JJ. were delivered by

**1    SOPINKA J.** (dissenting in part):-- This appeal and cross-appeal raise important issues relating
to fiduciary duty and breach of confidence. In particular, they require this Court to consider whether
fiduciary obligations can arise in the context of abortive arm's-length negotiations between parties
to a prospective commercial transaction. Also at issue are the nature of confidential information and
the appropriate remedy for its misuse.

The Facts

**2    **The facts are fully developed in the reasons for judgment of the trial judge, R. Holland J.
(1986), 53 O.R. (2d) 737, and in the judgment of the Ontario Court of Appeal (1987), 62 O.R. (2d)
1. My recital of them, here, will therefore be skeletal in nature. From time to time in these reasons,
some of the facts relating to specific issues will be examined in greater detail.

**3    **The parties to these proceedings are International Corona Resources Ltd. (which I will refer to
as either "Corona" or the "respondent") and Lac Minerals Ltd. (which I will refer to as either "Lac"
or the "appellant"). Corona, which was incorporated in 1979, was at material times a junior mining
company listed on the Vancouver Stock Exchange. Lac is a senior mining company which owns a
number of operating mines and is listed on several Stock Exchanges. This action arises out of
negotiations between Corona and Lac relating to the Corona property, the Williams property and the

Hughes property, all of which are located in the Hemlo area of northern Ontario.

4    The Corona property consists of 17 claims with an area of approximately 680 acres. The Williams property consists of 11 patented claims, covering a total of about 400 acres, and is contiguous to the Corona property and to the west. The Hughes property consists of approximately 156 claims and surrounds both the Corona and Williams properties, except to the north of the Williams property. It is now in the names of Golden Sceptre Resources Limited, Goliath Gold Mines Limited and Noranda Exploration Company, Limited.

5    In October 1980, Corona had retained Mr. David Bell, a geologist consultant to carry out an extensive exploration programme on its property which involved extensive diamond drilling. Bell hired Mr. John Dadds, a mining technician, to assist him. The core that was obtained from the drilling was identified, logged and then stored inside a core shack built on the Corona property. Assay results were sent to Bell and to the Corona office in Vancouver. Some of the results were communicated to the Vancouver Stock Exchange in the form of news releases and assay results, and were published from time to time in the George Cross News Letter, a daily newsletter published in Vancouver.

6    The results of this exploratory work led Bell to an interesting theory. The trial judge describes it in some detail, at p. 744:

> Mr. Bell testified that by February, 1981, he was sufficiently encouraged by the results of the drilling programme that he decided that it was time to acquire the Williams property and the claims to the north. Mr. Bell said that within the first month of drilling his opinion of the geology changed from what he initially thought was a secondary intrusive model, from reading the literature of the area, to a syngenetic deposit. That is a deposit formed at the same time and by the same process as the enclosing rocks. He concluded that the mineralization and gold values were not tied into a vein but rather that the mineralization was in a zone, or beds, of megasediment that indicated a volcanic origin. In Mr. Bell's opinion, in all likelihood, the distribution of gold could be spread over quite a large area and there could be pools or puddles of ore, indicating to him that the exploration programme should be extended along the zone to adjoining properties.

7    This increased the interest in surrounding properties and Bell, on behalf of Corona, requested Mr. Donald McKinnon, a prospector who was familiar with the properties, to attempt to acquire the Williams property. Representatives of Lac read about these results in the March 20, 1981 George Cross News Letter and arranged to visit the Corona property. This property visit took place on May 6, and Bell had arranged for Dadds to have core, assay results, sections, maps and a drill plan available at the core shack. Those present at the meeting consisted of Nell Dragovan, then President of Corona, and Messrs. Bell, Dadds, Sheehan (Vice-President for Exploration of Lac), and Pegg (a

Lac geologist). The visitors were shown cores, sections, logs with assay results added and a map showing the staking in the area. Bell discussed progress to date, plans for the future and his theory of the geology. Sheehan and Pegg both examined the core and, after the meeting in the core shack, which Bell said lasted about 45 minutes, they went outside. Bell took a map and explained where the earlier drilling had taken place as well as the location of future holes, and discussed the geology further. He also indicated that the formation was continuing to the west on the Williams property and that Corona wanted to continue its exploration there. Outcrops in the area were also inspected. Bell said that before he left, Sheehan told him that he "wanted me to drop into Toronto when I was there and to further the discussions of their visit and talk about possible terms". A meeting was arranged for May 8 in Toronto at Lac's head office.

**8**    R. Holland J. found as a fact that there were no discussions regarding confidentiality during the May 6 property visit except in connection with an unrelated matter.

**9**    Following the site visit, Sheehan and Pegg returned quickly to Lac's exploration office in Toronto and instructed Lac personnel to gather information on the Hemlo area from the Lac library of files. They then went to the Assessment Office of the Ontario Department of Mines to obtain copies of all claim maps, reports, publications and assessment work files that were available on the area. Sheehan told a Lac geologist to ascertain what claims would be necessary to cover the favourable belt to the east of the Corona property. The geologist decided that about 600 claims should be staked and immediately thereafter, on May 8, Lac began staking what are now known as the White River claims.

**10**    On May 8, Bell and Sheehan met and discussed the geology of the area, its similarity to the Bousquet area of Quebec, at which both Pegg and Sheehan had worked, and the possible terms of an agreement between Corona and Lac. Sheehan told Bell of Lac's staking to the east. Bell said that the two men discussed the properties around the Corona property. Corona's interest in the Williams and Hughes properties was mentioned and Sheehan gave Bell advice on how to pursue a patented claim. Bell told Sheehan that Corona had somebody doing that, without mentioning McKinnon by name. A number of avenues for progress were discussed and Sheehan said that he would send a letter outlining the terms that were discussed. Again, nothing was said regarding confidentiality.

**11**    On May 19, Sheehan wrote to Bell as follows (at p. 750):

> Further to our meeting in Toronto I would like to give you this letter as further evidence of our sincerity in joining with Corona re exploration in the Hemlo area.

> As we discussed there are a number of avenues that could be explored regarding a working arrangement re the property and to that end I will list the various possibilities:

a)    Corona could have our Company do a financing and ultimately we would scale it forward so as to control Corona.

b)    We form a joint venture where Long Lac (a Lac subsidiary) spends say 1.5 to 2.0 times amount spent by Corona for a 60% interest. Beyond that point we spend on a 60-40 basis or use a dilution formula down to a minimum should one party decide to stop contributing. In addition Lac would have to spend a definite amount of money to reach a threshold before they would acquire any interest.

c)    A possible significant cash payment with a variation in interests as a result of the amount of cash payment. Followed by a Lac work proposal.

As discussed we should entertain the possibility of Corona participate (sic) in the Hughes ground and that should be actively pursued. In addition we are staking ground in the area and recognizing Corona's limited ability to contribute we could work Corona into the overall picture as part of an overall exploration strategy.

I believe at some point within the next few weeks we should have an understanding that Corona and Lac should seriously examine an avenue for continual work in the area. Perhaps you could give our management a presentation of results to date ie, sections, general geology, longitudinal presentation -- location potential etc. Based on foregoing we could then arrive at a sound basis for structuring a working agreement.

**12**    The trial judge found that the reference to the Hughes ground was intended to include the Williams property as well. Bell replied by letter dated May 22 as follows:

I am in receipt of your letter dated May 19, 1981 regarding the Hemlo Property. First may I thank you for your fine hospitality
during my brief visit to Toronto.

I am forwarding a copy of your proposal to Vancouver for the other directors to review. We are presently well into our Phase II, exploring and extending the previously examined parameters outlined in Phase I. Our present plans are to complete 30,000 to 35,000 feet of diamond drilling at which time a general over-all review will take place.

At this point, until I hear otherwise from the directors in Vancouver, I like your idea of Corona's contribution with Long Lac Minerals Exploration Limited as part of an overall exploration programme in the area.

> In the meantime I do believe we should keep in touch and maintain the fine relationship presently established.

**13**   Bell wrote to Dragovan by letter dated May 23 which stated, in part, the following:

> Enclosed is a copy of a letter received from Long Lac Mineral Exploration Limited, also please find a copy of my letter to Lac in reply. This letter from Lac should be discussed with all directors.

**14**   On May 27, Corona released to the Vancouver Stock Exchange encouraging assay results of a drill hole, which the trial judge referred to as the "discovery hole". These results were published in the George Cross News Letter of May 29, and further results confirming an extension of the "discovery hole" were released on June 4 and published in the George Cross News Letter of June 8.

**15**   Subsequently, the results of further drill holes that were encouraging were published by Corona. On June 8, Mr. Murray Pezim, a stock promoter from Vancouver, became a director of Corona. Pezim arranged for Bell to make a presentation in Vancouver on behalf of Corona to a large number of brokers. Some of the information developed by Bell was imparted to those present at this meeting.

**16**   On June 15 a meeting was also arranged for June 30 at Lac's head office in Toronto, at which Bell was to make a presentation in accordance with Sheehan's letter of May 19. Following the meeting, sections, a detailed drill plan and apparently a vertically longitudinal section were left with Lac. Mr. Peter Allen, the President of Lac, advised Bell to be aggressive in his pursuit of the Williams property and Bell responded that Corona had somebody pursuing this property on their behalf. Allen told Sheehan to get a proposal out to Corona and Sheehan indicated that he would have such a proposal out within three weeks.

**17**   According to Bell, no one from Lac ever told him that they would not acquire the Williams property and Lac was never told that the information given to it was private, privileged or confidential. Although the evidence was contradictory, the trial judge found as a fact that the pursuit by Corona of the Williams property was mentioned at the meeting. This and other information revealed to Lac went beyond the information that had been made public. This finding was confirmed by the Court of Appeal. The trial judge also found that it was agreed that a proposal would be sent by Lac to Corona within three weeks, and that the purpose of the meeting was to discuss a possible deal between Corona and Lac in order to provide Corona with the financing needed to develop a mine.

**18**   Meanwhile, on June 8, McKinnon had spoken to Mrs. Williams by telephone and made an oral offer for the Williams property, which was followed by a written offer prepared by solicitors. On July 3, after some searching, Sheehan located Mrs. Williams by telephone and made an oral

offer to her. She asked for a written offer and by letter dated July 6, 1981, Lac's legal counsel put it in writing.

**19**    On July 21, McKinnon again spoke to Mrs. Williams who told him that she had another offer and that he should contact her Toronto solicitor. On July 22, McKinnon told Bell of the other offer and it was agreed by Bell and Dragovan that Corona should make an offer to Williams directly. At this time, no one from Corona knew that the other offer was from Lac. On July 23, Corona's solicitor prepared an offer, which was delivered on July 27. Also on July 23, Mrs. Williams' Toronto solicitor disclosed Lac's name to Corona's solicitor. Lac's offer was accepted on July 28 and a formal agreement was signed on August 25, 1981.

**20**    After hearing that the Lac offer had been accepted, Pezim turned the matter over to his solicitors. On August 18, 1981, Sheehan went to Vancouver to attempt to resume negotiations with Pezim, who asked for the return of the Williams property. No agreement was reached. Later, Mr. Donald Moore, another director of Corona attempted to revive negotiations with Sheehan, without success.

**21**    After the Corona-Lac relationship had come to an end, Corona concluded an agreement with Teck Corporation (hereinafter referred to as "Teck") dated December 10, 1981, which was subsequently amended by agreements dated August 13, 1982 and December 14, 1983. These agreements, while providing for a joint venture in connection with the possible development of a mine on the Corona property, also purport to give Teck a 50 percent interest in the fruits of Corona's lawsuit against Lac, with Teck agreeing to pay certain costs.

The Judgments Below

Ontario High Court

**22**    The trial judge considered the liability of Lac under three heads pleaded by Corona: contract, breach of confidence and breach of fiduciary duty. R. Holland J. concluded that no binding contract was entered into by the parties but found Lac liable under the other two heads of liability, breach of confidence and breach of fiduciary duty. He decided that the appropriate remedy for breach of fiduciary duty was the return of the Williams property to Corona but allowed Lac's claim for a lien for the cost of improvements, and the amounts paid to Williams excluding royalty payments. The actual amount spent by Lac on developing the property was $203,978,000 but this was discounted by $50,000,000 to take into account the fact that if Corona had not been deprived of the Williams property, it would have developed the property and the Williams property as one mine, thereby achieving a saving represented by the discount. Either party was entitled to undertake a reference to determine the amount by which the Williams property was enhanced by virtue of Lac's expenditure if dissatisfied with the trial judge's estimate of the discount of $50,000,000. Lac was ordered to transfer the property to Corona upon payment by Corona to Lac of these amounts.

**23**    A reference was also ordered to determine the amount of the profits obtained by Lac from the

Williams property. Lac was ordered to pay the amount of such profits to Corona with interest.

**24**    With the agreement of counsel, damages were assessed in the event that, on appeal, a court should decide that damages were the appropriate remedy. The assessment was made on the principles applicable to breach of fiduciary duty. The amount was $700,000,000 being the value of the mine as of January 1, 1986 on the basis of a discounted cash flow approach.

Court of Appeal

**25**    The Court of Appeal affirmed the findings of the trial judge with respect to breach of confidence and fiduciary duty. It also confirmed the remedy with the addition of its opinion that a constructive trust was an appropriate remedy for both the breach of confidence and fiduciary duty. The court did not deal with the appellant's attack on the assessment of damages. In the result, the appeal was dismissed with costs. I will deal more fully with the reasons of both the trial judge and the Court of Appeal when discussing the issues.

The Issues Before This Court

**26**    The issues raised in this appeal can be conveniently grouped under three headings:

> (1)    Fiduciary Duty

> > Did a fiduciary relationship exist between Corona and Lac which was breached by Lac's acquisition of the Williams property?

> (2)    Breach of Confidence

> > Did Lac misuse confidential information obtained by it from Corona and thereby deprive Corona of the Williams property?

> (3)    Remedy

> > What is the appropriate remedy if the answer to (1) or (2) is in the affirmative?

> (1)    Did a Fiduciary Relationship Arise between Lac and Corona?

**27**    The consequences attendant on a finding of a fiduciary relationship and its breach have

resulted in judicial reluctance to do so except where the application of this "blunt tool of equity" is really necessary. It is rare that it is required in the context of an arm's length commercial transaction. Kennedy J., in "Equity in a Commercial Context," in P. D. Finn, ed., Equity and Commercial Relationships, explains why, at p. 15:

> It would seem that part of the reluctance to find a fiduciary duty within an arm's length commercial transaction is due to the fact that the parties in that situation have an adequate opportunity to prescribe their own mutual obligations, and that the contractual remedies available to them to obtain compensation for any breach of those obligations should be sufficient. Although the relief granted in the case of a breach of a fiduciary duty will be moulded by the equity of the particular transaction, an offending fiduciary will still be exposed to a variety of available remedies, many of which go beyond mere compensation for the loss suffered by the person to whom the duty was owed, equity, unlike the ordinary law of contract, having [sic] regard to the gain obtained by the wrongdoer, and not simply to the need to compensate the injured party.

It was submitted that the departure of the courts below from this salutary rule has resulted in a plethora of claims that would impose fiduciary relationships in a commercial-type setting. Writing in The Advocates' Society Journal, Aug. 1988, Colin L. Campbell supports this point of view. He states at p. 44:

> The Lac-Corona decision, together with the decision in Standard Investments v. Canadian Imperial Bank of Commerce determining that a banker could be held to a fiduciary duty when he revealed information obtained in confidence, has given rise to a plethora of claims to impose fiduciary obligations where the parties' relationship has been formalized by a contract. In addition to the above principles, such obligations have been imposed on bankers, lawyers, stockbrokers, accountants, and others.

**28**    In Hospital Products Ltd. v. United States Surgical Corp. (1984), 55 A.L.R. 417, Dawson J. continued, at pp. 493-94:

> The undesirability of extending fiduciary duties to commercial relationships and the anomaly of imposing those duties where the parties are at arm's length from one another was referred to in Weinberger v. Kendrick (1892) 34 Fed Rules Serv. (2d) 450. And in Barnes v. Addy (1874) 9 Ch. App. 244 at 251, Lord Selborne LC said: "It is equally important to maintain the doctrine of trusts which is established in this court, and not to strain it by unreasonable construction beyond its due and proper limits. There would be no better mode of undermining the sound doctrines of equity than to make unreasonable and inequitable applications of them."

**29**    In our own Court, in Guerin v. The Queen, [1984] 2 S.C.R. 335, at p. 384, Dickson J. (as he then was) referred to a passage from Professor Weinrib's article, "The Fiduciary Obligation" (1975), 25 U. of T. L.J. 1, at p. 4, wherein the fiduciary obligation is described as "the law's blunt tool". In my opinion, equity's blunt tool must be reserved for situations that are truly in need of the special protection that equity affords.

**30**    While equity has refused to tie its hands by defining with precision when a fiduciary relationship will arise, certain basic principles must be taken into account. There are some relationships which are generally recognized to give rise to fiduciary obligations: director-corporation, trustee-beneficiary, solicitor-client, partners, principal-agent, and the like. The categories of relationships giving rise to fiduciary duties are not closed nor do the traditional relationships invariably give rise to fiduciary obligation. As pointed out by Dickson J. in Guerin v. The Queen, supra, at p. 384:

> It is sometimes said that the nature of fiduciary relationships is both established and exhausted by the standard categories of agent, trustee, partner, director, and the like. I do not agree. It is the nature of the relationship, not the specific category of actor involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence, should not be considered closed.

**31**    The nature of the relationship may be such that, notwithstanding that it is usually a fiduciary relationship, in exceptional circumstances it is not. See Shepherd, The Law of Fiduciaries, at pp. 21-22. Furthermore, not all obligations existing between the parties to a well-recognized fiduciary relationship will be fiduciary in nature. Southin J., in Girardet v. Crease & Co. (1987), 11 B.C.L.R. (2d) 361, observed that the obligation of a solicitor to use care and skill is the same obligation as that of any person who undertakes to carry out a task for reward. Failure to do so does not necessarily result in a breach of fiduciary duty but simply a breach of contract or negligence. She issued this strong caveat against the overuse of claim for breach of fiduciary duty (at p. 362):

> Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word "fiduciary" is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But "fiduciary" comes from the Latin "fiducia" meaning "trust". Thus, the adjective, "fiduciary" means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words. The obligation of a solicitor of care and skill is the same obligation of any person who

undertakes for reward to carry out a task. One would not assert of an engineer or physician who had given bad advice and from whom common law damages were sought that he was guilty of a breach of fiduciary duty. Why should it be said of a solicitor? I make this point because an allegation of breach of fiduciary duty carries with it the stench of dishonesty -- if not of deceit, then of constructive fraud. See Nocton v. Lord Ashburton, [1914] A.C. 932 (H.L.). Those who draft pleadings should be careful of words that carry such a connotation.

**32**    When the Court is dealing with one of the traditional relationships, the characteristics or criteria for a fiduciary relationship are assumed to exist. In special circumstances, if they are shown to be absent, the relationship itself will not suffice. Conversely, when confronted with a relationship that does not fall within one of the traditional categories, it is essential that the Court consider: what are the essential ingredients of a fiduciary relationship and are they present? While no ironclad formula supplies the answer to this question, certain common characteristics are so frequently present in relationships that have been held to be fiduciary that they serve as a rough and ready guide. I agree with the enumeration of these features made by Wilson J. in dissent in Frame v. Smith, [1987] 2 S.C.R. 99. The majority, although disagreeing in the result, did not disapprove of the following statement, at pp. 135-36:

> A few commentators have attempted to discern an underlying fiduciary principle but, given the widely divergent contexts emerging from the case law, it is understandable that they have differed in their analyses: see, for example, E. Vinter, A Treatise on the History and Law of Fiduciary Relationships and Resulting Trusts (3rd ed. 1955); Ernest J. Weinrib, "The Fiduciary Obligation" (1975), 25 U.T.L.J. 1; Gareth Jones, "Unjust Enrichment and the Fiduciary's Duty of Loyalty" (1968), 84 L.Q.R. 472; George W. Keeton and L.A. Sheridan, Equity (1969), at pp. 336-52; Shepherd, [The Law of Fiduciaries], at p. 94. Yet there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not the imposition of a fiduciary obligation on a new relationship would be appropriate and consistent.

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:

> (1)    The fiduciary has scope for the exercise of some discretion or power.
> (2)    The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
> (3)    The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power.

**33**    It is possible for a fiduciary relationship to be found although not all of these characteristics are present, nor will the presence of these ingredients invariably identify the existence of a fiduciary relationship.

**34**    The one feature, however, which is considered to be indispensable to the existence of the relationship, and which is most relevant in this case, is that of dependency or vulnerability. In this regard, I agree with the statement of Dawson J. in Hospital Products Ltd. v. United States Surgical Corp., supra, at p. 488, that:

> There is, however, the notion underlying all the cases of fiduciary obligation that inherent in the nature of the relationship itself is a position of disadvantage or vulnerability on the part of one of the parties which causes him to place reliance upon the other and requires the protection of equity acting upon the conscience of that other ...

**35**    The necessity for this basic ingredient in a fiduciary relationship is underscored in Professor Weinrib's statement, quoted in Guerin, supra, at p. 384 that:

> "... the hallmark of a fiduciary relation is that the relative legal positions are such that one party is at the mercy of the other's discretion."

To the same effect is the discussion by Professor Ong in "Fiduciaries: Identification and Remedies" (1986), 8 U. of Tasm. L. Rev. 311, in which he suggests that the element which gives rise to and is common to all fiduciary relationships is the "implicit dependency by the beneficiary on the fiduciary". This condition of dependency moves equity to subject the fiduciary to its strict standards of conduct.

**36**    Two caveats must be issued. First, the presence of conduct that incurs the censure of a court of equity in the context of a fiduciary duty cannot itself create the duty. In Tito v. Waddell (No. 2), [1977] 3 All E.R. 129, at p. 230, Megarry V.-C. said:

> If there is a fiduciary duty, the equitable rules about self-dealing apply: but self-dealing does not impose the duty. Equity bases its rules about self-dealing upon some pre-existing fiduciary duty: it is a disregard of this pre-existing duty that subjects the self-dealer to the consequences of the self-dealing rules. I do not think that one can take a person who is subject to no pre-existing fiduciary duty and then say that because he self-deals he is thereupon subjected to a fiduciary duty.

**37**    Second, applying the same principle, the fact that confidential information is obtained and misused cannot itself create a fiduciary obligation. No doubt one of the possible incidents of a fiduciary relationship is the exchange of confidential information and restrictions on its use. Where, however, the essence of the complaint is misuse of confidential information, the appropriate cause

of action in favour of the party aggrieved is breach of confidence and not breach of fiduciary duty.

38    In my opinion, both the trial judge and the Court of Appeal erred in coming to the conclusion that a fiduciary relationship existed between Corona and Lac. In my respectful opinion, both the trial judge and the Court of Appeal erred by not giving sufficient weight to the essential ingredient of dependency or vulnerability and too much weight to other factors. The latter are as follows:

(a)    that the state of the negotiations attracted the principle in United Dominions Corp. v. Brian Pty. Ltd. (1985), 59 A.L.J.R. 676;

(b)    that Lac had sought out Corona;

(c)    that the geochemical program constituted an embarkation on a joint venture;

(d)    that Corona had divulged confidential information to Lac;

(e)    that a practice in the mining industry supported the existence of a fiduciary relationship;

(f)    that the parties were negotiating towards a common object.

The United Dominions Case

39    This is a decision of the High Court of Australia involving a joint venture between three parties, United Dominions Corporation (UDC), Security Projects Ltd. (SPL) and Brian Pty. Ltd. (Brian). Land was purchased with money provided by the joint venture and was to be developed for a hotel and shopping centre. SPL acted as agent for the joint venturers and held moneys in trust which had been provided by the joint venture. UDC acted as principal financier of the project with the balance of the funds being provided by the other joint venturers. Prior to the alleged breach of fiduciary duty, the percentage participation of each joint venturer had been set and substantial amounts had been contributed by them. The land was mortgaged to UDC as security for borrowings by SPL which acted as agents for Brian and others in this respect. All this was consistent with the terms of a draft joint venture agreement that had been circulated among the participants and eventually was executed.

40    The mortgage which SPL granted to UDC contained a "collateralisation clause" which had the effect of subjecting lands of the joint venture to debts incurred by SPL extraneous to the joint venture. UDC was "fully aware that the land registered in the name of SPL was held in circumstances which required SPL to account to the intended partners" (per Gibbs C.J., at p. 678).

41    The enforcement of the collateralisation clause by UDC resulted in the loss of Brian's investment and of course it obtained no return thereon.

42    In light of the above, the court concluded that the parties had embarked on a joint venture which the court found to be plainly a partnership. The court further found, at p. 680, that prior to the grant of the first mortgage, the "arrangements between the prospective joint venturers had passed far beyond the stage of mere negotiation". Clearly, if the draft agreement had not been signed subsequently, an agreement substantially in accordance with its terms would have been found to

exist by the court. Prior to its execution, the relationship of UDC, SPL and Brian was that of a de facto partnership or joint venture. Furthermore, Brian entrusted SPL with its funds and its interest in the land with the full knowledge of UDC. Brian was therefore "at the mercy of their discretion". In this respect the case is clearly distinguishable from the case at bar. The trial judge found that Lac and Corona "were clearly negotiating towards a joint venture or some other business relationship". The respondent had pleaded that a partnership agreement existed between it and the appellant but this claim was abandoned. In this respect, the trial judge found as follows: "The most that can be said is that the parties came to an informal oral understanding as to how each would conduct itself in anticipation of a joint venture or some other business arrangement". (Emphasis added.)

**43**    The parties here had not advanced beyond the negotiation stage. Indeed, they had not as yet identified what precisely their relationship should be. Furthermore, Corona did not confer on Lac any discretionary power to acquire the Williams property. Lac proceeded unilaterally to acquire the property for itself allegedly making use of confidential information, and that essentially is the ground of Corona's complaint.

**44**    The Court of Appeal recognized that this case differed from the United Dominions case, supra, at p. 317. In its opinion, however, the other factors present in the case which I have enumerated above, (a) to (f), made up for the difference.

**45**    I cannot find that factor (b) adds very much to the case in favour of a finding that a fiduciary relationship existed. In every commercial venture, one of the parties approaches the other. Corona was seeking a senior mining company and Lac responded with an expression of interest. This is not an indicium of a fiduciary relationship. Nor can I accept that factor (c), the arrangement as to the geochemical program, was a step in the implementation of a joint venture. The trial judge did not so find and the evidence is too sketchy to be able to relate this activity to any proposed agreement between the parties, the nature of which itself was undetermined. With respect to factor (d) as explained above, the supply of confidential information is not necessarily referable to a fiduciary relationship and is therefore at best a neutral factor. The other two factors, (e) and (f), require more extensive consideration.

The Practice in the Industry

**46**    The trial judge concluded as follows, at pp. 537-38:

> I conclude, following Cunliffe-Owen, supra, that there is a practice in the mining industry that imposes an obligation when parties are seriously negotiating not to act to the detriment of each other.

**47**    He did so on the basis of the following evidence with which all experts were in agreement (at pp. 536-37):

> (Mr. Allen) A. If one geologist goes to another geologist and says, are you

interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be -- I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that they weren't, there was just some exchange of conversation or physical data, then I would say that while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was exchanged.

. . .

Q.    ... Does the obligation not to harm each other that you referred to, et cetera, flow from the fact that they were in negotiation or discussion about a possible deal itself so long as it's a serious matter as you said?

. . . . .

(Mr. Allen). Yes.

No examples were apparently given illustrating the operation of this practice. Cunliffe-Owen v. Teather & Greenwood, [1967] 1 W.L.R. 1421, which was referred to by the trial judge and relied on by the Court of Appeal, is a contract case. The principle is well established in contract law. It is accurately expressed by Ungoed-Thomas J. at p. 1438:

For the practice to amount to such a recognised usage, it must be certain, in the sense that the practice is clearly established; it must be notorious, in the sense that it is so well known, in the market in which it is alleged to exist, that those who conduct business in that market contract with the usage as an implied term; and it must be reasonable.

The burden lies on those alleging "usage" to establish it ....

The practice that has to be established consists of a continuity of acts, and those acts have to be established by persons familiar with them, although, as is accepted before me, they may be sufficiently established by such persons without a detailed recital of instances. Practice is not a matter of opinion, of even the most highly qualified expert, as to what it is desirable that the practice should be. However, evidence of those versed in a market - so it seems to me - may be admissible and valuable in identifying those features of any transaction that

attract usage ....

**48**    It is understandable that, in a contract setting, a practice that is notorious and clearly defined and relevant to the business under discussion should be incorporated as a term. It can readily be inferred that the parties agreed to it. It is a considerable leap from this principle to erect a fiduciary relationship on the basis of such a practice. No authority was cited to the Court that this concept can simply be transplanted in this fashion. It is significant that the trial judge did not rely on this evidence in finding that a fiduciary obligation existed (pp. 776-77). Moreover, accepting the evidence at face value, it is more consistent with the obligation of confidence. The practice relates to a duty which arises upon the exchange of confidential information. Furthermore, in the absence of any illustrations of the operation of the practice, we are left with an expert's opinion on what is essentially a question of law - the existence of a fiduciary duty. The practice among geologists to act honourably towards each other is no doubt admirable and a practice to be fostered, but it should not be used to create a fiduciary relationship where one does not exist.

Common Object

**49**    The Court of Appeal stressed that the parties were not simply negotiating an ordinary commercial contract but were negotiating in furtherance of a common object. This factor does not particularly distinguish negotiations in furtherance of any partnership or joint venture. All such negotiations seek to achieve a common object, namely the accomplishment of the business venture for which the partnership or joint venture is sought to be formed. I do not see how this factor can elevate negotiations to something more.

Dependency or Vulnerability

**50**    In my opinion, this vital ingredient was virtually lacking in this case. Its absence cannot be replaced by any of the factors mentioned above. The Court of Appeal dealt with it as follows, at pp. 49-50:

> It was a case of negotiations between a junior mining company (Corona) whose primary activities were those of locating, staking and evaluating mining claims and a senior mining company (LAC) whose activities included all of the above together with the practice and experience of bringing into production and operating gold mining properties. It was a case of the senior company seeking out the junior company in order to obtain information with respect to mining claims already owned by the junior company and to discuss a joint business venture. Having regard to the practice found to exist in the industry with respect to the obligation not to act to the detriment of each other, particularly with respect to confidential information disclosed, it was to be expected that Corona would divulge confidential information to LAC during the course of their negotiations. In those circumstances, it is only just and proper that the court find that there exists a fiduciary relationship with its attendant responsibilities of

dealing fairly including, but not limited to, the obligation not to benefit at the expense of the other from information received by one from the other.

**51**    This statement seems to imply that there was a kind of physical or psychological dependency here which attracted fiduciary duty. Illustrations of this type of dependency are not difficult to find. They include parent and child, priest and penitent and the like. Clearly, a dependency of this type did not exist here. While it is perhaps possible to have a dependency of this sort between corporations, that cannot be so when, as here, we are dealing with experienced mining promoters who have ready access to geologists, engineers and lawyers. The fact that they were anxious to make a deal with a senior mining company surely cannot attract the special protection of equity. If confidential information was disclosed and misused, there is a remedy which falls short of classifying the relationship as fiduciary. In Frame v. Smith, supra, Wilson J. dealt with this indicia of fiduciary duty in the following language (at pp. 137-38):

> This vulnerability arises from the inability of the beneficiary (despite his or her best efforts) to prevent the injurious exercise of the power or discretion combined with the grave inadequacy or absence of other legal or practical remedies to redress the wrongful exercise of the discretion or power. Because of the requirement of vulnerability of the beneficiary at the hands of the fiduciary, fiduciary obligations are seldom present in the dealings of experienced businessmen of similar bargaining strength acting at arm's length: see, for example, Jirna Ltd. v. Mister Donut of Canada Ltd. (1971), 22 D.L.R. (3d) 639 (Ont. C.A.); aff'd [1975] 1 S.C.R. 2. The law takes the position that such individuals are perfectly capable of agreeing as to the scope of discretion or power to be exercised, i.e., any "vulnerability" could have been prevented through the more prudent exercise of their bargaining power and the remedies for the wrongful exercise or abuse of that discretion or power ... are adequate in such a case.

**52**    If Corona placed itself in a vulnerable position because Lac was given confidential information, then this dependency was gratuitously incurred. Nothing prevented Corona from exacting an undertaking from Lac that it would not acquire the Williams property unilaterally. And yet the trial judge found that while the Williams property was discussed by Bell and Sheehan, the latter did not agree not to acquire the Williams property. Indeed it does not appear that Lac was ever asked to refrain from so doing. In the letter dated May 19, Sheehan wrote to Bell in part as follows:

> As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued.

The reference to the Hughes ground included the Williams property. It would seem that the possibility of Corona participating could only come about if the property were acquired. This would suggest that the parties contemplated that Lac might acquire the property in which event Corona

would have a possibility of participating. At the very least Lac might reasonably have considered that such a course of action was open to it. In view of the abandonment by Corona of any contractual claim, I conclude that even this limited protection was not secured by any contractual arrangement.

**53**    Accordingly, if Corona gave up confidential information, it did so without obtaining any contractual protection which was available to it. This and the fact that misuse of confidential information is the subject of an alternate remedy strongly militate against the application here of equity's blunt tool. I now turn to that alternate remedy, breach of confidence.

(2)    Breach of Confidence

**54**    Both the trial judge and the Court of Appeal applied three criteria in determining whether a breach of confidence had been made out by the respondent. These elements are:

(i)    Confidential Information

Did Corona supply Lac with information having a quality of confidence about it?

(ii)    Communication in Confidence

Did Corona communicate this information to Lac in circumstances in which an obligation of confidence arises?

(iii)    Misuse of Information

Did Lac by acquiring the Williams property to the exclusion of Corona misuse or make an unauthorized use of the information?

**55**    The trial judge made findings of fact in favour of the respondent with respect to each of these criteria:

(i)    Confidential Information

In the present case much of the information transmitted by Corona to Lac was private and had not been published. There is no doubt, however, that Corona wished to attract investors. Drill hole results were published on a regular basis

and incorporated in George Cross Newsletters [sic]. Mr. Bell permitted himself to be quoted in the March 20th George Cross Newsletter and made a presentation to a group of stockbrokers in Vancouver.

Mr. Bell also quite freely discussed the Corona results with brokers, investors and friends. Lac, however, was told more than the general public. Mr. Sheehan was shown the core, the drill plan and sections on May 6th. He discussed the geology with Mr. Bell on May 6th, May 8th and June 30th, and a full presentation with up-to-date results was made to Lac on June 30th [at p. 774].

(ii)    Communication in Confidence

I find as a fact that on May 6, 1981, there was no mention of confidentiality with respect to the site visit, except in connection with New Cinch. I prefer the evidence of Messrs. Bell and Dadds to that of Messrs. Sheehan and Pegg. Clearly the information was confidential and this must have been obvious to Mr. Sheehan.

The information, although partly public, was, I have found, of value to Lac and was used by Lac. It was transmitted with the mutual understanding that the parties were working towards a joint venture or some other business arrangement and, in my opinion, was communicated in circumstances giving rise to an obligation of confidence [at p. 775].

(iii)    Misuse of Information

Mr. Sheehan and Dr. Anhuesser testified that the information Lac acquired from Corona was of value in assessing the merits of the Williams property and Mr. Sheehan said that he made use of this information in making an offer to Mrs. Williams.

Certainly Lac was not authorized by Corona to bid on the Williams property [at p. 775].

**56**    There are concurrent findings of fact and these should not be disturbed by this Court unless we

are satisfied that they are clearly wrong. The appellant did not attack either the basic criteria or these findings of fact as such, but rather "the rules by which the existence of the elements as a matter of law are to be determined".

**57**    With respect to the first element, the appellant submitted that although some of the information was private, much of it was public. This combination did not act as a springboard to give the appellant an advantage over others. Essentially, the appellant submitted that the desirability of acquiring the Williams property could have been deduced from information which was public and it got no head start by obtaining information from the respondent.

**58**    In this regard the statement of Lord Greene in Saltman Engineering Co. v. Campbell Engineering Co. (1948), 65 R.P.C. 203 (C.A.) (leave to appeal to House of Lords refused), at p. 215, which was quoted by the trial judge, is apposite:

> I think that I shall not be stating the principle wrongly if I say this with regard to the use of confidential information. The information, to be confidential, must, I apprehend, apart from contract, have the necessary quality of confidence about it, namely, it must not be something which is public property and public knowledge. On the other hand, it is perfectly possible to have a confidential document, be it a formula, a plan, a sketch, or something of that kind, which is the result of work done by the maker upon materials which may be available for the use of anybody; but what makes it confidential is the fact that the maker of the document has used his brain and thus produced a result which can only be produced by somebody who goes through the same process.

**59**    Seager & Copydex Ltd., [1967] 1 W.L.R. 923 (C.A.), cited by the appellant, provides a useful illustration of the concept of the use of added information to get a head start or to use it as a springboard. The plaintiff Seager was the inventor of a patented carpet grip. He negotiated with the defendant Copydex with a view to development of his invention. Negotiations were terminated without a contract. Copydex then proceeded to produce a competing grip. The Court found that much of the information which Seager gave to Copydex was public. But there was some private information that resulted from Seager's efforts such as the difficulties which had to be overcome in making a satisfactory grip. At pages 931-32, Lord Denning M.R. stated:

> When the information is mixed, being partly public and partly private, then the recipient must take special care to use only the material which is in the public domain. He should go to the public source and get it: or, at any rate, not be in a better position than if he had gone to the public source. He should not get a start over others by using the information which he received in confidence. At any rate, he should not get a start without paying for it.

**60**    Corona had conducted an extensive exploration program on its own property. The information which it obtained was pertinent in evaluating the Williams property. Its geologist, Bell, had

developed a theory that the source of the zone of gold mineralization on Corona's property was volcanogenic. This meant that gold could be spread over a large area with "pools" of ore throughout. This led him to conclude that the exploration programme should be extended to the neighbouring properties which included the Williams property. Bell was the geologist who first firmly believed that it was the land of Havilah and his enthusiasm spread to his principals. This information was developed from the results of the exploration programme and the application of Bell's knowledge as a geologist. Lac got the benefit of this information. It had the advantage of several discussions with Bell who interpreted his findings and explained his volcanogenic theory. Bell allowed Lac's representatives to examine the drill cores and the individual assays. Lac's representatives were also advised that Corona was actively pursuing the Williams property. The trial judge found as a result that:

> On all the evidence I conclude that the site visit and the information disclosed by Corona to Lac was of assistance to Lac not only in assessing the Corona property but also in assessing other property in the area and in making an offer to Mrs. Williams [at p. 768].

**61**    This information was the springboard which led to the acquisition of the Williams property. Sheehan admitted that the offer to Mrs. Williams was based in part on information obtained from Corona. The degree of reliance on Bell's input is graphically illustrated by the fact that after Lac had optioned the Williams property, it located its three drill holes on the Williams property in the same area in which Bell would have located his next three holes, westerly from the Corona property.

**62**    It was suggested in argument that although some of the information was of a private nature, it was not incremental in the sense that it did not enhance the information so as to make the Williams property more desirable. This contention is effectively refuted by the actions of Lac. Immediately after the May 6 meeting, something in that meeting triggered a frenzy of activity on the part of Lac, including a staking of 640 claims, several further meetings with Corona and the acquisition of the Williams property. I agree therefore with the conclusion of the courts below that the information obtained from Corona by Lac went beyond what had been imparted publicly in the George Cross News Letter or the public investors' meeting. Furthermore, it put Lac in a preferred position vis-à-vis others with respect to knowledge of the desirability of acquiring the Williams property.

**63**    With respect to the second element the appellant submitted that the trial judge did not apply the reasonable man test in determining whether the information was imparted in circumstances in which an obligation of confidence arises. The trial judge in his reasons cited with approval the reasonable man test enunciated in Coco v. A. N. Clark (Engineers) Ltd., [1969] R.P.C. 41. Moreover, the trial judge, at p. 772, referred to the passage of Megarry J. at p. 48 which follows the articulation of that test:

> In particular, where information of commercial or industrial value is given on a business-like basis and with some avowed common object in mind, such as a

joint venture or the manufacture of articles by one party for the other, I would regard the recipient as carrying a heavy burden if he seeks to repel a contention that he was bound by an obligation of confidence: The trial judge, at p. 775, found that it was obvious to Sheehan that the information was confidential and that:

> It was transmitted with the mutual understanding that the parties were working towards a joint venture or some other business arrangement and, in my opinion, was communicated in circumstances giving rise to an obligation of confidence.

**64**    These findings were made at least in part on the basis of a preference of the evidence of Bell and Dadds to that of Sheehan and Pegg. As did the Court of Appeal, I accept them.

**65**    With respect to the third element, Lac submits that it did not misuse the information because it went to the public record and then started staking and making the inquiries which eventually culminated in the acquisition of the Williams property. The trial judge has found, however, that the information obtained from Corona was of value to Lac in assessing the merits of the Williams property and Lac made use of this information to the detriment of Corona. This finding is amply supported by the evidence and should be accepted.

**66**    The trial judge also found that Lac was not authorized by Corona to bid on the Williams property. I interpret this to mean that Corona did not advise Lac that it could bid on the Williams property. Furthermore, as noted above, Sheehan never expressly agreed that Lac would refrain from acquiring the Williams property. The trial judge so found. There was an "informal oral understanding as to how each would conduct itself in anticipation of a joint venture or some other business arrangement". The terms of this informal arrangement as they relate to the acquisition of the Williams property are very sketchy. I have set out above the evidence and findings of fact that relate to this matter, including the portion of the letter of May 19, 1981 which states:

> As discussed we should entertain the possibility of Corona participate [sic] in the Hughes ground and that should be actively pursued.

**67**    As I said earlier in my reasons, that statement is neutral as to who would acquire the property. It is consistent with either Corona's or Lac's acquiring the property but subject to the loose oral arrangement that they were working toward a joint venture or other business arrangement which would involve participation by Corona in accordance with one of the formulae set out in the May 19 letter or an arrangement similar thereto.

**68**    On this basis, acquisition by Lac of the Williams property to the exclusion of Corona was not an authorized use of the confidential information which it received from Corona and which was of assistance in enabling Lac to get the property for itself.

**69**    In summary, the three elements of breach of confidence were made out at trial, affirmed on appeal, and notwithstanding the able submissions for the appellant, I find the decision of the trial judge and the Court of Appeal unassailable on this branch of the case. Accordingly, with respect to liability for breach of confidence, the appeal fails.

   (3)    Nature of Remedy for Breach of Confidence

**70**    The trial judge dealt with remedy solely on the basis of breach of a fiduciary duty. On this basis he ordered that, upon payment to Lac of the amounts referred to above, the mine be transferred to Corona.

**71**    The Court of Appeal, at p. 65, affirmed the trial judge but after expressing the view that it "is artificial and difficult to consider the question of the proper remedy for breach of the obligation of confidence on the hypothesis that there is no co-existing fiduciary obligation", it concluded that a constructive trust would in such circumstances be a possible remedy.

**72**    Furthermore, based on the fact that (i) but for "LAC's actions, Corona would have acquired the Williams property" and (ii) "it may fairly be said that, but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property", the Court of Appeal concluded, at p. 66, that it was the appropriate remedy.

Constructive Trust or Damages

**73**    The foundation of action for breach of confidence does not rest solely on one of the traditional jurisdictional bases for action of contract, equity or property. The action is sui generis relying on all three to enforce the policy of the law that confidences be respected. See Gurry, Breach of Confidence, at pp. 25-26, and Goff and Jones, The Law of Restitution (3rd ed. 1986), at pp. 664-67.

**74**    This multi-faceted jurisdictional basis for the action provides the Court with considerable flexibility in fashioning a remedy. The jurisdictional basis supporting the particular claim is relevant in determining the appropriate remedy. See Nichrotherm Electrical Co. v. Percy, [1957] R.P.C. 207, at pp. 213-14; Gurry, op. cit., at pp. 26-27; and Goff and Jones, op. cit., at pp. 664-65. A constructive trust is ordinarily reserved for those situations where a right of property is recognized. As stated by the learned authors of Goff and Jones, op. cit., at p. 673:

> In restitution, a constructive trust should be imposed if it is just to grant the plaintiff the additional benefits which flow from the recognition of a right of property.

Although confidential information has some of the characteristics of property, its foothold as such is tenuous (see Goff and Jones, op. cit., at p. 665). I agree in this regard with the statement of Lord Evershed in Nichrotherm Electrical Co. v. Percy, supra, at p. 209, that:

> ... a man who thinks of a mechanical conception and then communicates it to
> others for the purpose of their working out means of carrying it into effect does
> not, because the idea was his (assuming that it was), get proprietary rights
> equivalent to those of a patentee. Apart from such rights as may flow from the
> fact, for example, of the idea being of a secret process communicated in
> confidence or from some contract of partnership or agency or the like which he
> may enter into with his collaborator, the originator of the idea gets no proprietary
> rights out of the mere circumstance that he first thought of it.

**75**    As a result, there is virtually no support in the cases for the imposition of a constructive trust
over property acquired as a result of the use of confidential information. In stating that such a
remedy is possible, the Court of Appeal referred to Goff and Jones, op. cit., at pp. 659-74. The
discussion of proprietary claims commences at p. 673 with the statement which I have quoted above
and thereafter all references to constructive trust pertain to an accounting of profits. No reference is
made to any case in which a constructive trust is imposed on property acquired as a result of the use
of confidential information.

**76**    In Canada as in the United Kingdom, the existence of the constructive trust outside of a
fiduciary relationship has been recognized as a possible remedy against unjust enrichment. See
Waters, Law of Trusts in Canada (2nd ed. 1984), at pp. 386-97.

**77**    In Canada this device has been sporadically employed where the unjust enrichment occurred
in the context of a pre-existing special relationship between the parties. Thus in Pettkus v. Becker,
[1980] 2 S.C.R. 834, Dickson J. (as he then was) spoke of "a relationship tantamount to spousal". In
Nicholson v. St. Denis (1975), 8 O.R. (2d) 315 (leave to appeal to the Supreme Court of Canada
refused), MacKinnon J.A. refused the remedy in the absence of "a special relationship" between the
parties. In Unident v. Delong, Joyce and Ash Temple Ltd. (1981), 50 N.S.R. (2d) 1, Hallett J.,
quoting MacKinnon J.A., refused restitution where a special relationship could not be shown.

**78**    In Pre-Cam Exploration & Development Ltd. v. McTavish, [1966] S.C.R. 551, an employee
acting on information which he obtained entirely in the course of his employment, staked certain
claims which would otherwise have been staked by the employer. This Court affirmed the decision
of the trial judge who held that the employee was a trustee of the claims for his employer. In his
reasons for the Court, Judson J. stated, at p. 555, that:

> ... it was a term of his employment, which McTavish on the facts of this case
> understood, that he could not use this information for his own advantage. The use
> of the term "fraud" by the learned Chief Justice at trial was fully warranted.

In these circumstances, Judson J. referred to the use of the constructive trust. I do not consider that
that decision lays down any principle that makes the remedy of a constructive trust an appropriate
remedy for misuse of confidential information except in very special circumstances.

**79**    Although unjust enrichment has been recognized as having an existence apart from contract or tort under a heading referred to as the law of restitution, a constructive trust is not the appropriate remedy in most cases. As pointed out by Professor Waters in Law of Trusts in Canada, supra, at p. 394, although unjust enrichment gives rise to a number of possible remedies:

> ... the best remedy in the particular circumstances is that which corrects the unjust enrichment without contravening other established legal doctrines. In most cases, as in Deglman v. Guar. Trust Co. of Can. and Constantineau itself, a personal action will accomplish that end, whether its source is the common law or equity, providing as it often will monetary compensation.

**80**    While the remedy of the constructive trust may continue to be employed in situations where other remedies would be inappropriate or injustice would result, there is no reason to extend it to this case.

**81**    The conventional remedies for breach of confidence are an accounting of profits or damages. An injunction may be coupled with either of these remedies in appropriate circumstances. A restitutionary remedy is appropriate in cases involving fiduciaries because they are required to disgorge any benefits derived from the breach of trust. In a breach of confidence case, the focus is on the loss to the plaintiff and, as in tort actions, the particular position of the plaintiff must be examined. The object is to restore the plaintiff monetarily to the position he would have been in if no wrong had been committed. See Dowson & Mason Ltd. v. Potter, [1986] 2 All E.R. 418, and Talbot v. General Television Corp. Pty. Ltd., [1980] V.R. 224. Accordingly, this object is generally achieved by an award of damages, and a restitutionary remedy is inappropriate.

**82**    The Williams property was acquired as a result of information which was in part public and in part private. It would be impossible to assess the role of each. The trial judge went no further than to find that the confidential information was "of value" to Lac and

> ... of assistance to Lac not only in assessing the Corona property but also in assessing other property in the area and in making an offer to Mrs. Williams [at p. 768].

**83**    The Court of Appeal went further and stated, at p. 65, that "but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property". The reasons do not disclose any factual basis for extending the finding of the trial judge and I see no basis for so doing. The best that can therefore be said is that it played a part. When the extent of the connection between the confidential information and the acquisition of the property is uncertain, it would be unjust to impress the whole of the property with a constructive trust.

**84**    The case has been presented on the basis that either a transfer of the property or damages is the appropriate remedy. The respondent contends that the former is appropriate and the appellant the latter. No submissions were made in oral argument for or against an accounting of profits.

Moreover, damages were assessed in the alternative in the event that on appeal this was considered the appropriate remedy. In all the circumstances, therefore, I have concluded that of the two alternatives presented, damages is the proper remedy.

**85**    It is, therefore, necessary to determine the basis upon which damages will be assessed. The formula for the measure of damages does not appear to be seriously disputed, although the application of the formula is. In Dowson & Mason Ltd. v. Potter, supra, Sir Edward Eveleigh adopted the statement of Lord Wilberforce in General Tire & Rubber Co. v. Firestone Tyre & Rubber Co., [1975] 2 All E.R. 173, in a breach of confidence action. Lord Wilberforce was dealing with the measure of damages applicable to economic torts. He stated, at p. 177:

> As in the case of any other tort (leaving aside cases where exemplary damages can be given) the object of damages is to compensate for loss or injury. The general rule at any rate in relation to 'economic' torts is that the measure of damages is to be, so far as possible, that sum of money which will put the injured party in the same position as he would have been in if he had not sustained the wrong (Livingstone v. Rawyards Coal Co [ (1880) 5 App. Cas. 25 at 39] per Lord Blackburn).

**86**    In applying this test it is necessary to consider what the wrong is and what the position of the plaintiff would have been if he had not sustained the wrong. To put it shortly, what loss was caused to the plaintiff by the defendant's wrong?

**87**    In my opinion, the wrong committed by Lac was the acquisition of the Williams property for itself and to the exclusion of Corona. That was contrary to the understanding found to exist by the trial judge that the parties were working towards a joint venture or some other business arrangement.

**88**    This set the parameters of the permitted use of the confidential information and its use within these parameters was not a misuse of it. Lac did not agree to refrain from acquiring the property and Corona did not tell Lac not to acquire the property. This would be surprising unless the parties thought that in keeping with their efforts to conclude a joint business arrangement, either one could acquire it for that purpose. This is supported by the letter of May 19 in which Sheehan set out three alternative "possibilities" for a working arrangement with Corona. That is followed with a paragraph relating to the Williams property. For ease of reference I will again reproduce the relevant correspondence:

> As discussed we should entertain the possibility of Corona participate (sic) in the Hughes ground and that should be actively pursued. In addition we are staking ground in the area and recognizing Corona's limited ability to contribute we could work Corona into the overall picture as part of an overall exploration strategy.

Bell's reply states in part:

> At this point, until I hear otherwise from the directors in Vancouver, I like your idea of Corona's contribution with Long Lac Minerals Exploration Limited as part of an overall exploration programme in the area.

**89**  The correspondence reflected the discussion between the parties up to that point. In my view it can only be read as envisaging a participation by Corona with Lac in the Williams property. Either party could acquire it for this purpose. This is further supported by the following evidence of Sheehan which was elicited on cross-examination. This evidence was relied on by the trial judge in concluding that a statement made by Bell at the meeting of May 8 that Corona was "happy with our land position" was made in the context of additional staking and not that it (Corona) was not interested in acquiring the Williams property:

> Q.    Mr. Sheehan, on May 8th -- and, my Lord, page 803, question 3971:

>> "Q.    Can you tell me now then, please, your discussion with Mr. Bell on the 8th as it concerns the Hughes property?
>> A.    My best recollection of that discussion was where the Hughes property was concerned was I was discussing the area in general. I believe I had indicated to Mr. Bell that we would be staking in the area.

>> MR. McDOUGALL: You have given that evidence.

>> THE DEPONENT: With respect to the Hughes property, I had suggested the possibilities that we pick up the Hughes property, that is to say Lac, that Corona may pick it up, that any combination of those factors could be addressed. In other words, if indeed we were going to make a deal, Lac could fund Corona since he had indicated that they were just a small company without much money."

> A.    Yes, that's correct.
> Q.    Were you asked those questions and did you give those answers?
> A.    Yes.

> MR. LENCZNER: And we have this already in on[e] of the tabs, my Lord, with regard to the May 19th letter, but let me just -- I had better pull out the tab. It is tab 146.

Q.  Page 863, the answer you gave:

"A.  Well, I think I had discussed with Mr. Bell in that meeting and I may have
referred to this in previous testimony that the patented ground as well as
the Hughes ground should be picked up and that's what that is referring to
there."

A.  Yes.
Q.  So that you had discussed with Bell on May 8th, picking up the Hughes ground
and the patented ground? A. Yes.
Q.  And that Lac could pick it up, Corona could pick it up?
A.  Yes.
Q.  Or you would even fund Corona to pick it up?
A.  Yes, we would do the funding.
Q.  In addition to all of that, you said you had a staking programme going down to
the east and he could participate in that if he wanted?
A.  Yes, we could bring him into that.
Q.  In that context, I suggest to you he said, "We are happy with our land position"?
A.  It was in that context that he said, "No, I'm happy with my land position and we
will continue drilling and doing the Phase II programme".

**90**    The trial judge is correct in his finding that Corona was interested in "the possession of either
Williams or Hughes". There is no finding, however, that acquisition by Lac of the Williams
property as part of the joint exploration programme along with continued negotiations towards an
agreement on the basis of one of the scenarios outlined in the letter of May 19 would have
constituted a breach of mutual understanding under which the confidential information was supplied
to Lac. Furthermore, I am satisfied that had that occurred, the most likely conclusion is that Lac and
Corona would have continued to negotiate and Corona would have made a deal with Lac for their
respective participation in a joint venture including the Williams property. Corona could not finance
the development on its own property without the assistance of a senior mining company.
Accordingly, it entered into an agreement with Teck on somewhat similar terms as those proposed
by Lac. Even after it discovered that Lac had acquired the Williams property, a director, Moore,
sought to continue the negotiations. His evidence in part is as follows:

Q.  What is it that you were setting about doing then in your attempts to reach Mr.
Sheehan?
A.  Well, the stage -- the stage was still set, even at that point, for -- to continue with
this joint venture. Lac had picked up a big piece of ground in the area, 600

claims, and Corona had a nice start, that Williams' claims were off on the side. We felt that they should be ours. But it was, uh, it was still possible in that scenario, in my opinion, to make a joint venture work, or to have a reconciliation and make a joint venture work, even with -- all the pieces were still there to make a good deal.

**91**    But for Lac's breach, those negotiations would likely have continued and it would have resulted in Corona's acquiring an interest in the Williams property of 50 percent or perhaps a smaller percentage interest. It would have also acquired a corresponding obligation to contribute on the same basis. Corona's damages should therefore be calculated on the basis of the loss of this interest.

**92**    In his reasons the trial judge stated, at p. 777:

> If Corona had obtained the Williams property, Corona may well have entered into a joint venture agreement with Lac covering the Corona and Williams properties together with the White River claims. Corona's damages would be assessed accordingly in an action for breach of contract.

R. Holland J. went on to hold that based on his finding of a fiduciary duty the appropriate remedy was a restitutionary remedy requiring the whole of the property to be returned to Corona upon payment of the added value. I have decided that there is no breach of a fiduciary duty and therefore, as in contract, account must be taken of the fact that but for the breach by Lac, a joint venture agreement would likely have resulted. Damages should be assessed accordingly.

Assessment of Damages

**93**    The appellant, in its factum, para. 177, submits as follows:

> If it is found that, through misuse of information relating to Corona's intentions or otherwise, the loss suffered by Corona was the loss of the opportunity to acquire and to explore the Williams property, Corona would be entitled to damages. However, its loss is not to be measured by LAC's gain. Corona is to be put in the same position it would have been if it had not sustained the wrong. In making that assessment in the case of a lost opportunity the correct approach is:

> i)    to determine the form of business arrangement that Corona would have been obliged to have entered into with a senior mining partner and the proportionate interest that Corona would probably have conceded to that partner. The later arrangement with Teck suggests this would be 55%. Sheehan suggested 60%;

> ii)   to value the property as improved by LAC. This was done by the trial judge and

produced a figure of $700,000,000.00 after tax, being the value created by the size of the facilities LAC decided to put on the Williams property. LAC disputed this assessment on appeal but the Court of Appeal did not deal with this issue. LAC's submissions on the value of the property as improved by LAC are set out in Appendix "A". In addition, Corona may have decided or been compelled to exploit the property with a lower rate of extraction. The value of the property must be discounted to reflect that eventuality;

    iii)    to deduct from that discounted figure the 60% (or 55%) interest of the senior partner;

    iv)    to deduct from that figure a capitalized estimate of the costs Corona would have had to contribute to the exploration and exploitation of the property; and

    v)    to deduct a further amount to reflect Corona's own share of responsibility for its loss.

**94**    I agree that this approach generally gives effect to the principles which I have stated above. I would not, however, include item v) to deduct a further amount to reflect Corona's own share of responsibility for its loss. This is essentially a plea of contributory negligence for which there is no support in the findings of fact or evidence.

    (i)    The Business Arrangement

**95**    In determining the nature of the business arrangement that the parties would likely have concluded, the arrangement with Teck is very pertinent. This arrangement was set out in a number of agreements. For my purposes I refer primarily to an Agreement dated December 10, 1981 (Property Agreement) with the "Joint Venture Agreement" attached as Schedule B, and the "Area of Interest Agreement" contained in a letter dated August 13, 1982 as amended by an agreement made as of December 14, 1983, particularly paragraphs 3.2 and 5. Under these agreements, the parties entered into the following arrangement.

    (a) Corona Property: Teck undertook to complete exploration and development work and prepare a feasibility study with respect to 17 properties. The initial costs were financed out of a fund to which both Teck and Corona contributed $1,000,000. Teck acquired a 55 percent interest upon completion of the feasibility study and election to bring the property into production, leaving Corona with 45 percent. Thereafter development was to be financed in accordance with the respective interests of the parties, i.e., 55 percent by Teck and 45 percent by Corona.

    (b)    Other Property: Any property in the area not covered by the property agreement subsequently acquired by either Teck or Corona would be shared on a 50-50 basis with contributions accordingly. This provision was expressly extended to

the Williams property contingent on Corona's obtaining a favourable judgment.

**96**   In the circumstances, I conclude that Corona would have concluded with Lac a business arrangement with respect to the Williams property substantially similar to that which it concluded with Teck: a 50-50 property interest with participation in the development costs in the same ratio. Although this is a slightly higher percentage in favour of Corona than that proposed by Sheehan and agreed upon with Teck in respect of Corona's own property, it is the figure that was applied to the Williams property in the Teck agreement. The benefit of any doubt as to whether it should be 45 percent or 50 percent should be given to the innocent party Corona rather than to the party in breach.

(ii)    Value of Improved Mine

**97**   The trial judge fixed the value at $700,000,000 after tax. Both parties take issue with this assessment. While there is some merit in some of the issues raised by each side, it has not been established that this is a wholly erroneous assessment and I accept it. I will deal with several of the criticisms which raise an issue of law or principle. Other objections are primarily factual and the findings of the trial judge should be accepted.

**98**   First, although not directly raised in this Court, the appellant submitted below that the date for valuation was the date of breach and not the date of trial. The trial judge chose January 1, 1986, a date during the latter period, applying equitable principles. Having regard to the flexibility possessed by the Court to do justice in an action for breach of confidence, I have no difficulty in applying those principles to this assessment to the extent of adopting the later date. To do otherwise would be to ignore the vast potential that the Williams property possessed at the time it was acquired by Lac. That potential can best be valued by determining its value as of the date fixed by the trial judge.

**99**   The trial judge elected to adopt a discounted cash flow approach to value the Williams property as opposed to a market capitalization approach. Although I recognize that each approach has its strengths and weaknesses, I am not prepared to hold that the trial judge erred in opting for a discounted cash flow of the mine on the Williams property over the life of the mine to ascertain its present value. In my opinion, there is ample evidence to support the conclusion that this was the proper means to assess the value of the property.

**100**   I am also of the opinion that the trial judge correctly applied this Court's decision in Florence Realty Co. v. The Queen, [1968] S.C.R. 42, in deducting corporate taxes from the cash flow to determine the value of the mine.

**101**   Furthermore, the figure of $700,000,000 was based on the payment of a 1 1/2 percent net smelter return to Mrs. Williams in accordance with the contract negotiated by Lac. Although Corona offered a 3 percent net smelter return to Mrs. Williams, which would reduce the value of the property, I accept the figure of 1 1/2 percent as the likely figure which would have been paid if Lac

had not been in breach of confidence.

(iii)    Damages for Loss of Interest in Mine

**102**    Damages for loss of Corona's interest in the mine are therefore assessed at $350,000,000 which is 50 percent of $700,000,000.

(iv)    Contribution to Development Costs

**103**    I agree with the appellant that Corona should not have the value by which the mine was increased by the expenditures made by Lac without contributing in accordance with its interest. Lac presented evidence that it had expended $203,978,000 in developing the Williams property. The trial judge held that had Corona developed the two properties together then a number of savings would have been realized over the sums expended by both Lac and Corona in developing their two mines independently. The trial judge suggested that there would have been only two shafts rather than three, only one mill and only one group of service facilities. For this reason, he estimated that Lac spent an additional $50,000,000 by virtue of its independent development of the Williams property.

**104**    I agree that this sum is to be deducted from the expenditures by Lac in developing the Williams property. The operative principle of damages is to place Corona in the position it would have occupied had there been no breach of confidence by Lac. If Lac had acquired the property for the benefit of both parties, the two properties would have been developed jointly rather than separately. Lac is, therefore, responsible for the extra costs incurred as a result of the inability to take advantage of any natural economies of scale.

**105**    Accordingly, $50,000,000 is to be deducted from the figure of $203,978,000 representing Lac's improvements to the property, for a difference of $153,978,000. One-half of this sum ($76,989,000) must be deducted from $350,000,000 for a difference of $273,011,000.

**106**    This does not fully dispose of the assessment of damages. Several further items having a possible bearing on the amount require consideration. In arriving at the figure of $153,978,000 the trial judge expressed some uncertainty with respect to the quantum of the deduction of $50,000,000 from the $203,978,000 which resulted in a difference of $153,978,000. Accordingly, a reference was directed but only if either party was dissatisfied with the trial judge's figure. The formal order expressed it as a reference concerning the amount of $153,978,000. As I read the trial judge's reasons, the uncertainty was in the amount of the deduction and not the $203,978,000 expenditure by Lac which was based on its records. Nevertheless, I propose to direct a reference in the same terms as the trial judge.

**107**    In addition, the trial judge ordered that the amounts paid to Mrs. Williams, exclusive of royalty payments, should also be paid by Corona. This cost of the acquisition of the property would have been necessary had no breach occurred. Corona would have been obliged to pay one-half of

these payments. Accordingly, one-half of the amounts paid to Mrs. Williams exclusive of royalty payments must be deducted from the award of damages of $273,011,000 or from that figure as varied by any reference undertaken as indicated above.

**108**    The trial judge also directed that the appellant pay the respondent the profits, if any, obtained by the appellant from the operation of the Williams mine. The foundation for this order was the restitutionary remedy which I have found to be inappropriate. Accordingly, no such order is made. The respondent is, however, entitled to pre-judgment interest in accordance with s. 138(1)(b) of the Courts of Justice Act, S.O. 1984, c. 11. If, therefore, a notice has been served as provided by that provision, the respondent will be entitled to interest in accordance with that section. The respondent is also entitled to post-judgment interest in accordance with s. 139 of the Courts of Justice Act.

Disposition

**109**    In the result, I would allow the appeal in part and dismiss the cross-appeal. I would set aside the judgment at trial and the order of the Court of Appeal and direct that judgment should issue as follows:

> 1.    The plaintiff is entitled to recover from the defendant damages in the sum of $273,011,000 less one-half of all sums paid to Mrs. Williams with the exception of royalties, subject to the right of either the plaintiff or defendant to undertake a reference to the Master concerning the deduction of $153,978,000.
> 2.    The plaintiff is entitled to recover pre-judgment interest from the defendant on the sum referred to in paragraph 1, or as varied on a reference, in accordance with s. 138(1)(b) of the Courts of Justice Act from the date of service of any notice, and post-judgment interest on the said sum in accordance with s. 139 of the Courts of Justice Act.
> 3.    The plaintiff is entitled to recover from the defendant the costs of the action.

**110**    I would also order that the appellant recover from the respondent the costs of the appeal and cross-appeal to the Court of Appeal and the costs of the appeal and cross-appeal to this Court.

> The following are the reasons delivered by

**111**    LAMER J.:-- I have read the judgments of my colleagues, Justice La Forest and Justice Sopinka. I am in agreement with my brother Sopinka J. and for the reasons set out in his judgment that the evidence does not establish in this case the existence of a fiduciary relationship.

**112**    I am in agreement with both of my colleagues, and concur in their reasons in support thereof, that there was a breach of confidence on the part of Lac Minerals Ltd.

**113**    As regards the appropriate remedy, I am of the view that the approach taken by La Forest J. is the proper one.

**114**    I would accordingly dismiss the appeal with costs and dismiss the cross-appeal with costs.

The following are the reasons delivered by

**115**    WILSON J.:-- I have had the advantage of reading the reasons of my colleagues, Justice Sopinka and Justice La Forest and I agree with my colleague, La Forest J., as to the appropriate remedy in this case. I propose to comment briefly on the three issues before the Court on this appeal as identified by them:

(1)    Fiduciary Duty

**116**    It is my view that, while no ongoing fiduciary relationship arose between the parties by virtue only of their arm's length negotiations towards a mutually beneficial commercial contract for the development of the mine, a fiduciary duty arose in Lac Minerals Ltd. ("Lac") when International Corona Resources Ltd. ("Corona") made available to Lac its confidential information concerning the Williams property, thereby placing itself in a position of vulnerability to Lac's misuse of that information. At that point Lac came under a duty not to use that information for its own exclusive benefit. Lac breached that fiduciary duty by acquiring the Williams property for itself.

**117**    It is, in other words, my view of the law that there are certain relationships which are almost per se fiduciary such as trustee and beneficiary, guardian and ward, principal and agent, and that where such relationships subsist they give rise to fiduciary duties. On the other hand, there are relationships which are not in their essence fiduciary, such as the relationship brought into being by the parties in the present case by virtue of their arm's length negotiations towards a joint venture agreement, but this does not preclude a fiduciary duty from arising out of specific conduct engaged in by them or either of them within the confines of the relationship. This, in my view, is what happened here when Corona disclosed to Lac confidential information concerning the Williams property. Lac became at that point subject to a fiduciary duty with respect to that information not to use it for its own use or benefit.

(2)    Breach of Confidence

**118**    I agree with my colleagues that Lac's conduct may also be characterized as a breach of confidence at common law with respect to the information concerning the Williams property. The breach again consisted of Lac's acquisition of the Williams property for itself, such property being the subject of the confidence.

(3)    The Remedy

**119**    It seems to me that when the same conduct gives rise to alternate causes of action, one at common law and the other in equity, and the available remedies are different, the Court should consider which will provide the more appropriate remedy to the innocent party and give the innocent party the benefit of that remedy. Since the result of Lac's breach of confidence or breach of

fiduciary duty was its unjust enrichment through the acquisition of the Williams property at Corona's expense, it seems to me that the only sure way in which Corona can be fully compensated for the breach in this case is by the imposition of a constructive trust on Lac in favour of Corona with respect to the property. Full compensation may or may not be achieved through an award of common law damages depending upon the accuracy of valuation techniques. It can most surely be achieved in this case through the award of an in rem remedy. I would therefore award such a remedy. The imposition of a constructive trust also ensures, of course, that the wrongdoer does not benefit from his wrongdoing, an important consideration in equity which may not be achieved by a damage award.

**120**    It is, however, my view that this is not a case in which the available remedies are different. I believe that the remedy of constructive trust is available for breach of confidence as well as for breach of fiduciary duty. The distinction between the two causes of action as they arise on the facts of this case is a very fine one. Inherent in both causes of action are concepts of good conscience and vulnerability. It would be strange indeed if the law accorded them widely disparate remedies. In his article on "The Role of Proprietary Relief in the Modern Law of Restitution," McCamus, in The Cambridge Lectures 1987, at p. 150, Professor McCamus poses the rhetorical question:

> Would it not be anomalous to allow more sophisticated forms of relief for breach of fiduciary duty than for those forms of wrongdoing recognized by the law of torts, some of which, at least, would commonly be more offensive from the point of view of either public policy or our moral sensibilities than some breaches of fiduciary duty?

**121**    I believe that where the consequence of the breach of either duty is the acquisition by the wrongdoer of property which rightfully belongs to the plaintiff or, as in this case, ought to belong to the plaintiff if no agreement is reached between the negotiating parties, then the in rem remedy is appropriate to either cause of action.

**122**    I would dismiss the appeal with costs. I would also dismiss the cross-appeal with costs.

The following is the judgment delivered by

LA FOREST J.:--

Introduction

**123**    The short issue in this appeal is whether this Court will uphold the Ontario Court of Appeal and trial court decisions ordering Lac Minerals Ltd. ("Lac") to deliver up to International Corona Resources Ltd. ("Corona"), land (the Williams property) on which there is a gold mine, on being compensated for the value of improvements Lac has made to the property ($153,978,000) in developing the mine.

**124**    The facts in this case are crucial. The trial lasted some five and one half months, and the hearing before the Court of Appeal took ten days. The trial judge made extensive findings of fact, and the Court of Appeal examined the record in detail and with care. The latter court emphatically dismissed any argument that the trial judge had overlooked or misconstrued the evidence, failed to make any necessary findings or made any erroneous inferences. It stated ((1987), 62 O.R. (2d) 1, at p. 4):

> Certainly the establishment of the facts in this case was fundamental and vital to the determination of the issues. It is submitted that erroneous inferences were taken from the facts, that evidence was overlooked or misconstrued, and that relevant findings were not made at all.

> There is no obligation on a trial judge to refer to every bit of conflicting evidence to show he has taken it into consideration, nor is he required to cite all the evidence to support a particular finding. In the instant case, the trial judge made some rather terse findings of fact in his recital of the events and of the relationship between the parties in the course of his lengthy reasons. On occasion he encapsuled a great deal of evidence in short form. However, the trial was a lengthy one, his reasons for judgment were lengthy and, as stated, he was not called on to cite every piece of relevant evidence to show he had considered it .... We can say in opening that we have not been persuaded that the learned trial judge overlooked or misconstrued any important or relevant evidence. There was ample evidence to support his conclusions on the facts and there is no palpable or overriding error in his assessment of the facts.

**125**    In this Court, Lac disclaimed any attack on the facts as found by the trial judge, but they argued that the Court of Appeal erred in making further findings and drawing inferences from the facts so found. I accept the facts as they are set out in the judgments below, and I would respectfully add that, in my view, the Court of Appeal in no way misconstrued the purport of what it describes as the trial judge's necessarily "rather terse findings of fact" in the course of lengthy reasons.

**126**    I have had the advantage of reading the reasons of my colleague, Justice Sopinka. He has given a general statement of the facts as well as the judicial history of the case, and I shall refrain from doing so. I should immediately underline, however, that while I am content to accept this statement as a general outline, it will become obvious that I, at times, take a very different view of a number of salient facts and the interpretation that can properly be put upon them, in particular as they impinge on the nature, scope and effect of the breach of confidence alleged to have been

committed by Lac against Corona.

**127**    It is convenient to set forth my conclusions at the outset. I agree with Sopinka J. that Lac misused confidential information confided to it by Corona in breach of a duty of confidence. With respect, however, I do not agree with him about the nature and scope of that duty. Nor do I agree that in the circumstances of this case it is appropriate for this Court to substitute an award of damages for the constructive trust imposed by the courts below. Moreover, while it is not strictly necessary for the disposition of the case, I have a conception of fiduciary duties different from that of my colleague, and I would hold that a fiduciary duty, albeit of limited scope, arose in this case. In the result, I would dismiss the appeal.

The Issues

**128**    Three issues must be addressed:

      1.    What was the nature of the duty of confidence that was breached by Lac?

      2.    Does the existence of the duty of confidence, alone or in conjunction with the other facts as found below, give rise to any fiduciary obligation or relationship? If so, what is the nature of that obligation or relation?

      3.    Is a constructive trust an available remedy for a breach of confidence as well as for breach of a fiduciary duty, and if so, should this Court interfere with the lower courts' imposition of that remedy?

Breach of Confidence

**129**    I can deal quite briefly with the breach of confidence issue. I have already indicated that Lac breached a duty of confidence owed to Corona. The test for whether there has been a breach of confidence is not seriously disputed by the parties. It consists in establishing three elements: that the information conveyed was confidential, that it was communicated in confidence, and that it was misused by the party to whom it was communicated. In Coco v. A. N. Clark (Engineers) Ltd., [1969] R.P.C. 41 (Ch.), Megarry J. (as he then was) put it as follows at p. 47:

> In my judgment, three elements are normally required if, apart from contract, a case of breach of confidence is to succeed. First, the information itself, in the words of Lord Greene, M.R. in the Saltman case on page 215, must "have the necessary quality of confidence about it." Secondly, that information must have been imparted in circumstances importing an obligation of confidence. Thirdly, there must be an unauthorized use of that information to the detriment of the party communicating it ...

This is the test applied by both the trial judge and the Court of Appeal. Neither party contends that it is the wrong test. Lac, however, forcefully argued that the courts below erred in their application of the test. Lac submitted that "The real issue is whether Corona proved that LAC received

confidential information from it and [whether] it should have known such information was confidential".

**130**    Sopinka J. has set out the findings of the trial judge on these issues, and I do not propose to repeat them. They are all supported by the evidence and adopted by the Court of Appeal. I would not interfere with them. Essentially, the trial judge found that the three elements set forth above were met: (1) Corona had communicated information that was private and had not been published; (2) while there was no mention of confidence with respect to the site visit, there was a mutual understanding between the parties that they were working towards a joint venture and that valuable information was communicated to Lac under circumstances giving rise to an obligation of confidence; and, (3) Lac made use of the information in obtaining the Williams property and was not authorized by Corona to bid on that property. I agree with my colleague that the information provided by Corona was the springboard that led to the acquisition of the Williams property. I also agree that the trial judge correctly applied the reasonable man test. The trial judge's conclusion that it was obvious to Sheehan, Lac's Vice-President Exploration, that the information was being communicated in circumstances giving rise to an obligation of confidence, following as it did directly on a finding of credibility against Sheehan, is unassailable.

**131**    In general, then, there is no difference between my colleague and me that Lac committed a breach of confidence in the present case. Where we differ -- and it is a critically important difference -- is in the nature and scope of the breach. The precise extent of that difference can be seen by a closer examination of the findings and evidence on the third element of the test set forth above, and I will, therefore, set forth my views on this element at greater length.

**132**    With respect to this aspect of the test, it is instructive to set out the trial judge's finding in full. He said ((1986), 53 O.R. (2d) 737), at pp. 775-76:

> C.(iii) Has Corona established an unauthorized use of the information to the detriment of Corona?
>
> Where the duty of confidence is breached, the confidee will not be allowed to use the information as a springboard for activities detrimental to the confider: see Cranleigh Precision Engineering, Ltd. v. Bryant et al., [1964] 3 All E.R. 289 (Q.B.).
>
> Mr. Sheehan and Dr. Anhuesser testified that the information Lac acquired from Corona was of value in assessing the merits of the Williams property and Mr. Sheehan said that he made use of this information in making an offer to Mrs. Williams.

> Certainly Lac was not authorized by Corona to bid on the Williams property.
>
> I have already reviewed the evidence dealing with the acquisition of the Williams property by Lac and the efforts made by Corona through Mr. McKinnon and also directly to acquire the Williams property. On a balance of probabilities I find that, but for the actions of Lac, Corona would have acquired the Williams property and therefore Lac acted to the detriment of Corona.
>
> I conclude that Corona has established the three requirements necessary for recovery based on the doctrine of breach of confidence. [Emphasis added.]

Later in his reasons he reiterated at p. 778 that "but for the actions of Lac, Corona would probably have acquired the Williams property".

**133**    The Court of Appeal was of the same view. It held at p. 66 that:

> ... the evidence also amply sustains the finding that the confidential information which LAC received from Corona was of material importance in its decision to acquire the Williams property. In this latter regard it may fairly be said that, but for the confidential information LAC received from Corona, it is not likely that it would have acquired the Williams property.

**134**    It was argued that this passage in the Court of Appeal's reasoning is a finding of fact that was not made by the trial judge and that the record will not support. In my view, the Court of Appeal in no way extended the finding of the trial judge. The portion of R. Holland J.'s reasons I have set out above was directed solely at the question of whether Corona had established an unauthorized use of the information to the detriment of Corona. He concluded that there had been an unauthorized use since Lac had not been authorized by Corona to bid on the Williams property. In other words, Corona did not consent to the use of the information by Lac for the purpose of acquiring the Williams land for Lac's own account, or, for that matter, for any purpose other than furthering negotiations to jointly explore and develop these properties. He also found that the information had been used to the detriment of Corona. When the sole question the learned trial judge was addressing was whether Lac misused the confidential information Corona had provided to it and his sole conclusion was that "but for the actions of Lac, Corona would have acquired the Williams property and therefore Lac acted to the detriment of Corona" [emphasis added], I find the conclusion inescapable that the trial judge found as a fact that but for the confidential information received and misused, Corona would have acquired the Williams property and that Lac was not authorized to obtain it.

**135**    If, as we saw, each of the three elements of the above-cited test are made out, a claim for

breach of confidence will succeed. The receipt of confidential information in circumstances of confidence establishes a duty not to use that information for any purpose other than that for which it was conveyed. If the information is used for such a purpose, and detriment to the confider results, the confider will be entitled to a remedy.

**136**    There was some suggestion that Lac was only restricted from using the information imparted by Corona to acquire the Williams property for its own account, and had Lac acquired the claims on behalf of both Corona and Lac, there would have been no breach of duty. This, as I have noted, seems to me to misconstrue the finding of the trial judge. What is more, the evidence, in my view, does not support that position. While Sheehan's letter of May 19, relied on by my colleague, may have been unclear as to who should acquire the Williams property, the events on June 30 make it clear that both Lac and Corona contemplated Corona's acquisition of the Williams claims. The trial judge, again making a finding of credibility against Sheehan and Allen (Lac's President), accepted the evidence of Corona's witnesses, Bell and Dragovan, that not only was the Williams property discussed at the meeting on this latter date, but that Corona's efforts to secure it were discussed and that Allen advised Corona that they had to be aggressive in pursuing a patent group such as this. Lac in no way indicated to Corona, at this time or any other, that they were also pursuing the property. Yet three days later, Sheehan spoke with Mrs. Williams about making a deal for her property, and on July 6, 1981, Lac's counsel and corporate secretary submitted a written bid for the eleven patented claims. It strains credulity to suggest that on June 30 either Lac or Corona contemplated that Corona had given Lac confidential information so that Lac could acquire the property on either its own behalf or on behalf of both parties jointly. Certainly Corona would not have allowed the use of the confidential information for Lac's acquisition of the property to Corona's exclusion. Had the joint acquisition of the property been an authorized use of the information, surely there would have been some discussion of Lac's efforts to that end at the June 30 meeting. Instead, Lac advised Corona to aggressively pursue the claims.

**137**    The evidence of Lac's President, Mr. Allen, and of the experts called on behalf of Lac also support the position that Lac was not entitled to bid on the property and that Corona could expect that Lac would not do so. Allen testified as follows, in a passage to which both courts below attached central importance:

> If one geologist goes to another geologist and says, are you interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be -- I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that they weren't, there was just some exchange of conversation or physical data, then I would say that while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was

exchanged. [Emphasis added.]

All the experts called by Lac agreed with the tenor of this statement. The testimony of Dr. Derry is indicative. He testified as follows:

> Q.    Ah, so now we have it this way: that if some -- so I understand your evidence --
>       if Sheehan knew, as apparently he does from the way you read the evidence, that
>       Corona was intending to acquire the Williams property; correct?
> A.    Yes.
> Q.    That, for at least some period of time, Lac is precluded from making an offer or
>       outbidding Corona on that property?

> A. I would say early on, yes. Q. Yes. And that obligation or the rationale for that
> preclusion comes from the fact that it is recognized
> in the industry, is it not?

> A.    Yes.

Whether these statements amount to a legally enforceable custom or whether they create a fiduciary duty are separate questions, but at the very least, they show that Lac was aware that it owed some obligation to Corona to act in good faith, and that that obligation included the industry-recognized practice not to acquire the property which was being pursued by a party with which it was negotiating.

**138**    Corona's activity following Lac's acquisition of the property is also noteworthy. The Court of Appeal thus described it at pp. 42-43:

> Upon learning from Dragovan of the LAC offer to Mrs. Williams, Pezim
> immediately instructed his solicitor to act for Corona in the matter and Bell
> ordered LAC's crew engaged in the joint geochemical sampling programme to
> leave Corona's property. After Sheehan had learned of the termination of the
> geochemical study, he telephoned Bell on August 4th and was told by him that
> the reason for the termination was LAC's offer to Mrs. Williams. Sheehan said
> that he was still interested in a deal with Corona and Bell answered that he would
> have to discuss the matter with Pezim. On August 18th Sheehan and Pezim met
> in Vancouver to discuss the Corona property. The meeting was abortive.
> According to Pezim's evidence, and the trial judge so found, Pezim insisted that
> it was a condition of any deal that LAC "give back" to Corona the Williams
> property. Subsequent negotiations between Sheehan and Donald Moore, a
> director of Corona, also failed to resolve the differences between LAC and
> Corona. After his meeting with Sheehan, Pezim, according to his testimony,
> instructed his solicitors to press on with the matter. This action was commenced
> on October 27, 1981, long before it was established that a producing gold mine

on the Williams property was a probability.

This is certainly inconsistent with Corona's having provided Lac the information so that Lac could acquire the property, whether alone or for their joint ownership.

**139**    This entire inquiry appears, however, to be misdirected. In establishing a breach of a duty of confidence, the relevant question to be asked is, "what is the confidee entitled to do with the information?" and not, "to what use he is prohibited from putting it?" Any use other than a permitted use is prohibited and amounts to a breach of duty. When information is provided in confidence, the obligation is on the confidee to show that the use to which he put the information is not a prohibited use. In Coco v. A. N. Clark (Engineers) Ltd., supra, at p. 48, Megarry J. said this in regard to the burden on the confidee to repel a suggestion of confidence:

> In particular, where information of commercial or industrial value is given on a business-like basis and with some avowed common object in mind, such as a joint venture or the manufacture of articles by one party for the other, I would regard the recipient as carrying a heavy burden if he seeks to repel a contention that he was bound by an obligation of confidence ....

In my view, the same burden applies where it is shown that confidential information has been used and the user is called upon to show that such use was permitted. Lac has not discharged that burden in this case.

**140**    I am therefore of the view that Lac breached a duty owed to Corona by approaching Mrs. Williams with a view to acquiring her property, and by acquiring that property, whether or not Lac intended to invite Corona to participate in its subsequent exploration and development. Such a holding may mean that Lac is uniquely disabled from pursuing property in the area for a period of time, but such a result is not unacceptable. Lac had the option of either pursuing a relationship with Corona in which Corona would disclose confidential information to Lac so that Lac and Corona could negotiate a joint venture for the exploration and development of the area, or Lac could, on the basis of publicly available information, have pursued property in the area on its own behalf. Lac, however, is not entitled to the best of both worlds.

**141**    In this regard, the case can be distinguished from Coco v. A. N. Clark (Engineers) Ltd., supra, in that here the confidential information led to the acquisition of a specific, unique asset. Imposing a disability on a party in possession of confidential information from participating in a market in which there is room for more than one participant may be unreasonable, such as where the information relates to a manufacturing process or a design detail. In such cases, it may be that the obligation on the confidee is not to use the confidential information in its possession without paying compensation for it or sharing the benefit derived from it. Where, however, as in the present case, there is only one property from which Lac is being excluded, and there is only one property that Corona was seeking, the duty of confidence is a duty not to use the information. The fact that Lac is precluded from pursuing the Williams property does not impose an unreasonable restriction

on Lac. Rather, it does the opposite by encouraging Lac to negotiate in good faith for the joint development of the property.

Fiduciary Obligation

**142**    Having established that Lac breached a duty of confidence owed to Corona, the existence of a fiduciary relationship is only relevant if the remedies for a breach of a fiduciary obligation differ from those available for a breach of confidence. In my view, the remedies available to one head of claim are available to the other, so that provided a constructive trust is an appropriate remedy for the breach of confidence in this case, finding a fiduciary duty is not strictly necessary. In my view, regardless of the basis of liability, a constructive trust is the only just remedy in this case. Nonetheless, in light of the argument, I think it appropriate to consider whether a fiduciary relationship exists in the circumstances here.

**143**    There are few legal concepts more frequently invoked but less conceptually certain than that of the fiduciary relationship. In specific circumstances and in specific relationships, courts have no difficulty in imposing fiduciary obligations, but at a more fundamental level, the principle on which that obligation is based is unclear. Indeed, the term "fiduciary" has been described as "one of the most ill-defined, if not altogether misleading terms in our law": see Finn, Fiduciary Obligations, at p. 1. It has been said that the fiduciary relationship is "a concept in search of a principle"; see Mason, "Themes and Prospects," in P. D. Finn, ed., Essays in Equity, at p. 246. Some have suggested that the principles governing fiduciary obligations may indeed be undefinable (Klinck, "The Rise of the 'Remedial' Fiduciary Relationship: A Comment on International Corona Resources Ltd. v. Lac Minerals Ltd." (1988), 33 McGill L.J. 600, at p. 603), while others have doubted whether there can be any "universal, all-purpose definition of the fiduciary relationship" (see Hospital Products Ltd. v. United States Surgical Corp. (1984), 55 A.L.R. 417, at p. 432; Austin, "Commerce and Equity -- Fiduciary Duty and Constructive Trust" (1986), 6 O.J.L.S. 444, at pp. 445-46). The challenge posed by these criticisms has been taken up by courts and academics convinced of the view that underlying the divergent categories of fiduciary relationships and obligations lies some unifying theme; see Frame v. Smith, [1987] 2 S.C.R. 99, at p. 134, per Wilson J.; Weinrib, "The Fiduciary Obligation" (1975), 25 U. of T. L.J. 1; Finn, "The Fiduciary Principle" Victoria Law School Conference Lecture, 1988; Shepherd, "Towards a Unified Concept of Fiduciary Relationships" (1981), 97 L.Q.R. 51; Frankel, "Fiduciary Law" (1983), 71 Calif. L. Rev. 795; Gautreau, "Demystifying the Fiduciary Mystique" (1989), 68 Can. Bar Rev. 1. This case presents a further opportunity to consider such a principle.

**144**    In Guerin v. The Queen, [1984] 2 S.C.R. 335, Dickson J. (as he then was) discussed the nature of fiduciary obligations in the following passage, at pp. 383-84:

>            The concept of fiduciary obligation originated long ago in the notion of
>            breach of confidence, one of the original heads of jurisdiction in Chancery.

> . . .

Professor Ernest Weinrib maintains in his article The Fiduciary Obligation (1975), 25 U.T.L.J. 1, at p. 7, that "the hallmark of a fiduciary relation is that the relative legal positions are such that one party is at the mercy of the other's discretion." Earlier, at p. 4, he puts the point in the following way:

> [Where there is a fiduciary obligation] there is a relation in which the principal's interests can be affected by, and are therefore dependent on, the manner in which the fiduciary uses the discretion which has been delegated to him. The fiduciary obligation is the law's blunt tool for the control of this discretion.

> I make no comment upon whether this description is broad enough to embrace all fiduciary obligations. I do agree, however, that where by statute, agreement, or perhaps by unilateral undertaking, one party has an obligation to act for the benefit of another, and that obligation carries with it a discretionary power, the party thus empowered becomes a fiduciary. Equity will then supervise the relationship by holding him to the fiduciary's strict standard of conduct.

> It is sometimes said that the nature of fiduciary relationships is both established and exhausted by the standard categories of agent, trustee, partner, director, and the like. I do not agree. It is the nature of the relationship, not the specific category of actor involved that gives rise to the fiduciary duty. The categories of fiduciary, like those of negligence, should not be considered closed. [Emphasis added.]

145    Wilson J. had occasion to consider the extension of fiduciary obligations to new categories of relationships in Frame v. Smith, supra. She found, at p. 136 that:

... there are common features discernible in the contexts in which fiduciary duties have been found to exist and these common features do provide a rough and ready guide to whether or not the imposition of a fiduciary obligation on a new relationship would be appropriate and consistent. Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:

    (1)   The fiduciary has scope for the exercise of some discretion or power.

    (2)   The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.

(3)    The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power. [Emphasis added.]

**146**    It will be recalled that the issue in that case, though not originally raised by the parties but argued at the request of the Court, was whether the relationship of a custodial parent to a non-custodial parent could be considered a category to which fiduciary obligations could attach. Wilson J. would have been willing to extend the categories of fiduciary relations to include such parties. While the majority in that case did not consider it necessary to address the bases on which fiduciary obligations arise (essentially because it considered the statute there to constitute a discrete code), as will be seen from my reasons below, I find Wilson J.'s approach helpful.

**147**    Much of the confusion surrounding the term "fiduciary" stems, in my view, from its undifferentiated use in at least three distinct ways. The first is as used by Wilson J. in Frame v. Smith, supra. There the issue was whether a certain class of relationship, custodial and non-custodial parents, were a category, analogous to directors and corporations, solicitors and clients, trustees and beneficiaries, and agents and principals, the existence of which relationship would give rise to fiduciary obligations. The focus is on the identification of relationships in which, because of their inherent purpose or their presumed factual or legal incidents, the courts will impose a fiduciary obligation on one party to act or refrain from acting in a certain way. The obligation imposed may vary in its specific substance depending on the relationship, though compendiously it can be described as the fiduciary duty of loyalty and will most often include the avoidance of a conflict of duty and interest and a duty not to profit at the expense of the beneficiary. The presumption that a fiduciary obligation will be owed in the context of such a relationship is not irrebuttable, but a strong presumption will exist that such an obligation is present. Further, not every legal claim arising out of a relationship with fiduciary incidents will give rise to a claim for breach of fiduciary duty. This was made clear by Southin J. (as she then was) in Girardet v. Crease & Co. (1987), 11 B.C.L.R. (2d) 361 (S.C.), at p. 362. She stated:

> Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word "fiduciary" is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But "fiduciary" comes from the Latin "fiducia" meaning "trust". Thus, the adjective, "fiduciary" means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words.

It is only in relation to breaches of the specific obligations imposed because the relationship is one

characterized as fiduciary that a claim for breach of fiduciary duty can be founded. In determining whether the categories of relationships which should be presumed to give rise to fiduciary obligations should be extended, the rough and ready guide adopted by Wilson J. is a useful tool for that evaluation. This class of fiduciary obligation need not be considered further, as Corona's contention is not that "parties negotiating towards a joint-venture" constitute a category of relationship, proof of which will give rise to a presumption of fiduciary obligation, but rather that a fiduciary relationship arises out of the particular circumstances of this case.

**148**    This brings me to the second usage of fiduciary, one I think more apt to the present case. The imposition of fiduciary obligations is not limited to those relationships in which a presumption of such an obligation arises. Rather, a fiduciary obligation can arise as a matter of fact out of the specific circumstances of a relationship. As such it can arise between parties in a relationship in which fiduciary obligations would not normally be expected. I agree with this comment of Professor Finn in "The Fiduciary Principle", supra, at p. 64:

> What must be shown, in the writer's view, is that the actual circumstances of a relationship are such that one party is entitled to expect that the other will act in his interests in and for the purposes of the relationship. Ascendancy, influence, vulnerability, trust, confidence or dependence doubtless will be of importance in making this out. But they will be important only to the extent that they evidence a relationship suggesting that entitlement. The critical matter in the end is the role that the alleged fiduciary has, or should be taken to have, in the relationship. It must so implicate that party in the other's affairs or so align him with the protection or advancement of that other's interests that foundation exists for the "fiduciary expectation". Such a role may generate an actual expectation that that other's interests are being served. This is commonly so with lawyers and investment advisers. But equally the expectation may be a judicially prescribed one because the law itself ordains it to be that other's entitlement. And this may be so either because that party should, given the actual circumstances of the relationship, be accorded that entitlement irrespective of whether he has adverted to the matter, or because the purpose of the relationship itself is perceived to be such that to allow disloyalty in it would be to jeopardise its perceived social utility.

It is in this sense, then, that the existence of a fiduciary obligation can be said to be a question of fact to be determined by examining the specific facts and circumstances surrounding each relationship; see Waters, Law of Trusts in Canada (2nd ed. 1984), at p. 405. If the facts give rise to a fiduciary obligation, a breach of the duties thereby imposed will give rise to a claim for equitable relief.

**149**    The third sense in which the term "fiduciary" is used is markedly different from the two usages discussed above. It requires examination here because, as I will endeavour to explain, it

gives a misleading colouration to the fiduciary concept. This third usage of "fiduciary" stems, it seems, from a perception of remedial inflexibility in equity. Courts have resorted to fiduciary language because of the view that certain remedies, deemed appropriate in the circumstances, would not be available unless a fiduciary relationship was present. In this sense, the label fiduciary imposes no obligations, but rather is merely instrumental or facilitative in achieving what appears to be the appropriate result. The clearest example of this is the judgment of Goulding J. in Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd., [1981] Ch. 105. There the plaintiff had transferred some $2,000,000 to the defendant's account at a third bank. Due to a clerical error, a second payment in the same amount was made later that day. Instructions to stop the payment were made, but not quickly enough. The defendant bank was put into receivership shortly after the payment made in error was received, and as it was insolvent, the plaintiff could only recover the full amount of its money if it could trace it into some identifiable asset. Responding to the argument that, even if the funds could be identified, they could not be recovered since there was no fiduciary relationship, Goulding J. made the following comments, at pp. 118-19, which are worth setting out extensively:

> The facts and decisions in Sinclair v. Brougham [1914] A.C. 398 and in In re Diplock [1948] Ch. 465 are well known and I shall not take time to recite them. I summarise my view of the Diplock judgment as follows: (1) The Court of Appeal's interpretation of Sinclair v. Brougham was an essential part of their decision and is binding on me. (2) The court thought that the majority of the House of Lords in Sinclair v. Brougham had not accepted Lord Dunedin's opinion in that case, and themselves rejected it. (3) The court (as stated in Snell, [Principles of Equity, 27th ed., 1973]) held that an initial fiduciary relationship is a necessary foundation of the equitable right of tracing. (4) They also held that the relationship between the building society directors and depositors in Sinclair v. Brougham was a sufficient fiduciary relationship for the purpose: [1948] Ch. 465, 529, 540. The latter passage reads, at p. 540: "A sufficient fiduciary relationship was found to exist between the depositors and the directors by reason of the fact that the purposes for which the depositors had handed their money to the directors were by law incapable of fulfillment." It is founded, I think, on the observations of Lord Parker of Waddington at [1914] A.C. 398, 441.

> This fourth point shows that the fund to be traced need not (as was the case in In re Diplock itself) have been the subject of fiduciary obligations before it got into the wrong hands. It is enough that, as in Sinclair v. Brougham [1914] A.C. 398, the payment into wrong hands itself gave rise to a fiduciary relationship. The same point also throws considerable doubt on Mr. Stubbs's submission that the necessary fiduciary relationship must originate in a consensual transaction. It was not the intention of the depositors or of the directors in Sinclair v. Brougham

> to create any relationship at all between the depositors and the directors as principals. Their object, which unfortunately disregarded the statutory limitations of the building society's powers, was to establish contractual relationships between the depositors and the society. In the circumstances, however, the depositors retained an equitable property in the funds they parted with, and fiduciary relationships arose between them and the directors. In the same way, I would suppose, a person who pays money to another under a factual mistake retains an equitable property in it and the conscience of that other is subjected to a fiduciary duty to respect his proprietary right. [Emphasis added.]

It is clear that if a fiduciary relationship was necessary for the plaintiff to be entitled to a proprietary tracing remedy, then such a relationship would be found. It is equally clear that this relationship has nothing to do with the imposition of obligations traditionally associated with fiduciaries. For another example, see Goodbody v. Bank of Montreal (1974), 47 D.L.R. (3d) 335 (Ont. H.C.), at p. 339, where a thief was considered to be a fiduciary so as to ground an equitable tracing order.

**150**    Professor Birks has described this approach as follows (Birks, "Restitutionary damages for breach of contract: Snepp and the fusion of law and equity," [1987] Lloyd's Mar. & Com.L.Q. 421, at p. 436):

> This approach moves the characterization of a relationship as fiduciary from the reasoning which justifies a conclusion to the conclusion itself: a relationship becomes fiduciary because a legal consequence traditionally associated with that label is generated by the facts in question.

Professor Weinrib has criticized it because ("The Fiduciary Obligation", supra, at p. 5):

> This definition in terms of the effect produced by the finding of a fiduciary relation begs the question in an obvious way: one cannot both define the relation by the remedy and use the relation as a triggering device for remedy.

Megarry V.-C. commented on this approach to identifying a fiduciary obligation in Tito v. Waddell (No. 2), [1977] 3 All E.R. 129, at pp. 231-32. In that case, the argument made was that:

> ... A was in a fiduciary position towards B if he was performing a special job in relation to B which affected B's property rights, at any rate if A was self-dealing. This ... could be put in two ways. First, there was a fiduciary duty if there was a job to be performed and it was performed in a self-dealing way. Alternatively, there was a fiduciary duty if there was a job to perform, and equity then imposed a duty to perform it properly if there was any self-dealing.

He rejected this position as follows, at p. 232:

I cannot see why the imposition of a statutory duty to perform certain functions, or the assumption of such a duty, should as a general rule impose fiduciary obligations, or even be presumed to impose any. Of course, the duty may be of such a nature as to carry with it fiduciary obligations: impose a fiduciary duty and you impose fiduciary obligations. But apart from such cases, it would be remarkable indeed if in each of the manifold cases in which statute imposes a duty, or imposes a duty relating to property, the person on whom the duty is imposed were thereby to be put into a fiduciary relationship with those interested in the property, or towards whom the duty could be said to be owed.

. . .

Furthermore, I cannot see that coupling the job to be performed with self-dealing in the performance of it makes any difference. If there is a fiduciary duty, the equitable rules about self-dealing apply: but self-dealing does not impose the duty. Equity bases its rules about self-dealing on some pre-existing fiduciary duty: it is a disregard of this pre-existing duty that subjects the self-dealer to the consequences of the self-dealing rules. I do not think that one can take a person who is subject to no pre-existing fiduciary duty and then say that because he self-deals he is thereupon subjected to a fiduciary duty.

**151**    Megarry V.-C. held in that case that there was no fiduciary relationship and so no breach of the fiduciary obligations that would have been imposed by finding such a relationship. Self-dealing would only have been a breach of fiduciary obligation if a fiduciary obligation existed. Megarry V.-C. rejected the notion that one can argue from a conclusion (there has been self-dealing) to a duty (therefore there is a fiduciary relationship) and then back to the conclusion (therefore there has been a breach of duty).

**152**    In my view, this third use of the term fiduciary, used as a conclusion to justify a result, reads equity backwards. It is a misuse of the term. It will only be eliminated, however, if the courts give explicit recognition to the existence of a range of remedies, including the constructive trust, available on a principled basis even though outside the context of a fiduciary relationship.

**153**    To recapitulate, the first class of fiduciary is not in issue in this appeal. It is not contended that all parties negotiating towards a joint venture are a class to which fiduciary obligations should presumptively attach. As will be clear from my discussion of the third usage of the term fiduciary, I am not prepared to hold that because a constructive trust is the appropriate remedy a fiduciary label therefore attaches, though I will deal later with why, even if the relationship is not fiduciary in any sense, a constructive trust may nonetheless be appropriate. The issue that remains for immediate discussion is whether the facts in this case, as found by the courts below, support the imposition of a fiduciary obligation within the second category discussed above, and whether, acting as it did, Lac was in breach of the obligations thereby imposed.

**154**    In addressing this issue, some detailed consideration must be given to the analysis made by the Court of Appeal. Before that court, Lac was attacking the trial judge's conclusion that Lac was in breach of its fiduciary duty to act fairly and not to the detriment of Corona by acquiring the Williams property. I note that, in their discussions of this breach, neither court below spoke of Lac's duty not to acquire the property for its own account to the exclusion of Corona, but rather spoke of a duty not to acquire the property at all. For the reasons I have outlined in my discussion of breach of confidence, and for reasons which I will more fully outline later, I am of the view that the courts below were correct in their description of the duty owed.

**155**    The Court of Appeal agreed with the submission made by LAC that the law of fiduciary relations does not ordinarily apply to parties involved in commercial negotiations. Such negotiations are normally conducted at arm's length. They held, however, that in certain circumstances fiduciary obligations can arise, and it is a question of fact in each case whether the relationship of the parties, one to the other, is such as to create a fiduciary relationship. United Dominions Corp. v. Brian Pty. Ltd. (1985), 59 A.L.J.R. 676, was given as an example of where such an obligation might arise. In terms of the scheme I have outlined above, the Court of Appeal accepted that the first usage of "fiduciary" was not in issue, but that the second must be more closely examined.

**156**    Before undertaking that examination, the court made the following comments on the relationship between fiduciary law and the law of confidential information, at pp. 47-48:

> ... the trial judge found that Corona imparted confidential information to LAC during the course of their negotiations. He recognized that the law regarding obligations imposed by the delivery of confidential information is distinct from the law imposing fiduciary duties and that it does not depend upon any special relationship between the parties. In Canadian Aero Service Ltd. v. O'Malley ... [1974] S.C.R. 592 at p. 616, Laskin J. said for the court:
>
>> The fact that breach of confidence or violation of copyright may itself afford a ground of relief does not make either one a necessary ingredient of a successful claim for breach of fiduciary duty.
>
>> That statement recognizes that the courts will provide relief for a breach of confidence in proper circumstances where there is no fiduciary relationship between the parties. On the other hand, a fiduciary relationship between parties may co-exist with a right of one of the parties to an obligation of confidence with respect to information of a confidential nature given by that party to the other party. It is indeed difficult to conceive of any fiduciary relationship where the right to confidentiality would not exist with respect to such information.

> In the case at bar, the trial judge concluded that the legal principles regarding the obligations imposed by the delivery of confidential information and the obligations imposed as a result of the existence of a fiduciary relationship are intertwined. We are of the opinion that he was correct in this conclusion and that the law of fiduciary relationships can apply to parties involved, at least initially, in arm's length commercial discussions. [Emphasis added.]

**157**    The Court of Appeal then discussed the several factors which in its view supported the finding of a fiduciary obligation. In doing so, they were specifically responding to Lac's submission that the correct approach is to ask "whether the relationship by law, custom or agreement is such that one party is obligated to demonstrate loyalty and avoid taking advantage for himself". In light of this submission to the court below, I must say that it lies ill in the mouth of Lac to now assert before this Court that the custom or usage found by the courts below cannot as a matter of law give rise to fiduciary obligations. Were I not of the view that that submission is in error, I incline to think that Lac may be estopped by its conduct below from raising it in this Court.

**158**    The Court of Appeal relied on four main factors in upholding the imposition of the fiduciary obligation. First, Lac was a senior mining company and Corona a junior, and Lac had sought out Corona in order to obtain information and to discuss a joint venture. Second, the parties had arrived at a mutual understanding of how each would conduct itself in the course of their negotiations, were working towards a common objective and had in fact taken preliminary steps in the contemplated joint exploration and development venture. Third, Corona disclosed confidential information to Lac and Lac expected to receive that confidential information in the course of the negotiations. Finally, there was established by Lac's own evidence a custom, practice or usage in the mining industry that parties in serious negotiation to a joint venture not act to the detriment of the other, particularly with respect to the confidential information disclosed, and the parties had reached the stage in negotiations where such an industry practice applied. In all these circumstances, the Court of Appeal found that it was just and proper that a fiduciary relationship be found, and a legal obligation not to benefit at the expense of the other from information received in negotiations imposed. By acquiring the Williams property, Lac had breached this obligation.

**159**    While it is almost trite to say that a fiduciary relationship does not normally arise between arm's length commercial parties, I am of the view that the courts below correctly found a fiduciary obligation in the circumstances of this case and correctly found Lac to be in breach of it. I turn then to a consideration of the factors which in this case support the imposition of that duty. These can conveniently be grouped under three headings, (1) trust and confidence, (2) industry practice and (3) vulnerability. As will be seen these factors overlap to some extent, but considered as a whole they support the proposition that Corona could reasonably expect Lac to not act to Corona's detriment by acquiring the Williams land, and that Corona's expectation should be legally protected.

Trust and Confidence

**160**   The relationship of trust and confidence that developed between Corona and Lac is a factor worthy of significant weight in determining if a fiduciary obligation existed between the parties. The existence of such a bond plays an important role in determining whether one party could reasonably expect the other to act or refrain from acting against the interests of the former. That said, the law of confidence and the law relating to fiduciary obligations are not coextensive. They are not, however, completely distinct. Indeed, while there may be some dispute as to the jurisdictional basis of the law of confidence, it is clear that equity is one source of jurisdiction: see Saltman Engineering Co. v. Campbell Engineering Co. (1948), 65 R.P.C. 203 (C.A.). In Guerin v. The Queen, supra, Dickson J. noted that the law of fiduciary obligations had its origin in the law of confidence. Professor Finn thought it was settled that confidential information, whether classified as property or not, will attract fiduciary law's protection provided the circumstances are such as to attract a duty of confidence: "The Fiduciary Principle", supra, at p. 50. I agree with the view of both courts below that the law of confidence and the law of fiduciary obligations, while distinct, are intertwined.

**161**   In a claim for breach of confidence, Gurry tells us (Breach of Confidence, at pp. 161-62):

> ... the court's concern is for the protection of a confidence which has been created by the disclosure of confidential information by the confider to the confidant. The court's attention is thus focused on the protection of the confidential information because it has been the medium for the creation of a relationship of confidence; its attention is not focused on the information as a medium by which a pre-existing duty is breached.

However, the facts giving rise to an obligation of confidence are also of considerable importance in the creation of a fiduciary obligation. If information is imparted in circumstances of confidence, and if the information is known to be confidential, it cannot be denied that the expectations of the parties may be affected so that one party reasonably anticipates that the other will act or refrain from acting in a certain way. A claim for breach of confidence will only be made out, however, when it is shown that the confidee has misused the information to the detriment of the confidor. Fiduciary law, being concerned with the exaction of a duty of loyalty, does not require that harm in the particular case be shown to have resulted.

**162**   There are other distinctions between the law of fiduciary obligations and that of confidence which need not be pursued further here, but among them I simply note that unlike fiduciary obligations, duties of confidence can arise outside a direct relationship, where for example a third party has received confidential information from a confidee in breach of the confidee's obligation to the confidor: see Liquid Veneer Co. v. Scott (1912), 29 R.P.C. 639 (Ch.), at p. 644. It would be a misuse of the term to suggest that the third party stood in a fiduciary position to the original confidor. Another difference is that breach of confidence also has a jurisdictional base at law, whereas fiduciary obligations are a solely equitable creation. Though this is becoming of less importance, these differences of origin give to the claim for breach of confidence a greater remedial

flexibility than is available in fiduciary law. Remedies available from both law and equity are available in the former case, equitable remedies alone are available in the latter.

**163**    The Court of Appeal characterized the relationship in the present case as one of "trust and cooperation". Lac and Corona were negotiating, and on the evidence of Sheehan, negotiating in good faith, towards a joint venture or some other business relationship. It was expected during these negotiations that Corona would disclose confidential information to Lac, and Corona did so. This was in conformity with the normal and usual practice in the mining industry. The evidence accepted by both courts below established a practice in the industry, known to Lac, that Lac would not use confidential information derived out of the negotiating relationship in a manner contrary to the interests of Corona. R. Holland J. found that it "must have been obvious" to Sheehan that he was receiving confidential information. In light of that finding, it should be apparent that the lowest possible significance can attach to the absence of discussions between the parties relating to confidentiality. Lac, in the view of the Court of Appeal, felt that it had some obligation to confirm areas of interest with Corona, and did so with respect to staking other property in the area. The trial judge, noting that Corona had "agreed" to Lac's staking in the area, thought that this gave rise to an "informal understanding as to how each would conduct itself in anticipation of" the conclusion of a formal business relationship. In all these circumstances, I am of the view that both parties would reasonably expect that a legal obligation would be imposed on Lac not to act in a manner contrary to Corona's interest with respect to the Williams property.

Industry Practice

**164**    Both courts below placed considerable weight on the evidence of Allen to the effect that there was a "duty" not to act to the other party's detriment when in serious negotiations through the misuse of confidential information. For ease of reference, I set out his testimony here again:

> If one geologist goes to another geologist and says, are you interested in making some sort of a deal and between the two of them, they agree that they should consider seriously the possibility of making a deal, I think for a short period of time that while they are exploring that, that any transference of data would be -- I would hope the geologists would be competent enough to identify the difference between published, unpublished, confidential and so on but in the case that they weren't, there was just some exchange of conversation or physical data, then I would say that while both of them were seriously and honestly engaged in preparing a deal, that Lac and the other party would both have a duty towards each other not to hurt each other as the result of any information that was exchanged.

All of Lac's experts agreed with this statement. The trial judge, in reliance on this evidence said, at pp. 763, 769 and 770:

THE EVIDENCE OF THE EXPERTS ON LIABILITY

. . .

C.    Whether the conduct of the parties, according to the experts, imposed fiduciary
obligations on Lac

. . .

I conclude, following Cunliffe-Owen, supra, that there is a practice in the
mining industry that imposes an obligation when parties are seriously negotiating
not to act to the detriment of each other.

The Court of Appeal affirmed the conclusion that Corona had established a "custom or usage" in
accordance with the principle set forth in Cunliffe-Owen v. Teather & Greenwood, [1967] 1 W.L.R.
1421 (Ch.), and that the trial judge was correct in applying that case.

**165**    Undoubtedly experts on mining practice are not qualified to give evidence on whether
fiduciary obligations arose between the parties, as the existence of fiduciary obligations is a
question of law to be answered by the court after a consideration of all the facts and circumstances.
Thus, while the term "fiduciary" was not properly used by the trial judge in this passage, the
evidence of the experts is of considerable importance in establishing standard practice in the
industry from which one can determine the nature of the obligations which will be imposed by law.

**166**    It will be clear then, that in my view Lac's submissions relating to custom and usage were
largely misdirected. The issue is not, as Lac submitted, what is "the legal effect of custom in the
industry". Rather, it is what is the importance of the existence of a practice in the industry,
established out of the mouth of the defendant and all its experts, in determining whether Corona
could reasonably expect that Lac would act or refrain from acting against the interests of Corona.
Framed thus, the evidence is of significant importance.

**167**    I must at this point briefly advert to the law relating to custom and usage. Lac submitted that
the Court of Appeal erred in using the terms "custom" and "usage" interchangeably. "Custom" in
the sense of a rule having the force of law and existing since time immemorial is not in issue in this
case. Indeed, Canadian law being largely of imported origin will rarely, if ever, evince that sort of
custom. Custom in Canadian law must be given a broader definition. In any event, both courts
below were not using the term in such a technical sense, as is clear from the fact that both
substituted the term "practice" as a synonym. It is not necessary to decide, and I do not decide,
whether a usage, properly established on the evidence, can give rise to fiduciary obligations. For
these purposes I accept the definition of "usage" from Halsbury's Laws of England, vol. 12, 4th ed.,
para. 445, at p. 28, as follows:

Usage may be broadly defined as a particular course of dealing or line of conduct
generally adopted by persons engaged in a particular department of business life,
or more fully as a particular course of dealing or line of conduct which has

> acquired such notoriety, that, where persons enter into contractual relationships
> in matters respecting the particular branch of business life where the usage is
> alleged to exist, those persons must be taken to have intended to follow that
> course of dealing or line of conduct, unless they have expressly or impliedly
> stipulated to the contrary.

**168**    I should mention that I have the greatest hesitation in saying that the only circumstances in which a legal obligation can arise out of a notorious business practice is when a contract results. The cases cited against implying terms in a contract have no relevance to negotiating practices. When the parties have reduced their understandings to writing, it is obviously the proper course for courts to be extremely circumspect in adding to the bargain they have set down (see, for example, Burns v. Kelly Peters & Associates Ltd. (1987), 41 D.L.R. (4th) 577, per Lambert J.A., at p. 601; Nelson v. Dahl (1879), 12 Ch. D. 568 (C.A.); Norwich Winterthur Insurance (Australia) Ltd. v. Con-Stan Industries of Australia Pty. Ltd., [1983] 1 N.S.W.L.R. 461 (C.A.). In any event, it is not, in my opinion, necessary to determine if the practice established by the evidence of Lac's executives and experts amounts to a legal usage. It is clear to me that the practice in the industry is so well known that at the very least Corona could reasonably expect Lac to abide by it. There is absolutely no substance to the submission of Lac that this practice is vague or uncertain. It is premised on the disclosure of confidential information in the context of serious negotiations. I do not find it necessary to define "serious", and will not interfere with the concurrent findings of the courts below. The industry practice therefore, while not conclusive, is entitled to significant weight in determining the reasonable expectations of Corona, and for that matter of Lac regarding how the latter should behave.

Vulnerability

**169**    As I indicated above, vulnerability is not, in my view a necessary ingredient in every fiduciary relationship. It will of course often be present, and when it is found it is an additional circumstance that must be considered in determining if the facts give rise to a fiduciary obligation. I agree with the proposition put forward by Wilson J. that when determining if new classes of relationship should be taken to give rise to fiduciary obligations then the vulnerability of the class of beneficiaries of the obligation is a relevant consideration. Wilson J. put it as follows in Frame v. Smith, supra, at pp. 137-38:

> The third characteristic of relationships in which a fiduciary duty has been
> imposed is the element of vulnerability. This vulnerability arises from the
> inability of the beneficiary (despite his or her best efforts) to prevent the injurious
> exercise of the power or discretion combined with the grave inadequacy or
> absence of other legal or practical remedies to redress the wrongful exercise of
> the discretion or power. Because of the requirement of vulnerability of the
> beneficiary at the hands of the fiduciary, fiduciary obligations are seldom present
> in the dealings of experienced businessmen of similar bargaining strength acting

at arm's length: see, for example, Jirna Ltd. v. Mister Donut of Canada Ltd. (1971), 22 D.L.R. (3d) 639 (Ont. C.A.), aff'd [1975] 1 S.C.R. 2. The law takes the position that such individuals are perfectly capable of agreeing as to the scope of the discretion or power to be exercised, i.e., any "vulnerability" could have been prevented through the more prudent exercise of their bargaining power and the remedies for the wrongful exercise or abuse of that discretion or power, namely damages, are adequate in such a case.

However, as I indicated, this case does not require a new class of relationships to be identified, but requires instead an examination of the specific facts of this case.

**170**    The Oxford English Dictionary, vol. 19, 2nd ed., at p. 786, defines "vulnerable" as follows:

> ... That may be wounded; susceptible of receiving wounds or physical injury.

> ... Open to attack or injury of a non-physical nature; esp., offering an opening to the attacks of raillery, criticism, calumny, etc.

Persons are vulnerable if they are susceptible to harm, or open to injury. They are vulnerable at the hands of a fiduciary if the fiduciary is the one who can inflict that harm. It is clear, however, that fiduciary obligations can be breached without harm being inflicted on the beneficiary. Keech v. Sandford (1726), Sel. Cas. T. King 61, 25 E.R. 223, is the clearest example. In that case a fiduciary duty was breached even though the beneficiary suffered no harm and indeed could not have benefitted from the opportunity the fiduciary pursued. Beneficiaries of trusts, however, are a class that is susceptible to harm, and are therefore protected by the fiduciary regime. Not only is actual harm not necessary, susceptibility to harm will not be present in many cases. Each director of General Motors owes a fiduciary duty to that company, but one can seriously question whether General Motors is vulnerable to the actions of each and every director. Nonetheless, the fiduciary obligation is owed because, as a class, corporations are susceptible to harm from the actions of their directors.

**171**    I cannot therefore agree with my colleague, Sopinka J., that vulnerability or its absence will conclude the question of fiduciary obligation. As I indicated above, the issue should be whether, having regard to all the facts and circumstances, one party stands in relation to another such that it could reasonably be expected that that other would act or refrain from acting in a way contrary to the interests of that other. In any event, I would have thought it beyond argument that on the facts of this case Corona was vulnerable to Lac.

**172**    The argument to the contrary seems to be based on two propositions. First, Corona did not give up to Lac any power or discretion to affect its interests. Second, Corona could have protected itself by a confidentiality agreement, and the Court should not interfere if the parties could have, but did not in fact protect themselves. In my view there is no substance to either of these arguments.

**173**    The first is rebutted by the facts. Lac would not have acquired the property but for the information received from Corona. Lac in fact acquired the property. In doing so it affected Corona's interests. All power and discretion mean in this context is the ability to cause harm. Clearly that is present in this case. Lac acquired a power or ability to harm Corona by obtaining the Williams property. Corona gave it that power by giving up information about the property and about Corona's intentions. Having regard to the well-established practice in the mining industry, Corona would have had no expectation that Lac would use this information to the detriment of Corona.

**174**    This leads to the second point. This Court should not deny the existence of a fiduciary obligation simply because the parties could have by means of a confidentiality agreement regulated their affairs. That, it seems to me, is an unacceptable proposition, particularly on the facts of this case. The concurrent findings below are that Sheehan was aware the information he was receiving was confidential information and that it was being received in circumstances of confidence. It is clear that a claim for breach of confidence is then available if the information is misused. Why one would then go and enter into a confidentiality agreement simply confirming what each party knows escapes me. I cannot understand why a claim for breach of confidence is available absent a confidentiality agreement, but a claim for breach of fiduciary duty is not. The fact that the parties could have concluded a contract to cover the situation but did not in fact do so does not, in my opinion, determine that matter. Many claims in tort could be avoided through more prudent negotiation of a contract, but courts do not deny tort liability; see Gautreau, supra, at p. 11; Central Trust Co. v. Rafuse, [1986] 2 S.C.R. 147. The existence of an alternative procedure is only relevant in my mind if the parties would realistically have been expected to contemplate it as an alternative. It is useful here to once again refer to the evidence of Lac's experts. Dr. Robertson testified as follows:

> Q.    Do large companies generally or typically make use of such agreements [confidentiality agreements]?
> A.    They are not common. In the last five years they have become increasingly so. Even prospectors now ask large companies for confidentiality agreements.

> This whole process is data dissemination. They rarely have anything so highly confidential that a large company will trade away its right to do what it wants to do in return for, in essence, very little back. [Emphasis added.]

Dr. Derry testified to similar effect:

> Q.    In 1981, in your view, how could Corona have protected itself if it both wanted to acquire more ground and it also wanted to allow the visit by Lac Minerals?
> A.    It would be unusual, but I think it would have to ask the visitor to make some

assurance, probably a written assurance, that he would not acquire ground or conflict with the interest of the owning company. [Emphasis added.]

The present litigation is, according to the evidence of Corona's witness Dr. Bragg, one of the reasons that confidentiality agreements are being used with increasing frequency. Where it is not established that the entering of confidentiality agreements is a common, usual or expected course of action, this Court should not presume such a procedure, particularly when the law of fiduciary obligations can operate to protect the reasonable expectations of the parties. There is no reason to clutter normal business practice by requiring a contract.

**175**    In this case the vulnerability of Corona at Lac's hand is clearly demonstrated by the circumstances in which Lac acquired the Williams property. Even though the offer from Corona would have paid to Mrs. Williams $250,000 within three years plus a 3 percent net smelter return, Mrs. Williams accepted the offer from Lac which paid only half that return. It is nothing short of fiction to suggest that vis-à-vis third parties or each other Lac and Corona stood on an equal footing. Corona was a junior mining company which needed to raise funds in order to finance the development of its property. This is why Corona welcomed the overture of Lac in the first place. Lac was a senior mining company that had the ability to provide those funds. Indeed Lac used this as a selling point to Mrs. Williams when it advised her that it was "an exploration and development company with four gold mines in production and had been in the mining and exploration business for decades".

**176**    I conclude therefore that Corona was vulnerable to Lac. The fact that these are commercial parties may be a factor in determining what the reasonable expectations of the parties are, and thus it may be a rare occasion that vulnerability is found between such parties. It is, however, shown to exist in this case and is a factor deserving of considerable weight in the identification of a fiduciary obligation.

Conclusion on Fiduciary Obligations

**177**    Taking these factors together, I am of the view that the courts below did not err in finding that a fiduciary obligation existed and that it was breached. Lac urged this Court not to accept this finding, warning that imposing a fiduciary relationship in a case such as this would give rise to the greatest uncertainty in commercial law, and result in the determination of the rules of commercial conduct on the basis of ad hoc moral judgments rather than on the basis of established principles of commercial law.

**178**    I cannot accept either of these submissions. Certainty in commercial law is, no doubt, an important value, but it is not the only value. As Grange J. has noted ("Good Faith in Commercial Transactions," Commercial Law: Recent Developments and Emerging Trends, Special Lectures of the Law Society of Upper Canada, 1985, at p. 70):

There are many limitations on the freedom of contract both in the common law

and by statute. Every one of them carries within itself the seeds of debate as to its meaning or at least its applicability to a particular set of facts.

In any event, it is difficult to see how giving legal recognition to the parties' expectations will throw commercial law into turmoil.

**179**   Commercial relationships will more rarely involve fiduciary obligations. That is not because they are immune from them, but because in most cases, they would not be appropriately imposed. I agree with this comment of Mason J. in Hospital Products Ltd. v. United States Surgical Corp., supra, at pp. 456-57:

> There has been an understandable reluctance to subject commercial transactions to the equitable doctrine of constructive trust and constructive notice. But it is altogether too simplistic, if not superficial, to suggest that commercial transactions stand outside the fiduciary regime as though in some way commercial transactions do not lend themselves to the creation of a relationship in which one person comes under an obligation to act in the interests of another. The fact that in the great majority of commercial transactions the parties stand at arms' length does not enable us to make a generalization that is universally true in relation to every commercial transaction. In truth, every such transaction must be examined on its merits with a view to ascertaining whether it manifests the characteristics of a fiduciary relationship.

**180**   A fiduciary relationship is not precluded by the fact that the parties were involved in pre-contractual negotiations. That was made clear in the United Dominions Corp. case, supra, where the majority held, at p. 680, that:

> A fiduciary relationship can arise and fiduciary duties can exist between parties who have not reached, and who may never reach, agreement upon the consensual terms which are to govern the arrangement between them.

The fact that the relationship between the parties in that case was more advanced than in the case at bar does not affect the value of the conclusion. See also Fraser Edmunston Pty. Ltd. v. A.G.T. (Qld) Pty. Ltd., Queensland S.C., (June 3, 1986, Williams J.), at p. 17. It is a question to be determined on the facts whether the parties have reached a stage in their relationship where their expectations should be protected. In this case the facts support the existence of a fiduciary obligation not to act to the detriment of Corona's interest by acquiring the Williams property by using confidential information acquired during the negotiation process.

**181**   The argument on morality is similarly misplaced. It is simply not the case that business and accepted morality are mutually exclusive domains. Indeed, the Court of Appeal, after holding that to find a fiduciary relationship here made no broad addition to the law, a view I take to be correct, noted that the practice established by the evidence to support the obligation was consistent with

"business morality and with encouraging and enabling joint development of the natural resources of the country". This is not new. Texts from as early as 1903 refer to the obligation of "good faith by partners in their dealings with each other extend[ing] to negotiations culminating in the partnership, although in advance of its actual creation" (Lindley, A Treatise on the American Law Relating to Mines and Mineral Lands (reprint of 2nd ed. 1903). In my view, no distinction should be drawn here between negotiations culminating in a partnership or a joint venture.

Remedy

**182**    The appropriate remedy in this case cannot be divorced from the findings of fact made by the courts below. As I indicated earlier, there is no doubt in my mind that but for the actions of Lac in misusing confidential information and thereby acquiring the Williams property, that property would have been acquired by Corona. That finding is fundamental to the determination of the appropriate remedy. Both courts below awarded the Williams property to Corona on payment to Lac of the value to Corona of the improvements Lac had made to the property. The trial judge dealt only with the remedy available for a breach of a fiduciary duty, but the Court of Appeal would have awarded the same remedy on the claim for breach of confidence, even though it was of the view that it was artificial and difficult to consider the relief available for that claim on the hypothesis that there was no fiduciary obligation.

**183**    The issue then is this. If it is established that one party, (here Lac), has been enriched by the acquisition of an asset, the Williams property, that would have, but for the actions of that party been acquired by the plaintiff, (here Corona), and if the acquisition of that asset amounts to a breach of duty to the plaintiff, here either a breach of fiduciary obligation or a breach of a duty of confidence, what remedy is available to the party deprived of the benefit? In my view the constructive trust is one available remedy, and in this case it is the only appropriate remedy.

**184**    In my view the facts present in this case make out a restitutionary claim, or what is the same thing, a claim for unjust enrichment. When one talks of restitution, one normally talks of giving back to someone something that has been taken from them (a restitutionary proprietary award), or its equivalent value (a personal restitutionary award). As the Court of Appeal noted in this case, Corona never in fact owned the Williams property, and so it cannot be "given back" to them. However, there are concurrent findings below that but for its interception by Lac, Corona would have acquired the property. In Air Canada v. British Columbia, [1989] 1 S.C.R. 1161, at pp. 1202-03, I said that the function of the law of restitution "is to ensure that where a plaintiff has been deprived of wealth that is either in his possession or would have accrued for his benefit, it is restored to him. The measure of restitutionary recovery is the gain the [defendant] made at the [plaintiff's] expense." [Emphasis added.] In my view the fact that Corona never owned the property should not preclude it from the pursuing a restitutionary claim: see Birks, An Introduction to the Law of Restitution, at pp. 133-39. Lac has therefore been enriched at the expense of Corona.

**185**    That enrichment is also unjust, or unjustified, so that the plaintiff is entitled to a remedy.

There is, in the words of Dickson J. in Pettkus v. Becker, [1980] 2 S.C.R. 834, at p. 848, an "absence of any juristic reason for the enrichment". The determination that the enrichment is "unjust" does not refer to abstract notions of morality and justice, but flows directly from the finding that there was a breach of a legally recognized duty for which the courts will grant relief. Restitution is a distinct body of law governed by its own developing system of rules. Breaches of fiduciary duties and breaches of confidence are both wrongs for which restitutionary relief is often appropriate. It is not every case of such a breach of duty, however, that will attract recovery based on the gain of the defendant at the plaintiff's expense. Indeed this has long been recognized by the courts. In In re Coomber, [1911] 1 Ch. 723, at pp. 728-29, Fletcher Moulton L.J. said:

> Fiduciary relations are of many different types; they extend from the relation of myself to an errand boy who is bound to bring me back my change up to the most intimate and confidential relations which can possibly exist between one party and another where the one is wholly in the hands of the other because of his infinite trust in him. All these are cases of fiduciary relations, and the Courts have again and again, in cases where there has been a fiduciary relation, interfered and set aside acts which, between persons in a wholly independent position, would have been perfectly valid. Thereupon in some minds there arises the idea that if there is any fiduciary relation whatever any of these types of interference is warranted by it. They conclude that every kind of fiduciary relation justifies every kind of interference. Of course that is absurd. The nature of the fiduciary relation must be such that it justifies the interference. There is no class of case in which one ought more carefully to bear in mind the facts of the case, when one reads the judgment of the Court on those facts, than cases which relate to fiduciary and confidential relations and the action of the Court with regard to them. [Emphasis added.]

**186**    In breach of confidence cases as well, there is considerable flexibility in remedy. Injunctions preventing the continued use of the confidential information are commonly awarded. Obviously that remedy would be of no use in this case where the total benefit accrues to the defendant through a single misuse of information. An account of profits is also often available. Indeed in both courts below an account of profits to the date of transfer of the mine was awarded. Usually an accounting is not a restitutionary measure of damages. Thus, while it is measured according to the defendant's gain, it is not measured by the defendant's gain at the plaintiff's expense. Occasionally, as in this case, the measures coincide. In a case quite relevant here, this Court unanimously imposed a constructive trust over property obtained from the misuse of confidential information: Pre-Cam Exploration & Development Ltd. v. McTavish, [1966] S.C.R. 551. More recently, a compensatory remedy has been introduced into the law of confidential relations. Thus in Seager v. Copydex, Ltd. (No. 2), [1969] 2 All E.R. 718 (C.A.), an inquiry was directed concerning the market value of the information between a willing buyer and a willing seller. The defendant had unconsciously plagiarized the plaintiff's design. In those circumstances it would obviously have been unjust to exclude the defendant from the market when there was room for more than one participant.

**187**    I noted earlier that the jurisdictional base for the law of confidence is a matter of some dispute. In the case at bar however, it is not suggested that either the contractual or property origins of the doctrine can be used to found the remedy. Thus while there can be considerable remedial flexibility for such claims, it was not argued that the Court may not have jurisdiction to award damages as compensation and not merely in lieu of an injunction in the exercise of its equitable jurisdiction, and since I am of the view that a constructive trust is in any event the appropriate remedy, I need not consider the question of jurisdiction further.

**188**    In view of this remedial flexibility, detailed consideration must be given to the reasons a remedy measured by Lac's gain at Corona's expense is more appropriate than a remedy compensating the plaintiff for the loss suffered. In this case, the Court of Appeal found that if compensatory damages were to be awarded, those damages in fact equalled the value of the property. This was premised on the finding that but for Lac's breach, Corona would have acquired the property. Neither at this point nor any other did either of the courts below find Corona would only acquire one half or less of the Williams property. While I agree that, if they could in fact be adequately assessed, compensation and restitution in this case would be equivalent measures, even if they would not, a restitutionary measure would be appropriate.

**189**    The essence of the imposition of fiduciary obligations is its utility in the promotion and preservation of desired social behaviour and institutions. Likewise with the protection of confidences. In the modern world the exchange of confidential information is both necessary and expected. Evidence of an accepted business morality in the mining industry was given by the defendant, and the Court of Appeal found that the practice was not only reasonable, but that it would foster the exploration and development of our natural resources. The institution of bargaining in good faith is one that is worthy of legal protection in those circumstances where that protection accords with the expectations of the parties. The approach taken by my colleague, Sopinka J., would, in my view, have the effect not of encouraging bargaining in good faith, but of encouraging the contrary. If by breaching an obligation of confidence one party is able to acquire an asset entirely for itself, at a risk of only having to compensate the other for what the other would have received if a formal relationship between them were concluded, the former would be given a strong incentive to breach the obligation and acquire the asset. In the present case, it is true that had negotiations been concluded, Lac could also have acquired an interest in the Corona land, but that is only an expectation and not a certainty. Had Corona acquired the Williams property, as they would have but for Lac's breach, it seems probable that negotiations with Lac would have resulted in a concluded agreement. However, if Lac, during the negotiations, breached a duty of confidence owed to Corona, it seems certain that Corona would have broken off negotiations and Lac would be left with nothing. In such circumstances, many business people, weighing the risks, would breach the obligation and acquire the asset. This does nothing for the preservation of the institution of good faith bargaining or relationships of trust and confidence. The imposition of a remedy which restores an asset to the party who would have acquired it but for a breach of fiduciary duties or duties of confidence acts as a deterrent to the breach of duty and strengthens the social fabric those duties are imposed to protect. The elements of a claim in unjust enrichment having been made out, I have

found no reason why the imposition of a restitutionary remedy should not be granted.

**190**    This Court has recently had occasion to address the circumstances in which a constructive trust will be imposed in Hunter Engineering Co. v. Syncrude Canada Ltd., [1989] 1 S.C.R. 426. There, the Chief Justice discussed the development of the constructive trust over 200 years from its original use in the context of fiduciary relationships, through to Pettkus v. Becker, supra, where the Court moved to the modern approach with the constructive trust as a remedy for unjust enrichment. He identified that Pettkus v. Becker, supra, set out a two-step approach. First, the Court determines whether a claim for unjust enrichment is established, and then, secondly, examines whether in the circumstances a constructive trust is the appropriate remedy to redress that unjust enrichment. In Hunter Engineering Co. v. Syncrude Canada Ltd., a constructive trust was refused, not on the basis that it would not have been available between the parties (though in my view it may not have been appropriate), but rather on the basis that the claim for unjust enrichment had not been made out, so no remedial question arose.

**191**    In the case at hand, the restitutionary claim has been made out. The Court can award either a proprietary remedy, namely that Lac hand over the Williams property, or award a personal remedy, namely a monetary award. While, as the Chief Justice observed, "The principle of unjust enrichment lies at the heart of the constructive trust": see Pettkus v. Becker, at p. 847, the converse is not true. The constructive trust does not lie at the heart of the law of restitution. It is but one remedy, and will only be imposed in appropriate circumstances. Where it could be more appropriate than in the present case, however, it is difficult to imagine.

**192**    The trial judge assessed damages in this case at $700,000,000 in the event that the order that Lac deliver up the property was not upheld on appeal. In doing so he had to assess the damages in the face of evidence that the Williams property would be valued by the market at up to 1.95 billion dollars. Before us there is a cross-appeal that damages be reassessed at $1.5 billion. The trial judge found that no one could predict future gold prices, exchange rates or inflation with any certainty, or even on the balance of probabilities. Likewise he noted that the property had not been fully explored and that further reserves may be found. The Court of Appeal made the following comment, at p. 59, with which I am in entire agreement:

> ... there is no question but that gold properties of significance are unique and rare. There are almost insurmountable difficulties in assessing the value of such a property in the open market. The actual damage which has been sustained by Corona is virtually impossible to determine with any degree of accuracy. The profitability of the mine, and accordingly its value, will depend on the ore reserves of the mine, the future price of gold from time to time, which in turn depends on the rate of exchange between the U.S. dollar and Canadian dollar, inflationary trends, together with myriad other matters, all of which are virtually impossible to predict.

To award only a monetary remedy in such circumstances when an alternative remedy is both available and appropriate would in my view be unfair and unjust.

**193**    There is no unanimous agreement on the circumstances in which a constructive trust will be imposed. Some guidelines can, however, be suggested. First, no special relationship between the parties is necessary. I agree with this comment of Wilson J. in Hunter Engineering Co. v. Syncrude Canada Ltd., supra, at p. 519:

> Although both Pettkus v. Becker and Sorochan v. Sorochan were "family" cases, unjust enrichment giving rise to a constructive trust is by no means confined to such cases: see Deglman v. Guaranty Trust Co., [1954] S.C.R. 725. Indeed, to do so would be to impede the growth and impair the flexibility crucial to the development of equitable principles.

As I noted earlier, the constructive trust was refused in Hunter Engineering Co. v. Syncrude Canada Ltd., not because the parties did not stand in any special relationship to one another, but because the claim for unjust enrichment was not made out. Similarly, in Pre-Cam Exploration & Development Ltd. v. McTavish, supra, it cannot be said that the parties stood in a "special relationship" to one another, but a constructive trust was nonetheless awarded. In Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd., supra, a constructive trust was imposed, but to describe the banks as standing in a special relationship one to the other would be as much of a fiction as describing them as fiduciaries. Insistence on a special relationship would undoubtedly lead to that same sort of reasoning from conclusions. Courts, coming to the conclusion that a proprietary remedy is the only appropriate result will be forced to manufacture "special relationships" out of thin air, so as to justify their conclusions. In my view that result can and should be avoided.

**194**    Secondly, it is not the case that a constructive trust should be reserved for situations where a right of property is recognized. That would limit the constructive trust to its institutional function, and deny to it the status of a remedy, its more important role. Thus, it is not in all cases that a pre-existing right of property will exist when a constructive trust is ordered. The imposition of a constructive trust can both recognize and create a right of property. When a constructive trust is imposed as a result of successfully tracing a plaintiff's asset into another asset, it is indeed debatable which the Court is doing. Goff and Jones, The Law of Restitution (3rd ed. 1986), at p. 78, take the position that:

> ... the question whether a restitutionary proprietary claim should be granted should depend on whether it is just, in the particular circumstances of the case, to impose a constructive trust on, or an equitable lien over, particular assets, or to allow subrogation to a lien over such assets.

> It is the nature of the plaintiff's claim itself which is critical in determining whether a restitutionary proprietary claim should be granted; the extent of that

> claim is a different matter, which should be dependent upon the defendant's knowledge of the true facts. There are certain claims which must always be personal. Such are claims for services rendered under an ineffective contract; the plaintiff is then in no different position from any unsecured creditor. In contrast there are other claims, for example, those arising from payments made under mistake, compulsion or another's wrongful act, where a restitutionary proprietary claim should presumptively be granted, although the court should always retain a discretion whether to do so or not.

**195**    In their view, a proprietary claim should be granted when it is just to grant the plaintiff the additional benefits that flow from the recognition of a right of property. It is not the recognition of a right of property that leads to a constructive trust. It is not necessary, therefore, to determine whether confidential information is property, though a finding that it was would only strengthen the conclusion that a constructive trust is appropriate. This is the view of Fridman and McLeod, Restitution, at p. 539, where they say:

> ... there appears to be no doubt that a fiduciary who has consciously made use of confidential information for private gain will be forced to account for the entire profits by holding such profits made from the use of the confidential information on a constructive trust for the beneficiary-estate. The proprietary remedy flows naturally from the conclusion that the information itself belonged to the beneficiary and there has been no transaction effective to divest his rights over the property.

**196**    I do not countenance the view that a proprietary remedy can be imposed whenever it is "just" to do so, unless further guidance can be given as to what those situations may be. To allow such a result would be to leave the determination of proprietary rights to "some mix of judicial discretion ... subjective views about which party 'ought to win' ..., and 'the formless void of individual moral opinion'", per Deane J. in Muschinski v. Dodds (1985), 160 C.L.R. 583, at p. 616.

As Deane J. further noted, at p. 616:

> Long before Lord Seldon's anachronism identifying the Chancellor's foot as the measure of Chancery relief, undefined notions of "justice" and what was "fair" had given way in the law of equity to the rule of ordered principle which is of the essence of any coherent system of rational law. The mere fact that it would be unjust or unfair in a situation of discord for the owner of a legal estate to assert his ownership against another provides, of itself, no mandate for a judicial declaration that the ownership in whole or in part lies, in equity, in that other ...

**197**    Much of the difficulty disappears if it is recognized that in this context the issue of the appropriate remedy only arises once a valid restitutionary claim has been made out. The constructive trust awards a right in property, but that right can only arise once a right to relief has

been established. In the vast majority of cases a constructive trust will not be the appropriate remedy. Thus, in Hunter Engineering Co. v. Syncrude Canada Ltd., supra, had the restitutionary claim been made out, there would have been no reason to award a constructive trust, as the plaintiff's claim could have been satisfied simply by a personal monetary award; a constructive trust should only be awarded if there is reason to grant to the plaintiff the additional rights that flow from recognition of a right of property. Among the most important of these will be that it is appropriate that the plaintiff receive the priority accorded to the holder of a right of property in a bankruptcy. More important in this case is the right of the property holder to have changes in value accrue to his account rather than to the account of the wrongdoer. Here as well it is justified to grant a right of property since the concurrent findings below are that the defendant intercepted the plaintiff and thereby frustrated its efforts to obtain a specific and unique property that the courts below held would otherwise have been acquired. The recognition of a constructive trust simply redirects the title of the Williams property to its original course. The moral quality of the defendants' act may also be another consideration in determining whether a proprietary remedy is appropriate. Allowing the defendant to retain a specific asset when it was obtained through conscious wrongdoing may so offend a court that it would deny to the defendant the right to retain the property. This situation will be more rare, since the focus of the inquiry should be upon the reasons for recognizing a right of property in the plaintiff, not on the reasons for denying it to the defendant.

**198**    Having specific regard to the uniqueness of the Williams property, to the fact that but for Lac's breaches of duty Corona would have acquired it, and recognizing the virtual impossibility of accurately valuing the property, I am of the view that it is appropriate to award Corona a constructive trust over that land.

**199**    Before turning to the cross-appeal, I must make brief reference to the relevance of the fact that Corona entered an arrangement with Teck under which the latter not only obtained an interest in the Corona property, but also an interest in the result of this lawsuit. Since I view this case as one where a restitutionary claim has been made out, the position of Teck is irrelevant. The focus must be on the enrichment Lac received at Corona's expense. That enrichment was found as a fact to be the Williams property. Subsequent to acquiring it, Corona would likely have entered a joint venture agreement with Lac. Lac has no one to blame but itself for that joint venture not coming about. Only because of Lac's breach of duty did the arrangement with Teck result. The fact that it is not proved that Teck demanded a share of the litigation as the price for joining with Corona is irrelevant. It cannot be said that such an agreement was unreasonable in the circumstances. Given Lac's breach of duty to Corona, and Corona's awareness of that breach, there is no way that Lac would ever have acquired an interest in the Williams property. Corona was entitled to cease negotiating with Lac and pursue other opportunities.

**200**    If, however, this case is viewed, as my colleague, Sopinka J., views it, as a case of compensation, then the position of Teck is relevant. Corona had to enter into an agreement with someone. Corona contemplated eventually owning approximately a one half interest in the developed properties. To award only an estimated value of a one half interest in the property when

that half will be further subdivided is, in essence, to award Corona only a one quarter interest in the Williams property. As I am of the view that damages are not an appropriate award, I need not discuss this matter further.

The Cross-Appeal

**201**    I can briefly deal with the cross-appeal. Lac has been enriched at the expense of Corona by acquiring the Williams property. Having acquired that property in breach of a duty of confidence and in breach of a fiduciary obligation, that enrichment is unjustified. Likewise, however, Corona will receive an enrichment when Lac hands over the property, in the amount of the value of the improvement of the land to Corona. That value is equal to what would have been spent by Corona to develop both properties, less what Corona in fact spent. The trial judge made a $50,000,000 downward adjustment to the amount Lac spent, directing a reference to determine the exact amount in the event the parties disputed the adjustment. I would affirm that award. The three elements of a claim for restitution are made out, namely there is an enrichment (the mine), that enrichment accrued to Corona at Lac's expense, and the enrichment is unjustified. The enrichment is not justified since, on the assumption that Corona had acquired the Williams property, it would of necessity have had to expend funds to develop the mine. In these circumstances, Lac is entitled to a restitutionary remedy, namely a lien on the Williams property to the extent that Corona was saved a necessary expenditure.

**202**    In view of this conclusion it becomes unnecessary to address the contingent cross-appeal by which Corona asked that damages be reassessed at $1.5 billion. I would dismiss the appeal with costs and dismiss the cross-appeal with costs.