**PART 3 OF 3 OF BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS (PRE-TRIAL BRIEF – ALLOCATION)**




Westlaw.

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

▷ ▣

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

Elder Advocates of Alberta Society v. Alberta

Her Majesty The Queen in Right of Alberta (Appellant) and Elder Advocates of Alberta Society and James O. Darwish, Personal Representative of the Estate of Johanna H. Darwish, deceased (Respondents) and Attorney General of Canada and Attorney General of British Columbia (Interveners)

Supreme Court of Canada

McLachlin C.J.C., Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell JJ.

Heard: January 27, 2011
Judgment: May 12, 2011
Docket: 33551

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing in part *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197, Carole Conrad J.A., Patricia Rowbotham J.A., Ronald Berger J.A. (Alta. C.A.); reversing in part *Elder Advocates of Alberta Society v. Alberta* (2008), 2008 CarswellAlta 1104, 2008 ABQB 490, 59 C.C.L.T. (3d) 23, 59 C.P.C. (6th) 243, [2008] 11 W.W.R. 70, 453 A.R. 1, 94 Alta. L.R. (4th) 10, S.J. Greckol J. (Alta. Q.B.)

Counsel: G. Alan Meikle, Q.C., Ward K. Branch, Michael Sobkin, for Appellant

Allan A. Garber, Nathan J. Whitling, for Respondents

Christine Mohr, for Intervener, Attorney General of Canada

Anthony Fraser, for Intervener, Attorney General of British Columbia

Subject: Public; Torts; Estates and Trusts; Restitution; Civil Practice and Procedure; Contracts; Constitutional

Health law --- Regional matters — Other health facilities — Nursing homes and homes for the aged

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to con-

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

tribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

Torts --- Negligence — Duty and standard of care — Fiduciary duty

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action — Class members' vulnerability alone was insufficient to ground fiduciary obligation, as their state of vulnerability did not arise from their relationship with province — Plaintiffs could not point to anything in legislation, or in factual relationship pleaded, that supported undertaking by province to act with undivided loyalty toward class members in setting, receipt and administration of accommodation charges — It was not clear that pleadings alleged that Crown, as distinguished from individual actors, was under fiduciary duty — Legal or substantial practical interests alleged in pleadings to be affected by Crown's exercise of authority were insufficient to attract fiduciary duty — Specific fiduciary duty that plaintiffs sought to establish related primarily to setting accommodation charges by regulation, and where government acts in exercise of its legislative functions, courts have consistently held that fiduciary duty does not arise.

Torts --- Negligence — Duty and standard of care — Duty of care

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to con-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

tribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action — Negligence claim was bound to fail at first step of Anns/Cooper inquiry — Legislative scheme did not impose duty of care on province — Legislative scheme did not impose duty on Crown to act in relation to class members with respect to accommodation charges — Plaintiffs failed to point to any duty to audit, supervise, monitor or administer funds related to accommodation charges in provisions — Simple fact of bad faith was not independently actionable — Misfeasance in public office was not raised before courts below.

Restitution and unjust enrichment --- General principles — When remedy available

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to contribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Trial judge correctly concluded that cause of action based on unjust enrichment with remedy of restitution was not hopeless, but rather analytically defensible — Whatever its chances of ultimate success, it was not plain and obvious that claim did not disclose cause of action, and it should be allowed to proceed to trial — Claim for unjust enrichment stood on different legal footing than claims for breach of fiduciary duty or negligence.

Civil practice and procedure --- Parties — Representative or class proceedings under class proceedings legislation — Certification — Plaintiff's class proceeding — Pleadings disclose cause of action

Long-term care facilities were funded in part by provincial funds and in part by charge levied on residents — In principle, government was responsible for costs of residents' medical care, but residents could be asked to con-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

tribute to costs of their housing and meals through payment of accommodation charges — Plaintiff advocacy group and individual plaintiff alleged that government artificially elevated required resident contributions to subsidize medical expenses that were properly responsibility of government — Plaintiffs sought return of monies or damages equivalent to amount of any over-payment of permitted accommodation charges — Plaintiffs' application to certify action as class proceeding was granted — Certification judge concluded action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on claim under Canadian Charter of Rights and Freedoms — Certification judge struck out action in breach of fiduciary duty, negligence in directing that facilities charge maximum accommodation charge, and ultra vires indirect taxation — Province's appeal was dismissed, and plaintiffs' cross-appeal was allowed in part — Common issues regarding breach of fiduciary duties owed to class members were reinstated — Crown appealed — Appeal allowed in part — Certification of class was upheld — It was ordered that unjust enrichment claim and claim for discrimination under s. 15(1) of Charter proceed to trial — Pleas of breach of fiduciary duty, negligence and bad faith were struck — Pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

Civil practice and procedure --- Parties — Representative or class proceedings under class proceedings legislation — Certification — Plaintiff's class proceeding — Preferable procedure

Droit de la santé --- Questions régionales — Autres établissements de santé — Centres d'hébergement et résidences pour personnes âgées

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

Délits civils --- Négligence — Devoir et norme de diligence — Devoir fiduciaire

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provin-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

cial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduci-aire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action — Vulnérabilité des membres du groupe à elle seule ne suffisait pas pour établir une obligation fiduciaire, puisque cette vulnérabilité ne résultait pas de leur relation avec la province — Partie demanderesse ne renvoyait pas à une disposition législative, ni à quoi que ce soit dans les rapports de fait invoqués, qui étayait un engage-ment de la province de faire preuve, envers les membres du groupe, d'une loyauté exclusive pour ce qui était de la fixation, de la perception et de l'administration des frais d'hébergement — Allégations n'indiquaient pas clairement que l'État, par opposition à une personne physique, avait une obligation fiduciaire — Intérêt juridique ou l'intérêt pratique essentiel que la partie demanderesse décrivait dans les actes de procédures comme étant touché par l'exercice du pouvoir de l'État n'était pas suffisant pour faire naître une obligation fiduciaire — Obli-gation fiduciaire précise que la partie demanderesse cherchait à établir se rapportait principalement à la fixa-tion par règlement des frais d'hébergement, et lorsque le gouvernement agit dans l'exercice de ses fonctions législatives, les tribunaux ont systématiquement conclu que cela ne donne lieu à aucune obligation fiduciaire.

Délits civils --- Négligence — Devoir et norme de diligence — Devoir de diligence

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provin-cial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours col-lectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action — Allégation de négligence était vouée à l'échec à la première étape du critère retenu dans les arrêts Anns et Cooper — Régime législatif n'imposait pas d'obligation de diligence à la province — Régime législatif n'imposait pas à l'État l'obligation d'agir pour le bénéfice des membres du groupe à l'égard des frais d'hébergement — Partie demanderesse n'a pu établir, dans les dispositions législatives, l'existence d'une obligation de vérifier, de superviser, de contrôler ou de gérer les fonds associés aux frais d'hébergement — Simple fait d'avoir agi de mauvaise foi ne donnait pas lui-même ouverture à un droit d'action — Il n'a pas été question de faute dans l'exercice d'une charge publique devant les tribunaux inférieurs.

Restitution et enrichissement injustifié --- Principes généraux — Lorsqu'un recours est disponible

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendant que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées — C'était à bon droit que la juge de première instance a conclu que la cause d'action fondée sur l'enrichissement injustifié ainsi que la demande de restitution n'étaient pas vouées à l'échec mais qu'elles étaient plutôt analytiquement défendables — Peu importe si la demande avait des chances d'être accueillie ou non, il n'était pas clair et évident qu'elle ne révélait aucune cause d'action, et il faudrait permettre qu'elle soit instruite — Allégation d'enrichissement injustifié reposait sur un fondement juridique différent des allégations de manquement à l'obligation fiduciaire ou de négligence.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

Procédure civile --- Parties — Recours collectifs intentés en vertu d'une loi relative aux recours collectifs — Autorisation — Recours collectif du demandeur — Procédures écrites révèlent une cause d'action

Établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires — En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas — Partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement — Partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes — Requête de la partie demanderesse en autorisation d'un recours collectif a été accordée — Juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande fondée sur la Charte canadienne des droits et libertés pouvaient être instruites — Juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires — Appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie — Série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies — État a formé un pourvoi — Pourvoi accueilli en partie — Autorisation d'intenter le recours collectif a été confirmée — Autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée — Allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées --- Allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

Procédure civile --- Parties — Recours collectifs intentés en vertu d'une loi relative aux recours collectifs — Autorisation — Recours collectif du demandeur — Procédure préférable

Long-term care facilities were funded in part by provincial funds and in part by a charge levied on residents. In principle, the government was responsible for costs of the residents' medical care, but residents could be asked to contribute to costs of their housing and meals through the payment of accommodation charges. The plaintiff advocacy group and individual plaintiff alleged that the government artificially elevated the required resident contributions to subsidize the medical expenses that were properly the responsibility of the government. The plaintiffs sought the return of monies or damages equivalent to the amount of any over-payment of permitted accommodation charges.

The plaintiffs' application to certify the action as a class proceeding was granted. The certification judge concluded the action could proceed on negligence, breach of contract, ultra vires action, unjust enrichment, bad faith in exercise of discretion, and on the claim under the Canadian Charter of Rights and Freedoms. The certification judge struck out the action in breach of fiduciary duty, negligence in directing that facilities charge the maximum accommodation charge, and ultra vires indirect taxation. The province's appeal was dismissed, and the plaintiffs' cross-appeal was allowed in part. The common issues regarding breach of fiduciary duties owed to class members were reinstated. The Crown appealed.

**Held:** The appeal was allowed in part.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

Per McLachlin C.J.C. (Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell JJ. concurring): The certification of the class was upheld. It was ordered that the unjust enrichment claim and the claim for discrimination under s. 15(1) of the Charter proceed to trial. The pleas of breach of fiduciary duty, negligence and bad faith were struck. The pleas of fiduciary duty, negligence and bad faith in exercise of discretion disclosed no cause of action.

The class members' vulnerability alone was insufficient to ground a fiduciary obligation, as their state of vulnerability did not arise from their relationship with the province. The class members would generally still be competent to manage their own affairs, or would be beneficiaries of duties owed by their own guardians and trustees, and therefore the province was not responsible for them. The class members were not being denied care and though their financial situation may have been affected by the levy of accommodation charges, that alone was not enough to warrant a fiduciary duty. The plaintiffs could not point to anything in the legislation, or in the factual relationship pleaded, that supported an undertaking by the province to act with an undivided loyalty toward the class members in the setting, receipt and administration of the accommodation charges. It was not clear that the pleadings alleged that the Crown, as distinguished from individual actors, was under a fiduciary duty. The legal or substantial practical interests alleged in the pleadings to be affected by the Crown's exercise of authority were insufficient to attract a fiduciary duty. The specific fiduciary duty that the plaintiffs sought to establish related primarily to the setting of accommodation charges by regulation, and where government acts in exercise of its legislative functions, courts have consistently held that fiduciary duty does not arise.

The negligence claim was bound to fail at the first step of the Anns/Cooper inquiry. The legislative scheme did not impose a duty of care on the province. The legislative scheme did not impose a duty on the Crown to act in relation to the class members with respect to the accommodation charges. The plaintiffs failed to point to any duty to audit, supervise, monitor or administer the funds related to the accommodation charges in the provisions.

The simple fact of bad faith was not independently actionable. Misfeasance in public office was not raised before the courts below.

The trial judge correctly concluded that the cause of action based on unjust enrichment with the remedy of restitution was not hopeless, but rather analytically defensible. Whatever its chances of ultimate success, it was not plain and obvious that the claim did not disclose a cause of action, and it should be allowed to proceed to trial. The claim for unjust enrichment stood on a different legal footing than the claims for breach of fiduciary duty or negligence.

Des établissements de soins de longue durée étaient financés à la fois par des subventions du gouvernement provincial et par des frais d'hébergement acquittés par les pensionnaires. En principe, le gouvernement prenait à sa charge les coûts afférents aux soins médicaux des pensionnaires, mais on pouvait demander à ces derniers de payer des frais d'hébergement pour défrayer le coût de leur logement et de leurs repas. La partie demanderesse, soit le groupe de défense des droits et le particulier, prétendait que le gouvernement avait artificiellement augmenté la contribution des pensionnaires en vue de financer les frais médicaux qui relevaient normalement du gouvernement. La partie demanderesse demandait le remboursement des sommes payées en sus des frais d'hébergement permis, ou des dommages-intérêts équivalant à ces sommes.

La requête de la partie demanderesse en autorisation d'un recours collectif a été accordée. La juge saisie de la demande d'autorisation du recours collectif a conclu que les allégations de négligence, bris de contrat, mesure ultra vires, enrichissement sans cause, mauvaise foi dans l'exercice d'un pouvoir discrétionnaire, et la demande

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

fondée sur la Charte canadienne des droits et libertés pouvaient être instruites. La juge saisie de la demande d'autorisation du recours collectif a radié les allégations relatives au manquement à une obligation fiduciaire, à la négligence du fait d'avoir requis des établissements qu'ils imposent les frais d'hébergement les plus élevés ainsi qu'à la taxe indirecte ultra vires. L'appel interjeté par la province a été rejeté et l'appel incident de la partie demanderesse a été accueilli en partie. Une série de questions communes ayant trait au manquement à l'obligation fiduciaire envers les membres du groupe ont été rétablies. L'État a formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli en partie.

McLachlin, J.C.C. (Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein, Cromwell, JJ. souscrivant à son opinion) : L'autorisation d'intenter le recours collectif a été confirmée. L'autorisation d'instruire l'allégation d'enrichissement injustifié et la demande fondée sur l'art. 15(1) de la Charte a été accordée. Les allégations relatives au manquement à l'obligation fiduciaire, à la négligence et à la mauvaise foi ont été radiées. Les allégations relatives à l'obligation fiduciaire, à la négligence et à la mauvaise foi dans l'exercice d'un pouvoir discrétionnaire ne révélaient aucune cause d'action.

La vulnérabilité des membres du groupe à elle seule ne suffisait pas pour établir une obligation fiduciaire, puisque cette vulnérabilité ne résultait pas de leur relation avec la province. Les membres du groupe seraient généralement encore capables de gérer leurs propres affaires ou seraient bénéficiaires des obligations de leurs propres tuteurs et fiduciaires; par conséquent, la province n'était pas responsable d'eux. Les soins n'étaient pas refusés aux membres du groupe et bien que leur situation financière pouvait être touchée par l'imposition des frais d'hébergement, ce facteur, à lui seul, ne suffisait pas pour justifier une obligation fiduciaire. La partie demanderesse ne renvoyait pas à une disposition législative, ni à quoi que ce soit dans les rapports de fait invoqués, qui étayait un engagement de la province de faire preuve, envers les membres du groupe, d'une loyauté exclusive pour ce qui était de la fixation, de la perception et de l'administration des frais d'hébergement. Les allégations n'indiquaient pas clairement que l'État, par opposition à une personne physique, avait une obligation fiduciaire. L'intérêt juridique ou l'intérêt pratique essentiel que la partie demanderesse décrivait dans les actes de procédures comme étant touché par l'exercice du pouvoir de l'État n'était pas suffisant pour faire naître une obligation fiduciaire. L'obligation fiduciaire précise que la partie demanderesse cherchait à établir se rapportait principalement à la fixation par règlement des frais d'hébergement, et lorsque le gouvernement agit dans l'exercice de ses fonctions législatives, les tribunaux ont systématiquement conclu que cela ne donne lieu à aucune obligation fiduciaire.

L'allégation de négligence était vouée à l'échec à la première étape du critère retenu dans les arrêts Anns et Cooper. Le régime législatif n'imposait pas d'obligation de diligence à la province. Le régime législatif n'imposait pas à l'État l'obligation d'agir pour le bénéfice des membres du groupe à l'égard des frais d'hébergement. La partie demanderesse n'a pu établir, dans les dispositions législatives, l'existence d'une obligation de vérifier, de superviser, de contrôler ou de gérer les fonds associés aux frais d'hébergement.

Le simple fait d'avoir agi de mauvaise foi ne donnait pas lui-même ouverture à un droit d'action. Il n'a pas été question de faute dans l'exercice d'une charge publique devant les tribunaux inférieurs.

C'était à bon droit que la juge de première instance a conclu que la cause d'action fondée sur l'enrichissement injustifié ainsi que la demande de restitution n'étaient pas vouées à l'échec mais qu'elles étaient plutôt analytiquement défendables. Peu importe si la demande avait des chances d'être accueillie ou non, il n'était pas clair et évident qu'elle ne révélait aucune cause d'action, et il faudrait permettre qu'elle soit instruite. L'allégation

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

d'enrichissement injustifié reposait sur un fondement juridique différent des allégations de manquement à l'obligation fiduciaire ou de négligence.

### Cases considered by *McLachlin C.J.C.*:

*Air Canada v. British Columbia* (1989), 1989 CarswellBC 706, [1989] 4 W.W.R. 97, [1989] 1 S.C.R. 1161, 59 D.L.R. (4th) 161, 95 N.R. 1, 36 B.C.L.R. (2d) 145, 41 C.R.R. 308, 2 T.C.T. 4178, [1989] 1 T.S.T. 2126, 1989 CarswellBC 67 (S.C.C.) — followed

*Anns v. Merton London Borough Council* (1977), *(*sub nom. *Anns v. London Borough of Merton)* [1977] 2 All E.R. 492, [1978] A.C. 728, [1977] 2 W.L.R. 1024, 121 S.J. 377, [1977] UKHL 4 (U.K. H.L.) — considered

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2000), 2000 CarswellOnt 3707, *(*sub nom. *Authorson v. Canada (Attorney General))* 53 O.R. (3d) 221, *(*sub nom. *Authorson v. Canada (Attorney General))* 84 C.R.R. (2d) 211 (Ont. S.C.J.) — followed

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2002), *(*sub nom. *Authorson v. Canada (Attorney General))* 157 O.A.C. 278, 58 O.R. (3d) 417, 2002 C.E.B. & P.G.R. 8448 (note), 2002 CarswellOnt 815, 33 C.C.P.B. 1, 215 D.L.R. (4th) 496, *(*sub nom. *Authorson v. Canada (Attorney General))* 92 C.R.R. (2d) 224 (Ont. C.A.) — referred to

*Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2003), *(*sub nom. *Authorson v. Canada (Attorney General))* 2003 C.E.B. & P.G.R. 8051, *(*sub nom. *Authorson v. Canada (Attorney General))* 227 D.L.R. (4th) 385, *(*sub nom. *Authorson v. Canada (Attorney General))* 109 C.R.R. (2d) 220, *(*sub nom. *Authorson v. Canada (Attorney General))* 306 N.R. 335, *(*sub nom. *Authorson v. Canada (Attorney General))* 66 O.R. (3d) 734 (note), *(*sub nom. *Authorson v. Canada (Attorney General))* [2003] 2 S.C.R. 40, 2003 CarswellOnt 2773, 2003 CarswellOnt 2774, 2003 SCC 39, 36 C.C.P.B. 29, *(*sub nom. *Authorson v. Canada (Attorney General))* 175 O.A.C. 363, 4 Admin. L.R. (4th) 167 (S.C.C.) — referred to

*B. (K.L.) v. British Columbia* (2003), 2003 CarswellBC 2405, 2003 CarswellBC 2406, 2003 SCC 51, 309 N.R. 306, [2003] 2 S.C.R. 403, 18 B.C.L.R. (4th) 1, 44 R.F.L. (5th) 245, 187 B.C.A.C. 42, 307 W.A.C. 42, 38 C.P.C. (5th) 199, [2003] R.R.A. 1065, 230 D.L.R. (4th) 513, [2003] 11 W.W.R. 203, 19 C.C.L.T. (3d) 66, 2004 C.L.L.C. 210-014 (S.C.C.) — followed

*Bennett v. British Columbia* (2009), 77 C.C.P.B. 56, 2009 BCSC 1358, 2009 CarswellBC 2635, 2009 C.E.B. & P.G.R. 8363 (B.C. S.C.) — referred to

*Brewer Brothers v. Canada (Attorney General)* (1991), 1991 CarswellNat 796, 8 C.C.L.T. (2d) 45, 129 N.R. 3, [1992] 1 F.C. 25, 80 D.L.R. (4th) 321, 1991 CarswellNat 170, 45 F.T.R. 325 (note) (Fed. C.A.) — distinguished

*Broome v. Prince Edward Island* (2010), 918 A.P.R. 24, 297 Nfld. & P.E.I.R. 24, [2010] 1 S.C.R. 360, 400 N.R. 148, 317 D.L.R. (4th) 218, 73 C.C.L.T. (3d) 1, 2010 CarswellPEI 20, 2010 CarswellPEI 21, 2010 SCC 11 (S.C.C.) — followed

*Childs v. Desormeaux* (2006), 30 M.V.R. (5th) 1, 80 O.R. (3d) 558 (note), 210 O.A.C. 315, 2006 CarswellOnt 2710, 2006 CarswellOnt 2711, 2006 SCC 18, 347 N.R. 328, 266 D.L.R. (4th) 257, 39 C.C.L.T. (3d)

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

163, [2006] 1 S.C.R. 643, [2006] R.R.A. 245 (S.C.C.) — followed

*Cooper v. Hobart* (2001), [2002] 1 W.W.R. 221, 2001 CarswellBC 2502, 2001 CarswellBC 2503, 2001 SCC 79, 8 C.C.L.T. (3d) 26, 206 D.L.R. (4th) 193, 96 B.C.L.R. (3d) 36, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 277 N.R. 113, [2001] 3 S.C.R. 537, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 160 B.C.A.C. 268, *(sub nom. Cooper v. Registrar of Mortgage Brokers (B.C.))* 261 W.A.C. 268 (S.C.C.) — followed

*D. (B.) v. Children's Aid Society of Halton (Region)* (2007), 39 R.F.L. (6th) 245, 49 C.C.L.T. (3d) 1, 284 D.L.R. (4th) 682, 2007 CarswellOnt 4789, 2007 CarswellOnt 4790, 2007 SCC 38, 365 N.R. 302, 227 O.A.C. 161, *(sub nom. Syl Apps Secure Treatment Centre v. D. (B.))* [2007] 3 S.C.R. 83, 86 O.R. (3d) 720 (note) (S.C.C.) — followed

*Design Services Ltd. v. R.* (2008), 69 C.L.R. (3d) 1, 55 C.C.L.T. (3d) 1, *(sub nom. Design Services Ltd. v. Canada)* 293 D.L.R. (4th) 437, *(sub nom. Design Services Ltd. v. Canada)* 374 N.R. 77, 64 C.C.L.I. (4th) 159, 2008 SCC 22, 2008 CarswellNat 1298, 2008 CarswellNat 1299, *(sub nom. Design Services Ltd. v. Canada)* [2008] 1 S.C.R. 737 (S.C.C.) — followed

*Drady v. Canada (Minister of Health)* (2007), 2007 CarswellOnt 4631 (Ont. S.C.J.) — referred to

*Drady v. Canada (Minister of Health)* (2008), 270 O.A.C. 1, 300 D.L.R. (4th) 443, 68 C.P.C. (6th) 306, 2008 CarswellOnt 5662, 2008 ONCA 659 (Ont. C.A.) — referred to

*Drady v. Canada (Minister of Health)* (2009), 260 O.A.C. 399 (note), 2009 CarswellOnt 2345, 2009 CarswellOnt 2346, [2009] 1 S.C.R. viii (note), 396 N.R. 396 (note) (S.C.C.) — referred to

*Eurig Estate, Re* (1998), *(sub nom. Eurig Estate v. Ontario Court (General Division), Registrar)* 114 O.A.C. 55, 1998 CarswellOnt 3950, 1998 CarswellOnt 3951, 40 O.R. (3d) 160 (headnote only), [2000] 1 C.T.C. 284, 165 D.L.R. (4th) 1, *(sub nom. Eurig Estate v. Ontario Court (General Division), Registrar)* 231 N.R. 55, 23 E.T.R. (2d) 1, [1998] 2 S.C.R. 565 (S.C.C.) — followed

*Frame v. Smith* (1987), 1987 CarswellOnt 969, 78 N.R. 40, [1987] 2 S.C.R. 99, 42 D.L.R. (4th) 81, 23 O.A.C. 84, 42 C.C.L.T. 1, [1988] 1 C.N.L.R. 152, 9 R.F.L. (3d) 225, 1987 CarswellOnt 347 (S.C.C.) — considered

*Garland v. Consumers' Gas Co.* (2004), 2004 CarswellOnt 1558, 2004 CarswellOnt 1559, 2004 SCC 25, 72 O.R. (3d) 80 (note), 237 D.L.R. (4th) 385, 319 N.R. 38, 43 B.L.R. (3d) 163, 9 E.T.R. (3d) 163, 42 Alta. L. Rev. 399, 186 O.A.C. 128, [2004] 1 S.C.R. 629 (S.C.C.) — followed

*Gorecki v. Canada (Attorney General)* (2006), 2006 CarswellOnt 1745, 265 D.L.R. (4th) 206, 208 O.A.C. 368, 2006 C.E.B. & P.G.R. 8191 (Ont. C.A.) — considered

*Guerin v. R.* (1984), 59 B.C.L.R. 301, 1984 CarswellNat 693, 1984 CarswellNat 813, [1984] 6 W.W.R. 481, *(sub nom. Guerin v. Canada)* [1984] 2 S.C.R. 335, 13 D.L.R. (4th) 321, *(sub nom. Guerin v. Canada)* 55 N.R. 161, [1985] 1 C.N.L.R. 120, 20 E.T.R. 6, 36 R.P.R. 1 (S.C.C.) — followed

*Harris v. R.* (2001), 2001 FCT 1408, 2001 CarswellNat 2887, 2001 CarswellNat 2888, *(sub nom. Harris v. Minister of National Revenue)* 214 F.T.R. 1, [2002] 1 C.T.C. 243, *(sub nom. Harris v. Canada)* [2002] 2

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

F.C. 484 (Fed. T.D.) — considered

*Hodgkinson v. Simms* (1994), 57 C.P.R. (3d) 1, 5 E.T.R. (2d) 1, [1994] 3 S.C.R. 377, 95 D.T.C. 5135, 97 B.C.L.R. (2d) 1, 117 D.L.R. (4th) 161, 171 N.R. 245, 1994 CarswellBC 438, 1994 CarswellBC 1245, [1994] 9 W.W.R. 609, 49 B.C.A.C. 1, 80 W.A.C. 1, 22 C.C.L.T. (2d) 1, 16 B.L.R. (2d) 1, 6 C.C.L.S. 1 (S.C.C.) — followed

*Hogan v. Newfoundland (Attorney General)* (2000), 2000 NFCA 12, 189 Nfld. & P.E.I.R. 183, 571 A.P.R. 183, 183 D.L.R. (4th) 225, 2000 CarswellNfld 47, 72 C.R.R. (2d) 1 (Nfld. C.A.) — considered

*Hollick v. Metropolitan Toronto (Municipality)* (2001), (sub nom. *Hollick v. Toronto (City)*) 56 O.R. (3d) 214 (headnote only), (sub nom. *Hollick v. Toronto (City)*) 205 D.L.R. (4th) 19, (sub nom. *Hollick v. Toronto (City)*) [2001] 3 S.C.R. 158, (sub nom. *Hollick v. Toronto (City)*) 2001 SCC 68, 2001 CarswellOnt 3577, 2001 CarswellOnt 3578, 24 M.P.L.R. (3d) 9, 13 C.P.C. (5th) 1, 277 N.R. 51, 42 C.E.L.R. (N.S.) 26, 153 O.A.C. 279 (S.C.C.) — followed

*Hunt v. T & N plc* (1990), 1990 CarswellBC 216, 43 C.P.C. (2d) 105, 117 N.R. 321, 4 C.O.H.S.C. 173 (headnote only), (sub nom. *Hunt v. Carey Canada Inc.*) [1990] 6 W.W.R. 385, 49 B.C.L.R. (2d) 273, (sub nom. *Hunt v. Carey Canada Inc.*) 74 D.L.R. (4th) 321, [1990] 2 S.C.R. 959, 1990 CarswellBC 759, 4 C.C.L.T. (2d) 1 (S.C.C.) — followed

*International Corona Resources Ltd. v. LAC Minerals Ltd.* (1989), 44 B.L.R. 1, 35 E.T.R. 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 69 O.R. (2d) 287, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 61 D.L.R. (4th) 14, 101 N.R. 239, 36 O.A.C. 57, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) [1989] 2 S.C.R. 574, 6 R.P.R. (2d) 1, (sub nom. *LAC Minerals Ltd. v. International Corona Resources Ltd.*) 26 C.P.R. (3d) 97, 1989 CarswellOnt 126, 1989 CarswellOnt 965 (S.C.C.) — considered

*Kingstreet Investments Ltd. v. New Brunswick (Department of Finance)* (2007), 2007 CarswellNB 6, 2007 CarswellNB 7, 2007 SCC 1, 355 N.R. 336, 25 B.L.R. (4th) 1, 51 Admin. L.R. (4th) 184, (sub nom. *Kingstreet Investments Ltd. v. New Brunswick*) [2007] 1 S.C.R. 3, 2007 D.T.C. 5041 (Fr.), 2007 D.T.C. 5029 (Eng.), 276 D.L.R. (4th) 342, 309 N.B.R. (2d) 255, 799 A.P.R. 255 (S.C.C.) — considered

*Nielsen v. Kamloops (City)* (1984), [1984] 5 W.W.R. 1, 1984 CarswellBC 476, 66 B.C.L.R. 273, [1984] 2 S.C.R. 2, 10 D.L.R. (4th) 641, 54 N.R. 1, 11 Admin. L.R. 1, 29 C.C.L.T. 97, 8 C.L.R. 1, 26 M.P.L.R. 81, 1984 CarswellBC 821 (S.C.C.) — considered

*Odhavji Estate v. Woodhouse* (2003), 19 C.C.L.T. (3d) 163, [2004] R.R.A. 1, 233 D.L.R. (4th) 193, 11 Admin. L.R. (4th) 45, [2003] 3 S.C.R. 263, 70 O.R. (3d) 253 (note), 2003 SCC 69, 2003 CarswellOnt 4851, 2003 CarswellOnt 4852, 312 N.R. 305, 180 O.A.C. 201 (S.C.C.) — referred to

*Pacific National Investments Ltd. v. Victoria (City)* (2004), 34 B.C.L.R. (4th) 1, 327 N.R. 100, [2004] 3 S.C.R. 575, 206 B.C.A.C. 99, 338 W.A.C. 99, 42 C.L.R. (3d) 76, [2005] 3 W.W.R. 1, 3 M.P.L.R. (4th) 1, 2004 SCC 75, 2004 CarswellBC 2673, 2004 CarswellBC 2674, 245 D.L.R. (4th) 211 (S.C.C.) — considered

*Peel (Regional Municipality) v. Canada* (1992), (sub nom. *Peel (Regional Municipality) v. Ontario)* 144 N.R. 1, 1992 CarswellNat 15, 55 F.T.R. 277 (note), 12 M.P.L.R. (2d) 229, 98 D.L.R. (4th) 140, [1992] 3

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

S.C.R. 762, 59 O.A.C. 81, 1992 CarswellNat 659 (S.C.C.) — considered

*Perez v. Galambos* (2009), 97 B.C.L.R. (4th) 1, [2009] 12 W.W.R. 193, *(sub nom. Galambos v. Perez)* [2009] 3 S.C.R. 247, 394 N.R. 209, 70 C.C.L.T. (3d) 167, 312 D.L.R. (4th) 220, 276 B.C.A.C. 272, 468 W.A.C. 272, 2009 CarswellBC 2787, 2009 CarswellBC 2788, 2009 SCC 48 (S.C.C.) — followed

*R. v. Sparrow* (1990), 1990 CarswellBC 105, 1990 CarswellBC 756, 70 D.L.R. (4th) 385, 111 N.R. 241, [1990] 1 S.C.R. 1075, [1990] 3 C.N.L.R. 160, 46 B.C.L.R. (2d) 1, 56 C.C.C. (3d) 263, [1990] 4 W.W.R. 410 (S.C.C.) — considered

*Roberts v. R.* (2002), 2002 CarswellNat 3438, 2002 CarswellNat 3439, *(sub nom. Wewaykum Indian Band v. Canada)* 2002 SCC 79, *(sub nom. Wewaykum Indian Band v. Canada)* [2003] 1 C.N.L.R. 341, *(sub nom. Wewaykum Indian Band v. Canada)* 220 D.L.R. (4th) 1, *(sub nom. Wewaykum Indian Band v. Canada)* 297 N.R. 1, *(sub nom. Wewaykum Indian Band v. Canada)* [2002] 4 S.C.R. 245, *(sub nom. Wewaykum Indian Band v. Canada)* 236 F.T.R. 147 (note) (S.C.C.) — followed

*Sagharian (Guardian ad litem of) v. Ontario (Minister of Education)* (2008), *(sub nom. Sagharian (Litigation Guardian of) v. Ontario (Minister of Education))* 172 C.R.R. (2d) 105, 2008 ONCA 411, 2008 CarswellOnt 2888 (Ont. C.A.) — considered

*Ultramares Corp. v. Touche* (1931), 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139 (U.S. N.Y. Ct. App.) — considered

*Welbridge Holdings Ltd. v. Greater Winnipeg (Municipality)* (1970), [1971] S.C.R. 957, 22 D.L.R. (3d) 470, [1972] 3 W.W.R. 433, 1970 CarswellMan 33, 1970 CarswellMan 83 (S.C.C.) — considered

*620 Connaught Ltd. v. Canada (Attorney General)* (2008), 2008 SCC 7, 290 D.L.R. (4th) 385, 371 N.R. 200, 2008 G.T.C. 1194 (Eng.), [2008] 1 S.C.R. 131, 74 Admin. L.R. (4th) 1, 2008 CarswellNat 399, 2008 CarswellNat 400 (S.C.C.) — considered

**Statutes considered:**

*Alberta Health Care Insurance Act*, R.S.A. 2000, c. A-20

Generally — referred to

s. 3 — considered

s. 4 — considered

s. 4(1) — considered

*Canada Health Act*, R.S.C. 1985, c. C-6

Generally — referred to

s. 2 "hospital services" — considered

s. 19(2) — considered

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

*Canadian Charter of Rights and Freedoms*, Part I of the Constitution Act, 1982, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11

    Generally — referred to

    s. 1 — considered

    s. 15 — pursuant to

    s. 15(1) — pursuant to

    s. 24(1) — considered

*Class Proceedings Act*, S.A. 2003, c. C-16.5

    Generally — referred to

    ss. 30-33 — referred to

*Constitution Act, 1982*, being Schedule B to the Canada Act 1982 (U.K.), 1982, c. 11, reprinted R.S.C. 1985, App. II, No. 44

    Generally — referred to

    s. 52 — considered

*Hospitals Act*, R.S.A. 2000, c. H-12

    Generally — referred to

    s. 1(c) "auxiliary hospital" — referred to

    ss. 25-27 — referred to

    s. 28(2) — referred to

    s. 29 — referred to

    s. 37 — referred to

    s. 38(1) — referred to

    s. 41 — referred to

    s. 43(l) — referred to

*Indian Act*, R.S.C. 1952, c. 149

    s. 18(1) — referred to

*Nursing Homes Act*, R.S.A. 2000, c. N-7

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

    Generally — referred to

    s. 1(a) "accommodation charge" — considered

    s. 8 — considered

    s. 8(1) — referred to

    s. 8(2) — considered

    s. 10(2) — considered

    s. 12 — referred to

    s. 19 — referred to

    s. 24 — considered

*Pension Act*, R.S.C. 1927, c. 157

    Generally — referred to

*Pension Act*, R.S.C. 1970, c. P-7

    Generally — referred to

*Protection of Children Act*, R.S.B.C. 1960, c. 303

    Generally — referred to

*Regional Health Authorities Act*, R.S.A. 2000, c. R-10

    s. 5 — referred to

    s. 9 — referred to

    s. 13 — referred to

    s. 14 — referred to

    s. 21 — referred to

*Royal Proclamation*, 1763 (U.K.), reprinted R.S.C. 1985, App. II, No. 1

    Generally — referred to

*War Veterans Allowance Act*, R.S.C. 1985, c. W-3

    s. 15(2) — referred to

**Regulations considered:**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

*Hospitals Act*, R.S.A. 2000, c. H-12

    *Hospitalization Benefits Regulation*, Alta. Reg. 244/90

    s. 5(1)(d) — referred to

    s. 5(8) — considered

*Nursing Homes Act*, R.S.A. 2000, c. N-7

    *Nursing Homes General Regulation*, Alta. Reg. 232/85

    Generally — referred to

    s. 4 — referred to

    *Nursing Homes Operation Regulation*, Alta. Reg. 258/85

    Generally — referred to

    s. 3(1) — considered

    s. 8 — referred to

    s. 9 — referred to

APPEAL from judgment reported at *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197 (Alta. C.A.).

POURVOI formé à l'encontre d'un jugement publié à *Elder Advocates of Alberta Society v. Alberta* (2009), 203 C.R.R. (2d) 344, 2009 ABCA 403, 2009 CarswellAlta 1986, 315 D.L.R. (4th) 59, 470 W.A.C. 270, 469 A.R. 270, 70 C.C.L.T. (3d) 30, 16 Alta. L.R. (5th) 1, 79 C.P.C. (6th) 19, [2010] 2 W.W.R. 197 (Alta. C.A.).

***McLachlin C.J.C.:***

1    It is a sad reality of life that as people age they may become unable to care for themselves and be obliged to live in special facilities providing greater or lesser degrees of assistance and medical care. In Alberta, chronic care for the elderly is provided through nursing homes and auxiliary hospitals. In principle, the government of Alberta is responsible for the costs of residents' medical care, but residents may be asked to contribute to the costs of their housing and meals through the payment of accommodation charges. In this case, 12,500 residents of Alberta's long-term care facilities ("LTCFs") sue as a class, alleging that the government artificially elevated the required resident contributions to subsidize medical expenses that are properly the responsibility of government.

2    The class has filed a statement of claim in which it alleges that the government's conduct constitutes a breach of fiduciary duty, negligence, bad faith in the exercise of discretion and/or unjust enrichment. The class seeks the return of monies or damages equivalent to the amount of any over-payment of the permitted accommodation charges. It is on the basis of these allegations that the action was certified. The class also brings an

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

equality claim under s. 15 of the *Canadian Charter of Rights and Freedoms*, which Alberta does not seek to have struck but argues should not proceed by way of class action.

3    At certification, the Province of Alberta challenged the claims of fiduciary duty, negligence, and bad faith in the exercise of discretion. The certification judge struck out the plea of breach of fiduciary duty and partially limited the duty of care alleged in negligence (2008 ABQB 490, 94 Alta. L.R. (4th) 10 (Alta. Q.B.)). The Court of Appeal upheld the entitlement of the plaintiff class to pursue all three causes of action (2009 ABCA 403, 16 Alta. L.R. (5th) 1 (Alta. C.A.)). The Crown in Right of Alberta now appeals to this Court, contending that all the claims should be struck out and the action decertified.

4    This is not a decision on the merits of the action, but on whether the causes of action pleaded are supportable at law. The question is whether the pleadings, assuming the facts pleaded to be true, disclose a supportable cause of action. If it is plain and obvious that the claim cannot succeed, it should be struck out.

5    I conclude that the pleas of fiduciary duty, negligence and bad faith in the exercise of discretion disclose no cause of action and should be struck out in their entirety, but that the claim of unjust enrichment should survive. It follows that the certification of the class is upheld, and the unjust enrichment claim may proceed to trial, together with the claim for discrimination under s. 15(1) of the *Charter*.

**I. Background**

6    Since this action is at a preliminary stage and the facts as pleaded are assumed true for our purposes, it is unnecessary to exhaustively review the factual and statutory background. Nevertheless, a brief overview is helpful to understand the context of the claims made.

7    When this action was commenced, the Province of Alberta and nine Regional Health Authorities ("RHAs") administered and operated Alberta's health care regime under a number of interlocking statutes and regulations, including the *Alberta Health Care Insurance Act*, R.S.A. 2000, c. A-20, the *Nursing Homes Act*, R.S.A. 2000, c. N-7, and the *Hospitals Act*, R.S.A. 2000, c. H-12. The RHAs received block-funding from the Province to deliver health care services, and the RHAs were responsible for managing the provision of health services: *Regional Health Authorities Act*, R.S.A. 2000, c. R-10, s. 5. Alberta Health Services is the successor to the nine former RHAs. Although this action was brought against the RHAs as well as the Crown in Right of Alberta, the RHAs took no part in this appeal, and an action remains pending against them. The relief sought in this Court relates only to the Crown in Right of Alberta.

8    Under the *Canada Health Act*, R.S.C. 1985, c. C-6, a province does not qualify for contribution from the federal government for health care expenditures if the province permits user charges under its health care insurance plan, with certain exceptions. For example, user charges for "accommodation or meals provided to an inpatient who ... requires chronic care and is more or less permanently resident in a hospital or other institution" are allowed: *Canada Health Act*, s. 19(2). As a condition of funding, chronic care must be provided as an insured hospital service: *Canada Health Act*, s. 2.

9    In Alberta, the Province must pay for "benefits in respect of health services provided to residents [of the province]", unless exempted by statute or regulation: *Alberta Health Care Insurance Act*, s. 4(1). Generally, persons attending hospitals in Alberta are not liable for services insured under the *Canada Health Act*. User charges are permitted for accommodation and meals: *Hospitals Act*, ss. 38(1) and 43(*l*).

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

10    Nursing homes, or LTCFs, are regulated by the *Nursing Homes Act* and receive funding from both the Alberta government, by way of the RHAs, and the nursing home residents themselves. Nursing home operations — which are run by either private operators or the RHAs, not by the Province — may impose on residents an accommodation charge for housing and meals, not to exceed a maximum daily amount prescribed by regulation: *Nursing Homes Act*, ss. 8 and 24; *Nursing Homes Operation Regulation*, Alta. Reg. 258/85, s. 3(1). An "accommodation charge" is a "charge in respect of nursing home care payable by a resident for accommodation and meals in a nursing home or an approved [hospital that provides nursing home care]": *Nursing Homes Act*, ss. 1(a) and 10(2). "Basic care" costs remain the fiscal responsibility of the Province: *Alberta Health Care Insurance Act*, ss. 3 and 4.

11    Auxiliary hospitals, which also provide for the care of long-term or chronic patients, are funded and operated in the same way: *Hospitals Act*, ss. 1(c), 28(2) and 37, and *Ministerial Order* 1/2006. The accommodation charges paid by residents of auxiliary hospitals are governed by the *Hospitals Act*, s. 41, and the *Hospitalization Benefits Regulation*, Alta. Reg. 244/90, s. 5(1)(d).

12    Collectively, these accommodation charges are the subject of the present action.

13    The representative plaintiffs are James Darwish, in his capacity as the personal representative of the estate of his mother, Johanna Darwish, and the Elder Advocates of Alberta Society, a non-profit group. Mr. Darwish was his mother's guardian and trustee when she lived in an LTCF; he is now her executor. When preparing her estate tax returns, he was advised by the local RHA that approximately two-thirds of the monthly accommodation charge his mother had been paying was for a "care component". He concluded that the remaining one-third had been allotted to accommodation and meals. Mr. Darwish contends that the allocation for accommodation and meals that residents must pay is more than required, and in effect requires residents to subsidize medical care costs that are entirely the responsibility of the Province, and for which Alberta is not entitled to charge residents under the legislative scheme. Together with the Elder Advocates, he commenced an action to recover the amount of the overpayment.

14    On August 1, 2003, Alberta's Minister of Health and Wellness promulgated the *Nursing Homes Operation Amendment Regulation*, Alta. Reg. 260/2003, s. 2, which raised the maximum accommodation charge payable by residents of the province's nursing homes and auxiliary hospitals. The plaintiffs' contention is that the Minister increased the permissible charge even though he was aware of a "past practice" on the part of LTCFs to apply the accommodation fees "to subsidize health care and off set care funding", and that, despite this knowledge, the Province instructed operators to charge the maximum allowable.

15    The representative plaintiffs sought to certify a class action under the *Class Proceedings Act*, S.A. 2003, c. C-16.5, maintaining that the Crown and the RHAs have failed to ensure that the monies paid by the residents of LTCFs for "accommodation and meals" are used exclusively for that purpose. The pleadings allege that the Province is only allowed to charge for the *actual* cost of accommodation and meals, and not to use funds collected at the maximum level to subsidize basic care costs. They claim the residents of Alberta's chronic care facilities have been overcharged and seek return of the overpayment or damages.

## II. The Decisions of the Alberta Courts

16    The class consists of about 12,500 residents who are institutionalized in LTCFs in Alberta. More than half are 85 years of age or older, and all have some form of chronic disability or incapacity. They are not capable of living on their own and require varying degrees of care, including help with feeding, toileting and other

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

fundamental aspects of daily life.

17      The representative plaintiffs pleaded numerous causes of action: (i) breach of fiduciary duty; (ii) breach of duty of care; (iii) breach of contract; (iv) unjust enrichment; (v) *ultra vires* action; (vi) *ultra vires* tax; and (vii) breach of s. 15(1) of the *Charter*. "Bad faith in the exercise of discretion" was also pleaded. I refer throughout to the pleas contained in the plaintiffs' Fresh Statement of Claim No. 2, issued March 1, 2010.

18      The certification judge approved the class definition and 67 common questions (2008 ABQB 490, 94 Alta. L.R. (4th) 10 (Alta. Q.B.)). In deciding to certify those questions, Justice Greckol declined to certify others based on fiduciary duty and *ultra vires* tax, striking them from the claim as they were bound to fail. She also struck a claim for a duty of care with respect to *setting* the accommodation charges, but permitted the plea of negligence in monitoring the collection and management of accommodation charges to stand. Finding that the requirements of certification were made out, Greckol J. concluded that a class action was the preferable procedure.

19      The Court of Appeal dismissed an appeal by the Province and permitted a cross-appeal by the representative plaintiffs (2009 ABCA 403, 16 Alta. L.R. (5th) 1 (Alta. C.A.)). In unanimous reasons, the court reinstated the plaintiffs' claim that Alberta owed and had breached a fiduciary duty to the class. The Province now appeals to this Court.

### III. Analysis

20      The test for striking out pleadings is not in dispute. The question at issue is whether the disputed claims disclose a cause of action, assuming the facts pleaded to be true. If it is plain and obvious that a claim cannot succeed, then it should be struck out: See *Hollick v. Metropolitan Toronto (Municipality)*, 2001 SCC 68, [2001] 3 S.C.R. 158 (S.C.C.), at para. 25; *Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.), at p. 980.

21      The issue we must decide on each of the disputed claims is whether this test is met and, separately, whether the class action should be decertified.

### A. The Claim for Breach of Fiduciary Duty

22      The question is whether the pleading of breach of fiduciary duty discloses a supportable cause of action, taking all the facts pleaded as true: *Hollick*, at para. 25; *Hunt*, at p. 991. Fiduciary duty is a doctrine originating in trust. It requires that one party, the fiduciary, act with absolute loyalty toward another party, the beneficiary or *cestui que trust*, in managing the latter's affairs.

23      The plaintiff class argues that the categories of fiduciary duty are not closed and that basic principle supports their claim. The representative plaintiffs contend that they have pleaded sufficient facts to make it at least arguable that such a duty is owed to the vulnerable members of the class. In their view, fiduciary duty is a flexible principle aimed at protecting the vulnerable from abuses of power and should not be burdened by high hurdles or confined to limited categories.

24      Alberta, by contrast, argues that it does not owe the plaintiff class a fiduciary duty on the facts pleaded. In its view, the doctrine that permits imposition of a fiduciary duty on a government is narrowly confined, and does not extend to a claim such as this. Together with the intervening Attorneys General of Canada and British Columbia, Alberta asks the Court to clarify the approach to identifying fiduciary duties owed by the government

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

to its citizens and to hold that no duty lies in the circumstances before us.

25     This case thus raises the question of when governments, as opposed to individuals, may be bound by a fiduciary duty. Fiduciary duty originated as a private law doctrine. In the past, state actors have been held to be under a fiduciary duty in limited circumstances, namely, in discharging the Crown's special responsibilities towards Aboriginal peoples and where the Crown is acting in a private capacity, as in its role as the public guardian and trustee. This claim does not fall within either of these situations.

26     In my view, the same broad principles apply to private actors and governments, though they may play out differently where the alleged fiduciary is a public authority. I will therefore proceed by examining the requirements of imposing fiduciary duty generally, and then turn to examine how those requirements apply in the governmental context.

*(1) The General Requirements for Imposition of a Fiduciary Duty*

27     The plaintiff class argues that, in addition to traditionally recognized categories like trustee or solicitor-client relationships, a fiduciary duty more broadly may arise whenever one person exercises power over another "vulnerable" person. They rely on *Frame v. Smith*, [1987] 2 S.C.R. 99 (S.C.C.), where Wilson J., in dissenting reasons later adopted and applied in *International Corona Resources Ltd. v. LAC Minerals Ltd.*, [1989] 2 S.C.C. 574 (S.C.C.), outlined the hallmarks of a fiduciary duty:

> Relationships in which a fiduciary obligation have been imposed seem to possess three general characteristics:
>
> (1) The fiduciary has scope for the exercise of some discretion or power.
>
> (2) The fiduciary can unilaterally exercise that power or discretion so as to affect the beneficiary's legal or practical interests.
>
> (3) The beneficiary is peculiarly vulnerable to or at the mercy of the fiduciary holding the discretion or power. [p. 136]

28     It is now clear that vulnerability alone is insufficient to support a fiduciary claim. As Cromwell J. explained in *Perez v. Galambos*, 2009 SCC 48, [2009] 3 S.C.R. 247 (S.C.C.), at para. 67:

> An important focus of fiduciary law is the protection of one party against abuse of power by another in certain types of relationships or in particular circumstances. However, to assert that the protection of the vulnerable is the role of fiduciary law puts the matter too broadly. The law seeks to protect the vulnerable in many contexts and through many different doctrines.

Cromwell J. concluded, at para. 68, that:

> [68] ... while vulnerability in the broad sense resulting from factors external to the relationship is a relevant consideration, a more important one is the extent to which vulnerability arises from the relationship: *Hodgkinson*, at p. 406.
>
> [Emphasis added.]

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

29    As useful as the three "hallmarks" referred to in *Frame* are in explaining the source fiduciary duties, they are not a complete code for identifying fiduciary duties. It is now clear from the foundational principles outlined in *Guerin v. R.*, [1984] 2 S.C.R. 335 (S.C.C.), *Hodgkinson v. Simms*, [1994] 3 S.C.R. 377 (S.C.C.), and *Galambos* that the elements outlined in the paragraphs that follow are those which identify the existence of a fiduciary duty in cases not covered by an existing category in which fiduciary duties have been recognized.

30    First, the evidence must show that the alleged fiduciary gave an undertaking of responsibility to act in the best interests of a beneficiary: *Galambos*, at paras. 66, 71 and 77-78; and *Hodgkinson*, *per* La Forest J., at pp. 409-10. As Cromwell J. wrote in *Galambos*, at para. 75: "what is required in all cases is an undertaking by the fiduciary, express or implied, to act in accordance with the duty of loyalty reposed on him or her."

31    The existence and character of the undertaking is informed by the norms relating to the particular relationship: *Galambos*, at para. 77. The party asserting the duty must be able to point to a forsaking by the alleged fiduciary of the interests of all others in favour of those of the beneficiary, in relation to the specific legal interest at stake.

32    The undertaking may be found in the relationship between the parties, in an imposition of responsibility by statute, or under an express agreement to act as trustee of the beneficiary's interests. As stated in *Galambos*, at para. 77:

> The fiduciary's undertaking may be the result of the exercise of statutory powers, the express or implied terms of an agreement or, perhaps, simply an undertaking to act in this way. In cases of *per se* fiduciary relationships, this undertaking will be found in the nature of the category of relationship in issue. The critical point is that in both *per se* and ad hoc fiduciary relationships, there will be some undertaking on the part of the fiduciary to act with loyalty.

> [Emphasis added.]

33    Second, the duty must be owed to a defined person or class of persons who must be vulnerable to the fiduciary in the sense that the fiduciary has a discretionary power over them. Fiduciary duties do not exist at large; they are confined to specific relationships between particular parties. *Per se*, historically recognized, fiduciary relationships exist as a matter of course within the traditional categories of trustee-*cestui qui trust*, executor-beneficiary, solicitor-client, agent-principal, director-corporation and guardian-ward or parent-child. By contrast, *ad hoc* fiduciary relationships must be established on a case-by-case basis.

34    Finally, to establish a fiduciary duty, the claimant must show that the alleged fiduciary's power may affect the legal or substantial practical interests of the beneficiary: *Frame*, *per* Wilson J., at p. 142.

35    In the traditional categories of fiduciary relationship, the nature of the relationship itself defines the interest at stake. However, a party seeking to establish an *ad hoc* duty must be able to point to an identifiable legal or vital practical interest that is at stake. The most obvious example is an interest in property, although other interests recognized by law may also be protected.

36    In summary, for an *ad hoc* fiduciary duty to arise, the claimant must show, in addition to the vulnerability arising from the relationship as described by Wilson J. in *Frame*; (1) an undertaking by the alleged fiduciary to act in the best interests of the alleged beneficiary or beneficiaries; (2) a defined person or class of persons vulnerable to a fiduciary's control (the beneficiary or beneficiaries); and (3) a legal or substantial practical interest

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 22
2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

of the beneficiary or beneficiaries that stands to be adversely affected by the alleged fiduciary's exercise of discretion or control.

*(2) Fiduciary Duties in the Governmental Context*

37     The general principles discussed above apply not only to relationships between private actors, but also to cases where it is alleged that the government owes a fiduciary duty to an individual or class of individuals. However, the special characteristics of governmental responsibilities and functions mean that governments will owe fiduciary duties only in limited and special circumstances. As Dickson J., as he then was, wrote for the majority in *Guerin*, at p. 385:

> It should be noted that fiduciary duties generally arise only with regard to obligations originating in a private law context. Public law duties, the performance of which requires the exercise of discretion, do not typically give rise to a fiduciary relationship. As the "political trust" cases indicate, the Crown is not normally viewed as a fiduciary in the exercise of its legislative or administrative function.

> [Emphasis added.]

38     Binnie J., for the Court, made the same point in *Roberts v. R.*, *(*sub nom. *Wewaykum Indian Band v. Canada)* 2002 SCC 79, [2002] 4 S.C.R. 245 (S.C.C.) [hereinafter *Wewaykum*], at para. 96: "The Crown can be no ordinary fiduciary; it wears many hats and represents many interests, some of which cannot help but be conflicting". *Guerin* exceptionally recognized that the Crown was under a fiduciary duty in the management of Indian lands for their benefit. But the Court there noted, at p. 385, that the fiduciary duty owed to the Aboriginal peoples of Canada is unique and grounded in analogy to private law:

> The mere fact, however, that it is the Crown which is obligated to act on the Indians' behalf does not of itself remove the Crown's obligation from the scope of the fiduciary principle. As was pointed out earlier, the Indians' interest in land is an independent legal interest. It is not a creation of either the legislative or executive branches of government. The Crown's obligation to the Indians with respect to that interest is therefore not a public law duty. While it is not a private law duty in the strict sense either, it is nonetheless in the nature of a private law duty. Therefore, in this *sui generis* relationship, it is not improper to regard the Crown as a fiduciary.

> [Emphasis added.]

Noting the unique nature of the fiduciary duty owed by the Crown in the Aboriginal context, courts have suggested that this duty must be distinguished from other relationships: *Hogan v. Newfoundland (Attorney General)* (2000), 183 D.L.R. (4th) 225 (Nfld. C.A.), at paras. 66-67.

39     In *R. v. Sparrow*, [1990] 1 S.C.R. 1075 (S.C.C.), the Court confirmed that the fiduciary duty owed by the Crown to Aboriginal peoples with respect to their lands is *sui generis*, at p. 1108:

> The *sui generis* nature of Indian title, and the historic powers and responsibility assumed by the Crown constituted the source of such a fiduciary obligation. In our opinion, *Guerin*, together with *R. v. Taylor and Williams* (1981), 34 O.R. (2d) 360, ground a general guiding principle for s. 35(1). That is, the Government has the responsibility to act in a fiduciary capacity with respect to aboriginal peoples. The relationship between the Government and aboriginals is trust-like, rather than adversarial, and contemporary recognition and af-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

firmation of aboriginal rights must be defined in light of this historic relationship.

[Emphasis added.]

Similarly, in *Wewaykum*, Binnie J. suggested that the fiduciary duty owed by the Crown to Aboriginal peoples is not restricted to instances where the facts raise "considerations 'in the nature of a private law duty'" (para. 74).

40      The unique and historic nature of Crown-Aboriginal relations described in these cases negates the plaintiff class' assertion that they serve as a template for the duty of the government to citizens in other contexts. The same applies to the only other situation where a Crown fiduciary duty has been recognized — such as where the Crown acts as the public guardian and trustee.

41      The special nature of the governmental context impacts on the requirements of a fiduciary relationship just discussed.

42      First, the requirement of an undertaking to act in the alleged beneficiary's interest will typically be lacking where what is at issue is the exercise of a government power or discretion.

43      The duty is one of utmost loyalty to the beneficiary. As Finn states, the fiduciary principle's function "*is not to mediate between interests*. It is to secure the paramountcy of *one side's* interests ... The beneficiary's interests are to be protected. This is achieved through a regime designed to secure loyal service of those interests" (P. D. Finn, "The Fiduciary Principle" in T. G. Youdon (ed.), *Equity, Fiduciaries and Trusts* (1989), at p. 27 (underlining added). See also *Hodgkinson*, *per* Sopinka J. and McLachlin J., as she then was, dissenting, at p. 468.

44      Compelling a fiduciary to put the best interests of the beneficiary before their own is thus essential to the relationship. Imposing such a burden on the Crown is inherently at odds with its duty to act in the best interests of society as a whole, and its obligation to spread limited resources among competing groups with equally valid claims to its assistance: *Sagharian (Guardian ad litem of) v. Ontario (Minister of Education)*, 2008 ONCA 411, 172 C.R.R. (2d) 105 (Ont. C.A.), at paras. 47-49. The circumstances in which this will occur are few. The Crown's broad responsibility to act in the public interest means that situations where it is shown to owe a duty of loyalty to a particular person or group will be rare: see *Harris v. R.*, 2001 FCT 1408, [2002] 2 F.C. 484 (Fed. T.D.), at para. 178.

45      If the undertaking is alleged to flow from a statute, the language in the legislation must clearly support it: *B. (K.L.) v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403 (S.C.C.), at para. 40; *Authorson (Litigation Guardian of) v. Canada (Attorney General)* (2000), 53 O.R. (3d) 221 (Ont. S.C.J.), at para. 28, aff'd (2002), 58 O.R. (3d) 417 (Ont. C.A.), at para. 73, rev'd on other grounds, 2003 SCC 39, [2003] 2 S.C.R. 40 (S.C.C.). The mere grant to a public authority of discretionary power to affect a person's interest does not suffice. A thorough examination of the provisions in issue is mandatory: *Guerin* addressed the *Indian Act*, R.S.C. 1952, c. 149, s. 18(1) (which confirms the Crown's duty to manage Indian lands for their use and benefit); *Authorson* dealt with the *Pension Act*, R.S.C. 1970, c. P-7, the *War Veterans Allowance Act*, R.S.C. 1985, c. W-3, s. 15(2), and the *Pension Act*, R.S.C. 1927, c. 157 (which set out the obligation of the government to hold and administer funds on behalf and for the benefit of incapable veterans and their dependants); and *B. (K.L.)* found that the language in the *Protection of Children Act*, R.S.B.C. 1960, c. 303, did not encompass the duty asserted.

46      If the alleged undertaking arises by implication from the relationship between the parties, the content of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

the obligation owed by the government will vary depending on the nature of the relationship, and should be determined by focussing on analogous cases: *B. (K.L.)*, at para. 41.

47    Generally speaking, a strong correspondence with one of the traditional categories of fiduciary relationship — trustee-*cestui qui trust*, executor-beneficiary, solicitor-client, agent-principal, director-corporation, and guardian-ward or parent-child — is a precondition to finding an implied fiduciary duty on the government.

48    In sum, while it is not impossible to meet the requirement of an undertaking by a government actor, it will be rare. The necessary undertaking is met with respect to Aboriginal peoples by clear government commitments from the *Royal Proclamation* of 1763 to the *Constitution Act, 1982* and considerations akin to those found in the private sphere. It may also be met where the relationship is akin to one where a fiduciary duty has been recognized on private actors. But a general obligation to the public or sectors of the public cannot meet the requirement of an undertaking.

49    For similar reasons, where the alleged fiduciary is the government, it may be difficult to establish the second requirement of a defined person or class of persons vulnerable to the fiduciary's exercise of discretionary power. The government, as a general rule, must act in the interest of all citizens: *Bennett v. British Columbia*, 2009 BCSC 1358 (B.C. S.C.), at paras. 61 and 71; and *Drady v. Canada (Minister of Health)* [2007 CarswellOnt 4631 (Ont. S.C.J.)], 2007 CanLII 27970, at para. 28, aff'd 2008 ONCA 659, 300 D.L.R. (4th) 443 (Ont. C.A.), leave to appeal ref'd [2009] 1 S.C.R. viii (note) (S.C.C.). It is entitled to make distinctions between different groups in the imposition of burdens or provision of benefits, subject to s. 15 of the *Charter*, which forbids discrimination. As stated in *Galambos*, the claimant must point to a deliberate forsaking of the interests of all others in favour of himself or his class. In the Aboriginal context, an exclusive duty in relation to Aboriginal lands is established by the special Crown responsibilities owed to this sector of the population and none other. Similarly, where the government duty is in effect a private duty being carried out by government, this requirement may be established. Outside such cases, a specific class of persons to whom the government owes an exclusive duty of loyalty is difficult to posit.

50    No fiduciary duty is owed to the public as a whole, and generally an individual determination is required to establish that the fiduciary duty is owed to a particular person or group. A fiduciary duty can exist toward a class — for example, adults in need of a guardian or trustee, or children in need of a guardian — but for a declaration that an individual is owed a duty, a person must bring himself within the class on the basis of his unique situation. Group duties have not often been found; thus far, only the Crown's duty toward Aboriginal peoples in respect of lands held in trust for them has been recognized on a collective basis.

51    Finally, it may be difficult to establish the requirement that the government power attacked affects a legal or significant practical interest, where the alleged fiduciary is the government. It is not enough that the alleged fiduciary's acts impact generally on a person's well-being, property or security. The interest affected must be a specific *private law* interest to which the person has a pre-existing distinct and complete legal entitlement. Examples of sufficient interests include property rights, interests akin to property rights, and the type of fundamental human or personal interest that is implicated when the state assumes guardianship of a child or incompetent person. The entitlement must not be contingent on future government action. For example, in *Authorson*, the right to the funds had already fully vested in the veterans' hands *before* the Crown took on the responsibility for administration: *Authorson* (C.A.), at paras. 60, 73(b) and 73(h); in the Aboriginal context, see *Guerin*, at p. 385. In other circumstances, a statute that creates a complete legal entitlement might also give rise to a fiduciary duty on the part of government in relation to administering the interest.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 25
2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

52    Access to a benefit scheme without more will not constitute an interest capable of attracting a fiduciary duty. Although the receipt of a statutory benefit may affect a person's financial welfare, absent evidence that the legislature intended otherwise, the entitlement is a creation of public law and is subject to the government's public law obligations in the administration of the scheme.

53    Moreover, the degree of control exerted by the government over the interest in question must be equivalent or analogous to direct administration of that interest before a fiduciary relationship can be said to arise. The type of legal control over an interest that arises from the ordinary exercise of statutory powers does not suffice. Otherwise, fiduciary obligations would arise in most day to day government functions making general action for the public good difficult or almost impossible.

54    It thus emerges that a rigorous application of the general requirements for fiduciary duty will of necessity limit the range of cases in which a fiduciary duty on the government is found. Claims against the government that fail to satisfy the legal requirements of a fiduciary duty should not be allowed to proceed in the speculative hope that they may ultimately succeed. The truism that the categories of fiduciary duty are not closed (as Dickson J. noted in *Guerin*, at p. 384) does not justify allowing hopeless claims to proceed to trial: see M. V. Ellis, *Fiduciary Duties in Canada* (loose-leaf), at pp. 19-3 and 19-24.10. Plaintiffs suing for breach of fiduciary duty must be prepared to have their claims tested at the pleadings stage, as for any cause of action.

*(3) Application to this Case*

55    I turn now to the application of these principles to the appeal before us. The core of the plaintiffs' pleading of fiduciary duty is found at para. 40 of the Fresh Statement of Claim No. 2:

> The Crown owed a <u>fiduciary duty to the Class members with respect to the implementation and administration of the Accommodation Charge to ensure that the Accommodation Fee was fair, reasonable and justifiable, that the Accommodation Fee reflects the cost of accommodation and meals, that the Accommodation Fee was</u> in their best interests, and that moneys paid pursuant to the Accommodation Charge would not be used to subsidize Health Care costs.

> [Emphasis added.]

See also paras. 32-42.

56    The plaintiffs' pleadings emphasize the vulnerability of the class members:

> 34. The Class members are frail, elderly, and have chronic disabilities. They are incapable of caring for themselves or living on their own. They are among the most vulnerable members of our society. A physician has determined that each Class member requires long-term care.

57    However, vulnerability alone is insufficient to ground a fiduciary obligation, as discussed earlier. In this case, their state of vulnerability does not arise from their relationship with Alberta: *Galambos*, at paras. 67-68. Moreover, as Alberta points out, class members will generally still be competent to manage their own affairs, or will be beneficiaries of duties owed by their own guardians and trustees; the Province is not responsible for them. They are not being denied care and though their financial situation may be affected by the levy of accommodation charges, that alone is not enough to warrant a fiduciary duty.

58    The plaintiffs do not point to anything in the legislation, or in the factual relationship pleaded, that sup-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

ports an undertaking by Alberta to act with undivided loyalty toward the claimant class members, in the setting, receipt and administration of the accommodation charges. The *Alberta Health Care Insurance Act* imposes an obligation on the Province to provide medical care, including chronic care, but provides no direction amounting to a statutory undertaking to act in the best interests of residents of Alberta generally, or in the best interests of residents residing in LTCFs in particular. Nor does the statute impose any obligation on the government to take into account anyone's interests in determining the contribution that may be sought from residents. There may be a trust relationship between *operators* and residents with respect to residents' property, but no similar trust relationship is established between the *Province* and residents: *Nursing Homes Act*, s. 8(1); *Nursing Homes General Regulation*, s. 4; *Nursing Homes Operation Regulation*, ss. 8-9.

59     Nor have the plaintiffs pleaded facts sufficient to establish an implied undertaking on the part of Alberta to act with undivided loyalty to the residents of LTCFs. They point to no analogous duty in private law. The facts pleaded do not assert any undertaking or any basis upon which such an undertaking could be posited.

60     Indeed, it is not clear that the pleadings allege that the Crown, as distinguished from individual actors, is under a fiduciary duty. Although the action was brought against Her Majesty the Queen in Right of Alberta, the allegations in the pleadings are against the Minister of Seniors and Community Supports and the Department of Alberta Health and Wellness. This makes it difficult to determine the second and third requirements of an undertaking to a defined group in relation to any legal or vital practical interests. The separate pleas against the RHAs may support a cause of action for breach of fiduciary duty, a matter not before us, but the pleas against the Crown do not. Absent pleadings fixing a specific undertaking on the Crown, how can we know to whom such a duty would be owed or indeed what duty is owed? Put simply, the pleadings against the Crown are too vague to permit the inference of a fiduciary duty on the Crown toward the plaintiff class.

61     Apart from these difficulties, the legal or substantial practical interests alleged in the pleadings to be affected by the Crown's exercise of authority is insufficient to attract a fiduciary duty. The pleadings speak of the right to chronic care and the right to be assessed a reasonable fee for the receipt of care. The entitlement to chronic care flows exclusively from statute, and no one contests that Alberta continues to provide such care. The allegation, at base, is that the plaintiffs are paying more than their meal and accommodation cost, with the result that the Province is offsetting its obligation to meet medical costs and thus pocketing money it is not entitled to pocket. The situation is not unlike that in *Gorecki v. Canada (Attorney General)* (2006), 208 O.A.C. 368 (Ont. C.A.), where Sharpe J.A. wrote, at para. 6:

> I agree with the motion judge's conclusion that it is plain and obvious that the action cannot succeed on the allegations of breach of fiduciary duty. The relationship between the Crown and the appellant flows entirely from the terms of the [Canada Pension Plan] and the statutory definition of that relationship bears none of the hallmarks of a fiduciary duty. The CPP confers no discretion on the Crown to act for the benefit of the appellant. The Crown does not undertake to administer CPP funds for the appellant's benefit. The only duty that the CPP imposes on the Crown or that the Crown assumes is the public law duty to fulfill the statutory terms of the CPP. This cannot be the source of a fiduciary duty owed to the appellant.

62     Finally, I note that the specific fiduciary duty that the plaintiffs seek to establish relates primarily to *setting* the accommodation charges by regulation. This is a *legislative* function of government. Where the government acts in the exercise of its legislative functions, courts have consistently held that a fiduciary duty does not arise: *Guerin*, at p. 385; *Wewaykum*, at para. 74. Deciding how to fund and implement insured health care services requires constant balancing of competing interests between all segments of the population, since everyone

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

receives health care. The Crown would be unable to meet its obligations to the public at large if we were to hold it to a fiduciary standard of conduct for one group among so many others. This aspect of the claim is doomed to fail.

63    In my view, the facts as pleaded, which are accepted as true for the purpose of the instant motion, do not establish a fiduciary duty on the Crown. Accordingly, I would strike the plea of breach of fiduciary duty.

*B. The Negligence Claim*

64    The plaintiff class pleads that Alberta is in breach of a duty of care to its members to act with due care, i.e. without negligence. It pleads:

> 43. The Defendants owed the Class members a <u>duty to exercise all reasonable care, skill, and diligence with respect to auditing, supervising, monitoring and administering</u> (i) the Health Care benefits paid by the Crown to the Health Authorities, (ii) the Health Care benefits provided by the Health Authorities to Long Term Care Facilities and (iii) the Accommodation Fee paid by the Class members, <u>to ensure that the Accommodation Fee was fair, just, and reasonable, to ensure that the Accommodation Fee reflected the actual cost of accommodation and meals, and that Accommodation Fees paid pursuant to the Accommodation Charge would not be used to subsidize Health Care costs.</u>

[Emphasis added.]

65    I note at the outset that the claim of negligence sits uncomfortably with the general thrust of the plaintiff class' grievance. That grievance, viewed broadly, appears mainly concerned with deliberate legislative and policy decisions. Hints of this remain in the way the negligence claim is cast: the duty is said to be "to ensure" rather than merely to take reasonable care. That said, the pleadings arguably evoke negligence in "auditing, supervising, monitoring and administering the health care benefit". The duty of care asserted with respect to setting the accommodation fees has been struck and is not appealed. It is therefore unnecessary to consider whether this pleading raises a triable cause of action in negligence.

66    The first and central question is whether the pleadings, assuming the facts alleged to be true, support a duty of care on Alberta to members of the plaintiff class. This requires us to determine first whether Alberta and the class members were in a relationship that gave rise to a *prima facie* duty of care, based on foreseeability and proximity. If a *prima facie* duty of care is established, the second step is to ask whether it is negated by policy considerations: See *Anns v. Merton London Borough Council* (1977), [1978] A.C. 728 (U.K. H.L.); *Nielsen v. Kamloops (City)*, [1984] 2 S.C.R. 2 (S.C.C.); *Cooper v. Hobart*, 2001 SCC 79, [2001] 3 S.C.R. 537 (S.C.C.), at para. 30; and *Broome v. Prince Edward Island*, 2010 SCC 11, [2010] 1 S.C.R. 360 (S.C.C.), at para. 14.

67    The claim raised in this case has not been previously recognized as giving rise to a duty of care. Therefore, we must examine whether it meets the foregoing requirements for imposing a duty of care in negligence: *Childs v. Desormeaux*, 2006 SCC 18, [2006] 1 S.C.R. 643 (S.C.C.), at para. 15.

68    In this case, as in *Broome*, the plaintiff class relies on provincial statutory obligations as the source of a private duty of care. The allegation, in essence, is that statutory and regulatory duties brought Alberta into a relationship of proximity with members of the class, whom it was reasonably foreseeable would be affected by failure to discharge these duties in a non-negligent manner. The *Cooper* analysis applies to claims grounded in statutory duties. As the Court, *per* Cromwell J., stated in *Broome*, at para. 13:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 28
2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

[13] [The *Anns/Kamloops*] test is the appropriate one even though the appellants mainly rely on statutory duties. Such duties do not generally, in and of themselves, give rise to private law duties of care. The *Anns/Kamloops* test determines whether public as well as private actors owe a private law duty of care to individuals enabling them to sue the public actors in a civil suit.

69     Determining whether a duty of care lies on the government proceeds by "review of the relevant powers and duties of the [government body] under the Act": *Cooper*, at para. 45. See also *Broome*, at para. 20; *D. (B.) v. Children's Aid Society of Halton (Region)*, 2007 SCC 38, [2007] 3 S.C.R. 83 (S.C.C.), at para. 27.

70     In this case, the legislative scheme does not impose a duty on the Crown to act in relation to the class members with respect to the accommodation charges. A review of the relevant provisions discloses a general duty on the Minister to provide insured health care services: *Alberta Health Care Insurance Act*, s. 3. However, the plaintiffs have failed to point to any duty to audit, supervise, monitor or administer the funds related to the accommodation charges in the provisions. The *Nursing Homes Act* imposes no positive duty on the Crown, but grants only permissive monitoring powers. Reporting requirements are discretionary (i.e. at the demand of the Minister). While they flow up the chain of command (i.e. the RHA or operator must report to the Minister), the *Minister* need not respond: *Nursing Homes Act*, ss. 12 and 19. The same is true of the Act's regulations (*Nursing Homes General Regulation* and *Nursing Homes Operation Regulation*) and the *Regional Health Authorities Act*, ss. 9, 13, 14 and 21, and accompanying regulations; as in the *Hospitals Act*, ss. 25-27 and 29, and its regulations. This case is distinguishable from *Brewer Brothers v. Canada (Attorney General)* (1991), [1992] 1 F.C. 25 (Fed. C.A.), relied on by the plaintiffs, where the statute in question imposed on the public authority a *positive duty to act*.

71     For these reasons, I conclude that the legislative scheme does not impose a duty of care on Alberta. However, the claimant class also argues that Alberta's conduct established a relationship of a sufficient proximity to support a duty of care. They rely generally on the fact that Alberta supervised, monitored and administered the accommodation fees. More particularly, they emphasize that Alberta directed the health authorities to charge the class members the maximum accommodation charge, without regard to the actual cost of accommodation and meals, and that information about the rates was communicated by the health authorities directly to the class members at the direction of Alberta. This, they argue, is sufficient to create a relationship of proximity.

72     In the absence of a statutory duty, the fact that Alberta may have audited, supervised, monitored and generally administered the accommodation fees objected to does not create sufficient proximity to impose a *prima facie* duty of care. As stated in *Broome*, at para. 40:

Even if the statute ought to be interpreted so that there was a duty to inspect the Home, on the record before me, <u>the statute gives no direction as to the purpose or scope of such inspections, imposes no standards to be applied and requires no action to be taken as a result of an inspection. No authority is cited for the proposition that such a bare duty of inspection would be sufficient to support a finding of proximity</u> between the Director and the children.

[Emphasis added.]

The specific acts alleged — that Alberta directed the charges and that the health authorities communicated them to members of the claimant class — fall under the rubric of administration of the scheme. As in *Broome*, the mere supplying of a service is insufficient, without more, to establish a relationship of proximity between the government and the claimants.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

73      I therefore conclude that, assuming the facts pleaded to be true, the negligence claim is bound to fail at the first step of the *Anns/Cooper* inquiry. Absent a statutory obligation to do the things that the plaintiffs claim were done negligently, the necessary relationship of proximity between Alberta and the claimants cannot be made out.

74      Were the pleadings to satisfy the first step of the *Anns/Cooper* test, they would fail at the second step, which asks whether the *prima facie* duty of care is negated by policy considerations. Where the defendant is a public body, inferring a private duty of care from statutory duties may be difficult, and must respect the particular constitutional role of those institutions: *Welbridge Holdings Ltd. v. Greater Winnipeg (Municipality)* (1970), [1971] S.C.R. 957 (S.C.C.), *per* Laskin J., as he then was, for the Court. Related to this concern is the fear of virtually unlimited exposure of the government to private claims, which may tax public resources and chill government intervention. It is arguable that to impose a duty of care on the plaintiff class on the facts pleaded would open the door to a claim in negligence by *any* patient in the healthcare system with an entitlement to receive funding for health services, whether primary or extended. This raises the spectre of unlimited liability to an unlimited class, decried by Cardozo Ch.J. in *Ultramares Corp. v. Touche*, 174 N.E. 441 (U.S. N.Y. Ct. App. 1931), at p. 444: see *Design Services Ltd. v. R.*, 2008 SCC 22, [2008] 1 S.C.R. 737 (S.C.C.), at paras. 59-66.

75      For these reasons, I would find that the pleadings do not disclose a duty of care and that the cause of action as pleaded is bound to fail. I would therefore strike the plea of negligence in its entirety.

### C. The Bad Faith Claim

76      The plaintiff class pleads that the instruction by the Minister of Health and Wellness to the LTCF operators to charge the maximum fee allowable under the regulations for accommodation and meals is a bad faith exercise of discretion. The plaintiffs say the Minister gave his instructions knowing full well of the past practice of certain LTCF operators of using surplus accommodation charges to subsidize basic care and operating costs properly the responsibility of the operator and the Province. This recklessness and breakdown of the orderly exercise of authority, they say, is sufficient to establish a distinct cause of action for bad faith.

77      I agree with the Province's submissions that the allegation of bad faith, as pleaded, is bootstrapped to the duty of care claim, and cannot survive on its own when the plea of negligence is struck. The pleadings disclose the explicit link between bad faith and negligence:

**Negligence: Breach of Duty of Care and Bad Faith**

. . . . .

44. In breach of their duty of care, the Defendants, acting recklessly, arbitrarily, and in bad faith, failed to exercise any, or any sufficient, care, skill, and diligence with respect to auditing, supervising, monitoring and administering (i) the Health Care benefits paid by the Crown to the Health Authorities, (ii) the Health Care benefits provided by the Health Authorities to Long Term Care Facilities and (iii) the Accommodation Fees paid by the Class members. In particular, the Defendants, acting recklessly, arbitrarily and in bad faith:

a) Had no rational basis for determining what accommodation and meals consist of;

b) Had no rational basis for calculating the actual cost of accommodation and meals or the Accommodation Fee;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 30
2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

c) Had no rational basis for separating or distinguishing Health Care costs, which are the responsibility of the Defendants, from Accommodation Fees, which are the responsibility of the Class members;

d) Failed to conduct any analysis to determine the actual cost of accommodation and meals and levied, either directly or through their agents, the maximum Accommodation Charge across the Province of Alberta (save for a very few exceptions[)];

e) Failed to account or require an accounting to be provided to the Class members with respect to the disposition of monies paid by the Class members as Accommodation Fees;

f) Failed to put in place any, or any proper, reporting, accounting and financial records and systems;

g) Permitted or alternatively failed to prevent the Class members from being charged for Health Care costs which are the responsibility of the Defendants including but not limited to [a detailed list follows]; and

h) By letter dated August 1, 2003, the Crown, by its Minister of Seniors and Community Supports, did unlawfully [list of particular actions omitted].

**Policy Decisions: Breach of Duty of Care and Bad Faith**

. . . . .

49. In breach of its duty of care and acting recklessly, arbitrarily and in bad faith, the Crown, pursuant to the Letters, did unlawfully and improperly direct and instruct the Predecessor Health Authorities and their agents to charge the maximum Accommodation Charge, notwithstanding the permissive and discretionary language of s. 3(1) of the *Nursing Homes Operation Regulation* and s. 8(2) of the *Nursing Homes Act*, as a result of which the Class members, save for a limited number of exceptions, were charged the maximum Accommodation Charge without regard to the actual cost of accommodation and meals.

50. In further breach of its duty of care and acting recklessly, arbitrarily and in bad faith, the Crown, pursuant to the Letters, unlawfully and improperly directed and instructed the Predecessor Health Authorities and their agents to charge the Class members for Health Care costs set out in paragraph 44(g) herein in circumstances where:

a) Such costs are Health Care costs pursuant to the *Nursing Homes Act* and regulations, the *Hospitals Act* and regulations, and Ministerial Directive D-317;

b) The Crown understood and has since acknowledged that such costs and services were the responsibility of the Defendants; and

c) The Crown understood and has since acknowledged that such costs were included as part of the block funding for Health Care provided by the Crown to the Health Authorities.

51. As a result of the negligent, *ultra vires* and bad faith actions of the Defendants:

a) There was no reasonable nexus between the Accommodation Fee and the cost of accommodation and meals;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

> b) The Class members paid an Accommodation Fee that was contrary to the *Hospitals Act* and the *Nursing Homes Act*;
>
> c) The Class members' right and entitlement to publicly funded Health Care services and benefits was violated; [and]
>
> d) Under the guise of the Accommodation Charge, the Class members paid an Accommodation Fee that included the cost of Health Care services and benefits the Class members were entitled to receive at no cost as described in paragraph 41(i) herein.
>
> 52. <u>As a result of the negligent and bad faith actions of the Defendants</u>, the Class members have suffered damage and loss.
>
> [Emphasis added.]

78      The law does not recognize a stand-alone action for bad faith. As the certification judge noted, at para. 408, the bad faith exercise of discretion by a government authority is properly a ground for judicial review of administrative action. In tort, it is an element of misfeasance in public office and, in employment law, relevant to the manner of dismissal. The simple fact of bad faith is not independently actionable.

79      At the hearing, counsel for the plaintiffs sought to argue that we should read the plea of bad faith as disclosing the tort of misfeasance in public office: *Odhavji Estate v. Woodhouse*, 2003 SCC 69, [2003] 3 S.C.R. 263 (S.C.C.). Notwithstanding the difficulty of raising this interpretation of the pleadings for the first time in response during oral hearing, I do not see how this claim is sustainable at law: The facts necessary to support such an allegation cannot be extricated from the pleas of negligence and fiduciary duty, and a court is not obliged to divine causes of action apart from those deliberately pleaded and argued by a party. Misfeasance in a public office was not raised before the courts below, and I would not now accede to this submission.

80      For these reasons, the plea of bad faith should be struck.

### D. The Unjust Enrichment Claim

81      The representative plaintiffs advanced a claim in restitution. Essentially, they plead that by overcharging them for accommodation and food, the government used their money to partially offset its obligations under the scheme, without being entitled to do so. The government, they plead, was thus unjustly enriched, and should be ordered to return the excess money thus obtained. They pleaded the following with respect to unjust enrichment:

> **Restitution**
>
> . . . . .
>
> 54. The Class members, with very limited exceptions, paid the maximum rates permitted by s. 3(1) of the *Nursing Homes Operation Regulation*, A.R. 258/85 as amended, <u>such that the Class members experienced a deprivation equal to the amount of the Accommodation Fees</u>.
>
> 55. <u>The payment of the Accommodation Fees constituted a corresponding benefit to the Defendants in that the payments relieved the Defendants from inevitable expenses they were required to incur pursuant to the *Hospitals Act*, the *Nursing Homes Act*, and *Ministerial Directive D-317*.</u>

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 32
2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

56. There exists no juristic reason for the Class members' deprivation and the Defendants' corresponding benefit because:

a) Section 19(2) of the *Canada Health Act*, R.S. 1985, c. C-6, s. 3(1) of the *Nursing Homes Operation Regulation* as amended, s. 8(2) of the *Nursing Homes Act*, ss. 5(1)(d) and 5(8) of the *Hospitalization Benefits Regulation*, and the Letters, are of no force or effect in that they violate s. 15 of the *Canadian Charter of Rights and Freedoms* (the "*Charter*") in that they authorize the imposition of Accommodation Charges upon the Class members which may not be imposed upon other patients solely on the basis of the Class members' age and/or mental and/or physical disabilities, are not justified under s. 1 of the *Charter*, and are of no force or effect by operation of s. 52 of the *Constitution Act, 1982*;

b) Section 3(1) of the *Nursing Homes Operation Regulation* as amended, ss. 5(1)(d) and 5(8) of the *Hospitalization Benefits Regulation*, and the Letters are *ultra vires* and inoperative in that contrary to the *Nursing Homes Act*, and the *Hospitals Act*, they purport to authorize the imposition of charges or fees against the Class members for goods and services other than accommodation and meals, including but not limited to [list of specific goods and services omitted], all of which are the financial responsibility of the Defendants;

c) The Letters are *ultra vires* and inoperative in that there was in fact no obligation on the part of the Long Term Care Facilities to impose the maximum Accommodation Charges, [and] there was no obligation on the part of the Class members to pay them;

d) The Crown's Minister of Seniors and Community Supports had no lawful authority in August of 2003 with respect to setting and monitoring the Accommodation Charge; ...

[Emphasis added.]

82    These pleadings mirror the test for unjust enrichment set out in *Garland v. Consumers' Gas Co.*, 2004 SCC 25, [2004] 1 S.C.R. 629 (S.C.C.), at para. 30:

As a general matter, the test for unjust enrichment is well established in Canada. The cause of action has three elements: (1) an enrichment of the defendant; (2) a corresponding deprivation of the plaintiff; and (3) an absence of juristic reason for the enrichment ...

The savings of an inevitable expense can constitute an enrichment of the defendant: *Garland*, at para. 31.

83    The thrust of Alberta's argument on this point is that the claim of unjust enrichment is bound to fail because the doctrine does not apply to a public authority in a case such as this. Governments enact laws and regulations that require citizens to pay monies to government in a variety of situations, and as a general rule, the citizen should have no right to recover such payments. It argues that this position is justified in terms of public policy; governments should not be required to endlessly defend levies made under valid statutes and regulations.

84    In reality, the situation is not so simple. As one writer delicately puts it, the application of restitutionary principles to public authorities in Canada "is a matter of some subtlety": P. D. Maddaugh and J. D. McCamus, *The Law of Restitution* (loose-leaf), at p. 22-1. Under the traditional common law doctrine, recovery from public authorities was recognized only on the grounds of *colore officii* (demands for unlawful payment from citizens by government officials for the receipt of benefits to which the citizen had a lawful entitlement) or duress (actual or

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

implied). Payments made pursuant to *intra vires* statutory schemes were potentially recoverable; those made pursuant to *ultra vires* legislation were not necessarily so.

85    The traditional doctrine, though workable in some circumstances, has been criticized on the ground that it produced inconsistent and inequitable results. A series of judicial decisions, responding to these concerns, has narrowed the ambit of the doctrine.

86    It has been held that benefits received by the government because of a mistake of law may be recovered, so long as the mistake caused the payment in question: *Air Canada v. British Columbia*, [1989] 1 S.C.R. 1161 (S.C.C.), at pp. 1200-01, *per* La Forest J., for three of the six members of the Court, in *obiter*. Thus, where payments are made to a government under an *intra vires* law pursuant to an unlawful demand for payment which was based on a misinterpretation of the governing legislation, the payments may be subject to restitution.

87    It has also been held that benefits received by the government pursuant to *ultra vires* legislation may be recoverable where the payment is made under practical compulsion or actual duress: *Eurig Estate, Re*, [1998] 2 S.C.R. 565 (S.C.C.), at p. 587, *per* Major J., for the majority. In that decision, the Court left open the question of the recoverability of payments made under *ultra vires* legislation *in the absence of compulsion*: *Eurig Estate*.

88    Again, courts have held that benefits conferred under an *agreement* with a public authority that is beyond the power of the state actor to make are recoverable in a restitutionary claim: *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75, [2004] 3 S.C.R. 575 (S.C.C.).

89    Most recently, this Court in *Kingstreet Investments Ltd. v. New Brunswick (Department of Finance)*, 2007 SCC 1, [2007] 1 S.C.R. 3 (S.C.C.), *per* Bastarache J., held that taxes collected by public authorities on the basis of an *ultra vires* statute are recoverable where the law is found to be unconstitutional. Restitution is generally "available for the recovery of monies collected under legislation that is subsequently declared to be *ultra vires*": at para. 12. Bastarache J. suggested that where the claim is for unconstitutional taxes, the claim should be brought under public law principles, and not the private law rules of unjust enrichment. However, he added that "[c]laims of unjust enrichment against the government may still be appropriate in certain circumstances": at para. 34. Although the Court rejected Justice La Forest's *obiter* proposal in *Air Canada*, at pp. 1203-04, that recovery of payments made under *ultra vires* legislation should never be possible, Bastarache J. did not go so far as to embrace Justice Wilson's dissent on this point (at pp. 1214-15), which would have permitted recovery in cases where unjust enrichment is applied.

90    Alberta argues that *Kingstreet* stands for the proposition that an action for unjust enrichment cannot be brought against the government. The only recourse, it argues, is under public law principles, such as a claim for misfeasance in public office. The plaintiff class, in response, argues that Alberta interprets *Kingstreet* too narrowly. It fastens on Bastarache J.'s statement that "[c]laims of unjust enrichment against the government may still be appropriate in certain circumstances".

91    In my view, *Kingstreet* stands for the proposition that public law remedies, rather than unjust enrichment, are the proper route for claims relating restitution of taxes levied under an *ultra vires* statute, on the ground that the framework of unjust enrichment is ill-suited to dealing with issues raised by a claim that a measure is *ultra vires*. However, *Kingstreet* leaves open the possibility of suing for unjust enrichment in other circumstances. The claim pleaded in this case is not for taxes paid under an *ultra vires* statute. It is not therefore precluded by this Court's decisions in *Kingstreet*. The pleading should be allowed to go to trial, at which point the propriety of the claim for unjust enrichment may be explored more fully in the context of the evidence ad-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

duced.

92    With respect to whether or not a juristic reason exists, Alberta argues that the regulation setting the maximum allowable accommodation charge is a complete answer to any claim in restitution. However, the claim that the regulation is itself invalid is a *Charter* claim, subject to *Charter* remedies.

93    Alberta argues that the cause of action for unjust enrichment must fail because there is a nexus between the levy and the cost of making the service or benefit available, and therefore that the applicable regulations are not *ultra vires*. However, the sufficiency of the nexus is a matter of reasonableness: see *620 Connaught Ltd. v. Canada (Attorney General)*, 2008 SCC 7, [2008] 1 S.C.R. 131 (S.C.C.), at para. 19, *per* Rothstein J., for the Court. It is better explored at trial than on a motion to strike.

94    Finally, Alberta argues that the claim for unjust enrichment is simply another way of asserting breach of fiduciary duty and negligence, and therefore should be struck. I cannot accept this argument. The claim for unjust enrichment stands on different legal footing than the claims for breach of fiduciary duty or negligence. On the law just reviewed, it should be allowed to proceed. I further note that the restrictions set out in *Welbridge* on suing governments (as opposed to government actors) in tort do not apply to actions for restitution: *Peel (Regional Municipality) v. Canada*, [1992] 3 S.C.R. 762 (S.C.C.).

95    In summary, the plaintiffs plead the three elements of unjust enrichment — benefit, deprivation, and absence of juristic reason for the deprivation. Whatever its chances of ultimate success, it is not plain and obvious that the claim does not disclose a cause of action, and it should be allowed to proceed to trial. As the trial judge correctly observed, at para. 443:

> I am satisfied that the cause of action based on unjust enrichment with the remedy of restitution is not hopeless, but rather analytically defensible, *albeit* novel, even dubious. I cannot say that it is "plain and obvious" that no claim exists; nor that the pleadings do not disclose a cause of action based on unjust enrichment with any hope of success.

96    I would permit the plea of unjust enrichment to proceed.

### E. The Section 15(1) Claim of Discrimination

97    The plaintiffs plead that the imposition on the class members of an obligation to pay health care costs violates s. 15(1) of the *Charter*. They say the charges were imposed solely on the basis of the class members' age, mental disability, physical disability, or some combination thereof, and the consequent infringement of their equality rights is not demonstrably justified under s. 1 of the *Charter*. They seek restoration of the accommodation charges and damages under s. 24(1) of the *Charter*, and a declaration that the listed provisions are of no force or effect to the extent of their inconsistency with s. 15(1).

98    My understanding is that the plea for relief under s. 15(1) is not directly challenged by the Province. Although the Province argues that a class action is not the preferable procedure for the *Charter* claim or its remedy, the Crown does not seek to strike the plea of discrimination itself; instead, it asks that we order it to proceed in another form. In light of my other conclusions, especially the survival of the plea of unjust enrichment, and without commenting on its merits, I would permit the s. 15 claim to proceed as part of the class action.

### F. Whether the Claim Should be Decertified

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2011 CarswellAlta 763, 2011 SCC 24, J.E. 2011-868, 81 C.C.L.T. (3d) 1, [2011] A.W.L.D. 2159, [2011] A.W.L.D. 2160, [2011] A.W.L.D. 2206, [2011] A.W.L.D. 2205, [2011] A.W.L.D. 2203, [2011] A.W.L.D. 2197, [2011] 6 W.W.R. 191, 41 Alta. L.R. (5th) 1, 2 C.P.C. (7th) 1, 331 D.L.R. (4th) 257, 416 N.R. 198, 499 A.R. 345, 514 W.A.C. 345, [2011] 2 S.C.R. 261, 201 A.C.W.S. (3d) 344, EXP 2011-1574, EYB 2011-190431

99    Although the claims for unjust enrichment and breach of s. 15(1) of the *Charter* survive, Alberta nevertheless argues that the action should be decertified because a class proceeding is not the preferable procedure. Alberta submits that an individualized cost review would have to be conducted for each proposed class member, to determine whether particular charges for individual residents of specific LTCFs did not reflect the actual cost of accommodation and meals. Alberta argues that the charges will vary by time, regions, operator and resident, and — on the plaintiffs' theory — there is no wrong done unless it can be shown that the costs of accommodation and meals for a particular resident did not reflect the actual costs of providing those services.

100    I would reject Alberta's argument: The common questions certified by the judge at first instance ask whether the accommodation charges, *as a practice carried out on a class-wide basis*, resulted in unjust enrichment. The claim as pleaded does not require an individual assessment of the nexus between *specific* accommodation and meal charges in order to ground any potential liability to the class. The *Class Proceedings Act* provides sufficient remedial flexibility — by means of the aggregate assessment of damages (ss. 30-33) — to address any potential difficulties in assessing, awarding, and distributing damages.

101    For these reasons, I find that a class proceeding remains the preferable procedure and I decline to decertify the action.

**Conclusion**

102    Based on the foregoing, I would allow the appeal in part and strike the pleas of breach of fiduciary duty, negligence and bad faith. Without endorsing them, I would leave untouched the claim of discrimination under s. 15(1) of the *Charter* and the plea of unjust enrichment, along with any other pleas which survived in the lower courts and were not appealed to this Court. Certification of the class and the unaffected common questions will remain, since the action, in truncated form, survives.

103    Costs will be in the cause.

*Appeal allowed in part.*

*Pourvoi accueilli en partie.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works




*Indexed as:*
## Gallen v. Allstate Grain Co.

**Between**
**Dave Gallen, Peter Guichon and Jack Guichon, carrying on**
**business under the firm name and style of Felix Farms and the**
**said Felix Farms, plaintiffs (respondents), and**
**Allstate Grain Company Ltd., defendant (appellant), and**
**Ronald Butterley and Reinhold Nunweiler, defendants**

[1984] B.C.J. No. 1621

9 D.L.R. (4th) 496

53 B.C.L.R. 38

25 B.L.R. 314

1984 CanLII 752

25 A.C.W.S. (2d) 179

1984 CarswellBC 104

Vancouver Registry No. CA821301

British Columbia Court of Appeal
Vancouver, British Columbia

**Seaton, Lambert and Anderson JJ.A.**

Judgment: filed April 16, 1984.

(40 pp.)

*Contracts -- Seller giving oral representation that seeds were weed-resistant -- Written contract*
*excluding responsibility for crop -- Crop failing because of weeds -- Oral representation held to be*
*a warranty not contradicting the written contract -- Seller liable for crop loss.*

This was an appeal from a decision awarding damages to the plaintiff for crop loss. The plaintiff had purchased seed from the defendant. He had been given an oral assurance that the seed would be weed-resistant. The formal contract signed by the plaintiff included a clause excluding any warranty as to the productiveness of the seed, and excluding any responsibility for the crop. When the crop was destroyed by weeds, the plaintiff brought an action for damages. The trial judge held that the oral representation was a collateral warranty.

HELD: The appeal was dismissed. Evidence of the oral representation was properly admitted in this case on the question of whether the formal contract represented the whole agreement between the parties. The question of whether the oral representation was a warranty was a question of fact, and the Court did not alter the trial judge's decision that it was a warranty. The warranty and the printed contract were to be interpreted together, harmoniously if possible. The Court held that there was no contradiction between the warranty that the seed was weed-resistant and the contractual exclusion of responsibility for crop results. The warranty therefore had contractual effect, and the defendant was liable for the breach of warranty.

**Counsel:**

D. Clifton Prowse, for the appellant.
G. Brian Longpre, for the respondents.

---

Separate reasons for judgment were delivered by Lambert, Seaton and Anderson JJ.A.

**LAMBERT J.A.:--**

I

The Issues

**1**    An oral representation was made by Mr. Nunweiler, the president of Allstate Grain Company Ltd., to the plaintiffs. Later, the plaintiffs reached an agreement with Allstate, and signed Allstate's standard form contract. The representation turned out to be wrong, and the plaintiffs suffered a loss. The plaintiffs sued and won. This appeal by Allstate is now limited to questions about the parol evidence rule. These are the questions:

    (a)    Is evidence of the oral representation admissible?

    (b)    Is the oral representation a warranty?

    (c)    Can the oral representation add to, subtract from, vary or contradict the signed document?

    (d)    Is there a contradiction between the oral representation and the signed document?

The answer to each of these questions depends, to some extent, on the answers to the others. So I propose to discuss them separately, but to answer them all at the end.

## II

The Facts

**2**   Allstate Grain Company Ltd. is a Saskatchewan company. It is in the business of selling seed to farmers and buying farm crops. It had sold buckwheat seed to farmers in Saskatchewan and bought their buckwheat crops. It had developed a standard form contract covering that type of transaction.

**3**   Allstate discovered that there was a very good market for early buckwheat in Japan. But buckwheat for that market had to be planted at the beginning of May and harvested before the end of July. That could not be done in Saskatchewan. So Allstate decided to embark on a new venture in contracting with farmers in the Lower Fraser Valley to grow first crop buckwheat for the Japanese market. Allstate started off by advertising for farmers who might be interested in such a project.

**4**   The plaintiffs were experienced farmers in Ladner. But first crop buckwheat was not a crop which had ever been grown in the Fraser Valley, though buckwheat had been grown as a second crop.

**5**   The plaintiffs answered Allstate's advertisement and a meeting took place between the plaintiffs and Mr. Nunweiler, in March 1980. They discussed planting procedures, yield, returns, and details of growth. The plaintiffs asked about weeds. They were assured by Mr. Nunweiler that there would be no problem with weeds; the buckwheat would grow up and cover the field like an umbrella, and the weeds would all be smothered. On 1 May, 1980, the plaintiffs signed Allstate's standard Buckwheat Marketing Agreement, 1980, by which they agreed to buy buckwheat seed from Allstate and to sell back the buckwheat crop. The contract contained this clause:

> 23.   Allstate gives no warranty as to the productiveness or any other matter pertaining to the seed sold to the producer and will not in any way be responsible for the crop.

The plaintiffs had prepared a substantial acreage for this project. They took delivery of Allstate's buckwheat seed and planted it. The buckwheat grew, but the weeds grew faster; they could not be controlled, and they destroyed the growing buckwheat.

**6**   The plaintiffs brought this action for breach of warranty, breach of collateral contract and negligent misrepresentation. Mr. Justice Paris found that the plaintiffs relied on Mr. Nunweiler's statement when, two months or so after the statement was made, they entered the buckwheat contract; and he found that Mr. Nunweiler was perfectly aware of the plaintiffs' concerns about weeds when he gave the assurances that he did. On that basis, Mr. Justice Paris decided that the assurances constituted a warranty, and that the defendant company was liable to the plaintiffs for

breach of warranty. Mr. Justice Paris said it was clear on the law that an exclusionary clause in the standard form contract would not avail the defendants if a collateral warranty was made out. Mr. Justice Seaton has set out the relevant passages from the reasons of Mr. Justice Paris and I will not repeat them.

**7**    Mr. Justice Paris also considered the claim for negligent misrepresentation. He did not decide whether a duty of care existed, because, assuming that it did exist, Mr. Nunweiler had complied with a reasonable standard of care. Mr. Nunweiler had relied on his experience in Saskatchewan, and he had relied on an expert in buckwheat, and he had relied on government publications. They all turned out to be wrong. But Mr. Nunweiler was not negligent when he relied on them and assured the plaintiffs that the buckwheat would smother the weeds.

**8**    Mr. Justice Paris decided that the other personal defendant, Ronald Butterley, was not involved in the misrepresentation. So he dismissed the claims against the two individual defendants. He awarded $18,000 damages, calculated from the profit lost in not growing barley, plus pre-judgment interest and costs, against Allstate. This appeal is brought by Allstate from that judgment. There is no cross-appeal.

III

Is Evidence of the Oral Representation Admissible?

**9**    The parol evidence rule is not only a rule about the admissibility of evidence. It reaches in to questions of substantive law. But it is a rule of evidence, as well as a body of principles of substantive law, and if the evidence of the oral representation in this case was improperly admitted, the appeal should be allowed.

**10**    The rule of evidence may be stated in this way: Subject to certain exceptions, when the parties to an agreement have apparently set down all its terms in a document, extrinsic evidence is not admissible to add to, subtract from, vary or contradict those terms.

**11**    So the rule does not extend to cases where the document may not embody all the terms of the agreement. And even in cases where the document seems to embody all the terms of the agreement, there is a myriad of exceptions to the rule. I will set out some of them. Evidence of an oral statement is relevant and may be admitted, even where its effect may be to add to, subtract from, vary or contradict the document:

    (a)    to show that the contract was invalid because of fraud, misrepresentation, mistake, incapacity, lack of consideration, or lack of contracting intention;

    (b)    to dispel ambiguities, to establish a term implied by custom, or to demonstrate the factual matrix of the agreement;

    (c)    in support of a claim for rectification;

    (d)    to establish a condition precedent to the agreement;

(e)  to establish a collateral agreement;

(f)  in support of an allegation that the document itself was not intended by the parties to constitute the whole agreement;

(g)  in support of a claim for an equitable remedy, such as specific performance or rescission, on any ground that supports such a claim in equity, including misrepresentation of any kind, innocent, negligent or fraudulent;

(h)  in support of a claim in tort that the oral statement was in breach of a duty of care.

I do not consider that I am setting out an exhaustive list. I am only showing that appropriate allegations in the pleadings will require that the evidence be admitted.

**12**   So if it is said that an oral representation, that was made before the contract document was signed, contains a warranty giving rise to a claim for damages, evidence can be given of the representation, even if the representation adds to, subtracts from, varies or contradicts the document, if the pleadings are appropriate, and if the party on whose behalf the evidence is tendered asserts that from the factual matrix it can be shown that the document does not contain the whole agreement. The oral representation may be part of a single agreement, other parts of which appear in the document. (The one contract theory.) Alternatively, the document may record a complete agreement, but there may be a separate collateral agreement, with different terms, one of which is the oral representation. (The two contract theory.)

**13**   On the basis of the pleadings in this case, I do not doubt that the evidence was properly admitted on the question of whether the document constituted a record of the whole agreement.

**14**   I should add that I can see very little residual practicality in the parol evidence rule, as a rule of evidence, in cases tried by a judge alone.

IV

Is the Oral Representation a Warranty?

**15**   A warranty is one of the terms that may form a part of a contractual relationship and affect the scope of the relationship. It may be either a representation as to the existence of a present fact ("This car has travelled only 10,000 kms."); or it may be a promise to bear the risk of the loss that will flow from a failure of a fact to occur in the future ("This car is guaranteed rustproof.").

**16**   It is not necessary to distinguish, in this case, between conditions, warranties, and other contractual terms that may give rise to claims in damages. But what must be done in this case is to distinguish between a warranty, where the breach gives rise to a claim for damages, and a bare and innocent misrepresentation, which may give rise to a claim in equity for rescission, but does not give rise to a claim for damages.

**17**    The distinction does not turn on whether the recipient of the representation acted on it. The distinction turns on whether the representation became a part of the contractual relationship between the maker and the recipient. That, in turn, depends on the intention of the parties, as derived from objective evidence, including, but not limited to, evidence that tends to show whether the representation was intended to be acted upon and was in fact acted upon.

**18**    Mr. Justice Seaton, whose reasons I have seen in draft form, has set out six factors listed in Halsbury as aids in determining whether a statement is a warranty or a bare representation. The six factors are only straws in the wind, but, to the extent that they are helpful, I think that the second factor, namely, that the recipient makes it clear that he regards the matter as so important that he would not contract without the assurance, and the third factor, namely, that the maker is stating a matter that should be within his knowledge and of which the recipient is known to be ignorant, both apply on the facts of this case, and both tend to show a warranty rather than a bare representation.

**19**    More helpful than Halsbury, in my opinion, are the reasons of Mr. Justice Robertson in Yorke v. Duval (1953) 9 W.W.R. (N.S.) 523, a decision of this Court. They contain two guides for determining whether a pre-contractual representation is a warranty. First, at p. 524-5, Mr. Justice Robertson said that the way to decide is to look at the contract in the light of all the surrounding circumstances, and that one of the first things to look to is to what extent the accuracy of the statement the truth of what is promised - would be likely to affect the substance and foundation of the adventure which the contract is intended to carry out. Then, second, at p. 525, Mr. Justice Robertson said that the essence of a warranty is that it becomes plain by the words and actions of the parties that it is intended that, in the purchase, the responsibility of the soundness will rest upon the vendor.

**20**    That seems to me to put the question squarely. What the trier of fact is trying to find out is this: who was to bear the risk that the statement might be wrong, the person who made it, or the person who acted on it? If it must be taken to have been intended, and understood, when said, to form a part of the contractual relations between the parties, then it is a warranty.

**21**    As was said by Mr. Justice Robertson in Yorke v. Duval, in the end it is a question of fact as to whether what was said was a warranty or just a statement. I will return to that question of fact in this case in Part VII of these reasons.

V

Can the Oral Representation Add to, Subtract from, Vary or Contradict the Signed Document?

**22**    Once the oral evidence has been properly admitted under the application of the parol evidence rule, the body of principles of substantive law that are also customarily treated as being encompassed by the rule must be considered.

**23**    In Part III of these reasons, I concluded that evidence of the oral representation was admissible

in this case either on the basis that the document did not contain the whole agreement, (the "one contract" theory), or on the basis that the document contained one complete agreement, but that the oral representation formed the basic term of another complete agreement, (the "two contract" theory).

24    But I wish to emphasize that these theories are legal analysis only. They are not real life. So the substantive law ought to be the same, whichever theory is adopted. It makes no sense to say that if the warranty is cast as part of a single contract, ("I am selling you a rust-proof car"), the consequence in law is different than if the warranty is cast as part of a separate collateral contract, ("If you buy this car from me, I will guarantee that it is rust-proof").

25    The crucial parol evidence principle of substantive law, for the purposes of this case, is the principle that forms one of the reasons for decision in Hawrish v. Bank of Montreal [1969] S.C.R. 515, Bauer v. Bank of Montreal [1980] 2 S.C.R. 102, and Carman Construction Ltd. v. C.P.R. Co. [1982] 1 S.C.R. 958, all decisions of the Supreme Court of Canada, and also in First National Mortgage Co. Ltd. v. Grouse Nest Resorts Ltd. (1977) 2 B.C.L.R. 300, a decision of this Court. That principle was stated in this way by Mr. Justice Martland, for the Supreme Court of Canada, in the Carman Construction case, at p. 969: "a collateral agreement cannot be established where it is inconsistent with or contradicts the written agreement".

26    I propose to make eight comments about that principle.

27    The first is that the principle has its root in the parol evidence rule as a rule of evidence, and in the "two contract" or "collateral contract" exception to that rule of evidence. There is no objection to the introduction of evidence to establish an oral agreement separate from the written agreement and made at the same time. See Heilbut, Symons & Co. v. Buckleton [1913] A.C. 30. But it is unreasonable to contemplate that, at the same time, and between the same parties, two contracts will be made dealing with the same subject matter, one of which contradicts the other. So, since the written one was clearly and demonstrably made, reason requires one to conclude that the oral one, contradicting it, was never made. This point was set out clearly by Mr. Justice Isaacs in the High Court of Australia, in Hoyt's Proprietary Ltd. v. Spencer (1919), 27 C.L.R. 133, at 145-6, and it is consistent with the reasons of Mr. Justice Strong, in the Supreme Court of Canada, in Byers v. McMillan (1887), 15 S.C.R. 194. Those are the two roots which Mr. Justice Judson relied on in Hawrish v. Bank of Montreal when he framed the modern restatement of the principle.

28    The second is that the principle can not be an absolute one. Let us suppose that a bank manager, acting within his authority, agrees that, if his customer will agree to sign and be bound by the bank's standard form of guarantee, then the guarantee will only be in effect for one year. The customer agrees on the basis of that assurance and he signs the standard form of guarantee which contains no mention of the one year period. Two years pass by. The bank manager is replaced. The principal debtor goes bankrupt and the bank sues the guarantor, who pleads the collateral agreement as a defence. At trial, evidence is given by the former bank manager. He says that he agreed on

behalf of the bank that the guarantee would only be in effect for a year. The second bank manager says that he knows about the agreement made by the first bank manager, but he also knows about the Hawrish case, which he thinks says that the agreement made by the first bank manager on behalf of the bank does not bind the bank, and that, if that is so, then he thinks that his duty to the bank's shareholders is to sue on the written guarantee. I do not consider that the bank would succeed in that case. The principle in Hawrish is not a tool for the unscrupulous to dupe the unwary.

29    The third comment is that Hawrish, Bauer and Carman Construction illustrate, by the attention given to the evidence, that the principle is not an absolute one. In Hawrish, at p. 520, Mr. Justice Judson said:

> Bearing in mind these remarks to the effect that there must be a clear intention to create a binding agreement, I am not convinced that the evidence in this case indicates clearly the existence of such intention. Indeed, I am disposed to agree with what the Court of Appeal said on this point.

In Bauer, at p. 111, Mr. Justice McIntyre said:

> For reasons which will appear later in that part of this judgment dealing with the collateral contract argument, I am of the view that there is no evidence which would support any such finding against the bank.

In Carman Construction, at p. 967, Mr. Justice Martland said:

> In my opinion there is no evidence in the present case to establish an intention to warrant the accuracy of the statement made by the C.P.R. employee to Fielding, i.e., no promise to make it good.

If the principle were an absolute one, there would have been no need in those cases to mention the evidence, because the statement alleged in each case, if established by the evidence, clearly contradicted the document. So the cases could have been disposed of by the application of the absolute principle, no matter how convincing the evidence, even if both parties agreed that the oral warranty was given, and was intended to be binding, and was intended to override or modify the document.

30    The fourth point is that Bauer v. Bank of Montreal explicitly recognizes a particular exception to the principle, where, at p. 111, Mr. Justice McIntyre, for the Supreme Court of Canada, said:

> Various authorities were cited for the proposition that a contract induced by misrepresentation or by an oral representation, inconsistent with the form of the written contract, would not stand and could not bind the party to whom the representation had been made. These authorities included Canadian Indemnity Company v. Okanagan Main Line Real Estate Board et al., per Judson J. at p.

> 500, Jacques v. Lloyd D. George and Partners Limited, per Lord Denning at pp.
> 630-631, Firestone Tire and Rubber Company Limited v. Vokins and Co. Ltd.,
> see Devlin J. at p. 39, and Mendelsohn v. Norman Ltd.

> No quarrel can be made with the general proposition advanced on this point by
> the appellant. To succeed, however, this argument must rest upon a finding of
> some misrepresentation by the bank, innocent or not, or on some oral
> representation inconsistent with the written document which caused a
> misimpression in the guarantor's mind, or upon some omission on the part of the
> bank manager to explain the contents of the document which induced the
> guarantor to enter into the guarantee upon a misunderstanding as to its nature.

So, if the contract is induced by an oral misrepresentation that is inconsistent with the written
contract, the written contract can not stand.

**31**   The fifth point is that the rationale of the principle, as discussed in the first point, above, does
not apply with equal force where the oral representation adds to, subtracts from, or varies the
agreement recorded in the document, as it does where the oral representation contradicts the
document. As far as "adding to" is concerned, there is nothing inherently unreasonable about two
agreements which add to each other. "Subtracting from" and "varying" represent a half-way stage
between "adding to", on the one hand, which is wholly reasonable, and "contradicting", on the other
hand, which is wholly unreasonable.

**32**   The sixth point is that, if Hawrish, Bauer, and Carman Construction are properly considered
on their facts, the law in Canada is no different from that stated by K.W. Wedderburn in his article
"Collateral Contracts" [1959] Camb. L.J. 58 at 62, where he says:

> What the parol evidence rule has bequeathed to the modern law is a presumption
> - namely that a document which looks like a contract is to be treated as the whole
> contract. This presumption is "very strong" but "it is a presumption only, and it is
> open to either of the parties to allege that there was, in addition to what appears
> in the written agreement, an antecedent express stipulation not intended by the
> parties to be excluded, but intended to continue in force with the express written
> agreement."

The presumption is always strong. But it is strongest when the oral representation is alleged to be
contrary to the document, and somewhat less strong when the oral representation only adds to the
document.

**33**   The seventh point is that, if it is correct to view the principle only as a strong presumption,
which I think is the correct view of Hawrish, Bauer and Carman, then that presumption would be
more rigorous in a case where the parties had produced an individually negotiated document than it

would be where a printed form was used,though it would be a strong presumption in both cases.

**34**    The eighth and final point is that, if it is correct to consider the principle only as a strong presumption, then the presumption would be less strong where the contradiction was between a specific oral representation, on the one hand, and a general exemption or exclusion clause that excludes liability for any oral representation, whatsoever, on the other hand, than it would be in a case where the specific oral representation was contradictory to an equally specific clause in the document. This point is made by Mr. Justice Anderson, whose reasons I have read in draft, and I agree with him that the point is established by the cases to which he refers.

**35**    I will return to this principle, on the facts of this case, in Part VII of these reasons.

VI

Is there a Contradiction between the Oral Representation and the Signed Document?

**36**    I propose to set out the oral representation and clause 23. If the oral representation is to have effect at all, it can be stated in this way:

> Allstate warrants that weeds will not be a cause of loss; the buckwheat will grow up and smother the weeds.

Clause 23 reads:

> 23.    Allstate gives no warranty as to the productiveness or any other matter pertaining to the seed sold to the producer and will not in any way be responsible for the crop.

In my opinion, the oral warranty and the printed document do not contradict each other. Taking clause 23 without regard to the oral warranty, and having regard to the fact that the clause does not exclude all warranties, I think that the proper interpretation of clause 23, in its context, is that all warranties pertaining to the seed are excluded, and that Allstate is not responsible for the yield. In the context, I think that the word "crop" means "yield".

**37**    But even if I am wrong, and clause 23, if it stood alone, would bear the meaning that Allstate was not to be liable for anything that prevented the production and harvesting of a buckwheat crop grown from the seed, I think it is proper to interpret clause 23 in its relationship with the oral representation that was made in this case, because it is in the light of that representation that the parties would have interpreted clause 23 when they read it over before signing the document. If that approach to interpretation is the correct one, then the oral representation and clause 23 must be interpreted harmoniously, if that can be done without depriving clause 23 of a natural and sensible meaning. Under that interpretation, Allstate would not be responsible for matters relating to the seed, for the yield, or for matters that might affect the production of the buckwheat arising from soil

conditions or from farming methods and practices, but Allstate would assume any risk that the crop would be destroyed by weeds. There is no reason why the usual rule that an harmonious construction should be preferred to a contradictory construction should not apply.

**38**   But, of course, the rationale of the harmonious construction rule is that the parties can not have intended to agree to inconsistent obligations. So the rule only applies where both obligations have contractual force. And that depends on whether the oral representation was a warranty. But the question of whether it was a warranty or a bare representation is a question of fact, determined by the objective evidence of whether it was intended to have contractual force. So the interpretation of the representation and the document, on the one hand, and the question of whether the representation is a warranty, on the other hand, are bound together and should be answered together.

VII

Conclusion

**39**   The trial judge said:

> It is clear on the law that the exclusionary clause in the contract will not avail the defendant, Allstate, if such a warranty is made out on the evidence. Is it so made out?

For the reasons I have set out in Parts V and VI, I think that it is a considerable oversimplification of the law to say that an exclusionary clause will not avail the defendant if a collateral warranty is made out on the evidence. Sometimes it will, sometimes it won't; the court must strive to reach the true contractual intention of the parties, guided, in the case of contradiction, by the strong presumption in favour of the document.

**40**   But even if the trial judge oversimplified the law, he considered the right question on the evidence, namely: Is a warranty made out as a matter of fact? I do not think that he misdirected himself on the principles to be applied in answering that question of fact. It involved a nice question of judgment and an assessment of the testimony and demeanour of the witnesses. Mr. Justice Paris concluded that Mr. Nunweiler's statement regarding weed control constituted a warranty. There is ample evidence to support that conclusion, much of it referred to by Mr. Justice Paris in his reasons. I do not think that it is open to me to consider that matter afresh, or, if I were to reach a different conclusion on the facts than Mr. Justice Paris, to substitute my view of the facts for his.

**41**   Once it has been decided that the oral representation was a warranty, then, in my opinion,

> (a)   evidence accepted on the basis that there would be a subsequent ruling on admissibility, becomes admissible;
> (b)   the oral warranty and the document must be interpreted together, and, if possible, harmoniously, to attach the correct contractual effect to each;

> (c)  if no contradiction becomes apparent in following that process, then the principle in Hawrish, Bauer and Carman has no application; and
>
> (d)  if there is a contradiction, then the principle in Hawrish, Bauer and Carman is that there is a strong presumption in favour of the written document, but the rule is not absolute, and if on the evidence it is clear that the oral warranty was intended to prevail, it will prevail.

**42**   Since, in my opinion, there is no contradiction in this case between the specific oral warranty and the signed standard form Buckwheat Marketing Agreement, 1980, I have concluded that the warranty has contractual effect and that the defendant, Allstate Grain Co. Ltd., is liable to the plaintiffs for breach of that warranty.

**43**   But if it were correct, in this case, to conclude that the oral representation and the Buckwheat Marketing Agreement, 1980 contradicted each other, then, on the basis of the facts found by the trial judge and his conclusion that the oral representation was intended to affect the contractual relationship of the parties, as a warranty, I would have concluded that, in spite of the strong presumption in favour of the document, the oral warranty should prevail.

**44**   I would dismiss the appeal.

LAMBERT J.A.

**45**   SEATON J.A.:-- The facts are set out in detail in Mr. Justice Lambert's opinion.

**46**   In March 1980 the plaintiffs considered the possibility of growing buckwheat. Allstate had been advertising. It was interested in selling the seed and buying the crop. Its profit lay in reselling crops. The plaintiffs went to Allstate where many things were discussed, including planting procedures, yield, details of growth, and so forth. Weed control was also discussed. Mr. Nunweiler, Allstate's manager, said that the buckwheat would grow quickly and smother weeds. Mr. Nunweiler disclosed that his experience with buckwheat growing was limited to one crop. It failed. The Guichons, on the other hand, had been farming for many years in the area in which it was intended to plant this crop. In May the plaintiffs decided to go ahead. A contract was entered into and a crop planted. The weeds smothered the buckwheat.

**47**   The trial judge said that the statement about weeds was an oral warranty and held Allstate liable. Mr. Nunweiler and the other employee who had made statements, were held not liable. Allstate appeals.

**48**   The evidence makes clear that this is not the case of a salesman making reckless statements to outwit a dull customer. The defendant Nunweiler passed on the best information that was available to him. The plaintiffs described themselves in their statement of claim as businessmen, and they appear to be accurate in so doing.

**49**   This is not the case of a contract being shoved across a counter with a curt, "sign here". Mr. Jack Guichon examined the contract at home and filled out part of it. That appears not to have happened until May. The cases of want of knowledge by the signer of a printed form are inapplicable.

**50**   The provision in the written contract that Allstate "will not in any way be responsible for the crop" is neither unreasonable nor unconscionable. It cannot be construed to permit a warranty that the crop would not be lost to weeds. I agree with the trial judge that the oral and the written cannot stand together; the words used simply will not permit it. There is no basis for saying that weed growth is an exception that the contract will permit and there is no reason to put the weed statement on a different level than the other statements made at the March meeting.

**51**   The oral term cannot be found to be a condition precedent. Nor can it be said to be a misrepresentation of the nature or effect of the contract.

**52**   It is difficult to know what bargain would have been arrived at had the plaintiffs been unwilling to accept the risk of crop failure, that is, if they had said to Allstate that the statements made at the March meeting about planting procedures, yield, return, details of growth and weed control were part of the contract. It may be that there would have been agreement to share the risk, to share both the losses and the profits. That question was not discussed and the bargain that was entered into assigned the risk in clear language to the plaintiffs. Nothing could be clearer than:

> "Allstate ... will not in any way be responsible for the crop."

It does not appear that the trial judge put his mind to the issues that arise when a party seeks to prove an oral provision that is contrary to the written contract. He said:

> "The Court: (Oral) The plaintiffs claim for damages for breach of a collateral warranty given to them by representatives of the defendant Allstate inducing them to enter into a production contract relating to buckwheat, which crop was, according to the plaintiffs, destroyed by weeds.
>
> It is clear on the law that the exclusionary clause in the contract will not avail the defendant, Allstate, if such a warranty is made out on the evidence. Is it so made out? I have no good reason to disbelieve the evidence of the plaintiffs as to the essential elements of the conversation between themselves and Nunweiler on their visit to the Allstate office. All three of them are most emphatic and clear as to what was said by Nunweiler on the subject of weed control. Nunweiler, although maintaining that he would not have said the things attributed to him by the plaintiffs, admits that his recollection of details of the conversation is vague and in fact he does not remember too much about the meeting at all. That is perfectly understandable because he had much less reason at the time to make a

note mentally of the details of their discussion than did the plaintiffs.

The plaintiffs went there to explore the feasibility of embarking upon a new venture. They wanted information about all those things that would be of interest to a farmer thinking of planting a new crop: planting procedures, yield, return and details of growth. I am sure that one of the matters they discussed was the subject of weed control. I am equally sure that their version of what was said by Nunweiler about that is essentially correct, namely, that there was no need to be concerned about weeds because the buckwheat, being a broad-leafed plant, would grow and cover like an umbrella and, therefore, smother any weeds.

This aspect of the conversation may, in retrospect be ascribed by the plaintiffs an importance somewhat larger than it had at the time of the conversation, since it was only one of many things discussed. But that too is perfectly understandable in view of what subsequently happened. The fact remains that the matter was of concern to them at the time, they directed their minds to it and made inquiries of the company regarding it. They would not have entered into the contract without having received assurances regarding it and they did receive those assurances. And Nunweiler would be perfectly aware of their concerns when he gave those assurances. That being so, his statements regarding weed control constituted a warranty, the breach of which gives a right to the plaintiffs to recover damages.

......

On the basis of the evidence in this case it simply does not seem possible at present to grow buckwheat early in the year in Ladner.

The defendant company, Allstate, is therefore liable for breach of warranty to the plaintiffs.

**53**    The trial judge appears not to have considered whether the parties intended that the oral assurances have contractual effect. Clearly Nunweiler had no such intention. The evidence does not support the suggestion that the plaintiffs did. Mr. J.F. Guichon, the most experienced of them, said that there were neither guarantees nor promises. Their later conduct does not suggest that the plaintiffs' views changed. They did not ask that the written contract be changed to reflect a warranty regarding weeds. They did not ask that the express provision that Allstate "will not in any way be responsible for the crop" be changed.

**54**    A statement in Anson's Law of Contracts (25th ed) at p. 126 was adopted by the Supreme Court of Canada in Carman Construction Ltd. v. CPR [1982] 1 S.C.R. 958; 136 D.L.R. (3d) 193. It shows that an oral warranty must be strictly proved, and that the existence of an intention to contract on the part of all parties must be clearly shown. This test is set out:

> "The question therefore is: On the totality of evidence, must the person making the statement be taken to have warranted its accuracy, i.e. promised to make it good?"

The evidence in this case falls far short of the test propounded there.

**55**    The trial judge did not consider whether the statements respecting weeds were mere words of expectation or estimate. Because he found that there was not negligence, such words would not be actionable. Nor does he appear to have considered the difference between contractual terms and mere representations. The absence of negligence makes the distinction important.

**56**    Halsbury, 4th Edition, Volume 9, paragraph 347 suggests six factors that have been taken into account in determining whether a statement would amount to a contractual term rather than a mere representation. The six factors are:

> "(1)    If only a brief period of time elapses between the making of the statement and the formation of the contract, the court may be disposed to hold that the statement is a term of the contract.
>
> (2)    Where the party to whom the statement is made makes it clear that he regards the matter as so important the he would not contract without the assurance being given, that is evidence of an intention of the parties that the statement is to be a term of the contract.
>
> (3)    Where the party making the statement is stating a fact which is or should be within his own knowledge and of which the other party is ignorant, that is evidence that the statement is intended to be a term of the contract.
>
> (4)    Where, subsequent to negotiations, the parties enter into a written contract and that contract does not contain the statement in question, that may point towards the statement being a mere representation, though there have been cases where it has been found that such a preliminary statement constitutes a collateral contract.
>
> (5)    Where the party making the statement suggests an independent survey or opinion that may show that no warranty was intended.
>
> (6)    It has been said that the maker of a statement can rebut an inference of warranty if he can show that he is innocent of fault in making it, and that it would not be reasonable in the circumstances to hold him bound by it."

In not a single one of those factors do we find support for elevating the defendant Nunweiler's statement into a contractual term. Every one of the factors when applied to the fact of this case

points away from a finding of a contractual term.

**57**   If I were free to do as I choose I would not give any encouragement to the Parol Evidence Rule as an admissibility rule. I am not attracted to deciding a point by refusing to hear evidence on an aspect of it. I am not free to choose, and the rule does not seem to need my support. I would favour retention of a respect for the written contract that makes it difficult to persuade the court that a term not recorded was intended to be part of the bargain.

**58**   I do not see how people can safely act through an agent or take an assignment of a contract if written documents are not treated with some respect. Lawyers can not give useful advice to people considering whether to contract if the written part is of little importance. Certainty, though no longer the only aim, remains an important aim in contract law.

**59**   Take this case. These plaintiffs did not make the claim that the defendants were responsible for weeds until Allstate had claimed in small debts court for the cost of the seed. The parties did not know the extent of their bargain until the trial judge ruled on it. They still don't. In the March discussions the defendant Nunweiler talked about yield, return, details of growth and other things. There is nothing to distinguish what he said about weed control from his other statements. Was Allstate responsible for all those things? The parties do not know what their bargain is. If the trial judge is right nothing is to be gained by looking at what they wrote down, what they called their contract.

**60**   I do not get much help from most of the recent English decisions. They are influenced by the legislation resulting from the reports of the Law Commission. We have only the amendment of 1974 in respect of consumer transactions.

**61**   Nor have I found academic writings to be of great help. Most question the recent decisions of the Supreme Court of Canada. While I might, on occasion, harbour the view that the Supreme Court of Canada has made a mistake it would be inappropriate for me to express the view, and wrong for me to be influenced by the view.

**62**   I think that this case falls to be decided on the law established in the Supreme Court of Canada most recently in Hawrish v. The Bank of Montreal [1969] S.C.R. 515; Bauer v. The Bank of Montreal [1980], 2 S.C.R. 102, 33 C.B.R. (N.S.) 291, 32 N.R. 191, (S.C.C.); Carman Construction Limited v. CPR (supra). Except to the extent that they have been overruled I would also follow the decisions of this Court.

**63**   Beaufort Realties (1964) Inc. v. Chomedey Aluminum Co. Ltd. [1980] 2 S.C.R. 718 is of no help to the respondent. It decided that whether an exclusionary clause was applicable where there was a fundamental breach was to be determined according to the true construction of the contract. In our case there is no fundamental breach, and a true construction of the contract clearly fixes this loss on the plaintiffs. It is also questionable whether we are dealing with an exclusionary clause. The clause does not seem to fall within the divisions suggested in Coote, "Exception Clauses", 1966

at p. 9. Nor does it seem to fall within the description found in "Exclusion Clauses in Contracts" by Yates.

**64**   Grouse Nest Resorts v. First National Mortgage (1977) 2 B.C.L.R. 302, has not been overruled and is not inconsistent with later cases in the Supreme Court of Canada. We cannot brush the decision aside and I do not see a valid basis on which to distinguish it.

**65**   In Bauer v. The Bank of Montreal (1980) 2 S.C.R. 102, McIntyre J. spoke for the Court. After dealing with the argument that the nature of the contract was misrepresented he turned to the argument that there was an express oral condition and said this:

> "However, it seems clear to me that this evidence would go towards imposing a limit on the bank's rights with respect to the security given by the debtor. This would clearly contradict the terms of the guarantee which, as has been pointed out, gave the bank the right to abstain from registration and perfection of security. On this basis, it would be inadmissible under the parole evidence rule and any collateral agreement founded upon it could not stand. I can see no distinction between the case at bar and that of Hawrish v. Bank of Montreal where in almost identical circumstances, Judson J. speaking for this Court said at p. 520:

>> Bearing in mind these remarks to the effect that there must be a clear intention to create a binding agreement, I am not convinced that the evidence in this case indicates clearly the existence of such intention. Indeed, I am disposed to agree with what the Court of Appeal said on this point. However, this is not in issue in this appeal. My opinion is that the appellant's argument fails on the ground that the collateral agreement allowing for the discharge of the appellant cannot stand as it clearly contradicts the terms of the guarantee bond which state that it is a continuing guarantee.

>> The appellant has relied upon Byers v. McMillan. But upon my interpretation that the terms of the two contracts conflict, this case is really against him as it is there stated by Strong J. that a collateral agreement cannot be established where it is inconsistent with or contradicts the written agreement. To the same effect is the unanimous judgment of the High Court of Australia in Hoyt's Proprietary Ltd. v. Spencer, which rejected the argument that a collateral contract which contradicted the written agreement could stand with it. Knox C.J., said at p. 139:

> A distinct collateral agreement, whether oral or in writing, and whether prior to or contemporaneous with the main agreement, is valid and enforceable even though the main agreement be in writing, provided the two may consistently stand together so that the provisions of the main agreement remain in full force and effect notwithstanding the collateral agreement. This proposition is illustrated by the decision in Lindley v. Lacy [supra], Erskin v. Adeane [supra], De Lassalle v. Guildford, [1901] 2 K.B. 215, and other cases.

> Any such collateral oral agreement as contended for by the appellant therefore may not stand in the face of the written guarantee. It follows that an additional argument raised by the guarantor relating to a claim that the collateral contract had been fundamentally breached will not require to be dealt with."

**66**    In Carman Construction Limited v. CPR (supra) Martland, J. spoke for all nine members of the court in language that is applicable here. The decision has met with criticism (see for example E.G. Hayck Commentary in (1982-83)7 Can. Bus. L.J. 328), but that does not relieve me of the obligation to follow it. The evidence in that case of an employee's statement is not dissimilar to the evidence here. Martland J., said of that (at p. 967):

> In my opinion there is no evidence in the present case to establish an intention to warrant the accuracy of the statement made by the C.P.R. employee to Fielding, i.e., no promise to make it good.

Later he said (at p. 969):

> There is an additional ground for denying the existence of a collateral warranty. Such a warranty, if it existed, would contradict the express terms of the contract as contained in cl.3.1. This court has held in Hawrish v. Bank of Montreal, supra, that a collateral agreement cannot be established where it is inconsistent with or contradicts the written agreement.

**67**    I am of the view that the parol evidence, if admitted, falls short of showing the requisite contractual intention, cannot create a contractual term that is capable of standing with the written term, and cannot create a term that overwhelms the written term.

**68**    In the result I would allow this appeal.

SEATON J.A.

**69**    ANDERSON J.A.:-- I have had the advantage of reading the reasons for judgment of Lambert J.A. and while I agree with his reasons, I am desirous of setting out, in addition, my own reasons as

to why, in my opinion, the exemption clause in the case on appeal does not exclude or override the express warranty given by the defendants as to weed control. I would add that I do not place any reliance on the fact that the written contract was a "standard form" contract.

**70**    In my opinion, while the words "not responsible for the crop" would be in the abstract, without reference to the negotiations and assurances leading up to the execution of the written contract lead to the conclusion that all matters relating to the crop including the question of weed control were solely for the plaintiffs, as the clause in quest ion is an exemption or exclusionary clause, the words "not responsible for the crop" must be construed in the light of the express promise made by the defendants. The words "not responsible for the crop" are not, in my opinion, so clear and unequivocal as to exclude the assurances given in respect of weed control. In the light of all the circumstances, as a matter of construction, I have reached the conclusion that the defendants must have meant by the words "not responsible for the crop" that the plaintiffs were to be "responsible for the crop" in all aspects, except that the plaintiffs could rely on the express promise made by the defendants with respect to weed control.

**71**    The defendants rely in the main on two judgments of the Supreme Court of Canada, namely, Bauer v. The Bank of Montreal (1980) 2 S.C.R. 102 and Carman Construction Limited v. C.P.R. (1982) 136 D.L.R. (3d) 193. These cases are, in my opinion, of no assistance because, in the first place, they do not purport to deal with exemption or exclusionary clauses and, in the second place, in those cases the alleged oral representations were contrary to the clear and plain terms contained in the written contracts.

**72**    With respect to Bauer, McIntyre J. specifically held that the clause in question was not an exemption clause and was, therefore, not subject to any special rules of construction. He went on to conclude that the submission that the contract of guarantee was executed after a misrepresentation by the bank as to its effect was well founded in law but lacked any evidentiary foundation on which such an argument could succeed. He set out the law at page 110 as follows:

> The third argument involves the assertion that the execution of the guarantee was procured by misrepresentation of its full nature and effect by the bank or, alternatively, that there was a failure to explain its nature and effect. The misrepresentation alleged is that the bank manager told the guarantor that upon his paying the amount secured under the guarantee, the book debts would be reassigned to him. This representation was false for the reasons that it contradicted the bank's own document. It was contended that the guarantee would not have been executed in its absence. Various authorities were cited for the proposition that a contract induced by misrepresentation or by an oral representation, inconsistent with the form of the written contract, would not stand and could not bind the party to whom the representation had been made. These authorities included Canadian Indemnity Company v. Okanagan Main Line Real Estate Board et al. [1971] S.C.R. 493, per Judson J. at 500, Jacques v. Lloyd D.

George and Partners Limited [1968] 1 W.L.R. 625 (C.A.) per Lord Denning at
pp. 630-631, Firestone Tire and Rubber Company Limited v. Vokins and Co.
Ltd. [1951] 1 Lloyds L.R. 32 (K.B.D.), see Devlin J. at p. 39, and Mendelssohn
v. Norman Ltd. [1970] 1 Q.B. 177 (C.A.).

No quarrel can be made with the general proposition advanced on this
point by the appellant. To succeed, however, this argument must rest upon a
finding of some misrepresentation by the bank, innocent or not, or on some oral
representation inconsistent with the written document which caused a
misimpression in the guarantor's mind, or upon some omission on the part of the
bank manager to explain the contents of the document which induced the
guarantor to enter into the guarantee upon a misunderstanding as to its nature.
For reasons which will appear later in that part of this judgment dealing with the
collateral contract argument, I am of the view that there is no evidence which
would support any such finding against the bank. The cases referred to above
support the general proposition advanced but rest upon a factual basis providing
support for the argument. In each case there is a clear finding of a specific
misrepresentation which led to the formation of the contract in question, a
circumstance not to be found here. This argument must fail as well.

73    The cases cited with approval by McIntyre J. deal specifically with exemption or exclusionary
clauses and make it clear that the words contained in such clauses will be narrowly construed, so
that the written words purporting to exclude warranties will not, except in very clear cases, be
utilized to defeat an express promise or warranty.

74    I quote from several of the judgments approved by McIntyre J. in Bauer. In giving the
judgment of the Supreme Court of Canada in Canadian Indemnity Co. v. Okanagan Mainline Real
Estate Board (1971) S.C.R. 493, Judson J. at page 500 said in part:

Whillis-Harding, in getting the indemnity agreement from the Board was
acting as agent for Canadian Indemnity. After the policy had been issued and
delivered it misrepresented the reason for the request for the execution of the
application and it was this misrepresentation as to the contents of the document
that induced the Board to sign. A party who misrepresents, albeit innocently, the
contents or effect of a clause inserted by him into a contract cannot rely on the
clause in the face of his misrepresentation: Mendelssohn v. Norman Ltd. [1969]
3 W.L.R. 139, [1969] 2 All E.R. 1215, Curtis v. Chemical Cleaning & Dyeing
Co. [1951] 1 K.B. 805, Jacques v. Lloyd D. George & Partners Ltd. [1968] 2 All
E.R. 187.

75    See also judgment of Devlin J. in Firestone Tyre & Rubber Co. Ltd. v. Vokins and Co. Ltd.

[1951] 1 Lloyds L.R. 32 at page 39 as follows:

> One may test the point by considering the construction of the contract if the phrase about pilferage of goods were not there. The position then would be that the lightermen have said: "We will deliver your goods; we promise to deliver your goods at such and such a place, and in the condition in which we receive them; but we are not liable if they are lost or damaged from any cause whatsoever". That is not in law a contract at all. It is illusory to say: "We promise to do a thing, but we are not liable if we do not do it." If the matter rested there, there would be nothing in the contract. The words that are introduced about theft and pilferage must do one of two things. Either they must impose a liability to do something in respect of theft or pilferage, or they must modify the construction of the clause.

76    See also judgment of Lord Denning M.R. in Mendelssohn v. Normand Ltd. (1970) 1 Q.B. 177 at page 183 as follow:

> There are many cases in the books when a man has made, by word of mouth, a promise or a representation of fact, on which the other party acts by entering into the contract. In all such cases the man is not allowed to repudiate his representation by reference to a printed condition, see Couchman v. Hill [1974] K.B. 554; Curtis v. Chemical Cleaning and Dyeing Co. [1951] K.B. 805; and Harling v. Eddy [1951] 2 K.B. 739; nor is he allowed to go back on his promise by reliance on a written clause, see City and Westminster Properties (1934) Ltd. v. Mudd [1959] Ch. 129, 145 by Harman J. The reason is because the oral promise or representation has a decisive influence on the transaction -- it is the very thing which induces the other to contract -- and it would be most unjust to allow the maker to go back on it. The printed condition is rejected because it is repugnant to the express oral promise or representation. As Devlin J. said in Firestone Tyre and Rubber Co. Ltd. v. Vokins & Co. Ltd [1951] 1 Lloyd's Rep. 32, 39: "It is illusory to say: 'We promise to do a thing, but we are not liable if we do not do it'." To avoid this illusion, the law gives the oral promise priority over the printed clause.

77    It follows from the above that McIntyre J. would not have applied the parol evidence rule, as enunciated in Bauer, to exemption clauses.

78    In my opinion, the proper course to be followed in determining whether an exemption clause excludes an express warranty is to determine as a matter of construction, having regard to all circumstances including the warranty, whether the exemption clause was, in fact, intended by the parties to exclude the express warranty.

79    In Beauford Realties Inc. v. Chomedy Aluminum Co. (1980) 116 D.L.R. (3d) 193, Ritchie J.

speaking for the Court of which McIntyre J. was a member, reviewed and approved the judgments of the House of Lords in Suisse Atlantique Societe d'Armement Maritime S.A. v. Rotterdamsche Kolen Centrale (1967) A.C. 361 and Photo Production Ltd. v. Securicor Transport Ltd. (1980) 1 ALL E.R. 556 and following those cases held that "the true construction of the contract is the governing consideration in determining whether or not an exclusionary clause remains unaffected and enforceable notwithstanding the fundamental breach."

**80**    It also follows from the Beaufort case that exemption clauses will be very narrowly construed and that unless such clauses are worded so as to clearly exclude the express warranty, they will not be effective. In the Beaufort case the headnote reads as follows:

> Where there is a fundamental breach of contract by a party in whose favour is drawn an exclusionary clause, the effect of the clause depends not on any rule of law but on the true construction of the contract. Where under a building contract a subcontractor agrees to waive his rights to a mechanics' lien, and the head contractor is in fundamental breach of contract by refusing to make payments as they fell due and the subcontractor elects to terminate the contract, the true construction of the contract is that the lien waiver ceases to bind the subcontractor.

**81**    It will be seen that even though the "waiver of lien" clause appeared to clearly preclude the subcontractor from filing a lien, that as a matter of construction, the failure by the head contractor to make payments on the contract, being a fundamental breach, had the effect of making the waiver clause inapplicable.

**82**    I close by quoting from the judgment of Viscount Dilhorne in the Suisse Atlantique case (supra) at page 392 as follows:

> "... there are judicial observation to the effect that exempting clauses, no matter how widely they are drawn, only avail a party when he is carrying out the contract in its essential respects. In my view, it is not right to say that the law prohibits and nullifies a clause exempting or limiting liability for a fundamental breach or breach of a fundamental term. Such a rule of law would involve a restriction on freedom of contract and in the older cases I can find no trace of it."

> "In each case not only have the terms and scope of the exempting clause to be considered but also the contract as a whole. In the cases I have cited above, I think that, on construction of the contract as a whole, it is apparent that the exempting clauses were not intended to give exemption from the consequences of the fundamental breach. Any provision that does so much be expressed in clear and unambiguous terms ..."

(underlining mine)

**83**    As I have already said, the wording of the exemption clause in the case on appeal is not, as a matter of construction, so clear and unambiguous as to exclude the oral warranty given by the defendants as to weed control.

**84**    For the above reasons I would dismiss the appeal.

ANDERSON J.A.

*Indexed as:*
## Allstate Grain Co. v. Guichon

### Allstate Grain Co. Ltd.
v.
### Jack Guichon, Peter Guichon and Dave Gallen, carrying on business under the firm name and style of Felix Farms and the said Felix Farms

[1984] S.C.C.A. No. 171

Also reported at:56 N.R. 233

File No.: 18827

Supreme Court of Canada

Record created: June 18, 1984.

**Appeal From:**

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

**Status:**

Application for leave to appeal is dismissed with costs (without reasons) June 18, 1984.

**Catchwords:**

*Contracts -- Parol Evidence Rule -- Whether the Parol Evidence Rule is merely a presumption which can be rebutted by an oral warranty that contradicts the terms of a written document.*

**Counsel:**

D.C. Prowse, for the motion.

G. Brian Longpré, contra.

**Chronology:**

1.    Application for leave to appeal:

> HEARD: June 18, 1984. S.C.C. Bulletin, 1984, p. 728. DISMISSED WITH
> COSTS: June 18, 1984 (without reasons). S.C.C. Bulletin, 1984, p. 728.
> Before: Ritchie, Beetz and McIntyre JJ.

**Procedural History:**

Judgment  at first instance: Judgment for respondents after
trial.
Paris J., October 4, 1982.


Judgment  on Appeal: Appeal dismissed.
Seaton, Lambert and Anderson JJ.A., May 9, 1984.



*Indexed as:*
## Cunningham v. Hamilton

**Between**
**Scott A. Cunningham, Doug Silverberg and Sheila Pasukonis,**
**Executrix and Trustee under the Last Will and Testament of**
**Pasukonis, Benedict, deceased, plaintiffs (respondents), and**
**Frederic C. Hamilton, Hamilton Brothers Petroleum Corporation,**
**Hamilton Brothers Oil & Gas Corporation, Hamilton Brothers Oil**
**Company, Hamilton Oil Corporation and BHP Holdings (USA) Inc.,**
**defendants (appellants), and**
**The Estate of Ferris F. Hamilton, Johnie M. Ouzts, Ulf G.**
**Linden, Hamilton Brothers Exploration Company, AB Volvo, Volvo**
**North America Corporation, The Broken Hill Proprietary Company**
**Limited and BHP Petroleum (Canada) Inc., defendants**
**And between**
**Scott A. Cunningham, Doug Silverberg and Sheila Pasukonis,**
**Executrix and Trustee under the Last Will and Testament of**
**Benedict Pasukonis, deceased, appellants (plaintiffs), and**
**The Broken Hill Proprietary Company Limited, respondents**
**(defendants), and**
**Frederic C. Hamilton, the Estate of Ferris F. Hamilton, Johnie**
**M. Ouzts, Olf G. Linden, Hamilton Brothers Exploration**
**Company, Hamilton Brothers Petroleum Corporation, Hamilton**
**Brothers Oil & Gas Corporation, Hamilton Oil Corporation, BHP**
**Holdings (USA) Inc., BHP Petroleum (Canada) Inc., AB Volvo,**
**Volvo North America Corporation and Ulf G. Lindent, defendants**
**And between**
**Scott A. Cunningham, Doug Silverberg and Sheila Pasukonis,**
**Executrix and Trustee under the Last Will and Testament of**
**Benedict Pasukonis, deceased, appellants (plaintiffs), and**
**AB Volvo, Volvo North America Corporation and Ulf G. Linden,**
**respondents (defendants), and**
**Frederic C. Hamilton, the Estate of Ferris F. Hamilton, Johnie**
**M. Ouzts, Hamilton Brothers Exploration Company, Hamilton**
**Brothers Petroleum Corporation, Hamilton Brothers Oil & Gas**
**Corporation, Hamilton Brothers Oil Company, Hamilton Oil**
**Corporation, The Broken Hill Proprietary Company Limited, BHP**

**Holdings (USA) Inc. and BHP Petroleum (Canada) Inc.,
defendants**

[1995] A.J. No. 476

29 Alta. L.R. (3d) 380

169 A.R. 132

55 A.C.W.S. (3d) 74

Appeal Nos. 15705, 15707 and 15708

Alberta Court of Appeal
Calgary Civil Sittings

**Fraser C.J.A., Bracco and O'Leary JJ.A.**

Heard: April 10 and 11, 1995.
Oral judgment: April 11, 1995.

(11 pp.)

On appeal from McBain J.

**Statutes, Regulations and Rules Cited:**

Alberta Rules of Court, Rules 30(h), 30(j), 31.

*Practice -- Service -- Service of notice, writ or statement of claim out of jurisdiction -- Requirement of necessary or proper party -- Requirement of good cause of action against named defendant -- Grounds for setting aside an order for service ex juris.*

Appeal from the order of a chambers judge striking an order for service ex juris against the respondents, BHP and VLV. The plaintiff-appellants' action for the economic loss they suffered was as a result of the devaluation of the shares of HOC Ltd. allegedly orchestrated by the defendants named in the action. BHP was the American parent of a Canadian company, XYP Inc., which had been involved in a merger with HOC Ltd. It was not the subject of any allegations of unfair or improper activity of any kind. The sole basis of the appellants' arguments consisted of the proposition that XYP was, at the time of the merger, the alter ego of BHP or vice versa. Accordingly, the appellants contended that the corporate veil should be lifted and that the court should treat BHP as the true successor of HOC Ltd. With respect to the VLV respondents, the

appellants argued that the chambers judge should have permitted service ex juris on the premise that the action against them was founded on a tort, namely, fraudulent or negligent misrepresentation, committed in Alberta.

HELD: Appeal allowed in part. The order striking service against BHP was upheld. The order striking service on the VLV respondents was set aside. The fact that BHP operated a number of its worldwide companies as an integrated economic unit could not justify the lifting of the corporate veil. With respect to the VLV respondents, the affidavit and other evidence adduced was sufficient to raise a "good arguable case" which was all that was required to provide sufficient basis for an order for service ex juris. The law did not require the appellants to establish a winning case as a condition precedent to securing an order for service ex juris.

**Counsel:**

W.E. Code, Q.C., and T.N. Cotter, for the plaintiffs (respondents) and for appellants (plaintiffs).
D.J. McDonald, Q.C., and B.R. Carbert, for the defendants (appellants).
M.H. Dale and K. Armstrong, for the respondents (defendants).

---

## MEMORANDUM OF JUDGMENT
## DELIVERED FROM THE BENCH

Reasons for judgment were delivered by Fraser C.J.A., concurred in by Bracco J.A. Dissenting reasons were delivered by O'Leary J.A.

**1**   FRASER C.J.A. (for the majority):-- This has been a two day Special Hearing. We have been asked to consider this matter on an urgent basis because of a looming limitation deadline. We have acceded to the request and give these brief reasons in compliance with the urgency pressed upon us.

**2**   This Court is divided in its view of this case. I have been asked to deliver the reasons on behalf of the majority of the Court and Mr. Justice O'Leary will deliver his dissenting reasons.

**3**   We agree that the appeal by the appellants, Scott A. Cunningham, Doug Silverberg and Sheila Pasukonis, Executrix and Trustee of the Estate of Benedict Pasukonis (Pasukonis) against the chamber judge's decision to strike the order for service ex juris against The Broken Hill Proprietary Company Limited (Broken Hill) must be dismissed. This parent corporation of BHP Holdings (USA) Inc. (BHP) is not the subject of any allegations of unfair or improper activity of any kind and in particular, the appellants do not allege any conspiracy or misrepresentation -- whether fraudulent or negligent -- involving Broken Hill. The sole basis of the appellants' arguments rests on the proposition the BHP was, at the time of the merger between it and Hamilton Oil Corporation

(HOC), the alter ego of Broken Hill or vice versa. Hence, contends the appellants, the corporate veil should be lifted and the Court should treat Broken Hill as the true successor corporation to HOC.

4    We do not agree. It is true that Broken Hill operates a number of its worldwide companies as an integrated economic unit. But the mere fact it does so does not mean that for legal purposes, separate legal entities will be ignored absent some compelling reason for lifting the corporate veil. As noted in Adams v. Cape Industries PLC [1990] 1 Ch. 438 (C.A.) 536, citing Goff, L.J. in Bank of Tokyo Ltd. v. Karoon, (Note) [1987] A.C. 45:

> [Counsel] suggested ... that it would be technical for us to distinguish between parent and subsidiary company in this context; economically, be said, they were one. But we are concerned not with economics but with law. The distinction between the two is, in law, fundamental and cannot here be bridged. [At 538]

> Therefore, this ground of appeal must fail.

5    The appellants argument that the chambers judge wrongly struck the order for service ex juris as it relates to AB Volvo, Volvo North American Corporation and Ulf G. Linden (the Volvo defendants). They argue that service should have been permitted under Rule 30(h) on the basis that their action is founded on a tort committed within Alberta -- that is, the fraudulent or negligent misrepresentation by the Volvo defendants. Alternatively, they argue that under Rule 30(j), the Volvo defendants are necessary or proper parties to the action against Hamilton Brothers Exploration Company (Ex Co) on the basis that the Ex Co claims and the Volvo claims are inextricably linked.

6    We do not need to address whether a non-resident who leads no evidence that he or she has been the victim of a tort in Alberta can come to this jurisdiction and join in an action launched by an Alberta resident based on a tortious claim in Alberta. That is because we are satisfied in any event, that the Volvo defendants are both necessary and proper parties in the action against Ex Co. Here, the appellants assert that they have been the victims of a conspiracy to devalue the common shares owned by them in HOC. The shares were the subject of the Volvo Group Tender Offer in 1984. We are satisfied that the affidavit evidence and the other evidence adduced is sufficient to raise what the relevant authorities describe as permitting an order for service ex juris, that is a "good arguable case". The law does not require that the appellants establish a winning case as a condition precedent to securing an order for service ex juris. As noted in Nova v. Grove, only prima facie evidence is needed and the standard of proof is lax at this stage. See also Paterson v. Hamilton (1991), 79 Alta. L.R. (2d) 111 (C.A.).

7    We have reached this conclusion because we are satisfied that the evidence before us raises an allegation of a conspiracy between the Volvo defendants and the Hamilton defendants (Frederic C. Hamilton, the Estate of Ferris F. Hamilton, Hamilton Brothers Petroleum Corporation, Hamilton Brothers Oil and Gas Corporation, Hamilton Brothers Oil company and HOC) to devalue the shares

of HOC. In support of this claim the appellants point to a number of pieces of evidence including the Eliassen litigation in U.S., Ulf Linden's testimony, the evidence of Mr. Miller and the Volvo Group Tender Offer along with their affidavit evidence. We are not required to weigh this evidence. But we have concluded that if proved, it would serve as a sufficient foundational basis for the alleged causes of action.

**8**    In these circumstances, it is not necessary that every one of the parties separately swear an affidavit or separately adduce other evidence to this effect. Certainly, Silverberg has expressly done so. With respect to Cunningham, it is asserted that he did not, as required by Rule 31, expressly swear that he had a reasonable cause of action against either the Hamilton defendants or the Volvo defendants. But inferentially, he did do so by setting out the claims he was relying on and the factual context of both the Ex Co claim and the Volvo claim. With respect to Pasukonis, the share registry discloses an Alberta address. We see no basis for excluding Pasukonis as a plaintiff in these actions.

**9**    We also note that in response to the Court's query whether we should be considering the forum conveniens test in exercising our discretion whether to allow service ex juris on the Volvo defendants and the Hamilton defendants, all counsel indicated that they had agreed that this matter would be dealt with separately.

**10**    It follows from what we have said that we dismiss the Hamilton defendants' appeal against the order allowing service ex juris upon them. Nor, for the reasons explained, should the claims against them be limited to the Ex Co claim only.

**11**    Therefore, in summary, we dismiss the appellants' appeal vis à vis Broken Hill. We allow the appellants' appeal vis à vis the Volvo defendants and we dismiss the appeal by the Hamilton defendants.

FRASER C.J.A.

**12**    O'LEARY J.A. (dissenting in part):-- I regret that I cannot agree with my colleagues on the disposition of one aspect of these appeals.

**13**    I agree that the learned chambers Judge was correct in setting aside the order for service ex juris with respect to the defendant Broken Hill Ppy. Ltd. The plaintiffs' appeal from that order must be dismissed.

**14**    I also agree that the appeal of the Hamilton defendants must be dismissed. The learned chambers Judge refused to set aside the Master's order permitting service ex juris on the Hamilton defendants who are outside the jurisdiction. One is a corporation registered in the Province of Alberta and served here. The other Hamilton defendants are arguably necessary or proper parties to the claims made by the Plaintiff Cunningham against the corporation.

**15**    My disagreement is with respect to the plaintiffs' appeal from the order of the learned chamber's Judge setting aside the Order for service ex juris in respect of the Volvo defendants. I would dismiss the plaintiffs' appeal from that Order.

**16**    The plaintiffs Silverberg and the Pasukonis Estate rely on Rule 30(h). They allege that the Volvo defendants made either negligent or fraudulent misrepresentations to them within the jurisdiction. In my view, the evidence is insufficient to show a good arguable case that there was any misrepresentation. It is alleged that the 1984 Volvo Tender offer misrepresented the value of certain assets underlying the shares it offered to purchase, including shares then owned by Silverberg, the late Benedict Pasukonis and Cunningham.

**17**    My opinion that the evidence falls short of establishing a good arguable case that a tort was committed in the jurisdiction by the Volvo defendants makes it unnecessary to go further. The result is that none of the plaintiffs is entitled to serve the Volvo defendants ex juris.

**18**    Had I found that the evidence disclosed a good arguable case that the Volvo defendants committed either negligent or fraudulent misrepresentation against either or both of Silverberg or Pasukonis within Alberta, I would not have been able to find that Cunningham is a necessary or proper party to the action by Silverberg and the Pasukonis Estate against the Volvo defendants. Cunningham resides in Colorado. No representations are alleged to have been made to him in the Province of Alberta. He has no connection with the other plaintiffs, except that all owned shares which were sold in 1984 pursuant to the Volvo Tender offer. To hold that Cunningham is a necessary or proper party to the tort claims of Silverberg and the Pasukonis Estate would permit every person to whom the offer was made to join this action as a plaintiff regardless of where the tort was committed and the claimants reside. In my view, Cunningham's claim against the Volvo defendants must stand on its own. Cunningham cannot be characterized as a necessary or proper party to the claims of the other plaintiffs.

**19**    Further, Cunningham has not shown that his claim against the Volvo defendants is so connected to his claim against the Hamilton defendants that the two should be joined. They allege two separate torts on two separate occasions. Cunningham's claims against the Hamilton defendants and the Volvo defendants have some common elements. In each he alleges that the same properties were undervalued. There are some common defendants to each of the claims. Cunningham's allegation that the Volvo Tender Offer was staged or contrived by the Volvo defendants to benefit the Hamilton defendants in respect of litigation then pending against the latter is, in my view, far-fetched. There is no evidence beyond pure speculation and conjecture that there was an underlying and continuing conspiracy involving the Hamilton defendants and the Volvo defendants.

**20**    I would dismiss the plaintiffs' appeal with respect to service ex juris on the Volvo defendants.

O'LEARY J.A.

qp/s/mjb/DRS/DRS



2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

⊳🗲🗋

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

Meditrust Healthcare Inc. v. Shoppers Drug Mart

MEDITRUST HEALTHCARE INC. (Plaintiff / Appellant) and SHOPPERS DRUG MART, a Division of IMASCO RETAIL INC., SHOPPERS DRUG MART LIMITED, DAVID BLOOM, ARTHUR KONVISER, LAWRENCE ROSEN, THE SOCIETY FOR CONCERNED PHARMACISTS, GLORIA ANDERSON, CAROLINE BEDARD SMITH, THE METROPOLITAN TORONTO PHARMACISTS' ASSOCIATION, RUTH MALLON, SAM HIRSCH, CANADIAN PHARMACEUTICAL ASSOCIATION, LEROY FEVANG, ONTARIO PHARMACISTS' ASSOCIATION and CANADIAN ASSOCIATION OF CHAIN DRUG STORES (Defendants / Respondents)

Ontario Court of Appeal

Carthy, Weiler, Laskin JJ.A.

Heard: January 11, 14, 2002
Judgment: October 18, 2002
Docket: CA C36688

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: reversing in part (2001), 15 B.L.R. (3d) 221 (Ont. S.C.J.)

Counsel: *Ronald D. Manes, David M. Golden, Duncan N. Embury*, for Appellant

*Mark A. Gelowitz*, for Respondent, Shoppers Drug Mart

*Ed Morgan*, for Respondent, Lawrence Rosen

*Rochelle Fox*, for Respondent, Sam Hirsch

*Cheryl M. Woodin*, for Respondent, Canadian Pharmaceutical Association

Subject: Torts; Corporate and Commercial; Civil Practice and Procedure

Conspiracy --- Nature and elements of tort — Damage

Plaintiff company owned shares of subsidiaries and licensee which carried on national mail-order pharmacy business — Plaintiff alleged that defendants conspired to destroy business and brought action for damages resulting from losses suffered due to alleged actions of defendants — Defendants brought motion for summary judgment dismissing part of action — Motion granted — Motions judge found that as shareholder of subsidiaries and licensee, plaintiff could not assert cause of action for wrong done to subsidiaries and licensee — Motions judge found that injuries suffered by

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

plaintiff as shareholder were derivative — Plaintiff appealed — Appeal allowed in part — Plaintiff's claim for damages for loss of goodwill permitted to go to trial — Shareholder may suffer personal damages for loss of goodwill that are not derivative of harm to company — Plaintiff was known publicly as corporate face of mail-order pharmacy business it owned and damage to that reputation would be damage to plaintiff personally, not to its subsidiaries — Plaintiff put forward cogent evidence that defendants embarked on campaign to destroy it and its national mail-order business and it was almost axiomatic that plaintiff would suffer loss of goodwill from defendants' alleged wrongful acts.

Corporations --- Nature of corporation — Distinct existence — From owner — General

Plaintiff company owned shares of subsidiaries and licensee which carried on national mail-order pharmacy business — Plaintiff alleged that defendants conspired to destroy business and brought action for damages resulting from losses suffered due to alleged actions of defendants — Defendants brought motion for summary judgment dismissing part of action — Motion granted — Motions judge found that injuries suffered by plaintiff as shareholder were derivative — Motions judge found that as shareholder of subsidiaries and licensee, plaintiff could not assert cause of action for wrong done to subsidiaries and licensee — Plaintiff appealed — Appeal allowed in part — Plaintiff's claim for damages for loss of goodwill permitted to go to trial — Shareholder may suffer personal damages for loss of goodwill that are not derivative of harm to company — Plaintiff was known publicly as corporate face of mail-order pharmacy business it owned and damage to that reputation would be damage to plaintiff personally, not to its subsidiaries — Plaintiff put forward cogent evidence that defendants embarked on campaign to destroy it and its national mail-order business and it was almost axiomatic that plaintiff would suffer loss of goodwill from defendants' alleged wrongful acts.

## Cases considered by *Laskin J.A.*:

*Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.*, [1983] 1 S.C.R. 452, 145 D.L.R. (3d) 385, 47 N.R. 191, [1983] 6 W.W.R. 385, 21 B.L.R. 254, 24 C.C.L.T. 111, 72 C.P.R. (2d) 1, 1983 CarswellBC 734, 1983 CarswellBC 812 (S.C.C.) — followed

*DiFlorio v. Con Structural Steel Ltd.*, 2000 CarswellOnt 316, 6 B.L.R. (3d) 253 (Ont. S.C.J.) — referred to

*Foss v. Harbottle* (1843), 67 E.R. 189, 2 Hare 461 (Eng. V.-C.) — followed

*Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, 1999 CarswellOnt 3171, 1999 CarswellOnt 3172, 178 D.L.R. (4th) 1, 247 N.R. 97, [2000] I.L.R. I-3741, 126 O.A.C. 1, 49 B.L.R. (2d) 68, 15 C.C.L.I. (3d) 1, 39 C.P.C. (4th) 100 (S.C.C.) — referred to

*Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, 1997 CarswellMan 198, 211 N.R. 352, 115 Man. R. (2d) 241, 139 W.A.C. 241, (sub nom. *Hercules Managements Ltd. v. Ernst & Young*) 146 D.L.R. (4th) 577, 35 C.C.L.T. (2d) 115, 31 B.L.R. (2d) 147, [1997] 8 W.W.R. 80, 1997 CarswellMan 199 (S.C.C.) — considered

*Hi-Tech Group Inc. v. Sears Canada Inc.*, 2001 CarswellOnt 9, 52 O.R. (3d) 97, 11 B.L.R. (3d) 197, 4 C.P.C. (5th) 35 (Ont. C.A.) — considered

*Johnson v. Gore Wood & Co.* (2000), [2001] 1 All E.R. 481 (U.K. H.L.) — considered

*Martin v. Goldfarb*, 1998 CarswellOnt 3319, 112 O.A.C. 138, 163 D.L.R. (4th) 639, 42 C.C.L.T. (2d) 271, 41 O.R. (3d) 161, 44 B.L.R. (2d) 158 (Ont. C.A.) — considered

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

*Rogers v. Bank of Montreal*, 64 B.C.L.R. 63, [1985] 5 W.W.R. 193, 30 B.L.R. 41, 1985 CarswellBC 176 (B.C. S.C.) — referred to

*Rogers v. Bank of Montreal* (1986), 9 B.C.L.R. (2d) 190, [1987] 2 W.W.R. 364, 1986 CarswellBC 400 (B.C. C.A.) — referred to

*Salomon v. Salomon & Co.* (1896), [1897] A.C. 22, 45 W.R. 193, [1895-99] All E.R. Rep. 33, 66 L.J. Ch. 35, 13 T.L.R. 46 (U.K. H.L.) — referred to

*Walters v. Royal Bank*, 2000 CarswellOnt 653, (sub nom. *Walters v. Royal Bank of Canada)* 130 O.A.C. 188 (Ont. C.A.) — considered

*642947 Ontario Ltd. v. Fleischer*, 2001 CarswellOnt 4296, 152 O.A.C. 313, 56 O.R. (3d) 417, 209 D.L.R. (4th) 182, 47 R.P.R. (3d) 191, 16 C.P.C. (5th) 1 (Ont. C.A.) — referred to

**Statutes considered:**

*Drug and Pharmacies Regulation Act*, R.S.O. 1990, c. H.4

    s. 142 — considered

    s. 144(1) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194

    R. 20 — referred to

    R. 20.04(1) — referred to

APPEAL by plaintiff from judgment reported at (2001), 15 B.L.R. (3d) 221 (Ont. S.C.J.), granting defendants' motion for summary judgment dismissing part of plaintiff's action.

*Laskin J.A.*:

**A. INTRODUCTION**

1    This appeal turns on the application of the rule in *Foss v. Harbottle* (1843), 2 Hare 461, 67 E.R. 189 (Eng. V.-C.), which holds that a shareholder does not have a cause of action for a wrong done to the corporation.

2    The appellant, Meditrust Healthcare Inc., owned a national mail-order pharmacy business, which it operated through a number of subsidiaries. Meditrust has alleged that Shoppers Drug Mart Limited and the other respondents conspired to destroy its mail-order business.

3    The respondents brought a motion for partial summary judgment to dismiss most of Meditrust's claims. The motions judge, Molloy J., granted the motion [at (2001), 15 B.L.R. (3d) 221 (Ont. S.C.J.)]. She held that for the claims

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

in question, any damages suffered by Meditrust were not suffered by it directly, but were derivative of damages suffered by the subsidiaries. In her view, the rule in _Foss v. Harbottle_ barred these claims.

4      Meditrust appeals. It advances these four submissions:

   1. The motions judge failed to apply the proper test for summary judgment under Rule 20.

   2. The motions judge erred in holding that Meditrust was not the proper plaintiff. Meditrust submits that it is a proper plaintiff for several reasons, including that it suffered personal damages not derivative of the damages to its subsidiaries;

   3. The motions judge erred in failing to hold that Meditrust carried on the mail-order pharmacy business;

   4. The motions judge erred in refusing to let Meditrust's conspiracy claim go to trial.

5      For the reasons that follow, I substantially agree with the motions judge. I would dismiss the appeal except for one claim, Meditrust's claim for damages for loss of goodwill, which I would let go to trial.

**B. BACKGROUND**

6      In 1992, Meditrust began a national mail-order pharmacy business. Its goal was to provide prescription services at a lower cost than the standard dispensing fees of other retail pharmacies. To meet provincial legislative and regulatory requirements, Meditrust operated the business through a number of subsidiaries, which it either owned or controlled, and in the province of Quebec through a licensee. These subsidiaries and the licensee provided dispensing services and prescription drugs to the public.

7      In this action, Meditrust alleges that Shoppers Drug Mart and the other respondents embarked on a global campaign to destroy Meditrust and eliminate it as a competitor in the Canadian retail pharmacy market. According to the statement of claim, the respondents waged this campaign in several ways, including false advertising and wrongful interference with Meditrust's suppliers and potential customers. The most serious complaint, however, is the respondents' admitted complicity in publishing a phoney letter in October 1996, written on behalf of a fictitious society of pharmacists and alleging that Meditrust's business was unsafe for patients and investors. The purpose of the letter was to undermine Meditrust's then ongoing initial public offering ("IPO"). The IPO failed completely.

8      Meditrust began this action in 1997. None of the subsidiaries or the Quebec licensee — the operators of the business — is a plaintiff in the action. The lengthy statement of claim alleges that the respondents committed a long list of economic torts that in some way caused economic harm to Meditrust. These torts include conspiracy, intentional interference with contractual relations, intimidation, unfair competition, unlawful infliction of economic harm, misleading advertising and injurious falsehood. Because of these alleged torts, Meditrust claims that it sustained damages for loss of revenue, for loss of competitive advantage, and for missed corporate opportunities and other business, and that it suffered damage to its goodwill.

9      In January 1999, nearly two years after it had begun this action, Meditrust sold its mail-order pharmacy business to Pharma Plus Drug Mart. Meditrust now contends that the main purpose of this litigation is to recover the difference between what it claims the sale price would have been, but for the respondents' conduct, and the actual sale price to Pharma Plus.

10      In June 2001, the respondents moved for partial summary judgment to dismiss most of Meditrust's claims. The respondents acknowledged that Meditrust's allegations of interference with its IPO (paras. 121-138 of the statement of

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

claim) raised a triable issue, but argued that the remainder of Meditrust's claims (paras. 1-120 and 139-160 of the statement of claim) disclosed no genuine issue for trial. Molloy J. agreed. She held that these other claims could be asserted only by the subsidiaries; the companies that operated the mail-order business. She, therefore, granted the partial summary judgment requested by the respondents.

## C. THE LEGAL CONTEXT FOR THE APPEAL

11      The legal context for this appeal has three important aspects: the rule in *Foss v. Harbottle*; the components of a cause of action for the economic torts alleged by Meditrust, each of which requires proof of damages; and the provincial regulatory scheme, which provides that only a pharmacist or a corporation run by a majority of pharmacists can own or operate a pharmacy.

12      The rule in *Foss v. Harbottle* provides simply that a shareholder of a corporation — even a controlling shareholder or the sole shareholder — does not have a personal cause of action for a wrong done to the corporation. The rule respects a basic principle of corporate law: a corporation has a legal existence separate from that of its shareholders. See *Salomon v. Salomon & Co. (1896), [1897] A.C. 22, 66 L.J. Ch. 35* (U.K. H.L.) A shareholder cannot be sued for the liabilities of the corporation and, equally, a shareholder cannot sue for the losses suffered by the corporation.

13      The rule in *Foss v. Harbottle* also avoids multiple lawsuits. Indeed, without the rule, a shareholder would always be able to sue for harm to the corporation because any harm to the corporation indirectly harms the shareholders.

14      *Foss v. Harbottle* was decided nearly 160 years ago but its continuing validity in Canada has recently been affirmed by the Supreme Court of Canada in *Hercules Management Ltd. v. Ernst & Young, [1997] 2 S.C.R. 165* (S.C.C.) and by this court in *Martin v. Goldfarb (1998), 163 D.L.R. (4th) 639* (Ont. C.A.).

15      In *Hercules Management Ltd.*, La Forest J. described the rule and its rationale in these words at pp. 211-12:

> The rule in *Foss v. Harbottle* provides that individual shareholders have no cause of action in law for any wrongs done to the corporation and that if an action is to be brought in respect of such losses, it must be brought either by the corporation itself (through management) or by way of a derivative action. The legal rationale behind the rule was eloquently set out by the English Court of Appeal in *Prudential Assurance Co. v. Newman Industries Ltd. (No. 2), [1982] 1 All E.R. 354*, at p. 367, as follows:
>
> > The rule [in *Foss v. Harbottle*] is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed on them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration.

To these lucid comments, I would respectfully add that the rule is also sound from a policy perspective, inasmuch as it avoids the procedural hassle of a multiplicity of actions.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

16     The rule in *Foss v. Harbottle* does not, of course, preclude an individual shareholder from maintaining a claim for harm done directly to it. Again, in *Hercules Management Ltd.*, La Forest J. explained the limit of the rule at 214:

> One final point should be made here. Referring to the case of *Goldex Mines Ltd. v. Revill* (1974), 7 O.R. (2d) 216 (C.A.), the appellants submit that where a shareholder has been directly and individually harmed, that shareholder may have a personal cause of action even though the corporation may also have a separate and distinct cause of action. Nothing in the foregoing paragraphs should be understood to detract from this principle. In finding that claims in respect of losses stemming from an alleged inability to oversee or supervise management are really derivative and not personal in nature, I have found only that shareholders cannot raise individual claims in respect of a wrong done to the corporation. Indeed, this is the limit of the rule in *Foss v. Harbottle*. [Emphasis in original.]

17     But he stressed that, to maintain a personal claim, a shareholder must establish all the components of the cause of action alleged:

> Where, however, a separate and distinct claim (say, in tort) can be raised with respect to a wrong done to a shareholder *qua* individual, a personal action may well lie, assuming that all the requisite elements of a cause of action can be made out.

18     In the present case, one of the components of a cause of action for each of the torts alleged by Meditrust is proof of damages suffered. The tort of conspiracy — the main tort relied on by Meditrust — is typical. In *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.* (1983), 145 D.L.R. (3d) 385 (S.C.C.), at 398-99, the Supreme Court of Canada affirmed that tort law recognizes a claim of conspiracy where either the predominant purpose of the defendant's conduct is to injure the plaintiff or where the defendant's conduct is directed towards the plaintiff, is unlawful and the defendant should know that the plaintiff is, thus, likely to be injured. But, in either case, "there must be actual damages suffered by the plaintiff." Therefore, Meditrust cannot maintain its action simply by showing that the respondents' predominant purpose was to harm it or by showing that the respondents engaged in unlawful conduct directed toward it. Meditrust also has to put forward some evidence that, because of the respondents' conduct, it suffered damages; damages that are not derivative of the damage suffered by the subsidiaries.

19     Yet, because of the prevailing provincial regulatory scheme governing pharmacies, Meditrust could not legally own and operate its national mail-order business. To comply with provincial laws, Meditrust had to incorporate subsidiaries to run the business in each province where it wished to locate.

20     Ontario was one such province. Under s. 142 of Ontario's *Drug and Pharmacies Regulation Act*, R.S.O. 1990, c. H-4, no corporation can own or operate a pharmacy unless the majority of its directors are pharmacists and a majority of each class of its shares is owned by and registered in the name of pharmacists. And, under s. 144(1) of the Act, "no person other than a pharmacist or a corporation complying with the requirements of s. 142 shall own or operate a pharmacy." Only a corporation meeting these statutory requirements could compound and dispense medications — the core function of the mail-order business — and derive revenues from them. Meditrust did not meet these statutory requirements. Thus, it had to incorporate a subsidiary that did. Indeed, Mr. Paul, the president and chief executive officer of Meditrust, acknowledged in his affidavit that Meditrust operated its mail-order pharmacy business through its subsidiaries and licensees.

21     I turn now to the issues on the appeal.

## D. ANALYSIS

*1. Did the motions judge fail to apply the proper test for summary judgment under Rule 20?*

22     Meditrust contends that the motions judge did not apply the proper test for summary judgment under Rule 20.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

It advances two submissions: the motions judge granted summary judgment even though Meditrust raised questions of mixed fact and law that can only be decided after a trial; and the motions judge wrongly held that Meditrust was required to lead all of the evidence on damages that it might lead at trial. I do not agree with these submissions. In my view, the motions judge properly applied the Rule 20 jurisprudence.

23    This court and the Supreme Court of Canada have wrestled with different formulations of the summary judgment test under Rule 20. But two principles have consistently been applied. First, the moving party has the burden of showing that the claim or defence does not raise a genuine issue for trial. But, second, because of rule 20.04(1), the responding party ordinarily has an evidentiary burden to put forward some evidence in support of its position — it "must lead trump or risk losing." In *Hi-Tech Group Inc. v. Sears Canada Inc. (2001), 52 O.R. (3d) 97* (Ont. C.A.), after discussing the previous Rule 20 case law, Morden J.A. set out these two principles at 104-105:

> These two Ontario decisions, *Dawson* more fully than *Irving Ungerman*, make it clear that: (1) the legal or per-suasive burden is on the moving party to satisfy the court that there is no genuine issue for trial before summary judgment can be granted (this is what rule 20.04(2) says); and (2), by reason of rule 20.04(1), there is an evidential burden, or something akin to an evidential burden (because the motions judge does not find facts), on the re-sponding party to respond with evidence setting out "specific facts showing that there is a genuine issue for trial". Failure of the responding party to tender evidence does not automatically result in summary judgment. The "evidential burden" is described by this court (Catzman, Austin, and Borins JJ.A.) in *Lang v. Kligerman*, [1988] O.J. No. 3708 in paras. 8 and 9 and by the High Court (Griffiths J.) in *Kaighin Capital Inc. v. Canadian National Sportsmen's Show (1987), 58 O.R. (2d) 790* at p. 792, 17 C.P.C. (2d) 59.

> The short point is that the motions judge, having considered all of the evidence and the parties' submissions on it, must be satisfied that there is no genuine issue for trial before he or she may grant summary judgment. This is the legal burden resting on the moving party and it never shifts. I do not think that *Guarantee Co. of North America* intended to detract from this. [Footnotes omitted.]

24    In granting partial summary judgment, the motions judge applied these two principles and the approach to a Rule 20 motion that underlies them. Meditrust's two arguments that she did not do so are misconceived. A responding party to a Rule 20 motion does not automatically avoid summary judgment by raising mixed questions of fact and law. Where the facts are not disputed — as Molloy J. found — a motions judge may, in a proper case, grant summary judgment on these questions. See *Guarantee Co. of North America v. Gordon Capital Corp. (1999), 178 D.L.R. (4th) 1* (S.C.C.);

25    Moreover, Meditrust lost the summary judgment motion not because it failed to lead all of the evidence on damages it might lead at trial, but because, in the view of the motions judge, it led no evidence at all that it had suffered direct damages flowing from the respondents' conduct. As the motions judge said, though damage was an essential component of the causes of action alleged, "no evidence was filed as to any direct damages sustained by Meditrust."

26    Accordingly, I would not give effect to this ground of appeal.

*2. Did the motions judge err in holding that Meditrust was not the proper plaintiff?*

27    The motions judge's decision rested on her view that the subsidiaries, not Meditrust, had the right to assert most of the claims advanced in the statement of claim. The subsidiaries, however, are not plaintiffs in the action. Meditrust has sold them and, therefore, no longer controls them.

28    Still, Meditrust maintains that it is the proper plaintiff. It puts forward four separate bases on which it claims to have the right to maintain this action: (1) the business was a single economic entity; (2) principal and agent; (3) it had a contractual right to sue; and (4) it suffered damages personally. I will discuss each of these.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

*(1) Single economic entity*

29     Meditrust submits that, because it was at the apex of a single economic entity, the rule in *Foss v. Harbottle* does not preclude it from maintaining this action. Meditrust points out that it completely controlled the subsidiaries, that its control of them was augmented by the unanimous shareholders' agreement, and was reflected in the consolidated financial statements for the business.

30     This submission shows the difference between economic reality and legal reality. The economic reality of the mail-order business was a single economic enterprise. But the legal reality was separate corporate entities. And the rule in *Foss v. Harbottle* is a corporate law rule, not an economic rule. A parent company that owns all the shares of its subsidiaries may exercise complete and constant control over them. That control, however, does not clothe the parent with the right to sue for the subsidiaries.

31     In rare cases, a court may disregard separate corporate entities for the benefit of innocent third parties. The court may "pierce the corporate veil" when the corporate structure has been used by the corporation's principals as a sham or to perpetrate a fraud. See, for example, *642947 Ontario Ltd. v. Fleischer* (2001), 56 O.R. (3d) 417 (Ont. C.A.). But here, Meditrust must be held to the corporate structure that it created. It created a structure in which it operated the business through subsidiaries. It must take not only the benefits of that structure, but also the burdens. The motions judge, thus, properly characterized Meditrust's attempted disregard of this structure as an attempt "to pierce its own corporate veil." Like her, I see no merit in Meditrust's single economic entity argument.

*(2) Principal and agent*

32     Meditrust also argues that the relationship between it and its subsidiaries was that of principal and agent. Where an agent enters into a contract on behalf of a principal, the principal can sue for its breach. Meditrust seeks to apply this proposition to tort. It submits that it can sue for the torts committed by the respondents against the subsidiaries.

33     The law of principal and agent is concerned with contract and property, not with torts. Meditrust cites no authority for the proposition that a principal has the right to sue in tort for harm done to its agent. Moreover, Meditrust's claim of a principal and agent relationship with its subsidiaries seems nothing more than an artificial attempt to avoid summary judgment. Its statement of claim contains no allegation that it is claiming as principal the damages suffered by its agents. I would not give effect to this argument.

*(3) Contractual right to sue*

34     Meditrust also submits that its security agreements with the subsidiaries enable it to maintain this action. I do not accept this submission either. Again, Meditrust has not pleaded reliance on these agreements in its statement of claim. Moreover, these agreements are simply standard form secured-lending agreements, under which Meditrust, as secured lender, has priority over subsequent secured creditors and all unsecured creditors in the case of default by the subsidiaries. No default, however, was alleged.

*(4) Personal damages*

35     Meditrust's main argument on appeal — as it was on the motion — is that it put forward enough evidence to raise a triable issue whether it had suffered damages independent from and not derivative of the damages suffered by the subsidiaries. The motions judge rejected this argument. She concluded that all the losses claimed by Meditrust were simply derivative of the losses allegedly suffered by the subsidiaries.

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

36      In submitting that the motions judge erred in her conclusion, Meditrust listed four categories of losses, each of which it asserted were direct and not derivative losses. These are the four categories:

    (i) loss of business opportunities and contractual relations;

    (ii) the costs of investments in its subsidiaries;

    (iii) loss in the value of its shares in its subsidiaries; and

    (iv) loss of goodwill.

37      For each category of loss, Meditrust alleged in its statement of claim and in the affidavit of Mr. Paul that it had "sustained damages." This incantation, no matter how often asserted, will not, standing alone, stave off a motion for summary judgment. A party responding to a motion for summary judgment must do more. As the Supreme Court of Canada said in _Guarantee Co. of North America v. Gordon Capital Corp._, _supra_ at p. 12, "a self-serving affidavit is not sufficient in itself to create a triable issue in the absence of detailed facts and supporting evidence."

38      In my opinion, Meditrust has not filed any evidence showing it may personally have suffered losses in any of the first three categories it relies on, but it has done so in the fourth category, loss of goodwill.

**(i) Loss of business opportunities and contractual relations**

39      Meditrust led evidence that it directly entered into a number of contracts and other business arrangements for the supply of prescription drugs. It contends that the respondents' tortious acts interfered with these contracts and other arrangements, and thus directly harmed Meditrust. For example, Meditrust points to its contract with Sears, which it says was cancelled because of the respondents' ruinous campaign. However, these lost contractual or business opportunities were, in reality, lost opportunities for the subsidiaries, not Meditrust. Only the subsidiaries could operate the mail-order business. They alone could benefit from the business arrangements. Therefore, they alone would be harmed by their cancellation. In his affidavit, Mr. Paul gave no evidence to show that Meditrust had suffered damages in its own right because of lost business opportunities.

40      The motions judge put it this way in her reasons at 233:

    . . . Meditrust has not filed any evidence of separate damages to it as a result of the failure of any of these contracts or arrangements. The same reasoning applies to cooperative arrangements with other organizations to advertise Meditrust's services. Meditrust has filed no evidence that it would earn any revenue directly from such business. It has merely alleged that the mail order business was harmed. It relies on the loss of the business itself which, as I have already said, is a loss sustained by the subsidiaries.

I agree with this passage.

**(ii) The costs of investments in its subsidiaries**

41      Meditrust submits that it suffered losses from its investment in its subsidiaries. Yet, it did not even claim these losses in its statement of claim. And it led no evidence that any of its subsidiaries had defaulted on their loans or that it had lost any money as a creditor.

**(iii) Loss in the value of its shares in its subsidiaries**

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

42    Meditrust also claims that the loss in the value of its shares in its subsidiaries is a direct loss for which it can sue the respondents. This claim, however, runs up against the rule in *Foss v. Harbottle* and was expressly rejected by this court in *Martin v. Goldfarb*, where Finlayson J.A. wrote at 660:

> Martin's claim was premised on the loss he suffered as an equity holder in his various corporations because the conduct of Axton ruined the corporations and destroyed the value of his equity in the corporations. There is authority of long standing for the proposition that where a wrong is occasioned to a corporation, a shareholder has no claim for damages in respect of that wrong: see *Foss v. Harbottle* (1843), 2 Hare 461, 67 E.R. 189.

See also *Rogers v. Bank of Montreal*, [1985] 5 W.W.R. 193 (B.C. S.C.); aff'd (1986), [1987] 2 W.W.R. 364 (B.C. C.A.). In other words, a shareholder in a company has no independent right of action based on an allegation of diminution in the value of its shares caused by damage to the company. The shareholder does not suffer a direct loss. Its loss merely reflects the loss suffered by the company.

43    Meditrust, nonetheless, submits that this principle, which was affirmed in *Martin v. Goldfarb*, should be reconsidered in the light of recent English case law. I think that submission is untenable for two reasons. First, Canadian appellate jurisprudence has consistently invoked *Foss v. Harbottle* to reject this kind of claim. Second, the most recent English authority, the House of Lords' decision in *Johnson v. Gore Wood & Co.* (2000), [2001] 1 All E.R. 481 (U.K. H.L.), does not support Meditrust's position. In *Johnson*, Lord Bingham admittedly put a gloss on the rule in *Foss v. Harbottle* when he stated the following proposition at 503: "Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder of the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding." But, to rely on this proposition to claim the loss in the value of its shares, Meditrust must at least show that it has a cause of action and the subsidiaries do not. This, Meditrust has failed to do. Therefore, in my view, Meditrust cannot maintain its claim for damages resulting from the loss in the value of its shares in its subsidiaries.

**(iv) Loss of goodwill**

44    Finally, Meditrust submits that it has a personal claim for damages for loss of goodwill. This is the most persuasive of all Meditrust's submissions. In principle, a claim for loss of goodwill is not precluded by the rule in *Foss v. Harbottle*. A shareholder may suffer personal damages for loss of goodwill, damages that are not derivative of harm to the company. The contentious question on this appeal is whether the evidentiary record supports Meditrust's claim. Although Meditrust's evidence could be stronger, I would permit its claim for harm to its goodwill to go to trial.

45    Goodwill includes reputation, position in the business community, client base, the expectation of continued public patronage and like considerations. See *DiFlorio v. Con Structural Steel Ltd.*, [2000] O.J. No. 340 (Ont. S.C.J.). It is akin to the loss of reputation claim asserted by the shareholder in *Martin v. Goldfarb*, which this court held could give rise to damages that were direct and not derivative of the damages to the company. As Finlayson J.A. said, at 672:

> I also think that Martin is entitled to something for "the insult", as they say in settlement discussions. He did maintain a certain standard of living before the bankruptcy and he works now as a security guard at a motel in Florida. It may well be that the judge on the assessment would want to consider, if the evidence warrants it, general damages for loss of reputation and credit arising out of the bankruptcy itself: see *Hoskins v. Price Waterhouse Ltd.*, supra.

46    The respondents, however, mount a formidable array of arguments that, though Meditrust may in principle have a claim for loss of goodwill, it has not provided any evidence to support it. The respondents point out that, though a claim for loss of goodwill was pleaded in the statement of claim, it was not argued before the motions judge. They also point out that the record contains only brief reference to Meditrust's goodwill, even though Meditrust had been

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

ordered to particularize the damages it allegedly suffered.

47     These are strong arguments. But there are balancing considerations. The record does show that Meditrust was known publicly as the corporate face of the mail-order business it owned. That public reputation is reflected in the following paragraph of Meditrust's prospectus:

> Management believes that Meditrust will be able to continue to compete effectively in Canada on the basis of its ability to provide national drug containment services, the Company's experience and the reputation of its mail order pharmacy, its current customer base, its sophisticated pharmacy technology systems and procedures, and the dependable and cost effective manner in which it serves it customers.

48     Damage to that reputation would be damage to Meditrust personally, not to its subsidiaries. Although Meditrust did not particularize any damage to its reputation, it did put forward cogent evidence that the respondents embarked on a campaign to destroy it and its national mail-order business. It seems to me almost axiomatic that Meditrust would suffer a loss of goodwill from the respondents' alleged wrongful acts. Although I consider it a close decision, I would err on the side of permitting the claim for damages for loss of goodwill to go to trial.

### 3. Did the motions judge err in failing to hold that Meditrust carried on the mail-order pharmacy business?

49     Meditrust submits that the motions judge erred in concluding that the subsidiaries alone carried on the mail-order pharmacy business. Meditrust submits that it did so as well. It contends that the motions judge erred because she focused on the dispensing and selling of prescription drugs, which was done by the subsidiaries. Meditrust asserts that the business was broader than merely filling prescriptions and embraced the organization and operation of an economic enterprise, including marketing, contracting, advertising, banking and purchasing. Meditrust says that it carried on these broader aspects of the business.

50     Even accepting that Meditrust did so, this ground of appeal must fail for the same reason that Meditrust's second ground of appeal largely failed. It put forward no evidence that it suffered losses from the respondents' interference with these broader aspects of the business. Instead, Meditrust claimed damages only for lost revenues from the dispensing and selling of drugs. But only the subsidiaries (and the licensee) carried on these activities. Thus, the only damages for loss of income that Meditrust claimed to have suffered and on which it led evidence were damages it suffered as a shareholder.

51     In substance, Meditrust did not carry on the mail-order business. Rather, it owned a group of companies that did. Mr. Paul acknowledged as much in his affidavit when he discussed potential liabilities for the incorrect preparation, labelling and distribution of prescriptions. He said that these liabilities "based upon the structure of the business, are actually liabilities of the pharmacy subsidiaries filling the individual prescriptions." Meditrust cannot have it both ways. It cannot claim to sue for harm in reality caused to the subsidiaries, yet shelter behind these same subsidiaries for any harm done by them. I would not give effect to this ground of appeal.

### 4. Did the motions judge err in refusing to let the conspiracy claim go to trial?

52     Meditrust submits on appeal, as it did before the motions judge, that the rule in _Foss v. Harbottle_ does not apply to a conspiracy claim. In other words, Meditrust says it can avoid the rule by showing that the respondents' unlawful conduct was directed at it. The motions judge rejected this submission and so do I.

53     In granting summary judgment on the conspiracy claim, the motions judge held at p. 229 that "the mere fact that Meditrust may have been the direct target of the alleged conspiracy is not sufficient to create a cause of action. Meditrust must have sustained direct injury in its own right (not as a result of injury to its subsidiaries) before it can have a cause of action."

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 3380, 165 O.A.C. 147, 28 B.L.R. (3d) 163, 61 O.R. (3d) 786, 220 D.L.R. (4th) 611

54    I agree. I add that Meditrust's submission runs counter to principle, to the Supreme Court of Canada's decision in *Canada Cement LaFarge Ltd.* and to this court's decision in *Walters v. Royal Bank (2000), 130 O.A.C. 188* (Ont. C.A.). I see no principled basis for holding that the rule in *Foss v. Harbottle* applies to other tort claims but not to a conspiracy claim. Moreover, *Canada Cement LaFarge Ltd.*, to which I referred earlier, states unequivocally that a plaintiff who alleges conspiracy must suffer direct injury in its own right before it can sue. And in *Walters*, this court approved the decision of the British Columbia Court of Appeal in *Rogers v. Bank of Montreal*, which, in turn, affirmed the proposition that an allegation of conspiracy does not affect the application of the rule in *Foss v. Harbottle*. For these reasons, I would not give effect to this ground of appeal.

**E. DISPOSITION**

55    I would allow the appeal only on the claim for damages for loss of goodwill. To that extent, I would set aside the order of the motions judge and dismiss the motion for summary judgment. I would otherwise dismiss the appeal. The parties may make written submissions on the costs of the appeal — both entitlement and amount — within 30 days of the release of the court's judgment.

*Carthy J.A.*:

    I agree.

*Weiler J.A.*:

    I agree.

*Appeal allowed in part.*

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. Govt. Works



Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

2012 ONSC 2744

Ontario Superior Court of Justice

Martin v. Astrazeneca Pharmaceuticals PLC

2012 CarswellOnt 6210, 2012 ONSC 2744, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294, 27 C.P.C. (7th) 32

# Joanne Martin, Corrine Middleton, Bernard Van Kerrebroeck, and Don Martin, Plaintiffs and Astrazeneca Pharmaceuticals PLC, Astrazeneca Pharmaceuticals, LP and Astrazeneca Canada Inc., Defendants

C. Horkins J.

Heard: November 23-25, 28-29, 2011

Judgment: May 7, 2012[*]

Docket: 06-CV-314632CP

Proceedings: additional reasons at *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 ONSC 4666, 2012 CarswellOnt 9934 (Ont. S.C.J.)

Counsel: James C. Orr, Megan B. McPhee, Ahmad Erfan, for Plaintiffs
Frank J. McLaughlin, Sarah Chesworth, Brandon Kain, for Defendants

Subject: Civil Practice and Procedure

## Table of Authorities

### Cases considered by *C. Horkins J.*:

*Agribrands Purina Canada Inc. v. Kasamekas* (2011), 2011 ONCA 460, 86 C.C.L.T. (3d) 179, 278 O.A.C. 363, 87 B.L.R. (4th) 1, 2011 CarswellOnt 5034, 334 D.L.R. (4th) 714, 106 O.R. (3d) 427 (Ont. C.A.) — followed

*Andersen v. St. Jude Medical Inc.* (2003), 2003 CarswellOnt 3478, 38 C.P.C. (5th) 122, 67 O.R. (3d) 136 (Ont. S.C.J.) — referred to

*Andersen v. St. Jude Medical Inc.* (2005), 2005 CarswellOnt 318, [2005] O.T.C. 50 (Ont. Div. Ct.) — referred to

*Andersen v. St. Jude Medical Inc.* (2010), 14 C.P.C. (7th) 412, 2010 ONSC 4708, 2010 CarswellOnt 10748 (Ont. S.C.J.) — distinguished

*Anderson v. Wilson* (1999), 36 C.P.C. (4th) 17, 44 O.R. (3d) 673, 1999 CarswellOnt 2073, 175 D.L.R. (4th) 409, 122 O.A.C. 69 (Ont. C.A.) — referred to

*Baker v. Suzuki Motor Co.* (1993), 12 Alta. L.R. (3d) 193, 1 M.V.R. (3d) 110, 143 A.R. 1, [1993] 8 W.W.R. 1, 17 C.C.L.T. (2d) 241, 1993 CarswellAlta 88 (Alta. Q.B.) — considered

*Balanyk v. University of Toronto* (1999), 1 C.P.R. (4th) 300, 1999 CarswellOnt 1786 (Ont. S.C.J.) — referred to

*Banerjee v. Shire Biochem Inc.* (2010), 88 C.P.C. (6th) 328, 2010 CarswellOnt 647, 2010 ONSC 889 (Ont. S.C.J.) — considered

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Bell v. Booth Centennial Healthcare Linen Services* (2006), 2006 CarswellOnt 7361 (Ont. S.C.J.) — considered

*Bellaire v. Independent Order of Foresters* (2004), 19 C.C.L.I. (4th) 35, 5 C.P.C. (6th) 68, 2004 CarswellOnt 5608 (Ont. S.C.J.) — considered

*Boulanger v. Johnson & Johnson Corp.* (2007), 2007 CarswellOnt 252, 40 C.P.C. (6th) 170 (Ont. S.C.J.) — referred to

*Bow Valley Husky (Bermuda) Ltd. v. Saint John Shipbuilding Ltd.* (1995), 130 Nfld. & P.E.I.R. 92, 1995 CarswellNfld 44, 405 A.P.R. 92, 126 D.L.R. (4th) 1, 21 B.L.R. (2d) 265 (Nfld. C.A.) — considered

*Bow Valley Husky (Bermuda) Ltd. v. Saint John Shipbuilding Ltd.* (1997), 221 N.R. 1, 1997 CarswellNfld 207, 1997 CarswellNfld 208, 153 D.L.R. (4th) 385, 490 A.P.R. 269, [1997] 3 S.C.R. 1210, 48 C.C.L.I. (2d) 1, 37 B.L.R. (2d) 1, 158 Nfld. & P.E.I.R. 269, 40 C.C.L.T. (2d) 235, 1999 A.M.C. 108 (S.C.C.) — referred to

*Bywater v. Toronto Transit Commission* (1998), 27 C.P.C. (4th) 172, 1998 CarswellOnt 4645, 83 O.T.C. 1 (Ont. Gen. Div.) — referred to

*Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.* (1983), [1983] 1 S.C.R. 452, 145 D.L.R. (3d) 385, 47 N.R. 191, [1983] 6 W.W.R. 385, 21 B.L.R. 254, 24 C.C.L.T. 111, 72 C.P.R. (2d) 1, 1983 CarswellBC 734, 1983 CarswellBC 812 (S.C.C.) — referred to

*Caputo v. Imperial Tobacco Ltd.* (2004), 2004 CarswellOnt 423, 236 D.L.R. (4th) 348, 42 B.L.R. (3d) 276, 22 C.C.L.T. (3d) 261, 44 C.P.C. (5th) 350, [2004] O.T.C. 112 (Ont. S.C.J.) — considered

*Carom v. Bre-X Minerals Ltd.* (1999), 35 C.P.C. (4th) 43, 1999 CarswellOnt 1456, 46 B.L.R. (2d) 247, 44 O.R. (3d) 173 (Ont. S.C.J.) — referred to

*Carom v. Bre-X Minerals Ltd.* (1999), 6 B.L.R. (3d) 82, 1 C.P.C. (5th) 82, 46 O.R. (3d) 315, 1999 CarswellOnt 4716 (Ont. Div. Ct.) — referred to

*Carom v. Bre-X Minerals Ltd.* (2000), 2000 CarswellOnt 3838, 138 O.A.C. 55, 1 C.P.C. (5th) 62, 11 B.L.R. (3d) 1, 196 D.L.R. (4th) 344, 51 O.R. (3d) 236 (Ont. C.A.) — referred to

*Cerqueira v. Ontario* (2010), 2010 CarswellOnt 5190, 2010 ONSC 3954 (Ont. S.C.J.) — considered

*Chartrand v. General Motors Corp.* (2008), 2008 BCSC 1781, 2008 CarswellBC 3050, 84 M.V.R. (5th) 57, 75 C.P.C. (6th) 221 (B.C. S.C.) — considered

*Chopik v. Mitsubishi Paper Mills Ltd.* (2002), 2002 CarswellOnt 2336, 26 C.P.C. (5th) 104 (Ont. S.C.J.) — referred to

*Cloud v. Canada (Attorney General)* (2004), 2004 CarswellOnt 5026, 73 O.R. (3d) 401, 192 O.A.C. 239, 27 C.C.L.T. (3d) 50, [2005] 1 C.N.L.R. 8, 2 C.P.C. (6th) 199, 247 D.L.R. (4th) 667 (Ont. C.A.) — considered

*Cunningham v. Hamilton* (1995), 1995 CarswellAlta 178, 29 Alta. L.R. (3d) 380, 169 A.R. 132, 97 W.A.C. 132 (Alta. C.A.) — considered

*Dewan v. Burdet (In Trust)* (2006), 2006 CarswellOnt 8413 (Ont. S.C.J.) — referred to

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Dewan v. Burdet (In Trust)* (2007), 2007 ONCA 752, 2007 CarswellOnt 7038 (Ont. C.A.) — referred to

*Di Gennaro v. BMO Nesbitt Burns Inc.* (2007), 2007 CarswellOnt 6575 (Ont. S.C.J.) — referred to

*Ernewein v. General Motors of Canada Ltd.* (2005), 260 D.L.R. (4th) 488, 46 B.C.L.R. (4th) 234, 218 B.C.A.C. 177, 359 W.A.C. 177, 2005 BCCA 540, 2005 CarswellBC 2592, 19 C.P.C. (6th) 253 (B.C. C.A.) — referred to

*Ernewein v. General Motors of Canada Ltd.* (2006), 2006 CarswellBC 680, 2006 CarswellBC 681, 353 N.R. 197 (note), 233 B.C.A.C. 320 (note), 386 W.A.C. 320 (note) (S.C.C.) — referred to

*Fehringer v. Sun Media Corp.* (2002), 27 C.P.C. (5th) 155, 2002 CarswellOnt 3569 (Ont. S.C.J.) — referred to

*Fehringer v. Sun Media Corp.* (2003), 2003 CarswellOnt 3841, 39 C.P.C. (5th) 151 (Ont. Div. Ct.) — referred to

*Fresco v. Canadian Imperial Bank of Commerce* (2009), 2009 C.L.L.C. 210-032, 84 C.C.E.L. (3d) 161, 71 C.P.C. (6th) 97, 2009 CarswellOnt 3481 (Ont. S.C.J.) — considered

*Frohlinger v. Nortel Networks Corp.* (2007), 2007 CarswellOnt 240, 40 C.P.C. (6th) 62, 2007 C.E.B. & P.G.R. 8233 (Ont. S.C.J.) — considered

*Gardner v. Ontario* (1984), 45 O.R. (2d) 760, 7 D.L.R. (4th) 464, [1984] 3 C.N.L.R. 72, 1984 CarswellOnt 909 (Ont. H.C.) — considered

*Gariepy v. Shell Oil Co.* (2002), 2002 CarswellOnt 2270, 23 C.P.C. (5th) 360, [2002] O.T.C. 459 (Ont. S.C.J.) — considered

*Gariepy v. Shell Oil Co.* (2004), 2004 CarswellOnt 8813 (Ont. Div. Ct.) — referred to

*Glover v. Toronto (City)* (2009), 2009 CarswellOnt 1985, 70 C.P.C. (6th) 303 (Ont. S.C.J.) — considered

*Goodridge v. Pfizer Canada* (2010), 85 C.P.C. (6th) 267, 73 C.C.L.T. (3d) 211, 101 O.R. (3d) 202, 2010 ONSC 1095, 2010 CarswellOnt 896 (Ont. S.C.J.) — followed

*Grant v. Canada (Attorney General)* (2009), 81 C.P.C. (6th) 68, 2009 CarswellOnt 7642 (Ont. S.C.J.) — referred to

*Gregorio v. Intrans-Corp.* (1994), 1994 CarswellOnt 237, 4 M.V.R. (3d) 140, 115 D.L.R. (4th) 200, 18 O.R. (3d) 527, 72 O.A.C. 51, 15 B.L.R. (2d) 109 (Ont. C.A.) — considered

*Harrington v. Dow Corning Corp.* (1996), 48 C.P.C. (3d) 28, 22 B.C.L.R. (3d) 97, [1996] 8 W.W.R. 485, 31 C.C.L.T. (2d) 48, 1996 CarswellBC 778 (B.C. S.C.) — considered

*Harrington v. Dow Corning Corp.* (2000), 2000 CarswellBC 2183, 2000 BCCA 605, 144 B.C.A.C. 51, 236 W.A.C. 51, 193 D.L.R. (4th) 67, [2000] 11 W.W.R. 201, 82 B.C.L.R. (3d) 1, 47 C.P.C. (4th) 191, 2 C.C.L.T. (3d) 157 (B.C. C.A.) — considered

*Harrington v. Dow Corning Corp.* (2001), 2001 CarswellBC 1873, 2001 CarswellBC 1874, 276 N.R. 200 (note), [2001] 2 S.C.R. vii (S.C.C.) — referred to

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Haskett v. Trans Union of Canada Inc.* (2003), 224 D.L.R. (4th) 419, 169 O.A.C. 201, 2003 CarswellOnt 692, 15 C.C.L.T. (3d) 194, 63 O.R. (3d) 577 (Ont. C.A.) — considered

*Haskett v. Trans Union of Canada Inc.* (2003), 326 N.R. 397 (note), 194 O.A.C. 400 (note), 2003 CarswellOnt 4754, 2003 CarswellOnt 4755 (S.C.C.) — referred to

*Heward v. Eli Lilly & Co.* (2007), 39 C.P.C. (6th) 153, 2007 CarswellOnt 611, 47 C.C.L.T. (3d) 114 (Ont. S.C.J.) — distinguished

*Hickey-Button v. Loyalist College of Applied Arts & Technology* (2006), 2006 CarswellOnt 3618, 267 D.L.R. (4th) 601, 211 O.A.C. 301, 31 C.P.C. (6th) 390 (Ont. C.A.) — considered

*Hollick v. Metropolitan Toronto (Municipality)* (2001), (sub nom. *Hollick v. Toronto (City)*) 56 O.R. (3d) 214 (headnote only), (sub nom. *Hollick v. Toronto (City)*) 205 D.L.R. (4th) 19, (sub nom. *Hollick v. Toronto (City)*) [2001] 3 S.C.R. 158, (sub nom. *Hollick v. Toronto (City)*) 2001 SCC 68, 2001 CarswellOnt 3577, 2001 CarswellOnt 3578, 24 M.P.L.R. (3d) 9, 13 C.P.C. (5th) 1, 277 N.R. 51, 42 C.E.L.R. (N.S.) 26, 153 O.A.C. 279 (S.C.C.) — followed

*Hughes v. Sunbeam Corp. (Canada) Ltd.* (2000), 2000 CarswellOnt 4614, 2 C.P.C. (5th) 335, 11 B.L.R. (3d) 236 (Ont. S.C.J.) — considered

*Hughes v. Sunbeam Corp. (Canada) Ltd.* (2002), 2002 CarswellOnt 2919, 28 B.L.R. (3d) 1, 61 O.R. (3d) 433, 165 O.A.C. 68, 25 C.P.C. (5th) 230, 219 D.L.R. (4th) 467 (Ont. C.A.) — referred to

*Hughes v. Sunbeam Corp. (Canada) Ltd.* (2003), [2003] 1 S.C.R. xi (note), 2003 CarswellOnt 1925, 2003 CarswellOnt 1926, 189 O.A.C. 200 (note), 224 D.L.R. (4th) vii (note), 320 N.R. 193 (note) (S.C.C.) — referred to

*Hunt v. T & N plc* (1990), 1990 CarswellBC 216, 43 C.P.C. (2d) 105, 117 N.R. 321, 4 C.O.H.S.C. 173 (headnote only), (sub nom. *Hunt v. Carey Canada Inc.*) [1990] 6 W.W.R. 385, 49 B.C.L.R. (2d) 273, (sub nom. *Hunt v. Carey Canada Inc.*) 74 D.L.R. (4th) 321, [1990] 2 S.C.R. 959, 1990 CarswellBC 759, 4 C.C.L.T. (2d) 1 (S.C.C.) — considered

*J.G. Young & Son Ltd. v. TEC Park Ltd.* (1999), 48 C.P.C. (4th) 67, 1999 CarswellOnt 3463 (Ont. S.C.J.) — referred to

*Kafka v. Allstate Insurance Co. of Canada* (2011), 2011 C.L.L.C. 210-026, 2011 CarswellOnt 3118, 2011 ONSC 2305, 89 C.C.E.L. (3d) 283, 12 C.P.C. (7th) 367 (Ont. S.C.J.) — referred to

*Kafka v. Allstate Insurance Co. of Canada* (2012), 2012 ONSC 1035, 2012 CarswellOnt 4089, 98 C.C.E.L. (3d) 53 (Ont. Div. Ct.) — referred to

*Khan v. Canada (Attorney General)* (2009), 2009 CarswellOnt 905 (Ont. S.C.J.) — referred to

*Khan v. Canada (Attorney General)* (2009), 2009 ONCA 737, 2009 CarswellOnt 6356 (Ont. C.A.) — referred to

*Khan v. Canada (Attorney General)* (2010), 2010 CarswellOnt 2635, 2010 CarswellOnt 2636, 407 N.R. 393 (note), 271 O.A.C. 398 (note) (S.C.C.) — referred to

*Kreutner v. Waterloo-Oxford Co-operative Inc.* (2000), 1 C.P.C. (5th) 237, 50 O.R. (3d) 140, 2000 CarswellOnt 2883, 135 O.A.C. 216 (Ont. C.A.) — followed

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Lambert v. Guidant Corp.* (2009), 2009 CarswellOnt 2535, 72 C.P.C. (6th) 120 (Ont. S.C.J.) — referred to

*Lambert v. Guidant Corp.* (2009), 82 C.P.C. (6th) 367, 2009 CarswellOnt 6512 (Ont. Div. Ct.) — referred to

*Lau v. Bayview Landmark Inc.* (1999), 1999 CarswellOnt 3442, 40 C.P.C. (4th) 301, 31 O.T.C. 220 (Ont. S.C.J.) — followed

*LeFrancois v. Guidant Corp.* (2009), 2009 CarswellOnt 3415 (Ont. S.C.J.) — distinguished

*LeFrancois v. Guidant Corp.* (2009), 2009 CarswellOnt 6005 (Ont. Div. Ct.) — referred to

*Lubarevich v. Nurgitz* (1996), 1 O.T.C. 360, 1996 CarswellOnt 1530 (Ont. Gen. Div.) — referred to

*Lynch v. Westario Power Inc.* (2009), 2009 CarswellOnt 4057 (Ont. S.C.J.) — referred to

*Markeljevic v. Ontario (Financial Services Commission)* (2005), 2005 CarswellOnt 2100, [2005] O.T.C. 386 (Ont. S.C.J.) — referred to

*Markson v. MBNA Canada Bank* (2007), 43 C.P.C. (6th) 10, 2007 ONCA 334, 2007 CarswellOnt 2716, 282 D.L.R. (4th) 385, 32 B.L.R. (4th) 273, 224 O.A.C. 71, 85 O.R. (3d) 321 (Ont. C.A.) — considered

*McCutcheon v. Cash Store Inc.* (2006), 27 C.P.C. (6th) 293, 80 O.R. (3d) 644, 2006 CarswellOnt 2973 (Ont. S.C.J.) — referred to

*Montreal Trust Co. of Canada v. Toronto Dominion Bank* (1992), 40 C.P.C. (3d) 389, 1992 CarswellOnt 1131 (Ont. Gen. Div.) — referred to

*Normart Management Ltd. v. West Hill Redevelopment Co.* (1998), 17 C.P.C. (4th) 170, 113 O.A.C. 375, 1998 CarswellOnt 251, 155 D.L.R. (4th) 627, 37 O.R. (3d) 97, 41 C.C.L.T. (2d) 282 (Ont. C.A.) — considered

*Penson Financial Services Canada Inc. v. Connacher* (2010), 2010 ONSC 2843, 2010 CarswellOnt 3398 (Ont. S.C.J. [Commercial List]) — considered

*Peter v. Medtronic Inc.* (2007), 50 C.P.C. (6th) 133, 2007 CarswellOnt 7975 (Ont. S.C.J.) — referred to

*Peter v. Medtronic Inc.* (2008), 2008 CarswellOnt 2759, 55 C.P.C. (6th) 242 (Ont. Div. Ct.) — referred to

*Peter v. Medtronic Inc.* (2010), 97 C.P.C. (6th) 392, 2010 CarswellOnt 5221, 2010 ONSC 3777, 267 O.A.C. 126, 79 C.C.L.T. (3d) 26 (Ont. Div. Ct.) — referred to

*Pro Swing Inc. v. ELTA Golf Inc.* (2006), 52 C.P.R. (4th) 321, [2006] 2 S.C.R. 612, 2006 SCC 52, 2006 CarswellOnt 7203, 2006 CarswellOnt 7204, 354 N.R. 201, 218 O.A.C. 339, 273 D.L.R. (4th) 663, 41 C.P.C. (6th) 1 (S.C.C.) — considered

*Punit v. Wawanesa Mutual Insurance Co.* (2006), 45 C.C.L.I. (4th) 109, 2006 CarswellOnt 7594 (Ont. S.C.J.) — referred to

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*R. v. Mohan* (1994), 18 O.R. (3d) 160 (note), 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 1994 CarswellOnt 1155, 1994 CarswellOnt 66 (S.C.C.) — referred to

*Research Capital Corp. v. Skyservice Airlines Inc.* (2008), 2008 CarswellOnt 3754 (Ont. S.C.J.) — considered

*Research Capital Corp. v. Skyservice Airlines Inc.* (2009), 2009 CarswellOnt 2662, 2009 ONCA 418 (Ont. C.A.) — referred to

*Ring v. Canada (Attorney General)* (2010), 918 A.P.R. 86, 297 Nfld. & P.E.I.R. 86, 86 C.P.C. (6th) 8, 72 C.C.L.T. (3d) 161, 2010 NLCA 20, 2010 CarswellNfld 86 (N.L. C.A.) — referred to

*Robinson v. Medtronic Inc.* (2009), 80 C.P.C. (6th) 87, 2009 CarswellOnt 6337 (Ont. S.C.J.) — considered

*Robinson v. Medtronic Inc.* (2010), 2010 ONSC 1739, 2010 CarswellOnt 1957 (Ont. S.C.J.) — considered

*Robinson v. Rochester Financial Ltd.* (2010), 89 C.P.C. (6th) 91, 2010 CarswellOnt 206, 2010 ONSC 463 (Ont. S.C.J.) — referred to

*Robinson v. Rochester Financial Ltd.* (2010), 2010 CarswellOnt 2153, 2010 ONSC 1899, 89 C.P.C. (6th) 118, 262 O.A.C. 148 (Ont. Div. Ct.) — referred to

*Rowe (Guardian ad litem of) v. Sears Canada Inc.* (2005), 2005 NLCA 65, 2005 CarswellNfld 305, 36 C.C.L.T. (3d) 78, *(*sub nom. *Rowe v. Sears Canada Inc.)* 251 Nfld. & P.E.I.R. 246, *(*sub nom. *Rowe v. Sears Canada Inc.)* 752 A.P.R. 246, 18 C.P.C. (6th) 209 (N.L. C.A.) — considered

*Sauer v. Canada (Minister of Agriculture)* (2008), 2008 CarswellOnt 5081 (Ont. S.C.J.) — considered

*Schick v. Boehringer Ingelheim (Canada) Ltd.* (2011), 10 C.P.C. (7th) 167, 2011 CarswellOnt 24, 2011 ONSC 63 (Ont. S.C.J.) — referred to

*Seale & Associates Inc. v. Vector Aerospace Corp.* (2007), 2007 CarswellOnt 9260 (Ont. S.C.J.) — referred to

*Serhan Estate v. Johnson & Johnson* (2004), 49 C.P.C. (5th) 283, 2004 CarswellOnt 2809, 11 E.T.R. (3d) 226, *(*sub nom. *Serhan (Estate Trustee) v. Johnson & Johnson)* 72 O.R. (3d) 296 (Ont. S.C.J.) — referred to

*Serhan Estate v. Johnson & Johnson* (2006), 2006 CarswellOnt 3705, 28 C.P.C. (6th) 83, *(*sub nom. *Serhan (Trustee of) v. Johnson & Johnson)* 85 O.R. (3d) 665, 269 D.L.R. (4th) 279, 213 O.A.C. 298, 24 E.T.R. (3d) 265 (Ont. Div. Ct.) — referred to

*Serhan Estate v. Johnson & Johnson* (2007), 2007 CarswellOnt 2150, 2007 CarswellOnt 2151, [2007] 1 S.C.R. x (note), *(*sub nom. *Johnson & Johnson v. Serhan)* 369 N.R. 397 (note), *(*sub nom. *Johnson & Johnson v. Serhan)* 234 O.A.C. 398 (note) (S.C.C.) — referred to

*Singer v. Schering-Plough Canada Inc.* (2010), 87 C.P.C. (6th) 276, 2010 ONSC 42, 2010 CarswellOnt 79 (Ont. S.C.J.) — considered

*Stewart v. General Motors of Canada Ltd.* (2007), 2007 CarswellOnt 3736 (Ont. S.C.J.) — referred to

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Taylor v. Tamboril Cigar Co.* (2005), 2005 CarswellOnt 4775 (Ont. C.A.) — considered

*Thermionics Ltd. v. Philco Products Ltd.* (1940), 1940 CarswellNat 40, *(*sub nom. *Philco Products Ltd. v. Thermionics Ltd.)* [1940] S.C.R. 501, *(*sub nom. *Philco Products Ltd. v. Thermionics Ltd.)* [1940] 4 D.L.R. 1 (S.C.C.) — referred to

*Toronto Community Housing Corp. v. Thyssenkrupp Elevator (Canada) Ltd.* (2011), 2011 ONSC 4914, 2011 CarswellOnt 8341, 19 C.P.C. (7th) 280 (Ont. S.C.J.) — referred to

*Tribar Industries Inc. v. KPMG LLP* (2009), 2009 CarswellOnt 1235 (Ont. S.C.J.) — considered

*Vaughan v. Ontario (Minister of Health)* (1996), 2 O.T.C. 241, 1996 CarswellOnt 1713, 49 C.P.C. (3d) 119 (Ont. Gen. Div.) — referred to

*Web Offset Publications Ltd. v. Vickery* (1999), 1999 CarswellOnt 2270, 123 O.A.C. 235, 43 O.R. (3d) 802 (Ont. C.A.) — referred to

*Western Canadian Shopping Centres Inc. v. Dutton* (2001), *(*sub nom. *Western Canadian Shopping Centres Inc. v. Bennett Jones Verchere)* 201 D.L.R. (4th) 385, [2002] 1 W.W.R. 1, 286 A.R. 201, 253 W.A.C. 201, 8 C.P.C. (5th) 1, 94 Alta. L.R. (3d) 1, 272 N.R. 135, 2001 SCC 46, 2001 CarswellAlta 884, 2001 CarswellAlta 885, [2001] 2 S.C.R. 534 (S.C.C.) — referred to

*Williams v. Canon Canada Inc.* (2011), 2011 ONSC 6571, 2011 CarswellOnt 12407 (Ont. S.C.J.) — referred to

*Wuttunee v. Merck Frosst Canada Ltd.* (2009), 2009 SKCA 43, 2009 CarswellSask 191, 69 C.P.C. (6th) 60, 324 Sask. R. 210, 451 W.A.C. 210, [2009] 5 W.W.R. 228 (Sask. C.A.) — followed

*Wuttunee v. Merck Frosst Canada Ltd.* (2009), 401 N.R. 399 (note), 494 W.A.C. 318 (note), 359 Sask. R. 318 (note), 2009 CarswellSask 681, 2009 CarswellSask 682 (S.C.C.) — referred to

**Statutes considered:**

*Class Proceedings Act, 1992*, S.O. 1992, c. 6
s. 1 "common issues" — considered

s. 5 — considered

s. 5(1) — considered

s. 5(1)(a) — considered

s. 5(1)(b) — considered

s. 5(1)(b)-5(1)(e) — referred to

s. 5(1)(c) — considered

s. 5(1)(d) — considered

s. 5(1)(e) — considered

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Code civil du Québec*, L.Q. 1991, c. 64
    art. 1003 — considered

*Family Law Act*, R.S.O. 1990, c. F.3
    Generally — referred to

*Federal Food, Drug and Cosmetic Act*, 21 U.S.C. 9
    Generally — referred to

*Food and Drugs Act*, R.S.C. 1985, c. F-27
    Generally — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    R. 4.06(2) — considered

    R. 21 — referred to

    R. 25.06(1) — considered

    R. 39.01(4) — considered

**Regulations considered:**

*Food and Drugs Act*, R.S.C. 1985, c. F-27
    *Food and Drug Regulations*, C.R.C. 1978, c. 870

    Generally — referred to

MOTION to certify action on behalf of class consisting of all persons in Canada who were prescribed and who consumed medication.

*C. Horkins J.*:

**Introduction**

1    This is a motion for certification of a proposed class action pursuant to s. 5 of the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 ("*Class Proceedings Act*").

2    The focus of this action is a drug called Seroquel and health risks that it is alleged to cause. Seroquel, also called quetiapine, is an antipsychotic medication that Health Canada has approved for use in the treatment of schizophrenia, the acute management of manic episodes with bipolar disorder and the acute management of depressive episodes associated with bipolar I and bipolar II disorder ("approved uses").

3    Seroquel is also used to treat anxiety, sleep disorders, depression and dementia-related psychosis. These are known as off-label uses that Health Canada does not approve.

4    The plaintiffs allege that the defendants designed, developed, manufactured and sold Seroquel for approved and "off-label" uses and are responsible for the health risks that the drug causes.

WestlawNext· CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

5    The plaintiffs seek to certify this action on behalf of a class consisting of "all persons in Canada who were prescribed and who consumed Seroquel."

**Overview of the Pleadings and Certification Motion**

6    This action was commenced over five years ago. There have been several amendments to the statement of claim. On this motion, the defendants consented to the "Second Amended Fresh as Amended Statement of Claim" (the "statement of claim"). This amendment was required to remove Bernard Van Kerrebroeck as a representative plaintiff because he no longer wishes to act in this role. The defendants filed a statement of defence to an earlier version of the statement of claim.

7    The statement of claim alleges that the plaintiff Joanne Martin was prescribed Seroquel in September 2005 as treatment for bipolar disorder. Ms. Martin consumed up to 600 mg of Seroquel on a daily basis for approximately 1 year, at which point she stopped consuming Seroquel. While taking Seroquel, Ms. Martin alleges that she experienced side effects, including significant weight gain (approximately 55 pounds) and problems with her balance which caused her to fall down frequently. After she stopped taking Seroquel, Ms. Martin pleads that she was able to lose a portion of the weight that she had gained and no longer experienced difficulties maintaining her balance. The plaintiff Don Martin is Joanne Martin's husband. He asserts a claim on behalf of all Family Law Act claimants.

8    The statement of claim alleges that the plaintiff Corrine Middleton was prescribed Seroquel in June 2005 to treat stress and obsessive compulsive behavior. This was an off-label use. Ms. Middleton consumed up to 175 mg of Seroquel daily, for approximately 6 months, at which point she stopped consuming Seroquel. While taking Seroquel, Ms. Middleton alleges that she experienced side effects, including significant elevated blood sugars and weight gain (approximately 25 pounds), neuropathy, hyperglycemia, loss of energy, increased thirst, numbness in her hands and feet, and soreness in her feet. In addition, Ms. Middleton states that she was diagnosed with diabetes in or about November 2005. Ms. Middleton had tested negative for diabetes in October 2003. After she stopped consuming Seroquel, Ms. Middleton was able to lose a portion of the weight that she had gained as a result of taking Seroquel.

9    The plaintiffs allege that Seroquel causes health risks that are described in para. 20 of the statement of claim as follows:

Seroquel causes serious and sometimes fatal injuries to the liver, kidneys and pancreas. Its adverse effects include, but are not limited to, ketoacidosis, pancreatitis, diabetes mellitus, weight gain, impaired glucose regulation, hyperglycemia, blindness, cataracts, increased thirst and hypoglycemia. Other serious injuries include a potentially fatal condition referred to as neuroleptic malignant syndrome (NMS), tardive dyskinesia, which can cause potentially irreversible, involuntary movements and other serious health problems associated with the onset of diabetes including heart disease, blindness, coma, seizures and death.

10    Further it is alleged in para. 22 of the pleading that the "specific risk associated with Seroquel and the new onset of diabetes is nearly 3.34 times higher than older drugs used to treat schizophrenia" and that "Seroquel has a much greater increased association with the onset of diabetes mellitus than any other anti-psychotic on the market."

11    The plaintiffs allege that the group of AstraZeneca companies are jointly responsible for all health risks associated with Seroquel and the damages that the plaintiffs and putative class have suffered. It is alleged that the defendants designed, developed, manufactured, promoted, distributed and sold Seroquel in Canada for the approved uses. It is also alleged that that they heavily marketed Seroquel for off-label uses.

12    The plaintiffs allege in para. 21 of the pleading that the product warnings for Seroquel were "vague, incomplete or otherwise wholly inadequate, both substantively and graphically, to alert prescribing physicians as well as consumer patients of the actual Health Risks associated with consuming Seroquel."

13    Further, the plaintiffs allege that the defendants conspired and agreed together to submit false, inaccurate, incomplete, and misleading information to Health Canada and the FDA, conceal the Health Risks associated with the consumption of Seroquel,

mislead the putative class members, health care providers and others about the safety and efficacy of Seroquel, delayed the amendment of package inserts and core data sheets to include warnings about the Health Risks associated with the consumption of Seroquel and engaged in a marketing campaign promoting the safety of Seroquel for off-label use, including use as a sleep aid and to treat anxiety, dementia-related psychosis and depression.

14    The respective roles of the defendants are set out in the statement of defence. AstraZeneca plc is incorrectly named by the plaintiffs as "AstraZeneca Pharmaceuticals plc." AstraZeneca plc is a public limited company organized under the laws of England and Wales, with its registered office located in London, England. AstraZeneca plc was formed in 1999 following a merger between Zeneca Group plc and Astra AB (this defendant is referred to as "AZ UK").

15    AstraZeneca plc is a holding company that indirectly owns 100% of AstraZeneca Canada Inc. ("AZ Canada") and AstraZeneca Pharmaceuticals LP ("AstraZeneca Pharmaceuticals"). AstraZeneca plc does not carry on business in Canada and did not at any material time manufacture, package, label, test, study, store, market, sell and/or distribute Seroquel for use in Canada.

16    AstraZeneca Pharmaceuticals ("AZ US") is an American company carrying on business as a Delaware limited partnership with its principal place of business in Wilmington, Delaware, U.S.A. AstraZeneca Pharmaceuticals is a brand name pharmaceuticals company that develops and manufactures prescription medicines in a number of therapeutic areas.

17    AZ US, *inter alia*, manufactures, packages, labels, tests, studies, stores, markets, sells, and/or distributes Seroquel for prescription by licensed physicians throughout the United States pursuant to approval by the United States Food and Drug Administration (the "FDA"). AZ US does not carry on business in Canada.

18    AZ Canada is an Ontario corporation carrying on business in Mississauga, Ontario. AstraZeneca Canada is a brand name pharmaceuticals company that develops prescription drugs in a number of therapeutic areas. Amongst other things, AstraZeneca Canada imports, packages, labels, tests, studies, stores, markets, sells, and/or distributes Seroquel for prescription by licensed physicians throughout Canada pursuant to approval by Health Canada.

19    AZ Canada has no authority to act as the agent for AZ UK or any subsidiary of AZ UK, including AZ US.

20    The statement of defence describes the development of Seroquel, its approved uses and the product warnings (what is known as the "product monograph"). In great detail, the defendants deny the allegations against them. They plead that they complied with all Health Canada requirements affecting Seroquel and that Seroquel is a safe and effective drug used to treat approved illnesses. Further, they deny that they marketed Seroquel for any off-label uses.

**The Evidence**

21    Before reviewing the evidence, it is important to note the purpose of evidence on a certification motion. Evidence explains the background to the action. A certification motion is not the time "to resolve conflicts in the evidence or to engage in finely calibrated assessments of evidentiary weight": *Cloud v. Canada (Attorney General)*, [2004] O.J. No. 4924 (Ont. C.A.) at para. 50 ("Cloud").

22    Motions for certification are procedural in nature and are not intended to provide the occasion for an exhaustive inquiry into factual questions that would fall to be determined at a trial when the merits of the claims of class members are in issue: see *Lambert v. Guidant Corp.*, [2009] O.J. No. 1910 (Ont. S.C.J.) at para. 82, leave to appeal ref'd [2009] O.J. No. 4464 (Ont. Div. Ct.) ("Lambert").

23    A plaintiff's evidentiary burden on a certification motion is low and the plaintiff is only required to adduce evidence to show some "basis in fact" to meet the requirements of ss. 5(1) (b) to (e) of the test for certification as a class action: see *Hollick v. Metropolitan Toronto (Municipality)*, [2001] 3 S.C.R. 158 (S.C.C.) at paras. 16-26 ("Hollick"); *Lambert* at paras. 56-74 (S.C.J.); *Cloud* at paras. 49 - 52 (C.A.); *Grant v. Canada (Attorney General)*, [2009] O.J. No. 5232 (Ont. S.C.J.) at para.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

21; *LeFrancois v. Guidant Corp.*, [2009] O.J. No. 2481 (Ont. S.C.J.) at paras. 13-14, leave to appeal ref'd [2009] O.J. No. 4129 (Ont. Div. Ct.) ("LeFrancois"); *Ring v. Canada (Attorney General)*, [2010] N.J. No. 107 (N.L. C.A.) ("Ring").

24     A defendant is entitled to deliver evidence in rebuttal, but the standard of proof on the defendant is inversely heavy. On a certification motion, it is not enough for the defendant to establish on a balance of probabilities that the facts differ from those asserted by the plaintiff. Rather the onus is to show that that there is no basis in the evidence for the facts asserted by the plaintiff. Evidence directed at the merits of the action may be admissible if it also bears on the requirements for certification. In determining the weight to be given to the defendant's rebuttal evidence, it is not the function of the court at the certification stage to decide factual issues in the same manner, and to the same extent, as when the court exercises its function as a trier of fact in the exercise of its ordinary jurisdiction: see *Lambert* at paras. 68-69.

25     While the evidentiary threshold for meeting the statutory criteria is low, the court has a gatekeeper function and it must consider all of the admissible evidence and decide if the s. 5 criteria are satisfied. Evidence tendered on a motion for certification of a class proceeding must meet the usual criteria for admissibility: see *Ernewein v. General Motors of Canada Ltd.*, 2005 BCCA 540, 260 D.L.R. (4th) 488 (B.C. C.A.), at para. 31 ("Ernewein"), leave to appeal to SCC dismissed, (2006), [2005] S.C.C.A. No. 545 (S.C.C.); see also *Singer v. Schering-Plough Canada Inc.*, 2010 ONSC 42, 87 C.P.C. (6th) 276 (Ont. S.C.J.), at paras. 49-50 ("Singer"); *Schick v. Boehringer Ingelheim (Canada) Ltd.*, 2011 ONSC 63 (Ont. S.C.J.), ("Schick").

*Sources of Evidence*

26     The parties filed extensive affidavit evidence. The plaintiffs each filed an affidavit as did Victoria Paris, a lawyer with the class counsel team. The plaintiffs also filed affidavits from two experts: Dr. William C. Wirshing and Dr. Laura M. Plunkett.

27     Dr. Wirshing is a psychiatrist, the Vice President of research and continuing medical education at Exodus Inc. in Culver City, CA; Clinical Director of Exodus Real Recovery in Westlake Village, CA; Medical Director of Psychological Care and Healing in West Los Angeles, CA; and an Adjunct Professor of Psychiatry at the Keck School of Medicine at the University of Southern California in Los Angeles, CA. He has considerable experience treating patients who suffer from various mental illnesses. This experience includes many years of treating patients with a variety of medications including Seroquel. His affidavit replies to the defendants' expert opinions that deal with the alleged relationship between Seroquel and metabolic disorders, and related issues.

28     Dr. Plunkett is a pharmacologist, toxicologist, United States Food and Drug Administration regulatory specialist and principal of a consulting company called Integrative Biostrategies, LLC. Integrative Biostrategies is a Houston-based consulting firm that works at the interface of biological science, regulatory affairs and business decisions to provide its clients with science-based solutions to issues associated with product development and stewardship. Before joining Integrative Biostrategies in 2001, Dr. Plunkett was the head of a consulting firm called Plunkett & Associates. Dr. Plunkett is board-certified as a Diplomate of the American Board of Toxicology. She has over twenty years of experience in the areas of pharmacology and toxicology, has worked in both government and academic research and has taught pharmacology and toxicology at the undergraduate and postgraduate levels.

29     Dr. Plunkett offers her opinion on whether use of Seroquel is causally associated with adverse metabolic effects and whether the Canadian labelling contained appropriate warnings based on what was publically known about the potential metabolic side-effects of Seroquel.

30     The defendants filed affidavit evidence from five experts: Dr. Barry Arnold, Dr. Eugene Barrett, Dr. Pierre Chue, Dr. Gwenderlyn Jansz and Anne Tomalin. They also filed a solicitor's affidavit from Katherine Stubits.

31     Dr. Arnold was responsible for Drug and Patient Safety at AstraZeneca from October 1992 to June 2006. Since 2006, in his current role as European Union Qualified Person for Pharmacovigilance, he has continued to be actively involved in the defendants' safety surveillance and evaluation programs for Seroquel. Dr. Arnold was integral in developing and implementing the safety surveillance procedure detailed in his affidavit. His affidavit also speaks to the pharmacovigilance the defendants have engaged in with respect to Seroquel over the years and addresses some of the issues raised in Victoria Paris's affidavit.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

32     Dr. Barrett is an endocrinologist and a professor at the University of Virginia. He chaired the November 2003 Consensus Conference on the relationship between second generation antipsychotics and obesity, diabetes, and lipid disorders. His affidavit reviews his opinion on the lack of a causal relationship between Seroquel and diabetes. It also addresses the nature of the analysis that would have to be done to determine "general causation" and individual injury causation for diabetes and weight gain.

33     Dr. Chue, a Canadian psychiatrist with considerable experience in the field of atypical antipsychotics, and Dr. Jansz, a family physician experienced in the treatment of mentally ill patients, provide evidence that address the role of Seroquel in treating mentally ill patients, the analysis in relation to "general causation" and individual injury causation, and address issues relating to the duty to warn and informed consent.

34     Anne Tomalin is a Canadian regulatory expert with 40 years of experience dealing with Heath Canada and its regulations. She describes the comprehensive regulatory regime within which AZ Canada operates. Ms. Tomalin reviewed AZ Canada's regulatory filings for Seroquel. She offers an opinion regarding AZ Canada's compliance with its regulatory obligations.

35     Finally, Kathy Stubits is a law clerk. Her affidavit attaches the proposed representative plaintiffs' medical records to provide an evidentiary basis for the opinions of Drs. Barrett and Chue.

*Admissibility Issues*

36     The defendants take the position that some of the plaintiffs' evidence is inadmissible and should be struck. In their written argument the defendants say that the following evidence is contentious:

(1) Statements by Dr. Laura Plunkett, sworn November 23, 2007, which are outside of her area of expertise, and/or are bald and conclusory and made without the requisite foundation in fact;

(2) All statements that constitute boilerplate, opinion, speculation, and statements of medical or legal opinion contained in the affidavits of the plaintiffs, Joanne Martin and Corrine Middleton, sworn November 22, 2007 and November 23, 2007 respectively;

(3) Documents attached to the solicitor's affidavit of Victoria Paris, sworn August 22, 2011. Her affidavit attaches 29 exhibits, 24 of which the defendants say are inadmissible; and

(4) Documents marked as exhibits to the cross-examination of the defence witness, Dr. Barry Arnold.

37     Initially, the plaintiffs objected to significant portions of Dr. Arnold's affidavit and requested that the court strike certain paragraphs of his affidavit. The complaint was based on the plaintiffs' position that parts of the affidavit were inadmissible because Dr. Arnold did not have direct knowledge of the evidence in issue. Further they relied on Dr. Arnold's evidence on his cross-examination when he stated that he did not talk to anyone at AstraZeneca Canada before swearing his affidavit. This request to strike Dr. Arnold's evidence was withdrawn in the plaintiffs' Admissibility of Evidence factum where the plaintiffs state that all evidence should be placed before the court and the court can "decide what weight if any to give to the evidence" that the plaintiffs and defendants have filed.

38     The proposal that the certification judge should weigh all the evidence is contrary to the direction in *Cloud*. Obviously there is a distinction between determining the admissibility of evidence and deciding what weight to attach to evidence that is admissible. As the gatekeeper, it is the role of the certification judge to determine admissibility. It is not the role of the certification judge to assess and weigh evidence and resolve conflicts in the evidence. When considering all of the admissible evidence that is before the court, the certification judge is assessing if there is some basis in fact for the s. 5(1) (b)-(e) criteria.

39     This limitation on the role of the certification judge does not mean that the court should accept the plaintiffs' affidavit without regard for the defendants' evidence. The court must consider all of the admissible evidence, including the cross-examinations, to decide if there is some evidence to support the s. 5 test.

40      The plaintiffs argue that courts in Ontario routinely adopt a more flexible approach to the admissibility of evidence on certification motions. I disagree. The plaintiffs rely on *LeFrancois* at para. 17 but it does not does not stand for the principle that admissibility rules should be relaxed on a certification motion.

41      In *LeFrancois*, Cullity J. was dealing with a different evidentiary issue. Having already certified the action, there was a dispute about the cut off dates to limit the plaintiff class. The defendant wanted to submit further fresh evidence to show that without the proposed cut off, notices would be set to people who did not have one of the defective alarm defibrillators. The plaintiff argued that this evidence was available during the certification motion and should not be allowed. Cullity J. decided to allow the evidence because to deny it would result in people being included who had no need to be put on notice about the action. While the usual rule of evidence precluded the introduction of fresh evidence that was always available, the court chose not to apply such a rigid exclusion of evidence in this unique situation.

42      *LeFrancois* does not stand for the general proposition that admissibility rules are relaxed on a certification motion. In fact there are numerous decisions confirming that evidence tendered on a certification motion must meet the usual criteria for admissibility: see *Schick* at para. 13; *Ernewein*, at para. 31; *Williams v. Canon Canada Inc.*, 2011 ONSC 6571 (Ont. S.C.J.) at para. 65; *Ring* at para. 21.

43      Basic evidentiary rules that govern affidavits are set out in rules 4.06(2) and 39.01(4) of the *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 that provide as follows:

> 4.06(2) An affidavit shall be confined to the statement of facts within the personal knowledge of the deponent or to other evidence that the deponent could give if testifying as a witness in court, except where these rules provide otherwise.

> 39.01(4) An affidavit for use on a motion may contain statements of the deponent's information and belief, if the source of the information and the fact of the belief are specified in the affidavit.

44      The court's "gatekeeper" role dealing with expert evidence is clear. Such evidence can only be tendered through a properly qualified expert: see *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.) at p. 20 ("*Mohan*"). This principle has been applied in several certification motions: see *Chopik v. Mitsubishi Paper Mills Ltd.* (2002), 26 C.P.C. (5th) 104 (Ont. S.C.J.); *Punit v. Wawanesa Mutual Insurance Co.* (2006), 45 C.C.L.I. (4th) 109 (Ont. S.C.J.); *Ernewein*; *Stewart v. General Motors of Canada Ltd.*, [2007] O.J. No. 2319 (Ont. S.C.J.) ("Stewart").

45      When expert evidence is admissible and produced on a motion for certification, the nature and amount of investigation and testing required to provide a basis for a preliminary opinion will not be as extensive as would be required for an opinion given at trial. It follows that some lesser level of scrutiny is applied to the opinions offered, if they are otherwise admissible: see *Stewart* at para. 19.

46      This motion for certification fails regardless of the admissibility issues. As explained below, the plaintiffs have not satisfied s. 5(1)(a). In these circumstances there is no need to embark on a consideration of the defendants' attack on the admissibility of the plaintiffs' evidence. However, I will deal with what I consider to be the main admissibility issue: the admissibility of Dr. Plunkett's evidence.

### Defendants' Position - Admissibility of Dr. Plunkett's Evidence

47      The defendants argue that several portions of Dr. Plunkett's affidavit should be struck because the opinions she provides are outside the scope of her qualifications. Other parts of her affidavit are inadmissible because the defendants say the opinions lack the cogency and factual foundation required for admission of expert evidence. Finally, the defendants say that several of Dr. Plunkett's assertions do not arise out of any direct knowledge and she fails to set out any basis for her assertions that would permit them to be tested.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

48    I will review Dr. Plunkett's qualifications and her opinion as it is set out in her affidavit and explained further on cross-examination. The defendants identify specific paragraphs in Dr. Plunkett's affidavit that they say should be struck. As I review Dr. Plunkett's evidence I will deal with each of these paragraphs.

*Dr. Plunkett's Qualifications*

49    Dr. Plunkett's qualifications are described in her affidavit and as well she was cross-examined on this issue. She describes herself as a "pharmacologist," a "toxicologist" and a "United States Food and Drug Administration (FDA) regulatory specialist." She is a consultant based in Houston. She holds a Ph.D. and conducted doctoral research relating to "cardiovascular pharmacology." Dr. Plunkett describes her expertise as relating to the fields of "pharmacology, toxicology, regulatory issues, and drug efficacy and risk-benefit analysis."

50    When cross-examined, Dr. Plunkett agreed as follows. She is not a medical doctor and does not treat or diagnose patients or prescribe medications to them. She would "definitely" defer to psychiatrists in the diagnosis and treatment of psychiatric illnesses and would "absolutely" defer to endocrinologists in the diagnosis and treatment of diabetes. It is clear that Dr. Plunkett is not qualified to provide expert medical evidence and cannot opine on the risk-benefit analysis that is part of a medical decision to prescribe medication to a patient.

*Review of Dr. Plunkett's Affidavit*

51    The following is a review of Dr. Plunkett's evidence. I will identify what parts of her evidence are objected to and rule on the admissibility as I progress through her evidence.

52    Dr. Plunkett states in her affidavit that she reviewed the following material:

a) scientific literature relating to the pharmacology and toxicology of anti-psychotic drugs in general and quetiapine (Seroquel) in particular;

b) labelling for Seroquel as provided by the Physician's Desk Reference;

c) the regulations of the U.S. Food and Drug Administration (FDA) relating to the development, approval, labelling and marketing of prescription drug products; and,

d) warnings provided by Health Canada in relation to the use and consumption of quetiapine (Seroquel).

53    Dr. Plunkett's affidavit provides a brief description of bipolar disorder and schizophrenia and the atypical anti-psychotic drugs used to treat these conditions. She reviews the difference between the older anti-psychotic drugs and the atypical ones that followed, such as Seroquel.

54    The affidavit lists the symptoms that are treated with Seroquel including off-label uses. Dr. Plunkett explains how Seroquel is absorbed in the body and she lists the adverse effects ("health risks") of the drug. The defendants do not object to any of this evidence. They agree that Dr. Plunkett can opine on causation but not the product warnings.

55    The health risks that Dr. Plunkett describes are as follows:

21. Seroquel use has been associated with deaths that have been attributed to severe liver, kidney, and pancreatic damage. Its adverse effects include, but are not limited to, ketoacidosis, pancreatitis, diabetes mellitus, weight gain, hyperglycemia, blindness, increased thirst, and hypoglycemia. Other serious injuries associated with Seroquel use include: a potentially fatal condition known as neuroleptic malignant syndrome (NMS); tardive dyskinesia, which can cause potentially irreversible, involuntary movements; and other serious health problems associated with the onset of diabetes including heart disease, blindness, coma, seizures and death ("Health Risks"). These Health Risks have been reported following both short-term and longer-term use of Seroquel.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

56    Dr. Plunkett states that it has been known for decades that many anti-psychotic drugs have effects to alter metabolism that can lead to weight gain and effects on glucose metabolism. Since 1999, it has been recognized that there are differences among the anti-psychotic drugs in relation to their propensity for inducing weight gain and changes in glucose metabolism, including the onset of diabetes. Further, since 2002 it has been recognized that clinically significant hyperglycemia and diabetic complications can occur during anti-psychotic treatment both with and without changes in weight gain.

57    Dr. Plunkett states that between January 1997 and July 2002 there were numerous adverse drug event reports to the US Food and Drug Administration, including reports that patients taking Seroquel experienced significant Health Risks. Her affidavit attaches copies of journal articles that discuss the relationship between Seroquel and some of the Health Risks. Dr. Plunkett includes a very brief sentence for each article describing what the author concluded. All of the articles dealt with the risk of diabetes when consuming Seroquel. In one case Dr. Plunkett attached an article from the Wall Street Journal about a study, rather than the study itself.

58    Dr. Plunkett relies on the above articles to provide the following opinion regarding the causal connection between Seroquel and the Health Risks. In paragraphs 31-32 of her affidavit she states:

> 31 <u>When considered as a whole in a weight-of-the-evidence assessment, the available scientific data indicate that Seroquel can cause physiological effects known to be risk factors for diabetes, including increased body weight and other metabolic effects, and can cause diabetes itself.</u> The scientific data include case reports published on an ongoing basis since 1999, a survey of adverse drug reports, epidemiological data assembled since 1999, and animal data. In reaching this conclusion, I have considered each source of information as important in the analysis of the risks associated with the consumption of Seroquel and have used the information in a manner that is consistent with accepted methods for establishing causation in a weight-of-the-evidence analysis.

> 32. <u>I believe that the available scientific data demonstrate that Seroquel consumption and use is associated with increased human Health Risks, including but not limited to an increased risk of clinically significant body weight gain, hyperglycemia, altered glucose metabolism, and an increased risk of diabetes and diabetes-related complications.</u>

[Emphasis added.]

59    The defendants say that the opinion in the underlined portions of the above paragraphs should be struck because it lacks cogency and a factual foundation. When the defendants cross-examined Dr. Plunkett about this opinion, she conceded that she did not include the epidemiology studies that say there is no association between Seroquel and diabetes. As a result, the defendants say that this opinion is based on an unbalanced sampling of published research. Further, the defendants criticize the opinion because Dr. Plunkett provided no analysis for the opinion. In my view, the defendants' position is asking the court to assess and weigh Dr. Plunkett's evidence in these paragraphs, a task that is outside the scope of certification.

60    Dr. Plunkett states that clinical trials performed with Seroquel as part of the drug development process are limited in their ability to identify risks associated with the drug's use in the general population. This is because drug development clinical trials are performed in either healthy volunteers or in patients that have often been pre-screened for the propensity to develop adverse effects such as hyperglycemia or diabetes, with such patients then usually excluded from studies. It is only after a drug has been placed on the market, and wider exposure is seen, that a true picture of the adverse effects associated with a drug can be observed. As a result, Dr. Plunkett believes that companies have a duty to carefully monitor their drugs after approval and during marketing for either the existence of new adverse events or a higher than expected incidence of known adverse effects. There is no objection to this evidence.

61    The defendants object to the opinion in paragraph 35 of Dr. Plunkett's affidavit where Dr. Plunkett states that that "Seroquel is not unique in terms of its efficacy" and there are "safer alternative therapies." Paragraph 35 states as follows:

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

Studies have shown that other anti-psychotic drugs have similar effectiveness to Seroquel but have less risk for hyperglycemia, weight gain, metabolic disturbances and diabetes. Therefore, there are safer alternative therapies that could be used that would also provide for effective treatment but with fewer side effects.

62    Support for this opinion is given in paragraph 36 where Dr. Plunkett adds as follows:

...in the CATIE Schizophrenia Trial, a trial sponsored by the National Institute of Mental Health which is the largest trial conducted to date comparing efficacy and safety of some of the most prescribed anti-psychotic drugs, it was shown that clozapine was more effective than other atypical anti-psychotics (*i.e.*, Seroquel, Zyprexa, Risperdal). Further, when all of the atypical agents studied were examined, including Seroquel, none of the agents was more effective or better tolerated than the typical anti-psychotic, perphenazine.

63    The defendants argue that the evidence in paragraph 35 is an assertion that should be struck because Dr. Plunkett did not state any foundation facts or rationale for this opinion. They say that the assertion that "safer" alternatives to Seroquel were available was made without having considered what alternatives were in fact available on the Canadian market at various times, whether these alternatives were "safer" and without even identifying the so called safer alternatives. However, Dr. Plunkett does add support for her opinion in paragraph 36. Once again, the defendants' position goes beyond the scope of challenge that is permitted on a certification motion. While the defendants have raised compelling reasons to question the usefulness of this opinion, this is a challenge that goes to the weight to be attached to this opinion, not its admissibility.

64    The rest of Dr. Plunkett's affidavit discusses the warnings of the health risks associated with Seroquel. The defendants say that the following paragraphs seek to provide opinions outside Dr. Plunkett's area of expertise and are therefore inadmissible. Only the sentences underlined in para. 39 are in issue.

37. Despite the findings of the studies discussed above, AstraZeneca failed to warn Health Canada, the FDA, physicians, other health practitioners, and patients of the Health Risks associated with the consumption of Seroquel at the time these risks were first identified.

38. A review of the most recent product monograph for Seroquel that is available to both health professionals and consumers in Canada demonstrates that, in my opinion, the warnings related to risks of hyperglycemia and diabetes in particular are not adequate to convey the risks posed by Seroquel itself. In the health professional section of the monograph, the discussion of hyperglycemia and diabetes is put forth as an effect of anti-psychotics in general only. Moreover, the monograph section intended for consumers fails to even mention these health risks.

39 <u>At the time that the Seroquel monograph in Canada failed to adequately warn physicians and consumers of the risks associated with use of the drug, other international regulatory bodies were requiring specific changes to product labelling related to the risks of hyperglycemia and diabetes that were associated with Seroquel, not anti-psychotics in general.</u> For example, in Japan, physicians were being specifically warned to not use Seroquel in patients with a history of diabetes and to monitor patients for development of glucose abnormalities during treatment with Seroquel, regardless of their medical history. Additionally, in 2005 permission to market Seroquel in France had been denied due in part to the risk of hyperglycemia and diabetes associated specifically with Seroquel, again not anti-psychotics in general. <u>Accordingly, I believe that the Defendants were not supplying physicians and consumers in Canada with risk information related to hyperglycemia and diabetes even though actions had been taken in other countries to warn physicians and patients of these risks.</u> 40. I believe that the product warnings in place at the time were wholly inadequate to warn health care providers and patients of the significant Health Risks associated with the consumption of Seroquel. Nonetheless, Seroquel was marketed heavily by the Defendants as safe and effective for the treatment of bipolar disorder and schizophrenia, promising fewer side effects than other similar treatments including the other atypical anti-psychotics on the market. Further, Seroquel was being prescribed by physicians for treatment of conditions other than bipolar disorder and schizophrenia, which use I believe was known by the Defendants.

. . .

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

42. I believe that the Defendants knew of the Health Risks associated with ingesting Seroquel. I believe that the Defendants failed to disclose these risks because of the anticipated negative impact it would have on the sale and consumption of Seroquel.

[Emphasis added.]

65    This case is about the marketing, sale and use of Seroquel in Canada not the United States. It is about the Canadian regulatory system that approves drugs such as Seroquel for use in Canada. It is Health Canada's approval of Seroquel in Canada and the defendants' warnings (product monographs) that Health Canada approved that are relevant, not the actions of the FDA in the United States. Dr. Plunkett does not have the necessary expertise to opine on the regulatory regime in Canada, what Seroquel was approved for in Canada and whether the Canadian warnings were adequate.

66    Dr. Plunkett's training and experience is entirely based in the United States. She has never worked or studied in Canada. Her only Canadian work appears to be the swearing of an affidavit dealing with Seroquel in the Quebec class action litigation. Dr. Plunkett admits that the Quebec affidavit is substantially identical to the one sworn for this motion. To the extent that Dr. Plunkett has regulatory expertise, it is purely American. She has no Canadian training or experience that could enhance her American expertise to any of the Canadian regulatory issues in this litigation. She conceded that her affidavit says nothing at all about Canadian requirements for the approval or labelling of pharmaceutical products. While I appreciate that Dr. Plunkett has some expertise, it is grounded in her American work experience. Further, there is no evidence to show that such expertise is transferable to the regulation of drugs in Canada.

67    An expert witness is properly qualified to express an opinion only if he or she is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify (see *Mohan* at para. 27). It is clear that Dr. Plunkett does not have the relevant expertise. I conclude that paras. 37- 42 of Dr. Plunkett's affidavit are inadmissible (only the underlined portions of para. 39 are inadmissible).

*Overview of Seroquel*

68    Seroquel is one of a class of medicines known as "atypical antipsychotics" or "second generation antipsychotics." Seroquel is approved in Canada for the treatment of schizophrenia and bipolar disorder, both of which are incurable psychotic illnesses.

69    Before the second generation antipsychotics arrived on the market in Canada in the 1990s, these psychotic illnesses were treated with a class of medications known as first generation antipsychotics. The advent of first-generation antipsychotics in the middle of the last century marked a significant advancement in the treatment of these devastating illnesses. Previously, there was no effective treatment for these illnesses.

70    While first generation antipsychotics are effective in treating some aspects of schizophrenia and bipolar disorder, they are strongly associated with many side effects, including disabling and stigmatizing neurological movement disorders, including extrapyramidal side effects and tardive dyskinesia. Tardive dyskinesia is irreversible in 50% of those afflicted. Indeed, the neurological side effects of first generation antipsychotics are so prevalent that the class of drugs became known as "neuroleptics."

71    A search for medications with efficacy to treat psychotic illness but without the debilitating neurological side effect burden of first generation antipsychotics led to the development of the second generation antipsychotics. The second generation antipsychotics are referred to as "atypical" because they are better tolerated and have far less neurological effects than first generation antipsychotics. The second generation antipsychotics generally also have better efficacy in treating the negative, cognitive and affective symptoms of psychiatric illness.

72    The individual response to these medications is highly variable in terms of both efficacy and side effects. Efficacy and tolerability cannot be accurately predicted in any given individual. Further, a person's own response to treatment may change over time.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

73    Today, second generation antipsychotics are recognized as the first line treatment for schizophrenia and bipolar disorder and use of first generation antipsychotics is no longer regarded as the standard of care in most clinical situations in Canada.

74    Seroquel came to market in Canada in 1998 as the fourth second generation antipsychotic that Health Canada approved. The other second generation antipsychotics and their dates of approval are: Clozaril (clozapine) in 1991; Risperdal (risperidone) in 1994; and Zyprexa (olanzapine) in 1996.

75    As described by Dr. Chue, it is generally accepted in clinical practice in Canada that Seroquel has the most benign side effect profile of the second generation antipsychotics. Dr. Wirshing agrees that Seroquel is the best in its class in terms of subjective tolerability and is in the "upper tiers" in terms of overall toxicity.

76    All of the experts, including Dr. Wirshing and Dr. Plunkett, agree that Seroquel is an effective drug.

*Approval of Seroquel in Canada*

77    In order to market a drug in Canada, a manufacturer must file a New Drug Submission and receive a Notice of Compliance from Health Canada.

78    The Seroquel New Drug Submission consisted of 150 volumes of materials, which included, amongst other things, voluminous safety data, non-Canadian package inserts, a draft Seroquel Product Monograph and clinical trial reports. All of the data submitted as part of the New Drug Submission related to treatment of schizophrenia.

79    Following a review of the New Drug Submission by a specialized group of scientists at Health Canada, Seroquel was first approved in Canada as safe and effective for the treatment of schizophrenia on December 2, 1997.

80    On November 5, 2004, Health Canada approved Seroquel for the acute management of manic episodes associated with bipolar disorder. As of that date, prescribing and safety information relating to bipolar mania was added to the product monograph. Every prescription medicine in Canada is required to have a product monograph, which contains, *inter alia*, prescribing information, warnings, and other safety information for that medication.

81    Health Canada approved Seroquel for the acute treatment of the depressive episodes associated with bipolar I and bipolar II disorder on August 18, 2008. In conjunction with that approval, further prescribing information and safety data relating to bipolar depression was added to the product monograph.

*The Seroquel Product Monograph and the "Health Risks"*

82    The defendants' regulatory expert, Anne Tomalin, explains the role of the product monograph, how it is approved and its content. She describes Health Canada's review of a new drug submission as rigorous and exacting. The product monograph is subject to its own review by scientific experts with clinical and/or medical expertise. An excerpt from page 12 of her report discussed this evidence as follows:

> The Product Monograph is regarded as "labelling" in Canada. All labels must have a statement that says, "Product Monograph available on request", or a similar statement. Once approved, the manufacturer is required to distribute a copy of the Product Monograph to all physicians at the time of marketing the product. Also, a copy of the Product Monograph is posted on the Health Canada website.

> During the review of an NDS [New Drug Submission], the Product Monograph is reviewed sentence by sentence and word by word to ensure that the very best information is provided to Healthcare Professionals when the document is approved. The reviewer carefully compares the wording in the proposed Product Monograph contained within the NDS to their notes and understanding of the data in the submission. They also compare the wording to the wording of the Product Monographs of other similar products in Canada, and to the international labelling that is available for the drug. The reviewer then ensures that there is consensus within the Therapeutic Division at Health Canada in terms of the revisions required. When

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

all of the revisions are ready, a Clarifax is sent to the company outlining all of the changes required. Frequently meetings or teleconferences are set up to discuss the changes required to ensure that there is a clear reflection of the data in the NDS.

**Contents of a Product Monograph**: There are three parts to the Product Monograph:

• Part 1 is referred to as the Prescribing Information for healthcare professionals. If there is a package insert for the healthcare professional, it must be identical to Part 1 of the Product Monograph. Part 1 of the Product Monograph is provided to a publication called the Compendium of Pharmaceutical Specialties (CPS), which is published and provided free of charge to all physicians and pharmacists in Canada once a year.

• Part 2 is referred to as the Scientific Information and contains information on the animal and clinical studies used to approve the drug.

• Part 3 is referred to as the Consumer Information section of the Product Monograph. If there is a package insert for the patient, it must be identical to Part 3 of the Product Monograph.

### *The Original Product Monograph - December 1997*

83    As already noted, every prescription medicine in Canada is required to have a product monograph, which contains, *inter alia*, prescribing information, warnings, and other safety information for that medication.

84    During Health Canada's review of the New Drug Submission, the draft product monograph is evaluated "sentence by sentence and word by word to ensure that the very best information is provided to Healthcare Professionals" (Anne Tomalin's report at p. 2122). The language in the product monograph is compared to the data in the New Drug Submission, the wording of product monographs of other similar medicines, and international labelling for the drug in question.

85    Once the product monograph is approved and a Notice of Compliance is issued, pharmaceutical companies distribute the product monograph to physicians across Canada and an up to date copy is posted on Health Canada's website. In addition, all product labels are required to indicate that the product monograph is available upon request.

86    The initial Seroquel product monograph, dated December 2, 1997, contained warnings and information about a number of the "Health Risks" based upon the clinical studies conducted in patients with schizophrenia. The 1997 product monograph included warnings for weight gain, tardive dyskinesia, cataracts, neuroleptic malignant syndrome, transaminase (liver enzymes) elevations, dizziness, impaired motor skills, dry mouth, seizures and death (in relation to neuroleptic malignant syndrome).

### *Revisions to the Product Monograph Regarding "Health Risks" Over Time*

87    Since December 1997, the Seroquel product monograph has been revised on 25 occasions. Nineteen of those revisions involved changes to the safety data contained in the product monograph.

88    Changes to a product monograph are a normal part of the life-cycle of a medicine. As both Dr. Plunkett and Ms. Tomalin have noted, it is only after a drug has been used in a broader population and over a greater amount of time that a full understanding of all of its risks and benefits can be known. Accordingly, the defendants (as well as Health Canada) have developed and implemented a robust drug safety program to identify and assess safety signals to determine if the worldwide labelling for its medicines need to be updated.

89    All of the defendants' medicines, including Seroquel, have a Core Data Sheet that contains the company's most up-to-date knowledge regarding the safety and efficacy of the medicine. In order to ensure that the Core Data Sheet contains the most current safety information, careful monitoring, evaluating, and reporting of adverse event reports takes place on a daily basis at the national level. In addition, the defendants routinely review the aggregate safety data for a medicine as a part of its SERM (Safety Evaluation and Review Meeting) process. Where new information results in a change to the safety profile of a medicine, the Core Data Sheet for the medicine is updated accordingly.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

90    The revised Core Data Sheet is then sent to regulatory staff in each country, including Canada, who work in consultation with the local regulatory authority to assess whether a change to that country's product monograph is warranted, and, if so, the content of that change. This assessment is based upon local regulatory standards, which differ between countries. Product monographs, therefore, vary from country to country. It is through this process that many of the changes to the Seroquel product monograph detailed below came about.

91    The dates of changes to the safety information contained in the Seroquel product monograph from 1997 to 2011 in relation to diabetes and weight gain are as follows. A diabetes warning (including exacerbation of diabetes, hyperglycaemia, diabetic ketoacidosis, diabetic coma, and death) was added to the product monograph on December 16, 2003 at the request of Health Canada as part of class-wide labeling for second generation antipsychotics. The warning was expanded on two occasions - April 25, 2005 and October 9, 2007. In addition, the April 2005 revision to the product monograph for diabetes added a recommendation that patients should be monitored for polydipsia (i.e., excessive thirst).

92    The original weight gain warnings in the product monograph were modified six times on the following dates: August 2, 2002; September 24, 2003; November 5, 2004; March 6, 2007; August 18, 2008; and May 19, 2009. The November 5, 2004 and August 18, 2008 revisions included the addition of weight gain data from the bipolar mania clinical trials and bipolar depression clinical trials, respectively, in conjunction with the approval of Seroquel for those indications.

**The Legal Framework**

93    Subsection 5(1) of the *Class Proceedings Act* sets out the criteria for the certification of a class proceeding. The language is mandatory. The court is required to certify the action as a class proceeding where the following five-part test for certification is met:

  (a) the pleadings or the notice of application discloses a cause of action;

  (b) there is an identifiable class of two or more persons that would be represented by the representative plaintiff or defendant;

  (c) the claims or defences of the class members raise common issues;

  (d) a class proceeding would be the preferable procedure for the resolution of the common issues; and

  (e) there is a representative plaintiff or defendant who,

    (i) would fairly and adequately represent the interests of the class,

    (ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

    (iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

94    These requirements are linked: "There must be a cause of action, shared by an identifiable class, from which common issues arise that can be resolved in a fair, efficient and manageable way that will advance the proceeding and achieve access to justice, judicial economy and the modification of behaviour of wrongdoers." (*Sauer v. Canada (Minister of Agriculture)*, [2008] O.J. No. 3419 (Ont. S.C.J.) at para. 14).

95    Winkler J. pointed out in *Frohlinger v. Nortel Networks Corp.*, [2007] O.J. No. 148 (Ont. S.C.J.) at para. 25 ("*Frohlinger*"), that the core of a class proceeding is "the element of commonality." It is not enough for there to be a common defendant. Nor is it enough that class members assert a common type of harm. Commonality is measured qualitatively rather than quantitatively. There must be commonality in the actual wrong that is alleged against the defendant and some evidence to support this.

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

96    The decision to certify is not merits-based. The test must be applied in a purposive and generous manner, to give effect to the important goals of class actions - providing access to justice for litigants; promoting the efficient use of judicial resources; and sanctioning wrongdoers and encouraging them to modify their behaviour: see *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534 (S.C.C.) at paras. 26-29 ("*Western Canadian Shopping*"); *Hollick* at para. 15.

97    In *Hollick*, at para. 25, the "some basis in fact" test was introduced when the court stated that "the class representative must show some basis in fact for each of the certification requirements set out in s. 5 of the Act, other than the requirement that the pleadings disclose a cause of action."

98    Since it is not the role of the court on a certification motion to "find facts," I conclude that *Hollick* directs the court to confirm that there is *some evidence* to support the s. 5 (b) - (e) requirements. This interpretation of the test is consistent with the low burden that rests on the plaintiff as explained in *Hollick* at para. 16 and consistent with how the numerous courts have applied the "some basis in fact" test: see *Fresco v. Canadian Imperial Bank of Commerce*, [2009] O.J. No. 2531 (Ont. S.C.J.) at para. 61 ("*Fresco*")).

### 5(1)(a) - Cause of Action

99    There have been several amendments to the statement of claim. On this motion, the defendants consented to the "Second Amended Fresh as Amended Statement of Claim." This amendment was required to remove Bernard Van Kerrebroeck as a representative plaintiff because he no longer wished to act in this role. The amendment is granted on consent. The defendants filed a statement of defence to an earlier version of the statement of claim.

100    The first criterion for certification is the disclosure of a cause of action. In *Cloud*, the Ontario Court of Appeal affirmed that the "plain and obvious" test from *Hunt v. T & N plc*, [1990] 2 S.C.R. 959 (S.C.C.) ("Hunt") that is used for Rule 21 motions is also used to determine whether the proposed class proceeding discloses a cause of action.

101    Unless the claim has a radical defect or it is plain and obvious that it could not succeed, the requirement in s. 5(1)(a) will be satisfied. This determination is to be made without evidence and claims that are unsettled in the jurisprudence should be allowed to proceed.

102    The pleading must be read generously to allow for inadequacies due to drafting frailties and the plaintiffs' lack of access to key documents and discovery information: see *Hunt* at 980; *Anderson v. Wilson* (1999), 44 O.R. (3d) 673 (Ont. C.A.), at 679.

103    Before considering whether the plaintiffs have satisfied the s.5(1)(a) criterion, I will deal with a preliminary point that the plaintiffs raised. They take the position that because the defendants filed a statement of defence, they have taken a fresh step and are precluded from disputing the plaintiffs' compliance with s. 5(1)(a).

104    The plaintiffs rely on *Bell v. Booth Centennial Healthcare Linen Services*, [2006] O.J. No. 4646 (Ont. S.C.J.) at paras. 5-6 ("Bell") and *Tribar Industries Inc. v. KPMG LLP*, [2009] O.J. No. 959 (Ont. S.C.J.) at para. 22 ("Tribar"). Both are decisions of Brown J. that involved motions to strike pleadings under Rule 21. In each case the defendant had already filed a statement of defence. In *Bell*, at para. 6, Brown J. stated that the "filing of a statement of defence signifies that the claim contains a recognizable cause of action to which the defendant can respond and should prevent a defendant from complaining subsequently about an irregularity in the statement of claim." However, in *Bell*, because the plaintiff did not object to the defendant bringing the motion, the court allowed it to proceed. In *Tribar*, the plaintiff raised the filing of the statement of defence as a bar to the motion and the court agreed. Brown J. noted, at para.22, that "[f]or courts to condone such a manner of pleading would strip the act of pleading over of any procedural significance and risk opening the door to interminable pleadings motions even after pleadings were closed."

105    The defendants rely on three decisions where despite the filing of the statement of defence, the court granted leave to bring the Rule 21 motion: see *Seale & Associates Inc. v. Vector Aerospace Corp.*, [2007] O.J. No. 1192 (Ont. S.C.J.); *Lynch v. Westario Power Inc.*, [2009] O.J. No. 2927 (Ont. S.C.J.); *Markeljevic v. Ontario (Financial Services Commission)*, [2005]

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

O.J. No. 2098 (Ont. S.C.J.). In these decisions the defendant did not concede in the statement of defence that a cause of action existed but rather disputed the existence of a cause of action in their pleading. The defendants in this action have taken the same approach and in paragraph 2 of their defence they plead that the statement of claim does not disclose a cause of action.

106     It is not necessary to resolve these two lines of cases. The issue in this case is unique to a class proceeding. I do not accept the plaintiffs' position that the filing of a statement of defence should preclude the defendants from taking a position on the s.5(1)(a) criterion. This is not a Rule 21 motion. While the same "plain and obvious test applies, the burden rests on the plaintiffs to satisfy s. 5(1)(a). A defendant may agree that there is a cause of action or dispute this criterion. Either way the plaintiff must still satisfy the court that the s. 5(1)(a) criterion is met. If the defendant disputes the existence of a cause of action and files a statement of defence this does not alter the plaintiff's burden.

*Analysis of the Causes of Action*

107     The plaintiffs say that they have pleaded the following causes of action: negligence and failure to warn, conspiracy and waiver of tort. In argument the plaintiffs agreed that waiver of tort is pleaded as a remedy.

108     For the numerous reasons that follow, this pleading is seriously deficient. It is plain and obvious that the causes of action as pleaded will fail. The plaintiffs have not satisfied the s. 5(1)(a) criterion.

109     Before considering whether the pleading discloses one or more of the causes of action, I will consider two fundamental problems with the way the causes of action are advanced against the defendants. First the description of each defendants' role is inconsistent with the alleged activities that are described in the pleading. Second, the pleading lumps the defendants together as a group and alleges that they are liable to the class for each cause of action.

*Inconsistent Pleading*

110     There is a real disconnect between the description of the defendants in this pleading and the actions that the plaintiffs seek to hold the defendants responsible for. Paragraphs 7 to 12 of the statement of claim describe the defendants and their respective roles. I have underlined the key excerpts to demonstrate this problem.

111     In para. 9, it is alleged that AZ Canada was "involved in and/or responsible for the *sales, distribution and marketing* of Seroquel in Canada."

112     In para. 11, it is alleged that the business of the three defendants "is inextricably interwoven with that of the other and each is the agent of the other for the purposes of *research, development, manufacture, marketing, sale and/or distribution of Seroquel in Canada.*"

113     In para. 12, it is alleged that the defendants "all or any one of them, were carrying on business as, *inter alia*, the *manufacturers and distributors* of Seroquel in Canada." However, in para. 9, AZ Canada's role is limited to *sales, distribution and marketing* of Seroquel in Canada.

114     In paragraph 19, the plaintiffs allege that the "[t]he Defendants *designed, developed, tested, manufactured, distributed, marketed and sold Seroquel in Canada.*" This is inconsistent with the narrower description of each defendant's role set out in paragraphs 7 to 12.

115     The scope of the defendants' alleged activities expands further in para. 26(a). The plaintiffs allege that the defendants owed them a duty of care and failed "to exercise reasonable care in designing, developing, researching, testing, manufacturing, analysing, recommending, merchandising, advertising, promoting, marketing, supplying and/or selling Seroquel." In para. 26(c) it is alleged that the defendants failed to "ensure that Seroquel was only promoted, marketed, advertised, recommended, merchandised, and sold for the uses approved by Health Canada."

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

116    A defendant is entitled to know the precise nature of what it is alleged to have done. The inconsistencies in this pleading create confusion and a lack of clarity as to which defendant did what in relation to Seroquel. The problem is compounded by the next pleading problem.

*The Enterprise Liability Allegations*

117    Not only is the pleading inconsistent but it lacks clarity as to each defendant's role because the pleading simply lumps them together as one.

118    The statement of claim alleges that the business of each defendant is "inextricably interwoven with that of the other and each is the agent of the other for the purpose of research, development, manufacture, marketing, sale and/or distribution of Seroquel in Canada." Courts have described this approach of lumping all defendants as one as the group or enterprise approach. It is the defendants' position that the enterprise liability allegation is deficient. For the reasons that follow, I agree.

119    The plaintiffs fail to identify the specific acts undertaken by each defendant which support these causes of action. The only pleaded conduct that is personal to any defendant is that AZ Canada "was involved in and/or responsible for the sales, distribution and marketing of Seroquel in Canada." The defendants, AZ U.K. and AZ U.S., are identified simply as "affiliate[s]" of AZ Canada. There is no indication of which defendant was the designer or manufacturer of Seroquel. Instead, the plaintiffs attribute liability to the defendants en masse, asserting that "[t]he business of each... is inextricably interwoven with that of the other and each is the agent of the other for the purposes of research, development, manufacture, marketing, sale and/or distribution of Seroquel in Canada." This bald assertion of enterprise liability is deficient for three reasons.

120    First, as a matter of pleading, it is inappropriate to simply "lump together" the three defendants. Allegations of enterprise liability were struck by Cumming J. in *Hughes v. Sunbeam Corp. (Canada) Ltd.*, [2000] O.J. No. 4595 (Ont. S.C.J.) at paras. 48-49 ("Hughes"), var'd on other grounds (2002), 61 O.R. (3d) 433 (Ont. C.A.), leave to appeal to S.C.C. refused, (2003), [2002] S.C.C.A. No. 446 (S.C.C.). This was a proposed class action and the defendants brought a motion to strike the pleading before the certification motion. Cumming J. stated as follows:

> The Claim (para. 9) simply lumps together all corporate defendants (other than ULC) and then proceeds to generalize the various allegations as applicable to all defendants indiscriminately. For example, the Claim (para. 11) alleges that the representative plaintiff is the owner of an ionization smoke alarm manufactured by this amorphous collection of Sunbeam defendants. There is no identification of a particular manufacturer of his smoke detector until the Response (para. 2(a)).

> In my view, and I so find, the pleading does not disclose any reasonable cause of action based upon the allegation of a single group enterprise by the so-called Sunbeam defendants.

121    Second, as a matter of substantive law, a parent corporation is not interchangeable with its subsidiary. As the Alberta Court of Appeal stated in *Cunningham v. Hamilton*, [1995] A.J. No. 476 (Alta. C.A.) at para. 4:

> ... It is true that Broken Hill operates a number of its worldwide companies as an integrated economic unit. But the mere fact it does so does not mean that for legal purposes, separate legal entities will be ignored absent some compelling reason for lifting the corporate veil....

122    Accordingly, "[a] position as shareholder, even a controlling shareholder, in a manufacturer is an insufficient foundation in itself to impose a manufacturer's duty": *Harrington v. Dow Corning Corp.*, [1996] B.C.J. No. 734 (B.C. S.C.) at para. 53 aff'd (2000), 193 D.L.R. (4th) 67 (B.C. C.A.), leave to appeal to S.C.C. refused, [2001] S.C.C.A. No. 21 (S.C.C.). The same rule applies where a manufacturer's duty is sought to be imposed on a subsidiary corporation for the actions of its parent. As the Ontario Court of Appeal noted in *Gregorio v. Intrans-Corp.*, [1994] O.J. No. 1063 (Ont. C.A.) at para. 28, that is inappropriate "unless the subsidiary is under the complete control of the parent and is nothing more than a conduit used by the parent to avoid liability."

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

123    Applying these principles, Ontario courts have frequently struck out allegations of enterprise liability where the plaintiff failed to plead material facts that would justify piercing the corporate veil: see *Sauer* at para. 89; *McCutcheon v. Cash Store Inc.* (2006), 80 O.R. (3d) 644 (Ont. S.C.J.) at paras. 16-26; *Di Gennaro v. BMO Nesbitt Burns Inc.*, [2007] O.J. No. 3934 (Ont. S.C.J.) at paras. 7-11.

124    As the court stated in the *Haskett v. Trans Union of Canada Inc.* (2003), 63 O.R. (3d) 577 (Ont. C.A.) at paras. 61-63, leave to appeal to S.C.C. refused, [2003] S.C.C.A. No. 208 (S.C.C.):

... In order to found liability by a parent corporation for the actions of a subsidiary, there typically must be both complete control so that the subsidiary does not function independently and the subsidiary must have been incorporated for a fraudulent or improper purpose or be used by the parent as a shield for improper activity....

The pleading falls short of suggesting that the relationship of the respective related respondent corporations is that of a conduit to avoid liability, nor is there an allegation that the parent company controls the subsidiary for an improper purpose.

For the above reasons, the claims against the companies as pleaded must be struck out as disclosing no reasonable cause of action.

125    The statement of claim in this case does not satisfy this test. There is no pleading that AZ U.K. or AZ U.S. completely controlled AZ Canada or used it as a conduit to avoid liability for a fraudulent or improper purpose.

126    Third, while the plaintiffs seek to justify enterprise liability on the basis that each defendant "is the agent of the other," this bald pleading, unsupported by any material facts, is insufficient to establish an agency relationship. This type of pleading was found to be deficient in *Gardner v. Ontario*, [1984] O.J. No. 3162 (Ont. H.C.) at para. 21:

These authorities satisfy me that the principal-agent relationship does not have to be explicitly stated in a statute or in an agreement entered into pursuant to that statute as is contended for by the applicant. They also support the inference that whether or not an agency relationship arises out of the factual context is a matter of law. However, an allegation of the bare conclusion of law is a bad pleading: see *Paradis v. Vaillancourt et al.*, [1943] O.W.N. 359. No facts are pleaded by the plaintiff in the statement of claim so as to support the conclusion of law alleged therein that the Dominion Government was the Band's agent in entering the 1894 agreement. Consequently, the pleading in so far as it alleges the agency relationship as the basis for claiming damages for breach of contract offends the rules.

127    Accordingly, the defendants cannot be liable for one another's conduct on this pleading. This is a critical failure, since no specific conduct is alleged against AZ U.K. and AZ U.S. at all. Further, no defendant, including AZ Canada, is individually identified as the designer or manufacturer of Seroquel. These are significant pleading deficiencies in the context of a products liability class action and prevent the statement of claim from satisfying s. 5(1)(a).

128    I will now review the causes of action in the pleading.

*The Negligence Claim is Deficient*

129    While the plaintiffs describe the cause of action simply as negligence and duty to warn, this is a pleading that covers different types of negligence, in addition to breach of the duty to warn. Based on the claim as asserted in paragraph 1 of the statement of claim, the negligence cause of action falls into three groups:

• negligent design, development and testing

• negligent manufacturing

• negligent distribution, marketing and sale.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

130     The statement of claim does not distinguish between these different negligence claims. Rather, it lumps them all together as negligence and provides particulars for this broad group. The plaintiffs wrongly assume that these distinct activities are identical and can be thrown into one single cause of action. As I explain below, these different forms of negligence are not the same. Therefore, to allege one cause of action is a flawed approach.

131     There is also a complete failure to provide particulars of each type of negligence. Rule 25.06(1) of the *Rules of Civil Procedure* requires that a statement of claim "contain a concise statement of the material facts on which the party relies for the claim." This rule directs the disclosure of the "material" facts, which include facts that establish the constituent elements of the claim. The material facts are to be stated with precision and clarity.

132     This pleading offends rule 25.06(1) because it fails to acknowledge the differences between the various types of negligent activity. Instead of precision and clarity, the pleading is muddled and vague. The defendants are entitled to know the material facts that the plaintiffs rely on to support each area of negligence. Generalized allegations of negligence are not sufficient: see *Khan v. Canada (Attorney General)*, [2009] O.J. No. 715 (Ont. S.C.J.) at para. 19, aff'd, 2009 ONCA 737 (Ont. C.A.), leave to appeal to S.C.C. refused, (2010), [2009] S.C.C.A. No. 516 (S.C.C.). As Strathy J. emphasized in *Cerqueira v. Ontario*, 2010 ONSC 3954 (Ont. S.C.J.) at para. 12, "defendants are entitled to know the case they must meet. The court must be fair to the plaintiff, but it must also be fair to the defendants."

133     The lack of precision and clarity in this pleading is also obvious from the manner in which the plaintiffs deal with approved uses of Seroquel and off-label uses. The pleading asserts negligent activity for approved uses of Seroquel and off-label uses, without drawing a clear line between the two uses. There is no dispute that approved and off-label uses are factually distinct. The plaintiffs cannot lump the two together. Materials facts must be pleaded for each plaintiff and for each distinct cause of action that the plaintiff is alleging.

*Negligent Design, Development and Testing*

134     This cause of action is advanced with respect to approved and off-label uses. Whether one looks at approved or off-label uses, the pleading is vague, there is no distinction drawn between approved and off-label uses and the pleading lacks essential elements that are necessary for this cause of action to survive. For example, in para. 1(b) the plaintiffs seeks a declaration that the "defendants were negligent in the design, development, testing, manufacturing, distribution, marketing and sale of Seroquel, as defined." At para. 26(a), the plaintiffs allege that the defendants owed a duty of care to the plaintiffs to "exercise reasonable care in designing, developing, researching, testing, manufacturing, analyzing, recommending, merchandising, advertising, promoting, marketing, supplying and/or selling Seroquel." It is alleged in para. 28 that the plaintiffs' damages occurred as a result of the defendants' negligence and particulars of this negligence are set out. There is a reference to failing to adequately "test" Seroquel but no reference to particulars of negligence in the "design or development" of Seroquel.

135     Further, in the facts that are pleaded in paras. 15-25, the only reference to the design, development and testing of Seroquel is the bare allegation in para. 19 that states "[t]he Defendants designed, developed, tested, manufactured, distributed, marketed and sold Seroquel in Canada."

136     Aside from the problem that this is a vague and bare pleading, it lacks important elements that are necessary for such a claim to survive. The plaintiffs do not identify the alleged design defect, nor do they plead that a safer and economically feasible alternative to Seroquel would have been adopted but for the defendants' negligence. Indeed, they do not even plead that a safer and economically feasible alternative to Seroquel exists. Instead, the plaintiffs simply plead that the risk associated with Seroquel for the "new onset of diabetes is 3.34 times higher than older drugs used to treat schizophrenia such as "Haldol." There is no pleading of any alternative medicine that is safer and economically feasible to manufacture.

137     These deficiencies are fatal. The statement of claim does not disclose sufficient material facts to sustain a cause of action for negligent design. The essential elements of this cause of action are set out in *Kreutner v. Waterloo-Oxford Co-operative Inc.* (2000), 50 O.R. (3d) 140 (Ont. C.A.) at para. 8 as follows:

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

For the purpose of this appeal, it is unnecessary to state definitively the ingredients of a claim based on the defective design of a product. However, to succeed in this case the plaintiffs are required to identify the design defect in Sherwood's valve, establish that the defect created a substantial likelihood of harm and that there exists an alternative design that is safer and economically feasible to manufacture: *Rentway Canada Ltd. v. Laidlaw Transport Ltd.* (1989), 49 C.C.L.T. 150, 16 M.V.R. (2d) 86 (Ont. H.C.J.), affirmed [1994] O.J. No. 50 (C.A.).

138    Liability for negligent "development" and "testing" also requires the plaintiff to plead that a safer alternative to Seroquel would have resulted but for the defendants' negligence. However, no such facts are pled in the statement of claim. This point is stated in *Baker v. Suzuki Motor Co.*, [1993] A.J. No. 605 (Alta. Q.B.) at para. 75 as follows:

However, the absence of testing alone cannot be proof of negligence unless the tests, had they been done, would have enabled the manufacturer to design the motorcycle in such a way that the fire would not have occurred. Without this type of evidence, this allegation of negligence must fail.

139    There are additional problems with this pleading when one looks solely at the allegation that the defendants designed, developed and tested for off-label uses. The pleading simply does not make sense. The term "off-label" use is not defined in the pleading and the pleading does not allege what particular off-label uses the defendants are alleged to have designed, developed and tested. These material facts of the negligence claim are missing.

140    There is no attempt to carve out the causes of action that the plaintiffs allege concerning off-label use as distinct from approved uses. Instead, unclear allegations of off-label use have simply been dropped into the negligence pleading.

141    Ms. Middleton advances the claim for negligent design, development and testing in relation to off-label users. She alleges that she was prescribed Seroquel in or about June 2005 for an off-label use, specifically as treatment for stress and obsessive compulsive behaviour. Ms. Middleton consumed up to 175 mg of Seroquel on a daily basis for approximately 6 months, at which point she ceased consuming Seroquel. While taking Seroquel, Ms. Middleton alleges that she experienced, among other side effects, significant elevated blood sugars and weight gain (approximately 25 pounds), neuropathy, hyperglycemia, loss of energy, increased thirst, numbness in her hands and feet, and soreness in her feet. In addition, Ms. Middleton alleges that she was diagnosed with diabetes in or about November 2005. Ms. Middleton had tested negative for diabetes in or about October 2003. Upon ceasing the consumption of Seroquel, Ms. Middleton was able to lose a portion of the weight that she gained as a result of taking Seroquel.

142    The statement of claim provides some clarity about the off-label use but only for the conspiracy cause of action. At para. 35, it is alleged that the defendants conspired and agreed together, "to engage in a marketing campaign promoting the safety of Seroquel for Off-Label Use, including use as a sleep aid and to treat anxiety, dementia-related psychosis and depression." Beyond this example, the pleading does not describe what is meant by the term off-label use.

143    The lack of clarity in this statement of claim is even more apparent because the examples of off-label use in para. 35 do not include the off-label uses that Ms. Middleton's claim is based upon (stress and obsessive compulsive behaviour).

144    In addition to these deficiencies there is a fundamental incoherency in asserting a claim for negligent design, development and testing in relation to off-label uses. This was recognized by Perell J. in the *Goodridge v. Pfizer Canada* (2010), 101 O.R. (3d) 202 (Ont. S.C.J.) at p.227 ("Goodridge"):

Negligence in design involves the innovator making poor choices and managing risk poorly when deciding how a product should be planned or put together. But the harm caused to the consumers of generic gabapentin is not a result of a design choice. Neurontin was not designed for any use other than as an adjunct treatment of epilepsy. Neurontin was not designed by the Defendants choosing to accept the risk of a propensity of suicidal behaviour; rather, a propensity for suicidal behaviour was a side effect to watch for and, if observed, it was a side effect to be disclosed by giving adequate warnings to the users of the drug. There is no design flaw in the case at bar because design errors presuppose design choices. The Plaintiffs submitted that Neurontin was a drug with a fatal flaw. That remains to be proven, but assuming that the

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

submission is true, its flaw was not a design flaw. The Defendants may have designed a drug that turned out to have a defect, but that is different than choosing to design a drug with a defect that could have been avoided by more careful decisions about how to design the drug. And, in any event, the Defendants made no design choices with respect to the off label uses of Neurontin.

145    In summary the negligent design, development and testing cause of action is fatally flawed. It is plain and obvious that it will fail and therefore must be struck.

*Negligent Manufacture*

146    The statement of claim asserts that the defendants were negligent in the "manufacturing" of Seroquel. However, the statement of claim says nothing at all about what was allegedly negligent about the manufacturing process. As well it is unclear who the plaintiffs say manufactured Seroquel. There is a complete lack of material facts in the pleading. Negligent manufacturing claims arise when something goes wrong in the manufacturing process. This is a distinct form of negligence that the plaintiffs simply lump together with the other types of negligence.

147    In *Rowe (Guardian ad litem of) v. Sears Canada Inc.*, 2005 NLCA 65 (N.L. C.A.) at paras. 19- 21, the court reviews the differences between the types of negligence claims and in particular negligent manufacturing:

Products negligence cases fall into three general classes: manufacturing defect, design defect and failure to warn. This case does not concern the third. In manufacturing defect cases something which should not be present is (the classic snail in the bottle of ginger beer) or something which should be present is not. Something goes wrong in the manufacturing process itself, or the handling of the product, which produces a product which is below the standard set by the manufacturer. Generally a high standard of care is imposed on manufacturers in cases of defect in manufacturing. This coupled with permitted inferences from circumstantial evidence has resulted in liability being imposed on manufacturers in the absence of precise evidence of how the manufacturing defect occurred. The proof of the presence of the defect and that the defect resulted in injury to the plaintiff permits the trial judge to draw an inference of negligence.

Design defect is not the result of something having gone wrong in the production of the product but an error in the design of the product. The central question is whether a different design ought to have been used by the manufacturer. In cases of design defect it is the design specifications themselves which create the risk to the consumer. As is obvious, a finding that there had been a design defect results in a whole line of products being defective. A finding of manufacturing defect relates only to the item under consideration.

148    It is plain and obvious that the statement of claim does not plead the material facts necessary to sustain a claim for negligent manufacturing. Accordingly, the statement of claim does not disclose a cause of action for negligent manufacturing and this pleading must be struck.

*Negligent Distributing, Marketing and Sale*

149    Once again the decision to lump the different negligence claims together is a problem. The statement of claim fails to deal with the fact that each type of negligence is unique.

**(a) Approved Uses**

150    The allegations of negligent distribution, marketing and sale in relation to the approved uses are deficient for several reasons.

151    First, the plaintiffs do not plead that Seroquel's propensity to injure outweighed the value of its use. However, this is a critical element of any negligent distribution, marketing and sale claim. In the absence of material facts to this effect, the pleading cannot justify the conclusion that the defendants were negligent in choosing to distribute, market and sell Seroquel, only that the defendants may have breached their duty to warn. This was explained by the British Columbia Court of Appeal

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

stated in *Harrington v. Dow Corning Corp.*, 2000 BCCA 605, 193 D.L.R. (4th) 67 (B.C. C.A.), at paras. 42-43 and 45, leave to appeal to S.C.C. refused, [2001] S.C.C.A. No. 21 (S.C.C.):

> At the risk of oversimplifying a complex decision-path, I venture to suggest the first step in every products liability case alleging negligent design, manufacture, or marketing is the determination of whether the product is defective under ordinary use or, although non-defective, has a propensity to injure. Some American authorities refer to this step as "general causation", whether a product is capable of causing the harm alleged in its ordinary use.

> The second step is the assessment of the state of the manufacturer's knowledge of the dangerousness of its product to determine whether the manufacturer's duty was not to manufacture and distribute, or to distribute only with an appropriate warning. It may be prudent to refer to this as an assessment of the state of the art; it may be that a manufacturer did not but should have known of its product's propensity for harm.

> . . .

> If the value of the product's use outweighed its propensity to injure such that distribution with a warning was appropriate, the third step will be an assessment of the reasonableness of the warning (whether direct or by a learned intermediary) given the state of the art and the extent of the risks inherent in the product's use.

152    Second, and related to the above point, many of the negligent distribution, marketing and sale allegations are in fact allegations that the defendants and their employees simply breached the initial or continuing duties to warn. These allegations fail to disclose a cause of action for the reasons discussed in connection with the duty to warn claim below. Indeed, Canadian courts have repeatedly recognized that "negligent marketing" is merely a synonym for breach of the duty to warn. As the Newfoundland Court of Appeal stated in *Bow Valley Husky (Bermuda) Ltd. v. Saint John Shipbuilding Ltd.*, [1995] N.J. No. 150 (Nfld. C.A.) at para. 82, var'd on other grounds, [1997] 3 S.C.R. 1210 (S.C.C.):

> Danger from products may be the result of negligence in manufacture, design or marketing. Here the finding of the trial judge is one of negligence in the marketing of the product, that is, failure to warn of the flammability of Thermaclad....

153    Third, the remaining negligent distribution, marketing and sale allegations concern claims that the defendants or their employees misrepresented information about Seroquel. While these allegations are framed as particulars of a negligence *simpliciter* claim, it is clear that they are effectively allegations of negligent misrepresentation. They are therefore deficient given the plaintiffs' failure to plead any particulars of the misrepresentation, or that they relied upon the misrepresentations and suffered damages as a result. As Strathy J. stated in *Singer* at paras. 67-69 and 73:

> The plaintiff's claim in negligence, as summarized in his counsel's factum, is that the defendants owed a duty of care to the plaintiff and class members to provide them with accurate information on the labeling of the products and not to make false or misleading claims on the labeling, advertising and marketing of the products. The plaintiff claims that the defendants breached this duty and that he suffered damages. The plaintiff does not give particulars of his damages, other than to describe them as "economic and other damages". Nor does the plaintiff plead a causal link between the defendants' negligence and his alleged damages.

> The pleading is replete with references to "misleading representations", "misleading claims", "misleading statements", "misleading labeling and advertising" and includes allegations that the defendants knew or should have known that their products did not have the qualities they ascribed to them.

> In effect, rather than plead negligent misrepresentation, the plaintiff has pleaded that the representations made on the packaging were false due to the negligence of the defendants. The plaintiff asserts that this is a different cause of action in negligence, with different essential elements. I am not persuaded by this assertion. The plaintiff's claim is clearly in negligent misrepresentation, albeit improperly pleaded. This is clear from a reading of the statement of claim and from the common issues proposed by plaintiff, particularly common issues 1 to 4 (see below and see the attached appendix).

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

As such, it suffers from the fatal defect that there is no pleading that the plaintiff relied on these misrepresentations and suffered damages as a result.

. . .

I conclude that the pleading expressed in negligence is really a claim for negligent misrepresentation; it fails to plead reliance and, as such, plainly cannot succeed.

154    As in *Singer*, the unparticularized pleadings of misrepresentation in this case fail to allege reliance by the plaintiffs or class members, and therefore do not satisfy s. 5(1)(a).

**(b) OffLabel Uses**

155    In addition to the above deficiencies, the negligent distributing, marketing and sale cause of action has a further defect as it relates to off-label uses. It is deficient and will fail because the defendants did not have a duty to "ensure" that Seroquel was not distributed, marketed or sold for off-label uses. This is because doctors have the legal right to prescribe Seroquel for off-label uses, regardless of the defendants' conduct. This was explained by Perell J. in *Goodridge* at paras. 14 and 98 as follows:

14 Physicians may lawfully prescribe a drug for other than its authorized use as set out in the product monograph. This practice is called "off-label" prescribing. Prescribing a drug for off label uses is not illegal, and it is a common practice of physicians. Medical practitioners are free to endorse or recommend off-label uses for medications and often do so, particularly when their patient's ailments are proving resistant to approved drugs....

. . .

98... Although the drug innovator can control the manufacture of its own product, monitor for adverse reactions to its product and give warnings about its own product, the innovator is not in a position to stop the generic manufacturer from releasing the generic drug or to stop physicians from prescribing the generic drug for off label uses. This conduct is not the innovator's conduct, and, in my opinion, it would be unfair to impose a duty of care on the innovator for another's conduct when the innovator cannot control, qualify, or stop that conduct. In my opinion, it would not be fair or just to make the innovator liable for failing to do something that should and can only be done by others.

*Failure to Warn Cause of Action*

156    The statement of claim alleges that the defendants breached their duty to warn of the dangers associated with consuming Seroquel including the "Health Risks" that are described in paragraph 20 of the pleading as follows:

Seroquel causes serious and sometimes fatal injuries to the liver, kidneys and pancreas. Its adverse effects include, but are not limited to, ketoacidosis, pancreatitis, diabetes mellitus, weight gain, impaired glucose regulation, hyperglycemia, blindness, cataracts, increased thirst and hypoglycemia. Other serious injuries include a potentially fatal condition referred to as neuroleptic malignant syndrome (NMS), tardive dyskinesia, which can cause potentially irreversible, involuntary movements and other serious health problems associated with the onset of diabetes including heart disease, blindness, coma, seizures and death ("Health Risks").

157    It is alleged that the product warnings were "vague, incomplete or otherwise wholly inadequate, both substantively and graphically, to alert prescribing physicians as well as consumer patients of the actual Health Risks associated with consuming Seroquel." Further it is alleged at paras. 21 and 25 of the statement of claim that the defendants did not "sufficiently warn of the serious adverse Health Risks associated with consuming Seroquel" and that the product "label was particularly deficient when considering the labeling done in other countries."

158    First, the statement of claim fails to provide sufficient particulars regarding the alleged breach of a duty to warn. There is no indication of which particular defendant breached a duty to warn or which defendant owed such a duty by virtue of having manufactured Seroquel. This type of deficiency was recognized by Cumming J. in *Hughes* at paras. 58-59:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

It is not clear from the pleading when the alleged duty to warn arose, either generally or in relation to each of the Sunbeam defendants. In alleging a failure with respect to a duty to warn, the pleading does not delineate this as an alternative, distinctive cause of action. Rather, the allegation of a breach of a duty to warn, being a failure to act, is blended together with the allegation of misrepresentation, that is, an improper action.

The Claim does not specify which defendant failed in respect of the alleged duty to warn and at what time. Any duty to warn with respect to a given product is owed only by the manufacturer of that product.

159    The statement of claim also fails to plead what warnings were given, how they were inadequate, and whether or how they could have been improved. A breach of the duty to warn requires a demonstration that the defendants failed to provide the appropriate level of specificity in the product monograph. The plaintiffs have not pleaded any material facts in relation to the actual warnings contained in the product monograph. This bare pleading does not disclose a tenable cause of action for duty to warn.

160    The pleading makes reference to the warnings in generic terms. However, there is no dispute that the warning is the product monograph. The defendants say that the content of the product monograph is therefore incorporated by reference for the purpose of assessing the s. 5(1)(a) criterion. This approach is consistent with well established case law: see *Montreal Trust Co. of Canada v. Toronto Dominion Bank* (1992), 40 C.P.C. (3d) 389 (Ont. Gen. Div.), at 395 -396); *Lubarevich v. Nurgitz*, [1996] O.J. No. 1457 (Ont. Gen. Div.); *Vaughan v. Ontario (Minister of Health)* (1996), 49 C.P.C. (3d) 119 (Ont. Gen. Div.), at 123) and *Web Offset Publications Ltd. v. Vickery*, [1999] O.J. No. 2760 (Ont. C.A.).

161    As the Ontario Court of Appeal stated in *Hickey-Button v. Loyalist College of Applied Arts & Technology* (2006), 267 D.L.R. (4th) 601 (Ont. C.A.) at para. 26 "[T]he determination required under s. 5(1)(a) is to be made by reference to the pleadings and any documents identified in the pleadings."

162    When the product monograph is considered, the problems with this pleading are even more apparent. The lack of particularity is illustrated by the fact that the product monograph does contain sufficient warnings to respond to the representative plaintiffs' claims. For example, the statement of claim pleads that Ms. Martin suffered two "injuries" as a result of ingesting Seroquel: weight gain and balance problems. The Seroquel product monograph at the time when Ms. Martin was first prescribed Seroquel in September 2005 contained warnings regarding weight gain and effects on cognitive and motor performance. Similarly, Ms. Middleton pleads that she took Seroquel "for six months starting in June 2005 and suffered weight gain and diabetes," and yet the product monograph as of April 25, 2005 contained a warning for weight gain and an expansive warning regarding hyperglycaemia and diabetes. There are no particulars that allow the defendants to understand why the plaintiffs allege that the warning was deficient.

*Conspiracy*

163    The plaintiffs advance a conspiracy cause of action against the defendants. The manner in which this claim is plead is fraught with problems. To appreciate the depth of the problem, it is helpful to review the law concerning conspiracy.

164    In Canada, there are two types of civil conspiracy: (1) predominant purpose, or conspiracy to injure; and (2) unlawful means or unlawful conduct conspiracy: see *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.*, [1983] 1 S.C.R. 452 (S.C.C.). The plaintiffs do not allege a predominant purpose type of conspiracy in the statement of claim.

165    The material facts pled in the statement of claim allege that the defendants' conduct was motivated by their own financial self-interest and was not undertaken for the primary purpose of injuring the class members.

166    The elements of the "unlawful means" form of conspiracy are set out in *Agribrands Purina Canada Inc. v. Kasamekas*, 2011 ONCA 460 (Ont. C.A.) at para. 26 ("Agribrands") as follows:

For the appellants to be liable for the tort of unlawful conduct conspiracy, the following elements must therefore be present:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

a) they act in combination, that is, in concert, by agreement or with a common design;

b) their conduct is unlawful;

c) their conduct is directed towards the [plaintiffs];

d) the [defendants] should know that, in the circumstances, injury to the [plaintiffs] is likely to result; and

e) their conduct causes injury to the [plaintiffs].

167    To sustain a claim for unlawful means conspiracy, the statement of claim must concisely plead material facts in support of each of these elements. This was explained in *Normart Management Ltd. v. West Hill Redevelopment Co.*, [1998] O.J. No. 391 (Ont. C.A.) at para. 21 ("Normart") where Finlayson J.A. quoted from Bullen, Leake and Jacob's, *Precedents of Pleadings*, 12th ed. (London: Sweet & Maxwell, 1975), as follows:

> The statement of claim should [1] describe who the several parties are and their relationship with each other. It should [2] allege the agreement between the defendants to conspire, and [3] state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to [4] set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must [5] allege the injury and damage occasioned to the plaintiff thereby.

168    Claims for conspiracy have been struck out where they were bald, overly speculative, or simply restated legal principles rather than pleaded material facts. As the court stated in *Penson Financial Services Canada Inc. v. Connacher*, 2010 ONSC 2843 (Ont. S.C.J. [Commercial List]) at para. 15:

> Rule 25.06(1) mandates a minimum level of material fact disclosure and if this level is not reached, the remedy is a motion to strike out the pleading. A proper pleading of conspiracy should enable a defendant to know the case he or she must meet. Conspiracy is a serious claim. A recitation of a series of events coupled with an assertion that they were intended to injure the plaintiff is insufficient, nor is it appropriate to lump some or all of the defendants together into a general allegation that they conspired: *Normart Management Ltd. and J. G. Young & Son Ltd. v. Tec Park Ltd.*

> [Emphasis added and footnotes omitted.]

169    The plaintiffs are not entitled to plead a deficient case in conspiracy on the theory that more detailed evidence of the claim will arise from discovery. The "plaintiff cannot go on a fishing expedition at discovery to gather the facts to make a proper plea": see *Research Capital Corp. v. Skyservice Airlines Inc.*, [2008] O.J. No. 2526 (Ont. S.C.J.) at para. 23, var'd on other grounds, 2009 ONCA 418 (Ont. C.A.) ("Research Capital").

170    The pleading of conspiracy in this case offends all of the above requirements. It lacks clarity, precision and the material facts necessary to support the constituent elements. For the reasons set out below, it is plain and obvious that the conspiracy claim will fail.

*The Parties to the Conspiracy*

171    To begin with, the plaintiffs have failed to adequately plead the relationship between the alleged parties to the conspiracy. I refer to the inconsistencies in the pleading regarding each defendant's role and the flawed enterprise liability approach that is discussed above.

172    The alleged conspiracy is dealt with in paras. 35 to 41 of the statement of claim. In para. 35, the plaintiffs allege as follows:

> 35. From at least 1997 at London, England, Wilmington, Delaware, Mississauga, Ontario and elsewhere the Defendants, by their directors, officers, servants and agents, wrongfully, unlawfully, maliciously, and lacking *bona fides*, conspired and agreed together the one with the other and with persons unknown to:...

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

173    No particulars of the relationship between the individual defendants, or their unnamed "directors, officers, servants and agents", are alleged in relation to the conspiracy. This type of problem was identified in *Taylor v. Tamboril Cigar Co.*, [2005] O.J. No. 4182 (Ont. C.A.) at para. 1 ("Taylor") as follows:

> We are not persuaded that Lax J. erred in finding that the appellants' statement of claim failed to plead properly the claims for conspiracy, breach of fiduciary duty and breach of trust. With respect to conspiracy, we agree with the motion judge that the pleading does not provide the required particularity. Among other deficiencies, it does not plead the particulars of the relationship between these defendants and the other alleged conspirators. Indeed, it does not plead that these defendants are conspirators....

174    The lack of clarity in the pleading continues because the plaintiffs assert that the defendants conspired with "persons unknown." Similar allegations of conspiracy have been struck out in other cases. For example, in *Robinson v. Medtronic Inc.*, 2010 ONSC 1739 (Ont. S.C.J.) at paras. 17-18 and 20 ("Robinson"), the court struck a reference in a conspiracy pleading to "person unknown" because such words are not a proper pleading of civil conspiracy.

175    In essence, the plaintiffs have simply lumped the defendants together without making any attempt to specify the nature of the defendants' relationship. Such a pleading cannot satisfy s. 5(1)(a). This was explained in *Research Capital* at para. 48:

> ...it is not an appropriate approach to pleading conspiracy to lump together several defendants and allege they conspired to do something, without providing the material facts and full particulars to support the plea, being: facts as to the parties to the conspiracy and their relationship; the agreement between the parties; the purpose or object of the conspiracy; acts done in furtherance of the conspiracy; and any injury to the plaintiff. As RCC did in its claim of conspiracy against Investments, it acknowledged it lacked the information to cite the requisite facts, but hoped to acquire information to establish conspiracy through oral and documentary discovery. Again, I find a plaintiff is not permitted to make a deficient claim and await discovery to gather the facts to make a proper plea.

176    Paragraph 37 of the statement of claim provides a long list of the overt acts that the defendants are alleged to have done. However, these acts are alleged against the defendants as a group. The group enterprise approach continues through the statement of claim into the conspiracy cause of action. The overt acts are not attributed to any particular defendant. It is not possible for a specific defendant to know from the statement of claim what it is alleged to have been done as part of the conspiracy. Rather, all of the defendants are simply lumped into the general allegation that they committed the list of overt acts in furtherance of the conspiracy. This "group" approach does not satisfy the degree of specificity that is required for a conspiracy claim.

177    Courts have recognized that a conspiracy pleading requires a high degree of specificity. However, this is the consequence of alleging such a serious cause of action. If the plaintiff does not have knowledge of the specifics, then it is not appropriate to plead conspiracy: see *Balanyk v. University of Toronto*, [1999] O.J. No. 2162 (Ont. S.C.J.) at para. 29; *J.G. Young & Son Ltd. v. TEC Park Ltd.*, [1999] O.J. No. 4066 (Ont. S.C.J.) at paras. 6 and 9.

*The Purpose or Objects of the Conspiracy*

178    The plaintiffs have also failed to adequately plead the purpose or objects of the conspiracy. Courts have struck out conspiracy claims where the plaintiff failed to plead the precise object of the conspiracy, or the purposes of a particular conspirator in entering into the agreement: see *Taylor*, at para. 1.

179    In this case, the purpose and objects of the conspiracy are pleaded as follows:

> 36. The Defendants were motivated to conspire and their predominant purposes, concerns, and motivations were:
>
>    a) to obtain approvals for Seroquel;
>
>    b) to increase or maintain revenue;

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

   c) <u>to increase or maintain profit;</u>

   d) <u>to increase or maintain market share;</u>

   e) <u>to avoid negative publicity and preserve public goodwill; and,</u>

   f) <u>to place corporate revenue and profit above the safety of the Class Members.</u>

 [Emphasis in original.]

180 In my view, the plaintiffs have simply plead a list of corporate activity that lacks the required precision.

*The Overt Acts*

181 Paragraph 37 of the statement of claim lists 25 "acts, among others" that were "done by the Defendants and their servants, agents and employees." The level of detail that a conspiracy pleading requires is missing. There is no indication of the time, place, actor or facts behind any of the acts: see *Dewan v. Burdet (In Trust)*, [2006] O.J. No. 5210 (Ont. S.C.J.) at para. 62, var'd on other grounds, 2007 ONCA 752 (Ont. C.A.).

182 Further, much of the same conduct is pled in support of the negligence claim. Such allegations are plainly insufficient as explained in *Normart* at paras. 22 and 25 as follows:

 ... While there is a statement as to the general terms of the conspiracy, there is no detail with respect to overt acts in furtherance of the conspiracy and no indication of what damages were suffered as a result of the conspiracy as opposed to the breach of contract....

 . . .

 ... Simply reciting a series of events and stating that they were intended to injure the appellant is hardly sufficient to establish a conspiracy at law particularly where the same facts have already been pleaded in support of an action for breach of contract. The basis in law of a stand alone conspiracy is simply not established.

183 In summary, plaintiffs have failed to adequately plead the overt acts. Instead they have provided an unparticularized list of 25 acts.

*The Unlawful Means*

184 The conspiracy pleading is also deficient because the plaintiffs do not sufficiently plead how the alleged acts amount to "unlawful" conduct for the purposes of the conspiracy tort. Paragraph 39 simply states that the "[d]efendants' conduct was unlawful because they knowingly marketed and sold Seroquel when they knew, or had reason to know, of the Health Risks associated with the consumption of Seroquel." This is the same allegation that is made for the negligence cause of action. This pleading does not address why such conduct is alleged to be unlawful.

185 While the pleading alleges that the defendants breached various statutes, this does not assist in understanding why the conduct in question is "unlawful." Simply listing a group of statues and alleging that they were breached does not provide sufficient clarity: see *Thermionics Ltd. v. Philco Products Ltd.*, [1940] S.C.R. 501 (S.C.C.) at para. 9; *Agribrands*, at para. 28.

186 It is not possible to determine from the statement of claim whether all of the defendants engaged in the same unlawful act. This failing is particularly significant given that the defendants are resident in Canada (AZ Canada), the United States (AZ U.S.) and England (AZ U.K.), and the statement of claim alleges that their conduct is unlawful by virtue of violating both Canadian and American legislation.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

187    Alleging a breach of a foreign law as support for the allegation of unlawful means conspiracy is a problem. As the Supreme Court of Canada stated in *Pro Swing Inc. v. ELTA Golf Inc.*, [2006] 2 S.C.R. 612 (S.C.C.) at para. 34 (and 100) "[i]t is well established that Canadian courts will not enforce a penal order, either directly or indirectly (Castel and Walker, at para. 8.3)."

*Injury and Causation*

188    The plaintiffs have also failed to adequately plead the injury and causation elements of the conspiracy. The only reference to this element of the conspiracy claim is found in para. 41 where the plaintiffs plead that the "[d]efendants knew that the conspiracy would cause injury and losses to the Plaintiffs, the Class Members and other Family Class members, and it did." This is clearly inadequate.

189    There is no allegation that the specific unlawful acts and/or the breaches of the various statutes caused the plaintiffs' injuries. There is also no allegation of what specific injuries the plaintiffs even suffered as a result of the conspiracy. These vague and unspecified allegations of causation are insufficient to meet the test in s. 5(1)(a).

190    As noted above, the plaintiffs rely on the alleged breach of foreign statues. It is unclear how a violation of the U.S. Federal Food, Drug and Cosmetic Act could cause any injury to Canadian class members, when Health Canada undertakes its own independent review of pharmaceutical drugs, as it did for Seroquel.

*Summary - s. 5(1) (a) criterion*

191    In summary, this is a statement of claim that offends the most basic rules governing pleadings. The deficiencies are numerous and fatal. It is plain and obvious that the causes of action in this pleading will fail. The plaintiffs have amended their statement of claim no less than five times, and the defendants have requested particulars. Yet the pleading still contains numerous significant deficiencies. The defendants' factum contains a detailed description of the deficiencies and requests the court to strike the pleading with no leave to amend. Despite being put on notice of the defence position, the plaintiffs made no effort to try and remedy their pleading. The amendment that they requested at the start of the hearing was solely to remove one of the representative plaintiffs.

192    The plaintiffs have not satisfied the s. 5(1)(a) criterion and the action cannot be certified. I will nevertheless consider the remaining s. 5 criteria.

**5(1)(b)- Identifiable Class**

*Legal Framework*

193    Subsection 5(1)(b) requires that there be "an identifiable class of two or more persons that would be represented by the representative plaintiff or defendant." The purpose of a class definition is: (a) to identify persons with a potential claim; (b) define who will be bound by the result; and (c) describe who is entitled to notice: *Bywater v. Toronto Transit Commission*, [1998] O.J. No. 4913 (Ont. Gen. Div.), at para. 10. To serve the mutual benefit of the parties, the class definition should not be unduly narrow or unduly broad.

194    Class membership identification is not commensurate with the elements of the causes of action advanced on behalf of the class. There must be a rational connection between the class member and the common issues: see *Sauer* at para. 32

195    In *Hollick*, the Supreme Court of Canada confirmed the test for determining if there is an "identifiable class." The plaintiff must define the class by reference to objective criteria, so that a given person can be determined to be a member of the class without reference to the merits of the action.

*The Class Definition*

196    The plaintiffs propose the following class definitions:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

a) all persons in Canada who were prescribed and who consumed Seroquel ("Patient Class"); and

b) the family members of the Patient Class, as defined by the Family Law Act and similar applicable provincial and territorial legislation ("Family Law Class").

197    The defendants state that there are four reasons why the plaintiffs have not satisfied s. 5(1)(b). First, there is no basis in the evidence to show that there are persons other than the representative plaintiffs who are interested in being included in the class. Second, the plaintiffs have failed to establish some basis in fact for a rational relationship between the broad Patient Class, and the common issues. Third, the Patient Class members do not share the same interest in the outcome of this litigation. Fourth, the Patient Class definition is unnecessarily overly broad.

*Two or More Persons*

198    The plaintiffs must provide some evidence of "two or more persons" who assert a claim. The plaintiffs state that the exact number and identity of class members is unknown. They rely on the affidavit evidence of Victoria Paris, a lawyer at the plaintiffs' law firm. The substance of this affidavit is information and belief. Ms. Paris was informed by Ms. McPhee, another lawyer at the plaintiffs' law firm.

199    Ms. Paris states that in addition to the named plaintiffs, the firm has "been in contact with more than thirty potential class members, who consumed Seroquel for both on and off label uses." No further evidence about these potential class members is provided.

200    As well, Ms. Paris states that there are proposed class actions in Alberta and British Columbia. The representative plaintiffs in the Alberta and British Columbia actions will seek to have their actions stayed if the Ontario action is certified. A third action was started in Quebec and the same class definition was proposed. The Quebec court denied certification for a variety of reasons, one being the absence of any evidence that a class exits. The decision denying certification is being appealed. This plaintiff therefore is still attempting to pursue his action in that province.

201    The statements of claim in Alberta and British Columbia allege the following. The representative plaintiff in the Alberta action took Seroquel in 2002 for schizophrenia and suffered weight gain and diabetes. In the British Columbia action one plaintiff took Seroquel in 2004 for depression and bi-polar disorder and experienced rapid weight gain. The second plaintiff in that action took Seroquel in 2001 for an antipsychotic disorder and experienced weight gain and diabetes. Aside from the fact that these statements of claim were issued, there is no evidence from the plaintiffs in these actions.

202    Therefore we are left Ms. Martin and Ms. Middleton. As will be clear later in this decision, there are real problems with Ms. Martin's claim. Due to the narrowing of the common issues Ms. Martin's claim is no longer connected to the common issues and she is not representative of a class, assuming one exists. This leaves Ms. Middleton as the sole representative plaintiff and her claim is limited to off-label use.

203    In my view, the plaintiffs have not provided a sufficient evidentiary basis to establish that a class of two or more persons exists. While I appreciate that the burden on the plaintiff to satisfy the s. 5 criteria is low, the evidence that has been provided is insufficient. I agree with the observations of Winkler, J. in *Lau v. Bayview Landmark Inc.*, [1999] O.J. No. 4060 (Ont. S.C.J.) at para. 23:

[A] class proceeding cannot be created by simply shrouding an individual action with a proposed class. That is to say, it is not sufficient to make a bald assertion that a class exists. The record before the court must contain a sufficient evidentiary basis to establish the existence of the class.

204    As Nordheimer, J. stated in *Bellaire v. Independent Order of Foresters*, [2004] O.J. No. 2242 (Ont. S.C.J.) at para. 33 ("Bellaire"):

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

In my view, before the extensive process of a class proceeding is engaged, it ought to be clear to the court that there is a real and subsisting group of persons who are desirous of having their common complaint (assuming there to be a common complaint) determined through that process. The scale and complexity of the class action process ought not to be invoked at the behest, and for the benefit, of a single complainant.

[Emphasis added.]

205    Other decisions have expressed the same points. For example in *Chartrand v. General Motors Corp.*, 2008 BCSC 1781 (B.C. S.C.), Martinson J. described the identifiable class requirement as an "air of reality test," testing the reality of the linkage between the plaintiff's claim and the proposed class. This requires not simply that there be a theoretical link between the claim, the class and the common issues, but that there be a demonstrated link in fact to two or more bona fide claimants.

206    It is not enough to say that more than thirty potential class members, who consumed Seroquel for both on and off-label uses, have been in contact with class counsel. There is no evidence about the nature of the contact. More importantly, there is no evidence to show that any of these people are desirous of having their common complaint (assuming there to be a common complaint) determined through the class action process. This cannot be assumed from the mere fact that a person contacted counsel.

*The Class Definition is Over-Inclusive*

207    The defendants argue that the class definition is overly broad. It captures those who have taken Seroquel without any side effects. The plaintiffs do not dispute that Seroquel helps patients. As noted above, Health Canada has approved Seroquel for use in Canada and it continues to be used to treat patients who suffer from schizophrenia, acute management of mania episodes associated with bipolar disorder I and II and acute treatment of depressive episodes associated bipolar disorder I and II. Further, all of the experts, including Dr. Wirshing and Dr. Plunkett agree that Seroquel is an effective drug. Therefore, the class definition is bound to include those who have no claim against the defendants. It will also include those who have suffered side effects that are not covered by the common issues and/or not covered by the statement of claim. For these reasons, the defendants say the class definition is overly broad.

208    A proposed class is not overbroad because it may include persons who ultimately will not have a claim against the defendants: see *Bywater* at para. 10; *Boulanger v. Johnson & Johnson Corp.*, [2007] O.J. No. 179 (Ont. S.C.J.) at para. 22. However, it should not be defined wider than necessary: see *Hollick* at para. 21. Despite the fact that Seroquel was only introduced in Canada in 1997, the definition does not indicate a period of time that is in issue. Dr. Wirshing has no criticism of the product monograph from the time Seroquel was first introduced in Canada in 1997 until 2001. Therefore at a minimum, if I was certifying this action, the class should be bounded by a start date of 1997.

209    Given the above problems with the class definition it fails to satisfy s. 5(1)(b) criterion.

*5(1)(c) - Common Issues*

*Legal Framework*

210    Subsection 5(1) of the *Class Proceedings Act* requires that "the claims or defences of the class members raise common issues." Section 1 of the *Class Proceedings Act* defines "common issues" as:

(a) common but not necessarily identical issues of fact, or

(b) common but not necessarily identical issues of law that arise from common but not necessarily identical facts....

211    For an issue to be common it must be a substantial ingredient of each class member's claim and its resolution must be necessary to the resolution of each class member's claim: see *Hollick* at para. 18.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

212    An issue will not be common if its resolution is dependent upon individual findings of fact that have to be made with respect to each individual claimant: see *Fehringer v. Sun Media Corp.*, [2002] O.J. No. 4110 (Ont. S.C.J.), aff'd, [2003] O.J. No. 3918 (Ont. Div. Ct.).

213    The underlying question is whether the resolution of a proposed common issue will avoid duplication of fact-finding or legal analysis: see *Western Canadian Shopping Centres Inc.*, at para. 39.

214    The core of a class proceeding is the element of commonality; there must be commonality in the actual wrong that is alleged against the defendant and some evidence to support this: see *Frohlinger*, at para. 25; *Fresco*, at para. 21.

215    An issue can be common even if it makes up a very limited aspect of the liability question and although many individual issues remain to be decided after its resolution: see *Cloud* at para. 53. It is not necessary that the answers to the common issues resolve the action or even that the common issues predominate. It is sufficient if their resolution will significantly advance the litigation so as to justify the certification of the action as a class proceeding.

216    The common issues criterion is not a high legal hurdle, but a plaintiff must adduce some basis in the evidence to show that the issues are common: *Hollick* at para. 25. As Lax J. stated in *Fresco*, at para. 61 "[w]hile only a minimum *evidentiary* basis is required, there must be some evidence to show that this issue exists and that the common issues trial judge is capable of assessing it in common. Otherwise, the task for the common issues trial judge would not be to determine a common issue, but rather to identify one." [Emphasis added.]

217    Finally, a plaintiff is not required to produce evidence on each element of a cause of action pleaded. As Lax J. stated in *Glover v. Toronto (City)*, [2009] O.J. No. 1523 (Ont. S.C.J.) at para. 56: "One cannot give meaning to the concept that the criterion in section 5(1)(a) is to be satisfied without evidence, but then require the plaintiffs to produce evidence for each of the material facts alleged."

*Analysis of Proposed Common Issues*

218    Initially the plaintiffs' common issues focused on the causal connection between Seroquel and the extensive list of health risks described in the statement of claim. The defendants responded that this approach was fatal to certification because the common issues lacked commonality and there was no evidence to show that such a broad approach could be managed on class wide basis. In reply, the plaintiffs amended the common issues and described the health risks arising from the use of Seroquel as "weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom."

219    The revised common issues that the plaintiffs wish to certify are as follows:

**General Causation**

(1) Can Seroquel cause weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom?

**Off-Label Promotion**

(2) Did the defendants, or any of them, promote, market, advertise, and/or recommend Seroquel for off-label uses? If the answer is yes, does this change the nature of the duty under common issue #3 or common issue #4, constitute unlawful conduct under common issue #7, and/or constitute behavior that would justify an election under common issue #8 or punitive damages under common issue #10?

**Negligence/ Duty to Warn**

(3) Did the defendants, or any of them, owe a duty of care to the Class in respect of the design, development, researching, testing, recommending, advertising, promoting and/or marketing of Seroquel as it relates to the risk of weight gain, diabetes

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

and/or related metabolic disturbances as well as secondary injuries flowing therefrom? If so, what was the nature of the duty?

(4) Did the defendants, or any of them, owe a duty to the Class to warn that Seroquel can cause weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom, and if so, when did the duty to warn arise?

(5) If the answer to #3 and/or #4 is yes, did the defendants, or any of them, breach such duty? If so, what was the nature of the breach?

**Conspiracy**

(6) Did the defendants, or any two or more of the defendants, act in combination to conceal information from the Class and/or Health Canada relating to the safety and efficacy of Seroquel, as it relates to weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom?

(7) If the answer to #2 and/or #6 is yes, was the defendants' conduct unlawful in that it violated the Food and Drugs Act or the Food and Drug Regulations?

**Waiver of Tort**

(8) Can the Class elect to have damages determined through an accounting and disgorgement of the proceeds of the sale of Seroquel?

(9) If so, in what amount and for whose benefit is such accounting to be made?

**Special, Aggravated and/or Punitive Damages**

(10) Should one or any of the defendants pay special, aggravated and/or punitive damages to the Class?

**Aggregate Assessment of Damages**

(11) Can damages be determined on an aggregate basis on behalf of the Class?

**Costs of Administration and Distribution**

(12) Should one or any of the defendants pay the costs of administering and distributing the amounts to which the Patient Class and Family Law Class are entitled?

**Prejudgment Interest**

(13) Should one or any of the defendants be ordered to pay prejudgment interest?

*Common issue # 1 - General Causation*

*Can Seroquel cause weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom?*

220      There are fatal problems with this common issue. The issue lacks commonality and the phrase "metabolic disturbances as well as secondary injuries flowing therefrom" is unclear. This phrase is repeated through many of the common issues. The following critique applies to the use of these words throughout the common issues.

*Unclear Terminology*

221      I start with the phrase "related metabolic disturbances as well as secondary injuries flowing therefrom." What does this mean?

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

222    The source of this common issue is *Heward v. Eli Lilly & Co.*, [2007] O.J. No. 404 (Ont. S.C.J.) at paras. 82-83. The only difference with the common issue in this case is the presence of weight gain that was absent in *Heward*. The focus in *Heward* was Zyprexa, another second generation antipsychotic drug. The court certified *Heward* and approved this common issue. The reasons in *Heward* do not discuss the meaning of metabolic injuries and secondary injuries. If the court had some evidence to explain these terms it is not apparent from the reasons.

223    The wording of this common issue focuses on metabolic disturbance related to weight gain and diabetes. It is not clear if the "secondary injuries" are secondary to the metabolic disturbance or weight gain and diabetes. Are the metabolic disturbances and the secondary injuries some or all of a list of symptoms that are part of the health risks described in the statement of claim? The plaintiffs made a decision to revise the common issues when faced with the defendants' criticism. It is unclear if this imprecise reference to "metabolic disturbances" and "secondary injuries" is an attempt to broaden the scope of the common issues to capture the full list of health risks that were originally in this common issue.

224    I questioned the plaintiffs about their use of the words "metabolic disturbances" as well as "secondary injuries flowing therefrom." In argument, plaintiffs' counsel explained that the earlier version of the common issue was too broad and this was an attempt to narrow it. The suggestion that they are trying to narrow this common issue is at odds with their next explanation. Plaintiffs' counsel went on to explain that they do not wish to catalogue all of the so called related injuries because this might exclude from a common issue trial, a related relevant injury that is not on the list. In effect this common issue has not been narrowed. Rather, through the use of such nebulous words it seeks to include an undefined list of symptoms.

225    Plaintiffs' counsel fairly conceded that there is no evidence that explains the term "metabolic disturbance and secondary injuries." Drs. Wirshing, Chue and Plunkett use the phrase "metabolic disturbance" without explaining it.

226    It is not an answer to say that a common issue can be certified because it was certified in another case: see *Lambert*, at para. 121. It does not relieve the plaintiffs of the some evidence requirement. Further, it is not an answer to say that expert evidence will be led at trial to explain unclear terminology in a proposed common issue. The common issues trial judge should not be left wondering what was intended by the words "metabolic disturbances as well as secondary injuries flowing therefrom." A common issue that lacks clarity will cause unnecessary confusion as the case progresses: see *Toronto Community Housing Corp. v. Thyssenkrupp Elevator (Canada) Ltd.*, 2011 ONSC 4914 (Ont. S.C.J.) at para. 188.

227    A certification judge cannot perform the task of assessing a common issue if it is unclear what it means. Some evidence from a medical expert explaining the phrase "metabolic disturbance as well as secondary injuries flowing therefrom" is required so the court can perform its task under s. 5. The plaintiffs have simply borrowed the words from *Heward* and assumed that the court will certify them in this case. That is not good enough. There must be some evidence to explain the meaning of the words together with some evidence that Seroquel can cause "related metabolic disturbances as well as secondary injuries flowing therefrom" and that this can be assessed in common.

228    To emphasize the importance of defining medical terms used in a common issue, consider the following definition of "metabolic" found on Medicinenet.com. This site describes "Metabolic" as "Relating to metabolism, the whole range of biochemical processes that occur within us (or any living organism). Metabolism consists of anabolism (the buildup of substances) and catabolism (the breakdown of substances)." In my view this dictionary definition suggests that the term has wide application. It reinforces the importance of providing some evidence so the medical term in the common issue is understood.

229    This leaves weight gain and diabetes. The defendants agree that there is some evidence that Seroquel can cause weight gain and diabetes. This evidence is obvious since the product monographs warn of these risks.

230    As I will explain below, Ms. Martin's statement in her affidavit that she gained weight as a result of taking Seroquel, is not supported by her medical records. The result is a representative plaintiff whose own claim is not grounded in the common issue.

231    The remaining consideration is whether this common issue, limited to weight gain and diabetes, can be assessed in common.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Lack of Commonality*

232    Common issue 1 is a general causation question. This means that if it was accepted as a common issue, an individual trial would be required to determine if Seroquel caused each class member to gain weight and/or develop diabetes. This common issue alone would not determine liability.

233    The plaintiffs have offered no evidence to show that this issue is capable of being assessed in common. It is not susceptible to a single answer at this abstract level. Asking in the abstract if Seroquel can cause weight gain and diabetes is only the beginning of the inquiry. There is a problem with a general causation question when there is no evidence that "compelling epidemiological or statistical evidence might be sufficient to establish individual causation or go a long way to doing so": *Wuttunee v. Merck Frosst Canada Ltd.*, [2009] S.J. No. 179 (Sask. C.A.) at para 144, leave to appeal to S.C.C. refused, (2009), [2008] S.C.C.A. No. 512 (S.C.C.) ("Wuttunee").

234    Adding to the difficulty is the fact that this is not a case where the drug is alleged to have caused a unique harm. In contrast, Seroquel is alleged to cause weight gain and diabetes. These are two conditions that are ubiquitous in society. The evidence that has been provided shows that this general causation question is just the beginning of the inquiry and that its resolution is dependent upon individual findings of fact with respect to each claimant.

235    The plaintiffs' expert, Dr. Wirshing, states that there is "great variability in the degree to which different populations of patients are affected by the metabolic toxicity of Seroquel." When Dr. Wirshing was cross-examined he provided further evidence that there would be considerable difficulty managing this issue in common. He agreed that the population data shows that some patients taking Seroquel will gain weight, some will lose weight and others will experience no weight change. As a result, the population data will not assist in determining causation for the class and an individual inquiry is required.

236    In Dr. Barrett's report he also explains the inability to answer this common issue by relying on the population data. It is clear from the following evidence that this common issue cannot be assessed in common. He states as follows in section 5 of his report:

> Population data is useful in providing an understanding for the risk factors that lead to diabetes and the relative magnitude of each risk factor. However, in determining whether or not Seroquel caused weight gain or DM in an individual patient it is not sufficient to simply examine population data. Population data cannot be translated to the issue of causation in the individual patient. This is underscored by the fact that diabetes and obesity are both common disorders in the Canadian population in the absence of Seroquel administration.

> In order to determine individual causation the court does need to appreciate as necessary background and context the population risk factors described in the section on general causation. It is then necessary to identify all of the diabetes risk factors the individual has and consider the strength of each individual risk factor possessed by the individual in order to appreciate the overall diabetes risk for that individual. Only then can one address whether Seroquel as a possible single risk factor can reasonably be considered as causative in that individual. This process requires analysis of the medical records, psychiatric records, history of pharmaceutical use and life changes that are occurring in each individual.

237    The individuality of this issue is also apparent from the evidence of Dr. Chue. He states at page 31 of his report as follows:

> In order to determine whether a drug such as Seroquel caused a specific "Heath Risk" to occur in a particular individual, an understanding is required of the prevalence, nature, etiology, and known or associated risk factors in the general population for each of the specific "Heath Risks".

> With this understanding, one would then need to consider the individual's unique circumstances including their risk factors for that specific "Heath Risk". This will require a comprehensive analysis by specialists qualified in the medical fields applicable to the particular "Health Risk". This will entail a review for each individual of their full medical history including complete medication exposure history, family history and psychiatric history, and other relevant factors including age,

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

ethnicity, lifestyle, and gender. This information would be obtained from medical and psychiatric records, and pharmacy records. Where there is incomplete information, further investigations and/or physical examination may be required.

Taking weight gain as an example, there is an epidemic of obesity in Canada with weight gain being an increasing problem in all strata of the general population. The population with mental illness is at greater risk of weight gain and obesity than the general population. Thus, a recorded weight change in an individual patient treated with Seroquel must be analyzed carefully taking into account the individual's specific risk factors and medical history in the context of the background population risk.

238    When the evidence dealing with diabetes is considered the individuality of the issue remains and we are led to the same conclusion: there is no evidence that this issue can be managed in common.

239    The prevalence of diabetes in our society is explained by Dr. Barrett in his report. He describes an epidemic of type 2 diabetes driven by diet and lack of exercise. In 2005, the Canadian Diabetes Association indicated that "5.5% of the population had diagnosed diabetes, which represented a 70% increase in diagnosed diabetes between 1998 and 2005." He goes on to state that "according to the Canadian Diabetes Association in 2005 2 of 3 Canadian adults and nearly 1 of 3 children age 12 to 17 were overweight or obese and are therefore at high risk of developing type 2 diabetes." To further emphasize the point he states that the "morbidly obese woman has a risk of developing diabetes that is ~6000% greater than that of a lean woman."

240    The path that diabetes takes is also individual. Dr. Barrett states that "the complex natural history of type 2 diabetes has a natural time course through which each individual patient that develops diabetes will move. The likelihood of progressing along this pathway is determined by their risk factor profile...As a result all these individuals may already have or be transiting towards diabetes in the absence of any new medication or intervention. This can only be assessed for the individual patient, based upon their risk factor profiles."

241    Dr. Barrett explains that the diagnosis of diabetes requires a blood test. Further many people with type 2 diabetes "can be asymptomatic or have only very mild symptoms that are not recognized as due to diabetes." As a result, "the disease can be present and undiagnosed for a considerable period of time. It has been estimated that in the United States and Canada, approximately one quarter to one third of individuals with type 2 diabetes...have not been diagnosed. Put somewhat differently, the date of diagnosis of disease frequently lags by years the date of true onset of disease, making undiagnosed diabetes a significant health issue."

242    Further, Dr. Barrett states that diabetes is a "multi-factorial disease with multiple risk factors that predispose to its development." He adds as follows in para. 2D of his report:

These risk factors are both genetic and environmental and strongly associate with disease development and have been used to guide screening strategies to identify early on those at highest risk. Significant risk factors for type 2 DM include age, family history of DM, obesity, race, ethnicity, history of gestational diabetes, and major neuropsychiatric disorders. In a given individual the risk for developing diabetes is a function of the combined risk factor burden he or she carries.

243    Dr. Arnold also explains the challenges of evaluating whether a causal association exists between Seroquel and diabetes at paras. 71-76 of his affidavit:

71 Determining whether a causal association exists between SEROQUEL use and diabetes is a difficult task due to the nature of the disease process of diabetes, its prevalence in the general population and the psychiatric population in particular, and the low incidence of diabetes adverse events relative to the number patients taking the drug.

72 Diabetes is a progressive disease that begins sub-clinically and progresses to an impaired fasting glucose with glucose intolerance, and then to full-blown diabetes. According to the literature, the prevalence of diabetes in the general population is now approximately 10% and is greater in the schizophrenic population. Therefore, a percentage of patients taking SEROQUEL would be expected to develop diabetes and/or hyperglycaemia as part of the prevalence of the background risk in this population.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

73 Because a percentage of patients treated with SEROQUEL would be expected to be diagnosed with diabetes as part of the natural incidence of that disease, individual adverse event reports of diabetes are of much more limited value than would be the case with adverse event reports for diseases that are less prevalent. Indeed, some disorders are reported so rarely and lack a natural cause that they are usually considered as drug-related unless demonstrated otherwise. Diabetes is not such a condition.

74 In the case of diabetes, because of its prevalence in society, it is far more complicated to assess the possible contribution of a medication such as SEROQUEL in an individual case report. To do so requires careful analysis of the individual's medical history, baseline medical condition, risk factors upon commencement of drug therapy, the changes during therapy, and the changes after therapy is discontinued. To compound this challenge, often the necessary information needed to assess an adverse event report cannot be obtained despite our follow-up protocols and best efforts to do so.

75 For these reasons, in evaluating whether there is a causal association between SEROQUEL and diabetes, it is necessary to analyse aggregate patient data to see whether the incidence of diabetes treated with SEROQUEL is higher than would be expected to occur without SEROQUEL treatment.

76 The results of the studies published in the scientific/medical literature over the years that have considered the association between SEROQUEL and diabetes have been inconsistent. A number of studies have assessed whether the use of SEROQUEL can increase patients' risk of diabetes, but many of the studies that did suggest an increased risk did not control for important risk factors. On the other hand, many of the studies which were better controlled for important diabetes risk factors failed to demonstrate any increased risk between SEROQUEL and diabetes. Therefore, it remains AstraZeneca's view that the evidence to date fails to demonstrate a causal association between SEROQUEL use and diabetes and, at most, any association suggested by some studies is extremely weak.

244   Dr. Wirshing's evidence is also relevant. It is his opinion that Seroquel causes the patient to become obese. Assuming such weight gain, he states that "diabetes is not a forgone conclusion even from significant amounts of weight."

245    When looking at whether Seroquel without weight gain can cause diabetes, Dr. Wirshing has seen this occur with individuals but he states that the causal connection is not shown in the group data. Even among the individuals, Dr. Wirshing states that there is no dose level for Seroquel above which you see a connection between Seroquel and weight gain and/or diabetes. This is important evidence because it reinforces the evidence of the defence experts that this issue cannot be answered on a common basis.

246    Lastly, Ms. Martin's evidence highlights the individuality of determining if Seroquel caused weight gain and/diabetes. While taking Seroquel Ms. Martin states in her affidavit that she experienced several side effects including weight gain of 90lbs. She states that while she tested negative for diabetes in 2006, she experienced diabetic symptoms. Clearly on the issue of diabetes, an individualized inquiry would be required to determine if there was a causal connection between her consumption of Seroquel and the diabetic symptoms that she refers to.

247    While Ms. Martin states that she gained weight after taking Seroquel, her medical records do not document the connection between Seroquel and the weight gain. Further even if she did gain weight, identifying the cause requires an individual inquiry because she possessed multiple risks factors for weight gain aside from Seroquel. Dr. Chue reviewed these points in his report at p. 2007 as follows:

According to the chart it would appear that Ms. Martin gained 100 lbs in the year prior to the day she was first prescribed Seroquel (September 21, 2005). The only other dated weight reference in the chart was on December 20, 2005 where it was noted that her weight was "approaching 300 lbs". Given that 280 lbs following a weight gain of 100 lbs could be said to be approaching 300 lbs", it is not clear from the record that Ms. Martin gained any weight on Seroquel. If Ms. Martin did gain weight while taking Seroquel, there is nothing in her records to support her claim of weight gain attributable to Seroquel. Ms. Martin possessed multiple risk factors for weight gain including impaired mobility/sedentary lifestyle, sedative medications including Percocet and Oxycontin, pre-existing and longstanding obesity, bipolar disorder and age.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

Moreover, prior to treatment and concurrently with Seroquel, Ms. Martin had been treated with a number of medications Zyprexa, Epival and avil. These medications were continued after Seroquel and the dose of for example, the Epival actually increased. These are all psychotropics that are strongly associated with weight gain and their adverse effects in patients with risk factors are often additive (for example, weight gain especially Zyprexa with Epival). In fact, if any weight gain continued after Ms. Martin started taking Seroquel, the data suggest that prior and concomitant medications, physical disability and lifestyle factors caused the trajectory of progressive weight gain that began well before Ms. Martin started on the Seroquel. In my opinion, there is no evidence to support Ms. Martin's claim that Seroquel caused her to gain 55, 90 pounds or any weight at all.

[Emphasis added.]

248    In summary, the plaintiffs have not provided any evidence to show that a methodology exists whereby general population data (or some other approach) can be used to assess this issue in common and arrive at an answer that is of any use to the class. The result is that each putative class member must have this question determined on an individual basis.

249    Because of the individuality of this general causation question and the lack of evidence that it can be answered in common, it becomes a "scientific question of interest." As the court stated in *Gariepy v. Shell Oil Co.*, [2002] O.J. No. 2766 (Ont. S.C.J.) at para. 67, aff'd, [2004] O.J. No. 5309 (Ont. Div. Ct.) "answering the scientific question only starts you on the necessary journey to find the final answer to the liability question in any given case."

250    The evidence in this case resembles the evidence in *Wuttunee*. The Saskatchewan Court of Appeal overturned the lower court's decision to certify. The defendant manufactured and distributed Vioxx, a pain relief medication that was voluntarily withdrawn from the market due to tests that suggested the drug caused an increased risk of heart attacks and strokes. As in this case, the plaintiffs in *Wuttunee* alleged that the medicine resulted in numerous types of unrelated health risks.

251    The plaintiffs in *Wuttunee* proposed a common issue for general causation in relation to two different types of physical injuries - gastro-intestinal injuries, and adverse cardiovascular events. The Court of Appeal rejected this common issue as paras. 145-146 as follows:

However, the wide diversity of complaints to which this issue is addressed was not considered below. In my respectful view, this diversity is fatal to consideration of this issue as a "common" issue. Clearly it is not susceptible to a single answer that would apply to the claims of all members of the class. Thus, while it is conceivable that proof that Vioxx significantly increased the risk of, for example, high blood pressure, might support the claims of the induced or purchaser subclasses (and I am by no means certain that it would), it would be irrelevant to those who claim other unrelated adverse conditions or injuries.

While, in theory, this lack of commonality across the class could be addressed by reference to subclasses (more refined and detailed, to be sure, than those identified in the certification order), it is significant that no attempt was made at the certification stage to do so, even though the class was divided into subclasses at that stage. In fact, any realistic attempt to break the question down into an array of distinct questions in a way that would apply to every claim asserted shows how very complex the question is. The appellants do not exaggerate, in my view, when they assert that this issue would require the court to determine and evaluate all of the effects that Vioxx may have on all of the gastrointestinal and cardiovascular body systems. The answers would almost necessarily vary from one sub-subclass complaint to another. This is a far cry, in my respectful view, from the "limited differentiation amongst class members" envisaged in the suggestion, in Rumley, of the possibility of a "nuanced" answer, where there might be variations in the answer to a common issue among class members.

252    The same conclusions apply in this case. This is made clear by *Lavallee*, in which a similar class proceeding for failure to warn of multiple health risks in relation to Seroquel was brought against the same defendants in Quebec. Notably, the petitioner in Quebec relied on a virtually identical expert report of the same expert, Dr. Laura Plunkett, and the literature referred to in *Lavallee* includes the literature cited by Dr. Plunkett in her affidavit in this action.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

253    Jacques J. refused certification (or "authorization") in *Lavallee*. He found that the petitioner failed to satisfy any of the criteria in s. 1003 of the *Code of Civil Procedure*. Dealing with the general causation question, Jacques J. found that the multiplicity of alleged risks, risk factors, warnings and other individuating factors (e.g., learned intermediaries), coupled with the fact that Seroquel was not defective, meant that "individual trials would be required in the case of each member in order to determine the liability of the Respondents, if any." I agree with and adopt the court's conclusions in *Lavallee*.

254    I reject this common issue.

**Common issue # 2 - Off-Label Promotion**

*Did the Defendants, or any of them, promote, market, advertise, and/or recommend Seroquel for off-label uses? If the answer is yes, does this change the nature of the duty under common issue 3 or common issue #4, constitute unlawful conduct under common issue #7, and/or constitute behavior that would justify an election under common issue #8 or punitive damages under common issue #10?*

*Not Connected to the Statement of Claim*

255    This is a common issue that is not connected to the statement of claim. I start by repeating what is set out above under my analysis of s.5(1)(a): the statement of claim lacks a clear statement of the material facts concerning the off-label use claim. In paragraph 15 of the statement of claim the plaintiffs allege as follows:

> Seroquel is approved for use prescribed to combat schizophrenia and bipolar disorders. Seroquel is also marketed by the Defendants and prescribed by physicians for numerous "off-label" uses, including treatment for anxiety, sleep disorders, depression and dementia-related psychosis ("Off-label Uses"). Off-label Uses are not uses for which approval has been received from Health Canada.

> [Emphasis added.]

256    It is alleged that the plaintiff Ms. Middleton was prescribed Seroquel in June 2005 for off-label uses described in para. 45 of the statement of claim as "*stress and obsessive compulsive behavior*", two uses not even referred to in paragraph 15 of the pleading.

257    This demonstrates the lack of connection between this common issue and the representative plaintiff that purports to represent the off-label claims. There is no allegation, let alone any evidence, that the defendants promoted Seroquel to Ms. Middleton's physician for stress or obsessive compulsive disorder. Indeed, there is no evidence regarding the doctor's reasons for prescribing Seroquel to Ms. Middleton for off-label uses.

*The Evidence - Off-Label Use of Seroquel*

258    There is evidence of numerous off-label uses for Seroquel. The expert evidence discloses at least 15 different types of off-label use: depression, substance abuse, post-traumatic stress, anxiety, behavioural disturbance in the elderly, autism, turrets, pervasive development disorders, control of impulsivity, agitation, sleep disturbance, aggression, dementia-related psychosis, obsessive compulsive disorder and other behavioural disorders.

259    It is important to draw a distinction between the defendants' alleged off-label promotion, marketing, advertising, and/or recommending of Seroquel and the prescription of Seroquel for off-label uses by Canadian physicians. The evidence of both psychiatry experts, Dr. Chue and Dr. Wirshing, establishes that prescribing Seroquel for off-label uses is a common clinical practice that is regarded as acceptable within the medical community.

260    Dr. Chue's evidence is that off-label use of second generation antipsychotics, including Seroquel, is a common, and indeed necessary practice. Physicians prescribe medicines that have not been approved for particular illnesses or patient groups,

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

either because there are no approved medicines for a particular condition, or the medicines that are approved are ineffective or not tolerated in particular patients.

261    Dr. Chue's evidence is that second generation antipsychotics have been widely used in the treatment of a variety of psychiatric disorders, including depressive disorders, substance abuse disorders, post-traumatic stress disorders, anxiety disorders, behavioural disturbance in the elderly, autism, turrets, pervasive development disorders, control of impulsivity, agitation, anxiety, sleep disturbance, aggression and behavioural disturbances in many different clinical situations. In his report Dr. Chue states as follows:

> These are off-label, non-approved indications, but nonetheless reflect widespread and generally accepted clinical practice because they are effective and helpful to patients suffering from these conditions. Physicians have a duty to treat illnesses, ameliorate symptoms and reduce distress, especially where not treating illnesses will have life-threatening consequences. Thus, on an individual basis, a trial of a medication on a risk-benefits basis is not only warranted, but required to reduce suffering, morbidity and mortality.

262    Dr. Wirshing's opinion is that Seroquel has a unique receptor binding profile that gives it a broader range of properties than many of the antipsychotic medications. He testified that Seroquel's unique receptor binding profile and particular characteristics "encourages clinicians to use it for off-label uses." Dr. Wirshing has prescribed Seroquel for many off-label uses, including anxiety syndromes, affective syndromes, acute agitation, severe obsessive compulsive disease, panic syndromes, major depression and sleep.

*No Evidence that Common Issue Exists*

263    The above evidence explains that there are many effective off-label uses for Seroquel. Further the evidence explains that such off-label use is widespread and generally accepted clinical practice. However, this is not some evidence to support the existence of this common issue. There is simply no evidence that the defendants or any of them, promoted, marketed, advertised, and/or recommend Seroquel for off-label uses in Canada or any evidence to suggest that such conduct is unlawful. Given the prevalence of off-label use by doctors one would think that the plaintiffs could present some evidence that the defendants promoted, marketed, advertised, and/or recommended off-label use of Seroquel in Canada. However, no evidence was provided.

264    Dr. Plunkett is silent about this issue. Dr. Wirshing testified as follows:

> Q. You also said from your own experience which is considerable with this drug and this company, you were not of the view that AstraZeneca illegally promoted Seroquel off-label?

> A. Certainly not to me and not to my personal and specific knowledge.

> Q. And the same is true obviously for Canada?

> A. That's obviously true for Canada, yes, sir.

265    The plaintiffs rely on evidence from Dr. Chue, Dr. Arnold and evidence about a settlement in the United States concerning Seroquel. A review of this evidence does not provide some evidence to support this common issue.

266    Dr. Chue was asked during cross-examination about seminars or meetings that he attended in the United States that were organized and sponsored by what he loosely called AstraZeneca. Canadian and American doctors attended. He recalls that material about new indications for Seroquel would have been presented to the group of doctors during the meeting. The content of these seminars is approved by an agency in Canada called PAAB. It regulates how a drug company interacts with the doctors and the advertising that takes place. Dr. Chue stated that "I have never been in a meeting where any product has been promoted in terms of off-label use."

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

267    The above evidence simply does not support this common issue. To the contrary, it is evidence that Dr. Chue never heard the defendants discuss off-label use and what the defendants told doctors during the seminars was regulated. Therefore it is not evidence of unlawful behavior.

268    Dr. Arnold was asked about a document titled "Seroquel Commercial Brand Plan (2001)" and a section called "Contents - Seroquel Marketing Strategy, Seroquel Communication Strategy, Seroquel Operational Plan 2001," prepared by the Global Seroquel Commercial Team. Dr. Arnold agreed that this is an internal Seroquel document. It lists "Key Issues" including "Broaden the Seroquel use on and off label." Dr. Arnold does not know what this means.

269    Under "Strategic Actions" the document states: "Broaden the use of Seroquel beyond its current label in a wide range of patient groups through aggressive communication of its unique profile, eg. mania, ADD, PDD." Dr. Arnold agreed that mania is a psychiatric condition and ADD may refer to Attention Deficit Disorder. He does not know what the Global Seroquel Commercial Team is but he surmised as follows:

> No, but I think we can surmise that within the Commercial function they have a team with global responsibility for the sales and marketing commercial plan for Seroquel, and my interpretation of this document is that it is very aspirational in nature. I have no idea how this communicated — or how this developed into operational activities. This is just a plan.

270    While this document talks about expanding the use of Seroquel and refers to off-label use, it was just a plan and it is not evidence of what happened in Canada.

271    Dr. Arnold stated that the different defendant companies were structured so that that each had a "separate marketing company within each country and they are a business in their own right, with their own management structure, their own objectives....Sales and Marketing is you will have some sort of global strategy set by the center and then the local marketing company will deliver the local operations." When Dr. Arnold was asked about the Global Seroquel Commercial Team he said that to his understanding it did not reflect what would have been done from a marketing perspective in Canada.

272    The plaintiffs also rely on a Settlement Agreement from the settlement of the American Seroquel litigation. In the Settlement Agreement it refers to claims that AZ US promoted the sale and use of Seroquel for unapproved uses. AZ US settled the action without any admission of liability and paid $520,000,000. There are problems with this evidence. It was a settlement without an admission of liability and it involved allegations concerning the promotion and sale of Seroquel for off-label use in United States, not Canada. It cannot be used to satisfy the some evidence test in this Canadian action.

273    In *Goodridge* at paras. 18-19, 36 and 41, Perell J. expressly rejected an attempt to use evidence about wrongful marketing activities in the United States as some evidence that it occurred in Canada. Evidence that the US company had paid a fine for wrongful off-label promotion of its drug and paid other amounts to settle civil liabilities, was rejected as some evidence to support an off-label use common issue in the Canadian action.

274    I agree with and adopt the approach taken in *Goodridge*. The similarity between *Goodridge* and this case is apparent from paras. 18-19 and 36 in *Goodridge* as follows:

> As I have said, these wrongful marketing activities took place in the United States. On this certification motion, there is, however, no basis in fact to find that in Canada, Parke-Davis Canada was a participant in any of the activities promoting the off-label use of Neurontin. There is no evidence of any Canadian doctor or health practitioner having been influenced by any promotional activities emanating from the United States, and there is no evidence of any promotional activities taking place in Canada....

> Further, on this certification motion, there is no basis in fact for concluding that the Parke-Davis in the United States carried on any wrongful promotional activities in Canada. The Plaintiffs submitted that since Canadian doctors would have been aware of and have had available to them the publications and presentations in the United States, this amounted to the United States division of Parke-Davis promoting the off-label uses in Canada. I disagree, the marketing and promotion of

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

Neurontin in Canada was conducted by and under the authority of Parke-Davis Canada, and there is no evidence of Parke-Davis Canada wrongfully promoting the off-label uses of Neurontin in Canada.

. . .

Returning to the narrative, in May 2004, an information was laid against Pfizer Inc. in the United States District Court, District of Massachusetts, concerning Warner-Lambert's promotion of Neurontin for off-label uses in the United States, and the following month, Pfizer Inc. agreed, on behalf of Warner-Lambert, to plead guilty, and it agreed to pay a fine of more than $240 million and to pay amounts in settlement of civil liabilities...

275    In this case, as in *Goodridge*, there is no evidence that AZ US was responsible for marketing activities in Canada. Dr. Arnold's evidence is that AZ Canada is a separate marketing company and while marketing strategy is created by a central global team, marketing in Canada is carried out by AZ Canada in accordance with Canadian regulations regarding promotional practices in the context of the Canadian PM. Nor is there any evidence that any physician in Canada was influenced by any off-label marketing by the defendants when deciding to prescribe Seroquel for off-label uses (assuming off-label marketing even occurred). As in *Goodridge*, the absence of such evidence is fatal to the certification of this common issue. I add that the above evidence distinguishes this case from *Andersen v. St. Jude Medical Inc.*, 2010 ONSC 4708 (Ont. S.C.J.). In *Andersen*, there was evidence that the US parent company was responsible for the marketing activities of the Canadian subsidiary.

276    In summary, there is simply no evidence that the defendants promoted, marketed, advertised, and/or recommended Seroquel for off-label uses. Assuming there was some evidence, there is simply no evidence of what might be "unlawful conduct."

*No Commonality*

277    Even if there was some evidence of this common issue, there is no evidence that it is capable of being assessed in common. This is not a case where one type of off-label use is alleged.

278    The common issue is presented in deceptively general terms. As Dr. Chue states at page 1982 of his report, Seroquel is used to treat a wide variety of illnesses as follows:

...in clinical practice, SGAs (and previously FGAs) have been widely used in the treatment of a variety of psychiatric disorders including depressive disorders, bipolar disorders all phases), substance abuse disorders, PTSD, anxiety disorders, behavioral disturbance in the elderly, autism, Tourettes, pervasive developmental disorder. They have also been used for the control of impulsivity, agitation, anxiety, sleep disturbance, aggression, and behavioral disturbances in many clinical situations (Beduin, 2010). These are off-label non-approved indications but nonetheless reflect widespread and generally accepted clinical practice because they are effective and helpful to patients suffering from these conditions.

279    As noted, this evidence and the statement of claim disclose at least 15 different types of off-label uses for Seroquel. The broad nature of this allegation leads to lack of commonality. For example, if the defendants promoted Seroquel for use in treating substance abuse, the issue would not be an ingredient of a claim for a person who was treated for one of the other uses. For individuals like Ms. Martin who were prescribed Seroquel for an approved use, the issue of whether the defendants marketed Seroquel for non-approved uses is not an ingredient of their claims and is not necessary for the resolution of their claims.

280    I reject this common issue.

*Common issues 3, 4 and 5 - Negligence issues*

*Common issue #3 - Did the Defendants, or any of them, owe a duty of care to the Class in respect of the design, development, researching, testing, recommending, advertising, promoting and/or marketing of Seroquel as it relates to the risk of weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom? If so, what was the nature of the duty?*

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Common issue #4 - Did the Defendants, or any of them, owe a duty to the Class to warn that Seroquel can cause weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom, and if so, when did the duty to warn arise?*

*Common issue #5 - If the answer to #3 and/or #4 is yes, did the Defendants, or any of them, breach such duty? If so, what was the nature of the breach?*

281    Common issues 3 and 4 and 5 are the negligence issues. The plaintiffs rely on what they call three areas of evidence to support these three issues. It is set out in their factum as follows:

   1. Seroquel was introduced into the Canadian market in 1997. The chemical composition of Seroquel has remained the same since its introduction to market. While the level of knowledge may have changed over time, the possible side-effects associated with the use of Seroquel have not.

   2. The approved target market for Seroquel has a number of risk factors for weight gain and metabolic disturbances. These risk factors may inform the appropriate standard of care.

   3. The defendants are in possession of substantial information and data regarding the health risks associated with the consumption of Seroquel that is not available to the Class Members or the public. This information includes clinical data, results of internal studies, discussions with physicians and regulatory authorities, and adverse events data. This knowledge imbalance may inform the appropriate standard of care.

282    Point 1 does not offer any evidence of these common issues. The date of Seroquel's introduction in the market place and its chemical composition is not some evidence of negligence or duty to warn. The third sentence in point 1 is simply a statement and counsel has not offered any source in the evidence to back this up. Point 2 also offers no evidence of these common issues and the second sentence is argument. Point 3 is not evidence but simply argument. The plaintiffs offered no evidence reference for these statements.

283    It is worth noting that there is no common issue that asks if Seroquel is defective. As well, the statement of claim does not allege that this drug was defective. Such a question might ground the commonality of the negligence common issues. However, it is absent in this case because there is no evidence that would support such a question. To the contrary, the evidence from all of the experts is that Seroquel is an effective drug.

284    The following review demonstrates that there is no evidence to show these common issues exist and are capable of being assessed in common.

*Common issue 3*

285    Assuming there was some evidence to support this common issue, it would be impossible to manage it in common because the issue lumps all defendants and different types of negligence together and draws no distinction between approved uses and off-label uses of Seroquel.

286    Dealing with common issue 3, the plaintiffs' own expert, Dr. Wirshing, gave the opinion that there is no issue about the research, design, development, marketing or testing of Seroquel. He testified as follows:

   Q. Okay. And just to knock off a few random points, Dr. Wirshing, you don't have any criticisms of AstraZeneca in respect to the research, design, development, pre-marketing, testing, that it carried out on Quetiapine?

   A. I don't believe I ever expressed an opinion in that regard, and certainly don't have any off the top of my head now.

287    On his cross-examination, Dr. Wirshing also expressed the following opinions concerning Seroquel:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

• Dr. Wirshing has no issue with the fact that Health Canada and the FDA approved Seroquel as being safe and effective for its indicated uses.

• Seroquel is safe and effective for its indicated uses.

• Seroquel is a useful medicine that works and is reasonably well-tolerated.

• Seroquel has good efficacy for both schizophrenia and bipolar disorder and is in the "upper tiers" amongst the other second-generation antipsychotics available in Canada in terms of its tolerability. It is a medicine that has very reasonable subjective tolerability.

• In his practice he prescribes Seroquel to approximately 15 to 20% of his patients for both on-label and off-label uses. He has prescribed Seroquel to approximately 10,000 patients and is of the opinion that its benefits outweigh its risks for many of his patients.

288     Dr. Chue's evidence must also be considered because it shows that there is no evidence to support this common issue. In his report, at pg.13-14 Dr. Chue states:

It is generally accepted in clinical practice that Seroquel has a more benign side effect profile than the other SGAs in Canada with low risks compared to others of agranulocytosis (Clozaril), cardiomyopathy (Clozaril), weight gain (Clozaril, Zyprexa), DM (Zyprexa, Clozaril), movement disorder (Risperdal, Invega), hyperprolactinemia (Risperdal, Invega), sexual dysfunction (Risperdal, Invega) and QTc prolongation (Zeldox, Invega).

In 2003, an Expert Review Panel of the Canadian Psychiatric association (CPA) on Efficacy and Effectiveness concluded in a report published in the Canadian Journal of Psychiatry that (Lalonde, 2003):

In terms of tolerability and safety, there are greater variations between the agents. Clozapine is associated with a minimal, yet definite, risk of life-threatening blood dyscrasias, which can be safely prevented by regular blood monitoring. Risperidone's tendency to cause EPS and hyperprolactinemia similarly limits its tolerability and acceptability for certain patients. Olanzapine may cause significant dosage-related EPS and weight gain and has also been linked to diabetes mellitus and hypertriglyceridemia. Of the 4 agents, quetiapine's tolerability and safety profile is the most benign.

Seroquel is frequently chosen as a preferred treatment option in patients at risk of certain side effects, or for patients who have already experienced side effects with other SGAs.

The 2003 Expert Review Panel report also stated that:

... In addition, its favourable tolerability make it the atypical least likely to degrade quality of life for most patients with side effects. For some, however, quetiapine-associated somnolence can initially decrease their quality of life.

The efficacy and tolerability profiles of quetiapine make it an attractive option in terms of patient acceptability.

... Quetiapine's efficacy has been documented in a number of different settings and its favourable relative to the other atypical antipsychotics is particularly appealing for acceptability in the long-term.

289     Even if there was some evidence to support common issue 3, it fails because it is overly broad. Eight different activities are listed which would require an inquiry into the defendants' activity for each one over a 14 year period. In essence, it is a common issue that asks multiple questions.

*Common issue 4 - Duty to Warn*

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

290    The last part of this question asks "when did the duty to warn arise." It assumes there is a single duty to warn. This ignores the fact that AZ Canada has an ongoing duty to warn. Further the evidence is clear: there was an evolution of knowledge and the question cannot be asked at one single point in time. The product monograph changed at different points in time and addressed weight gain and diabetes differently. There cannot be a single answer to this question that applies to the class for weight gain and diabetes. The lack of commonality is obvious.

*Warnings re Weight Gain*

291    Dealing specifically with the first part of common issue 4 and failure to warn, there is simply no evidence to support this issue. To the contrary, there is evidence that warnings were given for diabetes and weight gain. There is no evidence that these warnings were inadequate. The extensive evidence regarding the warnings is set out below.

*Summary of the Warnings - Weight Gain*

292    The defendants' warnings are set out in the product monographs that Health Canada approved. Anne Tomalin states that since the introduction of Seroquel and Health Canada's approval of the first product monograph, the product monograph has been updated 25 times and at least 19 of the updates have contained safety information within a 13 year period.

293    A weight gain warning was in the initial product monograph in 1997. In his affidavit, Dr. Arnold describes the warnings for weight gain and the amendments over time. An excerpt from his affidavit follows (his use of "NDS" means New Drug Submission):

**1996 NDS and December 1997 Product Monograph**

In the NDS filed with Health Canada in 1996, weight gain was noted as one of the important side effects seen in the clinical trials. Section 19.1.7 of the NDS stated that a statistically significantly greater proportion of subjects treated with SEROQUEL, compared with subjects treated with placebo, developed clinically significant weight gain (Exhibit C).

The initial SEROQUEL Product Monograph, dated 2 December 1997, included information on weight gain in both the Precautions and Adverse Reactions sections (Exhibit B). Under Precautions, the Product Monograph stated as follows:

**Weight Gain**

SEROQUEL was associated with weight gain. In clinical trials mean weight gain after 4-8 weeks of treatment was approximately 2.1 kg, after 18-26 weeks, 3.5 kg, and at 1 year, 5.6 kg.

The Adverse Reactions section of the monograph stated:

Weight Gain: As with other antipsychotics, SEROQUEL may be associated with weight gain. During acute therapy (up to 6 weeks) in placebo-controlled clinical trials, mean weight gain in patients taking SEROQUEL was 2.3 kilograms compared to a mean weight gain of 0.1 kilograms in patients taking placebo. In long-term trials average weight gain was 5.6 kilograms after one year of treatment (see PRECAUTIONS).

The Adverse Reactions section also included a table setting out certain adverse events reported in short-term, placebo-controlled Phase II-III schizophrenia trials, which included weight gain.

**2 August 2002 Product Monograph**

"Weight gain" was included in the list of possible side effects of SEROQUEL in the Information for the Consumer section that was introduced in the Product Monograph on 2 August 2002. Attached hereto and marked as Exhibit M is a true copy of the 2 August 2002 SEROQUEL Product Monograph.

**24 September 2003 Product Monograph**

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

On 24 September 2003, the Product Monograph was updated to incorporate weight gain data obtained from several uncontrolled, open label trials. The materials submitted to Health Canada for this label change included a PSUR, dated 14 September 2002; a SERM Justification Document; and clinical trial summaries. Attached hereto and marked as Exhibit N is a true copy of the 24 September 2003 SEROQUEL Product Monograph.

The weight gain data was revised in both the Precautions and the Adverse Reactions sections of the 24 September 2003 Product Monograph.

**5 November 2004 Product Monograph**

Health Canada approved AstraZeneca Canada's submission for a bipolar disorder - mania indication on 5 November 2004. The Product Monograph was updated in both the Precautions and Adverse Reactions sections to include additional weight gain data from the bipolar mania clinical trials. Weight gain was listed as a commonly observed adverse event in the short-term placebo-controlled bipolar disorder - mania trials, that being a side effect that occurred in 5% or more patients. Attached hereto and marked as Exhibit O is a true copy of the 5 November 2004 SEROQUEL Product Monograph.

**6 March 2007 Product Monograph**

In the Product Monograph, dated 6 March 2007, the Information for the Consumer section was updated to describe weight gain as a "common" side effect. Attached hereto and marked as Exhibit P is a true copy of the 6 March 2007 SEROQUEL Product Monograph. 18 August 2008 Updated Weight Gain Data in Conjunction with new Indication for Bipolar Depression

On 18 August 2008, Health Canada approved SEROQUEL for use of in the treatment of bipolar depression and approved a revised Product Monograph, which included weight gain data from the bipolar depression clinical trials. Attached hereto and marked as Exhibit Q is a true copy of the 18 August 2008 SEROQUEL Product Monograph.

The new weight gain data was added to the Warnings and Precautions and the Adverse Reactions sections of the Product Monograph.

**19 May 2009 Product Monograph Safety Update**

AstraZeneca Canada filed a Notifiable Change Submission on 18 December 2008 to revise the SEROQUEL Product Monograph based on recent safety updates to the CDS following a SERM meeting on 9 July 2008. The revised Product Monograph was approved by Health Canada on 19 May 2009. Attached hereto and marked as Exhibit R is a true copy of the 19 May 2009 SEROQUEL Product Monograph.

Information about the cumulative results of all clinical trials on the frequency of clinically significant weight gain (based on 7% increase from baseline) that occurred in 9.6% of SEROQUEL-treated patients and 3.8% of placebo-treated patients was added to the Product Monograph at that time.

In addition, the revised Information for the Consumer section stated that weight gain has been reported "very commonly" in people taking SEROQUEL.

**SERM's Consideration of Weight Gain**

Weight gain data has been reviewed by SERM on three occasions (June 2000, February 2002, and July 2008). AstraZeneca Canada provided to Health Canada safety updates which included weight gain data (e.g., results from ongoing clinical trials and analyses of other published studies), on an ongoing basis.

294    Dr. Chue also reviews the warnings for weight gain in part 6 of his report as follows:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

The original product monograph of December 2, 1997 reported weight gain and included data from the pre-registration clinical trials. Since 1997, the product monograph on weight gain has been updated to include data from clinical trials in 2003, and data from clinical trials for the bipolar disorder indications in November 2004 and August 2008. Further clinical trial data was added in May 2009. In addition, the information for the consumers section of the product monograph which was added to the monograph in 2002, contained the notation of "some weight gain" as a "possible side effect". This notation was revised in March 2007 to a "common" side effect, and revised again in May 2009, with the statement that weight gain has been reported "very commonly" in people taking Seroquel.

Weight gain is a recognized side effect of Seroquel and indeed, most psychotropic agents including the SGAs (Rummel-Kluge, 2010). From the literature and clinical experience, weight gain occurring with Seroquel is significantly less than with Clozaril or Zyprexa and comparable with Risperdal in keeping with the generally accepted hierarchy of association. This is a clinical scenario where order of treatment plays a role since weight gain or weight gain trajectory established on a previous treatment is very difficult to reverse. Metabolic side effects can easily be misattributed to the new medication rather than the medications switched from.

Furthermore, overweight and obesity are more prevalent in patients with schizophrenia and particularly bipolar disorder because of the illness itself, lifestyle and treatments. Of note, patients who are underweight before starting treatment may benefit from a treatment that restores normal body weight. Thus, appropriate treatments should avoid combinations of weight gain-inducing drugs and patients should be appropriately screened and counselled before starting treatment. Thereafter patients should be closely monitored according to a protocol and counselled throughout treatment with attention paid to the complications of weight gain and obesity. Patients should be referred for dietary and exercise consults and multidisciplinary programming provided to help patients manage weight gain through lifestyle change.

In my clinical experience, weight gain with Seroquel is manageable and is rarely a reason for discontinuation.

295    There is no evidence from the plaintiffs' experts to support this common issue. I have ruled that Dr. Plunkett's evidence is not admissible. However, even if it is admissible Dr. Plunkett offers no opinion at all about the warnings for weight gain.

296    In Dr. Wirshing's affidavit he states that the "dataset that AstraZeneca had compiled on [Seroquel] prior to its launch in December 1997 in Canada clearly indicated that clinically significant weight gain was a common side effect of [Seroquel]." He acknowledges that the weight gain data was "detailed in the Canadian package insert from launch in 1997." What he calls the "package insert" and then the "product label" must be the product monograph since he reviewed all of them. He concludes in the report that the "product label" for diabetes was inadequate for diabetes. He does not include weight gain in this opinion.

297    When Dr. Wirshing was cross-examined he stated that, in his opinion, the information regarding weight gain in the Canadian Seroquel PM was adequate from the outset. He testified as follows:

Q. It's not your opinion that the Canadian product monograph warnings, let me restate it. You don't have the opinion that the Canadian product monograph warning in respect to weight gain was inadequate?

A. ... As I recall, the Canadian label - the Canadian label has had a warning, albeit at a variable weight gain since the very beginning.

Q. Right. And the warning since the very beginning on weight gain, you considered to have been adequate?

A. Correct. As I know from the reading of it, there was some discussion as to whether it was appropriate to change the magnitude of that warning.

Q. Right.

A. But the placement of the warning in that location is appropriate and yes, I have no specific complaints about that.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*Warnings re Diabetes*

298    A diabetes warning (including exacerbation of diabetes, hyperglycaemia, diabetic ketoacidosis, diabetic coma, and death) was added to the product monograph on December 16, 2003 at the request of Health Canada as part of class-wide labeling for second generation antipsychotics. The warning was expanded on two occasions - April 25, 2005 and October 9, 2007. To be clear this means that from 1997 (when Seroquel was first approved for use) until December 2003, the Seroquel product monograph did not contain any warning about diabetes.

299    Dr. Arnold offers a detailed review of the warnings and the reasons for same. An excerpt from his affidavit follows. Speaking about the 2003 "labeling" (a generic term for the product monograph) he states:

    140. On or about 18 September 2003, Health Canada formally advised AstraZeneca Canada that it was implementing class labelling in Canada for the atypical antipsychotics in regard to glucose/diabetes. Health Canada advised AstraZeneca Canada that the class labelling was based on data available to Health Canada pertaining to all of the atypical antipsychotics. AstraZeneca did not have access to all of the data available to Health Canada, including the data submitted to Health Canada by the other manufacturers.

    141. On 20 November 2003, AstraZeneca filed a Notifiable Change Submission to revise the SEROQUEL Product Monograph in accordance with the class labelling change regarding the use of antipsychotics and glucose dysregulation.

    142. With this Submission, AstraZeneca Canada provided Health Canada with the 24 July 2003 Glucose Dysregulation Position Paper and the 22 September 2003 PSUR.

    143. These revisions to the SEROQUEL Product Monograph were approved by Health Canada, effective 16 December 2003. Attached hereto and marked as Exhibit F is a true copy of the 16 December 2003 SEROQUEL Product Monograph.

    144. A new section entitled "Hyperglycaemia" was added to both the Precautions and Adverse Reactions sections of the Product Monograph, which stated that exacerbation of pre-existing diabetes, hyperglycaemia, diabetic ketoacidosis, and diabetic coma, including some fatal cases, have been reported very rarely with SEROQUEL use. Clinical monitoring was also recommended in patients with diabetes or with risk factors for diabetes.

    145. In addition, the Information for the Consumer section was updated to recommend that, before starting SEROQUEL, patients tell their doctor if they have diabetes or a family history of diabetes.

300    Speaking about the April 2005 revisions to the product monograph Dr. Arnold states:

Further Class Labelling Change regarding Hyperglycaemia: 25 April 2005

    157. On 24 January 2005, Health Canada asked AstraZeneca Canada to file a further Notifiable Change in order to implement another class labelling update for all atypical antipsychotics to incorporate the wording from the U.S. class labelling regarding hyperglycaemia.

    158. The wording for the label change was provided to AstraZeneca Canada by Health Canada. The additional text included more details regarding recommendations for clinical monitoring of patients treated with atypical antipsychotics. It also acknowledged that the relationship between atypical antipsychotics and hyperglycaemia is not completely understood.

    159. AstraZeneca Canada implemented the proposed change to the SEROQUEL label, but informed Health Canada of our assessment that the data did not establish a causal relationship between SEROQUEL and diabetes.

    160. The revised Product Monograph was approved by Health Canada on 25 April 2005.

301    Speaking about the October 2007 revision to the product monograph Dr. Arnold states:

179. On 28 June 2007, AstraZeneca Canada submitted a Notifiable Change Submission to revise the SEROQUEL Product Monograph to accord with the changes to the CDS covering the glucose data from Trials 125, 126 and 127. The Submission included a Clinical Overview, entitled "Glucose Dysregulation", dated June 2007, which set out the rationale for the proposed label change.

180. The label change was approved by Health Canada on 9 October 2007. A reference to increases in blood glucose and hyperglycaemia, and occasional reports of diabetes, in clinical trials with SEROQUEL was added to the Warnings and Precautions section. In addition, the Warnings and Precautions section cross-referenced the new glucose data in the "Adverse Events" section which described the data from Trials 125, 126 and 127 of the label. The Information for the Consumer section was also revised, including a reference that increases in blood glucose and hyperglycaemia and occasional cases of diabetes have been reported with SEROQUEL.

302    Dr. Plunkett discusses the Seroquel labeling for diabetes in her affidavit. I have ruled that Dr. Plunkett's evidence is inadmissible. If I am wrong, her evidence is not helpful and cannot assist the plaintiffs despite the low burden that applies. I say this for the following reasons.

303    What did Dr. Plunkett review to offer her opinion about the warnings? Dr. Plunkett states in her affidavit that she reviewed the "labeling for Seroquel as provided in the Physicians' Desk Reference." This is the American equivalent to the Compendium of Pharmaceutical Specialties ("CPS"). It is not the product monograph, the warning that all drug manufacturers use and that Health Canada approves. As Anne Tomalin states, this American document has "no relevance in Canada." Dr. Plunkett states that she has also reviewed the regulations of the "U.S. Food and Drug Administration relating to the development, approval, labelling and marketing of prescription drug products but not the regulations of Health Canada." As well she says that she reviewed "warnings provided by Health Canada" regarding Seroquel.

304    Dr. Plunkett then states in para. 38 of her affidavit that she looked at the "most recent product monograph for Seroquel" and in her opinion "the warnings related to hyperglycemia and diabetes...are not adequate to convey the risks posed by Seroquel itself." She has two criticisms. First, she says that "[i]n the health professional section of the monograph, the discussion of hyperglycemia and diabetes is put forth as an effect of anti-psychotics in general only [and not specific to Seroquel] and second she says that "the monograph section intended for consumers fails to even mention these health risks."

305    With this in mind I turn to her cross-examination evidence. When asked about what product monograph she looked at she said that she "would have to go back to [her] files." Defence counsel tried to clarify which product monograph she based her opinion on. She was shown the October 9, 2007 product monograph. This was the product monograph in place when she swore her affidavit on November 23 2007. It was at that time the "most recent product monograph" for Seroquel. It was posted on the Health Canada website that Dr. Plunkett said she accessed to get the product monograph.

306    Although she stated in her affidavit that the product monograph had no information for consumers, this is not accurate. She agreed on cross-examination that the October 2007 product monograph does include a consumer section that sets out health risks.

307    Dr. Plunkett's second criticism is that the warnings for diabetes were not specific to Seroquel. This is simply wrong. Dr. Plunkett agreed on cross-examination that the October 2007 product monograph does include Seroquel specific information.

308    If Dr. Plunkett meant to address her criticism to an earlier product monograph, this was never stated, not even on re-examination. It is worth noting that the previous 2005 product monograph also had consumer information about diabetes and it had a warning specific to Seroquel.

309    In summary, even if Dr. Plunkett's evidence is admissible, it does not assist the plaintiffs.

310    Dr. Wirshing's opinion was served as reply evidence. In paragraph 51 and 81(c) of his affidavit he discussed the Seroquel warnings for diabetes as follows:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

> Although the current label warns reasonably about the risks of diabetes and increases in cholesterol and triglycerides, AstraZeneca continues to flatly deny that [Seroquel] causes diabetes. Further, the current warning about hyperglycemia and diabetes is a comparatively recent addition — despite the fact that this expected toxicity (i.e., weight gain) was known (or should have been known) to the company since before launch in 1997.

> Their product label has, until recently, been inadequate in its warnings about the impact on lipid and glucose metabolism, hyperglycemia, and diabetes.

311    Dr. Wirshing was cross-examined about this evidence to clarify what product monograph he was referring to. Although he swore the affidavit in 2011, he was actually referring to the October 2007 product monograph. He agreed that he has no criticism of this 2007 product monograph as follows:

> Q. So from and after October of 2007, you have no criticism of the Canadian product monographs warning with respect to glucose, hyperglycemia, and diabetes?

> A. True.

312    This confirms that there is no basis in the evidence for a failure to warn common issue from October 2007 forward.

313    Defence counsel then questioned Dr. Wirshing about the time frame prior to October 2007. When cross-examined, Dr. Wirshing confirmed that he has no criticism of the absence of a diabetes warning from 1997-2002:

> Q. But it is true that for the first, say, five years. So from 1997 to 2002, you don't have a criticism of the absence of a warning about diabetes in the Canadian product Monograph?

> A. Yeah. It's a very fair question as to where that number lies. And given the overall environment, that's probably true. It's a disappointment for me to say that because I believe that all of the companies, AstraZeneca included, knew about the risk before 2002. If we're looking at all of the realities of the world that we live in and the competitive environment, I would be comfortable with 2001, certainly.

314    So in the above exchange Dr. Wirshing first agrees that he has no criticism of the Seroquel product monograph from 1997-2002, but then he says he would be more comfortable with it from 1997-2001. However, he does not explain why he is more comfortable with it in 2001 than in 2002.

315    The cross-examination continued and Dr. Wirshing was asked about the period from 1997-2001. It was noted that Dr. Wirshing did not discuss the 2003 product monograph in his report. When asked if the 2003 product monograph was an adequate warning, he said it was a "clear improvement" but criticized this 2003 warning because in his view it was a "class" warning (i.e. warned about the risk of diabetes for the class of drugs and did not warn about diabetes specific to Seroquel.) However, cross-examination revealed that Dr. Wirshing was wrong because the 2003 product monograph does include data specific to Seroquel. Dr. Wirshing was given a chance to read the wording of the 2003 product monograph and he agreed that it spoke specifically about Seroquel.

316    This narrowed the window of possible evidence from Dr. Wirshing regarding the failure to warn from 2001 to 2003 or 2002 to 2003. Dr. Wirshing never offers any evidence to explain why he is critical of the lack of warning from 2001-2002. So we are left with his bald statement and no explanation for why he feels more comfortable with the warning in 2002 rather than the one in 2001.

317    Dr. Wirshing is not new to the Seroquel litigation. He filed an affidavit in the U.S. litigation and on agreement this is the affidavit that was filed in reply in this Ontario action. He has had every opportunity to address the warning issue with clarity and in particular explain his bald statement. While I recognize that the burden on the plaintiffs to offer some evidence is low, this bald statement is seriously deficient and cannot be used to satisfy the some evidence test. This is particularly so when the following evidence is considered.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

318    In 2003, a Consensus Conference reviewed the connection between the second generation antipsychotic drugs and diabetes and weight gain. A writing committee at the Conference published a report. Dr. Barrett was on this Committee and he reviewed the Conference and the report in his March 4, 2011 report as follows:

> The conference was convened in November 2003. I had the responsibility of chairing the writing committee. Prior to the conference, the writing committee reviewed the peer-reviewed literature related to second-generation antipsychotics. The committee consisted of endocrinologists, psychiatrists and obesity specialists. Presentations were made by investigators from the scientific academic community, pharmaceutical companies including Pfizer, Bristol-Myers Squibb, AstraZeneca, Eli Lilly, and Janssen, and the FDA related to extant data on the safety and efficacy of second-generation antipsychotics. The Consensus Statement was subsequently published in the journals Diabetes Care and the Journal of Clinical Psychiatry in February, 2004.

319    After reviewing the extensive medical literature available at that time, Dr. Barrett states that the committee felt there was "sufficient data to suggest an association between both obesity and diabetes for two second-generation antipsychotic agents, specifically clozapine and Zyprexa. The committee was not prepared to make the same finding for four others, finding the evidence either lacking or not sufficiently persuasive." For Seroquel, the committee found that there was "evidence of an association with modest weight gain but the evidence was discrepant regarding allegations of an association with diabetes or glucose dysregulation." Despite the discrepant evidence the defendants nevertheless included a specific warning in the product monograph in 2003.

320    In the face of this evidence from a panel of numerous experts, it cannot be suggested that Dr. Wirshing's bald statement offers some evidence of the failure to warn issue for the period of 2001-2003. The low burden requires something more than a bald statement from an expert witness who had every opportunity to explain himself.

321    It is worth noting that it is a struggle to understand what the plaintiffs' experts have to say about the failure to warn issue. On such a key issue in this case, the plaintiffs argue that there is some evidence to support the failure to warn common issue. However, when the reader puts the pieces of this evidence together (without embarking on any weighing of the evidence) it becomes apparent that there is no evidence to support this core issue.

*There is no Commonality in common issues 4 and 5*

322    The duty to warn common issue is not common to the class. To ask if the defendants owed a duty to warn the class cannot be answered in the abstract. The issue is too broad and offends the principle in *Rumley* as stated in para 29:

> It would not serve the ends of either fairness or efficiency to certify an action on the basis of issues that are common only when stated in the most general terms. Inevitably such an action would ultimately break down into individual proceedings.

323    This common issue would result in an answer that is so general it would have no impact on the litigation. It would do nothing to advance the claims of the class. It is not even common as between the representative plaintiffs. The issue is stated in the broadest possible terms and masks the individual inquires that are required.

324    As noted, the plaintiffs first proposed a group of common issues that focused on a long list of health risks. This was then narrowed on reply to weight gain diabetes and the unclear phrase "and/or related metabolic disturbances as well as secondary injuries flowing therefrom."

325    The narrowing of the health risks in the common issues to diabetes and weight gain means that all of Ms. Martin's health risks are dropped except for weight gain. She does not allege diabetes. It is not an ingredient of her claim. Even more problematic, there is no evidence to anchor her weight gain claim.

326    Properly understood, the duty to warn issue is not a single question for the entire class. You cannot owe a duty to an amorphous class of people that are situated differently. There is evidence of this lack of commonality in Dr. Barrett's report in section 2D as follows:

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

Each disorder has its own population prevalence, constellation of predisposing factors, pathogenesis and natural history. As such it is clear that to evaluate the possible relationship between each alleged health risk and Seroquel, it will be necessary to consider the known natural history and prevalence of each disorder, the known risk factors for developing that disorder and diagnostic characteristics used to diagnose the specific disorder and how each of these are reflect in the medical history and presentation of individual patients

327     There can be no single duty owed to the class as a group. Consider the variability of this case. The common issues describe two specific health risks (diabetes and weight gain). The warnings for diabetes are not the same as the warnings for weight gain. For each risk the warnings changed over time. There are 15 different types of uses. Three are approved and the rest are off-label.

328     In summary, there is no evidence to support this common issue or show that it can be managed in common. It is rejected.

*Common issues 6 and 7 - Conspiracy Claim*

*Common issue #6 - Did the Defendants, or any two or more of the Defendants, act in combination to conceal information from the Class and/or Health Canada relating to the safety and efficacy of Seroquel, as it relates to weight gain, diabetes and/or related metabolic disturbances as well as secondary injuries flowing therefrom?*

*Common issue #7 - If the answer to #2 and/or #6 is yes, was the Defendants' conduct unlawful in that it violated the Food and Drugs Act or the Food and Drug Regulations?*

329     As noted in the s. 5(1)(a) analysis, there are 5 elements to an unlawful conduct conspiracy claim. This common issue only covers two of the five elements: did they act in combination to conceal information and was this conduct unlawful. As a result, this common issue as framed cannot decide the conspiracy claim.

330     The plaintiffs describe seven pieces of evidence to support the conspiracy common issue. The following three clearly have nothing to do with concealing information. They are stated in para. 162 of the plaintiffs' factum as follows:

d) The Defendants' internal emails confirm that their own commercial interests governed the company's direction with respect to scientific research, dissemination of critical information, and product labelling;

f) The Defendants agreed to award funding for preclinical work based on the work's ability to demonstrate a competitive advantage for Seroquel. If the preclinical work risked results that were not clearly advantageous to Seroquel, funding was denied; and,

g) In April 2001, the Defendants considered the removal of the descriptor "limited" before "weight gain" in the Seroquel CDS. The Defendants' commercial team successfully resisted the amendment on the basis that it might damage Seroquel, despite the concerns raised by the Defendants' corporate representative, Dr. Arnold.

331     The remaining four pieces of evidence as set out in the plaintiffs' factum appear to talk about concealment. The evidence is described as follows:

a) As set out above, the evidence indicates that the Defendants may have violated s. 9 of the Food and Drugs Act through their off-label marketing of Seroquel and in failing to warn of the health risks associated with the use of Seroquel;

b) As set out above, the Defendants' internal documents reveal that they acted together to conceal unfavourable studies, cherry-pick data, reject research that could result in unfavourable findings and downplay significant negative data;

c) In 1997, the Defendants used a "smoke and mirrors job" to conceal a "cursed study" from U.S. and Canadian regulators;

e) The Defendants' internal emails confirm that the Defendants buried a number of trials that yielded unfavourable results, including Trials 15, 31, 56, and a trial called "COSTAR", and cherry-picked and suppressed data;

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

332    It is important to look at the actual evidence that points a, b, c and e refer to. There are two documents that the plaintiffs rely on as some evidence of concealment. Both documents were obtained from the files of AZ US in the US Seroquel litigation.

333    The first is an "Internal Memorandum" from Richard Lawrence dated February 12, 1997. The plaintiffs assert that this document is some evidence that the defendants concealed a study (Study 15) from Health Canada. The memorandum states as follows:

> Subject: US/Canada Investigator Meeting and Study 15
>
> I am not 100% comfortable with this data being made publically available at the present time...however I understand that we have little choice.... Lisa has done a great "smoke and mirrors" job!
>
> Adopting the approach Don has outlined should minimize (and dare I venture to suggest) could put a positive spin (in terms of safety) on this cursed study.
>
> Athena, with Mark Sahl having left I am not certain who is replacing him. Whoever it is... ought they speed a reserve press release through?
>
> Richard

334    The "cursed study" is Study 15 noted in the reference line. The memorandum was sent to eight people. Plaintiffs' counsel marked the Internal Memorandum as an exhibit on Dr. Arnold's cross-examination but did not ask him any substantive questions about it. This memorandum makes no reference whatsoever to concealing information from Health Canada.

335    The second document that the plaintiffs rely on is an email chain which contains an email from John Tumas to a group of people in December 1999. He uses the word "buried" in relation to three studies. The relevant excerpt is as follows:

> There has been a precedent set regarding "cherry picking" of data. This would be the recent Velligan presentations of cognitive function data from Trial 15 (one of the buried trials). Thus far I am not aware of any repercussions regarding interest in the unreported data.
>
> That does not mean that we should continue to advocate this practice. There is growing pressure from outside the industry to provide access to all data resulting from clinical trials conducted by industry. Thus far we have buried Trials 15, 31, 56 and are now considering COSTAR.
>
> The larger issue is how do we face the outside world when they begin to criticize us for suppressing data. One could say that our competitors indulge in this practice. However until now, I believe we have been looked upon by the outside world favorably with regard to ethical behavior. We must decide if we wish to continue to enjoy this distinction. The reporting of COSTAR results will not be easy. We must find a way to diminish the negative findings. But in my opinion we cannot hide them.

336    In the chain of emails is a response from Jim Gavin who talks about the data from COSTAR. He states that selectively using data from COSTAR "is pushing it too far in my opinion and might prove extremely damaging in the long term...and would destroy our current high standing in the publishing community."

337    Dr. Arnold was not asked if any of the people referred to in these documents worked for AZ Canada. He was not asked any substantive questions about the content of these documents.

338    There is no question that these two documents talk about the studies being buried and suppressing data. However there is no evidence about the nature of the information that was buried or concealed. These documents do not say that the studies were concealed from Health Canada. Further these documents do not talk about concealing information relating to the "safety

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

and efficacy of Seroquel, as it relates to weight gain, diabetes" which is the focus of this common issue. Further there is no evidence that AZ Canada was involved or that any of the matters referred to in the documents occurred in Canada.

339      The defendants' evidence from Dr. Arnold and Ann Tomalin (that is not challenged) refutes the plaintiffs' position that these documents offer some evidence of conspiracy. While the above memorandum and emails talk about study 15 being buried, it is the evidence of Dr. Arnold and Ann Tomalin that this study was given to Health Canada.

340      Dr. Arnold was the global Head of Drug Safety for the defendants for the majority of the period of time in question. Dr. Arnold expressly states that AstraZeneca at all times acted in the interests of patient safety in relation to its consideration of Seroquel's safety. He also states that AstraZeneca "at no time misinformed or failed to inform Health Canada, Canadian physicians or patients of the true safety profile of Seroquel as known and understood by AstraZeneca based on... evaluation of the currently available scientific knowledge and data." Ann Tomalin, the Canadian pharmaceutical regulatory specialist reviewed all of AstraZeneca's submissions to Health Canada. In her opinion, AstraZeneca Canada complied fully with its regulatory obligations. Ms. Tomalin was not cross-examined.

341      Dr. Arnold explains that the trials 15, 31, 53 and 56 were schizophrenia related efficacy studies. Study 15, the one that is described as being buried, was in fact given to Health Canada. It is listed in the table of contents that accompanied the New Drug Submission to Health Canada for Seroquel in September 1996. Dr. Arnold and Ann Tomalin both confirm that study 15 was part of this submission to Health Canada. Additionally, AZ Canada filed an Integrated Summary of Safety Information with Health Canada as part of the New Drug Submission for Seroquel and this contained efficacy and safety data from Trial 15.

342      The evidence from Dr. Arnold and Ms. Tomlin explains that trials 31, 53 and 56 were not part of the pre-registration clinical trial program. They were efficacy studies not designed to support a new indication, so there was no requirement to submit these reports to Health Canada. In any event, AZ Canada submitted: (a) an interim report for and weight gain data from Study 31 to Health Canada; (b) weight gain data from Study 53 to Health Canada; and (b) the full clinical Study 56 to Health Canada. Therefore, as Ms. Tomalin states, these studies, including Study 15, were not concealed from Health Canada. In addition, the serious suspected adverse drug reactions that occurred in these trials were shared with Health Canada.

343      The evidence also establishes that the defendants' decision to not submit these four studies for publication in journals was appropriate and consistent with industry standards at the time. It is Ms. Tomalin's opinion that there was no requirement at the time to publish all clinical studies in Canada, and it was not industry practice to do so. Dr. Arnold's evidence is that Trials 15, 31, 53 and 56 were not submitted to journals for publication because the studies failed to prove their hypotheses, or suffered from design flaws. This was consistent with the pharmaceutical industry practice at the time.

344      In summary, the Internal Memorandum and emails that the plaintiffs rely on for the conspiracy common issue do not provide some evidence to support common issue 6. Lastly the plaintiffs provided no evidence that any of the defendants' conduct was unlawful in that it violated the Food and Drugs Act or the Food and Drug Regulations.

*Common issues # 8 - 13 Remedial Issues*

8 - Can the Class elect to have damages determined through an accounting and disgorgement of the proceeds of the sale of Seroquel?

9 - If so, in what amount and for whose benefit is such accounting to be made?

10 - Should one or any of the Defendants pay special, aggravated and/or punitive damages to the Class?

11 - Can damages be determined on an aggregate basis on behalf of the Class?

12- Should one or any of the Defendants pay the costs of administering and distributing the amounts to which the Patient Class and Family Law Class are entitled?

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

13 -Should one or any of the Defendants be ordered to pay prejudgment interest?

345    Common issues 8 -13 are remedial. Given the lack of evidence to support any of the liability common issues, there is no evidence that grounds the remedial common issues. It follows that there is no reason to certify these remedial issues: see *Kafka v. Allstate Insurance Co. of Canada*, [2011] O.J. No. 1683 (Ont. S.C.J.) at para. 199 aff'd [2012] O.J. No. 1520 (Ont. Div. Ct.). In these circumstances, I will briefly comment on these common issues.

346    Common issues 8 and 9 deal with the remedy of an accounting and disgorgement of the proceeds of the sale of Seroquel. The plaintiffs refer to these issues as waiver of tort. They say that this common issue addresses the question of whether the class has the right to elect between compensatory tort damages and a restitutionary remedy of disgorgement.

347    The plaintiffs argue that where, on a class-wide basis, there exists a sufficient causal connection between the wrongful conduct and the amount for which the defendant could be ordered to account, waiver of tort may appropriately be certified as a common issue.

348    The statement of claim only pleads two forms of wrongdoing in connection with the plaintiffs' reservation of their right to elect disgorgement through the remedy of waiver of tort:

(a) deliberately withholding and/or concealing information about the Health Risks and harmful side-effects of Seroquel in order to gain approval from Health Canada and to market and sell Seroquel to the Plaintiffs in Canada; and

(b) deliberately and aggressively promoting, marketing, advertising, recommending, merchandising, and selling Seroquel for Off-label Use when they knew or ought to have known that such use was not approved by Health Canada.

349    As discussed, there is no basis in evidence for the assertions that the defendants wrongfully concealed information from Health Canada, or wrongfully promoted Seroquel for off-label uses. Accordingly, there is no basis in fact for any remedy of disgorgement for wrongdoing. For this reason alone, this common issue is rejected.

350    Common issue 10 asks if one or any of the defendants should pay special, aggravated and/or punitive damages to the class. Whether the defendants should pay special damages will depend on what special damages are being claimed. This is an individual matter. The statement of claim seeks different types of such special damages, including medical testing and monitoring, "hospital accounts, x-ray accounts, doctors' accounts, drugs, transportation, clothing, personal effects and other related expense." Determining whether the class members are entitled to any such damages is an inherently individual exercise and requires an examination of each type of special damage sought by each class member. Entitlement to aggravated damages in this case is not a common issue. As Strathy J. said in *Banerjee v. Shire Biochem Inc.*, 2010 ONSC 889, 88 C.P.C. (6th) 328 (Ont. S.C.J.) at para. 35:

...the issue of aggravated damages cannot form a common issue. Aggravated damages are assessed on an individual basis as part of general non-pecuniary damages: see *Carom v. Bre-X Minerals Ltd.*, above, at para. 83, and *Kotai v. The Queen of the North*, 2007 BCSC 1056, [2007] B.C.J. No. 1573, at paras. 40-42. Accordingly, the word "aggravated" should be removed from common issue (g).

351    As framed this common issue focuses on whether punitive damages should be awarded and not the quantum. The question of whether a defendant's conduct justifies an award of punitive damages has been accepted as a common issue in many class actions: see *Boulanger*, at para. 22; *Cloud*; *Heward*; *Peter v. Medtronic Inc.*, [2007] O.J. No. 4828 (Ont. S.C.J.), leave to appeal refd [2008] O.J. No. 1916 (Ont. Div. Ct.); *Andersen v. St. Jude Medical Inc.*, [2003] O.J. No. 3556 (Ont. S.C.J.) at para. 81, leave to appeal ref'd [2005] O.J. No. 269 (Ont. Div. Ct.); *Serhan Estate v. Johnson & Johnson*, [2004] O.J. No. 2904 (Ont. S.C.J.), aff'd [2006] O.J. No. 2421 (Ont. Div. Ct.), leave to appeal to C.A. refd, leave to appeal to S.C.C. refd, (2007), [2006] S.C.C.A. No. 494 (S.C.C.); and *Robinson v. Rochester Financial Ltd.*, 2010 ONSC 463 (Ont. S.C.J.), leave to appeal ref'd, 2010 ONSC 1899 (Ont. Div. Ct.).

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

352    A punitive damage claim does not always have the commonality necessary for a common issue. The case of *Robinson v. Medtronic Inc.*, [2009] O.J. No. 4366 (Ont. S.C.J.), aff'd 2010 ONSC 3777 (Ont. Div. Ct.) is an example. This was a product liability claim against the manufacturer of a medical device used to treat heart disease. The court refused to certify punitive damages as a common issue. The common issues associated with the negligence and conspiracy claims were not going to be dispositive of the defendant's liability because proof of causation and proof of damages depended on individual trials. The potential entitlement to punitive damages was therefore inextricably linked to the effect of the defendant's conduct on individual plaintiffs. The same problem arises in his case which makes this issue unsuitable for certification.

353    I accept that common issues 12 and 13 have been certified in other cases. However, they fail here because there is no underlying liability common issue that has been accepted.

### 5(1)(d) - Preferable Procedure

354    Subsection 5(1)(d) of the *Class Proceedings Act*, requires that a class proceeding be the preferable procedure for the resolution of the common issues. The preferability requirement has two concepts at its core: first, whether the class action would be a fair, efficient and manageable method of advancing the claim and second, whether the class action would be preferable to other reasonably available means of resolving the claims of class members.

355    The preferability inquiry is conducted through the lens of the three goals of class actions: access to justice, judicial economy and behaviour modification and by taking into account the importance of the common issues to the claims as a whole including the individual issues: see *Cloud* at para. 73; *Hollick* at paras. 27-28; and *Markson v. MBNA Canada Bank*, 2007 ONCA 334 (Ont. C.A.) at para. 69.

356    In determining whether a class proceeding is the preferable procedure for resolving the common issues, the court must consider not just the common issues, but rather, the claims of the class in their entirety: see *Hollick* at para. 29.

357    The preferable procedure requirement can be met even when there are substantial individual issues. However, a class proceeding will not satisfy the preferable procedure requirement when the common issues are overwhelmed or subsumed by the individual issues, such that the resolution of the common issues will not be the end of the liability inquiry but only the beginning.

358    In this case there is no single *common* issue that will significantly advance the litigation for the class. Consider what is left having reviewed each of the common issues: there is some evidence that common issue 1 exists. There is no benefit to certifying this common issue because the defendants concede that Seroquel can cause weight gain and diabetes. This point is obvious since the product monographs warn of these risks. Such a concession does nothing to move the class members' claims ahead. There is no commonality to the question. An individual inquiry is required to decide if Seroquel caused weight gain and/or diabetes for each class member.

359    The rest of the liability common issues collapse because they do not have a basis in fact and lack commonality. As well, the conspiracy common issues only deal with two elements of this cause of action and in any event fail to satisfy the some evidence test. The remaining elements are left for individual trials.

360    In this situation, there is simply no reason to conclude that a class action would be a fair, efficient and manageable method of advancing the claim.

### 5(1)(e) - A Representative Plaintiff with a Workable Litigation Plan

361    The final requirement for certification is that there be a representative plaintiff who will fairly and adequately represent the interests of the class, has produced a suitable litigation plan and does not have a conflict of interest on the common issues with other class members. The capability of the proposed representative to provide fair and adequate representation is an important consideration. The standard is not perfection, but the court must be satisfied that "the proposed representative will vigorously and capably prosecute the interest of the class..." *Western Canadian Shopping Centres Inc.* at para. 41.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

*The Representative Plaintiff*

362    There are several concerns regarding the proposed representative plaintiffs in this action.

363    Their level of interest and ability to vigorously and capably prosecute this action is questionable given the following evidence. When the representative plaintiffs were cross-examined they conceded that they have not read any of the product monographs that ground the duty to warn allegations against the defendants. This leads me to seriously question their level of interest and commitment. In *Singer* the representative plaintiff demonstrated the same lack of interest. He was not aware of the existence of the product monograph for the sunscreen product in question. This was one of many reasons why the representative plaintiff was rejected.

364    There is further evidence of the representative plaintiffs' lack of interest. When cross-examined Ms. Martin stated that she does not know the difference between the three defendants and she thought they were all the same. Ms. Middleton knew that she had sued more than one defendant but does not know the difference between them.

365    More serious is the lack of evidence to show that the claims of the representative plaintiffs are anchored in the class action. Ms. Martin alleges that as a result of taking Seroquel in 2005 she experienced transient weight gain, balance problems and involuntary movements. The last two of these complaints have been eliminated from the revised common issues. This leaves weight gain which in her case was transient. The statement of claim alleges that Ms. Martin gained approximately 55 pounds while taking Seroquel. There is no evidence that her weight gain was as a result of taking Seroquel. Ms. Martin states in her affidavit that she gained 90 pounds while taking Seroquel. However, her medical records state that she actually gained 100 pounds in the year *before* she started taking Seroquel and while she was taking Zyprexa (another second generation antipsychotic). Ms. Martin, claimed during her cross-examination that her doctor made a mistake in her chart and that she gained the weight the following year her use of Seroquel. However, there is no evidence from her doctor who made the notations on the medical chart. More serious is the following evidence. As detailed earlier in this judgment, the product monograph in place in 2005, when Ms. Martin took Seroquel, contained a warning for weight gain and the plaintiffs have not provided any evidence that the warning for weight gain was inadequate.

366    Ms. Middleton took Seroquel in 2005 for stress and obsessive compulsive behavior, both of which are off-label uses. She took Seroquel at a low dose for six months. Ms. Middleton says that as a result of taking Seroquel, she gained 25 lbs and was diagnosed with diabetes. However, the product monograph in place in 2005 warned about these two side effects and as already noted there is no evidence that this warning was inadequate. As a result, there is no evidence that anchors Ms. Middleton's claim in this action.

367    A class action must have a representative plaintiff who has a real interest in the dispute and will provide fair representation to the class. The representative plaintiff must be able to instruct counsel and to exercise independent judgment concerning the important issues that will arise during the progress of the litigation. There must be an informed representative plaintiff with a genuine claim that is supported with some evidence and anchored in the claim. Both representative plaintiffs fail to satisfy these requirements.

368    For the reasons set out above, the representative plaintiffs are not adequately informed about this action and do not have a real interest in this action. They are not suitable representative plaintiffs.

*The Litigation Plan*

369    The production of a workable litigation plan serves two purposes. First, it assists the court in determining whether the class proceeding is the preferable procedure and second it allows the court to determine if the litigation is manageable: see *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (Ont. S.C.J.), aff'd (1999), 46 O.R. (3d) 315 (Ont. Div. Ct.), rev'd on other grounds (2000), 51 O.R. (3d) 236 (Ont. C.A.).

Martin v. Astrazeneca Pharmaceuticals PLC, 2012 ONSC 2744, 2012 CarswellOnt 6210

2012 ONSC 2744, 2012 CarswellOnt 6210, [2012] O.J. No. 2033, 216 A.C.W.S. (3d) 294...

370    The amount of detail in a litigation plan will vary according to the circumstances and complexity of each case. However, a plan that simply sets out the usual steps that occur in any litigation is not acceptable: see *Bellaire*, at para.52.

371    The plan must provide sufficient detail that corresponds to the complexity of the litigation. The litigation plan will not be workable if it fails to address how the individual issues that remain after the determination of the common issues are to be addressed: see *Caputo v. Imperial Tobacco Ltd.* (2004), 236 D.L.R. (4th) 348 (Ont. S.C.J.) ("Caputo") at para. 76.

372    As stated in *Caputo*, at para. 78, the plan should contain "details as to the knowledge, skill and experience of the class counsel involved, an analysis of the resources required to litigate the class members claims to conclusion, and some indication that the resources available are sufficiently commensurate given the size and complexity of the proposed class and the issues to be determined."

373    While the plaintiffs litigation plan provides much of the usual detail that the court expects to see in a plan, it becomes a work of fiction because there are no common issues that have been accepted.

374    The plaintiffs have not satisfied s. 5(1)(e) criterion.

## Conclusion

375    In summary, I make the following orders:

(1) The plaintiffs are granted leave to delete Bernard Van Kerrebroeck as a plaintiff in this action and to amend the Amended Fresh as Amended Statement of Claim

(2) The plaintiffs' motion seeking certification of this action as a class proceeding is dismissed.

376    If the parties cannot agree on costs, they must deliver written submissions to the court by June 15, 2012, in accordance with a schedule to be agreed upon by counsel. This schedule must allow for a brief reply.

*Motion dismissed.*

## Footnotes

\*    Additional reasons at *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 27 C.P.C. (7th) 135, 2012 ONSC 4666, 2012 CarswellOnt 9934 (Ont. S.C.J.).

---

End of Document    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2013 ONSC 1169
Ontario Superior Court of Justice (Divisional Court)

Martin v. Astrazeneca Pharmaceuticals PLC

2013 CarswellOnt 2904, 2013 ONSC 1169, [2013] O.J. No. 1182, 226 A.C.W.S. (3d) 652

# Joanne Martin, Corrine Middleton, Bernard Van Kerrebroeck and Don Martin, Plaintiffs (Appellants) and Astrazeneca Pharmaceuticals PLC, Astrazeneca Pharmaceuticals, LP and Astrazeneca Canada Inc., Defendants (Respondents)

Aston, Herman and Lederer JJ.

Heard: February 21, 2013
Judgment: February 21, 2013
Docket: Toronto 300/12

Proceedings: affirming *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 CarswellOnt 6210, 2012 ONSC 2744, 27 C.P.C. (7th) 32, C. Horkins J. (Ont. S.C.J.); and affirming *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 ONSC 4666, 2012 CarswellOnt 9934, 27 C.P.C. (7th) 135, C. Horkins J. (Ont. S.C.J.); and additional reasons to *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 CarswellOnt 6210, 2012 ONSC 2744, 27 C.P.C. (7th) 32, C. Horkins J. (Ont. S.C.J.)

Counsel: James C. Orr, Megan B. McPhee, Aris Gyamfi, for Plaintiffs / Appellants
Frank J. McLaughlin, Sarah Chesworth, Brandon Kain, for Defendants / Respondents

Subject: Civil Practice and Procedure

**Table of Authorities**

**Cases considered by *Aston J.*:**

> *Attis v. Canada (Minister of Health)* (2008), 59 C.P.C. (6th) 195, 300 D.L.R. (4th) 415, 2008 CarswellOnt 5661, 2008 ONCA 660, 254 O.A.C. 91, 93 O.R. (3d) 35 (Ont. C.A.) — referred to

**Statutes considered:**

*Class Proceedings Act, 1992*, S.O. 1992, c. 6
> s. 5(1)(a) — considered

> s. 5(1)(b)-5(1)(e) — referred to

> s. 30(1) — pursuant to

APPEAL by from judmgents reported at *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 CarswellOnt 6210, 2012 ONSC 2744, 27 C.P.C. (7th) 32 (Ont. S.C.J.) and *Martin v. Astrazeneca Pharmaceuticals PLC* (2012), 2012 ONSC 4666, 2012 CarswellOnt 9934, 27 C.P.C. (7th) 135 (Ont. S.C.J.), dismissing plaintiffs' motion to certify class action proceeding and awarding defendant costs.

*Aston J.*, (Orally):

Martin v. Astrazeneca Pharmaceuticals PLC, 2013 ONSC 1169, 2013 CarswellOnt 2904

2013 ONSC 1169, 2013 CarswellOnt 2904, [2013] O.J. No. 1182, 226 A.C.W.S. (3d) 652

1    The plaintiffs appeal the May 7, 2012 decision of Horkins J. which denied certification of a proposed class proceeding. They also seek to appeal the costs decision on the motion, which awarded approximately $700,000 in favour of the defendants.

2    Seroquel is an anti-psychotic drug approved by Health Canada for the treatment of schizophrenia and bi-polar disorders. It is also widely prescribed for unapproved or "off label" uses such as sleep disorders and depression. It is widely regarded as an effective drug, but the defendants, who developed and market the drug, acknowledged that there is some evidence that it can cause weight gain and/or diabetes. The plaintiffs allege the defendants concealed these risks from consumers and from the regulator, Health Canada, or at the very least gave inadequate and untimely product warnings.

3    Justice Horkins dismissed the plaintiffs' motion for certification on the basis that the Second Amended Fresh as Amended Statement of Claim ("Claim") failed to disclose a cause of action as required by s. 5(1)(a) of the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 (*"CPA"*). Though unnecessary for the disposition of the motion, Justice Horkins also went on to find that the appellants had failed to provide sufficient evidence to meet the remainder of the tests set out in each of ss. 5(1)(b) through (e) of the *CPA*. In a separate decision, the Motions Judge awarded the defendants costs, comprised of $475,000 for fees, and approximately $169,000 for disbursements (primarily expert fees) plus the applicable GST and HST.

4    This appeal comes to the Divisional Court under s. 30(1) of the *CPA*. The appeal of costs requires leave, which was not seriously opposed by the respondents.

5    The standard of review with respect to s. 5(1)(a) of the *CPA* is correctness. See *Attis v. Canada (Minister of Health)* (2008), 93 O.R. (3d) 35 (Ont. C.A.) at para. 23.

6    At paragraphs 99 through 192 of the Reasons, the Motions Judge articulated the correct legal test under s. 5(1)(a), then concluded that the plaintiffs had failed to clearly and properly plead the essential facts required to establish a cause of action. She also found that the pleading was fatally defective in other respects. We endorse her Reasons. We agree with her analysis and conclusion.

7    The standard of review with respect to ss. 5(1)(b) through (e) calls for deference. The main thrust of the appellants' submission is that the Motions Judge erred by engaging in a "merits based" approach and placed too high an evidentiary burden on the plaintiffs.

8    Counsel for the plaintiffs does not challenge what the Motions Judge had to say in paragraphs 21 to 25 of her Reasons, concerning the purpose of evidence on a certification motion, the description of the low threshold of the plaintiffs' evidentiary burden or the court's limited function as a gate keeper. However, he submits that the Motions Judge did engage in an impermissible weighing of evidence, rather than limiting her consideration to whether the plaintiffs had established the "scintilla of evidence" required to meet their threshold burden.

9    We do not agree that the Motions Judge erred in this fashion. It is evident from the Reasons that she closely examined the plaintiffs' own evidence. She concluded that, on its own, it did not satisfy the "some basis in fact" test. It was not an error to closely scrutinize the plaintiffs' evidence, as for example by reference to the cross examination of their expert Dr. Wirshing. In our view, the Motions Judge did not expand her consideration of the evidence beyond the permissible boundaries that she had identified.

10    The plaintiffs have failed to demonstrate any basis upon which we would interfere with the conclusions of the Motions Judge with respect to ss. 5(1)(b) through (e) of the *CPA*.

11    Counsel for the plaintiffs has asked this court to permit a further amendment of the Statement of Claim in the event that we do not allow the appeal and certify the proceeding as a class action. We decline to do so.

12    The Motions Judge recognized the low evidentiary threshold the plaintiffs needed to meet on a certification motion and found that there was no evidence to support certain essential elements. A bald allegation is not enough. Without some evidence there is nothing to amend. Furthermore, as noted in paragraph 191 of the Reasons, the plaintiffs did not seek permission to

Martin v. Astrazeneca Pharmaceuticals PLC, 2013 ONSC 1169, 2013 CarswellOnt 2904
2013 ONSC 1169, 2013 CarswellOnt 2904, [2013] O.J. No. 1182, 226 A.C.W.S. (3d) 652

further amend their Claim from the Motions Judge. Their Notice of Motion to this Court does not ask for that as alternative relief. Moreover, there is no suggestion as to exactly how the plaintiffs would amend the latest version of the Statement of Claim and it is inappropriate for this Court to grant such relief *carte blanche.*

13    The standard of review on a cost decision is that it will only be set aside if the judge erred in principle or was "clearly wrong".

14    The plaintiffs submit that the Motions Judge erred in principle by failing to adequately take into account the chilling effect of her costs order and its implications regarding access to justice in class proceedings. They also submit that she erred in principle by increasing the costs payable on the basis on an Indemnity Agreement.

15    We do not accept those submissions. A careful reading of paragraph 24 of the Reasons on the costs award makes it plain that the indemnity agreement was only taken into account to refute the plaintiffs' submissions on the access to justice issue and not as a reason to impose a liability for costs or to increase those costs.

16    In the end, the Motions Judge did reduce the $1.2 million dollars in fees claimed by the defendants to $475,000.

17    In our view, the Motions Judge set out the appropriate legal principles with respect to costs on a motion to certify a class proceeding and exercised the broad discretion afforded to her in a balanced fashion. Though the costs award apparently sets a new bench mark in favour of a defendant successfully resisting a certification motion, there is no basis upon which to interfere with the award.

18    The appeals are therefore dismissed.

19    I have endorsed the Record on behalf of the panel: "These appeals are dismissed for oral reasons given and recorded. Costs in favour of the defendants are fixed at $30,000 all inclusive."

*Appeal dismissed.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.



Neutral Citation Number: [2013] EWHC 2608 (Ch)

Case No: HC13C03323 & HC13C03109

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 23/08/2013

Before:

**THE HONOURABLE MR JUSTICE PETER SMITH**
- - - - - - - - - - - - - - - - - - - -
Between:

| | |
|---|---|
| **Citicorp Trustee Company Ltd** | **Claimant** |
| - and - | |
| **(1) Barclays Bank Plc & Ors** | |
| **(2) Theatre (Hospitals) No 1 Plc** | |
| **(3) Theatre (Hospitals) No 2 Plc** | |
| **(4) Cooperatieve Centrale Raiffeisen-** | |
| **Boerenleenbank B.A. (trading as Rabobank** | |
| **International)** | |
| **(5) Capita Asset Services (London) Ltd** | |
| **(6) Ambac Assurance UK Ltd** | |
| **(7) Ambac Credit Products LLC** | |
| **(8) XY** | **Defendants** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr A Lenon QC & Mr A Clutterbuck** (instructed by **Norton Rose Fulbright**) for the **Claimant**
**Mr R Salter QC & Mr T Gentleman** (instructed by **Weil, Gotshal & Manges**) for the **First Defendant**
**Ms C Cooke** (instructed by **K&L Gates LLP**) for the **Second and Third Defendants**
**Mr R Knowles CBE QC** (instructed by **Linklaters and Mayer Brown**) for **Ambac Credit Products LLC and Ambac Assurance Ltd**

Hearing dates: 14th August 2013
- - - - - - - - - - - - - - - - - - - -

# Judgment

Peter Smith J:

## INTRODUCTION

1.  The Claimant ("the Trustee") is the Trustee under two issues of commercial mortgage backed floating rate Notes, in respect of underlying loans due for maturity in October 2031 in an aggregate amount of £660m ("the Notes").

2.  The issuers of the Notes are the Second and Third Defendants Theatre (Hospitals) No 1 Plc ("T1") and Theatre (Hospitals) No 2 Plc ("T2") respectively (collectively the "Issuers").

3.    The First and Fourth Defendants ("Barclays") and ("Rabobank") respectively are Noteholders.

## ISSUE OF PROCEEDINGS

4.    The present Part 8 proceedings were issued on 2nd August 2013 pursuant to a Beddoe order made by Morgan J on 31st July 2013.  He also ordered expedition and an accelerated timetable so that the trial could be heard in the week commencing 12th August 2013.  The urgency arises out of the fact that the loans underlying the lending structure of which the Notes form part mature on 15th October 2013 ("the Loan Maturity Date").  A restructuring would need to be negotiated and implemented against a very short timetable.  If the restructuring is not arranged it appears there is likely to be a security shortfall.

5.    The hearing before me which leads to this judgment arises out of the directions made by Morgan J on 31st July 2013.

## THE ISSUE

6.    The issue is to whether certain Notes held by Barclays and Rabobank (together "the Disputed Notes") are on the terms of the two Trust Deeds disenfranchised upon any Noteholder vote or direction to the Trustee (such a vote or direction being anticipated in the context of the proposed restructuring).  The Disputed Notes are senior Notes with an aggregate face value of £442m:-

   i)    Under T1 £231m Class A Notes and £57m Class B Notes are held by Barclays Bank Plc.  That represents the whole of the 2 senior classes of T1 Notes.  Those Notes are referred to as "the Disputed Barclays Notes".

   ii)   Under T2 £154m Class A Notes held by Rabobank.  These Notes represent the whole of the most senior Class of T2 Notes and are referred to as "the Disputed Rabobank Notes".  These are held by Rabobank but are the subject of a total return swap arrangement with Barclays.

## PARTICIPATORS

7.    The Trustees are represented by Mr Andrew Lenon QC and Mr Andrew Clutterbuck.  Barclays are represented by Mr Richard Salter QC and Mr Tom Gentleman.  Ms Charlotte Cooke represents T1 and T2.  T1 and T2 did not intend to take a position in the proceedings and were represented to assist the Court if and when required.

8.    Unfortunately until the morning of the hearing nobody was appearing to make competing arguments against Barclays.  This was important as will be seen below because of Barclays' changed stance as to the meaning and effect of the relevant provisions of the Trust Deed.  Mr Lenon QC for the Trustees made arguments on behalf of the junior classes of Notes who despite being aware of the proceedings did not intend to participate.  He did this pursuant to paragraph 6 of Morgan J's order which enabled the Trustee to advance such argument as it considered appropriate in the interest of unrepresented Noteholders.

9.    The junior Noteholders as I have said did not appear. The reason for that is unclear but I suspect that it was because of the later stance Barclays take on this dispute. Barclays somewhat surprisingly before me accepted that the Disputed Barclays' Notes were disenfranchised. However surprising that was it was not necessarily particularly significant in the overall picture as Barclays contended that the Disputed Rabobank Notes which it had a measure of control over were *not* disenfranchised.

10.    I will elaborate on the alternative arguments further in this judgment.

11.    The authority for Morgan J's order is to be found in the decision of the then Chancellor of the High Court (Sir Andrew Morritt) given in the decision *State Street Bank & Trust Company v Sompo Japan Insurance Inc & Ors [2010] EWHC 1461 (Ch).*

12.    In the course of that judgment the Chancellor had something to say about potential arguments being raised by a Trustee at paragraph 28 and following of his judgment in a postscript:-

> *"28 Not the least surprising feature of this case is the absence of any Noteholder prepared to participate. As the Notes were issued in dematerialised form to Clearstream and Euroclear and are payable to bearer the Trustee is unable to ascertain the identity of all Noteholders. Nevertheless the interlocutory processes, which included advertisement, revealed KBC Investments Ltd, BAWAG, Unicredit, Uniqa and Nataxis as Noteholders. None of them was prepared to take any part in the proceedings. In those circumstances I was grateful to counsel for the Trustee for his very helpful submissions but I think it is necessary to add a few words in relation to the position of a trustee in an application such as this.*
>
> *29 In view of the absence of any Noteholder prepared to participate I indicated before the hearing that I expected the Trustee to advance any arguments reasonably available to the Noteholders as a class. The response was a letter from the Trustee's solicitors stating*
>
> *"we are mindful of our duties to the Court, but we write on behalf of our client to request that the Chancellor does not require us or our client's counsel to address the court on any arguments available to any side in this litigation."*
>
> *The reason for this request was stated to be the wish of the Trustee "to maintain complete neutrality". The letter indicated that if I was not minded to accept their request the Trustee should be formally ordered to make such arguments and an adjournment to enable such arguments to be advanced would be required. In the event I made no such order, granted no adjournment and received considerable assistance from counsel for the Trustee.*

> *30 Nevertheless I remain concerned that the duties of a trustee in seeking the assistance of the court should be properly understood. In the case of a private trust, including a pension scheme, the trustee has been likened to a watchdog for unrepresented interests, see Re Druce [1962] 1 AER 563, 568. The trustee is expected to assist the court in the varied circumstances indicated in paragraph 21.81 Lewin on Trusts 18th Edition and the cases there cited. Of course there are differences between those trustees and the Trustee in this case but those differences do not, in my view, lead to any difference in the duty of the Trustee to the Court. If a trustee, of any description, applies to the court he is expected to assist the court by bringing to the court's attention any relevant legal proposition or argument affecting the position of unrepresented beneficiaries or parties. This is, in my view, but a specific application of the general duty to which Lord Birkenhead LC referred in Glebe Sugar Refining Company Ltd v Trustees of the Port and Harbours of Greenock [1921] WN 85 to the case of particular fiduciaries. That said I am in no doubt that, in the event, the duty was amply observed and performed by Counsel for the Trustee.*

13.     There are striking similarities in the present case. No junior Noteholder is prepared to participate in these proceedings. The identities of the Noteholders is not known to T1 and T2. The only entity having knowledge of who the junior Noteholders actually are is the Servicer as defined in the Servicing Agreement dated 11th May 2007 (the "Servicing Agreement"). The Servicer under the Servicing Agreement was initially a Barclays entity (there being quite a few of those in these documents) Barclays Capital Mortgage Servicing Ltd. It has recently been replaced by Capita Asset Services (London) Ltd ("the Servicer").

14.     The Servicer was not a party to the proceedings initially. Nor was any individual or company representing the junior Noteholders nor (initially) was another pair of companies called Ambac Credit Products LLC and Ambac Assurance UK Ltd (together called "Ambac"). However Ambac gave notice of intention to appear at the hearing and appeared by Mr Robin Knowles CBE QC who made submissions on behalf of Ambac. I will set out further below the relationship of Ambac to these matters. Ms Cooke and her solicitors accepted instructions on behalf of the Servicer.

15.     The Decision of the Chancellor above enables the arguments that could be put forward by people who are absent to be put forward by the Trustee. I can well understand why the Chancellor permitted the Trustee to do so but there is in my view a potential problem about his direction. Whilst the arguments can be submitted on behalf of such persons by the Trustee and the Court can actually determine them I do not see that any decision can bind the junior Noteholders unless they are party to the proceedings. It follows therefore that in my view it is quite possible for the junior Noteholders to sit on their hands during this hearing and see whether the result appertains which they desire. In the event they do not obtain the result they desire it is open to them to issue their own proceedings and seek to reargue the points.

16.     I appreciate that might be a difficult exercise and will undoubtedly be met with a primary argument that such proceedings when they were aware of these proceedings and chose not to participate constitute an abuse.  That is all very well.  In the context of the present case with the fast approaching maturity date it is quite possible that such proceedings could be issued very late in the day to be used as a negotiating tactic in finalising the terms of any restructuring.  It is extremely unlikely that any such proceedings could be heard before the maturity date.

17.     Therefore I directed that the Servicer be joined as a party and identify a junior Noteholder to the other parties' lawyers only (the name to be kept confidential to preserve the confidentiality of the investment).  That person was then designated as Defendant XY in these proceedings and I joined such Defendant and required the Trustee to serve all the documents in this action upon XY by 10 am 15th August 2013.

18.     I directed that XY be joined to represent all junior Noteholders so as to be bound by the judgment in such a class.  I gave XY until 10.30 on 22nd August 2013 liberty to apply to vary or discharge this order if they so wished.

19.     I dispensed with the need for them to file an acknowledgement of service.

20.     I joined Ambac and similarly dispensed with the need for them to file an acknowledgment of service.

21.     The result of those preliminary orders made at the start of the trial meant that every conceivable person that could be affected by the decision were joined as parties and given an opportunity to raise such arguments that they thought appropriate.  Despite the joinder of XY as it was self evidently not represented the Trustee made submissions on its behalf.

22.     Rabobank will be bound by the judgment as it is a party but has chosen not to appear.

CONCERNS

23.     Barclays' position was until service of its evidence on 8th August 2013 that none of the Disputed Notes was disenfranchised.  However the Trustee was aware via the Servicer that at least one junior Noteholder who has refused to come forward was of the view that the Disputed Notes *are* disenfranchised.  Faced with the conflict the Trustee issued the present proceedings.  The significance is whether or not the Disputed Notes are disenfranchised.  With those Notes it would be able to block any restructuring.

24.     The Trustee is also concerned that it may shortly receive a direction pursuant to clause 5.1 (d) of Schedule 1 to the Servicing Agreement purporting to be a direction by holders of not less than 50.1% of the aggregate Principal Amount Outstanding of the Most senior Class of Notes then outstanding.  At present if it were to receive such a direction the Trustee would be in doubt because of the challenge to the status of the Disputed Notes as to whether such direction was valid.

## THE TRANSACTIONS

25.  Under the terms of a Facility Agreement dated 6th October 2006 a group of banks (including Barclays) advanced in aggregate £1,650,000,000 ("the Propco Loans") to a group of borrowers comprising companies in the General Healthcare Group which carry on business as providers of healthcare in the UK through a network of private hospitals ("the Borrowers").

26.  The Propco Loans were split into senior and junior Loans. The senior Loans are referred to in the documentation as "the Whole Senior Loans". They were further divided with the majority of the lending banks' interest being acquired from the banks (including Barclays) by the Issuers. For this purpose the lending banks sold their participations in the Whole Senior Loans to the Issuers and were designated by the documentation as "the Sellers". In the case of the T1 transaction there are four such Sellers. In the case of the T2 transaction there is one lending bank namely Barclays. Barclays is in addition one of the Sellers in respect of the T1 transactions.

27.  The Notes were issued by the Issuers which are SPVs created solely to raise the purchase monies for the majority portion of the Whole Senior Loans being purchased from the Sellers.

28.  In addition to being a lender under the Propco Loans and a Seller Barclays was also the Arranger and the Lead Manager of both issues of the Notes. Finally of course as I have set out above another Barclays' company was until recently the Servicer.

29.  By a Servicing Agreement ("the Servicing Agreement") dated 11th May 2007 a Master Servicer and a Special Servicer were appointed. Their role was to carry out administrative tasks within the lending structure and act in accordance with the Servicing Standard. Their obligations are to maximise recovery of funds under the Whole Senior Loans and they play (unlike the Trustee) a commercial role in communicating and negotiating with the interested parties.

30.  The set up and structure of the various transactions seems to a simple minded property lawyer to be Byzantine in the extreme. This appears to be the nature of these kinds of contracts. However it must be appreciated that there are no special principles that apply to these contracts as regards construction and the construction of them falls to be decided in accordance with the general principles of construction applied by the Courts in respect of any document it is asked to construe.

31.  The nature of these transactions is summarised in paragraph 28 of the witness statement of Ms Jacky Kelly dated 8th August 2013 served on behalf of Barclays as follows:-

> *"It is in the nature of credit derivative contracts that they create synthetic exposures to assets rather than transferring assets (or interests in assets): and it is a common feature of credit derivative contracts that they contain an express statement that there is no requirement for either party to have any exposure to any Reference Entity, or to own or have any interest in any underlying Reference Obligation. Such*

> *contracts are payable "loss or no loss". That is the case in*
> *relation to the TRS."*

32.    Thus at least part of the transactions behind the Notes take place in the ether as it were and have their own status irrespective of what is actually going on in relation to the Notes. As will be seen there are various provisions in the documentation which protect the Trustee from having to enquire as to what dealings in respect of the Notes or any other transactions that affect the Notes there might be. The Trustee is entitled to act entirely on certificates provided by the Servicer or an Issuer or the entries shown on the screen shots from (for example) Euroclear or Clearstream Luxembourg ("Clearstream"). The Notes are deposited with the two depositories in accordance with provision 1.1 of the terms of the Notes. The entries on the screen are *"conclusive and binding for all purposes save in the case of manifest error (including for the purpose of any quorum requirements of or the right to demand a poll at meetings of the Noteholders...)"* (condition 1.3). The purpose of that provision as I have said is to avoid anybody having to go beyond the screen print of the clearinh houses and become entangled in what transaction if any has taken place in respect of the Notes off the register.

33.    In addition condition 6.6 prohibits the Issuer from purchasing any Notes.

34.    Further protection is given under the terms of the Trust Deed dated 11th May 2007 (clause 14.1 (c)) whereby the Trustee is entitled to call for a certificate (which was done and which was conclusive) or 14.1 (x) which provides that the Trustee unless notified to the contrary is entitled to assume without enquiry that no Notes are held by for the benefit of or on behalf of the Issuer, any of the Sellers any holding company of any of them or any subsidiary of such holding company. That clause has the words *"beneficial owner"* missing from it. I do not think it is significant.

35.    Under clause 14.1 (z), the Trustee is entitled to rely on any documents provided to it.

36.    The purpose of these provisions is to ensure smooth dealing in the Notes and so that persons dealing with them do not become embroiled in provisions or arrangements which affect those Notes but are not recorded on the relevant register or referred to in the relevant certificate. The purpose of the provision enabling the Trustee to assume without further ado that neither the Issuer nor Seller has acquired Notes is relevant to the present dispute because of the impact of the disenfranchisement provisions.

37.    These provisions as I have said are designed to ensure smooth dealings. They are not relevant in my view to the question of construction because they are designed to protect outsiders in dealing with the Notes; they are not relevant for an internal dispute where all the parties are arguing over the ownership or control of the Notes and whether or not the Notes are disenfranchised.

38.    The importance of ensuring that these matters are set out conclusively derives essentially from what is set out in paragraph 28 of Ms Kelly's witness statement above. All of the transactions in respect of the Notes are not actually linked to dispositions of the Notes. They are self standing arrangements designed to create obligations as to payment of interest and the like by reference to the Notes but they are self standing.

TRANSACTION STRUCTURE

39.    There is appended to this judgment a diagram which sets out the various transactions. This dispute concerns the Notes issued by T1 and T2.

40.    The Notes in question were acquired by Barclays and Rabobank in the sums set out in the following table:-

|  |  Initial Principal Amount | Noteholder | Rabobank TRS with Barclays | Barclays CDS with Ambac | Ambac Guarantee to Barclays |
|---|---|---|---|---|---|
| **Theatre 1** |  |  |  |  |  |
|  |  |  |  |  |  |
| Class A | £231,000,000 | Barclays | N/A | £174,300,000 | £56,700,000 |
| Class B | £57,000,000 | Barclays | N/A | None | £57,000,000 |
|  |  |  |  |  |  |
| **Theatre 2** |  |  |  |  |  |
|  |  |  |  |  |  |
| Class A | £154,000,000 | Rabobank | £154,000,000 | £154,000,000 | None |

41.    Subject to an argument on the meaning of the words *"beneficial owner"* Barclays has the legal and beneficial ownership of the Disputed Barclays Notes and for extraneous dealings that is evidenced by a screen shot from Euroclear.

42.    Rabobank is in a similar position with a similar screen shot from Euroclear in respect of the Disputed Rabobank Notes.

43.    The interesting element arises from the fact that the two sets of Notes were packaged as *"negative basis trades"* as set out in Ms Kelly's witness statement. Those consist of Notes and credit default protection in respect of the Notes. The credit protection was provided under the Credit Default Swaps ("CDS") and guarantees entered into by Barclays with Ambac. This Byzantine structure which takes place behind the curtain of the register is set out in the second schedule attached to this judgment.

44.    I need not go into the detail but under the terms of those arrangements in respect of the Disputed Barclays Notes Ambac can control how Barclays votes in respect of Notes it holds. In respect of the Disputed Rabobank Notes Barclays can control Rabobank but it is also subject to control by Ambac. The only relevance of those provisions is that one argument which was put forward on behalf of the junior Noteholders is that those provisions mean that the persons in whom the benefit of those provisions is vested are to be treated as *"beneficial owners"* for the purposes of disenfranchisement. Thus it is argued that Barclays because of the control it had over Rabobank is the beneficial owner as defined of the Disputed Rabobank Notes. The advantage of that argument in respect of the junior Noteholders is that the Disputed Rabobank Notes will also be disenfranchised. In contrast Barclays whilst accepting that its Notes are disenfranchised contends that the Rabobank Disputed Notes are not disenfranchised because Rabobank was neither a Issuer nor a Seller and that its control of Rabobank does not constitute it as a beneficial owner for the purpose of

these clauses.  If that is correct Barclays through Rabobank will control as I understand it 50.1% of the relevant Notes and will therefore be able to block any rescheduling despite the fact that its own Notes are disenfranchised.  This argument of the junior Noteholders was put forward by the Trustee.

## RELEVANT DOCUMENTS

45.     The major documents for the purpose of the construction exercise in my view are the Trust Deeds and the T1 Master Definitions Schedule and the T2 Master Definition Schedule.  I will deal with the T1 documentation.  There is no substantive differences in the T2 documentation and my conclusions on T1 will be equally applicable to T2.

## THE TRUST DEED

46.     The Trust Deed is dated 11th May 2007 as were the Master Definitions Schedule and the Servicing Agreement and the Loan Sale Agreements.  I am told that everything took place on the same day and the monies required to be paid or borrowed were dealt with electronically on the same day.

47.     The issue is as to whether any of the Notes are outstanding for the purpose of the Trust Deed.  One starts with clause 1.1 which save where the context otherwise requires or save where otherwise defined in the Trust Deed incorporates the meaning ascribed to capitalised terms in the Master Definitions Schedule.

48.     Outstanding is defined as:-

> *"1.2 "outstanding" means in relation to the Notes all the Notes issued other than:*
>
> *(a) those Notes which have been redeemed in full pursuant to these presents;*
>
> *(b) those Notes in respect of which the date for redemption in accordance with the Conditions has occurred and the redemption moneys (including premium (if any) and all interest payable thereon) have been duly paid to the Trustee or to the Principal Paying Agent in the manner provided in the Agency Agreement (and where appropriate notice to that effect has been given to the relevant Noteholders in accordance with Condition 15 (Notices to Noteolders) and remain available for payment against presentation of the relevant Notes;*
>
> *(c) those Notes which have become void under Condition 8 (Prescription);*
>
> *(d) those mutilated or defaced Notes which have been surrendered and cancelled and in respect of which replacements have been issued pursuant to Condition 14 (Replacement of the Notes);*

*(e) (for the purpose only of ascertaining the Principal Amount Outstanding of the Notes outstanding and without prejudice to the status for any other purpose of the relevant Notes) those Notes which are alleged to have been lost, stolen or destroyed and in respect of which replacements have been issued pursuant to Condition 14 (Replacement of the Notes); and*

*(f) any Global Note to the extent that it shall have been exchanged for another Global Note in respect of the Notes of the relevant class or for the Notes of the relevant class in definitive form pursuant to its provisions;*

*Provided that for each of the following purposes, namely:*

*(i) the right to attend and vote at any meeting of the Noteholders of any class or classes, an Extraordinary Resolution in writing, a Qualifying Extraordinary Resolution in writing or a Qualifying Resolution in writing as envisaged by paragraph 1 of Schedule 4 (provisions for Meetings of Noteholders) and any direction or request by the holders of Notes of any class or classes;*

*(ii) the determination of how many and which Notes are for the time being outstanding for the purposes of Clause 8.1, Conditions 10 (Note Events of Default) and 11 (Enforcement) and paragraphs 4, 7 and 9 of Schedule 4 (Provisions for Meetings of Noteholders);*

*(iii) any right, discretion, power or authority (whether contained in these presents, any other Issuer Transaction Document or vested by operation of law) which the Trustee is required, expressly or impliedly, to exercise in or by reference to the interests of the Noteholders or any class or classes thereof; and*

*(iv) the determination by the Trustee whether any event, circumstance, matter or thing is , in its opinion, materially prejudicial to the interests of the Noteholders or any class or classes thereof.*

*those Notes (if any) which are for the time being held by or on behalf of or for the benefit of the Issuer or each of the Sellers, any holding company of any of them or any other Subsidiary of any such holding company, in each case as beneficial owner, shall (unless and until ceasing to be so held) be deemed not to remain outstanding;"*

49.    The question therefore  whether or not the Disputed Barclays Notes and/or the Disputed Rabobank Notes are disenfranchised on the basis of the wording at the end of proviso (i) – (iv) namely:-

> *"those Notes (if any) which are for the time being held by or on behalf of or for the benefit for the Issuer or each of the Sellers, any holding company of any of them or any other Subsidiary of any such holding company, in each case as beneficial owner, shall (unless and until ceasing to be so held) be deemed not to remain outstanding."*

50.    One then turns to the Master Definitions Schedule for the meaning of the words Issuer and Seller:-

> *"Issuer" is defined to mean T1"*

> *"Sellers" means Barclays Bank Plc, a company incorporated under the laws of England and Wales, acting through its office at 1 Churchill Place, London E14 5HP, Dresdner Bank AG London Branch, a company incorporated under the laws of Germany, acting through its branch office at 30 Gresham Street, London EC2V 7PG, The Governor and Company of The Bank of Scotland, established by an Act of Parliament of Scotland of 1695 acting through its branch office at 155 Bishopsgate, London EC2M 3YB and Mizuho Corporate Bank, Ltd, a company incorporated under the laws of Japan, acting through its office at Bracken House, One Friday Street, London EC4M 9JA, each in its capacity as a seller of the Senior Loans (each a "Seller" and together, the "Sellers")."*

51.    The contrast between the definition for Issuer and Seller is in my view significant.  As I have said Issuers are expressly prohibited from acquiring Notes, Sellers are not.  It follows therefore that for the purposes of disenfranchisement all that needs to be said is that under T1 and/or T2 the Issuers are disenfranchised if they hold any Notes.  By way of contrast the definition of Seller appear to be given a more limited definition by reference to the capacity in which the Notes are held.  This to my mind is important guidance as to the determination of the question of construction.  It is by no means definitive but it is as I have said significant for reasons which I shall set out below.

## DISCUSSION

52.    The object of the disenfranchisement appears clear.  Any Notes that come within the definition are deemed not to remain outstanding.  There is always a difficulty in my view with clauses that deem things to happen or not happen because it is always artificial.    By making the Notes not outstanding artificially they become disenfranchised for the purpose of these major votes.  Thus in the context of the present problem these large senior Notes would have no power to vote in respect of a restructuring.    Consequently if they are disenfranchised the junior Note holders' powers are promoted.

53.    Why should this happen? The most startling fact in this case is that nobody was able to give me any clear basis for the *purpose* of the provision.  Further if either Barclays or Rabobank's Disputed Notes are disenfranchised that will have a significant impact on Ambac which could find the debts being rescheduled to its detriment but be

powerless to control how they should be voting because the Notes are disenfranchised. The junior Noteholders of course want them to be disenfranchised as it promotes their position.

54. The nearest anybody got to an explanation was by reference to the decision of Briggs J, as he then was, in *Assenagon Asset Management SA v The Irish Bank Resolution Corp* [2012] EWHC 2090 (Ch) at paragraph 56 where he said this:

> *"It was, as I have said, common ground that the purpose of the disentitlement to vote in respect of Notes beneficially held by the Bank or for its account was to prevent a vote designed to serve the interests of the Noteholders from being undermined by the exercise of votes cast in the interests of the Bank. Specifically, the prohibition was designed to prevent a Noteholder from succumbing to a conflict between the interests of the Noteholders and the interests of the Bank. It was also common ground that, although the language of the prohibition speaks in terms of the Issuer or its Subsidiary being disentitled to vote, it applies equally to any other person who or which holds his or its Notes for the benefit or for the account of the Bank. It is to be noted that it was common ground that the purpose of the clause was to prevent a vote designed to serve the interested Noteholders from being undermined by the exercise of votes cast in the interest of the bank. This provision, it is said, was designed to prevent a Noteholder from succumbing to a conflict between interested Noteholders and the interested Bank."*

55. Two possible examples were given in the course of argument in this case. First, if one refers to the first witness statement of Ms Bi date 2 August 2013 at paragraph 21 and following, she referred to the fact that Barclays was also a hedge counterparty under certain interest rate swap agreements were entered into with the Borrowers under the Whole Senior Loan. As set out in that paragraph Barclays pays the Borrowers floating rate interest on the notional amount of the loans in return for a fixed rate of interest from the Borrowers on the notional amount of the loans. However, it appears that if the Whole Senior Propco Loan is not repaid in full, and if the hedge agreements are consequentially terminated, the amounts due to the hedge counterparties rank ahead of the repayment of principal and interest in the Whole Senior Loan and therefore ahead of Noteholders. It is suggested in paragraph 22 of her witness statement that a termination by precipiative enforcement of the Whole Senior Loan could bring amounts up to £475 million due to the hedge counterparties. Thus it is suggested that Barclays could do rather well, to put it mildly, if there was a default and it was paid out under the hedging agreements. Thus it is suggested Barclays might use its power under the Notes to block any rescheduling to precipitate enforcement of the Whole Loan for its benefit.

56. It is thus said that the purpose of the clause is to prevent Barclays in this case from doing that because such an action would be for its benefit under the hedge agreements, and contrary to the interests of the Noteholders.

57. My reaction to that is, why should Barclays be prohibited from exercising rights it has in respect of assets or contractual rights it has to ensure a maximum return for it? In this case there is no contractual obligation which requires them expressly not to do

such a thing.  Nor is there any fiduciary or other obligation which commits them to do that.

58.     I cannot see what advantage Barclays would achieve as senior Noteholder in effect relinquishing its power to vote on these important matters.

59.     The other possible reason for the clause, which was referred to by Mr Salter QC in argument, was that the Sellers might be exposed on warranty or misstatement claims under the original sale and could use its majority power under the Notes to block claims to be brought against it.

60.     The answer to that is actually provided by the *Assenagon* case itself, where the court upheld the challenges to purported votes on the basis that they were oppressive to the minority.  As Mr Knowles QC said in argument, that provided the necessary protection for the junior Noteholders in the event, possibly, that the senior Noteholders might exercise their powers as senior Noteholders, to secure a separate benefit of the type contemplated above.

61.     It might be that there are other matters in the background of which I am unaware.  No party submitted that on the question of construction there was any surrounding circumstances or evidence to guide me or assist me in the construction of the clauses; the case involves a *"pure consideration of the words within the corners of the relevant documentation"*.

62.     I suspect that these provisions have evolved over the years and are repeated again and again in transactions like this, with the purpose of them being lost in the mists of time.  I do however find it surprising that Barclays is unable to explain to me why it would enter into such an arrangement which on its arguments could be so disadvantageous to it.

## BARCLAYS' ARGUMENTS

63.     When this matter first arose the Trustee wrote to Barclays on 1 July 2013.  In that letter it set out that based on matters which were brought to its attention, an issue arose as to what Notes were "outstanding" in respect of the Trust Deed, and that Barclays, being identified as a Seller, or any of its holding companies, as being holders of the Notes would on the face of it be deemed to be outstanding in accordance with the clause.

64.     This in effect meant that the word "Issuer" and the word "Seller" in the clause is merely shorthand for T1 and T2 and the banks identified in the Master Definitions Schedule respectively.  Thus if Barclays was a Seller at anytime it is disenfranchised if it holds *any* of the Disputed Barclays Notes.  This would extend to an acquisition made later on the market.

65.     Barclays' response was by a letter dated 5 July 2013.  Unsurprisingly, Barclays disagreed with that analysis and contended that the word "Seller" in the definitions, was intended on its wording, to exclude it only when it held the Notes in that capacity.  But reflects the wording of the end of the definition *"in its capacity as a Seller of the Senior Loans"*.  Thus when it is holding the Notes as such Seller it is disenfranchised, but if it does not hold the Notes as a Seller, it is not so disenfranchised.

66.   The letter reiterates that the purpose of the provision was to prevent Barclays in its capacity as Seller from exercising its votes attached to its notes in its own interest. However, having purchased credit protection in respect of the T1 Notes from Ambac, it is no longer holding any Notes in its capacity as Seller.

67.   This would appear to be an unsurprising stance on the part of Barclays because one would have thought it would not want to surrender its senior position unless it was forced to do so.

68.   A request by the Trustee to provide a certificate led to a response which was somewhat opaque. It provided the amount of Notes shown from a screenshot of Euroclear Clearstream, showing the Disputed Barclays Notes and stating *"[it] makes no representation as the capacity in which we hold the Notes"*.  In other words it left open the question to be determined from its challenge to the construction of the clauses put forward by the Trustee above.

## BARCLAYS' SOMERSAULT

69.   With the service of its evidence by Ms Kelly, Barclays performed a hundred per cent u-turn. Its stance as a result of that evidence (although there are certain ambiguities in Ms Kelly's evidence, contrast paragraph 6 of Ms Kelly's evidence with paragraph 41) was nevertheless that it was disenfranchised because it currently held the Notes.

70.   This was the stance it maintained before me. Thus Mr Salter QC's submission is that the use of the word "Seller" in the clause is simply to identify the Sellers for the purposes of disenfranchisement.

71.   I suspect this somersault caused some consternation and amusement. Ambac, at the end of the line, the supposed controller of the way in which these Notes were voted was not in favour of this concession of disenfranchisement. Thus that explains Mr Knowles QC's appearance, in effect to argue that which Barclays put forward in their letter of 5 July 2013, but which it abandoned.  By way of contrast, the junior Noteholders no longer had an interest in appearing because as far as they were concerned Barclays' concession was the best that they could hope to achieve. Had Barclays maintained its original stance doubtless the junior Noteholders would appear to argue that which Barclays now argues.

72.   Barclays' submission, in my view, has two difficulties.  First, if the purpose of the word *"Seller"* was merely to identify Barclays for the purpose of disenfranchising it *whenever, and in whatever capacity* it held the Notes, it could easily have done so in clause 1.2 by simply identifying Barclays and saying it was disenfranchised whenever it held Notes in any way, directly or indirectly, which were for its benefit beneficially. It is difficult to say why there would be an elaborate reference back to the Master Definitions Schedule if the purpose of the word Seller was merely to be for that identification.  It might be, of course, lazy drafting; there is a Master Definitions Schedule and therefore the draftsman might have simply, rather than create a new express identification, simply referred back to the Master Definitions Schedule.

73.   The second, and more damaging consequence, is that it requires the clearly defined definition of the word Seller, limiting it to Barclays in its capacity as a Seller, to be removed.  I accept that there is the power under 1.1 of the Trust Deed to ascribe

different meanings from those in the Master Definitions Schedule where the context requires, or where there are other definitions. The latter does not arise. Is there anything in the context to disregard it?

74.   No such context has been provided to me and I can see none in clause 1.2. Further as I said above the definition of Seller is neatly contrasted with that of Issuer. The Issuer requires no definition beyond the identification of T1 and T2 because they are not contemplated as buyers of Notes.   The Sellers are contemplated as being possible buyers of Notes.  Barclays for example took up the large amount of the T1 Notes because they were not taken up by other banks.

75.   That shows a purpose behind the definition namely that Barclays is only to be disenfranchised if it is holding Notes as Seller.

76.   That seems straight forward and appears fatally to undermine Barclays' reversed stance.

77.   There is however a difficulty which Mr Salter QC identified in argument.  Barclays never held the Notes in its capacity as Seller when the Trust Deed came into existence.  As I have set out above all of the transactions completed simultaneously; the cash was handed over and moved up the chain and the Notes were issued and sold and the Trust Deed came in to existence on the same day.  Therefore by the time the Trust Deed came in to force Barclays would never hold the Disputed Barclays Notes in a capacity as Seller.

78.   Thus that in his submission reinforces Barclays' stance that the use of the word "Seller" is merely for the purpose of identifying Barclays.

79.   The consequence of this argument in respect of the Disputed Rabobank Notes is that as Barclays is not a holder of the Notes (as opposed to controlling how they are voted contractually) but Rabobank is.    The Disputed Rabobank Notes are not disenfranchised for that reason.  If that contention is correct Barclays exercise a modicum of control as I have said because they can procure the voting of the Disputed Rabobank Notes which amount to 50.1%.

80.   There is a separate argument which has been raised by the Trustee on behalf of the junior Noteholders as to the meaning of the phrase "beneficial owner" that has significance as regards the Disputed Rabobank Notes but not as regards the Disputed Barclays Notes.

## AMBAC'S POSITION

81.   As I have said Mr Knowles QC stepped into the breach at the last minute in effect to revive the Barclays argument.  These were amplified in a letter that Linklaters sent to the Trustee's solicitors on 9th August 2013.  Mr Knowles QC adopted that as his skeleton argument.

82.   His primary submission turns on the use of the words *"in its capacity as Seller"*.

83.   Thus he submits there was a clear intent to restrict the definition of Seller whenever the defined word was used to the four banks acting in the capacity of a seller of the

Senior Loans. Thus he submits when Barclays acquires the Notes not as Seller of the Senior Loans (self evidently) but merely on the market for example it is not disenfranchised.

84.    The difficulty Mr Knowles QC faces is that outlined above namely that under the structure of all of the documents Barclays could never be a Seller during the period of the existence of the Trust Deed. Thus it is difficult to see what the point of that differentiation in the Trust Deed is meant to cover.

85.    Mr Knowles QC said I should just ignore it. The definition in the Master Definitions Schedule is clear and on that basis Barclays is only disenfranchised when it holds Notes in its capacity as Seller.

86.    The competing arguments mean I must either ignore the words *"in its capacity"* in the Master Definitions Schedule (I have already observed that I can see no reason for displacing that definition) or I ignore the express provisions in the Trust Deed because they can never operate so disenfranchisement can never operate.

87.    There is clearly a discrepancy between the two relevant provisions.

PRINCIPLES OF CONSTRUCTION

88.    The principles of construction are not in dispute. As I said above there are no particular special rules applicable to these kinds of documents. The principles were summarised in paragraph 19 of Mr Salter QC's skeleton argument as follows:-

> *"The relevant principles will be very familiar to the Court, and are unlikely to be significantly in dispute.*
>
> *The ultimate aim is to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant. The reasonable person is one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.*
>
> *The process of interpretation is an iterative process involving the checking of each of the rival meanings against the other provisions of the document and investigating its commercial consequences in the context of the overall contractual scheme and purpose of the contract. An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose.*
>
> *Where the parties have used unambiguous language, the court has to apply it. However, where the language used by the parties may be construed in two different ways, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other. The greater the ambiguity, the more persuasive may be an argument*

> *based upon the apparently greater degree of common sense of one version over the other. But "this does not elevate commercial common sense into an overriding criterion, still less does it subject the parties to the individual judge's own notions of what might have been the most sensible solution to the parties' conundrum"*

89.    I should add that in circumstances where the documents are ambiguous resort can be had to the surrounding circumstances as an aid to construction if necessary. That has no application as the parties agree.

CONCLUSION

90.    No evidence has been led as to the underlying commercial purpose of these transactions. There is no question in my view of a literal construction underlying any commercial common sense which might frustrate or distort the whole economic purpose.

91.    There is scanty evidence which I have summarised above which suggests that the purpose of this clause was to disenfranchise a Seller or Issuer if it held Notes. This was as set out in the *Assenagon* case to prevent an anticipated conflict of interest. As I said the difficulty is that on the facts of the set up of the documents in this case there was never a prospect of the Seller nor the Issuer in those capacities holding any of the Notes. My conclusion is that fact eluded the draftsman when this probably well trodden clause was incorporated but he kept the wording there as belt and braces position to ensure no one could ague beyond Notes being held as Seller.

92.    That does not mean that I accept Mr Salter QC's suggestion of construction. I reject his suggested construction for a number of reasons. First it does not make commercial sense for Barclays to surrender a large investment it makes in the Notes. That has nothing to do with potential conflict; this is a commercial acquisition. No explanation beyond *"legal advice"* has been given to me as to why Barclays somersaulted on its case. Barclays' initial stance is to be preferred in my view.

93.    Second the tortuous reference back to the Master Definitions Schedule simply to say that Barclays is disenfranchised whenever it holds any Notes is unlikely. It could have easily been said that the Issuer and Barclays (and the other banks of course) are disenfranchised if they hold any of the Notes or any Notes that are held for them in any situation where they are the beneficial owners. I cannot see why a senior Noteholder would agree to subordinate its interests in such a way. It might be I have missed something or I am not being fully put in the picture but it does not make commercial sense.

94.    I therefore conclude that Mr Knowles QC's submissions are correct. I give effect to the express definition in the Master Definitions Schedule. It is clear that any disenfranchisement can only apply to a Seller which is defined as being Barclays and the other banks in that capacity. As Barclays does not hold the Notes in the capacity of Seller they are not disenfranchised and the fact that it could never have held the Notes in the capacity of Seller is irrelevant.

95. I therefore conclude that Barclays is not disenfranchised in respect of the Disputed Barclays Notes.

## THE DISPUTED RABOBANK NOTES

96. Rabobank was neither an Issuer nor Seller. It acquired the Disputed Rabobank Notes pursuant to the prospectus.

97. The argument that these Notes are also disenfranchised is on the basis that Barclays is for the purposes of the Disputed Rabobank Notes a *"beneficial owner"*. This is the argument put up on behalf of the junior Noteholders. Barclays does not accept that nor of course does Ambac which as I have said controls the voting of both the Disputed Barclays Notes and the Disputed Rabobank Notes by virtue of the provisions in its CDS and guarantee documentation. It would not wish control to be lost by Barclays as a result of Rabobank not being held to be a beneficial owner of the Disputed Rabobank Notes by reason of the powers Barclays has to direct Rabobank.

## BENEFICIAL OWNER DISCUSSION

98. The traditional understanding of property lawyers of the phrase *"beneficial owner"* is the identification of the person for whom a property is held by another for the benefit for that person. I was referred to observations in that regard in *Sainsbury Plc v O'Connor (Inspector of Taxes) [1991] 1 WLR 963* at pages 969 as follows:-

> *"As Lord Diplock pointed out in Ayerst v. C & K (Construction) Ltd [1976] A.C. 167 at 177, the concept of beneficial ownership owes its origin to the Court of Chancery.*
>
> *"The archetype is the trust. The 'legal ownership' of the trust property is in the trustee, but he holds it not for his own benefit but for the benefit of the cestui que trust or beneficiaries. Upon the creation of a trust in the strict sense as it was developed by equity the full ownership in the trust property was split into two constituent elements, which became vested in different persons: the 'legal ownership' in the trustee, what came to be called the 'beneficial ownership' in the cestui que trust".*
>
> *The term "beneficial ownership" is therefore very well established. It is first found in a taxing statute, so far as I have been able to ascertain, in section 55 of the Finance Act 1927, where it appears in connection with relief from stamp duty on transfers. But in property legislation the term was already familiar to Parliament from section 7 of the Conveyancing Act 1881. Indeed it had appeared even earlier in section 1 of the Larceny Act 1868, and again in the cross-heading to section 58 of the Merchant Shipping Act 1894. But nowhere did Parliament see fit to define beneficial ownership. No doubt this was because it was already a term of art, well known and understood among lawyers.*

*"LORD JUSTICE NOURSE : I agree.*

*The first question is whether, within the meaning of section 532(3) of the Income and Corporation Taxes Act 1970, the "beneficial ownership" in the five per cent of the shares in Homebase Ltd which were subject to the unexercised put and call options in favour of GB was vested in Sainsburys or not. The broad purpose of section 532(3), which was not, in its application to group relief, modified by the restrictions introduced by the Finance Act 1973, is that in deciding the extent to which one company is owned by another you look not at the legal ownership of the shares but at their beneficial ownership. The only distinction made is between legal and beneficial ownership and there is nothing to suggest that the latter expression is to have some special meaning.*

*There is no difficulty in ascertaining the legal ownership of shares, which is invariably vested in the registered holder. Equally, it ought not to be difficult to ascertain their beneficial ownership, albeit that it may arise in a variety of ways, for example under a declaration of trust or by operation of law. I therefore approach the construction of section 532(3), a provision having general application for the purposes of the Tax Acts, in the expectation that the extent to which one company is beneficially owned by another was not intended to depend on fine distinctions between different cases.*

*Although I might not, with Lord Diplock, have gone so far as to think that the expression "beneficial ownership" is a term of art, it is certainly one which has for several centuries had a very well recognised meaning amongst property lawyers. And there can be no doubt that, in enacting a provision such as section 532(3), Parliament must have intended to adopt that meaning. It means ownership for your own benefit as opposed to ownership as trustee for another. It exists either where there is no division of legal and beneficial ownership or where legal ownership is vested in one person and beneficial ownership or, which is the same thing, the equitable interest in the property in another. Thus, to take the simplest case of divided ownership to which section 532(3) can apply, if Company A is the registered holder of shares in Company B as nominee, i.e. as a bare trustee, for Company C, the beneficial ownership of the shares or the equitable interest in them is vested in Company C.*

*Another case to which section 532(3) can apply is where Company A enters into an unconditional contract to sell shares in Company B to Company C. Shares in Company B not being readily obtainable in the market, such a contract is specifically enforceable at the suit of Company C. By parity*

> *with contracts for the sale of land, it has long been held that the right to specific performance gives Company C the equitable interest in the shares, Company A becoming a qualified trustee in the sense that it must preserve the shares for Company C while remaining entitled to any dividends accruing before completion".*

99.    On the facts of this case Barclays held the Disputed Barclays Notes legally and beneficially.  The conclusive effect of the screen is irrelevant for these purposes of course.  Rabobank held the Disputed Rabobank Notes legally and beneficially.

100.   There is no suggestion that Barclays and Ambac by virtue of the derivative arrangements and the other arrangement set out above thereby acquired any interest in either of the Disputed Notes.

101.   What is sought to be done in this argument is to stretch the meaning of the words beneficial owner to someone who whilst they have no actual interest in a proprietary sense might have an interest in an economic sense.

102.    The origin of this submission is paragraph 63 of Briggs J's judgment in *Assenagon* as follows:-

> *"It remains to consider the competition between Mr Snowden's and Mr Dicker's submissions on the assumption (which I have concluded is correct), that the applicability of the prohibition is to be tested as at the date (or time) of the meeting.  I am not persuaded to follow Mr Snowden's purposive line in interpreting the restriction as if it concerned the question whether votes (rather than Notes) were held beneficially for the Bank or for its order, so as to apply in any case where the Bank had obtained a mere contractual commitment from a Noteholder to vote his Notes in a particular way, even if wholly unconnected with any arrangement for the purchase of his Notes, whether by exchange or for cash.  Again, I consider that the prohibition must be construed as it stands, so as to relate to the beneficial holding of Notes, either in a proprietary sense or, perhaps, in an economic sense where, without conferring a proprietary interest, the Noteholder is obliged to confer upon or transfer to the Bank the whole of the economic risks and rewards arising from the Notes as at the date of the meeting."*

103.   That is in the context of a clause which disenfranchised the Issuer.  The provision whilst similar to the present one is not identical:-

> *"Neither the Issuer nor any Subsidiary should be entitled to vote at any meeting in respect of Notes beneficially held by it or for its account."*

104.   It must be seen what arguments were put forward.  As paragraph 57 shows Mr Snowdon QC submitted that the description of Noteholders applied either (i) because

the then votes of those Noteholders were held at the direction to the order of the Bank and (ii) because in any event the existence of the Contract for Sale of those Notes to the Bank in return for new Notes meant that the Bank had by then become the beneficial owner of those Notes.

105.    The Bank challenged both arguments.

106.    In paragraph 63 it is important to see that Briggs J *rejected* Mr Snowdon QC's first argument. He did however en passant suggest that the prohibition applies *"perhaps in an economic sense where without conferring a proprietary interest the Noteholder is obliged to confer upon or transfer to the Bank the whole of the economic risk or reward arising from the Notes…..."*

107.    Thus it is said Barclays through its provisions as regards the Disputed Rabobank Notes is in the same position and (presumably) Ambac is in the same position as regards both sets of Disputed Notes.

108.    It of course is not a Seller but the logical consequence of the analysis means that one should presumably categorise Ambac as being the beneficial owner.

109.    I asked Mr Knowles QC to tell me who were the beneficial owners in his view under both transactions. He skilfully avoided answering the question.

110.    Mr Salter QC argued against such a construction. Commercially that suited Barclays because it would then be able to control any restructuring by virtue of its control of the Disputed Rabobank Notes (subject to what Ambac might of course tell it).

111.    Given the fact that Briggs J rejected the first argument of Mr Snowdon QC the latter parts of paragraph 63 are a dictum. It might be possible in certain unusual circumstances to stretch the traditional and well understood meaning of the words beneficial ownership beyond a proprietary nature (although I cannot conceive of any circumstances where it would) but I do not think that there is any basis for so stretching the words in this case. I would respectfully therefore disagree with Mr Justice Briggs in so far as it is said that his construction has an impact on my construction of an entirely different document if there is any basis for so stretching the words "beneficial owner".

112.    It follows therefore that I do not accept that Barclays is disenfranchised because it contractually controls the voting of the Disputed Rabobank Notes.

113.    I therefore reject this argument which was in effect put on behalf of the junior Noteholders.

114.    The expression "economic interest" is too vague and will give great hostages to fortune and lead to uncertainty. In the present case Barclays can control the Disputed Rabobank Notes but it itself is subject to control by Ambac. As Mr Salter QC said it is caught in the middle. Yet the arguments are that despite the lack of actual control because of the ultimate control by Ambac it is nevertheless a beneficial owner and therefore caught by the disenfranchisement provisions. Why should it be exercising economic control as opposed to Ambac? Is it the possible case that both of them are exercising control for economic interest? If so is there more than one beneficial

owner? This demonstrates graphically how departing from the traditional meaning of the words beneficial owner makes a potentially huge minefield of uncertainty.

CONCLUSION

115.    I conclude therefore for the reasons set out above that neither the Disputed Barclays Notes nor the Disputed Rabobank Notes are disenfranchised.

116.    I will hear submissions as to the consequences of this decision.

### TRANSACTION STRUCTURE DIAGRAM

*The following diagram sets out the transaction structure relating to the issue of the Notes by the Issuer and the purchase of the Senior Loans by the Issuer. The diagram is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Prospectus.*



- II -



| IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION *et al.* | Court File No.:09-CL-7950 |
|---|---|
| In re: Nortel Networks Inc., *et al.*, | Case No. 09-10138 (KG) |

| | *ONTARIO* **SUPERIOR COURT OF JUSTICE (COMMERCIAL LIST)** | **IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE** |
|---|---|---|

### BOOK OF AUTHORITIES OF THE MONITOR AND CANADIAN DEBTORS (PRE-TRIAL BRIEF – ALLOCATION)

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini** LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett** LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby** LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:      (416) 979-2211
Fax:      (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay** LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam** LSUC#: 46735J
Jennifer.stam@gowlings.com
Tel:      (416) 862-5697
Fax:      (416) 862-7661
*Lawyers for the Canadian Debtors*

**BUCHANAN INGERSOLL & ROONEY PC**
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

**ALLEN & OVERY LLP**
Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

6325529

Dated: May 2, 2014
Wilmington, Delaware

**BUCHANAN INGERSOLL & ROONEY PC**


/s/  Kathleen A. Murphy
Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)]
mary.caloway@bipc.com
kathleen.murphy@bipc.com

-and-

**ALLEN & OVERY LLP**

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
1221 Avenue of the Americas
New York, NY  10020
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtors*