TAB 1

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
    Subchapter A. Income Tax
      Part 1. Income Taxes (Refs & Annos)
        Normal Taxes and Surtaxes
          Deferred Compensation, Etc.
          Methods of Accounting
            Adjustments

26 C.F.R. § 1.482−1, Treas. Reg. § 1.482−1

§ 1.482−1 Allocation of income and deductions among taxpayers.

Effective: March 26, 2013

Currentness

**(a) In general--(1) Purpose and scope.** The purpose of section 482 is to ensure that taxpayers clearly reflect income attributable to controlled transactions and to prevent the avoidance of taxes with respect to such transactions. Section 482 places a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer. This section sets forth general principles and guidelines to be followed under section 482. Section 1.482−2 provides rules for the determination of the true taxable income of controlled taxpayers in specific situations, including controlled transactions involving loans or advances or the use of tangible property. Sections 1.482−3 through 1.482−6 provide rules for the determination of the true taxable income of controlled taxpayers in cases involving the transfer of property. Section 1.482−7T sets forth the cost sharing provisions applicable to taxable years beginning on or after January 5, 2009. Section 1.482−8 provides examples illustrating the application of the best method rule. Finally, § 1.482−9 provides rules for the determination of the true taxable income of controlled taxpayers in cases involving the performance of services.

**(2) Authority to make allocations.** The district director may make allocations between or among the members of a controlled group if a controlled taxpayer has not reported its true taxable income. In such case, the district director may allocate income, deductions, credits, allowances, basis, or any other item or element affecting taxable income (referred to as allocations). The appropriate allocation may take the form of an increase or decrease in any relevant amount.

**(3) Taxpayer's use of section 482.** If necessary to reflect an arm's length result, a controlled taxpayer may report on a timely filed U.S. income tax return (including extensions) the results of its controlled transactions based upon prices different from those actually charged. Except as provided in this paragraph, section 482 grants no other right to a controlled taxpayer to apply the provisions of section 482 at will or to compel the district director to apply such provisions. Therefore, no untimely or amended returns will be permitted to decrease taxable income based on allocations or other adjustments with respect to controlled transactions. See § 1.6662−6T(a)(2) or successor regulations.

**(b) Arm's length standard--(1) In general.** In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of the transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). However, because identical transactions can rarely be located, whether a transaction produces an arm's length result generally will be determined by reference to the results of comparable transactions under comparable circumstances. See § 1.482−1(d)(2)

(Standard of comparability). Evaluation of whether a controlled transaction produces an arm's length result is made pursuant to a method selected under the best method rule described in § 1.482–1(c).

**(2) Arm's length methods--(i) Methods.** Sections 1.482–2 through 1.482–7 and 1.482–9 provide specific methods to be used to evaluate whether transactions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result. This section provides general principles applicable in determining arm's length results of such controlled transactions, but do not provide methods, for which reference must be made to those other sections in accordance with paragraphs (b)(2)(ii) and (iii) of this section. Section 1.482–7 provides the specific methods to be used to evaluate whether a cost sharing arrangement as defined in § 1.482–7 produces results consistent with an arm's length result.

**(ii) Selection of category of method applicable to transaction.** The methods listed in § 1.482–2 apply to different types of transactions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated transactions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see § 1.482–1(f)(2)(i) (Aggregation of transactions). In addition, other applicable provisions of the Code may affect the characterization of a transaction, and therefore affect the methods applicable under section 482. See for example section 467.

**(iii) Coordination of methods applicable to certain intangible development arrangements.** Section 1.482–7 provides the specific methods to be used to determine arm's length results of controlled transactions in connection with a cost sharing arrangement as defined in § 1.482–7. Sections 1.482–4 and 1.482–9, as appropriate, provide the specific methods to be used to determine arm's length results of arrangements, including partnerships, for sharing the costs and risks of developing intangibles, other than a cost sharing arrangement covered by § 1.482–7. See also §§ 1.482–4(g) (Coordination with rules governing cost sharing arrangements) and 1.482–9(m)(3) (Coordination with rules governing cost sharing arrangements).

**(c) Best method rule--(1) In general.** The arm's length result of a controlled transaction must be determined under the method that, under the facts and circumstances, provides the most reliable measure of an arm's length result. Thus, there is no strict priority of methods, and no method will invariably be considered to be more reliable than others. An arm's length result may be determined under any method without establishing the inapplicability of another method, but if another method subsequently is shown to produce a more reliable measure of an arm's length result, such other method must be used. Similarly, if two or more applications of a single method provide inconsistent results, the arm's length result must be determined under the application that, under the facts and circumstances, provides the most reliable measure of an arm's length result. See § 1.482–8 for examples of the application of the best method rule. See § 1.482-7 for the applicable methods in the case of a cost sharing arrangement.

**(2) Determining the best method.** Data based on the results of transactions between unrelated parties provides the most objective basis for determining whether the results of a controlled transaction are arm's length. Thus, in determining which of two or more available methods (or applications of a single method) provides the most reliable measure of an arm's length result, the two primary factors to take into account are the degree of comparability between the controlled transaction (or taxpayer) and any uncontrolled comparables, and the quality of the data and assumptions used in the analysis. In addition, in certain circumstances, it also may be relevant to consider whether the results of an analysis are consistent with the results of an analysis under another method. These factors are explained in paragraphs (c)(2)(i), (ii), and (iii) of this section.

**(i) Comparability.** The relative reliability of a method based on the results of transactions between unrelated parties depends on the degree of comparability between the controlled transaction or taxpayers and the uncontrolled comparables, taking into account the factors described in § 1.482–1(d)(3) (Factors for determining comparability), and after making adjustments for differences, as described in § 1.482–1(d)(2) (Standard of comparability). As the degree of comparability increases, the number and extent of potential differences that could render the analysis inaccurate is reduced. In addition, if adjustments are made to increase the degree of comparability, the number, magnitude, and reliability of those adjustments will affect the reliability of the results of the analysis. Thus, an analysis under the comparable uncontrolled price method will generally be more reliable than analyses obtained under other methods if the analysis is based on closely comparable uncontrolled transactions, because such an analysis can be expected to achieve a higher degree of comparability and be susceptible to fewer differences than analyses under other methods. See § 1.482–3(b)(2)(ii)(A). An analysis will be relatively less reliable, however, as the uncontrolled transactions become less comparable to the controlled transaction.

**(ii) Data and assumptions.** Whether a method provides the most reliable measure of an arm's length result also depends upon the completeness and accuracy of the underlying data, the reliability of the assumptions, and the sensitivity of the results to possible deficiencies in the data and assumptions. Such factors are particularly relevant in evaluating the degree of comparability between the controlled and uncontrolled transactions. These factors are discussed in paragraphs (c)(2) (ii) (A), (B), and (C) of this section.

(A) Completeness and accuracy of data. The completeness and accuracy of the data affects the ability to identify and quantify those factors that would affect the result under any particular method. For example, the completeness and accuracy of data will determine the extent to which it is possible to identify differences between the controlled and uncontrolled transactions, and the reliability of adjustments that are made to account for such differences. An analysis will be relatively more reliable as the completeness and accuracy of the data increases.

(B) Reliability of assumptions. All methods rely on certain assumptions. The reliability of the results derived from a method depends on the soundness of such assumptions. Some assumptions are relatively reliable. For example, adjustments for differences in payment terms between controlled and uncontrolled transactions may be based on the assumption that at arm's length such differences would lead to price differences that reflect the time value of money. Although selection of the appropriate interest rate to use in making such adjustments involves some judgement, the economic analysis on which the assumption is based is relatively sound. Other assumptions may be less reliable. For example, the residual profit split method may be based on the assumption that capitalized intangible development expenses reflect the relative value of the intangible property contributed by each party. Because the costs of developing an intangible may not be related to its market value, the soundness of this assumption will affect the reliability of the results derived from this method.

(C) Sensitivity of results to deficiencies in data and assumptions. Deficiencies in the data used or assumptions made may have a greater effect on some methods than others. In particular, the reliability of some methods is heavily dependent on the similarity of property or services involved in the controlled and uncontrolled transaction. For certain other methods, such as the resale price method, the analysis of the extent to which controlled and uncontrolled taxpayers undertake the same or similar functions, employ similar resources, and bear similar risks is particularly important. Finally, under other methods, such as the profit split method, defining the relevant business activity and appropriate allocation of costs, income, and assets may be of particular importance. Therefore, a difference between the controlled and uncontrolled transactions for which an accurate adjustment cannot be made may have a greater effect on the reliability of the results derived under one method than the results derived under another method. For example, differences in management efficiency may have a greater effect on a comparable profits method analysis than on a comparable uncontrolled price method analysis, while differences in product characteristics will ordinarily

have a greater effect on a comparable uncontrolled price method analysis than on a comparable profits method analysis.

**(iii) Confirmation of results by another method.** If two or more methods produce inconsistent results, the best method rule will be applied to select the method that provides the most reliable measure of an arm's length result. If the best method rule does not clearly indicate which method should be selected, an additional factor that may be taken into account in selecting a method is whether any of the competing methods produce results that are consistent with the results obtained from the appropriate application of another method. Further, in evaluating different applications of the same method, the fact that a second method (or another application of the first method) produces results that are consistent with one of the competing applications may be taken into account.

**(d) Comparability--(1) In general.** Whether a controlled transaction produces an arm's length result is generally evaluated by comparing the results of that transaction to results realized by uncontrolled taxpayers engaged in comparable transactions under comparable circumstances. For this purpose, the comparability of transactions and circumstances must be evaluated considering all factors that could affect prices or profits in arm's length dealings (comparability factors). While a specific comparability factor may be of particular importance in applying a method, each method requires analysis of all of the factors that affect comparability under that method. Such factors include the following--

**(i)** Functions;

**(ii)** Contractual terms;

**(iii)** Risks;

**(iv)** Economic conditions; and

**(v)** Property or services.

**(2) Standard of comparability.** In order to be considered comparable to a controlled transaction, an uncontrolled transaction need not be identical to the controlled transaction, but must be sufficiently similar that it provides a reliable measure of an arm's length result. If there are material differences between the controlled and uncontrolled transactions, adjustments must be made if the effect of such differences on prices or profits can be ascertained with sufficient accuracy to improve the reliability of the results. For purposes of this section, a material difference is one that would materially affect the measure of an arm's length result under the method being applied. If adjustments for material differences cannot be made, the uncontrolled transaction may be used as a measure of an arm's length result, but the reliability of the analysis will be reduced. Generally, such adjustments must be made to the results of the uncontrolled comparable and must be based on commercial practices, economic principles, or statistical analyses. The extent and reliability of any adjustments will affect the relative reliability of the analysis. See § 1.482–1(c)(1) (Best method rule). In any event, unadjusted industry average returns themselves cannot establish arm's length results.

**(3) Factors for determining comparability.** The comparability factors listed in § 1.482–1(d)(1) are discussed in this section. Each of these factors must be considered in determining the degree of comparability between transactions or

taxpayers and the extent to which comparability adjustments may be necessary. In addition, in certain cases involving special circumstances, the rules under paragraph (d)(4) of this section must be considered.

**(i) Functional analysis.** Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the functions performed, and associated resources employed, by the taxpayers in each transaction. This comparison is based on a functional analysis that identifies and compares the economically significant activities undertaken, or to be undertaken, by the taxpayers in both controlled and uncontrolled transactions. A functional analysis should also include consideration of the resources that are employed, or to be employed, in conjunction with the activities undertaken, including consideration of the type of assets used, such as plant and equipment, or the use of valuable intangibles. A functional analysis is not a pricing method and does not itself determine the arm's length result for the controlled transaction under review. Functions that may need to be accounted for in determining the comparability of two transactions include--

(A) Research and development;

(B) Product design and engineering;

(C) Manufacturing, production and process engineering;

(D) Product fabrication, extraction, and assembly;

(E) Purchasing and materials management;

(F) Marketing and distribution functions, including inventory management, warranty administration, and advertising activities;

(G) Transportation and warehousing; and

(H) Managerial, legal, accounting and finance, credit and collection, training, and personnel management services.

**(ii) Contractual terms--(A) In general.** Determining the degree of comparability between the controlled and uncontrolled transactions requires a comparison of the significant contractual terms that could affect the results of the two transactions. These terms include--

(1) The form of consideration charged or paid;

(2) Sales or purchase volume;

(3) The scope and terms of warranties provided;

(4) Rights to updates, revisions or modifications;

(5) The duration of relevant license, contract or other agreements, and termination or renegotiation rights;

(6) Collateral transactions or ongoing business relationships between the buyer and the seller, including arrangements for the provision of ancillary or subsidiary services; and

(7) Extension of credit and payment terms. Thus, for example, if the time for payment of the amount charged in a controlled transaction differs from the time for payment of the amount charged in an uncontrolled transaction, an adjustment to reflect the difference in payment terms should be made if such difference would have a material effect on price. Such comparability adjustment is required even if no interest would be allocated or imputed under § 1.482–2(a) or other applicable provisions of the Internal Revenue Code or regulations.

(B) Identifying contractual terms--(1) Written agreement. The contractual terms, including the consequent allocation of risks, that are agreed to in writing before the transactions are entered into will be respected if such terms are consistent with the economic substance of the underlying transactions. In evaluating economic substance, greatest weight will be given to the actual conduct of the parties, and the respective legal rights of the parties (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). If the contractual terms are inconsistent with the economic substance of the underlying transaction, the district director may disregard such terms and impute terms that are consistent with the economic substance of the transaction.

(2) No written agreement. In the absence of a written agreement, the district director may impute a contractual agreement between the controlled taxpayers consistent with the economic substance of the transaction. In determining the economic substance of the transaction, greatest weight will be given to the actual conduct of the parties and their respective legal rights (see, for example, § 1.482–4(f)(3) (Ownership of intangible property)). For example, if, without a written agreement, a controlled taxpayer operates at full capacity and regularly sells all of its output to another member of its controlled group, the district director may impute a purchasing contract from the course of conduct of the controlled taxpayers, and determine that the producer bears little risk that the buyer will fail to purchase its full output. Further, if an established industry convention or usage of trade assigns a risk or resolves an issue, that convention or usage will be followed if the conduct of the taxpayers is consistent with it. See UCC 1–205. For example, unless otherwise agreed, payment generally is due at the time and place at which the buyer is to receive goods. See UCC 2–310.

(C) Examples. The following examples illustrate this paragraph (d)(3)(ii).

**Example 1--**Differences in volume. USP, a United States agricultural exporter, regularly buys transportation services from FSub, its foreign subsidiary, to ship its products from the United States to overseas markets. Although FSub occasionally provides transportation services to URA, an unrelated domestic corporation, URA accounts for only 10% of the gross revenues of FSub, and the remaining 90% of FSub's gross revenues are attributable to FSub's transactions with USP. In determining the degree of comparability between FSub's uncontrolled transaction with URA and its controlled transaction with USP, the difference in volumes involved in the two transactions and the regularity with which these services are provided must be taken into account if such difference would have a material effect on the price charged. Inability to make reliable adjustments for these differences would affect the reliability of the results derived from the uncontrolled transaction as a measure of the arm's length result.

**Example 2--**Reliability of adjustment for differences in volume. (i) FS manufactures product XX and sells that product to its parent corporation, P. FS also sells product XX to uncontrolled taxpayers at a price of $100 per unit. Except for the volume of each transaction, the sales to P and to uncontrolled taxpayers take place under substantially the same economic conditions and contractual terms. In uncontrolled transactions, FS offers a 2% discount for quantities of 20 per order, and a 5% discount for quantities of 100 per order. If P purchases product XX in quantities of 60 per order, in the absence of other reliable information, it may reasonably be concluded that the arm's length price to P would be $100, less a discount of 3.5%.

(ii) If P purchases product XX in quantities of 1,000 per order, a reliable estimate of the appropriate volume discount must be based on proper economic or statistical analysis, not necessarily a linear extrapolation from the 2% and 5% catalog discounts applicable to sales of 20 and 100 units, respectively.

**Example 3.** Contractual terms imputed from economic substance. (i) FP, a foreign producer of wristwatches, is the registered holder of the YY trademark in the United States and in other countries worldwide. In year 1, FP enters the United States market by selling YY wristwatches to its newly organized United States subsidiary, USSub, for distribution in the United States market. USSub pays FP a fixed price per wristwatch. USSub and FP undertake, without separate compensation, marketing activities to establish the YY trademark in the United States market. Unrelated foreign producers of trademarked wristwatches and their authorized United States distributors respectively undertake similar marketing activities in independent arrangements involving distribution of trademarked wristwatches in the United States market. In years 1 through 6, USSub markets and sells YY wristwatches in the United States. Further, in years 1 through 6, USSub undertakes incremental marketing activities in addition to the activities similar to those observed in the independent distribution transactions in the United States market. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. Assume that, aside from these incremental activities, and after any adjustments are made to improve the reliability of the comparison, the price paid per wristwatch by the independent, authorized distributors of wristwatches would provide the most reliable measure of the arm's length price paid per YY wristwatch by USSub.

(ii) By year 7, the wristwatches with the YY trademark generate a premium return in the United States market, as compared to wristwatches marketed by the independent distributors. In year 7, substantially all the premium return from the YY trademark in the United States market is attributed to FP, for example through an increase in the price paid per watch by USSub, or by some other means.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' attribution to FP in year 7 of substantially all the premium return from the enhanced YY trademark in the United States market. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the YY trademark wristwatches. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for its incremental marketing activities in years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive agreement to exploit the YY trademark in the United States that allows USSub to benefit from the incremental marketing activities it performed. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term, exclusive agreement to exploit the YY trademark in the United States, an agreement that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

**Example 4.** *Contractual terms imputed from economic substance.* (i) FP, a foreign producer of athletic gear, is the registered holder of the AA trademark in the United States and in other countries worldwide. In year 1, FP enters into a licensing agreement that affords its newly organized United States subsidiary, USSub, exclusive rights to certain manufacturing and marketing intangible property (including the AA trademark) for purposes of manufacturing and marketing athletic gear in the United States under the AA trademark. The contractual terms of this agreement obligate USSub to pay FP a royalty based on sales, and also obligate both FP and USSub to undertake without separate compensation specified types and levels of marketing activities. Unrelated foreign businesses license independent United States businesses to manufacture and market athletic gear in the United States, using trademarks owned by the unrelated foreign businesses. The contractual terms of these uncontrolled transactions require the licensees to pay royalties based on sales of the merchandise, and obligate the licensors and licensees to undertake without separate compensation specified types and levels of marketing activities. In years 1 through 6, USSub manufactures and sells athletic gear under the AA trademark in the United States. Assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts in paragraph (ii) of this Example 4.

(ii) In years 1 through 6, USSub performs incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the license agreement with FP, that are also incremental as compared to those observed in the comparables. FP does not directly or indirectly compensate USSub for performing these incremental activities during years 1 through 6. By year 7, AA trademark athletic gear generates a premium return in the United States, as compared to similar athletic gear marketed by independent licensees. In year 7, USSub and FP enter into a separate services agreement under which FP agrees to compensate USSub on a cost basis for the incremental marketing activities that USSub performed during years 1 through 6, and to compensate USSub on a cost basis for any incremental marketing activities it may perform in year 7 and subsequent years. In addition, the parties revise the license agreement executed in year 1, and increase the royalty to a level that attributes to FP substantially all the premium return from sales of the AA trademark athletic gear in the United States.

(iii) In determining whether an allocation of income is appropriate in year 7, the Commissioner may consider the economic substance of the arrangements between USSub and FP and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that, ex ante, an uncontrolled taxpayer operating at arm's length would engage in the incremental marketing activities to develop or enhance intangible property owned by another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of a future benefit. In this case, USSub's undertaking the incremental marketing activities in years 1 through 6 is a course of conduct that is inconsistent with the parties' adoption in year 7 of contractual terms by which FP compensates USSub on a cost basis for the incremental marketing activities that it performed. Therefore, the Commissioner may impute one or more agreements between USSub and FP, consistent with the economic substance of their course of conduct, which would afford USSub an appropriate portion of the premium return from the AA trademark athletic gear. For example, the Commissioner may impute a separate services agreement that affords USSub contingent-payment compensation for the incremental activities it performed during years 1 through 6, which benefited FP by contributing to the value of the trademark owned by FP. In the alternative, the Commissioner may impute a long-term, exclusive United States license agreement that allows USSub to benefit from the incremental activities. As another alternative, the Commissioner may require FP to compensate USSub for terminating USSub's imputed long-term United States license agreement, a license that USSub made more valuable at its own expense and risk. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in this particular case.

**Example 5.** *Non-arm's length compensation.* (i) The facts are the same as in paragraph (i) of Example 4. As in Example 4, assume that, after adjustments are made to improve the reliability of the comparison for any material differences relating to marketing activities, manufacturing or marketing intangible property, and other comparability factors, the royalties paid by

independent licensees would provide the most reliable measure of the arm's length royalty owed by USSub to FP, apart from the additional facts described in paragraph (ii) of this Example 5.

(ii) In years 1 through 4, USSub performs certain incremental marketing activities with respect to the AA trademark athletic gear, in addition to the activities required under the terms of the basic license agreement, that are also incremental as compared with those activities observed in the comparables. At the start of year 1, FP enters into a separate services agreement with USSub, which states that FP will compensate USSub quarterly, in an amount equal to specified costs plus X%, for these incremental marketing functions. Further, these written agreements reflect the intent of the parties that USSub receive such compensation from FP throughout the term of the agreement, without regard to the success or failure of the promotional activities. During years 1 through 4, USSub performs marketing activities pursuant to the separate services agreement and in each year USSub receives the specified compensation from FP on a cost of services plus basis.

(iii) In evaluating year 4, the Commissioner performs an analysis of independent parties that perform promotional activities comparable to those performed by USSub and that receive separately-stated compensation on a current basis without contingency. The Commissioner determines that the magnitude of the specified cost plus X% is outside the arm's length range in each of years 1 through 4. Based on an evaluation of all the facts and circumstances, the Commissioner makes an allocation to require payment of compensation to USSub for the promotional activities performed in year 4, based on the median of the interquartile range of the arm's length markups charged by the uncontrolled comparables described in paragraph (e)(3) of this section.

(iv) Given that based on facts and circumstances, the terms agreed by the controlled parties were that FP would bear all risks associated with the promotional activities performed by USSub to promote the AA trademark product in the United States market, and given that the parties' conduct during the years examined was consistent with this allocation of risk, the fact that the cost of services plus markup on USSub's services was outside the arm's length range does not, without more, support imputation of additional contractual terms based on alternative views of the economic substance of the transaction, such as terms indicating that USSub, rather than FP, bore the risk associated with these activities.

**Example 6.** Contractual terms imputed from economic substance. (i) Company X is a member of a controlled group that has been in operation in the pharmaceutical sector for many years. In years 1 through 4, Company X undertakes research and development activities. As a result of those activities, Company X developed a compound that may be more effective than existing medications in the treatment of certain conditions.

(ii) Company Y is acquired in year 4 by the controlled group that includes Company X. Once Company Y is acquired, Company X makes available to Company Y a large amount of technical data concerning the new compound, which Company Y uses to register patent rights with respect to the compound in several jurisdictions, making Company Y the legal owner of such patents. Company Y then enters into licensing agreements with group members that afford Company Y 100% of the premium return attributable to use of the intangible property by its subsidiaries.

(iii) In determining whether an allocation is appropriate in year 4, the Commissioner may consider the economic substance of the arrangements between Company X and Company Y, and the parties' course of conduct throughout their relationship. Based on this analysis, the Commissioner determines that it is unlikely that an uncontrolled taxpayer operating at arm's length would make available the results of its research and development or perform services that resulted in transfer of valuable know how to another party unless it received contemporaneous compensation or otherwise had a reasonable anticipation of receiving a future benefit from those activities. In this case, Company X's undertaking the research and development activities and then providing technical data and know-how to Company Y in year 4 is inconsistent with the registration and subsequent exploitation of the patent by Company Y. Therefore, the Commissioner may impute one or more agreements between Company X and Company Y consistent with the economic substance of their course of conduct, which would afford Company X an appropriate portion of the premium return from the patent rights. For example, the Commissioner may impute a separate services agreement that affords Company X contingent-payment compensation for its services in year 4 for the benefit of Company Y, consisting of making

available to Company Y technical data, know-how, and other fruits of research and development conducted in previous years. These services benefited Company Y by giving rise to and contributing to the value of the patent rights that were ultimately registered by Company Y. In the alternative, the Commissioner may impute a transfer of patentable intangible property rights from Company X to Company Y immediately preceding the registration of patent rights by Company Y. The taxpayer may present additional facts that could indicate which of these or other alternative agreements best reflects the economic substance of the underlying transactions, consistent with the parties' course of conduct in the particular case.

**(iii) Risk--**(A) Comparability. Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant risks that could affect the prices that would be charged or paid, or the profit that would be earned, in the two transactions. Relevant risks to consider include--

(1) Market risks, including fluctuations in cost, demand, pricing, and inventory levels;

(2) Risks associated with the success or failure of research and development activities;

(3) Financial risks, including fluctuations in foreign currency rates of exchange and interest rates;

(4) Credit and collection risks;

(5) Product liability risks; and

(6) General business risks related to the ownership of property, plant, and equipment.

(B) Identification of taxpayer that bears risk. In general, the determination of which controlled taxpayer bears a particular risk will be made in accordance with the provisions of § 1.482–1(d)(3)(ii)(B) (Identifying contractual terms). Thus, the allocation of risks specified or implied by the taxpayer's contractual terms will generally be respected if it is consistent with the economic substance of the transaction. An allocation of risk between controlled taxpayers after the outcome of such risk is known or reasonably knowable lacks economic substance. In considering the economic substance of the transaction, the following facts are relevant--

(1) Whether the pattern of the controlled taxpayer's conduct over time is consistent with the purported allocation of risk between the controlled taxpayers; or where the pattern is changed, whether the relevant contractual arrangements have been modified accordingly;

(2) Whether a controlled taxpayer has the financial capacity to fund losses that might be expected to occur as the result of the assumption of a risk, or whether, at arm's length, another party to the controlled transaction would ultimately suffer the consequences of such losses; and

(3) The extent to which each controlled taxpayer exercises managerial or operational control over the business activities that directly influence the amount of income or loss realized. In arm's length dealings, parties ordinarily bear a greater share of those risks over which they have relatively more control.

(C) *Examples.* The following examples illustrate this paragraph (d)(3)(iii).

**Example 1.** FD, the wholly-owned foreign distributor of USM, a U.S. manufacturer, buys widgets from USM under a written contract. Widgets are a generic electronic appliance. Under the terms of the contract, FD must buy and take title to 20,000 widgets for each of the five years of the contract at a price of $10 per widget. The widgets will be sold under FD's label, and FD must finance any marketing strategies to promote sales in the foreign market. There are no rebate or buy back provisions. FD has adequate financial capacity to fund its obligations under the contract under any circumstances that could reasonably be expected to arise. In Years 1, 2 and 3, FD sold only 10,000 widgets at a price of $11 per unit. In Year 4, FD sold its entire inventory of widgets at a price of $25 per unit. Since the contractual terms allocating market risk were agreed to before the outcome of such risk was known or reasonably knowable, FD had the financial capacity to bear the market risk that it would be unable to sell all of the widgets it purchased currently, and its conduct was consistent over time, FD will be deemed to bear the risk.

**Example 2.** The facts are the same as in Example 1, except that in Year 1 FD had only $100,000 in total capital, including loans. In subsequent years USM makes no additional contributions to the capital of FD, and FD is unable to obtain any capital through loans from an unrelated party. Nonetheless, USM continues to sell 20,000 widgets annually to FD under the terms of the contract, and USM extends credit to FD to enable it to finance the purchase. FD does not have the financial capacity in Years 1, 2 and 3 to finance the purchase of the widgets given that it could not sell most of the widgets it purchased during those years. Thus, notwithstanding the terms of the contract, USM and not FD assumed the market risk that a substantial portion of the widgets could not be sold, since in that event FD would not be able to pay USM for all of the widgets it purchased.

**Example 3.** S, a Country X corporation, manufactures small motors that it sells to P, its U.S. parent. P incorporates the motors into various products and sells those products to uncontrolled customers in the United States. The contract price for the motors is expressed in U.S. dollars, effectively allocating the currency risk for these transactions to S for any currency fluctuations between the time the contract is signed and payment is made. As long as S has adequate financial capacity to bear this currency risk (including by hedging all or part of the risk) and the conduct of S and P is consistent with the terms of the contract (i.e., the contract price is not adjusted to reflect exchange rate movements), the agreement of the parties to allocate the exchange risk to S will be respected.

**Example 4.** USSub is the wholly-owned U.S. subsidiary of FP, a foreign manufacturer. USSub acts as a distributor of goods manufactured by FP. FP and USSub execute an agreement providing that FP will bear any ordinary product liability costs arising from defects in the goods manufactured by FP. In practice, however, when ordinary product liability claims are sustained against USSub and FP, USSub pays the resulting damages. Therefore, the district director disregards the contractual arrangement regarding product liability costs between FP and USSub, and treats the risk as having been assumed by USSub.

(iv) *Economic conditions.* Determining the degree of comparability between controlled and uncontrolled transactions requires a comparison of the significant economic conditions that could affect the prices that would be charged or paid, or the profit that would be earned in each of the transactions. These factors include--

(A) The similarity of geographic markets;

(B) The relative size of each market, and the extent of the overall economic development in each market;

(C) The level of the market (e.g., wholesale, retail, etc.);

(D) The relevant market shares for the products, properties, or services transferred or provided;

(E) The location-specific costs of the factors of production and distribution;

(F) The extent of competition in each market with regard to the property or services under review;

(G) The economic condition of the particular industry, including whether the market is in contraction or expansion; and

(H) The alternatives realistically available to the buyer and seller.

**(v) Property or services.** Evaluating the degree of comparability between controlled and uncontrolled transactions requires a comparison of the property or services transferred in the transactions. This comparison may include any intangible property that is embedded in tangible property or services being transferred (embedded intangibles). The comparability of the embedded intangibles will be analyzed using the factors listed in § 1.482–4(c)(2)(iii)(B)(1) (comparable intangible property). The relevance of product comparability in evaluating the relative reliability of the results will depend on the method applied. For guidance concerning the specific comparability considerations applicable to transfers of tangible and intangible property and performance of services, see §§ 1.482–3 through 1.482–6 and § 1.482–9; see also §§ 1.482–3(f), 1.482–4(f)(4), and 1.482–9(m), dealing with the coordination of intangible and tangible property and performance of services rules.

**(4) Special circumstances--(i) Market share strategy.** In certain circumstances, taxpayers may adopt strategies to enter new markets or to increase a product's share of an existing market (market share strategy). Such a strategy would be reflected by temporarily increased market development expenses or resale prices that are temporarily lower than the prices charged for comparable products in the same market. Whether or not the strategy is reflected in the transfer price depends on which party to the controlled transaction bears the costs of the pricing strategy. In any case, the effect of a market share strategy on a controlled transaction will be taken into account only if it can be shown that an uncontrolled taxpayer engaged in a comparable strategy under comparable circumstances for a comparable period of time, and the taxpayer provides documentation that substantiates the following--

(A) The costs incurred to implement the market share strategy are borne by the controlled taxpayer that would obtain the future profits that result from the strategy, and there is a reasonable likelihood that the strategy will result in future profits that reflect an appropriate return in relation to the costs incurred to implement it;

(B) The market share strategy is pursued only for a period of time that is reasonable, taking into consideration the industry and product in question; and

(C) The market share strategy, the related costs and expected returns, and any agreement between the controlled taxpayers to share the related costs, were established before the strategy was implemented.

**(ii) Different geographic markets--**(A) In general. Uncontrolled comparables ordinarily should be derived from the geographic market in which the controlled taxpayer operates, because there may be significant differences in economic conditions in different markets. If information from the same market is not available, an uncontrolled comparable derived from a different geographic market may be considered if adjustments are made to account for differences between the two markets. If information permitting adjustments for such differences is not available, then information derived from uncontrolled comparables in the most similar market for which reliable data is available may be used, but the extent of such differences may affect the reliability of the method for purposes of the best method rule. For this purpose, a geographic market is any geographic area in which the economic conditions for the relevant product or service are substantially the same, and may include multiple countries, depending on the economic conditions.

(B) Example. The following example illustrates this paragraph (d)(4)(ii).

**Example.** Manuco, a wholly-owned foreign subsidiary of P, a U.S. corporation, manufactures products in Country Z for sale to P. No uncontrolled transactions are located that would provide a reliable measure of the arm's length result under the comparable uncontrolled price method. The district director considers applying the cost plus method or the comparable profits method. Information on uncontrolled taxpayers performing comparable functions under comparable circumstances in the same geographic market is not available. Therefore, adjusted data from uncontrolled manufacturers in other markets may be considered in order to apply the cost plus method. In this case, comparable uncontrolled manufacturers are found in the United States. Accordingly, data from the comparable U.S. uncontrolled manufacturers, as adjusted to account for differences between the United States and Country Z's geographic market, is used to test the arm's length price paid by P to Manuco. However, the use of such data may affect the reliability of the results for purposes of the best method rule. See § 1.482–1(c).

(C) Location savings. If an uncontrolled taxpayer operates in a different geographic market than the controlled taxpayer, adjustments may be necessary to account for significant differences in costs attributable to the geographic markets. These adjustments must be based on the effect such differences would have on the consideration charged or paid in the controlled transaction given the relative competitive positions of buyers and sellers in each market. Thus, for example, the fact that the total costs of operating in a controlled manufacturer's geographic market are less than the total costs of operating in other markets ordinarily justifies higher profits to the manufacturer only if the cost differences would increase the profits of comparable uncontrolled manufacturers operating at arm's length, given the competitive positions of buyers and sellers in that market.

(D) Example. The following example illustrates the principles of this paragraph (d)(4)(ii)(C).

**Example.** Couture, a U.S. apparel design corporation, contracts with Sewco, its wholly owned Country Y subsidiary, to manufacture its clothes. Costs of operating in Country Y are significantly lower than the operating costs in the United States. Although clothes with the Couture label sell for a premium price, the actual production of the clothes does not require significant specialized knowledge that could not be acquired by actual or potential competitors to Sewco at reasonable cost. Thus, Sewco's functions could be performed by several actual or potential competitors to Sewco in geographic markets that are similar to Country Y. Thus, the fact that production is less costly in Country Y will not, in and of itself, justify additional profits derived from lower operating costs in Country Y inuring to Sewco, because the competitive positions of the other actual or potential producers in similar geographic markets capable of performing the same functions at the same low costs indicate that at arm's length such profits would not be retained by Sewco.

**(iii) Transactions ordinarily not accepted as comparables--**(A) In general. Transactions ordinarily will not constitute reliable measures of an arm's length result for purposes of this section if--

(1) They are not made in the ordinary course of business; or

(2) One of the principal purposes of the uncontrolled transaction was to establish an arm's length result with respect to the controlled transaction.

(B) Examples. The following examples illustrate the principle of this paragraph (d)(4)(iii).

**Example 1.** Not in the ordinary course of business. USP, a United States manufacturer of computer software, sells its products to FSub, its foreign distributor in country X. Compco, a United States competitor of USP, also sells its products in X through unrelated distributors. However, in the year under review, Compco is forced into bankruptcy, and Compco liquidates its inventory by selling all of its products to unrelated distributors in X for a liquidation price. Because the sale of its entire inventory was not a sale in the ordinary course of business, Compco's sale cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**Example 2.** Principal purpose of establishing an arm's length result. USP, a United States manufacturer of farm machinery, sells its products to FSub, its wholly-owned distributor in Country Y. USP, operating at nearly full capacity, sells 95% of its inventory to FSub. To make use of its excess capacity, and also to establish a comparable uncontrolled price for its transfer price to FSub, USP increases its production to full capacity. USP sells its excess inventory to Compco, an unrelated foreign distributor in Country X. Country X has approximately the same economic conditions as that of Country Y. Because one of the principal purposes of selling to Compco was to establish an arm's length price for its controlled transactions with FSub, USP's sale to Compco cannot be used as an uncontrolled comparable to determine USP's arm's length result from its controlled transaction.

**(e) Arm's length range--(1) In general.** In some cases, application of a pricing method will produce a single result that is the most reliable measure of an arm's length result. In other cases, application of a method may produce a number of results from which a range of reliable results may be derived. A taxpayer will not be subject to adjustment if its results fall within such range (arm's length range).

**(2) Determination of arm's length range--(i) Single method.** The arm's length range is ordinarily determined by applying a single pricing method selected under the best method rule to two or more uncontrolled transactions of similar comparability and reliability. Use of more than one method may be appropriate for the purposes described in paragraph (c)(2)(iii) of this section (Best method rule).

**(ii) Selection of comparables.** Uncontrolled comparables must be selected based upon the comparability criteria relevant to the method applied and must be sufficiently similar to the controlled transaction that they provide a reliable measure of an arm's length result. If material differences exist between the controlled and uncontrolled transactions, adjustments must be made to the results of the uncontrolled transaction if the effect of such differences on price or profits can be ascertained with sufficient accuracy to improve the reliability of the results. See § 1.482–1(d)(2) (Standard of comparability). The arm's length range will be derived only from those uncontrolled comparables that have, or through adjustments can be brought to, a similar level of comparability and reliability, and uncontrolled comparables that have a significantly lower level of comparability and reliability will not be used in establishing the arm's length range.

**(iii) Comparables included in arm's length range--(A) In general.** The arm's length range will consist of the results of all of the uncontrolled comparables that meet the following conditions: the information on the controlled transaction and the uncontrolled comparables is sufficiently complete that it is likely that all material differences have been identified,

each such difference has a definite and reasonably ascertainable effect on price or profit, and an adjustment is made to eliminate the effect of each such difference.

(B) Adjustment of range to increase reliability. If there are no uncontrolled comparables described in paragraph (e)(2)(iii)(A) of this section, the arm's length range is derived from the results of all the uncontrolled comparables, selected pursuant to paragraph (e)(2)(ii) of this section, that achieve a similar level of comparability and reliability. In such cases the reliability of the analysis must be increased, where it is possible to do so, by adjusting the range through application of a valid statistical method to the results of all of the uncontrolled comparables so selected. The reliability of the analysis is increased when statistical methods are used to establish a range of results in which the limits of the range will be determined such that there is a 75 percent probability of a result falling above the lower end of the range and a 75 percent probability of a result falling below the upper end of the range. The interquartile range ordinarily provides an acceptable measure of this range; however a different statistical method may be applied if it provides a more reliable measure.

(C) Interquartile range. For purposes of this section, the interquartile range is the range from the 25th to the 75th percentile of the results derived from the uncontrolled comparables. For this purpose, the 25th percentile is the lowest result derived from an uncontrolled comparable such that at least 25 percent of the results are at or below the value of that result. However, if exactly 25 percent of the results are at or below a result, then the 25th percentile is equal to the average of that result and the next higher result derived from the uncontrolled comparables. The 75th percentile is determined analogously.

**(3) Adjustment if taxpayer's results are outside arm's length range.** If the results of a controlled transaction fall outside the arm's length range, the district director may make allocations that adjust the controlled taxpayer's result to any point within the arm's length range. If the interquartile range is used to determine the arm's length range, such adjustment will ordinarily be to the median of all the results. The median is the 50th percentile of the results, which is determined in a manner analogous to that described in paragraph (e)(2)(iii)(C) of this section (Interquartile range). In other cases, an adjustment normally will be made to the arithmetic mean of all the results. See § 1.482–1(f)(2)(iii)(D) for determination of an adjustment when a controlled taxpayer's result for a multiple year period falls outside an arm's length range consisting of the average results of uncontrolled comparables over the same period.

**(4) Arm's length range not prerequisite to allocation.** The rules of this paragraph (e) do not require that the district director establish an arm's length range prior to making an allocation under section 482. Thus, for example, the district director may properly propose an allocation on the basis of a single comparable uncontrolled price if the comparable uncontrolled price method, as described in § 1.482–3(b), has been properly applied. However, if the taxpayer subsequently demonstrates that the results claimed on its income tax return are within the range established by additional equally reliable comparable uncontrolled prices in a manner consistent with the requirements set forth in § 1.482–1(e)(2)(iii), then no allocation will be made.

**(5) Examples.** The following examples illustrate the principles of this paragraph (e).

**Example 1.** Selection of comparables. (i) To evaluate the arm's length result of a controlled transaction between USSub, the United States taxpayer under review, and FP, its foreign parent, the district director considers applying the resale price method. The district director identifies ten potential uncontrolled transactions. The distributors in all ten uncontrolled transactions purchase and resell similar products and perform similar functions to those of USSub.

(ii) Data with respect to three of the uncontrolled transactions is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these three uncontrolled comparables is significantly lower than that of the other seven. Further, of those seven, adjustments for the identified material differences can be reliably made for only four of the uncontrolled transactions. Therefore, pursuant to § 1.482–1(e)(2)(ii) only these four uncontrolled comparables may be used to establish an arm's length range.

**Example 2.** Arm's length range consists of all the results. (i) The facts are the same as in Example 1. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

| Comparable | Result (price) |
|---|---|
| 1 | $44.00 |
| 2 | 45.00 |
| 3 | 45.00 |
| 4 | 45.50 |

(ii) The district director determines that data regarding the four uncontrolled transactions is sufficiently complete and accurate so that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, such differences have a definite and reasonably ascertainable effect, and appropriate adjustments were made for such differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction will consist of the results of all of the uncontrolled comparables, pursuant to paragraph (e)(2)(iii)(A) of this section. Thus, the arm's length range in this case would be the range from $44 to $45.50.

**Example 3.** Arm's length range limited to interquartile range. (i) The facts are the same as in Example 2, except in this case there are some product and functional differences between the four uncontrolled comparables and USSub. However, the data is insufficiently complete to determine the effect of the differences. Applying the resale price method to the four uncontrolled comparables, and making adjustments to the uncontrolled comparables pursuant to § 1.482–1(d)(2), the district director derives the following results:

| Uncontrolled comparable | Result (price) |
|---|---|
| 1 | $42.00 |
| 2 | 44.00 |
| 3 | 45.00 |
| 4 | 47.50 |

(ii) It cannot be established in this case that all material differences are likely to have been identified and reliable adjustments made for those differences. Accordingly, if the resale price method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction must be established pursuant to paragraph (e)(2)(iii)(B) of this section. In this case, the district director uses the interquartile range to determine the arm's length range, which is the range from $43 to $46.25. If USSub's price falls outside this range, the district director may make an allocation. In this case that allocation would be to the median of the results, or $44.50.

**Example 4.** Arm's length range limited to interquartile range. (i) To evaluate the arm's length result of controlled transactions between USP, a United States manufacturing company, and FSub, its foreign subsidiary, the district director considers applying the comparable profits method. The district director identifies 50 uncontrolled taxpayers within the same industry that potentially could be used to apply the method.

(ii) Further review indicates that only 20 of the uncontrolled manufacturers engage in activities requiring similar capital investments and technical know-how. Data with respect to five of the uncontrolled manufacturers is very limited, and although some material differences can be identified and adjusted for, the level of comparability of these five uncontrolled comparables is significantly lower than that of the other 15. In addition, for those five uncontrolled comparables it is not possible to accurately allocate costs between the business activity associated with the relevant transactions and other business activities. Therefore, pursuant to § 1.482–1(e)(2)(ii) only the other fifteen uncontrolled comparables may be used to establish an arm's length range.

(iii) Although the data for the fifteen remaining uncontrolled comparables is relatively complete and accurate, there is a significant possibility that some material differences may remain. The district director has determined, for example, that it is likely that there are material differences in the level of technical expertise or in management efficiency. Accordingly, if the comparable profits method is determined to be the best method pursuant to § 1.482–1(c), the arm's length range for the controlled transaction may be established only pursuant to paragraph (e)(2)(iii)(B) of this section.

**(f) Scope of review--(1) In general.** The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer is other than it would have been had the taxpayer, in the conduct of its affairs, been dealing at arm's length with an uncontrolled taxpayer.

    **(i) Intent to evade or avoid tax not a prerequisite.** In making allocations under section 482, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances.

    **(ii) Realization of income not a prerequisite--**(A) In general. The district director may make an allocation under section 482 even if the income ultimately anticipated from a series of transactions has not been or is never realized. For example, if a controlled taxpayer sells a product at less than an arm's length price to a related taxpayer in one taxable year and the second controlled taxpayer resells the product to an unrelated party in the next taxable year, the district director may make an appropriate allocation to reflect an arm's length price for the sale of the product in the first taxable year, even though the second controlled taxpayer had not realized any gross income from the resale of the product in the first year. Similarly, if a controlled taxpayer lends money to a related taxpayer in a taxable year, the district director may make an appropriate allocation to reflect an arm's length charge for interest during such taxable year even if the second controlled taxpayer does not realize income during such year. Finally, even if two controlled taxpayers realize an overall loss that is attributable to a particular controlled transaction, an allocation under section 482 is not precluded.

    (B) Example. The following example illustrates this paragraph (f)(1)(ii).

**Example.** USSub is a U.S. subsidiary of FP, a foreign corporation. Parent manufactures product X and sells it to USSub. USSub functions as a distributor of product X to unrelated customers in the United States. The fact that FP may incur a loss on the manufacture and sale of product X does not by itself establish that USSub, dealing with FP at arm's length, also would incur a loss. An independent distributor acting at arm's length with its supplier would in many circumstances be expected to earn a profit without regard to the level of profit earned by the supplier.

(iii) **Nonrecognition provisions may not bar allocation--**(A) In general. If necessary to prevent the avoidance of taxes or to clearly reflect income, the district director may make an allocation under section 482 with respect to transactions that otherwise qualify for nonrecognition of gain or loss under applicable provisions of the Internal Revenue Code (such as section 351 or 1031).

(B) Example. The following example illustrates this paragraph (f)(1)(iii).

**Example.** (i) In Year 1 USP, a United States corporation, bought 100 shares of UR, an unrelated corporation, for $100,000. In Year 2, when the value of the UR stock had decreased to $40,000, USP contributed all 100 shares of UR stock to its wholly-owned subsidiary in exchange for subsidiary's capital stock. In Year 3, the subsidiary sold all of the UR stock for $40,000 to an unrelated buyer, and on its U.S. income tax return, claimed a loss of $60,000 attributable to the sale of the UR stock. USP and its subsidiary do not file a consolidated return.

(ii) In determining the true taxable income of the subsidiary, the district director may disallow the loss of $60,000 on the ground that the loss was incurred by USP. National Securities Corp. v Commissioner, 137 F.2d 600 (3rd Cir. 1943), cert. denied, 320 U.S. 794 (1943).

(iv) **Consolidated returns.** Section 482 and the regulations thereunder apply to all controlled taxpayers, whether the controlled taxpayer files a separate or consolidated U.S. income tax return. If a controlled taxpayer files a separate return, its true separate taxable income will be determined. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer must be determined consistently with the principles of a consolidated return.

(2) **Rules relating to determination of true taxable income.** The following rules must be taken into account in determining the true taxable income of a controlled taxpayer.

(i) **Aggregation of transactions--**(A) In general. The combined effect of two or more separate transactions (whether before, during, or after the taxable year under review) may be considered, if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions. Generally, transactions will be aggregated only when they involve related products or services, as defined in § 1.6038A–3(c)(7)(vii).

(B) Examples. The following examples illustrate this paragraph (f)(2)(i).

**Example 1.** P enters into a license agreement with S1, its subsidiary, that permits S1 to use a proprietary manufacturing process and to sell the output from this process throughout a specified region. S1 uses the manufacturing process and sells its output to S2, another subsidiary of P, which in turn resells the output to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P, it may be appropriate to consider the arm's length character of the transfer prices charged by S1 to S2 and the aggregate profits earned by S1 and S2 from the use of the manufacturing process and the sale to uncontrolled parties of the products produced by S1.

**Example 2.** S1, S2, and S3 are Country Z subsidiaries of U.S. manufacturer P. S1 is the exclusive Country Z distributor of computers manufactured by P. S2 provides marketing services in connection with sales of P computers in Country Z, and in this regard uses significant marketing intangibles provided by P. S3 administers the warranty program with respect to P computers in Country Z, including maintenance and repair services. In evaluating the arm's length character of the transfer price paid by

S1 to P, of the fees paid by S2 to P for the use of P marketing intangibles, and of the service fees earned by S2 and S3, it may be appropriate to consider the combined effects of these separate transactions because they are so interrelated that they are most reliably analyzed on an aggregated basis.

**Example 3.** The facts are the same as in Example 2. In addition, U1, U2, and U3 are uncontrolled taxpayers that carry out functions comparable to those of S1, S2, and S3, respectively, with respect to computers produced by unrelated manufacturers. R1, R2, and R3 are a controlled group of taxpayers (unrelated to the P controlled group) that also carry out functions comparable to those of S1, S2, and S3 with respect to computers produced by their common parent. Prices charged to uncontrolled customers of the R group differ from the prices charged to customers of U1, U2, and U3. In determining whether the transactions of U1, U2, and U3, or the transactions of R1, R2, and R3 would provide a more reliable measure of the arm's length result, it is determined that the interrelated R group transactions are more reliable than the wholly independent transactions of U1, U2, and U3, given the interrelationship of the P group transactions.

**Example 4.** P enters into a license agreement with S1 that permits S1 to use a propriety process for manufacturing product X and to sell product X to uncontrolled parties throughout a specified region. P also sells to S1 product Y which is manufactured by P in the United States, and which is unrelated to product X. Product Y is resold by S1 to uncontrolled parties in the specified region. In evaluating the arm's length character of the royalty paid by S1 to P for the use of the manufacturing process for product X, and the transfer prices charged for unrelated product Y, it would not be appropriate to consider the combined effects of these separate and unrelated transactions.

**(ii) Allocation based on taxpayer's actual transactions--(A) In general.** The Commissioner will evaluate the results of a transaction as actually structured by the taxpayer unless its structure lacks economic substance. However, the Commissioner may consider the alternatives available to the taxpayer in determining whether the terms of the controlled transaction would be acceptable to an uncontrolled taxpayer faced with the same alternatives and operating under comparable circumstances. In such cases the Commissioner may adjust the consideration charged in the controlled transaction based on the cost or profit of an alternative as adjusted to account for material differences between the alternative and the controlled transaction, but will not restructure the transaction as if the alternative had been adopted by the taxpayer. See paragraph (d)(3) of this section (factors for determining comparability; contractual terms and risk); §§ 1.482–3(e), 1.482–4(d), and 1.482–9(h) (unspecified methods).

**(B) Example.** The following example illustrates this paragraph (f)(2)(ii).

**Example.** P and S are controlled taxpayers. P enters into a license agreement with S that permits S to use a proprietary process for manufacturing product X. Using its sales and marketing employees, S sells product X to related and unrelated customers outside the United States. If the license agreement between P and S has economic substance, the district director ordinarily will not restructure the taxpayer's transaction to treat P as if it had elected to exploit directly the manufacturing process. However, the fact that P could have manufactured product X may be taken into account under § 1.482–4(d) in determining the arm's length consideration for the controlled transaction. For an example of such an analysis, see Example in § 1.482–4(d)(2).

**(iii) Multiple year data--(A) In general.** The results of a controlled transaction ordinarily will be compared with the results of uncontrolled comparables occurring in the taxable year under review. It may be appropriate, however, to consider data relating to the uncontrolled comparables or the controlled taxpayer for one or more years before or after the year under review. If data relating to uncontrolled comparables from multiple years is used, data relating to the controlled taxpayer for the same years ordinarily must be considered. However, if such data is not available, reliable data from other years, as adjusted under paragraph (d)(2) (Standard of comparability) of this section may be used.

(B) Circumstances warranting consideration of multiple year data. The extent to which it is appropriate to consider multiple year data depends on the method being applied and the issue being addressed. Circumstances that may warrant consideration of data from multiple years include the extent to which complete and accurate data are available for the taxable year under review, the effect of business cycles in the controlled taxpayer's industry, or the effects of life cycles of the product or intangible property being examined. Data from one or more years before or after the taxable year under review must ordinarily be considered for purposes of applying the provisions of paragraph (d)(3)(iii) of this section (risk), paragraph (d)(4)(i) of this section (market share strategy), § 1.482–4(f)(2) (periodic adjustments), § 1.482–5 (comparable profits method), § 1.482–9(f) (comparable profits method for services), and § 1.482–9(i) (contingent-payment contractual terms for services). On the other hand, multiple year data ordinarily will not be considered for purposes of applying the comparable uncontrolled price method of § 1.482–3(b) or the comparable uncontrolled services price method of § 1.482–9(c) (except to the extent that risk or market share strategy issues are present).

(C) Comparable effect over comparable period. Data from multiple years may be considered to determine whether the same economic conditions that caused the controlled taxpayer's results had a comparable effect over a comparable period of time on the uncontrolled comparables that establish the arm's length range. For example, given that uncontrolled taxpayers enter into transactions with the ultimate expectation of earning a profit, persistent losses among controlled taxpayers may be an indication of non-arm's length dealings. Thus, if a controlled taxpayer that realizes a loss with respect to a controlled transaction seeks to demonstrate that the loss is within the arm's length range, the district director may take into account data from taxable years other than the taxable year of the transaction to determine whether the loss was attributable to arm's length dealings. The rule of this paragraph (f)(2)(iii)(C) is illustrated by Example 3 of paragraph (f)(2)(iii)(E) of this section.

(D) Applications of methods using multiple year averages. If a comparison of a controlled taxpayer's average result over a multiple year period with the average results of uncontrolled comparables over the same period would reduce the effect of short-term variations that may be unrelated to transfer pricing, it may be appropriate to establish a range derived from the average results of uncontrolled comparables over a multiple year period to determine if an adjustment should be made. In such a case the district director may make an adjustment if the controlled taxpayer's average result for the multiple year period is not within such range. Such a range must be determined in accordance with § 1.482–1(e) (Arm's length range). An adjustment in such a case ordinarily will be equal to the difference, if any, between the controlled taxpayer's result for the taxable year and the mid-point of the uncontrolled comparables' results for that year. If the interquartile range is used to determine the range of average results for the multiple year period, such adjustment will ordinarily be made to the median of all the results of the uncontrolled comparables for the taxable year. See Example 2 of § 1.482–5(e). In other cases, the adjustment normally will be made to the arithmetic mean of all the results of the uncontrolled comparables for the taxable year. However, an adjustment will be made only to the extent that it would move the controlled taxpayer's multiple year average closer to the arm's length range for the multiple year period or to any point within such range. In determining a controlled taxpayer's average result for a multiple year period, adjustments made under this section for prior years will be taken into account only if such adjustments have been finally determined, as described in § 1.482–1(g)(2)(iii). See Example 3 of § 1.482–5(e).

(E) Examples. The following examples, in which S and P are controlled taxpayers, illustrate this paragraph (f)(2)(iii). Examples 1 and 4 also illustrate the principle of the arm's length range of paragraph (e) of this section.

**Example 1.** P sold product Z to S for $60 per unit in 1995. Applying the resale price method to data from uncontrolled comparables for the same year establishes an arm's length range of prices for the controlled transaction from $52 to $59 per unit. Since the price charged in the controlled transaction falls outside the range, the district director would ordinarily make

an allocation under section 482. However, in this case there are cyclical factors that affect the results of the uncontrolled comparables (and that of the controlled transaction) that cannot be adequately accounted for by specific adjustments to the data for 1995. Therefore, the district director considers results over multiple years to account for these factors. Under these circumstances, it is appropriate to average the results of the uncontrolled comparables over the years 1993, 1994, and 1995 to determine an arm's length range. The averaged results establish an arm's length range of $56 to $58 per unit. For consistency, the results of the controlled taxpayers must also be averaged over the same years. The average price in the controlled transaction over the three years is $57. Because the controlled transfer price of product Z falls within the arm's length range, the district director makes no allocation.

**Example 2.** (i) FP, a Country X corporation, designs and manufactures machinery in Country X. FP's costs are incurred in Country X currency. USSub is the exclusive distributor of FP's machinery in the United States. The price of the machinery sold by FP to USSub is expressed in Country X currency. Thus, USSub bears all of the currency risk associated with fluctuations in the exchange rate between the time the contract is signed and the payment is made. The prices charged by FP to USSub for 1995 are under examination. In that year, the value of the dollar depreciated against the currency of Country X, and as a result, USSub's gross margin was only 8%.

(ii) UD is an uncontrolled distributor of similar machinery that performs distribution functions substantially the same as those performed by USSub, except that UD purchases and resells machinery in transactions where both the purchase and resale prices are denominated in U.S. dollars. Thus, UD had no currency exchange risk. UD's gross margin in 1995 was 10%. UD's average gross margin for the period 1990 to 1998 has been 12%.

(iii) In determining whether the price charged by FP to USSub in 1995 was arm's length, the district director may consider USSub's average gross margin for an appropriate period before and after 1995 to determine whether USSub's average gross margin during the period was sufficiently greater than UD's average gross margin during the same period such that USSub was sufficiently compensated for the currency risk it bore throughout the period. See § 1.482–1(d)(3)(iii) (Risk).

**Example 3.** FP manufactures product X in Country M and sells it to USSub, which distributes X in the United States. USSub realizes losses with respect to the controlled transactions in each of five consecutive taxable years. In each of the five consecutive years a different uncontrolled comparable realized a loss with respect to comparable transactions equal to or greater than USSub's loss. Pursuant to paragraph (f)(3)(iii)(C) of this section, the district director examines whether the uncontrolled comparables realized similar losses over a comparable period of time, and finds that each of the five comparables realized losses in only one of the five years, and their average result over the five-year period was a profit. Based on this data, the district director may conclude that the controlled taxpayer's results are not within the arm's length range over the five year period, since the economic conditions that resulted in the controlled taxpayer's loss did not have a comparable effect over a comparable period of time on the uncontrolled comparables.

**Example 4.** (i) USP, a U.S. corporation, manufactures product Y in the United States and sells it to FSub, which acts as USP's exclusive distributor of product Y in Country N. The resale price method described in § 1.482–3(c) is used to evaluate whether the transfer price charged by USP to FSub for the 1994 taxable year for product Y was arm's length. For the period 1992 through 1994, FSub had a gross profit margin for each year of 13%. A, B, C and D are uncontrolled distributors of products that compete directly with product Y in country N. After making appropriate adjustments in accordance with §§ 1.482–1(d)(2) and 1.482–3(c), the gross profit margins for A, B, C, and D are as follows:

|  | 1992 | 1993 | 1994 | Average |
|---|---|---|---|---|
| A...................................................................... | 13 | 3 | 8 | 8.00 |
| B...................................................................... | 11 | 13 | 2 | 8.67 |
| 7C...................................................................... | 4 | 7 | 13 | 8.00 |

| | | | | |
|---|---|---|---|---|
| 7D.......................................................................................................... | 7 | 9 | 6 | 7.33 |

(ii) Applying the provisions of § 1.482–1(e), the district director determines that the arm's length range of the average gross profit margins is between 7.33 and 8.67. The district director concludes that FSub's average gross margin of 13% is not within the arm's length range, despite the fact that C's gross profit margin for 1994 was also 13%, since the economic conditions that caused S's result did not have a comparable effect over a comparable period of time on the results of C or the other uncontrolled comparables. In this case, the district director makes an allocation equivalent to adjusting FSub's gross profit margin for 1994 from 13% to the mean of the uncontrolled comparables' results for 1994 (7.25%).

**(iv) Product lines and statistical techniques.** The methods described in §§ 1.482–2 through 1.482–6 are generally stated in terms of individual transactions. However, because a taxpayer may have controlled transactions involving many different products, or many separate transactions involving the same product, it may be impractical to analyze every individual transaction to determine its arm's length price. In such cases, it is permissible to evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings. In addition, the arm's length results of all related party transactions entered into by a controlled taxpayer may be evaluated by employing sampling and other valid statistical techniques.

**(v) Allocations apply to results, not methods--**(A) In general. In evaluating whether the result of a controlled transaction is arm's length, it is not necessary for the district director to determine whether the method or procedure that a controlled taxpayer employs to set the terms for its controlled transactions corresponds to the method or procedure that might have been used by a taxpayer dealing at arm's length with an uncontrolled taxpayer. Rather, the district director will evaluate the result achieved rather than the method the taxpayer used to determine its prices.

(B) Example. The following example illustrates this paragraph (f)(2)(v).

**Example.** (i) FS is a foreign subsidiary of P, a U.S. corporation. P manufactures and sells household appliances. FS operates as P's exclusive distributor in Europe. P annually establishes the price for each of its appliances sold to FS as part of its annual budgeting, production allocation and scheduling, and performance evaluation processes. FS's aggregate gross margin earned in its distribution business is 18%.

(ii) ED is an uncontrolled European distributor of competing household appliances. After adjusting for minor differences in the level of inventory, volume of sales, and warranty programs conducted by FS and ED, ED's aggregate gross margin is also 18%. Thus, the district director may conclude that the aggregate prices charged by P for its appliances sold to FS are arm's length, without determining whether the budgeting, production, and performance evaluation processes of P are similar to such processes used by ED.

**(g) Collateral adjustments with respect to allocations under section 482--(1) In general.** The district director will take into account appropriate collateral adjustments with respect to allocations under section 482. Appropriate collateral adjustments may include correlative allocations, conforming adjustments, and setoffs, as described in this paragraph (g).

**(2) Correlative allocations--(i) In general.** When the district director makes an allocation under section 482 (referred to in this paragraph (g)(2) as the primary allocation), appropriate correlative allocations will also be made with respect to any other member of the group affected by the allocation. Thus, if the district director makes an allocation of income, the district director will not only increase the income of one member of the group, but correspondingly decrease the income

of the other member. In addition, where appropriate, the district director may make such further correlative allocations as may be required by the initial correlative allocation.

**(ii) Manner of carrying out correlative allocation.** The district director will furnish to the taxpayer with respect to which the primary allocation is made a written statement of the amount and nature of the correlative allocation. The correlative allocation must be reflected in the documentation of the other member of the group that is maintained for U.S. tax purposes, without regard to whether it affects the U.S. income tax liability of the other member for any open year. In some circumstances the allocation will have an immediate U.S. tax effect, by changing the taxable income computation of the other member (or the taxable income computation of a shareholder of the other member, for example, under the provisions of subpart F of the Internal Revenue Code). Alternatively, the correlative allocation may not be reflected on any U.S. tax return until a later year, for example when a dividend is paid.

**(iii) Events triggering correlative allocation.** For purposes of this paragraph (g)(2), a primary allocation will not be considered to have been made (and therefore, correlative allocations are not required to be made) until the date of a final determination with respect to the allocation under section 482. For this purpose, a final determination includes--

(A) Assessment of tax following execution by the taxpayer of a Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) with respect to such allocation;

(B) Acceptance of a Form 870–AD (Offer of Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment);

(C) Payment of the deficiency;

(D) Stipulation in the Tax Court of the United States; or

(E) Final determination of tax liability by offer-in-compromise, closing agreement, or final resolution (determined under the principles of section 7481) of a judicial proceeding.

**(iv) Examples.** The following examples illustrate this paragraph (g)(2). In each example, X and Y are members of the same group of controlled taxpayers and each regularly computes its income on a calendar year basis.

**Example 1.** (i) In 1996, Y, a U.S. corporation, rents a building owned by X, also a U.S. corporation. In 1998 the district director determines that Y did not pay an arm's length rental charge. The district director proposes to increase X's income to reflect an arm's length rental charge. X consents to the assessment reflecting such adjustment by executing Form 870, a Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment. The assessment of the tax with respect to the adjustment is made in 1998. Thus, the primary allocation, as defined in paragraph (g)(2)(i) of this section, is considered to have been made in 1998.

(ii) The adjustment made to X's income under section 482 requires a correlative allocation with respect to Y's income. The district director notifies X in writing of the amount and nature of the adjustment made with respect to Y. Y had net operating losses in 1993, 1994, 1995, 1996, and 1997. Although a correlative adjustment will not have an effect on Y's U.S. income tax

liability for 1996, an adjustment increasing Y's net operating loss for 1996 will be made for purposes of determining Y's U.S. income tax liability for 1998 or a later taxable year to which the increased net operating loss may be carried.

**Example 2.** (i) In 1995, X, a U.S. construction company, provided engineering services to Y, a U.S. corporation, in the construction of Y's factory. In 1997, the district director determines that the fees paid by Y to X for its services were not arm's length and proposes to make an adjustment to the income of X. X consents to an assessment reflecting such adjustment by executing Form 870. An assessment of the tax with respect to such adjustment is made in 1997. The district director notifies X in writing of the amount and nature of the adjustment to be made with respect to Y.

(ii) The fees paid by Y for X's engineering services properly constitute a capital expenditure. Y does not place the factory into service until 1998. Therefore, a correlative adjustment increasing Y's basis in the factory does not affect Y's U.S. income tax liability for 1997. However, the correlative adjustment must be made in the books and records maintained by Y for its U.S. income tax purposes and such adjustment will be taken into account in computing Y's allowable depreciation or gain or loss on a subsequent disposition of the factory.

**Example 3.** In 1995, X, a U.S. corporation, makes a loan to Y, its foreign subsidiary not engaged in a U.S. trade or business. In 1997, the district director, upon determining that the interest charged on the loan was not arm's length, proposes to adjust X's income to reflect an arm's length interest rate. X consents to an assessment reflecting such allocation by executing Form 870, and an assessment of the tax with respect to the section 482 allocation is made in 1997. The district director notifies X in writing of the amount and nature of the correlative allocation to be made with respect to Y. Although the correlative adjustment does not have an effect on Y's U.S. income tax liability, the adjustment must be reflected in the documentation of Y that is maintained for U.S. tax purposes. Thus, the adjustment must be reflected in the determination of the amount of Y's earnings and profits for 1995 and subsequent years, and the adjustment must be made to the extent it has an effect on any person's U.S. income tax liability for any taxable year.

(3) **Adjustments to conform accounts to reflect section 482 allocations--(i) In general.** Appropriate adjustments must be made to conform a taxpayer's accounts to reflect allocations made under section 482. Such adjustments may include the treatment of an allocated amount as a dividend or a capital contribution (as appropriate), or, in appropriate cases, pursuant to such applicable revenue procedures as may be provided by the Commissioner (see § 601.601(d)(2) of this chapter), repayment of the allocated amount without further income tax consequences.

(ii) **Example.** The following example illustrates the principles of this paragraph (g)(3).

**Example** Conforming cash accounts. (i) USD, a United States corporation, buys Product from its foreign parent, FP. In reviewing USD's income tax return, the district director determines that the arm's length price would have increased USD's taxable income by $5 million. The district director accordingly adjusts USD's income to reflect its true taxable income.

(ii) To conform its cash accounts to reflect the section 482 allocation made by the district director, USD applies for relief under Rev. Proc. 65–17, 1965–1 C.B. 833 (see § 601.601(d)(2)(ii)(b) of this chapter), to treat the $5 million adjustment as an account receivable from FP, due as of the last day of the year of the transaction, with interest accruing therefrom.

(4) **Setoffs--(i) In general.** If an allocation is made under section 482 with respect to a transaction between controlled taxpayers, the Commissioner will take into account the effect of any other non-arm's length transaction between the same controlled taxpayers in the same taxable year which will result in a setoff against the original section 482 allocation. Such setoff, however, will be taken into account only if the requirements of paragraph (g)(4)(ii) of this section are satisfied. If the effect of the setoff is to change the characterization or source of the income or deductions, or otherwise distort taxable income, in such a manner as to affect the U.S. tax liability of any member, adjustments will be made to reflect the correct

amount of each category of income or deductions. For purposes of this setoff provision, the term arm's length refers to the amount defined in paragraph (b) of this section (arm's length standard), without regard to the rules in § 1.482–2(a) that treat certain interest rates as arm's length rates of interest.

**(ii) Requirements.** The district director will take a setoff into account only if the taxpayer--

(A) Establishes that the transaction that is the basis of the setoff was not at arm's length and the amount of the appropriate arm's length charge;

(B) Documents, pursuant to paragraph (g)(2) of this section, all correlative adjustments resulting from the proposed setoff; and

(C) Notifies the district director of the basis of any claimed setoff within 30 days after the earlier of the date of a letter by which the district director transmits an examination report notifying the taxpayer of proposed adjustments or the date of the issuance of the notice of deficiency.

**(iii) Examples.** The following examples illustrate this paragraph (g)(4).

**Example 1.** P, a U.S. corporation, renders construction services to S, its foreign subsidiary in Country Y, in connection with the construction of S's factory. An arm's length charge for such services determined under § 1.482–9 would be $100,000. During the same taxable year P makes available to S the use of a machine to be used in the construction of the factory, and the arm's length rental value of the machine is $25,000. P bills S $125,000 for the services, but does not charge S for the use of the machine. No allocation will be made with respect to the undercharge for the machine if P notifies the district director of the basis of the claimed setoff within 30 days after the date of the letter from the district director transmitting the examination report notifying P of the proposed adjustment, establishes that the excess amount charged for services was equal to an arm's length charge for the use of the machine and that the taxable income and income tax liabilities of P are not distorted, and documents the correlative allocations resulting from the proposed setoff.

**Example 2.** The facts are the same as in Example 1, except that, if P had reported $25,000 as rental income and $25,000 less as service income, it would have been subject to the tax on personal holding companies. Allocations will be made to reflect the correct amounts of rental income and service income.

**(h) Special rules--(1) Small taxpayer safe harbor.** [Reserved]

**(2) Effect of foreign legal restrictions--(i) In general.** The district director will take into account the effect of a foreign legal restriction to the extent that such restriction affects the results of transactions at arm's length. Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time. In the absence of evidence indicating the effect of the foreign legal restriction on uncontrolled taxpayers, the restriction will be taken into account only to the extent provided in paragraphs (h)(2) (iii) and (iv) of this section (Deferred income method of accounting).

**(ii) Applicable legal restrictions.** Foreign legal restrictions (whether temporary or permanent) will be taken into account for purposes of this paragraph (h)(2) only if, and so long as, the conditions set forth in paragraphs (h)(2)(ii) (A) through (D) of this section are met.

    (A) The restrictions are publicly promulgated, generally applicable to all similarly situated persons (both controlled and uncontrolled), and not imposed as part of a commercial transaction between the taxpayer and the foreign sovereign;

    (B) The taxpayer (or other member of the controlled group with respect to which the restrictions apply) has exhausted all remedies prescribed by foreign law or practice for obtaining a waiver of such restrictions (other than remedies that would have a negligible prospect of success if pursued);

    (C) The restrictions expressly prevented the payment or receipt, in any form, of part or all of the arm's length amount that would otherwise be required under section 482 (for example, a restriction that applies only to the deductibility of an expense for tax purposes is not a restriction on payment or receipt for this purpose); and

    (D) The related parties subject to the restriction did not engage in any arrangement with controlled or uncontrolled parties that had the effect of circumventing the restriction, and have not otherwise violated the restriction in any material respect.

**(iii) Requirement for electing the deferred income method of accounting.** If a foreign legal restriction prevents the payment or receipt of part or all of the arm's length amount that is due with respect to a controlled transaction, the restricted amount may be treated as deferrable if the following requirements are met--

    (A) The controlled taxpayer establishes to the satisfaction of the district director that the payment or receipt of the arm's length amount was prevented because of a foreign legal restriction and circumstances described in paragraph (h)(2)(ii) of this section; and

    (B) The controlled taxpayer whose U.S. tax liability may be affected by the foreign legal restriction elects the deferred income method of accounting, as described in paragraph (h)(2)(iv) of this section, on a written statement attached to a timely U.S. income tax return (or an amended return) filed before the IRS first contacts any member of the controlled group concerning an examination of the return for the taxable year to which the foreign legal restriction applies. A written statement furnished by a taxpayer subject to the Coordinated Examination Program will be considered an amended return for purposes of this paragraph (h)(2)(iii)(B) if it satisfies the requirements of a qualified amended return for purposes of § 1.6664–2(c)(3) as set forth in those regulations or as the Commissioner may prescribe by applicable revenue procedures. The election statement must identify the affected transactions, the parties to the transactions, and the applicable foreign legal restrictions.

**(iv) Deferred income method of accounting.** If the requirements of paragraph (h)(2)(ii) of this section are satisfied, any portion of the arm's length amount, the payment or receipt of which is prevented because of applicable foreign legal restrictions, will be treated as deferrable until payment or receipt of the relevant item ceases to be prevented by the foreign legal restriction. For purposes of the deferred income method of accounting under this paragraph (h)(2)(iv), deductions (including the cost or other basis of inventory and other assets sold or exchanged) and credits properly chargeable against

any amount so deferred, are subject to deferral under the provisions of § 1.461–1(a)(4). In addition, income is deferrable under this deferred income method of accounting only to the extent that it exceeds the related deductions already claimed in open taxable years to which the foreign legal restriction applied.

**(v) Examples.** The following examples, in which Sub is a Country FC subsidiary of U.S. corporation, Parent, illustrate this paragraph (h)(2).

**Example 1.** Parent licenses an intangible to Sub. FC law generally prohibits payments by any person within FC to recipients outside the country. The FC law meets the requirements of paragraph (h)(2)(ii) of this section. There is no evidence of unrelated parties entering into transactions under comparable circumstances for a comparable period of time, and the foreign legal restrictions will not be taken into account in determining the arm's length amount. The arm's length royalty rate for the use of the intangible property in the absence of the foreign restriction is 10% of Sub's sales in country FC. However, because the requirements of paragraph (h)(2)(ii) of this section are satisfied, Parent can elect the deferred income method of accounting by attaching to its timely filed U.S. income tax return a written statement that satisfies the requirements of paragraph (h)(2)(iii)(B) of this section.

**Example 2.** (i) The facts are the same as in Example 1, except that Sub, although it makes no royalty payment to Parent, arranges with an unrelated intermediary to make payments equal to an arm's length amount on its behalf to Parent.

(ii) The district director makes an allocation of royalty income to Parent, based on the arm's length royalty rate of 10%. Further, the district director determines that because the arrangement with the third party had the effect of circumventing the FC law, the requirements of paragraph (h)(2)(ii)(D) of this section are not satisfied. Thus, Parent could not validly elect the deferred income method of accounting, and the allocation of royalty income cannot be treated as deferrable. In appropriate circumstances, the district director may permit the amount of the distribution to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**Example 3.** The facts are the same as in Example 1, except that the laws of FC do not prevent distributions from corporations to their shareholders. Sub distributes an amount equal to 8% of its sales in country FC. Because the laws of FC did not expressly prevent all forms of payment from Sub to Parent, Parent cannot validly elect the deferred income method of accounting with respect to any of the arm's length royalty amount. In appropriate circumstances, the district director may permit the 8% that was distributed to be treated as payment by Sub of the royalty allocated to Parent, under the provisions of § 1.482–1(g) (Collateral adjustments).

**Example 4.** The facts are the same as in Example 1, except that Country FC law permits the payment of a royalty, but limits the amount to 5% of sales, and Sub pays the 5% royalty to Parent. Parent demonstrates the existence of a comparable uncontrolled transaction for purposes of the comparable uncontrolled transaction method in which an uncontrolled party accepted a royalty rate of 5%. Given the evidence of the comparable uncontrolled transaction, the 5% royalty rate is determined to be the arm's length royalty rate.

**(3) Coordination with section 936--(i)** Cost sharing under section 936. If a possessions corporation makes an election under section 936(h)(5)(C)(i)(I), the corporation must make a section 936 cost sharing payment that is at least equal to the payment that would be required under section 482 if the electing corporation were a foreign corporation. In determining the payment that would be required under section 482 for this purpose, the provisions of §§ 1.482–1 and 1.482–4 will be applied, and to the extent relevant to the valuation of intangibles, §§ 1.482–5 and 1.482–6 will be applied. The provisions of section 936(h)(5)(C)(i)(II) (Effect of Election--electing corporation treated as owner of intangible property) do not apply until the payment that would be required under section 482 has been determined.

**(ii) Use of terms.** A cost sharing payment, for the purposes of section 936(h)(5)(C)(i)(I), is calculated using the provisions of section 936 and the regulations thereunder and the provisions of this paragraph (h)(3). The provisions relating to cost sharing under section 482 do not apply to payments made pursuant to an election under section 936(h)(5)(C)(i)(I). Similarly, a profit split payment, for the purposes of section 936(h)(5)(C)(ii)(I), is calculated using the provisions of section 936 and the regulations thereunder, not section 482 and the regulations thereunder.

**(i) Definitions.** The definitions set forth in paragraphs (i)(1) through (i)(10) of this section apply to this section and §§ 1.482–2 through 1.482–9.

**(1)** Organization includes an organization of any kind, whether a sole proprietorship, a partnership, a trust, an estate, an association, or a corporation (as each is defined or understood in the Internal Revenue Code or the regulations thereunder), irrespective of the place of organization, operation, or conduct of the trade or business, and regardless of whether it is a domestic or foreign organization, whether it is an exempt organization, or whether it is a member of an affiliated group that files a consolidated U.S. income tax return, or a member of an affiliated group that does not file a consolidated U.S. income tax return.

**(2)** Trade or business includes a trade or business activity of any kind, regardless of whether or where organized, whether owned individually or otherwise, and regardless of the place of operation. Employment for compensation will constitute a separate trade or business from the employing trade or business.

**(3)** Taxpayer means any person, organization, trade or business, whether or not subject to any internal revenue tax.

**(4)** Controlled includes any kind of control, direct or indirect, whether legally enforceable or not, and however exercisable or exercised, including control resulting from the actions of two or more taxpayers acting in concert or with a common goal or purpose. It is the reality of the control that is decisive, not its form or the mode of its exercise. A presumption of control arises if income or deductions have been arbitrarily shifted.

**(5)** Controlled taxpayer means any one of two or more taxpayers owned or controlled directly or indirectly by the same interests, and includes the taxpayer that owns or controls the other taxpayers. Uncontrolled taxpayer means any one of two or more taxpayers not owned or controlled directly or indirectly by the same interests.

**(6)** Group, controlled group, and group of controlled taxpayers mean the taxpayers owned or controlled directly or indirectly by the same interests.

**(7)** Transaction means any sale, assignment, lease, license, loan, advance, contribution, or any other transfer of any interest in or a right to use any property (whether tangible or intangible, real or personal) or money, however such transaction is effected, and whether or not the terms of such transaction are formally documented. A transaction also includes the performance of any services for the benefit of, or on behalf of, another taxpayer.

**(8)** Controlled transaction or controlled transfer means any transaction or transfer between two or more members of the same group of controlled taxpayers. The term uncontrolled transaction means any transaction between two or more taxpayers that are not members of the same group of controlled taxpayers.

**(9)** True taxable income means, in the case of a controlled taxpayer, the taxable income that would have resulted had it dealt with the other member or members of the group at arm's length. It does not mean the taxable income resulting to the controlled taxpayer by reason of the particular contract, transaction, or arrangement the controlled taxpayer chose to make (even though such contract, transaction, or arrangement is legally binding upon the parties thereto).

**(10)** Uncontrolled comparable means the uncontrolled transaction or uncontrolled taxpayer that is compared with a controlled transaction or taxpayer under any applicable pricing methodology. Thus, for example, under the comparable profits method, an uncontrolled comparable is any uncontrolled taxpayer from which data is used to establish a comparable operating profit.

**(j) Effective dates--(1)** The regulations in this are generally effective for taxable years beginning after October 6, 1994.

**(2)** Taxpayers may elect to apply retroactively all of the provisions of these regulations for any open taxable year. Such election will be effective for the year of the election and all subsequent taxable years.

**(3)** Although these regulations are generally effective for taxable years as stated, the final sentence of section 482 (requiring that the income with respect to transfers or licenses of intangible property be commensurate with the income attributable to the intangible) is generally effective for taxable years beginning after December 31, 1986. For the period prior to the effective date of these regulations, the final sentence of section 482 must be applied using any reasonable method not inconsistent with the statute. The IRS considers a method that applies these regulations or their general principles to be a reasonable method.

**(4)** These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985, or before August 17, 1986, for transfers or licenses to others. Nevertheless, they will apply with respect to transfers or licenses before such dates if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date.

**(5)** The last sentences of paragraphs (b)(2)(i) and (c)(1) of this section and of paragraph (c)(2)(iv) of § 1.482–5 apply for taxable years beginning on or after August 26, 2003.

**(6)(i)** The provisions of paragraphs (a)(1), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f) (2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section are generally applicable for taxable years beginning after July 31, 2009. The provision of paragraph (b)(2)(iii) of this section is generally applicable on January 5, 2009.

**(ii)** A person may elect to apply the provisions of paragraphs (a)(1), (b)(2)(i), (d)(3)(ii)(C) Example 3, Example 4, Example 5, and Example 6, (d)(3)(v), (f)(2)(ii)(A), (f)(2)(iii)(B), (g)(4)(i), (g)(4)(iii), and (i) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9(n)(2).

**Credits**

[T.D. 8552, 59 FR 34990, July 8, 1994; T.D. 9088, 68 FR 51177, Aug. 26, 2003; T.D. 9278, 71 FR 44481, Aug. 4, 2006; 71 FR 76903, Dec. 22, 2006; T.D. 9441, 74 FR 351, Jan. 5, 2009; T.D. 9456, 74 FR 38839, Aug. 4, 2009; 74 FR 46345, Sept. 9, 2009; T.D. 9568, 76 FR 80089, Dec. 22, 2011; 77 FR 3606, Jan. 25, 2012; 78 FR 18234, March 26, 2013]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960; T.D. 9660, 79 FR 13227, March 10, 2014, unless otherwise noted.

AUTHORITY: Sections 1.6055–1 and 1.6055–2 also issued under 26 U.S.C. 6055.

Notes of Decisions (134)

Current through April 24, 2014; 79 FR 22776

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

Code of Federal Regulations
Title 26. Internal Revenue
Chapter I. Internal Revenue Service, Department of the Treasury
Subchapter A. Income Tax
Part 1. Income Taxes (Refs & Annos)
Normal Taxes and Surtaxes
Deferred Compensation, Etc.
Methods of Accounting
Adjustments

26 C.F.R. § 1.482–3, Treas. Reg. § 1.482–3

§ 1.482–3 Methods to determine taxable income in connection with a transfer of tangible property.

Currentness

**(a) In general.** The arm's length amount charged in a controlled transfer of tangible property must be determined under one of the six methods listed in this paragraph (a). Each of the methods must be applied in accordance with all of the provisions of § 1.482–1, including the best method rule of § 1.482–1(c), the comparability analysis of § 1.482–1(d), and the arm's length range of § 1.482–1(e). The methods are--

**(1)** The comparable uncontrolled price method, described in paragraph (b) of this section;

**(2)** The resale price method, described in paragraph (c) of this section;

**(3)** The cost plus method, described in paragraph (d) of this section;

**(4)** The comparable profits method, described in § 1.482–5;

**(5)** The profit split method, described in § 1.482–6; and

**(6)** Unspecified methods, described in paragraph (e) of this section.

**(b) Comparable uncontrolled price method--(1) In general.** The comparable uncontrolled price method evaluates whether the amount charged in a controlled transaction is arm's length by reference to the amount charged in a comparable uncontrolled transaction.

**(2) Comparability and reliability considerations--(i) In general.** Whether results derived from applications of this method are the most reliable measure of the arm's length result must be determined using the factors described under the best method rule in § 1.482–1(c). The application of these factors under the comparable uncontrolled price method is discussed in paragraph (b)(2)(ii) and (iii) of this section.

**(ii) Comparability--**(A) In general. The degree of comparability between controlled and uncontrolled transactions is determined by applying the provisions of § 1.482–1(d). Although all of the factors described in § 1.482–1(d)(3) must be considered, similarity of products generally will have the greatest effect on comparability under this method. In addition, because even minor differences in contractual terms or economic conditions could materially affect the amount charged in an uncontrolled transaction, comparability under this method depends on close similarity with respect to these factors, or adjustments to account for any differences. The results derived from applying the comparable uncontrolled price method generally will be the most direct and reliable measure of an arm's length price for the controlled transaction if an uncontrolled transaction has no differences with the controlled transaction that would affect the price, or if there are only minor differences that have a definite and reasonably ascertainable effect on price and for which appropriate adjustments are made. If such adjustments cannot be made, or if there are more than minor differences between the controlled and uncontrolled transactions, the comparable uncontrolled price method may be used, but the reliability of the results as a measure of the arm's length price will be reduced. Further, if there are material product differences for which reliable adjustments cannot be made, this method ordinarily will not provide a reliable measure of an arm's length result.

(B) Adjustments for differences between controlled and uncontrolled transactions. If there are differences between the controlled and uncontrolled transactions that would affect price, adjustments should be made to the price of the uncontrolled transaction according to the comparability provisions of § 1.482–1(d)(2). Specific examples of the factors that may be particularly relevant to this method include--

(1) Quality of the product;

(2) Contractual terms (e.g., scope and terms of warranties provided, sales or purchase volume, credit terms, transport terms);

(3) Level of the market (i.e., wholesale, retail, etc.);

(4) Geographic market in which the transaction takes place;

(5) Date of the transaction;

(6) Intangible property associated with the sale;

(7) Foreign currency risks; and

(8) Alternatives realistically available to the buyer and seller.

**(iii) Data and assumptions.** The reliability of the results derived from the comparable uncontrolled price method is affected by the completeness and accuracy of the data used and the reliability of the assumptions made to apply the method. See § 1.482–1(c) (Best method rule).

**(3) Arm's length range.** See § 1.482–1(e)(2) for the determination of an arm's length range.

(4) **Examples.** The principles of this paragraph (b) are illustrated by the following examples.

**Example 1.** Comparable Sales of Same Product. USM, a U.S. manufacturer, sells the same product to both controlled and uncontrolled distributors. The circumstances surrounding the controlled and uncontrolled transactions are substantially the same, except that the controlled sales price is a delivered price and the uncontrolled sales are made f.o.b. USM's factory. Differences in the contractual terms of transportation and insurance generally have a definite and reasonably ascertainable effect on price, and adjustments are made to the results of the uncontrolled transaction to account for such differences. No other material difference has been identified between the controlled and uncontrolled transactions. Because USM sells in both the controlled and uncontrolled transactions, it is likely that all material differences between the two transactions have been identified. In addition, because the comparable uncontrolled price method is applied to an uncontrolled comparable with no product differences, and there are only minor contractual differences that have a definite and reasonably ascertainable effect on price, the results of this application of the comparable uncontrolled price method will provide the most direct and reliable measure of an arm's length result. See § 1.482–3(b)(2)(ii)(A).

**Example 2.** Effect of Trademark. The facts are the same as in Example 1, except that USM affixes its valuable trademark to the property sold in the controlled transactions, but does not affix its trademark to the property sold in the uncontrolled transactions. Under the facts of this case, the effect on price of the trademark is material and cannot be reliably estimated. Because there are material product differences for which reliable adjustments cannot be made, the comparable uncontrolled price method is unlikely to provide a reliable measure of the arm's length result. See § 1.482–3(b)(2)(ii)(A).

**Example 3.** Minor Product Differences. The facts are the same as in Example 1, except that USM, which manufactures business machines, makes minor modifications to the physical properties of the machines to satisfy specific requirements of a customer in controlled sales, but does not make these modifications in uncontrolled sales. If the minor physical differences in the product have a material effect on prices, adjustments to account for these differences must be made to the results of the uncontrolled transactions according to the provisions of § 1.482–1(d)(2), and such adjusted results may be used as a measure of the arm's length result.

**Example 4.** Effect of Geographic Differences. FM, a foreign specialty radio manufacturer, sells its radios to a controlled U.S. distributor, AM, that serves the West Coast of the United States. FM sells its radios to uncontrolled distributors to serve other regions in the United States. The product in the controlled and uncontrolled transactions is the same, and all other circumstances surrounding the controlled and uncontrolled transactions are substantially the same, other than the geographic differences. If the geographic differences are unlikely to have a material effect on price, or they have definite and reasonably ascertainable effects for which adjustments are made, then the adjusted results of the uncontrolled sales may be used under the comparable uncontrolled price method to establish an arm's length range pursuant to § 1.482–1(e)(2)(iii)(A). If the effects of the geographic differences would be material but cannot be reliably ascertained, then the reliability of the results will be diminished. However, the comparable uncontrolled price method may still provide the most reliable measure of an arm's length result, pursuant to the best method rule of § 1.482–1(c), and, if so, an arm's length range may be established pursuant to § 1.482–1(e)(2)(iii)(B).

(5) **Indirect evidence of comparable uncontrolled transactions--(i) In general.** A comparable uncontrolled price may be derived from data from public exchanges or quotation media, but only if the following requirements are met--

(A) The data is widely and routinely used in the ordinary course of business in the industry to negotiate prices for uncontrolled sales;

(B) The data derived from public exchanges or quotation media is used to set prices in the controlled transaction in the same way it is used by uncontrolled taxpayers in the industry; and

(C) The amount charged in the controlled transaction is adjusted to reflect differences in product quality and quantity, contractual terms, transportation costs, market conditions, risks borne, and other factors that affect the price that would be agreed to by uncontrolled taxpayers.

(ii) **Limitation.** Use of data from public exchanges or quotation media may not be appropriate under extraordinary market conditions.

(iii) **Examples.** The following examples illustrate this paragraph (b)(5).

**Example 1.** Use of Quotation Medium. (i) On June 1, USOil, a United States corporation, enters into a contract to purchase crude oil from its foreign subsidiary, FS, in Country Z. USOil and FS agree to base their sales price on the average of the prices published for that crude in a quotation medium in the five days before August 1, the date set for delivery. USOil and FS agree to adjust the price for the particular circumstances of their transactions, including the quantity of the crude sold, contractual terms, transportation costs, risks borne, and other factors that affect the price.

(ii) The quotation medium used by USOil and FS is widely and routinely used in the ordinary course of business in the industry to establish prices for uncontrolled sales. Because USOil and FS use the data to set their sales price in the same way that unrelated parties use the data from the quotation medium to set their sales prices, and appropriate adjustments were made to account for differences, the price derived from the quotation medium used by USOil and FS to set their transfer prices will be considered evidence of a comparable uncontrolled price.

**Example 2.** Extraordinary Market Conditions. The facts are the same as in Example 1, except that before USOil and FS enter into their contract, war breaks out in Countries X and Y, major oil producing countries, causing significant instability in world petroleum markets. As a result, given the significant instability in the price of oil, the prices listed on the quotation medium may not reflect a reliable measure of an arm's length result. See § 1.482–3(b)(5)(ii).

(c) **Resale price method--(1) In general.** The resale price method evaluates whether the amount charged in a controlled transaction is arm's length by reference to the gross profit margin realized in comparable uncontrolled transactions. The resale price method measures the value of functions performed, and is ordinarily used in cases involving the purchase and resale of tangible property in which the reseller has not added substantial value to the tangible goods by physically altering the goods before resale. For this purpose, packaging, repackaging, labelling, or minor assembly do not ordinarily constitute physical alteration. Further the resale price method is not ordinarily used in cases where the controlled taxpayer uses its intangible property to add substantial value to the tangible goods.

(2) **Determination of arm's length price--(i) In general.** The resale price method measures an arm's length price by subtracting the appropriate gross profit from the applicable resale price for the property involved in the controlled transaction under review.

(ii) **Applicable resale price.** The applicable resale price is equal to either the resale price of the particular item of property involved or the price at which contemporaneous resales of the same property are made. If the property purchased in the controlled sale is resold to one or more related parties in a series of controlled sales before being resold in an uncontrolled

sale, the applicable resale price is the price at which the property is resold to an uncontrolled party, or the price at which contemporaneous resales of the same property are made. In such case, the determination of the appropriate gross profit will take into account the functions of all members of the group participating in the series of controlled sales and final uncontrolled resales, as well as any other relevant factors described in § 1.482–1(d)(3).

**(iii) Appropriate gross profit.** The appropriate gross profit is computed by multiplying the applicable resale price by the gross profit margin (expressed as a percentage of total revenue derived from sales) earned in comparable uncontrolled transactions.

**(iv) Arm's length range.** See § 1.482–1(e)(2) for determination of the arm's length range.

**(3) Comparability and reliability considerations--(i) In general.** Whether results derived from applications of this method are the most reliable measure of the arm's length result must be determined using the factors described under the best method rule in § 1.482–1(c). The application of these factors under the resale price method is discussed in paragraphs (c)(3) (ii) and (iii) of this section.

**(ii) Comparability--**(A) Functional comparability. The degree of comparability between an uncontrolled transaction and a controlled transaction is determined by applying the comparability provisions of § 1.482–1(d). A reseller's gross profit provides compensation for the performance of resale functions related to the product or products under review, including an operating profit in return for the reseller's investment of capital and the assumption of risks. Therefore, although all of the factors described in § 1.482–1(d)(3) must be considered, comparability under this method is particularly dependent on similarity of functions performed, risks borne, and contractual terms, or adjustments to account for the effects of any such differences. If possible, appropriate gross profit margins should be derived from comparable uncontrolled purchases and resales of the reseller involved in the controlled sale, because similar characteristics are more likely to be found among different resales of property made by the same reseller than among sales made by other resellers. In the absence of comparable uncontrolled transactions involving the same reseller, an appropriate gross profit margin may be derived from comparable uncontrolled transactions of other resellers.

(B) Other comparability factors. Comparability under this method is less dependent on close physical similarity between the products transferred than under the comparable uncontrolled price method. For example, distributors of a wide variety of consumer durables might perform comparable distribution functions without regard to the specific durable goods distributed. Substantial differences in the products may, however, indicate significant functional differences between the controlled and uncontrolled taxpayers. Thus, it ordinarily would be expected that the controlled and uncontrolled transactions would involve the distribution of products of the same general type (e.g., consumer electronics). Furthermore, significant differences in the value of the distributed goods due, for example, to the value of a trademark, may also affect the reliability of the comparison. Finally, the reliability of profit measures based on gross profit may be adversely affected by factors that have less effect on prices. For example, gross profit may be affected by a variety of other factors, including cost structures (as reflected, for example, in the age of plant and equipment), business experience (such as whether the business is in a start-up phase or is mature), or management efficiency (as indicated, for example, by expanding or contracting sales or executive compensation over time). Accordingly, if material differences in these factors are identified based on objective evidence, the reliability of the analysis may be affected.

(C) Adjustments for differences between controlled and uncontrolled transactions. If there are material differences between the controlled and uncontrolled transactions that would affect the gross profit margin, adjustments should

be made to the gross profit margin earned with respect to the uncontrolled transaction according to the comparability provisions of § 1.482–1(d)(2). For this purpose, consideration of operating expenses associated with functions performed and risks assumed may be necessary, because differences in functions performed are often reflected in operating expenses. If there are differences in functions performed, however, the effect on gross profit of such differences is not necessarily equal to the differences in the amount of related operating expenses. Specific examples of the factors that may be particularly relevant to this method include--

(1) Inventory levels and turnover rates, and corresponding risks, including any price protection programs offered by the manufacturer;

(2) Contractual terms (e.g., scope and terms of warranties provided, sales or purchase volume, credit terms, transport terms);

(3) Sales, marketing, advertising programs and services, (including promotional programs, rebates, and co-op advertising);

(4) The level of the market (e.g., wholesale, retail, etc.); and

(5) Foreign currency risks.

(D) Sales agent. If the controlled taxpayer is comparable to a sales agent that does not take title to goods or otherwise assume risks with respect to ownership of such goods, the commission earned by such sales agent, expressed as a percentage of the uncontrolled sales price of the goods involved, may be used as the comparable gross profit margin.

**(iii) Data and assumptions--**(A) In general. The reliability of the results derived from the resale price method is affected by the completeness and accuracy of the data used and the reliability of the assumptions made to apply this method. See § 1.482–1(c) (Best method rule).

(B) Consistency in accounting. The degree of consistency in accounting practices between the controlled transaction and the uncontrolled comparables that materially affect the gross profit margin affects the reliability of the result. Thus, for example, if differences in inventory and other cost accounting practices would materially affect the gross profit margin, the ability to make reliable adjustments for such differences would affect the reliability of the results. Further, the controlled transaction and the uncontrolled comparable should be consistent in the reporting of items (such as discounts, returns and allowances, rebates, transportation costs, insurance, and packaging) between cost of goods sold and operating expenses.

**(4) Examples.** The following examples illustrate the principles of this paragraph (c).

**Example 1.** A controlled taxpayer sells property to another member of its controlled group that resells the property in uncontrolled sales. There are no changes in the beginning and ending inventory for the year under review. Information regarding an uncontrolled comparable is sufficiently complete to conclude that it is likely that all material differences between the controlled and uncontrolled transactions have been identified and adjusted for. If the applicable resale price of the property

involved in the controlled sale is $100 and the appropriate gross profit margin is 20%, then an arm's length result of the controlled sale is a price of $80 ($100 minus (20% x $100)).

**Example 2.** (i) S, a U.S. corporation, is the exclusive distributor for FP, its foreign parent. There are no changes in the beginning and ending inventory for the year under review. S's total reported cost of goods sold is $800, consisting of $600 for property purchased from FP and $200 of other costs of goods sold incurred to unrelated parties. S's applicable resale price and reported gross profit are as follows:

| | |
|---|---|
| Applicable resale price...................................................................................................................... | $1000 |
| Cost of goods sold: | |
| Cost of purchases from FP..................................................................................... | 600 |
| Costs incurred to unrelated parties........................................................................ | 200 |
| Reported gross profit........................................................................................................................ | 200 |

(ii) The district director determines that the appropriate gross profit margin is 25%. Therefore, S's appropriate gross profit is $250 (i.e., 25% of the applicable resale price of $1000). Because S is incurring costs of sales to unrelated parties, an arm's length price for property purchased from FP must be determined under a two-step process. First, the appropriate gross profit ($250) is subtracted from the applicable resale price ($1000). The resulting amount ($750) is then reduced by the costs of sales incurred to unrelated parties ($200). Therefore, an arm's length price for S's cost of sales of FP's product in this case equals $550 (i.e., $750 minus $200).

**Example 3.** FP, a foreign manufacturer, sells Product to USSub, its U.S. subsidiary, which in turn sells Product to its domestic affiliate Sister. Sister sells Product to unrelated buyers. In this case, the applicable resale price is the price at which Sister sells Product in uncontrolled transactions. The determination of the appropriate gross profit margin for the sale from FP to USSub will take into account the functions performed by USSub and Sister, as well as other relevant factors described in § 1.482–1(d)(3).

**Example 4.** USSub, a U.S. corporation, is the exclusive distributor of widgets for its foreign parent. To determine whether the gross profit margin of 25% earned by USSub is an arm's length result, the district director considers applying the resale price method. There are several uncontrolled distributors that perform similar functions under similar circumstances in uncontrolled transactions. However, the uncontrolled distributors treat certain costs such as discounts and insurance as cost of goods sold, while USSub treats such costs as operating expenses. In such cases, accounting reclassifications, pursuant to § 1.482–3(c)(3)(iii)(B), must be made to ensure consistent treatment of such material items. Inability to make such accounting reclassifications will decrease the reliability of the results of the uncontrolled transactions.

**Example 5.** (i) USP, a U.S. corporation, manufactures Product X, an unbranded widget, and sells it to FSub, its wholly owned foreign subsidiary. FSub acts as a distributor of Product X in country M, and sells it to uncontrolled parties in that country. Uncontrolled distributors A, B, C, D, and E distribute competing products of approximately similar value in country M. All such products are unbranded.

(ii) Relatively complete data is available regarding the functions performed and risks borne by the uncontrolled distributors and the contractual terms under which they operate in the uncontrolled transactions. In addition, data is available to ensure accounting consistency between all of the uncontrolled distributors and FSub. Because the available data is sufficiently complete and accurate to conclude that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, such differences have a definite and reasonably ascertainable effect, and reliable adjustments are made to account for such differences, the results of each of the uncontrolled distributors may be used to establish an arm's length range pursuant to § 1.482–1(e)(2)(iii)(A).

**Example 6.** The facts are the same as Example 5, except that sufficient data is not available to determine whether any of the uncontrolled distributors provide warranties or to determine the payment terms of the contracts. Because differences in these contractual terms could materially affect price or profits, the inability to determine whether these differences exist between the controlled and uncontrolled transactions diminishes the reliability of the results of the uncontrolled comparables. However, the reliability of the results may be enhanced by the application of a statistical method when establishing an arm's length range pursuant to § 1.482–1(e)(2)(iii)(B).

**Example 7.** The facts are the same as in Example 5, except that Product X is branded with a valuable trademark that is owned by P. A, B, and C distribute unbranded competing products, while D and E distribute products branded with other trademarks. D and E do not own any rights in the trademarks under which their products are sold. The value of the products that A, B, and C sold are not similar to the value of the products sold by S. The value of products sold by D and E, however, is similar to that of Product X. Although close product similarity is not as important for a reliable application of the resale price method as for the comparable uncontrolled price method, significant differences in the value of the products involved in the controlled and uncontrolled transactions may affect the reliability of the results. In addition, because in this case it is difficult to determine the effect the trademark will have on price or profits, reliable adjustments for the differences cannot be made. Because D and E have a higher level of comparability than A, B, and C with respect to S, pursuant to § 1.482–1(e)(2)(ii), only D and E may be included in an arm's length range.

**(d) Cost plus method--(1) In general.** The cost plus method evaluates whether the amount charged in a controlled transaction is arm's length by reference to the gross profit markup realized in comparable uncontrolled transactions. The cost plus method is ordinarily used in cases involving the manufacture, assembly, or other production of goods that are sold to related parties.

**(2) Determination of arm's length price--(i) In general.** The cost plus method measures an arm's length price by adding the appropriate gross profit to the controlled taxpayer's costs of producing the property involved in the controlled transaction.

**(ii) Appropriate gross profit.** The appropriate gross profit is computed by multiplying the controlled taxpayer's cost of producing the transferred property by the gross profit markup, expressed as a percentage of cost, earned in comparable uncontrolled transactions.

**(iii) Arm's length range.** See § 1.482–1(e)(2) for determination of an arm's length range.

**(3) Comparability and reliability considerations--(i) In general.** Whether results derived from the application of this method are the most reliable measure of the arm's length result must be determined using the factors described under the best method rule in § 1.482–1(c).

**(ii) Comparability--**(A) Functional comparability. The degree of comparability between controlled and uncontrolled transactions is determined by applying the comparability provisions of § 1.482–1(d). A producer's gross profit provides compensation for the performance of the production functions related to the product or products under review, including an operating profit for the producer's investment of capital and assumption of risks. Therefore, although all of the factors described in § 1.482–1(d)(3) must be considered, comparability under this method is particularly dependent on similarity of functions performed, risks borne, and contractual terms, or adjustments to account for the effects of any such differences. If possible, the appropriate gross profit markup should be derived from comparable uncontrolled transactions of the taxpayer involved in the controlled sale, because similar characteristics are more likely to be found among sales of property by

the same producer than among sales by other producers. In the absence of such sales, an appropriate gross profit markup may be derived from comparable uncontrolled sales of other producers whether or not such producers are members of the same controlled group.

(B) Other comparability factors. Comparability under this method is less dependent on close physical similarity between the products transferred than under the comparable uncontrolled price method. Substantial differences in the products may, however, indicate significant functional differences between the controlled and uncontrolled taxpayers. Thus, it ordinarily would be expected that the controlled and uncontrolled transactions involve the production of goods within the same product categories. Furthermore, significant differences in the value of the products due, for example, to the value of a trademark, may also affect the reliability of the comparison. Finally, the reliability of profit measures based on gross profit may be adversely affected by factors that have less effect on prices. For example, gross profit may be affected by a variety of other factors, including cost structures (as reflected, for example, in the age of plant and equipment), business experience (such as whether the business is in a start-up phase or is mature), or management efficiency (as indicated, for example, by expanding or contracting sales or executive compensation over time). Accordingly, if material differences in these factors are identified based on objective evidence, the reliability of the analysis may be affected.

(C) Adjustments for differences between controlled and uncontrolled transactions. If there are material differences between the controlled and uncontrolled transactions that would affect the gross profit markup, adjustments should be made to the gross profit markup earned in the comparable uncontrolled transaction according to the provisions of § 1.482–1(d)(2). For this purpose, consideration of the operating expenses associated with the functions performed and risks assumed may be necessary, because differences in functions performed are often reflected in operating expenses. If there are differences in functions performed, however, the effect on gross profit of such differences is not necessarily equal to the differences in the amount of related operating expenses. Specific examples of the factors that may be particularly relevant to this method include--

(1) The complexity of manufacturing or assembly;

(2) Manufacturing, production, and process engineering;

(3) Procurement, purchasing, and inventory control activities;

(4) Testing functions;

(5) Selling, general, and administrative expenses;

(6) Foreign currency risks; and

(7) Contractual terms (e.g., scope and terms of warranties provided, sales or purchase volume, credit terms, transport terms).

(D) Purchasing agent. If a controlled taxpayer is comparable to a purchasing agent that does not take title to property or otherwise assume risks with respect to ownership of such goods, the commission earned by such purchasing agent, expressed as a percentage of the purchase price of the goods, may be used as the appropriate gross profit markup.

**(iii) Data and assumptions**--(A) In general. The reliability of the results derived from the cost plus method is affected by the completeness and accuracy of the data used and the reliability of the assumptions made to apply this method. See § 1.482–1(c) (Best method rule).

(B) Consistency in accounting. The degree of consistency in accounting practices between the controlled transaction and the uncontrolled comparables that materially affect the gross profit markup affects the reliability of the result. Thus, for example, if differences in inventory and other cost accounting practices would materially affect the gross profit markup, the ability to make reliable adjustments for such differences would affect the reliability of the results. Further, the controlled transaction and the comparable uncontrolled transaction should be consistent in the reporting of costs between cost of goods sold and operating expenses. The term cost of producing includes the cost of acquiring property that is held for resale.

**(4) Examples.** The following examples illustrate the principles of this paragraph (d).

**Example 1.** (i) USP, a domestic manufacturer of computer components, sells its products to FS, its foreign distributor. UT1, UT2, and UT3 are domestic computer component manufacturers that sell to uncontrolled foreign purchasers.

(ii) Relatively complete data is available regarding the functions performed and risks borne by UT1, UT2, and UT3, and the contractual terms in the uncontrolled transactions. In addition, data is available to ensure accounting consistency between all of the uncontrolled manufacturers and USP. Because the available data is sufficiently complete to conclude that it is likely that all material differences between the controlled and uncontrolled transactions have been identified, the effect of the differences are definite and reasonably ascertainable, and reliable adjustments are made to account for the differences, an arm's length range can be established pursuant to § 1.482–1(e)(2)(iii)(A).

**Example 2.** The facts are the same as in Example 1, except that USP accounts for supervisory, general, and administrative costs as operating expenses, which are not allocated to its sales to FS. The gross profit markups of UT1, UT2, and UT3, however, reflect supervisory, general, and administrative expenses because they are accounted for as costs of goods sold. Accordingly, the gross profit markups of UT1, UT2, and UT3 must be adjusted as provided in paragraph (d)(3)(iii)(B) of this section to provide accounting consistency. If data is not sufficient to determine whether such accounting differences exist between the controlled and uncontrolled transactions, the reliability of the results will be decreased.

**Example 3.** The facts are the same as in Example 1, except that under its contract with FS, USP uses materials consigned by FS. UT1, UT2, and UT3, on the other hand, purchase their own materials, and their gross profit markups are determined by including the costs of materials. The fact that USP does not carry an inventory risk by purchasing its own materials while the uncontrolled producers carry inventory is a significant difference that may require an adjustment if the difference has a material effect on the gross profit markups of the uncontrolled producers. Inability to reasonably ascertain the effect of the difference on the gross profit markups will affect the reliability of the results of UT1, UT2, and UT3.

**Example 4.** (i) FS, a foreign corporation, produces apparel for USP, its U.S. parent corporation. FS purchases its materials from unrelated suppliers and produces the apparel according to designs provided by USP. The district director identifies 10 uncontrolled foreign apparel producers that operate in the same geographic market and are similar in many respect to FS.

(ii) Relatively complete data is available regarding the functions performed and risks borne by the uncontrolled producers. In addition, data is sufficiently detailed to permit adjustments for differences in accounting practices. However, sufficient data is not available to determine whether it is likely that all material differences in contractual terms have been identified. For example, it is not possible to determine which parties in the uncontrolled transactions bear currency risks. Because differences in these contractual terms could materially affect price or profits, the inability to determine whether differences exist between the controlled and uncontrolled transactions will diminish the reliability of these results. Therefore, the reliability of the results of the uncontrolled transactions must be enhanced by the application of a statistical method in establishing an arm's length range pursuant to § 1.482–1(e)(2)(iii)(B).

**(e) Unspecified methods--(1) In general.** Methods not specified in paragraphs (a)(1), (2), (3), (4), and (5) of this section may be used to evaluate whether the amount charged in a controlled transaction is arm's length. Any method used under this paragraph (e) must be applied in accordance with the provisions of § 1.482–1. Consistent with the specified methods, an unspecified method should take into account the general principle that uncontrolled taxpayers evaluate the terms of a transaction by considering the realistic alternatives to that transaction, and only enter into a particular transaction if none of the alternatives is preferable to it. For example, the comparable uncontrolled price method compares a controlled transaction to similar uncontrolled transactions to provide a direct estimate of the price to which the parties would have agreed had they resorted directly to a market alternative to the controlled transaction. Therefore, in establishing whether a controlled transaction achieved an arm's length result, an unspecified method should provide information on the prices or profits that the controlled taxpayer could have realized by choosing a realistic alternative to the controlled transaction. As with any method, an unspecified method will not be applied unless it provides the most reliable measure of an arm's length result under the principles of the best method rule. See § 1.482–1(c). Therefore, in accordance with § 1.482–1(d) (Comparability), to the extent that a method relies on internal data rather than uncontrolled comparables, its reliability will be reduced. Similarly, the reliability of a method will be affected by the reliability of the data and assumptions used to apply the method, including any projections used.

**(2) Example.** The following example illustrates an application of the principle of this paragraph (e).

**Example.** Amcan, a U.S. company, produces unique vessels for storing and transporting toxic waste, toxicans, at its U.S. production facility. Amcan agrees by contract to supply its Canadian subsidiary, Cancan, with 4000 toxicans per year to serve the Canadian market for toxicans. Prior to entering into the contract with Cancan, Amcan had received a bona fide offer from an independent Canadian waste disposal company, Cando, to serve as the Canadian distributor for toxicans and to purchase a similar number of toxicans at a price of $5,000 each. If the circumstances and terms of the Cancan supply contract are sufficiently similar to those of the Cando offer, or sufficiently reliable adjustments can be made for differences between them, then the Cando offer price of $5,000 may provide reliable information indicating that an arm's length consideration under the Cancan contract will not be less than $5,000 per toxican.

**(f) Coordination with intangible property rules.** The value of an item of tangible property may be affected by the value of intangible property, such as a trademark affixed to the tangible property (embedded intangible). Ordinarily, the transfer of tangible property with an embedded intangible will not be considered a transfer of such intangible if the controlled purchaser does not acquire any rights to exploit the intangible property other than rights relating to the resale of the tangible property under normal commercial practices. Pursuant to § 1.482–1(d)(3)(v), however, the embedded intangible must be accounted for in evaluating the comparability of the controlled transaction and uncontrolled comparables. For example, because product comparability has the greatest effect on an application of the comparable uncontrolled price method, trademarked tangible property may be insufficiently comparable to unbranded tangible property to permit a reliable application of the comparable uncontrolled price method. The effect of embedded intangibles on comparability will be determined under the principles of § 1.482–4. If the transfer of tangible property conveys to the recipient a right to exploit an embedded intangible (other than in connection with the resale of that item of tangible property), it may be necessary to determine the arm's length consideration for such intangible separately from the tangible property, applying methods appropriate to determining the arm's length result

for a transfer of intangible property under § 1.482–4. For example, if the transfer of a machine conveys the right to exploit a manufacturing process incorporated in the machine, then the arm's length consideration for the transfer of that right must be determined separately under § 1.482–4.

**Credits**

[T.D. 8552, 59 FR 35011, July 8, 1994; 60 FR 16382, March 30, 1995]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960; T.D. 9660, 79 FR 13227, March 10, 2014, unless otherwise noted.

AUTHORITY: Sections 1.6055–1 and 1.6055–2 also issued under 26 U.S.C. 6055.

Notes of Decisions (23)

Current through April 24, 2014; 79 FR 22776

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 3

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter A. Income Tax
        Part 1. Income Taxes (Refs & Annos)
          Procedure and Administration
            Additions to the Tax, Additional Amounts, and Assessable Penalties

26 C.F.R. § 1.6662–6, Treas. Reg. § 1.6662–6

§ 1.6662–6 Transactions between persons described in
section 482 and net section 482 transfer price adjustments.

Effective: December 22, 2011

Currentness

<Text of section amended by 76 FR 80136, retroactively effective Dec. 16, 2011.>

**(a) In general--(1) Purpose and scope.** Pursuant to section 6662(e) a penalty is imposed on any underpayment attributable to a substantial valuation misstatement pertaining to either a transaction between persons described in section 482 (the transactional penalty) or a net section 482 transfer price adjustment (the net adjustment penalty). The penalty is equal to 20 percent of the underpayment of tax attributable to that substantial valuation misstatement. Pursuant to section 6662(h) the penalty is increased to 40 percent of the underpayment in the case of a gross valuation misstatement with respect to either penalty. Paragraph (b) of this section provides specific rules related to the transactional penalty. Paragraph (c) of this section provides specific rules related to the net adjustment penalty, and paragraph (d) of this section describes amounts that will be excluded for purposes of calculating the net adjustment penalty. Paragraph (e) of this section sets forth special rules in the case of carrybacks and carryovers. Paragraph (f) of this section provides coordination rules between penalties. Paragraph (g) of this section provides the effective date of this section.

**(2) Reported results.** Whether an underpayment is attributable to a substantial or gross valuation misstatement must be determined from the results of controlled transactions that are reported on an income tax return, regardless of whether the amount reported differs from the transaction price initially reflected in the taxpayer's books and records. The results of controlled transactions that are reported on an amended return will be used only if the amended return is filed before the Internal Revenue Service has contacted the taxpayer regarding the corresponding original return. A written statement furnished by a taxpayer subject to the Coordinated Examination Program or a written statement furnished by the taxpayer when electing Accelerated Issue Resolution or similar procedures will be considered an amended return for purposes of this section if it satisfies either the requirements of a qualified amended return for purposes of § 1.6664–2(c)(3) or such requirements as the Commissioner may prescribe by revenue procedure. In the case of a taxpayer that is a member of a consolidated group, the rules of this paragraph (a)(2) apply to the consolidated income tax return of the group.

**(3) Identical terms used in the section 482 regulations.** For purposes of this section, the terms used in this section shall have the same meaning as identical terms used in regulations under section 482.

**(b) The transactional penalty--(1) Substantial valuation misstatement.** In the case of any transaction between related persons, there is a substantial valuation misstatement if the price for any property or services (or for the use of property) claimed on any return is 200 percent or more (or 50 percent or less) of the amount determined under section 482 to be the correct price.

**(2) Gross valuation misstatement.** In the case of any transaction between related persons, there is a gross valuation misstatement if the price for any property or services (or for the use of property) claimed on any return is 400 percent or more (or 25 percent or less) of the amount determined under section 482 to be the correct price.

**(3) Reasonable cause and good faith.** Pursuant to section 6664(c), the transactional penalty will not be imposed on any portion of an underpayment with respect to which the requirements of § 1.6664–4 are met. In applying the provisions of § 1.6664–4 in a case in which the taxpayer has relied on professional analysis in determining its transfer pricing, whether the professional is an employee of, or related to, the taxpayer is not determinative in evaluating whether the taxpayer reasonably relied in good faith on advice. A taxpayer that meets the requirements of paragraph (d) of this section with respect to an allocation under section 482 will be treated as having established that there was reasonable cause and good faith with respect to that item for purposes of § 1.6664–4. If a substantial or gross valuation misstatement under the transactional penalty also constitutes (or is part of) a substantial or gross valuation misstatement under the net adjustment penalty, then the rules of paragraph (d) of this section (and not the rules of § 1.6664–4) will be applied to determine whether the adjustment is excluded from calculation of the net section 482 adjustment.

**(c) Net adjustment penalty--(1) Net section 482 adjustment.** For purposes of this section, the term net section 482 adjustment means the sum of all increases in the taxable income of a taxpayer for a taxable year resulting from allocations under section 482 (determined without regard to any amount carried to such taxable year from another taxable year) less any decreases in taxable income attributable to collateral adjustments as described in § 1.482–1(g). For purposes of this section, amounts that meet the requirements of paragraph (d) of this section will be excluded from the calculation of the net section 482 adjustment. Substantial and gross valuation misstatements that are subject to the transactional penalty under paragraph (b)(1) or (2) of this section are included in determining the amount of the net section 482 adjustment. See paragraph (f) of this section for coordination rules between penalties.

**(2) Substantial valuation misstatement.** There is a substantial valuation misstatement if a net section 482 adjustment is greater than the lesser of 5 million dollars or ten percent of gross receipts.

**(3) Gross valuation misstatement.** There is a gross valuation misstatement if a net section 482 adjustment is greater than the lesser of 20 million dollars or twenty percent of gross receipts.

**(4) Setoff allocation rule.** If a taxpayer meets the requirements of paragraph (d) of this section with respect to some, but not all of the allocations made under section 482, then for purposes of determining the net section 482 adjustment, setoffs, as taken into account under § 1.482–1(g)(4), must be applied ratably against all such allocations. The following example illustrates the principle of this paragraph (c)(4):

**Example.** (i) The Internal Revenue Service makes the following section 482 adjustments for the taxable year:

| | | |
|---|---|---|
| (1) | Attributable to an increase in gross income because of an increase in royalty payments..... | $9,000,000 |

| (2) | Attributable to an increase in sales proceeds due to a decrease in the profit margin of a related buyer...................................................................................... | 6,000,000 |
| (3) | Because of a setoff under § 1.482–1(g)(4)....................................................... | (5,000,000) |
| | Total section 482 adjustments...................................................................... | 10,000,000 |

(ii) The taxpayer meets the requirements of paragraph (d) with respect to adjustment number one, but not with respect to adjustment number two. The five million dollar setoff will be allocated ratably against the nine million dollar adjustment ($9,000,000/$15,000,000 x $5,000,000 = $3,000,000) and the six million dollar adjustment ($6,000,000/$15,000,000 x $5,000,000 = $2,000,000). Accordingly, in determining the net section 482 adjustment, the nine million dollar adjustment is reduced to six million dollars ($9,000,000 - $3,000,000) and the six million dollar adjustment is reduced to four million dollars ($6,000,000 - $2,000,000). Therefore, the net section 482 adjustment equals four million dollars.

**(5) Gross receipts.** For purposes of this section, gross receipts must be computed pursuant to the rules contained in § 1.448–1T(f)(2)(iv), as adjusted to reflect allocations under section 482.

**(6) Coordination with reasonable cause exception under section 6664(c).** Pursuant to section 6662(e)(3)(D), a taxpayer will be treated as having reasonable cause under section 6664(c) for any portion of an underpayment attributable to a net section 482 adjustment only if the taxpayer meets the requirements of paragraph (d) of this section with respect to that portion.

**(7) Examples.** The principles of this paragraph (c) are illustrated by the following examples:

Example 1. (i) The Internal Revenue Service makes the following section 482 adjustments for the taxable year:

| (1) | Attributable to an increase in gross income because of an increase in royalty payments..... | $2,000,000 |
| (2) | Attributable to an increase in sales proceeds due to a decrease in the profit margin of a related buyer.................................................................................... | 2,500,000 |
| (3) | Attributable to a decrease in the cost of goods sold because of a decrease in the cost plus mark-up of a related seller........................................................................... | 2,000,000 |
| | Total section 482 adjustments...................................................................... | 6,500,000 |

(ii) None of the adjustments are excluded under paragraph (d) of this section. The net section 482 adjustment ($6.5 million) is greater than five million dollars. Therefore, there is a substantial valuation misstatement.

Example 2. (i) The Internal Revenue Service makes the following section 482 adjustments for the taxable year:

| (1) | Attributable to an increase in gross income because of an increase in royalty payments..... | $11,000,000 |
| (2) | Attributable to an increase in sales proceeds due to a decrease in the profit margin of a related buyer.................................................................................... | 2,000,000 |
| (3) | Because of a setoff under § 1.482–1(g)(4)....................................................... | (9,000,000) |
| | Total section 482 adjustments...................................................................... | 4,000,000 |

(ii) The taxpayer has gross receipts of sixty million dollars after taking into account all section 482 adjustments. None of the adjustments are excluded under paragraph (d) of this section. The net section 482 adjustment ($4 million) is less than the lesser of five million dollars or ten percent of gross receipts ($60 million x 10% = $6 million). Therefore, there is no substantial valuation misstatement.

**Example 3.** (i) The Internal Revenue Service makes the following section 482 adjustments to the income of an affiliated group that files a consolidated return for the taxable year:

| | | |
|---|---|---:|
| (1) | Attributable to Member A...................................................................................... | $1,500,000 |
| (2) | Attributable to Member B...................................................................................... | 1,000,000 |
| (3) | Attributable to Member C...................................................................................... | 2,000,000 |
| | Total section 482 adjustments............................................................... | 4,500,000 |

(ii) Members A, B, and C have gross receipts of 20 million dollars, 12 million dollars, and 11 million dollars, respectively. Thus, the total gross receipts are 43 million dollars. None of the adjustments are excluded under paragraph (d) of this section. The net section 482 adjustment ($4.5 million) is greater than the lesser of five million dollars or ten percent of gross receipts ($43 million x 10% = $4.3 million). Therefore, there is a substantial valuation misstatement.

**Example 4.** (i) The Internal Revenue Service makes the following section 482 adjustments to the income of an affiliated group that files a consolidated return for the taxable year:

| | | |
|---|---|---:|
| (1) | Attributable to Member A...................................................................................... | $1,500,000 |
| (2) | Attributable to Member B...................................................................................... | 3,000,000 |
| (3) | Attributable to Member C...................................................................................... | 2,500,000 |
| | Total section 482 adjustments............................................................... | 7,000,000 |

(ii) Members A, B, and C have gross receipts of 20 million dollars, 35 million dollars, and 40 million dollars, respectively. Thus, the total gross receipts are 95 million dollars. None of the adjustments are excluded under paragraph (d) of this section. The net section 482 adjustment (7 million dollars) is greater than the lesser of five million dollars or ten percent of gross receipts ($95 million x 10% = $9.5 million). Therefore, there is a substantial valuation misstatement.

**Example 5.** (i) The Internal Revenue Service makes the following section 482 adjustments to the income of an affiliated group that files a consolidated return for the taxable year:

| | | |
|---|---|---:|
| (1) | Attributable to Member A...................................................................................... | $2,000,000 |
| (2) | Attributable to Member B...................................................................................... | 1,000,000 |
| (3) | Attributable to Member C...................................................................................... | 1,500,000 |
| | Total section 482 adjustments............................................................... | 4,500,000 |

(ii) Members A, B, and C have gross receipts of 10 million dollars, 35 million dollars, and 40 million dollars, respectively. Thus, the total gross receipts are 85 million dollars. None of the adjustments are excluded under paragraph (d) of this section. The net section 482 adjustment ($4.5 million) is less than the lesser of five million dollars or ten percent of gross receipts ($85 million x 10% = $8.5 million). Therefore, there is no substantial valuation misstatement even though individual member A's adjustment ($2 million) is greater than ten percent of its individual gross receipts ($10 million x 10% = $1 million).

**(d) Amounts excluded from net section 482 adjustments--(1) In general.** An amount is excluded from the calculation of a net section 482 adjustment if the requirements of paragraph (d)(2), (3), or (4) of this section are met with respect to that amount.

**(2) Application of a specified section 482 method--(i) In general.** An amount is excluded from the calculation of a net section 482 adjustment if the taxpayer establishes that both the specified method and documentation requirements of this paragraph (d)(2) are met with respect to that amount. For purposes of this paragraph (d), a method will be considered a specified method if it is described in the regulations under section 482 and the method applies to transactions of the type under review. An unspecified method is not considered a specified method. See §§ 1.482–3(e) and 1.482–4(d).

**(ii) Specified method requirement.** (A) The specified method requirement is met if the taxpayer selects and applies a specified method in a reasonable manner. The taxpayer's selection and application of a specified method is reasonable only if, given the available data and the applicable pricing methods, the taxpayer reasonably concluded that the method (and its application of that method) provided the most reliable measure of an arm's length result under the principles of the best method rule of § 1.482–1(c). A taxpayer can reasonably conclude that a specified method provided the most reliable measure of an arm's length result only if it has made a reasonable effort to evaluate the potential applicability of the other specified methods in a manner consistent with the principles of the best method rule. The extent of this evaluation generally will depend on the nature of the available data, and it may vary from case to case and from method to method. This evaluation may not entail an exhaustive analysis or detailed application of each method. Rather, after a reasonably thorough search for relevant data, the taxpayer should consider which method would provide the most reliable measure of an arm's length result given that data. The nature of the available data may enable the taxpayer to conclude reasonably that a particular specified method provides a more reliable measure of an arm's length result than one or more of the other specified methods, and accordingly no further consideration of such other specified methods is needed. Further, it is not necessary for a taxpayer to conclude that the selected specified method provides a more reliable measure of an arm's length result than any unspecified method. For examples illustrating the selection of a specified method consistent with this paragraph (d)(2)(ii), see § 1.482–8. Whether the taxpayer's conclusion was reasonable must be determined from all the facts and circumstances. The factors relevant to this determination include the following:

(1) The experience and knowledge of the taxpayer, including all members of the taxpayer's controlled group.

(2) The extent to which reliable data was available and the data was analyzed in a reasonable manner. A taxpayer must engage in a reasonably thorough search for the data necessary to determine which method should be selected and how it should be applied. In determining the scope of a reasonably thorough search for data, the expense of additional efforts to locate new data may be weighed against the likelihood of finding additional data that would improve the reliability of the results and the amount by which any new data would change the taxpayer's taxable income. Furthermore, a taxpayer must use the most current reliable data that is available before the end of the taxable year in question. Although the taxpayer is not required to search for relevant data after the end of the taxable year, the taxpayer must maintain as a principal document described in paragraph (d)(2)(iii)(B)(9) of this section any relevant data it obtains after the end of the taxable year but before the return is filed, if that data would help determine whether the taxpayer has reported its true taxable income.

(3) The extent to which the taxpayer followed the relevant requirements set forth in regulations under section 482 with respect to the application of the method.

(4) The extent to which the taxpayer reasonably relied on a study or other analysis performed by a professional qualified to conduct such a study or analysis, including an attorney, accountant, or economist. Whether the professional is an employee of, or related to, the taxpayer is not determinative in evaluating the reliability of that study or analysis, as long as the study or analysis is objective, thorough, and well reasoned. Such reliance is reasonable only if the taxpayer disclosed to the professional all relevant information regarding the controlled transactions at issue. A study or analysis that was reasonably relied upon in a prior year may reasonably be relied upon in the current year if the relevant facts and circumstances have not changed or if the study or analysis has been appropriately modified to reflect any change in facts and circumstances.

(5) If the taxpayer attempted to determine an arm's length result by using more than one uncontrolled comparable, whether the taxpayer arbitrarily selected a result that corresponds to an extreme point in the range of results derived from the uncontrolled comparables. Such a result generally would not likely be closest to an arm's length result. If the uncontrolled comparables that the taxpayer uses to determine an arm's length result are described in § 1.482–1(e)(2)(iii)(B), one reasonable method of selecting a point in the range would be that provided in § 1.482–1(e)(3).

(6) The extent to which the taxpayer relied on a transfer pricing methodology developed and applied pursuant to an Advance Pricing Agreement for a prior taxable year, or specifically approved by the Internal Revenue Service pursuant to a transfer pricing audit of the transactions at issue for a prior taxable year, provided that the taxpayer applied the approved method reasonably and consistently with its prior application, and the facts and circumstances surrounding the use of the method have not materially changed since the time of the IRS's action, or if the facts and circumstances have changed in a way that materially affects the reliability of the results, the taxpayer makes appropriate adjustments to reflect such changes.

(7) The size of a net transfer pricing adjustment in relation to the size of the controlled transaction out of which the adjustment arose.

(B) Services cost method. A taxpayer's selection of the services cost method for certain services, described in § 1.482–9(b), and its application of that method to a controlled services transaction will be considered reasonable for purposes of the specified method requirement only if the taxpayer reasonably allocated and apportioned costs in accordance with § 1.482–9(k), and reasonably concluded that the controlled services transaction satisfies the requirements described in § 1.482–9(b)(2). Whether the taxpayer's conclusion was reasonable must be determined from all the facts and circumstances. The factors relevant to this determination include those described in paragraph (d)(2)(ii)(A) of this section, to the extent applicable.

(iii) Documentation requirement--(A) In general. The documentation requirement of this paragraph (d)(2)(iii) is met if the taxpayer maintains sufficient documentation to establish that the taxpayer reasonably concluded that, given the available data and the applicable pricing methods, the method (and its application of that method) provided the most reliable measure of an arm's length result under the principles of the best method rule in § 1.482–1(c), and provides that documentation to the Internal Revenue Service within 30 days of a request for it in connection with an examination of the taxable year to which the documentation relates. With the exception of the documentation described in paragraphs (d)(2)

(iii)(B)(9) and (10) of this section, that documentation must be in existence when the return is filed. The district director may, in his discretion, excuse a minor or inadvertent failure to provide required documents, but only if the taxpayer has made a good faith effort to comply, and the taxpayer promptly remedies the failure when it becomes known. The required documentation is divided into two categories, principal documents and background documents as described in paragraphs (d)(2)(iii)(B) and (C) of this section.

(B) Principal documents. The principal documents should accurately and completely describe the basic transfer pricing analysis conducted by the taxpayer. The documentation must include the following--

(1) An overview of the taxpayer's business, including an analysis of the economic and legal factors that affect the pricing of its property or services;

(2) A description of the taxpayer's organizational structure (including an organization chart) covering all related parties engaged in transactions potentially relevant under section 482, including foreign affiliates whose transactions directly or indirectly affect the pricing of property or services in the United States;

(3) Any documentation explicitly required by the regulations under section 482;

(4) A description of the method selected and an explanation of why that method was selected, including an evaluation of whether the regulatory conditions and requirements for application of that method, if any, were met;

(5) A description of the alternative methods that were considered and an explanation of why they were not selected;

(6) A description of the controlled transactions (including the terms of sale) and any internal data used to analyze those transactions. For example, if a profit split method is applied, the documentation must include a schedule providing the total income, costs, and assets (with adjustments for different accounting practices and currencies) for each controlled taxpayer participating in the relevant business activity and detailing the allocations of such items to that activity. Similarly, if a cost-based method (such as the cost plus method, the services cost method for certain services, or a comparable profits method with a cost-based profit level indicator) is applied, the documentation must include a description of the manner in which relevant costs are determined and are allocated and apportioned to the relevant controlled transaction.

(7) A description of the comparables that were used, how comparability was evaluated, and what (if any) adjustments were made;

(8) An explanation of the economic analysis and projections relied upon in developing the method. For example, if a profit split method is applied, the taxpayer must provide an explanation of the analysis undertaken to determine how the profits would be split;

(9) A description or summary of any relevant data that the taxpayer obtains after the end of the tax year and before filing a tax return, which would help determine if a taxpayer selected and applied a specified method in a reasonable manner; and

(10) A general index of the principal and background documents and a description of the recordkeeping system used for cataloging and accessing those documents.

(C) Background documents. The assumptions, conclusions, and positions contained in principal documents ordinarily will be based on, and supported by, additional background documents. Documents that support the principal documentation may include the documents listed in § 1.6038A–3(c) that are not otherwise described in paragraph (d)(2)(iii)(B) of this section. Every document listed in those regulations may not be relevant to pricing determinations under the taxpayer's specific facts and circumstances and, therefore, each of those documents need not be maintained in all circumstances. Moreover, other documents not listed in those regulations may be necessary to establish that the taxpayer's method was selected and applied in the way that provided the most reliable measure of an arm's length result under the principles of the best method rule in § 1.482–1(c). Background documents need not be provided to the Internal Revenue Service in response to a request for principal documents. If the Internal Revenue Service subsequently requests background documents, a taxpayer must provide that documentation to the Internal Revenue Service within 30 days of the request. However, the district director may, in his discretion, extend the period for producing the background documentation.

(D) Satisfaction of the documentation requirements described in § 1.482–7(k)(2) for the purpose of complying with the rules for CSAs under § 1.482–7 also satisfies all of the documentation requirements listed in paragraph (d)(2)(iii)(B) of this section, except the requirements listed in paragraphs (d)(2)(iii)(B)(2) and (10) of this section, with respect to CSTs and PCTs described in § 1.482–7(b)(1)(i) and (ii), provided that the documentation also satisfies the requirements of paragraph (d)(2)(iii)(A) of this section.

**(3) Application of an unspecified method--(i) In general.** An adjustment is excluded from the calculation of a net section 482 adjustment if the taxpayer establishes that both the unspecified method and documentation requirements of this paragraph (d)(3) are met with respect to that amount.

**(ii) Unspecified method requirement--**(A) In general. If a method other than a specified method was applied, the unspecified method requirement is met if the requirements of paragraph (d)(3)(ii)(B) or (C) of this section, as appropriate, are met.

(B) Specified method potentially applicable. If the transaction is of a type for which methods are specified in the regulations under section 482, then a taxpayer will be considered to have met the unspecified method requirement if the taxpayer reasonably concludes, given the available data, that none of the specified methods was likely to provide a reliable measure of an arm's length result, and that it selected and applied an unspecified method in a way that would likely provide a reliable measure of an arm's length result. A taxpayer can reasonably conclude that no specified method was likely to provide a reliable measure of an arm's length result only if it has made a reasonable effort to evaluate the potential applicability of the specified methods in a manner consistent with the principles of the best method rule. However, it is not necessary for a taxpayer to conclude that the selected method provides a more reliable measure of an arm's length result than any other unspecified method. Whether the taxpayer's conclusion was

reasonable must be determined from all the facts and circumstances. The factors relevant to this conclusion include those set forth in paragraph (d)(2)(ii) of this section.

(C) No specified method applicable. If the transaction is of a type for which no methods are specified in the regulations under section 482, then a taxpayer will be considered to have met the unspecified method requirement if it selected and applied an unspecified method in a reasonable manner. For purposes of this paragraph (d)(3)(ii)(C), a taxpayer's selection and application is reasonable if the taxpayer reasonably concludes that the method (and its application of that method) provided the most reliable measure of an arm's length result under the principles of the best method rule in § 1.482–1(c). However, it is not necessary for a taxpayer to conclude that the selected method provides a more reliable measure of an arm's length result than any other unspecified method. Whether the taxpayer's conclusion was reasonable must be determined from all the facts and circumstances. The factors relevant to this conclusion include those set forth in paragraph (d)(2)(ii) of this section.

**(iii) Documentation requirement--**(A) In general. The documentation requirement of this paragraph (d)(3) is met if the taxpayer maintains sufficient documentation to establish that the unspecified method requirement of paragraph (d)(3)(ii) of this section is met and provides that documentation to the Internal Revenue Service within 30 days of a request for it. That documentation must be in existence when the return is filed. The district director may, in his discretion, excuse a minor or inadvertent failure to provide required documents, but only if the taxpayer has made a good faith effort to comply, and the taxpayer promptly remedies the failure when it becomes known.

(B) Principal and background documents. See paragraphs (d)(2)(iii)(B) and (C) of this section for rules regarding these two categories of required documentation.

**(4) Certain foreign to foreign transactions.** For purposes of calculating a net section 482 adjustment, any increase in taxable income resulting from an allocation under section 482 that is attributable to any controlled transaction solely between foreign corporations will be excluded unless the treatment of that transaction affects the determination of either corporation's income from sources within the United States or taxable income effectively connected with the conduct of a trade or business within the United States.

**(5) Special rule.** If the regular tax (as defined in section 55(c)) imposed on the taxpayer is determined by reference to an amount other than taxable income, that amount shall be treated as the taxable income of the taxpayer for purposes of section 6662(e)(3). Accordingly, for taxpayers whose regular tax is determined by reference to an amount other than taxable income, the increase in that amount resulting from section 482 allocations is the taxpayer's net section 482 adjustment.

**(6) Examples.** The principles of this paragraph (d) are illustrated by the following examples:

**Example 1.** (i) The Internal Revenue Service makes the following section 482 adjustments for the taxable year:

| | | |
|---|---|---|
| (1) | Attributable to an increase in gross income because of an increase in royalty payments..... | $9,000,000 |
| (2) | Not a 200 percent or 400 percent adjustment.................................................................. | 2,000,000 |
| (3) | Attributable to a decrease in the cost of goods sold because of a decrease in the cost plus mark-up of a related seller.................................................................. | 9,000,000 |

| Total section 482 adjustments............................................................................................ | 20,000,000 |
|---|---|

(ii) The taxpayer has gross receipts of 75 million dollars after all section 482 adjustments. The taxpayer establishes that for adjustments number one and three, it applied a transfer pricing method specified in section 482, the selection and application of the method was reasonable, it documented the pricing analysis, and turned that documentation over to the IRS within 30 days of a request. Accordingly, eighteen million dollars is excluded from the calculation of the net section 482 adjustment. Because the net section 482 adjustment is two million dollars, there is no substantial valuation misstatement.

**Example 2.** (i) The Internal Revenue Service makes the following section 482 adjustments for the taxable year:

| (1) | Attributable to an increase in gross income because of an increase in royalty payments..... | $9,000,000 |
|---|---|---|
| (2) | Attributable to an adjustment that is 200 percent or more of the correct section 482 price.. | 2,000,000 |
| (3) | Attributable to a decrease in the cost of goods sold because of a decrease in the cost plus mark-up of a related seller................................................................................................. | 9,000,000 |
| | Total section 482 adjustments............................................................................................ | 20,000,000 |

(ii) The taxpayer has gross receipts of 75 million dollars after all section 482 adjustments. The taxpayer establishes that for adjustments number one and three, it applied a transfer pricing method specified in section 482, the selection and application of the method was reasonable, it documented that analysis, and turned the documentation over to the IRS within 30 days. Accordingly, eighteen million dollars is excluded from the calculation of the section 482 transfer pricing adjustments for purposes of applying the five million dollar or 10% of gross receipts test. Because the net section 482 adjustment is only two million dollars, the taxpayer is not subject to the net adjustment penalty. However, the taxpayer may be subject to the transactional penalty on the underpayment of tax attributable to the two million dollar adjustment.

**Example 3.** CFC1 and CFC2 are controlled foreign corporations within the meaning of section 957. Applying section 482, the IRS disallows a deduction for 25 million dollars of the interest that CFC1 paid to CFC2, which results in CFC1's U.S. shareholder having a subpart F inclusion in excess of five million dollars. No other adjustments under section 482 are made with respect to the controlled taxpayers. However, the increase has no effect upon the determination of CFC1's or CFC2's income from sources within the United States or taxable income effectively connected with the conduct of a trade or business within the United States. Accordingly, there is no substantial valuation misstatement.

**(e) Special rules in the case of carrybacks and carryovers.** If there is a substantial or gross valuation misstatement for a taxable year that gives rise to a loss, deduction or credit that is carried to another taxable year, the transactional penalty and the net adjustment penalty will be imposed on any resulting underpayment of tax in that other taxable year. In determining whether there is a substantial or gross valuation misstatement for a taxable year, no amount carried from another taxable year shall be included. The following example illustrates the principle of this paragraph (e):

**Example.** The Internal Revenue Service makes a section 482 adjustment of six million dollars in taxable year 1, no portion of which is excluded under paragraph (d) of this section. The taxpayer's income tax return for year 1 reported a loss of three million dollars, which was carried to taxpayer's year 2 income tax return and used to reduce income taxes otherwise due with respect to year 2. A determination is made that the six million dollar allocation constitutes a substantial valuation misstatement, and a penalty is imposed on the underpayment of tax in year 1 attributable to the substantial valuation misstatement and on the underpayment of tax in year 2 attributable to the disallowance of the net operating loss in year 2. For purposes of determining whether there is a substantial or gross valuation misstatement for year 2, the three million dollar reduction of the net operating loss will not be added to any section 482 adjustments made with respect to year 2.

**(f) Rules for coordinating between the transactional penalty and the net adjustment penalty--(1) Coordination of a net section 482 adjustment subject to the net adjustment penalty and a gross valuation misstatement subject to the transactional penalty.** In determining whether a net section 482 adjustment exceeds five million dollars or 10 percent of gross receipts, an adjustment attributable to a substantial or gross valuation misstatement that is subject to the transactional penalty will be taken into account. If the net section 482 adjustment exceeds five million dollars or ten percent of gross receipts, any portion of such amount that is attributable to a gross valuation misstatement will be subject to the transactional penalty at the forty percent rate, but will not also be subject to net adjustment penalty at a twenty percent rate. The remaining amount is subject to the net adjustment penalty at the twenty percent rate, even if such amount is less than the lesser of five million dollars or ten percent of gross receipts.

**(2) Coordination of net section 482 adjustment subject to the net adjustment penalty and substantial valuation misstatements subject to the transactional penalty.** If the net section 482 adjustment exceeds twenty million dollars or 20 percent of gross receipts, the entire amount of the adjustment is subject to the net adjustment penalty at a forty percent rate. No portion of the adjustment is subject to the transactional penalty at a twenty percent rate.

**(3) Examples.** The following examples illustrate the principles of this paragraph (f):

**Example 1.** (i) Applying section 482, the Internal Revenue Service makes the following adjustments for the taxable year:

| | | |
|---|---|---|
| (1) | Attributable to an adjustment that is 400 percent or more of the correct section 482 arm's length result................................................................................................................ | $2,000,000 |
| (2) | Not a 200 or 400 percent adjustment.................................................................................. | 2,500,000 |
| | Total.................................................................................................................................. | 4,500,000 |

(ii) The taxpayer has gross receipts of 75 million dollars after all section 482 adjustments. None of the adjustments is excluded under paragraph (d) (Amounts excluded from net section 482 adjustments) of this section, in determining the five million dollar or 10% of gross receipts test under section 6662(e)(1)(B)(ii). The net section 482 adjustment (4.5 million dollars) is less than the lesser of five million dollars or ten percent of gross receipts ($75 million x 10% = $7.5 million). Thus, there is no substantial valuation misstatement. However, the two million dollar adjustment is attributable to a gross valuation misstatement. Accordingly, the taxpayer may be subject to a penalty, under section 6662(h), equal to 40 percent of the underpayment of tax attributable to the gross valuation misstatement of two million dollars. The 2.5 million dollar adjustment is not subject to a penalty under section 6662(b)(3).

**Example 2.** The facts are the same as in Example 1, except the taxpayer has gross receipts of 40 million dollars. The net section 482 adjustment ($4.5 million) is greater than the lesser of five million dollars or ten percent of gross receipts ($40 million x 10% = $4 million). Thus, the five million dollar or 10% of gross receipts test has been met. The two million dollar adjustment is attributable to a gross valuation misstatement. Accordingly, the taxpayer is subject to a penalty, under section 6662(h), equal to 40 percent of the underpayment of tax attributable to the gross valuation misstatement of two million dollars. The 2.5 million dollar adjustment is subject to a penalty under sections 6662(a) and 6662(b)(3), equal to 20 percent of the underpayment of tax attributable to the substantial valuation misstatement.

**Example 3.** (i) Applying section 482, the Internal Revenue Service makes the following transfer pricing adjustments for the taxable year:

| (1) | Attributable to an adjustment that is 400 percent or more of the correct section 482 arm's length result........................................................................................................... | $6,000,000 |
|---|---|---|
| (2) | Not a 200 or 400 percent adjustment................................................................................ | 15,000,000 |
| | Total.................................................................................................................. | 21,000,000 |

(ii) None of the adjustments are excluded under paragraph (d) (Amounts excluded from net section 482 adjustments) in determining the twenty million dollar or 20% of gross receipts test under section 6662(h). The net section 482 adjustment (21 million dollars) is greater than twenty million dollars and thus constitutes a gross valuation misstatement. Accordingly, the total adjustment is subject to the net adjustment penalty equal to 40 percent of the underpayment of tax attributable to the 21 million dollar gross valuation misstatement. The six million dollar adjustment will not be separately included for purposes of any additional penalty under section 6662.

**(g) Effective/applicability date--(1) In general.** This section is generally applicable on February 9, 1996. However, taxpayers may elect to apply this section to all open taxable years beginning after December 31, 1993.

**(2) Special rules.** The provisions of paragraphs (d)(2)(ii)(B), (d)(2)(iii)(B)(4) and (d)(2)(iii)(B)(6) of this section are applicable for taxable years beginning after July 31, 2009. However, taxpayers may elect to apply the provisions of paragraphs (d)(2)(ii)(B), (d)(2)(iii)(B)(4) and (d)(2)(iii)(B)(6) of this section to earlier taxable years in accordance with the rules set forth in § 1.482–9(n)(2).

**Credits**

[T.D. 8656, 61 FR 4880, Feb. 9, 1996; 61 FR 14248, April 1, 1996; 62 FR 46877, Sept. 5, 1997; T.D. 9278, 71 FR 44518, Aug. 4, 2006; T.D. 9441, 74 FR 390, Jan. 5, 2009; T.D. 9456, 74 FR 38875, Aug. 4, 2009; T.D. 9568, 76 FR 80136, Dec. 22, 2011]

SOURCE: T.D. 6500, 25 FR 11402, Nov. 26, 1960; 25 FR 14021, Dec. 21, 1960, unless otherwise noted.

Current through April 24, 2014; 79 FR 22776

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

United States Code Annotated
Title 11. Bankruptcy (Refs & Annos)
Chapter 3. Case Administration (Refs & Annos)
Subchapter IV. Administrative Powers

11 U.S.C.A. § 362

§ 362. Automatic stay

Effective: December 22, 2010
Currentness

**(a)** Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

**(2)** the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

**(3)** any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

**(4)** any act to create, perfect, or enforce any lien against property of the estate;

**(5)** any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

**(6)** any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

**(8)** the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

**(b)** The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--

**(1)** under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

**(2)** under subsection (a)--

**(A)** of the commencement or continuation of a civil action or proceeding--

**(i)** for the establishment of paternity;

**(ii)** for the establishment or modification of an order for domestic support obligations;

**(iii)** concerning child custody or visitation;

**(iv)** for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

**(v)** regarding domestic violence;

**(B)** of the collection of a domestic support obligation from property that is not property of the estate;

**(C)** with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

**(D)** of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

**(E)** of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

**(F)** of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

**(G)** of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

**(3)** under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

**(4)** under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

[**(5)** Repealed. Pub.L. 105-277, Div. I, Title VI, § 603(1), Oct. 21, 1998, 112 Stat. 2681-886]

**(6)** under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

**(7)** under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(8)** under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

**(9)** under subsection (a), of--

**(A)** an audit by a governmental unit to determine tax liability;

**(B)** the issuance to the debtor by a governmental unit of a notice of tax deficiency;

**(C)** a demand for tax returns; or

**(D)** the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless

such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

**(10)** under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

**(11)** under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

**(12)** under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

**(13)** under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

**(14)** under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

**(15)** under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

**(16)** under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

**(17)** under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

**(18)** under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

**(19)** under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer--

**(A)** to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

**(B)** a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

**(20)** under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

**(21)** under subsection (a), of any act to enforce any lien against or security interest in real property--

**(A)** if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

**(B)** if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

**(22)** subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

**(23)** subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

**(24)** under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

**(25)** under subsection (a), of--

    **(A)** the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

    **(B)** the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

    **(C)** any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

**(26)** under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

**(27)** under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and

**(28)** under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

**(c)** Except as provided in subsections (d), (e), (f), and (h) of this section--

    **(1)** the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

    **(2)** the stay of any other act under subsection (a) of this section continues until the earliest of--

        **(A)** the time the case is closed;

**(B)** the time the case is dismissed; or

**(C)** if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

**(3)** if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b)--

**(A)** the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

**(B)** on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

**(C)** for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)** as to all creditors, if--

**(I)** more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

**(II)** a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to--

**(aa)** file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

**(bb)** provide adequate protection as ordered by the court; or

**(cc)** perform the terms of a plan confirmed by the court; or

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded--

(**aa**) if a case under chapter 7, with a discharge; or

(**bb**) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

(**ii**) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

(**4**)(**A**)(**i**) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

(**ii**) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

(**B**) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

(**C**) a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

(**D**) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

(**i**) as to all creditors if--

(**I**) 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

(**II**) a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

(**III**) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

(ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if--

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that--

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either--

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

**(B)** multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

**(e)(1)** Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

**(2)** Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless--

**(A)** a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

**(B)** such 60-day period is extended--

**(i)** by agreement of all parties in interest; or

**(ii)** by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

**(f)** Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

**(g)** In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--

**(1)** the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

**(2)** the party opposing such relief has the burden of proof on all other issues.

**(h)(1)** In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)--

    **(A)** to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable; and

    **(B)** to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

**(2)** Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2), after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

**(i)** If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

**(j)** On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

**(k)(1)** Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

**(2)** If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

**(l)(1)** Except as otherwise provided in this subsection, subsection (b) (22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that--

**(A)** under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

**(B)** the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

**(2)** If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

**(3)(A)** If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

**(B)** If the court upholds the objection of the lessor filed under subparagraph (A)--

**(i)** subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

**(4)** If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)--

**(A)** subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

**(5)(A)** Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

**(B)** The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify--

**(i)** whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and

**(ii)** whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

**(C)** The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

**(D)** The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

**(m)(1)** Except as otherwise provided in this subsection, subsection (b) (23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).

**(2)(A)** If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

**(B)** If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

**(C)** If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.

**(D)** If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied--

**(i)** relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and

**(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

**(3)** If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)--

**(A)** subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

**(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

**(n)(1)** Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor--

**(A)** is a debtor in a small business case pending at the time the petition is filed;

**(B)** was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

**(C)** was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

**(D)** is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

**(2)** Paragraph (1) does not apply--

**(A)** to an involuntary case involving no collusion by the debtor with creditors; or

**(B)** to the filing of a petition if--

**(i)** the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

**(ii)** it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

**(o)** The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2570; Pub.L. 97-222, § 3, July 27, 1982, 96 Stat. 235; Pub.L. 98-353, Title III, §§ 304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352, 363, 365, 371; Pub.L. 99-509, Title V, § 5001(a), Oct. 21, 1986, 100 Stat. 1911; Pub.L. 99-554, Title II, §§ 257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115, 3116; Pub.L. 101-311, Title I, § 102, Title II, § 202, June 25, 1990, 104 Stat. 267, 269; Pub.L. 101-508, Title III, § 3007(a)(1), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 103-394,

Title I, §§ 101, 116, Title II, §§ 204(a), 218(b), Title III, § 304(b), Title IV, § 401, Title V, § 501(b)(2), (d)(7), Oct. 22, 1994, 108 Stat. 4107, 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub.L. 105-277, Div. I, Title VI, § 603, Oct. 21, 1998, 112 Stat. 2681-886; Pub.L. 109-8, Title I, § 106(f), Title II, §§ 214, 224(b), Title III, §§ 302, 303, 305(1), 311, 320, Title IV, §§ 401(b), 441, 444, Title VII, §§ 709, 718, Title IX, § 907(d), (o)(1), (2), Title XI, § 1106, Title XII, § 1225, Apr. 20, 2005, 119 Stat. 41, 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176, 181, 182, 192, 199; Pub.L. 109-304, § 17(b)(1), Oct. 6, 2006, 120 Stat. 1706; Pub.L. 109-390, § 5(a)(2), Dec. 12, 2006, 120 Stat. 2696; Pub.L. 111-327, § 2(a)(12), Dec. 22, 2010, 124 Stat. 3558.)

Notes of Decisions (5945)

11 U.S.C.A. § 362, 11 USCA § 362
Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 3. Case Administration (Refs & Annos)
            Subchapter IV. Administrative Powers

11 U.S.C.A. § 365

§ 365. Executory contracts and unexpired leases

Currentness

**(a)** Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

**(b)(1)** If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee--

**(A)** cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

**(B)** compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

**(C)** provides adequate assurance of future performance under such contract or lease.

**(2)** Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to--

**(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

**(B)** the commencement of a case under this title;

**(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

**(D)** the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

**(3)** For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance--

**(A)** of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

**(B)** that any percentage rent due under such lease will not decline substantially;

**(C)** that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

**(D)** that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

**(4)** Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

**(c)** The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

**(1)(A)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

**(B)** such party does not consent to such assumption or assignment; or

**(2)** such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or

**(3)** such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

[**(4)** Repealed. Pub.L. 109-8, Title III, § 328(a)(2)(C), Apr. 20, 2005, 119 Stat. 100]

**(d)(1)** In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

**(2)** In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

**(3)** The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

**(4)(A)** Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of--

    **(i)** the date that is 120 days after the date of the order for relief; or

    **(ii)** the date of the entry of an order confirming a plan.

**(B)(i)** The court may extend the period determined under subparagraph (A), prior to the expiration of the 120-day period, for 90 days on the motion of the trustee or lessor for cause.

**(ii)** If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

**(5)** The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

[**(6) to (9)** Repealed. Pub.L. 109-8, Title III, § 328(a)(3)(A), Apr. 20, 2005, 119 Stat. 100]

**[(10)** Redesignated (5)]

**(e)(1)** Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--

   **(A)** the insolvency or financial condition of the debtor at any time before the closing of the case;

   **(B)** the commencement of a case under this title; or

   **(C)** the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

**(2)** Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if--

   **(A)(i)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

   **(ii)** such party does not consent to such assumption or assignment; or

   **(B)** such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

**(f)(1)** Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

**(2)** The trustee may assign an executory contract or unexpired lease of the debtor only if--

   **(A)** the trustee assumes such contract or lease in accordance with the provisions of this section; and

   **(B)** adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

**(3)** Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under

such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

**(g)** Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease--

**(1)** if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

**(2)** if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title--

**(A)** if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or

**(B)** if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title--

**(i)** immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

**(ii)** at the time of such rejection, if such contract or lease was assumed after such conversion.

**(h)(1)(A)** If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and--

**(i)** if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

**(ii)** if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

**(B)** If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

**(C)** The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

**(D)** In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

**(2)(A)** If the trustee rejects a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller and--

**(i)** if the rejection amounts to such a breach as would entitle the timeshare interest purchaser to treat the timeshare plan as terminated under its terms, applicable nonbankruptcy law, or any agreement made by timeshare interest purchaser, the timeshare interest purchaser under the timeshare plan may treat the timeshare plan as terminated by such rejection; or

**(ii)** if the term of such timeshare interest has commenced, then the timeshare interest purchaser may retain its rights in such timeshare interest for the balance of such term and for any term of renewal or extension of such timeshare interest to the extent that such rights are enforceable under applicable nonbankruptcy law.

**(B)** If the timeshare interest purchaser retains its rights under subparagraph (A), such timeshare interest purchaser may offset against the moneys due for such timeshare interest for the balance of the term after the date of the rejection of such timeshare interest, and the term of any renewal or extension of such timeshare interest, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such timeshare plan, but the timeshare interest purchaser shall not have any right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

**(i)(1)** If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

**(2)** If such purchaser remains in possession--

**(A)** such purchaser shall continue to make all payments due under such contract, but may, [1] offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

**(B)** the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

**(j)** A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

**(k)** Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

**(l)** If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

**(m)** For purposes of this section 365 and sections 541(b)(2) and 362(b)(10), leases of real property shall include any rental agreement to use real property.

**(n)(1)** If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect--

    **(A)** to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

    **(B)** to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for--

        **(i)** the duration of such contract; and

        **(ii)** any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

**(2)** If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract--

    **(A)** the trustee shall allow the licensee to exercise such rights;

    **(B)** the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

    **(C)** the licensee shall be deemed to waive--

        **(i)** any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

        **(ii)** any claim allowable under section 503(b) of this title arising from the performance of such contract.

**(3)** If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, then on the written request of the licensee the trustee shall--

**(A)** to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and

**(B)** not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

**(4)** Unless and until the trustee rejects such contract, on the written request of the licensee the trustee shall--

**(A)** to the extent provided in such contract or any agreement supplementary to such contract--

**(i)** perform such contract; or

**(ii)** provide to the licensee such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law) held by the trustee; and

**(B)** not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment), including any right to obtain such intellectual property (or such embodiment) from another entity.

**(o)** In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

**(p)(1)** If a lease of personal property is rejected or not timely assumed by the trustee under subsection (d), the leased property is no longer property of the estate and the stay under section 362(a) is automatically terminated.

**(2)(A)** If the debtor in a case under chapter 7 is an individual, the debtor may notify the creditor in writing that the debtor desires to assume the lease. Upon being so notified, the creditor may, at its option, notify the debtor that it is willing to have the lease assumed by the debtor and may condition such assumption on cure of any outstanding default on terms set by the contract.

**(B)** If, not later than 30 days after notice is provided under subparagraph (A), the debtor notifies the lessor in writing that the lease is assumed, the liability under the lease will be assumed by the debtor and not by the estate.

**(C)** The stay under section 362 and the injunction under section 524(a) (2) shall not be violated by notification of the debtor and negotiation of cure under this subsection.

**(3)** In a case under chapter 11 in which the debtor is an individual and in a case under chapter 13, if the debtor is the lessee with respect to personal property and the lease is not assumed in the plan confirmed by the court, the lease is deemed rejected as of the conclusion of the hearing on confirmation. If the lease is rejected, the stay under section 362 and any stay under section 1301 is automatically terminated with respect to the property subject to the lease.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2574; Pub.L. 98-353, Title III, §§ 362, 402-404, July 10, 1984, 98 Stat. 361, 367; Pub.L. 99-554, Title II, §§ 257(j), (m), 283(e), Oct. 27, 1986, 100 Stat. 3115, 3117; Pub.L. 100-506, § 1(b), Oct. 18, 1988, 102 Stat. 2538; Pub.L. 101-647, Title XXV, § 2522(c), Nov. 29, 1990, 104 Stat. 4866; Pub.L. 102-365, § 19(b)-(e), Sept. 3, 1992, 106 Stat. 982-984; Pub.L. 103-394, Title II, §§ 205(a), 219(a), (b), Title V, § 501(d)(10), Oct. 22, 1994, 108 Stat. 4122, 4128, 4145; Pub.L. 103-429, § 1, Oct. 31, 1994, 108 Stat. 4377; Pub.L. 109-8, Title III, §§ 309(b), 328(a), Title IV, § 404, Apr. 20, 2005, 119 Stat. 82, 100, 104.)

Notes of Decisions (2362)

Footnotes

1        So in original. The comma probably should not appear.

11 U.S.C.A. § 365, 11 USCA § 365

Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 6

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      Subchapter III. The Estate (Refs & Annos)

11 U.S.C.A. § 541

§ 541. Property of the estate

Effective: December 22, 2010

Currentness

**(a)** The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

**(1)** Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

**(2)** All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is--

**(A)** under the sole, equal, or joint management and control of the debtor; or

**(B)** liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

**(3)** Any interest in property that the trustee recovers under section 329(b), 363(n), 543, 550, 553, or 723 of this title.

**(4)** Any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title.

**(5)** Any interest in property that would have been property of the estate if such interest had been an interest of the debtor on the date of the filing of the petition, and that the debtor acquires or becomes entitled to acquire within 180 days after such date--

**(A)** by bequest, devise, or inheritance;

**(B)** as a result of a property settlement agreement with the debtor's spouse, or of an interlocutory or final divorce decree; or

**(C)** as a beneficiary of a life insurance policy or of a death benefit plan.

**(6)** Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

**(7)** Any interest in property that the estate acquires after the commencement of the case.

**(b)** Property of the estate does not include--

**(1)** any power that the debtor may exercise solely for the benefit of an entity other than the debtor;

**(2)** any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease before the commencement of the case under this title, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case;

**(3)** any eligibility of the debtor to participate in programs authorized under the Higher Education Act of 1965 (20 U.S.C. 1001 et seq.; 42 U.S.C. 2751 et seq.), or any accreditation status or State licensure of the debtor as an educational institution;

**(4)** any interest of the debtor in liquid or gaseous hydrocarbons to the extent that--

**(A)(i)** the debtor has transferred or has agreed to transfer such interest pursuant to a farmout agreement or any written agreement directly related to a farmout agreement; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 544(a)(3) of this title; or

**(B)(i)** the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred; and

**(ii)** but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of this title;

**(5)** funds placed in an education individual retirement account (as defined in section 530(b)(1) of the Internal Revenue Code of 1986) not later than 365 days before the date of the filing of the petition in a case under this title, but--

**(A)** only if the designated beneficiary of such account was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were placed in such account;

**(B)** only to the extent that such funds--

**(i)** are not pledged or promised to any entity in connection with any extension of credit; and

**(ii)** are not excess contributions (as described in section 4973(e) of the Internal Revenue Code of 1986); and

**(C)** in the case of funds placed in all such accounts having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [1];

**(6)** funds used to purchase a tuition credit or certificate or contributed to an account in accordance with section 529(b)(1)(A) of the Internal Revenue Code of 1986 under a qualified State tuition program (as defined in section 529(b)(1) of such Code) not later than 365 days before the date of the filing of the petition in a case under this title, but--

**(A)** only if the designated beneficiary of the amounts paid or contributed to such tuition program was a child, stepchild, grandchild, or stepgrandchild of the debtor for the taxable year for which funds were paid or contributed;

**(B)** with respect to the aggregate amount paid or contributed to such program having the same designated beneficiary, only so much of such amount as does not exceed the total contributions permitted under section 529(b)(6) of such Code with respect to such beneficiary, as adjusted beginning on the date of the filing of the petition in a case under this title by the annual increase or decrease (rounded to the nearest tenth of 1 percent) in the education expenditure category of the Consumer Price Index prepared by the Department of Labor; and

**(C)** in the case of funds paid or contributed to such program having the same designated beneficiary not earlier than 720 days nor later than 365 days before such date, only so much of such funds as does not exceed $6,225 [1];

**(7)** any amount--

**(A)** withheld by an employer from the wages of employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986; or

except that such amount under this subparagraph shall not constitute disposable income as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title; or

**(B)** received by an employer from employees for payment as contributions--

**(i)** to--

**(I)** an employee benefit plan that is subject to title I of the Employee Retirement Income Security Act of 1974 or under an employee benefit plan which is a governmental plan under section 414(d) of the Internal Revenue Code of 1986;

**(II)** a deferred compensation plan under section 457 of the Internal Revenue Code of 1986; or

**(III)** a tax-deferred annuity under section 403(b) of the Internal Revenue Code of 1986;

except that such amount under this subparagraph shall not constitute disposable income, as defined in section 1325(b)(2); or

**(ii)** to a health insurance plan regulated by State law whether or not subject to such title;

**(8)** subject to subchapter III of chapter 5, any interest of the debtor in property where the debtor pledged or sold tangible personal property (other than securities or written or printed evidences of indebtedness or title) as collateral for a loan or advance of money given by a person licensed under law to make such loans or advances, where--

**(A)** the tangible personal property is in the possession of the pledgee or transferee;

**(B)** the debtor has no obligation to repay the money, redeem the collateral, or buy back the property at a stipulated price; and

**(C)** neither the debtor nor the trustee have exercised any right to redeem provided under the contract or State law, in a timely manner as provided under State law and section 108(b); or

**(9)** any interest in cash or cash equivalents that constitute proceeds of a sale by the debtor of a money order that is made--

**(A)** on or after the date that is 14 days prior to the date on which the petition is filed; and

**(B)** under an agreement with a money order issuer that prohibits the commingling of such proceeds with property of the debtor (notwithstanding that, contrary to the agreement, the proceeds may have been commingled with property of the debtor),

unless the money order issuer had not taken action, prior to the filing of the petition, to require compliance with the prohibition.

Paragraph (4) shall not be construed to exclude from the estate any consideration the debtor retains, receives, or is entitled to receive for transferring an interest in liquid or gaseous hydrocarbons pursuant to a farmout agreement.

**(c)(1)** Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law--

**(A)** that restricts or conditions transfer of such interest by the debtor; or

**(B)** that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**(2)** A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**(d)** Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

**(e)** In determining whether any of the relationships specified in paragraph (5)(A) or (6)(A) of subsection (b) exists, a legally adopted child of an individual (and a child who is a member of an individual's household, if placed with such individual by an authorized placement agency for legal adoption by such individual), or a foster child of an individual (if such child has as the child's principal place of abode the home of the debtor and is a member of the debtor's household) shall be treated as a child of such individual by blood.

**(f)** Notwithstanding any other provision of this title, property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title.

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2594; Pub.L. 98-353, Title III, §§ 363(a), 456, July 10, 1984, 98 Stat. 363, 376; Pub.L. 101-508, Title III, § 3007(a)(2), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 102-486, Title XXX, § 3017(b), Oct. 24, 1992, 106 Stat. 3130; Pub.L. 103-394, Title II, §§ 208(b), 223, Oct. 22, 1994, 108 Stat. 4124, 4129; Pub.L. 109-8, Title II, § 225(a), Title III, § 323, Title XII, §§ 1212, 1221(c), 1230, Apr. 20, 2005, 119 Stat. 65, 97, 194, 196, 201; Pub.L. 111-327, § 2(a)(22), Dec. 22, 2010, 124 Stat. 3560.)

Notes of Decisions (2779)

Footnotes

1      Dollar amount as adjusted by the Judicial Conference of the United States. See Adjustment of Dollar Amounts notes set out under
       this section and 11 U.S.C.A. § 104.

11 U.S.C.A. § 541, 11 USCA § 541

Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

United States Code Annotated
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 11. Reorganization (Refs & Annos)
            Subchapter II. The Plan (Refs & Annos)

11 U.S.C.A. § 1129

§ 1129. Confirmation of plan

Effective: December 22, 2010
Currentness

**(a)** The court shall confirm a plan only if all of the following requirements are met:

**(1)** The plan complies with the applicable provisions of this title.

**(2)** The proponent of the plan complies with the applicable provisions of this title.

**(3)** The plan has been proposed in good faith and not by any means forbidden by law.

**(4)** Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

**(5)(A)(i)** The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

**(ii)** the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

**(B)** the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

**(6)** Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

**(7)** With respect to each impaired class of claims or interests--

**(A)** each holder of a claim or interest of such class--

**(i)** has accepted the plan; or

**(ii)** will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

**(B)** if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

**(8)** With respect to each class of claims or interests--

**(A)** such class has accepted the plan; or

**(B)** such class is not impaired under the plan.

**(9)** Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that--

**(A)** with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

**(B)** with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive--

**(i)** if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

**(ii)** if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

**(C)** with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash--

**(i)** of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

**(ii)** over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

**(iii)** in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

**(D)** with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

**(10)** If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

**(11)** Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

**(12)** All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

**(13)** The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

**(14)** If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

**(15)** In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan--

**(A)** the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**(B)** the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

**(16)** All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

**(b)(1)** Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan

notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

**(2)** For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

**(A)** With respect to a class of secured claims, the plan provides--

**(i)(I)** that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

**(II)** that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

**(ii)** for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

**(iii)** for the realization by such holders of the indubitable equivalent of such claims.

**(B)** With respect to a class of unsecured claims--

**(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

**(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

**(C)** With respect to a class of interests--

**(i)** the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

**(ii)** the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

**(c)** Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

**(d)** Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

**(e)** In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

**CREDIT(S)**

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2635; Pub.L. 98-353, Title III, § 512, July 10, 1984, 98 Stat. 386; Pub.L. 99-554, Title II, §§ 225, 283(v), Oct. 27, 1986, 100 Stat. 3102, 3118; Pub.L. 100-334, § 2(b), June 16, 1988, 102 Stat. 613; Pub.L. 103-394, Title III, § 304(h)(7), Title V, § 501(d)(32), Oct. 22, 1994, 108 Stat. 4134, 4146; Pub.L. 109-8, Title II, § 213(1), Title III, § 321(c), Title IV, § 438, Title VII, § 710, Title XII, § 1221(b), Title XV, § 1502(a)(8), Apr. 20, 2005, 119 Stat. 52, 95, 113, 127, 196, 216; Pub.L. 111-327, § 2(a)(35), Dec. 22, 2010, 124 Stat. 3561.)

Notes of Decisions (1766)

11 U.S.C.A. § 1129, 11 USCA § 1129

Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

United States Code Annotated
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 15. Ancillary and Other Cross-Border Cases (Refs & Annos)
      Subchapter III. Recognition of a Foreign Proceeding and Relief

11 U.S.C.A. § 1520

§ 1520. Effects of recognition of a foreign main proceeding

Currentness

**(a)** Upon recognition of a foreign proceeding that is a foreign main proceeding--

**(1)** sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

**(2)** sections 363, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

**(3)** unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552; and

**(4)** section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

**(b)** Subsection (a) does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor.

**(c)** Subsection (a) does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such a case.

**CREDIT(S)**

(Added Pub.L. 109-8, Title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 141.)

Notes of Decisions (11)

11 U.S.C.A. § 1520, 11 USCA § 1520
Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 9

United States Code Annotated
    Title 35. Patents (Refs & Annos)
        Part II. Patentability of Inventions and Grant of Patents (Refs & Annos)
            Chapter 10. Patentability of Inventions (Refs & Annos)

35 U.S.C.A. § 102

§ 102. Conditions for patentability; novelty

Currentness

**(a) Novelty; prior art.**--A person shall be entitled to a patent unless--

**(1)** the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention; or

**(2)** the claimed invention was described in a patent issued under section 151, or in an application for patent published or deemed published under section 122(b), in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention.

**(b) Exceptions.**--

**(1) Disclosures made 1 year or less before the effective filing date of the claimed invention.**--A disclosure made 1 year or less before the effective filing date of a claimed invention shall not be prior art to the claimed invention under subsection (a)(1) if--

**(A)** the disclosure was made by the inventor or joint inventor or by another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

**(B)** the subject matter disclosed had, before such disclosure, been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor.

**(2) Disclosures appearing in applications and patents.**--A disclosure shall not be prior art to a claimed invention under subsection (a)(2) if--

**(A)** the subject matter disclosed was obtained directly or indirectly from the inventor or a joint inventor;

**(B)** the subject matter disclosed had, before such subject matter was effectively filed under subsection (a)(2), been publicly disclosed by the inventor or a joint inventor or another who obtained the subject matter disclosed directly or indirectly from the inventor or a joint inventor; or

**(C)** the subject matter disclosed and the claimed invention, not later than the effective filing date of the claimed invention, were owned by the same person or subject to an obligation of assignment to the same person.

**(c) Common ownership under joint research agreements.**--Subject matter disclosed and a claimed invention shall be deemed to have been owned by the same person or subject to an obligation of assignment to the same person in applying the provisions of subsection (b)(2)(C) if--

**(1)** the subject matter disclosed was developed and the claimed invention was made by, or on behalf of, 1 or more parties to a joint research agreement that was in effect on or before the effective filing date of the claimed invention;

**(2)** the claimed invention was made as a result of activities undertaken within the scope of the joint research agreement; and

**(3)** the application for patent for the claimed invention discloses or is amended to disclose the names of the parties to the joint research agreement.

**(d) Patents and published applications effective as prior art.**--For purposes of determining whether a patent or application for patent is prior art to a claimed invention under subsection (a)(2), such patent or application shall be considered to have been effectively filed, with respect to any subject matter described in the patent or application--

**(1)** if paragraph (2) does not apply, as of the actual filing date of the patent or the application for patent; or

**(2)** if the patent or application for patent is entitled to claim a right of priority under section 119, 365(a), or 365(b), or to claim the benefit of an earlier filing date under section 120, 121, or 365(c), based upon 1 or more prior filed applications for patent, as of the filing date of the earliest such application that describes the subject matter.

**CREDIT(S)**

(July 19, 1952, c. 950, 66 Stat. 797; Pub.L. 92-358, § 2, July 28, 1972, 86 Stat. 502; Pub.L. 94-131, § 5, Nov. 14, 1975, 89 Stat. 691; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, §§ 4505, 4806], Nov. 29, 1999, 113 Stat. 1536, 1501A-565, 1501A-590; Pub.L. 107-273, Div. C, Title III, § 13205(1), Nov. 2, 2002, 116 Stat. 1903; Pub.L. 112-29, § 3(b)(1), Sept. 16, 2011, 125 Stat. 285.)

### AMENDMENT OF SUBSECTION (D)(2)

<Pub.L. 112-211, Title I, §§ 102(2), 103(a), Dec. 18, 2012, 126 Stat. 1531, 1532, provided that effective on the later of the date that is 1 year after Dec. 18, 2012, or the date of entry into force of the treaty with respect to the United States, subsec. (d)(2) (as amended by the Leahy-Smith America Invents Act (Public Law 112-29; 125 Stat. 284)) is amended by striking "to claim a right of priority under section 119, 365(a), or 365(b), or to claim the benefit of an earlier filing date under section 120, 121, or 365(c)" and inserting "to claim a right of priority under section 119, 365(a), 365(b), 386(a), or 386(b), or to claim the benefit of an earlier filing date under section 120, 121, 365(c), or 386(c)".>

Notes of Decisions (2554)

35 U.S.C.A. § 102, 35 USCA § 102
Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 10

United States Code Annotated
    Title 35. Patents (Refs & Annos)
        Part II. Patentability of Inventions and Grant of Patents (Refs & Annos)
            Chapter 14. Issue of Patent

35 U.S.C.A. § 154

§ 154. Contents and term of patent; provisional rights

Currentness

**(a) In general.--**

**(1) Contents.**--Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process, referring to the specification for the particulars thereof.

**(2) Term.**--Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the United States or, if the application contains a specific reference to an earlier filed application or applications under section 120, 121, or 365(c), from the date on which the earliest such application was filed.

**(3) Priority.**--Priority under section 119, 365(a), or 365(b) shall not be taken into account in determining the term of a patent.

**(4) Specification and drawing.**--A copy of the specification and drawing shall be annexed to the patent and be a part of such patent.

**(b) Adjustment of patent term.--**

**(1) Patent term guarantees.--**

**(A) Guarantee of prompt Patent and Trademark Office responses.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the Patent and Trademark Office to--

**(i)** provide at least one of the notifications under section 132 or a notice of allowance under section 151 not later than 14 months after--

**(I)** the date on which an application was filed under section 111(a); or

**(II)** the date of commencement of the national stage under section 371 in an international application;

**(ii)** respond to a reply under section 132, or to an appeal taken under section 134, within 4 months after the date on which the reply was filed or the appeal was taken;

**(iii)** act on an application within 4 months after the date of a decision by the Patent Trial and Appeal Board under section 134 or 135 or a decision by a Federal court under section 141, 145, or 146 in a case in which allowable claims remain in the application; or

**(iv)** issue a patent within 4 months after the date on which the issue fee was paid under section 151 and all outstanding requirements were satisfied,

the term of the patent shall be extended 1 day for each day after the end of the period specified in clause (i), (ii), (iii), or (iv), as the case may be, until the action described in such clause is taken.

**(B) Guarantee of no more than 3-year application pendency.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to the failure of the United States Patent and Trademark Office to issue a patent within 3 years after the actual filing date of the application under section 111(a) in the United States or, in the case of an international application, the date of commencement of the national stage under section 371 in the international application, not including--

**(i)** any time consumed by continued examination of the application requested by the applicant under section 132(b);

**(ii)** any time consumed by a proceeding under section 135(a), any time consumed by the imposition of an order under section 181, or any time consumed by appellate review by the Patent Trial and Appeal Board or by a Federal court; or

**(iii)** any delay in the processing of the application by the United States Patent and Trademark Office requested by the applicant except as permitted by paragraph (3)(C),

the term of the patent shall be extended 1 day for each day after the end of that 3-year period until the patent is issued.

**(C) Guarantee of adjustments for delays due to derivation proceedings, secrecy orders, and appeals.**--Subject to the limitations under paragraph (2), if the issue of an original patent is delayed due to--

**(i)** a proceeding under section 135(a);

**(ii)** the imposition of an order under section 181; or

**(iii)** appellate review by the Patent Trial and Appeal Board or by a Federal court in a case in which the patent was issued under a decision in the review reversing an adverse determination of patentability,

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

the term of the patent shall be extended 1 day for each day of the pendency of the proceeding, order, or review, as the case may be.

**(2) Limitations.**--

**(A) In general.**--To the extent that periods of delay attributable to grounds specified in paragraph (1) overlap, the period of any adjustment granted under this subsection shall not exceed the actual number of days the issuance of the patent was delayed.

**(B) Disclaimed term.**--No patent the term of which has been disclaimed beyond a specified date may be adjusted under this section beyond the expiration date specified in the disclaimer.

**(C) Reduction of period of adjustment.**--

**(i)** The period of adjustment of the term of a patent under paragraph (1) shall be reduced by a period equal to the period of time during which the applicant failed to engage in reasonable efforts to conclude prosecution of the application.

**(ii)** With respect to adjustments to patent term made under the authority of paragraph (1)(B), an applicant shall be deemed to have failed to engage in reasonable efforts to conclude processing or examination of an application for the cumulative total of any periods of time in excess of 3 months that are taken to respond to a notice from the Office making any rejection, objection, argument, or other request, measuring such 3-month period from the date the notice was given or mailed to the applicant.

**(iii)** The Director shall prescribe regulations establishing the circumstances that constitute a failure of an applicant to engage in reasonable efforts to conclude processing or examination of an application.

**(3) Procedures for patent term adjustment determination.**--

**(A)** The Director shall prescribe regulations establishing procedures for the application for and determination of patent term adjustments under this subsection.

**(B)** Under the procedures established under subparagraph (A), the Director shall--

**(i)** make a determination of the period of any patent term adjustment under this subsection, and shall transmit a notice of that determination no later than the date of issuance of the patent; and

**(ii)** provide the applicant one opportunity to request reconsideration of any patent term adjustment determination made by the Director.

**(C)** The Director shall reinstate all or part of the cumulative period of time of an adjustment under paragraph (2)(C) if the applicant, prior to the issuance of the patent, makes a showing that, in spite of all due care, the applicant was unable to respond within the 3-month period, but in no case shall more than three additional months for each such response beyond the original 3-month period be reinstated.

**(D)** The Director shall proceed to grant the patent after completion of the Director's determination of a patent term adjustment under the procedures established under this subsection, notwithstanding any appeal taken by the applicant of such determination.

**(4) Appeal of patent term adjustment determination.**--

**(A)** An applicant dissatisfied with the Director's decision on the applicant's request for reconsideration under paragraph (3)(B)(ii) shall have exclusive remedy by a civil action against the Director filed in the United States District Court for the Eastern District of Virginia within 180 days after the date of the Director's decision on the applicant's request for reconsideration. Chapter 7 of title 5 shall apply to such action. Any final judgment resulting in a change to the period of adjustment of the patent term shall be served on the Director, and the Director shall thereafter alter the term of the patent to reflect such change.

**(B)** The determination of a patent term adjustment under this subsection shall not be subject to appeal or challenge by a third party prior to the grant of the patent.

**(c) Continuation.**--

**(1) Determination.**--The term of a patent that is in force on or that results from an application filed before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act shall be the greater of the 20-year term as provided in subsection (a), or 17 years from grant, subject to any terminal disclaimers.

**(2) Remedies.**--The remedies of sections 283, 284, and 285 shall not apply to acts which--

**(A)** were commenced or for which substantial investment was made before the date that is 6 months after the date of the enactment of the Uruguay Round Agreements Act; and

**(B)** became infringing by reason of paragraph (1).

**(3) Remuneration.**--The acts referred to in paragraph (2) may be continued only upon the payment of an equitable remuneration to the patentee that is determined in an action brought under chapter 28 and chapter 29 (other than those provisions excluded by paragraph (2)).

**(d) Provisional rights.**--

**(1) In general.**--In addition to other rights provided by this section, a patent shall include the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent under section 122(b), or in the case of an international application filed under the treaty defined in section 351(a) designating the United States under Article 21(2)(a) of such treaty, the date of publication of the application, and ending on the date the patent is issued--

**(A)(i)** makes, uses, offers for sale, or sells in the United States the invention as claimed in the published patent application or imports such an invention into the United States; or

**(ii)** if the invention as claimed in the published patent application is a process, uses, offers for sale, or sells in the United States or imports into the United States products made by that process as claimed in the published patent application; and

**(B)** had actual notice of the published patent application and, in a case in which the right arising under this paragraph is based upon an international application designating the United States that is published in a language other than English, had a translation of the international application into the English language.

**(2) Right based on substantially identical inventions.**--The right under paragraph (1) to obtain a reasonable royalty shall not be available under this subsection unless the invention as claimed in the patent is substantially identical to the invention as claimed in the published patent application.

**(3) Time limitation on obtaining a reasonable royalty.**--The right under paragraph (1) to obtain a reasonable royalty shall be available only in an action brought not later than 6 years after the patent is issued. The right under paragraph (1) to obtain a reasonable royalty shall not be affected by the duration of the period described in paragraph (1).

**(4) Requirements for international applications.**--

**(A) Effective date.**--The right under paragraph (1) to obtain a reasonable royalty based upon the publication under the treaty defined in section 351(a) of an international application designating the United States shall commence on the date of publication under the treaty of the international application, or, if the publication under the treaty of the international application is in a language other than English, on the date on which the Patent and Trademark Office receives a translation of the publication in the English language.

**(B) Copies.**--The Director may require the applicant to provide a copy of the international application and a translation thereof.

## CREDIT(S)

(July 19, 1952, c. 950, 66 Stat. 804; Pub.L. 89-83, § 5, July 24, 1965, 79 Stat. 261; Pub.L. 96-517, § 4, Dec. 12, 1980, 94 Stat. 3018; Pub.L. 100-418, Title IX, § 9002, Aug. 23, 1988, 102 Stat. 1563; Pub.L. 103-465, Title V, § 532(a)(1), Dec. 8, 1994, 108 Stat. 4983; Pub.L. 104-295, § 20(e)(1), Oct. 11, 1996, 110 Stat. 3529; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, §§ 4402(a), 4504], Nov. 29, 1999, 113 Stat. 1536, 1501A-557, 1501A-566; Pub.L. 107-273, Div. C, Title III, §§ 13204, 13206(a) (8), Nov. 2, 2002, 116 Stat. 1902, 1904; Pub.L. 112-29, §§ 3(j)(1), (2)(B), 9(a), 20(j)(1), Sept. 16, 2011, 125 Stat. 290, 316, 335; Pub.L. 112-274, § 1(h), Jan. 14, 2013, 126 Stat. 2457.)

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

### AMENDMENT OF SUBSECTION (A)(2), (3)

<Pub.L. 112-211, Title I, §§ 102(6)(A), 103(a), Dec. 18, 2012, 126 Stat. 1531, 1532, provided that effective on the later of the date that is 1 year after Dec. 18, 2012, or the date of entry into force of the treaty with respect to the United States, subsec. (a)(2) is amended by striking "section 120, 121, or 365(c)" and inserting "section 120, 121, 365(c), or 386(c)"; and subsec. (a)(3) is amended by striking "section 119, 365(a), or 365(b)" and inserting "section 119, 365(a), 365(b), 386(a), or 386(b)".>

### AMENDMENT OF SUBSECTION (D)(1)

<Pub.L. 112-211, Title I, §§ 102(6)(B), 103(a), Dec. 18, 2012, 126 Stat. 1531, 1532, provided that effective on the later of the date that is 1 year after Dec. 18, 2012, or the date of entry into force of the treaty with respect to the United States, subsec. (d)(1) is amended by inserting " or an international design application filed under the treaty defined in section 381(a)(1) designating the United States under Article 5 of such treaty" after "Article 21(2)(1) of such treaty".>

Notes of Decisions (495)

35 U.S.C.A. § 154, 35 USCA § 154
Current through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89) approved 3-25-14

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.